**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-00708-PAB-NRN

JOHN R. McKOWEN,

Plaintiff,

v.

GREG HARRINGTON,

TWO RIVERS FARMS F-2, INC.,

TWO RIVERS WATER & FARMING COMPANY,

TR CAPITAL PARTNERS, LLC,

WAYNE HARDING,

ATTORNEY GENERAL PHILIP WEISER,

SECURITIES COMMISSIONER TUNG CHAN,

ROBERT FINKE,

JENNIFER HUNT,

INDIA KIDD-AARON,

I. WISTAR MORRIS,

SAM MORRIS,

CHARLES F. KIRBY,

JEFFREY PLOEN,

JUSTIN YORKE,

Defendants.

---

**PROPOSED SECOND AMENDED COMPLAINT**

---

**PRELIMINARY STATEMENT — PRO SE CONSTRUCTION**

Plaintiff proceeds pro se. The pleadings of a pro se litigant are construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, and the Court accepts the well-pleaded

factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Plaintiff respectfully requests that this Second Amended Complaint be so construed.

Plaintiff John R. McKowen, appearing pro se, for his Second Amended Complaint, alleges as follows. This pleading is submitted with Plaintiff's Response to the Court's Order to Show Cause (Dkt. 326) to demonstrate that amendment is not futile and that each deficiency the Court identified is cured by specific, documented, defendant-by-defendant allegations.

## INTRODUCTION

This action does not seek to overturn, appeal, or modify the State of Colorado's judgment against Plaintiff. That judgment is on appeal in the Colorado appellate courts, where it will be decided. This is Plaintiff's pro se case against the private actors and the individual Colorado officials who, acting under color of state law, sanctioned the taking — from which the State profited — of the water and farming assets adjudicated by this Court in Paulson, No. 19-cv-02639-PAB-NRN (D. Colo.): civil claims under the Racketeer Influenced and Corrupt Organizations Act against the private actors who executed the taking, and federal civil-rights and takings claims against the state officials who sanctioned the taking from which the State profited. Those assets were stolen by insiders, transferred without consideration to a securities fraud felon, Greg Harrington, and endorsed by securities regulators without disclosure of Harrington's past, without notice or hearing, and without disclosure that Harrington is both a releasor and a releasee in *Paulson*. The State has threatened Plaintiff — the whistleblower in this case (Ex. 25) — with jail for unfounded violations resting on intentional misinterpretations of what its own Judgment states: its citation demands that Plaintiff rescind the offering made through his

federal bankruptcy filings, personally inform every offeree that he may not participate in "the offering or sale of securities" for twenty years — words broader than the Judgment's own injunction — and return funds (Ex. 52 at 31–32). The object is coercion: Plaintiff had sworn his claims at $1,191,142,124 in his bankruptcy schedules on March 2, 2026 — the State filed its own proof of claim on April 7, 2026 — submitting its claim to the estate's same-transaction counterclaims, 11 U.S.C. § 106(b) — and its citation issued ex parte seven days later, threatening jail unless Plaintiff undid the filings that created that exposure. Plaintiff has referred the conduct described in this Complaint to five federal investigative and prosecutorial agencies, including the United States Department of Justice and the Federal Bureau of Investigation; retaliation against him for those reports is itself a federal crime, 18 U.S.C. § 1513(e), and is pleaded below as a predicate act.

1. This case concerns the State-sanctioned taking of more than $50,000,000 in land and water assets — approximately $54,900,000 on the Estimated Current Valuation presented in the Debtor's Second Amended Disclosure Statement in *In re McKowen*, No. 25-16665-KHT (Bankr. D. Colo.) — standing behind approximately 800 shareholders of record — 544 on the certified transfer-agent shareholder register of VetaNova, Inc. alone (Olde Monmouth Stock Transfer, July 25, 2022), and approximately 254 holders of record of Two Rivers Water & Farming Company by that company's own final Form 10-K — whose whistleblower the State has threatened with jail unless he withdraws his federal filings. The case spans four connected eras, each building on the last. The first era built the property; the following three took it — with one object throughout: to capture the assets of Two Rivers Water & Farming Company and its subsidiaries and to extinguish the recorded security and the federally preserved

collection rights of the GrowCo investors, for the benefit of the State of Colorado and a private actor, Greg Harrington. First, from 2014 to May 2016, under Plaintiff's management, the enterprise was built lawfully: a capital structure subject to independent audit, investor capital deployed into the land, water, and greenhouse assets themselves, and a recorded security — Deed of Trust No. 404224, recorded September 25, 2015 — protecting the GrowCo investors' right to repayment (Era 1). Second, after Plaintiff resigned all management positions in May 2016, the insiders who assumed control converted a lawful, audited capital structure into a concealed Ponzi scheme — continuing to solicit investor money while diverting the capital already raised — and defeated the independent audit that would have exposed the diversion (Era 2). Third, with the diversion concealed, the pending Vaxa transaction was stripped of its deal protections in October 2018, the sitting board resigned en masse the following month, and a replacement board seated by the sole remaining officer closed the February 2019 bait-and-switch that delivered the company to Greg Harrington, a convicted securities felon, who took the platform without a shareholder vote and stripped its land, water, and proceeds through concealed, below-market insider dispositions (Era 3). Fourth, when the asset-stripping reached the one interest it could not remove — the recorded Deed of Trust No. 404224 securing the GrowCo investors' right to repayment — Harrington and the State of Colorado jointly executed the May 2023 Stipulation, which routed $2,000,000 to the State, released the Harrington-controlled Respondents, and directed bankruptcy filings whose stated purpose was to "clear title" on the collateral: the final act, aimed at erasing the security for the very capital the scheme had converted (Era 4). Plaintiff is the largest individual GrowCo investor, the holder of the recorded beneficiary rights under Deed of Trust, Reception No. 404224, and a person who

personally invested and advanced millions of dollars of his own capital — including a $1,218,157 purchase of GCP Super Units preferred interests and more than $1,400,000 contributed into McGrow — to keep the enterprise alive after he resigned all management positions in May 2016. A supermajority of the GrowCo investors — 77.36% — voluntarily and lawfully reorganized their GrowCo investment into VetaNova, Inc., the assignment the Paulson Final Order expressly protected (Ex. 46 ¶ 15). The value the enterprise stripped from Plaintiff and the co-investors across the four eras totals approximately $384,547,374 — $1,153,642,122 when trebled under 18 U.S.C. § 1964(c) — a figure pleaded, as set out in the Sixth Claim, to establish the scale and object of the scheme. Plaintiff seeks recovery of his own direct injury — the capital he personally advanced, his recorded secured interest under Deed of Trust No. 404224, his GrowCo securities, and his sole-proprietorship investment business — and does not assert the co-investors' claims. That direct loss is distinct from the residual that survived the stripping — Plaintiff's reorganized VetaNova, Inc. stake, valued at $19,244,650 (35.0540%) on the same Estimated Current Valuation — which is what remains after the taking, not a measure of it; the residual and the loss together state the rightful value of the position the scheme consumed.

2. What this action does not seek, and what it enforces. No claim in this action seeks to set aside, reverse, or enjoin the state-court judgment in *Chan v. Two Rivers*, No. 2021CV33922 (Denver Dist. Ct.), which is on appeal in the Colorado courts. Each claim instead enforces an independent federal right: the First Claim enforces this Court's own federal *Paulson* judgment under the Supremacy Clause and 28 U.S.C. §§ 2201–2202; the civil-rights claims enforce Plaintiff's rights under the Fourteenth and Fifth Amendments through 42 U.S.C. §§ 1983 and

1985(2), the latter reaching the State officials' and Harrington's retaliation against Plaintiff for his participation as a party and witness in the federal proceedings and his reports to federal law enforcement (18 U.S.C. § 1513(e)); and the racketeering claim enforces 18 U.S.C. § 1964(c) against the private actors. These are federal questions this Court may decide without disturbing the state judgment or the State's independent regulatory remedies.

3. The State conceded in 2019 that Plaintiff had no control over the company's funds or assets after his resignation. It nonetheless prosecuted him, and in 2023 it entered into a Stipulation with Harrington — without notice to Plaintiff and without any adjudication binding on him — that routed $2,000,000 to the State, released and dismissed the Harrington-controlled Respondents, and set in motion a bankruptcy plan whose stated purpose was to clear title on the assets securing the GrowCo investors.

4. Plaintiff brings federal civil-rights claims under 42 U.S.C. §§ 1983 and 1985(2) against the individual state officials and the private actor who acted jointly with them, a civil claim under the Racketeer Influenced and Corrupt Organizations Act, and related claims. Consistent with *Will v. Michigan Department of State Police*, Plaintiff asserts the § 1983 claims against the individual defendants only — in their individual capacities for damages and in their official capacities for prospective relief under *Ex parte Young.* Plaintiff does not ask this Court to sit in appellate review of, or to enjoin, any state-court proceeding; he does ask this Court to declare, under the supremacy of the federal Paulson judgment, that the State's recovery on the GrowCo securities is barred, as set forth in the First Claim. Separately, Plaintiff pleads a Fifth Amendment takings claim drawn to the jurisdictional lines: the relief sought is prospective

declaratory and injunctive relief against the responsible state officials under Ex parte Young, as set forth in the Seventh Claim.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343, because the claims arise under 42 U.S.C. § 1983, the First, Fifth, and Fourteenth Amendments, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–1968.

6. The Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367(a) and authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202. Venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

7. Plaintiff John R. McKowen is a Colorado resident; the largest individual investor in GrowCo Partners 1, LLC; the Liquidator of VitaNova Partners, LLC (the dissolved holding entity, distinct from the SEC-reporting successor VetaNova, Inc.); and the holder of the recorded beneficiary rights under Deed of Trust, Reception No. 404224. He resigned all officer and director positions at Two Rivers Water & Farming Company effective May 26, 2016.

8. Defendant Greg Harrington is a private individual who acquired control of Two Rivers in 2019 and who, as alleged below, acted under color of state law through coordinated, jointly executed conduct with the State officials. He was convicted of federal securities fraud (United States v. Harrington, D. Colo. No. 1:93-cr-00131) and has been the subject of multiple adjudicated fraudulent-transfer and Ponzi proceedings.

9. Defendant Wayne Harding was the chief financial officer of Two Rivers and GrowCo and directed the financial transactions that effected and concealed the diversion of GrowCo investor capital.

10. Defendant Charles Francis Kirby, who appears in the enterprise's own records, including the recorded deed's beneficiary schedule and the TR Capital ownership schedule, as "Charles B. Kirby," is a securities professional barred by the U.S. Securities and Exchange Commission who operated through affiliated entities, including Elevation Fund, LLC, Blue Yellow, LLC, and Blue & Green, LLC.

11. Defendant I. Wistar Morris is a controlling member of TR Capital Partners, LLC and a holder of GrowCo securities.

12. Defendants Philip Weiser (Attorney General), Tung Chan (Securities Commissioner), Robert Finke and Jennifer Hunt (Assistant Attorneys General), and India Kidd-Aaron (Assistant Attorney General) — collectively, the "individual State Defendants" — are sued in their individual capacities for damages and in their official capacities for prospective relief.

