**EXHIBIT B**

**COMPARISON COPY PURSUANT TO D.C.COLO.LCivR 15.1(b)**

This comparison copy shows the changes between Plaintiff's Amended Complaint (Dkt. 49) and the proposed Second Amended Complaint. Text struck through in red is deleted from the Amended Complaint; text underlined in black is added by the proposed Second Amended Complaint. Because the proposed Second Amended Complaint comprehensively re-pleads the action in response to the Court's June 23, 2026 Order (Dkt. 326), the comparison reflects revision of substantially all text.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. ~~1:~~25-cv-00708-PAB-NRN

JOHN R. McKOWEN,

Plaintiff,

v.

GREG HARRINGTON,

TWO RIVERS FARMS F-2, INC~~.~~.,

TWO RIVERS WATER & FARMING COMPANY,

TR CAPITAL PARTNERS, LLC,

WAYNE HARDING ~~STATE OF COLORADO~~,

ATTORNEY GENERAL PHILIP WEISER,

SECURITIES COMMISSIONER TUNG CHAN,

ROBERT FINKE,

JENNIFER HUNT,

INDIA KIDD-AARON,

I. WISTAR MORRIS,

SAM MORRIS,

CHARLES F. KIRBY,

JEFFREY PLOEN,

JUSTIN YORKE,

Defendants.

---

## PROPOSED SECOND AMENDED COMPLAINT

## PRELIMINARY STATEMENT — PRO SE CONSTRUCTION

Plaintiff proceeds pro se. The pleadings of a pro se litigant are construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, and the Court accepts the well-pleaded factual allegations as true and draws all reasonable inferences in Plaintiff's favor. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Plaintiff respectfully requests that this Second Amended Complaint be so construed.

Plaintiff John R. McKowen, appearing pro se, for his Second Amended Complaint, alleges as follows. This pleading is submitted with Plaintiff's Response to the Court's Order to Show Cause (Dkt. 326) to demonstrate that amendment is not futile and that each deficiency the Court identified is cured by specific, documented, defendant-by-defendant allegations.

## INTRODUCTION

~~[1.] This case arises from a multi-tiered scheme involving four core fraudulent events executed or enabled by three distinct categories of actors. These events include: (1) the misappropriation of investor capital through a Ponzi-like scheme; (2) the improper VAXA transaction transferring control of corporate assets; (3) the misuse of a federally-approved settlement agreement (the Paulson Settlement) to suppress and eliminate preserved investor rights; and (Exhibit 1) the unauthorized dissolution and asset redistribution of Two Rivers~~

Case No. 1:25-cv-00708-PAB-NRN Document 340-2 filed 05/13/26 USDC Colorado pg 3 of 78

Water & Farming Company without shareholder approval.

[2.] Defendants fall into three interrelated groups: (a) those who originated or directly facilitated the fraud ("Originators"); (b) state actors who failed to intervene, selectively prosecuted, or affirmatively protected the wrongdoing ("Enablers"); and (c) those who subsequently exploited the fraud through manipulation of legal process ("Opportunists").

[3.] Collectively, these coordinated or compounding actions resulted in the deprivation of Plaintiff's vested property rights, the unlawful dilution and reallocation of investor capital, and ongoing constitutional violations under color of state law.

This action does not seek to overturn, appeal, or modify the State of Colorado's judgment against Plaintiff. That judgment is on appeal in the Colorado appellate courts, where it will be decided. This is Plaintiff's pro se case against the private actors and the individual Colorado officials who, acting under color of state law, sanctioned the taking — from which the State profited — of the water and farming assets adjudicated by this Court in Paulson, No. 19-cv-02639-PAB-NRN (D. Colo.): civil claims under the Racketeer Influenced and Corrupt Organizations Act against the private actors who executed the taking, and federal civil-rights and takings claims against the state officials who sanctioned the taking from which the State profited. Those assets were stolen by insiders, transferred without consideration to a securities fraud felon, Greg Harrington, and endorsed by securities regulators without disclosure of Harrington's past, without notice or hearing, and without disclosure that Harrington is both a releasor and a releasee in *Paulson*. The State has threatened Plaintiff — the whistleblower in this case (Ex. 25) — with jail for unfounded violations resting on intentional misinterpretations of what its own Judgment states: its citation demands that Plaintiff rescind the offering made through his federal bankruptcy filings, personally inform every offeree that he may not participate in "the offering or sale of securities" for twenty years — words broader than the Judgment's own injunction — and return funds (Ex. 52 at 31–32). The object is coercion: Plaintiff had sworn his claims at $1,191,142,124 in his bankruptcy schedules on March 2, 2026 — the State filed its own proof of claim on April 7, 2026 —

submitting its claim to the estate's same-transaction counterclaims, 11 U.S.C. § 106(b) — and its citation issued ex parte seven days later, threatening jail unless Plaintiff undid the filings that created that exposure. Plaintiff has referred the conduct described in this Complaint to five federal investigative and prosecutorial agencies, including the United States Department of Justice and the Federal Bureau of Investigation; retaliation against him for those reports is itself a federal crime, 18 U.S.C. § 1513(e), and is pleaded below as a predicate act.

1. This case concerns the State-sanctioned taking of more than $50,000,000 in land and water assets — approximately $54,900,000 on the Estimated Current Valuation presented in the Debtor's Second Amended Disclosure Statement in *In re McKowen*, No. 25-16665-KHT (Bankr. D. Colo.) — standing behind approximately 800 shareholders of record — 544 on the certified transfer-agent shareholder register of VetaNova, Inc. alone (Olde Monmouth Stock Transfer, July 25, 2022), and approximately 254 holders of record of Two Rivers Water & Farming Company by that company's own final Form 10-K — whose whistleblower the State has threatened with jail unless he withdraws his federal filings. The case spans four connected eras, each building on the last. The first era built the property; the following three took it — with one object throughout: to capture the assets of Two Rivers Water & Farming Company and its subsidiaries and to extinguish the recorded security and the federally preserved collection rights of the GrowCo investors, for the benefit of the State of Colorado and a private actor, Greg Harrington. First, from 2014 to May 2016, under Plaintiff's management, the enterprise was built lawfully: a capital structure subject to independent audit, investor capital deployed into the land, water, and greenhouse assets themselves, and a recorded security — Deed of Trust No. 404224, recorded September 25, 2015 — protecting the GrowCo investors' right to repayment (Era 1). Second, after Plaintiff resigned all management positions in May 2016, the insiders who assumed control converted a lawful, audited capital structure into a concealed Ponzi scheme — continuing to solicit investor money while diverting the capital already raised — and defeated the independent audit that would have exposed the diversion (Era 2). Third, with the diversion concealed, the pending Vaxa

Case No. 1:25-cv-00708-PAB-NRN Document 349 filed 05/13/25 USDC Colorado pg 5 of 78

transaction was stripped of its deal protections in October 2018, the sitting board resigned en masse the following month, and a replacement board seated by the sole remaining officer closed the February 2019 bait-and-switch that delivered the company to Greg Harrington, a convicted securities felon, who took the platform without a shareholder vote and stripped its land, water, and proceeds through concealed, below-market insider dispositions (Era 3). Fourth, when the asset-stripping reached the one interest it could not remove — the recorded Deed of Trust No. 404224 securing the GrowCo investors' right to repayment — Harrington and the State of Colorado jointly executed the May 2023 Stipulation, which routed $2,000,000 to the State, released the Harrington-controlled Respondents, and directed bankruptcy filings whose stated purpose was to "clear title" on the collateral: the final act, aimed at erasing the security for the very capital the scheme had converted (Era 4). Plaintiff is the largest individual GrowCo investor, the holder of the recorded beneficiary rights under Deed of Trust, Reception No. 404224, and a person who personally invested and advanced millions of dollars of his own capital — including a $1,218,157 purchase of GCP Super Units preferred interests and more than $1,400,000 contributed into McGrow — to keep the enterprise alive after he resigned all management positions in May 2016. A supermajority of the GrowCo investors — 77.36% — voluntarily and lawfully reorganized their GrowCo investment into VetaNova, Inc., the assignment the Paulson Final Order expressly protected (Ex. 46 ¶ 15). The value the enterprise stripped from Plaintiff and the co-investors across the four eras totals approximately $384,547,374 — $1,153,642,122 when trebled under 18 U.S.C. § 1964(c) — a figure pleaded, as set out in the Sixth Claim, to establish the scale and object of the scheme. Plaintiff seeks recovery of his own direct injury — the capital he personally advanced, his recorded secured interest under Deed of Trust No. 404224, his GrowCo securities, and his sole-proprietorship investment business — and does not assert the co-investors' claims. That direct loss is distinct from the residual that survived the stripping — Plaintiff's reorganized VetaNova, Inc. stake, valued at $19,244,650 (35.0540%) on the same Estimated Current Valuation — which is what

remains after the taking, not a measure of it; the residual and the loss together state the rightful value of the position the scheme consumed.

2. What this action does not seek, and what it enforces. No claim in this action seeks to set aside, reverse, or enjoin the state-court judgment in *Chan v. Two Rivers*, No. 2021CV33922 (Denver Dist. Ct.), which is on appeal in the Colorado courts. Each claim instead enforces an independent federal right: the First Claim enforces this Court's own federal *Paulson* judgment under the Supremacy Clause and 28 U.S.C. §§ 2201–2202; the civil-rights claims enforce Plaintiff's rights under the Fourteenth and Fifth Amendments through 42 U.S.C. §§ 1983 and 1985(2), the latter reaching the State officials' and Harrington's retaliation against Plaintiff for his participation as a party and witness in the federal proceedings and his reports to federal law enforcement (18 U.S.C. § 1513(e)); and the racketeering claim enforces 18 U.S.C. § 1964(c) against the private actors. These are federal questions this Court may decide without disturbing the state judgment or the State's independent regulatory remedies.

3. The State conceded in 2019 that Plaintiff had no control over the company's funds or assets after his resignation. It nonetheless prosecuted him, and in 2023 it entered into a Stipulation with Harrington — without notice to Plaintiff and without any adjudication binding on him — that routed $2,000,000 to the State, released and dismissed the Harrington-controlled Respondents, and set in motion a bankruptcy plan whose stated purpose was to clear title on the assets securing the GrowCo investors.

4. Plaintiff brings federal civil-rights claims under 42 U.S.C. §§ 1983 and 1985(2) against the individual state officials and the private actor who acted jointly with them, a civil claim under the Racketeer Influenced and Corrupt Organizations Act, and related claims. Consistent with *Will v. Michigan Department of State Police*, Plaintiff asserts the § 1983 claims against the individual defendants only — in their individual capacities for damages and in their official capacities for prospective relief under *Ex parte Young*. Plaintiff does not ask this Court to sit in appellate review of, or to enjoin, any state-court proceeding; he does ask this Court to declare, under the supremacy of the federal Paulson judgment, that the State's recovery on the GrowCo securities is barred, as set forth in the First Claim.

Case No. 1:25-cv-00708-RBJ-NRN Document 40 filed 05/14/25 USDC Colorado pg 7 of 78

Separately, Plaintiff pleads a Fifth Amendment takings claim drawn to the jurisdictional lines: the relief sought is prospective declaratory and injunctive relief against the responsible state officials under Ex parte Young, as set forth in the Seventh Claim.

**JURISDICTION AND VENUE**

5. This Court has subject-matter jurisdiction under 28 U.S.C. §§§ 1331 and 28 U.S.C. § 1343, as Plaintiff brings because the claims arise under 42 U.S.C. §§§ 1983, 1985the First, Fifth, and Fourteenth Amendments, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962. Supplemental§§ 1961–1968.

6. The Court has supplemental jurisdiction over the state-law claims is properclaim under 28 U.S.C. § 1367.(a) and authority to grant declaratory relief under 28 U.S.C. §§ 2201–2202. Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to the claims occurred in this district and multiple Defendants reside or conduct business here.

Venue is proper in the District of Colorado under 28 U.S.C. § 1391(b), because all or a substantial part of the events or omissions giving rise to these claims occurred in this District, and the property and parties involved are located in Colorado.).

[4.] This Court also has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**PARTIES**

[5.] The individuals and entities named below ("Defendants") are listed in the order they appear in the case caption. Each is linked to one or more of three factual "Eras" defined in the Complaint's chronology. These Eras represent distinct time periods and types of misconduct that occurred after Plaintiff's resignation:

Case No. 1:25-cv-00788-PAB-NRN Document 30-2 filed 05/13/26 USDC Colorado pg 8 of 78

**Era 2** (2016–2018): Insider misappropriation and Ponzi-style concealment.

**Era 3** (2019–Present): Fraudulent conversion of assets through the Vaxa acquisition.

**Era 4** (2017–Present): State-enabled enforcement of fraud through misuse of legal authority.

[6.] Each defendant is assigned only to the Era(s) during which they acted. This structure ties each party's role to specific facts, time periods, and claims asserted.

~~[7.] Greg Harrington — Era 3; Era 4~~

~~Greg Harrington is a convicted securities felon who in 2019 gained control of Two Rivers Water & Farming Company through a merger with Vaxa Global, a Colorado-registered shell entity under his control. He signed the Q3 2019 10-Q as CEO and presented himself publicly as a fiduciary through a company called Fenner & Beane, LLLP—a name taken from a brokerage dissolved in 1941. In 2023, Harrington executed a document titled "Stipulation for Injunction and Other Relief," which was accepted by the Colorado Attorney General's Office without hearing, notice, or confirmation of corporate authority. The stipulation was used to initiate bankruptcy filings and an adversary proceeding aimed at extinguishing the lien rights of over 140 secured GrowCo investors. Harrington continues to control the Butte Valley greenhouse facility through a family member operating without investor approval or compensation.~~

7. Plaintiff John R. McKowen is a Colorado resident; the largest individual investor in GrowCo Partners 1, LLC; the Liquidator of VitaNova Partners, LLC (the dissolved holding entity, distinct from the SEC-reporting successor VetaNova, Inc.); and the holder of the recorded beneficiary rights under Deed of Trust, Reception No. 404224. He resigned all officer and director positions at Two Rivers Water & Farming Company effective May 26, 2016.

8. Defendant Greg Harrington is a private individual who acquired control of Two Rivers in 2019 and who, as alleged below, acted under color of state law through coordinated, jointly executed conduct with the State officials. He was convicted of federal securities fraud (United States v. Harrington, D. Colo. No. 1:93-cr-00131) and has been the subject of multiple adjudicated fraudulent-transfer and Ponzi proceedings.

9. Defendant Wayne Harding was the chief financial officer of Two Rivers and GrowCo and directed the financial transactions that effected and concealed the diversion of GrowCo investor capital.

10. Defendant Charles Francis Kirby, who appears in the enterprise's own records, including the recorded deed's beneficiary schedule and the TR Capital ownership schedule, as "Charles B. Kirby," is a securities professional barred by the U.S. Securities and Exchange Commission who operated through affiliated entities, including Elevation Fund, LLC, Blue Yellow, LLC, and Blue & Green, LLC.

11. Defendant I. Wistar Morris is a controlling member of TR Capital Partners, LLC and a holder of GrowCo securities.

12. Defendants Philip Weiser (Attorney General), Tung Chan (Securities Commissioner), Robert Finke and Jennifer Hunt (Assistant Attorneys General), and India Kidd-Aaron (Assistant Attorney General) — collectively, the "individual State Defendants" — are sued in their individual capacities for damages and in their official capacities for prospective relief.

~~1.~~ 13. Defendants Two Rivers Farms F-2, Inc~~. — Era 4 Entity that granted the GrowCo Deed of Trust securing investor capital in land and water rights. In 2023, it was placed into bankruptcy without corporate authority or creditor notice. The Stipulation used to support the filing was never adjudicated. Farms F-2 was then used to launch Adversary Proceeding No. 24-01111-KHT targeting the lien rights of over 140 secured investors.~~., Two Rivers Water & Farming Company~~ — Era 2; Era 3; Era 4 - Parent entity~~, and TR Capital Partners, LLC are the corporate entities through which ~~investor~~the capital was ~~misclassified and insider control transferred. Its name was later used to execute the Stipulation without vote or legal authority.~~

[8.] **TR Capital Partners, LLC — Era 2; Era 3; Era 4** - Conduit for asset redirection and insider control. Executed the Vaxa transaction and was falsely designated in the Stipulation as a controlling party.

[9.] **Wayne Harding — Era 2; Era 3** - As CFO and later CEO, misclassified $8 million in investor capital and approved the Vaxa transaction. Failed to perform required diligence on Harrington's criminal background.

