# EXHIBIT 1

United States v. Harrington — Securities-Fraud Conviction

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | s COURT USE ONLY s |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br>TWO RIVERS WATER & FARMING COMPANY, et al.,<br>Defendants. | |
| *Attorneys for Defendants Two Rivers Water & Farming Company and TR Capital Partners*<br><br>Andrew Contiguglia, #26901<br>The Contiguglia Law Firm, P.C.<br>138 W. 5th Ave.<br>Denver, CO 80204<br>Ph: (303) 780-7333 Fax: (303) 780-7337<br>E-Mail: ajc@contiguglia.com | Case No.: 2021CV033922<br><br>Courtroom: |
| **TWO RIVERS AND TR CAPITAL'S RESPONSE TO DEFENDANT MCKOWEN'S AMENDED MOTION FOR CONTEMPT OF COURT** | |

TWO RIVERS WATER AND FARMING COMPANY and TR CAPITAL PARTNERS, LLC ("Respondents), through counsel, respectfully submit its Response to defendant John R. McKowen's Amended Motion for Contempt of Court and states as follows:

**PROCEDURAL BACKGROUND**

1. The Colorado Commissioner of Securities filed a Complaint (the "Complaint") Exhibit I for Injunctive and Other Relief on December 10, 2021, through her counsel, the Office of the State of Colorado Attorney General, against Respondents John R. McKowen and GrowCo, Inc.;

GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; GrowCo Partners Super Units, LLC; Vitanova Partner, LLC; Vitanova Inc.; Vitanova, LLC; Vitanova Colorado, LLC; McGrow, LLC; MCG, LLC; GCO Land, LLC; Waterton Financial, Inc.; Jan McCaffrey; George McCaffrey; Wayne Harding; Edward J. Wallick; Richard G. Wiwi; and Kirsty Cameron. The Complaint alleges multimillion-dollar material misrepresentations and omissions to investors in the offer and sale of securities.

2. Two Rivers and TR Capital entered into a Settlement Agreement (Exhibit II) with the Colorado Commissioner of Securities (collectively the "Parties") on May 8, 2023, in which the Parties agreed to certain stipulated facts supporting injunctive relief prohibiting violating the Colorado Securities regulations, monetary damages and undertaking corporate actions to remove fraudulent liens placed on Respondent's property by prior management.

3. As stipulated in the Settlement Agreement with the Colorado Commissioner of Securities respondents filed bankruptcy petitions to remove the fraudulent liens placed on the property of affiliates by prior management (Exhibit II Section 1(f)). However, due to the extensive fraud, there was a systematic mismanagement and destruction of records by prior management which made Two Rivers unable to file within 14 days as stipulated. Through the Parties' respective counsel, extensions were granted to file the bankruptcy petitions.

4. Default judgments were entered against the other corporate defendants all controlled by McKowen, namely GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2 LLC; GrowCo Partners Super Units, LLC.; Vitanova Partner LLC; Vitanova Inc; Vitanova, LLC; Vitanova Colorado, LLC; McGrow, LLC; MCG, LLC; GCO Land, LLC; Waterton Financial, Inc; prohibiting violating the Colorado Securities regulations, raising money in the State of Colorado and making materially false misrepresentations to investors. (Exhibit III).

5. Except for Messrs. McKowen and Harding, the other individual defendants entered into settlement agreements similar to the Respondents' agreement. Messrs. McKowen and Harding proceeded to trial, and the Court has not yet reached a decision in their case.

**BACKGROUND OF RESPONDENTS**

6. The Respondent Two Rivers Water and Farming Company ("Two Rivers") is a Colorado corporation publicly owned with three primary affiliated companies Two Rivers Farms F-2, Inc., The Orlando Reservoir No. 2 Company, LLC ("OR2C"), HCIC Holdings, LLC. ("HCIC") and TR Capital Partners, LLC ("TR Capital") (collectively referred to as the "Companies").

7. The Respondents through the affiliated entities own real property and certain water rights.

8. From September 2019 to the date of this Response, the Companies have been managed by Mr. Greg Harrington who through Investors Fiduciary, LLC is both the largest creditor and equity holder of the Respondents. (Exhibit II Section 1(g)).

**PRIOR MANAGEMENT'S FRAUDULENT ACTIVITIES**

9. From 2010 until August 2019, Two Rivers and its affiliates were operated by John R. McKowen (CEO) and Wayne Harding (CFO and Treasurer). Mr. McKowen and Mr. Harding reorganized ownership of their operating subsidiaries based on two functional operations, water and farming. In 2010, Thorough Two Rivers Water & Farming Company began conducting private placements to purchase and operate water and farming assets in Colorado.

10. In 2016 Mr. McKowen took control of the GrowCo subsidiaries which had actively been pursuing opportunities in the cannabis cultivation business. In 2020, GrowCo and number of its affiliates filed for bankruptcy, seeking relief in part from obligations in various investor notes. The bankruptcy petition was dismissed by the bankruptcy court finding that GrowCo and its management were conducting an illegal cannabis cultivation business and therefore were not entitled to relief under appropriate federal statutes. (Exhibit IV).

11. The Securities Commissioner for the State of Colorado, Ms. Tung Chan ("Securities Commissioner") for activities the companies engaged in prior to current management involvement sued Two Rivers, TR Capital Partners, LLC ("TR Capital"), Mr. Harding, and Mr. McKowen, among others, alleging Mr. Harding and Mr. McKowen, through Two Rivers and TR Capital as well as another affiliated company, GrowCo, sold unregistered non-exempt securities in Colorado between 2014 and 2019 ("Commissioner Action"). Since the filing of the Compliant through false and misleading statements Mr. McKowen has attempted to claim to investors that both Mr. Harrington, as current management and the Securities Commissioner are attempting to divert the assets of the Respondents. (Exhibit V).

12. In fact, Mr. McKowen has been for more than a year soliciting funds from the very investors whom he has been charged with defrauding. The objective of these outrageous acts is to secure funding for VetaNova, Inc., as a successor to GrowCo, entities which have been ordered by this Court not to engage in misleading securities investment solicitations. (Exhibit VI).

**CURRENT MANAGEMENT**

13. In 2018, Mr. Greg Harrington through his financial services company, Investors Fiduciary, LLC. ("Fiduciary"), was approached by representatives of the Respondents for financing.

Terms were agreed upon whereby the Fiduciary advanced through three separate lines of credit $1,500,000.00 to Respondents and their subsidiaries. Only a few months after the funds were extended the Respondents and their affiliates were in default. Over the past six years, periodic interest and fees have been paid however those payments were insufficient to cure the default. (Exhibit II Section 1 (g))

14. Several months after the lines of credit were established but before the defaults Two Rivers management made an offer to buy a hemp growing owned by one of Mr. Harrington's companies. The suggested transaction appeared to be sound however was based on the false financial statements which showed an asset-rich company with a short-term liquidity issue. The parties agreed that the price would be determined through an analysis of an investment firm suggested by Two Rivers CEO Mr. Harding to arrive at a fair value purchase price. The consummated merger agreement was for over $14,000,000.00 in Two Rivers shares.

15. Mr. Harrington and his affiliates have never sold to the public the Two Rivers shares received in the merger. This has left Mr. Harrington with a theft loss of well over $15,000,000.00 if the defaulted lines of credit are included with the nearly worthless shares. The Colorado Commissioner of Securities in the settlement agreement acknowledges his loss.

16. Mr. Harrington secured the necessary interim financing to maintain administrative functions. However, fraudulent actions by prior management hampered efforts to secure further development financing. A thorough investigation by the Colorado Attorney General revealed that Two Rivers and its affiliates suffered from various issues, including unnecessary complexity, cross-allegations by prior management, incomplete books and records, ambiguous asset ownership, valuation inconsistencies, and a historical lack of internal controls. (Exhibit II Sections 1(h)).

17. In addition to resolving millions of dollars of judgments and other litigation, management resolved the Colorado Securities Commissioner Action against Two Rivers and TR Capital. The Respondents and the Commissioner entered into a Stipulation for Injunction and Other Relief ("Stipulation") see Exhibit I. The Stipulation alleges, among other things, Mr. McKowen, and Mr. Harding, as well as various coconspirators, undertook a series of fraudulent private placement offerings to enter the cannabis business. The ultimate result of those offerings raised well over $19 million. However, much of the proceeds were diverted for the personal gains of the conspirators. Included in this pattern of fraud was the encumbrance of property of the Respondent's affiliates for no consideration. (Exhibit II Section 1(e)).

18. The Stipulation between the Respondents and the Colorado Commissioner of Securities requires Two Rivers and TR Capital to facilitate Chapter 11, Subchapter V bankruptcy filings for their affiliates, The Orlando Reservoir No. 2 Company and Two Rivers Farms F-2, Inc. This is currently codified in the United State Bankruptcy Court Cases No. 23-13178-MER (OR2C) and No. 23-15627-KHT (TRF2). The purpose of these filings is to address alleged improper encumbrances placed on the assets by the aforementioned parties (Mr. Harding, Mr. McKowen, GrowCo, Inc., GrowCo Partners I, LLC) and potential unnamed co-conspirators.

19. McKowen continues to mislead the Court, investors, and unnamed coconspirators through numerous false or misleading accusations concerning the current CEO, Mr. Harrington. This pattern of deception has hindered the rehabilitation of the Respondents. In addition, the bankruptcy filings by the respondent's affiliates have been hampered by false claims, knowing, or unknowingly filed by investors at the behest of the McKowen. Exhibits VII.

20. Mr. McKowen further misleads the Court by referencing the *Sells v. Zion Bank case*. Mr. McKowen cites this case as evidence of Mr. Harrington's wrongdoing, but the Court dismissed the

charges against him (Exhibit VIII). Notably, the only felony charge against Mr. Harrington was a minor part of a much broader case against Drexel Burnham Lambert over 35 years ago. Since then, Mr. Harrington has demonstrably rebuilt his life, regaining his civil liberties, achieving financial stability, and launching numerous successful businesses.

**MR. MCKOWEN LACKS STANDING TO ENFORCE THE ATTORNEY GENERAL'S SETTLEMENT WITH TWO RIVERS AND TR CAPITAL**

21. The Stipulation for Injunction and Other Relief was made between the Colorado Securities Commissioner, Two Rivers Water & Farming Company, and TR Capital. It was executed by these specific parties and filed with this Court on or about March 5, 2023. Mr. McKowen was not a party to this agreement, and he was not an intended beneficiary of the provisions of the settlement.

22. To the contrary, the claims against Mr. McKowen proceeded to trial and were not resolved within this settlement stipulation. Mr. McKowen's crossclaims against Two Rivers and TR Capital were previously dismissed by this court.

23. Nothing within the settlement creates a direct benefit to Mr. McKowen that would establish a right to enforce Two Rivers' settlement obligations to the Commissioner.

24. Generally, only parties to a contract may seek to enforce its terms. See *Forest City Stapleton Inc. v. Rogers*, 393 P.3d 487, 490. In other words, a party must have the privity of contract to sue for breach of that contract. See Privity, Black's Law Dictionary (11th ed. 2019).

25. The only exception to this rule is when a third-party beneficiary to a contract is involved. In Colorado, a "person not a party to an express contract may bring an action on such contract if the parties to the agreement intended to benefit the non-party, provided that the benefit claimed is a direct and not merely an incidental benefit of the contract." *E.B. Roberts Constr. Co. v.*

*Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985). Generally speaking, a third-party beneficiary to a contract may generally sue to enforce its terms. *Bewley v Semler* 432 P3d 582 (Colo. 2018).

26. It is also generally known that a settlement agreement is a form of contract. See generally, *Million v. Grasse,* 2024 COA 22, 22CA1154 (Colo. App. Feb 29, 2024).

27. It's clear by the plain language of the stipulation that Mr. McKowen is not a party to the agreement. Further, he is not an intended beneficiary of the agreement, which would instill standing in him to enforce it.

28. As such, the Motion for Contempt filed by him is meritless and should be dismissed.

**MCKOWEN'S AMENDED MOTION FOR CONTEMPT IS FRIVOLOUS AND TWO RIVERS IS ENTITLED TO ITS ATTORNEYS FEES IN HAVING TO DEFEND AGAINST IT**

30. C.R.S. §13-17-102 provides that:

> [I]n any civil action of any nature commenced or appealed in any court of record in this state, the court shall award, by way of judgment or separate order, reasonable attorney fees against any attorney or party who has brought or defended a civil action, either in whole or in part, <u>that the court determines lacked substantial justification</u>.

Colo. Rev. Stat. § 13-17-102 Attorney fees - definitions (Colorado Revised Statutes (2024 Edition))(emphasis added).

31. Aside from Mr. McKowen failing to have standing to enforce the Commissioner's settlement with Two Rivers, it is apparent that Mr. McKowen continues to engage in a series of misrepresentations in an effort to trick potential investors into believing his shenanigans.

32. The filing of his Motion for Contempt is just another publicity stunt designed to feign and instigate credibility toward Mr. McKowen when, in fact, he has lost it.

33. At the time of the filing of his original Motion on March 7, 2024, Mr. McKowen identified and included approximately 100 additional "cc" recipients of his Motion. It is believed that these individuals are being courted by Mr. McKowen as potential investors in his VetaNova business. See attached Exhibit IX.

34. The inclusion of these 100 or so non-parties demonstrate Mr. McKowen's true motives: the embarrassment and harassment of Two Rivers and its CEO, Greg Harrington. In return, Mr. McKowen hopes to gain credibility among his constituents and convince them he wasn't at fault in this litigation.

35. The Court should send a message to Mr. McKowen that the filing of motions to enforce agreements to which one lacks standing, only in an effort to mislead a large group of individuals and cause humiliation to a party to this action, warrants the assessment of attorney fees against him.

**RESPONDENTS' REQUEST OF THIS COURT**

WHEREFORE Two Rivers and TR Capital respectfully request that this Court:

Dismiss McKowen's motion for contempt due to a lack of standing. The Court-approved settlement between Respondents and the Colorado Commissioner of Securities renders McKowen, who was not a party to the settlement, without legal standing to bring this motion.

Sanction McKowen for filing a misleading motion, and award attorney fees pursuant to C.R.S. §13-17-102. The supporting information presented by McKowen in the contempt motion is demonstrably false and misleading.

Dated April 11, 2024

Respectfully submitted,

THE CONTIGUGLIA LAW FIRM, P.C.

/s/ Andrew J. Contiguglia

______________________________

Andrew J. Contiguglia, #26901
Attorney for Defendant Two Rivers Water &
Farming Company and TR Capital Partners

**CERTIFICATE OF MAILING**

I hereby certify that a true and correct copy of the foregoing TWO RIVERS AND TR CAPITAL'S RESPONSE TO DEFENDANT MCKOWEN'S AMENDED MOTION FOR CONTEMPT OF COURT was filed via Colorado Courts E-File System (CCES), or sent via fax, email, or the U.S. Mail on April 11, 2024 to opposing counsel of record and interested parties.

/s/ Andrew J. Contiguglia

______________________________

The Contiguglia Law Firm, P.C.

# EXHIBIT 2

Sell v. Zions First National Bank — Ponzi Order Naming Harrington

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Query Reports Utilities Help Log Out

CLOSED,STD

# U.S. District Court
# DISTRICT OF ARIZONA (Phoenix Division)
# CIVIL DOCKET FOR CASE #: 2:05-cv-00684-SRB

Sell v. Zions First Natl Bk, et al
Assigned to: Senior Judge Susan R Bolton
Demand: $0
Cause: 18:1964 Racketeering (RICO) Act

Date Filed: 03/02/2005
Date Terminated: 07/14/2006
Jury Demand: Defendant
Nature of Suit: 470 Other Statutes: Racketeer/Corrupt Organization
Jurisdiction: Federal Question

**Plaintiff**

**James C Sell**
*as Receiver for American National Mortgage Partners, L.L.C., and Related Entities, and as Assignee of Creditors, Investors, Shareholders, Members, Partners and Trusts of the Receivership Entities*

represented by

**Lawrence E Wilk**
Jaburg Wilk - Phoenix, AZ
1850 N Central Ave., Ste. 1200
Phoenix, AZ 85004
602-248-1000
Email: lew@jaburgwilk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger L Cohen**
Jaburg & Wilk PC
Great American Tower
3200 N Central Ave
Ste 2000
Phoenix, AZ 85012
602-248-1000
Fax: 602-248-0522
Email: rlc@jaburgwilk.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Scott J Richardson**
Jaburg & Wilk PC
Great American Tower
3200 N Central Ave
Ste 2000
Phoenix, AZ 85012
602-248-1012
Fax: 602-248-0522
Email: srichardson@ngdlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kathi Mann Sandweiss**
Jaburg & Wilk PC
Great American Tower

3200 N Central Ave
Ste 2000
Phoenix, AZ 85012
602-248-1052
Fax: 602-248-0522
Email: kms@jaburgwilk.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Randy C. Kiesel C.P.A. PC** represented by **Wesley S Loy**
Broening Oberg Woods & Wilson PC
PO Box 20527
Phoenix, AZ 85036-0527
602-271-7700
Fax: 602-258-7785
Email: wsl@bowwlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zions First National Bank**
*a national banking association*
*also known as*
Zions First National Bank
*doing business as*
Zions Bank

represented by **Jennifer Hadley Catero**
Snell & Wilmer LLP
1 Arizona Ctr
400 E Van Buren
Phoenix, AZ 85004
602-382-6371
Fax: 602-382-6070
Email: jcatero@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel Philip Hoxie**
Snell & Wilmer LLP - Phoenix, AZ
1 E Washington St., Ste. 2700
Phoenix, AZ 85004
602-382-6000
Fax: 602-382-6070
Email: jhoxie@swlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Alan Williams**
Dioguardi Flynn LLP
7001 N Scottsdale Rd., Ste. 2060
Scottsdale, AZ 85253
480-951-8800
Fax: 480-951-8824
Email: twilliams@dioguardiflynn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Zions National Bank**
*Named as Zions National Bank (Utah and Idaho), a national banking association doing business as*
Zions Bank

represented by **Jennifer Hadley Catero**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel Philip Hoxie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Alan Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**National Bank of Arizona**
*a national banking association*

represented by **Jennifer Hadley Catero**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joel Philip Hoxie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd Alan Williams**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Western Security Bank**
*an Arizona corporation*

represented by **Richard L Green**
Osteen & Harrison
300 W Clarendon Ave
Ste 400
Phoenix, AZ 85013-3424
602-252-8888
Fax: 602-274-1209
Email: rgreen@vanosteen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Larry Dunning**
*husband*

represented by **Bryan F Murphy**
Burch & Cracchiolo PA
1850 N Central Ave., Ste. 1700
Phoenix, AZ 85004
602-234-9914
Fax: 602-234-0341
Email: bmurphy@bcattorneys.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sheila Dunning**
*wife*

represented by **Bryan F Murphy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Frank Caspare**
*husband*

represented by **Michael Salcido**
Molever Conelly PLLC
8161 E Indian Bend Rd
Ste 103
Scottsdale, AZ 85250
480-694-1280
Email: ms@arizonalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gail Caspare**
*wife*

**Defendant**

**Robert Rehm**
*husband*

represented by **Nicholas J DiCarlo**
DiCarlo Caserta McKeighan & Phelps PLC - Scottsdale
6900 E Camelback Rd., Ste. 250
Scottsdale, AZ 85251
480-222-0914
Fax: 480-222-0955
Email: ndicarlo@dcmplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Rehm**
*Named as Jane Doe Rehm - wife*

**Defendant**

**Gregory Harrington**
*husband*

represented by **Ashley D Adams**
Adams & Associates PLC
7502 E Monterey Way
Scottsdale, AZ 85251
480-219-1366
Fax: 480-219-1451
Email: aadams@azwhitecollarcrime.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Harrington**
*Named as Jane Doe Harrington - wife*

**Defendant**

**Paul Meka**
*husband*

represented by **Donald M Peters**
Miller LaSota & Peters PLC
722 E Osborn Rd., Ste. 100
Phoenix, AZ 85014

602-248-2900
Fax: 602-248-2999
Email: dpeters@lasotapeters.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Carol Meka**
*wife*

represented by **Donald M Peters**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Philip Vigarino**
*husband*

represented by **Curtis D Ensign**
Law Offices of Curtis Ensign
3225 N Central Ave
Ste 1609
Phoenix, AZ 85012-2413
602-266-3300
Fax: 602-266-3353
Email: curtisensign@cox.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Tricia Vigarino**
*wife*

represented by **Curtis D Ensign**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eric Strasser**
*husband*

**Defendant**

**Unknown Strasser**
*Named as Jane Doe Strasser - wife*

**Defendant**

**Daryl Coulter**
*husband*

represented by **J Phillip Glasscock**
J Phillip Glasscock PC
13430 N Scottsdale Rd
Ste 106
Scottsdale, AZ 85254
480-941-4359
Fax: 480-994-4223
Email: jpg@jpglaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pamela Coulter**
*wife*

represented by **J Phillip Glasscock**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark Kessler**
*husband*
*TERMINATED: 06/10/2005*

**Defendant**

**Unknown Kessler**
*Named as Jane Doe Kessler - wife*
*TERMINATED: 06/10/2005*

**Defendant**

**Marshall Boyce**
*husband*

represented by **David B Goldstein**
Hymson Goldstein Pantiliat & Lohr PLLC - Scottsdale
8706 E Manzanita Dr., Ste. 100
Scottsdale, AZ 85258
480-991-9077
Fax: 480-443-8854
Email: reception@legalcounselors.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly L Gibeaut**
Taser International
17800 N 85th St
Scottsdale, AZ 85255
480-502-6265
Fax: 480-991-0791
Email: hgibeaut@TASER.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unknown Boyce**
*Named as Jane Doe Boyce - wife*

represented by **David B Goldstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Holly L Gibeaut**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Helen Hartze**
*wife*
*TERMINATED: 06/10/2005*

**Defendant**

**Jon Doe Hartze**
*husband*

**Defendant**

| | | |
|---|---|---|
| **Randy Kiesel**<br>*husband* | represented by | **Wesley S Loy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Unknown Kiesel**<br>*Named as Jane Doe Kiesel - wife* | represented by | **Wesley S Loy**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**Randy C. Kiesel C.P.A. PC**
*an Arizona professional corporation*

**Defendant**

**David B Stocker**
*husband*

**Defendant**

**Unknown Stocker**
*Named as Jane Doe Stocker - wife*

**Defendant**

**David B. Stocker Limited**
*an Arizona professional corporation*

**Defendant**

| | | |
|---|---|---|
| **Mark Kesler**<br>*husband* | represented by | **Jason Mark Kalafat**<br>Kimerer & Derrick PC<br>221 E Indianola Ave<br>Phoenix, AZ 85012-2002<br>602-279-5900<br>Fax: 602-264-5566<br>Email: jkalafat@kimerer.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **Bernadette Kesler**<br>*wife* | represented by | **Jason Mark Kalafat**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

**Helen C Hartze**
*wife*
*also known as*
Connie Hartze

| Date Filed | # | Docket Text |
|---|---|---|
| 03/02/2005 | 1 | COMPLAINT FILED (JIR) (Entered: 03/03/2005) |
| 03/02/2005 | 2 | CERTIFICATION by pla re expert testimony, A.R.S. 12-2602A (CMM) (Entered: 03/08/2005) |
| 03/11/2005 | 3 | INITIAL ORDER by Judge David G. Campbell; plas shall ensure that all dft(s) promptly receive a copy of this order (cc: all counsel) re: order filed [3-1] (CMM) (ADI-ICMS, ). (Entered: 03/11/2005) |
| 06/10/2005 | 4 | CERTIFICATION re Expert Testimony - ARS 12-2602A by pla James C Sell (MAP) (Entered: 06/10/2005) |
| 06/10/2005 | 5 | AMENDED COMPLAINT by pla;; jury demand [1-1] terminating dft Helen Hartze, dft Jane Doe Kessler, dft Mark Kessler; adding dft Mark Kesler, Jane Doe Kesler, Helen C Hartze (DMT) (Entered: 06/13/2005) |
| 06/29/2005 | 6 | MOTION for Extension of Time to Serve the First Amended Complaint by Pla James C Sell. (MAP, ) (Entered: 07/09/2005) |
| 07/11/2005 | 7 | STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT re 5 First Amended Complaint by James C Sell, Marshall Boyce, Jane Doe Boyce. (LSP, ) (Entered: 07/12/2005) |
| 07/12/2005 | 8 | STIPULATION FOR EXTENSION OF TIME TO ANSWER FIRST AMENDED COMPLAINT re 5 by James C Sell, Randy Kiesel, Jane Doe Kiesel, Randy C. Kiesel, CPA, P.C. (TLJ, ) (Entered: 07/13/2005) |
| 07/12/2005 | 9 | STIPULATION re 5 Amended Complaint, that Zions and NBA's motion to dismiss 1st amended complaint may extend to 35 pages in length and is due 08/26/05, by James C Sell, Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (KCS) (Entered: 07/13/2005) |
| 07/13/2005 | 10 | SUMMONS Returned Executed by James C Sell. Philip Vigarino served (personal) on 6/26/2005, answer due 7/18/2005; Philip Vigarino served for Tricia Vigarino on 6/26/2005, answer due 7/18/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 11 | Summons Returned Unexecuted as to Philip Vigarino, Tricia Vigarino. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 12 | SUMMONS Returned Executed by James C Sell. Eric Strasser served (personal) on 6/27/2005, answer due 7/18/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 13 | Summons Returned Unexecuted as to Eric Strasser. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 14 | Summons Returned Unexecuted as to Larry Dunning. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 19 | SUMMONS Returned Executed by James C Sell (personal) upon Marshall Boyce served on 6/21/2005, answer due 7/11/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 20 | SUMMONS Returned Executed by James C Sell. Gail Caspare served on 6/30/2005, answer due 7/20/2005. (MAP, ) (Entered: 07/18/2005) |

| | | |
|---|---|---|
| 07/13/2005 | 21 | SUMMONS Returned Executed by James C Sell. Upon "Kat" for Jon Doe Hartze and Helen C Hartze served on 6/22/2005, answer due 7/12/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 22 | SUMMONS Returned Executed by James C Sell. Randy C. Kiesel, CPA, P.C. (personal) served on 6/22/2005, answer due 7/12/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 23 | SUMMONS Returned Executed by James C Sell. Randy Kiesel (personal) served on 6/22/2005, answer due 7/12/2005; Jane Doe Kiesel served (upon Randy Kiesel) upon 6/22/2005, answer due 7/12/2005. (MAP, ) (Entered: 07/18/2005) |
| 07/13/2005 | 24 | SUMMONS Returned Executed by James C Sell. Robert Rehm served (personal) on 6/22/2005, answer due 7/12/2005. (MAP, ) (Entered: 07/19/2005) |
| 07/18/2005 | 15 | ORDER granting 6 Motion for Extension of Time to 8/26/05 for Pla to effect service of the Amended Complaint upon remaining Dfts. The Court will not be inclined to grant additional extensions. Signed by Judge David G. Campbell on 7/14/05. (LSP, ) (Entered: 07/18/2005) |
| 07/18/2005 | 16 | ORDER granting 7 STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT to 8/12/05 for Dfts Marshall and Cynthia Boyce to file an answer to 5 First Amended Complaint by James C Sell, Marshall Boyce, Jane Doe Boyce. (LSP, ) filed by James C Sell, Marshall Boyce, Jane Doe Boyce, . Signed by Judge David G. Campbell on 7/14/05. (LSP, ) (Entered: 07/18/2005) |
| 07/18/2005 | 17 | ORDER granting 8 STIPULATION FOR EXTENSION OF TIME TO ANSWER FIRST AMENDED COMPLAINT to 8/12/05 for Dfts Randy Kiesel, Jane Doe Kiesel and Randy Kiesel CAP, PC to file an answer to 5 first amended complaint by James C Sell, Randy Kiesel, Jane Doe Kiesel, Randy C. Kiesel, CPA, P.C. (TLJ, ) filed by James C Sell, Randy Kiesel, Jane Doe Kiesel, Randy C. Kiesel, CPA, P.C., Jane Doe Kesler . Signed by Judge David G. Campbell on 7/14/05. (LSP, ) (Entered: 07/18/2005) |
| 07/18/2005 | 18 | ORDER granting 9 STIPULATION of Zions/NBA re 5 Amended Complaint an extension of time up to and including 8/26/05 to file motion to dismiss case in its entirety and that Zions and NBA's motion to dismiss 1st amended complaint may extend to 25 pages in length and is due 08/26/05, by James C Sell, Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (KCS) filed by James C Sell, National Bank of Arizona, Zions First National Bank (Utah and Idaho), Zions National Bank . Signed by Judge David G. Campbell on 7/14/05. (LSP, ) (Entered: 07/18/2005) |
| 07/18/2005 | | Copy of document number 15, mailed to Scott Richardson on this date. (TLJ, ) (Entered: 07/18/2005) |
| 07/18/2005 | | Copy of document number 16, mailed to Scott Richardson on this date. (TLJ, ) (Entered: 07/18/2005) |
| 07/18/2005 | | Copy of document number 17, mailed to Scott Richardson on this date. (TLJ, ) (Entered: 07/18/2005) |
| 07/18/2005 | | Copy of document number 18, mailed to Scott Richardson on this date. (TLJ, ) (Entered: 07/18/2005) |
| 07/18/2005 | 25 | SUMMONS Returned Executed by James C Sell. Jon Doe Hartze and Hlen Hartz served on 6/22/2005, answer due 7/12/2005. (KMG, ) (Entered: 07/20/2005) |
| 07/27/2005 | 26 | ANSWER/letter to Amended Complaint with request for trial by jury, segregated to the trial for all other defendants by Eric Strasser.(KCS) (Entered: 08/01/2005) |

| | | |
|---|---|---|
| 08/01/2005 | 27 | NOTICE OF CORRECTION BY THE CLERK re 26 Answer to Amended Complaint filed by Eric Strasser. Description of deficiency: Wrong file date entered. Follow up by Clerks Office: File date corrected to 07-27-05. Court use only: kcs. (APJ, ) (Entered: 08/01/2005) |
| 08/12/2005 | 28 | ANSWER to Amended Complaint, *Separate* ANSWER to Complaint *of Marshall Boyce and "Jane Doe" Boyce* by Marshall Boyce.(Goldstein, David) (Entered: 08/12/2005) |
| 08/17/2005 | 29 | STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT by Pamela Coulter. (Glasscock, J) (Entered: 08/17/2005) |
| 08/22/2005 | 30 | ORDER re 29 STIPULATION FOR EXTENSION OF TIME TO ANSWER COMPLAINT by Pamela Coulter. (Glasscock, J) filed by Pamela Coulter. Signed by Judge David G Campbell on 8/22/05. (DGC, ) (Entered: 08/22/2005) |
| 08/22/2005 | 31 | ANSWER to Amended Complaint by Western Security Bank. (Attachments: # 1 Answer Continuation)(Green, Richard) (Entered: 08/22/2005) |
| 08/23/2005 | 32 | First MOTION to Dismiss Case for Lack of Jurisdiction by Paul Meka, Carol Meka. (Peters, Donald) (Entered: 08/23/2005) |
| 08/23/2005 | 33 | ANSWER to Amended Complaint by Randy C. Kiesel, CPA, PC, Randy Kiesel, Jane Doe Kiesel.(Loy, Wesley) (Entered: 08/23/2005) |
| 08/24/2005 | 34 | ANSWER to Complaint with Jury Demand by Frank Caspare.(Salcido, Michael) (Entered: 08/24/2005) |
| 08/26/2005 | 35 | NOTICE of Appearance by Jennifer Hadley Dioguardi on behalf of Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona (Dioguardi, Jennifer) (Entered: 08/26/2005) |
| 08/26/2005 | 36 | MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 08/26/2005) |
| 08/26/2005 | 37 | MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 08/26/2005) |
| 08/26/2005 | 38 | MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Attachments: # 1 Exhibit A & B)(Dioguardi, Jennifer) (Entered: 08/26/2005) |
| 08/29/2005 | 39 | Joinder re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* by Defendants Paul Meka, Carol Meka, Paul Meka, Carol Meka filed by Paul Meka, Carol Meka, Paul Meka, Carol Meka. (Peters, Donald) (Entered: 08/29/2005) |
| 08/30/2005 | 40 | NOTICE of Appearance by J Phillip Glasscock on behalf of Daryl Coulter, Pamela Coulter (Glasscock, J) (Entered: 08/30/2005) |
| 09/02/2005 | 41 | STIPULATION re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona *Extending Time for Plaintiff to Respond* by James C Sell. (Sandweiss, Kathi) (Entered: 09/02/2005) |
| 09/02/2005 | 42 | STIPULATION re 37 MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint Extending Time for Plaintiff to Respond* by James C Sell. (Sandweiss, Kathi) (Entered: 09/02/2005) |

| | | |
|---|---|---|
| 09/08/2005 | 43 | STIPULATION re 32 First MOTION to Dismiss Case for Lack of Jurisdiction *Extending Time For Plaintiff to Respond* by James C Sell. (Sandweiss, Kathi) (Entered: 09/08/2005) |
| 09/12/2005 | 44 | ORDER re 42 STIPULATION re 37 MOTION to Strike Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint Extending Time for Plaintiff to Respond by James C Sell. (Sandweiss, Kathi) filed by James C Sell. Signed by Judge David G Campbell on 9/12/05. (DGC, ) (Entered: 09/12/2005) |
| 09/12/2005 | 45 | ORDER re 41 STIPULATION re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona Extending Time for Plaintiff to Respond by James C Sell. (Sandweiss, Kathi) filed by James C Sell. Signed by Judge David G Campbell on 9/12/05. (DGC, ) (Entered: 09/12/2005) |
| 09/16/2005 | 46 | ORDER re 43 STIPULATION re 32 First MOTION to Dismiss Case for Lack of Jurisdiction Extending Time For Plaintiff to Respond by James C Sell. (Sandweiss, Kathi) filed by James C Sell. Signed by Judge David G Campbell on 9/16/05. (DGC, ) (Entered: 09/16/2005) |
| 09/22/2005 | 47 | STIPULATION *TO ALLOW DEFENDANT GREGORY HARRINGTON TO FILE A RESPONSIVE PLEADING TO THE FIRST AMENDED COMPLAINT* by Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 09/22/2005) |
| 09/26/2005 | 48 | RESPONSE to Motion re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona filed by James C Sell. (Sandweiss, Kathi) (Entered: 09/26/2005) |
| 09/26/2005 | 49 | RESPONSE in Opposition re 37 MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* filed by James C Sell. (Sandweiss, Kathi) (Entered: 09/26/2005) |
| 09/26/2005 | 50 | STIPULATION re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint Extending Time and Page Limitation* by James C Sell. (Sandweiss, Kathi) (Entered: 09/26/2005) |
| 09/26/2005 | 51 | STIPULATION re 32 First MOTION to Dismiss Case for Lack of Jurisdiction *Extending Time to Respond* by James C Sell. (Sandweiss, Kathi) (Entered: 09/26/2005) |
| 09/27/2005 | 52 | First MOTION to Dismiss Counts/Claims : 1,2,3,4,5,6,7,8,9,10,15 by Philip Vigarino, Tricia Vigarino. (Ensign, Curtis) (Entered: 09/27/2005) |
| 09/28/2005 | 53 | *Separate* ANSWER to Amended Complaint by Larry Dunning, Sheila Dunning.(Murphy, Bryan) (Entered: 09/28/2005) |
| 09/28/2005 | 54 | DEMAND for Trial by Jury by Larry Dunning, Sheila Dunning. (Murphy, Bryan) (Entered: 09/28/2005) |
| 09/30/2005 | 55 | NOTICE of Appearance by Ashley D Adams-Feldman on behalf of Gregory Harrington (Adams-Feldman, Ashley) (Entered: 09/30/2005) |
| 09/30/2005 | 56 | Joinder *In Zions First National Bank's Motion To Stay Discovery* by Defendant Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 09/30/2005) |
| 09/30/2005 | 57 | Joinder *In Zions First National Bank's Motion To Strike Incorporation By Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* by Defendant Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 09/30/2005) |
| 09/30/2005 | 58 | Joinder *IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)* by Defendant Gregory Harrington. (Attachments: # 1 Exhibit Exhibit 1 to Defendant Gregory Harrington's Joinder in Zions First National Bank's |

| | | |
|---|---|---|
| | | Motion to Dismiss and Separate Motion to Dismiss/Summary Judgment for Failure to State a Claim Pursuant to 12(b)(6)# 2 Exhibit Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 3 Exhibit Exh A (Part 1) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 4 Exhibit Exh A (Part 2) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 5 Exhibit Exh A (Part 3) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 6 Exhibit Exh A (Part 4) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 7 Exhibit Exh A (Part 5) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 8 Exhibit Exh A (Part 6) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6)# 9 Exhibit Exh A (Part 7) to Exhibit 2 to DEFENDANT GREGORY HARRINGTON?S JOINDER IN ZIONS FIRST NATIONAL BANK?S MOTION TO DISMISS and SEPARATE MOTION TO DISMISS/SUMMARY JUDGMENT FOR FAILURE TO STATE A CLAIM PURSUANT TO 12(b)(6))(Adams-Feldman, Ashley) (Entered: 09/30/2005) |
| 09/30/2005 | 59 | STIPULATION *Stipulation to Allow Defendant Mark Kesler to File a Responsive Pleading to the First Amended Complaint and Order* by Mark Kesler. (Kalafat, Jason) (Entered: 09/30/2005) |
| 10/03/2005 | 60 | Joinder re 37 MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint and Separate Motion to Strike Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* by Defendants Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter filed by Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 10/03/2005) |
| 10/03/2005 | 61 | Joinder re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona by Defendants Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter filed by Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 10/03/2005) |
| 10/03/2005 | 62 | Joinder re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* by Defendants Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter filed by Daryl Coulter, Pamela Coulter, Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 10/03/2005) |
| 10/03/2005 | 63 | DEMAND for Trial by Jury by Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 10/03/2005) |

