# EXHIBIT 19

**McGrow, LLC — Formation, Capitalization, and Operations Articles of Organization (June 12, 2016); Executed Membership Subscriptions (January 2017); Notes and Revenue-Sharing Agreements (July and December 2017); Deposit Records**

# EXHIBIT 19 — SECTION A

**Formation (June 12, 2016)**

**Articles of Organization, Colorado Secretary of State ID 20161403102;**

**Founder's Membership Certificate No. 1 (John R. McKowen)**

E-Filed

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

Colorado Secretary of State
Date and Time: 06/12/2016 10:23 AM
ID Number: 20161403102

Document number: 20161403102
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

# Articles of Organization

filed pursuant to § 7-80-203 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

McGrow, LLC .

*(The name of a limited liability company must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd.". See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address

456 Madison St
*(Street number and name)*

Denver *(City)* CO *(State)* 80206 *(ZIP/Postal Code)*
Colorado *(Province – if applicable)* United States *(Country)*

Mailing address
(leave blank if same as street address)

456 Madison St
*(Street number and name or Post Office Box information)*

Denver *(City)* CO *(State)* 80206 *(ZIP/Postal Code)*
Colorado *(Province – if applicable)* United States . *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name
(if an individual)

McKowen *(Last)* John *(First)* *(Middle)* *(Suffix)*

or

(if an entity)

*(Caution: Do not provide both an individual and an entity name.)*

Street address

456 Madison St
*(Street number and name)*

Denver *(City)* CO *(State)* 80206 *(ZIP Code)*

Mailing address
(leave blank if same as street address)

456 Madison St
*(Street number and name or Post Office Box information)*

Denver (City) CO (State) 80206 (ZIP Code).

*(The following statement is adopted by marking the box.)*
☑ The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

Name (if an individual): McKowen (Last) John (First) ______ (Middle) ______ (Suffix)

or

(if an entity) ______________________________
*(Caution: Do not provide both an individual and an entity name.)*

Mailing address: 456 Madison St
*(Street number and name or Post Office Box information)*

______________________________

Denver (City) CO (State) 80206 (ZIP/Postal Code)
Colorado (Province – if applicable) United States (Country).

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
☐ The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*
☑ one or more managers.
or
☐ the members.

6. *(The following statement is adopted by marking the box.)*
☑ There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
☐ This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*
The delayed effective date and, if applicable, time of this document is/are ______________.
*(mm/dd/yyyy hour:minute am/pm)*

Notice:
Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| McKowen | John | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

456 Madison St
*(Street number and name or Post Office Box information)*

| Denver | CO | 80206 |
|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |

| Colorado | United States . |
|---|---|
| *(Province – if applicable)* | *(Country)* |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

NUMBER 1

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 6,000,000

# McGrow, LLC

## Membership Certificate

This Certifies that John R McKowen

is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 12th day of June, 20 16, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO NEW YORK

# EXHIBIT 19 — SECTION B

**Membership Subscription Round (January 2017)**
**Executed subscription (I. Wistar Morris, exemplar); signed Beall agreement ("GCP1 — Complete; GCP2 — within 6 months"); transmittal letters; issued membership certificates**

McGrow
Greenhouse Consultants

January 10, 2017

I. Wistar Morris
234 Broughton Lane
Villanova, PA 19085

Dear Wistar,

Thank you for all your help in financing the GrowCo Exchange Notes. As a result of your help, I have agreed to invite you to become members of McGrow, LLC, (McGrow). McGrow is an entity that was formed to sublease the GrowCo properties and provide materials and services to its tenants.

To become a member of McGrow, you will need to complete your subscription agreement and provide an initial capital contribution, which all members are providing in the same exact proportion of their proposed ownership interest, see the attached ownership schedule.

Your percentage ownership interest is 6.54% and therefore requires an initial capital contribution of $72,752 in three installments of $24,251 each. The first contribution is due now with the completion of your subscription agreement. The second contribution is due February 1, 2017 and the final contribution is due Mar 1, 2017.

Also attached are the McGrow Operating Agreement and a proforma of our Pueblo operations for your review.

Please call with any questions or concerns you may have.

John R. McKowen

John R. McKowen
Founder, Managing Member and CEO
McGrow, LLC
303 248 6883
2000 S Colorado Blvd
Tower 1, Suite 3100
Denver, CO 80222

McGrow
Greenhouse Consultants

## Ownership & Capitalization Table

| Member | Founders | Invested | Interests | Total | Initial Cap $ 0.0375 | Now | 1/31/17 | 2/28/17 | % | Annual Net |
|---|---|---|---|---|---|---|---|---|---|---|
| McKowen | 6,000,000 | $ 830,000 | 1,570,959 | 7,570,959 | $ 283,911 | $ 94,637.0 | $ 94,637 | $ 94,637 | 25.52% | $ 5,658,223 |
| Kirby | 4,000,000 | $ 175,000 | 331,226 | 4,331,226 | $ 162,421 | $ 54,140.3 | $ 54,140 | $ 54,140 | 14.60% | $ 3,236,980 |
| Beall | 3,333,333 | | | 3,333,333 | $ 125,000 | $ 41,666.7 | $ 41,667 | $ 41,667 | 11.24% | $ 2,491,196 |
| Morris | - | $ 1,025,000 | 1,940,040 | 1,940,040 | $ 72,751 | $ 24,250.5 | $ 24,251 | $ 24,251 | 6.54% | $ 1,449,906 |
| Prasil | - | $ 650,000 | 1,230,269 | 1,230,269 | $ 46,135 | $ 15,378.4 | $ 15,378 | $ 15,378 | 4.15% | $ 919,453 |
| Gruber | - | $ 500,000 | 946,361 | 946,361 | $ 35,489 | $ 11,829.5 | $ 11,830 | $ 11,830 | 3.19% | $ 707,271 |
| Edmundsen | - | $ 200,000 | 378,544 | 378,544 | $ 14,195 | $ 4,731.8 | $ 4,732 | $ 4,732 | 1.28% | $ 282,909 |
| Ploen | - | $ 1,164,527 | 2,204,126 | 2,204,126 | $ 82,655 | $ 27,551.6 | $ 27,552 | $ 27,552 | 7.43% | $ 1,647,273 |
| McCaffrey | | $ 1,500,000 | 2,839,083 | 2,839,083 | $ 106,466 | $ 35,488.5 | $ 35,489 | $ 35,489 | 9.57% | $ 2,121,814 |
| Others | - | $ 1,000,000 | 1,892,722.28 | 1,892,722 | $ 70,977 | $ 23,659.0 | $ 23,659 | $ 23,659 | 6.38% | $ 1,414,543 |
| **Total** | 13,333,333 | $ 7,044,527 | 13,333,333 | 26,666,666 | $ 1,000,000 | $ 333,333 | $ 333,333 | $ 333,333 | 89.89% | $ 19,929,567 |

| Consultants, Based On Performace | | | After Earning |
|---|---|---|---|
| Matt Taylor | 2,000,000 | 6.74% | $ 1,494,718 |
| Collon Kennedy | 1,000,000 | 3.37% | $ 747,359 |
| | 29,666,666 | 100.00% | $ 22,171,643 |

Annual net pre tax per Interest $ 0.75

1/30/17

[signature] - I agree

Fully - Unvested

GCP1 - Complete
GCP2 - within 6 months
McGrow - 1 Yr Profitable

[signature] John R McKown

McGrow
Greenhouse Consultants

January 30, 2017

I. Wistar Morris
234 Broughton Lane
Villanova, PA 19085

Dear Wistar,

Thank you for your investment of $72,752 in the McGrow Membership Offering. You have sen the initial investment of $24,251 and your second agreement is due on February 1, 2017

Enclosed are the following documents:

1. A executed copy of the Subscription Agreement.
2. A certificate representing the membership interests issued to you by McGrow, LLC. Please keep this certificate in a safe, secured place.
3. An Operating Agreement

Thank you for your participation. If you have any questions please call or send an email to john@mcgrowllc.com.

Sincerely,

John R. McKowen

John R. McKowen, CEO and Managing Member
GrowCo, LLC

## SUBSCRIPTION AGREEMENT

This SUBSCRIPTION AGREEMENT (this "Agreement"), dated as of January ___, 2017, is by and among McGrow, LLC, a Colorado limited liability company ("McGrow") on the one hand and I. Wistar Morris (the "Investor"), on the other hand.

**WHEREAS,** McGrow and the Investor are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(2) of the Securities Act of 1933, as amended (the "**Securities Act**") and Regulation D ("**Regulation D**") as promulgated by the United States Securities and Exchange Commission (the "**SEC**") under the Securities Act;

**WHEREAS,** McGrow desires to issue and sell, upon the terms and conditions set forth in this Agreement, up to 26,666,666 membership interests (the "**Offering**"), each membership interest a common membership interest in McGrow(the "**Membership Interests**");

**WHEREAS,** Investor, collectively with other persons or entities that purchase Membership Interests (the "**Investors**"), wishes to purchase, upon the terms and conditions stated in this Agreement, such number of Membership Interests as is set forth immediately below Investor's name on the signature page hereto;

**WHEREAS,** the parties hereto are executing and delivering this Agreement and the Membership Interests;

## ARTICLE 1
## SUBSCRIPTION

**Section 1.1 Subscription.** To solicit McGrow' acceptance of the Investor's subscription, the Investor must provide an executed copy of this Agreement together with a certified or bank check in the capital contribution of the Membership Interests for which the Investor is subscribing under this Agreement or concurrently with a wire transfer of the capital contribution of the Membership Interests for which the Investor is subscribing under this Subscription Agreement, in either case as provided in the instructions attached to this Agreement as **Schedule A**.

**Section 1.2 Rejection of Subscriptions.** McGrow may reject any subscription for any reason or no reason in its sole discretion. If any subscription is not accepted by McGrow, the amount so subscribed will be returned to the subscriber, without interest.

## ARTICLE 2
## CLOSING AND DELIVERY

**Section 2.1 Closing.**

(a) **Closing Date**. Closings of the subscription of Membership Interests will occur as subscriptions are received and accepted by McGrow.

(b) **Final Closing of Membership Interests.** Membership Interests will not be issued after the earlier of (i) the sale of 26,666,666 Membership Interests or (ii) February 28, 2017 unless otherwise extended by McGrow (the "Final Closing Date").

**Section 2.2 Delivery of Securities.** On each Closing Date, McGrow will deliver to the Investor all Membership Interests deliverable to the Investor in accordance with the number of Membership Interests for which the Investor paid pursuant to Section 1.1. The Membership Interests and will be issued in the name of the Investor and delivered by overnight mail to the address of the Investor set forth on the signature page of this Agreement. Investor acknowledges that such Membership Interests and any securities into which such Membership Interests are convertible or any Securities receivable upon exercise of may bear the following legend:

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). THE SECURITIES MAY NOT BE SOLD, TRANSFERRED OR ASSIGNED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER SAID ACT, OR AN OPINION OF COUNSEL IN FORM, SUBSTANCE AND SCOPE CUSTOMARY FOR OPINIONS OF COUNSEL IN COMPARABLE TRANSACTIONS THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER SAID ACT**

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

**Section 3.1 Representations and Warranties of McGrow.** McGrow hereby represents and warrants to the Investor as follows:

(a) **Good Standing.** McGrow is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Colorado.

(b) **Authorization.** McGrow' execution and delivery of this Agreement and the Membership Interests as well as its performance of its obligations under this Agreement and the Membership Interests has been duly and validly authorized by all required action. This Agreement and Membership Interests, when executed and validly executed are legal, valid, and binding obligations of McGrow, enforceable in accordance with their terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(c) **No Filing or Registration.** Except for (i) the filing of any required forms to comply with Regulation D or (ii) any state filings that may be required in connection with the transactions contemplated by this Agreement, no filing or registration with, or notice to or authorization, consent, finding by or approval of, any governmental authority is necessary for the execution and delivery of this Agreement by McGrow or the consummation by McGrow of the transactions contemplated hereby, the failure to obtain, make, or give which would be material to McGrow' business taken as a whole.

(d) **Authorization.** McGrow' execution and delivery of this Agreement and and its performance of its obligations under this Agreement and has been duly and validly authorized by all required corporate action. This Agreement and when executed, will have been validly executed and are legal, valid and binding obligations of McGrow, enforceable in accordance with its terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws relating to creditors' rights generally and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

**Section 3.2. Representations and Warranties of Investor.** The undersigned Investor represents and warrants to McGrow as follows:

(a) **Accredited Investor Status.** The Investor is an "accredited investor" within the meaning of SEC Rule 501, promulgated under Regulation D, as presently in effect by virtue of the reason(s) checked and initialed by the Investor on Schedule B annexed hereto.

(b) **Purchase Entirely for Own Account.** The Membership Interests to be purchased by the Investor and the shares of common stock of McGrow issuable upon conversion of the Membership Interests (the "**Membership Interests** ") will be acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and the Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. The Investor further represents that it does not have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Membership Interests, or the .

(c) **Disclosure of Information.** The Investor has reviewed all information it considers necessary or appropriate in deciding whether to purchase the Membership Interests. The Investor further represents that it has had an opportunity to ask questions and receive answers from McGrow regarding the terms and conditions of the offering of the Membership Interests and the business, properties, prospects and financial condition of McGrow and to obtain additional information (to the extent McGrow possessed such information or could acquire it without unreasonable effort or expense) and conduct its own independent investigation necessary to verify the accuracy of any information furnished to the Investor or to which the Investor had access.

(d) **Investment Experience.** The Investor (i) is experienced in evaluating and investing in private placement transactions in debt securities of companies similar to McGrow and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the investment in the Membership Interests and (ii) acknowledges that it can bear the economic risk of its investment in the Membership Interests, including the loss of the entire investment.

(e) **Authorization.** If the Investor is a corporation, a limited liability company, a partnership, or a trust, it is authorized and otherwise duly qualified to invest in McGrow and was not organized for the specific purpose of investing in McGrow.

(f) **Residence.** The Investor resides, or its office primarily responsible for the purchase of the Membership Interests is located, at the address listed on the signature page of this Agreement.

(g) **Restricted Securities.** The Investor understands that the Membership Interests are being sold pursuant to an exemption from registration under Section 4(2) of the Securities Act and Regulation D as promulgated under the Securities Act. The Investor also understands that the Membership Interests, and the may not be resold by the Investor without registration under the Securities Act or an exemption from the Securities Act, and that in the absence of an effective registration statement covering the Membership Interests, and/or the or an available exemption from registration under the Securities Act, the Membership Interests, and the may be restricted from transfer or sale in a transaction to which United States securities laws apply until maturity.

(h) **Legal Counsel.** The Investor has relied on the Investor's own legal counsel, and not on counsel for McGrow, McGrow, or the Placement Agent, to the extent the Investor has deemed necessary as to all legal matters and questions presented with reference to the offering and sale of the Membership Interests.

(i) **Issuer Reliance.** The Investor understands that McGrow has entered or will enter into this Agreement with the Investor in reliance upon the Investor's representations to McGrow, as set forth above.

## ARTICLE 4
## COVENANTS

**Section 4.1 Use of Proceeds from the Sale of Membership Interests.** McGrow shall use the proceeds received from the sale of the Membership Interests for general corporate purposes.

**Section 4.2 Sale of Assets.** So long as McGrow shall have any obligation under the Membership Interests, McGrow shall not, sell, lease or otherwise dispose of any portion of its assets outside the ordinary course of business.

## ARTICLE 5
## CONDITIONS TO CLOSING

**Section 5.1 Conditions to McGrow' Obligations.** Except for as may be waived in writing by McGrow, all of the obligations of McGrow under this Agreement are subject to the fulfillment, prior to or at the Closing..

**Section 5.2 Conditions to the Investor's Obligations.** Except as may be waived in writing by the Investor, all of the obligations of the Investor under this Agreement are subject to the fulfillment, prior to or at the Closing.

## ARTICLE 6
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES:

**Section 6.1** The representations and warranties of McGrow, and the Investor herein shall survive the Closing until the expiration of all applicable statutes of limitation.

## ARTICLE 7
## MISCELLANEOUS

**Section 7.1 Amendments.** This Agreement may be amended only by a written document signed by McGrow and agreed to in writing by Investors who at the time hold at least $66^2/_3\%$ of the capital contribution of outstanding Membership Interests in which event such agreement shall be deemed amended as to all parties; provided however, that any waiver of an Event of Default (as defined in the Membership Interests) occurring on account of McGrow' failure to make any payment of principal or interest shall not be effective against any Investor holding Membership Interests who has not agreed to such waiver in writing.

**Section 7.2 Counterparts and Facsimile Signatures.** This Agreement may be executed in any number of counterparts and signature pages may be delivered by facsimile or electronic transmission; each such counterpart or signature page shall be deemed to be an original.

**Section 7.3 Assignment.** Neither this Agreement nor any right created hereby shall be assignable by McGrow or the Investor (or any permitted assignee of McGrow or the Investor) without the prior written consent of the other party, except that this Agreement may be assigned (i) by the Investor to (a) an entity that wholly owns, is wholly owned by or is wholly under common ownership with the Investor or any permitted assignee of the Investor; (b) a trust for the benefit of the Investor or his or her immediate family members; or (c) by will or the laws of descent and distribution; or (ii) by McGrow to the successor in interest to all or substantially all of its business. Any attempt to assign any right under this Agreement in violation of this Section 7.3 shall be void. Nothing in this Agreement, express or implied, is intended to confer upon any person, other than the parties hereto and their respective permitted successors, permitted assigns, heirs, executors, administrators, or personal representatives, any rights or remedies under or by reason of this Agreement.

**Section 7.4 Entire Agreement.** Except as provided to the contrary herein, this Agreement and the Transaction Documents, contain the full and entire understanding and agreement between the parties with regard to the subject hereof and supersede all prior agreements and understandings of the parties with regard to such matters. Neither party shall be liable or bound to the other in any manner by any representations, warranties, covenants or agreements except as specifically set forth herein or therein.

**Section 7.5 Governing Law; Submission to Jurisdiction.** This Agreement shall be governed by and enforced pursuant to the laws of the State of Colorado. The parties to this Agreement hereby irrevocably submit to the exclusive jurisdiction of any federal or state court located within the State of Colorado, County of Denver, over any dispute relating to the terms of this Agreement and each party hereby irrevocably agrees that all claims in respect of such dispute or any suit, action or proceeding related thereto may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute.

Each of the parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**Section 7.6 Severability.** In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby unless, as a result of the selective enforcement of such remaining provisions a party hereto would fail to realize a benefit that was a fundamental part of the reason for such party to have entered into this Agreement.

**Section 7.7 Notices.** All notices, requests, demands and other communications hereunder shall be in writing, with copies to all the other parties hereto, and shall be deemed to have been duly given when (i) if delivered by hand, upon receipt, (ii) if sent by nationally recognized overnight delivery service (receipt requested), the next business day or (iii) if mailed by first-class registered or certified mail, return receipt requested, postage prepaid, four days after posting in the U.S. mails, in each case if delivered to the following addresses:

If to McGrow:

c/o McGrow, LLC
2000 South Colorado Blvd, Tower 1 Ste. 3100
Denver, Colorado 80222
Attn: John R McKowen, CEO

If to the Investor, to the address set forth on the signature page of this Agreement, or at such other address or facsimile number as any party may have advised the other by notice.

**Section 7.8 Attorney Fees.** If any action at law or in equity, including an action for declaratory relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees from the other party or parties, which fees shall be in addition to any other relief which may be awarded.

IN WITNESS WHEREOF, this Agreement is hereby duly executed by each party hereto as of the date first written above.

**SUBSCRIPTION BY INVESTOR:**

Membership Interests Subscribed for: 1,940,640

Total Subscription: $ 72752.00

I. Wistar Morris
(Exact name in which Membership Interests are to be issued)

[signature]
Signature

Dated: Jan 12, 2017

Address: 234 Broughton Lane
Villanova PA 19085

Investor
SSN/Tax ID No. 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

**ACCEPTANCE BY MCGROW, LLC**

By: [signature]
Name: John R McKowen
Title: CEO
Dated: 1/31, 2017

<u>**Schedule B**</u>

Please initial below the items, which apply to your status as an Accredited Investor.

| | |
|---|---|
| [initialed] | An individual having a net worth with spouse (excluding automobiles, principal residence and furnishings) at the time of purchase, individually or jointly, in excess of $1,000,000. |
| [initialed] | An individual whose individual net income was in excess of $200,000 in each of the two most recent years, or whose joint net income with his or her spouse was in excess of $300,000 in each of those years, and who reasonably expects his individual or joint net income with such investor's spouse to reach such level(s) in the current year. |
| ________ | A corporation or partnership not formed for the specific purpose of acquiring the Membership Interests, having total assets in excess of $5,000,000. |
| ________ | A small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958. |
| ________ | A self-directed employee benefit plan within the meaning of ERISA, with investment decisions made solely by persons who are accredited investors as defined in Rule 501(a) of Regulation D. |
| ________ | A trust with total assets in excess of $5,000,000 not formed for the specific purpose of acquiring the Securities, whose purchase is directed by a sophisticated person (i.e., a person who has such knowledge and experience in financial and business matters that he, she or it is capable of evaluating the merits and risks of an investment in the Securities). |
| ________ | An entity in which all of the equity owners are accredited investors. |

NUMBER 4

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 1,940,040

# McGrow, LLC

## Membership Certificate

This Certifies that I. Wistar Morris

is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 1st day of January, 20 17, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO NEW YORK

# OPERATING AGREEMENT

# OF

# MCGROW, LLC

JPM

# TABLE OF CONTENTS


**Section 1 - The Company** .......... 1
1.1 Purpose .......... 1
1.2 Term .......... 1
1.3 Title to Property .......... 1
1.4 Payments of Individual Obligations .......... 1
1.5 Noncompetition .......... 1
1.6 Definitions .......... 2
1.7 Other Terms .......... 2

**Section 2 - Company Capital** .......... 2
2.1 Capital Contributions .......... 2
2.2 Withdrawal or Reduction of Member's Capital Contribution .......... 2
2.3 Additional Contributions .......... 2
2.4 Valuation of Contributed Property .......... 3
2.5 Certificates .......... 3
2.6 Lost, Destroyed or Stolen Certificates .......... 4

**Section 3 - Allocations** .......... 4
3.1 Profits .......... 4
3.2 Losses .......... 4

**Section 4 - Distributions** .......... 5
4.1 Cash Available For Distribution .......... 5
4.2 Division Among Members and Transferees .......... 5
4.3 Amounts Withheld .......... 5
4.4 Limitation Upon Distributions .......... 5
4.5 In Kind Distributions .......... 5

**Section 5 - Management** .......... 6
5.1 Authority of the Managers .......... 6
5.2 Officers / Execution of Documents .......... 6
5.3 Right to Rely on Managers .......... 6
5.4 Higher Vote Required for Certain Actions .......... 6
5.5 Number, Tenure and Qualifications .......... 7
5.6 Resignation .......... 7
5.7 Removal of Manager .......... 7
5.8 Vacancies .......... 8
5.9 Indemnification of Managers and Officers .......... 8
5.10 Liability for Certain Acts .......... 8

**Section 6 - Amendments; Meetings** .......... 9




gkm

6.1 Amendments ..... 9
6.2 Meetings of the Board of Managers and Members ..... 9
(a) Call of Meetings ..... 9
(b) Place of Meetings ..... 9
(c) Notice of Meetings ..... 9
(d) Record Date for Member Meetings ..... 10
(e) Quorum ..... 10
(f) Manner of Acting ..... 10
(g) Proxies for Members ..... 11
(h) Conduct at Meetings ..... 11
(i) Telephonic Meeting ..... 11
(j) Waiver of Notice ..... 11
6.3 Action Without a Meeting ..... 11

**Section 7 - Transfers Of Interests; Additional and Substituted Members ..... 11**
7.1 Restriction on Transfer ..... 11
7.2 Additional Members ..... 12
7.3 Admission of Transferee as a Substituted Member ..... 12
7.4 Further Conditions ..... 12
7.5 Distributions and Allocations in Respect to Transferred and Additional Interests 12

**Section 8 - Action For Partition ..... 13**
8.1 Waiver of Partition ..... 13

**Section 9 - Dissolution And Winding Up ..... 13**
9.1 Dissolution ..... 13
9.2 Liquidator ..... 14
(a) Definition ..... 14
(b) Fees ..... 14
(c) Indemnification ..... 14
9.3 Winding Up ..... 14
9.4 Compliance With Certain Requirements of Regulations; Deficit Capital Accounts ..... 15
9.5 Deemed Contribution and Liquidation ..... 16
9.6 Rights of Members and Transferees ..... 16
9.7 Character of Liquidating Distributions ..... 16
9.8 Filings ..... 16

**Section 10 - Taxes ..... 16**
10.1 Partnership Classification ..... 16
10.2 Tax Information ..... 16
10.3 Code § 754 Election and Other Company Elections ..... 17
10.4 Taxes of Taxing Jurisdictions ..... 17
10.5 Tax Matters Partner ..... 17
(a) Designation ..... 17
(b) Communications ..... 18
(c) Accountants and Lawyers ..... 18



JEM

**Section 11 - Miscellaneous** ..... 18
11.1 Notices ..... 18
11.2 Binding Effect ..... 18
11.3 Construction ..... 18
11.4 Time ..... 19
11.5 Headings ..... 19
11.6 Severability ..... 19
11.7 Incorporation by Reference ..... 19
11.8 Further Action ..... 19
11.9 Governing Law; Jurisdiction; Venue ..... 19
11.10 Counterpart and Facsimile Execution ..... 19
11.11 Sole and Absolute Discretion ..... 20
11.12 Specific Performance ..... 20
11.13 No Partnership Intended for Nontax Purposes ..... 20
11.14 Rights of Creditors and Third Parties Under Operating Agreement ..... 20
11.15 Attorneys' Fees ..... 20

**Annex I - Definitions** ..... 1

Annex II - Allocations ..... 1
Special Allocations ..... 1
(a) Minimum Gain Chargeback ..... 1
(b) Member Minimum Gain Chargeback ..... 1
(c) Qualified Income Offset ..... 2
(d) Gross Income Allocation ..... 2
(e) Nonrecourse Deductions ..... 2
(f) Member Nonrecourse Deductions ..... 2
(g) Code § 754 Adjustment ..... 2
(h) Allocations Relating to Taxable Issuance of Membership Interests ..... 3
Curative Allocations ..... 3
Other Allocation Rules ..... 3
(a) When Allocations Are Made ..... 3
(b) Varying Interest ..... 3
(c) Consistent Reporting of Allocations ..... 3
(d) Sharing Excess Nonrecourse Liabilities ..... 4
(e) Treatment of Distributed Loan Proceeds ..... 4
Tax Allocations: Code § 704(c) ..... 4
(a) Code § 704(c) Allocations ..... 4
(b) Allocations to Reflect Revaluations ..... 4
(c) Elections ..... 4
(d) Residual Allocations ..... 4

**Exhibit A - Members** ..... 1



JLW

**OPERATING AGREEMENT**
**OF**
**MCGROW, LLC**
**A Colorado Limited Liability Company**

**THIS OPERATING AGREEMENT** is entered into effective as of June 12, 2016, by and between the Persons whose names are set forth on Exhibit A attached hereto, each of whom is a Member, pursuant to the provisions of the Colorado Limited Liability Company Act, as amended, on the following terms and conditions:

**SECTION 1**
**THE COMPANY**

**1.1 Purpose.** The purpose of the Company is to conduct any lawful activity.

**1.2 Term.** The term of the Company commenced on the date the Articles of Organization described in Section 7-80-204 of the Act were filed in the office of the Secretary of State of Colorado in accordance with the Act, and shall continue until the winding up and liquidation of the Company and its business is completed as provided in Section 9.

**1.3 Title to Property.** All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Member's Membership Interest in the Company shall be personal property for all purposes. The Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member, except as otherwise provided in this Agreement or in any other agreement between the Company and such Member.

**1.4 Payments of Individual Obligations.** The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of any Member.

**1.5 Noncompetition.** Each Member hereby agrees to disclose and make available to the Company each and every business opportunity that such Member becomes aware of in its capacity as a Member or otherwise, provided that no such disclosure or offer shall be required with respect to business opportunities that are not within the scope and purpose of the Company. Each Member further agrees that such Member shall be accountable to, and hold in trust for, the Company any income, compensation, or profit that such Member may hereafter derive from any such activity until and unless the Company elects not to pursue it, and that such Member will indemnify the Company for any profits that the Company may reasonably be viewed as having



JFM

foregone or any loss that it may incur as a result of any failure by such Member to disclose business opportunities to the Company.

Notwithstanding anything to the contrary herein, a Member shall not be treated as engaging in an activity contemplated by this Section 1.5 solely by reason of (1) owning an equity interest of less than five percent (5%) of the capital and profits of a corporation, partnership, limited liability company or other entity, or (2) owning a debt obligation of any such entity, provided that such debt obligation entitles such Member to receive only interest that is fixed, or varies by reference to an index or formula that is not based on the value or results of operations of such entity.

**1.6 Definitions.** Capitalized words and phrases used in this Agreement have the meanings set forth on Annex I.

**1.7 Other Terms.** Unless the context shall require otherwise:

(a) Words importing the singular number or plural number shall include the plural number and singular number respectively;

(b) All pronouns and any variations thereof shall be deemed to refer to masculine, feminine, or neuter, singular or plural, as the identity of the person or persons may require.

(c) References to "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation";

(d) Reference in this Agreement to "herein", "hereby" or "hereunder" or any similar formulation, shall be deemed to refer to this Agreement as a whole, including the Annexes and Exhibits, if any;

(e) Reference to "and" and "or" shall be deemed to mean "and/or".

## SECTION 2
## COMPANY CAPITAL

**2.1 Capital Contributions.** Each of the Members has made the Capital Contribution set forth for such Member on Exhibit A attached hereto.

**2.2 Withdrawal or Reduction of Member's Capital Contribution.** No Member or Transferee shall receive out of the Company's Property any part of its Capital Contributions until all liabilities of the Company, except liabilities to Members and Transferees on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

**2.3 Additional Contributions.**



JRM

(a) The Members may determine from time to time by majority vote that additional cash Capital Contributions are required for the Company's business and the amount thereof to be contributed by each Member, as well as the remedies for failure to make any such contribution.

(b) In lieu of the Members making additional Capital Contributions pursuant to Section 2.2(a), the Board of Managers, with majority approval of the Members, may cause the Company to borrow funds.

**2.4 Valuation of Contributed Property.** The value of property contributed by the Members has been agreed to by each Member. The Membership Interests have been determined and allocated based on such valuation and are deemed equal to the capital contributed. Notwithstanding the value assigned to property contributed to the Company, if the fair market value of any contributed property is ever determined to be other than the value so assigned, whether such is a result of a determination of the appraised value of the contributed property or of the Company, or occurs by reason of a determination by a court of competent jurisdiction or a final determination of the Internal Revenue Service, to be greater or lesser than the assigned value, the Capital Accounts, Membership Interests and Transferee Interests of each Member and Transferee shall be adjusted to reflect the finally determined fair market value as of the date of contribution. If a reallocation of Membership Interests and Transferee Interests made under the preceding sentence requires a redetermination and reallocation of Profits, Losses, and cash distributed to Members and Transferees, then each Member and Transferee shall promptly receive from or contribute back to the Company the amount or amounts required to give effect to such reallocation or redistribution as determined by the Board of Managers. The Members expressly recognize that valuation of certain contributed property may be difficult by virtue of the nature of the contributed property. Therefore, the Members view this Agreement to adjust the Capital Accounts and interests as necessary even though the Members have and will continue to make every effort to accurately value contributed property.

**2.5 Certificates.** The Board of Managers may authorize issuance of any authorized classes of Units with or without certificates. The fact that the Units are not represented by certificates shall have no effect on the rights and obligations of Members or Transferees. If Units of the Company are represented by certificates, the certificates shall be respectively numbered serially (either as a whole or for each class of Units or series thereof), as they are issued, shall be impressed with the Company seal, if any, or a facsimile thereof and shall be signed by any Officer designated by the Board of Managers. Each certificate shall state the name of the Company, the fact that the Company is organized or formed under the laws of the State of Colorado, the name of the person to whom issued, the date of issue, the class (or series of any class), and the number of Units represented thereby. If more than one class of Units or series within a class is authorized, the certificate shall contain a statement of the designations, preferences, qualifications, limitations, restrictions and special or relative rights of the Units of each class shall be set forth in full or summarized on the face or back of the



JRM

certificates which the Company shall issue, or in lieu thereof, the certificate may conspicuously set forth that such a statement or summary will be furnished to any Member or Transferee upon request without charge.

**2.6 Lost, Destroyed or Stolen Certificates.** No certificate for Units of the Company shall be issued in place of any certificate alleged to have been lost, destroyed or stolen except on production of evidence, satisfactory to the Board of Managers of such loss, destruction or theft, and if the Board of Managers so require, upon the furnishing of an indemnity bond in such amount with such terms and such surety as the Board of Managers may require.

## SECTION 3
## ALLOCATIONS

**3.1 Profits.** After giving effect to the special allocations set forth on Annex II regarding Special Allocations and Curative Allocations, Profits for any Allocation Year shall be allocated as set forth in Section 3.1(a) below, subject to the provisions of Section 3.1(b) below.

(a) Profits, if any, shall be allocated to the Members and their Transferees in accordance with their respective Sharing Ratios.

(b) If, in any prior Allocation Year, Losses were allocated among any of the Members and their Transferees pursuant to Section 3.2(b) below (and if and to the extent that the provisions this Section 3.1(b) have not been applied), Profits shall be reallocated among the same Members or their Transferees in the same manner and to the same extent as such Losses, to the extent possible. The provisions of this Section 3.1(b) shall be applied to Losses allocated under Section 3.2(b) in prior Allocation Years in the inverse order in which they occurred. The parties understand that the effect of this Section 3.1(b) is to reverse the effect of allocation of Losses under Section 3.2(b) as Profits become available.

**3.2 Losses.** After giving effect to the special allocations set forth on Annex II regarding Special Allocations and Curative Allocations, Losses for any Allocation Year shall be allocated as set forth in Section 3.2(a) below, subject to the limitation in Section 3.2(b) below.

(a) Losses for any Allocation Year shall be allocated to the Members and their Transferees in accordance with their respective Sharing Ratios.

(b) The Losses allocated pursuant to Section 3.2(a) shall not exceed the maximum amount of Losses that can be so allocated without causing any Member or Transferee to have an Adjusted Capital Account Deficit at the end of any Allocation Year. In the event some but not all of the Members or their Transferees would have Adjusted Capital Account Deficits as a consequence of an allocation of Losses pursuant to Section 3.2(a), the limitation set forth in this Section 3.2(b) shall be applied on a Person by Person



JRM

basis so as to allocate the maximum permissible Losses to each Member and Transferee under Section 1.704-1(b)(2)(ii)(d) of the Regulations.

## SECTION 4
## DISTRIBUTIONS

**4.1 Cash Available For Distribution.** Except as provided in Section 9.3, Cash Available for Distribution shall be distributed to the Members and their Transferees in such amounts and at such times as determined by the Board of Managers.

**4.2 Division Among Members and Transferees.** Subject to the provisions of Section 9.3, all distributions to the Members and Transferees pursuant to this Section 4 shall be divided among them in proportion to their respective Sharing Ratios.

**4.3 Amounts Withheld.** All amounts withheld or required to be withheld pursuant to the Code or any provision of any state or local tax law with respect to any payment, distribution or allocation to the Company, the Members or Transferees and treated by the Code (whether or not withheld pursuant to the Code) or any such tax law as amounts payable by or in respect of any Member or Transferee or any Person owning an interest, directly or indirectly, in such Member or Transferee shall be treated as amounts distributed to the Members and Transferees pursuant to this Section 4 for all purposes under this Agreement. The Board of Managers are authorized to withhold from distributions, or with respect to allocations, to the Members and Transferees and to pay over to any federal, state or local government any amounts required to be so withheld pursuant to the Code or any provisions of any other federal, state or local law and shall allocate any such amounts to the Members and Transferees with respect to which such amount was withheld.

**4.4 Limitation Upon Distributions.** The Company shall not make a distribution to a Member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the Company, other than liabilities to Members on account of their Membership Interests and liabilities for which the recourse of creditors is limited to specified Property, exceed the fair value of the assets of the Company, except that the fair value of Property that is subject to a liability for which the recourse of creditors is limited shall be included in the assets of the Company only to the extent that the fair value of that Property exceeds that liability.

**4.5 In Kind Distributions.** Irrespective of the nature of its Capital Contributions, no Member or Transferee shall have any right to demand or receive any distributions from the Company in any form other than cash, but the Board of Managers (or the Liquidator, in the case of distributions in liquidation) may make distributions in kind and may compel any Member or Transferee to accept a distribution in kind, including the distribution of a percentage of an asset, which percentage is different than the Member's or Transferee's Sharing Ratio.

## SECTION 5



JRM

## MANAGEMENT

**5.1 Authority of the Managers.** Subject to the limitations and restrictions set forth in this Agreement (including, without limitation, those set forth in this Section 5), the Managers shall have the sole and exclusive right to manage the business and affairs of the Company and shall have all of the rights and powers which may be possessed by managers under the Act. The Managers shall act as a Board of Managers, and for these purposes the Board of Managers shall act in a manner similar to a board of directors of a corporation.

**5.2 Officers / Execution of Documents.**

(a) The Company shall have such officers as shall be appointed by the Board of Managers, each having such power and duties as shall be provided by resolution of the Board of Managers and, where applicable, consistent with any employment or consulting agreements entered into between such officer(s) and the Company. In addition, the Board of Managers may appoint, employ or otherwise cause the Company to contract with such other Persons for the transaction of the business of the Company or the performance of services for or on behalf of the Company from time to time. The Board of Managers may delegate to any officer of the Company or to any such other Person such authority to act on behalf of the Company as the Board of Managers may from time to time determine appropriate. The salaries or other compensation of the officers and agents of the Company shall be fixed from time to time by the Board of Managers subject to, where applicable, any employment or consulting agreements entered into between such officer(s) and the Company.

(b) When authorized by the Board of Managers, any Manager or officer of the Company, or any other Person specifically authorized by the Board of Managers, may execute any contract, other agreement or document on behalf of the Company and may execute on behalf of the Company and file with the Secretary of State of the State of Colorado any filings required by the Act.

**5.3 Right to Rely on Managers.**

(a) Any Person dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any Manager as to:

(i) The identity of any Member; or

(ii) The officers who are authorized to execute and deliver any instrument or document of the Company.

**5.4 Higher Vote Required for Certain Actions.** Notwithstanding Section 5.1, the following decisions and actions shall not be made or taken without the affirmative vote of Members holding at least a majority of all Membership Interests held by all Members:

(a) The incurrence by the Company of any Debt or contract obligation that taken with all other existing Debts or contract obligations (other than anticipated obligations to pay for routine services and supplies), will require the Company to pay more than $1,000,000.00 in any Company Fiscal Year;

(b) The sale of all or substantially all of the Company's assets;

(c) The relocation of the Company's principal office or the opening of any Company office outside the State of Colorado;

(d) A change to the name of the Company;

(e) Knowingly perform any act that would subject any Member to liability in any jurisdiction;

(f) Cause the Company to voluntarily take any action with respect to the Company described in clauses (a)(iii), (b) or (c) of the definition of "Bankruptcy";

(g) Approve the dissolution of the Company; or

(h) Admit an Additional Member or a Substituted Member.

**5.5 Number, Tenure and Qualifications.** The number of Managers of the Company shall initially be one (1), but may be as many as five (5). Managers shall be appointed no less than annually by the affirmative vote of Members holding at least a majority of all Membership Interests held by all Members at a meeting of Members, which meeting shall be held during the month of June each year. The number of Managers may be increased or decreased from time to time through an amendment to this Agreement (if so allowed by law), but in no instance shall there be less than one (1) Manager nor shall any decrease have the effect of shortening the term of any incumbent Manager. Each Manager shall hold office until the next annual meeting of the Members or the Manager's earlier, Bankruptcy, death, dissolution, resignation or removal. If a Manager is an individual, such Manager must be eighteen (18) years of age or older.

**5.6 Resignation.** A Manager may resign at any time by giving written notice to the Members. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. Upon resignation as Manager such Person shall retain all other rights of a Member with respect to his Membership Interest, if any, subject to this Agreement or any other agreement of the Members.

**5.7 Removal of Manager.** In the event the Members shall at any time, or from time to time, be dissatisfied with the performance of a Manager under this Section 5 (regardless of whether such dissatisfaction shall constitute legal "cause" for termination),



gkm

the Members shall have the right to give the Manager written notice of such dissatisfaction, specifying the particulars in respect of which the performance is deemed by the Members to be unsatisfactory. If during the thirty (30)-day period from the date of such notice the performance shall continue to be unsatisfactory (if such notice relates to matters capable of being cured) or immediately if such unsatisfactory performance is not capable of being cured, the Members shall have the right to remove such Manager. The approval of those Members owning at least a majority of the Units held by all Members shall be required to elect a new Manager. Upon removal as Manager, such Person shall retain all other rights of a Member with respect to his Membership Interest, if any, subject to this Agreement and any other agreement of the Members.

**5.8 Vacancies.** Any vacancy occurring in the Board of Managers of the Company shall be filled by the affirmative vote of Members holding at least a majority of all Units held by all Members at a meeting of Members called specifically for that purpose. A Manager elected to fill a vacancy or to fill a position resulting from an increase in the number of Managers shall hold office until his earlier death, dissolution, resignation or removal.

**5.9 Indemnification of Managers and Officers.**

(a) The Company shall indemnify each Manager and each Officer (and their estates) in respect of payments made and personal liabilities incurred by that Manager or Officer in the ordinary and proper course of that Person's activities in connection with the Company's business or the preservation of the Company's business or property. For purposes of this Section 5.9, the term "Officer" means an individual who is or was designated by the Board of Managers as an officer of the Company (whether designated as President, Vice-President, Secretary, Treasurer or otherwise) or an individual who, as an Officer of the Company, is or was serving at the Company's request as a director, officer, partner, manager, managing member, trustee, employee or fiduciary or agent of another domestic or foreign entity or of an employee benefit plan.

(b) Section 5.9(a) shall be enforced only to the maximum extent permitted by law, and no Manager or other Person shall be indemnified from any liability for fraud, deceit, self-dealing or embezzlement.

(c) All indemnities provided for in this Agreement shall survive the termination of a Person's position entitling him to indemnification hereunder.

**5.10 Liability for Certain Acts.** Each Manager shall exercise his business judgment in managing the business, operations and affairs of the Company and shall perform his duties as a manager in good faith, in a manner he reasonably believes to be in the best interests of the limited liability company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall be entitled to rely on information, opinions, reports, or statements as if a director of a corporation and as provided in Section 7-108-401(2) of the Colorado Business Corporation Act. A person who so performs his duties shall not have any liability by



JPM

reason of being or having been a Manager. A Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a profit for the Members from the operations of the Company. A Manager shall not be responsible to any Member because of a loss of such Member's investment or a loss in operations, unless the loss shall have been the result of a failure to meet the standards of conduct set forth in this Section 5.10.

## SECTION 6
## AMENDMENTS; MEETINGS

**6.1 Amendments.**

(a) Amendments to this Agreement may be proposed by any Manager or by one or more Members holding ten percent (10%) or more of the Units. Following such proposal, the Board of Managers shall submit to the Members a verbatim statement of any proposed amendment, providing that the Board of Managers for the Company shall have approved of the same in writing as to form, and the Board of Managers shall include in any such submission a recommendation as to the proposed amendment. The Board of Managers shall seek the written vote of the Members on the proposed amendment or shall call a meeting to vote thereon and to transact any other business that the Board of Managers may deem appropriate. A proposed amendment shall be adopted and be effective as an amendment hereto if it receives the affirmative vote of the Members holding a majority of all Units held by all Members.

(b) Notwithstanding Sections 6.1(a) and 6.2, this Agreement shall not be amended without the consent of each Member adversely affected if such amendment would modify the limited liability of a Member, or alter the interest of a Member in Profits, Losses, other items, or any Company distributions.

**6.2 Meetings of the Board of Managers and Members.**

(a) **Call of Meetings.**

(i) Meetings of the Board of Managers may be called by any Manager. The call need not state the nature of the business to be transacted.

(ii) Meetings of the Members may be called by any Manager and shall be called by the Board of Managers or any Manager upon the written request of any Member. The call must state the nature of the business to be transacted.

(b) **Place of Meetings.** The meeting shall be the principal office of the Company unless otherwise stated by the Person giving the notice of a meeting.

(c) **Notice of Meetings.**

(i) Written notice stating the place, day and hour of the meeting of the Board of Managers shall be given not less than two (2) days nor more than fifty

(50) days before the date of the meeting, either personally or by mail, by or at the direction of the Manager calling the meeting, to each Manager.

(ii) Written notice stating the place, day and hour of the Members' meeting, as well as the purpose or purposes for which the meeting is called, shall be given not less than ten (10) days nor more than fifty (50) days before the date of the meeting, either personally or by mail, by or at the direction of the Person calling the meeting, to each Member entitled to vote at such meeting.

**(d) Record Date for Member Meetings.** For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section 6.2, such determination shall apply to any adjournment thereof.

**(e) Quorum.**

(i) A majority of all of the Managers shall constitute a quorum at any meeting of the Board of Managers. The Managers present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Managers whose absence would cause less than a quorum.

(ii) Members holding at least a majority of all Units held by all Members, represented in person or by proxy, shall constitute a quorum at any meeting of Members. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of Members holding that number of Units the absence of which would cause less than a quorum.

**(f) Manner of Acting.**

(i) Managers may vote in person at a Board of Managers meeting. Whenever the vote or consent of the Board of Managers is permitted or required under the Agreement, such vote or consent may be given at a meeting of the Board of Managers or may be given in accordance with the procedure prescribed in Section 6.3. Except as otherwise expressly provided in the Agreement, the affirmative vote or consent of a majority of the Managers shall control.

(ii) Members may vote in person or by proxy at a meeting of the Members. Whenever the vote or consent of Members is permitted or required under the Agreement, such vote or consent may be given at a meeting of Members or may be given

in accordance with the procedure prescribed in Section 6.3. Except as otherwise expressly provided in the Agreement, the affirmative vote or consent of the Members holding a majority of all Units held by all Members shall control.

(g) **Proxies for Members.** Each Member may authorize any Person or Persons to act for him by proxy on all matters in which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting of the Members. Every proxy must be signed by the Member or his attorney-in-fact. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the Member executing it.

(h) **Conduct at Meetings.** Each meeting of the Board of Managers or the Members shall be conducted by the Chair or such other Person as the Board of Managers may appoint pursuant to such rules for the conduct of the meeting as in place at such time.

(i) **Telephonic Meeting.** Managers or Members of the Company may participate in any meeting of the Board of Managers or Members, as the case may be, by means of conference telephone or similar communication if all Managers or Members, as the case may be, participating in such meeting can hear one another for the entire discussion of the matters to be voted upon. Participation in a meeting pursuant to this Section 6.2(i) shall constitute presence in person at such meeting.

(j) **Waiver of Notice.** When any notice is required to be given to any Manager or Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

**6.3 Action Without a Meeting.** Action required or permitted to be taken at a meeting of the Board of Managers or the Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed: (a) in the case of Board of Managers action, by all of the Managers, or (b) in the case of Member action, by all of the Members. Action taken under this Section 6.3 is effective when the required number of Managers or Members, as the case may be, have signed the consent, unless the consent specifies a different effective date.

## SECTION 7
## TRANSFERS OF INTERESTS; ADDITIONAL AND SUBSTITUTED MEMBERS

**7.1 Restriction on Transfer.**

(a) Except as otherwise permitted by this Agreement or a Buy-Sell Agreement (a "**Permitted Transfer**"), no Transferor may Transfer all or any portion of its Membership Interest or Transferee Interest or any rights therein. A Transferee shall be bound by any restrictions on its Transferee Interest set forth in this Agreement (or any

Buy-Sell Agreement as if it were a part hereof), but shall have no rights as a Member hereunder or thereunder except as expressly set forth herein or therein. In the event that any Transferor pledges or otherwise encumbers all or any part of its Membership Interest or Transferee Interest as security for the payment of a Debt, any such pledge or hypothecation shall be made pursuant to a pledge or hypothecation agreement that requires the pledgee or secured party to be bound by all of the terms and conditions of this Section 7. Each Transferor hereby acknowledges the reasonableness of the restrictions on Transfer imposed by this Agreement in view of the Company purposes and the relationships of the Members. Accordingly, the restrictions on Transfer contained herein shall be specifically enforceable.

(b) Notwithstanding the foregoing, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the interest Transferred shall be automatically designated as a Transferee Interest limited to the allocations and distributions as provided by this Agreement with respect to Transferee Interests, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the Transferor or Transferee of such interests may have to the Company.

**7.2 Additional Members.** No Person shall be admitted to the Company as an Additional Member without first obtaining the affirmative vote of the Members holding at least a majority of all Units held by all Members.

**7.3 Admission of Transferee as a Substituted Member.** Subject to the other provisions of this Agreement or any Buy-Sell Agreement, no Transferee may be admitted to the Company as a Substituted Member without first obtaining the affirmative vote of either the Board of Managers (other than a Manager who is also a Transferor), or if the Transferor is the sole Manager, those Members (other than the Transferring Member) holding at least a majority of all Units held by all such Members.

**7.4 Further Conditions.** As a further condition to being admitted as an Additional Member or Substituted Member, such Person shall execute, acknowledge and deliver to the Company such instruments as the Board of Managers may deem necessary or advisable to effect the admission of such Person as an Additional Member or Substituted Member, including (without limitation) the written acceptance and adoption by such Person of the provisions of this Agreement and to become a party to (and subject to all of the rights and obligations set forth in) any Buy-Sell Agreement. The Board of Managers may also require such Person to pay or reimburse the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the Person as an Additional Member or Substituted Member.

**7.5 Distributions and Allocations in Respect to Transferred and Additional Interests.**



JEM

(a) If any Membership Interest or Transferee Interest is sold (including an issuance by the Company), assigned, or Transferred during any Fiscal Year in compliance with the provisions of this Agreement or any other agreement of the Members, Profits, Losses, each item thereof, and all other items attributable to the Units in the Company for such Fiscal Year shall be divided and allocated between the Members, including the Transferor and the Transferee, by taking into account their varying interests during such Fiscal Year in accordance with Code § 706(d), using any conventions permitted by law and selected by the Board of Managers. All distributions with respect to a Transferred Interest made on or before the date of such Transfer shall be made to the Transferor, and all distributions thereafter shall be made to the Transferee.

(b) Solely for purposes of making such allocations and distributions, the Company shall recognize such Transfer or additional Membership Interest not later than the end of the calendar month during which it is given notice of such Transfer or issuance, provided that, if the Company is given notice of a Transfer or issuance at least ten (10) Business Days prior to the Transfer or issuance the Company shall recognize such Transfer or issuance as the date of such Transfer or issuance, and provided further that, if the Company does not receive a notice stating the date such interests were Transferred and such other information as the Board of Managers may reasonably require within thirty (30) days after the end of the Fiscal Year during which the Transfer occurs, then all such items shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company, was the owner of the Membership Interest or Transferee Interest on the last day of the Fiscal Year during which the Transfer occurs.

(c) Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 7.5, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any interest.

## SECTION 8
## ACTION FOR PARTITION

**8.1 Waiver of Partition.** No Member shall, either directly or indirectly, take any action to require partition, file a bill for Company accounting or appraisement of the Company or of any of its assets or properties or cause the sale of any Company property, and notwithstanding any provisions of applicable law to the contrary, each Member (and each of its legal representatives, successors, or assigns) hereby irrevocably waives any and all rights he may have to maintain any action for partition or to compel any sale with respect to its Company interest, or with respect to any assets or properties of the Company, except as expressly provided in this Agreement.

## SECTION 9
## DISSOLUTION AND WINDING UP

**9.1 Dissolution.** The Company shall only dissolve and commence winding up and liquidating upon the first to occur of any of the following ("Liquidating Events"):

(a) The happening of any event that makes it unlawful, impossible, or impractical to carry on the business of the Company; or

(b) The written consent of those Members holding at least a majority of all Units held by all Members to dissolve, wind up, and liquidate the Company.

Upon the occurrence of a Liquidating Event, the Company shall wind up its affairs in accordance with Section 9.3.

**9.2 Liquidator.**

**(a) Definition.** The "Liquidator" shall mean (i) the Board of Managers, if there is one, or (ii) if there is no Manager, then the Liquidator shall be appointed by the affirmative vote of the Members holding a majority of all Units held by all Members.

**(b) Fees.** In the event that the Liquidator is other than a Manager, the Company is authorized to pay a reasonable fee to the Liquidator for its services performed pursuant to this Section 9 and to reimburse the Liquidator for its reasonable costs and expenses incurred in performing those services.

**(c) Indemnification.** In the event that the Liquidator is a Person other than a Manager, for purposes of Section 5.9 the Liquidator shall be deemed to be an officer of the Company.

**9.3 Winding Up.** Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors and Members and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs. To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company Property has been distributed pursuant to this Section 9.3 and all requirements for dissolution by Colorado law have been fulfilled. The Liquidator shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and property, shall cause the Company Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order of priority:

(a) First, to creditors, including Members who are creditors, in the order of priority as provided by law; provided, however, that the Liquidator shall first pay, to the extent permitted by law, liabilities with respect to which any Member is or may be personally liable; and provided further, however, that the Company shall not be required to repay any indebtedness which has a remaining term in excess of one (1) year and to which the Members consent to take their distributions subject, or which the Members may, and agree to, assume;

(b) Second, to the setting up of such reserves as the Liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with Company business; provided, however, that any such reserves will be held by the Liquidator in trust for the purposes of disbursing such reserves in payment of any of such contingencies and, at the expiration of such period as the Liquidator shall deem advisable to distribute the balance thereafter remaining in the manner provided below; and

(c) The balance, if any, to the Members and Transferees in proportion to their Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

**9.4 Compliance With Certain Requirements of Regulations; Deficit Capital Accounts.** In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Section 9 to the Members and Transferees who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2). If any Member or Transferee has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member or Transferee shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever. In the discretion of the Liquidator, a pro rata portion of the distributions that would otherwise be made to the Members and Transferees pursuant to this Section 9 may be:

(a) Distributed to a trust established for the benefit of the Members and Transferees for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company. The assets of any such trust shall be distributed to the Members and Transferees from time to time, in the reasonable discretion of the Liquidator, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members and Transferees pursuant to Section 9.3; or

(b) Withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members and Transferees as soon as practicable.

The portion of the distributions that would otherwise have been made to each of the Members and Transferees that is instead distributed to a trust pursuant to Section 9.4(a) or withheld to provide a reserve pursuant to Section 9.4(b) shall be determined in the same manner as the expense or deduction would have been allocated if the Company had realized an expense equal to such amounts immediately prior to distributions being made pursuant to Section 9.3.



JFM

**9.5 Deemed Contribution and Liquidation.** Notwithstanding any other provision of this Section 9, in the event the Company is liquidated within the meaning of Regulations Section 1.704-l(b)(2)(ii)(g) but no Liquidating Event has occurred, the Company Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up. Instead, solely for federal income tax purposes, the Company shall be deemed to have contributed the Company Property in kind to a new limited liability company, which shall be deemed to have assumed and taken subject to all Company liabilities, in exchange for interests in the new limited liability company. Immediately thereafter, the Company shall be deemed to have made liquidating distributions of interests in the new limited liability company to its Members and Transferees, all in accordance with their respective Capital Accounts.

**9.6 Rights of Members and Transferees.** Except as otherwise provided in this Agreement:

(a) Each Member and Transferee shall look solely to the assets of the Company for the return of its Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company; and

(b) No Member or Transferee shall have priority over any other Member and Transferee as to the return of its Capital Contributions, distributions, or allocations.

**9.7 Character of Liquidating Distributions.** All payments made in liquidation of the interest of a retiring Member or Transferee pursuant to this Section 9 shall be made in exchange for the interest of such Member or Transferee in Company Property pursuant to Code § 736(b)(1), including the interest of such Member or Transferee in Company goodwill.

**9.8 Filings.** The Company shall file all documents necessary or appropriate with all governmental authorities to evidence and carry out the dissolution of the Company.

## SECTION 10
## TAXES

**10.1 Partnership Classification.** The Members intend for the Company to be treated as a partnership for federal income tax purposes pursuant to the provisions of Subchapter K of the Code and no construction shall be given nor any action taken which would jeopardize this treatment. Further, the Board of Managers are directed and empowered to take whatever action is necessary to continue the Company's partnership classification under the rules of Regulation Sections 301.7701-2 and 301.7701-3.

**10.2 Tax Information.** Necessary tax information shall be delivered to each Member and Transferee as soon as practicable after the end of each Allocation Year of the Company but not later than six (6) months after the end of each Allocation Year. The

Board of Managers shall file the tax returns for the Company prepared in accordance with the Code and Regulations.

**10.3 Code § 754 Election and Other Company Elections.** The Board of Managers shall make any and all elections for federal, state, and local tax purposes including, without limitation, any election, if permitted by applicable law: (a) to adjust the basis of Property pursuant to Code §§ 754, 734(b), and 743(b), or comparable provisions of state or local law, in connection with transfers of interests in the Company and Company distributions; (b) with the consent of the Members holding a majority of all Units held by all Members, to extend the statute of limitations for assessment of tax deficiencies against Members and Transferees with respect to adjustments to the Company's federal, state, or local tax returns; and (c) to the extent provided in Code §§ 6221 through 6231, to represent the Company, the Members and the Transferees before taxing authorities or courts of competent jurisdiction in tax matters affecting the Company, the Members, and the Transferees in their capacities as Members or Transferees, and to file any tax returns and to execute any agreements or other documents relating to or affecting such tax matters, including agreements or other documents that bind the Members and Transferees with respect to such tax matters or otherwise affect the rights of the Company, Members, and Transferees.

**10.4 Taxes of Taxing Jurisdictions.** To the extent that the laws of any Taxing Jurisdiction requires, each Member and Transferee required to do so by the Board of Managers will submit an agreement indicating that the Member or Transferee will make timely income tax payments to the Taxing Jurisdiction and that the Member or Transferee accepts personal jurisdiction of the Taxing Jurisdiction with regard to the collection of income taxes attributable to the Member's or Transferee's income, and interest and penalties assessed on such income. If the Member or Transferee fails to provide such agreement, the Company may withhold and pay over to such Taxing Jurisdiction the amount of tax, penalty and interest determined under the laws of the Taxing Jurisdiction with respect to such income. Any such payments with respect to the income of a Member or Transferee shall be treated as a distribution for purposes of Section 4. The Board of Managers may, where permitted by the rules of any Taxing Jurisdiction, file a composite, combined or aggregate tax return reflecting the income of the Company and pay the tax, interest and penalties of some or all of the Members and Transferees on such income to the Taxing Jurisdiction, in which case the Company shall inform the Members and Transferees of the amount of such tax, interest and penalties so paid.

**10.5 Tax Matters Partner.**

**(a) Designation.** John R. McKowen is hereby designated the Tax Matters Partner (as defined in Code § 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including resulting judicial and administrative proceedings. The Tax Matters Partner shall oversee the Company tax affairs in the overall best interests of the Company.



JRM

**(b) Communications.** The Tax Matters Partner shall, within five (5) days of receipt thereof, forward to each Member and Transferee a photocopy of any correspondence relating to the Company received from any taxing authorities. The Tax Matters Partner shall, within five (5) days thereof, advise each Member and Transferee in writing of the substance of any conversation held with any representative of such taxing authorities.

**(c) Accountants and Lawyers.** Any reasonable costs incurred by the Tax Matters Partner for retaining accountants and/or lawyers on behalf of the Company in connection with any taxing authority proceeding involving the Company shall be expenses of the Company. Any accountants and/or lawyers retained by the Company in connection with a tax authority proceeding involving the Company shall be selected by the Tax Matters Partner and the fees therefor shall be expenses of the Company.

## SECTION 11
## MISCELLANEOUS

**11.1 Notices.** Any notices, requests, demands, claims or other communications required or permitted hereunder shall be in writing and shall be mailed by registered or certified mail (in each case with return receipt requested), postage prepaid, or delivered by hand or by messenger or by email, addressed as set forth below or to such other address as shall have been furnished in writing to the Person initiating the notice or communication. Any notice or other communication so addressed and mailed, postage prepaid, by registered or certified mail (in each case with return receipt requested) shall be deemed to be delivered and given two Business Days after it was mailed. Any notice so addressed and otherwise delivered shall be deemed to be given when actually received by the addressee at the address set forth below, or to such other address as shall have been furnished in writing to the Person initiating the notice or communication:

(a) If to the Company, to the Company at its principal place of business;

(b) If to a Manager, to the Company's principal place of business; and

(c) If to a Member, to the address set forth below his signature to this Agreement.

**11.2 Binding Effect.** Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective heirs, legatees, legal representatives, successors, transferees, and assigns.

**11.3 Construction.** Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. The terms of this Agreement are intended to embody the economic relationship among the Members and shall not be subject to modification by, or be conformed with,

any actions by the Internal Revenue Service except as this Agreement may be explicitly so amended and except as may relate specifically to the filing of tax returns.

**11.4 Time.** Time is of the essence with respect to this Agreement.

**11.5 Headings.** Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

**11.6 Severability.** Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. If any provision of this Agreement becomes or is found to be illegal or unenforceable for any reason, such clause or provision must first be modified to the extent necessary to make this Agreement legal and enforceable and then if necessary, second, severed from the remainder of the Agreement to allow the remainder of the Agreement to remain in full force and effect.

**11.7 Incorporation by Reference.** Every exhibit, schedule, annex and other appendix attached to this Agreement and referred to herein is incorporated in this Agreement by reference unless this Agreement expressly otherwise provides.

**11.8 Further Action.** Each Member agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

**11.9 Governing Law; Jurisdiction; Venue.** The laws of the State of Colorado shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members. The parties agree that the District Court of the City and County of Denver, Colorado, shall have exclusive jurisdiction, including *in personam* jurisdiction, and shall be the exclusive venue for any and all controversies and claims arising out of or relating to this Agreement or a breach thereof, except as otherwise unanimously agreed by the parties. Each party understands that each has a constitutional right of due process which guarantees that each party must have minimum contacts with the State of Colorado prior to the exercise by such court of *in personam* jurisdiction over any party and said constitutional right is hereby expressly waived by each party.

**11.10 Counterpart and Facsimile/Electronic Execution.** This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document. All counterparts shall be construed together and shall constitute one agreement. This Agreement may be executed and delivered by facsimile or other electronically transmitted signature, with the same effect as if the signing Persons had delivered the original thereof.

**11.11 Sole and Absolute Discretion.** Except as otherwise provided in this Agreement, all actions which any Member may take as a Member pursuant to this Agreement may be taken and made at the sole and absolute discretion of such Member.

**11.12 Specific Performance.** Each Member agrees with the other Members that the other Members would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms and that monetary damages would not provide an adequate remedy in such event. Accordingly, it is agreed that, in addition to any other remedy to which the nonbreaching Members may be entitled, at law or in equity, the nonbreaching Members shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and specifically to enforce the terms and provisions hereof in any action instituted in any court of the United States or any state thereof having subject matter jurisdiction thereof.

**11.13 No Partnership Intended for Nontax Purposes.** The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Uniform Partnership Act of 1997, as amended, or the Colorado Uniform Limited Partnership Act of 1981, as amended. The Members do not intend to be partners one to another, or partners as to any third party. To the extent any Member by word or action, represents to another person that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability by reason of such wrongful representation.

**11.14 Rights of Creditors and Third Parties Under Operating Agreement.** This Agreement is entered into by and among the Members for the exclusive benefit of the Company, its Managers, its Members, and their successors and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other person. Except, and only to the extent provided by applicable statute, no such creditor or third party shall have any rights under this Agreement or any agreement between the Company and any Member with respect to any Capital Contributions or otherwise.

**11.15 Attorneys' Fees.** If any party shall commence any action or proceeding against another party in order to enforce the provisions hereof, or to recover damages as the result of the alleged breach of any of the provisions hereof, the prevailing party therein shall be entitled to recover all reasonable costs incurred in connection therewith, including, but not limited to, reasonable attorneys' fees.

**[THIS REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS]**



JPM

**IN WITNESS WHEREOF**, this Agreement has been executed by or on behalf of the Members effective as of the date first above written.

**MEMBERS:**

Name: John R. McKowen
Address: 456 Madison Street
Denver, Colorado 80206
Email: john@johnmckowen.com

**Annex I**
**to**
**Operating Agreement**
**of**
**McGrow, LLC**

**Definitions**

"**Act**" means the Colorado Limited Liability Company Act, as set forth in C.R.S. Sections 7-80-101 through 7-80-1101, as amended from time to time (or any corresponding provisions of succeeding law).

"**Additional Member**" means any Person who is admitted to the Company as a Member, and who acquires its Membership Interest in exchange for services or Capital Contributions and not by Transfer from another Person, and including a then existing Member to the extent that such Member's number of Units is increased as a result of such acquisition.

"**Adjusted Capital Account Deficit**" means, with respect to any Member or Transferee, the deficit balance, if any, in such Person's Capital Account as of the end of the relevant Allocation Year, after giving effect to the following adjustments:

(i) Credit to such Capital Account any amounts which such Member or Transferee is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

"**Affiliate**" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, manager, member, or general partner of such Person, or (iii) any Person who is an officer, director, manager, member, general partner, or trustee of any Person described in clauses (i) through (ii) of this sentence. For purposes of this definition, the term "controlling," "controlled by," or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise.

"**Agreement**" means this Operating Agreement, as amended from time to time. All references in this Agreement to "Section" or "Sections" are to section or sections of this Agreement unless otherwise specified. All references in this Agreement to "Annex" or "Exhibit" are to an annex or exhibit attached to this Agreement unless otherwise specified.

"**Allocation Year**" means (i) the period commencing on the effective date of this Agreement and ending on December 31, (ii) any subsequent period commencing on January 1 and ending on the following December 31, or (iii) any portion of the period described in clause (ii) for which the Company is required to allocate Profits, Losses and other items of Company income, gain, loss or deduction pursuant to Section 3.

"**Articles of Organization**" has the meaning set forth in Section 1.2.

"**Bankruptcy**" means, with respect to any Person, a "Voluntary Bankruptcy" or an "Involuntary Bankruptcy." A "Voluntary Bankruptcy" means, with respect to any Person, (a)(i) the inability of such Person generally to pay its debts as such debts become due, (ii) the failure of such Person generally to pay its debts as such debts become due, or (iii) an admission in writing by such Person of its inability to pay its debts generally or a general assignment by such Person for the benefit of creditors; (b) the filing of any petition or answer by such Person seeking to adjudicate it a bankrupt or insolvent, or seeking for itself any liquidation, winding up, reorganization, arrangement, adjustment, protection, relief, or composition of such Person or its debts under any law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking, consenting to, or acquiescing in the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for such Person or for any substantial part of its property; or (c) corporate action taken by such Person (if an entity) to authorize any of the actions set forth above. An "Involuntary Bankruptcy" means, with respect to any Person, without the consent or acquiescence of such Person, the entering of an order for relief or approving a petition for relief or reorganization or any other petition seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or other similar relief under any present or future bankruptcy, insolvency or similar statute, law or regulation, or the filing of any such petition against such Person which petition shall not be dismissed within ninety (90) days, or, without the consent or acquiescence of such Person, the entering of an order appointing a trustee, custodian, receiver, or liquidator of such Person or of all or any substantial part of the property of such Person which order shall not be dismissed within sixty (60) days.

"**Board of Managers**" means the method by which Managers of the Company act as provided in this Agreement, including without limitation Section 5.1.

"**Business Day**" means a day of the year on which banks are not required or authorized to close in Denver, Colorado.

"**Buy-Sell Agreement**" means an agreement between one or more of the Members and the Company imposing restrictions on the Transfer of Membership and/or Transferee Interests.

"**Capital Account**" means, with respect to any Member or Transferee, the Capital Account maintained for such Person in accordance with the following provisions:

(i) To each Person's Capital Account there shall be credited such Person's Capital Contributions, such Person's distributive share of Profits and any items in the nature of income or gain which are specially allocated pursuant to the provisions regarding Special Allocations or Curative Allocations on Annex II, and the amount of any Company liabilities assumed by such Person or which are secured by any Property distributed to such Person.

(ii) To each Person's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Property distributed to such Person pursuant to any provision of this Agreement, such Person's distributive share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to the provisions regarding Special Allocations or Curative Allocations on Annex II, and the amount of any liabilities of such Person assumed by the Company or which are secured by any property contributed by such Person to the Company.

(iii) In the event all or a portion of an interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(iv) In determining the amount of any liability for purposes of subparagraphs (i) and (ii), there shall be taken into account Code § 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Regulations. In the event the Board of Managers shall determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto (including, without limitation, debits or credits relating to liabilities which are secured by contributions or distributed property or which are assumed by the Company or its Members), are computed in order to comply with such Regulations, the Board of Managers may make such modification, provided that it is not likely to have a material effect on the amounts distributed to any Person pursuant to Section 9 upon the dissolution of the Company. The Board of Managers also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and Transferees and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)(g), and (ii)



JLM

make any appropriate modifications in the event unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b), provided that, to the extent that any such adjustment is inconsistent with other provisions of this Agreement and would have a material adverse effect on any Member, such adjustment shall require the consent of such Member.

"**Capital Contributions**" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any property (other than money) contributed to the Company by such Member (or its predecessor in interest) with respect to the interest in the Company held by such Person. The principal amount of a promissory note which is not readily traded on an established securities market and which is contributed to the Company by the maker of the note (or a Person related to the maker of the note within the meaning of Regulations Section 1.704-l(b)(2)(ii)(c)) shall not be included in the Capital Account of any Person until the Company makes a taxable disposition of the note or until (and to the extent) principal payments are made on the note, all in accordance with Regulations Section 1.704-1(b)(2)(iv)(d)(2).

"**Cash Available for Distribution**" means total cash income from Company operations during any given accounting period plus cash proceeds, if any, from the sale, refinancing, liquidation or other dispositions of Company Property, reduced by the sum of, among other things, all current expenses of the Company, as well as any allowances or reserves for contingencies or for repair to and maintenance of properties and for fees payable to the Board of Managers and adequate provisions for payment of all outstanding current obligations of the Company including repayment of any loans made by any Member.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"**Company**" means the Company formed pursuant to the Articles of Organization and this Agreement.

"**Company Minimum Gain**" has the meaning set forth in Sections 1.704-2(b)(2) and 1.704-2(d) of the Regulations.

"**Debt**" means (i) any indebtedness for borrowed money or deferred purchase price of property or evidenced by a note, bonds, or other instruments, (ii) obligations as lessee under capital leases, (iii) to the extent of the fair market value of any asset owned or held by such Person, obligations secured by any mortgage, pledge, security interest, encumbrance, lien or charge of any kind existing on any asset owned or held by the Company whether or not the Company has assumed or become liable for the obligations secured thereby, (iv) any obligation under any interest rate swap agreement (the amount of such obligation shall be deemed to be the amount that would be required to be paid by such Person to sell, unwind or terminate the swap transaction), (v) obligations under accounts payable and (vi) obligations under direct or indirect guarantees of (including obligations (contingent or otherwise) to assure a creditor against loss in respect of) indebtedness or obligations of the kinds referred to in clauses (i), (ii), (iii), (iv) and (v)



JRM

above, provided that indebtedness shall not include obligations in respect of any accounts payable that are incurred in the ordinary course of the Company's business and are not delinquent or are being contested in good faith by appropriate proceedings.

"**Depreciation**" means, for each Allocation Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Allocation Year, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Allocation Year, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Allocation Year bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Allocation Year is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"**Fiscal Year**" means (i) the period commencing on the effective date of this Agreement and ending on December 31, and (ii) any subsequent period commencing on January 1 and ending on the earlier to occur of (A) the following December 31 or (B) the date on which the Company Property is distributed pursuant to Section 9.3 and all requirements for dissolution by Colorado law have been fulfilled.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i) The initial Gross Asset Value of any asset contributed by a Member to the Company shall be the gross fair market value of such asset, as determined by the contributing Member and the Board of Managers, provided that, if the contributing Member is a Manager, the determination of the fair market value of a contributed asset shall require the affirmative vote of the Members holding a majority of the Units held by all Members;

(ii) The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values, as determined by the Board of Managers, as of the following times: ((A) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (B) in connection with the grant of an interest in the Company other than a de minimus interest as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a membership capacity or by a new Member acting in a membership capacity or in anticipation of being a member; (C) the distribution by the Company to a Member or Transferee of more than a de minimis amount of Property as consideration for an interest in the Company; (D) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); (E) under generally accepted industry accounting practices, provided all of the Company's property (excluding money) consists of stock, securities, commodities, options, warrants, futures, or similar

instruments that are readily tradable on an established securities market; and (F) at such other times as provided in the Regulations under Code § 704; provided that the provisions of this subsection (ii) shall at all times be only in compliance with the Regulations provided under Code § 704 and further provided that adjustments pursuant to clauses (A) and (B) and (C) above shall be made only if the Board of Managers reasonably determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members and Transferees in the Company;

(iii) The Gross Asset Value of any Company asset distributed to any Member or Transferee shall be adjusted to equal the gross fair market value of such asset on the date of distribution as determined by the distributee and the Board of Managers, provided that, if the distributee is a Manager, the determination of the fair market value of the distributed asset shall require the affirmative vote of the Members holding a majority of the Units held by all Members; and

(iv) The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code § 734(b) or Code § 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m) and subparagraph (vi) of the definition of "Profit" and "Losses" or item (g) regarding Special Allocations on Annex II; provided, however, that Gross Asset Values shall not be adjusted pursuant to this subparagraph (iv) to the extent the Board of Managers determine that an adjustment pursuant to subparagraph (ii) is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv), such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses. For purposes of this definition of Gross Asset Value, a Capital Contribution or distribution shall be considered de minimis if its value is less than $5,000.

"**Issuance Items**" has the meaning set forth in item (h) regarding Special Allocations on Annex II.

"**Lien**" means any mortgage, pledge, hypothecation, assignment, deposit, arrangement, encumbrance, lien (statutory or other), preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the Uniform Commercial Code (as in effect from time to time in the relevant jurisdiction), or any other similar recording or notice statute, and any lease having substantially the same effect as any of the foregoing.



JRM

(v) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Allocation Year, computed in accordance with the definition of "Depreciation";

(vi) To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code § 734(b) or Code § 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(4) to be taken into account in determining Capital Accounts as a result of a distribution other than in complete liquidation of a Member's interest, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profits or Losses; and

(vii) Notwithstanding any other provision of this definition of "Profits" and "Losses", any items which are specially allocated pursuant to the provisions regarding Special Allocations or Curative Allocations on Annex II shall not be taken into account in computing Profits or Losses.

The amounts of the items of Company income, gain, loss or deduction available to be specially allocated pursuant to the provisions of Annex II regarding Special Allocations and Curative Allocations shall be determined by applying rules analogous to those set forth in subparagraphs (i) through (vi) above.

"**Property**" means all real and personal property acquired by the Company and any improvements thereto, and shall include both tangible and intangible property.

"**Regulations**" means the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"**Regulatory Allocations**" has the meaning set forth on Annex II.

"**Sharing Ratio**" means the number of Units held by a Member or Transferee divided by the total number of outstanding Units held by all Members and Transferees.

"**Substituted Member**" means any Person admitted to the Company as a Member and who acquires its Membership Interest by Transfer from another Person (other than the Company).

"**Tax Matters Partner**" means that Person designated as the Tax Matters Partner pursuant to Section 10.5.

"**Taxing Jurisdiction**" means any state, local or foreign government that collects tax, interest or penalties, however designated, on any Member's or Transferee's share of the income or gain attributable to the Company.



JFM

"**Transfer**" means, as a noun, any voluntary or involuntary transfer, sale, pledge, hypothecation, or any other grant of a security interest in, or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, pledge, hypothecate, grant a security interest in, or otherwise dispose of.

"**Transferees**" mean one (1) or more Persons who acquire by a Transfer all or part of any Membership Interest or Transferee Interest. Such Persons, however, shall only own a Transferee Interest unless such Persons are admitted as Substituted Members in accordance with the terms of this Agreement.

"**Transferee Interest**" means as to any Transferee, its Capital Account, Units, rights to distributions, allocations of Profits and Losses, but not including Management Rights which are rights accorded only to Persons who are Members.

"**Transferor**" means a Member or Transferee who Transfers, or who proposes to Transfer, all or any portion of its Membership Interest or Transferee Interest, as the case may be.

"**Units**" are a measure of ownership of the Company and mean as to any Member, the number of Units shown on Exhibit A opposite its name and, as to any Transferee or Substituted Member or Additional Member, the number of Units acquired by it upon becoming a Member or Transferee, as the same may be adjusted from time to time to reflect Transfers of Units or the admission of Additional Members. Except as otherwise expressly provided in this Agreement, each Unit is of the same class as each other Unit and has the same rights as each other Unit.

**Annex II**
**to**
**Operating Agreement**
**of**
**McGrow, LLC**

**Allocations**

The provisions of this Annex II shall be modified as necessary to comply with the applicable provisions of the Code and the Regulations promulgated thereunder.

**Special Allocations.**

(a) **Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-2(f) of the Regulations, notwithstanding any other provision of Section 3 and this Annex II, if there is a net decrease in Company Minimum Gain during any Allocation Year, each Member and Transferee shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's or Transferee's share of the net decrease in Company Minimum Gain, determined in accordance with Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member or Transferee pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Regulations. This item (a) is intended to comply with the minimum gain chargeback requirement in Section 1.704-1(f) of the Regulations and shall be interpreted consistently therewith.

(b) **Member Minimum Gain Chargeback.** Except as otherwise provided in Section 1.704-1(i)(4) of the Regulations, notwithstanding any other provision of Section 3 and this Annex II, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Allocation Year, each Member and Transferee who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Regulations, shall be specially allocated items of Company income and gain for such Allocation Year (and, if necessary, subsequent Allocation Years) in an amount equal to such Member's or Transferee's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member and Transferee pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Regulations. This item (b) is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Regulations and shall be interpreted consistently therewith.

(c) **Qualified Income Offset.** In the event any Member or Transferee unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year) shall be specially allocated to each such Member and Transferee in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the Adjusted Capital Account Deficit of such Member or Transferee as quickly as possible, provided that an allocation pursuant to this item (c) shall be made only if and to the extent that such Member or Transferee would have an Adjusted Capital Account Deficit after all other allocations provided for in Section 3 and this Annex II have been tentatively made as if this item (c) were not in the Agreement.

(d) **Gross Income Allocation.** In the event any Member or Transferee has a deficit Capital Account at the end of any Company Allocation Year which is in excess of the sum of (i) the amount such Member or Transferee is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member or Transferee is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), each such Member or Transferee shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this item (d) shall be made only if and to the extent that such Member or Transferee would have a deficit Capital Account in excess of such sum after all other allocations provided for in Section 3 and this Annex II have been made as if item (c) and this item (d) were not in the Agreement.

(e) **Nonrecourse Deductions.** Nonrecourse Deductions for any Allocation Year shall be specially allocated among the Members and Transferees in proportion to their Sharing Ratios.

(f) **Member Nonrecourse Deductions.** Any Member Nonrecourse Deductions for any Allocation Year shall be specially allocated to the Member or Transferees who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Regulations Section 1.704-2(i)(1).

(g) **Code § 754 Adjustment.** To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code § 734(b) or Code § 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m)(2) or Regulations Section 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as the result of a distribution to a Member or Transferee in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Members and Transferees in accordance with their interests in the Company in the event Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member or

Transferee to whom such distribution was made in the event Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.

(h) **Allocations Relating to Taxable Issuance of Membership Interests.** Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of an interest in the Company to a Member (the "Issuance Items") shall be allocated among the Members and Transferees so that, to the extent possible, the net amount of such Issuance Items, together with all other allocations under this Agreement to each Member and Transferee, shall be equal to the net amount that would have been allocated to each such Member or Transferee if the Issuance Items had not been realized.

**Curative Allocations.** The allocations set forth in items (a), (b), (c), (d), (e), (f) and (g) regarding Special Allocations on Annex II (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this paragraph. Therefore, notwithstanding any other provision of Section 3 and this Annex II (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's and Transferee's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member or Transferee would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 3.1 and 3.2. In exercising its discretion under this paragraph, the Board of Managers shall take into account future Regulatory Allocations under items (a) and (b) regarding Special Allocations on Annex II that, although not yet made, are likely to offset other Regulatory Allocations previously made under items (e) and (f) regarding Special Allocations on Annex II.

**Other Allocation Rules.**

(a) **When Allocations Are Made.** Profits, Losses and any other items of income, gain, loss or deduction shall be allocated to the Members and Transferees pursuant to Section 3 and this Annex II as of the last day of each Allocation Year; provided that Profits, Losses and such other items shall also be allocated at such times as the Gross Asset Values of Company Property are adjusted pursuant to subparagraph (ii) of the definition of "Gross Asset Value".

(b) **Varying Interest.** For purposes of determining the Profits, Losses, or any other items allocable to any period, Profits, Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the Board of Managers using any permissible method under Code § 706 and the Regulations thereunder.

(c) **Consistent Reporting of Allocations.** The Members and Transferees are aware of the income tax consequences of the allocations made by



JPM

McGrow
Greenhouse Consultants

January 30, 2017

Jon and Linda Gruber
300 Tamal Plaza, Suite 280
Corte Madera, CA 94925

Dear Jon and Linda,

Thank you for your investment of $35,849 in the McGrow Membership Offering. You have sent the initial investment of $11,830 and your second agreement is due on February 1, 2017.

Enclosed are the following documents:

1. A executed copy of the Subscription Agreement.

2. A certificate representing the membership interests issued to you by McGrow, LLC. Please keep this certificate in a safe, secured place.
3.
4. An Operating Agreement.

Thank you for your participation. If you have any questions please call or send an email to john@mcgrowllc.com.

Sincerely,

John R. McKowen

John R. McKowen, CEO and Managing Member
GrowCo, LLC

McGrow
Greenhouse Consultants

January 30, 2017

Thomas Prasil Trustee Thomas Prasil Trust U/A/D 11-26-2003
3935 E. San Miguel Ave.
Paradise Valley, AZ 85253

Dear Tom,

Thank you for your investment of $46,135 in the McGrow Membership Offering. Enclosed are the following documents:

1. A executed copy of the Subscription Agreement.

2. A certificate representing the membership interests issued to you by McGrow, LLC. Please keep this certificate in a safe, secured place.

3. An Operating Agreement

Thank you for your participation. If you have any questions please call or send an email to john@mcgrowllc.com.

Sincerely,

John R. McKowen

John R. McKowen, CEO and Managing Member
GrowCo, LLC

NUMBER 4

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 1,940,040

# McGrow, LLC

## Membership Certificate

This Certifies that I. Wistar Morris

is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 1st day of January, 20 17, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO, NEW YORK

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO MCGROW, LLC THAT SUCH REGISTRATION IS NOT REQUIRED.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG MCGROW, LLC AND ITS MEMBERS (THE "LLC AGREEMENT"). MCGROW LLC MAINTAINS A COPY OF THE LLC AGREEMENT ON FILE AT ITS PRINCIPAL OFFICE AND WILL FURNISH A COPY OF THE LLC AGREEMENT, WITHOUT CHARGE, TO THE HOLDERS OF THIS CERTIFICATE UPON WRITTEN REQUEST.

- NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE LLC AGREEMENT.
- MCGROW, LLC MAY HAVE MORE THAN ONE THAN ONE CLASS OF MEMBERSHIP UNITS AUTHORIZED TO BE ISSUED AND THE PREFERENCES, VOTING POWERS, QUALIFICATIONS AND SPECIAL AND RELATIVE RIGHTS OF THE MEMBERSHIP UNITS IN EACH SUCH CLASS ARE SET FORTH IN THE LLC AGREEMENT.

---

**Assignment**

*For Value Received* ______________________ *hereby sells assigns and transfers to* ______________________ *a total of* ______________ *Units represented by this certificate and does hereby irrevocably constitute and appoint* ______________________ *as Attorney to transfer such Units on the books of McGrow, LLC with full power of in the premises.*

*Dated* ______________, *20*____

______________________________

*(signature corresponding exactly to name of holder appearing on face of certificate)*

*In presence of.*

______________________________

*Name (print or type):*

NUMBER 3

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 3,333,333

# McGrow, LLC

## Membership Certificate

This Certifies that Timothy J Beall is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 1st day of January, 20 17, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen – CEO, Managing Member

Timothy J. Beall – COO, Managing Member

HURCO. NEW YORK

NUMBER 6

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 946,361

# McGrow, LLC

## Membership Certificate

This Certifies that Jon D and Linda W Gruber Trust is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 1st day of January, 20 17, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO. NEW YORK

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO MCGROW, LLC THAT SUCH REGISTRATION IS NOT REQUIRED.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG MCGROW, LLC AND ITS MEMBERS (THE "LLC AGREEMENT"). MCGROW LLC MAINTAINS A COPY OF THE LLC AGREEMENT ON FILE AT ITS PRINCIPAL OFFICE AND WILL FURNISH A COPY OF THE LLC AGREEMENT, WITHOUT CHARGE, TO THE HOLDERS OF THIS CERTIFICATE UPON WRITTEN REQUEST.

- NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE LLC AGREEMENT.
- MCGROW, LLC MAY HAVE MORE THAN ONE THAN ONE CLASS OF MEMBERSHIP UNITS AUTHORIZED TO BE ISSUED AND THE PREFERENCES, VOTING POWERS, QUALIFICATIONS AND SPECIAL AND RELATIVE RIGHTS OF THE MEMBERSHIP UNITS IN EACH SUCH CLASS ARE SET FORTH IN THE LLC AGREEMENT.

---

**Assignment**

*For Value Received ______________________ hereby sells assigns and transfers to ______________________ a total of ____________ Units represented by this certificate and does hereby irrevocably constitute and appoint ______________________ as Attorney to transfer such Units on the books of McGrow, LLC with full power of in the premises.*

*Dated ____________, 20___*

______________________________

*(signature corresponding exactly to name of holder appearing on face of certificate)*

*In presence of.*

______________________________

*Name (print or type):*

NUMBER 8

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 1,230,269

# McGrow, LLC

## Membership Certificate

This Certifies that Thomas Prasil Trustee Thomas Prasil U/A/D 11-26-2003 is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.

In Witness Whereof the Limited Liability Company caused this Certificate to be executed by its duly authorized members this 1st day of January, 20 17, and its Limited Liability Company seal to be hereunto affixed.

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO NEW YORK

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO MCGROW, LLC THAT SUCH REGISTRATION IS NOT REQUIRED.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG MCGROW, LLC AND ITS MEMBERS (THE "LLC AGREEMENT"). MCGROW LLC MAINTAINS A COPY OF THE LLC AGREEMENT ON FILE AT ITS PRINCIPAL OFFICE AND WILL FURNISH A COPY OF THE LLC AGREEMENT, WITHOUT CHARGE, TO THE HOLDERS OF THIS CERTIFICATE UPON WRITTEN REQUEST.

- NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE LLC AGREEMENT.
- MCGROW, LLC MAY HAVE MORE THAN ONE THAN ONE CLASS OF MEMBERSHIP UNITS AUTHORIZED TO BE ISSUED AND THE PREFERENCES, VOTING POWERS, QUALIFICATIONS AND SPECIAL AND RELATIVE RIGHTS OF THE MEMBERSHIP UNITS IN EACH SUCH CLASS ARE SET FORTH IN THE LLC AGREEMENT.

---

**Assignment**

*For Value Received* ____________________ *hereby sells assigns and transfers to* ____________________ *a total of* ____________ *Units represented by this certificate and does hereby irrevocably constitute and appoint* ____________________ *as Attorney to transfer such Units on the books of McGrow, LLC with full power of in the premises.*

*Dated* ____________, *20*____

____________________

*(signature corresponding exactly to name of holder appearing on face of certificate)*

*In presence of.*

____________________

*Name (print or type):*

NUMBER 7

ORGANIZED UNDER THE LAWS OF THE STATE OF COLORADO

UNITS 2,204,126

# McGrow, LLC

## Membership Certificate

This Certifies that Highspeed Aggregate Inc.

*is a member of the above named Limited Liability Company and is entitled to the full benefits and privileges of such membership, subject to the duties and obligations, as more fully set forth in the Limited Liability Company Operating Agreement.*

**In Witness Whereof** *the Limited Liability Company caused this Certificate to be executed by its duly authorized members this* 1st *day of* January, *20* 17, *and its Limited Liability Company seal to be hereunto affixed.*

John R McKowen

John R McKowen – CEO, Managing Member

Timothy J. Beall– COO, Managing Member

HUBCO. NEW YORK

THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO MCGROW, LLC THAT SUCH REGISTRATION IS NOT REQUIRED.

THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG MCGROW, LLC AND ITS MEMBERS (THE "LLC AGREEMENT"). MCGROW LLC MAINTAINS A COPY OF THE LLC AGREEMENT ON FILE AT ITS PRINCIPAL OFFICE AND WILL FURNISH A COPY OF THE LLC AGREEMENT, WITHOUT CHARGE, TO THE HOLDERS OF THIS CERTIFICATE UPON WRITTEN REQUEST.

- NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THE LLC AGREEMENT.
- MCGROW, LLC MAY HAVE MORE THAN ONE THAN ONE CLASS OF MEMBERSHIP UNITS AUTHORIZED TO BE ISSUED AND THE PREFERENCES, VOTING POWERS, QUALIFICATIONS AND SPECIAL AND RELATIVE RIGHTS OF THE MEMBERSHIP UNITS IN EACH SUCH CLASS ARE SET FORTH IN THE LLC AGREEMENT.

---

**Assignment**

*For Value Received* ______________________________ *hereby sells assigns and transfers to* ______________________________ *a total of* ________________ *Units represented by this certificate and does hereby irrevocably constitute and appoint* ______________________________ *as Attorney to transfer such Units on the books of McGrow, LLC with full power of in the premises.*

*Dated* ________________, *20*____

______________________________

*(signature corresponding exactly to name of holder appearing on face of certificate)*

*In presence of,*

______________________________

*Name (print or type):*

# EXHIBIT 19 — SECTION C

**Note and Revenue-Sharing Round (July 2017)**

**Executed McGrow Notes and Revenue Sharing Agreements**

**(seven investors)**

# MCGROW NOTE

**USD $25,000** **July 21, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of High Speed Aggregate, Inc., or its assigns (the "**Holder**"), the principal sum of $25,000 in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1.** **Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2.** **Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1** **Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3.** **Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4.** **Event of Default.**

**4.1** **Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1** **Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2** **Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3** **Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5.** **Miscellaneous.**

**5.1** **Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2** **Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3** **Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4** **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: High Speed Aggregate, Inc.
8084 E. Orchard Rd.
Suite 4900
Greenwood Village, CO 80111

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

By: John L McKowen
John McKowen
Managing Member

**Revenue Sharing Agreement**

This Revenue Sharing Agreement (the "Agreement") dated July 21, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **HIGH SPEED AGGREGATE, INC.**, a Colorado corporation (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$25,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$12,500** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

JPM

ASSIGNOR:
McGrow, LLC
Name: John R. McKowen

By: John R McKowen
Title: Managing Member

ASSIGNEE:
High Speed Aggregate, Inc.
Name: Jeff Ploen

By: ________________
Title: CEO

# MCGROW NOTE

**USD $25,000** **July 21, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **JEFF P. PLOEN & REX H. PLOEN**, or its assigns (the "**Holders**"), the principal sum of **$25,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. Miscellaneous.**

**5.1 Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Jeff P. Ploen & Rex H. Ploen
6222 S Blackhawk Cr.
Centennial, CO 80111

JPM

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

By: ______________________
John McKowen
Managing Member

## Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 21, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **JEFF P. PLOEN & REX H. PLOEN.**, individuals(**"Assignees(s)"**). Assignor and Assignees are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$25,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$12,500** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignees within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignees without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

JPM

ASSIGNOR:
McGrow, LLC
Name: John R. McKowen

By: John R McKowen
Title: Managing Member

ASSIGNEES:
Name: Jeff P. Ploen & Rex H. Ploen

By: ________________
Individuals

# MCGROW NOTE

**USD $50,000** **July 24, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **McMahon Energy Partners, L.P**, or its assigns (the "**Holders**"), the principal sum of **$50,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. Miscellaneous.**

**5.1 Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: McMahon Energy Partners, L.P.
4545 S. Monaco St.
Denver, CO 80237

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

John R. McKowen

By:______________________________
John McKowen
Managing Member

## Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 24, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **McMahon Energy Partners, L.P,** a Colorado LLC (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$50,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$25,000** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

ASSIGNOR:

McGrow, LLC
Name: John R. McKowen

By:

John R. McKowen

__________________
Title: Managing Member

ASSIGNEE:
McMahon Energy Partners, L.P.
Name: Joe McMahon, Jr.

By: __________________
Title: General Partner

# MCGROW NOTE

**USD $50,000** **July 24, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Daryl A. Mendelsberg**, or their assigns (the "**Holders**"), the principal sum of **$50,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. Miscellaneous.**

**5.1 Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Daryl A. Mendelsberg
2242 S. Grape St.
Denver, CO 80222

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

By: John R. McKowen

John McKowen
Managing Member

# Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 24, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **Daryl A. Mendelsberg,** an individual, (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$50,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$25,000** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

ASSIGNOR:

McGrow, LLC
Name: John R. McKowen

By:
John R. McKowen
_________________
Title: Managing Member

ASSIGNEE:
Name: Daryl A. Mendelsberg

By: _________________
Individuals

# MCGROW NOTE

**USD $250,000** **July 25, 2017**

**FOR VALUE RECEIVED**, **MCGROW, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **THOMAS PRASIL TRUST U/A/D 11-26-2003**, or its assigns (the "**Holders**"), the principal sum of **$250,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 <u>Involuntary Bankruptcy or Insolvency Proceedings</u>.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 <u>Failure to Pay</u>.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. <u>Miscellaneous.</u>**

**5.1 <u>Successors and Assigns; Transfer.</u>** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 <u>Loss or Mutilation of Note.</u>** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 <u>Titles and Subtitles.</u>** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 <u>Notices</u>**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Thomas Prasil Trust U/A/D 11/26/2003
3935 E. San Miguel Ave.
Paradise Valley, AZ 85253

**5.5 <u>Governing Law</u>.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 <u>Waiver and Amendment</u>.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 <u>Collection Expenses</u>.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

By: ______________________________
John McKowen
Managing Member

# Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 25, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **Thomas Prasil Trust U/A/D 11-26-2003,** a trust (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$250,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$125,000** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

ASSIGNOR:

McGrow, LLC
Name: John R. McKowen

By:

__________________
Title: Managing Member

ASSIGNEE:
Thomas Prasil Trust, U/A/D 11-26-2003
Name: Thomas Prasil

By: __________________
Title: Trustee

# MCGROW NOTE

**USD $100,000** **July 26, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Hugo Zimmermann**, or its assigns (the "**Holders**"), the principal sum of **$100,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. Miscellaneous.**

**5.1 Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Hugo Zimmermann
Via Tull 7
Flims Dorf 7017 CH

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set

forth above.

**MCGROW, LLC**

By:________________________________
John McKowen
Managing Member

**Revenue Sharing Agreement**

This Revenue Sharing Agreement (the "Agreement") dated July 26, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **Hugo Zimmermann**, an individual, (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties.**"

In consideration for the loaned amount of **$100,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$50,000** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

ASSIGNOR:

McGrow, LLC
Name: John R. McKowen

By:

John R. McKowen

Title: Managing Member

ASSIGNEE:

Name: Hugo Zimmermann

By: ____________________

Title: Individuals

INDICATIONS OF INTEREST

*[For Participants that are entities:]*

Loan Amount: ____________________

____________________
Print or Type Name of Participant

____________________
Signature

By: ____________________
Name: ____________________
Title: ____________________

*[For Participants who are individuals:]*

Loan Amount: USD 100'000.–

HUGO ZIMMERMANN
Print or Type Name of Participant

____________________
Signature

By: ____________________
Name: HUGO ZIMMERMANN
Title: ____________________

# MCGROW NOTE

**USD $50,000** **July 28, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Matt Edmundson**, or its assigns (the "**Holders**"), the principal sum of **$50,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on November 1st, 2017, (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 22.5% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

**4.1.2 Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

**4.1.3 Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

**5. Miscellaneous.**

**5.1 Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

**5.2 Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

**5.3 Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

**5.4 Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Matt Edmundson
18539 WCR 4
Brighton, CO 80603

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

John R. McKowen

By:__________________________________
John McKowen
Managing Member

# Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 28, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **Matt Edmundson,** an Individual (**"Assignee"**). Assignor and Assignee are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$50,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto Assignee a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$25,000** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignee within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignee without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

ASSIGNOR:

McGrow, LLC
Name: John R. McKowen

By:
John R. McKowen
_________________
Title: Managing Member

ASSIGNEE:
Name: Matt Edmundson

By: _________________
Title: Individuals

# EXHIBIT 19 — SECTION D

**Note Round (December 2017)**

**Executed McGrow Notes with transmittal letters**

**(Gruber, Prasil, Zimmermann)**

McGrow
Greenhouse Consultants

December 12, 2017

Jon and Linda,

Thank you for your participation and investment of $50,000 in the McGrow 12% Note offering. The funds raised are being deployed to support the tenant of GCP1-1 to enable GrowCo's success. You are now also an equity owner of McGrow, LLC. The company does not issue physical membership interests. Ownership of membership interests are recorded in the company's books. There are currently 28,888,888 memberships outstanding. The books and records reflect that you have additional ownership of 444,334 membership interests. Once again, I thank you for your continuing support.

Sincerely,

John R. McKowen

John R. McKowen

# MCGROW NOTE

**USD $50,000** **November 27, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Jon D. and Linda W. Gruber Trust**, or its assigns (the "**Holders**"), the principal sum of **$50,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on February 25, 2018 (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 12% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

4.1.2 **Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

4.1.3 **Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

5. **Miscellaneous.**

5.1 **Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

5.2 **Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

5.3 **Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

5.4 **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Jon D. and Linda W. Gruber Trust
300 Tamal Plaza, Suite 280
Centennial, CO 80111

5.5 **Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

5.6 **Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

5.7 **Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

MCGROW, LLC

By: John R. McKowen
John McKowen
Managing Member

McGrow
Greenhouse Consultants

December 12, 2017

Tom,

Thank you for your participation and investment of $100,000 in the McGrow 12% Note offering. The funds raised are being deployed to support the tenant of GCP1-1 to enable GrowCo's success. You are now also an equity owner of McGrow, LLC. The company does not issue physical membership interests. Ownership of membership interests are recorded in the company's books. There are currently 28,888,888 memberships outstanding. The books and records reflect that you have additional ownership of 888,667 membership interests. Once again, I thank you for your continuing support.

Sincerely,

John R. McKowen

John R. McKowen

# MCGROW NOTE

**USD $100,000** **November 27, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Thomas Prasil Trust u/a/d 11/26/03**, or its assigns (the "**Holders**"), the principal sum of **$100,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on February 25, 2018 (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 12% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

**2.1 Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

4.1.2 **Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

4.1.3 **Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

5. **Miscellaneous.**

5.1 **Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

5.2 **Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

5.3 **Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

5.4 **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Thomas Prasil Trust u/a/d 11/26/03
3935 E. San Miguel Ave.
Paradise Valley, AZ 85253

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

**MCGROW, LLC**

By: John R. McKowen

John McKowen
Managing Member

McGrow
Greenhouse Consultants

December 12, 2017

Hugo,

Thank you for your participation and investment of $100,000 in the McGrow 12% Note offering. The funds raised are being deployed to support the tenant of GCP1-1 to enable GrowCo's success. You are now also an equity owner of McGrow, LLC. The company does not issue physical membership interests. Ownership of membership interests are recorded in the company's books. There are currently 28,888,888 memberships outstanding. The books and records reflect that you have ownership of 888,667 membership interests. Once again, I thank you for your continuing support.

Sincerely,

John R. McKowen

John R. McKowen

# MCGROW NOTE

**USD $100,000** **November 29, 2017**

**FOR VALUE RECEIVED**, **McGrow, LLC**, a Colorado limited liability company (the "**Company**"), promises to pay to the order of **Hugo Zimmermann**, or its assigns (the "**Holders**"), the principal sum of **$100,000** in lawful money of the United States of America, together with interest as provided herein.

The following is a statement of the rights of the Holder hereunder and the conditions to which this Note is subject and to which the Holder, by the acceptance of this Note, agrees:

**1. Maturity Date.** The entire outstanding principal balance and all unpaid accrued interest shall become fully due and payable on February 27, 2018 (the "**Maturity Date**").

**2. Interest.** Interest shall accrue on the outstanding principal balance of this Note at the rate of 12% per year and shall be computed on the basis of a year of 365 days for the actual number of days elapsed until the principal balance is paid. Notwithstanding any other provision of this Note, the Holder does not intend to charge, and the Company shall not be required to pay, any interest or other fees or charges or premiums in excess of the maximum permitted by applicable law; any payments in excess of such maximum shall be refunded to the Company or credited to reduce principal hereunder.

2.1 **Early Repayment.** At any time prior to the Maturity Date, the Company may repay the principal in full and all unpaid interest calculated to the date of the payment without penalty, and interest ceases to accrue upon full repayment of the principal amount.

**3. Waiver of Notice.** The Company hereby waives notice, presentment, protest and notice of dishonor.

**4. Event of Default.**

**4.1 Event of Default.** The occurrence of any one or more of the following shall constitute an "Event of Default" under this Note:

**4.1.1 Voluntary Bankruptcy or Insolvency Proceedings.** The Company shall have (a) applied for or consented to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (b) made a general assignment for the benefit of its creditors, (c) been dissolved or liquidated in full or in part, or (d) commenced a voluntary case or other proceeding seeking relief on its behalf as a debtor, or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition, compromise or other relief with respect to itself or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors or any other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it.

4.1.2 **Involuntary Bankruptcy or Insolvency Proceedings.** If any notice of intention is filed or any proceeding or filing is instituted or made against the Company in any jurisdiction seeking to have an order for relief entered against it as debtor or to adjudicate it as bankrupt or insolvent, or seeking liquidation, winding-up, reorganization, arrangement, adjustment, composition or compromise of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its properties or assets or seeking possession, foreclosure or retention, or sale or other disposition of, or other proceedings to enforce security over, all or a substantial part of the assets of the Company and the same has not been dismissed, vacated or stayed within sixty days of commencement.

4.1.3 **Failure to Pay.** Failure by the Company to pay timely any of the principal amount due under this Note on the date the same becomes due and payable or any accrued interest or other amounts due under this Note on the date the same becomes due and payable.

5. **Miscellaneous.**

5.1 **Successors and Assigns; Transfer.** Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and permitted transferees and assigns of the parties. The Company may not transfer or assign its obligations hereunder without the prior written consent of the Holder. This Note may not be transferred by the Holder without the written consent of the Company.

5.2 **Loss or Mutilation of Note.** Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Company, the Company shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. Fully executed copies of this Note are as enforceable as the original Note. Principal and interest is payable only to the Holder.

5.3 **Titles and Subtitles.** The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this agreement.

5.4 **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be given by: (a) personal delivery; (b) confirmed email sent during normal business hours of the recipient; (c) registered or certified mail, return receipt requested, postage prepaid; or (d) deposit with a nationally recognized overnight courier, with written verification of receipt. Such communications shall be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 6.4):

If to the Company: McGrow, LLC
456 Madison St
Denver, CO 80206

If to the Holder: Hugo Zimmermann
Via Tull 7 7017
Flims Dorf, Switzerland

**5.5 Governing Law.** The terms of this Note shall be construed in accordance with the laws of the State of Colorado, without regard to conflict of laws principles.

**5.6 Waiver and Amendment.** Any amendments to, changes in or additions to this Note may be made, and compliance with any covenant or provision herein set forth may be omitted or waived, only if approved in writing by both the Company and the Holder.

**5.7 Collection Expenses.** If this Note is not paid in accordance with its terms as a result of an Event of Default or otherwise, the Company shall pay to the Holder, in addition to principal and accrued interest thereon, all costs of collection of this Note, including reasonable attorneys' fees, court costs and other costs for the enforcement of payment of this Note.

IN WITNESS WHEREOF, the Company has caused this Note to be signed as of the date first set forth above.

McGROW, LLC

John R. McKowen

By:______________________________
John McKowen
Managing Member

# EXHIBIT 19 — SECTION E

**Deposit Records**

**Third-party investment deposits, McGrow account**

**(January–July 2017)**

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | ...6974 | Not available | $46,135.00 |



THE THOMAS E. PRASIL DECLARATION OF TRUST
THOMAS E. PRASIL
3935 E SAN MIGUEL AVE.
PARADISE VALLEY, AZ 85253-5060

91-2/1221 163

1466

DATE 1-23-2016

PAY TO THE ORDER OF McGrew LLC Escrow Account $ 46,135.00

Forty Six Thousand One Hundred Thirty Five and 00/100 DOLLARS

CHASE
JPMorgan Chase Bank, N.A.
www.Chase.com

MEMO

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | THE BANK OF NEW YORK MELLON | ...3757 | Not available | $24,251.00 |


I. WISTAR MORRIS III
234 BROUGHTON LN.
VILLANOVA, PA 19085-1814

611

January 25, 2017
Date

Pay to the Order of McGrow Water & Farming Co Escrow A/C $ 24,251.00

Twenty Four Thousand Two Hundred Fifty One and 00/100 Dollars

The Bank of New York Mellon
1 Wall Street
New York, NY 10286

For #2/3 Installment

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | THE BANK OF NEW YORK MELLON | ...3757 | Not available | $24,250.00 |


J. WISTAR MORRIS III
234 BROUGHTON LN.
VILLANOVA, PA 19085-1914
626
March 15, 2017
Date
Pay to the Order of McGrow, LLC $ 24,250.00
Twenty Four Thousand Two Hundred Fifty and 00/100 Dollars
Security Features Details on Back.
The Bank of New York Mellon
1 Wall Street
New York, NY 10286
For Final Installment Due on Note

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | THE BANK OF NEW YORK MELLON | ...3757 | Not available | $24,250.00 |


I. WISTAR MORRIS III
234 BROUGHTON LN.
VILLANOVA, PA 19085-1914

626

March 15, 2017
Date

Pay to the Order of McGrow, LLC $ 24,250.00

Twenty Four Thousand Two Hundred Fifty and 00/100 Dollars

The Bank of New York Mellon
1 Wall Street
New York, NY 10286

For Final Installment Due on Note

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | PROSPERITY BANK | ...8188 | Not available | $25,000.00 |


CHRIS R STEHR 01-12
1316 NW 186TH ST.
EDMOND, OK 73012

88-2285
1131 241

1612

DATE 6-2-17

PAY TO THE ORDER OF MCG Services $ -25,000.00-

-Twenty Five Thousand & no/100- DOLLARS

PROSPERITY BANK
OK EXPRESSWAY OFFICE

MEMO 1st payment

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | KEYBANK NA | ...0323 | Not available | $25,000.00 |


HIGH SPEED AGGREGRATE, INC. 11/09
8480 E ORCHARD RD, STE. 3600
GREENWOOD VILLAGE, CO 80111-5014
1148
57075
7/21/17
Date
Pay to the Order of MCG Services, LLC $ 25,000.
Twenty Five Thousand + no/100 Dollars
KeyBank National Association
Englewood, Colorado 80111
1-888-KEY4BIZ® Key.com®
For 5504A Note

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 2 | WELLS FARGO BK NA | ...9456 | 3373 | $25,000.00 |




For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Revenue Sharing Agreement

This Revenue Sharing Agreement (the "Agreement") dated July 21, 2017 is entered into by and between McGrow, LLC (**"Assignor"**) and **JEFF P. PLOEN & REX H. PLOEN.**, individuals(**"Assignees(s)"**). Assignor and Assignees are collectively referred to as the "**Parties**."

In consideration for the loaned amount of **$25,000** and of the premises and mutual covenants and obligations below, the Parties agree as follows:

1. Assignor hereby assigns unto a revenue sharing project payment (the **"PRP"**) for the Amerijuana LLC project **("Project")** with McGrow, LLC equal to **$12,500** (the **"Concession"**). The PRP shall not be reduced or set off in any way and shall not incur or be subject to costs incurred to deliver the goods and services provided during the Project.

2. Assignor shall pay the PRP to Assignees within 15 days of the last month of the Project's completion. The completion date is as yet unconfirmed, but is anticipated to be approximately November 1st, 2017. The Parties expressly agree that this Agreement does not create any rights in the Concessions.

3. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of the Parties. This Agreement shall not be assignable or transferable by Assignees without the prior written consent of Assignor.

4. This Agreement contains the entire agreement between the Parties relating to the subject matter of this Agreement at the date hereof to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

5. This Agreement will be governed by, construed, interpreted and applied in accordance with the laws of the State of Colorado, excluding any choice of law rules which would refer the matter to the laws of another jurisdiction. All disputes arising out of or related to the interpretation or enforcement of this Agreement shall be fully and finally resolved under Commercial Arbitration Rules of the American Arbitration Association by a panel of three arbitrators appointed in accordance with those rules. The arbitration proceeding shall take place in Denver, Colorado, or any such other location as the Parties may mutually agree, and shall be conducted in the English language. The arbitration award shall be final and binding on the Parties. A Party may enter judgment upon the award in any court of appropriate jurisdiction upon application thereto.

9. The Parties agree that this Agreement and its contents shall be considered confidential and shall not be disclosed to any other person or entity without the prior written consent of Assignor.

JPM

ASSIGNOR:
McGrow, LLC
Name: John R. McKowen

By: John R McKowen
Title: Managing Member

ASSIGNEES:
Name: Jeff P. Ploen & Rex H. Ploen

By: _______________
Individuals

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 1 | JPMORGAN CHASE BANK, NATIONAL ASSOCIATION | ...8285 | Not available | $50,000.00 |


MCMAHON ENERGY PARTNERS, LP
4545 S. MONACO ST. #144
DENVER, CO 80237

23-101-1020

849

July 24 20 17

PAY TO THE ORDER OF MCG Services, LLC $50,000.00

Fifty Thousand Dollars & NO/100 DOLLARS

JPMORGAN CHASE BANK, N.A
DENVER, COLORADO 80202
WWW.CHASE.COM

FOR McGmo LLC. Note

[redacted]

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# Check Details

| Item # | Bank | Account # | Check # | Amount |
|---|---|---|---|---|
| 3 | VECTRA BK COLORADO NA | ...5849 | Not available | $15,000.00 |


TERRI E. MENDELSBERG
DARYL A. MENDELSBERG
2242 S. GRAPE ST.
DENVER, CO 80222

1119

7/24/17 Date

Pay to the Order of MCG Services, LLC $ 15,000

Fifteen Thousand Dollars and 00/100 Dollars

VECTRABANK COLORADO
NATIONAL ASSOCIATION
COLORADO BLVD. BRANCH
1650 S. COLORADO BLVD.
DENVER, CO 80222

For McGrow Note

For your security, information like account numbers, signatures, and the ability to view the backs of checks have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

Equal Housing Lender

# EXHIBIT 20

GrowCo $2,000,000 Exchange Note Term Sheet
(22.5% Senior Exchange Notes due July 1, 2022 — February 15, 2017)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**GROWCO, INC.**

**Memorandum of Terms**

**22.5% Senior Exchange Notes due July 1, 2022**

This Memorandum of Terms dated as of February 15, 2017 summarizes the principal terms of an offering of notes of GrowCo, Inc. (which may be exchanged for preferred units of GCP Super Units, LLC), together with warrants to purchase common stock of GrowCo, Inc. **This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive purchase agreement. Nothing herein is binding except as set forth under "Confidentiality", and any sale of these securities is contingent on execution of a definitive agreement.**

**OFFERING**

| | |
|---|---|
| *Issuers:* | *GrowCo, Inc.,* a Colorado corporation ("**GrowCo**").<br>*GCP Super Units, LLC,* a Colorado limited liability company (the "**LLC**"), has been formed to invest in greenhouses that GrowCo is constructing, or intends to construct, for leasing to third-party marijuana growers along with associated business services. |
| *Securities Offered:* | GrowCo will issue up to $2,000,000 in principal amount of 22.5% Senior Exchange Notes due July 1, 2022 ("**Senior Notes**"), together with warrants to acquire up to 2,000,000 shares of common stock of GrowCo.<br>Senior Notes will be sold in principal amounts of multiples of $100,000, unless otherwise agreed to by GrowCo.<br>Outstanding principal of Senior Notes may be exchanged at any time for preferred units of the LLC ("**Preferred Units**") at an exchange rate of $1.00 per Preferred Unit. |
| *Purchase Price:* | 100% of principal amount, payable in cash. |
| *Use of Proceeds:* | Net proceeds will be used by GrowCo to complete construction of the second greenhouse, warehouse and extraction facilities at GrowCo's grow complex located in Pueblo County Colorado along with general and administrative expeses. |
| *Closings:* | Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than April 30, 2017. |
| *Investors:* | Institutional and other accredited investors. |

**SENIOR NOTES**

| | |
|---|---|
| *Principal:* | An amount equal to purchase price paid, payable in full in cash at maturity unless exchanged for Preferred Units as described under "—*Exchange Rights*" below. |
| *Stated Maturity:* | July 1, 2022. |
| *Interest:* | The Notes shall earn interest at 22.5% annually. Interest shall accrue until GrowCo becomes operational cash flow positive (as defined by U.S. GAAP). Once GrowCo is cash flow positive, interest shall be paid on the 15th day of the subsequent |

| | |
|---|---|
| | month when due. The accrued interest shall be paid in equal installments over a 6 month period. |
| *Rank:* | Senior Notes will rank *pari passu* with prior GrowCo notes and will not be subordinated to any of GrowCo's indebtedness for borrowed money. |
| *Exchange Rights:* | At the option of the holder, all or a portion of the outstanding principal amount of a GrowCo Note may be exchanged at any time (including at maturity) for Preferred Units at a rate of one Preferred Unit for each $1.00 of principal amount. Accrued interest on the exchanged principal amount will be payable in cash contemporaneously with the exchange. |
| *Prepayment:* | After April 1, 2019, Senior Notes may be prepaid, in whole or in part, by GrowCo at any time, without premium or penalty, upon thirty days' notice, subject to holders' rights to exchange their Senior Notes (as described under "—*Exchange Rights*" above) prior to prepayment. If GrowCo proposes to prepay less than all of the outstanding principal of, and accrued interest on, the then-outstanding Senior Notes, those Senior Notes will be prepaid pro rata. |

**PREFERRED UNITS:**

| | |
|---|---|
| *LLC Capitalization:* | GrowCo will own 2,000,000 of the LLC's outstanding common units. |
| *Capital Accounts:* | *Capital Account.* Upon an exchange of Senior Notes, each holder will have a capital account initially equal to the principal amount exchanged for Preferred Units.<br>*Allocations.* Net profits of the LLC (if any), computed quarterly, will be allocated to members pro rata, based on the number of Preferred Units held.<br>*Distributions.* Each holder of Preferred Units will be entitled to receive, within 45 days after the end of a calendar quarter, a distribution equal to 25% of the amount of the LLC's net profits (if any) allocated to such member as described above. Each such capital account will be decreased by the amount of distributions with respect thereto, as described below.<br>*Retained Allocations.* Net profits of the LLC that are allocated, but not distributed, to members will be used to finance the construction, development and operation of GrowCo's greenhouses and administrative services. Those funds will be invested in equity or debt instruments with terms established on an arm's-length basis. |
| *Optional Exchanges:* | Each Preferred Unit may be exchanged at any time, at the election of the holder, for one fully paid and nonassessable share of GrowCo common stock. |
| *Mandatory Exchanges:* | Holders of a majority of the LLC's common units may elect to require holders to exchange all (but not less than all) of the outstanding Preferred Units for GrowCo common stock at any |

| | |
|---|---|
| | time at which GrowCo common stock (a) is listed on an exchange, (b) had a closing market price equal to least $5.00 for each of 20 consecutive trading days and (c) had an average daily trading volume of at least 100,000 shares during such 20 trading days. In such event, each Preferred Unit would be exchanged for one fully paid and nonassessable share of GrowCo common stock. |
| *Liquidation Preference:* | Upon any liquidation, dissolution or winding up of the LLC, each holder of Preferred Units would be entitled to receive an amount equal to the holder's capital account. No distribution would be made with respect to the LLC's common units. |
| *Voting:* | In general, holders of the LLC's common units and holders of Preferred Units will vote together on any matter subject to the approval of members. |
| *Amendments and Waivers:* | The terms of the Preferred Units may be amended or waived only upon the written consent of the LLC, holders of a majority of the LLC's common units and holders of at least two-thirds of the Preferred Units. |

**WARRANTS**

| | |
|---|---|
| *GrowCo Warrants:* | Each purchaser of a Senior Note will receive a warrant to purchase, at a price of $0.25 per share in cash (no cashless exercises), one share of GrowCo common stock for each $1.00 in principal amount of such Senior Note. The GrowCo warrants will expire on April 1, 2022. |

**OTHER MATTERS**

| | |
|---|---|
| *Note Purchase Agreement:* | Any issuance of Senior Notes will be made only pursuant to a note purchase agreement, which will contain representations, warranties and covenants of GrowCo, the LLC and the investors and will include appropriate conditions of closing. GrowCo will make available to potential investors forms of the note purchase agreement, the Senior Notes, the LLC's operating agreement and an exchange agreement with respect to Preferred Units. |
| *Confidentiality:* | No potential investor shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, managers, partners, accountants and attorneys without the written consent of GrowCo. |
| *Placement Agents:* | GrowCo may engage one or more third-party firms or individuals to serve as placement agents in connection with the offering of Preferred Units. Any such placement agent will receive a placement fee of 7.0% of the principal amount of Senior Notes. |

# EXHIBIT 21

Two Rivers to McGrow Sublease (April 1, 2017)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# SUBLEASE AGREEMENT

THIS SUBLEASE AGREEMENT is entered into as of the 1st day of April, 2017, by and between Two Rivers Water & Farming Company ("Sublessor") and McGrow LLC ("Sublessee").

RECITALS:

A. On or about the 20th of January 2017, Two Rivers Water & Farming Co. ("Landlord") and Sublessor entered into a written lease agreement (the "Lease") pertaining to approximately 1,774 square feet of space located on the 3rd floor of the Lincoln ASB Colorado Center, LLC Building, located at 2000 S. Colorado Blvd., Denver, Colorado, known as Suite 1-3100 (the "Premises").

B. The Lease has been amended by Amendment Number 4 dated January 20 2015, which extended the lease till August 31, 2018, expiring at 11:59 PM, listed Minimum Monthly Rent from 9/1/16- 8/31/17 at $3,880.63 and from 9/1/17- 8/31/18 at $3,954.54 .

C. Sublessor desires to sublease to Sublessee approximately 1,774 square feet of the Premises to be known as Suite 1-3100 and delineated on Exhibit n/a attached hereto, made a part hereof, and incorporated herein by reference (the "Sublet Premises").

D. The consent of Landlord is required to permit such subletting.

NOW, THEREFORE, for good and valuable consideration, Sublessor and Sublessee agree as follows:

1. For value received, Sublessor, subject to the consent of Landlord, hereby sublets the Sublet Premises to Sublessee for a term commencing on April 1, 2017, or when vacated by Two Rivers Water & Farming Co., the present tenant thereof, whichever first occurs, (the "Occupancy Date"), and terminating on August 31, 2018. If Sublessor is unable to deliver possession of the Sublet Premises to Sublessee in accordance with the foregoing provisions as a result of Two Rivers Water & Farming Co.'s failure to timely vacate the same, then, notwithstanding the foregoing, Sublessee's right to occupy and obligation to pay rental for the Sublet Premises shall be delayed until Sublessor is able to obtain possession of the Sublet Premises and the deferral of Sublessee's obligation to pay such rental shall be in full satisfaction of any and all claims which Sublessee might otherwise have as a result of such delayed delivery of possession. Such subleasing shall be on the following terms and conditions:

A. The base rental to be paid by Sublessee shall be $Three Thousand Eight Hundred Eighty Eight Dollars and Sixty Three Cents ($3,880.63) per month, payable to Sublessor at to be provided later, Denver, Colorado. If Sublessee obtains occupancy of the Sublet Premises prior to the first day of any month, the rent due for that month shall be prorated based upon the number of days Sublessee occupied the Sublet Premises and shall be payable in advance. All other rent shall be payable on the first day of each month without notice commencing April 1, 2017, and on the first day of each month thereafter for the balance of the term of the Sublease.

B. Sublessee accepts the Sublet Premises in its present "as is" condition. All alterations and improvements to the Sublet Premises shall be subject to Landlord's prior written consent pursuant to the terms and provisions of the Lease and shall be at Sublessee's sole cost and

expense, including, but not limited to, any cost or expense incurred as a result of the installation of conduit required by Denver Building Code Rulings for Sublessee's telephone installation in the return air plenum suspended ceiling in the Sublet Premises. All changes and alterations to designation signs for the Sublet Premises and in the Building directory located in the lobby of the Building, any changes in locks required, and any changes required in the HVAC systems as a result of Sublessee's use of the Sublet Premises shall likewise be at Sublessee's sole cost and expense and shall require the prior written approval of Landlord.

C. Sublessee agrees to deposit with Sublessor the sum of Zero Dollars ($-0-) (the "Security Deposit"), which amount Sublessor agrees to hold in accordance with the provisions of Paragraph 2 of the Lease. With respect to the terms and provisions pertaining to said Security Deposit, Sublessor shall be deemed to be the landlord and Sublessee shall be deemed to be the tenant.

D. During the term of this Sublease, Sublessee agrees to pay to Sublessor any increase in Sublessor's rent pursuant to Paragraph(s) 2 of the Lease attributable to the Sublet Premises.

2. Sublessor agrees that, during the term of this Sublease, Sublessee shall be entitled to use 4 of the parking spaces in the Building parking garage allocated by Landlord to Sublessor pursuant to the terms of the Lease. Sublessee shall pay the going monthly rate for such space as the same is adjusted from time to time.

3. Sublessee hereby acknowledges receipt of copies of the lease documents described in Recitals A and B above, and in consideration of the Sublease Agreement, Sublessee hereby assumes and agrees to make all payments, perform and be bound by all Sublessor's covenants contained in the Lease as if Sublessee were the tenant thereunder with respect to the Sublet Premises.

4. This Sublease Agreement is further conditioned upon execution and delivery hereof to Landlord on or before 5:00 p.m., March 31, 2017 and subject to the consent of Landlord attached hereto.

IN WITNESS WHEREOF, the parties hereto have executed this Sublease Agreement the day and year first above written.

By: [signature]
Name: Wayne Harding, CEO

"Sublessor"

By: [signature] John R. McKowen
Name: John McKowen, Manager

"Sublessee"

# EXHIBIT 22

GrowCo Board Meeting Transcript (May 1, 2017)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Laura McKowen 0:00
Issue before you put in the Dropbox that'd

John McKowen 0:05
be good.

Wayne Harding 0:09
Will do okay?

Jeff Ploen 0:12
The The first item I would like to discuss is

Jan McCaffrey 0:19
the second item on the agenda,

Laura McKowen 0:23
which is to authorize. We have some management team appointments that we want to make on the on the grow, co management team,

John McKowen 0:35
the board appointments will have to save for the board meeting.

Wayne Harding 0:40
But a big issue that we have had with

Jeff Ploen 0:44
with the how this business is being run is, as felt by all the board members, is management, and so we are proposing that we hire an office manager

Jan McCaffrey 0:59
to handle the accounting in certain operational aspects, so that we offload those tasks from the board and from two rivers.

Laura McKowen 1:09
We the person would be hired

John McKowen 1:12
by grow Co. It would be a grow co employee, and we would hire Louise Lowe, who is already so everyone's already familiar with to assist this person in getting those types of things done. So

Wayne Harding 1:28
I would love to know people's thoughts on that, and

Jeff Ploen 1:31
if there are, you know, additional thoughts or ideas around it. I

Jan McCaffrey 1:47
Evan,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Laura McKowen 1:49
hi. This is John McKowen.

John McKowen 1:56
I have been excluded from these meetings,

Wayne Harding 2:00
and I believe that

Jeff Ploen 2:04
the information that's being passed through to Jan, Jan and

Jan McCaffrey 2:13
you, Laura, is incomplete and is

Unknown Speaker 2:21
in many instances, a scheme,

Unknown Speaker 2:24
and that

Unknown Speaker 2:27
the books and records

Unknown Speaker 2:30
and the management needs to be done by

Unknown Speaker 2:36
groco and

Unknown Speaker 2:39
Not by two rivers for the benefit of two rivers,

Unknown Speaker 2:44
which is what we saw last week.

Unknown Speaker 2:48
And so part of developing that separation, especially with the very precarious financial situation that I see

Unknown Speaker 3:01
two rivers being in

Unknown Speaker 3:05
I think that the one, the books and records, have been moved without consent, based upon what I know,

Unknown Speaker 3:14
transfers have been made without the consent of the board,

Unknown Speaker 3:19
from what I've seen,

Unknown Speaker 3:21
and less than full information is being given to the board members,

Unknown Speaker 3:28
and at the last minute of moving into production,

Unknown Speaker 3:34
Two Rivers is

Unknown Speaker 3:38
trying to obtain control over grow CO

Unknown Speaker 3:44
and material changes the capital structure of this company,

Unknown Speaker 3:49
and so an independent company needs to be set up where the shareholders

Unknown Speaker 4:01
are. Can be assured that

Unknown Speaker 4:05
the information that's necessary for them to make qualified decisions, good decisions needs to

Unknown Speaker 4:15
be established immediately before two rivers

Unknown Speaker 4:21
could have, could possibly go into bankruptcy

Unknown Speaker 4:25
and

Unknown Speaker 4:27
and so two rivers is only a shareholder, or one of its subs is a shareholder. I don't know how to structure. I don't know how a lot of two rivers is being structured these days. I don't know who the principles are that are driving these actions, and so

Unknown Speaker 4:46
just like the attempt last week to

Unknown Speaker 4:51
force through the issuance of shares, which is clearly a scheme

designed by their attorneys and them to.

Unknown Speaker 5:00
To steal assets from

Unknown Speaker 5:04
grow, co shareholders from MC grow.

Unknown Speaker 5:11
I think that there's there needs to be more transparency with the with the shareholders, more transparency given to the board members and

Unknown Speaker 5:23
without that, without that separation, there's going to be some derivative lawsuits filed.

Unknown Speaker 5:30
That's what I think about this as a first step in creating the returning the books and records to grow crow to its offices,

Unknown Speaker 5:41
turning over the the bank account to managers of grow co so that Wayne doesn't make the unauthorized transfers that he has made,

Unknown Speaker 5:53
and

Unknown Speaker 5:56
that's what I think we Need to that the board needs to do.

Unknown Speaker 6:01
Thank you. Any other comments?

Unknown Speaker 6:07
I'm in agreement.

Unknown Speaker 6:13
Okay, so,

Unknown Speaker 6:15
so there are several things that were mentioned in that are in various parts of the agenda, but one is to move the books and records back to the growth offices. Two is to turn over access to the bank accounts

Unknown Speaker 6:34
so that there's transparency and full disclosure on what's

Unknown Speaker 6:40
on transactions.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 6:43
The other is to hire an office manager

Unknown Speaker 6:48
to handle accountant accounting and certain operational aspects to offload management tasks that two rivers, you know, specifically Wayne has said

Unknown Speaker 6:57
is he would be welcome to offload.

Unknown Speaker 7:04
I think that covers those, those pieces with the goal of separating, of separating and grow COVID from grow co management from two rivers management and creating more autonomy and transparency for board members and shareholders. There Any other thoughts on that from anybody?

Unknown Speaker 7:31
I think that's okay.

Unknown Speaker 7:35
Thanks.

Unknown Speaker 7:38
The other items I'm just going through. I mean, everyone has seen this agenda. I am not going to waste time with a silent audience. If everyone's refusing to talk until our guests leave, which it sounds like what is happening.

Unknown Speaker 7:58
Is there any other comments that that Tim or John or Otto or McPhail or other guests Scott want to make about the agenda, Any items regarding the business?

Unknown Speaker 8:21
Okay, we will. I can only Laura this. John McKowen, I can only repeat what I already said. And I would

Unknown Speaker 8:30
suggest that whoever is creating these manipulations and schemes reconsider what they're doing and start working for the benefit of the shareholders of grow CO

Unknown Speaker 8:43
and stop the deception that the attorney on the other side created by saying we needed to all get along so that we could effectively deal with the SEC when in fact He was orchestrating, or someone was orchestrating,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 9:02
a scheme to take over grow co to hide these, these payments being

Unknown Speaker 9:08
illegally, unauthorized, transferred to

Unknown Speaker 9:14
to two rivers And to materially change the the the capital structure,

Unknown Speaker 9:25
and change, try to change agreements that were in place, and so

Unknown Speaker 9:33
unless they're looking for lawsuits,

Unknown Speaker 9:36
which was indicated By the ridiculous proposal they made over the weekend,

Unknown Speaker 9:43
that's what they're going to get, and this side is willing to try and accommodate whatever is necessary for the benefit of the shareholders of grow CO

Unknown Speaker 9:58
and stop trying.

Unknown Speaker 10:00
To steal assets at this late hour, very similar to Van wingerden, which the law firm on the other side represented at this late date when they when the majority of the

Unknown Speaker 10:14
the

Unknown Speaker 10:16
people on the other side who were still undisclosed to us, stood by by and did, hadn't done anything to build this asset that is now coming into cash flow over the last year.

Unknown Speaker 10:31
So I want to make sure that they understand that they are the ones that are

Unknown Speaker 10:39
pushing forward this agenda, which is going to end

Unknown Speaker 10:45
result in a lawsuit,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 10:49
and they have demonstrated no

Unknown Speaker 10:53
spirit of cooperation.

Unknown Speaker 10:58
They have been deceptive in their

Unknown Speaker 11:01
statements

Unknown Speaker 11:03
statements and motivations to for doing what they're doing, and that's why we're at where we're at today.

Unknown Speaker 11:13
Thanks, Mr. McKowen, it's Mike mcfail. If any of those comments were directed to me personally, I disagree that I'd done anything wrong, and I think those comments are inappropriate,

Unknown Speaker 11:28
there's no doubt that you would,

Unknown Speaker 11:33
but they seem to be true Given the facts as they've been conveyed to me. I

Unknown Speaker 11:45
and I will ask our guests to leave now, and we will stay on and convene the board meeting. Thanks you guys. Thank you.

Unknown Speaker 11:56
Thank you. Yeah. The only thing I would bring up guys, are we sure? Are the lawyers getting off this call as well? No Joe, no John, the lawyers were approved by

Unknown Speaker 12:10
I just wanted to throw out, and I'm not trying to throw a monkey wrench into this, but

Unknown Speaker 12:16
we used you guys with Pat Linden a couple of years ago on all of this, two rivers grow co stuff

Unknown Speaker 12:25
as and I was part of the group Pat was billing. So I don't know if that creates any conflict of interest, but you, you attorneys figure it out. I just don't want to get into it again later. So bye,

Unknown Speaker 12:43
bye, thanks, thanks.

Unknown Speaker 12:49
Okay,

Unknown Speaker 12:50
I can see

Unknown Speaker 12:53
who we who do we have on the call now?

Unknown Speaker 12:58
Jan

Unknown Speaker 13:01
Wayne.

Unknown Speaker 13:08
Hey, Otto,

Unknown Speaker 13:10
do we have Jeff still,

Unknown Speaker 13:13
yes.

Unknown Speaker 13:15
Scott mckow, John,

Unknown Speaker 13:18
all right, I see.

Unknown Speaker 13:21
Do we have Mike mcfail,

Unknown Speaker 13:23
I'm still here, sweet.

Unknown Speaker 13:32
All right,

Unknown Speaker 13:35
okay,

Unknown Speaker 13:36
I would like to convene the board meeting.

Unknown Speaker 13:42
Roco board meeting may 1,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 13:46
I will ask that I will chair the meeting unless anyone objects,

Unknown Speaker 13:54
and I will ask that it is recorded, unless anyone objects, and I will post the recording to drop box

Unknown Speaker 14:04
objects?

Unknown Speaker 14:07
Great. I want to ask Jan to take notes.

Unknown Speaker 14:13
I will anyone objects to that. Thank you.

Unknown Speaker 14:16
And

Unknown Speaker 14:18
in attendance, we have

Unknown Speaker 14:21
myself. Laura McKowen, Jan McCaffrey,

Unknown Speaker 14:26
we have Scott Nichol, John, Jeff and Wayne Harding,

Unknown Speaker 14:36
okay, Don Otto and Mike. I was here too. Hi. Otto. Mike, yes, our guest. Otto and Mike,

Unknown Speaker 14:46
okay, so we, I'm going to go down the agenda that was sent out. I will also pull that up. Jeff had asked me to pull that up, so I'm happy to do that. Laura, this is Wayne. Usually board meetings. You approve the part.

Unknown Speaker 15:00
Minutes. Would you like to do that in this agenda

Unknown Speaker 15:03
that that's on number one, that's actually on the agenda?

Unknown Speaker 15:09
Oh, apologize, I didn't see it.

Unknown Speaker 15:11
Just let me get there.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 15:21
Okay?

Unknown Speaker 15:22
Making sure I have the right agenda one second,

Unknown Speaker 15:42
sharing my screen now you

Unknown Speaker 15:45
know, if you guys can't see it,

Unknown Speaker 15:47
I can't. Thank you.

Unknown Speaker 15:53
Okay,

Unknown Speaker 15:56
the first item on the agenda is to I would actually like to suspend the prior meeting minutes

Unknown Speaker 16:03
are the last board meeting due to disagreements regarding authorization to issue new shares to anyone, the consideration for deferring interest payments and issuing shares to group board members We don't have,

Unknown Speaker 16:19
I feel

Unknown Speaker 16:21
the information necessary to make those decisions at this time,

Unknown Speaker 16:26
it's been given piecemeal and incompletely, so we would like to suspend prior meeting minutes, not approve them. Laura Wayne, I have a couple questions on that. Which meetings are you talking about? And also, why? What grounds are you basing that on? Besides you think that you were not given proper information,

Unknown Speaker 16:49
I don't actually need other grounds, other than not being given prior information, that is ground enough to suspend the prior meeting minutes. And at this point

Unknown Speaker 17:03
I'm specifically talking about March meeting minutes and the meeting minutes from last week that were taken and then information was sent

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

to the transfer agent asking to issue new shares.

Unknown Speaker 17:24
I don't know. I don't have the problem is that I don't have the full detail and

Unknown Speaker 17:32
information necessary to even know exactly what information was not given. I just know that there's been multiple discrepancies. There's been multiple

Unknown Speaker 17:46
conflicts in what information has been presented, and so

Unknown Speaker 17:53
the part of what we are going to be asking for in this meeting, down the agenda, is to hire outside counsel to look through the actual transactions. Additionally, a lot of information that we have asked for has not been given to date.

Unknown Speaker 18:11
Also on the issuance of shares, there were items from a $6 million note, as long as I've been a board member that has not been voted on. And then the items of the grow, CO, board member stock, I have no knowledge of that, so,

Unknown Speaker 18:29
right? That's an example.

Unknown Speaker 18:34
It

Unknown Speaker 18:36
restructuring the notes has been so piecemeal to us. I mean, I came on the board the first part of March, and I think I've been asking ever since those March notes for concise accounting of whose amendments are in. I think especially with this sec

Unknown Speaker 18:54
I mean, to to satisfy going forward, that there has to be clear communication to all the investors, there has to be clear communication and documentation that they've had the chance to make a decision before the capital structure of a company has changed, to go out and hand pick a few people and rush to issue stock to them when we don't have documentation that this has been done in an organized fashion, I'm not going to approve that.

Unknown Speaker 19:24
Well, the fact of the matter is, Jan and Laura, you did approve that, and nothing was rammed through or nothing was obfuscated from you,

giving you all the information that you requested, even through email chains early on, that you understood what was going on. So if you will go ahead and call that, and by the way, you're just saying minutes. I don't know specific minutes, but you just said March. I guess all minutes in March is that what you're talking about,

Unknown Speaker 19:52
all minutes in March and yesterday and last week's board meeting. Okay?

Unknown Speaker 19:59
This.

Unknown Speaker 20:00
Yeah,

Unknown Speaker 20:01
this is Jeff, I guess,

Unknown Speaker 20:04
as Wayne said, I don't understand really what's going on here. We

Unknown Speaker 20:11
We made these decisions over the last few months with the idea that we were trying to save money moving forward so that we could continue to pay our interest, payments to pay our accounts, payable to try and keep grow funded to the best of its ability. I mean, there was, there's been, you know, nothing

Unknown Speaker 20:44
out of the ordinary of what we've tried to do, in going back to these note holes, trying to see if we could get them to, you know, take the stock, as we all voted on, rather than take their interest so we could save the money. It's very upfront. There's nothing. There's nothing going on here other than the fact that we're trying to get the money saved. Some of the people have done it. Some of the people haven't. We've got a lot of interest that still needs to be paid. As Jen said, we're we're trying our best to see if we can get as many of the note holders to amend and take interest later. But to do this, you've got to give them some incentive. Our incentive, we can note

Unknown Speaker 21:42
was that we give them a share of stock. This is

Unknown Speaker 21:47
what we why are we all of a sudden wanting to change what we all agreed upon? We understand immense incentive, but to rush through and not have documentation that everybody has been offered the same thing. I don't see the rush to issue the stock till we've completed the task. That is an incorrect that is an incorrect statement. You're talking

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

about not getting proper information the board. Let's make sure that we say things that are accurate and are accurately descriptive. Every single one of those stock was prior approved by the board, and also, we have signed agreements that those note holders have accepted the terms that were approved by the board.

Unknown Speaker 22:37
They also, there were just there were, there was information about

Unknown Speaker 22:43
the $6 million note, which was not discussed. I'm going to just back this up the the point is there, I'm not surprised that that Jeff is confused, either.

Unknown Speaker 22:58
I don't think that I

Unknown Speaker 23:01
don't have confidence or faith that what is being done is being done with

Unknown Speaker 23:09
full

Unknown Speaker 23:11
knowledge of what the actual impact is to the business. And I also don't have faith that what is being done is in the best interest of the shareholders, and that that there has been full transparency.

Unknown Speaker 23:26
It may be motion on number one,

Unknown Speaker 23:30
I'm running this meeting, so can I do that?

Unknown Speaker 23:34
Yeah, you can tell I'll tell you what, Laura, you tell me when you're done with your comments, and then turn it over to me, the floor over to me. Please go ahead. I apologize for interrupting you.

Unknown Speaker 23:48
Is there a motion on number one?

Unknown Speaker 23:51
Is am I going to propose? Propose a motion on number one,

Unknown Speaker 23:57
I move to suspend the prior minutes. I

Unknown Speaker 24:04

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

a second

Unknown Speaker 24:11
call the motion, please.

Unknown Speaker 24:16
I know I know how to do this. Wayne, thanks, okay, well, other board members can ask for the motion be called if there's no further discussion.

Unknown Speaker 24:27
Okay, no further discussion on this one, there's,

Unknown Speaker 24:32
we're split, split two to two. You

Unknown Speaker 24:35
didn't even call for the vote. How do you know it's split two to two?

Unknown Speaker 24:40
Okay? The vote. Okay, sorry, asking for a motion. I The motion is to

Unknown Speaker 24:47
suspend the minutes for the meetings that were mentioned.

Unknown Speaker 24:53
Do I have a motion for that?

Unknown Speaker 24:57
Yes, I moved to suspend the minutes. Do.

Unknown Speaker 25:02
I second that, can we vote on suspending the prior meeting? Minutes?

Unknown Speaker 25:11
Jeff, I vote no.

Unknown Speaker 25:14
Swing I vote no. Jan votes yes

Unknown Speaker 25:18
and I vote yes. I

Unknown Speaker 25:25
Okay, so what the minutes from last Monday, then have not been approved?

Unknown Speaker 25:34
Do? We haven't been suspended, but they have not been approved.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 25:40
We have someone jumping on and off.

Unknown Speaker 25:44
I don't think so. Wayne's here, but

Unknown Speaker 25:47
sometimes

Unknown Speaker 25:49
people have like dings in the background and email come in or something,

Unknown Speaker 25:59
right? So the last week's meeting minutes were, do not need to be suspended. They were never approved to begin with. So well, we need to have a discussion on improving them or not

Unknown Speaker 26:11
we do. So I was going to say, let's make that a separate

Unknown Speaker 26:15
item. Okay? So open for discussion right now is to

Unknown Speaker 26:23
approve the meeting minutes for from last week's meeting,

Unknown Speaker 26:29
April 24

Unknown Speaker 26:34
have a motion to vote on that. I move to approve.

Unknown Speaker 26:39
I second to

Unknown Speaker 26:44
approve. Can we vote please?

Unknown Speaker 26:48
Who's in favor of approving the minutes from last week's meeting? May 24 or april 24

Unknown Speaker 26:57
Hi.

Unknown Speaker 27:01
I did I vote? No, I vote no. Also I asked and why you guys are voting? No,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 27:09
we've already said that.

Unknown Speaker 27:13
I'd like to hear it again.

Unknown Speaker 27:20
We're not approving the notes from last week.

Unknown Speaker 27:23
I'm not inaccurate.

Unknown Speaker 27:25
Do the minutes reflect something inaccurate? Well, one thing that's in there is a deadline for the amendments. I do not approve that because it's been piecemealed and approving the amendment was not approving issuance. I believe that everyone should have, you know, I've already talked about documentation and being fair, and I still don't have an answer on the $6 million note or the

Unknown Speaker 27:52
board members stock.

Unknown Speaker 27:54
Yeah, let's just talk about the around the issues for me to approve. Talk about the April 24 minutes. You definitely Jan, approved the extension to May 5. This, in fact, I was the one that mentioned that maybe the end of last week, and I believe was you or Laura says, Well, why don't we do it May 5 to get all the other amendments in? That's right. And then last week transpired, as it did, and you said that comfortable with that,

Unknown Speaker 28:21
the purpose of approving minutes is not to change what happened in the meeting, but to accurately reflect what happened in the meeting. I am trying to understand so going forward, I can understand what about the minutes were inaccurate about the meeting on the 24th

Unknown Speaker 28:42
the meeting, the minutes are not inaccurate. That was what was discussed in the meeting. The minutes are inaccurate there. The May 5 deadline. Wayne, you said was a soft extension. Let's just put something to try to push people to get the amendments in. And

Unknown Speaker 29:02
I feel there was clearly an agenda on april 24 when we were on the phone, you said that Mike was going to be late. You asked Otto to step off for some housekeeping, and your housekeeping was there. That is not correct. That's an April 26 meeting. I'm sorry. April

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 29:21
26 the state of Fauci facts as they are.

Unknown Speaker 29:24
There were two meetings last week. We're talking about April 24 right now. That was the April 26 I stand corrected on my date for the quote housekeeping when Otto was asked to step off. And by

Unknown Speaker 29:40
the way, that wasn't even a formal board meeting

Unknown Speaker 29:45
airport, no matter. Okay, I agree. It's just just stating the fact

Unknown Speaker 29:52
I'm trying to understand about these minutes, what is it accurate about representing what happened on April 24

Unknown Speaker 30:01
I guess I'm trying to understand what's accurate.

Unknown Speaker 30:06
Everything that's in these minutes I believe are accurate. I'll tell you what this is going nowhere. Let's go to the next agenda item.

Unknown Speaker 30:13
Good idea. Then the meeting minutes are not approved. So

Unknown Speaker 30:18
I heard that, all right.

Unknown Speaker 30:21
Authorize the item number two, the item is to authorize the Grow co board. And there's a few items so that the overall agenda is to talk about some grow co board and grow co management team appointments.

Unknown Speaker 30:37
The first one is, we would like to appoint Jan

Unknown Speaker 30:41
as the secretary and treasurer of this board,

Unknown Speaker 30:46
and that she would be compensated for that position.

Unknown Speaker 30:50
The reason we want to do this is so that she has authority to request the to request the shareholder information and sign documents representing the board approved transactions of the company.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 31:04
We what we ran into last week where we cannot get accurate shareholder information

Unknown Speaker 31:13
because she's not an officer of the company. I mean, overall, the reason all of these items

Unknown Speaker 31:20
we are suggesting, proposing so that we can more effectively run Roco as a company, both from a board side and from a management side. There has been from all of us, from Jeff, from me, from Wayne,

Unknown Speaker 31:42
commentary over the past two months that the requests that are being made on the board are really management issues of a company, but without the proper management team in place, we are being left to make decisions

Unknown Speaker 31:58
that a management team should make. It is very obvious that

Unknown Speaker 32:04
those requests and the way that things have been run is not the most efficient, and it's definitely not moving the for the company forward and in the way that is best for the shareholders. So we are proposing some new positions and some restructuring so that we can more effectively get there.

Unknown Speaker 32:28
So

Unknown Speaker 32:30
one of those is to appoint Jan as secretary and treasurer, which would give her the ability to sign documents for board approved transactions, of course, and then to allow

Unknown Speaker 32:46
we would we want to hire an office manager.

Unknown Speaker 32:51
Wayne, you've commented, you know, some at times that we are borrowing resources, you know, specifically Cheryl to do the accounting work. That shouldn't be the case. Grow. COVID should have its own

Unknown Speaker 33:04
office manager, slash accountant,

Unknown Speaker 33:08
to handle things like all of the tasks, basically around

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 33:15
organizing the books, organizing what is communicated to shareholders around these, you know, notes, organizing what needs to be paid and when, and making sure those payments happen, and really getting in front of it, not having, you know what, what feels like. What comes up every week is, oh, my god, we're late on another thing, or this is coming up. We need to rush to approve it, to really understand

Unknown Speaker 33:41
and have have a firm grasp on

Unknown Speaker 33:45
the operations from a financial perspective. So we're proposing that we hire someone

Unknown Speaker 33:50
and that we also use some of Louise. Louise's time to assist Jan and office manager

Unknown Speaker 34:01
for one came on, Louise is already super familiar with the company. She's been involved for years now. She knows the players, and she would be able to add a good level of efficiency into it. So

Unknown Speaker 34:16
discussion, thoughts, I

Unknown Speaker 34:23
I think you covered that. Well,

Unknown Speaker 34:29
should we make a motion? And what are you proposing? Or what is the proposal? Laura, do you have a proposal as to the compensation that we're going to be I see that we're talking about. Till Louise?

Unknown Speaker 34:43
So Louise would be one, yep, Louise would be $1,000 a month, proposing $2,500 a month for Jan.

Unknown Speaker 34:53
So would be an additional $3,500

Unknown Speaker 34:56
a month, outflow to the to us.

Unknown Speaker 35:00
And we're thinking on the office manager accounting,

Unknown Speaker 35:05

probably $5,000 a month is realistic. We want an account based

Unknown Speaker 35:10
on what they would be doing and the level of support that we would need. I think given, you know,

Unknown Speaker 35:17
given

Unknown Speaker 35:19
output of funds on a monthly basis, based on what we would actually gain. I mean, all of us have have other jobs. All of us are spending an exorbitant amount of time doing these things. So

Unknown Speaker 35:36
we weighed the cost benefit, you know, the type of person that we would need, and that's the compensation we're proposing. So 2500 for Jan the office manager would obviously be to determine guys, because we don't have that person. We don't have that job description fully fleshed out. But we're thinking about 5k about 60k a year, and then Louise for 1000 a month.

Unknown Speaker 36:03
So this is to approve that the the office manager is not to approve the

Unknown Speaker 36:10
salary for that person, yet, it's to approve the

Unknown Speaker 36:15
searching for and hiring of that role. So

Unknown Speaker 36:23
any other discussion? Yes, I wonder. I kind of wonder, really, at this particular stage, what is our what is our current cash position?

Unknown Speaker 36:38
Jeff's in your Dropbox.

Unknown Speaker 36:41
I can pull it up. Do we have it off the do, do we have it off the top of somebody's head

Unknown Speaker 36:47
in

Unknown Speaker 36:49
$200,000

Unknown Speaker 36:50

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

I think I have to go,

Unknown Speaker 36:53
Yeah, okay. That probably close enough. I'm just okay. I'm just trying to figure out the advantages obviously offset against the salary about doing this stuff, and that

Unknown Speaker 37:09
I do agree with with Laura, that

Unknown Speaker 37:15
it would be nice to have certainly a CEO in here.

Unknown Speaker 37:20
I guess that's not really what we're talking about with either Jan or

Unknown Speaker 37:28
an office manager, but somebody that still would have to report back to the board to get things done. So in some stages, it seems to me like we're going to be reviewing everything, just like we do anyway. So I don't know I'm I'm just trying to get see how much we gain from this. I all of this discussion about our books not being open and people can't get access to this, and all of these things, to me, this is beyond me. We everything that we've asked on the books, the records, everything to me, has been available at all times. I

Unknown Speaker 38:11
do you feel somebody doesn't have access to the to these different things, but to me,

Unknown Speaker 38:19
I don't understand this. I, I don't understand that, that, that we, that the board and or Wayne or we, that we haven't been communicating to people all of this stuff. I, it's nice.

Unknown Speaker 38:38
Half of it is, there's, a piece of transparency, okay, but there's also a level of foresight and the way that that the issues are being handled and seen

Unknown Speaker 38:55
that is troubling. We need to have our arms around, not just what the emergency of this week or the day is, but what

Unknown Speaker 39:06
the strategy is, what the reasons are why we are making decisions, and people who have the background to make those decisions and to provide The necessary and relevant information to make those decisions have been kept out of conversation at this point.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 39:27
And because of that, we have four people, one of whom have been with the company all along, and three others who are relatively new to the situation trying to make decisions, and it's not working.

Unknown Speaker 39:46
And I guess you seem to think, Laura, that the appointment of Jan here to this position, and the appointment of

Unknown Speaker 39:58
Louise to do.

Unknown Speaker 40:00
This,

Unknown Speaker 40:02
and the appointment of a manager will clear that up. It won't clear up everything, but it would certainly assist in a lot of the efficiency issues that seem to be going on. I mean, one is

Unknown Speaker 40:19
communication and just consistency of communication and and being able to communicate with our shareholders in a really buttoned up way, and to have deadlines and to have a plan, and to not be surprised all the time when we get called that this thing is going to be shut off, or that thing is going to be shut off, and always responding in a reactive way. It feels like we are consistently responding in a very reactive way. We don't know what the current cash flow position is. We are confused about when we get a $400 or $400,000

Unknown Speaker 40:57
investor coming in, how that money is going to be spent.

Unknown Speaker 41:05
So no, it doesn't fix everything. But clearly, the

Unknown Speaker 41:13
the methods we have in place to run this show are not

Unknown Speaker 41:21
they're not working,

Unknown Speaker 41:23
and we see this as a way to streamline a lot of the execution.

Unknown Speaker 41:37
We can't be sitting there in every

Unknown Speaker 41:42
if we, if we had, we are still going to have to approve things. Yes,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

you're right, but if we had

Unknown Speaker 41:49
an accurate picture of the information before, you know, we're way behind the eight ball. And if we have an accurate picture of what we're going you know what the impact is of our decisions? It would be a hell of a lot easier to move things through and to make wise decisions,

Unknown Speaker 42:10
but it feels extremely nice, Laura, are you? Are you thinking that this information is mainly going to be coming

Unknown Speaker 42:19
from an office manager that can lead us to possibly make better decisions because things have been organized and all of this, or is this information mainly going to be coming from Jan?

Unknown Speaker 42:33
Both they will work together

Unknown Speaker 42:37
once it is organized and caught up. I would think that what we want with an office manager is to have a more clear picture of cash flows, projected interest disbursements. I mean, it's

Unknown Speaker 42:52
having one person run the business, so we can run it like a business, so we know where the money's going when it goes forward, so we have a clear picture.

Unknown Speaker 43:02
I don't really office manager is probably not the greatest title. It's probably more of

Unknown Speaker 43:09
a an accounting role, not to mention office manager. When I think of an office manager, I think of someone that's handling, you know, the day to day ops of of an office i This is intended to be more of a

Unknown Speaker 43:24
accounting role

Unknown Speaker 43:26
and a manager type role. We would obviously come up with a

Unknown Speaker 43:33
a job description.

Unknown Speaker 43:39

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

You know, this is something that that Wayne has said too, that it's you would be happy to offload some of this stuff. So I don't I did a while ago, before all this stuff blew up, and we have a liticuous shareholder out there.

Unknown Speaker 43:53
But in general, I like the idea.

Unknown Speaker 43:58
I think Jan's the wrong person, and I think we have to do anything we possibly can to stay in business, conserve cash flow, so at this point in time, we'll not be voting for it. Once you have called a motion, if you are going to call a motion, and Laura, I would appreciate that you don't chat with other people as we discuss these items, particularly derogatory remarks about Jeff and myself.

Unknown Speaker 44:22
I there's not derogatory remarks. I don't think you said something like these guys or something I didn't read it fast enough you want to bring up your chat window.

Unknown Speaker 44:34
My chat window problems. Maybe that's one of the problems you have in terms of trying to understand what's going on these meetings as they're chatting with other people.

Unknown Speaker 44:44
I'm not chatting with anyone. What are you talking about? Too. I just saw, I saw a flash in front of my screen. Bring it up. Let's see that. Let's see the chat information, along with the time.

Unknown Speaker 44:55
Board members have to be other in love with each other. You weren't chatting. Why we're doing this?

Unknown Speaker 45:00
Discussion number two,

Unknown Speaker 45:03
what are you talking about in our Go To Meeting?

Unknown Speaker 45:08
Yeah, I'm seeing screen your chat window comes up three times when you were talking about number two, I think I minimized mine once and brought it back up Wayne, because I was going to go look for something Jeff had asked for. Oh, about the cash balances I was trying to get to my desktop. That's probably what happened

Unknown Speaker 45:28
anyway. No derogatory remarks made.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 45:35
Let's take a look at it. You said, Oh, God, these guys are something I didn't quite read it fast enough. Oh, there's a conversations I've been having with my brother and other people about other things. There's not

Unknown Speaker 45:47
why we're conducting

Unknown Speaker 45:51
a board.

Unknown Speaker 45:54
Yeah, sure. Wayne, so your window open up a few times

Unknown Speaker 46:00
meeting, I would appreciate if we don't chat or anything else during our board meeting.

Unknown Speaker 46:05
Okay, when you have your screen up, I'll halt you when you're looking at emails and such too. Okay, I'm

Unknown Speaker 46:13
not looking at any email. I was looking at your chat window.

Unknown Speaker 46:21
All right, let's

Unknown Speaker 46:23
open for discussion. We already had the discussion. I'm gonna ask for a motion to vote

Unknown Speaker 46:30
on authorizing Jan as a secretary and treasurer, appointing Jan to hire an office Jan and the board to hire an office manager for grow CO, and to hire Louise to assistant Jan and the office managers duties I make a motion to implement management items for grow CO, to appoint me as Secretary Treasurer for a nominal amount of $2,500 a month, and to search for a qualified office manager, slash accountant for the transactions of grow CO and to hire Louise Lowe to assist in The transition.

Unknown Speaker 47:16
Do I have a second?

Unknown Speaker 47:22
I second

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 47:27
and we vote on these items.

Unknown Speaker 47:32
Laura, before we vote, can? Could we have a little bit more discussion here?

Unknown Speaker 47:40
Yeah, you know, in some ways, I have no problems with, you know, if Jan's going to be trying to get things organized and do some things here,

Unknown Speaker 47:52
you know, possibly, you know, possibly hiring her. I, again, I, since she's on the board. I don't know if it's exactly the right person, but she is here. She's privid All of these things. So in some ways, it does make some sense to me. I don't know. I don't know what we gain myself from hiring. We're getting these things done right now,

Unknown Speaker 48:19
basically under the auspices of, you know,

Unknown Speaker 48:25
we don't have to pay for this. So paying for another $1,000 a month, I don't know, as far as bringing on, you know, I'd love to have a qualified person be the CEO of this company, but for $5,000 a month. I don't think we're going to get him. And for you know, as far as hiring an office manager, I don't know what he's going to do that Jan couldn't do. So to me, I don't know what we're going to get from this guy. I mean, how long is it going to take the guy to get up to speed? What is he What could he possibly give us, especially when any major items we're going to be continuing to vote on, just like we do now, I don't know what limitations we put on the guy, as far as $1,000 payables or something like this, but these are things that you know we certainly could delegate to Jan or somebody in that capacity. So, you know, in some ways, I'd like to break some of these things up,

Unknown Speaker 49:31
because I do think there's certainly a need here to continue. And if you think there's a lack of organization, I I don't particularly think that there is, but I guess that's what you and Jan seem to think that there is. You know, I don't think I have a problem myself with with Jan being a secretary, but I I'd want to know what her limitations are.

Unknown Speaker 50:00
Are as to make decisions, especially on financial matters that we would certainly establish, you know, some number that it would take a board, a board vote to to disperse funds or whatever. But as far as information gathering, and, you know, a liaison with our, you know,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

different creditors, accounts payable, note holders,

Unknown Speaker 50:31
right? This is what John, Jan wants to do. Then, you know, I would certainly consider that

Unknown Speaker 50:37
I will take on.

Unknown Speaker 50:40
Go ahead. Jeff, I'm sorry. Go ahead. Jen, go ahead. I apologize. No, I apologize. Basically, you know, I just am asking for a nominal amount more for the entire picture of getting this organized, because I don't feel there's the organization. The reason I feel we need an office manager is one. I can't do this entire task for $2,500 a month. I have another job, and we need someone with an accounting background that is qualified to then interface with two rivers. And yes, I'm not proposing to change anything, as far as board approval as a secretary and treasurer, I need to be a signer on an account I'd like the books and records to be in Grove co boards

Unknown Speaker 51:25
possession, and I think we need the office manager accountant to have that go smoothly.

Unknown Speaker 51:33
But I think what you're saying is maybe we should vote on these items separately. And I'm happy to make a motion to restate my motion to separate these. Yeah, let's separate them.

Unknown Speaker 51:45
So would you like me to make a motion regarding my appointment as secretary treasurer? Yes, please. Okay, I move to appoint Jan McCaffrey as secretary treasurer of groco Board for $2,500 a month as an officer, I will have authority to request shareholder information and sign documents representing board approved transactions of the company. All transactions do require Board approval.

Unknown Speaker 52:16
I'll second that.

Unknown Speaker 52:19
I Okay, so let's vote it. For it. Vote to have Jan hired a secretary treasurer of grow co

Unknown Speaker 52:29
I vote yes. I vote yes. I'm okay with that. I vote yes.

Unknown Speaker 52:35
I vote yes.

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 52:39
Great.

Unknown Speaker 52:40
Okay, so the next item

Unknown Speaker 52:44
to appoint,

Unknown Speaker 52:47
Jan to locate and hire a growth co office manager,

Unknown Speaker 52:52
slash

Unknown Speaker 52:54
accounting manager. We would come up with a title to handle accounting in certain operational aspects

Unknown Speaker 53:01
we would want to work with, you know, Wayne

Unknown Speaker 53:05
and probably Cheryl and Louise to define what the responsibilities are in as a from a general standpoint, it would Be to

Unknown Speaker 53:19
to wrap their arms around the books for grow co to manage the we would want to bring the books on to QuickBooks Online has been which has been discussed before. We would want to have them provide regular reports to the board so that we can be prepared to make decisions

Unknown Speaker 53:41
in these meetings efficiently, and we would want to have them be able to,

Unknown Speaker 53:47
yeah, execute bank transactions up until, you know, a certain smaller amount.

Unknown Speaker 53:53
It feels like we in this meeting. We would just want the permission to actually seek out

Unknown Speaker 54:03
and

Unknown Speaker 54:05
look for this person. It's going to take a little bit of time, and

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

then

Unknown Speaker 54:11
the actual hiring of the person would happen down the road.

Unknown Speaker 54:16
So Laura's a suggestion,

Unknown Speaker 54:19
maybe not a motion, but I like the concept in general. I don't know about QuickBooks Online, and because we have to consolidate, we're a public company, everything else, but we can take one step at a time. Why don't you guys try to find and I'm all about conserving cash right now, but why don't you guys try to find somebody and then come back, you know, a candidate, or whatever, and then come back and discuss with the board. But at this point in time, I'd vote, if you have a motion, I would not vote for it.

Unknown Speaker 54:46
Okay, so why don't we? The motion will be to locate an office manager

Unknown Speaker 54:56
and present them to the board.

Unknown Speaker 54:59
I would.

Unknown Speaker 55:00
Can someone make a motion for that? So I make a motion that I work to find someone that's qualified with both their accounting skills to be a office manager for grow CO

Unknown Speaker 55:15
and then present that to the board for approval. For approval? Okay,

Unknown Speaker 55:22
I'll second that.

Unknown Speaker 55:25
Hey, can we vote on that?

Unknown Speaker 55:28
I vote yes, yes,

Unknown Speaker 55:31
yes, I vote yes.

Unknown Speaker 55:34
Okay, unanimous approval for that. And then the third item is to hire Louise to assist Jan and this girl, co office manager. It would

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

initially be just to assist Jan in her duties as secretary and treasurer for 1k a month. Louise has is privy to a lot of the operation already. I think Jan will need immediate support and what she's doing. So I would,

Unknown Speaker 56:03
I would

Unknown Speaker 56:05
motion to push this through. Yeah, would that be like a contractor, 1000 or on payroll? I would, what do you

Unknown Speaker 56:15
propose?

Unknown Speaker 56:18
Well,

Unknown Speaker 56:19
I would,

Unknown Speaker 56:21
I don't know. I don't think she would need to be on payroll. It seems like if she's covered under two rivers and as a full time employee, it seems like it makes sense to have her as a contractor for grocer. She is not covered under two rivers as a full time employee, she left April 1.

Unknown Speaker 56:41
Oh, I did not know that. Okay, so she's an employee. I think she's an employee. MC, grow,

Unknown Speaker 56:48
yeah. Okay, so we would,

Unknown Speaker 56:53
I would say, as a contractor, then let's, let's put her on as a contractor for 1k a month.

Unknown Speaker 57:00
Yeah. And just for discussion, I feel that she is familiar enough with the notes and operations, things that can help me organize and streamline and also help with input,

Unknown Speaker 57:13
you know, for the qualifications of the person that we're seeking.

Unknown Speaker 57:20
Okay, I don't think that. I This is Jeff. I don't think it's appropriate that we have anybody that's working from a grow,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 57:34
work for us or be on within the within the within the Grow co company, myself. And as far as you know, I love, I love Louise, but I just don't think that that is appropriate, and I think that I could be mistaken. And

Unknown Speaker 58:00
I think it's been Cheryl, it's made, been making the, you know, updating this, as far as you know, who we paid on the interest, all of our note extensions and all of these things that still is within

Unknown Speaker 58:17
the Grow career, Yeah. And I think that Jen could can work with her. I, if I'm mistaken, I'd like to hear it from

Unknown Speaker 58:29
you know, you Wayne and and the rest of the board,

Unknown Speaker 58:34
Jeff, I agree with you your position, and in terms of conflicts also, and for the time being, I just suggested Jen work with Cheryl.

Unknown Speaker 58:47
Do we need to vote on it, or do we just want to say

Unknown Speaker 58:51
that, you know, I'll work with integrating with Cheryl and

Unknown Speaker 58:58
vote on

Unknown Speaker 59:00
it. Just kind of procedural question. Yeah, yeah, why don't? Why don't we leave it for now, I would prefer not really to vote on it, but I would unless you really want to. But I would prefer that, that you go ahead and start working with Cheryl, if you come back to us and say, look at this is untenable, or this is not working. I got to have this, this, this, this, this, or you're having problems,

Unknown Speaker 59:30
we certainly can revisit it. But to me,

Unknown Speaker 59:35
I think we should give it a go there first.

Unknown Speaker 59:41
Okay, so can I? Can I get a motion to vote on this?

Unknown Speaker 59:48

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

I move that we vote as to hire low Louise low to assist Jan McCaffrey and grow co office manager for $1,000 a month. I.

Unknown Speaker 1:00:00
I

Unknown Speaker 1:00:02
second that,

Unknown Speaker 1:00:06
and I record the vote.

Unknown Speaker 1:00:09
I vote no, no,

Unknown Speaker 1:00:14
yes, just gonna abstain.

Unknown Speaker 1:00:18
Okay, so we that is not approved

Unknown Speaker 1:00:22
for this meeting

Unknown Speaker 1:00:25
agenda item number three, I'll try to click along here.

Unknown Speaker 1:00:32
We want to create a committee that would consist of Jan a member of two rivers and a member of grow CO that should actually say MC grow the meeting minutes that I have up

Unknown Speaker 1:00:53
or not the that was the one piece I changed when I re sent them to everybody.

Unknown Speaker 1:00:59
So the meetings that it should say a committee consisting of Jan, one member of two rivers and one member of MC grow to provide a recommendation to us, the Grow co board to handle

Unknown Speaker 1:01:14
the following things. So consideration of all warrants, warrant holders for grow co notes and equity units to incentivize the delay of interest payments.

Unknown Speaker 1:01:23
Basically what we've been talking about for the past, you know, couple months, we would want to make a recommendation, a formal recommendation, on how this should be handled,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:01:35
what documents should actually be necessary to formally communicate this to the shareholders and note holders

Unknown Speaker 1:01:42
and documents to implement those changes once they have been accepted by shareholders, note holders or or not accepted.

Unknown Speaker 1:01:56
Basically, we want to do this so that

Unknown Speaker 1:02:01
we are keeping that the interest of the shareholders

Unknown Speaker 1:02:08
in mind, in balance, as we're as we're going forward, in making these decisions, and also, especially because there are Several folks out there, there's a lot of

Unknown Speaker 1:02:21
investors that belong to MC grow. There's a lot of investors that are on the two river side to have an equal balance in this recommendation.

Unknown Speaker 1:02:33
So I understand investors that belong to MC grow. Could you explain? Well, investors that that that are.

Unknown Speaker 1:02:43
So we would they don't belong to Monroe. That's not the right way to say it. Investors that are represented by, I

Unknown Speaker 1:02:51
mean, we have shareholders from all of the the companies right that that are. We have grow Co. There's their shareholders of grow Co. That's who we're wanting to keep in mind. And we want to have representation of balanced representation when we are going to make this recommendation, from MC grow, from two rivers, and from Jan, who would be on our board.

Unknown Speaker 1:03:17
So Laura, let me, let me just real quickly tell you where I stand on this, and then you can go ahead and do the motion, but I'm going to vote against this for two reasons. One,

Unknown Speaker 1:03:26
I think McGrew should have nothing to do with this. It's a huge conflict of interest. Bullet point number one, we've already done this. We've been working on since beginning of

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:03:43
someone has their email on or something. I keep thinking someone's coming on. Paul, any other

Unknown Speaker 1:03:54
thoughts on that?

Unknown Speaker 1:03:58
You know what this is? Jeff. I agree with Wayne. I think, to me, we've already done this. We work on it every single week. As far as what we're doing here, I I think it's to me, everything is out in the open, has been out in the open, and will continue to be out in the open, especially with we've got Jan trying to reorganize, or possibly bringing to light other things that I guess we don't know about. I can't imagine what it's going to be, but I guess we'll find out. On the other hand, I do agree with

Unknown Speaker 1:04:35
with Wayne. I don't see,

Unknown Speaker 1:04:39
I don't see any need for us to

Unknown Speaker 1:04:45
proceed with anybody else, other other than our board. We get feedback from all parties all the time. Anyway,

Unknown Speaker 1:04:56
we've got an agenda in front of us as far as.

Unknown Speaker 1:05:00
Is, you know, trying to do everything right for our leasee, to continue to do everything right for our shareholders and our note holders, and I think we address it every single week. I don't, I don't see how this, this helps us going forward, to tell you the truth. So I'm not in favor of it myself.

Unknown Speaker 1:05:25
Okay, I guess what I would like to see is, you know, so we had a knowledge of what was in, what the investors actually owned from the amendments that they put in, and what the projected cash flow of interest is. And if the other concern I have is with the different

Unknown Speaker 1:05:46
notes in the financing,

Unknown Speaker 1:05:49
are there people out there that still hold warrants that aren't getting the same compensation as others? I mean, is this, you know, just a really clear picture of the structure and what investors own,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

and

Unknown Speaker 1:06:04
that's why we appointed you secretary and treasurer, so you can come alongside us. We'll update you on all that stuff. This will be fun.

Unknown Speaker 1:06:13
Okay, so I'm going to ask for a motion to vote on this.

Unknown Speaker 1:06:19
I make a motion to authorize a committee consisting of myself, one member of two rivers, one member of grow co typical, typical, one member of

Unknown Speaker 1:06:28
to provide recommendation to grow co board to handle the organization of

Unknown Speaker 1:06:38
cash flow and

Unknown Speaker 1:06:42
of all the different notes, structures, yep,

Unknown Speaker 1:06:47
second,

Unknown Speaker 1:06:49
let's vote

Unknown Speaker 1:06:52
nay, not in favor.

Unknown Speaker 1:06:56
Yes, nay, not in favor.

Unknown Speaker 1:06:59
Yes, okay, so that will not be approved.

Unknown Speaker 1:07:04
So Laura, as as a sec on the fourth bullet point. Fourth one you might want to, we might want to separate them. You know, do them separate because that's a lot. Yeah, we're gonna, yeah, we're gonna do them separate. And so the truth is gonna be pretty easy in my, in my view, I think it's great to have another person on this account, case something happens to me or whatever. So I would be for a board motion to authorize Jan to be a signer on our existing grow COVID bank accounts, which are two. That's my motion. Second, it okay.

Unknown Speaker 1:07:35

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

All right, let's vote on that.

Unknown Speaker 1:07:37
I

Unknown Speaker 1:07:39
i

Unknown Speaker 1:07:41
That one was easy. The

Unknown Speaker 1:07:45
next one,

Unknown Speaker 1:07:47
next one is, I've already granted John McAllen view only access to our mcgrowth bank accounts. Okay, and that's done

Unknown Speaker 1:07:56
pursuant to mcgrowth construction agreement or whatever, but I he has that access. He should have had a email

Unknown Speaker 1:08:07
Wednesday or Thursday last week.

Unknown Speaker 1:08:09
Okay,

Unknown Speaker 1:08:12
take note of that. The third one I the third bullet point, I'd be against. We already have exist, two existing bank accounts, grow co I'm just telling you, it's really hard to open bank accounts. We have a good relationship with Wells Fargo, so you want to do a motion on that? I would be voting against that.

Unknown Speaker 1:08:29
All right, let's, um,

Unknown Speaker 1:08:32
just to make sure we're complete here, we don't need to vote on the you only access by mcgrowth, because it's already done that, right?

Unknown Speaker 1:08:40
Okay? And then

Unknown Speaker 1:08:43
a motion to, kind of get a motion to authorize Jan, or did you just create the motion?

Unknown Speaker 1:08:49

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

No, I didn't. I'm just trying to vote against this. Okay,

Unknown Speaker 1:08:54
accounts, it costs money to switch accounts, you know, to set them up. I would be I'm definitely a point. Go ahead and make a motion.

Unknown Speaker 1:09:07
I moved to authorize myself to locate an open bank account, to transfer grow co funds from existing bank account.

Unknown Speaker 1:09:16
Do I have a second?

Unknown Speaker 1:09:18
Second? Yep, I second.

Unknown Speaker 1:09:21
Shall we vote? Can we have a vote? Please, Nay,

Unknown Speaker 1:09:26
I vote, no, yes,

Unknown Speaker 1:09:31
yes. So that will not happen. It is denied.

Unknown Speaker 1:09:36
The next item

Unknown Speaker 1:09:39
is to authorize any two persons, either Jan Louise

Unknown Speaker 1:09:45
and the office manager when hired, to have authority to execute these bank transactions. We now

Unknown Speaker 1:09:53
this one's a little funky, because we have hired, we've authorized,

Unknown Speaker 1:09:59
we had.

Unknown Speaker 1:10:00
Agreed to bring Jan on. We'd not approve to bring Louise on, and we agreed to bring on this office manager. So

Unknown Speaker 1:10:09
agreed to bring on an office manager. We agreed to, we agreed to review a candidate or office manager to speak and present.

Unknown Speaker 1:10:20

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

I don't see,

Unknown Speaker 1:10:22
yeah,

Unknown Speaker 1:10:24
this is we can't we can't vote on this because the pieces aren't in place here. So I don't see any reason to even bring it up. But if we neither would like to change it in some way. Laura,

Unknown Speaker 1:10:38
okay, we'll strike it from the agenda for now,

Unknown Speaker 1:10:41
strike it.

Unknown Speaker 1:10:46
Okay.

Unknown Speaker 1:10:48
Number five is we would we want to hire independent counsel to investigate

Unknown Speaker 1:10:57
the issues that we're talking about? Disclosure, transparency,

Unknown Speaker 1:11:02
shareholder votes on material on material change and capitalization of the companies and that grow code would pay for this independent counsel.

Unknown Speaker 1:11:16
Dan, you have anything?

Unknown Speaker 1:11:19
I didn't I don't have I personally, I don't see any reason for this. We've got,

Unknown Speaker 1:11:25
we've got Mike. I think he's doing a good job for us and

Unknown Speaker 1:11:33
with our cash position and where we're at right now, I don't think, I don't think adding on additional expenses, which can be very, very expensive, I don't think it's the right time to do it.

Unknown Speaker 1:11:51
I agree with you, Jeff.

Unknown Speaker 1:11:54

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

I am

Unknown Speaker 1:11:57
I Mike has been hired for the the SEC investigation specifically not for for this.

Unknown Speaker 1:12:08
And the reason we want to do, do we want to hire outside for this is

Unknown Speaker 1:12:15
is separate from what Mike is doing.

Unknown Speaker 1:12:18
So

Unknown Speaker 1:12:21
I think we have our opinions out. Though, I would ask for a motion to vote on this.

Unknown Speaker 1:12:29
I moved to authorized independent counsel for Laura and Jan to investigate disclosure, transparency, shareholder vote on material change in capitalization of the company of principle, grow co would pay for the independent counsel.

Unknown Speaker 1:12:44
Do I have a second? I second that? Let's vote?

Unknown Speaker 1:12:51
No, no,

Unknown Speaker 1:12:55
yes.

Unknown Speaker 1:12:59
Okay, so that is denied.

Unknown Speaker 1:13:05
Number six,

Unknown Speaker 1:13:09
there is an invoice that was sent last week in the amount of $58,818.76

Unknown Speaker 1:13:18
by John it had a second email that included all the detail around the request for funds. This is all around the drying and carrying facility for mckow. So

Unknown Speaker 1:13:32

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

this is a request to authorize the payment.

Unknown Speaker 1:13:38
I'm not going to authorize the payment for two reasons. One, I got to make sure that the Grow code node holders are taken care of first. And the second reason is because now the construction agreement has expired. I'll look at a new construction agreement, but the other one that expired april 22 I know we made a payment to him on the 24th but it the in my mind, the construction agreement has expired.

Unknown Speaker 1:14:04
All right, I want to make a note that the the one thing we have, keeping this,

Unknown Speaker 1:14:14
this together,

Unknown Speaker 1:14:17
or not even together, the one thing we have, we're we're all here. I know it's been stated that grow CO is a real estate company, but grow CO is a real estate company with one tenant that they are committed to helping be successful. That tenant has been grow and if we we are weeks away from having a product that can actually be sold, and that will start to bring in cash flow,

Unknown Speaker 1:14:46
and to stop that process is completely cutting us off at the knees, at the at a very crucial hour.

Unknown Speaker 1:14:57
I agree with Laura, I've seen the timing.

Unknown Speaker 1:15:00
To

Unknown Speaker 1:15:03
when we have grow co coming to a place where they're going to cash flow, and the timing after what we've been through to have the disagreements is unfortunate, and I know we we need to take care of the note holders Absolutely. And I think we all agree that that needs to be done very quickly and efficiently and not be put off.

Unknown Speaker 1:15:26
We just have a desire to work through it

Unknown Speaker 1:15:31
in a thorough in a thorough manner,

Unknown Speaker 1:15:35
as well as being done quickly. So it's not that we are not going to

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

take care of note holders. It's not that we're going to piss all of our shareholders often, or the note holders off, but

Unknown Speaker 1:15:48
this is like, do we want to keep the the lights on, keep the process moving, and keep the the tenants continue To set set the tenant up to be successful? Um,

Unknown Speaker 1:16:03
in the meantime, we can create a new construction agreement. Why the construction agreement only went through? You know? Why? Why expired and when it expired? I have no idea why that was set up that way. I'll tell you why, because all this stuff should have been done by now,

Unknown Speaker 1:16:23
right? And it's not. And we know why.

Unknown Speaker 1:16:29
I think this is a matter for the attorneys, in my mind, because

Unknown Speaker 1:16:35
there's some items that I really don't want to get into of possibly why the capital has not been there,

Unknown Speaker 1:16:41
but that's not something I'm going to discuss.

Unknown Speaker 1:16:51
Even more concerned about this one thing, if this is not approved,

Unknown Speaker 1:16:57
we have to revisit this after working some things out, because I don't have enough knowledge to know why you feel the construction agreement is expired, so I can't speak to that right now,

Unknown Speaker 1:17:13
but it needs to be revisited quickly, because you are cutting the tenant off at The knees, and it's a very critical time for proto.

Unknown Speaker 1:17:23
And from the lawyers standpoint, I think Michael thinks that the construction agreement is and I think it is not out of force.

Unknown Speaker 1:17:36
Otto. If you're speaking for me, you're not that's not accurate. I mean, my clients have expressed their their opinion as to whether the agreement is in force. And that's, that's the the board members position right now.

Unknown Speaker 1:17:53

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

What is the thing? What is the thinking? What could possibly be the thinking behind not allowing the continuation of the one tenant that is in this facility

Unknown Speaker 1:18:05
that work is producing

Unknown Speaker 1:18:10
to continue the process, so that they so that we can be successful in this.

Unknown Speaker 1:18:18
Here's my thinking. Is there another way to do this cheaper, I'd like to maybe even go down and talk to the tenant, see what's going on there. I haven't been there for two or three months, and I know I have to go through proper channels to be able to view the

Unknown Speaker 1:18:34
property and also talk to the tenant. I'm also was under the understanding that there's actually two tenants now, there was one sub lease agreement signed March 1 with quality choices. It was, but I guess they haven't moved in yet.

Unknown Speaker 1:18:53
These are things I don't understand why they are confusing, like at this point.

Unknown Speaker 1:19:02
One why that's great. We you we should make sure that it's being done efficiently, and that it could be it's doing done at the right, you know, in the right way. But are you gonna, you know, when's that gonna happen? Making trips to Pueblo today, tomorrow, because there's a live product that needs to be dried and cured, and it needs to be set up so that it can be done. I can be there tomorrow.

Unknown Speaker 1:19:30
Other issues, like,

Unknown Speaker 1:19:32
there are other issues. But we keep, you know, when we get, we get to this point, and we say, you know, there's, maybe there's a better way to do this. And it's like, well, we're, you know, we're either involved in the business or we're not.

Unknown Speaker 1:19:47
I also

Unknown Speaker 1:19:49
allow me to speak clearly. I also think it's absolutely insane that we're doing business for the guy who said now he's going to sue us,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:19:59
makes no.

Unknown Speaker 1:20:00
Sense to me, either.

Unknown Speaker 1:20:04
So

Unknown Speaker 1:20:06
what is

Unknown Speaker 1:20:08
so? Okay,

Unknown Speaker 1:20:10
well, that's the lawyers can talk about that.

Unknown Speaker 1:20:15
It sounds like we need to

Unknown Speaker 1:20:20
meeting coming up. It sounds like we need to vote on or I would

Unknown Speaker 1:20:29
like to talk in the discussion a little bit and give my opinion on this.

Unknown Speaker 1:20:35
Well, I think we all want our tenant to be successful. And I think they're probably, you know, I'd like to go revisit it. You know what, what groco is, obligation is on this.

Unknown Speaker 1:20:54
You know, the money's been raised specifically

Unknown Speaker 1:20:59
for the purpose of, really, greenhouse two. Here we're continuing to fund,

Unknown Speaker 1:21:06
you know, bits and pieces, it seems, of all business of greenhouse one that I'm not sure that that's what this money is supposed to be going to. I would like us to certainly take a look at that. And while we continue on a weekly basis to be current, as we have in the past,

Unknown Speaker 1:21:33
with this, with this tenant, and on our accounts payable,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:21:40
as we all know, we've got

Unknown Speaker 1:21:43
probably another

Unknown Speaker 1:21:46
1015, 20

Unknown Speaker 1:21:48
different accounts payable of different creditors that were not payment that we're not current on. I think we've I think we've literally bent over backwards for this account,

Unknown Speaker 1:22:03
for this tenant and to be payable on here. And I just want to make sure that the our use of proceeds, defined by where we raise this money, is going, for the right principle here, for the right spot. Secondly,

Unknown Speaker 1:22:22
we do have other obligations. And of course, this tenant thinks always that this is, by far and away, the most important. And it is, though, I mean, it's not, it's not one and only obligation business, but really, really,

Unknown Speaker 1:22:41
you know, what I

Unknown Speaker 1:22:43
in my own mind, like Wayne said, you know, paying these interest payments could be just as important to us. If we don't pay the interest payments, we're in violation of, you know, different covenants that we have with the holders, and it opens us up to a lot of other things. So, you know, I think there's a lot of different considerations here, not that I'm necessarily opposed to this, but what I'd like to know is where we are on the payment schedule with this particular item, and what's left after this? And

Unknown Speaker 1:23:26
are we thinking that there's going to be any other obligations to our tenant once this is done at this particular time? Because we all know that we've got a very limited amount of cash to spend here going forward, this would reduce it by another, you know, quarter or whatever.

Unknown Speaker 1:23:49
And

Unknown Speaker 1:23:51

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

I, you know, I'd like to know how it fits in the whole scope of things. So, Jeff, that was a very good other obligations. Jeff, that's a very good point you brought up about the allocation of funds. If you look at the $5 million $7 million $5 million use of proceeds, you look at the $2 million use of proceeds, almost all of it went to GCP two, and now we're being accused of this appropriating funds, and we're just promulgating that by putting more money into GCP one. We told investors it went to GCP two. So I got a big issue with that too.

Unknown Speaker 1:24:28
All right, so let's Can I get a motion to vote on

Unknown Speaker 1:24:33
authorizing the best

Unknown Speaker 1:24:36
I'm make a motion to authorize payment from a grow construction expenses and draw requests for this week.

Unknown Speaker 1:24:45
Second,

Unknown Speaker 1:24:51
can we have a further

Unknown Speaker 1:24:55
delineation of

Unknown Speaker 1:24:59
what.

Unknown Speaker 1:25:00
Additional funds need to complete this project and how far along we are on it, I would like that that would

Unknown Speaker 1:25:09
that could certainly influence my vote.

Unknown Speaker 1:25:14
Okay, so we can,

Unknown Speaker 1:25:16
as an idea, we vote on this motion, but maybe a new motion about assigning Jan to work with Cheryl and John to put together what you requested, which I think is, is a good idea. I'm also, as I mentioned before, very concerned about the use of funds, particularly after the call this morning. I mean, after the our guests comment this morning.

Unknown Speaker 1:25:41
Okay, so why don't I restate the motion for this, and then I make a

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

new motion to get the answers, like Jeff and you are talking about, so that we can be or if we could just, could we tape? Could we just table the motion? Please, Laura and or Jen, until

Unknown Speaker 1:25:59
John comes back to us with,

Unknown Speaker 1:26:02
you know,

Unknown Speaker 1:26:05
specifics on the project, as to what, what the remaining expenses appear to be, and how close we are for the completion of this.

Unknown Speaker 1:26:16
Okay?

Unknown Speaker 1:26:21
And

Unknown Speaker 1:26:24
I make a motion that I'm assigned to work with John and with Cheryl to get a

Unknown Speaker 1:26:31
for

Unknown Speaker 1:26:34
completion, for the drying and curing and any

Unknown Speaker 1:26:38
expenses for GCP. One

Unknown Speaker 1:26:43
I second,

Unknown Speaker 1:26:45
let's vote on that motion. I,

Unknown Speaker 1:26:52
I,

Unknown Speaker 1:26:55
I

Unknown Speaker 1:26:56
Okay, so that is

Unknown Speaker 1:26:59
unanimously approved to go ahead and do that. It's Mike. If I could

make an additional suggestion, the board could ask the various councils on this call to advise particular board members on the use of proceeds issue that's been raised. Very, very good point. Thank you, Mike.

Unknown Speaker 1:27:26
So would we want to create a new

Unknown Speaker 1:27:29
motion for that and vote on it? Or, I don't know, a lot of stuff needs motions just kind of like a directive, you know? Yeah, all right, I will take a look at that. Seek advice if I don't have an understanding of it, so I'll take some time for that

Unknown Speaker 1:27:48
good.

Unknown Speaker 1:27:51
The number seven is to review and authorize past due interest payments to grow co note holders. So Laura, can we add to that also the issuance of shares of stock that we previously authorized? Or you just want to look at the cash payments.

Unknown Speaker 1:28:09
At this point, we want to look at the interest payments to note holders. I have

Unknown Speaker 1:28:16
a spreadsheet. I believe I want to make sure, yeah, we gave that to you on the 26 we went over that, and then you guys were going to get back to me by noon the next day, which you did, and you said you don't authorize those payments,

Unknown Speaker 1:28:33
right? Dropbox,

Unknown Speaker 1:28:37
I am and I would just let that board know that this, this non issuance of shares of stock after we've made commitments,

Unknown Speaker 1:28:47
is going to cause issues. I don't know what they are, but, I mean, there's going to cause some issues of people not getting stock. I mean, including Jan George's clients, you know, Hugo and their gaming over there, they were asking when the stock is going to be issued. So I'm trying to figure out what this hotel but I don't think stock should be issued until we have a clear picture from all the notes of what people actually own and what amendments are actually in. And once, once that is clear, then I think we readdress what needs to be issued,

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:29:20
right? I agree.

Unknown Speaker 1:29:23
And then, Laura, I also sent you an email. There was modifications done for the $4 million note to try to conserve interest. Bill sent that to me about a half hour before the meeting. I sent it out to everybody that I haven't I haven't had a chance to look at that yet. Bring that up too, if you want to, but just take a look. I received that just before the meeting Wayne and I'm not going to approve something that I get 10 minutes before, because I think it's the haste and the rush that has created some problems. I'm happy to visit that and get a clear understanding and vote on that later. Okay, do.

Unknown Speaker 1:30:00
I will do the same vehicle minutes reflect that, please. I appreciate that.

Unknown Speaker 1:30:07
Are you at the are you at the same yoke? Laura, that you you don't want to, at this point in time, approve the accrued payments? Yeah, I don't have because I honestly haven't looked at that email yet. I saw that it came through, but I was not. I've not been able to look at it, so I'm not comfortable treating it until I do. If the minutes would reflect that, then

Unknown Speaker 1:30:31
thank you.

Unknown Speaker 1:30:33
So let's talk about

Unknown Speaker 1:30:36
Okay, so

Unknown Speaker 1:30:38
I think there, this is what I have. I think it's the most recent and correct one.

Unknown Speaker 1:30:46
This is the one you sent me this morning, Jan, that you were looking at right.

Unknown Speaker 1:30:52
And

Unknown Speaker 1:30:54
those interest payments come to a total of 33,400

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:30:58
on the $4 million principal note,

Unknown Speaker 1:31:03
and I'm in agreement with that. And then the 27,004 91

Unknown Speaker 1:31:09
that's for the six and $7 million note.

Unknown Speaker 1:31:14
Total due is to pay us through March, not April. March, 60,008, 91

Unknown Speaker 1:31:23
we also were doing a reconciliation with a note holder, and his name is Brant we, we, and we only have an additional 1600 I'd like to get that approved too.

Unknown Speaker 1:31:34
Okay, I understand the 33,400

Unknown Speaker 1:31:38
I don't have a problem with the 1600 for Brandt we, we, but

Unknown Speaker 1:31:43
the interest payments of 27,000

Unknown Speaker 1:31:46
is that on another tab? Is that on the second Laura, click on that, grow, CO, exchange, note tab. That's where that comes from.

Unknown Speaker 1:31:54
Page Down. Zoom

Unknown Speaker 1:31:56
out. Zoom out a little bit.

Unknown Speaker 1:32:00
So I see one on there for Mark Anderson. Wayne, I said that that could be pending. I That's why we took it off. It says pending. Oh, okay, well, it's still this may be an old sheet. Maybe I didn't pull the most recent from Dropbox this morning. I didn't see that you took it off. I see $5,625

Unknown Speaker 1:32:20
for Mark MD Anderson on the $6 million exchange. Yeah, we're looking, if you want to look Jen at the screen that I have, yes, a good point. She's talking about row 15

Unknown Speaker 1:32:34
off too. We'll correct that

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Unknown Speaker 1:32:38
pending. Okay, thank you.

Unknown Speaker 1:32:42
So that brings that total to 21,008,

Unknown Speaker 1:32:48
67,

Unknown Speaker 1:32:49
right.

Unknown Speaker 1:32:54
Okay,

Unknown Speaker 1:32:56
so that other than that,

Unknown Speaker 1:33:00
are there any

Unknown Speaker 1:33:03
except that

Unknown Speaker 1:33:07
email I sent out about that modification. But you know, maybe you guys can get back to me on that.

Unknown Speaker 1:33:14
Yeah, I just need to digest that. I

Unknown Speaker 1:33:19
I'll look at it quickly. When we're when we're done,

Unknown Speaker 1:33:24
and I won't be able to get to it till possibly tomorrow morning. I've got it run as soon as this meeting's done and I'm out all day.

Unknown Speaker 1:33:35
So should we make motion? Do we need more discussion, or do we need to make a motion to authorize the interest payments in the total of $55,266.67

Unknown Speaker 1:33:49
and approximately, I think it's 1600 we're at we, we okay. So if you want me to make a motion, I will

Unknown Speaker 1:33:57
please do

Unknown Speaker 1:33:59
okay. I moved to to approve these past due interest payments of $55,266

Unknown Speaker 1:34:07
plus the 1600

Unknown Speaker 1:34:09
and odd dollars that's due to Brantley week.

Unknown Speaker 1:34:13
Okay?

Unknown Speaker 1:34:15
I second it.

Unknown Speaker 1:34:17
Oh, hi.

Unknown Speaker 1:34:20
I

Unknown Speaker 1:34:24
Okay, so it is approved to make those payments.

Unknown Speaker 1:34:30
The

Unknown Speaker 1:34:33
last item, well, there's other business if we have any additional but the number eight is to relocate and grow. Relocate the Grow co books to the Grow co offices at 22,000 South Colorado Boulevard.

Unknown Speaker 1:34:50
Confused on this one, that lease sublease is signed by mcgrowth. There's no grow co offices over there. I.

Unknown Speaker 1:35:00
So this would be if we had,

Unknown Speaker 1:35:04
if we were to hire

Unknown Speaker 1:35:07
Jan. Well, we are. We are putting Jan on the board. Basically the the books have been moved

Unknown Speaker 1:35:16
over to the Parker offices, Parker road offices where, wherever two

rivers is now, and we're motioning to have them

Unknown Speaker 1:35:26
move to a separate location.

Unknown Speaker 1:35:31
I actually was not aware that it's MC grow lease that it is not grow Co. I thought that there was

Unknown Speaker 1:35:37
that grow CO was on it. So I

Unknown Speaker 1:35:45
yeah, I have, don't have knowledge of the lease.

Unknown Speaker 1:35:52
If we had a office manager, which we're the one we're going to look for,

Unknown Speaker 1:35:57
and if we have Louise helping out,

Unknown Speaker 1:36:01
we would want to

Unknown Speaker 1:36:04
have the books located where the employees are. That's that's a request.

Unknown Speaker 1:36:12
Is the table this, until you get an office manager that the board approves, and then we can talk about it. Then

Unknown Speaker 1:36:20
I'm good with that. That's fine. I will table this agenda item until okay with that.

Unknown Speaker 1:36:28
Yeah, I think again, as I've said before, I think the books are completely open. I think they've always been open, and I don't anticipate any changes. I think Jen can go over and see them right there where they are with

Unknown Speaker 1:36:44
Cheryl, and

Unknown Speaker 1:36:47
just got access to everything.

Unknown Speaker 1:36:51

Docusign Envelope ID: 01790E1E-9590-4107-8FC1-CF2445CBE14E

Okay,

Unknown Speaker 1:36:52
Jan, any comments? So you get to table this one,

Unknown Speaker 1:36:56
I'm fine to table this until I have knowledge of

Unknown Speaker 1:37:00
if these are actually grow co offices, and I don't have that knowledge, so I'm fine to table this right now.

Unknown Speaker 1:37:09
Is there any other business that we all want to discuss? I

Unknown Speaker 1:37:20
i

Unknown Speaker 1:37:23
second approve. What

Unknown Speaker 1:37:29
was the motion move to adjourn?

Unknown Speaker 1:37:32
I second it?

Unknown Speaker 1:37:38
We? I approve? I guess we vote on that, and I'm

Unknown Speaker 1:37:43
to adjourn the meeting.

Unknown Speaker 1:37:47
I

Unknown Speaker 1:37:49
All right, that adjourns this board meeting

Unknown Speaker 1:37:53
notes will be Jan took notes. Those will be made available to everybody, and I will post the recording in Dropbox.

Unknown Speaker 1:38:02
Thank you, thanks. Bye. Thank you. Thank You. Thank

Transcribed by https://otter.ai

# EXHIBIT 23

$550,000 McGrow Units Term Sheet (July 18, 2017)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**MCGROW, LLC**
**Term Sheet**
**$500,000 McGrow Units**

This Term Sheet, dated as of July 18, 2017, summarizes the principal terms of units ("**McGrow Units**") to be offered by McGrow, LLC, a Colorado limited liability company, ("**McGrow**"). Each unit consists of notes ("**McGrow Notes**") and development fees ("**Development Fees**") to be paid from McGrow fees ("**McGrow Fees**") paid by Amerijuana, Inc. a Colorado corporation ("**Amerijuana**") for providing goods and services used to extract oil and manufacture products from marijuana plants. **This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive agreement. Nothing herein is binding except as set forth under "Confidentiality," and any sale of these securities is contingent on execution of a definitive agreement.**

## MCGROW UNITS

| | |
|---|---|
| *Issuer:* | McGrow is a Colorado limited liability company that provides greenhouse startup capital, machinery, materials and services to licensed third-party marijuana growers and extractors. |
| *Securities Offered:* | McGrow Units consisting of:<br>1. Up to $500,000 in principal amount of 22.5% McGrow Senior Notes due October 15, 2017, and<br>2. Development Fees equal to 50% of the principal amount of McGrow Notes issued pursuant to this offering. |
| *Purchase Price:* | McGrow Units will be sold in multiples of $100,000, unless otherwise agreed to by McGrow. |
| *Use of Proceeds:* | Net proceeds will be used by McGrow to provide Amerijuana with startup capital, machinery, proprietary McGrow processes, formulas and materials used to extract oil from marijuana plants and manufacture vapor cartridges. |
| *Closings:* | McGrow Units may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than July 31, 2017. |
| *Investors:* | Institutional and other accredited investors. |

## MCGROW NOTES

| | |
|---|---|
| *Principal:* | An amount up to $500,000 purchase price paid, payable in full at maturity. |
| *Stated Maturity:* | October 15, 2017. |
| *Interest:* | 22.50% annually, payable on the maturity date if not sooner. |

**DEVELOPMENT FEES:**

| | |
|---|---|
| *Fees:* | Development Fees are fees paid to McGrow Unit holders by McGrow from fees earned by McGrow for providing Amerijuana with startup capital, goods and services used to establish marijuana oil extraction and production facilities at 39327 Harbour Road, Avondale, CO. |

**OTHER MATTERS**

| | |
|---|---|
| *Unit Purchase Agreement:* | Any issuance of McGrow Notes or McGrow Fees will be made only pursuant to the McGrow Unit Purchase Agreement, which will contain representations, warranties and covenants of McGrow and investors and will include appropriate conditions of closing. McGrow will make available to potential investors (a) form of the McGrow Notes, (b) a copy of the Development Fee Agreement and (c) a copy of the McGrow Operating Agreement. |
| *Confidentiality:* | No potential investor shall disclose the terms of this Term Sheet to any person other than its officers, directors, managers, partners, accountants and attorneys without the written consent of McGrow. |
| *Placement Agents:* | McGrow may engage one or more third-party firms or individuals to serve as placement agents in connection with the offering of the McGrow Notes. Any such placement agent will receive a placement fee of 7.0% of the principal amount of McGrow Notes. |

# EXHIBIT 24

BCLS Forensic Report (August 16, 2017 Journal Entry)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Betzer
Call
Lausten
Schwartz

Forensic Accounting | Fraud Investigations | Economic Damages | Business Valuations | Bank Consulting | Receiverships | Data Analytics

December 4, 2018

John Chanin, Esq.
Foster Graham Milstein & Calisher, LLP
360 South Garfield Street, Suite 600
Denver, CO 80209

Re: GrowCo

Dear Mr. Chanin:

Pursuant to your request, we are submitting this Report on behalf of your client, GrowCo, LLC ("GrowCo"), in connection with the alleged financial improprieties at GrowCo.

## NATURE OF ENGAGEMENT

This engagement has been conducted in accordance with the Statement on Standards for Consulting Services promulgated by the American Institute of Certified Public Accountants and, as such, constitutes a transactional service. Accordingly, this engagement does not constitute any type of attestation service including, but not limited to, an audit, review or the application of agreed-upon procedures, nor does it constitute a compilation. In addition, this engagement is based on our oral understanding of the nature, scope and limitations of services to be provided.

We were not engaged to, nor did we perform, an audit of the financial information or schedules included in this case. This report is intended solely for the information and use by you and your clients.

## COMPENSATION AND QUALIFICATIONS

The *curriculum vitae* for Kristina Cook, which sets forth employment history, education, publications, seminar instruction, and consulting engagements within the last four years is attached at Exhibit A. Ms. Cook is being compensated for this engagement at her standard hourly rate of $300.

**FACTS OR DATA CONSIDERED**

A list of facts or data considered in the preparation of this Report is presented at Exhibit B attached hereto.

**BACKGROUND**

GrowCo is in the business of raising money for the construction of commercial greenhouses in Pueblo County and providing financial and management services for state-licensed marijuana growers who lease the greenhouses. To this end, GrowCo issued seven capital raises, including two equity raises and five debt raises, to raise money to fund the construction and management of the greenhouses, totaling over $18.9 million. One greenhouse, owned by GrowCo Partners 1, LLC ("GCP1"), has been completed and a second greenhouse ("GCP2") has been started, but not completed.

It is our understanding that, due to federal banking regulations, GrowCo could not possess its own bank accounts. As a result, another entity, Two Rivers Water and Farming Company and its operating entity TR Capital Partners, LLC (together, "Two Rivers") was responsible for holding the capital that GrowCo raised in its bank accounts and then distributing the capital when and as requested by GrowCo.

**SCOPE OF ANALYSIS**

You have asked us to perform a detailed analysis of the equity and debt funds received by GrowCo from investors and held by Two Rivers, and the subsequent uses of those funds.

**ANALYSIS**

To perform our analysis, we reviewed the GrowCo QuickBooks files as well as the bank statements provided. The GrowCo QuickBooks proved to be a challenge, as the books and records of both GrowCo as well as GCP1, LLC – a separate entity with a different ownership structure – were kept in the same set of books. Therefore, we determined that the most reliable source of data would be the bank records. We recorded all the bank transactions in a spreadsheet and used the QuickBooks as needed to determine details about each transaction if those details

were not available in the bank data. A schedule showing the bank statements analyzed is included at Schedule 1.

## Capital Raises

GrowCo offered 7 capital raises over the period from December 2014 to October 2017, as shown in the table below. We have analyzed the detail of these capital raises.

| Name | Type | Total Raised | Date Range |
|---|---|---|---|
| GCP 1 | Equity | $ 3,075,000 | Dec 2014 to Jan 2015 |
| $4M Note | Debt | $ 4,000,000 | Mar 2015 to Sep 2015 |
| GCP Super Units (GCP SU) | Equity | $ 5,323,500 | Jul 2015 to Oct 2017[1] |
| $1.5M Note | Debt | $ 100,000 | Apr 2016 |
| $6M Note | Debt | $ 1,910,000 | Mar 2016 to Jul 2016 |
| $7M Note | Debt | $ 2,977,000 | Jan 2016 to Jan 2017 |
| $2M Note | Debt | $ 1,520,000 | Feb 2017 to Sep 2017 |
| | | | |
| Total | | $ 18,905,500 | |

The total capital raised has been confirmed by BCLS to the Company's bank statements, using the Company's QuickBooks and a Master Investor Mailing List provided by Jan McCaffrey to cross-reference deposits to their proper capital raise.

Based on our analysis, $8,398,500 in equity was raised in the GCP1 and GCP SU equity offerings, and $10,507,000 in the five debt offerings.

In addition to the above, we analyzed into which accounts the money received in the offerings was deposited. As shown on Schedule 2, $14,328,666 of the cash, over 75%, was deposited in accounts designated as belonging to GrowCo in the GrowCo QuickBooks, and the remaining $4,464,865 was deposited in the account ending 7974, which is designated as a GCP1 account in the GrowCo QuickBooks.

It is our understanding that these funds were to be used to construct two greenhouses and fund the initial operations of the tenants of those greenhouses until such time as they became self-sustaining. The resulting revenue stream from rent was to be used to retire non-converted debt and pay interest/dividends to investors.

Our analysis showed that a material portion of the proceeds were not used for these purposes. Our discussion of our analysis is below.

[1] Bulk of the raise received July 2015 to April 2016; one $100,000 investment was received October 2017.

**Sources and Uses of Funds**

Schedule 3 shows the sources and uses of the funds by category according to our analysis of the bank statements. While our analysis did show $8,859,610.41 in expenditures for construction of the greenhouses and initial tenant operations, other notable uses include $5,566,381.25 net transfers to Two Rivers and its subsidiary entities Huerfano Cucharas Irrigation Company ("HCIC") and Dionisio Farms and Produce ("Dionisio") and $986,897.14 in transactions for which we do not have sufficient data to classify.

**Transfers to Two Rivers**

We analyzed the transfers to and payments on behalf of Two Rivers and its subsidiary entities, including online transfers to HCIC and online transfers and payments on behalf of Dionisio, from all GrowCo and GCP1 accounts.

Overall, GrowCo transferred or paid $4,577,860.83 to or on behalf of Two Rivers and its subsidiary entities. It also transferred another $1,644,975.77 to GCP1 accounts, from which an additional $988,520.42 was transferred to Two Rivers and its subsidiary entities. In total, $5,566,381.25 was transferred from GrowCo to Two Rivers and its subsidiary entities. These calculations are shown on Schedule 4.

**Due To/From Accounts**

The GrowCo QuickBooks contain four "Due To/From" accounts where transfers to Two Rivers and its subsidiary entities were recorded in GrowCo's QuickBooks:

- Due to/from 2 Rivers Water CO
- Due to/from 2 Rivers Farms
- Due to/from HCIC
- Due to/from TR Capital Partners

In these accounts, amounts owed to GrowCo from the other entities are debits, and amounts owed by GrowCo to the other entities are credits. Debits occur when GrowCo money is transferred to the other entities, or when GrowCo makes expenditures for the other entities. The credits reduce the amount owed to GrowCo, and occur when the other entities transfer money to GrowCo or make expenditures on GrowCo's behalf. We also call these credits "offsets," as they offset the amount owed to GrowCo.

We analyzed 87 credits totaling $12,308,387.16 to these four "Due To/From" accounts. Of these 87 credits, we identified at least 12 offsets whose documentation, calculation or purpose was unknown or unverifiable. As recorded on GrowCo's books, these entries reduce the amount owed to GrowCo from the other entities. If these items are not verifiable or legitimate, additional monies are owed from these entities to GrowCo.

These 12 transactions are shown on Schedule 5 and discussed below.

***Need Documentation of Calculation:***

Six of the 12 transactions totaling $83,844.80 are labeled as labor expenses related to the capital raises. However, the method of calculation and any related documentation has been omitted from what has been provided to us; therefore, we cannot verify the calculations. These appear to be allocations of Two Rivers officer salaries due to the way they've been recorded in TR Capital's QuickBooks file. In addition, only one of these entries was debited to Cost of Note Raised, further clouding their accuracy.

Two of the 12 transactions totaling $398,473 are labeled as debt discount, valuing warrants on the $4M and $6M exchange notes. The method of calculation and any related documentation has been omitted from what has been provided to us; therefore, we cannot verify the calculations. Note that these transactions were not included in Harding's "reconciliation," discussed below.

***Other Items (in date order):***

**December 31, 2014 - $25,000 credit, debit to "Cost of Capital – GCP 1":** The debit to this entry carries the memo "To reclass EGE capital raise expense" and the debit memo references the "20141231 Misc Asset Account Analysis" workbook, which has not been provided to us. This amount was not previously entered in either the "Due To/From TR Capital" account or the "Cost of Capital – GCP 1" account to need reclassification from or to either account, as the only debits in the "Due To/From TR Capital" through that date were $612,000 in cash transfers out to TR Capital, and there were no debits to the Cost of Capital account. As a result, we question the accuracy of this entry.

**July 31, 2015 - $530,327 credit, "To recognize transfer value of land, water, infrastructure less previously recognized":** No calculation or documentation concerning this entry has been provided. As TR Capital recognized $483,670 in gain on its books as a result of this transaction, it is possible that the exchange value was overstated. Without documentation of value, we question the accuracy of this entry.

**December 31, 2015 - $22,000 credit in Due To/From HCIC, "Adj[ust] [Non-Controlling Interest] balance to reported actual":** No calculation or documentation concerning this entry has been provided. It is unclear both why the Equity GrowCo Partner 1 account (which carried the debit on this entry) was incorrect, as well as why the adjustment would go to the Due To/From HCIC account. As a result, we question the accuracy of this entry.

**August 16, 2017 - $6,207,943.50 credit, "To clear IC accounts that were reconciled in 9/16":** Due to the size of this entry, we requested documentation from Harding as to its calculation and basis, which has been included as Schedule 6 (reformatted for our use here). However, the "reconciliation" provided by Harding does not support the $6,207,943.50 entry; in fact, it only shows $2.4 million in what Harding claims is owed by GrowCo to Two Rivers, over $3.8 million short of the journal entry.

*Reconciliation:*
We analyzed the "reconciliation" provided by Harding and identified 26 transactions that were also recorded in the QuickBooks, totaling $2,405,402. Of these transactions, $607,482.70 were transfers of actual funds and $1,797,919.73 were credits recorded via journal entries. The two largest of these were the transfer of the costs of constructing the greenhouse through December 31, 2014, $887,362, and the transfer of ownership of the bank account ending in 7366 to GrowCo on April 13, 2015, with a balance of $230,486.

The $2,405,402 in credits included in Harding's "reconciliation" that were actually recorded in GrowCo's books (less $639,172 in these credits that are questioned and discussed above, as well as $607,483 in credits that are already accounted for in the Actual Net Payments from GrowCo to Two Rivers), plus the $129,740 in water rights and $50,000 error correction listed in Harding's "reconciliation" but not recorded in GrowCo's books (assuming these are both legitimate and documented) are the total legitimate amounts GrowCo needed to pay to Two Rivers. Less the net amounts transferred from GrowCo to Two Rivers, both directly and through GCP 1 bank accounts, totaling $5,566,381 (see Schedule 4), the amount owed to GrowCo from Two Rivers is $4,227,894. This calculation is also shown on Schedule 7.

| | | |
|---|---|---|
| Actual Net Payments from GrowCo to Two Rivers | | $ 5,566,381 |
| ***Less:*** | | |
| Funds paid for by TR Cap on behalf of or transferred to GrowCo recorded in GrowCo books | 2,405,402 | |
| Less: Questioned entries | (639,172) | |
| Less: Amounts already included in Actual Net Payments above | (607,483) | |
| Plus: Water rights (pending documentation) | 129,740 | |
| Plus: Error correction (pending documentation) | 50,000 | |
| Total Payments Required from GrowCo to Two Rivers | | (1,338,487) |
| **Amount Owed by Two Rivers to GrowCo** | | **$ 4,227,894** |

**CONCLUSIONS**

Based on the foregoing analysis, we have reached the following conclusions with a reasonable degree of accounting probability:

First, GrowCo raised $18,905,500 in seven capital raises from December 2014 to September 2017.

Second, GrowCo spent $8,859,610 on the construction of one greenhouse, the partial construction of another greenhouse, and the financing and management of the tenants.

Third, a net amount of $5,566,381.25 was transferred from GrowCo to Two Rivers and its subsidiary entities or paid by GrowCo on behalf of Two Rivers and its subsidiary entities.

Fourth, twelve of the transactions recorded in QuickBooks to offset amounts owed by Two Rivers to GrowCo are questionable and may not represent legitimate offsets to the amounts owed by Two Rivers to GrowCo. Most notable of these is the journal entry for $6,207,943.50 on August 16, 2017, for which no corroborating documentation has been provided.

Fifth, based on our analysis thus far, Two Rivers owes GrowCo $4,227,894.

**LIMITING CONDITIONS**

As noted above, this report was prepared based upon the documentation provided to date, and the facts and circumstances presented during the review, and we therefore reserve the right to modify the analysis and conclusions presented herein if we undertake additional analysis of the information provided to date, and/or if we are provided additional information or documentation in the future.

**CONFIDENTIALITY**

We will hold confidential the fact of this engagement and any documents or information that you have provided (the “Confidential Information”), unless you consent to disclosure and subject to any court order or compulsory process that may require disclosure of the Confidential Information. If we are served with any order or subpoena or otherwise subjected to any compulsory process requiring the disclosure of the Confidential Information, we will advise you as quickly as possible to enable you to attempt to protect the Confidential Information.

Respectfully,



Kristina A. Cook, CPA/CFF, CFE

**Exhibit A**

# KRISTINA A. COOK, CPA/CFF, CFE

Professional History

Betzer Call Lausten & Schwartz, LLP
*(f/k/a Patten, MacPhee & Associates, Inc.* and *Schwartz Forensic Consulting Group)*
Denver, Colorado

4/11 to Present - Consultant at firm specializing in litigation support services, financial institution consulting, receiverships, fraud, forensic accounting and valuations.

Harper Lutz Zuber Hofer & Associates, LLC
Denver, Colorado

5/05 to 2/11 - Director of Fraud Services at consulting firm specializing in litigation support and forensic accounting.

Potts And Company, P.C.
Littleton, Colorado

2/04 to 4/05 - Accountant at accounting firm offering audit and tax services.

University Of Colorado
Boulder, Colorado

5/03 to 2/04 - Accountant III, Office of the University Controller
5/02 to 7/03 - Accountant II, Office of the Vice President for Academic Affairs and Research

BKD, LLP
(formerly Baird, Kurtz & Dobson, LLP)
Denver, Colorado

1/99 to 5/02 - Senior Tax Accountant at regional accounting firm offering full range of accounting, tax and consulting services.

Gerber Distributing Company
Englewood, Colorado

3/96 to 12/98 - Accountant

Junior Achievement, Inc.
Colorado Springs, Colorado

8/95 to 3/96 - Development Assistant

City of Saint Mary's
Saint Mary's, Alaska

2/94 to 6/95 - City Clerk/Treasurer

## Educational Background

B.S., Accounting, 1998 (*summa cum laude*), Regis University, Denver, Colorado.

CPA, State of Colorado, 2000. Member of both the AICPA and the Colorado Society of CPAs.

Certified Fraud Examiner, 2006. Member of the Association of Certified Fraud Examiners and the Colorado Chapter of Certified Fraud Examiners.

Certified in Financial Forensics (CFF), 2008.

## Published Article

"A Day in the Life of Janice Edwards, Forensic Accountant", *New Accountant Magazine,* 2011 High School Edition. Co-authored with Mark W. Lehman, CPA, CFE, Associate Professor Emeritus of Accountancy, Adkerson School of Accountancy, Mississippi State University.

Litigation Support Supplement

Expert Witness Testimony

Business Litigation

| | | |
|---|---|---|
| August, 2014 | - | Dmitriy Baravik v. Gregory Golyansky; Tatyana Golyansky As personal representative of the Estate of Leonard Golyansky; Spartacus, Inc.; and Moneta, Inc. Case No. 2012CV438 in the Arapahoe County District Court, Centennial, Colorado, re: forensic accounting. |
| April, 2013 | - | Arrabelle at Vail Square Residential Condominium Association, Inc., Plaintiff, v. Arrabelle at Vail Square, LLC and Vail Resorts Development Company, Defendants, Case No. 09CV320 in the Eagle County District Court, Eagle, Colorado, re: forensic accounting. |
| July, 2012 | - | United States Securities and Exchange Commission v. St. Anselm Exploration Co., Michael A. Zakroff, Mark S. Palmer, Anna M.R. Wells, and Steven S. Etkind, Case No. 11-cv-00668-REB-MJW in the United States District Court for the District of Colorado, re: forensic accounting. |
| August, 2011 | - | Rosemary Driscoll v. Eric A.M. Dennis, et al., Case No. 07-CV-00608-RPM-MJW, United States District Court for the District of Colorado, re: forensic accounting. |
| May, 2010 | - | Steve Blacker, d/b/a Dustbusters v. The Finishing Touch Janitorial Service, Inc., Case No. 09-CV-70, District Court, Boulder County, Colorado, re: damages. |
| April, 2009 | - | Luebke, et al. v. Modesitt, et al., Case No. 2008-CV-4712, District Court, Jefferson County, Colorado, re: fraud investigation. |
| April, 2009 | - | Gateway USA, Inc. v. William Eirish, Sr., et al., Case No. 07-CV-3200, District Court, City and County of Denver, Colorado, re: fraud investigation. |

Criminal Prosecution

| | | |
|---|---|---|
| May, 2017 | - | People of the State of Colorado v. Daniel Scott Sullivan, Case No. 15CR1803, in the District Court for Jefferson County, Colorado, re: fraud investigation. |
| August, 2012 | - | People of the State of Colorado v. Jennifer Geisick, Case No. 10CR456, in the District Court for Weld County, Colorado, re: fraud investigation. |
| January, 2012 | - | People of the State of Colorado v. Phillip Trujillo, |

Case No. 10-CR-749, District Court, Larimer County, Colorado, re: fraud investigation.

Bankruptcy

| | | |
|---|---|---|
| June, 2012 | - | Edra D. Blixseth, Debtor; Richard J. Samson, as Trustee for the Chapter 7 Estate of Edra D. Blixseth v. Western Capital Partners LLC, Case Number 09-60452, Adversary Number 10-00094 in the United States Bankruptcy Court for the District of Montana, re: fraudulent conveyance and insolvency. |

Marital Litigation

| | | |
|---|---|---|
| May, 2007 | - | In re: Marriage of Keller, Case No. 05-DR-314, District Court, Douglas County, Colorado, re: structure of pension plans. |

Expert Witness Depositions

| | | |
|---|---|---|
| November, 2011 | - | Julia Copeland Cooper v. NCS Pearson, Inc., Case No. 1:10-cv-02840-PAB-CBS in the United States District Court for the District of Colorado, re: damages. |
| January, 2011 | - | In re: Bowen Wellington Banbury, Case No. 09-31477ABC, US Bankruptcy Court for the District of Colorado, re: analysis of financial aspects of Chapter 11 Plan. |
| August, 2007 | - | International Beauty Products v. Beveridge and Lakhani, Case No. BC352097, Superior Court, County of Los Angeles, California, re: fraud investigation. |

Expert Reports/Consultation

| | | |
|---|---|---|
| February, 2013- | | THE TIERRA GROUP, LLC v. MADHAVA HONEY LTD., United States District Court for the District of Colorado, Civil Action No. 12-cv-00476-MSK-KLM, re: damages. |
| January, 2013 | - | Backbone Medical, LLC v. Lanx, Inc., G&K Santoro, Inc. Timothy Burney & Greg Santoro, Case Number 11CV501 in the Boulder County District Court, Boulder, Colorado, re: damages. |
| September, 2012 | - | 211 Eighth, LLC and Prince Creek Construction, Inc. v. Town of Carbondale, Colorado, Case Number 2011CV166, Garfield County District Court, Glenwood Springs, Colorado, re: damages. |
| August, 2012 | - | GORSUCH, LTD., a Colorado corporation, GORSUCH, LTD, B.C., a Colorado corporation, GORSUCH, LIMITED AT ASPEN, a Colorado corporation, GORSUCH, LIMITED AT KEYSTONE MOUNTAIN, a Colorado corporation, and |

GORSUCH COOPER. LLC, a Colorado limited liability company v. WELLS FARGO NATIONAL BANK ASSOCIATION, American Arbitration Association Case No. 77 148 Y 00017 12 GLO, re: damages.

April, 2012 - Naomi L. Miles Revocable Trust, Naomi L. Miles, Trustee, et al. v. Dennis R. Lawrence, et al., U.S. District Court for the District of Wyoming, Case No. 10-CV-0034-PAB; and Russell C. Fieldgrove, et al. v. Dennis R. Lawrence, et al., U.S. District Court for the District of Wyoming, Case No. 10CV0104-PAB; and The Martha W. Gibbs Revocable Trust, et al. v. Dennis R. Lawrence, et al., U.S. District Court for the District of Wyoming, Case No. 10-CV-0120-PAB; and The Arno Family Revocable Trust, et al. v. Dennis R. Lawrence, et al., U.S. District Court for the District of Wyoming, Case No. 10-CV-0258-PAB, re: forensic accounting.

February, 2012 - Cable Wireline, LLC v. Michael Kenney, Petroleum Pressure Surveys, LLC and Does 1 through 20, inclusive, Case No. 2011cv26 in the Logan County District Court, Sterling, Colorado, re: damages.

December, 2011 - John Mark Disorbio v. Julia Copeland Cooper, Case No. 2011CV1523 in the Jefferson County District Court, Jefferson County, Colorado, re: forensic accounting.

November, 2011 - In re: Estate of Allan R. Pepper, Deceased, Case Number 07PR1116, and Interests of Brian A. Pepper, Ward/Protected Person, Case Number 08PR417 in the Probate Court, City and County of Denver, Colorado, re: misappropriation.

November, 2011 - Tristant Partners, LLP v. Alpine Bank, et al., Case No. 09CV169 in the San Miguel County District Court, Telluride, Colorado, re: damages.

July, 2011 - People of the State of Colorado v. Richard Dale Mott, Case No. 10CR1209 in the Boulder County District Court, Boulder, Colorado, re: allegations of fraud.

May, 2011 - Gianzero, et al. v. Wal-Mart Stores, Inc. et al., Case No. 09-cv-00656-REB in the United States District Court for the District of Colorado, re: damages.

# EXHIBIT 25

Volant Law Whistleblower Letter (July 13, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# Exhibit 1036

# CRS Statute of Limitations
# &
# First Subpoenas

19534950

**STATE OF COLORADO**
**DEPARTMENT OF REGULATORY AGENCIES**
**DIVISION OF SECURITIES**

**-SUBPOENA DUCES TECUM-**

THE SECURITIES COMMISSIONER TO: Wells Fargo Bank NA, 1740 Broadway Street, Denver, CO 80274. Pursuant to Title 11, Article 51, Section 601, C.R.S.,

You are hereby required to produce all records in whatever form they are found, including but not limited to; contracts, bank statements, notices, wire transfers, checks, cashiers' checks, deposit slips, deposit items, withdrawal slips, loan applications, loan agreements, signature cards, safe deposit box rental agreements, memorandums, agreements, and all books, records, and documents reflecting and relating to the use, disbursement, and/or other disposition of funds which relate to all bank accounts of **(Any/All Accounts for Two Rivers Water & Farming Company to include account no** [redacted].

The documents requested shall be all those from February 2, 2015 to date of compliance of this Subpoena.

You are to produce the documents to Investigator, Christina Calabrese of the Colorado Division of Securities at 1560 Broadway St., Suite 900, Denver, Colorado 80202 on or before March 27, 2018. Unless otherwise specified or agreed upon by the requestor, transmit response in a secure electronic format.

Issued under authority of section 11-51-601, C.R.S., ______ ______.

(SEAL)

Rhea Babcock
Chief Investigator

VOLANT LAW LLC
Business | Litigation | Real Estate
333 West Hampden Ave., Suite 1000, Englewood, CO 80110
303-790-8400
**J. Bryan Gwinn, Esq.**
bgwinn@volantlaw.com

July 13, 2018

VIA E-LETTER

Christina Calabrese, Investigator
Colo. Dept. of Regulatory Agencies – Division of Securities
1560 Broadway, Suite 900
Denver, CO 80202

**RE: ADDITIONAL INFORMATION ON JOHN McKOWEN SUBPOENA**

Dear Ms. Calabrese,

We received a message from you before the July 4th holiday asking for more information on the GrowCo bank records and state securities filings.

Mr. McKowen was the founder, CEO and Chairman of Two Rivers Water and Farming Company ("Two Rivers") and GrowCo, Inc. ("GrowCo"). However, in May 2016, Mr. McKowen resigned all positions in Two Rivers and GrowCo and was replaced by Wayne Harding, who had served as CFO of Two Rivers and GrowCo. To assist with the transition in management, Mr. McKowen was hired as a consultant. During the transition period, significant differences in management developed between Mr. McKowen, Mr. Harding, and the new board of GrowCo and Two Rivers. The differences primarily centered around use of proceeds from capital raises conducted by GrowCo.

Starting in early 2017, Mr. McKowen became very concerned about the use of proceeds from the capital raises of GrowCo and demanded from Mr. Harding an accounting and proof of authorization for any use of such proceeds. Each request by Mr. McKowen was met with obfuscation. In late 2017, Mr. McKowen was able to force his way back onto the board of GrowCo and was appointed the new CEO. As CEO, Mr. McKowen made official requests for GrowCo books and records in Mr. Harding's possession – to no avail. In February 2018 GrowCo, through its attorney, made a formal Notice of Demand to the board of Two Rivers and GrowCo Partners 1, LLC to produce accounting related to the GrowCo raises. See attached.

In May 2018, data from the Two Rivers servers was dumped onto GrowCo's servers. This data contained certain GrowCo[1] bank accounts used while Mr. Harding was the CEO of Two Rivers and GrowCo. Mr. McKowen and the GrowCo staff examined the bank records. In their investigation, Mr. McKowen discovered a $6.2 million journal entry that offset money Two Rivers owed GrowCo. The entry was made in August 2017 but references an intercompany account reconciliation that was allegedly performed in September 2016. No backup or documentation for this entry has been found. When asked

[1] Two Rivers used several accounts in its name (-7366, -7974, -6629, and potentially -7539) for GrowCo funds. These accounts are being provided. Funds from these accounts were eventually transferred to the Key Bank account opened in May 2017. Additionally, another account (-7648) appears to have been operated by Two Rivers, and so is also being produced.

specifically about the money, its repayment and the authorization for the offsets, Mr. Harding replied, "There is no money, there is no authorization, we will sign a note." When Mr. Harding was informed that GrowCo did not want a promissory note because GrowCo already had notes from Two Rivers that were unpaid, Mr. Harding replied, "then sue us."

GrowCo is now in the process of conducting a forensic audit of the GrowCo bank accounts through the accounting firm of Betzer Call Lausten & Schwartz, LLP. We expect the audit will be completed within 60 days.

Regarding state filings, GrowCo had the benefit of counsel to handle compliance issues. Several filings for GrowCo can be found on EDGAR and it was Mr. McKowen's understanding that any required state filings were also made by securities counsel.

Lastly, the best document to show the number of investors – and the specific amount raised – would be the "Master Investor Mailing List" supplied in response to question #2. The spreadsheet has the various raises listed in column B. For instance, GCPl raised $3,230,927 from investors. The $1,174,385 figure beneath it represents the contribution of TR Capital in the form of land holdings, creating the total of $4,405,312 for that raise.

Lines 26-96 were only included because certain investors in TR Capital were paid a dividend in the form of GrowCo stock ("Dividend Units") – their ownership (column P) is relatively small. Though they were not solicited as investors they technically own stock and so were included. However, they were not used to raise any of the $19 million.

As you continue down column B the remaining raises are in **bold** and *the actual amount raised* is below that name. For instance, only $2,010,000 was raised on the $6M note and only $2,977,000 was raised on the $7M note. Our client informs me that outside the Dividend Units (line 26-96) there were sixty-nine (69) investors that compiled the $19 million in raises – a handful of significant ones and many invested in several raises.

[redacted]

Very truly yours,

Tobin D. Kern

Tobin D. Kern, Esq.
J. Bryan Gwinn, Esq.
TDK/jg

# EXHIBIT 26

Amerijuana Sales, Rent, and GCP-1 Payments (2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| Amerijuana, Inc. Sales Detail | | | | | | |
|---|---|---|---|---|---|---|
| Since 1/1/18 | | $ | | | | 704,540 |
| Date | Customer | | Amount | | | Balance |
| 05/16/2018 | Evolabs | $ | 1,000 | $ | | 714,540 |
| 05/11/2018 | Evolabs | $ | 15,000 | $ | | 713,540 |
| 05/11/2018 | Evolabs | $ | 4,000 | $ | | 698,540 |
| 05/10/2018 | Evolabs | $ | 8,500 | $ | | 694,540 |
| 05/04/2018 | Evolabs | $ | 16,500 | $ | | 686,040 |
| 05/04/2018 | Evolabs | $ | 7,336 | $ | | 669,540 |
| 04/23/2018 | Evolabs | $ | 9,556 | $ | | 662,204 |
| 04/20/2018 | Evolabs | $ | 3,037 | $ | | 652,648 |
| 04/18/2018 | Evolabs | $ | 9,990 | $ | | 649,611 |
| 04/12/2018 | Evolabs | $ | 7,700 | $ | | 639,621 |
| 04/11/2018 | Evolabs | $ | 24,363 | $ | | 631,921 |
| 04/09/2018 | Evolabs | $ | 31,647 | $ | | 607,558 |
| 04/06/2018 | Evolabs | $ | 18,500 | $ | | 575,911 |
| 04/02/2018 | Evolabs | $ | 2,000 | $ | | 557,411 |
| 04/02/2018 | Evolabs | $ | 9,750 | $ | | 555,411 |
| 03/30/2018 | Evolabs | $ | 16,050 | $ | | 545,661 |
| 03/30/2018 | Evolabs | $ | 8,317 | $ | | 529,611 |
| 03/27/2018 | Evolabs | $ | 30,000 | $ | | 521,294 |
| 03/26/2018 | Evolabs | $ | 9,750 | $ | | 491,294 |
| 03/22/2018 | Evolabs | $ | 3,000 | $ | | 481,544 |
| 03/14/2018 | Evolabs | $ | 1,760 | $ | | 478,544 |
| 03/12/2018 | Evolabs | $ | 2,500 | $ | | 476,784 |
| 03/09/2018 | Evolabs | $ | 30,240 | $ | | 474,284 |
| 03/09/2018 | Evolabs | $ | 9,500 | $ | | 444,044 |
| 03/09/2018 | Evolabs | $ | 15,014 | $ | | 434,544 |
| 03/02/2018 | Evolabs | $ | 9,204 | $ | | 419,530 |
| 03/02/2018 | Evolabs | $ | 9,000 | $ | | 410,326 |
| 03/02/2018 | Evolabs | $ | 9,500 | $ | | 401,326 |
| 03/02/2018 | Best Budz | $ | 4,000 | $ | | 391,826 |
| 03/01/2018 | Evolabs | $ | 14,626 | $ | | 387,826 |
| 02/22/2018 | Evolabs | $ | 52,100 | $ | | 373,200 |
| 02/21/2018 | Evolabs | $ | 30,000 | $ | | 321,101 |
| 02/14/2018 | Evolabs | $ | 24,845 | $ | | 291,101 |
| 02/09/2018 | Evolabs | $ | 11,191 | $ | | 266,256 |
| 02/05/2018 | Evolabs | $ | 5,200 | $ | | 255,064 |
| 02/02/2018 | Evolabs | $ | 9,123 | $ | | 249,864 |
| 01/26/2018 | Evolabs | $ | 63,436 | $ | | 240,741 |
| 01/26/2018 | Best Budz | $ | 17 | $ | | 177,306 |
| 01/25/2018 | | $ | 1,502 | $ | | 177,289 |
| 01/25/2018 | | $ | 4,877 | $ | | 175,787 |
| 01/22/2018 | Revenue | $ | 3,750 | $ | | 170,910 |
| 01/19/2018 | Evolabs | $ | 66,546 | $ | | 167,160 |
| 01/17/2018 | | $ | 10,639 | $ | | 100,613 |
| 01/17/2018 | | $ | 5,000 | $ | | 89,975 |
| 01/17/2018 | | $ | 438 | $ | | 84,975 |
| 01/17/2018 | | $ | 300 | $ | | 84,537 |
| 01/09/2018 | | $ | 28,835 | $ | | 84,237 |
| 01/05/2018 | | $ | 34,602 | $ | | 55,402 |
| 01/04/2018 | | $ | 10,800 | $ | | 20,800 |
| 01/02/2018 | | $ | 10,000 | $ | | 10,000 |

| Amerijuana, Inc. Rent Payment Detail | | | | | | |
|---|---|---|---|---|---|---|
| | | Since 1/1/18 | $ | | | 267,118 |
| Date | Payee | Memo | | Amount | | Balance |
| 5/18/18 | GrowCo | Rent | $ | 15,000 | $ | 267,118 |
| 5/11/18 | GrowCo | Rent | $ | 12,500 | $ | 252,118 |
| 5/4/18 | GrowCo | Rent | $ | 16,500 | $ | 239,618 |
| 4/10/18 | GrowCo | Rent | $ | 1,900 | $ | 223,118 |
| 4/10/18 | GrowCo | Rent | $ | 2,000 | $ | 221,218 |
| 4/10/18 | GrowCo | Rent | $ | 1,000 | $ | 219,218 |
| 3/30/18 | GrowCo | Rent | $ | 4,750 | $ | 218,218 |
| 3/7/18 | GrowCo | Rent | $ | 1,500 | $ | 213,468 |
| 3/1/18 | GrowCo | Rent | $ | 13,139 | $ | 211,968 |
| 2/28/18 | GCP 1 | Rent | $ | 51,758 | $ | 198,830 |
| 2/28/18 | GrowCo | Rent | $ | 5,500 | $ | 147,072 |
| 2/16/18 | GrowCo | Rent | $ | 30,121 | $ | 141,572 |
| 2/12/18 | GrowCo | Rent | $ | 35,845 | $ | 111,451 |
| 1/30/18 | GrowCo | Rent | $ | 21,950 | $ | 75,606 |
| 1/22/18 | GrowCo | Rent | $ | 1,125 | $ | 53,656 |
| 1/19/18 | GrowCo | Rent | $ | 18,500 | $ | 52,531 |
| 1/12/18 | GrowCo | Rent | $ | 5,000 | $ | 34,031 |
| 1/10/18 | GrowCo | Rent | $ | 8,650 | $ | 29,031 |
| 1/5/18 | GrowCo | Rent | $ | 10,381 | $ | 20,381 |
| 1/2/18 | GrowCo | Rent | $ | 10,000 | $ | 10,000 |

| Amerijuana, Inc. Paid by Amerijuana for GCP 1 Expense | | | | | | |
|---|---|---|---|---|---|---|
| | | since 1/1/18 | $ | 113,358 | $ | 40,319 |
| Date | Payee | Memo | | Expense | | GCP 1 |
| 3/2/18 | Link | Internet | $ | 4,489 | $ | 2,244 |
| 3/2/18 | Meiklejohn | Legal | $ | 10,000 | $ | - |
| 3/7/18 | Grahm | Legal | $ | 5,000 | $ | - |
| 3/12/18 | Energy | Black Hills | $ | 21,715 | $ | 10,858 |
| 4/16/18 | Energy | Black Hills | $ | 20,540 | $ | 10,270 |
| 5/4/18 | Grahm | Legal | $ | 15,000 | $ | - |
| 5/7/18 | Petroleum | Fuel | $ | 214 | $ | 107 |
| 5/10/18 | Mieklejohn | Legal | $ | 10,000 | $ | - |
| 5/14/18 | Petroleum | Fuel | $ | 200 | $ | 100 |
| 5/15/18 | Energy | Black Hills | $ | 8,251 | $ | 4,126 |
| 5/17/18 | Grahm | Legal | $ | 10,000 | $ | - |
| 5/18/18 | Energy | Black Hills | $ | 7,949 | $ | 3,974 |
| | AMI | Security | | | $ | 8,640 |

# EXHIBIT 27

GCP-1 Security Camera Footage (2017–2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

## GCP-1 GREENOUSE COMPLEX



**Image 1. – 2017 GCP-1 State-Of-The-Art Greenhouse**




**Image 2. – 2017 GCP-1 State-Of-The-Art Extraction Lab**




**Image 3 – 2018 GCP-1 State-Of-The-Art Growing Bays**

# EXHIBIT 28

Eviction of Amerijuana to GCP-1 (May 15, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**MINUTES OF THE SPECIAL MEETING OF THE BOARD AND MANAGERS OF GROWCO PARTNERS 1, LLC, A COLORADO LIMITED LIABILITY COMPANY HELD MAY 15, 2018**

Pursuant to Notice properly given and acknowledged, the Board and Managers of Growco Partners 1, LLC ("GCP1"), met via telephone conference call commencing at 9:45 A.M. E.D.T. Present were Samuel Morris, Jr., Wayne Harding, and Charles Bloom constituting all of the Board and Managers of GCP1. Wayne Harding was appointed secretary of the meeting.

1. On Motion by Charles Bloom, seconded by Samuel Morris, Jr., the Board and Managers voted unanimously to ratify and confirm the prior appointment and designation by the Common Unit Members of the two Common Unit Managers, Wayne Harding and Samuel Morris.
2. The Board and Managers acknowledged that no other Managers had been appointed by the Common Unit Members.
3. On Motion by Charles Bloom, seconded by Samuel Morris, Jr., the Board and Managers voted unanimously to Ratify and confirm all actions taken by Wayne Harding and Samuel Morris, Jr., either individually or together since May 25, 2016, the date of John McKowen's resignation as a Common Unit Manager.
4. On Motion by Charles Bloom, seconded by Wayne Harding, the Board and Managers voted unanimously to ratify and approve the decision to pursue eviction of Amerijuana, Inc.
5. The Board and Managers then discussed the pending litigation against GCP1, Samuel Morris, Jr., and Wayne Harding and concluded that if there is to be a settlement of the litigation, the settlement must include a dismissal with prejudice of the litigation.

There being no further business to come before the Board and Managers, the meeting was adjourned at 9:55 A.M. E.D.T.

Respectfully submitted,

Wayne Harding, Acting Secretary

**MINUTES OF THE SPECIAL MEETING OF THE BOARD AND MANAGERS OF GROWCO PARTNERS 1, LLC, A COLORADO LIMITED LIABILITY COMPANY HELD MAY 15, 2018**

Pursuant to Notice properly given and acknowledged, the Board and Managers of Growco Partners 1, LLC ("GCP1"), met via telephone conference call commencing at 9:45 A.M. E.D.T. Present were Samuel Morris, Jr., Wayne Harding, and Charles Bloom constituting all of the Board and Managers of GCP1. Wayne Harding was appointed secretary of the meeting.

1. On Motion by Charles Bloom, seconded by Samuel Morris, Jr., the Board and Managers voted unanimously to ratify and confirm the prior appointment and designation by the Common Unit Members of the two Common Unit Managers, Wayne Harding and Samuel Morris.
2. The Board and Managers acknowledged that no other Managers had been appointed by the Common Unit Members.
3. On Motion by Charles Bloom, seconded by Samuel Morris, Jr., the Board and Managers voted unanimously to Ratify and confirm all actions taken by Wayne Harding and Samuel Morris, Jr., either individually or together since May 25, 2016, the date of John McKowen's resignation as a Common Unit Manager.
4. On Motion by Charles Bloom, seconded by Wayne Harding, the Board and Managers voted unanimously to ratify and approve the decision to pursue eviction of Amerijuana, Inc.
5. The Board and Managers then discussed the pending litigation against GCP1, Samuel Morris, Jr., and Wayne Harding and concluded that if there is to be a settlement of the litigation, the settlement must include a dismissal with prejudice of the litigation.

There being no further business to come before the Board and Managers, the meeting was adjourned at 9:55 A.M. E.D.T.

Respectfully submitted,

Wayne Harding, Acting Secretary

# EXHIBIT 29

Vaxa 2018 Balance Sheet (December 31, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**VAXA GLOBAL, LLC AND SUBSIDIARIES**
**CONSOLIDATED BALANCE SHEETS**
**FOR THE YEARS ENDING DECEMBER 31, 2018 AND DECEMBER 31, 2017**

| | 2017 | 2018 |
|---|---|---|
| **ASSETS** | | |
| *CURRENT ASSETS* | | |
| Cash & Cash Equivalents | $ 40,975 | $ 48,031 |
| Total Current Assets | 40,975 | 48,031 |
| *PROPERTY AND EQUIPMENT, NET* | - | - |
| *OTHER ASSETS* | | |
| Exclusive Suppy Rights, net | 689,889 | 549,889 |
| Total Other Assets | 689,889 | 549,889 |
| **TOTAL ASSETS** | $ 730,864 | $ 597,920 |
| **LIABILITIES & OWNER'S EQUITY/(DEFICIT)** | | |
| *CURRENT LIABILITIES* | | |
| Accounts Payable, related party | $ 6,000 | $ - |
| Credit Agreement, related party | 12,657 | 275,101 |
| Customer Deposits | 50,000 | 250,000 |
| Obligations on Exclusive Rights | 600,000 | 404,890 |
| Promissory Notes, current portion - in default | 250,000 | 250,000 |
| Total Current Liabilities | 918,657 | 1,179,991 |
| *LONG TERM LIABILITIES* | | |
| Promissory Notes | - | - |
| Total Long Term Liabilities | - | - |
| TOTAL LIABILITIES | 918,657 | 1,179,991 |
| *OWNER'S EQUITY/(DEFICIT)* | | |
| Contributions | - | 500,000 |
| Accumulated Deficit | (187,793) | (1,082,071) |
| Total Equity/(Deficit) | (187,793) | (582,071) |
| **TOTAL LIABILITIES & EQUITY** | $ 730,864 | $ 597,920 |

**The accompanying notes to the consolidated financial statements are an integral part of these statements.**

# EXHIBIT 30

Easby / Vaxa Share Exchange Agreement (February 22, 2019)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

EX-10.1 2 ex10-1.htm

EXHIBIT 10.1

**SHARE EXCHANGE AGREEMENT**

This SHARE EXCHANGE AGREEMENT is made and entered into as of February 22, 2019 (the "**Effective Date**"), by and between EASBY LAND & CATTLE COMPANY, LLC, a Colorado limited liability company ("**EASBY**"), and TWO RIVERS WATER & FARMING COMPANY, a Colorado corporation ("**Two Rivers**"). For purposes of this Agreement, each of EASBY and Two Rivers is sometimes individually referred to as a "**Party**" and both are collectively referred to as the "**Parties**." All capitalized terms, if not otherwise defined in the body of this Agreement, will have the meanings assigned to such terms in **Schedule 1** attached to this Agreement.

A. EASBY holds of record a 100% membership interest (the "**Vaxa Interest**") in VAXA GLOBAL LLC, a Nevada limited liability company ("**Vaxa**"), which in turn holds of record a 100% membership interest in each of Ekstrak Labs LLC, a Nevada limited liability company ("**Ekstrak**"), and Gramz Holdings, LLC, a Colorado limited liability company ("**Gramz**" and, collectively with Vaxa and Ekstrak, the "**Vaxa Entities**"); and

B. Two Rivers desires to purchase from EASBY, and EASBY desires to sell to Two Rivers, the Vaxa Interest on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set out in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## THE EXCHANGE

**Section 1.01 Transfer of Vaxa Interest.** On the terms and conditions set forth in this Agreement, at the Closing, EASBY will sell, transfer, convey, assign, set over and deliver to Two Rivers, free and clear of all Encumbrances, good, valid and marketable title to the Vaxa Interest.

**Section 1.02 Issuance of Exchange Stock**. On the terms and conditions set forth in this Agreement:

**(a) Closing Stock**. At the Closing, Two Rivers shall issue and deliver to EASBY 30,000,000 shares (the "**Closing Stock**") of common stock, $0.001 par value, of Two Rivers ("**Two Rivers Common Stock**") determined as set forth in this Agreement.

**(b) Earn-Out Stock**.

(i) *Issuance*. Subject to the terms and conditions of this Agreement, on a date no later than five Business Days after the completion of the determination contemplated by **Section 1.02(b)**, Two Rivers shall issue and deliver to EASBY a number of duly authorized, fully paid and non-assessable additional shares of Two Rivers Common Stock, rounded to the nearest share (the "**Earn-Out Stock**" and collectively with the Closing Stock, the "**Exchange Stock**"), equal to the lesser of (i) 10 times EBITDA, divided by $1.00, and (ii) 20,000,000.

(ii) *Determination*.

(A) By no later than April 15, 2020, Two Rivers will prepare and deliver to EASBY a written statement setting forth in reasonable detail its determination of EBITDA (the "**EBITDA Calculation**").

(B) EASBY shall have a ten Business Day-period after receipt of the written statement pursuant to **Section 1.02(b)(ii)(A)** to review such written statement and the EBITDA Calculation set forth therein. During such period, EASBY and its Representatives shall have the right to inspect the books and records of the Vaxa Entities during normal business hours, upon reasonable prior notice and solely for purposes reasonably related to the determination of EBITDA. Prior to the expiration of such period, EASBY may object to Two Rivers' EBITDA Calculation by delivering a Notice of objection to Two Rivers, which Notice shall set forth EASBY's EBITDA Calculation, specify the items in Two Rivers' EBITDA Calculation disputed by EASBY, and describe in reasonable detail the basis for each objection. If EASBY fails to timely deliver a Notice of objection to Two Rivers pursuant to this **Section 1.02(b)(ii)(B)**, then the EBITDA Calculation provided by Two Rivers will be final and binding on the Parties.

(C) If EASBY timely delivers a Notice of objection in accordance with **Section 1.02(b)(ii)(B)**, the Parties shall attempt in good faith to resolve the disputed items and to agree upon the EBITDA Calculation. If the Parties resolve such dispute within five Business Days after EASBY's delivery of such Notice of objection, then their resolution of such dispute will be final and binding on the Parties.

(D) If the EBITDA Calculation is not resolved in accordance with **Section 1.02(b)(ii)(C)**, all unresolved disputed items with respect to the EBITDA Calculation will be referred to an Independent Accountant promptly following the end of the five Business Day-period referenced in **Section 1.02(b)(ii)(C)**. The Parties shall direct the Independent Accountant to render a written report on the unresolved disputed items with respect to the EBITDA Calculation as promptly as practicable, but in any event within ten Business Days after such submission. The Parties will furnish to the Independent Accountant such work papers, schedules, and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant will resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and not by independent review. The resolution of the dispute by the Independent Accountant will be final and binding on the Parties. The fees and expenses of the Independent Accountant will be borne by Two Rivers and EASBY in proportion to the amounts by which their respective EBITDA Calculations differ from the EBITDA Calculation as finally determined by the Independent Accountant.

**(c) Post-Closing Operation of Vaxa Entities.** Subject to the terms of this Agreement, following the Closing, Two Rivers shall have sole discretion with regard to all matters relating to the operation of the Vaxa Entities, provided that Two Rivers shall not, directly or indirectly, take any actions in bad faith for the sole or principal purpose of reducing EBITDA. Notwithstanding the foregoing, Two Rivers has no obligation to operate the Vaxa Entities in order to maximize the amount of EBITDA.

**Section 1.03** **Restrictions on Transfer.** The Exchange Stock will not be registered under the Securities Act or the securities laws of any state and may not be transferred, hypothecated, sold or otherwise disposed of until: (a) a registration statement with respect to such Exchange Stock is declared effective under the Securities Act; or (b) Two Rivers receives an opinion of counsel, reasonably acceptable to Two Rivers in form and substance, that an exemption from the registration requirements of the Securities Act is available. Each stock certificate representing any of the Exchange Stock will contain a legend substantially as follows:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, HYPOTHECATED, OR OTHERWISE DISPOSED OF UNTIL A REGISTRATION STATEMENT WITH RESPECT THERETO IS DECLARED EFFECTIVE UNDER SUCH ACT OR THE COMPANY RECEIVES AN OPINION OF COUNSEL, REASONABLY ACCEPTABLE TO TWO RIVERS IN FORM AND SUBSTANCE, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT IS AVAILABLE.

**Section 1.04** **Tax Treatment.** For U.S. federal income Tax purposes, the Parties intend that the Exchange qualify as a tax free "reorganization" within the meaning of Section 351 of the Code. No Party will take any action or make any filings with any Governmental Entity inconsistent with such intent.

## ARTICLE II
## CLOSING; CLOSING DELIVERIES

**Section 2.01** **Closing.** Upon the terms and subject to the conditions set forth in this Agreement, the Closing will take place remotely via the exchange of documents and signatures on the Closing Date.

**Section 2.02** **EASBY Closing Deliveries**. At the Closing, EASBY will deliver to Two Rivers:

(a) a membership interest certificate evidencing the Vaxa Interest, duly registered in the name of Two Rivers and dated as of the Closing Date, as contemplated in **Section 1.01**;

(b) a certificate, signed by a manager of EASBY and dated as of the Closing Date, certifying as to the matters set forth in **Section 6.01** and **Section 6.03**;

(c) an incumbency certificate, signed by a manager of EASBY and dated as of the Closing Date, certifying as to the names and signatures of the managers, officers and agents of EASBY authorized to sign this Agreement or any other documents to be delivered in connection with the Contemplated Transactions;

(d) good standing certificates for EASBY and each of the Vaxa Entities, each issued by the Secretary of State of the State of Colorado as of date within five Business Days of the Effective Date; and

(e) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Two Rivers, as may be required to give effect to this Agreement and the Contemplated Transactions.

**Section 2.03** **Two Rivers Closing Deliveries.** At the Closing, Two Rivers will deliver to EASBY:

(a) a stock certificate evidencing all of the shares of the Closing Stock, duly registered in the name of EASBY and dated as of the Closing Date, as contemplated in **Section 1.02(a)**;

(b) a certificate, signed by the Chief Executive Officer of Two Rivers and dated as of the Closing Date, certifying (i) as to the matters set forth in **Section 6.01** and **Section 6.02**; (ii) that attached thereto are true and complete copies of all resolutions adopted by the Board of Directors of Two Rivers authorizing the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions and that such resolutions are in full force and effect and are all the resolutions adopted in connection with the Contemplated Transactions;

(c) an incumbency certificate, signed by the Secretary of EASBY and dated as of the Closing Date, certifying as to the names and signatures of the officers and agents of Two Rivers authorized to sign this Agreement or any other documents to be delivered in connection with the Contemplated Transactions;

(d) a good standing certificate for Two Rivers, issued by the Secretary of State of the State of Colorado as of date within five Business Days of the Effective Date;

(e) the names and signatures of the officers of Two Rivers authorized to sign this Agreement and the other documents to be delivered in connection with the Contemplated Transactions;

(f) a final draft of the press release to be issued by Two Rivers, within one Business Day after the Closing Date, with respect to this Agreement and the Contemplated Transactions;

(g) a final draft of the Current Report on Form 8-K to be filed by Two Rivers, within four Business Days after the Closing Date, with respect to this Agreement and the Contemplated Transactions; and

(h) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to EASBY, as may be required to give effect to this Agreement and the Contemplated Transactions.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF TWO RIVERS

Except as disclosed in the Two Rivers Disclosure Schedule with specific reference to the Section of this Agreement to which the information stated in such disclosure relates (**provided** that the disclosure in any Section of the Two Rivers Disclosure Schedule shall qualify and be deemed disclosed with respect to other Sections of this ARTICLE III only to the extent it is readily apparent from the face of such disclosure that such disclosure is applicable to such other Sections), Two Rivers represents and warrants to EASBY as set forth in this ARTICLE III as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties speak expressly as of a different date). For purposes of the preceding sentence, “Section” shall mean a second-level subpart (if any) of a Section (*e.g.*, “3.01(a)”) but shall not require more detailed identification.

**Section 3.01 Organization; Standing and Power; Charter Documents; No Subsidiaries.**

**(a) Organization; Standing and Power.** Two Rivers is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Colorado and has the requisite corporate power and authority to own, lease, and operate its assets and to carry on its business as currently conducted. Two Rivers is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the assets and properties owned, leased, or operated by it or the nature of its business makes such qualification or license necessary, except where the failure to be so qualified or licensed or to be in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**(b) Charter Documents.** Two Rivers has delivered to EASBY true and complete copies of all of its Charter Documents, which are in full force and effect as of the Effective Date. Two Rivers is not in violation of any of the provisions of its Charter Documents.

**(c) Subsidiaries.** Section 3.01(c) of the Two Rivers Disclosure Schedule contains a true and complete listing of each entity in which Two Rivers owns any equity or other ownership interest, including each Subsidiary of Two Rivers.

**Section 3.02 Capital Structure.**

**(a) Capital Stock.** The authorized capital stock of Two Rivers consists of: (i) 200,000,000 shares of Two Rivers Common Stock; and (ii) 5,000,000 shares of Two Rivers Preferred Stock. As of the execution and delivery of this Agreement on the Effective Date: (A) 49,220,418 shares of Two Rivers Common Stock had been issued and are outstanding; (B) no shares of Two Rivers Preferred Stock had been issued or were outstanding; and (C) no shares of Two Rivers Common Stock or Two Rivers Preferred Stock were held in treasury. All of the outstanding shares of Two Rivers Common Stock have been duly authorized, are validly issued, fully paid and non-assessable, were issued in compliance with applicable Laws, and were not issued in violation of any Contract or any preemptive or similar rights of any Person. When issued in accordance with the terms of this Agreement, shares of Exchange Stock will be duly authorized, validly issued, fully paid and non-assessable and will not be subject to any pre-emptive rights. Two Rivers is not a party to any voting agreement with respect to any Two Rivers Equity Securities.

**(b) Stock Awards and Contracts.** As of the execution and delivery of this Agreement on the Effective Date: (i) 5,461,447 shares of Two Rivers Common Stock and no shares of Two Rivers Preferred Stock were reserved for issuance pursuant to outstanding options and other equity awards and pursuant to stock or equity plans; and (ii) 1,826,634 shares of Two Rivers Common Stock and no shares of Two Rivers Preferred Stock were reserved for issuance pursuant to outstanding warrants. Section 3.02(b) of the Two Rivers Disclosure Schedule sets forth a true and complete list of all Contracts to which Two Rivers was a party as of the Effective Date that obligate Two Rivers to issue any Two Rivers Equity Securities to any Person (other than as described in the preceding clauses (i) and (ii)) or to repurchase, redeem or otherwise acquire any Two Rivers Equity Securities from any Person.

**Section 3.03 Authority.** Two Rivers has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement and to consummate the Contemplated Transactions. The execution and delivery of this Agreement by Two Rivers and the consummation by Two Rivers of the Contemplated Transactions have been duly authorized by all necessary corporate actions on the part of Two Rivers and no other corporate actions on the part of Two Rivers are necessary to authorize the execution and delivery of this Agreement or to consummate the Exchange and the other Contemplated Transactions. This Agreement has been duly executed and delivered by Two Rivers and constitutes the legal, valid, and binding obligation of Two Rivers, enforceable against Two Rivers in accordance with their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar Laws affecting creditors' rights generally and by general principles of equity.

**Section 3.04 Non-Contravention.** The execution, delivery, and performance of this Agreement by Two Rivers, and the consummation by Two Rivers of the Contemplated Transactions, including the Exchange, do not and will not: (i) contravene or conflict with, or result in any violation or breach of, the Charter Documents of Two Rivers; (ii) conflict with or violate any Law applicable to Two Rivers or its properties or assets; (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in Two Rivers' loss of any benefit or the imposition of any additional payment or other Liability under, alter the rights or obligations of any Person under, give to any Person any rights of termination, amendment, acceleration or cancellation under, or require any Consent under, any Contract to which Two Rivers is a party or otherwise bound; or (iv) result in the creation of an Encumbrance on any of the properties or assets of Two Rivers.

**Section 3.05 Governmental Consents.** No Consent of any Governmental Entity is required to be obtained or made in connection with the execution, delivery and performance by Two Rivers of this Agreement or the consummation by Two Rivers of the Contemplated Transactions, except for the filing with the SEC of such reports under the Exchange Act as may be required in connection with this Agreement and the Contemplated Transactions.

**Section 3.06 Board Approval.** The Board of Directors of Two Rivers, by resolutions duly adopted by a unanimous vote at a meeting of all directors of Two Rivers duly called and held and, not subsequently rescinded or modified in any way, has: (i) determined that this Agreement and the Contemplated Transactions, upon the terms and subject to the conditions set forth herein, are in the best interests of Two Rivers and its shareholders; and (ii) approved and declared advisable the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions upon the terms and subject to the conditions set forth in this Agreement.

**Section 3.07 Anti-Takeover Statutes.** No "fair price," "moratorium," "control share acquisition," "supermajority," "affiliate transactions," "business combination," or other similar anti-takeover statute or regulation enacted under any Laws applicable to Two Rivers with respect to the Exchange, except to the extent that any such statute or regulation has been or will be complied with at Closing.

**Section 3.08 <u>SEC Documents</u>.**

**(a) SEC Documents.** The SEC Documents (including the exhibits thereto) filed on or prior to the Effective Date constitute all of the reports and other documents required to be filed by Two Rivers, during the period from January 1, 2018 to the Effective Date, under Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act. True and complete copies of all SEC Documents (including the exhibits thereto) are publicly available in the Electronic Data Gathering, Analysis and Retrieval database of the SEC. None of the exhibits to the SEC Documents filed with the SEC contains redactions pursuant to a request for confidential treatment. As of their respective filing dates or, if amended or superseded by a subsequent filing prior to the Effective Date, as of the date of the last such amendment or superseding filing, each of the SEC Documents complied as to form in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002, as amended (including the regulations promulgated thereunder). The SEC Documents, taken as a whole (but excluding any SEC Documents, or information therein, superseded by a subsequent filing prior to the Closing Date), do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the SEC Documents is, to the Knowledge of Two Rivers, the subject of ongoing SEC review or any outstanding SEC investigation, and there are no outstanding or unresolved comments received from the SEC with respect to any of the SEC Documents.

**(b) Financial Statements.** The consolidated financial statements of Two Rivers (including any notes and schedules thereto) contained in any of the SEC Documents: (i) complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto as of their respective dates; (ii) were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited interim financial statements, as may be permitted by the SEC for Quarterly Reports on Form 10-Q); and (iii) fairly presented in all material respects the consolidated financial position and the results of operations, changes in shareholders' equity and cash flows of Two Rivers as of the respective dates of, and for the periods referred to in, such financial statements, subject, in the case of unaudited interim financial statements, to normal and year-end audit adjustments as permitted by GAAP and the applicable rules and regulations of the SEC (but only if the effect of such adjustments would not, individually or in the aggregate, be material).

**(c) Undisclosed Liabilities.** Two Rivers has no Liabilities other than (i) Liabilities reflected or reserved against in Two Rivers' unaudited consolidated balance sheet (including in the notes thereto) as of September 30, 2018 included in the SEC Documents, (ii) Liabilities incurred since September 30, 2018 in the ordinary course of business consistent with past practice, (iii) Liabilities incurred in connection with this Agreement and the Contemplated Transactions, and (iv) such other Liabilities as do not have, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**Section 3.09 Absence of Certain Changes or Events.** Since September 30, 2018, except in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transactions, the business of Two Rivers has been conducted in the ordinary course of business consistent with past practice and there have not been any events, conditions, changes or effects that have had, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**Section 3.10 Taxes.**

**(a) Tax Returns and Payment of Taxes.** Two Rivers has duly and timely filed or caused to be filed (taking into account any valid extensions) all Tax Returns required to be filed by it. Such Tax Returns are true and complete in all material respects. Two Rivers is not currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business consistent with past practice. All Taxes due and owing by Two Rivers (whether or not shown on any Tax Return) have been timely paid or, where payment is not yet due, Two Rivers has made an adequate provision for such Taxes in Two Rivers' financial statements included in the SEC Documents (in accordance with GAAP). Two Rivers' most recent financial statements included in the SEC Documents reflect an adequate reserve (in accordance with GAAP) for all material Taxes payable by Two Rivers through the date of such financial statements. Two Rivers has not incurred any Liability for Taxes since the date of its most recent financial statements included in the SEC Documents outside of the ordinary course of business or otherwise inconsistent with past practice.

**(b) Withholding.** Two Rivers has withheld and timely paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, customer, shareholder, or other Person (including withholding of Taxes pursuant to Sections 1441 and 1442 of the Code or similar provisions under any Laws), and materially complied with all information reporting and backup withholding provisions of applicable Law.

**(c) Liens.** There are no Liens for Taxes upon the assets of Two Rivers other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate Actions and for which adequate reserves in accordance with GAAP have been made in the Two Rivers Balance Sheet.

**(d) Tax Deficiencies and Audits.** No deficiency for any amount of Taxes which has been proposed, asserted, or assessed in writing by any taxing authority against Two Rivers remains unpaid. There are no waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of Two Rivers. There are no Actions pending or, to the Knowledge of Two Rivers, threatened with respect to any Taxes of Two Rivers.

**(e) Intended Tax Treatment.** Two Rivers has not taken or agreed to take any action, and to the Knowledge of Two Rivers, there exists no fact or circumstance, that is reasonably likely to prevent or impede the Exchange from qualifying as a "reorganization" within the meaning of Section 351 of the Code.

**Section 3.11 Intellectual Property.** Two Rivers owns no Intellectual Property the loss of which would have a Material Adverse Effect with respect to Two Rivers. Two Rivers has taken commercially reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights, in all proprietary information held, or purported to be held, by Two Rivers as a trade secret. Two Rivers owns or licenses all Intellectual Property needed to conduct its business as currently conducted. Two Rivers has never materially infringed (directly, contributorily, by inducement or otherwise), misappropriated or otherwise violated any other Person's rights to Intellectual Property.

**Section 3.12 Compliance; Permits.** Two Rivers is in material compliance with all Laws, Orders and Permits applicable to it and its business or by which it or its business or any of its properties is bound. Since January 1, 2018, no Person (including any Governmental Entity) has issued any notice or notification stating that Two Rivers is not in compliance with any Law. Two Rivers holds all Permits applicable to its business. No suspension, cancellation, non-renewal or adverse modification of any Permit of Two Rivers is pending or, to the Knowledge of Two Rivers, threatened.

**Section 3.13 Litigation.** Except as disclosed in the SEC Documents, there is no Action pending, or to the Knowledge of Two Rivers, threatened against Two Rivers or any of its properties or assets or any Representative of Two Rivers (in the capacity of serving as such Representative), except as would not, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers. Neither Two Rivers nor any of its properties or assets is subject to any Order. There are no Governmental Entity inquiries or investigations, or internal investigations, pending or, to the Knowledge of Two Rivers, threatened, in each case regarding any accounting practices of Two Rivers or any malfeasance by any Representative of Two Rivers.

**Section 3.14 Brokers' and Finders' Fees.** Two Rivers has not incurred, nor will it incur, directly or indirectly, any liability for investment banker, brokerage, or finders' fees or agents' commissions, or any similar charges in connection with this Agreement or the Contemplated Transactions, other than fees of Emerging Growth Equities, Ltd.

**Section 3.15 Related Person Transactions.** Except as contemplated by **Section 6.02(f)**, there are no Contracts, transactions, arrangements or understandings between Two Rivers, on the one hand, and any Affiliate or Representative of Two Rivers (including any director, officer, or employee) or any holder of 5.0% or more of any equity securities of Two Rivers, on the other hand, that are required to be disclosed pursuant to regulations promulgated by the SEC but that have not been disclosed in the SEC Documents.

**Section 3.16 Employee Matters.**

**(a) Compliance with Laws Generally.** Two Rivers is not a party to and maintains no Contract, plan, program, policy, agreement, collective bargaining agreement, or other arrangement providing for compensation, severance, deferred compensation, performance awards, stock or stock-based awards, fringe, retirement, death, disability, or medical benefits or other employee benefits or remuneration of any kind, including each employment, termination, severance, retention, change in control, or consulting or independent contractor Contract, plan, program, arrangement, or agreement, in each case whether written or unwritten or otherwise, funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA (collectively, the "**Employee Plans**"). Two Rivers has not incurred, either directly or indirectly, any Liability relating to any prior Employee Plan.

**(b) Effect of Transaction.** Neither the execution or delivery of this Agreement nor the consummation of the Contemplated Transactions will (either alone or in combination with any other event): (i) entitle any Person to severance pay or any other payment; or (ii) accelerate the timing of payment, funding, or vesting, or increase the amount of compensation due to any such Person

**(c) Employment Law Matters.** Two Rivers is in compliance in all material respects with: (i) all applicable Laws and agreements regarding hiring, employment, termination of employment, plant closing and mass layoff, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, leasing and supply of temporary and contingent staff, engagement of independent contractors, including proper classification of same, payroll taxes, and immigration with respect to its employees and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing its employees.

**(d) Labor.** Two Rivers is not a party to, or subject to, any collective bargaining agreement or other agreement with any labor organization, work council, or trade union with respect to any of its operations. No material work stoppage, slowdown, or labor strike against Two Rivers with respect to employees who are employed within the United States is pending, threatened, or has occurred, and, to the Knowledge of Two Rivers, no material work stoppage, slowdown, or labor strike against Two Rivers with respect to employees who are employed outside the United States is pending, threatened, or has occurred. None of the employees of Two Rivers is represented by a labor organization, work council, or trade union. There are no Actions, government investigations, or labor grievances pending, or, to the Knowledge of Two Rivers, threatened relating to any employment related matter involving any employee or applicant.

**Section 3.17 Real Property and Water Rights.**

**(a) Owned Real Estate.** Section 3.17(a) of the Two Rivers Disclosure Schedule contains a true and complete list by address and legal description of all Owned Real Estate as of the Effective Date. Two Rivers has good and marketable fee simple title to all Owned Real Estate, free and clear of all Encumbrances. Two Rivers has not: (i) leased or granted any Person the right to use or occupy all or any part of the Owned Real Estate; (ii) granted any Person an option, right of first offer, or right of first refusal to purchase such Owned Real Estate or any portion thereof or interest therein; or (iii) received written notice of any pending, and to the Knowledge of the Two Rivers, there is no threatened condemnation Action affecting any Owned Real Estate or any portion thereof or interest therein. Two Rivers is not a party to any agreement or option to purchase any real property or interest therein.

**(b) Leased Real Estate.** Section 3.17(b) of the Two Rivers Disclosure Schedule contains a true and complete list of all Leases (including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto) as of the Effective Date for each Leased Real Estate (including the date and name of the parties to such Lease). Two Rivers has made available to EASBY a true and complete copy of each such Lease. With respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable, and in full force and effect; (ii) no party to each Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with or without notice, lapse of time, or both, would constitute a breach or default under such Lease; and (iii) Two Rivers' possession and quiet enjoyment of the Leased Real Estate under such Lease has not been disturbed and there are no disputes with respect to such Lease. Two Rivers has not assigned, pledged, mortgaged, hypothecated, or otherwise transferred any Lease or any interest therein to any Person.

**(c) Real Estate Used in the Business.** The Real Estate comprises all of the real property used or intended to be used in, or otherwise related to, the business of Two Rivers.

**(d) Water Rights.** Section 3.17(d) of the Two Rivers Disclosure Schedule lists and provides a summary of all contractual or statutory groundwater, surface water, or other rights to water allocation, acquisition, use, and transfer owned or held by Two Rivers (collectively, "**Water Rights**"). With respect to all Water Rights, Two Rivers has not: (i) sold, transferred, leased, or granted to any Person any present or future interest in or to any Water Rights; (ii) granted any Person an option, right of first offer, or right of first refusal to purchase, acquire, or lease any present or future interest in or to any Water Rights or any portion thereof; or (iii) received written notice of any pending, and to the Knowledge of the Two Rivers, there is no threatened, Action affecting any Water Rights or any portion thereof or interest therein. Two Rivers is not a party to any Contract to sell, transfer, or otherwise lease any Water Rights to any Person.

**Section 3.18 Personal Property.** Two Rivers in possession of and has good and marketable title to, or valid leasehold interests in or valid rights under contract to use, the machinery, equipment, furniture, fixtures and other tangible personal property and assets owned, leased, or used by Two Rivers, free and clear of all Encumbrances.

**Section 3.19 Environmental Matters.** Two Rivers is, and at all times has been, in compliance with all Environmental Laws in all material respects, which compliance includes the possession, maintenance of, compliance with, or application for, all Permits required under applicable Environmental Laws for the operation of the business of Two Rivers as currently conducted. Two Rivers has not disposed of, released, or discharged any Hazardous Substances on, at, under, in, or from any Real Estate currently or, to the Knowledge of Two Rivers, formerly owned, leased, or operated by Two Rivers or at any other location that is: (a) currently subject to any investigation, remediation, or monitoring; or (b) reasonably likely to result in liability to Two Rivers, in either case of (a) or (b) under any applicable Environmental Laws. Two Rivers has not: (y) produced, processed, manufactured, generated, transported, treated, handled, used, or stored any Hazardous Substances, except in compliance with all Environmental Laws, at any Real Estate; or (z) exposed any Person to any Hazardous Substances under circumstances reasonably expected to give rise to any Liability or obligation under any Environmental Law. Two Rivers has not received written notice of and there is no Action pending, or to the Knowledge of Two Rivers, threatened against Two Rivers, alleging any Liability or responsibility under or non-compliance with any Environmental Law or seeking to impose any financial responsibility for any investigation, cleanup, removal, containment, or any other remediation or compliance under any Environmental Law. Two Rivers is not subject to any Order, settlement agreement, or other Contract by or with any Governmental Entity or Person imposing any material Liability or obligation with respect to any of the foregoing. Two Rivers has not assumed or retained any material Liabilities under any applicable Environmental Laws of any other Person, including in any acquisition or divestiture of any property or business.

**Section 3.20 Material Contracts.**

**(a) Two Rivers Material Contracts.** For purposes of this Agreement, "**Two Rivers Material Contracts**" mean any of the following to which Two Rivers is a party or any of its assets are bound (excluding any Leases):

(i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the Securities Act), whether or not filed by Two Rivers with the SEC;

(ii) any employment, consulting, or similar Contract (in each case with respect to which Two Rivers has continuing obligations as of the Effective Date) with any current or former (A) officer of Two Rivers, (B) member of the Two Rivers' Board of Directors, or (C) employee or independent contractor providing for an annual base salary or payment in excess of $10,000;

(iii) any Contract providing for indemnification or any guaranty by Two Rivers or its principals;

(iv) any Contract that purports to limit the right of Two Rivers (A) to engage in any line of business, (B) to compete with any Person or solicit any client or customer, or (C) to operate in any geographical location;

(v) any Contract relating to the disposition or acquisition, directly or indirectly, by Two Rivers of assets or capital stock or other equity interests of itself or any other Person;

(vi) any Contract that grants any right of first refusal, right of first offer, or similar right with respect to any material assets, rights, equity, or properties of Two Rivers;

(vii) any Contract that contains any provision that requires the purchase of all or a material portion of Two Rivers' requirements for a given product or service from a given third party;

(viii) any Contract that obligates Two Rivers to conduct business on an exclusive or preferential basis or that contains a "most favored nation" or similar covenant with any Person;

(ix) any partnership, joint venture, limited liability company agreement, or similar Contract relating to the formation, creation, operation, management, or control of any joint venture or Person;

(x) any mortgages, indentures, guarantees, loans, credit agreements, security agreements, or other Contracts, in each case relating to indebtedness for borrowed money, whether as borrower or lender, other than accounts receivables and payables incurred in the ordinary course of business;

(xi) any agreement, license, franchise, permit, indenture or authorization that has not been terminated or performed in its entirety and not renewed that may be, by its terms, terminated, impaired or adversely affected by reason of the execution of this Agreement or the Contemplated Transactions;

(xii) any employee collective bargaining agreement or other Contract with any labor union;

(xiii) any IP Agreement;

(xiv) any other Contract under which Two Rivers is obligated to make payment or incur costs in excess of $10,000 in any year and which is not otherwise described in clauses (i) through (xiii) above; or

(xv) any Contract which is not otherwise described in clauses (i) through (xiv) above that is material to Two Rivers.

**(b) Schedule of Material Contracts; Documents.** Section 3.20(b) of the Two Rivers Disclosure Schedule sets forth a true and complete list of all Two Rivers Material Contracts. Two Rivers has made available to EASBY true and complete copies of all Two Rivers Material Contracts, including any amendments thereto.

**(c) No Breach.** All Two Rivers Material Contracts are legal, valid, and binding on Two Rivers, enforceable against Two Rivers in accordance with their respective terms, and are in full force and effect. Two Rivers has not violated any provision of, or failed to perform any obligation required under the provisions of, any Two Rivers Material Contract. Two Rivers is not in breach, and has not received written notice of breach, of any Two Rivers Material Contract.

**Section 3.21 Insurance.** Two Rivers maintains policies or binders of insurance with respect to its assets, business, operations, employees, officers and directors that are generally of the types, and in amounts, customarily carried by Persons conducting a business similar to Two Rivers.

**Section 3.22 Books and Records.** The minute books and stock record books of Two Rivers, true and complete copies of which have been made available to EASBY, are true and correct and have been maintained in accordance with sound business practices. The minute books of Two Rivers contain true and complete records of all meetings, and actions taken by written consent of, the shareholders, the Board of Directors, and any committees of the Board of Directors of Two Rivers, and no meeting, or action taken by written consent, of any such shareholders, Board of Directors, or committee has been held for which minutes have not been prepared and are not contained in such minute books.

**Section 3.23 Anti-Corruption Matters.** No Representative of Two Rivers has: (a) used any funds for unlawful contributions, gifts, entertainment, or other unlawful payments relating to an act by any Governmental Entity; (b) made any unlawful payment to any foreign or domestic government official or employee or to any foreign or domestic political party or campaign or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended; or (c) made any other unlawful payment under any applicable Law relating to anti-corruption, bribery, or similar matters. Two Rivers has not disclosed to any Governmental Entity that it violated or may have violated any Law relating to anti-corruption, bribery, or similar matters. No Governmental Entity is investigating, examining, or reviewing Two Rivers' compliance with any applicable provisions of any Law relating to anti-corruption, bribery, or similar matters.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF EASBY

Except as disclosed in the EASBY Disclosure Schedule with specific reference to the Section of this Agreement to which the information stated in such disclosure relates (provided that the disclosure in any Section of the EASBY Disclosure Schedule shall qualify and be deemed disclosed with respect to other Sections of this **ARTICLE IV** only to the extent it is readily apparent from the face of such disclosure that such disclosure is applicable to such other Sections), EASBY represents and warrants to Two Rivers as set forth in this **ARTICLE IV** as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties speak expressly as of a different date). For purposes of the preceding sentence, "Section" shall mean a second-level subpart (if any) of a Section (*e.g.*, "4.01(a)") but shall not require more detailed identification.

**Section 4.01** **Organization; Standing and Power; Charter Documents.**

**(a) Organization; Standing and Power.** EASBY and each of the Vaxa Entities: (i) is duly organized, validly existing and in good standing under the Laws of the State of Colorado or Nevada (as applicable) and has the requisite limited liability company power and authority to own, lease, and operate its assets and to carry on its business as now conducted; and (b) is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the assets and properties owned, leased, or operated by it or the nature of its business makes such qualification or license necessary, except where the failure to be so qualified or licensed or to be in good standing, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to such company.

**(b) Charter Documents.** EASBY has made available to Two Rivers true and complete copies of the Charter Documents of EASBY and each of the Vaxa Entities, all of which are in full force and effect as of the Effective Date. Neither EASBY nor any of the Vaxa Entities is in violation of any of the provisions of its Charter Documents.

**(c)** Subsidiaries. None of the Vaxa Entities has any Subsidiary or otherwise owns or has any interest in any shares or other ownership interests of any other Person, except that Vaxa holds a 100% membership interest in each of Gramz and Ekstrak,

**Section 4.02** **Capital Structure.**

**(a) Vaxa Interests.** The sole record and beneficial owner of the Vaxa Interest is EASBY, which owns the Vaxa Interest free and clear of all Encumbrances. The Vaxa Interest has been duly authorized and is validly issued, fully paid and non-assessable, and is not subject to any pre-emptive rights.

**(b) Ekstrak Interest.** The sole record and beneficial owner of the 100% membership interest in Ekstrak is Vaxa, which owns such interest free and clear of all Encumbrances. Vaxa's membership interest in Ekstrak has been duly authorized and is validly issued, fully paid, and non-assessable, and is not subject to any preemptive rights.

**(c) Gramz Interest.** The sole record and beneficial owner of the 100% membership interest in Gramz is Vaxa, which owns such interest free and clear of all Encumbrances. Vaxa's membership interest in Gramz has been duly authorized and is validly issued, fully paid, and non-assessable, and is not subject to any preemptive rights.

**Section 4.03 Authority.** EASBY has all requisite limited liability company power and authority to enter into and to perform its obligations under this Agreement and to consummate the Contemplated Transactions. The execution and delivery of this Agreement by EASBY and the consummation by EASBY of the Contemplated Transactions have been duly authorized by all necessary limited liability company actions on the part of EASBY and no other limited liability company actions on the part of EASBY are necessary to authorize the execution and delivery of this Agreement or to consummate the Exchange and the other Contemplated Transactions. This Agreement has been duly executed and delivered by EASBY and constitutes the legal, valid, and binding obligation of EASBY, enforceable against EASBY in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar Laws affecting creditors' rights generally and by general principles of equity.

**Section 4.04 Non-Contravention.** The execution, delivery and performance of this Agreement by EASBY, and the consummation by EASBY of the Contemplated Transactions, including the Exchange, do not and will not: (i) contravene or conflict with, or result in any violation or breach of, the Charter Documents of EASBY or any of the Vaxa Entities; (ii) conflict with or violate any Law applicable to EASBY or any of the Vaxa Entities or their respective properties or assets; (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in EASBY's or any of the Vaxa Entities' loss of any benefit or the imposition of any additional payment or other Liability under, or alter the rights or obligations of any Person under, or give to any Person any rights of termination, amendment, acceleration, or cancellation, or require any Consent under, any Contract to which EASBY or any Vaxa Entity is a party or otherwise bound; or (iv) result in the creation of an Encumbrance on any of the properties or assets of any of the Vaxa Entities.

**Section 4.05 Governmental Consents.** No Consent of any Governmental Entity is required to be obtained or made in connection with the execution, delivery, and performance by EASBY of this Agreement or the consummation by EASBY of the Contemplated Transactions.

**Section 4.06 Member Approval.** EASBY's members, by resolutions duly adopted by a unanimous vote or consent of all members of EASBY and not subsequently rescinded or modified in any way, have: (i) determined that this Agreement and the Contemplated Transactions, upon the terms and subject to the conditions set forth herein, are in the best interests of, EASBY and its members; and (ii) approved and declared advisable the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions upon the terms and subject to the conditions set forth in this Agreement.

**Section 4.07 Anti-Takeover Statutes.** No "fair price," "moratorium," "control share acquisition," "supermajority," "affiliate transactions," "business combination," or other similar anti-takeover statute or regulation enacted under any Laws applicable to EASBY or any of the Vaxa Entities is applicable with respect to the Exchange, except to the extent that any such statute or regulation has been or will be complied with at Closing.

**Section 4.08 Financial Statements.**

**(a) Financial Statements.** EASBY has provided to Two Rivers a true and complete copy of the Vaxa Balance Sheet. The Vaxa Entities were recently formed and, except for the Vaxa Balance Sheet, have no historical financial statements.

**(b) Undisclosed Liabilities.** None of the Vaxa Entities has any Liabilities other than (i) Liabilities reflected or reserved against in the Vaxa Balance Sheet, (ii) Liabilities incurred since December 31, 2018 in the ordinary course of business consistent with past practice, (iii) Liabilities incurred in connection with this Agreement and the Contemplated Transactions, and (iv) such other Liabilities as do not have, individually or in the aggregate, a Material Adverse Effect with respect to Vaxa.

**Section 4.09 Assets.** The Vaxa Entities own all of the assets reflected on the Vaxa Balance Sheet and have good and valid title, free and clear of any Encumbrances, to all of such assets. All fixed assets reflected on the Vaxa Balance Sheet are in good operating condition and repair, ordinary wear and tear excepted, with no material latent defects.

**Section 4.10** **Taxes.**

**(a) Tax Returns and Payment of Taxes.** Each of the Vaxa Entities has duly and timely filed or caused to be filed (taking into account any valid extensions) all Tax Returns required to be filed by it. Such Tax Returns are true and complete in all material respects. None of the Vaxa Entities is currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business consistent with past practice. All Taxes due and owing by any of the Vaxa Entities (whether or not shown on any Tax Return) have been timely paid or, where payment is not yet due, each of the Vaxa Entities has made an adequate provision for such Taxes in their financial statements (in accordance with GAAP). The financial statements of the Vaxa Entities provided to Two Rivers reflect an adequate reserve (in accordance with GAAP) for all material Taxes payable by the Vaxa Entities through the date of such financial statements. None of the Vaxa Entities has incurred any Liability for Taxes since December 31, 2018 outside of the ordinary course of business or otherwise inconsistent with past practice.

**(b) Withholding.** Each of the Vaxa Entities has withheld and timely paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, customer, shareholder, or other Person (including withholding of Taxes pursuant to Sections 1441 and 1442 of the Code or similar provisions under any Laws), and materially complied with all information reporting and backup withholding provisions of applicable Law.

**(c) Encumbrances.** There are no Encumbrances for Taxes upon the assets of any of the Vaxa Entities other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate Actions and for which adequate reserves in accordance with GAAP have been made in the financial statements of the Vaxa Entities provided to Two Rivers.

**(d) Tax Deficiencies and Audits.** No deficiency for any amount of Taxes which has been proposed, asserted, or assessed in writing by any taxing authority against any of the Vaxa Entities remains unpaid. There are no waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of any of the Vaxa Entities. There are no Actions ongoing, threatened, or pending with respect to any Taxes of any of the Vaxa Entities.

**(e) Intended Tax Treatment.** None of the Vaxa Entities has taken or has agreed to take any action, and to the Knowledge of EASBY there exists no fact or circumstance, that is reasonably likely to prevent or impede the Exchange from qualifying as a "reorganization" within the meaning of Section 351 of the Code.

**Section 4.11** **Absence of Certain Changes or Events.** Since the date of the Vaxa Balance Sheet, except in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transactions, the business of each Vaxa Entity has been conducted in the ordinary course of business consistent with past practice and there have not been or occurred any events, conditions, changes, or effects that have had, individually or in the aggregate, a Material Adverse Effect with respect to EASBY or Vaxa.

**Section 4.12** **Intellectual Property.** None of the Vaxa Entities owns Intellectual Property the loss of which would have a Material Adverse Effect with respect to Vaxa. Each of the Vaxa Entities has taken all commercially reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all proprietary information it holds, or that it purports to hold, as a trade secret. Each of the Vaxa Entities owns or otherwise has, and after the Closing will have, all Intellectual Property needed to conduct its business as currently conducted. None of the Vaxa Entities has materially infringed (directly, contributorily, by inducement or otherwise), misappropriated or otherwise violated any other Person's rights to Intellectual Property

**Section 4.13** **Compliance; Permits.** Each of the Vaxa Entities is and always has been in compliance with all Laws, Orders, and Permits applicable to it and its business or by which it or its business or properties are bound. No Person (including any Governmental Entity) has issued any notice or notification stating that any Vaxa Entity is not in compliance with any Law. Each Vaxa Entity holds all Permits applicable to its business. No suspension, cancellation, non-renewal, or adverse modifications of any Permits of any Vaxa Entity is pending or, to the Knowledge of EASBY, threatened.

**Section 4.14** **Litigation.** There is no Action pending, or to the Knowledge of EASBY, threatened against any of the Vaxa Entities or any of their respective properties or assets or any Representative of any of the Vaxa Entities (in the capacity of serving as such Representative). None of the Vaxa Entities nor any of their respective properties or assets are subject to any Order. There are no SEC inquiries or investigations, other Governmental Entity inquiries or investigations, or internal investigations pending or, to the Knowledge of EASBY, threatened, in each case regarding any accounting practices of the Vaxa Entities or any malfeasance by any Representative of any of the Vaxa Entities.

**Section 4.15** **Brokers' and Finders' Fees.** Neither EASBY or any of the Vaxa Entities has incurred, or will incur, directly or indirectly, any liability for investment banker, brokerage, or finders' fees or agents' commissions, or any similar charges in connection with this Agreement or the Contemplated Transactions, other than fees of Fenner & Beane payable solely by EASBY.

**Section 4.16** **Employee Matters.**

**(a) Compliance with Laws Generally.** None of the Vaxa Entities is a party to or maintains an Employee Plan. None of the Vaxa Entities has incurred, either directly or indirectly, any Liability relating to any prior Employee Plan.

**(b) Effect of Transaction.** Neither the execution or delivery of this Agreement nor the consummation of the Contemplated Transactions will (either alone or in combination with any other event): (i) entitle any Person to severance pay or any other payment; or (ii) accelerate the timing of payment, funding, or vesting, or increase the amount of compensation due to any such Person.

**(c) Employees.** None of the Vaxa Entities has any written or oral contract of employment or other employment agreement with any of its employees or any agreements relating to the temporary use or loaning of employees. None of the Vaxa Entities has any agreements or understandings with any employees or any policies or practices pertaining to severance or termination costs. All employees of the Vaxa Entities are employed at-will, and none of the Vaxa Entities is a party to any written or oral contracts, understandings or policies to the contrary.

**(d) Employment Law Matters.** Each of the Vaxa Entities: (i) is in compliance in all material respects with all applicable Laws and agreements regarding hiring, employment, termination of employment, plant closing and mass layoff, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, leasing and supply of temporary and contingent staff, engagement of independent contractors, including proper classification of same, payroll taxes, and immigration with respect to its employees and contingent workers; and (ii) is in compliance in all material respects with all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing its employees.

**(e) Labor.** None of the Vaxa Entities is a party to, or subject to, any collective bargaining agreement or other agreement with any labor organization, work council, or trade union with respect to any of its operations. No material work stoppage, slowdown, or labor strike against any of the Vaxa Entities with respect to employees who are employed within the United States is pending, threatened, or has occurred, and, to the Knowledge of EASBY, no material work stoppage, slowdown, or labor strike against any of the Vaxa Entities with respect to employees who are employed outside the United States is pending, threatened, or has occurred. None of the employees of any of the Vaxa Entities is represented by a labor organization, work council, or trade union. There are no Actions, government investigations, or labor grievances pending, or, to the Knowledge of EASBY, threatened relating to any employment-related matter involving any employee or applicant.

**Section 4.17 Real Property.** None of the Vaxa Entities owns any real estate.

**Section 4.18 Personal Property.** Each of the Vaxa Entities is in possession of and has good and marketable title to, or valid leasehold interests in or valid rights under contract to use, the machinery, equipment, furniture, fixtures, and other tangible personal property and assets it owns, leases, or uses, free and clear of all Encumbrances.

**Section 4.19 Environmental Matters.** Each of the Vaxa Entities is, and at all times has been, in compliance with all Environmental Laws in all material respects, which compliance includes the possession, maintenance of, compliance with, or application for, all Permits required under applicable Environmental Laws for the operation of the business of the Vaxa Entities as currently conducted. None of the Vaxa Entities has disposed of, released, or discharged any Hazardous Substances on, at, under, in, or from any real estate currently or, to the Knowledge of EASBY, formerly owned, leased, or operated by any of the Vaxa Entities or at any other location that is: (a) currently subject to any investigation, remediation, or monitoring; or (b) reasonably likely to result in liability to the Vaxa Entities, in either case of (a) or (b) under any applicable Environmental Laws. None of the Vaxa Entities has: (y) produced, processed, manufactured, generated, transported, treated, handled, used, or stored any Hazardous Substances, except in compliance with all Environmental Laws, at any real estate; or (z) exposed any Person to any Hazardous Substances under circumstances reasonably expected to give rise to any Liability or obligation under any Environmental Law. Neither EASBY nor any of the Vaxa Entities has received written notice of and there is no Action pending, or to the Knowledge of EASBY, threatened against any of the Vaxa Entities, alleging any Liability or responsibility under or non-compliance with any Environmental Law or seeking to impose any financial responsibility for any investigation, cleanup, removal, containment, or any other remediation or compliance under any Environmental Law. None of the Vaxa Entities is subject to any Order, settlement agreement, or other Contract by or with any Governmental Entity or Person imposing any material Liability or obligation with respect to any of the foregoing. None of the Vaxa Entities has assumed or retained any material Liabilities under any applicable Environmental Laws of any other Person, including in any acquisition or divestiture of any property or business.

**Section 4.20 Material Contracts.**

**(a) EASBY Material Contracts.** For purposes of this Agreement, "**EASBY Material Contracts**" means any of the following to which any of the Vaxa Entities is a party or any of its assets are bound:

(i) any employment, consulting or similar Contract (in each case with respect to which any of the Vaxa Entities has continuing obligations as of the Effective Date) with any current or former (A) officer of any of the Vaxa Entities, (B) member of EASBY or any of the Vaxa Entities, or (C) employee or independent contractor providing for an annual base salary or payment in excess of $10,000;

(ii) any Contract providing for indemnification or any guaranty by any of the Vaxa Entities or its principals;

(iii) any Contract that purports to limit the right of any of the Vaxa Entities (A) to engage in any line of business, (B) to compete with any Person or solicit any client or customer, or (C) to operate in any geographical location;

(iv) any Contract relating to the disposition or acquisition, directly or indirectly, by any of the Vaxa Entities of assets or capital stock or other equity interests of itself or any other Person;

(v) any Contract that grants any right of first refusal, right of first offer, or similar right with respect to any material assets, rights, equity, or properties of any of the Vaxa Entities;

(vi) any Contract that contains any provision that requires the purchase of all or a material portion of any of the Vaxa Entities' requirements for a given product or service from a given third party;

(vii) any Contract that obligates any of the Vaxa Entities to conduct business on an exclusive or preferential basis or that contains a "most favored nation" or similar covenant with any Person;

(viii) any partnership, joint venture, limited liability company agreement, or similar Contract relating to the formation, creation, operation, management, or control of any joint venture or Person;

(ix) any mortgages, indentures, guarantees, loans, credit agreements, security agreements, or other Contracts, in each case relating to indebtedness for borrowed money, by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, whether as borrower or lender, other than accounts receivables and payables incurred in the ordinary course of business;

(x) any agreement, license, franchise, permit, indenture or authorization that has not been terminated or performed in its entirety and not renewed that may be, by its terms, terminated, impaired or adversely affected by reason of the execution of this Agreement, the Closing, or the Contemplated Transactions;

(xi) any employee collective bargaining agreement or other Contract with any labor union;

(xii) any Intellectual Property Agreement;

(xiii) any other Contract under which any of the Vaxa Entities is obligated to make payment or incur costs in excess of $10,000 in any year and which is not otherwise described in clauses (i) through (xii) above; or

(xiv) any Contract which is not otherwise described in clauses (i) through (xiii) above that is material to any of the Vaxa Entities.

**(b) Schedule of Material Contracts; Documents.** Paragraph 4.20(b) of the EASBY Disclosure Schedule sets forth a true and complete list of all EASBY Material Contracts. EASBY has made available to Two Rivers true and complete copies of all EASBY Material Contracts, including any amendments thereto.

**(c) No Breach.** All EASBY Material Contracts are legal, valid, and binding on the Vaxa Entities, enforceable against in accordance with their respective terms, and are in full force and effect. None of the Vaxa Entities has violated any provision of, or failed to perform any obligation required under the provisions of, any EASBY Material Contract. None of the Vaxa Entities is in breach, and neither EASBY nor any of the Vaxa Entities has received written notice of breach, of any EASBY Material Contract.

**Section 4.21 Investment Purpose.** EASBY understands that the Earn-Out Stock and the Closing Stock (a) have not been registered under the Securities Act or the securities laws of any other jurisdiction, (b) are issued in reliance upon U.S. federal and state exemptions for transactions not involving a public offering, and (c) cannot be disposed of unless they are subsequently registered or exempted from registration under the Securities Act. EASBY is an "accredited investor" within the meaning of Rule 501 under the Securities Act and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Exchange Stock. The Exchange Stock is being acquired for EASBY's own account solely for investment and not with a view to resale or distribution thereof. EASBY has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects (financial and other) of Two Rivers, and EASBY acknowledges that it has been provided adequate access to the personnel, properties, premises and records of Two Rivers for such purpose. The determination of EASBY to acquire the Exchange Stock has been made by EASBY independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of Two Rivers that may have been made or given by EASBY or by any agent or employee of EASBY. EASBY has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in Two Rivers and making an informed decision with respect thereto. EASBY is able to bear the economic and financial risk of an investment in Two Rivers for an indefinite period of time.

**Section 4.22 Information Supplied.** None of the information supplied by EASBY to Two Rivers from time to time for inclusion in any filing, including an SEC Document, to be made with the SEC by Two Rivers in connection with this Agreement or the Contemplated Transactions contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

**Section 4.23 Books and Records.** The minute books and equity registers of each of the Vaxa Entities, true and correct copies of which have been made available to Two Rivers, are true and correct and have been maintained in accordance with sound business practices. The minute books of each of the Vaxa Entities contain accurate and complete records of all meetings, and actions taken by written consent of, the members and the board of managers (if any) of each of the Vaxa Entities, and no meeting, or action taken by written consent, of any such members and board of managers (if any) has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be transferred into the possession of Two Rivers.

## ARTICLE V
## COVENANTS

**Section 5.01 Conduct of Business of Vaxa Entities.** Each Vaxa Entity will, during the period from the Effective Date until the Closing, except as expressly authorized by this Agreement or as required by applicable Law or with the prior written consent of Two Rivers, conduct its business in the ordinary course of business consistent with past practice, and, to the extent consistent therewith, each Vaxa Entity will preserve intact its business organization, keep available the services of its current Representatives, preserve its present relationships with customers, suppliers, distributors, licensors, licensees, and other Persons having business relationships with such Vaxa Entity. Without limiting the generality of the foregoing, between the Effective Date and the Closing, except as otherwise expressly contemplated by this Agreement or as required by applicable Law, no Vaxa Entity will without the prior written consent of Two Rivers:

(a) amend its Charter Documents;

(b) declare, set aside, or pay any dividend or distribution (whether in cash, stock, property, or otherwise) in respect of, or enter into any Contract with respect to the voting of, any equity securities of any Vaxa Entity;

(c) issue, sell, pledge, dispose of or encumber any of its equity securities;

(d) (i) increase the compensation payable or that could become payable by such Vaxa Entity to any of its Representatives, other than increases in compensation made to non-officer employees in the ordinary course of business consistent with past practice or (ii) establish, adopt, enter into, amend, terminate, exercise any discretion under, or take any action to accelerate rights under any Employee Plans or any plan, Contract, program, policy, trust, fund, or other arrangement that would be an Employee Plan if it were in existence as of the Effective Date, or make any contribution to any Employee Plan, other than contributions required by Law, the terms of such Employee Plans as in effect on the Effective Date, or that are made in the ordinary course of business consistent with past practice;

(e) acquire, by exchange, consolidation, acquisition of stock or assets, or otherwise, any business or Person or division thereof or make any loans, advances, or capital contributions to or investments in any Person;

(f) transfer, license, sell, lease, or otherwise dispose of (whether by way of exchange, consolidation, sale of stock or assets, or otherwise) or pledge, encumber, or otherwise subject to any Lien, any of its assets;

(g) repurchase, prepay, or incur any indebtedness for borrowed money or guarantee any such indebtedness of another Person, issue or sell any debt securities or options, warrants, calls, or other rights to acquire any debt securities of such Vaxa Entity, guarantee any debt securities of another Person, or enter into any arrangement having the economic effect of any of the foregoing;

(h) enter into, amend, modify, or consent to the termination of (other than at its stated expiry date), any EASBY Material Contract;

(i) institute, settle, or compromise any Action involving the payment of monetary damages by such Vaxa Entity;

(j) make any change in any method of financial accounting principles or practices, in each case except for any such change required by a change in GAAP or applicable Law;

(k) (i) settle or compromise any Tax claim, audit, or assessment for an amount materially in excess of the amount reserved or accrued on the Vaxa Balance Sheet, (ii) make or change any Tax election, change any annual Tax accounting period, or adopt or change any method of Tax accounting, (iii) amend any Tax Returns or file claims for material Tax refunds, or (iv) enter into any closing agreement, surrender in writing any right to claim a Tax refund, offset, or other reduction in Tax liability, or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment;

(l) enter into any material Contract with respect to any joint venture, strategic partnership, or alliance;

(m) abandon, allow to lapse, sell, assign, transfer, grant any security interest in, or otherwise encumber or dispose of, or grant any right or license to, any Intellectual Property of such Vaxa Entity;

(n) terminate or modify in any material respect, or fail to exercise renewal rights with respect to, any material insurance policy; or

(o) adopt or effect a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, or other reorganization;

(p) adopt or effect a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, or other reorganization of any Vaxa Entity; or

(q) agree or commit to do any of the foregoing.

**Section 5.02 Limitation on Conflicting Actions.** Neither Party will, during the period from the Effective Date until the Closing, take any action that is intended or that would reasonably be expected to, individually or in the aggregate, prevent, materially delay, or materially impede the consummation of the Closing.

**Section 5.03 Access to Information.** From the Effective Date until the Closing, Two Rivers will afford EASBY and its Representatives reasonable access, at reasonable times and in a manner as will not unreasonably interfere with the business or operations of Two Rivers, to the Representatives, accountants, properties, offices, and other facilities and to all books, records, Contracts, and other assets of Two Rivers, and Two Rivers will furnish promptly to the Vaxa Parties such other information concerning the business and properties of Two Rivers as the Vaxa Parties may reasonably request from time to time. Two Rivers will not be required to provide access to or disclose information where such access or disclosure would jeopardize the protection of attorney-client privilege or contravene any Law. No investigation will affect Two Rivers' representations, warranties, covenants, or agreements contained in this Agreement, or limit or otherwise affect the remedies available to EASBY pursuant to this Agreement.

**Section 5.04 Confidentiality.**

**(a)** Neither Party shall, and each shall ensure that none of its respective Representatives, issue or disseminate any press release or other publicity or otherwise make any disclosure of any nature (to any supplier, customer, landlord, creditor or employee of either Party or to any other Person) regarding (a) the existence or, or the terms of, this Agreement or any of the other Transactional Documents or (b) Confidential Information of the other Party, except to the extent that such Party is required by Law to make any such disclosure; **provided** that, to the extent such disclosure is required by applicable law, such Party shall (a) promptly notify the other Party, (b) use its Reasonable Efforts consistent with such applicable law to consult with such other Party with respect to the text thereof and (c) cooperate with the other Party to narrow the scope of the disclosure required to be made. EASBY acknowledges that Two Rivers Common Stock is publicly traded and that any information obtained during the course of EASBY's consideration, evaluation and negotiation of the Contemplated Transactions could be considered to be material nonpublic information within the meaning of federal and state securities laws. Accordingly, EASBY agrees not to engage in any discussions, correspondence or transactions in respect of any Two Rivers Securities in violation of applicable securities laws.

**(b)** The covenants and agreements of the Parties set forth in Schedule 2 hereto are incorporated by reference as if set forth in the body of this Agreement.

**Section 5.05 Non-Competition; Non-Solicitation.** For a period of 36 months commencing on the Closing Date (the "**Restricted Period**"), EASBY will not, and will not permit any of its Affiliates or Representatives (each, a "**Restricted Person**") to, directly or indirectly:

(a) (i) engage in or assist other Persons in engaging in the Restricted Business; (ii) have an interest in any Person that engages, directly or indirectly, in the Restricted Business in any capacity, including as a partner, shareholder, member, employee, officer, director, manager, principal, agent, trustee, or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Effective Date) between Two Rivers and its customers, suppliers, and business contacts; provided that the foregoing shall not preclude such Restricted Person from owning, directly or indirectly, solely as an investment, (A) the Exchange Stock or (B) securities of any Person traded on any national securities exchange if such Restricted Person is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 1.0% or more of any class of securities of such Person;

(b) hire or solicit any employee or independent contractor of Two Rivers or its Subsidiaries or encourage any such employee or independent contractor to leave such employment or engagement or hire any such employee or independent contractor who has left such employment or engagement; **provided, however,** that nothing in this **Section 5.05 (b)** will prevent any Restricted Person from hiring any employee or independent contractor whose employment or engagement, as the case may be, has been terminated by Two Rivers and its Subsidiaries following the Closing;

(c) solicit or entice, or attempt to solicit or entice, any clients or customers of Two Rivers or its Subsidiaries or potential clients or customers of Two Rivers for purposes of diverting their business or services from Two Rivers or its Subsidiaries;

EASBY agrees and acknowledges that a breach or threatened breach of this **Section 5.06** would give rise to irreparable harm to Two Rivers, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by any Restricted Person of any such obligations, Two Rivers will be entitled, in addition to any and all other rights and remedies that may be available to it in respect of such breach, to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). EASBY agrees and acknowledges that the restrictions contained in this **Section 5.05** are reasonable and necessary to protect the legitimate interests of Two Rivers and constitute a material inducement to Two Rivers to enter into this Agreement and consummate the Contemplated Transactions. If any covenant contained in this **Section 5.05** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant will be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.05** and each provision of this **Section 5.05** are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written will not invalidate or render unenforceable the remaining covenants or provisions of this **Section 5.05**, and any such invalidity or unenforceability in any jurisdiction will not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.06 Notices of Certain Events.** Each Party will provide Notice to the other Party promptly of: (a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions; (b) any notice or other communication from any Governmental Entity in connection with the Contemplated Transactions; (c) any Actions commenced or threatened against such notifying Party that are related to the Exchange or the other Contemplated Transactions; and (d) any event, change, or effect between the Effective Date and the Closing that causes or is reasonably likely to cause the failure of any of the conditions set forth in **ARTICLE VI** to be satisfied. In no event will: (i) the delivery of any Notice by a Party pursuant to this **Section 5.06** limit or otherwise affect the respective rights, obligations, representations, warranties, covenants, or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement; or (ii) disclosure by a Party be deemed to amend or supplement the Two Rivers Disclosure Schedule or the EASBY Disclosure Schedule (as appropriate) or constitute an exception to such Party's representations or warranties. This **Section 5.06** will not constitute a covenant or agreement for purposes of **Section 6.02(b)** or **Section 6.03(b)**.

**Section 5.07 Public Announcements.** Each of the Parties agrees that no public release or announcement concerning the Contemplated Transactions will be issued by either Party without the prior written consent of the other Party, except as may be required by applicable Law or the rules or regulations of any applicable United States securities exchange or other Governmental Entity to which a Party is subject or submits, in which case the Party required to make the release or announcement will allow the other Party reasonable time to comment on such release or announcement in advance of such issuance.

**Section 5.08 Reasonable Efforts.** From the Effective Date to the Closing, upon the terms and subject to the conditions of this Agreement, the Parties will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable (subject to applicable Laws) to consummate and make effective the Exchange and the other Contemplated Transactions as promptly as practicable, including: (a) preparation and filing of all forms, registrations, and notices required to be filed with the SEC or any other Governmental Entity in connection with the Closing; and (b) the satisfaction of such Party's conditions precedent to Closing as set forth in **ARTICLE VI**.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01 Conditions to Each Party's Obligation to Effect the Exchange.** The respective obligations of each Party to effect the Exchange and the other Contemplated Transactions is subject to the satisfaction or waiver (where permissible pursuant to applicable Law) on or prior to the Closing Date of each of the following conditions:

**(a) No Injunctions, Restraints, or Illegality.** No Governmental Entity will have enacted, issued, promulgated, enforced, or entered any Laws or Orders, whether temporary, preliminary, or permanent, that make illegal, enjoin, or otherwise prohibit consummation of the Exchange or the other Contemplated Transactions.

**(b) Governmental Consents.** All Consents of any Governmental Entity required to consummate the Exchange and the other Contemplated Transactions will have been obtained, free of any condition that would reasonably be expected to have a Material Adverse Effect on either Party or Vaxa.

**Section 6.02 Conditions to Obligations of EASBY.** The obligations of EASBY to effect the transactions contemplated at the Closing are subject to the satisfaction by Two Rivers (or waiver by EASBY, where permissible pursuant to applicable Law) on or prior to the Closing Date of the following conditions:

**(a) Representations and Warranties.** The representations and warranties of Two Rivers set forth in this Agreement will be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

**(b) Performance of Covenants.** Two Rivers will have performed in all material respects all obligations, and complied in all material respects with the agreements and covenants, in this Agreement required to be performed by or complied with by it at or prior to the Closing.

**(c) Consents.** All Consents applicable to effectuate the Closing will have been received by Two Rivers and executed counterparts thereof will have been delivered to EASBY at or prior to the Closing.

**(d) No Action.** No Action will be pending or threatened before any Governmental Entity wherein an unfavorable injunction, judgment, Order, decree, ruling, or charge would: (i) prevent consummation of any of the Contemplated Transactions; (ii) cause any of the Contemplated Transactions to be rescinded following the Closing; or (iii) affect adversely the right of Two Rivers to effectuate the Exchange.

**(e) Material Adverse Effect.** Since the Effective Date, there will not have been any Material Adverse Effect with respect to Two Rivers or any event, change, or effect that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect with respect to Two Rivers.

**(f) Exchange for TR Capital Partners, LLC Preferred Units.** Two Rivers and holders of outstanding Preferred Units of TR Capital Partners, LLC will have entered into a binding agreement providing for the exchange of all of such outstanding Preferred Units for shares of Two Rivers Common Stock, subject to Two Rivers' receipt of stockholder approval to amend.

**(g) Documents.** Two Rivers will have delivered to EASBY such documents required by **Section 2.03**.

**Section 6.03 Conditions to Obligations of Two Rivers.** The obligations of Two Rivers to effect the transactions contemplated at the Closing are subject to the satisfaction by EASBY (or waiver by Two Rivers, where permissible pursuant to applicable Law) on or prior to the Closing Date of the following conditions:

**(a) Representations and Warranties.** The representations and warranties of EASBY set forth in this Agreement will be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

**(b) Performance of Covenants.** EASBY will have performed in all material respects all obligations, and complied in all material respects with the agreements and covenants, in this Agreement required to be performed by or complied with by it at or prior to the Closing.

**(c) Consents.** All Consents applicable to effectuate the Closing will have been received by EASBY and executed counterparts thereof will have been delivered to Two Rivers at or prior to the Closing.

**(d) No Action.** No Action will be pending or threatened before any Governmental Entity wherein an unfavorable injunction, judgment, Order, decree, ruling, or charge would: (i) prevent consummation of any of the Contemplated Transactions; (ii) cause any of the Contemplated Transactions to be rescinded following the Closing; or (iii) affect adversely the right of EASBY to effectuate the Exchange.

**(e) Material Adverse Effect.** Since the Effective Date, there will not have been any Material Adverse Effect with respect to EASBY or Vaxa or any event, change, or effect that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect with respect to EASBY or Vaxa.

**(f) Documents.** EASBY will have delivered to Two Rivers the documents required by **Section 2.02**.

## ARTICLE VII
## TERMINATION

**Section 7.01 Termination By Mutual Consent.** This Agreement may be terminated at any time prior to the Closing by the mutual written consent of the Parties.

**Section 7.02 Termination By Any Party.** This Agreement may be terminated by either Party prior to the Closing if any Governmental Entity will have enacted, issued, promulgated, enforced, or entered any Law or Order making illegal, permanently enjoining, or otherwise permanently prohibiting the consummation of the Closing and such Law or Order will have become final and nonappealable; **provided, however,** that the right to terminate this Agreement pursuant to this **Section 7.02(b)** will not be available to either Party whose breach of any representation, warranty, covenant, or agreement set forth in this Agreement has been the cause of, or resulted in, the issuance, promulgation, enforcement, or entry of any such Law or Order.

**Section 7.03 Termination by Any Vaxa Entity.** This Agreement may be terminated by EASBY at any time prior to the Closing if:

(a) if the Closing has not been consummated on or before April 15, 2019; **provided, however,** that the right to terminate this Agreement pursuant to this **Section 7.03(a)** will not be available to EASBY if EASBY's breach of any representation, warranty, covenant, or agreement set forth in this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated on or before such date; or

(b) there will have been a material breach of any representation, warranty, covenant, or agreement on the part of Two Rivers set forth in this Agreement such that the conditions to the Closing set forth in **Section 6.01** or **6.02** would not be satisfied and, in either such case, such breach is incapable of being cured by April 30, 2019; **provided, however,** that EASBY will give Notice to Two Rivers at least thirty days prior to such termination stating its intention to terminate this Agreement pursuant to this **Section 7.03(b)**; **provided further,** that EASBY will not have the right to terminate this Agreement pursuant to this **Section 7.03(b)** if it is then in material breach of any representation, warranty, covenant, or obligation under this Agreement, which breach has not been cured.

**Section 7.04** **Termination by Two Rivers.** This Agreement may be terminated by Two Rivers at any time prior to the Closing if there will have been a material breach of any representation, warranty, covenant or agreement on the part of EASBY set forth in this Agreement such that the conditions to the Closing set forth in **Section 6.01** or **6.03** would not be satisfied and, in either such case, such breach is incapable of being cured by April 30, 2019; **provided, however,** that Two Rivers will give Notice to EASBY at least 30 days prior to such termination stating its intention to terminate this Agreement pursuant to this **Section 7.04**; **provided further,** that Two Rivers will not have the right to terminate this Agreement pursuant to this **Section 7.04** if Two Rivers is then in material breach of any representation, warranty, covenant, or obligation under this Agreement, which breach has not been cured.

**Section 7.05** **Notice of Termination.** The Party desiring to terminate this Agreement pursuant to this **Article VII** (other than pursuant to **Section 7.01**) will deliver Notice of such termination to the other Party specifying with particularity the reason for such termination, and any such termination in accordance with this **Section 7.05** will be effective immediately upon delivery of such Notice to such other Party.

**Section 7.06** **Effect of Termination.** If this Agreement is terminated pursuant to this **Article VII**, it will become void and of no further force and effect, with no Liability on the part of either Party or any Representative of such Party to any other Party, except: (a) with respect to **Section 7.05**, **Section 7.06** and **Section 7.07**, which will remain in full force and effect and any other term or condition of this Agreement which, by its terms, would survive such termination, including **Section 5.04** and **Article IX**; and (b) with respect to any Liabilities or Losses incurred or suffered by a Party, to the extent such Liabilities or Losses were the result of fraud or the breach by the other Party of any of its representations, warranties, covenants, or other agreements set forth in this Agreement.

**Section 7.07** **Fees and Expenses Following Termination.**

**(a)** If this Agreement is terminated by Two Rivers other than pursuant to **Section 7.01** or the Closing otherwise does not occur on or prior to the End Date through no fault of EASBY or any of the Vaxa Entities, Two Rivers shall (i) reimburse EASBY for all Expenses actually incurred by EASBY or any of the Vaxa Entities solely in connection with this Agreement and the Contemplated Transactions after the Effective Date and prior to the termination of this Agreement and (ii) unless this Agreement has been terminated by Two Rivers pursuant to **Section 7.04**, pay to EASBY a termination fee of $1,000,000.

**(b)** If this Agreement is terminated by EASBY pursuant to **Section 7.03**, EASBY shall reimburse Two Rivers for all Expenses actually incurred by Two Rivers solely in connection with this Agreement and the Contemplated Transactions after the Effective Date and prior to the termination of this Agreement.

**(c)** Either Party seeking reimbursement pursuant to this **Section 7.07(a)** shall deliver to the other Party, within ten Business Days of termination of this Agreement, a Notice setting forth in reasonable detail, and attaching receipts or other reasonable documentation, the Expenses for which reimbursement is sought and shall respond to any inquiries regarding such Expenses within two Business Days. The reimbursing Party shall pay, by wire transfer of immediately available funds, the appropriate Expenses (and, if due pursuant to clause (ii) of **Section 7.07(a)**, the termination fee of $1,000,000) within five Business Days after receipt of such Notice.

**(d)** The Parties agree and acknowledge that the provisions of this **Section 7.07(a)** are an integral part of the Contemplated Transactions and that, without such provisions, the Parties would not have entered into this Agreement. If either Party fails to pay in a timely manner the amounts due pursuant to this **Section 7.07(a)** and, in order to obtain such payment, the other Party makes a claim against the non-paying Party that results in a judgment in an Action, the non-paying Party will pay to the other Party the Expenses incurred or accrued by such other Party in connection with such Action.

**(e)** Except as expressly set forth in this **Section 7.07(a)**, all Expenses incurred by either Party in connection with this Agreement and the Contemplated Transactions will be paid by such Party.

**Section 7.08 Extension; Waiver.** At any time prior to the Closing, either Party may, by written Notice, (a) extend the time for the performance of any of the obligations of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained in this Agreement, or (c) unless prohibited by applicable Law, waive compliance by the other Party with any of the covenants, agreements or conditions contained in this Agreement.

## ARTICLE VIII
## INDEMNIFICATION

**Section 8.01 Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained in this Agreement will survive the Closing and will remain in full force and effect until the date that is 18 months from the Closing Date; **provided, however,** that the Fundamental Representations of the Parties will survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days. All covenants and agreements of the Parties contained in this Agreement will survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and by Notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable survival period will not thereafter be barred by the expiration of the relevant representation or warranty and such claims will survive until finally resolved.

**Section 8.02 Indemnification by EASBY.** Subject to the other terms and conditions of this **ARTICLE VIII**, EASBY will indemnify and defend Two Rivers and its Affiliates and each of their respective employees, officers, directors, agents and other Representatives (collectively, the "**Two Rivers Indemnitees**") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, any of the Two Rivers Indemnitees based upon, arising out of, with respect to, or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of EASBY contained in this Agreement; or (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by EASBY pursuant to this Agreement.

**Section 8.03 Indemnification by Two Rivers.** Subject to the other terms and conditions of this **ARTICLE VIII**, Two Rivers will indemnify and defend EASBY and its Affiliates and each of their respective employees, officers, directors, agents and other Representatives (collectively, the "**Vaxa Indemnitees**") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, any of the Vaxa Indemnitees based upon, arising out of, with respect to, or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Two Rivers contained in this Agreement; or (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Two Rivers pursuant to this Agreement.

**Section 8.04 Certain Limitations.**

**(a)** EASBY shall not be liable to the Two Rivers Indemnitees for indemnification under **Section 8.02** until the aggregate amount of all Losses in respect of indemnification under **Section 8.02** exceeds $10,000 (the "Basket"), in which event EASBY shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which EASBY shall be liable pursuant to **Section 8.02** shall not exceed $1,000,000 (the "Cap").]

**(b)** Two Rivers shall not be liable to the EASBY Indemnitees for indemnification under **Section 8.03** until the aggregate amount of all Losses in respect of indemnification under **Section 8.03** exceeds the Basket, in which event Two Rivers shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which Two Rivers shall be liable pursuant to **Section 8.03** shall not exceed the Cap.

**(c)** Notwithstanding the foregoing, the limitations set forth in **Section 8.04(a)** and **Section 8.04(b)** shall not apply to Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any Fundamental Representation.

**(d)** For purposes of this **ARTICLE VIII**, any inaccuracy in or breach of any representation or warranty will be determined without regard to any materiality, Material Adverse Effect, or other similar qualification contained in or otherwise applicable to such representation or warranty.

**Section 8.05 Third Party Claims.** If any Indemnified Party receives Notice of the assertion or commencement of any Action made or brought by any Person who is not a Party or an Affiliate or Representative of a Party (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party will give the Indemnifying Party reasonably prompt Notice thereof, but in any event not later than thirty days after receipt of such Notice of such Third Party Claim. The failure to give such prompt Notice will not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such Notice by the Indemnified Party will describe the Third Party Claim in reasonable detail, will include copies of all material written evidence thereof, and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have the right to participate in, or by giving written Notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party will cooperate in good faith in such defense, provided that if EASBY is the Indemnifying Party, it shall not have the right to defend or direct the defense of any such Third Party Claim that is asserted directly by or on behalf of a Person that is a supplier or customer of Two Rivers or the Vaxa Entities or seeks an injunction or other equitable relief against Two Rivers. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.06**, it will have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party will have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel will be at the expense of the Indemnified Party; **provided, however,** that if in the reasonable opinion of counsel to the Indemnified Party: (a) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (b) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party will be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.06**, pay, compromise, and defend such Third Party Claim, and seek indemnification for any and all Losses based upon, arising from, or relating to such Third Party Claim. The Parties will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

**Section 8.06 Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party will not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.06**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give Notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such Notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum Liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 8.05**, it will not agree to any settlement without the written consent of the Indemnifying Party (which consent will not be unreasonably withheld or delayed).

**Section 8.07 Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") will be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt Notice thereof, but in any event not later than thirty days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt Notice will not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such Notice by the Indemnified Party will describe the Direct Claim in reasonable detail, will include copies of all material written evidence thereof, and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have thirty days after its receipt of such Notice to respond in writing to such Direct Claim. The Indemnified Party will allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim, and the Indemnified Party will assist the Indemnifying Party's investigation by giving such information and assistance (including access to the premises and personnel and the right to examine and copy any accounts, documents, or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty-day period, the Indemnifying Party will be deemed to have rejected such claim, in which case the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 8.08 Payments**. Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VIII**, the Indemnifying Party will satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The Parties agree that should an Indemnifying Party not make full payment of any such obligations within such 15 Business Day period, the amount payable will accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to 12.0%. Such interest will be calculated daily on the basis of a 365-day year and the actual number of days elapsed.

**Section 8.09 Effect of Investigation.** The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, will not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation, warranty, or covenant is, was, or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in **ARTICLE VI**, as the case may be.

**Section 8.10 Exclusive Remedies.** Subject to **Section 5.05** and **Section 9.12**, the Parties agree and acknowledge that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity, or willful misconduct on the part of a Party in connection with the Contemplated Transactions) for any breach of any representation, warranty, covenant, agreement, or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement, will be pursuant to the indemnification provisions set forth in this **ARTICLE VIII**. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted under Law, any and all rights, claims, and causes of action for any breach of any representation, warranty, covenant, agreement, or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement it may have against the other Party and its Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **ARTICLE VIII**. Nothing in this **Section 8.10** will limit any Person's right to seek and obtain any equitable relief to which any Person will be entitled or to seek any remedy on account of either Party's fraudulent activity, criminal activity, or intentional misconduct.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01 Interpretation; Construction.** The headings in this Agreement are for convenience of reference only, do not constitute part of this Agreement, and will not be deemed to limit or otherwise affect any of the provisions of this Agreement. Where a reference in this Agreement is made to a Section, Article, or Schedule, such reference will be to a Section of, Article of, or Schedule of this Agreement unless otherwise indicated. Unless the context otherwise requires, references in this Agreement: (a) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (b) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," and the word "or" is not exclusive. The definitions of terms in this Agreement will apply equally to the singular and plural forms of the terms defined. The words "hereof," "herein," "hereby," "hereto," and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by both Parties, and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

**Section 9.02** **Governing Law.** This Agreement will be governed by and construed in accordance with the internal laws of the State of Colorado without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Colorado.

**Section 9.03** **Submission to Jurisdiction.** Each of the Parties irrevocably agrees that any Action with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of and the rights and obligations arising under this Agreement brought by any other Party or its successors or assigns will be brought and determined exclusively in the courts located in Denver County, Colorado, or in the event (but only in the event) that such courts do not have subject matter jurisdiction over such Action in the United States District Court for the District of Colorado. Each of the Parties agrees that mailing of process or other papers in connection with any Action in the manner provided in **Section 9.05** or in such other manner as may be permitted by applicable Laws, will be valid and sufficient service thereof. Each of the Parties irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any Action relating to this Agreement or any of the Contemplated Transactions in any court or tribunal other than the aforesaid courts. Each of the Parties irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim, or otherwise, in any Action with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of and the rights and obligations arising under this Agreement: (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with this **Section 9.03**; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise); and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper, or (iii) this Agreement, or the subject matter hereof or thereof, may not be enforced in or by such courts.

**Section 9.04** **Waiver of Jury Trial.** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER OR ARISE OUT OF THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY AGREES AND ACKNOWLEDGES THAT: (a) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (b) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (c) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (d) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.04**.

**Section 9.05** **Notices.** All Notices will be in writing and addressed to the other Party at its address set out on the signature page of this Agreement (or to any other address that the receiving Party may designate from time to time in accordance with this **Section 9.05**). All Notices will be in writing and will be deemed to have been duly given, made, and received: (a) if personally delivered, on the date of delivery; (b) if by electronic transmission, upon receipt; (c) if mailed, three days after deposit in the United States mail, registered or certified, return receipt requested, postage prepaid; or (d) if by a courier delivery service providing overnight or "next-day" delivery, on the next business day after deposit with such service. A Notice is effective only if the Party giving the Notice has complied with the requirements of this **Section 9.05**. Any Party may alter the address to which such Notices will be sent by giving Notice to the other Party of such change of address in conformity with the provisions of this **Section 9.05**.

**Section 9.06 Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement, including that certain letter of intent of the Parties, dated June 20, 2018, as amended on August 24, 2018, and September 17, 2018 (and all other amendments thereto).

**Section 9.07 No Third Party Beneficiaries.** Except for the Two Rivers Indemnitees and the Vaxa Indemnitees, this Agreement are for the sole benefit of the Parties and their permitted assigns and respective successors and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.08 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 5.05**, upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

**Section 9.09 Assignment.** This Agreement will be binding upon and will inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party may assign its rights or obligations under this Agreement without the prior written consent of the other Party.

**Section 9.10 Remedies.** Except as otherwise provided in this Agreement: (a) any and all remedies expressly conferred upon a Party will be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at Law or in equity; and (b) the exercise by a Party of any one remedy will not preclude the exercise by it of any other remedy.

**Section 9.11 Further Assurances.** On a Party's reasonable request, the other Party will execute and deliver all such further documents and instruments, and take all such further acts, reasonably necessary to give full effect to this Agreement and the Contemplated Transactions.

**Section 9.12 Specific Performance.** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof or thereof, as the case may be, and that the Parties will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof.

**Section 9.13 Expenses.** Except as otherwise expressly provided in this Agreement, all Expenses incurred by a Party in connection with this Agreement and the Contemplated Transactions will be paid by such Party, whether or not the Closing will have occurred.

**Section 9.14 Counterparts; Effectiveness.** This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature, *e.g.*, www.docusign.com), or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

EASBY LAND & CATTLE COMPANY, LLC

By: */s/ G. A. Harrington*
G. A. Harrington, Authorized Agent

Address:
EASBY Land & Cattle Company, LLC
Attn: G.A. Harrington, Manager
201 Portage Avenue #1800
Winnipeg, MB
Email: info@vaxaglobal.com

TWO RIVERS WATER & FARMING COMPANY

By: */s/ Wayne Harding*
Wayne Harding, Chief Executive Officer

Address:
Two Rivers Water & Farming Company
Attn: Wayne Harding, Chief Executive Officer
3025 South Parker Road, Suite 140
Aurora, Colorado 80014
Email: wharding@2riverswater.com

**[SIGNATURE PAGE OF SHARE EXCHANGE AGREEMENT]**

## SCHEDULE 1

## DEFINITIONS

For purposes of this Agreement, the following terms will have the following meanings when used in this Agreement with initial capital letters:

"**Action**" means any action, cause of action, demand, arbitration, audit, hearing, litigation, lawsuit, notice of violation, proceeding, citation, summons, subpoena, or investigation (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, and whether public or private) of any nature, whether at law or in equity.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including, the terms "controlling," "controlled by," and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by Contract, or otherwise.

"**Agreement**" means this Share Exchange Agreement, including all Exhibits and Schedules (including the Two Rivers Disclosure Schedule and the EASBY Disclosure Schedule) hereto, as such agreement may be amended, supplemented, and modified from time to time.

"**Business Day**" means any day, other than Saturday, Sunday, or any day on which banking institutions located in Phoenix, Arizona, or Denver, Colorado, are authorized or required by Law or other governmental action to close.

"**Charter Documents**" means: (a) with respect to Two Rivers, its Restated Articles of Incorporation and Bylaws, each as amended, supplemented or further restated, and (b) with respect to EASBY and each of the Vaxa Entities, the Articles of Organization and the Operating Agreement of such limited liability company, each as amended, supplemented or restated.

"**Closing**" means the closing being held on the Closing Date pursuant to **Section 2.01**, at which, among other things, the Vaxa Interest will be exchanged for the Closing Stock.

"**Closing Date**" means, unless otherwise agreed upon by the Parties in writing, the earlier of (a) April 12, 2019, and (b) the third Business Day following the first Business day as of which all conditions to the Closing set forth in this Agreement have been satisfied or, to the extent permitted under this Agreement, waived.

"**Closing Stock**" has the meaning set forth in **Section 1.02(a)**.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, including the Treasury Regulations.

"**Confidential Information**" means any proprietary information, inventions, Intellectual Property, technical data, trade secrets, or know-how, including research, law firm and case information, products, services, customer lists and customers, contacts, investors and investor information, suppliers, leads, information, markets, software, developments, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, or other business information disclosed by one Party to another Party either directly or indirectly in writing, orally, or by drawings or observation, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and other materials that contain, are based on, or otherwise reflect, to any degree, any of the foregoing. Confidential Information will include all such information disclosed to a Party at, prior to, or following the Effective Date. Confidential Information will not include information that: (a) is in or enters the public domain without a breach of the confidentiality restrictions contained in this Agreement or another similar agreement; (b) is received from a third party without restriction on disclosure and without a breach of any nondisclosure obligation; or (c) is required to be disclosed by Order of any Governmental Entity; **provided, however,** that the disclosing Party is given reasonable notice and an opportunity to obtain a protective order against disclosure of such information.

"**Consent**" means any consent, authorization, registration, declaration, approval, action, waiver and similar writing.

"**Contemplated Transactions**" means all of the transactions contemplated by this Agreement or any other instrument, opinion, Contract, certificate, document or other statement executed and delivered by either of the Parties pursuant to the terms and conditions of, and in connection with the transactions contemplated by, this Agreement.

"**Contract**" means any contract, agreement, license, deed, note, bond, mortgage, indenture, lease, or other binding instrument or binding commitment, whether written or oral.

"**Direct Claim**" has the meaning set forth in **Section 8.07**.

"**Earn-Out Stock**" has the meaning set forth in **Section 1.02(b)(i)**.

"**EASBY**" has the meaning set forth in the first paragraph of this Agreement.

"**EASBY Disclosure Schedule**" means the disclosure schedule dated as of the Effective Date and delivered by EASBY to Two Rivers concurrently with the execution of this Agreement.

"**EASBY Material Contracts**" has the meaning set forth in **Paragraph 4.20**.

"**EBITDA**" means, with respect to the Measurement Period, the consolidated net income before interest, income taxes, depreciation and amortization of the Vaxa Entities for the Measurement Period, as such items are determined in accordance with GAAP.

"**EBITDA Calculation**" has the meaning set forth in **Section 1.02(b)(ii)(A)**.

"**Effective Date**" has the meaning set forth in the first paragraph of this Agreement.

"**Ekstrak**" has the meaning set forth in **recital A** to this Agreement.

"**Employee Plan**" has the meaning set forth in **Section 3.16(a)**.

"**Encumbrance(s)**" means, with respect to any property or asset, any mortgage, pledge, lien, charge, encumbrance, lease, security interest, license, easement, restriction, encroachment, condition, covenant, claim, exception, option, equity, right, other interest, or other encumbrance of any kind or nature whatsoever (whether absolute, accrued, disputed, contingent or otherwise), including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Law(s)**" means any applicable Law, and any Order or binding Contract with any Governmental Entity: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal, or remediation of any Hazardous Materials. The term Environmental Law(s) includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to a Person, all employers, trades, or businesses (whether or not incorporated) that would be treated together with such Person or any of its Affiliates as a "single employer" within the meaning of Paragraph 414 of the Code.

"**Exchange**" means the exchange of the Vaxa Interest for the Exchange Stock pursuant to the terms and conditions of this Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder.

"**Exchange Stock**" has the meaning set forth in **Section 1.02(b)(i)**.

"**Expenses**" means, with respect to any Person, all reasonable and documented out-of-pocket fees and expenses (including all fees and expenses of legal counsel, accountants, financial advisors, and investment bankers of such Person and its Affiliates), incurred by such Person or on its behalf in connection with or related to the authorization, preparation, negotiation, execution, and performance of this Agreement and any Contemplated Transactions, any litigation with respect thereto, the preparation, printing, filing, and mailing of any filing to be made with any Governmental Entity (including the SEC), or in connection with other regulatory Consents, and all other matters related to the Exchange and the other Contemplated Transactions.

"**Fundamental Representations**" means: (a) with respect to Two Rivers, those representations and warranties set forth in **Section 3.01(a)**, **Section 3.02(a)**, **Section 3.10**, **Section 3.14**, **Section 3.16** and **Section 3.16(c)** and (b) with respect to EASBY, those representations and warranties set forth in **Paragraph 4.01(a)**, **Paragraph 4.02**, **Paragraph 4.10**, **Paragraph 4.15**, **Paragraph 4.16** and **Paragraph 4.19**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Entity**" means (a) any federal, state, local, county, municipal or foreign government, regulatory authority, board, body, commission or other political subdivision thereof, (b) any agency or instrumentality of any government or political subdivision, or (c) any self-regulated organization or other non-governmental authority or quasi-governmental authority (to the extent that the rules, regulations, or Orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Gramz**" has the meaning set forth in **recital A** to this Agreement.

"**Hazardous Substance**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral, or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"**Indemnified Party**" means a Party making a claim for indemnification under **ARTICLE VIII**.

"**Indemnifying Party**" means a Party against whom a claim for indemnification under **ARTICLE VIII** are asserted.

"**Independent Accountant**" means an impartial, nationally recognized firm of independent certified public accountants, other the accountants of either Party, appointed by mutual agreement of Two Rivers and EASBY.

"**Intellectual Property**" means all: (a) patent and patent rights, trademarks and trademark rights, trade names and trade name rights, copyrights and copyright rights, service marks and service mark rights, and all pending applications for and registrations of the same; (b) brand names, trade dress, business and product names, logos, and slogans; (c) proprietary technology, including all know-how, trade secrets, quality control standards, reports (including test reports), designs, processes, market research and other data, computer software and programs (including source codes and related documentation), formulae, inventions and other ideas, methodologies, and technical information; (d) claims of the owner of any intellectual property for infringement of its rights by a third party, no matter when arising; and (e) other intellectual property.

"**Knowledge**" means: (a) with respect to Two Rivers, the actual knowledge of Wayne Harding, after due inquiry; and (b) with respect to the Vaxa Entities, the actual knowledge of G. A. Harrington, after due inquiry. An individual will be deemed to have actual knowledge of a particular fact or other matter if: (i) that individual is actually aware of that fact or matter; or (ii) a prudent individual could be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation, warranty, covenant, or other agreement.

"**Law**" means any law, common law, statute, constitution, ordinance, rule, regulation, code, Order or legally enforceable requirement enacted, issued, adopted, promulgated, enforced, ordered or applied by any Governmental Entity.

"**Lease**" means, with respect to a Party, any lease, sublease, license, concession or other Contract under which such Party holds any Leased Real Estate, including the right to all security deposits and other amounts and instruments deposited by or on behalf of such Party thereunder.

"**Leased Real Estate**" means any leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in real property held by Two Rivers.

"**Liability**" means any liability, indebtedness, or obligation of any kind (whether accrued, absolute, contingent, matured, unmatured, determined, determinable, or otherwise, and whether or not required to be recorded or reflected on a balance sheet under GAAP).

"**Losses**" means any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers.

"**Material Adverse Effect**" means, with respect to any Person, any event, occurrence, fact, condition, or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to: (a) the business, properties, results of operations or prospects, condition (financial or otherwise), or assets of such Person and its Subsidiaries, taken as a whole; or (b) the ability of a Party to consummate the Exchange or the other Contemplated Transactions on a timely basis.

"**Measuring Period**" means (a) if the Closing Date occurs during the first fifteen days of a calendar quarter, the one-year period beginning on the first day of such calendar quarter or (b) otherwise, the one-year period beginning on the first calendar day of the first full calendar quarter following the Closing Date. Solely as examples, (i) if the Closing Date occurs on or before April 15, 2019, the Measuring Period will extend from April 1, 2019 through March 31, 2020 and (ii) if the Closing Date occurs between April 16, 2019 and July 15, 2019 (inclusive), the Measuring Period will extend from July 1, 2019 through June 30, 2020.

"**Notice**" means any notice, request, consent, claim, demand, waiver or other communication under this Agreement, each of which shall be in writing.

"**Order**" means any order, writ, assessment, decision, injunction, decree, stipulation, determination, award, ruling or judgment of a Governmental Entity, whether temporary, preliminary or permanent.

"**Owned Real Estate**" means all land, together with all buildings, structures, fixtures, and improvements located thereon and all easements, rights of way, and appurtenances relating thereto, owned by Two Rivers.

"**Party**" and "**Parties**" have the respective meanings set forth in the first paragraph of this Agreement.

"**Permits**" means any permits, licenses, registrations, variances, clearances, commissions, franchises, exemptions, authorizations, approvals and similar writings granted or issued by or from Governmental Entities.

"**Person**" means any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization, or other entity, including any Governmental Entity, commission, board, department, bureau, or instrumentality.

"**Real Estate**" means, collectively, the Owned Real Estate and the Leased Real Estate.

"**Representative(s)**" means a Person's employees, managers, members, officers, directors, partners, shareholders, agents, attorneys, third-party advisors (including any accountants, insurers, rating agencies, consultants, bankers, financial advisors, custodians, and backup servicers), successors, and permitted assigns.

"**Restricted Business**" means any business or other venture that acquires, develops, or operates irrigated farmland and associated water rights and infrastructure, greenhouse operations, or redevelopment infrastructure for water management and delivery, in each case in the United States.

"**Restricted Period**" has the meaning set forth in **Section 5.05**.

"**Restricted Person**" has the meaning set forth in **Section 5.05**.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the regulations promulgated thereunder.

"**SEC Documents**" means (a) Two Rivers' Annual Report on Form 10-K for the fiscal year ended December 31, 2017, its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2018, June 30, 2018 and September 30, 2018, and its Current Reports on Form 8-K filed with the SEC since January 1, 2018 (but excluding any documents or portions thereof that are not deemed "filed" with the SEC) and (b) such other reports and other documents as are filed by Two Rivers with the SEC during the period between the Effective Date and the Closing Date pursuant to the requirements of Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, **provided** that information included in any Schedule 14A filed by Two Rivers during such period shall constitute an "SEC Document" only to the extent such information is incorporated by reference into Two Rivers' Annual Report on Form 10-K for the fiscal year ended December 31, 2018.

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, or other business entity of which a majority of the voting securities is at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement, or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third Party Claim**" has the meaning set forth in **Section 8.05**.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**Two Rivers**" has the meaning set forth in the first paragraph of this Agreement.

"**Two Rivers Balance Sheet**" means the audited consolidated balance sheet of Two Rivers as of December 31, 2017 contained in the SEC Documents.

"**Two Rivers Common Stock**" has the meaning set forth in **Section 1.02(a)**.

"**Two Rivers Disclosure Schedule**" means the disclosure schedule dated as of the Effective Date and delivered by Two Rivers to EASBY concurrently with the execution of this Agreement.

"**Two Rivers Equity Securities**" means Two Rivers Common Stock, Two Rivers Preferred Stock, and any restricted shares, restricted stock, stock appreciation rights, performance shares, profit participation rights, contingent value rights, "phantom" stock, or similar securities or rights issued by Two Rivers that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any shares of capital stock of Two Rivers.

"**Two Rivers Indemnitees**" has the meaning set forth in **Section 8.02** .

"**Two Rivers Material Contracts**" has the meaning set forth in **Section 3.20(a)**.

"**Two Rivers Preferred Stock**" means Preferred Stock of Two Rivers, $0.001 par value per share.

"**Vaxa**" has the meaning set forth in **recital A** to this Agreement.

"**Vaxa Balance Sheet**" means the unaudited consolidated balance sheet of the Vaxa Entities as of December 31, 2018, a copy of which was provided to Two Rivers on February 13, 2019.

"**Vaxa Entities**" has the meaning set forth in **recital A** to this Agreement.

"**Vaxa Indemnitees**" has the meaning set forth in **Section 8.03**.

"**Vaxa Interest**" has the meaning set forth in **recital A** to this Agreement.

"**Water Rights**" has the meaning set forth in **Section 3.17(d)**.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**SCHEDULE 2**

**CONFIDENTIALITY**

For purposes of this Schedule 2:

- "**EASBY Parties**" means, collectively, EASBY and the Vaxa Parties;

- "**Disclosing Party**" means either the EASBY Parties (including their respective Representatives) or Two Rivers (including its Representatives), as the party disclosing Evaluation Material;

- "**Receiving Party**" means either the EASBY Parties (including their respective Representatives) or Two Rivers (including its Representatives), as the party receiving Evaluation Material;

- "**Evaluation Material**" means all such information, data, reports, charts, interpretations, agreements, forecasts, records and other materials (whether documentary, oral, electronically stored or otherwise) furnished (whether before or after the date hereof) by a Disclosing Party to the Receiving Party with respect to the Agreement or the Contemplated Transactions, including Notes of the Receiving Party, it being understood that the failure of any Evaluation Material to be marked or otherwise labeled as confidential or proprietary information will not affect its status as Evaluation Material; **provided** that Evaluation Material does not include information that (a) becomes generally available to the public other than as a result of an act or omission by the Receiving Party or anyone to whom the Receiving Party transmits any Evaluation Material, (b) is or becomes available to you on a non-confidential basis from a source other than the Disclosing Party, if and only if such source is not prohibited from transmitting the information to the Receiving Party by a contractual, legal, fiduciary or other obligation, or (c) is otherwise lawfully and independently developed by you as shown on your books and records without use of the Evaluation Material; and

- "**Notes**" means all analyses, compilations, forecasts, studies, summaries, notes, records, data and other documents and materials in whatever form maintained, whether prepared by the Receiving Party or others, that contain or reflect or are generated from, or that reflect the Receiving Party's view of, any information, data, reports, charts, interpretations, agreements, forecasts, records and other materials constituting Evaluation Material.

1. *Confidentiality.* A Receiving Party (a) will keep all Evaluation Material it receives confidential and will not (except as required by applicable law, rules of any stock exchange or stock market, regulation or legal process, and only after compliance with Paragraph 4 below), without the prior written consent of the Disclosing Party, disclose any Evaluation Material in any manner whatsoever and (ii) will not use any Evaluation Material, directly or indirectly, for any purpose other than in connection with its completion of the Contemplated Transactions. The EASBY Parties and Two Rivers each agree to disclose the Evaluation Material only to their respective Representatives who (a) need to know the Evaluation Material for the purpose of completing the Contemplated Transactions, (b) are informed of the confidential nature of the Evaluation Material, and (c) agree to be bound by the terms of this Schedule 2 as if such Representative were a party to this Schedule 2. The EASBY Parties and Two Rivers agree they will direct, and use their best efforts to cause, each of their respective Representatives to observe the terms of this Schedule 2. The EASBY Parties and Two Rivers will be responsible for actions taken by any of their respective Representatives that would be deemed a breach of this Schedule 2 as if the EASBY Parties or Two Rivers, as the case may be, had taken such actions directly.

2. *Ownership of Evaluation Material.* All Evaluation Material furnished to a Receiving Party by a Disclosing Party will remain the sole and exclusive property of the Disclosing Party. To the extent that any Evaluation Material includes materials subject to the attorney-client privilege, the Disclosing Party is not waiving, and will not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Evaluation Material (including Evaluation Material related to pending or threatened litigation) to the Receiving Party. Except as specifically provided herein, nothing herein will be construed as to grant the Receiving Party any right or license under any patent, copyright, trademark or any other right relating to the Evaluation Material.

3. *Required Disclosure.* In the event that the Receiving Party is requested or required by applicable law, rules of any stock exchange or stock market, regulation or legal process to disclose any of the Evaluation Material, the Receiving Party will notify the Disclosing Party promptly in writing of the existence, terms and circumstances surrounding such a request so that the Disclosing Party may seek a protective order or other appropriate remedy or, in the Disclosing Party's sole discretion, waive compliance with the terms of this Schedule 2. The Receiving Party agrees to cooperate with the Disclosing Party to obtain a protective order or other appropriate remedy. In the event that no such protective order or other remedy is obtained, or that the Disclosing Party waives compliance with the terms of this Schedule 2, the Receiving Party will (a) furnish only that portion of the Evaluation Material that it is advised by the written legal opinion of its counsel is legally required, (b) exercise its best efforts to obtain reliable assurance that the Evaluation Material will be accorded confidential treatment, and (c) give the Disclosing Party written notice and a copy of the information to be disclosed as far in advance of its disclosure as practicable.

4. *No Representations or Warranties.* Except as expressly provided in the Agreement outside of this Schedule 3, the Parties agree that:

(a) a Disclosing Party has not made and is not making any representation or warranty, express or implied, as to the accuracy, usefulness or completeness of its Evaluation Material, including any projections, estimates, budgets, or information relating to the assets, liabilities, results of operations, conditions (financial or otherwise), customers, suppliers or employees of the Disclosing Party);

(b) a Disclosing Party will not have any liability to the Receiving Party or any other Person resulting from the use of Evaluation Material, or any errors therein or omissions therefrom;

(c) a Receiving Party is not entitled to rely on the accuracy, usefulness or completeness of any Evaluation Material and is only entitled to rely on the representations and warranties included in the Agreement, subject to the terms and conditions thereof; and

(d) a Receiving Party may not pursue any Action against the Disclosing Party arising from or relating to the provision, directly or indirectly, of Evaluation Material (or the information contained therein) by the Disclosing Party to the Receiving Party.

5. *Indemnification.* Each Party, in acting as a Receiving Party:

(a) agrees to indemnify and hold harmless the Disclosing Party and its Affiliates, successors and assigns from any Losses (including legal fees and the cost of enforcing this indemnity), as such Losses are incurred, arising out of or resulting from (a) any unauthorized use or disclosure of Evaluation Material by the Receiving Party or (b) any failure to comply with, or any breach of, this Schedule 2;

(b) acknowledges that (i) Evaluation Material has substantial proprietary value for the Disclosing Party, (ii) money damages would be both incalculable and an insufficient remedy for any breach of this Schedule 2 by the Receiving Party and (iii) any such breach would cause the Disclosing Party irreparable harm; and

(c) accordingly, agrees that in the event of any breach or threatened breach of this Schedule 2, the Disclosing Party, in addition to any other remedies at law, will be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

6. *Securities Law Compliance.* EASBY understands that (a) any Evaluation Material the EASBY Parties and their Representative receive may contain or constitute material non-public information concerning Two Rivers and (b) trading in Two Rivers Common Stock while in possession of material non-public information, or communicating that information to any other Person under circumstances in which it is reasonably foreseeable that such Person is likely to trade in Two Rivers Common Stock, could subject the EASBY Parties and their Representatives to liability under U.S. federal and state securities laws and the rules and regulations

promulgated thereunder, including Section 11(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. EASBY agrees that the EASBY Parties and their Representatives and Affiliates will not trade in Two Rivers Common Stock (A) while in possession of material non-public information, or (B) at all until they can do so in compliance with all applicable laws and without breach of this Schedule 2.

# EXHIBIT 31

Butte Valley / Vaxa Lease (March 15, 2019)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# FARM LEASE

This Lease Agreement (this "Lease"} is made effective as of March 15, 2019, by and between Two Rivers Water & Farming Co. ("Landlord"), and VAXA GLOBAL, LLC, (Tenant").

**PREMISES.** Landlord, in consideration of the lease payments provided in this Lease, leases to Tenant 158 irrigated acres, (the "Premises") located at 2083 County Road 104, Walsenburg, Colorado 81089 including use of irrigation equipment and infrastructure and water. This lease includse the use of the residential property and associated land.

**TERM.** The lease term will begin on March 15, 2019 and will terminate on March 14, 2021, renewal by agreement of the parties for up to five (5) years.

**PAYMENT.** The fee for the premises is $50,000 per year for the term of the lease. The first payment is due 6/15/19, 2019 for $50,000. Thereafter lease payments will be made quarterly at $12,500 each commencing quarterly commencing March 15, 2020.

**POSSESSION** Tenant shall be entitled to possesion the first day of the term of this Lease and shall yield possession to Landlord on the last day of the term of this Lease, unless otherwise agreed by both parties in writing. At the expiration of the term, Tenant shall remove its goods and effects and peaceably yield up the Premises to Landlord in as good condition as when delivered to Tenant, ordinary wear and tear excepted.

**NO PARTNERSHIP.** Nothing in this lease shall create a partnership, joint venture, employment, or any other relationship between Lessor and Lessee, than that of landlord and tenant. Neither party shall be liable, except as otherwise expressly provided herein, for the other party's obligations or liabilities. Tenant shall indemnify and hold Landlord and his property, including the Premises, free and harmless from all obligations and liabilities incurred by Lessee in conducting farming or other operations on the Premises, whether under this lease or otherwise.

**USE OF PREMISES/ ABSENCES.** The Premises shall be used for the purpose of planting, growing, and harvesting of crops; the feeding, pasturing, maintenance, and production of agricultural livestock; and the Premises shall not be used for any other purpose without Landlord's prior written consent. Tenant shall carry on all of the activities specified above in accordance with good husbandry and the best practices of the farming community in which the leased premises are situated. Tenant shall, at Tenant' s cost and expense, comply with any and all laws, ordinances, rules, regulations, requirements, and orders present or future, of any federal, state, county, or municipal governments which may in any way apply to the use, maintenance, operations, or production of crops on the leased premises, or the sale and or disposition of those crops. Tenant agrees not to apply pesticides, insecticides, fungicides, herbicides, or other chemical treatments that will have a residual effect beyond the term of this lease except with the prior written consent of Landlord.

**DISEASE OR BLIGHT.** If any disease or blight of any character appears on the Premises or in or on any **crop** growing or grown on the Premises, Tenant shall, at its expense:

(a) Employ the best known methods for eradicating such disease or blight; and
(b) Consult with and follow the advice of all experts on the subject recommended by

Landlord, who have offices or reside within fifty miles of Premises.

**PROPERTY INSURANCE.** Landlord and Tenant shall each be responsible to maintain appropriate insurance for their respective interests in the Premises and property located on the Premises. Tenant shall, at its expense, insure for their full insurable value, through insurance policies issued by companies acceptable to Landlord, any crops specified in this lease being grown by it on the Premises against damage or destruction by flood, fire, hail, and windstorms. The loss under any such policy shall be payable to Landlord and Tenant according to their respective interests in the crop.

**UTILITIES AND SERVICES.** Tenant shall pay all costs in connection with Tenant's operations on the leased premises, including but not limited to costs of preparing the leased premises for planting of crops, production costs, costs of tools and labor, electricity and other utilities.

**TAXES.** Landlord shall pay all real estate taxes which may be levied against the Premises. However, Tenant shall pay, before delinquency, all personal property taxes or assessments levied on Tenant's personal property situated in or about the leased premises during the term of this lease. On demand, Tenant shall provide to Landlord satisfactory evidence of payment of taxes.

**TERMINATION UPON SALE OF PREMISES.** Landlord may terminate this lease upon sixty (6) days' written notice to Tenant that the Premises have been sold. Should the property be sold to anyone other than the Tenant, Tenant will be given reasonable opportunity and allowance to complete the current growing season and harvest any crops thereon.

**DESTRUCTION OR CONDEMNATION OF PREMISES.** If the Premises are damaged or destroyed by fire or other casualty to the extent that enjoyment of the dwelling unit or farmland is substantially impaired, Landlord, in its sole discretion may elect to repair the Premises or terminate the Lease upon thirty (30) days' written notice to Tenant. If the Premises are condemned or cannot be repaired, this lease will terminate upon twenty (20) days' written notice by either party.

**DEFAULTS.** Tenant shall be in default of this Lease if Tenant fails to fulfill any lease obligation or term by which Tenant is bound. Subject to any governing provision of law to the contrary, if Tenant fails to cure any financial obligation within 30 days (or any other obligation within 30 days) after written notice of such default is provided by Landlord to Tenant, Landlord may elect to cure such default and the cost of such action shall be added to Tenant's financial obligations under this Lease. All sums of money or charges required to be paid by Tenant under this Lease shall be additional rent, whether or not such sums or charges are designated as "additional rent". The rights provided by this paragraph are cumulative in nature and are in addition to any other rights afforded by law.

**LATE PAYMENTS.** For any payment that is not paid within 30 days after its due date, tenant shall pay a late fee of $1,500.00.

**RESET PROVISION.** At the end of the two year term of the lease it may be renegotiated to accommodate future plans the Landlord may pursue for re-configuration and development of the farm.

**CUMULATIVE RIGHTS.** The rights of the parties under this Lease are cumulative and shall not be

construed as exclusive unless otherwise required by law.

**NON-SUFFICIENT FUNDS.** Tenant shall be charged the maximum amount allowable under applicable law for each check that is returned to landlord for lack of sufficient funds.

**ACCESS BY LANDLORD TO PREMISES.** Subject to Tenant's consent, (which shall not be unreasonably withheld), Landlord shalt have the right to enter the Premises to make inspections, provide necessary services, or show the unit to prospective buyers, mortgagees, tenants or workers. However, Landlord does not assume any liability for the care or supervision of the Premises. As provided by law, in the case of an emergency, Landlord may enter the Premises without Tenant's consent. During the last three months of this Lease, or any extension of this Lease, Landlord shall be allowed to display the usual "To Let" signs and show the Premises to prospective tenants.

**HUNTING.** Hunting rights are retained by Landlord and not granted to Tenant.

**DANGEROUS MATERIALS.** Tenant shall not keep or have on the Premises any article or thing of a dangerous, flammable, or explosive character that might substantially increase the danger of fire on the Premises, or that might be considered hazardous by a responsible insurance company, unless the prior written consent of Landlord is obtained and proof of adequate insurance protection is provided by Tenant to Landlord.

**MECHNICS LIENS.** Neither Tenant nor anyone claiming through the Tenant shall have the right to file mechanics liens or any other kind of lien on the Premises and the filing of this Lease constitutes notice that such lein(s) are invalid. Further, Tenant agrees to (1) give actual advance notice to any contractors, subcontractors or supplies of goods, labor, or services that such liens will not be valid, and (2} take whatever additional steps that are necessary in order to keep the premises free of all liens resulting from construction done by or for the Tenant.

**SUBORDINAATION OF LEASE.** This Lease is subordinate to any mortgage that now exists, or may be given later by Landlord, with respect to the Premises.

**ASSIGNABILITY/SUBLETTING.** Tenant may not assign or sublease any interest in the Premises, nor assign, mortgage or pledge this Lease, without the prior written consent of Landlord, which shall not be unreasonably withheld.

**NOTICE.** Notices under this Lease shall not be deemed valid unless given or served in writing and forwarded by mail, postage prepaid, addressed to the party at the appropriate address set forth below. Such addresses may be changed from time to time by either party by providing notice as set forth below. Notices mailed in accordance with these provisions shall be deemed received on the third day after posting.

**LANDLORD:**

Two Rivers Water & Farming Company
3025 S Parker Rd. #140
Aurora CO 80014

**TENANT:**

VAXA GLOBAL, LLC
2877 Paradise Road
Suite# 1004
Las Vegas, NV 89109

**REPAIRS, MAINTENANCE AND IMMPROVEMENTS:** Tenant will be responsible for repairs and maintenance of systems and infrastructure. Improvements must be preapproved by Landlord and Tenant will be reimbursed for preapproved improvements. Landlord agrees to have ultimate responsibility for major repairs to the diversion structure, not covered by government cost share "if available".

**GOVERNING LAW.** This Lease shall be construed in accordance with the laws of the State of Colorado.

**ENTIRE AGREEMENT/AMENDMENT.** This Lease contains the entire agreement of the parties and there are no other promises, conditions, understandings or other agreements, whether oral or written, relating to the subject matter of this Lease. This Lease may be modified or amended in writing, if the writing is signed by the party obligated under the amendment.

**SEVERABILITY.** If any portion of this Lease shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Lease is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**WAIVER**. The failure of either party to enforce any provisions of this Lease shall not be construed as a waiver or limitation of that party's right to subsequently enforce and compel strict compliance with ever provision of this Lease.

**BINDING EFFECT.** The pro visions of this Lease shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

LANDLORD: Two Rivers Water & Farming ~~Inc.~~ Company/WT

BY: [signature]
IT'S: CEO

TENANT: VAXA GLOBAL, LLC

BY: [signature]
IT'S: Mgr. [signature]

See attached Exhibit A for description of the Premises.



[initials]




This lease is for the areas listed above:
Area. 1, 2, 3, 4, 5, 6, 7, 8, 9 (less 6 acres already under a prior lease) and 12. Area 12 contains the residential property and surrounding land. Total acreage is 156 acres, more or less.

# EXHIBIT 32

Two Rivers Water & Farming Company Form 10-Q,
Quarterly Period Ended September 30, 2019 — Note 8 (Vaxa)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

10-Q 1 form10-q.htm

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

[X] QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the quarterly period ended September 30, 2019**

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

**For the transition period from _____ to _____**

**000-51139**
(Commission file number)

# Two Rivers Water & Farming Company
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Colorado** | **13-4228144** |
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**3025 S. Parker Road, Suite 140, Aurora, CO 80014**
(Address of principal executive offices) (Zip Code)

**(303) 222-1000**
(Registrant's telephone number, including area code)

**Not applicable**
(Former name, former address and former fiscal year, if changed since last report)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes [X] No [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | |
|---|---|
| Large accelerated filer [ ] | Accelerated filer [ ] |
| Non-accelerated filer [ ] | Smaller reporting company [X] |
| | Emerging growth company [X] |

If an emerging growth company, indicate by the check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [ ]

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes [ ] No [X]

Indicate the number of shares outstanding of each of the issuer's classes of common stock, as of the latest practicable date:87,145,235 shares as of November 22, 2019.

TABLE OF CONTENTS


| ITEM | DESCRIPTION | PAGE |
|---|---|---|
| PART 1 - FINANCIAL INFORMATION | | |
| ITEM 1. | FINANCIAL STATEMENTS | 3 |
| ITEM 2. | MANAGEMENT'S DISCUSSION AND ANALYSIS AND PLAN OF OPERATION | 26 |
| ITEM 3. | QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK | 31 |
| ITEM 4. | CONTROLS AND PROCEDURES | 31 |
| PART II. OTHER INFORMATION | | |
| ITEM 1. | LEGAL PROCEEDINGS | 33 |
| ITEM 1A. | RISK FACTORS | 33 |
| ITEM 2. | UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS | 34 |
| ITEM 3. | DEFAULTS UPON SENIOR SECURITIES | 34 |
| ITEM 4. | MINE SAFETY DISCLOSURES | 34 |
| ITEM 5. | OTHER INFORMATION | 34 |
| ITEM 6. | EXHIBITS | 35 |

# PART 1 - FINANCIAL INFORMATION

## ITEM 1. FINANCIAL STATEMENTS

**TWO RIVERS WATER & FARMING COMPANY AND SUBSIDIARIES**
**Condensed Consolidated Balance Sheets**
**(In thousands, except for number of shares)**
**(Unaudited)**

| | September 30, 2019 (Unaudited) | December 31, 2018 (Derived from Audit) |
|---|---|---|
| **ASSETS:** | | |
| **Current Assets:** | | |
| Cash and cash equivalents | $ 401 | $ 6 |
| Accounts receivable, related party | 17 | 0 |
| Deposits and other current assets | 63 | 58 |
| **Total Current Assets** | 481 | 64 |
| **Long Term Assets** | | |
| Property, equipment and software, net | 5 | 20 |
| Land | 3,252 | 3,299 |
| Water assets | 24,891 | 24,891 |
| Supply rights | 480 | - |
| Investment in GCP1 | 2,192 | 2,289 |
| Goodwill | 14,100 | - |
| Other long term assets | 98 | 96 |
| **Total Long Term Assets** | 45,018 | 30,595 |
| **TOTAL ASSETS:** | $ 45,499 | $ 30,695 |
| | | |
| **LIABILITIES & STOCKHOLDERS' EQUITY:** | | |
| **Current Liabilities:** | | |
| Accounts payable | $ 1,305 | $ 1,243 |
| Accrued liabilities | 5,963 | 5,780 |
| Current portion of notes payable, net of discount | 9,329 | 8,099 |
| Preferred dividend payable | 4,988 | 4,970 |
| **Total Current Liabilities** | 21,585 | 20,092 |
| Notes payable, net of current portion | 868 | 1,173 |
| **Total Liabilities** | 22,453 | 21,265 |
| **Commitments & Contingencies (Notes 4,7,9,10)** | | |
| **Stockholders' Equity:** | | |
| Common stock, $0.001 par value, 200,000,000 shares authorized, 83,195,939 shares issued and outstanding at September 30, 2019 and 45,574,458 shares issued and outstanding at December 31, 2018 | 84 | 46 |
| Preferred shares, $0.001 par value, 5,000,000 shares authorized, 64,935 shares issued and outstanding at September 30, 2019 and December 31, 2018. | 252 | 252 |
| Additional paid-in capital | 95,942 | 81,186 |
| Accumulated (deficit) | (95,596) | (94,454) |
| Total Two Rivers Water & Farming Company Stockholders' Equity | 682 | (12,970) |
| Noncontrolling interest in subsidiaries | 22,364 | 22,364 |
| **Total Stockholders' Equity** | 23,046 | 9,394 |
| **TOTAL LIABILITIES & STOCKHOLDERS' EQUITY** | $ 45,499 | $ 30,659 |

The accompanying notes to consolidated financial statements are an integral part of these statements

**TWO RIVERS WATER & FARMING COMPANY AND SUBSIDIARIES**
**Condensed Consolidated Statements of Operations**
**(In thousands, except for number of shares)**
**(Unaudited)**

| | Three Months Ended September 30 | | Nine Months Ended September 30 | |
|---|---|---|---|---|
| | 2019 | 2018 | 2019 | 2018 |
| **Revenue:** | | | | |
| Sales | $ 3 | $ - | $ 3 | $ - |
| Distribution Rights | 100 | - | 100 | - |
| Land leasing | - | - | 34 | - |
| Other | 5 | 5 | 8 | - |
| **Total Revenue** | 108 | 5 | 145 | 22 |
| Direct cost of revenue | - | - | - | - |
| **Gross Margin** | 108 | 5 | 145 | 22 |
| **Operating Expenses** | | | | |
| General and administrative | 312 | 661 | 1,149 | 1,838 |
| Dam demolition expense | (825) | 1,800 | (825) | 1,800 |
| Depreciation and amortization | 16 | 17 | 48 | 75 |
| Total operating expenses | (497) | 2,478 | 372 | 3,713 |
| **Profit (Loss) from Operations** | 605 | (2,473) | (227) | (3,691) |
| **Other Income (Expense)** | | | | |
| Interest expense | (390) | (217) | (918) | (736) |
| Gain (loss) on disposal of assets and intangibles | - | 37 | 85 | 114 |
| Loss on debt settlement | - | - | 33 | - |
| Other income | 1 | 4 | 1 | 15 |
| Gain on de-consolidation of GrowCo | - | - | - | 12,773 |
| Loss on investment in GrowCo Partners 1, LLC | (26) | - | (98) | (617) |
| Total other income (expense) | (415) | (176) | (897) | 11,549 |
| **Net Profit (Loss) from Continuing Operations Before Taxes** | 190 | (2,649) | (1,124) | 7,858 |
| Income tax (provision) benefit | - | - | - | - |
| **Net Profit (Loss) from Continuing Operations After Taxes** | 190 | (2,649) | (1,124) | 7,858 |
| **Net (Loss) from Deconsolidation and Discontinued Operations** | - | - | - | (810) |
| **Net Profit (Loss) before Preferred Dividends and Non-Controlling Interest** | 190 | (2,649) | (1,124) | 7,048 |
| Preferred distributions | (6) | (6) | (18) | (1,002) |
| Net loss attributable to non-controlling interest | - | - | - | - |
| **Net Profit (Loss) Attributable to Common Shareholders** | 184 | (2,655) | (1,142) | 6,046 |
| **Profit (Loss) Per Common Share - Basic:** | 0.00 | (0.08) | (0.02) | 0.18 |
| **Profit (Loss) Per Common Share – Basic and Dilutive:** | 0.00 | (0.08) | (0.02) | 0.16 |
| **Weighted Average Shares Outstanding:** | | | | |
| Basic | 71,006 | 34,256 | 57,057 | 33,529 |
| Dilutive | 85,867 | 34,256 | 57,057 | 37,149 |

The accompanying notes to consolidated financial statements are an integral part of these statements

**TWO RIVERS WATER & FARMING COMPANY AND SUBSIDIARIES**
**Condensed Consolidated Statements of Cash Flows**
**(In thousands)**
**(Unaudited)**

| | 2019 | 2018 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss, before NCI | $ (1,142) | $ 6,046 |
| Net loss from discontinued operations | - | 810 |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | |
| Depreciation and amortization | 48 | 75 |
| Accretion of debt discount | 313 | 178 |
| Loss (Gain) from debt extinguishment | (33) | - |
| Loss of modification of convertible debt | (8) | - |
| Stock issued for services | 144 | - |
| Stock option and warrant exercise | 290 | 1,220 |
| Gain on deconsolidation | - | (12,773) |
| Loss of investment in GrowCo | 98 | 617 |
| Loss (Gain) from disposal of fixed assets | (85) | (114) |
| Net change in operating assets and liabilities | | |
| Decrease (Increase) in accounts receivable, related party | (4) | 2 |
| Decrease in deposits, prepaid expenses and other assets | (2) | (47) |
| Increase (decrease) in accounts payable | 77 | 93 |
| Increase in distribution payable to preferred shareholders | 18 | 1,002 |
| Increase in accrued liabilities and other | (503) | 2,067 |
| **Net Cash Used in Operating Activities** | (789) | (824) |
| **Cash Flows from Investing Activities:** | | |
| Purchase of property and equipment | (33) | - |
| Sale of property and equipment | 47 | 72 |
| Investment in water assets | - | (102) |
| Acquisition | 9 | - |
| **Net Cash Used in Investing Activities** | 23 | (30) |
| **Cash Flows from Financing Activities:** | | |
| Borrowings on debt – related party | 20 | - |
| Proceeds from debt | 1,235 | 1,426 |
| Payment on notes payable | (94) | (532) |
| **Net Cash Provided by Financing Activities** | 1,161 | 894 |
| **Net Increase in Cash & Cash Equivalents** | 395 | 40 |
| **Beginning Cash & Cash Equivalents** | 6 | 14 |
| **Ending Cash & Cash Equivalents** | 401 | 54 |
| | | |
| Supplemental Disclosure of Cash Flow Information | | |
| Cash paid for interest | $ - | $ 196 |
| Shares issued in exchange for debt | $ 357 | $ - |
| Conversion of debt, preferred shares into Two Rivers common stock | $ 287 | $ 100 |
| Land exchanged for debt | $ 58 | $ - |
| Equipment exchanged for debt | $ 14 | $ - |
| Debt discount from beneficial conversion feature | $ 516 | $ - |
| Cashless exercise of warrants | $ 1 | $ 1 |

The accompanying notes to consolidated financial statements are an integral part of these statements

**TWO RIVERS WATER & FARMING COMPANY AND SUBSIDIARIES**
**Condensed Consolidated Statements of Changes in Stockholders' Equity**
**(In thousands)**
**(Unaudited)**

| | Voting Common Stock | | Water Redev. Preferred | | Additional Paid-in Capital | Accumulated (Deficit) | Non-Controlling Interest | Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balances December 31, 2017 | 32,750 | $ 34 | 65 | $ 252 | $ 77,267 | $ (97,168) | $ 31,752 | $ 12,137 |
| Net Income attributed to Two Rivers common shareholders | - | - | - | - | - | 6,046 | - | 6,046 |
| Prior period adjustment preferred shares | - | - | - | - | (100) | - | - | (100) |
| Stock issued in exchange for debt settlement | 874 | 2 | - | - | 98 | - | - | 100 |
| Shares issued for TR Capital conversions | 15 | - | - | - | - | - | - | - |
| Stock-based compensation | - | - | - | - | 1,190 | - | - | 1,190 |
| Shares issued for services | 1,091 | 0 | - | - | (1) | - | - | (1) |
| RSU issuance | 118 | 0 | - | - | (0) | - | - | - |
| Warrant issuance | - | - | - | - | 30 | - | - | 30 |
| Non-controlling interest | - | - | - | - | - | - | (383) | (383) |
| GrowCo deconsolidation | - | - | - | - | - | - | (8,858) | (8,858) |
| Balances, September 30, 2018 | 34,848 | $ 36 | 65 | $ 252 | $ 78,484 | $ (91,122) | $ 22,511 | $ 10,161 |
| Balances December 31, 2018 | 45,575 | $ 46 | 65 | $ 252 | $ 81,186 | $ (94,454) | $ 22,364 | $ 9,394 |
| Net Income attributed to Two Rivers common shareholders | - | - | - | - | - | (1,142) | - | (1,142) |
| Stock issued in exchange for debt settlement | 4,220 | 4 | - | - | 283 | - | - | 287 |
| Beneficial conversion feature on convertible debt | - | - | - | - | 516 | - | - | 516 |
| Stock-based compensation | - | - | - | - | 230 | - | - | 230 |
| Shares issued for services | 755 | 1 | - | - | 143 | - | - | 144 |
| Warrant exercise | 1,324 | 2 | - | - | (2) | - | - | - |
| Warrant issuance | - | - | - | - | 60 | - | - | 60 |
| Refundable shares issued for debt | 1,322 | 1 | - | - | 356 | - | - | 357 |
| Shares issued for acquisition | 30,000 | 30 | - | - | 13,170 | - | - | 13,200 |
| Balances September 30, 2019 | 83,196 | $ 84 | 65 | $ 252 | $ 95,942 | $ (95,596) | $ 22,364 | $ 23,046 |

The accompanying notes to consolidated financial statements are an integral part of these statements

**NOTE 1 – ORGANIZATION AND BUSINESS**

*Unless the context requires otherwise, references in this document to "Two Rivers," or the "Company" is to Two Rivers Water & Farming Company and its subsidiaries.*

**Corporate Evolution**

Prior to 2009, the Company was named Navidec Financial Services, Inc. ("Navidec") and had been engaged in mortgage lending and other enterprises unrelated to its current lines of business. Navidec was incorporated in the state of Colorado on December 20, 2002. On July 28, 2009, Navidec formed a wholly-owned Colorado corporation for the purpose of acquiring farm and water assets in the Colorado Huerfano/Cucharas watershed. On November 19, 2009, with shareholder approval, Navidec changed its name to Two Rivers Water Company. On December 11, 2012, with shareholder approval, the Company changed its name to Two Rivers Water & Farming Company.

On January 29, 2014, the board of directors approved a plan to reorganize our subsidiaries in a more integrated manner based on functional operations. We formed a new company, TR Capital Partners, LLC or TR Capital, which issued all of its common units to Two Rivers Water & Farming Capital. TR Capital then initiated the transactions described below under "Placement of Preferred Units". Following the completion of those transactions in September 2014, TR Capital and our other direct and indirect subsidiaries (excluding HCIC Holdings, LLC and Huerfano-Cucharas Irrigation Company) entered into a series of related transactions as the result of which assets and operations of such other subsidiaries transferred to TR Capital. As a result of those transactions, TR Capital owns all of the operations formerly conducted by those subsidiaries.

**Overview**

In 2009, we began acquiring and developing irrigated farmland and associated water rights and infrastructure. As of September 30, 2019, we own approximately 7,076 gross acres. Gross acres owned showed a net increase of 811 acres from 6,265 gross acres at December 31, 2018 due the addition of acreage owned by Huerfano Cucharas Irrigation Company that was previously not reported.

We are focused on water assets we have acquired and will acquire in the future. Since 2009, we have acquired strategic water assets and land in the Huerfano and Cucharas river basins in southeastern Colorado, thus the name Two Rivers. Our water asset area spans over 1,900 square miles and drops in elevation from over 14,000 feet down to the confluence of the Arkansas River, just east of Pueblo Colorado at 4,500 feet. We operate in a natural, gravity fed water alluvial. This basin is the last undeveloped basin along the front range of Colorado. We plan to develop this basin to properly manage the water contained therein and serve the community while providing returns to our investors.

Since October 2016, we have refocused on monetizing our assets through asset sales and reinvestment. We plan to sell assets that we have determined will not yield significant future returns to our shareholders and invest strategically in the assets that we believe will. We plan to take net proceeds, if any, from these sales and continue to invest in our water and water infrastructure.

In May 2014, we formed GrowCo, Inc., a wholly owned subsidiary of Two Rivers through the issuance of 20,000,000 shares of common stock. On August 1, 2014, we announced that we were placing 10,000,000 GrowCo shares in a trust to be distributed to Two Rivers' common shareholders. As of June 30, 2018, the Company owned 10,000,000 GrowCo shares out of reported shares outstanding of 34,343,000, or 29.12%. The reported outstanding shares were provided to the Company by GrowCo's management.

The Company requested from GrowCo management financial information to complete the Company's June 30, 2018 financials. On July 17, 2018 the Company was notified by GrowCo's management that GrowCo would not provide the requested financial information. This event triggered the Company's management to re-examine the consolidation and VIE (variable interest entity) rules under US GAAP. Management concluded that as of April 1, 2018 the consolidation of GrowCo and GrowCo's related entities was no longer required under US GAAP.

*Water Redevelopment Company*

We formed Water Redevelopment Company ("Water Redev") in February 2017 for the purpose of separating our water assets from the rest of our business and to facilitate raising additional capital to invest in our water assets. Water Redevelopment Company is a subsidiary of Two Rivers and focuses on development and redevelopment of infrastructure for water management and delivery. Water Redevelopment's primary area of focus is in the Huerfano-Cucharas river basin in southeastern Colorado. Although no final decision has been reached, we are considering various alternatives and proposals for financing and restructuring Water Redev including a spin-off to shareholders, direct funding and partial or full rights sales.

*Vaxa Entities*

On July 31, 2019, Two Rivers completed its acquisition of a 100% interest in Vaxa Global, LLC and its two wholly-owned subsidiaries, Ekstrak Labs, LLC and Gramz Holdings, LLC (together the "Vaxa Entities"), from Easby Land & Cattle Company, LLC, in exchange for 30,000,000 Two Rivers' common shares plus an additional 20,000,000 Two Rivers' common shares subject to an earn-out performance by the Vaxa Entities over a 12 month period. The number of earn-out shares will equal the lesser of:

- The quotient of 10 times the consolidated earnings before income taxes, depreciation and amortization, or EBITDA, of Vaxa for the twelve months ending June 30, 2020, divided by $1.00; and

- 20,000,000.

It is expected that the earn-out shares, if any, would be issued by August 2020.

We intend to expand Vaxa's operations to grow hemp on land that we own, using water that we supply. This will, in turn, provide additional hemp products to Ekstrak and Gramz™.

In September 2019, Vaxa entered into an agreement to purchase over $700,000 in extraction and processing equipment, and all seeds, clone and biological assets, as well as the 2019 hemp crop from Butte Valley farm, from Montverde Partners, LLC ("Montverde"), in exchange for 3,000,000 shares of our common stock which were contributed by Easby Land & Cattle, LLC. Monteverde is a joint venture partner of Vaxa in the Butte Valley hemp farming operation near Walsenburg, Colorado. The transaction closed in October 2019.

*Vaxa Global, LLC*

Vaxa Global, LLC farms and distributes Canadian originated patented-processed hemp for biomass sale and CBD extraction within the United States to states that are approved to extract CBD. Vaxa hemp is 100% organic, non-GMO, solvent free, THC free and 100% food-grade edible. Vaxa originated from one of the first industrial hemp distributors/farmers/manufactures in Canada into the US.

*Ekstrak Labs, LLC*

Ekstrak Labs, LLC is an emerging company in isolate extraction. Eskstrak plans to build state-of-the-art facilities with machinery that is proven to deliver optimal extraction results. Eskstrak is developing joint venture partnerships for brand diversification into various products and creating product lines for affiliated brands through white label wholesale products.

*Gramz Holdings, LLC*

Gramz Holdings, LLC is a supplier of Nature's Whole Spectrum™, natural whole plant compounds in consumer products designed to maintain the composition of the plant's natural source and state. Gramz™ was founded to respect the potential medicinal and therapeutic value of hemp's whole plant composition. Gramzs™ products include Gramz Whole Plant Matrix™ Sublingual Drops and Gramz Herbal Topical, with R&D in progress for additional products for both humans and pets.

**NOTE 2 - SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Principles of Consolidation*

The accompanying condensed consolidated financial statements include the accounts of Two Rivers, Huerfano-Cucharas Irrigation Company, TR Capital and its subsidiaries: Two Rivers Farms, and Two Rivers Water. All significant inter-company balances and transactions have been eliminated in consolidation.

Under guidance in ASC 810-10-05-8 "Consolidation of VIEs" (Variable Interest Entities) the Company's management has determined that GrowCo and its related entities, GCP1, GCP Super Units, GCP2, should no longer be consolidated for financial statement purposes. The Company now reports its ownership position under the equity method of accounting. Prior to June 30, 2018, GrowCo and its related entities were consolidated.

*Basis of Presentation*

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America ("U.S. GAAP") for interim financial information and with the instructions to Form 10-Q and Item 210 of Regulation S-X. Accordingly, they do not include all the information and footnotes required by U.S. GAAP for complete financial statements, although the Company believes that the disclosures made are adequate to make the information not misleading. In the opinion of management, all adjustments (consisting of only normal recurring accruals) considered necessary for a fair presentation for the periods presented have been included as required by Regulation S-X, Rule 10-01. Operating results for the three and nine months ended September 30, 2019 are not necessarily indicative of the results that may be expected for the year ended December 31, 2019. It is suggested that these condensed consolidated financial statements be read in conjunction with the Company's consolidated financial statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2018, as filed with the Securities and Exchange Commission on April 15, 2019.

*Deconsolidation of GrowCo, Inc.*

Even though the Company no longer consolidates GrowCo and GrowCo's related entities into the Company's financials, Management has determined that the Company is a guarantor of GrowCo's $4M Secured Notes. The Company did not sign these notes as a guarantor but has provided collateral owned by the Company with a 2018 appraised value of $2,359,000. Since Two Rivers' Management desires to present a conservative representation of its financial information it has determined to set the probability of collection against its collateral at 100% of the recent appraised value. The Company has recorded a contingent liability of $2,359,000 and offset this amount as an increase in the Company's investment in GCP1 (ASC 460-10-55-23c).

Additionally, US GAAP (ASC 810-10-40) provides guidance on "Derecognition" of a previously consolidated entity or entities. Under this guidance, Two Rivers shall account for the deconsolidation of a subsidiary or derecognition of a group of assets specified in ASC 810-10-40-3A by recognizing a gain or loss in net income attributable to the parent, measured as the difference between:

a. The aggregate of all of the following:

1. The fair value of any consideration received. In Two Rivers' case, no consideration was received.

2. The fair value of any retained noncontrolling investment in the former subsidiary or group of assets at the date the subsidiary is deconsolidated, or the group of assets is derecognized. In Two Rivers case, there were no retained noncontrolling investments in GrowCo or its related entities.

3. The carrying amount of any noncontrolling interest in the former subsidiary (including any accumulated other comprehensive income attributable to the noncontrolling interest) at the date the subsidiary is deconsolidated. In Two Rivers case, the total amount of the noncontrolling interest to derecognized is as follows as of April 1, 2018:

| Entity | April 1, 2018 |
|---|---|
| GrowCo | (1,230,000) |
| GrowCo Partners 1, LLC | 3,621,000 |
| GCP Super Units, LLC | 5,016,000 |
| TR Cap 20150630 Distribution, LLC | 497,000 |
| TR Cap 20150930 Distribution, LLC | 460,000 |
| TR Cap 20151231 Distribution, LLC | 495,000 |
| Total | $ 8,859,000 |

b. The carrying amount of the former subsidiary's assets and liabilities or the carrying amount of the group of assets.

With the above guidance, during the year ended December 31, 2018 the Company determined that the effect of the deconsolidation of GrowCo produced a gain of $12,773,000 which is a non cash adjustment. This amount consists of elimination of the noncontrolling interest in GrowCo of $8,859,000 and $3,914,000 from the removal of GrowCo's assets and liabilities. The $3,914,000 represented the amount of GrowCo liabilities over GrowCo's assets.

*Investment in GrowCo Partners 1, LLC (GCP1)*

Due to the deconsolidation of GrowCo and its related entities, which include GCP1, the Company's investment in GCP1 is now accounted for under the equity method.

*Non-controlling Interest*

Below is the detail of non-controlling interest shown on the condensed consolidated balance sheets.

| Entity | September 30, 2019 | Dec 31, 2018 |
|---|---|---|
| TR Capital | $ 20,342,000 | $ 20,342,000 |
| HCIC | 1,379,000 | 1,379,000 |
| F-1 | 29,000 | 29,000 |
| F-2 | 162,000 | 162,000 |
| DFP | 452,000 | 452,000 |
| Total | $ 22,364,000 | $ 22,364,000 |

*Reclassification*

Certain amounts previously reported have been reclassified to conform to current presentation. Certain labels of accounts/classifications have been changed.

*Use of Estimates*

The preparation of financial statements in conformity with generally accepted accounting principles in the United States requires management to make estimates and assumptions. These estimates and assumptions affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses during the reported period. Actual results could differ materially from those estimates.

*Cash and Cash Equivalents*

For purposes of reporting cash flows, Two Rivers considers cash and cash equivalents to include highly liquid investments with original maturities of 90 days or less. Those are readily convertible into cash and not subject to significant risk from fluctuations in interest rates. The recorded amounts for cash equivalents approximate fair value due to the short-term nature of these financial instruments.

*Concentration of Credit Risk*

Financial instruments that potentially subject Two Rivers to significant concentrations of credit risk include cash equivalents, marketable investments, advances and accounts receivable. The Company maintains its cash balances in the form of bank demand deposits, money market accounts that management believes to be of high credit quality. Accounts receivable are typically uncollateralized and are derived from transactions with and from customers primarily located in the United States.

*Fair Value of Measurements and Disclosures*

*Fair Value of Assets and Liabilities Acquired*

Fair value is the price that would be received from the sale of an asset or paid to transfer a liability (i.e., an exit price) in the principal or most advantageous market in an orderly transaction between market participants. In determining fair value, the accounting standards established a three-level hierarchy that distinguishes between (i) market data obtained or developed from independent sources (i.e., observable data inputs) and (ii) a reporting entity's own data and assumptions that market participants would use in pricing an asset or liability (i.e., unobservable data inputs). Financial assets and financial liabilities measured and reported at fair value are classified in one of the following categories, in order of priority of observability and objectivity of pricing inputs:

- *Level 1* – Fair value based on quoted prices in active markets for identical assets or liabilities.
- *Level 2* – Fair value based on significant directly observable data (other than Level 1 quoted prices) or significant indirectly observable data through corroboration with observable market data. Inputs would normally be (i) quoted prices in active markets for similar assets or liabilities, (ii) quoted prices in inactive markets for identical or similar assets or liabilities or (iii) information derived from or corroborated by observable market data.
- *Level 3* – Fair value based on prices or valuation techniques that require significant unobservable data inputs. Inputs would normally be a reporting entity's own data and judgments about assumptions that market participants would use in pricing the asset or liability.

The fair value measurement level for an asset or liability is based on the lowest level of any input that is significant to the fair value measurement. Valuation techniques should maximize the use of observable inputs and minimize the use of unobservable inputs.

*Recurring Fair Value Measurements*

The carrying value of the Company's financial assets and financial liabilities is their cost, which may differ from fair value. The carrying value of cash held as demand deposits, money market and certificates of deposit, marketable investments, accounts receivable, short-term borrowings, accounts payable and accrued liabilities approximated their fair value. Marketable investments are valued at Level 1 due to readily available market quotes. The fair value of the Company's long-term debt, including the current portion approximated its carrying value. Fair value for long-term debt was estimated based on quoted market prices of the identical debt instruments or values of comparable borrowings.

*Property and Equipment*

Property and equipment are stated at cost less accumulated depreciation. Depreciation is computed principally on the straight-line method over the estimated useful life of each type of asset, which ranges from three to twenty-seven and a half years. Maintenance and repairs are charged to expense as incurred; improvements and betterments are capitalized. Upon retirement or disposition, the related costs and accumulated depreciation are removed from the accounts, and any resulting gains or losses are credited or charged to income.

Below is a summary of premises and equipment:

| Asset Type | Life in Years | September 30, 2019 | December 31, 2018 |
|---|---|---|---|
| Office equipment, furniture | 5 – 7 | $ 12,000 | $ 12,000 |
| Computers | 3 | 46,000 | 46,000 |
| Vehicles | 5 | 9,000 | 25,000 |
| Farm equipment | 7 – 10 | 147,000 | 147,000 |
| Buildings | 27.5 | 10,000 | 10,000 |
| Website | 3 | 7,000 | 7,000 |
| Subtotal | | 231,000 | 247,000 |
| Less: Accumulated depreciation | | (226,000) | (227,000) |
| Net book value | | $ 5,000 | $ 20,000 |

*Land*

Land acquired for farming is recorded at cost. Some of the land acquired has not been farmed for many years, if not decades. Therefore, additional expenditures are required to make the land ready for efficient farming. Expenditures for leveling the land are added to the cost of the land. Irrigation is not capitalized in the cost of Land (*Property and Equipment* above). Land is not depreciated. However, once per year, management will assess the value of land held, and in their opinion, if the land has become impaired, Management will establish an allowance against the land.

The Company's land located in El Paso County, Colorado, is being partially developed into 35 to 40 acre lots to be sold. For the year ended December 31, 2018 the Company recognized a gain of $238,000 from approximately $360,000 in land sales. For the nine months ended September 30, 2019, we sold two lots totaling 78 acres for a gross sales price of $116,000, recognized a gain of approximately $68,000. This transaction provided cash of approximately $47,000, paid in full the first mortgage of the El Paso land note for approximately $58,000, and direct expenses of sale of approximately $11,000. In the three months ended September 30, 2019, there were no land sales.

*Water Rights and Infrastructure*

Subsequent to purchase of water rights and water infrastructure, management periodically evaluates the carrying value of its assets, and if the carrying value is in excess of fair market value, the Company will establish an impairment allowance. No amortization or depreciation is taken on the water rights. See the discussion below concerning Impairments – Water rights and infrastructure.

*Intangibles*

Two Rivers recognizes the estimated fair value of water rights acquired by the Company's purchase of stock in HCIC and Orlando. These intangible assets will not be amortized because they have an indefinite remaining useful life based on many factors and considerations, including, the historical upward valuation of water rights within Colorado.

In conjunction with the acquisition of Vaxa, the Company recognized goodwill of approximately $14,100,000 based on the issuance of 30,000,000 shares at the closing share price ($0.44) on the date of acquisition (July 31, 2019) plus net liabilities acquired (See NOTE 8).

*Impairments*

*Property and Equipment*

Once per year we review all property, equipment and software owned by the Company and compare the net book value of such assets with the fair market value of each piece of equipment having a net book value greater than $5,000. If it is determined that the net book value is greater than the fair market value, an impairment will be recorded. If impairment is necessary, a loss on the value of the affected asset will be recorded, and the impairment will not be reversed in future periods.

*Land*

Once per year we review each parcel of land owned by the Company together with improvements to each parcel and compare the carrying cost with the fair market value. If it appears that our carrying value may be greater than the fair market value, an independent appraisal will be ordered. If the appraised value is less than our carrying value, an impairment will be recorded. If impairment is necessary, a loss on the value of our land will be recorded, and the impairment will not be reversed in future periods.

*Water Rights and Infrastructure*

Once per year we assess the value of the water rights held by the Company, comparing our estimated values with recent sales of comparable water rights along with depreciation of the infrastructures. In the event that such assessment indicates that the carrying value is greater than the fair market value of the water rights or the depreciable replacement cost of our infrastructure, an impairment will be recorded. If impairment is necessary, a loss on value of our water rights will be recorded, and the impairment will not be reversed in future periods.

Prior to the year ended December 31, 2017, the Company recognized a $30,000 impairment on the Company's land and water shares.

For the year ended December 31, 2017, the Company examined the depreciable replacement cost of its water infrastructure. This analysis caused the recognition of $6,900,000 impairment to the water infrastructure.

In 2018, the Company obtained two independent appraisals covering its water assets. The appraisals were in excess of the Company's carrying value of it water rights and infrastructure.

For the year ended December 31, 2018 and the nine months ended September 30, 2019, the Company did not recognize any impairments.

*Revenue Recognition*

Effective January 1, 2018, the Company adopted ASC 606 — Revenue from Contracts with Customers. Under ASC 606, the Company recognizes revenue from the commercial sales of products, land, licensing agreements and farming contracts by applying the following steps: (1) identify the contract with a customer; (2) identify the performance obligations in the contract; (3) determine the transaction price; (4) allocate the transaction price to each performance obligation in the contract; and (5) recognize revenue when each performance obligation is satisfied. For the comparative periods, revenue has not been adjusted and continues to be reported under ASC 605 — Revenue Recognition. Under ASC 605, revenue is recognized when the following criteria are met: (1) persuasive evidence of an arrangement exists; (2) the performance of service has been rendered to a customer or delivery has occurred; (3) the amount of fee to be paid by a customer is fixed and determinable; and (4) the collectability of the fee is reasonably assured.

There was no impact on the Company's financial statements as a result of adopting Topic 606 for the three and nine months ended September 30, 2019 and 2018.

*Farming*

For the three and nine months ended September 30, 2019 the Company had approximately $0 in net crop share revenues. For the three and nine months ended September 30, 2018, the Company recognized approximately $0 in net crop share revenues. During 2018, the Company entered into a crop share arrangement for a percentage of a hemp crop produced on 4 acres of farm land at Butte Valley in Huerfano County, Colorado. A net payment of $18,000 for the Company's share was received in the three months ended December 31, 2018

Vaxa generates revenue from hemp farming operations, distribution agreements and CBD consumer product sales. For the nine months ended September 30, 2019, Vaxa generated approximately $103,000 in revenue. Prior to the acquisition, Vaxa entered into a farm lease with the Company to run a pilot hemp farming operation in Butte Valley on property that the Company owned.

*Member Assessments*

Once per year the HCIC board estimates HCIC's expenses, less anticipated water revenues, and establishes an annual assessment per ownership share. One-half of the member assessment is recorded in the second quarter of the calendar year and the other one-half of the member assessment is recorded in the third quarter of the calendar year. Assessments paid by Two Rivers Water Company to HCIC are eliminated in consolidation of the financial statements.

HCIC does not reserve against any unpaid assessments. Assessments due, but unpaid, are secured by the member's ownership of HCIC. The value of this ownership is significantly greater than the annual assessments.

*Stock Based Compensation*

Beginning January 1, 2006, the Company adopted the provisions of ASC 718 and accounts for stock-based compensation in accordance with ASC 718. Under the fair value recognition provisions of this standard, stock-based compensation cost is measured at the grant date based on the fair value of the award and is recognized as expense on a straight-line basis over the requisite service period, which generally is the vesting period. The Company elected the modified-prospective method, under which prior periods are not revised for comparative purposes. The valuation provisions of ASC 718 apply to new grants and to grants that were outstanding as of the effective date and are subsequently modified.

All options granted prior to the adoption of ASC 718 and outstanding during the periods presented were fully vested at the date of adoption.

*Dam Demolition Expense*

During the year ended December 31, 2018 a court date has been set for a hearing of the State of Colorado's legal action to compel the Company to demolish Cucharas #5 reservoir. A contingent liability, with an offsetting expense of $1,800,000 has been recognized. In July 2019, the Company reached a settlement with the State of Colorado, whereby the Company will pay approximately $1,000,000 plus interest to the State of Colorado in exchange for a full settlement of the above legal action. The Company recognized a reduction of this contingent liability from $1,800,000 to approximately $1,000,000, along with additional non-cash gains of approximately $25,000 from the negotiations and resolution of previously recorded accounts payable, on Two Rivers' in these financial statements. In the three months ending September 30, 2019, the Company made payments of approximately $82,000 to the State of Colorado in compliance with the payment terms of the settlement agreement. The balance of the accrued expense for the settlement was approximately $893,000 on September 30, 2019.

*Debt and Equity*

The Company follows beneficial conversion feature guidance in ASC 470-20, which applies to convertible stock as well as convertible debt. A beneficial conversion feature is defined as a nondetachable conversion feature that is in the money at the commitment date. The beneficial conversion feature guidance requires recognition of the conversion option's in-the-money portion, the intrinsic value of the option, in equity, with an offsetting reduction to the carrying amount of the instrument. The resulting discount is amortized as interest over the life of the instrument, if a stated maturity date exists, or to the earliest conversion date, if there is no stated maturity date. If the earliest conversion date is immediately upon issuance, the expense must be recognized at inception. When there is a subsequent change to the conversion ratio based on a future occurrence, the new conversion price may trigger the recognition of an additional beneficial conversion feature on occurrence.

On May 21, 2019, the Company entered into a convertible promissory note with an investor of the Company in the amount of $262,500. The note bears 10% interest and is payable in full on May 21, 2020. The Company has recorded a beneficial conversion feature of $258,000, which is recorded as a discount on the note payable and being amortized over the life of the note. As of September 30, 2019 the balance of the beneficial conversion feature is approximately $168,000.

On May 21, 2019, the Company entered into a convertible promissory note with an investor of the Company in the amount of $262,500. The note bears 10% interest and is payable in full on May 21, 2020. The Company has recorded a beneficial conversion feature of approximately $258,000, which is recorded as a discount on the note payable and being amortized over the life of the note. As of September 30, 2019, the balance of the beneficial conversion feature is approximately $168,000.

On September 19, 2019 the Company entered into a convertible promissory note with an investor of the Company in the amount of $575,000. The note bears 12% interest and is payable in full on March 19, 2020. The note is convertible after 180 days so no beneficial conversion feature was recognized. The Company recognized a total original issue discount amount of approximately $413,000 on the note consisting of a fixed amount of $58,000 and $356,000 for shares issued. Approximately 83% of the shares issued by the Company ($297,000 of the note discount) are returnable to the Company if the note is repaid on or before the maturity date.

*Preferred Dividend Payable*

Preferred dividend payable represents dividends payable to holders of preferred units of TR Capital, approximately $4,937,000 as of September 30, 2019 and preferred dividends owed to holders of the Water Redevelopment Company preferred shares of approximately $51,000.

Beginning on July 1, 2018, the Company terminated the accrual of the preferred dividends payable to TR Capital preferred members due to a binding letter of intent executed with an outside strategic partner. Additionally, TR Capital has not declared dividends due the Company's financial condition.

*Income Taxes*

The Company accounts for income taxes under the asset and liability method, which requires the recognition of deferred tax assets and liabilities for the expected future tax consequences of events that have been included in the financial statements. Under this method, the Company has determined the deferred tax assets and liabilities on the basis of the differences between the financial statement and tax basis of assets and liabilities by using enacted tax rates in effect for the year in which the differences are expected to reverse. The effect of a change in tax rates on deferred tax assets and liabilities is recognized in income in the period that includes the enactment date.

The Company recognizes deferred tax assets to the extent that it believes that these assets are more likely than not to be realized. In making such a determination, the Company considers all available positive and negative evidence, including future reversals of existing taxable temporary differences, projected future taxable income, tax-planning strategies, and results of recent operations. If the Company determines that it would be able to realize our deferred tax assets in the future in excess of their net recorded amount, it would make an adjustment to the deferred tax asset valuation allowance, which would reduce the provision for income taxes. The Company records uncertain tax positions in accordance with ASC 740 on the basis of a two-step process in which (1) it determines whether it is more likely than not that the tax positions will be sustained on the basis of the technical merits of the position and (2) for those tax positions that meet the more-likely-than-not recognition threshold, it recognizes the largest amount of tax benefit that is more than 50 percent likely to be realized upon ultimate settlement with the related tax authority.

The Company recognizes interest and penalties related to unrecognized tax benefits on the income tax expense line in the accompanying consolidated statement of operations. As of September 30, 2019, no accrued interest or penalties are included on the related tax liability line in the balance sheet.

*Net (Loss) per Share*

Basic net income per share is computed by dividing net income (loss) attributed to Two Rivers available to common shareholders for the period by the weighted average number of common shares outstanding for the period. Diluted net income (loss) per share is computed by dividing the net income for the period by the weighted average number of common and potential common shares outstanding during the period.

The dilutive effect of the outstanding 3,058,500 options, and 17,537,896 warrants at December 31, 2018, have an exercise price in excess of the Company's closing price of $0.17/share as of December 28, 2018; therefore these shares have not been included in the determination of diluted earnings per share since, under ASC 260 they would be anti-dilutive. As of September 30, 2019, the total number of warrants outstanding were 5,948,730, including 4,225,778 issued to Black Mountain which have an exercise price of $0.07878/share.

The common shares used in the computation of basic and diluted net income (loss) per share are reconciled as follows:

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2019 | 2018 |
| Weighted average number of shares outstanding – basic | 71,006,000 | 57,057,000 |
| Dilutive effect of convertible debt | 8,912,000 | - |
| Dilutive effect of warrant exercise | 5,949,000 | - |
| Weighted average number of shares outstanding – diluted | 85,867,000 | 57,057,000 |

*Recently Issued Accounting Pronouncements*

In March 2019 - the Financial Accounting Standards Board ("FASB") Update 2019-01—*Leases (Topic 842): Codification Improvements.* The transition and effective date provisions for this Update apply to Issue 1 and Issue 2 in the Update. They do not apply to Issue 3 in the Update because the amendments for that Issue are to the original transition requirements in Topic 842. The amendments in this Update amend Topic 842. That Topic has different effective dates for public business entities and entities other than public business entities. The effective date of those amendments is for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years for any of the following:

1) A public business entity
2) A not-for-profit entity that has issued, or is a conduit bond obligor for, securities that are traded, listed, or quoted on an exchange or an over-the-counter market
3) An employee benefit plan that files financial statements with the U.S. Securities and Exchange Commission (SEC).

For all other entities, the effective date is for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early application is permitted. An entity should apply the amendments as of the date that it first applied Topic 842, using the same transition methodology in accordance with paragraph 842-10-65-1(c). Management has determined to not adopt this application early. Further, it will have a minimal impact on the Company's financial statements.

In August 2018, FASB issued ASU 2018-13, Fair Value Measurement (Topic 820), "*Disclosure Framework – Changes to the Disclosure Requirements for Fair Value Measurement".* The amendments in this Update modify certain disclosure requirements of fair value measurements and are effective for all entities for fiscal years, and interim periods within those fiscal years, beginning after December 15, 2019. Early adoption is permitted. The Company is currently unable to determine the impact on its financial statements of the adoption of this new accounting pronouncement.

In March 2018, the FASB issued ASU No. 2018-05, Income Taxes (Topic 740) – "*Amendments to SEC Paragraphs Pursuant to SEC Staff Accounting Bulletin No. 118"*. The amendment provides guidance on accounting for the impact of the Tax Cuts and Jobs Act (the "Tax Act") and allows entities to complete the accounting under ASC 740 within a one-year measurement period from the Tax Act enactment date. This standard is effective upon issuance. The Tax Act has several significant changes that impact all taxpayers, including a transition tax, which is a one-time tax charge on accumulated, undistributed foreign earnings. The calculation of accumulated foreign earnings requires an analysis of each foreign entity's financial results going back to 1986. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, "*Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income".* The guidance permits entities to reclassify tax effects stranded in Accumulated Other Comprehensive Income as a result of tax reform to retained earnings. This new guidance is effective for annual and interim periods in fiscal years beginning after December 15, 2018. Early adoption is permitted in annual and interim periods and can be applied retrospectively or in the period of adoption. The Company is currently in the process of evaluating the impact of adoption on its consolidated financial statements.

In July 2017, the FASB issued Accounting Standards Update ("ASU") "*Income Statement – Reporting Comprehensive Income (Topic 220)*". This ASU deals with the reclassification of certain tax effects from Accumulated Other Comprehensive Income. The Company does not believe that there will be any significant financial impact due to prior taxable losses and our net operating loss carry forward.

In July 2017, FASB issued ASU "*Earnings Per Share (Topic 260); Distinguishing Liabilities from Equity (Topic 480); Derivatives and Hedging (Topic 815)*": (Part I) Accounting for Certain Financial Instruments with Down Round Features, (Part II) Replacement of the Indefinite Deferral for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests with a Scope Exception. Management believes that Topics 260 and 480 pertains to the Company and the impact will be immaterial.

In May 2017, the FASB issued ASU 2017-09, "*Compensation-Stock Compensation (Topic 718): Scope of Modification Accounting"*, which clarifies when a change to the terms or conditions of a share-based payment award must be accounted for as a modification. The new guidance requires modification accounting if the fair value, vesting condition or the classification of the award is not the same immediately before and after a change to the terms and conditions of the award. The new guidance is effective for all entities for annual periods, and interim periods within those annual periods, beginning after December 15, 2017, with early adoption permitted. The Company does not expect the adoption of this ASU to have a material impact on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-1, Business Combinations (Topic 805): Clarifying the Definition of a Business. The amendments in this update clarify the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions (or disposals) of assets or businesses. The definition of a business affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The amendments of this ASU are effective for public business entities for annual periods beginning after December 15, 2018, and interim periods within annual periods beginning after December 15, 2019. The amendments in this Update are to be applied prospectively on or after the effective date. Currently, the Company believes that this ASU has no impact on its financial statements and reporting; however, in the future it may have an impact on its financial statements with the adoption of this new accounting pronouncement.

In February 2016, the FASB issued ASU 2016-02, "Leases" Topic 842, which amends the guidance in former ASC Topic 840, *Leases*. The new standard increases transparency and comparability most significantly by requiring the recognition by lessees of right-of-use ("ROU") assets and lease liabilities on the balance sheet for all leases longer than 12 months. Under the standard, disclosures are required to meet the objective of enabling users of financial statements to assess the amount, timing, and uncertainty of cash flows arising from leases. For lessees, leases will be classified as finance or operating, with classification affecting the pattern and classification of expense recognition in the income statement. The Company adopted the new lease guidance effective January 1, 2019. The Company only has one lease in effect; its office lease located in Aurora Colorado. The lease rate is less than $3,000/month and expires on March 31, 2020. The Company is more likely than not to renew this lease and is not obligated to renew the lease. The office lease is insignificant to the financial presentation of the Company; therefore, it is not shown on the Company's financial statements. The Company has adopted the modified retrospective approach therefore the Company has no plans of restating prior periods and that there is no asset or liability currently.

Management does not believe that any other recently issued, but not effective, accounting standards if currently adopted would have a material effect on the accompanying consolidated financial statements.

**NOTE 3 – INVESTMENTS AND LONG-LIVED ASSETS**

*Land*

Upon purchasing land, the value is recorded at the purchase price or fair value, whichever is more appropriate. Costs incurred to prepare the land for the intended purpose are also capitalized in the recorded cost of the land. No amortization or depreciation is taken on land. However, the land is reviewed by management at least once per year to ascertain if a further analysis is necessary for any potential impairments.

*Water Rights and Infrastructure*

The Company has acquired both direct flow water rights and water storage rights. It has obtained water rights through the purchase of shares in a mutual ditch company, which it accomplished through its purchase of shares in HCIC, or through the purchase of an entity holding water rights, which it effected through its purchase of a membership interest of Orlando. The Company may also acquire water rights through outright purchase. In all cases, such rights are recognized under decrees of the Colorado water court and administered under the jurisdiction of the Office of the State Engineer.

Upon purchasing water rights, the value is recorded at our purchase price. If a majority interest is acquired in a company holding water assets (potentially with other assets including water delivery infrastructure, right of ways, and land), the Company determines the fair value of the assets. To assist with the valuation, the Company may consider reports from a third-party valuation firm. If the value of the water rights is greater than what the Company paid then a bargain purchase gain is recognized. If the value of the water assets are less than what the Company paid then goodwill is recognized.

Subsequent to purchase, management periodically evaluates the carrying value of its assets, and if the carrying value is in excess of fair market value, the Company will establish an impairment allowance. Currently, there are no impairments on the Company's land and water shares. No amortization or depreciation is taken on the water rights.

*Gain on Disposal of Assets*

During the nine months ended September 30, 2019 and 2018, we sold sub-divided, unimproved lots of land located in El Paso County Colorado and recognized a gain of approximately $68,000 and $80,000, respectively. For the nine months ended September 30, 2019, we recognized approximately $85,000 gain from sale and disposal of equipment.

**NOTE 4 – NOTES PAYABLE**

Below is a summary of the Company's consolidated long-term debt:

| | September 30, 2019 | | | December 31, 2018 | | |
|---|---|---|---|---|---|---|
| Note | Principal Balance | Accrued Interest | Discount | Principal Balance | Interest rate | Security |
| HCIC seller carry back | $ 6,323,000 | $ 1,050,000 | $ - | $ 6,323,000 | 6% | Shares in the Mutual Ditch Company |
| CWCB | 622,000 | 11,000 | - | 690,000 | 2.5% | Certain Orlando and Farmland assets |
| GrowCo note | 390,000 | 29,000 | - | 390,000 | 6% | None |
| Bridge loan Harding | 7,000 | 1,000 | - | 15,000 | 12% | Added to lien on Ellicott land |
| El Paso Land notes | 271,000 | 76,000 | - | 271,000 | 12% | Second lien on Ellicott land |
| Easby Credit Line (Vaxa), related party | 486,000 | 8,000 | - | - | - | Unsecured |
| Promissory Note (Vaxa) | 250,000 | - | - | - | - | Biomass material |
| Investors Fiduciary, related party | 786,000 | 133,000 | - | 551,000 | 20% | Shares of HCIC |
| Auctus Convertible Note | 262,500 | 9,000 | 168,000 | - | 10% | Unsecured |
| Morningview Convertible Note | 262,500 | 9,000 | 168,000 | - | 10% | Unsecured |
| Labry's Convertible Note | 575,000 | 2,000 | 388,000 | - | 12% | Unsecured |
| WRC convertible notes | 300,000 | 101,000 | - | 500,000 | 12% | Lien on water supply agreement |
| Butte Valley Land notes | 400,000 | 101,000 | - | 200,000 | 18% | Butte Valley Land |
| McFinney Agri-Finance | - | - | - | 60,000 | 6.8% | 2,400 acres of land in Ellicott Colorado |
| Powderhorn/Silverback note | - | - | - | 203,000 | 12% | Third lien on Ellicott land |
| Equipment loans | - | - | - | 57,000 | 5-8% | Equipment |
| Morningview Financial note | - | - | - | 75,000 | 18% | Unsecured |
| Total | 10,935,000 | $ 1,530,000 | $ (724,000) | 9,335,000 | | |
| Less: note discounts | (724,000) | | | (63,000) | | |
| Less: Current portion net of discount | (9,343,000) | | | (8,045,000) | | |
| Long term portion | $ 868,000 | | | $ 1,227,000 | | |

**NOTE 5 – SHORT-TERM CONVERTIBLE NOTE PAYABLE**

On September 24, 2019, we entered into an agreement ("Agreement") with an accredited investor ("Note Holder") to provide a net of $457,500 in short term working capital. Two Rivers intends to use these funds for the payment of certain debts, payments on accounts and working capital.

The face value of the convertible debt is $575,000 with a purchase price of $517,500, a 6-month term and an interest rate of 10% per annum. The debt is convertible at a per common stock price at the lower of 70% multiplied by the 10-day trailing market price of Two Rivers' common shares (representing a discount rate of 30%) or $0.30/share. The Convertible note is subject to other terms and conditions.

Two Rivers issued 1,101,532 shares of its common stock (the "Returnable Shares") to the Note Holder, as well as an additional 220,306 shares of Common Stock (the "Commitment Shares"), subject to the terms and conditions of the Agreement and the Note, pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act of 1933. If Two Rivers pays the convertible debt prior to 180 days from the date of the convertible note, the Returnable Shares shall be returned by the Note Holder to Two Rivers. If Two Rivers fails to pay the convertible note by that date, the Note Holder may retain the Returnable Shares.

In August 2019, Investors Fiduciary, LLC loaned $75,000 to the Company under the existing credit line to bring the balance to approximately $786,000 as of September 30, 2019. The credit line contains a conversion feature at a rate of $0.14 per share. Investors Fiduciary is controlled by Greg Harrington, CEO of the Company and Gerald Anderton, Sr., Chairman of the Board of the Company is an investor.

On May 24, 2019, we entered into separate securities purchase agreements with two investors pursuant to which we received $480,000 in cash, which we intend to use for the payment of outstanding indebtedness and accounts payable and for working capital. Pursuant to the securities purchase agreements, we issued convertible promissory notes, having a total principal amount of $525,000. Each of the notes has a one-year term and bears interest at the rate of 10% per annum. We sold the notes for an aggregate purchase price of $525,000, less $45,000 for payment for legal fees and original issue discount. Each of the notes is convertible into common stock at a price equal to 60% of the trailing market price of common stock (representing a discount of 40%). The minimum conversion price for each note is $0.20 per share unless and until such time, if any, as we do not make a principal and interest payment when due with respect to the note.

**NOTE 6 – INFORMATION ON BUSINESS SEGMENTS**

We organize our business segments based on the nature of the products and services offered. Currently, we focus on the Farms and Water business with Two Rivers Water & Farming Company as the Parent company. Therefore, we report our segments by these lines of businesses: Farms and Water. Water contains our Water Business (HCIC and Orlando). Our Parent category is not a separate reportable operating segment. Segment allocations may differ from those on the face of the income statement. In 2017, the prior farming operations were discontinued; however, we continue to report with a Farming Business since we are expanding our farming business in 2019.

In the following tables of financial data, the total of the operating results of these business segments is reconciled, as appropriate, to the corresponding consolidated amount. There are some corporate expenses that were not allocated to the business segments, and these expenses are contained in the "Total Operating Expenses" under Parent.

Operating results for each of the segments of the Company are as follows (in thousands):

| | Nine Months Ended September 30, 2019 | | | | Nine Months Ended September 30, 2018 | | | |
|---|---|---|---|---|---|---|---|---|
| | Parent | Vaxa | Water | Total | Parent | Greenhouse | Water | Total |
| Revenue | $ 34 | $ 103 | $ 8 | $ 145 | $ 10 | $ - | $ 12 | $ 22 |
| Less: Direct Cost of Revenue | - | - | - | - | - | - | - | - |
| Gross Margin | 34 | 103 | 8 | 145 | 10 | - | 12 | 22 |
| Expenses | | | | | | | | |
| Total Operating Expenses | (611) | (14) | 253 | (372) | (886) | - | (997) | (1,883) |
| Total Other Income (Expense) | (484) | 7 | (420) | (897) | 11,928 | - | (2,209) | 9,719 |
| Net Income (Loss) from Operations Before Income Taxes | (1,061) | 96 | (159) | (1,124) | 11,052 | - | (3,194) | 7,858 |
| Income Taxes (Expense) Credit | - | - | - | - | - | - | - | - |
| Net Income (Loss) from Operations | (1,061) | 96 | (159) | (1,124) | 11,052 | - | (3,194) | 7,858 |
| Net Income (Loss) from Discontinued Operations | - | - | - | - | - | (810) | - | (810) |
| Preferred dividends | - | - | (18) | (18) | (986) | - | (16) | (1,002) |
| Non-controlling interest | - | - | - | - | - | - | - | - |
| Net Income (Loss) | $ (1,061) | $ 96 | $ (177) | $ (1,142) | $ 10,066 | $ - | $ (3,210) | $ 6,046 |
| Segmented Assets | $ 24,856 | $ 24,856 | $ 20,131 | $ 45,500 | $ 10,746 | $ - | $ 20,175 | $ 30,921 |

**NOTE 7 – EQUITY TRANSACTIONS**

The Company has authorized 200,000,000 shares of common stock with a par value of $0.001. The total issued common stock as of September 30, 2019, was 83,195,969 common shares.

During the nine months ended September 30, 2019, Two Rivers issued the following common stock:

- 1,179,817 shares issued to Morningview as a $75,000 principal paydown plus interest, which represents the debt being fully paid at June 30, 2019 and which did not produce a loss because the conversion was made under the terms of the convertible debt agreement;
- 3,040,350 shares issued to Powderhorn/Silverback as a $127,665 principal paydown plus interest, which represents the debt being fully paid at June 30, 2019 and which did not produce a loss because the conversion was made under the terms of the convertible debt agreement;
- 555,560 shares issued to an investor relations firm. The shares issued were valued at $0.1283/share with a corresponding expense of approximately $71,000;
- 545,455 shares issued to Silverback for a cashless exercise of warrants;
- 255,231 shares issued to Black Mountain for a cashless exercise of warrants;
- 14,840 shares issued for a conversion from TR Capital;
- 523,395 shares issued to Black Mountain for a cashless exercise of warrants;
- 30,000,000 shares issued to Easby Land & Cattle Company, LLC. The shares were valued at $0.44/share or approximately $13,200,000;
- 185,000 shares issued to a chief financial officer firm. The shares issued were valued at $0.27/share with a corresponding expense of approximately $50,000;
- 139,985 shares issued for a conversion from TR Capital; and
- 1,321,838 shares issued to Labrys Fund, LP (see Note 5).

During the nine months ended September 30, 2018, Two Rivers issued 374,250 common stock to Black Mountain for a $100,000 principal reduction in its Note Payable.

During the nine months ended September 30, 2019, Two Rivers recognized $289,000 in stock based compensation to its employees and directors.

During the nine months ended September 30, 2018, Two Rivers recognized $373,000 in stock based compensation to its employees and directors.

Case No. 1:25-cv-00708-PAB-NRN Document 331-4 filed 07/13/26 USDC Colorado pg 296 of 313


During the nine months ended September 30, 2019, the Company recorded a total of $516,000 in beneficial conversion features related to Convertible Promissory Notes.

On May 21, 2019, the Company entered into a convertible promissory note with an investor of the Company in the amount of $262,500. The note bears 10% interest and is payable in full on May 21, 2020. The Company has recorded a beneficial conversion feature of approximately $258,000, which is recorded as a discount on the note payable and being amortized over the life of the note. As of September 30, 2019, the balance of the beneficial conversion feature is approximately $168,000.

**NOTE 8 – ACQUISITION OF VAXA GLOBAL**

On July 31, 2019, the Company closed on the purchase of all the membership interests in Vaxa Global, LLC ("Vaxa") and its two wholly-owned subsidiaries from the sole member Easby Land & Cattle, LLC ("Easby"). Greg Harrington, the managing member of Easby became the CEO of the Company and a member of the Board of Directors in September 2019. Vaxa is in the business of hemp farming, extraction and manufactured consumer CBD products. The closing occurred pursuant to a Share Exchange Agreement between the Company and Easby on February 22, 2019, as amended.

Pursuant to the Share Exchange Agreement, the Company issued a total of 30,000,000 shares of common stock to Easby at the closing for the Vaxa membership interests. There was no cash consideration paid for the acquisition. The Purchase Price for the acquisition, $13,200,000 was calculated using the closing price Two Rivers common stock on the date of closing, $0.44/share, multiplied by 30,000,000 shares.

In addition to the shares issued at closing, the Company may be required to issue additional shares of common stock pursuant to an earn-out covenant in the share exchange agreement. The number of earn-out shares will equal the lesser of:

i.) the quotient of 10 times the consolidated earnings before income taxes, depreciation and amortization, or EBITDA, of Vaxa for the twelve months ending June 30, 2020, divided by $1.00; and

ii.) 20,000,000.

It is expected that the earn-out shares, if any, would be issued by August 2020. There was no valuation applied to the earnout on the acquisition date due to the historical performance of Vaxa and the Company's expectation of the likelihood of material earnings during the window. The earnout valuation will be reviewed quarterly until its expiration in June 2020.

The acquisition date estimated fair value of the consideration transferred totaled $13,200,000, which consisted of the following:

| | | |
|---|---|---|
| Cash paid | $ | 0 |
| Common Stock Issued | | 13,200,000 |
| Total Purchase Price | $ | 13,200,000 |
| | | |
| Net Assets Acquired | $ | 511,000 |
| Net Liabilities & Retained Earnings | | (1,411,000) |
| Goodwill | | 14,100,000 |
| Total Purchase Price | $ | 13,200,000 |

The primary asset of Vaxa at the time of acquisition was an exclusive distribution agreement with a Canadian grower and supplier of cannabidiol-rich hemp biomass. The agreement was from its inception in December 2017 runs for a five-year term. The agreement calls for fixed payments of $700,000 for the exclusive supply rights at competitive fixed prices. Vaxa had recognized the value of the agreement as intangible asset and is amortizing the value over the 5 year period. The balance, net of amortization, on the time of acquisition was approximately $480,000.

During the preliminary purchase price allocation period, which may be up to one year from the business combination date, the Company may record adjustments to the assets acquired and liabilities assumed, with the corresponding offset to goodwill. After the preliminary purchase price allocation period, the Company may record adjustments to assets acquired or liabilities assumed subsequent to the purchase price allocation period in its operating results in the period in which the adjustments were determined.

Pro forma results

The following table sets forth the audited pro forma results of the Company as if the acquisition was effective on the first day of each period presented. These combined results are not necessarily indicative of the results that may have been achieved had the companies always been combined.

| | Six Months Ending Jun 30, 2019 (unaudited) | Twelve Months Ending Dec 31, 2018 (unaudited) |
|---|---|---|
| Revenue | $ 70,000 | $ 66,000 |
| Net Income (Loss) | $ (1,608,000) | $ 1,820,000 |
| Basic Net Income (Loss) per share | $ (0.02) | $ 0.03 |
| Diluted Net Income (Loss) per share | $ (0.02) | $ 0.03 |
| Weighted average shares – basic | 79,967 | 65,139 |
| Weighted average shares – diluted | 79,967 | 67,408 |

**NOTE 9 – GOING CONCERN**

The consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company has not generated significant revenues and has a net loss of $1,142,000 during the nine months ended September 30, 2019. Cash consumed from our operations during the nine months ended September 30, 2019 was $789,000. At September 30, 2019, the Company had a working capital deficit of $21,104,000 and an accumulated deficit of approximately $95,596,000. The HCIC seller carry back debt are in technical default.

These factors raise substantial doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability or classification of assets or the amounts and classification of liabilities that may result should the Company be unable to continue as a going concern. The following paragraphs describe management's plans to mitigate.

We are in the process of working with the Vaxa Entities and its funders to continue to fund Two Rivers operations. There is no assurances that this additional funding will occur.

Additionally, we continue to reduce our general and administrative expenses and cash required for our operations.

*Management Plans*

We believe that the actions discussed above are probable of occurring and mitigating the substantial doubt raised by our historical operating results. We believe the actions will satisfy our estimated liquidity needs 12 months from the issuance of these financial statements. However, we cannot predict, with certainty, the outcome of our actions to generate liquidity, including the availability of additional financing, or whether such actions would generate the expected liquidity as currently planned. There is, however, no assurance that the Company will be able to raise any additional capital through any type of offering on terms acceptable to the Company, as existing cash on hand will be insufficient to finance operations over the next twelve months.

**NOTE 10 - COMMITMENTS AND CONTINGENCIES**

*GrowCo $4M Notes Guaranty*

During the period ended December 31, 2015, GrowCo issued $4,000,000 in secured promissory notes to 17 individual investors. The notes have a security interest in the land, water and improvements on the 40 acres where GrowCo Partners 1 has its greenhouse and associated warehouse. The notes pay 22.5% in annual interest, with interest paid monthly, and are due April 1, 2020. GrowCo cannot prepay the notes; however, noteholders have the right to call the notes at the first anniversary, or thereafter, of each note with a 60-day notice to the Company. Due to the past due interest owed to the secured $4M Note holders, these notes are in technical default.

On January 19, 2018, Blue & Green, LLC ("Blue Green") filed a complaint against GrowCo claiming a default on payments by GrowCo to Blue Green under the terms of the $4 million GrowCo $2,115,000 promissory note held by Blue Green. The complaint requested immediate payment of the note, back due interest in excess of $300,000, and attorney fees.

Even though the Company no longer consolidates GrowCo and GrowCo's related entities into the Company's financials (see above Note 2 – Principals of Consolidation), under ASC 460-10-05, Management has determined that the Company is a guarantor of the $4M Secured Notes. The Company did not sign these notes as a guarantor but has provided collateral owned by the Company with a recent appraised value of $2,359,000. Since Two Rivers' Management desires to present a conservative representation of its financial information it has determined to set the probability of collection against its collateral at 100% of the recent appraised value. The Company has recorded a contingent liability of $2,359,000 and offset this amount as an increase in the Company's investment in GCP1 (ASC 460-10-55-23c).

*Operating Leases*

In January 2016, the Company entered into a new lease with the Colorado Center in Denver Colorado for the corporate headquarters. The space is 1,775 square feet and monthly payments of $3,900, with minor escalations and common area maintenance charges. The lease terminated on June 30, 2018. On March 1, 2017, the Company entered into a sub-lease agreement with its related party McGrow for its office facilities. McGrow did not fulfill its sub-lease agreement. In 2018, Two Rivers paid Colorado Center $24,000 as a penalty for early lease termination.

In February 2017, we entered into a new lease with Parker Road Campus, LLC in Aurora, Colorado, for our corporate headquarters. This space is 1,554 square feet and monthly payments of $2,201 which began on April 1, 2017. The lease terminates on March 31, 2020. The amounts due at the base rate are as follows:

| Period | Amount Due |
|---|---|
| July 1 – December 31, 2019 | $ 16,000 |
| 2020 | $ 7,000 |
| 2021 | - |

*Defined Contribution Plan*

Two Rivers does not have a defined contribution plan.

*Employment Agreements*

Since January 1, 2011, the Company has entered into a series of employment agreements with Wayne Harding in various capacities including Chief Financial Officer initially and later as Chief Executive Officer and Chairman. The initial term of the contract was one year, which renews automatically for successive one-year terms unless and until either party delivers notice of termination within 30 days of the expiration of the then current term. The original employment agreement was modified in 2017. On September 10, 2019, Harding resigned his positions as Chief Executive Officer and Member of the Board of Directors effective September 30, 2019. On September 10, 2019, Harding and the Company entered into a Management Services Agreement effective October 1, 2019 with a four month renewable term.

The Board determines annual incentive compensation at the Board's sole discretion. If there is a change of control, Mr. Harding is entitled to an accelerated option vesting.

*Prior Board of Directors Litigation*

On August 8, 2017, a summons was issued in the Arapahoe County District Court on behalf of former board members Dennis Channer, Rockey Wells and John Stroh demanding the Company pay $139,000 in attorneys' fees owed to Ryley Carlock & Applewhite ("RCA") for services rendered to the former board members at their behest while members of the board. The Company has agreed to pay $139,000 to RCA on behalf of Channer, Wells and Stroh. The $139,000 is included in our accounts payable on the balance sheet.

*DFP Litigation*

On October 18, 2017, at the Company filed a lawsuit against former employees of the its DFP farming operation for alleged theft. We are in the process of gathering evidence of the theft and setting a court hearing date. A former employee of DFP has filed a counter claim against the Company, which amount is immaterial. Management believes that claims against former employees are in excess of any counter claims. The counter claim on the lawsuit was settled in November 2019 and the Company will pursue an insurance claim for the theft losses.

**NOTE 11 – RELATED PARTY**

During the nine months ended September 30, 2019 Mr. Harding loaned the Company an additional $2,500. During the same period, the Company made repayments of approximately $11,000 leaving an outstanding balance of approximately $7,000 at September 30, 2019.

In August 2019, the Company received $75,000 in Bridge loans from Gerald Anderton which were added to the balance of the Credit Agreement with Investors Fiduciary, LLC. Mr. Anderton is an investor in Investors Fiduciary and currently serves on Two Rivers' Board and as Chairman of the Board. Greg Harrington, Chief Executive Officer of the Company is the controlling shareholder of Investors Fiduciary.

**NOTE 12 – SUBSEQUENT EVENTS**

Pursuant to ASC 855, management has evaluated all events and transactions that occurred from September 30, 2019 through the date of issuance of these financial statements. During this period, we had the following significant subsequent events:

- On November 7, 2019, Two Rivers entered into an agreement ("Agreement") with the Note Holder, an accredited investor, to provide a net of $315,000 in short term working capital. Two Rivers intends to use these funds for the payment of certain debts, payments on accounts and working capital.

  The face value of the convertible debt is $394,500 with a purchase price of $354,600, a 6-month term and an interest rate of 12% per annum. The debt is convertible at a price equal to the lower of (1) 70% multiplied by the lowest closing bid price or trading price (whichever is lower) of Two Rivers' common shares during the 10 trading days immediately preceding the conversion date (representing a discount rate of 30%) and (2) $0.30 per share. The convertible note is subject to other terms and conditions.

  Two Rivers issued 1,083,791 shares of its common stock (the "Returnable Shares") to the Note Holder, as well as an additional 200,000 shares of Common Stock (the "Commitment Shares"), subject to the terms and conditions of the Agreement and the Note, pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act of 1933. If Two Rivers pays the convertible debt prior to 180 days from the date of the convertible note, the Returnable Shares shall be returned by the Note Holder to Two Rivers. If Two Rivers fails to pay the convertible note by that date, the Note Holder may retain the Returnable Shares.

- On October 18, 2019, Black Mountain completed the cashless exercise of 2,665,505 shares of Common Stock.

- In September 2019, Vaxa entered into an agreement to purchase over $700,000 in extraction and processing equipment, and all seeds, clone and biological assets, as well as the 2019 hemp crop from Butte Valley farm, from Montverde Partners, LLC ("Montverde"), in exchange for 3,000,000 shares of our common stock which were contributed by Easby Land & Cattle, LLC. Monteverde is a joint venture partner of Vaxa in the Butte Valley hemp farming operation near Walsenburg, Colorado. The transaction closed in October 2019.

**ITEM 2. MANAGEMENT'S DISCUSSION AND ANALYSIS AND PLAN OF OPERATION**

*Unless the context requires otherwise, references in this Form 10-Q to "we," "our," "us" and similar terms refer to Two Rivers Water & Farming Company and its subsidiaries.*

***Note about Forward-Looking Statements***

*This Form 10-Q contains forward-looking statements, such as statements relating to our financial condition, results of operations, plans, objectives, future performance and business operations. These statements relate to expectations concerning matters that are not historical facts. These forward-looking statements reflect our current views and expectations based largely upon the information currently available to us and are subject to inherent risks and uncertainties. Although we believe our expectations are based on reasonable assumptions, they are not guarantees of future performance and there are a number of important factors that could cause actual results to differ materially from those expressed or implied by such forward-looking statements, including the risks described in Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2018. By making these forward-looking statements, we do not undertake to update them in any manner except as may be required by our disclosure obligations in filings we make with the Securities and Exchange Commission under the Federal securities laws. Our actual results may differ materially from our forward-looking statements.*

**Overview**

Our core business is the development of our water assets.

Current Rights Holdings

In Colorado it is important to have both surface and storage rights, of which we have both. To date, we have acquired, managed and used our water assets principally for use in irrigation, to increase the value and yield of our farmland.

We own the following surface water rights:

| Structure | Elevation | Priority No. | Appropriation Date | Consumptive Use | Decreed Amount |
|---|---|---|---|---|---|
| Butte Valley Ditch | 5,909 ft | 1 | 5/15/1862 | 360 A.F. | 1.2 cfs |
| Butte Valley Ditch | | 9 | 5/15/1865 | | 1.8 cfs |
| Butte Valley Ditch | | 86 | 5/15/1886 | | 3.0 cfs |
| Butte Valley Ditch | | 111 | 5/15/1886 | | 3.0 cfs |
| Robert Rice Ditch | 5,725 ft | 19 | 3/01/1867 | 131 A.F. | 3.0 cfs |
| Orlando Canal No. 3 | 5,911 ft | | 10/19/1903 | | |
| Huerfano Valley Ditch | 4,894 ft | 120 | 2/2/1888 | 2,891 A.F. | 42.0 cfs |
| Huerfano Valley Ditch | | 342 | 5/1/1905 | | 18.0 cfs |

"Consumptive use" is the term for the portion of a water diversion right that is actually consumed by its beneficial use. Where the beneficial use is agricultural irrigation, consumptive use represents the amount of water consumed by the irrigated crop or evaporated on the farm. After deducting consumptive use from the amount of water diverted and applied to irrigation, the remainder is described as "return flow" to the system. Such return flows are generally subject to appropriation downstream. Only the consumptive use portion of a given water right is subject to transfer (that is, a change in the point of diversion, place of use, or purpose of use). Therefore, water rights are often assigned monetary value based on the consumptive use portion. Although consumptive use varies by crop, rainfall, temperature and other factors, in southeastern Colorado, crops generally consume about two acre-feet of applied water for each acre planted, depending on the crops planted. In order to provide that amount of consumptive use water, an irrigator must generally apply three acre-feet of water (allowing for predictable return flow equal to about one-third of the applied water). We measure our water rights both in terms of the amount of the diversion or storage right, as the case may be, but also in terms of the historic consumptive use.

The following table presents our holdings of storage water rights:

| | Elevation | Priority No. | Appropriation Date | Average Annual Yield (A.F.) | Decreed Amount (A.F.) | Estimate of Current Effective Storage (A.F.) |
|---|---|---|---|---|---|---|
| Huerfano Valley Reservoir | 4,702 ft | 6 | 2/2/1888 | 1,424 | 2,017 | 1,000 |
| Cucharas Valley Reservoir | 5,570 ft | 66 | 3/14/1906 | 3,055 | 31,956 | Current no-fill |
| Cucharas Valley Reservoir | 5,705 ft | 66c[2] | 3/14/1906 | | 34,404 | restriction[1] |
| Orlando Reservoir #2 | 5,911 ft | 349 | 12/14/1905 | 1,800 | 3,110 | 1,500 |

Purchase of Vaxa Entities

On July 31, 2019, we completed our acquisition of Vaxa Global, LLC ("Vaxa") from Easby Land & Cattle Company, LLC pursuant to a share exchange agreement dated February 21, 2019 (the "Purchase Agreement"). Under the terms of the Purchase Agreement, we acquired 100% of the membership interest in Vaxa in exchange for 30,000,000 shares of our common stock and an earn-out arrangement for up to 20,000,000 additional shares of our common stock. The number of earn-out shares will equal the lesser of:

- The quotient of 10 times the consolidated earnings before income taxes, depreciation and amortization, or EBITDA, of Vaxa for the twelve months ending June 30, 2020, divided by $1.00; and
- 20,000,000.

It is expected that the earn-out shares, if any, would be issued by August 2020.

Vaxa owns a 100% membership interest in each of Ekstrak Labs LLC and Gramz Holdings, LLC.

- Vaxa grows hemp plants for cannabidiol, or CBD, extraction;
- Ekstrak extracts CBD hemp; and
- Gramz™ produces and sells CBD extract in the form of both isolate and full-spectrum oil, compounds, such as Gramz Herbal Topical and Gramz Whole Plant Matrix Sublingual Drops, which have been developed to capitalize on the medicinal and therapeutic benefits of hemp.

We intend to expand Vaxa's operations to grow hemp on land that we own, using water that we supply. This will, in turn, provide additional hemp products to Ekstrak and Gramz™.

---

[1] See State of Colorado litigation.

[2] This is a conditional right while the engineering and construction of structures are completed to perfect a water right, in this case to physically store the water. The conditional right establishes a seniority date but allows time for completion of the project. Conditional rights are reviewed every six years by the water court to confirm that progress is being made on the effort to perfect the right. When a conditional water right is perfected, which can be done incrementally in the case of storage, the water right becomes absolute. In addition, the Cucharas Valley Reservoir has Conditional rights to 34,404 A.F. of additional storage.

**Results of Operations**

*For the Three Months Ended September 30, 2019, compared to the Three Months Ended September 30, 2018*

During the three months ended September 30, 2019, we recorded revenues of approximately $108,000, compared to approximately $5,000 in the three-month period ended September 30, 2018. The increase of $103,000 was due to Vaxa acquisition.

Operating expenses during the three months ended September 30, 2019 and 2018 were approximately $328,000 and $678,000, respectively, excluding the dam demolition expense. The decrease of $350,000 was primarily due to the Company reducing its general and administrative expenses.

Other income and expenses for the three months ended September 30, 2019 and 2018 were approximately $415,000 and $176,000, respectively. The net increase of $239,000 in expenses was primarily the result of increased interest expense and a lack of gain on asset sales.

During the three months ended September 30, 2019 and 2018, we recognized a profit from continuing operations of $190,000 and a loss from continuing operations of $2,649,000, respectively.

During the three months ended September 30, 2019 and 2018, we recognized preferred distributions of approximately $6,000 and $6,000 for the accrued dividends on the preferred stock of Water Redevelopment.

As the result of the foregoing, the net profit attributed to our common shareholders for the three months ended September 30, 2019 was $184,000, compared to a net loss of $2,655 for the three months ended September 30, 2018.

In December 2018, a contingent liability was established regarding the State of Colorado's legal action to compel the Company to demolish Cucharas #5 reservoir. In that period, the Company recognized an expense of $1,800,000. In July 2019, the Company reached a settlement with the State of Colorado, whereby the Company will pay approximately $1,000,000 plus interest to the State of Colorado in exchange for a full settlement of the above legal action. In the three months ending September 30, 2019, the Company recognized a gain of $825,000 from the reduction of this contingent liability from $1,800,000 to approximately $1,000,000, along with additional non-cash gains of approximately $25,000 from the negotiations and resolution of previously recorded accounts payable, on Two Rivers' in these financial statements.

*For the Nine Months Ended September 30, 2019, compared to the Nine Months Ended September 30, 2018*

During the nine months ended September 30, 2019, we recorded revenues of approximately $145,000, compared to approximately $22,000 in the nine-month period ended September 30, 2018. The increase of $123,000 was due to the Vaxa acquisition.

Operating expenses during the nine months ended September 30, 2019 and 2018 were approximately $1,197,000 and $1,913,000, respectively. The decrease of $716,000 was primarily due to the Company reducing its general and administrative expenses.

Other income and expenses for the nine months ended September 30, 2019 and 2018 were approximately $897,000 in expenses and $11,549,000 in income, respectively. The net increase of $12,446,000 is mostly due to the recognition of the GrowCo deconsolidation.

During the nine months ended September 30, 2019 and 2018, we recognized a loss from continuing operations of $1,124,000 and a profit from continuing operations of $7,858,000, respectively.

During the nine months ended September 30, 2019 and 2018, we recognized preferred distributions of approximately $18,000 and $1,002,000. The reduction is due to the Company ceasing to record an accrual for the TR Capital's preferred distribution as of July 2018.

As the result of the foregoing, the net loss attributed to our common shareholders, after recognizing preferred distributions and income attributed to non-controlling interest, for the nine months ended September 30, 2019 was $1,142,000 loss, compared to a profit of $6,046,000 for the nine months ended September 30, 2018.

**Liquidity and Capital Resources**

***Resources***

We have expanded our operations relying on various funding mechanisms, including debt, convertible debt and equity capital. Since inception, we have raised and invested over $96 million to acquire, improve, integrate farm/water assets, launch related businesses, and support operations.

We believe with the anticipated influx of additional capital from strategic partners we will have sufficient capital to meet our anticipated cash needs for at least the next twelve months. In January and February 2019, the Company engaged in discussions with the Vaxa Group that would, among other things, strengthen and expand our business operations and enable the Company to raise additional capital. This acquisition of Vaxa closed on July 31, 2019. It is anticipated that this acquisition has, and will, facilitate the Company's receipt of working capital and provide strategic, vertically integrated hemp-focused businesses.

Our future working capital requirements will depend on many factors, including the expansion of farming and water projects. To the extent our cash, cash equivalents and cash flows from operating activities are insufficient to fund our future activities, we may need to raise additional funds through public or private equity or debt financing. We also may need to raise additional funds in the event we determine in the future to effect one or more acquisitions of businesses, technologies and products. If additional funding is required, we may not be able to effect an equity or debt financing on terms acceptable to us or at all.

We historically have funded our operations primarily from the following sources:

- proceeds of private placements of equity, equity-related and debt securities of Two Rivers Water & Farming Company and subsidiaries;
- cash flow generated from operations; and
- loans and lines of credit.

At the present time we have no available line or letters of credit.

Cash flow from operations has not historically been sufficient to sustain our operations without the above additional sources of capital. As of September 30, 2019, we had cash and cash equivalents of approximately $401,000. Cash flow used in our operating activities totaled approximately $789,000 for the nine months ended September 30, 2019 compared to operating activities using approximately $824,000 for the nine months ended September 30, 2018.

As of September 30, 2019, we had approximately $481,000 in current assets and approximately $21,585,000 in current liabilities. A large portion of the current liabilities ($7,373,000) is from the HCIC seller carryback notes, some of which were due June 30, 2016. As of September 30, 2019, we continue to be in default on the HCIC note payments. As a result, the entire amount of the notes has been classified as current.

Cash provided by investing activities was approximately $23,000 for the nine months ended September 30, 2019 compared to cash used in investing activities of approximately $30,000 for the nine months ended September 30, 2018.

Cash provided by financing activities was approximately $1,161,000 for the nine months ended September 30, 2019 compared to cash provided of approximately $894,000 for the nine months ended September 30, 2018.

Due to our financial condition, we have had to resort to borrowing under short-term convertible notes, which have high financing costs associated with them. On September 24, 2019, we executed a convertible promissory note in the principal amount of $575,000 had a purchase price of $517,500, a 6-month term, and an interest rate of 10% per annum. Net proceeds were approximately $457,500. The debt is convertible at a per common stock price at the lower of 70% multiplied by the 10-day trailing market price of Two Rivers' common shares (representing a discount rate of 30%) or $0.30/share. We issued 1,101,532 shares of our common stock (the "Returnable Shares") to the note holder, as well as an additional 220,306 shares of Common Stock (the "Commitment Shares"), subject to the terms and conditions of the securities purchase agreement and the note, pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act of 1933. If Two Rivers pays the convertible debt prior to 180 days from the date of the convertible

note, the Returnable Shares shall be returned by the note holder to Two Rivers. If Two Rivers fails to pay the convertible note by that date, the note holder may retain the Returnable Shares.

On November 7, 2019, we entered into a similar convertible note arrangement to provide a net of $315,000 in short term working capital. The face value of the convertible debt is $394,500 with a purchase price of $354,600, a 6-month term and an interest rate of 12% per annum. The debt is convertible at a price equal to the lower of (1) 70% multiplied by the lowest closing bid price or trading price (whichever is lower) of Two Rivers' common shares during the 10 trading days immediately preceding the conversion date (representing a discount rate of 30%) and (2) $0.30 per share. We issued 1,083,791 shares of our common stock (the "Returnable Shares") to the note holder, as well as an additional 200,000 shares of Common Stock (the "Commitment Shares"), subject to the terms and conditions of the securities purchase agreement and the note, pursuant to the exemption from registration contained in Section 4(a)(2) of the Securities Act of 1933. If Two Rivers pays the convertible debt prior to 180 days from the date of the convertible note, the Returnable Shares shall be returned by the Note Holder to Two Rivers. If Two Rivers fails to pay the convertible note by that date, the Note Holder may retain the Returnable Shares.

We intend to use these funds for the payment of certain debts, payments on accounts and working capital.

**Going Concern**

The consolidated financial statements have been prepared assuming the Company will continue as a going concern. The Company has not generated significant revenues and has a net loss of $1,142,000 during the nine months ended September 30, 2019. Cash consumed from our operations during the nine months ended September 30, 2019 was $789,000. At September 30, 2019, the Company had a working capital deficit of $21,104,000 and an accumulated deficit of approximately $95,596,000. The HCIC seller carry back debt are in technical default.

These factors raise substantial doubt about the Company's ability to continue as a going concern. The accompanying consolidated financial statements do not include any adjustments relating to the recoverability or classification of assets or the amounts and classification of liabilities that may result should the Company be unable to continue as a going concern. The following paragraphs describe management's plans to mitigate.

We are in the process of working with the Vaxa Entities and its funders to continue to fund Two Rivers operations. There is no assurances that this additional funding will occur.

Additionally, we continue to reduce our general and administrative expenses and cash required for our operations.

*Management Plans*

We believe that the actions discussed above are probable of occurring and mitigating the substantial doubt raised by our historical operating results. We believe the actions will satisfy our estimated liquidity needs 12 months from the issuance of these financial statements. However, we cannot predict, with certainty, the outcome of our actions to generate liquidity, including the availability of additional financing, or whether such actions would generate the expected liquidity as currently planned. There is, however, no assurance that the Company will be able to raise any additional capital through any type of offering on terms acceptable to the Company, as existing cash on hand will be insufficient to finance operations over the next twelve months.

**Critical Accounting Policies**

We have identified the policies below as critical to our business operations and the understanding of our results from operations. The impact and any associated risks related to these policies on our business operations is discussed throughout "Management's Discussion and Analysis of Financial Conditions and Results of Operations" where such policies affect our reported and expected financial results. For a detailed discussion of the application of these and other accounting policies, see Note 2 of the notes to condensed consolidated financial statements included elsewhere in this Form 10-Q. Our preparation of such condensed consolidated financial statements and this Form 10-Q requires management to make estimates and assumptions that affect the reported amount of assets and liabilities, disclosure of contingent assets and liabilities at the date of our financial statements, and the reported amounts of revenue and expenses during the reporting period. There can be no assurance that actual results will not differ from those estimates.

**Revenue Recognition**

We follow specific and detailed guidelines in measuring revenue; however, certain judgments may affect the application of our revenue policy. Revenue results are difficult to predict, and any shortfall in revenue or delay in recognizing revenue could cause our operating results to vary significantly from quarter to quarter and could result in future operating losses.

**Goodwill and Intangible Assets**

We have acquired water shares in Huerfano-Cucharas Irrigation Company, which is considered an intangible asset and shown on our balance sheet as part of "Water assets". Currently, these shares are recorded at purchase price less our pro rata share of the negative net worth in HCIC Holdings, LLC. Management evaluates the carrying value, and if necessary, will establish an impairment of value to reflect current fair market value.

In conjunction with the acquisition of Vaxa, the Company recognized goodwill of approximately $14,100,000 based on the issuance of 30,000,000 shares at the closing share price ($0.44) on the date of acquisition (July 31, 2019) plus net liabilities acquired (See NOTE 8).

**Impairment Policy**

At least once every year, management examines all of our assets for proper valuation and to determine if an impairment is necessary. In terms of real estate owned, this impairment examination also includes the accumulated depreciation. Management examines market valuations and if an additional impairment is necessary for lower of cost or market, then an impairment charge is recorded.

**ITEM 3. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK**

We are exposed to the impact of interest rate changes and change in the market values of our real estate properties and water assets. Because we had no market risk sensitive instruments outstanding as of September 30, 2019, it was determined that there was no material market risk exposure to our consolidated financial position, results of operations, or cash flows as of such date. We do not enter into derivatives or other financial instruments for trading or speculative purposes.

**ITEM 4. CONTROLS AND PROCEDURES**

**Management's Evaluation of Disclosures Controls and Procedures**

Our management, comprised of our chief executive officer (CEO) and chief financial officer (CFO), (presently the same person fills both officer roles), evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2019. The term "disclosure controls and procedures," as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, means controls and other procedures of a company that are designed to ensure that information required to be disclosed by a company in the reports that it files or submits under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Based on that evaluation, and taking the matters described below into account, the Company's CEO/CFO has concluded that our disclosure controls and procedures over financial reporting were not effective during reporting period ended September 30, 2019.

**Management's Report on Internal Control Over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over our financial reporting. "Internal control over financial reporting" is defined in Rule 13a-15(f) or 15d-15(f) under the Exchange Act as a process designed by, or under the supervision of, a company's principal executive and principal financial officers and effected by a company's board of directors, management and other personnel to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of a company;
- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with U.S. generally accepted accounting principles and that receipts and expenditures of a company are being made only in accordance with authorizations of management and directors of a company; and
- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of a company's assets that could have a material effect on the financial statements.

A material weakness is a control deficiency, or combination of control deficiencies, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

Our internal control system was designed to provide reasonable assurance to our management and board of directors regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations, which may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Based upon our evaluation of internal controls, the Company's management determined that the Company's controls over financial reporting were not adequate to ensure complex accounting calculations were performed correctly. As such, the Company's CEO/CFO has concluded that the Company's disclosure controls and procedures contain a material weakness as of the end of the period covered by this Report. Because of the material weaknesses identified, a reasonable possibility exists that a material misstatement in our consolidated financial statements will not be prevented or detected on a timely basis. While our internal controls are established and followed, it is clear by the identified weaknesses that they were not operating as they should be. Management believes that this was the case due to our limited staff along with time constraints and staff turnover. However, our CEO/CFO, who is also our Principal Accounting Officer, believes that the financial statements included in this quarterly report on Form 10-Q present, in all material respects, our financial position, results of operations and cash flows for the periods presented, in conformity with U.S. GAAP.

*Plan for Remediation of Material Weaknesses*

The remediation effort outlined below is intended to address the identified material weaknesses in internal control over financial reporting.

Once significant additional capital is raised, we plan to hire a qualified Chief Financial Officer. A short-term task of the new CFO will be to do a formal assessment of our internal controls.

## PART II. OTHER INFORMATION

### ITEM 1. LEGAL PROCEEDINGS

*State of Colorado litigation*

Two Rivers, the State of Colorado (Office of the State Engineer and the local Division Engineer), and neighboring water rights holders have been involved in litigation concerning water rights and claims by the State concerning an existing dam in Huerfano County, Colorado, and a demand by the State to breach the dam structure. (*Two Rivers Water and Farming Co. vs. Welton Land and Water Co*., (Pueblo Water Court)). As part of the litigation, Two Rivers has sought to have certain water rights demands by the neighboring water rights holders deemed wasteful. In the quarter ending March 31, 2016, Two Rivers entered into a stipulation agreement with the State, settling the State's claims, whereby Two Rivers agreed to take the existing dam structure down to the sediment level. Two Rivers was able to empty all the water in the Dam, but it was not be able to meet the requirements of the stipulation agreement by March 31, in part due to lack of capital. On April 3, 2018, Two Rivers was notified that the State had filed a motion for the issuance of a contempt of court citation based upon its failure to comply with the consent decree by March 31, 2018.

The State of Colorado also sued Mr. Harding (current CEO and acting CFO), the prior CFO, and the former directors of Two Rivers, former director and CEO John McKowen who had executed the agreement with the State for contempt for their failure to compel Two Rivers to carry out its obligations under the 2016 agreement. The five independent directors of Two Rivers resigned in November 2018. The case against Two Rivers and all the individuals had been scheduled for trial starting October 28, 2019. The Company has accrued $1,800,000 as a liability to cover the cost of deconstruction and penalties and fines.

In July 2019, the Company reached a settlement with the State of Colorado, whereby the Company will pay approximately $922,000 plus interest to the State of Colorado in exchange for a full settlement of the above legal action. The Company anticipates recognizing a reduction of this contingent liability from $1,800,000 to approximately $922,000, along with additional non-cash gains of approximately $50,000 from the negotiations and resolution of previously recorded accounts payable, on Two Rivers' financial reports dated September 30, 2019.

*Lawsuit against former employees*

On October 18, 2017, at the Company filed a lawsuit against former employees of its DFP farming operation for alleged theft. We are in the process of gathering evidence of the theft and setting a court hearing date. A former employee of DFP has filed a counter claim against the Company, which amount is immaterial. Management believes that claims against former employees are in excess of any counter claims. The counter claim on the lawsuit was settled in November 2019 and the Company will pursue an insurance claim for the theft losses.

*Blue & Green litigation*

On January 19, 2018 Blue & Green, LLC ("Blue Green") filed a complaint against GrowCo, Inc. claiming a default on payments by GrowCo to Blue Green under the terms of the GrowCo $2,115,000 promissory note held by Blue Green. The complaint is requesting immediate payment of the note, back due interest in excess of $300,000, and attorney fees. The Blue Green note is also secured by certain water and land property owned by Two Rivers. As a result of Blue Green's action, the Company has recorded a contingent liability of $2,359,000, which represents a current appraisal of the assets pledged by the Company. The Company understands that GrowCo is currently in a bankruptcy proceeding.

### ITEM 1A. RISK FACTORS

The risks described in Item 1A. Risk Factors, in our Annual Report on Form 10-K for the year ended December 31, 2018, could materially and adversely affect our business, financial condition and results of operations. Those risk factors do not identify all risks that we face, and operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations.

**ITEM 2. UNREGISTERED SALES OF EQUITY SECURITIES AND USE OF PROCEEDS**

During the quarter ended September 30, 2019 we issued and sold the unregistered securities set forth in the table below.

| Date | Persons or Class of Persons | Securities | Consideration |
|---|---|---|---|
| July 12, 2019 | TR Capital Preferred | 14,840 shares of Common Stock | TR Capital Conversion |
| July 17, 2019 | Black Mountain Equities | 523,395 shares of Common Stock | Cashless exercise of warrant for previous financing |
| July 31, 2019 | Easby Land & Cattle Company, LLC | 30,000,000 shares of Common Stock | 100% of Vaxa Global, LLC valued at $13,200,000 |
| August 9, 2019 | TR Capital Preferred | 139,985 shares of Common Stock | TR Capital Conversion |
| August 14, 2019 | Andrew Norstrud | 185,000 shares of Common Stock | Professional services valued at $49,950 |
| September 23, 2019 | Labrys Fund, LP | 1,321,838 shares of Common Stock | Financing costs valued at $355,000 |

We relied upon the exemption from registration contained in Section 4(a)(2) under the Securities Act, as the securities were sold only to investors, sophisticated as to the business of the Company, without the use of general solicitation or advertising. No underwriters or placement agents were used and no commissions were paid in the above stock transactions. A restrictive legend was placed on the certificates evidencing the securities issued in the above transactions.

**ITEM 3. DEFAULTS UPON SENIOR SECURITIES**

None.

**ITEM 4. MINE SAFETY DISCLOSURES**

Not applicable.

**ITEM 5. OTHER INFORMATION**

None.

**ITEM 6. EXHIBITS**

| Regulation S-K Number | Document |
|---|---|
| 2.1 | Share Exchange Agreement dated February 22, 2019, between Two Rivers Water & Farming Company and Easby Land & Cattle Company, LLC (1) |
| 10.1 | Convertible Promissory Note dated September 19, 2019 to Labrys Fund, LP (2) |
| 10.2 | Securities Purchase Agreement dated September 19, 2019 between Two Rivers Water & Farming Company and Labrys Fund, LP (2) |
| 31.1 | Rule 13a-14(a) Certification of Greg Harrington |
| 32.1 | Certification of Greg Harrington Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 |
| 101 | Financial statements from the Quarterly Report on Form 10-Q of Two Rivers Water & Farming Company for the quarterly period ended September 30, 2019, formatted in XBRL: (i) the Balance Sheets; (ii) the Statements of Operations; (iii) the Statements of Cash Flows; and (iv) the Notes to Financial Statements (5) |

(1) Filed as an exhibit to the Current Report on Form 8-K filed February 26, 2019.
(2) Filed as an exhibit to the Current Report on Form 8-K filed September 26, 2019.
(3) In accordance with Rule 406T of Regulation S-T, the information in these exhibits shall not be deemed to be "filed" for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to liability under that section, and shall not be incorporated by reference into any registration statement or other document filed under the Securities Act of 1933, as amended, except as expressly set forth by specific reference in such filing.

## SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**TWO RIVERS WATER & FARMING COMPANY**

Dated: November 25, 2019

By: */s/ Greg Harrington*
Greg Harrington, Chief Executive Officer and
Chief Financial Officer