# EXHIBIT 33

Vaxa Closing Documents
(Parts 1 and 2 — produced as CONFIDENTIAL - DEFENDANTS 015659 et seq.)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**EASBY LAND & CATTLE COMPANY LLC**

**Manager's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Manager of Easby Land & Cattle Company LLC, a Colorado limited liability company (the "***Company***"), pursuant to Section 2.02(b) of the Share Exchange Agreement dated February 22, 2019 by and between the Company and Two Rivers Water & Farming Company (the "***Exchange Agreement***"), hereby certifies to Two Rivers Water & Farming Company, on behalf of the Company and not in a personal capacity, as follows:

1. the representations and warranties of the Company set forth in the Exchange Agreement are true and correct in all respects on and as of the Closing, with the same effect as though made at and as of the Closing;

2. to the knowledge of the undersigned, each of the conditions set forth in Section 6.01 of the Exchange Agreement is satisfied as of the Closing; and

3. the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date, including the conditions set forth in Section 6.02 of the Exchange Agreement, except that the Company has not complied with the representation in Section 4.10(a), which condition has been waived by Two Rivers Water & Farming Company. Company intends to file taxes within 30 days of the completion of the audited financial statements for 2017 and 2018.

All capitalized terms used but not defined herein have the meanings assigned to them in the Exchange Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

Manager

# EASBY LAND & CATTLE COMPANY LLC

**Secretary's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Secretary of Easby Land & Cattle Company LLC, a Colorado limited liability company (the "***Company***"), pursuant to Section 2.02(e) of the Share Exchange Agreement dated February 22, 2019 by and between the Company and Two Rivers Water & Farming Company (the "***Exchange Agreement***"), hereby certifies, on behalf of the Company and not in a personal capacity, that:

1. Attached hereto as EXHIBIT A is a true, correct and complete copy of the Articles of Organization of the Company, as in full force and effect as of the date hereof, and such Articles of Organization have not been amended, modified or rescinded in any manner by the members or managers of the Company since February 18, 2019.

2. Attached hereto as EXHIBIT B are true, correct and complete copies of resolutions duly adopted by the Manager of the Company on July 31, 2019. Except as otherwise contemplated by such resolutions, such resolutions have not been amended or revoked and are in full force and effect on the date hereof, and are the only resolutions adopted by such Manager or by any other manager of the Company relating to the Exchange Agreement or the Contemplated Transactions (as defined in the Exchange Agreement) in effect as of the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

[signature]
Secretary

# <u>EXHIBIT A</u>

**Articles of Organization**

[attached]

E-Filed

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

Colorado Secretary of State
Date and Time: 02/18/2019 01:22 PM
ID Number: 20191139558

Document number: 20191139558
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization

filed pursuant to § 7-90-301 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

Easby Land & Cattle Company, LLC.

*(The name of a limited liability company must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd.". See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address: 2877 PARADISE ROAD *(Street number and name)*
SUITE 1004
LAS VEGAS *(City)* NV *(State)* 89109 *(ZIP/Postal Code)*
*(Province – if applicable)* United States *(Country)*

Mailing address (leave blank if same as street address): *(Street number and name or Post Office Box information)*
*(City)* *(State)* *(ZIP/Postal Code)*
*(Province – if applicable)* *(Country)*.

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name (if an individual): *(Last)* *(First)* *(Middle)* *(Suffix)*

or

(if an entity): Investors Fiduciary

*(Caution: Do not provide both an individual and an entity name.)*

Street address: 1600 Glenarm *(Street number and name)*
Suite 2901
Denver *(City)* CO *(State)* 80202 *(ZIP Code)*

Mailing address (leave blank if same as street address): *(Street number and name or Post Office Box information)*

_______________ CO _______________.
(City) (State) (ZIP Code)

*(The following statement is adopted by marking the box.)*
[X] The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

| | |
|---|---|
| Name (if an individual) | _______ (Last) _______ (First) _______ (Middle) _______ (Suffix) |
| or | |
| (if an entity) | Investors Fiduciary |
| *(Caution: Do not provide both an individual and an entity name.)* | |
| Mailing address | 1600 Glenarm *(Street number and name or Post Office Box information)* |
| | Suite 2901 |
| | Denver *(City)* CO *(State)* 80202 *(ZIP/Postal Code)* |
| | NV *(Province – if applicable)* United States *(Country)* |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
[ ] The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in
*(Mark the applicable box.)*
[X] one or more managers.
or
[ ] the members.

6. *(The following statement is adopted by marking the box.)*
[X] There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
[ ] This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*
The delayed effective date and, if applicable, time of this document is/are _______________.
*(mm/dd/yyyy hour:minute am/pm)*

Notice:
Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

HARRINGTON G A
(Last) (First) (Middle) (Suffix)

2877 PARADISE ROAD
(Street number and name or Post Office Box information)

SUITE 1004

LAS VEGAS NV 89109
(City) (State) (ZIP/Postal Code)

United States .
(Province – if applicable) (Country)

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

**<u>EXHIBIT B</u>**

**Resolutions**

[attached]

**EASBY LAND & CATTLE, LLC**
**ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF THE MANAGER**

July 31, 2019

In accordance with Colorado Statues and the Operating Agreement of Easby Land & Cattle, LLC, a Colorado limited liability corporation (the "Company"), the undersigned, constituting all of the members of the Company's Board of Directors (the "Board") hereby take the following actions and adopt the following resolutions by written consent as of July 31, 2019.

**WHEREAS**, the Manager has determined that it is in the best interest of the Company and its stockholders to complete the sale of Vaxa Global, LLC and its subsidiaries according to the terms of the Share Exchange Agreement (the "Agreement") dated February 22, 2019 between Easby Land & Cattle Company, LLC and Two Rivers Water & Farming Company.

**NOW, THEREFORE BE IT RESOLVED**, that the Manager and President of the Company are each directed and authorized to take all necessary steps and to execute all necessary documents to effectuate this purchase under the terms of the Agreement.

Greg Harrington

# OFFICE OF THE SECRETARY OF STATE
# OF THE STATE OF COLORADO

## CERTIFICATE OF FACT OF GOOD STANDING

I, Jena Griswold, as the Secretary of State of the State of Colorado, hereby certify that, according to the records of this office,

Easby Land & Cattle Company, LLC

is a

Limited Liability Company

formed or registered on 02/18/2019 under the law of Colorado, has complied with all applicable requirements of this office, and is in good standing with this office. This entity has been assigned entity identification number 20191139558 .

This certificate reflects facts established or disclosed by documents delivered to this office on paper through 07/24/2019 that have been posted, and by documents delivered to this office electronically through 07/27/2019 @ 21:01:16 .

I have affixed hereto the Great Seal of the State of Colorado and duly generated, executed, and issued this official certificate at Denver, Colorado on 07/27/2019 @ 21:01:16 in accordance with applicable law. This certificate is assigned Confirmation Number 11708593 .




Jena Griswold

Secretary of State of the State of Colorado

*********************************************End of Certificate*******************************************

*Notice: A certificate issued electronically from the Colorado Secretary of State's Web site is fully and immediately valid and effective. However, as an option, the issuance and validity of a certificate obtained electronically may be established by visiting the Validate a Certificate page of the Secretary of State's Web site, http://www.sos.state.co.us/biz/CertificateSearchCriteria.do entering the certificate's confirmation number displayed on the certificate, and following the instructions displayed. Confirming the issuance of a certificate is merely optional and is not necessary to the valid and effective issuance of a certificate. For more information, visit our Web site, http://www.sos.state.co.us/ click "Businesses, trademarks, trade names" and select "Frequently Asked Questions."*

SECRETARY OF STATE

STATE OF NEVADA

# CERTIFICATE OF EXISTENCE WITH STATUS IN GOOD STANDING

I, Barbara K. Cegavske, the duly elected and qualified Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporation soles, limited-liability companies, limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate.

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence, **VAXA GLOBAL LLC**, as a limited liability company duly organized under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since August 18, 2017, and is in good standing in this state.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on November 28, 2018.

Barbara K. Cegavske
Secretary of State

Electronic Certificate
Certificate Number: C20181128-2273

SECRETARY OF STATE

STATE OF NEVADA

# CERTIFICATE OF EXISTENCE
# WITH STATUS IN GOOD STANDING

I, Barbara K. Cegavske, the duly qualified and elected Nevada Secretary of State, do hereby certify that I am, by the laws of said State, the custodian of the records relating to filings by corporations, non-profit corporations, corporations sole, limited-liability companies, limited partnerships, limited-liability partnerships and business trusts pursuant to Title 7 of the Nevada Revised Statutes which are either presently in a status of good standing or were in good standing for a time period subsequent of 1976 and am the proper officer to execute this certificate.

I further certify that the records of the Nevada Secretary of State, at the date of this certificate, evidence, **EKSTRAK LABS LLC**, as a DOMESTIC LIMITED-LIABILITY COMPANY (86) duly organized under the laws of Nevada and existing under and by virtue of the laws of the State of Nevada since 08/29/2018, and is in good standing in this state.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on 07/29/2019.

Barbara K. Cegavske

BARBARA K. CEGAVSKE
Secretary of State

Certificate Number: B20190729118133
You may verify this certificate
online at http://www.nvsos.gov

OFFICE OF THE SECRETARY OF STATE
OF THE STATE OF COLORADO

# CERTIFICATE OF FACT OF GOOD STANDING

I, Jena Griswold, as the Secretary of State of the State of Colorado, hereby certify that, according to the records of this office,

Gramz Holdings, LLC

is a

Limited Liability Company

formed or registered on 11/28/2018 under the law of Colorado, has complied with all applicable requirements of this office, and is in good standing with this office. This entity has been assigned entity identification number 20181933649 .

This certificate reflects facts established or disclosed by documents delivered to this office on paper through 07/24/2019 that have been posted, and by documents delivered to this office electronically through 07/27/2019 @ 21:02:09 .

I have affixed hereto the Great Seal of the State of Colorado and duly generated, executed, and issued this official certificate at Denver, Colorado on 07/27/2019 @ 21:02:09 in accordance with applicable law. This certificate is assigned Confirmation Number 11708594 .




Jena Griswold

Secretary of State of the State of Colorado

*******************************************End of Certificate*******************************************

*<u>Notice: A certificate issued electronically from the Colorado Secretary of State's Web site is fully and immediately valid and effective.</u> However, as an option, the issuance and validity of a certificate obtained electronically may be established by visiting the Validate a Certificate page of the Secretary of State's Web site, http://www.sos.state.co.us/biz/CertificateSearchCriteria.do entering the certificate's confirmation number displayed on the certificate, and following the instructions displayed. <u>Confirming the issuance of a certificate is merely optional and is not necessary to the valid and effective issuance of a certificate.</u> For more information, visit our Web site, http://www.sos.state.co.us/ click "Businesses, trademarks, trade names" and select "Frequently Asked Questions."*

**EASBY LAND & CATTLE COMPANY LLC**

**Incumbency Certificate**

**July 31, 2019**

The undersigned, in the capacity of Manager of Easby Land & Cattle Company LLC, a Colorado limited liability corporation (the "***Company***"), pursuant to Section 2.02(c) of the Share Exchange Agreement dated February 22, 2019 by and between Two Rivers Water & Farming Company and the Company (the "***Exchange Agreement***"), hereby certifies to Two Rivers Water & Farming Company, on behalf of the Company and not in a personal capacity, that (a) each of the following was designated and appointed to the office or offices indicated below, and that said person continues to hold such office or offices at this time, (b) each of the following was authorized to sign, on behalf of the Company, the Exchange Agreement and any other documents to be delivered in connection with the Contemplated Transactions (as defined in the Exchange Agreement), and (c) the signature set forth opposite the name of each such person is his or her genuine signature:

| NAME | TITLE | SIGNATURE |
| --- | --- | --- |
| Greg Harrington | President | [signature] |
| | | |

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

[signature]
Manager

**VAXA GLOBAL LLC**

**Secretary's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Secretary of Vaxa Global LLC, a Nevada limited liability company (the "***Company***"), pursuant to Section 2.02(e) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and Two Rivers Water & Farming Company (the "***Exchange Agreement***"), hereby certifies, on behalf of the Company and not in a personal capacity, that:

1. Attached hereto as EXHIBIT A is a true, correct and complete copy of the Articles of Organization of the Company, as in full force and effect as of the date hereof, and such Articles of Organization have not been amended, modified or rescinded in any manner by the members or managers of the Company since August 18, 2017.

2. Attached hereto as EXHIBIT B is a true, correct and complete copy of the Operating Agreement of the Company, as in full force and effect on the date hereof, and such Operating Agreement has not been amended, modified or rescinded in any manner.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

Secretary

**EXHIBIT A**

**Articles of Organization**

[attached]

SECRETARY OF STATE

STATE OF NEVADA

# LIMITED LIABILITY COMPANY CHARTER

I, Barbara K. Cegavske, the Nevada Secretary of State, do hereby certify that **VAXA GLOBAL LLC** did on August 18, 2017, file in this office the Articles of Organization for a Limited Liability Company, that said Articles of Organization are now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain all the provisions required by the laws governing Limited Liability Companies in the State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on August 18, 2017.

Barbara K. Cegavske

Barbara K. Cegavske
Secretary of State

Certified By: Electronic Filing
Certificate Number: C20170818-1399
You may verify this certificate
online at http://www.nvsos.gov/

BARBARA K. CEGAVSKE
Secretary of State
202 North Carson Street
Carson City, Nevada 89701-4201
(775) 684-5708
Website: www.nvsos.gov

Filed in the office of
Barbara K. Cegavske
Secretary of State
State of Nevada
Document Number
20170354439-58
Filing Date and Time
08/18/2017 2:29 PM
Entity Number
E0395432017-0

# Articles of Organization
# Limited-Liability Company
(PURSUANT TO NRS CHAPTER 86)

USE BLACK INK ONLY - DO NOT HIGHLIGHT

ABOVE SPACE IS FOR OFFICE USE ONLY

| | |
|---|---|
| 1. Name of Limited-Liability Company: (must contain approved limited-liability company wording; see instructions) | VAXA GLOBAL LLC<br>☐ Check box if a Series Limited-Liability Company ☐ Check box if a Restricted Limited-Liability Company |
| 2. Registered Agent for Service of Process: (check only one box) | ☐ Commercial Registered Agent: Name<br>☒ Noncommercial Registered Agent (name and address below) OR ☐ Office or Position with Entity (name and address below)<br>FACTOR X CORPORATION<br>Name of Noncommercial Registered Agent OR Name of Title of Office or Other Position with Entity<br>9410 PROTOTYPE DR STE 15 (Street Address), RENO (City), Nevada 89521-5913 (Zip Code)<br>Mailing Address (if different from street address), City, Nevada, Zip Code |
| 3. Dissolution Date: (optional) | Latest date upon which the company is to dissolve (if existence is not perpetual): |
| 4. Management: (required) | Company shall be managed by: ☒ Manager(s) OR ☐ Member(s) (check only one box) |
| 5. Name and Address of each Manager or Managing Member: (attach additional page if more than 3) | 1) ANDRAYA CARSON (Name)<br>9410 PROTOTYPE DR STE 15 (Street Address), RENO (City), NV (State), 89521-5913 (Zip Code)<br>2) Name<br>Street Address, City, State, Zip Code<br>3) Name<br>Street Address, City, State, Zip Code |
| 6. Name, Address and Signature of Organizer: (attach additional page if more than 1 organizer) | I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.<br>FACTOR X CORPORATION (Name)<br>X FACTOR X CORPORATION (Organizer Signature)<br>9410 PROTOTYPE DR STE 15 (Address), RENO (City), NV (State), 89521-5913 (Zip Code) |
| 7. Certificate of Acceptance of Appointment of Registered Agent: | *I hereby accept appointment as Registered Agent for the above named Entity.*<br>X FACTOR X CORPORATION<br>Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity<br>8/18/2017 (Date) |

This form must be accompanied by appropriate fees.

**EXHIBIT B**

**Operating Agreement**

[attached]

# January 1, 2018

# Operating Agreement
# of
# Växa Global, LLC

## VÄXA GLOBAL, LLC
## Table of Contents

**Article One** **Formation of the Company ........................................ 1**

Section 1.01 The Limited Liability Company ........................................ 1
Section 1.02 The Name of the Company ........................................ 1
Section 1.03 Company to be taxed as a Partnership ........................................ 1
Section 1.04 Purpose and Scope of the Company ........................................ 1
Section 1.05 Purpose of Company Restrictions ........................................ 2
Section 1.06 Principal Office of the Company and Location of Records ........................................ 2
Section 1.07 Registered Agent and Registered Office ........................................ 2
Section 1.08 The Term of the Company ........................................ 2
Section 1.09 Venue ........................................ 2

**Article Two** **Tax Matters ........................................ 3**

Section 2.01 Tax Classification ........................................ 3
Section 2.02 The Tax Matters Partner ........................................ 3
Section 2.03 Tax Elections ........................................ 4

**Article Three** **Membership Interests ........................................ 4**

Section 3.01 Membership Interest in the Company ........................................ 4
Section 3.02 Valuation of Membership Interests in the Company ........................................ 4

**Article Four** **Capital Contributions and Capital Accounts ........................................ 4**

Section 4.01 Initial Capital Contributions ........................................ 4
Section 4.02 Voluntary Additional Capital Contributions ........................................ 5
Section 4.03 Prohibition against Mandatory Additional Capital Contributions ........................................ 5

| | |
|---|---|
| Section 4.04 | Establishment and Maintenance of Capital Accounts ............... 5 |
| Section 4.05 | Adjustment for Constructive Termination of Company ............ 6 |
| Section 4.06 | Revaluation Adjustment ............ 6 |
| Section 4.07 | No Interest or Return of Capital ............ 6 |
| Section 4.08 | Power to Modify Capital Account Provisions ............ 6 |
| Section 4.09 | Certain Property Deemed to be Loans ............ 7 |
| Section 4.10 | Negative Capital Accounts ............ 7 |
| Section 4.11 | Assignment of Capital Account ............ 7 |
| **Article Five** | **Allocations and Distributions ............ 7** |
| Section 5.01 | Allocation of Profits and Losses ............ 7 |
| Section 5.02 | Allocation to Avoid Capital Account Deficit ............ 8 |
| Section 5.03 | Special and Regulatory Allocations ............ 8 |
| Section 5.04 | Determination of Net Profits and Net Losses ............ 11 |
| Section 5.05 | Distributions to Members ............ 12 |
| **Article Six** | **Management of the Company ............ 13** |
| Section 6.01 | Management by Members ............ 13 |
| Section 6.02 | Day-to-Day Management ............ 13 |
| Section 6.03 | Appointment of Officers ............ 13 |
| Section 6.04 | Execution of Documents ............ 13 |
| Section 6.05 | Managing Member as Agent ............ 14 |
| Section 6.06 | No Authority of Individual Members ............ 14 |
| Section 6.07 | Non-Liability of Members for Acts or Omissions in Their Managerial Capacity ............ 14 |
| Section 6.08 | Limitations on Rights and Powers ............ 14 |
| Section 6.09 | Powers ............ 15 |
| Section 6.10 | Authorization to Execute Certain Instruments ............ 15 |
| Section 6.11 | Affidavit of Member or Member Principal Authority ............ 15 |
| Section 6.12 | Creation of Advisory Committee ............ 15 |
| **Article Seven** | **The Members ............ 16** |
| Section 7.01 | Names and Addresses of Members ............ 16 |
| Section 7.02 | Limited Liability of Members ............ 16 |
| Section 7.03 | Restrictions on Members' Withdrawal Rights ............ 16 |
| Section 7.04 | Restrictions on Assignees' Withdrawal Rights ............ 17 |
| Section 7.05 | No Right to Cause Dissolution ............ 17 |
| Section 7.06 | Waiver of Partition ............ 17 |
| Section 7.07 | Expulsion of a Member ............ 17 |
| Section 7.08 | Voting ............ 17 |
| Section 7.09 | Access to Information ............ 18 |
| **Article Eight** | **Meetings & Notice ............ 18** |
| Section 8.01 | Special Meetings ............ 18 |
| Section 8.02 | Notice of Meetings ............ 19 |
| Section 8.03 | Waiver of Meeting Notice ............ 19 |

| | |
|---|---|
| Section 8.04 | Voting by Proxy .......... 19 |
| Section 8.05 | Action by Consent .......... 19 |
| Section 8.06 | Quorum .......... 19 |
| Section 8.07 | Presence .......... 19 |
| Section 8.08 | Conduct of Meetings .......... 20 |
| Section 8.09 | Approval or Consent of Members .......... 20 |
| **Article Nine** | **Books, Records, and Bank Accounts .......... 20** |
| Section 9.01 | Books and Records .......... 20 |
| Section 9.02 | Accounting and Taxable Year .......... 20 |
| Section 9.03 | Reports .......... 20 |
| Section 9.04 | Bank Accounts and Company Funds .......... 21 |
| **Article Ten** | **Admission of Additional Members .......... 21** |
| Section 10.01 | Admission by Unanimous Consent of Members; Prerequisites .......... 21 |
| Section 10.02 | Capital Contributions and Fair Market Value .......... 21 |
| Section 10.03 | No Admissions in Violation of this Article .......... 21 |
| **Article Eleven** | **Transfer of Membership Interests by a Member .......... 21** |
| Section 11.01 | Restrictions on Transfer .......... 21 |
| Section 11.02 | Transfer of Interest .......... 22 |
| Section 11.03 | Additional Restrictions on Transfer .......... 23 |
| Section 11.04 | Transferee Treated as an Assignee Until Admitted as a Substitute Member .......... 24 |
| Section 11.05 | Conditions Required to Become a Substitute Member .......... 24 |
| Section 11.06 | Rights and Limitations of an Assignee .......... 24 |
| Section 11.07 | Permitted Transfers .......... 25 |
| Section 11.08 | Amendment of Operating Agreement and Articles of Organization .......... 25 |
| Section 11.09 | Disability of a Member .......... 25 |
| Section 11.10 | Death of a Member .......... 26 |
| Section 11.11 | Retirement of a Member .......... 27 |
| Section 11.12 | Purchase Price .......... 28 |
| Section 11.13 | Voting Rights of Transferred Interests .......... 29 |
| Section 11.14 | Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed .......... 30 |
| Section 11.15 | Creditor Rights; Charging Order Sole Exclusive Remedy .......... 30 |
| Section 11.16 | Company's Unilateral Purchase Option for Interest Acquired without Consent .......... 30 |
| Section 11.17 | Assignee or Charging Order Holder Assumes Tax Liability .......... 33 |

| | |
|---|---|
| **Article Twelve** | **Dissolution and Termination ....................................33** |
| Section 12.01 | Dissolution of the Company ....................................................33 |
| Section 12.02 | Liquidation of the Company Property .....................................33 |
| Section 12.03 | Company Property Sole Source.............................................34 |
| Section 12.04 | Sale of Company Assets during Term of the Company ..........34 |
| **Article Thirteen** | **Dispute Resolution Provisions ..................................35** |
| Section 13.01 | Resolution of Disputes among Members and within the Company.......................................................................................35 |
| Section 13.02 | Notice of Controversy and Designation of Authorized Representatives ..........................................................................35 |
| Section 13.03 | Commencement of Dispute Resolution Procedure..................35 |
| Section 13.04 | Selection of a Mediator ..........................................................35 |
| Section 13.05 | Time and Place for Mediation Conference..............................36 |
| Section 13.06 | Discovery and Exchange of Information.................................36 |
| Section 13.07 | Delivery of Written Summaries; Authority to Obtain Professional Assistance ..........................................................36 |
| Section 13.08 | Conduct of Mediation.............................................................36 |
| Section 13.09 | Final Determinations are binding on All Parties ......................36 |
| Section 13.10 | Arbitration ..............................................................................36 |
| Section 13.11 | Settlement during Mediation or Arbitration ............................37 |
| Section 13.12 | Qualified Appraisals...............................................................37 |
| Section 13.13 | Right to Seek Equitable Relief ................................................37 |
| Section 13.14 | Prevailing Party is entitled to Recover All Reasonable Costs ..........................................................................................37 |
| **Article Fourteen** | **General Matters ..........................................................37** |
| Section 14.01 | Successors and Assigns .........................................................37 |
| Section 14.02 | No Waiver ..............................................................................37 |
| Section 14.03 | Definitions ..............................................................................37 |
| Section 14.04 | Changing the Company's Situs ...............................................45 |
| Section 14.05 | No Duty to Mail Articles of Organization...............................45 |
| Section 14.06 | General Matters .......................................................................45 |

# Securities Law Disclosure

The membership interests or percentages of ownership of VÄXA GLOBAL, LLC (the "Company") have not been nor will be registered under the Securities Act of 1933, as amended, (the "Securities Act") or any other federal securities laws or the securities laws of any state. The membership interests or percentages of ownership are offered and sold in reliance on exemptions from the registration requirement of the Securities Act and laws and regulations enacted by the Securities and Exchange Commission effective April 15, 1982 pertaining to certain offers and sales of securities without registration under the Securities Act.

The Company will not be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, and will not file reports, proxy statements and other information with the Securities and Exchange Commission, or any state securities commission.

The limited liability company membership interests of the Company may not be offered for sale, sold, pledged, or otherwise transferred unless registered or qualified under applicable securities laws, or unless an exemption from registration or qualification exists. The availability of any exemption from registration or qualification must be established by an opinion of counsel for the owner the interest for which registration is sought. The opinion of counsel must be reasonably satisfactory to the Company.

**No Member may register any interest in the Company under any federal or state securities law without the express written consent of all Members.**

**The Members understand that some of the restrictions inherent in this form of business, and specifically set forth in this Agreement, may have an adverse impact on the fair market value of the Membership Interests if a Member attempts to sell or borrow against the Member's interest in the Company.**

# Acknowledgment of Members

By the execution of this Agreement, each of the Members agrees to the following provisions.

## Exempt from Registration

Investment in the Member's Interest (Interest) in the Company involves a high degree of risk and is suitable only for sophisticated investors. Interests are being offered in reliance upon one or more exemptions from registration provided by the Securities Act, as amended and any Securities Act of Colorado.

## Personal Investment of Member

The Member is purchasing the Interest for the Member's own investment and not with a view to the distribution or resale to any other Person.

## Restrictions on Transferability

The Company has disclosed to the Members by way of this Agreement and each Member acknowledges that the transferability of the Interest is severely limited. Each Member will bear the economic risk of investment for an indefinite period, as the Membership Interests have not been registered under the Securities Act or any state securities laws and cannot be offered or sold unless subsequently registered or unless an exemption from registration is available.

## Registration or Opinion of Counsel before Transfer

In addition to other prohibitions and restrictions on transfer under this Agreement, the Interest will not be sold publicly without registration under the Securities Act and any applicable state securities law. Before any public sale, the Member intending to sell an interest must first obtain opinion of counsel satisfactory to the Company that registration is not required in connection with any transaction. In no event may any Interest be sold within 12 months of original issue to that Member.

## Principal Address of Member

Each Member's principal residence is noted in this Agreement. Each Member shall notify the Company in writing within 5 days of any change in address of the principal residence of the Member.

## Access to Facts

Each Member has had and continues to have access to all material facts with respect to the Interest and is satisfied as to the advisability of making this investment.

## No Right to Registration

No Member may require the Company to register any Interest under Federal or state securities laws at any time, or to join in any future registration.

## Hold Harmless

Each Member agrees to hold the Company and its Members, Member Principals, Organizers and controlling Persons (as defined in the Securities Act, as amended), and any Persons affiliated with any of them or with the distribution of the Interest, harmless from all expenses, liabilities, and damages (including reasonable attorneys' fees) arising from a disposition of the Interest in any manner that violates the Securities Act, as amended, or of any applicable state securities law or that may be suffered by reason of a breach of any of the covenants, representations, and warranties contained in this Agreement.

# VÄXA GLOBAL, LLC
# a Colorado Limited Liability Company

## Article One
## Formation of the Company

### Section 1.01 The Limited Liability Company

This Operating Agreement for VÄXA GLOBAL, LLC, dated January 1, 2018, restates the Restated Operating Agreement of VÄXA GLOBAL, LLC, that was adopted and executed on or about August 15, 2017, as well as any other operating agreement in place prior to, as a Limited Liability Company under the laws of the State of Colorado. The Company was effective upon the filing of Articles of Organization as required by Colorado. The Members and their percentages of ownership are identified in the schedule attached to this Agreement as Exhibit "A."

This Agreement sets forth the rights, duties, obligations, and responsibilities of the Members with respect to the Company.

In consideration of the mutual promises, obligations, and agreements set forth in this Agreement, the parties to this Agreement agree to be legally bound by its terms.

### Section 1.02 The Name of the Company

The name of the Company is VÄXA GLOBAL, LLC (the "Company"). The Members may change the name of the Company or operate the Company under different names.

### Section 1.03 Company to be taxed as a Partnership

The Members intend to establish an entity that is subject to taxation as a partnership.

### Section 1.04 Purpose and Scope of the Company

The Company is organized to provide centralized management of investments and business activities.

In order to accomplish the foregoing purposes, the Company may perform the following activities:

> Own, acquire, manage, develop, operate, buy, sell, exchange, finance, refinance, and otherwise deal with real, personal, tangible, and intangible property, and any type of business, as the Members may deem from time to time to be in the best interests of the Company; and
>
> Conduct any lawful business and investment activity permitted under the laws of Colorado and in any other jurisdiction in which the Company may have a business or investment interest in order to accomplish the foregoing objectives.

The Company may engage in any other activities that are related or incidental to the foregoing purposes, as may be determined in the sole and absolute discretion of the Members.

## Section 1.05 Purpose of Company Restrictions

This Company is formed by those who know and trust one another.

Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a Member's interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. As a result, there are certain restrictions expressed in this Agreement that attach to and affect ownership of Membership Interests and the transfer of those interests. Those restrictions are not intended as a penalty but are intended to protect and preserve existing relationships based upon trust and to protect the Company's capital and its financial ability to continue to operate.

## Section 1.06 Principal Office of the Company and Location of Records

The street address of the principal office in the United States where the records of the Company are to be maintained is:

2728 N. 24th Street
Phoenix, AZ 85008

or such other place or places as the Members determine. The records maintained by the Company will include all records that the Company is required by law to maintain. The Company shall likewise maintain a records office in any jurisdiction that requires a records office. The Company shall maintain at each records office all records required by applicable law.

## Section 1.07 Registered Agent and Registered Office

The name of the initial Registered Agent of the Company is Fenner Beane and the initial registered office of the Company is:

4400 N Scottsdale Road, Ste 9-289, Scottsdale AZ 85251

## Section 1.08 The Term of the Company

The period of duration of the Company will be perpetual. The Company will begin on the date the Articles of Organization is filed with the Secretary of State of Colorado and will continue until terminated or dissolved in accordance with the provisions of this Agreement.

## Section 1.09 Venue

Venue for any dispute arising under this Operating Agreement or any disputes among any Members or the Company will be in the county of the Registered Office of the Company.

# Article Two
# Tax Matters

## Section 2.01 Tax Classification

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the federal income tax basis of a Member's Membership Interest and all other matters relating to the distributive share and taxation of items of income, gain, loss, deduction, depreciation, and credit will be as established by Subchapter K of the Internal Revenue Code.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the majority of the Members may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

## Section 2.02 The Tax Matters Partner

If the Company is required to have a tax matters partner, the majority of the Members shall promptly appoint a Member as tax matters partner. The majority of the Members may replace the tax matters partner at the discretion of the Members.

### (a) Legal and Accounting Costs for Tax Matters

The Company shall pay all legal and accounting costs associated with any proceeding by the Internal Revenue Service with respect to the Company's tax returns.

### (b) Discretion as to Tax Matters

The tax matters partner shall notify all of the Members upon receipt of any notice regarding any examination by any state, federal, or local authority with respect to the Company's tax compliance. Subject to its fiduciary duty to the Members, the tax matters partner may determine whether to contest any proceedings, how to pursue any proceedings, and whether and on what terms to settle any such dispute with the Internal Revenue Service.

### (c) Tax Classification as a Partnership

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the tax matters partner shall take all steps reasonably necessary to classify the Company as a partnership for tax purposes under the Code and Regulations. The tax matters partner shall, if appropriate, prepare and file any forms necessary or appropriate to classify the Company as a partnership under the laws of any jurisdiction in which the Company transacts business.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the tax matters partner may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

### Section 2.03 Tax Elections

A majority of the Members may make any applicable or available tax elections on behalf of the Company, but any decision to change the tax classification of the Company from partnership to corporation, or from corporation to partnership, requires approval by the super majority vote of the Members.

## Article Three
## Membership Interests

### Section 3.01 Membership Interest in the Company

Each Member's Initial Membership Interest is the percentage interest in Exhibit A attached to this Agreement. Membership Interests will be adjusted from time to time to account for non-*pro rata* Additional Capital Contributions and non-*pro rata* distributions to Members. If non-*pro rata* contributions or distributions are made, each Member's Membership Interest will then be determined by dividing the Capital Account of each Member by the aggregate of the then-existing capital accounts, after adjusting the Members' Capital Accounts to reflect the fair market value of the contributed property.

For purposes of determining the respective voting rights of the Members, adjustments to Membership Interests of the Members resulting from Additional Contributions or Distributions will be effective as of the first day of the month immediately following the date of the contribution or distribution.

The Company shall maintain a correct record of all Members and their Membership Interests together with amended and revised schedules of ownership caused by changes in the Members and changes in Membership Interests.

### Section 3.02 Valuation of Membership Interests in the Company

For all purposes, the value of the Company as an entity and of Membership Interests shall be their respective fair market values. Any dispute, contest, or issue of fair market value is to be resolved and determined by written Qualified Appraisal by a Qualified Appraiser selected by the Members.

## Article Four
## Capital Contributions and Capital Accounts

### Section 4.01 Initial Capital Contributions

The Members shall contribute as their initial capital contributions to the Company all of their right, title and interest in and to the property described in Exhibit A. The Members agree that the property described in Exhibit A has the fair market value (net of liabilities assumed or taken subject to or by the Company) listed opposite the scheduled property.

Each Member's Capital Account will be credited with an initial contribution equal to the fair market value as specified in Exhibit A.

### Section 4.02 Voluntary Additional Capital Contributions

The Members may make Additional Capital Contributions to the Company. Any Additional Capital Contribution shall be made *pro rata*, according to the Member's Membership Interest, unless otherwise agreed to by the unanimous consent of the Members. Consent does not need to be evidenced in writing and will be presumed to have been obtained unless there is clear and convincing evidence to the contrary.

The fair market value of any property other than cash or publicly traded securities to be contributed as an Additional Capital Contribution will be as agreed upon by the contributing Member and a majority in interest of the Members at the time of contribution. Alternatively, a disinterested appraiser selected by the Members may determine the fair market value of any contributed property.

### Section 4.03 Prohibition against Mandatory Additional Capital Contributions

The Company has no authority to require Additional Capital Contributions.

### Section 4.04 Establishment and Maintenance of Capital Accounts

A Capital Account will be established for each Member and will be maintained at all times during the existence of the Company in a manner that complies with the Internal Revenue Code and applicable Treasury Regulations. Each Capital Account will be maintained according to the following provisions:

#### (a) Credits to Member's Interest

Each Member's Interest will be credited with the fair market value of the Member's contribution of cash or other property, the Member's distributive share of profits, and the amount of any Company liabilities that are assumed by the Member.

#### (b) Debits to Member's Interest

Each Member's Capital Account will be debited the amount of cash and the fair market value of any property distributed to the Member under this Agreement, the Member's share of losses, and the amount of any liabilities of the Member that are secured by any property contributed by the Member to the Company.

#### (c) Assumption of Liability

An assumption of unsecured liability by the Company will be treated as a distribution of money to the Member, and the Company shall adjust the Member's Capital Account accordingly. Assumption of an unsecured liability of the Company by a Member will be treated as a cash contribution to the Company. The amount of any liability assumed under this provision will be determined according to Section 752(c) of the Internal Revenue Code.

#### (d) Adjustments for Noncash Distributions

If assets of the Company other than cash are distributed in kind to a Member, the Company shall adjust the Capital Accounts of the Members to

reflect the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold at fair market value in a cash sale in order to reflect unrealized gain or loss.

#### (e) Adjustment to Fair Market Value upon Transfer of Membership Interest

If an existing or new Member acquires an Interest, the Company shall adjust the Capital Accounts of the Members to reflect fair market value of all properties held by the Company.

### Section 4.05 Adjustment for Constructive Termination of Company

In the event of constructive termination of the Company as provided under Section 708 of the Internal Revenue Code, the Company shall adjust the Members' Capital Accounts to reflect fair market value of all properties held by the Company as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(b).

### Section 4.06 Revaluation Adjustment

The Company shall adjust the Members' Capital Accounts to reflect any revaluation of Company property (including intangible assets such as goodwill) as provided in this section.

#### (a) Adjustment Based on Fair Market Value

Any revaluation adjustment to a Member's Capital Account will be based on the fair market value of Company property on the date of the adjustment as provided under Code Section 7701(g).

#### (b) Adjustment for Unrealized Items

The Company shall adjust the Members' Capital Accounts to reflect the manner in which any unrealized income, gain, loss, or deduction inherent in the Company's property (to the extent that it has not been previously reflected in the Members' Capital Accounts) would be allocated among all the Members if there were a taxable disposition of such property for fair market value on the date of adjustment.

### Section 4.07 No Interest or Return of Capital

Notwithstanding any other provision of this Agreement, no Member is entitled to any interest on its Capital Account or Membership Interest or on the Member's Capital Contribution. No Member may demand or receive the return of all or any portion of the Member's Capital Account, Membership Interest, or Capital Contribution.

### Section 4.08 Power to Modify Capital Account Provisions

The Members may modify the manner in which the Capital Accounts are computed in order to comply with Treasury Regulation Section 1.704-1(b), provided that, in the reasonable judgment of the Members, the modification is not likely to have a material effect on the amounts distributable to any Member under this Agreement. The Members shall also make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company Capital reflected on the Company's

balance sheet, as computed for book purposes according to Treasury Regulation Section 1.704-1(b)(2)(iv)(g), relating to adjustments to book value.

### Section 4.09 Certain Property Deemed to be Loans

If for any reason the Company would otherwise be deemed to be an investment company within the meaning of Section 351 of the Internal Revenue Code, the Members intend to comply with the requirements of Section 721(b) of the Internal Revenue Code, so that contributions of property to the Company will not cause recognition of any gain or loss to any Member. Accordingly, if any contribution of property would cause the recognition of gain or loss to any Member under Section 721(b) of the Internal Revenue Code, then that property will be deemed to have been loaned to the Company. Any loan will bear interest at the minimum interest rate required under Section 7872 of the Internal Revenue Code. The Company shall return any property loaned to the Company under this provision to the lender of the property within 90 days of the lender's demand.

### Section 4.10 Negative Capital Accounts

In the event of liquidation of the Company or of a Member's Membership Interest no Member will be required to restore a deficit in the Member's Capital Account.

### Section 4.11 Assignment of Capital Account

Except as otherwise required by the Internal Revenue Code or Treasury Regulations, if any Membership Interest is assigned according to the terms of this Agreement, the Assignee will succeed to the Capital Account of the assignor to the extent that it relates to the assigned Membership Interest. If the assignment of an interest in the Company causes a termination of the Company under Section 708(b)(1)(B) of the Internal Revenue Code, the Capital Account that carries over to the Assignee will be adjusted according to Treasury Regulation Section 1.704-1(b)(2)(iv)(e).

## Article Five
## Allocations and Distributions

### Section 5.01 Allocation of Profits and Losses

Subject to the provisions of Section 5.02 and Section 5.03, all items of income, gain, loss, deduction and credit, whether resulting from the Company's operations or in connection with its dissolution, shall be allocated to the Members in proportion to their respective Membership Interests.

The Members, by unanimous agreement, may enter into agreements providing for the special allocation of items of income, gain, loss, deduction, or credit, provided that the special allocations have substantial economic effect as required by applicable federal tax law.

The Members may also agree to allocate net profits and net losses in a way that conforms to adjustments made to the Percentage Interests as a result of any loans made to the Company that have been converted to contributions to capital, any distributions of cash, or any liquidating distributions

If the Percentage Interest of a Member is not the same throughout a given Taxable Year, the Company shall determine the allocation of net profits and net losses to the Members taking into account the Members' varying Percentage Interests during the year. The Company shall make the determination consistent with the requirements of Section 706(d) of the Internal Revenue Code.

The Members shall have the authority to change the allocation provisions of this Section to the extent that the Company's legal counsel advises the Company that such change is required under the Internal Revenue Code in light of the manner in which the Members have agreed to bear losses and to share profits and distributions under this agreement.

## Section 5.02 Allocation to Avoid Capital Account Deficit

The Company shall not allocate net losses in such a way as would cause a Member to have a capital account deficit at the end of any Taxable Year. Any Company net losses that cannot be allocated to one or more of the Members without creating a negative Capital Account will be allocated to the remaining Members in proportion to their Capital Accounts until all Members have a Capital Account of zero. Net losses allocated when all Members have a Capital Account of zero shall be allocated proportionately among the Members according to their respective Membership Interests. If some but not all of the Members would have a deficit in their Capital Accounts because of allocation of losses, the Company shall allocate losses on a Member-by-Member basis in order to allocate the maximum permissible losses to each Member under Treasury Regulation Section 1.704(b)(2)(ii)(d). The Company shall allocate any remaining net losses to the Members in accordance with the Members' respective Membership Interests.

## Section 5.03 Special and Regulatory Allocations

The Company shall make the following special and regulatory allocations:

### (a) Allocations Related to Contributed Property

The Company shall allocate income, gain, loss, and deductions with respect to any property contributed to the capital of the Company among the Members in accordance with Section 704(c) of the Internal Revenue Code for the purpose of accounting for any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date the property was contributed. If the fair market value of any Company asset is adjusted, then in making subsequent allocations of income, gain, loss, and deductions with respect to the asset the Company shall account for any variation between the adjusted basis of the asset for federal income tax purposes and the asset's fair market value in the same manner as provided under Section 704(c) of the Internal Revenue Code.

### (b) Allocation of Member Nonrecourse Deductions

The Company shall allocate all Member Nonrecourse Deductions for each Taxable Year to the Member or Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which any Member Nonrecourse Deductions are attributable, in accordance with the ratio in

which the Members bear economic risk of loss and as provided in Treasury Regulation Section 1.704-2(i)(1).

### (c) Company Minimum Gain Chargeback

If there is a net decrease in Company Minimum Gain during any Company Taxable Year, the Company shall allocate items of Company income and gain for the year (and, if necessary, subsequent years) in proportion to the respective amounts required to be allocated to each Member in accordance within Treasury Regulation Section 1.704-2(f) and (g). This provision is intended to comply with the minimum gain chargeback requirement of Treasury Regulation Section 1.704-2.

To the extent permitted by Treasury Regulation Section 1.704-2 and for purposes of this provision only, the Company shall determine any deficit in each Member's Capital Account before any other allocations under this Article with respect to the Taxable Year and without regard to any net decrease in Member Minimum Gain during the Taxable Year.

### (d) Member Minimum Gain Chargeback

If there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during a Taxable Year after the Company computes and accounts for Company Minimum Gain Chargeback above, then Company shall allocate items of income and gain for that year (and, if necessary, for any subsequent years) to any Member who has a share of the Member Minimum Gain Attributable to that Member Nonrecourse Debt at the beginning of the year in the amount and proportions necessary to satisfy the provisions of Treasury Regulation Section 1.704-2(i).

### (e) Qualified Income Offset

If any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), the Company shall allocate items of Company income and gain to the Member so as to eliminate any deficit in the affected Members' Capital Accounts as quickly as possible to the extent required by Treasury Regulations. But the Company shall only make an allocation as provided under this provision only to the extent that an affected Member would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

This provision is intended to comply with the qualified income offset requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3).

### (f) Gross Income Allocation to Restore Capital Account Deficit

If any Member has a Capital Account deficit at the end of any Company Taxable Year that exceeds the sum of the amount the Member is obligated to restore under this Agreement and the amount the Member is deemed to be obligated to restore under the Regulations, then the Company shall allocate items of Company income and gain in the amount of the excess as quickly as is practicable. But the Company shall only make an allocation

as provided under this provision only to the extent that an affected Member would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

### (g) Allocation from Disposition of Property Not Revalued

Upon the admission of a Member or in the event a Membership Interest is liquidated, if properties of the Company are not revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and the Capital Accounts of the Members are not adjusted accordingly, then Company shall allocate gain or loss recognized upon the sale or other disposition of Company property among the Members to take into account the variation between the adjusted basis of the property and the property's fair market value as of the date the Member was admitted or the Interest was liquidated, as the case may be, as provided under Code Section 704(c).

### (h) Allocation Related to Adjustments in Tax Basis

To the extent an adjustment to the adjusted tax basis of any asset of the Company under Section 734(b) or 743(b) of the Internal Revenue Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining the Capital Accounts, the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and the Company shall allocate gain or loss to the Members consistent with the manner set forth under Treasury Regulation Section 1.704-1.

### (i) Allocation Related to Capital Event Adjustments

If the gross book value of any asset of the Company is increased or decreased for special events, the Company shall allocate gain or loss as required for Capital Account purposes. The Company shall take into account any difference between the adjusted basis of such asset for federal income tax purposes and the asset's gross book value for any subsequent allocations of income, gain, loss, or deductions with respect to any adjusted asset.

### (j) Allocation Consistent with Distributions

The Company shall allocate net profits and net losses in a manner that is consistent with:

> The requirements for distributions of cash described elsewhere in this Agreement;
>
> The requirements for distribution of assets of the Company upon its dissolution and winding up strictly in accordance with Capital Account balances as specified in the procedures described below; and
>
> The requirements of applicable Regulations under Section 704(b) of the Internal Revenue Code.

### (k) Allocations to Comply with Regulations and Intentions of Members

The allocations of net income, gains, net losses, and deductions set forth in this Agreement are intended to comply strictly with Treasury Regulation Section 1.704-1(b), Treasury Regulation Section 1.704-1(b)(4)(iv), and Treasury Regulation Section 1.704-2, and are intended to have "substantial economic effect" within the meaning of those Regulations.

The allocations may not be consistent with the intentions of the Members to allocate distributions. Accordingly, the Members are hereby authorized to allocate net profits, net losses, and other economic items among the Members so as to prevent the allocations from distorting the manner in which distributions are intended to be divided among the Members as specified in this Article. In general, the Members anticipate that these allocations will be accomplished by specially allocating other net profits, net losses, and items of income, gain, loss, and deductions among the Members so that the net amount of the allocations and any special allocations to the Member is zero. If, for whatever reason, the Members determine that the allocation provisions of this Agreement are unlikely to be respected for federal income tax purposes, the Members may amend the allocation provisions of this Agreement to the minimum extent necessary to affect the plan of allocations and distributions provided in this Agreement. The Members may adopt and revise rules, conventions, and procedures as the Members determine to be appropriate with respect to the admission of Members to reflect the Interest at the end of the year in accordance with the intentions of the Members. THIS DISCLOSURE PERTAINS TO THE TAX TREATMENT OF THE LLC. COMMON DISCLOSURE

## Section 5.04 Determination of Net Profits and Net Losses

For purposes of this Article, the terms "net profits" and "net losses" mean an amount equal to the Company's taxable income or loss for any year or period, determined in accordance with Section 703(a) of the Internal Revenue Code. All items of income, gain, loss, or deduction required to be stated separately under Section 703(a)(1) will be included in taxable income or loss. This determination of net profits and net losses includes the following items:

Any income of the Company that is exempt from federal income tax that is not otherwise taken into account in computing taxable income or loss under this Article.

Any expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code relating to non-deductible expenses that are not otherwise taken into account in computing taxable income or loss.

If the value of any Company asset is adjusted, the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset.

Any other items that are specially allocated under this Article will not be taken into account in computing net profits and net losses.

### Section 5.05 Distributions to Members

The primary intent of the Company is to retain Company funds in amounts determined in the sole and absolute discretion of the Members to meet the reasonable needs of the business or investments of the Company and other needs as provided in this Agreement. No Member may demand distributions of any Company funds or assets.

The Company may not distribute, in any single year, more than an amount equal to the Company income for the previous tax year plus 5% of the value of the assets of the Company on the last day of the previous calendar year, without the unanimous consent of all Members.

When any distributions of funds or other Company assets are made, the Company shall satisfy those distributions as follows:

#### (a) Distributions of Cash

The Company may make distributions of Company cash to the Members on a *pro rata* or *non-pro rata* basis as the Members, in their discretion, determine. Distributions may only be made from the cash reserves that exceed the reasonable working reserves of the Company as determined in the sole discretion of the Members.

Subject to this Agreement and applicable law, distributions of cash will first come from cash from operations as permitted under this Agreement, then from cash from the liquidation of the Company as provided in this Agreement.

#### (b) Distributions in Kind

The Members in their sole and absolute discretion, may make distributions in kind of Company property to the Members. Prior to any such distribution in kind, the difference between such established fair market value and the book value of the property to be distributed shall be adjusted by a credit or charge, as is appropriate, to the Members' Interests. Upon the distribution of such property, such adjusted value shall be charged to the Interests of the Members receiving such distributions.

#### (c) No Interest

If a Member does not withdraw all or any portion of the Member's share of any cash distribution made pursuant to subsection (a), the Member may not receive any interest on that portion of the distribution not so withdrawn, or on any additional Membership Interest, unless all Members agree.

#### (d) Cash from Capital Transactions

The proceeds of any capital transaction will be applied to payment of all expenses incurred in connection with the transaction and, to the extent specified in the terms of any capital transaction, to the payment of any indebtedness secured by the asset involved in the capital transaction.

#### (e) Allocation of Distributions

Except as otherwise provided in this Agreement, distributions will be allocated to the Members in proportion to their Membership Interests.

### (f) Return of Distribution

Any distribution made to the Members will be considered to comply with applicable law if the distribution is made from available Company assets. If a court of competent jurisdiction finds that a distribution violates applicable law, the Members must return their respective share of that distribution, provided that the request for return of the distribution is approved by 85% of the Members.

### (g) Deemed Notice to Creditors

Creditors of the Company will be deemed to have notice of the provisions of this Article and of the fact that Members are not required to return a Distribution unless the request for return of the Distribution has been approved by the 85% of the Members.

# Article Six
# Management of the Company

## Section 6.01 Management by Members

The Members will manage the Company. The Members may manage the Company by majority, or may appoint one or more "Managing Members" from their number to represent the Members in managing the Company. For purposes of this Agreement, the Members acting by majority to manage the Company or the Managing Members will be referred to collectively as the "Managing Member", whether one or more.

Managing Members must act in good faith, with the care that an ordinarily prudent person in a similar position would exercise under similar circumstances, and in a manner the Managing Member reasonably believes to be in the best interests of the Company.

## Section 6.02 Day-to-Day Management

The Managing Member may take all actions necessary, useful, or appropriate for the ordinary management and conduct of the Company's business. Subject to the restrictions in Section 6.08, the Managing Member may exercise all powers of the Company and do anything that is not reserved by the Members as specified in the Articles of Organization, in this Agreement, or in the Act.

## Section 6.03 Appointment of Officers

If authorized by a majority of the Members, the Managing Member may appoint officers and define their function and authority. Officers may but need not be a Member or Managing Member. Any appointment and assignment of function or authority will be made in writing and kept with the records of the Company.

## Section 6.04 Execution of Documents

The Managing Member may execute any instruments, contracts, agreements, or other documents providing for the acquisition, encumbrance, or disposition of property of the Company.

### Section 6.05 Managing Member as Agent

Unless specifically prohibited by the Articles of Organization, each Managing Member serves as an agent of the Company for the purpose of conducting business on behalf of the Company. As agent, the Managing Member may bind the company unless the Managing Member's action violates the terms of the Articles of Organization, this Agreement, or the Act, or unless third parties dealing with the Managing Member reasonably believe that the Managing Member does not have authority to act.

### Section 6.06 No Authority of Individual Members

No individual Member is an agent of the Company, and no Member other than a Managing Member may make any contracts, enter into any transactions or make any commitments on behalf of the Company.

### Section 6.07 Non-Liability of Members for Acts or Omissions in Their Managerial Capacity

To the extent permitted by Colorado law, all Members are released from liability for damages and other monetary relief on account of any act, omission, or conduct in the managing the Company. This release does not protect any Member from being required by a court to purchase the Membership interest of another Member who successfully contends that the Member committed actionable oppressive acts to the prejudice of the other Member. No amendment or repeal of this provision affects any liability or alleged liability of any Member for acts, omissions, or conduct that occurred before the amendment or repeal.

### Section 6.08 Limitations on Rights and Powers

Unless authorized by the unanimous written agreement of the Members, no Member, Managing Member, nor any other officer of the Company may:

> Enter into or commit to any agreement, contract, commitment or obligation on behalf of the Company obligating any Member to find additional capital, to make or guarantee a loan or to increase a Member's personal liability either to the Company or to third parties;
>
> Receive or permit any Member to receive any fee or rebate, or to participate in any reciprocal business arrangements that would conflict or compete with the business of the Company or otherwise contradict the intent of this Agreement;
>
> Materially alter the Business of the Company or deviate from any approved business plan of the Company;
>
> Permit the Company's funds to be commingled with the funds of any other Person;
>
> Do any act that contradicts this Agreement;
>
> Do any act which would make it impossible to carry on the Business of the Company;
>
> Confess a judgment against the Company;

Possess Property, or assign rights in specific Property, for other than a Company purpose; or

Admit any person as a Member, except as otherwise provided in this Agreement.

## Section 6.09 Powers

In pursuing its lawful purposes, the Company may do all things that limited liability companies are permitted to do under the Act.

## Section 6.10 Authorization to Execute Certain Instruments

With respect to all obligations, powers, and responsibilities under this Agreement, the Managing Member may execute and deliver any notes and other evidence of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements in any form on behalf of the Company as the Managing Member determines to be proper.

## Section 6.11 Affidavit of Member or Member Principal Authority

Any third party dealing with the Company may rely on a notarized writing signed by a Managing Member stating the Managing Member's authority to act for the Company. The Managing Member may use the following as an example of a valid writing:

The above example may be appropriately modified to reflect the Managing Member's fiduciary duty. The person signing on behalf of the Company may also execute and deliver to third parties a Memorandum of Operating Agreement, a copy of which may be attached to this Agreement as an Exhibit.

## Section 6.12 Creation of Advisory Committee

The Manager may establish an advisory committee ("Advisory Committee") of the Company consisting of two or more Members, beneficiaries of trusts that are Members or legal, financial, or other advisors to the Manager or any Member.

### (a) Annual Meetings

If the Advisory Committee is established, at least once per calendar year the Manager shall call a meeting of the Advisory Committee. The purpose of the meeting will be to generally inform the Advisory Committee of the business and operations of the Company since the last meeting of the Advisory Committee.

### (b) Committee Is Advisory Only

The Advisory Committee may make recommendations to or otherwise advise and consult with the Manager regarding the business and operation of the Company, but the Advisory Committee may not take any action on behalf of the Company or compel the Manager or any Member to take any action. The Advisory Committee may make a report of the meeting to the Members.

### (c) Payment of Expenses Authorized

Advisory Committee members will be entitled to payment from the Company for their reasonable expenses for their attendance at meetings of the Advisory Committee.

## Article Seven
## The Members

### Section 7.01 Names and Addresses of Members

The Company shall maintain a list of all Members of the Company, both past and present, and their last known mailing addresses. The list will be kept as part of the records of the company. The Company shall update the list of Members from time to time as necessary to maintain accurate records.

### Section 7.02 Limited Liability of Members

Except as provided in Article Four, no Member will be required to contribute capital to the Company for the payment of any losses or for any other purposes, and no Member will be responsible or obligated to any third party for any debts or liabilities of the Company in excess of the sum of:

That Member's unpaid required contributions to the capital of the Company,

Unrecovered contributions to the capital of the Company, and

The Member's share of any undistributed profits of the Company.

### Section 7.03 Restrictions on Members' Withdrawal Rights

No Member may withdraw from the Company or receive a return of any contributions to the Company until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Member who does any of the following will be considered to have breached this Agreement:

Attempting to withdraw from the Company;

Interfering in the management of the Company affairs;

Engaging in conduct which results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Owning a Membership Interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings;

Breaching any confidentiality provisions of this Agreement; or

Failing to discharge a legal duty to the Company.

Any Member who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Member who has breached this Agreement.

### Section 7.04 Restrictions on Assignees' Withdrawal Rights

No Assignee has the right to receive a return of any contributions (whether the contributions were made by the Assignee or by an Assignor) until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Assignee who does any of the following will be considered to have breached this Agreement:

Interfering in the management of the Company affairs;

Engaging in conduct that results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Breaching any confidentiality provisions of this Agreement;

Bringing any legal action against the Company to force the dissolution of the Company, to force any distribution of Company assets, or to appoint a receiver; or

Failing to discharge a legal duty to the Company.

Any Assignee who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Assignee who has breached this Agreement.

### Section 7.05 No Right to Cause Dissolution

No Member may cause the dissolution and winding up of the Company by court decree or otherwise.

### Section 7.06 Waiver of Partition

Each Member, individually and on behalf of the Member's successors and assigns, expressly waives any right to have any Company property partitioned.

### Section 7.07 Expulsion of a Member

The Company may only expel a Member for violation of this Agreement or for failing to make the Capital Contributions as required in Article Four. A Member may only be expelled on the unanimous consent of all Members, excluding the Member to be expelled.

An expelled Member will lose all rights as a Member of the Company, and the expelled Member's interests will be converted to that of an Assignee.

### Section 7.08 Voting

Members may only vote on the following matters:

Removal of a Managing Member;

Election of a successor Managing Member;

Termination and dissolution of the Company;

Amendment of this Agreement;

The extension of the term of the Company; and

Any matter requiring the vote of the Members as set out elsewhere in this Agreement or in the Act.

Members may vote by written consent, with or without a formal meeting. Assignees may not vote.

### Section 7.09 Access to Information

Subject to the provisions of this section, each Member is entitled to all information regarding the Company under the circumstances and subject to the conditions stated in this Agreement and the Act. Assignees have no right to information regarding the Company.

All Members and any Assignee who obtains any information are subject to the confidentiality provisions of this section.

#### (a) Confidential Information

The Members acknowledge that they may receive information regarding the Company in the form of trade secrets or other information that is confidential, the release of which may be damaging to the Company or to persons with whom it does business. Each Member shall hold in strict confidence any information regarding the Company that is identified as being confidential and may not disclose it to any person other than another Member, except for disclosures:

Compelled by law (but the Managing Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable),

To advisors or representatives of the Member of the Company, but only if they have agreed to be bound by the provisions of this section, or

Of information that Member also has received from a source independent of the Company that the Member reasonably believes it obtained without breach of any obligation of confidentiality.

#### (b) Enforcement through Specific Performance

The Members acknowledge that disclosure of confidential information may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the provisions of this section may be enforced by specific performance.

## Article Eight
## Meetings & Notice

### Section 8.01 Special Meetings

Special meetings of the Members may only be called by a majority in interest of the Members. Special meetings of the Members may only be called upon delivery to the

Members of notice of a special meeting of the Members given in accordance with this Agreement.

### Section 8.02 Notice of Meetings

The Company shall deliver notice (stating the date, time, and place of any meeting of the Members and a description of the purposes for which the meeting is called) to each Member of record entitled to vote at the meeting at the address as appears in the records of the Company at least 2 but no more than 30 days before the date of the meeting.

### Section 8.03 Waiver of Meeting Notice

A Member may waive notice of any meeting, before or after the date and time of the meeting as stated in the notice, by delivering a signed waiver to the Company for inclusion in the minutes. A Member's attendance at any meeting, in person or by proxy, waives objection to lack of notice or defective notice of the meeting, unless the Member objects to holding the meeting or transacting business at the meeting and waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

### Section 8.04 Voting by Proxy

The Members may appoint a proxy to vote or otherwise act for the Members pursuant to a written appointment form executed by the Member or the person's attorney in fact. An appointment of a proxy is effective when received by the secretary or other officer or agent of the Company authorized to tabulate votes. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 11 months unless otherwise expressly stated in the appointment form, or unless the authorization is revoked by the Member who issued the proxy.

### Section 8.05 Action by Consent

Any Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by all the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action taken, which consents, in the aggregate, are signed by all of the Members entitled to vote on the action and delivered to the Company for inclusion in the minutes.

### Section 8.06 Quorum

The presence of Members holding at least two-thirds of the Membership Interests constitutes a quorum for any meeting of the Members.

### Section 8.07 Presence

Any Member may participate in any meeting through the use of any means of communication by which all Members participating may simultaneously hear each other during the meeting. Any Member so participating will be deemed to be present in person at the meeting.

### Section 8.08 Conduct of Meetings

At any meeting of the Members, the Members shall appoint a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, to be kept with the records of the Company.

### Section 8.09 Approval or Consent of Members

Unless provided otherwise by the Act or this Agreement, any action of the Members requires a vote or written consent of at least two-thirds of the Members in favor of the action.

## Article Nine
## Books, Records, and Bank Accounts

### Section 9.01 Books and Records

The Company shall keep books of account with respect to the operation of the Company at the principal office of the Company, or at any other place as the Members determine. All Members and their duly authorized representatives will have access to the books at all reasonable times. The Company shall keep the following records:

A current list of the full name and last known address for delivery of notices of each Member;

A copy of the Articles of Organization (together with any amendments) and copies of any powers of attorney under which any certificate has been executed;

Copies of the Company's federal, state, and local income tax returns and reports, if any, for the 3 most recent years;

Copies of this Agreement (together with any amendments);

Copies of any financial statements of the Company for the 3 most recent years; and

Any other documents required by law.

### Section 9.02 Accounting and Taxable Year

The Company shall keep books of account consistent with any method authorized or required by the Internal Revenue Code and as determined by the Members. The Company shall close and balance the books at the end of each Company year. The Taxable Year of the Company will be the period authorized or required by the Internal Revenue Code, and as determined by the Members.

### Section 9.03 Reports

Within a reasonable time after the end of each Taxable Year the Company shall provide each Member with the information necessary to allow each Member to prepare and file their respective tax returns. The Company shall prepare all financial statements at the expense of the Company.

### Section 9.04 Bank Accounts and Company Funds

The Company shall deposit all cash receipts in the Company's depository accounts. All accounts used by or on behalf of the Company are property of the Company, and will be received, held, and disbursed by the Manager for the purposes specified in this Agreement. The Members shall not commingle Company funds with any other funds.

## Article Ten
## Admission of Additional Members

### Section 10.01 Admission by Unanimous Consent of Members; Prerequisites

Additional Members may only be added after the unanimous consent of the Members. Before being admitted as a Member, a prospective Member must first:

> Provide evidence satisfactory to the Company that admission of the prospective Member will not violate any applicable securities law, cause a termination of the Company under applicable provisions of the Code, or alter the status of any tax election made by the Company;
>
> Pay all reasonable expenses connected with admission as a Member, including professional fees incurred in obtaining opinions or valuations; and
>
> Agree to be bound by all of the terms and provisions of this Agreement by signing the Agreement.

### Section 10.02 Capital Contributions and Fair Market Value

Other than contributions of cash or publicly-traded securities, the fair market value of any property to be contributed by an additional Member as its initial Capital Contribution will be determined as agreed upon by the additional Member and the holders of a majority of the Membership Interests before the contribution is made. In the alternative, the Managing Member shall appoint a disinterested appraiser to determine the value of the property to be contributed.

### Section 10.03 No Admissions in Violation of this Article

Any attempt to admit an additional Member in violation of this Article will be null and void and of no effect.

## Article Eleven
## Transfer of Membership Interests by a Member

### Section 11.01 Restrictions on Transfer

Except as provided in this Article, no Member may transfer any Membership Interest either voluntarily or involuntarily by any means without the unanimous written consent of all Members. The Members are not required to consent to any attempted transfer and will not be subject to any liability for withholding consent.

Any attempted transfer of a Membership Interest or the admission of a Substitute Member in violation of the provisions of this Article will be null and void.

### Section 11.02 Transfer of Interest

No Member may transfer any Membership Interest without first offering in writing to sell the interest to the Company and to all other Members as provided in this section.

#### (a) Notice

A Member who intends to transfer a Membership Interest must first give notice to the Company and to all other Members of the Member's intent to transfer. Any notice of intent to transfer must include the following information.

##### (1) Writing Explaining Terms of Offer

If the Member received a written offer, then a copy of that written offer must be attached to the notice. If the Member received only an oral offer, then a written explanation of the oral offer must be attached to the notice.

The written explanation must be complete in all details respecting the purchase price and terms of payment.

##### (2) Certification of Genuine Offer

The Managing Member shall certify in the written notice that the offer is genuine to the best of the Managing Member's knowledge.

#### (b) Company's Priority Right to Purchase

The Company has the first right to purchase all or any portion of the Membership Interest according to the terms of any written notice of an offer except as the Company may elect to modify the terms as provided in Section 11.02(d) below. The Company may exercise this first right to purchase by giving written notice of the Company's intent to purchase to the selling Member within 90 days of receipt of the written notice of the offer.

#### (c) Other Members' Priority Right to Purchase

If the Company does not provide written notice of an intent to purchase the Membership Interest within 90 days, or if the Company provides written notice of an intent not to purchase the Membership Interest, any Member may purchase any portion of the Membership Interest according to the terms of the offer except as the Member may elect to modify the terms as provided in Section 11.02(d) below. A Member may exercise this right to purchase by giving notice of intent to purchase to the selling Member within 120 days of receipt of the written notice of the offer.

If more than one Member exercises the right to purchase the same Membership Interest, each Member may purchase a *pro rata* share of the Membership Interest in accordance with each Member's respective Membership Interest in the Company before the offer of sale.

### (d) Payment Terms under Company's or Members' Priority Right to Purchase

If the Company or a Member exercises the priority right to purchase a Membership Interest as provided above, then the Company or purchasing Member may, at the buyer's discretion pay the purchase price either:

According to the payment terms specified in the written notice of the offer provided by the selling Member, or

By delivery of an unsecured promissory note made by the buyer for the amount of the purchase price.

If the buyer chooses to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. The buyer may prepay the note in whole or in part at any time without penalty.

### (e) Closing on Purchase by the Company or a Member

The closing of any purchase of a Membership Interest under this section will occur at the principal office of the Company within 150 days from the date of the notice of intent to sell.

### (f) Transfer to Third Party After Nonexercise of Priority Right

If neither the Company nor any Member exercises their respective priority right to purchase the Membership Interest, the selling Member may transfer its Membership Interest to the party that made the original offer for the purchase price on the terms contained in the original offer.

The closing on any transfer to a third party under this section must occur within 60 days from the earlier of the expiration of the Company's and the other Members' priority rights to purchase or the date on which the Company and all other Members have provided written notice of their intent not to exercise their respective priority rights to purchase. If the Membership Interest is not sold to the prospective purchaser within the specified time, the Company and the other Members will again be offered an opportunity to exercise their respective priority rights to purchase the Membership Interest as provided in Section 11.02(b) and Section 11.02(c) above.

## Section 11.03 Additional Restrictions on Transfer

If any proposed transfer of Membership Interests or addition of a Substitute Member will result in termination of the Company under either Section 708(b) of the Internal Revenue Code or the Act, then the transfer is prohibited unless the Members specially approve the

transfer. If not approved by the Members, the attempted transfer will be disregarded and void *ab initio*.

The Members, however, may not approve any transfer or addition of a Substitute Member that violates any applicable federal or state securities law.

### Section 11.04 Transferee Treated as an Assignee Until Admitted as a Substitute Member

The transferee of a Membership Interest will hold the interest only as an Assignee until the transferee satisfies all the requirements of Section 11.05 to become a Substitute Member. As an Assignee, the transferee will have only those rights set forth in Section 11.06 of this Agreement.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

### Section 11.05 Conditions Required to Become a Substitute Member

An Assignee will not become a Substitute Member and will not have any rights as a Member until all of the conditions set forth in this section have been fully satisfied.

#### (a) Consent of the Members

All Members other than the assigning Member consent in writing to the admission of the Assignee as a Substitute Member.

#### (b) Execution of All Other Agreements

The assigning Member and the Assignee shall execute, acknowledge, and deliver to the Company instruments of transfer and assignments as are in form and substance satisfactory to the Company, including the written acceptance and adoption by the Assignee of this Agreement.

#### (c) Payment of a Reasonable Transfer Fee

An Assignee shall pay a reasonable transfer fee to the Company. The Company may establish the amount of the transfer fee on a case-by-case basis.

#### (d) Effective Date of Admission as Substitute Member

The effective date of an admission as a Substitute Member is the date on which all the remaining Members vote to accept the Assignee as a Substitute Member in accordance with this Agreement.

### Section 11.06 Rights and Limitations of an Assignee

An Assignee will be entitled to receive distributions from the Company to the same extent that the transferring Member would receive under this Agreement. Until the effective date that an Assignee is admitted as a Substitute Member, both the Company and the Members will treat the assignor of the transferred Membership Interest as the absolute owner of the transferred Membership Interest except with respect to any member distributions made which are attributable to the transferred Membership Interest.

An Assignee has substantially fewer rights than a Member. Assignees only hold a right to receive economic benefits when distributed from the Company in respect to the assigned Membership Interest. Other limitations on Assignees' rights include:

Access only to those Company records and information specifically authorized for the Assignees under the Act;

No right to vote in any Company matters; and

No other legal or economic rights.

### Section 11.07 Permitted Transfers

A Member may transfer a Membership Interest without the consent of any other Member to a trust for his or her benefit, to his or her spouse, to a trust for the benefit of his or her spouse, to his or her immediate family or to a trust for the benefit of his or her immediate family, so long as the proposed transfer does not:

Cause the Company to terminate for federal income tax purposes; or

Result in any event of default as to any secured or unsecured obligation of the Company; or

Cause a reassessment of any real property owned by the Company; or

Cause other adverse material impact to the Company.

The transferee of a Membership Interest transferred permitted by this section will be admitted as a Substitute Member without the necessity of compliance with Section 11.05, but the Company may require the transferee to accept the provisions of this Agreement in writing.

### Section 11.08 Amendment of Operating Agreement and Articles of Organization

If required by law, upon the admission of a new Member, the Company shall amend the Operating Agreement or the Articles of Organization to reflect any substitution of Members.

#### (a) Substitute Member Acceptance upon Amendment

Until the Operating Agreement or Articles of Organization is amended as contemplated by this section, an Assignee will not become a Substitute Member.

#### (b) Assessment of Fees

The Company may assess any fees, costs, or other expenses of any amendments made by reason of the admission of a Substitute Member against the Substitute Member whose entry into the Company necessitates the amendment.

### Section 11.09 Disability of a Member

If a Member becomes totally disabled, and continues to be totally disabled for a period of 24 months, the other Members may elect to purchase, and the disabled Member must sell, within 60 days after the expiration of the 24-month period, all of the disabled Member's

Membership Interest in the Company upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the disabled Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The terms "total disability" and "disability" mean a Member's inability to perform the material and substantial duties of his or her regular occupation.

The purchase price for the disabled Member's Membership Interest will be determined in accordance with the provisions of Section 11.12, with the date for determination of the purchase price being the end of the 24 month period described above.

If the disabled Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the disabled Member either:

> in cash or by certified check, within 60 days after the expiration of the 24-month period, or

> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the other Members choose to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each of the Members may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the disabled Member will deliver an assignment to each purchaser of his or her Membership Interest, together with any other instruments required by the Company, so that full and complete title to the Membership Interest can be transferred on the books of the Company.

Until the sale is complete, the agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled Member may exercise all of the Member's rights and voting authority and is entitled to receive distributions of cash or other property from the Company on behalf of the Member, but only if the agent or legal representative is a person or entity specifically listed as a permitted transferee in Section 11.07. An agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled member may consummate the sale to the other Members under this Section, including the execution of all necessary documents on the disabled Member's behalf, and collecting any payment on behalf of the disabled Member. If there is more than one agent or legal representative entitled to act for a disabled Member, the Company will designate in writing which agent or legal representative may act on behalf of the disabled Member.

## Section 11.10 Death of a Member

If a Member dies, the surviving Members may elect to purchase, and the deceased Member's legal representative or the heirs, distributes, or beneficiaries of the deceased

Member, as the case may be, must sell the deceased Member's Membership Interest in the Company within 60 days after the date of death of the deceased Member, upon the terms and conditions provided in this Section. Each of the surviving Members will purchase that portion of the deceased Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the deceased Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the deceased Member's Membership Interest is purchased pursuant to the provisions of this Section, the surviving Members will pay the purchase price to the deceased Member's estate either:

> in cash or by certified check, within days after the date of death of the deceased Member, or
>
> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the estate of the deceased Member will deliver an assignment to the surviving Members of the deceased Member's Membership Interest in the Company, together with any other instruments required by the Company, including inheritance tax waivers, so that full and complete title to the deceased Member's Membership Interest in the Company can be transferred on the books of the Company.

If a sale to the surviving Members is not completed, and except for transfers to those persons or entities specifically listed as permitted transferees in Section 11.07, any Membership Interest that is transferred as a result of the death of a Member will be an Assignee interest.

A transferee of any transfer under this section will be bound by all of the terms and conditions of this Agreement.

### Section 11.11 Retirement of a Member

If a Member elects to retire or otherwise voluntarily cease employment with the Company, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company as provided in this Section.

Within 60 days after the notice is delivered, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership

Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

If a Member's employment in the Company is terminated for cause, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company.

If the other Members desire to purchase the retiring Member's Membership Interest, they must give written notice to the retiring Member of their election to purchase all of the retiring Member's Membership Interest within 30 days after receipt of Company's notice. Within 60 days after the other Members give notice of their election to purchase all of the retiring Member's Membership Interest, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the retiring Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the retiring Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the retiring Member either:

> in cash or by certified check, within 60 days from the date of notice of the election to purchase, or
>
> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the retiring Member will deliver an assignment to the purchasers of his or her Membership Interest in the Company, together with any other instruments required by the Company, so that full and complete title to his or her Membership Interest in the Company can be transferred on the books of the Company.

### Section 11.12 Purchase Price

For purposes of a purchase of a Membership Interest in the Company referring to this Section, the purchase price for a Member's Membership Interest in the Company will be the fair market value of the Member's membership Interest determined pursuant to this Section.

Within 60 days after the end of each Taxable Year, the Members will determine the fair market value of each one percent Membership Interest in the Company for the then current Taxable Year, and will execute a certificate of valuation setting forth the fair market value. The Members at any time may execute a new certificate of valuation, revising the fair market value of each one percent Membership Interest in the Company. The most recent certificate of valuation, duly executed by the Members, will supersede all prior certificates of valuation. The fair market value of each one percent Membership Interest in the Company as redetermined from time to time will take into account the tangible and intangible assets of the Company, and other relevant factors, and liabilities of the Company. Good Will is an asset of the Company.

If the Members fail to redetermine the fair market value of each one percent Membership Interest in the Company within 60 days after any Taxable Year, the fair market value of each one percent Membership Interest in the Company for the purpose of establishing the purchase price will be determined by appraisal as follows:

> Not less than ten days prior to the date of the purchase, the seller of the Membership Interest must appoint one Qualified Appraiser, and the purchaser or purchasers of the Membership Interest must appoint one Qualified Appraiser.
>
> If either the seller or the purchasers fail to appoint a Qualified Appraiser, the Qualified Appraiser appointed by the other will determine the fair market value of each one percent Membership Interest in the Company owned by the seller.
>
> If the two Qualified Appraisers appointed by the seller and the purchasers fail to agree upon the fair market value of each one percent Membership Interest in the Company owned by the seller, the two Qualified Appraisers must appoint a third Qualified Appraiser five days prior to the date of the purchase, and the determination of the fair value of each one percent Membership Interest in the Company by the majority of the Qualified Appraisers will be binding upon all parties.
>
> The seller and purchasers will bear the costs of any Qualified Appraisals.

## Section 11.13 Voting Rights of Transferred Interests

A Member who transfers a Membership Interest to an Assignee will continue to hold all voting rights associated with the assigned interest until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

In the case of an Assignee who holds an interest received as a result of the death of a Member, the voting rights associated with the transferred interest will be suspended and disregarded for purposes of calculating votes until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

### Section 11.14 Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed

The Company is not required to recognize the purported interest of any transferee or Assignee who alleges to have received any interest other than by an authorized transfer or Assignment as provided under this Agreement. If the ownership of a Membership Interest is in doubt, or if there is reasonable doubt as to who is entitled to a distribution attributable to an interest, the Managing Member may accumulate the amounts to be distributed until this issue is finally determined and resolved. The Managing Member shall credit any accumulated amounts to the Capital Account associated with the interest.

### Section 11.15 Creditor Rights; Charging Order Sole Exclusive Remedy

If a creditor obtains a judgment by a court of competent jurisdiction against any Member or Assignee, the court may charge the Member or Assignee's interest with payment of the unsatisfied amount of the judgment from distributions attributable to the affected interest, but only to the extent permitted by the Act. To the extent any interest is charged with satisfaction of a judgment, the judgment creditor will receive no more than the rights of an Assignee; the creditor will not be admitted as a Member of the Company.

The charging order is the exclusive remedy by which a judgment creditor of a Member or an Assignee of a Membership Interest may obtain any satisfaction from the Company toward any judgment against the Member or Assignee. This section does not deprive any Member or Assignee of rights under any exemption laws available to the Member or Assignee.

### Section 11.16 Company's Unilateral Purchase Option for Interest Acquired without Consent

The Company will have the unilateral option to purchase any interest acquired by any transferee as provided in this section. For purposes of establishing the value of the interest under this provision, the interest will be deemed to be the interest of an Assignee.

#### (a) Circumstances Triggering Purchase Option

Any of the following circumstances will trigger the Company's unilateral right to purchase a transferee's interest. Collectively these events are referred to as "triggering events":

> If the Membership Interest of a deceased Member passes to an individual or entity other than as permitted under Section 11.10;
>
> If any individual, entity, organization, or agency obtains a Member's interest, whether inclusive or exclusive of voting rights as a result of:
>
> > Any valid court order that the Company is required by law to recognize;
> >
> > Being subject to a lawful charging order by a court of competent jurisdiction;

A levy or other transfer of a Membership Interest, with voting rights, that the Company has not approved but that the Company is required by law to recognize; or

Any decree of divorce or equitable division or property that transfers a Membership Interest in the Company.

If the Company's unilateral purchase option is exercised, the Company will purchase the affected interest of the transferee for the fair market value of the interest, valued as the interest of an Assignee.

If the interest is transferred subject to a divorce decree or equitable division of property, the Company's unilateral option as to the transferred interest will be suspended for a period of 90 days, and the divorcing Member will have all of the rights of the Company as set forth in this Section. If the divorcing Member fails to initiate exercise of the option within the 90-day period, the Company's unilateral option right will be restored.

### (b) Terms and Conditions of Exercisable Purchase Option

If the Company elects to exercise its unilateral purchase option, the following terms and conditions will apply to the transaction.

#### (1) Written Notice of Intent to Purchase

The Company will provide written notice to the Assignee or transferee within 90 days of the triggering event that the Company intends to purchase the interest. If the Company does not provide written notice within 90 days of the triggering event, the Company's unilateral purchase option will lapse.

#### (2) Exercise of Option and Date of Valuation

If the Company provides written notice of its intent to exercise its purchase option, then the Company may exercise the option within 180 days from the first day of the month following the month in which the Company provided the notice.

The valuation date for the interest to be purchased will be the first day of the month following the month in which notice is delivered.

#### (3) Written Appraisal Requirement

Unless the Company and the transferee or Assignee agree otherwise, the fair market value of any interest subject to the Company's purchase option will be determined by Qualified Appraisal performed by a Qualified Appraiser selected by the Company. The Qualified Appraiser must be qualified to perform business appraisals and to value limited liability company or partnership interests.

### (4) Acceptance or Rejection of Valuation

If the transferee objects to the appraiser's valuation report, it must deliver written notice of the transferee's objection to the Managing Member within 30 days from the date the transferee is provided with written notice of the valuation report. If the transferee does not object in writing within the required period, the report will be accepted as written.

If the transferee objects to the valuation report, closing of the sale will be postponed for a reasonable time until the valuation of the interest is resolved.

### (5) No Voting Rights during Purchase Option Period

Until the closing, the transferee will not be allowed to exercise any vote attributable to the interest that is subject to the purchase option. The transferee will be entitled to all items of income, deduction, gain, or loss from the interest. The transferee of the interest will be an Assignee unless all conditions have been satisfied for the transferee to become a Substitute Member as described in Section 11.05.

### (6) Location and Date of Closing

Closing of any sale under this section will occur at the principal office of the Company within 45 days of the date on which the valuation report is accepted by the transferee or the date on which the valuation of the interest is otherwise resolved.

### (7) Payment of Terms upon Exercise of Option

In order to prevent unduly burdening the Company's resources, the Company may unilaterally elect to pay any purchase money obligation in 30 equal annual installments. If the remaining term of the Company is less than 30 years, the Company may make equal annual installments over the remaining term of the Company. Interest on any unpaid principal amount will be determined at market rates determined as of the closing date and, at the option of the Company, may be adjusted annually as of the first day of each Taxable Year.

In determining whether the remaining term of the Company is less than 30 years, the Company may assume that any option to extend the Company term will be exercised by the Members. If the option to continue is not exercised, then the balance will become due and payable immediately upon dissolution of the Company.

The first installment of principal and interest will be due and payable on the first day of the Taxable Year following the

closing date. Subsequent annual installments will be due and payable on the first day of each subsequent Taxable Year until the entire obligation is fully paid. The Company may prepay any part of any purchase money obligation at any time without premium or penalty.

### Section 11.17 Assignee or Charging Order Holder Assumes Tax Liability

The Assignee of a Membership Interest and any person who acquires a charging order against a Membership Interest shall report income, gains, losses, deductions and credits with respect to the interest for the period in which the Assignee interest is held or for the period the charging order is outstanding.

## Article Twelve
## Dissolution and Termination

### Section 12.01 Dissolution of the Company

The Company will be dissolved only upon the occurrence of an event described in this section.

#### (a) Date Designated by the Members

The Company will be dissolved on a date designated by the Members.

#### (b) Judicial Dissolution

The Company will be dissolved upon the entry of a decree of judicial dissolution by a court of competent jurisdiction.

Upon dissolution, the Company shall thereafter conduct only activities necessary to wind up its affairs.

### Section 12.02 Liquidation of the Company Property

Upon dissolution of the Company, the Managing Member, or a liquidator appointed by a majority of the Members, shall liquidate the Company property, apply and distribute the proceeds from the liquidation of the property as contemplated by this Agreement, and cause the cancellation of the Company's Articles of Organization.

#### (a) Payment of Creditors and Provision for Reserves

The proceeds derived from the liquidation of property will first be applied toward or paid to any creditor of the Company who is not a Member in the order of priority of payment to any creditor as required by applicable law. After payment of liabilities owing to creditors, excluding Members, the Managing Member or liquidator shall set up a reserve of assets as the Managing Member or liquidator determines is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.

#### (1) Ability to Create an Escrow Account

Any reserves for contingent liabilities may, but need not, be paid over by the Managing Member or liquidator to a bank to be held in escrow for later payment.

#### (2) Distribution of Reserves

The Managing Member or liquidator shall distribute any remaining reserves after the Managing Member or liquidator is reasonably satisfied that any liabilities have been adequately resolved. The remaining reserves will be distributed to the Members or their assigns in the order of priority set forth in the provisions of this Agreement relating to distributions to the Members.

### (b) Distribution of Property after the Payment of Liabilities and Establishment of Reserves

After paying liabilities and providing for reserves, the Managing Member or liquidator shall satisfy any debts owed to Members with the remaining net assets of the Company, if any, and then distribute any remaining assets to the Members in proportion to their positive Capital Account balances.

### (c) Non-Cash Assets

If any part of the net assets distributable to the Members consists of notes or accounts receivable or other non-cash assets, the Managing Member or liquidator may take whatever steps it considers to be appropriate to convert the assets into cash or any other form to facilitate distribution. If any assets of the Company are to be distributed in kind, those assets will be distributed using their fair market value at the date of distribution, as determined by the Managing Member or liquidator.

## Section 12.03 Company Property Sole Source

Company property is the sole source for the payment of any debts or liabilities owed by the Company. Any return of capital contributions or liquidation amounts to the Members or Assignees (or both if the Company has Members and Assignees) will be satisfied only to the extent that the Company has adequate assets. If the Company does not have adequate assets to return the capital contributions, neither the Members nor Assignees will have any recourse against the Company or any other Members or Assignees, except to the extent that other Members may have outstanding debts or obligations owing to the Company.

## Section 12.04 Sale of Company Assets during Term of the Company

The sale of Company assets during the term of the Company does not constitute liquidation, dissolution, or termination of the Company as defined under this Article. The Company may reinvest the sale proceeds in other assets consistent with the business purposes for the Company. Further, the Members may participate in any real property exchange as defined in Code Section 1031 if the exchange fulfills the business purposes of the Company.

# Article Thirteen
# Dispute Resolution Provisions

The provisions of this Article are intended to supersede any rules governing mediation or arbitration under the law of Colorado or any other jurisdiction.

## Section 13.01 Resolution of Disputes among Members and within the Company

The Members shall use the procedure outlined in this Article to resolve any dispute, contest, or claim that may result among any of the Members or between one or more of the Members and the Company that may relate to this Agreement. It is the objective and purpose of all parties to resolve all disputes, contests, and claims without litigation using the alternative dispute resolution procedures set out in this Article.

## Section 13.02 Notice of Controversy and Designation of Authorized Representatives

Any person who has any dispute relating to the Company shall provide written notice to all Members and to any other person that has an interest in the controversy, describing the general nature of the controversy. The notice will designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of claimant. Two or more claimants may designate a common authorized representative.

Each respondent shall also designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of the respondent. Two or more respondents may designate a common authorized representative.

Written notice of the designation of the authorized representatives will be delivered to each party within 10 business days from the date the respondents receive notice of the controversy.

## Section 13.03 Commencement of Dispute Resolution Procedure

The authorized representatives shall conduct an initial meeting within 30 days from the date the claimant's notice is delivered to the respondents. The authorized representatives are entitled to collect and review all relevant evidence pertaining to the controversy and to negotiate and make a final determination to resolve the controversy. Resolution of any controversy by the authorized representatives will be conclusive and binding on all parties.

If the authorized representatives do not resolve the controversy within 30 days from the date of their initial meeting, they shall discontinue direct negotiations and submit the controversy to mediation.

## Section 13.04 Selection of a Mediator

Within 5 days of discontinuing direct negotiations the authorized representatives shall each submit to the other a written list of persons whom they consider to be qualified to serve as a mediator. Within 15 days after they exchange their lists of potential mediators the authorized representatives shall agree upon one mediator to mediate the controversy.

If the authorized representatives do not agree upon a mediator the controversy will be submitted to binding arbitration pursuant to Section 13.10.

## Section 13.05 Time and Place for Mediation Conference

The authorized representatives shall promptly designate a mutually convenient time and place for the mediation. If the authorized representatives fail to do so the controversy will be submitted to binding arbitration pursuant to Section 13.10.

## Section 13.06 Discovery and Exchange of Information

The Authorized Representatives are entitled to fully discover, obtain, and review all information relevant to the resolution of any controversy.

## Section 13.07 Delivery of Written Summaries; Authority to Obtain Professional Assistance

At least 7 days before the first mediation conference each authorized representative shall deliver a concise written summary of fact and law pertaining to the issues to be resolved to the mediator. The authorized representatives and the mediator may retain legal counsel, accountants, appraisers, and other experts whose opinions may assist the mediator in resolving the controversy.

## Section 13.08 Conduct of Mediation

The mediator shall determine the format for mediation conferences designed to ensure that the mediator and the authorized representatives have an equal opportunity to review the evidence and any relevant technical and legal presentations. The mediator shall determine the time schedule for the resolving the mediation and shall attempt to facilitate the parties' efforts in achieving a final resolution of all issues in dispute.

If the mediator is unable to facilitate a final resolution, then any remaining unresolved issues will be resolved by arbitration as provided in Section 13.10.

## Section 13.09 Final Determinations are binding on All Parties

Any final determination made by the authorized representatives or a mediator or arbitrator will be binding upon each party who receives notice of a controversy even if the party does not respond or designate a representative, or if the authorized representative of the party fails or refuses to participate in the designation of a mediator.

## Section 13.10 Arbitration

To the extent a final resolution of any controversy is not made according to the alternative dispute resolution procedures provided in this Article, the parties to the controversy shall submit to mandatory and binding arbitration. The controversy will be settled by arbitration according to the provisions of the Commercial Arbitration Rules of the American Arbitration Association. Any judgment rendered by the arbitrator may be entered in any court having competent jurisdiction. The arbitrator may conclude arbitration proceedings without a decision if the arbitrator determines that insufficient evidence was produced through the arbitration process to support a decision.

### Section 13.11 Settlement during Mediation or Arbitration

At any time before the conclusion of any mediation or arbitration, the authorized representatives may enter an agreement resolving the controversy. Any settlement agreement will be conclusive and binding on all parties.

### Section 13.12 Qualified Appraisals

If, it is necessary to obtain a Qualified Appraisal of the value of a Membership Interest in order to resolve a dispute, each of the parties to the dispute may choose a Qualified Appraiser to provide a valuation. In the alternative, the parties may agree to select one Qualified Appraiser. The mediator or arbitrator will determine to what extent the Qualified Appraisal will be used in resolving any dispute.

### Section 13.13 Right to Seek Equitable Relief

If a party materially breaches this Agreement, and if the other parties determine in good faith that the circumstances of the breach require immediate relief, the parties who allege the material breach may seek temporary restraining orders, preliminary injunctions, or similar provisional, equitable relief in a court of competent jurisdiction.

### Section 13.14 Prevailing Party is entitled to Recover All Reasonable Costs

The party who prevails in any dispute between one or more of the Members between any Member or Manager and the Company or between the Members themselves is entitled to recover from the losing party all reasonable costs incurred, including any attorney's fees and any costs of mediation, arbitration, court fees, appraisals, and expert witnesses' costs.

## Article Fourteen
## General Matters

### Section 14.01 Successors and Assigns

Subject to the restrictions on transfer provided in this Agreement, this Agreement is binding upon and will inure to the benefit of the Members, their respective successors, personal representatives, heirs, and assigns.

### Section 14.02 No Waiver

The failure of any Member to insist upon strict performance of any provision or obligation of this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligations under this Agreement, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

### Section 14.03 Definitions

For purposes of this Agreement, the following terms have the following meanings:

### (a) Act

*Act* means the Colorado Limited Liability Company Act. A.R.S. § 29-601 et seq., as amended from time to time.

### (b) Additional Member

*Additional Member* means a Member who is admitted to the Company after the execution of this Agreement, but who is not a Substitute Member.

### (c) Additional Capital Contribution

See *Capital Contribution.*

### (d) Affiliated Person

*Affiliated Person* means a Member, a member of an individual Member's Immediate Family, a Legal Representative, successor, Assignee, or trust for the benefit of a Member and members of the Immediate Families of the individual Member, and any corporation or other legal entity of which a majority of the voting interest is owned by any one or more of Affiliated Persons.

### (e) Agreement

*Agreement* means this Operating Agreement as it may be amended from time to time.

### (f) Articles of Organization

*Articles of Organization* means the Articles of Organization filed with the Secretary of State of Colorado as required by the Act as amended from time to time, or any other similar instrument as may be required to be filed by the laws of any other state in which the Company intends to conduct business.

### (g) Assignee

*Assignee* means the recipient of a Membership Interest by *Assignment.*

### (h) Assignment

*Assignment* means any method, whether direct or indirect or whether voluntary or involuntary, by which the legal or beneficial ownership of any interest in the Company is transferred or changed, including:

> Any sale, exchange, gift, or any other form of conveyance, assignment or transfer;
>
> A change in the beneficial interests of any trust or estate which holds any interest in the Company and a distribution from any trust or estate;
>
> A change in the ownership of any Member or Assignee which is a corporation, partnership, limited liability company or other legal entity, including the dissolution of the entity;

A change in legal or beneficial ownership or other form of transfer resulting from the death or divorce of any Member or Assignee or the death of the spouse of any Member or Assignee;

Any transfer or charge under a charging order issued by any court;

Any levy, foreclosure, or similar seizure associated with the exercise of a creditor's rights in connection with a mortgage, pledge, encumbrance, or security interest.

*Assignment* does not include any mortgage, pledge, or similar voluntary encumbrance or grant of a security interest in any interest in the Company.

### (i) Bankrupt

*Bankrupt* as used in this Agreement means the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors or other action taken voluntarily or involuntarily, by a Member under any Federal or State law for the benefit of an insolvent party. It does not include any filing of a petition of involuntary bankruptcy against a Member if the petition is dismissed within 45 days from the date of filing, nor does it include the issuance of a charging order against the interest of a Member, if the charging order is removed within 10 days from the service of the charging order.

### (j) Capital Account

*Capital Account* means the account established and maintained for each Member as provided in Section 4.04 and as provided in Treasury Regulation § 1.704-1(b)(2)(iv), as amended from time to time.

### (k) Capital Contribution

*Capital Contribution* means the total cash and other consideration contributed and agreed to be contributed to the Company by each Member. Each *Initial Capital Contribution* is shown in Exhibit A of this Agreement, attached to and incorporated into this Agreement. *Additional Capital Contribution* means the total cash and other consideration contributed to the Company by each Member other than the Initial Capital Contribution. Any reference in this Agreement to the Capital Contribution of a current Member includes any Capital Contribution previously made by any prior Member with respect to that Member's interest. The value of a Member's Capital Contribution is the amount of cash plus the fair market value of other property contributed to the Company.

### (l) Cash Flow Earnings

*Cash Flow Earnings* means the net income, including capital gains income, realized by the Company for the Taxable Year, reduced or increased according to the following guidelines:

### (1) Reductions of Net Income

Net income will be reduced by the actual payment of items that are not deductible by the Company for federal income tax purposes, including non-deductible travel and entertainment expenses, charitable contributions, non-deductible interest payments, the payment of debt principal and interest, the acquisition of depreciable property during the Taxable Year to the extent that the cost is not fully deductible in the year of acquisition, and any other payment that represents an actual decrease in the cash available to the Company.

### (2) Increases in Net Income

Net income will be increased by the amount expended for federal income tax purposes for intangible costs and expenses. Intangible expenses shall include depreciation, depletion and amortization costs reported as deductions for federal income tax purposes, but not depreciation reported as an expense that is deductible under Section 179 of the Internal Revenue Code.

### (3) Treatment of Gain on Asset Sale

The gain from the sale of a Company asset will be included in determining the net income of the Company for distribution purposes to the extent of payments of the gain amount actually received by the Company for the Taxable Year. Deferred payments of gain pursuant to an installment sale or other deferred payment arrangement will be considered as income in the year a payment is actually received.

The computation of Cash Flow Earnings does not include income from a partnership, trust, limited liability company, or other organization classified by federal tax law as a pass-through entity to the extent that distributions of income from the pass-through entity are not actually received during the Taxable Year or within 60 days after the close of the Taxable Year. Subsequent distributions to the Company from a pass-through entity that are attributable to income realized and reported for a prior year will increase the cash flow earnings for distribution purposes.

Cash Flow Earnings determined for distribution purposes will not include reasonable reserves. Reserves are amounts reasonably needed for working capital, debt service, deferred maintenance, and for anticipated capital improvements.

Cash Flow Earnings will take into account the obligation of the Company to the payment obligations of interest to Members who have advanced funds to the Company as loans and the payment of any guaranteed payment obligations of the Company. The distribution of earnings may be deferred for a reasonable time to the extent that the Company does not have available

cash to satisfy the distribution amount. The term "available cash" indicates the actual cash of the Company in checking accounts, money market funds, and 90-day Treasury Bills.

### (m) Charity

*Charity* as used in this Agreement includes any organization of a type described in each of Sections 170(c), 2055(a), and 2522(a) of the Internal Revenue Code.

### (n) Charitable Trusts

*Charitable Trust* as used in this Agreement includes any charitable remainder trust created under Section 664 of the Internal Revenue Code or any charitable income trust created under Treasury Regulations Section 1.170A-6(c); Treasury Regulations Section 25.2522(c); or Treasury Regulations Section 20.2055-2(e).

### (o) Company

*Company* means VÄXA GLOBAL, LLC, an Colorado Limited Liability Company.

### (p) Company Minimum Gain

*Company Minimum Gain* means the minimum amount of gain that would be realized by the Company if the Company disposed of all Company property subject to the liabilities in full satisfaction of those liabilities, computed strictly in accordance with Treasury Regulation Section 1.704-2(b) and (d).

### (q) Delivery

*Delivery* means:

Personal delivery to a party, or

Mailing by certified United States mail to the last known address of the party to whom delivery is made, with return receipt requested to the party making delivery, or

Electronic transmission by facsimile to a party, provided that receipt is confirmed in writing or by electronic transmission back to the sending party, or

Electronic mail transmission to a party, provided that receipt is confirmed in writing or by electronic mail transmission back to the sending party.

The effective date of delivery will be the date of personal delivery or the date of the return receipt, if received by the sending party. If no return receipt is provided, then the effective date will be the date the transmission would have normally been received via certified mail, provided there is evidence of mailing.

### (r) Disability

*Disability* of a Member means that any one of the following has occurred:

> The Member has been declared to be incompetent, incapacitated, or otherwise legally unable to effectively manage his or her property or financial affairs by a court of competent jurisdiction;
>
> The Member's incapacity has been certified in writing by two licensed physicians, including the Member's personal physician, after examining the Member, or
>
> The Member has disappeared or is absent for unexplained reasons, causing the Member to be unable to manage his or her property or financial affairs effectively, or
>
> The Member is being detained under duress or under law, causing the Member to be unable to manage his or her property or financial affairs effectively.

A Member's disappearance or absence or detention under duress may be established by an affidavit of any other Member. The affidavit shall describe the circumstances of the individual's disappearance, absence, or detention and may be relied upon by any third party dealing in good faith with the Company in reliance upon the affidavit.

Upon regaining capacity, a formerly incapacitated Member will have all the rights, power, and authority originally granted to the Member by this Agreement.

### (s) Immediate Family

*Immediate Family* means any Member's spouse, other than a spouse who is legally separated from the person under a decree of divorce or separate maintenance; parents, parents-in-law, descendants, including descendants by adoption, brothers, sisters, brothers-in-law, sisters-in-law, and grandchildren-in-law..

### (t) Independent Person

*Independent Person* means an individual who is not related to or subordinate to a claimant or respondent of any controversy concerning the Company, is not a Member of the Company, and has no financial stake in the resolution of the controversy other than fair and reasonable compensation for services rendered in seeking to resolve the controversy.

### (u) Initial Capital Contribution

See *Capital Contribution*.

### (v) Internal Revenue Code

References to the *Internal Revenue Code* or to its provisions are to the Internal Revenue Code of 1986, as amended from time to time, and the corresponding Treasury Regulations, if any. References to the *Treasury*

*Regulations* are to the Treasury Regulations under the Internal Revenue Code in effect from time to time. If a particular provision of the Internal Revenue Code is renumbered, or the Internal Revenue Code is superseded by a subsequent federal tax law, any reference is deemed to be made to the renumbered provision or to the corresponding provision of the subsequent law, unless to do so would clearly be contrary to the Members' intent as expressed in this Agreement. The same rule applies to references to the Treasury Regulations.

### (w) Legal Representative or Personal Representative

As used in this Agreement, the term "Legal Representative" or "Personal Representative" means a person's guardian, conservator, executor, administrator, Trustee, or any other person or entity personally representing a person or the person's estate.

### (x) Majority in Interest; 85 percent in interest of the Members

*Majority in Interest* means that more than 50 votes out of 100 votes that may be cast will determine the matter subject to the vote.

*85 percent in interest of the Members* means that at least 85 votes out of the total 100 votes that may be cast will be determinative of a given matter.

### (y) Managing Member

*Managing Member* means the Members who are responsible for managing the business of the Company, or one or more Member Principals who have been appointed by the Members to manage the Company.

### (z) Market Rate of Interest or Market Rate

The terms *market rate of interest* or *market rate* means the rate of interest identified as the "prime rate" by the WALL STREET JOURNAL in its Money Rates column, or, if two or more rates are reported as the "prime rate," the average of the two or more. If Sections 483 and 1274A of the Internal Revenue Code apply to this transaction, the minimum rate of interest of the purchase money obligation will be fixed at the rate of interest then required by those sections.

### (aa) Member

*Member* means any person or legal entity designated in this Agreement as a Member or any person or legal entity who becomes a Member as provided in this Agreement.

### (bb) Members

*Members* means all of the Members of the Company.

### (cc) Member Minimum Gain

*Member Minimum Gain* means, with respect to a Member Nonrecourse Debt, the least amount of gain that would be realized by the Company if the

Company disposed of the encumbered Company property in full satisfaction of the encumbrance.

### (dd) Member Nonrecourse Debt and Member Nonrecourse Deductions

*Member Nonrecourse Debt* means nonrecourse Company debt for which one or more Members bears economic risk of loss as defined in Treasury Regulation Section 1.704-2(b)(4).

*Member Nonrecourse Deductions* means, for each Taxable Year, the Company deductions that are attributable to Member Nonrecourse Debt and are characterized as "Member Nonrecourse Deductions" under Treasury Regulation Section 1.704-2(b).

### (ee) Member Principal

The term *Member Principal* refers to a Member who has been appointed by the Members to represent the Company in operational management.

### (ff) Membership Interest

*Membership Interest* means the ownership interest and rights of a Member in the Company, including the Member's right to a distributive share of the profits and losses, distributions, and the property of the Company and the right to consent or approve Company actions. All Membership Interests are subject to the restrictions on transfer imposed by this Agreement. Each Member's interest is personal property and no Member will acquire any interest in any of the assets of the Company.

Each holder of a Membership Interest will have the right to vote the holder's proportionate interest in the Company with respect to all matters which all Members have a right to vote under this Agreement or by law.

> Example: A Member with a Membership Interest of 35.5 percent will have a 35.5 percent ownership interest in the Company, and will have 35.5 votes out of 100 votes that may be cast on matters that require the consent or affirmative action of the Members.

Membership Interests may be adjusted from time to time as provided in Article Three.

### (gg) Person

As used in this Agreement, *Person* has the same broad meaning as defined in Section 7701(a)(1) of the Internal Revenue Code. The term specifically includes the Company, its successors and assigns, each Member or Assignee, their successors, assigns, heirs, and personal representatives. The phrase "*each other person*" identifies any individual, corporation, partnership, limited liability company, trust, or other party whose interest may be affected, adversely or otherwise, by the resolution of any dispute, contest, or claim.

### (hh) Property

*Property* means all Company property and rights as described in Exhibit A and any property real or personal, tangible or intangible otherwise acquired by the Company.

### (ii) Qualified Appraiser and Qualified Appraisal

A *Qualified Appraiser* means an appraiser who is a Member of the American Society of Appraisers, Business Valuations Division and accredited to perform business appraisals or valuations by those respective organizations or, alternatively, a certified public accountant accredited in business valuation by the American Institute of Certified Public Accountants. A *Qualified Appraisal* means any appraisal performed by a Qualified Appraiser.

### (jj) Securities Act

*Securities Act* refers to the Securities Act of 1933, as amended.

### (kk) Substitute Member

*Substitute Member* means any person not previously a Member who acquires a Membership Interest and is admitted as a Substitute Member according to the terms of Section 11.05 of this Agreement.

### (ll) Taxable Year

*Taxable Year* means the calendar year or any other accounting period selected by the Manager. Taxable year is synonymous with fiscal year for all purposes of this agreement.

## Section 14.04 Changing the Company's Situs

The situs of this Company may be changed only by the unanimous written consent of all of the Members.

## Section 14.05 No Duty to Mail Articles of Organization

The Company does not have an obligation to deliver or mail copies of the Articles of Organization or any amendments to the Members unless required to do so by the Act.

## Section 14.06 General Matters

The following general provisions and rules of construction apply to this Agreement:

### (a) Multiple Originals; Validity of Copies

This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original.

Any person may rely on a copy of this Agreement that the Managing Member certifies to be a true copy to the same effect as if it were an original.

### (b) Singular and Plural; Gender

Unless the context requires otherwise, words denoting the singular may be construed as plural and words of the plural may be construed as denoting the singular. Words of one gender may be construed as denoting another gender as is appropriate within the context. The word "or" when used in a list of more than two items may function as both a conjunction and a disjunction as the context requires or permits.

### (c) Headings of Articles, Sections, and Subsections

The headings of Articles, Sections, and Subsections used within this Agreement are included solely for the convenience and reference of the reader. They have no significance in the interpretation or construction of this Agreement.

### (d) Governing Law

This Agreement is governed, construed, and administered according to the laws of Colorado, as from time to time amended, except as to trust property required by law to be governed by the laws of another jurisdiction and unless the situs of administration is changed as provided in Section 14.04.

### (e) Notices

Unless otherwise stated, whenever this Agreement calls for notice, the notice will be in writing and will be personally delivered with proof of delivery, or mailed postage prepaid by certified mail, return receipt requested, to the last known address of the party requiring notice. Notice will be effective on the date personally delivered or on the date of the return receipt. If a party giving notice does not receive the return receipt but has proof that he or she mailed the notice, notice will be effective on the date it would normally have been received via certified mail. If notice is required to be given to a minor or incapacitated individual, notice will be given to the parent or legal representative of the minor or incapacitated individual.

### (f) Severability

The invalidity or unenforceability of any provision of this Agreement does not affect the validity or enforceability of any other provision of this Agreement. If a court of competent jurisdiction determines that any provision is invalid, the remaining provisions of this Agreement are to be interpreted and construed as if the invalid provision had never been included in this Agreement.

### (g) Acceptance

Each Manager and Member hereby acknowledges and confirms that he, she, or it has reviewed this Agreement, accepts all its provisions, and agrees to be bound by all the terms, conditions, and restrictions contained in this Agreement.

*(Remainder of page intentionally left blank)*

**IN WITNESS WHEREOF,** the Members have executed this Restated Operating Agreement as of the day and year first above written.

**Växa Global, LLC**

**Greg Harrington**
Manager

**By:**____________________________
Its: Member
Date: January 1, 2018_____________

**EXHIBIT A**

IN WITNESS WHEREOF, the foregoing OPERATING AGREEMENT, CONSISTING OF 50 pages, respectively, was adopted on the day and date first above written by the Members of VÄXA GLOBAL, LLC.

| Name of Member | Total Contribution | Percentage of Ownership Interest |
|---|---|---|
| VÄXA GLOBAL, LLC | $ 500,000 | 100 % |
| **MEMBERSHIP INTEREST TOTALS** | **$ 500,000** | **100 %** |

**AMMENDMENT TO VAXA GLOBAL, LLC OPERATING AGREEMENT**

A limited liability company established in Nevada

We the members of Vaxa Global, LLC hereby resolve and confirm on **February 19, 2019** the following:

1. The limited liability company is organized to transact any and all lawful business for which a limited liability company may be organized under Nevada Law.

2. Members of Vaxa Global, LLC: Section Exhibit A of the current LLC operating agreement is to amend to read:

EXHIBIT A

IN WITNESS WHEREOF, the foregoing OPERATING AGREEMENT, CONSISTING OF 50 pages, respectively, was adopted on the day and date first above written by the Members of VĂXA GLOBAL, LLC.

| Name of Member | Total Contribution | Percentage of Ownership Interest |
|---|---|---|
| Easby Land and Cattle Company, LLC | $ 500,000 | 100 % |
| MEMBERSHIP INTEREST TOTALS | $ 500,000 | 100 % |

3. The Managers of Vaxa Global, LLC with authority to open accounts, conduct banking, and sign contracts on behalf of Vaxa Global, LLC are:

   Andraya H. Carson, Greg Harrington

All other sections of the attached current LLC Operating agreement of Vaxa Global LLC remain in full force and effect

***The undersign have dully executed this LLC operating agreement amendment on the date first written above:***

| ***Member:*** | ***Signature:*** |
|---|---|
| Greg Harrington | [signature] |

Andraya Carson

**EKSTRAK LABS LLC**

**Secretary's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Secretary of Ekstrak Labs LLC, a Nevada limited liability company (the "***Company***"), pursuant to Section 2.02(e) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and Two Rivers Water & Farming Company (the "***Exchange Agreement***"), hereby certifies, on behalf of the Company and not in a personal capacity, that:

1. Attached hereto as EXHIBIT A is a true, correct and complete copy of the Articles of Organization of the Company, as in full force and effect as of the date hereof, and such Articles of Organization have not been amended, modified or rescinded in any manner by the members or managers of the Company since August 29, 2018.

2. Attached hereto as EXHIBIT B is a true, correct and complete copy of the Operating Agreement of the Company, as in full force and effect on the date hereof, and such Operating Agreement has not been amended, modified or rescinded in any manner.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

Secretary

# <u>EXHIBIT A</u>

**Articles of Organization**

[attached]

*050106*

**BARBARA K. CEGAVSKE**
**Secretary of State**
**202 North Carson Street**
**Carson City, Nevada 89701-4201**
**(775) 684-5708**
**Website: www.nvsos.gov**

| Filed in the office of | Document Number |
|---|---|
| *Barbara K. Cegavske* (signature) | **20180381076-56** |
| Barbara K. Cegavske | Filing Date and Time |
| Secretary of State | **08/29/2018 1:39 PM** |
| State of Nevada | Entity Number |
| | **E0408732018-3** |

(This document was filed electronically.)

# Articles of Organization Limited-Liability Company

(PURSUANT TO NRS CHAPTER 86)

**USE BLACK INK ONLY - DO NOT HIGHLIGHT**

**ABOVE SPACE IS FOR OFFICE USE ONLY**

**1. Name of Limited-Liability Company:** (must contain approved limited-liability company wording; see instructions)

EKSTRAK LABS LLC

Check box if a Series Limited-Liability Company ☐ Check box if a Restricted Limited-Liability Company ☐

**2. Registered Agent for Service of Process:** (check only one box)

☐ Commercial Registered Agent: ______ Name

☒ Noncommercial Registered Agent (name and address below) **OR** ☐ Office or Position with Entity (name and address below)

IFTC
Name of Noncommercial Registered Agent **OR** Name of Title of Office or Other Position with Entity

| 61 SPECTRUM BOULEVARD | LAS VEGAS | Nevada | 89101 |
|---|---|---|---|
| Street Address | City | | Zip Code |
| | | Nevada | |
| Mailing Address (if different from street address) | City | | Zip Code |

**3. Dissolution Date:** (optional)

Latest date upon which the company is to dissolve (if existence is not perpetual): ______

**4. Management:** (required)

Company shall be managed by: ☒ Manager(s) **OR** ☐ Member(s) (check only one box)

**5. Name and Address of each Manager or Managing Member:** (attach additional page if more than 3)

1) FENNER & BEANE
Name

| 2728 N 24TH ST | PHOENIX | AZ | 85008-7958 |
|---|---|---|---|
| Street Address | City | State | Zip Code |

2) ______
Name

| | | | |
|---|---|---|---|
| Street Address | City | State | Zip Code |

3) ______
Name

| | | | |
|---|---|---|---|
| Street Address | City | State | Zip Code |

**6. Name, Address and Signature of Organizer:** (attach additional page if more than 1 organizer)

**I declare, to the best of my knowledge under penalty of perjury, that the information contained herein is correct and acknowledge that pursuant to NRS 239.330, it is a category C felony to knowingly offer any false or forged instrument for filing in the Office of the Secretary of State.**

IFTC
Name

X IFTC
**Organizer Signature**

| 61 SPECTRUM BLVD | LAS VEGAS | NV | 89101 |
|---|---|---|---|
| Address | City | State | Zip Code |

**7. Certificate of Acceptance of Appointment of Registered Agent:**

*I hereby accept appointment as Registered Agent for the above named Entity.*

X IFTC
**Authorized Signature of Registered Agent or On Behalf of Registered Agent Entity**

8/29/2018
Date

CONFIDENTIAL - DEFENDANTS

*This form must be accompanied by appropriate fees.*

SECRETARY OF STATE

STATE OF NEVADA

# LIMITED LIABILITY COMPANY CHARTER

I, Barbara K. Cegavske, the Nevada Secretary of State, do hereby certify that **EKSTRAK LABS LLC** did on August 29, 2018, file in this office the Articles of Organization for a Limited Liability Company, that said Articles of Organization is now on file and of record in the office of the Nevada Secretary of State, and further, that said Articles contain all the provisions required by the laws governing Limited Liability Companies in the State of Nevada.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the Great Seal of State, at my office on August 29, 2018.

Barbara K. Cegavske

Barbara K. Cegavske
Secretary of State

Certified By: Electronic Filing
Certificate Number: C20180829-1276

**<u>EXHIBIT B</u>**

**Operating Agreement**

[attached]

# Version 2: NOVEMBER 28, 2018

# Operating Agreement
# of
# EKSTRAK LABS, LLC

## EKSTRAK LABS, LLC
## Table of Contents


**Article One** — **Formation of the Company** ........ **1**
Section 1.01 The Limited Liability Company ........ 1
Section 1.02 The Name of the Company ........ 1
Section 1.03 Company to be taxed as a Partnership ........ 1
Section 1.04 Purpose and Scope of the Company ........ 1
Section 1.05 Purpose of Company Restrictions ........ 2
Section 1.06 Principal Office of the Company and Location of Records ........ 2
Section 1.07 Registered Agent and Registered Office ........ 2
Section 1.08 The Term of the Company ........ 2
Section 1.09 Venue ........ 2

**Article Two** — **Tax Matters** ........ **3**
Section 2.01 Tax Classification ........ 3
Section 2.02 The Tax Matters Partner ........ 3
Section 2.03 Tax Elections ........ 4

**Article Three** — **Membership Interests** ........ **4**
Section 3.01 Membership Interest in the Company ........ 4
Section 3.02 Valuation of Membership Interests in the Company ........ 4

**Article Four** — **Capital Contributions and Capital Accounts** ........ **4**
Section 4.01 Initial Capital Contributions ........ 4
Section 4.02 Voluntary Additional Capital Contributions ........ 5

| | | |
|---|---|---|
| Section 4.03 | Prohibition against Mandatory Additional Capital Contributions | 5 |
| Section 4.04 | Establishment and Maintenance of Capital Accounts | 5 |
| Section 4.05 | Adjustment for Constructive Termination of Company | 6 |
| Section 4.06 | Revaluation Adjustment | 6 |
| Section 4.07 | No Interest or Return of Capital | 6 |
| Section 4.08 | Power to Modify Capital Account Provisions | 7 |
| Section 4.09 | Certain Property Deemed to be Loans | 7 |
| Section 4.10 | Negative Capital Accounts | 7 |
| Section 4.11 | Assignment of Capital Account | 7 |
| **Article Five** | **Allocations and Distributions** | **7** |
| Section 5.01 | Allocation of Profits and Losses | 7 |
| Section 5.02 | Allocation to Avoid Capital Account Deficit | 8 |
| Section 5.03 | Special and Regulatory Allocations | 8 |
| Section 5.04 | Determination of Net Profits and Net Losses | 11 |
| Section 5.05 | Distributions to Members | 12 |
| **Article Six** | **Management of the Company** | **13** |
| Section 6.01 | Management by Members | 13 |
| Section 6.02 | Day-to-Day Management | 14 |
| Section 6.03 | Appointment of Officers | 14 |
| Section 6.04 | Execution of Documents | 14 |
| Section 6.05 | Managing Member as Agent | 14 |
| Section 6.06 | No Authority of Individual Members | 14 |
| Section 6.07 | Non-Liability of Members for Acts or Omissions in Their Managerial Capacity | 14 |
| Section 6.08 | Limitations on Rights and Powers | 14 |
| Section 6.09 | Powers | 15 |
| Section 6.10 | Authorization to Execute Certain Instruments | 15 |
| Section 6.11 | Affidavit of Member or Member Principal Authority | 15 |
| Section 6.12 | Creation of Advisory Committee | 16 |
| **Article Seven** | **The Members** | **16** |
| Section 7.01 | Names and Addresses of Members | 16 |
| Section 7.02 | Limited Liability of Members | 16 |
| Section 7.03 | Restrictions on Members' Withdrawal Rights | 17 |
| Section 7.04 | Restrictions on Assignees' Withdrawal Rights | 17 |
| Section 7.05 | No Right to Cause Dissolution | 18 |
| Section 7.06 | Waiver of Partition | 18 |
| Section 7.07 | Expulsion of a Member | 18 |
| Section 7.08 | Voting | 18 |
| Section 7.09 | Access to Information | 18 |

| | |
|---|---|
| **Article Eight** | **Meetings & Notice ........................ 19** |
| Section 8.01 | Special Meetings ........................ 19 |
| Section 8.02 | Notice of Meetings ........................ 19 |
| Section 8.03 | Waiver of Meeting Notice ........................ 19 |
| Section 8.04 | Voting by Proxy ........................ 20 |
| Section 8.05 | Action by Consent ........................ 20 |
| Section 8.06 | Quorum ........................ 20 |
| Section 8.07 | Presence ........................ 20 |
| Section 8.08 | Conduct of Meetings ........................ 20 |
| Section 8.09 | Approval or Consent of Members ........................ 20 |
| **Article Nine** | **Books, Records, and Bank Accounts ........................ 20** |
| Section 9.01 | Books and Records ........................ 20 |
| Section 9.02 | Accounting and Taxable Year ........................ 21 |
| Section 9.03 | Reports ........................ 21 |
| Section 9.04 | Bank Accounts and Company Funds ........................ 21 |
| **Article Ten** | **Admission of Additional Members ........................ 21** |
| Section 10.01 | Admission by Unanimous Consent of Members; Prerequisites ........................ 21 |
| Section 10.02 | Capital Contributions and Fair Market Value ........................ 22 |
| Section 10.03 | No Admissions in Violation of this Article ........................ 22 |
| **Article Eleven** | **Transfer of Membership Interests by a Member ....... 22** |
| Section 11.01 | Restrictions on Transfer ........................ 22 |
| Section 11.02 | Transfer of Interest ........................ 22 |
| Section 11.03 | Additional Restrictions on Transfer ........................ 24 |
| Section 11.04 | Transferee Treated as an Assignee Until Admitted as a Substitute Member ........................ 24 |
| Section 11.05 | Conditions Required to Become a Substitute Member ........................ 25 |
| Section 11.06 | Rights and Limitations of an Assignee ........................ 25 |
| Section 11.07 | Permitted Transfers ........................ 25 |
| Section 11.08 | Amendment of Operating Agreement and Articles of Organization ........................ 26 |
| Section 11.09 | Disability of a Member ........................ 26 |
| Section 11.10 | Death of a Member ........................ 27 |
| Section 11.11 | Retirement of a Member ........................ 28 |
| Section 11.12 | Purchase Price ........................ 29 |
| Section 11.13 | Voting Rights of Transferred Interests ........................ 30 |
| Section 11.14 | Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed ........................ 30 |
| Section 11.15 | Creditor Rights; Charging Order Sole Exclusive Remedy ........................ 31 |

| | |
|---|---|
| Section 11.16 | Company's Unilateral Purchase Option for Interest Acquired without Consent ....................31 |
| Section 11.17 | Assignee or Charging Order Holder Assumes Tax Liability ....................34 |
| **Article Twelve** | **Dissolution and Termination ....................34** |
| Section 12.01 | Dissolution of the Company ....................34 |
| Section 12.02 | Liquidation of the Company Property ....................34 |
| Section 12.03 | Company Property Sole Source ....................35 |
| Section 12.04 | Sale of Company Assets during Term of the Company ....................35 |
| **Article Thirteen** | **Dispute Resolution Provisions ....................35** |
| Section 13.01 | Resolution of Disputes among Members and within the Company ....................36 |
| Section 13.02 | Notice of Controversy and Designation of Authorized Representatives ....................36 |
| Section 13.03 | Commencement of Dispute Resolution Procedure ....................36 |
| Section 13.04 | Selection of a Mediator ....................36 |
| Section 13.05 | Time and Place for Mediation Conference ....................37 |
| Section 13.06 | Discovery and Exchange of Information ....................37 |
| Section 13.07 | Delivery of Written Summaries; Authority to Obtain Professional Assistance ....................37 |
| Section 13.08 | Conduct of Mediation ....................37 |
| Section 13.09 | Final Determinations are binding on All Parties ....................37 |
| Section 13.10 | Arbitration ....................37 |
| Section 13.11 | Settlement during Mediation or Arbitration ....................38 |
| Section 13.12 | Qualified Appraisals ....................38 |
| Section 13.13 | Right to Seek Equitable Relief ....................38 |
| Section 13.14 | Prevailing Party is entitled to Recover All Reasonable Costs ....................38 |
| **Article Fourteen** | **General Matters ....................38** |
| Section 14.01 | Successors and Assigns ....................38 |
| Section 14.02 | No Waiver ....................38 |
| Section 14.03 | Definitions ....................38 |
| Section 14.04 | Changing the Company's Situs ....................46 |
| Section 14.05 | No Duty to Mail Articles of Organization ....................46 |
| Section 14.06 | General Matters ....................46 |

# Securities Law Disclosure

The membership interests or percentages of ownership of EKSTRAK LABS, LLC (the "Company") have not been nor will be registered under the Securities Act of 1933, as amended, (the "Securities Act") or any other federal securities laws or the securities laws of any state. The membership interests or percentages of ownership are offered and sold in reliance on exemptions from the registration requirement of the Securities Act and laws and regulations enacted by the Securities and Exchange Commission effective April 15, 1982 pertaining to certain offers and sales of securities without registration under the Securities Act.

The Company will not be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, and will not file reports, proxy statements and other information with the Securities and Exchange Commission, or any state securities commission.

The limited liability company membership interests of the Company may not be offered for sale, sold, pledged, or otherwise transferred unless registered or qualified under applicable securities laws, or unless an exemption from registration or qualification exists. The availability of any exemption from registration or qualification must be established by an opinion of counsel for the owner the interest for which registration is sought. The opinion of counsel must be reasonably satisfactory to the Company.

**No Member may register any interest in the Company under any federal or state securities law without the express written consent of all Members.**

**The Members understand that some of the restrictions inherent in this form of business, and specifically set forth in this Agreement, may have an adverse impact on the fair market value of the Membership Interests if a Member attempts to sell or borrow against the Member's interest in the Company.**

# Acknowledgment of Members

By the execution of this Agreement, each of the Members agrees to the following provisions.

## Exempt from Registration

Investment in the Member's Interest (Interest) in the Company involves a high degree of risk and is suitable only for sophisticated investors. Interests are being offered in reliance upon one or more exemptions from registration provided by the Securities Act, as amended and any Securities Act of Nevada.

## Personal Investment of Member

The Member is purchasing the Interest for the Member's own investment and not with a view to the distribution or resale to any other Person.

## Restrictions on Transferability

The Company has disclosed to the Members by way of this Agreement and each Member acknowledges that the transferability of the Interest is severely limited. Each Member will bear the economic risk of investment for an indefinite period, as the Membership Interests have not been registered under the Securities Act or any state securities laws and cannot be offered or sold unless subsequently registered or unless an exemption from registration is available.

## Registration or Opinion of Counsel before Transfer

In addition to other prohibitions and restrictions on transfer under this Agreement, the Interest will not be sold publicly without registration under the Securities Act and any applicable state securities law. Before any public sale, the Member intending to sell an interest must first obtain opinion of counsel satisfactory to the Company that registration is not required in connection with any transaction. In no event may any Interest be sold within 12 months of original issue to that Member.

## Principal Address of Member

Each Member's principal residence is noted in this Agreement. Each Member shall notify the Company in writing within 5 days of any change in address of the principal residence of the Member.

## Access to Facts

Each Member has had and continues to have access to all material facts with respect to the Interest and is satisfied as to the advisability of making this investment.

## No Commission or Remuneration

No commission or other remuneration may be paid to any Person in connection with the offer or sale of any Interest.

## No Right to Registration

No Member may require the Company to register any Interest under Federal or state securities laws at any time, or to join in any future registration.

## Hold Harmless

Each Member agrees to hold the Company and its Members, Member Principals, Organizers and controlling Persons (as defined in the Securities Act, as amended), and any Persons affiliated with any of them or with the distribution of the Interest, harmless from all expenses, liabilities, and damages (including reasonable attorneys' fees) arising from a disposition of the Interest in any manner that violates the Securities Act, as amended, or of any applicable state securities law or that may be suffered by reason of a breach of any of the covenants, representations, and warranties contained in this Agreement.

# EKSTRAK LABS, LLC
# a Nevada Limited Liability Company

## Article One
## Formation of the Company

### Section 1.01 The Limited Liability Company

This Operating Agreement for EKSTRAK LABS, LLC, dated November 28, 2018, restates the Restated Operating Agreement of EKSTRAK LABS, LLC, that was adopted and executed on November 28, 2018, as well as the Operating Agreement of EKSTRAK LABS, LLC, that was formed and established on November 28, 2018 as a Limited Liability Company under the laws of the State of Nevada. The Company was effective upon the filing of Articles of Organization as required by Nevada. The Members and their percentages of ownership are identified in the schedule attached to this Agreement as Exhibit "A."

This Agreement sets forth the rights, duties, obligations, and responsibilities of the Members with respect to the Company.

In consideration of the mutual promises, obligations, and agreements set forth in this Agreement, the parties to this Agreement agree to be legally bound by its terms.

### Section 1.02 The Name of the Company

The name of the Company is EKSTRAK LABS, LLC (the "Company"). The Members may change the name of the Company or operate the Company under different names.

### Section 1.03 Company to be taxed as a Partnership

The Members intend to establish an entity that is subject to taxation as a partnership.

### Section 1.04 Purpose and Scope of the Company

The Company is organized to provide centralized management of investments and business activities.

In order to accomplish the foregoing purposes, the Company may perform the following activities:

> Own, acquire, manage, develop, operate, buy, sell, exchange, finance, refinance, and otherwise deal with real, personal, tangible, and intangible property, and any type of business, as the Members may deem from time to time to be in the best interests of the Company; and
>
> Conduct any lawful business and investment activity permitted under the laws of Nevada and in any other jurisdiction in which the Company may have a business or investment interest in order to accomplish the foregoing objectives.

The Company may engage in any other activities that are related or incidental to the foregoing purposes, as may be determined in the sole and absolute discretion of the Members.

## Section 1.05 Purpose of Company Restrictions

This Company is formed by those who know and trust one another.

Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a Member's interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. As a result, there are certain restrictions expressed in this Agreement that attach to and affect ownership of Membership Interests and the transfer of those interests. Those restrictions are not intended as a penalty but are intended to protect and preserve existing relationships based upon trust and to protect the Company's capital and its financial ability to continue to operate.

## Section 1.06 Principal Office of the Company and Location of Records

The street address of the principal office in the United States where the records of the Company are to be maintained is:

Address of Record: 61 Spectrum Blvd, Las Vegas, NV 89101

Mailing: 4400 N Scottsdale Road, Suite 9-289, Scottsdale, AZ 85251

or such other place or places as the Members determine. The records maintained by the Company will include all records that the Company is required by law to maintain. The Company shall likewise maintain a records office in any jurisdiction that requires a records office. The Company shall maintain at each records office all records required by applicable law.

## Section 1.07 Registered Agent and Registered Office

The name of the initial Registered Agent of the Company is Fenner & Beane, LLLP and the initial registered office of the Company is:

Address of Record: 2728 N 24th Street, Phoenix, AZ 85008

Mailing: 4400 N Scottsdale Road, Suite 9-289, Scottsdale, AZ 85251

## Section 1.08 The Term of the Company

The period of duration of the Company will be perpetual. The Company will begin on the date the Articles of Organization is filed with the Secretary of State of Nevada and will continue until terminated or dissolved in accordance with the provisions of this Agreement.

## Section 1.09 Venue

Venue for any dispute arising under this Operating Agreement or any disputes among any Members or the Company will be in the county of the Registered Office of the Company.

# Article Two
# Tax Matters

## Section 2.01 Tax Classification

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the federal income tax basis of a Member's Membership Interest and all other matters relating to the distributive share and taxation of items of income, gain, loss, deduction, depreciation, and credit will be as established by Subchapter K of the Internal Revenue Code.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the majority of the Members may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

## Section 2.02 The Tax Matters Partner

If the Company is required to have a tax matters partner, the majority of the Members shall promptly appoint a Member as tax matters partner. The majority of the Members may replace the tax matters partner at the discretion of the Members.

### (a) Legal and Accounting Costs for Tax Matters

The Company shall pay all legal and accounting costs associated with any proceeding by the Internal Revenue Service with respect to the Company's tax returns.

### (b) Discretion as to Tax Matters

The tax matters partner shall notify all of the Members upon receipt of any notice regarding any examination by any state, federal, or local authority with respect to the Company's tax compliance. Subject to its fiduciary duty to the Members, the tax matters partner may determine whether to contest any proceedings, how to pursue any proceedings, and whether and on what terms to settle any such dispute with the Internal Revenue Service.

### (c) Tax Classification as a Partnership

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the tax matters partner shall take all steps reasonably necessary to classify the Company as a partnership for tax purposes under the Code and Regulations. The tax matters partner shall, if appropriate, prepare and file any forms necessary or appropriate to classify the Company as a partnership under the laws of any jurisdiction in which the Company transacts business.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the tax matters partner may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type

of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

### Section 2.03 Tax Elections

A majority of the Members may make any applicable or available tax elections on behalf of the Company, but any decision to change the tax classification of the Company from partnership to corporation, or from corporation to partnership, requires approval by the super majority vote of the Members.

## Article Three
## Membership Interests

### Section 3.01 Membership Interest in the Company

Each Member's Initial Membership Interest is the percentage interest in Exhibit A attached to this Agreement. Membership Interests will be adjusted from time to time to account for non-*pro rata* Additional Capital Contributions and non-*pro rata* distributions to Members. If non-*pro rata* contributions or distributions are made, each Member's Membership Interest will then be determined by dividing the Capital Account of each Member by the aggregate of the then-existing capital accounts, after adjusting the Members' Capital Accounts to reflect the fair market value of the contributed property.

For purposes of determining the respective voting rights of the Members, adjustments to Membership Interests of the Members resulting from Additional Contributions or Distributions will be effective as of the first day of the month immediately following the date of the contribution or distribution.

The Company shall maintain a correct record of all Members and their Membership Interests together with amended and revised schedules of ownership caused by changes in the Members and changes in Membership Interests.

### Section 3.02 Valuation of Membership Interests in the Company

For all purposes, the value of the Company as an entity and of Membership Interests shall be their respective fair market values. Any dispute, contest, or issue of fair market value is to be resolved and determined by written Qualified Appraisal by a Qualified Appraiser selected by the Members.

## Article Four
## Capital Contributions and Capital Accounts

### Section 4.01 Initial Capital Contributions

The Members shall contribute as their initial capital contributions to the Company all of their right, title and interest in and to the property described in Exhibit A. The Members agree that the property described in Exhibit A has the fair market value (net of liabilities assumed or taken subject to or by the Company) listed opposite the scheduled property.

Each Member's Capital Account will be credited with an initial contribution equal to the fair market value as specified in Exhibit A.

### Section 4.02 Voluntary Additional Capital Contributions

The Members may make Additional Capital Contributions to the Company. Any Additional Capital Contribution shall be made *pro rata*, according to the Member's Membership Interest, unless otherwise agreed to by the unanimous consent of the Members. Consent does not need to be evidenced in writing and will be presumed to have been obtained unless there is clear and convincing evidence to the contrary.

The fair market value of any property other than cash or publicly traded securities to be contributed as an Additional Capital Contribution will be as agreed upon by the contributing Member and a majority in interest of the Members at the time of contribution. Alternatively, a disinterested appraiser selected by the Members may determine the fair market value of any contributed property.

### Section 4.03 Prohibition against Mandatory Additional Capital Contributions

The Company has no authority to require Additional Capital Contributions.

### Section 4.04 Establishment and Maintenance of Capital Accounts

A Capital Account will be established for each Member and will be maintained at all times during the existence of the Company in a manner that complies with the Internal Revenue Code and applicable Treasury Regulations. Each Capital Account will be maintained according to the following provisions:

#### (a) Credits to Member's Interest

Each Member's Interest will be credited with the fair market value of the Member's contribution of cash or other property, the Member's distributive share of profits, and the amount of any Company liabilities that are assumed by the Member.

#### (b) Debits to Member's Interest

Each Member's Capital Account will be debited the amount of cash and the fair market value of any property distributed to the Member under this Agreement, the Member's share of losses, and the amount of any liabilities of the Member that are secured by any property contributed by the Member to the Company.

#### (c) Assumption of Liability

An assumption of unsecured liability by the Company will be treated as a distribution of money to the Member, and the Company shall adjust the Member's Capital Account accordingly. Assumption of an unsecured liability of the Company by a Member will be treated as a cash contribution to the Company. The amount of any liability assumed under this provision will be determined according to Section 752(c) of the Internal Revenue Code.

### (d) Adjustments for Noncash Distributions

If assets of the Company other than cash are distributed in kind to a Member, the Company shall adjust the Capital Accounts of the Members to reflect the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold at fair market value in a cash sale in order to reflect unrealized gain or loss.

### (e) Adjustment to Fair Market Value upon Transfer of Membership Interest

If an existing or new Member acquires an Interest, the Company shall adjust the Capital Accounts of the Members to reflect fair market value of all properties held by the Company.

## Section 4.05 Adjustment for Constructive Termination of Company

In the event of constructive termination of the Company as provided under Section 708 of the Internal Revenue Code, the Company shall adjust the Members' Capital Accounts to reflect fair market value of all properties held by the Company as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(b).

## Section 4.06 Revaluation Adjustment

The Company shall adjust the Members' Capital Accounts to reflect any revaluation of Company property (including intangible assets such as goodwill) as provided in this section.

### (a) Adjustment Based on Fair Market Value

Any revaluation adjustment to a Member's Capital Account will be based on the fair market value of Company property on the date of the adjustment as provided under Code Section 7701(g).

### (b) Adjustment for Unrealized Items

The Company shall adjust the Members' Capital Accounts to reflect the manner in which any unrealized income, gain, loss, or deduction inherent in the Company's property (to the extent that it has not been previously reflected in the Members' Capital Accounts) would be allocated among all the Members if there were a taxable disposition of such property for fair market value on the date of adjustment.

## Section 4.07 No Interest or Return of Capital

Notwithstanding any other provision of this Agreement, no Member is entitled to any interest on its Capital Account or Membership Interest or on the Member's Capital Contribution. No Member may demand or receive the return of all or any portion of the Member's Capital Account, Membership Interest, or Capital Contribution.

### Section 4.08 Power to Modify Capital Account Provisions

The Members may modify the manner in which the Capital Accounts are computed in order to comply with Treasury Regulation Section 1.704-1(b), provided that, in the reasonable judgment of the Members, the modification is not likely to have a material effect on the amounts distributable to any Member under this Agreement. The Members shall also make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company Capital reflected on the Company's balance sheet, as computed for book purposes according to Treasury Regulation Section 1.704-1(b)(2)(iv)(g), relating to adjustments to book value.

### Section 4.09 Certain Property Deemed to be Loans

If for any reason the Company would otherwise be deemed to be an investment company within the meaning of Section 351 of the Internal Revenue Code, the Members intend to comply with the requirements of Section 721(b) of the Internal Revenue Code, so that contributions of property to the Company will not cause recognition of any gain or loss to any Member. Accordingly, if any contribution of property would cause the recognition of gain or loss to any Member under Section 721(b) of the Internal Revenue Code, then that property will be deemed to have been loaned to the Company. Any loan will bear interest at the minimum interest rate required under Section 7872 of the Internal Revenue Code. The Company shall return any property loaned to the Company under this provision to the lender of the property within 90 days of the lender's demand.

### Section 4.10 Negative Capital Accounts

In the event of liquidation of the Company or of a Member's Membership Interest no Member will be required to restore a deficit in the Member's Capital Account.

### Section 4.11 Assignment of Capital Account

Except as otherwise required by the Internal Revenue Code or Treasury Regulations, if any Membership Interest is assigned according to the terms of this Agreement, the Assignee will succeed to the Capital Account of the assignor to the extent that it relates to the assigned Membership Interest. If the assignment of an interest in the Company causes a termination of the Company under Section 708(b)(1)(B) of the Internal Revenue Code, the Capital Account that carries over to the Assignee will be adjusted according to Treasury Regulation Section 1.704-1(b)(2)(iv)(e).

## Article Five
## Allocations and Distributions

### Section 5.01 Allocation of Profits and Losses

Subject to the provisions of Section 5.02 and Section 5.03, all items of income, gain, loss, deduction and credit, whether resulting from the Company's operations or in connection with its dissolution, shall be allocated to the Members in proportion to their respective Membership Interests.

The Members, by unanimous agreement, may enter into agreements providing for the special allocation of items of income, gain, loss, deduction, or credit, provided that the special allocations have substantial economic effect as required by applicable federal tax law.

The Members may also agree to allocate net profits and net losses in a way that conforms to adjustments made to the Percentage Interests as a result of any loans made to the Company that have been converted to contributions to capital, any distributions of cash, or any liquidating distributions

If the Percentage Interest of a Member is not the same throughout a given Taxable Year, the Company shall determine the allocation of net profits and net losses to the Members taking into account the Members' varying Percentage Interests during the year. The Company shall make the determination consistent with the requirements of Section 706(d) of the Internal Revenue Code.

The Members shall have the authority to change the allocation provisions of this Section to the extent that the Company's legal counsel advises the Company that such change is required under the Internal Revenue Code in light of the manner in which the Members have agreed to bear losses and to share profits and distributions under this agreement.

## Section 5.02 Allocation to Avoid Capital Account Deficit

The Company shall not allocate net losses in such a way as would cause a Member to have a capital account deficit at the end of any Taxable Year. Any Company net losses that cannot be allocated to one or more of the Members without creating a negative Capital Account will be allocated to the remaining Members in proportion to their Capital Accounts until all Members have a Capital Account of zero. Net losses allocated when all Members have a Capital Account of zero shall be allocated proportionately among the Members according to their respective Membership Interests. If some but not all of the Members would have a deficit in their Capital Accounts because of allocation of losses, the Company shall allocate losses on a Member-by-Member basis in order to allocate the maximum permissible losses to each Member under Treasury Regulation Section 1.704(b)(2)(ii)(d). The Company shall allocate any remaining net losses to the Members in accordance with the Members' respective Membership Interests.

## Section 5.03 Special and Regulatory Allocations

The Company shall make the following special and regulatory allocations:

### (a) Allocations Related to Contributed Property

The Company shall allocate income, gain, loss, and deductions with respect to any property contributed to the capital of the Company among the Members in accordance with Section 704(c) of the Internal Revenue Code for the purpose of accounting for any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date the property was contributed. If the fair market value of any Company asset is adjusted, then in making subsequent allocations of income, gain, loss, and deductions with respect to the asset the Company shall account for any variation between the adjusted basis of

the asset for federal income tax purposes and the asset's fair market value in the same manner as provided under Section 704(c) of the Internal Revenue Code.

### (b) Allocation of Member Nonrecourse Deductions

The Company shall allocate all Member Nonrecourse Deductions for each Taxable Year to the Member or Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which any Member Nonrecourse Deductions are attributable, in accordance with the ratio in which the Members bear economic risk of loss and as provided in Treasury Regulation Section 1.704-2(i)(1).

### (c) Company Minimum Gain Chargeback

If there is a net decrease in Company Minimum Gain during any Company Taxable Year, the Company shall allocate items of Company income and gain for the year (and, if necessary, subsequent years) in proportion to the respective amounts required to be allocated to each Member in accordance within Treasury Regulation Section 1.704-2(f) and (g). This provision is intended to comply with the minimum gain chargeback requirement of Treasury Regulation Section 1.704-2.

To the extent permitted by Treasury Regulation Section 1.704-2 and for purposes of this provision only, the Company shall determine any deficit in each Member's Capital Account before any other allocations under this Article with respect to the Taxable Year and without regard to any net decrease in Member Minimum Gain during the Taxable Year.

### (d) Member Minimum Gain Chargeback

If there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during a Taxable Year after the Company computes and accounts for Company Minimum Gain Chargeback above, then Company shall allocate items of income and gain for that year (and, if necessary, for any subsequent years) to any Member who has a share of the Member Minimum Gain Attributable to that Member Nonrecourse Debt at the beginning of the year in the amount and proportions necessary to satisfy the provisions of Treasury Regulation Section 1.704-2(i).

### (e) Qualified Income Offset

If any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), the Company shall allocate items of Company income and gain to the Member so as to eliminate any deficit in the affected Members' Capital Accounts as quickly as possible to the extent required by Treasury Regulations. But the Company shall only make an allocation as provided under this provision only to the extent that an affected Member would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

This provision is intended to comply with the qualified income offset requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3).

### (f) Gross Income Allocation to Restore Capital Account Deficit

If any Member has a Capital Account deficit at the end of any Company Taxable Year that exceeds the sum of the amount the Member is obligated to restore under this Agreement and the amount the Member is deemed to be obligated to restore under the Regulations, then the Company shall allocate items of Company income and gain in the amount of the excess as quickly as is practicable. But the Company shall only make an allocation as provided under this provision only to the extent that an affected Member would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

### (g) Allocation from Disposition of Property Not Revalued

Upon the admission of a Member or in the event a Membership Interest is liquidated, if properties of the Company are not revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and the Capital Accounts of the Members are not adjusted accordingly, then Company shall allocate gain or loss recognized upon the sale or other disposition of Company property among the Members to take into account the variation between the adjusted basis of the property and the property's fair market value as of the date the Member was admitted or the Interest was liquidated, as the case may be, as provided under Code Section 704(c).

### (h) Allocation Related to Adjustments in Tax Basis

To the extent an adjustment to the adjusted tax basis of any asset of the Company under Section 734(b) or 743(b) of the Internal Revenue Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining the Capital Accounts, the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and the Company shall allocate gain or loss to the Members consistent with the manner set forth under Treasury Regulation Section 1.704-1.

### (i) Allocation Related to Capital Event Adjustments

If the gross book value of any asset of the Company is increased or decreased for special events, the Company shall allocate gain or loss as required for Capital Account purposes. The Company shall take into account any difference between the adjusted basis of such asset for federal income tax purposes and the asset's gross book value for any subsequent allocations of income, gain, loss, or deductions with respect to any adjusted asset.

### (j) Allocation Consistent with Distributions

The Company shall allocate net profits and net losses in a manner that is consistent with:

> The requirements for distributions of cash described elsewhere in this Agreement;
>
> The requirements for distribution of assets of the Company upon its dissolution and winding up strictly in accordance with Capital Account balances as specified in the procedures described below; and
>
> The requirements of applicable Regulations under Section 704(b) of the Internal Revenue Code.

### (k) Allocations to Comply with Regulations and Intentions of Members

The allocations of net income, gains, net losses, and deductions set forth in this Agreement are intended to comply strictly with Treasury Regulation Section 1.704-1(b), Treasury Regulation Section 1.704-1(b)(4)(iv), and Treasury Regulation Section 1.704-2, and are intended to have "substantial economic effect" within the meaning of those Regulations.

The allocations may not be consistent with the intentions of the Members to allocate distributions. Accordingly, the Members are hereby authorized to allocate net profits, net losses, and other economic items among the Members so as to prevent the allocations from distorting the manner in which distributions are intended to be divided among the Members as specified in this Article. In general, the Members anticipate that these allocations will be accomplished by specially allocating other net profits, net losses, and items of income, gain, loss, and deductions among the Members so that the net amount of the allocations and any special allocations to the Member is zero. If, for whatever reason, the Members determine that the allocation provisions of this Agreement are unlikely to be respected for federal income tax purposes, the Members may amend the allocation provisions of this Agreement to the minimum extent necessary to affect the plan of allocations and distributions provided in this Agreement. The Members may adopt and revise rules, conventions, and procedures as the Members determine to be appropriate with respect to the admission of Members to reflect the Interest at the end of the year in accordance with the intentions of the Members.

## Section 5.04 Determination of Net Profits and Net Losses

For purposes of this Article, the terms "net profits" and "net losses" mean an amount equal to the Company's taxable income or loss for any year or period, determined in accordance with Section 703(a) of the Internal Revenue Code. All items of income, gain, loss, or deduction required to be stated separately under Section 703(a)(1) will be included in

taxable income or loss. This determination of net profits and net losses includes the following items:

> Any income of the Company that is exempt from federal income tax that is not otherwise taken into account in computing taxable income or loss under this Article.
>
> Any expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code relating to non-deductible expenses that are not otherwise taken into account in computing taxable income or loss.
>
> If the value of any Company asset is adjusted, the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset.

Any other items that are specially allocated under this Article will not be taken into account in computing net profits and net losses.

## Section 5.05 Distributions to Members

The primary intent of the Company is to retain Company funds in amounts determined in the sole and absolute discretion of the Members to meet the reasonable needs of the business or investments of the Company and other needs as provided in this Agreement. No Member may demand distributions of any Company funds or assets.

The Company may not distribute, in any single year, more than an amount equal to the Company income for the previous tax year plus 5% of the value of the assets of the Company on the last day of the previous calendar year, without the unanimous consent of all Members.

When any distributions of funds or other Company assets are made, the Company shall satisfy those distributions as follows:

### (a) Distributions of Cash

The Company may make distributions of Company cash to the Members on a *pro rata* or *non-pro rata* basis as the Members, in their discretion, determine. Distributions may only be made from the cash reserves that exceed the reasonable working reserves of the Company as determined in the sole discretion of the Members.

Subject to this Agreement and applicable law, distributions of cash will first come from cash from operations as permitted under this Agreement, then from cash from the liquidation of the Company as provided in this Agreement.

### (b) Distributions in Kind

The Members in their sole and absolute discretion, may make distributions in kind of Company property to the Members. Prior to any such distribution in kind, the difference between such established fair market value and the book value of the property to be distributed shall be adjusted by a credit or charge, as is appropriate, to the Members' Interests. Upon the distribution

of such property, such adjusted value shall be charged to the Interests of the Members receiving such distributions.

### (c) No Interest

If a Member does not withdraw all or any portion of the Member's share of any cash distribution made pursuant to subsection (a), the Member may not receive any interest on that portion of the distribution not so withdrawn, or on any additional Membership Interest, unless all Members agree.

### (d) Cash from Capital Transactions

The proceeds of any capital transaction will be applied to payment of all expenses incurred in connection with the transaction and, to the extent specified in the terms of any capital transaction, to the payment of any indebtedness secured by the asset involved in the capital transaction.

### (e) Allocation of Distributions

Except as otherwise provided in this Agreement, distributions will be allocated to the Members in proportion to their Membership Interests.

### (f) Return of Distribution

Any distribution made to the Members will be considered to comply with applicable law if the distribution is made from available Company assets. If a court of competent jurisdiction finds that a distribution violates applicable law, the Members must return their respective share of that distribution, provided that the request for return of the distribution is approved by 85% of the Members.

### (g) Deemed Notice to Creditors

Creditors of the Company will be deemed to have notice of the provisions of this Article and of the fact that Members are not required to return a Distribution unless the request for return of the Distribution has been approved by the 85% of the Members.

# Article Six
# Management of the Company

## Section 6.01 Management by Members

The Members will manage the Company. The Members may manage the Company by majority, or may appoint one or more "Managing Members" from their number to represent the Members in managing the Company. For purposes of this Agreement, the Members acting by majority to manage the Company or the Managing Members will be referred to collectively as the "Managing Member", whether one or more.

Managing Members must act in good faith, with the care that an ordinarily prudent person in a similar position would exercise under similar circumstances, and in a manner the Managing Member reasonably believes to be in the best interests of the Company.

### Section 6.02 Day-to-Day Management

The Managing Member may take all actions necessary, useful, or appropriate for the ordinary management and conduct of the Company's business. Subject to the restrictions in Section 6.08, the Managing Member may exercise all powers of the Company and do anything that is not reserved by the Members as specified in the Articles of Organization, in this Agreement, or in the Act.

### Section 6.03 Appointment of Officers

If authorized by a majority of the Members, the Managing Member may appoint officers and define their function and authority. Officers may but need not be a Member or Managing Member. Any appointment and assignment of function or authority will be made in writing and kept with the records of the Company.

### Section 6.04 Execution of Documents

The Managing Member may execute any instruments, contracts, agreements, or other documents providing for the acquisition, encumbrance, or disposition of property of the Company.

### Section 6.05 Managing Member as Agent

Unless specifically prohibited by the Articles of Organization, each Managing Member serves as an agent of the Company for the purpose of conducting business on behalf of the Company. As agent, the Managing Member may bind the company unless the Managing Member's action violates the terms of the Articles of Organization, this Agreement, or the Act, or unless third parties dealing with the Managing Member reasonably believe that the Managing Member does not have authority to act.

### Section 6.06 No Authority of Individual Members

No individual Member is an agent of the Company, and no Member other than a Managing Member may make any contracts, enter into any transactions or make any commitments on behalf of the Company.

### Section 6.07 Non-Liability of Members for Acts or Omissions in Their Managerial Capacity

To the extent permitted by Nevada law, all Members are released from liability for damages and other monetary relief on account of any act, omission, or conduct in the managing the Company. This release does not protect any Member from being required by a court to purchase the Membership interest of another Member who successfully contends that the Member committed actionable oppressive acts to the prejudice of the other Member. No amendment or repeal of this provision affects any liability or alleged liability of any Member for acts, omissions, or conduct that occurred before the amendment or repeal.

### Section 6.08 Limitations on Rights and Powers

Unless authorized by the unanimous written agreement of the Members, no Member, Managing Member, nor any other officer of the Company may:

Enter into or commit to any agreement, contract, commitment or obligation on behalf of the Company obligating any Member to find additional capital, to make or guarantee a loan or to increase a Member's personal liability either to the Company or to third parties;

Receive or permit any Member to receive any fee or rebate, or to participate in any reciprocal business arrangements that would conflict or compete with the business of the Company or otherwise contradict the intent of this Agreement;

Materially alter the Business of the Company or deviate from any approved business plan of the Company;

Permit the Company's funds to be commingled with the funds of any other Person;

Do any act that contradicts this Agreement;

Do any act which would make it impossible to carry on the Business of the Company;

Confess a judgment against the Company;

Possess Property, or assign rights in specific Property, for other than a Company purpose; or

Admit any person as a Member, except as otherwise provided in this Agreement.

### Section 6.09 Powers

In pursuing its lawful purposes, the Company may do all things that limited liability companies are permitted to do under the Act.

### Section 6.10 Authorization to Execute Certain Instruments

With respect to all obligations, powers, and responsibilities under this Agreement, the Managing Member may execute and deliver any notes and other evidence of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements in any form on behalf of the Company as the Managing Member determines to be proper.

### Section 6.11 Affidavit of Member or Member Principal Authority

Any third party dealing with the Company may rely on a notarized writing signed by a Managing Member stating the Managing Member's authority to act for the Company. The Managing Member may use the following as an example of a valid writing:

The above example may be appropriately modified to reflect the Managing Member's fiduciary duty. The person signing on behalf of the Company may also execute and deliver to third parties a Memorandum of Operating Agreement, a copy of which may be attached to this Agreement as an Exhibit.

### Section 6.12 Creation of Advisory Committee

The Manager may establish an advisory committee ("Advisory Committee") of the Company consisting of two or more Members, beneficiaries of trusts that are Members or legal, financial, or other advisors to the Manager or any Member.

#### (a) Annual Meetings

If the Advisory Committee is established, at least once per calendar year the Manager shall call a meeting of the Advisory Committee. The purpose of the meeting will be to generally inform the Advisory Committee of the business and operations of the Company since the last meeting of the Advisory Committee.

#### (b) Committee Is Advisory Only

The Advisory Committee may make recommendations to or otherwise advise and consult with the Manager regarding the business and operation of the Company, but the Advisory Committee may not take any action on behalf of the Company or compel the Manager or any Member to take any action. The Advisory Committee may make a report of the meeting to the Members.

#### (c) Payment of Expenses Authorized

Advisory Committee members will be entitled to payment from the Company for their reasonable expenses for their attendance at meetings of the Advisory Committee.

## Article Seven
## The Members

### Section 7.01 Names and Addresses of Members

The Company shall maintain a list of all Members of the Company, both past and present, and their last known mailing addresses. The list will be kept as part of the records of the company. The Company shall update the list of Members from time to time as necessary to maintain accurate records.

### Section 7.02 Limited Liability of Members

Except as provided in Article Four, no Member will be required to contribute capital to the Company for the payment of any losses or for any other purposes, and no Member will be responsible or obligated to any third party for any debts or liabilities of the Company in excess of the sum of:

That Member's unpaid required contributions to the capital of the Company,

Unrecovered contributions to the capital of the Company, and

The Member's share of any undistributed profits of the Company.

## Section 7.03 Restrictions on Members' Withdrawal Rights

No Member may withdraw from the Company or receive a return of any contributions to the Company until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Member who does any of the following will be considered to have breached this Agreement:

Attempting to withdraw from the Company;

Interfering in the management of the Company affairs;

Engaging in conduct which results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Owning a Membership Interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings;

Breaching any confidentiality provisions of this Agreement; or

Failing to discharge a legal duty to the Company.

Any Member who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Member who has breached this Agreement.

## Section 7.04 Restrictions on Assignees' Withdrawal Rights

No Assignee has the right to receive a return of any contributions (whether the contributions were made by the Assignee or by an Assignor) until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Assignee who does any of the following will be considered to have breached this Agreement:

Interfering in the management of the Company affairs;

Engaging in conduct that results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Breaching any confidentiality provisions of this Agreement;

Bringing any legal action against the Company to force the dissolution of the Company, to force any distribution of Company assets, or to appoint a receiver; or

Failing to discharge a legal duty to the Company.

Any Assignee who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Assignee who has breached this Agreement.

## Section 7.05 No Right to Cause Dissolution

No Member may cause the dissolution and winding up of the Company by court decree or otherwise.

## Section 7.06 Waiver of Partition

Each Member, individually and on behalf of the Member's successors and assigns, expressly waives any right to have any Company property partitioned.

## Section 7.07 Expulsion of a Member

The Company may only expel a Member for violation of this Agreement or for failing to make the Capital Contributions as required in Article Four. A Member may only be expelled on the unanimous consent of all Members, excluding the Member to be expelled.

An expelled Member will lose all rights as a Member of the Company, and the expelled Member's interests will be converted to that of an Assignee.

## Section 7.08 Voting

Members may only vote on the following matters:

Removal of a Managing Member;

Election of a successor Managing Member;

Termination and dissolution of the Company;

Amendment of this Agreement;

The extension of the term of the Company; and

Any matter requiring the vote of the Members as set out elsewhere in this Agreement or in the Act.

Members may vote by written consent, with or without a formal meeting. Assignees may not vote.

## Section 7.09 Access to Information

Subject to the provisions of this section, each Member is entitled to all information regarding the Company under the circumstances and subject to the conditions stated in this Agreement and the Act. Assignees have no right to information regarding the Company.

All Members and any Assignee who obtains any information are subject to the confidentiality provisions of this section.

### (a) Confidential Information

The Members acknowledge that they may receive information regarding the Company in the form of trade secrets or other information that is confidential, the release of which may be damaging to the Company or to persons with whom it does business. Each Member shall hold in strict confidence any information regarding the Company that is identified as

being confidential and may not disclose it to any person other than another Member, except for disclosures:

> Compelled by law (but the Managing Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable),
>
> To advisors or representatives of the Member of the Company, but only if they have agreed to be bound by the provisions of this section, or
>
> Of information that Member also has received from a source independent of the Company that the Member reasonably believes it obtained without breach of any obligation of confidentiality.

### (b) Enforcement through Specific Performance

The Members acknowledge that disclosure of confidential information may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the provisions of this section may be enforced by specific performance.

## Article Eight
## Meetings & Notice

### Section 8.01 Special Meetings

Special meetings of the Members may only be called by a majority in interest of the Members. Special meetings of the Members may only be called upon delivery to the Members of notice of a special meeting of the Members given in accordance with this Agreement.

### Section 8.02 Notice of Meetings

The Company shall deliver notice (stating the date, time, and place of any meeting of the Members and a description of the purposes for which the meeting is called) to each Member of record entitled to vote at the meeting at the address as appears in the records of the Company at least 2 but no more than 30 days before the date of the meeting.

### Section 8.03 Waiver of Meeting Notice

A Member may waive notice of any meeting, before or after the date and time of the meeting as stated in the notice, by delivering a signed waiver to the Company for inclusion in the minutes. A Member's attendance at any meeting, in person or by proxy, waives objection to lack of notice or defective notice of the meeting, unless the Member objects to holding the meeting or transacting business at the meeting and waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

### Section 8.04 Voting by Proxy

The Members may appoint a proxy to vote or otherwise act for the Members pursuant to a written appointment form executed by the Member or the person's attorney in fact. An appointment of a proxy is effective when received by the secretary or other officer or agent of the Company authorized to tabulate votes. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 11 months unless otherwise expressly stated in the appointment form, or unless the authorization is revoked by the Member who issued the proxy.

### Section 8.05 Action by Consent

Any Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by all the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action taken, which consents, in the aggregate, are signed by all of the Members entitled to vote on the action and delivered to the Company for inclusion in the minutes.

### Section 8.06 Quorum

The presence of Members holding at least two-thirds of the Membership Interests constitutes a quorum for any meeting of the Members.

### Section 8.07 Presence

Any Member may participate in any meeting through the use of any means of communication by which all Members participating may simultaneously hear each other during the meeting. Any Member so participating will be deemed to be present in person at the meeting.

### Section 8.08 Conduct of Meetings

At any meeting of the Members, the Members shall appoint a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, to be kept with the records of the Company.

### Section 8.09 Approval or Consent of Members

Unless provided otherwise by the Act or this Agreement, any action of the Members requires a vote or written consent of at least two-thirds of the Members in favor of the action.

## Article Nine
## Books, Records, and Bank Accounts

### Section 9.01 Books and Records

The Company shall keep books of account with respect to the operation of the Company at the principal office of the Company, or at any other place as the Members determine. All Members and their duly authorized representatives will have access to the books at all reasonable times. The Company shall keep the following records:

A current list of the full name and last known address for delivery of notices of each Member;

A copy of the Articles of Organization (together with any amendments) and copies of any powers of attorney under which any certificate has been executed;

Copies of the Company's federal, state, and local income tax returns and reports, if any, for the 3 most recent years;

Copies of this Agreement (together with any amendments);

Copies of any financial statements of the Company for the 3 most recent years; and

Any other documents required by law.

### Section 9.02 Accounting and Taxable Year

The Company shall keep books of account consistent with any method authorized or required by the Internal Revenue Code and as determined by the Members. The Company shall close and balance the books at the end of each Company year. The Taxable Year of the Company will be the period authorized or required by the Internal Revenue Code, and as determined by the Members.

### Section 9.03 Reports

Within a reasonable time after the end of each Taxable Year the Company shall provide each Member with the information necessary to allow each Member to prepare and file their respective tax returns. The Company shall prepare all financial statements at the expense of the Company.

### Section 9.04 Bank Accounts and Company Funds

The Company shall deposit all cash receipts in the Company's depository accounts. All accounts used by or on behalf of the Company are property of the Company, and will be received, held, and disbursed by the Manager for the purposes specified in this Agreement. The Members shall not commingle Company funds with any other funds.

## Article Ten
## Admission of Additional Members

### Section 10.01 Admission by Unanimous Consent of Members; Prerequisites

Additional Members may only be added after the unanimous consent of the Members. Before being admitted as a Member, a prospective Member must first:

Provide evidence satisfactory to the Company that admission of the prospective Member will not violate any applicable securities law, cause a termination of the Company under applicable provisions of the Code, or alter the status of any tax election made by the Company;

Pay all reasonable expenses connected with admission as a Member, including professional fees incurred in obtaining opinions or valuations; and

Agree to be bound by all of the terms and provisions of this Agreement by signing the Agreement.

### Section 10.02 Capital Contributions and Fair Market Value

Other than contributions of cash or publicly-traded securities, the fair market value of any property to be contributed by an additional Member as its initial Capital Contribution will be determined as agreed upon by the additional Member and the holders of a majority of the Membership Interests before the contribution is made. In the alternative, the Managing Member shall appoint a disinterested appraiser to determine the value of the property to be contributed.

### Section 10.03 No Admissions in Violation of this Article

Any attempt to admit an additional Member in violation of this Article will be null and void and of no effect.

## Article Eleven
## Transfer of Membership Interests by a Member

### Section 11.01 Restrictions on Transfer

Except as provided in this Article, no Member may transfer any Membership Interest either voluntarily or involuntarily by any means without the unanimous written consent of all Members. The Members are not required to consent to any attempted transfer and will not be subject to any liability for withholding consent.

Any attempted transfer of a Membership Interest or the admission of a Substitute Member in violation of the provisions of this Article will be null and void.

### Section 11.02 Transfer of Interest

No Member may transfer any Membership Interest without first offering in writing to sell the interest to the Company and to all other Members as provided in this section.

#### (a) Notice

A Member who intends to transfer a Membership Interest must first give notice to the Company and to all other Members of the Member's intent to transfer. Any notice of intent to transfer must include the following information.

#### (1) Writing Explaining Terms of Offer

If the Member received a written offer, then a copy of that written offer must be attached to the notice. If the Member received only an oral offer, then a written explanation of the oral offer must be attached to the notice.

The written explanation must be complete in all details respecting the purchase price and terms of payment.

#### (2) Certification of Genuine Offer

The Managing Member shall certify in the written notice that the offer is genuine to the best of the Managing Member's knowledge.

### (b) Company's Priority Right to Purchase

The Company has the first right to purchase all or any portion of the Membership Interest according to the terms of any written notice of an offer except as the Company may elect to modify the terms as provided in Section 11.02(d) below. The Company may exercise this first right to purchase by giving written notice of the Company's intent to purchase to the selling Member within 90 days of receipt of the written notice of the offer.

### (c) Other Members' Priority Right to Purchase

If the Company does not provide written notice of an intent to purchase the Membership Interest within 90 days, or if the Company provides written notice of an intent not to purchase the Membership Interest, any Member may purchase any portion of the Membership Interest according to the terms of the offer except as the Member may elect to modify the terms as provided in Section 11.02(d) below. A Member may exercise this right to purchase by giving notice of intent to purchase to the selling Member within 120 days of receipt of the written notice of the offer.

If more than one Member exercises the right to purchase the same Membership Interest, each Member may purchase a *pro rata* share of the Membership Interest in accordance with each Member's respective Membership Interest in the Company before the offer of sale.

### (d) Payment Terms under Company's or Members' Priority Right to Purchase

If the Company or a Member exercises the priority right to purchase a Membership Interest as provided above, then the Company or purchasing Member may, at the buyer's discretion pay the purchase price either:

> According to the payment terms specified in the written notice of the offer provided by the selling Member, or

> By delivery of an unsecured promissory note made by the buyer for the amount of the purchase price.

If the buyer chooses to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The

note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. The buyer may prepay the note in whole or in part at any time without penalty.

### (e) Closing on Purchase by the Company or a Member

The closing of any purchase of a Membership Interest under this section will occur at the principal office of the Company within 150 days from the date of the notice of intent to sell.

### (f) Transfer to Third Party After Nonexercise of Priority Right

If neither the Company nor any Member exercises their respective priority right to purchase the Membership Interest, the selling Member may transfer its Membership Interest to the party that made the original offer for the purchase price on the terms contained in the original offer.

The closing on any transfer to a third party under this section must occur within 60 days from the earlier of the expiration of the Company's and the other Members' priority rights to purchase or the date on which the Company and all other Members have provided written notice of their intent not to exercise their respective priority rights to purchase. If the Membership Interest is not sold to the prospective purchaser within the specified time, the Company and the other Members will again be offered an opportunity to exercise their respective priority rights to purchase the Membership Interest as provided in Section 11.02(b) and Section 11.02(c) above.

## Section 11.03 Additional Restrictions on Transfer

If any proposed transfer of Membership Interests or addition of a Substitute Member will result in termination of the Company under either Section 708(b) of the Internal Revenue Code or the Act, then the transfer is prohibited unless the Members specially approve the transfer. If not approved by the Members, the attempted transfer will be disregarded and void *ab initio*.

The Members, however, may not approve any transfer or addition of a Substitute Member that violates any applicable federal or state securities law.

## Section 11.04 Transferee Treated as an Assignee Until Admitted as a Substitute Member

The transferee of a Membership Interest will hold the interest only as an Assignee until the transferee satisfies all the requirements of Section 11.05 to become a Substitute Member. As an Assignee, the transferee will have only those rights set forth in Section 11.06 of this Agreement.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

## Section 11.05 Conditions Required to Become a Substitute Member

An Assignee will not become a Substitute Member and will not have any rights as a Member until all of the conditions set forth in this section have been fully satisfied.

### (a) Consent of the Members

All Members other than the assigning Member consent in writing to the admission of the Assignee as a Substitute Member.

### (b) Execution of All Other Agreements

The assigning Member and the Assignee shall execute, acknowledge, and deliver to the Company instruments of transfer and assignments as are in form and substance satisfactory to the Company, including the written acceptance and adoption by the Assignee of this Agreement.

### (c) Payment of a Reasonable Transfer Fee

An Assignee shall pay a reasonable transfer fee to the Company. The Company may establish the amount of the transfer fee on a case-by-case basis.

### (d) Effective Date of Admission as Substitute Member

The effective date of an admission as a Substitute Member is the date on which all the remaining Members vote to accept the Assignee as a Substitute Member in accordance with this Agreement.

## Section 11.06 Rights and Limitations of an Assignee

An Assignee will be entitled to receive distributions from the Company to the same extent that the transferring Member would receive under this Agreement. Until the effective date that an Assignee is admitted as a Substitute Member, both the Company and the Members will treat the assignor of the transferred Membership Interest as the absolute owner of the transferred Membership Interest except with respect to any member distributions made which are attributable to the transferred Membership Interest.

An Assignee has substantially fewer rights than a Member. Assignees only hold a right to receive economic benefits when distributed from the Company in respect to the assigned Membership Interest. Other limitations on Assignees' rights include:

Access only to those Company records and information specifically authorized for the Assignees under the Act;

No right to vote in any Company matters; and

No other legal or economic rights.

## Section 11.07 Permitted Transfers

A Member may transfer a Membership Interest without the consent of any other Member to a trust for his or her benefit, to his or her spouse, to a trust for the benefit of his or her spouse, to his or her immediate family or to a trust for the benefit of his or her immediate family, so long as the proposed transfer does not:

Cause the Company to terminate for federal income tax purposes; or

Result in any event of default as to any secured or unsecured obligation of the Company; or

Cause a reassessment of any real property owned by the Company; or

Cause other adverse material impact to the Company.

The transferee of a Membership Interest transferred permitted by this section will be admitted as a Substitute Member without the necessity of compliance with Section 11.05, but the Company may require the transferee to accept the provisions of this Agreement in writing.

## Section 11.08 Amendment of Operating Agreement and Articles of Organization

If required by law, upon the admission of a new Member, the Company shall amend the Operating Agreement or the Articles of Organization to reflect any substitution of Members.

### (a) Substitute Member Acceptance upon Amendment

Until the Operating Agreement or Articles of Organization is amended as contemplated by this section, an Assignee will not become a Substitute Member.

### (b) Assessment of Fees

The Company may assess any fees, costs, or other expenses of any amendments made by reason of the admission of a Substitute Member against the Substitute Member whose entry into the Company necessitates the amendment.

## Section 11.09 Disability of a Member

If a Member becomes totally disabled, and continues to be totally disabled for a period of 24 months, the other Members may elect to purchase, and the disabled Member must sell, within 60 days after the expiration of the 24-month period, all of the disabled Member's Membership Interest in the Company upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the disabled Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The terms "total disability" and "disability" mean a Member's inability to perform the material and substantial duties of his or her regular occupation.

The purchase price for the disabled Member's Membership Interest will be determined in accordance with the provisions of Section 11.12, with the date for determination of the purchase price being the end of the 24-month period described above.

If the disabled Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the disabled Member either:

in cash or by certified check, within 60 days after the expiration of the 24-month period, or

by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the other Members choose to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each of the Members may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the disabled Member will deliver an assignment to each purchaser of his or her Membership Interest, together with any other instruments required by the Company, so that full and complete title to the Membership Interest can be transferred on the books of the Company.

Until the sale is complete, the agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled Member may exercise all of the Member's rights and voting authority and is entitled to receive distributions of cash or other property from the Company on behalf of the Member, but only if the agent or legal representative is a person or entity specifically listed as a permitted transferee in Section 11.07. An agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled member may consummate the sale to the other Members under this Section, including the execution of all necessary documents on the disabled Member's behalf, and collecting any payment on behalf of the disabled Member. If there is more than one agent or legal representative entitled to act for a disabled Member, the Company will designate in writing which agent or legal representative may act on behalf of the disabled Member.

## Section 11.10 Death of a Member

If a Member dies, the surviving Members may elect to purchase, and the deceased Member's legal representative or the heirs, distributes, or beneficiaries of the deceased Member, as the case may be, must sell the deceased Member's Membership Interest in the Company within 60 days after the date of death of the deceased Member, upon the terms and conditions provided in this Section. Each of the surviving Members will purchase that portion of the deceased Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the deceased Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the deceased Member's Membership Interest is purchased pursuant to the provisions of this Section, the surviving Members will pay the purchase price to the deceased Member's estate either:

in cash or by certified check, within days after the date of death of the deceased Member, or

by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the estate of the deceased Member will deliver an assignment to the surviving Members of the deceased Member's Membership Interest in the Company, together with any other instruments required by the Company, including inheritance tax waivers, so that full and complete title to the deceased Member's Membership Interest in the Company can be transferred on the books of the Company.

If a sale to the surviving Members is not completed, and except for transfers to those persons or entities specifically listed as permitted transferees in Section 11.07, any Membership Interest that is transferred as a result of the death of a Member will be an Assignee interest.

A transferee of any transfer under this section will be bound by all of the terms and conditions of this Agreement.

## Section 11.11 Retirement of a Member

If a Member elects to retire or otherwise voluntarily cease employment with the Company, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company as provided in this Section.

Within 60 days after the notice is delivered, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

If a Member's employment in the Company is terminated for cause, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company.

If the other Members desire to purchase the retiring Member's Membership Interest, they must give written notice to the retiring Member of their election to purchase all of the retiring Member's Membership Interest within 30 days after receipt of Company's notice. Within 60 days after the other Members give notice of their election to purchase all of the

retiring Member's Membership Interest, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the retiring Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the retiring Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the retiring Member either:

> in cash or by certified check, within 60 days from the date of notice of the election to purchase, or
>
> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the retiring Member will deliver an assignment to the purchasers of his or her Membership Interest in the Company, together with any other instruments required by the Company, so that full and complete title to his or her Membership Interest in the Company can be transferred on the books of the Company.

### Section 11.12 Purchase Price

For purposes of a purchase of a Membership Interest in the Company referring to this Section, the purchase price for a Member's Membership Interest in the Company will be the fair market value of the Member's membership Interest determined pursuant to this Section.

Within 60 days after the end of each Taxable Year, the Members will determine the fair market value of each one percent Membership Interest in the Company for the then current Taxable Year, and will execute a certificate of valuation setting forth the fair market value. The Members at any time may execute a new certificate of valuation, revising the fair market value of each one percent Membership Interest in the Company. The most recent certificate of valuation, duly executed by the Members, will supersede all prior certificates of valuation. The fair market value of each one percent Membership Interest in the Company as redetermined from time to time will take into account the tangible and

intangible assets of the Company, and other relevant factors, and liabilities of the Company. Good Will is an asset of the Company.

If the Members fail to redetermine the fair market value of each one percent Membership Interest in the Company within 60 days after any Taxable Year, the fair market value of each one percent Membership Interest in the Company for the purpose of establishing the purchase price will be determined by appraisal as follows:

> Not less than ten days prior to the date of the purchase, the seller of the Membership Interest must appoint one Qualified Appraiser, and the purchaser or purchasers of the Membership Interest must appoint one Qualified Appraiser.
>
> If either the seller or the purchasers fail to appoint a Qualified Appraiser, the Qualified Appraiser appointed by the other will determine the fair market value of each one percent Membership Interest in the Company owned by the seller.
>
> If the two Qualified Appraisers appointed by the seller and the purchasers fail to agree upon the fair market value of each one percent Membership Interest in the Company owned by the seller, the two Qualified Appraisers must appoint a third Qualified Appraiser five days prior to the date of the purchase, and the determination of the fair value of each one percent Membership Interest in the Company by the majority of the Qualified Appraisers will be binding upon all parties.
>
> The seller and purchasers will bear the costs of any Qualified Appraisals.

## Section 11.13 Voting Rights of Transferred Interests

A Member who transfers a Membership Interest to an Assignee will continue to hold all voting rights associated with the assigned interest until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

In the case of an Assignee who holds an interest received as a result of the death of a Member, the voting rights associated with the transferred interest will be suspended and disregarded for purposes of calculating votes until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

## Section 11.14 Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed

The Company is not required to recognize the purported interest of any transferee or Assignee who alleges to have received any interest other than by an authorized transfer or Assignment as provided under this Agreement. If the ownership of a Membership Interest is in doubt, or if there is reasonable doubt as to who is entitled to a distribution attributable to an interest, the Managing Member may accumulate the amounts to be distributed until

this issue is finally determined and resolved. The Managing Member shall credit any accumulated amounts to the Capital Account associated with the interest.

### Section 11.15 Creditor Rights; Charging Order Sole Exclusive Remedy

If a creditor obtains a judgment by a court of competent jurisdiction against any Member or Assignee, the court may charge the Member or Assignee's interest with payment of the unsatisfied amount of the judgment from distributions attributable to the affected interest, but only to the extent permitted by the Act. To the extent any interest is charged with satisfaction of a judgment, the judgment creditor will receive no more than the rights of an Assignee; the creditor will not be admitted as a Member of the Company.

The charging order is the exclusive remedy by which a judgment creditor of a Member or an Assignee of a Membership Interest may obtain any satisfaction from the Company toward any judgment against the Member or Assignee. This section does not deprive any Member or Assignee of rights under any exemption laws available to the Member or Assignee.

### Section 11.16 Company's Unilateral Purchase Option for Interest Acquired without Consent

The Company will have the unilateral option to purchase any interest acquired by any transferee as provided in this section. For purposes of establishing the value of the interest under this provision, the interest will be deemed to be the interest of an Assignee.

#### (a) Circumstances Triggering Purchase Option

Any of the following circumstances will trigger the Company's unilateral right to purchase a transferee's interest. Collectively these events are referred to as "triggering events":

- If the Membership Interest of a deceased Member passes to an individual or entity other than as permitted under Section 11.10;
- If any individual, entity, organization, or agency obtains a Member's interest, whether inclusive or exclusive of voting rights as a result of:
  - Any valid court order that the Company is required by law to recognize;
  - Being subject to a lawful charging order by a court of competent jurisdiction;
  - A levy or other transfer of a Membership Interest, with voting rights, that the Company has not approved but that the Company is required by law to recognize; or
  - Any decree of divorce or equitable division or property that transfers a Membership Interest in the Company.

If the Company's unilateral purchase option is exercised, the Company will purchase the affected interest of the transferee for the fair market value of the interest, valued as the interest of an Assignee.

If the interest is transferred subject to a divorce decree or equitable division of property, the Company's unilateral option as to the transferred interest will be suspended for a period of 90 days, and the divorcing Member will have all of the rights of the Company as set forth in this Section. If the divorcing Member fails to initiate exercise of the option within the 90-day period, the Company's unilateral option right will be restored.

### (b) Terms and Conditions of Exercisable Purchase Option

If the Company elects to exercise its unilateral purchase option, the following terms and conditions will apply to the transaction.

#### (1) Written Notice of Intent to Purchase

The Company will provide written notice to the Assignee or transferee within 90 days of the triggering event that the Company intends to purchase the interest. If the Company does not provide written notice within 90 days of the triggering event, the Company's unilateral purchase option will lapse.

#### (2) Exercise of Option and Date of Valuation

If the Company provides written notice of its intent to exercise its purchase option, then the Company may exercise the option within 180 days from the first day of the month following the month in which the Company provided the notice.

The valuation date for the interest to be purchased will be the first day of the month following the month in which notice is delivered.

#### (3) Written Appraisal Requirement

Unless the Company and the transferee or Assignee agree otherwise, the fair market value of any interest subject to the Company's purchase option will be determined by Qualified Appraisal performed by a Qualified Appraiser selected by the Company. The Qualified Appraiser must be qualified to perform business appraisals and to value limited liability company or partnership interests.

#### (4) Acceptance or Rejection of Valuation

If the transferee objects to the appraiser's valuation report, it must deliver written notice of the transferee's objection to the Managing Member within 30 days from the date the transferee is provided with written notice of the valuation

report. If the transferee does not object in writing within the required period, the report will be accepted as written.

If the transferee objects to the valuation report, closing of the sale will be postponed for a reasonable time until the valuation of the interest is resolved.

### (5) No Voting Rights during Purchase Option Period

Until the closing, the transferee will not be allowed to exercise any vote attributable to the interest that is subject to the purchase option. The transferee will be entitled to all items of income, deduction, gain, or loss from the interest. The transferee of the interest will be an Assignee unless all conditions have been satisfied for the transferee to become a Substitute Member as described in Section 11.05.

### (6) Location and Date of Closing

Closing of any sale under this section will occur at the principal office of the Company within 45 days of the date on which the valuation report is accepted by the transferee or the date on which the valuation of the interest is otherwise resolved.

### (7) Payment of Terms upon Exercise of Option

In order to prevent unduly burdening the Company's resources, the Company may unilaterally elect to pay any purchase money obligation in 30 equal annual installments. If the remaining term of the Company is less than 30 years, the Company may make equal annual installments over the remaining term of the Company. Interest on any unpaid principal amount will be determined at market rates determined as of the closing date and, at the option of the Company, may be adjusted annually as of the first day of each Taxable Year.

In determining whether the remaining term of the Company is less than 30 years, the Company may assume that any option to extend the Company term will be exercised by the Members. If the option to continue is not exercised, then the balance will become due and payable immediately upon dissolution of the Company.

The first installment of principal and interest will be due and payable on the first day of the Taxable Year following the closing date. Subsequent annual installments will be due and payable on the first day of each subsequent Taxable Year until the entire obligation is fully paid. The Company may

prepay any part of any purchase money obligation at any time without premium or penalty.

### Section 11.17 Assignee or Charging Order Holder Assumes Tax Liability

The Assignee of a Membership Interest and any person who acquires a charging order against a Membership Interest shall report income, gains, losses, deductions and credits with respect to the interest for the period in which the Assignee interest is held or for the period the charging order is outstanding.

## Article Twelve
## Dissolution and Termination

### Section 12.01 Dissolution of the Company

The Company will be dissolved only upon the occurrence of an event described in this section.

#### (a) Date Designated by the Members

The Company will be dissolved on a date designated by the Members.

#### (b) Judicial Dissolution

The Company will be dissolved upon the entry of a decree of judicial dissolution by a court of competent jurisdiction.

Upon dissolution, the Company shall thereafter conduct only activities necessary to wind up its affairs.

### Section 12.02 Liquidation of the Company Property

Upon dissolution of the Company, the Managing Member, or a liquidator appointed by a majority of the Members, shall liquidate the Company property, apply and distribute the proceeds from the liquidation of the property as contemplated by this Agreement, and cause the cancellation of the Company's Articles of Organization.

#### (a) Payment of Creditors and Provision for Reserves

The proceeds derived from the liquidation of property will first be applied toward or paid to any creditor of the Company who is not a Member in the order of priority of payment to any creditor as required by applicable law. After payment of liabilities owing to creditors, excluding Members, the Managing Member or liquidator shall set up a reserve of assets as the Managing Member or liquidator determines is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.

##### (1) Ability to Create an Escrow Account

Any reserves for contingent liabilities may, but need not, be paid over by the Managing Member or liquidator to a bank to be held in escrow for later payment.

(2) **Distribution of Reserves**

The Managing Member or liquidator shall distribute any remaining reserves after the Managing Member or liquidator is reasonably satisfied that any liabilities have been adequately resolved. The remaining reserves will be distributed to the Members or their assigns in the order of priority set forth in the provisions of this Agreement relating to distributions to the Members.

### (b) Distribution of Property after the Payment of Liabilities and Establishment of Reserves

After paying liabilities and providing for reserves, the Managing Member or liquidator shall satisfy any debts owed to Members with the remaining net assets of the Company, if any, and then distribute any remaining assets to the Members in proportion to their positive Capital Account balances.

### (c) Non-Cash Assets

If any part of the net assets distributable to the Members consists of notes or accounts receivable or other non-cash assets, the Managing Member or liquidator may take whatever steps it considers to be appropriate to convert the assets into cash or any other form to facilitate distribution. If any assets of the Company are to be distributed in kind, those assets will be distributed using their fair market value at the date of distribution, as determined by the Managing Member or liquidator.

## Section 12.03 Company Property Sole Source

Company property is the sole source for the payment of any debts or liabilities owed by the Company. Any return of capital contributions or liquidation amounts to the Members or Assignees (or both if the Company has Members and Assignees) will be satisfied only to the extent that the Company has adequate assets. If the Company does not have adequate assets to return the capital contributions, neither the Members nor Assignees will have any recourse against the Company or any other Members or Assignees, except to the extent that other Members may have outstanding debts or obligations owing to the Company.

## Section 12.04 Sale of Company Assets during Term of the Company

The sale of Company assets during the term of the Company does not constitute liquidation, dissolution, or termination of the Company as defined under this Article. The Company may reinvest the sale proceeds in other assets consistent with the business purposes for the Company. Further, the Members may participate in any real property exchange as defined in Code Section 1031 if the exchange fulfills the business purposes of the Company.

# Article Thirteen
# Dispute Resolution Provisions

The provisions of this Article are intended to supersede any rules governing mediation or arbitration under the law of Nevada or any other jurisdiction.

## Section 13.01 Resolution of Disputes among Members and within the Company

The Members shall use the procedure outlined in this Article to resolve any dispute, contest, or claim that may result among any of the Members or between one or more of the Members and the Company that may relate to this Agreement. It is the objective and purpose of all parties to resolve all disputes, contests, and claims without litigation using the alternative dispute resolution procedures set out in this Article.

## Section 13.02 Notice of Controversy and Designation of Authorized Representatives

Any person who has any dispute relating to the Company shall provide written notice to all Members and to any other person that has an interest in the controversy, describing the general nature of the controversy. The notice will designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of claimant. Two or more claimants may designate a common authorized representative.

Each respondent shall also designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of the respondent. Two or more respondents may designate a common authorized representative.

Written notice of the designation of the authorized representatives will be delivered to each party within 10 business days from the date the respondents receive notice of the controversy.

## Section 13.03 Commencement of Dispute Resolution Procedure

The authorized representatives shall conduct an initial meeting within 30 days from the date the claimant's notice is delivered to the respondents. The authorized representatives are entitled to collect and review all relevant evidence pertaining to the controversy and to negotiate and make a final determination to resolve the controversy. Resolution of any controversy by the authorized representatives will be conclusive and binding on all parties.

If the authorized representatives do not resolve the controversy within 30 days from the date of their initial meeting, they shall discontinue direct negotiations and submit the controversy to mediation.

## Section 13.04 Selection of a Mediator

Within 5 days of discontinuing direct negotiations the authorized representatives shall each submit to the other a written list of persons whom they consider to be qualified to serve as a mediator. Within 15 days after they exchange their lists of potential mediators the authorized representatives shall agree upon one mediator to mediate the controversy.

If the authorized representatives do not agree upon a mediator, the controversy will be submitted to binding arbitration pursuant to Section 13.10.

### Section 13.05 Time and Place for Mediation Conference

The authorized representatives shall promptly designate a mutually convenient time and place for the mediation. If the authorized representatives fail to do so the controversy will be submitted to binding arbitration pursuant to Section 13.10.

### Section 13.06 Discovery and Exchange of Information

The Authorized Representatives are entitled to fully discover, obtain, and review all information relevant to the resolution of any controversy.

### Section 13.07 Delivery of Written Summaries; Authority to Obtain Professional Assistance

At least 7 days before the first mediation conference each authorized representative shall deliver a concise written summary of fact and law pertaining to the issues to be resolved to the mediator. The authorized representatives and the mediator may retain legal counsel, accountants, appraisers, and other experts whose opinions may assist the mediator in resolving the controversy.

### Section 13.08 Conduct of Mediation

The mediator shall determine the format for mediation conferences designed to ensure that the mediator and the authorized representatives have an equal opportunity to review the evidence and any relevant technical and legal presentations. The mediator shall determine the time schedule for the resolving the mediation and shall attempt to facilitate the parties' efforts in achieving a final resolution of all issues in dispute.

If the mediator is unable to facilitate a final resolution, then any remaining unresolved issues will be resolved by arbitration as provided in Section 13.10.

### Section 13.09 Final Determinations are binding on All Parties

Any final determination made by the authorized representatives or a mediator or arbitrator will be binding upon each party who receives notice of a controversy even if the party does not respond or designate a representative, or if the authorized representative of the party fails or refuses to participate in the designation of a mediator.

### Section 13.10 Arbitration

To the extent a final resolution of any controversy is not made according to the alternative dispute resolution procedures provided in this Article, the parties to the controversy shall submit to mandatory and binding arbitration. The controversy will be settled by arbitration according to the provisions of the Commercial Arbitration Rules of the American Arbitration Association. Any judgment rendered by the arbitrator may be entered in any court having competent jurisdiction. The arbitrator may conclude arbitration proceedings without a decision if the arbitrator determines that insufficient evidence was produced through the arbitration process to support a decision.

### Section 13.11 Settlement during Mediation or Arbitration

At any time before the conclusion of any mediation or arbitration, the authorized representatives may enter an agreement resolving the controversy. Any settlement agreement will be conclusive and binding on all parties.

### Section 13.12 Qualified Appraisals

If, it is necessary to obtain a Qualified Appraisal of the value of a Membership Interest in order to resolve a dispute, each of the parties to the dispute may choose a Qualified Appraiser to provide a valuation. In the alternative, the parties may agree to select one Qualified Appraiser. The mediator or arbitrator will determine to what extent the Qualified Appraisal will be used in resolving any dispute.

### Section 13.13 Right to Seek Equitable Relief

If a party materially breaches this Agreement, and if the other parties determine in good faith that the circumstances of the breach require immediate relief, the parties who allege the material breach may seek temporary restraining orders, preliminary injunctions, or similar provisional, equitable relief in a court of competent jurisdiction.

### Section 13.14 Prevailing Party is entitled to Recover All Reasonable Costs

The party who prevails in any dispute between one or more of the Members between any Member or Manager and the Company or between the Members themselves is entitled to recover from the losing party all reasonable costs incurred, including any attorney's fees and any costs of mediation, arbitration, court fees, appraisals, and expert witnesses' costs.

## Article Fourteen
## General Matters

### Section 14.01 Successors and Assigns

Subject to the restrictions on transfer provided in this Agreement, this Agreement is binding upon and will inure to the benefit of the Members, their respective successors, personal representatives, heirs, and assigns.

### Section 14.02 No Waiver

The failure of any Member to insist upon strict performance of any provision or obligation of this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligations under this Agreement, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

### Section 14.03 Definitions

For purposes of this Agreement, the following terms have the following meanings:

### (a) Act

*Act* means the Nevada Limited Liability Company Act. A.R.S. § 29-601 et seq., as amended from time to time.

### (b) Additional Member

*Additional Member* means a Member who is admitted to the Company after the execution of this Agreement, but who is not a Substitute Member.

### (c) Additional Capital Contribution

See *Capital Contribution.*

### (d) Affiliated Person

*Affiliated Person* means a Member, a member of an individual Member's Immediate Family, a Legal Representative, successor, Assignee, or trust for the benefit of a Member and members of the Immediate Families of the individual Member, and any corporation or other legal entity of which a majority of the voting interest is owned by any one or more of Affiliated Persons.

### (e) Agreement

*Agreement* means this Operating Agreement as it may be amended from time to time.

### (f) Articles of Organization

*Articles of Organization* means the Articles of Organization filed with the Secretary of State of Nevada as required by the Act as amended from time to time, or any other similar instrument as may be required to be filed by the laws of any other state in which the Company intends to conduct business.

### (g) Assignee

*Assignee* means the recipient of a Membership Interest by *Assignment.*

### (h) Assignment

*Assignment* means any method, whether direct or indirect or whether voluntary or involuntary, by which the legal or beneficial ownership of any interest in the Company is transferred or changed, including:

> Any sale, exchange, gift, or any other form of conveyance, assignment or transfer;
>
> A change in the beneficial interests of any trust or estate which holds any interest in the Company and a distribution from any trust or estate;
>
> A change in the ownership of any Member or Assignee which is a corporation, partnership, limited liability company or other legal entity, including the dissolution of the entity;

A change in legal or beneficial ownership or other form of transfer resulting from the death or divorce of any Member or Assignee or the death of the spouse of any Member or Assignee;

Any transfer or charge under a charging order issued by any court;

Any levy, foreclosure, or similar seizure associated with the exercise of a creditor's rights in connection with a mortgage, pledge, encumbrance, or security interest.

*Assignment* does not include any mortgage, pledge, or similar voluntary encumbrance or grant of a security interest in any interest in the Company.

### (i) Bankrupt

*Bankrupt* as used in this Agreement means the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors or other action taken voluntarily or involuntarily, by a Member under any Federal or State law for the benefit of an insolvent party. It does not include any filing of a petition of involuntary bankruptcy against a Member if the petition is dismissed within 45 days from the date of filing, nor does it include the issuance of a charging order against the interest of a Member, if the charging order is removed within 10 days from the service of the charging order.

### (j) Capital Account

*Capital Account* means the account established and maintained for each Member as provided in Section 4.04 and as provided in Treasury Regulation § 1.704-1(b)(2)(iv), as amended from time to time.

### (k) Capital Contribution

*Capital Contribution* means the total cash and other consideration contributed and agreed to be contributed to the Company by each Member. Each *Initial Capital Contribution* is shown in Exhibit A of this Agreement, attached to and incorporated into this Agreement. *Additional Capital Contribution* means the total cash and other consideration contributed to the Company by each Member other than the Initial Capital Contribution. Any reference in this Agreement to the Capital Contribution of a current Member includes any Capital Contribution previously made by any prior Member with respect to that Member's interest. The value of a Member's Capital Contribution is the amount of cash plus the fair market value of other property contributed to the Company.

### (l) Cash Flow Earnings

*Cash Flow Earnings* means the net income, including capital gains income, realized by the Company for the Taxable Year, reduced or increased according to the following guidelines:

### (1) Reductions of Net Income

Net income will be reduced by the actual payment of items that are not deductible by the Company for federal income tax purposes, including non-deductible travel and entertainment expenses, charitable contributions, non-deductible interest payments, the payment of debt principal and interest, the acquisition of depreciable property during the Taxable Year to the extent that the cost is not fully deductible in the year of acquisition, and any other payment that represents an actual decrease in the cash available to the Company.

### (2) Increases in Net Income

Net income will be increased by the amount expended for federal income tax purposes for intangible costs and expenses. Intangible expenses shall include depreciation, depletion and amortization costs reported as deductions for federal income tax purposes, but not depreciation reported as an expense that is deductible under Section 179 of the Internal Revenue Code.

### (3) Treatment of Gain on Asset Sale

The gain from the sale of a Company asset will be included in determining the net income of the Company for distribution purposes to the extent of payments of the gain amount actually received by the Company for the Taxable Year. Deferred payments of gain pursuant to an installment sale or other deferred payment arrangement will be considered as income in the year a payment is actually received.

The computation of Cash Flow Earnings does not include income from a partnership, trust, limited liability company, or other organization classified by federal tax law as a pass-through entity to the extent that distributions of income from the pass-through entity are not actually received during the Taxable Year or within 60 days after the close of the Taxable Year. Subsequent distributions to the Company from a pass-through entity that are attributable to income realized and reported for a prior year will increase the cash flow earnings for distribution purposes.

Cash Flow Earnings determined for distribution purposes will not include reasonable reserves. Reserves are amounts reasonably needed for working capital, debt service, deferred maintenance, and for anticipated capital improvements.

Cash Flow Earnings will take into account the obligation of the Company to the payment obligations of interest to Members who have advanced funds to the Company as loans and the payment of any guaranteed payment

obligations of the Company. The distribution of earnings may be deferred for a reasonable time to the extent that the Company does not have available cash to satisfy the distribution amount. The term "available cash" indicates the actual cash of the Company in checking accounts, money market funds, and 90-day Treasury Bills.

### (m) Charity

*Charity* as used in this Agreement includes any organization of a type described in each of Sections 170(c), 2055(a), and 2522(a) of the Internal Revenue Code.

### (n) Charitable Trusts

*Charitable Trust* as used in this Agreement includes any charitable remainder trust created under Section 664 of the Internal Revenue Code or any charitable income trust created under Treasury Regulations Section 1.170A-6(c); Treasury Regulations Section 25.2522(c); or Treasury Regulations Section 20.2055-2(e).

### (o) Company

*Company* means EKSTRAK LABS, LLC, a Nevada Limited Liability Company.

### (p) Company Minimum Gain

*Company Minimum Gain* means the minimum amount of gain that would be realized by the Company if the Company disposed of all Company property subject to the liabilities in full satisfaction of those liabilities, computed strictly in accordance with Treasury Regulation Section 1.704-2(b) and (d).

### (q) Delivery

*Delivery* means:

> Personal delivery to a party, or
>
> Mailing by certified United States mail to the last known address of the party to whom delivery is made, with return receipt requested to the party making delivery, or
>
> Electronic transmission by facsimile to a party, provided that receipt is confirmed in writing or by electronic transmission back to the sending party, or
>
> Electronic mail transmission to a party, provided that receipt is confirmed in writing or by electronic mail transmission back to the sending party.

The effective date of delivery will be the date of personal delivery or the date of the return receipt, if received by the sending party. If no return receipt is provided, then the effective date will be the date the transmission

would have normally been received via certified mail, provided there is evidence of mailing.

### (r) Disability

*Disability* of a Member means that any one of the following has occurred:

> The Member has been declared to be incompetent, incapacitated, or otherwise legally unable to effectively manage his or her property or financial affairs by a court of competent jurisdiction;
>
> The Member's incapacity has been certified in writing by two licensed physicians, including the Member's personal physician, after examining the Member, or
>
> The Member has disappeared or is absent for unexplained reasons, causing the Member to be unable to manage his or her property or financial affairs effectively, or
>
> The Member is being detained under duress or under law, causing the Member to be unable to manage his or her property or financial affairs effectively.

A Member's disappearance or absence or detention under duress may be established by an affidavit of any other Member. The affidavit shall describe the circumstances of the individual's disappearance, absence, or detention and may be relied upon by any third party dealing in good faith with the Company in reliance upon the affidavit.

Upon regaining capacity, a formerly incapacitated Member will have all the rights, power, and authority originally granted to the Member by this Agreement.

### (s) Immediate Family

*Immediate Family* means any Member's spouse, other than a spouse who is legally separated from the person under a decree of divorce or separate maintenance; parents, parents-in-law, descendants, including descendants by adoption, brothers, sisters, brothers-in-law, sisters-in-law, and grandchildren-in-law.

### (t) Independent Person

*Independent Person* means an individual who is not related to or subordinate to a claimant or respondent of any controversy concerning the Company, is not a Member of the Company, and has no financial stake in the resolution of the controversy other than fair and reasonable compensation for services rendered in seeking to resolve the controversy.

### (u) Initial Capital Contribution

See *Capital Contribution.*

### (v) Internal Revenue Code

References to the *Internal Revenue Code* or to its provisions are to the Internal Revenue Code of 1986, as amended from time to time, and the corresponding Treasury Regulations, if any. References to the *Treasury Regulations* are to the Treasury Regulations under the Internal Revenue Code in effect from time to time. If a particular provision of the Internal Revenue Code is renumbered, or the Internal Revenue Code is superseded by a subsequent federal tax law, any reference is deemed to be made to the renumbered provision or to the corresponding provision of the subsequent law, unless to do so would clearly be contrary to the Members' intent as expressed in this Agreement. The same rule applies to references to the Treasury Regulations.

### (w) Legal Representative or Personal Representative

As used in this Agreement, the term "Legal Representative" or "Personal Representative" means a person's guardian, conservator, executor, administrator, Trustee, or any other person or entity personally representing a person or the person's estate.

### (x) Majority in Interest; 85 percent in interest of the Members

*Majority in Interest* means that more than 50 votes out of 100 votes that may be cast will determine the matter subject to the vote.

*85 percent in interest of the Members* means that at least 85 votes out of the total 100 votes that may be cast will be determinative of a given matter.

### (y) Managing Member

*Managing Member* means the Members who are responsible for managing the business of the Company, or one or more Member Principals who have been appointed by the Members to manage the Company.

### (z) Market Rate of Interest or Market Rate

The terms *market rate of interest* or *market rate* means the rate of interest identified as the "prime rate" by the WALL STREET JOURNAL in its Money Rates column, or, if two or more rates are reported as the "prime rate," the average of the two or more. If Sections 483 and 1274A of the Internal Revenue Code apply to this transaction, the minimum rate of interest of the purchase money obligation will be fixed at the rate of interest then required by those sections.

### (aa) Member

*Member* means any person or legal entity designated in this Agreement as a Member or any person or legal entity who becomes a Member as provided in this Agreement.

### (bb) Members

*Members* means all of the Members of the Company.

### (cc) Member Minimum Gain

*Member Minimum Gain* means, with respect to a Member Nonrecourse Debt, the least amount of gain that would be realized by the Company if the Company disposed of the encumbered Company property in full satisfaction of the encumbrance.

### (dd) Member Nonrecourse Debt and Member Nonrecourse Deductions

*Member Nonrecourse Debt* means nonrecourse Company debt for which one or more Members bears economic risk of loss as defined in Treasury Regulation Section 1.704-2(b)(4).

*Member Nonrecourse Deductions* means, for each Taxable Year, the Company deductions that are attributable to Member Nonrecourse Debt and are characterized as "Member Nonrecourse Deductions" under Treasury Regulation Section 1.704-2(b).

### (ee) Member Principal

The term *Member Principal* refers to a Member who has been appointed by the Members to represent the Company in operational management.

### (ff) Membership Interest

*Membership Interest* means the ownership interest and rights of a Member in the Company, including the Member's right to a distributive share of the profits and losses, distributions, and the property of the Company and the right to consent or approve Company actions. All Membership Interests are subject to the restrictions on transfer imposed by this Agreement. Each Member's interest is personal property and no Member will acquire any interest in any of the assets of the Company.

Each holder of a Membership Interest will have the right to vote the holder's proportionate interest in the Company with respect to all matters which all Members have a right to vote under this Agreement or by law.

> Example: A Member with a Membership Interest of 35.5 percent will have a 35.5 percent ownership interest in the Company, and will have 35.5 votes out of 100 votes that may be cast on matters that require the consent or affirmative action of the Members.

Membership Interests may be adjusted from time to time as provided in Article Three.

### (gg) Person

As used in this Agreement, *Person* has the same broad meaning as defined in Section 7701(a)(1) of the Internal Revenue Code. The term specifically

includes the Company, its successors and assigns, each Member or Assignee, their successors, assigns, heirs, and personal representatives. The phrase "*each other person*" identifies any individual, corporation, partnership, limited liability company, trust, or other party whose interest may be affected, adversely or otherwise, by the resolution of any dispute, contest, or claim.

### (hh) Property

*Property* means all Company property and rights as described in Exhibit A and any property real or personal, tangible or intangible otherwise acquired by the Company.

### (ii) Qualified Appraiser and Qualified Appraisal

A *Qualified Appraiser* means an appraiser who is a Member of the American Society of Appraisers, Business Valuations Division and accredited to perform business appraisals or valuations by those respective organizations or, alternatively, a certified public accountant accredited in business valuation by the American Institute of Certified Public Accountants. A *Qualified Appraisal* means any appraisal performed by a Qualified Appraiser.

### (jj) Securities Act

*Securities Act* refers to the Securities Act of 1933, as amended.

### (kk) Substitute Member

*Substitute Member* means any person not previously a Member who acquires a Membership Interest and is admitted as a Substitute Member according to the terms of Section 11.05 of this Agreement.

### (ll) Taxable Year

*Taxable Year* means the calendar year or any other accounting period selected by the Manager. Taxable year is synonymous with fiscal year for all purposes of this agreement.

## Section 14.04 Changing the Company's Situs

The situs of this Company may be changed only by the unanimous written consent of all of the Members.

## Section 14.05 No Duty to Mail Articles of Organization

The Company does not have an obligation to deliver or mail copies of the Articles of Organization or any amendments to the Members unless required to do so by the Act.

## Section 14.06 General Matters

The following general provisions and rules of construction apply to this Agreement:

### (a) Multiple Originals; Validity of Copies

This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original.

Any person may rely on a copy of this Agreement that the Managing Member certifies to be a true copy to the same effect as if it were an original.

### (b) Singular and Plural; Gender

Unless the context requires otherwise, words denoting the singular may be construed as plural and words of the plural may be construed as denoting the singular. Words of one gender may be construed as denoting another gender as is appropriate within the context. The word "or" when used in a list of more than two items may function as both a conjunction and a disjunction as the context requires or permits.

### (c) Headings of Articles, Sections, and Subsections

The headings of Articles, Sections, and Subsections used within this Agreement are included solely for the convenience and reference of the reader. They have no significance in the interpretation or construction of this Agreement.

### (d) Governing Law

This Agreement is governed, construed, and administered according to the laws of Nevada, as from time to time amended, except as to trust property required by law to be governed by the laws of another jurisdiction and unless the situs of administration is changed as provided in Section 14.04.

### (e) Notices

Unless otherwise stated, whenever this Agreement calls for notice, the notice will be in writing and will be personally delivered with proof of delivery, or mailed postage prepaid by certified mail, return receipt requested, to the last known address of the party requiring notice. Notice will be effective on the date personally delivered or on the date of the return receipt. If a party giving notice does not receive the return receipt but has proof that he or she mailed the notice, notice will be effective on the date it would normally have been received via certified mail. If notice is required to be given to a minor or incapacitated individual, notice will be given to the parent or legal representative of the minor or incapacitated individual.

### (f) Severability

The invalidity or unenforceability of any provision of this Agreement does not affect the validity or enforceability of any other provision of this Agreement. If a court of competent jurisdiction determines that any provision is invalid, the remaining provisions of this Agreement are to be interpreted and construed as if the invalid provision had never been included in this Agreement.

### (g) Acceptance

Each Manager and Member hereby acknowledges and confirms that he, she, or it has reviewed this Agreement, accepts all its provisions, and agrees to be bound by all the terms, conditions, and restrictions contained in this Agreement.

*(Remainder of page intentionally left blank)*

**IN WITNESS WHEREOF,** the Members have executed this Restated Operating Agreement as of the day and year first above written.

**MEMBERS:**

**VAXA GLOBAL, LLC**

**GREG HARRINGTON**
**DIRECTOR**

By: ______________________
Its: Member
Date: Nov 28, 201

**EXHIBIT A**

IN WITNESS WHEREOF, the foregoing OPERATING AGREEMENT, CONSISTING OF 50 pages, respectively, was adopted on the day and date first above written by the Members of EKSTRAK LABS, LLC.

| Name of Member | Total Capital Contribution Contribution | Percentage of Ownership Interest |
|---|---|---|
| VAXA GLOBAL, LLC | $ 500 | 100 % |
| **MEMBERSHIP INTEREST TOTALS** | **$ 500** | **100 %** |

**GRAMZ HOLDINGS, LLC**

**Secretary's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Secretary of Gramz Holdings, LLC, a Colorado limited liability company (the "*Company*"), pursuant to Section 2.02(e) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and Two Rivers Water & Farming Company (the "*Exchange Agreement*"), hereby certifies, on behalf of the Company and not in a personal capacity, that:

1. Attached hereto as EXHIBIT A is a true, correct and complete copy of the Articles of Organization of the Company, as in full force and effect as of the date hereof, and such Articles of Organization have not been amended, modified or rescinded in any manner by the members or managers of the Company since November 28, 2018.

2. Attached hereto as EXHIBIT B is a true, correct and complete copy of the Operating Agreement of the Company, as in full force and effect on the date hereof, and such Operating Agreement has not been amended, modified or rescinded in any manner.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

Secretary

**EXHIBIT A**

**Articles of Organization**

[attached]

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

E-Filed

Colorado Secretary of State
Date and Time: 11/28/2018 08:19 PM
ID Number: 20181933649

Document number: 20181933649
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Organization

filed pursuant to § 7-90-301 and § 7-80-204 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name of the limited liability company is

Gramz Holdings, LLC

*(The name of a limited liability company must contain the term or abbreviation "limited liability company", "ltd. liability company", "limited liability co.", "ltd. liability co.", "limited", "l.l.c.", "llc", or "ltd.". See §7-90-601, C.R.S.)*

*(Caution: The use of certain terms or abbreviations are restricted by law. Read instructions for more information.)*

2. The principal office address of the limited liability company's initial principal office is

Street address

1600 Glenarm Place, Suite 2901
*(Street number and name)*

Denver *(City)* CO *(State)* 80202 *(ZIP/Postal Code)*
AZ *(Province – if applicable)* United States *(Country)*

Mailing address
(leave blank if same as street address)

4400 N SCOTTSDALE ROAD STE
*(Street number and name or Post Office Box information)*
STE 9-289

Scottsdale *(City)* AZ *(State)* 85251 *(ZIP/Postal Code)*
AZ *(Province – if applicable)* United States *(Country)*

3. The registered agent name and registered agent address of the limited liability company's initial registered agent are

Name
(if an individual)

Carson *(Last)* Andraya *(First)* *(Middle)* *(Suffix)*

or

(if an entity)

*(Caution: Do not provide both an individual and an entity name.)*

Street address

1600 Glenarm Place, Suite 2901
*(Street number and name)*

Denver *(City)* CO *(State)* 80202 *(ZIP Code)*

Mailing address
(leave blank if same as street address)

*(Street number and name or Post Office Box information)*

_______________ (City) CO (State) _______________ (ZIP Code).

*(The following statement is adopted by marking the box.)*

[X] The person appointed as registered agent has consented to being so appointed.

4. The true name and mailing address of the person forming the limited liability company are

| | | | | |
|---|---|---|---|---|
| Name (if an individual) | CARSON | ANDRAYA | | |
| | *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

or

(if an entity) _______________

*(Caution: Do not provide both an individual and an entity name.)*

Mailing address: 1600 Glenarm Place, Suite 2901

*(Street number and name or Post Office Box information)*

Denver (City) AZ (State) 80202 (ZIP/Postal Code)

AZ *(Province – if applicable)* United States *(Country)*.

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

[ ] The limited liability company has one or more additional persons forming the limited liability company and the name and mailing address of each such person are stated in an attachment.

5. The management of the limited liability company is vested in

*(Mark the applicable box.)*

[X] one or more managers.

or

[ ] the members.

6. *(The following statement is adopted by marking the box.)*

[X] There is at least one member of the limited liability company.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

[ ] This document contains additional information as provided by law.

8. *(Caution: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are _______________.

*(mm/dd/yyyy hour:minute am/pm)*

Notice:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

| Carson | Dray | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

1600 Glenarm Place, Suite 2901
*(Street number and name or Post Office Box information)*

| Denver | CO | 80202 |
|---|---|---|
| *(City)* | *(State)* | *(ZIP/Postal Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country)* | |

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

Disclaimer:
This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

# <u>EXHIBIT B</u>

**Operating Agreement**

[attached]

# VERSION 3: December 31, 2018

# Operating Agreement of GRAMZ HOLDINGS, LLC

## GRAMZ HOLDINGS, LLC
## Table of Contents


| | | |
|---|---|---|
| **Article One** | **Formation of the Company** | **1** |
| Section 1.01 | The Limited Liability Company | 1 |
| Section 1.02 | The Name of the Company | 1 |
| Section 1.03 | Company to be taxed as a Partnership | 1 |
| Section 1.04 | Purpose and Scope of the Company | 1 |
| Section 1.05 | Purpose of Company Restrictions | 2 |
| Section 1.06 | Principal Office of the Company and Location of Records | 2 |
| Section 1.07 | Registered Agent and Registered Office | 2 |
| Section 1.08 | The Term of the Company | 2 |
| Section 1.09 | Venue | 2 |
| **Article Two** | **Tax Matters** | **2** |
| Section 2.01 | Tax Classification | 2 |
| Section 2.02 | The Tax Matters Partner | 3 |
| Section 2.03 | Tax Elections | 3 |
| **Article Three** | **Membership Interests** | **4** |
| Section 3.01 | Membership Interest in the Company | 4 |
| Section 3.02 | Valuation of Membership Interests in the Company | 4 |
| **Article Four** | **Capital Contributions and Capital Accounts** | **4** |
| Section 4.01 | Initial Capital Contributions | 4 |
| Section 4.02 | Voluntary Additional Capital Contributions | 4 |
| Section 4.03 | Prohibition against Mandatory Additional Capital Contributions | 5 |

| | |
|---|---|
| Section 4.04 | Establishment and Maintenance of Capital Accounts ..... 5 |
| Section 4.05 | Adjustment for Constructive Termination of Company ..... 6 |
| Section 4.06 | Revaluation Adjustment ..... 6 |
| Section 4.07 | No Interest or Return of Capital ..... 6 |
| Section 4.08 | Power to Modify Capital Account Provisions ..... 6 |
| Section 4.09 | Certain Property Deemed to be Loans ..... 7 |
| Section 4.10 | Negative Capital Accounts ..... 7 |
| Section 4.11 | Assignment of Capital Account ..... 7 |
| **Article Five** | **Allocations and Distributions ..... 7** |
| Section 5.01 | Allocation of Profits and Losses ..... 7 |
| Section 5.02 | Allocation to Avoid Capital Account Deficit ..... 8 |
| Section 5.03 | Special and Regulatory Allocations ..... 8 |
| Section 5.04 | Determination of Net Profits and Net Losses ..... 11 |
| Section 5.05 | Distributions to Members ..... 12 |
| **Article Six** | **Management of the Company ..... 13** |
| Section 6.01 | Management by Members ..... 13 |
| Section 6.02 | Day-to-Day Management ..... 13 |
| Section 6.03 | Appointment of Officers ..... 13 |
| Section 6.04 | Execution of Documents ..... 13 |
| Section 6.05 | Managing Member as Agent ..... 14 |
| Section 6.06 | No Authority of Individual Members ..... 14 |
| Section 6.07 | Non-Liability of Members for Acts or Omissions in Their Managerial Capacity ..... 14 |
| Section 6.08 | Limitations on Rights and Powers ..... 14 |
| Section 6.09 | Powers ..... 15 |
| Section 6.10 | Authorization to Execute Certain Instruments ..... 15 |
| Section 6.11 | Affidavit of Member or Member Principal Authority ..... 15 |
| Section 6.12 | Creation of Advisory Committee ..... 15 |
| **Article Seven** | **The Members ..... 16** |
| Section 7.01 | Names and Addresses of Members ..... 16 |
| Section 7.02 | Limited Liability of Members ..... 16 |
| Section 7.03 | Restrictions on Members' Withdrawal Rights ..... 16 |
| Section 7.04 | Restrictions on Assignees' Withdrawal Rights ..... 17 |
| Section 7.05 | No Right to Cause Dissolution ..... 17 |
| Section 7.06 | Waiver of Partition ..... 17 |
| Section 7.07 | Expulsion of a Member ..... 17 |
| Section 7.08 | Voting ..... 17 |
| Section 7.09 | Access to Information ..... 18 |
| **Article Eight** | **Meetings & Notice ..... 18** |
| Section 8.01 | Special Meetings ..... 18 |
| Section 8.02 | Notice of Meetings ..... 19 |
| Section 8.03 | Waiver of Meeting Notice ..... 19 |

| | | |
|---|---|---|
| Section 8.04 | Voting by Proxy | 19 |
| Section 8.05 | Action by Consent | 19 |
| Section 8.06 | Quorum | 19 |
| Section 8.07 | Presence | 19 |
| Section 8.08 | Conduct of Meetings | 20 |
| Section 8.09 | Approval or Consent of Members | 20 |
| **Article Nine** | **Books, Records, and Bank Accounts** | **20** |
| Section 9.01 | Books and Records | 20 |
| Section 9.02 | Accounting and Taxable Year | 20 |
| Section 9.03 | Reports | 20 |
| Section 9.04 | Bank Accounts and Company Funds | 21 |
| **Article Ten** | **Admission of Additional Members** | **21** |
| Section 10.01 | Admission by Unanimous Consent of Members; Prerequisites | 21 |
| Section 10.02 | Capital Contributions and Fair Market Value | 21 |
| Section 10.03 | No Admissions in Violation of this Article | 21 |
| **Article Eleven** | **Transfer of Membership Interests by a Member** | **21** |
| Section 11.01 | Restrictions on Transfer | 21 |
| Section 11.02 | Transfer of Interest | 22 |
| Section 11.03 | Additional Restrictions on Transfer | 23 |
| Section 11.04 | Transferee Treated as an Assignee Until Admitted as a Substitute Member | 24 |
| Section 11.05 | Conditions Required to Become a Substitute Member | 24 |
| Section 11.06 | Rights and Limitations of an Assignee | 24 |
| Section 11.07 | Permitted Transfers | 25 |
| Section 11.08 | Amendment of Operating Agreement and Articles of Organization | 25 |
| Section 11.09 | Disability of a Member | 25 |
| Section 11.10 | Death of a Member | 26 |
| Section 11.11 | Retirement of a Member | 27 |
| Section 11.12 | Purchase Price | 28 |
| Section 11.13 | Voting Rights of Transferred Interests | 29 |
| Section 11.14 | Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed | 30 |
| Section 11.15 | Creditor Rights; Charging Order Sole Exclusive Remedy | 30 |
| Section 11.16 | Company's Unilateral Purchase Option for Interest Acquired without Consent | 30 |
| Section 11.17 | Assignee or Charging Order Holder Assumes Tax Liability | 33 |

| | |
|---|---|
| **Article Twelve** | **Dissolution and Termination ....................................33** |
| Section 12.01 | Dissolution of the Company ....................................33 |
| Section 12.02 | Liquidation of the Company Property ....................................33 |
| Section 12.03 | Company Property Sole Source....................................34 |
| Section 12.04 | Sale of Company Assets during Term of the Company ..........34 |
| **Article Thirteen** | **Dispute Resolution Provisions....................................35** |
| Section 13.01 | Resolution of Disputes among Members and within the Company....................................35 |
| Section 13.02 | Notice of Controversy and Designation of Authorized Representatives....................................35 |
| Section 13.03 | Commencement of Dispute Resolution Procedure..................35 |
| Section 13.04 | Selection of a Mediator ....................................35 |
| Section 13.05 | Time and Place for Mediation Conference....................................36 |
| Section 13.06 | Discovery and Exchange of Information....................................36 |
| Section 13.07 | Delivery of Written Summaries; Authority to Obtain Professional Assistance ....................................36 |
| Section 13.08 | Conduct of Mediation....................................36 |
| Section 13.09 | Final Determinations are binding on All Parties ....................36 |
| Section 13.10 | Arbitration ....................................36 |
| Section 13.11 | Settlement during Mediation or Arbitration ............................37 |
| Section 13.12 | Qualified Appraisals....................................37 |
| Section 13.13 | Right to Seek Equitable Relief ....................................37 |
| Section 13.14 | Prevailing Party is entitled to Recover All Reasonable Costs ....................................37 |
| **Article Fourteen** | **General Matters....................................37** |
| Section 14.01 | Successors and Assigns....................................37 |
| Section 14.02 | No Waiver ....................................37 |
| Section 14.03 | Definitions....................................37 |
| Section 14.04 | Changing the Company's Situs ....................................45 |
| Section 14.05 | No Duty to Mail Articles of Organization...............................45 |
| Section 14.06 | General Matters....................................45 |

# Securities Law Disclosure

The membership interests or percentages of ownership of GRAMZ HOLDINGS, LLC (the "Company") have not been nor will be registered under the Securities Act of 1933, as amended, (the "Securities Act") or any other federal securities laws or the securities laws of any state. The membership interests or percentages of ownership are offered and sold in reliance on exemptions from the registration requirement of the Securities Act and laws and regulations enacted by the Securities and Exchange Commission effective April 15, 1982 pertaining to certain offers and sales of securities without registration under the Securities Act.

The Company will not be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, and will not file reports, proxy statements and other information with the Securities and Exchange Commission, or any state securities commission.

The limited liability company membership interests of the Company may not be offered for sale, sold, pledged, or otherwise transferred unless registered or qualified under applicable securities laws, or unless an exemption from registration or qualification exists. The availability of any exemption from registration or qualification must be established by an opinion of counsel for the owner the interest for which registration is sought. The opinion of counsel must be reasonably satisfactory to the Company.

**No Member may register any interest in the Company under any federal or state securities law without the express written consent of all Members.**

**The Members understand that some of the restrictions inherent in this form of business, and specifically set forth in this Agreement, may have an adverse impact on the fair market value of the Membership Interests if a Member attempts to sell or borrow against the Member's interest in the Company.**

# Acknowledgment of Members

By the execution of this Agreement, each of the Members agrees to the following provisions.

## Exempt from Registration

Investment in the Member's Interest (Interest) in the Company involves a high degree of risk and is suitable only for sophisticated investors. Interests are being offered in reliance upon one or more exemptions from registration provided by the Securities Act, as amended and any Securities Act of Colorado.

## Personal Investment of Member

The Member is purchasing the Interest for the Member's own investment and not with a view to the distribution or resale to any other Person.

## Restrictions on Transferability

The Company has disclosed to the Members by way of this Agreement and each Member acknowledges that the transferability of the Interest is severely limited. Each Member will bear the economic risk of investment for an indefinite period, as the Membership Interests have not been registered under the Securities Act or any state securities laws and cannot be offered or sold unless subsequently registered or unless an exemption from registration is available.

## Registration or Opinion of Counsel before Transfer

In addition to other prohibitions and restrictions on transfer under this Agreement, the Interest will not be sold publicly without registration under the Securities Act and any applicable state securities law. Before any public sale, the Member intending to sell an interest must first obtain opinion of counsel satisfactory to the Company that registration is not required in connection with any transaction. In no event may any Interest be sold within 12 months of original issue to that Member.

## Principal Address of Member

Each Member's principal residence is noted in this Agreement. Each Member shall notify the Company in writing within 5 days of any change in address of the principal residence of the Member.

## Access to Facts

Each Member has had and continues to have access to all material facts with respect to the Interest and is satisfied as to the advisability of making this investment.

## No Right to Registration

No Member may require the Company to register any Interest under Federal or state securities laws at any time, or to join in any future registration.

### Hold Harmless

Each Member agrees to hold the Company and its Members, Member Principals, Organizers and controlling Persons (as defined in the Securities Act, as amended), and any Persons affiliated with any of them or with the distribution of the Interest, harmless from all expenses, liabilities, and damages (including reasonable attorneys' fees) arising from a disposition of the Interest in any manner that violates the Securities Act, as amended, or of any applicable state securities law or that may be suffered by reason of a breach of any of the covenants, representations, and warranties contained in this Agreement.

# GRAMZ HOLDINGS, LLC
# a Colorado Limited Liability Company

## Article One
## Formation of the Company

### Section 1.01 The Limited Liability Company

This Operating Agreement for GRAMZ HOLDINGS, LLC, dated December 31, 2018, restates the Restated Operating Agreement of GRAMZ HOLDINGS, LLC, that was adopted and executed on or about November 28, 2018, as a Limited Liability Company under the laws of the State of Colorado. The Company was effective upon the filing of Articles of Organization as required by Colorado. The Members and their percentages of ownership are identified in the schedule attached to this Agreement as Exhibit "A."

This Agreement sets forth the rights, duties, obligations, and responsibilities of the Members with respect to the Company.

In consideration of the mutual promises, obligations, and agreements set forth in this Agreement, the parties to this Agreement agree to be legally bound by its terms.

### Section 1.02 The Name of the Company

The name of the Company is GRAMZ HOLDINGS, LLC (the "Company"). The Members may change the name of the Company or operate the Company under different names.

### Section 1.03 Company to be taxed as a Partnership

The Members intend to establish an entity that is subject to taxation as a partnership.

### Section 1.04 Purpose and Scope of the Company

The Company is organized to provide centralized management of investments and business activities.

In order to accomplish the foregoing purposes, the Company may perform the following activities:

> Own, acquire, manage, develop, operate, buy, sell, exchange, finance, refinance, and otherwise deal with real, personal, tangible, and intangible property, and any type of business, as the Members may deem from time to time to be in the best interests of the Company; and
>
> Conduct any lawful business and investment activity permitted under the laws of Colorado and in any other jurisdiction in which the Company may have a business or investment interest in order to accomplish the foregoing objectives.

The Company may engage in any other activities that are related or incidental to the foregoing purposes, as may be determined in the sole and absolute discretion of the Members.

## Section 1.05 Purpose of Company Restrictions

This Company is formed by those who know and trust one another.

Capital is material to the business and investment objectives of the Company and its federal tax status. An unauthorized transfer of a Member's interest could create a substantial hardship to the Company, jeopardize its capital base, and adversely affect its tax structure. As a result, there are certain restrictions expressed in this Agreement that attach to and affect ownership of Membership Interests and the transfer of those interests. Those restrictions are not intended as a penalty but are intended to protect and preserve existing relationships based upon trust and to protect the Company's capital and its financial ability to continue to operate.

## Section 1.06 Principal Office of the Company and Location of Records

The street address of the principal office in the United States where the records of the Company are to be maintained is:

2728 N. 24th Street
Phoenix, AZ 85008

or such other place or places as the Members determine. The records maintained by the Company will include all records that the Company is required by law to maintain. The Company shall likewise maintain a records office in any jurisdiction that requires a records office. The Company shall maintain at each records office all records required by applicable law.

## Section 1.07 Registered Agent and Registered Office

The name of the initial Registered Agent of the Company is Ryan Hurley and the initial registered office of the Company is:

1600 Glenarm Place
Suite 2901
Denver, CO 80202

## Section 1.08 The Term of the Company

The period of duration of the Company will be perpetual. The Company will begin on the date the Articles of Organization is filed with the Secretary of State of Colorado and will continue until terminated or dissolved in accordance with the provisions of this Agreement.

## Section 1.09 Venue

Venue for any dispute arising under this Operating Agreement or any disputes among any Members or the Company will be in the county of the Registered Office of the Company.

# Article Two
# Tax Matters

## Section 2.01 Tax Classification

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the federal income tax basis of a Member's Membership Interest and all other matters

relating to the distributive share and taxation of items of income, gain, loss, deduction, depreciation, and credit will be as established by Subchapter K of the Internal Revenue Code.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the majority of the Members may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

## Section 2.02 The Tax Matters Partner

If the Company is required to have a tax matters partner, the majority of the Members shall promptly appoint a Member as tax matters partner. The majority of the Members may replace the tax matters partner at the discretion of the Members.

### (a) Legal and Accounting Costs for Tax Matters

The Company shall pay all legal and accounting costs associated with any proceeding by the Internal Revenue Service with respect to the Company's tax returns.

### (b) Discretion as to Tax Matters

The tax matters partner shall notify all of the Members upon receipt of any notice regarding any examination by any state, federal, or local authority with respect to the Company's tax compliance. Subject to its fiduciary duty to the Members, the tax matters partner may determine whether to contest any proceedings, how to pursue any proceedings, and whether and on what terms to settle any such dispute with the Internal Revenue Service.

### (c) Tax Classification as a Partnership

Unless the Members elect not to be treated as a partnership for federal income tax purposes, the tax matters partner shall take all steps reasonably necessary to classify the Company as a partnership for tax purposes under the Code and Regulations. The tax matters partner shall, if appropriate, prepare and file any forms necessary or appropriate to classify the Company as a partnership under the laws of any jurisdiction in which the Company transacts business.

However, if the Company has only one Member, or if, for any reason cannot be taxed as a partnership, the tax matters partner may classify the Company as a corporation, sole proprietorship, disregarded entity, or any other type of entity which the tax matters partner determines to be most advantageous to the Company and its Members.

## Section 2.03 Tax Elections

A majority of the Members may make any applicable or available tax elections on behalf of the Company, but any decision to change the tax classification of the Company from partnership to corporation, or from corporation to partnership, requires approval by the super majority vote of the Members.

# Article Three
# Membership Interests

## Section 3.01 Membership Interest in the Company

Each Member's Initial Membership Interest is the percentage interest in Exhibit A attached to this Agreement. Membership Interests will be adjusted from time to time to account for non-*pro rata* Additional Capital Contributions and non-*pro rata* distributions to Members. If non-*pro rata* contributions or distributions are made, each Member's Membership Interest will then be determined by dividing the Capital Account of each Member by the aggregate of the then-existing capital accounts, after adjusting the Members' Capital Accounts to reflect the fair market value of the contributed property.

For purposes of determining the respective voting rights of the Members, adjustments to Membership Interests of the Members resulting from Additional Contributions or Distributions will be effective as of the first day of the month immediately following the date of the contribution or distribution.

The Company shall maintain a correct record of all Members and their Membership Interests together with amended and revised schedules of ownership caused by changes in the Members and changes in Membership Interests.

## Section 3.02 Valuation of Membership Interests in the Company

For all purposes, the value of the Company as an entity and of Membership Interests shall be their respective fair market values. Any dispute, contest, or issue of fair market value is to be resolved and determined by written Qualified Appraisal by a Qualified Appraiser selected by the Members.

# Article Four
# Capital Contributions and Capital Accounts

## Section 4.01 Initial Capital Contributions

The Members shall contribute as their initial capital contributions to the Company all of their right, title and interest in and to the property described in Exhibit A. The Members agree that the property described in Exhibit A has the fair market value (net of liabilities assumed or taken subject to or by the Company) listed opposite the scheduled property.

Each Member's Capital Account will be credited with an initial contribution equal to the fair market value as specified in Exhibit A.

## Section 4.02 Voluntary Additional Capital Contributions

The Members may make Additional Capital Contributions to the Company. Any Additional Capital Contribution shall be made *pro rata*, according to the Member's Membership Interest, unless otherwise agreed to by the unanimous consent of the Members. Consent does not need to be evidenced in writing and will be presumed to have been obtained unless there is clear and convincing evidence to the contrary.

The fair market value of any property other than cash or publicly traded securities to be contributed as an Additional Capital Contribution will be as agreed upon by the contributing Member and a majority in interest of the Members at the time of contribution. Alternatively, a disinterested appraiser selected by the Members may determine the fair market value of any contributed property.

### Section 4.03 Prohibition against Mandatory Additional Capital Contributions

The Company has no authority to require Additional Capital Contributions.

### Section 4.04 Establishment and Maintenance of Capital Accounts

A Capital Account will be established for each Member and will be maintained at all times during the existence of the Company in a manner that complies with the Internal Revenue Code and applicable Treasury Regulations. Each Capital Account will be maintained according to the following provisions:

#### (a) Credits to Member's Interest

Each Member's Interest will be credited with the fair market value of the Member's contribution of cash or other property, the Member's distributive share of profits, and the amount of any Company liabilities that are assumed by the Member.

#### (b) Debits to Member's Interest

Each Member's Capital Account will be debited the amount of cash and the fair market value of any property distributed to the Member under this Agreement, the Member's share of losses, and the amount of any liabilities of the Member that are secured by any property contributed by the Member to the Company.

#### (c) Assumption of Liability

An assumption of unsecured liability by the Company will be treated as a distribution of money to the Member, and the Company shall adjust the Member's Capital Account accordingly. Assumption of an unsecured liability of the Company by a Member will be treated as a cash contribution to the Company. The amount of any liability assumed under this provision will be determined according to Section 752(c) of the Internal Revenue Code.

#### (d) Adjustments for Noncash Distributions

If assets of the Company other than cash are distributed in kind to a Member, the Company shall adjust the Capital Accounts of the Members to reflect the hypothetical "book" gain or loss that would have been realized by the Company if the distributed assets had been sold at fair market value in a cash sale in order to reflect unrealized gain or loss.

### (e) Adjustment to Fair Market Value upon Transfer of Membership Interest

If an existing or new Member acquires an Interest, the Company shall adjust the Capital Accounts of the Members to reflect fair market value of all properties held by the Company.

## Section 4.05 Adjustment for Constructive Termination of Company

In the event of constructive termination of the Company as provided under Section 708 of the Internal Revenue Code, the Company shall adjust the Members' Capital Accounts to reflect fair market value of all properties held by the Company as required by Treasury Regulation Section 1.704-1(b)(2)(iv)(b).

## Section 4.06 Revaluation Adjustment

The Company shall adjust the Members' Capital Accounts to reflect any revaluation of Company property (including intangible assets such as goodwill) as provided in this section.

### (a) Adjustment Based on Fair Market Value

Any revaluation adjustment to a Member's Capital Account will be based on the fair market value of Company property on the date of the adjustment as provided under Code Section 7701(g).

### (b) Adjustment for Unrealized Items

The Company shall adjust the Members' Capital Accounts to reflect the manner in which any unrealized income, gain, loss, or deduction inherent in the Company's property (to the extent that it has not been previously reflected in the Members' Capital Accounts) would be allocated among all the Members if there were a taxable disposition of such property for fair market value on the date of adjustment.

## Section 4.07 No Interest or Return of Capital

Notwithstanding any other provision of this Agreement, no Member is entitled to any interest on its Capital Account or Membership Interest or on the Member's Capital Contribution. No Member may demand or receive the return of all or any portion of the Member's Capital Account, Membership Interest, or Capital Contribution.

## Section 4.08 Power to Modify Capital Account Provisions

The Members may modify the manner in which the Capital Accounts are computed in order to comply with Treasury Regulation Section 1.704-1(b), provided that, in the reasonable judgment of the Members, the modification is not likely to have a material effect on the amounts distributable to any Member under this Agreement. The Members shall also make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company Capital reflected on the Company's balance sheet, as computed for book purposes according to Treasury Regulation Section 1.704-1(b)(2)(iv)(g), relating to adjustments to book value.

### Section 4.09 Certain Property Deemed to be Loans

If for any reason the Company would otherwise be deemed to be an investment company within the meaning of Section 351 of the Internal Revenue Code, the Members intend to comply with the requirements of Section 721(b) of the Internal Revenue Code, so that contributions of property to the Company will not cause recognition of any gain or loss to any Member. Accordingly, if any contribution of property would cause the recognition of gain or loss to any Member under Section 721(b) of the Internal Revenue Code, then that property will be deemed to have been loaned to the Company. Any loan will bear interest at the minimum interest rate required under Section 7872 of the Internal Revenue Code. The Company shall return any property loaned to the Company under this provision to the lender of the property within 90 days of the lender's demand.

### Section 4.10 Negative Capital Accounts

In the event of liquidation of the Company or of a Member's Membership Interest no Member will be required to restore a deficit in the Member's Capital Account.

### Section 4.11 Assignment of Capital Account

Except as otherwise required by the Internal Revenue Code or Treasury Regulations, if any Membership Interest is assigned according to the terms of this Agreement, the Assignee will succeed to the Capital Account of the assignor to the extent that it relates to the assigned Membership Interest. If the assignment of an interest in the Company causes a termination of the Company under Section 708(b)(1)(B) of the Internal Revenue Code, the Capital Account that carries over to the Assignee will be adjusted according to Treasury Regulation Section 1.704-1(b)(2)(iv)(e).

## Article Five
## Allocations and Distributions

### Section 5.01 Allocation of Profits and Losses

Subject to the provisions of Section 5.02 and Section 5.03, all items of income, gain, loss, deduction and credit, whether resulting from the Company's operations or in connection with its dissolution, shall be allocated to the Members in proportion to their respective Membership Interests.

The Members, by unanimous agreement, may enter into agreements providing for the special allocation of items of income, gain, loss, deduction, or credit, provided that the special allocations have substantial economic effect as required by applicable federal tax law.

The Members may also agree to allocate net profits and net losses in a way that conforms to adjustments made to the Percentage Interests as a result of any loans made to the Company that have been converted to contributions to capital, any distributions of cash, or any liquidating distributions

If the Percentage Interest of a Member is not the same throughout a given Taxable Year, the Company shall determine the allocation of net profits and net losses to the Members taking into account the Members' varying Percentage Interests during the year. The

Company shall make the determination consistent with the requirements of Section 706(d) of the Internal Revenue Code.

The Members shall have the authority to change the allocation provisions of this Section to the extent that the Company's legal counsel advises the Company that such change is required under the Internal Revenue Code in light of the manner in which the Members have agreed to bear losses and to share profits and distributions under this agreement.

### Section 5.02 Allocation to Avoid Capital Account Deficit

The Company shall not allocate net losses in such a way as would cause a Member to have a capital account deficit at the end of any Taxable Year. Any Company net losses that cannot be allocated to one or more of the Members without creating a negative Capital Account will be allocated to the remaining Members in proportion to their Capital Accounts until all Members have a Capital Account of zero. Net losses allocated when all Members have a Capital Account of zero shall be allocated proportionately among the Members according to their respective Membership Interests. If some but not all of the Members would have a deficit in their Capital Accounts because of allocation of losses, the Company shall allocate losses on a Member-by-Member basis in order to allocate the maximum permissible losses to each Member under Treasury Regulation Section 1.704(b)(2)(ii)(d). The Company shall allocate any remaining net losses to the Members in accordance with the Members' respective Membership Interests.

### Section 5.03 Special and Regulatory Allocations

The Company shall make the following special and regulatory allocations:

#### (a) Allocations Related to Contributed Property

The Company shall allocate income, gain, loss, and deductions with respect to any property contributed to the capital of the Company among the Members in accordance with Section 704(c) of the Internal Revenue Code for the purpose of accounting for any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date the property was contributed. If the fair market value of any Company asset is adjusted, then in making subsequent allocations of income, gain, loss, and deductions with respect to the asset the Company shall account for any variation between the adjusted basis of the asset for federal income tax purposes and the asset's fair market value in the same manner as provided under Section 704(c) of the Internal Revenue Code.

#### (b) Allocation of Member Nonrecourse Deductions

The Company shall allocate all Member Nonrecourse Deductions for each Taxable Year to the Member or Members who bear the economic risk of loss with respect to the Member Nonrecourse Debt to which any Member Nonrecourse Deductions are attributable, in accordance with the ratio in which the Members bear economic risk of loss and as provided in Treasury Regulation Section 1.704-2(i)(1).

### (c) Company Minimum Gain Chargeback

If there is a net decrease in Company Minimum Gain during any Company Taxable Year, the Company shall allocate items of Company income and gain for the year (and, if necessary, subsequent years) in proportion to the respective amounts required to be allocated to each Member in accordance within Treasury Regulation Section 1.704-2(f) and (g). This provision is intended to comply with the minimum gain chargeback requirement of Treasury Regulation Section 1.704-2.

To the extent permitted by Treasury Regulation Section 1.704-2 and for purposes of this provision only, the Company shall determine any deficit in each Member's Capital Account before any other allocations under this Article with respect to the Taxable Year and without regard to any net decrease in Member Minimum Gain during the Taxable Year.

### (d) Member Minimum Gain Chargeback

If there is a net decrease in Member Minimum Gain attributable to Member Nonrecourse Debt during a Taxable Year after the Company computes and accounts for Company Minimum Gain Chargeback above, then Company shall allocate items of income and gain for that year (and, if necessary, for any subsequent years) to any Member who has a share of the Member Minimum Gain Attributable to that Member Nonrecourse Debt at the beginning of the year in the amount and proportions necessary to satisfy the provisions of Treasury Regulation Section 1.704-2(i).

### (e) Qualified Income Offset

If any Member unexpectedly receives any adjustments, allocations, or distributions described in Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(4),(5) or (6), the Company shall allocate items of Company income and gain to the Member so as to eliminate any deficit in the affected Members' Capital Accounts as quickly as possible to the extent required by Treasury Regulations. But the Company shall only make an allocation as provided under this provision only to the extent that an affected Member would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

This provision is intended to comply with the qualified income offset requirement of Treasury Regulation Section 1.704-1(b)(2)(ii)(d)(3).

### (f) Gross Income Allocation to Restore Capital Account Deficit

If any Member has a Capital Account deficit at the end of any Company Taxable Year that exceeds the sum of the amount the Member is obligated to restore under this Agreement and the amount the Member is deemed to be obligated to restore under the Regulations, then the Company shall allocate items of Company income and gain in the amount of the excess as quickly as is practicable. But the Company shall only make an allocation as provided under this provision only to the extent that an affected Member

would have a remaining Capital Account deficit after all other allocations provided for in this Article have been computed.

### (g) Allocation from Disposition of Property Not Revalued

Upon the admission of a Member or in the event a Membership Interest is liquidated, if properties of the Company are not revalued pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and the Capital Accounts of the Members are not adjusted accordingly, then Company shall allocate gain or loss recognized upon the sale or other disposition of Company property among the Members to take into account the variation between the adjusted basis of the property and the property's fair market value as of the date the Member was admitted or the Interest was liquidated, as the case may be, as provided under Code Section 704(c).

### (h) Allocation Related to Adjustments in Tax Basis

To the extent an adjustment to the adjusted tax basis of any asset of the Company under Section 734(b) or 743(b) of the Internal Revenue Code is required, pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining the Capital Accounts, the amount of the adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and the Company shall allocate gain or loss to the Members consistent with the manner set forth under Treasury Regulation Section 1.704-1.

### (i) Allocation Related to Capital Event Adjustments

If the gross book value of any asset of the Company is increased or decreased for special events, the Company shall allocate gain or loss as required for Capital Account purposes. The Company shall take into account any difference between the adjusted basis of such asset for federal income tax purposes and the asset's gross book value for any subsequent allocations of income, gain, loss, or deductions with respect to any adjusted asset.

### (j) Allocation Consistent with Distributions

The Company shall allocate net profits and net losses in a manner that is consistent with:

The requirements for distributions of cash described elsewhere in this Agreement;

The requirements for distribution of assets of the Company upon its dissolution and winding up strictly in accordance with Capital Account balances as specified in the procedures described below; and

The requirements of applicable Regulations under Section 704(b) of the Internal Revenue Code.

### (k) Allocations to Comply with Regulations and Intentions of Members

The allocations of net income, gains, net losses, and deductions set forth in this Agreement are intended to comply strictly with Treasury Regulation Section 1.704-1(b), Treasury Regulation Section 1.704-1(b)(4)(iv), and Treasury Regulation Section 1.704-2, and are intended to have "substantial economic effect" within the meaning of those Regulations.

The allocations may not be consistent with the intentions of the Members to allocate distributions. Accordingly, the Members are hereby authorized to allocate net profits, net losses, and other economic items among the Members so as to prevent the allocations from distorting the manner in which distributions are intended to be divided among the Members as specified in this Article. In general, the Members anticipate that these allocations will be accomplished by specially allocating other net profits, net losses, and items of income, gain, loss, and deductions among the Members so that the net amount of the allocations and any special allocations to the Member is zero. If, for whatever reason, the Members determine that the allocation provisions of this Agreement are unlikely to be respected for federal income tax purposes, the Members may amend the allocation provisions of this Agreement to the minimum extent necessary to affect the plan of allocations and distributions provided in this Agreement. The Members may adopt and revise rules, conventions, and procedures as the Members determine to be appropriate with respect to the admission of Members to reflect the Interest at the end of the year in accordance with the intentions of the Members. THIS DISCLOSURE PERTAINS TO THE TAX TREATMENT OF THE LLC. COMMON DISCLOSURE

## Section 5.04 Determination of Net Profits and Net Losses

For purposes of this Article, the terms "net profits" and "net losses" mean an amount equal to the Company's taxable income or loss for any year or period, determined in accordance with Section 703(a) of the Internal Revenue Code. All items of income, gain, loss, or deduction required to be stated separately under Section 703(a)(1) will be included in taxable income or loss. This determination of net profits and net losses includes the following items:

Any income of the Company that is exempt from federal income tax that is not otherwise taken into account in computing taxable income or loss under this Article.

Any expenditures of the Company described in Section 705(a)(2)(B) of the Internal Revenue Code relating to non-deductible expenses that are not otherwise taken into account in computing taxable income or loss.

If the value of any Company asset is adjusted, the amount of the adjustment will be taken into account as gain or loss from the disposition of the asset.

Any other items that are specially allocated under this Article will not be taken into account in computing net profits and net losses.

## Section 5.05 Distributions to Members

The primary intent of the Company is to retain Company funds in amounts determined in the sole and absolute discretion of the Members to meet the reasonable needs of the business or investments of the Company and other needs as provided in this Agreement. No Member may demand distributions of any Company funds or assets.

The Company may not distribute, in any single year, more than an amount equal to the Company income for the previous tax year plus 5% of the value of the assets of the Company on the last day of the previous calendar year, without the unanimous consent of all Members.

When any distributions of funds or other Company assets are made, the Company shall satisfy those distributions as follows:

### (a) Distributions of Cash

The Company may make distributions of Company cash to the Members on a *pro rata* or *non-pro rata* basis as the Members, in their discretion, determine. Distributions may only be made from the cash reserves that exceed the reasonable working reserves of the Company as determined in the sole discretion of the Members.

Subject to this Agreement and applicable law, distributions of cash will first come from cash from operations as permitted under this Agreement, then from cash from the liquidation of the Company as provided in this Agreement.

### (b) Distributions in Kind

The Members in their sole and absolute discretion, may make distributions in kind of Company property to the Members. Prior to any such distribution in kind, the difference between such established fair market value and the book value of the property to be distributed shall be adjusted by a credit or charge, as is appropriate, to the Members' Interests. Upon the distribution of such property, such adjusted value shall be charged to the Interests of the Members receiving such distributions.

### (c) No Interest

If a Member does not withdraw all or any portion of the Member's share of any cash distribution made pursuant to subsection (a), the Member may not receive any interest on that portion of the distribution not so withdrawn, or on any additional Membership Interest, unless all Members agree.

### (d) Cash from Capital Transactions

The proceeds of any capital transaction will be applied to payment of all expenses incurred in connection with the transaction and, to the extent specified in the terms of any capital transaction, to the payment of any indebtedness secured by the asset involved in the capital transaction.

### (e) Allocation of Distributions

Except as otherwise provided in this Agreement, distributions will be allocated to the Members in proportion to their Membership Interests.

### (f) Return of Distribution

Any distribution made to the Members will be considered to comply with applicable law if the distribution is made from available Company assets. If a court of competent jurisdiction finds that a distribution violates applicable law, the Members must return their respective share of that distribution, provided that the request for return of the distribution is approved by 85% of the Members.

### (g) Deemed Notice to Creditors

Creditors of the Company will be deemed to have notice of the provisions of this Article and of the fact that Members are not required to return a Distribution unless the request for return of the Distribution has been approved by the 85% of the Members.

# Article Six
# Management of the Company

## Section 6.01 Management by Members

The Members will manage the Company. The Members may manage the Company by majority, or may appoint one or more "Managing Members" from their number to represent the Members in managing the Company. For purposes of this Agreement, the Members acting by majority to manage the Company or the Managing Members will be referred to collectively as the "Managing Member", whether one or more.

Managing Members must act in good faith, with the care that an ordinarily prudent person in a similar position would exercise under similar circumstances, and in a manner the Managing Member reasonably believes to be in the best interests of the Company.

## Section 6.02 Day-to-Day Management

The Managing Member may take all actions necessary, useful, or appropriate for the ordinary management and conduct of the Company's business. Subject to the restrictions in Section 6.08, the Managing Member may exercise all powers of the Company and do anything that is not reserved by the Members as specified in the Articles of Organization, in this Agreement, or in the Act.

## Section 6.03 Appointment of Officers

If authorized by a majority of the Members, the Managing Member may appoint officers and define their function and authority. Officers may but need not be a Member or Managing Member. Any appointment and assignment of function or authority will be made in writing and kept with the records of the Company.

## Section 6.04 Execution of Documents

The Managing Member may execute any instruments, contracts, agreements, or other documents providing for the acquisition, encumbrance, or disposition of property of the Company.

### Section 6.05 Managing Member as Agent

Unless specifically prohibited by the Articles of Organization, each Managing Member serves as an agent of the Company for the purpose of conducting business on behalf of the Company. As agent, the Managing Member may bind the company unless the Managing Member's action violates the terms of the Articles of Organization, this Agreement, or the Act, or unless third parties dealing with the Managing Member reasonably believe that the Managing Member does not have authority to act.

### Section 6.06 No Authority of Individual Members

No individual Member is an agent of the Company, and no Member other than a Managing Member may make any contracts, enter into any transactions or make any commitments on behalf of the Company.

### Section 6.07 Non-Liability of Members for Acts or Omissions in Their Managerial Capacity

To the extent permitted by Colorado law, all Members are released from liability for damages and other monetary relief on account of any act, omission, or conduct in the managing the Company. This release does not protect any Member from being required by a court to purchase the Membership interest of another Member who successfully contends that the Member committed actionable oppressive acts to the prejudice of the other Member. No amendment or repeal of this provision affects any liability or alleged liability of any Member for acts, omissions, or conduct that occurred before the amendment or repeal.

### Section 6.08 Limitations on Rights and Powers

Unless authorized by the unanimous written agreement of the Members, no Member, Managing Member, nor any other officer of the Company may:

> Enter into or commit to any agreement, contract, commitment or obligation on behalf of the Company obligating any Member to find additional capital, to make or guarantee a loan or to increase a Member's personal liability either to the Company or to third parties;
>
> Receive or permit any Member to receive any fee or rebate, or to participate in any reciprocal business arrangements that would conflict or compete with the business of the Company or otherwise contradict the intent of this Agreement;
>
> Materially alter the Business of the Company or deviate from any approved business plan of the Company;
>
> Permit the Company's funds to be commingled with the funds of any other Person;
>
> Do any act that contradicts this Agreement;
>
> Do any act which would make it impossible to carry on the Business of the Company;
>
> Confess a judgment against the Company;

Possess Property, or assign rights in specific Property, for other than a Company purpose; or

Admit any person as a Member, except as otherwise provided in this Agreement.

## Section 6.09 Powers

In pursuing its lawful purposes, the Company may do all things that limited liability companies are permitted to do under the Act.

## Section 6.10 Authorization to Execute Certain Instruments

With respect to all obligations, powers, and responsibilities under this Agreement, the Managing Member may execute and deliver any notes and other evidence of indebtedness, contracts, agreements, assignments, deeds, leases, loan agreements, mortgages, and other security instruments and agreements in any form on behalf of the Company as the Managing Member determines to be proper.

## Section 6.11 Affidavit of Member or Member Principal Authority

Any third party dealing with the Company may rely on a notarized writing signed by a Managing Member stating the Managing Member's authority to act for the Company. The Managing Member may use the following as an example of a valid writing:

The above example may be appropriately modified to reflect the Managing Member's fiduciary duty. The person signing on behalf of the Company may also execute and deliver to third parties a Memorandum of Operating Agreement, a copy of which may be attached to this Agreement as an Exhibit.

## Section 6.12 Creation of Advisory Committee

The Manager may establish an advisory committee ("Advisory Committee") of the Company consisting of two or more Members, beneficiaries of trusts that are Members or legal, financial, or other advisors to the Manager or any Member.

### (a) Annual Meetings

If the Advisory Committee is established, at least once per calendar year the Manager shall call a meeting of the Advisory Committee. The purpose of the meeting will be to generally inform the Advisory Committee of the business and operations of the Company since the last meeting of the Advisory Committee.

### (b) Committee Is Advisory Only

The Advisory Committee may make recommendations to or otherwise advise and consult with the Manager regarding the business and operation of the Company, but the Advisory Committee may not take any action on behalf of the Company or compel the Manager or any Member to take any action. The Advisory Committee may make a report of the meeting to the Members.

### (c) Payment of Expenses Authorized

Advisory Committee members will be entitled to payment from the Company for their reasonable expenses for their attendance at meetings of the Advisory Committee.

# Article Seven
# The Members

## Section 7.01 Names and Addresses of Members

The Company shall maintain a list of all Members of the Company, both past and present, and their last known mailing addresses. The list will be kept as part of the records of the company. The Company shall update the list of Members from time to time as necessary to maintain accurate records.

## Section 7.02 Limited Liability of Members

Except as provided in Article Four, no Member will be required to contribute capital to the Company for the payment of any losses or for any other purposes, and no Member will be responsible or obligated to any third party for any debts or liabilities of the Company in excess of the sum of:

That Member's unpaid required contributions to the capital of the Company,

Unrecovered contributions to the capital of the Company, and

The Member's share of any undistributed profits of the Company.

## Section 7.03 Restrictions on Members' Withdrawal Rights

No Member may withdraw from the Company or receive a return of any contributions to the Company until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Member who does any of the following will be considered to have breached this Agreement:

Attempting to withdraw from the Company;

Interfering in the management of the Company affairs;

Engaging in conduct which results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Owning a Membership Interest that becomes subject to a charging order, attachment, garnishment, or similar legal proceedings;

Breaching any confidentiality provisions of this Agreement; or

Failing to discharge a legal duty to the Company.

Any Member who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Member who has breached this Agreement.

### Section 7.04 Restrictions on Assignees' Withdrawal Rights

No Assignee has the right to receive a return of any contributions (whether the contributions were made by the Assignee or by an Assignor) until the Company is terminated and its affairs wound up according to the Act and this Agreement. Any Assignee who does any of the following will be considered to have breached this Agreement:

Interfering in the management of the Company affairs;

Engaging in conduct that results in the Company losing its tax status as a Company;

Engaging in conduct that tends to bring the Company into disrepute;

Breaching any confidentiality provisions of this Agreement;

Bringing any legal action against the Company to force the dissolution of the Company, to force any distribution of Company assets, or to appoint a receiver; or

Failing to discharge a legal duty to the Company.

Any Assignee who breaches this Agreement will be liable to the Company for damages caused by the breach. The Company may offset damages against any distributions or return of capital to the Assignee who has breached this Agreement.

### Section 7.05 No Right to Cause Dissolution

No Member may cause the dissolution and winding up of the Company by court decree or otherwise.

### Section 7.06 Waiver of Partition

Each Member, individually and on behalf of the Member's successors and assigns, expressly waives any right to have any Company property partitioned.

### Section 7.07 Expulsion of a Member

The Company may only expel a Member for violation of this Agreement or for failing to make the Capital Contributions as required in Article Four. A Member may only be expelled on the unanimous consent of all Members, excluding the Member to be expelled.

An expelled Member will lose all rights as a Member of the Company, and the expelled Member's interests will be converted to that of an Assignee.

### Section 7.08 Voting

Members may only vote on the following matters:

Removal of a Managing Member;

Election of a successor Managing Member;

Termination and dissolution of the Company;

Amendment of this Agreement;

The extension of the term of the Company; and

Any matter requiring the vote of the Members as set out elsewhere in this Agreement or in the Act.

Members may vote by written consent, with or without a formal meeting. Assignees may not vote.

### Section 7.09 Access to Information

Subject to the provisions of this section, each Member is entitled to all information regarding the Company under the circumstances and subject to the conditions stated in this Agreement and the Act. Assignees have no right to information regarding the Company.

All Members and any Assignee who obtains any information are subject to the confidentiality provisions of this section.

#### (a) Confidential Information

The Members acknowledge that they may receive information regarding the Company in the form of trade secrets or other information that is confidential, the release of which may be damaging to the Company or to persons with whom it does business. Each Member shall hold in strict confidence any information regarding the Company that is identified as being confidential and may not disclose it to any person other than another Member, except for disclosures:

Compelled by law (but the Managing Member must notify the Manager promptly of any request for that information, before disclosing it, if practicable),

To advisors or representatives of the Member of the Company, but only if they have agreed to be bound by the provisions of this section, or

Of information that Member also has received from a source independent of the Company that the Member reasonably believes it obtained without breach of any obligation of confidentiality.

#### (b) Enforcement through Specific Performance

The Members acknowledge that disclosure of confidential information may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the provisions of this section may be enforced by specific performance.

## Article Eight
## Meetings & Notice

### Section 8.01 Special Meetings

Special meetings of the Members may only be called by a majority in interest of the Members. Special meetings of the Members may only be called upon delivery to the

Members of notice of a special meeting of the Members given in accordance with this Agreement.

## Section 8.02 Notice of Meetings

The Company shall deliver notice (stating the date, time, and place of any meeting of the Members and a description of the purposes for which the meeting is called) to each Member of record entitled to vote at the meeting at the address as appears in the records of the Company at least 2 but no more than 30 days before the date of the meeting.

## Section 8.03 Waiver of Meeting Notice

A Member may waive notice of any meeting, before or after the date and time of the meeting as stated in the notice, by delivering a signed waiver to the Company for inclusion in the minutes. A Member's attendance at any meeting, in person or by proxy, waives objection to lack of notice or defective notice of the meeting, unless the Member objects to holding the meeting or transacting business at the meeting and waives objection to consideration of a particular matter at the meeting that is not within the purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

## Section 8.04 Voting by Proxy

The Members may appoint a proxy to vote or otherwise act for the Members pursuant to a written appointment form executed by the Member or the person's attorney in fact. An appointment of a proxy is effective when received by the secretary or other officer or agent of the Company authorized to tabulate votes. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 11 months unless otherwise expressly stated in the appointment form, or unless the authorization is revoked by the Member who issued the proxy.

## Section 8.05 Action by Consent

Any Action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the action is taken by all the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action taken, which consents, in the aggregate, are signed by all of the Members entitled to vote on the action and delivered to the Company for inclusion in the minutes.

## Section 8.06 Quorum

The presence of Members holding at least two-thirds of the Membership Interests constitutes a quorum for any meeting of the Members.

## Section 8.07 Presence

Any Member may participate in any meeting through the use of any means of communication by which all Members participating may simultaneously hear each other during the meeting. Any Member so participating will be deemed to be present in person at the meeting.

### Section 8.08 Conduct of Meetings

At any meeting of the Members, the Members shall appoint a person to act as secretary of the meeting. The secretary of the meeting shall prepare minutes of the meeting, to be kept with the records of the Company.

### Section 8.09 Approval or Consent of Members

Unless provided otherwise by the Act or this Agreement, any action of the Members requires a vote or written consent of at least two-thirds of the Members in favor of the action.

## Article Nine
## Books, Records, and Bank Accounts

### Section 9.01 Books and Records

The Company shall keep books of account with respect to the operation of the Company at the principal office of the Company, or at any other place as the Members determine. All Members and their duly authorized representatives will have access to the books at all reasonable times. The Company shall keep the following records:

A current list of the full name and last known address for delivery of notices of each Member;

A copy of the Articles of Organization (together with any amendments) and copies of any powers of attorney under which any certificate has been executed;

Copies of the Company's federal, state, and local income tax returns and reports, if any, for the 3 most recent years;

Copies of this Agreement (together with any amendments);

Copies of any financial statements of the Company for the 3 most recent years; and

Any other documents required by law.

### Section 9.02 Accounting and Taxable Year

The Company shall keep books of account consistent with any method authorized or required by the Internal Revenue Code and as determined by the Members. The Company shall close and balance the books at the end of each Company year. The Taxable Year of the Company will be the period authorized or required by the Internal Revenue Code, and as determined by the Members.

### Section 9.03 Reports

Within a reasonable time after the end of each Taxable Year the Company shall provide each Member with the information necessary to allow each Member to prepare and file their respective tax returns. The Company shall prepare all financial statements at the expense of the Company.

### Section 9.04 Bank Accounts and Company Funds

The Company shall deposit all cash receipts in the Company's depository accounts. All accounts used by or on behalf of the Company are property of the Company, and will be received, held, and disbursed by the Manager for the purposes specified in this Agreement. The Members shall not commingle Company funds with any other funds.

## Article Ten
## Admission of Additional Members

### Section 10.01 Admission by Unanimous Consent of Members; Prerequisites

Additional Members may only be added after the unanimous consent of the Members. Before being admitted as a Member, a prospective Member must first:

> Provide evidence satisfactory to the Company that admission of the prospective Member will not violate any applicable securities law, cause a termination of the Company under applicable provisions of the Code, or alter the status of any tax election made by the Company;
>
> Pay all reasonable expenses connected with admission as a Member, including professional fees incurred in obtaining opinions or valuations; and
>
> Agree to be bound by all of the terms and provisions of this Agreement by signing the Agreement.

### Section 10.02 Capital Contributions and Fair Market Value

Other than contributions of cash or publicly-traded securities, the fair market value of any property to be contributed by an additional Member as its initial Capital Contribution will be determined as agreed upon by the additional Member and the holders of a majority of the Membership Interests before the contribution is made. In the alternative, the Managing Member shall appoint a disinterested appraiser to determine the value of the property to be contributed.

### Section 10.03 No Admissions in Violation of this Article

Any attempt to admit an additional Member in violation of this Article will be null and void and of no effect.

## Article Eleven
## Transfer of Membership Interests by a Member

### Section 11.01 Restrictions on Transfer

Except as provided in this Article, no Member may transfer any Membership Interest either voluntarily or involuntarily by any means without the unanimous written consent of all Members. The Members are not required to consent to any attempted transfer and will not be subject to any liability for withholding consent.

Any attempted transfer of a Membership Interest or the admission of a Substitute Member in violation of the provisions of this Article will be null and void.

## Section 11.02 Transfer of Interest

No Member may transfer any Membership Interest without first offering in writing to sell the interest to the Company and to all other Members as provided in this section.

### (a) Notice

A Member who intends to transfer a Membership Interest must first give notice to the Company and to all other Members of the Member's intent to transfer. Any notice of intent to transfer must include the following information.

#### (1) Writing Explaining Terms of Offer

If the Member received a written offer, then a copy of that written offer must be attached to the notice. If the Member received only an oral offer, then a written explanation of the oral offer must be attached to the notice.

The written explanation must be complete in all details respecting the purchase price and terms of payment.

#### (2) Certification of Genuine Offer

The Managing Member shall certify in the written notice that the offer is genuine to the best of the Managing Member's knowledge.

### (b) Company's Priority Right to Purchase

The Company has the first right to purchase all or any portion of the Membership Interest according to the terms of any written notice of an offer except as the Company may elect to modify the terms as provided in Section 11.02(d) below. The Company may exercise this first right to purchase by giving written notice of the Company's intent to purchase to the selling Member within 90 days of receipt of the written notice of the offer.

### (c) Other Members' Priority Right to Purchase

If the Company does not provide written notice of an intent to purchase the Membership Interest within 90 days, or if the Company provides written notice of an intent not to purchase the Membership Interest, any Member may purchase any portion of the Membership Interest according to the terms of the offer except as the Member may elect to modify the terms as provided in Section 11.02(d) below. A Member may exercise this right to purchase by giving notice of intent to purchase to the selling Member within 120 days of receipt of the written notice of the offer.

If more than one Member exercises the right to purchase the same Membership Interest, each Member may purchase a *pro rata* share of the Membership Interest in accordance with each Member's respective Membership Interest in the Company before the offer of sale.

### (d) Payment Terms under Company's or Members' Priority Right to Purchase

If the Company or a Member exercises the priority right to purchase a Membership Interest as provided above, then the Company or purchasing Member may, at the buyer's discretion pay the purchase price either:

> According to the payment terms specified in the written notice of the offer provided by the selling Member, or
>
> By delivery of an unsecured promissory note made by the buyer for the amount of the purchase price.

If the buyer chooses to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. The buyer may prepay the note in whole or in part at any time without penalty.

### (e) Closing on Purchase by the Company or a Member

The closing of any purchase of a Membership Interest under this section will occur at the principal office of the Company within 150 days from the date of the notice of intent to sell.

### (f) Transfer to Third Party After Nonexercise of Priority Right

If neither the Company nor any Member exercises their respective priority right to purchase the Membership Interest, the selling Member may transfer its Membership Interest to the party that made the original offer for the purchase price on the terms contained in the original offer.

The closing on any transfer to a third party under this section must occur within 60 days from the earlier of the expiration of the Company's and the other Members' priority rights to purchase or the date on which the Company and all other Members have provided written notice of their intent not to exercise their respective priority rights to purchase. If the Membership Interest is not sold to the prospective purchaser within the specified time, the Company and the other Members will again be offered an opportunity to exercise their respective priority rights to purchase the Membership Interest as provided in Section 11.02(b) and Section 11.02(c) above.

## Section 11.03 Additional Restrictions on Transfer

If any proposed transfer of Membership Interests or addition of a Substitute Member will result in termination of the Company under either Section 708(b) of the Internal Revenue Code or the Act, then the transfer is prohibited unless the Members specially approve the

transfer. If not approved by the Members, the attempted transfer will be disregarded and void *ab initio*.

The Members, however, may not approve any transfer or addition of a Substitute Member that violates any applicable federal or state securities law.

### Section 11.04 Transferee Treated as an Assignee Until Admitted as a Substitute Member

The transferee of a Membership Interest will hold the interest only as an Assignee until the transferee satisfies all the requirements of Section 11.05 to become a Substitute Member. As an Assignee, the transferee will have only those rights set forth in Section 11.06 of this Agreement.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

### Section 11.05 Conditions Required to Become a Substitute Member

An Assignee will not become a Substitute Member and will not have any rights as a Member until all of the conditions set forth in this section have been fully satisfied.

#### (a) Consent of the Members

All Members other than the assigning Member consent in writing to the admission of the Assignee as a Substitute Member.

#### (b) Execution of All Other Agreements

The assigning Member and the Assignee shall execute, acknowledge, and deliver to the Company instruments of transfer and assignments as are in form and substance satisfactory to the Company, including the written acceptance and adoption by the Assignee of this Agreement.

#### (c) Payment of a Reasonable Transfer Fee

An Assignee shall pay a reasonable transfer fee to the Company. The Company may establish the amount of the transfer fee on a case-by-case basis.

#### (d) Effective Date of Admission as Substitute Member

The effective date of an admission as a Substitute Member is the date on which all the remaining Members vote to accept the Assignee as a Substitute Member in accordance with this Agreement.

### Section 11.06 Rights and Limitations of an Assignee

An Assignee will be entitled to receive distributions from the Company to the same extent that the transferring Member would receive under this Agreement. Until the effective date that an Assignee is admitted as a Substitute Member, both the Company and the Members will treat the assignor of the transferred Membership Interest as the absolute owner of the transferred Membership Interest except with respect to any member distributions made which are attributable to the transferred Membership Interest.

An Assignee has substantially fewer rights than a Member. Assignees only hold a right to receive economic benefits when distributed from the Company in respect to the assigned Membership Interest. Other limitations on Assignees' rights include:

Access only to those Company records and information specifically authorized for the Assignees under the Act;

No right to vote in any Company matters; and

No other legal or economic rights.

## Section 11.07 Permitted Transfers

A Member may transfer a Membership Interest without the consent of any other Member to a trust for his or her benefit, to his or her spouse, to a trust for the benefit of his or her spouse, to his or her immediate family or to a trust for the benefit of his or her immediate family, so long as the proposed transfer does not:

Cause the Company to terminate for federal income tax purposes; or

Result in any event of default as to any secured or unsecured obligation of the Company; or

Cause a reassessment of any real property owned by the Company; or

Cause other adverse material impact to the Company.

The transferee of a Membership Interest transferred permitted by this section will be admitted as a Substitute Member without the necessity of compliance with Section 11.05, but the Company may require the transferee to accept the provisions of this Agreement in writing.

## Section 11.08 Amendment of Operating Agreement and Articles of Organization

If required by law, upon the admission of a new Member, the Company shall amend the Operating Agreement or the Articles of Organization to reflect any substitution of Members.

### (a) Substitute Member Acceptance upon Amendment

Until the Operating Agreement or Articles of Organization is amended as contemplated by this section, an Assignee will not become a Substitute Member.

### (b) Assessment of Fees

The Company may assess any fees, costs, or other expenses of any amendments made by reason of the admission of a Substitute Member against the Substitute Member whose entry into the Company necessitates the amendment.

## Section 11.09 Disability of a Member

If a Member becomes totally disabled, and continues to be totally disabled for a period of 24 months, the other Members may elect to purchase, and the disabled Member must sell, within 60 days after the expiration of the 24-month period, all of the disabled Member's

Membership Interest in the Company upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the disabled Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The terms "total disability" and "disability" mean a Member's inability to perform the material and substantial duties of his or her regular occupation.

The purchase price for the disabled Member's Membership Interest will be determined in accordance with the provisions of Section 11.12, with the date for determination of the purchase price being the end of the 24 month period described above.

If the disabled Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the disabled Member either:

> in cash or by certified check, within 60 days after the expiration of the 24-month period, or
>
> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the other Members choose to pay the purchase price according to a promissory note, the note will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The note will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each of the Members may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the disabled Member will deliver an assignment to each purchaser of his or her Membership Interest, together with any other instruments required by the Company, so that full and complete title to the Membership Interest can be transferred on the books of the Company.

Until the sale is complete, the agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled Member may exercise all of the Member's rights and voting authority and is entitled to receive distributions of cash or other property from the Company on behalf of the Member, but only if the agent or legal representative is a person or entity specifically listed as a permitted transferee in Section 11.07. An agent of a disabled Member acting under a durable power of attorney or the legal representative of a disabled member may consummate the sale to the other Members under this Section, including the execution of all necessary documents on the disabled Member's behalf, and collecting any payment on behalf of the disabled Member. If there is more than one agent or legal representative entitled to act for a disabled Member, the Company will designate in writing which agent or legal representative may act on behalf of the disabled Member.

## Section 11.10 Death of a Member

If a Member dies, the surviving Members may elect to purchase, and the deceased Member's legal representative or the heirs, distributes, or beneficiaries of the deceased

Member, as the case may be, must sell the deceased Member's Membership Interest in the Company within 60 days after the date of death of the deceased Member, upon the terms and conditions provided in this Section. Each of the surviving Members will purchase that portion of the deceased Member's Membership Interest in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the deceased Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the deceased Member's Membership Interest is purchased pursuant to the provisions of this Section, the surviving Members will pay the purchase price to the deceased Member's estate either:

> in cash or by certified check, within days after the date of death of the deceased Member, or

> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the estate of the deceased Member will deliver an assignment to the surviving Members of the deceased Member's Membership Interest in the Company, together with any other instruments required by the Company, including inheritance tax waivers, so that full and complete title to the deceased Member's Membership Interest in the Company can be transferred on the books of the Company.

If a sale to the surviving Members is not completed, and except for transfers to those persons or entities specifically listed as permitted transferees in Section 11.07, any Membership Interest that is transferred as a result of the death of a Member will be an Assignee interest.

A transferee of any transfer under this section will be bound by all of the terms and conditions of this Agreement.

### Section 11.11 Retirement of a Member

If a Member elects to retire or otherwise voluntarily cease employment with the Company, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company as provided in this Section.

Within 60 days after the notice is delivered, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership

Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

If a Member's employment in the Company is terminated for cause, the Company must give notice of this event to the other Members, and the retiring Member must sell all of his or her Membership Interest in the Company.

If the other Members desire to purchase the retiring Member's Membership Interest, they must give written notice to the retiring Member of their election to purchase all of the retiring Member's Membership Interest within 30 days after receipt of Company's notice. Within 60 days after the other Members give notice of their election to purchase all of the retiring Member's Membership Interest, the other Members will purchase the retiring Member's Membership Interest upon the terms and conditions provided in this Section. Each of the other Members will purchase that portion of the retiring Member's Membership Interest in the Company in proportion to their percentage ownership of the total Membership Interests, unless they otherwise agree in writing.

The purchase price for the retiring Member's Membership Interest will be determined in accordance with the provisions of Section 11.12.

If the retiring Member's Membership Interest is purchased pursuant to the provisions of this Section, the other Members will pay the purchase price to the retiring Member either:

> in cash or by certified check, within 60 days from the date of notice of the election to purchase, or

> by delivery of unsecured promissory notes made by the other Members with the principal amounts of each note equaling the amount of the purchase price, as they may choose.

If the surviving Members choose to pay the purchase price according to a promissory note, the notes will bear a market rate of interest on the unpaid balance of principal. The principal amount of the note will be payable in ten equal annual payments of principal and amortized interest. The first payment will be due on the first anniversary of the note. Subsequent payments will be due on each subsequent anniversary date until the note is paid in full. The notes will provide for a 60-day right to cure after notice of any default on any payment before acceleration of the unpaid balance of principal and interest. Each surviving Member may prepay his or her note in whole or in part at any time without penalty or prepayment of interest.

Upon receipt of the purchase price or promissory note, at the case may be, the retiring Member will deliver an assignment to the purchasers of his or her Membership Interest in the Company, together with any other instruments required by the Company, so that full and complete title to his or her Membership Interest in the Company can be transferred on the books of the Company.

### Section 11.12 Purchase Price

For purposes of a purchase of a Membership Interest in the Company referring to this Section, the purchase price for a Member's Membership Interest in the Company will be the fair market value of the Member's membership Interest determined pursuant to this Section.

Within 60 days after the end of each Taxable Year, the Members will determine the fair market value of each one percent Membership Interest in the Company for the then current Taxable Year, and will execute a certificate of valuation setting forth the fair market value. The Members at any time may execute a new certificate of valuation, revising the fair market value of each one percent Membership Interest in the Company. The most recent certificate of valuation, duly executed by the Members, will supersede all prior certificates of valuation. The fair market value of each one percent Membership Interest in the Company as redetermined from time to time will take into account the tangible and intangible assets of the Company, and other relevant factors, and liabilities of the Company. Good Will is an asset of the Company.

If the Members fail to redetermine the fair market value of each one percent Membership Interest in the Company within 60 days after any Taxable Year, the fair market value of each one percent Membership Interest in the Company for the purpose of establishing the purchase price will be determined by appraisal as follows:

> Not less than ten days prior to the date of the purchase, the seller of the Membership Interest must appoint one Qualified Appraiser, and the purchaser or purchasers of the Membership Interest must appoint one Qualified Appraiser.
>
> If either the seller or the purchasers fail to appoint a Qualified Appraiser, the Qualified Appraiser appointed by the other will determine the fair market value of each one percent Membership Interest in the Company owned by the seller.
>
> If the two Qualified Appraisers appointed by the seller and the purchasers fail to agree upon the fair market value of each one percent Membership Interest in the Company owned by the seller, the two Qualified Appraisers must appoint a third Qualified Appraiser five days prior to the date of the purchase, and the determination of the fair value of each one percent Membership Interest in the Company by the majority of the Qualified Appraisers will be binding upon all parties.
>
> The seller and purchasers will bear the costs of any Qualified Appraisals.

### Section 11.13 Voting Rights of Transferred Interests

A Member who transfers a Membership Interest to an Assignee will continue to hold all voting rights associated with the assigned interest until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

In the case of an Assignee who holds an interest received as a result of the death of a Member, the voting rights associated with the transferred interest will be suspended and disregarded for purposes of calculating votes until the Assignee of the transferred interest satisfies all of the requirements to become a Substitute Member as provided in Section 11.05.

This Section does not apply to any Membership Interest purchased under the provisions of Section 11.09, Section 11.10, and Section 11.11.

## Section 11.14 Non-Recognition of an Unauthorized Transfer or Assignment; Accumulation of Amounts to be Distributed

The Company is not required to recognize the purported interest of any transferee or Assignee who alleges to have received any interest other than by an authorized transfer or Assignment as provided under this Agreement. If the ownership of a Membership Interest is in doubt, or if there is reasonable doubt as to who is entitled to a distribution attributable to an interest, the Managing Member may accumulate the amounts to be distributed until this issue is finally determined and resolved. The Managing Member shall credit any accumulated amounts to the Capital Account associated with the interest.

## Section 11.15 Creditor Rights; Charging Order Sole Exclusive Remedy

If a creditor obtains a judgment by a court of competent jurisdiction against any Member or Assignee, the court may charge the Member or Assignee's interest with payment of the unsatisfied amount of the judgment from distributions attributable to the affected interest, but only to the extent permitted by the Act. To the extent any interest is charged with satisfaction of a judgment, the judgment creditor will receive no more than the rights of an Assignee; the creditor will not be admitted as a Member of the Company.

The charging order is the exclusive remedy by which a judgment creditor of a Member or an Assignee of a Membership Interest may obtain any satisfaction from the Company toward any judgment against the Member or Assignee. This section does not deprive any Member or Assignee of rights under any exemption laws available to the Member or Assignee.

## Section 11.16 Company's Unilateral Purchase Option for Interest Acquired without Consent

The Company will have the unilateral option to purchase any interest acquired by any transferee as provided in this section. For purposes of establishing the value of the interest under this provision, the interest will be deemed to be the interest of an Assignee.

### (a) Circumstances Triggering Purchase Option

Any of the following circumstances will trigger the Company's unilateral right to purchase a transferee's interest. Collectively these events are referred to as "triggering events":

> If the Membership Interest of a deceased Member passes to an individual or entity other than as permitted under Section 11.10;
>
> If any individual, entity, organization, or agency obtains a Member's interest, whether inclusive or exclusive of voting rights as a result of:
>
> > Any valid court order that the Company is required by law to recognize;
> >
> > Being subject to a lawful charging order by a court of competent jurisdiction;

A levy or other transfer of a Membership Interest, with voting rights, that the Company has not approved but that the Company is required by law to recognize; or

Any decree of divorce or equitable division or property that transfers a Membership Interest in the Company.

If the Company's unilateral purchase option is exercised, the Company will purchase the affected interest of the transferee for the fair market value of the interest, valued as the interest of an Assignee.

If the interest is transferred subject to a divorce decree or equitable division of property, the Company's unilateral option as to the transferred interest will be suspended for a period of 90 days, and the divorcing Member will have all of the rights of the Company as set forth in this Section. If the divorcing Member fails to initiate exercise of the option within the 90-day period, the Company's unilateral option right will be restored.

### (b) Terms and Conditions of Exercisable Purchase Option

If the Company elects to exercise its unilateral purchase option, the following terms and conditions will apply to the transaction.

#### (1) Written Notice of Intent to Purchase

The Company will provide written notice to the Assignee or transferee within 90 days of the triggering event that the Company intends to purchase the interest. If the Company does not provide written notice within 90 days of the triggering event, the Company's unilateral purchase option will lapse.

#### (2) Exercise of Option and Date of Valuation

If the Company provides written notice of its intent to exercise its purchase option, then the Company may exercise the option within 180 days from the first day of the month following the month in which the Company provided the notice.

The valuation date for the interest to be purchased will be the first day of the month following the month in which notice is delivered.

#### (3) Written Appraisal Requirement

Unless the Company and the transferee or Assignee agree otherwise, the fair market value of any interest subject to the Company's purchase option will be determined by Qualified Appraisal performed by a Qualified Appraiser selected by the Company. The Qualified Appraiser must be qualified to perform business appraisals and to value limited liability company or partnership interests.

### (4) Acceptance or Rejection of Valuation

If the transferee objects to the appraiser's valuation report, it must deliver written notice of the transferee's objection to the Managing Member within 30 days from the date the transferee is provided with written notice of the valuation report. If the transferee does not object in writing within the required period, the report will be accepted as written.

If the transferee objects to the valuation report, closing of the sale will be postponed for a reasonable time until the valuation of the interest is resolved.

### (5) No Voting Rights during Purchase Option Period

Until the closing, the transferee will not be allowed to exercise any vote attributable to the interest that is subject to the purchase option. The transferee will be entitled to all items of income, deduction, gain, or loss from the interest. The transferee of the interest will be an Assignee unless all conditions have been satisfied for the transferee to become a Substitute Member as described in Section 11.05.

### (6) Location and Date of Closing

Closing of any sale under this section will occur at the principal office of the Company within 45 days of the date on which the valuation report is accepted by the transferee or the date on which the valuation of the interest is otherwise resolved.

### (7) Payment of Terms upon Exercise of Option

In order to prevent unduly burdening the Company's resources, the Company may unilaterally elect to pay any purchase money obligation in 30 equal annual installments. If the remaining term of the Company is less than 30 years, the Company may make equal annual installments over the remaining term of the Company. Interest on any unpaid principal amount will be determined at market rates determined as of the closing date and, at the option of the Company, may be adjusted annually as of the first day of each Taxable Year.

In determining whether the remaining term of the Company is less than 30 years, the Company may assume that any option to extend the Company term will be exercised by the Members. If the option to continue is not exercised, then the balance will become due and payable immediately upon dissolution of the Company.

The first installment of principal and interest will be due and payable on the first day of the Taxable Year following the

closing date. Subsequent annual installments will be due and payable on the first day of each subsequent Taxable Year until the entire obligation is fully paid. The Company may prepay any part of any purchase money obligation at any time without premium or penalty.

### Section 11.17 Assignee or Charging Order Holder Assumes Tax Liability

The Assignee of a Membership Interest and any person who acquires a charging order against a Membership Interest shall report income, gains, losses, deductions and credits with respect to the interest for the period in which the Assignee interest is held or for the period the charging order is outstanding.

## Article Twelve
## Dissolution and Termination

### Section 12.01 Dissolution of the Company

The Company will be dissolved only upon the occurrence of an event described in this section.

#### (a) Date Designated by the Members

The Company will be dissolved on a date designated by the Members.

#### (b) Judicial Dissolution

The Company will be dissolved upon the entry of a decree of judicial dissolution by a court of competent jurisdiction.

Upon dissolution, the Company shall thereafter conduct only activities necessary to wind up its affairs.

### Section 12.02 Liquidation of the Company Property

Upon dissolution of the Company, the Managing Member, or a liquidator appointed by a majority of the Members, shall liquidate the Company property, apply and distribute the proceeds from the liquidation of the property as contemplated by this Agreement, and cause the cancellation of the Company's Articles of Organization.

#### (a) Payment of Creditors and Provision for Reserves

The proceeds derived from the liquidation of property will first be applied toward or paid to any creditor of the Company who is not a Member in the order of priority of payment to any creditor as required by applicable law. After payment of liabilities owing to creditors, excluding Members, the Managing Member or liquidator shall set up a reserve of assets as the Managing Member or liquidator determines is reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company.

#### (1) Ability to Create an Escrow Account

Any reserves for contingent liabilities may, but need not, be paid over by the Managing Member or liquidator to a bank to be held in escrow for later payment.

#### (2) Distribution of Reserves

The Managing Member or liquidator shall distribute any remaining reserves after the Managing Member or liquidator is reasonably satisfied that any liabilities have been adequately resolved. The remaining reserves will be distributed to the Members or their assigns in the order of priority set forth in the provisions of this Agreement relating to distributions to the Members.

### (b) Distribution of Property after the Payment of Liabilities and Establishment of Reserves

After paying liabilities and providing for reserves, the Managing Member or liquidator shall satisfy any debts owed to Members with the remaining net assets of the Company, if any, and then distribute any remaining assets to the Members in proportion to their positive Capital Account balances.

### (c) Non-Cash Assets

If any part of the net assets distributable to the Members consists of notes or accounts receivable or other non-cash assets, the Managing Member or liquidator may take whatever steps it considers to be appropriate to convert the assets into cash or any other form to facilitate distribution. If any assets of the Company are to be distributed in kind, those assets will be distributed using their fair market value at the date of distribution, as determined by the Managing Member or liquidator.

## Section 12.03 Company Property Sole Source

Company property is the sole source for the payment of any debts or liabilities owed by the Company. Any return of capital contributions or liquidation amounts to the Members or Assignees (or both if the Company has Members and Assignees) will be satisfied only to the extent that the Company has adequate assets. If the Company does not have adequate assets to return the capital contributions, neither the Members nor Assignees will have any recourse against the Company or any other Members or Assignees, except to the extent that other Members may have outstanding debts or obligations owing to the Company.

## Section 12.04 Sale of Company Assets during Term of the Company

The sale of Company assets during the term of the Company does not constitute liquidation, dissolution, or termination of the Company as defined under this Article. The Company may reinvest the sale proceeds in other assets consistent with the business purposes for the Company. Further, the Members may participate in any real property exchange as defined in Code Section 1031 if the exchange fulfills the business purposes of the Company.

# Article Thirteen
# Dispute Resolution Provisions

The provisions of this Article are intended to supersede any rules governing mediation or arbitration under the law of Colorado or any other jurisdiction.

## Section 13.01 Resolution of Disputes among Members and within the Company

The Members shall use the procedure outlined in this Article to resolve any dispute, contest, or claim that may result among any of the Members or between one or more of the Members and the Company that may relate to this Agreement. It is the objective and purpose of all parties to resolve all disputes, contests, and claims without litigation using the alternative dispute resolution procedures set out in this Article.

## Section 13.02 Notice of Controversy and Designation of Authorized Representatives

Any person who has any dispute relating to the Company shall provide written notice to all Members and to any other person that has an interest in the controversy, describing the general nature of the controversy. The notice will designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of claimant. Two or more claimants may designate a common authorized representative.

Each respondent shall also designate an Independent Person as an authorized representative who is empowered to fully settle the controversy on behalf of the respondent. Two or more respondents may designate a common authorized representative.

Written notice of the designation of the authorized representatives will be delivered to each party within 10 business days from the date the respondents receive notice of the controversy.

## Section 13.03 Commencement of Dispute Resolution Procedure

The authorized representatives shall conduct an initial meeting within 30 days from the date the claimant's notice is delivered to the respondents. The authorized representatives are entitled to collect and review all relevant evidence pertaining to the controversy and to negotiate and make a final determination to resolve the controversy. Resolution of any controversy by the authorized representatives will be conclusive and binding on all parties.

If the authorized representatives do not resolve the controversy within 30 days from the date of their initial meeting, they shall discontinue direct negotiations and submit the controversy to mediation.

## Section 13.04 Selection of a Mediator

Within 5 days of discontinuing direct negotiations the authorized representatives shall each submit to the other a written list of persons whom they consider to be qualified to serve as a mediator. Within 15 days after they exchange their lists of potential mediators the authorized representatives shall agree upon one mediator to mediate the controversy.

If the authorized representatives do not agree upon a mediator the controversy will be submitted to binding arbitration pursuant to Section 13.10.

## Section 13.05 Time and Place for Mediation Conference

The authorized representatives shall promptly designate a mutually convenient time and place for the mediation. If the authorized representatives fail to do so the controversy will be submitted to binding arbitration pursuant to Section 13.10.

## Section 13.06 Discovery and Exchange of Information

The Authorized Representatives are entitled to fully discover, obtain, and review all information relevant to the resolution of any controversy.

## Section 13.07 Delivery of Written Summaries; Authority to Obtain Professional Assistance

At least 7 days before the first mediation conference each authorized representative shall deliver a concise written summary of fact and law pertaining to the issues to be resolved to the mediator. The authorized representatives and the mediator may retain legal counsel, accountants, appraisers, and other experts whose opinions may assist the mediator in resolving the controversy.

## Section 13.08 Conduct of Mediation

The mediator shall determine the format for mediation conferences designed to ensure that the mediator and the authorized representatives have an equal opportunity to review the evidence and any relevant technical and legal presentations. The mediator shall determine the time schedule for the resolving the mediation and shall attempt to facilitate the parties' efforts in achieving a final resolution of all issues in dispute.

If the mediator is unable to facilitate a final resolution, then any remaining unresolved issues will be resolved by arbitration as provided in Section 13.10.

## Section 13.09 Final Determinations are binding on All Parties

Any final determination made by the authorized representatives or a mediator or arbitrator will be binding upon each party who receives notice of a controversy even if the party does not respond or designate a representative, or if the authorized representative of the party fails or refuses to participate in the designation of a mediator.

## Section 13.10 Arbitration

To the extent a final resolution of any controversy is not made according to the alternative dispute resolution procedures provided in this Article, the parties to the controversy shall submit to mandatory and binding arbitration. The controversy will be settled by arbitration according to the provisions of the Commercial Arbitration Rules of the American Arbitration Association. Any judgment rendered by the arbitrator may be entered in any court having competent jurisdiction. The arbitrator may conclude arbitration proceedings without a decision if the arbitrator determines that insufficient evidence was produced through the arbitration process to support a decision.

### Section 13.11 Settlement during Mediation or Arbitration

At any time before the conclusion of any mediation or arbitration, the authorized representatives may enter an agreement resolving the controversy. Any settlement agreement will be conclusive and binding on all parties.

### Section 13.12 Qualified Appraisals

If, it is necessary to obtain a Qualified Appraisal of the value of a Membership Interest in order to resolve a dispute, each of the parties to the dispute may choose a Qualified Appraiser to provide a valuation. In the alternative, the parties may agree to select one Qualified Appraiser. The mediator or arbitrator will determine to what extent the Qualified Appraisal will be used in resolving any dispute.

### Section 13.13 Right to Seek Equitable Relief

If a party materially breaches this Agreement, and if the other parties determine in good faith that the circumstances of the breach require immediate relief, the parties who allege the material breach may seek temporary restraining orders, preliminary injunctions, or similar provisional, equitable relief in a court of competent jurisdiction.

### Section 13.14 Prevailing Party is entitled to Recover All Reasonable Costs

The party who prevails in any dispute between one or more of the Members between any Member or Manager and the Company or between the Members themselves is entitled to recover from the losing party all reasonable costs incurred, including any attorney's fees and any costs of mediation, arbitration, court fees, appraisals, and expert witnesses' costs.

## Article Fourteen
## General Matters

### Section 14.01 Successors and Assigns

Subject to the restrictions on transfer provided in this Agreement, this Agreement is binding upon and will inure to the benefit of the Members, their respective successors, personal representatives, heirs, and assigns.

### Section 14.02 No Waiver

The failure of any Member to insist upon strict performance of any provision or obligation of this Agreement, irrespective of the length of time for which such failure continues, shall not be a waiver of such Member's right to demand strict compliance in the future. No consent or waiver, express or implied, to or of any breach or default in the performance of any obligations under this Agreement, shall constitute a consent or waiver to or of any other breach or default in the performance of the same or any other obligation.

### Section 14.03 Definitions

For purposes of this Agreement, the following terms have the following meanings:

### (a) Act

*Act* means the Colorado Limited Liability Company Act. A.R.S. § 29-601 et seq., as amended from time to time.

### (b) Additional Member

*Additional Member* means a Member who is admitted to the Company after the execution of this Agreement, but who is not a Substitute Member.

### (c) Additional Capital Contribution

See *Capital Contribution.*

### (d) Affiliated Person

*Affiliated Person* means a Member, a member of an individual Member's Immediate Family, a Legal Representative, successor, Assignee, or trust for the benefit of a Member and members of the Immediate Families of the individual Member, and any corporation or other legal entity of which a majority of the voting interest is owned by any one or more of Affiliated Persons.

### (e) Agreement

*Agreement* means this Operating Agreement as it may be amended from time to time.

### (f) Articles of Organization

*Articles of Organization* means the Articles of Organization filed with the Secretary of State of Colorado as required by the Act as amended from time to time, or any other similar instrument as may be required to be filed by the laws of any other state in which the Company intends to conduct business.

### (g) Assignee

*Assignee* means the recipient of a Membership Interest by *Assignment.*

### (h) Assignment

*Assignment* means any method, whether direct or indirect or whether voluntary or involuntary, by which the legal or beneficial ownership of any interest in the Company is transferred or changed, including:

> Any sale, exchange, gift, or any other form of conveyance, assignment or transfer;
>
> A change in the beneficial interests of any trust or estate which holds any interest in the Company and a distribution from any trust or estate;
>
> A change in the ownership of any Member or Assignee which is a corporation, partnership, limited liability company or other legal entity, including the dissolution of the entity;

A change in legal or beneficial ownership or other form of transfer resulting from the death or divorce of any Member or Assignee or the death of the spouse of any Member or Assignee;

Any transfer or charge under a charging order issued by any court;

Any levy, foreclosure, or similar seizure associated with the exercise of a creditor's rights in connection with a mortgage, pledge, encumbrance, or security interest.

*Assignment* does not include any mortgage, pledge, or similar voluntary encumbrance or grant of a security interest in any interest in the Company.

### (i) Bankrupt

*Bankrupt* as used in this Agreement means the filing of a petition in voluntary bankruptcy or an assignment for the benefit of creditors or other action taken voluntarily or involuntarily, by a Member under any Federal or State law for the benefit of an insolvent party. It does not include any filing of a petition of involuntary bankruptcy against a Member if the petition is dismissed within 45 days from the date of filing, nor does it include the issuance of a charging order against the interest of a Member, if the charging order is removed within 10 days from the service of the charging order.

### (j) Capital Account

*Capital Account* means the account established and maintained for each Member as provided in Section 4.04 and as provided in Treasury Regulation § 1.704-1(b)(2)(iv), as amended from time to time.

### (k) Capital Contribution

*Capital Contribution* means the total cash and other consideration contributed and agreed to be contributed to the Company by each Member. Each *Initial Capital Contribution* is shown in Exhibit A of this Agreement, attached to and incorporated into this Agreement. *Additional Capital Contribution* means the total cash and other consideration contributed to the Company by each Member other than the Initial Capital Contribution. Any reference in this Agreement to the Capital Contribution of a current Member includes any Capital Contribution previously made by any prior Member with respect to that Member's interest. The value of a Member's Capital Contribution is the amount of cash plus the fair market value of other property contributed to the Company.

### (l) Cash Flow Earnings

*Cash Flow Earnings* means the net income, including capital gains income, realized by the Company for the Taxable Year, reduced or increased according to the following guidelines:

### (1) Reductions of Net Income

Net income will be reduced by the actual payment of items that are not deductible by the Company for federal income tax purposes, including non-deductible travel and entertainment expenses, charitable contributions, non-deductible interest payments, the payment of debt principal and interest, the acquisition of depreciable property during the Taxable Year to the extent that the cost is not fully deductible in the year of acquisition, and any other payment that represents an actual decrease in the cash available to the Company.

### (2) Increases in Net Income

Net income will be increased by the amount expended for federal income tax purposes for intangible costs and expenses. Intangible expenses shall include depreciation, depletion and amortization costs reported as deductions for federal income tax purposes, but not depreciation reported as an expense that is deductible under Section 179 of the Internal Revenue Code.

### (3) Treatment of Gain on Asset Sale

The gain from the sale of a Company asset will be included in determining the net income of the Company for distribution purposes to the extent of payments of the gain amount actually received by the Company for the Taxable Year. Deferred payments of gain pursuant to an installment sale or other deferred payment arrangement will be considered as income in the year a payment is actually received.

The computation of Cash Flow Earnings does not include income from a partnership, trust, limited liability company, or other organization classified by federal tax law as a pass-through entity to the extent that distributions of income from the pass-through entity are not actually received during the Taxable Year or within 60 days after the close of the Taxable Year. Subsequent distributions to the Company from a pass-through entity that are attributable to income realized and reported for a prior year will increase the cash flow earnings for distribution purposes.

Cash Flow Earnings determined for distribution purposes will not include reasonable reserves. Reserves are amounts reasonably needed for working capital, debt service, deferred maintenance, and for anticipated capital improvements.

Cash Flow Earnings will take into account the obligation of the Company to the payment obligations of interest to Members who have advanced funds to the Company as loans and the payment of any guaranteed payment obligations of the Company. The distribution of earnings may be deferred for a reasonable time to the extent that the Company does not have available

cash to satisfy the distribution amount. The term "available cash" indicates the actual cash of the Company in checking accounts, money market funds, and 90-day Treasury Bills.

### (m) Charity

*Charity* as used in this Agreement includes any organization of a type described in each of Sections 170(c), 2055(a), and 2522(a) of the Internal Revenue Code.

### (n) Charitable Trusts

*Charitable Trust* as used in this Agreement includes any charitable remainder trust created under Section 664 of the Internal Revenue Code or any charitable income trust created under Treasury Regulations Section 1.170A-6(c); Treasury Regulations Section 25.2522(c); or Treasury Regulations Section 20.2055-2(e).

### (o) Company

*Company* means GRAMZ HOLDINGS, LLC, an Colorado Limited Liability Company.

### (p) Company Minimum Gain

*Company Minimum Gain* means the minimum amount of gain that would be realized by the Company if the Company disposed of all Company property subject to the liabilities in full satisfaction of those liabilities, computed strictly in accordance with Treasury Regulation Section 1.704-2(b) and (d).

### (q) Delivery

*Delivery* means:

> Personal delivery to a party, or
>
> Mailing by certified United States mail to the last known address of the party to whom delivery is made, with return receipt requested to the party making delivery, or
>
> Electronic transmission by facsimile to a party, provided that receipt is confirmed in writing or by electronic transmission back to the sending party, or
>
> Electronic mail transmission to a party, provided that receipt is confirmed in writing or by electronic mail transmission back to the sending party.

The effective date of delivery will be the date of personal delivery or the date of the return receipt, if received by the sending party. If no return receipt is provided, then the effective date will be the date the transmission would have normally been received via certified mail, provided there is evidence of mailing.

### (r) Disability

*Disability* of a Member means that any one of the following has occurred:

> The Member has been declared to be incompetent, incapacitated, or otherwise legally unable to effectively manage his or her property or financial affairs by a court of competent jurisdiction;
>
> The Member's incapacity has been certified in writing by two licensed physicians, including the Member's personal physician, after examining the Member, or
>
> The Member has disappeared or is absent for unexplained reasons, causing the Member to be unable to manage his or her property or financial affairs effectively, or
>
> The Member is being detained under duress or under law, causing the Member to be unable to manage his or her property or financial affairs effectively.

A Member's disappearance or absence or detention under duress may be established by an affidavit of any other Member. The affidavit shall describe the circumstances of the individual's disappearance, absence, or detention and may be relied upon by any third party dealing in good faith with the Company in reliance upon the affidavit.

Upon regaining capacity, a formerly incapacitated Member will have all the rights, power, and authority originally granted to the Member by this Agreement.

### (s) Immediate Family

*Immediate Family* means any Member's spouse, other than a spouse who is legally separated from the person under a decree of divorce or separate maintenance; parents, parents-in-law, descendants, including descendants by adoption, brothers, sisters, brothers-in-law, sisters-in-law, and grandchildren-in-law..

### (t) Independent Person

*Independent Person* means an individual who is not related to or subordinate to a claimant or respondent of any controversy concerning the Company, is not a Member of the Company, and has no financial stake in the resolution of the controversy other than fair and reasonable compensation for services rendered in seeking to resolve the controversy.

### (u) Initial Capital Contribution

See *Capital Contribution*.

### (v) Internal Revenue Code

References to the *Internal Revenue Code* or to its provisions are to the Internal Revenue Code of 1986, as amended from time to time, and the corresponding Treasury Regulations, if any. References to the *Treasury*

*Regulations* are to the Treasury Regulations under the Internal Revenue Code in effect from time to time. If a particular provision of the Internal Revenue Code is renumbered, or the Internal Revenue Code is superseded by a subsequent federal tax law, any reference is deemed to be made to the renumbered provision or to the corresponding provision of the subsequent law, unless to do so would clearly be contrary to the Members' intent as expressed in this Agreement. The same rule applies to references to the Treasury Regulations.

### (w) Legal Representative or Personal Representative

As used in this Agreement, the term "Legal Representative" or "Personal Representative" means a person's guardian, conservator, executor, administrator, Trustee, or any other person or entity personally representing a person or the person's estate.

### (x) Majority in Interest; 85 percent in interest of the Members

*Majority in Interest* means that more than 50 votes out of 100 votes that may be cast will determine the matter subject to the vote.

*85 percent in interest of the Members* means that at least 85 votes out of the total 100 votes that may be cast will be determinative of a given matter.

### (y) Managing Member

*Managing Member* means the Members who are responsible for managing the business of the Company, or one or more Member Principals who have been appointed by the Members to manage the Company.

### (z) Market Rate of Interest or Market Rate

The terms *market rate of interest* or *market rate* means the rate of interest identified as the "prime rate" by the WALL STREET JOURNAL in its Money Rates column, or, if two or more rates are reported as the "prime rate," the average of the two or more. If Sections 483 and 1274A of the Internal Revenue Code apply to this transaction, the minimum rate of interest of the purchase money obligation will be fixed at the rate of interest then required by those sections.

### (aa) Member

*Member* means any person or legal entity designated in this Agreement as a Member or any person or legal entity who becomes a Member as provided in this Agreement.

### (bb) Members

*Members* means all of the Members of the Company.

### (cc) Member Minimum Gain

*Member Minimum Gain* means, with respect to a Member Nonrecourse Debt, the least amount of gain that would be realized by the Company if the

Company disposed of the encumbered Company property in full satisfaction of the encumbrance.

### (dd) Member Nonrecourse Debt and Member Nonrecourse Deductions

*Member Nonrecourse Debt* means nonrecourse Company debt for which one or more Members bears economic risk of loss as defined in Treasury Regulation Section 1.704-2(b)(4).

*Member Nonrecourse Deductions* means, for each Taxable Year, the Company deductions that are attributable to Member Nonrecourse Debt and are characterized as "Member Nonrecourse Deductions" under Treasury Regulation Section 1.704-2(b).

### (ee) Member Principal

The term *Member Principal* refers to a Member who has been appointed by the Members to represent the Company in operational management.

### (ff) Membership Interest

*Membership Interest* means the ownership interest and rights of a Member in the Company, including the Member's right to a distributive share of the profits and losses, distributions, and the property of the Company and the right to consent or approve Company actions. All Membership Interests are subject to the restrictions on transfer imposed by this Agreement. Each Member's interest is personal property and no Member will acquire any interest in any of the assets of the Company.

Each holder of a Membership Interest will have the right to vote the holder's proportionate interest in the Company with respect to all matters which all Members have a right to vote under this Agreement or by law.

> Example: A Member with a Membership Interest of 35.5 percent will have a 35.5 percent ownership interest in the Company, and will have 35.5 votes out of 100 votes that may be cast on matters that require the consent or affirmative action of the Members.

Membership Interests may be adjusted from time to time as provided in Article Three.

### (gg) Person

As used in this Agreement, *Person* has the same broad meaning as defined in Section 7701(a)(1) of the Internal Revenue Code. The term specifically includes the Company, its successors and assigns, each Member or Assignee, their successors, assigns, heirs, and personal representatives. The phrase "*each other person*" identifies any individual, corporation, partnership, limited liability company, trust, or other party whose interest may be affected, adversely or otherwise, by the resolution of any dispute, contest, or claim.

### (hh) Property

*Property* means all Company property and rights as described in Exhibit A and any property real or personal, tangible or intangible otherwise acquired by the Company.

### (ii) Qualified Appraiser and Qualified Appraisal

A *Qualified Appraiser* means an appraiser who is a Member of the American Society of Appraisers, Business Valuations Division and accredited to perform business appraisals or valuations by those respective organizations or, alternatively, a certified public accountant accredited in business valuation by the American Institute of Certified Public Accountants. A *Qualified Appraisal* means any appraisal performed by a Qualified Appraiser.

### (jj) Securities Act

*Securities Act* refers to the Securities Act of 1933, as amended.

### (kk) Substitute Member

*Substitute Member* means any person not previously a Member who acquires a Membership Interest and is admitted as a Substitute Member according to the terms of Section 11.05 of this Agreement.

### (ll) Taxable Year

*Taxable Year* means the calendar year or any other accounting period selected by the Manager. Taxable year is synonymous with fiscal year for all purposes of this agreement.

## Section 14.04 Changing the Company's Situs

The situs of this Company may be changed only by the unanimous written consent of all of the Members.

## Section 14.05 No Duty to Mail Articles of Organization

The Company does not have an obligation to deliver or mail copies of the Articles of Organization or any amendments to the Members unless required to do so by the Act.

## Section 14.06 General Matters

The following general provisions and rules of construction apply to this Agreement:

### (a) Multiple Originals; Validity of Copies

This Agreement may be executed in any number of counterparts, each of which will be deemed to be an original.

Any person may rely on a copy of this Agreement that the Managing Member certifies to be a true copy to the same effect as if it were an original.

### (b) Singular and Plural; Gender

Unless the context requires otherwise, words denoting the singular may be construed as plural and words of the plural may be construed as denoting the singular. Words of one gender may be construed as denoting another gender as is appropriate within the context. The word "or" when used in a list of more than two items may function as both a conjunction and a disjunction as the context requires or permits.

### (c) Headings of Articles, Sections, and Subsections

The headings of Articles, Sections, and Subsections used within this Agreement are included solely for the convenience and reference of the reader. They have no significance in the interpretation or construction of this Agreement.

### (d) Governing Law

This Agreement is governed, construed, and administered according to the laws of Colorado, as from time to time amended, except as to trust property required by law to be governed by the laws of another jurisdiction and unless the situs of administration is changed as provided in Section 14.04.

### (e) Notices

Unless otherwise stated, whenever this Agreement calls for notice, the notice will be in writing and will be personally delivered with proof of delivery, or mailed postage prepaid by certified mail, return receipt requested, to the last known address of the party requiring notice. Notice will be effective on the date personally delivered or on the date of the return receipt. If a party giving notice does not receive the return receipt but has proof that he or she mailed the notice, notice will be effective on the date it would normally have been received via certified mail. If notice is required to be given to a minor or incapacitated individual, notice will be given to the parent or legal representative of the minor or incapacitated individual.

### (f) Severability

The invalidity or unenforceability of any provision of this Agreement does not affect the validity or enforceability of any other provision of this Agreement. If a court of competent jurisdiction determines that any provision is invalid, the remaining provisions of this Agreement are to be interpreted and construed as if the invalid provision had never been included in this Agreement.

### (g) Acceptance

Each Manager and Member hereby acknowledges and confirms that he, she, or it has reviewed this Agreement, accepts all its provisions, and agrees to be bound by all the terms, conditions, and restrictions contained in this Agreement.

*(Remainder of page intentionally left blank)*

**IN WITNESS WHEREOF,** the Members have executed this Restated Operating Agreement as of the day and year first above written.

**MEMBERS: Gramz Holdings, LLC**

**Geraldine Greiner**
Managing Member

**By:** ______________________
Its: Member
Date: December 31, 2018

**Andraya Carson**
Managing Member

By: ______________________
Its: Member
Date: December 31, 2018

**VÄXA GLOBAL, LLC**

By: ______________________
Its: Manager
Date: 12/31/18

## EXHIBIT A

IN WITNESS WHEREOF, the foregoing OPERATING AGREEMENT, CONSISTING OF 50 pages, respectively, was adopted on the day and date first above written by the Members of GRAMZ HOLDINGS, LLC.

| Name of Member | Total Contribution | Percentage of Ownership Interest |
|---|---|---|
| VÄXA GLOBAL, LLC | $ 250,000.00<br>(issued as convertible stock) | 100 % |
| **MEMBERSHIP INTEREST TOTALS** | **$ 250,000.00** | **100 %** |

**TWO RIVERS WATER & FARMING COMPANY**

**Officer's Certificate**

**July 31, 2019**

The undersigned, in the capacity of Chief Executive Officer of Two Rivers Water & Farming Company, a Colorado corporation (the "***Company***"), pursuant to Section 2.03(b)(i) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and the Company (the "***Exchange Agreement***"), hereby certifies to Easby Land & Cattle Company LLC, on behalf of the Company and not in a personal capacity, as follows:

1. the representations and warranties of the Company set forth in the Exchange Agreement are true and correct in all respects on and as of the Closing, with the same effect as though made at and as of the Closing;

2. to the knowledge of the undersigned, each of the conditions set forth in Section 6.01 of the Exchange Agreement is satisfied as of the Closing;

3. the Company has complied with all the agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing Date, including the conditions set forth in Section 6.03 of the Exchange Agreement, except that the Company has not complied with the condition set forth in Section 6.03(f) of the Exchange Agreement, which condition has been waived by Easby Land & Cattle Company LLC; and

4. the representations made in Section 3.17(a) and 3.17(d) are qualified by matters known to Easby.

All capitalized terms used but not defined herein have the meanings assigned to them in the Exchange Agreement.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

[signature]

Wayne Harding
Chief Executive Officer

Two Rivers
WATER & FARMING

July 31, 2019

Broadridge Corporate Issuer Solutions
1717 Arch St., Suite 1300
Philadelphia, PA 19103

Dear Broadridge,

Please setup the following reserve for Two Rivers Water & Farming Company common stock (90207B107):

| Reserve Name | Original Allocated | Current Remaining | Restricted or Free Trading | File No./Type |
|---|---|---|---|---|
| Easby Exchange | 50,000,000 | 50,000,000 | Restricted | |

Thank you,

Wayne Harding
Chief Executive Officer

# TWO RIVERS WATER & FARMING COMPANY

## Secretary's Certificate

**July 31, 2019**

The undersigned, in the capacity of Secretary of Two Rivers Water & Farming Company, a Colorado corporation (the "***Company***"), pursuant to Section 2.03(b)(ii) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and the Company (the "***Exchange Agreement***"), hereby certifies, on behalf of the Company and not in a personal capacity, that:

1. The Company is delivering to Easby Land & Cattle Company LLC on the date hereof a copy of the Restated Articles of Incorporation of the Company, as amended, as certified to be true, correct and complete as of July 30, 2019, and such Restated Articles of Incorporation, as amended, are in full force and effect as of the date hereof have not been further amended, modified or rescinded in any manner by the Board of Directors or the stockholders of the Company since July 31, 2019.

2. Attached hereto as EXHIBIT A is a true, correct and complete copy of the Amended and Restated By-Laws of the Company, as in full force and effect on the date hereof, and such Amended and Restated By-Laws have not been amended, modified or rescinded in any manner.

3. Attached hereto as EXHIBIT B are true, correct and complete copies of resolutions duly adopted by the Board of Directors of the Company on February 21, 2019 and July 31, 2019. Except as otherwise contemplated by such resolutions, such resolutions have not been amended or revoked and are in full force and effect on the date hereof, and are the only resolutions adopted by such Board or by any committee of or designated by such Board relating to the Exchange Agreement or the Contemplated Transactions (as defined in the Exchange Agreement) in effect as of the date hereof.

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

DocuSigned by:
Tom Williams
Thomas Williams
Secretary 27616DA446D8499...

**<u>EXHIBIT A</u>**

**Amended and Restated By-Laws**

[attached]

E-Filed

Colorado Secretary of State
Date and Time: 06/04/2008 04:29 PM
Id Number: 20021354505

Document number: 20081303392

| | |
|---|---|
| Document processing fee | |
| If document is filed on paper | $125.00 |
| If document is filed electronically | $ 25.00 |

Fees & forms/cover sheets are subject to change.
To file electronically, access instructions for this form/cover sheet and other information or print copies of filed documents, visit www.sos.state.co.us and select Business Center.
Paper documents must be typewritten or machine printed.

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Amendment

filed pursuant to §7-90-301, et seq. and §7-110-106 of the Colorado Revised Statutes (C.R.S.)

ID number: 20021354505

1. Entity name: NAVIDEC FINANCIAL SERVICES, INC.
*(If changing the name of the corporation, indicate name BEFORE the name change)*

2. New Entity name: (if applicable) ______________________

3. Use of Restricted Words *(if any of these terms are contained in an entity name, true name of an entity, trade name or trademark stated in this document, mark the applicable box)*:

☐ "bank" or "trust" or any derivative thereof
☐ "credit union" ☐ "savings and loan"
☐ "insurance", "casualty", "mutual", or "surety"

4. Other amendments, if any, are attached.

5. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

6. If the corporation's period of duration as amended is less than perpetual, state the date on which the period of duration expires: ______________ *(mm/dd/yyyy)*

**OR**

If the corporation's period of duration as amended is perpetual, mark this box: ☑

7. *(Optional)* Delayed effective date: ______________ *(mm/dd/yyyy)*

Notice:

Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

8. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| McKowen | Joseph | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

271 Grant St # 204
*(Street name and number or Post Office information)*

| Denver | CO | 80203 |
|---|---|---|
| *(City)* | *(State)* | *(Postal/Zip Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country – if not US)* | |

*(The document need not state the true name and address of more than one individual. However, if you wish to state the name and address of any additional individuals causing the document to be delivered for filing, mark this box* ☑ *and include an attachment stating the name and address of such individuals.)*

**Disclaimer:**

This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

# AMENDMENT TO ARTICLES OF INCORPORATION

# OF

# NAVIDEC FINANCIAL SERVICES, INC.

Navidec Financial Services, Inc. hereby amends Article X of Articles of Incorporation as follows to reflect the election of board of directors.

## ARTICLE X

## BOARD OF DIRECTORS

The number of directors shall be fixed in accordance with the bylaws. The board of directors of the corporation shall consist of two directors, and the names and addresses of the persons who shall serve as directors until the annual meeting of shareholders or until their successors are elected and shall qualify are:

| Name | Address |
|---|---|
| John R. McKowen | 456 Madison St., Denver, CO. 80206 |
| Howard L. Farkas | 6601 East Progress Ave., Englewood, CO. 8011-1473 |

**NAVIDEC FINANCIAL SERVICES, INC.**
**MINUTES OF BOARD OF DIRECTORS MEETING**
**JULY 12, 2006**

A Meeting of the Board of Directors of Navidec Financial Services, Inc. (the "Company") was called and held on July 12, 2006 at the Company's offices at 8310 South Valley Highway, 3rd Floor, Englewood, Colorado 80112. John McKowen, the sole Director, President and Chief Executive Officer was present and served as Recording Secretary of the meeting. The meeting was called to order at 10:00AM (MDT).

**NOTICE OF MEETING:**

Pursuant to the By-laws of the Company, the meeting was called by John McKowen the Company's sole director. Notice to directors was waived and the Chairman declared the meeting to have been properly called and constituted for the transaction of business.

The Company considered and completed the following items of business:

**APPOINTMENT OF HOWARD L. FARKAS AS DIRECTOR.**

After discussion and consideration of appointing Howard L. Farkas as a Director of the Company, it was decided by the Board to appoint Mr. Farkas to the Board of the Company.

RESOLVED, Howard L. Farkas is hereby appointed as a Director of the Company.

**ADJOURNMENT**

There being no other matters of business before the Board, upon motion duly made by Mr. McKowen the meeting be adjourned at 10:05 A.M. MDT.

The undersigned, being the recording secretary for the meeting of the Navidec Financial Services, Inc. Board of Directors, by his signature below hereby attests that the above are a true and accurate reflection of the meeting on July 20, 2004.

John R. McKowen, Chairman, Director & Recording Secretary

# ARTICLES OF INCORPORATION

## OF

## NAVIDEC CAPITAL INC.

FILED
DONETTA DAVIDSON
COLORADO SECRETARY OF STATE

20021354505 C
$ 50.00
SECRETARY OF STATE
12-20-2002 15:59:09

## ARTICLE I

## NAME

The name of the corporation shall be Navidec Capital Inc.

## ARTICLE II

## PRINCIPAL OFFICE

The address of the corporation's initial principal office in this state is 6399 South Fiddlers Green Circle, Suite 300, Greenwood Village, Colorado 80111.

## ARTICLE III

## PERIOD OF DURATION

This corporation shall exist perpetually unless dissolved according to law.

## ARTICLE IV

## PURPOSE

The purpose for which this corporation is organized is to transact any lawful business or businesses for which corporations may be incorporated pursuant to the Colorado Business Corporation Act.

## ARTICLE V

## CAPITAL

The aggregate number of shares which this corporation shall have the authority to issue is 100,000,000 shares, with a par value of $.001, which shares shall be designated common stock. No share shall be issued until it has been paid for, and it shall thereafter be nonassessable. The corporation may also issue up to 10,000,000 shares of voting preferred stock with a par value of $.001. The preferred stock of the corporation shall be issued in one or more series as may be

determined from time to time by the Board of Directors. In establishing a series, the Board of Directors shall give to it a distinctive designation so as to distinguish it from the shares of all other series and classes, shall fix the number of shares in such series, and the preferences, rights and restrictions thereof. All shares in a series shall be alike. Each series may vary in the following respects: (1) the rate of the dividend; (2) the price at the terms and conditions on which shares shall be redeemed; (3) the amount payable upon shares in the event of involuntary liquidation; (4) the amount payable upon shares in the event of voluntary liquidation; (5) sinking fund provisions for the redemption of shares; (6) the terms and conditions on which shares may be converted if the shares of any series are issued with the privilege of conversion; and (7) voting powers.

## ARTICLE VI

## PREEMPTIVE RIGHTS

A shareholder of the corporation shall not be entitled to a preemptive right to purchase, subscribe for, or otherwise acquire any unissued or treasury shares of stock of the corporation, or any options or warrants to purchase, subscribe for or otherwise acquire any such unissued or treasury shares, or any shares, bonds, notes, debentures, or other securities convertible into or carrying options or warrants to purchase, subscribe for or otherwise acquire any such unissued or treasury shares.

## ARTICLE VII

## CUMULATIVE VOTING

The shareholders shall not be entitled to cumulative voting.

## ARTICLE VIII

## SHARE TRANSFER RESTRICTIONS

The corporation shall have the right to impose restrictions upon the transfer of any of its authorized shares or any interest therein. The Board of Directors is hereby authorized on behalf of the corporation to exercise the corporation's right to so impose such restrictions.

## ARTICLE IX

## REGISTERED OFFICE AND AGENT

The initial registered office of the corporation shall be at 6399 South Fiddlers Green Circle, Suite 300, Greenwood Village, Colorado 80111, and the name of the initial registered

agent at such address is Pat Mawhinney. Either the registered office or the registered agent may be changed in the manner provided by law.

## ARTICLE X

## INITIAL BOARD OF DIRECTORS

The number of directors shall be fixed in accordance with the bylaws. The initial Board of Directors of the corporation shall consist of two directors, and the names and addresses of the persons who shall serve as directors until the first annual meeting of shareholders or until their successors are elected and shall qualify are:

| Name | Address |
| --- | --- |
| Ralph Armijo | 6399 South Fiddlers Green Circle, Suite 300<br>Greenwood Village, CO 80111 |
| John R. McKowen | 6399 South Fiddlers Green Circle, Suite 300<br>Greenwood Village, CO 80111 |

## ARTICLE XI

## INDEMNIFICATION

1. <u>Limit on Director Liability</u>. The corporation shall indemnify its directors, officers, employees, fiduciaries, and agents to the full extent permitted by Colorado law.

2. <u>Indemnification Not Exclusive Right</u>. The indemnification provided by this Article shall not be deemed exclusive of any other rights to which those indemnified may be entitled under any bylaw, agreement, vote of shareholders or disinterested directors, or otherwise, and any procedure provided for by any of the foregoing, both as to action in his official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, officer, employee, fiduciary or agent and shall inure to the benefit of heirs, executors, and administrators of such a person.

3. <u>Insurance</u>. The corporation may purchase and maintain insurance on behalf of any person who is or was a director, officer, employee, fiduciary or agent of the corporation or who is or was serving at the request of the corporation as a director, officer, employee, fiduciary or agent of another corporation, partnership, joint venture, trust, or other enterprise against any liability asserted against him and incurred by him in any such capacity or arising out of his status as such, whether or not the corporation would have the power to indemnify him against such liability under provisions of this Article.

4. Limit on Director Liability. To the fullest extent provided in the Colorado Business Corporation Act, the officers, directors, fiduciaries, and agents of the company shall not be liable to the corporation or its Shareholders for monetary damages.

## ARTICLE XII

## TRANSACTIONS WITH INTERESTED DIRECTORS

No contract or other transaction between the corporation and one (1) or more of its directors or any other corporation, firm, association, or entity in which one (1) or more of its directors are directors or officers are financially interested shall be either void or voidable solely because of such relationship or interest, or solely because such directors are present at the meeting of the Board of Directors or a committee thereof which authorizes, approves, or ratifies such contract or transaction, or solely because their votes are counted for such purpose if:

(A) The fact of such relationship or interest is disclosed or known to the Board of Directors or committee which authorizes, approves, or ratifies the contract or transaction by a vote or consent sufficient for the purpose without counting the votes or consents of such interested directors;

(B) The fact of such relationship or interest is disclosed or known to the shareholders entitled to vote and they authorize, approve, or ratify such contract or transaction by vote or written consent; or

(C) The contract or transaction is fair and reasonable to the corporation.

Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or a committee thereof which authorizes, approves, or ratifies such contract or transaction.

The officers, directors and other members of management of this corporation shall be subject to the doctrine of "corporate opportunities" only insofar as it applies to business opportunities in which this corporation has expressed an interest as determined from time to time by this corporation's Board of Directors as evidenced by resolutions appearing in the corporation's minutes. Once such areas of interest are delineated, all such business opportunities within such areas of interest which come to the attention of the officers, directors, and other members of management of this corporation shall be disclosed promptly to this corporation and made available to it. The Board of Directors may reject any business opportunity presented to it and thereafter any officer, director or other member of management may avail himself of such opportunity. Until such time as this corporation, through its Board of Directors, has designated an area of interest, the officers, directors and other members of management of this corporation shall be free to engage in such areas of interest on their own and this doctrine shall not limit the rights of any officer, director or other member of management of this corporation to continue a business existing prior to the time that such area of interest is designated by the corporation. This provision shall not be construed to release any employee of this corporation (other than an

officer, director or member of management) from any duties which he may have to this corporation.

Liability of Directors. A director of the corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability arising from (i) any breach of the director's loyalty to the corporation or its stockholders, (ii) acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) any transaction from which the director derived any improper personal benefit or (iv) any other act expressly proscribed or for which directors are otherwise liable under the Colorado Business Corporation Act. If the Colorado Business Corporation Act is subsequently amended to authorize corporate action further limiting or eliminating the personal liability of directors, then the liability of a director of the corporation shall be limited or eliminated to the fullest extent permitted by the Colorado Business Corporation Act or other Colorado law, as so amended. Any repeal or modification of this paragraph (section) by the stockholders of the corporation shall not adversely affect any right or protection of a director of the corporation existing at the time of such repeal or modification.

## ARTICLE XIII

## MANAGEMENT

For the management of the business and for the conduct of the affairs of the corporation, and in further definition, limitation and regulation of the powers of the corporation, of its directors and of its stockholders or any class thereof, as the case may be, it is further provided that:

(A) The management of the business and the conduct of the affairs of the corporation shall be vested in its Board of Directors;

(B) The Board of Directors may from time to time make, amend, supplement or repeal the bylaws; provided, however, that the stockholders may change or repeal any bylaw adopted by the Board of Directors by the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of the capital stock of the corporation; and, provided further, that no amendment or supplement to the bylaws adopted by the Board of Directors shall vary or conflict with any amendment or supplement thus adopted by the stockholders;

(C) The directors of the corporation need not be elected by written ballot unless the bylaws so provide; and

(D) The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this right.

## ARTICLE XIV

## VOTING OF SHAREHOLDERS

With respect to any general action to be taken by shareholders of this corporation, a vote or concurrence of the holders of a majority of a quorum present at a duly called meeting or of any class or series shall be required unless a greater number is required by statute, these Articles as amended, rule or regulation to which the corporation is subject. In no case shall the required vote exceed a majority of the outstanding shares entitled to vote thereon.

## ARTICLE XV

## INCORPORATOR

The name and address of the incorporator is as follows:

Roger V. Davidson
Ballard Spahr Andrews & Ingersoll, LLP ✓
1225 17th Street, Suite 2300
Denver, CO 80121

FROM BALLARD SPAHR ANDREWS&INGERSOLL (FRI)10. 24'03 14:07/ST. 14:05/NO. 4200000868 P 2

20021354505

Change of Name

FILED
DONETTA DAVIDSON
COLORADO SECRETARY OF STATE

20031377573 C
$ 25.00
SECRETARY OF STATE
10-24-2003 15:37:22

# ARTICLES OF AMENDMENT TO ARTICLES OF INCORPORATION (PROFIT)

Form 205 Revised October 1, 2002
Filing fee: $25.00
Deliver to: Colorado Secretary of State
Business Division
1560 Broadway, Suite 200
Denver, CO 80202-5169
This document must be typed or machine printed
Copies of filed documents may be obtained at www.sos.state.co.us

ABOVE SPACE FOR OFFICE USE ONLY

Pursuant to § 7-110-106 and part 3 of article 90 of title 7, Colorado Revised Statutes (C.R.S.), these Articles of Amendment to its Articles of Incorporation are delivered to the Colorado Secretary of State for filing.

1. The name of the corporation is: Navidec Capital, Inc.
*(If changing the name of the corporation, indicate name of corporation BEFORE the name change)*

2. The date the following amendment(s) to the Articles of Incorporation was adopted: ______

3. The text of each amendment adopted (include attachment if additional space needed):
The name of the corporation shall be changed to Navidec Financial Services, Inc.

4. If *changing* the corporation name, the *new name* of the corporation is:
Navidec Financial Services, Inc.

5. If providing for an exchange, reclassification, or cancellation of issued shares, provisions for implementing the amendment if not contained in the amendment itself: N/A

6. Indicate manner in which amendment(s) was adopted (mark only one):

- [ ] No shares have been issued or Directors elected – Adopted by Incorporator(s)
- [ ] No shares have been issued but Directors have been elected – Adopted by the board of directors
- [ ] Shares have been issued but shareholder action was not required – Adopted by the board of directors
- [x] The number of votes cast for the amendment(s) by each voting group entitled to vote separately on the amendment(s) was sufficient for approval by that voting group – Adopted by the shareholders

7. Effective date (if not to be effective upon filing) N/A *(Not to exceed 90 days)*

8. The (a) name or names, and (b) mailing address or addresses, of any one or more of the individuals who cause this document to be delivered for filing, and to whom the Secretary of State may deliver notice if filing of this document is refused, are:
Roger V. Davidson, Esq., Ballard Spahr Andrews & Ingersoll, LLP, 1225 17th Street, Suite 2300
Denver, CO 80202

*Causing a document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed or the act and deed of the entity on whose behalf the individual is causing the document to be delivered for filing and that the facts stated in the document are true.*

Disclaimer: This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

SLC

Received Oct-24-2003 02:08pm From-303+298+3956 To-Colorado Secretary o Page 002



COMPUTER UPDATE COMPLETE - RM

Document processing fee
If document is filed on paper $125.00
If document is filed electronically $ 25.00
Fees & forms/cover sheets are subject to change.
To file electronically, access instructions for this form/cover sheet and other information or print copies of filed documents, visit www.sos.state.co.us and select Business Center.
Paper documents must be typewritten or machine printed.

E-Filed

Colorado Secretary of State
Date and Time: 11/19/2009 03:21 PM
ID Number: 20021354505

Document number: 20091609579
Amount Paid: $25.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Amendment

filed pursuant to §7-90-301, et seq. and §7-110-106 of the Colorado Revised Statutes (C.R.S.)

ID number: 20021354505

1. Entity name: NAVIDEC FINANCIAL SERVICES, INC.
*(If changing the name of the corporation, indicate name BEFORE the name change)*

2. New Entity name: (if applicable) Two Rivers Water Company

3. Use of Restricted Words *(if any of these terms are contained in an entity name, true name of an entity, trade name or trademark stated in this document, mark the applicable box)*:
   - ☐ "bank" or "trust" or any derivative thereof
   - ☐ "credit union" ☐ "savings and loan"
   - ☐ "insurance", "casualty", "mutual", or "surety"

4. Other amendments, if any, are attached.

5. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

6. If the corporation's period of duration as amended is less than perpetual, state the date on which the period of duration expires: ____________ *(mm/dd/yyyy)*

**OR**

If the corporation's period of duration as amended is perpetual, mark this box: ☑

7. *(Optional)* Delayed effective date: ____________ *(mm/dd/yyyy)*

Notice:

Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

8. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| Littman | Michael | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

7609 Ralston Road
*(Street name and number or Post Office information)*

| Arvada | CO | 80002 |
|---|---|---|
| *(City)* | *(State)* | *(Postal/Zip Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country – if not US)* | |

*(The document need not state the true name and address of more than one individual. However, if you wish to state the name and address of any additional individuals causing the document to be delivered for filing, mark this box* ☐ *and include an attachment stating the name and address of such individuals.)*

**Disclaimer:**

This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

SHAREHOLDER ACTION BY WRITTEN CONSENT "Any action required or permitted by Colorado Revised Statutes to be taken at a shareholder meeting may be taken without a meeting, if the shareholders holding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all of the shares entitled to vote thereon were present and voted, consent to such action in writing. Effectiveness of such action shall be as provided in Colorado Revised Statutes except when the requirements of Section 14 of the Securities Exchange Act of 1934 specify otherwise. Record date for determining shareholders entitled to take action, or entitled to be given notice under CRS 7-107-104 (as it may be amended) is the date the corporation first receives a writing upon which the action is taken pursuant to written consent of a majority of shareholders."

E-Filed

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

Colorado Secretary of State
Date and Time: 12/12/2012 10:50 AM
ID Number: 20021354505

Document number: 20121684464
Amount Paid: $1.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Amendment

filed pursuant to §7-90-301, et seq. and §7-110-106 of the Colorado Revised Statutes (C.R.S.)

ID number: 20021354505

1. Entity name: Two Rivers Water Company
*(If changing the name of the corporation, indicate name before the name change)*

2. New Entity name: Two Rivers Water & Farming Company
(if applicable)

3. Use of Restricted Words *(if any of these terms are contained in an entity name, true name of an entity, trade name or trademark stated in this document, mark the applicable box)*:
☐ "bank" or "trust" or any derivative thereof
☐ "credit union" ☐ "savings and loan"
☐ "insurance", "casualty", "mutual", or "surety"

4. Other amendments, if any, are attached.

5. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

6. If the corporation's period of duration as amended is less than perpetual, state the date on which the period of duration expires: ______________ *(mm/dd/yyyy)*

or

If the corporation's period of duration as amended is perpetual, mark this box: ☑

7. *(Optional)* Delayed effective date: ______________ *(mm/dd/yyyy)*

Notice:
Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

8. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| | | | |
|---|---|---|---|
| Harding | Wayne | | |
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

2000 S Colorado Blvd
*(Street name and number or Post Office information)*
ste 1-3100

| | | |
|---|---|---|
| Denver | CO | 80222 |
| *(City)* | *(State)* | *(Postal/Zip Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country – if not US)* | |

*(The document need not state the true name and address of more than one individual. However, if you wish to state the name and address of any additional individuals causing the document to be delivered for filing, mark this box ☐ and include an attachment stating the name and address of such individuals.)*

Disclaimer:
This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

E-Filed

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

Colorado Secretary of State
Date and Time: 02/26/2013 12:30 PM
ID Number: 20021354505

Document number: 20131130607
Amount Paid: $1.00

ABOVE SPACE FOR OFFICE USE ONLY

# Articles of Amendment

filed pursuant to §7-90-301, et seq. and §7-110-106 of the Colorado Revised Statutes (C.R.S.)

ID number: 20021354505

1. Entity name: Two Rivers Water & Farming Company
   *(If changing the name of the corporation, indicate name before the name change)*

2. New Entity name:
   (if applicable)

3. Use of Restricted Words *(if any of these terms are contained in an entity name, true name of an entity, trade name or trademark stated in this document, mark the applicable box):*

   ☐ "bank" or "trust" or any derivative thereof
   ☐ "credit union" ☐ "savings and loan"
   ☐ "insurance", "casualty", "mutual", or "surety"

4. Other amendments, if any, are attached.

5. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

6. If the corporation's period of duration as amended is less than perpetual, state the date on which the period of duration expires: ____________ *(mm/dd/yyyy)*

   or

   If the corporation's period of duration as amended is perpetual, mark this box: ☑

7. *(Optional)* Delayed effective date: ____________ *(mm/dd/yyyy)*

Notice:
Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

8. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| | | | |
|---|---|---|---|
| Harding | Wayne | | |
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

2000 S. Colorado Blvd.
*(Street name and number or Post Office information)*
Tower One Suite 3100

| | | |
|---|---|---|
| Denver | CO | 80222 |
| *(City)* | *(State)* | *(Postal/Zip Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country – if not US)* | |

*(The document need not state the true name and address of more than one individual. However, if you wish to state the name and address of any additional individuals causing the document to be delivered for filing, mark this box* ☐ *and include an attachment stating the name and address of such individuals.)*

Disclaimer:
This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

# AMENDMENT
# OF
# ARTICLES OF INCORPORATION
# OF
# TWO RIVERS WATER & FARMING, INC.

**TWO RIVERS WATER & FARMING, INC.**, hereinafter the "Corporation", pursuant to the Colorado Business Corporation Act, as amended, adopts the following Amendment to its Articles of Incorporation, effective December 31, 2012:

The following Resolution was adopted by the Board of Directors on January 30, 2013, to be effective December 31, 2012:

Article V, "CAPITAL" shall be amended to include the following Designation of Series BL Convertible Preferred Stock:

(a) The aggregate number of shares which this corporation shall have the authority to issue is 100,000,000 shares, with a par value of \$.001, which shares shall be designated common stock. No share shall be issued until it has been paid for, and it shall thereafter be nonassessable. The corporation may also issue up to 10,000,000 shares of voting preferred stock with a par value of \$0.001. The preferred stock of the corporation shall be issued in one or more series as may be determined from time to time by the Board of Directors. In establishing a series, the Board of Directors shall give to it a distinctive designation so as to distinguish it from the shares of all other series and classes, shall fix the number of shares in such series, and the preferences, rights, and restrictions thereof. All shares in a series shall be alike. Each series may vary in the following respects: (1) the rate of the dividend; (2) the price at the terms and conditions on which shares shall be redeemed; (3) the amount payable upon shares in the event of involuntary liquidation; (4) the amount payable upon shares in the event of voluntary liquidation; (5) sinking fund provisions for the redemption of shares; (6) the terms and conditions on which shares may be converted if the shares of any series are issued with the privilege of conversion: and (7) voting powers.

(b) Series BL Convertible Preferred Stock.

1. *Number of Shares; Designation*. A total of 4,000,000 shares of preferred stock of the Company are hereby designated as Series BL Convertible Preferred Stock (the "Series"). Shares of the Series ("Preferred Shares") will be authorized pursuant to a Conversion Agreement (the "Conversion Agreement") by and among the Company and the holders of the Company's Bridge Loan debt, a copy of which will be provided to any shareholder of the Company upon request therefor. Capitalized terms used herein and not otherwise defined have the respective meanings set forth in the Conversion Agreement.

2. *Rank.* The Series shall, with respect to rights (including to redemption payments) upon liquidation, dissolution or winding-up of the affairs of the Company, rank senior and prior to the common stock, par value $0.001 per share, of the Company (the "Company Common Stock"), and any additional series of preferred stock which may in the future be issued by the Company and are designated in the amendment to the Articles of Incorporation or the certificate of designation establishing such additional preferred stock as ranking junior to the Preferred Shares. Any shares of the Company's stock which are junior to the Preferred Shares with respect to rights (including to redemption payments) upon liquidation, dissolution or winding-up of the affairs of the Company are hereinafter referred to as "Junior Liquidation Shares."

3. *Dividends.*

(a) *Cumulative Preferred Dividend.* Holders of the Preferred Shares ("Shareholders") will be entitled to receive an annual dividend when and if declared by the Company's Board of Directors, at the rate of 8% *per annum*. The 8% dividend will be declared, if any, on March 31, and paid annually on May 15. The initial 8% dividend, if declared, payment will accrue from December 31, 2012 through December 31, 2013, declared on March 31, 2014 and first payable on May 15, 2014. Thereafter, the annual 8% dividend will accrue from January 1 to December 31. In the event that an 8% dividend is not paid when due, the amount of such unpaid 8% dividend will accumulate and compound at 8% *per annum* until paid.

(b) *Cumulative 10% Net Profits Participation Dividend* Shareholders will be entitled to receive an annual cumulative dividend, when and if declared, on a pro rata basis, equal to 10%, on a fully subscribed basis, of the Annual Net Profit ("Profit Participation"). Annual Net Profit is defined as the Company's earnings (as defined by U.S. GAAP) less interest payments and dividend payments and estimated income taxes owed. The Profit Participation will be determined annually after the Company's financial results are audited and, when and if declared, will be announced on March 31 and paid on May 15. The Profit Participation will first be determined and paid for the 2013 fiscal year, and, therefore, will first be payable on May 15, 2014. The Profit Participation payable to the holder of each Preferred Share outstanding on the respective payment date is determined by multiplying the Annual Net Profit by .10 and dividing that product by 3,794,000.

4. *Liquidation.* In the event of any liquidation, dissolution or winding up of the Company, either voluntary or involuntary, the holders of the Preferred Shares shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Company to the holders of the Company Common Stock by reason of their ownership of such stock, an amount per share for each Preferred Shares held by them equal to $1.00 (subject to adjustments)(the "Liquidation Preference"). If upon the liquidation, dissolution or winding up of the Company, the assets of the Company legally available for distribution to the holders of the Preferred Shares are insufficient to permit the payment to such holders of the entire Liquidation Preference then the entire assets of the Company legally available for distribution shall be distributed with equal priority and pro

rata among the holders of the Preferred Shares in proportion to the full amounts they would otherwise be entitled to receive.

5. *Conversion.*

(a) *Right to Convert.* Each Shareholder shall have the right to convert, at any time and from time to time, one Preferred Share held by such Shareholder, in multiples of at least ten thousand shares, for one share of common stock of the Company(the "Conversion Rate") as is determined in accordance with the terms of the Preferred Shares (a "Conversion"). The Conversion Price shall be subject to customary anti-dilution adjustments as defined herein. Any common stock of the Company received under a conversion of the Preferred Shares are "Conversion Shares."

(b) *Conversion Notice.* In order to convert Preferred Shares, a Shareholder shall send to the Company by mail or electronic or facsimile transmission, at any time prior to 3:00 p.m., Mountain Time, on the Business Day (as used herein, the term "Business Day" shall mean any day except a Saturday, Sunday or federal bank holiday) on which such Shareholder wishes to effect such Conversion (the "Conversion Date"), a notice of conversion in substantially the form attached as *Annex I* to the Conversion Agreement (a "Conversion Notice"), and stating the number of Preferred Shares to be converted., the Shareholder shall promptly thereafter send the Conversion Notice and the certificate or certificates being converted to the Company. The Company shall provide a calculation of the number of shares of Common Stock issuable upon such Conversion in accordance with the formula set forth in "Adjustments" below setting forth the basis for each component thereof, including the details relating to any adjustments made to the Conversion Price. The Company shall issue a new certificate for Preferred Shares to the Shareholder in the event that less than all of the Preferred Shares represented by a certificate are converted; provided, however, that the failure of the Company to deliver such new certificate shall not affect the right of the Shareholder to submit a further Conversion Notice with respect to such Preferred Shares and, in any such case, the Shareholder shall be deemed to have submitted the original of such new certificate at the time that it submits such further Conversion Notice. Except as otherwise provided herein, upon delivery of a Conversion Notice by a Shareholder in accordance with the terms hereof, such Shareholder shall, as of the applicable Conversion Date, be deemed for all purposes to be the record owner of the Common Stock to which such Conversion Notice relates.

(c) *Number of Conversion Shares.* The number of Conversion Shares to be delivered by the Company to a Shareholder for each Preferred Share pursuant to a Conversion shall be determined by dividing (i) the number of Preferred Shares offered for Conversion by one (1); provided, however, that the number of Conversion Shares issued shall never, when combined with all other then outstanding shares of common stock of the Company and shares of the Company common stock which have been subscribed for or otherwise committed to be issued, exceed the number of shares of the Company common stock then authorized to be delivered by the Company, and in the

event that there are insufficient shares of the common stock of the Company authorized to permit the full Conversion contemplated by any Conversion Notice, the Company will promptly take all such actions necessary so as to permit the full Conversion contemplated by such Conversion Notice as soon as practicable after receipt by the Company of such Conversion Notice.

(d) *Delivery of Conversion Shares*. The Company shall, no later than the close of business on the third (3rd) Business Day following the later of the date on which the Company receives a Conversion Notice from a Shareholder by mail, or facsimile or electronic transmission, and the date on which the Company receives the related Preferred Shares certificate (such third Business Day, the "Delivery Date"), issue and deliver or cause to be delivered to such Shareholder the proper number of Conversion Shares determined pursuant to paragraph 5(c) above.

(e) *Adjustments*. The Conversion rate shall be subject to adjustment from time to time as follows:

(i) *Adjustments for Subdivisions, Combinations or Consolidation of Company Common Stock*. In the event the outstanding shares of the Company Common Stock shall be subdivided by stock split, stock dividends or otherwise, into a greater number of shares of the Company Common Stock, the Conversion rate then in effect with respect to Preferred Shares shall, concurrently with the effectiveness of such subdivision, be proportionately decreased so that the number of shares of the Company Common Stock issuable on conversion of any shares of Preferred Shares shall be increased in proportion to such increase in outstanding shares. In the event the outstanding shares of the Company Common Stock shall be combined or consolidated, by reclassification or otherwise, into a lesser number of shares of the Company Common Stock, the Conversion rate then in effect with respect to the Preferred Shares shall, concurrently with the effectiveness of such combination or consolidation, be proportionately increased so that the number of shares of the Company Common Stock issuable on conversion of any of the Preferred Shares shall be decreased in proportion to such decrease in outstanding shares.

(ii) *Adjustments for Reclassification, Exchange and Substitution*. If the Company Common Stock issuable upon conversion of the Preferred Shares shall be changed into the same or a different number of shares of any other class or classes of stock or into any other securities or property, whether by capital reorganization, reclassification, merger, combination of shares, recapitalization, consolidation, business combination or other similar transaction (other than a subdivision or combination of shares provided for above), each of the Preferred Shares shall thereafter be convertible into the number of shares of stock or other securities or property to which a holder of the number of shares of the Company Common Stock deliverable upon conversion of such share of Preferred Shares shall have been entitled to upon such transaction. The provisions of this section on Adjustments shall similarly apply to successive capital

reorganizations, reclassifications, mergers, combinations of shares, recapitalizations, consolidations, business combinations or other similar transactions.

(iii) *Certificate as to Adjustments*. Upon the occurrence of each adjustment or readjustment of the Conversion Price pursuant to an Adjustment, the Company at its expense shall promptly compute such adjustment or readjustment in accordance with the terms hereof and furnish to each Shareholder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based and the Conversion Price then in effect. The Company, upon the written request at any time by any Shareholder, furnish or cause to be furnished to such Shareholder a like certificate setting forth (i) such adjustments and readjustments, (ii) the Conversion rate at the time in effect, and (iii) the number of shares of the Company Common Stock and the amount, if any, of other property that at the time would be received upon the conversion of such holder's Preferred Shares.

(iv) *Rounding*. All calculations under this Section 5(e) shall be made to (a) the nearest one hundredth of one cent or (b) the nearest share or (c) the nearest one hundredth of one percent, as the case may be.

(f) The Company shall at all times reserve and keep available for issuance upon the conversion of the Preferred Shares the maximum number of each of its authorized but unissued shares of the Company Common Stock as is reasonably anticipated to be sufficient to permit the conversion of all outstanding Preferred Shares, and shall take all action required to increase the authorized number of shares of the Company Common Stock, or any other actions necessary or desirable, if at any time there shall be insufficient authorized but unissued shares of the Company Common Stock to permit such reservation or to permit the conversion of all outstanding Preferred Shares.

6. *Status of Shares*. All Preferred Shares that are at any time converted pursuant to paragraph 5 above, and all Preferred Shares that are otherwise reacquired by the Company and subsequently canceled by the Board of Directors, shall be retired and shall not be subject to reissuance.

7. *Voting Rights*. The Series BL Convertible Preferred Stock does not carry any voting rights.

8. *Covenants*.

(a) Major Covenants. While any Preferred Shares are outstanding, the Company covenants, that unless it has the affirmative vote of Shareholders owning, in aggregate, not less than two-thirds (2/3) of the outstanding Preferred Shares: (1) not to incur any debt other than regular trade payables arising in day-to-day operations of the Company; and (2) not to transfer or sell assets (including to an affiliate or related person or entity). Each of these covenants is referred to as a "Major Covenant."

(b) Additional Covenants. While any Preferred Shares are outstanding, the Company covenants: (1) to plan, operate, and manage its farmland, water rights, and produce business to optimize long-term farm yields and meet its financial, regulatory, and contractual obligations and objectives; (2) to observe all financial covenants; (3) to maintain independent books and records of its assets, liabilities, and operations; (4) to make its books and records available for inspection by any holder of the Preferred Shares (including such holder's agent or representative) upon reasonable notice and conditions; (5) to segregate in a separate account net revenues from operations sufficient to pay when due: (i) the Cumulative 8% Preferred Dividend and (ii) 10% of its Annual Net Profit to pay when due the Profit Participation; (6) to include in its annual budget the Cumulative 8% Preferred Dividend and the Profit Participation; and (7) to place on its Board agenda proposed actions (with appropriate supporting materials) related to (i) the timely declaration and payment of the Cumulative 8% Preferred Dividend and (ii) calculation and payment resolution for the Profit Participation; (8) to use its best efforts to list its common stock on a national securities exchange promptly following achieving listing eligibility criteria; (9) to file on a timely basis all reports, notices, audits and other documents required to maintain its compliance with the Securities Exchange Act of 1934; (10) to notice, convene and conduct its annual meeting of shareholders not later than June 15 of each year; (11) to cause its independent public accounting firm to audit and issue its opinion with respect to the adequacy of the Company's financial reports; (12) to file a registration statement on or before July 1, 2013 with the SEC for the resale of the following securities: (a) for the Common Stock issuable on conversion of the Preferred underlying the Conversion Shares; and (b) for the Common Stock issuable upon exercise of the Warrants; and (13) To certify at least annually that, to the Company's actual knowledge, the Company is not in breach of a Major Covenant, or Company Covenant. Each of these covenants is referred to as a "Company Covenant."

(c) Events of Default. The following are Events of Default: (1) failure to declare and pay when due two consecutive annual installments of the Cumulative 8% Preferred Dividend; (2) the filing of a voluntary petition in bankruptcy by the Company or the approval of an involuntary petition in bankruptcy related to the Company; (3) the breach of a Major Covenant; and (4) the failure to remedy the breach of any Company Covenant within 60 days after actual notice of its breach.

9. *Redemption*. The Preferred Shares may be redeemed at any time by the Company provided the Company gives notice of redemption of all but not less than all of the outstanding Preferred Shares and the Company has on hand funds sufficient to redeem the Preferred Shares. The redemption price will be $1.00 per share plus accrued dividends, if any. Subject to the Shareholders' prior conversion of Preferred Shares, the Company will redeem all Preferred Shares which remain outstanding, for cash, on a specified business day which is at least thirty (30) days following the date of the notice of redemption. The Company has no obligation to redeem the Preferred Shares. The Company agrees that it will not redeem any Preferred Shares that would result in

any Shareholder having a beneficial common share ownership of the Company in excess of 9.9% (nine point nine percent).

10. *No Preemptive Rights.* No Shareholder of the Preferred Shares shall be entitled as of right to subscribe for, purchase, or receive any part of any new or additional shares of any class whether now or hereafter authorized, or of bonds, debentures, or other evidences of indebtedness convertible in to or exchangeable for shares of any class, but all such new or additional shares of any class, or bonds, debentures, or other evidences of indebtedness convertible into or exchangeable for shares, may be issued and disposed of by the Board of Directors on such terms as for such consideration (to the extent permitted by law), and to such person or persons as the Board of Directors in their absolute discretion may deem advisable.

11. *Registrar.* The Company will act as the Registrar for the Preferred Shares which will be transferable (i) only to other qualified investors, (ii) subject to any restrictions imposed by state and federal securities regulations, and (iii) solely through entry by the Company in a registration book maintained for that purpose.

**TWO RIVERS WATER & FARMING COMPANY**

Wayne Harding,
Secretary

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies of filed documents, visit www.sos.state.co.us.

E-Filed

Colorado Secretary of State
Date and Time: 09/21/2017 08:29 AM
ID Number: 20021354505

Document number: 20171704843
Amount Paid: $25.00

ABOVE SPACE FOR OFFICE USE ONLY

## Amended and Restated Articles of Incorporation

filed pursuant to §7-90-301, et seq. and §7-110-107 and §7-90-304.5 of the Colorado Revised Statutes (C.R.S.)

1. For the entity, its ID number and entity name are

ID number 20021354505
*(Colorado Secretary of State ID number)*

Entity name Two Rivers Water & Farming Company.

2. The new entity name (if applicable) is ______.

3. The amended and restated constituent filed document is attached.

4. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

5. *(**Caution**: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are ______.
*(mm/dd/yyyy hour:minute am/pm)*

**Notice**:

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that such document is such individual's act and deed, or that such individual in good faith believes such document is the act and deed of the person on whose behalf such individual is causing such document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S. and, if applicable, the constituent documents and the organic statutes, and that such individual in good faith believes the facts stated in such document are true and such document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is identified in this document as one who has caused it to be delivered.

6. The true name and mailing address of the individual causing the document to be delivered for filing are

Harding *(Last)* Wayne *(First)* ______ *(Middle)* ______ *(Suffix)*

3025 S Parker Rd
Ste 140
*(Street name and number or Post Office Box information)*

Aurora *(City)* CO *(State)* 80014 *(Postal/Zip Code)*

______ *(Province – if applicable)* United States *(Country – if not US)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

## Articles of Amendment

### Section 4, Other Amendments

ID Number: 20021354505

Entity Name: Two Rivers Water & Farming Company

Other amendments pursuant to Section 4 of the Articles of Amendment:

Section 5 of the Articles of Incorporation of Two Rivers Water & Farming Company are amended to provide as follows:

"The corporation is authorized to issue 200,000,000 common shares that shall have unlimited voting rights and are entitled to receive the net assets of the corporation upon dissolution."

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.sos.state.co.us.

E-Filed

Colorado Secretary of State
Date and Time: 03/16/2018 12:55 PM
ID Number: 20021354505

Document number: 20181219760
Amount Paid: $25.00

ABOVE SPACE FOR OFFICE USE ONLY

**Articles of Amendment**

filed pursuant to §7-90-301, et seq. and §7-110-106 of the Colorado Revised Statutes (C.R.S.)

1. For the entity, its ID number and entity name are

ID number 20021354505
*(Colorado Secretary of State ID number)*

Entity name Two Rivers Water & Farming Company.

2. The new entity name (if applicable) is ______________________.

3. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*
[X] This document contains additional amendments or other information.

4. If the amendment provides for an exchange, reclassification or cancellation of issued shares, the attachment states the provisions for implementing the amendment.

5. *(**Caution**: Leave blank if the document does not have a delayed effective date. Stating a delayed effective date has significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*

The delayed effective date and, if applicable, time of this document is/are ______________________.
*(mm/dd/yyyy hour:minute am/pm)*

**Notice:**

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that such document is such individual's act and deed, or that such individual in good faith believes such document is the act and deed of the person on whose behalf such individual is causing such document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S. and, if applicable, the constituent documents and the organic statutes, and that such individual in good faith believes the facts stated in such document are true and such document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is identified in this document as one who has caused it to be delivered.

6. The true name and mailing address of the individual causing the document to be delivered for filing are

Mack *(Last)* RoxAnn *(First)* D. *(Middle)* *(Suffix)*

Faegre Baker Daniels LLP
1470 Walnut Street, Suite 300
*(Street name and number or Post Office Box information)*

Boulder *(City)* CO *(State)* 80302 *(Postal/Zip Code)*

*(Province – if applicable)* United States *(Country – if not US)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

**ARTICLES OF AMENDMENT**
**TO**
**ARTICLES OF INCORPORATION**
**OF**
**TWO RIVERS WATER & FARMING COMPANY**

Pursuant to the provisions of the Colorado Business Corporation Act, as amended, Two Rivers Water & Farming Company (the "**Company**") hereby adopts the following Articles of Amendment to the Articles of Incorporation of the Company:

**ONE:** The name of the Company is Two Rivers Water & Farming Company, and the date of filing of the original Articles of Incorporation of the Company with the Colorado Secretary of State was December 20, 2002, with amendments filed on June 4, 2008, November 19, 2009, December 12, 2012 and February 26, 2013 (collectively, the "**Articles of Incorporation**").

**TWO:** The first sentence of paragraph (a) under Article V of the Articles of Incorporation is hereby deleted and replaced with the following:

> "The aggregate number of shares which this corporation shall have the authority to issue is 200,000,000 shares, with a par value of $.001, which shares shall be designated common stock."

**THREE:** The remainder of Article V and the Articles of Incorporation, as amended, remain in full force and effect.

* * * * *

The name and mailing address of the individual who causes this document to be delivered for filing, and to whom the Secretary of State may deliver notice if filing of this document is refused, is RoxAnn D. Mack, Faegre Baker Daniels LLP, 1470 Walnut Street, Suite 300, Boulder, Colorado 80302.

# <u>EXHIBIT B</u>

**Resolutions of Board**

[attached]

**TWO RIVERS WATER & FARMING COMPANY**
**Meeting of the Board of Directors**
**February 21, 2019**

A meeting of the Board of Directors (the "*Board*") of Two Rivers Water & Farming Company, a Colorado corporation (the "*Company*"), was held by telephone conference commencing at 9:00 a.m., Mountain standard time, on February 21, 2019. Layne Downs, Wayne Harding, James Kylstad and Thomas Williams, constituting all of the members of the Board, participated in the meeting.

Also participating by invitation were Mark L. Johnson of K&L Gates LLP, counsel for the Company; and Jay Seid, Gregory Berlacher and Franz Berlacher of Emerging Growth Equities, Ltd., financial advisors to the Company ("*EGE*"). Mr. Johnson kept the minutes of the meeting.

The meeting was called to order by Mr. Harding, with all of the participants present. Mr. Harding briefly reviewed the meeting agenda, as circulated to the Board prior to the meeting.

As the first order of business, Mr. Harding addressed the draft minutes of the February 11, 2019 board meeting as made available to the directors prior to the meeting. After a brief discussion, with Mr. Downs abstaining due to his absence at the February 11, 2019 meeting, it was unanimously:

**RESOLVED:** That the minutes of the meeting of the Board held on February 11, 2019 are approved in the form presented to the Board.

As the second order of business, Mr. Harding reviewed the status of the proposed transaction with Easby Land & Cattle Company, LLC ("*Easby*"), in which the Company would issue shares of its common stock ("*Common Stock*") to acquire the 100% membership interest in each Vaxa Global LLC ("*Vaxa*"), Ekstrak Labs LLC ("*Ekstrak*") and Gramz Holdings, LLC ("*Gramz*"). He noted the Company and Easby had agreed upon the final form of a share exchange agreement, including the schedules thereto (the "*Exchange Agreement*"), to effect the proposed acquisition. He noted that Easby was prepared to deliver and enter into the Exchange Agreement, subject to the Company's execution and delivery of the Exchange Agreement if and when approved by the Board.

As the third order of business, Mr. Harding introduced Mr. Johnson to present a summary of the key legal terms of the Exchange Agreement. As a preliminary matter, Mr. Johnson reminded the directors that neither he nor any of his firm's attorneys were members of the Colorado bar or otherwise qualified to address matters of Colorado law and that his presentation would be based on general principles of corporate law and federal securities law. In response to a comment from Mr. Johnson, the directors noted that, prior to the meeting, they had reviewed in detail the near-final draft of the Exchange Agreement, as had been circulated by Mr. Harding.

Mr. Johnson began his presentation by reviewing the structure of the proposed acquisition, starting with the consideration to be paid by the Company in exchange for the outstanding membership interest of Vaxa. He stated that the Company would issue to Easby a fixed number of shares of Common Stock at the acquisition closing and could be obligated, under an earn-out covenant based on Vaxa's consolidated EBITDA over a one-year period, to issue additional shares after the conclusion of the one-year earn-out period. He indicated the acquisition closing would be subject to standard closing conditions, plus a requirement that the Company enter into a binding agreement with the holders of preferred units of TR Capital Partners, LLC ("*TRCP*") providing for the exchange of all of the outstanding TRCP preferred units for Common Stock. Mr. Harding reminded the other directors that the Company does not have available a sufficient number of approved but unissued shares of Common Stock to effect both the proposed acquisition and the proposed exchange for TRCP preferred units, so the completion of the latter exchange

would be deferred pending, and subject to, stockholder approval of a resolution making available additional authorized shares.

Mr. Johnson next reviewed the timing of the proposed acquisition. He described the drafting process in resolving the form of the Exchange Agreement for execution and, subject to Board approval, the steps to be taken following execution. Mr. Harding described the rationale for establishing the closing date deadline of April 15, 2019, as well as proposed efforts by the Company to satisfy the closing conditions.

The directors engaged in a detailed discussion of the contemplated exchange with holders of TRCP preferred units. Messrs. Harding and Johnson responded to a number of questions from the other directors about, among other things, the contemplated exchange for TRCP preferred units, including inquiries about the reasons for the original formation of TRCP, the distribution rights attributable to TRCP preferred units, the purpose of the exchange, and relevant Securities and Exchange Commission disclosure obligations. Mr. Harding noted that, while the exchange for TRCP preferred units is being required by Easby, the exchange would have benefits for the Company and holders of Common Stock. The attendees concluded the discussion by noting the benefits the exchange could have for holders of Common Stock in simplifying and streamlining the Company's capital structure --- thereby facilitating market valuation of the Company and the Common Stock -- and eliminating the distribution preferences of the TRCP preferred units.

Mr. Johnson described in greater detail the terms of the earn-out provision that would be included in the Exchange Agreement, including how the number of earn-out shares would be calculated and the timing of the earn-out period and related share issuance. Messrs. Harding and Johnson responded to questions from the directors regarding the terms of the earn-out covenant and the impact of those terms on the Company and its stockholders.

Next, Mr. Johnson reviewed and summarized the various provisions of the Exchange Agreement, including the representations and warranties and the pre-closing covenants of the parties, as well the indemnification and termination provisions.

Mr. Johnson then reminded the directors that, in determining whether to proceed with the acquisition, they would need to satisfy their fiduciary responsibilities under Colorado corporate law. He reiterated that he was not qualified to discuss those responsibilities. He described generally the equivalent duties imposed under Delaware corporate law, but noted he was aware that, while Colorado courts sometimes look to Delaware case law for guidance, some case law had suggested Colorado might take a more stockholder-favorable view than Delaware in some circumstances. As a result, Colorado counsel should be consulted if the directors have any questions regarding applicable fiduciary responsibilities or other aspects of Colorado corporate law. After further discussion, the directors confirmed that they had no further questions and did not require additional explanation regarding fiduciary duties.

Mr. Johnson concluded his presentation by reviewing best practices for the Board and the Company with respect to confidentiality and communications regarding the proposed acquisition.

As the fourth order of business, Messrs. Seid, Berlacher and Berlacher discussed EGE's financial analysis of the proposed acquisition and the fairness opinion issued by EGE based on such analysis, a draft of which fairness opinion had been circulated to the Board prior to the meeting. Mr. Seid reviewed EGE's process for issuing the fairness opinion and noted the benefits of the proposed acquisition to the Company. Mr. Seid responded to questions from the Board and then, after the directors confirmed they had no further questions with regard to the fairness opinion, Messrs. Seid, Berlacher and Berlacher left the meeting at 10:00 a.m.

As the fifth order of business, Mr. Johnson referred to the draft resolutions circulated to the directors prior to the meeting. He led a discussion of the rationales and purposes of each of the resolutions being

considered, during which he responded to questions from the Board. Following this presentation and discussion, the Board having given due and proper consideration to all matters and things that are necessary or appropriate to enable it to evaluate and reach an informed conclusion as to the fairness and reasonableness of the proposed acquisition and the other transactions contemplated by the Exchange Agreement is in the best interests of all Company shareholders, it was unanimously:

**RESOLVED:** That the Board hereby:

(1) determines and resolves that:

(a) the terms and provisions of the Exchange Agreement in the form presented to the Board (a copy of which form shall be attached as EXHIBIT A to the minutes of this meeting) and

(b) the Contemplated Transactions (as defined in the Exchange Agreement)

are advisable and fair to, and in the best interests of, the Company and the holders of Common Stock;

(2) finds that the issuance of 30,000,000 shares of Common Stock (as defined in the Exchange Agreement, the "*Closing Stock*") and up to 20,000,000 additional shares of Common Stock (as defined in the Exchange Agreement, the "*Earn-Out Stock*") to Easby in exchange for a 100% membership interest in Vaxa Global LLC, a Nevada limited liability company, is advisable and fair to, and in the best interests of, the Company and the holders of Common Stock; and

(3) approves, adopts and confirms in all respects the Exchange Agreement and authorizes and directs the Company to enter into the Exchange Agreement.

**RESOLVED:** That the Chief Executive Officer of the Company (the "*Authorized Officer*") is authorized and directed, for and on behalf of the Company, to execute, deliver and cause the Company to carry out the provisions of, and perform its obligations under:

(1) the Exchange Agreement, with such changes, additions or amendments thereto as the Authorized Officer shall in his sole discretion deem necessary, appropriate or advisable, such determination to be conclusively evidenced by the execution and delivery thereof; and

(2) each other document contemplated by the Exchange Agreement or otherwise deemed by the Authorized Officer in his sole discretion to be necessary, appropriate or advisable in order to enable the Company to comply with the Exchange Agreement and complete the Contemplated Transactions, such determination to be conclusively evidenced by the execution and delivery thereof.

**RESOLVED:** That the Company shall, in exchange for the 100% membership interest in Vaxa Global LLC held by Easby and otherwise in accordance with the terms of the Exchange Agreement, issue and deliver:

(1) at the Closing (as defined in the Exchange Agreement), 30,000,000 shares of Common Stock, which shares shall comprise the Closing Stock; and

(2) on a date determined in accordance with the Exchange Agreement, a number of shares of common stock of the Company determined in accordance with Section 1.02(b)(ii) of the Exchange Agreement, up to a maximum of 20,000,000 shares, which shares, in the number so determined, shall comprise the Earn-Out Stock;

and that the Closing Stock and the Earn-Out Stock, when issued in accordance with the terms of the Exchange Agreement, will be duly authorized, validly issued, fully paid and nonassessable.

**RESOLVED:** That the approval of the Exchange Agreement and the Contemplated Transactions shall be effective for the purposes of any "fair price," "moratorium," "control-share acquisition," "interested stockholders," "business combination," "fair price" or other similar antitakeover statute or regulation of any jurisdiction that may purport to be applicable to the Exchange Agreement and the Contemplated Transactions; that the Authorized Officer is authorized and directed, for and on behalf of the Company, to take any further steps, if necessary, to render any such statute or regulation inapplicable to the Exchange Agreement and the Contemplated Transactions; and that the Board, to the extent permitted by applicable law, hereby elects that the Company not be subject to any such statute or regulation that may purport to be applicable to the Exchange Agreement and the Contemplated Transactions.

**RESOLVED:** That in order for the Corporation to comply with applicable requirements of the Securities Exchange Act of 1934, as amended, and all rules and regulations promulgated thereunder (the "*Exchange Act*"), the Authorized Officer is authorized and directed, for and on behalf of the Corporation, with the advice and assistance of outside legal counsel, to prepare, execute, deliver and file, or cause to be prepared, executed, delivered and filed, to the extent deemed by the Authorized Officer in his sole discretion to be necessary, appropriate or advisable in his sole discretion, after consultation with outside legal counsel:

(1) one or more Current Reports on Form 8-K, together with all required exhibits and schedules thereto (each a "*Form 8-K*"), with the Securities and Exchange Commission (the "*SEC*"),

(2) any and all other reports, statements, documents and information required to be filed by the Corporation pursuant to the Exchange Act or any applicable state securities laws, together with all required exhibits and schedules thereto, and

(3) any and all other reports, statements, documents and information that the Authorized Officer shall in his sole discretion deem necessary, appropriate or advisable, in such forms and containing such information as the Authorized Officer may deem necessary, appropriate or advisable, upon the advice of outside legal counsel, any such determination to be conclusively evidenced by the execution and filing thereof;

and that the Authorized Officer is authorized and directed, for and on behalf of the Corporation, to prepare, execute, deliver and file any financial statements, exhibits, amendments and supplements to the Forms 8-K and such other reports, statements, documents and information as may be deemed necessary, appropriate or advisable by the Authorized Officer, all such financial statements, exhibits, amendments and supplements to be in such forms and containing such information as the Authorized Officer may deem necessary, appropriate or advisable, upon the advice of outside legal counsel, such determination to be conclusively evidenced by the execution, delivery or filing thereof.

**RESOLVED:** That the Authorized Officers are severally authorized and directed, for and on behalf of the Corporation, to cooperate with Easby in the preparation, execution, delivery and filing of any other reports, statements, applications and information that may be required to be filed by the Corporation or Easby or any of their respective subsidiaries in connection with the Exchange Agreement and the Contemplated Transactions or contemplated by the foregoing

resolutions, pursuant to the statutes, rules and regulations of the U.S. federal government or any applicable state, local or foreign authority or regulatory body.

**RESOLVED:** That the Authorized Officer is authorized and directed, for and on behalf of the Corporation, to determine and pay all necessary and reasonable fees, expenses and other amounts to be paid, received and allowed in connection with the Contemplated Transactions, as may be deemed necessary, appropriate or desirable by the Authorized Officer in his sole discretion, such payment to be conclusive evidence of such determination.

**RESOLVED:** That the Authorized Officer is authorized and directed, for and on behalf of the Corporation, to take any and all steps in connection with initiating or defending legal proceedings in any court or agency as the Authorized Officers shall, after consulting with outside legal counsel for the Corporation, deem necessary, appropriate or advisable in connection with the Exchange Agreement or the Contemplated Transactions or as contemplated by the foregoing resolutions.

**RESOLVED:** That the Authorized Officer is authorized and directed, for and on behalf of the Corporation, to take or cause to be taken any and all such further actions and to prepare, execute, deliver and file, or cause to be prepared, executed, delivered and filed, all such further reports, schedules, statements, consents, documents, agreements, certificates and undertakings as the Authorized Officer shall determine to be necessary or appropriate to effect the Contemplated Transactions and the intent and purpose of any and all of the foregoing resolutions.

**RESOLVED:** That all actions previously taken and performed by any director, officer, employee or agent of the Corporation or the Board in connection with the actions contemplated or implied by the foregoing resolutions are adopted, ratified, confirmed and approved in all respects as the acts and deeds of the Corporation.

**RESOLVED:** That the Authorized Officer is authorized and directed, for and on behalf of the Corporation, to take any action (including the payment of expenses) and to do and perform or cause to be done and performed, all acts and things and to prepare, execute, file and deliver or cause to be prepared, executed, filed and delivered all such agreements, documents and instruments as the Authorized Officer shall in his discretion deem necessary, appropriate or advisable to effectuate the intent and purposes of the foregoing resolutions, such determination to be conclusively evidenced by the performance of such acts and things or the execution, filing and delivery of such agreements, documents and instruments, as applicable.

There being no further business to conduct, upon motion the meeting was adjourned at 10:18 a.m.

* * *

The undersigned hereby certifies that the foregoing are the minutes of the meeting of the Board held on February 21, 2019, duly adopted by the Board.

Wayne Harding, CEO and Chairman

## EXHIBIT A

### SHARE EXCHANGE AGREEMENT

## SHARE EXCHANGE AGREEMENT

This SHARE EXCHANGE AGREEMENT is made and entered into as of February __, 2019 (the "**Effective Date**"), by and between EASBY LAND & CATTLE COMPANY, LLC, a Colorado limited liability company ("**EASBY**"), and TWO RIVERS WATER & FARMING COMPANY, a Colorado corporation ("**Two Rivers**"). For purposes of this Agreement, each of EASBY and Two Rivers is sometimes individually referred to as a "**Party**" and both are collectively referred to as the "**Parties**." All capitalized terms, if not otherwise defined in the body of this Agreement, will have the meanings assigned to such terms in **Schedule 1** attached to this Agreement.

A. EASBY holds of record a 100% membership interest (the "**Vaxa Interest**") in VAXA GLOBAL LLC, a Nevada limited liability company ("**Vaxa**"), which in turn holds of record a 100% membership interest in each of Ekstrak Labs LLC, a Nevada limited liability company ("**Ekstrak**"), and Gramz Holdings, LLC, a Colorado limited liability company ("**Gramz**" and, collectively with Vaxa and Ekstrak, the "**Vaxa Entities**"); and

B. Two Rivers desires to purchase from EASBY, and EASBY desires to sell to Two Rivers, the Vaxa Interest on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants, terms, and conditions set out in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## THE EXCHANGE

**Section 1.01 Transfer of Vaxa Interest.** On the terms and conditions set forth in this Agreement, at the Closing, EASBY will sell, transfer, convey, assign, set over and deliver to Two Rivers, free and clear of all Encumbrances, good, valid and marketable title to the Vaxa Interest.

**Section 1.02 Issuance of Exchange Stock.** On the terms and conditions set forth in this Agreement:

**(a) Closing Stock.** At the Closing, Two Rivers shall issue and deliver to EASBY 30,000,000 shares (the "**Closing Stock**") of common stock, $0.001 par value, of Two Rivers ("**Two Rivers Common Stock**") determined as set forth in this Agreement.

**(b) Earn-Out Stock.**

(i) *Issuance.* Subject to the terms and conditions of this Agreement, on a date no later than five Business Days after the completion of the determination contemplated by **Section 1.02(b)**, Two Rivers shall issue and deliver to EASBY a number of duly authorized, fully paid and non-assessable additional shares of Two Rivers Common Stock, rounded to the nearest share (the "**Earn-Out Stock**" and collectively with the Closing Stock, the "**Exchange Stock**"), equal to the lesser of (i) 10 times EBITDA, divided by $1.00, and (ii) 20,000,000.

(ii) *Determination.*

(A) By no later than April 15, 2020, Two Rivers will prepare and deliver to EASBY a written statement setting forth in reasonable detail its determination of EBITDA (the "**EBITDA Calculation**").

(B) EASBY shall have a ten Business Day-period after receipt of the written statement pursuant to **Section 1.02(b)(ii)(A)** to review such written statement and the EBITDA Calculation set forth therein. During such period, EASBY and its Representatives shall have the right to inspect the books and records of the Vaxa Entities during normal business hours, upon reasonable prior notice and solely for purposes reasonably related to the determination of EBITDA. Prior to the expiration of such period, EASBY may object to Two Rivers' EBITDA Calculation by delivering a Notice of objection to Two Rivers, which Notice shall set forth EASBY's EBITDA Calculation, specify the items in Two Rivers' EBITDA Calculation disputed by EASBY, and describe in reasonable detail the basis for each objection. If EASBY fails to timely deliver a Notice of objection to Two Rivers pursuant to this **Section 1.02(b)(ii)(B)**, then the EBITDA Calculation provided by Two Rivers will be final and binding on the Parties.

(C) If EASBY timely delivers a Notice of objection in accordance with **Section 1.02(b)(ii)(B)**, the Parties shall attempt in good faith to resolve the disputed items and to agree upon the EBITDA Calculation. If the Parties resolve such dispute within five Business Days after EASBY's delivery of such Notice of objection, then their resolution of such dispute will be final and binding on the Parties.

(D) If the EBITDA Calculation is not resolved in accordance with **Section 1.02(b)(ii)(C)**, all unresolved disputed items with respect to the EBITDA Calculation will be referred to an Independent Accountant promptly following the end of the five Business Day-period referenced in **Section 1.02(b)(ii)(C)**. The Parties shall direct the Independent Accountant to render a written report on the unresolved disputed items with respect to the EBITDA Calculation as promptly as practicable, but in any event within ten Business Days after such submission. The Parties will furnish to the Independent Accountant such work papers, schedules, and other documents and information relating to the unresolved disputed items as the Independent Accountant may reasonably request. The Independent Accountant will resolve the disputed items based solely on the applicable definitions and other terms in this Agreement and not by independent review. The resolution of the dispute by the Independent Accountant will be final and binding on the Parties. The fees and expenses of the Independent Accountant will be borne by Two Rivers and EASBY in proportion to the amounts by which their respective EBITDA Calculations differ from the EBITDA Calculation as finally determined by the Independent Accountant.

(c) **Post-Closing Operation of Vaxa Entities.** Subject to the terms of this Agreement, following the Closing, Two Rivers shall have sole discretion with regard to all matters relating to the operation of the Vaxa Entities, provided that Two Rivers shall not, directly or indirectly, take any actions in bad faith for the sole or principal purpose of reducing EBITDA. Notwithstanding the foregoing, Two Rivers has no obligation to operate the Vaxa Entities in order to maximize the amount of EBITDA.

**Section 1.03 Restrictions on Transfer.** The Exchange Stock will not be registered under the Securities Act or the securities laws of any state and may not be transferred, hypothecated, sold or otherwise disposed of until: (a) a registration statement with respect to such Exchange Stock is declared effective under the Securities Act; or (b) Two Rivers receives an opinion of counsel, reasonably acceptable to Two Rivers in form and substance, that an exemption from the registration requirements of

the Securities Act is available. Each stock certificate representing any of the Exchange Stock will contain a legend substantially as follows:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, HYPOTHECATED, OR OTHERWISE DISPOSED OF UNTIL A REGISTRATION STATEMENT WITH RESPECT THERETO IS DECLARED EFFECTIVE UNDER SUCH ACT OR THE COMPANY RECEIVES AN OPINION OF COUNSEL, REASONABLY ACCEPTABLE TO TWO RIVERS IN FORM AND SUBSTANCE, THAT AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF SUCH ACT IS AVAILABLE.

**Section 1.04** **Tax Treatment.** For U.S. federal income Tax purposes, the Parties intend that the Exchange qualify as a tax free "reorganization" within the meaning of Section 351 of the Code. No Party will take any action or make any filings with any Governmental Entity inconsistent with such intent.

## ARTICLE II
## CLOSING; CLOSING DELIVERIES

**Section 2.01** **Closing.** Upon the terms and subject to the conditions set forth in this Agreement, the Closing will take place remotely via the exchange of documents and signatures on the Closing Date.

**Section 2.02** **EASBY Closing Deliveries. At the Closing, EASBY will deliver to Two Rivers:**

(a) **a membership interest certificate evidencing the Vaxa Interest, duly registered in the name of Two Rivers and dated as of the Closing Date, as contemplated in Section 1.01;**

(b) a certificate, signed by a manager of EASBY **and dated as of the Closing Date, certifying as to the matters set forth in Section 6.01 and Section 6.03;**

(c) **an incumbency certificate, signed by a manager of EASBY and dated as of the Closing Date, certifying as to the names and signatures of the managers, officers and agents of EASBY authorized to sign this Agreement or any other documents to be delivered in connection with the Contemplated Transactions;**

(d) **good standing certificates for EASBY and each of the Vaxa Entities, each issued by the Secretary of State of the State of Colorado as of date within five Business Days of the Effective Date; and**

(e) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to Two Rivers, as may be required to give effect to this Agreement and the Contemplated Transactions.

**Section 2.03** **Two Rivers Closing Deliveries.** At the Closing, Two Rivers will deliver to EASBY:

(a) a stock certificate evidencing all of the shares of the Closing Stock, duly registered in the name of EASBY and dated as of the Closing Date, as contemplated in **Section 1.02(a)**;

(b) a certificate, signed by the Chief Executive Officer of Two Rivers and dated as of the Closing Date, certifying (i) as to the matters set forth in **Section 6.01** and **Section 6.02**; (ii) that attached thereto are true and complete copies of all resolutions adopted by the Board of Directors of Two Rivers authorizing the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions and that such resolutions are in full force and effect and are all the resolutions adopted in connection with the Contemplated Transactions;

(c) **an incumbency certificate, signed by the Secretary of EASBY and dated as of the Closing Date, certifying as to the names and signatures of the officers and agents of Two Rivers authorized to sign this Agreement or any other documents to be delivered in connection with the Contemplated Transactions;**

(d) a good standing certificate for Two Rivers, issued by the Secretary of State of the State of Colorado as of date within five Business Days of the Effective Date;

(e) the names and signatures of the officers of Two Rivers authorized to sign this Agreement and the other documents to be delivered in connection with the Contemplated Transactions;

(f) a final draft of the press release to be issued by Two Rivers, within one Business Day after the Closing Date, with respect to this Agreement and the Contemplated Transactions;

(g) a final draft of the Current Report on Form 8-K to be filed by Two Rivers, within four Business Days after the Closing Date, with respect to this Agreement and the Contemplated Transactions; and

(h) such other customary instruments of transfer, assumption, filings, or documents, in form and substance reasonably satisfactory to EASBY, as may be required to give effect to this Agreement and the Contemplated Transactions.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF TWO RIVERS

Except as disclosed in the Two Rivers Disclosure Schedule with specific reference to the Section of this Agreement to which the information stated in such disclosure relates (**provided** that the disclosure in any Section of the Two Rivers Disclosure Schedule shall qualify and be deemed disclosed with respect to other Sections of this ARTICLE III only to the extent it is readily apparent from the face of such disclosure that such disclosure is applicable to such other Sections), Two Rivers represents and warrants to EASBY as set forth in this ARTICLE III as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties speak expressly as of a different date). For purposes of the preceding sentence, "Section" shall mean a second-level subpart (if any) of a Section (*e.g.*, "3.01(a)") but shall not require more detailed identification.

**Section 3.01 Organization; Standing and Power; Charter Documents; No Subsidiaries.**

**(a) Organization; Standing and Power.** Two Rivers is a corporation duly organized, validly existing, and in good standing under the Laws of the State of Colorado and has the requisite corporate power and authority to own, lease, and operate its assets and to carry on its business as currently conducted. Two Rivers is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the assets and properties owned, leased, or operated by it or the nature of its business makes such qualification or license necessary, except where the failure to be so qualified or licensed or to be in good standing would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**(b) Charter Documents.** Two Rivers has delivered to EASBY true and complete copies of all of its Charter Documents, which are in full force and effect as of the Effective Date. Two Rivers is not in violation of any of the provisions of its Charter Documents.

**(c) Subsidiaries.** Section 3.01(c) of the Two Rivers Disclosure Schedule contains a true and complete listing of each entity in which Two Rivers owns any equity or other ownership interest, including each Subsidiary of Two Rivers.

**Section 3.02 <u>Capital Structure</u>.**

**(a) Capital Stock.** The authorized capital stock of Two Rivers consists of: (i) 200,000,000 shares of Two Rivers Common Stock; and (ii) 5,000,000 shares of Two Rivers Preferred Stock. As of the execution and delivery of this Agreement on the Effective Date: (A) 49,220,418 shares of Two Rivers Common Stock had been issued and are outstanding; (B) no shares of Two Rivers Preferred Stock had been issued or were outstanding; and (C) no shares of Two Rivers Common Stock or Two Rivers Preferred Stock were held in treasury. All of the outstanding shares of Two Rivers Common Stock have been duly authorized, are validly issued, fully paid and non-assessable, were issued in compliance with applicable Laws, and were not issued in violation of any Contract or any preemptive or similar rights of any Person. When issued in accordance with the terms of this Agreement, shares of Exchange Stock will be duly authorized, validly issued, fully paid and non-assessable and will not be subject to any pre-emptive rights. Two Rivers is not a party to any voting agreement with respect to any Two Rivers Equity Securities.

**(b) Stock Awards and Contracts.** As of the execution and delivery of this Agreement on the Effective Date: (i) 5,461,447 shares of Two Rivers Common Stock and no shares of Two Rivers Preferred Stock were reserved for issuance pursuant to outstanding options and other equity awards and pursuant to stock or equity plans; and (ii) 1,826,634 shares of Two Rivers Common Stock and no shares of Two Rivers Preferred Stock were reserved for issuance pursuant to outstanding warrants. Section 3.02(b) of the Two Rivers Disclosure Schedule sets forth a true and complete list of all Contracts to which Two Rivers was a party as of the Effective Date that obligate Two Rivers to issue any Two Rivers Equity Securities to any Person (other than as described in the preceding clauses (i) and (ii)) or to repurchase, redeem or otherwise acquire any Two Rivers Equity Securities from any Person.

**Section 3.03 Authority.** Two Rivers has all requisite corporate power and authority to enter into and to perform its obligations under this Agreement and to consummate the Contemplated Transactions. The execution and delivery of this Agreement by Two Rivers and the consummation by Two Rivers of the Contemplated Transactions have been duly authorized by all necessary corporate actions on the part of Two Rivers and no other corporate actions on the part of Two Rivers are necessary to authorize the execution and delivery of this Agreement or to consummate the Exchange and the other Contemplated Transactions. This Agreement has been duly executed and delivered by Two Rivers and constitutes the legal, valid, and binding obligation of Two Rivers, enforceable against Two Rivers in accordance with

their respective terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar Laws affecting creditors' rights generally and by general principles of equity.

**Section 3.04 Non-Contravention.** The execution, delivery, and performance of this Agreement by Two Rivers, and the consummation by Two Rivers of the Contemplated Transactions, including the Exchange, do not and will not: (i) contravene or conflict with, or result in any violation or breach of, the Charter Documents of Two Rivers; (ii) conflict with or violate any Law applicable to Two Rivers or its properties or assets; (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in Two Rivers' loss of any benefit or the imposition of any additional payment or other Liability under, alter the rights or obligations of any Person under, give to any Person any rights of termination, amendment, acceleration or cancellation under, or require any Consent under, any Contract to which Two Rivers is a party or otherwise bound; or (iv) result in the creation of an Encumbrance on any of the properties or assets of Two Rivers.

**Section 3.05 Governmental Consents.** No Consent of any Governmental Entity is required to be obtained or made in connection with the execution, delivery and performance by Two Rivers of this Agreement or the consummation by Two Rivers of the Contemplated Transactions, except for the filing with the SEC of such reports under the Exchange Act as may be required in connection with this Agreement and the Contemplated Transactions.

**Section 3.06 Board Approval.** The Board of Directors of Two Rivers, by resolutions duly adopted by a unanimous vote at a meeting of all directors of Two Rivers duly called and held and, not subsequently rescinded or modified in any way, has: (i) determined that this Agreement and the Contemplated Transactions, upon the terms and subject to the conditions set forth herein, are in the best interests of Two Rivers and its shareholders; and (ii) approved and declared advisable the execution, delivery and performance of this Agreement and the consummation of the Contemplated Transactions upon the terms and subject to the conditions set forth in this Agreement.

**Section 3.07 Anti-Takeover Statutes.** No "fair price," "moratorium," "control share acquisition," "supermajority," "affiliate transactions," "business combination," or other similar anti-takeover statute or regulation enacted under any Laws applicable to Two Rivers with respect to the Exchange, except to the extent that any such statute or regulation has been or will be complied with at Closing.

**Section 3.08 SEC Documents.**

**(a) SEC Documents.** The SEC Documents (including the exhibits thereto) filed on or prior to the Effective Date constitute all of the reports and other documents required to be filed by Two Rivers, during the period from January 1, 2018 to the Effective Date, under Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act. True and complete copies of all SEC Documents (including the exhibits thereto) are publicly available in the Electronic Data Gathering, Analysis and Retrieval database of the SEC. None of the exhibits to the SEC Documents filed with the SEC contains redactions pursuant to a request for confidential treatment. As of their respective filing dates or, if amended or superseded by a subsequent filing prior to the Effective Date, as of the date of the last such amendment or superseding filing, each of the SEC Documents complied as to form in all material respects with the applicable requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act of 2002, as amended (including the regulations promulgated thereunder). The SEC Documents, taken as a whole (but excluding any SEC Documents, or information therein, superseded by a subsequent filing prior to the Closing Date), do not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the SEC Documents is, to the Knowledge of Two Rivers, the subject of ongoing SEC review or

any outstanding SEC investigation, and there are no outstanding or unresolved comments received from the SEC with respect to any of the SEC Documents.

**(b) Financial Statements.** The consolidated financial statements of Two Rivers (including any notes and schedules thereto) contained in any of the SEC Documents: (i) complied as to form in all material respects with the published rules and regulations of the SEC with respect thereto as of their respective dates; (ii) were prepared in accordance with GAAP applied on a consistent basis throughout the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited interim financial statements, as may be permitted by the SEC for Quarterly Reports on Form 10-Q); and (iii) fairly presented in all material respects the consolidated financial position and the results of operations, changes in shareholders' equity and cash flows of Two Rivers as of the respective dates of, and for the periods referred to in, such financial statements, subject, in the case of unaudited interim financial statements, to normal and year-end audit adjustments as permitted by GAAP and the applicable rules and regulations of the SEC (but only if the effect of such adjustments would not, individually or in the aggregate, be material).

**(c) Undisclosed Liabilities.** Two Rivers has no Liabilities other than (i) Liabilities reflected or reserved against in Two Rivers' unaudited consolidated balance sheet (including in the notes thereto) as of September 30, 2018 included in the SEC Documents, (ii) Liabilities incurred since September 30, 2018 in the ordinary course of business consistent with past practice, (iii) Liabilities incurred in connection with this Agreement and the Contemplated Transactions, and (iv) such other Liabilities as do not have, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**Section 3.09 <u>Absence of Certain Changes or Events</u>.** Since September 30, 2018, except in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transactions, the business of Two Rivers has been conducted in the ordinary course of business consistent with past practice and there have not been any events, conditions, changes or effects that have had, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers.

**Section 3.10 <u>Taxes</u>.**

**(a) Tax Returns and Payment of Taxes.** Two Rivers has duly and timely filed or caused to be filed (taking into account any valid extensions) all Tax Returns required to be filed by it. Such Tax Returns are true and complete in all material respects. Two Rivers is not currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business consistent with past practice. All Taxes due and owing by Two Rivers (whether or not shown on any Tax Return) have been timely paid or, where payment is not yet due, Two Rivers has made an adequate provision for such Taxes in Two Rivers' financial statements included in the SEC Documents (in accordance with GAAP). Two Rivers' most recent financial statements included in the SEC Documents reflect an adequate reserve (in accordance with GAAP) for all material Taxes payable by Two Rivers through the date of such financial statements. Two Rivers has not incurred any Liability for Taxes since the date of its most recent financial statements included in the SEC Documents outside of the ordinary course of business or otherwise inconsistent with past practice.

**(b) Withholding.** Two Rivers has withheld and timely paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, customer, shareholder, or other Person (including withholding of Taxes pursuant to Sections 1441 and 1442 of the Code or similar provisions under any Laws), and materially complied with all information reporting and backup withholding provisions of applicable Law.

(c) **Liens.** There are no Liens for Taxes upon the assets of Two Rivers other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate Actions and for which adequate reserves in accordance with GAAP have been made in the Two Rivers Balance Sheet.

(d) **Tax Deficiencies and Audits.** No deficiency for any amount of Taxes which has been proposed, asserted, or assessed in writing by any taxing authority against Two Rivers remains unpaid. There are no waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of Two Rivers. There are no Actions pending or, to the Knowledge of Two Rivers, threatened with respect to any Taxes of Two Rivers.

(e) **Intended Tax Treatment.** Two Rivers has not taken or agreed to take any action, and to the Knowledge of Two Rivers, there exists no fact or circumstance, that is reasonably likely to prevent or impede the Exchange from qualifying as a "reorganization" within the meaning of Section 351 of the Code.

**Section 3.11** **Intellectual Property.** Two Rivers owns no Intellectual Property the loss of which would have a Material Adverse Effect with respect to Two Rivers. Two Rivers has taken commercially reasonable steps to maintain the confidentiality of, and otherwise protect and enforce its rights, in all proprietary information held, or purported to be held, by Two Rivers as a trade secret. Two Rivers owns or licenses all Intellectual Property needed to conduct its business as currently conducted. Two Rivers has never materially infringed (directly, contributorily, by inducement or otherwise), misappropriated or otherwise violated any other Person's rights to Intellectual Property.

**Section 3.12** **Compliance; Permits.** Two Rivers is in material compliance with all Laws, Orders and Permits applicable to it and its business or by which it or its business or any of its properties is bound. Since January 1, 2018, no Person (including any Governmental Entity) has issued any notice or notification stating that Two Rivers is not in compliance with any Law. Two Rivers holds all Permits applicable to its business. No suspension, cancellation, non-renewal or adverse modification of any Permit of Two Rivers is pending or, to the Knowledge of Two Rivers, threatened.

**Section 3.13** **Litigation.** Except as disclosed in the SEC Documents, there is no Action pending, or to the Knowledge of Two Rivers, threatened against Two Rivers or any of its properties or assets or any Representative of Two Rivers (in the capacity of serving as such Representative), except as would not, individually or in the aggregate, a Material Adverse Effect with respect to Two Rivers. Neither Two Rivers nor any of its properties or assets is subject to any Order. There are no Governmental Entity inquiries or investigations, or internal investigations, pending or, to the Knowledge of Two Rivers, threatened, in each case regarding any accounting practices of Two Rivers or any malfeasance by any Representative of Two Rivers.

**Section 3.14** **Brokers' and Finders' Fees.** Two Rivers has not incurred, nor will it incur, directly or indirectly, any liability for investment banker, brokerage, or finders' fees or agents' commissions, or any similar charges in connection with this Agreement or the Contemplated Transactions, other than fees of Emerging Growth Equities, Ltd.

**Section 3.15** **Related Person Transactions.** Except as contemplated by **Section 6.02(f)**, there are no Contracts, transactions, arrangements or understandings between Two Rivers, on the one hand, and any Affiliate or Representative of Two Rivers (including any director, officer, or employee) or any holder of 5.0% or more of any equity securities of Two Rivers, on the other hand, that are required to be disclosed pursuant to regulations promulgated by the SEC but that have not been disclosed in the SEC Documents.

**Section 3.16** **Employee Matters.**

**(a) Compliance with Laws Generally.** Two Rivers is not a party to and maintains no Contract, plan, program, policy, agreement, collective bargaining agreement, or other arrangement providing for compensation, severance, deferred compensation, performance awards, stock or stock-based awards, fringe, retirement, death, disability, or medical benefits or other employee benefits or remuneration of any kind, including each employment, termination, severance, retention, change in control, or consulting or independent contractor Contract, plan, program, arrangement, or agreement, in each case whether written or unwritten or otherwise, funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA (collectively, the "**Employee Plans**"). Two Rivers has not incurred, either directly or indirectly, any Liability relating to any prior Employee Plan.

**(b) Effect of Transaction.** Neither the execution or delivery of this Agreement nor the consummation of the Contemplated Transactions will (either alone or in combination with any other event): (i) entitle any Person to severance pay or any other payment; or (ii) accelerate the timing of payment, funding, or vesting, or increase the amount of compensation due to any such Person

**(c) Employment Law Matters.** Two Rivers is in compliance in all material respects with: (i) all applicable Laws and agreements regarding hiring, employment, termination of employment, plant closing and mass layoff, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, leasing and supply of temporary and contingent staff, engagement of independent contractors, including proper classification of same, payroll taxes, and immigration with respect to its employees and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing its employees.

**(d) Labor.** Two Rivers is not a party to, or subject to, any collective bargaining agreement or other agreement with any labor organization, work council, or trade union with respect to any of its operations. No material work stoppage, slowdown, or labor strike against Two Rivers with respect to employees who are employed within the United States is pending, threatened, or has occurred, and, to the Knowledge of Two Rivers, no material work stoppage, slowdown, or labor strike against Two Rivers with respect to employees who are employed outside the United States is pending, threatened, or has occurred. None of the employees of Two Rivers is represented by a labor organization, work council, or trade union. There are no Actions, government investigations, or labor grievances pending, or, to the Knowledge of Two Rivers, threatened relating to any employment related matter involving any employee or applicant.

**Section 3.17 Real Property and Water Rights.**

**(a) Owned Real Estate.** Section 3.17(a) of the Two Rivers Disclosure Schedule contains a true and complete list by address and legal description of all Owned Real Estate as of the Effective Date. Two Rivers has good and marketable fee simple title to all Owned Real Estate, free and clear of all Encumbrances. Two Rivers has not: (i) leased or granted any Person the right to use or occupy all or any part of the Owned Real Estate; (ii) granted any Person an option, right of first offer, or right of first refusal to purchase such Owned Real Estate or any portion thereof or interest therein; or (iii) received written notice of any pending, and to the Knowledge of the Two Rivers, there is no threatened condemnation Action affecting any Owned Real Estate or any portion thereof or interest therein. Two Rivers is not a party to any agreement or option to purchase any real property or interest therein.

**(b) Leased Real Estate.** Section 3.17(b) of the Two Rivers Disclosure Schedule contains a true and complete list of all Leases (including all amendments, extensions, renewals,

guaranties, and other agreements with respect thereto) as of the Effective Date for each Leased Real Estate (including the date and name of the parties to such Lease). Two Rivers has made available to EASBY a true and complete copy of each such Lease. With respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable, and in full force and effect; (ii) no party to each Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with or without notice, lapse of time, or both, would constitute a breach or default under such Lease; and (iii) Two Rivers' possession and quiet enjoyment of the Leased Real Estate under such Lease has not been disturbed and there are no disputes with respect to such Lease. Two Rivers has not assigned, pledged, mortgaged, hypothecated, or otherwise transferred any Lease or any interest therein to any Person.

**(c) Real Estate Used in the Business.** The Real Estate comprises all of the real property used or intended to be used in, or otherwise related to, the business of Two Rivers.

**(d) Water Rights.** Section 3.17(d) of the Two Rivers Disclosure Schedule lists and provides a summary of all contractual or statutory groundwater, surface water, or other rights to water allocation, acquisition, use, and transfer owned or held by Two Rivers (collectively, "**Water Rights**"). With respect to all Water Rights, Two Rivers has not: (i) sold, transferred, leased, or granted to any Person any present or future interest in or to any Water Rights; (ii) granted any Person an option, right of first offer, or right of first refusal to purchase, acquire, or lease any present or future interest in or to any Water Rights or any portion thereof; or (iii) received written notice of any pending, and to the Knowledge of the Two Rivers, there is no threatened, Action affecting any Water Rights or any portion thereof or interest therein. Two Rivers is not a party to any Contract to sell, transfer, or otherwise lease any Water Rights to any Person.

**Section 3.18 Personal Property.** Two Rivers in possession of and has good and marketable title to, or valid leasehold interests in or valid rights under contract to use, the machinery, equipment, furniture, fixtures and other tangible personal property and assets owned, leased, or used by Two Rivers, free and clear of all Encumbrances.

**Section 3.19 Environmental Matters.** Two Rivers is, and at all times has been, in compliance with all Environmental Laws in all material respects, which compliance includes the possession, maintenance of, compliance with, or application for, all Permits required under applicable Environmental Laws for the operation of the business of Two Rivers as currently conducted. Two Rivers has not disposed of, released, or discharged any Hazardous Substances on, at, under, in, or from any Real Estate currently or, to the Knowledge of Two Rivers, formerly owned, leased, or operated by Two Rivers or at any other location that is: (a) currently subject to any investigation, remediation, or monitoring; or (b) reasonably likely to result in liability to Two Rivers, in either case of (a) or (b) under any applicable Environmental Laws. Two Rivers has not: (y) produced, processed, manufactured, generated, transported, treated, handled, used, or stored any Hazardous Substances, except in compliance with all Environmental Laws, at any Real Estate; or (z) exposed any Person to any Hazardous Substances under circumstances reasonably expected to give rise to any Liability or obligation under any Environmental Law. Two Rivers has not received written notice of and there is no Action pending, or to the Knowledge of Two Rivers, threatened against Two Rivers, alleging any Liability or responsibility under or non-compliance with any Environmental Law or seeking to impose any financial responsibility for any investigation, cleanup, removal, containment, or any other remediation or compliance under any Environmental Law. Two Rivers is not subject to any Order, settlement agreement, or other Contract by or with any Governmental Entity or Person imposing any material Liability or obligation with respect to any of the foregoing. Two Rivers has not assumed or retained any material Liabilities under any applicable Environmental Laws of any other Person, including in any acquisition or divestiture of any property or business.

**Section 3.20 Material Contracts.**

(a) **Two Rivers Material Contracts.** For purposes of this Agreement, "**Two Rivers Material Contracts**" mean any of the following to which Two Rivers is a party or any of its assets are bound (excluding any Leases):

(i) any "material contract" (as such term is defined in Item 601(b)(10) of Regulation S-K of the Securities Act), whether or not filed by Two Rivers with the SEC;

(ii) any employment, consulting, or similar Contract (in each case with respect to which Two Rivers has continuing obligations as of the Effective Date) with any current or former (A) officer of Two Rivers, (B) member of the Two Rivers' Board of Directors, or (C) employee or independent contractor providing for an annual base salary or payment in excess of $10,000;

(iii) any Contract providing for indemnification or any guaranty by Two Rivers or its principals;

(iv) any Contract that purports to limit the right of Two Rivers (A) to engage in any line of business, (B) to compete with any Person or solicit any client or customer, or (C) to operate in any geographical location;

(v) any Contract relating to the disposition or acquisition, directly or indirectly, by Two Rivers of assets or capital stock or other equity interests of itself or any other Person;

(vi) any Contract that grants any right of first refusal, right of first offer, or similar right with respect to any material assets, rights, equity, or properties of Two Rivers;

(vii) any Contract that contains any provision that requires the purchase of all or a material portion of Two Rivers' requirements for a given product or service from a given third party;

(viii) any Contract that obligates Two Rivers to conduct business on an exclusive or preferential basis or that contains a "most favored nation" or similar covenant with any Person;

(ix) any partnership, joint venture, limited liability company agreement, or similar Contract relating to the formation, creation, operation, management, or control of any joint venture or Person;

(x) any mortgages, indentures, guarantees, loans, credit agreements, security agreements, or other Contracts, in each case relating to indebtedness for borrowed money, whether as borrower or lender, other than accounts receivables and payables incurred in the ordinary course of business;

(xi) any agreement, license, franchise, permit, indenture or authorization that has not been terminated or performed in its entirety and not renewed that may be, by its terms, terminated, impaired or adversely affected by reason of the execution of this Agreement or the Contemplated Transactions;

(xii) any employee collective bargaining agreement or other Contract with any labor union;

(xiii) any IP Agreement;

(xiv) any other Contract under which Two Rivers is obligated to make payment or incur costs in excess of $10,000 in any year and which is not otherwise described in clauses (i) through (xiii) above; or

(xv) any Contract which is not otherwise described in clauses (i) through (xiv) above that is material to Two Rivers.

**(b) Schedule of Material Contracts; Documents.** Section 3.20(b) of the Two Rivers Disclosure Schedule sets forth a true and complete list of all Two Rivers Material Contracts. Two Rivers has made available to EASBY true and complete copies of all Two Rivers Material Contracts, including any amendments thereto.

**(c) No Breach.** All Two Rivers Material Contracts are legal, valid, and binding on Two Rivers, enforceable against Two Rivers in accordance with their respective terms, and are in full force and effect. Two Rivers has not violated any provision of, or failed to perform any obligation required under the provisions of, any Two Rivers Material Contract. Two Rivers is not in breach, and has not received written notice of breach, of any Two Rivers Material Contract.

**Section 3.21 Insurance.** Two Rivers maintains policies or binders of insurance with respect to its assets, business, operations, employees, officers and directors that are generally of the types, and in amounts, customarily carried by Persons conducting a business similar to Two Rivers.

**Section 3.22 Books and Records.** The minute books and stock record books of Two Rivers, true and complete copies of which have been made available to EASBY, are true and correct and have been maintained in accordance with sound business practices. The minute books of Two Rivers contain true and complete records of all meetings, and actions taken by written consent of, the shareholders, the Board of Directors, and any committees of the Board of Directors of Two Rivers, and no meeting, or action taken by written consent, of any such shareholders, Board of Directors, or committee has been held for which minutes have not been prepared and are not contained in such minute books.

**Section 3.23 Anti-Corruption Matters.** No Representative of Two Rivers has: (a) used any funds for unlawful contributions, gifts, entertainment, or other unlawful payments relating to an act by any Governmental Entity; (b) made any unlawful payment to any foreign or domestic government official or employee or to any foreign or domestic political party or campaign or violated any provision of the Foreign Corrupt Practices Act of 1977, as amended; or (c) made any other unlawful payment under any applicable Law relating to anti-corruption, bribery, or similar matters. Two Rivers has not disclosed to any Governmental Entity that it violated or may have violated any Law relating to anti-corruption, bribery, or similar matters. No Governmental Entity is investigating, examining, or reviewing Two Rivers' compliance with any applicable provisions of any Law relating to anti-corruption, bribery, or similar matters.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF EASBY

Except as disclosed in the EASBY Disclosure Schedule with specific reference to the Section of this Agreement to which the information stated in such disclosure relates (provided that the disclosure in any Section of the EASBY Disclosure Schedule shall qualify and be deemed disclosed with respect to other

Sections of this **ARTICLE IV** only to the extent it is readily apparent from the face of such disclosure that such disclosure is applicable to such other Sections), EASBY represents and warrants to Two Rivers as set forth in this **ARTICLE IV** as of the Effective Date and as of the Closing Date (except to the extent such representations and warranties speak expressly as of a different date). For purposes of the preceding sentence, "Section" shall mean a second-level subpart (if any) of a Section (*e.g.*, "4.01(a)") but shall not require more detailed identification.

**Section 4.01 Organization; Standing and Power; Charter Documents.**

**(a) Organization; Standing and Power.** EASBY and each of the Vaxa Entities: (i) is duly organized, validly existing and in good standing under the Laws of the State of Colorado or Nevada (as applicable) and has the requisite limited liability company power and authority to own, lease, and operate its assets and to carry on its business as now conducted; and (b) is duly qualified or licensed to do business as a foreign corporation and is in good standing in each jurisdiction where the character of the assets and properties owned, leased, or operated by it or the nature of its business makes such qualification or license necessary, except where the failure to be so qualified or licensed or to be in good standing, would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect with respect to such company.

**(b) Charter Documents.** EASBY has made available to Two Rivers true and complete copies of the Charter Documents of EASBY and each of the Vaxa Entities, all of which are in full force and effect as of the Effective Date. Neither EASBY nor any of the Vaxa Entities is in violation of any of the provisions of its Charter Documents.

**(c)** Subsidiaries. None of the Vaxa Entities has any Subsidiary or otherwise owns or has any interest in any shares or other ownership interests of any other Person, except that Vaxa holds a 100% membership interest in each of Gramz and Ekstrak.

**Section 4.02 Capital Structure.**

**(a) Vaxa Interests.** The sole record and beneficial owner of the Vaxa Interest is EASBY, which owns the Vaxa Interest free and clear of all Encumbrances. The Vaxa Interest has been duly authorized and is validly issued, fully paid and non-assessable, and is not subject to any pre-emptive rights.

**(b) Ekstrak Interest.** The sole record and beneficial owner of the 100% membership interest in Ekstrak is Vaxa, which owns such interest free and clear of all Encumbrances. Vaxa's membership interest in Ekstrak has been duly authorized and is validly issued, fully paid, and non-assessable, and is not subject to any preemptive rights.

**(c) Gramz Interest.** The sole record and beneficial owner of the 100% membership interest in Gramz is Vaxa, which owns such interest free and clear of all Encumbrances. Vaxa's membership interest in Gramz has been duly authorized and is validly issued, fully paid, and non-assessable, and is not subject to any preemptive rights.

**Section 4.03 Authority.** EASBY has all requisite limited liability company power and authority to enter into and to perform its obligations under this Agreement and to consummate the Contemplated Transactions. The execution and delivery of this Agreement by EASBY and the consummation by EASBY of the Contemplated Transactions have been duly authorized by all necessary limited liability company actions on the part of EASBY and no other limited liability company actions on the part of EASBY are necessary to authorize the execution and delivery of this Agreement or to consummate the Exchange and the other Contemplated Transactions. This Agreement has been duly executed and

delivered by EASBY and constitutes the legal, valid, and binding obligation of EASBY, enforceable against EASBY in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, moratorium, and other similar Laws affecting creditors' rights generally and by general principles of equity.

**Section 4.04 Non-Contravention.** The execution, delivery and performance of this Agreement by EASBY, and the consummation by EASBY of the Contemplated Transactions, including the Exchange, do not and will not: (i) contravene or conflict with, or result in any violation or breach of, the Charter Documents of EASBY or any of the Vaxa Entities; (ii) conflict with or violate any Law applicable to EASBY or any of the Vaxa Entities or their respective properties or assets; (iii) result in any breach of or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in EASBY's or any of the Vaxa Entities' loss of any benefit or the imposition of any additional payment or other Liability under, or alter the rights or obligations of any Person under, or give to any Person any rights of termination, amendment, acceleration, or cancellation, or require any Consent under, any Contract to which EASBY or any Vaxa Entity is a party or otherwise bound; or (iv) result in the creation of an Encumbrance on any of the properties or assets of any of the Vaxa Entities.

**Section 4.05 Governmental Consents.** No Consent of any Governmental Entity is required to be obtained or made in connection with the execution, delivery, and performance by EASBY of this Agreement or the consummation by EASBY of the Contemplated Transactions.

**Section 4.06 Member Approval.** EASBY's members, by resolutions duly adopted by a unanimous vote or consent of all members of EASBY and not subsequently rescinded or modified in any way, have: (i) determined that this Agreement and the Contemplated Transactions, upon the terms and subject to the conditions set forth herein, are in the best interests of, EASBY and its members; and (ii) approved and declared advisable the execution, delivery, and performance of this Agreement and the consummation of the Contemplated Transactions upon the terms and subject to the conditions set forth in this Agreement.

**Section 4.07 Anti-Takeover Statutes.** No "fair price," "moratorium," "control share acquisition," "supermajority," "affiliate transactions," "business combination," or other similar anti-takeover statute or regulation enacted under any Laws applicable to EASBY or any of the Vaxa Entities is applicable with respect to the Exchange, except to the extent that any such statute or regulation has been or will be complied with at Closing.

**Section 4.08 <u>Financial Statements</u>.**

**(a) Financial Statements.** EASBY has provided to Two Rivers a true and complete copy of the Vaxa Balance Sheet. The Vaxa Entities were recently formed and, except for the Vaxa Balance Sheet, have no historical financial statements.

**(b) Undisclosed Liabilities.** None of the Vaxa Entities has any Liabilities other than (i) Liabilities reflected or reserved against in the Vaxa Balance Sheet, (ii) Liabilities incurred since December 31, 2018 in the ordinary course of business consistent with past practice, (iii) Liabilities incurred in connection with this Agreement and the Contemplated Transactions, and (iv) such other Liabilities as do not have, individually or in the aggregate, a Material Adverse Effect with respect to Vaxa.

**Section 4.09 <u>Assets</u>.** The Vaxa Entities own all of the assets reflected on the Vaxa Balance Sheet and have good and valid title, free and clear of any Encumbrances, to all of such assets. All fixed assets reflected on the Vaxa Balance Sheet are in good operating condition and repair, ordinary wear and tear excepted, with no material latent defects.

**Section 4.10 Taxes.**

(a) **Tax Returns and Payment of Taxes.** Each of the Vaxa Entities has duly and timely filed or caused to be filed (taking into account any valid extensions) all Tax Returns required to be filed by it. Such Tax Returns are true and complete in all material respects. None of the Vaxa Entities is currently the beneficiary of any extension of time within which to file any Tax Return other than extensions of time to file Tax Returns obtained in the ordinary course of business consistent with past practice. All Taxes due and owing by any of the Vaxa Entities (whether or not shown on any Tax Return) have been timely paid or, where payment is not yet due, each of the Vaxa Entities has made an adequate provision for such Taxes in their financial statements (in accordance with GAAP). The financial statements of the Vaxa Entities provided to Two Rivers reflect an adequate reserve (in accordance with GAAP) for all material Taxes payable by the Vaxa Entities through the date of such financial statements. None of the Vaxa Entities has incurred any Liability for Taxes since December 31, 2018 outside of the ordinary course of business or otherwise inconsistent with past practice.

(b) **Withholding.** Each of the Vaxa Entities has withheld and timely paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any employee, creditor, customer, shareholder, or other Person (including withholding of Taxes pursuant to Sections 1441 and 1442 of the Code or similar provisions under any Laws), and materially complied with all information reporting and backup withholding provisions of applicable Law.

(c) **Encumbrances.** There are no Encumbrances for Taxes upon the assets of any of the Vaxa Entities other than for current Taxes not yet due and payable or for Taxes that are being contested in good faith by appropriate Actions and for which adequate reserves in accordance with GAAP have been made in the financial statements of the Vaxa Entities provided to Two Rivers.

(d) **Tax Deficiencies and Audits.** No deficiency for any amount of Taxes which has been proposed, asserted, or assessed in writing by any taxing authority against any of the Vaxa Entities remains unpaid. There are no waivers or extensions of any statute of limitations currently in effect with respect to any Taxes of any of the Vaxa Entities. There are no Actions ongoing, threatened, or pending with respect to any Taxes of any of the Vaxa Entities.

(e) **Intended Tax Treatment.** None of the Vaxa Entities has taken or has agreed to take any action, and to the Knowledge of EASBY there exists no fact or circumstance, that is reasonably likely to prevent or impede the Exchange from qualifying as a "reorganization" within the meaning of Section 351 of the Code.

**Section 4.11 Absence of Certain Changes or Events.** Since the date of the Vaxa Balance Sheet, except in connection with the execution and delivery of this Agreement and the consummation of the Contemplated Transactions, the business of each Vaxa Entity has been conducted in the ordinary course of business consistent with past practice and there have not been or occurred any events, conditions, changes, or effects that have had, individually or in the aggregate, a Material Adverse Effect with respect to EASBY or Vaxa.

**Section 4.12 Intellectual Property.** None of the Vaxa Entities owns Intellectual Property the loss of which would have a Material Adverse Effect with respect to Vaxa. Each of the Vaxa Entities has taken all commercially reasonable steps to maintain the confidentiality of and otherwise protect and enforce its rights in all proprietary information it holds, or that it purports to hold, as a trade secret. Each of the Vaxa Entities owns or otherwise has, and after the Closing will have, all Intellectual Property needed to conduct its business as currently conducted. None of the Vaxa Entities has materially infringed (directly, contributorily, by inducement or otherwise), misappropriated or otherwise violated any other Person's rights to Intellectual Property

**Section 4.13** **Compliance; Permits.** Each of the Vaxa Entities is and always has been in compliance with all Laws, Orders, and Permits applicable to it and its business or by which it or its business or properties are bound. No Person (including any Governmental Entity) has issued any notice or notification stating that any Vaxa Entity is not in compliance with any Law. Each Vaxa Entity holds all Permits applicable to its business. No suspension, cancellation, non-renewal, or adverse modifications of any Permits of any Vaxa Entity is pending or, to the Knowledge of EASBY, threatened.

**Section 4.14** **Litigation.** There is no Action pending, or to the Knowledge of EASBY, threatened against any of the Vaxa Entities or any of their respective properties or assets or any Representative of any of the Vaxa Entities (in the capacity of serving as such Representative). None of the Vaxa Entities nor any of their respective properties or assets are subject to any Order. There are no SEC inquiries or investigations, other Governmental Entity inquiries or investigations, or internal investigations pending or, to the Knowledge of EASBY, threatened, in each case regarding any accounting practices of the Vaxa Entities or any malfeasance by any Representative of any of the Vaxa Entities.

**Section 4.15** **Brokers' and Finders' Fees.** Neither EASBY or any of the Vaxa Entities has incurred, or will incur, directly or indirectly, any liability for investment banker, brokerage, or finders' fees or agents' commissions, or any similar charges in connection with this Agreement or the Contemplated Transactions, other than fees of Fenner & Beane payable solely by EASBY.

**Section 4.16** **Employee Matters.**

**(a) Compliance with Laws Generally.** None of the Vaxa Entities is a party to or maintains an Employee Plan. None of the Vaxa Entities has incurred, either directly or indirectly, any Liability relating to any prior Employee Plan.

**(b) Effect of Transaction.** Neither the execution or delivery of this Agreement nor the consummation of the Contemplated Transactions will (either alone or in combination with any other event): (i) entitle any Person to severance pay or any other payment; or (ii) accelerate the timing of payment, funding, or vesting, or increase the amount of compensation due to any such Person.

**(c) Employees.** None of the Vaxa Entities has any written or oral contract of employment or other employment agreement with any of its employees or any agreements relating to the temporary use or loaning of employees. None of the Vaxa Entities has any agreements or understandings with any employees or any policies or practices pertaining to severance or termination costs. All employees of the Vaxa Entities are employed at-will, and none of the Vaxa Entities is a party to any written or oral contracts, understandings or policies to the contrary.

**(d) Employment Law Matters.** Each of the Vaxa Entities: (i) is in compliance in all material respects with all applicable Laws and agreements regarding hiring, employment, termination of employment, plant closing and mass layoff, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, leasing and supply of temporary and contingent staff, engagement of independent contractors, including proper classification of same, payroll taxes, and immigration with respect to its employees and contingent workers; and (ii) is in compliance in all material respects with all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing its employees.

**(e) Labor.** None of the Vaxa Entities is a party to, or subject to, any collective bargaining agreement or other agreement with any labor organization, work council, or trade union with respect to any of its operations. No material work stoppage, slowdown, or labor strike against

any of the Vaxa Entities with respect to employees who are employed within the United States is pending, threatened, or has occurred, and, to the Knowledge of EASBY, no material work stoppage, slowdown, or labor strike against any of the Vaxa Entities with respect to employees who are employed outside the United States is pending, threatened, or has occurred. None of the employees of any of the Vaxa Entities is represented by a labor organization, work council, or trade union. There are no Actions, government investigations, or labor grievances pending, or, to the Knowledge of EASBY, threatened relating to any employment-related matter involving any employee or applicant.

**Section 4.17** **Real Property.** None of the Vaxa Entities owns any real estate.

**Section 4.18** **Personal Property.** Each of the Vaxa Entities is in possession of and has good and marketable title to, or valid leasehold interests in or valid rights under contract to use, the machinery, equipment, furniture, fixtures, and other tangible personal property and assets it owns, leases, or uses, free and clear of all Encumbrances.

**Section 4.19** **Environmental Matters.** Each of the Vaxa Entities is, and at all times has been, in compliance with all Environmental Laws in all material respects, which compliance includes the possession, maintenance of, compliance with, or application for, all Permits required under applicable Environmental Laws for the operation of the business of the Vaxa Entities as currently conducted. None of the Vaxa Entities has disposed of, released, or discharged any Hazardous Substances on, at, under, in, or from any real estate currently or, to the Knowledge of EASBY, formerly owned, leased, or operated by any of the Vaxa Entities or at any other location that is: (a) currently subject to any investigation, remediation, or monitoring; or (b) reasonably likely to result in liability to the Vaxa Entities, in either case of (a) or (b) under any applicable Environmental Laws. None of the Vaxa Entities has: (y) produced, processed, manufactured, generated, transported, treated, handled, used, or stored any Hazardous Substances, except in compliance with all Environmental Laws, at any real estate; or (z) exposed any Person to any Hazardous Substances under circumstances reasonably expected to give rise to any Liability or obligation under any Environmental Law. Neither EASBY nor any of the Vaxa Entities has received written notice of and there is no Action pending, or to the Knowledge of EASBY, threatened against any of the Vaxa Entities, alleging any Liability or responsibility under or non-compliance with any Environmental Law or seeking to impose any financial responsibility for any investigation, cleanup, removal, containment, or any other remediation or compliance under any Environmental Law. None of the Vaxa Entities is subject to any Order, settlement agreement, or other Contract by or with any Governmental Entity or Person imposing any material Liability or obligation with respect to any of the foregoing. None of the Vaxa Entities has assumed or retained any material Liabilities under any applicable Environmental Laws of any other Person, including in any acquisition or divestiture of any property or business.

**Section 4.20** **Material Contracts.**

**(a)** **EASBY Material Contracts.** For purposes of this Agreement, "**EASBY Material Contracts**" means any of the following to which any of the Vaxa Entities is a party or any of its assets are bound:

(i) any employment, consulting or similar Contract (in each case with respect to which any of the Vaxa Entities has continuing obligations as of the Effective Date) with any current or former (A) officer of any of the Vaxa Entities, (B) member of EASBY or any of the Vaxa Entities, or (C) employee or independent contractor providing for an annual base salary or payment in excess of $10,000;

(ii) any Contract providing for indemnification or any guaranty by any of the Vaxa Entities or its principals;

(iii) any Contract that purports to limit the right of any of the Vaxa Entities (A) to engage in any line of business, (B) to compete with any Person or solicit any client or customer, or (C) to operate in any geographical location;

(iv) any Contract relating to the disposition or acquisition, directly or indirectly, by any of the Vaxa Entities of assets or capital stock or other equity interests of itself or any other Person;

(v) any Contract that grants any right of first refusal, right of first offer, or similar right with respect to any material assets, rights, equity, or properties of any of the Vaxa Entities;

(vi) any Contract that contains any provision that requires the purchase of all or a material portion of any of the Vaxa Entities' requirements for a given product or service from a given third party;

(vii) any Contract that obligates any of the Vaxa Entities to conduct business on an exclusive or preferential basis or that contains a "most favored nation" or similar covenant with any Person;

(viii) any partnership, joint venture, limited liability company agreement, or similar Contract relating to the formation, creation, operation, management, or control of any joint venture or Person;

(ix) any mortgages, indentures, guarantees, loans, credit agreements, security agreements, or other Contracts, in each case relating to indebtedness for borrowed money, by way of direct loan, sale of debt securities, purchase money obligation, conditional sale, guarantee or otherwise, whether as borrower or lender, other than accounts receivables and payables incurred in the ordinary course of business;

(x) any agreement, license, franchise, permit, indenture or authorization that has not been terminated or performed in its entirety and not renewed that may be, by its terms, terminated, impaired or adversely affected by reason of the execution of this Agreement, the Closing, or the Contemplated Transactions;

(xi) any employee collective bargaining agreement or other Contract with any labor union;

(xii) any Intellectual Property Agreement;

(xiii) any other Contract under which any of the Vaxa Entities is obligated to make payment or incur costs in excess of $10,000 in any year and which is not otherwise described in clauses (i) through (xii) above; or

(xiv) any Contract which is not otherwise described in clauses (i) through (xiii) above that is material to any of the Vaxa Entities.

**(b) Schedule of Material Contracts; Documents.** Section 4.20(b) of the EASBY Disclosure Schedule sets forth a true and complete list of all EASBY Material Contracts. EASBY has made available to Two Rivers true and complete copies of all EASBY Material Contracts, including any amendments thereto.

**(c) No Breach.** All EASBY Material Contracts are legal, valid, and binding on the Vaxa Entities, enforceable against in accordance with their respective terms, and are in full force and effect. None of the Vaxa Entities has violated any provision of, or failed to perform any obligation required under the provisions of, any EASBY Material Contract. None of the Vaxa Entities is in breach, and neither EASBY nor any of the Vaxa Entities has received written notice of breach, of any EASBY Material Contract.

**Section 4.21** **<u>Investment Purpose</u>.** EASBY understands that the Earn-Out Stock and the Closing Stock (a) have not been registered under the Securities Act or the securities laws of any other jurisdiction, (b) are issued in reliance upon U.S. federal and state exemptions for transactions not involving a public offering, and (c) cannot be disposed of unless they are subsequently registered or exempted from registration under the Securities Act. EASBY is an "accredited investor" within the meaning of Rule 501 under the Securities Act and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Exchange Stock. The Exchange Stock is being acquired for EASBY's own account solely for investment and not with a view to resale or distribution thereof. EASBY has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects (financial and other) of Two Rivers, and EASBY acknowledges that it has been provided adequate access to the personnel, properties, premises and records of Two Rivers for such purpose. The determination of EASBY to acquire the Exchange Stock has been made by EASBY independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of Two Rivers that may have been made or given by EASBY or by any agent or employee of EASBY. EASBY has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in Two Rivers and making an informed decision with respect thereto. EASBY is able to bear the economic and financial risk of an investment in Two Rivers for an indefinite period of time.

**Section 4.22** **<u>Information Supplied</u>.** None of the information supplied by EASBY to Two Rivers from time to time for inclusion in any filing, including an SEC Document, to be made with the SEC by Two Rivers in connection with this Agreement or the Contemplated Transactions contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

**Section 4.23** **<u>Books and Records</u>.** The minute books and equity registers of each of the Vaxa Entities, true and correct copies of which have been made available to Two Rivers, are true and correct and have been maintained in accordance with sound business practices. The minute books of each of the Vaxa Entities contain accurate and complete records of all meetings, and actions taken by written consent of, the members and the board of managers (if any) of each of the Vaxa Entities, and no meeting, or action taken by written consent, of any such members and board of managers (if any) has been held for which minutes have not been prepared and are not contained in such minute books. At the Closing, all of those books and records will be transferred into the possession of Two Rivers.

## ARTICLE V
## COVENANTS

**Section 5.01** **Conduct of Business of Vaxa Entities.** Each Vaxa Entity will, during the period from the Effective Date until the Closing, except as expressly authorized by this Agreement or as required by applicable Law or with the prior written consent of Two Rivers, conduct its business in the ordinary course of business consistent with past practice, and, to the extent consistent therewith, each Vaxa Entity will preserve intact its business organization, keep available the services of its current Representatives, preserve its present relationships with customers, suppliers, distributors, licensors, licensees, and other Persons having business relationships with such Vaxa Entity. Without limiting the generality of the foregoing, between the Effective Date and the Closing, except as otherwise expressly contemplated by this Agreement or as required by applicable Law, no Vaxa Entity will without the prior written consent of Two Rivers:

(a) amend its Charter Documents;

(b) declare, set aside, or pay any dividend or distribution (whether in cash, stock, property, or otherwise) in respect of, or enter into any Contract with respect to the voting of, any equity securities of any Vaxa Entity;

(c) issue, sell, pledge, dispose of or encumber any of its equity securities;

(d) (i) increase the compensation payable or that could become payable by such Vaxa Entity to any of its Representatives, other than increases in compensation made to non-officer employees in the ordinary course of business consistent with past practice or (ii) establish, adopt, enter into, amend, terminate, exercise any discretion under, or take any action to accelerate rights under any Employee Plans or any plan, Contract, program, policy, trust, fund, or other arrangement that would be an Employee Plan if it were in existence as of the Effective Date, or make any contribution to any Employee Plan, other than contributions required by Law, the terms of such Employee Plans as in effect on the Effective Date, or that are made in the ordinary course of business consistent with past practice;

(e) acquire, by exchange, consolidation, acquisition of stock or assets, or otherwise, any business or Person or division thereof or make any loans, advances, or capital contributions to or investments in any Person;

(f) transfer, license, sell, lease, or otherwise dispose of (whether by way of exchange, consolidation, sale of stock or assets, or otherwise) or pledge, encumber, or otherwise subject to any Lien, any of its assets;

(g) repurchase, prepay, or incur any indebtedness for borrowed money or guarantee any such indebtedness of another Person, issue or sell any debt securities or options, warrants, calls, or other rights to acquire any debt securities of such Vaxa Entity, guarantee any debt securities of another Person, or enter into any arrangement having the economic effect of any of the foregoing;

(h) enter into, amend, modify, or consent to the termination of (other than at its stated expiry date), any EASBY Material Contract;

(i) institute, settle, or compromise any Action involving the payment of monetary damages by such Vaxa Entity;

(j) make any change in any method of financial accounting principles or practices, in each case except for any such change required by a change in GAAP or applicable Law;

(k) (i) settle or compromise any Tax claim, audit, or assessment for an amount materially in excess of the amount reserved or accrued on the Vaxa Balance Sheet, (ii) make or change any Tax election, change any annual Tax accounting period, or adopt or change any method of Tax accounting, (iii) amend any Tax Returns or file claims for material Tax refunds, or (iv) enter into any closing agreement, surrender in writing any right to claim a Tax refund, offset, or other reduction in Tax liability, or consent to any extension or waiver of the limitation period applicable to any Tax claim or assessment;

(l) enter into any material Contract with respect to any joint venture, strategic partnership, or alliance;

(m) abandon, allow to lapse, sell, assign, transfer, grant any security interest in, or otherwise encumber or dispose of, or grant any right or license to, any Intellectual Property of such Vaxa Entity;

(n) terminate or modify in any material respect, or fail to exercise renewal rights with respect to, any material insurance policy; or

(o) adopt or effect a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, or other reorganization;

(p) adopt or effect a plan of complete or partial liquidation, dissolution, restructuring, recapitalization, or other reorganization of any Vaxa Entity; or

(q) agree or commit to do any of the foregoing.

**Section 5.02 Limitation on Conflicting Actions.** Neither Party will, during the period from the Effective Date until the Closing, take any action that is intended or that would reasonably be expected to, individually or in the aggregate, prevent, materially delay, or materially impede the consummation of the Closing.

**Section 5.03 Access to Information.** From the Effective Date until the Closing, Two Rivers will afford EASBY and its Representatives reasonable access, at reasonable times and in a manner as will not unreasonably interfere with the business or operations of Two Rivers, to the Representatives, accountants, properties, offices, and other facilities and to all books, records, Contracts, and other assets of Two Rivers, and Two Rivers will furnish promptly to the Vaxa Parties such other information concerning the business and properties of Two Rivers as the Vaxa Parties may reasonably request from time to time. Two Rivers will not be required to provide access to or disclose information where such access or disclosure would jeopardize the protection of attorney-client privilege or contravene any Law. No investigation will affect Two Rivers' representations, warranties, covenants, or agreements contained in this Agreement, or limit or otherwise affect the remedies available to EASBY pursuant to this Agreement.

**Section 5.04 Confidentiality.**

**(a)** Neither Party shall, and each shall ensure that none of its respective Representatives, issue or disseminate any press release or other publicity or otherwise make any disclosure of any nature (to any supplier, customer, landlord, creditor or employee of either Party or to any other Person) regarding (a) the existence or, or the terms of, this Agreement or any of the other Transactional Documents or (b) Confidential Information of the other Party, except to the extent that such Party is required by Law to make any such disclosure; **provided** that, to the extent such disclosure is required by applicable law, such Party shall (a) promptly notify the other Party, (b) use its Reasonable Efforts consistent with such applicable law to consult with such other Party with respect to the text thereof and (c) cooperate with the other Party to narrow the scope of the disclosure required to be made. EASBY acknowledges that Two Rivers Common Stock is publicly traded and that any information obtained during the course of EASBY's consideration, evaluation and negotiation of the Contemplated Transactions could be considered to be material nonpublic information within the meaning of federal and state securities laws. Accordingly, EASBY agrees not to engage in any discussions, correspondence or transactions in respect of any Two Rivers Securities in violation of applicable securities laws.

**(b)** The covenants and agreements of the Parties set forth in Schedule 2 hereto are incorporated by reference as if set forth in the body of this Agreement.

**Section 5.05 Non-Competition; Non-Solicitation.** For a period of 36 months commencing on the Closing Date (the "**Restricted Period**"), EASBY will not, and will not permit any of its Affiliates or Representatives (each, a "**Restricted Person**") to, directly or indirectly:

(a) (i) engage in or assist other Persons in engaging in the Restricted Business; (ii) have an interest in any Person that engages, directly or indirectly, in the Restricted Business in any capacity, including as a partner, shareholder, member, employee, officer, director, manager, principal, agent, trustee, or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the Effective Date) between Two Rivers and its customers, suppliers, and business contacts; provided that the foregoing shall not preclude such Restricted Person from owning, directly or indirectly, solely as an investment, (A) the Exchange Stock or (B) securities of any Person traded on any national securities exchange if such Restricted Person is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own 1.0% or more of any class of securities of such Person;

(b) hire or solicit any employee or independent contractor of Two Rivers or its Subsidiaries or encourage any such employee or independent contractor to leave such employment or engagement or hire any such employee or independent contractor who has left such employment or engagement; **provided**, **however**, that nothing in this **Section 5.05(b)** will prevent any Restricted Person from hiring any employee or independent contractor whose employment or engagement, as the case may be, has been terminated by Two Rivers and its Subsidiaries following the Closing;

(c) solicit or entice, or attempt to solicit or entice, any clients or customers of Two Rivers or its Subsidiaries or potential clients or customers of Two

Rivers for purposes of diverting their business or services from Two Rivers or its Subsidiaries;

EASBY agrees and acknowledges that a breach or threatened breach of this **Section 5.06** would give rise to irreparable harm to Two Rivers, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by any Restricted Person of any such obligations, Two Rivers will be entitled, in addition to any and all other rights and remedies that may be available to it in respect of such breach, to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond). EASBY agrees and acknowledges that the restrictions contained in this **Section 5.05** are reasonable and necessary to protect the legitimate interests of Two Rivers and constitute a material inducement to Two Rivers to enter into this Agreement and consummate the Contemplated Transactions. If any covenant contained in this **Section 5.05** should ever be adjudicated to exceed the time, geographic, product or service, or other limitations permitted by applicable Law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant will be deemed reformed, in such jurisdiction to the maximum time, geographic, product or service, or other limitations permitted by applicable Law. The covenants contained in this **Section 5.05** and each provision of this **Section 5.05** are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written will not invalidate or render unenforceable the remaining covenants or provisions of this **Section 5.05**, and any such invalidity or unenforceability in any jurisdiction will not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section 5.06** **Notices of Certain Events.** Each Party will provide Notice to the other Party promptly of: (a) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the Contemplated Transactions; (b) any notice or other communication from any Governmental Entity in connection with the Contemplated Transactions; (c) any Actions commenced or threatened against such notifying Party that are related to the Exchange or the other Contemplated Transactions; and (d) any event, change, or effect between the Effective Date and the Closing that causes or is reasonably likely to cause the failure of any of the conditions set forth in **ARTICLE VI** to be satisfied. In no event will: (i) the delivery of any Notice by a Party pursuant to this **Section 5.06** limit or otherwise affect the respective rights, obligations, representations, warranties, covenants, or agreements of the Parties or the conditions to the obligations of the Parties under this Agreement; or (ii) disclosure by a Party be deemed to amend or supplement the Two Rivers Disclosure Schedule or the EASBY Disclosure Schedule (as appropriate) or constitute an exception to such Party's representations or warranties. This **Section 5.06** will not constitute a covenant or agreement for purposes of **Section 6.02(b)** or **Section 6.03(b)**.

**Section 5.07** **Public Announcements.** Each of the Parties agrees that no public release or announcement concerning the Contemplated Transactions will be issued by either Party without the prior written consent of the other Party, except as may be required by applicable Law or the rules or regulations of any applicable United States securities exchange or other Governmental Entity to which a Party is subject or submits, in which case the Party required to make the release or announcement will allow the other Party reasonable time to comment on such release or announcement in advance of such issuance.

**Section 5.08** **Reasonable Efforts.** From the Effective Date to the Closing, upon the terms and subject to the conditions of this Agreement, the Parties will use commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable (subject to applicable Laws) to consummate and make effective the Exchange and the other Contemplated Transactions as promptly as practicable, including: (a) preparation and filing of all forms, registrations, and notices required to be filed with the SEC or any other Governmental Entity in connection with the

Closing; and (b) the satisfaction of such Party's conditions precedent to Closing as set forth in **ARTICLE VI**.

## ARTICLE VI
## CONDITIONS TO CLOSING

**Section 6.01** **Conditions to Each Party's Obligation to Effect the Exchange.** The respective obligations of each Party to effect the Exchange and the other Contemplated Transactions is subject to the satisfaction or waiver (where permissible pursuant to applicable Law) on or prior to the Closing Date of each of the following conditions:

(a) **No Injunctions, Restraints, or Illegality.** No Governmental Entity will have enacted, issued, promulgated, enforced, or entered any Laws or Orders, whether temporary, preliminary, or permanent, that make illegal, enjoin, or otherwise prohibit consummation of the Exchange or the other Contemplated Transactions.

(b) **Governmental Consents.** All Consents of any Governmental Entity required to consummate the Exchange and the other Contemplated Transactions will have been obtained, free of any condition that would reasonably be expected to have a Material Adverse Effect on either Party or Vaxa.

**Section 6.02** **Conditions to Obligations of EASBY.** The obligations of EASBY to effect the transactions contemplated at the Closing are subject to the satisfaction by Two Rivers (or waiver by EASBY, where permissible pursuant to applicable Law) on or prior to the Closing Date of the following conditions:

(a) **Representations and Warranties.** The representations and warranties of Two Rivers set forth in this Agreement will be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

(b) **Performance of Covenants.** Two Rivers will have performed in all material respects all obligations, and complied in all material respects with the agreements and covenants, in this Agreement required to be performed by or complied with by it at or prior to the Closing.

(c) **Consents.** All Consents applicable to effectuate the Closing will have been received by Two Rivers and executed counterparts thereof will have been delivered to EASBY at or prior to the Closing.

(d) **No Action.** No Action will be pending or threatened before any Governmental Entity wherein an unfavorable injunction, judgment, Order, decree, ruling, or charge would: (i) prevent consummation of any of the Contemplated Transactions; (ii) cause any of the Contemplated Transactions to be rescinded following the Closing; or (iii) affect adversely the right of Two Rivers to effectuate the Exchange.

(e) **Material Adverse Effect.** Since the Effective Date, there will not have been any Material Adverse Effect with respect to Two Rivers or any event, change, or effect that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect with respect to Two Rivers.

(f) **Exchange for TR Capital Partners, LLC Preferred Units.** Two Rivers and holders of outstanding Preferred Units of TR Capital Partners, LLC will have entered into a binding

agreement providing for the exchange of all of such outstanding Preferred Units for shares of Two Rivers Common Stock, subject to Two Rivers' receipt of stockholder approval to amend.

(g) **Documents.** Two Rivers will have delivered to EASBY such documents required by **Section 2.03**.

**Section 6.03 Conditions to Obligations of Two Rivers.** The obligations of Two Rivers to effect the transactions contemplated at the Closing are subject to the satisfaction by EASBY (or waiver by Two Rivers, where permissible pursuant to applicable Law) on or prior to the Closing Date of the following conditions:

(a) **Representations and Warranties.** The representations and warranties of EASBY set forth in this Agreement will be true and correct in all respects on and as of the Effective Date and on and as of the Closing Date with the same effect as though made at and as of such date.

(b) **Performance of Covenants.** EASBY will have performed in all material respects all obligations, and complied in all material respects with the agreements and covenants, in this Agreement required to be performed by or complied with by it at or prior to the Closing.

(c) **Consents.** All Consents applicable to effectuate the Closing will have been received by EASBY and executed counterparts thereof will have been delivered to Two Rivers at or prior to the Closing.

(d) **No Action.** No Action will be pending or threatened before any Governmental Entity wherein an unfavorable injunction, judgment, Order, decree, ruling, or charge would: (i) prevent consummation of any of the Contemplated Transactions; (ii) cause any of the Contemplated Transactions to be rescinded following the Closing; or (iii) affect adversely the right of EASBY to effectuate the Exchange.

(e) **Material Adverse Effect.** Since the Effective Date, there will not have been any Material Adverse Effect with respect to EASBY or Vaxa or any event, change, or effect that would, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect with respect to EASBY or Vaxa.

(f) **Documents.** EASBY will have delivered to Two Rivers the documents required by **Section 2.02**.

## ARTICLE VII
## TERMINATION

**Section 7.01 Termination By Mutual Consent.** This Agreement may be terminated at any time prior to the Closing by the mutual written consent of the Parties.

**Section 7.02 Termination By Any Party.** This Agreement may be terminated by either Party prior to the Closing if any Governmental Entity will have enacted, issued, promulgated, enforced, or entered any Law or Order making illegal, permanently enjoining, or otherwise permanently prohibiting the consummation of the Closing and such Law or Order will have become final and nonappealable; **provided, however,** that the right to terminate this Agreement pursuant to this **Section 7.02(b)** will not be available to either Party whose breach of any representation, warranty, covenant, or agreement set forth in this Agreement has been the cause of, or resulted in, the issuance, promulgation, enforcement, or entry of any such Law or Order.



CONFIDENTIAL - DEFENDANTS' 015927

**Section 7.03** **Termination by Any Vaxa Entity.** This Agreement may be terminated by EASBY at any time prior to the Closing if:

(a) if the Closing has not been consummated on or before April 15, 2019; **provided, however,** that the right to terminate this Agreement pursuant to this **Section 7.03(a)** will not be available to EASBY if EASBY's breach of any representation, warranty, covenant, or agreement set forth in this Agreement has been the cause of, or resulted in, the failure of the Closing to be consummated on or before such date; or

(b) there will have been a material breach of any representation, warranty, covenant, or agreement on the part of Two Rivers set forth in this Agreement such that the conditions to the Closing set forth in **Section 6.01** or **6.02** would not be satisfied and, in either such case, such breach is incapable of being cured by April 30, 2019; **provided, however,** that EASBY will give Notice to Two Rivers at least thirty days prior to such termination stating its intention to terminate this Agreement pursuant to this **Section 7.03(b)**; **provided further,** that EASBY will not have the right to terminate this Agreement pursuant to this **Section 7.03(b)** if it is then in material breach of any representation, warranty, covenant, or obligation under this Agreement, which breach has not been cured.

**Section 7.04** **Termination by Two Rivers.** This Agreement may be terminated by Two Rivers at any time prior to the Closing if there will have been a material breach of any representation, warranty, covenant or agreement on the part of EASBY set forth in this Agreement such that the conditions to the Closing set forth in **Section 6.01** or **6.03** would not be satisfied and, in either such case, such breach is incapable of being cured by April 30, 2019; **provided, however,** that Two Rivers will give Notice to EASBY at least 30 days prior to such termination stating its intention to terminate this Agreement pursuant to this **Section 7.04**; **provided further,** that Two Rivers will not have the right to terminate this Agreement pursuant to this **Section 7.04** if Two Rivers is then in material breach of any representation, warranty, covenant, or obligation under this Agreement, which breach has not been cured.

**Section 7.05** **Notice of Termination.** The Party desiring to terminate this Agreement pursuant to this **Article VII** (other than pursuant to **Section 7.01**) will deliver Notice of such termination to the other Party specifying with particularity the reason for such termination, and any such termination in accordance with this **Section 7.05** will be effective immediately upon delivery of such Notice to such other Party.

**Section 7.06** **Effect of Termination.** If this Agreement is terminated pursuant to this **Article VII**, it will become void and of no further force and effect, with no Liability on the part of either Party or any Representative of such Party to any other Party, except: (a) with respect to **Section 7.05**, **Section 7.06** and **Section 7.07**, which will remain in full force and effect and any other term or condition of this Agreement which, by its terms, would survive such termination, including **Section 5.04** and **Article IX**; and (b) with respect to any Liabilities or Losses incurred or suffered by a Party, to the extent such Liabilities or Losses were the result of fraud or the breach by the other Party of any of its representations, warranties, covenants, or other agreements set forth in this Agreement.

**Section 7.07** **Fees and Expenses Following Termination.**

**(a)** If this Agreement is terminated by Two Rivers other than pursuant to **Section 7.01** or the Closing otherwise does not occur on or prior to the End Date through no fault of EASBY or any of the Vaxa Entities, Two Rivers shall (i) reimburse EASBY for all Expenses actually incurred

by EASBY or any of the Vaxa Entities solely in connection with this Agreement and the Contemplated Transactions after the Effective Date and prior to the termination of this Agreement and (ii) unless this Agreement has been terminated by Two Rivers pursuant to **Section 7.04**, pay to EASBY a termination fee of $1,000,000.

**(b)** If this Agreement is terminated by EASBY pursuant to **Section 7.03**, EASBY shall reimburse Two Rivers for all Expenses actually incurred by Two Rivers solely in connection with this Agreement and the Contemplated Transactions after the Effective Date and prior to the termination of this Agreement.

**(c)** Either Party seeking reimbursement pursuant to this **Section 7.07(a)** shall deliver to the other Party, within ten Business Days of termination of this Agreement, a Notice setting forth in reasonable detail, and attaching receipts or other reasonable documentation, the Expenses for which reimbursement is sought and shall respond to any inquiries regarding such Expenses within two Business Days. The reimbursing Party shall pay, by wire transfer of immediately available funds, the appropriate Expenses (and, if due pursuant to clause (ii) of **Section 7.07(a)**, the termination fee of $1,000,000) within five Business Days after receipt of such Notice.

**(d)** The Parties agree and acknowledge that the provisions of this **Section 7.07(a)** are an integral part of the Contemplated Transactions and that, without such provisions, the Parties would not have entered into this Agreement. If either Party fails to pay in a timely manner the amounts due pursuant to this **Section 7.07(a)** and, in order to obtain such payment, the other Party makes a claim against the non-paying Party that results in a judgment in an Action, the non-paying Party will pay to the other Party the Expenses incurred or accrued by such other Party in connection with such Action.

**(e)** Except as expressly set forth in this **Section 7.07(a)**, all Expenses incurred by either Party in connection with this Agreement and the Contemplated Transactions will be paid by such Party.

**Section 7.08 Extension; Waiver.** At any time prior to the Closing, either Party may, by written Notice, (a) extend the time for the performance of any of the obligations of the other Party, (b) waive any inaccuracies in the representations and warranties of the other Party contained in this Agreement, or (c) unless prohibited by applicable Law, waive compliance by the other Party with any of the covenants, agreements or conditions contained in this Agreement.

## ARTICLE VIII

## INDEMNIFICATION

**Section 8.01 Survival.** Subject to the limitations and other provisions of this Agreement, the representations and warranties contained in this Agreement will survive the Closing and will remain in full force and effect until the date that is 18 months from the Closing Date; **provided, however,** that the Fundamental Representations of the Parties will survive for the full period of all applicable statutes of limitations (giving effect to any waiver, mitigation, or extension thereof) plus 60 days. All covenants and agreements of the Parties contained in this Agreement will survive the Closing indefinitely or for the period explicitly specified therein. Notwithstanding the foregoing, any claims asserted in good faith with reasonable specificity (to the extent known at such time) and by Notice from the non-breaching Party to the breaching Party prior to the expiration date of the applicable survival period will not thereafter be barred by the expiration of the relevant representation or warranty and such claims will survive until finally resolved.

**Section 8.02** **Indemnification by EASBY.** Subject to the other terms and conditions of this **ARTICLE VIII**, EASBY will indemnify and defend Two Rivers and its Affiliates and each of their respective employees, officers, directors, agents and other Representatives (collectively, the "**Two Rivers Indemnitees**") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, any of the Two Rivers Indemnitees based upon, arising out of, with respect to, or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of EASBY contained in this Agreement; or (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by EASBY pursuant to this Agreement.

**Section 8.03** **Indemnification by Two Rivers.** Subject to the other terms and conditions of this **ARTICLE VIII**, Two Rivers will indemnify and defend EASBY and its Affiliates and each of their respective employees, officers, directors, agents and other Representatives (collectively, the "**Vaxa Indemnitees**") against, and will hold each of them harmless from and against, and will pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, any of the Vaxa Indemnitees based upon, arising out of, with respect to, or by reason of: (a) any inaccuracy in or breach of any of the representations or warranties of Two Rivers contained in this Agreement; or (b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Two Rivers pursuant to this Agreement.

**Section 8.04** **Certain Limitations.**

**(a)** EASBY shall not be liable to the Two Rivers Indemnitees for indemnification under **Section 8.02** until the aggregate amount of all Losses in respect of indemnification under **Section 8.02** exceeds $10,000 (the "Basket"), in which event EASBY shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which EASBY shall be liable pursuant to **Section 8.02** shall not exceed $1,000,000 (the "Cap").]

**(b)** Two Rivers shall not be liable to the EASBY Indemnitees for indemnification under **Section 8.03** until the aggregate amount of all Losses in respect of indemnification under **Section 8.03** exceeds the Basket, in which event Two Rivers shall be required to pay or be liable for all such Losses from the first dollar. The aggregate amount of all Losses for which Two Rivers shall be liable pursuant to **Section 8.03** shall not exceed the Cap.

**(c)** Notwithstanding the foregoing, the limitations set forth in **Section 8.04(a)** and **Section 8.04(b)** shall not apply to Losses based upon, arising out of, with respect to or by reason of any inaccuracy in or breach of any Fundamental Representation.

**(d)** For purposes of this **ARTICLE VIII**, any inaccuracy in or breach of any representation or warranty will be determined without regard to any materiality, Material Adverse Effect, or other similar qualification contained in or otherwise applicable to such representation or warranty.

**Section 8.05** **Third Party Claims.** If any Indemnified Party receives Notice of the assertion or commencement of any Action made or brought by any Person who is not a Party or an Affiliate or Representative of a Party (a "**Third Party Claim**") against such Indemnified Party with respect to which the Indemnifying Party is obligated to provide indemnification under this Agreement, the Indemnified Party will give the Indemnifying Party reasonably prompt Notice thereof, but in any event not later than thirty days after receipt of such Notice of such Third Party Claim. The failure to give such prompt Notice will not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such Notice by the Indemnified Party will describe the Third Party Claim in reasonable detail, will include copies of

all material written evidence thereof, and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have the right to participate in, or by giving written Notice to the Indemnified Party, to assume the defense of any Third Party Claim at the Indemnifying Party's expense and by the Indemnifying Party's own counsel, and the Indemnified Party will cooperate in good faith in such defense, provided that if EASBY is the Indemnifying Party, it shall not have the right to defend or direct the defense of any such Third Party Claim that is asserted directly by or on behalf of a Person that is a supplier or customer of Two Rivers or the Vaxa Entities or seeks an injunction or other equitable relief against Two Rivers. If the Indemnifying Party assumes the defense of any Third Party Claim, subject to **Section 8.06**, it will have the right to take such action as it deems necessary to avoid, dispute, defend, appeal or make counterclaims pertaining to any such Third Party Claim in the name and on behalf of the Indemnified Party. The Indemnified Party will have the right to participate in the defense of any Third Party Claim with counsel selected by it subject to the Indemnifying Party's right to control the defense thereof. The fees and disbursements of such counsel will be at the expense of the Indemnified Party; **provided, however,** that if in the reasonable opinion of counsel to the Indemnified Party: (a) there are legal defenses available to an Indemnified Party that are different from or additional to those available to the Indemnifying Party; or (b) there exists a conflict of interest between the Indemnifying Party and the Indemnified Party that cannot be waived, the Indemnifying Party will be liable for the reasonable fees and expenses of counsel to the Indemnified Party in each jurisdiction for which the Indemnified Party determines counsel is required. If the Indemnifying Party elects not to compromise or defend such Third Party Claim, fails to promptly notify the Indemnified Party in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Third Party Claim, the Indemnified Party may, subject to **Section 8.06**, pay, compromise, and defend such Third Party Claim, and seek indemnification for any and all Losses based upon, arising from, or relating to such Third Party Claim. The Parties will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim, including making available records relating to such Third Party Claim and furnishing, without expense (other than reimbursement of actual out-of-pocket expenses) to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Third Party Claim.

**Section 8.06** **Settlement of Third Party Claims.** Notwithstanding any other provision of this Agreement, the Indemnifying Party will not enter into settlement of any Third Party Claim without the prior written consent of the Indemnified Party, except as provided in this **Section 8.06**. If a firm offer is made to settle a Third Party Claim without leading to liability or the creation of a financial or other obligation on the part of the Indemnified Party and provides, in customary form, for the unconditional release of each Indemnified Party from all Liabilities in connection with such Third Party Claim and the Indemnifying Party desires to accept and agree to such offer, the Indemnifying Party will give Notice to that effect to the Indemnified Party. If the Indemnified Party fails to consent to such firm offer within ten days after its receipt of such Notice, the Indemnified Party may continue to contest or defend such Third Party Claim and in such event, the maximum Liability of the Indemnifying Party as to such Third Party Claim will not exceed the amount of such settlement offer. If the Indemnified Party fails to consent to such firm offer and also fails to assume defense of such Third Party Claim, the Indemnifying Party may settle the Third Party Claim upon the terms set forth in such firm offer to settle such Third Party Claim. If the Indemnified Party has assumed the defense pursuant to **Section 8.05**, it will not agree to any settlement without the written consent of the Indemnifying Party (which consent will not be unreasonably withheld or delayed).

**Section 8.07** **Direct Claims.** Any Action by an Indemnified Party on account of a Loss which does not result from a Third Party Claim (a "**Direct Claim**") will be asserted by the Indemnified Party giving the Indemnifying Party reasonably prompt Notice thereof, but in any event not later than thirty days after the Indemnified Party becomes aware of such Direct Claim. The failure to give such prompt Notice will

not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure. Such Notice by the Indemnified Party will describe the Direct Claim in reasonable detail, will include copies of all material written evidence thereof, and will indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Indemnified Party. The Indemnifying Party will have thirty days after its receipt of such Notice to respond in writing to such Direct Claim. The Indemnified Party will allow the Indemnifying Party and its professional advisors to investigate the matter or circumstance alleged to give rise to the Direct Claim, and whether and to what extent any amount is payable in respect of the Direct Claim, and the Indemnified Party will assist the Indemnifying Party's investigation by giving such information and assistance (including access to the premises and personnel and the right to examine and copy any accounts, documents, or records) as the Indemnifying Party or any of its professional advisors may reasonably request. If the Indemnifying Party does not so respond within such thirty-day period, the Indemnifying Party will be deemed to have rejected such claim, in which case the Indemnified Party will be free to pursue such remedies as may be available to the Indemnified Party on the terms and subject to the provisions of this Agreement.

**Section 8.08 Payments**. Once a Loss is agreed to by the Indemnifying Party or finally adjudicated to be payable pursuant to this **Article VIII**, the Indemnifying Party will satisfy its obligations within 15 Business Days of such final, non-appealable adjudication by wire transfer of immediately available funds. The Parties agree that should an Indemnifying Party not make full payment of any such obligations within such 15 Business Day period, the amount payable will accrue interest from and including the date of agreement of the Indemnifying Party or final, non-appealable adjudication to the date such payment has been made at a rate per annum equal to 12.0%. Such interest will be calculated daily on the basis of a 365-day year and the actual number of days elapsed.

**Section 8.09 Effect of Investigation.** The representations, warranties and covenants of the Indemnifying Party, and the Indemnified Party's right to indemnification with respect thereto, will not be affected or deemed waived by reason of any investigation made by or on behalf of the Indemnified Party (including by any of its Representatives) or by reason of the fact that the Indemnified Party or any of its Representatives knew or should have known that any such representation, warranty, or covenant is, was, or might be inaccurate or by reason of the Indemnified Party's waiver of any condition set forth in **ARTICLE VI**, as the case may be.

**Section 8.10 Exclusive Remedies**. Subject to **Section 5.05** and **Section 9.12**, the Parties agree and acknowledge that their sole and exclusive remedy with respect to any and all claims (other than claims arising from fraud, criminal activity, or willful misconduct on the part of a Party in connection with the Contemplated Transactions) for any breach of any representation, warranty, covenant, agreement, or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement, will be pursuant to the indemnification provisions set forth in this **ARTICLE VIII**. In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted under Law, any and all rights, claims, and causes of action for any breach of any representation, warranty, covenant, agreement, or obligation set forth in this Agreement or otherwise relating to the subject matter of this Agreement it may have against the other Party and its Affiliates and each of their respective Representatives arising under or based upon any Law, except pursuant to the indemnification provisions set forth in this **ARTICLE VIII**. Nothing in this **Section 8.10** will limit any Person's right to seek and obtain any equitable relief to which any Person will be entitled or to seek any remedy on account of either Party's fraudulent activity, criminal activity, or intentional misconduct.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.01** **Interpretation; Construction.** The headings in this Agreement are for convenience of reference only, do not constitute part of this Agreement, and will not be deemed to limit or otherwise affect any of the provisions of this Agreement. Where a reference in this Agreement is made to a Section, Article, or Schedule, such reference will be to a Section of, Article of, or Schedule of this Agreement unless otherwise indicated. Unless the context otherwise requires, references in this Agreement: (a) to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and (b) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. Whenever the words "include," "includes," or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation," and the word "or" is not exclusive. The definitions of terms in this Agreement will apply equally to the singular and plural forms of the terms defined. The words "hereof," "herein," "hereby," "hereto," and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement. The Parties have participated jointly in negotiating and drafting this Agreement. In the event that an ambiguity or a question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by both Parties, and no presumption or burden of proof will arise favoring or disfavoring either Party by virtue of the authorship of any provision of this Agreement.

**Section 9.02** **Governing Law.** This Agreement will be governed by and construed in accordance with the internal laws of the State of Colorado without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of Laws of any jurisdiction other than those of the State of Colorado.

**Section 9.03** **Submission to Jurisdiction.** Each of the Parties irrevocably agrees that any Action with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of and the rights and obligations arising under this Agreement brought by any other Party or its successors or assigns will be brought and determined exclusively in the courts located in Denver County, Colorado, or in the event (but only in the event) that such courts do not have subject matter jurisdiction over such Action in the United States District Court for the District of Colorado. Each of the Parties agrees that mailing of process or other papers in connection with any Action in the manner provided in **Section 9.05** or in such other manner as may be permitted by applicable Laws, will be valid and sufficient service thereof. Each of the Parties irrevocably submits with regard to any such Action for itself and in respect of its property, generally and unconditionally, to the personal jurisdiction of the aforesaid courts and agrees that it will not bring any Action relating to this Agreement or any of the Contemplated Transactions in any court or tribunal other than the aforesaid courts. Each of the Parties irrevocably waives, and agrees not to assert, by way of motion, as a defense, counterclaim, or otherwise, in any Action with respect to this Agreement and the rights and obligations arising under this Agreement, or for recognition and enforcement of any judgment in respect of and the rights and obligations arising under this Agreement: (a) any claim that it is not personally subject to the jurisdiction of the above named courts for any reason other than the failure to serve process in accordance with this **Section 9.03**; (b) any claim that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise); and (c) to the fullest extent permitted by the applicable Law, any claim that (i) the Action in such court is brought in an inconvenient forum, (ii) the venue of such Action is improper, or (iii) this Agreement, or the subject matter hereof or thereof, may not be enforced in or by such courts.

**Section 9.04** **Waiver of Jury Trial.** EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER OR ARISE OUT OF THIS AGREEMENT IS

LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY AGREES AND ACKNOWLEDGES THAT: (a) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION; (b) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER; (c) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY; AND (d) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS **SECTION 9.04**.

**Section 9.05 Notices.** All Notices will be in writing and addressed to the other Party at its address set out on the signature page of this Agreement (or to any other address that the receiving Party may designate from time to time in accordance with this **Section 9.05**). All Notices will be in writing and will be deemed to have been duly given, made, and received: (a) if personally delivered, on the date of delivery; (b) if by electronic transmission, upon receipt; (c) if mailed, three days after deposit in the United States mail, registered or certified, return receipt requested, postage prepaid; or (d) if by a courier delivery service providing overnight or "next-day" delivery, on the next business day after deposit with such service. A Notice is effective only if the Party giving the Notice has complied with the requirements of this **Section 9.05**. Any Party may alter the address to which such Notices will be sent by giving Notice to the other Party of such change of address in conformity with the provisions of this **Section 9.05**.

**Section 9.06 Entire Agreement.** This Agreement constitutes the entire agreement between the Parties with respect to the subject matter of this Agreement and supersedes all other prior agreements and understandings, both written and oral, between the Parties with respect to the subject matter of this Agreement, including that certain letter of intent of the Parties, dated June 20, 2018, as amended on August 24, 2018, and September 17, 2018 (and all other amendments thereto).

**Section 9.07 No Third Party Beneficiaries.** Except for the Two Rivers Indemnitees and the Vaxa Indemnitees, this Agreement are for the sole benefit of the Parties and their permitted assigns and respective successors and nothing in this Agreement, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 9.08 Severability.** If any term or provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Except as provided in **Section 5.05**, upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Contemplated Transactions are consummated as originally contemplated to the greatest extent possible.

**Section 9.09 Assignment.** This Agreement will be binding upon and will inure to the benefit of the Parties and their respective successors and permitted assigns. Neither Party may assign its rights or obligations under this Agreement without the prior written consent of the other Party.

**Section 9.10 Remedies.** Except as otherwise provided in this Agreement: (a) any and all remedies expressly conferred upon a Party will be cumulative with, and not exclusive of, any other remedy contained in this Agreement, at Law or in equity; and (b) the exercise by a Party of any one remedy will not preclude the exercise by it of any other remedy.

**Section 9.11 __Further Assurances.__** On a Party's reasonable request, the other Party will execute and deliver all such further documents and instruments, and take all such further acts, reasonably necessary to give full effect to this Agreement and the Contemplated Transactions.

**Section 9.12 __Specific Performance.__** The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof or thereof, as the case may be, and that the Parties will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof.

**Section 9.13 __Expenses.__** Except as otherwise expressly provided in this Agreement, all Expenses incurred by a Party in connection with this Agreement and the Contemplated Transactions will be paid by such Party, whether or not the Closing will have occurred.

**Section 9.14 __Counterparts; Effectiveness.__** This Agreement may be executed in counterparts, each of which will be deemed an original, but both of which together will constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including .pdf or any electronic signature, *e.g.*, www.docusign.com), or other transmission method and any counterpart so delivered will be deemed to have been duly and validly delivered and be valid and effective for all purposes.

**[SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

EASBY LAND & CATTLE COMPANY, LLC

By: ______________________________
G. A. Harrington, Authorized Agent

Address:
EASBY Land & Cattle Company, LLC
Attn: G.A. Harrington, Manager
201 Portage Avenue #1800
Winnipeg, MB
Email: info@vaxaglobal.com

TWO RIVERS WATER & FARMING COMPANY

By: ______________________________
Wayne Harding, Chief Executive Officer

Address:
Two Rivers Water & Farming Company
Attn: Wayne Harding, Chief Executive Officer
3025 South Parker Road, Suite 140
Aurora, Colorado 80014
Email: wharding@2riverswater.com

**[SIGNATURE PAGE OF SHARE EXCHANGE AGREEMENT]**

## SCHEDULE I

## DEFINITIONS

For purposes of this Agreement, the following terms will have the following meanings when used in this Agreement with initial capital letters:

"**Action**" means any action, cause of action, demand, arbitration, audit, hearing, litigation, lawsuit, notice of violation, proceeding, citation, summons, subpoena, or investigation (whether civil, criminal, administrative, judicial, or investigative, whether formal or informal, and whether public or private) of any nature, whether at law or in equity.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person. For the purposes of this definition, "control" (including, the terms "controlling," "controlled by," and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities, by Contract, or otherwise.

"**Agreement**" means this Share Exchange Agreement, including all Exhibits and Schedules (including the Two Rivers Disclosure Schedule and the EASBY Disclosure Schedule) hereto, as such agreement may be amended, supplemented, and modified from time to time.

"**Business Day**" means any day, other than Saturday, Sunday, or any day on which banking institutions located in Phoenix, Arizona, or Denver, Colorado, are authorized or required by Law or other governmental action to close.

"**Charter Documents**" means: (a) with respect to Two Rivers, its Restated Articles of Incorporation and Bylaws, each as amended, supplemented or further restated, and (b) with respect to EASBY and each of the Vaxa Entities, the Articles of Organization and the Operating Agreement of such limited liability company, each as amended, supplemented or restated.

"**Closing**" means the closing being held on the Closing Date pursuant to **Section 2.01**, at which, among other things, the Vaxa Interest will be exchanged for the Closing Stock.

"**Closing Date**" means, unless otherwise agreed upon by the Parties in writing, the earlier of (a) April 12, 2019, and (b) the third Business Day following the first Business day as of which all conditions to the Closing set forth in this Agreement have been satisfied or, to the extent permitted under this Agreement, waived.

"**Closing Stock**" has the meaning set forth in **Section 1.02(a)**.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, including the Treasury Regulations.

"**Confidential Information**" means any proprietary information, inventions, Intellectual Property, technical data, trade secrets, or know-how, including research, law firm and case information, products, services, customer lists and customers, contacts, investors and investor information, suppliers, leads, information, markets, software, developments, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, or other business information disclosed by one Party to another Party either directly or indirectly in writing, orally, or by drawings or observation, whether or not marked or designated as "confidential," and all notes, analyses, summaries, and

other materials that contain, are based on, or otherwise reflect, to any degree, any of the foregoing. Confidential Information will include all such information disclosed to a Party at, prior to, or following the Effective Date. Confidential Information will not include information that: (a) is in or enters the public domain without a breach of the confidentiality restrictions contained in this Agreement or another similar agreement; (b) is received from a third party without restriction on disclosure and without a breach of any nondisclosure obligation; or (c) is required to be disclosed by Order of any Governmental Entity; **provided, however,** that the disclosing Party is given reasonable notice and an opportunity to obtain a protective order against disclosure of such information.

"**Consent**" means any consent, authorization, registration, declaration, approval, action, waiver and similar writing.

"**Contemplated Transactions**" means all of the transactions contemplated by this Agreement or any other instrument, opinion, Contract, certificate, document or other statement executed and delivered by either of the Parties pursuant to the terms and conditions of, and in connection with the transactions contemplated by, this Agreement.

"**Contract**" means any contract, agreement, license, deed, note, bond, mortgage, indenture, lease, or other binding instrument or binding commitment, whether written or oral.

"**Direct Claim**" has the meaning set forth in **Section 8.07**.

"**Earn-Out Stock**" has the meaning set forth in **Section 1.02(b)(i)**.

"**EASBY**" has the meaning set forth in the first paragraph of this Agreement.

"**EASBY Disclosure Schedule**" means the disclosure schedule dated as of the Effective Date and delivered by EASBY to Two Rivers concurrently with the execution of this Agreement.

"**EASBY Material Contracts**" has the meaning set forth in **Section 4.20**.

"**EBITDA**" means, with respect to the Measurement Period, the consolidated net income before interest, income taxes, depreciation and amortization of the Vaxa Entities for the Measurement Period, as such items are determined in accordance with GAAP.

"**EBITDA Calculation**" has the meaning set forth in **Section 1.02(b)(ii)(A)**.

"**Effective Date**" has the meaning set forth in the first paragraph of this Agreement.

"**Ekstrak**" has the meaning set forth in **recital A** to this Agreement.

"**Employee Plan**" has the meaning set forth in **Section 3.16(a)**.

"**Encumbrance(s)**" means, with respect to any property or asset, any mortgage, pledge, lien, charge, encumbrance, lease, security interest, license, easement, restriction, encroachment, condition, covenant, claim, exception, option, equity, right, other interest, or other encumbrance of any kind or nature whatsoever (whether absolute, accrued, disputed, contingent or otherwise), including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"**Environmental Law(s)**" means any applicable Law, and any Order or binding Contract with any Governmental Entity: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the

"**Hazardous Substance**" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral, or gas, in each case, whether naturally occurring or man-made, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

"**Indemnified Party**" means a Party making a claim for indemnification under **ARTICLE VIII**.

"**Indemnifying Party**" means a Party against whom a claim for indemnification under **ARTICLE VIII** are asserted.

"**Independent Accountant**" means an impartial, nationally recognized firm of independent certified public accountants, other the accountants of either Party, appointed by mutual agreement of Two Rivers and EASBY.

"**Intellectual Property**" means all: (a) patent and patent rights, trademarks and trademark rights, trade names and trade name rights, copyrights and copyright rights, service marks and service mark rights, and all pending applications for and registrations of the same; (b) brand names, trade dress, business and product names, logos, and slogans; (c) proprietary technology, including all know-how, trade secrets, quality control standards, reports (including test reports), designs, processes, market research and other data, computer software and programs (including source codes and related documentation), formulae, inventions and other ideas, methodologies, and technical information; (d) claims of the owner of any intellectual property for infringement of its rights by a third party, no matter when arising; and (e) other intellectual property.

"**Knowledge**" means: (a) with respect to Two Rivers, the actual knowledge of Wayne Harding, after due inquiry; and (b) with respect to the Vaxa Entities, the actual knowledge of G. A. Harrington, after due inquiry. An individual will be deemed to have actual knowledge of a particular fact or other matter if: (i) that individual is actually aware of that fact or matter; or (ii) a prudent individual could be expected to discover or otherwise become aware of that fact or matter in the course of conducting a reasonably comprehensive investigation regarding the accuracy of any representation, warranty, covenant, or other agreement.

"**Law**" means any law, common law, statute, constitution, ordinance, rule, regulation, code, Order or legally enforceable requirement enacted, issued, adopted, promulgated, enforced, ordered or applied by any Governmental Entity.

"**Lease**" means, with respect to a Party, any lease, sublease, license, concession or other Contract under which such Party holds any Leased Real Estate, including the right to all security deposits and other amounts and instruments deposited by or on behalf of such Party thereunder.

"**Leased Real Estate**" means any leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in real property held by Two Rivers.

"**Liability**" means any liability, indebtedness, or obligation of any kind (whether accrued, absolute, contingent, matured, unmatured, determined, determinable, or otherwise, and whether or not required to be recorded or reflected on a balance sheet under GAAP).

"**Losses**" means any losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including reasonable attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement, and the cost of pursuing any insurance providers.

"**Material Adverse Effect**" means, with respect to any Person, any event, occurrence, fact, condition, or change that is, or would reasonably be expected to become, individually or in the aggregate, materially adverse to: (a) the business, properties, results of operations or prospects, condition (financial or otherwise), or assets of such Person and its Subsidiaries, taken as a whole; or (b) the ability of a Party to consummate the Exchange or the other Contemplated Transactions on a timely basis.

"**Measuring Period**" means (a) if the Closing Date occurs during the first fifteen days of a calendar quarter, the one-year period beginning on the first day of such calendar quarter or (b) otherwise, the one-year period beginning on the first calendar day of the first full calendar quarter following the Closing Date. Solely as examples, (i) if the Closing Date occurs on or before April 15, 2019, the Measuring Period will extend from April 1, 2019 through March 31, 2020 and (ii) if the Closing Date occurs between April 16, 2019 and July 15, 2019 (inclusive), the Measuring Period will extend from July 1, 2019 through June 30, 2020.

"**Notice**" means any notice, request, consent, claim, demand, waiver or other communication under this Agreement, each of which shall be in writing.

"**Order**" means any order, writ, assessment, decision, injunction, decree, stipulation, determination, award, ruling or judgment of a Governmental Entity, whether temporary, preliminary or permanent.

"**Owned Real Estate**" means all land, together with all buildings, structures, fixtures, and improvements located thereon and all easements, rights of way, and appurtenances relating thereto, owned by Two Rivers.

"**Party**" and "**Parties**" have the respective meanings set forth in the first paragraph of this Agreement.

"**Permits**" means any permits, licenses, registrations, variances, clearances, commissions, franchises, exemptions, authorizations, approvals and similar writings granted or issued by or from Governmental Entities.

"**Person**" means any individual, corporation, partnership, joint venture, association, limited liability company, joint-stock company, trust, unincorporated organization, or other entity, including any Governmental Entity, commission, board, department, bureau, or instrumentality.

"**Real Estate**" means, collectively, the Owned Real Estate and the Leased Real Estate.

"**Representative(s)**" means a Person's employees, managers, members, officers, directors, partners, shareholders, agents, attorneys, third-party advisors (including any accountants, insurers, rating agencies, consultants, bankers, financial advisors, custodians, and backup servicers), successors, and permitted assigns.

"**Restricted Business**" means any business or other venture that acquires, develops, or operates irrigated farmland and associated water rights and infrastructure, greenhouse operations, or redevelopment infrastructure for water management and delivery, in each case in the United States.

"**Restricted Period**" has the meaning set forth in **Section 5.05**.

"**Restricted Person**" has the meaning set forth in **Section 5.05**.

"**SEC**" means the United States Securities and Exchange Commission.

"**Securities Act**" means the Securities Act of 1933, as amended, and the regulations promulgated thereunder.

"**SEC Documents**" means (a) Two Rivers' Annual Report on Form 10-K for the fiscal year ended December 31, 2017, its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2018, June 30, 2018 and September 30, 2018, and its Current Reports on Form 8-K filed with the SEC since January 1, 2018 (but excluding any documents or portions thereof that are not deemed "filed" with the SEC) and (b) such other reports and other documents as are filed by Two Rivers with the SEC during the period between the Effective Date and the Closing Date pursuant to the requirements of Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, **provided** that information included in any Schedule 14A filed by Two Rivers during such period shall constitute an "SEC Document" only to the extent such information is incorporated by reference into Two Rivers' Annual Report on Form 10-K for the fiscal year ended December 31, 2018.

"**Subsidiary**" of a Person means a corporation, partnership, limited liability company, or other business entity of which a majority of the voting securities is at the time beneficially owned, or the management of which is otherwise controlled, directly or indirectly, through one or more intermediaries, or both, by such Person.

"**Taxes**" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"**Tax Return**" means any return, declaration, report, claim for refund, information return or statement, or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Third Party Claim**" has the meaning set forth in **Section 8.05**.

"**Treasury Regulations**" means the regulations promulgated under the Code.

"**Two Rivers**" has the meaning set forth in the first paragraph of this Agreement.

"**Two Rivers Balance Sheet**" means the audited consolidated balance sheet of Two Rivers as of December 31, 2017 contained in the SEC Documents.

"**Two Rivers Common Stock**" has the meaning set forth in **Section 1.02(a)**.

"**Two Rivers Disclosure Schedule**" means the disclosure schedule dated as of the Effective Date and delivered by Two Rivers to EASBY concurrently with the execution of this Agreement.

"**Two Rivers Equity Securities**" means Two Rivers Common Stock, Two Rivers Preferred Stock, and any restricted shares, restricted stock, stock appreciation rights, performance shares, profit participation rights, contingent value rights, "phantom" stock, or similar securities or rights issued by Two Rivers that are derivative of, or provide economic benefits based, directly or indirectly, on the value or price of, any shares of capital stock of Two Rivers.

"**Two Rivers Indemnitees**" has the meaning set forth in **Section 8.02Section 1.02(a)**.

"**Two Rivers Material Contracts**" has the meaning set forth in **Section 3.20(a)**.

"**Two Rivers Preferred Stock**" means Preferred Stock of Two Rivers, $0.001 par value per share.

"**Vaxa**" has the meaning set forth in **recital A** to this Agreement.

"**Vaxa Balance Sheet**" means the unaudited consolidated balance sheet of the Vaxa Entities as of December 31, 2018, a copy of which was provided to Two Rivers on February 13, 2019.

"**Vaxa Entities**" has the meaning set forth in **recital A** to this Agreement.

"**Vaxa Indemnitees**" has the meaning set forth in **Section 8.03**.

"**Vaxa Interest**" has the meaning set forth in **recital A** to this Agreement.

"**Water Rights**" has the meaning set forth in **Section 3.17(d)**.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

## SCHEDULE 2

## CONFIDENTIALITY

For purposes of this Schedule 2:

- "**EASBY Parties**" means, collectively, EASBY and the Vaxa Parties;
- "**Disclosing Party**" means either the EASBY Parties (including their respective Representatives) or Two Rivers (including its Representatives), as the party disclosing Evaluation Material;
- "**Receiving Party**" means either the EASBY Parties (including their respective Representatives) or Two Rivers (including its Representatives), as the party receiving Evaluation Material;
- "**Evaluation Material**" means all such information, data, reports, charts, interpretations, agreements, forecasts, records and other materials (whether documentary, oral, electronically stored or otherwise) furnished (whether before or after the date hereof) by a Disclosing Party to the Receiving Party with respect to the Agreement or the Contemplated Transactions, including Notes of the Receiving Party, it being understood that the failure of any Evaluation Material to be marked or otherwise labeled as confidential or proprietary information will not affect its status as Evaluation Material; **provided** that Evaluation Material does not include information that (a) becomes generally available to the public other than as a result of an act or omission by the Receiving Party or anyone to whom the Receiving Party transmits any Evaluation Material, (b) is or becomes available to you on a non-confidential basis from a source other than the Disclosing Party, if and only if such source is not prohibited from transmitting the information to the Receiving Party by a contractual, legal, fiduciary or other obligation, or (c) is otherwise lawfully and independently developed by you as shown on your books and records without use of the Evaluation Material; and
- "**Notes**" means all analyses, compilations, forecasts, studies, summaries, notes, records, data and other documents and materials in whatever form maintained, whether prepared by the Receiving Party or others, that contain or reflect or are generated from, or that reflect the Receiving Party's view of, any information, data, reports, charts, interpretations, agreements, forecasts, records and other materials constituting Evaluation Material.

1. *Confidentiality.* A Receiving Party (a) will keep all Evaluation Material it receives confidential and will not (except as required by applicable law, rules of any stock exchange or stock market, regulation or legal process, and only after compliance with Paragraph 4 below), without the prior written consent of the Disclosing Party, disclose any Evaluation Material in any manner whatsoever and (ii) will not use any Evaluation Material, directly or indirectly, for any purpose other than in connection with its completion of the Contemplated Transactions. The EASBY Parties and Two Rivers each agree to disclose the Evaluation Material only to their respective Representatives who (a) need to know the Evaluation Material for the purpose of completing the Contemplated Transactions, (b) are informed of the confidential nature of the Evaluation Material, and (c) agree to be bound by the terms of this Schedule 2 as if such Representative were a party to this Schedule 2. The EASBY Parties and Two Rivers agree they will direct, and use their best efforts to cause, each of their respective Representatives to observe the terms of this Schedule 2. The EASBY Parties and Two Rivers will be responsible for actions taken by any of their respective Representatives that would be deemed a breach of this Schedule 2 as if the EASBY Parties or Two Rivers, as the case may be, had taken such actions directly.

2. *Ownership of Evaluation Material.* All Evaluation Material furnished to a Receiving Party by a Disclosing Party will remain the sole and exclusive property of the Disclosing Party. To the extent that any Evaluation Material includes materials subject to the attorney-client privilege, the Disclosing Party is not

waiving, and will not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Evaluation Material (including Evaluation Material related to pending or threatened litigation) to the Receiving Party. Except as specifically provided herein, nothing herein will be construed as to grant the Receiving Party any right or license under any patent, copyright, trademark or any other right relating to the Evaluation Material.

3. *Required Disclosure.* In the event that the Receiving Party is requested or required by applicable law, rules of any stock exchange or stock market, regulation or legal process to disclose any of the Evaluation Material, the Receiving Party will notify the Disclosing Party promptly in writing of the existence, terms and circumstances surrounding such a request so that the Disclosing Party may seek a protective order or other appropriate remedy or, in the Disclosing Party's sole discretion, waive compliance with the terms of this Schedule 2. The Receiving Party agrees to cooperate with the Disclosing Party to obtain a protective order or other appropriate remedy. In the event that no such protective order or other remedy is obtained, or that the Disclosing Party waives compliance with the terms of this Schedule 2, the Receiving Party will (a) furnish only that portion of the Evaluation Material that it is advised by the written legal opinion of its counsel is legally required, (b) exercise its best efforts to obtain reliable assurance that the Evaluation Material will be accorded confidential treatment, and (c) give the Disclosing Party written notice and a copy of the information to be disclosed as far in advance of its disclosure as practicable.

4. *No Representations or Warranties.* Except as expressly provided in the Agreement outside of this Schedule 3, the Parties agree that:

(a) a Disclosing Party has not made and is not making any representation or warranty, express or implied, as to the accuracy, usefulness or completeness of its Evaluation Material, including any projections, estimates, budgets, or information relating to the assets, liabilities, results of operations, conditions (financial or otherwise), customers, suppliers or employees of the Disclosing Party);

(b) a Disclosing Party will not have any liability to the Receiving Party or any other Person resulting from the use of Evaluation Material, or any errors therein or omissions therefrom;

(c) a Receiving Party is not entitled to rely on the accuracy, usefulness or completeness of any Evaluation Material and is only entitled to rely on the representations and warranties included in the Agreement, subject to the terms and conditions thereof; and

(d) a Receiving Party may not pursue any Action against the Disclosing Party arising from or relating to the provision, directly or indirectly, of Evaluation Material (or the information contained therein) by the Disclosing Party to the Receiving Party.

5. *Indemnification.* Each Party, in acting as a Receiving Party:

(a) agrees to indemnify and hold harmless the Disclosing Party and its Affiliates, successors and assigns from any Losses (including legal fees and the cost of enforcing this indemnity), as such Losses are incurred, arising out of or resulting from (a) any unauthorized use or disclosure of Evaluation Material by the Receiving Party or (b) any failure to comply with, or any breach of, this Schedule 2;

(b) acknowledges that (i) Evaluation Material has substantial proprietary value for the Disclosing Party, (ii) money damages would be both incalculable and an insufficient remedy for any breach of this Schedule 2 by the Receiving Party and (iii) any such breach would cause the Disclosing Party irreparable harm; and

(c) accordingly, agrees that in the event of any breach or threatened breach of this Schedule 2, the Disclosing Party, in addition to any other remedies at law, will be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief

that may be available from a court of competent jurisdiction (without any requirement to post bond).

6. *Securities Law Compliance.* EASBY understands that (a) any Evaluation Material the EASBY Parties and their Representative receive may contain or constitute material non-public information concerning Two Rivers and (b) trading in Two Rivers Common Stock while in possession of material non-public information, or communicating that information to any other Person under circumstances in which it is reasonably foreseeable that such Person is likely to trade in Two Rivers Common Stock, could subject the EASBY Parties and their Representatives to liability under U.S. federal and state securities laws and the rules and regulations promulgated thereunder, including Section 11(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. EASBY agrees that the EASBY Parties and their Representatives and Affiliates will not trade in Two Rivers Common Stock (A) while in possession of material non-public information, or (B) at all until they can do so in compliance with all applicable laws and without breach of this Schedule 2.

management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal, or remediation of any Hazardous Materials. The term Environmental Law(s) includes the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to a Person, all employers, trades, or businesses (whether or not incorporated) that would be treated together with such Person or any of its Affiliates as a "single employer" within the meaning of Paragraph 414 of the Code.

"**Exchange**" means the exchange of the Vaxa Interest for the Exchange Stock pursuant to the terms and conditions of this Agreement.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the regulations promulgated thereunder.

"**Exchange Stock**" has the meaning set forth in **Section 1.02(b)(i)**.

"**Expenses**" means, with respect to any Person, all reasonable and documented out-of-pocket fees and expenses (including all fees and expenses of legal counsel, accountants, financial advisors, and investment bankers of such Person and its Affiliates), incurred by such Person or on its behalf in connection with or related to the authorization, preparation, negotiation, execution, and performance of this Agreement and any Contemplated Transactions, any litigation with respect thereto, the preparation, printing, filing, and mailing of any filing to be made with any Governmental Entity (including the SEC), or in connection with other regulatory Consents, and all other matters related to the Exchange and the other Contemplated Transactions.

"**Fundamental Representations**" means: (a) with respect to Two Rivers, those representations and warranties set forth in **Section 3.01(a)**, **Section 3.02(a)**, **Section 3.10**, **Section 3.14**, **Section 3.16** and **Section 3.16(c)** and (b) with respect to EASBY, those representations and warranties set forth in **Section 4.01(a)**, **Section 4.02**, **Section 4.10**, **Section 4.15**, **Section 4.16** and **Section 4.19**.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Entity**" means (a) any federal, state, local, county, municipal or foreign government, regulatory authority, board, body, commission or other political subdivision thereof, (b) any agency or instrumentality of any government or political subdivision, or (c) any self-regulated organization or other non-governmental authority or quasi-governmental authority (to the extent that the rules, regulations, or Orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**Gramz**" has the meaning set forth in **recital A** to this Agreement.

**MEETING OF THE BOARD OF DIRECTORS OF
TWO RIVERS WATER AND FARMING COMPANY
("Company")**

March 5, 2019

A Meeting of the Board of Director of the Company (the "Board") was held on March 5, 2019. The meeting was held via conference call and was called to order by Mr. Wayne Harding at 3:00 PM MST pursuant to notice duly given. Attending were the Company's directors: Wayne Harding, Thomas Williams, Layne Downs and James Kylstad.

Mr. Harding acted as Chairman of the meeting and as Recorder. The February 21, 2019 board minutes were approved by unanimous vote.

Mr. Harding reviewed the Company's cash position and provided an update on additional bridge loan funding from Vaxa Global related parties. Based on representations by Mr. Greg Harrington, Mr. Harding stated that he expected funds to arrive in the next day or two. He will provide the Board with an updated proposed cash disbursements to be paid after funds. He requested that if any members of the Board has any questions or issues, to contact him directly.

Mr. Harding and Mr. Williams lead a discussion on the TR Capital Partners, LLC preferred membership units ("TR Cap") conversion into the Company's common shares. An agreement is necessary to be in place for the closing of the Stock Exchange Agreement between the Company and Vaxa/Ekstrak/Gramz. Mr. Williams will draft a memo to the Board on steps necessary and potential offer to be made to the TR Cap holders. Mr. Harding disclosed to the Board that he will need to recuse himself from any negotiations with TR Cap, since he holds a position in TR Cap.

Further, Messrs. Harding and Williams updated the Board on their discussion with Mark Johnson (the Company's SEC counsel) on the potential of a reverse split of the Company's common shares, which would necessitate a vote of the Company's shareholders. With the reverse split, the Company can keep the existing shares authorized at 200,000,000 common shares.

There being no further business in front of the Board, the Board was adjourned at 3:25 PM MST, through a proper motion and acceptance.

Respectfully submitted:

Wayne Harding, Recorder

DocuSign Envelope ID: A27BB744-76EA-4C34-891E-5BF804E9501E

**TWO RIVERS WATER & FARMING COMPANY**

**Incumbency Certificate**

**July 31, 2019**

The undersigned, in the capacity of Secretary of Two Rivers Water & Farming Company, a Colorado corporation (the "***Company***"), pursuant to Section 2.02(c) of the Share Exchange Agreement dated February 22, 2019 by and between Easby Land & Cattle Company LLC and the Company (the "***Exchange Agreement***"), hereby certifies to Easby Land & Cattle Company LLC, on behalf of the Company and not in a personal capacity, that (a) the following person was designated and appointed to the office indicated below, and that said person continues to hold such office at this time, (b) the following person was authorized to sign, on behalf of the Company, the Exchange Agreement and any other documents to be delivered in connection with the Contemplated Transactions (as defined in the Exchange Agreement), and (c) the signature set forth opposite the name of such person is his genuine signature:

| NAME | TITLE | SIGNATURE |
| --- | --- | --- |
| Wayne Harding | Chief Executive Officer | |

IN WITNESS WHEREOF, the undersigned has executed this certificate on behalf of the Company as of the date first set forth above.

DocuSigned by:

Tom Williams

Thomas Williams

Secretary

276T6DA446D8499...

# TWO RIVERS WATER & FARMING COMPANY

## Secretary's Certificate

**July 31, 2019**

The undersigned, being the duly elected and qualified Secretary of Two Rivers Water & Farming Company, a Colorado corporation (the "***Company***"), hereby certifies to Broadridge Corporate Issuer Solutions, the Company's transfer agent, that the Company has authorized the issuance of an aggregate 50,000,000 shares of the Company's common stock in the "Easby Reserve" for issuance in partial consideration for a 100% membership interest in Vaxa Global LLC.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Secretary's Certificate on July 31, 2019.

DocuSigned by:
Tom Williams
27816DA446D8499
Thomas Williams
Secretary

IRS DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI OH 45999-0023

Date of this notice: 07-26-2019

Employer Identification Number:
84-2530776

Form: SS-4

Number of this notice: CP 575 G

EASBY LAND & CATTLE COMPANY LLC
GREG HARRINGTON SOLE MBR
4400 N SCOTTSDALE ROAD STE 9-289
SCOTTSDALE, AZ 85251

For assistance you may call us at:
1-800-829-4933

IF YOU WRITE, ATTACH THE
STUB AT THE END OF THIS NOTICE.

WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN). We assigned you EIN 84-2530776. This EIN will identify you, your business accounts, tax returns, and documents, even if you have no employees. Please keep this notice in your permanent records.

When filing tax documents, payments, and related correspondence, it is very important that you use your EIN and complete name and address exactly as shown above. Any variation may cause a delay in processing, result in incorrect information in your account, or even cause you to be assigned more than one EIN. If the information is not correct as shown above, please make the correction using the attached tear off stub and return it to us.

A limited liability company (LLC) may file Form 8832, *Entity Classification Election*, and elect to be classified as an association taxable as a corporation. If the LLC is eligible to be treated as a corporation that meets certain tests and it will be electing S corporation status, it must timely file Form 2553, *Election by a Small Business Corporation*. The LLC will be treated as a corporation as of the effective date of the S corporation election and does not need to file Form 8832.

To obtain tax forms and publications, including those referenced in this notice, visit our Web site at www.irs.gov. If you do not have access to the Internet, call 1-800-829-3676 (TTY/TDD 1-800-829-4059) or visit your local IRS office.

**IMPORTANT REMINDERS:**

* Keep a copy of this notice in your permanent records. **This notice is issued only one time and the IRS will not be able to generate a duplicate copy for you.** You may give a copy of this document to anyone asking for proof of your EIN.

* Use this EIN and your name exactly as they appear at the top of this notice on all your federal tax forms.

* Refer to this EIN on your tax-related correspondence and documents.

If you have questions about your EIN, you can call us at the phone number or write to us at the address shown at the top of this notice. If you write, please tear off the stub at the bottom of this notice and send it along with your letter. If you do not need to write us, do not complete and return the stub.

Your name control associated with this EIN is EASB. You will need to provide this information, along with your EIN, if you file your returns electronically.

Thank you for your cooperation.