13. Defendants Two Rivers Farms F-2, Inc., Two Rivers Water & Farming Company, and TR Capital Partners, LLC are the corporate entities through which the capital was raised and the assets stripped, and which, with the entities identified in the Sixth Claim, constitute the association-in-fact enterprise.

## FACTUAL BACKGROUND

**Era 1 — Lawful Capital Formation (2002 – May 26, 2016)**

14. Between 2014 and 2017, GrowCo raised capital from investors to construct greenhouse facilities. The GCP-1 Operating Agreement (Jan. 12, 2015) granted the Preferred Members a priority repayment right under Section 13.03(c) (Ex. 4 at 32). To secure those obligations, the grantors recorded a Deed of Trust in Huerfano County on September 25, 2015, Reception No. 404224, encumbering land and water rights for the benefit of the GCP-1 Preferred Members (Ex. 6). This recorded secured interest, and the collection rights the Paulson settlement preserved, are the property at the center of this action.

15. From 2002 through 2016, Plaintiff led the formation, capitalization, and development of Two Rivers and its affiliates, including GrowCo and TR Capital Partners. He raised over $40 million through SEC-compliant Rule 506(c) offerings and developed over 7,900 acres across El Paso, Pueblo, and Huerfano Counties, including senior water and reservoir rights. The 2015 Form 10-K was audited by Eide Bailly LLP, which issued an unqualified opinion, and the company reached a $32.7 million public market capitalization. Plaintiff resigned from all positions of control on May 26, 2016 (Ex. 10 at 2).

16. Plaintiff resigned all management positions at Two Rivers effective May 26, 2016 (Ex. 10 — Form 8-K). In 2019, the State moved to dismiss a contempt citation against Plaintiff with prejudice, conceding in its own words that discovery had produced “no evidence … that Mr. McKowen retained sufficient ability, either directly or indirectly, to control the funds or assets” of Two Rivers or its subsidiaries following his resignation, and the court granted the dismissal

with prejudice (Ex. 34). That concession covers the same post-resignation period in which the misappropriation alleged below occurred.

**Era 2 — The Ponzi Scheme and Concealment (May 26, 2016 – 2018)**

17. Once control passed to insiders, they made an undisclosed decision: to stop investing in the build while continuing to solicit and accept new investor funds, diverting that capital to repayment of prior obligations — converting a lawful structure into a concealed Ponzi scheme. At least $8 million in investor capital was misclassified as general-and-administrative expense. The use-of-proceeds language itself shows the turn (Ex. 9, 12, 20); note interest was redirected to the insider entity Blue Yellow (Ex. 8); and $729,103.15 was paid to Defendant Kirby's vendor entity Blue & Green (Ex. 18 at 1).

18. On June 27, 2016, Plaintiff put then-chief-executive Harding on written notice that the raise "could become a Ponzi scheme," that money raised "for the stated purpose of building greenhouses" was "in fact being spent primarily to pay interest to others and salaries," and directed Harding to account for the proceeds (Ex. 13).

19. After his resignation, and during the very period in which the State conceded he had no control, Plaintiff personally contributed more than $1,400,000 of his own funds into McGrow — capital contributions, loans, and the payment of the enterprise's legal expenses — to keep the business alive (Ex. 17). That sum was in addition to his $1,218,157 purchase of GCP Super Units preferred interests (Ex. 63), his initial capital contribution into McGrow, and the revolving credit facility of up to $10,000,000 that his VitaNova, LLC extended to GCP Super Units on June 1, 2018 (Ex. 64). Plaintiff was thus directly injured in his own property: his recorded secured interest, his GrowCo securities, and the capital he personally advanced.

20. The diversion was concealed. At the May 1, 2017 GrowCo board meeting, Defendant Ploen voted with Harding to defeat the independent audit and refuse production of the general ledger (Ex. 22). On August 16, 2017, a fabricated journal entry of $6,207,943.50 was recorded by Harding with no supporting documentation; more than $4.2 million was left unpaid to GrowCo; and GrowCo was deconsolidated so the parent could use its assets while not reporting its losses (Ex. 24 at 6).

21. Rather than steward the producing asset, Harding took on Black Mountain "death-spiral" convertible financing — a term sheet dated March 21, 2017 and a securities purchase agreement, note, and warrant executed April 26, 2017 — which matured into a dilutive pump-and-dump cycle that collapsed the share price and left the public company upside down (Ex. 40).

22. GCP-1 was nonetheless a real, operating greenhouse: the tenant, Amerijuana, produced product and paid rent (Ex. 26), corroborated by site camera footage (Ex. 27).

23. On May 15, 2018, the insider-controlled board ratified the eviction of the cash-flow-positive tenant Amerijuana (Ex. 28), severing the project's last revenue stream; the eviction was thereafter completed through the Pueblo County District Court, No. 2018CV30282. The operative act was the board's decision to destroy the project's income.

24. Plaintiff reported the misappropriation to the Colorado Securities Commissioner beginning in 2017 and formalized the report on July 13, 2018 through his counsel, Tobin D. Kern, Esq., of Volant Law (Ex. 25 at 4) — the protected activity the later State enforcement action retaliated against.

**Era 3 — The Vaxa Bait-and-Switch and Asset Seizure (2019 – Present)**

25. Greg Harrington is a convicted securities felon (United States v. Harrington, D. Colo. No. 1:93-cr-00131; a 2006 Zions Ponzi co-defendant) (Exs. 1, 2) who solicited under the defunct 1941 brokerage name "Fenner & Beane" (Ex. 38).

26. Harrington's move was a bait-and-switch, and the deal papers document the switch. On June 20, 2018, Two Rivers signed a letter of intent to acquire Vaxa on protected terms: an initial payment of $1,500,000 in market-priced shares, a purchase price capped by an earn-out at ten times EBITDA, and a valuation validated by an independent fairness opinion and appraisal (Ex. 56). On October 22, 2018, a revised, binding letter of intent stripped those protections: the fairness-opinion requirement was eliminated, the initial payment became 30,000,000 newly issued shares delivered at closing, and the earn-out multiple fell from ten times to 2.5 times EBITDA (Ex. 57). The following month the entire board of directors resigned; in December 2018 Harding — by then sole officer, chief executive, chief financial officer, and chairman — appointed a replacement board of his and Harrington's choosing (Two Rivers 2018 Form 10-K, Part III); the parties executed the Share Exchange Agreement on February 22, 2019, and the transaction closed on the stripped terms on July 31, 2019 (Ex. 32, Note 8). Rather than invest, Harrington merged Two Rivers with his own shell, Vaxa — which held negative equity of $582,071 — for which Two Rivers issued 30,000,000 unrestricted shares, priced at $13.2 million with a $14.1 million goodwill plug. No shareholder vote was held, no board resolution was adopted, and no cash changed hands (Ex. 29, 30, 32, 33). Harrington signed both sides of the transaction (Easby Land & Cattle Company and GRAMZ Holdings). Having acquired roughly $50 million in hard assets, he took the company private: after the third-quarter 2019

Form 10-Q, Two Rivers ceased all public reporting (Ex. 32). Every asset so acquired was thereafter either sold — with the proceeds routed to the insider circle and the Scottsdale mailbox, as pleaded below — or remains in Harrington's possession and control to this day; he paid nothing for any of it, and neither the assets nor their proceeds have ever reached the secured investors.

27. Harrington then leased the 158-acre Butte Valley parcel to his affiliate Vaxa for $50,000 per year, effective March 15, 2019, without approval or disclosure (Ex. 31).

28. He stripped the El Paso County land: the October 18, 2019 Bar 10 Road sale and the December 20, 2019 Henderson Lane sale, both below value, with identical pre-set insider tickets distributed to the insider funds and routed to a single Scottsdale mailbox (Ex. 35, 36, 39, 5).

29. On January 31, 2020, $72,540.49 — substantially the entire balance of TR El Paso Land's account — was removed by instruction recorded only as "per Chad" (Ex. 37).

30. The Securities and Exchange Commission revoked the registration of all classes of Two Rivers securities effective August 19, 2022 (Ex. 41).

**Era 4 — The State-Enabled Capture (2017 – Present)**

31. On May 5, 2023, the State and Harrington executed a "Stipulation for Injunction and Other Relief" in the state enforcement action, entered as an order on May 9, 2023, without notice to Plaintiff and without any adjudication of facts binding on Plaintiff. The Stipulation is an instrument "STIPULATED AND AGREED by and between the Commissioner and Respondents," and Harrington personally signed it as Chief Executive Officer of Two Rivers and Managing Member of TR Capital (Ex. 44 — Stipulation, 25-708 Dkt. 1-2 / 49-2).

32. The Stipulation's terms establish the joint action and the exchange: (a) the Respondents agreed to pay the State $2,000,000 from the proceeds of any sale of company property (¶ 2(b)); (b) in return, the Commissioner agreed to "release and acquit, and forever discharge the Respondents from any and all claims" and to dismiss them as defendants (¶ 2(d), ¶ 3); (c) the State and Harrington jointly agreed to place company subsidiaries into bankruptcy for the stated "purpose … to clear title on the assets that were improperly and fraudulently incumbered [sic]" — that is, to void the 404224 Deed of Trust securing the GrowCo investors (¶ 3(a)); and (d) Harrington agreed to "assist the Commissioner" by providing records to build the case against "Prior Management," defined in ¶ 1(d) as Wayne Harding and John McKowen (Ex. 44 at 3–6). Assistant Attorney General India Kidd-Aaron personally signed the Stipulation as to form for the Attorney General, as counsel for the Securities Commissioner (Ex. 44, signature page).

33. A private party who jointly executes an instrument allocating state enforcement power, releases, and a plan to strip a third party's secured property is a willful participant in joint action with the State, acting under color of state law. *Lugar v. Edmondson Oil Co.; Dennis v. Sparks.* This is not the mere use of a state procedure. *Scott v. Hern.* The February 2, 2024 letter from Harrington to Commissioner Chan, copying Assistant Attorney General Kidd-Aaron and referring to "our settlement, including the substantial fine that was agreed upon" (Ex. 47), corroborates the continuing coordination. The letter states the financial leverage in its own terms: Plaintiff's efforts to enforce the collateral "have significantly increased the work required to recover assets ... which has an impact on our settlement, including the substantial fine that was agreed upon" — and because Stipulation ¶ 2(b) makes the State's $2,000,000 payable only "from the proceeds of any sale of company property," the State would not be paid

unless Plaintiff's secured claims were suppressed. Harrington wrote to the Commissioner in the State's own first person — "the judgments obtained by our office's complaint"; "our inability to prevent Mr. McKowen" (Ex. 47).