[10.] **State of Colorado — Era 4** - Endorsed and enforced a fraudulent Stipulation despite actual and constructive knowledge of Harrington's disqualification and lack of authority. Suppressed Plaintiff's lien enforcement rights.

[11.] **Attorney General Philip Weiser — Era 4** - Directed the Department of Law during the suppression of Plaintiff's rights and the enforcement ofraised and the assets stripped, and which, with the fraudulent Stipulation.

[12.] **Securities Commissioner Tung Chan — Era 4** - Ignored complaints, failed to investigate Harrington's fiduciary role, and permitted violations of investor protections preserved under entities identified in the Paulson Settlement.

[13.] **Robert Finke — Era 4** - Senior counsel who failed to intervene despite awareness of Harrington's control and the legal defects in the filings.

**Jennifer Hunt — Era 4** – Senior counsel for Chan who appeared in court as a Sixth Claim, constitute the association-in-fact witness while invoking privilege to block cross-examination. Refused to produce a 30(b)(6) witness and relied on the Stipulation in place of evidenceenterprise.

[14.] **India Kidd-Aaron — Era 4** - Co-authored and signed the Stipulation. Advanced it without board approval or judicial process, materially aiding Harrington's scheme.

[15.] **I. Wistar Morris — Era 2** - Insider and beneficiary of investor distributions sourced from misappropriated funds. Participated in or tolerated the Ponzi structure.

[16.] **Sam Morris — Era 2** - Board member and legal counsel to his brother. Failed to act against capital diversion while holding fiduciary responsibility.

[17.] **Charles F. Kirby — Era 2; Era 3** - Barred securities professional who used proxies to raise and redirect funds. On information and belief, supported the Vaxa transaction knowing Harrington's record.

[18.] **Jeffrey Ploen — Era 2** - GrowCo board member who blocked internal audit requests and enabled concealment of misclassified investor capital.

[19.] **Justin Yorke — Era 2; Era 3** - Two Rivers director during the misappropriation and conversion phases. Likely received insider benefit from asset diversion.

[20.] **Debra Reynolds — Era 4** - As Public Trustee, refused to process Plaintiff's foreclosure filing. Her office's refusal obstructed statutory enforcement of secured rights.

## FACTUAL BACKGROUND

**Era 1: — Lawful Capital Formation (2002 – May 26, 2016)**

This era was defined by lawful 14. Between 2014 and 2017, GrowCo raised capital formation, documented compliance, and the execution of a transparent agricultural and infrastructure development plan. from investors to construct greenhouse facilities. The GCP-1 Operating Agreement (Jan. 12, 2015) granted the Preferred Members a priority repayment right under Section 13.03(c) (Ex. 4 at 32). To secure those obligations, the grantors recorded a Deed of Trust in Huerfano County on September 25, 2015, Reception No. 404224, encumbering land and water rights for the benefit of the

GCP-1 Preferred Members (Ex. 6). This recorded secured interest, and the collection rights the Paulson settlement preserved, are the property at the center of this action.

15. From 2002 through 2016, Plaintiff led the formation, capitalization, and development of Two Rivers and its affiliates, including GrowCo and TR Capital Partners. He raised over $40 million through SEC-compliant Rule 506(c) offerings and developed over 7,900 acres across El Paso, Pueblo, and Huerfano Counties, including senior water and reservoir rights. The 2015 Form 10-K was audited by Eide Bailly LLP, which issued an unqualified opinion, and the company reached a $32.7 million public market capitalization. Plaintiff resigned from all positions of control on May 26, 2016 (Ex. 10 at 2).

16. Plaintiff resigned all management positions at Two Rivers effective May 26, 2016 (Ex. 10 — Form 8-K). In 2019, the State moved to dismiss a contempt citation against Plaintiff with prejudice, conceding in its own words that discovery had produced “no evidence … that Mr. McKowen retained sufficient ability, either directly or indirectly, to control the funds or assets” of Two Rivers or its subsidiaries following his resignation, and the court granted the dismissal with prejudice (Ex. 34). That concession covers the same post-resignation period in which the misappropriation alleged below occurred.

**Era 2 — The Ponzi Scheme and Concealment (May 26, 2016 – 2018)**

17. Once control passed to insiders, they made an undisclosed decision: to stop investing in the build while continuing to solicit and accept new investor funds, diverting that capital to repayment of prior obligations — converting a lawful structure into a concealed Ponzi scheme. At least $8 million in investor capital was misclassified as general-and-administrative expense. The use-of-proceeds language itself shows the turn (Ex. 9, 12, 20); note interest was redirected to the insider entity Blue Yellow (Ex. 8); and $729,103.15 was paid to Defendant Kirby’s vendor entity Blue & Green (Ex. 18 at 1).

18. On June 27, 2016, Plaintiff put then-chief-executive Harding on written notice that the raise “could become a Ponzi scheme,” that money raised “for the stated purpose of building greenhouses” was “in

fact being spent primarily to pay interest to others and salaries," and directed Harding to account for the proceeds (Ex. 13).

19. After his resignation, and during the very period in which the State conceded he had no control, Plaintiff personally contributed more than $1,400,000 of his own funds into McGrow — capital contributions, loans, and the payment of the enterprise's legal expenses — to keep the business alive (Ex. 17). That sum was in addition to his $1,218,157 purchase of GCP Super Units preferred interests (Ex. 63), his initial capital contribution into McGrow, and the revolving credit facility of up to $10,000,000 that his VitaNova, LLC extended to GCP Super Units on June 1, 2018 (Ex. 64). Plaintiff was thus directly injured in his own property: his recorded secured interest, his GrowCo securities, and the capital he personally advanced.

20. The diversion was concealed. At the May 1, 2017 GrowCo board meeting, Defendant Ploen voted with Harding to defeat the independent audit and refuse production of the general ledger (Ex. 22). On August 16, 2017, a fabricated journal entry of $6,207,943.50 was recorded by Harding with no supporting documentation; more than $4.2 million was left unpaid to GrowCo; and GrowCo was deconsolidated so the parent could use its assets while not reporting its losses (Ex. 24 at 6).

21. Rather than steward the producing asset, Harding took on Black Mountain "death-spiral" convertible financing — a term sheet dated March 21, 2017 and a securities purchase agreement, note, and warrant executed April 26, 2017 — which matured into a dilutive pump-and-dump cycle that collapsed the share price and left the public company upside down (Ex. 40).

22. GCP-1 was nonetheless a real, operating greenhouse: the tenant, Amerijuana, produced product and paid rent (Ex. 26), corroborated by site camera footage (Ex. 27).

23. On May 15, 2018, the insider-controlled board ratified the eviction of the cash-flow-positive tenant Amerijuana (Ex. 28), severing the project's last revenue stream; the eviction was thereafter completed through the Pueblo County District Court, No. 2018CV30282. The operative act was the board's decision to destroy the project's income.

24. Plaintiff reported the misappropriation to the Colorado Securities Commissioner beginning in 2017 and formalized the report on July 13, 2018 through his counsel, Tobin D. Kern, Esq., of Volant Law (Ex. 25 at 4) — the protected activity the later State enforcement action retaliated against.

**Era 3 — The Vaxa Bait-and-Switch and Asset Seizure (2019 – Present)**

25. Greg Harrington is a convicted securities felon (United States v. Harrington, D. Colo. No. 1:93-cr-00131; a 2006 Zions Ponzi co-defendant) (Exs. 1, 2) who solicited under the defunct 1941 brokerage name "Fenner & Beane" (Ex. 38).

26. Harrington's move was a bait-and-switch, and the deal papers document the switch. On June 20, 2018, Two Rivers signed a letter of intent to acquire Vaxa on protected terms: an initial payment of $1,500,000 in market-priced shares, a purchase price capped by an earn-out at ten times EBITDA, and a valuation validated by an independent fairness opinion and appraisal (Ex. 56). On October 22, 2018, a revised, binding letter of intent stripped those protections: the fairness-opinion requirement was eliminated, the initial payment became 30,000,000 newly issued shares delivered at closing, and the earn-out multiple fell from ten times to 2.5 times EBITDA (Ex. 57). The following month the entire board of directors resigned; in December 2018 Harding — by then sole officer, chief executive, chief financial officer, and chairman — appointed a replacement board of his and Harrington's choosing (Two Rivers 2018 Form 10-K, Part III); the parties executed the Share Exchange Agreement on February 22, 2019, and the transaction closed on the stripped terms on July 31, 2019 (Ex. 32, Note 8). Rather than invest, Harrington merged Two Rivers with his own shell, Vaxa — which held negative equity of $582,071 — for which Two Rivers issued 30,000,000 unrestricted shares, priced at $13.2 million with a $14.1 million goodwill plug. No shareholder vote was held, no board resolution was adopted, and no cash changed hands (Ex. 29, 30, 32, 33). Harrington signed both sides of the transaction (Easby Land & Cattle Company and GRAMZ Holdings). Having acquired roughly $50 million in hard assets, he took the company private: after the third-quarter 2019 Form 10-Q, Two Rivers ceased all public reporting (Ex. 32). Every asset so acquired was thereafter either sold — with

the proceeds routed to the insider circle and the Scottsdale mailbox, as pleaded below — or remains in Harrington's possession and control to this day; he paid nothing for any of it, and neither the assets nor their proceeds have ever reached the secured investors.

27. Harrington then leased the 158-acre Butte Valley parcel to his affiliate Vaxa for $50,000 per year, effective March 15, 2019, without approval or disclosure (Ex. 31).

28. He stripped the El Paso County land: the October 18, 2019 Bar 10 Road sale and the December 20, 2019 Henderson Lane sale, both below value, with identical pre-set insider tickets distributed to the insider funds and routed to a single Scottsdale mailbox (Ex. 35, 36, 39, 5).

29. On January 31, 2020, $72,540.49 — substantially the entire balance of TR El Paso Land's account — was removed by instruction recorded only as "per Chad" (Ex. 37).

30. The Securities and Exchange Commission revoked the registration of all classes of Two Rivers securities effective August 19, 2022 (Ex. 41).

**Era 4 — The State-Enabled Capture (2017 – Present)**

31. On May 5, 2023, the State and Harrington executed a "Stipulation for Injunction and Other Relief" in the state enforcement action, entered as an order on May 9, 2023, without notice to Plaintiff and without any adjudication of facts binding on Plaintiff. The Stipulation is an instrument "STIPULATED AND AGREED by and between the Commissioner and Respondents," and Harrington personally signed it as Chief Executive Officer of Two Rivers and Managing Member of TR Capital (Ex. 44 — Stipulation, 25-708 Dkt. 1-2 / 49-2).

32. The Stipulation's terms establish the joint action and the exchange: (a) the Respondents agreed to pay the State $2,000,000 from the proceeds of any sale of company property (¶ 2(b)); (b) in return, the Commissioner agreed to "release and acquit, and forever discharge the Respondents from any and all claims" and to dismiss them as defendants (¶ 2(d), ¶ 3); (c) the State and Harrington jointly agreed to place company subsidiaries into bankruptcy for the stated "purpose … to clear title on the assets that were improperly and fraudulently incumbered [sic]" — that is, to void the 404224 Deed of Trust

Case No. 1:25-cv-00788-PAB-NRN Document 30-2 filed 05/13/25 USDC Colorado

securing the GrowCo investors (¶ 3(a)); and (d) Harrington agreed to "assist the Commissioner" by providing records to build the case against "Prior Management," defined in ¶ 1(d) as Wayne Harding and John McKowen (Ex. 44 at 3–6). Assistant Attorney General India Kidd-Aaron personally signed the Stipulation as to form for the Attorney General, as counsel for the Securities Commissioner (Ex. 44, signature page).

33. A private party who jointly executes an instrument allocating state enforcement power, releases, and a plan to strip a third party's secured property is a willful participant in joint action with the State, acting under color of state law. *Lugar v. Edmondson Oil Co.; Dennis v. Sparks.* This is not the mere use of a state procedure. *Scott v. Hern.* The February 2, 2024 letter from Harrington to Commissioner Chan, copying Assistant Attorney General Kidd-Aaron and referring to "our settlement, including the substantial fine that was agreed upon" (Ex. 47), corroborates the continuing coordination. The letter states the financial leverage in its own terms: Plaintiff's efforts to enforce the collateral "have significantly increased the work required to recover assets ... which has an impact on our settlement, including the substantial fine that was agreed upon" — and because Stipulation ¶ 2(b) makes the State's $2,000,000 payable only "from the proceeds of any sale of company property," the State would not be paid unless Plaintiff's secured claims were suppressed. Harrington wrote to the Commissioner in the State's own first person — "the judgments obtained by our office's complaint"; "our inability to prevent Mr. McKowen" (Ex. 47).

34. Consistent with the Stipulation's stated purpose, Two Rivers Farms F-2, Inc. — the Harrington-controlled debtor — filed two adversary proceedings in May 2024 to extinguish the recorded security. Adversary No. 24-01111 sought to declare void the Deed of Trust at Reception No. 404224 and to quiet title to the encumbered Huerfano County land and water rights in the debtor, naming GrowCo Capital Partners 1, LLC, the Morris family interests, the insider funds, and approximately one hundred secured investors as defendants. Adversary No. 24-01112 sought the same relief as to the companion Deed of Trust at Reception No. 404225, and named as defendants GrowCo, Inc., Blue & Green, LLC,

VetaNova, Inc., and John R. McKowen, among other secured investors. Both proceedings sought to strip the GrowCo investors of the recorded security the State had branded "fraudulent," and both collapsed for failure to prosecute in 2025 (Ex. 48). (These 2024 adversary proceedings are distinct from Plaintiff's own adversary proceeding against the State, Adv. No. ~~operational~~26-01111.)

35. When Plaintiff sought to reorganize through his own Chapter 11 (In re McKowen, No. 25-16665-KHT) and to distribute the preserved beneficiary interests to the investors, the State — a creditor by virtue of its judgment (Ex. 51) — objected to the plan rather than support the distribution that would have paid the GrowCo investors, and the case was dismissed. The Public Trustee likewise rejected Plaintiff's nonjudicial foreclosure on the 404224 security (Ex. 50) — closing the ordinary statutory remedy while the title-clearing effort proceeded.

36. The State's enforcement judgment and its destruction of the investors' security cannot be reconciled. On July 9, 2025, the State obtained a judgment of $16,578,690.33 against Plaintiff and others, expressly sought and entered as "damages, restitution, and disgorgement" under C.R.S. § 11-51-602(2) — the investor-recovery provision measured by the consideration investors paid for their securities (Ex. 51 at 73, 110). The judgment is thus premised on the proposition that the GrowCo investors are owed the return of their invested capital. Yet the State does not remit that recovery to the investors; it collects it for the State. And through the May 5, 2023 Stipulation (Ex. 44), the same State acted to void the Deed of Trust, Reception No. 404224 — the recorded security that is the investors' independent means of recovering that same invested capital from the encumbered property. The State thereby asserted the validity of the investors' losses to justify its own recovery while simultaneously acting to extinguish the investors' (and Plaintiff's) security for those losses.

37. The judgment's injunction is narrow by its own terms. It enjoins Plaintiff from "participation in private securities transactions in or from the state of Colorado" for twenty years (Ex. 51 at 112) — a defined category, not a bar on securities activity generally. The judgment itself illustrates the category with FINRA "selling away" discipline — "twenty-two undisclosed private securities transactions" sold

away from a supervising firm for commissions — and with sales-representative analysis turning on "transaction-based compensation for the solicitation" (Ex. 51 at 100–101). Plaintiff's written agreements provided flat monthly fees and construction-milestone stock, not transaction-based compensation (Exs. 11, 14, 15, 16, 17). Whether the state court correctly applied that category to Plaintiff is before the Colorado Court of Appeals and is not at issue here. What matters to this action is what the contempt machinery now targets: Plaintiff's federal-court filings themselves (¶ 69).

38. In this action the private defendants did not assert any separation from the State. Instead, Harrington and Ploen filed formal joinders adopting the State Defendants' briefs as their own (Dkts. 154, 155, 207, 208, 212), litigating as a single bloc with the State rather than as independent private parties — conduct corroborative of the joint enterprise alleged above.

**The Paulson Preservation and Plaintiff's Chain of Title**

39. The secured obligation (2015). The GrowCo Capital Partners 1, LLC Operating Agreement, dated January 12, 2015, granted the Preferred Members a priority right of repayment on liquidation under Section 13.03(c), and provided that the Company would "grant the Preferred Members a security interest in substantially all of the assets of the Company" to secure those amounts — the "Secured Obligations" (Ex. 4, §§ 5.04, 13.03(c)).