| | | |
|---|---|---|
| 10/03/2005 | 64 | STIPULATION *Stipulation to Allow Defendant Mark Kesler to File a Responsive Pleading to the First Amended Complaint* by Mark Kesler. (Kalafat, Jason) (Entered: 10/03/2005) |
| 10/03/2005 | 65 | STIPULATION *Stipulation to Allow Defendant Mark Kesler to File a Responsive Pleading to the First Amended Complaint* by Mark Kesler. (Kalafat, Jason) (Entered: 10/03/2005) |
| 10/04/2005 | 66 | ORDER re 51 STIPULATION re 32 First MOTION to Dismiss Case for Lack of Jurisdiction *Extending Time to Respond* by James C Sell. (Sandweiss, Kathi) filed by James C Sell. Signed by Judge David G Campbell on 10/4/05. (DGC, ) (Entered: 10/04/2005) |
| 10/04/2005 | 67 | ORDER re 50 STIPULATION re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint Extending Time and Page Limitation* by James C Sell. (Sandweiss, Kathi) filed by James C Sell. Signed by Judge David G Campbell on 10/4/05. (DGC, ) (Entered: 10/04/2005) |
| 10/04/2005 | 68 | Joinder *Defendants Mark and Bernadette Kesler's Joinder in 38 Zions First National Bank's Motion to Dismiss First Amended Complaint* by Defendant Mark Kesler. (Kalafat, Jason) Modified on 10/5/2005 (LSP). DOCKET TEXT MODIFIED TO CORRECT DOCUMENT LINKAGE. (Entered: 10/04/2005) |
| 10/04/2005 | 69 | Joinder *Defendants Mark and Bernadette Kesler's Joinder in 36 Zions First National Bank's Motion to Stay Discovery* by Defendant Mark Kesler. (Kalafat, Jason) Modified on 10/5/2005 (LSP). DOCKET TEXT MODIFIED TO CORRECT DOCUMENT LINKAGE. (Entered: 10/04/2005) |
| 10/04/2005 | 70 | Joinder *Defendants Mark and Bernadette Kesler's Joinder in 37 Zions First National Bank's Motion to Strike Incorporation by Reference of Receiver's Interim Report into Plaintiff's First Amended Complaint* by Defendant Mark Kesler. (Kalafat, Jason) Modified on 10/5/2005 (LSP). DOCKET TEXT MODIFIED TO CORRECT DOCUMENT LINKAGE. (Entered: 10/04/2005) |
| 10/05/2005 | 71 | NOTICE TO FILER OF DEFICIENCY re 68 Joinder filed by Mark Kesler, 69 Joinder filed by Mark Kesler, 70 Joinder, filed by Mark Kesler. Description of deficiency: Documents linked incorrectly. (LSP) (Entered: 10/05/2005) |
| 10/06/2005 | 72 | STIPULATION *to Extend Date to File Replies in Support of: Motion to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona -and- Motion to Strike Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* by Zions First National Bank (Utah and Idaho). (Williams, Todd) (Entered: 10/06/2005) |
| 10/07/2005 | 73 | Ex Parte MOTION to Withdraw as Attorney *of record with Consent of Client* by Larry Dunning, Sheila Dunning. (Murphy, Bryan) (Entered: 10/07/2005) |
| 10/07/2005 | 74 | RESPONSE in Opposition re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* filed by James C Sell. (Attachments: # 1 Exhibit Exhibit A# 2 Exhibit Exhibit 2# 3 Exhibit Exhibit 3)(Sandweiss, Kathi) (Entered: 10/07/2005) |
| 10/07/2005 | 75 | RESPONSE in Opposition re 32 First MOTION to Dismiss Case for Lack of Jurisdiction filed by James C Sell. (Sandweiss, Kathi) (Entered: 10/07/2005) |
| 10/13/2005 | 76 | ORDER re 72 STIPULATION *to Extend Date to File Replies in Support of: Motion to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona -and- Motion to Strike Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* by Zions First National Bank (Utah and Idaho). |

| | | |
|---|---|---|
| | | (Williams, Todd) filed by Zions First National Bank (Utah and Idaho), . Signed by Judge David G Campbell on 10/13/05. (DGC, ) (Entered: 10/13/2005) |
| 10/14/2005 | 77 | ORDER denying 73 Motion to Withdraw as Attorney. Signed by Judge David G Campbell on 10/14/05. (DGC, ) (Entered: 10/14/2005) |
| 10/14/2005 | 78 | RESPONSE re 56 Joinder *in Zions First National Bank's Motion to Stay Discovery filed by Harrington* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/14/2005) |
| 10/14/2005 | 79 | RESPONSE re 57 Joinder *in Zions Motion to Strike Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint filed by Harrington* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/14/2005) |
| 10/17/2005 | 80 | RESPONSE re 61 Joinder, *in Zions Motion to Stay Discovery filed by Coulter Defendants* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/17/2005) |
| 10/17/2005 | 81 | RESPONSE re 60 Joinder, *in zions Motion to Strike Incorporation by Reference of Receiver's Interim Report into Plaintiff's First Amended Complaint and Separate Motion to Strike filed by Coulter Defendants* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/17/2005) |
| 10/17/2005 | 82 | RESPONSE re 69 Joinder, *in Zions Motion to Stay Discovery filed by Kesler Defendants* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/17/2005) |
| 10/17/2005 | 83 | RESPONSE re 70 Joinder, *in Zions Motion to Strike Incorporation by Reference of Receiver's interim Report into Plaintiff's first Amended Complaint filed by Kesler Defendants* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/17/2005) |
| 10/18/2005 | 84 | REPLY to Response to Motion re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint , Reply In Support of Motion to Dismiss* filed by Paul Meka, Carol Meka. (Peters, Donald) (Entered: 10/18/2005) |
| 10/19/2005 | 85 | STIPULATION re 74 Response in Opposition to Motion, 81 Response,, 80 Response *Stipulation to Extend Time to File Replies to (1) Motion to Dismiss; (2) Motion to Stay Discovery (3) Motion to Strike Incorporation by Reference of Receiver's Interim Report in Plaintiff's Amended Complaint* by Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 10/19/2005) |
| 10/26/2005 | 86 | RESPONSE re 58 Joinder,,,,,,,,, *Opposition to Defendant Harrington's Joinder in Zions Motion to Dismiss* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/26/2005) |
| 10/26/2005 | 87 | RESPONSE re 58 Joinder,,,,,,,,, *Opposition to Defendant Harrington's Separate Motion For Summary Judgment* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 10/26/2005) |
| 10/26/2005 | 88 | STATEMENT of Separate Statement of Facts in Support of Opposition to Defendant Gregory Harrington's Motion for Summary Judgment re 87 Response, 58 Joinder,,,,,,,,, by Plaintiff James C Sell. (Attachments: # 1 Exhibit 1-4# 2 Exhibit 5-9# 3 Exhibit 10 Part A# 4 Exhibit 10 Part B# 5 Exhibit 10 Part C# 6 Exhibit 10 Part D# 7 Exhibit 10 Part E# 8 Exhibit 10 Part F# 9 Exhibit 11-14)(Sandweiss, Kathi) (Entered: 10/26/2005) |
| 10/27/2005 | 89 | RESPONSE in Opposition re 52 First MOTION to Dismiss Counts/Claims : 1,2,3,4,5,6,7,8,9,10,15 *filed by Defendants Vigarino* filed by James C Sell. (Sandweiss, Kathi) (Entered: 10/27/2005) |
| 10/31/2005 | 90 | ORDER re 85 STIPULATION re 74 Response in Opposition to Motion, 81 Response,, 80 Response *Stipulation to Extend Time to File Replies to (1) Motion to Dismiss; (2) Motion to Stay Discovery (3) Motion to Strike Incorporation by Reference of Receiver's Interim Report in Plaintiff's Amended Complaint* by Daryl Coulter, Pamela Coulter. (Glasscock, J) |

| | | |
|---|---|---|
| | | filed by Daryl Coulter,, Pamela Coulter, . Signed by Judge David G Campbell on 10/31/05. (DGC, ) (Entered: 10/31/2005) |
| 11/02/2005 | 91 | RESPONSE re 62 Joinder, *Opposition to Joinder of Pamela Coulter and Pamela Coulter as Personal Representative of Darrel Coulter in Zions First National Bank and National Bank of Arizona's Motion to Dismiss First Amended Complaint* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 11/02/2005) |
| 11/02/2005 | 92 | STIPULATION re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint Stipulated Request to Extend Page Limit Re Reply Supporting Motion to Dismiss First Amended Complaint* by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 11/02/2005) |
| 11/03/2005 | 93 | STIPULATION *TO EXTEND DATE TO REPLY TO RESPONSES TO MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF GREG HARRINGTON* by Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 11/03/2005) |
| 11/03/2005 | 94 | RESPONSE re 68 Joinder, *Opposition to Defendants Mark and Bernadette Kesler's Joinder in Zions First National Bank's Motion to Dismiss First Amended Complaint* by Plaintiff James C Sell. (Sandweiss, Kathi) (Entered: 11/03/2005) |
| 11/07/2005 | 95 | REPLY to Response to Motion re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona filed by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 11/07/2005) |
| 11/07/2005 | 96 | REPLY to Response to Motion re 37 MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint* filed by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 11/07/2005) |
| 11/07/2005 | 97 | REPLY to Response to Motion re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* filed by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C)(Dioguardi, Jennifer) (Entered: 11/07/2005) |
| 11/07/2005 | 98 | REPLY to Response to Motion re 37 MOTION to Strike *Incorporation by Reference of Receiver's Interim Report Into Plaintiff's First Amended Complaint and Separate Motion to Strike Incorporation by Reference of Receiver's Interim Report Into Plailntiff's First Amended Complaint* filed by Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 11/07/2005) |
| 11/07/2005 | 99 | REPLY to Response to Motion re 36 MOTION to Stay Discovery on Behalf of Zions First National Bank and National Bank of Arizona *as Joined in by Coulter and Coulters Joinder in Zions' Reply* filed by Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 11/07/2005) |
| 11/07/2005 | 100 | REPLY to Response to Motion re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint and Joinder in Zion's Reply in Support of Motion to Dismiss First Amended Complaint* filed by Daryl Coulter, Pamela Coulter. (Glasscock, J) (Entered: 11/07/2005) |
| 11/09/2005 | 101 | ORDER re 92 STIPULATION re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint Stipulated Request to Extend Page Limit Re Reply Supporting Motion to Dismiss First Amended Complaint* by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) filed by National Bank of Arizona,Zions First National Bank (Utah and Idaho), Zions National Bank. Signed by Judge David G Campbell on 11/9/05. (DGC, ) (Entered: 11/09/2005) |

| | | |
|---|---|---|
| 11/09/2005 | 102 | ORDER re 93 STIPULATION *TO EXTEND DATE TO REPLY TO RESPONSES TO MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF GREG HARRINGTON* by Gregory Harrington. (Adams-Feldman, Ashley) filed by Gregory Harrington. Signed by Judge David G Campbell on 11/9/05. (DGC, ) Modified on 11/14/2005 (APJ, ). WRONG PDF DOCUMENT ATTACHED. ENTRY HAS BEEN RE-FILED. (Entered: 11/09/2005) |
| 11/11/2005 | 103 | Joinder re 38 MOTION to Dismiss Case for Lack of Jurisdiction *First Amended Complaint* by Defendants Larry Dunning, Sheila Dunning. (Stipe, James) (Entered: 11/11/2005) |
| 11/14/2005 | 104 | NOTICE OF CORRECTION BY THE CLERK re 102 Order. Description of deficiency: Wrong pdf document attached. Follow up by Clerks Office: The deficiency has been addressed by the Clerk. Court use only: dgc. (APJ, ) (Entered: 11/14/2005) |
| 11/14/2005 | 105 | ORDER re 93 STIPULATION *TO EXTEND DATE TO REPLY TO RESPONSES TO MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF GREG HARRINGTON* by Gregory Harrington. (Adams-Feldman, Ashley) filed by Gregory Harrington, . Signed by Judge David G Campbell on 11/09/05. (DGC, ) (Entered: 11/14/2005) |
| 11/15/2005 | 106 | STIPULATION *TO EXTEND THE DATE TO FILE REPLIES TO RESPONSES TO MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF GREG HARRINGTON* by Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 11/15/2005) |
| 11/22/2005 | 107 | ORDER re 106 STIPULATION *TO EXTEND THE DATE TO FILE REPLIES TO RESPONSES TO MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT FILED ON BEHALF OF GREG HARRINGTON* by Gregory Harrington. (Adams-Feldman, Ashley) filed by Gregory Harrington. Signed by Judge David G Campbell on 11/22/05. (DGC, ) (Entered: 11/22/2005) |
| 12/09/2005 | 108 | Joinder *In Zions First National Bank's Reply to Plaintiff's Opposition to Motion to Dismiss* by Defendant Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 12/09/2005) |
| 12/09/2005 | 109 | Reply *to Plaintiff's Opposition to Motion to Dismiss and Motion for Summary Judgment* by Defendant Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 12/09/2005) |
| 12/09/2005 | 110 | STATEMENT of Defendant Gregory Harrington's Separate Statement of Facts Filed in Support of His Motion to Dismiss/Summary Judgment for Failure to State a Claim Dated September 30, 2005 by Defendant Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 12/09/2005) |
| 12/09/2005 | 111 | STATEMENT of Defendant Gregory Harrington's Controverting Statement of Facts by Defendant Gregory Harrington. (Attachments: # 1 Affidavit Supplemental Declaration of Gregory Harrington)(Adams-Feldman, Ashley) (Entered: 12/09/2005) |
| 12/09/2005 | 112 | MOTION to Dismiss Case by Robert Rehm. (DiCarlo, Nicholas) (Entered: 12/09/2005) |
| 12/22/2005 | 113 | ORDER re recusal of Judge David G. Campbell. Case reassigned to Judge Lawrence O Anderson. Judge David G Campbell no longer assigned to case. Signed by Judge David G Campbell on 12/22/05. (DGC,nvj) (Entered: 12/22/2005) |
| 12/23/2005 | 114 | MOTION to Strike 110 Statement *Defendant Harrington's Separate Statement of Facts Filed in Support of His Motion to Dismiss/Summary Judgment for Failure to State a claim Dated September 30, 2005; Alternative Motion for Leave to File Response* by James C Sell. (Sandweiss, Kathi) (Entered: 12/23/2005) |

| | | |
|---|---|---|
| 01/03/2006 | 115 | RESPONSE to Motion re 114 MOTION to Strike 110 Statement *Defendant Harrington's Separate Statement of Facts Filed in Support of His Motion to Dismiss/Summary Judgment for Failure to State a claim Dated September 30, 2005; Alternative Motion for Leave to File Response DEFENDANT GREGORY HARRINGTON'S RESPONSE TO PLAINTIFF'S MOTION TO STRIKE filed by Gregory Harrington. (Adams-Feldman, Ashley) (Entered: 01/03/2006)* |
| 01/04/2006 | 116 | Party Elects Assignment of Case to District Judge Jurisdiction (MAP, ) (Entered: 01/05/2006) |
| 01/05/2006 | 117 | MINUTE ORDER re 116 Pursuant to Local Rule 3.8(a), a request has been received for a random reassignment of this case to a District Judge FURTHER ORDERED Case reassigned to by random draw to Judge Susan R. Bolton. All further pleadings should now list the following COMPLETE case number: CIV-05-684-PHX-SRB. (MAP, ) (Entered: 01/05/2006) |
| 01/09/2006 | 118 | RESPONSE in Opposition re 112 MOTION to Dismiss Case *and Joinder in Zion's First National Bank's Motion to Dismiss First Amended Complaint* filed by James C Sell. (Cohen, Roger) (Entered: 01/09/2006) |
| 01/19/2006 | 119 | Pursuant to LRCiv 7.2(f) of the Rules of Practice of the United States District Court for the District of Arizona, IT IS ORDERED setting oral argument for 112 MOTION to Dismiss Case filed by Robert Rehm,, 38 MOTION to Dismiss Case for Lack of Jurisdiction First Amended Complaint filed by National Bank of Arizona, Zions First National Bank (Utah and Idaho), Zions National Bank, and 58 Defendant Gregory Harrington's Joinder in Zions Motion to Dismiss and Separate Motion to Dismiss on January 30, 2006 at 9:30 a.m.Entered by Judge Susan R Bolton on 1/19/06. (SRB, )(This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (Entered: 01/19/2006) |
| 01/23/2006 | 120 | REPLY to Response to Motion re 112 MOTION to Dismiss Case filed by Robert Rehm. (DiCarlo, Nicholas) (Entered: 01/23/2006) |
| 01/30/2006 | 121 | Minute Entry for proceedings held before Judge Susan R Bolton: Motion Hearing held on 1/30/2006 re 112 Defendant's MOTION to Dismiss Case, 58 Defendant's Motion to Dismiss and 38 Defendant's MOTION to Dismiss Case for Lack of Jurisdiction First Amended Complaint. Matter taken under advisement. (Court Reporter Kim Moll) (MAW) (Entered: 01/30/2006) |
| 01/30/2006 | 122 | Notice re Notice of Appearance/Change of Counsel Within the Firm by Marshall Boyce (Mahaffy, Steven) (Entered: 01/30/2006) |
| 02/10/2006 | 123 | ORDER granting 32 Motion to Dismiss Case for Lack of Jurisdiction; denying 36 Motion to Stay; granting 37 Motion to Strike 39 Joinder 60 ; granting 38 Motion to Dismiss Case for Lack of Jurisdiction; granting 52 Motion to Dismiss Counts/Claims; granting 112 Motion to Dismiss Case; denying 114 Motion to Strike . Signed by Judge Susan R Bolton on 02/09/06. (DNH) (Entered: 02/10/2006) |
| 03/01/2006 | 124 | MOTION for Extension of Time to File Second Amended Complaint by James C Sell. (Sandweiss, Kathi) (Entered: 03/01/2006) |
| 03/07/2006 | 125 | RESPONSE to Motion re 124 MOTION for Extension of Time to File Second Amended Complaint filed by Zions First National Bank (Utah and Idaho), Zions National Bank, National Bank of Arizona. (Dioguardi, Jennifer) (Entered: 03/07/2006) |
| 03/10/2006 | 126 | RESPONSE to Motion re 124 MOTION for Extension of Time to File Second Amended Complaint filed by Philip Vigarino, Tricia Vigarino. (Ensign, Curtis) (Entered: 03/10/2006) |

| | | |
|---|---|---|
| 03/29/2006 | 127 | ORDER granting 124 Plaintiff's Motion for Extension of Time to File Second Amended Complaint. Signed by Judge Susan R Bolton on 3/29/06. (SRB) (Entered: 03/29/2006) |
| 03/30/2006 | 128 | Notice re State Court's Order Granting Leave to Amend Plaintiff's State Court Complaint by James C Sell (Cohen, Roger) (Entered: 03/30/2006) |
| 07/14/2006 | 129 | JUDGMENT - IT IS ORDERED AND ADJUDGED that pursuant to the Court's order dated 2/10/06, judgment is entered against plaintiff. Plaintiff to take nothing and this action is dismissed without prejudice. (SAT) (Entered: 07/14/2006) |
| 08/09/2006 | 130 | TRANSCRIPT DESIGNATION AND ORDER FORM by National Bank of Arizona for proceedings held on 1/30/2006 before Judge Bolton. (Williams, Todd) (Entered: 08/09/2006) |
| 08/17/2006 | 132 | TRANSCRIPT of Defendant's Motion to Dismiss Proceedings held on 1/30/06 before Judge Susan R Bolton. Court Reporter: Kim R Moll. (BAS, ) (Entered: 08/22/2006) |
| 08/18/2006 | 131 | TRANSCRIPT DESIGNATION AND ORDER FORM by James C Sell for proceedings held on 1/30/2006 before Judge Judge Susan Bolton. (Cohen, Roger) (Entered: 08/18/2006) |

**PACER Service Center**

**Transaction Receipt**

05/13/2025 13:34:12

| | | | |
|---|---|---|---|
| **PACER Login:** | jrmckowen | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:05-cv-00684-SRB |
| **Billable Pages:** | 14 | **Cost:** | 1.40 |

# EXHIBIT 3

GCP-1 Term Sheet (October 31, 2014)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# TWO RIVERS WATER AND FARMING COMPANY

## MEMORANDUM OF TERMS

**Preferred Units of GrowCo Partners 1, LLC**
**and**
**Common Stock Purchase Warrants of GrowCo, Inc.**

This Memorandum of Terms dated as of October 31, 2014, summarizes the principal terms of an offering of preferred units of GrowCo Partners 1, LLC ("**Partners**") and associated warrants to purchase common stock of GrowCo, Inc. ("**GrowCo**"), an indirect subsidiary of Two Rivers Water and Farming Company ("**Two Rivers**").

**THIS SUMMARY DOES NOT PURPORT TO BE COMPLETE AND IS QUALIFIED IN ITS ENTIRETY BY THE TERMS AND CONDITIONS OF THE COMPLETE AND DEFINITIVE SUBSCRIPTION AGREEMENT. NOTHING HEREIN IS BINDING AND THE SALE OF THE PREFERRED UNITS AND ASSOCIATED WARRANTS IS CONTINGENT ON NEGOTIATION AND EXECUTION OF SUCH SUBSCRIPTION AGREEMENT.**

### OFFERING TERMS

**ISSUERS:**

*Partners,* a Colorado limited liability company, has been formed to construct and manage either one or two greenhouse facilities (the "**Greenhouses**") that will be leased to marijuana growers.

*GrowCo,* a Colorado corporation, will perform construction, management and other services for Partners pursuant to a services agreement with specified periodic fees.

*Two Rivers,* a Colorado corporation, is the parent of GrowCo.

**SECURITIES OFFERED:**

Partners will sell either 6,000,000 or 10,000,000 units (the "**Offered Units**"), each consisting of one preferred unit of Partners (a "**GCP Preferred Unit**") and a warrant (a "**GrowCo Warrant**") to purchase one share of common stock of GrowCo ("**GrowCo Common**"). Each Offered Unit may be exchanged for one share of common stock ("**TURV Common**") of Two Rivers in the circumstances described below.

**PURCHASE PRICE:**

$1.00 per Offered Unit. Offered Units will be sold in multiples of 1,000.

**GROSS AMOUNT OF PROCEEDS:**

Either $6.0 million or $10.0 million.

**USE OF PROCEEDS:**

Net proceeds will be used by Partners primarily:

- to finance the construction of either one Greenhouse (if 6,000,000 Offered Units are sold) or two Greenhouses (if 10,000,000 Offered Units are sold), each to be leased to marijuana growers;
- to lend up to $1.0 million to Greenhouse lessees pursuant to lines of credit (the "**Credit Facility**");

- to finance the purchase of farmland and water taps for the Greenhouse(s); and
- for working capital and other general corporate purposes of Partners.

**TARGET CLOSING DATE**: The targeted closing date (the "**Closing Date**") will be on or before November 14, 2014.

**INVESTORS:** Institutional and other accredited investors, including affiliates of Emerging Growth Equities, Ltd. ("**EGE**").

**POST CLOSING CAPITALIZATION:**

**PARTNERS:** Depending upon whether 6,000,000 or 10,000,000 Offered Units are sold, either 6,000,000 or 10,000,000 common units of Partners ("**GCP Common Units**") will be issued to TR Capital Partners, LLC, a subsidiary of Two Rivers.

**GROWCO:** As of the date hereof, there are 30,000,000 shares of GrowCo Common outstanding, of which 10,000,000 are restricted shares that are held by GrowCo's management and business partners and that remain subject to vesting.

Depending upon whether 6,000,000 or 10,000,000 Offered Units are sold, an additional 6,000,000 or 10,000,000 shares of GrowCo Common would be reserved by GrowCo for issuance upon exercises of GrowCo Warrants.

**TWO RIVERS:** The current and proforma capitalization of Two Rivers is shown in Table A hereto.

**TERMS OF OFFERED UNITS**

**GCP PREFERRED UNITS:**

*Capital Accounts:* Each holder of GCP Preferred Units will have a capital account initially equal to the purchase price paid for those GCP Preferred Units. Such capital account will bear a yield at the rate of 12.0% per annum, computed quarterly, with such yield being added to the capital account. Each such capital account will be decreased by the amount of any distributions with respect thereto, as described below.

*Distributions:* For the following purposes, "**Distributable Amount**" means, with respect to a specified calendar year, (a) the cash flow provided by operations of Partners for such quarter, plus (b) the amount of principal and interest received by Partners from the Credit Facility during such period, plus (c) the amount of deferred lease payments received by Partners during such period (which deferred payments may, under the lease agreements relating to the Greenhouse(s), total up to $1,000,000).

In general, and to the extent the Distributable Amount

for a calendar quarter permits, the class of GCP Preferred Units will receive each quarter preferred yield distributions totaling 3.0% of the aggregate amount of GCP Preferred Unit capital accounts, and then will participate pro rata with the class of GCP Common Units in receiving distributions of the balance (if any) of such Distributable Amount. Each holder of GCP Preferred Units will be entitled to receive, within 45 days after the end of each calendar quarter, the following:

- a *preferred yield distribution* equal to 3.0% of such holder's capital account at the end of such quarter, *provided* that if the Distributable Amount for such quarter is not sufficient to pay such yield distribution on all of the GCP Preferred Units, such Distributable Amount will be paid to the holders of GCP Preferred Units pro rata, on the basis of their capital accounts at the end of such quarter; and
- a *participating profits distribution* equal to (a) the amount, if any, of Distributable Amount for such quarter remaining after payment of the GCP Preferred Unit preferred yield distributions for such quarter, *multiplied by* (b) the quotient, computed as of the end of such quarter, of dividing (i) the number of GCP Preferred Units held by such holder by (ii) the number of GCP Preferred Units plus, if the Credit Facility and any deferred lease amounts have been paid in full as of the end of such quarter, the number of GCP Common Units.

Holders of GCP Preferred Units will be entitled to continue to receive participating distributions even if their capital accounts have been reduced to $0 or less as a result of prior distributions.

Holders of GCP Common Units will not be entitled to receive any distributions of any kind with respect to a calendar quarter unless (A) the GCP Preferred Unit preferred yield distributions for such quarter have been paid in full and (B) the Credit Facility and any deferred lease amounts have been paid in full as of the end of such quarter.

*Redemption:*

The GCP Preferred Units will not be subject to redemption.

*TURV Exchanges:*

Each of the GCP Preferred Units may be exchanged at any time, at the election of the holder, as follows:

- such GCP Preferred Unit, together with a GrowCo Warrant to purchase one share of GrowCo Common, may be exchanged for one share of TURV Common;
- any GCP Preferred Unit for which the accompanying

GrowCo Warrant has been detached may be exchanged for 0.9 shares of TURV Common.

*Liquidation Preference and Security:* In the event of any liquidation, dissolution or winding up of Partners, each holder of GCP Preferred Units would be entitled to receive, prior and in preference to any distribution of any assets of Partners to the holders of GCP Common Units, an amount equal to such holder's capital account with respect to such GCP Preferred Units.

The payment of the GCP Preferred Unit liquidation preference will be secured by a pledge of substantially all of the assets of Partners, including the Greenhouse(s), the generators to be used for the Greenhouse(s), and certain water rights and land located in Huerfano County, Colorado owned of record by Orlando Reservoir No. 2 Company, LLC, a wholly owned subsidiary of Two Rivers.

*Voting:* In general, holders of GCP Common Units and GCP Preferred Units will vote together (with each holder having one vote for each GCP Common Unit or GCP Preferred Unit on a share-for-share basis) on any matter subject to the approval of Partners.

*Amendments and Waivers:* The terms of the GCP Preferred Units may be amended or waived only upon the written consent of Partners and holders of at least two-thirds of the GCP Preferred Units.

**GROWCO WARRANTS:**

*Exercise Price:* $1.00 in cash per share of GrowCo Common (no cashless exercises).

*Expiration Date:* Earlier of (a) the fifth anniversary of the Closing Date and (b) immediately prior to the closing of a Qualified IPO.

*Transfer:* GrowCo Warrants will be separable from the related GCP Preferred Unit and will be transferrable subject to compliance with applicable securities laws.

**<u>OTHER MATTERS</u>**

**PURCHASE AGREEMENT:** Any investment will be made only pursuant to a Subscription Agreement, which will contain forms of the Partners operating agreement, the GrowCo Warrants and an Exchange Agreement with respect to the Offered Units as well as representations, warranties and covenants of Partners, GrowCo, Two Rivers and the investors and appropriate conditions of closing.

**EQUITABLE ADJUSTMENTS:**

The conversion rates and other share- or unit-related information in this Memorandum of Terms will be subject to equitable adjustment for stock dividends, splits, combinations and similar events occurring after the Closing Date.

**CONFIDENTIALITY:**

No investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, members, managers, partners, accountants and attorneys, without the written consent of Partners, GrowCo and Two Rivers.

**PLACEMENT AGENT:**

EGE is serving as the exclusive Placement Agent in connection with the offering of the Offered Units and in exchange therefor will receive a placement fee of ___% of gross proceeds, together with a warrant to purchase, at a price of $1.00 per Offered Unit, a number of Offered Units equal to ___% of the total Offered Units sold in the offering.

Partners will issue to TR Capital Partners, LLC a warrant to purchase, at a price of $0.001 per GCP Common Unit, a number of GCP Common Units equal to the number of Offered Units purchased by EGE from time to time pursuant to the warrant described in the preceding paragraph.

The summary descriptions included in the other sections of this Memorandum of Terms do not give effect to any exercise of the warrants to be granted to EGE and TR Capital Partners, LLC as described above.

Table A

**Two Rivers Water and Farming Company**

As of October 31, 2014

| | | |
|---|---|---|
| Current Outstanding | 26,524,538 | $1.13 |
| TR Capital Conversion | 31,209,336 | $0.83 |
| Warrants & Options (cash only) | 17,721,688 | $2.14 |
| Incentive Plans | 10,846,060 | |
| GrowCo Partners 1, LLC | 10,000,000 | $1.00 |
| | 96,301,622 | |

# EXHIBIT 4

GCP-1 Operating Agreement (January 12, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

*[EXECUTION VERSION]*

# LIMITED LIABILITY COMPANY AGREEMENT

**among**

**GROWCO PARTNERS 1, LLC**

**and**

**MEMBERS NAMED IN SCHEDULE 1**

**Dated as of January 12, 2015**

# TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ....1
Section 1.01 . Definitions ....1
Section 1.02 . Interpretation ....7

**ARTICLE II** ORGANIZATION ....8
Section 2.01 . Formation ....8
Section 2.02 . Name ....8
Section 2.03 . Principal Office ....8
Section 2.04 . Registered Office and Agent ....8
Section 2.05 . Purpose and Powers ....8
Section 2.06 . Term ....8
Section 2.07 . No State-Law Partnership ....8

**ARTICLE III** UNITS ....9
Section 3.01 . Units Generally ....9
Section 3.02 . Authorization and Issuance of Preferred Units ....9
Section 3.03 . Authorization and Issuance of Common Units ....9
Section 3.04 . Certification of Units ....9
Section 3.05 . Action by Consent ....10

**ARTICLE IV** MEMBERS ....10
Section 4.01 . Admission of New Members ....10
Section 4.02 . Representations and Warranties of Members ....10
Section 4.03 . No Personal Liability ....11
Section 4.04 . No Withdrawal ....11
Section 4.05 . Death ....12
Section 4.06 . Voting ....12
Section 4.07 . Power of Members ....12
Section 4.08 . No Interest in Company Property ....12

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ....12
Section 5.01 . Existing Capital Contributions ....12
Section 5.02 . Additional Capital Contributions ....12
Section 5.03 . Maintenance of Capital Accounts ....13
Section 5.04 . Quarterly Yield on Preferred Units ....13
Section 5.05 . Succession Upon Transfer ....13
Section 5.06 . Negative Capital Accounts ....13
Section 5.07 . No Withdrawal ....14
Section 5.08 . Treatment of Loans From Members ....14
Section 5.09 . Modifications ....14

**ARTICLE VI** ALLOCATIONS ....14
Section 6.01 . Allocation of Net Income and Net Loss ....14
Section 6.02 . Regulatory and Special Allocations ....14
Section 6.03 . Tax Allocations ....15
Section 6.04 . Allocations in Respect of Transferred Units ....16
Section 6.05 . Curative Allocations ....16

**ARTICLE VII** DISTRIBUTIONS ....17
Section 7.01 . Preferred Yield Distributions ....17
Section 7.02 . Participating Distributions....17
Section 7.03 . Other Distributions ....18
Section 7.04 . Tax Withholding; Withholding Advances....18
Section 7.05 . Distributions in Kind ....20
Section 7.06 . Compliance with Law....20

**ARTICLE VIII** MANAGEMENT ....20
Section 8.01 . Establishment of the Board ....20
Section 8.02 . Board Composition; Vacancies ....20
Section 8.03 . Removal; Resignation ....21
Section 8.04 . Meetings ....21
Section 8.05 . Quorum; Manner of Acting ....22
Section 8.06 . Action By Written Consent ....22
Section 8.07 . Manager Status ....22
Section 8.08 . Committees....22
Section 8.09 . Officers ....23
Section 8.10 . No Personal Liability....23

**ARTICLE IX** EXCHANGES OF PREFERRED UNITS ....23
Section 9.01 . Exchange Agreement....23
Section 9.02 . Transfer of Preferred Units Upon Exchange ....23

**ARTICLE X** TRANSFERS ....24
Section 10.01 . General Restrictions on Transfer....24

**ARTICLE XI** CONFIDENTIALITY ....25
Section 11.01 . Nondisclosure ....25
Section 11.02 . Permitted Disclosures....25
Section 11.03 . Excluded Information....25

**ARTICLE XII** TAX MATTERS....26
Section 12.01 . Tax Matters Member ....26
Section 12.02 . Tax Returns ....26
Section 12.03 . Company Funds....27

**ARTICLE XIII** DISSOLUTION AND LIQUIDATION....27
Section 13.01 . Events of Dissolution ....27
Section 13.02 . Effectiveness of Dissolution....27
Section 13.03 . Liquidation ....27
Section 13.04 . Cancellation of Articles....28
Section 13.05 . Survival of Rights, Duties and Obligations....28
Section 13.06 . Recourse for Claims ....28

**ARTICLE XIV** EXCULPATION AND INDEMNIFICATION ....29
Section 14.01 . Exculpation of Covered Persons ....29
Section 14.02 . Liabilities and Duties of Covered Persons ....29
Section 14.03 . Indemnification ....30
Section 14.04 . Survival ....31

**ARTICLE XV** MISCELLANEOUS ....................31
Section 15.01 . Further Assurances ....................31
Section 15.02 . Notices ....................31
Section 15.03 . Severability ....................32
Section 15.04 . Entire Agreement ....................32
Section 15.05 . Successors and Assigns ....................32
Section 15.06 . No Third-Party Beneficiaries ....................32
Section 15.07 . Amendment ....................32
Section 15.08 . Waiver ....................33
Section 15.09 . Governing Law ....................33
Section 15.10 . Submission to Jurisdiction ....................33
Section 15.11 . Waiver of Jury Trial ....................33
Section 15.12 . Equitable Remedies ....................33
Section 15.13 . Remedies Cumulative ....................34

EXHIBIT A Form of Joinder Agreement
SCHEDULE 1 Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of GrowCo Partners 1, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of January 12, 2015 among the Company, TR Capital Partners, LLC and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on October 31, 2014 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. **Definitions**. The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b) any consents or approvals of any Governmental Authority; and

(c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost

recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b) immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c) the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i) the acquisition of additional Units in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d) the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e) if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

"**Code**" means the Internal Revenue Code of 1986.

"**Colorado Act**" means the Colorado Limited Liability Company Act, Title 7, Article 80, Section s 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

"**Common Managers**" has the meaning set forth in Section 8.02(a)(i).

"**Common Members**" means the Members who own Common Units as listed in the Member Schedule.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 14.01(a).

"**Credit Facility**" means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Exchange Agreement**" means the Exchange Agreement to be entered into among the Company, GrowCo, Two Rivers and the Holders listed on Schedule 1 thereto, in such form as an authorized Officer shall approve (such approval to be conclusively evidenced by such Officer's execution thereof on behalf of the Company).

"**Fair Market Value**" means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Lease Agreement**" means a lease agreement entered into by the Company, as lessor, and a third-party lessee in connection with the leasing of any greenhouse that is owned by the Company or an Affiliate thereof, if the construction or other acquisition of such greenhouse was funded (in whole or in part) with $50,000 or more of proceeds from the sale of Preferred Units.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means:

(a) TRCP, which as of the date of this Agreement holds 4,398,043 Common Units, has executed this Agreement and is identified as a Member on the Member Schedule, so long as it continues to be shown on the Member Schedule (as updated from time to time) as the owner of one or more Units; and

(b) each other Person who is admitted as a Member in accordance with the terms of this Agreement and the Colorado Act, in each case so long as such Person is shown on the Member Schedule (as updated from time to time) as the owner of one or more Units.

The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

(a) a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b) a Distributive share of the assets of the Company,

(c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.09.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Preferred Managers**" has the meaning set forth in Section 8.02(a)(ii).

"**Preferred Members**" means Members who own Preferred Units as listed in the Member Schedule.

"**Preferred Units**" means Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement.