34. Consistent with the Stipulation's stated purpose, Two Rivers Farms F-2, Inc. — the Harrington-controlled debtor — filed two adversary proceedings in May 2024 to extinguish the recorded security. Adversary No. 24-01111 sought to declare void the Deed of Trust at Reception No. 404224 and to quiet title to the encumbered Huerfano County land and water rights in the debtor, naming GrowCo Capital Partners 1, LLC, the Morris family interests, the insider funds, and approximately one hundred secured investors as defendants. Adversary No. 24-01112 sought the same relief as to the companion Deed of Trust at Reception No. 404225, and named as defendants GrowCo, Inc., Blue & Green, LLC, VetaNova, Inc., and John R. McKowen, among other secured investors. Both proceedings sought to strip the GrowCo investors of the recorded security the State had branded "fraudulent," and both collapsed for failure to prosecute in 2025 (Ex. 48). (These 2024 adversary proceedings are distinct from Plaintiff's own adversary proceeding against the State, Adv. No. 26-01111.)

35. When Plaintiff sought to reorganize through his own Chapter 11 (In re McKowen, No. 25-16665-KHT) and to distribute the preserved beneficiary interests to the investors, the State — a creditor by virtue of its judgment (Ex. 51) — objected to the plan rather than support the distribution that would have paid the GrowCo investors, and the case was dismissed. The Public Trustee likewise rejected Plaintiff's nonjudicial foreclosure on the 404224 security (Ex. 50) — closing the ordinary statutory remedy while the title-clearing effort proceeded.

36. The State's enforcement judgment and its destruction of the investors' security cannot be reconciled. On July 9, 2025, the State obtained a judgment of $16,578,690.33 against Plaintiff and others, expressly sought and entered as "damages, restitution, and disgorgement" under C.R.S. § 11-51-602(2) — the investor-recovery provision measured by the consideration investors paid for their securities (Ex. 51 at 73, 110). The judgment is thus premised on the proposition that the GrowCo investors are owed the return of their invested capital. Yet the State does not remit that recovery to the investors; it collects it for the State. And through the May 5, 2023 Stipulation (Ex. 44), the same State acted to void the Deed of Trust, Reception No. 404224 — the recorded security that is the investors' independent means of recovering that same invested capital from the encumbered property. The State thereby asserted the validity of the investors' losses to justify its own recovery while simultaneously acting to extinguish the investors' (and Plaintiff's) security for those losses.

37. The judgment's injunction is narrow by its own terms. It enjoins Plaintiff from "participation in private securities transactions in or from the state of Colorado" for twenty years (Ex. 51 at 112) — a defined category, not a bar on securities activity generally. The judgment itself illustrates the category with FINRA "selling away" discipline — "twenty-two undisclosed private securities transactions" sold away from a supervising firm for commissions — and with sales-representative analysis turning on "transaction-based compensation for the solicitation" (Ex. 51 at 100–101). Plaintiff's written agreements provided flat monthly fees and construction-milestone stock, not transaction-based compensation (Exs. 11, 14, 15, 16, 17). Whether the state court correctly applied that category to Plaintiff is before the Colorado Court of Appeals

and is not at issue here. What matters to this action is what the contempt machinery now targets: Plaintiff's federal-court filings themselves (¶ 69).

38. In this action the private defendants did not assert any separation from the State. Instead, Harrington and Ploen filed formal joinders adopting the State Defendants' briefs as their own (Dkts. 154, 155, 207, 208, 212), litigating as a single bloc with the State rather than as independent private parties — conduct corroborative of the joint enterprise alleged above.

**The Paulson Preservation and Plaintiff's Chain of Title**

39. The secured obligation (2015). The GrowCo Capital Partners 1, LLC Operating Agreement, dated January 12, 2015, granted the Preferred Members a priority right of repayment on liquidation under Section 13.03(c), and provided that the Company would "grant the Preferred Members a security interest in substantially all of the assets of the Company" to secure those amounts — the "Secured Obligations" (Ex. 4, §§ 5.04, 13.03(c)).

40. The recorded security (September 25, 2015). To record that security, the grantors — Orlando Reservoir No. 2 Company, LLC and Two Rivers Farms F-2, Inc. — executed Deed of Trust, Reception No. 404224, recorded September 25, 2015 in Huerfano County, encumbering the described land and water rights for the benefit of the GCP-1 Preferred Members (the "Beneficiaries"). The deed recites that the Beneficiaries "are entitled to certain preferred payments upon liquidation of GCP 1, as more specifically set forth in Section 13.03(c) of the Operating Agreement (the 'Secured Obligations')," and provides that the Beneficiaries' rights rank pari passu, "proportionate the amounts owing to such Beneficiaries under Section 13.03(c)" (Ex. 6).

41. The security follows the Preferred units. Under Section 5.05 of the Operating Agreement (Succession Upon Transfer), on any transfer of the units the transferee "shall succeed to the Capital Account of the Transferor … and shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII" — including the Section 13.03(c) secured entitlement (Ex. 4, § 5.05). The 404224 collateral is therefore appurtenant to the GCP-1 Preferred and passes with the units by operation of the instruments themselves; no separate recorded deed-beneficiary assignment is required for the security to follow the Preferred.

42. Plaintiff's Preferred position and its Paulson-protected assignment. Plaintiff acquired 1,218,157 GCP Super Units Preferred interests for $1,218,157 (at $1.00 per unit), confirmed by GrowCo on October 19, 2015, carrying the Section 13.03(c) entitlement (Ex. 63). Beginning with the February 23, 2020 exchange, the GCP Super Units Preferred interests were assigned into VitaNova Partners, LLC — the assignment the *Paulson* Final Order expressly protected: persons who "assigned the securities to VitaNova Partners, LLC are not excluded as Class Members by virtue of such assignment" (Ex. 43). In May 2021, GrowCo, GCP-1, VitaNova Partners, VetaNova, Two Rivers, and TR Capital executed a six-party settlement agreement, dated May 26, 2021, under which Two Rivers and TR Capital exchanged their GrowCo and GCP-1 equity for 4,384,913 VetaNova units and the parties exchanged entity-level releases — Plaintiff signed only on behalf of entities, was not a party in his individual capacity, and released no claim of his own; in its paragraph 3, GCP-1 "agree[d] to terminate and release Two Rivers" from the Deed of Trust No. 404224 obligations and purported to authorize a future satisfaction filing. That promise was never performed: no satisfaction or release of Deed of Trust No. 404224 was ever recorded with the Huerfano County Clerk and Recorder, and the

deed remains of record, unsatisfied. The approximately 80 investors whose obligations the deed secures — obligations the agreement's own recitals describe as "owed to investors" — were not parties to that agreement, received no notice of it, and did not consent to any release of their security; and Two Rivers thereafter repudiated the agreement by asserting cross-claims against Plaintiff in March 2022 within the general release it had given, and cannot enforce the agreement's terms against Plaintiff. Two Rivers' own later conduct confirms the promise was never performed: the May 5, 2023 Stipulation directed bankruptcy filings whose stated purpose was to "clear title" on the same collateral (¶ 32), and in May 2024 the Harrington-controlled debtor sued approximately one hundred secured investors to have the deeds declared void (¶ 34) — proceedings without purpose if the 2021 agreement had released anything. The executed agreement is of record in In re McKowen, No. 25-16665-KHT (Bankr. D. Colo.), Dkt. 103, Ex. A.

43. The 2021 exchange into VetaNova. On August 17, 2021, the VitaNova Partners interests were exchanged into VetaNova, Inc., which holds approximately 90% of the beneficial interest; 77.36% of the GrowCo investors converted into VetaNova (Ex. 46 ¶ 15). The consolidation's business purpose is documented in VetaNova's public filings. The May 26, 2021 settlement unified the GrowCo platform under VetaNova for the development and financing of controlled-environment greenhouse agriculture: on August 4, 2021, VetaNova signed a letter of intent with Mastronardi Produce Limited for the exclusive purchase, marketing, and sale of the produce from the greenhouse facilities VetaNova was to develop; VetaNova's registration statement became effective on September 27, 2021, with its warrant terms keyed to qualification of the shares on the OTCQX or OTCQB markets (Form S-1/A, Exhibits 10.13 and

4.1); and by November 2021 VetaNova was engaging Dalmore Group, LLC, a FINRA-registered broker-dealer, as broker of record for a $10,000,000 Regulation A offering — an engagement executed on February 8, 2022 and qualified by the Securities and Exchange Commission on June 17, 2022. On December 10, 2021, the State filed Chan v. Two Rivers Water & Farming Co., No. 2021CV33922 (Denver Dist. Ct.), naming Plaintiff; the development and financing the settlement had been executed to enable did not survive the enforcement action.

44. The 2023 distribution; Plaintiff's legal title and agency. Upon the 2023 dissolution of VitaNova Partners, the 404224 and 404225 beneficiary rights were distributed in kind: VetaNova, Inc. holds approximately 90% of the beneficial interest, the non-exchanging investors approximately 10%, and Plaintiff took and holds legal title to the beneficiary rights under recorded Deeds of Trust Nos. 404224 and 404225 in his own name (Ex. 53), and holds and enforces that interest in the capacity the Deed of Trust itself provides: the deed states that the Beneficiaries "may appoint a lenders' agent to act for and on behalf of all Beneficiaries and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust" (Ex. 6), and Plaintiff acts in that enforcement capacity — as liquidator of VitaNova Partners, LLC, under the liquidation machinery of the Operating Agreement (Ex. 4, § 13.03) — a capacity that passed with the rights themselves: at dissolution Plaintiff was VitaNova Partners' sole member, and the in-kind distribution its declaration records (Ex. 53) placed both the beneficiary rights and their enforcement in his hands — and as declared in his sworn Schedule A/B, which lists the beneficiary interests and states that Plaintiff "does not presently hold recorded fee title" (In re McKowen, No. 25-16665-KHT,

Dkt. 88, Attachments 1.1–1.2). That agency concerns enforcement of the security instrument; Plaintiff asserts in this action only his own claims and his own injury. Plaintiff asserts the claims in this action in his own right and for his own injury — as the holder of that interest under the recorded deeds of trust and as a GrowCo investor who personally advanced capital into the enterprise — and not on behalf of the other beneficial owners, who are not parties and whom Plaintiff, appearing pro se, does not represent.