40. The recorded security (September 25, 2015). To record that security, the grantors — Orlando Reservoir No. 2 Company, LLC and Two Rivers Farms F-2, Inc. — executed Deed of Trust, Reception No. 404224, recorded September 25, 2015 in Huerfano County, encumbering the described land and water rights for the benefit of the GCP-1 Preferred Members (the "Beneficiaries"). The deed recites that the Beneficiaries "are entitled to certain preferred payments upon liquidation of GCP 1, as more specifically set forth in Section 13.03(c) of the Operating Agreement (the 'Secured Obligations')," and provides that the Beneficiaries' rights rank pari passu, "proportionate the amounts owing to such Beneficiaries under Section 13.03(c)" (Ex. 6).

41. The security follows the Preferred units. Under Section 5.05 of the Operating Agreement (Succession Upon Transfer), on any transfer of the units the transferee "shall succeed to the Capital Account of the Transferor … and shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII" — including the Section 13.03(c) secured entitlement (Ex. 4, § 5.05). The 404224 collateral is therefore appurtenant to the GCP-1 Preferred and passes with the units by operation of the instruments themselves; no separate recorded deed-beneficiary assignment is required for the security to follow the Preferred.

42. Plaintiff's Preferred position and its Paulson-protected assignment. Plaintiff acquired 1,218,157 GCP Super Units Preferred interests for $1,218,157 (at $1.00 per unit), confirmed by GrowCo on October 19, 2015, carrying the Section 13.03(c) entitlement (Ex. 63). Beginning with the February 23, 2020 exchange, the GCP Super Units Preferred interests were assigned into VitaNova Partners, LLC — the assignment the *Paulson* Final Order expressly protected: persons who "assigned the securities to VitaNova Partners, LLC are not excluded as Class Members by virtue of such assignment" (Ex. 43). In May 2021, GrowCo, GCP-1, VitaNova Partners, VetaNova, Two Rivers, and TR Capital executed a six-party settlement agreement, dated May 26, 2021, under which Two Rivers and TR Capital exchanged their GrowCo and GCP-1 equity for 4,384,913 VetaNova units and the parties exchanged entity-level releases — Plaintiff signed only on behalf of entities, was not a party in his individual capacity, and released no claim of his own; in its paragraph 3, GCP-1 "agree[d] to terminate and release Two Rivers" from the Deed of Trust No. 404224 obligations and purported to authorize a future satisfaction filing. That promise was never performed: no satisfaction or release of Deed of Trust No. 404224 was ever recorded with the Huerfano County Clerk and Recorder, and the deed remains of record, unsatisfied. The approximately 80 investors whose obligations the deed secures — obligations the agreement's own recitals describe as "owed to investors" — were not parties to that agreement, received no notice of it, and did not consent to any release of their security; and Two Rivers thereafter repudiated the agreement by asserting cross-claims against Plaintiff in March 2022 within the general

release it had given, and cannot enforce the agreement's terms against Plaintiff. Two Rivers' own later conduct confirms the promise was never performed: the May 5, 2023 Stipulation directed bankruptcy filings whose stated purpose was to "clear title" on the same collateral (¶ 32), and in May 2024 the Harrington-controlled debtor sued approximately one hundred secured investors to have the deeds declared void (¶ 34) — proceedings without purpose if the 2021 agreement had released anything. The executed agreement is of record in In re McKowen, No. 25-16665-KHT (Bankr. D. Colo.), Dkt. 103, Ex. A.

43. The 2021 exchange into VetaNova. On August 17, 2021, the VitaNova Partners interests were exchanged into VetaNova, Inc., which holds approximately 90% of the beneficial interest; 77.36% of the GrowCo investors converted into VetaNova (Ex. 46 ¶ 15). The consolidation's business purpose is documented in VetaNova's public filings. The May 26, 2021 settlement unified the GrowCo platform under VetaNova for the development ~~of Two Rivers~~ and financing of controlled-environment greenhouse agriculture: on August 4, 2021, VetaNova signed a letter of intent with Mastronardi Produce Limited for the exclusive purchase, marketing, and sale of the produce from the greenhouse facilities VetaNova was to develop; VetaNova's registration statement became effective on September 27, 2021, with its warrant terms keyed to qualification of the shares on the OTCQX or OTCQB markets (Form S-1/A, Exhibits 10.13 and 4.1); and by November 2021 VetaNova was engaging Dalmore Group, LLC, a FINRA-registered broker-dealer, as broker of record for a $10,000,000 Regulation A offering — an engagement executed on February 8, 2022 and qualified by the Securities and Exchange Commission on June 17, 2022. On December 10, 2021, the State filed Chan v. Two Rivers Water & Farming ~~Company and its affiliated entities, including GrowCo and TR Capital Partners~~Co., No. 2021CV33922 (Denver Dist. Ct.), naming Plaintiff; the development and financing the settlement had been executed to enable did not survive the enforcement action.

~~[21.] During this time, Plaintiff raised over $40 million in investor capital through SEC-compliant Rule 506(c) offerings. That capital was used to acquire and develop over 7,900~~

~~gross acres of~~

land across El Paso, Pueblo, and Huerfano Counties, comprising irrigable farmland, grazing land, and senior ditch and reservoir rights tied to the Huerfano-Cucharas Irrigation Company and the Orlando Reservoir system. [See Exhibit 11 – Audited 2014 10-K]

[22.] Plaintiff directed the renovation of key infrastructure assets, including the complete overhaul of the Orlando Reservoir outlet works and the installation of a gravity-fed water storage and delivery system designed to serve over 40,000 acres. During this time, the company also undertook significant operational improvements, including drip irrigation, laser-leveling, and the transition to organic-certified crop production.

[23.] In 2014, Plaintiff founded GrowCo, which became the flagship vehicle for developing high-yield greenhouse facilities in Pueblo County. Through GrowCo Partners 1, LLC, over $4.4 million was raised to construct a 90,000 square foot greenhouse and 15,000 square foot warehouse (known as GCP-1). Construction was completed in 2015, and lease revenue began flowing in Q4 2015.

[24.] A second greenhouse was launched under GrowCo Partners 2, LLC in 2016, supported by an additional $5.9 million in secured financing. These projects were governed by independent boards, documented through offering memoranda and term sheets, and subjected to annual audits by national accounting firms.

[25.] The Company's 2015 10-K was audited by Eide Bailly LLP, a top-25 nationally recognized CPA firm registered with the Public Company Accounting Oversight Board (PCAOB). Eide Bailly issued an unqualified opinion, confirming that the financial statements for the year ending December 31, 2015 fairly presented the Company's position, operations, and use of funds under Generally Accepted Accounting Principles.

[26.] At its peak in 2015, Two Rivers Water & Farming Company achieved a $32.7 million public market capitalization, reflecting investor confidence in the vertically integrated, asset-backed model Plaintiff had created. The company's filings were current. Its financial statements were independently audited. Its operations were aligned with its stated mission.

[27.] On May 26, 2016, Plaintiff formally resigned from all positions of control. The Company's 2015 10-K, filed after the end of that fiscal year, reflected the Company's operations under Plaintiff's leadership—including the completion of GCP-1, the launch of GCP-2, and the continuation of SEC-compliant financial reporting. It documented lease revenue commencing in Q4 2015 and full capitalization of the greenhouse development**. [See Exhibit 12 – 2015 Two Rivers 10-K]**

[28.] The Company's 2016 10-K, issued after Plaintiff's departure, referred to him only as "former CEO and largest shareholder" and classified all transactions involving Plaintiff's post-resignation investment vehicles—such as Johnny Cannaseed and McGrow—as related-party arrangements. The 10-K did not identify Plaintiff as having any role in management, governance, or financial control. **[See Exhibit 13 – Two Rivers 2016 10-K]**

[29.] Eide Bailly LLP, is a top-25 is nationally ranked public accounting firm registered with the Public Company Accounting Oversight Board (PCAOB). Eide Bailly issued an unqualified audit opinion, affirming that the financial statements fairly presented the Company's position, operations, and use of funds in accordance with U.S. Generally Accepted Accounting Principles (GAAP).

Case No. 1:25-cv-00708-PAB-NRN Document 40 filed 07/13/25 USDC Colorado

[30.] These independent audited filings confirm that as of the date of Plaintiff's resignation, the business was properly capitalized, transparent, and in full compliance with its stated investor commitments.

Era 2: Ponzi Scheme & Concealment (May 26, 2016 – 2018)

[31.] This era was defined by a deliberate departure from the disclosed business model and a concealed shift into a Ponzi-style structure—engineered by insiders who refused to invest further but demanded repayment from new capital, knowing that such funds were essential to complete the project as originally promised.

[32.] Following Plaintiff's resignation on May 26, 2016, operational and financial control passed to a new set of executives, board members, and large investors. These insiders inherited a functional, partially built asset base with secured water rights, positive lease revenue, and a fully developed plan that required only continued capital to complete the second greenhouse and reach sustainable scale.

[33.] Instead, they made a critical, undisclosed decision: to stop investing in the business model they had inherited, while continuing to solicit and accept new investor funds. Rather than using those funds to build the second greenhouse or advance operations, they diverted capital to cover prior obligations—including investor payouts, undisclosed liabilities, and internal shortfalls. This redirection of use—from development to repayment—transformed what had been a lawful structure into a concealed Ponzi scheme.

[34.] They were able to do this because they held the power: board seats, executive titles, or controlling equity positions. They controlled disclosures, accounting classifications, and

financial reporting. New investors were never told that the project had been internally halted. To the outside world, development appeared to continue, even as insiders knew it had already collapsed.

[35.] Spending on farming and water infrastructure continued—without new capital raises to support those expenditures. It was this very inconsistency that first caught Plaintiff's attention. No longer in control but deeply familiar with the financial architecture, Plaintiff observed capital-intensive activities moving forward without the inflow of matching capital. This imbalance was unsustainable. It made no sense unless capital was being secretly diverted or misclassified.

[36.] That suspicion was soon confirmed. A 2018 forensic audit by BCLS CPAs revealed a fabricated $6.2 million journal entry, recorded on August 16, 2017 by then-CEO Wayne Harding. The entry purported to offset obligations owed by Two Rivers to GrowCo, despite lacking any documentation, board authorization, or reconciliation. The audit concluded that more than $4.2 million remained unpaid to GrowCo. Simultaneously, GrowCo was deconsolidated from Two Rivers' financial statements—allowing Two Rivers to avoid reporting its losses and obligations while continuing to benefit from the use of GrowCo-developed assets.

[37.] SEC filings from this period omitted these material facts. They did not disclose the funding shortfall, the misclassification of investor funds, or the lack of corporate authorization for key financial decisions. At least $8 million in investor capital was misclassified as general and administrative expenses, concealing its improper use and perpetuating the illusion of solvency.

[38.] Worse still, investor protections were actively dismantled. Distributions to preferred investors were suspended by TR Capital, with no replacements, no disclosures, and no reconciliations. Investor communications became sporadic or ceased entirely.

[39.] Then came the most telling act of internal sabotage: cash-flow-positive tenants were evicted from GrowCo facilities, without replacement or justification, severing the project's last source of income. These evictions—funded by investor capital—were not a business mistake. They were a calculated move to cut off visibility and destroy the revenue stream that could have exposed the internal collapse.

[40.] The scheme was not designed to fix the project—it was designed to kill it, before the fraud could be discovered. The parties in control prioritized protecting themselves, not the investors. They exploited their power to strip the project of viability, conceal its failure, and set the stage for the desperate measures that would follow.

[41.] This Ponzi scheme was the original fraud. Every subsequent deception—financial, legal, and political—flows from this concealed breach.

Era 3: Vaxa Global Fraud
(2019–Present)

[42.] Greg Harrington is a convicted securities felon who served prison time for his role in the 1990 Drexel Burnham Lambert junk bond scandal—one of the largest financial fraud cases in

U.S. history. In 2006, he was named as a co-defendant in a federal Ponzi scheme involving Zions Bancorp.

[43.] In 2014, Harrington registered "Fenner & Beane, LLLP" in Colorado under the name of a brokerage that had ceased to exist in 1941. He built a fake website and used the email domain fennerbeane.com to send investor communications. The site claimed the firm was founded in

1919 and operated globally, while Harrington's biography falsely identified him as CEO of Two Rivers and described more than $500 million in fictitious transactions. These materials, complete with legal disclaimers mimicking federal financial compliance, were used to obscure his felony record and manufacture professional legitimacy.

[44.] Harrington entered the Two Rivers orbit through Wayne Harding, who by 2018 had buried the company in unsatisfied obligations and investor liabilities. In an effort to avoid collapse, Harding resorted to convertible debt deals known as "death spiral financing"—a high-risk tactic that trades long-term dilution for short-term cash. Over time, these deals matured into a sophisticated pump-and-dump cycle. With each new round, Harding issued increasingly discounted stock that flooded the market, collapsed share value, and made recovery impossible. It was in this environment—when no traditional funding source would engage—that Harrington appeared.

[45.] Harrington initially offered capital through death-spiral-style terms but quickly realized the true opportunity: a classic bait-and-switch. Rather than invest in Two Rivers, he offered to merge it with his own entity—Vaxa Global, a shell company with no assets, negative equity, and no financial disclosures. Harding agreed. The transaction was structured to give Harrington effective control of Two Rivers without capital contribution, audit, shareholder approval, or independent review. Harrington signed the Q3 2019 10-Q as CEO, and from that moment, began extracting value and positioning himself as the controlling actor behind GrowCo and its secured assets.

[46.] In 2023, he drafted and executed the "Stipulation for Injunction and Other Relief"—a legal document used to initiate bankruptcy filings and an adversary proceeding against over 140

secured GrowCo investors. The Colorado Attorney General's Office accepted this document without hearing, without cross-examination, and without validating Harrington's claimed authority. Through this vehicle, more than $2 million in investor-secured value was redirected to insiders and State-backed counsel—without notice or payment to the investors themselves.

[47.] Harrington never appeared under oath, never submitted to discovery, and never provided documentation of lawful control. Yet to this day, he continues to hold the Butte Valley greenhouse facility through his brother, who operates the secured GrowCo asset without compensation to the rightful investors. What began as a dilution trap ended with a bait-and-switch. And with the State's blessing, it became a seizure. During Plaintiff's first substantive meeting with attorneys from the Colorado Attorney General's Office, State officials openly admitted they had little to no experience in securities law. But that did not matter to them. They were already in political prosecution mode—"show me the man, I'll show you the crime." Rather than investigate Harrington's false filings and felony record, they aligned with him and turned the power of the State against the whistleblower trying to stop him.

[48.] This era was defined by the fraudulent acquisition of control over a public company by a convicted securities felon, and the ongoing conversion of investor-backed assets for personal enrichment. The scheme began in 2019, when Greg Harrington used a defunct Nevada entity —Vaxa Global, LLC—to gain control of Two Rivers Water & Farming Company. Vaxa had no meaningful operations and held negative equity of $582,071. In exchange, Harrington received 30,000,000 unrestricted shares of Two Rivers common stock. No shareholder vote

was held. No board resolution was adopted. No cash changed hands. [See Exhibit 8 – 2019 10-Q, Note 8]

[49.] The Company priced the transaction at $13.2 million based on the issuance of 30 million shares at $0.44 per share. In reality, Two Rivers assumed $1.4 million in net liabilities and booked $14.1 million in goodwill to justify the accounting entry. The transaction was executed under the leadership of then-CEO Wayne Harding, who signed the public filings, approved the valuation, and facilitated Harrington's entry into the company. At the time, Harrington was a convicted securities felon. While it is unclear whether Harding or the Board had actual knowledge of Harrington's conviction, they had a fiduciary duty to know—particularly in a control-level transaction involving a public company and the issuance of unrestricted shares. Their failure to conduct basic diligence or disclose Harrington's background constitutes a material breach of duty. Taken together, these acts and omissions contributed to violations of federal securities law, including 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

[50.] Harrington personally signed the Vaxa acquisition documents as both President of the selling entity (Easby Land & Cattle Co., LLC) and controlling party through GRAMZ Holdings, LLC. These entities were used to control both sides of the transaction. The GRAMZ Operating Agreement contained restrictive securities clauses, including preemptive disclaimers against registration and personal liability. [See Exhibits 11 and 12 – Vaxa Closing Documents] The address listed on official formation documents—2877 Paradise Rd, Unit 1004, Las Vegas—was confirmed by Turnberry Place management to have no resident by the

Case No. 1:25-cv-00708-PAB-NRN Document 39 filed 05/13/25 USDC Colorado

name Harrington or Carson, further reinforcing the fictitious nature of the transaction's representations.