"**Quarterly Distributable Amount**" means, with respect to a Fiscal Quarter, the sum of: (a) the Company's cash flow from operations for such Fiscal Quarter, as determined in accordance with applicable U.S. generally accepted accounting principles in effect from time to time; (b) the total amount of principal and interest received by the Company during such Fiscal Quarter pursuant to payments made under any Credit Facility; and (c) the total amount of deferred lease payments received by the Company during such Fiscal Quarter pursuant to any Lease Agreement.

"**Quarterly Yield**" has the meaning set forth in Section 5.04.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933.

"**Security Agreement**" means the pledge and security agreement to be entered into by the Company in favor of the Preferred Members, pursuant to Section 13.03(c).

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning set forth in Section 12.01.

"**Taxing Authority**" has the meaning set forth in Section 7.05(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**TRCP**" means TR Capital Partners, LLC, a Colorado limited liability company, or any of its successors or assigns.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water and Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Preferred Units and Common Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.04(b).

Section 1.02. **Interpretation**. For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

# ARTICLE II
## ORGANIZATION

Section 2.01. **Formation**.

(a) The Company was formed on October 31, 2014, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b) This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02. **Name**. The name of the Company shall be "GrowCo Partners 1, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03. **Principal Office**. The principal office of the Company shall be located at 2000 South Colorado Boulevard**,** Tower 1, Suite 3100, Denver, Colorado, or such other place as may from time to time be determined by the Board. The Board shall give prompt notice of any such change to each of the Members.

Section 2.04. **Registered Office and Agent**.

(a) The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b) The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05. **Purpose and Powers**.

(a) The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto.

(b) The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06. **Term**. The term of the Company commenced on October 31, 2014, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07. **No State-Law Partnership**. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and

each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
### UNITS

Section 3.01. **Units Generally**. Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable. The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02. **Authorization and Issuance of Preferred Units**. Subject to compliance with Section 10.01(a), the Company is hereby authorized to issue a class of Units designated as Preferred Units, of which no Preferred Units are outstanding as of the date of this Agreement. The Company may issue up to a total of 10,000,000 Preferred Units.

Section 3.03. **Authorization and Issuance of Common Units**. The Company is hereby authorized to issue a class of Units designated as Common Units. As of the date hereof, (a) a total of 4,398,043 Common Units have been issued and are outstanding and (b) a total of 5,601,957 Common Units are subject to purchase by TRCP at a price of $0.0001 per Common Unit pursuant to the terms of a warrant issued by the Company to TRCP. TRCP is entitled to exercise such warrant to purchase Common Units only to the extent that more than 4,398,043 Preferred Units are issued, and such limitation on exercise may not be amended or modified without the approval of the Board, including at least one Preferred Member.

Section 3.04. **Certification of Units**. The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member. In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.
>
> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE

REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.05. **Action by Consent**. Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests (including Common Units and Preferred Units) may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests. A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
### MEMBERS

Section 4.01. **Admission of New Members**.

(a) New Members may be admitted from time to time subject to compliance with the provisions of Section 4.01(b) and, in connection with a Transfer of Units, Article X.

(b) In order for any Person not already a Member to be admitted as a Member, whether pursuant to an issuance or a Transfer of Units, such Person shall have executed and delivered a Joinder Agreement to the Company. Upon the amendment of the Member Schedule by the Board and the satisfaction of any other applicable conditions (including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units), such Person shall be admitted as a Member and issued such Units and the Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

Section 4.02. **Representations and Warranties of Members**. By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b) Such Member (i) unless otherwise agreed to by the Board prior to such Member's execution of a Joinder Agreement, is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c) Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d) Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f) Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h) The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i) This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j) Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04. **No Withdrawal**. A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c) the making by such Member of a general assignment for the benefit of such Member's creditors;

(d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e) the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05. **Death**. The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06. **Voting**. Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit and one vote per Preferred Unit (voting together as a single class) on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07. **Power of Members**. The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act. Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08. **No Interest in Company Property**. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01. **Existing Capital Contributions**. TRCP has made the Capital Contribution giving rise to its initial Capital Account and is deemed to own 4,398,043 Common Units on the date hereof.

Section 5.02. **Additional Capital Contributions**.

(a) No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b) No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

Section 5.03. **Maintenance of Capital Accounts**. The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 5.03. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Member's Capital Account shall be increased by the amount of:

(i) such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii) the amount of any increase in such Capital Account pursuant to Section 5.04;

(iii) any Net Income or other item of income or gain allocated to such Member pursuant to Article VI; and

(iv) any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b) Each Member's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property Distributed to such Member pursuant to Article VII and Section 13.03(c);

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article VI; and

(iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04. **Quarterly Yield on Preferred Units**. Effective as of 11:59 p.m., Mountain time, on the final day of each Fiscal Quarter, the Capital Account balance of each Preferred Member shall be increased automatically by an amount equal to (a) a rate of return of 3.0% (or, if the Preferred Units held by such Preferred Member were not outstanding for the entire Fiscal Quarter, 3.0% multiplied by the percentage of the number of days in such Fiscal Quarter that such Preferred Units were outstanding), *multiplied by* (b) the amount of the Capital Account of such Preferred Member immediately prior to such time on such final day. As used herein, the term "**Quarterly Yield**" shall mean, with respect to a specified Preferred Member for a specified Fiscal Quarter, the amount of the increase in such Preferred Member's Capital Account for such Fiscal Quarter as computed in connection with this Section 5.04.

Section 5.05. **Succession Upon Transfer**. In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII in respect of such Units.

Section 5.06. **Negative Capital Accounts**. In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.07. **No Withdrawal**. No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.08. **Treatment of Loans From Members**. Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iv), if applicable.

Section 5.09. **Modifications**. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

# ARTICLE VI
## ALLOCATIONS

Section 6.01. **Allocation of Net Income and Net Loss**. For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02 and the Preferred Unit Distributions set forth in Section 7.01, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02. **Regulatory and Special Allocations**. Notwithstanding the provisions of Section 6.01:

(a) If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Section s 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of

such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Section s 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

(ii) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e) The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations**.

(a) Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c) If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04. **Allocations in Respect of Transferred Units**. In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of Article X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05. **Curative Allocations**. In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a) not specified in this Article VI, or

(b) clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01. **Preferred Yield Distributions**. Distributions pursuant to this Section 7.01 are subject only to Section 7.06, and no Distributions shall be made with respect to Common Units or any other Membership Interests unless and until all Distributions due under this Section 7.01 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to Preferred Units a total amount equal to the least of:

(a) the aggregate Quarterly Yields of all Preferred Members for such Fiscal Quarter;

(b) the Quarterly Distributable Amount with respect to such Fiscal Quarter; and

(c) the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter.

The total amount of Distributions, if any, due under this Section 7.01 with respect to a Fiscal Quarter shall be allocated and paid to Preferred Members as follows: (i) if such total amount of Distributions is determined pursuant to the preceding clause (a), to each Preferred Member in an amount equal to such Preferred Member's Quarterly Yield for such Fiscal Quarter; (ii) if such total amount of Distributions is determined pursuant to the preceding clause (b), to the Preferred Member's pro rata in proportion to their holdings of Preferred Units as of the end of such Fiscal Quarter; and (iii) if such total amount of Distributions is determined pursuant to the preceding clause (c), to each Preferred Member in an amount equal to the amount of such Preferred Member's Capital Account as of the end of such Fiscal Quarter.

Section 7.02. **Participating Distributions**. Distributions pursuant to this Section 7.02 are subject only to Section 7.01 and Section 7.06, and no other Distributions shall be made with respect to Preferred Units, Common Units or any other Membership Interests unless and until all Distributions due under Section 7.01 and this Section 7.02 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to those Common Units and Preferred Units that were outstanding for the entire Fiscal Quarter a total amount equal to the amount by which the Quarterly Distributable Amount with respect to such Fiscal Quarter exceeds the amount Distributable to Preferred Units in accordance with Section 7.01 for such Fiscal Quarter (that is, the amount, if any, by which the Quarterly Distributable Amount exceeds the amount determined pursuant to Section 7.01(a)). The total amount of Distributions, if any, due under this Section 7.02 with respect to a Fiscal Quarter shall be allocated and paid:

(a) if as of the end of such Fiscal Quarter any principal or interest under any Credit Facility is outstanding or any deferred lease amount under any Lease Agreement has not been paid in full, then to Preferred Members pro rata in proportion to their holdings of those Preferred Units that were outstanding for all of such Fiscal Quarter, *provided* that the amount Distributed to Preferred Members pursuant to this clause (a) shall not exceed the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter (and any amount Distributable in excess thereof shall be paid in accordance with the following clause (b)); and

(b) otherwise, to Preferred Members and Common Members pro rata in proportion to their holdings of those Preferred Units and Common Units, collectively, that were outstanding for all of such Fiscal Quarter (that is, for purposes of clarity, each Member shall receive a Distribution equal to the total amount to be so Distributed *multiplied by* a fraction, the numerator of which shall be the number of such Member's Preferred Units that were

outstanding for all of such Fiscal Quarter plus the number of such Member's Common Units that were outstanding for all of such Fiscal Quarter and the denominator of which shall be the total number of Preferred Units outstanding plus the total number of Common Units outstanding, all such Units being determined as of the end of such Fiscal Quarter).

Section 7.03. **Other Distributions**.

(a) **General**. After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to Section 7.06, the Board shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of other Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies.

(b) **Priority of Distributions**. After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to the priority of Distributions pursuant to Section 13.03(c), if applicable, all Distributions determined to be made by the Board pursuant to Section 7.02 shall be made in the following manner:

(i) *first,* to the Preferred Members pro rata in proportion to their holdings of Preferred Units, until Distributions under this clause (a) equal the aggregate amount of Capital Contributions attributable to the Preferred Members in respect of their acquisitions of Preferred Units;

(ii) *second,* to the Common Members pro rata in proportion to their holdings of Common Units, until Distributions under this clause (b) equal the aggregate amount of Capital Contributions attributable to the Common Members in respect of their acquisitions of Common Units; and

(iii) *third*, any remaining amounts to the Members holding Common Units and/or Preferred Units pro rata in proportion to their holdings of Preferred Units and Common Units, collectively, as of the end of such Fiscal Quarter (determined consistently with the provisions set forth in Section 7.02(b).

Section 7.04. **Tax Withholding; Withholding Advances**.

(a) **Tax Withholding**. If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i) an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii) any certificate that the Board may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.04(b).

(b) **Withholding Advances**. The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this Section 7.04(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances**. Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

(i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification**. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this Section 7.04(d) and the obligations of a Member pursuant to Section 7.04(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.04, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding**. Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the

event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.05. **Distributions in Kind**.

(a) The Board is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.01 and Section 7.02 shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to Section 7.03.

(b) Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.06. **Compliance with Law**. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

## ARTICLE VIII
### MANAGEMENT

Section 8.01. **Establishment of the Board**. The Board is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02. **Board Composition; Vacancies**.

(a) The Company and the Members shall take such actions as may be required to ensure that the number of managers constituting the Board initially is two and, commencing following the initial issuance of at least 1,000,000 Preferred Units and continuing at all times at which any Preferred Units are outstanding, five. The Board shall be comprised as follows:

(i) two individuals designated by the Common Members (the "**Common Managers**"), who initially shall be Tim Beall and John McKowen;

(ii) effective following the initial issuance of at least 1,000,000 Preferred Units, two individuals designated by the Preferred Members (the "**Preferred Managers**"); and

(iii) effective following the initial issuance of at least 1,000,000 Preferred Units, one individual (the "**Independent Manager**") who is not an Affiliate of the Company or any Member and who is acceptable to the Common Managers and the Preferred Managers.

(b) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Common Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(c) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Preferred Manager, then the Preferred Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(d) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of an Independent Manager, then the Common Managers and the Preferred Managers shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03. **Removal; Resignation**.

(a) **Common Managers**. A Common Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b) **Preferred Managers**. A Preferred Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Preferred Members.

(c) **General**. A Manager may resign at any time from the Board by delivering a written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04. **Meetings**.

(a) **Generally**. The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board. Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b) **Special Meetings**. Special meetings of the Board shall be held on the call of any three Managers upon at least three days' written notice (if the meeting is to be held in person) or 24 hours' written notice (if the meeting is to be held by telephone communications or video conference) to the Managers, or upon such shorter notice as may be approved by all the Managers. Any Manager may waive such notice as to himself.

(c) **Attendance and Waiver of Notice**. Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05. **Quorum; Manner of Acting**.

(a) **Quorum**. A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b) **Participation**. Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting. A Manager may vote or be present at a meeting either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.

(c) **Binding Act**. Each Manager shall have one vote on all matters submitted to the Board or any committee thereof. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board.

Section 8.06. **Action By Written Consent**. Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action. Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.07. **Manager Status**.

(a) **Reimbursement; Other Capacities**. Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time. Nothing contained in this Section 8.07 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b) **No Employment**. This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.08. **Committees**.

(a) **Establishment**. The Board may, by resolution approved by a majority of the Managers (including at least one of the Preferred Managers), designate from among the Managers one or more committees, each of which shall be comprised of one or more Managers; *provided* that in no event may the Board designate any committee with all of the authority of the Board. Subject to the immediately preceding proviso, any such committee, to the extent provided in the resolution forming such committee, shall have and may exercise the authority of the Board, subject to the

limitations set forth in Section 8.08(b). The Board at any time may, by resolution approved by a majority of the Managers, dissolve any committee or, by resolution approved by a majority of the Managers (including at least one of the Common Managers and at least one of the Preferred Managers), remove any member of a committee at any time.

(b) **Limitation of Authority**. No committee of the Board shall have the authority of the Board in reference to:

(i) authorizing or making Distributions to Members;

(ii) authorizing the issuance of any Membership Interest;

(iii) approving a plan of merger or sale of the Company;

(iv) recommending to the Members a voluntary dissolution of the Company or a revocation thereof;

(v) filling vacancies in the Board; or

(vi) altering or repealing any resolution of the Board that by its terms provides that it shall not be so amendable or repealable.

Section 8.09. **Officers**. The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Board. Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.10. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
### EXCHANGES OF PREFERRED UNITS

Section 9.01. **Exchange Agreement**. Contemporaneously with its execution and delivery of a Joinder Agreement, each Preferred Member may, at its election, execute and deliver to the Company a joinder agreement or other written understanding pursuant to which such Preferred Member becomes a party to the Exchange Agreement, *provided* that the foregoing requirement shall not apply to Two Rivers in connection with its acquisition of Preferred Units upon exchanges pursuant to the Exchange Agreement as contemplated by Section 9.02.

Section 9.02. **Transfer of Preferred Units Upon Exchange**. Upon the effective time of an exchange of a Preferred Unit as provided in Article II of the Exchange Agreement and without limitation by Article X, such Preferred Unit shall be Transferred to Two Rivers or GrowCo, as provided in the Exchange Agreement, and all rights under this Agreement with respect to such Preferred Unit, including

the right to receive Distributions, shall accrue to the benefit of Two Rivers or GrowCo, as the case may be.

## ARTICLE X
### TRANSFERS

Section 10.01. **General Restrictions on Transfer**.

(a) Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi) if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii) if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b) Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01. **Nondisclosure**. Each Preferred Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Preferred Member acknowledges that: (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Preferred Member is subject, no Preferred Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Preferred Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Preferred Member is or becomes aware. Each Preferred Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02. **Permitted Disclosures**. Nothing contained in Section 11.01 shall prevent any Preferred Member from disclosing Confidential Information: (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Preferred Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Preferred Member's Representatives who, in the reasonable judgment of such Preferred Member, need to know such Confidential Information and agree to be bound by the provisions of this Article XI as if a Preferred Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units from such Preferred Member, as long as such Transferee agrees to be bound by the provisions of this Article XI as if a Preferred Member; *provided* that in the case of clause (a), (b) or (c), such Preferred Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03. **Excluded Information**. The restrictions of Section 11.01 shall not apply to Confidential Information that: (a) is or becomes generally available to the public other than as a result of a disclosure by a Preferred Member in violation of this Agreement; (b) is or becomes available to a Preferred Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Preferred Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Preferred Member without use of Confidential Information; or (d) becomes available to the receiving Preferred Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential

Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

## ARTICLE XII
### TAX MATTERS

Section 12.01. **Tax Matters Member**.

(a) **Appointment**. The Members hereby appoint TRCP as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b) **Tax Examinations and Audits**. The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings. Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c) **Income Tax Elections**. The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Members holding a majority of the outstanding Common Units. All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d) **Tax Returns and Tax Deficiencies**. Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.04(d).

(e) **Resignation**. The Tax Matters Member may resign at any time. If TRCP ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Preferred Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02. **Tax Returns**. At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.09) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03. **Company Funds**. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## ARTICLE XIII
### DISSOLUTION AND LIQUIDATION

Section 13.01. **Events of Dissolution**. The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a) the determination of the Board to dissolve the Company;

(b) an election to dissolve the Company made by holders of a majority of the Common Units;

(c) the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d) the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02. **Effectiveness of Dissolution**. Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03. **Liquidation**. If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

(a) **Liquidator**. The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting**. As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) **Distribution of Proceeds**. The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii) *third,* to the Preferred Members in amounts equal to their respective Capital Accounts; and

(iv) *fourth*, to Members in the same manner as Distributions are made under Section 7.03.

The Company shall, within sixty days after the date of the initial issuance of Preferred Units, enter into the Security Agreement in favor of the Preferred Members, pursuant to which the Company shall grant the Preferred Members a security interest in substantially all of the assets of the Company solely for purposes of securing payment of amounts set forth in the preceding clause (iii). As and to the extent set forth in the Security Agreement, the security interest granted to the Preferred Members pursuant to the Security Agreement shall be *pari passu* in all respects with any similar security interest granted in favor of the members of any other limited liability company of which TRCP is the sole or a majority holder of common units and that is formed in connection with the acquisition, construction and/or operation of up to three additional greenhouses (including related purchases of farmland and water taps) for leasing to marijuana growers. The Security Agreement shall be in a form prepared by the Company and approved by the Board, including at least one of the Preferred Managers.

(d) **Discretion of Liquidator**. Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04. **Cancellation of Articles**. Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05. **Survival of Rights, Duties and Obligations**. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06. **Recourse for Claims**. Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's

share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

Section 14.01. **Exculpation of Covered Persons**.

(a) **Covered Persons**. As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b) **Standard of Care**. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c) **Good Faith Reliance**. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Colorado Act.

Section 14.02. **Liabilities and Duties of Covered Persons**.

(a) **Limitation of Liability**. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) **Duties**. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

Section 14.03. **Indemnification**.

(a) **Indemnification**. To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

(ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Reimbursement**. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c) **Entitlement to Indemnity**. The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d) **Insurance**. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e) **Funding of Indemnification Obligation**. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause**. If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment**. The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04. **Survival**. The provisions of this Article XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
### MISCELLANEOUS

Section 15.01. **Further Assurances**. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02. **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or

(d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

| | |
|---|---|
| If to the Company: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Facsimile: (303) 845-9400<br>E-mail: info@2riverswater.com<br>Attention: Chief Financial Officer |
| with a copy to: | K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts 02111-2950<br>Facsimile: (617) 261-3175<br>E-mail: mark.johnson@klgates.com<br>Attention: Mark L. Johnson |

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04. **Entire Agreement**. This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibits and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05. **Successors and Assigns**. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06. **No Third-Party Beneficiaries**. Except as provided in Article XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07. **Amendment**. Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units and Preferred Units, voting together as a single class. Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a

manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding at least two-thirds of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of Units shall be effective only with that Member's consent. Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(c) and Section 15.11.

Section 15.09. **Governing Law**. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10. **Submission to Jurisdiction**. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11. **Waiver of Jury Trial**. Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12. **Equitable Remedies**. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other

parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13. **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**GROWCO PARTNERS 1, LLC**

By: [signature]
Name: WAYNE HARDING
Title: CFO

COMMON MEMBER:

**TR CAPITAL PARTNERS, LLC**

By: [signature]
Name: WAYNE HARDING
Title: CFO

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

**JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT**

Reference is hereby made to the Limited Liability Company Agreement dated as of January 12, 2015, as it may be amended from time to time (the "**Agreement**"), among GrowCo Partners 1, LLC and the Members Named in SCHEDULE 1. Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GrowCo Partners 1, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a [Common][Preferred] Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: ______________________

**[NAME OF NEW MEMBER]**

By: ____________________________________
Name:
Title:

Agreed and Accepted:

**GROWCO PARTNERS 1, LLC**

By: ____________________________________
Name:
Title:

**MEMBER SCHEDULE**

**Common Units**:

| Member Name and Address | Number of Units | Date of Issue | Capital Contribution | Certificate Number |
|---|---|---|---|---|
| TR Capital Partners, LLC<br>2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222 | 4,398,043 | January 12, 2015 | $1,000.00 | CU-1 |

**Preferred Units**: None.

| Name | Units |
|---|---|
| I. Wistar Morris | 1,278,262 |
| Christopher L. Morris | 500,000 |
| Jesse Dovich | 438,597 |
| Jon D. and Linda W. Gruber Trust | 250,000 |
| TR Capital Partners, LLC | 177,203 |
| Samuel W. Morris, Jr. | 117,562 |
| Michael S. Barish | 108,696 |
| Hugo Zimmermann | 106,295 |
| Matt Edmundson | 104,198 |
| Jeff Porter | 100,000 |
| Eric Petersen | 100,000 |
| Charles J. Bloom IRA | 100,000 |
| Martha Morris | 95,598 |
| Cotswold Foundation | 94,506 |
| Eleventh Generation | 93,506 |
| I. Wistar Morris IRA | 89,240 |
| JMW Fund, LLC | 65,732 |
| San Gabriel Fund, LLC | 65,732 |
| Jacob A. & Michelle K. Bevan | 50,362 |
| David A. Jenkins | 50,000 |
| Njevity, Inc. | 43,767 |
| Richland Fund, LLC | 34,640 |
| Michael and Linda Harnish | 32,885 |
| Elevation Fund | 29,332 |
| Wayne Harding | 28,292 |
| Maureen Miller | 25,000 |
| Gus Blass, III | 23,592 |
| Capital Properties LLC | 23,592 |
| L.A. & Linda Walker | 21,816 |
| West Hampton Special Situations Fund | 12,740 |
| JPG Investments, LLC | 12,268 |
| James Cochran | 11,796 |
| Eric Porter | 10,000 |
| Kirby Enterprise Fund | 9,038 |
| Thomas Prasil Trust | 8,334 |
| Charles B Kirby | 7,078 |
| Thomas Prasil | 6,870 |
| San Gabriel Benefit Plan fbo John McGrain | 6,554 |
| Growth Ventures, Inc Profit Sharing Plan & Trust | 4,676 |
| Paul Powell | 4,624 |
| JDC Ventures, LLC | 3,922 |
| Sondra W Margolies | 3,922 |
| San Gabriel Benefit Plan fbo Justin Yorke | 3,278 |
| John R Rogers | 2,820 |
| Frank Guy | 2,476 |
| Sandra Diaz R/O IRA | 2,164 |
| Michael Berenhaus | 1,960 |
| Charles and Sandra Curtis | 1,960 |
| John J Blum | 1,960 |
| Gregory A. Harrison | 1,960 |
| Donald S Darendinger Rev. Trust u/a 7/3/2007 | 1,960 |
| Susan Doukas | 1,960 |
| Stephen D. Brown | 1,960 |
| SLMI Holding LLC | 1,960 |
| Presley Reed | 1,958 |
| John R Rogers SEP IRA | 1,718 |
| High Speed Aggregate Inc. | 1,718 |
| Wardenburg 2009 Family Trust | 1,718 |
| Growth Ventures, Inc Pension Plan & Trust | 1,718 |
| Jason Paulley R/O IRA | 1,718 |
| Maureen Miller, IRA | 1,374 |
| Charles & Sandra Curtis JWROS | 1,202 |
| Frank & Shirley Mills | 1,176 |
| Jordan Family LLC | 1,030 |
| Norman McClain | 980 |
| Lawrence & Karen Cake | 980 |
| Margaret Elizabeth Crumbley | 980 |
| Tom Ellison | 980 |
| Robert Stanger | 980 |
| Adam Linn | 980 |
| John N. Alessandro | 980 |
| Nazim Lokhandwala | 980 |
| Lloyd Grant | 980 |
| Brenda Forwood | 980 |
| F. Richard Stark | 980 |
| Francis & Jeffrey Chan | 980 |
| John Black | 980 |
| Joseph R. Stanger | 980 |
| Konrad & Linda Kuhn | 980 |
| Belva Barbalace | 980 |
| Charles Biemiller, IRA | 980 |
| Carl Swarts, IRA a/c 177072 | 858 |
| William C Kottke R/O IRA | 858 |
| Constantine Hagepanos R/O IRA | 858 |
| Ashley Weatherford R/O IRA | 858 |
| Paul Hartmann R/O IRA | 858 |
| John Black | 858 |
| John Alesandro | 806 |
| Timothy & Patricia Gillis | 746 |
| Constantine Hagepanos | 490 |
| George Rosch | 490 |
| Stephen Troutman | 430 |
| Heather Evans | 344 |
| Thomas Forti | 344 |
| Jason Paulley Roth IRA | 344 |
| Ernest Dufresne | 172 |
| Total | 4,417,949 |

# EXHIBIT 5

TR Capital Insider Ownership Schedule

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| Name | Attn | QAs + Cash | TR Cap Shares | Ownership % | Key Groups | |
|---|---|---|---|---|---|---|
| JMW Fund, LLC | | $ 1,393,105 | 1,990,150 | 6.66% | 22.03% | 88.51% |
| San Gabriel Fund, LLC | | $ 1,393,105 | 1,990,150 | 6.66% | | |
| Richland Fund, LLC | | $ 734,170 | 1,048,814 | 3.51% | | |
| JPG Investments, LLC | | $ 260,000 | 371,428 | 1.24% | | |
| San Gabriel Benefit Plan fbo John McGrain | | $ 138,904 | 198,434 | 0.66% | | |
| San Gabriel Benefit Plan fbo Justin Yorke | | $ 69,475 | 99,250 | 0.33% | | |
| Elevation Fund | | $ 621,671 | 888,099 | 2.97% | | |
| Kirby Enterprise Fund | | $ 191,570 | 273,673 | 0.92% | 5.13% | |
| Charles B Kirby | | $ 150,000 | 214,286 | 0.72% | | |
| West Hampton Special Situations Fund | | $ 270,024 | 385,748 | 1.29% | | |
| L.A. & Linda Walker | | $ 462,356 | 660,508 | 2.21% | | |
| Gus Blass, III | | $ 500,000 | 714,286 | 2.39% | 4.78% | |
| Capital Properties LLC | | $ 500,000 | 714,286 | 2.39% | | |
| I. Wistar Morris | | $ 4,549,372 | 5,622,940 | 18.81% | 56.57% | |
| Cotswold Foundation | | $ 2,410,628 | 2,861,362 | 9.57% | | |
| Eleventh Generation | | $ 2,570,960 | 2,831,100 | 9.47% | | |
| Martha Morris | | $ 2,550,823 | 2,894,414 | 9.68% | | |
| I. Wistar Morris | | $ 2,465,508 | 2,701,956 | 9.04% | | |

# EXHIBIT 6

Deed of Trust, Reception No. 404224 (September 25, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

404224
Page 1 of 9
Nancy C. Cruz, Clerk & Recorder
Huerfano County, CO RP $0.00
09-25-2015 08:11 AM Recording Fee $51.00

# DEED OF TRUST

**THIS INDENTURE,** is made this 9th day of September, 2015 between Orlando Reservoir No. 2 Company, LLC, a Colorado limited liability, and Two Rivers Farms F-2, Inc., a Colorado corporation, whose address is 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, hereinafter referred to collectively as "Grantor," and the Public Trustee of Huerfano County, State of Colorado, hereinafter referred to as Public Trustee.

**WITNESSETH, THAT:**

**WHEREAS,** GrowCo Partners 1, LLC, a Colorado limited liability company ("GCP 1") and those beneficiaries listed on the attached Exhibit A (the "Beneficiaries"), whose address is c/o Wayne Harding, 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, are parties to that certain Limited Liability Company Agreement dated January 12, 2015 (the "Operating Agreement");

**AND WHEREAS,** pursuant to the Operating Agreement, the Beneficiaries are entitled to certain preferred payments upon liquidation of GCP 1, as more specifically set forth in Section 13.03(c) of the Operating Agreement (the "Secured Obligations");

**AND WHEREAS,** because of the business and ownership affiliation among Grantor and GCP 1, Grantor benefits from the financial investments made by the Beneficiaries pursuant to the Operating Agreement, as well as the business operations of GCP 1, and thus Grantor is desirous of securing the payment and performance of said Secured Obligations on behalf of GCP 1 and is willing to encumber the Property (as defined below) as provided herein;

**AND WHEREAS,** the rights of the Beneficiaries with respect to the Secured Obligations rank, and will rank, pari passu in right of enforcement among the Beneficiaries, such Beneficiaries having acknowledged and agreed that their rights shall be treated in a like and equal manner proportionate the amounts owing to such Beneficiaries under Section 13.03(c) of the Operating Agreement. Such Beneficiaries may appoint a lenders' agent to act for and on behalf of all Beneficiaries and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust.

**NOW THEREFORE,** the Grantor, in consideration of the premises and for the purpose aforesaid, does hereby grant, bargain, sell and convey unto the said Public Trustee in trust forever, the following described property and water rights ("Property"), situate in Huerfano County, State of Colorado, to wit:

See the attached Exhibit B.

also known by street address as: N/A
and assessor's schedule or parcel number: 2300000423

**TO HAVE AND TO HOLD** the same, together with all and singular the privileges and appurtenances thereunto belonging, in trust nevertheless, that: a) in case of default in the payment of said Secured Obligations or any part thereof, or b) in case default shall be made or violation or breach of any of the terms, conditions, covenants or agreements herein contained, the Beneficiaries hereunder or the legal holder of the indebtedness secured hereby may declare a violation of any of the covenants herein contained and may elect to advertise said property for sale, and demand such sale by filing a notice of election and demand for sale with the Public Trustee. Upon receipt of such notice of election and demand for sale, the Public Trustee shall cause such notice to be recorded in the recorder's office of the county in which said property is situated.

The Public Trustee shall then give public notice of the time and place of sale by advertisement to be published for four weeks (once each week for five successive weeks) in some newspaper of general circulation at that time published in the county or counties in which said property is located. A copy of such notice shall be mailed to all persons entitled to receive notice as provided by law. It shall and may then be lawful for the Public Trustee to sell said property for the highest and best price the property will bring in cash and to dispose of the said property (en masse or in separate parcels, as the said Public Trustee may think best), together with all the right, title and interest of the Grantor therein, at public auction at any place as may be specified by statute and designated in the notice of sale.

The Public Trustee shall make and give to the purchaser of such property at such sale, a certificate of purchase as required by law. Unless the property is redeemed, the public trustee shall execute and record a confirmation deed to the holder of the certificate of purchase no less than fifteen days after the date of sale or, if later, the expiration of all redemption periods and the receipt of all statutory fees and costs.

The Public Trustee shall, out of the proceeds of such sale and after first paying and retaining all fees, charges and costs of making said sale, pay to the Beneficiaries hereunder the Secured Obligations according to the tenor and effect thereof, rendering the overplus, if any, unto those persons entitled thereto as a matter of law. Said sale as evidenced by the

confirmation deed executed and recorded by the Public Trustee shall operate as a perpetual bar, both in law and equity, against the Grantor and all other persons claiming the said property, or any part thereof, by, from, through or under the Grantor. The holders of said Secured Obligations may purchase said property or any part thereof; and it shall not be obligatory upon the purchaser at any such sale to see to the application of the purchase money.

The Grantor covenants with and warrants to the Public Trustee, that at the time of the ensealing of and delivery of these presents the Grantor is well seized of the said lands, tenements and property in fee simple, and has good right, full power and lawful authority to grant, bargain, sell and convey the same in the manner and form as aforesaid; hereby fully and absolutely waiving and releasing all rights and claims the Grantor may have in or to said lands, tenements, and property under and by virtue of any act of the General Assembly of the State of Colorado or of the United States Congress, now existing or which may hereafter be passed in relation thereto, and that the same are free and clear of all liens and encumbrances whatever, except

The Grantor further warrants to the Public Trustee the quiet and peaceable possession of said property against all persons who may lawfully claim the whole or any part thereof, and that the Grantor shall and will forever defend the title to said property against such person or persons.

Until payment in full or other release of the Secured Obligations, the Grantor shall timely pay all taxes and assessments levied on the property; any and all amounts due on account of principal and interest or other sums on any senior or junior encumbrances, if any; and will keep all improvements that may be on said lands insured against any casualty loss, including extended coverage, in a company or companies, meeting the net worth requirements of the Beneficiaries hereof in an amount which will yield to the Beneficiaries, after reduction by co-insurance provisions of the policy, if any, not less than the then total indebtedness. Each policy shall contain a loss payable clause naming the Beneficiaries as mortgagee and shall further provide that the insurance may not be canceled upon less than ten days written notice to the Beneficiaries. At the option of the Beneficiaries, the original policy or policies of insurance shall be delivered to the Beneficiaries as further security for the indebtedness. Should the Grantor fail to insure and deliver the policies or to pay taxes or assessments as the same fall due, or to pay any amounts payable upon senior encumbrances, if any, the Beneficiaries may make any such payments or procure any such insurance, and all monies so paid shall be added to and become a part of the indebtedness secured by this Deed of Trust and may be paid out of the proceeds of the sale of the property if not paid by the Grantor. In addition, and at its option, the Beneficiaries may declare the indebtedness secured hereby and this Deed of Trust to be in default for failure to procure insurance or make any of the payments required by this paragraph.

If all or any part of the property or an interest therein is sold or transferred by the Grantor without the Beneficiaries' prior written consent, excluding (a) the creation of a lien or encumbrance on par or subordinate to this Deed of Trust, (b) the creation of a purchase money security interest, or (c) the grant of any leasehold interest, Beneficiaries may, at their option, declare all the sums secured by this Deed of Trust to be immediately due and payable. Beneficiaries shall have waived such option to accelerate if, prior to the sale or transfer, Beneficiaries and the person to whom the property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Beneficiaries and that the interest payable on the sums secured by this Deed of Trust shall be at such rate as Beneficiaries shall request.

**IN CASE OF ANY DEFAULT** whereby the right of foreclosure occurs hereunder, the Beneficiaries shall at once become entitled to the possession, use and enjoyment of the property aforesaid, and to the rents, issues and profits thereof, from the accruing of such right and during the pendency of foreclosure proceedings and the period of redemption, if any. Such possession shall at once be delivered to the beneficiaries on request. Upon refusal, delivery of such possession may be enforced by Beneficiaries by any appropriate civil suit or proceeding. The Beneficiaries shall be entitled to a Receiver for said property, and of the rents, issues and profits thereof, after such default, including the time covered by foreclosure proceedings and the period of redemption, if any, and shall be entitled thereto as a matter of right without regard to the solvency or insolvency of the Grantor or of the then owner of said property and without regard to the value thereof. Such Receiver may be appointed by any court of competent jurisdiction upon ex parte application and without notice -- notice being hereby expressly waived -- and all rents, issues and profits, income and revenue therefrom shall be applied by such Receiver to the payment of the indebtedness hereby secured, according to the law and the orders and directions of the court.

**IN THE CASE OF ANY DEFAULT** of any payments due with respect to the Secured Obligations, according to the tenor and effect of the Operating Agreement or any part thereof, or of a breach or violation of any of the covenants or agreements herein by the Grantor, the whole of said principal sum hereby secured and the interest thereon to the time of the sale may at once, at the option of the legal holder thereof, become due and payable, and the said property be sold in the manner and with the same effect as if said indebtedness had matured. If foreclosure be made by the Public Trustee, attorney's fees in the sum of up to $1,500 for services in the supervision of said foreclosure proceedings shall be allowed by the Public Trustee as a part of the cost of foreclosure; and if foreclosure be made through the courts, a reasonable attorney's fee shall be taxed by the court as a part of the cost of such foreclosure proceedings.

**IT IS FURTHER UNDERSTOOD AND AGREED** that if a release of this deed of trust is required, the Grantor will pay the expense thereof; all of the covenants and agreements herein contained shall extend to and be binding upon the heirs, personal representatives, successors and assigns of the respective parties hereto; and that the singular number shall include the plural and the plural the singular.

**IN WITNESS WHEREOF,** the Grantor has caused its corporate name to be hereunto subscribed by its CFO and Managing Member on the day first written above.

Executed on September 9, 2015.

ORLANDO RESERVOIR NO. 2 COMPANY, LLC
a Colorado limited liability company

By: Wayne Harding, CFO and Treasurer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

This instrument was acknowledged before me on this 9th day of September, 2015 by Wayne Harding in his capacity as Chief Financial Officer of Orlando Reservoir No. 2 Company, LLC.

ANASTASSIYA GEGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184021818
MY COMMISSION EXPIRES 06/06/2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

TWO RIVERS FARMS F-2, Inc.
a Colorado corporation

By: Wayne Harding, CFO

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

The foregoing instrument was acknowledged before me this 9th day of September, 2015, by Wayne Harding, as Chief Financial Officer of Two Rivers Farms F-2, Inc. a Colorado corporation.