45. Result. Plaintiff today holds legal title to the 404224 beneficiary rights in his own name, acquired by the in-kind distribution pleaded above; VetaNova holds approximately 90% of the beneficial interest, subject to its March 27, 2026 individual assignments to the beneficial owners, which vest upon each owner's proof of claim, with unvested interests reverting to VetaNova; and the Section 13.03(c) secured position follows the Preferred by operation of Section 5.05 and the deed's own terms. Plaintiff's personal stake in the residual is the 35.0540% equity interest in VetaNova, Inc. pleaded in ¶ 1 — sworn in his bankruptcy schedules as a 35% interest (Dkt. 88, Schedule A/B, Line 19) and valued at $19,244,650 on the Estimated Current Valuation; he holds legal title both as liquidator of dissolved VitaNova Partners and as agent for the named beneficiary-lenders — the enforcement capacity the Deed of Trust itself provides (Ex. 6). The secured interest under the recorded deeds of trust, the Preferred priority it secures, the capital Plaintiff personally advanced, and the Paulson-preserved collection rights are the personally owned property at the center of this action.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Enforcement of the Federal *Paulson* Judgment (Supremacy Clause) and Declaratory Relief**

**— 28 U.S.C. §§ 2201–2202**

**— against the private and corporate Defendants, and against the individual State Defendants in their official capacities for prospective declaratory relief only**

46. Re-allegation and the limited relief sought. Plaintiff re-alleges the foregoing paragraphs. This Claim seeks one thing: a declaration of the scope of this Court's own judgment in *Paulson v. Two Rivers Water and Farming Co.*, No. 19-cv-02639-PAB-NRN (D. Colo.), and enforcement of that judgment in aid of the jurisdiction the *Paulson* Court expressly retained. Plaintiff does not ask this Court to sit in appellate review of, to reopen, to reverse, or to enjoin the state-court judgment or the ongoing state proceeding in *Chan v. Two Rivers*, No. 2021CV33922 (Denver Dist. Ct.); that judgment is on appeal in the Colorado courts, where it will be decided. Plaintiff does not seek to bar the State of Colorado from its independent regulatory remedies under the Colorado Securities Act — its injunctive relief, its industry bar, or its civil penalties. The declaration sought reaches only the point at which the State's and the bound Defendants' conduct collides with what the federal judgment adjudicated and preserved: the State's monetary recovery of the GrowCo investors' losses, and the use of the Stipulation and the deed-voiding bankruptcy claims to reach the investors' preserved collection security. This is enforcement of a federal judgment by the court that entered it, not interference with a state one.

47. The property interest. Plaintiff holds specifically identified, constitutionally cognizable property: (a) his recorded secured beneficiary interest under Deed of Trust, Reception No.

404224 (Ex. 6); (b) the GCP-1 Preferred priority-of-repayment right that deed secures under Section 13.03(c) of the GCP-1 Operating Agreement (Ex. 4); and (c) the *Paulson*-preserved right to collect amounts due under the GrowCo securities — the Final Order providing that "the Class Members shall retain their GrowCo securities and are not releasing the limited claim for payment of their securities, including claims in the event of a GrowCo liquidation, including in the GrowCo Bankruptcy Action" (Ex. 43). These are not "contractual rights" in the abstract; they are a recorded lien, a secured contractual priority, and a federally preserved collection right in identified real property and water, held by Plaintiff as set forth in the Chain of Title above.

48. What Paulson preserved, its transferability, and the enforcement forum. The *Paulson* Final Order and Settlement Agreement resolved and barred the investor claims arising from the GrowCo offerings, preserved the Class Members' retained securities and their collection rights, entered a Complete Bar Order, and retained jurisdiction over the settlement's implementation (Ex. 43). The Final Order further declared those retained securities and claims transferable: persons who "assigned the securities to VitaNova Partners, LLC are not excluded as Class Members by virtue of such assignment" (Ex. 43) — the court-authorized assignment by which Plaintiff and VetaNova hold the preserved rights, as set forth in the Chain of Title above. In Docket No. 199 of the *Paulson* case, this Court directed that the question whether these Defendants have violated the *Paulson* Settlement be resolved in this action, where the alleged violators are parties (Ex. 49). And in this action this Court has already recited the *Paulson* Court's retention of jurisdiction over the Settlement's implementation — "without affecting the finality of this Order, this Court retains [jurisdiction over] ... the Settlement Agreement,

including its implementation" (Dkt. 259, quoting *Paulson* Dkt. 178 at 20) — and, in denying Plaintiff's emergency motion regarding the Deed of Trust No. 404224 interest as seeking relief beyond the scope of the operative complaint (Dkt. 259), identified the precise gap this First Claim now closes: it pleads the enforcement of the *Paulson* preservation of the 404224 secured interest within the complaint itself. A federal court possesses jurisdiction to enforce and effectuate its own judgment. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994).

49. The State's duty, the whistleblower report, and the inversion. The Colorado Securities Act charges the Commissioner "to protect investors," C.R.S. § 11-51-101(2), and authorizes a monetary recovery only "on behalf of some or all of the persons injured," § 11-51-602(2), creating no other cause of action, § 11-51-604(12). The State's lawful role was to regulate and to disclose. On July 13, 2018, Plaintiff — through counsel, Tobin D. Kern, Esq., of Volant Law — did exactly what that regime contemplates: he reported the diversion of GrowCo investor capital to the Colorado Division of Securities, identifying the unsupported $6,207,943.50 journal entry of August 16, 2017, producing the bank records and the master investor list, and expressly asking the State to subpoena Two Rivers and Wayne Harding (Ex. 25). The State's duty on receiving that report was to investigate the diversion and protect the investors. It did the opposite. It prosecuted the whistleblower, and — through the May 5, 2023 Stipulation (Ex. 44), entered without notice to or hearing for Plaintiff — it endorsed and accepted Greg Harrington, a convicted securities-fraud felon (*United States v. Harrington*, D. Colo. No. 1:93-cr-00131) who had already seized control of Two Rivers through the 2018–2019 reverse merger and become its Chief Executive Officer on September 19, 2019, as the "legitimate" Chief

Executive Officer, without disclosing his conviction or Ponzi history (Exs. 1, 2); claimed $2,000,000 for the State "from the proceeds of any sale of company property" (¶ 2(b)); branded the investors' recorded security "fraudulent" and directed the bankruptcy to "clear title" on the encumbered assets — reaching Deeds of Trust Nos. 404224 and 404225 securing the GrowCo investors (¶ 3(a)); and defined "Prior Management" to mean Harding and Plaintiff (¶ 1(d)). The State did not regulate and disclose the fraud its own whistleblower reported; it endorsed the fraud's beneficiary and participated in a taking. Plaintiff remains a federal whistleblower: his June 11, 2026 criminal referrals of this same conduct to five federal agencies are of record in this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), and are protected activity under 18 U.S.C. § 1513(e).

50. The State is bound by supremacy — not preclusion. By C.R.S. § 11-51-602(2) the Commissioner's recovery is the investors' own offering-loss claim asserted in a representative capacity, and § 11-51-604(12) creates no other. The State's $16,578,690.33 recovery — measured as investor funds paid in less amounts returned (Ex. 51) — is therefore the investors' offering-loss claim, and it falls within the scope of what the federal judgment adjudicated, barred, and preserved. That recovery, and the bankruptcy claims asserted to reach the 404224 Deed of Trust — an attack on the very collection rights the judgment expressly preserved — conflict with the federal judgment. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, a federal judgment is supreme over conflicting state action regardless of whether the State was a party to the federal proceeding; conflicting state relief cannot override what the federal judgment resolved and preserved. This Claim rests solely on that supremacy — on the conflict between the State's recovery of the investors' representative offering-loss claim and the federal

judgment that adjudicated and preserved those claims. It does not rest on res judicata, collateral estoppel, or any contention that the State is a party to, a releasor under, or otherwise precluded by the *Paulson* Settlement.

51. Harrington is bound directly — he signed the *Paulson* Settlement, and its own terms bind him. Harrington did not merely head the administration that settled *Paulson* — he personally executed the *Paulson* Settlement Agreement on behalf of Two Rivers Water & Farming Company, signing "By: Greg Harrington / Its: CEO" (Ex. 43, Settlement Agreement signature counterpart, *Paulson* Dkt. 180 at ECF pg. 26 of 68, DocuSign envelope EAFC5179-41FE-4602-BAB9-63739CE99748). By that signature he gave Two Rivers' release with his own hand, and on the same page he warranted that he had "full authority … to take appropriate action required or permitted to be taken pursuant to this Settlement Agreement to effectuate its terms" (Ex. 43, § 48). The signature establishes beyond dispute that Harrington had actual notice of the Settlement's terms — including the collection rights the Class retained — and that he is the officer through whom Two Rivers acted.

That signed fact triggers the binding the Settlement's own definitions supply. Harrington is personally a Releasee: § 1.dd(ii) defines "Releasee" to include "the past and present officers … of Two Rivers," and he was Two Rivers' Chief Executive Officer at the Settlement's October 2020 execution and its March 2023 approval; TR Capital, which he controls, is a named Releasee (§ 1.dd(iii)). He simultaneously stands on the releasing side: the *Paulson* release is two-way by its own terms — "Released Claims" include "any and all Claims of or by the Defendants as against the Releasors … that were asserted, could have been asserted, or could in the future be asserted, arising from, based on, or relating to allegations in the Class Action" (§ 1.cc) — and Two Rivers, the

Defendant and Settling Party, gave that Defendants'-side release through the signature Harrington placed on it. He received the investors' release and gave the company's, in his officer capacity — a Releasee and, through the company he signed for, a releasor.

Having signed the agreement that preserved the Class Members' collection rights, Harrington may not use or enforce the May 5, 2023 Stipulation — which he also executed as Chief Executive Officer of Two Rivers and Managing Member of TR Capital, seven weeks after the Final Order (Ex. 44) — to reassert, as "admitted" fact, the released claims against the GrowCo investors, or to reach the one thing the Complete Bar Order "will not bar," the preserved collection rights. He is bound as an officer of a bound party who executed the very agreement underlying the decree, with actual notice on the face of his own signature. *Wilson v. United States*, 221 U.S. 361, 376 (1911); Fed. R. Civ. P. 65(d)(2)(B); *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179–80 (1973). This bar reaches Harrington without any Supremacy Clause or state-action analysis, because he is bound as a party — by his own signature and by the Settlement's definitions. The *Paulson* release also carries an express covenant not to sue: the settling parties "agree and covenant not to sue or prosecute ... any suit or proceeding in any forum based upon or related to any Released Claims against any Releasee" (Ex. 43, covenant not to sue). Because the retained collection claim is, by Section 1.g, not a Released Claim, that covenant leaves the investors' collection right untouched while barring the bound Defendants from prosecuting the released claims they reasserted through the May 5, 2023 Stipulation and the 2024 deed-voiding adversary proceedings.

52. The corporate Defendants are bound directly. Two Rivers Water & Farming Company was a *Paulson* Defendant and Settling Party; TR Capital Partners, LLC is a named Releasee (§

1.dd(iii)); and Two Rivers Farms F-2, Inc. is their controlled instrumentality, through which the 2024 adversary proceedings (Adv. Nos. 24-01111 and 24-01112, Bankr. D. Colo.) reassert against the Class Member investors the released "no consideration" theory and reach the preserved deed-of-trust security. A bound corporation may not do through a wholly controlled instrumentality what it released the right to do directly. Settling Parties' enforcement is preserved — "Nothing in the Final Order … shall bar any action or Claim by the Settling Parties … to enforce the terms of the Settlement Agreement" (¶ 29) — and Plaintiff, a Settling Party, brings this Claim in part as that enforcement.