[51.] After filing the Q3 2019 10-Q, Two Rivers ceased making public disclosures. No 10-K was filed. No audited financials followed. Regulatory compliance ended. Harrington and affiliated insiders continued to control the company, liquidating stock and rerouting access to cash-generating assets, while shareholders and secured investors were left without recourse. [See Exhibit 18 – 2018 10-K]

[52.] With control consolidated, Harrington caused Two Rivers to lease the Butte Valley property—including 158 irrigated acres, irrigation infrastructure, and a residence—to his affiliate, Vaxa Global, for $50,000 annually under a five-year lease. The lease, effective March 15, 2019, was executed without shareholder approval, board resolution, or public disclosure. No lease income was reported to Two Rivers investors. The resulting cash flow—derived from GrowCo-developed infrastructure—was privately diverted. [See Exhibit 13 – Vaxa Lease Agreement]

[53.] The lease was not incidental. It was the mechanism of monetization. Harrington's brother became the operator. Crops were grown. Revenue was generated. Yet the secured investors who funded the infrastructure received no communication, no distribution, and no legal forum. The public entity was hollowed out. The balance sheet collapsed. And yet insiders remained in control of the core asset base.

[54.] By the end of 2021, the company's governance was functionally dead. Two Rivers no longer operated as a public company. But the infrastructure—paid for by GrowCo investors—remained in Harrington's control. The fraud had succeeded: through a fabricated transaction,

unlawful stock issuance, and undisclosed self-dealing, over $10 million in investor capital was converted into private gain.

[55.] Harrington had achieved control. Harding had facilitated it. The fraud was not a closed chapter—it remains active. The infrastructure remains diverted. The public entity remains dead. And the enrichment continues.

Era 4: Colorado Civil RICO
(2017–Present)

[56.] This era was defined not by private misconduct, but by state-enabled racketeering. After years of documented fraud, asset diversion, and federal court orders preserving investor rights, the State of Colorado entered the scheme—not to investigate it, but to enforce it.

[57.] As early as 2017, Plaintiff submitted information to the Colorado Securities Commissioner identifying capital misclassification, insider distributions, and the redirection of new investor funds to repay old obligations—a Ponzi structure. These warnings were ignored. The State took no regulatory action against those responsible. No audit was triggered. No enforcement was opened.

[58.] In 2019, the Colorado Attorney General's Office filed a motion in Pueblo Water Court that explicitly acknowledged Plaintiff had resigned from all control of Two Rivers in May 2016, and confirmed that Plaintiff held no legal responsibility for events thereafter. Yet by 2021, the same office reversed course and began working directly with Greg Harrington—a convicted securities felon—to fabricate a legal mechanism to eliminate Plaintiff, silence litigation exposure, and strip secured investor rights.

[59.] That mechanism was the Stipulation for Injunction and Other Relief (Exhibit 2)—executed in 2023 without hearing, without vote, and without corporate authority. The Stipulation was

~~drafted by Harrington, signed over a weekend, and presented by State attorneys as binding on entities he did not control. It committed Two Rivers and TR Capital to file bankruptcy petitions on behalf of subsidiaries Harrington had no legal authority to govern. The State accepted and enforced the Stipulation as if adjudicated fact, using it to launch Chapter 11 bankruptcy filings and a related adversary proceeding that named over 140 secured investors as defendants in an effort to void their lien interests. [See Exhibits 1, 2, 5]~~

~~[60.] When Plaintiff objected, the State blocked cross-examination, refused to produce a Rule 30(b)(6) designee, and allowed Assistant Attorney General Jennifer Hunt to simultaneously act as fact witness and legal counsel. No evidentiary hearing was permitted. No corporate records were authenticated. No testimony from Harrington was ever taken under oath.~~

~~[61.] Meanwhile, Plaintiff's attempts to foreclose on the GrowCo Deed of Trust (Reception No. 404224) were obstructed. The adversary proceeding clouded title. And while the U.S. Trustee ultimately moved to dismiss the bankruptcies, the damage had been done. Enforcement rights were frozen. Capital accounts were nullified. The State had placed its seal on a fraudulent structure.~~

~~[62.] This was not negligence. It was complicity. And based on Plaintiff's known affiliation as a Trump-aligned precinct leader and political whistleblower, it was also retaliatory. The State chose to prosecute the whistleblower, while protecting the felon. It advanced a false legal narrative, blocked discovery, and imposed enforcement based on fabricated authority —all under color of law.~~

~~[63.] Following his resignation from Two Rivers in 2016, Plaintiff did not walk away from the obligations owed to GrowCo investors. Instead, he continued to invest personal capital—~~

Case No. 1:25-cv-00788-PAB-NRN Document 39-2 filed 05/13/25 USDC Colorado

more than any other stakeholder—and spearheaded the formation of a restructured public company: VetaNova, Inc. This new entity was fully SEC-registered, free of legacy liabilities, and structured with experienced operational partners and committed institutional financing. VetaNova represented a viable platform for salvaging investor value through modernized operations and regulatory compliance. However, on December 10, 2021, the Colorado Attorney General's Office filed Denver District Court Case No. 21CV33922, relying on a fraudulent Stipulation authored by Greg Harrington. That filing immediately collapsed the reorganization, froze access to funding, and halted investor recovery efforts midstream. The case remains unadjudicated to this day.

[64.] **The fraud was private. The cover-up was public. And, the prosecution was political.**

## LEGAL FRAMEWORK AND FEDERAL JURISDICTION

[65.] This action arises under the Constitution and laws of the United States. Plaintiff seeks redress for deprivations of constitutional rights under color of state law, actionable pursuant to 42

U.S.C. § 1983 and § 1985, as well as civil remedies under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1964. The claims include violations of due process, equal protection, unlawful retaliation for protected political activity, and conspiracy to obstruct and distort legal process to deprive Plaintiff and other secured investors of property rights.

[66.] This Court also retains exclusive jurisdiction to enforce the Paulson Settlement Agreement under Case No. 19-cv-02639-PAB-NRN, which included a Complete Bar Order prohibiting further litigation against released parties for conduct arising from the GrowCo securities offerings. Declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201–2202,

~~and supplemental jurisdiction is proper under 28 U.S.C. § 1367(a) for related state law claims including fraud, constructive fraud, and violation of secured interests under Colorado law. This action challenges not only the unlawful conversion of secured assets but the knowing participation of state actors in a pattern of racketeering conduct.~~

44. The 2023 distribution; Plaintiff's legal title and agency. Upon the 2023 dissolution of VitaNova Partners, the 404224 and 404225 beneficiary rights were distributed in kind: VetaNova, Inc. holds approximately 90% of the beneficial interest, the non-exchanging investors approximately 10%, and Plaintiff took and holds legal title to the beneficiary rights under recorded Deeds of Trust Nos. 404224 and 404225 in his own name (Ex. 53), and holds and enforces that interest in the capacity the Deed of Trust itself provides: the deed states that the Beneficiaries "may appoint a lenders' agent to act for and on behalf of all Beneficiaries and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust" (Ex. 6), and Plaintiff acts in that enforcement capacity — as liquidator of VitaNova Partners, LLC, under the liquidation machinery of the Operating Agreement (Ex. 4, § 13.03) — a capacity that passed with the rights themselves: at dissolution Plaintiff was VitaNova Partners' sole member, and the in-kind distribution its declaration records (Ex. 53) placed both the beneficiary rights and their enforcement in his hands — and as declared in his sworn Schedule A/B, which lists the beneficiary interests and states that Plaintiff "does not presently hold recorded fee title" (In re McKowen, No. 25-16665-KHT, Dkt. 88, Attachments 1.1–1.2). That agency concerns enforcement of the security instrument; Plaintiff asserts in this action only his own claims and his own injury. Plaintiff asserts the claims in this action in his own right and for his own injury — as the holder of that interest under the recorded deeds of trust and as a GrowCo investor who personally advanced capital into the enterprise — and not on behalf of the other beneficial owners, who are not parties and whom Plaintiff, appearing pro se, does not represent.

45. Result. Plaintiff today holds legal title to the 404224 beneficiary rights in his own name, acquired by the in-kind distribution pleaded above; VetaNova holds approximately 90% of the beneficial interest, subject to its March 27, 2026 individual assignments to the beneficial owners, which vest upon each owner's proof of claim, with unvested interests reverting to VetaNova; and the Section 13.03(c) secured position follows the Preferred by operation of Section 5.05 and the deed's own terms. Plaintiff's personal stake in the residual is the 35.0540% equity interest in VetaNova, Inc. pleaded in ¶ 1 — sworn in his bankruptcy schedules as a 35% interest (Dkt. 88, Schedule A/B, Line 19) and valued at $19,244,650 on the Estimated Current Valuation; he holds legal title both as liquidator of dissolved VitaNova Partners and as agent for the named beneficiary-lenders — the enforcement capacity the Deed of Trust itself provides (Ex. 6). The secured interest under the recorded deeds of trust, the Preferred priority it secures, the capital Plaintiff personally advanced, and the Paulson-preserved collection rights are the personally owned property at the center of this action.

**CLAIMS FOR RELIEF**

~~COUNT I: Violation~~ **FIRST CLAIM FOR RELIEF**

**Enforcement of the Federal *Paulson* Judgment (Supremacy Clause) and Declaratory Relief — 28 U.S.C. §§ 2201–2202**

**— against the private and corporate Defendants, and against the individual State Defendants in their official capacities for prospective declaratory relief only**

46. Re-allegation and the limited relief sought. Plaintiff re-alleges the foregoing paragraphs. This Claim seeks one thing: a declaration of the scope of this Court's own judgment in *Paulson v. Two Rivers Water and Farming Co.*, No. 19-cv-02639-PAB-NRN (D. Colo.), and enforcement of that judgment in aid of the jurisdiction the *Paulson* Court expressly retained. Plaintiff does not ask this Court to sit in appellate review of, to reopen, to reverse, or to enjoin the state-court judgment or the ongoing state

proceeding in *Chan v. Two Rivers*, No. 2021CV33922 (Denver Dist. Ct.); that judgment is on appeal in the Colorado courts, where it will be decided. Plaintiff does not seek to bar the State of Colorado from its independent regulatory remedies under the Colorado Securities Act — its injunctive relief, its industry bar, or its civil penalties. The declaration sought reaches only the point at which the State's and the bound Defendants' conduct collides with what the federal judgment adjudicated and preserved: the State's monetary recovery of the GrowCo investors' losses, and the use of the Stipulation and the deed-voiding bankruptcy claims to reach the investors' preserved collection security. This is enforcement of a federal judgment by the court that entered it, not interference with a state one.

47. The property interest. Plaintiff holds specifically identified, constitutionally cognizable property: (a) his recorded secured beneficiary interest under Deed of Trust, Reception No. 404224 (Ex. 6); (b) the GCP-1 Preferred priority-of-repayment right that deed secures under Section 13.03(c) of the GCP-1 Operating Agreement (Ex. 4); and (c) the *Paulson*-preserved right to collect amounts due under the GrowCo securities — the Final Order providing that "the Class Members shall retain their GrowCo securities and are not releasing the limited claim for payment of their securities, including claims in the event of a GrowCo liquidation, including in the GrowCo Bankruptcy Action" (Ex. 43). These are not "contractual rights" in the abstract; they are a recorded lien, a secured contractual priority, and a federally preserved collection right in identified real property and water, held by Plaintiff as set forth in the Chain of Title above.

48. What Paulson preserved, its transferability, and the enforcement forum. The *Paulson* Final Order and Settlement Agreement resolved and barred the investor claims arising from the GrowCo offerings, preserved the Class Members' retained securities and their collection rights, entered a Complete Bar Order, and retained jurisdiction over the settlement's implementation (Ex. 43). The Final Order further declared those retained securities and claims transferable: persons who "assigned the securities to VitaNova Partners, LLC are not excluded as Class Members by virtue of such assignment" (Ex. 43) — the court-authorized assignment by which Plaintiff and VetaNova hold the preserved rights, as set forth

in the Chain of Title above. In Docket No. 199 of the *Paulson* case, this Court directed that the question whether these Defendants have violated the *Paulson* Settlement be resolved in this action, where the alleged violators are parties (Ex. 49). And in this action this Court has already recited the *Paulson* Court's retention of jurisdiction over the Settlement's implementation — "without affecting the finality of this Order, this Court retains [jurisdiction over] ... the Settlement Agreement, including its implementation" (Dkt. 259, quoting *Paulson* Dkt. 178 at 20) — and, in denying Plaintiff's emergency motion regarding the Deed of Trust No. 404224 interest as seeking relief beyond the scope of the operative complaint (Dkt. 259), identified the precise gap this First Claim now closes: it pleads the enforcement of the *Paulson* preservation of the 404224 secured interest within the complaint itself. A federal court possesses jurisdiction to enforce and effectuate its own judgment. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381–82 (1994).

49. The State's duty, the whistleblower report, and the inversion. The Colorado Securities Act charges the Commissioner "to protect investors," C.R.S. § 11-51-101(2), and authorizes a monetary recovery only "on behalf of some or all of the persons injured," § 11-51-602(2), creating no other cause of action, § 11-51-604(12). The State's lawful role was to regulate and to disclose. On July 13, 2018, Plaintiff — through counsel, Tobin D. Kern, Esq., of Volant Law — did exactly what that regime contemplates: he reported the diversion of GrowCo investor capital to the Colorado Division of Securities, identifying the unsupported $6,207,943.50 journal entry of August 16, 2017, producing the bank records and the master investor list, and expressly asking the State to subpoena Two Rivers and Wayne Harding (Ex. 25). The State's duty on receiving that report was to investigate the diversion and protect the investors. It did the opposite. It prosecuted the whistleblower, and — through the May 5, 2023 Stipulation (Ex. 44), entered without notice to or hearing for Plaintiff — it endorsed and accepted Greg Harrington, a convicted securities-fraud felon (*United States v. Harrington*, D. Colo. No. 1:93-cr-00131) who had already seized control of Two Rivers through the 2018–2019 reverse merger and become its Chief Executive Officer on September 19, 2019, as the "legitimate" Chief Executive Officer, without

disclosing his conviction or Ponzi history (Exs. 1, 2); claimed $2,000,000 for the State "from the proceeds of any sale of company property" (¶ 2(b)); branded the investors' recorded security "fraudulent" and directed the bankruptcy to "clear title" on the encumbered assets — reaching Deeds of Trust Nos. 404224 and 404225 securing the GrowCo investors (¶ 3(a)); and defined "Prior Management" to mean Harding and Plaintiff (¶ 1(d)). The State did not regulate and disclose the fraud its own whistleblower reported; it endorsed the fraud's beneficiary and participated in a taking. Plaintiff remains a federal whistleblower: his June 11, 2026 criminal referrals of this same conduct to five federal agencies are of record in this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), and are protected activity under 18 U.S.C. § 1513(e).

50. The State is bound by supremacy — not preclusion. By C.R.S. § 11-51-602(2) the Commissioner's recovery is the investors' own offering-loss claim asserted in a representative capacity, and § 11-51-604(12) creates no other. The State's $16,578,690.33 recovery — measured as investor funds paid in less amounts returned (Ex. 51) — is therefore the investors' offering-loss claim, and it falls within the scope of what the federal judgment adjudicated, barred, and preserved. That recovery, and the bankruptcy claims asserted to reach the 404224 Deed of Trust — an attack on the very collection rights the judgment expressly preserved — conflict with the federal judgment. Under the Supremacy Clause, U.S. Const. art. VI, cl. 2, a federal judgment is supreme over conflicting state action regardless of whether the State was a party to the federal proceeding; conflicting state relief cannot override what the federal judgment resolved and preserved. This Claim rests solely on that supremacy — on the conflict between the State's recovery of the investors' representative offering-loss claim and the federal judgment that adjudicated and preserved those claims. It does not rest on res judicata, collateral estoppel, or any contention that the State is a party to, a releasor under, or otherwise precluded by the *Paulson* Settlement.