ANASTASSIYA GEGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184021818
MY COMMISSION EXPIRES 06/06/2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

**EXHIBIT A**
to
**Deed of Trust**

I. Wistar Morris
Christopher L. Morris
Jesse Dovich
Jon D. and Linda W. Gruber Trust
Samuel W. Morris, Jr.
Michael S. Barish
Matt Edmundson
Jeff Porter
Eric Petersen
Charles J. Bloom IRA
Martha Morris
Cotswold Foundation
Eleventh Generation
I. Wistar Morris IRA
JMW Fund, LLC
San Gabriel Fund, LLC
Hugo Zimmermann
Jacob A. & Michelle K. Bevan
Hugo Zimmermann
David A. Jenkins
Njevity, Inc.
Richland Fund, LLC
Michael and Linda Harnish
Elevation Fund
Maureen Miller
Gus Blass, III
Capital Properties LLC
L.A. & Linda Walker
West Hampton Special Situations Fund
JPG Investments, LLC
James Cochran
Eric Porter
Kirby Enterprise Fund
Samuel W. Morris, Jr.
Charles B Kirby
Thomas Prasil
San Gabriel Benefit Plan fbo John McGrain
Growth Ventures, Inc Profit Sharing Plan & Trust
Thomas Prasil Trustee U/A/D November 26, 2003
Paul Powell
JDC Ventures, LLC
Sondra W Margolies
Thomas Prasil Trustee UAD Nov 26, 2003
San Gabriel Benefit Plan fbo Justin Yorke
John R Rogers
Frank Guy
Sandra Diaz R/O IRA
Michael Berenhaus
Charles and Sandra Curtis
John J Blum
Gregory A. Harrison
Donald S Darendinger Rev. Trust u/a 7/3/2007
Susan Doukas
Stephen D. Brown

SLMI Holding LLC
Presley Reed
John R Rogers SEP IRA
High Speed Aggregate Inc.
Wardenburg 2009 Family Trust
Growth Ventures, Inc Pension Plan & Trust
Jason Paulley R/O IRA
Maureen Miller, IRA
Charles & Sandra Curtis JWROS
Frank & Shirley Mills
Jordan Family LLC
Norman McClain
Lawrence & Karen Cake
Margaret Elizabeth Crumbley
Tom Ellison
Robert Stanger
Adam Linn
John N. Alessandro
Nazim Lokhandwala
Lloyd Grant
Brenda Forwood
F. Richard Stark
Francis & Jeffrey Chan
John Black
Joseph R. Stanger
Konrad & Linda Kuhn
Belva Barbalace
Charles Biemiller, IRA
Carl Swarts, IRA a/c 177072
William C Kottke R/O IRA
Constantine Hagepanos R/O IRA
Ashley Weatherford R/O IRA
Paul Hartmann R/O IRA
John Black
John Alesandro
Timothy & Patricia Gillis
Constantine Hagepanos
George Rosch
Stephen Troutman
Heather Evans
Thomas Forti
Jason Paulley Roth IRA
Ernest Dufresne
Wayne Harding
Wayne Harding, IRA
TR Capital Partners, LLC

**EXHIBIT B**
**to**
**Deed of Trust**

LAND – LEGAL DESCRIPTION

A parcel of land located in Sections 17, 18, 19 and 20, Township 26 South, Range 66 West of the 6th P.M., County of Huerfano, State of Colorado, also being a portion of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E") being more particularly described as follows:

Beginning at the southeast corner of the Orlando Reservoir No. 2 parcel and the northerly right-of-way line of Huerfano County Road No. 104; thence along said northerly right-of-way line the following three (3) courses:

1) N 85°18'00"W, a distance of 303.00 feet;
2) On the arc of a curve to the right, through a central angle of 30°38'00", whose radius is 600.00 feet, an arc length of 320.79 feet;
3) 54°40'00"W, a distance of 665.85 feet; thence departing said northerly right-of-way line the following twenty-seven (27) courses:

1) N 29°45'12"W, a distance of 604.71 feet;
2) N 26°55'29"W, a distance of 359.64 feet;
3) N 20°11'06"W, a distance of 487.20 feet;
4) N 32°26'57"W, a distance of 602.35 feet;
5) N 53°33'17"W, a distance of 138.08 feet;
6) N 66°50'22"W, a distance of 301.61 feet;
7) N 75°17'28"W, a distance of 137.03 feet;
8) N 85°04'32"W, a distance of 309.44 feet;
9) S 88°31'11"W, a distance of 157.36 feet;
10) N 76°43'49"E, a distance of 182.98 feet;
11) N 73°18'09"E, a distance of 168.99 feet;
12) N 58°37'40"E, a distance of 47.34 feet;
13) N 28°30'52"E, a distance of 144.34 feet;
14) N 34°51'01"W, a distance of 140.93 feet;
15) N 18°19'17"E, a distance of 77.07 feet;
16) N 41°59'46"E, a distance of 118.15 feet;
17) N 42°50'14"E, a distance of 151.08 feet;
18) N 42°24'43"E, a distance of 253.21 feet;
19) N 38°36'33"E, a distance of 32.56 feet;
20) N 23°25'39"E, a distance of 141.45 feet;
21) N 00°39'19"E, a distance of 102.77 feet;
22) N 29°08'34"W, a distance of 378.60 feet;
23) N 34°13'15"W, a distance of 114.68 feet;
24) N 63°26'11"W, a distance of 100.95 feet;
25) N 63°26'11"W, a distance of 70.12 feet;
26) On the arc of a curve to the right, through a central angle of 153°27'11", whose radius is 381.91 feet, an arc length of 1022.84 feet;
27) N 00°01'00"E, a distance of 27.60 feet, to the North line of the Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence S 89°59'00"E, along said North line a distance of 2047.92 feet; thence departing said North line the following twenty-four (24) courses:

1) S 00°01'00"W, a distance of 61.13 feet;
2) S 55°00'31"E, a distance of 79.16 feet;

3) S 36°54'16"E, a distance of 228.02 feet;
4) S 47°48'31"E, a distance of 262.80 feet;
5) S 60°48'16"E, a distance of 90.60 feet;
6) S 30°37'38"E, a distance of 403.12 feet;
7) S 56°18'35"E, a distance of 376.36 feet;
8) S 57°59'41"E, a distance of 274.36 feet;
9) S 58°32'41"E, a distance of 402.85 feet;
10) S 35°31'10"E, a distance of 174.28 feet;
11) S 04°49'25"E, a distance of 111.00 feet;
12) S 21°50'49"W, a distance of 166.48 feet;
13) S 02°50'15"W, a distance of 67.98 feet;
14) N 81°50'02"W, a distance of 101.65 feet;
15) S 51°28'22"W, a distance of 87.41 feet;
16) S 67°08'14"W, a distance of 75.69 feet;
17) S 48°36'02"W, a distance of 36.58 feet;
18) S 17°31'48"W, a distance of 26.11 feet;
19) S 02°51'57"W, a distance of 138.14 feet;
20) S 70°33'01"E, a distance of 329.43 feet;
21) S 29°45'05"E, a distance of 173.68 feet;
22) S 48°12'39"E, a distance of 127.54 feet;
23) S 65°10'56"E, a distance of 67.41 feet;
24) S 45°56'50"E, a distance of 175.27 feet to the boundary of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence along said boundary the following three (3) courses:
1) S 06°27'00"E, a distance of 233.05 feet;
2) S 19°01'00"W, a distance of 799.00 feet;
3) S 46°14'00"W, a distance of 1850.00 feet, to the Point of Beginning, Containing 322.21 acres, more or less.

ACCORDING TO THE CLERK AND RECORDER FOR HUERFANO COUNTY, COLORADO.

WATER RIGHTS – LEGAL DESCRIPTION

The following water rights situate, lying and being in the County of Huerfano, COLORADO, described as follows:

A) ORLANDO RESERVOIR NO. 2, decreed for a total of 3,110 acre- feet storage, as follows:

I) ORLANDO RESERVOIR NO. 2, for storage of 43,560,000 cubic feet of water (1,000 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication October 3, 1921 (previous adjudication date was October 15, 1901), in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River through and by means of the Orlando Canal No. 3, and Greasewood Arroyo, through and by means of the Greasewood Arroyo Diverting Canal, and as more particularly describes in the aforesaid Decree entered October 31, 1921, in Civil Action No. 1414 (Priority No. 349).

II) ORLANDO RESERVOIR NO. 2, (ENLARGEMENT), for storage of 35,078,750 CUBIC FEET OF WATER (800 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication (conditional) October 3, 1921 in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right made absolute by Decree in Civil Action No. 1414-60, and 1414-62, entered November 1, 1960, and November 8, 1962 (Priority No. 349).

III) ORLANDO RESERVOIR NO. 2, (SECOND ENLARGEMENT), for storage of 1,310 acre-feet of water, for irrigation, date of appropriation October 2, 1906, date of adjudication (conditional) October 3, 1921, in Civil Action 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right partly made absolute November 1, 1960 (320 acre-feet) and April 2, 1962 (990 acre-feet) (Priority No. 367 ½).

Together with the Orlando Canal No. 3 andthe Greasewood Arroyo Diverting Canal, described as follows:

IV) That the headgate of the Orlando Canal No. 3, is located at a point on the North bank of the Huerfano River, from whence the West quarter corner of Section 25, Township 26 South, Range 66 West of the 6th PM, bears North 5°30' West 973 feet, said canal having a carrying capacity of 130 cubic feet of water per second of time.

V) That the headgate of the Greasewood Arroyo Diverting Canal, is located at a point on the said Greasewood Arroyo, from whence the Northeast corner of Section 18, Township 26 South, Range 66 West of the 6th PM, bears North 68°3' East 2920 feet, said canal having a carrying capacity of 1500 cubic feet of water per second of time.

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

B) BUTTE VALLEY DITCH, decreed for a total of 9 cubic-feet per second, as follows:

I) BUTTE VALLEY DITCH for diversion of 1.2 cubic-feet of water per second of time, from The Huerfano River for irrigation, date of appropriation May 15, 1862, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. l).

II) BUTTE VALLEY DITCH (ENLARGEMENT) for diversion of 1.8 cubic-feet of water per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1865, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 9).

III) BUTTE VALLEY DITCH (SECOND ENLARGEMENT), for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼, Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 86).

IV) BUTTE VALLEY DITCH (KILLIAN) for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication February 23, 1898 (Killian Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (previous adjudication date of June 12, 1889) (Priority No. 111).

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

C) ROBERT RICE DITCH, decreed for a total of 3.0 cubic feet per second of time, as follows: From the Huerfano River, for irrigation, date of appropriation March 1, 1867, date of adjudication June 12, 1889 (Reed Decree), original decreed point of diversion in NW 1/4 Section 22, T. 26 S., R. 66 W., 6th P.M., point of diversion transferred to SW 1/4 Section 10, T. 26 S., R. 66 W, 6th P.M., approximately 1700 feet from the west line and 550 feet from the south line of said Section 10, in Case No. 91CW39, Water Div. 2 on May 19, 1992 Huerfano County, Colorado (Priority 19)

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

# EXHIBIT 7

GCP Super Units Term Sheet (September 30, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**GCP Super Units, LLC**

**MEMORANDUM OF TERMS**

**Preferred Units of GCP Super Units, LLC**
**and**
**Common Stock Purchase Warrants of GrowCo, Inc.**

This Memorandum of Terms dated as of September 30, 2015 summarizes the principal terms of an offering of preferred units of GCP Super Units, LLC ("**GCP SU**") and associated warrants to purchase common stock of GrowCo, Inc. ("**GrowCo**"). **This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive purchase agreement. Nothing herein is binding except as set forth under "Confidentiality," and any sale of these securities is contingent on execution of a definitive agreement.**

## OFFERING TERMS

**ISSUERS:**

*GCP SU,* a Colorado limited liability company, has been formed to invest in (a) up to four greenhouses that GrowCo is, or intends to, construct for leasing to third-party marijuana growers and (b) the operations of GrowCo Business Development, LLC ("**GBD**"), which will provide management services to the greenhouses.

*GrowCo,* a Colorado corporation, is an indirect subsidiary of Two Rivers Water & Farming Company ("**Two Rivers**").

**SECURITIES OFFERED:**

GCP SU will sell 5,500,000 units (the "**Super Units**"), each consisting of one preferred unit of GCP SU (a "**GCP SU Preferred Unit**") and a warrant (a "**GrowCo Warrant**") to purchase one share of common stock of GrowCo (a "**GrowCo Common Share**").

**PURCHASE PRICE:**

$1.00 per Super Unit. Super Units will be sold in multiples of 1,000. There is a minimum investment of $100,000, which may be waived in the discretion of GCP SU.

**GROSS AMOUNT OF PROCEEDS:**

$5,500,000

**USE OF PROCEEDS:**

Net proceeds will be used by GCP SU to purchase:

- preferred units of GrowCo Partners 1, LLC ("**GCP1**") having a 5.00% profit interest in GCP1, which has been formed by GrowCo to construct an initial greenhouse facility and has entered into a lease pursuant to which that facility is being leased by a third-party marijuana grower;
- preferred units of GBD having a 36.11% profit interest in GBD, which initially will provide services to GCP1 and subsequently will provide services to three other greenhouse facilities to be constructed by GrowCo: GrowCo Partners 2, LLC ("**GCP2**"), GrowCo Partners 3, LLC ("**GCP3**") and GrowCo Partners 4, LLC ("**GCP4**"); and

- preferred units of GCP2 having a 50.00% profit interest in GCP2, which has been formed by GrowCo to construct a second greenhouse facility that will be leased to, and operated by, the entity that will lease GCP1.

In the event fewer than 5,500,000 Super Units are sold, the amounts invested in GCP1, GBD and GCP2, and the related profit interests will be decreased proportionately. For example, if GCP SU sells 4,400,000 (80.0%) of the Super Units, GCP SU will purchase GCP1 preferred units having a profit interest of 4.0%, GPC2 preferred units having a profit interest of 40.00%, and GBD preferred units having a profit interest of 28.88%.

**CLOSINGS**: Super Units may be sold at one or more closings to be held from time to time after the date hereof. It is expected that all such closings will be held by no later than November 30, 2015.

**INVESTORS:** Institutional and other accredited investors, and other qualifying individuals and entities.

**POST CLOSING CAPITALIZATION:**

*GCP SU:* GrowCo owns all of the outstanding GCP SU common units. Investors in this offering will hold all of the outstanding GCP SU Preferred Units, which will be the only outstanding preferred interests of GCP SU.

Distributions received by GCP SU from its preferred unit holdings (initially in GCP1, GCP2 and GBD) will be applied solely to GCP SU Preferred Units, as follows:

- 25.0% of cash received will be distributed to holders of GCP SU Preferred Units pro rata (that is, the investors in this offering); and
- 75.0% of cash received will be held by GCP SU, for the benefit of GCP SU Preferred Units, (increasing their capital accounts) and applied to purchase preferred units of GCP2, GCP3, GCP4 and GBD.

No distribution will be made on GCP SU common units.

| | |
|---|---|
| *GCP1:* | There are 4,500,000 common units of GCP1 currently outstanding of which Two Rivers owns 4,146,564. If all of the Super Units are sold, an additional 500,000 common units will be issued, of which Two Rivers will receive 500,000 common units. At that time there will be 5,000,000 outstanding common units of GCP1.<br><br>Existing investors hold 4,500,000 GCP1 preferred units, and GCP SU will receive 500,000 newly issued preferred units, if all of the Super Units are sold, for a total of 5,000,000 outstanding preferred units of GCP1.<br><br>Net profits of GCP1 will be allocated and paid quarterly to holders of GCP1 common and preferred units, pro rata. |
| *GCP2:* | Two Rivers currently owns 5,000,000 of the common units of GCP2.<br><br>If all of the Super Units are sold, GCP SU will own outstanding 5,000,000 GCP2 preferred units.<br><br>Net profits of GCP2 will be allocated and paid quarterly to holders of GCP2 common and preferred units, pro rata. |
| *GCP3 and GCP4:* | Two Rivers will own 5,000,000 common units of each of GCP3 and GCP4.<br><br>It is expected that GCP SU will purchase and own 1,195,022 GCP3 preferred units and 1,195,022 GCP4 preferred units, if all of the Super Units are sold.<br><br>Net profits of GCP3 and GCP4 will be allocated and paid quarterly to holders of, respectively, GCP3 and GCP4 common and preferred units, pro rata. |
| *GBD:* | Two Rivers currently owns 5,000,000 outstanding common units of GBD.<br><br>GCP SU will own 3,611,293 GBD preferred units, which will be issued for a $2,500,000 cash capital contribution, if all of the Super Units are sold.<br><br>Net profits of GBD will be allocated and paid quarterly to holders of GBD common and preferred units, pro rata. |

*GrowCo:* A total of 30,000,000 GrowCo Common Shares currently are outstanding, of which a) 10,000,000 are held by Two Rivers, (b) 10,000,000 restricted shares are held in escrow for future distribution in 2,500,000 share increments to Two Rivers' shareholders of record on January 1, 2015, April 1, 2015, July 1, 2015, October 1, 2015, and (c) 10,000,000 restricted shares that are held by GrowCo's management and business partners and that remain subject to performance-based vesting. Up to an additional 11,000,000 GrowCo Common Shares will be reserved for issuance upon Super Units exchange and exercises of GrowCo Warrants being offered hereby.

**REGISTRATION OF COMMON SHARES:** Following the final closing of Super Units sales, GrowCo will prepare and file with the Securities and Exchange Commission a Form S-1 registration statement to register under the Securities Act of 1933 investors' resales, until six months after the final closing date, of GrowCo Common included in the Optional or Mandatory Exchanges of Units, subject to the restriction described under "TRANSFER LIMITATION" below.

GrowCo will agree to use its commercially reasonable efforts to cause the registration statement on Form S-1 to become effective within six months of the final closing date. In any event, GrowCo will agree to use its commercially reasonable efforts to cause a Form 10 registration statement covering the Common Shares to become effective on, or as soon as reasonably possible after, the date that is six months after the final closing date, in order to qualify the stock for trading on an OTC marketplace.

**TRANSFER LIMITATION:** After an effective registration and trading on an exchange, each investor purchasing Units will agree not to sell more than 20% of the Common Shares it acquires in the offering during any calendar quarter.

**<u>TERMS OF SUPER UNITS</u>**

**GCP SU PREFERRED UNITS:**

*Capital Accounts:* Each holder of GCP SU Preferred Units will have a capital account initially equal to the purchase price paid for those GCP SU Preferred Units.

*Allocations.* Net profits of GCP SU (if any), computed quarterly, will be allocated to members pro rata, based on the number of GCP SU Preferred Units held.

*Distributions.* Each holder of GCP SU Preferred Units will be entitled to receive, within 45 days after the end of each calendar quarter, a distribution equal to 25% of the amount of GCP SU net profits, if any, allocated to such member as described above. Each such capital account will be decreased by the amount of distributions with

| | |
|---|---|
| | respect thereto, as described below.<br>*Retained Allocations.* Net profits of GCP SU that are allocated, but not distributed, to members (including holders of GCP SU Preferred Units) will be used to finance the construction, development and operation of GrowCo's third and fourth greenhouses and administrative services through GBD. Those funds will be invested in equity or debt instruments with terms established on an arm's-length basis. |
| *Optional Exchanges:* | Each Super Unit may be exchanged at any time, at the election of the holder, as follows:<br>• transfer to GrowCo such GCP SU Preferred Unit and the right to acquire one GrowCo Common Share under the associated GrowCo Warrant, in exchange for one fully paid and nonassessable share of GrowCo Common; or<br>• transfer to GrowCo such GCP SU Preferred Unit in exchange for nine-tenths (0.9) of a fully paid and nonassessable share of GrowCo Common. |
| *Mandatory Exchanges:* | GrowCo may elect to require holders to exchange all (but not less than all) of the outstanding GCP SU Preferred Units for GrowCo Common at any time at which GrowCo Common (a) are listed on an exchange, (b) had a closing market price equal to least $5.00 for each of 20 consecutive trading days, and (c) had an average daily trading volume of at least 100,000 GrowCo Common during such 20 trading days. In such event, each GCP SU Preferred Unit would be exchanged for nine-tenths (0.9) of a fully paid and nonassessable share of GrowCo Common. |
| *Liquidation Preference:* | In the event of any liquidation, dissolution or winding up of GCP SU, each holder of GCP SU Preferred Units would be entitled to receive an amount equal to such holder's capital account. No distribution will be made with respect to GCP SU common units. |
| *Voting:* | In general, holders of GCP SU common units and GCP SU Preferred Units will vote together (with each holder having one vote for each GCP SU common unit or GCP SU Preferred Unit on a share-for-share basis) on any matter subject to the approval of Partners. |
| *Amendments and Waivers:* | The terms of the GCP SU Preferred Units may be amended or waived only upon the written consent of GCP SU, holders of a majority of the GCP SU common units and holders of at least two-thirds of the GCP SU Preferred Units. |

| | |
|---|---|
| **GROWCO WARRANTS:** | |
| *Exercise Price:* | $1.00 in cash per share of GrowCo Common (no cashless exercises). |
| *Expiration Date:* | October 1, 2020. |
| *Transfer:* | GrowCo Warrants will be separable from the related GCP SU Preferred Unit and will be transferrable subject to compliance with applicable securities laws. |

**OTHER MATTERS**

| | |
|---|---|
| **PURCHASE AGREEMENT:** | Any investment in Super Units will be made only pursuant to a purchase agreement, which will contain representations, warranties and covenants of GCP SU and the investors and appropriate conditions of closing. GrowCo will make available to potential investors forms of the GCP SU operating agreement, the GrowCo Warrants and an exchange agreement with respect to the Super Units. |
| **CONFIDENTIALITY:** | No investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, managers, partners, accountants and attorneys, without the written consent of GrowCo. |
| **PLACEMENT AGENTS:** | GrowCo may engage one or more third-party firms or individuals to serve as placement agents in connection with the offering of the Super Units. Any such placement agent will receive a placement fee of 7.0% of gross proceeds of Super Units placed by such agent and 7.0% in GrowCo Warrants. |

# EXHIBIT 8

Blue Yellow Payment Instructions (January 20, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**Monday, May 12, 2025 at 5:01:49 PM Mountain Daylight Time**

---

**Subject:** Re: note payment to Blue Yellow
**Date:** Wednesday, January 20, 2016 at 4:51:04 PM Mountain Standard Time
**From:** Amy Atkinson
**To:** Wayne Harding, Chuck Kirby
**CC:** John McKowen
**Attachments:** Blue Yellow Wire Instructions.docx

Here are the wire instructions for the Blue Yellow account.

Amy Atkinson

**From:** Wayne Harding
**Sent:** Wednesday, January 20, 2016 2:39 PM
**To:** Chuck Kirby ; Amy Atkinson
**Cc:** John McKowen
**Subject:** note payment to Blue Yellow

Chuck and Amy,

John has asked that the interest GrowCo owes him on his promissory note be paid directly to Blue Yellow. I previously requested ach/wire info so this can be completed. I've also attached my interest calculations so you know the amount to be paid to Blue Yellow on behalf of John.

I used the 17th of each month due to the terms of the bridge note between GrowCo and John (Section 4b).

Please call or email with any questions.

Wayne Harding, CFO
GrowCo, Inc.
w: (303) 222-1032
c: (303) 290-0123

# EXHIBIT 9

GrowCo $6,000,000 Exchange Note Term Sheet (April 22, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**From:** Wayne Harding <WHarding@trgrowco.com>
**To:** 'Justin Yorke' <justin@mcgrainfinancial.com>, Gus Blass <gusblass@aol.com>
**Cc:** John McKowen <JMcKowen@trgrowco.com>
**Date:** Fri, 20 May 2016 20:42:07 +0000
**Subject:** GrowCo $6M Exchange note offering
**Attachments:** 22.5 Pct Senior Exchange Note Proforma.xlsx, GrowCo 22.5 Percent Senior Exchange Note Due May 31, 2018 Purchase Agreement.pdf, GrowCo 22.5 Percent Senior Exchange Notes Due May 31, 2018 Term Sheet.pdf

Justin and Gus,

Documents attached.

Wayne Harding, CFO

GrowCo, Inc.

w: 303-222-1000 X4

c: 303-290-0123

**GROWCO, INC.**

**Memorandum of Terms**

**22.5% Senior Exchange Notes due May 31, 2018**

This Memorandum of Terms dated as of April 22, 2016 summarizes the principal terms of an offering of notes of GrowCo, Inc. (which may be exchanged for preferred units of GCP Super Units, LLC), together with warrants to purchase common stock of GrowCo, Inc. and its parent, Two Rivers Water & Farming Company. **This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive purchase agreement. Nothing herein is binding except as set forth under "Confidentiality," and any sale of these securities is contingent on execution of a definitive agreement.**

**<u>OFFERING</u>**

| | |
|---|---|
| *Issuers:* | *GrowCo, Inc.,* a Colorado corporation ("**GrowCo**"), is an indirect subsidiary of Two Rivers Water & Farming Company ("**Two Rivers**").<br>*GCP Super Units, LLC,* a Colorado limited liability company (the "**LLC**"), has been formed to invest in greenhouses that GrowCo is constructing, or intends to construct, for leasing to third-party marijuana growers. |
| *Securities Offered:* | GrowCo will issue up to $6,000,000 in principal amount of 22.5% Senior Exchange Notes due May 31, 2018 ("**Senior Notes**"), together with warrants to acquire up to 6,000,000 shares of common stock of Two Rivers and up to 6,000,000 shares of common stock of GrowCo.<br>Senior Notes will be sold in principal amounts of multiples of $100,000, unless otherwise agreed to by GrowCo.<br>Outstanding principal of Senior Notes may be exchanged at any time for preferred units of the LLC ("**Preferred Units**") at an exchange rate of $1.00 per Preferred Unit. |
| *Purchase Price:* | 100% of principal amount, payable in cash or by surrender of GrowCo's 22.5% Exchange Notes due April 1, 2017 ("**Prior Notes**"). If a Prior Note is surrendered, the principal amount would be applied to pay purchase price on a dollar-for-dollar basis and accrued interest would be paid in cash. |
| *Use of Proceeds:* | Net proceeds will be used by GrowCo to support the operations of the LLC. |
| *Closings:* | Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than May 31, 2016. |
| *Investors:* | Institutional and other accredited investors. |

**<u>SENIOR NOTES</u>**

| | |
|---|---|
| *Principal:* | An amount equal to purchase price paid, payable in full in cash at maturity unless exchanged for Preferred Units as described under "—*Exchange Rights*" below. |
| *Stated Maturity:* | May 31, 2018. |

*Interest:* 22.5% annually, payable in cash. Interest initially will accrue (compounding as of the final day of each calendar month from June through October 2016) and become payable on November 30, 2016, and thereafter will accrue and be payable in arrears on the final day of each calendar month to maturity.

*Rank:* Senior Notes will rank *pari passu* with Prior Notes and will not be subordinated to any of GrowCo's indebtedness for borrowed money.

*Exchange Rights:* At the option of the holder, all or a portion of the outstanding principal amount of a GrowCo Note may be exchanged at any time (including at maturity) for Preferred Units at a rate of one Preferred Unit for each $1.00 of principal amount. Accrued interest on the exchanged principal amount will be payable in cash contemporaneously with the exchange.

*Prepayment:* Senior Notes may be prepaid, in whole or in part, by GrowCo at any time, without premium or penalty, upon ten business days' notice, subject to holders' rights to exchange their Senior Notes (as described under "—*Exchange Rights*" above) prior to prepayment. If GrowCo proposes to prepay less than all of the outstanding principal of, and accrued interest on, the then-outstanding Senior Notes, those Senior Notes will be prepaid pro rata.

**PREFERRED UNITS:**

*LLC Capitalization:* Two Rivers owns all of the LLC's outstanding common units, and no Preferred Units are outstanding.

*Capital Accounts:* *Capital Account.* Upon an exchange of Senior Notes, each holder will have a capital account initially equal to the principal amount exchanged for Preferred Units.

*Allocations.* Net profits of the LLC (if any), computed quarterly, will be allocated to members pro rata, based on the number of Preferred Units held.

*Distributions.* Each holder of Preferred Units will be entitled to receive, within 45 days after the end of a calendar month, a distribution equal to 25% of the amount of the LLC's net profits (if any) allocated to such member as described above. Each such capital account will be decreased by the amount of distributions with respect thereto, as described below.

*Retained Allocations.* Net profits of the LLC that are allocated, but not distributed, to members will be used to finance the construction, development and operation of GrowCo's greenhouses and administrative services. Those funds will be invested in equity or debt instruments with terms established on an arm's-length basis.

*Optional Exchanges:* Each Preferred Unit may be exchanged at any time, at the election of the holder, for one fully paid and nonassessable share of GrowCo common stock.

| | |
|---|---|
| *Mandatory Exchanges:* | Holders of a majority of the LLC's common units may elect to require holders to exchange all (but not less than all) of the outstanding Preferred Units for GrowCo common stock at any time at which GrowCo common stock (a) is listed on an exchange, (b) had a closing market price equal to least $5.00 for each of 20 consecutive trading days and (c) had an average daily trading volume of at least 100,000 shares during such 20 trading days. In such event, each Preferred Unit would be exchanged for one fully paid and nonassessable share of GrowCo common stock. |
| *Liquidation Preference:* | Upon any liquidation, dissolution or winding up of the LLC, each holder of Preferred Units would be entitled to receive an amount equal to the holder's capital account. No distribution would be made with respect to the LLC's common units. |
| *Voting:* | In general, holders of the LLC's common units and holders of Preferred Units will vote together on any matter subject to the approval of members. |
| *Amendments and Waivers:* | The terms of the Preferred Units may be amended or waived only upon the written consent of the LLC, holders of a majority of the LLC's common units and holders of at least two-thirds of the Preferred Units. |

**WARRANTS**

| | |
|---|---|
| *Two Rivers Warrants:* | Each purchaser of a Senior Note will receive a warrant to purchase, at a price of $0.50 per share in cash (no cashless exercises), one share of Two Rivers common stock for each $1.00 in principal amount of such Senior Note. The Two Rivers warrants will expire on May 31, 2021.<br><br>The Two Rivers warrants will be separable from the related Senior Note and will be transferrable subject to compliance with applicable securities laws. Two Rivers will agree to (a) file with the Securities and Exchange Commission, within ten business days following the final closing date for sales of Senior Notes, a registration statement on Form S-3 for shares of Two Rivers common stock purchasable upon exercise of the Two Rivers warrants and (b) use its reasonable efforts to cause the Securities and Exchange Commission to declare the Form S-3 to be effective and to remain effective, subject to certain exceptions, through May 31, 2018. |
| *GrowCo Warrants:* | Each purchaser of a Senior Note will receive a warrant to purchase, at a price of $0.50 per share in cash (no cashless exercises), one share of GrowCo common stock for each $1.00 in principal amount of such Senior Note. The GrowCo warrants will expire on May 31, 2021. |

**OTHER MATTERS**

| | |
|---|---|
| *Note Purchase Agreement:* | Any issuance of Senior Notes will be made only pursuant to a note purchase agreement, which will contain representations, warranties and covenants of Two Rivers, GrowCo, the LLC and the investors and will include appropriate conditions of closing. GrowCo will make available to potential investors forms of the note purchase agreement, the Senior Notes, the LLC's operating agreement and an exchange agreement with respect to Preferred Units. |
| *Confidentiality:* | No potential investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, managers, partners, accountants and attorneys without the written consent of GrowCo. |
| *Placement Agents:* | GrowCo may engage one or more third-party firms or individuals to serve as placement agents in connection with the offering of Preferred Units. Any such placement agent will receive a placement fee of 7.0% of the principal amount of Senior Notes. |

# EXHIBIT 10

Form 8-K — McKowen Resignation (May 26, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**UNITED STATES**

**SECURITIES AND EXCHANGE COMMISSION**

**Washington, D.C. 20549**

# FORM 8-K

**CURRENT REPORT**

**Pursuant to Section 13 or 15(d) of**

**the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported) May 25, 2016

**TWO RIVERS WATER & FARMING COMPANY**

(Exact name of registrant as specified in charter)

Colorado

(State or other jurisdiction of incorporation)

| 000-51139 | 13-4228144 |
|---|---|
| (Commission File Number) | (IRS Employee Identification No.) |

| 2000 South Colorado Blvd., Tower 1 Suite 3100, Denver, Colorado | 80222 |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (303) 222-1000

Not Applicable

(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

/__/ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

/__/Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

/__/Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b)

/__/Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

On May 25, 2016, John R. McKowen resigned as our Chief Executive Officer, effective immediately.

On May 26, 2016, Mr. McKowen resigned from all of his other positions with our company and our subsidiaries, including from our Board of Directors. At the time of his resignation, Mr. McKowen was our Chairman of the Board and was not a member of any Board committee. Mr. McKowen resigned due to a potential conflict of interest. This conflict might arise from Mr. McKowen's ownership in an entity that is applying for cultivation cannabis licensing within the State of Colorado. Mr. McKowen's entity potentially may lease facilities from GrowCo and its subsidiaries based upon mutually agreeable terms.Mr. McKowen tendered resignation from our Board of Directors and from his other remaining positions with our company and subsidiaries is filed as an exhibit to this current report on Form 8-K.

**SECTION 9 – FINANCIAL STATEMENTS AND EXHIBITS**

**Item 9.01. Financial Statements and Exhibits**

(d) Exhibits

| Exhibit Number | Description |
|---|---|
| 17. | Email communication sent by John R. McKowen to the Board of Directors of Two Rivers Water & Farming Company, as to his resignation from the Board of Directors and other positions with Two Rivers Water & Farming Company and subsidiaries. |

**SIGNATURE**

Pursuant to the requirements of the Securities and Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**TWO RIVERS WATER & FARMING COMPANY**
(Registrant)

By: /s/ Wayne Harding
Dated: June 1, 2016 Wayne Harding, Chief Financial Officer

**EXHIBIT INDEX**

| Exhibit Number | Description |
|---|---|
| 17. | Email communication sent by John R. McKowen to the Board of Directors of Two Rivers Water & Farming Company, as to his resignation from the Board of Directors and other positions with Two Rivers Water & Farming Company and subsidiaries. |

EX-17 2 exhibit17_ex17.htm EXHIBIT 17

*Exhibit 17.1*

To the Two Rivers Water & Farming Company Board of Directors; GrowCo, Inc. Board of Directors; the Dionisio Farms & Produce, Inc. Board of Directors; GrowCo Partners 1, LLC Board of Managers; TR Capital, LLC Board of Managers; GCP Super Units, LLC Board of Managers, and any other affiliates of Two Rivers Water & Farming Company and GrowCo, Inc.:

After much discussion and deliberation with the directors, major shareholders and outside counsel, as of May 26, 2016, I have resigned from my corporate officerships, director positions and board of managers designations of Two Rivers Water & Farming Company and all of it's controlled subsidiaries due to a pending conflict of interest. This conflict might arise from my ownership in an entity that is applying for cannabis licensing within the State of Colorado. Once this entity obtains the necessary licensing, we intend to potentially lease facilities from GrowCo and its subsidiaries at mutually agreeable terms.

I will deliver a hard coy of my resignation within the next few days

Sincerely,

/S/

John R. McKowen

# EXHIBIT 11

McKowen GrowCo Consulting Agreement (June 1, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# BUSINESS CONSULTING AGREEMENT

This CONSULTING AGREEMENT (the "Agreement") is made and entered into as of June 1, 2016, by and between **GrowCo, Inc.** a Colorado corporation, located at 2000 S Colorado Blvd, Ste. 1-3100, Denver, Colorado 80222 ("Client" or the "Company") and **John R. McKowen,** an individual, whose address is 456 Madison St., Denver CO 80206 ("Consultant").

RECITALS:

WHEREAS, the Company, is in the business of providing greenhouses and related infrastructure and services to agriculture and cannabis growers in the State of Colorado in the United States;

WHEREAS, the Company recently accepted the resignation of its Chief Executive officer and board member;

WHEREAS, the Consultant has expertise with the Company's agriculture, water and cannabis activities, which the Company needs;

WHEREAS, the Consultant has expertise in capital raising for the Company, which the Company needs;

WHEREAS, the Company desires to retain the services of the Consultant to assist, as needed and with time allocation determined by Consultant, in the transition to a new Chief Executive Officer and assisting with capital raising; and

WHEREAS, the Consultant wishes to render such services to the Company upon the terms and conditions and the covenants set forth in this agreement.

NOW, THEREFORE, in consideration of the foregoing recitals and the agreements and covenants herein set forth, the parties, agreeing to be legally bound, hereto agree as follows:

1) Scope of Service. The Consultant will provide assistance with management transition, water legal actions and transactions (through parent of the Company), Company's legal actions and capital raise assistance. These activities are hereby referred to as "Services."

2) Term ("term") and Termination. Services by Consultant begins June 1, 2016 and the term of this agreement shall be for six months commencing on the date hereof.

3) Fees and Expenses. The Company will pay Consultant $15,000 per month, starting immediately with the first payment due on July 1, 2016 and thereafter by the 1st of each month.

4) Consultant has certain compensation potentially due him related to his previous employment as the CEO of Two Rivers Water & Farming Company as defined by his employment agreement dated, January 11, 2011. Without agreeing as to whether the compensation is due or not due, the Company agrees to pay for the health benefits and lease of the vehicle as paid him as CEO during the term of this agreement.

5) Consultant Status. Consultant is an independent contractor performing certain consulting services for Client and is not an employee, agent, representative, officer, or partner of Client. Consultant has no power or authority to act for, represent, or bind Client or any affiliate of Client in any manner. Consultant acknowledges and agrees, and it is the intent of the parties hereto, that, under this Agreement, Consultant receives no Client sponsored benefits (except as contemplated in Section 3 and 4) from Client, including, but not limited to, paid vacation, sick leave, and 401(k) or other retirement plan participation. Nothing

contained herein shall be deemed to create any relationship between the parties other than that of a principal and independent contractor.