53. Declaration sought. Plaintiff seeks a declaration, in aid of this Court's retained jurisdiction over the implementation of the *Paulson* judgment, that:

(a) the Class Members' GrowCo securities, the preserved collection rights, and the Deed of Trust No. 404224 enforcement rights securing them were retained by the Class Members and were not released or extinguished by the *Paulson* Settlement, Final Judgment, or Complete Bar Order;

(b) the State's monetary recovery of the GrowCo investors' losses against Plaintiff, and the deed-voiding bankruptcy claims, conflict with and are barred by that federal judgment to the extent they seek that investor recovery or the extinguishment of those preserved rights;

(c) the bound Defendants — Harrington, Two Rivers, TR Capital, and Two Rivers Farms F-2 — may not use or enforce the Stipulation or the deed-voiding bankruptcy claims to reassert the released claims or reach the preserved collection security;

(d) the retained GrowCo securities and collection rights were, by the Final Order's own terms, transferable, and were validly assigned, so that Plaintiff, as holder of legal title, may enforce the preserved rights he asserts here; and

(e) the GrowCo investors' offering-loss and collection claims, having been adjudicated, barred, and preserved by the *Paulson* judgment, may not be asserted or recovered by any person or entity — including any governmental entity — claiming "by or through, on behalf of, for the benefit of, derivatively for, or as representative of" the Class Members; and the State's monetary recovery, obtainable under C.R.S. Section 11-51-602(2) only "on behalf of the persons injured," is such a representative assertion and is governed and barred by that federal judgment.

This declaration leaves the state-court judgment's regulatory injunction and the State's independent regulatory remedies wholly intact.

**SECOND CLAIM FOR RELIEF**

**Denial of Due Process — 42 U.S.C. § 1983 (Fourteenth Amendment)**

**— against Harrington and the individual State Defendants**

54. Plaintiff re-alleges the foregoing paragraphs. First, the property interest: Plaintiff held constitutionally protected property interests in his recorded secured lien under Deed of Trust No. 404224, the GCP-1 Preferred priority it secured, the Paulson-preserved collection rights, and the capital he personally advanced. Second, the deprivation: the May 5, 2023 Stipulation — entered without notice to Plaintiff, without hearing, and without any adjudication binding on him — allocated $2,000,000 of the proceeds of the securing assets to the State, released the Harrington respondents, and adopted the plan to use bankruptcy to clear title on the collateral

(Ex. 44 at 5), and it was thereafter deployed to those ends. Third, the process owed: notice and an opportunity to be heard before state officials and a private signatory disposed of, redirected proceeds from, or initiated title-clearing proceedings against the collateral securing Plaintiff's recorded interest. That entitlement is settled law: the holder of a recorded security interest possesses a substantial property interest, and actual notice is a "minimum constitutional precondition" to a proceeding that will adversely affect that interest where the holder's name and address are reasonably ascertainable — as Plaintiff's were, from the face of the recorded deed. *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 798–800 (1983). A proceeding need not adjudicate the merits of the holder's claim to adversely affect it, and a cause of action is itself a species of property protected by due process. *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 485, 488 (1988). Fourth, why the process afforded did not cure the deprivation: by the time of the later enforcement trial, the Stipulation had already allocated the sale proceeds, released the Harrington respondents, adopted the title-clearing plan, and treated the secured interests as fraudulent — all before Plaintiff had notice or party status as to that transaction — and at trial the State developed its factual case through its own attorneys while refusing a Rule 30(b)(6) designee, denying Plaintiff a meaningful opportunity to examine adverse witnesses and test the factual basis for the deprivation (Ex. 45) — and the State's own 2019 dismissal-with-prejudice, conceding Plaintiff retained no post-resignation control (Ex. 34), shows the State knew Plaintiff had no control over the assets the Stipulation disposed of. Mathews v. Eldridge. The deprivation was effected under color of state law through the joint action of Harrington and the State Defendants. Lugar v. Edmondson Oil Co. The conduct on which this and the following claims against the individual State Defendants rest was not

prosecutorial advocacy but administrative, investigative, and transactional action outside the scope of absolute immunity: the State Defendants negotiated and drafted the May 5, 2023 Stipulation with a private party out of court, awarded the State $2,000,000 from the proceeds of company-property sales, endorsed and installed Greg Harrington — without disclosing his federal securities-fraud conviction and Ponzi history — as the lawful chief executive of Two Rivers, and arranged the bankruptcy "clear title" plan and the disposition of the 404224 collateral. The State owed and breached a duty of ordinary inquiry into the counterparty it endorsed: Harrington's federal securities-fraud conviction (United States v. Harrington, D. Colo. No. 1:93-cr-00131) was a public record in the State's own federal district. And from August 21, 2023 forward, the State acted with actual knowledge on the record: Plaintiff's Amended Closing Argument informed the court and the State's counsel that Harrington had told Plaintiff and others of his securities-fraud conviction (Ex. 46 ¶ 33) — after which the State proceeded to the July 9, 2025 judgment, retained the $2,000,000 allocation, and pressed the enforcement acts pleaded below, each with that knowledge. By defendant: Commissioner Chan is the official in whose name the enforcement action was brought and on whose authority the May 5, 2023 Stipulation was executed and the $2,000,000 allocation taken, and she was the addressee of Harrington's February 2, 2024 solicitation that the State "take appropriate action" against Plaintiff (Ex. 44; Ex. 47 at 2) — transactional and administrative acts. Assistant Attorney General Hunt recorded a fixed adverse view of Plaintiff in advance of adjudication in the January 19, 2023 internal email (Ex. 42) — fact-development outside courtroom advocacy. Assistant Attorney General Kidd-Aaron signed the Stipulation as to form and was copied on the February 2, 2024 solicitation (Ex. 44, signature page; Ex. 47 at 2) — transactional

participation in the out-of-court disposition. Attorney General Weiser personally attended the enforcement trial against Plaintiff for a full day, accompanied by members of his office and by Commissioner Chan; Assistant Attorney General Finke sat at the State's counsel table at that trial alongside Hunt and Kidd-Aaron — facts pleaded on Plaintiff's personal observation, establishing each defendant's personal knowledge of and personal engagement in the enforcement effort rather than supervisory remove; the conduct on which liability rests remains the out-of-court transactional and administrative acts set out above. Absolute prosecutorial immunity does not reach such investigative, administrative, and property-directed conduct. Imbler v. Pachtman; Buckley v. Fitzsimmons.

**THIRD CLAIM FOR RELIEF**

**First Amendment Retaliation and Selective Enforcement — 42 U.S.C. § 1983**

**— against the individual State Defendants**

55. Plaintiff re-alleges the foregoing paragraphs. Plaintiff engaged in protected activity by reporting the diversion of GrowCo investor capital to the Colorado Division of Securities, beginning in 2017 and formalized through the July 13, 2018 letter of his counsel, Tobin D. Kern, Esq., of Volant Law (Ex. 25). The report was specific: it identified the fabricated $6,207,943.50 journal entry, delivered the supporting bank records and the master investor list, disclosed the forensic audit then underway, and expressly requested that the State subpoena Harding — "a subpoena to Two Rivers and Mr. Harding would be very beneficial" (Ex. 25). The State did not act on the report for more than three years. Plaintiff renewed the notice on the record of the State's own enforcement case: his August 21, 2023 Amended Closing Argument informed the Attorney General's Office and the court that Harrington — to whom the

Stipulation had delivered control of the encumbered assets — was by his own account a convicted securities-fraud felon, and that the Stipulation he signed was unsworn and never adjudicated (Ex. 46). The State corrected nothing. When it acted, it prosecuted the reporter alongside the diverter, under the Stipulation's joint "Prior Management" recital — treating the man who reported the diversion identically to the man who committed it — while releasing the Harrington-controlled Respondents, the parties who held control of the company and its assets. The State's own 2019 concession that Plaintiff retained no control over the company's funds or assets after his resignation is direct documentary proof that the enforcement lacked a good-faith basis as to Plaintiff specifically (Ex. 34). Assistant Attorney General Hunt's January 19, 2023 internal email reflects a fixed adverse view of Plaintiff in advance of adjudication (Ex. 42). Plaintiff's protected activity continues: on June 11, 2026, he submitted federal criminal referrals, reporting the conduct pleaded in this Complaint as violations of 18 U.S.C. § 1962 and other federal statutes, to five federal investigative and prosecutorial agencies, anchored on the same documented conduct, and noticed those referrals on the dockets of this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), expressly in his capacity as a federal whistleblower. The selective-enforcement showing is pleaded within this claim, anchored to the released-Respondents comparator rather than to membership in a protected class.

**FOURTH CLAIM FOR RELIEF**

**Conspiracy to Deprive Civil Rights — 42 U.S.C. § 1983**

**— against Harrington and the individual State Defendants**

56. Plaintiff re-alleges the foregoing paragraphs. Harrington and the State Defendants reached an agreement to deprive Plaintiff of his federally protected rights and acted on it: they negotiated and jointly executed the May 5, 2023 Stipulation (Ex. 44), agreed within it to use bankruptcy to clear title on the securing assets, agreed that Harrington would assist the prosecution, and advanced the parallel bankruptcy proceedings against the secured investors (Ex. 48). The continuing coordination is corroborated by Harrington's February 2, 2024 letter to the Commissioner copying Assistant Attorney General Kidd-Aaron (Ex. 47). A private party who willfully participates in joint action with state officials acts under color of state law. Dennis v. Sparks; Tonkovich v. Kansas Bd. of Regents.

**FIFTH CLAIM FOR RELIEF**

**Fraud and Constructive Fraud — against Harrington, Harding, and the corporate Defendants**

57. Plaintiff re-alleges the foregoing paragraphs and pleads with particularity. Pursuant to the February 22, 2019 Share Exchange Agreement, as amended, Harrington and Harding — the officers who negotiated, authorized, and executed the transaction — caused Two Rivers to issue 30,000,000 shares to the Easby shell entity at the July 31, 2019 closing in exchange for the insolvent Vaxa Global entity, representing in and through the transaction documents to Two Rivers, its board, and its shareholders that Vaxa constituted value for the shares issued (Exs. 29, 30). The representation was false when made: Vaxa's own financial statements showed

negative equity of approximately $582,071 (Ex. 30), the transaction was undertaken without independent valuation or shareholder vote, and the protections of the original letter of intent — market-priced initial shares, an independent fairness opinion, and appraisal — had been stripped by the binding October 22, 2018 revision (Exs. 56, 57). The Company's own quarterly report disclosing the acquisition applied no value to the earn-out "due to the historical performance of Vaxa and the Company's expectation of the likelihood of material earnings during the window" — the acquirer's own admission that it expected the acquired business to produce no material earnings — while recording $14,100,000 of goodwill, exceeding the entire $13,200,000 purchase price, against net-negative assets (Ex. 32, Note 8). The purpose and effect were to seize control of the company and the assets securing the GrowCo investors. Plaintiff's injury from the fraud is direct, not derivative: the issuance delivered control of the obligor on the 404224 collateral to the perpetrators, who then stripped the securing assets — injuring Plaintiff's own recorded security and Paulson-preserved collection rights, an injury distinct from any injury to Two Rivers itself. As to reliance: the fraud operated on the corporate machinery on which Plaintiff's security depended, and Plaintiff pleads it both as fraud on the entity effected by its own faithless officers, for which reliance by Plaintiff is not an element under the constructive-fraud theory, and as part of the fraudulent scheme pleaded in the Sixth Claim. The corporate Defendants acted through their officers Harrington and Harding in authorizing and effecting that issuance and are liable for it. Plaintiff did not discover, and could not reasonably have discovered, the fraudulent character and effect of this transaction until the resulting deprivation of his secured interest became manifest through the 2023 Stipulation and

the 2024 adversary proceedings; the claim is therefore timely under the discovery rule. Fed. R. Civ. P. 9(b).