51. Harrington is bound directly — he signed the *Paulson* Settlement, and its own terms bind him. Harrington did not merely head the administration that settled *Paulson* — he personally executed the

*Paulson* Settlement Agreement on behalf of Two Rivers Water & Farming Company, signing "By: Greg Harrington / Its: CEO" (Ex. 43, Settlement Agreement signature counterpart, *Paulson* Dkt. 180 at ECF pg. 26 of 68, DocuSign envelope EAFC5179-41FE-4602-BAB9-63739CE99748). By that signature he gave Two Rivers' release with his own hand, and on the same page he warranted that he had "full authority … to take appropriate action required or permitted to be taken pursuant to this Settlement Agreement to effectuate its terms" (Ex. 43, § 48). The signature establishes beyond dispute that Harrington had actual notice of the Settlement's terms — including the collection rights the Class retained — and that he is the officer through whom Two Rivers acted.

That signed fact triggers the binding the Settlement's own definitions supply. Harrington is personally a Releasee: § 1.dd(ii) defines "Releasee" to include "the past and present officers … of Two Rivers," and he was Two Rivers' Chief Executive Officer at the Settlement's October 2020 execution and its March 2023 approval; TR Capital, which he controls, is a named Releasee (§ 1.dd(iii)). He simultaneously stands on the releasing side: the *Paulson* release is two-way by its own terms — "Released Claims" include "any and all Claims of or by the Defendants as against the Releasors … that were asserted, could have been asserted, or could in the future be asserted, arising from, based on, or relating to allegations in the Class Action" (§ 1.cc) — and Two Rivers, the Defendant and Settling Party, gave that Defendants'-side release through the signature Harrington placed on it. He received the investors' release and gave the company's, in his officer capacity — a Releasee and, through the company he signed for, a releasor.

Having signed the agreement that preserved the Class Members' collection rights, Harrington may not use or enforce the May 5, 2023 Stipulation — which he also executed as Chief Executive Officer of Two Rivers and Managing Member of TR Capital, seven weeks after the Final Order (Ex. 44) — to reassert, as "admitted" fact, the released claims against the GrowCo investors, or to reach the one thing the Complete Bar Order "will not bar," the preserved collection rights. He is bound as an officer of a bound party who executed the very agreement underlying the decree, with actual notice on the face of his own signature. *Wilson v. United States*, 221 U.S. 361, 376 (1911); Fed. R. Civ. P. 65(d)(2)(B); *Regal Knitwear Co. v.*

*NLRB*, 324 U.S. 9, 14 (1945); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 179–80 (1973). This bar reaches Harrington without any Supremacy Clause or state-action analysis, because he is bound as a party — by his own signature and by the Settlement's definitions. The *Paulson* release also carries an express covenant not to sue: the settling parties "agree and covenant not to sue or prosecute ... any suit or proceeding in any forum based upon or related to any Released Claims against any Releasee" (Ex. 43, covenant not to sue). Because the retained collection claim is, by Section 1.g, not a Released Claim, that covenant leaves the investors' collection right untouched while barring the bound Defendants from prosecuting the released claims they reasserted through the May 5, 2023 Stipulation and the 2024 deed-voiding adversary proceedings.

52. The corporate Defendants are bound directly. Two Rivers Water & Farming Company was a *Paulson* Defendant and Settling Party; TR Capital Partners, LLC is a named Releasee (§ 1.dd(iii)); and Two Rivers Farms F-2, Inc. is their controlled instrumentality, through which the 2024 adversary proceedings (Adv. Nos. 24-01111 and 24-01112, Bankr. D. Colo.) reassert against the Class Member investors the released "no consideration" theory and reach the preserved deed-of-trust security. A bound corporation may not do through a wholly controlled instrumentality what it released the right to do directly. Settling Parties' enforcement is preserved — "Nothing in the Final Order … shall bar any action or Claim by the Settling Parties … to enforce the terms of the Settlement Agreement" (¶ 29) — and Plaintiff, a Settling Party, brings this Claim in part as that enforcement.

53. Declaration sought. Plaintiff seeks a declaration, in aid of this Court's retained jurisdiction over the implementation of the *Paulson* judgment, that:

(a) the Class Members' GrowCo securities, the preserved collection rights, and the Deed of Trust No. 404224 enforcement rights securing them were retained by the Class Members and were not released or extinguished by the *Paulson* Settlement, Final Judgment, or Complete Bar Order;

(b) the State's monetary recovery of the GrowCo investors' losses against Plaintiff, and the deed-voiding bankruptcy claims, conflict with and are barred by that federal judgment to the extent they seek that investor recovery or the extinguishment of those preserved rights;

(c) the bound Defendants — Harrington, Two Rivers, TR Capital, and Two Rivers Farms F-2 — may not use or enforce the Stipulation or the deed-voiding bankruptcy claims to reassert the released claims or reach the preserved collection security;

(d) the retained GrowCo securities and collection rights were, by the Final Order's own terms, transferable, and were validly assigned, so that Plaintiff, as holder of legal title, may enforce the preserved rights he asserts here; and

(e) the GrowCo investors' offering-loss and collection claims, having been adjudicated, barred, and preserved by the *Paulson* judgment, may not be asserted or recovered by any person or entity — including any governmental entity — claiming "by or through, on behalf of, for the benefit of, derivatively for, or as representative of" the Class Members; and the State's monetary recovery, obtainable under C.R.S. Section 11-51-602(2) only "on behalf of the persons injured," is such a representative assertion and is governed and barred by that federal judgment.

This declaration leaves the state-court judgment's regulatory injunction and the State's independent regulatory remedies wholly intact.

## SECOND CLAIM FOR RELIEF

**Denial of Due Process — Denial of Notice and Hearing (42 U.S.C. § 1983 (Fourteenth Amendment))**

[67.] Plaintiff incorporates by reference all prior paragraphs.

[68.] Defendants acting under color of state law deprived Plaintiff of constitutionally protected property interests — including security rights under a recorded Deed of Trust and contractual rights under the Paulson Settlement — without notice or hearing.

[69.] The Stipulation accepted by the State and used to authorize bankruptcy filings was not

~~adjudicated, voted on, or authorized by any corporate governance procedure. Plaintiff was never provided an opportunity to be heard.~~

~~[70.] These violations not only deprived Plaintiff of his historical right to enforce secured interests, but also destroyed a viable path to restore investor value. Plaintiff had formed VetaNova, Inc., a fully SEC-registered public company with operational partners and institutional financing, which was actively advancing toward recovery. The December 10, 2021 state filing, based on the fraudulent Stipulation, collapsed that effort midstream. The case remains unadjudicated, and the loss of this reorganization vehicle continues to impair both Plaintiff and the secured investors he was seeking to protect.~~

~~[71.] These acts constitute a violation of the Due Process Clause of the Fourteenth Amendment, actionable under 42 U.S.C. § 1983.~~

~~COUNT II: Violation of Equal Protection — Selective Enforcement (42 U.S.C. § 1983)~~

~~[72.] Plaintiff incorporates by reference all prior paragraphs.~~

~~[73.] Defendants, including the Colorado Attorney General's Office and the Colorado Securities Division, selectively enforced state power to pursue Plaintiff while actively protecting Greg Harrington — a known securities felon.~~

~~[74.] The State took no action against Harrington, despite clear evidence of securities fraud, conversion of public assets, and use of falsified filings.~~

~~[75.] The discriminatory enforcement of regulatory authority denied Plaintiff equal protection under the law.~~

~~COUNT III: Retaliation for Protected Activity (42 U.S.C. § 1983)~~

~~[76.] Plaintiff incorporates by reference all prior paragraphs.~~

~~[77.] Plaintiff's history as a whistleblower and political actor — including prior filings with the Securities Commissioner and service as a Republican precinct leader — was known to Defendants.~~

~~[78.] The State of Colorado's decision to prosecute Plaintiff, while shielding Harrington, was done in retaliation for Plaintiff's political alignment and for protected efforts to enforce investor rights.~~

~~[79.] Such retaliation constitutes an unconstitutional use of state power in violation of the First and Fourteenth Amendments.~~

~~**COUNT IV: Civil Conspiracy to Deprive Constitutional Rights (42 U.S.C. § 1983 and § 1985)**~~

~~[80.] Plaintiff incorporates by reference all prior paragraphs.~~

~~[81.] Defendants Greg Harrington, TR Capital insiders, and public officers of the State of Colorado jointly conspired to execute a plan that deprived Plaintiff of constitutionally protected rights.~~

~~[82.] This included the fabrication of a Stipulation, unlawful bankruptcy filings, the misuse of privilege to block testimony, and the denial of access to a fair hearing.~~

~~[83.] These actions constitute a civil conspiracy under color of law to violate Plaintiff's rights under 42 U.S.C. § 1983 and §1985.~~

~~[84.] The damage caused by this conspiracy was not limited to past misconduct. At the time the State initiated prosecution on December 10, 2021, Plaintiff had launched a viable, federally registered reorganization vehicle—VetaNova, Inc.—with a confirmed public market capitalization exceeding $65 million. The platform was clean, financeable, and supported by experienced operators and institutional capital. Based on Plaintiff's track record in launching successful public companies—including Navidec (NASDAQ: NVDC) and BPZ Resources (NYSE: BPZ)—VetaNova was positioned to scale rapidly and carried a credible projection of achieving a $1 billion market capitalization within twelve months. The State's unlawful prosecution, premised on a knowingly fraudulent Stipulation and executed without notice, hearing, or adjudication, destroyed this opportunity midstream. The loss of VetaNova represents the most quantifiable economic injury caused by the conspiracy and underscores both the magnitude of harm and the intentional suppression at the heart of this action.~~

~~COUNT V: Fraud and Constructive Fraud (State Law)~~

~~[85.] Plaintiff incorporates by reference all prior paragraphs.~~

Case No. 1:25-cv-00788-PAB-NRN Document 30 filed 05/07/25 USDC Colorado

[86.] Defendant Greg Harrington knowingly made false representations and material omissions in drafting and executing the Stipulation for Injunction and Other Relief. These included falsely asserting that he held lawful authority to bind Two Rivers and TR Capital; fabricating obligations owed to the State; and concealing the fact that the Stipulation had not been approved by any corporate board, investor group, or judicial officer. He further misrepresented the legal standing of Farms F-2 and Orlando Reservoir No. 2, using the Stipulation to initiate bankruptcy proceedings without vote, consent, or evidentiary support.

[87.] The State of Colorado, acting through the Attorney General's Office, was aware of these misrepresentations. Rather than reject the Stipulation, the State signed it, filed it in open court, and presented it as a basis for prosecution. The State's silence on Harrington's felony record, corporate overreach, and known procedural defects gave false assurances of legality, judicial support, and factual accuracy. That silence was not neutral—it was instrumental.

[88.] As a direct result of this coordinated fraud, Plaintiff was stripped of his ability to foreclose on a secured Deed of Trust; falsely portrayed as liable for conduct he did not commit; and publicly attacked by the State based on documents it knew to be fraudulent. The State's complicity in those misrepresentations destroyed a functioning $65 million reorganization entity—VetaNova, Inc.—which had been structured for investor recovery and had credible projections exceeding $1 billion in market potential based on Plaintiff's prior public company record. The destruction of that opportunity constitutes compensable fraud and supports claims for actual and punitive damages.

[89.] As a direct result, Plaintiff was deprived of property and legal recourse.

Case No. 1:25-cv-00708-RAB-NRN Document 49 filed 05/13/25 USDC Colorado

~~COUNT VI: Declaratory Relief — Invalidity of Stipulation, Bankruptcy Filings, and Adversary Proceedings~~

~~[90.] Plaintiff incorporates by reference all prior paragraphs.~~

~~[91.] This Court has authority under 28 U.S.C. §§ 2201–2202 to declare the legal rights and obligations of the parties. Declaratory relief is necessary to resolve the continued reliance on a fraudulent Stipulation and the cloud of litigation it created.~~

~~[92.] Plaintiff seeks a declaration that:~~

~~[(a)] The "Stipulation for Injunction and Other Relief" is void ab initio,~~

~~[(b)] The Chapter 11 bankruptcies of Two Rivers Farms F-2 and Orlando Reservoir No. 2 were filed without valid authority and are legally void,~~

~~Adversary Proceeding~~ **— against Harrington and the individual State Defendants**

54. Plaintiff re-alleges the foregoing paragraphs. First, the property interest: Plaintiff held constitutionally protected property interests in his recorded secured lien under Deed of Trust No. 404224, the GCP-1 Preferred priority it secured, the Paulson-preserved collection rights, and the capital he personally advanced. Second, the deprivation: the May 5, 2023 Stipulation — entered without notice to Plaintiff, without hearing, and without any adjudication binding on him — allocated $2,000,000 of the proceeds of the securing assets to the State, released the Harrington respondents, and adopted the plan to use bankruptcy to clear title on the collateral (Ex. 44 at 5), and it was thereafter deployed to those ends. Third, the process owed: notice and an opportunity to be heard before state officials and a private signatory disposed of, redirected proceeds from, or initiated title-clearing proceedings against the collateral securing Plaintiff's recorded interest. That entitlement is settled law: the holder of a recorded security interest possesses a substantial property interest, and actual notice is a "minimum constitutional precondition" to a proceeding that will adversely affect that interest where the holder's name and address are reasonably ascertainable — as Plaintiff's were, from the face of the recorded deed. *Mennonite Board of Missions v. Adams*, 462 U.S. 791, 798–800 (1983). A proceeding need not

adjudicate the merits of the holder's claim to adversely affect it, and a cause of action is itself a species of property protected by due process. *Tulsa Professional Collection Services v. Pope*, 485 U.S. 478, 485, 488 (1988). Fourth, why the process afforded did not cure the deprivation: by the time of the later enforcement trial, the Stipulation had already allocated the sale proceeds, released the Harrington respondents, adopted the title-clearing plan, and treated the secured interests as fraudulent — all before Plaintiff had notice or party status as to that transaction — and at trial the State developed its factual case through its own attorneys while refusing a Rule 30(b)(6) designee, denying Plaintiff a meaningful opportunity to examine adverse witnesses and test the factual basis for the deprivation (Ex. 45) — and the State's own 2019 dismissal-with-prejudice, conceding Plaintiff retained no post-resignation control (Ex. 34), shows the State knew Plaintiff had no control over the assets the Stipulation disposed of. Mathews v. Eldridge. The deprivation was effected under color of state law through the joint action of Harrington and the State Defendants. Lugar v. Edmondson Oil Co. The conduct on which this and the following claims against the individual State Defendants rest was not prosecutorial advocacy but administrative, investigative, and transactional action outside the scope of absolute immunity: the State Defendants negotiated and drafted the May 5, 2023 Stipulation with a private party out of court, awarded the State $2,000,000 from the proceeds of company-property sales, endorsed and installed Greg Harrington — without disclosing his federal securities-fraud conviction and Ponzi history — as the lawful chief executive of Two Rivers, and arranged the bankruptcy "clear title" plan and the disposition of the 404224 collateral. The State owed and breached a duty of ordinary inquiry into the counterparty it endorsed: Harrington's federal securities-fraud conviction (United States v. Harrington, D. Colo. No. 1:93-cr-00131) was a public record in the State's own federal district. And from August 21, 2023 forward, the State acted with actual knowledge on the record: Plaintiff's Amended Closing Argument informed the court and the State's counsel that Harrington had told Plaintiff and others of his securities-fraud conviction (Ex. 46 ¶ 33) — after which the State proceeded to the July 9, 2025 judgment, retained the $2,000,000 allocation, and pressed the enforcement acts

Case No. 1:25-cv-00708-PAB-NRN Document 39 filed 05/11/26 USDC Colorado

pleaded below, each with that knowledge. By defendant: Commissioner Chan is the official in whose name the enforcement action was brought and on whose authority the May 5, 2023 Stipulation was executed and the $2,000,000 allocation taken, and she was the addressee of Harrington's February 2, 2024 solicitation that the State "take appropriate action" against Plaintiff (Ex. 44; Ex. 47 at 2) — transactional and administrative acts. Assistant Attorney General Hunt recorded a fixed adverse view of Plaintiff in advance of adjudication in the January 19, 2023 internal email (Ex. 42) — fact-development outside courtroom advocacy. Assistant Attorney General Kidd-Aaron signed the Stipulation as to form and was copied on the February 2, 2024 solicitation (Ex. 44, signature page; Ex. 47 at 2) — transactional participation in the out-of-court disposition. Attorney General Weiser personally attended the enforcement trial against Plaintiff for a full day, accompanied by members of his office and by Commissioner Chan; Assistant Attorney General Finke sat at the State's counsel table at that trial alongside Hunt and Kidd-Aaron — facts pleaded on Plaintiff's personal observation, establishing each defendant's personal knowledge of and personal engagement in the enforcement effort rather than supervisory remove; the conduct on which liability rests remains the out-of-court transactional and administrative acts set out above. Absolute prosecutorial immunity does not reach such investigative, administrative, and property-directed conduct. Imbler v. Pachtman; Buckley v. Fitzsimmons.