6) Confidentiality; Return of Client Property.

a) "Confidential Information" of a party means and includes, but is not limited to, all information about that party, including, but not limited to, hardware, software, screens, specifications, designs, plans, drawings, data, prototypes, discoveries, research, developments, methods, processes, procedures, improvements, "know-how," trade secrets, compilations, market research, marketing techniques and plans, business plans and strategies, customer names and other information related to customers, price lists, pricing policies and financial information or other business and/or technical information and materials, in written, graphic, machine-readable form or in any other medium. Notwithstanding anything to the contrary contained in this Agreement, Confidential Information shall not include any information that: (i) is in the public domain or becomes generally known to parties outside of this Agreement on a non-confidential basis, through no wrongful act of the party to this Agreement having received such information from the disclosing party; (ii) is lawfully obtained by either party of this Agreement, as the case may be, from a party outside of this Agreement without any obligation to maintain the information as proprietary or confidential; (iii) was known to either party to this Agreement, as the case may be, prior to its disclosure by the other party to this Agreement, without any obligation to keep it confidential as evidenced by tangible records kept in the ordinary course of business; (iv) is independently developed by either party to this Agreement, as the case may be, without reference to any Confidential Information disclosed by the other party to this Agreement as evidenced by tangible records kept in the ordinary course of business; (v) is the subject of a written agreement whereby Consultant or Client, as the case may be, consents to the use or disclosure of such Confidential Information by the other party to this Agreement; or (vi) is required by applicable law to be disclosed by either Client or Consultant.

b) Consultant agrees that at all times during the Term of this Agreement, Consultant shall preserve as confidential all Confidential Information concerning Client, and any actual or potential financial, strategic or operational partners that has been disclosed to the Consultant, and Consultant shall not, without the prior written consent of Client, use for Consultant's own benefit or purposes, or disclose to any other party such Confidential Information, except as required by Consultant's engagement with Client, or as required by applicable law. These obligations with respect to confidentiality shall continue for a period one year after the expiration or termination of this Agreement. The terms of this paragraph do not impair the right to disclose such Confidential Information by Consultant in order to defend Consultant from any claim in any court of law once Consultant gives Client notice of such intended use.

c) All records, business plans, financial statements, manuals, memoranda, documents, correspondence, reports, records, charts, lists and other similar data delivered to or compiled by Consultant or by or on behalf of Client or its representatives, which pertain to the Business of Client shall be and remain the property of Client and be subject at all times to its discretion and control. In the event of the expiration or termination of Consultant's engagement hereunder, all such materials pertaining to the Business of Client which has been obtained by Consultant shall be delivered promptly to Client upon written request by Client once all Compensation and expenses have been paid in accordance with this Agreement; provided, however, that Consultant may retain copies of any such documents and materials which may be reasonably necessary to maintain business, accounting, and legal records associated with this Agreement subject to the non-disclosure provisions of Section 10(b).

7) Notice/Cure. Anything contained in this Agreement to the contrary notwithstanding, neither party

shall have failed to perform any material obligation or duty under this Agreement unless and until:

a) Consideration. In the case of a failure to pay any consideration, such failure shall not have been cured within fifteen (15) business days after receipt of written notice thereof from the party demanding payment.

b) Non-Money. In the case of any other failure to perform any obligation or duty under this Agreement, such failure shall not have been cured within fifteen (15) business days after receipt of written notice from the demanding party describing in reasonable detail the failure.

8) Indemnification.

a) Client shall indemnify and hold Consultant and its officers, directors, employees, agents, Consultant's affiliates, and representatives harmless from and against any and all actions, suits, proceedings, liabilities, losses, damages, judgments, fines, amounts paid in settlement, losses, costs and expenses, including, but not limited to, reasonable attorneys' and experts' fees and court costs, (each, a "Loss"), paid or incurred by Consultant and arising out of or in connection with any claim by a third party relating to any untrue statement of a material fact, or any omission to state a material fact, based upon information furnished by Client to Consultant in connection with the Services or any other work performed for Client by the Consultant.

b) Consultant shall indemnify and hold Client and its officers, directors, employees, agents, consultants, affiliates, and representatives harmless from and against any and all Losses, paid or incurred by Client and arising out of or in connection with any claim by a third party relating to Consultant's performance of the Services or any other work performed for Client by the Consultant; provided, however, that notwithstanding the foregoing, in no event will Consultant indemnify Client for any Losses arising out of or in connection with any untrue statement of a material fact, or any omission to state a material fact, based upon information furnished by Client to Consultant in connection with the Services or any other work performed for Client by the Consultant.

9) Miscellaneous.

a) Amendments. This Agreement may be amended, supplemented or modified only in a writing signed by the parties hereto.

b) Notices. All notices and other communications provided for or permitted hereunder shall be in writing and shall be delivered personally, by facsimile or by courier service providing for next day service, or sent by registered or certified mail, postage prepaid, and return receipt requested, or electronic mail, if confirmed by a subsequent written letter to the party at the address noted below:

If to Client:
Two Rivers Water & Farming Company
Attention: Wayne Harding
2000 S Colorado Blvd
Ste 1-3100
Denver, CO 80222
Telephone: (303) 222-1000 X4
Facsimile: (303) 845-9400
Email: wharding@trgrowco.com

If to Consultant:
John McKowen
456 Madison St.
Denver CO 80206
Telephone: 303-248-6883
Email: mckowen.john@gmail.com



JM

c) Governing Law; Jurisdiction. This Agreement shall be governed by the laws of the State of Colorado without regard to conflicts of laws principles, the parties agree to submit to the jurisdiction of the courts of the State of Colorado for all purposes, and sole and exclusive venue for any dispute or disagreement arising under or relating to this agreement shall be in a court sitting in the City and County of Denver, Colorado.

d) Waiver. Failure or delay on the part of either party hereto to enforce any right, power, or privilege hereunder shall not be deemed to constitute a waiver thereof Additionally, a waiver by either party or a breach of any promise hereof by the other party shall not operate as or be construed to constitute a waiver of any subsequent waiver by such other party.

e) Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

f) Assignability. Neither party may assign or delegate any or all of its rights (other than the right to receive payments) or its duties or obligations hereunder without the consent of the other party, which consent will not be unreasonably withheld or delayed; provided, however, that either party may assign this agreement, without the need to obtain consent of the other party, to an affiliate of such party or to its successor-in-interest. An assignee will have all of the rights and obligations of the assigning party set forth in this Agreement.

g) Attorneys' and Experts' Fees; Remedies. In any action, suit or proceeding brought to enforce any provision of this Agreement, or where any provision of this Agreement is validly asserted as a defense, the prevailing party shall be entitled to recover reasonable attorneys' and experts' fees and expenses in addition to any other available remedy. Other than the right to recover fees in the preceding sentence, in any dispute between the parties arising out of this Agreement, neither party shall be liable to the other for any indirect, special, consequential or incidental damages (including, without limitation, lost profits).

h) No Third Party Beneficiary. The terms and provisions of this Agreement are intended solely for the benefit of each party hereof and their respective successors or permitted assigns, and it is not the intention of the parties to confer third-party beneficiary rights upon any other person or entity.

i) Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

j) Section Headings, Construction. The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

k) Entire Agreement. This Agreement (including all Exhibits and Appendices) constitutes the entire agreement among the Parties and supersedes any prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they related in any way to the subject matter hereof.

l) Currency. All references to currency within this Agreement, unless otherwise stated, shall mean United States Dollars.

m) Business Day. For the purposes of this Agreement, a business day is defined as any calendar day during which the New York Stock Exchange is scheduled to be officially open for business for any period of time.

n) Counterparts. This Agreement may be executed in one or more counterparts, by the parties hereto and any successor in interest, each of which shall be deemed to be an original and all of which together shall be deemed to constitute one and the same agreement and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

o) No Violation of Other Agreements. Each of the parties hereto represent and warrant that execution, delivery, or performance of this agreement does not conflict with, or violate the terms of, any other agreement to which it is a party or by which it is bound.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers or agents as set forth below.

**CONSULTANT:**

Date: June 1, 2016

By: John R. McKowen
Name: John R. McKowen

**CLIENT:**

Wayne Harding

Date: June 1, 2016

By: Wayne Harding
Name: Wayne Harding
Title: CFO

# EXHIBIT 12

GrowCo $7,000,000 Exchange Note Term Sheet (June 6, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**GROWCO, INC.**

**Memorandum of Terms**

**22.5% Senior Exchange Notes due July 1, 2021**

This Memorandum of Terms dated as of June 6, 2016 summarizes the principal terms of an offering of notes of GrowCo, Inc. (which may be exchanged for preferred units of GCP Super Units, LLC), together with warrants to purchase common stock of GrowCo, Inc. **This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive purchase agreement. Nothing herein is binding except as set forth under "Confidentiality", and any sale of these securities is contingent on execution of a definitive agreement.**

**OFFERING**

| | |
|---|---|
| *Issuers:* | *GrowCo, Inc.,* a Colorado corporation ("**GrowCo**"), is an indirect subsidiary of Two Rivers Water & Farming Company ("**Two Rivers**").<br>*GCP Super Units, LLC,* a Colorado limited liability company (the "**LLC**"), has been formed to invest in greenhouses that GrowCo is constructing, or intends to construct, for leasing to third-party marijuana growers along with associated business services. |
| *Securities Offered:* | GrowCo will issue up to $7,000,000 in principal amount of 22.5% Senior Exchange Notes due July 1, 2021 ("**Senior Notes**"), together with warrants to acquire up to 7,000,000 shares of common stock of GrowCo.<br>Senior Notes will be sold in principal amounts of multiples of $100,000, unless otherwise agreed to by GrowCo.<br>Outstanding principal of Senior Notes may be exchanged at any time for preferred units of the LLC ("**Preferred Units**") at an exchange rate of $1.00 per Preferred Unit. |
| *Purchase Price:* | 100% of principal amount, payable in cash. |
| *Use of Proceeds:* | Net proceeds will be used by GrowCo to support the operations of Two Rivers, GrowCo and of the LLC. |
| *Closings:* | Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than June 30, 2016. |
| *Investors:* | Institutional and other accredited investors. |

**SENIOR NOTES**

| | |
|---|---|
| *Principal:* | An amount equal to purchase price paid, payable in full in cash at maturity unless exchanged for Preferred Units as described under "—*Exchange Rights*" below. |
| *Stated Maturity:* | July 1, 2021. |
| *Interest:* | Interest at 10% annually, interest paid by the 15th day after each calendar month. Interest is increased to 22.5% annually, upon the Corporation becoming operational cash flow positive (as defined by U.S. GAAP). |

| | |
|---|---|
| *Rank:* | Senior Notes will rank *pari passu* with prior GrowCo notes and will not be subordinated to any of GrowCo's indebtedness for borrowed money. |
| *Exchange Rights:* | At the option of the holder, all or a portion of the outstanding principal amount of a GrowCo Note may be exchanged at any time (including at maturity) for Preferred Units at a rate of one Preferred Unit for each $1.00 of principal amount. Accrued interest on the exchanged principal amount will be payable in cash contemporaneously with the exchange. |
| *Prepayment:* | After January 1, 2019, Senior Notes may be prepaid, in whole or in part, by GrowCo at any time, without premium or penalty, upon thirty days' notice, subject to holders' rights to exchange their Senior Notes (as described under "—*Exchange Rights*" above) prior to prepayment. If GrowCo proposes to prepay less than all of the outstanding principal of, and accrued interest on, the then-outstanding Senior Notes, those Senior Notes will be prepaid pro rata. |

**PREFERRED UNITS:**

| | |
|---|---|
| *LLC Capitalization:* | Two Rivers owns all of the LLC's outstanding common units, and 5,100,000 Preferred Units are outstanding. |
| *Capital Accounts:* | *Capital Account.* Upon an exchange of Senior Notes, each holder will have a capital account initially equal to the principal amount exchanged for Preferred Units.<br>*Allocations.* Net profits of the LLC (if any), computed quarterly, will be allocated to members pro rata, based on the number of Preferred Units held.<br>*Distributions.* Each holder of Preferred Units will be entitled to receive, within 45 days after the end of a calendar quarter, a distribution equal to 25% of the amount of the LLC's net profits (if any) allocated to such member as described above. Each such capital account will be decreased by the amount of distributions with respect thereto, as described below.<br>*Retained Allocations.* Net profits of the LLC that are allocated, but not distributed, to members will be used to finance the construction, development and operation of GrowCo's greenhouses and administrative services. Those funds will be invested in equity or debt instruments with terms established on an arm's-length basis. |
| *Optional Exchanges:* | Each Preferred Unit may be exchanged at any time, at the election of the holder, for one fully paid and nonassessable share of GrowCo common stock. |
| *Mandatory Exchanges:* | Holders of a majority of the LLC's common units may elect to require holders to exchange all (but not less than all) of the outstanding Preferred Units for GrowCo common stock at any time at which GrowCo common stock (a) is listed on an exchange, (b) had a closing market price equal to least $5.00 for each of 20 consecutive trading days and (c) had an average |

daily trading volume of at least 100,000 shares during such 20 trading days. In such event, each Preferred Unit would be exchanged for one fully paid and nonassessable share of GrowCo common stock.

*Liquidation Preference:* Upon any liquidation, dissolution or winding up of the LLC, each holder of Preferred Units would be entitled to receive an amount equal to the holder's capital account. No distribution would be made with respect to the LLC's common units.

*Voting:* In general, holders of the LLC's common units and holders of Preferred Units will vote together on any matter subject to the approval of members.

*Amendments and Waivers:* The terms of the Preferred Units may be amended or waived only upon the written consent of the LLC, holders of a majority of the LLC's common units and holders of at least two-thirds of the Preferred Units.

**WARRANTS**

*GrowCo Warrants:* Each purchaser of a Senior Note will receive a warrant to purchase, at a price of $0.25 per share in cash (no cashless exercises), one share of GrowCo common stock for each $1.00 in principal amount of such Senior Note. The GrowCo warrants will expire on July 1, 2021.

**OTHER MATTERS**

*Note Purchase Agreement:* Any issuance of Senior Notes will be made only pursuant to a note purchase agreement, which will contain representations, warranties and covenants of Two Rivers, GrowCo, the LLC and the investors and will include appropriate conditions of closing. GrowCo will make available to potential investors forms of the note purchase agreement, the Senior Notes, the LLC's operating agreement and an exchange agreement with respect to Preferred Units.

*Confidentiality:* No potential investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, managers, partners, accountants and attorneys without the written consent of GrowCo.

*Placement Agents:* GrowCo may engage one or more third-party firms or individuals to serve as placement agents in connection with the offering of Preferred Units. Any such placement agent will receive a placement fee of 7.0% of the principal amount of Senior Notes.

# EXHIBIT 13

June 27, 2016 "Capital Raise Concerns" Email
(McKowen to Harding — quoted verbatim in the Denver District Court Judgment)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

## JUNE 27, 2016 "CAPITAL RAISE CONCERNS" EMAIL

John R. McKowen to Wayne Harding

*Source: Quoted verbatim in Findings of Fact, Conclusions of Law, and Judgment, Denver Dist. Ct. No. 2021CV33922 (July 9, 2025), Finding of Fact ¶ 129 — admitted at trial as Exhibit 23.*

> "We addressed concerns several weeks ago that the current capital raise could become a Ponzi scheme, whereby we were raising capital from some people for the stated purpose of building greenhouses but proceeds were, whether purposely or not, were in fact being spent primarily to pay interest to others and salaries. I think we need to quickly assess where we stand. I suggest you compile data quickly that allows us to see how proceeds have been spent for the $2M raised to date and what the realistic expectation is for completion of this raise."

Note: This page reproduces the email text exactly as quoted by the court. Before filing, substitute the native message (export the original from Outlook as a PDF/.eml) — the placeholder "GrowCo Capital Raise.eml" copied as 0 bytes.

# EXHIBIT 14

McGrow Combined Agreements (Master Agreement and Five Sub-Agreements, July 22, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# MASTER AGREEMENT

THIS MASTER AGREEMENT (the "**Agreement**") is dated and effective as of this 22 of July, 2016, by and between McGrow, LLC, a Colorado limited liability company ("**McGrow**") and GrowCo, Inc. a Colorado corporation ("**GrowCo**").

WHEREAS, McGrow provides advisory, construction and financing services for development stage companies; and

WHEREAS, GrowCo is a development stage company in need of advisory, construction and financing services.

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter set forth in a series of agreements each as set forth herein, the parties hereby agree as follows:

1. Agreements.

1.1 Advisory Services. McGrow will provide advisory services to GrowCo pursuant to the Advisory Services Agreement attached hereto as Exhibit 1 (the "**ASA**").

1.2 Construction Services. McGrow will provide construction services to GrowCo pursuant to the Construction Services Agreement attached hereto as Exhibit 2 (the "**CSA**").

1.3 Financing Services. McGrow will provide financing services to GrowCo pursuant to the Financing Services Agreement attached hereto as Exhibit 3 (the "**FSA**").

1.4 Non-Compete and Exclusivity. McGrow and GrowCo agree to be bound by the restrictions and obligations set forth in the Exclusivity and Non-Solicit Agreement attached hereto as Exhibit 4 (the "**ENSA**").

1.5 Stock Purchase Agreement. McGrow shall be entitled to shares of GrowCo common stock pursuant to the Stock Purchase Agreement attached hereto as Exhibit 5 (the "**SPA**").

1.6 Collectively, the ASA, CSA, FSA, ENSA and SPA shall be referred to as the "**McGrow Agreements**".

2. Term. This Agreement shall begin as of the first date set forth above and shall remain in effect for so long as any of the McGrow Agreements remain in effect.

3. Miscellaneous. This Agreement shall be binding upon and shall inure to the benefit of the successors and assignees of the parties. This Agreement contains the complete understanding of the parties with respect to the subject matter hereof and no modification or waiver of any provision hereof shall be valid unless in writing and signed by the parties, unless specifically provided to the contrary. This Agreement may not be amended except by an instrument in writing signed by McGrow and GrowCo. Notwithstanding anything to the contrary herein, no party shall be required to violate any law or the good faith reasonable exercise of such party's professional responsibility.

4. Governing Law; Attorney Fees. This Agreement shall be governed and interpreted in all respects pursuant to the laws of the State of Colorado without regard to conflict of laws principles which

JRM

# ADVISORY SERVICES AGREEMENT

THIS ADVISORY SERVICES AGREEMENT (the "**Agreement**") is dated and effective as of this 22 day of July, 2016 ("**Effective Date**"), by and among McGrow, LLC, a Colorado limited liability company ("**McGrow**") and GrowCo, Inc, a Colorado corporation ("**GrowCo**").

## RECITALS

WHEREAS, McGrow provides advisory services for development stage companies;

WHEREAS, GrowCo is a development stage company in need of advisory services;

WHEREAS, GrowCo desires to retain McGrow in connection with the provision of certain advisory services relating to its business formation and development, and McGrow desires to provide such advisory services to GrowCo on the terms and conditions herein set forth; and

WHEREAS, GrowCo and McGrow have agreed upon a fair compensation for the advisory services provided by McGrow hereunder.

## AGREEMENT

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter set forth, the parties hereby agree as follows:

1. Authorization.

1.1 No Right to Control GrowCo. Notwithstanding anything to the contrary herein, McGrow acknowledges that this Agreement does not create or provide any: (a) ownership interest in GrowCo; or (b) right to control GrowCo's management decisions in the operation of its business.

2. Obligations of McGrow.

2.1 Appointment of McGrow; Advisory Services. GrowCo hereby retains McGrow and McGrow agrees to provide the advisory services described in **Exhibit A** (collectively, the "**Advisory Services**"). In the event that any terms provided in this Agreement conflicts with the terms in any of the agreements set forth on **Exhibit A**, the terms of this Agreement will control.

2.2 Relationship of the Parties. McGrow is an independent contractor for GrowCo. Nothing in this Agreement will be construed as creating an employer-employee relationship between GrowCo and McGrow or any employee of McGrow, as a guarantee of future employment, or as a limitation upon GrowCo's rights to terminate this Agreement in accordance with its terms. McGrow will be solely responsible for compensating each of its employees performing Advisory Services, withholding any sums from amounts payable to such employees with respect to federal, state or local taxes, FICA contributions, unemployment insurance, or similar matters and paying all such amounts. McGrow and its employees will not be eligible for any fringe benefits (including health insurance, paid vacation, sick leave or other employment benefits) that may be provided to employees of GrowCo and will not participate in any GrowCo qualified benefit plans. From time to time, McGrow may replace any of its employees or independent contractors (including hiring and firing employees and terminating the relationship with any independent contractors providing the Advisory Services hereunder), and may obtain alternative types or sources of the Advisory Services in McGrow's sole discretion.

JEM

2.3 Records. Solely for purposes of providing the records management and Advisory Services for GrowCo under this Agreement, McGrow shall be granted access to GrowCo files, which includes, but is not limited to on-line accounting records and banking statements, and may use such files subject to reasonable restrictions imposed by GrowCo on McGrow's management of GrowCo's files. Such files shall be maintained at GrowCo's offices and copies of such files may be maintained at McGrow's offices or offsite storage facilities at McGrow's sole discretion. Information shall be subject to and protected by applicable state and federal law, rules and regulations, including those promulgated by any applicable state regulatory division.

2.4 Limitation on McGrow's Authority. Advisory Services shall not include, and McGrow shall not at any time or in any manner engage, pursuant to this Agreement, in providing to GrowCo or any client or customer of GrowCo, any services that, under applicable state law, cannot be provided by a business under applicable state or federal laws. If any Advisory Services or acts required or requested of McGrow herein would be reasonably likely to be construed, as reasonably determined by McGrow, by a court of competent jurisdiction, or any municipal board or local authority charged under any state or federal laws to be illegal or otherwise in violation of any state, federal or local laws or regulations then the requirement or other request to perform that act shall be deemed waived or not required by GrowCo. In order to preserve independence and quality, GrowCo shall have complete control and supervision over its provision of any of its business operations including, but not limited to: (i) the establishment and maintenance of quality assurance policies; (ii) the acceptance, continuation of, and fee or price arrangements with customers or vendors; (iii) the management and supervision of GrowCo's business; and (iv) at all times GrowCo shall: (A) bear the risk of loss and opportunity for profit of GrowCo's business, and (B) determine who is entitled to possession of the licensed premises of GrowCo's business subject to a valid lease. Although GrowCo has delegated to McGrow under the terms of this Agreement various ministerial advisory matters, GrowCo retains the exclusive right, through its own personnel, to manage and control its own business (including cannabis-related operations).

3. Obligations of GrowCo.

3.1 Independent Identity. GrowCo shall continue to maintain itself as a separate legal identity and shall observe all legal requirements and customary practices necessary to maintain GrowCo as a separate legal entity distinct from any other person or entity, including McGrow. GrowCo shall also maintain its own business identity, including, without limitation, letterhead and business cards. Nothing herein shall prevent GrowCo from being acquired by or otherwise combining with any other person or entity, in which case this Agreement may be terminated in accordance with the terms of this Agreement.

3.2 Compliance with State Law. GrowCo shall comply with all applicable state, federal, municipal and local laws and regulations related to the operation of its business.

3.3 Taxes and License Fees. GrowCo shall be responsible for the accurate reporting and payment of all excise, sales and other taxes. GrowCo shall further be responsible for the payment of application and renewal fees for all licenses and permits required for the operation GrowCo's business.

4. Term. Provided that neither party is in material breach of this Agreement or in material breach of the agreements set forth in Section 8.1, the term of this Agreement shall commence on the Effective Date and shall continue for a period of six (6) months after the Effective Date (unless sooner terminated pursuant to Sections 8 or 9 hereof).

5. Fee. GrowCo will pay to McGrow the fees for the Advisory Services as set forth on **Exhibit A**. All amounts owed by GrowCo to McGrow, if unpaid when due, will bear interest accruing as of their original due date at one and one-half percent (1.5%) per month or the highest commercial contract



JFM

interest rate the law allows, whichever is less.

6. Mutual Nondisclosure. Neither GrowCo nor McGrow shall at any time or in any manner, directly or indirectly, use or disclose to any third party any trade secrets or other Confidential Information (defined herein) learned or obtained from the other party hereto as a result of its relationship with the other party hereto or any direct or indirect subsidiary or affiliate (i.e., a person which controls, is controlled by or under common control with a party) of the other party, except as (i) may be required by law or legal, regulatory or judicial process; provided that the disclosing party shall give prompt written notice to the other party of such requirement, disclose no more information than is so required, and cooperate with any attempts by the other party to obtain a protective order or similar treatment; or (ii) to its or its affiliates' directors, officers, attorneys, accountants, advisors or consultants who need to know such information in such capacities and who agree to comply with the non-disclosure obligations set forth in this Section 6. As used herein, the term "**Confidential Information**" means confidential, proprietary or personal information of a party or its affiliates that is not generally known in the industry in which the parties or any of their direct or indirect subsidiaries or (in the case of information of or about clients of either party) clients is engaged, including such information that in any way relates to the products, processes, services, inventions (whether patentable or not), formulas, techniques or know-how, including, but not limited to, information relating to distribution systems and methods, research, development, purchasing, accounting, procedures, marketing, customers, vendors, merchandising and selling, of McGrow or GrowCo or any of their respective direct or indirect subsidiaries or affiliates, or the clients of either party, and regardless of the format in which it is presented or embodied (written, graphic, electromagnetic or otherwise). The term "Confidential Information," as used herein, does not include information (a) which was already in the public domain other than through any disclosure in violation of this Section 6, (b) information already in the possession of the other party and not subject to any confidentiality obligations of the other party, or (c) which is or was disclosed as a matter of right by a third party source provided such third party source is not, to the knowledge of the receiving party, bound by confidentiality obligations in favor of the owner of the Confidential Information in question. Each party agrees that it will adopt reasonable precautions to guard against unauthorized release or use of Confidential Information, and that it will not use or disclose such Confidential Information in any manner that will unfairly benefit itself or damage the other party hereto. Each party agrees to return to the other party all such Confidential Information pertaining to the other party upon termination of this Agreement. In lieu of returning all Confidential Information, a party may destroy such Confidential Information provided that the other party hereto has agreed in writing that destruction is acceptable. This Section 6 shall survive the termination of this Agreement.

7. Warranties, Disclaimers, Limitations on Liability and Indemnity.

7.1 Warranty, Disclaimer and Limitation on Liability. McGrow will act diligently and use reasonable care in providing Advisory Services to GrowCo. GrowCo hereby releases and forever discharges McGrow and its affiliates, parents, employees, subcontractors, agents and assigns from any liability in any way connected with this Agreement or the Advisory Services, except for any liability for intentional torts or gross negligence. McGrow does not warrant the success or results of GrowCo. McGrow shall not be liable to GrowCo under any circumstances for special, exemplary, punitive or consequential damages relating to the Advisory Services except for intentional torts or gross negligence. GrowCo shall not be liable to McGrow for special, exemplary, punitive or consequential damages relating to this Agreement.

7.2 Indemnity. McGrow hereby agrees to indemnify and hold harmless GrowCo and its affiliates from and against any liability or losses (including, without limitation, reasonable attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against GrowCo or its affiliates as a result of any gross negligence, willful misconduct or fraud by

McGrow in connection with its provision of any services under this Agreement. GrowCo hereby agrees to indemnify and hold harmless McGrow and its affiliates from and against any liability or losses (including, without limitation, attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against McGrow or its affiliates as a result of (i) GrowCo's breach of this Agreement; and (ii) any negligence, willful misconduct or fraud by GrowCo in connection with the operation of GrowCo's business or performance under this Agreement.

8. Termination. Other than any termination pursuant to Section 9 hereof, this Agreement may only be terminated in accordance with and subject to the provisions of this Section 8.

8.1 By McGrow. McGrow may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; (b) at any time if GrowCo is wound-up or liquidated or files for bankruptcy or other action is taken against it under any statute for the protection of creditors; or (c) subject to Section 8.3, at any time, with or without cause, provided that McGrow must have provided GrowCo with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

8.2 By GrowCo. GrowCo may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; or (b) subject to Section 8.3 hereof, at any time, with or without cause, provided that GrowCo must have provided McGrow with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

8.3 Effect of Termination.

8.3.1 Payment of Money Owed. Upon the termination of this Agreement for any reason, GrowCo shall pay all amounts due to McGrow and McGrow shall pay all amounts due to GrowCo under this Agreement as soon as practicable but in no event later than five (5) days after the effective date of such termination, it being understood that any amounts due to each other under any other agreements by and between, or which may be entered into by and between, the parties shall be payable in accordance with the provisions thereof.

8.3.2 Survival of Certain Provisions. The parties' rights and obligations under this Agreement that, by their nature (specifically including obligations to keep Confidential Information confidential), extend beyond the terms of this Agreement will survive any expiration or termination of this Agreement.

8.3.3 License of Proprietary Systems. Nothing in this Agreement shall prevent GrowCo from independently obtaining any licenses or other agreements providing for GrowCo's right to use any Proprietary and Customized Applications (as defined below) used in the provision of the Advisory Services.

As used herein, "Proprietary and Customized Applications" means, collectively, software applications owned by McGrow or owned by one or more third parties and licensed or otherwise provided to McGrow, and any customizations or extensions to or other enhancements of such software applications developed and/or owned by McGrow, that are used or available for use to provide Advisory Services to GrowCo immediately prior to the effective date of termination of this Agreement.

9. Miscellaneous.

9.1 This Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assignees of the parties.



JRM

9.2 GrowCo shall not assign, confer any right in, assume in bankruptcy, pledge, mortgage or otherwise encumber this Agreement, in whole or in part, without the prior written consent of McGrow, which can be withheld in McGrow's sole discretion. For the avoidance of doubt, a merger, change of control, reorganization (in bankruptcy or otherwise) or a stock sale of GrowCo shall be deemed an "assignment" requiring such consent, regardless of whether GrowCo is the surviving entity. Any attempted action in violation of the foregoing shall be null and void ab initio and of no force or effect. McGrow may, in its discretion, assign this Agreement to any other direct or indirect parent, subsidiary or affiliate of McGrow, or to any third party that in connection therewith is acquiring all or substantially all of the assets of McGrow, and GrowCo shall be liable hereon to the same extent as if such agreement were originally made with such other person, firm or corporation.

9.3 This Agreement contains the complete understanding of the parties with respect to the subject matter hereof and no modification or waiver of any provision hereof shall be valid unless in writing and signed by the parties, unless specifically provided to the contrary. This Agreement may not be amended except by an instrument in writing signed by McGrow and GrowCo. Notwithstanding anything to the contrary herein, no party shall be required to violate any law or the good faith reasonable exercise of such party's professional responsibility.

10. Governing Law. This Agreement shall be governed and interpreted in all respects pursuant to the internal and substantive laws of the State of Colorado without regard to conflict of laws principles which might cause the law of another jurisdiction to apply. Each party hereby expressly consents and submits to the exclusive in personam jurisdiction and exclusive venue in the City and County of Denver, Colorado.

11. Notices. Any notice, request, consent or communication under this Agreement shall be effective only if it is in writing and (a) personally delivered, (b) sent by certified or registered mail, return receipt requested, postage pre-paid, (c) sent by a nationally recognized overnight delivery service, with delivery confirmed, (d) e-mailed (with a copy simultaneously sent by first class mail or any other delivery method permitted hereunder), or (e) telexed or telecopied, with receipt confirmed, addressed as follows:

| | |
|---|---|
| If to McGrow: | McGrow, LLC<br>456 Madison St.<br>Denver, CO 80206 |
| If to GrowCo: | GrowCo, Inc.<br>2000 S Colorado Blvd. #1-3100<br>Denver, CO 80222<br>Attn: CFO |

or such other persons or addresses as shall be furnished in writing by any party to the other party. A notice shall be deemed to have been given as of the date when (i) personally delivered, (ii) three (3) days after the date when deposited with the United States mail properly addressed, (iii) when receipt of a notice sent by an overnight delivery service is confirmed by such overnight delivery service, or (iv) when receipt of the e-mail, telex or telecopy is confirmed, as the case may be.

12. Relationship of the Parties. The relationship between GrowCo and McGrow is that of an independent contractor and nothing in this Agreement shall be construed to create any partnership, joint venture or any similar relationship between the parties. Other than as expressly set forth in this Agreement, neither party has any express or implied authority to act or make any representations whatsoever on behalf of the other party.



JCM

13. Counterparts. This Agreement may be executed in counterparts, including electronically transmitted counterparts, each of which shall be deemed an original and together shall be considered a single agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

McGrow, LLC

By: ______________________
Name: John McKowen
Title: Manager

GrowCo, Inc.

By: ______________________
Name: Wayne Harding
Title: Pursuant to authority granted in a Resolution of the GrowCo Board of Directors dated July 21, 2016

EXHIBIT A

ADVISORY SERVICES

Strategic Planning and Development in all aspects of transition of Wayne Harding into the Chief Executive Office Position with Two Rivers Water & Farming Company

**Fee for Advisory Services:**

GrowCo and McGrow have agreed that GrowCo shall pay to McGrow a fee for all Advisory Services in the amount of $7,500 per month beginning with the first payment being made on the Effective Date, and subsequent monthly payments being payable on the 1st day of the month following the month in which the fee was incurred.

# CONSTRUCTION SERVICES AGREEMENT

THIS CONSTRUCTION SERVICES AGREEMENT (the "**Agreement**") is dated and effective as of this 22 day of July, 2016 ("**Effective Date**"), by and among McGrow, LLC, a Colorado limited liability company ("**McGrow**") and GrowCo, Inc, a Colorado corporation ("**GrowCo**").

## RECITALS

WHEREAS, McGrow provides construction services for greenhouse facilities companies;

WHEREAS, GrowCo is a greenhouse facilities company in need of construction services;

WHEREAS, GrowCo desires to retain McGrow to perform certain construction services and McGrow desires to provide such construction services to GrowCo on the terms and conditions herein set forth; and

WHEREAS, GrowCo and McGrow have agreed upon a fair compensation for the construction services provided by McGrow hereunder.

## AGREEMENT

1. Obligations of McGrow.

1.1 Appointment of McGrow; Construction Services. GrowCo hereby retains McGrow and McGrow agrees to provide Construction Services described in **Exhibit A** (collectively, the "**Construction Services**"). In the event that any terms provided in this Agreement conflicts with the terms in any of the agreements set forth on **Exhibit A**, the terms of this Agreement will control.

1.2 Relationship of the Parties. McGrow is an independent contractor for GrowCo. Nothing in this Agreement will be construed as creating an employer-employee relationship between GrowCo and McGrow or any employee of McGrow, as a guarantee of future employment, or as a limitation upon GrowCo's rights to terminate this Agreement in accordance with its terms. McGrow will be solely responsible for compensating each of its employees performing Construction Services, withholding any sums from amounts payable to such employees with respect to federal, state or local taxes, FICA contributions, unemployment insurance, or similar matters and paying all such amounts. McGrow and its employees will not be eligible for any fringe benefits (including health insurance, paid vacation, sick leave or other employment benefits) that may be provided to employees of GrowCo and will not participate in any GrowCo qualified benefit plans. From time to time, McGrow may replace any of its employees or independent contractors (including hiring and firing employees and terminating the relationship with any independent contractors providing the Construction Services hereunder), and may obtain alternative types or sources of the Construction Services in McGrow's sole discretion.

1.3 Records. Solely for purposes of providing the records management and Construction Services for GrowCo under this Agreement, McGrow shall be granted access to GrowCo files, which includes, but is not limited to on-line accounting records and banking statements, and may use such files subject to reasonable restrictions imposed by GrowCo on McGrow's management of GrowCo's files. Such files shall be maintained at GrowCo's offices and copies of such files may be maintained at McGrow's offices or offsite storage facilities at McGrow's sole discretion. Information shall be subject to and protected by applicable state and federal law, rules and regulations, including those promulgated by any applicable state regulatory division.

JEM

1.4 Limitation on McGrow's Authority. Construction Services shall not include, and McGrow shall not at any time or in any manner engage, pursuant to this Agreement, in providing to GrowCo or any client or customer of GrowCo, any services that, under applicable state law, cannot be provided by a business under applicable state or federal laws. If any Construction Services or acts required or requested of McGrow herein would be reasonably likely to be construed, as reasonably determined by McGrow, by a court of competent jurisdiction, or any municipal board or local authority charged under any state or federal laws to be illegal or otherwise in violation of any state, federal or local laws or regulations then the requirement or other request to perform that act shall be deemed waived or not required by GrowCo. In order to preserve independence and quality, GrowCo shall have complete control and supervision over its provision of any of its business operations including, but not limited to: (i) the establishment and maintenance of quality assurance policies; (ii) the acceptance, continuation of, and fee or price arrangements with customers or vendors; (iii) the management and supervision of GrowCo's business; and (iv) at all times GrowCo shall: (A) bear the risk of loss and opportunity for profit of GrowCo's business, and (B) determine who is entitled to possession of the licensed premises of GrowCo's business subject to a valid lease. Although GrowCo has delegated to McGrow under the terms of this Agreement various ministerial construction matters, GrowCo retains the exclusive right, through its own personnel, to manage and control its own business (including cannabis-related operations).

2. Obligations of GrowCo.

2.1 Independent Identity. GrowCo shall continue to maintain itself as a separate legal identity and shall observe all legal requirements and customary practices necessary to maintain GrowCo as a separate legal entity distinct from any other person or entity, including McGrow. GrowCo shall also maintain its own business identity, including, without limitation, letterhead and business cards. Nothing herein shall prevent GrowCo from being acquired by or otherwise combining with any other person or entity, in which case this Agreement may be terminated in accordance with the terms of this Agreement.

2.2 Compliance with State Law. GrowCo shall comply with all applicable state, federal, municipal and local laws and regulations related to the operation of its business.

2.3 Taxes and License Fees. GrowCo shall be responsible for the accurate reporting and payment of all excise, sales and other taxes. GrowCo shall further be responsible for the payment of application and renewal fees for all licenses and permits required for the operation GrowCo's business.