**SIXTH CLAIM FOR RELIEF**

**Civil RICO — 18 U.S.C. § 1962(c)**

**— against Harrington, Harding, Kirby, Yorke, I. Wistar Morris, Sam Morris, and Ploen**

58. Plaintiff re-alleges the foregoing paragraphs. The enterprise is an association-in-fact, distinct from each defendant, consisting of Greg Harrington; the entities he operated from a single Scottsdale, Arizona mailbox (4400 N. Scottsdale Road, Suite 9-289) (Ex. 39) — Investors Fiduciary, LLC; Fenner & Beane, LLLP; Easby Land & Cattle Company, LLC; Easy Water, LLC; and WaterVault America — together with Two Rivers Water & Farming Company, TR Capital Partners, LLC, TR El Paso Land, LLC, and the insider funds (Elevation Fund, JMW Fund, Richland Fund, and San Gabriel Fund). The enterprise functioned as a continuing unit with the common purpose of capturing the assets of Two Rivers and its subsidiaries and impairing the GrowCo investors' secured interest under Deed of Trust No. 404224, targeting it for extinguishment. *United States v. Turkette.* The enterprise operated by and for the TR Capital Partners control group — insiders and their affiliated funds who together held 88.51% of TR Capital Partners, LLC: the Morris family bloc (56.57%, comprising I. Wistar Morris, the Cotswold Foundation, Eleventh Generation, and Martha Morris), the Yorke funds (JMW Fund, San Gabriel Fund, and Richland Fund), and the Kirby funds (Elevation Fund, Kirby Enterprise Fund, and Charles B. Kirby) (Ex. 5 at 2).

59. Each defendant participated in conducting the affairs of the enterprise, as follows.

**Harrington** directed the enterprise. A federally convicted securities-fraud felon (D. Colo. No. 1:93-cr-00131) (Ex. 1), and a previously adjudicated insider of a Ponzi scheme (Ex. 2), he seized control of Two Rivers in 2019 through the Vaxa reverse merger — causing Two Rivers to issue 30,000,000 shares to his Easby shell for an insolvent entity, with no shareholder vote, board resolution, or cash (Exs. 29, 30, 32, 33) — installed himself as chief executive, fronted the fictitious "Fenner & Beane" (Ex. 38), drafted the May 5, 2023 Stipulation (Ex. 44), and routed the enterprise's proceeds to his Scottsdale mailbox (Exs. 35, 36, 37, 39).

**Harding**, as Two Rivers' chief financial officer and later chief executive, recorded the fabricated $6,207,943.50 journal entry on August 16, 2017 (Ex. 24), executed the Vaxa share issuance (Ex. 30), signed the El Paso land conveyances as chief financial officer, and received insider payoffs of $1,300.00 and $2,275.41 from the El Paso proceeds (Exs. 35, 36).

**Kirby**, a securities professional barred by the Securities and Exchange Commission, was an insider of the TR Capital control group through Elevation Fund, the Kirby Enterprise Fund, and his personal holding (Ex. 5); he used the "Blue Yellow" and "Blue & Green" entities to receive redirected GrowCo note interest totaling $729,103.15 at Harding's written direction and with Kirby copied on the instruction (Exs. 8, 18); and his Elevation Fund received the insider payoffs of $2,429.02 and $4,251.55 from the El Paso proceeds (Exs. 35, 36).

**Yorke** controlled three of the four insider funds in the TR Capital Partners control group — the JMW Fund, the San Gabriel Fund, and the Richland Fund (Ex. 5); the funds' holdings ran to Yorke personally, through the San Gabriel Benefit Plan "fbo Justin Yorke" at Yorke's own Pasadena address on Richland Place (Ex. 59) — through which the control group held 88.51% of TR Capital Partners, LLC, the entity that received and held the diverted GrowCo capital. His

role in TR Capital was not merely economic: he sat and acted as a member of its board of directors — the company's February 2015 board minutes record that Yorke attended and acted at the November 12, 2014 meeting of the TR Capital Partners board, voting on the declaration of a distribution to the preferred members (Ex. 58) — placing him at the board table of the enterprise's holding entity from the outset. He executed the modification of TR Capital's limited-liability-company agreement — Two Rivers' chief financial officer addressed him with the board itself: "Dear TR Capital Board, Justin and John" (Ex. 61) — and Harding sent Yorke personally, at his McGrain Financial address, the chief financial officer's weekly reports on the transfer of the DFP assets, the Bessemer shares, and the El Paso County land into TR Capital (Ex. 60) — the same El Paso land whose sale proceeds his funds received in 2019. The coordination continued after the closings: on April 2, 2020, Harding wrote to McGrain, Yorke, and Christopher Bragg, calculating interest owed to and refunds due "your funds" — Richland, JMW, and San Gabriel — on the funds' advances for GCP1 legal fees (Ex. 62). Each of his three funds received the identical pre-set insider payoffs of $2,429.02 and $4,251.55 from the El Paso land proceeds — on the same tickets, at the same closings, through the same title agent as the other insider funds (Exs. 35, 36) — evidencing an allocation fixed in advance by agreement among the fund principals. The fund group also had its own seat in the boardroom: Christopher Bragg — a partner in the McGrain Financial group, the group affiliated with the San Gabriel, JMW, and Richland funds (Exs. 5, 62) — served as a Two Rivers director and audit-committee member from September 2016 until the November 2018 mass resignation (Two Rivers 2016 and 2017 Forms 10-K, Part III), giving Yorke's funds board-level representation throughout the diversion, the October 22, 2018 stripping of the Vaxa

transaction's protections (Ex. 57), and the resignations that cleared the way for the replacement board. As a principal of the insider control group, Yorke shared the controlling bloc's duty to the shareholders of the company the group controlled not to permit the stripping of those protections or the takeover it enabled; the bloc permitted both, and his funds took the proceeds. One who directs three coordinated funds inside the bloc that owned the enterprise's holding entity, holds board representation through the funds' own partner, and joins the pre-arranged division of the proceeds, participates in the operation and management of the enterprise.

I. **Wistar Morris** was the single largest individual holder in the TR Capital control group (27.85%), and the Morris family entities — including the Cotswold Foundation, Eleventh Generation, and Martha Morris — together held 56.57% of TR Capital Partners (Ex. 5). He sat as a director of TR Capital Partners itself: the company's February 2015 board minutes list him among "all of the directors" (Ex. 58). He participated in the operation and management of the enterprise through his attorney and board representative, Sam Morris, who held the Morris seat on the Two Rivers board from July 2016 until the November 2018 resignation and sat on the GrowCo Partners 1 board as his proxy — the acts of an agent installed to represent the principal's interest being acts of the principal. And he was the largest single recipient of the El Paso land proceeds: the Morris-affiliated Cotswold Foundation's payoffs of $5,100.00 and $8,926.60 — $14,026.60 in total — exceeded every other payee on the two closings (Exs. 35, 36).

**Sam Morris**, a director of Two Rivers from July 2016 until his resignation in November 2018 — chair of its compensation committee, chair of its governance and nominating committee, and a member of its audit committee during the period in which the fabricated $6,207,943.50 journal

entry was recorded and GrowCo was deconsolidated (Two Rivers 2016, 2017, and 2018 Forms 10-K, Part III) — and the attorney for and board proxy of I. Wistar Morris, represented the Morris interest on the Two Rivers board, and one of GrowCo Partners 1's two Common Unit Managers, jointly with Harding: the signed May 15, 2018 minutes confirm "the two Common Unit Managers, Wayne Harding and Samuel Morris," ratify "all actions taken by Wayne Harding and Samuel Morris, Jr., either individually or together since May 25, 2016, the date of John McKowen's resignation," approve the eviction that extinguished the operating tenant's revenue, and condition any settlement of the litigation then pending against GCP-1, Harding, and Morris himself on its dismissal with prejudice (Exs. 28, 28b). Morris thus connected all three levels of the enterprise in one person — manager of the investors' collateral entity, director of the diverting parent, and personal attorney to the TR Capital director who received the largest individual share of the proceeds. He sat on the board on October 22, 2018, when Two Rivers executed the binding revised letter of intent that stripped the Vaxa transaction's protections — eliminating the independent fairness opinion and committing 30,000,000 newly issued shares at closing (Ex. 57) — and he owed the shareholders a duty to stop that transaction and the continuing diversion; instead, the following month he and the entire board resigned, clearing the way for the replacement board under which the issuance closed on July 31, 2019, pursuant to the February 22, 2019 agreement, while the Morris interests he represented received the El Paso insider payoffs (Exs. 35, 36) — thereby participating in the operation and management of the enterprise.

**Ploen**, a GrowCo director, acted to conceal the enterprise: at the May 1, 2017 board meeting he voted with Harding to defeat an independent audit and outside counsel and to deny the return of

GrowCo's books and records, and represented that "everything is out in the open" — approximately three and a half months before Harding recorded the fabricated $6.2 million entry that an audit would have surfaced (Ex. 22 at 35).

60. The defendants conducted the affairs of that enterprise through a pattern of racketeering activity: a scheme to defraud the secured GrowCo investors, the 404224 beneficiaries, and Plaintiff as holder of the recorded secured interest by stripping the assets of Two Rivers and its subsidiaries through concealed, below-market, self-dealing dispositions to a recurring circle of insiders, and by concealing those dispositions, in furtherance of which the defendants repeatedly used the United States mails and interstate wires, 18 U.S.C. §§ 1341, 1343. The El Paso County land sales set out below are a fully documented, representative instance of that method; the same method was then directed at the assets securing the GrowCo investors' 404224 interest. The pattern spans two connected periods: the 2016–2018 conversion and concealment of GrowCo investor capital (Era 2), pleaded in the alternative as predicate acts in the two paragraphs that follow, and the 2019–2026 asset-stripping and collateral-extinguishment campaign that completed the scheme.

61. The pattern begins with the conversion of GrowCo investor capital in 2016–2018 (Era 2), documented in the BCLS forensic report (Ex. 24). Plaintiff pleads the following Era 2 acts as predicate acts of racketeering, in the alternative and in addition to the acts set out below: (a) between 2015 and 2017, Harding, by interstate wire and mail, redirected GrowCo note interest to the insider entity Blue Yellow and caused $729,103.15 to be paid to Kirby's vendor entity Blue & Green at Harding's written direction — including the January 20, 2016 written payment instruction — with Kirby copied on the instruction — diverting, and concealing the diversion

of, funds owed to the investors whose recovery the 404224 collateral secured (Exs. 8, 18), 18 U.S.C. §§ 1341, 1343; (b) on August 16, 2017, Harding recorded the fabricated $6,207,943.50 journal entry with no supporting documentation, left more than $4.2 million unpaid to GrowCo, and deconsolidated GrowCo so the parent could use its assets while concealing its losses, transmitting the resulting false financial reports by interstate wire (Ex. 24 at 6), 18 U.S.C. § 1343; (c) at the May 1, 2017 board meeting, Ploen voted with Harding to defeat the independent audit and outside counsel and to refuse production of the general ledger that would have exposed the diversion, representing that "everything is out in the open" (Ex. 22 at 35); and (d) on May 15, 2018, the GrowCo Partners 1 board on which Sam Morris sat ratified the insiders' post-resignation actions, including the eviction of the cash-flow-positive tenant that severed the collateral's revenue stream (Ex. 28). These acts converted and concealed the capital whose repayment the Deed of Trust No. 404224 collateral secured, and were the opening acts of the same scheme — by the same participants, using the same method of concealed insider diversion, against the same secured position — that the enterprise carried to completion in 2019–2026.