**THIRD CLAIM FOR RELIEF**

**First Amendment Retaliation and Selective Enforcement — 42 U.S.C. § 1983**

**— against the individual State Defendants**

55. Plaintiff re-alleges the foregoing paragraphs. Plaintiff engaged in protected activity by reporting the diversion of GrowCo investor capital to the Colorado Division of Securities, beginning in 2017 and formalized through the July 13, 2018 letter of his counsel, Tobin D. Kern, Esq., of Volant Law (Ex. 25). The report was specific: it identified the fabricated $6,207,943.50 journal entry, delivered the

supporting bank records and the master investor list, disclosed the forensic audit then underway, and expressly requested that the State subpoena Harding — "a subpoena to Two Rivers and Mr. Harding would be very beneficial" (Ex. 25). The State did not act on the report for more than three years. Plaintiff renewed the notice on the record of the State's own enforcement case: his August 21, 2023 Amended Closing Argument informed the Attorney General's Office and the court that Harrington — to whom the Stipulation had delivered control of the encumbered assets — was by his own account a convicted securities-fraud felon, and that the Stipulation he signed was unsworn and never adjudicated (Ex. 46). The State corrected nothing. When it acted, it prosecuted the reporter alongside the diverter, under the Stipulation's joint "Prior Management" recital — treating the man who reported the diversion identically to the man who committed it — while releasing the Harrington-controlled Respondents, the parties who held control of the company and its assets. The State's own 2019 concession that Plaintiff retained no control over the company's funds or assets after his resignation is direct documentary proof that the enforcement lacked a good-faith basis as to Plaintiff specifically (Ex. 34). Assistant Attorney General Hunt's January 19, 2023 internal email reflects a fixed adverse view of Plaintiff in advance of adjudication (Ex. 42). Plaintiff's protected activity continues: on June 11, 2026, he submitted federal criminal referrals, reporting the conduct pleaded in this Complaint as violations of 18 U.S.C. § 1962 and other federal statutes, to five federal investigative and prosecutorial agencies, anchored on the same documented conduct, and noticed those referrals on the dockets of this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), expressly in his capacity as a federal whistleblower. The selective-enforcement showing is pleaded within this claim, anchored to the released-Respondents comparator rather than to membership in a protected class.

Case No. 1:25-cv-00708-RAB-NRN Document 40 filed 05/13/25 USDC Colorado

## FOURTH CLAIM FOR RELIEF

## Conspiracy to Deprive Civil Rights — 42 U.S.C. § 1983

## — against Harrington and the individual State Defendants

56. Plaintiff re-alleges the foregoing paragraphs. Harrington and the State Defendants reached an agreement to deprive Plaintiff of his federally protected rights and acted on it: they negotiated and jointly executed the May 5, 2023 Stipulation (Ex. 44), agreed within it to use bankruptcy to clear title on the securing assets, agreed that Harrington would assist the prosecution, and advanced the parallel bankruptcy proceedings against the secured investors (Ex. 48). The continuing coordination is corroborated by Harrington's February 2, 2024 letter to the Commissioner copying Assistant Attorney General Kidd-Aaron (Ex. 47). A private party who willfully participates in joint action with state officials acts under color of state law. Dennis v. Sparks; Tonkovich v. Kansas Bd. of Regents.

## FIFTH CLAIM FOR RELIEF

## Fraud and Constructive Fraud — against Harrington, Harding, and the corporate Defendants

57. Plaintiff re-alleges the foregoing paragraphs and pleads with particularity. Pursuant to the February 22, 2019 Share Exchange Agreement, as amended, Harrington and Harding — the officers who negotiated, authorized, and executed the transaction — caused Two Rivers to issue 30,000,000 shares to the Easby shell entity at the July 31, 2019 closing in exchange for the insolvent Vaxa Global entity, representing in and through the transaction documents to Two Rivers, its board, and its shareholders that Vaxa constituted value for the shares issued (Exs. 29, 30). The representation was false when made: Vaxa's own financial statements showed negative equity of approximately $582,071 (Ex. 30), the transaction was undertaken without independent valuation or shareholder vote, and the protections of the original letter of intent — market-priced initial shares, an independent fairness opinion, and appraisal — had been stripped by the binding October 22, 2018 revision (Exs. 56, 57). The Company's own quarterly report disclosing the acquisition applied no value to the earn-out "due to the historical

performance of Vaxa and the Company's expectation of the likelihood of material earnings during the window" — the acquirer's own admission that it expected the acquired business to produce no material earnings — while recording $14,100,000 of goodwill, exceeding the entire $13,200,000 purchase price, against net-negative assets (Ex. 32, Note 8). The purpose and effect were to seize control of the company and the assets securing the GrowCo investors. Plaintiff's injury from the fraud is direct, not derivative: the issuance delivered control of the obligor on the 404224 collateral to the perpetrators, who then stripped the securing assets — injuring Plaintiff's own recorded security and Paulson-preserved collection rights, an injury distinct from any injury to Two Rivers itself. As to reliance: the fraud operated on the corporate machinery on which Plaintiff's security depended, and Plaintiff pleads it both as fraud on the entity effected by its own faithless officers, for which reliance by Plaintiff is not an element under the constructive-fraud theory, and as part of the fraudulent scheme pleaded in the Sixth Claim. The corporate Defendants acted through their officers Harrington and Harding in authorizing and effecting that issuance and are liable for it. Plaintiff did not discover, and could not reasonably have discovered, the fraudulent character and effect of this transaction until the resulting deprivation of his secured interest became manifest through the 2023 Stipulation and the 2024 adversary proceedings; the claim is therefore timely under the discovery rule. Fed. R. Civ. P. 9(b).

**SIXTH CLAIM FOR RELIEF**

**Civil RICO — 18 U.S.C. § 1962(c)**

**— against Harrington, Harding, Kirby, Yorke, I. Wistar Morris, Sam Morris, and Ploen**

58. Plaintiff re-alleges the foregoing paragraphs. The enterprise is an association-in-fact, distinct from each defendant, consisting of Greg Harrington; the entities he operated from a single Scottsdale, Arizona mailbox (4400 N. Scottsdale Road, Suite 9-289) (Ex. 39) — Investors Fiduciary, LLC; Fenner & Beane, LLLP; Easby Land & Cattle Company, LLC; Easy Water, LLC; and WaterVault America — together with Two Rivers Water & Farming Company, TR Capital Partners, LLC, TR El Paso Land,

Case No. 1:25-cv-00788-PAB-NRN Document 49 filed 05/13/25 USDC Colorado

LLC, and the insider funds (Elevation Fund, JMW Fund, Richland Fund, and San Gabriel Fund). The enterprise functioned as a continuing unit with the common purpose of capturing the assets of Two Rivers and its subsidiaries and impairing the GrowCo investors' secured interest under Deed of Trust No. 404224, targeting it for extinguishment. *United States v. Turkette.* The enterprise operated by and for the TR Capital Partners control group — insiders and their affiliated funds who together held 88.51% of TR Capital Partners, LLC: the Morris family bloc (56.57%, comprising I. Wistar Morris, the Cotswold Foundation, Eleventh Generation, and Martha Morris), the Yorke funds (JMW Fund, San Gabriel Fund, and Richland Fund), and the Kirby funds (Elevation Fund, Kirby Enterprise Fund, and Charles B. Kirby) (Ex. 5 at 2).

59. Each defendant participated in conducting the affairs of the enterprise, as follows.

**Harrington** directed the enterprise. A federally convicted securities-fraud felon (D. Colo. No. 1:93-cr-00131) (Ex. 1), and a previously adjudicated insider of a Ponzi scheme (Ex. 2), he seized control of Two Rivers in 2019 through the Vaxa reverse merger — causing Two Rivers to issue 30,000,000 shares to his Easby shell for an insolvent entity, with no shareholder vote, board resolution, or cash (Exs. 29, 30, 32, 33) — installed himself as chief executive, fronted the fictitious "Fenner & Beane" (Ex. 38), drafted the May 5, 2023 Stipulation (Ex. 44), and routed the enterprise's proceeds to his Scottsdale mailbox (Exs. 35, 36, 37, 39).

**Harding**, as Two Rivers' chief financial officer and later chief executive, recorded the fabricated $6,207,943.50 journal entry on August 16, 2017 (Ex. 24), executed the Vaxa share issuance (Ex. 30), signed the El Paso land conveyances as chief financial officer, and received insider payoffs of $1,300.00 and $2,275.41 from the El Paso proceeds (Exs. 35, 36).

**Kirby**, a securities professional barred by the Securities and Exchange Commission, was an insider of the TR Capital control group through Elevation Fund, the Kirby Enterprise Fund, and his personal holding (Ex. 5); he used the "Blue Yellow" and "Blue & Green" entities to receive redirected GrowCo note interest totaling $729,103.15 at Harding's written direction and with Kirby copied on the instruction

(Exs. 8, 18); and his Elevation Fund received the insider payoffs of $2,429.02 and $4,251.55 from the El Paso proceeds (Exs. 35, 36).

**Yorke** controlled three of the four insider funds in the TR Capital Partners control group — the JMW Fund, the San Gabriel Fund, and the Richland Fund (Ex. 5); the funds' holdings ran to Yorke personally, through the San Gabriel Benefit Plan "fbo Justin Yorke" at Yorke's own Pasadena address on Richland Place (Ex. 59) — through which the control group held 88.51% of TR Capital Partners, LLC, the entity that received and held the diverted GrowCo capital. His role in TR Capital was not merely economic: he sat and acted as a member of its board of directors — the company's February 2015 board minutes record that Yorke attended and acted at the November 12, 2014 meeting of the TR Capital Partners board, voting on the declaration of a distribution to the preferred members (Ex. 58) — placing him at the board table of the enterprise's holding entity from the outset. He executed the modification of TR Capital's limited-liability-company agreement — Two Rivers' chief financial officer addressed him with the board itself: "Dear TR Capital Board, Justin and John" (Ex. 61) — and Harding sent Yorke personally, at his McGrain Financial address, the chief financial officer's weekly reports on the transfer of the DFP assets, the Bessemer shares, and the El Paso County land into TR Capital (Ex. 60) — the same El Paso land whose sale proceeds his funds received in 2019. The coordination continued after the closings: on April 2, 2020, Harding wrote to McGrain, Yorke, and Christopher Bragg, calculating interest owed to and refunds due "your funds" — Richland, JMW, and San Gabriel — on the funds' advances for GCP1 legal fees (Ex. 62). Each of his three funds received the identical pre-set insider payoffs of $2,429.02 and $4,251.55 from the El Paso land proceeds — on the same tickets, at the same closings, through the same title agent as the other insider funds (Exs. 35, 36) — evidencing an allocation fixed in advance by agreement among the fund principals. The fund group also had its own seat in the boardroom: Christopher Bragg — a partner in the McGrain Financial group, the group affiliated with the San Gabriel, JMW, and Richland funds (Exs. 5, 62) — served as a Two Rivers director and audit-committee member from September 2016 until the November 2018

mass resignation (Two Rivers 2016 and 2017 Forms 10-K, Part III), giving Yorke's funds board-level representation throughout the diversion, the October 22, 2018 stripping of the Vaxa transaction's protections (Ex. 57), and the resignations that cleared the way for the replacement board. As a principal of the insider control group, Yorke shared the controlling bloc's duty to the shareholders of the company the group controlled not to permit the stripping of those protections or the takeover it enabled; the bloc permitted both, and his funds took the proceeds. One who directs three coordinated funds inside the bloc that owned the enterprise's holding entity, holds board representation through the funds' own partner, and joins the pre-arranged division of the proceeds, participates in the operation and management of the enterprise.

**I. Wistar Morris** was the single largest individual holder in the TR Capital control group (27.85%), and the Morris family entities — including the Cotswold Foundation, Eleventh Generation, and Martha Morris — together held 56.57% of TR Capital Partners (Ex. 5). He sat as a director of TR Capital Partners itself: the company's February 2015 board minutes list him among "all of the directors" (Ex. 58). He participated in the operation and management of the enterprise through his attorney and board representative, Sam Morris, who held the Morris seat on the Two Rivers board from July 2016 until the November 2018 resignation and sat on the GrowCo Partners 1 board as his proxy — the acts of an agent installed to represent the principal's interest being acts of the principal. And he was the largest single recipient of the El Paso land proceeds: the Morris-affiliated Cotswold Foundation's payoffs of $5,100.00 and $8,926.60 — $14,026.60 in total — exceeded every other payee on the two closings (Exs. 35, 36).

**Sam Morris**, a director of Two Rivers from July 2016 until his resignation in November 2018 — chair of its compensation committee, chair of its governance and nominating committee, and a member of its audit committee during the period in which the fabricated $6,207,943.50 journal entry was recorded and GrowCo was deconsolidated (Two Rivers 2016, 2017, and 2018 Forms 10-K, Part III) — and the attorney for and board proxy of I. Wistar Morris, represented the Morris interest on the Two Rivers

Case No. 1:25-cv-00708-PAB-NRN Document 49 filed 05/13/25 USDC Colorado

board, and one of GrowCo Partners 1's two Common Unit Managers, jointly with Harding: the signed May 15, 2018 minutes confirm "the two Common Unit Managers, Wayne Harding and Samuel Morris," ratify "all actions taken by Wayne Harding and Samuel Morris, Jr., either individually or together since May 25, 2016, the date of John McKowen's resignation," approve the eviction that extinguished the operating tenant's revenue, and condition any settlement of the litigation then pending against GCP-1, Harding, and Morris himself on its dismissal with prejudice (Exs. 28, 28b). Morris thus connected all three levels of the enterprise in one person — manager of the investors' collateral entity, director of the diverting parent, and personal attorney to the TR Capital director who received the largest individual share of the proceeds. He sat on the board on October 22, 2018, when Two Rivers executed the binding revised letter of intent that stripped the Vaxa transaction's protections — eliminating the independent fairness opinion and committing 30,000,000 newly issued shares at closing (Ex. 57) — and he owed the shareholders a duty to stop that transaction and the continuing diversion; instead, the following month he and the entire board resigned, clearing the way for the replacement board under which the issuance closed on July 31, 2019, pursuant to the February 22, 2019 agreement, while the Morris interests he represented received the El Paso insider payoffs (Exs. 35, 36) — thereby participating in the operation and management of the enterprise.

**Ploen**, a GrowCo director, acted to conceal the enterprise: at the May 1, 2017 board meeting he voted with Harding to defeat an independent audit and outside counsel and to deny the return of GrowCo's books and records, and represented that "everything is out in the open" — approximately three and a half months before Harding recorded the fabricated $6.2 million entry that an audit would have surfaced (Ex. 22 at 35).

60. The defendants conducted the affairs of that enterprise through a pattern of racketeering activity: a scheme to defraud the secured GrowCo investors, the 404224 beneficiaries, and Plaintiff as holder of the recorded secured interest by stripping the assets of Two Rivers and its subsidiaries through concealed, below-market, self-dealing dispositions to a recurring circle of insiders, and by concealing

those dispositions, in furtherance of which the defendants repeatedly used the United States mails and interstate wires, 18 U.S.C. §§ 1341, 1343. The El Paso County land sales set out below are a fully documented, representative instance of that method; the same method was then directed at the assets securing the GrowCo investors' 404224 interest. The pattern spans two connected periods: the 2016–2018 conversion and concealment of GrowCo investor capital (Era 2), pleaded in the alternative as predicate acts in the two paragraphs that follow, and the 2019–2026 asset-stripping and collateral-extinguishment campaign that completed the scheme.