3. Term. Provided that neither party is in material breach of this Agreement or in material breach of the agreements set forth in Section 8.1, the term of this Agreement shall commence on the Effective Date and shall continue for a period of nine (9) months after the Effective Date (unless sooner terminated pursuant to Sections 8 or 9 hereof).

4. Fee. GrowCo will pay to McGrow the fees for the Construction Services as set forth on **Exhibit A.** All amounts owed by GrowCo to McGrow, if unpaid when due, will bear interest accruing as of their original due date at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less.

5. Mutual Nondisclosure. Neither GrowCo nor McGrow shall at any time or in any manner, directly or indirectly, use or disclose to any third party any trade secrets or other Confidential Information (defined herein) learned or obtained from the other party hereto as a result of its relationship with the other party hereto or any direct or indirect subsidiary or affiliate (i.e., a person which controls, is controlled by or under common control with a party) of the other party, except as (i) may be required by law or legal, regulatory or judicial process; provided that the disclosing party shall give prompt written notice to the other party of such requirement, disclose no more information than is so required, and



JEM

cooperate with any attempts by the other party to obtain a protective order or similar treatment; or (ii) to its or its affiliates' directors, officers, attorneys, accountants, advisors or consultants who need to know such information in such capacities and who agree to comply with the non-disclosure obligations set forth in this Section 6. As used herein, the term "**Confidential Information**" means confidential, proprietary or personal information of a party or its affiliates that is not generally known in the industry in which the parties or any of their direct or indirect subsidiaries or (in the case of information of or about clients of either party) clients is engaged, including such information that in any way relates to the products, processes, services, inventions (whether patentable or not), formulas, techniques or know-how, including, but not limited to, information relating to distribution systems and methods, research, development, purchasing, accounting, procedures, marketing, customers, vendors, merchandising and selling, of McGrow or GrowCo or any of their respective direct or indirect subsidiaries or affiliates, or the clients of either party, and regardless of the format in which it is presented or embodied (written, graphic, electromagnetic or otherwise). The term "Confidential Information," as used herein, does not include information (a) which was already in the public domain other than through any disclosure in violation of this Section 6, (b) information already in the possession of the other party and not subject to any confidentiality obligations of the other party, or (c) which is or was disclosed as a matter of right by a third party source provided such third party source is not, to the knowledge of the receiving party, bound by confidentiality obligations in favor of the owner of the Confidential Information in question. Each party agrees that it will adopt reasonable precautions to guard against unauthorized release or use of Confidential Information, and that it will not use or disclose such Confidential Information in any manner that will unfairly benefit itself or damage the other party hereto. Each party agrees to return to the other party all such Confidential Information pertaining to the other party upon termination of this Agreement. In lieu of returning all Confidential Information, a party may destroy such Confidential Information provided that the other party hereto has agreed in writing that destruction is acceptable. This Section 6 shall survive the termination of this Agreement.

6. Warranties, Disclaimers, Limitations on Liability and Indemnity.

6.1 Warranty, Disclaimer and Limitation on Liability. McGrow will act diligently and use reasonable care in providing Construction Services to GrowCo. GrowCo hereby releases and forever discharges McGrow and its affiliates, parents, employees, subcontractors, agents and assigns from any liability in any way connected with this Agreement or the Construction Services, except for any liability for intentional torts or gross negligence. McGrow does not warrant the success or results of GrowCo. McGrow shall not be liable to GrowCo under any circumstances for special, exemplary, punitive or consequential damages relating to the Construction Services except for intentional torts or gross negligence. GrowCo shall not be liable to McGrow for special, exemplary, punitive or consequential damages relating to this Agreement.

6.2 Indemnity. McGrow hereby agrees to indemnify and hold harmless GrowCo and its affiliates from and against any liability or losses (including, without limitation, reasonable attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against GrowCo or its affiliates as a result of any gross negligence, willful misconduct or fraud by McGrow in connection with its provision of any services under this Agreement. GrowCo hereby agrees to indemnify and hold harmless McGrow and its affiliates from and against any liability or losses (including, without limitation, attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against McGrow or its affiliates as a result of (i) GrowCo's breach of this Agreement; and (ii) any negligence, willful misconduct or fraud by GrowCo in connection with the operation of GrowCo's business or performance under this Agreement.

7. Termination. Other than any termination pursuant to Section 9 hereof, this Agreement may only be terminated in accordance with and subject to the provisions of this Section 8.

7.1 By McGrow. McGrow may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; (b) at any time if GrowCo is wound-up or liquidated or files for bankruptcy or other action is taken against it under any statute for the protection of creditors; or (c) subject to Section 8.3, at any time, with or without cause, provided that McGrow must have provided GrowCo with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

7.2 By GrowCo. GrowCo may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; or (b) subject to Section 8.3 hereof, at any time, with or without cause, provided that GrowCo must have provided McGrow with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

7.3 Effect of Termination.

7.3.1 Payment of Money Owed. Upon the termination of this Agreement for any reason, GrowCo shall pay all amounts due to McGrow and McGrow shall pay all amounts due to GrowCo under this Agreement as soon as practicable but in no event later than five (5) days after the effective date of such termination, it being understood that any amounts due to each other under any other agreements by and between, or which may be entered into by and between, the parties shall be payable in accordance with the provisions thereof.

7.3.2 Survival of Certain Provisions. The parties' rights and obligations under this Agreement that, by their nature (specifically including obligations to keep Confidential Information confidential), extend beyond the terms of this Agreement will survive any expiration or termination of this Agreement.

7.3.3 License of Proprietary Systems. Nothing in this Agreement shall prevent GrowCo from independently obtaining any licenses or other agreements providing for GrowCo's right to use any Proprietary and Customized Applications (as defined below) used in the provision of the Construction Services.

As used herein, "Proprietary and Customized Applications" means, collectively, software applications owned by McGrow or owned by one or more third parties and licensed or otherwise provided to McGrow, and any customizations or extensions to or other enhancements of such software applications developed and/or owned by McGrow, that are used or available for use to provide Construction Services to GrowCo immediately prior to the effective date of termination of this Agreement.

8. Miscellaneous.

8.1 This Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assignees of the parties.

8.2 GrowCo shall not assign, confer any right in, assume in bankruptcy, pledge, mortgage or otherwise encumber this Agreement, in whole or in part, without the prior written consent of McGrow, which can be withheld in McGrow's sole discretion. For the avoidance of doubt, a merger, change of control, reorganization (in bankruptcy or otherwise) or a stock sale of GrowCo shall be deemed an "assignment" requiring such consent, regardless of whether GrowCo is the surviving entity. Any attempted action in violation of the foregoing shall be null and void ab initio and of no force or effect. McGrow may, in its discretion, assign this Agreement to any other direct or indirect parent, subsidiary or affiliate of McGrow, or to any third party that in connection therewith is acquiring all or substantially all of the assets of McGrow, and GrowCo shall be liable hereon to the same extent as if such agreement were



JRM

originally made with such other person, firm or corporation.

8.3 This Agreement contains the complete understanding of the parties with respect to the subject matter hereof and no modification or waiver of any provision hereof shall be valid unless in writing and signed by the parties, unless specifically provided to the contrary. This Agreement may not be amended except by an instrument in writing signed by McGrow and GrowCo. Notwithstanding anything to the contrary herein, no party shall be required to violate any law or the good faith reasonable exercise of such party's professional responsibility.

9. Governing Law. This Agreement shall be governed and interpreted in all respects pursuant to the internal and substantive laws of the State of Colorado without regard to conflict of laws principles which might cause the law of another jurisdiction to apply. Each party hereby expressly consents and submits to the exclusive in personam jurisdiction and exclusive venue in the City and County of Denver, Colorado.

10. Notices. Any notice, request, consent or communication under this Agreement shall be effective only if it is in writing and (a) personally delivered, (b) sent by certified or registered mail, return receipt requested, postage pre-paid, (c) sent by a nationally recognized overnight delivery service, with delivery confirmed, (d) e-mailed (with a copy simultaneously sent by first class mail or any other delivery method permitted hereunder), or (e) telexed or telecopied, with receipt confirmed, addressed as follows:

If to McGrow: McGrow, LLC
456 Madison St.
Denver, CO 80206

If to GrowCo: GrowCo, Inc.
2000 S Colorado Blvd. #1-3100
Denver, CO 80222
Attn: CFO

or such other persons or addresses as shall be furnished in writing by any party to the other party. A notice shall be deemed to have been given as of the date when (i) personally delivered, (ii) three (3) days after the date when deposited with the United States mail properly addressed, (iii) when receipt of a notice sent by an overnight delivery service is confirmed by such overnight delivery service, or (iv) when receipt of the e-mail, telex or telecopy is confirmed, as the case may be.

11. Relationship of the Parties. The relationship between GrowCo and McGrow is that of an independent contractor and nothing in this Agreement shall be construed to create any partnership, joint venture or any similar relationship between the parties. Other than as expressly set forth in this Agreement, neither party has any express or implied authority to act or make any representations whatsoever on behalf of the other party.

12. Counterparts. This Agreement may be executed in counterparts, including electronically transmitted counterparts, each of which shall be deemed an original and together shall be considered a single agreement.

EXHIBIT A

CONSTRUCTION SERVICES

McGrow shall supervise all aspects of the construction of:

(a) "GCP 1" which means the greenhouse facility to be completed located at 39327 Harbour Road, Avondale, Colorado, 81022.

(b) "GCP 2" which means the greenhouse facility to be built and located at 39335 Harbour Road, Avondale, CO 81022.

(c) "Extraction Facility" which means the extraction facility to be built and located at 39335-B Harbour Road, Avondale, CO 81022.

**Fee for Construction Services:**

GrowCo and McGrow have agreed that GrowCo shall pay to McGrow a fee for all Construction Services in the amount of $15,000 per month beginning with the first payment being made on the Effective Date, and subsequent monthly payments being payable on the 1st day of the month following the month in which the fee was incurred.



JRM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

McGrow, LLC

By: John R McKowen
Name: John McKowen
Title: Manager

GrowCo, Inc.

By: ______________________
Name: Wayne Harding
Title: Pursuant to authority granted in a Resolution of the GrowCo Board of Directors dated July 21, 2016

# FINANCIAL SERVICES AGREEMENT

THIS FINANCIAL SERVICES AGREEMENT (the "**Agreement**") is dated and effective as of this 22 day of July, 2016 ("**Effective Date**"), by and among McGrow, LLC, a Colorado limited liability company ("**McGrow**") and GrowCo, Inc, a Colorado corporation ("**GrowCo**").

## RECITALS

WHEREAS, McGrow provides financial services for development stage companies;

WHEREAS, GrowCo is a development stage company in need of financial services;

WHEREAS, GrowCo desires to retain McGrow to perform certain financial services and McGrow desires to provide such financial services to GrowCo on the terms and conditions herein set forth; and

WHEREAS, GrowCo and McGrow have agreed upon a fair compensation for the financial services provided by McGrow hereunder.

## AGREEMENT

1. Obligations of McGrow.

1.1 Appointment of McGrow; Financial Services. GrowCo hereby retains McGrow and McGrow agrees to provide Financial Services described in **Exhibit A** (collectively, the "**Financial Services**"). In the event that any terms provided in this Agreement conflicts with the terms in any of the agreements set forth on **Exhibit A**, the terms of this Agreement will control.

1.2 Relationship of the Parties. McGrow is an independent contractor for GrowCo. Nothing in this Agreement will be construed as creating an employer-employee relationship between GrowCo and McGrow or any employee of McGrow, as a guarantee of future employment, or as a limitation upon GrowCo's rights to terminate this Agreement in accordance with its terms. McGrow will be solely responsible for compensating each of its employees performing Financial Services, withholding any sums from amounts payable to such employees with respect to federal, state or local taxes, FICA contributions, unemployment insurance, or similar matters and paying all such amounts. McGrow and its employees will not be eligible for any fringe benefits (including health insurance, paid vacation, sick leave or other employment benefits) that may be provided to employees of GrowCo and will not participate in any GrowCo qualified benefit plans. From time to time, McGrow may replace any of its employees or independent contractors (including hiring and firing employees and terminating the relationship with any independent contractors providing the Financial Services hereunder), and may obtain alternative types or sources of the Financial Services in McGrow's sole discretion.

1.3 Records. Solely for purposes of providing the records management and Financial Services for GrowCo under this Agreement, McGrow shall be granted access to GrowCo files, which includes, but is not limited to on-line accounting records and banking statements, and may use such files subject to reasonable restrictions imposed by GrowCo on McGrow's management of GrowCo's files. Such files shall be maintained at GrowCo's offices and copies of such files may be maintained at McGrow's offices or offsite storage facilities at McGrow's sole discretion. Information shall be subject to and protected by applicable state and federal law, rules and regulations, including those promulgated by any applicable state regulatory division.

JRM

1.4 Limitation on McGrow's Authority. Financial Services shall not include, and McGrow shall not at any time or in any manner engage, pursuant to this Agreement, in providing to GrowCo or any client or customer of GrowCo, any services that, under applicable state law, cannot be provided by a business under applicable state or federal laws. If any Financial Services or acts required or requested of McGrow herein would be reasonably likely to be construed, as reasonably determined by McGrow, by a court of competent jurisdiction, or any municipal board or local authority charged under any state or federal laws to be illegal or otherwise in violation of any state, federal or local laws or regulations then the requirement or other request to perform that act shall be deemed waived or not required by GrowCo. In order to preserve independence and quality, GrowCo shall have complete control and supervision over its provision of any of its business operations including, but not limited to: (i) the establishment and maintenance of quality assurance policies; (ii) the acceptance, continuation of, and fee or price arrangements with customers or vendors; (iii) the management and supervision of GrowCo's business; and (iv) at all times GrowCo shall: (A) bear the risk of loss and opportunity for profit of GrowCo's business, and (B) determine who is entitled to possession of the licensed premises of GrowCo's business subject to a valid lease. Although GrowCo has delegated to McGrow under the terms of this Agreement various ministerial financial matters, GrowCo retains the exclusive right, through its own personnel, to manage and control its own business (including cannabis-related operations).

2. Obligations of GrowCo.

2.1 Independent Identity. GrowCo shall continue to maintain itself as a separate legal identity and shall observe all legal requirements and customary practices necessary to maintain GrowCo as a separate legal entity distinct from any other person or entity, including McGrow. GrowCo shall also maintain its own business identity, including, without limitation, letterhead and business cards. Nothing herein shall prevent GrowCo from being acquired by or otherwise combining with any other person or entity, in which case this Agreement may be terminated in accordance with the terms of this Agreement.

2.2 Compliance with State Law. GrowCo shall comply with all applicable state, federal, municipal and local laws and regulations related to the operation of its business.

2.3 Taxes and License Fees. GrowCo shall be responsible for the accurate reporting and payment of all excise, sales and other taxes. GrowCo shall further be responsible for the payment of application and renewal fees for all licenses and permits required for the operation GrowCo's business.

3. Term. Provided that neither party is in material breach of this Agreement or in material breach of the agreements set forth in Section 8.1, the term of this Agreement shall commence on the Effective Date and shall continue for a period of nine (9) months after the Effective Date (unless sooner terminated pursuant to Sections 8 or 9 hereof).

4. Fee. GrowCo will pay to McGrow the fees for the Financial Services as set forth on **Exhibit A.** All amounts owed by GrowCo to McGrow, if unpaid when due, will bear interest accruing as of their original due date at one and one-half percent (1.5%) per month or the highest commercial contract interest rate the law allows, whichever is less.

5. Mutual Nondisclosure. Neither GrowCo nor McGrow shall at any time or in any manner, directly or indirectly, use or disclose to any third party any trade secrets or other Confidential Information (defined herein) learned or obtained from the other party hereto as a result of its relationship with the other party hereto or any direct or indirect subsidiary or affiliate (i.e., a person which controls, is controlled by or under common control with a party) of the other party, except as (i) may be required by law or legal, regulatory or judicial process; provided that the disclosing party shall give prompt written notice to the other party of such requirement, disclose no more information than is so required, and



JPM

cooperate with any attempts by the other party to obtain a protective order or similar treatment; or (ii) to its or its affiliates' directors, officers, attorneys, accountants, advisors or consultants who need to know such information in such capacities and who agree to comply with the non-disclosure obligations set forth in this Section 6. As used herein, the term "**Confidential Information**" means confidential, proprietary or personal information of a party or its affiliates that is not generally known in the industry in which the parties or any of their direct or indirect subsidiaries or (in the case of information of or about clients of either party) clients is engaged, including such information that in any way relates to the products, processes, services, inventions (whether patentable or not), formulas, techniques or know-how, including, but not limited to, information relating to distribution systems and methods, research, development, purchasing, accounting, procedures, marketing, customers, vendors, merchandising and selling, of McGrow or GrowCo or any of their respective direct or indirect subsidiaries or affiliates, or the clients of either party, and regardless of the format in which it is presented or embodied (written, graphic, electromagnetic or otherwise). The term "Confidential Information," as used herein, does not include information (a) which was already in the public domain other than through any disclosure in violation of this Section 6, (b) information already in the possession of the other party and not subject to any confidentiality obligations of the other party, or (c) which is or was disclosed as a matter of right by a third party source provided such third party source is not, to the knowledge of the receiving party, bound by confidentiality obligations in favor of the owner of the Confidential Information in question. Each party agrees that it will adopt reasonable precautions to guard against unauthorized release or use of Confidential Information, and that it will not use or disclose such Confidential Information in any manner that will unfairly benefit itself or damage the other party hereto. Each party agrees to return to the other party all such Confidential Information pertaining to the other party upon termination of this Agreement. In lieu of returning all Confidential Information, a party may destroy such Confidential Information provided that the other party hereto has agreed in writing that destruction is acceptable. This Section 6 shall survive the termination of this Agreement.

6. Warranties, Disclaimers, Limitations on Liability and Indemnity.

6.1 Warranty, Disclaimer and Limitation on Liability. McGrow will act diligently and use reasonable care in providing Financial Services to GrowCo. GrowCo hereby releases and forever discharges McGrow and its affiliates, parents, employees, subcontractors, agents and assigns from any liability in any way connected with this Agreement or the Financial Services, except for any liability for intentional torts or gross negligence. McGrow does not warrant the success or results of GrowCo. McGrow shall not be liable to GrowCo under any circumstances for special, exemplary, punitive or consequential damages relating to the Financial Services except for intentional torts or gross negligence. GrowCo shall not be liable to McGrow for special, exemplary, punitive or consequential damages relating to this Agreement.

6.2 Indemnity. McGrow hereby agrees to indemnify and hold harmless GrowCo and its affiliates from and against any liability or losses (including, without limitation, reasonable attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against GrowCo or its affiliates as a result of any gross negligence, willful misconduct or fraud by McGrow in connection with its provision of any services under this Agreement. GrowCo hereby agrees to indemnify and hold harmless McGrow and its affiliates from and against any liability or losses (including, without limitation, attorneys' fees) arising out of any claims, actions, litigations, disputes or proceedings brought by any third parties against McGrow or its affiliates as a result of (i) GrowCo's breach of this Agreement; and (ii) any negligence, willful misconduct or fraud by GrowCo in connection with the operation of GrowCo's business or performance under this Agreement.

7. Termination. Other than any termination pursuant to Section 9 hereof, this Agreement may only be terminated in accordance with and subject to the provisions of this Section 8.



JRM

7.1 By McGrow. McGrow may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; (b) at any time if GrowCo is wound-up or liquidated or files for bankruptcy or other action is taken against it under any statute for the protection of creditors; or (c) subject to Section 8.3, at any time, with or without cause, provided that McGrow must have provided GrowCo with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

7.2 By GrowCo. GrowCo may terminate this Agreement: (a) at any time pursuant to Section 9 hereof; or (b) subject to Section 8.3 hereof, at any time, with or without cause, provided that GrowCo must have provided McGrow with at least five (5) days' advance written notice of any termination (specifying the effective date of such termination).

7.3 Effect of Termination.

7.3.1 Payment of Money Owed. Upon the termination of this Agreement for any reason, GrowCo shall pay all amounts due to McGrow and McGrow shall pay all amounts due to GrowCo under this Agreement as soon as practicable but in no event later than five (5) days after the effective date of such termination, it being understood that any amounts due to each other under any other agreements by and between, or which may be entered into by and between, the parties shall be payable in accordance with the provisions thereof.

7.3.2 Survival of Certain Provisions. The parties' rights and obligations under this Agreement that, by their nature (specifically including obligations to keep Confidential Information confidential), extend beyond the terms of this Agreement will survive any expiration or termination of this Agreement.

7.3.3 License of Proprietary Systems. Nothing in this Agreement shall prevent GrowCo from independently obtaining any licenses or other agreements providing for GrowCo's right to use any Proprietary and Customized Applications (as defined below) used in the provision of the Financial Services.

As used herein, "Proprietary and Customized Applications" means, collectively, software applications owned by McGrow or owned by one or more third parties and licensed or otherwise provided to McGrow, and any customizations or extensions to or other enhancements of such software applications developed and/or owned by McGrow, that are used or available for use to provide Financial Services to GrowCo immediately prior to the effective date of termination of this Agreement.

8. Miscellaneous.

8.1 This Agreement shall be binding upon and shall inure to the benefit of the permitted successors and assignees of the parties.

8.2 GrowCo shall not assign, confer any right in, assume in bankruptcy, pledge, mortgage or otherwise encumber this Agreement, in whole or in part, without the prior written consent of McGrow, which can be withheld in McGrow's sole discretion. For the avoidance of doubt, a merger, change of control, reorganization (in bankruptcy or otherwise) or a stock sale of GrowCo shall be deemed an "assignment" requiring such consent, regardless of whether GrowCo is the surviving entity. Any attempted action in violation of the foregoing shall be null and void ab initio and of no force or effect. McGrow may, in its discretion, assign this Agreement to any other direct or indirect parent, subsidiary or affiliate of McGrow, or to any third party that in connection therewith is acquiring all or substantially all of the assets of McGrow, and GrowCo shall be liable hereon to the same extent as if such agreement were



JRM

originally made with such other person, firm or corporation.

8.3 This Agreement contains the complete understanding of the parties with respect to the subject matter hereof and no modification or waiver of any provision hereof shall be valid unless in writing and signed by the parties, unless specifically provided to the contrary. This Agreement may not be amended except by an instrument in writing signed by McGrow and GrowCo. Notwithstanding anything to the contrary herein, no party shall be required to violate any law or the good faith reasonable exercise of such party's professional responsibility.

9. Governing Law. This Agreement shall be governed and interpreted in all respects pursuant to the internal and substantive laws of the State of Colorado without regard to conflict of laws principles which might cause the law of another jurisdiction to apply. Each party hereby expressly consents and submits to the exclusive in personam jurisdiction and exclusive venue in the City and County of Denver, Colorado.

10. Notices. Any notice, request, consent or communication under this Agreement shall be effective only if it is in writing and (a) personally delivered, (b) sent by certified or registered mail, return receipt requested, postage pre-paid, (c) sent by a nationally recognized overnight delivery service, with delivery confirmed, (d) e-mailed (with a copy simultaneously sent by first class mail or any other delivery method permitted hereunder), or (e) telexed or telecopied, with receipt confirmed, addressed as follows:

If to McGrow: McGrow, LLC
456 Madison St.
Denver, CO 80206

If to GrowCo: GrowCo, Inc.
2000 S Colorado Blvd. #1-3100
Denver, CO 80222
Attn: CFO

or such other persons or addresses as shall be furnished in writing by any party to the other party. A notice shall be deemed to have been given as of the date when (i) personally delivered, (ii) three (3) days after the date when deposited with the United States mail properly addressed, (iii) when receipt of a notice sent by an overnight delivery service is confirmed by such overnight delivery service, or (iv) when receipt of the e-mail, telex or telecopy is confirmed, as the case may be.

11. Relationship of the Parties. The relationship between GrowCo and McGrow is that of an independent contractor and nothing in this Agreement shall be construed to create any partnership, joint venture or any similar relationship between the parties. Other than as expressly set forth in this Agreement, neither party has any express or implied authority to act or make any representations whatsoever on behalf of the other party.

12. Counterparts. This Agreement may be executed in counterparts, including electronically transmitted counterparts, each of which shall be deemed an original and together shall be considered a single agreement.



JEM

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

McGrow, LLC

By: ______________________
Name: John McKowen
Title: Manager

GrowCo, Inc.

By: ______________________
Name: Wayne Harding
Title: Pursuant to authority granted in a Resolution of the GrowCo Board of Directors dated July 21, 2016

EXHIBIT A

FINANCIAL SERVICES

McGrow shall assist GrowCo in raising capital for its 22.5% Exchange Note Offering as of the date of this agreement.

**Fee for Financial Services:**

GrowCo and McGrow have agreed that GrowCo shall pay to McGrow a fee for all Financial Services in the amount of $7,500 per month beginning with the first payment being made on the Effective Date, and subsequent monthly payments being payable on the 1st day of the month following the month in which the fee was incurred.



JRA

**EXCLUSIVITY AND NON-SOLICIT AGREEMENT**

This Exclusivity and Non-Solicit Agreement (this "**Agreement**") is dated and effective as of this 22 day of July, 2016, by and between GrowCo, Inc., a Colorado corporation ("**GrowCo**") and McGrow, LLC, a Colorado limited liability company ("**McGrow**"), each individually known as a "**Party**" and collectively known as the "**Parties**."

WHEREAS, the Parties have entered into the Master Agreement ("**Master Agreement**") dated even herewith whereby McGrow provides certain consulting services to McGrow;

WHEREAS, this Agreement is a material inducement to GrowCo entering into the Master Agreement and GrowCo would not agree to enter into the Master Agreement unless McGrow was bound by non-compete, non-solicit and exclusivity obligations set forth herein; and

WHEREAS, McGrow acknowledges and agrees that this Agreement is necessary to protect the interests of GrowCo.

NOW, THEREFORE, in consideration of the promises and the mutual covenants hereinafter set forth herein, the parties hereby agree as follows:

1. Exclusivity. From the date hereof until the termination or expiration of the Master Agreement, GrowCo agrees that (i) McGrow, or its authorized affiliates, shall be the exclusive provider to GrowCo of all services contemplated or described in the McGrow Agreements (as defined in the Master Agreement), and (ii) GrowCo will not lease any real property other than such real property leased to a tenant approved by McGrow.

2. Non-Solicitation. From the date hereof until the termination or expiration of the Master Agreement, except in connection with the performance of a Party's duties and obligations under the Master Agreement, the Parties and each member of the Parties agree not to directly or indirectly, in one or a series of transactions, solicit or otherwise induce or influence any customer, supplier, lessor, licensor, licensee or other person or entity without the prior written consent of the other Party.

3. Remedies. The necessity of the protections against the competition by either Party and the nature and scope of such protection have been carefully considered and agreed upon by the Parties hereto. The Parties acknowledge that the consideration provided for in the Master Agreement is sufficient and adequate to compensate it for agreeing to the restrictions contained in this Agreement and that such restrictions will not cause it undue hardship. If, however, any court determines that the foregoing restrictions are for any reason unenforceable, the Parties shall negotiate in good faith to and agree to modify such restrictions to include as much of their nature and scope as will render them enforceable or if the Parties are not able to reach such an agreement then the Parties may submit the matter to such court to determine which modifications are necessary to make this Agreement enforceable and the Parties agree to comply with this Agreement as so modified. A Party seeking enforcement of its rights hereunder shall be entitled to such injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions, without the necessity of posting bond or other undertaking in connection therewith (to the extent permitted by applicable law). Any such requirement of bond or undertaking is hereby waived by the Parties, and the Parties acknowledge that in the absence of such a waiver, a bond or undertaking may be required by the court.

4. Consideration. The consummation of the transactions and services contemplated by the Master Agreement shall constitute the consideration for each of the covenants set forth in this Agreement.

JRM

5. Cooperation. Each party hereto shall cooperate with the other party and shall take such further action and shall execute and deliver such further documents as may be necessary or desirable in order to carry out the provisions and purposes of this Agreement.

6. Governing Law. This Agreement and the transactions contemplated hereby, and all disputes between the parties under or related to the Agreement or the facts and circumstances leading to its execution, whether in contract, tort or otherwise, shall be governed and construed in accordance with the laws of the State of Colorado, applicable to contracts executed in and to be performed entirely within the State of Colorado, without regard to the laws that might be applicable under conflicts of laws principles. EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A JURY TRIAL IN ANY LEGAL PROCEEDING ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN

7. Interpretation of Agreement. Each Party hereto and his/its counsel cooperated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto shall be deemed the work product of the Parties and may not be construed against any Party by reason of its preparation. Accordingly, any rule of law, or any legal decision that would require interpretation of any ambiguities in this Agreement against the Party that drafted it, is of no application and is hereby expressly waived. The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intentions of the parties regarding this Agreement.

8. Waiver. The rights and remedies of the Parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party, (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given, and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

9. Entire Agreement and Modification. This Agreement and the Master Agreement supersedes all prior agreements between the Parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the Parties with respect to its subject matter. This Agreement may not be amended except by a written agreement executed by each Party hereto. There are no representations, agreements, arrangements or understandings, oral or written, between the parties to this Agreement, relating to the subject matter contained in this Agreement, which are not fully expressed herein.

10. Parties in Interest; Assignment. This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective permitted successors, assigns, heirs and/or personal representatives, except that neither this Agreement nor any interest herein shall be assigned or assignable by operation of law or otherwise by one Party without the prior written consent of the other Party, not to be unreasonably withheld. Nothing in this Agreement, expressed or implied, is intended to confer on any person other than the Parties and their respective successors and permitted assigns any rights or remedies under or by reason of this Agreement.

11. Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

12. Counterparts. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

McGrow, LLC

By: John R McKowen

Name: John McKowen
Title: Manager

GrowCo, Inc.

By: ______________________

Name: Wayne Harding
Title: Pursuant to authority granted in a Resolution of the GrowCo Board of Directors dated July 21, 2016

JRM

# GrowCo, Inc.
# Stock Purchase Agreement

This Stock Purchase Agreement (this "Agreement") is entered into as of July 22, 2016 is between GrowCo, Inc., a Colorado corporation ("GrowCo"), and McGrow, LLC a Colorado limited liability company ("McGrow").

Whereas, GrowCo proposes to issue to McGrow a total of 10,000,000 shares (the "Shares") of common stock, $0.001 par value, of GrowCo ("Common Stock"); and

Whereas, in connection with, and as a condition to, the issuance of the Shares, McGrow has agreed to enter into this Agreement;

Now, Therefore, in consideration of the premises and of the mutual agreements contained in this Agreemint and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Definitions.** As used in this Agreement, the following definitions shall apply to the capitalized terms indicated below:

(a) "Board" means the Board of Directors of GrowCo.

(b) "Cause" means the occurrence of any of the following events: (i) the commission by McGrow or any McGrow Representative of any felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (ii) the attempted commission by McGrow or any McGrow Representative of, or participation by McGrow or any McGrow Representative in, a fraud or act of dishonesty against GrowCo; (iii) the material violation by McGrow or any McGrow Representative of any material term of any contract or agreement between McGrow and GrowCo or of any statutory duty owed to GrowCo; (iv) the unauthorized use or disclosure by McGrow or any McGrow Representative of material confidential information or trade secrets of GrowCo; or (v) gross misconduct by McGrow or any McGrow Representative.

(c) "Continuous Service" means that McGrow's service with GrowCo is not interrupted or terminated. A change in the capacity in which McGrow renders service to GrowCo, provided that there is no interruption or termination of McGrow's service with GrowCo, shall not terminate McGrow's Continuous Service.

(d) "Escrow Agent" means GrowCo, as escrow agent acting pursuant to Section 8.

(e) "Extraction Facility" means the extraction facility to be built and located at 39339-B Harbour Road, Avondale, CO 81022.

(f) "GCP 1" means the greenhouse facility to be completed located at 39327 Harbour Road, Avondale, Colorado, 81022.

(g) "GCP 2" means the greenhouse facility to be built and located at 39339 Harbour Road, Avondale, CO 81022.

(h) "Repurchase Price" means, with respect to GrowCo's repurchase of Unvested Shares pursuant to Section 3(b), an amount equal to the product, rounded to the nearest whole cent, of (i) $0.00001 multiplied by (ii) the number of Unvested Shares being repurchased.

(i) "Securities Act" means the Securities Act of 1933, as amended.

(j) "McGrow Representative" means any officer, manager, director or other representative of McGrow.



JRM

(k) "Transfer" means sell, assign, transfer, pledge, hypothecate, gift, mortgage, or otherwise encumber or dispose.

(l) "Unvested Shares" means those Shares that are not Vested Shares.

(m) "Vested Shares" means those Shares that have vested pursuant to Section 2.

2. **Vesting.** Transfer of the Shares shall be immediate and become vested. Vested shares will become Unvested Shares if under the following conditions:

(a) First Vesting Tranche. A total of 3,333,334 of the Shares shall become Unvested Shares upon either of the following occurring:

(i) GCP 1 has not been completed to the reasonable satisfaction of GrowCo within 90 days from providing all funds in a separate construction bank account to be managed and dispersed by consent of GrowCo and McGrow and used solely for the completion of GCP 1; or

(ii) Immediately upon termination pursuant the Construction Services Agreement dated July , 2016 if Shares have not become unvested pursuant to Section 2(a)(i).

(b) Second First Vesting Tranche. Subject to Shares having vested pursuant to Section 2(a)(i), a total of 3,333,333 of the Shares shall become Unvested Shares upon any of the following:

(i) GCP 2 has not been completed to the reasonable satisfaction of GrowCo within 180 days from GrowCo providing all funds required pursuant to the Construction Services Agreement dated July 22, 2016 in a separate construction bank account to be managed and dispersed by consent of GrowCo and McGrow and used solely for the completion of GCP 2; or

(ii) Immediately upon termination pursuant the Construction Services Agreement dated July , 2016 if Shares have not become unvested pursuant to Section 2(b)(i).

(c) Third Vesting Tranche. Subject to Shares having vested pursuant to Section 2(a)(i) and (b)(i), a total of 3,333,334 of the Shares shall become Unvested Shares upon any of the following:

(i) The Extraction Facility has not been completed to the reasonable satisfaction of GrowCo within 180 days from GrowCo providing all funds required pursuant to the Construction Services Agreement dated July 22, 2016 in a separate construction bank account to be managed and dispersed by consent of GrowCo and McGrow and used solely for the completion of the Extraction Facility; or

(ii) Immediately upon termination pursuant the Construction Services Agreement dated July 22, 2016 if Shares have not become unvested pursuant to Section 2(c)(i).

3. **Right of Repurchase of Unvested Shares.**

(a) Transfers. McGrow may not Transfer any Unvested Shares, or any interest therein, except to GrowCo pursuant to this Section 3.

(b) Repurchase by GrowCo. The Company may elect to repurchase from McGrow any or all of the then-Unvested Shares for the Repurchase Price either (i) upon the termination of McGrow's Continuous Service or (ii) at any time at which it is no longer possible for such Unvested Shares to remain vested pursuant to the terms of Section 2. In order to exercise such election, GrowCo shall (i) within

ninety (90) days of termination of McGrow's Continuous Service, provide written notice to McGrow of the Board's determination to exercise such election and (ii) within thirty (30) days of delivery of such notice, pay the Repurchase Price by mailing or otherwise delivering to McGrow a check payable to the order of McGrow, or a written notice confirming that GrowCo has canceled indebtedness owed to GrowCo by McGrow, or a combination thereof. Upon GrowCo's payment of the Repurchase Price in accordance with the preceding clause (ii), the Escrow Agent shall deliver to GrowCo a certificate or certificates evidencing the Unvested Shares being repurchased, each duly endorsed for transfer to GrowCo, and GrowCo shall become the legal and beneficial owner of such Unvested Shares and all rights and interests therein or relating thereto.

(c) Legend. Any certificate(s) representing the Shares shall carry substantially the following legend:

"THE TRANSFERABILITY OF THIS CERTIFICATE AND THE SHARES OF COMMON STOCK REPRESENTED HEREBY ARE SUBJECT TO RESTRICTIONS, TERMS AND CONDITIONS (INCLUDING REPURCHASE AND TRANSFER RESTRICTIONS) CONTAINED IN A STOCK RESTRICTION AGREEMENT, A COPY OF WHICH MAY BE OBTAINED UPON WRITTEN REQUEST TO THE SECRETARY OF THE CORPORATION."

4. **Restrictions on Vested Shares.**

(a) Transfers. McGrow may not at any time Transfer any Vested Shares to any individual, corporation, partnership or other entity that engages in any business activity that is in competition, directly or indirectly, with the products or services being developed, manufactured or sold by GrowCo. The determination of whether any proposed Transferee engages in any business activity that is in competition with those of GrowCo shall be made by the Board in good faith.

5. **Share Adjustments.**

(a) Changes in Company Capital Stock. If, as a result of any reorganization, recapitalization, reclassification, stock dividend, stock split, reverse stock split or other similar change in GrowCo's capital stock, the outstanding shares of Common Stock are increased or decreased or are exchanged for a different number or kind of shares or other securities of GrowCo, or additional shares or new or different shares or other securities of GrowCo or other non-cash assets are distributed with respect to such shares of Common Stock or other securities, or, if, as a result of any merger, consolidation or sale of all or substantially all of the assets of the Company, the outstanding shares of Common Stock are converted into or exchanged for a different number or kind of securities of GrowCo or any successor entity (or a parent or subsidiary thereof), the Board shall make an appropriate or proportionate adjustment in (i) the number and kind of Shares and (ii) the Repurchase Price per Unvested Share. The adjustment by the Board shall be final, binding and conclusive. No fractional Shares shall be issued under this provision resulting from any such adjustment, but the Board in its discretion may make a cash payment in lieu of fractional Shares. Upon the occurrence of any merger or consolidation of GrowCo with or into another entity as a result of which the Common Stock is converted into or exchanged for the right to receive cash, securities or other property, or any exchange of the Common Stock for cash, securities or other property pursuant to a share exchange transaction, the restrictions on transfer and the other provisions of this Agreement shall inure to the benefit of GrowCo's successor and shall apply to the cash, securities or other property that the Unvested Shares were converted into or exchanged for pursuant to such transaction in the same manner and to the same extent as they applied to the Unvested Shares under this Agreement.