62. The Era 2 acts are pleaded as predicates in the alternative, and nothing in them takes this claim outside 18 U.S.C. § 1964(c). Plaintiff does not rely on any conduct actionable as fraud in the purchase or sale of securities: the acts pleaded above are the diversion and concealment of funds already owed to GrowCo and its secured investors — creditor and collateral injury, not securities-purchaser injury. Nor does the Paulson settlement (D. Colo. No. 19-cv-02639-PAB-NRN) reach them: its release is bounded by the Class Action allegations concerning the October 2014 – December 2017 offerings, and § 1.cc expressly preserves "collection of any

amounts due under the GrowCo securities" — the very collection right, secured by Deed of Trust No. 404224, whose impairment and attempted extinguishment Plaintiff pleads here. In any event, whether or not treated as actionable predicates, the Era 2 acts establish the origin, method, relatedness, and continuity of the pattern and the concealment on which the discovery-rule tolling pleaded below rests.

63. On or about October 18, 2019, the enterprise sold the 5080 Bar 10 Road parcel in El Paso County, Colorado, for $56,500 — below the assessor's contemporaneous residential-land value — and, through the title-company closing and interstate wires, disbursed the proceeds to the insider circle on identical, pre-set "partial payoff" tickets of $2,429.02 each to Elevation Fund, LLC (controlled by defendant Kirby), JMW Fund, LLC, Richland Fund, LLC, and San Gabriel Fund, LLC, together with a payoff to defendant Harding and a payment to the Morris-affiliated Cotswold Foundation, and wired the net proceeds to the enterprise's Scottsdale mailbox — disclosing none of it to the secured investors or beneficiaries of the 404224 collateral. The identical allocation across four affiliated funds, the single title agent, and the single brokerage, repeated on the successive closing below, evidence a pre-arranged self-dealing distribution rather than arm's-length lender economics. (Ex. 35.)

64. On or about December 20, 2019, the enterprise sold the 5185 Henderson Lane parcel for $57,000 — again below the assessor's residential-land value — disbursed proceeds to the same insider circle on identical "partial payoff" tickets of $4,251.55 each, and wired $22,625.50 in net proceeds to the same Scottsdale mailbox, again without disclosure to the secured investors or beneficiaries. (Ex. 36.)

65. The enterprise then drained the proceeds from the subsidiary: on or about January 31, 2020, $72,540.49 — substantially the entire balance of TR El Paso Land's account no. 2653057727, addressed to the Scottsdale mailbox — was removed by verbal instruction recorded only as "per Chad," with no payee disclosed on the statement, concealing the destination of the proceeds. "Chad" is Chad Harrington, defendant Greg Harrington's brother — listed in Two Rivers' own records as a member of management and a signer on company bank accounts, and the person handling the El Paso closings in that period. (Ex. 37.)

66. The enterprise concealed these asset dispositions from the secured investors and the 404224 beneficiaries by causing Two Rivers to cease filing the periodic reports required of an SEC-registered issuer after its third-quarter 2019 Form 10-Q. Approximately 1,689 acres left the company during the resulting reporting blackout with no Form 10-K, 10-Q, or 8-K disclosing the dispositions or the related-party payoffs, and the Securities and Exchange Commission revoked the registration of all classes of Two Rivers securities effective August 19, 2022. (Ex. 41.)

67. On May 5, 2023, the enterprise, acting jointly with the State, executed the Stipulation that extracted $2,000,000 and directed the bankruptcy filings whose stated purpose was to "clear title" on the assets securing the GrowCo investors — turning the enterprise's asset-stripping method against the 404224 secured collateral itself. (Ex. 44.)

68. In 2024, the enterprise caused the Two Rivers debtor to file Adversary Proceedings 24-01111 and 24-01112, using the mails and the courts in an effort to declare the 404224 and 404225 Deeds of Trust void as to the secured investors and complete the extinguishment of the secured position. (Ex. 48.)

69. In furtherance of the same objective, the enterprise — through Harrington's February 2, 2024 solicitation to the Securities Commissioner and Assistant Attorney General Kidd-Aaron to "take appropriate action" against Plaintiff (Ex. 47 at 2) and the jointly executed Stipulation — procured the State's April 14, 2026 Contempt Citation, which charges as contempt Plaintiff's federal filings themselves — a bond exchange proposed in his Chapter 11 plan on the public docket of the United States Bankruptcy Court, to issue pursuant to 11 U.S.C. § 1145(a) — that is, only upon federal-court approval of a disclosure statement and confirmation of the plan, and a board resolution of VetaNova, Inc., an SEC-reporting company — and seeks, by a motion requesting ex parte relief, a $25,000 fine, attorney fees, orders compelling Plaintiff to rescind the plan offering, to inform every offeree of his own twenty-year disqualification, and to return any funds obtained, and punitive incarceration of "no less than 90 days, and as much as 179 days" — one day below the six-month threshold at which the citation's own advisement recognizes the right to a jury trial — with imprisonment available until performance (Ex. 52 at 6, 29–31). The State thereby seeks to jail Plaintiff for his federal-court filings unless he undoes them. The citation itself documents the coordination behind it: the State's investigator affirms that he contacted counsel appearing for defendants Wistar Morris and Ploen in this action, and that she supplied him Plaintiff's March 28, 2026 communication to the beneficial owners — her March 31, 2026 forwarding email is the citation's own Exhibit D (Ex. 52, Verification ¶¶ 10–11 & Ex. D) — and the citation was filed at 8:55 a.m. on April 14, 2026, the morning of the 1:30 p.m. federal bankruptcy hearing noticed in the very communication supplied. And since June 11, 2026 — when Plaintiff provided truthful information concerning this same conduct to five federal law-enforcement agencies, noticed on the dockets of this Court (Dkt. 324) and the

Tenth Circuit (No. 26-1190, Doc. 38) — the State Defendants have continued to press the citation and to seek Plaintiff's incarceration, knowing him to be a federal informant. That continuation is retaliation against an informant, 18 U.S.C. § 1513(e) — itself an enumerated racketeering predicate, 18 U.S.C. § 1961(1)(B) — and carries the pattern into 2026. (Ex. 52.)

70. These acts are related: they share the same enterprise and participants, the same method (concealed, below-market, self-dealing dispositions of Two Rivers assets routed through the Scottsdale mailbox and the insider circle, followed by litigation and bankruptcy machinery aimed at the secured collateral), and the same ultimate objective — to loot Two Rivers and defeat the GrowCo investors' recovery on their secured 404224 interest. The pattern is continuous: measured from the 2016–2018 Era 2 conversion pleaded in the alternative above, it extends nearly a decade; measured only from the 2019 closings through the 2024 deed-voiding adversary proceedings and the 2025 effort to clear title, approximately six years — establishing closed-ended continuity on either measure. H.J. Inc. v. Northwestern Bell Tel. Co. The 2016–2018 diversion of GrowCo capital is both the origin of the scheme and, in the alternative, part of the pattern itself. The pattern is also open-ended and threatens continuation: the same objective was pursued most recently through the April 14, 2026 Contempt Citation (Ex. 52), which seeks to coerce Plaintiff into abandoning the federal proceedings that stand between the enterprise and the secured collateral. That same act, by attacking the reorganization that was Plaintiff's means of raising capital and retaining counsel, sought to keep Plaintiff from pursuing recovery at all.

71. Plaintiff was directly injured in his business and property by reason of the pattern — the clouding and attempted extinguishment of his recorded secured interest under Deed of Trust

No. 404224, the impairment of the Paulson-preserved collection rights the deed secures, and the loss of the capital he personally advanced — the more than $1,400,000 contributed into McGrow (Ex. 17) and the $1,218,157 invested in GCP Super Units (Ex. 63). The acts directed at the secured collateral — the May 2023 Stipulation and the 2024 deed-voiding adversary proceedings — proximately caused that injury, which is direct and not derivative of injury to any other person. Plaintiff's injury is direct in a further and independent respect: at all relevant times Plaintiff conducted his investment business as a sole proprietor, in his own name, reporting it on Schedule C of his individual federal income tax returns, so that the business had no legal existence separate from Plaintiff and its income and property were his own. That business earned gross receipts of $648,704 in 2016 — the year of Plaintiff's resignation and the onset of the diversion — and its income then collapsed, to $152,210 in 2017 and to a net loss in 2018, after which the business never again earned a return and, by 2022, no longer operated. The only receipts Plaintiff earned in the final years were from unrelated consulting work — the sale of his own labor — not from the investment business, which the pattern had rendered incapable of earning. That business was three decades in the building, and its principal asset was Plaintiff's documented record of capital formation: twice — with Navidec, Inc. and BPZ Resources, Inc. — Plaintiff built an enterprise from inception to a value exceeding $1,000,000,000 within approximately four years, and in each instance the investors realized their exits before the ensuing market downturn, a record documented in filings with the United States Securities and Exchange Commission available on EDGAR. That record was the business's earning mechanism: it is what secured sponsorship and underwriting from middle-market broker-dealers and the pathway from initial over-the-counter listing to national-

exchange listing for each venture. The State's contempt citation now demands that Plaintiff personally inform every offeree that he "may not participate in the offering or sale of securities" for twenty (20) years (Ex. 52 at 31–32) — a bar the Judgment does not impose; its injunction is limited to private securities transactions (Ex. 51 at 112). A principal falsely described as barred cannot obtain broker-dealer sponsorship or exchange listing; the demanded notice would extinguish what remains of the business's goodwill — property of the sole proprietorship — and that destruction is pleaded as injury to Plaintiff's business and property, in an amount to be proven at trial. The loss thus fell on Plaintiff directly, in his own business and property, and not derivatively through any entity. In the alternative, the Era 2 conversion itself injured Plaintiff in the same property: it created and left unpaid the amounts whose collection the Paulson settlement expressly preserved (§ 1.cc) and whose security the later acts impaired and targeted for extinguishment. The injury Plaintiff pleads is not securities-purchaser injury and does not rest on conduct actionable as fraud in the purchase or sale of securities; it is the impairment and attempted extinguishment of his recorded lien, deed-of-trust collateral, and property-collection rights, effected through asset-stripping and the mails and wires and the litigation and bankruptcy machinery directed at that collateral. See 18 U.S.C. § 1964(c). *Holmes v. Securities Investor Protection Corp.* Because the Era 2 diversion was concealed — the independent audit defeated, the general ledger withheld, the fabricated journal entry undocumented, and GrowCo deconsolidated — and because the later dispositions and their concealment kept the injury hidden until the State and Harrington executed the Stipulation in 2023 and the estate filed the deed-voiding adversaries in 2024, this action, filed in 2025, is timely under the four-year limitations period for civil RICO as to all predicate acts, including

the Era 2 acts pleaded in the alternative. *Rotella v. Wood.* Plaintiff is entitled to treble damages, costs, and attorney's fees under 18 U.S.C. § 1964(c). Plaintiff seeks in this action the recovery of his own direct injury: the capital he personally advanced (more than $1,400,000 into McGrow and $1,218,157 in GCP Super Units), the value of his own GrowCo securities and of the recorded secured interest he holds, and the collapse of his sole-proprietorship investment business, in an amount to be proven at trial and trebled under 18 U.S.C. § 1964(c). The full value the enterprise stripped across Plaintiff and the co-investors — approximately $384,547,374, or $1,153,642,122 trebled, as scheduled in *In re McKowen*, No. 25-16665-KHT, Schedule A/B, Attachment 4.34-708 — is pleaded to establish the scale and object of the scheme; Plaintiff's own direct loss is a component of it, and Plaintiff, appearing pro se, seeks recovery only of that direct loss and does not assert the co-investors' claims. This is distinct from the $19,244,650 residual value of Plaintiff's reorganized VetaNova, Inc. stake that remains, valued on the same Estimated Current Valuation presented in the Debtor's Second Amended Disclosure Statement in that case.