61. The pattern begins with the conversion of GrowCo investor capital in 2016–2018 (Era 2), documented in the BCLS forensic report (Ex. 24). Plaintiff pleads the following Era 2 acts as predicate acts of racketeering, in the alternative and in addition to the acts set out below: (a) between 2015 and 2017, Harding, by interstate wire and mail, redirected GrowCo note interest to the insider entity Blue Yellow and caused $729,103.15 to be paid to Kirby's vendor entity Blue & Green at Harding's written direction — including the January 20, 2016 written payment instruction — with Kirby copied on the instruction — diverting, and concealing the diversion of, funds owed to the investors whose recovery the 404224 collateral secured (Exs. 8, 18), 18 U.S.C. §§ 1341, 1343; (b) on August 16, 2017, Harding recorded the fabricated $6,207,943.50 journal entry with no supporting documentation, left more than $4.2 million unpaid to GrowCo, and deconsolidated GrowCo so the parent could use its assets while concealing its losses, transmitting the resulting false financial reports by interstate wire (Ex. 24 at 6), 18 U.S.C. § 1343; (c) at the May 1, 2017 board meeting, Ploen voted with Harding to defeat the independent audit and outside counsel and to refuse production of the general ledger that would have exposed the diversion, representing that "everything is out in the open" (Ex. 22 at 35); and (d) on May 15, 2018, the GrowCo Partners 1 board on which Sam Morris sat ratified the insiders' post-resignation actions, including the eviction of the cash-flow-positive tenant that severed the collateral's revenue stream (Ex. 28). These acts converted and concealed the capital whose repayment the Deed of Trust No. 404224 collateral secured, and were the opening acts of the same scheme — by the same

participants, using the same method of concealed insider diversion, against the same secured position — that the enterprise carried to completion in 2019–2026.

62. The Era 2 acts are pleaded as predicates in the alternative, and nothing in them takes this claim outside 18 U.S.C. § 1964(c). Plaintiff does not rely on any conduct actionable as fraud in the purchase or sale of securities: the acts pleaded above are the diversion and concealment of funds already owed to GrowCo and its secured investors — creditor and collateral injury, not securities-purchaser injury. Nor does the Paulson settlement (D. Colo. No. 19-cv-02639-PAB-NRN) reach them: its release is bounded by the Class Action allegations concerning the October 2014 – December 2017 offerings, and § 1.cc expressly preserves "collection of any amounts due under the GrowCo securities" — the very collection right, secured by Deed of Trust No. 404224, whose impairment and attempted extinguishment Plaintiff pleads here. In any event, whether or not treated as actionable predicates, the Era 2 acts establish the origin, method, relatedness, and continuity of the pattern and the concealment on which the discovery-rule tolling pleaded below rests.

63. On or about October 18, 2019, the enterprise sold the 5080 Bar 10 Road parcel in El Paso County, Colorado, for $56,500 — below the assessor's contemporaneous residential-land value — and, through the title-company closing and interstate wires, disbursed the proceeds to the insider circle on identical, pre-set "partial payoff" tickets of $2,429.02 each to Elevation Fund, LLC (controlled by defendant Kirby), JMW Fund, LLC, Richland Fund, LLC, and San Gabriel Fund, LLC, together with a payoff to defendant Harding and a payment to the Morris-affiliated Cotswold Foundation, and wired the net proceeds to the enterprise's Scottsdale mailbox — disclosing none of it to the secured investors or beneficiaries of the 404224 collateral. The identical allocation across four affiliated funds, the single title agent, and the single brokerage, repeated on the successive closing below, evidence a pre-arranged self-dealing distribution rather than arm's-length lender economics. (Ex. 35.)

64. On or about December 20, 2019, the enterprise sold the 5185 Henderson Lane parcel for $57,000 — again below the assessor's residential-land value — disbursed proceeds to the same insider circle on

identical "partial payoff" tickets of $4,251.55 each, and wired $22,625.50 in net proceeds to the same Scottsdale mailbox, again without disclosure to the secured investors or beneficiaries. (Ex. 36.)

65. The enterprise then drained the proceeds from the subsidiary: on or about January 31, 2020, $72,540.49 — substantially the entire balance of TR El Paso Land's account no. 2653057727, addressed to the Scottsdale mailbox — was removed by verbal instruction recorded only as "per Chad," with no payee disclosed on the statement, concealing the destination of the proceeds. "Chad" is Chad Harrington, defendant Greg Harrington's brother — listed in Two Rivers' own records as a member of management and a signer on company bank accounts, and the person handling the El Paso closings in that period. (Ex. 37.)

66. The enterprise concealed these asset dispositions from the secured investors and the 404224 beneficiaries by causing Two Rivers to cease filing the periodic reports required of an SEC-registered issuer after its third-quarter 2019 Form 10-Q. Approximately 1,689 acres left the company during the resulting reporting blackout with no Form 10-K, 10-Q, or 8-K disclosing the dispositions or the related-party payoffs, and the Securities and Exchange Commission revoked the registration of all classes of Two Rivers securities effective August 19, 2022. (Ex. 41.)

67. On May 5, 2023, the enterprise, acting jointly with the State, executed the Stipulation that extracted $2,000,000 and directed the bankruptcy filings whose stated purpose was to "clear title" on the assets securing the GrowCo investors — turning the enterprise's asset-stripping method against the 404224 secured collateral itself. (Ex. 44.)

68. In 2024, the enterprise caused the Two Rivers debtor to file Adversary Proceedings 24-01111 and 24-01112, using the mails and the courts in an effort to declare the 404224 and 404225 Deeds of Trust void as to the secured investors and complete the extinguishment of the secured position. (Ex. 48.)

69. In furtherance of the same objective, the enterprise — through Harrington's February 2, 2024 solicitation to the Securities Commissioner and Assistant Attorney General Kidd-Aaron to "take appropriate action" against Plaintiff (Ex. 47 at 2) and the jointly executed Stipulation — procured the

State's April 14, 2026 Contempt Citation, which charges as contempt Plaintiff's federal filings themselves — a bond exchange proposed in his Chapter 11 plan on the public docket of the United States Bankruptcy Court, to issue pursuant to 11 U.S.C. § 1145(a) — that is, only upon federal-court approval of a disclosure statement and confirmation of the plan, and a board resolution of VetaNova, Inc., an SEC-reporting company — and seeks, by a motion requesting ex parte relief, a $25,000 fine, attorney fees, orders compelling Plaintiff to rescind the plan offering, to inform every offeree of his own twenty-year disqualification, and to return any funds obtained, and punitive incarceration of "no less than 90 days, and as much as 179 days" — one day below the six-month threshold at which the citation's own advisement recognizes the right to a jury trial — with imprisonment available until performance (Ex. 52 at 6, 29–31). The State thereby seeks to jail Plaintiff for his federal-court filings unless he undoes them. The citation itself documents the coordination behind it: the State's investigator affirms that he contacted counsel appearing for defendants Wistar Morris and Ploen in this action, and that she supplied him Plaintiff's March 28, 2026 communication to the beneficial owners — her March 31, 2026 forwarding email is the citation's own Exhibit D (Ex. 52, Verification ¶¶ 10–11 & Ex. D) — and the citation was filed at 8:55 a.m. on April 14, 2026, the morning of the 1:30 p.m. federal bankruptcy hearing noticed in the very communication supplied. And since June 11, 2026 — when Plaintiff provided truthful information concerning this same conduct to five federal law-enforcement agencies, noticed on the dockets of this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38) — the State Defendants have continued to press the citation and to seek Plaintiff's incarceration, knowing him to be a federal informant. That continuation is retaliation against an informant, 18 U.S.C. § 1513(e) — itself an enumerated racketeering predicate, 18 U.S.C. § 1961(1)(B) — and carries the pattern into 2026. (Ex. 52.)

70. These acts are related: they share the same enterprise and participants, the same method (concealed, below-market, self-dealing dispositions of Two Rivers assets routed through the Scottsdale mailbox and the insider circle, followed by litigation and bankruptcy machinery aimed at the secured

collateral), and the same ultimate objective — to loot Two Rivers and defeat the GrowCo investors' recovery on their secured 404224 interest. The pattern is continuous: measured from the 2016–2018 Era 2 conversion pleaded in the alternative above, it extends nearly a decade; measured only from the 2019 closings through the 2024 deed-voiding adversary proceedings and the 2025 effort to clear title, approximately six years — establishing closed-ended continuity on either measure. H.J. Inc. v. Northwestern Bell Tel. Co. The 2016–2018 diversion of GrowCo capital is both the origin of the scheme and, in the alternative, part of the pattern itself. The pattern is also open-ended and threatens continuation: the same objective was pursued most recently through the April 14, 2026 Contempt Citation (Ex. 52), which seeks to coerce Plaintiff into abandoning the federal proceedings that stand between the enterprise and the secured collateral. That same act, by attacking the reorganization that was Plaintiff's means of raising capital and retaining counsel, sought to keep Plaintiff from pursuing recovery at all.

71. Plaintiff was directly injured in his business and property by reason of the pattern — the clouding and attempted extinguishment of his recorded secured interest under Deed of Trust No. 404224, the impairment of the Paulson-preserved collection rights the deed secures, and the loss of the capital he personally advanced — the more than $1,400,000 contributed into McGrow (Ex. 17) and the $1,218,157 invested in GCP Super Units (Ex. 63). The acts directed at the secured collateral — the May 2023 Stipulation and the 2024 deed-voiding adversary proceedings — proximately caused that injury, which is direct and not derivative of injury to any other person. Plaintiff's injury is direct in a further and independent respect: at all relevant times Plaintiff conducted his investment business as a sole proprietor, in his own name, reporting it on Schedule C of his individual federal income tax returns, so that the business had no legal existence separate from Plaintiff and its income and property were his own. That business earned gross receipts of $648,704 in 2016 — the year of Plaintiff's resignation and the onset of the diversion — and its income then collapsed, to $152,210 in 2017 and to a net loss in 2018, after which the business never again earned a return and, by 2022, no longer

operated. The only receipts Plaintiff earned in the final years were from unrelated consulting work — the sale of his own labor — not from the investment business, which the pattern had rendered incapable of earning. That business was three decades in the building, and its principal asset was Plaintiff's documented record of capital formation: twice — with Navidec, Inc. and BPZ Resources, Inc. — Plaintiff built an enterprise from inception to a value exceeding $1,000,000,000 within approximately four years, and in each instance the investors realized their exits before the ensuing market downturn, a record documented in filings with the United States Securities and Exchange Commission available on EDGAR. That record was the business's earning mechanism: it is what secured sponsorship and underwriting from middle-market broker-dealers and the pathway from initial over-the-counter listing to national-exchange listing for each venture. The State's contempt citation now demands that Plaintiff personally inform every offeree that he "may not participate in the offering or sale of securities" for twenty (20) years (Ex. 52 at 31–32) — a bar the Judgment does not impose; its injunction is limited to private securities transactions (Ex. 51 at 112). A principal falsely described as barred cannot obtain broker-dealer sponsorship or exchange listing; the demanded notice would extinguish what remains of the business's goodwill — property of the sole proprietorship — and that destruction is pleaded as injury to Plaintiff's business and property, in an amount to be proven at trial. The loss thus fell on Plaintiff directly, in his own business and property, and not derivatively through any entity. In the alternative, the Era 2 conversion itself injured Plaintiff in the same property: it created and left unpaid the amounts whose collection the Paulson settlement expressly preserved (§ 1.cc) and whose security the later acts impaired and targeted for extinguishment. The injury Plaintiff pleads is not securities-purchaser injury and does not rest on conduct actionable as fraud in the purchase or sale of securities; it is the impairment and attempted extinguishment of his recorded lien, deed-of-trust collateral, and property-collection rights, effected through asset-stripping and the mails and wires and the litigation and bankruptcy machinery directed at that collateral. See 18 U.S.C. § 1964(c). *Holmes v. Securities Investor Protection Corp.* Because the Era 2 diversion was concealed — the independent audit

defeated, the general ledger withheld, the fabricated journal entry undocumented, and GrowCo deconsolidated — and because the later dispositions and their concealment kept the injury hidden until the State and Harrington executed the Stipulation in 2023 and the estate filed the deed-voiding adversaries in 2024, this action, filed in 2025, is timely under the four-year limitations period for civil RICO as to all predicate acts, including the Era 2 acts pleaded in the alternative. *Rotella v. Wood.* Plaintiff is entitled to treble damages, costs, and attorney's fees under 18 U.S.C. § 1964(c). Plaintiff seeks in this action the recovery of his own direct injury: the capital he personally advanced (more than $1,400,000 into McGrow and $1,218,157 in GCP Super Units), the value of his own GrowCo securities and of the recorded secured interest he holds, and the collapse of his sole-proprietorship investment business, in an amount to be proven at trial and trebled under 18 U.S.C. § 1964(c). The full value the enterprise stripped across Plaintiff and the co-investors — approximately $384,547,374, or $1,153,642,122 trebled, as scheduled in *In re McKowen*, No. 25-16665-KHT, Schedule A/B, Attachment 4.34-708 — is pleaded to establish the scale and object of the scheme; Plaintiff's own direct loss is a component of it, and Plaintiff, appearing pro se, seeks recovery only of that direct loss and does not assert the co-investors' claims. This is distinct from the $19,244,650 residual value of Plaintiff's reorganized VetaNova, Inc. stake that remains, valued on the same Estimated Current Valuation presented in the Debtor's Second Amended Disclosure Statement in that case.

## SEVENTH CLAIM FOR RELIEF

### Fifth Amendment Takings — Prospective Relief (*Ex parte Young*)

### — against the individual State Defendants in their official capacities (prospective relief)

72. Plaintiff re-alleges the foregoing paragraphs. Plaintiff's property-deprivation relief under this Claim is prospective and declaratory, sought against the individual State officials in their official capacities under *Ex parte Young*, as set forth in the Second Claim and the Prayer. The Claim arises directly under the Takings Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment.

Case No. 1:25-cv-00708-PAB-NRN Document 140 filed 01/13/26 USDC Colorado

Plaintiff held protected private property: his recorded secured lien under Deed of Trust No. 404224, the GCP-1 Preferred priority it secures, the *Paulson*-preserved collection rights, and the capital he personally advanced. The State of Colorado took that property through the May 5, 2023 Stipulation (Ex. 44), to which Plaintiff was not a party and which was entered without notice to or hearing for Plaintiff. In that Stipulation the State endorsed and accepted Greg Harrington — without any disclosure of his prior federal securities-fraud conviction and Ponzi-scheme history (Exs. 1, 2) — as the legitimate Chief Executive Officer of Two Rivers Water & Farming Company and its affiliates; the State claimed $2,000,000 for itself "from the proceeds of any sale of company property"; and the State adopted the position that the recorded secured interests were "fraudulent" encumbrances and directed that the related bankruptcy "clear title on the assets" so encumbered — that is, extinguish the recorded Deed of Trust No. 404224 and the companion Deed of Trust No. 404225 securing the GrowCo investors. The State then entered judgment in favor of the Commissioner in the amount of the investors' losses, $16,578,690.33, and the record shows no distribution of that recovery to the injured investors (Ex. 51). The State took that property without lawful authority and without compensation: the Colorado Securities Act authorizes the Commissioner to recover only "on behalf of the persons injured," C.R.S. § 11-51-602(2), and creates no other cause of action, § 11-51-604(12), so no provision of the Act authorized the State to take the investors' recovery for its own account. The State has paid no compensation. On these facts, Plaintiff seeks prospective relief against the individual State Defendants in their official capacities under *Ex parte Young* — a declaration that those officials may not continue to pursue, under the May 5, 2023 Stipulation, the extinguishment of Plaintiff's recorded Deed of Trust No. 404224 secured interest, and an order prospectively restraining them from further steps to void or clear title to that interest — framed so as not to enjoin or set aside any pending state-court proceeding.