(b) Special Dividends and Other Events. The Board shall increase the number of Shares subject to this Agreement to take into consideration extraordinary dividends, acquisitions or dispositions of stock or property, or any other event to avoid distortion in the operation of this Agreement.

6. **Rights as a Stockholder.** Subject to the terms of Section 7, McGrow shall have the rights of a stockholder with respect to the voting of, and dividends on, the Shares. McGrow shall be



JRM

considered the record owner of the Shares. However, any Shares held by the Escrow Agent pursuant to Section 7 shall be voted in accordance with instructions of the Escrow Agents board of directors. McGrow shall be entitled to receive all dividends and any other distributions declared on the Shares; provided that GrowCo is under no duty to declare any such dividends or to make any such distribution and provided, further, that any such dividends or other distributions paid on Unvested Shares shall be held in escrow until such time, if ever, as such Unvested Shares become Vested Shares.

7. **Escrow of Shares.** All Vested and Unvested Shares shall be held in escrow by the Escrow Agent. The Escrow Agent is hereby directed to transfer the Vested and Unvested Shares in accordance with this Agreement or instructions signed by both McGrow and GrowCo. If GrowCo exercises its repurchase rights under Section 3(b), the Escrow Agent, upon receipt of written notice of such exercise from GrowCo or such assignee, shall take all steps necessary to accomplish the transfer contemplated by clause (ii) of Section 3(b). McGrow hereby grants the Escrow Agent an irrevocable power of attorney coupled with an interest to take any and all actions required to effect such transfer. The Escrow Agent may act in reliance upon advice of counsel in reference to any matter connected with this Agreement and shall not be liable for any mistake of fact or error of judgment, or for any acts or omissions of any kind, unless caused by its willful misconduct or gross negligence. If, from time to time while the Escrow Agent is holding Unvested Shares, there is any stock dividend, stock split or other change in or respecting such shares, any and all new, substituted or additional securities to which McGrow is entitled by reason of ownership of the Unvested Shares shall be immediately subject to this escrow, deposited with the Escrow Agent and included thereafter as "Unvested Shares" for purposes of this Agreement, including Section 3(b).

8. **Certain Tax Matters.**

(a) Withholding. If GrowCo in its discretion determines that it is obligated to withhold any tax in connection with the transfer of, or the lapse of restrictions on, the Shares, GrowCo may withhold from McGrow's remuneration the appropriate amount of tax. If GrowCo does not withhold an amount from McGrow's remuneration sufficient to satisfy the withholding obligation of GrowCo, McGrow will make reimbursement on demand, in cash, for the amount under withheld.

(b) Independent Advice. McGrow represents that McGrow has received tax advice from McGrow's own personal tax advisor on the tax consequences of a purchase of the Shares. McGrow understands the tax consequences of filing (and not filing) a Section 83(b) election under the Internal Revenue Code of 1986, as amended, as well as any applicable regulations and guidance thereunder. The filing of a Section 83(b) election is McGrow's responsibility.

9. **Investment Representations and Understandings.** McGrow represents, warrants and acknowledges that McGrow: (a) has had an opportunity to ask questions of and receive answers from a GrowCo representative concerning the terms and conditions of McGrow's investment in the Shares; (b) is acquiring the Shares for McGrow's own account for the purpose of investment, and not with a view to any resale or other distribution thereof; (c) is a sophisticated investor with such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of an investment in the Shares; and (d) is able to bear the economic risk of the investment in the Shares for an indefinite period of time because the Shares have not been registered under the Securities Act, and therefore, cannot be offered or sold unless they are subsequently registered under the Securities Act or an exemption from such registration is available. McGrow acknowledges that GrowCo may place legends on any stock certificate representing the Shares with the securities laws and contractual restrictions thereon and issue related stop transfer instructions. McGrow acknowledges and understands that the Shares have not been registered under the Securities Act, nor registered pursuant to the provisions of the securities laws or other laws of any other jurisdictions, in reliance on exemptions for private offerings contained in Section 4(2) of the Securities Act and in the laws of such jurisdictions. McGrow further understands that GrowCo is under no obligation to register the Shares under the Securities Act or to comply with the requirements for any exemption that might otherwise be available, or to supply McGrow with any information necessary to enable McGrow to make routine sales of the Shares pursuant to Rule 144 under the Securities Act or any other rule of the Securities and Exchange Commission.

10. **Lock-Up.**

(a) Restrictions. McGrow agrees that McGrow will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to GrowCo's initial public offering and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days or such other period as may be requested by GrowCo or the lead managing underwriter(s) to accommodate applicable regulatory restrictions on (1) the publication or other distribution of research reports and (2) analyst recommendations and opinions, including the restrictions contained in Rule 2711(f)(4) of the Financial Industry Regulatory Authority or Rule 472(f)(4) of the New York Stock Exchange, or any successor provisions or amendments thereto), (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo (including any Shares) held immediately prior to the effectiveness of the registration statement for GrowCo's initial public offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any such shares whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of such shares or other securities, in cash or otherwise. The foregoing provisions of this Section 10(a) shall not apply to the sale of any shares to an underwriter in GrowCo's initial public offering. The underwriters in connection with GrowCo's initial public offering are intended third party beneficiaries of this Section 10(a) and shall have the right, power and authority to enforce the provisions hereof as though they were parties hereto. McGrow further agrees, if requested by the underwriters of GrowCo's initial public offering, to execute an agreement that is consistent with this Section 10(a) or that is necessary to give further effect hereto.

(b) Stop Transfer Instructions. In order to enforce the foregoing covenant, GrowCo may impose stop-transfer instructions with respect to the Shares or any other shares of GrowCo's capital stock held by McGrow (and transferees and assignees thereof) until the end of such restricted period.

11. **Miscellaneous.**

(a) Notices. All notices to be given or otherwise made to any party to this Agreement shall be deemed to be sufficient if contained in a written instrument, delivered by hand in person, or by express overnight courier service, or by electronic facsimile transmission (with a copy sent by first class mail, postage prepaid), or by registered or certified mail, return receipt requested, postage prepaid, addressed, if to McGrow, to the address set forth below, and if to GrowCo, to GrowCo's principal executive offices, attention of the Chief Financial Officer.

(b) Entire Agreement; Modification. This Agreement constitutes the entire agreement between the parties relative to the subject matter hereof, and supersedes all proposals, written or oral, and all other communications between the parties relating to the subject matter of this Agreement. This Agreement may be modified, amended or rescinded only by a written agreement executed by both parties.

(c) Waivers. From time to time, GrowCo may waive its rights hereunder either generally or with respect to one or more specific transfers or actions that have been proposed, attempted or made. All action to be taken by GrowCo shall be taken by vote of a majority of the Board then in office. No waiver of any breach or default hereunder shall be considered valid unless in writing, and no such waiver shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

(e) Equitable Relief. The parties hereto agree and declare that legal remedies may be inadequate to enforce the provisions of this Agreement and that equitable relief, including specific performance and injunctive relief, may be used to enforce the provisions of this Agreement.

(f) Severability. The invalidity, illegality or unenforceability of any provision of this Agreement shall in no way affect the validity, legality or enforceability of any other provision.



JRM

(g) Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the limitations set forth herein.

(h) Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of Colorado.

(i) Construction. Any reference herein to "including" shall be interpreted as "including without limitation." The captions of the sections of this Agreement are for convenience of reference only and in no way define, limit or affect the scope or substance of any section of this Agreement.

(j) Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but both of which together shall constitute one and the same instrument.

GROWCO, INC.

By: ______________________
Name: Wayne Harding
Pursuant to authority granted in a Resolution of the GrowCo Board of Directors dated July 21, 2016

MCGROW, LLC

By: ______________________
Name: John McKowen, Manager

# EXHIBIT 15

10,000,000-Share GrowCo Certificate (November 4, 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

SEE RESTRICTIVE LEGEND ON REVERSE

NUMBER 8-3

# GrowCo

SHARES -10,000,000-

INCORPORATED UNDER THE LAWS OF THE STATE OF COLORADO

AUTHORIZED: 100,000,000 COMMON SHARES,
$0.001 PAR VALUE PER SHARE

SEE REVERSE FOR CERTAIN DEFINITIONS

*This Certifies That* -MCGROW LLC-

*is the owner of* ***TEN MILLION***

*Fully Paid and Non-Assessable Common Stock, $0.001 Par Value of*

**GrowCo, Inc.**

*transferable on the books of this Corporation in person or by attorney upon surrender of this Certificate duly endorsed or assigned. This Certificate and the shares represented hereby are subject to the laws of the State of Colorado, and to the Articles of Incorporation and the Bylaws of the Corporation, as now or hereafter amended. This Certificate is not valid until countersigned by the Transfer Agent.*

*IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by the facsimile signatures of its duly authorized officers and to be sealed with the facsimile seal of the Corporation.*

*Dated:* 11/04/16

PRESIDENT

GrowCo, Inc. CORPORATE SEAL Colorado

SECRETARY

*Countersigned:*
CORPORATE STOCK TRANSFER, INC.
3200 Cherry Creek South Drive, Suite 430
Denver, CO 80209

By
Transfer Agent and Registrar Authorized Officer

008

© Mountain Financial Print & Design, LLC

# EXHIBIT 16

MCG Services, LLC Bank Statements
(Wells Fargo account 2694072907, August – December 2016)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# Wells Fargo Simple Business Checking

Account number: **2694072907** ■ August 19, 2016 - August 19, 2016 ■ Page 1 of 4

WELLS FARGO

MCG SERVICES, LLC
456 MADISON ST
DENVER CO 80206-4439

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (163)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

The plans you establish today will shape your business far into the future. The heart of the planning process is your business plan. Take the time now to build a strong foundation. Find out more at wellsfargoworks.com/plan.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ☐ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 8/19 | $0.00 |
| Deposits/Credits | 30,000.00 |
| Withdrawals/Debits | - 0.00 |
| **Ending balance on 8/19** | **$30,000.00** |
| Average ledger balance this period | $30,000.00 |

Account number: **2694072907**

**MCG SERVICES, LLC**

*Colorado account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 102000076

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

WELLS FARGO

## Transaction history

| *Date* | *Check Number* | *Description* | *Deposits/ Credits* | *Withdrawals/ Debits* | *Ending daily balance* |
|---|---|---|---|---|---|
| 8/19 | | eDeposit IN Branch/Store 08/19/16 03:01:50 Pm 3155 E 1St Ave Denver CO 2907 | 30,000.00 | | 30,000.00 |
| **Ending balance on 8/19** | | | | | **30,000.00** |
| **Totals** | | | **$30,000.00** | **$0.00** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 08/19/2016 - 08/19/2016 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|

We waived the fee this fee period to allow you to meet the requirements to avoid the monthly service fee. Your fee waiver is about to expire. You will need to meet the requirement(s) to avoid the monthly service fee.

| **How to avoid the monthly service fee** | Minimum required | This fee period |
|---|---|---|
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $30,000.00 ☑ |

C1/C1

## Account transaction fees summary

| *Service charge description* | *Units used* | *Units included* | *Excess units* | *Service charge per excess units ($)* | *Total service charge ($)* |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 3 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

# IMPORTANT ACCOUNT INFORMATION

Here's some clarifying information on when your account could become dormant and what could happen.

**When does my account become dormant?**
Generally, your account becomes dormant if you do not initiate an account-related activity for 12 months for a checking account, 34 months for a savings account, or 34 months after the first renewal for a Time Account (CD). An account-related activity is determined by the laws governing your account. Examples of account-related activity are depositing or withdrawing funds at a banking location or ATM, or writing a check which is paid from the account. Automatic transactions (including recurring and one-time), such as pre-authorized transfers/payments and electronic deposits, set up on the account may not qualify as account-related activity that you initiated.

**What happens to a dormant account?**

We put safeguards in place to protect a dormant account which may include restricting the following: transfers between your Wells Fargo accounts using your ATM/debit card; transfers by phone using our automated banking service; transfers or payments through online, mobile, and text banking (including Bill Pay); or wire transfers (incoming and outgoing).

Normal monthly service and other fees continue to apply (except where prohibited by law). Your account funds may be transferred to the appropriate state if no activity occurs in the account within the time period as specified by state law. This transfer is known as "escheat." After transferring your account funds to the state, we will close your account and any interest will stop accruing. To recover your account funds, you must file a claim with the state.

For more information, please see your Business Account Agreement, speak with a local banker, or call the phone number on the top of your statement.

---

We would like to remind you of the following:

Under the ACH Rules, the Bank can return any non-consumer ACH debit entry as unauthorized until midnight of the business day following the business day the Bank posts the entry to your account. In order for the Bank to meet this deadline, you are required to notify us to return any non-consumer ACH debit entry as unauthorized by the cutoff time we separately disclose. The cutoff time is currently 3:00 PM Central Time. If you do not timely notify us of the unauthorized non-consumer ACH debit entry, we will not be able to return it without the cooperation and agreement of the originating bank and the originator of the debit entry. Any other effort to recover the funds must occur solely between you and the originator of the entry.

WELLS FARGO

## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.
2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.
3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance shown on your statement . . . . . . . . . . . . . . . . . . . . . $ ____________

**ADD**

**B.** Any deposits listed in your register or transfers into your account which are not shown on your statement.

$ ____________
$ ____________
$ ____________
\+ $ ____________

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**CALCULATE THE SUBTOTAL**

(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**SUBTRACT**

**C.** The total outstanding checks and withdrawals from the chart above . . . . . . . . . . . . . - $ ____________

**CALCULATE THE ENDING BALANCE**

(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ ____________

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount $** | |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# Wells Fargo Simple Business Checking

Account number: **2694072907** ■ August 20, 2016 - September 22, 2016 ■ Page 1 of 4

WELLS FARGO

MCG SERVICES, LLC
456 MADISON ST
DENVER CO 80206-4439

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (163)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Get a clear look at the business financing process to decide if and when business credit is right for you. Visit wellsfargoworks.com/credit to find out more.

Credit decisions subject to credit qualification.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ☐ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 8/20 | $30,000.00 |
| Deposits/Credits | 89,700.00 |
| Withdrawals/Debits | - 108,070.08 |
| **Ending balance on 9/22** | **$11,629.92** |
| Average ledger balance this period | $19,390.77 |

Account number: **2694072907**

**MCG SERVICES, LLC**

*Colorado account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 102000076

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

WELLS FARGO

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 8/22 | | eDeposit IN Branch/Store 08/22/16 03:46:18 Pm 3155 E 1St Ave Denver CO 2075 | 30,450.00 | | |
| 8/22 | | Online Transfer to McKowen J Checking xxxxxx1925 Ref #Ibeclngdgl on 08/20/16 | | 20,000.00 | 40,450.00 |
| 8/24 | | Online Transfer to McKowen J Ref #Ibeclpbl6L Checking Jrm Consulting Fee | | 15,000.00 | 25,450.00 |
| 8/25 | | Purchase authorized on 08/24 Denver Boulder Cou 303-8827267 CO S466237740921552 Card 2075 | | 23.72 | |
| 8/25 | | Online Transfer to McKowen J Ref #Ibe2Wk73FD Checking Reimburse T Beall Attny Retainer | | 10,000.00 | 15,426.28 |
| 8/29 | | eDeposit IN Branch/Store 08/29/16 04:35:44 Pm 3155 E 1St Ave Denver CO 2075 | 22,750.00 | | |
| 8/29 | | Purchase authorized on 08/27 Cucina Colore Denver CO S306240756362907 Card 2075 | | 337.69 | 37,838.59 |
| 8/30 | | Online Transfer to McKowen J Ref #Ibexz2Yhp8 Checking Dor $5600 PC $2500 Reimburse | | 8,100.00 | 29,738.59 |
| 8/31 | | WF Direct Pay-Payment- McKowen 300K Note-Tran ID Dp086038122 | | 3,500.00 | 26,238.59 |
| 9/1 | | eDeposit IN Branch/Store 09/01/16 12:30:08 Pm 2043 S Colorado Blvd Denver CO 2075 | 15,000.00 | | 41,238.59 |
| 9/2 | | Online Transfer to McKowen J Ref #Ibev42Svdm Checking September 2016 Consulting Fee | | 15,000.00 | |
| 9/2 | | Online Transfer to McKowen J Ref #Ibexz4Dbjf Checking Douglass 4000 Kennedy 5000 Sept 16 Fees | | 9,000.00 | 17,238.59 |
| 9/7 | | Purchase authorized on 09/06 Elway's Denver CO S586250670720843 Card 2075 | | 74.35 | 17,164.24 |
| 9/9 | | Direct Pay Monthly Base | | 10.00 | 17,154.24 |
| 9/12 | | Purchase authorized on 09/09 Sos Registration F 303-894-2200 CO S586252499326016 Card 2075 | | 50.00 | |
| 9/12 | | Purchase authorized on 09/08 Fourteen Seventy T Denver CO S386252830457035 Card 2075 | | 100.60 | 17,003.64 |
| 9/15 | | WF Direct Pay-Payment- 1300K Note 12 Percent-Tran ID Dp086878502 | | 13,000.00 | 4,003.64 |
| 9/19 | | Two Rivers Water McG Servic McG Services Finders Fee | 14,000.00 | | |
| 9/19 | | Online Transfer to McKowen J Ref #Iber75Y48L Checking Reimburse Tim Beall Payroll 09 15 16 | | 7,500.00 | |
| 9/19 | | ATM Withdrawal authorized on 09/19 Glendale Denver CO 0009286 ATM ID 3213H Card 2075 | | 300.00 | 10,203.64 |
| 9/20 | | Two Rivers Water McG McG Services Construction Mgmt Contract | 7,500.00 | | 17,703.64 |
| 9/21 | | Purchase authorized on 09/20 Sos Registration F 303-894-2200 CO S586263659638756 Card 2075 | | 50.00 | |
| 9/21 | | Purchase authorized on 09/20 Denver Boulder Cou 303-8827267 CO S306264648868914 Card 2075 | | 23.72 | 17,629.92 |
| 9/22 | | WF Direct Pay-Payment- Tran ID Dp087206520 | | 6,000.00 | 11,629.92 |
| **Ending balance on 9/22** | | | | | **11,629.92** |
| **Totals** | | | **$89,700.00** | **$108,070.08** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| | | |
|---|---|---|
| Fee period 08/19/2016 - 09/22/2016 | Standard monthly service fee $10.00 | You paid $0.00 |

WELLS FARGO

***Monthly service fee summary (continued)***

We waived the fee this fee period to allow you to meet the requirements to avoid the monthly service fee. This is the final period with the fee waived. For the next fee period, you need to meet the requirement(s) to avoid the monthly service fee.

| **How to avoid the monthly service fee** | Minimum required | This fee period |
|---|---|---|
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $19,391.00 ☑ |

C1/C1

## Account transaction fees summary

| *Service charge description* | *Units used* | *Units included* | *Excess units* | *Service charge per excess units ($)* | *Total service charge ($)* |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 8 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

# IMPORTANT ACCOUNT INFORMATION

To verify your identity when you contact us, we may use a service that compares information your mobile or wireless operator has with information you have provided us. Please refer to our Privacy Policy for how we treat your data.

**Is your wireless operator authorized to provide information to assist in verifying your identity?**

Yes, and we may rely on this information to assist in verifying your identity.

You authorize your wireless operator (AT&T, Sprint, T-Mobile, US Cellular, Verizon, or any other branded wireless operator) to use your mobile number, name, address, email, network status, customer type, customer role, billing type, mobile device identifiers (IMSI and IMEI) and other subscriber status details, if available, solely to allow verification of your identity and to compare information you have provided to Wells Fargo with your wireless operator account profile information for the duration of the business relationship.

You may opt out by contacting your mobile or wireless operator directly.

WELLS FARGO

## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.
2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.
3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance shown on your statement . . . . . . . . . . . . . . . . . . . . . $ ______________

**ADD**

**B.** Any deposits listed in your register or transfers into your account which are not shown on your statement.

$ ______________
$ ______________
$ ______________
\+ $ ______________

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ______________

**CALCULATE THE SUBTOTAL**

(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ______________

**SUBTRACT**

**C.** The total outstanding checks and withdrawals from the chart above . . . . . . . . . . . . . - $ ______________

**CALCULATE THE ENDING BALANCE**

(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ ______________

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount $** | |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# Wells Fargo Simple Business Checking

Account number: **2694072907** ■ September 23, 2016 - October 24, 2016 ■ Page 1 of 4

MCG SERVICES, LLC
456 MADISON ST
DENVER CO 80206-4439

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (163)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Get a clear look at the business financing process to decide if and when business credit is right for you. Visit wellsfargoworks.com/credit to find out more.

Credit decisions subject to credit qualification.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ☐ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 9/23 | $11,629.92 |
| Deposits/Credits | 70,300.00 |
| Withdrawals/Debits | - 62,991.45 |
| **Ending balance on 10/24** | **$18,938.47** |
| Average ledger balance this period | $19,891.96 |

Account number: **2694072907**

**MCG SERVICES, LLC**

*Colorado account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 102000076

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

WELLS FARGO

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 9/28 | | Purchase authorized on 09/20 Taqueria El Valle Aurora CO S306264748191100 Card 2075 | | 76.28 | |
| 9/28 | | Purchase authorized on 09/27 Safelite Autoglass 614-210-9192 OH S586270700835892 Card 2075 | | 367.61 | 11,186.03 |
| 9/29 | | WF Direct Pay-Payment- McKowen 300K Note-Tran ID Dp00209959 | | 3,500.00 | 7,686.03 |
| 10/3 | | Two Rivers Water Growco McG Services McG Services | 47,500.00 | | |
| 10/3 | | Online Transfer to McKowen J Checking xxxxxx1925 Ref #Ibekf6Qb6Z on 10/01/16 | | 15,000.00 | 40,186.03 |
| 10/4 | | Two Rivers Water McG McG Services Growco Note Raise Offering Costs | 9,800.00 | | |
| 10/4 | | Purchase authorized on 10/03 Public Works-Prkg Denver CO S586277571515674 Card 2075 | | 1.00 | |
| 10/4 | | Purchase authorized on 10/03 Denver Boulder Cou 303-8827267 CO S306277792605354 Card 2075 | | 11.00 | |
| 10/4 | | Online Transfer to McKowen J Ref #Ibecm4Xhsx Checking Reimburse Oct 1 Payments Aok Douglass | | 10,600.00 | 39,374.03 |
| 10/5 | | Purchase authorized on 10/04 Dropbox*R4Yrc9N6Jq Db.TT/Cchelp CA S386278481287200 Card 2075 | | 99.00 | |
| 10/5 | | WF Direct Pay-Payment- Oct 1 Cons Fee-Tran ID Dp00563577 | | 7,500.00 | 31,775.03 |
| 10/6 | | Online Transfer to McKowen J Ref #Ibe5T2Mqqf Checking Reimburse Husch Blackwell Bill | | 3,473.00 | 28,302.03 |
| 10/11 | | Direct Pay Nonwf Bus Pymt Trans | | 9.00 | |
| 10/11 | | Direct Pay Monthly Base | | 10.00 | 28,283.03 |
| 10/12 | | WF Direct Pay-Payment- Contract Construction Consulting Fee-Tran ID Dp00901961 | | 7,500.00 | 20,783.03 |
| 10/18 | | WF Direct Pay-Payment- October 2016-Tran ID Dp01248947 | | 13,000.00 | 7,783.03 |
| 10/19 | | Online Transfer From McKowen J Ref #Ibegjbs77B Checking Repay Interest Pay on $1300K Loan By McG | 13,000.00 | | 20,783.03 |
| 10/24 | | Purchase authorized on 10/21 Denver Boulder Cou 303-8827267 CO S586295751035101 Card 2075 | | 20.41 | |
| 10/24 | | Online Transfer to McKowen J Ref #Ibexzmgkxg Checking Reimburse Overpayment on 12% Note | | 1,790.00 | |
| 10/24 | | Purchase authorized on 10/24 Holiday Auto Care Mobi Denver CO P00466298762164189 Card 2075 | | 34.15 | 18,938.47 |
| **Ending balance on 10/24** | | | | | **18,938.47** |
| **Totals** | | | **$70,300.00** | **$62,991.45** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 09/23/2016 - 10/24/2016 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $19,892.00 ☑ |

C1/C1

WELLS FARGO

## Account transaction fees summary

| *Service charge description* | *Units used* | *Units included* | *Excess units* | *Service charge per excess units ($)* | *Total service charge ($)* |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 2 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

# IMPORTANT ACCOUNT INFORMATION

It's important for you to have peace of mind.

We want to ensure you're comfortable with your accounts and have the tools you need to manage your money. We recommend you visit your local Wells Fargo bank location, or call the toll-free number that appears on this statement, to make sure you are satisfied with all your accounts and services.

We'll spend time understanding your financial needs and reviewing your accounts and options. We'll also help you close any accounts or discontinue services you do not recognize or want, and discuss the process that's been established to address any remaining concerns resulting from accounts and services opened on your behalf.

WELLS FARGO

## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.
2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.
3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance shown on your statement . . . . . . . . . . . . . . . . . . . . . $ ____________

**ADD**

**B.** Any deposits listed in your register or transfers into your account which are not shown on your statement.
$ ____________
$ ____________
$ ____________
+ $ ____________

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**CALCULATE THE SUBTOTAL**

(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**SUBTRACT**

**C.** The total outstanding checks and withdrawals from the chart above . . . . . . . . . . . . . - $ ____________

**CALCULATE THE ENDING BALANCE**

(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ ____________

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount $** | |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# Wells Fargo Simple Business Checking

Account number: **2694072907** ■ October 25, 2016 - November 22, 2016 ■ Page 1 of 5

MCG SERVICES, LLC
456 MADISON ST
DENVER CO 80206-4439

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (163)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Get a clear look at the business financing process to decide if and when business credit is right for you. Visit wellsfargoworks.com/credit to find out more.

Credit decisions subject to credit qualification.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ☐ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 10/25 | $18,938.47 |
| Deposits/Credits | 102,750.00 |
| Withdrawals/Debits | - 114,081.08 |
| **Ending balance on 11/22** | **$7,607.39** |
| Average ledger balance this period | $37,398.37 |

Account number: **2694072907**

**MCG SERVICES, LLC**

*Colorado account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 102000076

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

WELLS FARGO

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 10/26 | | Purchase authorized on 10/24 Finish Line Car WA Denver CO S006298753756948 Card 2075 | | 22.95 | |
| 10/26 | | Bill Pay Ken Bart on-Line No Account Number on 10-26 | | 50.00 | 18,865.52 |
| 10/28 | | WF Direct Pay-Payment- Contract Construction Consulting Fee-Tran ID Dp01800653 | | 7,500.00 | |
| 10/28 | | WF Direct Pay-Payment- Monthly Retainer-Tran ID Dp01805735 | | 4,000.00 | |
| 10/28 | | WF Direct Pay-Payment- Aok Strategies Monthly Retainer-Tran ID Dp01805299 | | 5,000.00 | 2,365.52 |
| 10/31 | | Two Rivers Water 22750.00 McG Services Offering Costs Payment | 22,750.00 | | |
| 10/31 | | Purchase authorized on 10/30 Apl* Itunes.Com/Bi 866-712-7753 CA S386303702579354 Card 2075 | | 310.94 | |
| 10/31 | | Purchase authorized on 10/29 Dropbox*64Zf1Fjn7Q Db.TT/Cchelp CA S386303860804358 Card 2075 | | 99.00 | |
| 10/31 | | WF Direct Pay-Payment- McKowen 300K Note-Tran ID Dp01879325 | | 3,500.00 | 21,205.58 |
| 11/2 | | Two Rivers Water McG McG Services Financial Services | 7,500.00 | | |
| 11/2 | | Two Rivers Water McG Rvw Gh McG Services McG Services | 15,000.00 | | |
| 11/2 | | Online Transfer to McKowen J Ref #Ibegjgz422 Checking November 2016 Consulting Fee | | 15,000.00 | 28,705.58 |
| 11/3 | | WT Fed#01584 Firstbank /Org=Kirby Enterprise Capital Management Srf# 2016110300001039 Trn#161103124627 Rfb# | 20,000.00 | | |
| 11/3 | | Wire Trans Svc Charge - Sequence: 161103124627 Srf# 2016110300001039 Trn#161103124627 Rfb# | | 15.00 | |
| 11/3 | | Purchase authorized on 11/01 Exxonmobil 9928 Denver CO S306306575802490 Card 2075 | | 41.48 | 48,649.10 |
| 11/4 | | Two Rivers Water McG Servc McG Services Partial Payment of Gc Construction Services | 30,000.00 | | |
| 11/4 | | Purchase authorized on 11/03 Elway's Denver CO S306308059112081 Card 2075 | | 598.04 | 78,051.06 |
| 11/8 | | Direct Pay Individual Pymt Trans | | 1.00 | |
| 11/8 | | Direct Pay Nonwf Bus Pymt Trans | | 6.00 | |
| 11/8 | | Direct Pay Monthly Base | | 10.00 | 78,034.06 |
| 11/9 | | Purchase authorized on 11/08 Denver Boulder Cou 303-8827267 CO S386313821803826 Card 2075 | | 13.20 | 78,020.86 |
| 11/10 | | Purchase authorized on 11/09 Conoco - Trimed En Denver CO S466314778280975 Card 2075 | | 66.43 | |
| 11/10 | | WF Direct Pay-Payment- Contract Construction Consulting Fee-Tran ID Dp02514437 | | 7,500.00 | 70,454.43 |
| 11/14 | | Purchase authorized on 11/11 Apl* Itunes.Com/Bi 866-712-7753 CA S306316448433500 Card 2075 | | 5.17 | |
| 11/14 | | Purchase authorized on 11/12 Elway's Denver CO S386317777804769 Card 2075 | | 870.52 | 69,578.74 |
| 11/15 | | Two Rivers Water McG McG Services Advisory Services | 7,500.00 | | |
| 11/15 | | Wire Trans Svc Charge - Sequence: 161115095265 Srf# 0060610320916435 Trn#161115095265 Rfb# | | 30.00 | |
| 11/15 | | WT Fed#08908 Jpmorgan Chase Ban /Ftr/Bnf=Kotzker Law Group Coltaf Account Srf# 0060610320916435 Trn#161115095265 Rfb# | | 50,000.00 | 27,048.74 |
| 11/16 | | WF Direct Pay-Payment- Meiklejohn Retainer-Tran ID Dp02772467 | | 6,000.00 | |
| 11/16 | | WF Direct Pay-Payment- 1300K Note 12 Percent-Tran ID Dp02772541 | | 13,000.00 | 8,048.74 |
| 11/17 | | Purchase authorized on 11/15 Finish Line Car WA Denver CO S286320631259125 Card 2075 | | 21.95 | 8,026.79 |
| 11/18 | | Purchase authorized on 11/17 801 Chophouse Denver CO S306323132361944 Card 2075 | | 315.84 | |
| 11/18 | | Purchase authorized on 11/18 Holiday Auto CA Denver CO P00000000956345722 Card 2075 | | 35.51 | 7,675.44 |
| 11/21 | | Purchase authorized on 11/18 Starbucks Store 08 Denver CO S586323602578716 Card 2075 | | 9.67 | |

WELLS FARGO

## *Transaction history (continued)*

| *Date* | *Check Number* | *Description* | *Deposits/ Credits* | *Withdrawals/ Debits* | *Ending daily balance* |
|---|---|---|---|---|---|
| 11/21 | | Purchase authorized on 11/18 Starbucks Store 08 Denver CO S306323603103916 Card 2075 | | 2.25 | |
| 11/21 | | Purchase authorized on 11/18 Do Drop Inn West Pueblo CO S586323787457569 Card 2075 | | 56.13 | 7,607.39 |
| **Ending balance on 11/22** | | | | | **7,607.39** |
| **Totals** | | | **$102,750.00** | **$114,081.08** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 10/25/2016 - 11/22/2016 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $37,398.00 ☑ |

C1/C1

## Account transaction fees summary

| *Service charge description* | *Units used* | *Units included* | *Excess units* | *Service charge per excess units ($)* | *Total service charge ($)* |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 5 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

### Important Account Information

Periodically, it is necessary to update selected sections of the disclosures you received when you opened your business account. These updates provide you with the most up to date account information and are very important; so please review this information carefully and feel free to contact us with any questions or concerns.

**Effective Feb 17, 2017:**
If a business debit card or business ATM card purchase amount exceeds the current available balance* in the primary linked checking or savings account when you are making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the bank and your card's daily dollar limit.

We will first try to approve the full amount of the purchase with available funds in your checking account, account(s) linked for Overdraft Protection, and, if you are enrolled, using debit card overdraft service.

If this cannot result in an approval of the full amount of the purchase, the bank may approve a portion of the purchase using the remaining available funds in your checking account. This is called a "partial authorization." Here are some important details about partial authorizations:
- The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card.

- If you are unable/unwilling to provide an additional form of payment, the partial authorization will be reversed by the merchant.
- Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

Thank you for being a Wells Fargo business customer. As a valued Wells Fargo customer we hope you find this information helpful. Again, if you have questions or concerns about these changes, please contact your local banker or call the number listed on your statement.

*This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchan t.

WELLS FARGO

## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

## Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.
2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.
3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance shown on your statement . . . . . . . . . . . . . . . . . . . . . $ ____________

**ADD**

**B.** Any deposits listed in your register or transfers into your account which are not shown on your statement.

$ ____________
$ ____________
$ ____________
\+ $ ____________

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**CALCULATE THE SUBTOTAL**

(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ____________

**SUBTRACT**

**C.** The total outstanding checks and withdrawals from the chart above . . . . . . . . . . . . . - $ ____________

**CALCULATE THE ENDING BALANCE**

(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ ____________

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount $** | |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# Wells Fargo Simple Business Checking



WELLS FARGO

MCG SERVICES, LLC
456 MADISON ST
DENVER CO 80206-4439

## Questions?

*Available by phone 24 hours a day, 7 days a week:*
Telecommunications Relay Services calls accepted

**1-800-CALL-WELLS** (1-800-225-5935)

*TTY:* 1-800-877-4833
*En español:* 1-877-337-7454

*Online:* wellsfargo.com/biz

*Write:* Wells Fargo Bank, N.A. (163)
P.O. Box 6995
Portland, OR 97228-6995

## Your Business and Wells Fargo

Get a clear look at the business financing process to decide if and when business credit is right for you. Visit wellsfargoworks.com/credit to find out more.

Credit decisions subject to credit qualification.

## Account options

*A check mark in the box indicates you have these convenient services with your account(s). Go to wellsfargo.com/biz or call the number above if you have questions or if you would like to add new services.*

| | |
|---|---|
| Business Online Banking | ✓ |
| Online Statements | ✓ |
| Business Bill Pay | ✓ |
| Business Spending Report | ✓ |
| Overdraft Protection | ☐ |

## Activity summary

| | |
|---|---|
| Beginning balance on 11/23 | $7,607.39 |
| Deposits/Credits | 128,826.00 |
| Withdrawals/Debits | - 109,168.76 |
| **Ending balance on 12/21** | **$27,264.63** |
| Average ledger balance this period | $38,878.32 |

Account number: **2694072907**

**MCG SERVICES, LLC**

*Colorado account terms and conditions apply*

For Direct Deposit use
Routing Number (RTN): 102000076

For Wire Transfers use
Routing Number (RTN): 121000248

**Overdraft Protection**

This account is not currently covered by Overdraft Protection. If you would like more information regarding Overdraft Protection and eligibility requirements please call the number listed on your statement or visit your Wells Fargo store.