**SEVENTH CLAIM FOR RELIEF**

**Fifth Amendment Takings — Prospective Relief (*Ex parte Young*)**

**— against the individual State Defendants in their official capacities (prospective relief)**

72. Plaintiff re-alleges the foregoing paragraphs. Plaintiff's property-deprivation relief under this Claim is prospective and declaratory, sought against the individual State officials in their official capacities under *Ex parte Young*, as set forth in the Second Claim and the Prayer. The Claim arises directly under the Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment. Plaintiff held protected private property: his recorded

secured lien under Deed of Trust No. 404224, the GCP-1 Preferred priority it secures, the *Paulson*-preserved collection rights, and the capital he personally advanced. The State of Colorado took that property through the May 5, 2023 Stipulation (Ex. 44), to which Plaintiff was not a party and which was entered without notice to or hearing for Plaintiff. In that Stipulation the State endorsed and accepted Greg Harrington — without any disclosure of his prior federal securities-fraud conviction and Ponzi-scheme history (Exs. 1, 2) — as the legitimate Chief Executive Officer of Two Rivers Water & Farming Company and its affiliates; the State claimed $2,000,000 for itself "from the proceeds of any sale of company property"; and the State adopted the position that the recorded secured interests were "fraudulent" encumbrances and directed that the related bankruptcy "clear title on the assets" so encumbered — that is, extinguish the recorded Deed of Trust No. 404224 and the companion Deed of Trust No. 404225 securing the GrowCo investors. The State then entered judgment in favor of the Commissioner in the amount of the investors' losses, $16,578,690.33, and the record shows no distribution of that recovery to the injured investors (Ex. 51). The State took that property without lawful authority and without compensation: the Colorado Securities Act authorizes the Commissioner to recover only "on behalf of the persons injured," C.R.S. § 11-51-602(2), and creates no other cause of action, § 11-51-604(12), so no provision of the Act authorized the State to take the investors' recovery for its own account. The State has paid no compensation. On these facts, Plaintiff seeks prospective relief against the individual State Defendants in their official capacities under *Ex parte Young* — a declaration that those officials may not continue to pursue, under the May 5, 2023 Stipulation, the extinguishment of Plaintiff's recorded Deed of Trust No. 404224 secured interest, and an order prospectively restraining them from further

steps to void or clear title to that interest — framed so as not to enjoin or set aside any pending state-court proceeding.

**EIGHTH CLAIM FOR RELIEF**

**Conspiracy to Intimidate and Retaliate Against a Federal-Court Party and Witness — 42 U.S.C. § 1985(2) (first clause) — against Harrington and the individual State Defendants**

73. Plaintiff re-alleges the foregoing paragraphs. Plaintiff is a party and witness in proceedings in the courts of the United States, including In re McKowen, No. 25-16665-KHT (Bankr. D. Colo.), and its pending appeal, No. 26-cv-02108-CNS (D. Colo.); the adversary proceeding McKowen v. State of Colorado, Adv. No. 26-01111-KHT; and this action. Harrington and the individual State Defendants conspired to deter Plaintiff, by force, intimidation, and threat, from attending and prosecuting those federal proceedings freely, fully, and truthfully, and to injure him on account of his having done so. In furtherance of that conspiracy — evidenced by Harrington's February 2, 2024 letter soliciting that the State "take appropriate action" against Plaintiff (Ex. 47) and the jointly executed Stipulation — and documented inside the citation itself, whose verification affirms that the State's investigator contacted counsel of record for defendants Wistar Morris and Ploen in this action and received from her Plaintiff's creditor communications, incorporated as the citation's Exhibit D (Ex. 52, Verification ¶¶ 10–11 & Ex. D) — the State Defendants filed the April 14, 2026 Contempt Citation, at 8:55 a.m. on the morning of the 1:30 p.m. federal bankruptcy hearing, which charges Plaintiff's federal bankruptcy filings themselves as the contempt and seeks, by a motion requesting ex parte relief, fines, rescission of the plan offering, compelled notice by Plaintiff to every offeree of his

own disqualification, and punitive incarceration of no less than 90 and as much as 179 days — one day below the citation's own six-month jury-trial threshold — with imprisonment available until performance — relief that would compel Plaintiff to undo his federal filings or go to jail (Ex. 52 at 6–7, 32). The first clause of § 1985(2) requires no racial or class-based animus. Kush v. Rutledge, 460 U.S. 719 (1983). Plaintiff was injured thereby and may recover damages under 42 U.S.C. § 1985. The State Defendants are sued in their individual capacities; Harrington is liable as a private conspirator. Plaintiff is, in addition, a federal whistleblower: his June 11, 2026 criminal referrals of the same conduct to five federal agencies are noticed on the dockets of this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), and the intimidation pleaded here seeks to force the abandonment of the federal proceedings in which he is party, witness, and referring complainant. The coercive structure is explicit: imprisonment until performance — jail unless Plaintiff undoes his federal filings. The object of that coercion was not only to force withdrawal of the federal filings but to disable Plaintiff's capacity to pursue these claims at all. The Chapter 11 reorganization the citation attacked was the vehicle through which Plaintiff — who is without capital and litigates pro se — would have reorganized, raised capital, and retained counsel to prosecute these claims against the enterprise and the State. That reorganization was dismissed on May 11, 2026, and the dismissal is now on appeal (No. 26-cv-02108-CNS). The coordinated attack on it — the State's objection lodged inside the bankruptcy and the contempt filed hours before the disclosure hearing — shared a single object: to keep a seventy-six-year-old pro se litigant from pursuing his claims and from raising the capital to retain counsel, leaving the enterprise's capture of the secured collateral unchallenged. And the filings the contempt targets are the proceedings in which the

State faces the consequences of its own acts: its attorneys' out-of-court transactional conduct in the Stipulation, outside the reach of prosecutorial immunity (¶ 54); its Proof of Claim No. 19 in In re McKowen, No. 25-16665-KHT, by which it submitted its judgment to federal bankruptcy jurisdiction; and its monetary recovery taken in the investors' name, which placed that recovery within the scope of the federal Paulson judgment (¶ 50). Plaintiff is the party positioned to pursue those consequences; the contempt threatens imprisonment unless he abandons the proceedings that would impose them. The State Defendants' continuation of that coercion after June 11, 2026 — against a known federal informant — is conduct Congress has made criminal. 18 U.S.C. § 1513(e).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

74. Declare, in aid of this Court's retained jurisdiction over the implementation of the *Paulson* judgment, that:

(a) the Class Members' GrowCo securities, the preserved collection rights, and the Deed of Trust No. 404224 enforcement rights securing them were retained by the Class Members and were not released or extinguished by the *Paulson* Settlement, Final Judgment, or Complete Bar Order;

(b) the State's monetary recovery of the GrowCo investors' losses against Plaintiff, and the deed-voiding bankruptcy claims, conflict with and are barred by that federal judgment to the extent they seek that investor recovery or the extinguishment of those preserved rights;

(c) the bound Defendants — Harrington, Two Rivers, TR Capital, and Two Rivers Farms F-2 — may not use or enforce the Stipulation or the deed-voiding bankruptcy claims to reassert the released claims or reach the preserved collection security;

(d) the retained GrowCo securities and collection rights were, by the Final Order's own terms, transferable, and were validly assigned, so that Plaintiff, as holder of legal title, may enforce the preserved rights he asserts here; and

(e) the GrowCo investors' offering-loss and collection claims, having been adjudicated, barred, and preserved by the *Paulson* judgment, may not be asserted or recovered by any person or entity — including any governmental entity — claiming "by or through, on behalf of, for the benefit of, derivatively for, or as representative of" the Class Members; and the State's monetary recovery, obtainable under C.R.S. Section 11-51-602(2) only "on behalf of the persons injured," is such a representative assertion and is governed and barred by that federal judgment.

This declaration leaves the state-court judgment's regulatory injunction and the State's independent regulatory remedies wholly intact;

75. Enter prospective relief against the individual State Defendants in their official capacities under Ex parte Young — specifically, a declaration that those officials may not continue to pursue, under the May 5, 2023 Stipulation, the extinguishment of Plaintiff's recorded Deed of Trust No. 404224 secured interest, and an order prospectively restraining them from further

steps to void or clear title to that interest — framed so as not to enjoin or set aside any pending state-court proceeding;

76. Award compensatory and punitive damages against Harrington, Harding, Kirby, Yorke, I. Wistar Morris, Sam Morris, and Ploen, against the corporate Defendants, and against the individual State Defendants in their individual capacities, in an amount to be proven at trial;

77. Award treble damages, costs, and attorney's fees under 18 U.S.C. § 1964(c);

78. Award damages under 42 U.S.C. § 1985 against Harrington and the individual State Defendants, in their individual capacities, for the conspiracy to intimidate and retaliate against a federal-court party and witness, as set forth in the Eighth Claim; and

79. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted this 13th day of July, 2026.

*/s/ John R. McKowen*
John R. McKowen
Pro Se Plaintiff
5200 South Quebec Street, #117
Greenwood Village, CO 80111
Telephone: 303-248-6883
Email: john@johnmckowen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of July, 2026, I submitted the foregoing for filing by e-mail to the Clerk of the United States District Court for the District of Colorado pursuant to the Court's Procedures for Pro Se Electronic Filing. Upon docketing, the foregoing will be served on counsel of record via the Court's CM/ECF system. I further certify that on this same date, I served a copy of the foregoing via e-mail on Defendant Wayne Harding, a non-CM/ECF participant who appears pro se, at wayne@wayneharding.com.

*/s/ John R. McKowen*
John R. McKowen