Case No. 1:25-cv-00708-PAB-NRN Document 340 filed 07/13/26 USDC Colorado

## EIGHTH CLAIM FOR RELIEF

### Conspiracy to Intimidate and Retaliate Against a Federal-Court Party and Witness

### — 42 U.S.C. § 1985(2) (first clause) — against Harrington and the individual State Defendants

73. Plaintiff re-alleges the foregoing paragraphs. Plaintiff is a party and witness in proceedings in the courts of the United States, including In re McKowen, No. 25-16665-KHT (Bankr. D. Colo.), and its pending appeal, No. 26-cv-02108-CNS (D. Colo.); the adversary proceeding McKowen v. State of Colorado, Adv. No. 26-01111-KHT; and this action. Harrington and the individual State Defendants conspired to deter Plaintiff, by force, intimidation, and threat, from attending and prosecuting those federal proceedings freely, fully, and truthfully, and to injure him on account of his having done so. In furtherance of that conspiracy — evidenced by Harrington's February 2, 2024 letter soliciting that the State "take appropriate action" against Plaintiff (Ex. 47) and the jointly executed Stipulation — and documented inside the citation itself, whose verification affirms that the State's investigator contacted counsel of record for defendants Wistar Morris and Ploen in this action and received from her Plaintiff's creditor communications, incorporated as the citation's Exhibit D (Ex. 52, Verification ¶¶ 10–11 & Ex. D) — the State Defendants filed the April 14, 2026 Contempt Citation, at 8:55 a.m. on the morning of the 1:30 p.m. federal bankruptcy hearing, which charges Plaintiff's federal bankruptcy filings themselves as the contempt and seeks, by a motion requesting ex parte relief, fines, rescission of the plan offering, compelled notice by Plaintiff to every offeree of his own disqualification, and punitive incarceration of no less than 90 and as much as 179 days — one day below the citation's own six-month jury-trial threshold — with imprisonment available until performance — relief that would compel Plaintiff to undo his federal filings or go to jail (Ex. 52 at 6–7, 32). The first clause of § 1985(2) requires no racial or class-based animus. Kush v. Rutledge, 460 U.S. 719 (1983). Plaintiff was injured thereby and may recover damages under 42 U.S.C. § 1985. The State Defendants are sued in their individual capacities; Harrington is liable as a private conspirator. Plaintiff is, in addition, a federal whistleblower: his June 11, 2026 criminal referrals of the same conduct to five federal agencies are

noticed on the dockets of this Court (Dkt. 324) and the Tenth Circuit (No. 26-1190, Doc. 38), and the intimidation pleaded here seeks to force the abandonment of the federal proceedings in which he is party, witness, and referring complainant. The coercive structure is explicit: imprisonment until performance — jail unless Plaintiff undoes his federal filings. The object of that coercion was not only to force withdrawal of the federal filings but to disable Plaintiff's capacity to pursue these claims at all. The Chapter 11 reorganization the citation attacked was the vehicle through which Plaintiff — who is without capital and litigates pro se — would have reorganized, raised capital, and retained counsel to prosecute these claims against the enterprise and the State. That reorganization was dismissed on May 11, 2026, and the dismissal is now on appeal (No. 26-cv-02108-CNS). The coordinated attack on it — the State's objection lodged inside the bankruptcy and the contempt filed hours before the disclosure hearing — shared a single object: to keep a seventy-six-year-old pro se litigant from pursuing his claims and from raising the capital to retain counsel, leaving the enterprise's capture of the secured collateral unchallenged. And the filings the contempt targets are the proceedings in which the State faces the consequences of its own acts: its attorneys' out-of-court transactional conduct in the Stipulation, outside the reach of prosecutorial immunity (¶ 54); its Proof of Claim No. 19 in In re McKowen, No. 25-16665-KHT, by which it submitted its judgment to federal bankruptcy jurisdiction; and its monetary recovery taken in the investors' name, which placed that recovery within the scope of the federal Paulson judgment (¶ 50). Plaintiff is the party positioned to pursue those consequences; the contempt threatens imprisonment unless he abandons the proceedings that would impose them. The State Defendants' continuation of that coercion after June 11, 2026 — against a known federal informant — is conduct Congress has made criminal. 18 U.S.C. § 1513(e).

~~(a) No. 24-01111-KHT improperly named over 140 secured investors and violated the Paulson Settlement Agreement, and~~

Case No. 1:25-cv-00788-RMR-NRN Document 130 filed 01/13/26 USDC Colorado

[(c)] All actions derived from or relying upon the Stipulation are without legal force.

[93.] A declaration to this effect is necessary to remove the cloud over Plaintiff's secured interests, to restore investor confidence, and to prevent continued use of these instruments in any proceeding.

**COUNT VII – CIVIL RICO (18 U.S.C. §§ 1962(c), 1962(d))**

[94.] Plaintiff incorporates all prior allegations by reference.

[95.] This claim arises under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. Plaintiff alleges that Defendants engaged in a pattern of racketeering activity, coordinated through an enterprise, which directly injured Plaintiff's property interests.

Case No. 1:25-cv-00708-PAB-NRN Document 30-2 filed 05/13/25 USDC Colorado

[96.] Beginning no later than 2017 and continuing through the present, Defendants formed an association-in-fact enterprise, including Greg Harrington, Wayne Harding, TR Capital Partners, LLC, certain state actors within the Colorado Attorney General's Office, and others, with the shared purpose of stripping secured investor assets, relitigating barred claims, and diverting value through fabricated litigation.

[97.] Plaintiff first notified the Colorado Securities Commissioner in 2017 that GrowCo investor funds were being misappropriated in a Ponzi-like structure. The State ignored these warnings and took no regulatory action to stop the misconduct.

[98.] In 2019, the Colorado Attorney General's Office, acting through Special Deputy District Attorney Philip Lopez, filed a motion in Pueblo Water Court confirming that John R. McKowen left Two Rivers in May 2016 and had no control or authority thereafter. The contempt citation against Plaintiff was dismissed with prejudice. (Exhibit 7)

[99.] Despite this formal dismissal, in 2023 the Colorado Attorney General's Office reversed its position and collaborated with Greg Harrington to draft and sign the "Stipulation for Injunction and Other Relief." The Stipulation blamed Plaintiff for fraud, committed $2 million in payments to the State, and handed control of Two Rivers assets to Harrington—a convicted felon.

[100.] This Stipulation was entered into court without notice or hearing, and over a weekend, excusing Harrington from any personal accountability and clearing the path for bankruptcy filings.

[101.] Harrington then filed Chapter 11 petitions for Farms F-2 and Orlando Reservoir No. 2, along with Adversary Proceeding No. 24-01111, which sought to void the GrowCo Deed of

Case No. 1:25-cv-00708-RBJ-RN Document 39-2 filed 05/13/25 USDC Colorado

Trust (Reception No. 404224) and sue more than 140 secured investors—in direct violation of the Complete Bar Order in the Paulson Settlement Agreement. (Exhibit 1)

[102.] The State, having drafted and signed the Stipulation, knowingly enabled Harrington to revive barred claims and bypass judicial scrutiny.

[103.] The U.S. Trustee and Plaintiff moved to dismiss the bankruptcy. The bankruptcy court granted the dismissal, but the Stipulation remains unadjudicated and is still used to interfere with Plaintiff's lien enforcement.

[104.] Predicate acts of racketeering include:

[105.] Bankruptcy fraud under 18 U.S.C. §157(1) and (2),

[106.] Wire fraud and mail fraud under 18 U.S.C. §1341 and §1343,

[107.] Extortion under color of official right,

[108.] Securities fraud under 15 U.S.C. §78j(b) and 17 C.F.R. §240.10b-5,

[109.] Obstruction of justice through fraudulent Stipulation and litigation.

[110.] The enterprise's conduct injured Plaintiff by stripping lien enforcement rights, discrediting Plaintiff through false public filings, delaying access to judicial relief, and devaluing secured investor property through coordinated asset diversion.

[111.] Each Defendant conspired to violate 18 U.S.C. §1962(c) and is liable under 18 U.S.C. §1962(d) for conspiracy to engage in racketeering activity.

**WHEREFORE,** Plaintiff demands treble damages under 18 U.S.C. §1964(c), costs of suit, reasonable attorney's fees, and all other relief to which he is entitled at law or in equity.

The enterprise did not end with the execution of the Stipulation. It continued through judicial delay, nonaction, and procedural obstruction. The Denver District Court has now had the false

~~Stipulation before it for over a year—without ruling. The Colorado Attorney General's Office has refused to withdraw or reconsider its position, despite having access to exculpatory evidence from state and federal sources. This ongoing failure has exacerbated the original harm, allowed Harrington to retain control of secured assets, and caused continued injury to Plaintiff and over 140 investors.~~

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that ~~this~~the Court~~ enter~~ :

74. Declare, in aid of this Court's retained jurisdiction over the implementation of the *Paulson* judgment~~ in his favor~~ , that:

(a) the Class Members' GrowCo securities, the preserved collection rights, and the Deed of Trust No. 404224 enforcement rights securing them were retained by the Class Members and were not released or extinguished by the *Paulson* Settlement, Final Judgment, or Complete Bar Order;

(b) the State's monetary recovery of the GrowCo investors' losses against Plaintiff, and the deed-voiding bankruptcy claims, conflict with and are barred by that federal judgment to the extent they seek that investor recovery or the extinguishment of those preserved rights;

(c) the bound Defendants~~, jointly and severally, and award the following~~ — Harrington, Two Rivers, TR Capital, and Two Rivers Farms F-2 — may not use or enforce the Stipulation or the deed-voiding bankruptcy claims to reassert the released claims or reach the preserved collection security;

(d) the retained GrowCo securities and collection rights were, by the Final Order's own terms, transferable, and were validly assigned, so that Plaintiff, as holder of legal title, may enforce the preserved rights he asserts here; and

(e) the GrowCo investors' offering-loss and collection claims, having been adjudicated, barred, and preserved by the *Paulson* judgment, may not be asserted or recovered by any person or entity — including any governmental entity — claiming "by or through, on behalf of, for the benefit of, derivatively for, or as representative of" the Class Members; and the State's monetary recovery, obtainable under C.R.S. Section 11-51-602(2) only "on behalf of the persons injured," is such a representative assertion and is governed and barred by that federal judgment.

This declaration leaves the state-court judgment's regulatory injunction and the State's independent regulatory remedies wholly intact;

75. Enter prospective relief: against the individual State Defendants in their official capacities under Ex parte Young — specifically, a declaration that those officials may not continue to pursue, under the May 5, 2023 Stipulation, the extinguishment of Plaintiff's recorded Deed of Trust No. 404224 secured interest, and an order prospectively restraining them from further steps to void or clear title to that interest — framed so as not to enjoin or set aside any pending state-court proceeding;

~~[1.] Compensatory damages in an amount to be determined at trial, including but not limited to the loss of secured enforcement rights, clouded title, destruction of investor capital, reputational injury, and the collapse of VetaNova, Inc.—a $65 million market capitalization public company with credible expectations of reaching $1 billion;~~

76. Award compensatory and punitive damages against Harrington, Harding, Kirby, Yorke, I. Wistar Morris, Sam Morris, and Ploen, against the corporate Defendants, and against the individual State Defendants in their individual capacities, in an amount to be proven at trial;

77. Award treble damages ~~pursuant to~~ , costs, and attorney's fees under 18 U.S.C. § 1964(c~~) for racketeering conduct under Count VII (RICO~~);

~~[2.] Punitive~~78. Award damages under 42 U.S.C. § 1985 against ~~all~~Harrington and the individual State Defendants ~~found to have acted with malice, fraud, or reckless disregard~~, in their individual capacities, for ~~Plaintiff's constitutional and statutory~~

~~rights;~~

~~[3.] Declaratory relief that:~~

~~[(a)]~~ the ~~Stipulation for Injunction~~conspiracy to intimidate and ~~Other Relief is void ab initio;~~

~~[(b)] the bankruptcy filings~~retaliate against a federal-court party and ~~adversary~~

~~proceedings based on that Stipulation are without legal force;~~

~~Plaintiff retains enforcement rights under~~witness, as set forth in the ~~Paulson Settlement~~Eighth Claim; and

~~Colorado law;~~

~~[4.] Injunctive relief permanently enjoining Defendants from asserting or enforcing any right, claim, or proceeding based on the fraudulent Stipulation or its derivatives;~~

~~[5.] Restitution and restoration of Plaintiff's secured interests, including the GrowCo Deed of Trust (Reception No. 404224), and all related capital account rights;~~

~~[6.] Attorneys' fees and costs, including under 42 U.S.C. § 1988 and 18 U.S.C. § 1964(c), or as otherwise permitted in equity;~~

~~[7.] Pre- and post-judgment interest as allowed by law;~~

~~Any~~79.Grant such other and further relief as the Court deems just~~,~~ and proper~~, and equitable~~.

Respectfully submitted~~, May 12, 2025~~ this _____ day of ___________, 2026.

*~~John R. McKowen~~/s/ John R. McKowen*
John R. McKowen
Pro Se Plaintiff
5200 ~~S~~South Quebec ~~St.~~Street, #117
Greenwood Village, CO ~~80111~~80111
~~(~~Telephone: 303~~) -~~-248-6883
~~john@Johnmckowen.com~~

# ~~TABLE OF EXHIBITS~~

~~Exhibit 1 – Paulson Settlement Agreement~~

~~Federal settlement preserving investor enforcement rights under pages 1.cc and 28.~~

~~Entered in Case No. 19-cv-02639-PAB-NRN.~~

~~Exhibit 2 – Factually Fraudulent Stipulation~~

~~Drafted by Harrington and enforced by the State without hearing, authority, or vote.~~

~~Exhibit 3 – Farms F-2 Bankruptcy Petition~~

~~Filed December 6, 2023, using the fraudulent Stipulation to launch unauthorized bankruptcy.~~

~~Exhibit 4 – Farms F-2 Adversary Proceeding~~

~~Filed May 22, 2024; names over 140 secured investors in an attempt to void GrowCo lien rights.~~

~~Exhibit 5 – Huerfano County Deed of Trust (Reception No. 404224)~~

~~Recorded September 25, 2015; secures GrowCo Preferred Member obligations.~~

~~Exhibit 6 – 1990 Drexel Felony Conviction~~

~~Court record showing Harrington's criminal conviction for securities fraud and imprisonment.~~

~~Exhibit 7 – 2006 Zions Ponzi Case~~

~~Civil case identifying Harrington in a prior investment fraud scheme.~~

~~Exhibit 8 – 2019 10-Q Vaxa Purchase, Note 8~~

~~SEC filing showing Vaxa's negative equity, Harrington's 30M share acquisition, and $14.1M goodwill.~~

~~Exhibit 9 – Affidavit of Qualified Holder~~

~~Filed April 30, 2025; confirms statutory authority to foreclose under C.R.S. § 38-38-100.3.~~

~~Exhibit 10 – Huerfano Trustee NJF Rejection Email~~

~~May 6, 2025 refusal by Debra Reynolds to process Plaintiff's foreclosure, despite legal compliance.~~

~~Exhibit 11 – Vaxa Closing Documents, Part 1~~

~~Signed by Harrington as President of Easby Land & Cattle Company—on both sides of the transaction.~~

Exhibit 12 – Vaxa Closing Documents, Part 2
Includes GRAMZ Holdings Operating Agreement; shows securities disclaimers and risk-shifting.

Exhibit 13 – Vaxa/Two Rivers Butte Valley Lease
Five-year lease transferring GrowCo-developed assets to Harrington affiliate at $50,000 per year.

Exhibit 14 – Fenner & Beane
Fictitious financial firm created by Harrington using a defunct brokerage name and fabricated credentials. Used in email communications and website promotion.

Exhibit 15 – Two Rivers 2015 10-K
Audited by Eide Bailly LLP. Confirms GCP-1 completion, lease revenue, and full compliance under Plaintiff's control.

Exhibit 16 – Two Rivers 2016 10-K
Fully compliant capital raises and development. Acknowledges Plaintiff's resignation; identifies all post-departure transactions as related-party.

Exhibit 17 – Two Rivers 2017 10-K
Documents ongoing collapse, deconsolidation of GrowCo, and deterioration of capital structure.

Exhibit 18 – Two Rivers 2018 10-K
Discloses the Vaxa share exchange and pending collapse of public reporting and governance.

Exhibit 19 – BCLS CPA Forensic Audit
Independent audit confirming a $6.2M fabricated journal entry and approximately $4.2M intended for GCP-2 withheld causing collapse of GrowCo business model.

Case No. 1:25-cv-00708-PAB-NRN Document 39 filed 07/31/26 USDC Colorado

Email: john@johnmckowen.com

**CERTIFICATE OF SERVICE**

I hereby certify that on ~~May 12, 2025~~this _____ day of ___________, 2026, I ~~filed~~submitted the foregoing ~~**Amended Complaint** via email~~for filing by e-mail to the ~~U.S.~~Clerk of the United States District Court for the District of Colorado ~~at **cod_prose_filing@cod.uscourts.gov** , in accordance with~~pursuant to the Court's Procedures for Pro Se ~~litigants.~~ Electronic Filing. Upon docketing, the foregoing will be served on counsel of record via the Court's CM/ECF system. I further certify that on this same date, I served a ~~true and correct~~ copy of the ~~same was served~~ foregoing via ~~email~~e-mail on ~~the following parties:~~

~~Amy Colony~~
~~Colorado Department of Law Email: amy.colony@coag.gov~~

~~Zach Fitzgerald~~
~~Colorado Department of Law Email: zach.fitzgerald@coag.gov~~

Defendant Wayne Harding, a non-CM/ECF participant who appears pro se, at wayne@wayneharding.com.

~~Email: wayne@wayneharding.com~~

~~Respectfully submitted,~~

~~Dated: May 12,~~

~~2025~~

*/s/ John R. McKowen*
John R. McKowen ~~Pro Se Plaintiff~~