WELLS FARGO

## Transaction history

| Date | Check Number | Description | Deposits/ Credits | Withdrawals/ Debits | Ending daily balance |
|---|---|---|---|---|---|
| 11/25 | | Two Rivers Water Growco AP McG Services McG Services | 23,826.00 | | 31,433.39 |
| 11/29 | | Purchase authorized on 11/28 Cucina Colore Denver CO S386333740271075 Card 2075 | | 62.56 | |
| 11/29 | | Purchase authorized on 11/28 Cucina Colore Denver CO S466333791879573 Card 2075 | | 225.39 | |
| 11/29 | | WF Direct Pay-Payment- Monthly Retainer-Tran ID Dp03343929 | | 4,000.00 | |
| 11/29 | | WF Direct Pay-Payment- Aok Strategies Monthly Retainer-Tran ID Dp03344355 | | 5,000.00 | |
| 11/29 | | WF Direct Pay-Payment- Contract Construction Consulting Fee-Tran ID Dp03348481 | | 7,500.00 | |
| 11/29 | | ATM Withdrawal authorized on 11/29 Glendale Denver CO 0005829 ATM ID 3213R Card 2075 | | 300.00 | 14,345.44 |
| 11/30 | | WT Fed#05975 Jpmorgan Chase Ban /Org=Jason Kotzker DBA Kotzker Law Group Srf# 4860300335Es Trn#161130138879 Rfb# Bpl of 16/11/30 | 50,000.00 | | |
| 11/30 | | Wire Trans Svc Charge - Sequence: 161130138879 Srf# 4860300335Es Trn#161130138879 Rfb# Bpl of 16/11/30 | | 15.00 | |
| 11/30 | | WF Direct Pay-Payment- McKowen 300K Note-Tran ID Dp03444937 | | 3,500.00 | |
| 11/30 | | Online Transfer to McKowen J Ref #Ib033B5Rvq Checking Monthly Jrm Consulting Fee | | 15,000.00 | 45,830.44 |
| 12/1 | | Two Rivers Water McG McG Services Financial Sv 7500 Advisory Sv 7500 Construction S | 30,000.00 | | |
| 12/1 | | Purchase authorized on 11/29 Seasons 52 0004 Lone Tree CO S466335115200679 Card 2075 | | 604.48 | |
| 12/1 | | WF Direct Pay-Payment- Replenish Escrow Account-Tran ID Dp03531851 | | 12,000.00 | 63,225.96 |
| 12/2 | | Purchase authorized on 11/29 Centennial Gun Clu Centennial CO S586334705405907 Card 2075 | | 200.00 | 63,025.96 |
| 12/5 | | Purchase authorized on 12/01 Elway's Denver CO S466336769681844 Card 2075 | | 252.24 | |
| 12/5 | | Purchase authorized on 12/04 Elway's Denver CO S586339028154853 Card 2075 | | 80.00 | |
| 12/5 | | Purchase authorized on 12/04 Cucina Colore Denver CO S466340072255672 Card 2075 | | 162.15 | 62,531.57 |
| 12/8 | | Direct Pay Individual Pymt Trans | | 1.00 | |
| 12/8 | | Direct Pay Monthly Base | | 10.00 | |
| 12/8 | | Direct Pay Nonwf Bus Pymt Trans | | 12.00 | 62,508.57 |
| 12/9 | | Purchase authorized on 12/08 Elway's Denver CO S586343016623439 Card 2075 | | 143.94 | 62,364.63 |
| 12/12 | | ATM Withdrawal authorized on 12/11 Glendale Denver CO 0001135 ATM ID 3213H Card 2075 | | 300.00 | |
| 12/12 | | WF Direct Pay-Payment- Return of Strainwise Escrow-Tran ID Dp04104033 | | 20,000.00 | 42,064.63 |
| 12/13 | | WF Direct Pay-Payment- Contract Construction Consulting Fee-Tran ID Dp04150617 | | 7,500.00 | 34,564.63 |
| 12/14 | | Online Transfer to McKowen J Ref #Ibe8Qqzx5L Checking Over Deposit Into McG | | 13,000.00 | 21,564.63 |
| 12/16 | | WF Direct Pay-Payment- Meiklejohn Retainer-Tran ID Dp04445503 | | 6,000.00 | 15,564.63 |
| 12/20 | | Two Rivers Water McD McG Services McG Services | 25,000.00 | | |

WELLS FARGO

## *Transaction history (continued)*

| *Date* | *Check Number* | *Description* | *Deposits/ Credits* | *Withdrawals/ Debits* | *Ending daily balance* |
|---|---|---|---|---|---|
| 12/20 | | WF Direct Pay-Payment- Jrm Interest Payment 12 16-Tran ID Dp04563327 | | 13,000.00 | 27,564.63 |
| 12/21 | | ATM Withdrawal authorized on 12/20 Glendale Denver CO 0002579 ATM ID 3213R Card 2075 | | 300.00 | 27,264.63 |
| **Ending balance on 12/21** | | | | | **27,264.63** |
| **Totals** | | | **$128,826.00** | **$109,168.76** | |

*The Ending Daily Balance does not reflect any pending withdrawals or holds on deposited funds that may have been outstanding on your account when your transactions posted. If you had insufficient available funds when a transaction posted, fees may have been assessed.*

### Monthly service fee summary

For a complete list of fees and detailed account information, please see the Wells Fargo Fee and Information Schedule and Account Agreement applicable to your account or talk to a banker. Go to wellsfargo.com/feefaq to find answers to common questions about the monthly service fee on your account.

| Fee period 11/23/2016 - 12/21/2016 | Standard monthly service fee $10.00 | You paid $0.00 |
|---|---|---|
| **How to avoid the monthly service fee** | Minimum required | This fee period |
| Have any **ONE** of the following account requirements | | |
| · Average ledger balance | $500.00 | $38,878.00 ☑ |

C1/C1

## Account transaction fees summary

| *Service charge description* | *Units used* | *Units included* | *Excess units* | *Service charge per excess units ($)* | *Total service charge ($)* |
|---|---|---|---|---|---|
| Cash Deposited ($) | 0 | 3,000 | 0 | 0.0030 | 0.00 |
| Transactions | 3 | 50 | 0 | 0.50 | 0.00 |
| **Total service charges** | | | | | **$0.00** |

### Important Account Information

Periodically, it is necessary to update selected sections of the disclosures you received when you opened your business account. These updates provide you with the most up to date account information and are very important; so please review this information carefully and feel free to contact us with any questions or concerns.

**Effective Feb 17, 2017:**
If a business debit card or business ATM card purchase amount exceeds the current available balance* in the primary linked checking or savings account when you are making a purchase, you may be able to use your available balance to pay for a portion of the total purchase. The transaction will be subject to a partial authorization daily purchase limit set by the bank and your card's daily dollar limit.

We will first try to approve the full amount of the purchase with available funds in your checking account, account(s) linked for Overdraft Protection, and, if you are enrolled, using debit card overdraft service.

If this cannot result in an approval of the full amount of the purchase, the bank may approve a portion of the purchase using the remaining available funds in your checking account. This is called a "partial authorization." Here are some important details about partial authorizations:
- The remaining amount of the purchase total would need to be covered by another form of payment, such as cash or another card.

- If you are unable/unwilling to provide an additional form of payment, the partial authorization will be reversed by the merchant.
- Not all merchants are able to accept partial authorizations or process transactions using multiple forms of payment.

Thank you for being a Wells Fargo business customer. As a valued Wells Fargo customer we hope you find this information helpful. Again, if you have questions or concerns about these changes, please contact your local banker or call the number listed on your statement.

*This balance may not reflect all of your transactions, such as checks you have written or debit card transactions that have been approved but not yet submitted for payment by the merchan t.

# IMPORTANT ACCOUNT INFORMATION

Periodically, we may evaluate the timing of statements, monthly service fee assessment and interest payments to your accounts. We may adjust the timing in order to align your statement, monthly service fee assessment (if any) and interest payment dates with one another. You may receive a partial statement that reflects activity and interest payments from the last statement date to the date of the change. No monthly service fees will be assessed during a partial statement period and there will be no impact to your interest rate or compounding frequency.

WELLS FARGO

## General statement policies for Wells Fargo Bank

■ **Notice:** Wells Fargo Bank, N.A. may furnish information about accounts belonging to individuals, including sole proprietorships, to consumer reporting agencies. If this applies to you, you have the right to dispute the accuracy of information that we have reported by writing to us at: Overdraft Collections and Recovery, P.O. Box 5058, Portland, OR 97208-5058.

You must describe the specific information that is inaccurate or in dispute and the basis for any dispute with supporting documentation. In the case of information that relates to an identity theft, you will need to provide us with an identity theft report.

### Account Balance Calculation Worksheet

1. Use the following worksheet to calculate your overall account balance.
2. Go through your register and mark each check, withdrawal, ATM transaction, payment, deposit or other credit listed on your statement. Be sure that your register shows any interest paid into your account and any service charges, automatic payments or ATM transactions withdrawn from your account during this statement period.
3. Use the chart to the right to list any deposits, transfers to your account, outstanding checks, ATM withdrawals, ATM payments or any other withdrawals (including any from previous months) which are listed in your register but not shown on your statement.

**ENTER**

**A.** The ending balance shown on your statement . . . . . . . . . . . . . . . . . . . . . $ ______________

**ADD**

**B.** Any deposits listed in your register or transfers into your account which are not shown on your statement.
$ ______________
$ ______________
$ ______________
\+ $ ______________

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ______________

**CALCULATE THE SUBTOTAL**

(Add Parts A and B)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **TOTAL** $ ______________

**SUBTRACT**

**C.** The total outstanding checks and withdrawals from the chart above . . . . . . . . . . . . . - $ ______________

**CALCULATE THE ENDING BALANCE**

(Part A + Part B - Part C)
This amount should be the same as the current balance shown in your check register . . . . . . . . . . . . . . . . . . . . . . . . . $ ______________

| Number | Items Outstanding | Amount |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | **Total amount $** | |

©2010 Wells Fargo Bank, N.A. All rights reserved. Member FDIC. NMLSR ID 399801

# EXHIBIT 17

McKowen Capital Contributions Ledger
(deposits, withdrawals, and accrued balances)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**McKowen Balances**

| Deposits/Withdrawals | | | | | 6.00% | |
|---|---|---|---|---|---|---|
| **Date** | **Amount** | **Wire/Check #** | **Principal Balance** | **Interest Owed** | **Accrued Balance** | |
| 2016 & 2017 | $ 625,391 | Balance Forward | $ 625,391 | $ - | | |
| 2/5/2018 | $ 17,500 | Wire | $ 642,891 | $ - | | |
| 2/9/2018 | $ 28,705 | Wire | $ 671,596 | $ 428.59 | $ 672,025 | |
| 2/9/2018 | $ 1,000 | Wire | $ 673,025 | $ - | $ 673,025 | |
| 2/12/2018 | $ 7,000 | Wire | $ 680,025 | $ 336.51 | $ 680,361 | |
| 2/15/2018 | $ 2,000 | Wire | $ 682,361 | $ 340.01 | $ 682,701 | |
| 3/2/2018 | $ 6,000 | Wire | $ 688,701 | $ 1,705.90 | $ 690,407 | |
| 3/6/2018 | $ 5,000 | Wire | $ 695,407 | $ 459.13 | $ 695,866 | |
| 3/16/2018 | $ 1,750 | 1766 | $ 697,616 | $ 1,159.01 | $ 698,775 | |
| 3/20/2018 | $ 10,000 | 1764 | $ 708,775 | $ 465.08 | $ 709,240 | |
| 4/26/2018 | $ 15,000 | 1675 | $ 724,240 | $ 4,370.78 | $ 728,611 | |
| 4/30/2018 | $ 5,000 | 1676 | $ 733,611 | $ 482.83 | $ 734,094 | |
| 6/7/2018 | $ 10,000 | Wire | $ 744,094 | $ 4,646.20 | $ 748,740 | |
| 6/8/2018 | $ 5,500 | Wire | $ 754,240 | $ 124.02 | $ 754,364 | |
| 6/8/2018 | $ 11,800 | Wire | $ 766,164 | $ - | $ 766,164 | |
| 6/8/2018 | $ (303) | Wire | $ 765,861 | $ - | $ 765,861 | |
| 6/12/2018 | $ 10,000 | 1792 | $ 775,861 | $ 510.57 | $ 776,372 | |
| 6/18/2018 | $ (603) | Wire | $ 775,769 | $ 775.86 | $ 776,545 | |
| 7/3/2018 | $ 293,589 | Wire | $ 1,070,134 | $ 1,939.42 | $ 1,072,073 | |
| 7/3/2018 | $ 3,000 | 1790 | $ 1,075,073 | $ - | $ 1,075,073 | |
| 8/6/2018 | $ (6,750) | Wire | $ 1,068,323 | $ 6,092.08 | $ 1,074,415 | |
| 9/5/2018 | $ (5,000) | Wire | $ 1,069,415 | $ 5,341.62 | $ 1,074,757 | |
| 9/26/2018 | $ (6,000) | Wire | $ 1,068,757 | $ 3,742.95 | $ 1,072,500 | |
| 10/15/2018 | $ 4,000 | 1685 | $ 1,076,500 | $ 3,384.40 | $ 1,079,884 | |
| 10/18/2018 | $ 75,000 | Wire | $ 1,154,884 | $ 538.25 | $ 1,155,422 | |
| 10/31/2018 | $ 4,500 | Wire | $ 1,159,922 | $ 2,502.25 | $ 1,162,425 | |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12/26/2018 | $ | 1,000 | Wire | $ | 1,163,425 | $ | 10,825.94 | $ | 1,174,251 |
| 12/31/2018 | $ | 5,000 | Wire | $ | 1,179,251 | $ | 969.52 | $ | 1,180,220 |
| 1/9/2019 | $ | 1,000 | Wire | $ | 1,181,220 | $ | 1,768.88 | $ | 1,182,989 |
| 1/30/2019 | $ | 6,000 | 1695 | $ | 1,188,989 | $ | 4,134.27 | $ | 1,193,123 |
| 2/20/2019 | $ | 10,000 | Wire | $ | 1,203,123 | $ | 4,161.46 | $ | 1,207,285 |
| 2/21/2019 | $ | 4,570 | Wire | $ | 1,211,855 | $ | 200.52 | $ | 1,212,056 |
| 2/21/2019 | $ | 5,000 | Wire | $ | 1,217,056 | $ | - | $ | 1,217,056 |
| 2/28/2019 | $ | 1,569 | 2879107 | $ | 1,218,624 | $ | 1,419.90 | $ | 1,220,044 |
| 3/1/2019 | $ | 6,000 | 1621 | $ | 1,226,044 | $ | 203.10 | $ | 1,226,247 |
| 3/18/2019 | $ | 1,569 | 2879108 | $ | 1,227,816 | $ | 3,473.79 | $ | 1,231,290 |
| 3/22/2019 | $ | (3,137) | Wire | $ | 1,228,152 | $ | 818.54 | $ | 1,228,971 |
| 3/29/2019 | $ | (3,220) | Wire | $ | 1,225,751 | $ | 1,432.84 | $ | 1,227,183 |
| 4/8/2019 | $ | 100,000 | Wire | $ | 1,327,183 | $ | 2,042.92 | $ | 1,329,226 |
| 4/11/2019 | $ | 10,000 | Wire | $ | 1,339,226 | $ | 663.59 | $ | 1,339,890 |
| 5/1/2019 | $ | 10,000 | Wire | $ | 1,349,890 | $ | 4,464.09 | $ | 1,354,354 |
| 5/15/2019 | $ | 7,500 | 1805 | $ | 1,361,854 | $ | 3,149.74 | $ | 1,365,004 |
| 6/3/2019 | $ | 10,000 | Wire | $ | 1,375,004 | $ | 4,312.54 | $ | 1,379,316 |
| 6/4/2019 | $ | 10,000 | Wire | $ | 1,389,316 | $ | 229.17 | $ | 1,389,545 |
| 7/3/2019 | $ | 5,000 | Wire | $ | 1,394,545 | $ | 6,715.03 | $ | 1,401,261 |
| 7/16/2019 | $ | 5,000 | Wire | $ | 1,406,261 | $ | 3,021.52 | $ | 1,409,282 |
| 7/19/2019 | $ | 5,000 | Wire | $ | 1,414,282 | $ | 703.13 | $ | 1,414,985 |
| 7/29/2019 | $ | 10,000 | Wire | $ | 1,424,985 | $ | 2,357.14 | $ | 1,427,342 |
| 8/1/2019 | $ | 5,000 | Wire | $ | 1,432,342 | $ | 712.49 | $ | 1,433,055 |
| 8/15/2019 | $ | 5,000 | Wire | $ | 1,438,055 | $ | 3,342.13 | $ | 1,441,397 |
| 8/30/2019 | $ | 10,000 | Wire | $ | 1,451,397 | $ | 3,595.14 | $ | 1,454,992 |
| 9/3/2019 | $ | 7,500 | Wire | $ | 1,462,492 | $ | 967.60 | $ | 1,463,460 |
| 9/13/2019 | $ | 20,000 | Wire | $ | 1,483,460 | $ | 2,437.49 | $ | 1,485,897 |
| 9/16/2019 | $ | 5,000 | Wire | $ | 1,490,897 | $ | 741.73 | $ | 1,491,639 |
| 10/7/2019 | $ | 1,000 | Wire | $ | 1,492,639 | $ | 5,218.14 | $ | 1,497,857 |
| 10/9/2019 | $ | 5,000 | Wire | $ | 1,502,857 | $ | 497.55 | $ | 1,503,355 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 10/15/2019 | $ | 5,000 | Wire | $ | 1,508,355 | $ 1,502.86 | $ | 1,509,857 |
| 10/22/2019 | $ | 5,000 | Wire | $ | 1,514,857 | $ 1,759.75 | $ | 1,516,617 |
| 11/22/2019 | $ | (20,000) | Wire | $ | 1,496,617 | $ 7,826.76 | $ | 1,504,444 |
| 12/17/2019 | $ | (20,000) | Wire | $ | 1,484,444 | $ 6,235.90 | $ | 1,490,680 |
| 1/1/2020 | $ | - | Equity Investment | $ | 1,490,680 | $ 3,711.11 | $ | 1,494,391 |
| 1/10/2020 | $ | (7,865) | Wire | $ | 1,486,526 | $ 2,236.02 | $ | 1,488,762 |
| 1/15/2020 | $ | (10,000) | Wire | $ | 1,478,762 | $ 1,238.77 | $ | 1,480,001 |
| 1/28/2020 | $ | (10,000) | Wire | $ | 1,470,001 | $ 3,203.99 | $ | 1,473,205 |
| 1/31/2020 | $ | (15,000) | Wire | $ | 1,458,205 | $ 735.00 | $ | 1,458,940 |
| 2/14/2020 | $ | (10,000) | Wire | $ | 1,448,940 | $ 3,402.48 | $ | 1,452,343 |
| 2/24/2020 | $ | (5,000) | Wire | $ | 1,447,343 | $ 2,414.90 | $ | 1,449,758 |
| 3/2/2020 | $ | (5,000) | Wire | $ | 1,444,758 | $ 1,688.57 | $ | 1,446,446 |
| 3/4/2020 | $ | (5,000) | Wire | $ | 1,441,446 | $ 481.59 | $ | 1,441,928 |
| 3/6/2020 | $ | (5,000) | Wire | $ | 1,436,928 | $ 480.48 | $ | 1,437,408 |
| 3/10/2020 | $ | (5,000) | Wire | $ | 1,432,408 | $ 957.95 | $ | 1,433,366 |
| 3/30/2020 | $ | (5,000) | Wire | $ | 1,428,366 | $ 4,774.69 | $ | 1,433,141 |
| 3/30/2020 | $ | (30) | Wire Transfer Fee | $ | 1,433,111 | $ - | $ | 1,433,111 |
| 4/8/2020 | $ | (5,000) | Wire | $ | 1,428,111 | $ 2,149.67 | $ | 1,430,260 |
| 4/28/2020 | $ | (5,000) | Wire | $ | 1,425,260 | $ 4,760.37 | $ | 1,430,021 |
| 4/28/2020 | $ | (30) | Wire Transfer Fee | $ | 1,429,991 | $ - | $ | 1,429,991 |
| 5/11/2020 | $ | (5,000) | Wire | $ | 1,424,991 | $ 3,098.31 | $ | 1,428,089 |
| 5/11/2020 | $ | (30) | Wire Transfer Fee | $ | 1,428,059 | $ - | $ | 1,428,059 |
| 5/15/2020 | $ | (5,000) | Wire | $ | 1,423,059 | $ 952.04 | $ | 1,424,011 |
| 5/22/2020 | $ | (5,000) | Wire | $ | 1,419,011 | $ 1,660.24 | $ | 1,420,671 |
| 5/22/2020 | $ | (30) | Wire Transfer Fee | $ | 1,420,641 | $ - | $ | 1,420,641 |
| 5/29/2020 | $ | (5,000) | Wire | $ | 1,415,641 | $ 1,657.41 | $ | 1,417,299 |
| 6/5/2020 | $ | (13,100) | Wire | $ | 1,404,199 | $ 1,651.58 | $ | 1,405,850 |
| 6/22/2020 | $ | (7,500) | Wire | $ | 1,398,350 | $ 3,978.56 | $ | 1,402,329 |
| 6/26/2020 | $ | (5,000) | Wire | $ | 1,397,329 | $ 932.23 | $ | 1,398,261 |
| 6/26/2020 | $ | (30) | Wire Transfer Fee | $ | 1,398,231 | $ - | $ | 1,398,231 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 7/3/2020 | $ | (5,000) | Wire | $ | 1,393,231 | $ | 1,631.27 | $ | 1,394,862 |
| 7/6/2020 | $ | (5,000) | Wire | $ | 1,389,862 | $ | 696.62 | $ | 1,390,559 |
| 7/10/2020 | $ | (5,000) | Wire | $ | 1,385,559 | $ | 926.57 | $ | 1,386,486 |
| 7/17/2020 | $ | (5,000) | Wire | $ | 1,381,486 | $ | 1,616.49 | $ | 1,383,102 |
| 7/17/2020 | $ | (30) | Wire Transfer Fee | $ | 1,383,072 | $ | - | $ | 1,383,072 |
| 7/21/2020 | $ | (5,000) | Wire | $ | 1,378,072 | $ | 922.05 | $ | 1,378,994 |
| 7/21/2020 | $ | (30) | Wire Transfer Fee | $ | 1,378,964 | $ | - | $ | 1,378,964 |
| 7/23/2020 | $ | (5,000) | Wire | $ | 1,373,964 | $ | 459.65 | $ | 1,374,424 |
| 7/23/2020 | $ | (30) | Wire Transfer Fee | $ | 1,374,394 | $ | - | $ | 1,374,394 |
| 7/27/2020 | $ | (1,000) | ATM | $ | 1,373,394 | $ | 916.26 | $ | 1,374,310 |
| 7/27/2020 | $ | (5,000) | Wire | $ | 1,369,310 | $ | - | $ | 1,369,310 |
| 7/27/2020 | $ | (30) | Wire Transfer Fee | $ | 1,369,280 | $ | - | $ | 1,369,280 |
| 7/29/2020 | $ | (5,000) | Wire | $ | 1,364,280 | $ | 456.44 | $ | 1,364,737 |
| 7/29/2020 | $ | (30) | Wire Transfer Fee | $ | 1,364,707 | $ | 456.43 | $ | 1,365,163 |
| 7/31/2020 | $ | (1,000) | ATM | $ | 1,364,163 | $ | 454.76 | $ | 1,364,618 |
| 8/3/2020 | $ | (5,000) | Wire | $ | 1,359,618 | $ | 682.08 | $ | 1,360,300 |
| 8/3/2020 | $ | (1,000) | ATM | $ | 1,359,300 | $ | - | $ | 1,359,300 |
| 8/4/2020 | $ | (1,000) | ATM | $ | 1,358,300 | $ | 226.55 | $ | 1,358,526 |
| 8/5/2020 | $ | (1,000) | Atm | $ | 1,357,526 | $ | 226.38 | $ | 1,357,753 |
| 8/6/2020 | $ | (5,000) | Wire | $ | 1,352,753 | $ | 226.25 | $ | 1,352,979 |
| 8/6/2020 | $ | (826) | Debt Card | $ | 1,352,153 | $ | - | $ | 1,352,153 |
| 8/7/2020 | $ | (1,000) | ATM | $ | 1,351,153 | $ | 225.36 | $ | 1,351,379 |
| 8/7/2020 | $ | (44) | Debit Card | $ | 1,351,335 | $ | - | $ | 1,351,335 |
| 8/10/2020 | $ | (225) | Debt Card | $ | 1,351,110 | $ | 675.67 | $ | 1,351,785 |
| 8/10/2020 | $ | (1,000) | ATM | $ | 1,350,785 | $ | - | $ | 1,350,785 |
| 8/10/2020 | $ | (5,000) | Wire | $ | 1,345,785 | $ | - | $ | 1,345,785 |
| 8/10/2020 | $ | (99) | Debit Card | $ | 1,345,686 | $ | - | $ | 1,345,686 |
| 8/10/2020 | $ | (466) | Debit Card | $ | 1,345,220 | $ | - | $ | 1,345,220 |
| 8/10/2020 | $ | (200) | Debit Card | $ | 1,345,020 | $ | - | $ | 1,345,020 |
| 8/10/2020 | $ | (305) | Debit Card | $ | 1,344,715 | $ | - | $ | 1,344,715 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8/10/2020 | $ | (36) | Debit Card | $ | 1,344,679 | $ | - | $ | 1,344,679 |
| 8/10/2020 | $ | (900) | ATM | $ | 1,343,779 | $ | - | $ | 1,343,779 |
| 8/10/2020 | $ | (100) | ATM | $ | 1,343,679 | $ | - | $ | 1,343,679 |
| 8/10/2020 | $ | (78) | Debit Card | $ | 1,343,601 | $ | - | $ | 1,343,601 |
| 8/10/2020 | $ | (10,000) | Wire | $ | 1,333,601 | $ | - | $ | 1,333,601 |
| 8/10/2020 | $ | (30) | Wire Transfer Fee | $ | 1,333,571 | $ | - | $ | 1,333,571 |
| 8/12/2020 | $ | (5,000) | Wire | $ | 1,328,571 | $ | 444.52 | $ | 1,329,015 |
| 8/12/2020 | $ | (30) | Wire Transfer Fee | $ | 1,328,985 | $ | - | $ | 1,328,985 |
| 8/18/2020 | $ | (1,200) | Wire | $ | 1,327,785 | $ | 1,328.99 | $ | 1,329,114 |
| 8/19/2020 | $ | (1,500) | Wire | $ | 1,327,614 | $ | 221.30 | $ | 1,327,836 |
| 8/20/2020 | $ | (2,000) | Wire | $ | 1,325,836 | $ | 221.27 | $ | 1,326,057 |
| 8/20/2020 | $ | (30) | Wire Transfer Fee | $ | 1,326,027 | $ | - | $ | 1,326,027 |
| 8/21/2020 | $ | (1,000) | Wire | $ | 1,325,027 | $ | 221.00 | $ | 1,325,248 |
| 8/21/2020 | $ | (30) | Wire Transfer Fee | $ | 1,325,218 | $ | - | $ | 1,325,218 |
| 8/24/2020 | $ | (2,000) | Wire | $ | 1,323,218 | $ | 662.61 | $ | 1,323,881 |
| 8/24/2020 | $ | (30) | Wire Transfer Fee | $ | 1,323,851 | $ | 661.61 | $ | 1,324,512 |
| 8/28/2020 | $ | (1,000) | Wire | $ | 1,323,512 | $ | - | $ | 1,323,512 |
| 8/28/2020 | $ | (30) | Wire Transfer Fee | $ | 1,323,482 | $ | 882.34 | $ | 1,324,365 |
| 8/31/2020 | $ | (1,000) | ATM | $ | 1,323,365 | $ | - | $ | 1,323,365 |
| 8/31/2020 | $ | (1,000) | Wire | $ | 1,322,365 | $ | - | $ | 1,322,365 |
| 8/31/2020 | $ | (30) | Wire Transfer Fee | $ | 1,322,335 | $ | - | $ | 1,322,335 |
| 9/2/2020 | $ | (1,000) | Wire | $ | 1,321,335 | $ | 440.78 | $ | 1,321,775 |
| 9/4/2020 | $ | (2,000) | Wire | $ | 1,319,775 | $ | 440.44 | $ | 1,320,216 |
| 9/8/2020 | $ | (1,000) | ATM | $ | 1,319,216 | $ | 879.85 | $ | 1,320,096 |
| 9/9/2020 | $ | (2,000) | Wire | $ | 1,318,096 | $ | 219.87 | $ | 1,318,316 |
| 9/11/2020 | $ | (2,000) | Wire | $ | 1,316,316 | $ | 439.37 | $ | 1,316,755 |
| 9/11/2020 | $ | (30) | Wire Transfer Fee | $ | 1,316,725 | $ | - | $ | 1,316,725 |
| 7/10/2026 | $ | (29) | Wire Transfer Fee | $ | 1,316,696 | $ | 467,059.39 | $ | 1,783,755 |

| Description |
| --- |
| McGrow |
| Capital Contribution |
| TURV Stock Loan |
| Loan AMI |
| Loan AMI |
| Loan AMI |
| Loan AMI |
| Loan AMI |
| Lowe Consulting Fee |
| Loan GrowCo Legal FGMC |
| Loan GrowCo Legal FGMC |
| Loan GrowCo Legal Meiklejohn |
| TURV Stock Loan |
| TURV Stock Loan |
| Loan AMI |
| Petty Cash, John McKowen |
| VitaNova Capital Contribution- John Ballard |
| Petty Cash, John McKowen |
| VitaNova Capital Contribution |
| Consulting Fee McKowen Joe |
| Return of Capital, McKowen |
| Return of capital to John McKowen |
| Return of capital, McKowen, Overpayment $1,327.59 |
| Legal VitaNova Littman |
| TURV Stock Loan |
| Jan McCaffrey Compensation |

| |
|---|
| Loan AMI |
| Loan GrowCo Legal Wadsworth |
| VitaNova Capital Contribution |
| Interest Payment on JRM Home Equity Bridge Loan |
| TURV Stock Loan |
| TURV Stock Loan |
| Blue Yellow Settlement Legal Schlie |
| Loan GrowCo United Rental |
| Interest Payment on JRM Home Equity Bridge Loan |
| Loan GrowCo United Rental |
| ‹eimbursement to JRM for final 2 payments to United Renta |
| IRS Payment for MCG Services for Tax Year 2017 |
| Blue Yellow Settlement Payment |
| VitaNova Capital Contribution |
| VitaNova Capital Contribution |
| Loan GrowCo Legal Hilbert |
| VitaNova Capital Contribution |
| VitaNova Capital Contribution |
| VitaNova Capital Contribution |
| VitaNova Capital Contribution |
| VitaNova Capital Contribution |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |
| JRM Short Term Loan |

JRM Short Term Loan
JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
Conversion to VitaNova Partners LLC
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 1170 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan

BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan

BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan
BoA 7391 Repay JRM Short Term Loan

**Bank Info**

ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB047YGBXL BUSINESS CHECKING JRM SHORT TERM LOAN
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB048CXXNS BUSINESS CHECKING JRM ADVANCE FOR KIRBY PAYMENT
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB048FW49Z BUSINESS CHECKING JRM SHORT TERM LOAN
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB048MBDDV BUSINESS CHECKING JRM SHORT TERM NOTE
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB048XYQVB BUSINESS CHECKING JRM SHORT TERM LOAN
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB04BLXG94 BUSINESS CHECKING JRM SHORT TERM LOAN.
ONLINE TRANSFER TO MCG SERVICES, LLC REF #IB04BYYZZW BUSINESS CHECKING JRM SHORT TERM LOAN FOR ATTORNEY RETAINER
CHECK # 1766
CHECK # 1764
CHECK # 1675

C

WT FED#00383 FIRSTBANK /FTR/BNF=West Hampton Special Situations Fun SRF# OW00000263171037 TRN#180607090430 RFB# OW00000263171037
WT FED#06065 FIRSTBANK /FTR/BNF=West Hampton Special Situations Fun SRF# OW00000263669358 TRN#180608137425 RFB# OW00000263669358
PURCHASE BANK CHECK OR DRAFT

CHECK # 1792

WT FED#01385 BANK OF AMERICA, N /FTR/BNF=Vita Nova Inc dba Vita Nova LLC SRF# 0060610184551207 TRN#180703099659 RFB#
CHECK # 1790

CHECK # 1685
WT FED#00551 FIRSTBANK /FTR/BNF=West Hampton Spc Sit Fund LLC SRF# 0060610291405567 TRN#181018099398 RFB#
WT FED#02227 BANK OF AMERICA, N /FTR/BNF=VitaNova SRF# OW00000327386998 TRN#181031095302 RFB# OW00000327386998

WT FED#06206 KEYBANK NATIONAL A /FTR/BNF=The Schaffer Group SRF# OW00000357428557 TRN#181226045257 RFB# OW00000357428557

WT FED#08151 ZIONS BANCORPORATI /FTR/BNF=Wadsworth Warner Conrady SRF# OW00000359956981 TRN#181231073491 RFB# OW0000035995698

WT FED#09828 BANK OF AMERICA, N /FTR/BNF=VitaNova SRF# OW00000365244427 TRN#190109082914 RFB# OW00000365244427

CHECK # 1695

WT FED#06058 FIRSTBANK /FTR/BNF=West Hampton Special Situations Fun SRF# OW00000389040010 TRN#190220048643 RFB# OW00000389040010

WT FED#05668 FIRSTBANK /FTR/BNF=West Hampton Special Situations Fun SRF# OW00000389638227 TRN#190221062902 RFB# OW00000389638227

WT FED#05192 US BANK, NA /FTR/BNF=John Henry Schlie PC SRF# OW00000389631902 TRN#190221052014 RFB# OW00000389631902

CHECK # 2879107

CHECK # 1621

CHECK # 2879108

Paid directly to Blue Yellow by Title company from proceeds of JRM home closing

WT FED#02712 BANK OF AMERICA, N /FTR/BNF=VitaNova SRF# OW00000422075274 TRN#190411107508 RFB# OW00000422075274

WT FED#03818 BANK OF AMERICA, N /FTR/BNF=VitaNova SRF# OW00000435351248 TRN#190501097689 RFB# OW00000435351248

CHECK # 1805

WIRE TYPE:WIRE IN DATE: 190603 TIME:0958 ET TRN:2019060300342153...

WIRE TYPE:WIRE IN DATE: 190604 TIME:0941 ET TRN:2019060400257389...

WIRE TYPE:WIRE IN DATE: 190703 TIME:0810 ET TRN:2019070300257084...

WIRE TYPE:WIRE IN DATE: 190716 TIME:1232 ET TRN:2019071600339256...

WIRE TYPE:WIRE OUT DATE:190719 TIME:1515 ET TRN:2019071900407037 SERVICE...

Paid By JRM WT FED#03264 CITYWIDE BANKS /FTR/BNF=Ogborn Mihm Coltaf Account SRF# 0060610256214998 TRN#190913134087 RFB#

# EXHIBIT 18

GrowCo / Blue & Green Vendor Ledger ($729,103.15)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

12:24 PM
09/12/17

# GrowCo Partners 1, LLC
## Vendor QuickReport
### All Transactions

| Type | Date | Num | Memo | Account | Clr | Split | | Due Month | Paid in Month | Amount Due |
|---|---|---|---|---|---|---|---|---|---|---|
| **Blue & Green, LLC** | | | | | | | | | | |
| Bill | 03/24/2015 | N-001 | A-001 | 20000 · Accounts Payable | | 81100 · Loan Note Interest Expense | | | | |
| Check | 04/30/2015 | 14452 | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Bill | 05/01/2015 | N-009 | A-009 | 20000 · Accounts Payable | | 81100 · Loan Note Interest Expense | | | | |
| Bill | 05/08/2015 | Partial | Partial Interest | 20000 · Accounts Payable | | 81100 · Loan Note Interest Expense | | | | |
| Bill Pmt | 06/08/2015 | 1098 | | 11000 · Main Operating - GCP1 7974 | √ | 20000 · Accounts Payable | | | | |
| Check | 06/09/2015 | 14461 | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 07/01/2015 | WIRE | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 08/03/2015 | | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Deposit | 08/06/2015 | | N-009 Deposit | 11001 · Main Operating GrowCo 7366 | √ | 27701 · N/P Blue & Green LLC | | | | |
| Deposit | 08/21/2015 | | N-009 Deposit | 11001 · Main Operating GrowCo 7366 | √ | 27701 · N/P Blue & Green LLC | | | | |
| Check | 08/28/2015 | | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 10/01/2015 | | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 11/05/2015 | ACH | Nov Note | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 12/02/2015 | ACH | Dec Note | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | | | |
| Check | 01/05/2016 | ACH | January Note | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | 2015 | December | January | $ 39,656.25 |
| Check | 01/20/2016 | ACH | | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | 2016 | January | February | $ 39,656.25 |
| Check | 02/01/2016 | ACH | February GrowCo note interest payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | February | March | $ 39,656.25 |
| Check | 02/16/2016 | ACH | | 11000 · Main Operating - GCP1 7974 | √ | 81100 · Loan Note Interest Expense | | March | April | $ 39,656.25 |
| Check | 03/01/2016 | ACH | March GrowCo note interest payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | April | May | $ 39,656.25 |
| Check | 03/17/2016 | ACH | Bridge Loan - GrowCo | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | May | June | $ 39,656.25 |
| Check | 04/08/2016 | ACH | April GrowCo note interest partial payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | June | July | $ 39,656.25 |
| Check | 04/25/2016 | ACH | Kirby GrowCo note interest partial payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | July | August | $ 39,656.25 |
| Check | 05/03/2016 | ACH | VOID: May GrowCo note interest payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | August | September | $ 39,656.25 |
| Check | 05/03/2016 | ACH | Kirby GrowCo note interest | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | September | October | $ 21,150.00 |
| Check | 05/18/2016 | ACH | GrowCo SU Interest Due | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | October | November | $ 21,150.00 |
| Check | 06/06/2016 | ACH | June GrowCo note interest partial payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | November | December | $ 21,150.00 |
| Check | 06/15/2016 | ACH | Bridge Loan - GrowCo | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | December | January | $ 21,150.00 |
| Check | 06/21/2016 | ACH | June GrowCo note interest partial payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | 2017 | January | February | $ 21,150.00 |
| Check | 07/12/2016 | ACH | July GrowCo note interest payment | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | February | March | $ 21,150.00 |
| General | 08/01/2016 | 2016C | To Move Payment to Blue & Yellow | 11001 · Main Operating GrowCo 7366 | √ | 81100 · Loan Note Interest Expense | | March | April | $ 49,059.38 |
| Check | 09/08/2016 | ACH | August GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | April | May | $ 49,059.38 |
| Check | 10/05/2016 | ACH | GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | May | June | $ 49,059.38 |
| Check | 11/02/2016 | ACH | GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | June | July | $ 49,059.38 |
| Check | 12/01/2016 | ACH | GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | July | August | $ 49,059.38 |
| Check | 01/17/2017 | ACH | GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | August | | |
| Check | 02/27/2017 | ACH | GrowCo note interest payment | 11002 · GrowCo Construction Acct 6629 | √ | 81100 · Loan Note Interest Expense | | | **Total** | **$ 729,103.15** |