# EXHIBIT 45

Trial Transcripts, Volumes I – VII
(Chan v. Two Rivers, Denver Dist. Ct. No. 21CV33922, July 10 – 18, 2023)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO

1437 Bannock Street
Denver, Colorado 80202

^FOR COURT USE ONLY^

TUNG CHAN, Securities Commissioner for the State of Colorado,

Plaintiff,

vs.

TWO RIVERS WATER & FARMING COMPANY, et al.,

Defendants.

Case No: 21CV33922
Courtroom: 259

REPORTER'S TRANSCRIPT
July 10, 2023
VOLUME I

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Courtroom 259, Denver, Colorado 80202, on Monday, July 10, 2023, at 9:10 a.m., before the HONORABLE CHRISTOPHER J. BAUMANN, District Court Judge. These proceedings were reported by Theresa L. Mendez, Registered Professional Reporter and Notary Public for the State of Colorado.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

ROBERT W. FINKE, 40756*
First Assistant Attorney General
JENNIFER H. HUNT, 29964*
Senior Assistant Attorney General
INDIA KIDD-AARON, 48420*
Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Tel: (720) 508-6401
Fax: (720) 508-6037
Robert.Finke@coag.gov
Jennifer.Hunt@coag.gov
India.Kidd-Aaron@coag.gov

APPEARING FOR THE DEFENDANTS:

JOHN McKOWEN (Pro Se)
335A Josephine Street
Denver, Colorado 80206
john@johnmckowen.com
(303) 248-6883

WAYNE HARDING (Pro Se)
22586 E. Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

ALSO PRESENT: Jennifer Reynard, Paralegal to Plaintiffs
Brian Keener, Assistant Attorney General Fellow
Kaitlyne Hernandez, Law Clerk
Connor Muelken, Division Clerk

I N D E X

WITNESSES:


| | |
|---|---|
| MARY LOUGHRAN | 66 |
| | 66 |
| DIRECT EXAMINATION BY MS. HUNT | 66 |
| CROSS-EXAMINATION BY MR. MCKOWEN | 92 |
| CROSS-EXAMINATION BY MR. HARDING | 108 |
| TAMMIE MARTINEZ | 119 |
| | 119 |
| DIRECT EXAMINATION BY MR. FINKE | 119 |
| CROSS-EXAMINATION BY MR. HARDING | 149 |
| CROSS-EXAMINATION BY MR. MCKOWEN | 168 |
| JOE McMAHON | 182 |
| | 183 |
| DIRECT EXAMINATION BY MS. KIDD-AARON | 183 |
| CROSS-EXAMINATION BY MR. MCKOWEN | 235 |
| CROSS-EXAMINATION BY MR. HARDING | 260 |


EXHIBITS


| EXHIBITS | ADMITTED |
|---|---|
| Exhibit 26 | 140 |
| Exhibit 35 | 69 |
| Exhibit 36 | 82 |
| Exhibit 47 | 71 |
| Exhibit 55 | 197 |
| Exhibit 56 | 78 |
| Exhibit 57 | 199 |
| Exhibit 61 | 204 |
| Exhibit 114 | 78 |

EXHIBITS (continued.)


| EXHIBITS | ADMITTED |
|---|---|
| Exhibit 116 | 85 |
| Exhibit 117 | 87 |
| Exhibit 119 | 88 |
| Exhibit 126 | 190 |
| Exhibit 127 | 186 |
| Exhibit 128 | 218 |
| Exhibit 129 | 222 |
| Exhibit 130 | 223 |
| Exhibit 132 | 225 |
| Exhibit 133 | 227 |
| Exhibit 139 | 124 |
| Exhibit 141 | 128 |
| Exhibit 1047 | 118 |

P R O C E E D I N G S

(Whereupon, the following proceedings were had in open court.)

THE COURT: Let's go on the record in 21CV33922. If I can have entries of appearance starting with plaintiff.

MS. KIDD-AARON: Hello, Your Honor. India Kidd-Aaron on behalf of the plaintiff.

MS. HUNT: Jennifer Hunt on behalf of the plaintiff.

MR. FINKE: Good morning, Your Honor. Robert Finke, First Assistant Attorney General, on behalf of the plaintiff.

THE COURT: All right. Good morning. And then for defense, do we have Mr. McKowen?

MR. MCKOWEN: Yes, Your Honor, correct.

THE COURT: All right. Can you just state your first and last name for me?

MR. MCKOWEN: John McKowen.

THE COURT: Thank you.

MR. MCKOWEN: M-C-K-O-W-E-N.

THE COURT: Thank you. And do we have Mr. Harding?

MR. HARDING: Good morning. Wayne Harding, pro se.

THE COURT: All right. Thank you. All right. I have a list of things to discuss before we get started, but before we do that, is plaintiff ready to proceed?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: And Mr. McKowen?

MR. MCKOWEN: Yes.

THE COURT: And Mr. Harding?

MR. HARDING: Yes.

THE COURT: Okay. All right. First of all, thank you for the joined order of proof. I appreciate that. I understand that there needs to be some flexibility. Some witnesses may go a little longer, a little shorter than others, but I generally use this as a pretty good guide of gauging where we are in the trial and if we're on task and -- and on schedule, so thank you for that.

With regards to exhibits, are there any stipulated exhibits, Ms. Kidd-Aaron?

MS. KIDD-AARON: So Your Honor, we have stipulated to --

(Court reporter asked the attorney to speak louder.)

THE COURT: Ms. Kidd-Aaron, you can -- you can pull that microphone closer or use the one at the

podium.

MS. KIDD-AARON: Okay. I'll go to the podium if that's easier.

We have stipulated to some of the exhibits, Your Honor. I believe Mr. McKowen had objections to plaintiff's exhibits.

THE COURT: Okay. So you stipulated to some of the defense exhibits?

MS. KIDD-AARON: Yes.

THE COURT: All right. And which ones are those?

MS. HUNT: I can go through them.

THE COURT: Okay.

MS. HUNT: We have stipulated to -- with Defendant McKowen's Exhibits 1005, 1006, 1007, 1008, 1009. I'm sorry. Not 9. 1010, 11 and 12.

And then 1016, 17, 18, 19 and then 1028, 29, 31, 32, and 1037 and 38.

THE COURT: Mr. McKowen, do you agree?

MR. MCKOWEN: I believe so. I'm just looking for my list, but I believe so.

THE COURT: Okay. Go ahead and look at your list and let me know if you agree, and if you do, then I will admit those exhibits.

MS. HUNT: Also, I missed Exhibit 1015 as

well.

MR. MCKOWEN: It would be more efficient for me just to say what you're not stipulating to. I should have asked to hold on a second so I can get my list.

MS. HUNT: These are Mr. McKowen's exhibits. They're just the ones that we agreed to.

MR. MCKOWEN: Both of us are hearing impaired. And so if you speak into the mic, that would be great. But which ones are you not agreeing to?

MS. HUNT: We had given you this -- the list. I can hand it to you again and you can read it, perhaps. The stipulated -- the stipulated exhibits. We had that discussion this morning.

MR. MCKOWEN: Can you just tell me the number of the ones you don't agree to?

THE COURT: Well, let's do this. I have this list. I won't admit them now.

We can proceed forward with opening statements, and perhaps the parties can just connect with each other over the lunch hour.

I like to admit whatever is stipulated because you can just use them as you see fit throughout the trial. You don't have to ask my

permission to put it up on the screen or use it with the witness. It's already been admitted. So we'll hold off on that. Just talk to each other when you have a moment, and I will admit those.

Do you have any for Mr. Harding?

MS. HUNT: I have one, 2002.

THE COURT: Mr. Harding, do you agree?

MR. HARDING: For the stipulation?

THE COURT: Correct.

MR. HARDING: That's fine.

THE COURT: Exhibit 2002?

MR. HARDING: Exhibit 2002, I accept that stipulation.

THE COURT: All right. The Court will admit Mr. Harding's exhibit, which is Exhibit 2002. My understanding is Mr. McKowen objects to the plaintiff's exhibits, so there's no stipulation as to those exhibits at this time. Okay. Either side requesting a sequestration order?

MR. MCKOWEN: Say again, please, sir.

THE COURT: Yeah. Is either side requesting a sequestration order?

MR. MCKOWEN: Yes.

THE COURT: Okay. The Court will enter a sequestration order. We will put a notice on the

door, so any witnesses for either side that have not yet testified will need to leave the courtroom and will not be permitted into the courtroom until they're ready to testify, and once they have testified, their -- no witness is allowed to discuss their testimony with any other witness.

So we'll put that notice on the door. I think Connor just wanted to get that notice. Help me recognize any witnesses that you may have that come into the courtroom. I don't know -- I know them by name, but I don't know what they look like.

MS. HUNT: And just a point of clarification. Does the sequestration order apply to expert witness?

THE COURT: No. So expert witness for either side are welcome to remain in the courtroom and observe the testimony. But any other witnesses, lay witnesses, are excluded from the courtroom until we call them for further testimony. Yes, Mr. McKowen?

MR. MCKOWEN: For a fact witness on their side, even if he's a government employee, can he be in the room or not in the room?

THE COURT: Not if he is a lay witness, or she is a lay witness.

MR. MCKOWEN: Meaning they're not here as an expert?

THE COURT: Correct. Either side -- hold on. Either side can have an advisory witness. I don't know if you have one or not, Ms. Kidd-Aaron.

MS. KIDD-AARON: We don't have any fact witnesses in the room, Your Honor. Mr. Joe Burtness works for the Division, but he's not one of our witnesses.

THE COURT: Yeah. If he's not a witness, then he's welcome to be in the courtroom. It's a public courtroom so anybody can watch.

MR. MCKOWEN: Is he on the witness list?

MS. HUNT: No. And he's also our advisory representative from the Division.

THE COURT: Okay. So he's not on the witness list, but if he is an advisory witness, even if he were to testify, an advisory witness is allowed to remain in the courtroom.

Just like if you wanted somebody to sit in here with you and assist with your presentation, even if that person was a witness, they can be in here as your advisory witness and excluded from the sequestration order. Attorney General's Office commissioner has -- and tell me his name again? I'm

sorry.

MS. KIDD-AARON: Mr. Joe Burtness.

THE COURT: Spell the last name?

MS. KIDD-AARON: B-U-R-T-N-E-S-S.

THE COURT: Joe Burtness will be advisory witness for the plaintiff. Mr. McKowen, do you have an advisory witness that you would like to be in the courtroom?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: And your experts are welcome to come and go during the testimony. They're not excluded.

All right. There are three claims by the plaintiff that are at issue. These are the three claims that were in the complaint filed on December 10, 2021. Two Rivers has dismissed as cross claims against defendants McKowen and Harding, and the Court has dismissed defendant Harding's and Mr. McKowen's counter cross claim against Two Rivers. So I only need to show that plaintiff's claims are at issue. Plaintiff agree?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: All right. Mr. McKowen, do you

agree?

MR. MCKOWEN: Yes, Your Honor. I just have one question on --

THE COURT: Okay.

MR. MCKOWEN: I didn't have time to read through your opinion on my dismissal on the cross claim. Did you do that with or without prejudice? Do you -- do you know?

THE COURT: Dismissal without, and we can give you a copy if you need it.

MS. KIDD-AARON: Yeah. I have a copy. I just didn't have a chance to get -- just thank you.

THE COURT: Mr. Harding, any questions?

MR. HARDING: No, sir.

THE COURT: All right. Mr. McKowen, yesterday evening, I did deny your motion to dismiss. So you probably haven't seen that order as well. Welcome to get you a copy sometime this morning so you can review it, but that was the motion to dismiss that was filed, I believe, in April. So that motion was denied as well.

All right. There are a handful of motions in limine that remain outstanding.

There are three related motions that concern experts. Mr. McKowen, your motion in limine

to limit expert testimony of plaintiff's experts that was filed on June 20th. I would like some clarification on that motion.

So as I read that motion, you are challenging the testimony of both experts for plaintiff, so Mr. Rome and also Ms. Martinez. In your order of proof, it looks like Ms. Martinez is scheduled to testify this morning. So I would like to at least address your motion in limine concerning her.

Your motion indicates that your issue with the testimony of Mr. Rome and Ms. Martinez is that they will offer opinions on the use of proceeds of the GrowCo offerings, but then your motion states that the experts will be opining on the applicable laws and legal standards.

My understanding of Ms. Martinez's testimony is that she is a nonretained expert, works for the Division as an accountant, and that she would be testifying as to where money is moving, and not necessarily offering opinions on the legal standard, which is what you're concerned about in your motion.

So let me start with plaintiff. Can you clarify what Ms. Martinez will be testifying to?

MR. FINKE: Thank you, Your Honor. Your

Honor is correct. Ms. Martinez's testimony will be about the movement of money throughout the GrowCo entities.

THE COURT: And nothing about the applicable legal standard or how it applies in this case?

MR. FINKE: That's correct.

THE COURT: So Mr. McKowen, you kind of lumped Ms. Martinez and Mr. Rome in together in your motion in limine. What counsel has just stated is that Ms. Martinez is not offering opinions on the applicable legal standard, but is explaining how money is being moved and transferred.

So do you object to that testimony, and if so, on what grounds?

MR. MCKOWEN: So my objection to Ms. Martinez is that some of her characterizations of the dollar -- not the dollar amounts, but the -- but the label of the dollar amounts and, for example, on the -- she's saying McKowen served X number. McKowen this number, McKowen that number.

In my view, that's an opinion, you know. It's not necessarily that I could see something that is necessarily corroborated with any sort of evidence. It's just a compilation of entities, and

then the label is where I have a problem with the -- where I think the opinion is coming in.

And so I'm willing to -- if -- I mean, I welcome her testimony. I honestly do. If I -- if I can cross-examine those labels and what they mean, then with respect to her. But I don't have any objection beyond that.

THE COURT: Okay. So at this time I'm going to deny the motion in limine, in part, concerning Ms. Martinez. First of all, the motion was untimely. However, given your clarification today, I'm not going to exclude her testimony. I'm going to allow Ms. Martinez to testify, provided sufficient foundation is laid for her testimony and for her qualifications.

Mr. McKowen, you can challenge her qualifications. You can challenge her testimony on cross-examination. You can make whatever contemporaneous objection you want to make to her testimony, and I will rule on those contemporaneous objections, but I'm not going to exclude her as a witness pursuant to your motion in limine.

MR. MCKOWEN: Okay.

THE COURT: I'm going to allow her to testify, but I will take any objections as they come.

MR. MCKOWEN: I understand, Your Honor.

THE COURT: Okay. With regards to Mr. Rome, part of the argument that the Commissioner makes is that Mr. Rome is -- well, it dovetails with Mr. Hart and other motions in limine. There's a -- a comparison being made between the anticipated testimony of Mr. Rome and Mr. Hart.

I don't believe I have Mr. Rome's report. I looked through the court file again, and my clerk did as well. If I missed it, I apologize. If not, if you can give me a copy, I'd like to review it. And then I will rule on that motion in limine as well concerning him, but I don't think he's testifying for Mr. Hart until Thursday. So I think there's some time to deal with that.

MS. HUNT: And, Your Honor, and -- and we'll also just note we did not file a response to that motion in large part because we believe it does state the correct statement of the law on how -- what the line is in the testimony that -- the witness that Mr. Rome may provide, and we intend to elicit testimony that complies with those standards.

THE COURT: Okay. So the other motions, the motion to strike Mr. McKowen's expert disclosure and motion in limine to exclude expert testimony from

the defense, the Court will rule on those motions after I've had a chance to look at Mr. Rome's report. And I will endeavor to do that either tonight or tomorrow. Okay.

The other motion that is outstanding that may come into play today is Mr. McKowen's amended motion in limine to preclude testimony. And this was a motion to preclude testimony of any class members of the Paulson settlement. So Mr. McKowen, would you like to address that motion this morning?

MR. MCKOWEN: Yeah, Your Honor. Can I speak?

THE COURT: You can go to the podium.

MR. MCKOWEN: Okay.

THE COURT: And I've read the motion and the response and so you don't need to repeat what's in the motion, but if there's anything you'd like to supplement, feel free to do so.

MR. MCKOWEN: I could only add what's already there -- or not add, but restate.

You know, it's a federal court order, and the -- there's several witnesses that are releasors in that court order.

And so to the extent that they are cooperating or providing testimony, I believe that

that court order prohibits it.

THE COURT: All right. Which witnesses are you referring to on the order of proof?

MR. MCKOWEN: Well, I see that Mary -- is it Lowhan or Loughran?

MS. HUNT: Loughran. Loughran.

MR. MCKOWEN: Loughran. And then off the top of my head, the attorney that -- and I don't think they're calling him today. I think they're calling him tomorrow.

MS. KIDD-AARON: Mr. Buchanan? Mr. Buchanan?

MR. MCKOWEN: Mr. Buchanan.

There's -- I believe that there's a hundred and something releasors in that federal settlement. And as part of that settlement, it was intended to be a final settlement with -- or against all claims.

And so part of that consideration was, I don't participate in any lawsuits against you, and you don't participate in any of them against me.

I can -- there's another one on the -- if I can just pull the witness list.

MS. KIDD-AARON: Mr. McMahon and Mr. Harnish.

(Court reporter asked for clarification.)

MS. KIDD-AARON: Mr. McMahon and Mr. Harnish, and Mr. Harnish is Mr. Harding's witness.

MR. MCKOWEN: Mr. McMahon, is he testifying today? Is he here today?

MS. KIDD-AARON: He's testifying today, yes.

MR. MCKOWEN: Okay. So he's -- he's -- he's on that. He's a releasor. And I don't remember if this fits in with any of them, because, honestly, I'd like to have him testify, but I -- I don't want to give up anything associated with that -- with that federal court order. So...

THE COURT: All right. When you refer to "he," you're talking about Mr. McMahon?

MR. MCKOWEN: Say again?

THE COURT: When you refer to "he," you're talking about Mr. McMahon?

MR. MCKOWEN: Yes.

THE COURT: All right. And you're aware that you have Mr. Harnish as one of your anticipated witnesses?

MR. MCKOWEN: Yeah. He's -- he's -- he was also a releasor of that settlement and I'm a releasee. Jim Cochran is a -- is a releasor.

THE COURT: So Mr. --

MR. MCKOWEN: Tim Beall, who's on his list is a -- I think he's a releasor and I'm a releasee. And so my opinion is, is that the -- the greater issue is whether or not -- and I guess I would like to get it on the record.

Is that as much as I'd like to hear his testimony, I welcome it. The greater issue for me is -- is this -- is the federal court order valid and is it going to -- going to be honored in this courtroom?

THE COURT: Okay. So can you explain for me or clarify for me, are you asking me to exclude any Paulson defendants that are anticipated to testify for the plaintiff, but not to exclude Paulson defendants that are part of your witness list and that you intend to testify? Or are you asking me to exclude everyone including your own witnesses that fall under that category?

MR. MCKOWEN: The -- the order itself is very specific, and it talks in term -- doesn't talk in terms of defendants. It talks in terms of releasor and releasee and release claims.

And so the releasors, I guess I would say that the -- the pro -- the prohibition of bringing

any derivative claims, which we would argue that this is. And that the investors, of which I was the largest, so I'm a releasor or a releasee technically. And so that's what -- that's what the settlement agreement talks about. It doesn't talk in terms of defendants and plaintiffs in there.

THE COURT: So my specific question is, are you asking me to excluded only the plaintiff's witnesses that are subject to the Paulson settlement, or are you asking me to exclude theirs and yours as well?

MR. MCKOWEN: No. Because it -- the -- the pro -- the prohibition is the -- is just the releasors, but the intent of the parties was that this would settle all claims.

THE COURT: Okay. All right. I'm not sure that answered -- answered my question, but I understand. I understand what you're saying.

MR. MCKOWEN: The prohibition against cooperating is just defined in the releasor section of the -- of the settlement agreement. It's not defined that way in the releasee section. But you have people that are both releasors or releasees.

THE COURT: I understand. And what I further understand was there -- there are some

releasors that are on the plaintiff's witness list, and there are some releasors that, apparently, are on your witness list as well.

And you are requesting that I exclude the plaintiff's witnesses that may be releasors, but apparently not asking me to exclude witnesses that you may want to call that are also releasors. And that seems to me to be inconsistent, and I'm just trying to get some clarification.

MR. MCKOWEN: I don't -- I don't know what witnesses I am calling that are releasors.

THE COURT: It was mentioned Mr. Harnish and Mr. Cochran.

MR. MCKOWEN: Mr. Harnish and Mr. Cochran are...

THE COURT: Mr. Harding's witnesses?

MR. MCKOWEN: Yes.

THE COURT: Not yours?

MR. MCKOWEN: Correct.

THE COURT: But you're asking to exclude Mr. Harnish and Mr. Cochran as well?

MR. MCKOWEN: Yes. I'm -- I'm asking to exclude any releasors from the Paulson case.

THE COURT: Okay. All right. Thank you. For plaintiff, any additional argument you'd like to

make or record?

MS. KIDD-AARON: Your Honor, for the reasons that you denied Mr. McKowen's motion to dismiss, we would just like to reiterate this case is brought under 602. The releasors that Mr. McKowen would like to prevent from testifying in this trial, they are not bringing this case. The State is bringing this case under 602.

They are our witnesses, support. We are not bringing this case on their behalf, which I think is part of Mr. McKowen's argument, and that is actually the preclusion in the settlement that he's talking about. So we would just ask that the Court consider that and allow us to bring our witnesses under our separate case.

THE COURT: Concerning the amended McKowen motion in limine to preclude testimony, the Court denies that motion for two reasons.

First of all, the motion's untimely. It's an untimely motion in limine.

The original motion in limine was filed on June 22nd. The amended motion was filed on June 23rd.

In any event, regardless of the timing of the filing, the Court does not read the settlement

order as shielding witnesses from being called by the Commissioner in an enforcement action.

So I recognize the federal court order approving the settlement, but I don't read that order as telling the Commissioner that in a separate action, an enforcement action for which the requested relief is completely different than the requested relief that was at issue in the federal case, that the Commissioner should be precluded from calling witnesses in support of their case, even the witnesses that may have been part of that other case.

So I'm not preventing them from testifying. Commissioner can call their witnesses as they see fit. Mr. Harding, you can call those witnesses that may fall under that settlement agreement in your case as well, if you choose to do that.

But your objection is noted, Mr. McKowen. So by my ruling in this matter, you are not waiving any objection that you may have somewhere down the line, but I'm not going to prevent those witnesses from testifying in this case.

MR. MCKOWEN: Okay.

THE COURT: All right. I believe those are the only issues I have to discuss. Anything from plaintiff before we get going?

MS. HUNT: Your Honor, we have one more witness issue we wanted to get some clarification on. Mr. McKowen, his first -- or, I guess, his second witness now on his list is a designated representative of the Commissioner.

And we don't -- we would get some clarity on whether that's a proper witness designation. We know the individual. You know, it's not "some person." So we would like to get some clarification on how the Court wants to handle that.

THE COURT: Let me get his witness list first. So Mr. McKowen, on your exhibit list that's attached to the trial management order, witness number one, says designated representative of Commissioner, Tom Chan. Is that what you're referring to?

MS. HUNT: Yes.

THE COURT: Who is that person?

MR. MCKOWEN: I don't know. I don't know who I can talk to or who I can challenge on plaintiff's side regarding their case.

I'm here on behalf of myself, but where are the -- where are the -- where is the fact witness that represents the plaintiff in these issues rather than just the -- the witnesses? Where is the party

that is the -- that is the -- that is the plaintiff? Should we bring the Commissioner in?

I mean, I'm assuming that there's someone on -- on behalf of the Commissioner can speak for the Commission. That's all I'm saying.

THE COURT: Okay. Well, I can't answer that question for you. So the answer, I think, from the plaintiff or for the plaintiff is Mr. McKowen doesn't know and doesn't have a specific person in mind, and that unidentified person is not on the order of proof.

So we'll proceed with the witnesses that are on the order of proof and, Mr. McKowen, you can cross-examine their witnesses, who they're offering in support of their case.

And if -- if you choose to cross-examine them, you can do that. And you can challenge the evidence that they have against you, and we'll just proceed forward in that way. I can't tell you what witness to call or -- or who this person may be. That's not -- that's not my role to do that.

MR. MCKOWEN: Then I would call the Commissioner.

THE COURT: Commissioner is not on the good faith order of proof.

MR. MCKOWEN: Okay.

THE COURT: All right. Anything else for the plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen, before you step away from the podium, is there -- stay there. Is there anything else you'd like to discuss before we start opening statements?

MR. MCKOWEN: I think there's a few other -- I think there's another motion in front of you. I may be wrong. But I have a rebuttal witness, rebuttal expert witness that I've listed as a -- as a witness, and there has been some contention on whether I'm entitled to that.

THE COURT: Right. You're talking about Mr. Hart?

MR. MCKOWEN: Yes.

THE COURT: Mr. Hart? So I have asked the Commissioner to give me Mr. Rome's report. I have read Mr. Hart's report. I have not read Mr. Rome's report. And part of the Commissioner's argument is that Mr. Rome is offering opinions completely different than what Mr. Hart is offering opinions on. And therefore, Mr. Hart's report is not a rebuttal report, but it is actually a report that should have

been disclosed earlier.

Either way, the reports are late, but to make a good record on potentially how late those reports are, I need to compare the reports and decide if you should have filed your report by the earlier deadline or by the rebuttal deadline. And in order to do that, I have to compare the contents of the report.

So I'm not excluding Mr. Hart from testifying at this point. Mr. Hart is not scheduled to testify until Thursday, including Mr. Rome. Between now and then, I will review those, Mr. Rome's report, and I will rule on that particular motion. Okay.

MR. MCKOWEN: Thank you.

THE COURT: Thank you.

MS. HUNT: And -- and, Your Honor, it's -- I think you have the exhibit number, but Mr. Rome's report is 140.

THE COURT: 140.

MS. HUNT: 140.

THE COURT: Okay.

MR. MCKOWEN: Could you repeat that comment, please?

MS. HUNT: Mr. Rome's report can be found

in the exhibit notebook at Exhibit 140.

MR. HARDING: Thank you.

THE COURT: Mr. Harding, is there anything you'd like to discuss before we get going?

MR. HARDING: No, sir.

THE COURT: Just give me one moment. Mr. Harding, you've been wanting to know if you could look into the TV; is that correct? Or is that Mr. McKowen?

MR. HARDING: Your Honor, that was me, Wayne Harding. And I don't know if I have a specific thing that I want to show yet, but I thought it would be beneficial to know that that A/V equipment is available in case they would like to use it, and I would make notification before I use it that everything's set up.

THE COURT: You don't need it for opening?

MR. HARDING: No, sir.

THE COURT: Any opening for plaintiff?

MS. HUNT: I'm sorry, Your Honor. Could you repeat that?

THE COURT: Any openings for plaintiff?

MS. HUNT: Yes.

OPENING STATEMENTS

MS. HUNT: Good morning, Your Honor. Smoke

and mirrors. That, and one empty greenhouse is all that is left of at least $19 million that John McKowen and Wayne Harding raised from nearly 100 investors who were lured by the promise of being in at the ground floor of the exciting new marijuana industry.

They crafted an alluring narrative through misleading marketing materials, persuasive pitches, and inflated projections.

Defendants seduced investors into believing that they were getting a foot in the door in a widely prudent industry, and would eventually have a stake in a publicly traded company.

These promises were nothing but smoke and mirrors. There was nothing real on the other side. The story of how GrowCo went so wrong is a textbook example of why the Colorado Securities Act requires licensing of security professionals, registration of securities, and robust disclosure of all material information before selling to investors.

So I want to start by framing where we are today. Which is to decide whether defendants' conduct violated three provisions of the Colorado Securities Act.

First, by using unlicensed sales

representatives to offer and sell securities. Second, selling unregistered securities --

(Court reporter asked the party to speak slower.)

MS. HUNT: Second, selling unregistered securities without complying with all legal requirements. Third, engaging in a fraudulent scheme, including making material misrepresentations and omissions in connection with the offer and sale of securities.

The companies that offered these securities had defaulted and are dissolved. Several individual defendants have entered stipulations and have been dismissed from the case. There may be other people who were involved in these companies at various times who are not defendants.

Regardless, the two people who formed and managed the companies, and were responsible for compliance with the Colorado Securities Act are here today.

Mr. Harding, who signed all of the financial documents and investment documents with investors, and Mr. McKowen, the mastermind behind the whole venture.

So what was this investment opportunity?

There was no dispute about how GrowCo was formed and how investor money was raised. It all started in 2014 when McKowen was the CEO of Two Rivers Water & Farming company, a publicly traded company he had cofounded to buy and consolidate water rights in Pueblo County to sell to farmers, and later to cities and towns from the water sources.

But Mr. McKowen soon learned that water speculation is a long game, and is not profitable in the short term. As the largest Two Rivers shareholder, he stood to lose a lot of money if the share price of Two Rivers tanked. Mr. McKowen will likely tell you himself that he knows how to spot hot investments that will be attractive to investors.

So he came up with an idea to capitalize on the newly legalized marijuana industry in Colorado, and infuse cash into Two Rivers. And, Mr. Harding, as the CFO of Two Rivers, was more than happy to help realize this issue. The biggest problem was that marijuana was still federally illegal.

And, Two Rivers, as a publicly traded company, could not legally be involved in the marijuana business. So McKowen and Harding found another way.

They would create a new subsidiary of Two

Rivers called GrowCo, transfer four parcels of land to the new company, raise millions of dollars through mostly debt (ph) private offerings, and that they would be able to build greenhouses. They would lease those greenhouses to licensed marijuana growers.

They would stay legal by not touching the plants or getting involved in the actual marijuana business, and they would pay back investors with the rent from the greenhouses.

But they had no experience as landlords, and no experience in the marijuana business. It was all smoke and mirrors designed to hide what was really going on behind the scenes.

I want to start by addressing a couple of the more -- the more technical violations, the licensing and registration. GrowCo's first violation of the Securities Act was its use of salespeople who did not have licenses that were required to bring in investment funds. The evidence there is not in dispute.

GrowCo paid George and Jan McCaffrey and Kristy Cameron to solicit investor money. Later, during the time when Mr. McKowen was no longer part -- no longer being considered an issuer because he had briefly left the company, they paid him to raise

investor funds.

Former defendants, George and Jan McCaffrey and Kristy Cameron, have all filed stipulations admitting that they did indeed sell securities for GrowCo without a license. Those have been filed with this Court.

And Mr. McKowen admits that he did not have a valid securities license when he was selling under his company, GrowCo. And you will see records showing that at various times, GrowCo paid all the individuals what amounts to commissions for bringing in money for GrowCo.

So GrowCo, through its managers, McKowen and Harding, violated the Colorado Securities Act by using unlicensed sales representatives to sell GrowCo offerings. The Commissioner will --

(Court reporter asked the party to speak slower.)

MS. HUNT: The Commissioner will ask at the end of this trial for a verdict against defendants on this claim.

Commissioner's second claim for relief. And GrowCo's second violation of the Securities Act was that the company, again through its management, Mr. McKowen and Mr. Harding, offered and sold these

securities without complying with the Colorado Security Act's registration requirements.

McKowen and Harding, as the issuer and the promoters, pitched the investment as a private offering only available to accredited investors. However, the evidence will establish that they failed to meet the legal requirements to invoke the exemption that could have potentially applied to these offerings.

First, while the state law does incorporate federal registration exemptions that apply to certain private offerings made to accredited investors, it also requires issuers to file a notice with the Division of Securities in Colorado when exempt private offerings are made in Colorado. Defendants admit they did not file any notice.

Second, to take advantage of the federal exemptions in the first place, the issuer has to disclose the prior bad acts of controlled persons, and limit the offerings to existing relationships with accredited investors.

Mr. McKowen will admit that GrowCo never disclosed that -- that the CEO and founder himself, and had his securities license suspended years before for failing to disclose material information to

investors.

And the evidence will show that these were not private offerings to accredited investors. By their own admission, defendants did not limit their offerings to just people that they already had relationships with.

They cast a much wider net through presentations, webcasts, and other reach-outs and they also sold to some investors who were not accredited. So the evidence will show that the defendants' offerings violated the Colorado Securities Act registration requirements. And, accordingly, we will ask for a verdict in favor of the Commission on the third claim for relief.

Which brings us to the third and most egregious violation of the Securities Act. It will be established by the evidence showing that Mr. McKowen and Mr. Harding engaged in a scheme to defraud investors, and made material fraudulent statements and omissions in the sale of these GrowCo securities.

GrowCo's promoters, including Mr. McKowen, Mr. Harding, and others under their supervision, marketed the marijuana greenhouse project as a low-risk real estate investment in a booming new

industry.

You will see PowerPoint presentations that they showed to investors with great pictures of a greenhouse, bumper crops of marijuana, and touting company leaders for their deep experience in the industry.

These presentations misled investors to believe they were investing in a venture with multiple greenhouses run by businesspeople with deep experience in the industry. The materials given to investors also highlighted the intent to take the company public, a very attractive proposition to investors.

You will also see term sheets with very basic information about the terms of the investments and uses of funds, sometimes accompanied by simplistic pro forma projections.

To overcome investor fears about potential conflicts between federal and state marijuana laws, McKowen and Harding provided general safe harbor statements in their materials about compliance with federal and state laws and assured investors that GrowCo itself would not touch the plants, which would have been illegal, just be a landlord. None of this was legal.

They did not give investors a private placement memorandum, and the numbers on the pro formas were plucked from thin air, based only on McKowen's belief in his own abilities. And Mr. McKowen quickly began engaging in conduct that violated state marijuana laws and undermined the entire venture.

By late 2015, one greenhouse had been built, costing around $5 million, and a licensed grower ten (ph), Suncanna, was starting to grow product and pay rent. Investors would see interest payments for a while. But this wasn't enough for John McKowen. He wanted more.

The real money was not going to be in leasing greenhouse space to growers. So Mr. McKowen wanted to get involved in the growing and selling marijuana as well.

First, he tried to take over control of Suncanna and its marijuana license through contract. His dispute with Suncanna's operator resulted in that tenant's eviction and a lawsuit, leaving the greenhouse with no licensed tenant and no income.

In the meantime, you'll hear about seven -- several Two Rivers board members became concerned about Mr. McKowen's conduct and his interest in

working with the operations side of the marijuana business.

And because it could be problematic, both under marijuana laws and as self-dealing, they hired a law firm to investigate and prepare a report. But rather than be pushed out by the board, Mr. McKowen chose to resign from both Two Rivers and GrowCo in May 2016, and then formed his own company, McGrow, for marijuana operations. But he remained involved in Two Rivers and GrowCo business as Two Rivers' largest shareholder.

By mid-2016, you will hear how Two Rivers was running out of money and desperately needed McKowen to keep raising investor funds. And McKowen stayed very much involved, just from the outside. More smoke and mirrors.

At this point, McGrow, Mr. McKowen's company, entered into three agreements with GrowCo, through Mr. Harding, to provide consulting and construction services and also to continue to raise funds from investors, despite the fact that he did not have a securities license.

Mr. Harding will admit that Two Rivers and GrowCo were struggling to remain solvent and to find enough cash to make required investor payments. The

only source of revenue at this point was investor funds, meaning that new investor money would have to be used to pay existing investors, a classic Ponzi scheme. Despite this, they continued to solicit the investments.

When it became too difficult to explain to investors why they were conducting yet another raise for capital for the same entity, they would create a new company and raise more capital, supposedly to build those greenhouses and support tenants. But no other greenhouses were ever completed.

Because a marijuana company could not open a bank account, all GrowCo investors were deposited -- funds were deposited into four accounts owned by Two Rivers.

Tammie Martinez, a forensic accountant with the Division of Securities, will explain how investor funds were -- from -- from all these companies that you see on the screen, were coming into these accounts, and transfers were made routinely to and from Two Rivers and other related subsidiaries for operating expenses and salaries.

There was no money to complete the greenhouses. And Mr. McKowen and Mr. Harding's help just put up more smoke screens.

In June 2016, he entered into a lease for the greenhouse through his new company, Johnnie Canniseed. Neither Mr. McKowen nor Johnnie Canniseed had a marijuana license, a violation of the lease terms.

In August, Mr. McKowen applied for a license with the state marijuana regulators on behalf of Johnnie Canniseed. Still unlicensed in October, Johnnie Canniseed subleased the greenhouse to another company. Mr. McKowen then solicited more investor funds, this time on behalf of his own company, McGrow, calling the offering the least risky, most rewarding offering I have brought to you, because all the factors for production and revenue are in place. But he did not disclose that McGrow itself was participating in marijuana business activity without the required license.

Unsurprisingly, Mr. McKowen had rocky relationships with his new subtenants, which never got up and running. You will hear testimony about his multiple unscrupulous business dealings with various vendors.

Still without a license and unable to work effectively with any tenants who did have a license, what did Mr. McKowen do next? He erected more

mirrors to help him raise even more money, which leads to our endgame. By 2016, the evidence will show that there could be no legitimate argument that this wasn't simply a "doing business" venture, and the defendants were engaged in securities fraud, making material misrepresentations and omissions about the viability of the business and its income.

Indeed, at this point, the only income was investor money. And GrowCo entities continued raising investor money through September 2017, with the bulk of the funds coming in between December 2014 and July 2016. Most of which time, Mr. McKowen was still in charge at Two Rivers and GrowCo.

By the later part of 2016, it was clear that GrowCo -- the GrowCo entities would not be able to make investor payments anymore. Laying the blame on the subtenant, GrowCo had to ask the investors to modify the notes.

Mr. Harding continued to paint a rosy picture of the venture's future success, making false misrepresentations regarding the GrowCo entity's viability. And Mr. McKowen kept raising funds.

In July 2017, Mr. McKowen wrestled control of GrowCo from Two Rivers on the strength of his status as the largest shareholder and threats of

lawsuits based on allegations about misappropriated funds. And after gaining control in the fall, Mr. McKowen refused to give Two Rivers GrowCo's accounting. And so Two Rivers had to remove -- you'll hear how Two Rivers removed GrowCo from its public filings with the SEC.

So by October 2017, Mr. McKowen had effectively separated GrowCo from Two Rivers and appeared poised to have total control over both the greenhouses and marijuana growing business, and he was actively participating in growing, marketing, and selling the marijuana products. And Harding continued to work for Mr. McKowen and for GrowCo.

And then in December 2017, the state denied Johnnie Canniseed's marijuana license. In the midst of a bitter fight at this point about where the money had gone, Mr. McKowen pivoted to yet another inter -- set of interconnected entities, the VitaNova entities, and started putting out more offerings.

These were structured similarly to GrowCo's, including similar investor presentations, term sheets, subscription documents, and disclosures.

And they adopted the same purpose as GrowCo, constructing greenhouses to lease to third parties.

In April 2018, Mr. McKowen started soliciting GrowCo investors, asking them to convert their secured investments, secured by real property, to one of the VitaNova entities. He did not disclose that converting the GrowCo investments to VitaNova risked losing their property interests that secured their investments. Nor did he explain that he himself would disproportionately benefit from the conversions because of the financial interests he had on all sides of the transactions.

And in January of 2019, despite knowing that marijuana-related companies cannot take advantage of federal bankruptcy reorganization, Mr. McKowen filed for Chapter 11 on behalf of the GrowCo entities. He continued to solicit GrowCo investors to convert to VitaNova.

Predictably, McKowen also filed for bankruptcy. Neither the Chapter 11 bankruptcy nor the conversions fulfilled Mr. McKowen's promises to investors, and he's never stopped soliciting investors for this greenhouse venture.

So what does all this mean under the antifraud provisions of the Colorado Securities Act?

The evidence will show that the entire venture operated as a scheme to defraud investors.

From the start, Mr. McKowen and Mr. Harding concealed key information both from the Two Rivers board and potential GrowCo investors.

Here's what you will not see evidence of this week: You will not see any evidence that Mr. McKowen and Mr. Harding briefed or received formal approval from the Two Rivers board for the plan to take the company into the risky marijuana business.

You will not see any evidence that defendants told investors that GrowCo was paying fees to unlicensed sales representatives.

You will not see any evidence that they told investors about specific state and federal requirements for compliance with marijuana regulations, including the kind of activities that require license, federal enforcement power or the impact of the Department of Justice's guidance for federal enforcement.

You will not see any evidence that defendants gave investors actual financials of either GrowCo or Two Rivers.

And you will not see any evidence that defendants directed potential investors to look at Two Rivers federal filings.

You will not see any evidence that defendants informed investors their funds were being held in various bank accounts owned by Two Rivers and that money would be transferred to Two Rivers and its other subsidiaries for their use.

You will not see any evidence that they disclosed the Two Rivers board's concerns about McKowen's conduct to investors.

You will not see evidence that defendants told potential investors that McKowen had a checkered business history, including failed ventures, bankruptcies, disciplinary issues with security regulators, and self-dealing.

And you will not see any evidence that they informed investors that McKowen was directly and personally involved in the marijuana business, including marketing and selling marijuana without a license.

In fact, you will hear from three investors who will tell you that they were not told any of these things, any of the supporting information, which if they had known, would have led them to pass on this investment.

And you will likely hear the same from Mr. McKowen and Mr. Harding themselves because they

didn't think they had an obligation to disclose this kind of information. The lack of disclosure was a smokescreen preventing investors from seeing what was really going on.

The business model was a failure. And other than two failed tenancies, the only source of revenue was investor funds, a classic fraudulent scheme.

So despite defendants raising nearly 19 -- well, at least $19 million, the first greenhouse fell into disrepair. The second greenhouse was never completed. And investors lost their entire investment principal, let alone realize the big returns they were promised.

This is exactly what the Colorado Securities Act was designed to prevent. You'll hear from Gerry Rome, the former Colorado Securities Commissioner, who will explain the origins and purposes of the Colorado Securities Act, and why licensing, registration and disclosure are so important.

He will explain that investment in private securities offerings can be inherently risky, which is why the Act reverses the traditional concept of caveat and tort, to place the burden on the issuer or

promoter to disclose all risks and information that will be material to an investor's decision.

He will also discuss why selling to accredited investors, while important to registration exemptions, does not absolve the promoter from making robust disclosures of all material information.

And he will explain why accurate information about compliance with marijuana regulations, promoter's past business history, the use of proceeds, unlicensed and unregistered conduct, and any real estate interests backing the investments are all material information that must be disclosed prior to selling an investment.

And, finally, he will talk about loan activities, like inducing investors to modify notes, and how those can be a component of an overall fraudulent scheme.

In short, Mr. Rome will make clear that McKowen and Harding cannot hide behind their private offerings and supposed registration exemptions to avoid liability for violations of the Colorado Securities Act.

The evidence will establish that defendants violated the anti-fraud provisions of the Act, and we'll ask for a verdict at the end of this trial in

favor of the Commissioner on her first claim for relief.

So to sum up, the GrowCo entities run by Mr. McKowen and Mr. Harding raised at least $19 million from investors to build four greenhouses. While we do not have a clear picture of where all that money went, we know that it did not go to building four greenhouses.

Investors were only repaid a fraction of their principal investment, many received none. And many were induced to convert their worthless investments into VitaNova.

There is no dispute that individuals without securities -- securities licenses received fees for bringing in investor money, or that registration exemption notices were never filed with the Division of Securities. And there was no dispute about the kind of information that was provided to potential investors.

Defendants simply appear to believe that the Colorado Securities Act doesn't apply to them.

You'll probably hear multiple excuses and finger-pointing about who lost all the money. For the Commissioner's case, while this is an interesting issue, who lost money is not the central issue.

What matters is that defendants before this Court today, engaged in conduct that operated as a fraud against the investors, including numerous misstatements and omissions of fact crucial for investors to make informed investment decisions.

Where there's smoke there's usually fire. By the end of this case, we will have cleared away the smoke obscuring the scene to reveal a clear image of multiple violations of the Act's licensing, registration, and anti-fraud provisions.

Based on this evidence, we will ask this Court to return a verdict on all three claims in favor of the Commissioner, impose an injunction barring Mr. McKowen and Mr. Harding from any involvement in private securities transactions in Colorado for 20 years, and for entry of judgment, joint and several, in the amount of $19 million. Thank you.

THE COURT: Thank you. Mr. McKowen, would you like to make an opening statement?

MR. MCKOWEN: Yes, please.

Wow, that's quite a story if it were all true. It doesn't resemble the facts. It doesn't resemble the Colorado securities law, and this seems -- this doesn't look like a securities law case

to me at all.

It seems more like a lawyer monologue case, the relitigation of a licensing procedure. The issue is what is required to be disclosed and when it is required to be disclosed? And who are the investors that you're dealing with?

If they are -- if they are people who are unsophisticated or don't have the ability to bear the loss of their investment in a start-up company, in a start-up industry that has lost more than 70 percent of its participants since the original licensing, and that's because the price of marijuana dropped from $2,500 an ounce to well below a thousand dollars an ounce. In fact, it probably sells right now for somewhere between 4 and $500 an ounce.

One of my potential partners, who is in the room right now, when I explained to them that we were going to put together a program that would sell marijuana for a thousand dollars an ounce based upon it being $2,000, he laughed at me. And he said that marijuana is never going below $2,000 an ounce.

That's simply just not been the case.

I think part of what's going on here, and I don't really know what their motive is in the -- in the -- what the motive is for the plaintiff in this

case, but I think it is, in part, a disdain for my political speech.

I'm a -- I'm a Trump supporter. I'm a very avid Trump supporter. I'm a local PCP, precinct committee person. I was also a delegate to the -- to the County, Denver County, and a delegate to the -- to the state convention.

And the problem that we have in America right now, and I'm not trying to go too far with this, is that we seem to have -- be finding ways through proxies to hate each other and find reasons why we shouldn't try to figure things out and make them work.

In this case, it is definitely a due process case where property is being taken unconstitutionally from the beginning in this -- in this -- illegally from the beginning in this -- in this business venture, and through even right now, even this week.

I look forward to going through the facts, fact by -- material fact by material fact, looking at the law, applying the Colorado Revised Statutes, which is a -- a state that coordinates its laws with the -- with the federal government.

And it's very specific on how that's done.

And we'll go through the various Colorado Revised Statutes and see what the requirements are regarding disclosure. They talk about memorandums needing to be put together to be given to investors, and all kinds of this information and that information. That's simply not what the Colorado Revised Statutes say as it relates to the disclosure requirements.

But even with that in mind, I never did not present to an investor everything that I thought I knew or was trying to do in any instance where they asked for that. This case has been adjudicated by three competent jurisdictions. Same facts, same investors, same dollar amounts. And in each of those instances they found no wrongdoing.

It's been before the SEC. It's been before a -- a case in -- in Pennsylvania that was arbitrated before FINRA, and all the claims that are similar to the claims that the -- the plaintiff is trying to make were dismissed.

Now if you're familiar with arbitrations, they're usually trying to cut the baby in half. This, in less than 30 days, comes back -- came back with a decision. And we'll put that -- we'll show that, we'll bring that on the record that that's not what happened here.

I can tell you what happened here. And I need to -- I think that I need to get clear in my mind what fraud is, and I'm -- I am not an attorney. I only know that I don't lie. I only know that I don't try to deceive my investors because my lifeblood in my business is my investors, but that doesn't mean every deal works out.

That doesn't mean that they're not bearing the risk associated with a start-up in an industry that in Colorado was chosen to be made legal, and that is -- has been illegal for as long as -- as along as I've been alive. I think it's been a Schedule I drug forever.

So I don't think anybody was under the misconception of that this -- there was risk associated with this deal. There was never the conveyance by me that was a -- not a risky deal, that it didn't have risk associated with it.

In fact, the disclosures that they put up there is -- that is a safe harbor, is to let investors know that this is marijuana. I don't smoke marijuana. I don't consume marijuana.

And I was looking for something to do with Two Rivers. And the reason I was looking for something to do with Two Rivers is because it's my

job, personally and morally, that if I take money from someone else who would join with me -- and I'm one of the largest investors in this deal.

If you're to believe that the -- that the plaintiffs in this -- in this case somehow I wanted to put in $3 million of my own money and find a way to lose it. And I continued to put money into this deal to protect my investors.

I continued to communicate with them on a regular basis. I stopped it recently because we're in a -- in a lawsuit, and any communication that I would communicate to them, it would have gone -- it would immediately go to the state and I -- and I would see that -- that -- their comments on that.

So the real issue is, as it relates to fraud, was there actual false representation or an act done by me? There was a false representation and an act that -- that was done. And as often the case, and the reason for Sarbanes-Oxley, and the -- and the reason that all the Enron officers went to jail and Arthur Anderson is no longer with us is because fraud often gets put into the accounting because it's complex and there's words that you can use, and this and that, but there was no false representation by me or act by me.

There certainly wasn't any knowledge of falsity. I have used the best quality attorneys that I can find to help me navigate a very complex set of laws and rules. But in Colorado, those laws and rules primarily are the laws and rules associated with what I'm doing, which is raising start-up capital.

I've been doing it for 20, 25 years. Is -- is coordinating with the federal law. And I'll -- we'll go through and we'll look at the statutes and what the statute will say, that starting in -- in 1990, the state adopted the 1933 Act, and that was the baseline for what the laws are in Colorado.

And if -- and if there are any new laws or regulations, the Colorado Securities Commissioner could say, you know, we don't really think that fits Colorado. That's not what we want to do here. And in order for them to not just arbitrarily -- which I hear from the plaintiff, have heard repeatedly, will interpret what our laws say.

That's not what the -- that's not what the Colorado Revised Statutes said.

Colorado Revised Statutes say this is our baseline. We'll coordinate with the federal law. We use the 1933 Act and the regulatory agencies that are

associated with that.

And if the Commissioner returns that we're going to do something different, the process is they go through rulemaking, and that rulemaking is very specific.

It's a 90 day -- I think they have within 90 day -- 90 days they have to say we can -- we're going to suggest, want to change this about the Colorado securities law. And that rulemaking process will go out and get comments from the industry, all the participants like you often see in -- in creation of the laws.

And if and when it's determined that that is -- that that's going to be the law, they publish it so that the people that are in the industry have the opportunity to respond. You can't go out and say, this is what we think it should be and this is what -- this is how you need to behave.

This is a highly regulated industry, and you can't tell someone that the -- that they need to do something in -- in -- in the form of disclosure that's different than what your -- the Colorado Revised Statutes say.

75 percent of the people and 75 percent of the capital that was invested are investors with me.

The people that are complaining in this case, and they should be complaining. What the hell -- what happened to their money? Where did it go? Why -- what -- what really happened?

That's why when I say if Mr. McMahon is -- is testifying, I -- I want to -- this is the first time I've had an opportunity to actually talk in an open forum about what has happened.

I -- and I offered and -- and the statute of limitations probably applies here. I offered to meet with the -- the Commissioner's office back in 2017.

We've got documentation that says Mr. McKowen will willingly come in and talk to you about what has happened here. Never talked to him once. Never -- they didn't want to talk to me.

We'll see if the -- the revised statutes apply or not, but there's never been any intent to deceive on my part. I'm not associated with Two Rivers after May 26, 2016. I chased them as hard as I could.

I -- I held their feet to the fire wherever I could. I wasn't on their board.

I did certain things for them, but what I did for them is what you always see when you transfer

the leadership in a particular company.

You don't say, hey, you know, I'm going to go fishing or I'm going to do this or do that. Usually, there's a transition period and generally there's a contract associated with that, and that's what we developed here. Because I needed to do something with the water assets that was the runway for turning that into -- to cash flow was much longer than I anticipated.

I learned a lot of things from when I started Two Rivers, and its predecessor in 2002 to when I start -- changed the name to Two Rivers in 2010 and we started acquiring water and farming assets.

What I learned was is that runway is way beyond what we can sustain as a company.

Am I -- so that's when we switched to marijuana. We thought there was an opportunity there. Not to -- for John McKowen to want to -- to want to become an operator of marijuana and be a grower.

The reason I had to do what I did is because the -- the guy that was operating, developing our greenhouse was a thief. He stole our money. He stole our equipment.

I have got statements from -- contemporaneous statements from people who worked for him that will say, this guy's not only a thief, he's a coke head. He's not -- he's -- he -- I didn't say to Mr. Van Wingerden that I -- I really want your -- your -- your license. By then, everybody had learned what 280E is.

If you're not in an industry, you don't know what it is. But it's a tax provision that doesn't allow you to write off or take as a loss when you're calculating your income, your G&A.

So as a result, that's going to -- for the price to climb. And that's one of the reasons why these entities have gone out of business.

One, the price of marijuana probably goes for $400 either an ounce or a pound. I'm not -- not sure. But that's the benchmark and that's what it's gone down to.

And so my intent has not been to deceive. My intent for seven years, which I have given up my life to get those people's money back, has been one of the most difficult things I have ever tried to do. But here I am today, still trying to get in front of the forum that says money was stolen, money was taken, but it wasn't taken by me.

It was taken by the people after me. And it was taken by a group inside of TR Capital that we will see. The evidence will show that he and I do not get along. We're seated here together because that's how they chose us to be together.

But I've been chasing him for -- it became abundant -- abundantly clear to me that money was disappearing. If you pull up that -- that use of proceedings, you can't really see it, but that's a use of proceeds. You can't see it, Your Honor, because the -- the text is too small.

But we'll pull that out as we go along here. And that's -- I always put out a use of proceeds. And we'll see if that use of proceeds was as described.

We'll see if that money went where it was supposed to go. Whatever you, accounting-wise, you call it, we'll see if it went there. And Mr. Harding will have the opportunity to tell us why he thinks it was justified.

But they don't know what the truth is. They're in search of someone, me, to make me something. It's -- it's the statement that if any of us know history, that this is -- this is a case, and I don't know. I don't actually know their motives.

But this is a case where, show me the man, and I will show you the violation. And that's what they have done here. Because it doesn't match with the facts. It doesn't match with the law and it doesn't -- certainly doesn't match with my intent for the last seven years. That's all I have to say, Your Honor.

THE COURT: Thank you, Mr. McKowen. Mr. Harding, would you like to make an opening statement as well?

MR. HARDING: Thank you for this opportunity. I mean, this is certainly -- I've been waiting for a -- an official venue or environment to show the story, the facts as they are. Not weave some incredible story that the AG's office has laid in front of you.

And we'll -- I will be presenting evidence to support everything we have to say. First thing I will say, is after listening to them, I think maybe I'm one of the dumbest people in the room. I put $125,000 of my own money in this. I'm talking money, checks that I wrote. And I'm not that wealthy of a guy.

The other thing is when people said -- I told them about this case and I said I'm doing pro

se. And I think I had an attorney friend say to me, "You know what pro se means in Latin?" And I go, "representing yourself." "No. Stupid."

But I will tell you what. I don't have $200,000 to pay for the defense. And I don't think there's an attorney around that can explain this case better than I can. It kind of reminds me of the old proverb: Let's talk about the elephant in the room.

In case you forgot, there was an elephant that came to town, knowing what an elephant looked like. And so he said, let's give this a try. So they picked out four or five people, they blindfolded the people. They put them into the room, and they had them touch different parts of the elephant.

One person had the leg, oh, that must be a tree trunk. The other person said, touching the nose, well, that must be a snake. And then another person touched the tail. Well, that has to be a rope. Another person touched the side. It has to be a wall.

What we need to do here is remove the blinders and blinds that particularly the prosecution has in this case.

There was an effort to make money for everyone, including me, and that's why I invested

$125,000. And that's why I also told some of my friends to get involved.

Looking back, bad move. But I will tell you, I will show you evidence there was no fraud. There was full disclosure, and all the information is there and all the dollars are accounted for. Thank you.

THE COURT: All right. Thank you, Mr. Harding. We're almost at 10:30. Let's go ahead and take a 15-minute recess and then we will start with plaintiff's witnesses at 10:40.

(Whereupon, a recess was taken at 10:32 a.m.)

(Whereupon, the proceedings resumed at 10:57 a.m.)

THE COURT: Okay. We are back on the record in 21CV33922. All parties and counsel are present. And are we ready for plaintiff's first witness?

MS. HUNT: We are, Your Honor.

THE COURT: Go ahead and call your witness.

MS. HUNT: The State calls Mary Loughran.

THE COURT: All right. Ms. Loughran, if you'll come up here to my left, to the witness stand. You should probably just wind your way, probably

around that side of the table. Before you sit down, I'll swear you in so you can put your things down.

Whereupon,

MARY LOUGHRAN,

the witness having been first duly sworn, was examined and testified on her oath as follows:

THE COURT: You may be seated.

When you're ready.

DIRECT EXAMINATION

BY MS. HUNT:

Q. Good morning, Ms. Loughran. Hopefully you can see me over here?

A. Yes.

Q. Could you state and spell your last name for the Court?

A. Loughran, L-O-U-G-H-R-A-N.

Q. What do you do for a living?

A. I am a software consultant.

Q. And if you could bring the mic down to your mouth, please? Thank you.

A. I'm a software consultant.

Q. Are you an investment professional of any kind?

A. I am not an investment professional.

Q. Do you regularly invest in private

securities offerings?
A. I do not.
THE COURT: Ms. Loughran, you can -- I'm sorry to interrupt. You can push that microphone towards the podium so you don't have to lean -- lean back.
Q. (BY MS. HUNT) And you're here today because you were an investor in GrowCo?
A. I was.
Q. How did you first learn about GrowCo?
A. I learned about GrowCo through Jan McCaffrey, who I play tennis with.
Q. And how did it come up?
A. We were playing tennis and then she said that she knew of a -- an investment I may be interested in.
Q. And how do you know Jan?
A. From playing tennis. Yeah. Strictly from playing tennis.
Q. What did Jan tell you about this investment?
A. She said -- I mean, I don't remember all -- all the details, but she said it was a good investment. It would go through George, her husband. Just it was associated with marijuana.

Q. Could you turn in your book in front of you to the exhibit marked 35?
A. (The witness complied.)
Q. What is Exhibit 35?
A. So Exhibit 35 is e-mail correspondence between me and Jan.
Q. And it looks like, if you look on the second page, the first e-mail is Friday, December 4, 2015?
A. Okay.
Q. And is that from Jan to you?
A. Yes.
Q. And the remainder of this is correspondence then between you and Jan?
A. Correct. About GrowCo.
Q. Right.
A. Purchase, yep.
Q. Okay.
MS. HUNT: And I'd like to admit Exhibit 35, please.
THE COURT: Any objection, Mr. McKowen, to the Court receiving Exhibit 35 into evidence?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.

THE COURT: Without objection, Exhibit 35 is admitted.

(Whereupon, Exhibit No. 35 was admitted.)

(BY MS. HUNT) So if you look at the first e-mail on the second page. Was this Jan sending you a summary about the investment?

A. Yes.

Q. Did you have some questions or concerns about investing in this offering?

A. I -- I did, and I expressed my concerns to Jan.

Q. And what were those concerns? It looks like you expressed this in the e-mail on the bottom of the first page?

A. Right. So first, my first concern was that I would not put 150,000 into this or a hundred thousand into this. And also, I was concerned that GrowCo being affiliated with marijuana wouldn't be able to be publicly traded.

MR. HARDING: Your Honor, if I may, could you ask the witness to speak up just a little bit. I'm getting, like every, other word?

THE COURT: If you could raise your voice, I would appreciate it.

THE WITNESS: I will try.

THE COURT: Thank you.

MS. HUNT: The microphone helps. I have the same problem. Get really close to it.

Q. (BY MS. HUNT) Were they asking for a hundred thousand dollar investment?

A. As the minimum, yeah.

Q. And so then did Jan respond to -- with some information to address your concerns?

A. Yes. So in the -- it stated in the e-mail, you know, she -- she addressed concerns over the cash flows, issues about the cash flows that I had mentioned. She made -- you know, made references to it becoming publicly traded.

Yeah.

Q. Okay. And then by the end of this e-mail exchange, had you decided whether to invest or not?

A. I'm not sure if it was at the end of this -- this e-mail exchange. Let me see. So the date on this is, as you said, December 20th.

Q. Were you still hesitant to put in $150,000?

A. I mean, I would -- I would not -- yes. I was hesitant to put in 150,000. I was hesitant to put in a hundred thousand.

Q. In the first e-mail on -- Jan references a growth summary. Can I have you turn to Exhibit 47?

A. (The witness complies.) Uh-huh.
Q. Does this look like the summary you received before you made your investment?
A. It does.
Q. And is this what you read and relied on before investing?
A. Yes. A few things to call out.
Q. We'll get there. I want to just --
A. Yes.
Q. -- make sure you know what this exhibit is.
MS. HUNT: Your Honor, I'd like to admit Exhibit 47.
THE COURT: Mr. McKowen, any objection to 47?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: Without objection, 47 is admitted.
(Whereupon, Exhibit No. 47 was admitted.)
Q. (BY MS. HUNT) So I want to walk through a little bit. This memorandum is titled, "Senior Secured Notes GrowCo, Inc." And it's dated April 1, 2015 at the top.
Can you look down? I want to call out a

couple of pieces, under securities offered.
A. Uh-huh.
Q. And if you look, they were -- how much money were they trying to raise with this?
A. 5 million.
Q. And then under purchase price, where you would be getting your -- having a principal amount dollar for dollar, and you also could get the warrants to purchase GrowCo shares?
A. Correct.
Q. And if you look at use of proceeds?
A. Uh-huh.
Q. And these are what you understood the money would be used for?
A. Correct.
Q. That provided a letter of credit to Suncanna, debt financing for a second greenhouse, and general corporate purposes for GrowCo?
A. Correct.
Q. So going on to the next page. What was your understanding about your ability to redeem this note and take your principal back out?
A. So it said in the paperwork and Jan and I also discussed the fact that the note was called -- so that was definitely a factor.

(Court reporter asked for clarification.)

THE WITNESS: It was clearly stated in the documentation as well as in discussions Jan and I had, that the note was callable.

Q. (BY MS. HUNT) And by "callable," does that mean you could -- you could, by going through certain procedures, pull your principal back out?

A. Yes.

Q. At any time?

A. Yes.

Q. And what was the interest rate going to be?

A. 22.5 percent.

Q. And under security, you understood -- did you understand that your notes would be secured by real property interests?

A. Yes. That was also discussed.

Q. And that -- were these interests in this term sheet?

A. Yes.

Q. And then going on the next page, under intention to become a U.S. publicly traded company. Did this lead to you believe the intent was to take GrowCo public?

A. Yes.

Q. And was that important to you?

A. I mean, it's definitely a factor.
Q. So ultimately, you were persuaded to invest. How much did you invest?
A. 50,000.
Q. What persuaded you to invest?
A. I would say definitely the fact that it was callable, that it was secured. Jan was recommending this as a good investment to me. Had a good interest rate.
Q. What is the source of funds you used to invest?
A. I used my retirement funds.
Q. Could you turn to Exhibit 56?
A. (The witness complied.)
Q. This is a pretty thick exhibit. There's a lot of pages. And I think you have had an opportunity to review this before.
A. Uh-huh.
Q. But is Exhibit 56 the packet of subscription information and all the details of your investment?
A. Yes.
Q. Other than the term sheet you just looked at, and the subscription documents that are here in Exhibit 56, did you receive any other written

disclosures from GrowCo?
A. I -- I may have. I mean, I received a projection of cash flows. Maybe it's here.
Q. It is. Let's go back to Exhibit 47 on the fourth page.
A. Right.
Q. Go to the fourth page. And this was the projections that you received?
A. That's correct.
Q. And then the next page, it looks like you also received some real property information?
A. Yes.
Q. Did it ever occur to you, when you made this investment, that you would not be able to get your principal back out?
A. It never occurred to me that I would not receive my principal back. Never.
Q. If you go back to Exhibit 50 -- I'm sorry, 56. When did you make your investment?
A. In June 2015.
Q. Moving on to Exhibit 114. Can you look at that, please?
A. (The witness complied.)
MS. HUNT: Before we do that, I think I needed to offer Exhibit 56.

THE COURT: Mr. McKowen, any objection to 56?

MR. MCKOWEN: No, Your Honor. I think I stipulated to all of their exhibits except for the -- she's a releasor. I thought we already got past that.

THE COURT: Well, my understanding when I asked that this morning before we started is that you were not stipulating to the People's exhibits.

MR. MCKOWEN: Well, I have no objection.

THE COURT: To all of their exhibits?

MR. MCKOWEN: Except for the -- the ones relating to her being a witness and releasor. We've resolved that, I think, but I have no problem with any of these.

THE COURT: Are there any exhibits that relate to the Paulson settlement that we discussed earlier?

MS. HUNT: No.

MR. MCKOWEN: Except for --

MS. HUNT: My understanding -- my understanding, we had some exchanges last week. My understanding was that he was objecting to witnesses who -- such as Ms. Loughran, and that he may have been conflating witnesses and exhibits, but he did

not clearly stipulate to the exhibits, which is why we are offering them one by one.

THE COURT: I can admit the plaintiff's exhibits without objection from you, and then I will ask Mr. Harding alone if he objects.

MR. MCKOWEN: I'm sorry?

THE COURT: Do you want me to admit all the plaintiff's exhibits, written exhibits, at this point without objection, or do you have specific objections to some of the exhibits?

MR. MCKOWEN: I have no objections to Ms. Loughran or the other releasor witnesses beyond what I objected to this morning. The rest of the objections, I need to see them as they come out and how they're used.

THE COURT: All right. So Ms. Hunt, just offer them one at the time. You can clarify over the lunch hour if you'd like, and I can admit them after the lunch hour.

MS. HUNT: Thank you, Your Honor.

THE COURT: All right. So Exhibit 56 Mr. McKowen does not object to.

Mr. Harding?

MR. HARDING: No. I have no objections, and I will stipulate for everything.

THE COURT: Exhibit 56 is admitted.
(Whereupon, Exhibit No. 56 was admitted.)
Q. (BY MS. HUNT) All right. Can I have you, then, turn to 114?
A. (The witness complied.)
Q. What is Exhibit 114?
A. 114 is a letter from Wayne Harding notifying me that there was an audit done of GrowCo's financial statements.
Q. All right. So -- and this was dated January 7, 2016?
A. Correct.
Q. And this is a letter that you received?
A. Yes.
MS. HUNT: I'd like to offer Exhibit 114, please.
THE COURT: Any objection, Mr. McKowen, to 114?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No.
THE COURT: 114 is admitted.
(Whereupon, Exhibit No. 114 was admitted.)
Q. (BY MS. HUNT) When you received this in January 2016, what did this confirm for you?

A. It confirmed that I was the owner of a $50,000 note. It had the correct maturity date, interest rate, and it also confirmed the collateral on the note.
Q. And that's for Greenhouse 156 acres of land in Pueblo County and additional land and water rights in Huerfano County?
A. Correct.
Q. At some point were you asked to amend your note?
A. I was.
Q. Can we go back to Exhibit 56?
A. (The witness complied.)
Q. And page 115 on the PDF.
A. (The witness complied.)
Q. This is pretty deep into the exhibit. I will pull it out for you. It's on the screen.
A. Uh-huh.
Q. If you can see that?
A. Uh-huh.
Q. Is this the amendment that you signed?
A. Yes.
THE COURT: This is page 115?
MS. HUNT: Yes.
THE COURT: And where is that?

MS. HUNT: It is in Exhibit 56. And it is the -- there's a Bates Number at the bottom of the page, COGRW057371.

THE COURT: Thank you.

MS. HUNT: I'd like to offer exhibit -- oh. This is already offered. Never mind.

Q. (BY MS. HUNT) So this is the -- the amendment that you signed. What reason were you given for you to amend your note?

A. That GrowCo was having trouble paying interest, paying monthly interest on notes.

Q. Did they say why they were having trouble?

A. There was an issue with the tenants, something along those lines.

Q. And so if you look in the middle of the page here, three things. These are what you agreed to do for modification?

A. Correct.

Q. And that would change your interest rate temporarily and defer some amount?

A. Correct.

Q. And in return, you were going to -- they were going to reprice the warrant?

A. Correct.

Q. And then after September 30, 2017, the

deferred interest would be paid in full and the monthly note paid at the original interest rate?

A. Correct.

Q. Did you receive all the payments under this amendment or your original note?

A. I do not believe so. I --

Q. Let me ask you this: At some point did you stop receiving?

A. I did. So I stopped receiving interest payments October 2017, but then, in addition, there were a number of months of interest missing.

Q. Okay.

A. Before then, before October 2017.

Q. So there were months -- so you did receive some interest checks, but there were months they didn't come?

A. Correct.

Q. When they didn't come, did you get an explanation why?

A. I did not.

MR. HARDING: I'm sorry. Could you repeat that last one thing that you said?

THE WITNESS: I did not.

MR. HARDING: You don't know why you didn't receive?

MR. MCKOWEN: She did not.

THE COURT: She said, "I did not."

MR. HARDING: Thank you.

THE WITNESS: I did not receive notification why I did not receive interest.

Q. (BY MS. HUNT) So you said they finally stopped in October of 2017. Can you turn to Exhibit 36, please?

A. (The witness complied.)

Q. This is an e-mail from Jan McCaffrey to herself, perhaps a blast e-mail. Did you receive this e-mail from Jan McCaffrey?

A. I did.

MS. HUNT: Permit to offer Exhibit 36?

THE COURT: Any objection to 36, Mr. McKowen?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: 36 is admitted.

(Whereupon, Exhibit No. 36 was admitted.)

Q. (BY MS. HUNT) So this e-mail from Jan McCaffrey is addressed to GrowCo noteholders, correct?

A. Yes.

Q. And acknowledging they are behind on interest payments to noteholders?
A. Yes.
Q. And there's a great deal of explanation here about what's happening with the greenhouses and the tenants?
A. Uh-huh.
Q. Did -- what concerns did this raise for you, if any?
A. It was very concerning to me.
Q. And was this all the information you received about what was happening with the greenhouse tenant?
A. This is all the official information I received.
Q. And did you talk to Jan as well?
A. I did -- I did talk to Jan. I'm sure I would talk to Jan. Maybe I'll just say it like that, right? It's five years ago, so...
Q. Right. So did Jan or anyone at GrowCo tell you at the time that the tenant was a company owned by John McKowen?
A. No.
Q. Did you -- what did you do at this point? Did you try to cash out your note?

A. I called my note for the first time.
Q. Will you turn to the next page of the exhibit? It looks like on January 30th you e-mailed Jan back. Is that your first time you tried to call your note?
A. It is most likely the first time I tried to call the note.
Q. And what was her response?
A. Her initial response was it would be difficult if people started calling their notes.
Q. So did you take additional steps then --
A. Yes.
Q. -- to continue to try to call your note?
A. Yes. So I should say around this time, I didn't hire a lawyer to help me with what to do with the situation. What were my options? Dot, dot, dot. And I called my note I would say probably four or five different ways from January to May.
Q. Well, let me have you look at Exhibit 116.
A. (The witness complied.)
Q. Do you recognize this exhibit?
A. Yes.
Q. This is e-mail correspondence between you and it looks like Two Rivers and GrowCo?
A. Right. Because in the note, that's who it

says to notify when calling the note.

Q. And the date is April 30th of 2018?

A. Yes.

MS. HUNT: I'd like to offer Exhibit 116, please.

THE COURT: Any objection, Mr. McKowen?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: 116 is admitted.

(Whereupon, Exhibit No. 116 was admitted.)

Q. (BY MS. HUNT) And you reference in this e-mail, due to recent happenings at GrowCo, it's in your best interests to call your note. Was it successful?

A. No.

Q. And you mentioned you had enlisted other help maybe from an attorney to help you get your note?

A. Right.

Q. Did you also have your IRA, your retirement funds company try to help?

A. Yes. Yes. So like I said, I -- I probably called my note four or five different ways, and one of those ways was through the trustee where the note

was held.

Q. Were you ever able to call your note and to redeem your $50,000?

A. No.

Q. Can you take a look at Exhibit 117, please?

A. (The witness complied.)

Q. The text -- the text message in the middle there?

A. Uh-huh.

Q. Is that a text conversation between you and Jan McCaffrey?

A. It is.

Q. And you are, again, asking about the demand on your note?

A. Yes.

Q. And what was her response?

A. There was no money to pay the note.

MS. HUNT: I'd like to offer Exhibit 119 [sic], please?

THE COURT: Any objection, Mr. McKowen?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

MS. HUNT: I'm sorry. That's 117.

THE COURT: It's 117?

MS. HUNT: Yes. 117.

THE COURT: Without objection, 117 is admitted.

(Whereupon, Exhibit No. 117 was admitted.)

Q. (BY MS. HUNT) Up to this point, had you ever had any communications with John McKowen?

A. No.

Q. So were your only -- your communications all through Jan?

A. All communication was through Jan. Prior to the purchase and with the purchase, at least one e-mail came from George, George's account, George McCaffrey's account, and other e-mails had George cc'd.

Q. Okay. Did you know whether Jan McCaffrey had a securities license?

A. I didn't think she did.

Q. And how did you think this was being sold to you?

A. Jan said it was going through George.

Q. So then after you were unsuccessful in calling your note, did Mr. McKowen ever contact you to invest in another private placement for his companies?

A. Yes, he did.

Q. Can you take a look at Exhibit 119?
MR. MCKOWEN: What's the number?
MS. HUNT: 119.
Q. (BY MS. HUNT) Do you recognize this exhibit?
A. I do.
Q. Is this an e-mail to you, I suppose to a lot of people, from John McKowen?
A. Yes.
Q. On July 22 of 2019?
A. Yes.
MS. HUNT: I'd like to offer Exhibit 119, please.
THE COURT: Any objection, Mr. McKowen?
MR. MCKOWEN: No, Your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: 119 is admitted.
(Whereupon, Exhibit No. 119 was admitted.)
Q. (BY MS. HUNT) And see there, this letter is, dear investor, and it's from VitaNova, referenced VitaNova as a newly organized Colorado company, and it wants you to invest in, you know, a hundred thousand dollar minimum invest. Did you consider investing in this?

A. No.
Q. Why not?
A. I mean, given what had happened to date, there was no way I would have invested.
Q. Were you ever asked to convert your existing note into a VitaNova investment?
A. Yes. I would say that is in the e-mails received.
Q. Did you convert?
A. No.
Q. Why not?
A. I mean, I wouldn't. I would lose my security. The collateral on my note, the terms would change.
Q. So your concern was if you converted, you lose the real property interest that backed your note?
A. Yes. And not only that. I -- I would not put more money into this.
Q. After this e-mail in Exhibit 119, did you continue and do you still continue to receive e-mail solicitations from Mr. McKowen?
A. Yes.
Q. Has he made statements in any of these e-mails that he intends to sell property notes to

secure your note and use the proceeds --
A. He has.
Q. -- for other uses?
A. Sorry. He has.
Q. Is there specific information that you would have liked to know when making a decision to invest in this $4 million note?
A. Yes.
Q. Would you have wanted to know that the note was not being sold through George McCaffrey?
A. Yes.
Q. Would you have wanted to know that he was unlawful for --
MR. HARDING: I object. She is leading the witness.
THE COURT: Sustained.
MS. HUNT: Okay.
Q. (BY MS. HUNT) Did you understand that the ownership of GrowCo being in a publicly traded company of Two Rivers, that it was owned by Two Rivers?
A. I knew it was affiliated with Two Rivers. I'm not sure if I knew it was owned by Two Rivers.
Q. Were you ever told that two -- that Two Rivers could not be involved legally in the marijuana

business?
A. No.
Q. Would you have wanted to know that?
A. Yes.
Q. Did you know whether GrowCo paid Two Rivers for the land that was backing your note?
A. I did not know that.
Q. If it was not actually paid in cash, would that have been important to you?
A. Yes.
Q. Were you ever told that Mr. McKowen, a principal in GrowCo, was involved in activities that required a marijuana license without having one?
A. I did not know that.
Q. Would you have wanted to know that?
A. Yes.
Q. Were you ever told that Mr. McKowen's license to offer and sell securities had been suspended years before for failure to disclose material information to investors?
A. I was not told that.
Q. Would that have been important to you?
A. Yes, it would of.
Q. And you mentioned that you were told there were some issues with tenants. Beyond that, were you

told that Two Rivers and GrowCo and other subsidiaries were experiencing cash flow problems?

A. I was not told that.

Q. Would that have been important to know?

A. Yes.

Q. Were you told ever that the investments that in GrowCo were being raised to support the parent company, Two Rivers?

A. No.

Q. Would that have been important to you?

A. Yes.

Q. Were you ever told that other investors, from offerings made by this company, had not been paid?

A. I was not told that.

Q. Would that have been important to you?

A. Yes.

MS. HUNT: Thank you, Ms. Loughran. That's all I have.

THE WITNESS: Okay. Thank you.

THE COURT: Mr. McKowen, any cross-examination?

MR. MCKOWEN: Yes.

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Nice to meet you.
A. Nice to meet you.
Q. I have a couple of questions.
MR. MCKOWEN: And if I could, Jennifer, are you the one that's -- so can we pull up the -- the term sheet? I think it's 56.
MS. HUNT: 47.
MR. MCKOWEN: It's plaintiff's --
MS. HUNT: 47.
Q. (BY MR. MCKOWEN) That's a term sheet. That's the term sheet for the -- for the investment that you made the $4 million note investment?
A. Yes.
Q. Can you highlight the bold print in the second paragraph? So let's get that up there. But let me -- let me back up here.
I've never -- did we have a phone call recently?
A. We had a phone call in 2023.
Q. Yeah. Recently. A couple months ago, whatever. And that didn't go very far when -- when we talked to each other.
It was pretty short because there was -- from my perspective, there was a lawsuit going on and all of that.

A. Right.
Q. Did you talk to me before you ever invested?
A. I do not believe I ever spoke to you.
Q. I don't think so either. Are you -- I think you said that -- did you say that you had invested in this type of deal before?
A. I have not.
Q. Private placement?
A. No.
Q. Start-up?
A. No.
Q. And the money that you invested was out of your IRA retirement account?
A. Yes.
Q. Clearly not suitable for a start-up. Clearly not suitable for this type of investment.
MS. HUNT: Objection, Your Honor. He's testifying.
THE COURT: Sustained. You have to pose a question.
MR. MCKOWEN: Sorry.
Q. (BY MR. MCKOWEN) Whenever I do this because I'm not an attorney, and I need to be guided through some of this. But do you think you were

suitable for this type of investment?

A. I mean, I know I asked Jan if I could invest from an IRA account, and she said yes.

Q. Okay. And regardless of whether it came from an IRA or some other place, do you think that you're personally suitable for this type of investment?

A. I mean, I would say, if the investment was what was presented to me, then yes. But that's not the case.

Q. How was it not what it was presented to be?

A. The funds were not used as they were specified in the term sheet they would be -- how they would be used. It was not callable.

Q. What is your recollection or your belief of how the funds were used?

A. How the funds should have been used?

Q. No. They should have been used according to -- were you -- were you presented with a pro forma?

MR. MCKOWEN: I think we had it up there. Can you pull it back up?

THE COURT: Exhibit 47?

MS. HUNT: Yes.

MR. MCKOWEN: Is there any way you can blow

that up? Thank you.
Q. (BY MR. MCKOWEN) So it's got projections from 2/15, 2/16, 2/17, 2018, and this is a -- an operations pro forma and then there's projected distributions?
A. So this is from 2015. This is all projections.
Q. Did this come from when you -- from your original investment?
A. Yes. Yes.
Q. Okay. Do you know who prepared that pro forma?
A. I do not, but I must have gotten it from Jan.
Q. Right. So do you think that the information provided to you was accurate at the time it was created or it was believed to be accurate at the time it was created, or do you think it was a deception?
A. I really don't know.
Q. Do you -- I think you answered this already. Do you know who prepared that, and I believe you said --
A. I won't have any idea who prepared it.
MR. MCKOWEN: Can we go back to the -- the

term sheet, please? Can you pull up that bottom harbor -- safe harbor language?

For discussion only, all terms are subject to -- you can make it a little bigger, or not?

Q. (BY MR. MCKOWEN) Anyway, it's safe harbor language, the same thing that you see in nearly every document that I would have -- that I prepared or our attorneys prepare and we put out.

And so it's a projection, and it's nonbinding, which is what it says, and it's not the agreement, which the upper portion says.

Were you presented with an actual note to -- to -- were you presented with a -- with subscription documents?

A. I mean, I would have to go through what -- what I have. I have a lot the documentation on GrowCo.

Q. You signed something. You signed something too, and you wired your money in; is that correct?

A. The trustee wired the money, but yeah.

Q. Yeah. I mean, you gave them the instructions that we saw?

A. Uh-huh. Yes.

Q. I didn't make copies of this, but they're on the server but -- and I don't know how much

longer, but basically it's her subscription agreement along with the acknowledgement letter from her IRA.

MS. HUNT: Mr. McKowen, this is all in Exhibit 56 that's been admitted.

MR. MCKOWEN: Okay. Can we pull that up? Great. And this -- are there supplemental? Are there additional pages that go along with this?

Can we go past that page, scroll to the next one and to the next one and to the next one. Okay. So these are all the documents that you initiated the transaction?

MS. HUNT: There's a lot more. There's a whole lot more.

MR. MCKOWEN: Okay. Keep going. So there should be an accredited investor qualification. Okay. The whole thing. If I would have known, I would have copied this, but I don't think you can -- if you can, go to the page that is where you sign the accredited investor questionnaire. It looks like this.

MS. HUNT: It's exactly the same thing as her signature. You can look at 57361.

MR. MCKOWEN: Next time, Your Honor, I will make six of them so everybody gets to see. Oh. He's going to make copies.

Let's move on to -- while he's doing that, I did make six copies of this.

Q. (BY MR. MCKOWEN) This is part of the security agreement. I didn't copy the whole thing, but it speaks to the security associated with the -- and I have six copies of it --

MS. HUNT: What is it? I'm sorry. Is this on your exhibit list?

MR. MCKOWEN: Say again?

MS. HUNT: Is this on your exhibits?

MR. MCKOWEN: No. It's on yours.

MS. HUNT: Oh. It's part of the subscription document.

MR. MCKOWEN: And I do have six copies of these.

THE COURT: If it's part of the exhibit that's already been admitted. Is that what this is?

MS. KIDD-AARON: That's what he's representing to us, Your Honor.

THE COURT: And which exhibit?

MR. MCKOWEN: It's a part of the note, the actual note.

MS. HUNT: It's part of 56.

Can you go to page 57283? Is that what you're looking for?

MR. MCKOWEN: Can I --

THE COURT: Mr. McKowen, is what you have in your hand on the screen? Because there's no need to admit duplicate exhibits.

MR. MCKOWEN: Yeah. This is from their exhibit. It's the actual note, and I'm trying to highlight a -- the section about security. Okay. Great.

Q. (BY MR. MCKOWEN) So when -- whoever sold this note to you, and I take responsibility for it because I'm the CEO of the company and it was done when -- when I was the CEO, and so part of what was presented in the note that you received -- and I have a copy of the actual note that you received -- was this security agreement.

And it -- it reflects what is said in the term sheet. And that is you're going to get a first deed of trust encumbering GCP-1, and you're also going to get a deed of trust from Two Rivers Farms F-2, LLC, that's located in Huerfano County. That's a water asset. It's a very valuable water asset.

THE COURT: Mr. McKowen, what's your question for the witness?

Q. (BY MR. MCKOWEN) Did you rely on this security as part of the reason for the investment?

A. Yes. As I stated, the fact that the note was secured was a factor.
Q. Okay.
A. In me investing, in my investing.
Q. Okay. So -- and do you know if those deeds of trust were recorded?
A. I mean, I'm not sure I understand what "recorded" means.
Q. A deed of trust is -- is a collateral, the security associated with that. Like when you buy a house. Like a deed of trust is something that secures your note. And so part of what you were expecting to receive was in the agreement that you signed, you believed you were going to receive this or this was part -- this was part of that note?
A. So in the terms of my note, it mentioned deeds of trust.
Q. And this is -- this is that.
A. Okay.
Q. Did you think that a start-up business where greenhouses were to be constructed was a risky investment?
A. I'm not. No. I don't think it was so risky. I mean...
Q. Is there a reason why you haven't done this

type of investment before, especially, like in from your IRA?
A. It has never been presented to me. It has never been presented to me.
Q. Okay. Are you familiar with the -- the Paulson settlement case, and have you --
MS. HUNT: Objection; outside the scope of direct.
THE COURT: Overruled.
MR. MCKOWEN: Did you say "overruled"?
THE COURT: Yeah. Overruled.
MR. MCKOWEN: Yeah, thank you.
Q. (BY MR. MCKOWEN) Are you familiar with that settlement?
A. I know of the settlement. I don't know all the details.
Q. Do you know -- do you know that they're processing claims for that settlement?
A. Yes.
Q. Have -- have you submitted your claim for that settlement?
A. Yes.
Q. Good.
A. Could I add that the --
THE COURT: Hold on. You have to wait for

a question. Do you have another question on that topic?

MR. MCKOWEN: No. Is there something else you would like to say about it?

THE WITNESS: Well, I was just going to clarify that the expected payment or payout from that is around 3 percent of the original investment. So meaning it's very small. I just wanted to clarify that.

Q. (BY MR. MCKOWEN) It's ridiculous. Whereas, do you think that this water -- these water reservoirs, this -- these water rights, in the -- in Huerfano County and the greenhouse in Pueblo County are valuable?

A. Sure.

Q. You don't think they're valuable?

A. I said yes.

Q. Oh, okay. I'm sorry. And are you currently aware of any offer that is being made to acquire those water rights?

A. I don't.

Q. Did you receive a letter from me. Maybe I took the full list. Did you receive a letter from me discussing a $3.8 million offer?

A. I am not sure. I mean, I'm not reading

your e-mails in detail.
Q. I mean, like in the last month, did you receive?
A. Not that I know of, no. I don't believe so.
Q. Okay.
A. No.
Q. Would you be surprised if -- to learn that an offer for 3.8 million has been made?
A. I don't know. I mean, why would I be surprised? I mean...
Q. It would be a surprise to you?
A. No.
Q. Okay. Do you know what has happened to that $3.8 million offer for that?
A. No.
Q. Do you know what portion your investment would be if that were paid?
A. No.
Q. Would you be shocked to hear that would cover a hundred percent?
MS. HUNT: Objection, Your Honor. He's testifying again.
THE COURT: Sustained. Next question.
It was sustained. Next question.

MR. MCKOWEN: Yeah. I'm trying to formulate it. Sorry.

THE COURT: It's okay.

MR. MCKOWEN: Without testifying.

Q. (BY MR. MCKOWEN) Would you expect that if something happened to that security, based upon the deed of trust that had been filed, that you should receive the benefit of that deed of trust?

A. If I could rephrase just to make sure I'm understanding? Are you saying if that was to be sold, would I expect part of the proceeds to come to me?

Q. Yes.

A. Yes.

Q. Okay. And that deed of trust, do you know what it says?

A. I don't know exactly what a deed of trust says.

Q. Okay. Would it be reasonable of you to believe that you're a beneficiary of that deed of trust based upon the -- these notes?

MS. HUNT: Objection; I think it's calling for a legal opinion.

THE COURT: Overruled. You can answer.

THE WITNESS: I mean, like I said, I'm a

noteholder. The reservoir is mentioned as a deed of trust in my note. So if it sells, I think I have rights to them.

Q. (BY MR. MCKOWEN) And we're with you a hundred percent. This has been -- has this been difficult for you? Do you think you've been treated fairly?

A. No.

Q. I would agree with you. Do you think that the -- the reason you haven't been treated fairly is because from the money that -- that you contributed was not used on the -- as the -- as the proceeds said it should be used?

A. I mean, I would be speculating.

Q. Well --

A. Why -- and I don't know really what other investors feel. I'm not sure, right? So you're asking me have I been treated differently?

Q. I don't think you were treated --

MR. HARDING: Also, I object to that question.

THE COURT: On what grounds?

MR. HARDING: What's that?

THE COURT: On what grounds?

MR. HARDING: Let me tell you the reason

why: Is because he's making assumptions of fact that hasn't been proven.

THE COURT: Overruled.

Q. (BY MR. MCKOWEN) So all I'm trying to get at here through questioning you -- questioning you, cross-examining you appropriately, is you made an investment, correct? You made an investment?

A. Yes.

Q. In this $4 million note. The document that you executed is a subscription agreement for the $4 million note; is that right?

A. I'm not sure.

Q. Okay. You -- am I allowed to refresh her memory by showing her a document?

THE COURT: You can, but she didn't say that she -- well, did she say she didn't remember? Or she said she didn't know. She said she didn't know. So there's no reason to refresh her recollection. She already answered it.

MR. MCKOWEN: Okay. All right. So not to belabor this anymore.

Q. (BY MR. MCKOWEN) Do you believe that there were reasons why the first greenhouse cost more than what was originally projected?

A. I -- I don't -- I don't know those kind of

details about businesses.
Q. So it's your belief, though, and correct me if I'm wrong. Is it your belief that while I was the CEO, the money was used inappropriately?
A. That is my belief.
Q. Okay. All right.
MR. MCKOWEN: That's all I have, Your Honor.
THE COURT: Thank you. Mr. Harding, any questions?
THE WITNESS: I do, sir.

CROSS-EXAMINATION

BY MR. HARDING:
Q. Ms. Loughran, did I get -- get your name right?
A. It's Loughran.
Q. Loughran?
A. Loughran.
Q. Loughran. Okay. I apologize. Never met you before, have I?
A. No. No.
Q. Okay. Unfortunately, we're meeting in court, but thank you for coming and I know it's kind of stressful especially having been in court for a while?

A. Never.

Q. Okay. I got it. So I wanted to -- so we never met, we never talked on the phone?

A. I do not believe we have ever spoken.

Q. Okay. Your prior testimony, I think I heard it right, saying that -- and I think we saw some evidence here about can't pay the note or having some cash flow issues and I'm paraphrasing, would that -- would that be an accurate way of stating that? Or we can pull up the document.

A. Yeah. Meaning cannot -- cannot -- I cannot redeem my note because there's no -- the funds are unavailable.

Q. Okay. It also was apparent that the e-mail from Jan McCaffrey that stated that the note has to be restructured, and you signed some documentation on that restructuring and -- and you submitted that, that form, and in that e-mail, did it not say, because of cash flow issues?

A. It's possible. The e-mail you're referring to is the one that was already discussed where the strike price on the warrant was reduced from a dollar to 25 cents in that restructuring e-mail, that's -- I believe that's the only one you could be referring to.

Q. Okay. So I'm -- I'm referring to -- to Plaintiff's Exhibit 36.

MR. HARDING: If you can bring that up, please? And why don't you just highlight the first paragraph so we can all look at that.

THE WITNESS: Okay.

Q. (BY MR. HARDING) Can you read maybe the first two sentences?

A. "I want to acknowledge that we are behind on interest payments. We have had our challenges with tenant."

Q. Okay. And you remember that?

A. Yeah. Yeah. Yeah.

Q. Okay. Okay. Thank you. Now, if you don't mind, let's go back and visit exhibit, Plaintiff's Exhibit 56. Let's go to -- there on page number 10. These are representations. The last third of the page, starting with exception three, it says, representations and warranties of investors. And if you look -- wait. Yes. Look at C. "Such investors have an opportunity to discuss with the management of GrowCo, the business management, and financial affairs of GrowCo and the terms and conditions of the offering of the notes and the warrants."

I don't think maybe you remember seeing

that, but that was in the document that you signed. Do you remember signing the document?

A. I'm not sure if I remember signing the document, but I'm not disputing it.

Q. Okay. So somewhere in here, there is a read and approved signature from you. And I -- just bear with me a second. If you look at Plaintiff's Exhibit page 16, read and approved? Do you see that now? It kind of comes back to you.

A. No. I don't -- I'm just saying I don't doubt that I -- I signed it.

Q. Okay. Thank you. And by the way, I don't mean to push or anything. And I got to say, I feel terrible about your 50,000. Just like I feel sorry -- sorry about other people's lost money. So I want to try to approach this and just get to the facts. Did you complete an accredited investor questionnaire?

A. Yes.

Q. You did?

A. Yes.

Q. Okay. I will tell you -- and I know it's just mean to ask questions, but do you feel that, based upon your answers that you're giving me today, the Court today -- for example, I don't know what a

deed of trust is.

I'm not slighting you, I'm just perceiving what you're saying. It seems to me that maybe you don't qualify as an accredited investor. You agree with that or do you know about the accredited investor form?

A. I do. So what are the terms, what were the criteria of an accredited investor?

Q. Well, you have dusted off my knowledge for that one. But I do believe, and I guess I can answer a question of the witness, correct?

THE COURT: Not if you're going to offer a lengthy explanation about what it is.

MR. HARDING: Yeah. I'll try to make it short. I believe in what Michelangelo said, "simplicity is the ultimate sophistication." So I will try to make it as simple and brief as possible.

So the accredited investor questionnaire, I believe, calls for a minimum of $200,000 in income individually for the last two years, or liquid assets in excess of a million dollars not including your home.

I believe that's what it said. I don't have it in front of me. We can dig it up if you want.

THE WITNESS: Based on that, I am an accredited investor.

Q. (BY MR. HARDING) Okay. All right. Very good. So you're an accredited investor and you invested in this -- this offering, correct?

A. Yes.

Q. Okay. 50,000 from your IRA?

A. Correct?

Q. Okay. One moment please.

Oh. Did you also, in one of those e-mails, do you remember reading that, we need to not only for cash-flow purposes but because we were having problems with a tenant?

A. Yes. It was on that.

Q. Okay. And then when you called the note, I think you said four or five times, the explanation that the note could not be paid at this point in time was because of what?

A. The funds were not available.

Q. Okay.

A. But also I called it and never were the funds available any time after, right?

Q. Right. So --

A. No attempt was made to -- to repay my principal and other investors.

Q. I'm sorry. Would you repeat it again, maybe a little bit slower, what you said?

A. As far as I know, no attempt was made to repay the principal.

Q. Right. During the first part of your note when did you receive interest payments for a while?

A. Less than a year-and-a-half.

Q. Say it again, please?

A. Less than a year-and-a-half after purchase.

Q. Correct. But when the first -- note first came out interest-free payments, and I think there was a period of time where you received reduced interest payment for the modification of the note that you signed?

A. Correct. Right.

MR. HARDING: Okay. Again, thank you, ma'am, for showing up, and I appreciate it. Your Honor, that's all my questions.

THE COURT: Thank you. Before we do redirect, Mr. McKowen, we had provided to copies to you and an exhibit that you were discussing.

MR. MCKOWEN: Oh. Thank you. Can I go back up?

THE COURT: I'm going to have him go back up. I don't know if he intends on introducing them.

I don't know if that was an exhibit that we just saw a moment ago that she had signed.

MS. KIDD-AARON: Your Honor, I believe what he's looking for is the accredited investor report, and that is not part of Exhibit 56.

THE COURT: Right. All right. Mr. McKowen, you can go back up and continue with cross-examination before redirect.

MR. MCKOWEN: Can I pass these out so that everybody can see?

THE COURT: You may show counsel, you can show the witness, and then you can ask questions about it.

MR. MCKOWEN: So this is --

THE COURT: Before you ask questions, how do you have it marked? Are you starting with 1001?

MR. MCKOWEN: Yeah. So I would mark it as -- I think I went up to 1045 or something like that. Can I mark it 1046?

THE COURT: Does the plaintiff agree that Mr. McKowen is up to 1045?

MS. KIDD-AARON: We're checking, Your Honor.

THE COURT: Thank you.

MS. HUNT: It would be 1047.

THE COURT: All right. Mr. McKowen, if you'd mark this as Exhibit 1047, please.
MR. MCKOWEN: Okay.
THE COURT: You can just handwrite it on the document that you have.
MR. MCKOWEN: Write it on the document? Is that what you're saying?
THE COURT: Correct. Just at the bottom.
Q. (BY MR. MCKOWEN) So on the first page, it says joinder agreement.
(Court reporter asked for clarification.)
MR. MCKOWEN: Joinder agreement. Joinder J-O-I-N-D-E-R.
Q. (BY MR. MCKOWEN) Ms. Loughran, do you know what a joinder agreement is?
A. Right now, I do not.
Q. I'm sorry. Can you repeat?
A. I said right now I do not. I'm not sure when I signed it, I did. I'm not sure. But at the moment, I do not remember.
Q. Mr. Harding had explained what a -- an accredited investor is, and do you recognize on page 3 is that your handwriting?
A. Yes.
Q. Okay. And on page 4, is that your

signature and your name?

A. Yes.

Q. Do you know that -- or paragraph 2 of the third page.

A. Yes.

Q. It says that we're going to -- it says, "Your answers will be kept confidential. However, by signing this questionnaire, you agree that GrowCo and their counsel may rely on information set forth in this questionnaire for purposes of complying with applicable securities law." Do you agree with that or do you -- do you recognize that?

A. I don't remember it, but I mean, it was eight years ago.

MR. MCKOWEN: That's all I have, Your Honor, on that document.

THE COURT: Are you offering that as an exhibit?

MR. MCKOWEN: Yes. I'm offering this exhibit.

THE COURT: Any objection to 1047?

MS. HUNT: No, Your Honor.

THE COURT: All right. Exhibit 1047 will be admitted. So Mr. McKowen, if you could just put that exhibit on the court reporter's desk, the one

that you have that says 1047 on it. Is it multiple pages?

MR. HARDING: And, Your Honor, for the record, I don't object either.

THE COURT: Thank you, Mr. Harding.

(Whereupon, Exhibit No. 1047 was admitted.)

THE COURT: Redirect?

MS. HUNT: Your Honor, we have no further questions.

THE COURT: Ms. Loughran, your testimony is complete. Thank you.

THE WITNESS: Okay. Thank you.

THE COURT: You may step down. Ms. Loughran, you can just leave that document with Mr. McKowen.

MR. MCKOWEN: Thank you.

THE COURT: All right. Let's go ahead and take our lunch recess. We'll take a recess for one hour. About 1:10, we'll be back.

One thing on scheduling for tomorrow: I need to finish in the courtroom at 11:45. I have a security meeting that starts at noon, which is going to be out of the building.

It usually takes an hour. So probably take an hour and 15 minutes tomorrow. I just wanted to

let you know if that would impact your scheduling of witnesses, but we will need to stop at 11:45 tomorrow.

(Whereupon, a recess was taken at 12:14 p.m.)

(Whereupon, the proceedings resumed at 1:15 p.m.)

THE COURT: All right. Let's go back on the record in 21CV33922. All parties and counsel are present, and we are ready for plaintiff's next witness.

MR. FINKE: Thank you, Your Honor. The plaintiff calls Tammie Martinez.

THE COURT: Ms. Martinez, if you'll come up here to my left. Before you sit down, I'm going to swear you in.

Whereupon,

TAMMIE MARTINEZ,

the witness having been first duly sworn, was examined and testified on her oath as follows:

THE COURT: You may be seated. Go ahead.

DIRECT EXAMINATION

BY MR. FINKE:

Q. Ms. Martinez, can you spell -- state your name, spell your first and last name for the record?

A. It's Tammie Martinez, T-A-M-M-I-E, M-A-R-T-I-N-E-Z.
Q. Can you tell the Court your occupation?
A. I'm an auditor with the State of Colorado Division of Securities.
Q. Okay. We'll get into your duties in a little bit. But for now, can you tell us exactly where you're currently employed?
A. I work for the Division of Securities.
Q. Is that part of the Department of Regulatory Agencies?
A. Yes, it is.
Q. Okay. Have you been asked to analyze the sources and use of funds in the Two Rivers and GrowCo matter?
A. Yes, I have.
Q. Were you able to complete that analysis and come to some conclusions and opinions about the use of funds?
A. Yes, I have.
Q. Okay. Before we get to your opinions, I'd like to ask you some questions to qualify you as an expert in the area of forensic accounting. Can you please tell the Court about your educational background?

A. Yes. I have a Bachelor of Science degree in accounting, and I also have a CPA. That stands for Certified Public Accountant. So I have a license to practice in the State of Colorado.

I also have two other certifications. I have a CFF. That stands for Certified in Financial Forensics, and then a CFE. That's a Certified Fraud Examiner.

Q. Can you please tell the Court what was required of you to obtain your CPA?

A. Yes. It required that I have a degree and some working experience with another CPA supervising me and I was able to pass a four-part test to become a CPA.

Q. And for the CFF, the certified forensic -- what was that? What does CFF stand for again?

A. Certified in financial forensics.

Q. Certified in financial forensics. What is required to obtain that designation?

A. That designation is given by the AICPA, that's the American Institute of Certified Public Accountants. And with that, what I got, I was able to obtain that by having the right amount of work experience and education.

Q. Are you a member of any professional

accounting fiscal organizations or associations?

A. Yes. I am. I'm a member of the AICPA that I previously mentioned. I'm also a member of the Association of Certified Fraud Examiners. And I'm also a member of the Colorado chapter of the Association of Certified Fraud Examiners.

Q. How long have you been an auditor with the Division of Securities?

A. I have been with the Division for a little over 16 years now.

Q. And what are your duties as an auditor with the Division?

A. So as an auditor with the Division, I work very closely with our enforcement section, where the investigators are. So I assist them when they're working on investigations.

And my job primarily goes with looking at all of the financial documents that they may obtain as part of an investigation. Primarily, I look at bank records and then make summaries and exhibits about those documents.

Q. And prior to joining the Division of Securities, where else did you work?

A. Right prior before getting to the Division of Securities, I worked for the Division of Insurance

and I was a financial examiner for them for three years. That's also with the State of Colorado Department of Regulatory Agencies.

Prior to that, I worked for a CPA firm for five years in Arvada, Colorado. And prior to that, I just had other accounting jobs and payroll jobs.

Q. Do you review on a regular basis, current accounting and forensic accounting literature?

A. Yes, I do.

Q. Have you testified as an expert in accounting previously?

A. Yes, I have.

Q. And where -- where have -- how many cases have involved securities fraud?

A. All of the cases that I have testified in resolve around securities fraud. I've been qualified as an expert in forensic accounting in Denver County, Larimer County, El Paso County, Jefferson County.

(Court reporter asked the witness to speak slower.)

THE WITNESS: So Denver County, Larimer County, Jefferson County, El Paso County, and I believe, Arapahoe County as well.

Q. (BY MR. FINKE) I'm going to ask you to turn to Exhibit 139 in the binder in front of you.

MR. FINKE: Will you pull that up on the screen as well?

Q. (BY MR. FINKE) Let me know when you're there, Ms. Martinez.

A. Okay. I'm there.

Q. Do you recognize this document?

A. Yes, I do.

Q. And what is it?

A. This is a copy of my CV.

Q. Is it a true and accurate copy?

A. Yes, it is.

MR. FINKE: Your Honor, I'd offer Exhibit 139 into evidence.

THE COURT: Any objection? Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: 139 is admitted.

(Whereupon, Exhibit No. 139 was admitted.)

Q. (BY MR. FINKE) I'm going to direct your attention to the bottom half of -- the bottom third of page 1, and the -- and the top of page 2 and just have you -- is this an accurate list of the cases you've been qualified as an expert?

A. Yes. There's these three and there's some

more on the page -- next page as well. And then I also recently testified in the preliminary injunction hearing in front of this Court for -- for NA (ph) Capital. And that was in front of George -- Judge Shockley.

Q. So with that addition of the Anthony Capital matter, this CV is up to date?

A. Yes, it is.

Q. Are you familiar with reviewing and analyzing bank statements and related financial records, including checks, wire transfers, and deposits?

A. Yes, I am.

MR. FINKE: Your Honor, pursuant to Colorado Rules of Evidence 702, the plaintiff moves that Tammie Martinez be qualified as an expert witness in forensic accounting.

THE COURT: Mr. McKowen, any voir dire or objection?

MR. MCKOWEN: No voir dire and I have no objection.

THE COURT: Mr. Harding, any voir dire or objections?

MR. HARDING: No objections. No.

THE COURT: All right. Without objection,

Ms. Martinez will be qualified as an expert under 702 in forensic accounting.

MR. FINKE: Thank you, Your Honor.

Q. (BY MR. FINKE) Now, turning to the issues in this case, Ms. Martinez, did you review bank records related to Two Rivers and GrowCo entities and other companies related to this matter?

A. Yes, I did.

Q. Did you create a document that outlines what bank records you reviewed?

A. Yes, I did.

Q. Okay. Can we pull up 141 and have you turn to 141, Ms. Martinez? And let's go to that top third if you can. Thank you. And what is this document that we're looking at, Exhibit 141?

A. So this document is a summary of all the banking transactions within these five different bank accounts that are listed here.

Q. Okay. It's a multipage document. If you want to turn to the next page as well and take a look at that. Are there additional bank records that you reviewed?

A. Yes, there is.

Q. Okay. So there's two more additional bank records on that? Bank accounts on that page?

A. Yes.

Q. And then the third page, similarly, is there additional bank records that you reviewed?

A. Yes, there is.

Q. And so the top -- the top part of this document has the accounts that you reviewed. What does the bottom part of the document reveal?

A. So the bottom part of the document on each of these exhibits show two tables. So the one on the left represents the inflows of the deposits that were deposited into these bank -- this bank account. And then the table on the right represents the withdrawals or the outflows from the same bank account that's listed on the top.

Q. Did you prepare this document?

A. Yes, I did.

Q. How did you prepare the document?

A. I prepared the document by getting the subpoenaed information from the bank, and then from there we use a software program to help us turn those transactions into an Excel spreadsheet. And then from there, I classify each of the transactions to come up with the summary.

Q. Okay. Is this a true and accurate copy of the document that you prepared in this matter?

A. Yes, it is.

MR. FINKE: Your Honor, I'd ask for 141 to be admitted.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: Without objection, 141 is admitted.

(Whereupon, Exhibit No. 141 was admitted.)

Q. (BY MR. FINKE) Okay. Ms. Martinez, if you could take us through the first page of the document, did you make findings related to this matter that are displayed on this -- on this table?

A. Yes, I do. So just to explain again, I took all of the transactions in the five bank accounts listed at the top, and I summarized them into deposits and withdrawals. And so we go through that first table on the left that's labeled the deposits, and I can explain that to you.

So the first -- it says category up there under the first column. So those are the different categories of what I assigned to each of the deposits.

And then the next column is sum. And

that's the sum amount of all the transactions within that category. And then there's a column for count. That means the number of transactions that are included in that category with that sum amount. And then there's a percentage column, and that represents the percentage of the total deposits.

And then you'll also notice that there's a line drawn and there's one that's right under the first three categories for the deposits.

Then the amounts that are above that line represent at least 90 percent of the amount, the deposits that went into the bank account. And then you'll also see the same thing on the right with the withdrawals. There's a line drawn and everything above that line represents 90 percent of the monies that were withdrawn out of this account.

And then you'll also see some colors on there. So I have things highlighted in orange and highlighted in green, and those will correspond to the next pages of this exhibit where we see those.

And there's also at the bottom a reconciliation, and that's just reconciling all the transactions in these bank accounts for the time period are accounted for.

Q. Okay. So based on your review of these

five bank accounts -- actually, scratch that.
Let me just ask you:
Those five bank accounts that you see, they start with 7366 on the top left and 7539. Are those the account numbers?
A. Yes, they are.
Q. And how did you obtain those documents?
A. Those were obtained by subpoena.
Q. Now, going back to the deposit side of the ledger, can you tell us what your conclusions were with these five bank accounts related to investor funds?
A. Yes, I can. So the first category of deposits is investor funds. So I was able to account for over $17 million in investor funds going into this bank account, and that accounted for over 80 percent of the deposits into these bank accounts.
The second category is for Mr. John McKowen, and that's over 1.5 million. And that represented almost 8 percent of the monies going into these bank accounts.
And then the next one is money coming in from the transfer from TR Capital Partners, and that was over a million dollars, accounting for almost 5 percent of the money deposited into this bank -- or

into these bank accounts, plural.

Q. Okay. And then moving over to the withdrawal side, give us a summary of what your findings were with respect to these bank accounts?

A. Okay. So moving over to the withdrawal side, they represent the first category was business. There was over $6.7 million in business expenses paid out of these accounts.

And that was almost 32 percent of the withdrawals. And then there were transfers to this TR Capital Partners account, and that was over $6.5 million, and that was almost 31 percent of the withdrawals going out.

There were payments to Aaron Van Wingerden. So that was $2.3 million over 11 percent of the money going out. There were payments to investors of 2.2 million, little over 10 percent of the monies going out to them.

There were also transfers to McGrow or MCG Services, which we'll also talk about next. And that's over $847,000, representing almost 4 percent of the withdrawals. And then there are amounts to Mr. John McKowen for over $500,000, and that accounted for 2.38 percent of the withdrawals.

Q. Based on your analysis of these five bank

accounts, would you draw any conclusions about how investor funds were used?

A. Yes. So looking at these five bank accounts, there was a significant amount that went out to this TR Capital Partners. And so that's why I also analyzed that bank account to see what happened with the money there.

I do acknowledge that there were business expenses in here. You'll see that there are business expenses. There are payments to Aaron Van Wingerden for the greenhouse construction expenses.

But there are also payments to Waterton Financials, that's for $209,500. Those were for commissions for Waterton Financial, Inc. Is the company owned by Jan and George McCaffrey. So those are monies going directly to them. There were also some finder's fees, over $175,000, that went out as well.

Q. Do you know who those finder's fees went to?

A. Yes. They went into Kristy Cameron, a Kristy Cameron and Anne Wallick. Those are the ones that I can remember offhand.

Q. Okay.

A. There were some other conclusions that I

have drawn too. So there were payments to -- and forgive me if I say this wrong, but it's Dionisio, D-I-O-N-I-S-I-O, and I don't believe that had anything to do with the GrowCo operations.

Q. Okay. And that's the entry right below the -- the line on the withdrawal side. Is that what you're referring to?

A. That is correct, yes. And there's also payments going out to a company by the name of HCIC Holdings, and I don't believe that had anything to do with the GrowCo operations.

Q. Okay. Turning to the second page, could you tell the Court why you created this table?

A. So this next table, it only includes the summary of two accounts. These two accounts are in the name of MCG Services, LLC, and this exhibit here summarizes the transactions only in these two bank accounts.

Q. Okay.

A. And it's set up the same way as the one that we just went through. So there is inflows and deposits on the left side of that table. There's outflows or disbursements on the right table. There's also that line drawn to represent the 90 percent, and, again, the color coding will go back

to that first exhibit. So the green and the -- I believe it's the green ones that I have highlighted here.

Q. So just so we're all oriented correctly, the -- on page -- the page we're looking at, the transfer from Two Rivers on the inflow side, does that correspond to the page 1, the transfer to McGrow on the outflow side?

A. Yes. It does.

Q. Okay. So that just carries that number over to this table?

A. Right.

Q. Okay.

A. Uh-huh. And so for this exhibit, we start with the inflows, the largest amount of money that went into these two bank accounts came from investors of over $1 million dollars, representing over 31 percent of the money into these accounts.

The second largest category were transfers from Two Rivers that were over $847,000 and over 24 percent of the deposits.

There was also income. The income was over 744,000, representing 21.58 of the deposits going into these bank accounts.

John McKowen, I have deposits from him

totaling $367,743.99, for over 10 percent of the deposits. And then there was some money in from McCaffrey. So that would be either Waterton Financial, George McCaffrey or Jan McCaffrey. That's what that represents. And that's over $275,000.

Q. Having completed this table, were there any conclusions that you drew from your analysis?

A. Yes. There were more money from investors coming into this bank account. Also, I see that there's money transferred in from Two Rivers. So they're commingling funds between Two Rivers bank accounts, which are supposed to be for GrowCo and to the MCG Services accounts, which, I believe, was supposed to be for the McGrow operation. And I also see that there's money going back out to Two Rivers for over $464,000.

Q. Is it your understanding that money from the various GrowCo entities was commingled into Two Rivers?

A. Yes. So they didn't have bank accounts in the name of GrowCo. They were all naming them Two Rivers, and so that money -- that's why it says transfer from Two Rivers, because that's where it's coming from and going to. So it's on both sides there.

Q. And based on your review, is -- is some of that Two Rivers money further commingled with McGrow money?

A. Yes. That's what I was saying here because it goes from Two Rivers into MCG Services. And then we'll also talk about on the next page that it also goes to TR Capital Partners.

Q. That's exactly where I'm going.

A. Okay.

Q. So turning to the third page of Exhibit 141, what is -- what is this analyzing?

A. This is, again, the same kind of format that I've been using for the other two. This one is analyzing the deposits and withdrawals from TR Capital Partners, LLC, bank account at Wells Fargo. And so when we look at this one, we see that the largest amount of deposits going into this bank account at over $6.5 million represents 40 percent of the deposits into this bank account.

Q. And does that deposit summary correspond with the withdrawal summary from the first page of the document?

A. Yes, it does.

Q. Okay. And then go ahead, Ms. Martinez.

A. And then we just see income as the next

category. Dionisio, again, I see for 1.3 million. There's some investors in this bank account as well. There's some money from Mr. Wayne Harding for over 659,000. And then there was some money that I was unable to categorize, and that's over 397,000. It only represented 2.44 percent of the deposits.

Q. Based on your review of this bank account, do you come to any conclusions?

A. Yes. This represented to me, again, that money was commingled. So again, came from Two Rivers over to TR Capital Partners. So we see that here it's also some money that comes in from McGrow or the MCG Services accounts highlighted in yellow there, over $47,000 dollars. And then a lot of money that came into this account was used for business expenses.

That's the largest amount of monies going out of this account, at over 7.8 million and there is, again, money going to HCIC Holdings, LLC. There's money going to Two Rivers. So it just shows that the money's commingled in this bank account as well and paying for a lot -- a lot of different -- different expenses here.

Q. And was it your understanding that -- I'm sorry. Was it HCIC was not part the GrowCo

operation?
A. That's my understanding. It was a separate entity.
Q. And was it your understanding that Dionisio was not part of GrowCo operation?
A. That's correct.
Q. I'm going to have you turn to Exhibit 26. I know that's a ways back in the book.
MR. HARDING: Your Honor?
THE COURT: Yes?
MR. HARDING: They're referring to an exhibit. I received their electronic exhibit information last week as a Zip file where they zipped it. I don't see Exhibit 26.
MR. FINKE: It was e-mailed separately to you.
MR. HARDING: Oh. It was a separate e-mail?
MR. FINKE: Yeah.
MR. HARDING: Thank you. I apologize.
MR. MCKOWEN: What's the number?
MR. FINKE: 26.
MR. MCKOWEN: 26?
MR. FINKE: 26, yes.
MR. HARDING: Can you give me just a

second?

MR. MCKOWEN: I don't have a 26.

MR. FINKE: I believe the e-mail came from Ms. Reynard.

MR. HARDING: So Exhibit 26?

Just -- I don't know. Just go ahead and put it up on the screen. That's fine.

MR. FINKE: We don't have it on the screen.

THE COURT: It hasn't been admitted yet.

MR. FINKE: It hasn't been admitted.

MR. HARDING: You can go ahead, then.

MR. FINKE: Why don't I lay some foundation and we'll go from there?

Ms. Martinez, are you at Exhibit 26?

THE WITNESS: Yes, I am.

Q. (BY MR. FINKE) And what is this document?

A. So this is just to further show the Court in more detail the kind of commingling that I saw between the investors' money coming in and what bank accounts it would be deposited to and just kind of highlighting the uses of those funds as well.

Q. Okay. And you created this document from the bank records that you reviewed?

A. Yes, I did.

Q. Is it a true and accurate copy of the

document you created in front of you as Exhibit 26?
A. Yes, it is.
MR. FINKE: Your Honor, I ask to admit 26.
THE COURT: Mr. McKowen, any objection?
MR. MCKOWEN: Say again?
THE COURT: Any objection to Exhibit 26 being admitted?
MR. MCKOWEN: I don't know what it is.
THE COURT: You don't have it up yet?
MR. MCKOWEN: Can I get a copy of it somewhere?
THE COURT: Yes. It's probably in a binder. Or those binders for counsel.
MR. FINKE: It's in the binder behind you. I can show you a copy, Mr. McKowen, if that helps.
MR. MCKOWEN: I don't have an objection.
THE COURT: Mr. Harding, any objection?
MR. HARDING: No, sir.
THE COURT: Exhibit 26 is admitted.
(Whereupon, Exhibit No. 26 was admitted.)
MR. MCKOWEN: I'd like to follow along, so can you pull that out, please?
MR. FINKE: Okay. I'm sorry, Your Honor. Was it -- was it admitted?
THE COURT: Exhibit 26 is admitted.

MR. FINKE: Thank you.

THE COURT: Do you have a hardcopy in a binder? Do you have an extra binder?

MR. FINKE: It should be in your binder.

THE COURT: No. I have it. So defendants have it. Thank you. Mr. McKowen, Exhibit 26 was just put on your table.

MR. MCKOWEN: Thank you.

THE COURT: In a hardcopy.

Q. (BY MR. FINKE) Okay. Ms. Martinez, can you explain -- take us through the first page of Exhibit 26 and what your findings were?

A. Yes. This exhibit is for a very short time period. So I just tried to -- to draw it here so that we can show the Court kind of what was happening to people's money once it would go into these bank accounts.

So for this exhibit, I have Hugo Zimmermann, he's one of the investors in the GrowCo operation. He had two separate investments on the same day, two wires. So the first one for $49,982 on April 13th of 2015, and then another for 200,000 on April 13, 2015. Those deposits went into Two Rivers Water & Farming Company escrow account, and that account number ending in 7974.

So I have those two transactions and they total up to $249,982.

And so those then roll over. And on the same day there was a transfer made to TR Capital Partners, LLC, into the account ending in 7648, and that was on April 13th of 2015 and $249,950.20 was transferred over there.

And so I'm just kind of following the green arrows. Then, from there, on April 14th of 2015, that money was transferred over -- or transferred back to Two Rivers Water & Farming Company to the account ending in 7366.

And so that shows you how it was going from Two Rivers to TR Capital Partners to Two Rivers. And then on the bottom part, that last square that I have that was showing the money going into Two Rivers Water & Farming, there's money going out of that account as well.

So on April 14th of 2015, a hundred thousand dollars goes back to TR Capital Partners. And then again another hundred thousand dollars on April 23rd of 2015 goes back to TR Capital Partners. And then on April 29th of 2015, 50,000 goes back to TR Capital Partners.

And then on May 1st, 50,000 goes back to TR

Capital Partners. So that's just a small example of the monies that I was analyzing what I was seeing in the bank accounts and what was happening.

Q. Did you draw any conclusions from that flow of funds?

A. It's -- it's commingled to me. So the money comes in, goes to TR Capital. It goes to one Two Rivers account. It goes to TR Capital Partners and then to Two Rivers and then back again to TR Capital Partners, so that's a lot of back and forth.

Q. Okay. Turning to page 2 of Exhibit 26, what is that document?

A. So this what I call or what I refer to as a snapshot in time of what was happening in this bank account during this time period. So this here is analyzing the money that went into Two Rivers Water & Farming, the account ending in 7366.

Q. And what did you find regarding your analysis of that bank account?

A. So at the top part where it's darker blue, those represent all the deposits going into the bank account.

And we'll see in green, that's that $249,950.20. We'll see that there. But there were also other monies that were going into this bank

account during this same time period.

And these other deposits in here were mostly from GrowCo investors. So we have Tom Prasil, Ursula Gutscher. We have the Zimmermann money coming in. There's some money from Brant Wiwi. There's Matthew Kelley and Megan Kelly and then Blue & Green, LLC.

So immediately before that first transaction coming in on April 13th of 2015, the lower amount there that's in pink, that's the beginning of what's in that bank account at that time. So there was about $47,000 in that bank account to begin with.

And then we'll see the transfer back to TR Capital Partners. Those are those individual transfers that I went through that totaled $300,000. There's also money going to this HCIC Holdings again. That was for $55,000.

And the note I have on there is that HCIC Holding, LLC., this bank account had John McKowen and Wayne Harding as signers on that bank account as well.

Q. Just so I can clarify that statement that you just made regarding note one, it is your statement that John McKowen and Wayne Harding were

signers on HCIC's bank account?
A. Yes.
Q. Okay.
A. And then there's a category there for Waterton Financial and the McCaffreys. That's money going to Waterton Financial, Inc. That total is $26,250. And that that represents the commissions that were being made to the McCaffreys.
And we also have some finder's fees that were paid out totaling $14,500, and those payments went to Kristy Cameron and Ed Wallick. We do have a payment to Aaron Van Wingerden. There's some investor payments and then a small payment to Mr. McKowen.
Q. Now, and just so -- for transparency, I see under investor payments on this page, a payment of $5,000 to Husch Blackwell. Is that -- is that the law firm Husch Blackwell?
A. I do believe it was. So that's an error that I made on my part.
Q. So you discovered that error since creating this table that actually should have gone into business line?
A. Yes, I did.
Q. Okay. Any conclusions that you drew from

this analysis?
A. It just shows me, again, that the money was commingled, so again it went back to TR Capital Partners. Money went to HCIC Holdings, and then it was also used to pay these commissions to the people that weren't licensed to sell these securities.
Q. And that would be the McCaffreys?
A. Yes.
Q. And Kristy Cameron?
A. And Mr. Wallick.
Q. All right. Let's turn to page 3 of the Exhibit 26. Can you tell us what is represented here?
A. So this one is developed pretty much the same as I just went through the others. These amounts up here at the top that are in the darker blue, those represent the deposits into that bank account during that time period. So you'll see the 249,950.20. This is the account that Mr. Zimmermann -- I can't remember his name. I'm sorry. Mr. Zimmermann's money went in and out of. So that's what you'll see highlighted in green on this one.
And then you'll also see the -- the line items for the four transactions totaling $300,000,

and those are highlighted in yellow. Those we saw on the previous page of this -- in the previous page of this exhibit.

So this is just stating that the beginning balance in the bank account before the first deposit was made into it. So as of April 16, 2015, there was over $65,000 in this bank account.

It did go to pay some business expenses. So that's what this money was used for. It was used to pay payroll, and I just have notes here that show that Mr. McKowen and Mr. Harding were getting paid out of this TR Capital Partners payroll.

So it states that their salaries made up over -- let me see. What does it say? It's over 43 point -- or it's 43.5 percent of this first amount. That's what note one says. And under note two, their combined salaries accounted for 39.14 percent of the total payroll.

I also see down below to the last line number before the ending balance, that there was a payment made to the West Hampton Special Situation fund, that the notation on that check says "JRM 300K note." And so I believe that was to pay for -- or it was made for the benefit of Mr. McKowen.

Q. So based on your review, it's your

**REPORTER'S TRANSCRIPT - July 10, 2023**

conclusion that investors' funds were used for personal use?

A. Yeah. In paying for that -- that payment that was for the benefit of Mr. McKowen, yes.

MR. MCKOWEN: Can you point out what lines you're looking at please? I'm having a hard time following.

THE WITNESS: It says note three. It is like the line right above where it says ending balance. And there's a note that says note three. That's the line item I'm talking about.

MR. MCKOWEN: This is page 3?

THE WITNESS: Yes.

MR. FINKE: Thank you. Note three is the bottom of the page along with the check.

MR. MCKOWEN: And what -- what is the statement that she just confirmed? What was the statement?

MR. FINKE: Let me -- let me just go on with my examination, Mr. McKowen, and you can ask her that on cross.

Q. (BY MR. FINKE) Based on your review of the financial records of the GrowCo entities, is it your conclusion that there was commingling between -- of investor funds between the various entities?

A. Yes.
Q. Is it your conclusion that investor funds were used for personal use?
A. Yes.
Q. Is it your conclusion that investor funds were used for noninvestment purposes?
A. Yes.
MR. FINKE: One moment, Your Honor.
THE COURT: Yes.
MR. FINKE: No further questions, Your Honor.
THE COURT: Mr. McKowen, any questions on cross-examination?
MR. MCKOWEN: I do, but I'm not an accountant. Do you want to go first?
MR. HARDING: Well, I'll go second because -- I'd be happy to.
MR. MCKOWEN: Can I go after him?
THE COURT: Do you want to go first, Mr. Harding?
MR. HARDING: I'd be happy to.
THE COURT: All right. Go ahead.

CROSS-EXAMINATION

BY MR. HARDING:
Q. Ms. Martinez, we have a similar background.

You and I both worked with Marshall Hornstein. He was a good accountant. I was there early in the 1980s establishing your audit department.
A. Oh, nice. Okay.
Q. So I appreciate your time. I noticed one thing in particular because words are very, very important here. The AG's office used the word "review" many, many, many, times. Does that word have a special meaning to you?
A. As an accountant, yes, a review is...
Q. But what does that mean as an accountant?
A. That means that you're offering an opinion about financial statements.
Q. Okay. Isn't there three different layers of reviewing or viewing financial statements? What are they?
A. I believe compilation. That's what I did with Mr. Hornstein. I did a compilation -- compiled financial statements.
Q. Compile, compilation. I'll take that.
A. Yep. And then you could review financial statements and you can also do an audit of financial statements.
Q. Okay. Did you present those three different things that an auditor or CPA does from the

lower in terms of lowest reliability or confidence. And I've said this thing. Lowest level of confidence would be compilation. Such as, you know, somebody comes in with the proverbial shoebox and you do the debits and credits and do the financial statements. That's essentially a compilation; is it not?
A. Yes.
Q. Okay. The next one is a review. In a review, what does that entail?
A. A review is a more detailed look into financial statements.
Q. Can you give more specifics about how the AICPA define a review?
A. This is very -- this is outside the scope of what I am here to talk about today. First, I didn't do a review. Okay.
Q. So you -- so when the AG's office -- let me just make sure. When they stated "review," we're not using review in an accounting standpoint, are we?
A. Not as a formal -- a formal accounting because we didn't do -- a review refers to financial statements and looking at a review of that. We didn't do that in this case. What we did was take some bank statements and re-create some books and records that we were able to understand what was

happening to these people's money that invested in this GrowCo operation. So that's what I did.

Q. Okay. Look at the GrowCo just a minute. I'm just trying to understand.

A. Okay.

Q. That a -- a review is a review of financial statements, like a compilation is a financial statement, audited financial statements, but would give rise to those financial statements?

A. Right. It's giving an opinion about the financial statement. That's not what I did here. I'm not sure what you're getting at.

Q. I'm sorry. I did not hear your response.

(Court reporter asked for clarification.)

MR. HARDING: I'm sorry. I did not understand or hear fully her response.

THE WITNESS: Okay. Can you repeat the question?

Q. (BY MR. HARDING) Okay. So really, I mean, the job of an accountant, CPA or whatever is to produce financial statements. Which is really language of business, right? In terms of communicating information back and forth, right? And --

THE COURT: Hold on. She didn't answer.

She didn't answer. Yes --

THE WITNESS: Yes.

THE COURT: -- or correct -- right.

THE WITNESS: Right.

Q. (BY MR. HARDING) Sorry. And we have already determined -- and correct me if I'm wrong -- a compilation is more or less like, here is my shoebox. Give me some financial statements. You don't do much with it.

Here is a review. You somewhat answered it. There's certain review criteria that's set forth by the American Institute of CPAs. There's a binder full of it.

We're not going into detail, but it's a higher level -- level of confidence, not total confidence. Nothing really is. But a higher level of confidence than a compilation?

A. Correct.

Q. And doesn't financial statements give rise to business transactions, or business -- sorry. Business transactions give rise to financial statements?

A. That is what they recorded, yes.

Q. Okay. Business transactions -- is it all cash?

A. Not usually, no.
Q. Okay. So what did you look at? Did you look at just the bank accounts?
A. I looked at a number of things. I did look at the bank accounts and that's what I primarily focused on, because from there I could see what was happening to the deposits into the bank accounts. I also reviewed the QuickBooks records and the lengthy investor list that we have gone over throughout the investigation.
Q. Did you review any noncash transactions in your report?
A. I reviewed what was in the bank statements, so...
Q. So would it be safe to say you looked at only cash transactions?
A. From my analysis, yes, I looked at the banking transactions.
Q. Okay. So you have also made some other statements I'd like to have clarity on, and we need to go right into the report. There says that there's a large amount of funds for business expenses. I didn't quite understand what that meant. Can you explain that to me?
A. So when I was explaining how I go through

each transaction, I assign a category to them. They appear to be for business expenses.

So it was either, like, for example, paying a phone bill. There was some charges there, some business transactions for paying a security team.

It looked like there was some construction payments. That's what was included in business expenses.

Q. So usually in an accounting environment, each deposit or check or whatever has source documentation. Did you go to the source documentation on quote, "a large amount of funds for business expenses," which means there were some funds that were not for business expenses. Did you look at the source of documentation giving rise to cash transactions?

A. I looked at the bank accounts, and I looked at what they gave us for if there was a check written, if there was a deposit made. It was a lot of information related to those transactions, which I analyzed. I also looked at the QuickBooks transactions, too, to kind of help me say was this a business expense or what was this?

Q. One of the things I really like about QuickBooks is the ability to scan the source

document. For example, a phone bill comes in, $132. And we're aware that's a business expense. We're going to scan that phone bill and put it in QuickBooks and pay the $132. The records that I kept with QuickBooks had scanning the source documentation --

MR. FINKE: Objection, Your Honor.

THE COURT: Hold on, sir. What's the objection?

MR. FINKE: He's testifying.

THE COURT: Sustained.

MR. HARDING: What was the objection?

THE COURT: The objection was that you're testifying and not asking a question, and I sustained it. So go ahead ask a question.

Q. (BY MR. HARDING) Did you -- I want to make sure I'm clear. Did you look at source documentation?

A. Yes.

Q. Okay. So let's take a look at -- in your report. I find it strange, but maybe you can elucidate.

So if you look at the exhibit, I have an Exhibit D but I think it's -- it's the three -- I forgot. Maybe I have an Exhibit D.

MR. FINKE: It's Exhibit 141.

MR. HARDING: It was one that was up there.

Q. (BY MR. HARDING) So let's take my name, for example, 185,000, seven count. That means there was seven transactions that I made for 185,000?

A. Yes. Let me get back over there.

Q. Okay. Take your time.

A. So yes. For your transactions, Wayne Harding, I have $185,000 for seven transactions, yes.

Q. And you looked at each one of those seven transactions for my 185,000?

MR. MCKOWEN: Which line are you on? Which line are you on?

MR. HARDING: It's the one right below the green transfer from McGrow. Right?

Q. (BY MR. HARDING) It showed I had a deposit of seven transactions for $185,000. I don't -- I'd just like to see the -- I want to know about the transactions you saw that I deposited $185,000 into that account?

A. So again, I looked at the bank statements. And some of the bank statements had transfers between accounts with Mr. McKowen and yourself. So it might have been a transfer or it may have been a deposit, a check that was written. That's how I come up with

the amounts that were categorized as money coming from you.

Q. Okay. And then over on the other side you saw Wayne Harding down a little bit over halfway from the withdrawals from those accounts, same page. I withdrew $21,015 according to this, and that's six transactions?

A. Yes.

Q. Okay. So now let's go to the next -- I'm just trying to figure out what I did here because it doesn't really jive with my recollection -- recollection. So I'm going to ask you another question, is then on inflows, I deposited with TR Capital Partners, Wayne Harding, 20 transactions for $659,114. Is that what you're stating?

A. I don't know where you're at. Where are you at? Are you on MCG Services?

Q. TR Capital.

A. TR Capital. Okay.

Q. It's the -- it's the last page of that exhibit.

A. Okay. So I have categorized for money in from you $659,114.77 and that was 20 transactions.

Q. Okay. So I kind of added it all up. The net was -- the company paid me about 126,558. And

you can do the calculations if you want to, but I did the inflows and outflows. That's essentially what I got.

MR. FINKE: Objection. Testifying again.

MR. HARDING: Which it could be, is it --

THE COURT: Hold on. Hold on. Hold on. Don't interrupt. The objection is that you were testifying and didn't pose a question. Sustained. You have to ask a question, please.

Q. (BY MR. HARDING) Okay. I will withdraw that question. In your review, did you come across the times that I personally loaned money to the company?

A. If money came in from you as classified on these documents as money inflow or a deposit from you, yes.

Q. So that would be in the inflow; is that correct?

A. Correct.

Q. Okay. Where do you find -- there was several times where I actually did not -- or deferred salary. Would that be in there too?

A. If you did not take the salary, no. It's not in there.

Q. Okay. One moment. What was the date

ranges of your exam?
A. For which one are you talking about, TR Capital Partners?
Q. The entire report that you -- that you gave us.
A. I have the dates on the first one. So it's December 1st of 2014 through March 31st of 2018. And these other ones go a little bit longer, on TR Capital Partners it was through October 29, 2018. So they're all in the exhibits there.
Q. Okay. Let's go back to that subject about a compilation review audit. Let me just speak to you in general, or ask you a question in general. If you have a set of financial statements that are compiled, a set of financial statements that are reviewed, a set of financial statements that are audited. In general, which one can you more rely on?
A. The audited financial statements.
Q. And why is that?
A. Because they were looked over by an independent party.
Q. Say again, please?
A. They were looked at by independent CPAs that looked at the books.
Q. But doesn't also -- independent CPA, they

can do a compilation and review too?
A. CPA firms can do all three of those things, yes. Is that what your question is?
Q. Yeah. I just wanted to see if you'd agree with me. So a compilation review or audit can be done by a CPA or, essentially, if they don't do a compilation review or audit, it could be done by a normal bookkeeper, correct?
A. Well, a bookkeeper can do it but then they can't call it compiled, reviewed or audited. Yes.
Q. They cannot issue an opinion or a description of what they did on the financial statements, correct?
A. Correct.
Q. Okay. Let's get back to your work. Do you consider what you did a compilation?
A. No.
Q. Do you consider what you did a review?
A. No.
Q. Do you consider what you did an audit?
A. No, but what I did do is look at all the banking transactions and make conclusions from looking at --
Q. A simple yes-or-no question.
A. I don't have a CPA firm. Only CPA firms

can do compilation reviews and audit.

Q. Okay.

A. So I analyze the bank records is what I do and put them in summaries.

Q. Sorry to interrupt. Your resume has -- you are with the State of Colorado -- excuse me, you also have an accounting -- tax accounting service, correct?

A. Correct.

Q. Okay. So do you work full-time for the State of Colorado?

A. I do.

Q. You do?

A. Uh-huh.

Q. And then you do the tax stuff on the side and make a little extra money or whatever?

A. Yes, I do.

Q. I did that a couple of times. Okay. So also you gave, I think, the AG's office asked --

MR. HARDING: If we just bring this up so I get this right.

Q. (BY MR. HARDING) That your -- your conclusion, your opinion was that there were commingling of funds -- we'll get to that in a second, commingling of funds, and also their funds

were used, or some funds were used for personal purposes, correct?

A. Correct.

Q. Okay. Let's talk about, then, your opinion. You are member of the Association of Certified Fraud Examiners?

A. Yes.

Q. Okay. With your opinion that you gave, was that under a CFE ethics and standards?

A. It was my professional opinion given the work that I did.

Q. Let me repeat the question. The opinion you just gave to the Court and us, is this under the code of ethics with the Association of Certified Fraud Examiners?

A. I don't understand what you're asking me. Did they say if I could certify for the associations that I could give an opinion?

Q. Let's back up. Are you a current member of the Association of Certified Fraud Examiners?

A. I am.

Q. Okay. Being a member, do you abide by the ethics?

A. Yes.

Q. Okay. So whatever you do, you abide by

their ethics, correct?
A. Correct.
Q. Did you abide by their ethics standards in giving the opinion to the Court today what you just gave an opinion to? Commingling of funds, personal use of money?
A. Yes. That's what I found and that's what my opinion is.
Q. Well, it says a certified fraud examiner --
(Court reporter asked the party to speak slower.)
Q. (BY MR. HARDING) So I just want to -- that's not a question. You stated that you complied with the ethics of certified fraud examiners?
A. Yes.
Q. Okay. Are you aware of Ethic Number 5: "A certified fraud examiner in connection with examinations will obtain evidence or other documentation to establish a reasonable basis for any opinion rendered." Do you believe that you did that after my questioning and your answers?
A. I do.
Q. Okay. Let's talk about commingling funds. And I think you mentioned problems with banking. In fact, even our banker says, hey, let's put everything

into the TR account or Two Rivers or whatever. Under the Colorado securities statutes regulations -- I have it here somewhere. I can quote it. Do you know what I'm talking about?

A. The Colorado securities standards.

Q. Colorado securities standards and regulations?

A. Yes.

Q. Where does it say that commingling is illegal or against the law?

A. That is beyond the scope of what I'm here to testify. I'm not here to testify about the Colorado Securities Act. I believe we have somebody else to speak to you about that.

Q. So would it be safe to say you don't know?

A. I can't tell you the exact part of the Colorado Securities Act that says that.

Q. So now you're referring to an exact section on the securities standards? Because you said you don't know the exact one, or do you know in general, does the Colorado Securities Act, regulations, whatever they call it.

Does it say companies cannot comingle funds?

A. I believe it is a problem, yes. It's a

problem from my standpoint. If you're supposed to be accounting for people's investments and then you're sending into three other bank accounts, from an accounting standpoint that makes everything difficult to track and difficult to run a business doing it that way.

Q. Repeat what you last said about being off track and what?

A. If you're transferring money from one bank account to another to another, it's harder to track a business that way. When you're not supposed to commingle business and personal funds, things like that.

Q. Okay. Let's just say it's harder to track. But it's not impossible, is it?

A. It's not impossible.

Q. If you have an audit of a company that commingles funds, and, of course, I think you're -- you're familiar with the standard -- accounting standard codification two something -- it's under segment reporting. You're familiar with segment reporting; is that correct?

A. Sure.

Q. Okay. So under segment reporting and you got an audit out there looking at transactions,

looking at source documentation, even though one thing went in one account and one thing went into another account, as long as it's properly accounted for in the proper bucket, would that not be okay?

A. It is not the way I was trying to keep books. I guess I will put it that way. You're not supposed to do it that way. It's not impossible.

Q. Okay. So that would not be the way that you keep the books. But would that be a violation of any accounting standard, any regulation, any law that you know of?

A. I know that commingling is an issue.

Q. I'm sorry. I did not hear what you --

A. It's an issue here. So I don't know. I can't state the exact law. I don't have that with me right now.

Q. So would it be safe to say you can't, like, pinpoint something to say you cannot comingle funds?

A. I cannot point to something myself.

MR. HARDING: That's all my questions. Thank you.

THE COURT: Thank you.

Mr. McKowen, do you have any questions for cross-examination?

MR. MCKOWEN: I do. I do.

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Do you know who the parent company is as it relates to Two Rivers Water & Farming Company and TR Capital? Or let me add, who the parent is or who's -- which one is really the one operating the entity?

A. I do not. I know it's in these documents somewhere, but that was not part of my analysis. My analysis was looking at the bank records and the bank transactions.

Q. Yeah. And it kind of troubles me. Let me see if I understand what I'm looking at. For TR Capital, you have that as account number 7648; is that right? Ending in 7648, that's the last page?

A. Yes, I do.

Q. And you show that I was the signer until October 29, 2018?

A. On this account, no. On the other ones, yes. So for TR Capital Partners --

Q. TR Capital, right?

A. Yes. TR Capital Partners ending in 7648.

Q. And you show that Kristy Cameron -- and I don't know. I guess that we were all three signers on that account all the way up until October 29,

2018?

A. Yes. That's what I saw.

Q. Okay. Rather than asserting something differently, I think the format is supposed to be I ask the questions and she answers and if I think something differently, I will have my opportunity to -- to testify; is that right, Your Honor?

THE COURT: That's correct.

Q. (BY MR. MCKOWEN) Okay. So you're saying, in terms of inflows, can you define what inflows are to you?

A. Inflows are also called deposits. So that represents all deposits in the bank accounts.

Q. Okay. And in the category column, does that mean that Wayne Harding was making deposits himself?

A. It could be either, like I was saying, transfers between the accounts and there was transfers and they would have people's names on them. Or they were checks that were written and deposited from Mr. Harding.

Q. Like if he was on -- if he signed the deposit slip, then he would be the...

A. No. I'm saying if money came from him. It wouldn't be that he actually walked into the bank and

deposited it himself. It's money from him.

Q. So you're saying that Wayne Harding personally deposited into the TR Capital account $659,000?

A. Yes. That's what my analysis showed.

MR. MCKOWEN: These are worthless numbers, Your Honor.

THE COURT: I'm sorry. I didn't hear that.

MR. MCKOWEN: These are worthless numbers.

MR. FINKE: I'm just going to object.

THE COURT: Hold on. There's an objection.

MR. FINKE: He is making an argument, Your Honor.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Okay. We'll address these things later, I guess.

And no number three. I have never seen financials this way -- prepared this way, so I'm trying to find my way through them.

A. These are not financial statements. It's just a summary of the banking transactions.

Q. That is clear.

Where is the financial statement relating to notes that you had there? There was note three where $1,500 was paid to -- paid on a note that I had

that was 300,000?
A. Yes. That was on the previous Exhibit Number 26.
MR. MCKOWEN: Can you pull that up for me, please? I don't think that's the document.
No. It's -- there you go. Can you pull up the explanation and the -- and -- and the check?
Q. (BY MR. MCKOWEN) So that's a payment directly to West Hampton Special Situations Fund. And it's for $1,500. And the memo says, "JRM 300K note." Do you know what that JRM 300K note means?
A. Yes.
Q. What does it mean?
A. That was a personal note of yours, I do believe.
Q. It was a what?
A. A personal note of yours. This was being paid on your behalf.
Q. Right. And so your characterization of that is that it was for personal use, right?
A. Yes. And my exact note said this payment was made for the benefit of John McKowen, JRM 300K note.
Q. If I borrowed money from someone, and in this case, West Hampton funds, personally signed on

it because they require that they -- in order for them to lend it to me, I sign for it personally. Are you familiar with -- with that in the business?

A. Yes. I believe that could happen.

Q. Yeah. Do you believe that that's what happened in this case?

A. I believe that this was your personal responsibility. It was being paid out of this bank account is what I believed.

Q. So could there be a business agreement where I borrow money, the company needs the money. I lend it to the company, and I -- I require them to pay me, and then -- or I require them, like some lenders do, to have the payment made to them directly?

A. Are you asking me if that could happen? Hypothetical? It might happen if that's what your agreement is. But I don't know what happened in this situation. All I know is that this payment has your initials on it. And this note was your personal obligation.

Q. Do you think that that's an opinion that you have?

A. That this payment was made to your benefit? Yes, I do.

MR. MCKOWEN: That's my objection to the characterization of -- and I'm addressing the Court. Because I reserved my right to be able to question these entries and what they mean.

THE COURT: Well, you can ask her a question and she can respond and if there's some other explanation you had that you want to offer for the Court, you can do that under oath when it's your turn to call witnesses.

MR. MCKOWEN: Understand.

Q. (BY MR. MCKOWEN) So it's your opinion that was a payment for my personal use?

A. This payment was for your personal benefit, yes.

Q. Okay. Do you think that it's possible that it's money that I borrowed and placed it into the company?

MR. FINKE: Objection. He is asking the witness to speculate.

THE COURT: Overruled.

MR. MCKOWEN: How is it --

THE COURT: I overruled it. She can answer.

Ms. Martinez, go ahead.

THE WITNESS: (No verbal response.)

MR. MCKOWEN: Well, we'll address it on --

THE COURT: Hold on. Do you want her to answer the question that you asked her or are you withdrawing the question?

Q. (BY MR. MCKOWEN) No. I mean, it's your opinion that -- that your characterization is your own personal characterization in a lot of these?

A. This is -- I categorized these transactions based on my professional experience.

And like I testified before, I've been working for the Division for over 16 years and I have testified in many cases using the same kind of summaries and information.

Q. And for all the reasons that Mr. Harding cited, do you think that this is a -- a report that can be relied upon as if it were an audit?

A. It couldn't be called an audit in the traditional accounting sense. But it is my opinion, and it's a summary of the banking transactions. That's what this is, a summary of the banking transactions.

Q. And does that summary include an opinion about how these things are characterized? Does -- does that label represent a characterization that you are -- that you are surmising certain things?

A. Well, I do use my professional opinion to create these categories, as we talked about earlier, for business expenses. It's things that I looked at, and I'm like, oh, that looks like something that was used for the business or construction or office related or payroll, things like that.
Q. I get it that it is your opinion. And that's the only answer -- question that I'm trying to get an answer, is this is your opinion. Are you familiar with the financial accounting with public companies?
A. I mean, very little. That's not my -- my background is in tax work. So it's not what I specialize in or what I have work experience in, no.
Q. Have you ever completed a 10-Q or a 10-K?
A. No. I have not.
Q. And when you -- have you ever looked at a 10-Q or 10-K?
A. I have, yes.
Q. And a -- and a 10-Q or a 10-K, what's the difference between the two?
A. Again, this is not my area of expertise but I believe a 10-K is what is reported monthly and a 10-Q is what's reported quarterly to the SEC.
Q. The K -- did you say that the K is an

annual report and the -- and the Q is a quarterly?
A. I thought one of them was a monthly. I'm not positive on that because that's not my area of expertise.
Q. Don't you think that's a fundamental aspect of the public company accounting, to know what a Q and K?
A. On a public accounting, yes. I'm not doing that here. What I'm doing is summarizing bank transactions.
Q. Public company accounting.
A. Public company accounting, yes.
Q. Yeah. Which is different than just public accounting. Public company accounting has strict requirements that are required to be met by the SEC and PCAOB, public company accounting somebody.
MR. FINKE: Objection; testifying.
THE COURT: Overruled.
Q. (BY MR. MCKOWEN) Would you admit this -- this audit is primarily -- or this is reporting that you're -- you're giving on a public company?
A. I don't understand what your question is.
Q. Is Two Rivers a public company?
A. I believe so, yes.
Q. And are all of these companies on here

either affiliates or subsidiaries?

A. Well, all the companies on here are Two Rivers. So that first exhibit that we talked about had five accounts that were in the name of Two Rivers, but you know that GrowCo investors went into those bank accounts. So there are no bank accounts in the name of GrowCo. There are no bank accounts in the name of McGrow. It's either Two Rivers or MCG Services, or TR Capital Partners.

Q. So let's stick with that just a little bit. And the reason I had Mr. Harding go first is because he is the detail person.

As someone who goes out and raises public money, I'm responsible for making sure that the accounting work is done according to public company accounting standards.

Are you familiar with -- have you -- do you have any credentials related to that?

A. No. I do not.

Q. Do you know -- not knowing that the 10-Q or 10-K are different time periods, do you know what the required -- the reporting standard is? Is there a difference between the standard of -- reporting standard from the two of them?

A. Again, that's not my area of expertise.

I'm here to talk about the bank records and the banking transactions. That's beyond the scope of my analysis.

Q. Can I get just a "yes" or "no"? Are you familiar with those accounting standards?

A. I know there are some, but I can't testify to any of those right now.

Q. Are you familiar with Sarbanes-Oxley?

A. Yes.

Q. What is the -- how was -- when was Sarbanes-Oxley started and why was it started?

A. It was started to stop all the financial statement fraud that was going on.

Q. Right. And so is it your opinion, based upon what you said, this reporting that you gave to -- that you're giving to us is fraudulent?

A. I'm telling you that the funds were deposited into these bank accounts and they were commingled between all these different entities. That's what I'm testifying to today.

Q. Okay. You -- did you imply that commingling is something bad?

A. Yes. It's not something that you should do.

Q. Is it bad according to the requirements of

Sarbanes-Oxley?
A. I don't know all the requirements of Sarbanes-Oxley. I know what it was created for. I know that it's -- it leaves the responsibility of the certified financial statements to the companies' management. I know that it creates internal controls for companies. Again, that's beyond the scope of what my analysis in this case was for.
Q. So you're not aware of whether it satisfies or doesn't satisfy Sarbanes-Oxley?
A. My summaries? Is that what you're asking?
Q. Right.
A. My summaries are not -- again, that we are not talking about financial statements. These are not financial statements. What they are are summaries of banking transactions.
Q. Are you -- are you aware that the SEC looked at these accounting statements up to a certain time frame?
A. I didn't know that, no.
Q. Okay. Do you know that -- that the accounting statements, if they're fraudulent, that's a criminal offense and you -- and you have to sign something that says that it's a -- at least that you're -- if the CEO and the CFO, when they submit a

10-K, that they are signing something that says, if this isn't accurate, I know I'm going to go to jail?
A. Yes. That's certifying the financial statements by the management, yes.
Q. Right. And so the rigor associated with 10-K -- and you know the rigor that's associated with the 10-K compared to a 10-Q?
A. As I stated before, I've never done that in my professional work experience, no. I'm sure it's a lot of work to put one of those together.
Q. Would you say that your professional work experience is basically public accounting, not public company accounting?
A. As I stated early on, I did work for a public accounting firm for five years early in my career, but we didn't issue financial statements. All we did was compile financial statements.
And my duties were centered around tax returns and doing financial statements on a tax basis, which is way different.
Q. Yeah. I'm not talking about that. I'm talking about --
A. Okay. Well, I'm just telling you what my experience is.
Q. So the difference between a 10-K and a

10-Q, is a 10-K is audited. Are you familiar with that?
A. As I stated before, it's not in my background. So...
Q. Right.
A. Okay.
Q. Are you familiar with -- do you have the same potential entities as a 10-Q that you can go -- that the officers of the company and the board, the -- the audit -- the -- excuse me -- the audit committee. And that every public company has to have an audit committee. Are you familiar with that?
A. Yes. That is just my general background as a CPA, yes.
Q. Right.
A. And again, I didn't work in public accounting.
Q. Are you -- are you required, or do you know that they are required to sign off on that document as well with the same penalties as Sarbanes-Oxley would have?
MR. FINKE: Your Honor, I feel like we are getting a little far afield of the scope of direct.
THE COURT: SUSTAINED.
MR. MCKOWEN: I'm sorry. I didn't get the

objection.

MR. FINKE: Beyond the scope of direct.

MR. MCKOWEN: Meaning, don't keep doing it?

THE COURT: Correct.

MR. MCKOWEN: All right. I think I beat that to death.

THE COURT: Okay. All right. Thank you. Any redirect?

MR. FINKE: No redirect, Your Honor.

THE COURT: All right. Ms. Martinez, your testimony is complete. Thank you.

THE WITNESS: Thank you.

THE COURT: You may step down.

MR. MCKOWEN: Thank you.

THE COURT: All right. Let's start the next witness and we'll take a recess at 3.

Come up here to the witness stand, and before you sit down, I'm going to swear you in.

Whereupon,

JOE McMAHON,

the witness having been first duly sworn, was examined and testified on his oath as follows:

MR. HARDING: Your Honor?

THE COURT: Yes.

MR. HARDING: Can I try one of those

listening devices if you don't mind? I can hear, but it's just kind of a little garbled. Thank you.

THE COURT: All right. We're ready.

MS. KIDD-AARON: Okay.

DIRECT EXAMINATION

BY MS. KIDD-AARON:

Q. Hello, Mr. McMahon.

A. Hello.

Q. How are you doing today?

A. Good.

Q. Good. Can you state and spell your full name for me?

A. Joe McMahon, Junior, M-C-M-A-H-O-N.

Q. Thank you. What is your educational background?

A. College degree, Bachelor of Business Administration in petroleum land management, University of Texas.

Q. Okay. And do you have any professional licenses or certificates?

A. I'm a certified professional landman through the American Association of Professional Landmen.

Q. And what do you do for a living?

A. I'm a landman.

Q. Okay. Thank you. Do you have any professional background in finance or securities?

A. No. Just overall investing through the years.

Q. Okay. And what type of investment?

A. Stocks, bonds primarily. Real estate, oil and gas investments. Things of that nature.

Q. Okay. Do you invest on your own behalf or does someone else invest for you?

A. Both.

Q. Okay. And how are you familiar with the defendants in this case?

A. Back in 2016 or '17, I was -- through some people I know were out playing golf. They invited me to a meeting to raise money for some greenhouses that were going to be built or being built in Pueblo, Colorado.

So went to a meeting, and John McKowen was there and I think Wayne Harding was there, and there were some other people there too.

Q. Okay. And you said you went to a meeting. Was this like a presentation? What type of meeting?

A. A presentation to raise money for GrowCo, which my understanding was owner and building these greenhouse or houses. There was one partially

completed, I believe, at the time, and the plan was to build it out and start on greenhouse number two.
Q. Okay. And you say it was partially completed. Did you know how, was it 90 percent?
A. I don't know. That's just what I heard. I never visually drove down to Pueblo and witnessed it myself, just what I was told in the room at the meeting.
Q. And who told you that?
A. I believe the people that were pitching the -- the deal with GrowCo.
Q. Okay. And do you remember who that was, who gave the presentation?
A. I think John McKowen gave the presentation.
Q. Okay. And do you remember receiving any documentation relating to that presentation?
A. I think I may have received a folder with some pro forma information in it, spreadsheets detailing what the investment would look like over a period of years.
Q. Okay. There is a large binder in front of you. If you could turn to exhibit or tab 127?
A. Okay.
Q. Does this document look familiar?
A. Yes.

Q. What is it?

A. Well, it was their pamphlet or their brochure in their raise (ph) for which I was attending the meeting.

Q. Okay. And then does this -- you know, you can flip through it if you need to. Does this look like a true and accurate copy?

A. Yes. You got to understand it's been six or seven years, and I really didn't pay much attention to the information that was in here. But I do recall seeing this.

Q. Okay.

MS. KIDD-AARON: I would like to move to admit what's been marked as Exhibit 127.

THE COURT: Any objection, Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 127 is admitted.

(Whereupon, Exhibit No. 127 was admitted.)

Q. (BY MS. KIDD-AARON) Seems like you didn't pay much attention to what was in this document. What was the information you did pay attention to?

A. Well, they were looking to raise an X amount of dollars, and I was going to contribute

$100,000. What I was interested in was what was the deal? What was I going to get out of that, and when I was going to get it back.

So basically, the -- it was structured or laid out to me that I was investing a hundred thousand dollars. I would be paid 10 percent interest annually, paid monthly. At such time as the operation, meaning the greenhouses, were up and running with paying -- paying people that were growing marijuana.

First of all, these things were set up to grow marijuana, these greenhouses. And they had to get a qualified grower in there to grow the product, and so they were looking for money to get this going. So I initially invested, with other people, a hundred thousand dollars.

We were going to get 10 percent interest annually, paid monthly, until such time as these growers got their crops going, could have harvests and there was positive cash flow. Meaning that they were paying the lease on these greenhouses.

At that point, the interest rate was supposed to go to 22 or 22-1/2 percent.

At the end of the day, which would have been the note matured, I believe, in July of '21 or

'22 -- I think it was '21. We were going to get our money back, including the interest we had been accumulating over the years, or we had to write to -- along with the initial note, the hundred thousand we put in, we received warrants or I received warrants to purchase up to a hundred thousand shares in GrowCo for 25 cents a share.

So basically at the end of the day, July of '21, if it was a going concern, I had the option to buy stock in the company for 25 cents a share.

Q. Okay. I'm going to unpack that a little bit. So before you -- before we go further into your investment, were you told anything about other investors in GrowCo?

A. Other investors?

Q. Yes. So other offerings, other people who invested in this company?

A. No, I wasn't told. The people I was with that introduced me to the GrowCo venture had prior dealings with the individuals promoting GrowCo. So from that standpoint, I guess there were other investments out there prior to my investments that other people had made.

Q. And what did you know about those other investments?

A. Not much. I really couldn't elaborate on that.
Q. All right. So did you invest in what came to be known as a $7 million note?
A. Correct.
Q. Did you sign anything related to -- excuse me. Did you sign anything related to that investment?
A. I believe so. They had a subscription or some form to fill out. I filled it out. Forms on accredited investors, net worth, things like that. I filled those out.
So I filled those out, signed them, and tendered my check.
Q. Okay. And if you could turn to 126?
A. Okay.
Q. Does this look familiar?
A. Yes, it does.
Q. What is it?
A. Well, it's just a note where they're thanking me for my investment.
They enclosed a promissory note -- note for a hundred thousand dollars. A copy of the executed exchange purchase agreement.
Q. Okay. I'm going to stop you. And if you

want to flip through really quickly and tell me if the rest of this looks familiar to you. And you don't have to explain what's in it, just say it looks familiar to you.

A. Yes. I looked at my file before I came here, and this stuff looks pretty familiar.

Q. Okay. And what is this packet in its entirety?

A. Well, this is the GrowCo investment package that they gave me when I invested a hundred thousand dollars. It has the agreement of the common stock purchase for warrants, things like that, my agreement. It was signed by them.

Q. Okay. And is this a true and accurate copy?

A. Yes, ma'am. I believe so.

MS. KIDD-AARON: Your Honor, I would move to admit what has been identified as Exhibit 126.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 126 is admitted.

(Whereupon, Exhibit No. 126 was admitted.)

Q. (BY MS. KIDD-AARON) Okay. Mr. McMahon,

what is McMahon Energy Partners LP?

A. That's the Texas Limited Partnership. I own the -- I am the limited partner and I am the general partner. It's just myself and it's a company engaged in various investments, real estate investments, and oil and gas investments and stocks and bonds. We have -- we have, you know, brokerage accounts also.

Q. And you invested in GrowCo through McMahon Energy Partners?

A. I did.

Q. Okay. And you mentioned that McMahon Energy Partners has real estate investments. Did you think that GrowCo was a real estate investment?

A. I did, yes.

Q. And where did you get that understanding?

A. Well, from the whole -- from the way the whole thing was presented and set up. It's set up as a -- as a greenhouse or two greenhouses. So that's, you know, a greenhouse that's sitting on some property, so it's real estate. And I think during the meeting it was asked, you know, through somebody in the meeting, how is our investment -- you know, each of these hundred thousand dollar people that were putting in money or even more, how is this

protected?
Well, it's secured by the property. That's the answer we got from GrowCo. It's secured by the property, meaning the greenhouse or greenhouses.
Q. Okay. And did that turn out to be the case?
A. I haven't figured that out. I think through everything that's transpired, I don't know who owns title to those greenhouses. There's a series of transactions from what I understand, conveyances. I'm not sure where title is to the actual dirt holding on which these greenhouses sit.
Q. Okay. But do you believe that is with GrowCo still?
A. I'm hoping it is.
Q. Okay. And so based on this letter, it looks like Bill Gregorak signed on behalf of GrowCo?
A. Right.
Q. Do you know who that is?
A. I don't remember him. I was trying to picture him but I really can't. He's -- when we signed all this or when we picked up this information, I think we went to Two Rivers offices, which were on the corner of I-25 and Colorado Boulevard, and I may have met him in that office.

I'm not really sure. But that's where I handed off my paperwork and my funds.
Q. So did Mr. Gregorak tell you anything about this investment?
A. Not that I recall.
Q. Okay. And apologize I don't have an exact page number, but on the fourth page should be the GrowCo common stock purchase form.
A. Yes.
Q. Okay. So is this the purchase form you mentioned a moment ago?
A. Yes, correct.
Q. And can you tell us again, what was your understanding of the purpose of this purchase warrant?
A. Well, my understanding was that if we loaned them this money through the senior exchange note for $7 million, we're going to accrue and collect interest at such point the note's due in July of 2021.
And I would assume at that point we get all our money back from the original investment, or we had the rights, we had warrants, initially, where we could purchase stock in the company.
And I could -- I had the right or warrants

to up to a hundred thousand shares at 25 cents a share. That was my understanding.

Q. What was your understanding about the laws around marijuana at that time?

A. Well, I think it was back in 2016, if I recall, it was a fairly new deal in Colorado. The law had passed. The dispensaries were opening up. People were, you know, starting to grow operations. My understanding was it was pretty heavily regulated as far as licenses, permits, you know, who's qualified and who's not qualified.

And you had to jump through all the hoops and be certified and qualified and have the correct permits to grow it, sell it, market it or whatever.

Q. Okay. At the presentation, did anyone talk to you about if anyone in GrowCo had any licenses?

A. No one mentioned anyone at GrowCo. It came up John McKowen was going to step down from Two Rivers because it was a public company, and a public company official could not hold a marijuana license or have a permit to grow marijuana.

And he wanted to be involved in the business, I assume, day-to-day, so he was stepping down from Two Rivers and was going to, you know, pursue the marijuana end of it, I guess, individually

or through GrowCo. I don't know which exactly.

Q. And so at the time he gave this presentation, was it your understanding that he was still part of Two Rivers?

A. At the time, yes. But I really don't know for sure. I can't say that for sure.

Q. Okay. And was he a part of GrowCo?

A. I assumed he was. They were pitching the deal.

Q. Okay. And you mentioned that Mr. McKowen couldn't hold a marijuana license being involved in a publicly traded company?

A. That's what I was told. Whether that's fact or fiction, I don't know. I was told that. It makes sense, you know. The government back then, maybe they still do have different laws where marijuana dispensaries, you know, they had to pay cash.

They couldn't deal with credit cards or things like that.

Banks wouldn't take their money or whatever, so maybe a public company or a public company official had to be a little bit, you know. Maybe that just didn't fly. I'm not sure. I'm just telling you what I was told at the time.

Q. And so if a publicly traded company couldn't be involved in marijuana business, how was GrowCo going to go public?

A. I don't know.

Q. Okay. Did anybody ever explain how you would -- how this equity conversion would happen? This GrowCo equity conversion?

A. No.

Q. Okay. Did you receive any -- you said that you were supposed to receive interest payments in relation to this investment, correct?

A. Yes, ma'am.

Q. Did you receive any of those interest payments?

A. I did. Shortly -- we signed up, or I signed up on this in September -- August or September, and I believe in October I received a check. And I received several checks every month thereafter.

Q. I apologize. If you can turn to Exhibit 55?

A. I have it.

Q. And what is this?

A. Well, 55 is a check to McMahon Energy Partners from Two Rivers Water & Farming for 194.44,

which was probably -- it's the memo is the August interest payment. So it's obviously prorated.

Q. Okay. And then the rest of these documents, are these also interest payments?

A. Yes, they are, and they probably appear for the full amount, correct.

Q. And are these true and accurate copies?

A. Yes, they are.

MS. KIDD-AARON: Your Honor, I'm going to move to admit Exhibit 55.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 55 is admitted.

(Whereupon, Exhibit No. 55 was admitted.)

Q. (BY MS. KIDD-AARON) So Mr. McMahon, there are about eight interest payments here.

A. Okay.

Q. Six, sorry. Are these all the interest payments you were owed under the $7 million note?

A. Well, no. We -- they were supposed to get -- we were supposed to get interest payments every month at 10 percent, and then at such point that 10 percent was going to escalate to 22 or

22-1/2 percent, I believe. And so they, you know, I think February was the last interest payment I received.

Q. Did you inquire about why you were not receiving your interest payments?

A. We did and -- or I did, and I think we were told that the growers just needed time to get their crops going so they could harvest and so they could sell it and pay for it.

So we were approached by GrowCo with an amendment in, I believe, March of 2017, and it was dated back to February of 2017 stating that basically we would -- stating basically that the interest payment would go from 10 percent to 22-1/2 percent, but it wouldn't be paid. It would accrue and the first payment would be in October of 2017.

Q. Okay. If you could turn to 57?

A. Okay.

Q. There are three pages here, and you can look at all three pages.

A. Okay.

Q. And then let me know is this the amendment you were referring to?

A. Yes, it is.

Q. Is it a true and accurate copy?

A. Yes, it is.
MS. KIDD-AARON: Your Honor, I would move to admit Exhibit 57.
THE COURT: Mr. McKowen, any objection?
MR. MCKOWEN: I do not, Your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No.
THE COURT: Exhibit 57 is admitted.
(Whereupon, Exhibit No. 57 was admitted.)
Q. (BY MS. KIDD-AARON) Okay. So Mr. McMahon, as far as that 22.5 percent you mentioned, did you ever get any interest payments of 22.5 percent?
A. I don't think I did. I looked around. I may have. You know, that is 2017, so it's six years ago. I didn't go back in my bank records, but in my file I couldn't find anything to that effect.
Q. Do you remember asking about the interest payments after you signed this amendment?
A. Not asking about them, because we knew that they would be deferred until October of '17.
Q. Okay. And while they were deferred, did you have any other communication with Mr. McKowen or Mr. Harding?
A. Not Mr. Harding. Mr. McKowen approached us, or approached me, on a new venture called McGrow.

And that was probably in July of 2017. So I'm sitting there with deferred interest payments that weren't made on the GrowCo note, but I have signed a deal where we have changed the interest rate from 10 to 22-1/2 percent, and so I'm going to get a payment hopefully in October.

So I believe it was about July we get -- I get approached and a short-term note, 3 months, 90 days, again, at 22-1/2 percent interest. They're looking for money to -- for this company called McGrow, which in essence, was going to buy machinery or a machine to extract oil from the marijuana plants.

THE COURT: Ms. Kidd-Aaron, we're at 3, so find a good stopping point.

MS. KIDD-AARON: Okay. I think we can stop here, and then I will go to the next exhibit.

THE COURT: Okay. All right.

Mr. McMahon, we're going to take our recess so you may step down.

THE WITNESS: Okay.

THE COURT: 15 minutes. So I'll see everybody back at 3:15.

THE WITNESS: Okay.

Right here at 3:15?

THE COURT: Correct. All right. Thank you.

(Whereupon, a recess was taken at 3:08 p.m.)

(Whereupon, the proceedings resumed at 3:22 p.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. Mr. McMahon is on the witness stand in direct examination.

MS. KIDD-AARON: Thank you, Your Honor.

Q. (BY MS. KIDD-AARON) Mr. McMahon, when we left off, we were talking about McGrow. And you said that your understanding was that McGrow was supposed to buy marijuana extraction machinery; is that correct?

A. Yes, ma'am.

Q. And what is marijuana extraction machinery?

A. I don't know exactly, but assume it's a machine where you put the marijuana plant through it and it squeezes it or heats it or does something, and -- and oil comes out that is the residue, and that's evidently worth more than the seeds or the flower or whatever, that was my understanding. It's an oil, basically.

Q. Okay. And who told you that? Gave you that explanation?

A. I think I read it someplace. I can't recall where, but it was the same group that originally invested in McGrow. We were talking about it and we figured out, you know, we received a few interest payments. We would get some more in October.

So we figured things were still on the up-and-up, and so we went along with it. It was a $50,000 investment on my part for a 90-day loan at 22-1/2 percent.

They paid five or six months before at 10 percent and then they said they couldn't pay any more, and so they deferred it to October, in which case it was going to go to 22-1/2 percent on McGrow -- excuse me -- on GrowCo. So on McGrow, July, August, September, October, 30 days again.

And so we figured we would give it a roll and maybe it would work and see what happens.

Q. Okay. When you say that same group, are you talking about the friends that you went to the $7 million note presentation with?

A. Pretty much so. It was most of that same group. Some of them did not do it, but the majority

of them did do it.
Q. Okay. And do you remember any of the names of those people?
A. Well, it was Daryl Mendelsberg, Phil Gustafson (ph). I think Gary Mendelsberg was in on it. I don't know if Jeff Ploen was in on it or not. I'm not sure.
Q. Okay. Can you turn --
A. That's on the second deal, the McGrow venture you're talking about.
Q. Okay. These were people who were affiliated with McGrow, or invested in McGrow?
A. McGrow. They also were invested in GrowCo too.
Q. Okay. Will you turn to 61? Tab 61?
A. Okay.
Q. Do you know what this is?
A. Yes. I have seen this.
Q. And what is it?
A. Well, it's an e-mail from John McKowen just advising the group, in this case, Daryl Mendelsberg, about the 500,000 offering for McGrow, 90-day -- well, that's a -- yeah. It's 22-1/2 percent. He says, "This is the least risky, most rewarding --"
Q. Okay. I'm going to stop you right there.

But this does look familiar to you? You have seen this before?

A. Yes, I have. I have a copy of this.

Q. Okay. And this is a true and accurate copy?

A. Correct.

Q. Okay.

MS. KIDD-AARON: Your Honor, I would move to admit Exhibit 61.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: Exhibit 61 is admitted.

(Whereupon, Exhibit No. 61 was admitted.)

Q. (BY MS. KIDD-AARON) Okay. I apologize for interrupting you, Mr. McMahon.

So you were talking about this e-mail saying, "This is the least risky, most rewarding offer I've brought to you." Correct?

A. Yes, ma'am.

Q. And who's this e-mail from?

A. Well, it -- the one I'm looking at -- well, actually, it was from Jeff Ploen to Daryl Mendelsberg and it was a forwarded message from John McKowen. So

I don't know exactly what the chain was in there, but I -- did receive a copy of this.
Q. Okay.
A. And I have a copy of it.
Q. So it looks like you received it from Daryl Mendelsberg at the top there?
A. Could be. Correct. Yes.
Q. And what is your relationship with Daryl Mendelsberg?
A. We just play golf together, just social friends.
Q. Okay. And was he one of the people that attended the $7 million note presentation with you?
A. Yes, ma'am.
Q. Okay. And so you -- did you discuss this McGrow investment with Daryl Mendelsberg?
A. We did. We decided it was on the up-and-up.
Q. Okay. Did you talk to Mr. McKowen about this investment before you invested?
A. I did not.
Q. What was your takeaway from this e-mail when you received it from Mr. Mendelsberg?
A. Well, we looked at it, and I just -- you know, I asked them with everything -- you know, they

thought -- they thought the same as I did. That we've been paid some interest payments, things were on hold. We're going to 22-1/2 percent.

We had heard rumors where there had been some bad tenants in there, meaning not paying their rent, maybe vandalizing the place. But things were all supposed to be on the up-and-up and they were being fixed and we were going forward.

So you know, we still had -- I mean, I still had trust and faith. And just like any other investment -- not like any other investment, but sometimes when people invest, you know, there's a -- there's a greed factor involved. You know, you want as much as you can get. 22-1/2 percent is a lot. That's kind of unheard of.

But the money was big or supposedly big in the marijuana business. It was coming down.

I mean, they were paying record prices for marijuana, but with the legalization, the market got flooded and the prices came down.

But we were still fairly early and we figured this would work. There was a machine. There was a greenhouse in place.

I had seen pictures of actual marijuana plants that were inside this greenhouse. So I

assumed they were growing them there. I don't think they were just placed there. So they were growing there and it was in operation.

So this McGrow is going to take a piece of this greenhouse, put this machine in there and make this oil.

And so in July of 2017, you know, I -- I rolled the dice again and went with it.

Q. Okay. You said 22.5 percent is a lot?

A. Yeah. I think so.

Q. Is that based on other investments that you've made?

A. Well, yeah. I mean, I tell you, you go to a U.S. Treasury note or a bank CD is not going to pay you that at all. Of course, there's not the risk involved in those instruments as they are in these. So this is a riskier type investment, so they're going to pay more. Even on other risky investments, apartment houses, oil and gas ventures, drilling deals, you don't see people boasting a 22-1/2 percent rate, at least I don't.

And I've been doing it a long time.

So I thought it was pretty good and, you know, we had been paid the 10 percent upfront and basically this was all, in my mind, short term. The

22 is going to kick in. We're going to get that. You have a tenant that has a cash flow crop, and I forget how often they harvest it. Two or three times a year, maybe. I forget. The price is high.

So I'm thinking in my mind, you know, this is sustainable. We'll see what happens, because in 2021, my note on the GrowCo deal is going to mature and I'm going to get all my money back plus the interest I made, plus I have the option to go in and buy a piece of the company with my warrants or the stock. How it's going to be a public company, you asked me earlier. I have no idea.

On the GrowCo deal, that's a 90-day note at 22-1/2 percent, you know, 90 days, we're either going to fish or cut bait. We'll know where we stand.

Q. I just want to clarify. You said the GrowCo deal. The McGrow deal was a 90-day deal, or --

A. The McGrow was the 90-day note. That was the machine, and the money was going to buy this machine to make this oil or extract the oils from the marijuana. That was my understanding.

Q. And going back to the 22.5 percent being a high interest rate, had you heard of other GrowCo offerings before you invested in the $7 million note

offering that 22.5 percent interest rate?
A. No. I had not heard that that rate was being offered. I know -- I don't know if it was McGrow -- or excuse me -- GrowCo, but some of the people who introduced me to the GrowCo people in that meeting had done prior business with John McKowen, and I just don't know what the relationship was or what the -- the deal was. I was not involved in those.
Q. Okay. I also want to talk to you a bit about the risk that you mentioned. So you said you knew that this was risky. What element of it seemed risky to you?
A. Well, you know, when you hear interest rates like this, you always wonder things when you're raising money and you're -- you know, everything you read, these are unregistered securities.
So you know, you got a lot of bells and whistles going off when you're doing your due diligence, could I -- I probably should have done more due diligence. I relied on what my buddies were telling me. They've been around the block. They have done these things before.
So in my mind and in my world, when you start getting into interest payments higher than the

norm, you kind of wonder, you know, are we looking at a Ponzi-type scheme? And that's the first thing that crossed my mind.

You know, I walked into that meeting, that initial meeting back in 2016, and I had my daughter with me, and -- who handles a lot of my business and day-to-day activities. And I told her, I said, if we go in there on this marijuana deal and these guys are in shorts and flip-flops, we're leaving.

Well, they weren't. They were all in suits and ties and, you know, they were polished and they had their brochures and so we took it, and I looked at it and I couldn't make much out of the pro forma, the numbers, but the concept and the idea sounded reasonable.

The interest rates were high, so the greed factor from the investor kicks in. Yeah.

You know, I want all that I can get. I will take all the 10 percent interest payments someone's going to pay me, or 22.5 percent, any day of the week.

The thing is, on any Ponzi scheme, it's only as good as, you know, as your last investor you bring in. If they can keep paying so the money can be kicked upstairs to pay off the earlier investors.

So in -- in February of '17, when the interest payments stopped, and we did get a notice and an amendment to the agreement that, you know, the reason was the growers didn't have any product to sell or they were experiencing difficulty and they needed more time.

So can we have time to pay you your interest, but we will take your interest, we'll stop it right now in February and we'll take it from 10 percent to 22-1/2 percent retroactive to February of 2017.

This is for GrowCo, and so I said fine. So I kick this to mid-October. And in the interim, McGrow comes along and that's just a 90-day note at 22-1/2 percent. And after we wrote -- or after I wrote that check, I really didn't hear anything from anybody.

You asked me did I receive a payment in 2017 for the GrowCo matter, and I -- I can't -- I don't recall. I don't have it in my -- in my notes if I did. I could go back through my bank records and check it out.

So you know, by mid-October, both GrowCo is due and McGrow is due, and I don't have anything at that point.

Q. So at that point, when you don't have anything from McGrow. It's supposed to be this 90-day short-term loan, 22.5 percent. The least risky, most rewarding offering John McKowen has ever brought to you, what were you thinking?

A. Well, and if you take that a step further. If you look at that letter -- e-mail a little bit further, it says, "As with the flower, we sell out all our product each week on our McGrow marketing website."

Well, you know, if something is being sold. I mean, I'm not reading that in black and white. But where is the money? I have never seen it. Nothing from McGrow ever came back to me. And from that point forward, nothing from GrowCo ever came back to me.

But I read something like that, and I'm thinking, well -- and I see pictures of marijuana plants in the greenhouse and I assume they're my greenhouse, but there was no money. And that was -- that was basically the end of it. I think -- well, I think we just got duped.

Q. And you -- the sentence you just read, "As with the flower, we sell out all product each week on our McGrow marketing website bestbud.net." When you

read that, who did you think "we" was referring to?
A. McGrow, which was the people or the company we invested for the machine. So we sell that out, but at the same time, you know, they're in space owned by GrowCo, I assume, in which I have a senior note, but I'm not getting anything for it.
And I -- I heard different stories. One tenant grew his crop, harvested it, and packed up and left. You go to plant the next day at the greenhouse and nothing's there. I heard one tenant vandalized the plant.
So I don't know. I mean, I never went down there to physically look at it.
Somebody's paying rent someplace. I mean, I don't think McGrow or GrowCo would give somebody free rent. They may defer it a little bit, and that would be normal, maybe, if the guy is having a hard time growing his crop.
I, as an investor, never saw anything after that February '17 -- 2017, 10 percent interest payment. I never saw anything after my July 2017 $50,000 investment.
Q. And did you know anything about marijuana licensing requirements in Colorado?
A. Well, as I mentioned earlier, you asked me

laws and things like that. It's my understanding that anybody growing marijuana, selling marijuana or having anything to do with it, has to have some type of license or permits.

It's regulated by the State of Colorado. They can get a -- I'm sure the state gets a pretty good revenue from it.

And so you know, I assume all this stuff had to be done under people that were properly licensed and had the proper permits.

Q. And to your knowledge, did McGrow have a marijuana license?

A. I don't think so. I don't think McGrow ever had a marijuana license because McGrow was supposed to be -- excuse me. I got confused with GrowCo and McGrow. Okay. Did McGrow, the machine, ever have a marijuana license? I don't know.

Q. Okay. And did GrowCo ever have a marijuana license?

A. I don't know. I would think -- I would think not. It wouldn't be needed because all we were were just the greenhouse. We're the tenant. We're leasing to, you know, John Doe marijuana grower. You know, we're -- we can be -- you know, we can be the city and county building leasing space to a bunch of

lawyers. I don't know.

Q. So would you assume -- or sorry. Let me rephrase.

Based on what you just said, did you believe that the person who the greenhouse or the company that the greenhouse was being leased to had a marijuana license?

A. I don't know. I tell you what I got. My belief was that John McKowen was running the show. I think he was the -- I think he was the grower, the marketer, and the seller. He had people in there and I don't know what his relationship was with them, but I don't know where the rent was going.

Myself, I never saw any payments after the February interest payments, so I don't know. And I don't know who the marijuana was being sold to. I'm reading in this memo here that we're -- you know, each week we sell -- sell out the flower, all our product each week. Well, you know, that thing, I don't know what it's worth but it's worth something.

Q. And was any information ever volunteered to you about who was licensed, who had a marijuana license?

A. No.

Q. And I want to go back to the risk issue one

more time. Was there any information from Mr. McKowen, Mr. Harding, Mr. Gregorak, anyone else associated with GrowCo or McGrow who told you about the risks involved within this company?

A. No, not really. Not at all. I mean, we went in there with the understanding that the State of Colorado legalized marijuana, and so there's going to be a boom or somewhat of a boom, maybe a spike for a while where there's going to be a need for this product, and so we were going to be growers.

We -- we came in, I did, as an investor supposedly to own a greenhouse or have a note owning a greenhouse, and that we were going to lease to licensed marijuana growers. They were going to harvest their product. They were going to sell it to whoever, dispensaries or whatever, and we were to be paid rent.

And after about -- and I don't even know if we got paid rent. So the risk in my mind, from that standpoint, being a landlord I thought it was pretty low. And I thought I was getting a pretty high return on my investment at 10 percent. So that's why I was in. With the idea that the investment was going to go to 22 percent interest rates.

Q. Did your understanding that the land and

the greenhouse secured your investment in GrowCo have any effect on you?

A. Yes, it did.

Q. What was that effect?

A. That I was secure. That I was safe.

Q. And safe in what way?

A. Well, safe that somebody -- if it went down, at least we'd have something we could go liquidate and, you know, get something out of it. But I mean, quite frankly, you know, I walked in here today and I'm looking outside at the docket and all the list of the names, and there's -- there's four GrowCo entities listed there.

There's the McGrow entity. There's a VitaNova, there's four VitaNova entities. There are these gentlemen, they're listed. So you got a whole list of people and the question is, where's the dirt? Who owns the title to GrowCo?

I mean, I thought that was the building itself. You know, why would you set up GrowCo 2 or GrowCo 3? I mean, there's a lot of shuffling going around here and doesn't make sense to me. I mean, I understand you have different investments and you have different corporate shells you set up, but I think -- I think it's going to be a hard time for

anybody to determine where the title is to those greenhouses down there.
I mean, that could probably be determined on the Pueblo County Assessor's Office, but those aren't necessarily accurate.
Q. Mr. McMahon, can you turn to tab 128?
A. (The witness complied.) Okay.
Q. Okay. Can you look at this and let me know what it is?
A. It's the term sheet for the McGrow units, $550,000.
Q. Did you receive this term sheet?
A. I did.
Q. And does this look like a true and accurate copy?
A. It does.
MS. KIDD-AARON: Your Honor, I would move to admit Exhibit 128.
THE COURT: Any objection, Mr. McKowen?
MR. MCKOWEN: No. Thank you.
THE COURT: Mr. Harding?
MR. HARDING: No.
THE COURT: 128 is admitted.
(Whereupon, Exhibit No. 128 was admitted.)
Q. (BY MS. KIDD-AARON) Mr. McMahon, earlier

you mentioned that you assumed McGrow and GrowCo were related. And then you just stated that when you looked at the parties in this case, you saw that there were several GrowCo entities and McGrow entity. Why did you believe that McGrow was part of the GrowCo entities?

A. Because -- why did I think McGrow was part of the GrowCo entities?

Q. Right. Why did you think they were related?

A. They were using the same greenhouse. Their op -- McGrow -- McGrow was set up in the GrowCo greenhouse.

Q. And did you think --

A. Also, John McKowen solicited both of them.

Q. So when you say he "solicited both of them," he solicited the $7 million note and the McGrow entity?

A. Yeah. He was at that meeting, correct.

THE COURT: Mr. McMahon, can you pull that microphone towards you?

THE WITNESS: Oh, I'm sorry.

Q. (BY MS. KIDD-AARON) And when you say they were -- you thought they were related. Did you think one was a parent company? Did you just think they

had business dealings? What did you think their relation was?

A. Between GrowCo and McGrow?

Q. Yes.

A. I thought one was the greenhouse, GrowCo, and McGrow was the machine to extract the product from the marijuana plant.

Q. Okay. So did you think that McGrow was a subsidiary of GrowCo?

A. No. I thought, you know, not really. I just thought they were all just mixed together. I wouldn't call it a subsidiary, but, you know, I guess you could. I think they were all kind of doing the same thing. And McGrow was just a whole different entity because it centered around a piece of machinery to extract this. That's what the money was supposed to be used for, to buy the machinery to extract the oil or the product from these marijuana plants.

Q. Can you look at this Exhibit 128 for me and let me know if there are any risks detailed in this exhibit?

A. (The witness complied.)

No. On Exhibit F, first two pages I don't see any mention of any risk factors.

Q. Okay. Were you told of any risk factors?
A. No. I was not.
Q. And to your knowledge, does McGrow have a publicly traded parent company?
A. I do not know.
Q. Okay. Were you ever directed to a publicly traded parent company?
A. I don't think so. Are you talking about VitaNova?
Q. No. I'm just -- if you know of any?
A. No. I do not know of any. I just knew of GrowCo and McGrow.
THE COURT: Can we go back? The witness mentioned Exhibit F that's at the bottom of page -- Exhibit 128. Or, I'm sorry. At the bottom of Exhibit 128, but we're referring to Exhibit 128?
MS. KIDD-AARON: Yes. Correct.
THE COURT: Sorry.
Q. (BY MS. KIDD-AARON) Mr. McMahon, will you turn to 129?
A. (The witness complied.) Okay.
Q. So does this look familiar?
A. Yes, it does.
Q. What is it?
A. It's the McGrow note for $50,000.

Q. And is this a true and accurate copy?
A. Yes, ma'am.
MS. KIDD-AARON: Your Honor, I would move to admit Exhibit 129.
THE COURT: Any objection, Mr. McKowen?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No objection.
THE COURT: 129 is admitted.
(Whereupon, Exhibit No. 129 was admitted.)
Q. (BY MS. KIDD-AARON) Mr. McMahon, you told us that you invested $50,000 in McGrow, which this document appears to show?
A. Correct.
Q. And you also mentioned that it was in July 2017, which this document appears to show?
A. Correct.
Q. And if you turn to the third page, and it is signed by John McKowen?
A. Right.
Q. To your knowledge, was anybody else involved in McGrow?
A. To my knowledge, no one -- no one else was involved.
Q. And if you can turn to page -- or sorry --

tab 130?
A. Okay.
Q. Does this look familiar?
A. Yes.
Q. What is it?
A. The check I wrote for my investment in McGrow.
Q. And is this a true and accurate copy?
A. Yes, it is.
MS. KIDD-AARON: Your Honor, I would move to admit Exhibit 130.
THE COURT: That sticky note, who is that?
MS. KIDD-AARON: Oh, I'm sorry.
Who wrote this note, Mr. McMahon, at the top that says, "Second McKowen deal"?
THE WITNESS: I did. That's my handwriting.
THE COURT: Okay. 130 is offered. Mr. McKowen, any objection?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: 130 is admitted.
(Whereupon, Exhibit No. 130 was admitted.)
Q. (BY MS. KIDD-AARON) And Mr. McMahon, what

is MCG Services, LLC?

A. You know, I don't know. I'm trying to remember that. I put that note on there probably just to tell me it was for the McGrow deal, and I had that in my memo and the check. But I couldn't tell what you MCG Services, LLC are.

I'm speculate that it is McGrow services, maybe it was a -- maybe it was a separate entity that John McKowen had set up to pay himself service fees for advising either GrowCo or McGrow. I noticed in the -- in the note and in the summary that he was going to be allowed to pay himself certain fees for services to McGrow.

Q. Okay. So just to clarify, Mr. McKowen, who you said was the sole person working for or working with McGrow, was paying John McKowen for services at McGrow?

A. That would be my understanding, yes.

Q. Did you have any other dealings, investments with Mr. McKowen?

A. No, ma'am.

Q. Okay. So when you realized that -- you said in about October 2017 you were not receiving any payments from either your GrowCo investment or your McGrow investment?

A. Correct.
Q. At what point did you -- or actually let me rephrase.
Did you take any action to try to get paid?
A. I believe in -- in 2018, after the first of the year, I wrote a letter just, you know, stating they were all in default, and, you know, I wanted my money back.
Q. Okay. Can you turn to tab 132?
A. Okay. I got it.
Q. What is this document?
A. Well, that's my demand letter for the promissory note to McGrow on the $50,000 note.
Q. And this is a true and accurate copy?
A. Yes, ma'am.
MS. KIDD-AARON: Your Honor, I move to admit Exhibit 132.
THE COURT: Mr. McKowen, any objection?
MR. MCKOWEN: No.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: 132 is admitted.
(Whereupon, Exhibit No. 132 was admitted.)
Q. (BY MS. KIDD-AARON) So it looks like you sent this letter on February 2, 2018?

A. Yes.
Q. You sent it to John McKowen?
A. Correct.
Q. Did you ever receive a response?
A. No, I did not.
Q. Did you ever pursue any additional actions with regard to this letter?
A. No. I did not.
Q. And I believe you've already stated that you never received any additional payments from GrowCo and you never received any payments from McGrow; is that correct?
A. Correct.
Q. If you can turn to tab 133?
A. (The witness complied.)
Q. What is this?
A. This was a letter I received from Two Rivers and basically it -- I recall -- yeah. It was from their auditors trying to determine what amount I was owed in the default.
Q. And is -- sorry. Is this a true and accurate copy?
A. It is.
MS. KIDD-AARON: Your Honor, I move to admit Exhibit 133.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: 133 is admitted.

(Whereupon, Exhibit No. 133 was admitted.)

Q. (BY MS. KIDD-AARON) So apologies for my interruption, Mr. McMahon. So you were saying that this was a letter from the auditors saying the money you were owed by GrowCo, correct?

A. Right. Due by GrowCo. Due at the end of 2017. I believe that's an accurate amount 16,250 in interest payments.

Q. And it looks like your entire $100,000 principal investment is still -- was still owed to you?

A. Correct.

Q. Were you ever paid that principal?

A. No, ma'am.

Q. Were you ever paid that interest?

A. No, ma'am.

Q. Do you know why this letter is from Two Rivers if this is for a GrowCo investment?

A. I don't know.

Q. Did you ever have any deals with Two

Rivers?
A. No. Except -- no. I had no dealing whatsoever with Two Rivers except I was in their offices. That's where I initially signed up and gave my initial check for the GrowCo investment.
Q. Did you understand Two Rivers to have a relationship with GrowCo?
A. I heard about it, but I didn't know what it was. I thought I was dealing with GrowCo. It was a separate, standalone entity.
Now, having said that, I knew that these people were also involved in Two Rivers and probably other farming operations down in Pueblo or in the Arkansas Valley. I don't know for sure.
Q. Did you know that Two Rivers was a publicly traded company?
A. I did, and like I said before, it was my understanding that John McKowen had to step down from it to -- because he wanted to be in the marijuana business, and you could not be on a publicly traded company, their board, if you were going to be in the marijuana business.
Q. Were you ever directed to Two Rivers public filings, their SEC filings, for any information about GrowCo?

A. No, I was not.
Q. If you could turn to Exhibit 134?
A. (The witness complied.) Okay.
Q. Does this e-mail look familiar?
A. I don't recall it, but that's my e-mail address and that's my name. I do recall -- recall talking to VitaNova.
Q. Can you tell me a bit about your conversations with VitaNova?
A. Well, this -- this e-mail is dated in September of 2019. It was actually back in 2018 after about the first of the year when I wrote that demand letter, I started getting calls from George McCaffrey who's on this e-mail, and Jan McCaffrey. And they were trying to explain to me what VitaNova was, and that, basically, my investment in GrowCo was gone.
It's just not going to happen and if I wanted to salvage anything out of it, I needed to convert my note, my hundred thousand dollar note to VitaNova to invest -- to invest in VitaNova or VitaNova stock. And I think that they were -- I mean, I had to pay a fee to do that.
And they sent me some pro formas and things that how they were going to resurrect GrowCo or how

it would all come out at the end, and I would be made whole. I had pro formas I think they sent me.

And I just couldn't -- I couldn't do any due diligence. The numbers meant nothing to me. I felt they were pulled out of the thin air and they didn't mean anything to me. So after a while, I just -- you know, I would take their phone calls and listen to them, but I didn't do anything with VitaNova at all.

And then I want to say then George [sic] McKowen started e-mailing me too. And I don't know if it was under the guise of VitaNova.

I can't exactly remember. It may have been. And at one point I just told them to take me off of their e-mail list.

Q. So John McKowen started e-mailing you in addition to George and Jan McCaffrey; is that correct?

A. Well, it's my understanding that George and Jan McCaffrey in VitaNova, that was set up, but John McKowen was behind it. It was his company too.

Q. Okay. And what did you understand VitaNova to do? What was the purpose of the company?

A. Couldn't figure it out. The way they purported it to me is that if I took my GrowCo note

and throw it -- threw it in with VitaNova, that they were going to go forward and I would get some value from GrowCo. They were involved with GrowCo in some capacity. What it was, I -- I don't know.

Q. So you said that George and Jan McCaffrey told you that GrowCo was done. Your hundred thousand dollar investment was done. That was one of John McKowen's companies or at least he was affiliated with it. And now they were reaching out to you about VitaNova, another of John McKowen companies, and they wanted to you convert your hundred thousand dollar investment to VitaNova?

A. Correct.

Q. How was converting from one John McKowen company to another John McKowen company going to save your $100,000 investment?

A. I don't know.

Q. Was that ever explained to you?

A. No. It wasn't, or if it was, it may have been. But I don't think so. But the answer to that question is that I would own this VitaNova and that they would -- everything would be worked out through them and that they would be the surviving shell entity or whatever you want to call it.

Q. Were there any new individuals involved in

VitaNova other than the people that were involved in GrowCo?

A. I don't know. I know that my friends, when we initially attended the GrowCo presentation, they received the same type of solicitations.

Q. And you said that you would have to pay more money on top of your $100,000 investment to make this conversion, correct?

A. Yeah. Well, it says here you can invest up to $18,750. So yeah. I mean, it was going to cost me 18,750 to stay in the game, I guess.

Q. So you made these investments. Were you ever able -- go back to GrowCo for a moment. You were supposed to be able to convert your debt investment into an equity investment. Were you ever able to do that?

A. No.

Q. Have you received any additional instruction on how to do that?

A. No.

Q. So you invested with John McKowen and his businesses at least twice. You have lost, it sounds like $150,000 at least?

A. Correct.

Q. Is there anything that would have changed

your mind about investing in the $7 million note had you known it before you invested?

A. Well, I found out later, after the fact, that Mr. McKowen had declared bankruptcy and then he had had certain securities licenses revoked or suspended. And so that's a red flag.

Q. Okay. And does that apply to McGrow investment as well?

A. Yes.

Q. So knowing about the bankruptcy and the regulatory action, that potentially would have change your mind about investing?

A. Yeah. It would if I had known that going in. I didn't hear about that until after the fact.

Q. Is that something that you think should have been disclosed to you?

A. Oh, yes.

Q. Is there anything else that you think should have been disclosed to you?

A. I think that at the end of the day, in my mind, I thought John McKowen was the -- was the grower, the marketer, and the seller out of GrowCo and McGrow. And, you know, it's -- it was a sloppy business in that the pro formas we would receive from Mr. McKowen meant absolutely nothing.

You couldn't count on any of the figures. They were all over the board. And to my knowledge, no one gave us an accounting outside of Two Rivers on what they owed us on the first note, but nobody gave us an accounting of the income and profit/loss of the -- of the greenhouse.

I mean, you know, what were the rents? What were the expenses? Well, there shouldn't be any expenses because you've got a renter in there paying the rent supposedly. I don't know what kind of arrangement they made, unless they were taking funds themselves for providing advice or knowledge to these growers on what to do and how to grow, harvest, and market and sell this product.

Q. And then about the pro formas. So earlier you mentioned that you do have some personal investment experience. You've invested on your own behalf, others have invested for you?

A. Correct.

Q. Have you reviewed pro formas before?

A. Yes.

Q. Do you understand them?

A. I think so.

Q. Okay. Have you ever seen a pro forma like the ones you received related to these investments?

A. No. I mean, the numbers were from thin air and I -- I just couldn't document them or tie them to anything.

Q. Okay. And were you able to get any clarification about those numbers?

A. No. But at that point, it was -- it was so far down the road I didn't even try.

MS. KIDD-AARON: Thank you. No further questions.

THE COURT: Thank you. Mr. McKowen, any questions?

MR. MCKOWEN: No. Not of this witness, but I would -- I would like to cross.

THE COURT: You want to cross-examine this witness?

MR. MCKOWEN: Yeah.

THE COURT: All right. Go ahead.

MR. MCKOWEN: I'll make it quick.

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Mr. McMahon, you made your investment in August of 2016 according to this document. Does that sound correct?

A. Yes. Correct.

Q. And you reference having made the

investment along with a group of people who attended a presentation. Do you remember where that was? Was it in Two Rivers office? Was it in Jeff Ploen's office?

A. It was in Jeff Ploen's office, I believe.

Q. Yeah. And were you with Daryl -- Daryl Mendelsberg?

A. Mendelsberg, yes.

Q. Yeah. I was at that. So -- but I don't remember you but I was at that presentation.

A. Right.

Q. Did you know that I had been -- that I had resigned from -- from Two Rivers and GrowCo in May of 2016?

A. I don't know that you had resigned, but I heard that you had stepped down from your capacity because they were -- Two Rivers was a publicly traded company, GrowCo wasn't. But to be in the marijuana business, you couldn't be on the board of a publicly traded company was my knowledge. So yes, I did know you stepped down.

Q. Yeah. I signed a resignation and put out an 8-K and you know -- you know what an 8-K is. You're a very sophisticated investor.

A. Well, no. What is an 8-K?

Q. Huh?

A. What is an 8-K?

Q. It's a -- just a public announcement.

A. Oh. Okay. Well, I just -- people I do business with are very close quarters and we don't really deal with public companies all that much, so I didn't know what an 8-K was. Sorry.

(Court reporter asked for clarification.)

MR. MCKOWEN: It's an eight with a dash and a K. It's a form. It's an SEC form where you're just announcing it.

Q. (BY MR. MCKOWEN) So you're in the -- I wanted to ask, business, you're a landman. Got a degree from University of Texas of course. Did you ever do any land work here in Colorado during the boom of when it went crazy here in Colorado. I mean, they had a lot of Houston offices moved to Colorado?

A. Yes, sir. I did.

Q. Yeah. Were you -- were you downtown?

A. No. I was in the North Cherry Creek area offices.

Q. Okay. Yeah. And in the -- and in the land business, there's a lot of speculation with tracts and dry holes and exploration wells and all that, right?

A. Correct.

Q. Yeah. And so you're familiar with risk and the associated returns with risks, and you're also familiar with, I would bet, because I have done -- I did an oil and gas deal in Peru as well. And so you can have different people own different parcels of a particular section. Is that -- is that accurate?

A. Yes.

Q. Yeah. If you have different investors and different parcels, they're going to own it through a separate entity, right?

A. They can. Depends on how or the way you structure it.

Q. Yeah. It's common practice if they have this set of investors, then do you think you -- it wouldn't be unusual to have a -- for a separate group to have a different ownership interest and have it structured that way?

A. Say that again? I'm not sure.

Q. I'm just saying when you're setting up a real estate deal or an oil and gas field or whatever, if you have a different group of investors, it's not unusual for them to be organized in -- in a way that they have the ownership of that particular deal?

A. Correct. Yes.

Q. Yeah. And so if you had -- and if -- if you had an ownership interest in -- in -- down in Pueblo County and it was a start-up deal and all you were going to do with the -- the first part of that, and you had -- and you had broken that 160, 157 acres, you broke it into four separate entities, GrowCo Partners 1, GrowCo Partners 2, 3 and 4, and there were different potential investors in that, it's not that unusual to have it structured that way?

A. Yeah. Correct. I mean, I have a -- I have a section of land. I have a parcel. I have owners A, B, C here. C, D and F here. I got XYZ corporation here and XYZ cooperation here. So the question is, though, are they owning each of their quarter-sections or are they undividedly owning under that whole section?

So is your question, then, if you have GrowCo A, B, C, D or GrowCo 1, 2, 3, and you know you got different GrowCo partners. But do they each have an undivided interest in one entity or do they each have their -- is there a partition? GrowCo 1 owns this, GrowCo 2 owns this, GrowCo 3 owns that.

Q. And so undivided interest is a -- is an oil and gas kind of -- in terms of property and -- and cash flow associated with it.

But it would depend upon how the deal is structured for each investor. They wouldn't know from that -- from that investment what their ownership interest should be?

A. Well, they should know what their ownership interest should be. I mean, you know, if I -- if I invest in $7 million and I put in a hundred thousand dollars, I kind of know what my ownership interest is and what I'm getting back. In this case 10 percent and 22-1/2 percent and then in 2021, my entire investment.

Q. Separate deals.

A. Okay.

Q. Like you had said, can the -- I think you invested in the -- the $7 million note structure that was put together after I left. And then you properly recognized that we were going to -- and I'm using the royal way. Just like sometimes he did when he was talking about what we were going to do as it relates to their investment.

Investors often will say "we." You know. And that's -- that doesn't mean that you are trying to specifically define what that ownership or who "we" is. Would you agree with me on that?

A. Yeah. But what I was saying, John, I was

talking about myself.
Q. Yeah. Well, and so I often use that myself, and I've been in this business for 20, 25 years. So I talked to you and there was a group and I was at Jeff Ploen's office and -- and I think that the waterfall was I've been doing business with Jeff Ploen. He and I did a PPC deal or an oil and gas deal in Peru together. We had --
MS. KIDD-AARON: Objection, Your Honor. Mr. McKowen is testifying. Can you ask a question?
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) So anyway, Jeff Ploen knew me, which you have testified, and he knew Daryl Mendelsberg and that's how you ended up in the room; is that correct?
A. Yes, sir.
Q. And so you -- did you assume that I put that deal, the $7 million deal, that you invested in -- did you assume that I had structured that deal?
A. I did, yes.
Q. Would it surprise you if you learned, knew that I didn't structure that deal?
A. Why were you there?
Q. Why were you there in the room?
A. Because I had signed an agreement, a series

of agreements which we won't get into today, but you alluded to it, where I would provide a transition for GrowCo and Two Rivers to be able to take over and --

MS. KIDD-AARON: Objection, Your Honor. I would ask that if Mr. McKowen doesn't have questions for this witness, that we move on.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) And so your assumption wasn't necessarily based on fact. It was just what your assumption was about my relationship with McGrow and GrowCo?

A. And the fact that you were in the room pitching the deal. I mean, what would -- you take anybody else in my position -- and I know that it was disclosed to me that you were stepping down because you wanted to get into the marijuana business. Fine.

You were pitching the deal, though, and you ended up to be very involved with GrowCo.

Q. So were you -- are you aware that there was an agreement that required me to do that sort of thing for the company for a six-month time frame?

A. No. I had no idea. I wouldn't be privy to that.

Q. And were you aware that there was a series of agreements that were controlled by a master

agreement? Was that ever shown to you?
A. No. I have no idea.
Q. Yeah. And when you went to subscribe, did I sign any of the subscription agreements?
A. I don't remember. I'd have to look back. I think there was a Gregory or George. No, Gregory. Somebody out of Two Rivers offices that signed. You did sign the note on the McGrow deal. On the GrowCo deal, I don't believe so. I don't believe so.
I don't recall seeing your name on that, but I'd have to go back and review the subscription agreement.
Q. The McGrow was my deal. You're correct about that.
A. Okay.
Q. And so you had mentioned that --
Can you pull up 133? Plaintiff's Exhibit 133?
A. Yes. I have it right here.
Q. And it's from Two Rivers, correct?
A. Correct.
Q. And -- and the subject line, the Re, it says confirmation, right?
A. Say that again?
Q. There's a -- a statement of what this

letter is and it talks about a confirmation?

A. Yeah. GrowCo exchange note confirmation.

Q. And are you familiar with why that is being written by Two Rivers?

A. No, I'm not. I don't know.

Q. So Two Rivers you knew was associated with Two Rivers -- I mean, GrowCo was associated with Two Rivers?

A. I did not know in what capacity. I mean, my -- my dealings was with GrowCo. And I ended up at Two Rivers offices subscribing, signing everything with GrowCo and tendering the check, I think, to GrowCo.

Q. And you're apparently not that familiar with public company accounting and how they do all that stuff?

A. Well, I'm familiar with accounting, and I mean, yeah. I'm familiar with accounting, you know, certain things have to be disclosed. What -- what are you getting at?

Q. I'm just saying that's not unusual that Two Rivers would send out the confirmation because they're required by public company accounting to consolidate their -- their financial statements?

A. Well, so what you're telling me is I get

this note from Two Rivers in February 20th of 2018, saying that I'm owed a hundred thousand dollars and my interest owed is 16,250. So are you telling me that GrowCo does not owe this to me, but Two Rivers owes this to me?

Q. No. That's not what I'm saying. I'm saying that when you have a public company that has ownership of a -- an entity, which Two Rivers did have an ownership interest in GrowCo -- that there are certain tests that the Company is required to do and so when they go to do an audit, what they're doing here is simply trying to confirm with you that the information that they have on their books on a consolidated basis says that GrowCo owes you that money?

A. Okay. I thought of that. And taking that a step further, doesn't this also indicate that McMahon Energy Partners also has an interest with somebody, either Two Rivers or GrowCo, based on this amount of money here?

Q. Yeah. It's just -- it's just an accounting principle and they're just trying to confirm the accountants -- the accountants are the ones that sent that out?

A. Okay. So yes. So yeah. Somebody owes me

that. And so I have an ownership interest someplace. It's on Two Rivers Water & Farming letterhead, but I did my deal with GrowCo, so I'm a little confused here. Who owes me?

Q. What's the last part?

A. Who owes me $100,000 plus accrued interest?

Q. GrowCo would owe that to you and then you would have some --

THE COURT: Stop. You need to pose a question. It's not a back and forth. If he poses a question back to you, that doesn't -- that's not an invention to provide unsworn testimony.

Q. (BY MR. MCKOWEN) Okay. So I've got this -- I believe that you -- you have it in your -- in your exhibits, if not, can you pull up the subscription agreement? I thought I wrote down the number but it's basically the -- the joinder agreement for your subscription in the GrowCo note.

THE WITNESS: In the GrowCo note? Anybody recall a number that it is? Would that be 128 or something like that?

MS. KIDD-AARON: 126.

MR. MCKOWEN: Yeah. I think it's 126.

THE WITNESS: I was pretty close. I said 128.

Okay. I have 126 here, sir.

Q. (BY MR. MCKOWEN) And so somewhere in there there's a joinder agreement, and you're attesting to that you're an accredited investor?

A. Right.

Q. And that's obviously true in terms of your sophistication and you're saying that you have these investments and they came to you through this group of people that -- that had invested with me before; is that correct?

A. Yes, sir.

Q. Okay. Did -- aside from that meeting in Jeff Ploen's office in the Tech Center, did -- did you communicate anything other than the subscription documents? Did we talk about it?

A. In Jeff Ploen's office? I don't recall. Because I think I, wherever I got these documents, I ended up -- and I may have -- I either signed them or I delivered them to Two Rivers office.

Q. Yeah. You ended up going to the Two Rivers office to sign them?

A. I think so.

Q. So I wasn't -- I had resigned in May, and you -- but you didn't know that I hadn't necessarily resigned then?

A. Correct.

Q. Okay. Do you know who put together that pro forma that is associated with that -- that presentation?

A. No, sir.

Q. Do you know who put the presentation together?

A. The people behind GrowCo would be my understanding and it was probably you, I thought.

It would -- it would have been you.

Q. I'm not hearing you. I'm sorry?

A. Okay. Who put together the presentation? It was my understanding it was you.

Q. Okay.

A. You were pitching this deal. We get a packet. I assume it came from you. And so you're telling me you resigned back in May, though, right?

Q. Right. Are you -- are you aware that Jeff Ploen was a director of GrowCo?

A. At one point, yes.

Q. Yeah. And are you aware that I almost immediately in 2016, I had disputes with GrowCo and how the funds were being spent?

A. No. I'm not aware of that.

Q. Yeah. I have -- you don't remember that?

A. Who me?
Q. Yeah.
A. No. You have to understand, Mr. McKowen, this came about from a social encounter with guys that I deal with on a social basis, and they said, you know, you need to come to this meeting. It may be of interest to you. It's an investment. May be up your alley, and I did. I brought my assistant, who's my daughter who works for me.
And we had drawbacks but we decided to, you know, based on the pitch at the meeting and everything and who was present, we decided to invest.
Q. Did you think this was a relatively safe investment?
A. When the question was asked, what's our money secured by? The land? The property? And the answer was yes, it gave me a pretty good feeling that it would be more secure than I thought it would be.
Q. Okay. And is it your testimony that I was the one that gave you that assurance?
A. Somebody did, there were a lot of people in that meeting.
Q. Yeah. Yeah. So Jeff Ploen was -- was one of the directors of -- of GrowCo.
Are you aware that he was paid a commission

for everybody that was in that room?

A. No, sir. I am not.

Q. Okay.

MR. MCKOWEN: You and I exchanged e-mails and it's understandable and I have a -- I guess I would need to create another Exhibit 1049. And I think the e-mail is in -- in your list of exhibits.

MS. KIDD-AARON: This exhibit is from 2021, which is outside of the date range of this case, so I object to the admission of this exhibit.

THE COURT: Well, he hasn't offered it yet. Doesn't sound like that exhibit is part of the plaintiff's exhibit list. So if you want to try to introduce it, you can. I need to look at it. I've never seen it.

MR. MCKOWEN: Okay. You need to see it?

THE COURT: Yes. Was this disclosed pretrial?

MS. KIDD-AARON: No.

MR. MCKOWEN: It's in their disclosure.

THE COURT: Have the People seen this exhibit?

MS. KIDD-AARON: No. I just don't believe before today, Your Honor, but I can take a closer look at it.

THE COURT: If we could have Ms. Kidd-Aaron take a look at that to see if it's been disclosed in discovery at some point pretrial.

MR. MCKOWEN: Do you want to see it again?

MS. KIDD-AARON: Your Honor, this does not look familiar. I don't know if we have seen this before. I know that it was not in the exhibit list. So I just don't know.

THE COURT: Mr. McKowen, did you provide that to plaintiff prior to trial?

MR. MCKOWEN: It's an exchange between he and I. The plaintiff? It was in there. I'm sorry. It was in there. They've got -- I don't know. Almost a half a terabyte of documents, you know. You saw a small portion of it when I delivered the thumb drive to you. So it's in there.

THE COURT: Right. Well, you're saying it is and the AG is saying it isn't. So I haven't seen it. So how am I to know whether or not it was disclosed pretrial? Do you have a record? Do you have the information that the attorney general provided it to you?

MR. MCKOWEN: That they -- that they provided it to me?

THE COURT: Right.

MR. MCKOWEN: Yeah, I do.

THE COURT: And was that e-mail provided to you by them?

MR. MCKOWEN: It was in the -- it was in the -- the Rule 26 disclosures that they made to me that was every e-mail that I ever had related to any of these people.

MS. KIDD-AARON: Your Honor, can I ask if there's a Bates label at the bottom of that document? Is there a Bates label?

MR. MCKOWEN: No.

MS. KIDD-AARON: All of our documents have Bates labels that were disclosed.

MR. MCKOWEN: Well, I -- I went and pulled it based upon the information, but it's -- it's not that material. It doesn't matter. I'm just -- my point is just the -- my point in presenting it is just the discussion between Mr. McMahon and I. It doesn't -- it's not anything of any significance. I can understand his perspective.

THE COURT: Okay. Well, my concern is if you're going to try to introduce an exhibit that wasn't disclosed between the parties, then that's an untimely disclosure and I'm not going to permit the exhibit.

MR. MCKOWEN: Okay.

THE COURT: If you want to make a further record and you think otherwise, you can show me that that was exchanged between the parties and whether you're providing it to them or they're providing it to you, then I'm willing to consider the exhibit. But if it hasn't been disclosed and you're not able to demonstrate that it has been, then I'm not going to permit the exhibit.

MR. MCKOWEN: It has been disclosed but it's -- it's not even worth the ten minutes that we spent on it.

THE COURT: Okay. Are you withdrawing your offer of the exhibit then?

MR. MCKOWEN: Say again?

THE COURT: Are you withdrawing your offer of the exhibit, or not offering the exhibit?

MR. MCKOWEN: Yeah. I'm withdrawing.

THE COURT: 1049 is withdrawn. I don't know if it was ever offered, but 1049 is not admitted.

Q. (BY MR. MCKOWEN) Mr. McMahon, you had either heard -- someone had said to you that I have declared bankruptcy. At least that was your testimony?

A. Uh-huh.
Q. Can you tell me who told that you?
A. No. Just conversation amongst the bigger group. You probably know the players: Jeff Ploen, Daryl Mendelsberg.
Q. I haven't declared bankruptcy. Were you aware of that? I did put GrowCo in bankruptcy.
A. Okay.
Q. Were you aware of that?
A. No. I was not.
Q. Okay. Were you -- are you aware that there's a settlement agreement in place that was approved by a federal court?
A. I received a call, a voicemail, prior to the Fourth of July weekend, from somebody back east about Two Rivers and a settlement where they needed -- they wanted a substantiation of my claim.
And so is that what you're talking about?
Q. Yes.
A. Okay. I heard that's going on. That's the first I heard of it, and I don't know what the status is or anything, but what I did do, I forwarded those people my affidavit of that -- that's in this trial.
Q. And a copy of your note?
A. And what?

Q. And a copy of your note as well?

A. Yeah. I'd have to look. I couldn't attest to that.

Q. Okay.

THE WITNESS: Your Honor?

THE COURT: Yes?

THE WITNESS: Can I have two minutes to send my daughter a text message? I'm supposed to pick up my grandson. So she can pick him up. It will take one minute.

THE COURT: Okay. Can you do it from there?

THE WITNESS: I can do it from right here.

THE COURT: Okay.

MR. MCKOWEN: Can I go to the bathroom real fast? I'll take two minutes.

THE COURT: And we're going to finish this witness today, even if we have to go past 5.

THE WITNESS: Done. Thank you.

THE COURT: I think we're ready.

Q. (BY MR. MCKOWEN) Mr. McMahon, are you aware that I started complaining about the use of your money almost immediately in the latter part of 2016, 2017?

A. No, sir. I'm not.

Q. Are you -- when you get information about me and your investment, not that it should be a topic after six, seven years later, who do you get that primarily from, the group?

A. Yes, sir. Yeah. Primarily.

Q. And so are you aware that I think it's the people inside of that group who took your money and used it inappropriately?

A. I don't know. I can't address that.

Q. Yeah. So this trial is in large part, from my perspective about that. Have you had a chance to see or even bother to look at the complaint or anything like that?

A. I've read through it. Like I said earlier, there's so many entities out there on the docket board and looking through this book, going back years before I was involved, you got GCP-1, you know, this and that.

And just -- it's just too -- it's above my pay grade. It's above my pay grade. It's too confusing for me. I just know I dealt with two entities, GrowCo and McGrow. And I put up money for both, signed notes and everything. Was paid a little bit and it's all gone now.

And what you just told me now is that you

put -- you personally didn't declare bankruptcy but you put GrowCo into bankruptcy.
Q. Right.
A. So -- and then you're telling me did I get a notice of a settlement. Well, I got a notice just before the fourth of July from some due diligence company back east saying that Two Rivers did something and there's -- you know, they want to substantiate my claim.
So you've got a lot of moving parts in this.
Q. I can't go back and forth with you.
A. Okay.
MR. MCKOWEN: Can you pull up 1027 of my exhibits? Can you pull up the -- thanks.
MR. HARDING: What exhibit is this?
Q. (BY MR. MCKOWEN) When you were --
THE COURT: Hold on. Hold on. There's a question, Mr. Harding.
MR. HARDING: What exhibit is that?
THE COURT: 1027.
MR. HARDING: Thank you.
MR. MCKOWEN: Of mine.
THE COURT: Go ahead. Sorry to interrupt.
Q. (BY MR. MCKOWEN) Mr. McMahon, is that the

kind of plant you were talking about that -- that you were shown or in the greenhouses?
A. I don't know if that's the exact plant, but I saw a picture similar to that, yes.
Q. I wasn't looking at you when you indicated how tall it was. That particular picture is -- is a problem. Are you familiar with marijuana plants and them growing and that sort of thing?
A. No, sir.
Q. Would you be surprised if I told you neither was I?
A. Well, I would be because I understand this is supposed to be your business.
Q. Okay.
MR. MCKOWEN: Can you pull up 1029 and scroll all the way to the bottom? Keep going. It's at the bottom.
Q. (BY MR. MCKOWEN) So this was --
MR. MCKOWEN: Keep it on that front -- second picture. Sorry.
Q. (BY MR. MCKOWEN) When you were referencing the money for putting in the machine, were you ever given any images of that machine ad all that?
A. I don't know if it was the exact machine, but we saw pictures of a machine supposed to do what,

you know, you -- you were claiming it was supposed to do.

Q. Okay.

A. I mean, I couldn't tell you if -- if it was the machine or just a picture of a machine, but yeah. I did see a picture of one.

Q. And this is the machine and this is the space that we changed the -- that you were referencing it, but you don't necessarily recall any of that or the specifics of that?

A. I just recall reviewing pictures from time to time. I couldn't tell you the time frame or where they were. I saw pictures of marijuana plants, and I saw pictures of a machine and some tube. Maybe with some oil in it.

Q. Are you aware that I'm the largest cash investor in McGrow, that I was investing right alongside of you?

A. No. I did not know that.

Q. Okay. Are you aware that I was one of the largest investors, if not the largest investor, in GrowCo?

A. I did not know that.

MR. MCKOWEN: I don't have anything else. Thank you, Mr. McMahon, for coming. Maybe we can get

some of this straightened out.

THE COURT: Thank you. Mr. Harding, any questions?

MR. HARDING: Yes, sir.

THE COURT: All right. Go ahead.

CROSS-EXAMINATION

BY MR. HARDING:

Q. Mr. McMahon, thank you for delaying yourself picking up your grandkid. Because I know it's really important to be with your grandkids. I've got seven of them. How many do you have?

A. Five.

Q. Five. Bless your heart. Okay. Just a couple of points of clarity, and I will get you out of here real quick. First one is you said that you invested a hundred thousand in GrowCo and 50,000 in McGrow; is that correct?

A. Yes, sir.

Q. And you did get paid back something on the GrowCo side?

A. Yes, sir.

Q. Okay. Approximately what? 10,000 about or --

A. No. It wasn't that much. Take five months times $815, whatever that comes out to be. So a

little over $4,000.
Q. Okay. And then the GrowCo investment, did you receive funds back from that at all?
A. No, sir.
Q. Okay. And you mentioned that you met -- and I think you mentioned my name that you might have met with me too. But to tell you the truth, I don't ever remember meeting with you. Are you sure that you met with me?
A. No, I'm not. The only place I probably would have met with you would be two places. Number one, at the initial meeting on the GrowCo deal or number two, when I was at your office when I handed over my checks and the signed agreements. Whether I met with you or not I just can't remember.
Q. Okay. Thank you for that. Are you aware that -- well, you were mentioning it's hard, it gets mixed up and I know there's a lot of entities. You mentioned GrowCo and McGrow. And it was during GrowCo probably that -- if you met me or whatever, had any kind of correspondence with me it would probably be GrowCo. Right? You never saw me represent or say anything or anything else about McGrow, did you?
A. You're correct. Just GrowCo only.

Q. Just GrowCo only. Okay. I appreciate that.

Did -- when we met, do you remember if I made any investment statements or promises to you or representations?

A. No, sir. I don't.

Q. Okay. Thank you, sir.

MR. HARDING: If you can pull up Exhibit -- please, one moment, please -- 126. And would you please go to page 21 of that exhibit toward the bottom. This is -- if you hold have that up for us, I think that will be helpful.

THE WITNESS: Page what?

MR. HARDING: It's page 21 of the PDF. It's section 3.4.

Q. (BY MR. HARDING) Oh, by the way, are you -- are you -- it sounds like you're an accredited investor?

A. Well, whatever that is. What is it?

Q. Well, it's -- the -- the definition changes over time, but I believe when you were doing fund -- you know, capital raise; it was an income and this from a single standpoint -- from a single person, income greater than 200 or maybe 250 over the last two years per year and/or a net worth greater than

$1 million, excluding your home?
A. Okay.
Q. And I believe also when you did the subscription you signed an accredited investor form, correct?
A. Probably.
Q. We can always find it if that's necessary. So 3.4 says that you have sufficient knowledge and experience investing in companies similar to GrowCo and GCPSU in terms of their stages of development, are able to evaluate the risks or merits of the investment?
A. Correct.
Q. So you -- you more or less agree with that statement, correct?
A. I do.
Q. Okay. Thank you. And then up there at 3.3, disclosure information, that you've had an opportunity to discuss with management, GrowCo, GrowCo's super units, business management, finan -- sorry. Reading too fast -- business management, financial payers of GrowCo, PCP super units, and other terms and conditions of this offering. You were given that opportunity, correct?
A. Correct.

Q. Okay. And it sounds like most of that correspondence of that opportunity was between you, your -- well, I don't know how you say it -- buddies, investment group, or guys that get together and play golf or whatever, and then also meet with Mr. McKowen; is that correct?

A. Yeah.

MR. HARDING: I appreciate your time. I think you should go get your grandkids and spend some time with them. Thank you so much.

THE WITNESS: No. My daughter is going to do that. Thank you.

THE COURT: Any redirect?

MS. KIDD-AARON: No, Your Honor.

THE COURT: All right. Mr. McMahon, your testimony is complete.

Thank you.

THE WITNESS: Thank you.

THE COURT: You may step down.

Okay. We're at 4:45. I would suggest we recess and not start another witness. Plaintiff agree?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: Yes.

THE COURT: And Mr. Harding?

MR. HARDING: That's fine.

THE COURT: We are set for 9 a.m. every day. I'm fine starting at 8:30. But I know probably from the court file, I don't know if we discussed it previously at the pretrial, starting at 9:00 every single day if the parties had planned your schedules around 9:00, I'm fine keeping it at 9:00. But I know with jury trials, we always start at 8:30.

I'm fine starting early tomorrow or the rest of the way or we can keep it at 9:00. Plaintiff at what position?

MS. KIDD-AARON: Plaintiff is flexible and happy to do whatever the Court wants to do.

THE COURT: All right. Mr. McKowen, do you have a preference?

MR. MCKOWEN: 9:00 is fine. I can start whenever you want.

THE COURT: What about 8:30?

MR. MCKOWEN: I can start at 5 if you want. 8:30 is fine.

THE COURT: All right. I don't know if I can do 5 but I can do 8:30.

Mr. Harding, do you have a preference?

MR. HARDING: Your Honor, I potentially

prefer 8:30.

THE COURT: Well, if it's okay with everybody, I will be here at 8:30. Let's start at 8:30 tomorrow. Just keep in mind I do have to finish early at 11:45 and then we'll start up again probably at 1:15 because my meeting is from 12 to 1. So I will hustle back for 1:15. Anything from plaintiff then before we recess?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen, anything from you?

MR. MCKOWEN: Only I'd like to talk to them and get a good sense of where we are in terms of witnesses for tomorrow and that.

THE COURT: All right. Do you have a copy of the order of proof that was provided to me?

MR. MCKOWEN: Yeah.

THE COURT: Anything other than that?

MR. MCKOWEN: No.

THE COURT: Mr. Harding, anything from you?

MR. HARDING: Only that he has my order of proof. His is behind his computer.

THE COURT: All right. And I would ask the parties, at some point, if you can discuss about admitting any other exhibits by stipulation. I will ask you in the morning if you have a list of those.

It makes the time go faster.

If you have no objection to them, you get to spend more time talking about the substance and not establishing foundation for exhibits. So I would suggest you talk about that.

MR. MCKOWEN: Can we leave stuff here?

THE COURT: You can leave everything in here. We don't have anything else on the docket tomorrow. So we'll lock up once everybody's out of the courtroom.

All right. I will see you tomorrow.

WHEREUPON, the within proceedings were adjourned at the approximate hour of 4:54 p.m. on the 10th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, THERESA L. MENDEZ, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 268 herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 24th day of July, 2023.

My commission expires September 21, 2025.

Theresa L. Mendez, RPR
Registered Professional Reporter
and Notary Public

**REPORTER'S TRANSCRIPT - VOLUME II - July 11, 2023**

| | |
|---|---|
| DENVER DISTRICT COURT, CITY AND COUNTY OF DENVER, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | ^COURT USE ONLY^ |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>vs.<br><br>TWO RIVERS WATER & FARMING COMPANY, et al.,<br>Defendants. | Case No.: 21CV3392<br><br>Courtroom: 259 |

REPORTER'S TRANSCRIPT

Tuesday, July 11, 2023

VOLUME II

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Courtroom 25, Denver, Colorado 80202 on Tuesday, July 11, 2023, commencing at 8:21 a.m., before the HONORABLE CHRISTOPHER J. BAUMANN, District Court Judge. These proceedings were reported by Melanie L. Giamarco, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public for the state of Colorado.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF

ROBERT W. FINKE, 40756
First Assistant Attorney General
JENNIFER HUNT, 29964
Senior Assistant Attorney General
INDIA KIDD-AARON, 48420
Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Tel: (720) 508-6401
Fax: (720) 508-6037
robert.finke@coag.gov
jennifer.hunt@coag.gov
india.kidd-aaron@coag.gov

APPEARING FOR THE DEFENDANT:

JOHN McKOWEN (Pro Se)
335A Josephine Street
Denver, Colorado 80206
john@johnmckowen.com
(303) 248-6883

WAYNE HARDING (Pro Se)
22586 East Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

ALSO PRESENT: Brian Keener, Assistant Attorney General Fellow
Kaitlyne Hernandez, Law Clerk
Connor Muelken, Division Clerk

**REPORTER'S TRANSCRIPT - VOLUME II - July 11, 2023**

INDEX OF EXAMINATION


| WHITNEY BUCHANAN (via WebEx) | PAGE |
|---|---|
| Direct Examination by Ms. Kidd-Aaron | 5 |
| Cross-Examination by Mr. McKowen | 49 |

| WAYNE HARDING | PAGE |
|---|---|
| Direct Examination by Ms. Hunt | 101 |


INDEX OF ADMITTED EXHIBITS


| EXHIBIT | PAGE |
|---|---|
| Exhibit 4 | 111 |
| Exhibit 6 | 129 |
| Exhibit 7 | 157 |
| Exhibit 8 | 150 |
| Exhibit 9 | 157 |
| Exhibit 10 | 188 |
| Exhibit 13 | 205 |
| Exhibit 21 | 188 |
| Exhibit 22 | 193 |
| Exhibit 23 | 215 |
| Exhibit 24 | 205 |
| Exhibit 44 | 137 |
| Exhibit 49 | 167 |
| Exhibit 51 | 24 |

INDEX OF ADMITTED EXHIBITS (CONTINUED)


| EXHIBIT | PAGE |
| --- | --- |
| Exhibit 52 | 127 |
| Exhibit 62 | 15 |
| Exhibit 63 | 221 |
| Exhibit 64 | 226 |
| Exhibit 85 | 171 |
| Exhibit 90 | 218 |
| Exhibit 91 | 218 |
| Exhibit 102 | 35 |

P R O C E E D I N G S

THE COURT: Let's go on the record in Case Number 21CV33922. All parties and counsel are present. And is plaintiff ready to proceed?

MS. KIDD-AARON: Yes, your Honor.

THE COURT: Mr. McKowen, are you ready to proceed?

MR. McKOWEN: Yes, I am.

THE COURT: And Mr. Harding, are you ready to proceed?

MR. HARDING: I am, sir.

THE COURT: All right. Just to make a record, off the record, just one moment ago, we were speaking -- I was speaking with Mr. Harding about how he would testify. And I explained that he would be sworn in, he'd be able to make a sworn statement. He'd be subject to cross-examination by plaintiff's counsel and then be given an opportunity to make a final sworn statement and rebuttal.

And Mr. McKowen, that'll be the same process for you. Just understand if you call yourself as a witness, you are subject to cross-examination by the other side.

And then we also talked about scheduling for

Mr. Harnish, who is one of Mr. Harding's witnesses. Our order of proof shows day six, or sometime thereafter. I instructed Mr. Harding to discuss with Mr. McKowen and opposing counsel scheduling of witnesses. And also, Mr. Harnish is testifying via WebEx. If he does testify, and that would be the same process that we have used today, that we're using today for plaintiff's witness.

All right. Let's go ahead and we'll start testimony then. Plaintiff's next witness.

MS. KIDD-AARON: Plaintiff's witness is Whitney Buchanan.

(Whitney Buchanan appearing via WebEx.)

DIRECT EXAMINATION

BY MS. KIDD-AARON:

Q. Good morning, Mr. Buchanan.

A. Good morning.

Q. Can you hear me okay?

A. I can. Can you hear me?

Q. I can. Thank you.

THE COURT: So, Mr. Buchanan, can you hear me as well?

THE WITNESS: Yes.

THE COURT: Let me turn my video on. I'm sorry. There we go. Can you hear me as well?

THE WITNESS: Yes. Thank you.

THE COURT: All right. I need to swear you in.

I do show a Mr. Keener on. Is Mr. Keener a witness or an observer? Oh, Mr. Keener's over here. All right. We're ready.

Q. (By Ms. Kidd-Aaron) Mr. Buchanan, can you state and spell your full name for me?

A. My full name is Whitney Buchanan, W-h-i-t-n-e-y, last name, B-u-c-h-a-n-a-n.

Q. Thank you. And what is your educational background?

A. I have a degree in mechanical engineering and a law degree.

Q. And what do you do for work? What is your profession?

A. I've been continuously licensed as an attorney in New Mexico since September 26, 1984.

Q. And have you ever -- or do you have any professional licenses or certificates outside of your legal license?

A. No.

Q. Have you ever worked in the finance industry?

A. No.

Q. In the securities industry?

A. No.

Q. How are you familiar with the defendants in this case?

A. In the spring of 2017, we bought a farm out just a little bit west of Fowler, Colorado, and we were going to cultivate CBD hemp on that farm. And I encountered the GrowCo greenhouse down in Avondale while we were looking for a place to clone CBD hemp, because at that time, the zoning authority in Pueblo County, Colorado, insisted that there was no such thing as feminized seeds, and you could only cultivate clones if you're going to grow CBD outdoors.

Q. And when you say "we," who are you referring to?

A. We had a company called TOL Grizzly Bear, LLC, and there were several other companies that were investors in that company. And that's who bought the farm and was going to cultivate the CBD.

Q. And when you encountered the greenhouse, did you speak with anyone there?

A. I met with Tim Beall. I know he calls himself Tim Beall, but I've called him Beall for so

long, I'm going to say it wrong. I'm sorry.
Q. Okay. And that is -- can you spell his last name, for the record?
A. B-e-a-l-l.
Q. Thank you. And what did you and Tim Beall meet about?
A. Well, we met at the Avondale facility and talked about whether or not they could accommodate us with a bay or two to clone CBD. And then we started talking about the rest of our experience and our operation, and the fact that we had a Vitalis carbon dioxide extraction unit up in Colorado in the lab, and Tim became very interested in that equipment.
Q. And can you tell us more about what that extraction equipment does?
A. What it does is you have a compressor that compresses carbon dioxide to a state called supercritical, which is about 5,500 psi. And it pumps that highly compressed CO2 through feedstock plant material --
THE COURT: Hold on one sec.
MR. McKOWEN: I object to this testimony.
THE COURT: On what grounds?
MR. McKOWEN: It's not relevant to the

complaint. It's a contract between -- that is separate and apart from the issues in this complaint.

THE COURT: Overruled.

Mr. Buchanan, you can finish your response.

A. Okay. So the equipment pumps the CO2 through plant material and strips out the oil from the solid matter, and you can collect the oil and process it.

Q. (By Ms. Kidd-Aaron) Okay. And this is specifically for THC oil, or . . .

A. You can use it for anything from lavender to algae to CBD hemp to marijuana, any of those things.

Q. And did you ever go into business with Mr. Beall?

A. Well, we entered into a contract with a company called McGrow to lease this equipment.

Q. And what was your understanding? What was McGrow going to do with this equipment?

A. They were going to take marijuana flower and trim materials that they couldn't sell as smokeable and run it through this equipment and extract the oil and fill vapor cartridges with the oil.

Q. And what was your understanding about the marijuana laws at this time specifically related to someone operating an extraction?

A. There's a -- oh, I didn't have any idea. I just knew that hemp and marijuana were two different constitutional and statutory regulatory schemes in Colorado. And I assumed that they knew the regulatory scheme for the business that they were operating.

Q. And when you say "they," who are you referring to?

A. Well, it started out as GrowCo, and after we had already financed the equipment, you know, it was in the process of being built, then they shifted the name on the contract to McGrow.

Q. And when you say "they," is it still Tim Beall? Was there anybody else involved?

A. John McKowen was the one who was negotiating the contract with us.

Q. And so did you speak directly with John McKowen or was it someone else from TGO Grizzly?

A. We communicated -- I communicated directly with John. I was drafting the contract and negotiating it with him.

Q. And I want to take a step back for a

moment. So you said initially it was GrowCo, and then it was McGrow. Can you explain that?

A. I understood that GrowCo owned the greenhouse, and we started negotiating this contract. And we had already secured our financing for the equipment. The money had gone to Vitalis to build the equipment. And we signed a master lease with our finance company to purchase this equipment and made a down payment. So the equipment was coming. And well into this process, Tim Beall said, you need to change it to say McGrow instead of GrowCo. And I didn't feel like we really much choice, but (indiscernible) their corporate structure.

Q. Okay. You cut out a little bit at the end, so I'm going to ask you to say -- to repeat what you said, starting at, you didn't really have much choice.

A. Yes. And we had already financed the equipment and made a down payment for it, and it needed to go somewhere, so I didn't really question their corporate structure. I didn't question how McGrow fit into GrowCo.

Q. Okay. And did you have an understanding of the relationship between GrowCo and McGrow?

A. I understand that they're different entities, and one of them has assets, and one didn't really have any assets.

Q. And which one had assets, to your understanding?

A. GrowCo.

Q. And was that -- did that change make any difference to you, going from a contract with GrowCo to McGrow?

A. It had repercussions. I didn't feel like we could really quibble about it at that time, because this equipment was going to show up, and it needed to go somewhere. And we were going to pay $22,000 a month for it until it did, so . . .

Q. And what were the repercussions that you were . . .

A. I think the repercussions were that almost immediately, McGrow started creating excuses for not making payments. And we ultimately ended up having to repossess the equipment.

Q. Okay. Did you sign any contracts related to this?

A. Yes.

Q. So I sent you a few exhibits. And I'm going to ask if you can turn to Exhibit 62.

A. I have it.
Q. Sorry. It's taking me a little bit longer.
So does this look familiar to you?
A. Yes.
Q. What is it?
A. It is called a third amended service agreement.
Q. And what is a service agreement -- how do you know what it is?
A. I drafted this and redrafted it and redrafted it. And this is an agreement between our company, TOL Grizzly Bear, LLC, as the lessor of the agreement, and OGZ Holdings, LLC, who was the -- going to be the operator of the equipment, and McGrow, who was going to be leasing the equipment.
MR. McKOWEN: Can you tell me the exhibit number again?
MS. KIDD-AARON: 62. 62.
MR. McKOWEN: Thank you.
Q. (By Ms. Kidd-Aaron) And is this a true and accurate copy?
A. Yes.
MS. KIDD-AARON: Your Honor, I would move to

admit Exhibit 62.

THE COURT: Mr. McKowen, any objection?

MR. McKOWEN: Yes. It's not relevant to this issue.

THE COURT: Objection overruled.

Mr. Harding, any objection to 62?

MR. HARDING: Was the number five two or six two?

THE COURT: Six two.

MR. HARDING: I'm sorry, your Honor. Just give me a quick second. I was on the wrong exhibit. No objection.

THE COURT: 62 is admitted.

(Exhibit 62 was admitted into evidence.)

Q. (By Ms. Kidd-Aaron) And so why is this a third amended service agreement?

A. We had ongoing discussions over things that John did or didn't like or wanted changed (indiscernible) a while for us to get this finalized.

Q. Okay. And what types of things did Mr. McKowen not like?

A. I don't really recall the specifics at this time. I just know that this went back and forth and back and forth for a long time.

Q. And was this agreement adhered to by both parties?

A. We adhered to it. We provided the equipment. We delivered it, and OGZ Holdings set it up and started to operate it.

Q. And were there payment requirements under this agreement?

A. Yes, there were lease payments that needed to be made. And we accommodated that period of time while the equipment was being dialed in to operate in an optimal fashion by reducing (indiscernible) during that time.

Q. And were those payments made?

A. Some were, and some were not.

Q. Do you know approximately how many were not?

A. I would say that about half of them were not. And we would get partial payments. We would send notices of default and demands. And they would make enough -- just enough payment to keep us from defaulting the equipment out with them under the contract.

Q. And so what did you do when the payments were not made?

A. We corresponded with them through our

attorneys and pointed out the contractual provisions and how far behind they were and demanded payment.

Q. And when they didn't pay, why didn't you repossess the equipment?

A. We ultimately did repossess it, but bear in mind, this equipment was something on a scale that you could not simply pack it up and move it next door the same day. It required about $30,000 worth of labor to move it and, you know, set it up and dial it in again. And it also required finding a place that was big enough to utilize it. And after we ended up finally repossessing it, it sat in storage for a year while we made payments on it until we could find that place.

Q. So what was your understanding of who was going to be operating this equipment? Was it McGrow?

A. OGZ Holdings was supposed to be paid to run the equipment, because this is sophisticated equipment to run. It's not something that you just turn on and turn off. So OGZ ran it for a while. They didn't get paid, and they were run off. And then McGrow's own employees began to operate it.

Q. Do you know if McGrow's employees or

anyone at McGrow was -- had Amerijuana license?

A. Come to find out that they did not, and that it was unlawful for them to operate this equipment under Colorado law.

Q. How did you find that out?

A. My attorneys told me.

Q. And what attorneys -- why did you have these attorneys?

A. We had them for a couple of reasons, but, regarding this instance, it was to get this equipment back.

Q. And what did they tell you specifically? How did the licensing issue come up?

A. Well, we were -- according to the contract, we were supposed to proceed through some various alternative dispute resolution processes in the event of a default, or claim of a default. And during that process, our attorneys at Greenspoon Marder in Denver said, hey, they're not even lawfully leasing this from you. You need to get the holder of the license at that facility on this lease.

Q. And do you know who the holder of the license was?

A. Yes. It was Amerijuana, Inc., which was

Mike McCullough and Tom Wegs.

Q. And were you able to get marijuana on the lease?

A. Yes. We had a mediation. And Mike McCullough showed up and signed on to a lease. And we let McGrow off of the lease.

Q. And did you ever inquire about why Amerijuana wasn't on the lease initially?

A. I didn't inquire about it, but I understood that -- I didn't know the Colorado marijuana laws adequately. I suspect that, between McGrow and the marijuana, they did. They should have.

Q. Okay. And so you assumed that the people who were signing the lease who were -- had the obligation to have the license knew the law? Is that what you're saying?

A. I assume so. They were the ones owning and operating Amerijuana greenhouse in Colorado, yes.

Q. And I want to go back for a moment to GrowCo and McGrow.

So you said you thought that GrowCo was the owner of the greenhouse?

A. Yes.

Q. Go ahead.
A. Yes, that's the representations that were made by Tim. And it was also something that I came to understand through a series of e-mails, investor e-mails.
Q. That GrowCo was the owner of the greenhouse?
A. Yes.
Q. Do you still believe that GrowCo is the owner of the greenhouse?
A. At this point in time, I don't know who owns the greenhouse.
Q. And why is that?
A. Because in the process of GrowCo's bankruptcy, they were supposed to enter into a transaction with a company called VitaNova Partners that he was supposed to acquire the greenhouse from.
Q. And do you know -- whose company is VitaNova Partners? How does that play into this?
A. It's a company created by John McKowen to arrest control of the greenhouse away from GrowCo and Two Rivers and their creditors.
Q. So what was your understanding of John McKowen's relationship to GrowCo?

A. I understood that he was a principal in GrowCo. I don't know his exact title, but I understand that he had operational control over GrowCo at that time.

Q. So did you understand why he created another company to take control of the greenhouse?

A. I do, because in the context of this bankruptcy, there were, I want to say, 17 million dollars worth of debtors who were making claims, and the greenhouse would have to be liquidated to pay them maybe 5 percent of their notes.

Q. And did you understand -- or whose company was McGrow?

A. John McKowen.

Q. So did you understand McGrow to be a subsidiary of GrowCo? Or what was the relationship between the two?

A. I had a vague understanding, but I understood that they were related entities. I didn't know to what extent --

MR. McKOWEN: Can he speak up? I can't hear him, please.

THE COURT: Mr. Buchanan, can you speak up just a little bit?

THE WITNESS: Yes.

THE COURT: Thank you.

A. I understood them to be related entities, but I did not have a firm understanding of the extent to which GrowCo exercised control over McGrow.

Q. (By Ms. Kidd-Aaron) And why did you believe them to be related?

A. The names, and the fact that the manager who was working for GrowCo told me to change the name on the contract to McGrow. So I had a GrowCo employee telling me to change the contract name to McGrow.

Q. Okay. And you also mentioned that John McKowen was involved in both companies.

Did that have any influence on your belief that these were related companies?

A. Yes. I mean, I'm dealing with the same people. I'm dealing with John for McGrow and was dealing with John for GrowCo.

Q. And so outside of this business relationship with TOL Grizzly, did you have any other dealings with John McKowen, GrowCo, McGrow?

A. Yes.

Q. And what were they?

A. I purchased a $100,000 note from GrowCo.

Q. If you can turn to Exhibit 51.
A. Is this the memorandum of terms?
Q. It should be the memorandum of terms, and it also should be a subscription, a contract.
A. Yes. Yes, it's like 52 pages, correct?
Q. That sounds about right.
A. I have it.
Q. So do you know what this is?
A. Yes, these are the documents that I was presented with in order to have GrowCo accept my $100,000 in exchange for a note.
Q. And is this a true and accurate copy?
A. Yes.
MS. KIDD-AARON: Your Honor, I would like to admit Exhibit 51 into evidence.
THE COURT: Mr. McKowen, any objection to 51?
MR. McKOWEN: Just that the same --
THE COURT: Can you pull that microphone down so the witness can hear you?
MR. HARDING: The same standing objection that he's a releaser under the Paulson agreement, and that his testimony is in violation of that agreement.
THE COURT: All right. Objection overruled

pursuant to my previous order.

Mr. Harding, any objection to 51?

MR. HARDING: No, sir.

THE COURT: All right. 51 is admitted.

(Exhibit 51 was admitted into evidence.)

Q. (By Ms. Kidd-Aaron) So prior to your hundred-thousand-dollar investment, did you receive any information about this investment?

A. I received a packet that suggested that these notes -- proceeds would be used to finish the second greenhouse.

Q. And you say "the second greenhouse."

Had the first greenhouse already been completed?

A. Yes. And I had visited that greenhouse.

Q. What did you think when you visited that greenhouse?

A. I thought it was a spectacular operation. I was very, very impressed.

Q. And what was so impressive about it?

A. They had the ability to deliver water and nutrients on a computerized basis with a boom moving down from pot to pot in order to make sure that the exact amount of water and nutrients were delivered. They had blackout material available to

promote flowering. They had infloor heating. It was state-of-the-art.

Q. And was it your understanding that the second greenhouse would be similar or the same as the first greenhouse?

A. Identical, yes.

Q. And did anyone tell you that?

A. I don't know if anybody specifically stated that, but, you know, the general message was, we're going to build the same thing here. And the ribs were already there, of the greenhouse, so you could see that it was the same construction.

Q. And how far along was the second greenhouse?

A. Just at the stage where you could see the ribs. That was it.

Q. Did you have any understanding of how much money had been raised to build the first greenhouse, or how much it cost?

A. No. No, I did not.

Q. Did you have any understanding of how much money had been raised to build the second greenhouse?

A. I understood that it would take two million dollars to finish it.

Q. You cut out for a second.
So you said you understood it would take two million dollars to finish the second greenhouse?
A. Yes.
Q. And so this -- what you invested in came to be known, I believe, as the two-million-dollar GrowCo note?
A. Yes.
Q. And that was the two million dollars that was supposed to finish the second greenhouse?
A. Yes.
Q. And did you know anything about money that was raised prior to the two-million-dollar GrowCo note?
A. No.
Q. Did anyone ever volunteer any information about money that was raised related to these greenhouses?
A. No.
Q. Were you ever told about the risks associated with this investment?
A. I was not told about them, no.
Q. And were you asked if you were an accredited investor?
A. Yes.

Q. So if you turn to the last page of that packet.
A. Yes.
Q. This appears to be an accredited investor questionnaire?
A. Correct.
Q. Did you complete this information?
A. I did.
Q. Did anyone ever follow up with you to verify this information?
A. No.
Q. So I want to go back to the first page, to the term sheet.
Did you receive this term sheet prior to investing?
A. Yes.
Q. And go ahead and look through it, if you need to.
Do you remember this term sheet including anything about risks involved in this investment?
A. No.
Q. Were there any verbal conversations or other conversations about the risks specific to this investment?
A. Nothing beyond the general discussion

that, at that point in time, it was questionable whether or not the federal government would clamp down on the marijuana industry. So I understood that the interest rate would be high for a private debt placement, because you could not go to a bank and borrow this money.

Q. And you say the interest would be high.

Are you talking about on page 1 where it says -- where it talks about the 22.5 percent interest rate?

A. Yes.

Q. Do you have an investment history?

A. I have an investment history, but not with, you know, private note placements, no.

Q. So more public investments? Or what type of investments are you more familiar with?

A. I have an income portfolio with stocks. I have a trading portfolio where I trade options. I'm approved as a level three option trader. I have pattern day trader status with my broker.

Q. And do you trade on your own behalf, or does your broker trade for you?

A. I trade exclusively on my own behalf.

Q. And so you have -- you mentioned that 22.5 percent is a high interest rate, and that you

thought that was because of the risk involved with marijuana being illegal federally, correct?

A. Yes.

Q. And so can you tell me more about high-risk interest payments, that relationship?

A. Well, if going out and borrowing money from individuals is your only source of debt financing, you're going to have to pay a significant amount in light of the risk, the government risk.

Q. Did you understand there to be any risk related to Colorado marijuana laws?

A. No. And my understanding (indiscernible) they derived from a constitutional amendment, so --

Q. You cut out for a moment. Your understanding --

A. Let me repeat.

Q. Go ahead.

A. My understanding is that Colorado's statutory and regulatory scheme derives from a constitutional amendment in the Colorado constitution, so I was less concerned.

MS. KIDD-AARON: Okay. I'm sorry. My computer just died, your Honor.

THE COURT: Okay.

MS. KIDD-AARON: Is that okay?

THE WITNESS: I can still hear you, India.

THE COURT: That's fine with me.

MS. KIDD-AARON: Okay. Thank you.

Q. (By Ms. Kidd-Aaron) Sorry about that, Mr. Buchanan.

Okay. So your understanding was that Colorado had legalized marijuana under a constitutional amendment.

What -- were you provided by GrowCo, McGrow, any of these companies any information about how they were adhering to Colorado marijuana laws?

A. None.

Q. Did you ever inquire?

A. No.

Q. And is that because you assumed that they were?

A. Yes.

Q. Did you ever receive any interest payments, any of these 22.5 percent interest payments, related to this investment?

A. Not a penny.

Q. Were you ever told why?

A. No. And I didn't ask, because I had

bigger problems with that operation.
Q. And what were those bigger problems?
A. The payments on the equipment and having to repossess the equipment.
Q. And do you remember how much McGrow was supposed to be paying for the equipment per month?
A. I know that the contract was for $50,000 a month, but I can't remember how that was supposed to be divided.
Q. And when you say "divided," who was supposed to be paying?
A. Between us and between OGZ Holdings and for operating the equipment, I can't recall.
Q. Okay. And did you own this equipment?
A. We were purchasing it on a lease-to-purchase basis from our financers.
Q. And how much were you paying to lease this equipment, or to purchase it?
A. Roughly $22,000 a month.
Q. Okay. So you were paying $22,000 a month. And for how many months were you leasing?
A. I want to say 48 months.
Q. Forty-eight -- sorry. Say it again?
A. I want to say 48 months, but I can't recall the exact duration of that lease.

Q. Okay. So approximately four years?

A. Yes.

Q. So you were paying this $22,000 a month for that whole time?

A. Yes.

Q. And how long did McGrow possess this equipment?

A. I want to say they -- it was at that location through the time that Amerijuana took over the lease, and we ended up having to go to court to file a stipulated judgment and then repossess it. So I want to say 18 months, two years, something like that.

Q. Okay. And during that time, you said you received about half of the $50,000 payments?

A. You know, we received reduced payments, and we ended up leaving a good chunk of money on the table just to be able to get into a position to not have to litigate to get an order of restitution, or order for a writ of restitution to get it back.

Q. And why did you have to litigate to repossess?

A. Well, in the original lease, we didn't have a built-in remedy, but when Amerijuana took

over, we did as a condition of signing onto the lease, we made them sign a stipulated judgment and order for writ of restitution in advance of their entering the lease, because I felt confident that they would default as well.

Q. So all in all, the investment and this lease agreement, how much money, approximately, do you think you were out with these companies?

A. Between Amerijuana and McGrow, $200,000.

Q. So $200,000 for the lease?

A. $200,000 for the missed payments and the period of time that, you know, it took us to get it back.

Q. And another $100,000 for the GrowCo investment?

A. Yes.

Q. So about $300,000 total?

A. Yes.

Q. Have you seen any of this money? Has it been returned?

A. No, not a penny.

Q. Have you ever received an explanation about why it hasn't been returned?

A. Not from John or -- I certainly have my own ideas from my conversations with Tim Beall.

Q. And what has he told you, Mr. Beall?

A. He's told me basically that McGrow sucked all the money out of the operation by leveraging the relationship with the tenant in such a way that McGrow got the money and the tenant got the boot.

Q. And do you believe this? What was your -- what was your impression of what you were being told?

A. The details seemed to be fairly compelling.

Q. And why is that?

A. Well, I understood that McGrow insisted that the tenant, Amerijuana, buy nutrients and soil through McGrow at inflated prices; that McGrow took control of the sale of the oil. And essentially, the tenant was not left with enough money to pay their rent. And he ultimately was evicted owing about a million dollars in rent.

Q. So you said McGrow took responsibility for the selling of the oil just now?

A. Yes.

Q. And earlier you said that McGrow -- to your knowledge, no one at McGrow had a license, correct, a marijuana license?

A. Correct.
Q. Can you turn to Exhibit 102?
A. Yes.
Q. Can you tell me what this is?
A. This is an audit letter that I got from Wayne Harding telling me where my note stood in terms of what was owed and what was paid.
Q. And does this look like a true and accurate copy?
A. Yes.
MS. KIDD-AARON: Your Honor, I would like to admit 102 into evidence.
THE COURT: Mr. McKowen, any objection to 102?
MR. McKOWEN: I'm looking at it right now. It's another confirmation. No objection.
THE COURT: Mr. Harding, any objection?
MR. HARDING: None.
THE COURT: 102 is admitted.
(Exhibit 102 was admitted into evidence.)
Q. (By Ms. Kidd-Aaron) Mr. Buchanan, you said this is a letter from Mr. Harding saying what you are owed. This letter is from Two Rivers.
Did you have any dealings with Two Rivers?
A. I had originally reached out to Two

Rivers to talk about the investment opportunity.

Q. Okay. And why did you reach out to Two Rivers if it was a GrowCo investment?

A. I want to say that the GrowCo investment was -- opportunity was mentioned on the Two Rivers website.

Q. Okay. So it was a GrowCo investment, but it was on the Two Rivers website?

A. Yes, because it was my understanding that GrowCo was a subsidiary of Two Rivers Water and Farming.

Q. And Two Rivers is a publically traded company?

A. It was at the time, yes.

Q. And did GrowCo being a subsidiary of this publically traded company have an effect on you?

A. I was very impressed with Two Rivers. And they presented a compelling investment case for their company.

Q. And what details were compelling to you?

A. The water rights, mostly.

Q. And what about the water rights?

A. Water -- it means everything in the west. I come from farming and ranching families,

and it's the difference between $50-an-acre pasture land and $4,000-an-acre potato farming land.

Q. So what I'm understanding you to say is you thought that Two Rivers was more valuable because of these water rights, the shares?

A. I thought that was the main value to Two Rivers is the water rights.

Q. And did you think that that value -- GrowCo would benefit from that value?

A. Yes. It seemed like a solid company, a solid parent company for the subsidiary.

Q. And what was your understanding -- other than Two Rivers being the parent and GrowCo being the subsidiary, what was your understanding of their relationship?

A. I didn't have a detailed understanding.

Q. And did you know anything about the marijuana laws related to publically traded companies at that time?

A. I'm sorry. I lost you there. Can you repeat that?

Q. Of course.

Did you know anything about the marijuana laws related to publically traded companies at that time?

A. At that time, no.
Q. Did anyone ever volunteer that information, anyone related to Two Rivers or GrowCo?
A. No. I had to discover that on my own.
Q. And what did you discover?
A. Well, I discovered that the 100,000 shares of Two Rivers that John McKowen assigned to me in exchange for some delinquent payments on the equipment were not readily tradeable because I couldn't get a brokerage to accept them.
Q. And why couldn't you get a brokerage to accept them?
A. Because they were in the marijuana greenhouse business, and there were federal laws that prevented them from allowing shares in that business to be deposited with them.
Q. And you're talking about Two Rivers, not GrowCo, correct?
A. Correct.
Q. So Two Rivers, a publically traded company, their shares could not be readily traded on the public market?
A. I couldn't get a broker to take them. And by the time we found a broker to take them, the

shares had declined from 50 cents apiece to 4 cents apiece, and it wasn't worth our time.

Q. And when you say "our," you're still referring to TOL Grizzly?

A. Yes.

Q. And you said Mr. McKowen gave you $100,000 worth of -- or what he represented to be $100,000 worth of Two Rivers shares in exchange for the payments that were not made on the extraction machine?

A. It was a hundred thousand shares at 50 cents apiece, so $50,000 worth of payments.

Q. And it was in exchange for back payments on the extraction lease?

A. Yes, and it was documented not only on the third amended service agreement, but with an ancillary document at a later date to flesh it out.

Q. And at any point, did Mr. McKowen tell you that you may have trouble selling or trading these shares because of the marijuana relationship?

A. He didn't tell me before the transaction, but we had some dialogue after it where he suggested different sort of out-in-the-woods brokerages that might take the shares in exchange for 20 percent of the shares,

but the amount of documentation we had to produce to get them to take it was prohibitive.

Q. Okay. I'm going to go back to this Exhibit 102.

A. Okay.

Q. Again, this is coming from Two Rivers in relation to GrowCo which, based on your testimony, was not abnormal, because you found a GrowCo investment on Two Rivers' website.

At this point, had you spoken to Wayne Harding before?

A. My first contact with Wayne was in relationship to placing this investment. And we communicated primarily by e-mail.

Q. By e-mail?

A. Yes.

Q. And so when you received this audit letter, what did you think this was for?

A. I knew it was relative to my note. And I knew that, because of e-mails that I had received, that there was a major war going on between John and Wayne over, you know, where funds had gone between GrowCo and Two Rivers. And there was a lot of finger-pointing. And I already knew why I was getting this letter.

Q. Okay. So you were getting this letter in relation to John McKowen and Wayne Harding fighting over funds.
Can you tell me more about those funds they were fighting over?
A. There were allegations that funds that were supposed to go to GrowCo had been used by Two Rivers for non-GrowCo purposes, and that was a subject of great contention between the two.
Q. And were they accusing each other of misusing these funds or other people?
A. Each other.
Q. Did you ever get a clear understanding about what happened to those funds?
A. No.
Q. And in this letter, it doesn't mention anything about that dispute, but it does mention what you are owed.
So it says $100,000 in principal, which you said you were never repaid, correct?
A. Correct.
Q. And it says over $18,000, almost $19,000 in interest?
A. Correct.
Q. Were you ever paid that interest?

A. No.
Q. Did you understand this investment to be secured?
A. I did not.
Q. Did you have any knowledge about prior investments that were secured?
A. I came to understand later that there were previous rounds of fundraising, and that some of these were secured and some were not.
Q. Was there any information that you discovered after entering this business relationship that you wish you would have known before entering the business relationship, the TOL Grizzly business relationship?
A. I wish I had known that there had been allegations regarding FINRA violations. I wish I had known that there were multiple rounds of fundraising prior to this 2-million-dollar note. I wish I had known that McGrow was not adequately capitalized to enter into a transaction. I wish I had known that McGrow was not licensed properly to lease this equipment and operate it on marijuana. Yeah, those are the four big ones.
Q. Okay. And are there any specific -- let me rephrase.

Do you also wish you would have known those items, those things, before investing $100,000 in GrowCo? Are there additional things you wish you would have known? Can you tell me more about that?

A. Those are the high points.

Q. And when you say there's rumors about FINRA discipline, can you tell me more about that?

A. I came to discover later that Mr. McKowen had had some, I don't want to say ethical difficulties, I'll just say regulatory difficulties with his license to broker securities.

Q. And why was that important to you, or why would that have been important?

A. I think that it's a reflection of the willingness to comply with the law and the willingness to honor an agreement.

Q. And you also mentioned that you wish you would have known that there were prior fund raises.

What did you come to learn about these prior fund raises?

A. I came to learn that this 2-million-dollar raise was the 16th and 17th million-dollar raise. And, you know, this is a 5-million-dollar facility on its best day. It's not a 20-million-dollar facility. So the question

is, you know, where did the other 12 million dollars go?

Q. And to your knowledge, was the second greenhouse ever built?

A. To my knowledge, no, but I hadn't been out there in a while.

Q. Did you have any more contact with GrowCo, McGrow, VitaNova after you realized -- after you received this audit letter and realized your investment was gone?

A. I did. You know, I had received a solicitation to convert my GrowCo note to shares in VitaNova Partners, LLC, and then later to convert those shares to shares of publically traded VitaNova.

Q. And the publically traded VitaNova, whose company is that?

A. John McKowen.

Q. What was your understanding of what these VitaNova companies were going to do?

A. They were going to build a field of solar panels and grow hydroponic tomatoes and vegetables indoors and sell them to -- as fresh produce to local markets.

Q. Did you ever convert your shares of

GrowCo?

A. I did.

Q. What did you convert them to?

A. And by the way, I didn't have shares in GrowCo. I had a note. And I converted it to shares of VitaNova Partners, LLC.

Q. Thank you.

So you converted them to equitable shares from a debt note?

A. Yes.

Q. And so VitaNova, LLC, you said?

A. VitaNova Partners, LLC.

Q. Partners, LLC.

And why did you make this conversion?

A. Because I was advised by my bankruptcy attorneys that the most amount I could get out of the GrowCo bankruptcy for my hundred-thousand-dollar investment was roughly $5,800. That was their estimate.

Q. Did you think the equitable shares of VitaNova Partners would be more than $5,000?

A. I didn't know, but I had optimism that somehow, this could get turned around, but I had equity in that greenhouse, yeah.

Q. So you believed that the equity shares

in VitaNova Partners would give you equity in the greenhouse?

A. Yes.

Q. And why was that significant to you?

A. Well, it was significant because that was literally the only asset that was going to remain from the GrowCo bankruptcy. And I didn't want to see that investment -- I would rather risk losing $5,000 except losing $95,000, is what I'm saying.

Q. Did you have to pay any additional money to convert?

A. I didn't, but there was an opportunity presented later to pay roughly $5,000 to convert these to shares in a publically traded company, and I didn't take that opportunity.

Q. Did anything ever come of the equity shares in VitaNova Partners?

A. No. I don't think that VitaNova Partners, LLC, ever acquired the greenhouse.

Q. They never -- what was the last part?

A. I don't think they ever actually acquired the greenhouse like they were supposed to.

Q. Okay. And were you told that they would

acquire the greenhouse, VitaNova Partners?
A. Yes.
Q. Who told you that?
A. John McKowen.
Q. And why do you believe that VitaNova Partners never acquired the greenhouse? What gives you that belief?
A. Well, I know that they were supposed to pay GrowCo, I want to say, something like a million dollars at the end of -- or middle of December of last year, and they didn't pay it.
Q. Okay. So do you still have these equity shares?
A. I have them, but I have an ownership interest in the company that doesn't really own anything, so . . .
Q. Can you dispose of them?
A. I don't think so. They're not publically traded. And I don't think there's a market for them in light of the circumstances that have developed.
Q. And were you aware of that when you made this conversion?
A. I was -- can you repeat that? I'm not quite sure what you're asking. Was I aware of

what?

Q. Sure. Were you aware that these shares might be hard to dispose of when you made the conversion?

A. Yes, I was aware of that, but I understood that they'd be shares that -- in a company that owned something.

Q. And by "owned something," you're referring to the greenhouse?

A. Yes.

Q. What representations were made to you, or what risks were you made aware of before you made the conversion?

A. I was between a rock and a hard place. It's, you know, right off $95,000, and take 5 from the bankruptcy, or take roughly the same amount in the Paulson class action, or, you know, just sit back and -- with a bucket of popcorn and watch what happens in the bankruptcy. So I felt like this was my best opportunity to, you know, cut off the four fingers to save the thumb.

Q. But no one ever volunteered any information to you about the risks involved?

A. No, but I already understood that there were -- this was not a good situation to be in.

Q. And I apologize for going backwards, but I do want to ask you about the relationship between McGrow and Two Rivers.

A. Okay.

Q. Did you understand the two of them to have a relationship?

A. I understood that at that time, GrowCo was a fully owned subsidiary of Two Rivers.

Q. McGrow. I'm sorry.

A. Oh, McGrow. McGrow and Two Rivers? I don't think I ever had any understanding about their exact relationship, no.

Q. Were you ever directed to look at Two Rivers' public files to find disclosures about GrowCo, McGrow or VitaNova?

A. No.

Q. Were you ever directed to look at any public companies' disclosures for those companies?

A. No.

MS. KIDD-AARON: Thank you. No further questions.

THE COURT: Thank you. Mr. McKowen, do you have any questions, cross-examination?

MR. McKOWEN: I do.

THE COURT: Okay. You can take your laptop

up to the podium, and the witness can then see you.

MR. McKOWEN: Okay.

CROSS-EXAMINATION

BY MR. McKOWEN:

Q. Can you see me okay, Mr. Buchanan?

A. Yes.

Q. This is, I think, the first time that you and I have actually seen each other. We've talked in the past, but I don't ever remember having met you or -- I wouldn't recognize you if I saw you, so . . .

So you first knew of -- became aware of what McGrow was doing in -- and GrowCo was doing was in the spring of 2017?

A. Yes.

Q. And did you know at that point in time what my position was with Two Rivers, GrowCo and McGrow?

A. I don't know your titles. I did know that you had operational authority over GrowCo and McGrow.

MR. McKOWEN: Your Honor, I'm having a very, very difficult time being able to defend myself, because I can't understand the speech, no matter what the volume is, you know, and so I can only

guess at what's being said to me. And it's because of my hearing impairment.

THE COURT: Okay.

MR. McKOWEN: And so I can hear the conversation in this room well enough, especially when I have the assistance of that, and the hearing aids that I wear, but someone's going to have to either explain to me, or we're going to have to arrange so that there's text underneath his -- his testimony, like, someone who would be deaf. I don't know how that -- you would handle that, but I personally cannot -- I'm only guessing at what he's -- what Mr. Buchanan is saying, so I don't know what his response was to what my relationship was with Two Rivers, GrowCo and McGrow.

THE COURT: Okay. Well, Mr. Buchanan, I'm going to have you speak up. And feel free to use an outside voice even though you're right in front of your computer.

Mr. McKowen, the headset is sitting on your table, if you would like to use that, and if you're not able to hear a response, you can ask the witness to repeat his response.

MR. McKOWEN: That's not going to work. The amount of volume doesn't -- actually increases

that, but I can't hear the -- I can't distinguish the determination just like I can hear from you. From him, through this technology, I can't figure out exactly what he's saying. And so -- I can put that on, but that -- the reason it's sitting over there is because it -- the amplification doesn't do anything for the enunciation of the words for me.

THE COURT: Okay. Well, I understand you have hearing issues. We've offered you a listening device. I'm not having trouble hearing the witness even though he is appearing on screen because he is hooked into the courtroom's audio system, which is what we were using yesterday, so it's the same audio system, and you didn't express the same concern yesterday. So it's -- if it's a volume issue, I can have Mr. Buchanan speak up.

MR. McKOWEN: It's not a volume issue. In fact, that exacerbates it. In fact, I had that problem yesterday. I just tried to deal with it. But in that situation, we were dealing with each other in this room. And so the -- like, right now when you're talking to me, I can understand you perfectly, and I don't have to have that on. But I can only guess at what he is responding. And so if you want me to guess at that, I'll do that. But

I'm letting the Court know that I cannot understand what Mr. Buchanan is saying. I can guess at what he's saying. And so the question about Two Rivers, the relationship between Two Rivers and GrowCo and McGrow, I think maybe the solution is, as best I can, phrase it as a yes-no question.

THE COURT: Okay. Well, I don't want you to guess on it, but -- all right. Ms. Kidd-Aaron?

MR. McKOWEN: May I offer a suggestion for -- so we are having real-time, and we will offer Mr. McKowen the real-time for the purpose of this witness, if that would help.

THE COURT: That would help.

MR. McKOWEN: Again, like with her, I have a hard time understanding the enunciation. I can hear the vowels, but I can't hear exactly what the specific enunciation is.

THE COURT: Okay. Well, do we have a device that Mr. McKowen can look at the real-time?

So Mr. McKowen, we're going to pull up what's called real-time, so the court reporter is writing down what we're saying, and you should be able to read it here in just one moment, so you'll be able to read your question and read the response.

MR. McKOWEN: Perfect. The only problem is is that I can't pay the $1.70 a page for that.

THE COURT: It sounds like the AG's office is willing to make an accommodation and let you do it for free while we use WebEx for this witness. Is that correct?

MS. KIDD-AARON: That is correct, your Honor. Just for the record, I also want to note that when I spoke yesterday, Mr. McKowen did not make any comment about my enunciation. He also objected to things that I said today during this testimony, so he could hear me just fine.

THE COURT: I will note the same observations. And I will also note, Mr. McKowen, we have had previous court appearances where everybody appeared via WebEx in this courtroom. We were not all present, and you never expressed to me that you could not hear something, so we're willing to, I think, make this accommodation today right now in court with this WebEx witness. Can you see that screen okay? And can you see what my responses are in writing?

MR. McKOWEN: Yes, I can.

THE COURT: Are you ready --

MR. McKOWEN: It's M-c-K-o-w-e-n.

THE COURT: She'll make that correction when she finalizes her transcript.

All right. Are you ready to proceed forward with Mr. Buchanan's cross-examination?

MR. McKOWEN: Yes.

THE COURT: When you're ready. This is a transcript that she's literally does as we're speaking, so you may read some things that aren't exactly spelled correctly. It all gets corrected when she goes back and reworks the transcript. But what I'm seeing on screen is substantially what everybody is saying. It may not be perfect spelling, but I don't think that there's anything that has been on the screen that prevents you from understanding what the substance of the response is. Would you agree?

MR. McKOWEN: I would.

THE COURT: Okay. Proceed forward. Mr. McKowen, you can ask your next question.

MR. McKOWEN: Okay. I'll repeat that question.

Q. (By Mr. McKowen) Mr. Buchanan, what did you understand the relationship to be between John McKowen, Two Rivers, GrowCo and McGrow in the spring of 2017?

A. I did not know your titles, but I understood that you had operational control over McGrow and GrowCo.

Q. Okay. And did you know that I resigned from GrowCo in May of 2016?

A. I did not know that.

Q. And what made you believe or think that I had operational control over GrowCo in -- past May of 2016?

A. Because that was a GrowCo-owned greenhouse, and Tim Beall said that you ran it.

Q. Okay. And I can understand that misunderstanding.

Was your primary contact with -- as it relates to GrowCo the greenhouse, Two Rivers, was that -- your contact Tim Beall, bell, Tim Beall?

A. Tim was managing the operations of the greenhouse. He was taking care of maintenance and operational issues at the site. You and I were dealing directly with each other over the lease of the equipment.

Q. That's correct.

And did you consider the equipment agreement and your investment in GrowCo to be two separate agreements?

A. Yes, two separate transactions.
Q. That's right.
And did you think that they were related in any particular way?
A. The success of both of them depended on the success of the tenant in growing marijuana in the greenhouse.
Q. Did the equipment that was leased have anything to do with growing in the greenhouse?
A. Only from the standpoint that the greenhouse was to provide the feedstock for the equipment to process.
Q. Did you -- you commented a few minutes ago, a few seconds ago, that Tim Beall was operating manager and responsible for growing in the greenhouse and the equipment and all that.
Is that your understanding?
A. No. My understanding is that Tim was there to handle whatever things a landlord would need to handle for the tenant in that greenhouse.
Q. And who was the tenant at the greenhouse, as far as you know?
A. At that time, it was Amerijuana, Inc. Mike McCullough was there the very first time I visited the greenhouse.

Q. I see. And he was one of the owners of the -- of Amerijuana?

A. Yes. He was one of the two owners and then became the sole owner for a period before your son, Joe, became a part owner of that business.

Q. My son, Joe, became a part owner of that business?

A. Yes. He acquired Tom Wegs' interest in that business.

Q. And where did you get that information from?

A. From Tim Beall.

Q. And when did you get that information from Tim?

A. Right around the time that Mike McCullough pushed Tim Wegs out of the business.

Q. Would you be surprised if that's not true?

A. I would be very surprised if that's not true.

Q. Would you be surprised that Tim was fired from the greenhouse?

A. That Tim was fired? No, I would not be surprised.

Q. So it would be relevant, don't you

think, if the information that you were getting from Tim was somewhat tainted, greatly tainted, in his perspective after he was fired?

A. I've never known Tim to tell me anything that wasn't true.

Q. Okay. So -- but your information about my son becoming an owner of the greenhouse, a partner of the greenhouse, came from Tim Beall; is that right?

A. Yes.

Q. And you would be surprised if he -- the information he gave you was not correct?

A. Can you repeat that? I missed the first part of that.

Q. And you would be surprised if that information about Tim Beall, Tom Wegs and Mike McCullough were not -- was not correct?

A. I would be surprised.

Q. Okay. Let's go back to what you had thought was going on earlier before Tim Beall was fired. And I know he was fired because I fired him from his relationship with McGrow.

A. Okay.

Q. So in April of 2017, you began discussing the use of your equipment for extraction

to be used inside of the first greenhouse; is that correct?

A. It was in that time period, in the spring of 2017, yes.

Q. Had you invested in GrowCo at that point in time?

A. I don't know. I want to say that the investment took place around the same time.

Q. And who sold you -- who presented that information to you?

A. Wayne Harding did.

Q. And you mentioned that there was a presentation that you were provided. And I think you said that it was quite impressive, or something like that; is that correct?

A. The greenhouse itself was quite impressive. And the website for Two Rivers/GrowCo was impressive. The written documents I got were simply pro forma documents.

MR. McKOWEN: Do we have a copy of that presentation that's in the -- in the disclosures?

MS. KIDD-AARON: He's not referring to the 7-million-dollar note we reviewed yesterday. That's not the presentation he's asking -- or he's talking about.

MR. McKOWEN: Okay.

Q. (By Mr. McKowen) So the presentation that you were presented with came from Wayne Harding; is that correct?

A. I didn't get a presentation other than the offering, the memorandum of terms that we identified earlier as an exhibit.

Q. So you received the term sheet?

A. Yes.

Q. And do you remember what the term sheet was for? Was it for a 7-million-dollar offering?

A. Two million.

Q. Two million. Okay.

You are a very sophisticated investor; is that correct?

A. Me? I don't know if I'm as sophisticated as you would like to think. I'm comfortable handling my own investments, but I don't brag about my level of sophistication.

Q. But you are an accredited investor; is that correct?

A. I am an accredited investor, yes.

Q. And you signed an accredited investor questionnaire?

A. Yes.

Q. And the accredited investor questionnaire contains information relating to your -- to a certain income or asset level?
A. Yes.
Q. And does it -- did it contain information relating to your ability to evaluate the investment?
A. I don't recall.
Q. Okay. But I was not the one who presented that investment to you?
A. Correct.
Q. Okay. And I was not the one who was running the greenhouse, however you characterize that, for Amerijuana.
Was that your understanding?
A. Correct.
Q. And do you know how Tim Beall was being compensated?
A. I understood him to be an employee of GrowCo, And later I understood him to be an employee of McGrow.
Q. In the spring of 2017, did you believe him to be an employee of GrowCo?
A. Initially, yes.
Q. Initially, was he an employee in the

spring of 2017?
A. I don't know if he was or not, but that was my understanding.
Q. Okay. So Tim Beall was an employee of McGrow and GrowCo is what you believed at that time; is that right?
A. I understood him initially to be an employee of GrowCo. I later understood him to be an employee of McGrow.
Q. That's probably accurate.
Did you believe that I was a licensed person and operating the greenhouse, the greenhouse in which your equipment was -- was located?
A. I did not understand you to be the person who had the marijuana license, no.
Q. Did you believe that I was the person who was growing and processing the marijuana for the licensed entity that was the tenant?
A. I did not believe that you were growing the marijuana. I did believe that you were leasing and operating the equipment. And I was unclear about how you were being reimbursed by the tenant for that.
Q. You believed that I was operating your equipment?

A. Not personally operating it, but your company signed a lease with my company to lease this equipment.
Q. That's correct. I was the entity that entered into the agreement with you related to the equipment that I became aware of through Tim Beall.
A. Yes.
Q. Okay. But I was not -- do you think I was the one who was operating the equipment in the greenhouse?
A. Are we talking about the extraction equipment or other equipment in the greenhouse?
Q. Yeah, the equipment that was leased from you, do you believe I was the one that was operating that equipment?
A. No. OGZ Holdings was operating that equipment.
Q. And OGZ Holdings, was that someone that you provided -- or who provided -- and what was that gentleman's name?
A. His name was Noah Lane. I don't know if you remember Noah, but Noah was the one who set up the equipment and operated it for a month or so before he was told not to come back.
Q. And when he was told not to come back,

did he give you an explanation of why he was fired?
A. I didn't think he had been fired. I simply thought that your people had learned how to operate the equipment by observing him and didn't -- you didn't feel like you needed to pay him anymore.
Q. So what you came to understand is that he was let go for not being able to effectively operate the equipment; is that right?
A. No. He was let go because you didn't want to pay him when you could pay your own employees significantly less to do the same work.
Q. Where did you come to believe that from?
A. Well, I know that Noah didn't get paid. And I know that he's owed about a hundred thousand dollars, because he and I are still in contact. And he's the one -- he's the sales engineer who put together the equipment for us.
Q. Just one second, please.
MR. McKOWEN: Can you pull up my Exhibit 1029?
Q. (By Mr. McKowen) Mr. Buchanan, do you have the ability to see 1029?
A. I do not.
THE COURT: Somebody have it on digital, or

in a -- able to e-mail it to him?

TECHNICIAN: I can e-mail it. I just sent them.

THE COURT: Mr. Buchanan, let us know when that e-mail comes through.

THE WITNESS: Okay. Is it coming to my Comcast address?

TECHNICIAN: Yes.

THE COURT: Yes, it is.

THE WITNESS: I have it.

THE COURT: All right. Go ahead and take a look at it. You have it open?

THE WITNESS: Yes.

THE COURT: All right. Mr. McKowen, he has Exhibit 1029.

Q. (By Mr. McKowen) So it's, I think, a total of 15 pages. And initially, I would ask you to go to the second-to-the-last page.

A. Are we talking about the photograph?

Q. Yes.

A. Okay.

Q. Have you ever met Noah?

A. Yes, I've met Noah.

Q. And is that him? Mr. Buchanan, is the person in that picture Noah?

A. I'm zooming in on it. And it may or may not be him, but he doesn't look like that now, that's all I can say.
Q. Oh, okay. He still works for you, or with you?
A. He worked for OGZ Holdings.
Q. He was a nice-enough guy, don't you think?
A. Noah is a war hero, in my mind, okay?
Q. Green Beret, right?
A. Yes, sir, tip of the spear.
Q. That's correct. My working relationship with Noah was good. He was a gentleman and, like you say, he was a Green Beret.
But would you be surprised that the reason I let him go, asked him not to come back, was not because we couldn't pay him, it was because he wasn't delivering the results that we wanted?
A. You and I have had several e-mail exchanges where I tried to explain to you that just because you're taking 90 percent of the oil that's in the material doesn't mean that the oil is 90 percent THC. We went around and around on this, John.
Q. That's correct.

So you and I were debating whether or not what was needed for the tenant in the production of this oil that was being sold pursuant to a contract?

A. You failed to understand that if an oil is 60 percent THC because the plant has 60 percent THC oil in it, if I tell you I can get 90 percent of that oil that's in the 4 kilograms of what's being extracted doesn't mean that it makes the oil 90 percent THC. It just means that if there's 4 kilograms in there, we're going to get 3.6 kilograms of it out. We are not going to magically turn 65 percent oil into 90 percent oil. We're just going to get 90 percent of what's in there.

Q. So we had a dispute over this, and you believe that I just don't understand what is happening with that equipment, right?

A. I believe that you understood fully, but you leveraged this idea into a reason not to pay us and not to pay Noah. That's what I believe.

Q. Were you aware of the contract that the tenant, Amerijuana, had with the purchaser?

A. I would have no reason to be privy to that contract.

Q. Are you still there?

A. Yes.

MR. McKOWEN: We've lost -- we've lost the website for a second. It should come back. Okay. It's back.

A. What I said was I would have no reason to be privy to that contract, sir.

Q. (By Mr. McKowen) And would you be surprised that the reason that we were not happy with the -- we, the royal "we," the collective "we," but not me as the operator, was not happy that the client for whom the oil was being sold was not happy with the product?

A. I am not at all surprised that you created unreasonable expectations in that buyer because you did not understand the limitations of the material you were putting in the equipment.

Q. So the -- there was a dispute between you and I about the ability to deliver the quality of product that the purchaser of the product was demanding from us. You -- is that -- is that your understanding? Or you think it was just an excuse I was making for not wanting to pay Noah?

A. You know, when I explained to you the actual math, that we can't get more THC out than is in the material, I would have hoped that that would

shed light on and end the dispute, but apparently, you had ulterior motives in keeping this dispute going, and it involved not paying us and not paying Noah.

Q. So can you turn to the next picture, the next page, which has a different picture?

A. Yes.

Q. This picture is a picture that I had access to throughout the greenhouse that was security cameras that we deployed in this greenhouse and in the warehouse, by way of explanation.

A. Okay.

Q. Were you familiar with the contract with who we had this -- we, the universal "we."

Amerijuana signed a contract with a purchaser. Were you familiar with that aspect of the -- of the business at all?

A. I have no familiarity with it.

Q. Do you know who Evolab is?

A. I understood that they were going to purchase the oil.

Q. Right. And do you know what their standing was inside the oil business, THC oil business, in Colorado?

A. No.
Q. Would you be surprised to know that they were the largest provider of retail THC products in Colorado?
A. I think I -- you said something about that in an e-mail that you circulated to investors.
Q. Were you aware that they had entered into -- "they" being Amerijuana -- had entered into an agreement with Evolab whereby Evolab would purchase 100 percent of the product from Amerijuana if it came up to their standards?
A. I'm not familiar with that agreement. I don't know.
Q. So you -- this picture here, does it look like the totality of equipment that you provided to us, "us" being McGrow, who leased it to Amerijuana, who operated the equipment?
A. It's the (indiscernible) of inside. There are outside components, namely, the compressor and the chillers.
Q. Right. So there's additional equipment that you can see that you can recognize, and I couldn't point them out to you, that is set up in this operation?
A. We not only provided you with the

extractor, we provided you with a full suite of post-extraction-processing equipment, including distillation tower and so forth.

THE COURT: Can I clarify some testimony? Did Mr. Buchanan say that the picture represents the bulk of the inside equipment?

THE WITNESS: Yes.

THE COURT: All right. Thank you.

Q. (By Mr. McKowen) It's your testimony that the equipment that is in here does not represent everything that we had in the greenhouse, "we" collectively, McGrow leased from you and then re-leased to, or provided it for Amerijuana?

A. There are components that are required to compress the CO2 that are very loud. There are components that are required to cool the CO2 coming out of the equipment that need to be outside to vent heat. And those outside pieces are not depicted, because we are only looking at the inside of the warehouse area adjacent to the greenhouse.

Q. Would you be surprised that Evolab agreed with you that the greenhouse that I built, GCP1, was phenomenal, state-of-the-art?

A. That was a fantastic greenhouse, sir.

Q. They thought the same thing. They

agreed with you.
Have you been able to establish leasing your equipment to other --
A. Yes.
Q. -- growers in Colorado?
A. Not in Colorado. We had to ship it to Oklahoma.
Q. I see.
And the greenhouse in Oklahoma, was Tim Beall a part of that?
A. It was an outdoor grow, and he was a part of that.
Q. I see.
But was Tim Beall a part of that?
A. Yes. He's the one who arranged us to re-lease the equipment.
Q. Is he still a part of that, do you know?
A. He is not.
Q. Do you know why he's not?
A. It's my understanding that they lost their genetics and could not produce a high enough product to be sellable.
Q. And was that a result of Tim Beall's consultation with them? Or what caused that?
A. I don't know what the finger-pointing in

that operation involves, sir. I just know that he was --

MS. KIDD-AARON: Your Honor, I'm going to make an objection. Tim Beall is not a defendant in this case. He's not a party in this case at all. And they're talking about a business that's also not related to this case now.

THE COURT: Overruled.

A. I don't know if -- who blamed who in that operation. I just know that that market is oversaturated, and the business did not operate at a profit and was shut down.

Q. (By Mr. McKowen) Okay. We'll bring Tim Beall up later on.

But the bottom line for us in trying to put this together was to make cash flow to create a profit --

MS. KIDD-AARON: I'm going to object and ask that Mr. McKowen ask a question and not testify.

THE COURT: Sustained.

THE WITNESS: Your Honor, may I leave to go grab a charger for my iPad?

THE COURT: Hold on one second.

Mr. Buchanan, you need to charge your computer?

THE WITNESS: I need to grab a charger and plug it in, yes.

THE COURT: That's fine. Go ahead.

THE WITNESS: Okay. I'll be right back.

THE COURT: We've been going about two hours. Why don't we take a 15-minute recess at this point. And when Mr. Buchanan gets back, I'll let him know we're in recess. But let's go off the record and we'll come back in 15 minutes.

(Recess taken from 10:37 a.m. until 10:51 a.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. Mr. Buchanan is on screen, WebEx, under oath, and continued cross-examination. Mr. McKowen.

MR. McKOWEN: Thank you, your Honor.

Q. (By Mr. McKowen) Mr. Buchanan, are you there?

A. Yes, sir, I'm here.

Q. Okay. Great.

So when we took a break, we were looking at this picture that is available to me because I can screen capture images throughout the greenhouse, throughout the outdoor facilities, all of that.

The question that I have is that, have you

seen -- since this first greenhouse was built, have you seen any other greenhouses that are as fantastic as this one was?

A. Your greenhouse was the best greenhouse I've ever seen, sir.

Q. I think so, too.

Do you think that if we could have dialed this in and made oil available to all of the state of Colorado, because you're not allowed to ship it -- not supposed to, not allowed to ship it over state lines, do you think that this would have been a business combination that would dominate the oil space and provided in Colorado and --

MS. KIDD-AARON: Objection. He is asking the witness to speculate.

THE COURT: Sustained.

MR. McKOWEN: What is the objection? Let me see.

THE COURT: Speculation. You're asking the witness to speculate.

MR. McKOWEN: Okay.

Q. (By Mr. McKowen) Based on your experience, would you say that you're qualified to assess the oil markets in Colorado?

A. No.

Q. Okay. But you are familiar with greenhouses?

A. I am familiar with your greenhouse. And I have seen other greenhouses from the outside. And I was impressed with your greenhouse, sir. It's the best one I've ever been in. But I've not been in more than a handful of greenhouses.

Q. Okay. We'll cover more about this as we move along in this case. I appreciate that.

Let's talk about VitaNova Partners and the exchange of the stock and your inability, and you're not alone, to deposit the stock, which you have testified to.

A. Okay.

Q. So you exchanged your GrowCo note which was a 2-million-dollar offering that you invested in in the spring of 2017.

You exchanged that with -- for ownership interest in VitaNova Partners; is that correct?

A. Yes.

Q. And the reason you did that is because, I think you testified, it seemed like the only thing left to do, or something like that?

A. You made a compelling argument that the only way to keep that investment alive would be to

convert it to equity and owning the greenhouse, and I agreed.

Q. Did you think it would be difficult to move forward with GrowCo?

A. GrowCo was in a bankruptcy, and it was going to be dissolved and the assets sold and the proceeds distributed.

Q. And do you know that it was in bankruptcy, but it was required to -- or it was asked to withdraw from bankruptcy?

A. I understood that the bankruptcy was dismissed.

Q. Yes. And it was a -- what did they call it? What do attorneys call it? It was an unopposed motion to dismiss?

A. I'm not sure.

Q. Okay. So it was dismissed from bankruptcy. And the business model that I put together started with VitaNova Partners.

Is that -- was that your understanding?

A. That was my only understanding at the time.

Q. And did you, we, I, do something to further that opportunity?

A. That's a way of putting it. You did do

something. You created another company and gave me an opportunity to exchange my VitaNova Partners shares in shares for a publically traded company, also called VetaNova, but with a different spelling.

Q. It was V-e-t-a-N-o-v-a; is that correct?

A. Yes, sir.

Q. And it was a shell corporation that we acquired; is that correct?

A. I guess. I don't know.

Q. How did we obtain our -- how did VetaNova obtain its listing?

A. I don't know. I never participated in VetaNova with the E.

MS. KIDD-AARON: Your Honor, again, I would object, because Mr. McKowen is asking the witness to speculate about things he doesn't know about.

THE COURT: I'm going to -- I agree. I'm going to overrule. He answered it and said he didn't know.

Q. (By Mr. McKowen) You were given shares of V-e-t-a-N-o-v-a symbol VTNA; is that correct?

A. No.

Q. You never received those shares?

A. I did not participate in that offer.

Q. This is part of what I didn't hear previously, this question. I thought I heard you say you tried to deposit these shares with a broker-dealer, but you were unable to do that.

What shares were you referring to, or did I mishear what you were talking about altogether?

A. It was the Two Rivers shares that you transferred from your own account.

Q. I see. The settlement that we had is I was going to give you Two Rivers shares; is that right?

A. Two Rivers shares, it means for $50,000 of unpaid payments on equipment.

Q. And the shares that I -- did I end up giving -- or transferring you those shares?

A. Yes, and they're still sitting at Broadridge Issuer Solutions. I can't get them out. And now the company is defunct.

Q. I see. So the Broadridge is the transfer agent?

A. Yes.

Q. And you deposited the shares -- or you didn't -- that's -- that was the transfer agent for Two Rivers.

And the shares that were in Two Rivers, were

they free trading?
A. I assume that they were, but I could not get anybody to accept them so that I could sell them.
Q. And do you know why you can't get them to accept it?
A. There were two issues. The one was the marijuana issue, and the other was the penny stock nature of the shares.
Q. I see. And it's difficult to deposit shares that are penny stocks anywhere; is that correct?
A. Yes.
Q. And at the time the shares were transferred to you, what was the market for that stock?
A. I don't know about the volume, but the share price was 50 cents at that time.
Q. And how many shares did I transfer to you?
A. 100,000 shares. And it's noted on one of the exhibits we've gone over today.
Q. Right. And the issue -- when you say that being Amerijuana stock, that was a problem?
A. Yes. And the information that Two

Rivers provided to the investment community, the paragraph that appeared on my brokerage website is that it was involved in marijuana greenhouses.

Q. I see. And when was it that you were trying to deposit those shares?

A. Right after we received them and for a period of several months.

Q. Do you remember the date, approximately, the year?

A. Let me look on this document on our third amended service agreement and see if I can ascertain that.

It would have to be the fall of 2017.

Q. I see. And that makes sense, because the Cole Memorandum, are you familiar with that?

A. I've heard of it, but I've -- it was never presented to me in the context of any of our transactions.

Q. Right. It was -- it was the problem, and so it's understandable in your response about that at that point in time has -- was accurate.

Do you know that -- do you know that after the Cole Memorandum was -- I don't know what the term would be, but it was changed by, I believe, an attorney general. And there are now shares,

marijuana shares -- marijuana-related shares that can be traded in the markets.
Are you familiar with that?
A. I'm not. And it wasn't material to us at that point, because the value of these shares had diminished to an insignificant amount.
Q. Correct. But at the time when I transferred it to you, if you could have sold it, it would have been -- could have amounted to a significant amount of money?
A. $50,000 at the time.
Q. You talked about, in your testimony, the -- I believe you said the tension between McKowen and Harding; is that correct?
A. Yes. There was an e-mail battle going on, and I was a recipient of those e-mails.
Q. And what was the focus of that -- that e-mail battle?
A. Whether Two Rivers had taken GrowCo's money or not.
Q. And do you remember when that e-mail battle was going on?
A. I don't.
Q. Would you say it was late 2017, early 2017?

A. It preceded the audit letter that I got in February of 2018, so it would have been before then that it started.

Q. I see.

And that audit confirmation number, that's not a confirmation letter from the auditors -- that's not something that is strange to you, is it?

A. I wouldn't call it strange, but it's the first one I've ever received.

Q. Do you understand what is going on with that audit letter?

A. I understand that allegations had been made that Two Rivers had misappropriated and misused funds that belonged to GrowCo, and that this audit was intended to try to resolve that issue objectively.

Q. That explanation, was that contained inside of the audit letter, confirmation letter itself?

A. No, that was something that I think Wayne had said in an e-mail.

Q. I see.

And so the confirmation letter was at the end of 2017 as part of the 2018 -- or 2017 audit; is that correct?

A. The letter was issued February 20th, so I'm assuming the audit was completed before the letter was issued.

Q. Are you familiar with 10Qs, 10Ks, that sort of thing?

A. I've read a few.

Q. Are you being facetious, or would you say that you've read a lot of them?

A. I'd say I've read a number of them. I don't know what's a little or what's a lot in this context.

Q. But -- well, let me ask you, in your attorney practice, did you ever do any SEC work?

A. I didn't hear your question. Please repeat.

Q. Sorry.

In your practice, attorney practice, did you ever do any SEC work?

A. No. Class-action litigator, insurance bad faith, and cardiac pacemakers, things like that.

MR. McKOWEN: I think that's all I have, Mr. Buchanan.

THE COURT: Thank you, Mr. McKowen. Mr. Harding, do you have any questions?

MR. HARDING: I do.

THE COURT: Go ahead.

MR. HARDING: If I could have just one second to set up with all these computers.

CROSS-EXAMINATION

BY MR. HARDING:

Q. Well, hello, Mr. Buchanan. We finally meet face-to-face.

A. Yes, sir.

Q. And I do have a little bit of a problem hearing, but not quite as bad as my somewhat more challenged hearing codefendant over here, but I did appreciate as you slowed down and pronounciate well so I could get rid of the court-issued hearing device, which I find listening in a can, so thank you for doing that.

And also, before I start -- it's going to be pretty short, but before I start, I just want to say, I'm sincerely -- sincerely apologize for your lost investment. I don't know if you know this or not, maybe you do or don't, but, you know, I invested along with everybody else. I had $125,000, and to me, that was a lot of money.

But were you aware, were you aware of my investment?

A. I was not, but I knew that you were involved, because you and I had signed the papers for my investment.

Q. Hold on. Okay. Yes, I saw the signatures. And I guess I did have some contact with you for that one note with GrowCo.

But I think, really, our business -- well, let's go back to what you signed. And I think it was Exhibit 62, or 51. Hold on. No, it's Exhibit 51. I apologize.

You've seen this before, right, in prior testimony?

A. I don't know if I've seen it in prior testimony, but I have had occasion to dig these papers up and use them in the class action.

Q. And so I maybe used the wrong words.

When I said "prior testimony," I mean today, you've seen this document?

A. Yes, I have it in front of me right now.

Q. Okay. Would you go to the section on the note purchase agreement? And I don't know if I can find this quickly on this one.

A. Can you tell me roughly how many pages in that is?

Q. I'm trying to do that. I apologize.

It's the note purchase agreement, and it's section 3. And I'm going down these pages here. One moment, please. So it's a senior note purchase agreement. I don't have paginations on this. It says Exhibit A. And there's one page right after that that's full of a table of contents. And I'd like to direct your attention to section 3.3.

A. I have it.

Q. Thank you, sir.

So this is a document that you signed. And I got to get to 3.3. And it says: Disclosure of information. Such investor has had an appropriate -- an opportunity to discuss with the management of GrowCo and GCPSU, the business manager, financial shares at GrowCo and GCPSU, and the terms and conditions of that offering of each investor's securities.

Did you have that opportunity?

A. I assumed that if I had had questions, you would have answered them. You've always been receptive and cordial to any overtures that I've made to have a dialogue.

Q. There's a little delay here because I'm reading some of your feedback on the screen to make sure I understood you correctly. Thank you for

that.

So at any point in time when you invested in this hundred-thousand-dollar security, was there anything that -- I really don't remember our contact at the time, but is there anything that you felt that I was deceptive on, or I did not answer properly?

A. I don't think that I asked any questions of you, Wayne.

Q. Okay. So after this note -- I'm trying to go through memory lane here with you, sir. After that note, I think you and I made some direct contact about a hemp situation.

Do you remember that?

A. I do. You did us a tremendous service in allowing us to dry a hemp crop in the greenhouse ahead of the weather. You saved our season, sir.

Q. And really, that was not only letting you dry your hemp for, I don't know, was it five -- four or five weeks in the greenhouse as we're trying to rehabilitate it? And was that around 2017?

A. That was at the end of 2018, well after we had cleared out our equipment.

Q. Okay. And part of that agreement -- I

don't remember we had a written agreement. We definitely had a handshake, or a verbal agreement, did we not, that you would go in there and, yes, utilize it, but you would also take care and fix some minor things that you needed to fix at the greenhouse? It wasn't just a one-way deal, was it?

A. No. What we had to do is get your power back on in the greenhouse. Your electric company needed a 25-thousand-dollar cash deposit to turn the power back on so that you could heat the greenhouse and not damage it further.

Q. Bingo. Thank you for reminding me of that. There's lot of moving parts here.

And so you did that. And I think part of that deposit was applied toward some sort of rent that you paid, and then there were some additional monies that were owed to you.

Is that a correct statement?

A. Yes. Our transaction was that we would pay the deposit. It was to be fully refundable. And we would also pay for the power and the propane that we used in the greenhouse while we were drying. So we turned the power back on to heat the floors to dry the hemp, and we had reimbursed you for the propane that was burned in that process.

Q. Thank you for that.
Now, I believe, upon getting the deposit back, we were able to pay you back and we were even-Steven, right?
A. Well, we had a little snag at the end of the negotiation where you owed $6,200 more, and somebody else reached out to me and said, Would you take five? And I did.
Q. Okay. Was that me?
A. That wasn't you. I want to say that was somebody else in your organization. I don't know if it was George McCaffrey, or who, but somebody reached out to me and negotiated a reduction in the last payment.
Q. And until today, has this been -- since that hemp-drying exposure between -- you know, when you wrap that up, and I guess you got the $5,000.
To today, have we had any contact?
A. The only contact we've had is when I suggested to you the opportunity in the greenhouse to create feminized seed as a way of making the greenhouse viable. And we discussed that briefly. And that's it.
Q. Okay. So I did not contact you to ask for any -- or ask about your testimony or what

you're going to say or tell you what to say, but I didn't do any of that, did I?

A. No, we've not had any discussion about this case, sir, or any other case.

Q. Okay. So why don't you, within a few words, describe our business relationship together.

A. Our business relationship revolved around you transacting the sale of a $100,000 note to me. And it involved you allowing us to have access to the greenhouse to dry our hemp. One of those things I'm happy about, and one not so much.

Q. Well, let me get a little more specific.

Was it a positive relationship, negative, or neutral?

A. Wayne, you've always been very kind and gracious to me.

Q. Thank you, sir. I appreciate that.

So let me ask you -- now, let's come back a little bit. And again, I think I'll take ten more minutes of your time.

But you mentioned -- we were talking about GrowCo. And I think you stated that you understood that GrowCo was the owner of the greenhouse, correct?

A. That's what I understood.

Q. And at any point in time, did anybody tell you that GrowCo is the owner but does not touch the plant, they're the landlord?

A. Nobody specifically said that, but I understood Amerijuana was the tenant, and they were authorized to touch the plant.

Q. You also made a statement, Mr. Buchanan, that -- I wrote it down, and maybe I wrote it down, but typed it down, something about John sucked all the money out of McGrow.

Do you remember that statement?

A. Yes. And that had to do with John's role as a consultant to Amerijuana.

Q. So why the word "suck"?

A. Well, there was, from what I could ascertain, a concerted effort to become an intermediary between vendors of soil and fertilizer in order to extract a profit from the tenant.

Q. Okay. As far as you know, did I have any role in McGrow?

A. No.

Q. As far as you know, in terms of any kind of GrowCo entity besides GrowCo and GrowCo Partners One and Two and GrowCo GCP Super Units -- and I'm referring mostly to VetaNova, this, that and the

other thing, and all these other entities set up.

As far as you know, I did not have any involvement in those entities, right?

A. Correct.

Q. It seems the plaintiffs just really like to focus on these GrowCo note confirmations that have Two Rivers letterhead on top.

MR. HARDING: Can we pull that up briefly? I just want to -- and that was Exhibit 102, I think.

A. Okay. What would you like to know?

Q. (By Mr. Harding) So when you receive this -- when you -- they had this -- were you thinking it was Two Rivers, or was it actually a GrowCo note?

A. I knew it was a GrowCo note, but I also understood that GrowCo was a wholly-owned subsidiary of Two Rivers at some point.

Q. Was it wholly owned or was it partially owned, or do you not particularly know?

A. I understood that, at some point in time, it was wholly owned, but I don't know if it remained that way.

Q. Also talked about some communications back and forth about John McKowen's, Mr. McKowen's

claim that I misused funds. And I believe that was -- how were you -- how'd you find out about that?

A. By e-mails that were being circulated. And I also understood at one point in time that GrowCo sued Two Rivers and then changed its mind and dismissed the lawsuit.

Q. And you also stated that you saw some e-mail from me, like a rebuttal or some sort of response. And, you know, I can't -- maybe you can help me, because I tried to stay out of the e-mail tis-tat-type of thing. I wanted to come to a formal environment and --

MS. KIDD-AARON: Objection, your Honor. He's testifying.

THE COURT: Sustained.

Q. (By Mr. Harding) When did you -- I -- I don't really remember seeing e-mails or putting together an e-mail about my rebuttal.

So you did receive something from me about that?

A. I believe so, yes.

Q. Okay.

A. But not me as an individual, me as somebody on an e-mail string with all of the

investors in Two Rivers and GrowCo.

Q. And that e-mail was from me, or was that from John McKowen?

A. Both of them, I believe, were addressed to groups of people, and I was part of that group.

Q. Yes, but who was the originator or the writer of the e-mail?

A. I believe that John first raised these issues, and you responded to them. I don't believe that you raised them and he responded.

Q. I believe also in your testimony under Mr. McKowen you stated that Wayne stated that we were trying to resolve differences, and I think that's when we were talking about the amounts back and forth.

Did I understand that correctly?

A. Say that again.

Q. In your prior testimony today, you mentioned that I stated that we're trying to resolve differences between who owes what money to what entity.

Did I understand your testimony correctly?

A. Yes, I understood you to be the person spearheading the audit effort to resolve these issues, one way or another.

Q. And did anything come out of that?
A. I don't know.
Q. Mr. McKowen asked you about 10Qs and 10Ks, and you said you've read a few.
Did you ever read Two Rivers' 10Ks or 10Qs?
A. I may have, but it would have been a long time ago.
Q. And I know it's thrilling reading, but thank you for your response.
MR. HARDING: That's all the questions I have, Mr. Buchanan. I really appreciate your time today. Thank you, sir.
THE COURT: Any redirect?
MS. KIDD-AARON: No, your Honor.
THE COURT: So if everybody will stay on WebEx, except for Mr. Buchanan, your testimony is complete, so you are welcome to log off at this time.
THE WITNESS: Thank you.
THE COURT: Thank you. All right. We have to do a hard stop at 11:45. I don't know if it makes sense to just take a recess now before we start the next witness. I'll let the parties know that we are getting a CART interpreter.
So a CART interpreter is a communication

access real-time translation. So it's basically closed-captioning based on what's being said in the courtroom. That interpreter is going to access the courtroom through WebEx, so it'd be helpful, I think, to everybody, and the interpreter, if we just kept our computers open and kept our WebEx on so she can see us speaking and see the courtroom.

She will then share her screen with anybody that wants to look at it. And so you, Mr. McKowen, you, Mr. Harding, if you'd like to do it, she will share her WebEx screen with you, and it'll have closed-captioning on the screen.

MR. HARDING: Thank you, your Honor.

THE COURT: I've never used that before. I don't know exactly what it looks like, so I would suggest that we're going to start up again at 1:15. I believe the CART interpreter is going to join us right about that same time. So before we start up testimony again, just make sure that you can see the closed-captioning and figure out what that's going to look like on your screen so you can read it sufficiently, okay?

MR. HARDING: Thank you.

MR. McKOWEN: Thank you.

THE COURT: I'm going to go ahead, and I

will stop my video, and I will mute myself, but I'm going to leave the WebEx courtroom on. So just keep in mind that when we're hooked into WebEx, we're also hooked into the sound system. And so anything you may be saying in the courtroom, if you're not on mute, will be broadcast via WebEx to anybody else that has joined us.

MR. McKOWEN: And just to clarify, your Honor, the WebEx that you're going to leave on, is that how we're going to be able to access the --

THE COURT: The interpreter?

MR. McKOWEN: Yes.

THE COURT: Correct. So you'll need to keep your laptops open. I would suggest making sure they're plugged into a power source so they don't shut off.

MR. McKOWEN: Great.

THE COURT: Anything -- and I wasn't saying that because yours did. Trust me, I've done it plenty of times. I have done it plenty of times on meetings and such things. But it'll be on all afternoon, so there'll be at least a few hours.

Anything from plaintiff, then, before we recess?

MS. KIDD-AARON: No, your Honor.

THE COURT: Anything for you, Mr. McKowen?

MR. McKOWEN: No, your Honor.

THE COURT: And anything for you, Mr. Harding?

MR. HARDING: No, sir.

THE COURT: All right. We'll be in recess until 11:15. Thank you for your patience with that extended lunch hour.

(Recess taken from 11:29 a.m. until 1:22 p.m.)

THE COURT: All right. Let's go on the record in 21CV33922. All parties and counsel are present. The record should reflect that we also have the assistance of a CART interpreter for the remainder of this trial. And both Mr. McKowen and Mr. Harding have access to that on their computer screens. Is that correct, Mr. McKowen?

MR. McKOWEN: Yes, your Honor.

THE COURT: And Mr. Harding?

MR. HARDING: It is, but when I testify, will I see it up there also?

THE COURT: I don't know if it'll be on this screen, but you can bring your laptop to the witness stand. Is it on your laptop?

MR. HARDING: No, sir. We only have one

laptop which shows the output.

THE COURT: Are we able to put it up on the screen? I thought we were putting it up on the big screen.

THE CLERK: We can. I mean . . .

MS. HUNT: We're putting the exhibits on the screen.

THE COURT: So is there just one laptop? Is there a way to use another laptop for both individuals?

MR. HARDING: Sir, I have another laptop.

(A discussion was held off the record.)

THE COURT: They're going to be putting exhibits up on the big screen.

MR. McKOWEN: If you could put that on mine, that's all I'd need. I'll talk to him when he gets back.

THE COURT: Okay. Well, I thought we had this worked out before I came in, so . . .

MR. McKOWEN: Almost.

(Recess taken from 1:24 p.m. until 1:26 p.m.)

THE COURT: All right. Back on the record. All right. So Mr. Harding, you have your laptop that has the CART text on it; is that correct?

MR. HARDING: That's correct. It appears to be working.

THE COURT: And you can bring that to the witness stand. I think you're the next witness. And Mr. McKowen, you have that text on the laptop in front of you as well; is that correct?

MR. HARDING: Yes, your Honor.

THE COURT: Yes?

MR. HARDING: Yes.

THE COURT: All right. Plaintiff's next witness?

MS. HUNT: Plaintiff calls Wayne Harding.

THE COURT: Mr. Harding, you can set your computer down. And before you sit down, I'll swear you in.

(Wayne Harding was sworn.)

DIRECT EXAMINATION

BY MS. HUNT:

Q. Good afternoon, Mr. Harding.

A. Good afternoon.

Q. Can you go ahead and state and spell your last name for the Court?

A. Wayne Harding, H-a-r-d-i-n-g.

Q. What do you do for a living?

A. I'm retired. I do very small -- some

contract work, try to make ends meet.
Q. Are you an accountant?
A. Yes, I was trained as an accountant.
Q. If we could have you just get a little closer to the microphone.
A. May I just make a request if somebody might hand me the water that I poured over there, please? Thank you.
THE COURT: And Mr. Harding, if you pull that microphone towards the podium, it'll help adjust the way you're looking.
Q. (By Ms. Hunt) And I think we've heard testimony from others about this, but you were employed by Two Rivers during time period of the GrowCo investments?
A. Yes.
Q. And were you also employed by GrowCo?
A. I'm trying to remember whether I received any paychecks from GrowCo. I don't remember the case. My pay came from Two Rivers or TR Capital Partners, I believe.
Q. Were you part of the management team at GrowCo?
A. Yes, I was.
Q. Before we get into Two Rivers and GrowCo

in detail, I want to talk a little bit about your work history before then.
When you started your career -- and again, you said you were an accountant?
A. Yes.
Q. You worked at both big and small CPA firms; isn't that right?
A. Yes.
Q. What did you do there?
A. Mostly audit work at the firms. I did some write-up compilation work.
Q. And at one point, you had your own CPA practice; is that right?
A. I did.
Q. You specialized in tax work and computer consulting?
A. Yes, individual tax work and computer consulting and some financial statement compilations.
Q. Okay. In the late '80s, you sold your practice and went to work for a software company?
A. Yes.
Q. And what did you do there?
A. I came on to do two things for the software company. One is to help improve the

functionality of the application as it pertains to accounting and accounting compliance. The other one is to act as, a term back then, evangelist or marketing person to reach out to other CPA firms and get them involved supporting our software.

Q. So it was accounting-related software?

A. Yes.

Q. And you worked there until around 2000?

A. Yes.

Q. And what did you do after that?

A. The software company that I worked for, Great Plains Software, went public with Goldman Sachs around 1997. We were kind of missing some numbers, revenue numbers, and so there was a voluntary reduction in force. I decided to go out and do some additional consulting, particularly in the technology field, but also accounting.

My specialty was what people would call now cloud-based accounting, or cloud-based applications. I actually started what we called back then hosted services with IBM.

Q. How long did you do that?

A. I was in the consulting reign in that particular field probably between 2000 to 2004 and '5. I did have a few different clients. May I

correct that? I was essentially doing that kind of consulting work until July 2008 when I began work at Two Rivers Water and Farming Company, which, at the time, was named Navidec Financial Services.

Q. So around the time -- at the time you joined Navidec, which became Two Rivers, you didn't have any experience raising capital at that point, did you?

A. Oh, no, I've raised some capital. In fact, I actually had a series 7 license way back when, 1970, late '70s, I think. We raised some funds, I think, for a couple different projects. One was a car wash out in the Lakewood area. But other than that, no.

Q. Had you had any experience serving as an officer of a publically traded company?

A. Not -- well, I was vice president of Great Plains Software, which is publicly traded, but I don't think I was listed as an officer or legally as an officer that had signing and compliance responsibilities.

Q. And at that point, you had not had any experience issuing private securities offerings; isn't that right?

A. No.

Q. Is that correct that you had not issued private securities offerings?

A. No, that's not correct. I just testified that back in the 1970s, I helped raise some money. One was for a car wash that was on Wadsworth. I'd consider that private investment.

Q. Okay. But other than those back in the '70s, in all the intervening years, you had not done any of that kind of work?

A. That's -- that's correct. And it wasn't the '70s. I think it might have been 1980 or '81, something like that.

Q. All right. So you just mentioned starting at Two Rivers around 2008 when it was Navidec; is that right?

A. No.

Q. So when did you start with Two Rivers?

A. I started with Navidec Financial Services in July of 2008.

Q. And when did it become Two Rivers?

A. Probably about two years after that. I'm thinking sometime in 2010, later part of 2010. It's part of the public record, but fall of 2010. We changed our name to Two Rivers Water at the time because we were focused on water, trying to figure

out what the next big investment, the big wave would be.

And then we decided, based upon research and feedback, that you need to put water to consumptive use. And because of that, we wanted to enter into the farming business. We acquired a farm, and so we changed our name to Two Rivers Water and Farming.

Q. Do you recall when that was, approximately?

A. So when we went from Navidec to Two Rivers Water was probably mid to late 2010. Shortly thereafter, I think within a year, 18 months, we added "and Farming" to it.

Q. Okay. So with Two Rivers Water and Farming, we'll stick with that company, what was your position at the outset?

A. At the very beginning, I was a senior accountant.

Q. Was that with Two Rivers or Navidec?

A. Navidec Financial Services.

Q. So when the company became Two Rivers Water and Farming, what was your position?

A. Let me approach this, if I can, a little bit differently, because again, I'm unsure exactly

the name-change dates, but within about a year of being employed by them, I would say the fall of 2009, I changed positions to controller.

Q. And what is the responsibility of a controller?

A. Controller keeps the books. He or she is responsible for accurate financial information.

Q. And how long did you work as the controller?

A. I think it was about a year until I was promoted, elected position by the board to be chief financial officer.

Q. And you were chief financial officer until at least 2016, correct?

A. Yes. In 20 -- I got to think about dates here. Sorry. In 2016, toward the middle of 2016, we hired a chief financial officer. But for a while there, I was chief financial officer by itself, yes.

Q. And they hired a chief financial officer in 2016 because you became CEO, correct?

A. Yes, that's mostly the reason.

Q. Can I have you take a look at, in the book in front of you, Exhibit 4?

A. I have it.

Q. Do you know what Exhibit 4 is?
A. This is an employment agreement between Two Rivers Water and Farming and myself.
Q. And it's dated August 2017?
A. It is.
Q. And it says there at the top that the employee, you, has been employed by the company as CFO under an employment agreement dated January 1, 2011, and that on June 13, 2016, you were made CEO of the company and elected to the board of directors.
Is that all correct?
A. Yes.
Q. And then this is an employment agreement that you did the following year in August of 2017, correct?
A. I guess so, because it mentions the other dates, and this is dated in the future, so I guess so, yes.
Q. And this is the agreement under which you were -- continued to be employed by Two Rivers at least as of August of 2017?
A. Correct.
MS. HUNT: I'd like to offer admission of Exhibit 4, please.

THE COURT: Mr. McKowen, any objection?
MR. McKOWEN: No.
THE COURT: Mr. Harding, any objection?
MR. HARDING: No.
THE COURT: Exhibit 4 is admitted.
(Exhibit 4 was admitted into evidence.)
Q. (By Ms. Hunt) So as CFO of Two Rivers, a publically traded company, you signed the SEC filings, correct?
A. I did.
Q. You signed investor documents?
A. I did.
Q. You signed financial statements, prepared financial statements?
A. Well, I think -- no, I didn't sign the statements. I signed representations under the Sarbanes-Oxley rules, I think it's Exhibit 30 one dot whatever and 32 dot whatever that says that I believe these financial statements to be accurate.
Q. And when you became CEO, did you continue to sign the investor documents, like the subscription agreements and all that stuff?
A. I might have signed some, but it looked like that a lot of that was switched over to our CFO at the time, Bill Gregorak, G-r-e-g-o-r-a-k.

Q. But you were CEO of the company at that time, correct?

A. Yes.

Q. And you were running GrowCo at that time, correct?

A. So the question was, I was running GrowCo at that time, correct?

I was involved in the operations of GrowCo.

Q. Was someone else -- when you say you were involved with the operations of GrowCo in 2016, 2017, what was your involvement?

A. I believe I was CFO of GrowCo.

Q. And did you sign those investor documents?

A. Yes.

Q. And you served on the Two Rivers board from 2010 until 2019; is that right?

A. I'm sorry. Water went down wrong.

Q. That's okay. Take your time.

A. Yes, I think those dates are correct.

Q. I think you've mentioned this already a little bit in answer to my earlier question, but what was Two Rivers' business when you started it?

A. Well, first of all, I didn't start Two Rivers, but Two Rivers' business was to invest in

water.

Q. And who was the founder of Two Rivers?

A. That would be John McKowen.

Q. And did Two Rivers own any real estate and water rights?

A. Yes.

Q. What real estate and water rights? I mean, not the specifics, but generally, what type?

A. We had land, both nonproductive and irrigable and farming land in Pueblo and El Paso and Huerfano County. We also owned water rights in Huerfano and El Paso County. And we also had an interest, somewhat control over a municipal district in eastern El Paso.

Q. Now, Two Rivers had a number of subsidiary companies, correct?

A. Yes.

Q. And did Two Rivers create subsidiaries to handle these different parts of the business?

A. Yes, that would be a fair assumption, yes.

Q. So there were subsidiaries for water and farming operations?

A. Along with the marijuana investments that we did.

Q. And those came a little later, right?
A. It started in, I'm thinking, sometime in 2014 after the passage, I think it was Prop 8 or something like that.
Q. Yeah, we'll get to that in a minute.
A. Okay.
Q. I want to talk right now just a little about the water and farming subsidiaries.
Were any of those subsidiaries profitable?
A. Yes. The farming was profitable in the first one or two years that we had it, but then it became unprofitable.
Q. Was that the Dionisio, Dionisio Farm?
A. Correct. Dionisio, good Italian name, Farms.
Q. Was that the only Two Rivers subsidiary that was profitable at that time?
A. We had profit -- "at that time," what time would be that time?
Q. Let's say before you formed GrowCo.
A. Correct. I believe that's correct.
Q. And then at some point, Two Rivers formed a company called TR Capital; is that right?
A. That's correct.
Q. And what was TR Capital?

A. Well, we were going to New York, and also in the West Coast, trying to raise money. And I'm summarizing a little bit, but the investment banker said, well, this is really great, but you got so many things going on, if you can't get their attention within two or three minutes, you're out the door.

So Mr. McKowen came up with an idea whereby we give exchange rights to all these individual small subsidiaries that we're trying to clean up and put them into an ownership position into a company, or an LLC called TR Capital LLC, TR, essentially, Two Rivers.

The whole idea behind that is then they would get a percentage -- first of all, they'd get a dividend, and they would get a percentage of profit, and they would also have the right to exchange into Two Rivers Water and Farming. It -- I wouldn't say substantially, but it did a good job simplifying our financial statements so people could more readily understand them.

Q. And whose idea was this to create TR Capital?

A. I think I stated that, but I will state it again. Mr. McKowen.

Q. Thank you. Is it fair to say that Mr. McKowen owned the largest number of insider shares at Two Rivers?

A. Yes.

Q. And keeping in mind the time frame, say, before the GrowCo entities were formed, was Two Rivers ever profitable?

A. Can I go back to that last question and ask, you said within the time frame, or you said that Mr. McKowen owned the largest amount of insider shares. My answer was yes, but I had to qualify that by saying, which -- what time frame are you talking about?

Q. Well, I'm talking about, at this point, let's say before 2014.

A. Then my answer remains the same. Yes. And could you repeat that last question?

Q. The last question was, again, before GrowCo was formed, did Two Rivers ever make money? Was it ever profitable?

A. We did one quarter. Oh, wait. Before 2014. I don't remember.

Q. Just one moment.

Was Two Rivers at that time, I guess at the time when you were thinking about forming GrowCo,

had it been making money and able to pay investors, Two Rivers?

A. As I mentioned, I don't remember whether we were making money or not. We did pay the TR Capital investors some of their dividends, but then we stopped doing that, and I forgot exactly when that was.

Q. So how did the plan to form GrowCo come about?

A. I believe it was John McKowen. And then I heard people take claim for it or whatever, that they told John, Mr. McKowen, to do it, but in my mind, it came out of John McKowen, formed GrowCo, and I thought it was fine, a good idea.

Q. And why did you think it was a good idea?

A. Well, it was the wild west out here when it came to marijuana passage, and everybody was trying to get on board. And we wanted to find the highest and best use of some of our land and water assets, and we thought this would be a good fit.

Q. And you saw this as an opportunity to bring money into Two Rivers through the profitability of the marijuana industry, correct?

A. I saw this as an opportunity to raise

capital for the GrowCo entity.

Q. But also for Two Rivers?

A. The term sheets at Two Rivers -- I'm sorry. The term sheets at GrowCo and their subsidiaries had, yes, stated that some of those funds would be spent for general administrative purposes.

Q. But you did see this also as an opportunity to bring the profits from the GrowCo into Two Rivers?

A. Yes. At the very beginning, Two Rivers, I believe, owned -- was the sole owner of GrowCo when they formulated it. They owned 20 million shares. And then we started -- additional shares, and also using those shares to help raise funds. But yes, at the very beginning, Two Rivers was the sole owner of GrowCo.

Q. So the plan, as I understand it, was to build greenhouses and collect rents; is that correct?

A. Yes.

Q. And GrowCo and Two Rivers were not going to be growing or operating a growing business, correct?

A. Correct.

Q. Why was this important?

A. Because we couldn't. At that point in time, you could not have a publically traded company, even on a nonregistered exchange, that -- kind of the vernacular back then was "touch the plant." You can't touch the plant or have anything to do with it. Being a landlord is okay in terms of what our marijuana attorneys told us, but we did not want to get involved with the grow business, management of the grow business, or anything that had to do with the operations of a marijuana operation.

Q. And you understood that touching the plant in any way would require a marijuana license?

A. I didn't understand that part. What I understood in terms of requirements of a marijuana license, and one of the reasons I got a marijuana license is because you can go in and -- with the license, a proper license, you can go in unsupervised and look at what the landlord's doing without having a landlord take you by the hand.

When I did not have my license, I had to be -- I could go in, I guess, I wouldn't be arrested for touching the plant, so to speak, I mean, literally, but I could not go unsupervised,

but I could go into that facility without a license.

Q. And so you eventually got a license?

A. Yes.

Q. And was that your idea?

A. It might be -- I really don't remember. I think it might be my idea, Mr. McKowen's idea, or some other idea. Because of my involvement with GrowCo Partners 1, we wanted to keep track of what's going on with the tenant.

Q. When GrowCo was formed, and I guess we'll talk about all this -- the other entities as well, but when the GrowCo entities were formed, were they consolidated with Two Rivers financials for SEC purposes?

A. They were, not only for SEC purposes, but for proper financial reporting.

Q. And that means that the Two Rivers 10Ks and 10Qs would disclose information about GrowCo?

A. Yes.

Q. But the GrowCo companies themselves were not public, that's right?

A. Correct.

Q. So they would not have filed their own public statements?

A. What do you mean by public statements?

Q. The 10Qs and 10Ks.

A. They would not file an individual 10Q or 10K.

Q. Now, the Two Rivers board, they weren't involved, were they, in the day-to-day operations of the GrowCo business; is that right?

A. No, not on the day-to-day. They oversaw certain aspects, but no, not day-to-day.

Q. They would oversee, like, issuing new securities, approve that?

A. They would approve that and/or GrowCo's board would approve it, but it would have to be approved by the board.

Q. Have you ever found board meeting minutes that memorialize the Two Rivers board's approval of forming GrowCo in the first instance?

A. You took -- when I left on September 19th, 2018 -- no, sorry, 2019, essentially, the only thing I took was on my personal laptop that had e-mails and other things, but it did not have the complete set of all documents and items like that. It was left behind at the corporation.

Q. Are you aware of any formal meeting

minutes that memorialize the approval of the formation of GrowCo by the Two Rivers board?

A. I think I am aware. And maybe I can go back and try to dig that up again. But GrowCo would not exist without a board approval to establish GrowCo by Two Rivers Water and Farming.

Q. So GrowCo was formed in 2014; is that right?

A. I believe it's toward the end of 2014, yes.

Q. And Suncanna was lined up as the original tenant and operator of the greenhouse?

A. Let's go back to my previous answer. I think it was early part of '14.

Q. Okay.

A. And, yes, we met -- originally, I didn't meet Aaron Van Wingerden and Tim Beall, but I believe Mr. McKowen met them. He was impressed with their operations. We went to go see the large operations in Larkspur. It's called Dutch Heritage Garden. Impressive organization, we thought, I thought. And they seemed to know what they're talking about, because I think Mr. McKowen went to say the same thing, we're not growers, and we're not marijuana guys, but these people were very

interested in teaming up with somebody that has the water, has the land, and they can provide the expertise.

And by the way, Aaron Van Wingerden is part of the Van Wingerden family who also, back East, produces greenhouse structures, so it seemed pretty synergistic to us.

Q. Mr. Van Wingerden was going to have the operator license, the marijuana license?

A. Yes.

Q. You and Mr. McKowen actually filed the paperwork to form Suncanna; isn't that right?

A. I believe that's correct. We wanted to help him make sure he's in full compliance with everything.

Q. Were you ever an officer of Suncanna?

A. Yes. I was elected or appointed, I forgot by whom, maybe Mr. McKowen, to be CFO of Suncanna. That lasted a very short period of time, two, three, four months. And the reason for that, from my memory, is there were some feelings that they needed some oversight in terms of funds flow, you know, are they -- because they were accruing rent but not paying it, but they're going to pay it soon, and making sure that the cash and funds will

be there, so it's good to have a third-party oversight. So based upon that, I believe I became CFO.

Q. You said for two or three months you performed that duty?

A. I'm thinking definitely less than a year.

Q. Who owned the land on which the greenhouses were going to be built?

A. What period of time?

Q. Let's say when you formed GrowCo in 2014.

A. Right when we formed GrowCo, Two Rivers owned the land.

Q. And you transferred it?

A. We transferred it through a deed of trust and an intercompany payment of $240,000 for the water rights, $240,000 for the assistance and the intellectual property, and $50,000 for the land.

Q. Was that a cash transaction?

A. This would be a lot faster if you listened to my answers. I said it was a noncash book transaction.

Q. So it was just an -- it was on the book.

It was just an accounting transfer?

A. That's correct. It was an accounting transaction. We have intercompany accounts, and we booked it that way.

Q. All right. With the plan in place, you needed to raise money, right?

A. Correct.

Q. What was Two Rivers' involvement supposed to be? It was just the parent company?

A. Oh, no, it's -- well, depends what you mean by "just a parent company." Let me elucidate.

You know, when a company gives rise to another company, a subsidiary, particularly one that's majority owned with consolidation issues, that we -- you know, it's like our kid. It's like our baby. We take care of it. We grow. We got to raise capital. We've got to manage it. We got to, you know, make sure it's hopefully profitable and there's a return to our shareholders.

Q. Can I have you turn to Exhibit 52 in the book? Do you know what Exhibit 52 is?

A. I will shortly. Just give me a second.

Q. That's fine.

A. Yes. I didn't read it word for word, but it's coming back to me. Go ahead.

Q. So this is a March 17, 2015, letter signed by you. And it's discussing -- it appears to be on behalf of TR Capital Partners, LLC, and it mentions that the managers of TR Capital Partners had determined that the distribution due to you and other holders of the TR Capital Partners' preferred units will be paid by delivery of units rather than cash; is that right?

A. Yes.

Q. Can you explain what's going on here?

A. Well, we were low on funds. We did not have the funds to pay the dividends, the preferred member share dividends. And so it was determined, I think John McKowen came up with this idea, that, let's distribute something of equal value to them at that point in time in lieu of a cash dividend. And so therefore, we were distributing some units, preferred units that we, Two Rivers, TR Capital, owned and the GrowCo partners want.

Q. This was shortly after GrowCo had been formed, within a year, maybe?

A. Yes.

Q. And it was your assessment that the GrowCo shares were of equal value to the cash dividends?

A. I don't remember if it's one for one or not. And it might say that in here. There was a -- I don't remember. There was a workbook that we used for figuring out distribution. I just don't remember it's one for one or what it was.

Q. That's fine.

Was this a way to bring some of the Two Rivers investor money into GrowCo?

A. No.

Q. Why not?

A. It's a dividend for existing holders.

MS. HUNT: Your Honor, at this time, I'd like to offer Exhibit 52.

THE COURT: Mr. McKowen, any objection to 52?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 52 is admitted.

(Exhibit 52 was admitted into evidence.)

Q. (By Ms. Hunt) So, Mr. Harding, the plan for raising money for GrowCo, that involved debt and equity raises, correct?

A. Yes.

Q. Were the debt offerings secured?

A. Most of them, yes.
Q. The earlier ones?
A. Yes.
Q. And they were secured by what?
A. Land and water rights.
Q. Do you remember which land and water rights they were?
A. I think the grow -- and I'm trying to do my best to remember accurately. I think the GrowCo 4-million-dollar note, which is the first debt offering we had right after GrowCo Partners 1, LLC, equity offering, that was a lien against the GCP1 building and, I think, associated water rights in that area or certain shares that were Huerfano-Cucharas Irrigation Company.
I think subsequent offerings also included some what we call Butte Valley, which is water rights and some land that we owned in (indiscernible) County, it was deeds of trust filed against that, too.
Q. And we've heard GCP1. We've heard GCP Super Units. I think it would help if we take a look at an exhibit.
MS. HUNT: Can you pull up Exhibit 6?
Q. (By Ms. Hunt) All right. If you look a

few pages in, it looks like this is created as of September 2017.
Dose that sound right to you?
A. Yes.
Q. Do you know what this is?
A. Funds flow from the different entities.
Q. The entirety of Exhibit 6, do you recognize it, all the pages?
A. I recognize these flowcharts, yes.
Q. Are these things that you prepared?
A. I probably prepared, and then we bounced it off Mr. McKowen and maybe some other people, but I might have been the author of this, yes.
Q. And it was something that Two Rivers used in its business?
A. Yes. I don't know what you mean by "used in its business." We used this, in fact, you might see something like in some of our filings.
MS. HUNT: I'd like to offer Exhibit 6.
THE COURT: Mr. McKowen, any objection?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: Exhibit 6 is admit.
(Exhibit 6 was admitted into evidence.)

Q. (By Ms. Hunt) This first page on Exhibit 6, and it shows a chart with Two Rivers Water and Farming Company at the top. On the left side are water redevelopment, Huerfano-Cucharas Irrigation Company, which we can call HCIC, because that's a mouthful, and Orlando Reservoir Number 2.

Are those the water and farming companies that Two Rivers had?

A. Had when?

Q. Well, at the time -- what is that chart showing us? Do you know what time frame?

A. Yeah, I had a pretty good idea what time frame. It was toward the end -- I believe toward the end of 2016, came about through our water task force that we put together.

Q. And on the right side, you have GrowCo, Inc., GrowCo Partners 1, GrowCo Partners 2, and GCP Super Units.

Do you see those?

A. Yes.

Q. Why were all those -- what was the purpose of all those companies on the right?

A. Well, GrowCo we've talked about. To begin with, that's kind of the mother ship of the marijuana investment area.

GrowCo Partners 1 relates to the land water assets, construction improvements in the first greenhouse. GrowCo Partners 2, LLC, is with the second greenhouse. And GCP Super Units, LLC, since we're running out of cash and need additional cash, that was another entity we used to raise money.

Q. So Super Units was formed to raise additional cash because you were running out of cash from the prior offerings?

A. Right. We were having over -- we are overspending more trying to get our greenhouse in line and also providing enough support services, support, financial, whatever, to our tenants. What I mean by that is we deferred rent. You know, we accrued rent. We had tenant issues that we've heard about before. So we needed additional cash.

Q. Why not just issue another offering out of GrowCo or GCP1 or GCP2?

A. If I remember correctly, I believe the Super Units had some interest capabilities, kickers in GrowCo Partners 1 and GrowCo Partners 2, so it had different interests instead of just in Partners 1 and Partners 2, spread the risk.

Q. So the Super Units would also include interests in the other GrowCo companies?

A. I don't know if it included interest in all the other GrowCo companies, but I believe that it was definitely an exchange right within Partners 1 and Partners 2, and then also the conversion capability into GrowCo stock.

Q. Can I have you turn to the next page of Exhibit 6, please? What is this page showing us?

A. Okay. So now my dates are coming back to me. It was the -- back in the summer of 2017, I asked the board to put together a task force on how do we capitalize in our land and water. Forget all this marijuana stuff. We got to, you know, get back to focusing on Two Rivers Water and Farming Company.

So we came out with this new company, the idea called Water Redevelopment Company. And what that was is to take certain assets that we already had, put it into water redef as a company, transfer it in there, and start raising additional capital, which we did.

Q. And so as of September 2017, it looks like this shows the parent is still Two Rivers Water and Farming, and then underneath that is TR Capital Partners.

And that was your operating arm?

A. Yes.
Q. And then underneath that you had groups of farming companies, water companies, and then the marijuana companies; is that right?
A. Yes, that's a good way to summarize.
Q. And then down below there are some notes that talk about the various cross-ownerships among the subsidiaries?
A. Yes.
Q. And then on the next page of the exhibit, it says "Funds Flow" at the top?
A. Yes.
Q. Does that accurately depict how the funds were flowing among all these companies?
A. Yeah, I think it's a pretty good depiction.
Q. So all the funds here were flowing up from the GrowCo companies up to Two Rivers?
A. Some of the funds were. For example, let's take a look at GrowCo Partners 1, footnote 4. It says, "TR Capital Partners/Two Rivers owns," let's call it a third, but is controlling for consolidation purposes. So essentially -- and plus there was preferred memberships and common memberships, okay?

So it depends on which one is which, what you got in terms of flows, fund flows. But yes, there would be some funds flowing into Two Rivers from GrowCo Partners 1 if funds were available.

Same thing with Partners 2, had the same type of note to it.

Q. Where did you find investors for GrowCo?

A. Well, mostly, we started out -- our first fundraising was in 2014, I believe. And that was through a broker-dealer named Emerging Growth Equities out of the Philadelphia, Pennsylvania, area. They raised -- of the 5 million I think they were seeking, they raised about 3.1 or two million. And then TR Capital invested in the rest to get the funds up to, I think, 4.1 million to hopefully fully construct the greenhouse.

Q. But you went beyond that, correct, to find new investors?

A. Oh, I'm sorry. I'm not answering your question.

So they found investors. In fact, they found one of our major key investors that was investing with us for a very long time. Also, John McKowen had quite the list of investors in network. I had, of course, myself and a few friends that I

got involved in also.

Q. And did you ask some other people to raise money for GrowCo?

A. No, I didn't ask anybody else to raise money --

MR. McKOWEN: We lost our feed.

A. -- for GrowCo that I can remember, no.

MS. HUNT: You lost, which feed?

MR. McKOWEN: The text.

MS. HUNT: Oh, it appears they've lost their text feed.

THE COURT: All right. We'll check on that.

MS. HUNT: No, he is talking about his CART.

THE COURT: It looks like we lost your feed in the courtroom.

MS. HUNT: It may have gone asleep. I don't know how to wake the computer up.

CART REPORTER: I think it might have fallen asleep, Judge, because I'm still going.

THE COURT: We just need to sign into that account. Give us a minute. Is it back up?

MR. McKOWEN: Yes. We're ready.

THE COURT: You can begin.

Q. (By Ms. Hunt) GrowCo did continue to use other people to raise capital, correct?

A. Yes.
Q. The George and Jan McCaffrey?
A. Yes.
Q. And Kristy Cameron?
A. Yes.
Q. I believe a Mr. Wiwi?
A. Yes.
Q. W-i-w-i.
You didn't do anything to make sure that they were licensed to sell securities, correct?
A. No. And at the time, I believe it was Mr. McKowen who said, you know, he -- I said, what about paying the fees? He said, well, these are finder's fees that, you know, you don't have to be registered. People do finder's fees all the time.
Q. And so you didn't -- you didn't think you needed to worry about the licensing?
A. Correct.
Q. Can you take a look at Exhibit 44, please? Are you familiar with Exhibit 44?
A. Yes.
Q. And this is a letter from you to Mr. Burtiness at the Colorado Department of Regulatory Agencies, the Division of Securities, providing Two Rivers' response to a subpoena; is

that correct?
A. Yes.
Q. And did you prepare the materials that are attached to this letter?
A. I don't remember, but I probably did. I don't think anybody -- it probably didn't come from anybody else.
Q. To the extent there's financial information from the books, this would be something that would be within your responsibility, right?
A. Correct.
MS. HUNT: Your Honor, I'd like to admit Exhibit 44.
THE COURT: Any objection, Mr. McKowen?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: Exhibit 44 is admitted.
(Exhibit 44 was admitted into evidence.)
Q. (By Ms. Hunt) Can you turn to page 6 of the document? The pages aren't really numbered, but the sixth page in. It is the -- it is titled, "Vendor QuickReport." And it has a Waterton Financial information.
Do you see that?

A. One moment. Yes, I see that.

MR. McKOWEN: Can you blow that up? We can start, I suppose, with the first set, the Waterton Financial at the top, just blow it up.

Q. (By Ms. Hunt) Do you know what Waterton Financial is?

A. Yes.

Q. And that was the company that George and Jan McCaffrey had their money put into for their fees?

A. Yes.

Q. And you can see there at the -- I don't know if you can see that. Hopefully you can see it on your paper there, that, for example, at the top, Waterton Financial, it looks like checks were made out of the main operating GrowCo account for, in the first line, $26,250, called "Cost of GrowCo note raised."

Did I read that right?

A. Yes.

Q. So does this chart here, does this show all the monies paid to the McCaffreys to raise funds for GrowCo?

A. For the time period that's assessed in the top report, January through December 2015.

Q. Okay. If you look about four pages further in, there's the same kind of a chart for Kristy Cameron.

Do you see that?

A. Yes.

Q. It looks like she was paid for cost of GrowCo note raised about $9,000 total; is that right?

A. $9,500.

Q. Okay. Thank you.

All right. So in addition to the individuals that we've talked about raising money for GrowCo, you also did road shows and presentations?

A. Yes.

MS. HUNT: Can I have you pull up Exhibit 7, please?

Q. (By Ms. Hunt) Do you recognize Exhibit 7?

A. I do.

Q. What is it?

A. It's a presentation that Jeff Ploen and I did virtually remotely, or whatever, with a company that supposedly had investors interested in the marijuana space to help us raise capital called

DealFlow.

Q. Do you know approximately when this was? Do you know what year? It says November 17 on the front. Do you know what year?

A. I'm guessing 2015.

Q. So this was a presentation made to potential investors that Two Rivers or GrowCo did not have relationships with, correct?

A. Yes. Although, somebody who was an investor, they might also sign on to get an update or whatever, but it was targeted for new investors.

Q. And this is for the 7-million-dollar note?

A. Yes.

Q. And you said you gave this presentation. Who else was with you?

A. Jeff Ploen, P-l-o-e-n.

Q. And it looks like, if you page through it, it includes a Safe Harbor statement, correct?

A. Yes.

Q. It has some, like a map of marijuana legalization by state, sales and charts about the sales of cannabis. If you go to the page that, at the bottom, is 5159, there's some pictures.

In those pictures, they're showing the first

greenhouse that was complete and the start on the second?

A. Yes.

Q. You have a site plan. And then you have a projected return. If we could flip to that page.

Is that something you might call a pro forma?

A. Yes.

Q. Who prepared this pro forma?

A. Usually these pro formas are a joint effort by Mr. McKowen and myself, so I don't -- I can't remember if it was just me or just him, but I'm going to assume we were both involved with this.

Q. And where do the numbers come from?

A. Which numbers?

Q. Let's say, let's go with the use of proceeds. How did you determine those numbers?

A. Based upon what we knew at the time in terms of what we needed to complete the buildout and get back into -- get into operations.

Q. And what information were you relying on to figure out how much you would need to build the greenhouses?

A. I don't remember, but knowing how I do

spreadsheets, this is probably a summary sheet. And there's a lot of detail behind these numbers, particularly if they're not, like, whole numbers, like, $4 million, like, for example, the 435 or something, there's usually detail behind all that.

Q. What about grower operations? What was the source of the numbers for grower operations?

A. That I'm almost positive was from a workbook that -- or part -- this is probably the summary sheet from a workbook that contained multiple worksheets of which that number was rolled up from. I don't remember exactly the details on that.

Q. But the numbers in the worksheets, what was the source of those?

A. The numbers in the worksheets that I do not have in front of me? It's probably, I'm guessing, the leases, or the leases that we anticipate signing in -- signing onto along with bringing GrowCo Partners 1 -- sorry, the second greenhouse online and perhaps even the third greenhouse online.

Q. The GrowCo cash flows, was that based on your projection of what you would get in rent?

A. You know, can I go back just a little

bit so we make sure we have full clarity? What I'm looking at here now is, first of all, how we're going to use the proceeds. And then the second category is grower operations. I'm trying to remember why grower operations is in it, because we're not growers. But it might be to show that the grower has plenty of funds left over to pay the rent that we're asking.

And so you go to the third one, GrowCo cash flows, is that the one you're focusing on? Because I was looking at grower operations, and I was confused, and I misstated.

Q. All right. So let's go back, then, to grower operations.

What did you base those numbers on?

A. It was, I'm guessing, a lot of spreadsheets. A lot of years have passed, but I'm guessing that, again, we had detailed information about how much would be produced by each greenhouse, or section of greenhouse, and the going rate, and then the cost of cultivation and taxes and things like that.

Q. How did you know how much would be grown by each greenhouse?

A. That would not be my call. I would take

some numbers and put it in. I would not know that.

CART REPORTER: I'm not hearing Mr. Harding really well. His mic is going in and out. I don't know if there's anything we can do about that.

THE COURT: It's not going out here in the courtroom, so I'm not hearing the same thing. So just interrupt if you have any issues. Do you need him to repeat his response?

CART REPORTER: Yes, please.

THE WITNESS: Can we maybe have the court reporter read it back?

THE COURT: Do you have that, Melanie?

(The last answer was read back.)

THE COURT: Ms. Messinger, did you hear that?

CART REPORTER: I didn't. Not well.

THE COURT: We'll need a handheld mic. Do we have one?

CART REPORTER: If she could get that a little slower for me.

(The last answer was read back.)

CART REPORTER: Thank you.

Q. (By Ms. Hunt) And now, then, to the cash flows section, is that where you would just -- is that based on the projected rent income?

A. The first number is, yes.
Q. And what are the other numbers in that section?
A. It looks like there are some obligated or debt-service payments to the different entities that we raised capital from.
Q. And then you have a common stock analysis.
Where do those numbers come from?
A. Those were probably mostly mine, because I know the current outstanding shares. I would also know the potential dilution of additional shares. The next four numbers are probably a discussion between Mr. McKowen and myself.
Q. Okay.
A. Came up with a net income, divided by the diluted, fully diluted shares, came the earnings per share, and estimate of market multiple of 20, and that's $2.81 a share.
CART REPORTER: And, Judge, I'm sorry, I'm not hearing Mr. Harding very well. It's in and out.
Q. (By Ms. Hunt) Can you make sure, Mr. Harding, that you're next to the microphone?
A. I'm almost eating the microphone, but --

THE COURT: It's true. Ms. Messinger, do you need that response read back or restated?

CART REPORTER: Yes, please.

(The last answer was read back.)

Q. (By Ms. Hunt) All right. If we can turn to the next page of this exhibit, you have a statement here that GrowCo greenhouses yields 300 percent more at 1/5th the COGS.

What is COGS?

A. Cost of goods sold.

Q. And what is that based on, that statement?

A. That was probably based upon interviewing our growers and doing additional research. I did not come up with those numbers.

CART REPORTER: I can't --

THE COURT: I don't know what's going on, Ms. Messinger, because he's about an inch from the microphone, and it's coming through.

CART REPORTER: Okay.

THE COURT: Loudly.

CART REPORTER: So sorry.

THE COURT: Over the court system, so I don't know if it's a connection issue.

CART REPORTER: I hear you fine.

THE WITNESS: I would be happy to use the microphone.

THE COURT: You can try holding it. I don't know if it's going to have feedback with your other microphone that close, but you can try.

THE WITNESS: Would this be any better?

THE COURT: Ms. Messinger, is that better?

CART REPORTER: No. Should I leave and come back in?

THE COURT: We can try that. We're all on the same system, so I'm not sure what's going on.

CART REPORTER: True.

THE COURT: Mr. McKowen?

MR. McKOWEN: Is there a reason why we're not still using her? Because hers were completely understandable.

THE COURT: Because the court reporter was making an accommodation because you're not paying for real-time, so the Court is providing a CART interpreter in lieu of the court reporter. It's not the court reporter's obligation to provide real-time to the parties unless they pay for it. So we have a court interpreter.

MS. HUNT: And Mr. McKowen, are you able to hear him, sitting there?

MR. McKOWEN: I'm sorry?
MS. HUNT: Are you able to hear Mr. Harding?
MR. McKOWEN: Honestly, it's the same problem that I have with everyone.
THE COURT: We're providing a court interpreter. I'm not sure what the issue is. Everybody, I think, can hear just fine. Through these -- the microphone amplification is the same, no matter what microphone is being used from my perspective, so I'm not sure what's going on.
Ms. Messinger, do you want to log out and come back in?
CART REPORTER: I'll do that.
THE COURT: Ms. Messinger, are you back?
CART REPORTER: I'm back, Judge.
THE COURT: Okay. Mr. Harding, can you state your first and last name to see if she can hear you?
THE WITNESS: Wayne Harding.
THE COURT: Ms. Messinger, can you hear that?
CART REPORTER: It was garbled.
THE COURT: Try the handheld mic, please.
THE WITNESS: Wayne Harding.
CART REPORTER: I heard that better. I

heard the last name.

THE COURT: We'll keep going. Like I said, I'm not discerning any difference between how things sound with my microphone, with the witness stand microphone or the handheld microphone. They all sound the same to me, so I don't know why it's not coming through as clearly as I'm hearing it for Ms. Messinger, but Ms. Messinger, interrupt us if you need to.

CART REPORTER: Okay.

Q. (By Ms. Hunt) Mr. Harding, on the last couple of pages of this exhibit, it has contact information, lists you as the contact; is that correct?

A. Yes.

Q. And it lists you as managing director of GrowCo?

A. Yes.

Q. Can I have you turn to Exhibit 8, please? Do you recognize Exhibit 8?

A. Yes.

Q. Does it look like substantially the same presentation for the 7-million-dollar note?

A. Yes, but the projections might be a little different. I don't know for sure.

Q. And it looks like it's in a little bit different order.
Was this just a different form of the presentation given to investors?
A. I'm assuming so.
Q. Was this something that you put together?
A. Probably, or helped to assist.
MS. HUNT: I'd like to offer Exhibit 8.
THE COURT: Mr. McKowen, any objection?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: Exhibit 8 is admitted.
(Exhibit 8 was admitted into evidence.)
Q. (By Ms. Hunt) So Exhibit 7 we noted was for the DealFlow presentation.
Do you know what you used this Exhibit 8 for?
A. No.
Q. Is this something you would give to potential investors?
A. Could be, yes.
Q. Can you turn to Exhibit 9? And you can page through this.

Do you recognize Exhibit 9?
A. Yes.
Q. What is Exhibit 9?
A. It's another presentation. I probably had something to do with putting it together. I don't remember where we gave it, if we gave it at all, or just sent it out. I believe that we gave it, though, somewhere.
Q. If you look towards the back, you are listed as the contact; is that correct?
A. Yes.
Q. And it looks like this one is also for the 7-million-dollar note; is that right?
A. Yes.
Q. This one's a little different.
It still includes the Safe Harbor statement, right?
A. Yes.
Q. And it has some information about the market and sales statistics.
If you go to the page that has -- it discusses agricultural assets and greenhouse expertise, there's a couple of pictures on the side, the circles. I think you have it right in front of you. There's two pictures in circles.

A. Oh, I see it. Yes, I have that.
Q. And this is explaining to potential investors the history of GrowCo, how it was formed, in brief?
A. Yes.
Q. And talks about having a partnership with a greenhouse operator and developed a model to introduce industrial-scale efficiencies, correct?
A. Yes.
Q. That will revolutionize the economics of producing marijuana.
And then you say that GrowCo leases state-of-the-art cultivation infrastructure without touching the plant?
A. Yes.
Q. Did you prepare this?
A. Again, there's a lot of presentations. I know I had my thumbprint over it. I don't know if I was the ultimate or the initial author, but I'm sure I was involved in this one.
Q. Do you know when this presentation was given, approximately?
A. I thought -- I thought, going through here, I saw a date somewhere.
Q. Well, do you know approximately when you

were marketing or soliciting for the 7-million-dollar note?

A. I believe it was probably July of 2016 or '17. I don't think '18. I'm just looking at the due date of the note. We usually made notes three- to five-year maturity, so just based upon the due date of the note.

Q. And if you can turn to the page that says "Risk Factors" at the top, you list economic and political risk factors.

Why did you tell people about the economic risk factors?

A. Because these are risk factors that we wanted to communicate.

Q. And what did you communicate on these issues?

A. Well, let me go back to my memory, and hopefully I'll get it close to being right. The economic is -- it requires substantial cash to put in state-of-the-art greenhouses. They're not cheap.

There's an economic risk in pricing of the marijuana. In fact, we knew that going in. I know we've had some discussions over that. It was over 25 -- it was mentioned before. It was over $2,500

a pound wholesale. Yesterday I went home and I checked the Colorado Department of Revenue site about their stated value of a wholesale pound of flower, and it was, like, $706, but that's always way behind. It's probably less than that. So pricing's an issue.

Taxation. We got 280E that says you can only deduct the direct cost of your cost of goods and cost of production, which was very burdensome on the marijuana business. And I think that that is still out there. I haven't really been keeping track of that that much.

Financial's hard to get. Why is financing hard to get? Well, it's a new investment. It's a new frontier. And banking is a real big issue. So banks are not going to fund you. So you have to turn to individuals or private equity or a similar source of cash, but definitely not banks.

Political. Well, the federal government hasn't, still hasn't, approved marijuana for consumption. We have MED, means the Marijuana Enforcement Division. They have --

CART REPORTER: Judge, I'm sorry to interrupt. I feel like I'm not getting Mr. Harding's testimony very well.

THE COURT: All right. Hold on. Let's switch the microphone from counsel table over to the podium. That's about the last option I can think of.

CART REPORTER: Okay. Or I can -- the last option I can think of is that I try to get somebody else on, maybe their equipment is better. I don't know.

THE COURT: All right. Mr. Harding, can you state your first and last name?

THE WITNESS: Wayne Harding.

THE COURT: Ms. Messinger, can you hear that?

CART REPORTER: No, not well.

THE COURT: All right. We'll go off the record. We'll take a recess. Ms. Messinger, do you want to try to get somebody to substitute for you?

CART REPORTER: Yes, I will. I'm on it. Thank you.

THE COURT: You can step down, Mr. Harding.

(Recess taken from 2:44 p.m. until 3:19 p.m.)

THE COURT: Case Number 21CV33922, all parties and counsel are present. And I believe we

have our audio issues corrected, so, Ms. Messinger, if you have any additional issues hearing the witness, please let us know. Feel free to interrupt.

CART REPORTER: I will, Judge. Thanks.

THE COURT: All right. Continued direct examination.

MS. HUNT: Yes. Thank you.

RESUMED DIRECT EXAMINATION

BY MS. HUNT:

Q. Mr. Harding, I believe we were discussing Exhibit 9, which is still up on the screen. We were talking about the risk factors.

Just to close this out, do you recall, when giving this presentation or a presentation like it, whether you talked about any other risk factors that are not listed here?

A. I don't recall.

MS. HUNT: I think I have not offered Exhibit 9, and I'd like to -- and I think I probably forgot to offer Exhibit 7, so I would like to offer both 7 and 9.

THE COURT: All right. Let's talk about 9 first. That's one on the screen, correct?

MS. HUNT: Yes.

THE COURT: Exhibit 9, Mr. McKowen, any objection?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: Exhibit 9 is admitted.

(Exhibit 9 was admitted into evidence.)

THE COURT: And then Exhibit 7 was the flow sheet?

MS. HUNT: Exhibit 7 was another presentation, yes.

THE COURT: This one that's on the screen?

MS. HUNT: Yes.

THE COURT: Mr. McKowen, any objection to Exhibit 7?

MR. McKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 7 is admitted.

(Exhibit 7 was admitted into evidence.)

MS. HUNT: All right. Thank you.

Q. (By Ms. Hunt) Before I move on to a new topic, I did want to go back and ask one more question about the payments we looked at to the McCaffreys and to Kristy Cameron for the fees for

bringing in funds.
Were those fees that GrowCo paid to those individuals for bringing in funds, were those dependent on how much money they brought in?
A. Yes.
Q. So they were paid based -- like a transaction, if they brought in a particular amount of money, they would get paid for that transaction?
A. Yes.
Q. And so we have heard a lot that these are called private offerings that you were doing.
Is that how you would refer to it?
A. Yes.
Q. What does that mean, to your knowledge, that it's a private offering?
A. To my knowledge, it's not a blanket offering to anybody. It's usually a targeted offer to certain investors. It also does not involve certain registrations that you have to do with the Securities and Exchange Commission. Such as, for example, if you do probably -- or you're used to an IPO, initial public offering, they file a Form S1, unless you're a foreign corporation, you file a different form. But none of these were filed with the SEC except for the requirements to file a

Form D.

Q. Right. And you did file Form Ds?

A. I did.

Q. And you signed those? You signed the Form Ds?

A. I did.

Q. Did you file any notices of exemption from registration with the Colorado Division of Securities?

A. I did not.

Q. So you believe, and I think you've mentioned this in talking to a couple of investors, that you were only offering these to accredited investors, correct?

A. Correct.

Q. And that was based on the questionnaires that you would include with the offering documents?

A. Yes.

Q. Other than reviewing the questionnaires, did you do any other diligence to be sure they qualified?

A. No. I read the questionnaires and their answers, made sure they were complete.

Q. Can I have you look back at Exhibit 6 for a moment, because that's the flowchart that we

looked at earlier. And can I have you look to the second page?

Am I correct that you held management positions with just about every company on this chart? Is that right?

A. I believe so.

Q. Are there any in this chart that you did not have a management role?

A. I don't think so. I had -- at various points in time, everything on this chart I had some sort of management position.

Q. With GrowCo, you were responsible for sending out the investor documents, the subscription documents?

A. Not totally, but I did probably the majority, yes.

Q. And you sent out the investor questionnaires?

A. It's part of the development packet is what they complete, yes.

Q. And you helped put together the term sheet?

A. Yes.

Q. And you would -- at least while you were CFO, you signed the subscription agreements?

A. Yes.

Q. And you usually provided the investors with the packet, correct?

A. Yes, along with a certificate, if there is one, if it's an equity deal. If it's a debt deal, then they got the original note.

Q. Can I have you turn to Exhibit 47?

MS. HUNT: If we could blow up the top part of that?

Q. (By Ms. Hunt) We looked at this exhibit the other day.

MS. HUNT: Is this already admitted?

THE COURT: 47 is admitted.

MS. HUNT: Yes, okay.

Q. (By Ms. Hunt) So Exhibit 47, which we looked at the other day, yesterday, I believe, is a memorandum of terms for the 4-million-dollar note; is that correct?

A. No.

Q. What is the term sheet for, then?

A. It says here, securities offered, 5-million-dollar in aggregate principal amount is senior secured promissory note, so I don't think it's the 4 million.

Q. So you just -- so we had been talking

about the note -- this particular note as the 4-million-dollar note.

Was the 4-million-dollar note originally supposed to raise 5 million?

A. Judging by the date, I think you might be accurate in that statement.

Q. So this is what we've been referring to as the 4-million-dollar note.

A. Okay.

Q. Is this pretty representative of the kinds of terms sheets that you would give to potential investors?

A. Yes.

Q. And so it has the date at the top. I think you highlighted the bold language there at the top that you would include. The securities offered, there's a section there for that, and the purchase price. Let's focus on the use of proceeds.

Did you -- would you provide the language that's in this term sheet? Did you write this?

A. I don't remember.

Q. So for the 4-million-dollar note, it looks like the purpose, the proceeds were to be used to provide a letter of credit to Suncanna, to

provide debt financing for a second greenhouse, and for general corporate purposes; is that right?

A. Yes.

Q. And on the next page, it describes the notes and also describes the security for the notes, correct?

A. Yes.

Q. There's discussion of price, of the capitalization, the intention to become a publically traded company.

Do you see all that?

A. Yes.

Q. If you turn to the page with the pro forma, so are these -- is this another example of a pro forma?

A. Yes.

Q. And did you prepare this?

A. I had -- I was involved with the authorship of it. It wasn't totally me, I don't think, because I don't -- I wouldn't know productions and that kind of amounts, or what -- I would have to rely on other people on certain numbers.

Q. Okay. This one has a section on Suncanna operations and on distributions.

What were -- under the Suncanna operations projections, what were these numbers based on?

A. Estimates.

Q. And where were you getting the information to make the estimates?

A. I really don't remember, but I can give you kind of what I think I got the information from.

Q. Okay.

A. I think that I got this information from -- depends when I put it together -- from Aaron Van Wingerden and/or Tim Beall. They would be the ones that would know this type of production and numbers.

Q. Did you base it on just information they told you, or did they have, like, documentation or any kind of, you know, worksheets that they gave you?

A. Again, usually, these pro formas, almost every single number has like a detailed worksheet underneath it, you know, that rolls up to this as a summary. If you're asking me, did I verify numbers that they gave me? Is that your question?

Q. Yes.

A. No. We looked at them as the

subject-matter expert in greenhouse operations, and also marijuana production, even though it's nascent in terms of marijuana production. They knew a lot more than I did.

Q. And on the section on distributions, where did those numbers come from?

A. It looks like that's percentages based upon productivity and who gets split what. There might be some legal documents behind that, but again, there's probably detailed worksheets behind that, too.

Q. And when you say there's detailed worksheets behind that, where do the numbers on the worksheets come from?

A. Well, some of these numbers are depending on other numbers. Like that percentage, you know, it says 75 percent, 50 percent, 50 percent. Without me seeing the entire workbook, I'm just -- I'm guessing, but it came from the flow of -- this one, distribution, it comes from the flow of funds.

Q. These are projections, correct?

A. That's correct.

Q. So how did you estimate the flow of funds?

A. Probably based upon that first table up there called Suncanna Ops.
Q. Did Mr. McKowen provide the numbers for these tables?
A. Could have. Don't remember.
Q. Could you turn to Exhibit 49, please? This appears to be another memorandum of terms.
Do you recognize it?
A. Yes.
Q. It looks like it's for a 6-million-dollar note in April of 2016?
A. Yes.
Q. And this one is GrowCo, Inc., and Super Units, GCP Super Units?
A. Yes.
Q. Do you recall this offering?
A. Yes.
Q. And was this a memorandum of terms that you sent out to -- with respect to this offering?
A. Yes.
MS. HUNT: I move to admit Exhibit 49, please.
THE COURT: Mr. McKowen, any objection?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: 49 is admitted.

(Exhibit 49 was admitted into evidence.)

Q. (By Ms. Hunt) If you look down here on the use of proceeds, it says, "Net proceeds will be used by GrowCo to support the operations of the LLC," meaning this GCP Super Units. That was a lot more detail than we saw on the last one.

Do you know why there's less detail on the use of proceeds?

A. No I don't. I might have known why. I just don't know why.

Q. Do you recall what this offering was intended to do?

A. Raise additional capital so we can get GrowCo and its subsidiaries off and running, operational.

Q. And this one doesn't appear to have any pro forma on the back.

Was it unusual for you to send out a term sheet without pro forma projections?

A. It's not unheard of, but it looks like, on the other ones, we sent out pro formas. I don't know why, or I don't know -- maybe there would have been one. I don't remember.

Q. Will you look at Exhibit 51, which I believe is already admitted?

MS. HUNT: Is that correct?

THE COURT: 51?

MS. HUNT: Yes.

THE COURT: 51 is admitted.

Q. (By Ms. Hunt) There's a lot in this document, but the first few pages is another memorandum of terms, correct?

A. Yes.

Q. And this one is for the February 15, 2017, 2-million-dollar note?

A. Yes.

Q. And this one, the use of proceeds, if you look at that paragraph, is, they will be used by GrowCo to complete construction of the second greenhouse, warehouse and extraction facilities at GrowCo's grow complex along with general and administrative expenses.

Do you see that?

A. Yes.

Q. Were any of these funds actually used for those purposes?

A. Yes.

Q. Were all of the funds used for those

purposes?
A. Yes.
Q. Can you explain that?
A. I don't know what you want me --
Q. Well, was the second greenhouse ever completed?
A. No.
Q. The projections that we were looking at on the other exhibits, did GrowCo ever come close to meeting those projections?
A. I don't believe so.
Q. I'm going to have you turn to Exhibit 85, please.
Do you recognize Exhibit 85? Do you recognize this exhibit?
A. Yes.
Q. Is this a different version of the A -- basically a summary or a summary term sheet?
A. This is -- I think there's a term sheet, too, but this is for the Super Units.
Q. So is this something that you would send to potential investors to summarize the offering?
A. Yes.
Q. And on the front page, you have a list of business highlights; is that right?

A. Yes.

Q. Do you know approximately when this was prepared?

A. I hesitate because I'm trying to remember and also read the verbiage in here, verbiage in here, so it was -- it was after September 1st, 2015, because I made a statement in here that lease payments began accruing then, but it was before July 2017, because I said, "we're attempting to," by July 2017, so somewhere in that time frame.

Q. So somewhere maybe in 2016 or 2017?

A. Yep.

Q. And at that point, you were still targeting to build and lease four greenhouses?

A. Don't know about four, but maybe, but definitely that first one and two.

Q. And then on the second page, it has a -- the first sentence says, "GrowCo formed GCP SU for purposes of financing the construction of a second greenhouse and providing services to Suncanna"; is that right?

A. Yes.

Q. A second greenhouse that wasn't built?

A. No, not completed.

Q. This one has -- also, it has some numbers at the back.
What is this chart with the numbers? This first chart, GCP SU ownership, what is this showing us?
A. So GCP SU was formed for additional capital, and then they would take the additional capital, use it for the purposes stated on the page 1, but also receive equity in those different assets. So there's GBD services, GCP1, 2, 3, 4. And that shows -- that will show the investor what they're getting through the super unit.
Q. Were GCP3 and GCP4 ever formed?
A. They might have been formed with the Secretary of State, but that's about it.
MS. HUNT: I'd like to offer Exhibit 85.
THE COURT: Any objection, Mr. McKowen?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: 85 is admitted.
(Exhibit 85 was admitted into evidence.)
Q. (By Ms. Hunt) Other than the subscription documents, were there any other materials that you would give to investors about

the investment before you would send them the subscription agreement?

A. Yes.

Q. What would you send them?

A. What we just looked at all these different slide shows. I'm sure they saw those.

Q. So other than the slide shows and the term sheets and the pro formas and the summaries that we've looked at, is there anything missing, any kind of document that you would send written disclosures to investors?

A. Yes.

Q. What would you send?

A. You didn't put in the qualified investor questionnaire.

Q. Well, we'll look at that. I'm talking about things you would send to solicit the investment other than the subscription documents and all the agreements they would signed.

A. No, I believe that we probably sent a qualified investor questionnaire to them, too, right at the very beginning to make sure that they're a qualified investor.

Q. Okay. Aside from the presentations and the term sheets with the pro formas on them, and

the investor questionnaire, is there anything else you would send?

A. Probably not, not initially, no.

Q. So let's then go back to Exhibit 51. And starting on -- which we looked at earlier, after the term sheet, and this was Mr. Buchanan's materials, so the letter, March 7, 2017, like the fourth page.

So this says that, you know, he's agreeing to invest $100,000. You've sent a promissory note, the exchange note purchase agreement, an executed exchange agreement and the accredited investor questionnaire.

Are those the materials that investors would receive?

A. Yes.

Q. Can I have you take a look at --

MS. HUNT: It's -- Jan, it's page 23 of the electronic file, if you could go there, yes, on this exhibit?

Q. (By Ms. Hunt) And this is from the senior note purchase agreement.

Do you see that?

A. Yeah. It would be helpful if you tell me the paragraph number or section.

Q. Yes, I will get there.
MS. HUNT: Janet, can you go back a couple pages to the title, the senior note purchase agreement, the title page? Back a couple pages? Back, not forward, to the senior note purchase agreement title page.
MR. McKOWEN: What exhibit number again?
MS. HUNT: 51.
MR. McKOWEN: Thank you.
MS. HUNT: There you go.
Q. (By Ms. Hunt) So this is the senior note purchase agreement between GrowCo, Inc., and investors from February 21, 2017. You were looking at that earlier.
Do you remember that?
A. Yes.
Q. And then if we go back to that page 23 with -- in paragraph -- actually, let's start with paragraph 4, which is a few pages ahead. We looked at that earlier. The disclosure paragraph, I'm looking for that. Paragraph 3. I'm sorry. And we looked earlier at paragraph 3.3, disclosure of information, and you talked about that with Mr. Buchanan?
A. Yes.

Q. And I believe also with Mr. McMahon?
A. Yes.
Q. And I think maybe with Ms. Loughran?
A. I believe so.
Q. So can we look, then, at the paragraphs before that, paragraph 2, which was the representations and warranties of GrowCo?
Do you see that?
A. Yes.
Q. And so this -- this section, this paragraph 2 and its subparts, would you agree that this represents the promises that GrowCo made to the investors?
A. Yes, at that point in time.
Q. And if you look down on page -- on paragraph 2.4, it has the use of funds, correct?
A. Yes.
Q. So this one is to finish the GCP2 greenhouse, and operating capital and offering costs; is that right?
A. Yes.
Q. And what's offering costs?
A. That's the costs that we were paying finder's fees or broker-dealers to raise us money.
Q. Is there anything in here that explains

what offering costs is?
A. I don't remember.
Q. If you can look down at 2.6, "Governmental Consents and Filings," do you see that?
A. Yes.
Q. So here, GrowCo is warrantying that no consent, approval order or authorization of, or registration, qualification, designation, declaration, or filing with, any federal, state, or local governmental authority is required on the part of GrowCo in connection with the issuance and sale of this note, except for filings pursuant to Regulation D of the Securities Act and applicable state securities laws, which have been made or will be made in a timely manner.
Do you see that?
A. I do.
Q. So broker is promising that any filings required by state securities laws will -- have been made or will be made?
A. Correct.
Q. If you look at 2.8, "Compliance with Other Instruments," and here, GrowCo is warrantying that it is not in violation or default of any --

let's see -- note, indenture, mortgage, lease or other agreement or contract to which GrowCo is a party, or by which it is bound, the violation of which would have a GrowCo MAE.

Do you know what MAE stands for?

A. It was defined earlier somewhere. It's in section 2.1, first subparagraph in the middle, it looks like. And that's -- material adverse effect is MAE.

Q. Okay. Thank you. And then paragraph 2.9 on the next page, and it notes that GrowCo warrants that it has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GrowCo MAE.

Do you see that?

A. I see it.

Q. So those were all things that GrowCo had to warrant to investors in this agreement?

A. Yes.

Q. So these offerings, like the one we're looking at here -- and you would agree, this is pretty similar in structure to all the debt offerings?

A. I would think so, yes.
Q. They included common stock warrants?
A. I don't know if every single offering did, but probably.
Q. And did this mean that investors could eventually exchange their debt interest for equity shares?
A. What is "this"?
Q. The stock warrants.
A. Stock warrants allow you to not exchange debt to shares. A warrant is just a warrant. It gives you the opportunity or ability to buy shares of stock during a set period of time at a set price.
Q. And was the idea that the company would eventually become publically traded and this would be very valuable to investors?
A. Hopefully, yes.
Q. All right. So other than the -- all the documents we saw earlier, the pro formas, the term sheets, the presentations, the subscription documents like the ones in Exhibit 51, was that the sum total of written materials that investors would receive?
A. I don't think I heard the accredited

investor questionnaire. Did you say that?
Q. And the accredited investor questionnaire. I was lumping that in with all the subscription documents that they had to sign.
A. I believe so.
Q. Okay. You didn't give investors a private placement memorandum?
A. No.
Q. Why was that?
A. We were told by our SEC attorney, Mark Johnson from K&L Gates, actually, it was out of Boston, that if they're accredited investors, we do not -- there's a lot of things that we don't have to do as long as we make sure they're accredited investors. And that is on the disclosure items that they've already been disclosed with our other filings with the SEC. And the complete PPM, which is called private placement memorandum, is not necessary.
Q. And that was based on what this lawyer told you?
A. That's correct.
Q. Did you expect investors to ask if they wanted more information?
A. Yes.

Q. Did you expect investors to go look at Two Rivers' SEC filings?
A. Yes, if they want to.
Q. But you didn't direct them to go do that, did you?
A. I don't think I ever did.
Q. And you didn't provide any other written disclosures of risks other than what we looked at here today?
A. No.
Q. And you didn't provide any information about the specific federal and state requirements for compliance with federal and state marijuana regulations to investors?
A. One moment. I got to read the text. Just a second.
No, we didn't provide any -- any specific information to an investor about the state requirements for compliance with federal and state marijuana regulations to investors. I don't remember any specific information about compliance that I would have provided to an investor.
Q. And once you started having trouble with the tenants paying rent, other than sending out e-mails updating the investors that you were having

issues paying rent, did you provide investors with detail on what was going wrong?

A. Yes, particularly with GCP1, or GrowCo Partners 1, we tried to get out quarterly newsletter. We also provided in some situations, I think at year-end, I provided financial statements in GrowCo Partners 1. So we tried to keep them up to date, particularly also those that were holding notes, and we asked for forbearance and modification of the notes. We did provide information about why we're asking for that, and why we're falling behind on payments.

Q. And we'll look at that later, but for new investors, what kind of disclosures would you give new investors about issues you've been having with the tenants?

A. Well, I'm trying to figure out when the issues with tenants stopped. And so then to disclose with new investors, when was the last time we brought in new investors? I believe that there was some overlap. And I did not provide investors with that information about -- that I know of -- about problem tenants, if that was concurrent with our offering.

Q. But you assumed that the materials that

you provided that we've talked about today were sufficient because you believed you were only selling to accredited investors?

A. Correct.

Q. So the companies, the various GrowCo entities that we've talked about, GrowCo, GCP1, GCP2 and GCP Super Units, they ultimately raised around 19 million dollars; is that correct?

A. Yeah, gross, close to that.

MS. HUNT: Can we take a look at Exhibit 1032? It's Mr. McKowen's exhibit. And I believe we've stipulated to this one. Page 4.

Q. (By Ms. Hunt) And this is an audit report from the Betzer Call Lausten firm.

Are you familiar with this?

A. I am, but it's not an audit report. You should be precise in your words.

Q. I apologize. It's a report.

A. Thank you.

Q. From auditors, or from the company.

My only point here is, this chart was in that -- in that report.

Does this look like a reasonable representation of the fundraising for GrowCo?

A. It does.

Q. Both the amount raised and the date ranges?

A. It does, without me completely trueing it down, but yes, it does.

Q. So it looked like you were raising money from December '14 through September 2017?

A. Okay.

Q. Is that correct?

A. That's correct.

Q. And is it fair to say that the bulk of that money was raised between December 2014 and, say, July of 2016?

A. Well, I said I agree with this. And it does look like that, so we got 14 -- 14 -- 14 million of the 8 -- 19.

Q. I think we heard testimony before that the GrowCo entities did not have their own separate bank accounts in their name; is that correct?

A. GrowCo Partners 1 did for a while, but then it got closed down, so we had to find a different home for it. But I do think there was one there as a GrowCo Partners 1 as a title, or it might be an internal documentation that we had to settle this account, Two Rivers escrow, or whatever's -- GCP1, I believe.

Q. Primarily, the money went into Two Rivers' accounts, correct?

A. They went into Two Rivers' accounts with Two Rivers' names on it, yes.

Q. Can you take a look at Exhibit 10, please? And you can page through this, if you like, because I'm going to ask you if you know what it is.

A. Well, I don't know if we produced it or somebody else produced it, but it looks like a transfer ledger between GCP1 and Two Rivers. It's hard to read this. And transfers between GrowCo and GCP1, GrowCo to Two Rivers, it looks like some transfers.

Q. Well, at the top -- the first page says, "1. A list containing account name and number for each GrowCo bank account for which Two Rivers was the custodian."

Was that something that was provided in response to a division subpoena?

A. It might be. In fact, I think I remember seeing that in the different exhibits.

Q. And this is something that you would have put together?

A. Quite possibly, yes.

Q. So on the front page, you have five bank accounts there: four Wells Fargo and one KeyBank.
Were these the accounts that GrowCo investor money went into?
A. To the best of my knowledge, yes.
Q. And you as the CFO, or in any other capacity, did you supervise transferring money to and from these various accounts?
A. I knew that they were happening. And I've done some -- I did some of those transfers, yes.
Q. And were GrowCo investor funds used for Two Rivers' operations?
A. Yes.
Q. And for overhead?
A. General and administrative.
Q. And salaries?
A. General and administrative expenses.
Q. Thinking about Two Rivers and the GrowCo entities, was it pretty much the same staff among all the entities?
A. It was. And that gave rise about how to allocate properly through segment reporting, what general and administrative expenses went to, what bucket. We spent a lot of time analyzing that

based upon people's time.

There's a concept called time-driven activity-based costing in cost accounting. We looked at that. We looked at several ways to try to properly cover our G&A based upon time expended and the resources.

Q. If you could bear with me one moment. All right. I can keep going.

All right. I want to move on -- oh, I have one more exhibit to show you here.

MS. HUNT: 21, please.

Q. (By Ms. Hunt) Can you take a look through Exhibit 21? I will represent to you that we have blocked out the personal contact information, the e-mails on the side. That's what the black boxes are, but other than that, do you recognize this?

A. So if you're asking for about page 1, 2, 3, on 21, I recognize these -- most of these, almost all these. I think they were probably all -- well, some of them were not investors. We have at the end of page 3 Greg Berlacher. He was the president of merger and growth equities. Cheryle Steele was the accountant for us. We already talked about Janet McCaffrey and Joe

McKowen. And I'm looking at most of these other ones, and they seem to be the investors.

Q. Did Mr. Berlacher, Cheryle Steele, Janet McCaffrey, Joe McKowen -- were they also investors?

A. Not that I'm aware of.

Q. Do you believe this is a reasonably accurate list of the investors?

A. I do.

Q. And then the remaining pages that appeared to list investors, the amount they own and the dates, do you recognize this?

A. Yes.

Q. Is this something that you would have put together?

A. Yeah, I remember putting it -- yes, I remember putting this together.

Q. And it looks reasonably accurate?

A. It is.

MS. HUNT: I'd like to move to admit Exhibit 21.

THE COURT: Mr. McKowen, any objection?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 21 is admitted.

(Exhibit 21 was admitted into evidence.)

MS. HUNT: And I also need to offer Exhibit 10, although I believe it might be subsumed in another exhibit, which is what I was looking for, but I'll go ahead and offer Exhibit 10 as well.

THE COURT: Mr. McKowen, any objection to 10?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: Hold on a second. I got to figure out what 10 is. Oh, no objection.

THE COURT: 10 is admitted.

(Exhibit 10 was admitted into evidence.)

Q. (By Ms. Hunt) So I want to move into the year 2016. A lot happened in that year. We already talked about Suncanna, the first tenant in the greenhouse.

They had had a reasonably good start, right?

A. Oh, yes. I was -- I was really impressed with their grow, not that I really know what I was looking at, but it looked -- looked impressive.

Q. Were they able to grow and pay rent?

A. Well, they were on a deferred rent arrangement. So we were deferring the rent, accruing the rent, but they didn't owe it for a few months. I don't remember exactly when, but we wanted to time it so they would have the cash flow to pay the rent and start catching up.

Q. So before they started paying rent, were you able to pay interest payments to investors?

A. I don't -- I believe that we were paying interest payments up until the time that we asked for a forbearance, and then we stopped paying because we couldn't afford it.

Q. And what funds were being used to pay the interest payments?

A. It was funds that we were raising for the construction and the general and administrative overhead from GrowCo entities.

Q. At some point, did issues arise between Mr. Van Wingerden of Suncanna and Mr. McKowen?

A. Yes.

Q. Do you know what those issues are?

A. I can tell you what Aaron Van Wingerden told me. I don't know, is that admissible or not?

Q. I don't need you to tell me any out-of-court statements from other people, but did

you personally know what the issues were?

A. Only -- only from what I heard from different parties.

Q. Did the dispute cause disruption in operations?

A. Yes.

Q. How so?

A. Somehow the MED, Marijuana Enforcement Division, was notified by somebody, everybody has their own theory who, that Aaron Van Wingerden, who had the license, is not effectively managing the grow operation for Suncanna, but it's being overseen or overridden by Mr. McKowen.

Q. And so then, what happened with Suncanna after that?

A. Then Ed came in, and they suspended the license pending hearing. And because the licenses were suspended -- and this is like in February or March of '16 -- because the license was suspended, they had to destroy the crop, so the crop was destroyed.

Q. And when you say MED, M-E-D, that's the Marijuana Enforcement Division?

A. Correct.

Q. And so it was your understanding that

their concern was that Mr. McKowen was actually running the marijuana business?

A. Yes. And he did not have a license.

Q. So sometime in this early 2016 time frame, you, I believe, became aware that a few Two Rivers board members were starting to look into concerns about Mr. McKowen, correct?

A. I was.

Q. And was this related to his attempt to take over Suncanna and move into the marijuana business side of things?

A. Probably. Perhaps. You need to ask them, but they were concerned about conflicts of interest.

Q. Did you share their concerns?

A. I met with them in April of 2016. I said, I don't think there's a conflict of interest. And any potential conflicts are disclosed in the 10K. But you as board members have the right to investigate yourself and come up with a conclusion or a fact-finding mission. Therefore, they hired attorney Howard Glickman from some big firm who came out with a report that -- many of the issues that he raised that I disagreed with, but he raised it, and the board became very concerned.

Q. And we'll talk about that report in a minute.

But before the report was issued, did those board members try to take any action to remove Mr. McKowen?

A. Before the report was issued -- it's coming down to timing now. I think the final report was issued in June of '16, but they had preliminary information about what was contained in the report in May of '16.

Q. And they called a meeting, right? And they had summoned Mr. McKowen to come?

A. I believe so, yes.

Q. At that time, then, did Mr. McKowen resign from Two Rivers and GrowCo?

A. Yes. I think a lot of -- some -- and again, it'd be a board meeting with board minutes, but I think that some attended remotely, but then I think John just says, well, look, I'll just remove the issues and I'm out, you know, I resign.

Q. At this time, is it fair to say that Two Rivers and its subsidiaries were not in a good financial condition?

A. That's correct.

Q. All right. We've talked about the

report.

MS. HUNT: Can you pull up Exhibit 22?

Q. (By Ms. Hunt) Do you have it in front of you? Do you have it?

A. Yes. Yes, I have it.

Q. Is this the report of that committee that we've been talking about?

A. Appears so.

Q. And it was submitted to the board?

A. It was.

Q. Of Two Rivers? Does this look like a true and correct copy of that report?

A. Yes.

MS. HUNT: I'd like to offer Exhibit 22.

THE COURT: Mr. McKowen, any objection?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: None.

THE COURT: Exhibit 22 is admitted.

(Exhibit 22 was admitted into evidence.)

Q. (By Ms. Hunt) So I just want to ask you a few things about this report. It says that these committee members who did this were members of the board of directors who had been deemed independent as required by the nominating compensation and

corporate governance committee charter.
Do you agree with that?
A. Yes.
Q. And in the next paragraph, it says that the committee is charged with reviewing conflicts of interest of directors, senior executives, and consider waivers or actions related thereto.
Do you agree with that?
A. Yes.
Q. I don't want to belabor this report, it can speak for itself, but I do want to call your attention to a paragraph in the middle of page 4, starting with, "There were numerous delays and difficulties in getting the greenhouse built."
Do you see that paragraph?
A. I do.
Q. Is that -- do you agree with the characterization of what was going on there in that paragraph?
A. Let me reread it again. It's a lot of stuff in here. Hold on, please.
Yes, there's some information. I -- yes, I agree with this paragraph.
Q. So was it your understanding that it was Mr. McKowen's plan to purchase Suncanna's retail

marijuana license in order to grow and sell marijuana in the greenhouse?

A. Yes, after he got licensed, because he was trying to get a license.

Q. And can you turn to page 6, please, the paragraph starting, "Mr. McKowen's baseless accusations"? And here, the committee is discussing their concern about interference with a review process, among other things, and the special meeting that they attempted to call.

Is that consistent with your recollection of what happened?

A. For the most part. I don't quite understand -- and I know we spent a lot of time trying to rebut and tried to address some of these concerns as a board, but I didn't know he was intentionally interfering with the committee until he found out the report was going on or would be coming out soon, and that was in the end of May of 2016.

Q. Okay. And according to this, the committee was intending to remove him as CEO at the special meeting, but he resigned instead?

A. They -- they did not tell me this information at that point in time. I didn't know.

Q. Can you turn to page 8, please? In the middle -- the paragraph starting, "The Committee notes that it is concerned by representations that have been made in the GrowCo Partners 2, LLC offering documents that involve certain approvals allegedly given by the Company, but which have not given," do you know what they are talking about?

A. I don't remember. Again, there is a rebuttal report that we came up with, and we might have addressed that. I just don't know. You might have that evidence, I don't --

Q. And then two paragraphs down in the middle there, it says (as read:) The only way capital is being raised by the Company is through the private placement of debt and equity that has been led by Mr. McKowen and his contacts.

Is that accurate?

A. No, I raised some money, and some of Mr. McKowen's contacts raised money.

Q. On page 9, the next page, and it starts to discuss the structure of the company's marijuana-related affiliate created under the GrowCo, Inc. subsidiary.

Do you see that?

A. Yes.

Q. There the committee notes that it's not aware of any board meeting of the company at which the company authorized the formation of GrowCo.

Do you dispute that? We talked about that earlier.

A. I do. I don't have any specific information, but again, large things like that, and I was pretty much a stickler about board meetings, and minutes were documented.

Q. And they also raise concerns about, in the next paragraph down, about whether all the funds raised have gone to the purposes stated in the offering documents, correct? Do you see that?

A. I see that. Hold on. It says it is not clear to the committee whether all of the funds raised have gone to the purposes stated in the offering documents, because some of these -- because some of these funds may have gone to general administrative expenses of the company or to service TR capital debt. This is a concern that the committee urges its assessors to investigate, and we did.

Q. And what did you find?

A. It was -- and you'll hear from Mike Harnish who was the chair of an independent review

committee that we formed to take a look at transfers between different accounts to see if they were proper, and reflect accurately the term sheet. We have found that there was nothing improper in that area. There might have been a $300,000 difference which then we signed a note to GrowCo for. And based upon my recent calculations, that was probably too big of a note, because it was closer to a break-even, that it was all accounted for.

Q. Were investor funds ever used to service TR Capital debt?

A. Well, Two Rivers received compensation reimbursement for general administrative expenses. They could have taken any funds that they got. Funds are commingled. They could have taken some of those fund and given it to TR Capital Partners. However, I believe that TR Capital Partners stopped receiving cash distributions sometime in 2013 or '14.

Therefore, that letter, that one exhibit that you showed me earlier about the distribution of a certain GrowCo GCP1, so as I talk through this and think with my mouth, I don't think any funds were paid or used for TR Capital cash

distributions.
Q. Okay. Can you turn to page 10 of this report? And it lists conclusions. And I don't want to read them all, but did you agree with any of these conclusions?
A. I agreed with our board report and what it says. I can read through each one of these and see if I remember what the board report said, but it might be more expedient to look at the board report.
Q. Well, that's where we'll go next.
Can you look at Exhibit 24, please? Is this the rebuttal report that you're talking about?
A. Yes.
Q. And the original report was dated June 29, 2016; is that right?
A. Yes.
Q. And this is August 19, 2016?
A. Right.
Q. Looks like it's from you, Samuel Morris and Mike Harnish?
A. Yes.
Q. And you were directors of Two Rivers?
A. At the time.
Q. It says on page 1 here that the intent

was to establish an internal record about the report?

A. Yes.

Q. I'd like to turn to page 2 of the report. There's two page 1s here because one was a photocopy. But if we go to the second page of the report, it starts, "Because the report was disclosed."

A. Right.

Q. This rebuttal report begins by talking about whether they -- this -- the committee's memo should have been disclosed to any investors.

And it looks like the board here determined that the report should not be disclosed; is that correct?

A. Correct.

Q. Either to Two Rivers investors or to GrowCo investors?

A. That's correct.

Q. And now it looks like it's because securities counsel said you were not legally required to; is that correct?

A. As long as we address these issues -- without reading this, I remember Mark Johnson said, you know, you guys need to launch an internal

report and see how much is true or false, and the new guys can determine whether or not further disclosure is required.

But as long as that -- you know, now that John McKowen is resigned, retired -- sorry, resigned, and now you have a new board, it might -- I think he said it was not necessary as long as the board is certified with the rebuttal report.

Q. Okay. He said it was not necessary, correct?

A. I believe that's what his words were, "not necessary."

Q. But that wouldn't have prevented you from disclosing it?

A. Oh, I could disclose it, I guess. Yes.

Q. So what follows in this exhibit is a list of the things that the board disagrees with from the committee's report, correct?

A. Yes, I believe so.

Q. If something is not addressed in this rebuttal report, is it fair to say that the board had no disagreement with the committee's findings on an issue? That may not have been a good question.

A. That would be my perspective. There's

two other authors of the report. Ask them. I know Mike Harnish will be as a witness, so that may be one of the questions you might ask him, too.

Q. Well, is it fair to say that if the board had an issue with a conclusion or a statement in the committee report, it would have gone into this rebuttal report?

A. I would think so.

Q. I want to direct your attention to paragraph 15, which is where this report takes issue with the conclusion that the Two Rivers board had not approved GrowCo's formation.

A. Yes.

Q. And it references in the middle of that paragraph, starts (as read:) The minutes of the board meeting on July 17, 2014, state that Mr. McKowen provided the board an update on the formation of GrowCo, and the reasons for it. And in that meeting, they have issued shares of GrowCo.

That doesn't say that the board approved the formation, correct?

A. Yeah, that's correct.

Q. It's an update on the formation already done, correct?

A. That's the way I read it, yes.

Q. And so in preparing this rebuttal report, did you go back and look for all the meeting minutes to try to address this issue?
A. I think we probably did, so . . .
Q. And so if there wasn't -- if there was a meeting with minutes that evidenced the formation of GrowCo being approved by Two Rivers, wouldn't you think that would be cited here?
A. Probably would be, yes.
Q. After Mr. McKowen resigned, he continued to be involved in GrowCo?
A. Yes.
Q. He was the largest shareholder; was that true?
A. It was kind of fluid, but I would say yes. He -- I believe he had 10 million shares. And supposedly, Tim Beall and Aaron Van Wingerden were supposed to get five million shares apiece, this never occurred because of a fallout between two and then three of them. But to answer your question, yes, I believe he was.
Q. And he was invited to board meetings?
A. Yes. He could -- he was not on the board for a while, and he could attend and listen.
Q. And at this time, you were pretty much

in charge of GrowCo; is that right?
A. I was the CEO of GrowCo, yes.
Q. So if you could take a look at Exhibit 13. I think we've heard some testimony this week about agreements that Mr. McKowen entered into with GrowCo.
Do you recognize Exhibit 13?
A. Well, there's lot to it, but I do, scanning the pages.
Q. And the first page is a master agreement, and it's dated 22 July 2016 between McGrow and GrowCo. And it lists three agreements, or actually, it lists several agreements, but the three I want to talk about are the advisory services, construction services and financing services; is that correct?
A. Yes.
Q. Were these agreements that GrowCo entered into with McGrow, John McKowen's company, to get services from him?
A. Yes.
Q. And that was following his resignation?
A. Yes.
Q. And then this master agreement has all of the other agreements attached, correct?

A. Yes.

MS. HUNT: I'd like to offer Exhibit 13, please.

THE COURT: Any objection, Mr. McKowen?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: None.

THE COURT: Exhibit 13 is admitted.

(Exhibit 13 was admitted into evidence.)

MS. HUNT: And actually, I actually need to go back and offer Exhibit 24, if I didn't.

THE COURT: Mr. McKowen, any objection to Exhibit 24?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: 24 is admitted.

(Exhibit 24 was admitted into evidence.)

Q. (By Ms. Hunt) So I want to turn us quickly first to the advisory services agreement, which is the first agreement in this packet, but specifically to the page called Exhibit A, which explains the services provided.

Do you see that?

A. I don't see Exhibit A.

Q. It's -- the page at the bottom ends with 350.

A. Okay. Hold on. I see it now.

Q. There we go. And this is the advisory services contract. In the services it says here (as read:) Strategic planning and development in all aspects and transition of Wayne Harding into the Chief Executive Office position with Two Rivers Water and Farming Company.

What were those services that were to be provided?

A. Any kind of questions I have or transitions I have. It's kind of normal when a new CEO comes on to have the outgoing one cooperate and help out with any questions that might occur or operational issues that might happen.

Q. And he was being paid $7,500 per month for that?

A. Yes.

Q. And then the agreement was the construction services agreement. And again, I turn to the exhibit on that one, which is page number ending 356. For this one, it looks like McGrow, which is, again, Mr. McKowen's company, could supervise all aspects of construction of GCP1, GCP2

and the extraction facility.
Do you see that?
A. I do.
Q. And he was going to be paid $15,000; is that right?
A. Per month.
Q. Per month?
And then the third one is a financial services agreement. And again, if we can go to the exhibit in that, which ends in 364. And it says, McGrow, again, Mr. McKowen's company, shall assist GrowCo in raising capital for its 22 and a half percent exchange note offering as of the date of this agreement.
Do you know which offering that was? Would that be the 7-million-dollar note?
A. I believe it is, yes. We wanted to try to complete that.
Q. And that GrowCo will pay McGrow a fee of $7,500 per month.
A. Is that a question?
Q. Is that correct?
A. That's correct.
Q. All right. So you were having Mr. McKowen, through his company, McGrow, help

raise funds, still?

A. Yes.

Q. Can I have you turn to Exhibit 44? Okay. Exhibit 44. If we could turn to page 14 of the document, which might be the last page, actually. And it is the vendor QuickReport, January through December 2016 from MCG Services.

Do you see that?

A. Yes.

Q. And what was MCG Services?

A. I believe that was also McGrow. They changed their name for us to pay the MCG Services.

Q. And then over on the split column, it lists cost of capital, 7-million-dollar note raise, and there's a $14,000, $9,500 and $27,750 for the cost of capital raise.

Were those payments made for Mr. McKowen's assistance in bringing in funds?

A. Based upon that description, I'd say yes.

Q. And were they paid based on how much funds were brought in?

A. No. It was a flat monthly fee.

Q. How does the flat monthly fee add up to, for example, $22,750?

A. I don't know without further analysis.
Q. And then down below, there's cost of capital for the 2-million-dollar raise.
Do you see that?
A. Yes.
Q. And $22,500 and $4,000.
Again, were those paid to Mr. McKowen for his assistance in bringing in money?
A. Yes.
Q. And were they based on the amount of money brought in?
A. I'd like to change my answer to the last question that I answered. No.
Q. So they were not based on that?
A. No, they were not paid to John McKowen. They were paid to MCG Services.
Q. Is that Mr. McKowen's company?
A. Yes, but I don't know if there's anybody else in there, too, but it wasn't to John McKowen.
Q. And was that paid for bringing in funds for GrowCo?
A. Based upon that description, I would say yes.
Q. In June 2016, is it your understanding that McKowen, through his company, McGrow, entered

into a lease of the GCP1 greenhouse?

A. I believe that's correct. I don't know the exact dates, but yes.

Q. And that was on behalf of his company, Johnny Canniseed?

A. Yes.

Q. Canniseed -- Johnny Canniseed did not have a license at that point; is that correct?

A. That's correct.

Q. And Mr. McKowen did not have a license?

A. That's correct.

Q. And is it correct that the lease allowed them to accrue the rent and pay nothing for several months?

A. If that's what the lease says, that's correct.

Q. So GrowCo was able to pay interest payments for a little while, correct?

A. Yes.

Q. How long?

A. Don't remember.

Q. And the revenue to make those payments, did they come from rent?

A. We did receive some rent, but not a lot, so some came from rent, and some came from capital

raises.

Q. At some point, then, did you become concerned about the ability to keep making the payments in 2016?

A. Yes. I don't know if it's 2016, but I was concerned.

Q. And were you concerned that the only funds to pay existing investors was new investor money?

A. I guess I was, because we stopped paying the investors because we weren't generating the revenue we were expecting to pay -- to get.

Q. Can you take a look at Exhibit 23, please?

A. I'm sorry. What was the exhibit again?

Q. 23. Do you recognize this e-mail exchange?

A. It comes back to me, yes.

Q. And this was an e-mail from John McKowen to you on Monday, June 27th, at the bottom there?

A. Mm-hmm.

Q. And he's expressing concern that the capital raise could become a Ponzi scheme.

Is this the 2-million-dollar raise?

A. It looks like it is. He refers to it.

Q. Whereby you're raising capital from some people for the purpose of building greenhouses, but proceeds were being spent primarily to pay interest to others and salaries.

Do you see that?

A. Yes.

Q. It appears, then, that this is when you decided to postpone interest payments, is that right, or consider postponing interest payments?

A. Well, I definitely -- I definitely took this to heart. And probably we started at that point in time, or shortly thereafter. Again, I said I don't quite remember when the modifications came about. We did get some evidence, I think you had evidence about showing -- from Mr. McMahon about the different correspondence, and I just don't remember the dates.

Q. But before, say, June 2016, was the rent income always enough to pay the interest payments?

A. No.

Q. So you were using other investor money to pay interest payments?

A. Probably. We were capitalizing interest, part of the debt on constructing the greenhouse, which you'll point out in my testimony.

Q. All right. So starting in, say, mid 2016, why was GrowCo unable to keep making interest payments to investors?

A. The implosion of Suncanna, the issues that we had with trying to find a new tenant, so there was no real revenue coming in. Although, we did collect about, I think, 20 to 30 thousand dollars from Suncanna. I don't know exactly how much, but it was around that area.

Q. And so in 2016, though, Suncanna was out, correct?

A. That's correct. And then we signed a lease with MCG Services, or McGrow, and they were going to sublease the space to license marijuana growers.

Q. This was the Johnny Canniseed lease?

A. Oh, yes, it was with Johnny Canniseed.

Q. And so then they were going to sublet to a tenant, and that was Amerijuana?

A. They had two tenants in there. One was Amerijuana, and one was -- they grew medical marijuana only. And I forgot the name of it. And what we did is we expended money to bifurcate that greenhouse so it can accommodate two different licenses, of licensing growers, Amerijuana was one

of them, quality -- I think it's coming back to me, Quality Choice was the other tenant, that then Johnny Canniseed was managing the facility, or whatever, and then supposedly collecting rent, which happened a little bit, that we had some rent collected. I don't remember the exact amount.

Q. Were the subtenants ultimately successful?

A. No.

Q. Do you know why?

A. I don't have firsthand knowledge why. I've heard different stories. But the fact of the matter is they didn't pay rent. And Quality Choice moved out in the middle of the night. Amerijuana, we had to go to court to evict them.

Q. To your understanding, were there any conflicts between the subtenant and Mr. McKowen?

A. I heard about that, yes.

Q. So you've mentioned a couple times about how you eventually had to ask investors to modify their notes, correct?

A. Yes.

Q. I'll have you take a look at Exhibit 90.

MS. HUNT: Before we go any further, I need to remember to admit Exhibit 93. I offer

Exhibit 93 -- 23. It's late in the afternoon, people.

THE COURT: Mr. McKowen, any objection to 23?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?

MR. HARDING: None.

THE COURT: Exhibit 23 is admitted.

(Exhibit 23 was admitted into evidence.)

Q. (By Ms. Hunt) So let's look at Exhibit 90.

MS. HUNT: And I don't recall whether this one has been entered, but we'll go ahead and do it. 90?

THE COURT: 90 is not admitted.

MS. HUNT: Okay.

Q. (By Ms. Hunt) Do you have that, Mr. Harding?

A. I do.

Q. And this is the first amendment to the 4-million-dollar note?

A. Yes.

Q. From one of the investors. It looks like this one is Harnish?

A. Yes.

Q. I don't know why this is on here -- copied twice, but why did you start asking for these amendments?

A. I think we were concerned about being perceived as a Ponzi scheme, whether -- you know, we can argue whether that's true or not, I don't think it is, but -- based upon accounting rules.

However, we wanted to conserve cash and not borrow money to pay interest payments, particularly when the interest payments had nothing to do with construction or improvement of the property.

Q. And what did you tell these investors about why you needed to amend the notes?

A. Well, there was an exhibit up that you showed for Mr. McMahon about -- I stated that we've had problems with tenants.

Q. Okay.

A. And I'm sure that that was disclosed. And that's why -- you have to give people a reason why -- I can't -- we can't pay you.

Q. Did you disclose to any investors that Mr. McKowen was actually the leaseholder in the greenhouse?

A. Don't remember.

Q. And you were still doing offerings of

securities in 2016, 2017?
A. We paused our offering in the summer of 2016 until the board could complete their internal report.
Q. And that was in August of 2016?
A. Right. And then --
Q. So after August 2016, did you continue to raise funds?
A. Yes.
Q. Did you in your presentations to new investors include information about the issues with the tenants?
A. So I'm trying to remember if I personally raised any additional funds after August 2016, or September 2016. I don't remember. We can look at the investor list, but I don't remember if I raised the funds, and if I made that disclosure.
Q. You were still the CEO of GrowCo?
A. I was, I think, still, at that time.
MS. HUNT: I'd like to move to admit Exhibit 90.
THE COURT: Any objection, Mr. McKowen?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?

MR. HARDING: Nope.
THE COURT: 90 is admitted.
(Exhibit 90 was admitted into evidence.)
Q. (By Ms. Hunt) And then Exhibit -- if you could look at Exhibit 91, please? And this is dated in March of 2017.
Do you see that?
A. Yes.
Q. And the second page is the first amendment to the 6-million-dollar note.
Do you see that?
A. Yes.
Q. So this is another amendment to a different note?
A. Yes.
Q. In March of 2017?
A. Appears to be that way.
MS. HUNT: Move to admit Exhibit 91.
THE COURT: Any objection, Mr. McKowen?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: 91 is admitted.
(Exhibit 91 was admitted into evidence.)
Q. (By Ms. Hunt) Did Mr. McKowen

eventually come back to the management of GrowCo?
A. Yes.
Q. Can you explain how that came about?
A. Well, in -- it was not a positive, frictionless relationship in Mr. McKowen. Also -- and he kept pushing to get on the board. He finally convinced us to have his daughter on the board along with his son, Joe McKowen. We're still trying to get the -- you know, keep the ship afloat and make a business enterprise out of GrowCo.
Additionally, as of November 2016, I believe, we lost our director and officer insurance that would have covered directors and officers. When that occurred, or shortly thereafter, I believe I was the first one to resign, or Jeff Ploen was also on the board, he resigned, but we resigned somewhere shortly thereafter, the lack of D&O coverage and the complete -- not complete -- an issue that we had in terms of personalities.
Q. When you lost the insurance coverage, was that in 2018?
A. Yes. Yes. I think it was November -- I'm sorry. It was -- no. You're correct. It was November 2018. So I forgot when I resigned from GrowCo. I can go back and try to find my records.

But I think one of the issues was whether or not GrowCo was now a subsidiary, a full subsidiary of Two Rivers and will be covered by the directors and officers insurance.

Under the terms, both side A and side B of directors and officers insurance, it had to be a majority-owned entity. And at that point in time, it became that was only one-third owned by Two Rivers. And so that caused us a lot of concern, I believe -- it caused me lot of concern.

Q. Well, let me back up.

When was it -- do you recall when it was that Mr. McKowen came back and came on the GrowCo board?

A. I think it was sometime in early '17. I could be wrong. 2017.

Q. Could I have you take a look at Exhibit 63? Do you recognize Exhibit 63?

A. I'm scanning it. Looks like a set of board minutes from Two Rivers Water and Farming Company.

Q. And it looks like it's the meeting of July 5th, 2017?

A. Yes.

Q. And it was called to order by you?

A. Okay.
Q. That you acted as the chairman of the meeting?
A. Yes.
Q. Does this look like a true and correct copy of the meeting minutes of that meeting?
A. As far as I know, yes.
MS. HUNT: I'd like to offer Exhibit 63.
THE COURT: Any objection, Mr. McKowen?
MR. McKOWEN: No, your Honor.
THE COURT: Mr. Harding?
MR. HARDING: None.
THE COURT: Exhibit 63 is admitted.
(Exhibit 63 was admitted into evidence.)
Q. (By Ms. Hunt) So this is on July 5th of 2017. And it looks like you were leading a discussion, in the middle of page there, on issues related to John McKowen and proposals he has made regarding both Two Rivers and GrowCo. And then a list -- you have a list of counterproposals that were agreed to.
What was happening here? What was going on with this meeting?
A. I think Two Rivers -- of course, they had one-third, I think, at that time. Ten million

out of the 30 million shares is quite an investment. Still looked like -- it still looked promising. And there -- as I testified before, there was friction between Mr. McKowen and his people, shall we say, and Jeff Ploen and myself.

A case in point would be, one time -- we always approve prior minutes. And so we were taking minutes one time. And I don't think John McKowen was observing the meeting. And then we presented the minutes. Everybody was okay in the minutes. And then John McKowen's daughter refused, along with Jan McCaffrey, refused to sign the minutes because they wanted to change them. Well, that's not how you do corporate governance. If you were there and the minutes are accurate, you sign them. You don't change them. Things like that. I wanted to get out.

Q. Well, let's stay here in 2017 at this moment. So here there's a bunch of recommendations, including GrowCo agreeing to a settlement offer to Aaron Van Wingerden.

So was their litigation still ongoing at this point with Aaron Van Wingerden and Suncanna?

A. So what was happening, and I think this was disclosed in our SEC filings, there was a

lawsuit between GrowCo, Suncanna, Aaron Van Wingerden, John McKowen, Wayne Harding about -- I think John McKowen or GrowCo loaned Aaron Van Wingerden $350,000 that he was supposed to use for the greenhouse, and he didn't, and we were trying to get that back. And then he countersued us. It was something like tortious business interference or something, so we wanted to try and settle that outside of court.

Q. Was this lawsuit -- you mentioned it was in the SEC filings. Those were Two Rivers disclosures?

A. Yes.

Q. Was that lawsuit or what was going on with that disclosed to potential GrowCo investors specifically?

A. Only through Two Rivers filings.

Q. It also mentions here, "stand down on threatened current lawsuits."

What was that about?

A. Well, I don't specifically know, but it seems like lot of blustery acts were going back and forth about, I'm suing you. Who's suing me? It was terrible.

Q. And then it also says that "McKowen may

observe at GrowCo board meetings."

So this was when he started coming back and being involved?

A. Or maybe I wasn't resigned by then. I don't -- I really don't remember. I think Jeff Ploen left. I stayed on for another month or two, and then I had it, and I resigned. Again, I can maybe look at my records about when I resigned.

Q. Well, let's look at the next exhibit. And we are almost done here, I promise.

Can you look at Exhibit 64, please? Do you recognize Exhibit 64?

A. Yeah, I recognize this.

Q. What is this?

A. Well, it's a technical accounting memo. It's called variable interest entities. I don't know how much detail you want me to go into, but it was essentially an outgrowth of our friends down in Houston, Texas, called Enron. And they now had a large standard, accounting standard, about how do you account for subsidiaries. So it changed drastically what you consolidate, what you don't consolidate, in terms of subsidiaries. So it's just more than just ownership. It's like, how you exert control or not.

For example, Enron maybe had a 5 percent ownership in something, and they had it valued in their books, but they really controlled the entity, so they should have recorded the off-balance sheet, financing and debt and things like that. So I know that's probably more than you want to know, but kind of got into the VIE stuff. That's why I took liberty at --

Q. Okay. I appreciate that. Let me ask you a couple questions about this document.

This is dated November 7, 2017; is that right?

A. Yeah.

Q. It was to the files and to, it looks like, your auditors?

A. Yes.

Q. And it was from you and Bill Gregorak?

A. Yes.

Q. And it was a VIE analysis pertaining to GrowCo?

A. Yes.

MS. HUNT: Could I move to admit Exhibit 64, please?

THE COURT: Any objection, Mr. McKowen?

MR. McKOWEN: No, your Honor.

THE COURT: Mr. Harding?
MR. HARDING: No.
THE COURT: Exhibit 64 is admitted.
(Exhibit 64 was admitted into evidence.)
Q. (By Ms. Hunt) And it lists some facts here that I think might be helpful in the timeline. It starts off by talking about the prior three months ending September 2017, and from inception of GrowCo, Two Rivers has been consolidating GrowCo.
And we talked about that earlier, correct?
A. Yes.
Q. And then there's been some events in a three-month period ending September 30, 2017, and the last three months ending December 31, 2017, that required a formal analysis of whether GrowCo should be consolidated anymore; is that correct?
A. Yes.
Q. So it looks like here that as July of 2017, the GrowCo board consisted of you, Jeff Ploen, Laura McKowen, and Jan McCaffrey; is that right?
A. Sounds right.
Q. And then in mid month, Jeff Ploen and Laura McKowen resigned; is that right?
A. I think so.

Q. I mean, it's -- I'm reading from this -- these facts here.
A. Then it must be right.
Q. And then in July 19, 2017, Joe McKowen, John McKowen's son, was elected to the GrowCo board to represent John McKowen's interests; is that correct?
A. Yes.
Q. And then it lists the stock ownership as of September 30, 2017. And it has some more information on the next page about stock transfers. And then it says on October 23rd, 2017, John McKowen was elected to the GrowCo board.
And at that point, you were still on the board; is that correct?
A. Yes.
Q. And then at this point, is this the -- the rest of this is a management analysis.
Is this the explanation and the point at which Two Rivers deconsolidated GrowCo?
A. That's correct.
Q. And why did they do that?
A. For what we've just been talking about the last ten minutes.
Q. Okay. Is it because the --

A. Because of accounting standards, I think it's 810, accounting standards codification 810 dealt with, when do you consolidate a company? When do you not?

Q. But at this point, if it's deconsolidated, that means you're no longer reporting anything about GrowCo on the Two Rivers public filings, correct?

A. We do not report anything in our financial statements. They might be still covered in a note or something. It also chooses the characteristic of how I report. It goes from a consolidated financials into showing GrowCo as a separate investment on the asset side and any corresponding direct liability that Two Rivers is obligated for on the liability side.

Q. I believe earlier you testified that you left Two Rivers and GrowCo in maybe 2019.

Does that sound right?

A. September 19, 2019.

Q. Okay. So after this deconsolidation, you continued on for a little while through 2018, correct?

A. Again, I forgot exactly when I resigned from the GrowCo board.

Q. And GrowCo ended up terminating the Johnny Canniseed lease in 2018 for nonpayment; is that right?

A. That sounds right.

Q. To your knowledge, did Johnny Canniseed ever get a retail marijuana license?

A. To my knowledge, no.

Q. Is it fair to say that from Suncanna's eviction on, no tenant or subtenant in that greenhouse was consistently able to operate and pay rent?

A. That's correct, consistently, no.

Q. Why did you decide to resign in 2019?

A. Well, we were in a pickle. We needed funding. We needed cash. And we met this group out of North Dakota. They went by different various names. VOX Global was one of them. They did fund us and some bridge notes and bridge financing to help us stay in business.

And part of the deal was -- and I was getting ready to retire anyway. And it was very stressful on me. I'm missing some payroll, loaning money to the company. That's been disclosed in filings as a related party transaction. And I just wanted to get out, so I thought that was a good way

to get out.

Now, again, it was stressful. We needed money. These hemp producers from North Dakota and Saskatchewan came. And should have done a better due diligence, because these guys turned out to be one bad apple. I guess maybe that's something common between hemp and marijuana and people and organizations, but I sidetrack.

And part of the deal was we would complete the merger, and I would resign, which I did.

Did that answer your question?

Q. Yes.

Would it be fair to say that Mr. McKowen created or fostered a toxic environment at Two Rivers and GrowCo?

A. Well, that's somewhat fair to say. Mr. McKowen -- I don't like the guy. He probably doesn't like me. He's very good at finance -- I believe financing, capital raise and everything else, but, man, he -- he and I had some major run-ins. And that's probably -- I just wanted to put all that stuff behind me, so I folded up ship.

But by that time, I think John was no longer involved with Two Rivers. He's out doing his own thing. But still, it was -- it was not a -- it was

not a warm and cozy environment, shall we say. And he probably might be the -- the next person to admit that he's not the greatest manager or people person in the world either.

Q. So after you left Two Rivers and GrowCo, 2019, I think you said at the beginning of our time together that you've been retired and doing some consulting work.

Have you done any consulting work for Mr. McKowen's companies?

A. Yeah, I did for a while. I helped him do the financial reporting for VitaNova and the filings. And I also -- I also invested some additional money in that, the venture, the VitaNova venture, thinking this is, you know, good money after bad, shouldn't do it, but I tried it because I think that maybe, maybe we can get something out of this. And it's about a year ago since the last time I helped him file.

MS. HUNT: Okay. Thank you, Mr. Harding. I have no further questions at this time.

THE WITNESS: You're welcome.

THE COURT: Thank you. All right, Mr. Harding, you can step down. We will take cross-examination from Mr. McKowen first tomorrow.

So after Mr. McKowen cross-examines Mr. Harding, I will allow Mr. Harding to make a sworn statement, obviously under oath. I'll swear you in again tomorrow. You can make that sworn statement. You don't have to ask yourself questions and answer them. You can just make a sworn statement, additional information that you would like me to know based on the questions that were asked by plaintiff, and then I will give plaintiff a chance to redirect you as a witness. You can call yourself later in your own case as a witness, but that's how we'll proceed tomorrow. Do you understand?

MR. HARDING: I'm sorry, your Honor, you kind of lost me. So tomorrow I'm going to make a sworn statement as if I'm testifying myself, or is that later?

THE COURT: That'll be tomorrow.

MR. HARDING: That's tomorrow.

THE COURT: So if you had an attorney, your attorney would ask you additional questions tomorrow. You don't have an attorney, so I'll just allow you to make a sworn statement. This is after Mr. McKowen cross examines you. And then once you make your statement, the plaintiff will have an

opportunity to redirect tomorrow, so ask you some additional questions.

MR. HARDING: And also, Mr. McKowen.

THE COURT: Mr. McKowen won't redirect tomorrow. Redirect is if he were to call you as a witness. He's not calling you as a witness.

MR. HARDING: And then after my sworn statement tomorrow, do I go on again with another statement or testimony?

THE COURT: Once the plaintiff's case is finished, then each of you will have a chance to present whatever witnesses or -- that you would like to present, and if that includes calling yourself as a witness and making a statement, a sworn statement, and being subject to cross-examination, you can do that as well. Do you understand?

MR. HARDING: Yeah. Essentially, my sworn statement, though, is -- could be, like, my final statement type of thing. It's not a sworn statement in answering what -- oh, I see what you're saying. A sworn statement in answering all the questions they asked of me today.

THE COURT: Correct.

MR. HARDING: Thank you.

THE COURT: Mr. McKowen, you had a question?

MR. McKOWEN: And since I'm pro se as well, after I am sworn in, will I have that same opportunity?

THE COURT: Correct.

MR. McKOWEN: Okay.

THE COURT: Anything for plaintiff, then, before we recess?

MS. KIDD-AARON: No, your Honor.

THE COURT: Mr. McKowen, anything from you?

MR. McKOWEN: Yeah, I have some questions about -- but it can wait until tomorrow.

THE COURT: Okay. Mr. Harding, anything from you?

MR. HARDING: None. When do we start again tomorrow?

THE COURT: 8:30 tomorrow.

MR. HARDING: Thank you.

THE COURT: All right. Everybody have a good night. We'll see you tomorrow.

(Whereupon, the within proceedings were recessed at 5:07 p.m. on July 11, 2023.)

REPORTER'S CERTIFICATE

STATE OF COLORADO ) ss.
COUNTY OF DENVER )

I, MELANIE L. GIAMARCO, do hereby certify that I am a Registered Professional Reporter and Notary Public within the State of Colorado.

I further certify that this deposition was taken in machine shorthand by me at the time and; place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript of the proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the result of the within litigation.

In witness whereof, I have affixed my signature this 7th day of August, 2023.

/s/ Melanie L. Giamarco

Melanie L. Giamarco
Registered Professional Reporter
Registered Merit Reporter
Certified Realtime Reporter

Notary ID: 20014025991
My Commission expires: August 14, 2025

DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO

1437 Bannock Street
Denver, Colorado 80202

^FOR COURT USE ONLY^

TUNG CHAN, Securities Commissioner for the State of Colorado,

Plaintiff,

vs.

TWO RIVERS WATER & FARMING COMPANY, et al.,

Defendants.

Case No: 21CV33922
Courtroom: 259

REPORTER'S TRANSCRIPT
July 12, 2023
VOLUME III

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Courtroom 259, Denver, Colorado 80202, on Wednesday, July 12, 2023, at 8:48 a.m., before the HONORABLE CHRISTOPHER J. BAUMANN, District Court Judge. These proceedings were reported by Theresa L. Mendez, Registered Professional Reporter and Notary Public for the State of Colorado.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

ROBERT W. FINKE, 40756*
First Assistant Attorney General
JENNIFER H. HUNT, 29964*
Senior Assistant Attorney General
INDIA KIDD-AARON, 48420*
Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Tel: (720) 508-6401
Fax: (720) 508-6037
Robert.Finke@coag.gov
Jennifer.Hunt@coag.gov
India.Kidd-Aaron@coag.gov

APPEARING FOR THE DEFENDANTS:

JOHN McKOWEN (Pro Se)
335A Josephine Street
Denver, Colorado 80206
john@johnmckowen.com
(303) 248-6883

WAYNE HARDING (Pro Se)
22586 E. Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

ALSO PRESENT: Jennifer Reynard, Paralegal to Plaintiffs
Brian Keener, Assistant Attorney General Fellow
Kaitlyne Hernandez, Law Clerk
Connor Muelken, Division Clerk

**REPORTER'S TRANSCRIPT - VOLUME III - July 12, 2023**

I N D E X


| | PAGE |
|---|---|
| WAYNE HARDING | 4 |
| CROSS EXAMINATION BY MR. MCKOWEN | 6 |
| REDIRECT EXAMINATION BY MS. HUNT | 151 |
| EXAMINATION BY THE COURT | 161 |
| RECROSS-EXAMINATION BY MR. MCKOWEN | 163 |
| JOHN R. MCKOWEN | 171 |
| DIRECT EXAMINATION BY MS. KIDD-AARON | 171 |

| EXHIBITS | ADMITTED |
|---|---|
| 1048 | 45 |
| 1-141 | 57 |
| 1049 | 58 |
| 1009 | 84 |
| 1050 | 137 |

P R O C E E D I N G S

THE COURT: Back on the record in 21CV33922. All parties and counsel are present.

We also have the assistance of a CART interpreter who verified that she can hear us.

And both defendants, Mr. McKowen and Mr. Harding, have their interpretation on their computer screens in front of them. And we're ready for cross-examination of Mr. Harding.

Mr. Harding, if you'll come back. And before you sit down, I'll swear you back in since it's a new day.

WAYNE HARDING,

the defendant having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: And, Mr. McKowen, it's your cross-examination.

MR. MCKOWEN: Yes.

THE COURT: If you need to move that laptop with the CART interpretation to the other end of the table or move your laptop to the podium, that's fine.

MR. MCKOWEN: I've got a split screen, so I can see the text just fine.

I am assuming we're going to use this again for exhibits today.

THE COURT: For exhibits, yes.

MR. MCKOWEN: And then the WebEx, whenever I need to be on it, I have it.

THE COURT: So just take your laptop with you to the podium.

MR. MCKOWEN: Your Honor, just one -- when we left last night, I wanted to find out about the testimony -- or the ability to testify for Mr. Hart if there's a plaintiff that I can -- a representative of the plaintiff that I can -- I have a thousand questions that I want to ask someone.

And then have you had a chance to review Rome -- Mr. Rome to see if he's --

THE COURT: We'll address Mr. Rome at the end of the day.

MR. MCKOWEN: Okay.

THE COURT: As far as a witness for you, you'll have to confer with opposing counsel about witnesses. There's already a good faith order of proof that the parties have submitted to the Court.

The purpose of that order of proof is to identify for the Court and for each other who the anticipated witnesses are that are going to be testifying. So I already have that.

If you want there to be modifications to

that, I will consider it, but you have to talk about it with opposing counsel. If they object, I will take their objection and rule on it.

MR. MCKOWEN: I will talk to them on a break or something.

THE COURT: Okay.

CROSS EXAMINATION

BY MR. MCKOWEN:

Q. So, Mr. Harding, this case is about, most significantly about following the Colorado Revised Statutes as it relates to securities and the Colorado Securities Act?

Have you looked at any of those statutes?

A. Recently I did.

Q. Recently you did. Okay. Perfect. I got it.

And what sections did you review?

A. I don't remember. I did some different searches on different topic areas, but I don't remember specific sections.

Q. Okay. So part of what the plaintiff is alleging is that we, you and me together, I guess you would say, conspired to commit fraud upon the investors.

And they seem to be saying that the

offering documents are part of that fraud, and that the offering documents had false representation or omissions.

Do you believe that that is the case?

A. I do not.

Q. And do you believe that in putting together these documents that there was any knowledge about any sort of falsity that they were false in any way?

A. No.

Q. And did you put them together with an intent to deceive?

A. No.

Q. Did you expect the investors or warrant (ph) the investors that the term sheet was the deal?

A. No. It was a summary, potential summary of the deal, but it was not the deal.

Q. Can we pull up the term sheet for GCP-1?

MS. KIDD-AARON: What exhibit number?

MR. MCKOWEN: 1010. Can you highlight that second paragraph?

Q. (BY MR. MCKOWEN) Can you read that, Mr. Harding?

A. Yes.

This summary does not purport to be complete and is qualified in its entirety

by the terms and conditions of the complete and definitive subscription agreement. Nothing herein is binding and the sale of preferred units and associated warrants is contingent on negotiation and execution of such subscription agreement.

Q. So these term sheets that the investors all received, was that the deal? Is that the deal?

A. As I mentioned before, no, it's not the deal. It's a summary of the deal. There's a lot of documents that -- with the deal. Maybe you can explain what you mean by "the deal."

Q. Was that the agreement with the investors that they get to rely on? Is this term sheet, the document, that they get to rely on or are they required to execute an agreement?

A. They execute a subscription agreement.

Q. In fact, didn't the company, at least when I was there, have a complete set of subscription instructions?

A. Yes. Every offering had, from my memory, had subscription instructions and documentation.

Q. What do you mean by "documentation"?

A. If I remember correctly, it's different

from different offerings.

Let's take GrowCo Partners 1, that they were talking about today. I believe they initially get the term sheet. You see the subscription agreement. They receive accredited investor questionnaire.

They received -- after execution of payment, they received a certificate showing their preferred membership, ownership in GrowCo Partners 1.

If there's a -- forgot if there's a warrant attached to this one or not. But if there is, there would be a warrant attached. If there's an exchange option, there would be an Exchange Agreement also attached. I think I got most of that. I mean, I covered it all.

Q. So these documents that were presented to the investors, who prepared them?

A. These were originally prepared -- well, I might have taken a stab at it to save some money. But particularly this one, I believe it was prepared by K&L Gates, Mark Johnson, out of the Boston office.

And then future documents, they were all reviewed by and prepared -- I don't know about prepared -- but we updated documents and had Mark Johnson review and approve.

Q. And Mark Johnson is an attorney?

A. Mark Johnson is an SEC attorney and also was our attorney for other SEC matters.

Q. And we used -- "we" being the royal "we," at the time, Two Rivers and GrowCo used him extensively?

A. Yes.

Q. And we used him to the extent that we knew about his family and when he was on vacation, and he was very attentive to us, and he knew that we were relying on him to give us good advice?

MS. HUNT: Objection. That calls for speculation.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Do you think that -- do you know where Mark Johnson was educated?

A. I believe Harvard.

Q. And was his focus at K&L Gates on SEC work?

A. That's my understanding.

Q. And did -- he was -- was he expensive for us to use as an attorney as a start-up firm?

A. Well, I think that we got a pretty good rate and deal from him. And one of things we did is, make sure he bid on a job-type of thing. And sometimes we would spend more hours and have

breakdowns or bylaws. I think -- my personal opinion, I think he was very reasonably priced.

Q. Right. And do you know where he was born and raised?

A. Somewhere in Nebraska.

Q. And did we talk about that with him?

A. A few times. I know you talked more to him about that than I did. But he was a Nebraska boy.

Q. Right. And we would talk about -- not extensively, but we would talk about the Buffs football games against the Huskers, and there was this gentle sort of thing.

But do you feel like he gave us a break in prices because you felt -- why do you think he gave us a break in prices?

A. Start-up company, small company. He knew we had capital we wanted to conserve and use capital the best we could.

When we were referred to him by another Attorney Hershberger (ph) that was resigning or he went on into a full-time in-house counsel job, I believe. He recommended Mark Johnson, and I'm sitting here going, yeah, this is going to be expensive. But we built a good relationship, and he was very fair with us on the fees.

I believe I answered your question.
Q. I think you did too.
So he -- would you say that he prepared a draft of the offering documents and then we implemented them or how did we get his advice on paper?
A. I don't know if we got his advice on paper. We did a lot of phone calls back and forth. And every single document, security documents we had, we had him review, at least review, if not help draft.
Q. And so can we go to the -- inside these offering documents, there should be the subscription instructions if we scroll through it on -- I don't know how many pages we got on this.
A. Could you refer me to the tab that is up there so I can look?
MR. MCKOWEN: Can you go ahead and go to the pro forma? I'm trying to see if I can get that on my screen.
Q. (BY MR. MCKOWEN) What is that?
A. That's what we call a cap table or capitalization table showing current outstanding shares and --
(Court reporter asked for clarification.)
THE WITNESS: That's what we call a cap

table or a capitalization table. And it shows total shares that are currently outstanding and potential shares that could come into the marketplace through exercising of conversions, exchange, warrants, options, RSUs, restricted stock units, and incentive plans, represent incentive plans that Two Rivers had.

Q. (BY MR. MCKOWEN) So this document is a document that tells the potential investor how many shares are outstanding in Two Rivers, the capital conversion. What does that mean?

A. TR Capital Partners, LLC, preferred members had the opportunity at their direction to convert one unit, preferred unit to one share of Two Rivers.

Q. And the prices on the column to the right of the shares outstanding and the column that is totaled, that is the shares that would be outstanding fully diluted, right?

A. Yes.

Q. Explain what fully diluted means.

A. That means every single holder of other securities, other than a common stock, decide to exercise a conversion into Two Rivers common stock, that would be our projection of the shares outstanding once that occurs. In this case, as of October 31, 2014, would be 96,301,622.

Q. And the exercise prices is the column on the right?

A. Not totally accurate. The first price on current outstanding was the current market price as of October 31, 2014.

Q. If and when the owner of a warrant or a convertible instrument were to exercise, those are the prices that they would need to exercise at?

A. Correct.

Q. And is there generally a time frame associated with the right, whether it's a warrant or a convertible right or an inside incentive plan or GrowCo Partners 1? Is there a time frame generally associated with those options and warrants?

A. Generally, but let's look at each category. TR Capital conversion, I don't think they had a time frame. They can convert at any time they wanted to.

Warrants and options definitely did have to exercise from -- to GrowCo Partners 1. I do not remember if there was a date finality where they couldn't convert anymore. I just don't remember.

Q. Who do you think assembled this particular chart?

A. I probably did.

Q. And where do you think you got that data

from?

A. Well, let's go through each category. The first one is current outstanding. We use a transfer agent, and that transfer agent would have daily reports about what shares we have outstanding.

So I'm sure there was reports from a transfer agent showing 26,524,538 shares.

Q. What is a transfer agent?

A. A transfer agent is a third-party that most public companies use to act as a keeper of the shares and could be other securities too, but in our case just the common shares.

So they can keep track of who owns what and what time limits they buy it. So they get information from exchanges or through, I guess, a company called CECE -- or CED, I'm sorry. It stands for something or maybe nothing. I don't know. But it's a company that everybody uses to keep track of shares outstanding.

Q. Is the transfer agent somebody that can just get some office space and start doing this or do they need to be qualified to do it?

Do they have to be certified to be a transfer agent?

A. Yes. There's some rigor involved becoming

a transfer agent because it's an important job.

Q. So a transfer agent is someone who everyone can rely on that can make mistakes. But generally they're what the industry relies on for factual data, including a broker/dealer, including market maker, that this is the information associated with this company?

A. The current outstanding shares would be from the transfer agent. And we talked about sometimes they make a mistake. But my exposure in the last 15 years, transfer agents are pretty spot on.

Q. So it's part of the industry. If you're going to be a public company, you have a transfer agent. You can't transfer shares digitally without the transfer agent --

A. Correct.

Q. And are you familiar with the term, "settlement date"?

A. Yes.

Q. What does that mean?

A. So if somebody exercises warrants or options or even sell -- I sell common stock. There is a two- or three-day settlement date whereby the transaction occurs and the shares are settled into

that account.
Q. So it's not something that is -- is decided by the industry participants. It's a highly regulated aspect of the industry.
A. In my view it is.
Q. Okay. And so do you think that any of this data up here is false?
A. No.
Q. Why weren't we giving this to -- why weren't we, when I was the CEO and you were the CFO, why weren't we giving this to our potential investors?
A. Well, it's another fact that they probably would like to know. And if everybody exercises, we share what's outstanding (ph) of Two Rivers, and does it have negative or positive or no impact whatsoever.
Q. Was there something associated with Two Rivers that made the number of shares outstanding in Two Rivers relevant to them if they were sophisticated investors if they knew what they're doing?
A. Yes. In this case, if they convert, let's say, GrowCo Partners 1 into Two Rivers' shares, they want to know the potential impact it might have on marketing value and how many shares are outstanding

that may come to --

Q. And so it was potentially some reward to them if the business model worked out?

A. Correct.

Q. Okay. And do you think that the majority of our investors, the larger investors, were sophisticated?

A. I thought all our investors in our private offerings were sophisticated based upon -- and the ones I talked to -- based on the accredited portion questionnaire. There's probably some investors, and I have some at the top of my head that are probably much more sophisticated than the others did -- there's levels of sophistication.

Q. Let me ask you some questions about that sophistication.

Do you think that the -- that Mary Loughran is a sophisticated investor?

A. When I cross-examined, and I hope I didn't insult her, I go, "It doesn't sound like you're a sophisticated investor." I said, "Did you complete the form?" She said, "Yes, and I am a sophisticated investor. What does that mean." And I gave her the threshold.

But I would not consider her -- based upon

her testimony, the first time I met her, I probably had doubts or questions about her sophistication in investing in securities.

Q. I have the same doubts about that relating to deeds of trust.

Do you remember what her response was related to a deed of trust?

A. She definitely did not act like or describe that -- I think she asked what is a deed of trust or she kind of worked around it. But she did not have a proper answer for a deed of trust.

Q. Okay. Was a deed of trust important as it relates to the GrowCo Partners' investment?

A. Yes.

Q. Why was it important?

A. For security. We heard from the investors you brought out that would -- they were having deeds of trust against their property.

Q. And why do you think it was -- that the security being a deed of trust? Do you know what the deed of trust was for, and do you know what a deed of trust accomplishes?

A. A deed of trust is a legal way to notify people that there are some sort of incumbrance or a right to that particular property that's probably

outlined in the actual deed of trust documentation.

Q. And did you file deeds of trusts on these properties?

A. I did.

Q. And a deed of trust, is there an order in which a deed of trust gets honored?

A. Yes.

Q. And what does that mean?

A. There's an order. It's essentially first come, first serve. First filing.

Q. How is the order determined?

A. It's determined by the day and time of filing.

Q. Of filing?

A. Unless, in the deed itself, it says subordinate or there's other agreements that would make it not that way, but usually it's the date of filing and the time of filing.

Q. In the deed of trust, does it describe what you're receiving and how you're receiving it?

A. Yes, sir.

Q. Does it do the who, what, where, when thing. Like who is the beneficiary of the deed of trust?

A. Yes.

Q. Does it describe that?
A. Yes.
Q. Does it describe or say when it was filed?
A. The -- after you file it, you get back a deed of trust usually, if you pay the clerk to mail it back to you, and it will have a date and time stamp.

MR. MCKOWEN: Can we go to the -- scroll down further to the accredited investor questionnaire?

(Whereupon, there was a pause in the proceedings.)

MR. MCKOWEN: Can you pull up that highlighted portion.

Q. (BY MR. MCKOWEN) Can you read that, Mr. Harding?
A. Your answers will be kept confidential. However, by signing this questionnaire, you agree that partners GrowCo and their counsel may rely on the information set forth in this questionnaire for purposes of complying with all applicable securities laws and may present this questionnaire to such parties as it deems -- reasonably deems appropriate if called upon to establish its compliance with such securities laws.

Q. Is this portion of the investor questionnaire -- are you familiar with the term, "self-certifying"?
A. Yes.
Q. As it relates to your status as an accredited investor?
A. Yes.
Q. What does that mean?
A. That person who is completing the questionnaire is making a certification that everything I have on that questionnaire, I -- is true and accurate.
Q. So we have the ability -- -- "we" being the company, you, me, executive officers, putting this together, have the right to be able to rely upon the investor's statements that they are an accredited investor?
A. That's my understanding.
Q. Do we have a duty to go beyond this accredited investor questionnaire?
MS. HUNT: Objection. This is calling for a legal conclusion.
THE COURT: Overruled.
THE WITNESS: Hold on. Let me read the question. I lost connection to the CART. Just give

me a second.
Q. (BY MR. MCKOWEN) Do you want me repeat my question?
A. Now I see.
Q. Do you want me to repeat my question?
A. "Do you want me to repeat your question." I don't see anything before that, so please do.
(Record read by the court reporter.)
THE WITNESS: I think I heard the court reporter say, do we have an obligation to go beyond what is in the questionnaire to verify information?
Was that you're question?
Q. (BY MR. MCKOWEN) Yes.
A. No. Not that I was aware of.
Q. Why do you believe that?
A. Well, I think it would take a lot of time and effort. Certain things that people certify to, you could have the trust and go on. Where do you stop? Do you pull a credit report? Do you start calling friends and family? Do you ask for bank statements? This would be -- probably in my view would be cumbersome.
Q. Do you think the reason was that it's unyielding, as you say? I can't imagine that that would be a reason why you don't have to find out

something that the law requires.

A. I really don't understand your question. If you can rephrase that.

Q. Did we ever discuss who we were offering making these offers to? Were we ever asked by Mark Johnson, are you going out to just accredited investors?

A. Yes. And we said yes.

Q. And was that the basis -- did he give us advice about -- or comment on or say something to the effect of good, that you're only going out to accredited investors and we can self-certify -- we can rely on their statements without doing this -- what would otherwise be unyielding?

A. The thing I remember is that he was happy that we were focusing on only accredited investors. I don't remember the second part about doing additional research or not. He could have said that. I just don't remember.

Q. So did he -- were you familiar with the exemptions that were available -- let me back up.

Do you know what an exemption is?

A. Yes.

Q. What is it juxtaposed to in raising capital?

A. I'm going to try to understand your question.
Q. Let me rephrase it.
A. Okay.
Q. If you're going to raise capital in the United States from investors, can you just go out and raise capital and not have to register it or find some sort of exemption associated with it?
A. That's my understanding, it's either registered or an exemption to the registration.
Q. So if you're going to raise capital from investors, a number of investors that you don't know or may not know, you either have to have something registered with the SEC or there has to be an exemption available to the issuer; is that correct?
A. My understanding, yes.
Q. And so we relied on exemptions to raise capital. And yesterday you were asked what a private placement is as compared to -- or what was the definition of a private placement.
Were all of these offerings when I was there, and -- were all these offers private placements?
A. Yes.
Q. And would you consider the regulations

associated with those private placements and who can invest and be called an accredited investor and who can't? Does that require a certain amount of sophistication by you and me to understand that we're complying with the laws, the federal laws as they relate to these offerings?

A. Yes.

Q. And have you ever heard of a Blue Sky requirement?

A. I have.

Q. Tell us what that means.

A. My understanding of Blue Sky is, because there's 50 states, probably 51, 52 jurisdictions that under Blue Sky register there or under the Blue Sky laws which we pay fees to be able to do that.

But then when we file with the federal government it's also acceptable to the state.

Q. So you -- to satisfy the federal regulations as it relates to exemptions, you have to satisfy the Blue Sky laws as well?

A. Correct. And let me add something to my last response. I believe Colorado's one of the Blue Sky states.

Q. Say again?

A. I believe Colorado is one of the Blue Sky

states.
Q. Well, if we go back to your original explanation, we got 50 states, right?
A. Correct.
Q. And those 50 states all have Blue Sky laws, right?
A. I don't know for sure. But I know that Colorado is part of the Blue Sky state. I think there may be some slight modifications. I don't know, but could. I don't know.
Q. They have independent laws associated with that. And part of the regulatory scheme is you have to satisfy -- if you're going to sell securities in that state, you have to satisfy those requirements?
A. Correct.
Q. Okay. So did we file forms that inform investors -- inform the SEC in what we're doing?
A. Yes. Yes.
Q. And what is that form?
A. It's called a Form D.
Q. And did we file the form associated with this offering, the $4 million note and the GrowCo GCP Super Units?
A. To the best of my knowledge, yes.
Q. Do you remember if we filed them on time?

A. It might have been a few days late on one or two of them, but I think we're pretty close to being on time.

Q. Okay. So we may not have met some of the Blue Sky requirements for the State of Colorado, and that's part of their complaint, correct?

A. I really don't know. But sounds like it is.

Q. Okay. And do you think, in part, they could be right?

A. Could be, yes.

Q. Okay. Let's move on to the actual agreement. And in this case, this is an equity deal as compared to what other kind of deal?

A. Debt.

Q. Okay. And so was there a reason why we broke up the property -- what property did we do this development on?

A. We had property in Pueblo County, east of Pueblo City. It contained 157 acres. And I think we saw some schematics or maps yesterday that show how the properties have been legally divided up into four parcels, one for GrowCo Partners 1, one for 2, one for 3, and one for 4.

Q. And this is an offering for one particular

segment -- for the development of one particular segment?

A. That's correct.

Q. And what were we going to do on that property?

A. Construct state of the art analysis associated extra such as per house, per room.

Q. And that particular property or the properties, the four segments of that property were approximately 40 acres each, 39, something like that.

Did we build a greenhouse on that property?

A. Yes.

Q. And have we received testimony from at least one sophisticated investor, accredited investor, about what that property looked like and how it performed and all of that?

A. Yes. I think that with the testimony from yesterday, he stated a couple times that it was very sophisticated and he was very impressed with the greenhouse.

MS. HUNT: Your Honor, can I ask that Mr. McKowen not ask the witness to repeat other witness' testimony.

THE COURT: Sustained.

MR. MCKOWEN: I'm just reading it so it's

going slow.

Q. (BY MR. MCKOWEN) So let's move on to the actual document, the contract between the investors and the company, GCP-1 or the limited liability company.

MR. MCKOWEN: It's in this document. Just scroll down, or is it up -- further up? Those are the subscription instructions. These are detailed instructions.

THE WITNESS: I'm sorry. Was that a question?

Q. (BY MR. MCKOWEN) Yes. Are these detailed instructions?

A. I think they are very detailed.

Q. So we're telling the investor what they need to do in order to actually be a subscriber to this investment, right?

A. That's correct.

Q. And so does it state that, one, you have to fill out an accredited investor questionnaire?

A. Well, I can't read it from here, but I'm just remembering that it probably did. And I'm sure it's listed in there about things you have to do and things you have to review.

Q. And one of the things that they have to do

is also complete a subscription agreement associated with this investment?

A. Yes.

Q. And is that subscription agreement part of the representation of what we're intended to do for them in exchange for their money?

A. Yes.

Q. And they need to do for us. And do they need to -- and I believe -- I can't read it either, but I believe that one of the requirements is that they join in in the investment with other investors?

A. That's correct. And, in fact, I think I thought you asked for the list of things they have to do.

One agreement they also have to complete is what is called a joinder agreement that does what you just stated.

Q. Right. And the joinder agreement was also confusing to one of the investors yesterday.

MS. HUNT: I was objecting to the last question as testimony from Mr. McKowen.

THE COURT: Sustained. There was no question.

Q. (BY MR. MCKOWEN) Okay. So was a joinder agreement signed by all investors in this deal?

A. Yes.

MR. MCKOWEN: Okay. Can we pull up the actual limited liability company agreement?

MS. KIDD-AARON: Did you have an exhibit number?

MR. MCKOWEN: Same exhibit.

MS. KIDD-AARON: I can't find it. Can you please point us to the page?

MR. MCKOWEN: No. I don't have the Bates number. I will try to -- if I need that document, I will try to pull it up again.

Q. (BY MR. MCKOWEN) At any rate, they became members of the LLC, the limited liability company, right?

A. That's correct.

Q. And were there two types of members in the limited liability company?

A. There were.

Q. And what were they?

A. Preferred and common.

Q. And who are the common members?

A. I believe it's TR Cap.

Q. I believe you're right. And who were the preferred members?

A. TR Cap at the beginning had about 1,100,000

of preferred units because it wasn't a complete offering, but the aggressive preferred members were individual investors.

Q. And why would TR Capital receive preferred membership interest as well?

A. Because they paid for it.

Q. They paid for it in the form of some sort of consideration?

A. Correct. It might have been some cash, but there was also the consideration. It was, as I mentioned before, I think on Monday it's a noncash transaction where they were taking some of the property in exchange for a credit or intercompany credit of -- I think it's about 200 -- 490,000 which was 250 for the water, 250 for management putting together, another 40,000 for the land.

And I'm sorry that doesn't add up to 490, but it was something like that, in that area.

Q. I'm not sure about that. But we'll move on or we'll never get through this.

So the investors became part of the limited liability company. And did the preferred investors have protection associated with their investment, security?

A. They have security. There was a deed of

trust filed on their behalf.

Q. And was it filed in Huerfano County?

A. No.

Q. Say it again?

A. No.

Q. Are you sure?

A. Well, if the property's in Pueblo, it would be filed in Pueblo County, but maybe it was filed in Huerfano County, particularly if they had some water rights that were titled in Huerfano County potentially. I just don't remember that part.

Q. We'll revisit that one.

MR. MCKOWEN: And we'll pull up the deed of trust and refer to -- pull up 1015 for me, please. Can you blow up that upper right portion?

Q. (BY MR. MCKOWEN) Do you know what this is?

A. That's a filing of the deed of trust, and it was in Huerfano County.

Q. And what is the significance of 404224, do you know?

A. I think that's the county bookmark or an index code that they might use to help locate that document.

Q. Do you think it's also a number that is a ranking order?

A. I don't know.

MR. MCKOWEN: Pull up, if you could get rid of this -- let's -- I'm trying to get organized. But attached to this particular deed of trust, is there a list of beneficiaries?

THE WITNESS: From my --

MR. MCKOWEN: Can you scroll down?

THE WITNESS: From my memory, yes -- memory yes.

MR. MCKOWEN: Let's just take the title and blow that up, if you would.

Q. (BY MR. MCKOWEN) Exhibit A to the deed of trust, inside the body, it references deed of trust. I don't know that that will improve, but take half of it -- half of them.

Do you recognize these names?

A. I do.

Q. And what are they?

A. Investors in the -- I believe it's either investors in GCP-1 -- I would have to look at the front page of the deed of trust or maybe the exchange note.

Q. If it's GCP-1, these would be preferred members, right?

A. Correct.

MR. MCKOWEN: Can you eliminate that and go back to the first page, please. So can you highlight the first two paragraphs, full paragraphs?

Q. (BY MR. MCKOWEN) So the second paragraph is -- can you read that for me?

A. Whereas, GrowCo Partners 1, LLC, a Colorado limited liability company, ("GCP-1"), and those beneficiaries listed in the attached Exhibit A, (the "beneficiaries"), whose address is care of Wayne Harding, 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, are parties to that certain limited liability company agreement, dated January 12, 2015, (the "operating agreement").

Q. Do you want to change your opinion about whether or not GrowCo Partners 1 had a deed of trust filed in Huerfano County?

A. If this is the complete document, I will change my testimony. I see it was also filed in Huerfano County.

Q. So this is the actual deed of trust that the -- has the recordation number, date, and then the complete elements of what that deed of trust is doing. It has a grantor and a grantee. Would you agree?

A. Yes.

MR. MCKOWEN: Can we get rid of this particular deed of trust and move to the next one? Can you blow up that upper right corner for me, please.

Q. (BY MR. MCKOWEN) Do you remember what the number was on the previous one, the number in that lower left-hand corner?

A. No.

Q. It was 404224. What is this number?

A. 404225.

Q. And it's also in Huerfano County, correct?

A. Yes.

MR. MCKOWEN: Can we eliminate this and go to the first two full paragraphs, if you will?

Q. (BY MR. MCKOWEN) Pretty much the same sort of recitation, except for a different set of investors, correct?

A. Yes.

Q. And who is this deed of trust? Who are the beneficiaries associated with this deed of trust?

A. It says, pay to the order of the beneficiary -- I'm looking here to try to find the beneficiary. Here it is.

Q. What is the third line down in the second full paragraph after "witness of fact"?

A. The third or the fourth line? Which one? Did you say the third or the fourth one?
Q. The third line down in that paragraph?
A. Of 4 million and no/$100 dollars, open parens, $4 million, close parens, payable to the order of the beneficiary whose address is c/o (care of).
Q. That's good enough. Is this -- does this detail who are the beneficiaries of that particular investment?
A. We would have to see if there's a schedule 1 for the benefit of -- in the first paragraph toward the end.
MR. MCKOWEN: Scroll down to the beneficiary, the exhibit.
Q. (BY MR. MCKOWEN) Do you recognize these investors?
A. I do.
Q. And so this deed of trust is security on property in Huerfano County?
A. Yes.
Q. And does it detail what the property is in Huerfano County?
A. It should. It should be part of the deed of trust.

Q. Correct. So you've got a deed of trust that is 404224, I believe. And then you've got a second deed of trust that is 404225.

Were they filed on the same day?

A. I believe that it was -- the attorney we were using, she filed them both. But as she mentioned, one has to go before the other. And then we need to have some sort of a joint security agreement, which I believe we produced and signed about they have equal status.

Q. There's some issues associated with these two filings. Are you aware of what those issues are?

A. I am not.

Q. Okay. They were filed correctly, although one was not filed timely. And by not filing --

MS. HUNT: Objection; Mr. McKowen is testifying.

THE COURT: Sustained. You're making commentary, and then posing a question and then after the response, frequently confirming that he gave the correct response.

So all you need to do is ask the question, get the response and move onto the next question.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) What is the difference

between these two deeds of trusts?

A. There's a lot of difference. There's different beneficiaries. It might be different, and I think it's the same collateral.

Q. Were they filed sequentially?

A. Yes. My understanding that our attorney mailed both of those or had somebody file it with the clerk in Huerfano County.

But again, as I previously -- as in my previous testimony stated, you can't have two deeds of trust filed simultaneously. One has to go after the other.

Q. Correct. Thank you for that.

When was the GrowCo Partners investment offering completed or done?

A. I believe it's beginning of 2015. It was finally completed January or February.

Q. And was it the first investment?

A. I believe that was the first investment for GrowCo entities.

Q. For the investments that were done by GrowCo, GrowCo Partners 1, in order of time was the first to be done, offer and completed. Whatever the number was, that was -- is that correct?

A. My understanding, yes.

Q. And what was the second offering that was done?

A. I believe it was the $4 million note.

Q. And so it would make sense that one deed of trust sits in front of the other one. It was filed before the other one, the ranking of order of sequence. Would you agree?

A. Yes. The order of filing is important. And if one came out the other -- barring any other -- notwithstanding any agreement or any other things, then that would be correct.

Q. And so those were two offerings that were done when I was the CEO; is that correct?

A. Yes.

MR. MCKOWEN: And do you believe -- can we pull up the stipulation that was part of the dismissal or the agreement with Two Rivers?

MS. HUNT: We haven't loaded that exhibit.

MR. MCKOWEN: You don't have it.

Can we take a break so I can pull that up? It's important.

THE COURT: Is it in your exhibit binder?

MR. MCKOWEN: I don't see it in my exhibit list. But it's -- obviously, it became an exhibit or could become an exhibit that I would like to

introduce because of content in the stipulation.

THE COURT: Is that not part of the AG's exhibits? You don't have that loaded.

MS. HUNT: We have not put in one of our exhibits. It's in the Court file. We don't have it ready to pull up.

THE COURT: Mr. McKowen, do you have that in your materials?

MR. MCKOWEN: I do.

THE COURT: All right. Go ahead and get it.

(Whereupon, there was a pause in the proceedings.)

MR. MCKOWEN: Is it that document I forwarded to you this morning?

MS. REYNARD: I'm having some --

MR. MCKOWEN: It is not the document that I sent to you this morning?

THE WITNESS: It is not a document.

THE COURT: We can go off the record.

(Whereupon, a recess was taken at 9:55 a.m.)

(Whereupon, the proceedings resumed at 10:01 a.m.)

THE COURT: Back on the record in

21CV33922. All parties and counsel are present. Mr. Harding is on the witness stand under oath.

Q. (BY MR. MCKOWEN) So, Mr. Harding, were you an investor in the $4 million note?

A. Yes.

Q. Is that part of the -- what was the total amount that you invested in -- in the entities?

A. I invested $100,000 in the $4 million note and 25,000 in GCP-1.

Q. So we have two deeds of trust that are associated with Huerfano County that were security for your investment, correct?

A. Yes.

Q. When evaluating your investment in those securities, one equity, did the security associated with that, was that important to you?

A. Yes. It was important.

Q. Do you think that the Two Rivers executive officers, you and me at the time this was made, created those deeds of trust, had those deeds of trust authorized, do you think that they -- we did that to deceive investors?

A. No.

Q. Do you think that we did that to secure the investments?

A. Yes.

Q. Do you think that there was anything fraudulent about assigning the ownership interest in those -- in those assets were complicitous in any manner?

A. No.

Q. Did you have a chance -- did you read the stipulation that was completed on -- I don't know who completed it, but it was signed by Greg Harrington? Did you have a chance to read that?

A. Are we referring to part of this case that we're here in today?

Q. You don't have that -- do you not know there was a stipulation entered into by the Two Rivers and TR Capital?

A. I don't remember that. I don't remember that.

Q. Okay.

THE COURT: Yes. That needs to be labeled at 1048.

MR. MCKOWEN: Say it again.

THE COURT: That needs to be labeled as 1048.

Well, it hasn't been admitted yet. You haven't offered it. You can give a copy to counsel.

There should be an extra copy for the witness.

Can you tell me again, Mr. McKowen, what this document is?

MR. MCKOWEN: This is a Stipulation for Injunction and Other Relief.

THE COURT: For Mr. Harrington?

THE WITNESS: From Two Rivers and TR Capital. Two Rivers, I believe he signed it as -- he signed it on behalf of Two Rivers or a farming company and TR Capital as the CEO and managing member. CEO of Two Rivers and managing member of TR Capital.

THE COURT: Are you offering this as an exhibit?

MR. MCKOWEN: Yes, I am.

THE COURT: Is there any objection by the plaintiff?

MS. HUNT: No objection.

THE COURT: Without objection, Exhibit 1048 is admitted.

(Whereupon, Exhibit No. 1048 was admitted.)

THE WITNESS: Your Honor, I have no objection either.

THE COURT: Thank you. I forgot to ask.

THE WITNESS: Would you like me to answer

your question now that I have the document in front of me?

THE COURT: You'll have to restate the question. I don't remember the question.

Q. (BY MR. MCKOWEN) So this is a stipulation by Greg Harrington on behalf of Two Rivers and TR Capital. Can you read item F?

A. Prior management fraudulently used Two Rivers' subdivisions (sic), including, but not limited to, the assets of Orlando Reservoir No. 2 Company, LLC, Two Rivers Farms F-2, Inc., and other properties located throughout Colorado.

Over several years, a practice of utilizing fraudulent conveyances and encumbrances which included the aforementioned properties, falsely portrayed providing security interests to GrowCo related investors.

In fact, the elaborate scheme was meant to shift control of the financial benefit of those assets among the defendants and their co-conspirators.

Q. Do you believe that the -- that you and I fraudulently created this scheme to -- that was meant to shift control of the financial benefit of those assets among the defendants and their

co-conspirators?

A. Absolutely not.

Q. Why do you say that?

A. Because it's false. We did not do that in F.

Q. Who were the beneficiaries of those deeds of trust?

A. Investors.

Q. And was I -- am I a defendant in this case? In this case am I a defendant?

A. You are.

Q. And am I a beneficiary of that GCP-1 deed of trust?

A. I don't think you are. I don't remember, but there is an exhibit there, your name would show up if you are.

Q. We'll pull that up again in a minute.

Do you believe that I am -- I am a defendant?

Do you believe I developed an elaborate scheme to shift control of the financial benefit of the $4 million note?

A. No. I do not.

Q. Do you think this statement is ridiculous?

A. I would categorize it as beyond ridiculous.

Q. Is this a statement, this stipulation a -- is it attested to, as far as its truthfulness?

A. I'm assuming it is. I don't see a statement that says attested to its accuracy or whatever, but it's signed by Greg Harrington.

And after seeing this document, to get back to one of your previous questions, I do remember it. And I do remember reading this.

Q. Since you weren't even aware of this -- apparently not aware of this, if they -- if they, being plaintiff and Two Rivers, as part of this agreement, this -- shifted in your control of that asset without being a part of that agreement, do you believe that would be unfair?

MS. HUNT: Objection. He's asking about facts not in evidence.

THE COURT: Overruled on that ground.

MS. HUNT: It's also speculation.

THE COURT: Sustained.

MR. MCKOWEN: Pull up the order.

MS. KIDD-AARON: It's not in evidence. It's not an exhibit you asked us for.

MR. MCKOWEN: You're right. I don't have it as an exhibit, but it's certainly before you.

MS. KIDD-AARON: You need to ask Connor to

print it out.

Q. (BY MR. MCKOWEN) Were you involved in the creation of this stipulation and order?

A. No.

Q. Is the assets, the investment that you made associated with this stipulation?

A. One moment. I guess it's at least indirectly related to that.

Q. Well, the stipulation says, in paragraph 8, it talks about these deeds of trust were created to shift their ownership, an elaborate scheme to shift control of the financial benefit of those assets to me and I assume you were one of the co-conspirators.

If that were the case, and if there were the -- an impact on those assets, would that be something that you would be upset about?

A. Yes.

Q. Do you think that that would impact your investment?

MS. HUNT: Objection; calls for speculation.

THE COURT: Overruled.

THE WITNESS: If there was something wrong with the deed of trust, or it was improperly made or illegally made, that means I would not be a

beneficiary of that deed of trust, and I would lose some of my security. I think that answered your question.

Q. (BY MR. MCKOWEN) Well, you lay out a predicate in a long sentence, but you don't say what from that "if."

A. If I didn't properly answer your question, maybe you can ask it again differently.

Q. If an agreement were had that impacted the deeds of trust that you were a beneficiary of, would that upset you?

A. Yes.

MR. MCKOWEN: Your Honor, can I dig that out and have it printed on the actual order itself when we take a break?

THE COURT: Which order?

MR. MCKOWEN: The order, the subject to this Stipulation for Injunction and Other Relief.

THE COURT: You're talking about the order that the Court has issued?

MR. MCKOWEN: Yeah.

THE COURT: Kaitlyne, can you e-mail Connor and ask him to print it off, four copies?

MR. MCKOWEN: Do you want me to wait for that or --

THE COURT: Not unless you need to.

MR. MCKOWEN: I don't need to. I can discuss it when it comes.

Q. (BY MR. MCKOWEN) Are you aware -- and I'm not saying you should be.

Are you aware that an offer has been made to purchase some of those assets?

A. Yes.

Q. And what is it that you are aware of?

A. I think I saw an e-mail from you, Mr. McKowen, about a 3- or $4 million offer to purchase the greenhouse or some associated entity that you had. That's what I remember.

Q. If that were true -- if there were a $3.8 million offer on that investment -- or in the assets that are collateralized as part of the investment in GCP-1, and the $4 million note, that impacted your right to be able to sell that asset and retrieve your portion of your assets, would that be upsetting to you?

A. It depends.

Q. On what?

A. Well, what's the offer? Is it a dollar or is it 50 percent of my investment, my entire investment? I need to know the offer.

Q. If, in fact, there were an offer for 3.8 million -- and in my e-mail, did I say who the offer was made by?

A. I don't remember.

Q. Okay. But if that -- if, in fact, the $3.8 million offer were made for the Orlando Reservoir, as it is right now, would that upset you?

A. Probably not. I think it might be a good step forward. But again, what does that do to my collateral and security and how much do I get paid to release that deed and do the sale?

Q. Isn't that how you would get paid and what order and how you would benefit from that if, in fact, it were true? Isn't that already detailed in the deeds of trust and the agreements?

A. Parts of it is. I think the deed of trust, with the exhibits, it shows what beneficiaries are but not what percentage of sales proceeds they get.

So again, I would have to look at the deal, but I would say that would be a positive step in my mind.

Q. And do you believe that the investment agreement, both the operating agreement for GCP-1 and the note agreement, the actual note, has information that would spell out how you participate in these --

in these assets?

A. It might. Usually in an LLC agreement, you have a section called liquidation preferences of liquidations. And so it might be in that operating document, the LLC operating document, but it's been so long, I don't specifically remember.

Q. I was not aware that the note is not part of the $4 million note documentation, the note itself is not part of that.

MS. HUNT: We have that as an exhibit. It's in our exhibits

MR. MCKOWEN: It's in your exhibits?

MS. HUNT: Yeah. You can look in our list. It's in there.

MR. MCKOWEN: Say again.

MS. HUNT: You can look at our exhibit list. It's in there.

MR. MCKOWEN: I apologize, Your Honor. This is actually my first rodeo. I spent millions of dollars defending these four investors, and I can't afford an attorney. It doesn't mean I shouldn't be prepared.

Q. (BY MR. MCKOWEN) Let me pose what I say as a different question.

If in the note agreement, which I've read

many times because of the issue relating to the priority of these liens, if it spelled out exactly how you participated in any distributions of that note, would you be surprised that it's spelled out there?

A. No.

Q. In fact, it probably would be fraudulent if we didn't spell out how you would participate in those notes?

A. Don't know.

Q. It would at least be a material mistake?

A. That's kind of a legal question, but I would say that it's good that that amount of distribution or whatever is spelled out.

Q. It's highly likely that the security and how you would benefit from it is spelled out. And if I can get it pulled up, I will show you.

THE COURT: Mr. McKowen, why don't we take a break until 10:45. You can look at plaintiff's exhibit list and get a number on that.

It's part of the reason I'd like to have the parties stipulate to exhibits early on in the case. And I would encourage you to continue to have that discussion, because frankly I think every exhibit, with the exception of maybe two, neither one

of you have objected to their admission because -- well, for whatever reason, you haven't objected and we're just using time admitting exhibits.

If they're already stipulated, you'll have the number, and you can just pull it up and the AG's office have assisted you in doing that. It saves time.

MR. MCKOWEN: I understand, Your Honor, and I will try to expand the exhibits that I want to stipulate to and I will try to get that done with plaintiff's counsel today.

THE COURT: And if there's any exhibits that are not in your exhibit notebook or in Mr. Harding's notebook or the AG's notebook that you would like to use, you need to bring copies to court and you need to let the other side know that you're potentially going to use those exhibits.

You're supposed to do it pretrial, and I know there might be an exhibit or two that you think of during the testimony you then want to admit.

The attorney general's office has not objected to that procedure at this point. But you need to bring those to court because it's not the AG's responsibility or the Court's responsibility to get your exhibits prepared for you.

We're trying to make an accommodation. I know you're pro se. But you also need to be thinking as we move along in this trial. We're only on day three. We probably have a few days left. You need to figure out what it is to get your exhibits ready for admission if you want to offer them.

MR. MCKOWEN: I understand, and I will do my best to comply, and I will try to narrow down and specify any exhibits that I would object to and stipulate to the rest.

THE COURT: Let's -- Mr. Harding, you may step down, and we'll go off the record. We'll come back at 10:45.

(Whereupon, a recess was taken at 10:27 a.m.)

(Whereupon, the proceedings resumed at 10:46 a.m.)

THE COURT: Let's go back on the record in 21CV33922. All parties and counsel are present, Mr. Harding's on the witness stand, under oath.

Continue cross-examination by Mr. McKowen.

MR. MCKOWEN: Your Honor, I've talked to plaintiff's counsel, and I agreed to stipulate to the rest of the exhibits.

THE COURT: For the AG; is that correct?

MS. HUNT: Yes sir.

THE COURT: Mr. Harding, do you have any objection?

THE WITNESS: No.

THE COURT: All exhibits that are on the witness list that I have, will be admitted and you can make a further record on those exhibits. I won't take time right now.

I think it's exhibits -- Exhibits 1 through 141 at this time; is that correct?

MS. HUNT: Yes, that's correct. Thank you.

THE COURT: And that's your understanding, Mr. McKowen?

MR. MCKOWEN: Yes.

THE COURT: And Mr. Harding?

MR. HARDING: Yes.

THE COURT: Exhibits 1 through 141 will be admitted without objection. Thank you for you doing that.

(Whereupon, Exhibit Nos. 1-141 were admitted.)

THE COURT: Mr. McKowen, you have an exhibit that we printed off for you. It's the Court's order on the stipulation. Do you have that?

MR. MCKOWEN: I do have the stipulation and

I have the order.

THE COURT: Are you intending on offering the order into evidence?

MR. MCKOWEN: Yes.

THE COURT: I can take judicial notice of it as part of the court file. If you want to mark and make that an exhibit, that's fine.

Do you want to do that?

MR. MCKOWEN: Yes.

THE COURT: 1049?

MR. MCKOWEN: Okay.

THE COURT: 1049, are you offering that exhibit? Mr. McKowen, are you offering that exhibit?

MR. MCKOWEN: Yes. I'm offering that exhibit.

THE COURT: Any objection by plaintiff's --

MS. HUNT: No objection.

THE COURT: Mr. Harding?

THE WITNESS: No objection.

THE COURT: Exhibit 1049 is admitted.

You may continue.

(Whereupon, Exhibit No. 1049 was admitted.)

MR. MCKOWEN: Thank you. Thank you for your leeway.

On Exhibit 1049, I provided a copy to the

witness, Mr. Harding.

Q. (BY MR. MCKOWEN) Mr. Harding, can you read item number 3 in the court order?

A. The defendants shall comply with the provisions of the stipulation attached hereto, and such stipulation shall be incorporated into and made part of this order as if fully stated herein.

Q. So I would like to go to Exhibit 1048.

Can you read item 2.b -- 2.b, 2.a?

A. "Respondents shall pay $2,000,000.00 from the proceeds of any sale of company property. In the event the payment of $2,000,000.00 is not paid within twenty-four months from the filing of this Stipulation, an 8% interest rate shall accrue at the time of the execution of the Stipulation, (the Repayment Period).

"The Commissioner shall provide written notice to Respondents, that shall be sent certified mail, of any default of this Stipulation.

"Upon receipt of the Commissioner's notice, Respondents shall have 90 days to cure. If Respondent fails to cure, the Commissioner has remedies available specified in paragraph 2(d) of this Stipulation."

Q. Can you read 2.d?

A. "Dismissal and Release by Commissioner: In the event that the Respondents fully perform their obligations set forth in Paragraph 2.b. herein, the Commissioner shall release and acquit, and forever discharge the Respondents of any and all claims, rights, demands, obligations actions or causes of action set forth in the Complaint.

"In the event that the conditions for the forgoing release are not satisfied as set out in Paragraph 2.b., the Commissioner may enforce the total amount of Respondents' liability due under the Stipulation and include an interest of 8% as specified in paragraph 2.b."

Q. And one final paragraph is paragraph 3.a.

A. "Within fourteen (14) days from execution of this Stipulation and its approval by the Court, Two Rivers shall place the Orlando Reservoir No. 2 Company, LLC, and Two Rivers Farms F-2, Inc., in Chapter 5 Bankruptcy, or such other Bankruptcy relief that may be applicable, so that the Bankruptcy Court may equitably distribute any sale proceeds to individual investors identified in this action, which is the primary concern of the Commissioner.

"In part, the purpose of the Bankruptcy is to clear title on the assets that were improperly and

fraudulently incumbered by the Defendants and alleged unnamed co-conspirators."

Q. So item 3.a., again repeats the statement that the assets were improperly and fraudulently incumbered by the defendants and alleged unnamed co-conspirators.

What we read before, do you think that that ties into this agreement here?

A. You said "what we read before." Just recently just now, after the break, what we were reading?

Q. No. When we were reading the -- the statement that -- that the -- that these -- that you and I conspired in a creation of these deeds of trust, to transfer ownership to me and other defendants, and unnamed co-conspirators, do you think that statement is true?

A. No.

Q. And it's repeated in the last sentence of 3.a. What do you think the combination of those stipulations, which the Court has ordered to be fulfilled, what do you think that does -- or how does that set up the disposition of -- the distribution of those assets?

A. Well, it appears that there might be a

bankruptcy filing to try to wipe out the liens. However, my understanding of liens and legal system is that the lienholders have a right to appear and try to not make that happen.

Q. Have you been notified by the bankruptcy court of the filing?

A. No.

Q. Have the 14 days elapsed since this order?

A. Yes.

Q. What do you interpret of the statement that payment of $2 million releases Two Rivers from any obligation, a payment of $2 million within 24 months -- two years?

A. What do I think about that?

Q. Say again.

A. Did you ask me what did I think about that?

Q. Yes.

A. I don't think I have an opinion on it. I have nothing to do with Two Rivers or TR Capital. If that's the deal they want to work out and pay $2 million, that's their business.

Q. It relieves them of any obligations; is that correct?

A. I never released them of any obligations.

Q. Say again?

A. I never released them -- of them being Two Rivers and TR Capital -- of any obligation.
Q. So do you believe this has impact on your means -- deeds of trust?
A. Yes.
Q. Were you in the room as they say -- in the deal. Were you in the room when this deal was cut?
A. No.
Q. Do you think it alters your potential recovery of money both in terms of time and amount if -- if this agreement is acted upon?
A. Yes.
Q. We also were able to retrieve your --
THE COURT: You'll have to get to the microphone so the CART interpreter can hear you.
MR. MCKOWEN: Can you pull up Exhibit 56 of plaintiff's exhibits and take it to page 27?
Can you scroll up to the point where it tells us what this document is part of.
Q. (BY MR. MCKOWEN) So it's a form of the note that is associated with the subscription agreement for the $4 million note.
Would you agree, Mr. Harding?
A. It's pretty hard for me to see the screen what I'm doing now, Exhibit 56, what I have in front

of me. From what I've seen so far, it looks accurate.

Q. She has it pulled up on the screen.

A. So would you repeat the question again?

Q. Is this the note that investors in the $4 million note were subscribing to?

A. I believe so.

Q. And on page 27, does it talk about the security?

A. Yes.

Q. Can you read that or is it too difficult?

A. I can read it.

Q. Can you read it on your own?

A. What are you requesting, that I read it out loud or read it and then make sure --

Q. Read it out loud if you want to or you can just digest it.

A. I will digest it.

(Whereupon, there was a pause in the proceedings.)

THE WITNESS: Okay. I've read it.

Q. (BY MR. MCKOWEN) Does it talk about Huerfano County water rights?

A. Yes.

Q. Does it talk about Two Rivers Farms F-2?

A. Yes.
Q. Do you know that those properties are in Huerfano County?
A. Yes. I know for sure that the --
Q. And does it say in this security agreement here that -- that there was a junior deed of trust that -- excuse me -- that the deeds of trust relate to Pueblo County and a first deed of trust on certain real property, which is further spelled out in the deed of trust and the property in Huerfano County.
And so those deeds of trust secure this note?
A. Yes.
Q. And I won't waste any more of the Court's time on this. But I may bring it up in my own testimony. So let's move on from this and move to the next topic.
Mr. Harding, when I was the CEO of the company, the company being Two Rivers Water and Farming, what was the original entity that subsequently became Two Rivers?
A. The original one was Navidec Financial Services. I think one before that called Navidec, Inc. I think it was a publicly created company through reverse merger, but essentially I believe it

was Navidec Financial Services.
Q. This is my exhibit list. And I think it is material to start to combat this notion of a scheme and that these deals are necessarily complex, but they're not.
Would you agree with that?
A. Would I agree with -- be more specific, that it was -- would I disagree that it was a scheme? Yes.
Q. These deals are complex?
A. No.
Q. Do you think an average person on the street would understand what we're talking about?
A. I don't know about that. But accredited investors could go with a savvy investment. I don't think it's overly complex.
Q. So if you're not used to the vernacular or of 8-K, 10-Q 10-K, Form D, it's like me not being used to terms of -- defined terms in Colorado statutes in certain sections.
Would you say that in order to understand these deals, you have to understand the financial industry and especially as it relates to private placements?
A. I don't know if it's ultimately totally

necessary, but it certainly can help. Sure.

MR. MCKOWEN: So can we pull up Exhibit 1005?

MR. HARDING: Can I go get the exhibit book, Judge -- Your Honor?

THE COURT: Yes.

You said this is 1005?

MR. MCKOWEN: Yes, Your Honor.

What is that form?

THE WITNESS: It looks like -- I'm just looking at it now. It's a Form 10 --

Q. (BY MR. MCKOWEN) Does it have an acronym on like what form it is?

A. It's a Form 10-SB. It's for Registration of Securities for Navidec Financial Services.

Q. And so is this a document representation of a private placement?

A. No.

Q. What is it as compared to a private placement?

A. It's for registered shares. It's for a stock being registered.

Q. Right. And this document is filed with a regulatory agency. Who is that?

A. United States Securities and Exchange

Commission.

Q. And do you know when the Securities and Exchange Commission was formed?

A. When was it formed?

Q. Correct.

A. It was formed under the security laws in '93 -- I think it's '31 and '32 or '32 and '33.

Q. Right. And so the '33 Act, as it relates to determining what is -- determines what is required in the form of filing, in the form of filings in order to accomplish a registration of the shares.

And this SB-2, when the SEC -- does the SEC approve -- say we approve your registration?

A. Yes.

Q. Have you ever seen a registration say approved by the SEC?

A. Probably have or the other thing will happen too is with the SEC, I believe they have a comment period. And if there's no comment from the SEC, then it becomes effective.

Q. And they don't approve anything, they just say we have no more comments, right?

A. Yes.

Q. And so when they have no more comments, then you get to file a notice that says effectiveness

and you file that upon EDGAR?

A. Yes.

Q. Do you know what EDGAR is?

A. It's a filing that says for the Securities and Exchange Commission. It stands for electronic data gathering and recording, something like that.

For a while there, I always thought it was J. Edgar Hoover, but I was wrong. It stands for the filing system.

Q. Right. And it's highly regulated as well, the filing of those forms?

A. Absolutely. It's the Securities and Exchange Commission.

Q. And it's a vernacular on its own, same way the lawyers have a vernacular on -- that are trying too hard to stumble, fools like me trying to represent themselves. Not only am I not an attorney, but I'm representing myself.

And so that's how Navidec Financial Services came into existence as a publicly traded company, correct?

Who's the Company on there?

A. Navidec Financial Services, Inc.

Q. And does that address any issues in its filing that it became public through a spinoff?

A. I don't know.
Q. Okay. Anyway, it's a complex process. You have to have highly qualified attorneys to get these deals done if you don't want to find yourself in hot water.
Does it tell you what firm was representing the issuer in this case?
A. Yes.
Q. Who was that?
A. I believe it was Roger Davidson with Ballard Spahr Andrew & Ingersoll.
Q. And it's Roger Davidson?
A. Yes.
Q. And did we ever use Roger Davidson when you were with me?
A. Yes.
Q. And when we were using him, at that time, then there was a -- started to be a great collaboration of law firms. Do you remember the name of that firm?
A. I don't. I don't remember. I think Roger also -- I think he went out on his own, maybe not.
Q. Does the name Cohen Brandon Smith (ph) mean anything to you?
A. Say it again, please.

Q. Cowen Brandon & Smith?
A. No.
Q. The point being -- and I am trying to ask you questions about that.
As far as you know, have I ever done anything in the form of this type -- these types of documents on my own? Do I always employ legal counsel, as far as you know?
A. When you say "documents like this," like the registration statement documents?
Q. My thing is, I don't have a connected -- speak louder into the mic.
THE COURT: Is your CART not connected to your laptop?
MR. MCKOWEN: I will pull it up, but I lost it just like I was losing that one yesterday, and I don't want to take the time. If he speaks into the mic, I will hear it.
THE COURT: That's not going to work. We have a CART interpreter --
MR. MCKOWEN: No --
THE COURT: Correct --
THE WITNESS: I know we're on the record but --
THE COURT: Hold on.

THE WITNESS: -- I was just going to suggest the refresh button on the browser. It works.

MR. MCKOWEN: Okay. I'm back in.

THE COURT: You can ask your question again if you need to.

Q. (BY MR. MCKOWEN) Have you ever known, during the time you've worked with me, to -- for me to create the filings that we would submit to the SEC, the 10-Ks especially, the 10-Qs, what was a more usual methodology operating, as it relates to accountants and attorneys?

A. You hire them to comply with the requirements.

Q. And would you say that the attorneys that have represented us while you were part of that organization have been knowledgeable, well-informed, and provided us excellent guidance?

A. Yes. On the excellent guidance part, I don't know if it's excellent, but they gave us good guidance.

Q. And did I often have to be told, either on the accounting side or on the legal side that, John, you don't know what you're talking about?

A. Well, if you're asking for my comments, I don't think I ever said, John, you don't know what

you're talking about. But I do tell you that is not a right way of doing it. That's not the proper way of doing it. If that's what you're referring to.

Q. Have I ever told them or you as a CFO, and working with complex issues, that that doesn't make sense to me?

A. No.

Q. I have never told you that the way you value warrants doesn't make sense?

A. Yes. I'm sorry. Yes. We have had a lot of discussions on fair valuation of warrants, on impairment and appraisals of different assets, and on consolidation routines, yes.

Q. Have I ever tried to enforce, and have you ever said, okay, John, I'm going to do it your way?

A. Not when it comes to filings.

Q. Right. So there's been a lot of discussion about toxic work environment and how John McKowen dominated you.

As it relates to what matters, accounting matters, if you told me, this is the law and this is what the accountants are going to approve, otherwise you're not going to get this done, have I always acquiesced?

A. Eventually there are some areas we argued

about, but when the auditors say, no, this is it, then we complied.

Q. Okay. This is a securities fraud case.

Do you think that -- or do you know what the statutory requirement in a C.R.S. ruling to securities is for a toxic work environment?

A. No.

Q. Is it relevant, in your opinion -- because we know I'm hard to get along with. Everybody knows that.

But do I try to get you to do something that -- and are you that submissive to me that you would do something that you know isn't right?

A. I think that's a correct assessment. I would not do something in terms of a public representation, investor relations or filings that I did not agree with, so I would not sign that.

Q. And do you think any of the filings were knowingly fraudulent?

A. Absolutely not.

Q. And do you think any of our filings were designed to deceive the investor?

A. No.

Q. And the projections that we used and were provided to them, to the potential investor, did we

put them together, did I put them together, regardless of who it was, just -- with the intent of trying to deceive our investors?

A. Are you referring to the GrowCo pro formas that the plaintiff brought up yesterday as evidence?

Q. That's one of them. I mean, we provided pro formas for every investor, right, as part of our package?

A. For many years we had complex financial models that --

THE COURT: Hold on. You got to let him finish his response.

THE WITNESS: We haven't produced the four key financial statements all tied together, so -- and I was -- that was my main job. That was my deal, was doing pro forma financial statements for Two Rivers and its entities taken as a whole.

Q. (BY MR. MCKOWEN) And so for GrowCo, did you try to determine the price of marijuana in the marketplace?

A. No.

Q. Did you rely on someone else to provide you with that information?

A. Yes.

Q. And typically who was that?

A. As I testified yesterday, it's the growers, the people, and the greenhouse operators who know what they're doing.

I don't know, you know, the proper numbers for sales price, operational expenses, costs of goods sold. I just didn't know that.

I did know lease rates based upon the lease documents.

Q. And that pro forma yesterday, which was for the $7 million offering, when was that put together?

A. Well, we had another exhibit showing -- I think it's pretty accurate. It's showing the different offerings we had at GrowCo and the dates.

So I would say that $7 million memo offering, it was prepared shortly before the offering, the dates. I don't remember what it was, the date.

Q. Okay.

A. I think it was early 2016. Again, I --

Q. Let's go back to some exhibits that I do have that are relevant.

MR. MCKOWEN: Can you pull up 1008?

Who is it from and who is it to? Can you highlight that?

Q. (BY MR. MCKOWEN) So this is greenhouse

capital costs and upgrades?

MS. HUNT: Can we pause one second? I just want to make sure we're looking at the right exhibit but not to others. It's not matching my list, so...

We stipulated to this. Thank you.

THE COURT: 1008 is admitted previously by stipulation.

MR. MCKOWEN: Yes.

THE COURT: So you can ask your question.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) Is this an e-mail, as far as you can tell?

A. Yes. This is an e-mail.

Q. What's the date on it?

A. July 1, 2014.

Q. And that would be a time frame that was within this time period that's been defined in many exchanges of documents, right?

A. Correct.

Q. And this would have been in the early stages of trying to figure out what it would take to put this greenhouse in. Would you agree?

A. Yes.

MR. MCKOWEN: Can you pull that back up?

Q. (BY MR. MCKOWEN) Who is it from and who is

it to?

A. It's from Timothy Beall to yourself, Kristy Cameron and myself, and CC Strawberry Fields and Rich Kwesell, which at the time, this is our initial -- not maybe initial, but over the summer we went and visited the greenhouse that I previously testified, looking at their operations and their capabilities.

And I believe the discussion was Rich Kwesell, which he and his brother, Mike, I think still owns Strawberry Fields, a retail medical marijuana dispensary, in a few different areas, and they also want to get in the greenhouse business to do their own grow facilities.

So we were commenting about what it's going to cost, who's going to be leasing the property, and we were going to go out and get capital for this because we think it's a great opportunity. I summarized. But it's coming back to me now.

MR. MCKOWEN: Can we go back to that and can you highlight the bottom one-third of that?

Q. (BY MR. MCKOWEN) In this e-mail, is it telling us what the costs would be for putting up GCP-1?

A. Yes.

Q. What is that cost?

A. 2,321,000.

MR. MCKOWEN: I'm sorry. I want to get all the way to the bottom. That's my fault.

Can you -- is there a next page to this?

Q. (BY MR. MCKOWEN) Does that look like he's trying to tell us what we need to put on additional as bells and whistles to this project?

A. Yes.

Q. And one of those things would be a ton of supplemental light?

A. Yes.

Q. So his projected overall costs for the Cadillac, Mercedes would be 3.321 million?

A. Yes.

Q. Okay. That's the costs projection.

MR. MCKOWEN: Can we go to 1009?

THE COURT: This has not been admitted yet.

MS. HUNT: We did not stipulate to this one. We needed a little more witness testimony context for what it is.

THE COURT: So you'll have to establish a foundation for the exhibit through this witness or another witness.

Q. (BY MR. MCKOWEN) So -- at this point in time, Wayne, I had shifted your turn direction of Two

Rivers. Would you agree?
A. Yes. I think there was a comment there. Again, trying to figure out how we capitalize on our water assets and our land and the recent -- I think it was 2012, passed Amendment 64 or something of the Constitution of Colorado, that effective date was January 1st of 2014, that legalized recreational adult use of marijuana. So we started focusing a lot of our efforts on GrowCo.
Q. And so did we know anything about that, growing marijuana?
A. I don't think you did. But I can definitely tell you, I didn't know anything about growing marijuana.
Q. Right. And so we went out and started looking to see if there were people out there that would be willing to partner with; is that correct?
A. Right. We really wanted to find the best of the best.
MR. MCKOWEN: And so can you pull up --
Q. (BY MR. MCKOWEN) Did we eventually select Aaron Van Wingerden and Tim Beall?
A. We did.
Q. What is Tim Beall's -- what is his association with Aaron Van Wingerden and his efforts?

A. My understanding of Tim Beall at the time that we are talking about, he was the CFO or the controller for Dutch Heritage Gardens. And I also think that Aaron Van Wingerden's dad put him there to try to help out and oversee different items.
Q. So we met Tim Beall and Aaron Van Wingerden. And we can show you information on how we did that. But let's just say we decided to try to work with them on building this first greenhouse, so in line of building this first greenhouse; is that accurate?
A. Yes.
Q. And they provided us with numbers that they thought the job could be done with?
A. Yes.
Q. And what the yield would be, the results would be from that, if we were able to accomplish that, right?
A. Yes.
THE COURT: Are you offering the exhibit?
MR. MCKOWEN: I am offering the exhibit.
THE COURT: Any objection?
MS. HUNT: Yes. We don't know what it is, what the exhibit is, what it is tending to show or what date it is from.

THE COURT: Sustained. You need to provide additional foundation for the exhibit.

What is it?

MR. MCKOWEN: This exhibit is --

THE COURT: No. Through the witness.

Q. (BY MR. MCKOWEN) Is this exhibit a projection of operational costs?

A. For GrowCo, it is.

Q. For GCP-1?

A. Yes. I believe it is. That's GCP-1, and they would receive the expenses and the distribution or income.

Q. It's the greenhouse that we were going to build, the first greenhouse that we were going to build, right? We didn't even have raw land then, right? You still owned it?

A. Two Rivers still owned the land and was going to be transferred over to GrowCo and GCP-1 at the time --

Q. Right. Two Rivers still owned the land and they had identified the land that they were going to -- that they thought would be best for putting this greenhouse on. And do you remember that?

A. I don't think I was involved with land selection by then. I wasn't involved in that

conversation.

Q. So the e-mail that we're getting from -- Two Rivers is getting from Tim Beall lays out the costs per square foot and totaled for greenhouse number one; is that right?

A. Yes.

Q. And then the exhibit I'm trying to bring into evidence, it's for operational projections, right?

A. For GCP-1, I believe.

Q. Correct. Yes.

A. This, I believe, was put together to help go out and find a broker/dealer. We settled on merging growth equities in the Philadelphia area to help us raise funds, but we had to show pro formas of what we could do with being a landlord of that greenhouse.

Q. So we've got two projections. We have got projections for the costs of putting up the greenhouse and then we got projections for the operations.

And is it your understanding that they were prepared by Tim Beall?

A. The operations definitely were prepared by Tim Beall. It's a little bit easier in terms of

lease revenue and associated expenses. I might have done that on the real estate side of things.

Q. Well, this is what we got from them. Would you agree?

A. This particular exhibit, I can't say for certain that they gave this to us, this particular exhibit.

Q. You don't know if they gave that to us or not; is that what you're saying?

A. That's correct.

Q. Did we have a pro forma for GCP-1?

A. Yes, we did.

Q. Was it this pro forma?

A. We had several different pro formas of GCP-1, but that looks like a pro forma for the first greenhouse.

THE COURT: Are you re-offering the exhibit?

MR. MCKOWEN: I'm offering the exhibit.

THE COURT: Plaintiff's position?

MS. HUNT: We'll not object at this time. Thank you.

THE COURT: Exhibit 1009 is admitted.

(Whereupon, Exhibit No. 1009 was admitted.)

MR. MCKOWEN: Thank you.

Q. (BY MR. MCKOWEN) So what do you think this exhibit tells us in terms of operations?

A. Well, in my mind, this exhibit shows the leasing operation of the first greenhouse. You can see there the revenue was probably the income from the lease rates. Expenses are probably can -- common area maintenance or other type of expenses we might have.

And then there's the general administrative overseeing the property, that's what that appears to me to be.

Q. And so with our pro formas like the one yesterday, which I think you explained that way, which I think was the pro forma for the $7 million exchange note. What we're getting from the actual operator is their estimation of production, pricing, and then we calculate simple arithmetic. We calculate what we think the gross revenue is going to be?

A. No. I think they calculated the gross revenue. They knew the poundage and the production and they knew the price they were going to sell it out at. Maybe that put one times the other, put it in a spreadsheet.

Q. Thank you. We didn't have any idea about

the poundage, did we?

A. No.

Q. We didn't have any idea about production, did we?

A. No.

Q. And we didn't have any idea of the price we were going to sell it out, did we?

A. No.

Q. Correction. We, being universal, we in putting this together.

We didn't know anything about price, right?

A. Correct.

Q. Okay. And we in talking to them, intended for them to be the developer and the licensee?

A. Correct -- well, Dutch Heritage Gardens and Aaron Van Wingerden individually being a licensee under the name, Suncanna, but that's essentially correct.

We looked at them in my mind as subject matter experts that we needed to rely on to put the pro formas together.

Q. Right. You're right. And I stand corrected. We're talking about does this make sense economically to put something together. But the revenue stream is something like number of pounds,

price per pound, right?
A. Correct. But in this one, I don't think it's the operations of Suncanna. I believe this one is from GCP-1 for the rental of the building, our projections from the lease of the building, associated direct expenses, and what it means to be -- in this case it looks like net loss earnings or common shares.
This might be even before we did GCP-1. We were looking at just a Two Rivers consolidated standpoint.
Q. So in the top lines, the -- you got the revenue associated with production, right?
A. No. Again, I believe that this was revenue from the lease of a greenhouse that we wanted to build. It was not from operating a grow facility.
Q. You may be right.
How many square feet were in GCP-1?
A. Approximately GCP-1 total square footage was about 47-, 48,000 quarter feet, of which 40,000 was the actual under the greenhouse umbrella.
There was another couple thousand feet above auxiliary equipment room, and there was another 7- or 8,000 square feet footprint of the warehouse.
Q. Are you sure of those numbers?

A. Not positive.
Q. And GCP-1, number of square feet in the greenhouse is 47-, 48,000?
MS. HUNT: Objection. Mr. McKowen is testifying.
THE COURT: For that one, are you posing a question?
Q. (BY MR. MCKOWEN) I'm asking, so the total square footage inside the greenhouse, under the greenhouse umbrella, as you put it, you believe it was 47-, 48,000 square feet?
A. I thought it was --
THE COURT: Objection overruled for that question.
Go ahead.
THE WITNESS: I thought it was 42,000 for the actual greenhouse itself, but I could be off a few thousand square feet.
Q. (BY MR. MCKOWEN) Would it surprise you to know that it was 90,000 square feet?
A. For the one greenhouse?
Q. Right. For GCP-1?
A. No. I guess it would surprise me because I don't remember it to be that great.
Q. How many square feet was the warehouse?

A. I think 7- or 8,000 square feet.
Q. Would it surprise you to know it was 15,000 square feet?
A. It could be. As I mentioned before, it was 7- or 8,000 footprint. I know that there was offices that were constructed up above and other things that were added. So it wouldn't be that surprising to me.
Q. Okay. Did the construction costs for GCP-1 turn out to be 3 -- 3.2 million, whatever was up there?
A. No.
Q. Did you have any idea why it was greater than the projection that was given to us by Tim Beall and Aaron Van Wingerden?
A. I think they were -- well, they were wrong on their numbers. I came in at almost $7 million. I have it in the book somewhere, and I will incorporate that part of my testimony.
And the reason for that, there was some friction between Tim Beall and Aaron. There was -- I haven't proved it, but I've found evidence there was equipment that we purchased that went over to another greenhouse they were building.
There was some bad weather. And in the summer of '15, we couldn't construct for 2 or

3 weeks. It was really rainy.

So it was -- it was a lot of errors and some mountains in terms of taking of equipment and bringing it to a different greenhouse.

Q. You stated that you think there was friction between Tim and Aaron in the summer of 2015?

A. I don't know when it occurred. They might still be friends at that point in time, but there was friction, and I think that might have increased the costs.

In fact, when we tried to evict Suncanna, also known as Aaron Van Wingerden, for not paying rent because he lost his license, Tim was, at that point in time, not friendly with Aaron Van Wingerden.

Q. Was that in 2015?

A. Yes. Towards the late spring, summer 2015, is what registers in my mind.

Q. Would it surprise you that it occurred in 2016?

A. Not surprising. But it occurred in 2016. I'm going through the timeline whereby -- the eviction of Suncanna, I believe, was in mid to late '15. So it might be part '16, too. But in my mind it's 2015.

Q. Can you reconcile that statement for me?

Did we have any production in 2015, summer of 2015?

A. There was no production. I don't believe there was any production in 2015. We were in the process of evicting Aaron and trying to get additional tenants in.

Q. Do you believe there wasn't any production in 2015?

A. There was production, as I testified last -- yesterday.

Aaron Van Wingerden had production at the beginning of 2015, but the production was destroyed because he -- license was suspended and then revoked.

Q. We'll get to that. Hang on.

THE COURT: Hold on. Let him finish his response.

THE WITNESS: So after that, it took a while to get some additional tenants in to get back to grow again. So there might have been production towards the end of '15.

Q. (BY MR. MCKOWEN) You previously testified that you had difficulty in delays and getting the greenhouse built because of the bad weather in the summer of 2015?

A. Okay. So thank you for that jog. So it must have been 2016. So 2015, we're still getting

certificate of occupancy.
And I think Aaron, Suncanna moved in September of '15 under a TCO -- TOC, temporary occupancy certificate, and began production then.
Q. Do you believe that they moved in in 2015 while it was still under construction?
A. There was still things to do. But my understanding is you couldn't move in and start production till at least you have a temporary occupancy certificate. And I think we acquired that in September, October of '15.
Q. They started -- okay. And they started production in September, October of 2015. You previously stated that his license was suspended in 2015.
A. And that year, I will correct myself, is now early 2016, is when the issues started to fall in terms of the issue with his license.
Q. So construction was still going on in 2015. They occupied -- they actually were occupied the entire time because they were the developer, right?
A. I don't know if they occupied it because they were the developer, but they were developing the greenhouse and different things to do. But we wanted to get them in there when we had the TOC so we can

start producing, and therefore start paying rent to GrowCo Partners.

Q. Okay. Let's turn back to the concept of why the construction costs were greater than they had projected. Why do you think that was?

A. Well, as I previously testified, they missed the numbers. They missed the costs of construction. It was higher than what they represented by almost all the price.

I think part of that is mismanagement, part might be some friction between some partners or whatever. Part was, I was told, don't have proof, there was equipment that we purchased, lights, other facility, other improvements that ended up in a different warehouse.

Q. I believe the tension was starting to develop between Aaron Van Wingerden and me?

A. Yes.

Q. And did I ever mention that I believed I was receiving information that they were taking equipment and moving it up to Dutch Heritage?

A. Yes.

Q. And that they were not pricing -- was it clear to you that I was becoming upset with Aaron Van Wingerden, as it relates to the costs of putting up

this greenhouse and construction costs and missing equipment?

A. Yes.

Q. And do you remember me approaching the largest investor who was Mr. Morris?

A. You have had a lot of conversations with Mr. Morris. I don't know what you're asking about specifically.

Q. Do you remember me talking to you about I'm going to talk to Mr. Morris because it's going to be -- we need to stop this right now and finish the greenhouse on our own, and that this is a bad client, bad tenant, bad partner?

A. I don't remember you saying you're going to talk to Mr. Morris to me. I don't remember. That doesn't mean it didn't happen.

Q. Okay. Do you think that -- that I was dissatisfied with Aaron Van Wingerden because of the costs and the missing equipment and stuff like that?

A. Yes.

Q. And do you think that -- that Tim Beall was also becoming disenchanted with Aaron about that?

A. Yes. I think it would be about that. But I know they then started not getting along.

Q. Would you be surprised -- did you ever see

statements from security guards, Tim Beall in the middle of this process, that my fears were accurate relating to construction costs and all that moving equipment up to Dutch Heritage?

A. I saw a lot of indicative e-mails back and forth, and some conversations I overheard. It was definitely not harmony with that group.

And I think one of your issues with Aaron Van Wingerden was the blown budget. And we had investors we had to go back to and explain, not a good situation.

Q. Do you think I was keeping our investors apprised of what was going on?

A. Yes. Typically Mr. Morris was involved. He was involved, but I don't remember that conversation you were referring to. And that's how we had to go out and get the additional next raise, $4 million, to make up for the major cost of overruns.

Q. What was Mr. Morris -- what was his bite size as an investor?

A. Mr. Morris is a very competent, well-to-do investor. He has a CFA designation which is not easy to get a certified financial analyst.

His bite size? I've never asked for his

net worth or whatever. But from a broker/dealer and everything else, he was part of the Poehl (ph) family that came out of Philadelphia and Sun Oil Company. And so they had multiple different entities they invest in.

He would sometimes take 40 or 50 or 60 percent of our deal, and then he wanted us to work our butt off and raise the rest of the money. His bite size, if you mean investment size, was easily in the millions for us.

Q. Could Mr. Morris easily write a $2 million check?

A. Yes. It wasn't really checks. It was wires. But, yes, it seems...

Q. And was I communicating with him regularly?

A. Yes.

Q. And so is there a difference between the projections that you make at the time that you believe to be accurate and failure in those projections -- is failure in those projections fraud?

A. Well, we didn't anticipate failure, but it was, when everything is said and done. But what we put together, that was our best estimate based on information that we had.

Q. Do we have safe harbor statements related

to projections when we put them out?
A. Yes. Everything -- PowerPoint slides, we saw that on day one, we had safe harbor statements, projections and all sorts of stuff that can go wrong.
Q. Some of the factors included are beyond our control, is that part of the safe harbor statement?
A. Yes.
Q. And that generalized safe harbor statement that we put out with these projections, who prepped that for us?
A. I believe that came from Mark Johnson of K&L Gates.
Q. Okay. So you put together a pro forma. You included it with subscription documents, and you determine whether or not the investor is accredited, right?
A. Yes.
Q. And do you believe in any part of that process in -- in putting that together, that there was a statement inside those pro formas or the complex subscription agreements, do you believe there was fraud inside of that?
A. No.
Q. Do you believe there was the intention for us to deceive Mr. Morris or other investors?

A. No.

Q. Do you think that investors like Mr. Morris believed that we were trying to deceive them?

MS. HUNT: Objection; calls for speculation.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Did they -- did they, as investors, rely upon the documents that we gave to them?

MS. HUNT: Objection; calls for speculation.

THE COURT: Sustained.

MR. MCKOWEN: Okay. I'm not a lawyer, so... I'm trying to get at the elements of fraud here.

Q. (BY MR. MCKOWEN) Do you believe there was any false representation in the documents we put together while I was the CEO?

A. No. I mean, I believed there was no false representation.

Q. And we had no knowledge at the time. Did we have any knowledge at the time that the numbers that we were putting out and showing to them were false?

A. No. We had no knowledge of any false

information we were providing.

THE COURT: We're at noon. So find a good stopping point in the next handful of minutes, please.

MR. MCKOWEN: I can stop after this line of questioning.

Q. (BY MR. MCKOWEN) So did they know -- did Mr. Morris know or did you believe that Mr. Morris was a sophisticated investor?

A. Yes.

Q. Did they have what they call a family practice, a family office?

A. Yes. I would say that it would be a family office. But he also had a broker/dealer advisement or something through -- he was one of the main people on acute family office.

Q. Did he have an attorney working with him on reviewing documents and seeing whether or not they were sufficient?

A. Yes.

Q. What was his name?

A. Sam Morris. I heard there's only a distant connection in terms of Mr. Morris and Sam Morris.

Q. They're part of the Morris family that goes back to the 1600s, correct, do you know that?

A. I heard that. Never seen their genealogy.

Q. Do you know what that significance of the 11th-generation fund is?

A. I'm guessing one of the funds they invested in were application -- are different offerings as the 11th-generation funds. And that I think that means the 11th generation that's here in America. So they've been here a long time. But that's what I was told by somebody.

Q. Aside from the size of the amount of investment that he could make, did every investor receive the same information?

A. Yes.

Q. Let me remind you of one more thing and we'll break for lunch.

Did every investor have the opportunity to ask additional questions about the investment?

A. Yes.

Q. Did some ask additional questions?

A. Yes.

Q. Did EGE ask additional questions?

A. So EGE is Emerging Growth Equities out of the Philadelphia area that helped us raise money for the GrowCo Partners 1, LLC. That was the first raise. And they did their due diligence.

I think they came out with a cane, you know, looked it over, looked at the pro formas. And you do that as a broker/dealer to protect your clients.

So yes, EGE did a good amount of due diligence.

Q. Did they know that I had a pre -- what was an -- NASD sit-down in 1985?

A. I don't remember. It might have come -- I can't comment. I don't remember.

Q. Would it surprise you that Greg Berlacher, the CEO of EGE, asked for the information?

A. Wouldn't surprise me.

Q. Do you know that it was provided to them?

A. Don't know.

MR. MCKOWEN: Okay. That's it.

THE COURT: Mr. Harding, you may step down. We're going to take our lunch recess here in just a moment.

Just wanted to make a record on stipulated exhibits for plaintiffs. So I have listed 1 through, whatever the last number was, 141. I believe there were quite a few in there that were reserved. Some weren't actual exhibits.

So all exhibits, with the exception of the

following reserved exhibits, have been admitted. And let me give you a list of the reserved. It's fairly lengthy: 32, 38, 39, 42, 46, 58, 68, 69, 73, 74, 75, 76, 77, 78, 79, 83, 92, 97, 98, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 115, 120, 121, 122, 123, 124, 125, 135, 136, and 137 are the reserved exhibits. So those aren't exhibits yet. They're not admitted.

All the other exhibits that are on that exhibit list have been admitted by stipulation.

We'll take a lunch recess until 1:15.

Anything for plaintiff before we break?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Anything from you, Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: We'll see you back at 1:15.

(Whereupon, a lunch recess was taken at 12:06 p.m.)

(Whereupon, the proceedings resumed at 1:18 p.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And, Mr. Harding, I will have you come back up, and

you're still under oath, and continue cross-examination by Mr. McKowen.

Q. (BY MR. MCKOWEN) So I'd like to call or bring up Exhibit -- McKowen's Exhibit 1018. Do you have that?

A. I do.

Q. And what is that?

A. It's a filing with the U.S. Securities & Exchange Commission, noting your departure from chief executive officer of the company, along with some of the other duties you had.

MR. MCKOWEN: Could you highlight the body of the notice? Down here? The bottom half. Just the narrative. Okay. You can take that off.

Q. (BY MR. MCKOWEN) So that's an 8K, right?

A. It is.

Q. An 8K is how we formally announce, "we" being us in the industry, announce certain material events?

A. Correct.

Q. And so -- what date did I resign from Two Rivers, GrowCo, and all of its subsidiaries?

A. I believe it was May 26, 2016 -- no. You resigned May 25th as chief executive officer. And subsequently, the next day, you resigned from all

these other positions within our company subsidiaries.

Q. And so after that date, was I a part of any formal board meeting where it was just the board members of Two Rivers or GrowCo?

A. I'm going to reread your question. Just a minute. Yes.

Q. When was I an official board member in the board meeting?

A. That wasn't your question. I'm reading your question as so: You stated, after that date, was I a part of any formal board meeting where it was just the board members of Two Rivers or GrowCo.

Q. There were times when I asked to be invited as a guest, and I would appear as a guest. Would you agree?

A. Yes.

Q. And then after that, I was excused from the meeting so that the board could have -- convene the meeting without me?

A. Probably.

Q. Okay. So do you remember the board meeting that you had in June of 2016 that was a Two Rivers board meeting?

A. I don't know off the top of my head. I

think I remember seeing some minutes from that meeting as one of the exhibits previously.

Q. It was a meeting where -- and I will ask you if you can recall this, where you met with the board members of Two Rivers and you also brought Sam Morris on as a board member?

A. Okay.

Q. Okay. You remember that?

A. It would be better if I can see the minutes from the board meeting.

Q. I have an audio of that board meeting. I'm trying to avoid having to play that, but if that's what we need to do, that's what we need to do.

A. Well, believe me, I don't want to listen to the whole board meeting either. I'm just --

Q. It's 19 minutes --

THE COURT: Hold on. Let him finish his response, please.

THE WITNESS: I'm just trying to recall if there were numerous meetings. I'm just trying to recall.

MR. MCKOWEN: Can I jog your --

THE COURT: You're stepping on his response. Please finish your answer.

THE WITNESS: I thought that that was a

previous exhibit, but maybe that was a different board meeting, but maybe you can highlight some points to help me remember.

Q. (BY MR. MCKOWEN) Can I jog your memory about the meeting?

A. Please.

Q. So it was the meeting where you were trying to get passed the withholding, if you will, of the resolution to the investigation of me, so that I could start to raise capital for you?

A. Yes. I remember a discussion in that area, but probably was June of 2016.

Q. What did I say? I think I said -- anyway in June of 2016, right after I left?

A. Correct.

Q. And so in that meeting, did you say that if you don't get capital into this company, I might as well hand you the keys?

A. I don't remember saying that, but I know we were in a dire situation and we needed to do a formal investigation into the independent director's report and try to resolve that and then we can move forward for fundraising.

Q. And do you remember saying in that meeting that John McKowen has raised 90 percent of the

capital for this company?

A. I remember saying that in the past. I don't know what was in that meeting.

Q. Okay. And so part of my departure was a series of agreements that were put together that I've got listed in here on 1019, McGrow agreements. Can you pull that up? Do you remember these agreements?

A. I do.

Q. Were they approved by the board?

A. I believe they were, yes.

Q. Is it your usual practice to have meetings of substantial agreements approved by the board?

A. Substantial agreements --

Q. Material.

A. Material agreements particularly as it impacts the valuation of the company, the shareholders, the corporate company's (ph) the shareholders, yes.

Q. So there were a series of agreements that were signed.

MR. MCKOWEN: Can you highlight the agreements?

Q. (BY MR. MCKOWEN) So there was an advisory services agreement. Can you describe what the purpose of that was?

A. Well, I will. We went over this yesterday or two days ago, and for each one of those different constructs, different agreements, there is a section about would you provide.

Generally, I think it would be more specific to. But in general, I think advisory services are to help in the transition of your resignation to where we go in the future.

Construction services, you were going to take over the construction of GCP-1. I think that was more or less in operations. So maybe some maintenance items, but also to do the construction in GCP-2. Financing services would be, what you just referred to raise capital.

Q. So the overall purpose of these agreements, was it to help you in a transition of moving forward?

A. It was -- that was probably the primary reason to help me with the transition.

And also, trying to cooperate with you as you left, because it wasn't -- I would not consider that a friendly departure.

Q. On the day that we -- that I departed from the company, you testified yesterday that you weren't aware of a board meeting that had been called to fire me?

A. I was not aware of a board meeting for your termination, I believe.

Q. Okay. Neither was I aware. But there was a problem that we had that had to be solved inside the company. And the problem that needed to be solved was twofold.

The Coleman memorandum was still in place, which prohibited a public company from being an operator of a marijuana license. The other problem was is that if I was going to become --

MS. HUNT: He's testifying again. I object to that.

THE COURT: Sustained. You have to pose a question, please.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) Do you think the problem was twofold? And one of them was a conflict of interest?

A. As I mentioned before, there was a conflict of interest, but it was fully disclosed. So that was one of them.

Q. And the other one was is that a public company cannot operate a -- or was the other problem also a public company cannot operate a marijuana license at that time?

A. I believe that there was some talk in that area. I don't know if it was mentioned in the independent review report, but I think you brought that up a couple of times about the issue.

We, Growco/Two Rivers, because GrowCo was the subsidiary of Two Rivers, we could not touch the plant.

Q. And from your perspective, was it my solution on my own to -- and I believe this was 25, 26, to avoid the problems, that if I were to become a licensed marijuana person, that that would resolve this issue?

A. Let me think about that. Let me reread that question from you again. Just give me a second.

That was part of it. That perspective was correct. That was part of it. Again, the board picked on some of their other findings where they wanted to terminate their relationship.

Q. Had the agreement between Aaron Van Wingerden and myself already been completed?

A. I believe so.

Q. And that agreement was essentially Exhibit 116 (sic)?

MR. MCKOWEN: Can you bring that up, 1016? It's a member interest purchase agreement.

THE WITNESS: Yes. I remember that.

Q. (BY MR. MCKOWEN) And this membership interest agreement, purchase agreement, you didn't really have much to do with that creation development?

A. That's correct. I just heard that you and Aaron and maybe Tim Beall at the time debating, particularly the attorney's office, I think it was Husch Blackwell, trying to hammer out the deal. The membership interest of purchase agreement that you referred to.

Q. Do you remember the law firm at all that developed the agreement?

A. I thought it was Husch Blackwell.

Q. It was.

A. Okay. Thank you.

Q. And do you remember yesterday in Ms. Martinez's exhibit, she had indicated that the payment, that that was the payment to an investor?

A. I remember the conversation. I didn't know if she said it was to an investor or not, but in my mind it was improperly classified.

Q. Okay. Well, we'll review that. If I can move my own pace along and without interrupting you and trying to stick to what's relevant.

So that membership interest -- purchase agreement -- membership interest purchase agreement was a rather lengthy and complex agreement.

And do you ever remember what your role was in that? What -- how was it that you were enabled to see the bank account for...

A. You jogged my memory. Thank you. So part of the purchase agreement, unbeknownst to me until it happened, I was notified, is that I would act -- because there was a lack of trust between the parties. I would act as a CFO type of role to make sure the accounting was done right and the proper payments were made.

Q. And did you have -- view only access to those accounts or did you have the ability to write checks out of that account?

A. I don't think I was on -- I might have been on the signature card. You opened the bank account in one of the few banks at that time that would bank a marijuana business. And it was Pueblo Bank and Trust, not Pueblo Trust. And I believe I might have been on that account.

Q. In order to go on that account, did Aaron Van Wingerden have to sign something to allow you to come onto that account?

A. I think we all went down together and opened it up together with the banker. We made an appointment.

You had to wait several days to open a bank account, because you're a marijuana business. And we finally went there, and I think Tim Beall, Aaron and myself was there doing signature cards. I think maybe Aaron came a little later and signed the card. I just don't remember precisely.

Q. Do you know why it was that Pueblo Bank and Trust or was it -- Pueblo Bank and Trust, or was it Colorado Bank and Trust?

A. I think you're right. It's Colorado Bank and Trust.

Q. Do you know why they banked with Colorado Bank and Trust?

A. As previously mentioned, that's one of the few banks at that point in time that would bank a marijuana business.

Q. It was a state bank, right?

A. That's correct. State Charter, I think that was one of the reasons why they were able to do that. Even there was FDIC issues and things going on that I -- the banking business, Bank -- Suncanna's business.

Q. Did you ever attempt to write checks out of that account?

A. No. I don't think so. But one time I wired a payment out of that account to, I believe, GCP-1 for partial rent or I wired money out of that account, Two Rivers, for reimbursement.

I think, Aaron on this purchase agreement, I think he got paid $350,000. I remember getting a cashier's check January, February of '16, and coming down and getting that paid at your request.

Q. So if you did wire money out of that account, it was only at the permission or behest of Harrington that would --

A. He definitely knew that money was going to be paid out of that account. I don't know if I specifically got the signoff permission wire confirmation -- wire publication, or whatever they call it, but he knew the terms of the deal.

And, in fact, in this memo, you see Exhibit C here, it's missing, but we can put together a budget about cash flow coming in and cash flow going out. And that was part of that agreement.

MR. MCKOWEN: Did you have part of that agreement as Exhibit C that you can put up? Exhibit C was not included.

Q. (BY MR. MCKOWEN) So based upon your recall, you think that you may have wired money out of that account. That was the result of that $350,000 deposit?
A. I don't know if the wire was because of that 350,000. Let me add a little more clarity to Exhibit C.
I now remember that we were all going to get together and create a budget. When that agreement was signed, budget wasn't in yet, but the whole idea was to create a budget and maintain, you know, cash flow to that budget.
But I definitely wired money out of that account. I think it was $15,000. And then about two years later, Aaron turned around, sued me for federal wire fraud. That was real fun, too.
Q. Do you know where that $350,000 deposit, if it did come in, where it came from?
A. The $350- came from funds, I believe, Two Rivers and GrowCo, for the requirement of MIPA. Or it might have come from -- I'm a little confused. It came from one of our entities or it also might have come from you also, John. I just don't remember.
Q. I'm a little confused. Would it surprise you to know that any money paid to Aaron Van

Wingerden at this time was $350,000 that I paid?

A. No. That would not surprise me.

MR. MCKOWEN: Can you pull up 1017, please.

Can you just expand on the remitter, is the corrected phrase, which I think is in the left half portion of the check itself, so it came from me.

Do you know where I got that money from?

A. I do not. Let me put it this way. Maybe I did back then, but I don't remember. So either I did not or I did, but I forgot.

Q. (BY MR. MCKOWEN) Did you know that I had a partner in a proposed license for acquiring Suncanna's membership interest purchase agreement?

A. Now that you mention it, it's coming back to me. Was it Tim Beall?

Q. That's not accurate. Do you really think that's accurate?

MS. HUNT: Objection, Your Honor.

He testified he doesn't know.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Let's go back to the membership interest purchase agreement, if you could, please.

THE COURT: What's the exhibit number?

MR. MCKOWEN: Can you go to the first page?

Q. (BY MR. MCKOWEN) Can you identify the parties?

A. On each group -- limited liability company and Aaron Van Wingerden, individual himself, Suncanna, LLC.

Q. And can you go to the end of the agreement and see who the signers of the agreement are? So RH Group, LLC, is the purchaser and item -- the manager. Do you know who the managers of RH Group were?

THE COURT: Mr. McKowen, I'm going to stop you. You need to get out of the habit of just making an unsworn statement and then asking a question. It may or may not be directly related to that unsworn statement. You'll have a chance to provide sworn testimony.

But everything you're saying that is unworn is unpersuasive to me. It's not a sworn statement. Do you understand?

MR. MCKOWEN: I understand. It would be better if I went under oath and testified to certain things first before I start referring to them?

THE COURT: It would be better if you just asked questions of this witness and any sworn statements you want to make, you'll have an opportunity to do that later.

MR. MCKOWEN: And I'm truly trying to get this.

THE COURT: I understand.

MR. MCKOWEN: And so are you stopping me because I'm laying too much of a predicate rather than just asking the question?

THE COURT: Well, you're laying a predicate by just making a definitive statement as if it's true. And then frequently not asking the witness if that's true, correct, accurate, just making a statement and then asking a different question.

MR. MCKOWEN: I see.

THE COURT: It needs to be a question and a response.

MR. MCKOWEN: Okay. Let me see if I can get that right.

Q. (BY MR. MCKOWEN) Mr. Harding, do you know that RH Group was the purchaser of Suncanna's license?

A. Yes, I do now. The document is in front of me.

Q. Did you know who the members of RH Group were?

A. I don't remember.

Q. This agreement, I believe you testified

that you knew that -- I don't know -- who Husch Blackwell was; is that correct?

A. Yes.

Q. And did you have any conversations with the attorney from Husch Blackwell?

A. Oh, yes, yes.

Q. And do you remember who that attorney was?

A. For some reason, Larry pops in my brain, and I don't remember the last name, but maybe it will come to me later. It's one of those senior moments, but he seems to be very competent.

Q. If I gave you a name, could you say if it refreshes your memory?

A. That would help.

Q. Steve Levine?

A. That's it. Steve Levine. Thank you. That was him.

Q. Do you remember having conversations with Steve Levine? As problems developed, did those develop into the execution on this MIPA?

A. My memory says almost immediately.

Q. What were the problems associated with that, that you could remember?

A. There was something about that $350,000 check that was in Exhibit 1017. How it was supposed

to be spent and how it was really spent and not paid back. I think something happened there. I think that was the initial catalyst that started some issues.

Q. When you say there were problems associated with the $350,000 check, can you remember any of those problems?

A. I believe that there was restrictions in the $350,000 that might be covered in the MIPA. But where the 350 was supposed to go to on behalf of or being spent by did not occur.

I believe Aaron Van Wingerden used it for Dutch Heritage Gardens or past due energy bills or things like that. But this is what I had been told. I didn't verify all that.

Q. Were there problems between Tim Beall and Aaron Van Wingerden after MIPA was signed?

A. Yes.

Q. Can you tell me what some of those problems were?

A. I believe Tim began accusing Aaron Van Wingerden of stealing some capital items that we purchased for the greenhouse, and also not properly implementing all the lights, not buying the lights, having being charged for it.

I also think there were issues in terms of his management style, between -- in my view, we have three type A forceful managers and entrepreneurs, whatever you want to call it, and it just doesn't work out.

People were going after everybody else for, what I would consider stupid stuff. But there is some good stuff. If it was true, Aaron was, and I don't have proof of it, Aaron's stealing stuff that we purchased, that's an issue.

Q. "Stupid stuff." Aaron stealing stuff that we purchased, then that's an issue. Stupid stuff is what I'm seeing here.

Was your intent in that statement to say that's a real issue, not stupid stuff?

A. That's true. If there's steps involved involving personalities, conflicts occur. But if there's stuff involved, that's a major issue. Internal control governance and items like that.

So I don't remember saying that stealing was stupid stuff, but there was other stuff that I would consider just personality stuff, like come on guys, let's get together and get this thing to work.

Q. Do you remember any problems in the operation of the greenhouse between Aaron Van

Wingerden and Tim Beall?

A. What time frame period?

Q. In the time period between when the agreement was signed and before we could obtain a marijuana license, which we never did. Almost immediately at that time frame?

A. When you say the agreement -- MIPA that's an Exhibit 1016?

Q. Yes.

A. Okay. As I testified, in my mind, in my memory, almost -- I shouldn't say instantaneous. Give it a week or two or three weeks. There was a lot of conflict going back and forth between those -- the three; Tim Beall, Aaron Van Wingerden, John McKowen.

And it also impacted -- because keep in mind, at this point in time, Suncanna has lost their grow license with Aaron Van Wingerden being with Suncanna.

And so that's why our H Group was formed to try to get a license for, I believe our H Group -- or get the license back to Suncanna so they could resume grow again. But problems almost instantly arose.

Q. So before Aaron Van Wingerden lost his license, were there problems, physical problems,

associated with Aaron and Tim Beall?

A. I don't specifically remember that before he lost his license. I don't remember that. I think it was some construction issues.

The evaporated wall on the south end of the building was not fully operational and complete. There were licensing, electrician screwed up the amperage or whatever, some of the lights were blowing off, some of the yellow lights didn't exist.

Q. Do you remember a ditch screen blocking in Aaron Van Wingerden on the property in his truck?

A. Yes. But that's after. My recollection is that's after he lost his license. Tim, more or less took over, along with you, Mr. McKowen.

And there was essentially a water issue in one of the roads coming in. And so they wanted to fix that.

And being part of the management, GCP wanted to fix it. But then what happened was after that it turned into what I would consider trench warfare. Aaron and his people could not get in because the trench was sitting there not being worked on.

And so the large trucks and vans, whatever, couldn't go back and forth, so that ended up in

another lawsuit.

I'm going back to your question, Mr. McKowen. So yes, I remember a ditch being done. Locking in Aaron. I think at one time he was locked in at the facility and then somebody helped him out, and the ditch was bigger and he couldn't get back in.

Q. Do you remember the ditch being dug? Who dug that ditch and what was the purpose of that ditch?

A. As previously testified, the purpose of the ditch -- it was flooding. It rained a lot that season. So it was really muddy. It's hard to get trucks back and forth. So they were going to do us a drainage pipeline underneath the road.

And so therefore a ditch had to be built. An Tim Beall ended up -- he had some other people working for him.

Russ, maybe -- I forget his last name -- they had one of those small backhoes, I believe, and dug a trench.

Q. Was his name Russ Coppock?

A. Yes.

Q. What was his role? What was his role with the company?

A. I believe Russ was either a contractor for

GrowCo or GCP-1, or he was the employer -- he was the employee. He was, I would consider him to be the general manager guy. I don't think he was a grower or anything, but he helped maintain the facilities and the site.

Q. So would you say that the digging of the ditch stranded Aaron inside the circle of the ditch?

A. I think one time, and this is after multiple calls to the Pueblo County sheriff. I think at one time he was blocked in. And I got a phone call or whatever.

And I think I remember telling him -- I go, Tim, that's imprisonment. You got to at least let the guy out and then dig the ditch and solve the water problem. He was able to get out after a few hours, but he was mad.

Q. Who did you get that phone call from?

A. Aaron might have called me or Tim might have called me. I just don't remember. But I remember that I was informed that he was caught inside the facility.

When I say "the facility," I mean the land, you know, not inside the greenhouse, but the land -- couldn't get out.

Because the other thing that we did, you're

asking why can't I just go off the road. But the other thing that we did for security purposes -- so people in the middle of the night can't just drive the truck in, bust through the greenhouse and grab the plants. That's the theory behind it at the time.

So we did a -- a ditch, a 6-foot ditch around the entire property. That's 6-foot wide, approximately 6 foot with the berm. So no large truck could get out or get in. They would have to go through that access road and also the side parking (ph).

Q. Was that ditch a security ditch? So you couldn't drive trucks to the greenhouse warehouse?

A. That's correct.

MS. HUNT: Your Honor, I interpose an objection. I think we're going really far afield of the issues that are relevant.

THE COURT: Sustained.

MR. MCKOWEN: Can I respond to that?

THE COURT: Sure.

MR. MCKOWEN: There's the inference that I took over this license before any license was removed for me. At -- I'm trying to overcome that inference.

It's been stated by the plaintiffs that that's what happened. And I'm trying to establish,

and it's important because a major part of their case is John McKowen took over that license and he was running the company.

MS. HUNT: I would just correct that our issue is that he was attempting to take over the license through this MIPA. We have always agreed he never had a marijuana license.

THE COURT: I've been thinking for at least the last several minutes of these questions in my own mind what the relevance is. So the objection is sustained, and you need to get back to -- well, I think you can move on from the issue of why the ditch around this premises and whether or not Mr. Beall or somebody else was unable to get out. I just don't see how that's relevant.

MR. MCKOWEN: Okay. I will testify to it in testimony.

THE COURT: Well, it's not relevant. You won't.

MR. MCKOWEN: Pardon me?

THE COURT: If it's not relevant you won't testify to it. You can move on to a different area.

MR. MCKOWEN: I will try to make it relevant.

THE COURT: Thank you.

Q. (BY MR. MCKOWEN) I have a statement signed by Tim Beall that is contemporaneous with the operation of the greenhouse, and I would like to introduce that statement. That was authored by him, signed by him, and dated by him.

THE COURT: Well, you haven't identified the exhibit, and you haven't told me --

MR. MCKOWEN: Yes. It's 1022.

MS. HUNT: And we object to that exhibit as a hearsay statement not sworn.

THE COURT: Well, if it's Exhibit 1022, there hasn't been any foundation laid for that exhibit, so the objection is sustained.

MR. MCKOWEN: I will move on past the whole issue, and hopefully I can establish foundation. I thought I had the -- but I'll move on.

Q. (BY MR. MCKOWEN) Let's talk about the offerings after I left.

How many offerings were done after May -- effectively done after May 25, 2016?

A. I think we wrapped up one and we had two other ones. What happened with the two other ones, I think one was -- one was done in the past with investor feedback. We modified some of the terms and called it something different, and took the other

people with the information into that. With the new offering, but I think it was approximately two.

Q. So would you say there was a total of four note offerings, one after another?

A. No. There was not. I don't think there was four note offerings, one after the another. There might have been three. I think there's two equities, GrowCo Partners 1 and GrowCo Partners 2 and the other one was debt.

Q. Okay.

MR. MCKOWEN: Can you pull up the BCL list, audit and conclusion statement, 1032. The reason I'm asking to have that pulled up is to identify the offerings that were, according to them, completed after I left.

Question, Your Honor. Is that establishing a foundation for -- this is essentially the question for a common area of an exhibit?

THE COURT: Yeah. 1032 has already been admitted, so you can use it any way you wish.

Q. (BY MR. MCKOWEN) Mr. Harding, when you say that one of the note offerings -- and there's four note offerings up there -- are you referring to one that was completed, the one that was done in April 2016?

A. I am. That 1.5 million note was not very successful. So what we did is we took the persons that invested the hundred thousand, and I think they converted it into the $6 million note. And that still didn't have good traction. And so went to the $7 million note, I believe. That's why you have some date overlap.

Q. So the testimony has been so far that there was a substantial portion of these three, four offerings was done before I left; is that correct?

A. That's correct.

Q. And so if a substantial portion of those three or four offerings were done before I left, how is it that on -- in June of 2016, the company had no money? What is the total of those offerings, the ones that started before I left?

A. Are you asking me to add that up?

Q. Just ballpark?

A. Fourteen million -- 14 million, that includes the $6 million note, because we stopped fundraising after the board received the report from the independent directors.

Q. I'm having a hard time adding those numbers up to come to 14 million.

A. Three plus four is seven. Seven plus five

is 12. Twelve plus two is fourteen.

Q. I see the total raised for the $6 million note, the $7 million note, and the April 2016 note. Are those the totals that were raised right before I left?

A. So I believe that a majority, if not all, of the $6 million note was raised before you left.

Q. So let me restate my question. I left in May of 2016. And the testimony has been that I helped raise a substantial amount of those notes. So between, right before I left, for the notes, not the GCPS or GCP-1, what is the total of those three capital raises?

A. The total, I believe which is the total of first three, GCP-1, $4 million note and super units. Is that what you're asking?

Q. I guess I'm not being clear. Maybe I don't know what I'm doing. I lost my mind. For the three notes that were started in 2016 that went on until I left, what is the total of those three notes?

A. It is about 6.4 million.

Q. 6.1 million?

A. 6.4 million.

Q. Yeah. That's close. Not 14. If 6.4 million were raised between April -- or a

significant portion of 6.4 million was raised between April and May, how is it that we were out of money in June of 2016?

A. These date ranges are pretty large and broad. March 2016 and July 2016 and January '16 and January 2017. I would have to go back and look at the records -- but suffice it to say, we were spending an incredible amount of money trying to finish GCP-1, going through different lawsuits and operating the businesses.

Q. Okay. This morning I had copied and created a document that I want to use as an exhibit that is -- that comes from disclosure and Mr. Harding's Rule 26 disclosures. And it is an accounting --

THE COURT: You need to get in front of the mic, Mr. McKowen, so the CART interpreter can hear you.

MR. MCKOWEN: I sent them to Connor to print out.

THE COURT: Which exhibit number?

MR. MCKOWEN: It's an exhibit that is taken from disclosure from Mr. Harding that is a trial balance (ph) at -- he labels it as GC source and use of funds.

And I believe I sent a copy to him right before getting started -- or we resumed. Let me resend it now. It has been resent.

I provided it to plaintiffs earlier this morning, and it moves on to a new topic. And that's the GC sources and funds and use of funds. And I promise tomorrow I will have all exhibits printed that I intend to use for the day.

MS. HUNT: Could we ask if you have -- if Mr. McKowen has new exhibits he wants to show he send them to counsel. He has been sending some things to my paralegal, but he hasn't sent them to all of us.

THE COURT: Yeah. Whatever he's sending, we'll make you a copy right now. Are you talking about in the future?

MS. HUNT: In the future.

THE COURT: Okay. In the future, it needs to go to all counsel.

MS. HUNT: And I just want to get some clarification on how much longer Mr. McKowen intends to go. He's gone far beyond his time estimate in the order of proof and has had an opportunity to call Mr. Harding in his case. I just want to plan our witnesses.

THE COURT: Mr. McKowen, how much longer do

you anticipate your cross-examination taking?

MR. MCKOWEN: I will finish by three.

THE COURT: So another 40 minutes?

Connor, was that e-mail -- copied or was this the first time?

MR. MUELKEN: This is the first time.

THE COURT: Mr. McKowen, we'll have to mark that as 1050. For identification purposes, tell me what it is.

MR. MCKOWEN: This is a document that was in --

THE COURT: Mr. McKowen, can you give counsel a copy of those.

MR. MCKOWEN: Sorry.

THE COURT: If you can do it at the podium, at the microphone so that the CART interpreter can pick you up. And just tell me what it is so I can make a note.

MR. MCKOWEN: It's a -- labelled as GC, which I believe means GrowCo. Sources -- source and use of funds.

It's a -- starts with a compilation of the capital that was raised through 9/30/17.

THE COURT: Okay. I just needed a description in my exhibit list. So if you want to

try to establish a foundation through this witness, you can do that now.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) This is a document that was prepared by Two Rivers or GrowCo?

MS. HUNT: Objection, Your Honor.

He's testifying again.

THE COURT: Sustained. You need to ask the witness what the exhibit is and have him testify as to what it is.

Q. (BY MR. MCKOWEN) So I need to establish the foundation with him?

THE COURT: Correct. Unless it's a stipulated exhibit.

Q. (BY MR. MCKOWEN) Okay. Do you recognize this exhibit?

A. I do.

Q. And can you tell me what it is?

A. It was -- and I believe I created this document. After the forensic accounting report came out, I was really perplexed about how that account came up with 4-plus million dollars being misappropriated.

So this is what I took a stab at to see, you know, whether we're agreeing with her BCLS or

not, and whether we can account properly for the funds.

And so this is my work that I put together. During my testimony I did -- something a lot simpler to your understanding.

But it boils down to that there was a total -- in my estimation, back in September 2017, there was a total of $541,000 of expenditures over what capital was raised by GrowCo and affiliates.

And on the top of that, Two Rivers signed a promissory note for 455,000. So I'm trying to get my head around that report. Because that report is causing a lot of issues out there, the way it was broadly dissimulated.

And that was a reason also for the board to get together and do an internal audit report, which we'll hear from Mr. Harnish on Friday about the process and procedures that they went through to account for the funds received.

Q. So it's a report that we put together that is another -- it's evidence of what you believe the capital that was raised and how it was spent?

A. Correct. At that point in time.

Q. Up to 9/30/17?

A. Yes.

Q. I'd like to submit this into -- as an exhibit.

THE COURT: All right. 1050 is offered. Any objection?

MS. HUNT: No, Your Honor.

THE COURT: Without objection, 1050 is admitted.

MR. HARDING: I will go ahead and admit it. It's okay. I'm just a witness.

THE COURT: Not just, but no objection by you, Mr. Harding?

MR. HARDING: No objection.

THE COURT: 1050 is admitted.

(Whereupon, Exhibit No. 1050 was admitted.)

Q. (BY MR. MCKOWEN) So is it your testimony that the only funds that went to -- for use of Two Rivers Land & Water -- Water and Land was 540,000?

A. No.

Q. Can you explain what this report says then, line by line?

A. By each line item? Do you want me to do each line item? I don't know what you're asking me.

Q. Yeah, by each line.

A. Okay. So and again, this spreadsheet or whatever, it's probably part of a workbook that I

have substantiation for these numbers. So I'm sure I have it somewhere on my computer, because that's probably some files I took on my computer when I left Two Rivers.

So I believe that, and I believe that was net, the net funds received as of September 30, 2017, in capital raises was 18,033,385.

Then I examined the September 30, 2017, trial balance that we have. It was also reviewed by auditors, but not this particular worksheet, but the trial balance was.

And at that point in time, the GCP-1 total cost -- at that point in time, so this is coming from the September 30th trial balance which the accounting records, what we use to produce financial statements to keep track of cost expenses, whatever.

Q. Can I ask questions after each line item specific to that line item?

A. Fine with me.

Q. Okay. So GCP-1 total cost, what goes into that number?

A. That number consists of materials, labor, debt service, which is interest expense while construction takes ahold. Probably the land, the water and the admin fee that charged upfront that I

spoke about a couple of times.

Q. When you say "interest expense," what are you referring to?

A. We had a series of notes which were raised to build a greenhouse. Like any other real estate transaction, a development of real estate transaction, you capitalize the cost of your debt service until that facility is put into functions and to use.

Q. So at that point in time on GCP-1, part of that debt service would have been attributed to the $4 million note?

A. Yes.

Q. Okay. Would it also be attributed to tenant support?

A. I don't think so. Tenant support is an expense. So anything you do to support a tenant, that would be a deduction off of the lease income that we get.

Q. So the total cost is 5,826,513, the first line. And down below, you got "2015 GC Expenses." And then down below, you've got a "Parent Allocation 2014-61/2016 a 1,344,000." Is there any G&A for Two Rivers in those numbers?

A. No. And this is a part that requires

analysis. And that's why we approach it different ways.

We need to break up or to spread the G&A cost being a public company, legal cost, part of my time, a lot of John McKowen's time. Other time that corporately we were paying for out of Two Rivers Water and Farming Company, and TR Cap.

But GrowCo and related entities needed to pick up their fair share of the general administration expenses. So that was my allocation at the time, what should be allocated as a credit back to the parent.

Q. So from the beginning date, would the beginning date be from 2014 through 2016?

A. That one line item 1,344,000 as it signifies from June 2014 when we formed GrowCo through June of 2016, that was -- at this point in time, my analysis of the shared G&A.

Then the next line is the allocation based upon my analysis at that time for two months -- actually, three months, July, August, September -- sorry. It's 14, 15 months, from July of '16 to September of '17 of 272,800.

Q. So the funds were generated from 2014, and the end date on this is 9/30/17, but the funds were

generated from capital raises. And how many capital raises -- you indicated that the TR Capital was being reimbursed for some of their expenses; is that right?

A. TR Capital was essentially the operating company of Two Rivers Water & Farming Company. So therefore, we reimbursed either TR Capital or Two Rivers. It's essentially the same budget.

Q. Okay. So TR Capital --

A. Let me add one more thing. When I say "reimbursed," we had seven intercompany accounts. Not to get too technical, but debit one side and credit the other side.

So let's just take this number as just an example. Let's just say that if we didn't do this before, we just determined between 2014 and June 2016, we expended, which is low, because I reanalyzed this. But we expended $1,344,000.

So what will happen is on GrowCo's books, it says, we owe Two Rivers and TR Cap 1,344, and then the other intercompany side, we say, TR Cap and Two Rivers say, okay. You owe us 1,344,000. Therefore, when you consolidate financial statements, those two things wipe out because it's consolidated.

But to give an investor a clear idea of what's happening, that's why they require on the

financial statements, they have what they call segment reporting.

Segment reporting reports of each business unit on how much money they made, what was their cost of sales, what is their expenses, taxes, if anything, bottom line income or expense.

And that, my further analysis, which you'll see when I testify, is how I slice the onion again. Trying to figure this one out...

Q. Okay. So you indicated that TR Capital expended a certain amount of money on behalf of GrowCo or one of its affiliates GCP-1?

A. Yes.

Q. And during this time period, did TR Capital raise any capital?

A. No.

Q. Okay. So if TR Capital didn't raise any capital, the expenses that you're charging to GrowCo, and then I assume transferring that payment to TR Capital, came essentially all from GrowCo capital raises?

A. Most of it. Depends on what time frame you're looking at. If you're -- September 30, 2017, I think at that point in time, we had instituted our water development efforts to try to raise capital,

which we were successful in doing.

We also raised some short-term funds from doing crop loans with farms and produce, which I think I put $50,000 into -- through crop loan lien.

We also had 2,712 acres, I believe, in eastern El Paso that was part of the Sunset & Metro district that we actually own land on so we can control that district because of our landowners.

That was doing no good for us just sitting there and we weren't capitalizing on it.

So with the board approval, we began partialing off the lots into the 35 to 40-acre lots with associated domestic oil permits.

We met one of the board members who knows real estate. His name is James Cochran. You might see him on some of the other reports. He and I went down to the realtor and we began this process, surveying and doing other things to sell the land.

Quite frankly, it's out in the middle of nowhere -- just sagebrush and everything else. But I was amazed at how successful it was in selling those lots.

So our purchase price on the lots in El Paso was about $662 an acre. We ended up netting 14-, $1,500 an acre. So that's another way we were

raising money.
Q. Can I ask you to shorten your responses and just respond to the question that I'm asking.
A. Okay.
Q. The question is, did TR Capital raise any money on its own behalf during this time frame?
A. No.
Q. Did TR Capital use any of the funds directly or indirectly from the GrowCo Capital raises?
A. Yes.
Q. And how much did it use for -- of these funds -- did it use for the execution of TR Capital projects or whatever?
A. Just a minute. I'm reading the question. Could you expand on what you were asking about TR Capital projects or whatever?
Q. Okay. TR Capital raised $18 million. Of that $18 million, how much was used by TR Capital and what was it used for?
A. So I disagree with that first statement. TR Capital did not raise $18 million in cash. I will answer the second question now.
TR Capital was providing G&A services, like Two Rivers, kind of altered the -- providing services

and they got reimbursed for services to GrowCo incentives.

Q. I misspoke. GrowCo raised $18 million. Of that $18 million, how much was spent by TR Capital for G&A, general and administrative expenses?

A. Let's put TR Capital and Two Rivers together, kind of the same entity.

And so what I have in this report, it looks like, on behalf of GrowCo, they spent about 1.6 million during that time frame.

Q. So it's your testimony, under oath, that $18 million was raised by GrowCo, et al, and that TR Capital spent, charged, collected a total of $1.6 million for those three years?

A. I haven't -- I'm having a little bit of trouble with your questions, and I apologize if I extended my answer.

You asked about charge, collected -- spent, charge, collected, in my mind, those are three different buckets. Can you clarify your question, please.

Q. So -- and just plain layman's terms, GrowCo raised X amount for purposes that were spelled out in the use of proceeds. At -- from that use of proceeds, you have some allocations for corporate

purposes.
So whether it's G&A or some other corporate purpose, how much money was used by TR Capital, Two Rivers of that money, and what was the authorization for using that money?
A. So based upon this particular worksheet, it looks like there was an allocation of G&A of about 1.6 million.
The authorization dispended or reimburses for G&A, general administration, lies in the term sheets -- the term sheet -- term sheets of the GrowCo offerings.
Q. The total amount, whether if it was G&A or for any other purpose, how much money was spent of the money raised by -- from GrowCo investors, was used for any expense inside of Two Rivers or TR Capital?
A. According to this report, appears to be about 2.9 million to 3 million that was used.
Q. So it's not 1.3. It's 2.9 to 3 million. Is that what your testimony...
A. I'm sorry. Hold on. I got my lines mixed up. I'm sorry. It was pure allocation of 1,344,000 and pure allocation that 272,800, so that's approximately 1.6 million.

Q. So your testimony is now that for any expense inside of Two Rivers or TR Capital, it's gone from 1.3 million to 1.6 to 3.2 -- between 2.9 and 3 million, now back to 1.6 million?

A. As I explained, I was looking at the spreadsheet kind of crookedly, and I got some line items mixed up, I apologize. It's 1,344,000 and 273,000 on this particular report.

Q. So you have identified -- were you through with your answer?

A. Yes.

Q. So you have identified Two Rivers Land & Water 540,000, correct? It's about the fourth line down.

A. Two Rivers Land & Farming.

Q. Fourth item down on the list, Two Rivers Land & Water, 540,000?

A. Oh, yes. That's the 540,000, which is what I talked about a couple times before, which is the 250- for the administration fee. 250- for the water rights, and 40,000 for the land, for GCP water.

Q. Okay. And so that's one allocation.

Is there any allocation, any charge to GrowCo from the "2015 GC Expenses" of related 2477 (ph), of those expenses, is there any G&A expense

inside of that?
A. Don't think so.
Q. You don't?
A. Don't know for sure, but I prepared this. Unless I made an error, the overhead expenses are in the allocation. These are actual expenses, checks written, that type of thing, or whatever, and that's what I have down there, GC expenses.
Q. Okay. Again, I'm running out of time, and everybody has been very patient with me. But quick answer, inside of 2016 GC expenses, is there any allocation, any payments for G&A expenses inside of that?
A. Not to my knowledge.
Q. Okay. But you don't know for sure, right?
A. I don't know a hundred percent for sure until I trace back all of my work.
Q. In "2017, GC Expenses," there's 1,691,083, any G&A inside of that?
A. Not that I am familiar with.
Q. Okay. "Parent Allocation," who's the parent?
A. That would be Two Rivers/TR Capital.
Q. I'm sorry?
A. Two Rivers or TR Capital Partners.

Q. Okay. And so that's an allocation that is a Two Rivers allocation, right?
A. Yes.
Q. Two Rivers are GR Capital. And another allocation, 272,800 for the period of 2016 to 2017. So inside of Two Rivers Land & Water, 2015 on GC Expenses, 2016 GC Expenses, 2017 GC Expenses, and Parent Allocation, Two Rivers' allocation, which is -- that's a fairly large number. Have you identified and compared whether or not those expenses were authorized by or in the use of proceeds from each of these offerings?
A. Yes.
Q. Okay. And why is it identified as Parent Allocation rather than not Two Rivers allocation?
A. Don't know.
Q. Seems like it's kind of an nonsophistication; would you agree?
A. No.
Q. Okay.
MR. MCKOWEN: Nothing further, Your Honor.
THE COURT: Let's go ahead and we'll take a recess now. So, Mr. Harding, you can step down.
Mr. McKowen, I assume up there somewhere you have Exhibit 1048, 1049, and 1050?

MR. MCKOWEN: I do.

THE COURT: All right. Why don't we put those on the Court reporter's table so we don't lose those.

MR. MCKOWEN: 1050 and 1049.

THE COURT: Okay. I think you have 1048 as well, unless you already put it up here.

MR. MCKOWEN: I will bring the 1050 up --

THE COURT: And the 1050 is marked correctly, did you write 1050?

MR. MCKOWEN: I just marked it now.

THE COURT: That's fine. If you need to look over the recess, pull out 1048 and 1049. Make sure they're marked and make sure the Court reporter has them.

MR. MCKOWEN: Okay.

THE COURT: Okay. Let's go ahead and we'll take a 15-minute recess.

(Whereupon, a recess was taken at 2:48 p.m.)

(Whereupon, the proceedings resumed at 3:06 p.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And Mr. Harding, if you'll come back up.

THE WITNESS: (The witness complied.)

THE COURT: You're still under oath. You can make a sworn statement regarding any issues that you were cross-examined about.

And as I stated yesterday, once you finish making your sworn statement, then I will give the plaintiff an opportunity to redirect.

What would you like me to know? What would you like to say?

THE WITNESS: I just want to make a statement. And my statement is, I waive a right to make a sworn statement in this particular testimony, in the interest of time and courtesy.

So I want to make a statement, of course, so when I testify will cover that. So I appreciate the opportunity and wait.

THE COURT: Okay. That's fine. Any redirect based on questions that Mr. McKowen asked?

MS. HUNT: Yes, Your Honor.

THE COURT: Go ahead.

REDIRECT EXAMINATION

BY MS. HUNT:

Q. Okay. I'm going to follow up on just a few things, Mr. Harding, that we -- that you had talked about with Mr. McKowen today.

You went through quite a bit talking about sophisticated investors and accreditation. Is it your understanding that accreditation is a term of art?
A. Yes.
Q. Has a specific meaning?
A. Yes.
Q. Are you equating sophistication and accreditation?
A. No.
Q. So you understand they mean different things?
A. Yes. I think someone being a sophisticated investor may not be an accredited investor. For example, maybe someone's who's only worth a half million dollars, but they know what they're doing in terms of investment.
Q. And so being an accredited investor, on the flip side, it wouldn't necessarily mean they're sophisticated?
A. That's true.
Q. And accreditation, you understand, applies to registration exemptions, correct?
A. Yes.
Q. Is it you understanding it applies more

broadly than that?
A. No. I don't think so.
Q. We spent some time looking at the deeds of trusts that secured some of the notes. Do you recall that?
A. Yes.
Q. Can you pull up Exhibit 1015? And we talked at length about the first few in this -- in Huerfano County deeds of trust. Do you recall that?
A. Yes.
Q. I'm going to look at the Pueblo County deeds of trust. So the first one is, I believe is on page 12 of this document.
And is this a deed of trust that you filed?
A. Let me go get the hard copy, please.
Q. Oh, okay.
A. What was it?
Q. 1015?
A. Okay. I got it.
Q. All right. Can you look through these -- starting on page 12, the Pueblo County deeds of trust. Were these deeds of trust that you were involved in filing?
A. Yes.
Q. And if you look at the one on page 12,

which is at the top. It says, Official Records of Pueblo County Clerk and Recorder, has a 2017679 number.

A. Okay.

Q. And the date is October 2, 2015.

Do you see that?

A. Yes.

Q. If you look a little further down on the property, it's the "Northwest Quarter (1/4) of the Southeast Quarter (1/4)" in Pueblo County. Do you see that?

A. Yes.

Q. And if we go down to Exhibit A, the beneficiaries, is this the dead of trust for the GCP-1 equity investors?

A. Yes. I think so.

Q. Okay. And if you keep going down to the next deeds of trust -- actually, the next one is a copy of the same thing.

So let's keep going down to page 1 -- D1. Is this the deed of trust for this Pueblo property for the $4 million noteholders?

A. Yes.

Q. Okay. And it states, at the top, December 7, 2015; is that correct?

A. Yes.
Q. So is this behind the GCP-1 equity investors' deeds of trust?
A. I have to look at the date of recording. One moment, please. It is.
Q. Can you turn to Exhibit 56 in our -- can you go to page 27. This is part of the subscription information. This is the agreement. The subscription agreement?
A. Can you just give me the section? I cannot read it.
Q. It's section 5.
A. Okay. One moment please.
Q. On security.
THE COURT: And that's Bates 57283?
MS. HUNT: Yes.
Q. (BY MS. HUNT) Are you there?
A. I am now.
Q. And if you look at that paragraph 5 on "Security," it discusses:
"The notes are secured by certain assets."
And it references the first deeds of trust encumbering certain real property in Pueblo County.
A. Okay.

Q. And a junior deeds of trust in Huerfano County?
A. Okay.
Q. And we just looked at those Pueblo County deeds of trust, this $4 million note was not the first deeds of trust, correct?
A. Yeah. If this is referring to the same certain (ph) real property. I don't know if it, because we had additional property in Pueblo County.
Q. Okay. But it is not referring to the same -- if it is referring to that same property, it's not a first note?
A. That's correct.
Q. You spent a fair amount of time also looking at the Suncanna, the MIPA, for purchasing the Suncanna interest. Some suggestion that was part of the same property -- those were things beyond your control or beyond the company's control, correct?
That the issues with Suncanna and the problems with the tenants and all that stuff we talked about, those were things beyond the company's control. Do you recall that?
A. I think so. We probably have some control over it, but there was a lot of exterior issues.
Q. And Suncanna -- we talked about -- was

evicted because of the loss -- partly because of the loss of license, the loss of marijuana license?

A. Yes. That was probably the cause of eviction. Essentially, they didn't pay the rent. And so they -- they didn't pay the rent because they were not growing the marijuana.

Q. And just to confirm, you testified yesterday that they couldn't grow marijuana because of loss of license and that was partly because of Mr. McKowen's attempt to get involved with the company. Is that your understanding?

MR. MCKOWEN: Your Honor, I object.

THE COURT: On what grounds?

MR. MCKOWEN: That was --

THE COURT: You have to hold the microphone up to you.

MR. MCKOWEN: That was what I was trying to get to, is that -- was I trying to take control of this license. And I was essentially told to move on. And now she wants to revisit it.

THE COURT: Overruled.

When I told you to move on, you were talking about ditches (ph), and Mr. Beall not being able to get passed the ditches. That's when I told you to move on, so you can answer the question.

THE WITNESS: Repeat the question, please.

Q. (BY MS. HUNT) My question was, was the license, to your understanding, was a major reason why the license was suspended and then revoked, was because a nonlicensed person, Mr. McKowen, was trying to get involved?

A. I don't know if it's a major reason, but I believe that was one of the reasons. And I think the issue -- a report about the revocation of the license and why they did that.

Q. Okay. And I want to move on to -- I'm talking about the greenhouse and its costs. We have a fair amount of testimony about that. And I want to make sure if it's right.

Did you agree with Mr. McKowen that the greenhouse cost $7 million to build?

A. I think it's close to that.

Q. Okay.

A. I would have to check the records. I think it's six-something.

MS. HUNT: Can we pull up Exhibit 85? And we looked at this yesterday.

Q. (BY MS. HUNT) And the first page under highlights. And that second paragraph:

"GrowCo has completed construction of its

first greenhouse facility." And:
"Lease payments began accruing on September 1, 2015. The first greenhouse cost approximately 5 million to build or approximately $50 a square foot and estimates each additional greenhouse will cost approximately 5 million."
Do you see that?
A. I do.
Q. And this was a summary that was given to investors you were soliciting in front of GCP -- GCP Super Units?
A. It was.
Q. Did you ever tell any of these investors or potential investors that the greenhouse actually cost closer $7 million?
A. No. Because at that time we put that information, I believe, it was $5 million. There was additional expenses due to the damage and additional repairs and improvements to greenhouse after this was issued.
Q. Okay. So the original -- so if this was true, then the original cost of the greenhouse was 5 million?
A. This is -- no. It says, the first

greenhouse cost approximately 5 million to build. It doesn't say the original cost. At that point in time, we probably had $5 million in the greenhouse or whatever that date is.

Q. Okay. Let's move on to Mr. McKowen's departure. He had a fair amount of testimony about that. And we looked at the financing services agreement, and you looked at that yesterday as well. Do you remember that?

A. Yes.

Q. And you had mentioned that -- well, actually, first I want to understand. Did you know at the time whether Mr. McKowen was licensed to sell securities when you entered into the financing agreement?

A. I didn't think he was licensed to sell securities. He was an officer. My understanding, and it could be inaccurate, that officers of the company can solicit capital from investors without being licensed, and maybe that's a mistake.

Q. Was he an officer of GrowCo when he was entered into that -- the financing agreement?

A. No.

Q. Okay. When you were talking about the conflict of interests issue that had arose -- that

had raised the concern of some of the board members and you mentioned it had been fully disclosed. When you say "it had been fully disclosed," was that in Two Rivers' public findings?

A. Yes.

Q. Was that ever fully disclosed to GrowCo investors, outside of the Two Rivers filings?

A. Not to my knowledge.

MS. HUNT: That's all I have. Thank you.

THE COURT: All right. Thank you.

Mr. Harding, I have just a few questions. It's probably going to sound very basic, but I will give each side, and that includes you, an opportunity to follow up on my questions.

So at any time I ask questions, I make sure both sides or all three sides have an opportunity or all three parties have an opportunity to clarify if you need to.

EXAMINATION

BY THE COURT:

Q. So first question, would you agree that all the offerings in this case were securities?

A. Yes.

Q. And do you believe that you were legally permitted to sell securities?

A. Yes.
Q. How so?
A. Being an officer of the organization.
Q. So is it fair to say that you would agree that your belief is you were exempted from having to have a license to sell these securities?
A. Correct.
Q. And you -- off the top of your head, have a statute in mind that permits you to do that?
A. No. I had a couple people tell me. One was Mr. McKowen, and I don't know if an attorney told me or not, but -- no, I did not have a statute.
Q. Okay. Did you know Mr. McKowen had a prior bankruptcy before making these offerings?
A. No. I forgot when it came -- well, before making these offerings, a total of seven GrowCo offerings.
Q. Correct.
A. I don't think I was aware of it until at the very end, when it came up. So it was probably after the offerings was made.
Q. Was that before you resigned from these entities?
A. Yes.
Q. So did you know that Mr. McKowen had prior

regulatory issues before the offerings were made in this case?

A. I believe I did. And I talked to him about it, and we also talked to, I think Marc Johnson or some other attorney about it. And they stated that if the violation was 10 or 15 years or longer ago, then that would not be a disclosure issue.

THE COURT: Ms. Hunt, any follow-up on the questions I asked?

MS. HUNT: No, Your Honor.

THE COURT: Mr. McKowen?

RECROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Were you relying upon the advice of Marc Johnson, our SEC counsel, about whether or not the information about me, having a suspension in 1985, which was 30-plus years prior to this incident?

Did he advise us, you, in any way that this needed to be disclosed?

A. I don't know if it was from Marc Johnson, but it was from a legal source. And it might have been also discussion with Brent Berlocker (ph), who was the CEO of -- who did our broker/dealer the first deal, but something visioned in my mind that that did not need to be disclosed.

MR. MCKOWEN: That's it.

THE COURT: Mr. Harding, do you want to make any sworn statement regarding these questions I just asked?

MR. HARDING: No, sir.

THE COURT: You may step down. Thank you. Plaintiff's next witness?

MS. HUNT: We have a scheduling issue we'd like to discuss.

THE COURT: Okay.

MS. HUNT: We have -- the proceeding with Mr. Harding took probably double the time than was estimated.

Mr. Rome is actually here and could testify. It would be out of order, because we intended to do Mr. McKowen next. But we have -- Mr. Rome is not available on Friday. He is available tomorrow, but not on Friday. And so we propose going ahead and taking him out of order and getting him done today.

THE COURT: Mr. McKowen, do you have any objection to that?

MR. MCKOWEN: I do.

THE COURT: All right. As far as taking him out of order?

MR. MCKOWEN: Regarding the order, we had set this a couple days ago, and not under any circumstances was it proposed that Mr. Rome would be testifying today.

I was supposed to follow through and be a witness called to the stand and to do the cross on that. And so that time far exceeded any time period that would have been taken by the extended time period associated with the cross of Mr. Harding.

My -- I don't know that -- that you ruled on the -- whether they can testify or whether my attorney can provide a rebuttal witness, but he's out of town today. But he is scheduled to be back tomorrow and available tomorrow morning, and that's what time Mr. Rome was supposed to testify. If he could come tomorrow morning, that works just fine with me.

THE COURT: Okay. Mr. Harding, do you have a position?

MR. HARDING: No position.

THE COURT: So what I hear you saying, Mr. McKowen, is one, your expert isn't here to observe his testimony, and two, doesn't sound like you're prepared to cross-examine him today? Would that be a fair statement?

MR. MCKOWEN: Yes.

THE COURT: Ms. Hunt, do you respond?

MS. HUNT: I think we would prefer to get him done today, he's here. If that's not an option, I suppose we can start Mr. McKowen, if we can interrupt his testimony and have Mr. Rome testify tomorrow morning that would be preferable.

We are afraid that Mr. McKowen's testimony might go more than a day tomorrow and then Mr. Rome is not available on Friday.

THE COURT: So we'll take Mr. Rome's testimony tomorrow, even if that means interrupting Mr. McKowen's testimony. That happens frequently in cases, especially if it's a court trial. So we'll start with Mr. McKowen. Take us up to 5 o'clock today and then we'll stop. Mr. Rome can testify at 8:30 in the morning.

Mr. McKowen, according to the order of proof, Mr. Rome was the first witness up on July 13, which is tomorrow, so your expert should have notice about when he was expected to testify. And if he wants to be here, he could be here and he could listen to that testimony. Understand?

MR. MCKOWEN: I do understand. And so my rebuttal witness who was going to testify after Rome

tomorrow -- and so if we end up taking my testimony after Mr. Rome's testimony, we're going to go through the end of the day and he had blocked off tomorrow to do this.

So I'm perfectly okay to not only move Mr. Rome to first thing in the morning, but it would be -- my rebuttal is a working attorney with lots of commitments so he blocked out this day.

And so I would ask the Court allow him to testify after Mr. Rome and then restart my direct or whatever. If I'm being clear.

THE COURT: Mr. Rome looks like he's scheduled to take maybe two hours tomorrow morning?

MS. HUNT: I think that the direct is less than an hour.

THE COURT: People have any objection to the Court receiving Mr. Hart's testimony tomorrow?

MS. HUNT: We do have an objection to receiving his testimony in general. But as far as timing, it's not ideal to not rest our case first. But if Mr. Hart is not available and he is willing to testify, I think that would be okay.

THE COURT: So, Mr. McKowen, my suggestion to you is you ask Mr. Hart if he's available to testify on Friday. Pursuant -- after your testimony,

but if he's not available, then we'll take Mr. Rome in the morning. If there's any time left over, we'll take you for the remainder of the morning and then we can take up Mr. Hart after our lunch recess.

MR. MCKOWEN: Yeah.

THE COURT: Or we can do them consecutive. It just depends on how long Mr. Rome takes. If it takes us right up to, you know, fairly close to the lunch hour, then we can start Mr. Hart first thing after the lunch recess.

MR. MCKOWEN: So just knowing him and how busy he is, he would be blocking out the time to listen to Mr. Rome. And then if he could give his testimony, we should be able to get -- it's my understanding, if the timing of the testimony is correct, we should be able to get both of them in by the morning. And then we can get me, the continuation of my direct. Otherwise, he has to come in and come back later in the day. And I'm pretty sure that's not how he blocked out his schedule.

THE COURT: Well, you can at least ask him. My experience is, when I have physicians testify, they have to reschedule patients and that doesn't work.

I don't know if he has meetings or client

meetings scheduled, you can ask him that. If he has other professional or personal obligations on Friday that he can't be here, then so be it.

But I think the preference is, is that he testifies after you testify, because he's actually part of your case and not part of the People's case. So if he can alter his schedule, I'd ask you to inquire if that's possible. If it's not, then he could come back tomorrow morning and make a record if it's not. If we have to, we will take it out of order.

MR. MCKOWEN: Say again.

THE COURT: If we have to, we'll take him out of order. If we have to take his testimony out of order, we will, but that is not my preference.

MR. MCKOWEN: Okay. I will ask him and be straightforward so I can probably -- I will have the answer for you first thing in the morning.

MS. KIDD-AARON: Your Honor, may I make a comment for the record?

THE COURT: Yes.

MS. KIDD-AARON: I do want to also make a comment that Mr. McKowen took twice as long as he told us he was going to take for his cross, so that is part of the reason that our schedule has to

change. So I do not think that plaintiff should be punished for that.

THE COURT: I agree. I think the longer than anticipated testimony probably falls on you, Mr. McKowen. However, I don't see any prejudice to the People or to the plaintiff. So if we take that particular witness out of order, especially based on the anticipated testimony that I reviewed -- I reviewed his report, so...

I'll make a ruling on the motions in limine before we leave tonight, and then we'll discuss the order tomorrow. But it sounds like for right now, we're ready to go with Mr. McKowen, is that correct?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: All right. Mr. McKowen, if you will come up.

Yes, Mr. Harding?

MR. HARDING: Yes. A point of clarity. So I'm a little confused, and I'd like to know this for me to prepare --

THE COURT: Can you pull that microphone up to you?

MR. HARDING: Point of clarity for the next few days in court. Is Mr. Hart going to be allowed to testify or not?

THE COURT: I'm going to make that ruling at the end of the day.

MR. HARDING: Today?

THE COURT: Correct.

MR. HARDING: If you said that, I apologize.

THE COURT: That's fine.

All right. Mr. McKowen, you can put your laptop down and find a space there. And before you sit down, I'll swear you in.

Whereupon,

JOHN R. MCKOWEN,

the Defendant having been first duly sworn, was examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MS. KIDD-AARON:

Q. Mr. McKowen, please state and spell your full name for the record.

A. My full name is John Roderick McKowen.

Q. Can you spell that?

A. J-O-H-N, R-O-D-E-R-I-C-K, M-C-K-O-W-E-N.

Q. And do you currently hold any professional licenses or certificates?

A. No.

Q. Have you ever held any professional

licenses or certificates?

A. If you count a Series 7 license, the license to sell securities, as professional licenses, I had a Series 7.

I also had whatever allows you to be a manager of a brokerage firm. I was the owner of a brokerage firm and registered with -- it was the NASD during that time frame.

Q. Okay. And when did you hold those licenses?

A. I started holding them -- I started with Merrill Lynch and was trained in New York for that in 1978, and I surrendered my license -- or I was suspended in 1985 or '86. That suspension was initially for a month.

I think it went to SEC and they extended it, the suspension to a full year and then I did not -- I could have come back and reapplied but I didn't. And so in 1990, the SEC revoked my license for failing to reregister.

So from 1978 till I think 1986 or '87, but it was revoked for not paying the fees to be relicensed in 1990.

Q. Okay. So the question was, when did you hold those licenses? Is the answer 1978 to 1984?

A. You can say that it was, would be 1985/86.
Q. Okay. What is your educational background?
A. I have a four-year degree from Metropolitan State College. It used to be right across the street in the Forum building. And that was a four-year degree in economics.
And then that's the only degree I had. I went to law school for school. And that school, I was at DU for two years at night, but I didn't finish.
Q. So you have a bachelor's in economics and you went to law school for two years; is that correct?
A. That's correct. At night.
Q. Do you have any other degrees other than an economics degree?
A. No.
Q. And what is your relationship to the defendant companies?
A. I probably formed all of them. And if I formed them, I was the CEO until I resigned.
Q. So you formed Two Rivers?
A. That's correct.
Q. And you were the CEO until you resigned in May 2016?

A. That's correct.
Q. You formed TR Capital?
A. That's correct.
Q. You were the CEO until you resigned in May 2016?
A. That's correct.
Q. You formed GrowCo, Inc.?
A. That's correct.
Q. You were the CEO until you resigned in May 2016?
A. That's correct.
Q. And then again in October 2017?
A. In October of 2017, I became the CEO of GrowCo again.
Q. Okay. And you formed GCP-1?
A. That's correct.
Q. And you were the CEO until you resigned in May 2016?
A. That's correct.
Q. You formed GCP-2?
A. Yes.
Q. And you were the CEO until you resigned in May 2016?
A. That's correct.
Q. You formed GCPSU, GCP Super Units?

A. That's correct.
Q. And you were the CEO until you resigned in May 2016?
A. That's correct.
Q. You formed McGrow?
A. That's correct.
Q. What is your current position with McGrow?
A. McGrow is a dissolved company.
Q. When did you dissolve McGrow?
A. I'm not sure. Probably --
THE COURT: Mr. McKowen, can you pull out that microphone towards the podium? Thank you.
Q. (BY MS. KIDD-AARON) You formed VitaNova Partners, LLC?
A. That's correct.
Q. And you were the CEO, a managing member?
A. A managing member.
Q. What's your current position with VitaNova Partners, LLC?
A. I am a managing member and -- yeah.
Q. You formed VitaNova, Inc. with an I?
A. Correct.
Q. You're the CEO?
A. Correct.
Q. What is your current position with

VitaNova, Inc.?
A. I believe that entity dissolved as well.
Q. You formed VitaNova Colorado, LLC?
A. That's correct.
Q. You were the managing member?
A. I was, yes.
Q. What is your current position?
A. That -- I believe that entity has dissolved as well.
Q. And you formed VitaNova, LLC?
A. That's correct.
Q. You were the managing member?
A. That's correct.
Q. What is your current position with VitaNova, LLC?
A. I believe it's dissolved.
Q. As we've discussed during this trial, multiple times, GrowCo was a subsidiary to Two Rivers, correct?
A. Initially, yes.
Q. When GrowCo was dissolved in, I believe 2018, what was its relationship to Two Rivers?
A. It's a dissolved corporation that has assets that shouldn't be dissolved pursuant to dissolution of statutes in Colorado, and any proceeds

from the dissolution should be distributed according to dissolution rules in Colorado.

Q. Okay. The question I asked was, what was the relationship between GrowCo, Inc., and Two Rivers when GrowCo, Inc., was dissolved?

A. When GrowCo, Inc., was dissolved, Two Rivers owned a little more -- I think it owned about a little over 30 percent of the shares of GrowCo.

Q. Two Rivers owned 30 percent of the shares of GrowCo?

A. Correct.

Q. Okay. So was it still a subsidiary?

A. Yes.

Q. But it wasn't wholly owned?

A. No.

Q. So whether you created Two Rivers, Two Rivers was initially a company that was built to utilize water rights, correct?

A. I would say that Two Rivers was formed to acquire and develop water rights and associated land in Colorado.

Q. Okay. And the water rights were not producing enough money for overhead, so you moved into farming, correct?

A. That's correct.

Q. And at some point during that farm adventure, Two Rivers acquired Dionisio Farms, correct?

A. Correct.

Q. At some point Dionisio Farms was profitable?

A. I think it was cash flow positive. I don't recall if it -- I believe it was cash flow positive and whatever the distinction is between that and reported earnings. I don't know that I could state that it was reporting earnings. I believe the only thing it was was cash flow positive.

Q. And during that farming time, Two Rivers also agreed that Two Rivers F1 and Two Rivers F2 -- Two Rivers Farms F1 and F2?

A. Yes. It acquired land and water rights prior to the move into farming. It was originally named Two Rivers Water, and then we started acquiring water -- farming assets, productive farming assets, to Dionisio Farms.

Q. During the time that Two Rivers moved into farming, Two Rivers Farms F1 and F2 were created, correct?

CART INTERPRETER: Sorry. Your Honor, can I get her to repeat that question?

THE COURT: Yes.

Q. (BY MS. KIDD-AARON) Yes. I said, during the time that Two Rivers moved into farming, Two Rivers Farms F1 and F2 were created?

A. That was the -- I believe those were the initial farms that were acquired that caused or precipitated the changing of the name to Two Rivers Water and Farming Company.

Q. And that was during Two Rivers' venture into farming, correct?

A. That's correct.

Q. The farms Dionisio F1 and F2, also did not have enough money to cover operations, correct?

A. That's correct.

Q. So you were approached or somehow came into contact with Aaron Van Wingerden and Tim Beall and the idea of GrowCo was launched, correct?

A. As a matter of timing, I would say I made the decision that the -- creating cash flow, the time frame for creating cash flow was much longer than I originally anticipated.

And I went about seeking someone to -- that would potentially be a tenant if we put up greenhouses, state of the art greenhouses. And I don't know exactly whether I was referred to Aaron

Van Wingerden and Tim Beall or they heard me and called me. I'm not entirely certain who contacted who first.

Q. Okay. So you decided to put up greenhouses to grow marijuana and GrowCo was the next venture to Two Rivers, correct?

A. No. We decided to put up greenhouses to lease to licensed growers who were growing marijuana.

Q. And GrowCo was the next venture for Two Rivers, correct?

A. And we formed GrowCo to see if we could develop cash flow, correct.

Q. For Two Rivers?

A. For both the investors and GrowCo and Two Rivers, because at that time initially Two Rivers owned a hundred percent of GrowCo, and when we finalized the deal with Aaron Van Wingerden, they received a third of the shares. Two Rivers received two-thirds of the shares. And then Two Rivers declared a dividend to the shareholders of Two Rivers for a third of the shares.

So at the end of that evolution, Two Rivers owned a third of outstanding shares of GrowCo. The shareholders of Two Rivers of record for each of the four quarters in 2015 were to receive --

Q. Mr. McKowen, I'm going to stop you.

The question that I asked you was, was GrowCo created as the next venture of Two Rivers?

A. I'm sorry. I thought you asked me if -- I thought I answered that. And then you asked me about -- okay.

Q. So, yes, is the answer?

A. Yes.

Q. Was Marc Johnson your legal counsel for marijuana-related issues?

A. Yes.

Q. Was Marc Johnson the one who informed you that a publicly traded company could not be a marijuana business?

A. No. He wasn't. So let me back up and change the response. Marc Johnson created the safe harbor language that we put out with each of the presentations.

But I got a phone call from an attorney who I used in the past, and he called me up and said, I'm going to give you some free advice, John, and you need to know that the public company cannot be the holder of a marijuana license. So make sure you draw a bright line between the leasing and the growing or the selling or the processing.

Q. If Two Rivers had not pulled a marijuana license, could Two Rivers participate in activities that required a marijuana license?

A. Depends on what you mean by activities that are required for a marijuana license.

Q. Mr. Harding testified that entering the greenhouse without a licensed party required a license?

A. No. I think he testified and I was going to ask him to clarify that. I think he testified he couldn't enter the greenhouse without the landlord taking you through.

Q. That was not his testimony.

So is it your testimony that an unlicensed party can enter a greenhouse that was growing marijuana without an unlicensed party?

A. Well, it was his testimony. I wrote it down at the time. But I'm not trying to argue with you. You're correct. You cannot just -- you can go into a greenhouse if you sign it and you're with a licensed party, preferably, the approval of whoever the owner of the license is.

Q. So an unlicensed party needs to be accompanied by a licensed party?

A. That's correct.

Q. So back to my original question. If Two Rivers could not hold a license as a publicly traded company, could it participate in activities that required a license?

A. Yes. I mean, again, it depends on what you mean, what activities that they are doing. If they're the landlord, we have the right to go in and repair. We have the right to inspect. To see if there was any potential damage to the property. But I think we're required to give them a 24-hour notice and to arrange for a licensed person to be with us.

Q. So the landlord needed to be with the licensed person or be licensed to enter?

A. That's correct.

Q. So how could the landlord be licensed if Two Rivers could not hold the license?

A. The landlord didn't need to be licensed. They're all kinds of facilities around the state where an unlicensed person owns those facilities and leases it out to a licensed person.

So I guess I don't understand your question.

Q. So you just testified that you either need to be licensed to enter the greenhouse or you need to be accompanied by a licensed party?

A. Right.
Q. Mr. Harding testified that he held a license?
A. Yeah. I think he did. I think he got the license as part of the MIPA agreement.
Q. Mr. Harding was an officer of Two Rivers?
A. That's right.
Q. So how can Mr. Harding hold a license as an officer of a publicly traded company?
A. I don't think that he was holding the license as a -- with the intention of being a grower or being someone who processed or provided delivery or anything like that.
I think he was performing that duty, and there's different levels of licenses I understand. But I don't think that he was violating any laws by holding a license as part of the MIPA agreement.
Q. Does the Colorado marijuana law make that distinction?
A. I don't know.
Q. Okay. So then you don't know if he's violating the law if you don't know the Colorado law?
A. What I know is he obtained a license. Is this one -- is this a marijuana case, because I didn't prepare to know what the marijuana licensing

requirements are.

Q. So you don't know if he's violating the law?

A. No. I don't know if he was violating the law by obtaining a license on behalf of -- through the MIPA. I read that that was created by attorneys that we were relying on.

MS. KIDD-AARON: Can you pull up Exhibit 25, please.

Q. (BY MS. KIDD-AARON) So as of today, this exhibit has been stipulated to?

MR. HARDING: I'm sorry, did you say --

MS. KIDD-AARON: 25.

THE WITNESS: So basically lease terms?

Q. (BY MS. KIDD-AARON) Yes. So, Mr. McKowen, this is a lease between GrowCo, Inc., and Johnny Cannaseed. Johnny Cannaseed is one of your companies that is not named in this case. If you turn to -- if you turn to page 3.

A. Okay.

Q. Section 2.4 through 2.6.

A. Okay.

Q. It lists the "Cole Memorandum," the Colorado Marijuana Code and Colorado Retail Marijuana Code, and cites to those laws. Do you see that?

A. I do.
Q. As a leaseholder, was it your responsibility to understand these laws?
A. Let me read. "Cole Memorandum" shall mean the memorandum for all United States attorneys issued by the U.S. Department of Justice and written by Deputy Attorney General --
(Court reporter asked for clarification.)
THE WITNESS: Why don't I just read it silently to myself so I can understand.
I understand those are the definitions of what those things are.
Q. (BY MS. KIDD-AARON) Okay. So was it your obligation to understand those laws. Why is it included?
A. I don't know why it was included in this agreement, but it is, so...
Q. So you signed the agreement without knowing the terms?
A. I can tell you then and now, I don't know what the requirements are for retail marijuana license, medical marijuana license, or the full understanding of the Cole Memorandum, and I signed this agreement.
Q. So you signed an agreement without

understanding the terms?
A. If those codes are required to be understood in a lease agreement, the terms of the lease agreement, I suppose I'd like to see whether they're part of the terms of the lease agreement and how they're used inside this document.
Q. Okay. Again, the question is, did you sign this agreement without understanding the terms?
A. Yes. I did not fully understand those terms and...
Q. So when the accredited investor signed their large agreements for their investments, did you expect them to understand all the terms?
A. No.
Q. Okay. So there's a good chance that you were in violation of the marijuana laws and did not know it?
A. I don't know if there's a good chance. I think that's a pretty far leap to say by signing this lease agreement I'm in violation of the laws.
Q. Well, you said you did not understand the laws, correct?
A. Right.
Q. You said you signed this lease agreement that mentions the laws without understanding them,

correct?

A. I said to you that I don't understand these laws as they're fully explained or contained inside of this agreement.

Q. Okay.

MS. KIDD-AARON: Can you pull up Exhibit 37, please.

Q. (BY MS. KIDD-AARON) So Exhibit 37 is a PowerPoint that was distributed to investors. Says, "Connecting Investors With Marijuana" on the front page. The second page, it says, "Safe Harbor Statement" I believe you referred to.

A. Okay.

Q. And it says towards the middle of the page:

"Factors that may cause actual results to differ materially from those contemplated by such forward looking statements include, without limitation, the market price of marijuana, changes in applicable statutory and regulatory requirements regarding marijuana, uncertainties in the laws regarding the legal use of marijuana, the strength and financial resources of our competitors."

So in your Safe Harbor Statement, includes

changes to marijuana laws, potentially being a material factor in your future living statements. How would you know the changes to marijuana laws if you don't know the marijuana laws?

A. That's the point of the Safe Harbor Statement. It's saying that these things could change without knowing exactly what those uncertainties are. Their disclosing -- the point of the Safe Harbor Statement is to let investors know what you don't know or what you're not telling them about it. That it's a risk associated with the deal. That's the whole point of the Safe Harbor Statement.

Q. Does the Safe Harbor Statement say that you do not understand the marijuana laws?

A. No.

Q. Does the Safe Harbor Statement say that you may not be in compliance with the marijuana laws at the time that you were releasing this document?

A. It says it could be a possibility.

Q. It says that the changes -- could be changes in applicable statutory and regulatory law.

A. That's right.

Q. Does it say that you do not understand the current and statutory and regulatory law?

A. No, it doesn't say that. But going back to

the agreement, show me how it's applicable to that lease.

Q. Do you think that investors would want to know that you do not know the current statutory and regulatory law?

A. I don't think it's a discloser requirement.

Q. Do you think investors would want to know that you don't know the applicable statutory and regulatory law?

A. I will respond the same, I don't think it's a disclosure requirement.

Q. That wasn't my question.

A. I don't know what an investor would want to know.

Q. So if you're selling marijuana or marijuana -- you're in a marijuana-related business, do you think it's important for investors to know that you do not know the applicable laws?

A. I don't think it's a disclosure requirement. I don't think -- there's a thousand different associated businesses, like my providers, like construction people.

I don't think that all of those people know what the marijuana laws are and that it's -- that they're amorphous, and that that's a risk in this

deal. The point of the Safe Harbor Statement is to say what the risks are.

Q. Does the Safe Harbor Statement say that you don't know the applicable laws?

A. That's about the fourth time you've asked me that, and I will say that I don't think that that's a duty of ours to disclose that.

Q. Well, I'm probably going to keep asking until you answer, so...

A. Well...

Q. Do you think it's important to know what laws you are potentially violating?

A. I think it's something that an investor should be aware of as a risk. I'm not violating any laws. You're jumping from not knowing how it applies to the lease, which we should look at, to saying that I should know how it applies to the lease, and I should tell investors what that means.

Q. I'm not asking you about the lease right now. I'm asking you about the Safe Harbor Statement.

A. You predicated these questions on what was contained in the lease, right? We are in the leasing business.

Q. Can you please turn back to the first page.

A. (The witness complied.) Are you responding

to me?

Q. Mr. McKowen, can you please read what it says on this first page of Exhibit 37?

A. Connecting Investors with Marijuana. The Safe Harbor Statement?

Q. Yes. It's on the screen.

A. "Connecting Investors with Marijuana."

Q. Anywhere on that page does it say anything about leasing?

A. I'm confused about the exhibit that I'm supposed to be on. I'm sorry. The top says 37, and when I flip it over it says Exhibit 35, and then it says, "Connecting Investors With Marijuana."

Q. Okay. Does it say anything about a lease?

A. Well, that's the title page of the presentation --

(Court reporter asked for clarification.)

THE WITNESS: This is a presentation that was prepared. And I don't know if it was given to investors or not.

Q. (BY MS. KIDD-AARON) Mr. McKowen, the only question I asked, does it say anything about a lease on this page?

A. On "Connecting Investors With Marijuana"?

Q. Yes.

A. No.
Q. Can you please turn to the last page.
A. The last page of this exhibit?
Q. Yes.
A. (The witness complied.)
Q. Whose contact information is on this page?
A. Mine.
Q. Did you prepare this document?
A. Probably.
Q. Okay. So if you were providing investors with a presentation titled, "Connecting Investors With Marijuana," does it seem important that you understand the marijuana laws?
A. No, it doesn't. It talks about building greenhouses.
Q. Can you please turn to Exhibit 61.
So as we've established, you were the founder, and I guess managing member -- I can't remember if McGrow was an LLC or not -- of McGrow.
This is a solicitation that you sent to investors. Mr. McMahon testified to receiving this solicitation from one of his friends. This is originally from you.
This second paragraph starts with:
"This is the least risky, most rewarding

offering I have brought to you."
Did you draft that?
A. Yes. For Jeff Ploen.
Q. And it says:
"We even have the wholesalers champing at the bit to sell them the product. As with the flower, we sell out all product each week on our McGrow Marketing web site, bestbud.net."
Did you draft that?
A. Yes.
Q. Who is "we"?
A. It is the collective of like I said several times in the -- through these discussions. It's a sense of the word "we." And so the "we" is us as landlords providing the facilities to our tenants and they're the ones that are operating it. And so that's the "we" that I intended to say.
Q. So "we" includes McGrow?
A. Yes.
Q. So "we," including McGrow, are selling marijuana products?
A. No. We are lending capital to the licensee to pay for labor and machine fees. With that, "we" and the tenant and licensee are in business. Meaning

that we are going to start receiving rental revenues.

Q. So it says:

"We even have the wholesalers champing at the bit to sell them the product. As with the flower, we sell out all product each week on our McGrow Marketing web site, bestbud.net."

A. Right.

Q. So you're saying that McGrow is not selling marijuana products even though that's what it says in this?

A. What it's saying is, is we're providing the tenant and it's all-inclusive. We are the lending capital to the licensee, not us, to pay for labor and machine fees. And with that, we and the tenant licensee are in business.

Q. Is that what it says?

A. Say again?

Q. Is that what it says?

A. It's exactly what it says verbatim.

Q. No. Actually I just read it verbatim, and it says:

"We even have the wholesalers champing at the bit to sell them the product. As with the flower, we sell out all product

each week on our McGrow Marketing web site, bestbud."

So McGrow has a marketing website to sell flower and other marijuana products, correct?

A. No, it's not correct. I'm telling you exactly what our role is and what McGrow's role is, and that is we provide capital to the tenant, the licensee, we brought in the machines, I had to co-sign for that.

And now they have -- because of our capital and our connections, because I brought them to the purchaser and they negotiated a deal with the purchaser.

So now we've helped them create as a collective, as a member of the team, but not a licensee, they now have a full production line that they can deliver product to the marketplace.

Q. Did McGrow have a marijuana license?

A. What's that?

Q. Did McGrow have a marijuana license?

A. No, they did not.

Q. Okay. Is marketing and selling marijuana products a licensed activity?

A. Is marketing and selling marijuana products a licensed activity? I would say that it is. I

would say that creating marketing material for the licensee is not in the marijuana business.

Q. So yesterday Mr. Buchanan testified that you leased equipment from his company to TOL Grizzly (ph). He also testified that OGZ, which was the company that was originally supposed to operate the machinery was let go by you. Tim Beall was also let go by you. So once Tim Beall and OGZ was no longer part of McGrow, who operated the extraction machinery?

A. I'm sorry. Well, they were partially paid by me, by McGrow.

Q. I'm going to restate the question.

A. Okay.

Q. Once Tim Beall and OGZ was no longer affiliated with McGrow, who operated the extraction machinery?

A. The licensee.

Q. Okay. Did McGrow have any involvement with operating the machinery?

A. Did McGrow have any involvement with operating the machinery? No, except for the train making. Making sure that they brought in the right people to train.

Q. So why did McGrow sign the agreement with

TOL Grizzly?

A. Because TOL Grizzly wouldn't accept the purchase by the licensee. They wanted me to sign as a guarantor.

Q. Did McGrow have assets?

A. McGrow raised capital specifically for the purposes of installing the machinery.

Q. Did McGrow have assets?

A. Yes. It raised capital. I believe it raised $500,000 of which -- or maybe even a million dollars of which Mr. McMahon was part of.

Q. So did McGrow have assets beyond the capital raised from investors?

A. No.

Q. So how was McGrow going to pay back investors their capital?

A. Let me go back to the sheet -- or this e-mail that I didn't send to Mr. McMahon. I sent it to Jeff Ploen who was a director of GrowCo.

Q. How did McGrow plan to repay investors?

A. It was going to make money from the lease of the machine for a 90-day loan at 22-1/2 percent. That's how it was going to make money.

Q. Do you know if it was within -- let me rephrase.

Could McGrow lease a marijuana extraction machine to a licensed marijuana grower without having a license?

A. Yeah. The same way you can lease a building. You can lease all the equipment that's used in there.

Q. And you know that based on your understanding of the marijuana laws?

A. No. I know that based upon my understanding of what we were attempting to do. I never had anybody tell me that we couldn't.

And in the testimony from Mr. Buchanan, he said that he was leasing it to us, and we were re-leasing to the tenant, and he wasn't licensed.

I don't think the marijuana laws say that you need to be licensed to lease equipment to a licensed -- a licensee. I don't think that's the law at all.

Q. But you don't know, because you don't know the marijuana law, correct?

A. I don't have to have a marijuana license to know that I can lease a building to a licensee.

Q. You don't know because you don't know the marijuana law, correct?

A. I think I've answered that about ten times.

Q. So, no is the answer?

MS. KIDD-AARON: Could we turn to McKowen Exhibit 1019.

MR. HARDING: What number is that?

MS. KIDD-AARON: 1019.

Q. (BY MS. KIDD-AARON) So these are the agreements that you signed with GrowCo after your departure in May 2016?

A. Correct.

Q. As I believe we have established you were not licensed to offer and sell securities, correct?

A. We've established that...

Q. You were not licensed to offer and sell securities, correct?

A. No. I did not have a license to sell securities, but that wasn't required of me.

Q. Okay. And why wasn't it required of you?

A. Because I was the officer and director of the company. I was the CEO of the issuer, and I have the right to be able to do that according to the SEC laws.

Q. Were you the CEO, the issuer, when you resigned in May 2016?

A. Say that again.

Q. Were you the CEO, the issuer, when you

resigned in May 2016?

A. Was I the CEO of the issuer when I resigned in 2016? Which issuer are you talking?

Q. Two Rivers, GrowCo Inc., GCP-1, GCP-2, GCPSU?

A. No, I was not.

Q. Okay. So you are not licensed to offer and sell securities?

A. That's correct.

Q. And you no longer fell under the issuer exemption?

A. No. I wasn't selling securities.

Q. Was part of this contract to raise capital on behalf of GrowCo, Inc.?

A. Not this contract, not the advisory services contract.

Q. Any of the McGrow agreements?

A. I was the financial consultant for that. And I think there's an agreement in here, so there's a construction services agreement.

Q. Yesterday Mr. McMahon testified that you gave the presentation for the $7 million note. That was after you resigned in May 2016. Were you licensed to offer and sell securities?

A. I wasn't trying to sell securities. I was

there on behalf of the company, explaining as the former CEO, a month or two months after, what this project was about.

I didn't structure the deal. I didn't send out the subscription agreements. I didn't set the terms of the deal. I didn't prepare the subscription documents. I didn't receive capital --

Q. Did you give the presentation?

A. Yeah. I gave the presentation of what this business model was about.

Q. Is it reasonable that that is considered a solicitation to some of the investors?

A. I don't think it's reasonable to assume that I'm trying to sell them securities. I think it's reasonable for them to assume, which they knew that I was the former CEO and what was this business model now. I didn't send them the subscription agreements. I didn't send them the instructions. I didn't sign the agreements.

Q. Did you give the presentation?

A. I gave the presentation.

Q. Did you provide information about the $7 million offering?

A. No.

Q. So what did you do in the presentation?

A. I told them what the business model was.
Q. You didn't say anything about the $7 million?
A. I didn't know the terms of the deal.
MS. KIDD-AARON: Can you pull up Plaintiff's Exhibit 8.
(Court reporter asked for clarification.)
Q. (BY MS. KIDD-AARON) Have you seen this PowerPoint before?
A. Just one second, please. I have. I have seen this PowerPoint presentation before.
Q. In Mr. McMahon's testimony he said he received this as the presentation you gave. Did you provide him with this presentation?
A. No.
Q. Was this presentation or was this PowerPoint a part of that presentation?
A. I don't know if it was or wasn't. I talked freeform when I was -- it was about seven or eight people there who had all been brought there by Jeff Ploen.
Q. What was the goal of the presentation?
A. My role in talking to them was to explain to them what the business model was about.
Q. Why were you explaining the business model

to them?

A. Because I was the one who created the business model, and it was only two days, a month and a half or two months. Prior to that, I resigned, and I knew what the business model was better than anybody else.

Q. Did Mr. Harding know what the business model was?

A. Yeah. He was two months into it, but they needed my assistance.

Q. To do what?

A. To explain what the business model is.

Q. In order to do what?

A. They were solicited -- they were soliciting investors based upon documentation that they had put together.

Q. So you were helping solicit investors?

A. I was explaining the business model.

Q. I'm going to take that as a yes.

MS. KIDD-AARON: We're going to bring up the chart of the GrowCo investments.

THE COURT: What exhibit do we have up?

MS. HUNT: 1032.

THE COURT: Exhibit 1032 is on the screen.

Q. (BY MS. KIDD-AARON) Okay. So the first

GrowCo investment is an equity investment in GCP-1, correct?
A. 1032?
Q. Yes.
A. I show it as the BCLS audit.
Q. It's on the screen.
MR. FINKE: Page 4.
MS. KIDD-AARON: Page 4.
THE WITNESS: Okay. Okay. I'm here.
Q. (BY MS. KIDD-AARON) GCP-1, equity investment was the first GrowCo-related investment, correct?
A. That's correct.
Q. You were the CEO at the time?
A. That's correct.
Q. The GrowCo, $4 million note was the second investment, correct?
A. That's correct.
Q. You were the CEO at the time?
A. That's correct.
Q. And the GCPSU investment?
A. That's correct.
Q. And you were the CEO at the time?
A. That's correct.
Q. And there's the $1.5 million note?

A. Yes.
Q. And you were the CEO at the time?
A. Yes.
Q. And then there's the $6 million note?
A. Yes.
Q. And you were the CEO at the time?
A. For whatever time frame, between March 2016 and May, so it would have been two months, yep.
Q. And then there are two -- there's a $7 million note and $2 million note that took place after you were no longer CEO, correct?
A. Well, I was the -- I was there from January 16 to May 26 for the $7 million note.
Q. So you were the CEO when the $7 million was initiated?
A. When it was started, correct.
Q. So there's only one GrowCo offering that you were not the CEO for, correct?
A. No. I don't think that that's correct to say that. I think what is correct to say is, I was the CEO from March of 2016 to May 25, and then from May 25th of 2016 to July, someone else was doing it.
And then from January 2016 till May 2016, I was the CEO. And then from that point forward, to January of 2017, someone else was doing it.

Q. So, Mr. McKowen, will you look at this chart and tell me which of these offerings you were not a part of?

A. I think I just told you that.

Q. By name, please.

A. From?

Q. Not by date, by name, please.

A. The $6 million note, I was part of at the beginning. From the $7 million note, I was part of it from the beginning. And I wasn't part of the $2 million note at all.

Q. So the only investment opportunity that you were not a part of is the $2 million note?

A. That's correct.

Q. What was the relationship between McGrow and GrowCo entities while you were not the CEO of GrowCo, Inc.?

A. What was the relationship of McGrow and the GrowCo entities while I was not the CEO of GrowCo, Inc.? The relationship was, I was an investor. And one -- as a CEO, I was one of the largest investors that McGrow owned shares of GrowCo, Inc., and had these agreements.

Q. Okay. So the relationship between McGrow and GrowCo, Inc., was that McGrow was a shareholder

of GrowCo, Inc.?
A. That's correct.
Q. Was McGrow allowed to make decisions related to GrowCo because of those shared interests?
A. No.
Q. So what was the purpose of McGrow and the shares of GrowCo, Inc.?
A. What was the purpose of the shares? What was the purpose of McGrow owning shares of GrowCo, Inc.? It was part of the consideration that I asked for when I formed McGrow.
Q. Okay. And why did they give you that?
A. They must have needed my help.
Q. So did you have input through McGrow because you owned shares of GrowCo, Inc., in McGrow?
A. No. Because I had no ability to change the board, and I was excluded from the board meetings.
Q. So what help did they need from you?
A. The services that I was to provide through the McGrow agreements.
Q. And what services did you provide?
A. All of them.
Q. What are "all of them"?
A. Let's go back. The consult advisory services, the construction services, the financing

services, and there's one more, marketing services.

Q. So through those services, did you make decisions about GrowCo?

A. No.

Q. So what did you do with those services then? When you made marketing, did someone tell you what to do?

A. The marketing services were primarily for the benefit of the tenant, which is what the website was about.

I arranged the advertising. I arranged and paid for advertising campaign with -- with what's the local -- I think weekly newspaper.

Q. Westword?

A. Yes.

Q. So did you -- did someone tell you to make those decisions, or did you make those decisions?

A. I would meet with the tenants and say how can we improve your business? What is it that we could do? I have this capital that I'm willing to lend to you. What can we do to improve your business?

Q. So the tenants made those decisions?

A. Absolutely.

Q. So then why were you being paid for these

services by GrowCo if the tenants were making the decisions?

A. Why were you being paid for those services by GrowCo if the tenant was making the decisions?

I was providing ownership -- I was given an ownership interest. McGrow was given ownership interest in GrowCo as part of the overall consideration for us, me and McGrow investors, doing things that would assist the tenant in developing revenue and providing capital.

Q. Why were you being paid by GrowCo if the tenant was making decisions?

A. GrowCo must have thought the services that I could provide were valuable.

Q. Right. But I just asked you if you were making decisions related to those services and you said the tenants were making those decisions?

A. The tenant was making those decisions about whether or not they wanted to use this extraction machine. Whether they wanted to grow this particular flower, how do we grow it. Whether they were willing to pay for the advertising in Westword.

So I would come to them with proposals like as a marketer as any potential advertiser would.

I would come to them as a person who would

provide them with machines that could create the flower. I would arrange for the purchaser of the flower or the buyer of the oil, to come in and -- because I happened to know one of the principals there, would they come and take a look at this -- this facility.

And they would meet with the tenant, and they would sample the oil and ship it to the purchaser who was licensed. And the purchaser would -- they would deliver oil to -- the purchaser evaluated it.

Initially they would say, this is crap. You guys don't know what you're doing, McKowen. And I said, well, I'm not the one doing it. Would you come and train these people to do it?

Q. So the valuable services you were providing, is connecting the licensed marijuana sellers to buyers?

A. In that particular instance, yes.

MS. KIDD-AARON: Can we turn to Plaintiff's Exhibit 48.

THE WITNESS: Okay.

Q. (BY MS. KIDD-AARON) So this is a Certificate of Absence of Records and Licensure from the Division of Securities record keeper.

Specifically this addresses registration for the -- the extension from registration for the defendant entities and lack thereof. According to the records, as we've discussed previously, GrowCo Partners 1, GrowCo, Inc., GCPSU, TR Capital, and McGrow. All of these records, we searched for all of these records.

McGrow did not have any exemption from registration files, correct?

A. I don't understand the question.

Q. So we looked at the solicitation, you said at least $500,000 was raised for McGrow. Did you ever file registration or exemption from registration or that --

A. Did I file Form D?

Q. Yes.

A. I don't think so. I may not have.

Q. Okay. And so did you file for registration?

A. No. These were exempt offerings. That was an exempt offering.

Q. Okay. So you did not file for registration or exemption for registration from McGrow?

A. I did not file a Form D. That doesn't mean the exemptions weren't available to me.

Q. Please just answer the question, Mr. McKowen.

A. I'm trying to. You're asking me why -- I'm admitting that I didn't do something that is a requirement, but that does not mean the exemptions weren't available to me.

Q. I did not ask you that.

A. Okay.

Q. What services was McGrow, other than connecting licensed marijuana growers to marijuana buyers, what other services was McGrow -- sorry -- and also leasing the extraction machine, what other services was McGrow providing to the tenants of the greenhouse?

A. The services -- I answered the question about four times now. The services in the McGrow agreement.

It was essentially an interface, in many instances, between the tenant and GrowCo that they didn't seem to be able to make, or at least they wanted my services for six months and then they didn't renew them.

Q. And why didn't they renew them?

A. I don't know.

Q. The GrowCo shares that McGrow acquired,

were they shares that previously belonged to Two Rivers' shareholders?

A. No.

Q. Mr. McKowen, do you remember being deposed?

A. Yes.

Q. And that would have been on -- does Monday, January 9, 2023, sound familiar?

A. It probably is accurate.

Q. Okay. Was there a court reporter there?

A. Both times I was deposed, there was a court reporter there.

Q. Were you under oath?

A. Yes, I was.

Q. And your testimony today is that the shares that I McGrow acquired were not previously Two Rivers' shareholder shares, correct?

A. That's correct.

MS. KIDD-AARON: Your Honor, we have a sealed deposition. I don't know if you'd like to be presented with that at this time.

THE COURT: I don't need it. You can open it.

MS. KIDD-AARON: Okay. May I approach the witness, Your Honor?

THE COURT: Yes.

THE WITNESS: Okay.

Q. (BY MS. KIDD-AARON) Mr. McKowen, if you could read page 78, starting at line 6.

A. And McGrow also -- space, we became the custodian to the GrowCo shareholders that belonged to the Two Rivers' shareholders. And then we also got a third of the shares inside McGrow to replace Tim Beall and Aaron Van Wingerden. And they had turned in their shares and we were issued new shares.

Q. Keep going, please.

A. So we effectively controlled, at that point in time, I think as much as two-thirds of the GrowCo shares. Keep going?

Q. No. So was that statement true at the time?

A. The question that you asked me?

Q. The statement that you made during the deposition. Was that true at the time you made it?

A. Yes. It's true now.

Q. So what am I misunderstanding about McGrow's ownership of GrowCo's shares?

A. The question was --

THE WITNESS: Can you tell me, repeat the question to me of what she asked.

(Court reporter asked for clarification.)

MS. KIDD-AARON: I can re-ask it.

Q. (MS. KIDD-AARON) I asked if McGrow took ownership of GrowCo shares that were previously owned by Two Rivers' investors?

A. And my answer is no.

Q. Okay. So can you explain what you just read from your deposition, what does that mean?

A. It means that the shares that were issued to Tim Beall and Aaron Van Wingerden were surrendered to the company.

Q. Okay. Before that, it says that McGrow also became the custodian of the GrowCo shares that belonged to the Two Rivers shareholders.

And then we also got a third of the shares inside of McGrow to replace Tim Beall and Aaron Van Wingerden. They had turned to -- they had turned in their shares and we were issued new shares.

So we effectively controlled, at that point in time, I think as much as two-thirds of GrowCo shares.

A. Okay. So let me explain the distinction to you.

Q. Please do.

A. The new shares were issued to us after Tim Beall and Van Wingerden. It's a completely new

certificate. I didn't acquire it from any shareholders.

We were the custodian for shares that were owned and still are owned by shareholders of GrowCo -- shareholders of GrowCo that previously -- let me get the language of this exactly right.

We -- I, in -- when I was the CEO of Two Rivers, I -- and I think I explained this previously -- created a third of the shares that were to go to Two Rivers' shareholders of record, and shareholders of the record, each order in 2015.

And those shares couldn't be distributed without a registration statement. So it had to be held as a custodian.

And the deal I negotiated was that McGrow would be the custodian of those shares, because I didn't trust GrowCo.

Q. So if McGrow controlled as much as two-thirds of GrowCo shares, did McGrow control GrowCo?

A. I would say that we were -- the problem was this, GrowCo had two board members from Two Rivers and two board members from McGrow and so no one had control over -- over GrowCo, because you couldn't get the controlling vote. There was four votes and they

also split it. Those votes as a tie.

And that's the point of the one audio presentation that I wanted to make, but I need to -- I need to use -- so that we're not listening to an hour and a half of audio.

I need to use this software to narrow down -- and I had this conversation with Ms. Hunt to narrow down the specific times of -- of inside that conversation. But she also says it's hearsay. But it will prove this point that you're trying to make.

And so we were custodian for a third, McGrow owned a third, but there were only two -- four board members. And so the board was consistently split. And so I didn't know if I was going to exercise any control over GrowCo.

Q. So your testimony is McGrow controlled two-thirds of GrowCo shares, but because there were only four board members, you did not have controlling interest?

A. That's right. Not without a very big legal battle. But the original question that you asked is, did we purchase shares from previous -- GrowCo shares previously owned by other shareholders. No, we didn't.

Q. I did not ask if you purchased.

A. I thought that's exactly what you asked.

THE COURT: Ms. Kidd-Aaron, I want you to find a stopping point. We'll be done for the day.

MS. KIDD-AARON: We can stop, Your Honor.

THE COURT: Mr. McKowen, you may step down. Before we address the motions in limine -- Connor, can you get the exhibits that Ms. Mendez has and make copies for us. We're going to upload those four exhibits and give the exhibits back to the reporter.

Let's talk about the motions in limine concerning experts.

Mr. McKowen, you filed a motion in limine to limit expert testimony of the plaintiff's experts, Mr. Rome and Ms. Martinez. I believe you already addressed Ms. Martinez. But let's address Mr. Rome who's anticipated to testify.

MR. MCKOWEN: That's correct.

THE COURT: Any additional record you'd like to make on that motion?

MR. MCKOWEN: No. I think the motion speaks for itself.

THE COURT: Okay. For the plaintiff, any additional record you'd like to make on the motion?

MS. HUNT: I would reiterate what I said the other day, that we did not file a response, but

we understand that motion to generally correct the state of law and that it's an expert's testimony and we intend to follow it.

THE COURT: Mr. McKowen, your motion generally challenges the testimony of Mr. Rome on the following grounds: The second-to-last paragraph of the motion states that the simple analysis of the reports of other experts, show that they're opining on the applicable law and legal standards, and thereby, serving the functions of the Court.

Finally, the experts are opining on whether the defendants had committed security fraud or the particular likelihood that they had.

The Court denies the motion for the following reasons. First of all, the motion is untimely. But nonetheless, even if it was a timely filed motion, I did have a chance to review the report of Mr. Rome. And although he does touch on those areas that you take issue with in the motion, the anticipated testimony is not excludible.

For those reasons, the Court did rely in part on Lawrence v. People, which is 486 P.3d 269, that addresses expert testimony from Mr. Rome himself, actually in that particular case.

And the Colorado Supreme Court indicated

that such testimony may be helpful in certain cases, including complex security cases. In that case, it was a criminal case. And this one is a civil case obviously. But I think the analysis still applies here.

So the Court will not exclude the testimony of Mr. Rome. I will decide what weight, if any, to give his testimony, but I do think it's appropriate to allow him to testify and present these opinions to the Court.

MR. MCKOWEN: Can I ask you a question about what you just said?

THE COURT: Sure.

MR. MCKOWEN: And so the Court will allow the testimony, and then it will decide whether it's appropriate or not, when it's presented; is that correct?

THE COURT: What I said was, I'll decide what weight, if any, to give it. So as the factfinder in this case, I listen to the evidence that is admissible, and then I decide how persuasive it is. I can give it some weight. I can give it a lot of weight. I can believe some of it, part of it, or none of it. Just like a jury would be able to do. I will do the same thing as a factfinder.

MR. MCKOWEN: Okay. I understand.

THE COURT: Okay. The other two motions are motions that were filed by the People. There's a motion to strike McKowen's expert disclosure, and that's Mr. Hart. And then also a motion in limine to exclude expert testimony.

I've read both. I've read Mr. Hart's report for the plaintiff. Any additional argument or record you'd like to make?

MR. FINKE: No. I believe it's all in the papers, Your Honor.

THE COURT: Mr. McKowen, any additional records?

THE CART INTERPRETER: I'm sorry, Your Honor, I didn't hear him.

MR. FINKE: Your Honor, I believe our position is stated in the papers.

THE COURT: Mr. McKowen, any additional argument or record you would like to make?

MR. MCKOWEN: Only that the law says that it's -- there's supposed to be -- I think some effect that there -- these are to be applied liberally and that I didn't have the money at the time, but when I did acquire the money to be able to pay for the expert rebuttal, not firsthand testimony that I

immediately acted upon -- and so...

THE COURT: Right. Mr. Harding, I didn't ask you before. Any record you'd like to make on this particular motion or these two motions from the plaintiff?

MR. HARDING: No, sir.

THE COURT: And the previous motion from Mr. McKowen?

MR. HARDING: No, sir.

THE COURT: Thank you. The Court notes the following: The amended case management order in this case that was entered on February 14, 2023, set the following deadlines: Defense expert reports were due April 3rd. Discovery deadline is May 22. Rebuttal reports are due or were due May 29.

Mr. McKowen disclosed Mr. Hunt's report on or about June 7, 2023, which is over two months after the April 3 deadline, over two weeks after the discovery deadline.

The Court does find that this is not a rebuttal report. I compared the two reports, and frankly, they're touching upon similar issues.

However, the issue of whether the claimed securities were exempted was essential or is an essential issue or has been since the inception of

the case, the need for expert testimony on this issue cannot be said to have risen -- recently or just based on the plaintiff disclosing Mr. Rome's report.

So I do find that the filing is late, and that it is over two months late. It's not a rebuttal report.

However, the Court has to weigh that against the fact that strict adherence to the deadlines has not been sanctioned by our appellate courts, and it's not sanctioned by the statutes or court rules -- court rules, not statutes.

The trial court has to consider, one, the failure -- whether the failure to disclose was substantially justified or harmless.

And, two, whether excluding evidence would be disproportionate to the harm caused by the nondisclosure.

Undoubtedly, the disclosure was untimely as I've stated. The Court has not given -- as based on the record that has been made today or in the filings that the defendant did not previously disclose the opinions of Mr. Hunt due to financial constraints.

Mr. Hunt appears to have performed some work at the behest of Mr. McKowen, as far back as January and March of 2022. The work done over a year

appears to form the basis of Mr. Hunt's opinion which related -- memorialized in the June 6, 2023, report.

The Court, however -- so the Court will find that the delay was not substantially justified.

However, the report is less than two pages, consists mainly of legal conclusions that conflict with the conclusions of Plaintiff's expert, Mr. Rome.

So bottom line for the Court is the scope of the anticipated testimony is narrow, and this is the testimony of Mr. Hart. That the anticipated testimony is narrow, concerns mainly legal interpretation, is that the Court will ultimately have to decide and plaintiff has had over a month to prepare how to rebut it.

Now, the concerns with compensation for the expert can be addressed on cross-examination. So you can present that testimony, I think there was -- it's unclear from the filing exactly how much money he has earned in preparing the report and doing his work on this case. But I'm not so concerned about that particular issue that it can't be addressed on cross-examination, and I will decide again, what weight, if any, to give this witness's testimony as well.

The Court, thus, includes the late

disclosure was harmless. Exclusion of the evidence will be disproportionate to the harm caused by the untimely disclosure.

So the Court will not prevent Mr. Hart from testifying. Plaintiff may make any evidentiary objections as you see fit during his testimony, and the Court will rule on contemporaneous objections.

Plaintiff may challenge Mr. Hunt's credentials on voir dire as well and I will decide whether or not he is qualified to render the opinions. And as I have stated, the Court will decide what weight to give to the testimony.

So as far as timing tomorrow, if you want to call Mr. Rome, we can do that first thing.

MS. HUNT: We will do that, Your Honor.

THE COURT: And then, Mr. McKowen, as I stated, I would prefer that you reach out to Mr. Hart and see if he is available to testify on Friday morning, as opposed to tomorrow, because that is the anticipated order that was provided to the Court.

And I understand the plaintiff's position of wanting to have that witness called in the order. If he is not able, however, to make arrangements to testify on Friday, then I will permit him to testify tomorrow.

And I would suggest, based on today's proceedings, that you probably have him available first thing. We will have it safely starting at 8:30, probably 10:30. Does that sound reasonable, 10 o'clock?

MS. HUNT: Our direct will likely be around an hour or maybe less, so it will depend on the cross.

THE COURT: So if Mr. Hart can't reschedule for Friday, I would have him here at -- well, if you can have him here at 8:30, if you want him to listen to the testimony of Mr. Rome. Otherwise, I would have him here no later than 10 a.m., so we can take him at that time.

MR. MCKOWEN: Okay. Can I respond a little bit just to clarify?

THE COURT: Yes.

Go ahead.

MR. MCKOWEN: So the expectation is that Mr. Rome will testify at 8:30; is that correct?

THE COURT: That's correct.

MR. MCKOWEN: And that if he wants to observe Mr. Rome's testimony, then Mr. Hart needs to be here at 8:30?

THE COURT: Correct.

MR. MCKOWEN: And that if he can't make it here on Friday morning, for some good reason that needs to be explained to the Court or whatever, then he needs to be here at 10 a.m.?

THE COURT: Correct.

MR. MCKOWEN: Okay. I will try to make that happen.

THE COURT: Anything else for the plaintiff on experts or Court's rulings?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No, Your Honor. Thank you.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: Okay. The Court will upload the defense exhibits that were admitted during trial in a hard copy form into the Court file.

Normally, I have the parties upload their respective exhibits, but, Mr. McKowen, I don't believe you have the ability to do that. So the Court will upload your four hard copy exhibits that were received.

All the other exhibits, the Court, at the end of the trial, order that those exhibits be uploaded into the Court file within seven days. But

for these exhibits, the Court will do it.

And if you have any other exhibits that have not been disclosed or are not in your defense exhibit book, your book, and this applies to you as well, Mr. Harding, you need to bring those in hard copy form and give them to opposing counsel, so the Court or opposing counsel is not obligated to make the copies on the spur of the moment.

Do you understand?

MR. MCKOWEN: I do. I need to stop screwing up and taking hours to get in front of -- collectively, in front of the Court and in front of the other parties, exhibits that I need to come -- if I'm going to use them during the day.

Reasonably, that I need to bring them with me to the Court, so that if I want to introduce them, then they need to be in hand in the moment.

THE COURT: That's correct.

MR. MCKOWEN: Okay. No more screwing around.

THE COURT: Anything else from plaintiff before we recess?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, Your Honor.

THE COURT: Okay. See everybody at 8:30.

WHEREUPON, the within proceedings were adjourned at the approximate hour of 5:11 p.m. on the 12th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, THERESA L. MENDEZ, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 231 herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 11th day of August, 2023.

My commission expires September 21, 2025.

Theresa L. Mendez
_______________________________
Theresa L. Mendez, RPR
Registered Professional Reporter
and Notary Public

**REPORTER'S TRANSCRIPT - VOLUME IV - July 13, 2023**

DISTRICT COURT, CITY AND COUNTY OF DENVER
STATE OF COLORADO
Court Address:
1437 Bannock Street
Denver, Colorado 80202

Case No: 21CV33922
Courtroom: 259

TUNG CHAN, Securities Commissioner for the State of Colorado,

Plaintiff,

vs.

TWO RIVERS WATER AND FARMING CO., et al.,

Defendants.

REPORTER'S TRANSCRIPT
July 13, 2023
VOLUME IV

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Denver, Colorado 80202, Division 209, on Thursday, July 13, 2023, at 8:34 a.m., before HONORABLE CHRISTOPHER J. BAUMANN. These proceedings were reported by Wendy McCaffrey, Registered Professional Reporter and Notary Public.

APPEARANCES:

For the Plaintiff:
ROBERT FINKE, ESQ.
First Assistant Attorney General
INDIA KIDD-AARON, ESQ.
Assistant Attorney General
JENNIFER HUNT, ESQ.
Senior Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway
8th Floor
Denver, Colorado 80203
(720) 508-6401
Robert.Finke@coag.gov
India.Kidd-Aaron@coag.gov
Jennifer.Hunt@coag.gov

For the Defendants:
WAYNE HARDING
Pro Se
22586 East Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

JOHN MCKOWEN
Pro Se
335A Josephine Street
Denver, Colorado 80206
(303) 218-6883
john@johnmckowen.com

INDEX


| WITNESSES | Page |
|---|---|
| GERALD ROME | |
| Direct Examination by Ms. Hunt | 5 |
| Cross-Examination by Mr. McKowen | 37 |
| Cross-Examination by Mr. Harding | 73 |
| Redirect Examination by Ms. Hunt | 114 |
| Direct Examination by The Court | 119 |
| JOHN MCKEOWN | |
| Direct Examination by Ms. Kidd-Aaron (Continued) | 123 |
| Cross-Examination by Mr. Harding | 218 |

EXHIBITS

| NUMBER | INITIAL REFERENCE | ADMITTED |
|---|---|---|
| 11 | 143 | -- |
| 14 | 185 | -- |
| 15 | 185 | -- |
| 19 | 213 | -- |
| 22 | 160 | -- |
| 23 | 158 | -- |
| 24 | 163 | -- |
| 25 | 147 | -- |
| 27 | 78 | -- |
| 28 | 79 | -- |
| 34 | 217 | -- |
| 38 | 154 | 156 |
| 47 | 80 | -- |
| 48 | 175 | -- |
| 49 | 81 | -- |
| 51 | 83 | -- |

EXHIBITS (continued)

| NUMBER | INITIAL REFERENCE | ADMITTED |
|---|---|---|
| 52 | 176 | -- |
| 56 | 131 | -- |
| 59 | 123 | -- |
| 61 | 169 | -- |
| 96 | 199 | -- |
| 99 | 184 | -- |
| 113 | 187 | -- |
| 126 | 131 | -- |
| 128 | 173 | -- |
| 130 | 171 | -- |
| 132 | 226 | -- |
| 134 | 197 | -- |
| 138 | 6 | -- |
| 141 | 223 | -- |
| 1006 | 166 | -- |
| 1019 | 153 | -- |
| 1030 | 139 | -- |
| 1032 | 139 | -- |
| 1051 | 39 | 39 |
| 2013 | 220 | 233 |

P R O C E E D I N G S

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

* * * * *

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And we are ready for Plaintiff's next witness?

MS. HUNT: Good morning.

THE COURT: Good morning.

MS. HUNT: The Plaintiff calls Jerry Rome.

THE COURT: Mr. Rome, if you'll come up here to my left.

GERALD ROME

was called as a witness on behalf of the Plaintiff and, having been first duly sworn, testified as follows:

THE COURT: Is he going to need exhibit binders, do you think?

MS. HUNT: I don't think so. Actually, he can just view them on the screen.

THE COURT: When you're ready.

DIRECT EXAMINATION

BY MS. HUNT:

Q. Good morning, Mr. Rome.

A. Good morning.

Q. Can you please state your full name and spell your last name for the court.
A. Sure. It's Gerald Rome. Last name is R-o-m-e.
Q. Thank you. What do you do for a living?
A. So I am currently retired.
Q. Do you do anything in your retirement?
A. Well, I do provide expert witness services.
Q. Okay. Are you a licensed attorney?
A. Yes. I've been a licensed attorney since 1980.
MS. HUNT: Go ahead and pull up Exhibit 138, please.
Q. (BY MS. HUNT) Mr. Rome, is Exhibit 138 an accurate and recent copy of your resume?
A. Yes, it is.
Q. Couple of things on your qualifications. Can you tell us about your educational background?
A. Sure. Undergraduate degree from the University of Colorado in Boulder and a law degree from the University of Denver.
Q. What year was that?
A. 1980.
Q. And your career -- has your entire career, or at least most of it, been involved in

securities-related matters?

A. A substantial portion of it has been involved in litigating security-related matters.

Q. Can you walk us through your work history related to securities regulation?

A. Sure. I'll probably start with the most recent. I was a securities commissioner for the State of Colorado for about four and a half years. Under the Colorado Securities Act, the commissioner's charged with administering and enforcing the provisions under the Securities Act.

Prior to that, for 10 years, I was a deputy securities commissioner for Colorado. In that role, I supervised and managed the enforcement section, which is a group of investigators who investigate claims or complaints regarding securities law violations.

And I also supervised and managed the enforcement section, which licensed broker dealers, investment advisors, conduct examinations, and we did license revocation actions under that group.

Q. Okay.

A. Prior to that time, for -- well, a total of seven years, I was at the Colorado Attorney General's office. Part of that time was doing -- was a chief civil enforcement attorney for the division.

I handled all of their civil litigation, all of their license revocation. I also spent a couple of years in the criminal prosecutions unit, where I did criminal securities fraud prosecution.

I also spent some time in -- when you start back in 1980, there's a lot that you can do. I spent some time in private practice with a small firm. And we represented a couple of local broker dealers. So I defended those broker dealers in both federal and state regulatory actions.

Q. And aside from your regular day job, have you had any other work experience related to securities?

A. Yes. For a period of about five years, I was adjunct professor at the University of Denver, the Daniels College of Business, where I taught a graduate-level course called Real Estate Securities and Syndication.

The course involved the students putting together a real estate development project, and then they -- we were -- the course was about how -- if you're raising funds from investors, how you comply with both the federal and state securities requirements in raising those funds.

Q. Okay. Have you been involved in any associations?

A. Yes. There's a national organization for state securities regulators called NASAA. It's the North American Securities Administrators Association. It's the 50 state regulators and the Canadian provinces. I served on the board of directors for a number of years with that organization.

I was involved in a number of different committees, from federal legislation to senior issues to project groups. And so I did a lot of work on behalf of NASAA.

And then, when I retired in 2019, NASAA awarded me their lifetime achievement award.

Q. Have you been qualified as an expert in court before?

A. Yes, I have. I've been qualified in state district courts in most counties on the Front Range, ranging from Larimer County, Weld, Adams, JeffCo, Boulder, Denver, Arapahoe, Douglas, El Paso, Pueblo, Teller Counties.

Q. Are these all listed all those on the second page of your resume?

A. I think so, yes.

Q. Were these all criminal securities fraud cases?

A. Yes. They were all criminal securities fraud

cases.

MS. HUNT: At this time, I would like to offer Mr. Rome as an expert in Colorado securities law and regulation.

THE COURT: Mr. McKowen, any objection?

MR. MCKOWEN: No, Your Honor.

THE COURT: I'm sorry; move closer to the microphone.

MR. MCKOWEN: No, Your honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: With no objection, will be qualified as such under Rule 702.

Q. (BY MS. HUNT) Mr. Rome, I want to start by asking you some questions about the Colorado Securities Act more generally. What is the purpose of the Colorado Securities Act?

A. Well, it's straightforward. The act itself states, the purpose and -- the purpose is to protect investors and maintain investor confidence in the securities markets.

Q. How does the act do that?

A. So the act does that by requiring sellers of securities to make full and fair disclosures of material facts to investors. So it's the burden on the

seller to make those disclosures, not the buyer to conduct their own sort of due diligence.

It's different than we typically think about consumer transactions. The example I usually use is, if I go down to a used car lot to buy a used car, the burden is on me, as the buyer, to make sure the car's worth what they want me to pay.

It makes some sort of sense, in that you can kick the tires, take a test drive, look under the hood. The securities laws changes that around totally. It takes the burden off the buyer and puts the burden on the seller to disclose all those -- all the things about that securities transaction.

So it didn't always used to be that way. Back at the turn of the century, the burden was still on the buyer to do homework, due diligence, ask the right questions. But what happens is we, in this country, evolved interstate communications, and so someone in New York can sell securities to someone in Colorado. And that became a recipe for fraud.

And so the state legislators got involved and made a policy decision that they wanted to encourage investments. They wanted people to invest in companies. Obviously, if you invest in companies, companies hire people, there's growth, and that's all a

good thing.

So 1913, Kansas state legislature passed the first security law, which made this transformation from taking the burden off the buyer and putting the burden on the seller to make these full and fair disclosures.

Colorado enacted its Securities Act in 1923, and by the end of the '20s, all 50 -- 48 states by the time had adopted that version of the securities laws. The federal government, following the market crash of '29 and the depression, did the same thing with the Securities Act of 1933.

So all states and federal securities law now -- now have that requirement, that when you're selling the securities, that you have to make full and fair disclosure of material facts to investors.

Q. And since you've mentioned the federal laws as well, I want to just ask you a little bit about the interplay between federal and state securities laws. Is the state act preempted by federal laws?

A. There are certain specific areas where federal law has permitted the state law. But the one area where it has preempted is with respect to the antifraud provisions.

Q. If the SEC were to decline to pursue an enforcement action against a particular individual or

company, would that preclude the commissioner from creating an enforcement action?

A. No, it would not. And that's happened before. You know, each government agency has its own reasons and rationale for looking at a case and making their own determination.

So both the federal regulators and the state regulators act independently and make their own evaluation of how to handle any specific case.

Q. In your experience as commissioner, was it common for the SEC and the commissioner to agree to take on different cases?

A. So you -- being good government employees, you like to coordinate. But sometimes, governmental interests are different, and you take different kinds of actions.

Q. So I want to talk -- before we get to the fraud, I want to talk a little bit about the registration and licensing. Why does the act require licensing of -- of salespeople?

A. So you go back to this notion that the purpose of the act is to protect investors and maintain confidence in the securities markets. So the Securities Act does that three different ways.

One is requiring the registration of

securities offerings. So what that means is, if you're doing a public offering to the -- to the general public, the regulators get a chance to review your offering document. So the promoter has to submit the offering materials to the federal and state regulators, who vet the document and then approve it or disapprove it. So that's one aspect.

The other aspect -- the other aspect is the licensing of securities professionals. So there's this notion that, for you to sell securities, you have to have a certain level of competence and expertise. And so there's a licensing regimen in place.

You have to take an exam. You have to abide by certain rules and regulations as a securities professional.

And the third way that investors are protected is through the antifraud provisions, and those involve, like we've discussed, the requirement that the promoter or seller make full and fair disclosure of the material facts to the investors.

Q. Let's talk a little bit more about registration. And I think you mentioned earlier that there are some -- some areas that the federal laws sort of supercede, in some way, the state law. Is that your regi- -- is registration one of those areas?

A. It's probably the primary -- primary area where there is some federal preemption.

Q. So what is a -- are there -- back up. Strike that. The federal law includes -- does it include some exemptions to registration --

A. Yes.

Q. -- requirements?

A. Yes.

Q. Are those for private offerings?

A. Yes. So there's a distinction between a public offering and a private offering. If you're offering the securities to the public, then you're required to register those securities, submit your offering documents to the regulators.

There is an exemption called private offering. That exemption involves, if you're offering it to family members, you know, business associates, close personal families, you're not offering it to the general, then -- general public, then it's a private offering, and you don't have to comply with the registration provisions.

Q. Are those known as Reg D?

A. So, yes. The history is kind of -- is -- puts it a little bit in context. Reg D didn't come about till the early '80s. Prior to that time, there

was this notion that a private offering just involved close friends, business associates, family members, and the courts and promoters and regulators had a hard time drawing distinctions between, at what point does a private offering become a public offering.

In order to bring clarity to the market, the SEC passed Regulation D in the early '80s, which set some standards that were easily complied with by the private sector in raising money under private offerings.

And so we have the Reg D, which includes some rules in putting together 506, 505 and 504.

Q. Does making a general solicitation -- meaning to the public or people that you don't already have a relationship with, does that take you out of Reg D?

A. Yes, it does. You -- you -- once you make the offering to the general public, then that exemption is no longer available to you.

Q. So these Reg D exemptions, these federal exemptions, are these exemptions that the Colorado securities regulators recognize?

A. Yes. We -- we -- our laws are consistent with and are coordinated with the SEC Reg D rules and regulations, for the most part.

Q. So then, in addition to whatever findings --

Reg D findings you need to make, is there any particular state requirement that you need to meet if you are claiming a federal exemption?

A. Yes. So, typically, when you're claiming a Reg D exemption, you need to file what's called a Form D with the -- with the Colorado Division of Securities.

The statute says that, if you're doing a Reg D offering, that Form D and the payment of the fee shall be filed with the -- with the state division.

Q. So it's not sufficient to file with the SEC? It needs to be filed with the State?

A. Well, the State, the Securities Act says "shall."

Q. If an exemption applies, does that mean that the promoter is exempted from full disclosure of all material facts about the investment?

A. No. And there's a very important distinction. There's three requirements: registration, licensing and the NFR provision. Simply, if you comply with the registration provision, you still have to comply with the NFR provision, which requires full and fair disclosure of material facts.

Q. Is it your opinion that the -- and let me back up. You did have a chance to review the offering

documents and investment materials in this case?

A. Yes. I attached an exhibit to my report that lists the documents I reviewed.

Q. Is it your opinion that the debt and equity offerings in this case are securities?

A. In my opinion, yes, they are. Both the debt and equity offerings are securities under the Colorado Securities Act.

Q. And what about offers to exchange securities? Is that a transaction involving the sale of securities?

A. So some of the transactions I reviewed -- so an investor may have invested and received a debt or equity security, and then later on were offered an exchange, where with an exchange for certain rights with respect to the earlier transaction, they would receive new securities or new equities with respect to that transaction.

Each time you have that sort of an exchange, then that is a new securities transaction, and at the time you have a securities transaction, then the NFR antifraud provisions, the full and fair disclosure provisions kick in at that time.

Q. So a company that's issuing securities, who at the company is generally held responsible for making sure that the securities laws are followed?

A. So with respect to the antifraud provisions, the Section 501 specifically says, in connection with the securities transaction, it's unlawful to -- and it uses the words "directly" or "indirectly."

So with -- what those words mean is, if you are directly participating in a securities transaction, and you make material misrepresentations or omissions, then you are liable under 501.

The "indirect" language simply means you cannot commit a violation indirectly when you're prohibited to do that from directly. So what generally that means is that you can't -- if you're -- if you're running a company and you're raising funds, you can't hire a bunch of sales agents and have those sales agents go out and make misrepresentations, and you isolate yourself from those transactions and say, "I have nothing to do with that."

So the statute attempts to get at those kinds of situations, where you're operating directly. So if you're directly involved in the transaction, you know, you control the company, or you communicate with investors, or you control the transaction by signing off on documents, then you're directly participating in the transaction.

You can do that indirectly if you control the

operations of the company, if you control the sales agents who are working for you. So when we talk about "indirectly," we're talking about control or control persons of the corporation.

Q. All right. Let's switch gears a little and talk about -- you talked around this a little bit, but you talked about the antifraud provisions and the duties to fully disclose material information.

In your experience, in your opinion, what kind of information is material to an investor before they invest?

A. So the statute uses the word "material." And the Colorado appellate courts define what they mean by "material," and they say a material fact is a fact that are -- where there's a substantial likelihood that reasonable investor would find the information important.

And by "important," does it significantly alter the total mix of information? So when it says "substantial likelihood that a reasonable investor," we're talking about an objective test, not -- not what any one individual investor might think is important, but the objective, reasonable investor, what they -- what they think is important in making their investment decisions.

Q. Okay. Let's go through some types of information. First of all, the use of investment proceeds. In your opinion, is the use of investment proceeds material information for investors?

A. So -- so when you're preparing either registration documents or preparing most private offerings, you'll see the preparation of Private Placement Memorandums, which are disclosure documents for private offerings.

The Use of Proceeds section, how the money's going to be used by the promoter, are usually the front part of the documents because it's -- it's crucial to the investor. So the notion is, are those investment proceeds supporting the business activities that are going to generate the profits?

So, for instance, in a real estate development project, if I wanted to develop a condo project and I wanted to use investor funds, I needed to buy a vacant piece of property and construct the condos that I eventually would sell and hopefully reap a profit and show the profits to investors.

The investor would want to know how much of those funds are going directly to the construction of the condos. So, for instance, if you have administrative fees or other kinds of costs, those

aren't going to build the condo unit. So they're not supporting the business purposes that is going to generate profits.

So it's important, in my opinion, that investors understand where their investment money is going. If the large percentage of those investment monies are going to support the business purposes, then there's less risk that the investment may ultimately fail.

If there's a diversion of those monies for different reasons, then -- then the risk of the investment ultimately succeeding or failing changes.

Q. And is it sufficient, in your opinion, to just say that some funds will go towards administrative expenses?

A. Well -- well, I -- if -- I think full disclosure would require you to identify the amounts that are going to -- and they -- can be approximations or estimates -- but they should be fairly specific as to where the amounts that are going to, those sorts of things.

Q. What about the commingling of funds? And when I say that, I'm meaning, if investor funds are going to be put into multiple different accounts that would be accessed by different companies, is that an

issue, in your opinion?

A. Yeah. It relates to the Use of Proceeds. If you have a real estate development project, and you have the investor funds that are going to the development of that project in a segregated account, then the investor has some assurances that those funds will be used for that purpose.

If those funds are, in fact, commingled in accounts of other businesses or other real estate development projects, then -- and they're -- and those funds lose their identity with the commingling, then the risk of those funds not going to the purpose stated in the offering increases, and the success or failure -- or the success of that project also decreases.

Q. I want to ask you now about promoters, that the promoters or the people running the company, their past business experience. Is that kind of information material information, in your opinion, for investors?

A. So it depends. If you're talking about a large company -- say, like, you know, a large public company like Apple, what any one individual officer or director, what their background is may not be as important to the investor as it is with a smaller company.

If you have a smaller company with a small group of control people who are operating the company, then the investor is relying on a few people for the success of that operation: Their decision-making, their business judgment, and their honesty depends upon those one or two or three people.

So in those situations, their background becomes important to the investor because they're relying on those individuals for the success or failure of the -- of the investment program.

Q. What about the past performance of previous offerings in the same project?

A. So, in my opinion, that would be an important fact for a reasonable investor to know. Obviously, if you're doing a series of projects where -- where you've represented to the investors that you have constructed warehouses and you want to do a series of warehouses, the success or failure of that initial project is important to investors who are being asked to invest in the later projects.

So that information becomes important. Obvious -- it's obvious. I mean, if the initial project was a success, that gives some comfort level to the investor that the next project's going to be a success.

If that initial project isn't a success, then there's a higher risk that the subsequent one is not going to be a successful project.

Q. And would that include any full disclosure of any reasons -- the specific reasons why, perhaps, past offerings have not been successful?

A. Well, I think that, when you're talking about the full -- you know, the full and fair disclosure obligations of the seller, if there's been a prior project that was unsuccessful, then I think it would be -- the reasonable investor would believe it important to know or have a full understanding of why that previous project failed.

So the whole idea is that the investors are given all this information, and then they can make a judgment call on whether or not they want to take the risk of investing in this project. But it's after the full information is provided to them.

Q. All right. In a real estate venture where the underlying business requires some sort of licensing, or, like this one, for example, marijuana, is it important for the issuers to accurately disclose the status of any required license needed to operate the business?

A. My response to that is yes. In my opinion,

it is important to the reasonable investor. And Colorado is one of the first states to legalize the retail -- the growing and selling of retail marijuana.

But in conjunction with that legalization, there was a highly regulated atmosphere that was put in place. So if the profit or success of the business is contingent upon producing and selling marijuana, then the -- the compliance with those marijuana laws and maintaining the status of your marijuana license increases.

Obviously, if you lose your marijuana license, you can't grow and sell the marijuana, and the project becomes very untenable at that point in time. So -- so information to the investor, in my opinion, is important as to the ongoing compliance with the marijuana laws to ensure a proper status of the marijuana license.

Q. And in your opinion, is it enough to just give general citations to the risks inherent in investing in the marijuana industry?

A. Well, I reviewed the offering documents here, and there were some disclosures regarding the fact that marijuana is still illegal under federal law, and -- and those disclosures were there.

But you also have the state licensing regime,

and -- which probably was more important to the investors, in that losing the marijuana license puts the whole operation at risk.

Q. In your opinion, is it important information for investors to know whether the securities being offered are being sold by unlicensed individuals and are not in compliance with registration requirements?

A. So when you're offering securities to investors, the securities industry is highly regulated. There's obviously numerous things you need to comply with: registration, licensing and the antifraud provisions.

If you -- if you are not fully complying with all the securities laws, then you put your business at risk or subject to potential regulatory actions by both federal and state regulators.

So, in my opinion, it would be an important fact for the reasonable investor to know that there's full compliance, and if there's not full compliance, disclosure as to what areas you're not complying with the securities laws. Once that disclosure's made, then the investor can make their decision to invest or not.

Q. So, in many -- well, in most real estate investments, secured by some kind of property, and you reviewed some things that showed that the investments

here were secured by property; is that right?

A. Correct. Yes.

Q. In that case, is it important, in your opinion, for investors to have complete and accurate information about the status of the real estate interests that secure their investments?

A. Sure. Whenever you're providing disclosures to investors, you can always talk about the good things, the reasons why you should invest with us, along with the reasons that create risks.

One of the reasons we'll say development projects carry less risk is that, usually, they're secured by liens on the real estate, so that if a project fails, then there's potential for the investor to recover their investment monies from the lien that exists on the property.

So -- so, in that situation, the status of the liens, how much do the liens cover the investment proceeds, the number of liens, the priority of liens all become important information because they go to the degree of risk that the investors have in that real estate development project.

Q. And, finally, is it -- in your opinion, is it important for investors to be told if their money may be used to pay prior investors?

A. So we go back to the Use of Proceeds, right? So how are the investor proceeds being used? Are they going for the business purposes?

If newer investor money or proceeds are used to pay interest to prior investors -- and that's the definition of a Ponzi scheme -- then, yes, that information needs to be provided to the investors, along with the other Use of Proceeds information given to them.

Q. And moving away from the provision of the antifraud provision on disclosure, doesn't the act also just include a general prohibition of operating a fraudulent scheme?

A. Yes. There's two subsections under the antifraud provision. So in addition to misrepresentations and omissions of material facts, you have engaging in a scheme to fraud, and also engaging in an act, practice, or course of business that would operate as a fraud or deceit on any person.

Q. And you mentioned the term "Ponzi scheme." Is that generally considered a fraud or deceit --

A. Yes.

Q. -- under the act? What are lulling activities?

A. So "lulling activities" is a term used both

in the securities industry, by the courts. If there's been post transactions -- so, typically, when you're looking at disclosure, disclosures have to be made at or prior to the time of the transaction.

Lulling activities are post transaction activities that are meant to lull the investor into a false sense of security. And the purpose is to prevent inquiry or prevent the filing of complaints with regulators or, you know, to give the investors assurances that nothing is suspect.

And the appellate courts, both federal -- the federal appellate courts have said that those lulling activities relate back to the initial transaction and are part of and furtherance of the scheme to defraud.

Q. Do those include some misleading update communications?

A. That's exactly what they are. So any -- any activity that is there to give assurance to the investors, when it -- when, in fact, that's not what's going on behind the scenes, to give them that false sense of security.

Q. Can modify -- asking investors to modify their notes be considered illegal activities?

A. Yeah. Given the right set of facts, certainly, it can.

Q. We've heard quite a bit about accredited investors. Are you familiar with what an accredited investor is?

A. Yes, I am.

Q. What is that?

A. So it's a term of art in the securities industry, and it has to do with the registration provisions. So if -- and specifically, Reg D offerings, Regulation D offerings.

So we talked a little bit about the history of registration and the SEC trying to set some clear guidelines for when promoters can make private offerings. So they came up with this term "accredited investors."

So the idea is that, if you're a financially sophisticated individual, you should be able to participate in private offerings. And -- and so, again, it was difficult to have a standard of who is a financially sophisticated person.

So they came up with this notion that, if we identify a certain level of income and wealth, that -- that person, we can somewhat -- we can presume them to be financially sophisticated.

So back in the early '80s, the SEC came up with this notion of an accredited investor, with, you

know, an income level of $200,000 a year and the net worth of a million, minus -- not counting your house.

Back in the early '80s, that was a standard. They haven't changed that standard since then. So it's a little bit of a different standard now. But the whole idea is that these people, accredited investors, are financially sophisticated, and so that the registration provisions in the private offering exemption can apply to those people.

So it's important to know that there's no -- when you're talking about the antifraud provisions and the disclosure requirements, there's no exemption or exception, or there's no different standard for accredited investors; promoters still have to comply with the antifraud provisions with respect to accredited investors as they would with any other investors.

So that term is a registration provision term, and it applies for those exemptions from the registration requirements.

Q. So if an issuer or promoter sends out a questionnaire to an investor, and they fill out the questionnaire and answer all the questions right, in your opinion, is the -- is the issuer or promoter permitted to rely on that for the registration

exemption?

A. So the promoter's required to take reasonable steps to ensure that the investor is an accredited investor for the registration exemption under Reg D.

Q. Would a questionnaire do that for the registration piece?

A. Well, it depends upon the questionnaire and the depth and the kind of information requested in the questionnaire.

Q. And -- and if they -- assuming they can rely on that -- again, just to make sure I understand -- does that mean that they don't have to give the same disclosures to these accredited investors as they would to nonaccredited investors?

A. Right. There's no -- there's no exemption to the antifraud provisions. I also should mention, with respect to accredited investors, in order to comply with the private offering exemption, you have to have a substantial preexisting relationship with that accredited investor.

You -- you know, many times, you see there are these accredited investor lists that go around, and they -- accredited investors are cold-called by promoters. Once you cold-call someone to -- and -- and promote your investment opportunity, that's a public

offering, and you lose that private offering exemption.

Or if you hold investor seminars, and you invite the public to those investor seminars, that's a public offering of those securities, and you lose that private offering exemption.

Q. In your opinion, are the terms "accredited investor" and "sophisticated investor" synonymous?

A. No, they're not.

Q. Why not?

A. Well, the accredited investor, the standard is just a monetary standard. You meet the income and net worth requirements. To be financially sophisticated is a different standard. You have the background, you have the experience -- you know, you've been involved in the securities industry.

That's a different kind of standard than the accredited investor standard.

Q. Can issuers of private offerings -- assuming an exemption would apply, can an issuer of a private offering rely on SEC filings of a parent company to make their disclosures?

A. So we go back to the beginning of the requirement is on the seller, the promoter, to make full and fair disclosures. You cannot -- so it's -- it's the burden on the seller to ensure the information

gets to the buyer.

There's no obligation on the investor to dig around, to do their research, to do their due diligence. That information has to be provided by the seller.

Q. And is it sufficient to rely on an investor asking questions, if they have them?

A. No. Again, you go back to this notion that it's -- it's seller beware, not buyer beware. So the burden is on the seller.

MS. HUNT: If I can have just one moment.

THE COURT: Yes.

Q. (BY MS. HUNT) There's one more question I'm going to ask you about the -- about materiality of disclosures.

Is -- the -- the -- a prior regulatory discipline of an investor -- of a promoter or issuer -- control person of issuer, is that important information that investors need to know?

A. So, again, if we're talking about a company that is being run by one or two individuals, then their past regulatory history becomes more important because we're talking about their -- their business judgment and their decision-making and their honesty.

And so it -- that information can be

important to the reasonable investor, in my opinion.
Q. And does it matter if it's been many years prior?
A. So that's a factor that you look at. But in this situation, if you look at the underlying basis for the regulatory action against Mr. McKowen, it involved inadequate disclosures and excessive fees, and those issues -- or -- are related to the allegations that have been raised in this lawsuit.
So -- so I think that, even though the event happened way back -- not way back, but in 1985, they're relevant to the reasonable investor in that way.
Q. And -- and can these -- do these prior disciplinary or regulatory actions have impact on the ability to even qualify for Reg D exemptions?
A. Yes, they can. So there's a -- what we call in the securities business "bad actor disqualifications." If you're a bad actor, you meet, sort of, different definitions of bad actor, then you're not allowed to make private offerings and take advantage of Regulation D.
Q. There is a time limit on that particular exemption, right?
A. Well, some -- so it depends upon what kind of bad actor disqualification you're talking about. So

there's some time limits on it. And there's a number of different conditions that apply that -- and it varies from condition to condition.

Q. Is it your understanding that -- that an issuer always has to disclose the regulatory conduct, the bad actor conduct of the -- the promoters or the control persons involved?

A. So, right there, you're mixing up the registration provisions with the antifraud provisions. So if you're -- so what qualifies as a bad actor disqualification may be different from what a promoter's required to disclose under the antifraud provisions. So those are two different standards.

MS. HUNT: Okay. That's all I have. Thank you, Mr. Rome.

THE COURT: Thank you. Any questions on cross-examination?

MR. MCKOWEN: Yes.

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Good morning, Mr. Rome.

A. Good morning.

Q. You have quite an extensive history related to the securities industry. And there's more than a couple of specific points I'd like to get to, perhaps

starting with the regulation -- the regulations of the industry itself. So I left one exhibit, what I'd like to be an exhibit.

MR. MCKOWEN: Your Honor, I'd like to present some specific language -- the specific language in certain sections of the Colorado Securities Act and be able to refer to them because I have relied on them in my research about and looking at Mr. Rome's opinion and his statements.

And so I'd like to be able to just specifically refer to certain sections of the Securities Act and see if they apply or don't apply or what the application would be as it relates to the Securities Act.

THE COURT: Okay. You can ask him those questions.

MR. MCKOWEN: Say again?

THE COURT: You can ask him those questions.

MR. MCKOWEN: Okay. Can I use this as an exhibit?

THE COURT: Have you shown that to the Plaintiff?

MS. HUNT: I don't have any objection as to showing this to the witness. I don't think it's appropriate as an exhibit. It's just statutory

language.

THE COURT: We'll call it Exhibit 1051. Court will admit it. It'll help me follow along with the testimony.

(Exhibit 1051 was admitted into evidence.)

MR. MCKOWEN: 1051, Your Honor?

THE COURT: 1051. And I need a copy. 1051 is admitted.

MR. MCKOWEN: Okay. Do you need a copy?

THE COURT: Yes.

MR. MCKOWEN: I'm about to give the witness a copy as well. And I gave Mr. Harding a copy. Is there anyone else at this point in time I need to give a copy to?

THE COURT: Do you have the copy that was labeled 1051? Plaintiff has a copy? That's all.

MR. MCKOWEN: And when we are done with this, then I understand the procedure is that I'm offering this as an exhibit, and we -- I give it to the court reporter?

THE COURT: You offered it. I admitted it over objection. And so, when the testimony's finished, I'll have you give it to the court reporter.

Q. (BY MCKOWEN) It was impressive, to me, Mr. Rome, that you could nail down the purposes and

label it as the purposes. And -- but there's some additional language that's included in the Section 2.

And that is that the purposes of this article are "to protect investors, maintain public confidence" --

THE REPORTER: Wait. Say that again slower, please. Just reread what you read, please.

MR. MCKOWEN: I'm a -- the recorder -- they're not putting the recorder's question on here. I have a hearing problem.

The COURT: She asked you to slow down.

MR. MCKOWEN: Oh.

THE COURT: You were reading the statute, and you were doing it very quickly. She's asking you to slow down.

MR. MCKOWEN: Oh. I'm very sorry.

Q. (BY MR. MCKOWEN) "The purposes of this article are to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in the capital markets."

So would you consider an issuer try -- trying to raise capital in the public markets a participant in the capital markets?

A. Sure.

Q. Okay. And so, to me, my understanding would mean, and I want to see if you agree, that the purpose of that particular part of the purpose of the act was to enable start-ups to access those markets. Do you agree?

A. Well, so -- so the Securities Act is a balancing act between, you know, requiring disclosure, protecting investors, and avoiding unreasonable burdens on the securities market.

Q. Okay. So there's a third part to the Securities Act, and you've kind of touched on it. And that is, is that, "Provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article, and rules and regulations won't promulgate under the federal acts and statutes, to the extent coordination is consist with both the purposes and provisions of this act."

So the first part -- and it was relatively short -- these are the two articles that -- or three paragraphs that I saw -- it's a relatively short description of what the Securities Act is intended to do, isn't it? Would you say that's accurate?

A. Sure.

Q. And so, to understand the securities -- how

securities are regulated into in the Colorado statutes, would you say that you need to know what the federal securities laws say?

A. Well, so -- so I think the statute says that -- that the act needs to be coordinated with the federal laws to the extent that they're consistent with both the purpose provisions.

So certain areas of the securities laws are more of -- well, so -- so I think that having -- understanding of the federal securities laws as a state securities regulator is probably important, yes.

Q. And, in fact, doesn't the Colorado Securities Act -- which, in my lay understanding of it is, would be 11-51 and its associated provisions?

A. That is the act.

Q. Okay. And so the -- there's -- I've given the -- a -- the next page of what I've presented to you is references to federal statutes, and it talks about what those references are and how they intertwine with the Colorado Securities Act.

And it -- and, to me, it's very specific. And so I'd like to establish what that relationship is between the Colorado Securities Act and the SEC regulations and -- and other regulatory agencies associated with the SEC.

So the baseline for the -- for the Colorado Securities Act is January 1st, 1990; is that right?
A. There was a major amendment to the act in 1990, yes.
Q. And as those amendments are made, does the securities commissioner have the right to look at those amendments and determine whether or not they're going to incorporate that in the Colorado Securities Act?
A. I'm not sure I understand your question.
Q. So the base -- baseline is January 1st, 1990. The federal regulations are the baseline for the Colorado securities regulations. Is that a fair statement?
A. Can you -- I'm not sure what you're saying.
Q. Well, why don't I just read the first paragraph on the second page. "Each reference in this article" -- which is the Colorado Securities Act -- "each reference in this article to a federal act or statute means, unless the context otherwise requires that act or statute has in effect on January 1, 1990, together with all rules and regulations under such act or statute in effect on that date, except as subsequent amendments may become applicable to this article, pursuant to Section 2." What does that mean to you?
A. So I think, when the act was amended, it

meant to say that -- that any reference to a federal provision, statutory or regulatory provision, shall be incorporated in and applied to as of the time of the amendment to the Securities Act.

Q. And so the -- there's the recognition that there's going to be an amendment, or there's probably going to be amendments to the federal acts, and when that occurs, does it give the commissioner the right to examine that and say, "This doesn't work for us here in Colorado; maybe we don't want that to be in -- in part of our securities law"? Is that . . .

A. So there are -- there are references to federal provisions in the registration provisions of the Securities Act. So I think, generally speaking, this reference refers to those sorts of statutory cites.

Q. Okay. So when there is an amendment to the federal act, my question is, does the commissioner -- are they able to say, "I agree with that amendment and it's adopted," or -- or, "I think I'm going to see if we can change the law that is different to some degree than what the amendment on the federal acts are"?

A. So you go back to the page 1, where we interpret the Colorado Securities Act, or coordinated with the federal provisions, as long as they're

consistent with the purpose of the Colorado Securities Act and the provisions of the Colorado Securities Act.

So if there is something that's not -- that's not -- is contrary to the purpose of the state act or is inconsistent with the provisions of the state act, the commissioner does not have to coordinate the act with those federal rules and regulations.

Q. So the baseline is the federal rules and regulations.

A. No. The baseline is the Colorado Securities Act. And then the Colorado Securities Act is coordinated with the federal statutes and provisions, as long as the purpose and the -- and the provisions are not inconsistent.

Q. Okay. And if the -- if the commissioner determines that it's inconsistent, is there a process for them diverging or not incorporating the federal Securities Act?

A. So -- so, no. The process is simply enforcing the Colorado Securities Act, irrespective of what the federal regulations or rules are.

Q. This Section 2(A) would seem to disagree with you. "Whether or not an amendment to an federal act or statute to which reference is made in this article is enacted with an effective date after January 1st, 1990,

or whenever an amendment to any rule or regulation, any such federal act or statute, the statute is promulgated with an effective date after such date, the securities commissioners shall determine whether giving effect to such an amendment is consistent with the purposes of" -- "of this article set forth in 11-51-101-2."

A. So -- so there are federal provisions that are referenced in the registration provisions of the state act. And so 2(A) is referring to those. So, for instance, certain offerings are coordinated with the federal offerings, and that's what this applies to.

But later on in 2(A), you see -- see where there's this notion that, if the federal amendment is inconsistent with the state purposes or provisions, then there's a different standard.

Q. My reading of this is, if there's an amendment to the federal act, the commissioner -- and the commissioner says it's inconsistent because you're coordinated, is there a rulemaking process laid out?

A. The only -- the only time that the securities commissioner would look to the federal amendments is if there's already coordination going on and there's some change in that, or if it's -- if it's a new amendment, then the federal statute or rule would have to preempt state law.

So you get into this notion of preemption, and preemption has to be specific. The federal government has to preempt the state regulators in a specific area.

Q. There's a sentence in here about -- actually, 10 lines down, that says, "If the security commissioner determines that an inconsistent" -- "inconsistency exists between federal and" -- "and the state law, the commissioner" -- "the Securities Commission commissioner shall commence rulemaking proceedings for the purpose of making, amending, or rescinding such rules under this article, as appropriate to carry out the policy stated in 11-51-101-3."

A. So you're referring to state provisions that already reference or require coordination with federal acts. So if those federal -- so if you have coordination already place and the federal government amends those requirements, then the section refers to that coordination or that aspect of the act.

Q. I think this is where we disagree, so I'm going to -- your interpretation. And let me just move on and let me just say that.

After that, it says, "If no rulemaking process with respect to such amendment is commenced within 90 days after the effective date of such

amendment or within 90 days after the effective date of this article, as set forth in Section 11-51-801, if later such amendments apply to this article."

So if there's an amendment, then nothing is done by the commissioner within 90 days, then it becomes part of the Colorado Securities Act; do you agree with that statement?

A. So you -- so I think you're misinterpreting that section. This section applies to places in the act where there's already a reference to federal statute or rule or regulation. The first sentence says that.

So if we're required to coordinate certain offerings under the registration provisions with the federal act, and that federal provision is amended, then the section you just read applies to that amendment.

Q. And if -- and if that particular coordination is amended at the federal level, and the securities commission can then say, you know, "I don't know if we can go along with that," and then they set upon a rulemaking process, is that -- is that your opinion?

A. No. The act says what it says. I mean, if the act says that these offerings shall be coordinated with the federal act, and then they need to be

coordinated with the federal act.

Q. Agreed. And so there's a specific rulemaking process to stay coordinated with the federal act, and it's spelled out in these next few pages. And if a -- if -- and that rulemaking is very specific.

It's, 90 days, nothing is done, then that coordination that previously -- previously existed stands as part of the Colorado Securities Act.

A. Well, yes. That's what this -- the provision says what it says.

Q. Okay. Do you think that the exempt transactions are fairly well defined by the -- by the federal laws?

A. Well, I mean, I -- they -- the federal exemptions are defined, yes.

Q. Okay. And so, can you -- can I reiterate what I think I heard you say about registrations and exemption? So that you -- so I'm -- am I -- would -- let me gather my thoughts.

I'd like to reiterate what I think you said, what I think I heard you say about types of transactions, whether they're a registration or an exemption. Can I do that and see if you agree with me?

A. You can ask me a question, sure.

Q. Okay. So, in the United States, if you're

going to raise a significant amount of money, or any amount of money that would require some sort of exemption, you either can raise the money as an exemption, or you need to register a document; is that fairly accurate?

A. That's fairly accurate.

Q. Okay. Inside the Colorado Securities Act, there's a specific provision of -- relating to exemption transactions. And there's a whole list of exemptions that qualifies transactions are being exempt.

And I've listed the one that we were relying -- we were relying on. And that exemption is any transaction not involving a public offering. So if we were not doing a public offering, would the transactions that we did qualify for an exemption?

A. So the answer is, if it's a private offering -- in other words, no securities have been offered to anyone in the public -- then, yes; that's an exemption under the registration provisions of the state act.

Q. Do you think that the offerings that we made, at least while I was there, were public offerings?

A. So you're asking my opinion, and from the information I reviewed, there -- the -- the

corporations the company used, accredited investors, cold-call lists, and cold calls were made to investors, that takes you out of the private offering exemption.

There was also presentations made to investors, and if the company did not have a substantial preexisting relationship with the people it invited to those presentations, then that would take you out of the private offering exemption.

Q. So your opinion is, is that these offerings that we made were -- were public offerings?

A. Yes.

Q. Okay. And if you -- if you used a broker dealer, which we did, for a significant portion of the -- of the offering, I had no -- did not know many of those investors, and so it's your testimony that, if I didn't know those investors, have a preexisting relationship with those investors, I can't have a private placement?

A. So the -- so the private offering exemptions requires you to have a preexisting relationship with those investors. So if you use a broker dealer, and that broker dealer is engaged by you to make the offering on your behalf, and those offerings are made to customers of that broker dealer, then there may be a preexisting relationship in that situation.

But for the material I reviewed, I did not see any sort of relationship with the firm in this case.

Q. So the requirement to have a preexisting relationship can be adopted if you're using third parties who have a preexisting relationship?

A. If you have a broker dealer that has a client base that you have a preexisting relationship with.

Q. And -- okay. And so, if . . .

A. You can't recruit any third party or any person off the street and ask them to bring in their family and friends to invest in your offering and -- and maintain that as a private offering.

Q. Okay. What if someone contacts me and says -- as the CEO of the company, and says, "I've got a buddy who invested with you, and I'd like to take a look at what you're -- you're doing"? Would you consider that to be a preexisting relationship?

A. No. They called you; they have no relationship with you. It's not preexisting. It's not substantial.

Q. So if one person told another person about the offering, and they approached me, I didn't approach them, then I'm not allowed to -- to sell that -- as the issuer, I'm not allowed to sell that to that person?

A. Not until you've established a preexisting, substantial relationship with that person.

Q. Does it -- where -- I don't want to jump down that rabbit hole because I don't have that much time. And we'll just say that we disagree on some -- some aspects of that.

We talked about -- and both you and Plaintiff's counsel used the word "promoters." And "promoters" is also used in SEC regulations. What is a promoter?

A. Well, I mean, in a general sense, it's someone who is offering investment opportunities to investors in some endeavor.

Q. And so can a promoter be someone who is other than a broker dealer?

A. Yes.

Q. And can that person be compensated for introducing that -- that potential client -- well, that potential relationship?

A. Well, I assume they can be paid. I mean, I'm not sure what your question is.

Q. Well, I'm trying to advance along the concept of promoter, and promoters are a large part of the industry, not so much here in Colorado, but in New York. So the promoter is someone who can go out and

talk to people about the -- the -- a particular offering.

A. So the definition of a "securities sales representative" or "agent" is whether or not you're receiving transaction-based compensation. Commissions -- in other words, for engaging in or asking investors to invest in a company.

So if I'm a sales agent, and I'm asking an investor to invest in a company, and I receive a commission based upon the amount of the investment, transaction-based compensation, then I'm a securities sales representative, and I need to be licensed.

Q. How can a promoter, if you will, if they're -- if they are paid a flat fee, and there's -- I think other conditions beyond that that the SEC has guidelines on, they can introduce people to you, that, as long as it's not commission-based, as -- and you can sell to them?

A. So "transaction-based compensations" is a term of art, and it may well encompass a flat fee, depending upon the circumstances of that payment of the flat fee.

Q. So it's a -- so it's allowable?

A. No, it's not. What I'm saying is, transaction-based compensation, you can't get around

the notion that you're receiving commissions by somehow structuring it as a flat fee if your intent is to avoid that.

So -- so it -- so "transaction-based compensation's" a term of art, and you've got to look at the -- the facts of each transaction and how that sales agent is being compensated for selling those investments. So it depends upon the facts, is what I'm saying.

Q. And I agree with you. And so I'm just trying to get at the question of -- I'm trying to ask the question, can a promoter be compensated under certain circumstances, and the people that they refer to you, can you sell -- can the issuer sell the investment to those people?

A. Well, I'd have to be given specific facts for me to render some sort of opinion.

Q. If those facts were satisfied -- certain facts were satisfied, can an issuer sell to that person introduced to them that they don't have a preexisting relationship with?

A. Well, now you've added another factor. So you added the preexisting relationship factors in, which is different from what we've been talking about. We're talking about transaction-based compensation.

Q. A commission?
A. Right.
Q. And you can't -- but --
A. Well, it's broader than a commission.
Q. Well, let's just agree to disagree on some of that. And -- but it's conceivable -- what I'm hearing you say, it's conceivable that if someone knows someone, and they introduce that someone to you, that's what a promoter would be, is that you can then talk to that person, and under the right certain facts, you can -- the issuer can sell to that third party that they didn't know?
A. If you don't have a preexisting substantial relationship, then you can't take advantage of the private offering.
THE REPORTER: You said can or cannot?
THE WITNESS: Cannot.
Q. (BY MR. MCKOWEN) The judge has admonished me to move on and stop beating things. And I think he's right. Otherwise, I'm -- the next page is "Denial or Revocation of Exemptions." And, again, if I could read this particular section of the Colorado Securities Act.
"The securities commissioner may, by order, deny or revoke the exemption specified in 11-51-307-1(G) with respect to this" -- "the specific

security or transaction if the security commissioner finds that such order is necessary in the public interest for the protection of investors."

Do you -- I mean, I'm just reading the act. But I do have a question that relates to that. "The securities commissioner may, by summary order of 11-51-606-3(B), summarily suspend the exemption specified in Section 11-51-307-1(G) as to the specific secure" -- "security or issuer, pending final determination of any proceeding under this section."

Do you know if the securities commissioner issued a -- a suspension of an exemption on -- on the securities that we were conducting?

A. I'm not aware. I don't know.

Q. And so Part 2 goes to -- indirectly goes to but is very similar to the language in the federal bad actor rules that you referenced. And I've highlighted -- highlighted down below the pertinent section. But let me read the entire section because this is very, very important to what we've done here.

"The securities commissioner may, by rule or order, deny or revoke an exemption specified in 11-51-308," which is where we're saying we are entitled to an exemption, "with respect to a specific security transaction issue or class of persons if the issuer,

any of its predecessors, or any of the issuers, directors, officers, general partners, beneficial owners, or 10 percent more of many class of equity securities or any of its promoters then presently connected with the issuer in any capacity has been convicted within 10 years of any felony in connection with the purpose or sale of the security."

In the -- would you consider this to be what they call as a term of art in the industry a "look-back period"?

A. Well, I don't know if I would refer to it as a "look-back period." It simply says what it says, that the commissioner can revoke an exemption, or, you know, commence proceedings to revoke an exemption if the promoter has a felony conviction within the past 10 years. It says that.

Q. Does anyone that you know of associated with this -- the offerings that we did, were they ever convicted of a felony in connection with the sale of securities?

A. I'm not aware of any.

Q. And -- okay. And so, if there weren't any, then it would be difficult for the securities commissioner just arbitrarily to say, "You can't have an exemption; we're stopping this"?

A. Well, this is -- I mean, you're speaking about one provision under the act, 310, Subsection 2. There are a number of different provisions under the act that a securities commissioner can look at to, you know, enjoin or stop any offer that is a violation of the act.

Q. Okay. And I accept that. But this is just relating to the denial or revocation of an exemption, irrespective of if we were entitled to it or not, the look-back period, and that's a -- and that's a term of art with the SEC. It's 10 years and it has to have been a felony.

A. Well, that's what this -- that's what this provision says.

Q. Thank you.

A. So this is a registration provision. It's listed under the Registration Provision of the Securities Act, and it applies to registrations.

Q. Correct.

A. It doesn't apply to the licensing provisions, and it doesn't apply to the antifraud provisions. Those are in separate sections of the act. So we're specifically talking here about the registration provisions.

Q. The registration provisions, or is it talking

about exemption provisions?

A. Well, we're talking about -- anything under the 300s are registrations. 400s are licensing, a separate section under the act, and the 500s are related to antifraud provisions.

Q. Right. But what I'm saying -- and I agree with you; this refers to exemption. And if you have an exemption, irrespective of whether you originally qualified for it or not, the look-back period is 10 years.

A. Well, under this provision, there are other provisions that have other standards as to whether or not the commissioner's entitled to proceed with some sort of action to enjoin or stop an offering that's taking place.

Q. Let's move on. I think we're talking around each other. Let's move on to the next portion of that particular section. That's on the next page. And it's Number 3.

"No order under Subsection 1 or 2 of this section operates retroactively. No person may be considered to have violated 11-51-301 or 11-51-305 by reason of an offer of sale effective after the entry of an order under Subsection 1 or 2 of this section if that person sustains the" -- "if that person sustains

the burden of proof that the person did not in the exercise of reasonable care could have known of the order."

So the first part is how can -- how far can you look back. And this is saying, if they didn't know that you -- that you can't operate retroactively and go back and say that. Is that your understanding?

A. So -- well, I mean, the words of the statute speak for themselves. And they apply to this section, not other sections of the act.

Q. Do you have the one that I gave you? This seems to be missing a particular section. Oh. This -- you have a section that refers to the filing of sales literature? It's about . . .

MR. HARDING: This?

MR. MCKOWEN: It's about four pages, five. It's titled "Filing the Sales Literature."

May I approach the witness?

THE COURT: Yes.

MR. MCKOWEN: Thank you.

Q. (BY MR. MCKOWEN) This part? "Securities commissioner may, by rule or order, require the filing of a prospectus." "Prospectus" is what we in the industry are required to provide investors prior to them making an investment. So it's a term of art.

We can also call it a red herring. It's -- it's what you're looking to if you were a broker dealer, or that's what you would call it -- "a pamphlet, a circular, a form letter, an advertisement, or other sales literature addressed or intended to be for distribution to prospective investors, unless the security or the transaction is exempted by 11-51-307, 11-51-308, or 11-51-309."

We are relying on the exemption of not being a public offering. So, your statement, did you -- do you believe that's consistent with your statement that -- that the -- that some sort of pamphlet, circular, form letter, or prospectus or advertisement needs to be provided to prospective investors?

MS. HUNT: Objection. This mischaracterizes the testimony.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Is there a requirement if we have a -- if we qualify for an exemption under 11-51-308 that we provide the investor any of these sales documents?

A. So this section says that the -- the commissioner may require the information listed be provided to the commissioner.

Q. Right.

A. So it doesn't say anything about -- so -- so this is a registration provision. And it goes to registering the securities or perhaps exemption from registering those securities.

It doesn't go to the antifraud provisions. Doesn't go to the disclosure requirements that a promoter has to the investors. So -- so this is separate and apart from that.

Q. And that's the same answer that you provided to the previous section, that if you don't qualify for the exemption, then -- and part of the qualification, in your opinion, is that you -- you need to -- you need to not be committing fraud?

A. No. That's -- that's not what I said. So you've been focusing on the registration provisions and what is required to obtain a registration or exemption from registration. Those are separate and apart from the -- from the issuer's disclosure requirements.

Q. I agree. But if you qualify for an exemption under 11-51-308, are you required to, according to the commissioner, provide this information to the investor?

A. I think you're misreading that provision, Mr. McKowen.

Q. In your opinion, going back many, many years, do start-ups fail more frequently, more often, and is

there greater risk associated with investing in a start-up than investing in an established company with history and earnings and -- and facts?

A. Yeah. I think the answer to that question's obvious. Yes.

Q. Okay. So if -- if a -- the offering documents say that this is a start-up, and there's risk associated with it, then they would be disclosing something about the business that matters?

A. In my opinion, that would be an important fact. But you need to -- so I think what you're getting at here is -- I mean, you can't say to an investor, "This is a highly risky investment; if you invest, you may lose your entire investment," and call that good, call that full and fair disclosure.

That is not what the law requires. The law requires that you provide the investor the reasons why it's a risky investment, the reasons why it may fail. You can tell the investor the reasons why it may succeed, but you need to inform the investor exactly what those risks are in that start-up company.

What's the basis of the company? How is the company going to earn profits? And why the investment monies may be at risk when they invest in that company. So you need to be, when you're making disclosures to

investors, much more specific than this general notion that this is a start-up, and it's a risky investment.

Q. If you told them that this is a start-up, and you may lose all your money, that's a part of what needs to be said, is -- isn't it?

A. Well, that's a start. It needs to be full-throated disclosure of the important facts to that investor.

Q. Okay. If you -- do you -- do you think that disclosing to them -- "them," the prospective investor -- that you're investing in a marijuana-related industry, you're building greenhouses to grow marijuana, do you think that that's also risk disclosure?

A. Well, I mean, I think you need to provide more disclosure than that. I'm -- I'm -- so, on the positive, that would -- you could indicate to an investor that, you know, it's a new industry, it's a growing industry, and we have a way of growing and selling marijuana that's efficient, and we can make profits on that, but you also have to disclose what are the risks, and those risks, they are inherent in obtaining and maintaining a marijuana license in order to do what you want to do.

So you can say those things, but you need

to -- you need to express why -- why there are risks and why the investment may fail or succeed.

Q. That's the sort of thing you'd see in a Private Placement Memorandum that you talked about?

A. Well, so, that's the sort of thing you see when you see full and fair disclosure to investors.

Q. And you described that as they're generally -- generally provided to private placement investors?

A. In my experience, promoters of private placement -- of private offerings provide Private Placement Memorandums. That's the standard. It's unusual to see private offerings that do not provide such a document.

Q. You have used the term "promoter" again. So, clearly, it must be that the promoter can provide investors to people -- to an issuer?

A. So promoters can provide disclosures to investors. I mean, they're required to.

Q. So promoters can introduce investors to an issuer?

A. Yes.

Q. Even if you have no prior relationship with the investor that they're introducing you to?

A. Well, so, now you're talking about the issue

of whether it's a public offering or private offering. If you want to rely on the private offering exemption, the -- you have to have the preexisting, substantial relationship with that investor.

Q. Do you provide PPMs, Private Placement Memorandums, too in public offerings?

A. Public offerings, you are -- you register your offering, so the offering document, whatever it may be called, your registration statement or your prospectus is reviewed by the state and federal regulators before it's disseminated to the public.

Q. That's a prospectus?

A. Right.

Q. But it's not a Private Placement Memorandum?

A. Well, that's just a name on the document. So it's standard practice in the industry for private offerers, private offerings, to provide Private Placement Memorandum.

So when I taught my class on Real Estate Securities and Syndication, the students were required to prepare a Private Placement Memorandum as part of their -- their course requirements.

So they had to prepare disclosure documents so that they have an understanding of what full and fair disclosures were to investors.

Q. But would you say that you present a PPM, a Private Placement Memorandum, in a registration offering, S1, S2, S3?

A. So -- so the PPM is the disclosure document to the investors from the promoter or the offerer.

Q. A PPM, a Private Placement Memorandum, is something that's used in private placements? That's why it's called a Private Placement Memorandum?

A. That's my understanding.

Q. And you said that a promoter can use a PPM, and a promoter is someone who introduces you to an issuer; otherwise, if you knew the investor, you don't need the promoter, right?

A. Well -- well, so it's the offerer that's relying on the exemption, correct? So if the offerer's relying on the exemption, they're the ones that need the preexisting relationship with that investor.

Q. Okay. Is a -- an issuer, the CEO, required to be a registered representative in order to sell shares of the shore (sic)?

A. So -- so, under the state act, if the CEO is providing substantial duties for the company, then they're not -- they don't come within the definition of a securities sales representative.

Q. If I'm the CEO of company, and I'm

responsible for everything -- putting a business plan together, I'm hiring a CFO, I'm hiring contractors to build the greenhouse, all of those things -- I'm actively engaging 14 hours a day as the CEO of a company, do I have to be a registered representative to sell shares of the -- of my company?

A. So, as I said, you -- you -- if you're performing substantial duties for the company, which it sounds like you're doing, then you don't -- you don't fit within the definition of a securities sales representative. Securities sales representatives need to be licensed.

So the answer to your question is, no, you don't need to be licensed with the state.

Q. Okay. Regarding marijuana laws in Colorado, what do you think I need to know as the CEO of a company that is building greenhouses to lease to licensed marijuana brokers?

Do you believe that I need to know everything about the marijuana laws in Colorado, or do you think that the requirement that I have -- the absolute requirement that I have is I have to know my tenants are licensed?

MS. HUNT: Objection. This is beyond the scope of Mr. Rome's expertise.

THE COURT: Overruled.

THE WITNESS: So -- so the question is, what do you need to disclose to investors? And if you don't have knowledge of the marijuana industry and the licensing requirements, and you're attempting to run a marijuana business and generate profits for your investors, then, in my opinion, you should inform your investors that you lack knowledge about the marijuana licensing provisions and regulations in the state.

Q. (BY MR. MCKOWEN) So if I understand your reply, I need to know -- one, I -- I don't agree with your characterization that I'm running a marijuana business. I'm running a greenhouse construction.

MS. HUNT: Objection. He's testifying.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Do you think I was running a marijuana business?

A. Well, from my review, you're building a warehouse to grow -- eventually grow marijuana and sell the marijuana, reap the profits from that. That's part of the business plan.

Q. I'm running a business to grow marijuana? That's what --

A. Well, not -- not -- the offering, as my understanding, is you're soliciting investors to invest

in building warehouses where the marijuana's going to be grown and sold.

Q. The business isn't to run a marijuana business. Is that -- is your opinion that GrowCo was to run a marijuana business, or was it to build the infrastructure and then lease it?

A. So -- so the -- my understanding of reviewing the documents is GrowCo was going to construct the warehouses, and they had knowledge of how to efficiently grow the marijuana.

They may lease the warehouse to -- and that's what happened in the first one -- lease the warehouse to a medically licensed -- not medically -- marijuana-licensed grower who was going to grow the marijuana and sell it, from those profits, pay GrowCo the lease payments back, which would eventually get back to profits for the investor.

That's my understanding of the basic structure.

Q. Well, we were -- we were in the business -- do you think we were in the business of constructing warehouses, or do you believe that we were building and constructing greenhouses with an attached warehouse?

A. Well, the idea is to have -- is you were constructing -- I'm not sure of the distinction between

the warehouse or a grow facility. But the idea was to enable the tenant to grow and sell marijuana.

Q. Right. Do you think it's -- what's important, is, one, I know they're licensed, and, two, that they have a history of being able to grow effectively marijuana in the facilities that we're leasing?

A. So -- so what's -- what I believe is important is what was -- what should have been disclosed to the investors with respect to your understanding, knowledge of, and the status of the marijuana licensing for GrowCo.

MR. MCKOWEN: Okay. Thank you very much. No more -- no more questions.

THE COURT: Thank you. Mr. Harding, any questions for you?

MR. HARDING: I do, sir. Fifteen or 20 minutes.

THE COURT: Let's go ahead and take our recess now then. Mr. Rome, you may step down. And we will be back in 15 minutes.

(Break from 10:24 a.m. to 10:40 a.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. Mr. Rome is on the witness stand, under oath. And cross-examination

by Mr. Harding.

MR. HARDING: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HARDING:

Q. Mr. Rome, nice to meet you. My name is Wayne Harding. I'm one of the Defendants.

A. Good morning.

Q. Good morning. Hey, I wanted to ask you some, just, general questions first, clarify your resume, some of the other statements you said. By the way, congratulations on your retirement in 2019. Hope you've spent a lot of time with your family outside these engagements.

A. Thank you.

Q. So let's talk about the engagements. How many of these engagements have you had?

A. To act as an expert witness?

Q. Yes.

A. You mean, to act as an expert witness? Is that what you're talking about?

Q. Yeah. As an expert witness, how many, approximately, times have you been engaged? By the way; I apologize, I know the other Defendant and I are -- have a hard time hearing, so sometimes there's a pause because I have to read what's going on.

A. I would estimate 40 to 50 times.
Q. Okay. And out of those 40 or 50 times, have you always represented the AG's office?
A. Yes.
Q. Okay. You've always represented them as a plaintiff, I guess?
A. Never as a defendant, no.
Q. Okay. So, essentially, an expert witness for the AG's office, or for plaintiffs in general?
A. Well, they use me as one of their expert witnesses.
Q. Okay. And your fee is -- I think I read $300?
A. No. My hourly fee for work on this case is $175.
Q. Okay. And is it different when you come to court?
A. No.
Q. Okay. And there's no other fee involved? There's no success fee or anything else?
A. No.
Q. Okay. Thank you, sir. You also represented early on that you were an adjunct professor at University of Denver?
A. Yes.

Q. Can you be sure of the title?
A. Yes.
Q. I spent six years speaking, teaching at University of Denver, and there was disagreement on what title I could use, and they insisted on "adjunct instructor," not "professor." So you were an adjunct professor at University of Denver?
A. Well, the adjunct, I'm not sure if they had a title for me. I just know that I taught that course for five years. So I was an adjunct. Whether it was a professor or instructor, I'm not sure.
Q. Okay. But we can agree that terms are really important here, can we not?
A. Well, the securities law terms are important.
Q. Okay. So one other thing about University of Denver. I think you mentioned that you taught in the real estate school. Is that the Barns or Burns?
A. Daniels College of Business.
Q. Daniels College of Business. But there's a real estate school there?
A. The Burns, yes.
Q. Burns. Okay. And you taught a course on real estate, I think?
A. It was called Real Estate Securities and Syndication.

Q. Okay. How's your level of knowledge when it comes to accounting?
A. I'm not a CPA.
Q. That's not the question. What's your knowledge when it comes to accounting, sir?
A. I have a basic understanding of accounting.
Q. So when -- it sounds like, at the School of -- at the Daniels College of Business, the Burns Real Estate School, you were putting together, I guess, like, a real estate type of project?
A. Well, the students were required to put together a real estate development project.
Q. Catching up here on the reading. I apologize for the pause. And part of that real estate project is you helped your students produce pro formas; is that correct?
A. Well, they produced the pro forma.
Q. But you graded it; you oversaw it; you answered questions?
A. Yes.
Q. Okay. It sounds like a real estate development project -- they're going to develop, whatever, part of a building, parking garage, office center, whatever, right?
A. Correct.

Q. Okay. In that pro forma that students did, when did they -- how did they capitalize that project? Did they use their own money? I understand it's hypothetical. But they go out and solicit money, I mean, in terms of pretending to do that, or was it their own funding? In other words, did they have debt?

A. So the concept was that they would have to reach out to investors to fund at least part of their projects. So that the point and purpose of the course was to gain -- have them gain an understanding of how to comply with the federal and state securities laws.

Q. Okay. Let me repeat my question. On some of those projects they submitted to you for grades or to review or whatever, as the adjunct professor of that course, did any of those courses or any of those pro formas have debt associated with it?

A. Yes.

Q. Yes? So when debt is associated with a real estate project, is that debt -- if you don't know, you don't know -- is that debt capitalized into the cost of the project until the project comes into fruition, or is it expensed?

A. Off the top of my head, I don't know the answer.

Q. Okay. Fair enough. Let's talk about

disclosures. Can you make a verbal disclosure?
A. Sure.
Q. Okay. Let me back up a little bit and just take a look at your exhibit here on what you looked at. Did you look at the term sheets involved with the offering?
A. I reviewed some term sheets.
Q. We can bring them up for you if it would be helpful. But -- so you probably remember, in the term sheets, I think, every one of those, if I got your testimony -- should be more precise in disclosure -- but I think every one of those term sheets had a provision for the general operations or general administration of the greenhouse or of the entity. Is that not correct?
A. I would have to look at the term sheet.
Q. Okay. So let's bring them up.
MR. HARDING: Can we display presentation or Exhibit Number 27, please.
And, actually, I think there's a book with exhibits, if it's better on your eyes. It's certainly better on my eyes in reading this.
THE COURT: It's up to the witness.
MR. HARDING: For the witness, there's a book.

THE WITNESS: Yeah. I prefer the hard copy.
Q. (BY MR. HARDING) Are you okay reading off the screen?
A. No. I prefer this.
Q. I'm going to pull it up. I'm going to go to mine and pull it up while you get the book.
A. What's the exhibit number?
Q. 27, sir. Can we start at the very bottom? And you can read that to us. There's a -- four short bullet points, "Use of Proceeds." Could you please read that for us, please?
A. So, at the bottom of 172, it states, "Use of Proceeds. Net proceeds will be used by partners primarily to finance the construction of either one greenhouse, if 6 million offered units are sold, or two greenhouses, if 10 million offered units are sold, each to be leased to marijuana growers, to lend up to 1.0 million to greenhouse leases, pursuant to lines of credit, the credit facility to finance to purchase of farmland and water taps for greenhouses and for working capital and other general corporate purposes of partners."
Q. Thank you. Let's go to the next term sheet. I think it's Exhibit Number 28. So let's go back down to "Use of Proceeds." Don't read the whole thing,

unless you want to for your response. But would you please read the first bullet point on the top?

A. Exhibit 28. "Preferred units of GrowCo Partners 1, LLC, GCPI" --

Q. I apologize. Let me stop there. It's page 2, the first bullet point at the very top.

A. Page 2, "Preferred units of GCP2, having a 50.00 percent profit interest in GCP, which has been formed by GrowCo to construct a second greenhouse facility that will be leased to and operated by the entity that will lease GCP1."

Q. Okay. So assuming that the cost of interest -- interest is -- we'll get to this later in terms of other testimony -- but the cost of interest that is incurred during the construction progress and project, until it's ready for occupancy, assuming, sir, that you capitalize that interest, then that would be proper in terms of the cost expenses for the second greenhouse?

A. Again, I'm not an accountant or CPA, but that well may be true.

Q. Okay. You said that "that may well be true." Okay. Let's go to Exhibit 47. So this is another term sheet that we have not seen before today, correct?

A. Yes.

Q. Okay. And this is a term sheet, you agree, with the senior secured notes of GrowCo, Inc.?

A. Okay.

Q. Okay. Could we go down to the Use of Proceeds?

A. Okay.

Q. At the very become.

A. Yes.

Q. Would you read me the last bullet point, please?

THE COURT: Mr. Rome, pull that microphone towards the podium, please. Thank you.

THE WITNESS: The last bullet point reads, "For general corporate purposes."

Q. (BY MR. HARDING) Thank you. Let's go to the next exhibit, Exhibit 49.

A. Okay.

Q. Can you identify this, please?

A. This is Exhibit -- 49 is a "GrowCo, Inc., Memorandum of Terms for a Senior Exchange Note," dated May 31, 2018.

Q. All right. So would you read, about two-thirds of the way down, under the category "Use of Proceeds"?

A. So it states, "Net proceeds will be used by

GrowCo to support the operations of the LLC."

Q. Okay. Based upon your experience, exposure, maybe not through accounting, but through courses in real estate, Burns School at University of Denver, and just general knowledge, can you tell me what operations are of an LLC? In general.

A. Well, I assume that references to operating the business, but the day-to-day operating costs of the business.

Q. So would salary be part of that?

A. Yes.

Q. Would debt service be part of that?

A. Yes.

Q. Okay. Would office supplies be part of that?

A. Okay. Yes.

Q. Would travel expenses be part of that?

A. I'm not sure about travel expense.

Q. Okay. Maybe from the IRS standpoint, legitimate travel expenses to go back and forth between greenhouses and that type of thing?

A. Possibly.

Q. Okay. Can we just summarize that "operating" usually means business operations, expenses of property, property incurred should be part of the operations?

A. Sounds common sense to me.
Q. Okay. Thank you. Let's go to -- which one was that? Was that 49? Let's go to Exhibit 51. Can you identify this?
A. So it's another Memorandum of Terms for GrowCo, dated July 1, 2022, Exhibit 51.
Q. Thank you. Have you seen this document before?
A. I don't recall.
THE COURT: Which exhibit is that? I'm sorry.
THE WITNESS: It's Plaintiff's Exhibit 51.
Q. (BY MR. HARDING) Quite possible that you've seen it; you just don't remember it; maybe that's the case?
A. That's possible.
Q. Okay. And, in fact, let me backtrack a little bit. Those last three, I think, Memorandums of Terms before this, do you remember reading those documents?
A. So I recall reading Memorandum of Terms, documents similar, but I don't recall specifically whether or not I reviewed those documents.
Q. Okay. Thank you. So in this particular one that you identified as a Memo of Terms for GrowCo,

Inc. -- let's go down to Use of Proceeds. It's about two-thirds of the way down. Could you read me that section, please?

A. Sure. "Net proceeds will be used by GrowCo to complete construction of the second greenhouse, warehouse, and extraction facilities at GrowCo's grow complex, located in Pueblo County, Colorado, along with general and administrative expenses."

Q. Boy, there's that word, 'General and administrative expenses." Is that not correct?

A. That language is there.

Q. Yes. Okay. Thank you. Now, also, it says "grow complex." Does it say anything about us growing or -- sorry -- GrowCo growing, or we're just building a complex, or it's kind of hard to determine there?

A. Well, it says "grow complex."

Q. Okay. So you don't know whether we're actually growing or somebody else is growing, or we're the developer, the builder -- for example, Trammell Crow is a big developer in town, and they develop office complexes, but I don't think they have offices there. Do you agree with that?

A. About Trammell Crow?

Q. Well, okay. Let's make it generic. An office building developer builds an office building,

hoping to get a return. Is that normal, right?
A. Sure.
Q. Do -- that office developer, do they actually -- more times than not, do they take office space in that office building?
A. Possibly.
Q. But more times than not, do you think they do? If you're an office developer, and your deal is to pound -- you know, bring the -- do the vertical improvement, whatever?
A. I'm not that familiar with office developers, in general, to comment on that.
Q. Okay. Thank you. So we just -- now looked at, I think, -- one, two, three, four, five, six -- six term sheets, I believe, and it correlates to the operation that we were doing with debts and equity?
A. Okay.
Q. So in Exhibit A, in terms of what you saw, you're not quite sure whether you saw the term sheets or not, or do you now remember reviewing?
A. As I stated earlier, I reviewed term sheets like these, if not these exact term sheets.
Q. Okay. Do you think these term sheets, Terms of Disclosure, are these term sheets important to the investor?

A. So these term sheets do contain some disclosure.

Q. Thank you. Including the disclosure that we just covered in terms of, you know, constructing the greenhouse, general and administrative and operational, correct?

A. They -- they contain some disclosure.

Q. All right. So I guess that's not an answer, but that's fine. You used the -- I think it might be a term of art in law, and I don't know -- but you used the word "fair and full disclosure" every once in a while.

Is that a -- like, a case law-supported concept, or is that a general concept? Is that a gut kind of concept?

A. No. It's a case law-supported concept.

Q. Okay. And tell me how the case law came out in terms of what is the definition of that the State of Colorado uses for "full and fair disclosure."

A. So I'm not sure of your question.

Q. I thought you answered -- correct me if I'm wrong -- that -- I asked where the term "full and fair disclosure" came from, and you said it was from case law. And so tell me the case law. Tell me how it's applying, sir.

A. So there are a number of Colorado appellate courts that use the phrase when describing the seller's obligation in a security transaction to provide full and fair disclosure of material facts to the investors.

There -- so there are a number of cases. I don't have them at my fingertips, but I certainly can get them for you.

Q. So you stated that "to provide full and fair disclosure of material facts." What is a material fact?

A. So, again, the Colorado appellate courts have defined "material fact" for us, and their definition is, a fact is material if there's a substantial likelihood that the investor would find the information important, and by "important," does it significantly alter the total mix of information.

Q. Thank you. You also talked about briefly about the exchange transaction work, and it's almost like a new offering, and I believe you said if new certificates are issued or new notes are issued?

A. Sure. If there's a new security, debt or equity issues, then it's a new transaction.

Q. Okay. So --

A. It's a separate transaction. Yeah.

Q. Okay. So if I give you a full million,

$100,000 note, and I came up to you, and I said, "Mr. Rome, this thing's not going like we projected" -- by the way, that's probably a disclosure too, isn't it?

A. It's part. Some disclosure.

Q. It adds up. This is all part of disclosure to our investors and whatever. And I want to tell you, you know "Things are not going right; I need you to defer some interest on the note that you have," can you sign an amendment to the note? Keep the note as-is. Is that a new security?

A. In my opinion, that would be a modification of the debt of the note.

Q. Okay. Thank you. I truly understand the need to understand where funds, you know, came from but went and report back to the investor. So in that -- in that statement, were you aware that we were using specific bank accounts to collect investor money?

A. I don't -- I don't -- I did not -- the information I reviewed, I didn't -- I don't have an understanding of that. So, no. The answer to your question is, no.

Q. Okay. You did review the offering documents, correct?

A. I reviewed some of the offering documents.

Q. Just some?

A. Not all.
Q. To make your opinion?
A. Yes.
Q. Okay. So the summary documents that you reviewed, were they wiring -- the documents, were they wiring instructions on what account it goes into?
A. I don't recall.
Q. Okay. I'm pausing here because of the ambulance. I apologize. The siren. But also, I'm trying to determine where to pull up these documents, but I might do that later to save the Court some time and have that prepared in my testimony.
Is commingling funds -- not the greatest idea in the world, I'll grant you that -- but is commingling of funds against the law?
A. It -- well, I suspect -- I can't come up with every fact situation. There may be some fact situations where that -- or some sort of law, so it's hard for me to answer that question.
Q. Okay. So you cannot point to legal precedent or anything legally -- or, let's talk about Colorado securities registration. Whatever it's called. Is it in there, "Thou shall not commingle funds"?
A. There's no language like that in the act.
Q. Okay. Thank you. So you also stated here

that funds were commingled, but you also just stated to me that you didn't look at all the offering documents or the bank statements. How did you come to the conclusion that the funds were commingled?

MS. HUNT: Objection, Your Honor. I think that this misstates Mr. Rome's opinion testimony. He did not offer an opinion that the funds were commingled.

THE COURT: Overruled. He can clarify.

MR. HARDING: Your Honor, I'd like to tell you that, in the report, I think he did mentioned --

THE COURT: I overruled the objection.

MR. HARDING: So I can't argue that, huh?

THE COURT: Well, he can answer the question.

MR. HARDING: Oh. Oh. You're right. I'm sorry.

THE COURT: So he can answer.

THE WITNESS: So in my previous testimony, I was asked about commingling, and it was my opinion that commingling of funds can be an important fact for an investor to know, especially with respect to real estate development projects.

When funds are earmarked for a specific project, say, for instance, building a greenhouse, and then those funds get commingled with funds from other

entities, were they being used for other purposes, maybe conflicts of interest involved, then those sorts of facts would be important to a reasonable investor because it affects the risk of their investment in that project.

Q. (BY MR. HARDING) Makes sense to me. Agree with that. So let's go back to your report. And in page 2, second paragraph, under "Overview" -- we can pull that up, I guess. Or is that necessary? Do you know the exhibit number? Thank you.

I'm going to ask you a question about Paragraph 2. The second paragraph. I'm sorry. Underneath "Overview."

Before I get to that, though, let me take a situation where funds come in to a -- particular funds come into a particular account, and then construction happens, the supplier says, "I need wired funds," that particular escrow account to collect the funds, set up for just for collecting and not set up for the operations, and so -- and also, in the operations, they were set up for wires, the collection of funds is not -- so money was transferred out of the escrow account, collection of funds to pay a supplier, construction supplier, would that be a proper transfer?

A. Proper in terms of . . . I'm not sure your

question.

Q. Okay. Let me rephrase it. Would that be commingling of funds if I transfer funds from one account, an escrow account that was set up to collect investor money, and put it over to the operating account to construct the building, and in the term sheets and also in the subscription documents, it calls for the construction of Building A; is that commingling of funds?

A. So were the -- so were the accounts under separate entities? I mean, or the same entity?

Q. Well, in this -- let's keep it simple. Same entity. It's Entity A. And Entity A escrow, Entity A operating.

A. Well, so it doesn't sound like commingling to me.

Q. Thank you. So what evidence did you look at to say that it appears -- I know it's not definitive -- if you read that -- actually, would you please read that paragraph?

A. "From my review, it appears that McKowen and Harding diverted the offering proceeds away from GrowCo and commingled the funds with companies controlled by McKowen, paying the administrative expenses and salaries of executives, including McKowen and Harding

in those companies. Despite raising more than $19 million, only one of the promised four greenhouses was constructed."

Q. Okay. I have two questions here, sir. One is -- and I stated this appears, not definitive -- but what evidence do you have to make you say there's an appearance of this?

A. So from the documents I reviewed, it appeared that some investor funds made it to the bank accounts of other entities that -- that weren't involved in the construction of the greenhouses.

Q. But if it was for the construction, from the escrow account to the construction account, would that be a diversion of funds?

A. So what I'm -- I'm just stating a fact here, that it appeared to me that the funds were basically commingled with other funds from other entities.

Q. In Exhibit A, you said you looked at some -- some of that information, the funds going back and forth. Could you point to me in Exhibit A which exhibit that is? It's on the same document.

A. So I don't have a recollection of exactly which documents that information came from, so it could come from any number of documents listed on Exhibit A, including the Complaint filed by the Attorney General's

office, to the depositions, and -- and so I'm -- to answer that question, I'm not sure exactly where -- which document that information came from.

Q. Okay. Thank you. Is that probably why maybe you qualified that statement, says, "It appears"?

A. So I'm rendering an opinion as to what facts might be important to a reasonable investor in this situation. So I'm not -- I'm not testifying as to what exactly occurred in this case. I'm not -- I'm not a factual witness.

Q. You're not a factual witness, but you are an expert witness, correct?

A. Right.

Q. You produced a report, correct?

A. Correct.

Q. In that report, it says that, "It appears that McKowen and Harding diverted the offering proceeds away from GrowCo and commingled funds."

A. Correct.

Q. Okay. But you don't -- can't offer to us any evidence of that?

A. Well, that statement's not there to prove the matter asserted.

Q. Also, I think that we just talked about operations of business. We talked about salary and

payroll. And you said that's probably part of the operations of a business?
A. Okay.
Q. Okay. All right. So it says that we diverted funds, paying administrative expenses and salaries of executives McKowen and Harding. So that, by itself, that's a diversion of funds because we paid operations and we paid salaries?
A. For which company?
Q. GrowCo. It says, "Away from GrowCo" -- "GrowCo and commingled the funds with the companies controlled by McKowen, paying administrative expenses and salaries of executives, including McKowen and Harding, and these" -- "those companies." You said GrowCo.
I don't know if you define GrowCo as representing -- just wait a second -- here it is. Paragraph 2, the first report -- the first page of the report.
"Based on the information" -- well, why don't you read -- would you agree that, in Paragraph 2, page 1, it says, "GrowCo and the related entities, GrowCo (sic)"? That's how you define GrowCo.
Okay. So GrowCo-related entities. We diverted -- you state we diverted funds to pay my

salary and Mr. McKowen's salary and administrative expenses. Based upon the term sheets and our discussion this morning, would you like to change that?

A. So I'm not sure what you're asking.

Q. Diverted. The diversion of funds. This is a serious accusation that I've been -- I'm being charged with. And I'm just saying that I -- you have facts of that, and you just said previously that operations includes administrative, and administrative expenses includes -- we had an argument about travel, but we said salaries.

A. So there are other entities involved other than GrowCo, including Two Rivers and other subsidiaries of Two Rivers.

Q. We were just talking about GrowCo here.

A. I'm talking about the diversion taking place with Two Rivers and the other subsidiaries of Two Rivers.

Q. Okay. This is not in the report. This is something new to me. How did you come up with that statement, and where's your evidence?

A. It's from -- from the information I reviewed in preparation for the case.

Q. Can you pinpoint where the evidence is coming from in the documents you reviewed?

A. So I cannot pinpoint exactly, but it's from the information list on Exhibit A. Either the Complaint, I assume, or the depositions. So . . .

Q. Part of your -- your review of the exhibits, I think you had -- maybe I thought you had in there that you looked at some investor presentations. Did you do that or not?

A. I think I reviewed an investor presentation.

Q. Okay. In that investor presentation, do you remember anything about building state-of-the-art greenhouses?

A. I don't recall specifically.

Q. Do you remember reading about building greenhouses?

A. Well, so, whether that information came from a presentation -- presentation or from other information, I'm not sure.

Q. But you remember seeing "building greenhouses"?

A. Right.

Q. Okay. In fact, I think we read about it a couple of times in the term sheets just previously, correct?

A. I believe so.

Q. Okay. And was there any information about

GrowCo or -- at the time they were raising money, about we will -- GrowCo will be touching the plant, growing the plant, or was it just building the facilities?

A. I don't have a specific recollection.

Q. Okay. Thank you. You have a statement here, page 2, toward the bottom, toward the end of the next-to-last -- well, the last paragraph.

MR. HARDING: You can bring that up. And if you'll highlight the last two. No, the paragraph -- the last two sentences of that paragraph.

Q. (BY MR. HARDING) Read me the -- the last two sentences of your report.

A. That paragraph?

Q. No, the last sentences, sir.

A. Of what you've highlighted?

Q. The last two sentences, yeah, that's blown up.

A. "Without a marijuana license, GrowCo had no legal ability to receive any income from the marijuana operation of its one greenhouse. These facts were not disclosed to prior or subsequent investors."

Q. So, evidently, you know something about the Marijuana Enforcement Division and the laws of Colorado Department of Revenue when it comes to marijuana and marijuana enforcement because you made this statement.

A. So I reviewed the final order issued by the administrative law judge in its action relative to this case.
Q. And that -- can you tell me -- I know you probably don't have that as exhibits, but what -- that review case was against, was that the one against Suncanna that you reviewed?
A. Yes.
Q. Okay. What's the relationship between Suncanna and GrowCo?
A. From my understanding, Suncanna was a subtenant of GrowCo, or a tenant of GrowCo.
Q. Okay. Can we clarify that maybe a little bit? It was a tenant of GrowCo Partners 1?
A. (No audible response.)
Q. Okay. So based upon that, was -- did you find any investment or relationship or anything between GrowCo Partners 1 and Suncanna that -- of the administrative judge review that you looked at?
A. So the order I reviewed on -- there was findings of fact that, after Suncanna and -- and Winterburden? Is that its name?
Q. Aaron Van Wingerden.
A. Yes.
THE REPORTER: Say that again. Aaron who?

MR. HARDING: Van Wingerden. It's a Dutch name.

THE WITNESS: After that relationship was terminated, that Mr. McKowen operated the marijuana facility for two months without the proper licensing, and the Marijuana Enforcement Division then went in and suspended that operation because of that violation. And --

Q. (BY MR. HARDING) Okay.

A. -- and subsequent to that, Mr. McKowen applied for a marijuana license that was eventually denied by the Marijuana Enforcement Division.

Q. Okay. Thank you. I did not hear anything about GrowCo Partners 1.

A. In terms of . . .

Q. The administrative law judge, of -- whatever it's called, review.

A. Well, so, okay --

Q. Okay? So where did you get the information or where did you find it was important that GrowCo had no legal ability to be -- receive income from any of the marijuana operations at one of its greenhouses? You stated that you saw the lease, and the lease is support income; albeit, there's issues by the lease. You saw that.

But we signed the lease. Don't you think that there was hopefully an ability to generate income?

A. Well, the concept was you would generate income from the growing and selling of the marijuana. So if you had no license to grow or sell marijuana, there was no -- the tenant had no ability to generate any income and -- and, thereby, no ability to pay any lease payments.

Q. So the concept was -- just trying to understand -- that we were going to grow and sell marijuana, "we" being, I guess, GrowCo?

A. So -- so the tenant would grow and sell the marijuana and make lease payments based upon the profits from that growing and selling of the marijuana.

Q. Was that in the administrative law summary judgment?

A. I believe so.

Q. Okay. I don't know. I have to go back and take a look, to tell you the truth. So -- but we could generate income from lease income -- couldn't we? -- if it's a straight lease?

A. Well, sure. But -- but the tenant was there to generate income from the marijuana sales.

Q. So you reviewed the lease between GrowCo Partners 1 and Suncanna?

A. I don't recall reviewing the lease.

Q. Okay. So you don't recall in there whether or not there was a -- besides just a stated rent and common area maintenance and some other things -- I think there was an administration fee -- was there anything in that document, that lease that we state that we participate in the revenue profits or any kind of success or failure of Suncanna --

A. I never --

Q. -- that you --

A. -- reviewed the lease.

Q. Oh, okay. So if you didn't review the lease, how could you say that we have no income -- cannot receive any income from marijuana operations?

A. Well --

Q. On its one greenhouse?

A. So, based upon how the investment opportunity was presented to the investors.

Q. Okay. So you looked at the -- did you look at GrowCo Partners 1 offering documents? And I think that was done through Mark John and K&L Gates out of the Philadelphia area?

A. I don't have a specific recollection.

Q. Okay. So you don't know about the cash flow pro formas and the projections that we provided as part

of, I guess, sales or marketing materials or whatever?
A. I don't have a recollection of that.
MR. HARDING: Okay. Why don't we go to page 3 of the report. Middle of the first full paragraph, please. Why don't you highlight the sentence that begins with "each successive offerings."
THE WITNESS: Do you want me to read that?
Q. (BY MR. HARDING) Yeah. You can read that. They're going to highlight it for you for . . .
Just -- why don't you read -- starts with "H, in each successive offering."
A. "In each successive offering, McKowen and Harding failed to disclose to investors the misuse of investor funds in the prior offerings, the lack of construction of additional greenhouses, the lack of a marijuana license, the denial of McKowen's application for a marijuana license, and the need to raise additional investor funds to operate their separate businesses."
Q. Did we determine previously that we didn't need to have a marijuana license, "we," GrowCo, to lease out a building?
A. Well, so, again, I'm looking at it from the perspective of the investor and what the investor expected; that there would be a tenant in place that

would grow and sell the marijuana; that would supply the lease payments to GrowCo, which, in turn, would supply the profits to the investors.

Q. Are you aware of any emails or correspondence to existing investors about why they need to modify the note?

A. I reviewed some of those emails.

Q. And did you recall an email asking for extension on the notes and the reason why, having problems with our tenant?

A. I didn't see those.

Q. Okay. So didn't see them. All right. So you state here, "The misuse of investor funds of prior offerings." I'm still trying to get at the proof, the evidence of the misuse of investor funds. Where did you get this information? Can I see evidence, please, for the statement?

A. So, again, it's from the information that I have reviewed, including the Complaint filed by the Attorney General's office.

Q. Okay. In doing your work, did you contact me at all?

A. No, I didn't.

Q. Okay. Did you ever contact Mr. McKowen at all?

A. No.

Q. Is that standard process in a -- in a -- an expert witness testimony, that you want to try to gather as much facts or listen to other people's opinion, or do you just go with what your client gives you?

A. No. It's not standard practice to contact, say, the defendants in a lawsuit, no.

Q. Let's go to page 4. Let's go down to two-thirds of the way down, starts middle of the paragraph, "Likewise," under "Use of Investment Proceeds." It says, "Likewise, it is important." Mr. Rome, would you be so kind to read just that sentence, "Likewise"?

A. "Likewise, it is important for an investor to know that the investor funds are commingled with other funds from other businesses and not the business investors thought they were investing in."

Q. Okay. So, earlier, you cannot produce any evidence, and it seemed like you were a little wishy-washy on misuse of funds. I'm asking for evidence. And is that a prior characterization of your testimony or summary?

A. Again, I'm not a fact witness, if that's what you're getting at.

Q. Okay. So let me pose a question on something else. If indeed investor funds were commingled and not used to -- what the investor intended to be used, based upon the subscription documents, the term sheets, and things like that, then that's an issue, isn't it?

A. So that's the kind of information -- it's my opinion, that's the kind of information that needs to be -- to disclose to investors.

Q. But if there was not commingling funds, if management executives at the time and outside independent auditors did not see any commingling of funds, if that's the case, then why disclose commingling of funds when nothing occurred?

A. So commingling of funds goes along with this concept of disclosing how the proceeds are going to be used in the investment offering.

Q. But if there was not -- it -- it could be wrong, and I think we have -- or I have facts that says otherwise, but if there was not commingling of funds, then this doesn't really apply, does it? Why would we -- let me put it a different way.

If I have an offering, we're doing everything by the book, we have people saying we're a public company, everything else, and there's no evidence of commingling of funds -- despite what some of these

bogus reports say, there's no evidence of commingling of funds, we don't have to disclose it then.

A. I would agree with that.

Q. Okay. Thank you. On the last paragraph, footnote, last paragraph, first sentence. Can you read that for me, please?

A. "In addition, investors were not told that investment proceeds would be used for purposes other than the construction of greenhouses, that the investment funds would be commingled with other funds, or that they would be used for purposes unrelated to the business of GrowCo."

Q. Okay. I think we beat that commingling horse dead. So -- but we also looked at the term sheets that we gave all investors. Would you -- does this now change, about -- "Investment proceeds would be used for purposes other than construction of greenhouses," would you change that now based upon the information that you saw this morning?

A. No.

Q. No? So even though we told the investor -- for general administrative purposes, we told them that, but you said we didn't tell them that?

A. So -- so the term sheets that I read a bit ago indicated that the funds would be used both for

construction of the greenhouse and for administrative purposes, but there's no -- in my opinion, it's important to know how much of those proceeds are going to be used for the actual construction and how much are going to be used for administrative costs.

That was not defined in those term sheets. So -- so you can review, you used 90 percent of those funds for administrative costs and operations and only 10 percent for the construction of the greenhouse. To me, that would be an important fact for the investor to know.

Q. Okay. That's your opinion. So let me read this to you again and ask you again to think about this.

"Investors were not told that investment proceeds, whether their specific dollar amounts or not, it was disclosed, investors were not told that investment proceeds would be used for purposes other than construction of greenhouses." Is that an accurate statement?

A. Say that again. I don't understand your question.

Q. Your report states --

MS. HUNT: Mr. Rome is not offering an opinion to whether they actually were used for those

purposes. He's using the baseline fact to discuss whether that information would be material to -- if true, which he is not here to decide whether it's true -- if that information would be material to investors. We're wasting a lot of time here.

THE COURT: Overruled. It's a fair question. You can answer. He can repeat it as well if you'd like.

THE WITNESS: Yes.

Q. (BY MR. HARDING) Okay. Based upon this current conversation and what we saw on the term sheets and everything, albeit they're not specific dollars, this sentence that you have in your report, would you like to modify it? "In addition, investors were not told that investment proceeds would be used for purposes other than the construction of greenhouses"?

A. No. I'm not changing that.

Q. Okay.

MR. MCKOWEN: Your Honor?

THE COURT: Yes.

MR. MCKOWEN: I don't know if --

THE COURT: You need to pull the microphone towards you, please.

MR. MCKOWEN: I'm objecting to -- this report that is prepared by him is riddled with conclusions of

facts. He has repeatedly said he's not a fact witness, but this report is nothing but conclusions of fact that he says should have been disclosed.

He's not here to do that. He's here to provide what the requirements would be as a standard, not to list and -- and, in his report, repeatedly state what facts are and that -- that those facts are the cause for fraud.

THE COURT: All right. Objection overruled. You stipulated to the admission of the report yesterday. The report's been admitted. He can testify to the contents. You cross-examined him. Mr. Harding is cross-examining him, and I'll decide what weight, if any, to give the testimony.

MR. MCKOWEN: Can I respond?

THE COURT: Not to my order. Not if you're going to argue with me about my order. That's my order.

MR. MCKOWEN: I won't argue with you. I'm sorry.

Q. (BY MR. HARDING) I think I'm almost done here. Appreciate your time. Can you -- we -- you used the word several times, I think, "substantial preexisting relationship." And I think you kind of defined that. Can you define that again, please?

A. It's -- "substantial" meaning more than casual. "Preexisting," existing prior to the time of the offer.

Q. Is this a term of legalism, or is that kind of more the subjective term?

A. No. It's a -- it's a term of art in the securities industry.

Q. And it essentially says what you just stated?

A. Correct.

Q. More than casual, but other type of relationship besides, like, let's grab a cup of coffee, that kind of thing, right?

A. Right.

Q. What about golfing buddies? See them every week.

A. So you're asking whether or not you can offer a private investment to your golfing buddies?

Q. Let's say I'm on the board of GrowCo. Do you know who's on the board of GrowCo?

A. It varies over time. So . . .

Q. Okay. So, go past that. Let's say I'm on the board of GrowCo. You asked me, "Hey, what are you doing?" Hey, you know, every week, Wednesday at 2:00, we have tee time at Valley Country Club.

And, "Oh, it's great, you know, things are

going well, you got this thing and that thing going on, whatever," and then, once a week, and then, "Hey, after golf, let's go grab some beers." Is that casual?

A. So, I mean, to relate it back to this case, I mean, if you're talking about a private offering, I think that the intent of that exemption goes to those kinds of relationships.

Q. Okay. So if a director of GrowCo would happen to have one of our sales agents, I think, or however you want to classify it, Jeff Ploen, if you had that kind of relationships, and we went in or John McKowen went in for a presentation with his golfing buddies, that's probably -- what was it, a substantial preexisting relationship?

A. Okay.

Q. So "okay" means you agree with me?

A. So I think -- I think, in terms of a private offering, that would be an individual you could make a private offering to.

Q. Thank you. Did -- I know that you didn't -- you said that you didn't talk to myself or Mr. McKowen. Did you talk to any of the investors directly?

A. I reviewed investor interviews and emails.

Q. But you -- you did not directly contact them, saying, "Can you tell me what" -- because we agreed

early on that verbal disclosure is disclosure -- you did not talk to the investors about what was verbally said to them?

A. So I reviewed the investor interview reports.

Q. That wasn't my question.

A. So -- so that information, what was their discussion of how the offering or investment was promoted to them, is contained in those interview reports.

Q. Let me try to ask that question again. I think it's a simple yes or no. Did you, in preparing this report, instead of talk -- you know, looking at the interviews of your client, did you independently go out -- because you were talking about substantial preexisting relationships -- you're talking about material misrepresentations of facts and everything else -- did you talk to any investor about what documentation they received and also what verbal disclosure they received?

A. So I did not have any independent conversations with investors.

Q. One other last question, I think. One other statement you made I just want some clarity on.

I think you stated that -- I have it written down quickly -- and, you know -- tried to find it in

the transcript -- that you stated that GrowCo stated they had sufficient experience to grow marijuana. Do you remember that statement?

A. I don't recall that.

Q. Okay. Because, in your research -- let me just ask this -- in your research, do you think the company itself, GrowCo, as defined in your report -- do you think we had sufficient -- or that we needed or that we represented to any of us that we had sufficient knowledge, or did we have the right tenant -- we thought we had the right tenant and the right consultant or whatever to help us do that? Do you -- you don't know?

A. No, I don't.

MR. HARDING: Thank you for your time. Enjoy your retirement.

That's all, Your Honor.

THE COURT: Thank you. Redirect?

MS. HUNT: Just a couple of questions to follow up.

REDIRECT EXAMINATION

BY MS. HUNT:

Q. We were talking just a moment ago, you -- Mr. Harding had you look through all those term sheets. Do you recall that?

A. Yes.
Q. Looking at the -- at the -- the Use of Proceeds language?
A. Yes.
Q. Do you see anything in there discussing that money might be spent or would be spent on expenses of Two Rivers or other Two Rivers subsidiaries?
A. I did not see that information.
Q. In your opinion, is that important information, if true, that investors would need to know?
A. Yes. If the investor funds are going to a company or business entity that's -- whose purposes are different from what the GrowCo entities were doing, yes.
Q. And you're not here -- are you here to offer opinions about whether any of the factual allegations in this case actually happened?
A. I am not a fact witness.
Q. And you're not offering an opinion about whether funds were actually, like, commingled or diverted in any way?
A. Correct.
Q. When Mr. McKowen was talking with you, you talked a bit about licenses and what promoters can do.

Do you recall that?
A. Yes.
Q. If a promoter introduces an investor to an issuer and receives transaction-based compensation of any kind, does that person need to be licensed?
A. If they don't have corresponding substantial duties with the entity, then, yes, they need to be licensed.
Q. Okay. And once a CEO, for example, of a company -- if the CEO resigns from a company and no longer has that issuer exemption available, does that person need to be licensed to sell securities of that former company?
A. Yeah. If he's receiving transaction-based compensation and the issuer exemption's no longer available -- in other words, he is not performing any duties for the company -- then he would need to be licensed as a sales rep.
Q. What if he's providing duties as an independent contractor, as under a contract, not as a salaried employee?
A. The duties would have to be in connection with the company.
Q. Okay. And you spent a bit of time looking at the provisions of the Colorado Securities Code and

printout of select provisions. We looked at that Section 305, which discussed the filing of sales literature. Do you recall that?

A. Yes.

Q. Yes? Does that have anything to do with whether the exemptions apply in the first place under Section 308?

A. No, it wouldn't.

Q. Same thing with Section 310. We were looking at a 10-year look-back to revoke a registration. Does that have anything to do with whether the exemption applied in the first place?

A. No, it wouldn't.

Q. And are you familiar with Section 308-1(P)?

A. Yes.

Q. And what is that?

A. That is the section that is coordinated with Registration D offerings. If you are doing a private offering, under Reg D, then that subsection of the state act requires you to file your Form D and a fee with the State Division of Securities.

Q. So is -- is Section 308-1(P), is that the state exemption that is for the -- if you're claiming a -- a federal exemption?

A. Exactly.

Q. Okay. Does it require a separate notice to be filed with the Securities Division?

A. Yes, it does.

Q. Does that have anything to do with Section 305, filing of sales literature?

A. No, it doesn't.

Q. I just want to make clear about a couple of things before you wrap up. Is the -- the exemption requirement -- the notice of exemption requirement in 308-1(P), in your opinion, is that consistent in any way with any federal securities laws or regulations?

A. No. In fact, the federal law allows states to require the filing of that form and charging that fee.

Q. Okay. And is there anything inconsistent -- start that over again. Are the antifraud requirements, Section 51-101 of the state act, is there anything inconsistent with that and the federal securities laws and regulations?

A. No, there isn't.

MS. HUNT: Thank you, Mr. Rome. Nothing further.

THE COURT: Just a couple of clarifying questions, similar to what was just asked by Plaintiff.

//

DIRECT EXAMINATION

BY THE COURT:

Q. So if all investors are accredited investors, and if a private offering, is the issuer -- issuer still required to file an exemption with the state commissioner? The state commissioner?

A. Yes. Under that Subsection 308-1(P), you are required to file the form and pay the fee.

Q. And if an offering is exempt from registration, Form D has to be filed with the SEC, right?

A. Yes.

Q. And then a notification of securities registration exemption has to be filed with the Colorado Securities Commission?

A. Correct.

Q. And are there any exceptions to that requirement?

A. No.

Q. Okay. And you stated, your opinion is that all the offerings that you reviewed in this case were public offerings?

A. So, no. That is not my testimony. I reviewed information that would indicate that some of the offerings were made to the general public, in the

sense that there were people on what are called accredited investor lists that were cold-called or that, perhaps, in the public was invited to investor presentations.

So if the offerings that would have involved that activity, they would not qualify for private offering, in that they had made the offering to the public at large.

THE COURT: Any follow-up? By the Plaintiff?

MS. HUNT: No, Your Honor.

THE COURT: Mr. McKowen, any follow-up questions?

MR. MCKOWEN: None. None.

THE COURT: Mr. Harding?

MR. HARDING: None.

THE COURT: Mr. Rome, your testimony is complete. Thank you. You may step down.

(The witness, Gerald Rome, was excused at 11:47 a.m.)

THE COURT: We're almost to the noon hour. We'll take our recess here in just a moment. I assume this is Mr. Hart in the back; is that correct? Okay. Mr. McKowen, did you have an opportunity to speak to Mr. Hart about his availability to testify tomorrow after your testimony is complete today?

MR. MCKOWEN: I did.

THE COURT: Can you pull the microphone?

MR. MCKOWEN: I did, Your Honor.

THE COURT: What record do you want to make concerning that?

MR. MCKOWEN: Mr. Hart said he could be available tomorrow.

THE COURT: Is that correct, Mr. Hart?

MR. HART: Yes, Your Honor.

THE COURT: My preference would be to pick up Mr. McKowen's testimony. We were on direct examination. We'll finish Mr. McKowen's testimony, potentially today, maybe early tomorrow, or in the morning tomorrow, and then I would expect Mr. Hart to testify after that.

Any issues with that timing for Plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: What time tomorrow?

THE COURT: We'll have all afternoon for Mr. McKowen. If we don't finish today, I would hope that we would finish sometime in the morning tomorrow before we take up Mr. Hart's testimony.

MR. HARDING: Before we do what?

THE COURT: Before we take up Mr. Hart's testimony.

MR. HARDING: And I also have Mike Harnish to testify via WebEx. I'm trying to get to him about when to anticipate his testimony. If this is off the course, then we can talk later.

THE COURT: I think you have to confer with Plaintiff's counsel and give them a good-faith estimate of how long you think all the testimony's going to take, and try to schedule him accordingly.

Anything from Plaintiff before we break?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: All right. We'll be in recess until 1:00.

(Break from 11:50 a.m. to 1:01 p.m.)

THE COURT: Let's go back on the record in 21CV33922. All parties and counsel are present. And are we ready to continue with Mr. McKowen?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: Mr. McKowen, I'm going to swear

you in again because it's a new day.

JOHN MCKOWEN

was called as a witness on behalf of the Plaintiff and, having been first duly sworn, testified as follows:

MR. HARDING: I'm okay about proceeding too.

THE COURT: Good. I figured you were. You look ready.

MR. MCKOWEN: Should I bring up my exhibits?

MS. KIDD-AARON: Yes.

DIRECT EXAMINATION

BY MS. KIDD-AARON:

Q. Good afternoon, Mr. McKowen.

A. Good morning.

Q. When we left off yesterday, we were talking about McGrow, I believe.

A. Yes.

Q. If you could pull up Plaintiff's Exhibit 59.

A. What exhibit, please?

Q. 59.

A. I have it up.

Q. Okay. Mr. McKowen, this is the denial of Johnnie Canniseed's retail marijuana license and your associated key license, correct?

A. The application for my key license, yes.

Q. This says the initial decision is an

application, or is this a decision?

A. It's a -- it's a decision about whether or not I'm going to receive an associated key license.

MS. KIDD-AARON: So if you turn to page 3, where it says, "Procedural Background." If you could highlight that first paragraph, under "Procedural Background," Ms. Raynard. Okay.

Q. (BY MS. KIDD-AARON) And it says, "The initial denial was issued on November 23rd, 2016." Am I reading that correctly?

A. Yes, you are.

Q. If you turn to page 9 of this document. It discusses the Suncanna buyout and the MIPA, as you referred to it.

A. What paragraph are you referring to? On page 9?

Q. On page 51, under the Suncanna buyout.

A. Okay.

Q. And then, if you turn to page 10, under that same section, please.

A. Okay.

Q. Paragraph 54, it says, "Van Wingerden lost or gave control of Suncanna and the associated key license." Am I reading that correctly?

A. Which paragraph are you talking about?

Q. 54.
A. 54? "On February 25, 2016, Van Wingerden gave up, lost, or gave unlawful control of Suncanna as the associated key license." I see that.
Q. And 55, it says, "Suncanna had no other key licenses besides Van Wingerden"?
A. I see that.
Q. "On February 25th, 2016, GrowCo, through Tim Bell and Wayne Harding, began to exercise the privileges granted under Suncanna's RMCF license, cultivating, harvesting, and selling marijuana."
A. I see that.
Q. Okay. "GrowCo is the parent company" -- "GrowCo and its parent companies" -- "parent company" -- excuse me -- "Two Rivers, do not and never have held a marijuana license from the state licensing authority." Paragraph 57. Do you see that?
A. I do see that.
Q. "After MIPA was executed on February 25th, 2016, Van Wingerden's decision-making for Suncanna ended. Van Wingerden had no alarm codes and no access to Suncanna bank accounts." Do you see that?
A. I see that.
Q. And then, if you skip down to 61, it says, "On March 4th, 2016, large quantities of marijuana were

growing and continued to grow on the licensed premises."

A. I see that.

Q. If we go to page 15, the Johnnie Canniseed group of applications.

A. I see that.

Q. "On or about August 29, 2016, McKowen and Kirby submitted to the MED a business application for Johnnie Canniseed's RCMF license. Johnnie Canniseed intended to grow marijuana at the Harbor Road location, the licensed premises that Van Wingerden and Suncanna were soon to be evicted from." Do you see that?

A. I see that.

Q. If you'd please turn to page 17, "Conclusions of Law." I apologize. Please bear with me. Actually, please turn to page 18.

So on page 18, it states, "The applicable marijuana law. Amendment 64 clearly states that certain acts of cultivating marijuana are not unlawful only if the person" -- "not unlawful" -- sorry -- "only if the person conducting such activity is the holder of a current valid license issued by the state licensing authority." Do you see that?

A. I do.

Q. Okay. "Lawful operation of marijuana

facilities, notwithstanding any other provision of law, the following acts are not unlawful and shall not be an offense under Colorado law or be a basis for seizure or forfeiture of assets under Colorado law if the person is 21 or older."

"This is for persons who are licensed, cultivating, harvesting, processing, packaging, transporting, displaying, or possessing marijuana." Do you see that?

A. I do.

Q. "Delivery or transfer to marijuana to marijuana testing facilities, selling marijuana to a marijuana cultivation facility, a marijuana product manufacturing facility, or retail marijuana store, or the purchase of marijuana from a marijuana cultivation facility." Do you see that?

A. I see that.

Q. Okay. And then NED goes over the reasons, starting on page 22, the violations of law that led to this denial. First ground, "The denied applicants violated the statute by submitting applications that did not set forth sufficient information for the SLA to make its decision as to whether a state license should be granted." Do you see that?

A. I do.

Q. The second allocation. "This allegation was" -- "has been proven by preponderance of evidence. The denied applicants' group cultivated, transferred, and sold retail marijuana without a license between March 4th and April 18, 2016." Do you see that?

A. I see that.

Q. The third ground for denial is -- this allegation is proven as well -- "Denied applicants McKowen and Kirby had financial or direct interest in Suncanna that they did not disclose on their Johnnie Canniseed license application and found they did not disclose the original litigation proceedings between GCP1 and Suncanna or the buyout of Suncanna in his application, despite clear and comprehensive requests to disclose all such matters." Do you see that?

A. I do.

THE REPORTER: Could I ask you to read a little slower? You're reading about 260 words a minute. I'm not really getting it. Thank you.

MS. KIDD-AARON: Sure. Absolutely.

Q. (BY MS. KIDD-AARON) So, Mr. McKowen, I don't want to go through every one of these violations. But I do want to know, did you disclose any of these violations to investors?

A. This report came about after I left the --

this report is -- what date?

Q. This report is from . . .

A. 2017? Through the fall of 2016?

MR. HARDING: Your Honor? Judge, would you ask Mr. McKowen maybe -- I can read the transcript, but it might be helpful to hear him. I can't really hear him at all.

MR. MCKOWEN: Can you hear me?

THE COURT: Can the CART interpreter hear him okay?

CART PROVIDER: I can.

Q. (BY MS. KIDD-AARON) So this denial, this document itself, is issued December 2017.

A. Okay.

Q. The initial denial was in November 2016.

A. Okay. And that was after I had resigned from GrowCo, Two Rivers, and any of their affiliates.

Q. Did you make any disclosures to your McGrow investors?

A. Yeah. They were fully aware that I'd been denied.

Q. Were they made aware of the reasons you were denied?

A. I don't know if that's exactly true, but they knew I was denied.

Q. Okay. So they knew that you were not licensed, that you attempted to be licensed and did not receive a license, but you don't know if they knew or if you told them if you were denied, for example, for lack of proper disclosure?
A. I honestly can't recall. But they definitely knew I was denied.
Q. So, Mr. McKowen, based on this document, your initial denial in November 2016 and this document from December 2017, is it still your testimony that you do not understand the marijuana laws of Colorado?
A. I disagree with many of the findings in the determination, and it wasn't subject to -- first of all, they never talked to me. In fact, they refused to talk to me, so the analysis of that -- of that process as -- as it compares to me, as it -- of my behavior is completely inaccurate.
Q. Okay. I'm going to restate my question.
A. Go ahead.
Q. Based on your initial denial in November of 2016 and this document from December 2017, is it still your testimony that you do not understand the Colorado marijuana laws?
A. That's correct. I do not fully understand the marijuana laws.

Q. If you could go to Plaintiff's Exhibit 126. I apologize. 56.

A. I have it.

Q. Okay.

MS. AARON-KIDD: I'm sorry. Your Honor, I'm having some technical difficulties.

Q. (BY MS. KIDD-AARON) If you could go to Bates Number 57283.

A. I'm there.

Q. Okay. Under "Default, Events of Default," "Event of default means any one of the following events, whatever the reason for such event of default and whether it shall be voluntary or involuntary or be affected by operation of law or pursuant to any judgment, decree; or order of any court or any order, rule, or regulation of any administrative or government body: A default in the payment of principal of any note, other than as part of the redemption price, when it becomes due and payable." Am I reading that correctly?

A. Yes, you are.

Q. And then, on the next page, Bates Number 57284, on the top of the page, "The company commences a voluntary case or proceeding under any applicable bankruptcy law or any other case or

proceeding to be adjudicated, bankrupt, or insolvent, or consents to filing of petition, application, answer or consent seeking reorganization or relief under any applicable bankruptcy law." Am I reading that correctly?

A. Yes, you are.

Q. Okay. So I believe we discussed that Mark Johnson, K&L Gates, Harvard-graduated lawyer, prepared these documents, correct?

A. I believe so.

Q. So we've also discussed that at least three of the investors that were before this court were not repaid their principal at any point, including when their note was due; is that correct?

A. I believe -- I believe that's correct.

Q. And under this agreement, that is a default?

A. No. I have no disagreement with the document, when and if those events occurred.

Q. Okay. And additionally, you filed bankruptcy on behalf of GrowCo and the other GrowCo entities, correct?

A. That's correct.

Q. And that was a voluntary bankruptcy filing?

A. Yes.

Q. So that is another example of default?

A. Yes.

Q. Okay. And this is in relation to the $4 million note. You were the CEO at the time the $4 million note was issued, correct?

A. That's correct.

Q. And so would you say that you have involvement with this contract?

A. When was it due? I don't think I was -- I know I wasn't the CEO then.

Q. Were you the CEO when the contract was issued?

A. I was.

MS. KIDD-AARON: Okay. Your Honor, can I take a five-minute break to try to figure this out?

THE COURT: Yes.

MS. KIDD-AARON: Thank you.

THE COURT: All right. We'll take a five-minute recess. Mr. McKowen, if you'd like to step down, you can do that.

(Break from 1:28 p.m. to 1:36 p.m.)

THE COURT: Mr. McKowen, you can come back up.

Back on the record in 21CV33922. All parties and counsel are present. Mr. McKowen's on the witness stand under oath. Continued direct examination.

MS. KIDD-AARON: Thank you, Your Honor.
Q. (BY MS. KIDD-AARON) If we could turn to page Bates-labeled 57265.
A. I'm there.
Q. Okay. Paragraph 2, "Representations and Warrants of GrowCo." "GrowCo hereby represents and warrants to each investor acquiring notes and warrants at each closing that the following representations are true and complete as of the date hereof and will be true and complete as of such closing date, except to the extent made only as of specified date, in which case, as of such time or date."
A. I see that.
Q. Okay. And if you turn to the next page, "Compliance with Other Instruments." "GrowCo is not in violation or default of any provision of its Articles of Incorporation, any judgment order, writ, or degree to which GrowCo or its properties are subject, any note, indenture, mortgage lease, or other agreement or contract to which GrowCo is a party, or by which it is bound, the violation of which" -- or, I'll just stop there. Do you see that language?
A. I do.
Q. Okay. And then it goes further, next -- sorry -- next paragraph, G, "Permits," "GrowCo has all

franchises, permits, licenses, and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected." Do you see that?

A. Yes, I do.

Q. Okay. So I believe we have established earlier that these contracts are pretty much the same throughout the offerings.

A. Okay.

Q. So this language would be in all of the subscription documents.

A. Yes.

Q. Okay. And so you're stating in the subscription documents -- or GrowCo is stating in its subscription documents that there's compliance with other instruments, including notes, correct?

A. That's correct.

Q. Okay. But we also read the definition of default, correct?

A. The definition of default is correct.

Q. Which included non-repayment of principal?

A. Correct.

Q. And not paying interest on time?

A. Correct.

Q. Okay. So this is a $4 million note. We also

know that there was an amendment. We went over this with Mary Loughran when she testified, correct?
A. Correct.
Q. And so when there were offerings after her note defaulted, she attempted to call it in and couldn't, was GrowCo in compliance with these agreements?
A. I don't know when she attempted to call it in. But at the time, I -- at the time the offering was made to her, it was in compliance.
Q. Okay. And what about when the $7 million note was offered and this language was contained in that note?
A. I don't know what was disclosed to the investor as part of the subscription agreement. I -- I believe that was in August of 2016.
Q. Okay. At the presentation, did you disclose any of the information that you knew about?
A. No. That -- that was not what I was hired for.
Q. Okay. Please turn to page with Bates label 57268.
A. I'm there.
Q. Okay. At the top, Paragraph 4, "Conditions to Obligations of Investors at Closing." The

obligations of each investor to purchase an investor's" -- "such investor's note and such investor's warrant from GrowCo at closing are subject to fulfillment. Prior to each closing of each of the following conditions, those representations and warrants of GrowCo contained in Section 2 shall be true and correct, all as of such closing, except to the extent made only as of the specified date, in which case of such case, time, or date." Do you see that?
A. I do.
Q. And do you remember the representations and warrants we just went over?
A. Which ones are you talking about specifically as it relates to this investment?
Q. Specifically, as it relates to this investment, I'm talking about the permits and being in compliance with the notes.
A. Yeah. We had all the permits that were necessary to -- this was -- I believe this -- this note was offered in 2015.
Q. This was in 2015?
A. Yeah. We weren't -- we had all the building permits, all of the local zoning permits, all of that.
Q. Okay. And this language is also in the $7 million and the $2 million note?

A. I don't know if it was or wasn't. I didn't -- I didn't close those on . . . That was notes. They were after I was -- after I resigned.

Q. Okay. We've established that you participated in the $7 million note. You gave a presentation, and it started when you were still the CEO of GrowCo, correct?

A. I think that -- that the notes present -- or the -- the documentation associated with that was -- I think I may have been there -- that -- my understanding -- my best recall is the -- the $7 million note was the first note that was offered after our -- or I was there for maybe a month and a -- and a half when it was a -- for when it was a -- being started.

And I think that, in June, they -- the company was running out of money. There's a Two Rivers board minutes where they are saying they didn't have any money. So I'm not sure any capital was raised when I was the CEO under -- for the $7 million note because I know that -- that -- or I believe they had stopped when the SEC investigation started.

And I don't know when the SEC investigation started, but I think it was -- I mean, I don't -- I don't remember when it was, but it was -- it was before

this note offering.

Q. Will you bring up Exhibit 1030, page 4.

A. Exhibit 1030, page 4?

Q. That's your exhibit, Mr. McKowen.

A. Oh. I had 1032. My apologies. Page 4. Okay.

Q. So, Mr. McKowen, you resigned in May 2016, according to this chart in your exhibit, the $7 million note.

A. Can you hang on till I get there?

Q. Yep. 1030. So I'll just have to . . . 1032.

A. I mean, 1030 is what we're looking for?

Q. 1032.

A. Sorry. The BCLS audit?

Q. Yes. Page 4.

A. Okay. I have it.

Q. Okay. So the $7 million note was initiated in January 2016. According to this document, you resigned in May 2016; is that correct?

A. Correct.

Q. Okay. And as we also established yesterday, while you were no longer -- once you were no longer the CEO of GrowCo, your company, McGrow, controlled two-thirds of the shares of GrowCo, and you had two

parties on the GrowCo board, correct?

A. Correct.

Q. Okay. So at that time, that was when the $2 million note was offered?

A. That's when it was initially offered, and I believe, on -- that's when it was initially offered. I was CEO.

Q. Okay. So -- so, that language, is that language that we just reviewed included in all of those offering documents?

A. I believe it was included in all of the offering documents that I -- in which I was the CEO. And I think the critical time frame is when money was actually raised and presented the investors.

Q. Okay. And so, according to this chart, it looks like money started being raised for the $7 million note in January 2016.

A. That's what it says.

Q. Okay. So my question to you is, did you make any disclosures about the defaults, about not paying principal to investors of these later notes?

A. I would have to see those actual offering documents.

Q. So do you believe that that information is included in the term sheets that we reviewed earlier

with Mr. Rome?

A. I'm -- he says that he wasn't a fact-finder, and I accept that, so that he was relying on information that you provided.

Q. Okay. I'm going to re-ask my question. Do you believe those disclosures are included in the term sheets that we reviewed earlier?

A. I don't know. I'd have to look at each one. I can -- I can -- I believe that they were included in -- on -- GCPI -- (mumbling) --

THE REPORTER: Speak into the microphone. I can't hear you.

THE WITNESS: GCPI -- slow down?

THE REPORTER: No. Just louder. In the microphone.

THE WITNESS: Okay. Sorry. The $4 million note, and then the GCP super units. And to the extent -- to the extent that I was the CEO, and the documents were drafted and presented, I probably -- it probably includes that.

Q. (BY MS. KIDD-AARON) Okay.

A. I don't -- I -- I can't say that for sure.

Q. Okay. And the term sheets, was there any disclosure about the MED Colorado initial denial from November 2016?

A. I don't know.

Q. Okay. Are the term sheets the only documents that investors received prior to investment?

A. No.

Q. What other documents did they receive?

A. They typically -- when I was doing the offerings, they -- it included the term sheet as -- as the initial document, which had the -- well, they received a term sheet. They more than likely received a pro forma, a projection.

And then, when they indicated an interest, they would receive the actual subscription agreement for each one. They would receive either the operating agreement for the -- operating agreement for the LLC, if it was an equity deal, and if it was a note deal, they would receive a copy of the form of the note.

And then they would receive subscription agreements, which generally included an accredited investor questionnaire, and then they would receive wiring instructions.

Q. Okay. So if these disclosures were not contained in the term sheets or the subscription documents, they were not provided?

A. I'd have -- I'd have to take a look at each one to see if that's the case.

Q. If they are not contained --
A. If they are not contained --
Q. -- in the term sheets or the subscription documents, then they are not provided?
A. When you say "these documents," are you -- are you -- what are you referring to?
Q. The term sheets and the subscription documents that you just mentioned.
A. I would be very shocked if people didn't receive that. I know that they did when I was the CEO.
Q. So the disclosures, if this -- they exist, they would be located in the term sheet or the subscription documents?
A. The disclosures would be located in -- I don't necessarily know that they would be in the term sheet because that is -- as the -- as the term sheets say, that's for discussion purposes only.
But the subscription agreement, the -- the instrument of the investment, which would be the -- the note itself, or the -- or if it was an equity investment, it would be the limited liability company.
Q. If we could turn to Exhibit 11.
MR. HARDING: I'm sorry; what exhibit is that one?
MS. KIDD-AARON: 1032.

MR. HARDING: Thank you.
MS. KIDD-AARON: It's McKowen's exhibit.
THE WITNESS: 10-11, or . . .
Q. (BY MS. KIDD-AARON) 11. Plaintiff's Exhibit 11. Please turn to page 6 of 8, Bates-labeled 55310.
A. Just one moment.
MR. HARDING: And that exhibit is what?
MS. KIDD-AARON: 11.
THE WITNESS: Okay.
Q. (BY MS. KIDD-AARON) Okay. So this appears to be an email from you to GrowCo and related managers or affiliated investors. It is from April of 2018. According to this, and according to, I believe, your -- well, maybe not.
According to this, you returned to GrowCo in October 2017; is that correct?
A. I did. Oh, yeah. 2017.
Q. This email appears to be about GCP1 owing GrowCo money; is that correct?
A. I think that this is about the formation of VetaNova.
Q. And are you on page 55310?
A. No.
Q. That would be the problem.

A. Okay.

Q. Okay. So this appears to be to GrowCo and affiliated investors.

A. Yes.

Q. Discusses your return October 2017?

A. Yes.

Q. Discusses that you believe GCP1 owes GrowCo somewhere between 4 and $6 million?

A. Correct.

Q. Two Rivers owes GrowCo something in excess of a million dollars?

A. That's correct.

Q. That you are not receiving accounting from Mr. Harding and Sam Morris, who are the directors of Two Rivers?

A. That's correct.

Q. That the tenant failed to pay over a million dollars in rent after harvesting a crop?

A. Correct.

Q. And then, at the bottom, it talks about Chapter 11 reorganization and how it is not available to GrowCo because GrowCo receives its income primarily from marijuana-related businesses?

A. Correct.

Q. But you did file bankruptcy on behalf of

GrowCo and the related entities, correct?
A. I did.
Q. Okay. So was this a misrepresentation to investors when you said that bankruptcy was not available?
A. I can look it up -- perhaps you have the information -- when I actually filed the Chapter 11.
Q. I believe it was early 2019. So less than a year after this email.
A. So on April 13, 2018, I wrote this email, saying that Chapter 11 -- that I did not believe it was available. And -- but the Chapter 11 filing wasn't until 2019?
Q. Yes. Early 2019.
A. Okay. And so that's what this says.
Q. Okay. Was it a misrepresentation when you told investors that bankruptcy was not available to GrowCo because it was in the marijuana industry?
A. I -- I don't know if it was a misrepresentation. It was my belief at the time.
Q. So ultimately, you filed for bankruptcy. The bankruptcy was voluntarily dismissed because the trustee determined that GrowCo was a marijuana-related company, and bankruptcy was not available?
A. That's right.

Q. Okay. So your belief in this email was correct?

A. My belief when I wrote this email was correct.

Q. Okay. But you filed bankruptcy anyway?

A. I filed bankruptcy after talking to a Colorado bankruptcy attorney, and he suggested that we would -- that it would be available.

Q. Okay. And as we determined in the subscription documents, voluntary bankruptcy is a default event under the subscriptions, correct?

A. Correct.

Q. Will you go to Exhibit 25.

A. I am there.

Q. Okay. So on this first page, we have tenant, is Johnnie Canniseed, LLC, which is -- you are the . . .

A. What page are you on?

Q. The first page.

A. Okay.

Q. Which we have determined you are the founder, and I don't know if that is still an entity, but you were the managing member, correct?

A. Oh. Are we speaking about -- which entity are you -- I mean, I was a founder of all these

entities, but which entity -- which entity are we talking about specifically? If it was GrowCo, it wouldn't have a managing member. If it was an LLC, it would have a managing member.

So I was the founder of all of these entities except the water ones after I left.

Q. So we're talking about Johnnie Canniseed, the tenant.

A. Okay. Johnnie Canniseed, the tenant, and I and Chad Kirby were the founders.

Q. Okay. And were you the managing member?

A. Yes. I don't know if we were both managing members, but I was the one that was primarily directing the activities of the company.

Q. Okay. And the landlord is GrowCo, Inc.?

A. Yes. Um, no. It's a subsidiary of GrowCo, Inc., which was GC GrowCo Partners 1, LLC.

Q. So according to this first page, very first paragraph, it says, GrowCo, Inc., Colorado corporation, is the landlord.

A. Again, I must be on the -- on the wrong . . .

Q. On the very first page. So it says "Lease." "Summary of basic lease terms. Landlord, GrowCo, Inc." It's on the screen, if that helps.

A. Yeah. This is 165, right?

Q. 25.

A. 125?

Q. No, just 25.

A. I'm sitting -- I'm looking at 24, 25. Of -- sorry.

Q. That's okay. So do you see that GrowCo, Inc., is the landlord, and Johnnie Canniseed is the tenant?

A. I do.

Q. Okay. Can you turn to page 7?

A. Okay.

Q. Paragraph 5.4, "Place of payments, monthly rental, additional rent, and all other sums payable by tenant to landlord under this lease shall be paid to landlord at the place where the payments to landlord's best summary case (sic) lease terms or such other places landlord may from time to time designate in."

A. That's what it says.

Q. Okay. You can turn to page 12. Okay? Paragraph 9.3, "Compliance with Laws." "Tenant will comply with all laws relating to the use, condition, or occupancy of the property, including all zoning laws, licensing laws, and laws under the Colorado Medical and Retail Marijuana codes.

"Nothing shall be done or kept on the

property in violation of any law, and the property shall be used, kept, and maintained by tenant in compliance with all laws, including Certificate of Occupancy issued for the buildings and the property, and all zoning laws."

So yesterday, when we looked at this, you asked me where it said that you were responsible, as the tenant, for understanding the Colorado Medical Marijuana Code and the Colorado Retail Marijuana Code. Does this answer your question?

A. Could you repeat specific basically the question that you're asking me? A short version of it.

Q. Sure. So yesterday, we went through this lease. Do you remember that?

A. Not necessarily, but that doesn't mean anything.

Q. Okay. Went through the lease. I referenced the Colorado Medical Marijuana Code and Colorado Retail Marijuana Code on page 3. You asked me where in this lease it said that you were responsible for understanding those laws. Does Paragraph 9.3 answer your question?

A. No.

Q. Okay. Turn to page 22.

A. Can I expound upon my answer briefly?

Q. No.
A. No?
Q. That answers my question.
A. Okay.
Q. Are you on page 22?
A. I'm there.
Q. Okay. Paragraph 16.3, "Continuing Violation." "If tenant fails to observe or perform the same covenant or obligation under this lease, including the payment of rent or other monetary obligations, regardless of whether such defaults have been cured, in which the event landlord shall not be required to give notice of the third or subsequent default, and tenant shall have no further right to cure the same covenant or obligation hereunder." Did I read that correctly?
A. You did read it correctly.
Q. If you could turn to the next page, page 23.
A. I'm there.
Q. Paragraph 17.1, under "Landlord's Remedies." "Remedies, generally, upon the occurrence of any tenant default, landlord shall have the right, at landlord's election, then or any time thereafter, to exercise any one or more of the following."
We turn to the next page, 17.3. "Right to Terminate Possession. Upon the occurrence of any

tenent default, landlord may, if landlord so elects, at any time thereafter terminate this lease and the lease term on giving tenant notice in writing of landlord's intention to do so, and tenant's right to possession of the property will immediately cease, and the lease will be terminated, or landlord may terminate tenant's right to possession only without terminating this lease"; is that correct?

A. That's what it says.

Q. Okay. So if we go back to Exhibit 11.

A. Okay. I'm there.

Q. Okay. So the same page we were looking at, Bates-labeled 55310. "In November" -- "in late November of 2017, one of the two GCP1's tenants failed to pay over a million dollars in rent after having harvested a full crop.

"As a result of that failure, GrowCo was unable to pay the November interest payments on its debt. We were pursuing that money in court." Do you think it would have been relevant at this point to let investors know that Johnnie Canniseed was the tenant?

A. Johnnie Canniseed was never the tenant.

Q. So it would not have been relevant to let investors know that Johnnie Canniseed was the tenant?

A. One of the requirements for Johnnie Canniseed

to be the tenant would -- would have had to be licensed, and they never got licensed.

Q. So if Johnnie Canniseed was the tenant and not licensed, it would have been in violation of Colorado law?

A. If Johnnie Canniseed fulfilled the obligations of the lease, it -- in order to do that, in order to take possession as a grower, it would have had to be licensed, and it never became licensed.

So we entered into a subsequent agreement with GrowCo when it became clear that we were not going to get a license, and we subleased it. And those would be the terms that would subsequently comply. Johnnie Canniseed was never licensed.

Q. Okay. If we could go back to McKowen's Exhibit 1019. Are you there?

A. Yes.

Q. These are the McGrow agreements that we discussed yesterday. Based on yesterday's testimony, Mr. McKowen, you signed these agreements after you left -- resigned from Two Rivers and GrowCo and the other GrowCo entities in May 2016.

A. Yes. I resigned in May -- May 25th and 6th, and this is an agreement on the 22nd of July.

Q. Can you speak into the microphone? So I

believe you said you resigned on May 24th and 25th of 2016?

A. 25th and 26th.

Q. 25 and 26th? And then these agreements were signed subsequently?

A. That's correct.

Q. And these agreements were to provide services to GrowCo entities?

A. That's correct.

Q. Okay. Included in these agreements, you were to provide consulting services on construction and capital raises?

A. That's correct.

Q. Okay. And you received payments for these agreements?

A. I received a flat fee on -- and it was not contingent upon the six counts of the offering.

Q. Okay. And MCG Services is the bank account related to McGrow, correct?

A. MCG Services is wholly owned by McGrow.

MS. KIDD-AARON: Okay. Your Honor, at this time I would like to introduce an exhibit that is not on our witness list -- or our exhibit list.

THE COURT: What's the number?

MS. KIDD-AARON: 38.

THE COURT: And what's the document so I can describe it on my list?

MS. KIDD-AARON: Sure. It is a bank record for MCG Services.

THE COURT: Do Mr. McKowen and Mr. Harding have a copy?

MS. KIDD-AARON: I will give them copies right now, Your Honor.

THE COURT: Thank you.

Q. (BY MS. KIDD-AARON) Mr. McKowen -- excuse me -- Mr. McKowen, this is a Wells Fargo bank statement. You'll see, on the first page, it says "MCG Services, LLC." This was a document that Tammie Martinez, our accounting expert, used in her analysis.

A. Okay.

Q. Does this look familiar to you?

A. It doesn't look familiar to me, but it's probably accurate. We did open up an MCG Services, LLC, account, and this looks like that.

MS. KIDD-AARON: Okay. Your Honor, I would like to move to admit Exhibit 38.

THE COURT: Any objection, Mr. McKowen?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: Exhibit 38 is admitted.

(Exhibit 38 was admitted into evidence.)

Q. (BY MS. KIDD-AARON) If you could turn to the second page. You'll see, towards the bottom of the transactions, it's highlighted, but it's gray.

THE COURT: Do you have a copy for me?

MS. KIDD-AARON: Oh, I'm sorry.

THE COURT: Thank you.

Q. (BY MS. KIDD-AARON) And you'll see a transaction from 9/19. And it is a deposit from Two Rivers to MCG Services, finder's fee of $14,000. Do you see that?

A. I do.

Q. Okay. So does that mean that not all of your compensation was flat rate?

A. I -- I don't know. I don't know. I mean, it says "Finder's Fee." So my answer is, I don't know.

Q. Okay.

A. My compensation -- I don't -- I don't know what that's intended to be or what it's -- what -- what the calculation is for. But it does say "Finder's Fee."

Q. Okay. And I believe that Mr. McMahon testified that the presentation he attended for the $7 million note, the presentation you gave, was in

August of 2016.
A. I don't -- I don't know if the presentation that I gave was in -- in August of 2016 or when it was.
Q. It was after you left GrowCo, correct?
A. Correct.
Q. That was May 2016?
A. Right.
Q. There was a brief pause to determine whether or not GrowCo was participating in a Ponzi scheme?
A. Correct. No, that wasn't the -- that wasn't -- I don't believe that -- that that was the purpose of the investigation.
Q. I'm not referring to the investigation. I'm referring to the email we reviewed yesterday. I can pull it up. Or try to pull it up.
A. If you can just tell me what it was again, I can respond.
Q. Okay. You sent an email to, I believe, Sam Morris and Mr. Harding, maybe another party, that said that there were concerns that the interest payments of investors were going to pay older investors, and there was a concern that there might be a Ponzi scheme.
A. Yes. I definitely raised that as an issue.
Q. Okay. And so there was a pause. I believe Sam Morris suggested a pause so that you could look

into that matter, a pause from raising?
A. I don't -- I don't know that.
Q. We can pull up the email, if that would be helpful.
A. Okay.
MS. KIDD-AARON: If we could pull up Exhibit 23.
THE WITNESS: Your Honor, what was the exhibit number?
THE COURT: 38. And tell me again, what do we have on the screen? Is it 23?
MS. KIDD-AARON: Yes.
THE WITNESS: I'm -- I'm there.
Q. (BY MS. KIDD-AARON) Okay. Go ahead and read it. Let me know if this refreshes your memory.
A. Okay. It's regarding --
Q. You can read it silently.
A. Oh.
Q. And then just let me know when you're done.
A. Okay. So I've read my email to -- the first part of the email ended -- so that gets one out of the Ponzi scheme agreement. Do you want me to read -- read the second one? Second part?
Q. No. So, I guess, does this refresh your memory? Do you want me to re-ask the question I asked

before we pulled this exhibit up?

A. Please.

Q. Okay. So what I was asking was, did you take a break from fundraising because of this concern?

A. I don't know that we -- that they did or not. But I was concerned at this stage that we were -- that they -- that there -- the raising of capital, this would have been, I guess, the Series 7 or the -- the $7 million note, that it's -- it was going -- it was going to look like a Ponzi scheme.

Q. Okay. And so why are you -- this is in, I believe, June of 2016, after you resigned in May of 2016. Why are you bringing up concerns about GrowCo and a Ponzi scheme?

A. I believe that it was part of my duty as in providing advisory service.

Q. So this was part of your McGrow agreement?

A. Yes. In a -- in the second email, it references the -- the 2 million raised to date. So I must have had some belief that 2 million had been raised.

Q. And that is 2 million associated with the $7 million note, correct?

A. I don't know exactly. In recalling that schedule -- in recalling that schedule, there was the

1,000 that was part of a note, and then there was -- and I think the next raise was not the 7 million, but there was a series of four -- four separate notes. So . . .

I don't know exactly where the -- where the money that had been raised to that date had come from, but that kind of indicates to me -- it answers the question of what had been raised after I resigned.

Q. Okay. So you believe that $2 million was raised after you resigned?

A. Some of it may have been raised before I resigned, but at 6/27/2016, which is only a month later, that -- I'm saying or suggesting that that 2 million had been raised to date.

Q. Okay. If you could turn to Plaintiff's Exhibit 22.

A. I'm there.

Q. You're there? Do you know what this is, Mr. McKowen?

A. It's a report by the Nominating Compensation Corporate Governance Committee of Two Rivers Water and Farming Co. concerning an appearance of conflict of interest-related party transactions, dated June 29, 2016.

Q. Okay. So this investigation that led to this

report is the reason that you resigned, correct?

A. No.

Q. Was this investigation taking place when you resigned?

A. Not that I know of.

Q. Then why did you resign?

A. I believe, that one, there was a conflict of interest. And, two, that public company couldn't become a licensee. And so, on my own volition, because we were -- because I was concerned about those things, I -- I resigned.

I found out afterwards that -- that they were -- I didn't know -- the meeting that was supposed to occur on the 26th of May, I didn't know any -- any of that.

Q. So it was just a coincidence that you resigned on the same day that the meeting was supposed to occur?

A. Yes. I wasn't included in any of the discussions or anything like that.

Q. Was it ever brought to your attention that GrowCo board members were concerned that you formed GrowCo without proper board permission?

A. I don't believe that's accurate.

Q. Okay. So this report goes through in good --

in great detail the board's concerns.

A. Okay.

Q. And at this time, were the Two Rivers and GrowCo board the same people? Was it -- were they made up of the same people?

A. At this time, I don't -- I'm not entire -- I think they were definitely members of the GrowCo board, who were members of the Two Rivers board, but I don't think it was exclusively made of that.

Q. Okay. This board -- or, excuse me -- this report was released after you negotiated the MIPA, correct?

A. This report? Yes. I think the MIPA was negotiated in, like, February.

Q. Okay. And the MIPA was an attempt to take over Suncanna's license, correct?

A. No. I wouldn't use the verb "attempt to take over."

Q. Attempt to purchase?

A. That's what -- that's what the agreement says.

Q. Okay. Without approval from MED?

A. The MIPA stated they were -- needed to be approval by the MED to -- in order for to consummate the transaction.

Q. Okay. Was that one of the concerns of the board, the MIPA?
A. It may have been. Again, I wasn't a party to the discussions.
Q. Did you receive this report?
A. I did, after -- after it was issued.
Q. Okay. And you reviewed this report, correct?
A. Yes. It was issued on -- looks like in June of -- June of 2016.
Q. Right. And you reviewed this report, correct?
A. I don't know when I actually reviewed it, but I clearly had resigned by June of 2016.
Q. Okay. You can turn to Exhibit 24.
A. I'm there.
Q. Okay. So have you seen this memo before?
A. I have.
Q. Okay. Were you involved in the drafting of this memo?
A. I don't believe so.
Q. This memo is a response to the report that we just looked at.
A. Okay.
Q. Does that sound familiar?
A. Well, I -- I became aware of it afterwards.

Q. Okay.

A. I think I only became aware of it when discovery was made in this case.

Q. This report discusses a number of things that the authors disagree with in the investigation. It also discusses the 8K that you mentioned regarding your resignation from Two Rivers and subsidiary companies.

A. Okay.

Q. It also discusses why this is not going to be provided to investors. The report that we just looked at addressing the concerns, the conflicts of interest, regarding you and your affiliation with the marijuana business.

A. Can you tell me where that discussion is or where they decided not to provide that information to investors?

Q. Yes. So it is on the third page.

A. Okay.

Q. It says, "Filing of the report with the Securities and Exchange Commission under cover of current report on Form 8K was not required. Under the instructions to Form 8K, because the report does not fall within any of the defined events that must be addressed by a Form 8K or under Regulation FD, as a result of the report having been distributed to third

parties, including some of the company shareholders, because the individual or individuals or who distributed the report were not acting on behalf of the company."

A. Yes. Can you tell me which -- the number of the paragraph that you just read?

Q. So it's the third page, and it's the first bulleted paragraph on the third page.

A. Are we looking at the Memorandum to File?

Q. Yes.

A. In the third page, I see the, "If the" -- "If the company were to disclose the report publicly, it may be required on an ongoing basis to publicly update the company's response to the report." I see that.

Q. Okay. So I'm at the first bullet point. That's what I just read was the first bullet point.

A. I see. Filing -- let me read it to myself. Okay.

Q. Okay. And the next bullet point says, "Even though the report was not required to be filed via a Form 8K, the company could elect to file such a Form 8K, and so there was an option to disclose this information." We talked a lot about disclosures in this case.

A. Yes.

Q. It would have -- it seems like it would have been information that a reasonable investor would want to know, that board members were concerned about conflicts of interest related to you and the marijuana industry. Do you agree?

A. Yeah. I -- and -- and this -- yeah, this is Two Rivers Water and Farming Co., so they are publicly traded, and somebody made the decision that it . . .

The board was advised by its security counsel, Mark Johnson at K&L Gates, LLP. These -- these are his -- this is his legal advice. And so I'm a little bit surprised that -- at -- at the conclusions of all of it.

But I'm -- I wouldn't question -- based upon my experience with Mark Johnson, I wouldn't question it, but it seems like, to me, it's material.

Q. Okay. Okay. If we can turn to McKowen Exhibit 1006.

MR. HARDING: I'm sorry; what was that?

MS. KIDD-AARON: 1006.

THE WITNESS: I'm there. I am there.

Q. (BY MS. AARON-KIDD) So this is the GrowCo formation documents filed with the Colorado Secretary of State, correct?

A. That's correct.

Q. Okay. I notice that you are the only person listed on this document. So you were listed as the registered agent. Your mailing address is also the only one listed. And I believe you are listed as the party causing this document to be filed.

With some of the other formation documents, I've noticed that Mr. Harding is also on these documents. Does that sound accurate?

A. So I filed this -- this report, this Article of -- of Incorporation, online. And so the principal address of the company is the 2000 South Colorado Boulevard. We -- we had offices down -- that's where we had offices down. And so I'm the only one that filed this report; that's correct.

Q. Okay. And is it also correct that some of the other Secretary of State filings have -- list both you and Mr. Harding -- for example, the Suncanna filing?

A. And I use -- I don't -- I don't know. I would have to see it. But typically, it's only one person because it's, you know, a five-minute process online, and it's -- my experience is, whoever is completing the filing of that is the -- is the name that goes on there.

I don't know if I've ever seen -- I don't

believe I've ever put two names on.

Q. So I don't know if we have the Suncanna. Do we? Okay. So one of the accusations by the board is that you created GrowCo, Inc., without their approval, and potentially without their knowledge.

A. Yeah. I don't agree with that.

Q. And yesterday, Mr. Harding testified that there don't appear to be any board members memorializing the vote to approve GrowCo.

A. I don't know if that was his testimony. I don't recall it being that. I . . .

I think -- I know, for myself, that I didn't have access to those records, and that's been an issue for -- since the beginning of this -- since the beginning of this lawsuit.

Q. Okay. So do you remember there being a board member -- board meeting where you discussed the approval of GrowCo?

A. I believe there was.

Q. Okay. When would that have taken place?

A. Before this -- before this Articles of Incorporation were -- were filed, probably, but definitely before any substantive activity occurred. They -- they were -- there were several filings of these, these articles.

As -- a -- at least from my -- from my practice, I would register a name that was like that or similar to that -- Inc., LLC, Real Estate Holdings, that sort of thing, just to reserve the name.
Q. Okay. My question is about whether or not there was a board meeting approving the GrowCo, Inc., formation.
A. And I think I answered that.
Q. And there are no board minutes that you have seen, correct?
A. There's no board-made minutes that I can get on any of these activities that I can get my hands on.
Q. So I want to turn back to Exhibit 61. Plaintiff's Exhibit 61.
A. It's an email; is that right?
Q. Yes. This is the email solicitation for McGrow. So, yesterday, you mentioned that you did not send this email to Mr. McMahon, but rather, it was forwarded to Mr. McMahon, correct?
A. That's correct. I don't know if this particular email was, but the one that we were looking at yesterday.
Q. If you look at the top, it says that it's from Daryl Mendelsberg to Joe McMahon.
A. The top says it is from me. From Joe to --

okay. Yeah. So Joe was copying the email that I sent to Jeff Ploen, and then Jeff Ploen forwarded that to Daryl Mendelsberg. Then Daryl Mendelsberg then forwarded it to Joe McMahon.

Q. Correct.

A. Okay.

Q. When Mr. McMahon approached you about investing, you accepted this investment and signed a contract with him, correct?

A. I believe he invested in the $7 million raise, and that occurred sometime in, I believe, August of -- August of -- in the fall of 2016. And he -- and he attended a meeting in which I was there honoring the contract that I had signed by McGrow.

Q. Okay. So I'm going to re-ask my question. When Mr. McMahon -- excuse me -- approached you about investing in McGrow, provided you a check to invest in McGrow, you signed an agreement with him and accepted his investment, correct?

A. I don't think so. Let me point out the distinction, if I can, in why I'm saying, "I don't think so." He was in the meeting that was -- that Jeff Ploen had put together with Daryl Mendelsberg.

And I think there was probably -- he -- maybe five, six, seven people in that meeting. It was in

Jeff Ploen's office in the Tech Center. And so he didn't approach me. He was part of that -- part of that meeting, that.

And then, subsequent to that, he invested. And so the acceptance of his investment, the sending out of the documents associated with that, all of the offering documents, that sort of thing would have been handled by someone other than me because I was gone.

Q. Okay. So we're going to look at -- we're going to look at Exhibit 130.

MS. KIDD-AARON: Ms. Raynard, if you could enlarge the check.

Q. (BY MS. KIDD-AARON) So it says, "McMahon Energy Partners," which Mr. McMahon testified to this being his company and the company he uses to invest, and there is a $50,000 payment to MCG Services, LLC. You just said earlier that MCG Services is wholly owned by McGrow.

A. Correct.

Q. Okay. So this is an investment -- a $50,000 investment by Mr. McMahon in McGrow?

A. That's correct.

Q. Okay.

A. The investment that he made as a result of that meeting -- and I get what you're saying now. So

we're -- we're not talking about his investment in GrowCo?

Q. Correct.

A. We're talking about the investment in McGrow, and that occurred in July of 2017?

Q. Correct.

A. And -- and, yes. So I will have to look at that subscription agreement to see exactly what it said, but I would have been the one that accepted his -- this $50,000 and put it into the MCG Services account.

Q. Okay. So did you make any disclosures to him about any of the things we've previously discussed, the initial MED denial from 2016?

A. I -- I don't recall. I mean, the whole world knew -- knew at that point in time that my license had been denied.

Q. Did they know why?

A. I don't -- I can't remember. I don't know specifically what was provided to the investors, but I -- we -- I -- I just don't know.

Q. Okay. Would it again be contained in the term sheet if it was a disclosure?

A. I would have to look at that term sheet. I probably used a -- a template, and so I don't know

exactly what -- what it would have had in it. Probably had the usual -- the delivery probably had the usual safe harbor statements and that sort of thing.

Q. So when you say -- you use the term "template," it would be the same template as the GrowCo term sheets?

A. I'm thinking so, but I don't know for sure.

MS. KIDD-AARON: Can we pull up Plaintiff's Exhibit 128?

THE WITNESS: I'm there.

Q. (BY MS. KIDD-AARON) Okay. So I'm looking through this. I don't see any disclosure related to the MED denial or the reasons for the MED denial. Please let me know if you do.

A. The term sheet probably wouldn't have had that. The term sheet is always -- was always what they all say, and this summary -- in the -- generally, it's -- this language, this summary does not purport to be complete.

And it's qualified in its entirety by the terms and conditions of a definitive agreement. "Nothing herein is binding except set forth under confidentiality."

And so I think I testified before that that part of the offering documents generally started with

the -- the term sheet to get an indication of interest, and if there was an indication of interest, then we would -- we would have sent out a subscription agreement itself and a -- and a copy of the note and the wire instructions.

THE COURT: Would you mind telling me when you get to a good stopping point? We'll take a recess.

MS. KIDD-AARON: Yes. We can stop here.

THE COURT: You're sure? Okay.

Mr. McKowen, you may step down.

MR. MCKOWEN: Thank you.

THE COURT: We'll take a recess until 3:15.

Anything from Plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: All right. 3:15.

(Break from 2:54 p.m. to 3:25 p.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. Mr. McKowen's on the witness stand, under oath. Continue with direct examination.

MS. KIDD-AARON: Thank you, Your Honor.

Q. (BY MS. KIDD-AARON) Please turn to Exhibit 48, Plaintiff's Exhibit 48. Are you there, Mr. McKowen?

A. Yes, I am.

Q. Okay. So this is an Absence of Records from the Colorado Securities of -- Colorado Securities Division -- excuse me -- stating that there's no record of a notice -- filing for exemption or notice with the securities commissioner for TC Capital and McGrow, LLC; is that correct?

A. Let me understand what -- what that means. So this is saying that there is no registration statement or notice -- notice of exemption for GrowCo funds listed above for TR Capital Partners or McGrow, LLC.

And so the filing requirement for either the Notice of Exemption would be the Form D, and the filing of a registration statement would be something that had been reviewed by the SEC and -- and the -- not approved, but released. "No further comments."

So I can't speak for TR Capital Partners, LLC. I don't have those records. And I -- and I don't know if -- I don't know if TR Capital Partners even has a CIK, which is their designation for filing with the SEC. So I don't know that about -- that about that

with McGrow, LLC.

I don't know -- I don't know if -- if we filed a Form D, but it wouldn't surprise me if we didn't, hadn't.

Q. Okay. So you understand what this document says, and the document says there has been no notice filed with the State of Colorado, correct?

A. It says that there's been no registration -- registration statement or notice of intention.

Q. Right.

A. The two -- the documents would have been two different types of documents. The Form D would have been for the notice of any exemption and -- and the actual.

Q. I understand, Mr. McKowen. I'm just asking, do you understand that this is saying that there's no notice of any exemption; that this is what this document is saying?

A. There's no Notice of Exemption or registration statement.

Q. Okay. Can you turn to Exhibit 52.

A. I'm there.

Q. Okay. So this is a document for TR Capital. Specifically, this is -- I believe Mr. Harding testified about this document and the distributions

described in this document.
Distributions described in this document are distributions of GrowCo Partners 1 preferred units, and they are being distributed in lieu of a cash distribution for TR Capital Partners investors.
A. Okay.
Q. To your knowledge, was any Notice of Exemption filed with the SEC, a Form D, or a notice filed with the commissioner for any offerings related to TR Capital distributions or any other investments?
A. I don't -- I don't -- to my knowledge, I don't know.
Q. Okay. So you understand that the Blue Sky laws are the state securities laws, correct?
A. Correct.
Q. And so I believe one of the sections of the Colorado Securities Act that you looked at earlier with Mr. Rome was 11-51-308; is that correct?
A. 308?
Q. Yes.
A. That would be for the exemption.
Q. Okay. So 11-51-308-1(P) describes the exemption from registration using firearm exemptions.
A. Yes. That last sentence says that you need to file that Form D.

Q. Okay. And that you need to be in compliance with the federal laws -- correct? -- in order to meet that exemption requirement?

A. I don't know that you need to have filed that. In fact, I specifically think that you don't have to have filed that form in order to have -- be able to use the exemption. And I've been advised of that many times.

You -- you are in violation of the requirement, the state requirement to -- to file those -- to separately file that Form D, and generally, you can get that done through the organization that Mr. Rome alluded that, that NASAA.

And -- and -- but I -- I'm -- I'm -- so you can file -- if you file a Form D through NASAA, they make the distribution to all the states. I don't know if that was done or not done.

Q. Okay. So 11-51-308-1(P) says, "Any offer or sale of a security in compliance with an exemption from registration with the Securities and Exchange Commission, under Section 3(B)(1) or 4(A)(2) of the Federal Securities Act of 1933, as amended, pursuant to regulations adopted in accordance with the Federal Act of the Securities and Exchange Commission, except that an offer of sale of a security in compliance with an

exemption from registration with the Securities and Exchange Commission under Regulation A, and adopted pursuant to Section 3(B) of the Federal Securities Act of 1993, as amended, is not exempted under this section.

"The issuer shall file with the securities commissioner a Notification of Exemption and a form prescribed by the securities commissioner and pay an exemption fee to be determined, collected pursuant to Section 11-51-707."

So the Certificate of Absence of Records that we just looked at is saying that, that last part -- let's see -- "The issuer shall file with the securities commissioner a Notification of Exemption in a form prescribed by the securities commissioner and pay an exemption fee," was not completed?

A. I -- I have to believe that their records are accurate, so as it relates to McGrow, I would say that that's probably true. I don't know that.

THE COURT: Can you pull the microphone over, Mr. McKowen?

MR. MCKOWEN: I'm sorry. If I'm told maybe 30 more times, maybe I'll finally get it in my head.

So I've read that -- that particular citation many times. I think it's referred to maybe as many as

five times in the -- in the trial component. So I -- I'm -- in our first meeting, I think that I mentioned that I don't know that we filed the Form Ds on time or paid the fees associated with all of them.

Q. (BY MS. KIDD-AARON) Okay. So the notices for the State were not filed, and the fees were not paid, and McGrow and TR Capital did not file Form Ds?

A. I can't speak to, off the top of my head, whether TR Capital filed that -- filed the Form D, especially in relationship to their distribution of the -- of the -- I think they distributed preferred membership interests in GCP1.

Q. Correct. So that was in March -- according to this email, Exhibit 52, which we were just looking at, or letter, that was March 17th, 2015, when you were the CEO of TR Capital, and your testimony is, you don't know if Form Ds were filed?

A. I don't know if they were. But if -- if the State -- if DORA records say that they've searched EDGAR, and they're not there, then I would believe that that's true.

Q. Okay. Okay. So Exemption 506, under the Securities Act of 1933, provides -- provides for the private offering exemptions that you were speaking about earlier with Mr. Rome, correct?

A. That's right.

Q. Okay.

A. As amended. 33, as amended. I think you said they came into being, like, in 1980.

Q. So, as amended, so whatever the most recent version is. That's what you mean. So 506(A) says, "Exemption offers and sales of securities by an issuer that satisfy the conditions in Paragraph B or C of this section shall be deemed to be transactions not involving any public offering within the meaning of Section 4(A)(2) of the act," which is the section that is exempted under the Colorado Securities Act, correct? 4A2?

A. No. I think 4(A)(2) is -- is a -- it is referenced, but it's a -- it's part of the coordination between the Colorado Securities Act, and so it's -- it's one of the things that Mr. Rome and I couldn't reach consensus on.

But it's -- it's -- 4(A)(2), I can't speak to off the top of my head, but Mr. Hart could when we talk to him. But I think that's related to the filing of registration statements, not exemption.

Q. Okay. So I just read in the Colorado Securities Act where it says, "Any offer or sale of a security in compliance with an exemption with the

Securities and Exchange Commission, under Section 3(B)(1) or 4(A)(2) of the Federal Securities Act of 1933."

A. Okay.

Q. Okay. And so, under 506, it says, "Offers and sales of securities by an issuer that satisfy conditions in Paragraph B or C of the section shall be deemed to be transactions not involving any public offering within the meaning of Section 4(A)(2) of the act."

A. Very good.

Q. Okay? So, also under 506, which we have discussed multiple times, and it's also mentioned in the Complaint, is the bad act or disqualification; specifically, that is 506(D).

And it says, "No exemption under this section shall be available for a sale of securities if the issuer, any predecessor of the issuer, any affiliated issuer, any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer, any beneficial owner of 20 percent or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power, any promoter connected with the issuer in any capacity at the time of such sale, any investment

manager of an issuer that is a pooled investment fund" -- and it goes on.

But I believe that I have described your role or your title, based on that -- what I just read, correct?

A. What is inaccurate is, if you're a bad actor, that you cannot avail yourself of those exemptions.

Q. Okay. But I'm just asking you, do you fall within any of those descriptions: issuer, predecessor issuer, affiliated issuer, director, executive officer?

A. Well, all of them, almost.

Q. Okay. Okay. And under -- let me see -- D(1)(6), "Is suspended or expelled from membership in or suspended or barred from association with a member of a registered national securities exchange or registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade."

A. That's the definition of what? I'm sorry.

Q. That is one of the definitions for bad actor disqualification.

A. Right.

Q. Okay. And then, under 506(E), it says, "Disclosure of prior bad act or events. The issuer

shall furnish to each purchaser in a reasonable time period" -- sorry -- "a reasonable time prior to sale a description in writing of any matters that would have triggered disqualification under Paragraph D(1) of this section but occurred before September 23rd, 2013.

"The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes that it did not know and in the exercise of reasonable care could not have known of the existence of an undisclosed matter or matters."

A. Okay.

MS. KIDD-AARON: Okay. Your Honor, this document is a brokerage record for John McKowen from FINRA. It's Exhibit 99. I do believe that you have -- so this is already in the exhibit. The difference is, we were unable to get the certified copy from FINRA until Tuesday morning. And so I'm just hoping to switch out the exhibit.

THE COURT: Any objection to that, Mr. McKowen?

MR. MCKOWEN: Is it the CRV?

MS. KIDD-AARON: Yes.

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: None, sir.

THE COURT: This certified copy will be substituted for the one that I currently have in my book, and then this could be uploaded as Exhibit 99.

MS. KIDD-AARON: Oh, okay. I am being told we also have two more, Exhibits 15 and 14. Exhibit 15 is an enforcement action against George McCaffrey, who recently settled out of this case but was a defendant in this case, and Exhibit 14 is the BrokerCheck report for Mr. McCaffrey.

THE COURT: So, certified copies again?

MS. KIDD-AARON: Yes.

THE COURT: So that's 14 and 15?

MS. KIDD-AARON: Yes.

THE COURT: Any objection, Mr. McKowen, to switching out certified copies?

MR. MCKOWEN: No.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: All right. 14 and 15 will be switched out.

MR. MCKOWEN: These both relate to George McCaffrey, and so they -- the numbers are --

Q. (BY MS. KIDD-AARON) This one is 15, 14, and 99.

A. 99? And they're all just switched out?
Q. They're switched out, yeah. Same thing. Only -- the only addition is this cover letter that's certifying it.
Okay. We can look at Exhibit 99, which is the BrokerCheck for Mr. McKowen that I just provided.
THE COURT: My 15 looks different.
MS. KIDD-AARON: Does it? Your Honor, what do you have for 15?
THE COURT: "Financial Industry Regulatory Authority, Notice of Acceptance of AWC," and it has a "to" and a "from," and it has a date of September 10th, 2018. So it doesn't look like what you provided me.
MS. KIDD-AARON: Okay. So, let's see. The one -- I'll provide it to you again.
THE COURT: And 14 looks a little different than the one I previously had.
MS. AARON-KIDD: Your Honor, may I approach?
THE COURT: Yes. So the one you just gave me?
MS. KIDD-AARON: Does that look like the 15 you have?
THE COURT: This looks like what you just gave me.
MS. KIDD-AARON: Okay.

THE COURT: This?

MS. KIDD-AARON: That looks like --

THE COURT: This does not look like what I have in my binder.

MS. KIDD-AARON: Okay. Let me check. While we are looking at that, 99 looks the same. We can hold on 15, Your Honor, if we could swap out the other two.

THE COURT: I think we need to look at 14 as well.

MS. KIDD-AARON: Okay. So let's just go with 99. If we need the other two, I will revisit.

THE COURT: 99, we're going to swap out?

MR. MCKOWEN: 99, you're going to swap out?

THE COURT: 14 and 15, we are not going to swap out at this time.

MR. MCKOWEN: Okay.

THE COURT: They don't look to be the same document, at least on first appearance.

MS. KIDD-AARON: Actually, Your Honor, I think the -- I think 14 is actually 113.

THE COURT: That looks right to me. Do you want to substitute 113 with what you have -- what you've handed me as 14?

MS. KIDD-AARON: Yes, please, Your Honor. We will deal with the final document later, if that's

okay.

THE COURT: All right. Mr. McKowen, do you understand that, and Mr. Harding, that what I have right now that says 14, that we were going to swap out with 14 is actually 113?

MR. MCKOWEN: "McCaffrey"?

MS. KIDD-AARON: Yeah.

MR. MCKOWEN: Yes.

MR. HARDING: Yes, I do.

THE COURT: So we will swap out 113.

Q. (BY MS. KIDD-AARON) Mr. McKowen, I apologize for the confusion. If you could look at Exhibit 99, which is the BrokerCheck report, your BrokerCheck report that I just provided you.

A. Okay.

Q. And if you could turn . . .

A. Okay.

Q. So page 4. I guess. At the top, it says, "Regulatory Final." Keep going.

A. Yes.

Q. Keep going.

A. It's double-sided, so . . .

Q. Page 8?

A. 7.

Q. 7? Okay. There you go. I think that's it.

Yes.

A. I am there.

Q. Okay. So it says -- in this last big paragraph towards the bottom it says, "There was a complaint filed on July 22nd, 1986, by NASD District Number 3 against Respondents Hamilton Boner; Bandblick, Inc.; John R. McKowen, John Sherman, Ronald Hamilton, alleging violation of Article 3 of the Rules of Fair Practice, and that Respondent member, acting through Respondents McKowen and Sherman, engaged in deceptive and fraudulent contrabands in completing a series of transactions to sell customers securities." Do you see that?

A. That's what it says.

Q. Okay. It says, "February 17, 1987, appeal to the Board of Governors by the Respondent member. McKowen and Sherman called for review as to Respondent Hamilton," correct?

A. Correct.

Q. "Board of Governor's decision rendered June 9, 1987, wherein the findings, as contained in the first cause relating to inaccurate confirmations, are dismissed as to Respondent Sherman.

"Findings of violations of Article 3 are dismissed as to all Respondents, and the remaining

findings are affirmed. Therefore, Respondent member McKowen and Sherman are censured. Respondent member Sherman are" -- "Respondents member McKeown and Sherman are fined $15,000 each." Do you see that?
A. I do.
Q. Okay. And then, the next paragraph says, "Order affirming disciplinary action taken by Registered Security Association on the basis of commissioner's opinion issued this day is ordered that disciplinary action taken by the National Association of Securities Dealers, Inc., against Hamilton Boner, Inc.; John R. McKowen; and John E. Sherman, and the association's assessment of costs be, and they hereby are affirmed." Do you see that?
A. That's the last paragraph?
Q. Second-to-last paragraph.
A. Right before Disclosure 3 of 3?
Q. Yes.
A. Okay.
Q. Okay? So, based on this, we see that you were at one point licensed, correct?
A. Correct.
Q. To offer and sell securities? Your license was suspended and then revoked for lack of payment of fines?

A. I don't know if that's what that "revoked for nonpayment means."

Q. Okay. Was it suspended?

A. It was. It was suspended.

Q. Okay. And based on the language that I've previously read of 506(D)(1)(6), it says, "Is suspended or expelled from membership in or suspended or barred from association with members of the Registered National Securities Exchange or Registered National or affiliated securities association." NASD is a securities association, correct? Or was?

A. Yeah. It's -- it's replaced as part of --

THE REPORTER: Speak up, please.

THE WITNESS: Yes. It was -- FINRA is -- absorbed the former NASD.

Q. (BY MS. KIDD-AARON) Okay. Which is also an affiliated securities association, correct? FINRA?

A. It's a financial regulatory authority. I don't entirely know all of its functioning, but it is -- part of its functioning is to regulate securities.

Q. Okay. So that suspension falls under bad act or disqualifications because of the timing. I believe it was 1986?

Yes. 1986. The disqualification would not

fall under D but would fall under B, "Disclosure of prior bad act or events, and the issuer shall furnish to each purchaser a reasonable time prior to sale a description in writing of any matters that would have triggered disqualification under Paragraph D(1), but this section that occurred before September 23rd, 2013."

A. That's not accurate.

Q. I'm reading the law.

A. I know you're reading the law, but you're not reading all of that.

Q. Okay. "The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes that it did not know and in the exercise of reasonable care could not have known of the existence of the undisclosed matter or matters."

A. Yeah. You're -- what you're not reading is the -- well, there's two things that you're not reading. You didn't finish the paragraph up above as to what -- what portions of the Complaint were dismissed. And the fraud sections of the Complaint were dismissed.

And the -- what was affirmed was the -- actually, the suspension was increased from 30 days to

a year, and disgorgement and the payment of the assessed costs stuck.

And so that -- that's what -- the Section 18 part, I believe, is the fraud portion of those regulations, and then -- but all the remaining findings are affirmed; "Thereby, member McKowen is suspended from and fined 25,000," and that went to 1,000.

And suspension was for a year, but the -- the fraud provisions and the inaccurate confirmations were dismissed.

Q. So you were suspended for a year?

A. Yes.

Q. 506(D)(1)(6) says, "Is suspended from membership or association with national or affiliated securities association." It does not say anything about fraud.

A. "Is suspended."

Q. Correct.

A. Yeah. I'm not -- I'm not suspended, no.

Q. Okay.

A. It was for a year. And -- and it -- the second part of that -- again, I think you're -- don't have and you're not able to read is that it's part of what we talked about this morning, and it addresses it specifically in the -- in the language in -- of bad

actor. There's a look-back period.

Q. There's no look-back period for 6, 506(D)(1)(6).

A. Yes, there is.

Q. I am reading the language to you as it is written in the rule.

A. We'll wait for Mr. Hart because you and I don't need to argue about it. I can just tell you that there is a look-back period.

Q. So, based on this, you did not provide written disclosure, even though when I read to you and asked you if you fell under the category of issuer, any predecessor, issuer, affiliate issuer, director, executive officer, you said that all of those titles applied to you.

A. That's correct.

Q. Okay.

A. But it doesn't apply to me. It says "is suspended." I'm not suspended anymore. And if you look back 10 years, according to the bad actor rules -- and that's part of what Mr. Hart submitted in his -- in his brief, or whatever he filed or whatever I filed that he's going to testify to tomorrow.

Q. If you could turn to Exhibit 113, which is the BrokerCheck report for Mr. McCaffrey that I just

provided.
A. That -- that we -- that I labeled 14 and 15?
Q. Right. So it's actually -- 113 is the BrokerCheck.
A. And it's 113 of your exhibits?
Q. Yes. Correct.
A. Okay.
Q. If you could turn to page 11.
A. Let me get there.
Q. Okay.
A. It's a transition process. 113, correct?
Q. Correct. I'm sorry. Page 14, actually.
A. Page 14 of Exhibit 113. And -- let's see. Mine aren't numbered. It has a Bates number, but it's . . .
Q. You look at the document I just provided you, George McCaffrey, CRD.
A. And that would be 14 or 15, numbers that you gave me? Or look at the . . .
Q. It's this one.
A. 14?
Q. Okay.
A. I have it in front of me.
Q. Are you on page 14?
A. Oh. Okay.

Q. I don't think -- that is not the right page being projected. It might be 15 on that one. Okay. So I'm going to keep going. So this is -- the date initiated is 10/2018.

It says, "The employing firm is NTB Financial Corporation." This is a regulatory action against Mr. McCaffrey by FINRA for selling away from his licensed broker dealer, correct?

A. Yes. That's what this is.

Q. And FINRA determined that Mr. McCaffrey, by connecting you with his investors from NTB and receiving a commission from GrowCo or Two Rivers and those entities, was participating in the unlicensed sale of securities, correct?

A. I don't know what the law provides. I know that he's required to inform the -- the NTB -- well, I'll just call it NTB. So what page are you reading from?

Q. 14.

A. 14? "Without admitting or denying the findings" . . . And what are you asking me to agree to?

Q. That Mr. McCaffrey provided you with investors related to the greenhouses -- that is what's described here -- and that FINRA determined that he was

selling away from his licensed broker dealer, so he was participating in the unlicensed offer and sale of securities.

A. Well, during this time frame, he was licensed, and I don't know if he -- I wasn't aware that -- he hadn't informed NTB about his activities.

Q. But that -- that's what FINRA determined, right?

A. I don't know if they determined it or not. It -- no. It says that it's without admitting or denying, but that those were the allegations.

Q. Okay. And, as a result, Mr. McCaffrey was suspended for -- from the industry for 18 months?

A. Okay.

Q. If you could turn to Exhibit 134. So this is an email from George McCaffrey to Mr. McMahon. This email is in reference to VetaNova Colorado, LLC, one of the companies that you said you --

A. Just one second, please. Okay. On there, at 134.

Q. One of the companies that you said you were the founder and managing member of was VetaNova Colorado, LLC?

A. That's correct. I was the -- the founder of and managing director of VetaNova, Colorado, LLC.

Q. And so this email is asking for Mr. McMahon to exchange his original investments. Specifically, Mr. McMahon invested in a 7 million GrowCo note and McGrow note, as we have previously reviewed.

So this would be exchanging his investment in McGrow to convert to VetaNova Colorado, LLC, shares, correct?

A. Correct. It was -- this letter was part of a mass mailing to all investors.

Q. Okay. And Mr. -- during this time which is September 11, 2019, almost exactly a year after this FINRA action and the 18-month suspension, Mr. McKowen is -- I mean, Mr. McCaffrey is sending out this solicitation, correct?

A. This -- so this solicitation, this explanation of what we're doing isn't something that Mr. McMahon did. It's a -- it was a mass -- I sent out these emails to all of the GrowCo, McGrow investors so that they all had the same opportunity. And so Mr. McMahon did not avail himself of this.

Q. And this opportunity was to convert their investments from GCP1, GCP super units, or McGrow to VetaNova Colorado, LLC?

A. Correct.

Q. Okay.

A. But he declined. He didn't do anything. And I think he -- this is the time period when he asked to -- to have his name off the list. And so I took anyone who -- any of the original hundred investors or so, if they said, "Take me off the list," I took them off the list.

Q. If you could turn to Exhibit 96.

A. I am there. 99. Oh, 96. I'm there.

Q. Okay. This is also an email from George McCaffrey in September 2019, approximately one year after his regulatory action from FINRA, barring or suspending him from offering and selling securities for 18 months.

This email is to Mike Harnish. And it is asking him to convert his investment in the GrowCo -- GrowCo and/or McGrow entities to VetaNova, LLC, correct?

A. I don't know if -- what George McCaffrey's status was on September 21st, 2019, in terms of, had he been suspended by then? So I don't -- I don't know what George -- what his status was.

He certainly was -- was not a -- a control person, meaning he owned a sufficient number of shares to become a control person. I don't know if he -- he was -- he was at some point in time a -- I think a

board member and maybe -- maybe even a COO. But I don't know if it matches up that way.

Q. So this email, he signed as, "Best regards, George McCaffrey, executive manager, VetaNova, LLC."

A. I'm not seeing that part. Oh, back to the top. "Executive manager, George, VetaNova-dot-com." I -- I can't really say one way or the other. But I -- I'm -- I don't know George to lie.

And so if he says that for that -- uh -- that particular offering, which is a -- it's not a -- it's -- it's more along the same thing that I said, that we sent these out to all members until they said, "Take me off the list," because we were trying to give everyone the same opportunity.

And I don't know if -- if Mike Harnish -- which is a director; that's who my Magic Mike is -- I don't know. He did end up converting into VetaNova, Inc., or VetaNova, LLC, but I can't really -- I don't know when he exactly did that.

Q. Okay. At the time of these two emails that we just looked at, did you provide any disclosures about anything that had gone wrong with the GrowCo entities at this point, so the number of offerings related to building the greenhouses and their failure, the reg -- your regulatory action, Mr. McCaffrey's

regulatory action?
A. I don't know what George discloses to them. But, again, we weren't required to disclose a suspension for a year in 1985, '86. We'll just have to disagree until my rebuttal witness appears tomorrow. But the reg -- the regulations on a bad actor are very . . .
Q. So you did not disclose your regulatory action. Did you disclose Mr. McCaffrey's regulatory action?
A. I did not -- I did not disclose it.
Q. Okay.
A. I only became aware of this, what happened to George, as -- in his -- what he was disclosing or not disclosing to NTB, I think, recently here, in the last year or so.
Q. Okay. So did you have a duty as the issuer to discover that information that is publicly available on the BrokerCheck website?
A. Do we have a duty to disclose information that's contained on BrokerCheck?
Q. Do you, as the issuer, have a duty to be -- learn of information of regulatory actions of one of your executives when it is publicly available?
A. I don't know if we have a duty or not.

Q. You can go back to Exhibit 11.
A. I certainly didn't -- wasn't aware of the consequences of his disciplinary action until then.
Q. If you can go to Bates Number 55307.
A. And that's 11?
Q. Yes. Exhibit 11.
A. And there are other people who I am aware of --
THE COURT: Is there a question on the table? There's no question on the table.
MR. MCKOWEN: Okay. I thought that there was.
THE COURT: There wasn't. She just asked you to go to Exhibit 11.
MR. MCKOWEN: Okay.
THE COURT: And gave you a Bates page number.
Q. (BY MS. KIDD-AARON) Which is 55307.
A. Okay.
Q. Okay. So it says, towards the middle of the page, "My fellow investors, a number of you have reached out to me after receiving a reorganization proposal from John McKowen.
"I am writing as a friend and not as any" -- "any official capacity regarding the latest email that was received from John McKowen, proposing

reorganization of GrowCo and associated companies into a new entity. In the upcoming weeks, you will be called upon to make a very quick decision about whether to accept this reorganization or not.

"You, of course, are welcome to take whichever path you desire. Here is why I will my vote my multiple investments in GrowCo, GCP1, and GCP12, against the proposed reorganization.

"First, there are many items that won't work for me regarding my debt position. I do not see why the secured debt holders would ever give up their security position. In receivership, the secured holders would be driving the process.

"Second, the proposed" -- "the proposal keeps mentioning that the tenant is paying. This is not the case."

So we've already looked at your email talking about the tenant not paying. We -- I discussed with you that Johnnie Canniseed was actually the tenant and was not paying. The subtenant, Amerijuana, Quality Choice, when they were not paying, Johnnie Canniseed was also not paying. I believe that's what Mr. Harnish is referring to.

Apologize. This is an email from Mr. Harnish, which you can see if you turn to the next

page, and at the top, "See my comment from Mike Harnish." And so this is referring to these conversions that we just looked at, conversions from the GrowCo entities, McGrow, to the VetaNova entities.

Mr. Harnish is discussing that he does not want to give up his secured position, which we also talked about, some of the early investments were secured, GCP1, and GrowCo specifically, the $4 million note.

So for those investors that did decide to convert, they lost their secured interest, correct?

A. No.

Q. What happened to their secured interest?

A. Their secured interest was exchanged for -- initially, for a preferred membership interest in VetaNova Partners, LLC. And in that -- that interest was subsequently transferred to VetaNova -- VetaNova, Inc.

And so they did not lose their individual participation or the protection that it provided. It -- it aggregated all of those liens, deeds of trust, into -- into VetaNova, and it increased their participation in those deeds of trust.

Q. So the parties in the $4 million note who did not convert their interest, and such as Mary Loughran,

lost their position?

A. No. That was our first discussion when we met in your offices and we went back and forth for probably a -- an hour. And so Mary Loughran still has -- still is a beneficiary of -- on the deed of trust that -- that she is listed as a beneficiary on the Orlando assets.

And, first -- it's not a first; it's -- it sits behind the, um, deed of trust that VetaNova, Inc., now has. And so she retained -- she retained that deed of trust individually and didn't participate in VetaNova, Inc.

Mike Harnish eventually converted everything, so he not only participates in that deed of trust; he participates in the GCP1 deed of trust.

Q. So your testimony is that these conversions gave you an interest, replaced the GCP1 interest, so currently, the lien order is -- the State has a lien against these properties, GCP1 has a lien against these properties, the $4 million note is the third place, so your testimony is that, through these conversions, VetaNova now has the second place lien that was once GCP1?

A. Yes. The conversion into VetaNova, Inc., VetaNova, Inc., V-e-t-a-N-o-v-a, now owns all of those

deed of trusts and those properties, and so they participate through VetaNova, Inc.

And then Mike Harnish actually converted everything, but Mary Loughran didn't, but she still has her beneficiary interest from that deed of trust. And she has -- she has not lost the ability to collect on that.

Through the actions that -- that VetaNova, Inc., took, up in the air, is -- is this stipulation and order that was recently public. I don't know what impact that's going to have, but it wasn't something that I was in the room to negotiate with.

Q. So you gave Ms. Loughran a scenario and told her that there is a $3.8 million offer on the table and asked her if she would be surprised if that were the case.

You also asked her if she would be surprised if she got -- if that offer went through, that it would pay the entirety of the money that she was owed in relation to the $4 million note, and she testified, yes, that would be surprising to her.

Right now, you're testifying -- you're agreeing with me that the State is in the first position, that now you have inserted through these conversions VetaNova into the second position, and that

Mary's investment is in the third position.

A. It's always been in the third position.

Q. So will $3.8 million cover both the first lien, the second lien, and provide Mary with the entirety of her investment?

A. So the first lien is -- with the State is -- is $4,400,000. But the $3.8 million offer is net of all of that. It's not -- it's -- the offer, as best I understand it -- and it's been conveyed to me by Chuck Kirby, but I haven't seen the offer -- I've -- I've asked for it, and they don't want to give it to me.

So I'm -- I told -- I'm told that the 3.8 million offer is on top. It will take care of all these other liens on the Orlando asset on just the reservoir. So if -- if, in fact, that -- that -- that 3.8 million is done, and the purchaser -- and the purchaser is someone who'd been buying water rights on the -- on the Orlando -- and so I checked that out.

And I also checked it -- it's with who they have dealt with, so that 3.8 million, if it follows the distributions that are required, according to the -- the note agreement, the priority, it could conceivably pay her back all her money.

She doesn't have to worry about the State's $400,000 lien. She doesn't have to worry about any of

the lienholders. That's the neat -- the noteholders and GCP1.

I was going to wait till tomorrow, but I have an email from -- from Chuck on -- on that particular offer. But I'll introduce it tomorrow.

Q. So you were yesterday discussing the stipulation between the securities commissioner for the State of Colorado and Two Rivers in their settlement in this case, correct?

A. Correct.

Q. And I believe the language that you specifically -- part of the language that you specifically took issue with was, "Over several years, a practice of utilizing fraudulent conveyances and encumbrances, which included the aforementioned properties, falsely portraying" -- "providing secured interest in trust to GrowCo-related investors.

"In fact, the elaborate scheme was meant to shift control of the financial assets among the defendants and their coconspirators." So based upon what you just described, the GCP1 assets were shifted from GCP1 investors to VetaNova?

A. The -- the call that the GCP1 would have on those assets was not shifted from them to me, a defendant? And we went through that. I'm not one of

the listed beneficiaries.

Q. Okay. But you are -- who was involved in VetaNova, with an e, other than you, John McKowen?

A. 75 percent of the investors and 75 percent of the capital have gone to -- voluntarily agreed to become part of VetaNova.

Q. Do their new contracts with VetaNova contain a secured interest?

A. VetaNova acquired the liens that -- that -- of the investors that exchanged into VetaNova stock. So they've aggregated all of the liens that they would have in -- into VetaNova, as part of the agreement.

Q. So they do not have a secured interest?

A. They do have a secured interest. Their secured interest is aggregated, and, like I said, they improved their participation in the liens.

Q. Okay. So go back to the $4 million note again. If there's a $3.8 million on the table, and then there are two liens ahead of it, and if the note is for $4 million, how is Mary going to be paid back the entirety of her . . .

A. Because this offer is saying, We'll take the property as-is, today, for 3.8 million, and don't worry about the -- what liens are on the -- the Orlando Reservoir, which is just one piece of the property.

Q. Okay. As we established yesterday, you took -- you were deposed, under oath, correct?

A. Correct.

Q. I believe it was January 9th.

A. Correct. I think. I'm guessing that's correct.

Q. I apologize, Mr. McKowen. You were deposed a second time as well, correct?

A. Yes.

Q. Okay.

A. I know exactly where she's going because I listed it as a -- as an exhibit.

Q. Okay. So you were deposed the second time on February 7th, 2023, and you were also under oath, correct?

A. Yes.

(Video playing from deposition.)

QUESTION: "So do you have an estimation of the notes that are secured to this land, the value of the notes secured to this land?"

CART PROVIDER: Excuse me. I can't hear what is being said.

THE COURT: It's a deposition video being played on screen. You do not need to transcribe that.

CART PROVIDER: Understood.

MS. KIDD-AARON: Can we rewind it?

ANSWER: "$4 million note has -- in foreclosure, and we would foreclose the -- we would foreclose the GCP1. I don't intend to close the -- try to foreclose on the $4 million note because it's owned by GrowCo, and GrowCo's dissolved, so it gets nothing."

QUESTION: "GrowCo gets nothing?"

ANSWER: "GrowCo -- from this property, it gets nothing."

QUESTION: "Okay. So what about the investors who are still holding onto that investment?"

ANSWER: "Say it again."

QUESTION: "What about the investors who still have an investment in the GrowCo $4 million note?"

ANSWER: "They're going to be screwed."

(End of video testimony.)

THE COURT: The video is finished.

Q. (BY MS. KIDD-AARON) So Mary is one of the investors that's going to be screwed as it relates to GCP1, GrowCo, the $4 million note?

A. As it relates to GCP1. The lien is on GCP1 because it sits behind the preferred investors. The $3.8 million offer is not about GCP1. It's about the Orlando. And it's 3.8 million, irrespective of the

liens, and it's -- it's supposedly going to be paid inside -- close inside one or two weeks, according to Chuck.

So if you own -- if you own a deed of trust, if the $4 million note has a deed of trust on GCP1, which it doesn't have, it has -- it has -- that deed of trust is on GCP2. So there's no lien that the $4 million note has on GCP1.

Q. So your testimony today is that the GrowCo investors are not screwed?

A. No. The -- I'm saying that the 4 million note investors have very specific liens, and their best lien is on the Orlando Reservoir and the F2.

Q. So GCP1 does not have a lien against the Orlando Reservoir?

A. GCP1 has a -- a -- it's a -- what we discussed were, one of them is 42, 24, something like that, and then the -- the -- the $4 million note has a lien just behind that, but the 3.8 million doesn't care about those liens.

That's an offer for cash today, and someone else will -- purchaser will worry about how the liens get satisfied, the State and otherwise.

Q. Okay. And you're going to present evidence on this offer tomorrow?

A. Say again.
Q. And you're going to present evidence on this offer tomorrow?
A. I'm going to show you some communications between Chuck Kirby and I regarding that.
Q. If we can turn to Exhibit 19. Okay. So this is the County -- the Pueblo County Assessor's Title History for the land where the greenhouse is situated.
A. Okay.
Q. If we look at -- so, Parcel 1, is this the parcel where the greenhouse is located?
A. Yes. Yes.
Q. And at the bottom, it shows, in August -- on August 31st, 2011, the land was conveyed to Two Rivers via warranty deed for $400,000; is that correct?
A. The entire 157, 58 acres was conveyed.
Q. For $400,000?
A. Oh. I guess.
Q. In 2011, correct?
A. Correct.
Q. Okay. And then, in 2015, April 2015, it was conveyed from Two Rivers to GrowCo, Inc., via a quitclaim deed for $0. Do you see that?
A. I do.
Q. And then it was conveyed from GrowCo, Inc.,

to GrowCo Partners 1, LLC, quitclaim deed for $0 in June of 2015. Do you see that?

A. I do.

Q. Okay. And then there was a correction made later that month.

A. Yeah.

Q. Do you think that the investors should know when this greenhouse is being conveyed to another entity?

A. The investors being what -- which group of investors?

Q. So, for example, Mr. McMahon testified that be believed that his investment in the $7 million note gave him an ownership interest in the greenhouse and the property.

A. I believe that he -- he believed that, but his investment in -- in the 4 million note?

Q. Seven.

A. In the 7 million note, he didn't have any liens, as far as I know, but . . .

Q. But the investors believed that, and then the property's being transferred via quitclaim deed for no value. Do you think the investors should know that? Do you think that's a disclosure that should be made to them?

A. To the -- to the $7 million investor?
Q. To any investor.
A. Well, the -- it was disclosed. These -- these transactions are disclosed. We're -- like, in GCP1, the -- they are told that GCP1 is a quarter section of the acres.
And it identifies that -- that quarter -- not quarter section -- that -- it identifies what that one-quarter portion of GCP1 -- of -- of the overall 150 acres, 59, 57 acres. It specifically not only shows them that -- the -- the total acres; it shows them what GCP1 is.
Q. Where are these disclosures being made?
A. Oh, we had a map up yesterday of -- of the -- a -- of the 157 acres.
Q. Where are these disclosures being made?
A. Well, in a GCP1 offering, I think it's disclosed that -- that the parcel of land that -- that -- at the -- that the deed's going to be on, and that deed of trust, that lien, was filed.
Q. Okay. And does GCP1 still own the greenhouse, or was it conveyed to VetaNova, with an e?
A. It was conveyed to VetaNova.
Q. Okay. Were the GCP1 investors made aware of that conveyance?

A. Yes.
Q. Where is that disclosed?
A. One, I sent out -- well, one, we filed a -- an 8K, and so it was publicly available, but I believe I also attached the contract in -- in an email to all investors.
Q. Is GCP1 a public company?
A. No.
Q. Okay. So would investors have a reason to look for publicly filed SEC information related to GCP1?
A. No. But VetaNova is.
Q. Okay. And are the investors -- do they have any input when this land is conveyed?
A. They do through their board of directors -- through the board of directors that took them -- they elected those board of directors.
Q. Are the investors paid any money when the property is conveyed for zero dollars?
A. I would say that, when it's conveyed for zero dollars -- and, one, this is a -- this is a -- a court filing -- the original conveyance to Two Rivers was valued at 400,000. And then Two Rivers quitclaimed that deed to GrowCo.
And at the time, GrowCo owned a hundred

percent of -- or Two Rivers owned a hundred percent of GrowCo. And so the investors in Two Rivers received a -- or were aware of that transaction.

Q. So your testimony is that this would be publicly available SEC filings that the investors do not get any money in relation to these conveyances; their input is through the board of directors; is that correct?

A. No. I'm -- I'm saying that the value didn't shift. If Two Rivers conveyed property at zero, an entity that Two Rivers owned a hundred percent of.

Q. Can we turn to Exhibit 34.

A. Say again?

Q. Exhibit 34?

A. Okay. Thank you. So --

Q. So this is a Certificate of Absence of Records from the Division of Securities. And this is specific to registration to sell -- offer and sell securities.

And it found that Jan McCaffrey, Wayne Harding, and Kirsty Cameron had never or do not hold licenses to sell securities. We heard Mr. Harding discuss that he falls within the issuer exemption, or believes that he falls within the issuer exemption.

However, Jan McCaffrey, who we discussed a

bit, she sold the $4 million note to Mary Loughran and received a commission, and Kirsty Cameron also sold unlicensed and received commissions, correct?

A. Kirsty Cameron received commissions. Jan McCaffrey, I -- just, whatever commissions paid were paid through Waterton. And in -- on -- they -- in our mind, they were paid. They were paid -- I mean, they were paid commissions on that.

Q. Okay.

A. And I don't think that -- no, I know that Jan McCaffrey at one time had a series of them, but I don't know if she did at the time the sale was made.

MS. KIDD-AARON: I have no further questions for now, Your Honor.

THE COURT: Thank you. Mr. Harding, do you have any questions for Mr. McKowen?

Mr. Harding: I do, sir.

CROSS-EXAMINATION

BY MR. HARDING:

Q. I was a little bit confused after this back-and-forth in your testimony, so I thought I'd ask you a few questions so I can get at least clarity in my head about some of your statements.

A. Okay.

Q. First thing that started off was about

licenses and marijuana and being able to work in the marijuana industry. Do you remember that?

A. Yes.

Q. Okay. And I think there was some discussion back and forth about what type of license I had and why I got the license, and so can you tell me again -- I think you stated why I got my license.

A. I believe that you got your license --

THE COURT: Mr. McKowen, pull that microphone over to you.

THE WITNESS: I believe you got your license in association with the MIPA, the execution of membership interest, purpose agreement for Suncanna.

Q. (BY MR. HARDING) Yeah. I think that's correct. And do you remember the type of license I received?

A. I think it was an employee license.

Q. I believe you're correct.

MR. HARDING: Your Honor, I would like to submit an additional piece of evidence that I covered with the Plaintiff and the other Defendant this morning.

THE COURT: What's the number?

MR. HARDING: I don't know how to do it procedurally, but . . .

THE COURT: What's the number?

MR. HARDING: Well, it . . . It would be -- it would be my -- it would be my disclosure. And if you hold on, I'll try to pull that up.

MR. FINKE: 2013. 2013.

THE COURT: What's the description of the document?

MR. HARDING: So -- I'll give you a copy of this?

THE COURT: Sure. Both sides, or does Mr. McKowen and the Plaintiff have it?

MR. HARDING: They do already, yes.

Mr. McKowen, what's this exhibit number?

THE COURT: It's Exhibit 2013.

Q. (BY MR. HARDING) So I believe, at the time, I went down and I got the license to fulfill the MIPA, trying to establish internal controls and everything like that with the MIPA. And I think that's what you said was your understanding, correct?

A. Correct.

Q. Okay.

A. It was in connection with the Suncanna membership interest purchase agreement.

Q. Okay. At the time -- and then this license, to the best of your knowledge, does it allow me to grow

plants?
A. I mean, I don't -- as an employee, I don't think that you -- I don't think you could go buy a facility and -- and become a -- start planting. I think you can work for a -- someone who has a -- I don't know what they call it. A key license or something like that.
Q. Do you know how many licenses -- different licenses there are today?
A. Today? No.
Q. Would it surprise you to find out there's only 12 different licenses?
A. As a total in the state of Colorado?
Q. I think it's 12 to 14.
A. Yeah. I would be shocked.
Q. Okay. And -- and recently -- I mean, what, only, like, two or three of those actually deal with a growing authorization out of the 12, 13 licenses?
A. Yeah. That's news to me.
Q. Okay. You also were asked by the Plaintiff about Cole Amendment and Colorado marijuana laws. And I think you stated that you -- you know, you didn't know that much and weren't that -- an expert in that area, correct?
A. Correct.

Q. Did you do anything to -- I mean, the course -- because you're -- you're renting to tenants, marijuana tenants and everything else, did you -- did you use outside consultants to help you understand, you know, the Cole Amendment, how it impacts your business, and the Colorado marijuana laws, and . . .
A. Yes.
Q. How does --
A. Yes.
Q. -- it impact -- did you seek outside help?
A. Yes.
Q. And who did you seek help from?
A. And we paid for it. And we paid for it.
Q. Okay. And who did you seek help from?
A. A law firm named Vicente Sederberg.
Q. Okay. Is that the only one, or . . .
A. And the -- in the licensing of Suncanna, they were the only ones that -- that I arranged for Aaron Van Wingerden to go down and see.
Q. Okay. So was there any other firms that -- that helped direct us on the marijuana side? Like, I think you mentioned Steve Levine. Was that correct?
A. Yes. That -- that was -- after Aaron Van Wingerden had his license, I went to Husch Blackwell, which is a fairly well-respected marijuana-involved law

firm. In fact, they hold seminars and all kinds of stuff to attract clients. And inside of Husch Blackwell, I think their lead marijuana person is Steve Levine.

Q. You were in the room here when Exhibit 141 was shown, which is the Attorney General's accounting report from their inside staff member. I believe her name was Gonzales, Tammie Gonzales. Do you remember that?

A. Yes.

MR. HARDING: Can I see that exhibit, please? 141.

THE WITNESS: It's Tammie Martinez, I think.

MR. HARDING: Oh. Tammie Martinez. Sorry.

Can you maybe blow up that center section? I'm going to do this. I'm going to pull mine up. Wasn't -- it wasn't in the original.

Q. (BY MR. HARDING) So, in that report, do you -- do you agree with some of these numbers? Like, for example, I deposited $185,000 into one of the bank accounts. When you were CEO, you would -- you would know about transactions like that, particularly from related parties that we have to report related party transactions --

A. Right.

Q. -- in our filings. I don't remember putting any kind of related party transaction in.

MS. KIDD-AARON: Objection. He's testifying now.

THE COURT: Sustained.

Q. (BY MR. HARDING) And you remember --

THE COURT: Hold on. Sustained. You need to pose a question.

Q. (BY MR. HARDING) Do you remember, under related party transactions filed with public documents, the SEC, was there ever $185,000 disclosed that I loaned or deposited in the company?

A. I believe there was.

Q. I can't hear you.

A. I believe there was.

Q. Don't remember? Okay.

MR. HARDING: So if you go to the second page. Sorry. Third page. You can blow up kind of the first third.

Q. (BY MR. HARDING) Do you remember any kind of related party filings for me depositing 659,115 -- $115? Is it shown there in our report?

A. As I -- I don't know why you would have deposited 659,000, and I believe that your investment in the GrowCo entities was 185,000 or some number like

that.

Q. Okay. And then, on the outflow side, it shows that I took out $949,658. I rounded up.

A. Yeah. None of these numbers make sense to me. And I would have -- if I'd -- if you had taken out $50,000 shy of -- of a million dollars, I would have called the sheriff.

Q. And wouldn't that show up in our 10K filings under the executive compensation section?

A. Yeah. And so, I'm not -- I'm -- the problem that I have with this report is it doesn't -- and I -- I think I mentioned this at the time -- the categorization is so incomplete, it becomes meaningless.

So when the outflows, it says, is $994,000, and it's over a time period of -- of four, five years, that means -- I guess -- I mean, I don't -- I don't know what it means. I don't know if it was salary, and you certainly weren't paid that kind of money in salary.

So these designations, to me, as someone who's used to looking at audited financials, don't mean anything to me. I can't -- I can't tell what -- what -- what they mean.

Q. Okay. Thank you. When did GrowCo and its

subsidiaries, the different subsidiaries of GrowCo, when did they stop the capital raise?

A. When did the GrowCo subsidiaries stop raising capital? I think it was in a -- 2017.

MR. HARDING: Please bring up Exhibit 132. And I think, somewhere in that chart -- yes. Blow that up.

Q. (BY MR. HARDING) So do you think that's pretty accurate? It looks like September 2017; it was a small offering up until that date?

A. Yeah. I -- it -- it's ballparking-ish to me. I think it's -- the end of 2017, I think that the capital raises for GrowCo stopped.

Q. Okay. So I also heard the attorney general today state that -- or discussed about some of the provisions and representations in the security or note purchase agreement, whereby these -- they, I think, in my mind, alluded to that we were in default somewhere or something like that.

To the best of your knowledge, were we in compliance? And that includes sign -- signed extension agreements with any debtholder. You think that we were in compliance through that time period, based upon, you know, the representations that we made?

A. I don't know what some of the representations

you made were because I wasn't there. But the -- your comment about capitalizing interest on real estate-type of development changes the perspective for me somewhat.

But I still would like to know what amount was -- I agree with Mr. Rome that -- what was that amount? You know, and -- and was it -- was it reflected in the -- in the -- the Use of Proceeds section?

So I'm still up in the air about that. But it -- my experience with you is that you don't lie, and you can't be made to lie, you know, as a -- as a CPA. As a CFO.

Q. Thank you. As I say in the show business, stay tuned. That will be part of my testimony.

So when was -- I think you were saying at one point that Harding and Morris did not provide accounting or CP1 information to you. Do you remember the last time GrowCo Partners 1 filed a tax return?

A. I'm assuming that you filed it that year. I mean, the following year, that you filed it when it was due. Or you incorporated it in your filings with -- with Two Rivers when you were at . . . When you were . . .

Q. Maybe -- maybe a little clearer. The tax return for GrowCo Partners 1 is an LLC pass-flow entity

tax return, and it's pretty thick. You have all the partners we have to report to. I didn't -- do you think -- or do you remember moving the tax services to file tax returns over to an independent third-party CPA by the name of -- I forgot -- Yanney, Zanney, something in southeast Denver?

A. Yeah. I didn't like that.

Q. So -- sorry. Again?

A. Yeah. I remember that. I didn't like that because it was -- it was expensive.

Q. Right. And who did I work with to -- within the organization here, who did I work with to help the accountant put together the information?

A. I don't recall the name. But I remember them coming into our office, and that's . . .

Q. Could it possibly be George McCaffrey that actually helped me meet with Anney, Zanney, whatever his name is, CPA?

A. Could be.

Q. Sorry?

A. It could be.

Q. Okay. So to prepare a tax return, don't I have to have financial records?

A. Absolutely.

Q. Okay. So, based upon your statement that

you're not receiving accounting on GCP1 from Harding and Morris, would you like to modify that?

A. I would like to -- on -- on GCP1, I don't think, if I said it about GCP1, it wouldn't be accurate because our investors are very sophisticated, and if they don't get that pass-through that they can use as a deduction on their tax return, my phone would stop ringing. So . . .

Q. I'm trying to understand your answer. Just give me a quick second. It appears that you skirted my question a little bit. But I'll move on.

I think that, also, you stated that Sam Morris paused the capital raise -- no, I think, maybe -- somebody -- somebody in the testimony said Sam Morris paused -- recommended pausing the capital raise due to your email in June 2016, something that we were running a Ponzi scheme, or we could be running a Ponzi scheme.

Was that the reason for the pause of the capital raise, or was it because we needed to get to the bottom of the internal board report, governance report?

A. I -- I don't know what the cause of the -- what the independent board members were seeking, but it was directly related to that and not the Ponzi scheme.

But I was raising the issue of, we need to be aware of -- you need to be aware of taking dollars in over here and distributing -- distributing them over there.

And what became enlightening to me, in that regard, again, was your testimony about capitalized interest and -- and how that can be a part of your -- your cost basis in -- in -- in that. If it's consistent with what the term sheet said.

THE COURT: We're -- Mr. Harding, we're at 5:00. So can you find a good stopping place?

MR. HARDING: One more question, Your Honor, and depending on his answer, my question will take probably less than a minute.

THE COURT: Okay.

Q. (BY MR. HARDING) There was a -- there was a letter produced. I didn't write down the exhibit -- I apologize -- about TR Capital doing in-kind distributions of -- for example, we could not afford -- TR Capital could not afford cash, but I think, on your direction, didn't you come up with a deal by saying, "Wait a second. You know, TR Capital, because they put money in GCP1, they have some additional preferred units -- of course they have common units, and I think we should distribute like -- in-kind, like value to them"? Do you remember that?

A. I do.

Q. Okay. So, in your opinion, and you're pretty astute in securities, if I give you a 1 percent interest in my LLC because I owed you some money, and you take that in consideration of that money, is that something you have to file with the reg- -- a commission?

MS. KIDD-AARON: Objection. Mr. McKowen is not an expert in this case.

THE COURT: Sustained. The way you phrase the question is you're asking for his opinion.

Q. (BY MR. HARDING) Did you think that we needed to file registrations with the like-kind distributions we made with TR Capital of our ownership -- "our," TR Capital -- ownership in GCP1?

A. You know, I -- honestly, at the time, I didn't think -- I don't know what I thought, but it's surprising to me, but if it -- if it's -- if it's considered a sale of security, then it probably needs to be filed.

Q. But you don't know whether or not an exchange -- if I gave you my -- my share -- I owe you a thousand dollars, I give you a thousand dollars of my interest in the LLC, you have no opinion on if it's --

A. The question is, is it a sale? And if -- and

if they're exchanging cash that owed for that, is that a sale? I don't know, but I could see how it might be a requirement. I don't know.

Q. Fair enough. I think we have another expert showing up tomorrow, so maybe I'll save that for the questions tomorrow.

MR. HARDING: Thank you, Your Honor. That's all I have.

THE COURT: All right. Is that all you have for today, or . . .

MR. HARDING: Today.

THE COURT: Okay. You're still --

MR. HARDING: I'm not leaving yet. I'm leaving today, but --

THE COURT: Okay. Do you still have questions of Mr. McKowen?

MR. HARDING: No, that's it . I'm done. I rest, whatever it's called.

THE COURT: You're finished with your cross-examination?

MR. HARDING: I rest my cross today.

THE COURT: Okay. All right. We have Exhibit 2013, which appears to be a copy of Mr. Harding's MED license.

People -- or Plaintiff have any objection to

2013?

MS. KIDD-AARON: No, no objection.

THE COURT: Mr. McKowen? Do you have an objection?

MR. MCKOWEN: I do not, Your Honor.

THE COURT: Exhibit 2013 will be admitted.

(Exhibit 2013 was admitted into evidence.)

THE COURT: Mr. McKowen, tomorrow morning, I'll take your sworn statement, and then, if the Plaintiff has any redirect examination of you, they can do that at that time.

MR. MCKOWEN: Okay. Your Honor, can you tell me what a sworn statement is supposed to do?

THE COURT: Well, normally, if you had an attorney, your attorney could then ask your questions --

MR. MCKOWEN: Yeah.

THE COURT: -- based on what has been asked of you by other counsel. I'm not going to make you ask yourself your own questions and then answer them. So if you want to make a sworn statement under oath regarding the issues that you were asked about on direct examination by the Plaintiff or cross-examination by Mr. Harding, you can do that.

MR. MCKOWEN: And so --

THE COURT: Or if you want to do like Mr. Harding did, you can waive making a sworn statement at this time, and then once the Plaintiff has completed with their case, you can then call yourself as a witness in your own case and make a sworn statement at the time.

Either way, you're still going to be subject to cross-examination or redirect by the Plaintiff.

MR. MCKOWEN: Okay.

THE COURT: I'll ask you in the morning what you want to do. If you do not plan on making a sworn statement tomorrow, then you need to have Mr. Hart here first thing in the morning because it looks, based on the Order of Proof, that the Plaintiff will be out of witnesses. Is that correct?

MS. KIDD-AARON: That's correct, Your Honor.

MR. MCKOWEN: So they're done with my direct?

THE COURT: Once you're finished testifying, this -- this round, the Plaintiff has no more witnesses, and then I'll start asking the two of you to start calling your witnesses, and I intend to start with you.

MR. MCKOWEN: Okay. Great.

THE COURT: Actually, Mr. Hart is your witness or Mr. Harding's witness? Your witness, right?

MR. MCKOWEN: Mr. Harding is a witness?

THE COURT: Mr. Hart.

MR. MCKOWEN: Hart is my witness.

THE COURT: So we intend on starting with you, and you need to start calling your witnesses tomorrow.

MR. MCKOWEN: At 8:30? He can't -- he told me he could be available at 9:00.

THE COURT: We'll start at 8:30. So . . .

MR. MCKOWEN: What if I can't get him to start at 8:30?

THE COURT: Call a different witness.

MS. KIDD-AARON: If it's helpful, I do think I'll have a couple of redirect questions. I don't know if Mr. McKowen is going to make a sworn statement. It won't take a long time, but probably 30 minutes.

THE COURT: Either way, they're going to have a redirect question from you. If you can have Mr. Hart here ready to go at 9:00.

MR. MCKOWEN: I will do that.

THE COURT: Okay. You may step down.

(The witness was excused at 5:07 p.m.)

THE COURT: Anything else from Plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Anything else for you,

Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No, sir.

THE COURT: All right. We'll see everybody tomorrow at 8:30. Thank you.

WHEREUPON, the within proceedings were concluded at 5:08 p.m. on the 13th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, WENDY McCAFFREY, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 237 pages herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had. I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 31st day of July, 2023.

My commission expires January 31, 2024.

/s/ Wendy McCaffrey

Wendy McCaffrey
Professional Court Reporter

DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO

1437 Bannock Street
Denver, Colorado 80202

^FOR COURT USE ONLY^

TUNG CHAN, Securities Commissioner for the State of Colorado,

Plaintiff,

vs.

TWO RIVERS WATER & FARMING COMPANY, et al.,

Defendants.

Case No: 21CV033922
Courtroom: 259

REPORTER'S TRANSCRIPT
July 14, 2023
VOLUME V

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Courtroom 259, Denver, Colorado 80202, on Friday, July 14, 2023, at 8:31 a.m., before the HONORABLE CHRISTOPHER J. BAUMANN, District Court Judge. These proceedings were reported by Theresa L. Mendez, Registered Professional Reporter and Notary Public for the State of Colorado.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

ROBERT W. FINKE, 40756*
First Assistant Attorney General
JENNIFER H. HUNT, 29964*
Senior Assistant Attorney General
INDIA KIDD-AARON, 48420*
Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Tel: (720) 508-6401
Fax: (720) 508-6037
Robert.Finke@coag.gov
Jennifer.Hunt@coag.gov
India.Kidd-Aaron@coag.gov

APPEARING FOR THE DEFENDANTS:

JOHN McKOWEN (Pro Se)
335A Josephine Street
Denver, Colorado 80206
john@johnmckowen.com
(303) 248-6883

WAYNE HARDING (Pro Se)
22586 E. Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

ALSO PRESENT: Jennifer Reynard, Paralegal to Plaintiffs
Brian Keener, Assistant Attorney General Fellow
Kaitlyne Hernandez, Law Clerk
Connor Muelken, Division Clerk

I N D E X


| | |
|---|---|
| WILLIAM T. HART | 7 |
| DIRECT EXAMINATION BY MR. MCKOWEN | 7 |
| VOIR DIRE BY MR. FINK | 9 |
| CROSS-EXAMINATION BY MR. FINKE | 39 |
| CROSS-EXAMINATION BY MR. HARDING | 42 |
| EXAMINATION BY THE COURT | 43 |
| REDIRECT EXAMINATION BY MR. MCKOWEN | 45 |
| JOE BURTNESS | 53 |
| DIRECT EXAMINATION BY MR. MCKOWEN | 53 |
| JOHN MCKOWEN | 67 |
| TESTIMONY OF MR. MCKOWEN | 68 |
| CROSS-EXAMINATION BY MS. KIDD-AARON | 167 |


EXHIBITS


| EXHIBITS | ADMITTED |
|---|---|
| 1037 | 71 |
| 1042 | 120 |
| 1027 | 123 |
| 1038 | 139 |
| 1039 | 141 |
| 1033 | 147 |

P R O C E E D I N G S

(Whereupon, the following proceedings were had in open court.)

THE COURT: Let's go back on the record 21CV33922. All parties and counsel are present. We have our CART interpreter with us again today as we have the last several days.

Plaintiff ready to proceed this morning?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: And defense?

MR. MCKOWEN: Yes.

THE COURT: I should say, Mr. McKowen.

MR. MCKOWEN: Yes.

THE COURT: And Mr. Harding?

MR. HARDING: I am. I might need a reinvite to the CART, so I will let you know if that's an issue.

THE COURT: Are you on the CART site right now?

MR. HARDING: No.

THE COURT: Let's get you on there.

MR. HARDING: I got it, sir. Thank you.

THE COURT: So Mr. McKowen, if you'll come back up. We need to finish your testimony this morning. It's another day, so I'm going to swear you

in before you set up.

JOHN McKOWEN,

the Defendant having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: And we are -- well, I needed to ask you. Do you want to make a sworn statement this morning?

THE WITNESS: No. I'm going to reserve the right to make it after some additional testimony if that's available.

THE COURT: Okay. It is. So then we are ready for the plaintiff's redirect examination.

MS. KIDD-AARON: Your Honor, in the interest of time, since Mr. McKowen's expert's here, I'm going to not redirect and close.

THE COURT: All right. So no redirect. That means your testimony, at last for right now, is completed. You may step down.

THE WITNESS: Does that mean, in my layman's interpretation, the plaintiff has rested its case?

THE COURT: I'm going to ask them as soon as you step off the witness stand.

Any additional witnesses for plaintiff?

MS. KIDD-AARON: No, Your Honor.

The plaintiff rests.

THE COURT: Any requests or motion by either side?

MR. HARDING: None, sir.

THE COURT: Mr. McKowen?

MR. MCKOWEN: None.

THE COURT: Did you have any questions or motion request for the Court before we move forward?

MR. MCKOWEN: No, Your Honor.

THE COURT: And for the plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: We are complete -- we are finished with plaintiff's case at this point. They may have some rebuttal, if you choose to call witnesses or testify on your own behalf.

But at this point, we're ready for the defense case. Mr. McKowen, would you like to call your first witness?

MR. MCKOWEN: Yes, Your Honor. I'd like to call Bill Hart as our rebuttal expert witness.

THE COURT: Mr. Hart, if you'll come up here to my left. I don't know if he needs those binders, Mr. McKowen. You may want to move those off of the witness stand for him.

MR. MCKOWEN: Say again.

THE COURT: I don't know if Mr. Hart is going to need these binders.

MR. MCKOWEN: No. Okay.

THE COURT: So we should take them off of the witness stand.

Mr. Hart, I'm going to swear you in, so if you can raise your right hand for me.

Whereupon,

WILLIAM T. HART,

the witness having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: You may be seated.

DIRECT EXAMINATION

BY MR. MCKOWEN:

Q. Mr. Hart, can you state your full name for the Court?

A. William T. Hart.

Q. Can you spell that?

A. H-A-R-T.

MR. COURT: Mr. Hart, can you get a little closer to the microphone?

THE WITNESS: William T. Hart, H-A-R-T.

(Court reporter asked for clarification.)

THE WITNESS: Last name, H-A-R-T.

Q. (BY MR. MCKOWEN) And can you give us some

background information on your education?
A. Yes. I graduated from the Denver University law school in 1975.
Q. And where did you attend your undergraduate?
A. Regis College, here in Denver.
Q. It's a nice school. And what, as an attorney, is -- do you have a specialty as an attorney? Have you focused on any particular type of work?
A. Yes. Federal and state securities laws.
Q. I see. And how long have you been practicing that?
A. Since 1976.
Q. Since 1976. And would you say that your businesses is primarily on utilizing SEC and Colorado --
MR. FINKE: Objection; leading.
MR. MCKOWEN: -- securities laws?
THE COURT: Sustained. This is your witness so you can't use leading questions.
MR. MCKOWEN: Okay.
Q. (BY MR. MCKOWEN) Are you familiar with the SEC regulations regarding the issuance of securities?
A. Yes.

Q. And how many cases would you say that you have filed documents related to SEC and Colorado securities?

A. Well, if you talk about registration statements, Regulation A offerings, 10-Ks, 10-Qs, 8-Ks, process statements. I don't keep track. It has to be in the hundreds.

Q. And what's the difference between registration statement and a private placement?

MR. FINKE: Objection. He hasn't been qualified as an expert.

THE COURT: Sustained. He has to be qualified as an expert first.

MR. MCKOWEN: I would like to propose to the Court that Mr. Hart be accepted as an expert witness.

THE COURT: Any voir dire or objection by the plaintiff?

MR. FINKE: Some voir dire, Your Honor.

MR. MCKOWEN: Okay.

VOIR DIRE

BY MR. FINK:

Q. Good morning, Mr. Hart. My name is Rob Finke. I'm from the Attorney General's Office.

A. Good morning.

Q. Mr. Hart, have you ever been qualified as a expert witness in any case in the state court?

A. No.

Q. Have you ever litigated enforcement action under the Colorado Securities Act?

A. No.

Q. Have you been involved in any case litigating exemptions under 11-51-308?

A. No.

Q. Have you ever litigated any securities case?

A. No. I'm not a trial attorney.

Q. Are you familiar with the law providing private offerings?

A. Yes.

Q. Do you know the test articulated by the Colorado Supreme Court to determine whether an offering is private?

A. No.

Q. Are you familiar with the case law regarding whether or not an offering is a private offering under Colorado Law?

A. Yes. I have read some of those cases.

Q. Do you know what the centennial case regarding private offerings is?

A. No.
Q. Mr. Hart, how long have you known Mr. McKowen?
A. Maybe three years.
MR. FINKE: Your Honor, the plaintiff would object to Mr. Hart as an expert witness. He doesn't have any understanding. He's not litigated any cases regarding 11-51-308. He didn't know the test regarding private offering, so we would object.
THE COURT: Objection is sustained at this time. Mr. McKowen, you'll have to establish further foundation for his qualifications concerning the Colorado Securities Act.
Q. (BY MR. MCKOWEN) Mr. Hart, have you prepared the documents that relate to the filing of a private placement?
A. I prepared private offering memorandums, yes.
Q. And would you say that you are familiar with those requirements, those requirements, meaning whatever regulations there are in composing and utilizing the documents necessary for satisfying the SEC and state requirements for a private placement?
A. Yes.
Q. And can you tell me when you began

preparing those documents and how often or how many of those would you say approximately that you've prepared?

A. I imagine I've prepared hundreds of private offering memorandums.

Q. And have you ever experienced difficulty with the preparation of those documents as it related to your clients?

A. No.

MR. MCKOWEN: Your Honor, I think this witness is definitely an expert in the preparation of documents that -- that not necessarily for this case, but similar to the requirements that would be used.

THE COURT: Any objection or additional voir dire?

MR. FINKE: No. We maintain our objection, Your Honor.

THE COURT: Objection sustained. I still haven't heard about his familiarity with the Colorado Securities Act.

Q. (BY MR. MCKOWEN) So have you -- are you familiar with the Colorado Securities Act?

A. Yes.

Q. And are you familiar with the requirements inside the Colorado Securities Act for private

placements?

A. Well, generally we rely for private placements on SEC Rule 506, and -- which is part of Regulation D, and offering under 506 is considered to be a covered security and is therefore exempt from state regulation.

Q. And what is your opinion or what is your reasoning or why do you say that the requirement is set out by Rule 506 or Regulation D?

MR. FINKE: Your Honor, he's getting into opinion testimony at this point.

THE COURT: Sustained. He hasn't been offered -- or accepted as an expert yet. And I should clarify, Mr. McKowen, what are you offering him as an expert in?

MR. MCKOWEN: I'm saying that he knows what it takes to file a -- documents with -- that are private placement documents and has been doing so for -- since 1979.

And that this case, a central issue of this case is whether or not the documents were filed that were filed by the companies, which he didn't prepare, whether or not he could attest to what would be required to create and present an effective, either registration or an exemption form registration.

THE COURT: At the federal level, state level or both?

MR. MCKOWEN: This is the issue that we have -- that we would -- I would have him testifying to that is in direct opposition of what Mr. Rome stated yesterday.

That -- and it relates to the coordination between the Federal Securities Law and the State Securities Law, and they are coordinated.

They even reference in the complaint federal securities regulations.

THE COURT: No. I understand what his ultimate opinions are because I read his report several times. So I understand what you're trying to do.

What you need to establish first, if you can, is how he is familiar with the federal regulations and how it interplays with the Colorado Securities Act and the state regulations. I haven't heard sufficient information about that.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) Mr. Hart, are you familiar with the interplay between the federal securities regulations and the state regulations?

A. In so far as private offerings?

Q. Yes.
A. Yes.
Q. And have you relied on your knowledge of that interplay between the state regulations and the federal regulations in your preparation of private placement offering documents?
A. Yes.
Q. And would you say --
MR. MCKOWEN: I can't get him to testify something until he's accepted.
Q. (BY MR. MCKOWEN) But have you incorporated the interplay between the federal regulations and the state regulations in the preparation of documents?
A. Yes.
Q. And when did regulations, the regulations related to private placement offerings, as it relates to exemptions, Regulation D, that sort of thing, when did that come into play?
MR. FINKE: Objection; calls for opinion and expert testimony.
THE COURT: Overruled.
Q. (BY MR. MCKOWEN) When did that come into play?
A. I don't remember.
Q. Okay. Are they part of -- are those

regulations, meaning the state regulations and the federal regulations, coordinated?

MR. FINKE: Once again, calls for expert testimony.

THE COURT: Sustained on that question.

Q. (BY MR. MCKOWEN) Would you say that you are familiar with, perhaps even an expert as it relates to the preparation of documents that satisfy both the federal and state regulations?

A. Yes.

Q. And how long have you been doing that?

A. Since 1976.

Q. And just as an estimate, if you have, how many of those documents have you prepared?

A. Since 1976, it has to be in the hundreds.

Q. And have those -- any of those documents that you've prepared been the subject of litigation as it relates to work that you prepared in their filing?

A. No.

THE COURT: Are you reoffering him as an expert -- hold on -- in private placement offering documents.

MR. MCKOWEN: I am offering him -- offering him as an expert in private placement offering

documents that are -- that are coordinated with both the federal and state laws in Colorado.

THE COURT: Any voir dire or objection.

MR. FINKE: No. We'll just maintain our objection based on his answers to prior to voir dire, Your Honor.

THE COURT: Over objection, the Court will admit Mr. Hart as an expert in the preparation of federal and state private placement offering documents. And the Court will decide what weight, if any, to give to his testimony like any other witness.

MR. MCKOWEN: Thank you, Your Honor.

Q. (BY MR. MCKOWEN) I believe I need to offer him as an expert witness?

THE COURT: You did, and I qualified him as such, so you can ask him about his report.

MR. MCKOWEN: Okay. I appreciate it very much. Thank you.

THE COURT: Subject to additional objection by the plaintiff, but you can ask him for opinions at this point.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) Mr. Hart, in the preparation of documents for private placement offerings, is there a limitation on the amount of

money that can be raised under Rule 506?

MR. FINKE: Objection; beyond the scope of the report and the expert disclosure.

THE COURT: Sustained. That's not in his report.

Q. (BY MR. MCKOWEN) I didn't make a copy of this report for -- as an exhibit today, but it's not on file with the Court. I would have made a copy if I thought it was relevant.

THE COURT: Well, the file is an attachment to motion. It had not been admitted into evidence. Do you need a copy of his report for your examination?

MR. MCKOWEN: I do if I'm going to --

THE COURT: Do you remember where it was in the Court file? Give us a moment. We'll make a copy for you.

MR. MCKOWEN: Your Honor, I'm going to need a copy of the report as well.

THE COURT: Connor's making a copy for you.

MR. MCKOWEN: Okay. I'm commenting on that just because you said make a copy of his report for his examination. I'm just letting you know I need one as well, so I appreciate.

THE COURT: I assume Mr. Hart has a copy

with him.

THE WITNESS: I do.

THE COURT: Looks like we are ready to go. A copy of Mr. Hart's report has been provided to Mr. McKowen and Mr. Harding.

Next question.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) In the report, Mr. Hart, there's references to paragraphs. What are those paragraphs referring to?

A. I believe they're referring to paragraphs in the complaint.

Q. Okay. And so paragraph 50 says, the complaint alleges that McKowen's one-year suspension posed by the NASD prevented entities making offerings outlined in the complaint from relying on Rule 506 due to provisions of 506(d), section --

MR. FINKE: Objection.

THE COURT: What was the objection?

MR. FINKE: He's just stating something. He's not asking a question.

THE COURT: Are you going to ask a question with regard to the paragraph?

MR. MCKOWEN: Yes, I am.

THE COURT: Go ahead and do that.

Objection's sustained.

Q. (BY MR. MCKOWEN) Isn't it a requirement of that rule that was suspended by the NASD quorum, and am I currently suspended?

MR. FINKE: Objection; calls for hearsay. The report is based solely on hearsay, Your Honor. The report purports to be the opinion from an unnamed SEC attorney, and that's the basis for his opinion.

THE COURT: Theresa, can you read that question back?

MR. FINKE: I will withdraw the objection.

THE COURT: All right.

(Record read.)

THE COURT: Restate that question or rephrase that question.

Q. (BY MR. MCKOWEN) Mr. Hart, Rule 506(d) Roman Numeral VI, as it relates to suspensions, what are the requirements?

A. Well, that particular section says this is the bad act provisions that disqualifies an issuer from using Rule 506. And part of this particular section says, if someone is suspended or expelled. It doesn't say was suspended or expelled.

Q. And so do you believe that the bad act or provisions apply to me with respect to any offerings

that I did from private placements from 2014 to 2019?

MR. FINKE: Objection; calls for hearsay. The report states that it was based on a call inquiry to the SEC and an opinion by an SEC attorney.

THE COURT: Is the information, Mr. McKowen, that the witness is providing based on his own familiarity with the statutes or based on his call with the SEC, unnamed SEC attorney or regulator?

Q. (BY MR. MCKOWEN) So Mr. Hart, is your opinion about the requirements of Rule 506(d), Roman Numeral VI, based upon your knowledge or the call to the SEC or both?

A. No. It's based upon the reading of the rule itself.

THE COURT: Objection overruled.

Q. (BY MR. MCKOWEN) In paragraph 52 of the complaint, the plaintiff states that inaccurate disclosure of NASD action is a violation of the Securities Act and disqualifies the offering from exemption from securities registration.

You state that's not true and state -- and you also state, see Section 4 of the Securities Act 33. Is that based upon your own knowledge or any other reference that you looked at?

A. Well, it's based upon -- if I can find it

here in Regulation 506. Part of 506, Rule 506 -- I'm going to find the section. I believe it's 506(d)(2), says, the paragraph (d)(1) of this section will not apply with respect to a conviction, order, judgment, decree, suspension, expulsion or bar that occurred or was issued before September 23, 2013, and all these suspensions from the NASD occurred before September 23, 2013.

Q. So it's your opinion, based upon your knowledge and that rule, that offerings for exemption prior to that date, the adoption of -- says NASD, but I had to think at that point in time it was FINRA, does not require that disclosure in order to conduct a private placement offering?

MR. FINKE: Objection; leading.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Do you think the allegation in the complaint in paragraph 52 is accurate?

A. No.

Q. Okay. In paragraph 82 of the complaint, the plaintiff -- TR Capital did not file a Form D with the Securities and Exchange Commission in the connection of the offerings in securities made by TR Capital. Is a Form D required to be filed with the

SEC in order to avail itself from the exemption of Rule 506?

A. No.

Q. Does a Form D need to be filed with the State in reference to Rule 506 in order for it to rely on 506?

MR. FINKE: Objection; outside the scope of the expert report.

THE COURT: Overruled.

THE WITNESS: The Form D is required to be filed with the state, but the failure to file a Form D does not disqualify an exemption.

MR. MCKOWEN: Thank you.

Q. (BY MR. MCKOWEN) On the following page, in paragraph 224 of the complaint, it alleges that the defendants did not file a notice of securities registration exemption pursuant to 11-51-308(1)(p).

Is a registration statement required as a result of to avail itself of Rule 506?

A. Is a registration statement required?

Q. Right.

A. No.

Q. What is a registration statement?

A. A registration statement is something that's typically filed in connection with the public

offering of securities.

Q. And if the objections to the utilization of Rule 506 entitled it -- entitled the defendants to utilize 506, would a registration statement need to be filed?

A. If a private offering exemption was not available, yes, a registration statement would need to be filed.

Q. If it is available, does the registration statement need to be filed?

A. No.

Q. The regulations and requirements to satisfy the SEC and any coordinated rules by the state with the SEC, would you say that they're complex?

A. No.

Q. Would you say that -- that is, they are not complex because you're an attorney or would they be complex if you were an investor?

MR. FINKE: Objection; outside the scope of the expert.

MR. MCKOWEN: I will withdraw the question.

Q. (BY MR. MCKOWEN) On the second page, you say that on January 13, '22, you sent a question to the SEC's office chief of counsel in Exhibit 1. If we can go to Exhibit 1.

Is this a tool commonly used by SEC, used by you to reach clarification on some issues if you think there's -- if you would like to get a specific answer?

A. Yes.

Q. And do you believe you can rely on those responses?

A. Yes.

Q. And so the question that was asked per your request, company X filed a Form D with SEC claiming an exemption of Rule 506(b). However, company X did not make a notice filing with Colorado, which is required by the Colorado Securities Act. Despite the failure to make the required notice filing, the security offered by company and still a covered security and therefore the Rule 506(b) an exemption is available to the company X.

Do you think that is an accurate description for what the defendants were trying to do or trying to avail themselves -- is this a good description of the situation and the characterization?

A. Well, according to complaint, the defendants or the issuers who were controlled by the defendants on numerous occasions did not make my

filings with the State pursuant to this particular section.

Q. Okay. So if you go to the next page. They're responding to various types of offerings. Which of these offerings apply?

A. 506(b).

Q. And the response to your question, is the exemption available to defendant?

MR. FINKE: Objection; hearsay.

THE COURT: Overruled.

Q. (BY MR. MCKOWEN) That despite the failure to make the required notice finding, are the securities offered by company X still a covered security and, therefore, the Rule 506 exemption is available to company X. Their response is no.

MR. FINKE: Objection; hearsay.

THE COURT: Overruled.

THE WITNESS: No. Their response was the 506 exemption was still available, despite the failure to file a notice with Colorado.

THE COURT: Hold on. Was that based on this written document or was that based on the conversation with the attorney or regulator?

THE WITNESS: Both.

THE COURT: Sustained.

I'm not permitting any testimony concerning the conversations he had with a regulator. I don't know who that person is. I can't judge that person's credibility.

Plaintiff cannot challenge that person and the information that was provided to that person. And I believe he's already testified to this based on his familiarity with the rules and this would be improper bolstering.

So frankly, this document was unclear to me what those responses were and who was providing those responses.

The report is more clear to me that he was speaking to some unnamed or unidentified attorney or regulator, so that objection is clear to me.

But now that I know who prepared this document, where it came from, and also that the testimony is based on his conversations with this unnamed attorney or regulator, the objection is sustained, and the Court will not consider that evidence.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) So is it your opinion based upon your knowledge and your experience, that 506(b) is available to the defendants GrowCo, even

though they had not filed or timely filed the Form D?

A. Yes. And some of the information, in my report, came off the website of Securities and Exchange Commission, which is public information.

So the particular section, the page which goes down which rules covered -- or which offerings were exempted, which offerings were not. Like it says 506(b), that's from the SEC's website on frequently asked questions, which is publicly available to anybody.

Q. Okay.

A. Let me go on to state --

THE COURT: Hold on. There's not a question. Next question.

Q. (BY MR. MCKOWEN) Can I ask him what he was going to say?

THE COURT: Yes.

Q. (BY MR. MCKOWEN) What were you going to say?

A. On the second page, the frequently asked questions, it's stated that even if the offering is not subject to state registration or qualification, there still may be state notice filing requirements and fees.

Q. Okay. What is a restricted security based

upon your experience?

MR. FINKE: Objection; outside the scope of the expert disclosure.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Part of what we're trying to determine here as it relates to Mr. Rome's testimony that he provided yesterday, were you sitting in the courtroom?

A. Yes.

Q. And did the issue of restricted securities come up?

A. I don't remember.

Q. Did he discuss what is required in order to raise capital from investors?

A. In a general sense, yes.

Q. And in that general sense, what was his -- what are the requirements based upon your knowledge and information in preparing the documents for a private placement, is a private placement a public offering?

A. A private placement is not a public offering.

Q. Is a private placement a restricted security?

MR. FINKE: Objection; beyond the scope of

the expert.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Are you familiar with Rule 144?

A. Yes.

Q. Rule 144, what is that according to Section 481 of the Securities Act?

MR. FINKE: Objection; beyond the scope of the expert report.

THE COURT: Sustained.

MR. MCKOWEN: I don't understand.

THE COURT: Where is it in the report, the provision you're talking about.

MR. MCKOWEN: Say again.

THE COURT: Where in the report the provision that you're talking about.

MR. MCKOWEN: It's on the page after the response, the SEC response. It talks about restricted securities.

THE COURT: That's just a printout. That's not a stated opinion in the report that he could talk about or a stated area in his report that he -- that you were giving the notice to the other side that they intended to talk about -- that he intended to talk about.

Q. (BY MR. MCKOWEN) Mr. Hart, what is this page? Where did it come from as part of your report?
A. From the website of the Securities and Exchange Commission.
Q. So it's information that the SEC has put out as it relates to restricted securities?
A. Yes.
Q. And part of what we're trying to do here is speak to the information that Mr. Rome provided yesterday. And he covered many, many topics, and it was over a period of, I believe, like three hours.
Did he speak generally about restricted securities?
A. I don't recall.
Q. Did he talk about the requirement to either register securities or for a public offering or you are required to qualify for an exemption?
A. Yes.
Q. And so what types of securities is an issuer required to, based upon your experience, what type of security -- what type of capital raise requires a registration?
MR. FINKE: Objection; outside the scope of the expert report.
THE COURT: Overruled.

Q. (BY MR. MCKOWEN) So --

THE COURT: You could answer the question.

THE WITNESS: Could you repeat the question?

MR. MCKOWEN: Yes.

Q. (BY MR. MCKOWEN) What type of securities are required to be registered in an offering?

A. Securities which are not sold in a private offering.

Q. So the choice is really fundamentally between either a registered security or a private offering if you're going to raise capital?

A. Yes.

Q. And if you're going to raise capital that is for a public offering, what type of documents are required to be completed and who approves those documents?

A. Well, you would file a registration statement with the Securities and Exchange Commission. They would review it. Oftentimes, they have issue -- issue a common letter, wanted things added, changed, deleted, so on and so forth. And once they have no more comments regarding the registration statement then the registration statement can go effective.

Q. So that's for a public offering of securities. And can -- are there requirements or restrictions of who may invest in a public offering?

MR. FINKE: Objection; outside the scope of the expert disclosure.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) In your opinion, were the capital raises available to the defendant companies, was Rule 506 available?

A. Yes.

Q. And you've answered that two times now. And so if 506(b) is an exemption for that makes it available that you can raise capital without filing a registration statement?

A. Yes.

Q. And are you familiar with the various requirements of Rule 506(b)?

A. Yes.

Q. And yesterday Mr. Rome testified that -- that there are requirements that were not met because the private placement wasn't available.

If the private placement is available, and you're relying on 506(b), are you limited in any particular way as a result of Section 4(1) of the Securities Act?

Is the issuer -- do they have restrictions in reliance on 506(b), in how they would make the offering, who they would make the offering to, dollar amounts, that sort of thing?

MR. FINKE: Objection; beyond the scope of the expert disclosure.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) What is the point of Rule 506(b)?

A. To establish an exemption for the sale securities under the Federal Securities Act, Securities Act of 1933.

Q. And so inside Rule 506(b), there are requirements that have to be met. You can't just do anything?

A. Yes.

Q. And is it important for an issuer to satisfy those requirements in order to utilize Rule 506(b)?

A. Yes.

Q. And did Mr. Rome speak to any of those requirements yesterday in his testimony?

A. I don't recall.

Q. Do you remember if he talked about what an accredited investor is?

A. Yes.
Q. And did he detail how you establish -- how an issuer establishes whether or not they are an accredited investor?
A. Well, as I recall, he mentioned it's typically in something that the investor would sign indicating whether or not he's an accredited investor.
Q. And can an accredited investor, according to what Mr. Rome said, can the Company rely upon that certification by the investor that they meet certain requirements?
MR. FINKE: Objection; beyond the scope of the expert disclosure.
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) In the objection by counsel, what I'm getting on the screen here is beyond the scope of expert disability -- sure. Is that supposed to be testimony?
THE COURT: I think it's disclosure, beyond the scope of the expert disclosure. So beyond the record of Mr. Hart that you provided to me.
MR. MCKOWEN: Okay.
Q. (BY MR. MCKOWEN) In your report, Mr. Hart, is there any portion of it that speaks to the

requirements of 506(b)?
A. Well, in the first paragraph of the report, it talks about Rule 506.
Q. And so do you think that the plaintiff's complaint is -- that mentions Rule 506(b), is something that you intended to provide to the Court?
A. Well, my report references certain sections of the complaint.
Q. So stating that 506(b) is available to the companies, you don't think that you're testifying or that you are testifying to its availability and there are additional conditions?
A. I don't understand the question.
Q. They are, the Court's limiting your testimony to the information in the -- in your report, and you tell -- you speak to their objection and whether or not that -- those objections or whether or not their complaint accurately states the requirements of Rule 506(b).
And you only speak to portions of their complaint and how it -- it is available to the companies.
MR. FINKE: Just wondering if there's a question in there.
THE COURT: Sustained. What's your

question, Mr. McKowen?

MR. MCKOWEN: Is he testifying -- does he have knowledge of the requirements of Rule 506(b), and is he to respond to the availability of 506(b) to the companies?

And so my question is, can he address the questions generally about whether 506(b) is available?

THE COURT: Well, let me clarify maybe where I'm coming from. He could testify to what's in his report, subject to objection by the plaintiff. And one of those objections was relaying information that he may have had or received from the unnamed SEC attorney or regulator. I have already sustained that objection.

But for the other information where you're going through various paragraphs of the complaint and asking him to opine on those various paragraphs, what's set forth in the report is generally fair game.

I think what you're trying to do is use Mr. Hart to rebut the testimony of Mr. Rome and Mr. Hart is not a rebuttal expert. I have already ruled that he's not a rebuttal expert when I was addressing the motions in limine.

So you can't have Mr. Hart come up on the witness stand and simply use him to rebut the testimony of Mr. Rome, because those opinions, many of them, have not been disclosed to the plaintiff. The plaintiff has to have an opportunity to know what the opinions of Mr. Hart are going to be so they can prepare to challenge those opinions.

So you can't just ask him if he heard testimony yesterday and illicit information beyond what is in his report.

MR. MCKOWEN: Okay. So let me see if I can digest that because I don't want to waste the Court's time or everybody's time. Let me see if I understand what you have said. Is Mr. Hart a rebuttal witness?

THE COURT: Not a rebuttal witness. He's your witness. He is a defense witness in your case in chief. And he was never -- the Court has never indicated that he is a rebuttal expert, meaning somebody can just come in, listen to the testimony of somebody else, and get on the witness stand and say why that witness, previous witness was right or wrong.

MR. MCKOWEN: Okay. So I understand he's not a rebuttal witness. But he is a -- allow him to opine on private placements as an expert.

THE COURT: True. But confined to what he has already disclosed to the plaintiff.

MR. MCKOWEN: Okay. So he is limited -- limited to the responses in this document?

THE COURT: Yes. He's limited to the opinions that he has put in his report and that you have disclosed to the plaintiff.

MR. MCKOWEN: Okay. And so any broad description of 506(b) and it's requirements that are alleged by the plaintiff cannot be utilized or cannot be asked of him?

THE COURT: If it's not in the report; that's correct. So for example you were asking him questions about accredited investors, there's nothing in the report about accredited investors. You're asking him about 506(b), he refers to 506, but when he refers to specific provisions, it's 506(d).

MR. MCKOWEN: Okay. Then I have no further questions for the witness.

THE COURT: Okay. Thank you. Any cross-examination by plaintiff?

MR. FINKE: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. FINKE:

Q. Hello, again, Mr. Hart.

A. Hello.
Q. I just want to be clear. Your testimony, your opinions that you gave on direct and your report, were based solely on the ability to qualify for the exemptions from registration, correct?
A. Correct.
Q. And your testimony is unrelated to any of the other provisions of the Colorado Securities Act?
A. Correct.
Q. Is it your opinion that an offering that is exempt under 506, no notice needs to be required under 11-53-308(1)(p)?
A. No. Notice is required, but if notice is not given that is not a disclosed exemption, which means it's still a covered security.
Q. The failure to give notice would still be violation of Colorado Securities Act, correct?
A. Yes.
Q. And I think you testified, or at least it's in your report, and I want to get a little clarification on this from you, that a security that is exempt under 506, that doesn't mean that it's a nonpublic offering or private offering under the Colorado Securities Act?
A. Yes. I believe it is, because an offering

conducted under Rule 506 on the national market Securities Improvement Act is exempt.
Q. So maybe exempt, but notice needs to be filed?
A. Yes.
Q. So I'm just trying to understand your opinion regarding the interplay between 11-51-308(1)(i) and (1)(p).
Can you clarify that?
A. What's -- what is the first one 11-51(1)(i)?
Q. Yes. I think you referred to (1)(i) in your report, and you recalled 308(i), but it's actually (1)(i).
Separate and apart from 11-51-308(1)(p), Section 11-51-308(i) under C.R.S. provides, any transactions not involving any public offering section is exempt from registration in Colorado.
Can you explain to the Court what you mean by that?
A. Well, that's -- there's a number of private offering exemptions that are available. One is any transaction not involving a public offering.
Q. Okay. But if you qualify, if you have an exempt offering -- maybe I'm just not understanding

your testimony.
If you have a public offering, then there's no exemption, correct?
A. Correct.
Q. If you qualify under Reg D or 506, you need -- it may be exempt, but you need to file the notice with the Colorado Securities Commissioner, correct?
A. Yes.
Q. Okay. And failure to file that notice would be a violation of the Securities Act?
A. Yes.
Q. In your -- you have a hypothetical in your report -- actually, I will withdraw that question.
No further questions, Your Honor.
THE COURT: All right. Just give me one moment, please. Thank you.
Mr. Harding, any questions?
MR. HARDING: I do, sir.
THE COURT: All right. Go ahead.
CROSS-EXAMINATION
BY MR. HARDING:
Q. Hello, Mr. Hart.
A. Good morning.
Q. On your report, bottom of page 1, does it

state the Form D -- this deals with the plaintiff's complaint, paragraph 82, and actually -- actually deals with the section called TR Capital distributions, Section 77 through 82. You're referring to the distributions that TR Capital partners made of membership interest units to existing investors of TR Capital.

Is it your opinion that a Form D is not required to be filed?

A. A Form D is required to be filed, but the failure to file does not destroy exemption.

Q. Okay. I'm reading down here, a Form D is not required to be filed with the SEC. Okay. I get it -- in order to obtain exemptions, but they do want that Form D filed?

A. Yes.

MR. HARDING: Thank you.

THE COURT: Any redirect, Mr. McKowen?

MR. MCKOWEN: No.

EXAMINATION

BY THE COURT:

Q. So Mr. Hart, if I could just clarify. If I'm understanding your testimony correct from what Mr. Harding was asking, a failure to file a Form D does not destroy the exemption, but it's still a

violation of the file requirements?
A. Yes.
Q. And under the Colorado Securities Act, is there any situation in which an issuer can offer a security without either registering the security or filing a notice of exemption?
A. Yes. The transaction not involving public offering.
Q. So in this case, where you have -- assuming you have a private offering, are you saying that you still don't have to file a notice of exemption with the securities commissioner in Colorado?
A. If you're relying on that one particular section that deals with 506, a filing is required but the failure to file does not destroy the exemption.
Q. That's where I want to get clarification. You're still required to file either a registration or a notice of exemption from registration, correct?
A. Not if you're relying on exemption for any transaction not involving public offering. There's a whole list of exemptions for registration. The 506 is one of them. A transaction not involving any public offering is another.
Q. Well, I thought what you said was you still have to file but it doesn't destroy the exemption.

A. That's only for 506, not for the exemption of a transaction not involving public offering. There's no filing required there.

Q. In Colorado your testimony is, if it's a private offering, you do not have to file anything with the Colorado Securities Commission?

A. If it's a transaction not involving public offering, no filing's required.

Q. With anybody?

A. Correct.

Q. Okay.

THE COURT: For Mr. McKowen, it's your witness. I will start with you. Did you have any follow-up questions based upon what I just asked, and if you do, you need to step to a microphone.

MR. MCKOWEN: Yes.

REDIRECT EXAMINATION

BY MR. MCKOWEN:

Q. So Mr. Hart, when you say "failure to file a Form D does not destroy the availability of the exemption," what do you mean by that?

A. What I mean is, although it is required to be filed, a Form D, Notice of Exemption Form D, with the filing fee, if you don't file, it does not destroy the exemption provided by the National

Securities Improvement Act that 506 offering is a covered security and, therefore, exempt from registration, exempt from state registration.

MR. MCKOWEN: Okay. Thank you.

THE COURT: For plaintiff?

MR. FINKE: I have no further questions, Your Honor?

THE COURT: Mr. Harding, any follow-up questions?

MR. HARDING: I do not.

THE COURT: Mr. Hart, your testimony is complete. Thank you. You may step down.

(Witness excused.)

THE COURT: Mr. McKowen, we are still in your case. Do you want to call any additional witnesses on your behalf?

MR. MCKOWEN: Do I want to call any additional witnesses on my behalf?

THE COURT: Correct. And that can include you.

MR. MCKOWEN: Yes. I would like to call any fact witness from the plaintiff.

THE COURT: Well, you haven't identified -- we've been through this. You haven't identified any particular witness from the Commissioner's office.

MR. MCKOWEN: I don't have sufficient information to be able to name someone other than the plaintiff in itself -- herself.

THE COURT: Ms. Kidd-Aaron --

MS. KIDD-AARON: I do, Your Honor. Can you hear me? Sorry.

So Your Honor, we have attempted to address this issue with Mr. McKowen. There was a deposition of the investigator on this case. And we asked him if there was anyone else that he wanted to speak to to answer his questions. We've asked him for this trial if there's anyone particular, and we just haven't gotten an answer.

So the Commissioner will not be able to answer specific questions relating to this case. We don't know what questions specifically Mr. McKowen wants to ask, so we need more information if he wants to call somebody from the Commission.

THE COURT: I guess I should ask if plaintiff's willing to make that investigator or any other person available for testimony.

MS. KIDD-AARON: If we can understand the relevance and what questions Mr. McKowen wants to ask of them.

THE COURT: Mr. McKowen, who do you want to

call to testify and what do you expect their testimony to be.

MR. MCKOWEN: I would like to call someone who can respond to the hundreds or so questions that I have regarding the development of the facts that are contained.

For example, in the expert testimony yesterday from Mr. Rome, that he's not a fact witness, and he was provided these facts, and that's what he's relying on for his opinion.

And so I believe I have the -- or should be able to talk to someone who is -- who has presented those facts to Mr. Rome.

And I don't know who that person is. If it's the investigator that's been sitting here as an advisory witness, and if he could answer those questions, I will talk to him.

But my experience with him in the -- in the deposition that I took with him, is that he was not the individual who determined whether or not a fact was relevant or not.

MS. KIDD-AARON: So, Your Honor, if I'm understanding what Mr. McKowen is saying, the -- our expert asked us for information he felt he needed to develop his report and we provided that information.

Mr. McKowen also has that information in the documentation. He has all the documents we provided the expert.

And additionally, as the attorneys on this case, we decided what to put in the complaint and how to try this case.

So that is not someone from the Commission who could provide that information.

THE COURT: So my recollection of Mr. Rome's testimony, is that I don't know if he said this directly, but to a large extent he was assuming that the allegations were true and then opining on if they were true. Why is that relevant to this case and how does that form his opinion? That's how I heard it.

With that said, if there is a particular witness, Mr. McKowen, that you would like to call from the Commissioner's office, you already know what the investigator -- this is Mr. Burtness; is that correct?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: You already deposed Mr. Burtness. You know what he's going to say. If you believe he has testimony that is relevant to this lawsuit that you would like me to hear, because I've

never heard from Mr. Burtness.

It sounds like the plaintiff is willing to make him available to testify. He's been in court for this entire trial or nearly all of it. If you'd like to call him as a witness, you can make that request, and I'll take argument from the other side if they object but if they don't or even if they do, and I decide it's relevant and appropriate, you can call him as a witness.

What I hear you saying, is that you don't think that he has the information that you are seeking and you want someone else from the Commission to testify. I don't know who that someone else is. So you have to let me know who that person will be.

MR. MCKOWEN: Your Honor, I don't know who that would be. I'm willing to call Mr. Burtness as a witness here, and -- but he's, as you say, he's been sitting in the courtroom the entire time.

And my objection to him being in here initially was that he was going to be a fact -- if he was going to be a fact witness, he shouldn't be sitting here.

THE COURT: I allowed him to stay in as an advisory witness, which is common in every trial I have ever done.

If there's somebody with particular expertise and information about a lawsuit or about a civil case, like a case detective, that person is frequently allowed to sit in the court room and assist the attorneys in the presentation of their case even if though they be testifying later on as a fact witness.

So that doesn't present any issues for me. And you may not like that. But as an advisory witness, someone who is intimately familiar with the facts of this case, he's allowed to sit as an advisory witness. They get one. They don't get multiple advisory witnesses. They get one.

MR. MCKOWEN: I accept that.

THE COURT: So yes, he's heard testimony but...

MR. MCKOWEN: I would like to call Mr. Burtness then.

THE COURT: As a fact witness?

THE WITNESS: As a fact witness?

THE COURT: Plaintiff?

MS. HUNT: Thank you, Your Honor.

I think we would object to Mr. Burtness as being called as a fact witness. This is civil enforcement action. The Commission nor Mr. Burtness

has had any participation in or involvement in any fact at issue in this case that we need to prove.

He simply oversaw and conducted an investigation of existing facts so we can prepare our case. So we would object on relevance grounds. He doesn't have any relevance information about firsthand knowledge of participating in the events that took place that we have to prove.

THE COURT: Well, he's the case investigator and so I think on its face, I believe his testimony would be relevant. He's also been deposed. So I assume both sides or all parties have a good idea of what he's going to testify to.

So I'm not going to exclude Mr. McKowen calling him as a witness, just a blanket exclusion. I'll allow him to call Mr. Burtness as a witness and take any contemporaneous objection to his testimony.

MS. HUNT: Thank you, Your Honor. Could we potentially have a morning break before we start that?

THE COURT: That's fine. All right. Let's go ahead and take a 15-minute recess. And when we get back, Mr. McKowen, if you'd like to call Mr. Burtness as a witness, you can do that.

MR. MCKOWEN: Thank you, Your Honor.

THE COURT: See everybody in 15 minutes.

(Whereupon, a recess was taken at 10:05 a.m.)

(Whereupon, the proceedings resumed at 10:20 a.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. We are still in Mr. McKowen's case.

Mr. McKowen, would you like to call your next witness --

MR. MCKOWEN: I would like to call Mr. Burtness.

THE COURT: Mr. Burtness, good morning. Please come up here to my left. Before you sit down, I will swear you in.

Whereupon,

JOE BURTNESS,

the witness having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: You may be seated.

DIRECT EXAMINATION

BY MR. MCKOWEN:

Q. Good morning, Mr. Burtness.

A. Good morning.

Q. Are you familiar with the expert report

that was -- that the expert relied upon for facts, if true, with the basis of his opinion?
A. I know that it was talked about in court this week. I don't believe I've read it.
Q. Did you have anything to do with the preparation of those facts that were submitted to him?
A. Which facts?
Q. The facts -- the facts that are represented in the -- can we pull up the opinion or the opinion from Mr. Rome?
MS. HUNT: We can do that. But Your Honor, I think we already represented to this Court that it was counsel who sent the information to Mr. Rome.
THE COURT: Okay. Well, I don't think that was the question. I think your question was broader than that. So if you want to bring up that exhibit on the screen, we can do that.
MR. HARDING: Your Honor?
THE COURT: Yes.
MR. HARDING: Mr. McKowen said the expert report. Is he referring to the Rome report?
THE COURT: That's the only one that's been admitted. So that's what I would assume.
Is that correct? When you say "expert

report," you're referring to Mr. Rome?

MR. MCKOWEN: The report of Mr. Rome. Do you want the numbers?

THE COURT: Exhibit 140 is on the screen.

MR. MCKOWEN: Can you blow up the first paragraph of that report?

Q. (BY MR. MCKOWEN) So this report is, by my understanding, and I believe it was the testimony of Mr. Rome that he's not a fact witness.

Do you remember that?

A. Yes.

Q. And that he was rendering an opinion as to the duty of persons offering or selling such securities to disclose material facts in connection with the offer and sale of those securities and to explain the concept of materiality. He wasn't here to be a fact witness, and he stated that many times.

MR. MCKOWEN: Can we role through this opinion letter?

MS. REYNARD: Second paragraph?

Q. (BY MR. MCKOWEN) The information I received in promoting investments in GrowCo and related entities, John McKowen and Wayne Harding and others made a number of misrepresentations and omissions of facts to investors.

Were you involved in the presentation to Mr. Rome that he relied on and concluded that misrepresentations and omissions of fact to investors were made?

A. I was not involved in any presentation.

Q. Were you involved in the presentation or the facts associated with the representation?

A. I don't know which facts were submitted to Mr. Rome.

Q. What part of my question don't you understand?

A. No. I answered your question. I don't know which facts were submitted to Mr. Rome.

Q. You don't know which facts were submitted to Mr. Rome?

A. That's right.

MR. MCKOWEN: So this is the dilemma that I have, Your Honor. I'm supposed to have the ability to counter the facts to have a witness here who I can talk to about the development of those facts that were presented to and developed by the plaintiff.

The problem that I have is, I do not know the personnel -- the people involved in the development of those facts. I wouldn't be able to define who that person was.

And in my deposition, the -- where it requires you -- I think 30(b)(6) or something like that -- for the party -- for the plaintiff to designate a person who can discuss the facts associated with the -- with the deposition.

And the reply I got in the deposition was essentially this, that he's giving. And the attorneys say in the deposition that they can't provide it because it's attorney work product.

So I have never had the opportunity to speak to, to question, to cross-examine the individual or individuals or the supervisor of the individuals that develop the facts that are being relied on in this case that makes serious allegations that Mr. Rome is using in his opinion.

And can I make an oral motion?

THE COURT: You can. What's your motion?

MR. MCKOWEN: I would like to make a motion for the Court to compel the plaintiff to give to me, which they haven't done over six, seven, eight, nine months, since the beginning of the case, who developed the facts associated with the complaint?

THE COURT: Response?

MS. HUNT: Your Honor, I will say a couple of things.

First of all, we disclosed the entire Investigative File in initial disclosures, which was, I don't know how many thousands of pages, including interview memos from investigators, including Mr. Burtness.

We made Mr. Burtness available to discuss the investigation. But the case was developed by attorneys as every case is.

Again, this is part of the problem that the investors are not -- they interview witnesses and provide the memos, provide all the documents that were discovered. And we also disclosed our expert witness timely.

He had a list of the things that he considered. And Mr. McKowen chose not to depose him and explore the bases for his opinion until we got here at trial.

So I'm not -- I'm not exactly sure what it is he wants from an investigator that's relevant to defending him, but he's had multiple opportunities to review our case, to review our documents, and to review the witness memos and to depose witnesses.

THE COURT: Mr. McKowen, generally what I'm hearing is that there may be a disconnect between how you view the allegations and how you think the Court

may view the allegations.

The plaintiff has put forth claims that they have to prove, and I will decide whether or not they prove those claims or not. That's a decision I have to make based on the evidence that I hear.

Simply because they have drawn inferences from the thousands of pages of documents and interviews that they've done. All the discovery that you reviewed, simply because they've drawn inferences based on that and decided to bring a lawsuit against you, doesn't mean that I'm viewing that as -- as true. They still have to prove it up.

And what I hear you saying is that Mr. Rome, when he testified, stated he's not a fact witness. Meaning he didn't go out and interview, conduct his own investigation.

He relied on the information that was provided in Exhibit A, all of which was provided to you.

And based on that information, he may have drawn inferences that he still has to support with evidence and that I have to consider and give whatever weight I deem is appropriate to that testimony. That's just the nature of asserting claims and proving claims.

So I'm not sure what you're asking me to do or what you're asking the plaintiff to do. If this witness doesn't have any additional evidence or testimony to further the claims for plaintiff or support your case in defense, then so be it. This isn't -- his testimony is not going to be particularly helpful to either side.

If there's somebody else at the AG's office that you think exists that you can pin down and say, this is what you know, and this is what you told Mr. Rome, if it's one of the attorneys, then that is attorney-client privilege and work product.

MR. MCKOWEN: So then you would have explained my dilemma perfectly.

I don't have an opportunity to disagree with the facts that are being presented. And a perfect example of that is the use of stipulations that have obvious -- that are obviously wrong, that we have demonstrated that in -- in the presentation so far.

Liens were filed for the benefit of the investors and that those liens are still in place, and so the statement that it was a contrivance for the defendants to transfer the ownership of those properties, as we showed there by presenting evidence

of those liens that are filed with the state. That that statement is on its face patently false.

THE COURT: Then you can provide that testimony when I swear you in.

MR. MCKOWEN: Say again.

THE COURT: You can provide that testimony when I swear you in. If there's a lien that exists and in place and you know about it, you have every opportunity to go out and get the document and bring it into court. If you haven't done that, okay, but you can testify to that on the witness stand.

If there are things that you heard in this trial that you don't agree with, and you want to get on the witness stand and swear to tell the truth and tell me why it's wrong, then I'll give you a chance to do that.

MR. MCKOWEN: And I appreciate that. I think part of what I'm trying to get at is, and I understand you're the trier of the facts here. The jury would have been lost in this case a long time ago anyway.

And you've been gracious in your support of our ability to, to -- but to try this case. But I can't call the attorney and put them on the stand because of attorney-client privilege.

And I'm trying to find out who made the decision to file this complaint and what facts did they use associated with that.

And if the rebuttal of those facts is entirely left up to me, that doesn't seem to be fair due process. I can't question the -- a party on the other side and develop the credibility of those witnesses as it relates to the facts that are being relied on as this case moves along, is my opinion.

And if -- and if you believe that -- that -- that the facts are self-evident from what the plaintiff put together or -- and in conjunction to any rebuttal that I have as compared as being able to do the process of actually cross-examining the actual witness of that. And the process that allows you to determine the credibility of the witness. It requires me to state things about the attorneys that I believe would not be consistent with the decorum required in the case.

And so again, I want to make the motion that they provide the entity that Mr. -- entity people or persons that provided the information to Mr. Rome for him to make the assumptions that he made.

And if the response is that they don't have

to do that because they developed it, and I can't interview -- or I can't cross-examine them because of attorney-client privilege, that's the same thing that they said in the deposition. And they repeated it for eight hours, so...

THE COURT: Well, Mr. Rome provided an exhibit to his report that says, the information that he was provided and that he considered in reaching the opinions that he gave yesterday.

Part of what I heard him say is he reviewed the complaint. And as I've stated a couple of times today, it's my perception that he was assuming or taking at face value those allegations in part and rendering opinions based on the allegations.

The Attorney General's Office filed a complaint on behalf of the security commissioner of the state of Colorado, and are alleging misconduct on your part, fraud on your part. Whether that's true or not depends on how the evidence plays out in this trial.

So if you're trying to get at why did Mr. Rome reach the conclusions he did, whether he was bias, whether he was not credible, yesterday was your opportunity to challenge him when he provided that testimony, and your statement that you want to know

what information he considered in reaching those conclusions, that's all set forth in his report.

And so I don't know what else you're asking -- what the Court can do.

MR. MCKOWEN: As part of this process Thursday, or I believe it would be Wednesday, you indicated that -- and I'm not questioning you, I'm just trying to understand the process.

You indicated that you would make a decision about whether or not Mr. Rome could testify and whether or not Mr. Hart could testify. And so -- but you qualified them with the ability to hear the testimony and make decisions associated with that. And my -- what's the term -- "stipulation" was conditioned on that same concept.

And so yesterday when I attempted to object to something, you indicated that I couldn't object because I agreed to allow Mr. Rome to testify.

THE COURT: Well, you're talking about it's his report. You stipulated to the admission of his report, which once it's admitted into evidence, either side can ask about the contents of the report.

MR. MCKOWEN: Okay. Well, a part of what I need to do here is establish a clean record as -- because this Court is the Court of whatever they call

it, original jurisdiction or fact-finder or whatever.

And so I repeat, I'm making a motion for the plaintiff to compel the parties inside of the Division of Securities to be able to cross-examine them and how they came to the opinions that were presented to Mr. Burtness, and so I stand by that motion.

THE COURT: Any final record by the plaintiff on that motion?

MS. KIDD-AARON: Your Honor, I just -- from what Mr. McKowen is saying, if I'm understanding him correctly, I just don't think he's understanding the process. Mr. Burtness conducted an investigation. He provided us with thousands of documents.

I personally reviewed the bulk of those documents and drafted this complaint. My name's assigned to it. We provided him with those documents. He's complained about the number of documents multiple times, so --

THE COURT: As too much or too little?

MS. KIDD-AARON: As too much. So the answers that he's looking for are in the documents that we provided him. That is what I relied on, and I relied on that and the laws of Colorado and the federal -- the SEC that it was cited in the

complaint.

So I don't know -- there is no one at the division to provide those answers because I drafted the complaint, and I provided him with the documents that I relied on.

THE COURT: Well, the motion is denied as vague and overbroad, Mr. McKowen. I don't know who that person is. It's not my responsibility to identify that person. What the plaintiff is saying is that they provided you all the discovery in this case, the entire Investigative File, in this case and whatever witnesses you think should be here to testify, that's within your control as well, as a litigant.

You had the right to identify witnesses that you want to be here to testify and ask questions of, and you've done that in part. If you are saying, well, I need somebody else here, that's not for me to identify who that person is, and as a litigator.

I know you're representing yourself and it's a difficult thing to do. But you've read all the discovery, I assume. You seem to have a pretty good handle on the facts of this case. You made a lot of factual -- filings demonstrating that you have a good handle on the facts of this case, and you know

who all the players are. This case has been going on now for over a year and a half. There's been litigation dating back many years before that.

So I don't think there's any surprises here. There have been claims made against you. Plaintiff have to prove them up, and I'll decide whether or not they've done that based on the witnesses that I hear.

So do you have any additional questions for this particular witness?

MR. MCKOWEN: I do not.

THE COURT: Any cross-examination by the plaintiff?

MS. HUNT: No, Your Honor.

THE COURT: Mr. Harding, any cross-examination?

MR. HARDING: No, Your Honor.

THE COURT: Mr. Burtness, you may step down.

(Witness excused.)

THE COURT: Mr. McKowen, do you have any other witnesses including yourself?

MR. MCKOWEN: I call myself to the stand.

Whereupon,

JOHN MCKOWEN,

having been previously first duly sworn, testified on his oath as follows:

THE COURT: So I'll have you come up.

You are already under oath from this morning, so your oath will continue. So you can be seated.

All right. Mr. McKowen, now is your opportunity to offer me testimony, sworn testimony in support of your defense. So what would you like to say?

TESTIMONY OF MR. MCKOWEN

MR. MCKOWEN: Thank you, Your Honor.

Let me make sure I'm wired into the cockpit so that I don't need to be reminded again about speaking into the mic and speaking directly to her and seeing the exhibits.

THE COURT: Can you still see the CART interpreter if you lower your screen a little bit?

MR. MCKOWEN: I can see her.

THE COURT: Can you still see the closed captioning if you were to move your screen down a little bit?

The only reason I ask is we have the top of your forehead showing on the WebEx.

MR. MCKOWEN: How about this?

THE COURT: That might help the interpreter.

MR. MCKOWEN: So can we call -- bring up Exhibit 1038 -- excuse me -- 1036. And that would be one of mine, exhibits.

MS. KIDD-AARON: Your Honor, I just want to note we did not stipulate to this exhibit.

THE COURT: So Mr. McKowen, 1036 is not admitted yet. You have to establish a foundation for the exhibit before I can do that. You haven't offered it yet. So I will just tell you that it's not admitted yet. You need to establish foundation first.

MR. MCKOWEN: I'm going to try to do that now.

So this -- the facts related to this case go back, as you know, to 2014. And the first time I actually had an opportunity to speak directly to the Commissioner's office or the Commissioner's office in conjunction with the attorneys associated -- that represent the Commissioner, was -- I want to say that it was less than a year ago, in February, a year ago. So I think I'm pretty accurate about that.

And at that time I met with -- I remember meeting with Ms. India Kidd and I'm sorry,

Kidd-Aaron, and Ms. Hunt. And -- so this exhibit here is an expression of -- is an e-mail from the Attorney General's Office that is dated January 19, 2023, which is six, seven months ago.

And -- and it was in response to our very first meeting, which I have talked about. And they indicated that we could discuss the statute of limitations, and if it was a possibility of some sort of settlement. And it was very telling to me what they said in response to this e-mail in the first sentence.

And so I would like to be able to offer this as an exhibit that demonstrates from my perspective the -- as the beginning part of my ability to influence the investigation that developed the facts. And so that's why I'm pulling up this exhibit.

THE COURT: 1036 is offered. Any objection?

MS. KIDD-AARON: Your Honor, we object on the relevance basis and we don't agree, I guess, with what Mr. McKowen says in his e-mail.

THE COURT: Give me one moment.

Exhibit 1036 is rejected on relevance grounds, settlement discussions, Mr. McKowen, between

you and Attorney's General Office is not relevant to the claims at issue. So I'm not admitting 1036.

MR. MCKOWEN: Okay.

So in this complaint, an investigation was launched sometime in 2017, late 2017. And I believe that it is barred by virtue it is time barred from being presented.

And so I'd like to bring into -- pull up Exhibit 1037, and see if we can get that admitted into -- as an exhibit.

THE COURT: 1037 has been offered. Any objection?

MS. KIDD-AARON: No, Your Honor.

THE COURT: 1037 will be admitted.

(Whereupon, Exhibit No. 1037 was admitted.)

MS. KIDD-AARON: 1036?

THE COURT: 1037. Do you want to make sure you're looking at what I'm looking at? It's a subpoena duces tecum.

MR. MCKOWEN: Yes. It's related to statute of limitations. I don't know if it's the first subpoena, but first one I could find.

THE COURT: Is plaintiff's position still the same?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: Without objection, 10 -- 1037 is admitted.

MR. MCKOWEN: So what we have here is a subpoena.

THE COURT: Actually, let me back up. It was already admitted by stipulation. Sorry. I just noticed. 1037 is already admitted by stipulation.

MR. MCKOWEN: Say again.

THE COURT: 1037 is already admitted by stipulation.

MR. MCKOWEN: Okay. And so this is a subpoena issued by the original, as far as I can tell, chief investigator Rio Babcock, and it's issued on the 27th of February 2018.

And my reading of the Colorado revised statutes, is there's two time bars associated with bringing a fraud's claimant. And one of them calls for a three-year limitation, and the other one calls for a five-year limitation.

The three-year limitation is, I believe, based upon when the plaintiff becomes aware of possible violations.

And so I think that this is -- if my statement is in fact true, then February of 2018, which is long -- which this subpoena is a result of

that investigation, would be way past that three-year time frame.

And so I believe that this entire complaint is time barred, and I don't know if -- if at this point in time, a motion is appropriate, but if it is, I would like to make a motion to have this case dismissed because it's barred by the time limitation within which it had to be brought as described in the --

THE COURT: I'm taking your testimony right now. This isn't the kind of motion that I'm wanting or requesting or entertaining from the witness stand of a witness who is testifying.

MR. MCKOWEN: Okay. I understand that. And as you know, I have absolutely no idea of what I'm doing, and I'm just trying to comply with -- because I can't afford an attorney and I'm trying to comply. And I'm understanding if you're representing yourself pro se you have to comply with the rules.

Anyway, so I offer this as testimony that this complaint should be time barred and that I also have attached a letter from Tobin Kern, T-O-B-I-N, K-E-R-N, and I have used Tobin Kern as a SEC counsel for many years back in 2021 or '22.

He was able to get me a $12 million

judgment in my favor, and in favor of the predecessor, one of the predecessor companies of what became Two Rivers.

And it covers a number of topics relating to the presentation. But the most meaningful I think is a recitation that the money has been raised, and this is probably another request by me of GrowCo, of the people of GrowCo to produce the books and records that authorized them to use the capital that they used.

That started -- the use of that lead my objections to that capital, use of that capital, in a manner that I didn't believe was authorized and is inconsistent with the use of proceeds in the offering documents after I left.

I think the offering documents before I left were used appropriately. The fraud occurred, if my assertions are correct, didn't occur with the preparation of the offering documents. It occurred with the use of proceeds, if I'm understanding or -- if it is as I believed it to be after I left.

So one of the significant complaints or statements in the -- in the complaint filed by the plaintiff that based upon some testimony that was developed by the attorneys and through the production

of -- through discovery and production of documents. There amounts to -- it's difficult to entirely calculate it, but it exceeds a half a terabyte of information of data.

And I know the assumption is is that I would have been able to review all of that. One, I mean, I just simply haven't been able to do that. But I put my exhibit list together to respond to the allegations as I think would be the best defense.

And so my testimony is fundamentally based on the declaration that I filed with the federal court, and so I'd like to call that up, which is 1002, and I will use that as the timeline and as the development of the proof necessary to prove that the elements of fraud just don't exist in this case and have not been presented.

MS. KIDD-AARON: Your Honor, I would like to object. I don't believe this exhibit was stipulated to. Sorry. I'm just trying to open it.

THE COURT: 1002 had not been admitted yet. Are you offering the exhibit --

MR. MCKOWEN: Yes.

THE COURT: -- or are you tendering on establishing a foundation for it?

MR. MCKOWEN: Yes. What I was talking

about when I was in my recitation was building the foundation for why I would call this an exhibit.

THE COURT: You have to tell me and explain to me what it is in your own words.

MR. MCKOWEN: What this is is a narrative that is the development of -- it's essentially a timeline and a development of the creation of Two Rivers, the creation of GrowCo, and what -- and my assertion about what happened, what went wrong with GrowCo.

THE COURT: Exhibit 1002 is admitted. Any objection?

MS. KIDD-AARON: Plaintiff would object on the ground of relevance and hearsay. I think plaintiff was fine with Mr. McKowen testifying to this information with the ability to cross, but would not like the exhibit in.

THE COURT: Exhibit 1002 is rejected on hearsay grounds. So Mr. McKowen, you can testify directly today under oath about the things that you think are relevant in this document, but simply admitting an out-of-court statement in support of yourself and not against yourself doesn't fall within the nonhearsay definition. So it is hearsay, and I'm not hearing any exception to the hearsay.

MR. MCKOWEN: Okay. It's hearsay, and hearsay is not permitted as evidence or -- is that safe?

THE COURT: That's correct. Because you wrote this out of court. This is your statement that was made out of court, and you're offering it for the truth of the matter asserted today. So you can testify to the information that's in here, but you just have to do it right now as opposed to, I did it back in May, I think was the date, and I want my statement admitted. That's a hearsay statement.

MR. MCKOWEN: Okay. I think I get it. I'm going to just use it as my guide as I testify and it's not as an exhibit.

THE COURT: Understanding you cannot just read from it.

MR. MCKOWEN: Okay. I -- so it's not before the Court, but I can refer to or refresh my memory as -- and speak to it, right?

THE COURT: That's correct.

MR. MCKOWEN: Okay. So a lot of -- there's been an allegation of fraud was committed and a scheme was developed by me, and that that -- that scheme was designed to take people's money and not really accomplish the goals that were presented to

investors.

And I've got a history that that is not the case, as it relates to what I was doing with Two Rivers when I founded it and what I was doing subsequently with GrowCo and its various subsidiaries.

So it's important to understand the business model that I was utilizing and have been utilizing for 25 years.

And that business model is to provide capital to a startup. The first stage capital to a startup that I believe is something that will have the ability within a relatively short period of time to become a company that could be taken public, and I have the skill set, developed the skill set over time to do that.

And so some people in this business, some investors, some in the capital market's business focus on providing the C capital to specific ideas.

And my specific idea was to always look at the marketplace and see what I think is something that in the future is going to be something that the market is going to want to acquire, the stock market, the public stock market is going to want to acquire.

So I hired, always hired the best available

securities lawyers to help me create the offering documents and to keep me in compliance with securities laws, both the federal securities laws and the state's securities laws.

Unlike some other people, I've always been pretty much a one-person shop, who had the ability to -- and knew investors, and the numbers of investors I knew grew over time because of the deals that I did. And those investors are in this -- in this offering, and so I knew them. Many of them I had the preexisting relationship with them to be able to -- to create and do the offerings in GrowCo.

And by way of the example as an illustration of that model from beginning to end was in the -- and it became the predecessor for the Two Rivers.

So what may seem complex and a scheme, when the securities are offered is not that at all. The failure of a business model, if the investors are presented with the information that they need to make an informed decision, and it is -- if it is presented to them, what matters is in terms of a fraud is -- was there -- is there the intent and creation of a document that is false, or are there actions that are false.

And did I know they were false when I made those presentations to those investors, and did I have the intent to deceive them, and so did they rely on that and become a victim of my deception and did that cause harm? That's my understanding that has been explained to me by my attorneys over time.

And so with that first project that I took on, I put in, I think, 100-some thousand dollars as the startup capital.

And the reason that I have some of the exhibits in here, is to demonstrate that that was my model and it eventually -- and it was successful, and that allowed me to do another offering in 2006, that similar concept, similar business model. And that created a spinoff that originally was Navidec Financial Services, and that was the entity whose name became Two Rivers in 2010.

And so in each of these business models, I can show the early stage investment by me and the then subsequent investment by or along with others, and I can show how they became publicly traded.

And that became the exit strategy for those early stage investors. And in 1996, that was an Internet company when Internet was -- and you took your phone, and you put your landline phone and you

connected it. You put this in a cradle and do these bings and bongs, and it was nothing more than a translation of Morris code.

And so the company that I developed, that business model was successful. We raised capital for them that was -- that built upon the initial capital that I provided and editors provided through Regulation D private placement utilizing 506.

And then I introduced the company to a broker/dealer, a local broker/dealer, and they conducted a public company offering through an S1 Registration statement.

And that public company eventually became partners with Microsoft. They developed the first online transaction for purchasing cars through a company. I don't know what your history is in the Denver area. But they put up this business portal for Burt Chevrolet. Burt Chevrolet was one of the first and it was a large car enterprise-owned, the people in Denver were familiar with.

And then they were able to acquire additional financing through relationships that I had, and Silicon Valley. And they've gone to develop the back office for Wells Fargo, and at that stage Microsoft development with them.

At any stage it could have failed, and eventually it did fail. And I was fortunate to see the opportunity, even was invited on the Oprah Show to talk about are there any real opportunities left.

And there was a movie called Slackers. And so there's all the opportunities had been taken, but the truth was the opportunity that we've seen in human evolution, the development of the Internet was just beginning.

But with that particular investment, as happens with all investments that they are cyclical in nature. So I could see the dot com bubble crash coming -- because the market capitalization, the number of shares outstanding times, the price of the stock for Yahoo and Google wasn't here yet.

A lot of the nominate players in the Internet space weren't even started. Twitter wasn't there. Google wasn't there.

But the market for Yahoo by itself was larger than the combined market cap for -- and this would be my analysis that I would present to my investors, and I always talk to my investors.

In fact my securities counsel said, John, you need to shut up. You're communicating too much information with them. One day that's going to bite

you in the ass, in the rear end.

And even today, I still communicate with investors, almost regularly on a daily basis, covering all the issues, not just the successes, but the issues related to the company.

And so we, as the early stage investors or I as an early stage investor, doing a private placement and joined with others, decided that we did not want to hand create on the stock that we had purchased at a lower price, which is generally the -- what happens with startup capital. And all of these rounds, if you will, are identified as round one or round A or the B round or the C round or the D round. And we were always A round. We were always the initial round.

And so the price that we -- that I made my initial investment in, I believe was like at $4. The Company became -- filed an S1 or it may even be an SB2, then elevated to the NASDAQ small cap market. And within three or four years it had been elevated to NASDAQ national market status.

So the opportunity presented itself for me and my investors to get out of the market, and we did. And all of what I'm citing to you can be viewed on EDGAR through the public company filings. And so

we did that and we got out of the marketplace.

We did very well, and when I do these deals, I put in -- I don't take vacations while I'm doing the deal, so I took two years off once it was completed.

And it seems like I do a deal every six to eight years. And so that company called Navidec, when they went out of business, and the reason they went out of business is the reason a lot of these companies went out of business.

They went from doing their development work in one of the industrial offices in the Tech Center that is a single floor and maybe they had 5,000 square feet.

The biggest risk that you can have, and I have always used outside management to run the company. I was located on outside of management -- management who I brought in to be the management team.

And what happened with them is they thought that the money was always going to be there because they had seemed easy to them that they got the capital.

And so within a year after doing the deal with someone from financing from Silicon Valley. In

a certain sense that was crazy, crazy money. They didn't know me from Adam. I just knew -- I just got an introduction from someone I knew out there.

And they took me into Montgomery Securities one of the larger mid-tier broker-dealers inside a two-hour presentation with the investment bankers. They committed and gave the company $25 million. And $25 million to them was still a big number.

And so they believed that was so easy to do, that instead of staying in their industrial office space, they moved across the road, which is I-25, and took down two floors, two full floors of a Class A office building next to -- that have been developed by John Madden, that was right next to the top glass thing out there.

And the cost associated with that is -- that was associated with that was astronomical. They put in air hockey machines. They provided food, all of that stuff that you would see.

And so despite the growth in their stock and the capital that they received, when the dot com bubble came, they went out of business. They had overspent. And that is the same thing that happened on the next deal.

And as a part of looking out for the

investors associated with that deal, the Navidec deal, I came back in, just like I did with GrowCo, and I took over the company.

And when I took over that company, that they had a spinoff that I had created as a result of a reverse merger that created a shell, and that reverse merger became Navidec Financial Services.

And the merger that I completed was done in 2006 was -- as crazy as it sounds -- I didn't know how to write code, so I didn't really understand how the business was or how to perform the business, the Navidec that was the Internet company.

So in 2005, I think it was, maybe 2006, 2004, I took that shell, which was publicly traded because it was a spinoff of a public company and that merger, that distribution was completed through a filing with the SEC to make it publicly traded.

And so I took that, and I -- some of my original investors there that had done very well became an investor base for me.

And we did, crazy as it sounds, I met a father and the son was named Manolo Zuniga. And what they had was oil and gas in Peru. Because Fernando was the minister of Petro Peru. And the minister of Petro Peru knew where oil and gas was that was

slightly offshore in shallow water.

And the reason it hadn't been explored as the only people that were doing that exploration in Peru now were the large oil and gas companies. And they can't afford to gear up to do a small exploration that they knew would be successful, because the players in the area were SO which is the foreign version of Exon.

And then the -- and so Dr. Zuniga, the father, knew where those properties were. They needed some startup capital. And I provided, along with others, some startup capital.

And the players in that were people that are still inside the -- they were part of the Navidec deal, some were. And they were part of the BPZ Energy. And that was the name of the company.

And I went to Peru three or four times. But did I know anything about how to drill oil and gas well? No.

Did I know how to write code? No. Did I know how to grow marijuana or how to get a license to grow marijuana? No. But I looked to find the management team, that if I gave them startup capital, they could create a real business out of it.

And so I went to Peru, I think three times.

Went all the way through the northern part of Peru, and went to exam -- couldn't see it because it hadn't been developed, but I went to the place where they were going to start to drill in and looked out into the ocean.

And we gave them the lighting (ph), and Jeff Ploen went there with me, so did Lance Bower. They were investors in this deal and so was Chuck Kirby in this deal. They were all players in that investment, and it did very well.

And the reason I thought it would do well, is because a tremendous oil and gas clout (ph) had been created in Colorado in the 80s, late 80s.

And I spoke to that when I was speaking to Mr. McMahon, because he's a landman. And some of the terms he was using, I understood and he understood what they meant.

We collectively provided them with $6 million in startup capital. And they drilled their first well, and it was exactly what Manolo and Dr. Zuniga had projected.

It was tested at 9500 barrels of oil a day. You don't get those in the United States. They may be getting them now because of all the lateral drilling, but back then, it was a major thing,

whether by look, luck or not, that turned out well. And the stock went from being concept of zero, just like the Internet deal. Went to become listed through a registration statement on the New York Stock Exchange.

And so were halfway through the cycle of the business model that I was trying to employ with Two Rivers and GrowCo.

But again, what happened was, is the management team thought, hey, this is easy. Look at all the money they gave us, and we knew oil and gas was there.

And so they ended up also getting a loan from the World Bank. I think as much as a billion dollars in the overall loans for the development of this field.

And they put in one, one well after another. And their original projection was something like, we think there's overall could be 2 billion and 3 trillion cubic feet of gas. The numbers were just incredible.

So the stock went from concept to $30 a share, and I think we were in it 4 or $5. And there was always an A warrant and B warrant associated with it.

So you can see that as that type of business structure associated with what we're -- we're trying to do both with Two Rivers and GrowCo.

And so whether I did the reverse merger and created that, or did that reverse merger with Navidec and BPC Energy, that's where the spinoff occurred of Navidec Financial Services.

And I created that spinoff and the mechanics associated with that. And I used a brokerage firm here in town that was Roger Davidson who I talked about the other day that was a well-known attorney for the firm.

I don't know if I'm pronouncing correctly. It was Cohen, Brown and Schmidt, and I think they then merged -- had occurred a lot of firms were merging up, merging up and that's how you got these huge law firms.

But as with the Internet deal, BPC Energy got way over their skis in terms of the capital that they had and the loans that they needed to pay back to the World Bank.

And so in 2008, when we had the leverage buyout, real estate collapse, the banks were overleveraged and all that. BPC Energy over the next year went out of business.

But we got out before that collapse. The stock went from zero to 30. We didn't hang around till 30. It's the same, the bulls make a little, the bears make a little, and the pigs get slaughtered.

And so -- I have always sort of followed that. And so when it looks like the markets are crazy, we try to recognize that. And we got out before the 2008 crash. And I think I exited and most of the people exited in the $20 range.

It was just you know -- we had a great return because we had the stock and we had two warrants associated with each of the deals.

And then that takes us to what happened with Two Rivers, because I took that shell that was spun off their Navidec Financial Services. And I happened to own some -- have some capital as a result of -- BPC didn't want to give us the shares that we were entitled to.

And I hired -- to sue them, and this was in Arapahoe County and did a great job. And I wish I could have afforded him to help me here, but that's what we got. I think it was a total of $12 million judgment and so...

We went through that. When I say we went through that time period. We invested in real estate

and that sort of thing and tried to become a developer of fix and flip homes.

It was for me to be viewed as a parking place for the capital until I found a deal that I wanted to do, that I felt would have legs.

And then -- it makes you wonder whether -- or what I've learned is that you can convince yourself that if you do it, it's got to work. That you become arrogant about what it is that you're doing and what you selected and that you can figure everything out. And that's the old maxim, pride comes before fall.

Because the next deal I wanted to do was water rights. And so I started looking throughout Colorado and seeing what water deal I could do.

And so I ran into one of the individuals that was -- and I don't know how I came to know him, but we became interested in the Two River Basin down in -- it starts in Huerfano County.

And one part of the river was the Cucharas Branch. And they built -- they had a dam that needed to be repaired.

And the other branch was the Huerfano Branch. And they converged together and were supposed to flow into the Arkansas River. And so I

became convinced that I could make that deal work.

And that water was a good business, a good asset to own, and they are good assets to own. They're still good assets today to own.

What I didn't know was, and I learned the hard way, and it became part of the difficulty associated with this is the runway, which is what capital investors talk about in terms of how much money do I need to get liftoff, you know for earnings. How long does that runway need to be and can you pay for that runway.

And so I was making trips down to to Huerfano County and Pueblo County, and I would say at least three or four times a day, a week.

And it was -- it's about 2-1/2 hours down to Walsenburg, which has its own history and 2-1/2 hours back. And I did that, I want to say, for one, two, three years.

And when I came to learn about water was that it does not -- you do not create the revenue stream that you think you're going to be able to create in the time frame that I thought I was going to create it.

And the players in the water business, which are government entities, Denver water. Denver

water uses water that comes -- the state of Colorado is divided into thirds.

On the Front Range, the water flows from the, I think, it's Palmer Ridge, but where -- if you're heading south, you got to go over Monument and come back down. That's where the water flows north.

And to the south of that, the water flows to the Arkansas, and if you're to the east of the Continental Divide in Colorado, it's going to hit eventually to the Gulf of Mexico.

It's going to go through Missouri, Missouri going to get into Mississippi and Mississippi is going to end up in the Gulf of Mexico.

And there is some transfer from the western side of the Continental Divide into the eastern side. And part of that as it related to the Arkansas River was a huge dam in terms of Colorado, that was built by JFK as part of that, one of the projects he was doing.

And as far as the dam goes, it wasn't like a Hoover that had been built back in the depression. But I learned a lot about the transfer of water assets. I got to know all of the players.

I got to know the Water Conservation Board, CWCB, we'll call it, and they would lend money for

the repair of dams, and there was two dams that needed to be repaired.

There's an outstanding loan that is a lien that I took down to -- or a loan that I took down, a note was given by the CWCB, that I think was something like I had an original loan, maybe something between 1- and maybe $3 million. And today that loan is $400,000. That's what they were referring to in -- back and forth between, I think, Ms. Kidd-Aaron, is one of the liens that was on the Orlando Reservoir that we repaired -- that I repaired and it's functioning perfectly now.

And then the CWCB wanted to lend the company, and that's when you speak of generally is a weed (ph) that is almost appropriate.

They wanted to lend me $10 million, and they may have created a loan for $10 million to -- in c/o (care of) the Cucharas Dam, which is a huge dam, and a lot of the pictures have an image of that dam and so do the promotional material.

And so what I discovered is you're not going to get that deal. And it's going to be a 4- or 5-month project. And so I turned it back -- to the CWCB, and they looked at me like I was crazy.

They said, John -- I think it was Kurt and

the new head of the Panama (ph) is the head of the lending arm -- or the CWCB. She was actually underneath Kurt, and then she got promoted and became his boss.

They looked at me and they said, you know, what are you doing? Nobody is turning back -- this law. I said, I can't make that deal happen. I can't wrap us with this deal.

And so that's when -- and that was around late 2013, 2014. And I said I've got to find a way to protect the assets that we have, and the water assets to provide.

And I got to -- I've got to find something that could feed us cash flow, positive cash flow, that would enable us to hang onto these water assets and Two Rivers could move forward, and initially Two Rivers -- all of the shares of GrowCo can have a controlling interest in it and that gets us to GrowCo.

And so that's the story of the business models that I do and how I do it, and the successes that I have had and the huge failure that I had here.

And I believe the failure was twofold. Aaron Van Wingerden wasn't telling us the truth about what was going on when he was taking money, and he

was taking equipment. And that's when I went from cost of -- originally projected cost of, I think, 4 million. The raise was 3.-something million, but you needed an additional amount.

The state is incorrect in the definition of what the intent was for the use of funds. It was never just to build the greenhouses. It was always to provide the capital necessary for the license grower to get in his first crops and bring them to the market.

And so it's not $20 million. I built four greenhouses. And we didn't -- it was always the first greenhouse GCP-1, the total raise was intended to be $6 million, but we ended up settling on a total of $5 million for that, 5 to 6 or $7 million.

That was because Aaron Van Wingerden took the money and took the equipment, if I can get the evidence or if I can overcome the hearsay associated with how I knew that and the testimony associated with that.

Based upon what I know hearsay to be, it's highly likely that I will not be able to get that into evidence, but it's the truth. And I'll present it in -- it's contemporaneous how I view as contemporaneous statements made by people who were

there watching the equipment disappear.

One of the statements is attested to and notarized. And so maybe I'll be able to get that in. And so that was part of the initial failure. But there was never, when I was there, a failure to, I believe adequately describe what we're trying to do, and to deliver on the collateral that I said that we were going to deliver to them.

And so I think we fulfilled those obligations, both for GCP-1, GCPSU, the deeds of trust, associated with them and the $4 million notes.

And then we -- because of the -- there's the testimony by the plaintiffs that I just had to be in what GrowCo wants to be -- to grow marijuana myself. I wanted that license to grow myself. And that's simply not the case.

I've never tried to be the management of an industry that I knew nothing about. When I went into, it was always defined management that had demonstrated or history in being able to do what they say they were going to do. And I thought Aaron Van Wingerden would satisfy that. And we'll see what I can get into evidence and what I can't.

The third failure -- first failure is inaccurate projections. But that doesn't mean that

failure -- there's a distinction in my mind between fraud and failure.

If at the time they made the investment, you represented what you thought you could do fully or fairly, according to the SEC guidelines and we used attorneys. And we always used accountants and the accountants have always provided financials according to -- starting with GAAP and using PCA.

I never tried to do any of these things without the use of those professionals, because of my experience back in 1985. I didn't ever want to repeat that. And so I relied on that.

The failure then became, after I left, in my view, I can be convinced that I'm wrong about that. But I don't know that I am. That money was taken. That the scheme essentially was, we're going to overcharge on G&A.

And we're going to take that money and say this is cost associated to GrowCo associated with GrowCo. And then we're going to take those monies and use them for farming. Use them for water development -- if they created a new company, and use them for other purposes.

And if, in fact, that's true, they didn't have the authorization to do that. And even if they

did have the authorization to do that, where's the ownership of the assets?

Why didn't the landowners -- I mean, the owners of -- the contributor of the capital in the $7 million raise. Why didn't they get the same consideration that GCP-1 got, GCPSU got and the $4 million notes got?

Because it's one thing to borrow the money and say you have a right to that capital, but if, in fact, it was used to develop these other assets then the investors in GrowCo and the $7 million note, should have pieces of paper to say we used this -- if we used it to -- if being the universal we, the royal we -- if it was used for those purposes, then there's something wrong because the use of that money should be -- should reflect ownership.

And so that's the story that I'm -- that's the narrative that I'm going to try to establish in my testimony and be able to respond to plaintiff's cross-examination.

THE COURT: Okay. Well, we're going to go another five minutes up till noon, and we have to take a recess. And we'll have to take a longer recess till 12:15, 1:15, so we'll start up at 1:30. So we'll go another six minutes is my account.

MR. MCKOWEN: Okay. So let's see what I can get in ten minutes. If -- I'm going to try to not pull up exhibits and get them admitted if they don't fit the overall narrative.

But one of the -- the first failure is with my selection of work -- to work with Aaron Van Wingerden and his partner, Tim Beall.

And so if we could pull up Exhibit 107, kind of put the time frame on it and what that looked like.

THE COURT: 107 has already been admitted. 1007.

MR. MCKOWEN: I'm sorry. 1007, plaintiff's?

THE COURT: Correct. That's already been admitted.

MR. MCKOWEN: Huh?

THE COURT: It has already been admitted.

MR. MCKOWEN: Okay. So in the vernacular of the industry, I'm not someone who focuses on an industry. I'm someone who is what they would call a generalist. Meaning that I'm willing to take a look at anything, if I could understand it and find the management to -- to operate the business.

And typically, typically they're motivated

because they are unable to attract the viable capital that I can potentially deliver.

And so over this time frame that I just told the story about, collectively, I probably raised or there were raises based upon my original capital contributions with others, that probably exceeds $2 billion.

And so -- and I'm not saying that I'm the one who raised it. I'm saying I'm the one to be able to raise it after we put in our original dollars.

So this is how I came to meet Aaron Van Wingerden and Tim Beall, and it occurred in April of 2014. And they are a tag team. It's Batman and Robin. It's Sherlock Holmes and Watson. And so they -- and the person who did the early development of the relationship was Tim Beall.

And I was -- like I said, I was looking for someone to -- to -- that could grow inside a commercial greenhouse.

And I had been -- I had been looking for -- and we read up on the type of greenhouse that I wanted, and that was a modern state of the art greenhouse that was temperature-controlled, climate controlled, including humidity, that had sensors throughout the greenhouse that would open or close

the roof.

It would turn on the heating, turn on the cooling. It captured some efficiencies because of the water rights that we had.

And then it had a cooling wall -- certain cooling wall, so it's the same -- it's almost the same thing -- affect as a radiator does in a car. You've got water being -- there's a ripple of material plastic or seems like it's cardboarding.

And so you can use the water and water rights, just drip that down the water wall and not have to pay the electricity costs and all the other things associated with how you would cool your home. It would be too expensive.

THE COURT: Mr. McKowen, I hate to interrupt, but it's 12, and I need to get to my other commitments. So we'll recess your testimony and start up again at 1:30.

MR. MCKOWEN: Thank you.

THE COURT: I will see everybody at 1:30.

(Whereupon, a lunch recess was taken at 12:00 p.m.)

(Whereupon, the proceedings resumed at 1:21 p.m.)

THE COURT: All right. Mr. McKowen, you

can come back up.

We are back on the record 21CV33922. All parties and counsel are present. Mr. McKowen is on the witness stand in his own case making a sworn statement and direct examination of himself, and I don't know if I made clear before you started, but the plaintiff can still object as the testimony goes along.

I don't want you to just think I'm asking for a free-formed narrative necessarily or things that are being said that you think a timely objection needs to be made to, please do so.

I don't think I made that clear before we started, and I will rule on objections. Same with you, Mr. Harding, if there's an objection you want to lodge to what's being said on evidentiary grounds, you can do that.

MR. HARDING: Is the CART person back from lunch yet? Are you getting any feedback?

MR. MCKOWEN: I'm not getting any.

MR. HARDING: I have to rely on this because I cannot hear.

THE COURT: Is everybody here?

MR. HARDING: Well, if you want to --

THE COURT: We'll wait. We're going to

wait for the CART interpreter.

MR. HARDING: I just can't hear him.

THE COURT: Then we'll go off the record, and as soon as our CART interpreters are back on, we can start.

(Whereupon, a recess was taken at 1:23 p.m.)

(Whereupon, the proceedings resumed at 1:30 p.m.)

THE COURT: Mr. McKowen, you can be seated. Let's go back on the record in 21CV33922. All parties and counsel are present. And we have the CART interpreters up on the screen.

MR. MCKOWEN: Yes, Your Honor.

THE COURT: We are in Mr. McKowen's testimony. He's still under oath, his direct examination of himself. And I had stated, Mr. Harding, and before we had the CART interpreter, I don't know how much you picked up.

Even though Mr. McKowen was making a sworn statement, you and, also, the plaintiff can object to the testimony along the way.

I'm not inviting just an uninterrupted narrative necessarily. If there's an objection that you think is proper, you can interrupt the testimony

and make the objection, and I'll rule on the objection.

MR. HARDING: Thank you.

THE COURT: Just as a lawyer had asked the question.

MR. HARDING: Right. Thank you.

THE COURT: Mr. McKowen?

MR. MCKOWEN: So to summarize what I said in my lengthy dialogue, the point is is that the business model and the execution of it is identical to the previous business models that I've done. It's not a scheme that I developed to defraud investors out of their capital.

So I'd like to also see if this is inappropriate. In my questioning of the proffered expert testimony, I was in part relying upon the decision in People vs. Baker. And can I give you the quotation in that?

THE COURT: Let me stop you, Mr. McKowen. If you're making legal argument, that's not the purpose of you testifying. The purpose of you testifying is to make a sworn statement regarding the facts of this case.

So if you take issue with some of the evidence, if you have a different version of events,

whatever may be, now is your time to give me that information. But as far as reasserting legal issues and arguments, that's not proper to do when I'm taking your sworn testimony.

MR. MCKOWEN: Okay. Can we open up the MIPA agreement?

MS. KIDD-AARON: Mr. McKowen, can you speak into the microphone.

MR. MCKOWEN: Yes. Can we open up the Exhibit 1016, the Suncanna MIPA?

MR. HARDING: I think you have two copies there. Can I have one?

MR. MCKOWEN: I do. And if we could turn to page 3. I'm sorry. It's page 2 on MIPA, and it's 2.3, and it speaks to the $350,000 initial payment, in 2.3(a).

It says that the 350,000 initial payment and immediate available funds will be delivered to seller to be held by seller until closing, at which time it will be applied towards the balance of the purchase due at closing.

And I read that to say that it's -- that it is not to be used, and if there is no closing, it's to be returned.

And that was my understanding of the deal.

And that money was never returned. And --

MS. KIDD-AARON: Your Honor, I'd like to object based on relevance. I don't know how this is relevant to the State's case.

THE COURT: How is it relevant, Mr. McKowen?

MR. MCKOWEN: It's relevant to the one -- the $350,000 payment was introduced. It's a capital contribution that I made to the investment that is among -- a series of investments that I made that totaled 2.5 to $3 million, and I don't know exactly what it is.

And so I'm trying to point out that, one, I'm one of the largest investors in this entire enterprise, and I did not set upon doing this and putting capital in to create a fraud on other investors. I'm out of my money just as much.

THE COURT: Overruled. You can continue with your sworn statement.

MR. MCKOWEN: Okay. And so that $350,000, and another -- I think we have the number somewhere, but it is indicated in -- in the exhibit by Ms. Martinez.

I don't know that we have to pull it up. But there was two-plus million dollars that was

advanced to Mr. Van Wingerden to bring the crop into production, and to also help him pay the legal bills to get his license.

And I think it's been testified to that -- that John McKowen got the license for him or something to that effect.

We obtained the reservation of the name Suncanna just like we had with a lot of the other entities. But that doesn't mean we were the owner -- Mr. Van Wingerden was the sole owner of Suncanna, and he's the one that applied for the license, and I wouldn't know how to complete and submit the license.

And so that was done through the law firm Vincente, Setterburg, which at the time it may be still -- it was well-known for its representation of license holders.

(Court reporter asked for clarification.)

MR. MCKOWEN: V-I-N-C-E-N-T-E, S-E-T-T-E-R-B-U-R-G, I think.

And so that speaks to the use of funds. So you have a greenhouse that originally was projected to cost $4 million -- a million dollars that was coming from, I believe, TR Capital, and 300-something million that was the capital that was raised through GCP-1.

And I think in the accounting of what it cost to -- to put up the greenhouse, it wasn't double, but it was significantly higher, maybe as much as 50 percent higher.

And the additional funds were funds that were lent to Mr. Van Wingerden pursuant to the promissory note, and he walked away from all of it.

And I attempted to sue him over that. And the other parties to the lawsuit who would have -- who provided the capital decided to settle the agreement and to pay Mr. Van Wingerden, I think it was maybe a half million dollars from insurance proceeds to him, and I objected to that and refused to -- to settle.

But eventually, I settled, but I refuse to be a part of any payment to him. And so he was able to walk away from my 350,000 that I borrowed. I borrowed from one of the Kirby's funds and I'm still paying on that today. In fact I'm going to lose my house probably in the middle of August.

But with that said, the relevance of $350,000 and indication of the type of person that Mr. Van Wingerden was is demonstrated by that.

There is exhibits that have been accepted into -- have been accepted, and they would be the

offering documents for GCP-1, $4 million notes and GCP Super units.

And I would like to be able to switch out the GrowCo $4 million note offering document, because it doesn't contain the security documents which we were looking for yesterday.

And security documents contain a specific formula for the distribution of funds from the liens that are collateral. And I thought it was in there. And we looked for it, and it wasn't in there. But it is one of the documents that is listed in the agreement as an exhibit to the agreements.

And I'd like to be able to bring that in to demonstrate how on GCP how the GrowCo investors participate in that distribution of funds if a liquidation -- if there is a liquidation.

THE COURT: Do you have that document with you?

MR. MCKOWEN: No. I do not. I have to -- I went to look for it again in my copy of this, but it's definitely -- I have it on the computer, and I also believe it was -- that it is part of the discovery, Rule 26 discovery. And I'd like to swap it out tomorrow if I can. If there's no objection.

THE COURT: You'll have to confer with

plaintiff and Mr. Harding about doing that.

MR. MCKOWEN: Okay.

THE COURT: I can't do it now, since we don't have the document.

MR. MCKOWEN: Okay. I'll talk to them before I leave.

I would like to offer into as an exhibit, a segment of the Paulson settlement agreement as it relates to the security interest of these investments.

And so we have the document in -- as an exhibit, and I'd like to be able to call that document and show how that -- how those -- how the settlement agreement did not affect -- specifically did not affect the abilities of the beneficiaries of those liens, was not a part of this settlement.

And so the investors retained the ability to be able to pursue, independently pursue the -- the foreclosure if that's what was going to be on those claims.

THE COURT: What's the exhibit number?

MR. MCKOWEN: It is 1041.

MS. KIDD-AARON: Your Honor, this is a document that has not been stipulated to. We object to this as not being relevant to this case, and

specifically it is not at issue whether or not the settlement precludes investors from foreclosing on their lease.

THE COURT: Any response, Mr. McKowen?

MR. MCKOWEN: I think there was a direct relationship to this case, in that the liens that the Court is speaking about, the claims that it's speaking about is the collateral for which -- for GCP-1, GCP-2, GCPSU and the $4 million note.

THE COURT: Mr. Harding, did you have a position?

MR. HARDING: No position.

THE COURT: Exhibit 1041 -- well, the objection is sustained. The Court doesn't find that it's relevant.

MR. MCKOWEN: Yes. I talked about -- excuse me -- I talked about that there's a $3.8 million offer on the table. And that it came up as a result of Chuck Kirby, whose son manages, Jack Kirby manages, I believe he is the manager of Blue and Green, and I believe he's the manager of Blue and Yellow.

And I wanted to introduce the e-mails that I received or -- the beginning of the e-mails that I received relating to his abilities to move forward as

the agent in that foreclosure.

And that, actually, it's not a foreclosure. It was an offer to accept or to make payment of the 3.8 million for the liens as is and that entity that would be purchasing the -- those liens, would worry about the order in which the liens are executed and what the net would be.

And that was a discussion yesterday, especially as it relates to one of the plaintiff's witnesses, which is Mary Loughran.

THE COURT: What's the exhibit number?

MR. MCKOWEN: It's the $4 million note, and that is 1011.

MS. KIDD-AARON: Sir, these -- Mr. McKowen, this document is offering -- what you're talking about, is it included in this exhibit or would you like to add it to this exhibit?

MR. MCKOWEN: I need to add it to this exhibit.

MS. KIDD-AARON: Have we seen it?

THE COURT: 1011 has already been admitted. I'm not going to add documents to an exhibit that's already been admitted. Do you want to mark it and ask to introduce it under a different number, we can do that.

MR. MCKOWEN: I will introduce what I have as an additional exhibit, but I would like to point out the relevance of the agreement to this -- why this is part of -- why this part --

MS. KIDD-AARON: Mr. McKowen, do you have the document? Has plaintiff seen the document that you're trying to admit?

MR. MCKOWEN: I'm first trying to show its relevance.

THE COURT: Hold on. First, I want to know what the number is, because a month from now when we're reviewing the transcript and exhibits, we're going to get lost in numbers in the testimony. So what is the exhibit number for what you are talking about?

MR. MCKOWEN: The first exhibit number is 1011.

THE COURT: That's already been admitted. And I'm stating I'm not adding to that exhibit because it's already been admitted.

MR. MCKOWEN: I understand, Your Honor. I'm trying to point to a very relevant --

THE COURT: You're arguing relevance, and all I'm trying to do is get a number on it. And 1042, I don't think has been admitted yet. So do you

want to mark those e-mails as Exhibit 1042?

Did you have those in hardcopy?

MR. MCKOWEN: I do. If I can explain further that, what I'm about to present to you doesn't mean anything if I don't show you what's in 1011.

THE COURT: I understand. But in order to admit an exhibit, counsel for plaintiff has to look at it. Mr. Harding has to look at it. I'll have to know what the number is, and then I'll start asking for -- you can start trying to lay a foundation for it. But I'm trying to start with step one by getting the exhibit number on it and get the document in front of counsel.

MR. MCKOWEN: Okay. Gotcha.

THE COURT: Did you have copies for everybody?

MR. MCKOWEN: I do.

THE COURT: Make sure it's marked 1042.

MR. MCKOWEN: 1042?

THE COURT: Yes.

MR. MCKOWEN: The relevance of this document is --

THE COURT: Let's get you in front of a microphone.

MR. MCKOWEN: The relevance of this document is the communication between Chuck Kirby and I, and Chuck and I are currently in odds because I owe him money, rightfully owe him money related to money that I borrowed like the 350,000.

The total amount was 150, but it's been reduced down to 399, and a penalty -- 499. And he had -- he had been negotiating with Greg Harrington, the current CEO of Two Rivers, and they had an offer -- and he's the one that instituted the call, that he said and I have --

MS. KIDD-AARON: Objection, hearsay.

THE COURT: Sustained. You can't tell me what somebody else said.

MR. MCKOWEN: I'm telling what I heard. Is that hearsay?

THE COURT: You're telling me what you heard somebody else say, that's hearsay.

THE WITNESS: Okay.

THE COURT: Unless it falls under exception, which I'm not hearing.

MR. MCKOWEN: Okay. This agreement is attached to it, whatever that number is, is something that is required by 1011, requires an agent to be appointed for liquidations of -- or any sort of

action on behalf of the $4 million note holders.

And so he proposed to me an agreement that would appoint him as the agent. And I wouldn't do that to make him the sole agent.

The agreement itself which it states in 1011 requires a super majority, 66.23 percent. And I intentionally acquired 35 percent, which blocks him from -- blocks anyone from being the agent that would negotiate this.

And what I sent to him was -- that proposed how we would settle the deeds of trust, 404225, and 404222, 40422 -- should be 224, not 244.

And so part of where that is at is an agent needs or co-agents need to be appointed and -- and I took multiple phone calls from him regarding the offer, and I asked for an affidavit so I could do exactly what you're asking for here.

And the point is, is that according to him, that offer is still in place, or at least the last time I talked to him. And so if you followed the formula that I'm suggesting, where --

MS. KIDD-AARON: Your Honor, I would move to strike the hearsay about what Chuck Kirby has told Mr. McKowen as to offer.

THE COURT: Sustained. I'm not going to

consider hearsay exhibits. Are you offering Exhibit 1042?

MR. MCKOWEN: As a part of the response to plaintiff's statement, that they don't see how Ms. Loughran can be fully repaid in the execution on these deeds of trust.

THE COURT: Any objection by the plaintiff on 1042?

MS. KIDD-AARON: Yes, Your Honor. Plaintiff objects based on relevance. Mr. McKowen has described this as an offer for $3.8 million that would reimburse the $4 million note. Nothing in this agreement states that.

Additionally, this appears to be an agreement from Mr. McKowen to Chuck Kirby. Chuck Kirby, I believe, has been in this courtroom several days this week.

And if Mr. McKowen wanted to put him on the stand to talk about this deal, I feel that would have been an opportunity, but right now, we're just relying on Mr. McKowen and his explanation of what this is even though that explanation does not match the contents.

THE COURT: Mr. Harding, your position?

MR. HARDING: Well, first of all, to

correct what the plaintiff said. Chad Kirby was in this room, not Chuck Kirby. Again, words and terminology --

THE COURT: Don't lecture either side, Mr. Harding. My question to you was do you object to the admission of 1042.

MR. HARDING: Yes, because it's incomplete. It refers to exhibits and I'd like to see those exhibits.

THE COURT: 1042 is admitted.

(Whereupon, Exhibit No. 1042 was admitted.)

MR. MCKOWEN: There is a representative in the courtroom today of that same LLC.

THE COURT: Okay. That's not relevant to me. I'm trying to address the claims in this case, and it's a public courtroom. Anybody could show up and watch. I don't care who they are unless it's a sequestered witness.

MR. MCKOWEN: I'm responding to the plaintiff's statement.

THE COURT: You don't need to respond to their statement.

MR. MCKOWEN: I'd like to pull up 1027, which is Tim Beall's massive crop failure. This is a picture of Tim Beall standing inside the greenhouse.

THE COURT: Can you speak into the microphone, sir. Thanks.

MR. MCKOWEN: This is a picture of Tim Beall standing in front of the crop as it's -- this would be in the vegetation stage, and the gutters, which are the highest that you can grow in this greenhouse are at 14-feet.

And you can see that to his right, the plant is almost touching the gutter. And this was -- this is a picture, and there are other pictures that show how prolific these greenhouses are, and it's because of their technology.

But this picture is deceptive, and this is my testimony, because this crop became infected with spider mites. And what that meant was, when you have plants that are this large and so dense, you can't effectively grow the marijuana because you don't have the ability, no matter what you do to get to the inside of that 50-foot wide or 60-foot wide greenhouse to see if spider mites or other bugs might be infesting your crop.

And so I thought he was able to effectively grow -- he wasn't. He was thrilled that this crop was as large as it was. But when I went to the -- went to other greenhouses, and especially to the

Kwesell's greenhouse which is -- had a greenhouse similar to what we had.

The plants were never taller than 4, 5 foot tall. They caused them to flower by depriving them of light, which is how you get the plant to flower.

And you could walk in between the plant and easily inspect each one of them, and your cycle for growing was reduced, so essentially could produce almost the same amount because you had more cycles of growing in a year.

But he did not have the experience even though he claimed to have the experience to effectively grow a greenhouse.

And so as a result, the ability to make the rent payments, after everything was finally resolved and moving forward, and this crop relates to the crops, the marijuana crop being grown by the tenant of marijuana, and it had to be completely destroyed because it was filled with bugs.

And so that's why this picture is here. And that's why I'm giving that as an explanation the reason why he was fired.

THE COURT: Are you offering 1027?

MR. MCKOWEN: I would like to offer that as an exhibit.

THE COURT: Any objection?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: Exhibit 1027 is admitted.

(Whereupon, Exhibit No. 1027 was admitted.)

MR. MCKOWEN: I believe that we've already admitted 1029 with Whitney Buchanan's testimony.

THE COURT: That's correct.

MR. MCKOWEN: So I will like to turn to that.

This e-mail is dated September 21, 2017. And it's to Wayne Harding, Jeff Ploen, and Chuck Kirby, and it was forwarded to me, and it's an e-mail string between Whitney Buchanan to Tim Beall, and then it's forwarded by Tim Beall to Wayne Harding, Jeff Ploen, and Joe Kirby.

At this time I believe Wayne Hardy and Jeff Ploen were -- were the directors of -- of GrowCo. And I don't know why Chuck is on there. But it certainly is something that he probably would have wanted to know as a way to determine exactly what was going on.

You can see that the e-mail has slowly turned hostile towards me, when previously it was

not.

He was on a campaign to -- to have character assassination. And so read me again words back -- I thought you might want to read and share this as you deem appropriate.

And so it was sent to various people, and we talked about the, the agreement that we had he, and I don't know what it's relevance is to this -- the complaint in this agreement, but it was allowed to be introduced and accepted.

What's relevant is the difference between the two pictures. And I think there was an objection that I was leading the witness. But what is relevant about these two pictures and what's going on is, I had arranged -- I -- objection -- that I had arranged through someone I knew who had gotten into the -- been part of a marijuana resale of a product, that was probably the dominant resale in Colorado.

And that was Evo Labs. And I got John, who was a friend of mine or a friend of a friend of mine. And I went out to see them and take some pictures to them of the greenhouse.

And they said we're definitely interested. Send us some of your product. And we sent that product to them. And they said that this product is

no good. They can't use it.

And so there was a debate back and forth between Whitney Buchanan and I about what the machines produce and what the machines can produce. And this young man Dinova (ph) is trying to get that done.

And testimony by Whitney was that his machine doesn't do that. And I said, no -- and we know that. As good a person he is and has Green Beret and all that. We know that that isn't what matters. What matters is what does Evo Labs want and how do we produce it.

And when I say we, it's the same advice if I were saying we are testifying here. We are litigating this -- that doesn't mean that I'm the judge or anything other than a defendant. But I wouldn't be -- I'm not trying to define the roles when I say "we" in this. I'm using it in a elective way of saying, us, me as the landlord and financier for the equipment that is a very real solution for creating revenue stream, introduced the Evo Labs' people and they came out.

And they not only came out to look at the machine that we had. They came out to tell us what machines we need, and that was part of the discussion

yesterday, whether you remember or not.

And so the gentlemen, the three gentleman in the lab coats in this picture, they are Evo Lab technicians. They came out free of charge. They even lent us some of the equipment that we would use to create product that they would be willing to buy.

And they stayed there until that product was produced correctly. And that was -- that took about a week for them. And so they donated all of that. And they said in the consideration for teaching these -- the workers inside of -- inside of VitaNova, inside of marijuana was they wanted to commit to a hundred percent sale of the product to them.

And so marijuana did commit to that and started shipping that product immediately to them. And -- and what happened was, is they -- the product that was shipped to them was of the quality that they wanted. But the amount of production was so great that they bought it every week for two months and they were choking on it. They thought we simply cannot take this much product.

And what we're going to amend that agreement so that what we don't take, you can then resell to anybody else in Colorado. And that's what

they started doing, and that's when you start seeing the revenue take off for payment of rent. And then we started seeing rent payments to GCP-1.

And so, we had finally reached the point, "we," being combination of landlord, assistance, financing, bring in the right people to teach the people inside of marijuana, and we amended the lease so that extra revenue was coming into, into GCP-1, so that they could pay more because of the additional lease payment.

And that was the time frame that Whitney referenced that for six months those lease payments -- or the payments to him were being made, and then they stopped.

And the reason they stopped is that after all of that time commitment, hard work, and finally getting into production, for some reason GCP-1 chose to evict this tenant.

And today I can't understand why they did it. The only possible explanation is, to me, that money had been spent, and they couldn't justify it. And the amount of money that they had spent was a problem for the people, because this is 2017 for the people who had spent it. Because they were also the people that financed the eviction.

And so that's an add-on to really getting at what the money was used for and why this project failed.

When the parent was finally evicted, which I think was like six months later, maybe a little bit later, there was no -- they didn't have -- the managers of GCP-1, did not, at the time, did not have a tenant lined up to come in, and no tenant did come in until -- as far as I know, until I came back to GCP-1, when it was released, and Wayne Harding resigned, and that was in January, February of 2019. And so that's further explanation of why this failed.

And so there are written demands and oral demands being made by me in 2016. And the relationship between Two Rivers, GrowCo, GCP-1, and me was anything but cordial, in fact I would say it's hostile.

And the plaintiff contends that there was a collusion, conspiracy going on between Wayne Harding and I, and they've written their complaint and their follow-on statements that way. And nothing can be further from the truth.

When we were -- when we were -- when I was the CEO and board member, chairman of the board, there's the -- the term sheets were put together with

pro formas, and utilizing 506(b), I think, as an investment via goal as an exemption investment.

And I would like to testify about the advice that was given to me as it relates to the requirements of 506 since it wasn't done this morning, because the proffered statement from the expert didn't go into certain aspects of 506(b).

So I would like to now shift to just statements about 506(b). And what my understanding is in using it, which I have used for over 20, 25 years, going back to the first private placement, which was in 1996 and each subsequent use of that same Regulation D 506 exemption for registration -- from registration.

THE COURT: Okay. Ms. Kidd-Aaron?

MS. KIDD-AARON: Your Honor, I would object to any hearsay statements, so anything that was told to Mr. McKowen. I'm okay with him talking about his understanding.

I would also object to anything that goes back to 1996 as not being relevant to this case and ask that Mr. McKowen speak to things that are relevant to this case.

THE COURT: Mr. Harding?

MR. HARDING: I don't object to that

testimony.

THE COURT: Objection overruled.

I'm not taking -- well, two things. One, if you're talking about your understanding based on something that your attorney told you, what your attorney may have said is not, in my mind, being offered for the truth of the matter asserted.

I'm not assuming that his statements are true. It may be offered to explain why you're doing what you're doing or why you're thinking what you're thinking.

But I'm not considering your attorney's statements as substantive evidence of whether or not there was a registration violation here.

Second of all, if you talk about things your attorney tells you, you don't have to. You have attorney-client privilege. You can keep that information between the two of you.

But if you start asking about it, then plaintiff and Mr. Harding can cross-examine you on that information. And I will find that you're waiving your attorney-client privilege at least to that particular issue by introducing that testimony.

Do you understand?

MR. MCKOWEN: I do understand. Am I

waiving the right for them to redirect any questioning of the attorney?

THE COURT: Which attorney are you talking about?

MR. MCKOWEN: Mr. Hart.

THE COURT: Oh, Mr. Hart?

MR. MCKOWEN: Yeah.

THE COURT: Does that open the door to plaintiff recalling Mr. Hart to ask about those specific conversations, I would say yes.

MR. MCKOWEN: Okay.

THE COURT: Just on that particular issue, it doesn't mean you have to, and it doesn't mean that by you opening the door to this testimony, you get to call Mr. Hart yourself and ask him that testimony. That's not how that works.

MR. MCKOWEN: I'm just looking to spread some sunshine on it, on the concept benefit.

I understand what you just said, and I can't call Mr. Hart, but they could if they thought that that they wanted to redirect questions to Mr. Hart, that either -- for whatever their reasons are. And so I couldn't object to them recalling Mr. Hart; is that correct?

THE COURT: I think that's generally

correct. It's hard to make a ruling like that in a vacuum before I hear what you're going to say. But generally it is.

MR. MCKOWEN: Yep. Okay. So every term sheet, every subscription agreement, every safe harbor statement I have used, in I believe in both Two Rivers and GrowCo were prepared by Mark Johnson who was our SEC counsel at the time. He's retired now.

Again he was -- I think a hundred graduate -- and graduated with a law degree from Harvard. And when he retired, I think he had 40 years experience doing this type of work and other type of work that were -- I think it was at the hands of their securities, one aspect of the securities compliance. And he created the documents that we used for GCP-1, GCPSU, and the $4 million note, and probably had some hand in the subsequent notes that were drafted while I was there.

And those notes and -- and those notes have, I believe, been reviewed by Mr. Hart, although he wasn't expressing an opinion about that. But they reflect exactly what was used and what I believe to be the requirement.

And I have not received -- I take that

back. I believe that the attorneys who filed the class action claimant, and the attorneys that are the same attorneys that filed the FINRA arbitration against Emergent Growth Equities. And part of their claim was for fraud.

The claims were almost identical, if not identical to the claims in this case, and that's why I have listed them here.

But my testimony here is that I relied on the advice of counsel and that all these documents are essentially similar with respect to their use of 506 and the relevant parts of 506. And so that's what I'm testifying to.

Can I testify to what I believe, based upon the documents and the advice I was given?

THE COURT: Any objection by plaintiff?

MS. KIDD-AARON: I will wait to hear what he says, Your Honor.

THE COURT: Any objection by you, Mr. Harding?

MR. HARDING: None.

MR. MCKOWEN: And so in each and every case, the advice regarding the amount, the dollar amount that you could raise was unlimited. There was no restriction on the dollar amount.

MS. KIDD-AARON: Objection; that's not at issue in this case.

THE COURT: Sustained.

MR. MCKOWEN: They also indicated that if you did not -- if you received accredited investor questionnaire as was written in these documents which are identical, that the -- that the test for whether or not they were accredited is self-certified and that 506 does not require you to do anything else to determine whether or not they're accredited investors.

And that if they were in fact -- if the only investors that you brought into -- into your investment opportunity were -- had certified that they were accredited investors, that there was no requirement because it wasn't a public offering.

And as we went through the state C.R.S. requirement on sales literature. And if you are eligible for and utilize a Regulation D exemption, it is not a public offering and therefore, you do not have to provide any other documentation like a private placement memorandum or all the things that were listed in the Colorado securities article that we went through yesterday.

Do you need a specific reference in that

section to where it says that?

THE COURT: Only if you want to provide it.

MR. MCKOWEN: I did yesterday.

THE COURT: I'm not going to tell you what I need or don't need at this point. It's up to you.

MR. MCKOWEN: Can I provide it?

THE COURT: What are you providing?

MR. MCKOWEN: This is a section, verbatim section of C.R.S. 11-51-305.

THE COURT: I don't need a copy of it. I have a statute book. So I could look it up if I need to.

MR. MCKOWEN: The reason I'm going to because of the expert witness from the plaintiff objected to it, said it wasn't accurate.

So it's me testifying that the burden of proof is that why isn't that accurate, or I think and I'm trying to establish what I think I know. And that also is consistent with the legal advice provided and why you don't see a private placement memorandum or anything like that in our offering documents is because I believe it's not required. They believe it's not required.

And so I have done PPMs in the past, and that private placement memorandum, and that's not

required in this particular offering.

(Court reporter asked for clarification.)

MR. MCKOWEN: I would like to bring into evidence four additional exhibits relating to claims, the false claims in the plaintiff's complaint. And the first one --

MS. KIDD-AARON: Mr. McKowen, can you speak into the microphone?

MR. MCKOWEN: And the first one of those would be the SEC no action letter, and that is Exhibit 1038, and it speaks to a review of the SEC.

THE COURT: 1038 is already admitted. So you can talk about it. You don't have to introduce it.

MR. MCKOWEN: Can I check on these other three while we're doing it?

THE COURT: Yes.

MR. MCKOWEN: What about 1039?

THE COURT: 1039 is not admitted.

MR. MCKOWEN: What about 1040?

THE COURT: No.

MR. MCKOWEN: And 1041.

THE COURT: 1041 was offered a little while ago and refused, rejected.

MR. MCKOWEN: It was a motion was made and

it was sustained that it not be accepted?

THE COURT: You offered 1041 also in settlement order, and I sustained the objection to that exhibit.

MR. MCKOWEN: So can you pull up or look at 1038?

Sometime -- sometime after I left and after I resigned from being the CEO of Two Rivers, GrowCo and all of their affiliates, a -- an investigation was launched, and I don't know what the cause of that investigation was.

And I don't know if anyone was interviewed by that investigation, but I've been investigated by the SEC on multiple occasions.

And the SEC does not render an opinion about their investigation. The SEC, just like with the review of offering documents, they either stop commenting in the case of a registration or in the case of an investigation if they're not going to move forward with some sort of enforcement action.

They just simply send you a letter that we do not intend to recommend the enforcement action by the Commission. This was issued in 2018.

I -- the --

(Court reporter asked for clarification.)

MR. MCKOWEN: This was issued in March of 2018, and I would guess that, although I don't have any record of it, and they did not contact me. That generally when the SEC comes to investigate, they want to know everything about the status of that company at that point in time.

And they had reviewed the offering documents, because that period to be the central issue along with maybe whether or not there was adequate disclosure or whether or not the exemptions were proper, all of those things. But they did not -- they decided not to move forward with anyone.

And so I think that speaks to some of the issues in this case relating to fraud, relating to the use of exemptions, relating to accounting and whether it was appropriate, which would speak to the issue that Mr. Harding raised.

And it makes sense to me, but I would like to see the evidence associated with that. And that is the -- the capitalization of interest costs as something that's permitted and was indicated could be used in the proceeds of the offering.

So I offer this as one -- one authority, very knowledgeable authority --

THE COURT: You need to speak into the

microphone.

MR. MCKOWEN: Very knowledgeable authority that did not find any -- did not find a reason to move forward with some sort of administrative action, enforcement action.

THE COURT: Is there an objection?

MS. KIDD-AARON: Yes, Your Honor. We object. Apologies. I didn't realize we had stipulated to this exhibit.

THE COURT: 1038's admitted.

(Whereupon, Exhibit No. 1038 was admitted.)

MR. MCKOWEN: I thought --

THE COURT: Yes. You had mentioned that you offered it. I'm assuming you're explaining the testimony to why it's relevant to this document. Not offering the exhibit again for --

MR. MCKOWEN: Did I say that?

THE COURT: You just used word "offer" has a very particular meaning when I hear it so...

MR. MCKOWEN: I apologize. I didn't -- I did, and I meant to explain the importance of the document.

So now I would like to introduce 1039, which is a dismissal of McKowen from an attorney general's case involving Two Rivers and GrowCo at the

time.

THE COURT: 1039?

MR. MCKOWEN: Correct.

THE COURT: Any objection by the plaintiff?

MS. KIDD-AARON: Yes, Your Honor. We object to the relevance of this document. This is a separate case that the State brought against Two Rivers. And Mr. McKowen is introducing -- his -- this document that shows he was no longer at Two Rivers, essentially.

THE COURT: Why are you offering 1039?

MR. MCKOWEN: As --

THE COURT: Why?

MR. MCKOWEN: The reason I'm offering it is they looked at the funds that came into Two Rivers' bank accounts, some of which were GrowCo funds were utilized as escrow accounts for the GrowCo funds. Some of them were utilized as operational funds for GrowCo. But they were labeled as Two Rivers' funds.

And the reason they had -- they -- the legal action was a contempt citation, for if you had all of this money, why didn't you raise the dam.

And they specifically had named me as one of the defendants. And they concluded that I should be dismissed because -- and I think they brought this

contempt citation in late 2016, maybe 2017.

And the reason they dismissed me was because they found no evidence that I had any control over the funds or the company.

THE COURT: Mr. Harding, what's your position? Did you have any objection?

MR. HARDING: No objection.

THE COURT: 1039 will be admitted.

(Whereupon, Exhibit No. 1039 was admitted.)

MR. MCKOWEN: So you can see by, I think you call it the caption or whatever, that plaintiff is, People of Colorado, Attorney General's Office is representing -- representing Bill Tyner, the division engineer, and he's the attorney, the attorney general's -- the first assistant is Paul Benton, and the senior assistant was Philip Lopez.

And the statement in the dismissal -- or the order that is being sought is to an unopposed motion to dismiss contempt citation issued to John McKowen and William Broderick and to vacate trial.

If you turn to page 3, page 3 states that the -- in sections -- in paragraph 5, Section 5, the status concluded that the contempt citation to Mr. McKowen should be dismissed with prejudice for the following reasons.

Although we signed a consent decree as chairman of the board and records of Two Rivers Water and Farming Company, and as the chief executive, those -- Mr. McKowen left those positions shortly after the entrance of the consent decree. And the consent decree was I believe in 2016, maybe a month before.

The State's discovery to date, and this is, I believe issued in -- 15th day of August 2019. And right in the sweet spot of when these capital raises occurred. And that Mr. McKowen retained or that the state -- the State's discovery today has not produced any evidence to show that Mr. McKowen retained as sufficient ability either directly or indirectly to control of the funds or assets that could have been used to -- by Two Rivers or its subsidiaries to fundraising of the trust and fully comply with consent decree.

The State's discovery to date has not proved any evidence that Mr. McKowen retained sufficient control within Two Rivers or any of its subsidiaries to compel Two Rivers to comply with the consent decree.

MS. KIDD-AARON: Again, Your Honor, I would object. This is in relation to a dam that Two Rivers

was supposed to repair, and that is not at issue in this case.

THE COURT: Overruled.

MR. MCKOWEN: Although the State has not concluded all of its discovery, the state believes it's unlikely to recover evidence that justifies the proceeding to trial against Mr. McKowen.

And so they were examining -- they examined, as far as I know, all of Two Rivers' bank accounts. Some of which belonged to GrowCo as we know from previous testimony. There were no GrowCo-named bank accounts. And I had no authority or ability to direct the use of those funds is their conclusion.

And part of the complaint against me is that I had ability to do some of the things that occurred inside of Two Rivers to control them during the time frame when I think funds were potentially converted for the use of Two Rivers and in their farming, in their dam or raising of the dam, all of that. So that's my testimony.

THE COURT: Okay.

MR. MCKOWEN: The 1040 EGE 2022 is Exhibit 1040, is a FINRA arbitration by the identifying broker/dealer in -- in the documents that

have been presented so far as a broker/dealer who was the -- was a broker/dealer of record for the GCP-1 offering.

And FINRA, the same defendants in -- or the same plaintiffs in that case are releasers in the federal case and were investors in GrowCo partners 1, which is -- and the allegations that they make are similar to, if not, exactly like the allegations contained in the plaintiff's complaint.

And my point in bringing this to the Court's attention is to simply point out another tribunal, competent tribunal to determine whether or not those allegations relating to the -- one of the offerings completed the initial GrowCo offering, found the complaints to be true or not true. The claims to be true or not true as it relates to the GCP-1 offering.

THE COURT: This is 1040?

MR. MCKOWEN: Correct.

THE COURT: FINRA dispute resolutions services award?

MR. MCKOWEN: It's the -- yes. It's the results of the decision from the -- from the FINRA arbitration.

THE COURT: Plaintiffs's position?

MS. KIDD-AARON: We object based on relevance. This case does not involve the parties in this case and is brought under FINRA rules. This case is brought under the Colorado Securities Act.

THE COURT: Mr. Harding?

MR. HARDING: I have no objection.

THE COURT: 1040 is rejected on relevance grounds.

MR. MCKOWEN: I would like to introduce as an exhibit if it hasn't already been introduced, 1033. It is an exhibit that shows -- that comes from discovery from Wayne Harding about the ownership of TR Capital at the time.

THE COURT: 1033 is offered. Plaintiff's position?

MS. KIDD-AARON: We would ask that Mr. McKowen provide more foundation so we can better understand how this is relevant to this case.

THE COURT: Objection is foundation.

Mr. Harding?

MR. HARDING: I have no objection to this.

THE COURT: Objection is sustained. You have to establish more foundation, Mr. McKowen.

MR. MCKOWEN: Can I do that now?

THE COURT: Yes, you can.

MR. MCKOWEN: So we received testimony already in this proceeding that TR Capital controlled the operations of Two Rivers, that the TR Capital was the operating entity of Two Rivers.

And I think that we've listed the bank accounts over which flows, capital flows and money flows in and out.

And so I'm trying to identify, and it's a limited number of investors -- I'm trying to identify the ownership interest in -- in TR Capital to determine who had the ability to influence the actions of TR Capital.

And that's all that this is ownership interest in TR Capital, because I honestly don't know who inside of TR Capital, if there was a conversion of assets, who was responsible for making that happen.

THE COURT: So where did this document come from?

MR. MCKOWEN: It comes from the spreadsheet, name attention, whoever that is, Q and A's in cash TR Cap shares and ownership was provided in a discovery that Mr. Harding provided.

I added the percentages based upon groups that I know were associated with particular

individuals.

THE COURT: So did you prepare this document?

MR. MCKOWEN: I prepared for this testimony, I simply did the additions in the far right of the document. Everything to the left of that is -- was produced by Wayne Harding.

THE COURT: Plaintiff's position?

MS. KIDD-AARON: No objection, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No objection.

THE COURT: 1033 is admitted.

(Whereupon, Exhibit No. 1033 was admitted.)

MR. MCKOWEN: As I explained in the foundation, TR Capital was -- although there's quite a few numbers of investors out there, they are -- based upon my knowledge, controlled by four separate groups.

And they collectively represent 85 -- 88.15 percent of the ownership interest of TR Capital, and therefore they had the ability -- they had collectively had the ability to direct the flow of funds, and they should have had or probably did have managing members.

And I believe that Mr. Harding was a

manager of TR Capital after I left, but I don't know if he remained that way.

But the significance is that one of the key investors, large investors, one of the investors that could, as they say in the business, scratch a check for $3 million, and he did scratch a check for $3 million on a couple of occasions and collectively provided, it looks like in this, something in excess of $10 million and amounted to 56.57 percent.

And what's relevant is he is either the largest investor or one of the largest original investors in all four offerings.

And so for me, it's -- it's hard for me to believe that, knowing him as I do, and having had him invest inconsistently throughout this 4- or 5-year time frame, that he was -- but I don't know -- but that he was directing these -- this conversion of capital.

THE COURT: What's the date range that applies to this, to these ownership interests?

MR. MCKOWEN: It's TR Capital, and TR Capital was -- I think we have had evidence for its formation date and the purpose of this formation date. Because all of these -- these particular investments, I believe would have -- primarily were

made prior to my resignation.

He may have added to it afterwards, and that's one of the questions I have had and we kind of addressed that on the surface level. Were there capital raises by TR Capital after I left that were used for purposes and they could have been rightly used for purposes of fixing water and that sort of thing.

And so I would say for the most part, most of those -- most of those capital raises as it relates to water and farming and all that, were probably done prior to my departure and after Two Rivers was formed in 2010, so that would be the date range.

The other larger investment group is the 22.03, and that role associated with John McKran (ph) who has since deceased, I think within the last two or three years.

And I, in contact through my e-mails that I send out and inform investors what is going on. I am in contact. And one of the people that is a beneficiary or a trustee of these funds receives that information as well.

In fact, when I send out, he's usually, even though he's on the West Coast -- I send out send

receipt and read receipt, and he's nearly always one of the first ten or so who acknowledges he's received it and read it.

I think it's -- I've been informed by Mr. Harding that the -- that TR Capital controls GrowCo, Two Rivers, and that it financed the eviction of the tenants in GCP-1 that I previously testified to, had just begun effectively producing a steady stream of revenue.

And they started that action, I believe, in the picture that I showed was in November of 2017. I think they started eviction action in early part of 2018, which to me made no sense whatsoever.

Because they were starting to receive cash flow. And so in my effort to determine who -- who made the decision to evict inside of TR Capital or if it wasn't TR Capital, and that's going to be part of my calling of Mr. Harding to the witness stand. I wanted to just get out my ownership interest of TR Capital.

Has 1032 been admitted?

THE COURT: Yes, it has.

MR. MCKOWEN: Okay. I'd like to pull that up. BCS -- BCLS audit conclusions. BCLS is located here in Denver, and I was referred to them by John

Chanin, an attorney with Foster Graham Milstein & Calisher.

(Court reporter asked for clarification.)

MR. MCKOWEN: Slower? The lead attorney that I had was with a firm, and his name was John Chanin, C-H-A-N-I-N, and he was with the law firm of Foster Graham.

And he recommended Betzer Call Lausten & Schwartz to submit a report in connection with the alleged financial improprieties at GrowCo.

And he recommended that BCLS is a -- what we use as the name for the accounting firm. And they do forensic accounting, fraud investigation, economic damages, that sort of thing. And they seem to be very proficient in what they were doing, and they were also very expensive.

I was quoted originally a price of 35,000, and it ended up over $90,000.

MS. KIDD-AARON: Your Honor, may we take a brief recess for a restroom break?

THE COURT: Yes. We'll take a 15-minute recess. Mr. McKowen, you may step down. We'll be back at 3:30.

(Whereupon, a recess was taken at 3:17 p.m.)

(Whereupon, the proceedings resumed at 3:33 p.m.)

THE COURT: Mr. McKowen, you can come back up.

Back on the record 21CV33922. All parties and counsel are present. Mr. McKowen is giving his sworn statement, direct examination, still under oath.

MR. MCKOWEN: So the accounting professionals that they used at Betzer Call, BCLS, was Christina Cook. And the report regarding the use of royal funds seems to be well prepared.

It has a list of the capital raises, and I think that list has been used several times in testimony here to determine when and how much capital was raised during or for a particular note offering.

I would just add to the GCP-1 offering was $3 million, but an additional one million in assets or some cash was contributed by TR Capital.

And she goes through her entire analysis. And this is not an audit report as I have listed in the -- in the title of this exhibit.

It is an initial report with conclusions and analyses. And I'd like to speak to those conclusions because it confirmed my suspicions or

heightened my suspicions regarding the conversion of capital or which conversion of capital. And so it's one, two, three, four, five, six pages in and it has the beginning of its conclusions.

And conclusions are that first GrowCo raised 18 -- 955 -- 105 (ph) thousand in seven capital raises from December 14th to September of 2017.

Second, GrowCo spent 8,859,610 on the construction of one greenhouse, partial construction of another greenhouse, and financing and management of the tenants. And I think that that is accurate as well .30- a net amount --

(Court reporter asked for clarification.)

THE COURT: Mr. McKowen, why don't you shuffle the binders around so you're facing forward and not -- you seem to be facing away or moving the microphone. Your back is to everybody else in the courtroom.

MR. MCKOWEN: Okay.

THE COURT: Can you put your computer on the corner there and just face forward towards the reporter?

MR. MCKOWEN: Third, in the amount of 5,500,000 was transferred to GrowCo and Two Rivers,

and it's subsidiary entities were paid by GrowCo on behalf of Two Rivers.

Fourth, that there are certain offsets. And fifth, our analysis thus far Two Rivers owes GrowCo 4,227,894.

And coming to those conclusions, it's easy for me to follow along, but there are some discrepancies that she mentions that are offsets that she says at the time of the writing of this report have not been accounted for.

And that that six of the 12 transactions totaled 83,844, to total 398, and the offsets that she felt weren't sufficiently explained somewhere in here were approximately $6 million.

My point is simply that I would like, and I've been demanding since as early as late 2016 that it appeared to me that there were funds being used that belonged to GrowCo that were used for farming, which was my most visual recognition of why and how was this going on, because the farming activity down there to support Dioniscio Farms was millions of dollars each season because they were shipping truckload after truckload of cabbage along the Front Range. And for the development of salads. It had been a longstanding contract.

So for me, I didn't receive explanations hardly at all, just denials that the funds were spent inappropriately.

And to this day, I haven't received an explanation that counters my theory based upon me looking at some of the data spreadsheets that I finally did get my hands on, that there was a -- an amount that was determined to be G&A, general and administrative expense, that was way beyond the expense associated with the G&A of GrowCo.

There were maybe three professionals in the office, and contrary to what the previous accounting report said, I don't know of anybody that doesn't get paid a salary inside of any of these entities if the fact you're working eight to ten hours a day and your time spent on it is -- is at least, maybe 40, 50 percent order to GrowCo.

And so you can't come up with a number as relates to salary. You can come up with numbers that maybe get there, if, in fact, you're capitalizing the interest expense that apparently you can do with real estate projects. I'm not an accountant. I don't know if that's accurate or not accurate.

It probably would have been one of those questions that I would have asked Wayne as the audit

was being developed or analysis, what is this a million plus or 2 million plus.

The other day we bounced around a million 3, a million 6, a million 7.

And I would like just like -- I'm open to the concept of capitalization of that interest is standard in -- in the build-out of real estate assets.

I want to know if it's -- was the same amount that was presented in the pro forma. I want to know that it was authorized, and I want to know if, in fact, it was those funds were used to, as an appropriate part of the build-out of GCP-1, if any of that was used for the finishing of GCP-1. Or if it was used for GCP-2, there should have been some sort of deed of trust, some shares with a potential preference, even though it's debt, some equity ownership perhaps in those entities, and that never occurred as far as I know.

And so I'm not saying that a hundred percent there was a conversion, but if those things can't be answered sufficiently, then -- then they need to be, and I still have yet to have a layman's visualization, interpretation of saying this money came from GrowCo raise. You may not see it,

Mr. McKowen, but the numbers are there.

And the big part of that is potentially the interest expense associated with a -- the development of real estate. And even according to Mr. Rome, who more specialized in that sort of financing indicated that that was a legitimate use of funds if it was indicated, and it would -- the payment of interest, prior interest, would not be a Ponzi scheme as I had raised in my comments to them in the summer of 2016, but I'd like to see that.

So that's all I have with that. I think I may be close to wrapping up. Did we already go through this? I'd like to present 1022, 1023, 1024, 1025 and 1026. They are statements that were recorded at the time. Signed at the time -- dated.

I would like to offer them as exhibits that would demonstrate my suspicions about Aaron Van Wingerden were accurate. Have I offered that and has it been rejected?

THE COURT: 1022 through 1026 have not been offered.

MR. MCKOWEN: I would like to offer those as contemporaneous statements made at the time when the theft was going on by people who are like Russ Coppock was being --

THE COURT: Mr. McKowen, you're going to have to do them one at a time. So -- unless there's no objection to admitting all of them at this time.

MS. KIDD-AARON: There is an objection, Your Honor.

THE COURT: Start with 1022.

MR. MCKOWEN: Actually, I like to start with 1021.

THE COURT: Go ahead.

MR. MCKOWEN: 1021 is a statement by -- we paid for the hiring of a security guard, and the security guard -- a security guard was at the facility 24 hours a day. And in order to gain access to the facility, you would have to get past the six-foot mode (ph).

THE COURT: Mr. McKowen, let me stop you. This is a statement that Kurt Marscheider, M-A-R-S-C-H-E-I-D-E-R, prepared; is that correct?

MR. MCKOWEN: Right.

THE COURT: It strikes me as hearsay. Plaintiff's position?

MS. KIDD-AARON: We object on the grounds of hearsay, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: I'm okay with the admission.

THE COURT: Right. 1021 is rejected. It's a short paragraph, Mr. McKowen, and I was reading it while you were describing it, and it's clearly hearsay.

MR. MCKOWEN: And just so I understand, Your Honor, so I don't keep repeating this mistake. Hearsay is a document that is lacking in what?

THE COURT: Hearsay is an out-of-court statement offered in court for the truth of the matter asserted.

MR. MCKOWEN: Okay. That kind of raises some other questions, but let's just move forward.

THE COURT: So just so you know. This is a typed statement by Kurt Marscheider?

MR. MCKOWEN: Yes.

THE COURT: Obviously he's not here in court. He's not testifying to observing these things. He just wrote a statement, apparently gave it to you or somebody else and now you're coming into court asking to introduce his statement, and that's hearsay. That's classic hearsay.

The defense -- I'm sorry -- the plaintiff would have no opportunity to cross-examine Mr. Marscheider regarding the accuracy of what he says because he's not here to testify.

MR. MCKOWEN: So would an --

THE COURT: Nor would Mr. Harding.

MR. MCKOWEN: Would an affidavit that is signed regarding that suffice?

THE COURT: No.

MR. MCKOWEN: Would he actually have to come to court and testify?

THE COURT: He would have to come to court.

MR. MCKOWEN: And just so I don't get caught in a spiral loop of what the hell -- and what is the difference between that and the statement that isn't even sworn to by Greg Harrington?

THE COURT: Has a statement by Greg Harrington been admitted into evidence?

MR. MCKOWEN: It's part of the order of a dismissal. It's the stipulation.

THE COURT: I don't remember if he objected to it or not. I can't remember that testimony, but I know that this is hearsay.

MS. KIDD-AARON: Mr. McKowen admitted that, Your Honor.

THE COURT: Without objection or one of his own exhibits?

MS. KIDD-AARON: He admitted as one of his exhibits, stipulation.

THE COURT: And you didn't object?
MS. KIDD-AARON: No.
THE COURT: So that was a stipulated admission, in fact?
MR. MCKOWEN: I don't know.
MS. KIDD-AARON: You did so so that you could talk about what you thought was worthy incorrect statements. And you did it the day that you had Connor printing out documents on your behalf because it was not part of the exhibit list that we agreed to.
MR. MCKOWEN: I --
THE COURT: Hold on. I don't -- we don't need to get into an argument about why am I admitting one exhibit and not -- 1021 was offered and rejected as hearsay.
MR. MCKOWEN: We'll take that up with them later. All of these statements are similar. None of these people have appeared in court and testified.
THE COURT: I understand that with regards to 1021. You want to offer other exhibits and go through them or do you want to withdraw or not offer any additional exhibits?
MR. MCKOWEN: Is there any value to the Court, any value to me in having the Court reject the

exhibits if we know that they're all statements signed, one of them has an affidavit, but they're from the time period, and none of these people, as far as I know, have appeared before the Court.

THE COURT: Exhibit 1022 is an out-of-court statement from Tim Beall. Exhibit 1023 is an out-of-court statement from Russ Coppock, C-O-P-P-O-C-K. Exhibit 1024 is a statement from Burt Block (ph). 1025 is a statement from Klint Kane. K on both of those. 1026 is a statement by Bill Wilson. Are those the exhibits that you're referring to?

MR. MCKOWEN: Yes, Your Honor.

THE COURT: Having just looked at them as I was calling off the numbers, they look to be out-of-court statements.

If you want to offer them and have me rule on the exhibits, I am. I don't know if there's an exception. You're asking me to just look at exhibits that haven't been offered yet. And to give you an opinion or give you a statement as to whether or not they would be admissible, that's not the Court's role to do that.

If you want to offer them and let the other side make objections, if you want to provide any

testimony to try to establish foundation or hearsay exception, you can do that.

MR. MCKOWEN: Well, if I can offer the statements and provide some foundation and see if there's an exception available to the hearsay rule.

But -- or if at this point in time, if I were to get any one of them to testify remotely, do I have the ability to do that at this late date?

THE COURT: Plaintiff have a position on that?

MS. KIDD-AARON: I guess it would be plaintiff's preference not to do that, but if Mr. McKowen is able to do so within the time frame that we've allotted for this case, we would allow it.

THE COURT: So here's the deal. We're at least a day behind. I don't have any confidence we're going to pick up any pace here in the next day or two.

We're scheduled through the end of next week, which is longer than what the plaintiff suggested. We cut it down from three weeks to two weeks.

If you think you can get any of these witnesses --

MR. MCKOWEN: I do.

THE COURT: -- and complete their testimony in a timely manner and allow Mr. Harding to call the witnesses that are already on the order of proof. Because none of these witnesses are on the order of proof. So we're modifying the order of proof, but we're not going into the third week. I do not have the ability to go into a third week.

MR. MCKOWEN: I definitely can get them. I'm about to wrap up, and are we expecting a cross that they think is going to be an hour -- and so...

THE COURT: And then you intend on calling on Mr. Harding. Mr. Harding intends on providing a sworn statement. We're already through Monday at that point, so...

MR. MCKOWEN: I don't think we'll go into a third week. I would be surprised if I couldn't get, depending upon the length of Mr. Harding's testimony and that, that I couldn't get one or two of these people, the key people to give testimony within that time frame.

And the testimony would be relatively quick from my standpoint is, do you remember this statement that you wrote? Did the events occur, and do you stand by that statement?

THE COURT: They can't just adopt the

hearsay statement. You can't just show them an out-of-court statement and say, Is this your statement, and is it true?

It's still a hearsay statement. If you want them to testify, they have to testify to all these events here in court so they can be subject to cross-examination.

MR. MCKOWEN: Could they do it remotely?

THE COURT: I don't hear the plaintiff objecting to doing it remotely.

MS. KIDD-AARON: No objection, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No objection. Also, I think you called it the order of proof. I do have Tim Beall as a potential witness, so it is on there.

In terms of my testimony, I anticipate no less -- I anticipate no greater than two hours or maybe even an hour. I want to get to the point where people want to cross-examine me, whatever that time frame is.

THE COURT: Okay. All right. So to wrap up, I'm not admitting any additional exhibits at this time. You're not offering as far as I can tell. I rejected 1021.

The other exhibits all appear to be

hearsay. If you want to spend time now trying to introduce them, you can. If you want to move on to other topics, you can.

You need to confer with plaintiff's counsel about additional witnesses that you may want to add to the order of proof, and confer how you can get your witnesses, Mr. Harding's witnesses, and any rebuttal witnesses done next week.

MR. MCKOWEN: I will talk to Mr. Harding and I will talk to plaintiff's counsel.

I think I'm done for now.

THE COURT: Cross-examination?

MS. KIDD-AARON: Yes, Your Honor.

Your Honor, do you mind if I ask if we plan to go to five today?

THE COURT: Yes.

MS. KIDD-AARON: If I go a few minutes over, if I have like ten minutes past five, would that be okay?

THE COURT: I mean, frankly, I think we should be done by five. Everybody here is going to be here next week. We're not trying to finish up a witness, so we don't have to bring him back. I think everybody would appreciate it if we get done by five.

MR. MCKOWEN: I have no objection.

MS. KIDD-AARON: Thank you.

CROSS-EXAMINATION

BY MS. KIDD-AARON:

Q. Mr. McKowen, at the beginning of your testimony, you discuss your belief that there was a time bar to this case. C.R.S. 11-51-602 (ph) is the statute under a -- regulatory injunction action under the Colorado Securities Act. Do you see any time bar in that statute?

A. I don't have the statute in front of me. Do you have a copy of it?

Q. It says:

"Whenever it appears to securities commissioner upon sufficient evidence satisfactory to the securities commissioner that any person has engaged in or is about to engage in any act or practice constituting violation of any provision of this article or any rule or order under this article, the securities commissioner may apply to the district court of the City and County of Denver to temporarily restrain or preliminarily or permanently enjoin the act or practice in question."

A. That -- I understand that. I'm referring to claims for damages.

Q. Okay. And damages section, under 602, 6022:

"The securities commissioner may include in any action authorized by subsection (1) of this section, relating to any violation of section 11-51-301, 11-51-401, or 11-51-501, a claim for damages under section 11-51-604."

A. Okay. Does that speak to any time bar related to fraud involving securities claims?

Q. So you also made reference to Two Rivers use of capital that you believe was inappropriate, correct?

A. Yes.

Q. We previously discussed that you were deposed on January 9, 2023, under oath, correct?

A. Yes.

Q. Okay. And you also acknowledged in your testimony today that Two Rivers' bank accounts were used for GrowCo, correct?

A. Two Rivers' bank accounts were used for GrowCo, but were identified as GrowCo, internally identified as GrowCo.

Q. So Two Rivers accounts were used for GrowCo, correct?

A. Correct.

Q. And after the water business did not provide enough operational -- enough for operations, the farming business did not provide enough operations, GrowCo was created to support the operations of Two Rivers, correct?

A. I don't think so. I think it's -- it was formed to develop a business that could generate cash flow, and that that cash flow, if sufficient, a portion of it would belong to Two Rivers if it created the cash flow or if services were provided by Two Rivers relating to necessary overhead that GrowCo needed, that they could provide that services and be compensated for that.

Q. Mr. McKowen, in the interest of time, can you answer the question I'm asking you? So I'm going to ask again. Was GrowCo created to support the operations of Two Rivers?

A. No.

Q. Was GrowCo where investments were put into Two Rivers' accounts to enhance the price of Two Rivers?

A. No.

Q. Did you own shares of -- during the early inception of GrowCo, did you own shares of GrowCo?

A. At the first inception of GrowCo, I personally did not own shares of GrowCo.

Q. You did not own shares of GrowCo because your motivation was to increase the share price of Two Rivers?

A. My motivation to own -- I don't know. I don't even know what you're asking.

Q. I'm sorry?

A. No. I don't even understand the question.

Q. Your motivation was to do -- to enhance the value of Two Rivers' shares?

A. No.

Q. Okay. Do you have your deposition transcript?

A. I do not. I need to plug in my computer cord.

MR. HARDING: Your Honor, can I take a quick, like, five-minute break?

THE COURT: Take a five-minute recess.

MR. HARDING: You can continue on. I could catch up.

THE COURT: No. You need to be in here for all the testimony, and we can get Mr. McKowen's

laptop plugged in.

(Whereupon, a recess was taken at 4:08 p.m.)

(Whereupon, the proceedings resumed at 4:11 p.m.)

MR. MCKOWEN: Question, if I can repeat it.

(Court reporter asked for clarification.)

THE COURT: You have to be on the microphone, Mr. McKowen.

MR. MCKOWEN: And can you disconnect -- can you repeat the question because it scrolled up, and I can't retrieve it. I can only guess at it.

Q. (BY MS. KIDD-AARON) I said, so your motivation was to do whatever you needed to do to enhance the value of Two Rivers' shares.

A. Within the constraints of it being legal, yeah. That would be my job to enhance the value of Two Rivers' shares.

Q. And because -- that was because you owned shares of Two Rivers or owned shares in Two Rivers?

A. No. Enhancing the value of Two Rivers' shares is a goal that benefits everybody, and that was my goal.

Q. Okay. So you were deposed on January 9th, January 9, 2023, under oath, correct? Correct

Mr. McKowen?
A. Correct.
Q. Please turn to page 74.
A. (The witness complied.) I'm there.
Q. Okay. Please go to line 24. It says:
"It would have been unusual at that stage" --
Excuse me, this is you speaking.
"It would have been unusual at that stage for me to have an individual ownership interest in GrowCo other than through Two Rivers, I believe."
I asked you:
"Okay. And why is that?"
You responded: "Why is that?"
I responded, "Uh-Huh."
And your response was:
"My motivation is Two Rivers is the public company. My motivation is to do whatever enhances the value of Two Rivers because I own shares of Two Rivers."
A. Okay.
Q. Did I read that correctly?
A. Yeah. You read it correctly.
Q. Okay. And so then the Two Rivers' bank

accounts were used to enhance the share prices of Two Rivers?

A. No.

Q. Okay. So please go to page 75, line 9.

A. (The witness complied.)

Q. I asked you:

"Okay. So how does" -- how is you owning shares of GrowCo deter from that goal?"

And your answer:

"I don't own -- at that stage, I don't own shares of --

I responded: "Right."

So I guess I'm trying to figure out why, in your mind, are those incompatible, you owning shares of GrowCo, Inc., and Two Rivers and enhancing the value of Two Rivers?

A. Your response:

"Because Two Rivers owns that -- there's a side of people who are going to be the operators, Tim and Aaron, I wanted to incentivize them if the value cash flow, when generated, comes to Two Rivers, it's -- it becomes -- it enhances the value, the book value, earnings per share. If they occur, that sort of

thing, of Two Rivers, and that's sufficient."
Did I read that correctly?
A. Yes.
Q. You also spoke to -- during your testimony skill set of creating new businesses, correct?
A. Yes.
Q. Specifically to C capital as your specialty, one of your specialties?
A. To provide early stage capital, yes.
Q. Along with providing that C capital -- let me rephrase.
In providing that C capital, you did not always adhere to the appropriate regulations, correct?
A. That's incorrect.
Q. Okay. So...
A. That's incorrect.
Q. So did you always hire licensed parties to raise capital for you?
A. I -- I believed at the time, and still have some belief, although it's refined, that it was permissible to use promoters to raise capital.
Q. Unlicensed promoters?
A. Unless it's a promotor or a finder.

Q. So finders and promoters are not subject to the securities laws of the State of Colorado?
A. No. I'm not saying that at all.
Q. So you use unlicensed parties to raise capital?
A. I believed it was legal to -- to use finders and promoters to raise capital.
Q. So, yes, is the answer, you used unlicensed parties to raise capital?
A. Yes.
Q. And that includes Jan McCaffrey, George McCaffrey and Chris Kim (ph)?
A. Yes.
Q. And they were compensated based on that capital they raised?
A. Yes.
Q. And you didn't disclose you were using unlicensed parties to raise capital to investors?
A. I think that we did, because we filled in on our Form Ds, the funds paid to finders on some of them.
Q. Okay. Were investors directed to the Form Ds?
A. No. But any --
Q. Were the names of the parties, the

unlicensed parties, listed on the Form Ds?
A. No.
Q. You state, stated in your testimony that you presented investors with the information they needed to make informed decisions.
And you also stated that you did not commit fraud because it was not your intention to commit fraud, correct?
A. That's correct.
Q. Okay. And under section 11-51-501 of the Colorado Revised Statute:

"Fraud and other prohibited conduct includes to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made; not misleading..."

A. Okay.
Q. So that includes material, misrepresentations and material omissions?
A. Okay.
Q. Mr. Rome testified to the definition or his opinion of the definition of materiality. So I would ask you about, did you make any disclosures to

investors about the laws related to public companies and their involvement of marijuana-related companies?

A. Rome testified to the definition of or his opinion of the definition of the materiality. So I would ask you about did you make -- did you identify disclosures to investors about the laws related to public companies and their involvement with marijuana-related companies? Yes.

Q. Did you make disclosures to investors about your lack of understanding of marijuana laws?

A. Not specifically.

Q. Did you make disclosures to investors about your noncompliance with marijuana laws?

A. I don't believe that I did not comply with marijuana laws.

Q. Did you make disclosures to investors that Dioniscio F, Two Rivers F-1, and Two Rivers F-2, might also be using the Two Rivers' bank accounts designated for GrowCo?

A. That's the bank accounts that were used, that those bank accounts were escrow accounts for GrowCo.

Q. Did you disclose to investors that those accounts may also be used for Dioniscio, Two Rivers F-1 and Two Rivers F-2?

A. I don't know why you're saying Dioniscio F-1 and F-2.

Q. Do you not understand the question?

A. Yes. I don't understand the question.

Q. Okay. Did you make disclosures to investors that the GrowCo bank accounts that were actually Two Rivers' bank accounts designated for GrowCo, were also used for Dioniscio, Two Rivers F-1 and Two Rivers F-2?

A. Is that the case? I don't know. I don't know if that's what happened.

Q. Okay. You can turn -- again, we're going to look at in your sworn testimony from your first deposition, if you could turn to page 81.

A. (The witness complied.) Okay.

Q. On page 89, I asked the question:

"Okay. So did the farms Dioniscio F-1, F-2 or under their umbrella of TR Capital, did they have separate bank accounts from the ones that were designated from GrowCo?"

Your response is:

"I think so."

I said:

"Okay. But you're not sure of the money

that was designated GrowCo was going into the accounts for GrowCo, Two Rivers, or into other accounts?"

"No. I'm sure they went into what they were designated to GrowCo accounts -- "

Sorry.

A. So I'm saying that you're asking me...

Q. One moment, Mr. McKowen.

I'm going to withdraw that question in the interest of time.

In the later offerings, did you disclose to investors that you had trouble repaying the $4 million notes and the interest payments related to the $4 million notes?

A. What do you mean by later offerings?

Q. For the $7 million and $2 million notes, you did not disclose that GrowCo had issues paying the principal and the interest payments related to the $4 million note?

A. I don't recall that the principal payment amounts were due at that time. But I believe that when I -- I believe that when I resigned --

Q. Okay. Mr. McKowen, you did not disclose that the interest payments were not paid timely for the $4 million note?

A. Well, you're asking me the time frame.
Q. I'm not.
A. Is there a time frame associated with the 7 million and the 2 million?
Q. Were they after the $4 million note?
A. When was the disclosure for the 7 million and the $2 million notes, when --
Q. The presentation that you gave in August of 2016 was for the $7 million. You disclosed to the investors that there were problems paying interest for the $4 million note from 2015.
A. At the time that the 7 million and the $2 million note were being offered, I don't know that -- that the notes were not current.
Q. Okay. So I'm going to take that answer as no. For the VitaNova offerings, did you -- you did not disclose to investors that you participated in the $4 million note, the $7 million note and were part of the failure for those notes?
A. What do you mean by "I participated"?
Q. You did not disclose to investors that the bankruptcy that you filed was defaulted under the $4 million note, $7 million, both of which you participated in?
A. Again, what do you mean by participated?

Did I invest in it, or do you mean, was I part of the sales of those notes?

Q. Mr. McKowen, you were the CEO for the $4 million note. You solicited for the $7 million note?

A. On the front end.

Q. And the front end, yes. When you were and you are supposed to disclose material information, you did not disclose?

MR. MCKOWEN: Your Honor, I need to think about and answer and not be interrupted in my answer.

So let me see if I understand the question correctly from you.

Did I -- was I a person who sold the $4 million note and was responsible for the sale of the $4 million note? Yes. 100 percent.

Was I responsible for the sales of the $2 million note, which I think occurred in February of 2017?

Q. (BY MS. KIDD-AARON) Mr. McKowen, that is not my question.

A. Then I can't answer it. I don't know what you're asking me. You asked if I participated in a $2 million note, and I responded, do you mean that I assisted in the sale of the $2 million note, or was I

an investor in it? And if I was, when was that presentation participation made, and if it was in February of 2017, no, I was not participating in that note.

Q. Mr. McKowen, I said $7 million note, and I think the date was August of 2016. It's a presentation that Mr. McMahon testified to, and your McGrow agreement was separate.

A. Are you done?

I'd like to answer your response to the $2 million note. You asked me about the $2 million note as well, did you not?

Q. Mr. McKowen, I'm going to move on.

You did not disclose to investors that you were the tenant of Johnnie Cannaseed, correct?

A. I was never --

Q. Or -- excuse me. I'm sorry. The tenant GCP-1 through Johnnie Cannaseed?

A. I was never the tenant of GCP-1, because I could not get a license.

Q. Okay. We have reviewed Exhibit 25, which is a lease agreement between GrowCo, Inc., and Johnnie Cannaseed, which is admitted into evidence.

Did you not disclose to investors that when the subtenant could not pay the rent or the lease

price, that Johnnie Cannaseed was actually responsible and not paying the lease, correct?

A. When I --

THE CART PROVIDER: Could you repeat the question, please. This is CART.

MS. KIDD-AARON: Sure.

Q. (BY MS. KIDD-AARON) I said, you did not disclose to investors that you were the tenant, and when the subtenant did not pay the lease, you were responsible for paying the lease and also did not pay?

A. After I was denied the marijuana license, I entered into a new agreement with GCP-1, where I would be able to re-lease, sublease the GCP-1 -- 2, a licensed marijuana grower. If that's your question, did I do those things, the answer is yes.

Q. No. That was not my question.

You did not disclose to investors that you attempted to circumvent the marijuana laws by signing a private agreement to purchase marijuana license, correct?

A. That is a boldface lie.

Q. You did not disclose the reasons that you were denied a marijuana license by MED, correct?

A. That is not correct.

Q. You did not disclose to investors that you were denied a license because you violated the statute by submitting applications that did not set forth sufficient information for the SLA to make its decision as to whether a state license should be granted, correct?

A. I disclosed to investors that I did not -- was not able to obtain a license.

Q. You did not disclose to investors that you were denied license because you grew, cultivated, transferred, and sold retail marijuana without a license between March 4th and April 18, 2016?

A. That's another boldface lie.

Q. You did not disclose that you had financial and direct interest in Suncanna and did not disclose that Johnnie Cannaseed applications, eviction litigation proceedings between GCP-1 Suncanna for the filings of Suncanna, in your application, despite the clear and comprehensive request, you disclosed all such matters, including litigation and financial interest, correct?

A. I never owned any interest in Suncanna. That's another boldface lie.

Q. You did not disclose to investors that you unlawfully exercised privileges reserved for licenses

when they themselves, when you yourself was not a license holder, correct?

A. Your predicate to these questions are statements of what you are alleging, and they're not correct.

Q. I am reading your denial from the MED.

A. And I am telling you that that is what they printed and that is their final decision is not accurate.

Q. And you did not disclose any of their reasons for their final decision to investors, correct?

A. No. I did not present that to the investors, I don't believe. I just said my license was turned down.

Q. You did not disclose to investors that the Two Rivers wanted to resign your conflicts of interest related to your involvement in the marijuana industry, correct?

A. I did not -- I disclosed, not only did I disclose to the Two Rivers' board and GrowCo board of the potential conflicts of interest. I spearheaded the potential conflicts of interest that would occur if, in fact, I became license, and I would have did that, too, as part of my disclosure duties to the

board.

Q. So you did not disclose to the investors that the GrowCo board wanted you to resign because of conflicts of interest?

A. The GrowCo board did not force my resignation.

Q. You did not disclose to investors the investigation by the Two Rivers of the board?

A. It wasn't -- I was not the one that decided not to do that. We went through that yesterday, and the decision not to disclose to the investors through a Form D was made by someone other than me.

Q. You did not make that disclosure to McGrow investors, correct?

A. I don't know -- I believe I probably did. It was only five or six investors in McGrow, and I talked to them extensively about what the plan was going to be to help service the tenants; that's what was the purpose of McGrow.

Q. You did not disclose that investigation to the VitaNova investors, correct?

A. Is, do you mean, V-I-T-A-N-O-V-A?

Q. I mean any of the VitaNova entities.

A. Well, there's several different VitaNova entities. One's V-E-T-A. One is V-I-T-A, and

there's LLCs, and there's incorporated, and I repeatedly disclosed everything necessary for them to be fully informed.

Q. You did not disclose this investigation to the VitaNova investors, correct?

A. I disclosed everything to the V-E-T-A-N-O-V-A investors, and that was -- the license was denied in 2017, '18, and V-E-T-A-N-O-V-A is an entity that didn't come into being, I think until 2022.

Q. Mr. McKowen, I'm asking about the investigation?

A. Okay. The investigation in 2016?

Q. Yes.

A. Okay. They -- the investors knew all about the denial of the -- of the license, and the investigation that was done was instigated by --

Q. Mr. McKowen, that's not my question.

THE COURT: Hold on. Let him finish.

Finish your response, please.

THE WITNESS: The investigation by the SEC, which came back as no -- that they weren't going to pursue no action letter. I did not make the decision about that. I wasn't on the board, and V-E-T-A, had not been even formed until five or six years later.

So I believe that every investor in V-E-T-A-N-O-V-A was fully aware that I was denied a license, and they were previous owners of GrowCo investments, so they were fully aware.

Q. (BY MS. KIDD-AARON) My question is about the Two Rivers investigation that resulted in a report saying that they wanted you to resign for conflicts of interest. Did you disclose that to any of the VitaNova entities?

A. They the -- that investigation was completed, I believe in 2016. And the decision to not publish that confidential memorandum was a decision made by the board at that time.

But the investors I had in V-E-T-A, N-V-A (ph), that that decision was circulated even though it was confidential and it's been testified to in the pleadings here that it was circulated amongst the investors.

Q. You mentioned Two Rivers or the SEC investigation, which is 1038. This letter is from March 28, 2018. You resigned from Two Rivers in May 2016, correct?

A. You mentioned the Two Rivers or the SEC investigation, which is 1038. I don't know what that means. This letter is for one, you resigned from Two

Rivers in May 2016. The sentence doesn't even make any sense to me.

Q. Mr. McKowen --

A. I have no idea.

THE COURT: Stop. Stop. Mr. McKowen, stop. Okay. You're reading from the CART interpreter's screen, and there might be some spelling that's not quite correct on that.

And while you're reading out loud, this court reporter is having to transcribe what you're reading to yourself.

So if you'll just wait on each other and let her ask the question and read it, and if you need her to restate it, she can, and Ms. Kidd-Aaron, if you let him respond, please, and do not talk over each other and please do not talk over me.

THE WITNESS: Okay, Your Honor.

THE COURT: Thank you.

Q. (BY MS. KIDD-AARON) Did you resign in May 2016 from Two Rivers?

A. I did?

Q. Did the SEC issue a letter in March 2018?

A. I believe they did.

Q. Is the letter that the SEC issued related to Two Rivers?

A. It is.
Q. Were you a part of Two Rivers in March 2018?
A. Was I part of Two Rivers in March of 2018? No.
Q. Does this letter say anything about you directly?
A. The SEC no action letter?
Q. March 2018 letter?
A. Is that the no action letter?
Q. It's the March 2018 SEC letter?
A. If it is the SEC no action letter and it was issued in March 2018, it does not say anything other than the SEC is not intending to pursue any enforcement action.
Q. Against Two Rivers, correct?
A. That's correct.
Q. Mr. McKowen, you testified that you have experience with reverse mergers, correct?
A. That's correct.
Q. Reverse mergers have a lower regulatory burden than initial public offerings, correct?
A. I don't know if that's true or not.
Q. There are fewer public disclosures, correct?

A. Fewer than what?
Q. Than initial public offering?
A. I think that part of the reverse merger requires -- it's a complicated process, and it has to be filed with the SEC and approved.
Q. The due diligence process is less for reverse mergers, correct?
A. Less than -- less than what?
Q. Initial public offerings.
A. There are many forms of initial public offerings. I think that as part of the due diligence process, we -- or part of the registration process, we had to complete a -- an SB2, I think. I will have to refresh my memory. And that is a public offering.
Q. There is less information available to investors in a reverse merger than initial public offering, correct?
A. I've answered that question, and SB2 is a public offering, and it has disclosure requirements, and I believe that the SEC that -- the SEC never approves an offering. They just stop commenting and say that they have no comments.
And so the SB2, I think, is what we used and it became effective.
Q. In your testimony you spoke a great deal

about Aaron Van Wingerden and his effect on the failings of the GrowCo entities, correct?

A. His effect and his impact on what we were trying to do, correct?

Q. Aaron Van Wingerden signed the MIPA in February 2016, correct?

A. That's correct.

Q. The GrowCo entities continued to raise money after that time, correct?

A. That's correct.

Q. And GrowCo entities continued to raise money to build greenhouses, correct?

A. Correct.

Q. You testified that the greenhouse was over budget and was supposed to cost approximately $4 million, correct?

A. The budget for building the greenhouse should have come in around $4 million, correct.

MS. KIDD-AARON: If we can pull up Exhibit 85.

Q. (BY MS. KIDD-AARON) In the fourth paragraph, it states the first greenhouse cost approximately $5 million to build, correct?

A. Is this the confidential summary?

Q. This is the GrowCo Partners Super Units,

LLC, offering is a confidential summary at the top?
A. And what are you asking me about?
Q. Paragraph 4, where it says, the first greenhouse cost approximately $5 million to build?
A. That's correct.
Q. And estimates that each additional greenhouse will cost approximately $5 million.
A. I believe that is correct.
Q. So based on your testimony today that the greenhouse should cost about $4 million, actually cost about $5 million, according to this document, the overrun was a million dollars, correct?
A. Correct.
Q. And as we have seen multiple times from BCLS report, the GrowCo entities raised almost $19 million in relation to building these greenhouses and supporting these greenhouses, correct?
A. No, incorrect.
Q. And only one greenhouse was completed according to --
A. 1-1/2 greenhouses were completed.
Q. You stated in your testimony that part of the fundraisers were to provide capital to marijuana growers, correct?
A. It was to support capital. It was raised

to build a greenhouse and support the licensed tenants and the greenhouses.

Q. And you also testified that you don't understand the Colorado marijuana laws, correct?

A. I did not say I don't understand the marijuana laws. I said that I understood it sufficiently to determine whether or not the -- we were engaging a licensed marijuana grower.

Q. Did you understand it well enough to know if you could provide capital to support marijuana growers?

A. According to what I understood was, according to our attorneys, it was proper for us to provide a loan to the marijuana growers, a reasonable loan to the marijuana growers, tenants.

Q. You stated in your testimony that there is a difference between fraud and failure. The GrowCo entities failed multiple times, GCP-1, $4 million note continued to fail. But you never provided the investors with full disclosures about the failures?

A. That's not accurate.

Q. $7 million note presentation, you did not provide those investors with information about the amendments that previous investors signed because the GrowCo entities were unable to pay interest payments?

A. I don't know if that's accurate or not. I don't know the dates that the amendments were signed.

Q. You did not provide investors with information about why your marijuana license was denied?

A. I provided the marijuana growers -- I provided the investors with information that I had been denied.

Q. You did not provide investors information that you had been disciplined by a regulatory agency for similar behavior in the past?

A. I was not required to provide that information.

Q. Did you not inform McGrow investors that you were not properly licensed to market and sell marijuana?

A. I did not market and sell marijuana.

MS. KIDD-AARON: If we can pull up, I believe it's Exhibit 11. If we can pull up Exhibit 61, please.

Q. (BY MS. KIDD-AARON) I'm reading the large paragraph in the middle of the page, and in the middle of that paragraph:

"We even have the wholesalers champing at the bit to sell them the product. As

with the flower, we sell out all product each week on our McGrow Marketing website, bestbud.net."

You said that in your testimony you were a generalist and you look at anything that you can understand, correct?

A. Correct.

Q. You testified previously that you did not understand the marijuana laws. Today you're testifying that you did understand the marijuana laws enough to know what you could do, correct?

MR. MCKOWEN: Your Honor, I'm representing myself, and so do I -- am I able to represent myself as if I'm the attorney for myself and object to some of her questions?

THE COURT: Yes. You can object.

MR. MCKOWEN: I'm objecting to her making statements and not even waiting until I reply and talking over me and, even after you admonished her to not do that. And I'm trying to comply with what you're asking.

So we spent a lot of time yesterday on this very -- on this e-mail. And all of the questions associated with this e-mail have been asked and answered.

THE COURT: Sustained to asked and answered.

MS. KIDD-AARON: Okay.

THE COURT: At least on that question.

MS. KIDD-AARON: I asked another question so I don't know if you want me to ask it again.

THE COURT: Will you ask it again? I'm not sure either of the question.

Q. (BY MS. KIDD-AARON) You said in your testimony that you were a generalist?

A. Yes.

Q. And you work on anything you understand?

A. Yes.

Q. Your testimony regarding your understanding of marijuana law has been inconsistent?

A. Is that your testimony of you?

Q. Has it been inconsistent?

A. Okay. Has it been inconsistent? No. I don't think it has.

Q. You testified today regarding Tim Beall. And the reason -- sorry. Let me rephrase.

You testified that you hired experts related to things that you don't understand, correct?

A. I testified if I was going to get into an industry that I wanted to be involved with, that I

would look to find operators and managers of that industry that had demonstrated the ability to operate the business effectively.

Q. And you testified that that's why you hired Tim Beall?

A. That's why I hired Aaron Van Wingerden and Tim Beall.

Q. And you fired Tim Beall because you did not think that he was an expert because he grew plants too large?

A. I fired Tim Beall because he caused the entire greenhouse full of crop to be destroyed.

Q. Because the plants were too large?

A. No. Because the plants developed spider mites, which is a common affliction to plants, and it makes the flower and the oil that you would try to develop with that worthless.

Q. And that the plants should only be about 4 feet tall according to the Kwesells?

A. I observed at the Kwesell's greenhouse that their plants were significantly less. And I asked them why are your plants so small or so not as large.

He said I need to be -- Rich Kwesell said, I need to be able to inspect the plants individually, and because they are smaller, I get more growing

cycles in the season. That's what I said.

THE COURT: Ms. Kidd-Aaron, how much time do you have left?

MS. KIDD-AARON: Your Honor, I can stop.

THE COURT: Okay. All right. Mr. McKowen, you can step down. We will finish the cross-examination of Ms. Kidd-Aaron on Monday morning.

MR. MCKOWEN: Okay.

THE COURT: And Mr. Harding will have a chance to cross-examine you and then rebuttal you can make a final sworn statement.

MR. MCKOWEN: Okay.

THE COURT: And before I forget, I need to have the original Exhibit 1042, which you probably have, Mr. McKowen, maybe over on your table.

If we can get that, we will make a copy of it. We'll give one to the court reporter and we will upload it into our file on Monday morning.

If you can hand it to Kaitlyne. Does that have Exhibit 1042 written on it, Mr. McKowen?

We can just make a copy of that and give it to Ms. Mendez before she leaves.

All right. If the parties confer over the weekend, and Mr. McKowen adds some witnesses to the

order of proof by agreement, if the parties can submit an amended order of proof, I would appreciate it.

Part of my concern is, and frankly I should have raised this on Monday when you gave it to me.

Is Mr. Harding's witnesses there is no estimated time for direct. There's estimated time for cross-examination but nothing about direct.

And right now just based on what is left of Mr. McKowen's witnesses and then Mr. Harding's witnesses without direct time is, I think a little over 16 hours of testimony which is a little over two days. And so if we're adding witnesses, I would like to know what the parties are thinking as to whether all testimony can be completed.

So I know we're scheduled through all next week. It sounds like we'll probably be done with testimony Wednesday.

We can do closing if you want to do closing in court or if you want to do written closing, we can talk about that as well.

But if you want to do closings in court, I would think we would be doing that Wednesday, maybe Thursday. But I just want to make sure that the parties are in agreement to a large extent about

finishing testimony next week.

MR. MCKOWEN: I have a question.

THE COURT: Go ahead.

MR. MCKOWEN: What does closing mean?

THE COURT: Closing argument.

MR. MCKOWEN: Okay.

THE COURT: You understand what the closing argument is?

MR. MCKOWEN: You summarize your case and try to consolidate what you think is relevant and present it to the judge.

THE COURT: Correct.

Mr. Harding?

MR. HARDING: Your Honor, my list -- I forgot what you call that list. The only one because of all of them were tentative.

The only one that I was planning on calling was based upon the progress here was Mike Harnish. That will take probably his presentation, my questioning an hour.

I do have Tim Beall as a potential witness on that, but the other ones, I don't need to call at this point in time. That could change, but at this point in time...

THE COURT: I'm not going to hold you to

that. It's on the order of proof right now. I just want the parties to talk and confirm with each other and add your direct time in there and if there are additional witnesses, add them onto the order of proof.

And Mr. McKowen, if you intend on calling those witnesses by WebEx, and it sounds and again there wasn't an objection by the plaintiff, if that changes, you can let me know on Monday morning.

But assuming there is no objection, you need to make sure they how to WebEx into the courtroom. And if there's any documents that they need as part of their testimony, you're going to have to e-mail it to them before they testify.

MR. MCKOWEN: Okay.

THE COURT: Mr. McKowen, you asked I think, any questions you had? Mr. Harding, any further questions from you?

MR. HARDING: No further questions.

THE COURT: Any issues for the plaintiff before we recess?

MS. KIDD-AARON: No, Your Honor.

THE COURT: So we will start Monday morning at 8:30. Mr. Harding?

MR. HARDING: This can may be off the

record. What can we leave here or what do you recommend we take home?

THE COURT: We can go off the record.

WHEREUPON, the within proceedings were adjourned at the approximate hour of 5:07 p.m. on the 14th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, THERESA L. MENDEZ, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 204 pages herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 3rd day of August, 2023.

My commission expires September 21, 2025.



Theresa L. Mendez, RPR
Registered Professional Reporter
and Notary Public

| | |
|---|---|
| DISTRICT COURT, CITY AND COUNTY OF DENVER, STATE OF COLORADO<br><br>1437 Bannock Street<br>Denver, Colorado 80202 | ^FOR COURT USE ONLY^ |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>vs.<br><br>TWO RIVERS WATER & FARMING COMPANY, et al.,<br><br>Defendants. | Case No: 21CV33922<br>Courtroom: 259 |

REPORTER'S TRANSCRIPT
July 17, 2023
VOLUME VI

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Courtroom 259, Denver, Colorado 80202, on Monday, July 17, 2023, at 8:34 a.m., before the HONORABLE CHRISTOPHER J. BAUMANN, District Court Judge. These proceedings were reported by Theresa L. Mendez, Registered Professional Reporter and Notary Public for the State of Colorado.

A P P E A R A N C E S

APPEARING FOR THE PLAINTIFF:

ROBERT W. FINKE, 40756*
First Assistant Attorney General
JENNIFER H. HUNT, 29964*
Senior Assistant Attorney General
INDIA KIDD-AARON, 48420*
Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Tel: (720) 508-6401
Fax: (720) 508-6037
Robert.Finke@coag.gov
Jennifer.Hunt@coag.gov
India.Kidd-Aaron@coag.gov

APPEARING FOR THE DEFENDANTS:

JOHN McKOWEN (Pro Se)
335A Josephine Street
Denver, Colorado 80206
john@johnmckowen.com
(303) 248-6883

WAYNE HARDING (Pro Se)
22586 E. Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

ALSO PRESENT: Jennifer Reynard, Paralegal to Plaintiffs
Brian Keener, Assistant Attorney General Fellow
Kaitlyne Hernandez, Law Clerk
Connor Muelken, Division Clerk

**REPORTER'S TRANSCRIPT - VOLUME VI - July 17, 2023**

I N D E X


| | PAGE |
|---|---|
| JOHN MCKOWEN | 5 |
| CONTINUED CROSS-EXAMINATION BY MS. KIDD-AARON | 6 |
| REDIRECT EXAMINATION BY MR. MCKOWEN | 58 |
| WAYNE HARDING | 102 |
| DIRECT EXAMINATION BY MR. MCKOWEN | 102 |
| CROSS-EXAMINATION BY MS. HUNT | 183 |
| REDIRECT EXAMINATION BY MR. MCKOWEN | 188 |
| MICHAEL W. HARNISH | 195 |
| DIRECT EXAMINATION BY MR. HARDING | 196 |
| CROSS-EXAMINATION BY MS. KIDD-AARON | 205 |
| CROSS-EXAMINATION BY MR. MCKOWEN | 208 |
| REDIRECT EXAMINATION BY MR. HARDING | 218 |
| EXAMINATION BY THE COURT | 221 |

| EXHIBITS: | ADMITTED |
| --- | --- |
| 1042 | 10 |
| 2006 | 50 |

P R O C E E D I N G S

THE COURT: Okay. Back on the record in 21CV33922. All parties and counsel are present. Anything from plaintiff before we get started.

MS. KIDD-AARON: No, Your Honor.

THE COURT: Defense.

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. McKowen.

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding.

MR. HARDING: No. I was just reading what he said. I couldn't hear him.

THE COURT: Okay.

MR. HARDING: No, Your Honor.

THE COURT: All right. Thank you. All right. Mr. McKowen, I think we're still on your examination. So you're welcome to come back up and I will swear you in.

Whereupon,

JOHN MCKOWEN,

the Defendant having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: You may be seated. We are on continued cross-examination of Mr. McKowen by the plaintiff.

CROSS-EXAMINATION (continued.)
BY MS. KIDD-AARON:
Q. Good morning, Mr. McKowen.
A. Good morning, Ms. Kidd-Aaron.
Q. I want to talk to you a bit more about the bank accounts for the GrowCo entities. Were there four bank accounts with Wells Fargo?
A. I'm not certain. I think there was more than four.
Q. Okay. More than four for the GrowCo entities?
A. As defined in -- in the complaint, yeah.
Q. Okay. Did each offering have its own bank account?
A. I'm not certain about that.
Q. So were multiple offerings being deposited into the same bank account?
A. I'm not certain about that either.
Q. So --
MS. KIDD-AARON: Jen, if you would play clip 56?
(Video played in the courtroom.)
THE COURT: I'm not requiring the court reporter to transcribe what's being played on the screen.

And, Ms. Kidd-Aaron, I should ask: Is that okay with you? Do you have any objection to that?
MS. KIDD-AARON: No, Your Honor.
THE COURT: Okay. Mr. McKowen.
MR. MCKOWEN: No, Your Honor.
THE COURT: Mr. Harding.
MR. HARDING: No, sir.
THE COURT: Thank you.
Q. (BY MS. KIDD-AARON) So Mr. McKowen, does that help? Do you remember if there were multiple offerings going into the same account?
A. Again, I'm not certain to that. Can I ask a question?
Q. Sure.
A. Is this the testimony -- or my deposition?
Q. Yes.
A. Is there a -- a page that I can turn to?
Q. 228.
A. Maybe this will refresh my memory. It starts on page 228?
Q. Yes.
A. Okay. Which line? 19?
Q. Four.
A. Four. And you're referencing 4 through 9; is that correct?

Q. Yes.

A. Okay. So what I would say is, again, I'm not certain about it. I -- in this -- my testimony here, I'm just saying I would bet you'll end up -- in the -- funds initially ended up in one of these accounts.

Q. Okay.

MS. KIDD-AARON: And so Jen, can you play the video again?

(Video played in the courtroom.)

THE WITNESS: And so can you restate your question? Because I'm not sure what you're asking me.

Q. (BY MS. KIDD-AARON) If multiple offerings went into the same bank account of the investor funds?

A. And again, I'm -- I think the proper answer is no. But I still can't answer it with any specificity. Because I'm stating I bet you the funds ended up in one of these accounts, not the same account.

Q. Okay. So here you say, "Yeah. And I bet" -- do you see that?

A. Yes.

Q. Okay. Did GCPSU have its own bank account?

A. No. I don't think so.
Q. All right. I'm going to move on to Exhibit 1042. This is the e-mail/agreement that you offered into evidence on Friday.
A. Okay.
Q. So in relation to the Orlando Reservoir Number 2, LLC?
A. Can you give me an opportunity to --
Q. Sure.
A. 1042, and it's on a...
Q. Yes.
A. I'm sorry. In my book, I don't have a 1042. Was it presented here in court?
Q. It was.
A. Okay.
THE COURT: Do we have a 1042, Theresa, on your desk? It looks like we have it.
We'll upload that today.
MS. KIDD-AARON: Can you pass that to Mr. McKowen, please?
THE COURT: And that says 1042 on it. Right, Mr. McKowen.
THE WITNESS: It does.
THE COURT: Make sure we get that back so we can upload it into the court file.

MR. MCKOWEN: I will.

(Exhibit Number 1042 was marked for identification.)

Q. (BY MS. KIDD-AARON) Okay. Mr. McKowen, this appears to refer to the Orlando Reservoir Number 2, LLC; is that correct?

A. That is correct.

Q. Do you own the Orlando Reservoir Number 2, LLC?

A. No. It's currently owned by Two Rivers, I believe.

Q. Does the Orlando Reservoir Number 2, LLC, have any assets besides the reservoir?

A. The Orlando number two LLC, as far as I know, has not just the reservoir, but it has water rights that allow the -- the owner to divert water off the Huerfano River and into the reservoir as a separate right.

Q. Do you currently have the right to dispose of the reservoir and the water rights?

A. No. I don't.

Q. Okay. And if you can turn to Plaintiff's Exhibit 126. So the second to last page. It's page 50.

A. (The witness complied.)

Q. Mr. McKowen, plaintiff's exhibit?

A. Just one second, please.

Has this -- has this exhibit been approved by the Court?

Q. Which exhibit?

A. This 1026.

Q. 126. Plaintiff's exhibit.

A. Second to the last page?

Q. Yes. It should be the accredited investor questionnaire.

A. Okay. I have that in front of me.

Q. So we've spoken a little bit about this questionnaire. Is this the same questionnaire you used or the GrowCo entities used for all their offerings?

A. Basically. There's some that may be somewhat different.

Q. What would those differences be?

A. I can't tell you off the top of my head.

Q. So here you were referring to the Securities Act of 1933, correct?

A. The questionnaire, yes.

Q. And that is to define the accredited investor?

A. It is to define an accredited investor,

certifying, is what we said.
Q. And the accredited investor definition you are -- or this document is relying on, is income; is that correct?
A. Income and assets. And specifically foreign entity as compared to an individual.
Q. And there are no questions about knowledge or experience related to the financial industry, correct?
A. Related to the financial industry, that's correct.
Q. Are there any accredited investor forms that do ask about experience in the financial industry?
A. Yes.
Q. Can you tell me which one?
A. In this particular instance, I believe, he invested in the exchange notes. And so we would need to pull up the exchange note purchase agreement.
Q. Okay. I am not sure you answered my question so I'm going to re-ask it. Are there any accredited investor forms that ask the investor about knowledge and experience in the financial industry?
A. Yes.
Q. And it is attached to the -- sorry?

A. Attached to the what?
Q. Where would I find that document?
A. In the -- in the purchase agreement for the $7 million note.
Q. So this is the purchase agreement for the $7 million note?
A. No. This is the -- is -- is an accredited investor questionnaire.
Q. If you go to the first page of the document?
A. Yes.
Q. Is there another place where that questionnaire might exist?
A. It's a -- it's a -- as with this accredited investor qualification questionnaire, it's just one of two things that we do, although Mr. Rome said that only the financial condition is currently the test.
But we made a decision as a company that we were going to ask questions specifically or make them attest to the fact that they had the sophistication and knowledge to evaluate the investment, and that's contained in the security purchase agreement.
This isn't the security purchase agreement. This is just a thank you letter, if you will.
Q. Okay. So the questionnaire only asks about

financials?
A. This questionnaire?
Q. Correct.
A. But we decided as a company, even though we knew that the current requirement was just as it relates to their financial condition, which Mr. Rome testified that that was sufficient, and he thought it was a mistake in the industry to not ask about the sophistication. And I think you've heard me say -- talk about the sophistication of investors as well in my testimony.
And so we decided to add it to the security purchase agreement statements that they would need to make in order for them to -- to qualify for the investment.
Q. Okay. So the question I'm asking, though, is about -- you're saying that in the agreement, one of the reps and warrants was about sophistication?
A. Yes.
Q. Okay. But in your questionnaire itself there was no questions about sophistication?
A. Not in this particular questionnaire, which is the current industry standard. Our duty is to find out -- we developed -- our attorneys developed this questionnaire. We decided that as a matter of

policy, that the -- this -- this questionnaire is not sufficient.

And so I believe the -- the statute or Mr. Rome testified to the statute doesn't require an attestation as to the knowledge and -- and understanding that the investor may have about the -- the investment, but, again, we -- we decided to include it in the security purchase agreement where they would make that attestation.

Q. So there is a distinction between sophistication and an accredited investor, correct?

A. We think it's important, and so we wanted to know that.

Q. So there's a distinction?

A. Not according to what Mr. Rome had to say, but we wanted to know.

Q. So "yes," there's a distinction?

A. Yes.

Q. And based on Mary Loughran's testimony, do you believe she's a sophisticated investor?

A. Not my conversations with her here, but she made the attestation in the security purchase agreement.

MS. KIDD-AARON: Thank you. No further questions.

THE COURT: Thank you. Mr. Harding, any questions on cross-examination.

MR. HARDING: I do, sir.

CROSS-EXAMINATION

BY MR. HARDING:

Q. Good morning, Mr. McKowen.

A. Good morning, Mr. Harding. Give me one second, please.

(Court reporter asked for clarification.)

THE WITNESS: I was just commenting that I needed to get in the cockpit here, and make sure that I'm doing what I'm doing now, and that's to be able to address you directly and have the -- the exhibits in front of me.

Q. (BY MR. HARDING) During your testimony, you -- you stated money was taken. I think you referred to the overcharge of G&A and produced other items. Was that -- do you remember that?

A. Yes.

(Court reporter asked the parties to speak louder.)

Q. (BY MR. HARDING) I'm sorry. Go ahead. About more definition about money was taken or overcharged G&A and used for other items?

A. Yes. I said that.

Q. Okay. Can you give us more detail on why you think that or what evidence you have?

A. Based upon the information that we were operating off of, and my own experience in -- in going down to the greenhouse on a regular basis, meaning maybe once every one or two weeks. I could see that crops were being put in by Dionisio and -- and so I knew that or I believe that that's not in the use of proceeds, and so that was the initial prompting or suspicion that came to me.

And then we ran out of funds, and it didn't seem conceivable to me that we had run out of the funds that should have come in to Two Rivers from the capital that was being raised.

Q. Were you aware, Mr. McKowen, of loans that were made by individuals including myself, to help fund the crop at the Dionisio Farms and produce?

A. At the time I didn't know of them.

Q. Okay. Given that, do you want to change your answer about Dionisio or where the funds came from in terms of crop inputs?

A. I would need to see that, because I know that -- that the Dionisio Farms, each summer cost -- I would estimate that -- that the expenses of -- associated with farming which, I believe, we were

required to provide to him, exceeded a couple million dollars.

Q. So if you --

MR. HARDING: First of all, would you go to Exhibit 129? 1029. Sorry. And bring that up on the screen if you could.

Q. (BY MR. HARDING) You notice that there's --

A. Just one second, please. Just one second. Okay.

Q. You notice throughout the document, if you page through it, there's handwritten notes. Do you know who made those handwritten notes?

A. Yes.

Q. Who was that person?

A. I honestly don't know.

Q. Okay.

MR. HARDING: Maybe page through a couple more. Maybe it will come to you. Okay. There's another one. I can't read it from here. I don't have it in front of me. But can you read that handwritten note? What does it say?

THE WITNESS: "SEC issued. JRM needs to file form four on these transcripts."

Q. (BY MR. HARDING) Looking at the large view

of that handwriting, do you now recognize it?
A. I would only be guessing.
Q. Would it surprise you that perhaps that would be my handwriting?
A. No.
Q. Okay.
MR. HARDING: Let's go to Exhibit 1038, the SEC no-action letter. Next page.
Q. (BY MR. HARDING) As far as you were aware, I think you might have testified to this --
A. Hold on, please.
Q. Okay. Sorry.
A. That exhibit is 1032. And did you say go to 1038?
Q. I thought it was 1032.
A. I think it's 1038.
Q. Oh, I'm sorry. I correct myself. 1038. You're correct. The SEC no-action letter.
A. Yes. I'm there.
Q. And based upon your past exposure with the SEC, filing numerous documents and everything else. And I think you had mentioned, like, for registration statements or whatever, they never really comment on something. They just -- they stop commenting or they say no further comments?

A. They -- they say we have no further comments, whether it's an S-1 registration statement, a Reg A registration statement, an investigation. I've never seen a document that approves or disapproves a document.

It's either continue to answer their comments, or they then -- or that ends up in a no-comment letter and you're either effective with the registration statement or the investigation potentially has gone away for that moment.

Q. Okay. After this letter or several years before that letter, was there any other SEC involvement rather than just the standard, maybe, review that they have to do in Sarbanes-Oxley every three years? Is there anything you're aware of that the SEC had any further actions against Two Rivers?

A. Yes. But it was a predecessor of Two Rivers.

Q. Correct. I mentioned in my question, five years before this, was there any other SEC action?

A. In the time period that is the time period designated by the plaintiff before this complaint, no.

Q. Okay. What is the date of the letter?

A. The date of the letter is March 19, 2018.

Q. Do you -- do you remember a conversation that we had at the beginning of 2016 about a notification of the SEC review?

A. I do, but I cannot -- I can't speak to the specifics, but I knew that they were going to conduct a review. An investigation, I think, a formal investigation, I think.

Q. To the best of your memory, it was like early in 2016, right?

A. I believe so.

Q. Okay. And then this letter is dated March 2018. It seemed like it's a two-year time difference?

A. Yes. It could be three. Depends on where.

Q. It seems like, in your opinion, it probably took a lot of time to review documents if it -- if it was two years. Do you agree?

A. Yes.

Q. Thank you. What is your understanding of the exceptions as it relates to the State of Colorado and offerings?

A. Our attorneys have provided the basis for -- or the legal basis for how we should go to market and raise the capital. And I believe what they -- I remember Marc Johnson always asking me --

or us, generally, when we were talking to him about these sort of things, we would talk to him together.

And he would ask: Is this going out to only accredited investors? And my response was always yes. The investors are always accredited investors and -- and that an exemption exists based upon 506C. And that he would prepare -- excuse me -- the documents that way.

Q. Okay. So based upon your understanding at the time of legal advice, you didn't think that a filing with the state was necessary based upon the advice that we got?

A. I can't say that the advice did not say to file with the state, a notice. And -- but I subsequently learned that not only does the Form D need to be found -- filed federally, you need to file it with -- you can file it and it will go out to all states if you do it through a NAASA organization, the organization of securities something. But it needs to go to the state and the fee needs to be paid.

Q. Let's go back, briefly, to the SEC letter. Are you aware -- I think you answered this. But after this letter, was there -- are you aware of any other SEC actions or requests for information from Two Rivers, TR Cap subsidiaries?

A. Uh-huh.
Q. Okay.
MR. HARDING: Let's pull up Exhibit 1032, please. BCLS report. Can you highlight the --
THE WITNESS: Just one second. Just one second. I'm there.
MR. HARDING: Can you highlight the first subheading in the two paragraphs?
THE WITNESS: The first subheading is nature of the engagement -- nature of the engagement. Is that what you're referring to?
Q. (BY MR. HARDING) Okay. It's on the screen or you can read it from your document in front of you or can you read it here to me. Can you read me the nature of the engagement?
A. Okay. Nature of engagement.
Q. I'm sorry. There are two paragraphs.
A. Compensation and qualification.
Q. Could you read the paragraph that starts with "this engagement"?
A. "This engagement has been conducted in accordance with the Statement on Standards For Consulting Services promulgated by the American Institute of Certified Public Accountants and, as such, constitute -- constitutes a transactional

service.

Accordingly, this engagement does not constitute any type of attestation service including, but not limited to, an audit, review or the application of agreed upon procedures, nor does it constitute a compilation.

In addition, this engagement is based on our oral understanding of the nature and scope and limitations of services to be provided. We were -- we were not engaged to, nor did we perform, an audit of the financial information or schedules included in this case. This report is intended solely for the information and use by you and your clients." (As spoken.)

Q. Okay. So a lot of questions here. Let me start with, I believe that you were in or present when the plaintiff's expert accounting witness gave testimony?

A. I was.

Q. Do you remember the conversation we had about different levels of attestation?

A. Yes.

Q. And do you remember those three levels?

A. Vaguely. I can try to summarize it.

Q. Let me ask it in a question.

We talked about -- did we not talk about the three levels? The first is the lowest level of attestation, compilation. The next one is review. And the best way to get an independent third-party opinion on the proper disclosure of all financial information is through an audit. Do you remember that?

A. I do remember that. And I know that that's the process that we have used in production of any financial statements that we -- that we would release to the public, and that if we did otherwise, and signed that Sarbanes-Oxley statement, they'd probably come and put us in jail.

Q. Okay. So it's your understanding that quarterly your 10-Q filings have reviews done by the auditors, and every year an annual audit done?

A. Correct.

Q. When that annual audit was done, was there -- was it a clean opinion in the last two or three that I was involved? In other words, was there any subjectivity to that opinion or additional statement in that opinion?

A. I -- I don't think I understand what you're question is.

Q. I will pass on that question. We'll see

that opinion later.

MR. HARDING: Let's go down to -- they mention clients.

Q. (BY MR. HARDING) Who are your clients? If it's still up there in the last paragraph. Can you read that? I think you already read that. So clients. I'm confused. What are clients?

A. I -- the letter is to John Chanin at Foster Graham Milstein & Calisher, and they're addressing it to him and they're saying that this information is solely -- this report is intended solely for the information and use of John and his firm, and me, the client.

Q. How do you define "clients"?

A. I think it speaks for itself. I hired Foster Graham to represent me in -- at this point in time, in this case. And the reason they were talking to Betzer Call Lausten and Schwartz was because I asked them to. Explained to him that we needed to get an outside person to take a look at these numbers.

Because at the time, in December of 2018, it probably was first quarter of 2018 or so. Prior to that, prior to my returning back to GrowCo, which is in -- which was in October of 2017, we were not

getting the responses to questions about the use of proceeds.

Q. Did you -- I think you shared this report. We'll get back to that. But it seems like there should only be solely used information to you and your clients. And -- but before we get there, did you read the entire report?

A. I probably read it a hundred, if not more, times.

Q. Okay. All right. Fair enough. And would you consider -- let me put it this way: Did you send this report out?

A. To -- to different people? Investors?

Q. Yes, sir.

A. I did.

Q. How many?

A. I probably sent it to all of the investors in the GrowCo entities.

Q. Anybody else?

A. I don't know. I can't remember who else I might have sent it to.

Q. Okay. Now knowing what you know, do you still fully agree with this report?

A. Now knowing what I know, I would say that there are explanations regarding the journal entries

that I'm willing to listen to and be convinced that it's not -- it's not all of what needs to be understood about the use of proceeds.

Q. Okay.

MR. HARDING: We can -- if we can get rid of that blowup window. And let's page down through the report, please. So toward the back of the report --

Keep going to the exhibits, please. Keep going. Keep going. There's a listing of exhibits. There it goes. Stop there, please. Thank you.

Q. (BY MR. HARDING) So I remember giving some of this information to your auditor. Never heard back from them. But you provided them information to them, too. This is a list of their exhibits. You might want to look at your hard copy.

A. I'm going there. So I remember giving some of this information to the auditor.

Q. Say again what you said?

A. I was repeating and trying to understand your question. Can you ask it again?

Q. Well, there's a list of exhibits that they used to compile this report. And I -- I recognize maybe a page, maybe a half a page of stuff that came from me. I'm just -- I guess the other exhibits came

from you?
A. That could be.
Q. Bear with me. I'm pulling it up on my computer so I can read it better.
So in the list of exhibits -- I'm going to pick up here. So the first page, don't you agree the first page looks like a bunch of stuff that came from us and they reviewed it? First page of exhibits. Exhibit B. I'm sorry.
A. It's hard for me to say where they -- who -- it's hard for me who gave that to them. And so I'm -- I couldn't attest to who provided the information to whom.
Q. Okay.
MR. HARDING: Let's go down to Exhibit B. And let's go to page 8.
THE WITNESS: I'm there.
Q. (BY MR. HARDING) Okay.
MR. HARDING: About seven or eight lines down, on page 8, Exhibit B. Why don't you just highlight those areas starting with the Bates, four lines down, and maybe highlight the next 20 lines. You don't have to be precise. Okay. Whatever. All right. Well, do you know who a Bates -- do you know who Bates replaces?

THE WITNESS: I do now, I think.

Q. (BY MR. HARDING) Okay. Who is Bates? Do you know? Because I -- I never saw all the exhibits. I only saw a list, so I'm just kind of guessing. Well, who's Bates?

A. I don't -- I don't know. I -- I was going to say Bates, that it was a Bates numbering system, but I don't know who Bates is.

Q. Okay. EarthKosher, did we ever do business with a company called EarthKosher to the best of your knowledge?

A. I don't recall.

Q. Okay. Bais Ben-Zion. Seven exhibits. Did we ever do business with a Bais Ben-Zion?

A. No. Not that I can recall.

Q. How about Rabbi Blech?

A. Rabbi?

Q. There's a Rabbi Blech and a Rabbi Blech invoice there?

A. Oh. Blech. Your German's not very good. I don't know. I honestly don't know.

Q. Okay. What about kosher inspection? I think they mean inspection. Were you -- were you doing anything kosher wise? There's several different exhibits there that they looked at.

A. The only thing I can guess is that -- is that maybe they were looking at bills that were paid to -- through Two Rivers for -- that -- that Dionisio may have paid because they may have had a product that was sold to the processor that they used that put all that together. But I'm just guessing. I don't know who those people are. I don't know what -- what it is.

But having a Rabbi and kosher and those sort of things seems to be connected to something.

Q. How about Dover, Mr. B? Do you know anybody who you think you ever did business with, Dover, Mr. B? This is on the page -- top of page 9 now.

A. Dover, Mr. B doesn't ring a bell.

Q. Okay. Now, to my Jewish friends in the audience, I apologize. I'm going to get this one wrong too, but how about Mashgichim of Nepal? One, two, three, four of those.

(Court reporter asked for clarification.)

MR. HARDING: M-A-S-H-G-I-C-H-I-M of Capital N, E-P-A-L.

That doesn't ring a bell to you?

A. No. But it consist with what you previously said.

Q. Okay. How about Oregon kosher?
A. Say again?
Q. Doesn't ring a bell?
A. Oregon kosher? No.
Q. What about the Aleia's Inspection?
A. I don't know.
Q. Okay. Oh, my gosh. There's a bunch of Bais Ben-Zion at the bottom of page 9 into page 10, all the way through page 10, all the way down to two-thirds of page 11. Do you see that?
A. Yes.
Q. How many -- approximately how many invoices are that?
A. I don't know.
Q. Would you say at least 50?
A. I can count them, but I don't know. 50 would seem like a good enough.
Q. It is a good number. It's over a page, almost two pages. I would think -- wouldn't you think that it would be -- if this was with Bais Ben-Zion, and we had 50-whatever invoices here that they inspected for this report, wouldn't you think that it would stick in your mind who that person or company is?
A. In my two -- I think, two years of farming

that we did with Dionisio, and bills were paid through Dionisio, then it's conceivable, but I cannot speak to it.

Q. Okay. How about Sholom Yehuda Mostofsky?

MR. HARDING: Okay. We'll spell it out if you want me to. S-H-O-L-O-M, next one Yehuda, Y-E-H-U-D-A, next one is Mostofsky M-O-S-T-O-F-S-K-Y. Ring a bell?

THE WITNESS: No.

Q. EarthKosher ring a bell?

A. No.

Q. Zushe Blech? That's the last third of page 12. Ring a bell?

A. Zushe Blech invoices.

(Court reporter asked for clarification.)

THE WITNESS: I don't know.

MR. HARDING: Just a minute. I'm looking up the court reporter, what you said. Just give me a second.

I will spell it for you. Sorry.

THE WITNESS: I can spell it.

MR. HARDING: That would be great.

THE WITNESS: Z-U-S-H-E B-L-E-C-H.

Q. (BY MR. HARDING) Oregon kosher. That's listed on page 14. Ring a bell?

A. (No verbal response.)
Q. Are you waiting for my question? Because I think I gave you a question. The name is EarthKosher. Does it ring a bell?
A. No, it doesn't.
Q. Okay. China Inspection? China Inspection. Does that ring a bell?
A. What page are you on?
Q. Well, I'm on page 15 toward the bottom, China Inspection and Ethiopia Inspection. Does that ring a bell?
A. China Inspection. None of those ring a bell.
Q. Okay. So you would think that you would know if we're doing business in China, you as CEO, and we ordered an inspection or something. I'm just assuming you've never seen these documents before besides this report?
A. My comment would be, that, no, I wouldn't expect that I might know who, if, in fact, it was a bill presented to Two Rivers for farming relating to Dionisio Farms that I never knew who the end client was regarding the shipment of cabbage.
I know -- accept that he shipped it to a processor in Colorado Springs and other places, but

primarily Colorado Springs, and that that process, that processor and others were his major clients. And so who they then subsequently sold to, I don't have any idea.

Q. Okay.

A. That's not something I would have need -- needed to know as the CEO. I knew that he could grow cabbage like crazy down there and we got pictures relating to that. And where it went after it went off his farm, I don't know. And what expenses he had associated with that, I don't know. I just know that we -- it seemed like us paying in the millions of dollars for the -- for the growing and -- and processing of the cabbage and other crops that he grew.

Q. Would the name Taylor -- sorry. Would the name Taylor Farms ring a bell as one of the big buyers of produce from Dionisio Farms and Produce?

A. Yeah. Yes. I believe that's the one that was in Colorado Springs.

Q. And there was one, I think, in Tulsa at one time. I was kind of freaked out because they had a shooting there or something. I forgot what the name was. Do you remember that name?

A. I recall that one of his clients was in

Oklahoma. Yeah.

Q. Right. But it wasn't, like, Bais Ben-Zion, was it?

A. I mean, just logically looking at it, he clearly -- we -- we agreed to pay for the expenses associated with the farming. And we were to be reimbursed when this -- when the product was sold.

This could easily have been an expense of -- of his that the -- of Dionisio Farms, that he paid. Because in order to sell, he might have had to -- and if, in fact, the clients were producing kosher food, then not knowing everything about the requirements of kosher food, I know some because I grew up on Long Island -- spent three years growing -- growing up -- growing up on Long Island in a Jewish community.

And -- and used to -- well, it used to be the only place my friends and I would do sports was at the Jewish Community Center, and I got to know some things about that.

And I think one of the -- one of the requirements in kosher food is, you have to have a Rabbi do some inspection or blessing or something like that. So it's not inconceivable to me, but I do not know that those were the specifics of the

transactions with Dionisio Farms.
Q. Page 18 of exhibits. These are all the invoices -- sorry. Page 18 of exhibit. These are all the invoices from Bais Ben-Zion, a lot of them. But you were not involved enough to know them as --
A. That's correct.
Q. Okay. Did you or do you know of anybody that flew to Salt Lake from LAX?
MR. HARDING: Let's look at page -- page 19 toward the top. Pull it up. That's fine.
THE WITNESS: 19? Page 19?
Q. (BY MR. HARDING) Yes.
A. I'm there.
Q. Okay. I blew it up for you. It's close to the top, right after Ben?
A. Okay.
Q. Did we have business in Salt Lake City? Looks like somebody left from Salt Lake City to L -- LA airport. Is that the way you read July 17th?
A. I -- I have no knowledge about what that might be.
Q. Okay. How about Korea.pdf?
A. Where is that now?
Q. Go down a little bit further down.
A. I see it. Korea.pdf.

Q. Yeah. I'm sorry. You didn't -- you didn't answer?

A. I have no idea what that is.

Q. I think you're getting the point. But let me go one last way.

MR. HARDING: And down a little bit further, middle of the page, kind of long -- get rid of that. A long PDF.

Q. (BY MR. HARDING) Contractual analysis report grammar corrected. What the heck is that?

A. Where are you looking?

Q. Middle of the page. Right there in front of you.

A. Contractual analysis report grammar corrected. Sounds like a -- I don't know what that is.

Q. Mr. McKowen, on this Exhibit B, would it be safe for me to say that there's a lot of stuff we didn't know where it come from? We don't recognize it or you don't recognize it?

A. That would be fair.

Q. Okay. Would there maybe be errors in the exhibit?

A. There could be.

Q. And if there's errors in the exhibit,

you're going to still trust the report?

A. I'm going to trust BCLS report based upon the recommendation from the attorney who recommended them to me, and I subsequently looked to see what sort of credibility BCLS had in the community. And -- but I wouldn't -- I wouldn't have -- the -- the report doesn't seem to be predicated upon or makes statements associated with certain things.

Q. So we heard, I think, on Tuesday morning from Mr. Rome that he's not a back checker. He's just looking at information given by one side.

And in that, he -- do you remember -- do you remember that -- that discussion?

A. I do.

Q. Where it went. There's a lot of things under discussion. But do you remember the discussion about he wasn't quite sure what the term sheets said?

A. Yes.

Q. And do you remember that we pulled up every single term sheet that was in the offering, and every single term sheet -- and I have quotes if you want to go back to them. And every single term sheet said something to the effect of, for operations, general administrative expenses, that type of thing. Every single term sheet. Do you remember that?

A. Yes.
Q. Okay. So in the report, BCLS, can you show me in the report where general and administrative overhead is shown in this report?
A. It doesn't say.
Q. It doesn't say. Okay. So it could be very well that perhaps, they didn't even look at general administration expense allocation?
A. Who's "they"?
Q. "They." BCLS, I guess.
A. I would find it -- it could be that, but I think that that would be unusual for BCLS not to look at those things. But I don't think that that was what they questioned.
Q. So really, it was only a partial scope. They didn't look at the term sheet and tied it into the authorized expenditures including G&A?
A. Yeah. And I have a problem -- yes. And I have a problem with the overall process of the -- of that expert witness and -- and its process, how that whole thing was developed and -- and how it was presented.
The term -- the term sheet clearly states that, you know, on every term sheet, that this is just a term sheet and for discussion purposes, not

the -- not the contract.

Q. Okay. Refresh my -- so you cannot point to a place where they accounted for G&A in that report in the spreadsheets they had?

A. I don't know what the journal entry that was made, and I think they said there were only 12 of them, with one big one that was 6 million. I -- I don't know what the journal entry was referring to, and -- and that's the question that I have, whether it -- whether it contained G&A or whether it contained, you know, every legitimate expense in the world.

But the -- the report says it was unexplained to them, and -- or they couldn't account for it. And so my -- it generates -- generated significant concern for me, and I wanted to know, of the funds that were spent, who authorized the expenditure, and if it was spent on something other than what was said in the use of funds, what -- what did -- did the investors get for the use of their funds?

Q. Did they ever tell you that they tried to reach out to me to explain any entry they might have a question with, such as that $6 million, which by the way, was a deconsolidation entry? Did they ever

tell you that they asked for information from me, additional information, not the initial information?
A. I don't recall that, but I would have expected it.
Q. Okay. Would it surprise you to hear after they got all my information, they never contacted me again?
A. I don't know.
Q. Okay. And you took this report, and I think you testified -- how many people did you send this to?
A. Probably whatever, whatever number of investors we had.
(Court reporter asked for clarification.)
THE WITNESS: Whatever the number of investors we had. And I wouldn't say it was 40. There's like a hundred-and-something investors that I communicated with regularly.
Q. (BY MR. HARDING) Okay. And do you know those investors, when you sent it out, did you say, okay. This is -- you're my client. Please do not disburse this based upon my agreement with BCLS?
A. I -- I feel like there's a conflict of the -- of the contract with my duty to inform the investors.

Q. Right. But were you aware that any of that was rebroadcasted when you sent it out to your investors, that this is for internal purposes only, as it says in the first paragraph of the BCLS report?

A. Yeah. I mean, I read it and I can read it again to see if it's -- you know, if what you're saying is accurate. But just like with anything that we -- being in the business, we know that our first duty is to our investors. And so if something has come to a grinding halt, I have a duty to let them know.

Q. Okay. So you did not --

A. That, in my view, supercedes any contract.

Q. Okay. So --

A. They never complained.

Q. But the question was do you know if it was rebroadcast? And, I guess, the more particular question is when you sent this report out -- let's just call a hundred-and-something people clients. When you sent this out, did you tell them not to distribute it?

A. I don't know if I did or didn't.

Q. Okay. Based upon your testimony, are you now having thoughts and questions about this report?

A. Yeah. I have a lot of questions about it

and they're fundamentally the same.

I don't know what money was used for what regarding the use of capital, but I was questioning it from 2000, 2000 -- late 2016 on. And I think part of what we're sitting in this courtroom for is, let's account for that money.

Q. Were you given a copy of the Two Rivers' board internal audit report -- or I didn't call it audit -- internal report. Yeah. Look at what this report said, and what they thought, the board, actually happened. Did you not receive a copy of that?

A. I probably did. You'll have to tell me exactly which report you're talking about.

Q. Well, Mr. McKowen, I don't know off of the top of my head. And Mr. Harnish comes to testify, he may talk about that report. Maybe it will jog your memory. But I don't know where I can bring the report up now.

A. I would welcome that.

Q. Okay.

MR. HARDING: It's under my exhibit list. And I gave you access to drive.

THE CLERK: I just need to know what number.

MR. HARDING: What's that?

THE CLERK: What number?

THE WITNESS: Your Honor, I'm going to get up to go find my copy or a copy of the -- Harding's exhibit list?

THE COURT: Okay. That's fine.

THE WITNESS: I will wait until he has a specific.

MR. HARDING: It's under exhibit -- I sent you -- I thought that you guys received this, Exhibit 2001, 2002?

MS. HUNT: Which number are you wanting us to pull up? What number?

MR. HARDING: It's Exhibit 2006. Okay.

THE COURT: Just give us a moment while Mr. McKowen gets his exhibit list. Go ahead. Get your list.

THE WITNESS: Yeah. I was going to pull the actual exhibits if -- if he's going to refer to them.

THE COURT: Do you have -- so you just want to get his exhibit binder.

THE WITNESS: Yes.

THE COURT: Okay. That's fine.

Just wait so he can do that and read the

CART -- caption.

MS. KIDD-AARON: Your Honor, in the meantime, I just want to note that we have not stipulated to this exhibit.

THE COURT: I see that.

THE WITNESS: I can't find one. If it gets pulled up on the screen, I will try to do it from there.

THE COURT: Do you not have a copy of Mr. Harding's exhibits.

MR. HARDING: Your Honor, I -- I gave the other parties to this case electronic access to these files, and I did print out for you that exhibit. But I thought they could pull it up so they have access to it.

THE COURT: So it sounds like the AG's office does have the exhibits on electronic versions. So Mr. McKowen, the AG is going to pull up the exhibit on the screen. If that doesn't work for you, let me know. I have a hard copy here. I prefer to use it so I can highlight as we go along.

THE WITNESS: We'll see if --

THE COURT: If that's not sufficient, let me know.

THE WITNESS: Okay.

THE COURT: For you to look on the screen.

THE WITNESS: Okay. Thank you.

THE COURT: We're looking at 2006. Next question.

Q. (BY MR. HARDING) So I should have remembered these. I apologize. And so Harnish audit committee report.

MR. HARDING: Could you pull that up, please?

THE CLERK: Is this the right page?

MR. HARDING: You don't have that exhibit?

MS. HUNT: We're trying to figure out if this is the right page. The exhibit included multiple documents.

MR. HARDING: You start at the first page.

MS. KIDD-AARON: This is the first page.

THE COURT: First page of 2006.

That's not what I have in my binder, but...

MR. HARDING: I apologize. I didn't number the subtitles. Under 2006, there's a total of three files. Sorry. Six files. You have that in your binder, Your Honor. And I guess they don't have access to it, 2006. There's a folder underneath that and it says, "Harnish Audit Committee Report." That's it.

THE COURT: That's what I have.

Q. (BY MR. HARDING) Okay. This is a -- a result of one, because we did two different things. This is a result of one of the reports. Did you -- did you ever receive this or get to it?

MS. KIDD-AARON: So again, we have not stipulated to this. I would object and request that Mr. Harding lay a foundation.

THE COURT: Objection sustained. You have to have a sufficient foundation to admit the exhibit. I don't hear you offering it yet, but were you asking him what this exhibit is.

MR. HARDING: Okay. Do you recognize any of this exhibit?

THE WITNESS: I need to have it blown up. Your Honor, I have an objection. And where -- where are we at in -- in the process here? Isn't this a cross-examination of me?

THE COURT: It's a cross-examination. He can admit exhibits through your testimony, if he would like to. And what he is asking you is if you have seen this exhibit. It hasn't been admitted yet. He hasn't offered it yet.

THE WITNESS: Okay. I -- I -- I don't remember seeing it and -- is -- is it -- is he

limited in the cross to my testimony, or can he just go wherever he wants?

THE COURT: He has to cross-examine based on what was elicited during direct examination.

THE WITNESS: He has to limit his cross based upon what was presented in my direct testimony.

THE COURT: Correct.

THE WITNESS: This isn't in my direct testimony.

THE COURT: Well, you may not have talked about this report but you talked about similar issues. So if your objection is relevance or beyond the scope of direct examination, that objection is overruled.

THE WITNESS: Okay.

Q. (BY MR. HARDING) So to -- I would like to admit this into evidence because it helps to address Mr. McKowen's statement about, A, not getting the information and, B, misuse of funds.

THE COURT: Plaintiff's position? 2006 is offered.

MS. KIDD-AARON: Your Honor -- so Your Honor, this specific page actually is Plaintiff's Exhibit 93 as well, and it has been admitted.

THE COURT: One moment. All right.

Mr. Harding, do you agree that this page, Exhibit 2006, page 1, is the same as Exhibit 93?

It looks like it to me.

MR. HARDING: Yes. The only difference is this one is not signed in 93. I did submit two different signatures. That's the only difference that I can see.

THE COURT: Page 2 of Exhibit 2006 is the exact same letter, just with Mr. Cochran's signature.

MR. HARDING: That's correct.

THE COURT: Does the plaintiff object to these two pages being admitted.

MS. KIDD-AARON: No, Your Honor.

THE COURT: Mr. McKowen.

THE WITNESS: I do not object.

THE COURT: All right. 2006, pages 1 and 2 are admitted.

MR. HARDING: Can you pull up the last paragraph, please?

(Whereupon, Exhibit No. 2006 was admitted.)

Q. (BY MR. HARDING) Can you read that?

THE WITNESS: Your Honor, in my copy of plaintiff's exhibit, I only have one page.

THE COURT: You're talking about plaintiff's, right.

THE WITNESS: Right.

THE COURT: Right. Plaintiff's only has one page in their Exhibit 93. 2006 is the same letter that's in Exhibit 93. The first one has Mr. Harnish's signature, and the next page, which is the same letter, has Mr. Cochran's signature.

THE WITNESS: Okay.

THE COURT: Do you understand.

THE WITNESS: Yes.

Q. (BY MR. HARDING) Can you read the last paragraph that's blown up for you? Or you can do it from your printed copy.

A. "In the second analysis, the audit committee concluded between 32,000 and 455,000 was due GrowCo GCPSU from Two Rivers based upon how services for -- from Two Rivers were calculated. It was also noted that a promissory note was executed from Two Rivers to GrowCo effectively satisfying that funding gap using the $455,000 amount." (As spoken.)

Q. Does -- does that help jog your memory seeing that report?

A. I believe that there were quite a few documents, but I -- I don't have any reason to question.

Q. Okay. And now, based upon your testimony,

do you -- well, I'm sorry. One other evidence -- piece of evidence I want to submit for acceptance, maybe it already has been. But it's the PDF that's labeled, "Intercompany Funds Flow Analysis 20170508." And it starts at the top, "memo-draft."

THE COURT: What's the exhibit number.

MR. HARDING: 2006, but it's under a separate deal, and it starts with "memo draft."

Keep going, one more.

THE COURT: This is 2006, page 9 through 12 in my book, by Mr. --

THE WITNESS: Gregorak.

THE COURT: Gregorak, G-R-E-G-O-R-A-K.

Q. (BY MR. HARDING) So I'd like to admit this into evidence. This is a memo that our then CFO worked on or tried to explain the intercompany --

MS. KIDD-AARON: Object to testifying.

THE COURT: Sustained. If there's no agreement between the parties that this be admitted yet, you have to establish foundation for it and then offer it.

MR. HARDING: Okay. I will do that later. I will table this one. So Mr. McKowen, based upon -- one moment. Based upon our discussion here today, do you have doubts about this report, BCLS?

THE WITNESS: The fundamental questions that it has, I don't think have been answered. They don't answer the questions raised in my mind in the -- in the complaint.

Q. (BY MR. HARDING) Okay. So you still think that overall this -- this report is valid in terms of what happened to the $4+ million?

A. I think the -- the question posed by the complaint is a legitimate question and I haven't -- I haven't seen anything that answers how you raise $18 million and you only put up 1-1/2 greenhouses. The complaint doesn't mention that you're also including expenses associated with funding the -- the operations, which is what happened when I was there.

And I think that the fundamental question of where did $6 million go is yet to be answered. Whether it's asked correctly in the BCLS report or otherwise.

Q. Okay. Thank you. And I have another question: If there were audited numbers, audited numbers that, in your mind, explained where the money went, would you rely on that more or would you rely on an accounting report that's not even a compilation?

A. I -- I don't think those are my choices.

So I would say that I don't think some accounting reports necessarily reflect the truth, even if they're audited. Arthur Anderson could attest to that or our former officers that are in jail could attest to that.

And so the fundamental question still needs to be answered. And that's the question that that BCLS report says fundamentally raises. What is -- what are the answers to these journal entries?

And -- and what I would say, if you want me to proffer that -- that the concept of capitalized business expense, the payment of -- of interest is something that I hadn't taken into consideration in my calculations. But that would need to be reconciled with the use of proceeds, because the -- the use of proceeds that are in the subscription documents say that you can accomplish certain things.

And I understand why it wasn't accomplished in GCP-1, and GCP in the $4 million note and GCPSU, which get us to about 12,000. It's a combination of delays and failure to -- to meet projections that -- that the company had been given.

But still, there seems to me to be some explanation that needs to be made. And if -- and if that explanation is capitalized interest costs, I

think there was a duty at some point in time to say -- to tell the investors, because of the time delays, we're not hitting our marks and what do you -- what do you want to do? That's what I think.

Q. Okay. I think I got most of it. So I have just a couple, hopefully, two more quick questions.

You remember our discussion about compilation, review and audit early on. And do you remember what BCLS report said about their type of scope or their level of assurance?

A. Yeah. They said that it wasn't that.

Q. It was not a compilation, correct?

A. Right. And it wasn't an audit.

Q. And is a compilation more or less the lowest type of accounting work that an accounting firm could do unless they have a special project?

A. I -- I think that what they said was that this is not an audit report, and it's -- I think the fundamental comment is that it needs to be -- don't rely on it as an audit.

And I would think to -- I don't know if it says it doesn't contain a compilation report specifically. But it says this is a preliminary report.

Q. Okay. But if BCLS gave you an audit report

on the same thing that they're looking at, wouldn't you have a lot more confidence in that report?

A. Absolutely.

Q. And would you have less confidence if it's review, not an audit?

A. Again, I would -- I would have to -- to look at the audit report, who -- who did it, and -- and -- and go through the things that we typically went through, the annual battle that you and I always fought, or I would say, this -- this doesn't make any common sense to me at all, you know.

And you would rely -- well, whether it makes common sense to you or not, it complies with public company accounting board rules that complies with GAAP. It complies with so many -- I still don't know what that means.

MR. HARDING: Okay. Thank you. No more questions, Your Honor.

THE COURT: Thank you. So Mr. McKowen, rebuttal. You can make a final sworn statement concerning the issues that were addressed on cross-examination. So if there's anything on cross-examination of either side that you want to clarify for the Court, now is your chance to do that by making a sworn statement.

THE WITNESS: As compared to doing it through my own redirect? Is that what you're saying?

THE COURT: This -- this is your redirect of yourself.

THE WITNESS: Okay.

THE COURT: This is your redirect.

THE WITNESS: Is the sworn statement.

THE COURT: Well, this is your redirect. This is the portion of your testimony that I would consider to be redirect. So you can make a sworn statement. You're under oath, obviously, and you can address anything that was brought up in cross-examination that you think you may want to clarify for the Court.

It's not a chance to redo your direct examination and redo the sworn statements you already made. But if there were things that were asked of you by plaintiff or Mr. Harding, maybe you think you want to respond to or clarify, now is your chance.

THE WITNESS: And so the sworn statement isn't a -- is something that's -- it's not necessarily something that's written. It's what I would do right now under oath. Is that what your --

THE COURT: Right. It's your -- it's your oral testimony today. Just like last week.

THE WITNESS: Okay. Can we take a break?

THE COURT: I was planning on taking a break at 10:15, 10:30. Do you need to take a break now.

THE WITNESS: No. I can wait.

THE COURT: Okay. Let's wait till our normally scheduled recess.

THE WITNESS: Okay.

MR. MCKOWEN: I'll give you this exhibit so it doesn't get lost.

THE COURT: Is that -- is that 1042.

MR. MCKOWEN: 1042.

THE COURT: I will take it to make sure we have a copy and get it uploaded.

MR. MCKOWEN: So for further clarification, Your Honor, my sworn statement is my redirect?

THE COURT: Correct. Correct.

MR. MCKOWEN: And -- and so I can address the questions that -- that were asked of me, and I have made notes on my cell phone regarding that. But this first part will be -- goes to -- can you turn that on? I want to use that as well.

(Court reporter asked for clarification.)

REDIRECT EXAMINATION

MR. MCKOWEN: The first topic that I want

to cover under redirect is -- is coordination. Seems to be an important part of -- of this -- of the establishing the facts in this case. And I think that some of the testimony by the -- by the expert regulations law accounting, I have -- I have two problems with that testimony overall.

The first big problem that I have, Your Honor, is that I think the evolution of this -- of this -- of that particular aspect where the expert witness is relying on facts that I haven't had an opportunity to cross-examine, is a big problem. And it -- and it seems like that the development of that whole process is something --

MS. KIDD-AARON: Your Honor, I would object to making a legal argument.

THE COURT: Overruled.

MR. MCKOWEN: I'm just testifying to what my impressions of what has happened.

THE COURT: Well, if you're arguing the facts, that's for closing argument.

MR. MCKOWEN: No. I'm arguing -- I'm arguing about the facts associated with that testimony. Not -- not as it relates to the law, but I haven't had the opportunity to examine, you know, the -- the presentation.

THE COURT: You can make a statement of fact, but if you are making an argument or giving me your impressions, then that would be a proper objection from the opposing counsel.

MR. MCKOWEN: So I haven't been given the opportunity to cross-examine the -- the facts. That's just --

THE COURT: You're talking about the accounting expert, Ms. Martinez.

MR. MCKOWEN: No. Well, I'm talking about both of them. I haven't been given the opportunity to cross the -- the testimony associated with what the expert used. And I'm not arguing the law. I'm saying, just simply saying that I wasn't given that opportunity to cross-examine.

THE COURT: Which expert are you talking about.

MR. MCKOWEN: Mr. Rome.

THE COURT: You were given an opportunity to cross-examine Mr. Rome.

MR. MCKOWEN: Okay. I wasn't given an opportunity to cross the factfinder on which he based his opinion.

THE COURT: We -- we discussed this issue at length last week.

MR. MCKOWEN: Yeah.

THE COURT: Mr. Burtness appeared. We called him as a witness. You had an opportunity to ask him questions. Sounds like maybe other additional witness that you're planning on calling during this trial.

But as far as what you're doing now, you need to respond to any of the questions that were asked to you on cross-examination to complete your testimony today, and then we can move on to other witnesses.

MR. MCKOWEN: Okay.

THE COURT: If you're simply reasserting a statement or an argument that you haven't had a chance to examine anybody from the commissioners office, we discussed that issue. I made rulings on that issue. So let's continue your testimony.

MR. MCKOWEN: Okay. So you're sustaining the objection; is that correct? If my testimony is that -- that I have not been given the opportunity to examine the fact witness. I'm not arguing whether I have the right to or not here. I'm just simply saying I wasn't given the opportunity to examine -- cross-examine the fact witness because I couldn't name who that would be.

THE COURT: I understand. So the objection was that you were making an argument. Based on what you've said so far now, sustained. You're making an argument. Is there anything you want me to know factually about the case? The facts of the case based on the questions that you were asked on cross-examination.

MR. MCKOWEN: Okay. I thought -- all right. I have, as you know, I'm operating pro se. And so I have had to go home and reflect on what has happened during the day, and -- and what I should -- how I can prepare for tomorrow. And so I would like to be able to look at my cell phone because that's where I have the information about what's proper on -- under a -- a redirect.

THE COURT: Then we'll take our recess now and we'll start back up at 10:30. Before we do that, let me just put this on the record so I don't forget. I was provided a DVD of Exhibit 18. So this exhibit, I will take this as the Court's copy, but the official copy has to be filed with the clerk's office so they can take possession of it and put it in records. I assume you already knew that, great. But just make that filing with the clerk's office.

But this is my copy, right?

MR. MCKOWEN: Yes, Your Honor.

MS. KIDD-AARON: Thank you, Your Honor.

THE COURT: And then we will make a copy of Exhibit 2006, pages 1 and 2 and upload that into the Court file as well. We'll be in recess till 10:30.

(Whereupon, a recess was taken at 10:13 a.m.)

(Whereupon, the proceedings resumed at 10:30 a.m.).

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And the -- well, Mr. McKowen is on the witness stand under oath, and we are in his redirect examination.

MR. MCKOWEN: So, Your Honor, I have a point of clarity that I need to ask you about, and the purpose of redirect. And I'm not an attorney, but I get to act as an attorney in my stead if it's within the bounds of whatever an attorney can do on redirect; is that correct?

THE COURT: Correct.

MR. MCKOWEN: Okay. And so is one of the purpose of the redirect is for me to provide testimony that rebuts the testimony of the cross-examiners?

THE COURT: Correct.

MR. MCKOWEN: And does that include exhibits?

THE COURT: Correct.

MR. MCKOWEN: Okay. And so my testimony is, is that on redirect, is that the plaintiff's attorney said that -- said in their cross-examination that the -- that the exemptions aren't available to me -- or the company. It's actually the company, not to me. And that is inaccurate.

And I'd like to -- to say that the exemptions or the coordination is clearly spelled out in the Colorado Revised Statutes.

MS. KIDD-AARON: I want to object. Mr. McKowen is making a legal argument.

THE COURT: Overruled.

MR. MCKOWEN: And so one of the purposes coordination. There's two primary purposes in my view regarding coordination. And, one, is to align the Colorado Revised Statutes with when a registration statement is required, and, two, to explicitly spell out when an exemption is -- is -- is allowed.

And the testimony was, by the expert witness and plaintiff in their summary, was that this -- the coordination did not allow for an

exemption that we could rely on, the Company could rely on in its offerings.

And I believe it's -- that it is spelled out specifically in Section 11-51-311. And in that exemption it's -- in that section of the -- of the C.R.S., it clearly states that an exemption from registration under the Federal Securities Act shall be exempt from registration under this article.

And I'd like to present evidence beyond just the reading of the statute that supports that. And -- and I'd like to present evidence that's publicly available, that the -- the Commissioner of Securities has stated exactly that publicly and in testimony.

And so I'd like to offer an exhibit that says that.

THE COURT: Okay. What's the exhibit?

MR. MCKOWEN: Should I -- I've provided it to the other parties.

THE COURT: What's the number?

MR. MCKOWEN: It's -- I'm wanting to put it into...

THE COURT: Mark it as 1052.

MS. KIDD-AARON: Mr. McKowen, which exhibit are you looking at?

MR. MCKOWEN: It's coordination according to the Colorado Securities Act. 1052?

THE COURT: Correct.

MR. MCKOWEN: I provided it to the -- over the weekend, I provided it to -- to the other parties in the case.

THE COURT: And what is it?

MR. MCKOWEN: It is -- it's a legal research memo that I have obtained from a service, an online service called Casetext that is owned by Thomson Reuters.

THE COURT: So are you offering Exhibit 1052?

MR. MCKOWEN: Yes.

THE COURT: Plaintiffs's position.

MS. KIDD-AARON: We object based on we don't have a draft of this document, and also we're not disputing the coordination between the federal and state law.

THE COURT: Mr. Harding, your position?

MR. HARDING: I do not -- well, my position is to allow it because it quotes case law and it's important to discuss.

THE COURT: Objection sustained. This is -- there's not a foundation for this -- for this

exhibit. If you want to make a legal argument as part of your closing argument, you can do that.

But you're offering this for the truth of the matter that's asserted that some unnamed, unknown attorney created regarding the law potentially applicable to this case. But you can make a legal argument on your own, but admitting an exhibit from somebody else that prepared it is not proper. So the Court rejects that exhibit.

MR. MCKOWEN: Can I make sure I'm clear on what you're saying?

THE COURT: Yes.

MR. MCKOWEN: So I'm not an attorney, but in this case, I'm an attorney for me, correct? And in my evaluation of -- of available public resources, I'm not allowed to have an opinion that rebuts theirs because I'm not an attorney.

THE COURT: No. That's not what I'm saying at all. If you want to admit an exhibit, it has to be admissible under the Rules of Evidence. So if you went out and got legal advice from Casetext or some other attorney a third party, that's fine. It helps you prepare for trial. That doesn't mean that it's admissible as an exhibit under the Rules of Evidence.

MR. MCKOWEN: Okay.

THE COURT: So if you want to make that legal argument, when it comes time for closing argument, you can do that.

MR. MCKOWEN: Okay.

THE COURT: Simply saying, hey, this is what some other attorney or Casetext told me when I asked a question, is -- is not admissible under the Rules of Evidence.

MR. MCKOWEN: Okay. So what -- what I am allowed to do is I can rebut the testimony, and it has to be sufficient. It -- it -- for right now where we're at in the trial. It has to be sufficient to -- that I have made a statement that -- that says that the plaintiff in this case is inaccurate in their determination of what coordination means and leave it at that.

And I'm not saying -- I'm not upset with that decision or anything like that. But I'm just trying to understand the requirement. And what you're saying is that the requirement is I can make the statement that I disagree with what they're saying, but I can't pull in any third-party statement because it's either hearsay or I'm arguing the law.

THE COURT: Correct.

MR. MCKOWEN: Okay. So let me -- let me

add Mr. Rome was called to the stand as an expert witness for what is the law and as it relates to private placements. He said a couple of things.

He said that the exemption wasn't available to us because of -- because of fraud. And that -- and that goes into the consideration of whether an exemption is available or not.

And that's not accurate. There is -- there was -- there is no -- no finding of fraud, and it -- and in -- in anywhere that he could point to, and plaintiff has brought, that has -- plaintiff has presented and alleges there's fraud. But they haven't provided any evidence of that fraud, and it's not a component part of, is an exemption available in a particular time and place.

And we couldn't get -- really get into that with my expert witness because he testified to the fact that 506C was available, but he didn't really go into any of the requirements for -- for its availability.

And under one of the requirements is -- or the only requirements that Mr. Rome stated was that -- or he said there's two requirements. One, you have to have an existing, substantive relationship with the potential investor. And that's

completely inaccurate.

And he said that -- he said that the current rules state that a -- only require a financial certification, and that -- that he disagreed with that.

He thought it was a policy change that -- and I can remember back when I was a broker and that was the case. But that's subsequently been changed. And so I think we can say that the information contained -- contained in the -- in the accredited investor questionnaire can be -- we obtained that, and it's a -- it's a rather detailed statement with specific requirements both for an entity and for an individual.

And we saw the -- the accredited investor questionnaire that we used for one of the offerings, but I can show you the accredited investor questionnaire through -- for all -- it turns out to be three offerings when I was there in the beginning of three others.

And so I'd like to go through that just to show that that portion of the accredited -- accredited certification was -- was done and then I'd also like to show where the sophistication and knowledge questions or certifications by the investor

are done, and that we have -- and that they have agreed, the potential investor has agreed that we are allowed to rely upon their statements in determining whether or not they're considered accredited.

So I'd like to pull up as an exhibit -- and I think all of these -- I think all of these have been admitted as exhibits. I'd like to pull up the offering documents associated with each of the offerings.

And so -- and I believe everybody has a copy of these exhibits.

And I'd like to start with GrowCo Partners 1, LLC and that's Exhibit 1010. And, unfortunately, I didn't Bates number this exhibit, but if you can turn to the instructions that are GCP-1 subscription instructions, it's a large -- it's a -- that's the only thing on that page. And it's -- I show it as the 13th page in -- into that particular exhibit.

And if you go to the 15th page, there's a highlighted portion that is the accredited investor qualification questionnaire for an individual.

And the highlighted portions say that, "Your answers will be kept confidential. However, by signing this questionnaire, you agree that Partners" -- which is a defined term -- "GrowCo and

their counsel may rely upon the information set forth in this questionnaire for purposes of complying with the applicable securities laws."

Which I believe, because of coordination, are the laws that the SEC has relating to a rule 506C private placement. And it goes through and we have each individual and we can pull up those specific individuals if we need to. And they have -- they -- they -- they need to sign whether they're an individual or if they're an entity, they need to sign as an entity. And that particular page is on 17.

And qualifications for those -- for an individual and entity are different. And so they have to identify what they are. And then each of these -- each of these particular, I'll say, financial condition of the investor have to be signed and -- and presented as part of the securities purchase agreement.

And the problem that we ran into before, and I -- and I need to bring into evidence, is that in the development of the -- that was put together on each of these -- each of these subscription agreements alludes to the accredited investor qualification questionnaire.

But it's only with respect to the

financial, which is sufficient, but I'd like to bring into or bring into evidence the actual securities purchase agreement itself, because this isn't that. This is just the accredited questionnaire associated with that. And in order to determine if the -- if the company has -- has provided or asked the question of each of the investors, have they subscribed and have they attested to their sophistication and their knowledge.

And so I'd like to pull that up and present that. I'd like to see if it's in any of the particular -- any of the offering documents. So the GCP-1 document didn't contain the actual purchase agreement, that no purchase agreement and is something that the -- that --

MS. KIDD-AARON: Mr. McKowen, can you speak into the microphone, please?

MR. MCKOWEN: Okay. I was. It is -- it is contained in the $4 million note documents and that document is -- that exhibit is 1011. And if you scroll to page 8 of that exhibit, you'll see on page 7 it's titled, "Execution copy note purchase agreement." And you'll see this formatting of all of these agreements essentially the same. They were prepared by Marc Johnson, SEC counsel, and they

contain the same essential way on formatting.

So on page 8, you see representations and warranties of the investors. And if you look --

THE COURT: I'm not seeing where you're at.

MR. MCKOWEN: It -- it would be page 8.

THE COURT: Page 8 of what? I'm on Exhibit 1011. It's all unpaged or unnumbered. So how far in -- how far in do I go? Are we on the term sheet or are we on the purchase agreement?

MR. MCKOWEN: We're on the note purchase agreement. Can you put that up, please?

THE COURT: Do I have that page? GrowCo note purchase agreement, and then what page do you want me to go to?

MR. MCKOWEN: Then I want you to scroll down to the table of contents.

THE COURT: Got it.

MR. MCKOWEN: And can you blow up the section on representations and warranties of the investor? And on -- on item 3.7 it says, "accredited investor." So I'd like to go there. Section 3.7. That table of content appears to be off.

Item C, disclosure of information, says: "Such investor has had an opportunity to discuss with management -- with the management of GrowCo the

business, management, and financial affairs of GrowCo and the terms and conditions of the offering of the notes and the warrants. The foregoing, however, does not limit or modify representations of warranties in Section 2" --

(Court reporter asked the party to speak slower.)

MR. MCKOWEN: The foregoing, however, does not limit or modify the representations of GrowCo in Section 2 or the right of such investor to rely thereon.

Knowledge and experience. Such investor has sufficient knowledge and experience investing in companies similar to GrowCo in terms of their stage of development so as to be able to evaluate the risk and merits of an investment, and such investor's notes and such investor's warrants" -- too fast. "And such investors warrants and if such investor is able financially to bear the risk thereof."

This is the part of each of these agreements that, although not required according to former Commissioner Rome, the expert witness, that we chose as a company to add to every subscription agreement that the investor needs to attest to.

And so down in Section G, accredited

investor. Such investor is an accredited investor as defined in rule 501A of Regulation D, promulgated under the Securities Act, and has otherwise delivered to GrowCo a supplemental letter of investment representations in a -- in a form by GrowCo.

So the agreement is the -- is the document that has ultimate control over what the Company says and what the investor says, but we chose to augment that with the supplemental accredited investor questionnaire that relates to their financial condition.

And so even though Mr. Rome -- and I know where he's coming from because I was there when this -- this wasn't that -- that requirement wasn't in the -- in regulations that you didn't have to have this language about knowledge and -- and experience.

We chose, the company chose, to put it in so that they -- so that the investor was subscribing -- is attesting to that as a representation of them. And so we believe we're fully meeting the requirements of an accredited investor.

I would like to pull up -- we had the other day introduced as an exhibit the C.R.S. as it relates to the actual regulations relating to exemptions.

And so I'd -- I'd like to pull that particular section up again. I don't have it in front of me. Do we have the exhibit number for that?

THE COURT: Is it 1051?

MR. MCKOWEN: Can you pull up 1051, please?

MS. KIDD-AARON: We don't have an electronic version of that.

MR. MCKOWEN: I handed it to you physically.

MS. KIDD-AARON: Right. We don't have it for the screen.

MR. MCKOWEN: You don't? Okay. Your Honor, do you have it?

THE COURT: I do.

MR. MCKOWEN: So election -- Section 11-51-311 has specific language that -- that states, "An offering exempt from registration under the Federal Securities Act, other than an intrastate offering, is also exempt from registration under the Colorado Securities Act."

Mr. Rome wanted to expand on that. That, as he said in other parts of the -- of his testimony, the language in 11-51-311 speaks for itself. It doesn't say that -- that if it's exempt from registration under the Federal Securities Act of 1933

and some other particular qualification. It says clearly that other than an intrastate offering, it is also exempt from registration under the Colorado Securities Act.

And so we -- the Company --

THE COURT: You need to talk into the microphone, please.

MR. MCKOWEN: I disagree with the characterization that an exemption is not available to -- to us, to -- to the company, to all of the companies, and that there's no additional requirement at the time of offering, which is what is critical too, as a component part of -- of making the offering and that issues related to fraud, especially when none were presented of any fraud having been committed by me or any of the principals in -- in these offerings.

And that fraud is the burden of the plaintiff to prove by a specific act, and the AF said that -- that the exemption is not available if fraud is involved.

And there's no -- there was no fraud at that time, and I don't believe it's something that you can look at the facts, and suggest which part of it we're trying to do here is determine if there was

fraud, and say if there's the potential for fraud, the exemption's not available too.

And I'm not trying to argue the law. I'm simply saying the statute speaks for itself and our attorney drafted it and we used these agreements to rely on that.

The other significant issue is, he said, Mr. Rome said that -- and it's a completely separate and different issue. He said that you could only present your investment to someone who you had a preexisting relationship with. And that's simply not -- not correct.

The -- the requirements for making available an investment to accredited investors only, or to accredited investors, is the only requirement that is required by the securities and the 1933 Act.

And that there's no requirement of a preexisting relationship. And we will prove that in our closing arguments, I guess, is where that will -- someplace elsewhere that the securities act states that.

The relevant authority on this is, and I didn't copy it, and so it hasn't been introduced as an -- as an exhibit.

MS. KIDD-AARON: Mr. McKowen, can you speak

into the microphone?

MR. MCKOWEN: Okay. Can you hear me?

MS. KIDD-AARON: Yes.

MR. MCKOWEN: Okay. And so the relevant portion of the securities regulation that speaks directly to this and as it relates to Rule 506C, is 15 U.S.C. Section 77D and 17CFR.

MS. KIDD-AARON: Your Honor, I would object. This sounds like a legal opinion.

THE COURT: Sustained. It's legal argument.

MR. MCKOWEN: Okay. I will just leave it at Mr. Rome is not accurate in his statement that -- and I don't know the difference between this and C.R.S. what I'm trying to address -- I'm just simply pointing to a statute.

THE COURT: I think part of the issue, Mr. McKowen, is this is rebuttal. Or I'm sorry. This is redirect testimony. When I said rebuttal, what I was trying to convey is if there was anything asked by either side during your cross-examination that you would like to clarify for the Court, now is the time to do it.

I don't remember either side asking you about Mr. Rome's testimony during your direct

examination. If I'm wrong any side, please correct me. This isn't a rebuttal to all the evidence that you've been presented, or that the plaintiff has presented. This is only -- this is completing your testimony.

This is not a rebuttal to everything that's already been said in this trial. So I'm trying to get your testimony to a point of completion. And the purpose of redirect is not to go as long as you did on direct examination. I have never had anybody go as long or even close to as long in redirect as they did in direct because that's not the purpose of redirect. The purpose of redirect is just to clarify some issues that may have come up on cross-examination.

MR. MCKOWEN: And I believe that the issue of who can invest in Rule 506C -- 506C, was brought up on the --

(Court reporter asked the party to speak louder.)

MR. MCKOWEN: Okay. And so I believe that it was brought up again in cross-examination that the issue of who can invest pursuant to a 506. And I'm just trying to state that Mr. Rome is wrong and I -- I think that Mr. Harding may have --

THE COURT: All right. Cite the statute and move on.

MR. MCKOWEN: Say again?

THE COURT: If there's a statute that you want to cite to me, cite the statute and move on, please.

MR. MCKOWEN: Okay. On -- on cross --

THE COURT: Just cite me the statute.

MR. MCKOWEN: Oh. You want me to -- sorry.

THE COURT: You seem to want to cite the statute. I'm just telling you, cite me the statute and then move on.

MR. MCKOWEN: Okay. 15 U.S.C. Section 77D and 17CFR; Section 230.506 of Section 77D.

THE COURT: Got it.

MR. MCKOWEN: Yesterday, Ms. Kidd-Aaron, we got into a discussion about statute of limitations. And I either asked her or she -- anyway, she didn't quote -- she didn't start reading the section that relates to the statute of limitations.

She read sections that relate to Chan, the Commissioner bringing these actions. And I think that the Colorado Revised Statutes clearly identify the -- clearly identify what the statute of limitations are, and -- and I can give you the

section of the Colorado Revised Statute that speaks to that.

THE COURT: Go ahead.

MR. MCKOWEN: It's 11-51-604, and there were particular subsections of that will address this -- an issue of -- of whether it's three years or five years, and whichever is earlier, without reading the statute to you.

I think that, and I'm not certain, but I think that -- I believe that the issue was brought up on cross of whether these were interest payments or whether it was a Ponzi scheme. And I don't know, as I have said previously, whether it's a Ponzi scheme or whether it's interest payments.

And I believe, based upon Mr. Harding's cross today that that issue remains unresolved, and that the critical issue to me and my understanding of whether something is a Ponzi scheme or an interest payment is that if you're paying off subsequent investors with money that you're raising from subsequent offerings, then that's a Ponzi scheme.

And I raised that issue in e-mails that were presented as -- as exhibits, not by me. And Mr. Harding has -- has brought up the issue of -- of whether or not the use of proceeds have been fully

accounted for.

And I think that there needs to be a clear definition of what the use of proceeds were that -- that were provided to investors and whether or not any investors were paid off from funds raised from these offerings.

THE COURT: Did you have an objection, Mr. Harding?

MR. HARDING: I'm just having problems with connecting to the CART. I don't know if anybody else is having that same issue.

THE COURT: Are you able to see the CART captioning, Mr. McKowen?

MR. MCKOWEN: I haven't. Hang on a second but I'm not. I'm working off a hardcopy when I'm talking.

THE COURT: Is our CART interpreter there? Do you have any information on your end?

MR. MCKOWEN: I was following it earlier, but...

CART PROVIDER: I am, Your Honor. Let me check my feed.

MR. HARDING: I will try to do a reconnect. I got a server error.

CART PROVIDER: Well, that's on my end.

THE COURT: We're getting the same server error. The Court is.

CART PROVIDER: I am, too. Okay. For the time being, Your Honor, I'm assuming it's probably something on Streamtext's end. I'm just going to share my screen so you don't have to wait.

THE COURT: Okay.

CART PROVIDER: Okay.

THE COURT: Do you have that up, Mr. Harding?

MR. HARDING: It's still spinning. Trying to refresh the page. No, I still get a server error.

THE COURT: This is on the -- she's sharing her screen on the -- on the WebEx screen.

MR. HARDING: Oh. I'm sorry. I can see that part. Okay. Thank you. Apologize.

THE COURT: It's okay. Mr. McKowen, do you have that up as well?

MR. MCKOWEN: I do.

THE COURT: All right. Mr. McKowen, you can continue.

MR. MCKOWEN: So in cross-examination by Mr. Harding this morning, the issue was brought up regarding the repayment of loans or the use -- the raising of capital as it relates to farming.

And I don't know if the loans, if any of the proceeds from the raising -- for the use of -- that were used for farming, it's not included as far as I know in any -- any offering documents that I put out that as a use of proceeds for any of the -- any of the $7 million loans.

And so the issue as far as my understanding what a Ponzi scheme is, is were any of the funds raised for any of the offerings used to pay off loans that are related to farming or water development or anything like that, because they weren't contained in the use of proceeds for the documents that were presented, the use of proceeds from the documents.

I can go through each one of these documents as I did for the $4 million note and cover the accredited investor as it relates to the financials, and the representations as it relates to each of the investors certifying that they are knowledgeable and have sufficient experience to make this decision.

I will take an hour or two hours to do that, to go through all of those. Maybe not that long. At least an hour, and if I'm going to have an abundance of caution, then that's what I should do. So we should go through each of those other ones.

THE COURT: Call them up.

MR. MCKOWEN: Okay. Can you pull up GCP Super Units, LLC which is 1012? And scroll past the term sheet. Stay there for a second, if you would, please. And highlight the bold portion of the term sheet.

In each and every one of our documents, it states, "This summary does not purport to be complete and is qualified in its entirety by the terms and conditions of a definitive purchase agreement."

I'd like to point out that there -- there are pictures in the presentation that show the construction and development of this and we had testimony that the -- that these greenhouses were among the most sophisticated greenhouses that he had ever seen.

And when I was the CEO -- and if you can go to page 4 of the presentation. If you keep scrolling, you'll get to the page where it says page 4 in the upper right. If you look at these images -- can you highlight the panoramic-view top picture?

So we went down to Pueblo County and put in a greenhouse from dirt. Nothing there. And this is GCP-1. And some of the images associated with the buildout of construction of it, and we brought into

being this GCP-1 greenhouse, and the preferred investors were given a deed of trust on the greenhouse and a deed of trust on the Orlando Reservoir.

The counsel for the plaintiff continues to raise this question about whether or not I'm on the deeds of trust or if I'm an owner of -- of that deed -- of that -- a beneficiary from those deed of trusts. And I answered before, and my answer remains the same, I'm not a beneficiary. And I don't know what the relevance is of that to the deed of trust and the Orlando.

I don't have -- I don't have any -- I don't have any pictures of that, but we basically took a reservoir on a major waterway on the Front Range of Colorado that was inoperable, and I borrowed money, use of that -- dollars, I borrowed the money, and we brought that into production. I brought that into production. And we did that in Two Rivers prior to these GrowCo offerings.

So if you can scroll to page 24 -- 25 of 94. And while you're bringing that up, the reason I took the time that I took today, or I took to explain my business model, has been repeatedly stated by plaintiff that McKowen developed a Ponzi -- or a -- a

scheme -- a fraudulent scheme to take money from investors.

And it's -- and that the development of the water assets and the farming assets and the greenhouse assets took seven years of my life to do that. But prior to that, the business model is exactly the same.

And there was nothing -- the only difference between what I was explaining -- and it sounds like it was a waste of time in this business model, is that this business model failed.

And so that goes over more than 20 years of time, and I took four hours to explain it, and I guess I set a record for time for testimony.

Anyway, this on page 25 of 94 is the individual questionnaire that in the subscription agreement it will allude to this as part of the representations of the investor. This is for the Super Units. And if you scroll forward, you'll see the representations for an entity.

You'll see -- then see the joinder agreement to the purchase agreement, the structure that we put together in conjunction with our attorney was that we provided them the documents on the entire purchase agreement to the investor, but their

subscription could be had to a note by a joinder agreement to the purchase -- purchase agreement -- purchaser agreement.

And on that they -- they filled in how much they chose to -- to purchase, and they signed the joinder agreement. And that brought them into the purchase agreement.

There's some other joinder agreements, and those are all related to additional equity that the Super Unit purchaser would be -- have the opportunity to see what that looks like in terms of warrants.

If you go to page 37, even though it's not numbered when I scroll through it on the -- on the WebEx, it -- on page 1 -- and this is 37 pages into it. And the agreement is on the -- on the screen and it says that it's the execution copy.

And this agreement was -- was dated as of October 16, 2015, and was the third investment that we offered to investors to -- to finance what we were doing. And you can see in Section 3, we've got the same sections related to knowledge and experience in private investors.

And so if we go down to those pages, Section 3, you have 6 and 3.3. You don't have it?

MS. KIDD-AARON: What is the page number?

MR. MCKOWEN: On my document it says it is page number 44 of 94. Okay?

And so 3.3 contains the same standard language that -- that we used and relied on from Marc Johnson at K&L Gates that such investor has had an opportunity to discuss the business, management, and financial affairs of GCPSU and GrowCo, and the terms and conditions of the offering of the Super Units with management of GCPSU and GrowCo.

The foregoing, however, does not limit or modify the representations and warranties of GCPSU and GrowCo in Section 2, or the right of such investor to rely thereon.

3.4 states, "Knowledge and experience. Such investor has sufficient knowledge and experience in investing in companies similar to GCPSU and GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in the Super Units, and such investor is able financially to bear the risks of such investment."

3.6 states, "Such investor is an accredited investor as defined in Rule 501A of Regulation D promulgated under the Securities Act and has otherwise delivered to GCPSU a supplemental letter,

which is the accredited investor questionnaire representations in the form provided by GCPSU."

They were required to sign the joinder agreement for the note, and we relied upon their representations in determining whether or not they were accredited investors, which included not just the representations as to their net worth or -- or income, but also in the body of the document, which is the more controlling document, we asked them to represent that they are that.

And again, Mary Loughran and Joe McMahon and Whitney, whatever his last name is, all signed those agreements for the particular investment that they invested in.

So that's for the GCP --

THE COURT: Hold on, Mr. McKowen. Mr. Harding?

MR. HARDING: Yeah. Your Honor, I will stipulate that those different clauses, the one about accredited investor, about disclosure and opportunities to talk, and also sophisticated investor knowing what they were doing. I will stipulate that that's on every single document to save time.

THE COURT: Does plaintiff have any record

on that?

MS. KIDD-AARON: We're fine with that, Your Honor.

THE COURT: So Mr. McKowen, it sounds like the parties are stipulating that in -- that in every one of these offerings, there is a similar document with similar language.

MR. MCKOWEN: Thank you.

THE COURT: Do you accept that --

MR. MCKOWEN: I do.

THE COURT: -- stipulation? Do you accept that stipulation?

MR. MCKOWEN: Yes, I do, Your Honor.

THE COURT: Okay. So I don't think you need to go through the offering documents for every one, based on that stipulation.

MR. MCKOWEN: Okay. The next exhibit I would like to pull up because it was referred to by plaintiff's counsel -- excuse me. Is 101 -- excuse me, 1015, deeds of trust during McKowen tenure in Two Rivers.

If you could encapsulate the --

MS. KIDD-AARON: Your Honor, if this is supposed to be within the scope of plaintiff's cross, I did not go over the deeds of trust.

(Court reporter asked for clarification.)

MS. KIDD-AARON: If this is supposed to be within the scope of plaintiff's cross, I did not go over the deeds of trust.

THE COURT: I don't, frankly, remember. I don't remember there being deeds of trust back in his direct examination, and you did not bring it up in your cross-examination.

MS. KIDD-AARON: Correct.

THE COURT: That I think I remember, Mr. Harding, is that what you remember as well?

MR. HARDING: It is.

THE COURT: So Mr. McKowen, the objection is essentially beyond the scope of your cross-examination. So you brought this up in your direct examination, but it was not asked about in your cross-examination, so it's not proper for redirect examination. But the evidence is still there in your direct examination testimony.

MR. MCKOWEN: I must be losing my mind because this morning I thought she asked me about the deeds of trust in the Orlando Reservoir.

THE COURT: I don't know if she did or you just brought it up.

MS. KIDD-AARON: Your Honor, I asked about

the agreement that Mr. McKowen introduced, and I -- I think it's 1042.

MR. MCKOWEN: Which -- I have a copy.

THE COURT: 1042 is the joint agent appointment agreement, VitaNova.

MR. MCKOWEN: I see. Well, let me address it that way, then.

THE COURT: So if I didn't state it, the objection is sustained.

MR. MCKOWEN: Okay. The joint agent agreement was something that Chuck Kirby actually asked for. Actually, he asked for a -- an agreement that would appoint him as the -- as the sole agent of the agreement that -- that is -- that is required by the $4 million note purchase agreement.

So maybe the starting point for that is to go back to the -- to go back to the agreement that we were looking at this morning. And that is the $4 million note purchase agreement, and its relevance, because the -- the solution to this could have been in large part to some of these investors coming from that, but -- so let's go back there first.

MS. KIDD-AARON: Your Honor, I would ask that we have a similar stipulation. I think everyone

is aware that there's a deed of trust associated with the $4 million note. And I -- I personally I think plaintiff is fine with Mr. McKowen telling us how this is related to that deed of trust without going back to it.

THE COURT: So what are you offering to stipulate to?

MS. KIDD-AARON: To just discussing the deed of trust. We understand the deed of trust is in the $4 million note. I believe Mr. McKowen is asking to go back to review that deed of trust.

THE COURT: Mr. McKowen, the plaintiff is willing to stipulate that there is a deed of trust that is associated with the $4 million note.

MR. MCKOWEN: Yeah. That's not what I'm trying to get at here. I'm trying to get at the agent -- who appoints the agent to execute on a -- any sort of fault associated with that.

And that's relevant to a logjam that we have and -- and it should be something that should be brought to the Court's attention so that they understand what -- what that agreement says about how you execute on the -- potentially execute on the deeds of trust.

THE COURT: As it relates to 1042?

MR. MCKOWEN: And as it relates to 1042, which is, if you can pull that back up. 1042, I believe, is an e-mail exchange between me and Chuck Kirby relating to an offer that I don't have the numbers on to substantiate what I'm saying is on -- is or was on the table.

I exchanged an e-mail with him or a text message with him, I think, at 5 or 6:00 this morning. He's an early riser just like me and he says contact his attorney to get that affidavit.

So I'm pursuing that. Hopefully, it will come before Christmas.

MS. KIDD-AARON: I would move to strike because of hearsay, Your Honor.

THE COURT: Sustained. The Court will not consider that response.

MR. MCKOWEN: Okay. So can we pull up 1042?

THE CLERK: I don't have that electronic in this case.

THE COURT: I have it -- I have it in hardcopy.

MR. MCKOWEN: I believe it's in the e-mail between Chuck Kirby and me and also contains the terms of a -- of an agent that I proposed and it's

been accepted as an exhibit.

MS. KIDD-AARON: We have the hardcopy, Mr. McKowen. We just don't have it in trial director, so it won't be on the screen.

MR. MCKOWEN: Okay. So I would like to pull up the -- the $4 million note purchase agreement that shows what Mr. Kirby and I are -- are going over and why it's relevant. We're no longer arguing about the deed of trust. We're arguing about who executes on that -- on that remedy that's -- and the -- where that proposal sits in the agreement, the note.

MS. KIDD-AARON: Your Honor, I'm just trying to understand. This still feels like it's outside of the scope, so I'm just trying to understand.

THE COURT: Overruled. Mr. McKowen, just get to the point that you're trying to make.

MR. MCKOWEN: The point is, is that I'm trying to show in the note purchase agreement exactly what is required to execute on a potential offer that's out there, if I can get the dollar amount.

THE COURT: What's the exhibit?

MR. MCKOWEN: The exhibit is the note purchase agreement for --

THE COURT: Just give me the Exhibit

Number.
MR. MCKOWEN: I believe it is 1011.
THE COURT: Is that it?
MR. MCKOWEN: Yes.
THE COURT: What provision do you want to highlight for the Court?
MR. MCKOWEN: If we can go down to the actual subscription or the purchase agreement.
MS. HUNT: Can you give me a page number? Page number, please?
MR. MCKOWEN: (No verbal response.)
THE COURT: Are you trying to get to the execution copy of the note purchase agreement itself.
MR. MCKOWEN: Yes.
THE COURT: I'm there. Which part of the document do you want to -- do you want to highlight for the Court?
MR. MCKOWEN: If you can roll down to -- this is the term sheet -- if you can roll -- scroll down to the actual purchase agreement.
MS. KIDD-AARON: Is it the note purchase agreement?
MR. MCKOWEN: It's the note purchase agreement.
MS. KIDD-AARON: Page 7.

THE COURT: Mr. McKowen, what do you want me to be looking at?

MR. MCKOWEN: Pardon me?

THE COURT: What do you want me to be looking at in this document? What paragraph?

MR. MCKOWEN: I'm trying to find it.

THE COURT: We're almost at 12:00. Why don't we go ahead and take our lunch recess until 1:00 p.m. Mr. McKowen, you can step down. We'll take the remainder of your testimony when we get back.

(Whereupon, a lunch recess was taken at 11:58 a.m.)

(Whereupon, the proceedings resumed at 1:06 p.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And Mr. McKowen, we are still in your redirect examination, so you may come back. You're under oath. When we left you were looking for a document, or at least a provision in the note purchase agreement.

MR. MCKOWEN: Yes. Your Honor, since I haven't been able to produce the -- the exhibit that would make it relevant -- that would make it relevant

to the 3.8 million, which was the point of 1042. I will just skip that.

THE COURT: Okay.

MR. MCKOWEN: And so I'm done.

THE COURT: All right. Well, then your testimony is complete. You may step down.

Need a headset?

MR. MCKOWEN: Yes, I do.

THE COURT: If you need a headset --

MR. HARDING: No. I have a headset.

THE COURT: No. I think Mr. McKowen wanted one.

MR. MCKOWEN: Thank you. Just in case.

THE COURT: All right. Mr. McKowen, would you like to call your next witness.

MR. MCKOWEN: Yes. I'd like to call -- I'd like to call Wayne Harding.

THE COURT: All right. Mr. Harding, if you'll come up.

MR. HARDING: Do I need to bring the WebEx thing up too?

THE COURT: I would bring that up so you can read the CART captions.

MR. HARDING: Well, I have it on this one but not the WebEx.

THE COURT: I think it's helpful if you're on the screen just so the interpreter can see that you're responding.

MR. HARDING: Okay.

THE COURT: Once you get situated, I will swear you in.

Whereupon,

WAYNE HARDING,

the Defendant having been first duly sworn, was examined and testified on his oath as follows:

THE COURT: You may be seated.

THE WITNESS: I'm going to grab my hearing aids just in case.

DIRECT EXAMINATION

BY MR. MCKOWEN:

Q. Good afternoon, Mr. Harding.

A. Good afternoon.

Q. Can you state your name, your full name for the record?

A. Wayne Harding.

THE COURT: Mr. Harding?

THE WITNESS: Wayne Harding.

MR. MCKOWEN: Are we -- Your Honor, are we using the visible voice caps through the WebEx?

THE COURT: Are you not -- is it not

showing up on your screen.
MR. MCKOWEN: I did not put it back.
THE COURT: I don't know if that server issue is --
MR. MCKOWEN: I have records, but all I see is -- I'm using it on WebEx, but all I see is visible voice caps.
THE COURT: I think it's -- I think it's through the link. I think that should be through the link. The server issue, I think, is resolved.
CART PROVIDER: I can do both if you want me to, Your Honor.
THE COURT: Mr. McKowen, can you pull up the CART link?
MR. MCKOWEN: I'm trying to. I'm going to have to pull it from -- down from Connor. I have that CART link up but I'm not -- I'm seeing it now.
THE COURT: It's working for Mr. McKowen. And, Mr. Harding, is CART working for you as well?
MR. HARDING: It is. Thank you. It is.
Q. (BY MR. MCKOWEN) So Mr. Harding, did you -- did you spell out your name?
A. One moment.
THE COURT: Mr. McKowen, while he's adjusting his headset, can you pull that microphone

over to you a little bit.

THE WITNESS: Hard -- Wayne -- W-A-Y-N-E. Harding, H-A-R-D-I-N-G.

Q. (BY MR. MCKOWEN) And what is your educational background?

A. I have a undergraduate University of Denver. Bachelor's of science, business administration emphasis in accounting. An MBA from the University of Denver with real estate construction management emphasis.

Q. And I heard you say earlier that you were some sort of professor, teacher at the University of Denver; is that correct?

A. Correct. I have spoke at or taught as adjunct instructor at the University of Denver for about six years. I did some undergraduate stuff on accounting. Most of my time spent at the freshman (ph) BA program in their strategic cost management course.

Q. And tell me about your -- the significant parts of your education -- your -- your business background?

A. Well, I graduated from University of Denver with undergraduate degree. I worked for a variety of CPA practices. One was called Peat Marwick Mitchell

at the time, now called KPMG. The other one is Touche Ross, which is now part of Deloitte.

As I mentioned briefly on Monday, questioning Ms. Martinez, I also spent a couple years with the same firm she was at, later establishing art of practices procedures for that firm.

Then I went on my own, I specialized in individual simplified tax -- tax preparation. We did write-up work for clients. We did attests to their financials. Did a lot of computer technology consulting.

I actually wrote an article in March of 1987 that was published in the Journal of Accountancy. It's a professional -- professional publication for the American Institute of CPAs, and was about how CPA's shouldn't erase the opportunity of computer consulting. That article was seen by a bunch of people, and eventually I was reached out by a guy named Doug Burgum at the Great Plains Software. That name might ring a bell. He was a Republican candidate for president.

I worked for them for 11 years. I loved it. Guy was an entrepreneur. He knew public markets. Was just a great guy to work for and, you know, great company to work with. When I joined in

'89, there was about 230 employees.

When I left, there was about 1100 employees and they eventually sold after being public with Goldman Sachs. They were -- they were bought in 2000 by Microsoft.

Part of my emphasis with Great Plains Software was working with --

MS. HUNT: Your Honor, this answer is going off the topic from the question. It's nonresponsive.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) When did you first begin working for Two Rivers?

A. July 2008.

Q. And when you began working for Two Rivers, were you hired as -- or into an accounting position?

A. I was.

Q. And what was that position?

A. I believe it was senior accountant.

Q. And did you eventually become the CFO?

A. I did.

Q. When did you become the CFO?

A. I believe it was September 2009.

MS. HUNT: I'm going to object, Your Honor. This -- this is cumulative. He went through all of his background in his direct in the case.

THE COURT: Sustained.

MR. MCKOWEN: Then I will move on. I didn't know what I needed to establish.

THE COURT: Any testimony that he's already provided, you don't have to repeat that testimony.

Q. (BY MR. MCKOWEN) Okay. So who did we -- did you rely upon any attorney for -- or auditing firm for guidance on how to do the offerings that we did that are the subject of this complaint?

A. For the offerings in question that we've been covering in court, we relied almost solely on Marc Johnson at K&L Gates.

MS. HUNT: I'm going to renew my objection, cumulative. We've heard a lot of testimony about relying on Mr. Johnson. I think that's very clear.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) You individually, did you believe that we were getting good advice from Marc Johnson?

MS. HUNT: Objection; cumulative.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Is there anything what you would add to what you have already said about Marc Johnson as it relates to his advice that he gave to us?

MS. HUNT: Objection; that asked for a narrative.

THE COURT: Overruled.

THE WITNESS: Just a minute, please. So the next question is anything that I would like to add based on Marc Johnson's expertise?

Q. (BY MR. MCKOWEN) Yes.

A. I thought it was very competent in security -- securities law.

Q. And were we -- have you testified to the -- how often you and I were on the phone to him and what were we generally asking of him?

A. I don't -- we have talked to him often. I don't know, you know, how often we were on the phone but it was frequent. And we asked him to prepare the offering documents for GrowCo and affiliates. Might have one or two times asked him to review the 10-K filings, but I don't quite remember.

Q. And did we generally ask him his advice prior to offering any or making any offer to any investor about a particular offering?

A. Oh, absolutely. We asked them -- asked him what we were able to -- the type of people that we were able to offer this offering to. He said accredited investors.

MS. HUNT: Objection, Your Honor. Hearsay.
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) And were there times when you were on the phone separately from when the times I was on the phone with you and him?
A. Yes.
Q. And in terms of accounting advice, how often were you on the phone with them independent of me?
MS. HUNT: Objection, Your Honor. Who is -- who is "them"? Vague.
THE COURT: Who is "them"?
MR. MCKOWEN: The people that we -- that we would use. I'm having to read it. The people that we would use for accounting advice as it relates to offering documents and 10-Q's and 10-K's, that sort of thing.
THE COURT: That objection is sustained. I don't think I have heard any testimony on who you spoke to about accounting advice.
MR. MCKOWEN: Okay.
Q. (BY MR. MCKOWEN) Wayne, Mr. Harding, did you -- did you engage the services of accounting firms to -- to assist us in making sure, from an accounting standpoint, that we complied with

Sarbanes-Oxley, AAC, ACOU, and whatever it was, the accounting guidelines for Public Company Accounting -- PCAOB?

A. The answer to that is yes. I believe you're referring to the, also, the PCAOB, Public Company Accounting Oversight Board.

Q. And did I interact with those people on a regular basis?

A. Not regular.

Q. And did I ever object to some of the accounting rules that you were telling me that we had to abide by?

A. Yes.

Q. And typically what was my objection when it occurred?

A. I think the first objection I heard from you was the valuation of some property that we owned in Boston and how to carry that on the financial statements.

I think it also had to do, other items had to do with the appraisals of our water assets and Huerfano or Pueblo County and the necessity for appraisals and potential write-downs in that area.

We had disagreements, but when push came to shove or everybody agreed with the offers --

Q. Did I?

A. -- that they suggested.

Q. Do you think that I agreed with these recommendations or do you think that I fought back on that?

MS. HUNT: Calls for speculation.

THE COURT: Overruled.

THE WITNESS: You eventually agreed with the auditors' position on every issue they had.

Q. (BY MR. MCKOWEN) And in -- in testimony and depositions and that, it's been suggested that on multiple occasions by plaintiff's counsel that I would bully you in your job to do what I wanted to you to do or thought you should do as it relates to being the CFO. Do you -- do you recall any of those conversations?

A. I remember the question about the toxic environment that I answered. In terms of published financial statements and the PCAOB, along with Sarbanes-Oxley and associated regulations have, I would not sign something that I thought was fraudulent or inaccurate in a material way.

Q. And so -- and I think I'm losing this thing again. And so would you say that you stuck by your principals and your -- your accounting? I don't know

if there's any system that you assigned or that you would -- that you said you would -- you would abide by the rules. Certainly Sarbanes-Oxley is that. Did you ever change anything because I wanted you to?

A. No.

Q. Okay. And do you think that the accounting that we, you, the company, performed for the offering documents that we prepared, complied with the regulations of -- that we were trying to offer private placements? Did they abide by the paying or providing any sort of information that was counter to the requirements of the -- of the CFO?

MS. HUNT: Objection, Your Honor. That question is vague and compound.

THE COURT: Sustained. Break that question up. That was a long question.

THE WITNESS: Your Honor, the transcript's working but I can't get the hearing aids to work.

THE COURT: Let's try a different headset. Does that work?

THE WITNESS: Keep going I'll -- I will figure it out.

THE COURT: Well, we need to try to figure it out now. Mr. McKowen, is your CART captioning working?

MR. HARDING: It -- it was working for me.

THE COURT: Is it working for you, Mr. McKowen?

MR. MCKOWEN: It's slow but that's why I'm pausing, because I have to hear -- generally hear your question. I think I'm going to take these off, and I actually do more and then I'll read the -- I can hear better without that and I will read it from here, but it is slow.

THE COURT: That objection is sustained. You need to ask a shorter question.

MR. MCKOWEN: Okay.

CART PROVIDER: And, Your Honor, if you want me to -- I'm sorry to interrupt, but I can share my screen.

THE COURT: All right. Well, we can go ahead and share your screen.

Q. (BY MR. MCKOWEN) Do you think that the offering documents complied with -- that we -- that we jointly put together with the professionals, in your opinion, complied with the regulations?

MS. HUNT: Objection; calls for an opinion testimony.

THE COURT: Sustained. He's not an expert. He hasn't been offered as an expert.

Q. (BY MR. MCKOWEN) In your personal opinion, did we put together any documents that were misleading?

A. No.

Q. Either by omission or commission, do you think that we told any lies?

A. I can speak for myself. The answer is no.

Q. And let's move on to, do you know how much I personally invested in the GrowCo companies?

A. I'm trying to add the different activities. I think it probably was around $2 million.

Q. And did you ever see me structure any agreement that I tried to favor me over the investors?

A. I don't think so.

Q. Do you remember when we put the deeds of trust together for GrowCo Partners 1?

A. Yes.

Q. And in that deed of trust, you filed the document; is that correct?

A. I don't believe I filed it. I asked our attorney. I think her name was Nicole Smith out of Greenwood Village who put the documents together and filed on my behalf.

Q. And did she file them in an order that,

although they were right after the -- one right after the other, which we have already heard in testimony, do you believe that was the correct order for filing them in Pueblo County?

A. I do.

Q. Do you think that was the correct order for filing them in Orlando County?

A. Huerfano County?

Q. Oh. Sorry. Huerfano County?

A. I do.

Q. In those deeds of -- deeds of trust, does it mention my name?

A. I think they might, as an Exhibit A to investors.

Q. As part of the beneficiaries?

A. I'm sorry. Beneficiaries Exhibit A, yes.

MR. MCKOWEN: Can we pull that up? The deeds of trust.

THE COURT: What's the number?

MR. MCKOWEN: It is -- for me it is 10 -- excuse me. It is 1015. Can you go to Exhibit A? Can you highlight one-third of the exhibits, or the beneficiaries? That's more like two-thirds. So let's -- let's get to a point where we can actually --

MR. HARDING: I can read that.

Q. (BY MR. MCKOWEN) Can you read it?

A. Yes.

Q. Do you see my name on that list?

A. So far I don't.

MR. MCKOWEN: And can you display the names below David A. Jenkins?

Q. (BY MR. MCKOWEN) And do you see my name on that list?

A. No, I do not.

MR. MCKOWEN: Can you -- could we go back to the -- to see which deed of trust this Exhibit A is and then where it's listing the beneficiaries?

Can you highlight the -- I believe it's the second, third -- second full paragraph.

Q. (BY MR. MCKOWEN) So this is the list for GrowCo Partners 1 as the grantor, correct?

A. Yes.

Q. And the grantees or the beneficiaries are listed in Exhibit A, correct?

A. Yes.

Q. Okay. And is this the complete list of investors in GCP-1? Preferred investors?

A. I believe it is.

Q. Do you remember if GrowCo, GCP Super Units

also invested in GCP-1?

A. If I remember correctly, the Super Units purchased membership units into GCP-1.

Q. And why did -- why were -- why were additional preferred membership interests in GCP-1 purchased?

A. Let me make sure I'm clear on the question. Why were they purchased by the GCP Super Units?

Q. Why did GCP Super Units purchase interest in GCP-1?

A. To provide additional capital.

Q. And do you know if I invested in GrowCo GCP Super Units?

A. It's one of those investments. It might be the Super Units that you invested in. I think it was like 1.1 or $1.3 million.

Q. Would it surprise you if I were one of those investors in GCP Super units?

A. As I stated before, I think maybe you're one -- one of the investors in GCP Super Units.

Q. Can you pull up the -- skip that. I will never get out of here.

Did you or anyone else file a subsequent lien or try to add GCPSU as a lienholder on GCP-1?

A. I don't remember.

Q. Were there additional deeds of trust filed while I was the CEO of -- of Two Rivers Inc. and GrowCo?

Were there any additional deeds of trust filed on the Huerfano assets that were -- that were investors in any of the -- that were investors in GrowCo associated with the filing of the -- the filing of the deed of trust on -- on the Orlando assets?

A. Yes. There's a deed of trust filed with the Orlando assets. I don't know if it's this deed of trust or not, but yes, there was an encumbrance of the -- some of the Orlando assets.

Q. By GrowCo investors?

A. Well, it would be by the original owner, one of our subsidiaries naming the beneficiaries. And so the beneficiaries would be the investors that have, you know, interest in that property.

Q. As it relates to GrowCo investors, were there any deeds of trust filed on the Orlando assets. Any additional?

A. Yes. I think there was additional filings on that, based upon investor request.

Q. Was that done while I was the CEO of Two Rivers and GrowCo?

A. I don't remember.
Q. Okay. Well, let me refresh your memory if I can. Were any deeds of trust filed on behalf of the $4 million note?
A. I believe so because this is a secured note.
MR. MCKOWEN: Okay. Can we pull up the deed of trust that is for the $4 million investors, note investors? It's -- I believe if you scroll down, you'll find it next. Can you scroll down to where the beneficiaries are?
Q. (BY MR. MCKOWEN) Do you see my name on that list anywhere?
A. I do not.
Q. Would you agree that if I had an investment in GCPSU for which a significant amount of money was invested in GCP-1, that if I did not request you to file an additional deed of trust for GCP-1, would that be -- or if I did file, ask you to file that, would that be me trying to transfer the ownership of the Orlando asset to me?
A. In which how -- how you described it, it could be perceived that way, and actually, it would be that way.
Q. If I -- if I asked, had you to file a deed

of trust on the Orlando assets that had my name on it, that could potentially be a conflict of interest, right?

A. It would be a disclosure item. If you notice that list there. You can pull that up again. You can see that list for the $4 million GrowCo note. I believe my name is on there. Yes. See Wayne Harding IRA, for a hundred thousand?

Q. And did you make an investment in the $4 million note?

A. I did. A hundred thousand dollars.

Q. So you were rightly a beneficiary on that deed of trust?

A. Correct.

Q. And although it's a significant amount to you, which you said, for the overall $4 million, there are other interests that are significantly larger?

A. That's correct.

Q. Okay. And do you -- do you know who Greg Harrington is?

A. Yes, I know Greg Harrington.

Q. And how did you come to meet Greg Harrington?

A. I was introduced to Greg Harrington in, I

believe, 2018 or early 2019, through a mutual associated friend that knew what we were doing in terms of the marijuana and hemp space. His name escapes me now. Matt -- or I was introduced to him, because they were looking for end production in the Colorado area.

Q. And did he make any investments in Two Rivers?

A. Well, I don't know if he personally. But he had a group of friends, and we needed cash back then. I think it was 2019 and we received some bridge notes -- I mean, I'm sure some bridge notes from him and his -- his group.

Q. And how did he become the CEO of Two Rivers?

A. To augment my prior testimony, it was Matt Taylor was the person's name that introduced us. To get to your most current question, when I resigned on September 19, 2019, the actual CEO was one of Greg Harrington's acquaintance or investors.

His name is Gerald Anderton. Somewhere where along the way, I guess, Greg Harrington, and I don't know how, but he became the CEO.

Q. So when you resigned from Two Rivers, was there any succession planned or were in line that led

to Greg Harrington being the CO -- CEO?

MS. HUNT: Your Honor, I'm going to object to this line of questioning. This is -- this is beyond the scope of what's relevant in this case now. We're talking about Two Rivers CEO in 2019. That's not at issue in this case.

THE COURT: What's the relevance, Mr. McKowen?

MR. MCKOWEN: The relevance is that Greg Harrington was the CEO of this company when it was named a party to this lawsuit. And Greg Harrington was dismissed from this lawsuit, and I'm trying to figure out how he became the CEO of Two Rivers. Because it greatly impacted our ability to do something with those assets.

MS. HUNT: Greg Harrington was never a defendant in this lawsuit. Two Rivers was and is now dismissed. But in any event, their time period ends in 2019 that is relevant in this case.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Are you familiar with the stipulation that -- that Greg Harrington signed to become dismissed from this lawsuit?

A. Yes.

Q. Do you know if that stipulation was sworn

to in terms of the truth?
A. I believe it was.
MR. MCKOWEN: Can we pull up that stipulation?
MS. HUNT: We don't have it electronic, I believe.
MR. MCKOWEN: I believe we should be able to get our hands on that stipulation because they filled it out and they had him sign it.
Q. (BY MR. MCKOWEN) Did you read -- obviously, I think you testified that you read the stipulation; is that right?
A. I did.
Q. And that stipulation dramatically impacted the rights of those investors, the beneficiaries of the deed of trust, those two deeds of trust on the Orlando assets.
MS. HUNT: Objection; he's testifying.
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) I would like to take the time to find that stipulation and introduce it as evidence.
THE COURT: It's already in the Court's filing. I can take judicial notice of it.
MS. HUNT: We've already introduced it.

It's in the record.

MR. MCKOWEN: And so can we make copies of that and distribute them?

THE COURT: I already have them in the Court file, I don't need a copy.

MS. KIDD-AARON: Everyone has a copy.

MR. MCKOWEN: Okay.

I would like to be able to provide Mr. Harding, the witness, with a copy of that stipulation.

MS. HUNT: You see it's notarized.

MR. MCKOWEN: Say again?

MS. HUNT: You see that it's notarized.

MR. MCKOWEN: Right. It's not notarized as to the truth. It's notarized as to the signature.

MS. HUNT: All right. You want to show that to him, go ahead.

MR. MCKOWEN: Would I like to do what with it?

MS. HUNT: If you want to show him that, go ahead.

Q. (BY MR. MCKOWEN) This is the -- this is the order and this is the signature of Wayne Harding. What is the notary?

A. I have it in front of me.

Q. And does it say that this stipulation is true and correct?

MS. HUNT: Objection, Your Honor. This document speaks for itself. The writing of the document and the notarization speak for itself.

THE COURT: Sustained. I have a copy of it. I'm looking at it right now.

Q. (BY MR. MCKOWEN) Okay. What is the -- what is it that the notary is attesting to?

MS. HUNT: Lodging the same objection. It speaks for itself.

THE COURT: Sustained. Is there something about the stipulation that you disagree with or you want to ask the witness about?

MR. MCKOWEN: I'm trying to ask him that, Your Honor. What I disagree with is that it doesn't say that it is the truth. If you look at the stipulation from Kristy Cameron, it says that this stipulation is true -- my testimony is true and correct. This does not say that.

MS. HUNT: I will just object to the extent he's made a legal argument.

THE COURT: Sustained. I can read -- I -- Mr. McKowen, I can read the document. Like I think I have enough ability to read the document and draw

conclusions from it on my own as a factfinder. If there's something you want to argue to me in arguments, you can, but you don't need to argue through Mr. Harding about this particular point.

MR. MCKOWEN: I'm not trying to.

So at this particular time, I'm trying to get something across, but are you saying, Your Honor, this is not the time to do that?

THE COURT: Are you trying to get across this is not an affidavit, that it's not a sworn statement. It's just signed by him? Is that the point you're trying to get across?

MR. MCKOWEN: I'm trying to get the point across that it's not a sworn to. He's not swearing to the truth of this -- his stipulation.

THE COURT: I see that. I see the this is not an affidavit. It's a document that was signed by him and submitted to the Court. Actually, let me back up. It says, "Subscribed to and sworn before me by Greg Harrington -- Gregory Harrington." So I can read that. I understand what it says.

MR. MCKOWEN: Thank you. That's all I'm trying to get across. And I'm trying to not testify.

Q. (BY MR. MCKOWEN) You have stated that that stipulation is something that you wouldn't agree

with. Is that what -- is that what I heard you say?
A. Yes.
Q. And what part of it don't you agree with?
A. Let's start with A. It says that we sold unregistered nonexempt securities in Colorado. That was unregistered but they were exempt.

"B, Defendants made material misrepresentations admissions to investors in the offer and sale of the securities."

In my case, I disagree with that.

"C, Defendants from 2014 through 2019, raised more than 19 million through several debt equity offerings of unregistered, nonexempt securities that were offered and sold by unlicensed broker-dealers."

I don't agree with the nonexempt. It appears to me that when this was sold by unlicensed broker dealers.

"D, Actions of prior management, specifically Wayne Harding and John McKowen and various other co-conspirators (hereinafter Prior Management), caused the Respondents to undertake securities

offerings which fraudulently included material misrepresentations of use of proceeds, bank fraud, share price manipulation, misleading financial statements, and conversion of company property."

In my case, I totally disagree with everything stated in D.

"E, Prior management hired broker dealers, sales representatives, private placement companies and investor relations firms, who knowingly solicited investors to invest in Two Rivers and GrowCo related entities knowing that they were not compliant with Colorado State marijuana licensing."

Let's stop there. We had nothing to do with -- in my mind, Two Rivers and GrowCo had nothing to do about touching the plant.

We were developing our water access. We were building structures -- to grow marijuana.

"Prior management of Two Rivers and GrowCo did knowingly and intentionally diverted those investor funds into various other business entities in a

deliberate effort to conceal their actions from law enforcement, bank regulators, and investors by failing to advise that the funds were used for marijuana cultivation and distribution."

In my case, that is totally false.

"Additionally, prior management failed to disclose that funds were also used for undisclosed personal enrichment."

In my case, that's completely false.

"Prior management fraudulently used Two Rivers subsidiaries" -- that's F.

"Prior management fraudulently used Two Rivers' subsidiaries, including, but not limited to, the assets of Orlando Reservoir Number 2, Company, LLC., Two Rivers Farms F-2, and other properties located throughout Colorado.

"Over several years, a practice of utilizing fraudulent conveyances and encumbrances which included -- "

(Court reporter asked the witness to speak slower.)

THE WITNESS: "the aforementioned properties, falsely portrayed providing a secured

interest in GrowCo related investors, two GrowCo related investors.

"In fact, the elaborate scheme was meant to shift control of the financial benefit of those assets among the defendants and their co-conspirators."

We just saw some evidence of that, that, at least in Mr. McKowen's case, I did not see that on the exhibits of beneficiaries my hundred thousand dollar investment, if so noted as a security. Security. That's it.

"G, Greg Harrington became a CEO on September 19, 2019. He became" -- let me pause there. That by itself is not right. In fact, you can look at more public filings and see it was Gerald Anderton that was appointed CEO. "He became cognizant of several financial and legal positions regarding the respondent's assets." Whatever that means.

"He slowly started uncovering the actions perpetrated by prior management. Prior management participated in a creative and fraudulent accounting practices obscured by the creation of a multitude of subsidiaries in order to further lure investors in deferred investor funds.

Because of the foregoing, there remains only an adversarial relationship between prior management and new management based upon prior management's fraudulent activities which have had a devastating impact on respondents."

I don't know how I can get more forceful by saying this is hogwash. This is all untrue.

"Prior management engaged in complex schemes set the assets and liabilities among various related entities through a pattern of seemingly benign transactions. Prior management skillfully prepared false reports -- false financial reports which overvalued assets and disguised liabilities, defrauding Mr. Harrington and various Harrington family-related entities as well as other investors identified in the Commissioner's complaint."

The lies continue, sir.

"Prior management. I, prior management and others involved in the distribution of GrowCo TR" -- or sorry -- "Two Rivers offerings are currently attempting to continue benefitting from their prior fraudulent activities by making false and misleading claims to the GrowCo and Two Rivers investors."

From my standpoint, that's false. "The Commissioner and respondents acknowledge that new

management had no prior knowledge of fraud perpetrated by the defendants and other unnamed parties, who acted as co-conspirators. New management has worked diligently to unwind the convoluted and deliberately intricate and complex system of business and entity structure specifically created by prior management in a scheme to defraud investors."

Your Honor, I have never done that. I never defrauded investors or made any kind of misrepresentations.

I don't know if I need to go on. I can if you'd like me to. I think -- I think --

Q. (BY MR. MCKOWEN) That's a lot of information.

A. I mean, the Court has a general idea.

Q. Let's see if we can unpack some of it. The first -- one of the first. There's a lot of big statements in there. Do you believe that these statements have been entered into the record of the Court?

A. Yes. The Judge had said that he's looking at the documents in the case file.

Q. Right. And did you have an opportunity -- were you ever consulted with as an -- as an investor

in the $4 million note? Were you ever given the opportunity to respond to the stipulation?

A. No. Well, until today?

Q. Do you know who drafted it?

A. No.

Q. Do you believe that your property rights have been altered, changed, or taken away from you in any way as a result of this document?

A. Potentially. Because in the next Section 2 in B, it says, "Respondent shall pay $2 million from the proceeds of any sale of company property." That also I have a lien on as we saw in that deed of trust.

Q. And so by him -- what -- what do you think that -- that -- that particular section says?

A. 2B? The one I just referred to?

Q. Yes.

MS. HUNT: I'm going to object to this line of questioning. Again, the document speaks for itself. What Mr. Harding thinks it says is not relevant to this case.

THE COURT: Overruled.

THE WITNESS: Well, to me, it could mean some of our -- I mean, my investment could be at risk. I don't know for sure. And it might be a

complex legal issue or something I'd have to go to court to protect.

But it's not -- it's not a positive term of the settlement for me for sure.

Q. (BY MR. MCKOWEN) For you personally, not asking for a legal interpretation. For you personally, do you think that a -- if Mr. Harrington pays or Two Rivers pays a certain amount of money over time, that they have satisfied the requirements for being released, Two Rivers being released?

A. That's the way I read it.

Q. Are you a releasor in the Paulson settlement case?

A. Yes.

Q. And when you -- when you did not object to that, becoming a releasor in that case, is it your opinion, about you personally, that you were now a releasor in that case?

A. Yes.

Q. Did you file any claims in that case?

A. No.

Q. Why not?

A. Well, I haven't decided for sure if I'm not going to file a claim or not. But in my mind, that's the wrong thing to do. You know, there's a certain

pot of money, and some people think that that was not a proper investment and they blame us, blame me.

So it doesn't make sense to me to try to get, I don't know, $0.10 on the dollar or whatever. You see, it just -- it's not a good indicate -- it's not a good indication, if you ask me.

Q. What part of the terms of that Paulson settlement -- I believe you said a certain part of money and then it would amount to $0.10 on the dollar or whatever. Is that what you're referring to as -- as -- or your reason for not deciding to file a claim?

A. Yes.

Q. Are you familiar with the terms of that settlement, independent of what the dollar amount would be?

A. Somewhat. It's been a while since I read that document because there's a lot of documents to read. So yes, I somewhat came out over here or whatever, so I'm somewhat familiar based upon --

Q. Are you familiar with the insurance coverage that was associated with that?

MS. HUNT: Objection, Your Honor. The policy settlement is not relevant to this case.

THE COURT: Sustained.

MR. MCKOWEN: I'm not trying to argue with you. But I don't know if I have the ability to say why it's relevant. I'd like to be able to do that.

THE COURT: You can make a record. Go ahead.

MR. MCKOWEN: Say again? I'm sorry.

THE COURT: You can make a record on that objection. Go ahead.

MR. MCKOWEN: The reason it's relevant is it directly impacts the 10 percent that he -- that Wayne Harding's talking about as being something that is unsatisfactory to him.

MS. HUNT: I maintain the same objection. That's not relevant either.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) In your opinion, did you -- do you believe, independent of any other document, that you had a -- you had the right to fully exercise, along with other beneficiaries, your right to potentially foreclose on that -- on the Orlando assets?

A. Yes.

Q. Do you -- are you aware of anything that interferes with that ability?

A. I'm not aware of anything at this point.

Q. Do you think that the -- the stipulation interfere -- interferes with that ability?

A. I do.

Q. Do you think that going into or after any sort of settlement, as it relates to that property, had the right to interfere with your ability to participate with other beneficiaries in the foreclosure on that property?

MS. HUNT: Objection; that calls for a legal conclusion.

THE COURT: Sustained.

MR. MCKOWEN: Let's go back. And -- and that's what Mr. Harding was objecting to previously with this Denver court thing. Not that you're recording -- recording it to -- to take it with you. You can't roll back and see what was previously stated in the -- in the -- in the statement. He had a list of objections that were on and on and on. And -- and so I wanted to be able to ask him about those particular objections, but now I can't retrieve them. I can't go back and look at what he has previously said.

THE COURT: True. You don't have real time reporting offered to you. You have to do what the court does, and take notes along the way.

MR. MCKOWEN: I can see it. Let me pull up the -- I do. I was looking at the -- but I don't see that I can scroll back on that either. Let me try it another way. I will try to recall some of the things. You tell me if I'm accurate when I ask the question, Mr. Harding.

Q. (BY MR. MCKOWEN) Does that -- does that stipulation say that you and I committed fraud?

A. Yes.

Q. I think it says it in multiple places. Tell me if you believe that's true as well.

A. Well, I'm looking. I don't know if it's multiple or how many, but I just looked at something, and I'm assuming in the part of section G, 1G, it says, "Prior management, based upon prior management's fraudulent activities."

MR. MCKOWEN: Your Honor, can I have a copy of that made so I can read from it, because I can't recall?

THE COURT: You can. Didn't we make a copy of it when you offered it? Did we not make a copy of it when you originally were trying to offer it.

MR. MCKOWEN: No. Because it's already been admitted into evidence and I don't have that with me.

THE COURT: We'll get a copy to you.
It's 10 -- what's the number, again?
MS. HUNT: It's 48, 1048.
THE COURT: Thank you.
Q. (BY MR. MCKOWEN) Do you -- and I don't know if I've already asked this. Do you believe that stipulation stipulates to the facts in this case?
A. Absolutely not.
Q. Let me rephrase the question: Whether true or not, do you think that that stipulation tries to stipulate to the facts in this case?
A. Could you rephrase that question maybe a little bit differently?
Q. We have the stipulation that has been signed by Greg Harrington. The Judge has said that he is -- I'm trying to second guess what he's thinking.
Do you think that the stipulation is attempting to or Greg Harrington is attempting to stipulate to the facts in this case?
A. I don't know what he's thinking. But this, in my mind, this stipulation is for falsehoods.
Q. If those falsehoods were facts in this case, would you believe that they're prejudicial?
A. So if they were actually true facts? The

facts stated in this stipulation injunction, are you talking about if these facts were in the case, were they accurate or not? Is that what you're asking?

Q. No. I'm not trying to testify to whether they are accurate or not. I'm trying to see if you believe they are a record of the case by Greg Harrington as to the facts?

MS. HUNT: Your Honor?

THE COURT: Plaintiff?

MS. HUNT: I'm going to object to these questions. First of all -- and I want to make the record that plaintiff's been offered this stipulation in exhibits offered by Mr. McKowen. And, again, it speaks for itself. We understand that they disagree with it. I think we're belaboring the point at this points.

THE COURT: Well, the question is argumentative. So sustained as argumentative. And I agree. You're the one that offered 1048. So the reason it's in evidence is because you asked that it be put into evidence. I will decide what weight I need to give it, having never heard from or seen Mr. Harrington.

MR. MCKOWEN: That's correct. And that's something I want to get into, but if something is --

if something is offered as evidence, can it be offered as that it -- that it is -- the demonstration of a particular party who was dismissed of their credibility, their -- if something is offered as evidence, does that mean it can be used to impeach their testimony by examining what is being said?

THE COURT: I'm not exactly sure what you're asking me.

MR. MCKOWEN: The reason I would let it come into testimony or I let it come into testimony -- and to be testified was to show that this guy is a crook. Was to show that his statements, that he's willing to make false -- patently false statements, and that needs to be taken into consideration by the Court or I would hope it is taken into consideration by the Court.

When I said can we introduce it as an exhibit, I wasn't objecting to it. I thought I told the truth. I thought I wanted it to come into evidence to show how false it is, and several instances demonstrated how false it is.

And I'm -- I'm trying to enable the -- this witness to also say the same thing.

THE COURT: And he already has. He's already gone through at least six or seven paragraphs

of it, which we just provided you another copy of the stipulation.

He's already said that he disagrees with it.

MR. MCKOWEN: Okay.

THE COURT: The question that you were asking to that got objected to, is you were asking an argumentative question.

MR. MCKOWEN: Okay. I get it. And hopefully I'm picking up on these things, and maybe by the time the trial is over, I will get it right. Which whatever it's going to be what it's going to be.

Q. (BY MR. MCKOWEN) In your dealings with Mr. Harrington, have you ever known him to go on to -- on to provide anything that is sworn to the truth?

A. I don't know if this document is sworn to what he says is the truth. That's, I think, the only -- I -- I don't think he ever sworn anything to me.

Q. We've already covered that, and the judge is fully aware of it as he has said. Has -- did -- has Greg Harrington ever filed a 10-K related to -- to Two Rivers?

A. Not to my knowledge.
Q. And so he's never signed off based upon the requirements of Sarbanes-Oxley, that the financial records of Two Rivers are true and accurate?
A. I don't know the answer to that, but I know where to get it.
Q. You don't know if he's ever filed a 10-K for Two Rivers?
A. 10-K, no. But I thought you also said 10-Q or any kind of Sarbanes-Oxley filing.
Q. Has he ever signed the 10-K?
A. Not the 10-K.
Q. And does that require an audit and attesting to the truth and accuracy by the CEO?
A. It does, and it's the same as a 10-Q. And the last filing of the 10-Q I remember September 30th of '19, and I actually assisted with that.
Q. And so I'm trying to go somewhere with this. Do you remember that -- that Greg Harrington or Two Rivers was scheduled to be deposed in this case?
A. Yes.
Q. And were they deposed in this case?
MS. HUNT: Objection; relevance.
THE COURT: What's the relevance?

MR. MCKOWEN: The relevance is that Greg Harrington has stated, I think, even in his stipulation here that he can't figure out the records. He can't figure out -- the records were so screwed up that he can't possibly straighten things out. And so that was the reason for -- I'm trying to get Mr. Harding to recall, because he was the immediate predecessor of Greg Harrington.

He -- he says that he doesn't know who this George or other guy is, and neither do I. And I looked -- tried to look at every 10-K filed or Q filed on Two Rivers.

And so that's the relevancy of -- of Greg Harrington as a -- as a -- the signer of this agreement, even though it's not so much of the truth. I'm asking Mr. Harding if he knows that Mr. Harrington has ever signed anything that involving our business, the business that I created, and that somehow he got his hands on, has he ever signed anything that is an attest -- a testament to the truth of what he's saying that has to do with us.

THE COURT: You asked him that question and he said -- my recollection is he said no, or he didn't know. I'd have to look at it in the transcript, but you've asked that question.

MR. MCKOWEN: As it relates to the stipulation but not the 10-K.

THE COURT: Didn't you ask him if he ever -- if Mr. Harrington ever prepared a 10-K?

MR. MCKOWEN: Yes.

THE COURT: And didn't he respond to that.

MR. MCKOWEN: And she objected to what's the relevance of that and I responded.

THE COURT: No. She objected when you were getting into his deposition.

MR. MCKOWEN: He was -- I was going to get to that, Your Honor. He's never been deposed in this case.

THE COURT: Those are two separate issues. Has he been deposed or has he filed a document that he's sworn to.

MR. MCKOWEN: That's what I'm trying to ask him.

THE COURT: Mr. Harding, has he ever -- has Mr. Harrington ever filed a 10-K for any of these entities at issue in this case?

THE WITNESS: I know that he has not filed a 10-K to the best of my knowledge, and the 10-K would just be for a -- for Two Rivers and any of their consolidated subsidiaries. I will leave it

there.

THE COURT: To your knowledge, has he been deposed in this matter?

THE WITNESS: Not to my knowledge.

THE COURT: Okay. Move on.

Q. (BY MR. MCKOWEN) You previously said that he was -- that Two Rivers was scheduled to be deposed, right?

MS. HUNT: Objection, Your Honor. Again, we're talking about whether he was deposed.

THE COURT: Well, that's not what he said. He asked about Two Rivers, not Mr. Harrington. So...

MS. HUNT: And I will object about Two Rivers as well.

THE COURT: Overruled.

MR. MCKOWEN: I'm trying to --

THE COURT: I've overruled. You don't have to explain why? Has Two Rivers been deposed in this case?

THE WITNESS: Not to my knowledge.

Q. (BY MR. MCKOWEN) Do you know why and when his deposition did not occur?

A. I don't know why. And because it didn't occur, that would not be when. We don't know when either.

Q. You would just testify -- your testimony would be that he was not deposed in this case?

A. To the best of my knowledge, that's correct.

Q. Okay.

MR. MCKOWEN: I'd like to go into -- I don't know if this is appropriate or not, Your Honor. I'm sure they'll object if I ask it in a way that I would ask it, but I want to try it anyway.

Q. (BY MR. MCKOWEN) Do you remember a conversation that you and I had just in the last day or so, where you said, you're never going to get that guy, meaning Harrington, deposed?

A. That's correct. I had a -- yeah. And the reason why I said that is I had a judgment against Two Rivers trying to collect it and it took me forever to try to find anybody or anything for me to be able to collect my judgment.

Q. Do you know of any other instances where Greg Harrington, as it relates to Two Rivers, has been -- people have attempted to depose him and don't seem to be able to get it done?

MS. HUNT: Objection; relevance.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) So Greg Harrington is the

current CEO of Two Rivers?
A. I think so.
Q. And as far as you know, he has not stipulated to the truth in the stipulation. He was not deposed in discovery in this case, and he has not signed any 10-Q and he took over the 10-K and I think he did supplements that said 10-Q. You're required -- are you required to file a 10-K every year on a public company?
MS. HUNT: Objection; relevance, cumulative, asked and answered.
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) In your experience as the CFO, do you believe you were required to file a 10-K every year?
A. Yes.
Q. And so Mr. Harding -- or Mr. Harrington took over the company in 2019; is that correct?
A. Yes.
Q. It's 2023. How many, if you were the -- the CFO of -- of Two Rivers, how many 10-Ks would have been filed?
MS. HUNT: Objection; relevance.
THE COURT: Sustained.
MR. MCKOWEN: The relevance is, is that you

can't get this guy under -- under oath. And we have got testimony in this stipulation about all kinds of things that he suddenly has the ability to understand and make decisions about it --

THE COURT: The objection -- hold on. The objection is sustained. You have Mr. Harrington on your witness list. Do you have him under subpoena to testify?

MR. MCKOWEN: I have attempted to, but I haven't been able to get him there. And I have attempted hard. But...

Do you think, Mr. Harding, that being able to -- to clearly state in his stipulation, in the stipulation by Greg Harrington -- and that's why I wanted to go through these -- these factual stipulations in the stipulation.

Do you think its incongruent for him to be so clear about what wasn't done between you and I, but he's absolutely certain in the stipulation that we did these certain false things.

MS. HUNT: Objection; relevance, hearsay. I don't know. Sorry.

THE COURT: Will you read that question?

Q. (BY MR. MCKOWEN) Do you think it's incongruent with the testimony in this, if it is

testimony. In this stipulation to be so certain about what we have done that is fraudulent but is -- he can be certain about the fraud and state it, but he cannot be certain enough to file 10-Ks?

MS. HUNT: Objection; that calls for speculation.

THE COURT: Sustained. You're asking him to opine on the truthfulness of another witness. You can't do that.

MR. MCKOWEN: I'd better move on before...

Q. (BY MR. MCKOWEN) Were you the CFO when the first greenhouse was being built?

A. Yes.

Q. Did you help prepare the offering documents for the GCP-1 private placement?

A. Well, I was part of a team that prepared those documents, myself. We have had input. Also the underwriter, Origin Growth Equities had input. Their legal inhouse counsel had input, and there was another external attorney that had input on that document.

Q. So you were the CFO. Were you the CFO when they prepared? You said yes. What part of input into the preparation of those documents would you typically be involved in?

A. Well, I would oversee and review all the documents that go out when it comes to financing it. Capital raises. I would be involved in that.

Q. Okay. So did we prepare -- we, collectively, the management team, you and me and people we hired. Did we work with like Tim Beall. Would you, because was -- would you -- did you prepare a pro forma for that particular offering of GCP-1?

A. Well, it depends on what you say "prepare." I'm mean, I'm pretty good at Excel and the spreadsheets, and so I will take information and put it in and prepare financials from that, cash flow projections. But in terms of the assumptions, particularly in the nursery, or the GrowCo marijuana business, I would have to take input from people that we hired or were -- are in business with.

Q. So those document -- those -- that document -- that offering -- those documents -- those offering documents have been entered into exhibits. And there was -- was there a pro forma in those offering documents?

A. I believe there was.

Q. Did you make up the numbers associated with the amount of production for that pro forma?

A. No.
Q. -- to waterfall? When I say "waterfall," do you understand what I mean?
A. Yes.
Q. And so the -- there were two sets of projections. There were projection -- projections for the cost of building that greenhouse. Do you remember that?
A. I do remember that part of that, yes.
Q. You've answered the question. Let me ask the next question, please. Do you think that -- did you prepare the numbers relating to the operation's projection?
A. I didn't -- I did not actually come up with the numbers, because I know nothing about operating a greenhouse or growing marijuana. I relied on other people, Aaron Van Wingerden, Tim Beall, to get production. The same thing on the cost of the greenhouse. I had no idea what it cost to build a greenhouse. And they submitted numbers to us.
Q. Do you think I knew those numbers?
A. No.
Q. Where do you think those numbers came from?
A. Tim Beall, Aaron Van Wingerden.
Q. And so when we -- us, collectively, because

that's how we've been lumped. When we prepared these offering documents, did we try to guess at what those numbers would be or did we go someplace else and get those numbers?

MS. HUNT: Objection; cumulative. This is not -- it has been asked and answered and, also, this was dealt with extensively during Mr. Harding's direct last week.

THE COURT: Sustained.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) So if those documents were used by the plaintiff to prove fraud, would you think that that's in a -- inappropriate?

A. Yes.

Q. Let's go to 1016, the Suncanna logo. Were you involved in the preparation of this document?

A. I don't think so.

Q. Do you know who drafted this document?

A. I believe this document came about -- I think it's backdated. What is it? February 23, 2016. I remember toward the beginning of that year, you and Aaron were trying to work out an agreement between -- is it Suncanna?

THE WITNESS: Can you blow up the first part of that? The first paragraph? It might help

with the reading.

Q. (BY MR. MCKOWEN) Let me see if I can make the question more precise. Who -- do you have any knowledge about who helped Aaron? And I believe the other part is RH Group. Do you know if any attorney -- any other attorney was involved in the preparation of this document?

A. I believe we used a few different ones. But I believe this was Steve Levine at Husch Blackwell. He has his offices at that cash register building because I remember going there briefly and getting a check or something.

Q. Did Two Rivers' subsidiary GrowCo, at the time, did they pay for the drafting of this agreement?

A. I don't remember.

Q. Okay.

A. They should -- they should -- should not have because it doesn't pertain to us. I mean directly.

Q. Whereby we would provide funding to the tenant as far as the use of proceeds?

A. Yes. I believe that's actually part of this document, but yes, that was one of the offers we were looking at for raising funds to help fund our

tenants.

Q. Do you remember who drafted or helped Van Wingerden apply for a marijuana license?

A. I forgot the attorney's name, but it's with Vincenti Sederberg, V-I-N-C-E-N-T-I -- Sederberg. They were doing a lot of work in this particular genre of marijuana at the time.

And I believe they also helped -- I believe they referred people that -- I believe they were the people that helped with the license application for Suncanna.

MS. HUNT: I'm going to ask for another cumulative objection here. We've discussed this MIPA and how it was -- how it came about extensively last week.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Do you think the MIPA agreement between Suncanna and RH Group was something that was significant material? Became a huge part of this case and the facts associated with it?

MS. HUNT: Objection; vague. I don't understand what he means by significant in this case.

THE COURT: Sustained. Can you rephrase?

MR. MCKOWEN: Yeah.

Q. (BY MR. MCKOWEN) Has the plaintiff

asserted that RH Group, in joining on as a member, illegally grew marijuana?

A. Okay. So that's the question to me? Has the plaintiff asserted that RH Group and John McKowen illegally grew marijuana? I believe one of their actions or causes or claim against John McKowen, is that he illegally grew marijuana. I don't know specifically if it was between RH Group and John McKowen.

Q. You don't know the -- the relevance between RH Group and John McKowen? Is that what you just stated?

A. I didn't state that, but I think I do know the relevance between RH Group and John McKowen. I believe it was you, Mr. McKowen, that started RH Group.

Q. Was there -- was there another partner to RH Group?

A. I believe it was Tim Beall.

Q. Do you think that it was Chad Kirby?

A. Yes. Now that you mention that, yes. He was the other party to RH Group, Chad Kirby.

Q. So back to paying for Husch Blackwell, you said that it would have been improper for Two Rivers or GrowCo to pay for that; is that correct?

A. Yeah. Unless there's some sort of agreement between us and disclosures made about related parties' transactions.
Q. Did we have an agreement with, "we" being GrowCo, have an agreement to pay for his operations, in support of his marijuana operations?
A. Yeah. I think that's covered in the MIPA about how GrowCo or GCP-1 would help advance funds to get his operations back in line again.
Q. So would it -- would it -- would you think it's inappropriate if we agreed to, "we" being GrowCo, agreed to pay for, one, the licensing that -- that Vincenti Sederberg, that would have been -- do you disagree that that would have been an appropriate use as a -- the agreement to support his operations to become a licensee and operate that license?
A. If that's part of an agreement, then that's not improper.
Q. Do you know how he came to know, "he" being Aaron Van Wingerden, how he came to know who Husch Blackwell was?
A. No.
Q. Would it surprise you that I introduced him to Vincenti -- to Husch Blackwell?
A. No.

Q. Would it surprise you that I introduced him to Vincenti Sederberg?

A. No. It wouldn't surprise me.

Q. Did you ever attend any of those meetings at Vincenti Sederberg?

A. I did.

Q. And was -- was I there and was he there? "He" being Aaron Van Wingerden.

A. Sometimes, sometimes not. For example, when, I think it was Kristy Cameron and I were helping to put together the -- the application for Suncanna, and it was back in 2015 or helping them put together the application. There were some meetings I'm sure you weren't there. But there's a lot of paperwork, a lot of work.

Q. And so the -- it would have been a part of the support to the tenant to help him obtain a license?

A. Correct.

Q. Did any of us become owners or parties to that -- I think they call it a key license or a pro license?

A. Not that I'm aware of. Oh, wait. What do you mean by either of us? That any of us, "us" being people employed by Two Rivers or GrowCo, or... More

specificity might be good.

Q. Okay. So we had fallings out as some people, I think you testified to in -- in the -- in my cross or somewhere in there. This is the first time I'm asking you the question by calling you as a witness.

When the membership interest purchase agreement was put together, were you drawn into that membership interest purchase agreement?

A. I was.

Q. Did you have an employee license before then?

A. Are you referring to a marijuana employee license?

Q. Yes.

A. No.

Q. You did -- you did not get a marijuana employee license?

A. Before then, I did not.

Q. Yeah. That's what I was trying to say. You got one, but you did not get one before the MIPA; is that correct?

A. Correct.

Q. And you got -- is there a reason why you got an employee license as a result of the -- the

MIPA?
MS. HUNT: Objection; this is getting cumulative. We discussed Mr. Harding's license and his involvement with the MIPA last week.
THE COURT: Sustained.
Q. (BY MR. MCKOWEN) Okay. So it's already been testified to that you obtained your license as a result of the MIPA. When you -- what did you perceive your role to be as an employee associated with that MIPA license?
A. Well, even though I think I might have had the title of CFO or CEO with Suncanna, that was for banking purposes, I believe. And then, really, my role was to oversee the budget that was submitted as an exhibit. Which I didn't see it on that MIPA, but as an exhibit to make sure that was complying with being done properly. It was general controls.
Q. Are you -- are you saying that you're uncertain as to whether you were the CFO or CEO of -- with Suncanna?
A. Correct. Or managing member. I specifically don't remember. Something strikes me last week I saw something. I was CEO. I also think it might be covered in that MIPA, but I don't know for sure.

Q. So as the CEO, CFO, or any of those things, I'd like for you to review your thoughts about that because I don't know what the marijuana license requirements were, but you did or are willing to say, I believe, in your testimony yesterday or someday prior to today, that you were representing GrowCo in trying to determine how cash was being moved through Suncanna?

A. It could be both GrowCo and GCP-1.

And that description is a little wrong. It would be both GrowCo and GCP-1.

Q. You -- you believe that I was trying to represent the interest of GrowCo and how cash was being moved through Suncanna?

A. Yes.

Q. And how was I going to determine that?

A. When the MIPA was signed, one of the exhibits was a budget that you, I believe Chad, Aaron, Tim all agreed on, and it was up to me to monitor that budget to make sure there's proper expenditures along that budget and with the outside of it.

Q. So there was a budget that was prepared for -- through the MIPA; is that accurate?

A. Yes. That's my understanding.

Q. And the parties associated with that, or the interested parties in the transaction would have been GCP-1 because that was the greenhouse?

A. Yes.

Q. Suncanna because they were the licensee?

A. Yes.

Q. And Chad Kirby and -- and myself because we were RH Group?

A. Yes. That's my understanding.

Q. And Tim Beall at the time was working with Aaron Van Wingerden up until a point; is that correct?

A. Correct.

Q. And at some point in time, it seemed like Tim Beall went from being a Union Army member to a Confederate Army member. Is that an analogy that you would use? I mean that as one day he was all of a sudden for, not for Suncanna, but for the -- the purchaser of Suncanna?

A. It was an extremely interesting relationship and dynamics between two or more people. But yes, somewhat Civil War, which is what your metaphor was.

Q. It was something, somewhat warlike. Would you say that is accurate?

A. Civil War.
Q. Yeah.
(Court reporter asked for clarification.)
THE WITNESS: Civil War.
Q. (BY MR. MCKOWEN) Civil War. Okay. And so how would you say that Tim Beall, based upon your observation, changed as it related to Tim -- Aaron Van Wingerden?
MS. HUNT: Your Honor, I've listened for a while and waiting, but I do think that we are, again, covering ground that we covered extensively last week with regard to what happened between Suncanna and Tim -- and Aaron Van Wingerden.
MR. MCKOWEN: We've never.
THE COURT: We have. We covered a lot. I don't know about this particular question, but overruled. You can answer the question.
THE WITNESS: I'm rereading the question and pausing just a little bit.
I think what started it. The thing that I remember is there were cost overruns in the greenhouse. Significant time delays and cost overruns.
And then I think it was Tim Beall that went to -- I was a part of this meeting so I -- but I

believe it was told to you and you started -- they started complaining about theft at the site of the property and also how the -- being done. He was battering it out.

Q. (BY MR. MCKOWEN) I was told to you -- and we started complaining about the site of the property. Do you know what we -- what I was complaining about in regards to the site?

A. I'm sorry. That should read "theft at the property." Things were missing.

Q. And I was complaining to you during this time period that things were missing?

A. We had heard from you and other people and we tried to trace down different structural items, lights, electrical equipment and, in fact, then it -- it then came to sabotage. Things were destroyed.

Q. Who was the protagonist or the person you believe was providing that information? Did anybody speak to you directly about it?

A. I believe I got verbal communication. I also got a lot of e-mails and other statements from -- from Tim Beall, I think, was the first person that started to bring up issues.

But then there was some other people piled on to their own testimony.

Q. There was an incident, or there was at least one incident when you went down to the greenhouse, GCP-1.

That was kind of illustrative of the Civil War, related to the ditch. And you testified yesterday or the day before that Aaron Van Wingerden got inside -- inside of the moat and he was and he was effectively locked in, because that truck wasn't going to get on the other side of the moat.

And do you know -- you were there at that time; is that correct?

MS. HUNT: I'm going to object; relevance and cumulative.

THE COURT: Sustained on cumulative. I have already heard about the ditch.

MR. MCKOWEN: You've already heard -- heard that, yeah.

Q. (BY MR. MCKOWEN) And so you've already testified that he was locked in. You've already -- you were already testified -- you've already testified that the ditch was filled back in.

I don't know if you have testified who told or how the ditch got filled back in so Aaron could get back out?

A. I don't remember for sure, but I think you

and I had a phone conversation too. And you were up here and I was down there in the war zone. And I think you and I talked about it.

And you said, well, you can't imprison somebody like that. And I agreed, I mean, so I got Burt, I think, or something to go back for a small backhoe and filled things in so he can get out.

Q. Are you sure it was Burt? There was a Burt. Who was the foreman down there for construction at that time?

A. There's a lot of people coming in and out. I thought it was Burt that was the main construction guy down there. I told him fill the ditch in so he could leave. And my -- I know Burt sticks in my brain.

Q. Do you know the name Russ Coppock?

A. Ooh. Maybe it was Russ Coppock, yes. One of the other employees.

Q. Do you believe he was the construction foreman?

A. I think Russ was and Burt was his assistant, or vice versa.

Q. So how often during this time frame when you were up and tracked the money and making sure that things sure that things were being spent on what

we were paying for, how often did you go down there?
A. At least twice, about three times a week.
Q. And when you went down there, did I -- did we ever drive down there together?
A. Yes.
Q. How often did we drive together?
A. I would say more times than not, we would drive together.
Q. And when we would drive down there, aside from just shooting the bull, did we talk about what we were going to do down there?
A. Oh, sure.
Q. And so on this particular instance of one, I don't know who told me, but at some point in time you and I had a conversation about being -- about Aaron Van Wingerden being locked in. And I told you to go get them and fill in that ditch.
MS. HUNT: Objection; he's testifying.
THE COURT: Sustained. It's also cumulative.
Move on.
Q. (BY MR. MCKOWEN) Did we have a conversation about filling in that ditch?
THE COURT: Move on. That was the same -- that was the same question that I sustained the

objection on. I don't need to hear anymore about the ditch, trust me.

MR. MCKOWEN: Okay, Your Honor. I'm sorry. I apologize.

Q. (BY MR. MCKOWEN) So was the MIPA agreement part of what you were trying to effect for the purposes of eliminating the -- what was the purpose of the needing (ph) MIPA from the GCP-1 standpoint?

A. Well -- the manager of GCP-1 also -- and we needed to get a viable paying tenant in there. And at that point in time during construction of MIPA, I think Suncanna was under a suspension order, not a termination order, from the marijuana enforcement division.

So there was hope that somehow we could get a licensed, paying tenant in there. Whether it be Suncanna if they didn't lose their license, or somebody else.

Q. Do you know when the license was denied for RH Group?

A. I believe it was sometime in spring of 2016.

Q. You want to rethink that?

A. Okay. I could. I mean, there was a piece of evidence that showed the denial of RH Group, I

think, I mean, that grow license might -- might have been later. I don't -- I don't remember.

Q. Would you be surprised to know that RH Group's license was never denied?

A. Yes, because I thought I remembered seeing something that there was no license granted or that RH Group was denied, and maybe it was some other entity.

Q. Would you be surprised to learn that RH Group was just told to withdraw its license, and that's what it did?

MS. HUNT: Objection.

Mr. McKowen is trying to get testimony in through this witness that is actually his own testimony that he should have done in his redirect.

THE COURT: Sustained. It's also a good stopping point. So let's go ahead and take our afternoon recess, 15 minutes. Mr. Harding, you may step down.

(Whereupon, a recess was taken at 3:01 p.m.)

(Whereupon, the proceedings resumed at 3:15 p.m.)

THE COURT: Back on the record on 21CV33922. All parties and counsel are present.

Continue direct examination of Mr. Harding, who is under oath, by Mr. McKowen.

Q. (BY MR. MCKOWEN) Mr. Harding, after I left, who became the managing member of TR Capital?

A. I'm trying to remember. When you were there, I think there were three managing members. Mr. Morris, John McKowen, myself and I think when you resigned your position in May of 2016, maybe Gus Blass was there too. These are all investors. Gus Blass and/or Sam Morris were also involved. Other than that, I really don't have specific information.

Q. When I left, did you -- were you one of the managing members of TR Capital?

A. Yes, I just -- I stated that.

Q. Okay. Were you the CEO of Two Rivers and GrowCo? Well, let me rephrase that. Were you also the manager of -- I get cumulative. Were you also the manager of Two Rivers, the CEO of Two Rivers?

A. I think I was appointed in July 2016 to be the CEO of Two Rivers.

MR. HARDING: Your Honor, I'm going to go get my computer so I can...

THE COURT: Okay.

MR. HARDING: Thank you.

Q. (BY MR. MCKOWEN) So you were the manager

of TR Capital, Two Rivers, and the manager of GrowCo. Were you the manager of GrowCo as well -- or CEO of GrowCo as well?

A. I believe so.

Q. And were you also the -- the managing member of GCP-1?

A. A managing member, yes.

Q. Okay. And were you the managing member or CEO, of essentially all of the entities of the -- at a time of Two Rivers and TR capital -- Two Rivers and GrowCo and their subsidiaries?

A. I believe so, except for the Huerfano-Cucharas Irrigation Company. I was acting as treasurer.

Q. Okay. So how long did you stay in those positions?

MS. HUNT: Your Honor, I am going to lodge a cumulative objection. We went through this in detail last week.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) I thought I had the definition of cumulative together. And that was asking too many questions in one question?

THE COURT: That's compound. That's a compound question. Cumulative is you've already

asked it. It's already been answered or that testimony has already been elicited in some -- by some other witness.

Q. (BY MR. MCKOWEN) Okay. Was there someone else prior to that who was the CEO and/or manager of all those entities?

A. You were.

Q. At the same time. I was?

A. Yes.

Q. Okay. Do you think that's a conflict of interest?

A. Being managers or CEO, no.

Q. Of all of those entities?

A. No.

Q. Was there a managing member of GrowCo after I left?

A. Well, GrowCo was incorporated, and usually we don't have managing members unless it's an LLC. So GrowCo CEO until May 25 or 26th of 2016, was John McKowen. I was CFO. And then there was a few different board members there too.

Q. So when I left, you were -- you became the CEO of GrowCo? Is that your testimony?

A. Yes. I don't think it was immediate. It had to be passed by the board. Eventually it was.

Q. Was there ever a board that -- of GrowCo after I left that had five members to it?
A. It could have.
Q. Was it a problem that -- was a problem that it had, after I left, immediately that there was only four members?
A. Now that you're asking these questions, it's coming back to me a little bit. But yes, there was. I don't think there was ever five members. There was a four-member board, which caused issues about two votes yea, two votes nay, you know.
So there was some stalemates going on there.
Q. So let me see if I -- because it's not clear to me on the -- on the transcript here. After I left, all there ever became after that was a four-member board; is that right?
MS. HUNT: Your Honor, I again am going to object to the discussion of the four-member board and the stalemates. We had extensive questioning about that last week. My objection is cumulative.
THE COURT: That's my recollection, too, so sustained.
MR. MCKOWEN: Move on?
THE COURT: Yes, please.

MR. MCKOWEN: Okay.
Q. (BY MR. MCKOWEN) Let's go back to the 10-Qs and 10-Ks. Was there any Q or any K completed and submitted to the SEC after I left?
A. Oh, yes.
Q. So when -- when was -- I -- I resigned in May 25, 2016, and so there were Qs and Ks that were submitted to the SEC after I left. For how long were those submitted?
A. The last filing was the 10-Q for the period ending September 30, 2019.
Q. September of 2019?
A. September 30, 2019. The last 10-K, which is an annual report was filed with the effective period ending December 31, 2018, and we'll see some of those later.
Q. So a K was filed for the year of 2018, and subsequent Qs were filed up until -- for the first two quarters, and in the third quarter up until the third quarter; is that correct?
A. Up to and including the third quarter.
Q. Who signed the K attesting to the compliance with Sarbanes-Oxley?
A. Well, in general, the K is signed by the CFO or chief accounting officer, chief executive

officer, and because it's annual report, the majority of the board of directors. But in my case, I've have always had all of the board of directors sign off.

I don't remember, since we were kind of in a transitionary period, there were some new board members coming on after some resigned because of the lack of the old (ph) insurance. I believe it's easy to find out. But I don't, off the top of my head, remember all the signatures on the K.

But this testimony today, before the break, I started wondering who signed the 10-Q for September 30, 2019, because it was filed, albeit late.

Greg Harrington signed under the PCAOB affirmation of accuracy and perjury and penalty of law. He signed that 10-Q as chief executive officer, and chief accounting officer. After that there was no other Q or Ks filed.

There was an 8-K, which is a information, public information form, you know, that you file dated March 30, 2020, whereby they blamed COVID-19 for the lack of filing on time the K, which then never was filed.

Q. Okay. You resigned from GrowCo -- you resigned from GrowCo in October of 2018; is that

right?

A. Sounds about right.

Q. But you didn't resign -- when did you resign from Two Rivers?

A. September 19, 2019.

Q. So prior to 2018 K being filed, was the 2018 10-K filed?

MS. HUNT: Objection; asked and answered.

THE COURT: Sustained.

MR. MCKOWEN: Okay.

Q. (BY MR. MCKOWEN) Did you consolidate GrowCo in the 2018 10-K?

A. No.

Q. Why not?

A. We touched on that last week. It's the variable interest entity rules under the U.S. cap, whereby there's a certain set of tests you do whether or not you consolidate the company or not. And there's a memo in supportive evidence that has my answer to position on that.

Because of those criteria -- you can pull up the memo if you want. Those criteria dictated that we stopped consolidating GrowCo and its entities, I think, in Q3 2017.

Q. Okay. So you didn't consolidate because

you didn't think you needed to because GrowCo was no longer required to be consolidated; is that right?

MS. HUNT: Objection; cumulative. We went over this in detail last week.

THE COURT: Sustained.

MR. MCKOWEN: Meaning it's been asked and answered before?

THE COURT: Correct. Correct.

Q. (BY MR. MCKOWEN) Okay. Because -- so the -- the first bit of news that I don't think has been -- that I've heard and it's been testified to. I'm going to lay the foundation for that -- for that question as it relates to Sarbanes-Oxley. What are -- what are the requirements of Sarbanes-Oxley that anyone who's a signatory to that, what are they signing to?

A. They're attesting to the accuracy, to the best of their knowledge, of the financial representations made in those filings. And they also are statement and I can see the full statement in Two Rivers, September 30, 2018, sorry, 2019 Q, but it refers to the Sarbanes-Oxley provision, and it's very onerous.

If you willingly mislead somebody, commit fraud or purposely publish something you know is

inaccurate, it could result in jail time.

Q. And I think we've asked and answered that before. So when you're signing that document, after Sarbanes-Oxley, it becomes what you said it becomes; is that correct?

A. Correct.

MS. HUNT: Objection; cumulative.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) So when Greg Harrington, he signed a Q; is that right?

A. He signed the September 30, 2019 10-Q filing as chief executive officer and chief principal accounting officer, I believe.

Q. So I was mistaken. He does have his signature that something attests to the truth of it that I know of. And that would be the 10-Q.

MS. HUNT: Objection; Mr. McKowen's testifying.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Okay. Do you see any problems with his testimony, and his stip -- "his" being Greg Harrington -- his stipulation and the injunction and other relief associated with this case, and his signing the 10-Q?

A. I see major problems.

Q. What major problems do you see?

A. So let's take a look at these documents and I'll try to put them in a time frame. Mr. Harrington signed the September 30, 2019 10-Q on late -- it was due like in November 15th or 14. He signed it November 30th of 2019. That's okay. He filed an extension.

Then on March 30, 2020, he comes out with another formal filing. Sorry folks, we won't be on time, March 30th when the audit's due. There is a 15-day grace period to get the audit in. It was never filed.

On March 30th of 2020, he stated it was the COVID, COVID-19 virus that precluded them from filing the information. I would think that --

MS. HUNT: I -- I'm sitting on my hands a little bit, but I want to object to this detailed discussion of what Mr. Harrington represented in a document that we don't have in front of us. It's an out-of-court statement, and is not relevant to this case. We have not offered Mr. Harrington's testimony in this case.

THE COURT: Any response? No? Mr. McKowen, what's your question?

MR. MCKOWEN: Oh. That question was to me,

as I -- what's the relevance? I probably can't speak to it as well as Mr. Harding could because I wasn't there and I'm not that familiar with it.

But it seems to me in his stipulation here he's attesting to knowledge about the offerings that all occurred prior to March of 2019, and stating -- which we acknowledge wasn't under oath -- that fraud was being committed and all sorts of things.

And he's testifying that in retrospect.

When he previously testified that on according -- and signed it as to -- as to Sarbanes-Oxley, none of these things that he's alleging here occurred. Everything's on the order. That's -- that's the relevance.

THE COURT: Mr. Harding?

MR. HARDING: Yeah. Thank you, Your Honor. What we have here is a stipulation that was signed by the plaintiff, that we wanted to -- I'm happy to question he is pointing out that you have to see who signed the stipulation and what his motivations are, and was he truthful or not.

And this shows that either he was truthful about the filings in the SEC or he was truthful here and not with the U.S. government.

THE COURT: All right. You can finish your

response, but we don't need a long -- any long examination or any longer examination about Mr. Harding.

Mr. Harding, I'm sorry. About Mr. Harrington. Mr. Harrington is not a defendant in this case. Yes, he signed the stipulation on behalf of Two Rivers and Two Rivers was dismissed out. But I'm having trouble drawing the connection between this evidence and the claims that the plaintiff has to prove up in this case.

And I understand you take issue with Mr. Harrington, and you want to litigate every issue in this case. But I'm not sure that this is getting me any closer to resolving the claims in this case, and it's a lot of information that you're throwing at the Court that I'm not sure is entirely relevant.

And I know it's important to you, but I'm not sure it's as important to me in resolving these claims. If Mr. Harrington was testifying as a witness here, might be a little different. Might have a little bit more flexibility. But I think I've been flexible so far and I think the AG was saying that they have as well.

So finish this response, and then let's move on to something, which I know you want to ask,

which is the financials and things that Mr. Harding was doing in this case, and I would like to hear that testimony instead of circling back to Mr. Harrington and whether or not he's a truthful or untruthful person.

You're the one that elicited the test -- or the document or admitted the stipulation document.

So you're bringing this testimony before the Court, or this evidence before the Court, and then you're trying to knock it down and explain why it's -- why the Court should disregard it, when you're the ones that -- you're that one that introduced it in the first place. So Mr. Harding, finish your response and then let's move on.

THE WITNESS: In my mind, from a financial perspective and disclosure perspective, both those situations don't sync up. Either he's truthful one way or the other. That's it.

Q. (BY MR. MCKOWEN) Okay. I'm going to move on. Let's talk about the financial statements for the offering documents that were -- that are the subject matter of this complaint and whether they were truthful and accurate and what -- let's -- I don't want to be compounding and being cumulative both.

So let's -- were they -- were the -- were the documents that are underlying, the financial statements that are underlying these years from 2014 until you resigned in 2018 as it relates to GrowCo and the coordination with Two Rivers, were they accurate and truthful from your perspective as the CFO of most of them and then the CEO?

A. Yes. The historical financial statements on a combined consolidated basis, in my opinion, are accurate and truthful.

Q. Okay. Do you recognize --

MR. MCKOWEN: Honestly, Your Honor, I think all the questions associated with those financial statements have been asked and answered and they can only be cumulative moving forward. So I don't have any more questions for this witness.

THE COURT: Okay. Thank you. For plaintiff, cross-examination?

MS. HUNT: Yes, Your Honor.

CROSS-EXAMINATION

BY MS. HUNT:

Q. Hello, Mr. Harding.

A. Good morning.

Q. I just want to follow-up on a couple things that you talked about with Mr. McKowen. I want to

make sure I understand your testimony about the deeds of trust talked about earlier.

And you -- I believe you mentioned that you filed -- you saw deeds of trust that were for the GCP-1 and the -- the $4 million note, correct? You've looked at those several times.

A. Correct.

Q. Was it your testimony that you filed also a deed of trust for the GCPSU investment offering?

A. I do not think I did that.

Q. Was there a deed of trust filed for the -- for the GCPSU?

A. I don't remember filing that. Somebody might have but I don't remember doing that.

Q. Okay. And were there multiple deeds of trust, to your knowledge, filed on the same property for different investments? It was unclear to me from your conversation with Mr. McKowen.

A. I think that GCP, the GrowCo Partners 1 greenhouse improvement claimed water rights. I believe there's two deeds of trust on that. There's the GrowCo -- sorry, GCP-1 preferred members and then there's the GrowCo $4 million note. Could have been some other deeds of trust, but I don't remember.

Q. Okay. And then I want to finally talk a

bit about the advice you got from counsel that's been discussed several times and you talked about it this morning.

And is it right you asked Mr. Johnson, that securities attorney, you asked him for advice about making sure you had the correct SEC paperwork, correct? For the registration exemption?

A. Well, "SEC paperwork," what do you mean by that?

Q. The registration exemption paperwork that you -- that you were doing everything correctly?

A. Correct. There's something you don't file with the SEC but yes, we want to make sure we do it correctly in terms of the offering and the exemption of the offering.

Q. To make sure you were compliant with the registration exemption provisions, correct?

A. Yes.

Q. Because you were concerned making sure this continued to qualify as a private offering exempt from registration?

A. Right. Otherwise there would be a private placement memorandum, a lot more documents that go to an investor.

Q. And you wanted to be sure that you were

selling to accredited investors because the private offerings have to be limited to private investors, correct?

A. Correct.

Q. And so your focus and Mr. Johnson's work was on the exemption piece, correct?

A. Well, not only the exemption piece, but just make sure are these properly disclosed and correct forms were signed. So there was a lot of them.

You know, there's the accredited investor questionnaire. There's the joinder agreement, the security purchase agreement or the note purchase agreement, the subscription agreement, I believe. So there's like four or five documents there. We wanted to make sure they were proper.

Q. So all the documents that we looked at that were given to investors as part of their either soliciting them when they signed up. All those documents were the ones that you had Mr. Johnson look at?

A. No. Not all of them.

Q. There was some you didn't?

A. I don't think he looked at the PowerPoint.

Q. Okay. But the -- the formal documents?

A. Right.
Q. And you didn't have him look at the PowerPoint?
A. I don't remember him looking or planning on the PowerPoint.
Q. And from what I hear, you didn't ask him any specific questions about the requirements under the Colorado Securities Act, correct?
A. That's correct. I don't remember asking about the Colorado Securities Act.
Q. You didn't ask him about the use of unlicensed salespeople, say promotors selling?
A. Did not ask about that. My impression from information I received is that these are finder fees. They do it all the time. And he didn't say that. I just got information that, okay. I should have validated or verified. But that we didn't have to -- we were okay paying finders fees to people that helped us sell securities.
Q. And you didn't specifically ask Mr. Johnson about what you needed to do to make sure you were complying with Section 501 of the Colorado Securities Act; is that right?
A. That's correct. I don't remember asking him that.

MS. HUNT: That's all I have at this time. Thank you.

THE COURT: Thank you. All right. Mr. Harding, so similar to Mr. McKowen, in cross-examination of yourself, you can just make a sworn statement based on the questions that were asked of you on direct examination by Mr. McKowen.

MR. HARDING: I don't have any cross.

THE COURT: Okay. Mr. McKowen, do you have any redirect based on the questions that were asked by the attorney general.

MR. MCKOWEN: Can I -- is it a -- a proper purpose to ask him questions that were asked of him by Ms. Hunt just now?

THE COURT: You have questions about that?

MR. MCKOWEN: Yeah. Some. I have questions about that.

THE COURT: That's fine. You can do that at this point.

MR. MCKOWEN: Say again?

THE COURT: Yes. You can do that at this point.

REDIRECT EXAMINATION

BY MR. MCKOWEN:

Q. I believe your answer, as far as deeds of

trust for GCPSU were there any filed, and you responded no. Is that right? Or you didn't know?

A. I didn't know. I don't remember.

Q. Were any deeds of trust -- there's four properties -- excuse me. There's four properties there. We have stated that already, correct? As part of their overall project in Avondale? So that are GCP-1 GCP-2, 3, 4?

A. Correct. There was a 157-acre tract that we subdivided into four development tracts, of approximately 39, 40 acres apiece.

Q. Did you say a 107 acres?

A. It was a total of a hundred and -- they have 107. I think I said 157 acres. And if I said 107, it's supposed to be 157. Four almost equal lots of 39 to 40 acres apiece.

Q. So there was GCP-1?

A. Yes.

Q. Deeds of trust for filing, correct?

(Court reporter asked for clarification.)

Q. (BY MR. MCKOWEN) Was there a deed of trust filed for GCP -- GrowCo Partners 1 and GCP-1?

A. Yes.

Q. And was that deed of trust the first one to the preferred members?

A. Yes.
Q. And the two, the four -- $4 million note was the second one?
A. Yes.
Q. And was -- as far as you know, were any other deeds of trust filed on that related to the investors in this case?
A. For GCP-1, I don't -- I do not think so.
Q. Okay. GCP-2, do you know if any deeds of trust were filed on that?
A. Might have been. I don't remember.
Q. Did GrowCo itself have any deeds of trust on the properties, the -- the four properties that consisted of approximately 160 acres?
A. I think the way that it flowed was Two Rivers owned this tract of land, about 160 acres, and then what we did is we subdivided and then we got, I guess, a change of title or I don't know exactly what it's called.
But we changed the name or ownership from GrowCo to GCP-1 for the first lot, GrowCo to GCP-2 for the second lot, and I also think if you look at the corp -- or the county records, you'll see the ownership of GCP 3 and GCP 4 even though we haven't done anything with it yet.

Q. Correct. So what -- what do you believe the -- who -- who do you think owns the -- has the first deed of trust on GCP-2?

A. Well, the title is in GrowCo Partners 2, LLC. I don't know if there's a deed of trust on that particular parcel, and improvements, whatever it is. So I don't know about a deed of trust on there.

Q. Would it refresh your memory to say that the deed of trust for GCP-1 was what we said the two, the preferred and the note for GCP-2, it was the -- it was GCPSU, the preferred members of that, I believe, on that. Is it part of your recollection?

MS. HUNT: Objection; he said he didn't remember and now Mr. McKowen is testifying.

THE COURT: Sustained.

Q. (BY MR. MCKOWEN) Did GCPSU have -- have an ownership interest in any of the lots, had deeds of trust on any of the lots?

A. Again, I don't know about the deeds of trust, but if you look at the term sheet, you'll see, you know, where that -- those funds were going to go to. Preferred membership units in one, two, and some other places we -- and for operations.

Q. So the term sheet wouldn't be the proper agreement, but if there were deeds of trust that were

granted, we could probably find that in the -- in the subscription agreement for GCPSU, the allocation of what was to be assigned?

A. I would assume so. I don't remember it being in there, but I think so.

Q. And so GCPSU was the third, in terms of time of the offering documents. Is that correct?

A. I believe so.

Q. And the -- GCPSU was being done and completed in the spring, summer of 2016?

A. When you say was "done and completed," do you mean that the raise was completed, right?

Q. Right.

A. Yes. I think we had that wrapped up before you left in May of '16.

Q. Okay. And so I don't need to go crazy on this either.

If there were deeds of trust that were supposed to be registered, they would -- on behalf of GCPSU, is it fair to say, and would you believe that would be recorded or it would be memorialized as to what would or should have been created in the operating agreement? Well, it is an LLC. So the operating agreement would be the membership agreement for GCPSU?

A. I'm a little -- I mean, I don't quite understand the question, but I can take a stab at something maybe would help answer this question. I do remember --

Q. Let me see if I can stab at the damn question. And that "damn" is at me.

Were there requirements to record deeds of trust for the preferred members of GCPSU?

A. I don't remember that, but I do remember we issued membership certificates to GCPSU as called for in the subscription documents. I just -- I don't remember on the deed of trust filing, proof in the pudding is the county records.

Q. And if there -- if there was to be something that should be recorded, it would have been stated inside that operating agreement for the definition of what a preferred member is in GCPSU?

A. Yes. I would think so.

MR. MCKOWEN: Okay. That's it.

THE COURT: Thank you. Mr. Harding, you may step down. Thank you. Mr. McKowen, do you have any additional witnesses in your case.

MR. MCKOWEN: Do I have any more witnesses in my case?

THE COURT: Correct.

MR. MCKOWEN: No. None that I can call.

THE COURT: All right. Then we are finished with Mr. McKowen's case. Mr. Harding, we'll start your case now. Do you have any witnesses in your case?

MR. HARDING: Yes, Your Honor. But based upon some feedback I received about timing -- actually, the one witness besides myself that I have, is Michael Harnish. And I -- I told him stand down, looks like tomorrow. But I can reconnect with him to see if he's available because I'd like him to go first before I give my testimony.

THE COURT: He was by remote; is that correct?

MR. HARDING: That's correct.

THE COURT: You want -- why don't we take a recess and contact him.

MR. HARDING: Five minutes.

THE COURT: If we have to stop early today it's not the worst thing in the world. As I told you probably last week, on Monday morning we have a group that meets right outside our window on Mondays. They haven't started the music yet. Usually it starts around 3 to 3:30. So Mr. Harding, step out. If it will work, it will work. If not, we'll just recess

early and pick up tomorrow.

(Whereupon, a recess was taken at 4:00 p.m.)

(Whereupon, the proceedings resumed at 4:14 p.m.).

THE COURT: All right. Let's go back on the record in 21CV33922. All parties and counsel are present. And we are in Mr. Harding's case. Mr. Harding, would you like to call your first witness?

MR. HARDING: Yeah. I'd like to call Michael Harnish.

THE COURT: Michael Harnish is appearing via WebEx by agreement of the parties. Just by agreement of the parties or by a court order.

MS. KIDD-AARON: Agreement of the parties, Your Honor.

THE COURT: So by agreement of the parties. Mr. Harnish, I'm going to swear you in now. If you'll raise your right hand for me, please.

(Witness sworn.)

THE COURT: Thank you. Mr. Harding, when you're ready.

MICHAEL W. HARNISH,

the witness having been first duly sworn, was

examined and testified on his oath as follows:

DIRECT EXAMINATION

BY MR. HARDING:

Q. Mr. Harnish, thank you for joining us today. Why don't you, for the record, I guess you say your full name and post your name, whatever, and spell it out for the reporter, please?

A. Michael Wyly Harnish. Wyly is spelled W-Y-L-Y. Harnish is H-A-R-N-I-S-H.

Q. And Mr. Harnish, would you give us a little background about yourself and professional level, like designations and items like that?

A. Yes. I'm a -- have been a CPA. I'm retired now. I let my license expire. I was also a certified financial, financial forensics and in information technology as well as forensic use and computers with EnCase and a few other certifications, but those probably speak to the issue.

Q. Mr. Harnish, how long have we known each other?

A. I don't know exactly, but probably at least 30 years.

Q. Yeah. It's been a long time. So do you remember where we met or...

A. We were both sought after for the speaker

circuit for technology as part of the AICPA, American Institute of Certified Public Accountants seminars and presentations. I think we probably met then.

We also served on one or more committees, including one that you chaired that ended up resulting in the certification and discovery of XBRL for financial reporting adopted by the SEC, and have been -- have probably done other major technological things over the years as well.

Q. So we have had kind of a business relationship and also a personal relationship throughout the years?

A. Yes. Yes.

Q. During our relationship, has it been subjective views. Has it been positive? Negative? Who cares?

A. It's -- it's been positive. Yeah. I mean, you don't owe me any money. That's good. But we have always found each other strong professional sources for different speeches and different things we've been on, so I would say very positive.

Q. Thank you. So tell me about your involvement with Two Rivers, how did that come about?

A. I had invested in GrowCo, and in probably July -- I think on July 7th of 2016, is when I joined

the board of Two Rivers. But it was primarily to kind of look after my investment and those of others. And you were the -- at that point, the CEO, and had asked me to come on board and chair the audit committee, which I agreed to do.

Q. Okay. And what did -- so you were at the audit committee. You were on the board with Two Rivers. Did you hold any positions with any subsidiaries of GrowCo or GrowCo entities?

A. I did not.

Q. Okay. How much money did you invest in GrowCo or GrowCo subsidiaries?

A. A total of $222,855 -- $885.

Q. And you invested because?

A. Well, it started out as a bridge loan for -- for GrowCo and the return was extremely high, and so I invested the first 35,000 -- 30,000, excuse me, at that point. And made good interest on the bridge loan and then took that money and invested it in GCP-1, which is the first GrowCo greenhouse and earned decent interest on that, and also made an investment on Super Units, which I'm not sure actually paid off.

And I think I may have made an investment in one or more other of the subscriptions as well

that were earning interest at that time.

Q. So when you came on, you came on the board approximately June of 2016, a few weeks after McKowen resigned?

A. July 7th of 2016.

Q. July 7th. Okay. Do you remember a correspondence, I think, an e-mail from Mr. McKowen asking -- I think it was several times, but asking -- saying that money had been improperly diverted and that we need accountability for that?

A. There was an e-mail that went to both the board of GrowCo and Two Rivers stating that approximately, as I recall, $6 million of funds had been diverted by Wayne Harding, yourself, and Sam Morris. As chair of the audit committee, of course we took that extremely seriously, and convened a subcommittee to look into those allegations.

Q. So when you looked into the allegations, you came up with a report, and it's earmarked in my --

MS. KIDD-AARON: Objection; leading.

THE COURT: Sustained.

Q. (BY MR. HARDING) What was the outcome of the audit -- the audit committee report on these transfers?

A. The outcome was that we could not find any evidence of improperly diverted funds to yourself or to Sam Morris, and published the same in a report in April, I believe, of 20 -- 2018.

Q. Okay. So you're referring to the Two Rivers Water and Farming Board of Directors Audit Committee report dated April 25, 2018, correct?

A. Yes, I am.

Q. Could you read the last paragraph for me, please?

A. Yes.

THE COURT: What exhibit are you referring to?

MR. HARDING: It's the category -- hang on, please. It's the category that says TR Cap, GrowCo cash transfer reconciliation. You have a tab on that, and underneath that. I'm sorry. Hold on a second. I didn't quite tell you the right one. It's Exhibit 2006 on your tab, Your Honor.

And in that tab, you'll see most of the way through there, but Harnish audit copy report that's signed. A one pager.

THE COURT: All right. 2006.

MR. HARDING: Has this been submitted for evidence?

THE COURT: 2006 pages 1 and 2 have been admitted.

MS. KIDD-AARON: Yes, Your Honor.

Q. (BY MR. HARDING) Do you recognize this report?

A. I do.

Q. Were you one of the co-authors of this report?

A. I was.

Q. And could you read me the last paragraph, please?

A. Yes. "In the second analysis, the audit committee concluded that between 32,000 and $455,000 was due GrowCo GCP Super Units from Two Rivers, based upon how services from Two Rivers were calculated. It was also noted that a promissory note was executed from Two Rivers to GrowCo, effectively satisfying that funding gap using the $455,000 amount."

Q. Okay. Thank you. And in that last paragraph, it refers to calculations of some sort. And we have that as also an exhibit called TR Cap, GrowCo cash transfer reconciliation.

MR. HARDING: Can you open that up, please? It's the last -- Your Honor, it's the last page in that section. It should be a spreadsheet printed

landscape with some yellow and green and blue.

THE COURT: In my book, 2006, page 4. It's black and white.

Q. (BY MR. HARDING) So Mr. Harnish --

THE COURT: Hold on, Mr. Harding. Is that allocation of G&A? Is that the one you're referring to?

MR. HARDING: Yes.

THE COURT: All right. So this is 2006 page 4 in my book.

Q. (BY MR. HARDING) So before we get into some of the nitty-gritty and the numbers, we need to look at the G&A because wasn't it true that the offering documents called for the support of --

MS. KIDD-AARON: Objection; leading, Your Honor.

THE COURT: Sustained. It's a leading question.

MR. HARDING: Okay.

Q. (BY MR. HARDING) Why was the analysis of G&A important for us to do that?

A. In the analysis that we did, we undertook as the subcommittee, it was multiple steps involved. One was to make sure that all monies that were raised as part of the various subscriptions found their way

to a GrowCo bank account. Some were originally given to TR Cap. And so we wanted to make sure that all the monies raised were properly accounted for in GrowCo bank account, at least up until that time.

Secondarily, we wanted to take a look at what each of the offerings allowed for G&A, because at that point, Two Rivers was doing the accounting and handling the various other business of GrowCo.

So G&A was very important to that -- to that analysis.

To that extent, we asked Bill Gregorak, the CFO, to take a look at three different takes of G&A. One was to look at each of the positions in management, CFO, CEO, so on and so forth, and to determine what percentage of their time was spent on water management, on GrowCo, on Two Rivers, and that was done.

Then we asked, instead of each person, each executive having their own percentage allocation, what if we would strike an overall average of those allocations, of those percentages, and took a look at it that way.

The third was that we took the actual charges to each of the subsidiaries and -- and took a look at it that way. The latter -- the last being

the most beneficial to GrowCo, and that's what resulted for the -- to the $455,000 figure. So we actually took the evident G&A which benefited GrowCo the most in looking at the analysis.

Q. So if I heard you correctly, it wasn't just an average. I mean, it was trying to say let's -- or were you trying to say let's err on the conservative side?

A. We didn't want to -- we didn't want to err at all, but we took a look at different methods of allocating G&A and probably took the most precise, and the one that could be defended the most, since about 50 percent, as I recall, of the charges were charged directly to the subsidiaries. It was determining what about the other 50 percent of the charges. And so we actually looked at specific charges and went from that standpoint.

MR. HARDING: Thank you. I'm done with my direct.

THE COURT: This exhibit, were you offering this exhibit?

MR. HARDING: I'm sorry. What about the exhibit?

THE COURT: Were you offering this exhibit?

MR. HARDING: Oh. I'm sorry. I thought it

was offered. Yes, I'm offering this exhibit.

THE COURT: Any objection by plaintiff?

MS. KIDD-AARON: No, Your Honor.

THE COURT: Any objection by you, Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: All right. Exhibit 2006, page 4 in my book will be admitted.

(Whereupon, Exhibit No. 2006 was admitted.)

THE COURT: Mr. Harding, do you have a copy of that exhibit that's in color.

MR. HARDING: Yes. I can e-mail it to you.

THE COURT: Will you e-mail it to Connor or Kaitlyn and then they can print it off my color printer.

MR. HARDING: Certainly. Thank you, Mr. Harnish. Stay tuned, though. Not done.

THE COURT: All right. You're done with direct examination?

MR. HARDING: I am done with direct.

THE COURT: Cross-examination by plaintiff?

MS. KIDD-AARON: Yes, Your Honor. Hello, Mr. Harnish.

THE WITNESS: Hello.

CROSS-EXAMINATION

BY MS. KIDD-AARON:
Q. So I just have a few questions for you. So when you say "GrowCo's bank account," are you referring to a Two Rivers bank account?
A. No. GrowCo, I'm talking about the money transferred to and from GrowCo from Two Rivers.
Q. Okay. Where was that money stored?
A. The -- I'm not sure I understand the question.
Q. Was the GrowCo bank account a Two Rivers bank account designated for GrowCo?
A. For some time it was, until in 2017 early on, GrowCo took over all of their own accounting and finances.
Q. And did it have an account with a bank under the GrowCo name?
A. Did -- did GrowCo or Two Rivers?
Q. The GrowCo bank account.
A. I assume that it was under the GrowCo name, because GrowCo managed it at that point.
Q. And you said you were on the audit committee?
A. Yeah.
Q. What were your responsibilities?
A. I was chair of the audit committee, so I

communicated with the external CPAs for the publication of the 10-Q, 10-K, 8-K, and that was primarily it, but when this came up, we determined it was serious enough that we had to look into it.

I should add that not all members of the -- of the audit committee were on the subcommittee. The reason why is that Sam Morris, who was on the audit committee, was named in the allegation, and therefore, was recused from service.

And Chris Greg, the other member of the audit committee, was in Los Angeles managing the family desk, and because of that, because of the travel and time commitment, was excused as well. We then used Jim Cochran who is local to Denver and knowledgeable in the financial world, and Jim and I undertook the -- undertook the review.

Q. Was this money that you discovered 32,000 to 455,000 paid back to GrowCo?

A. There was a note due to GrowCo payable in 2018 as I recall. However, I think I resigned from the board before I knew what happened with all of that.

Most of it was actually taken up by subsequent G&A, so -- and that's why the date was set to 2018.

MS. KIDD-AARON: Thank you, Mr. Harnish.

THE WITNESS: Sure.

THE COURT: Mr. McKowen, cross-examination?

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Good afternoon, Mr. Harnish.

A. Good afternoon.

Q. So we've been kicking this football back and forth for about five days. And the football, to me, is how much G&A was allocated for, in terms of dollar amounts, to the parent, to Two Rivers who are TR Capital. Do you know that amount from the time you were a board member and conducted audit work?

A. I do not know the number offhand. However, I can tell you that each year we took each issue to see whether or not there was a cap on G&A allocation that Two Rivers could take. And then we went to the G&A allocation as determined by the actual charges I mentioned before.

Q. And if I remember correctly, you said that you selected in your analysis, you had three different methodologies put together. And you selected the one that was most beneficial for GrowCo; is that correct?

A. That is correct.

Q. And -- but you don't know the two -- $62,000 question, and those are how much was authorized by the -- do you know how much was authorized by the various term sheets, the dollar amount?

A. Yes. We went down through each term sheet for each subscription. There was one in which there was Two Rivers at no allocation. And then we looked at the term sheet for each of the other subscriptions to make sure that the allocation fell in line with that term sheet.

Q. But do you know the dollar amount of what the term sheets and probably, more specifically, what the subscription documents called for?

A. I can -- I can pretty well come up with that. If I can refer to some notes here. The -- the net raise, I've got one, two, three, four, five, six, seven different issues, starting with GCP-1, and I know the net raise for each of those. And we can go down through those. And then the term sheet for G&A, I can tell you what we used for the wording.

MS. KIDD-AARON: Your Honor? I'm sorry, Mr. Harnish.

THE WITNESS: Yeah.

MS. KIDD-AARON: I just want to ask what

Mr. Harnish is -- is referring to.

THE COURT: Mr. Harnish, what are you looking at?

THE WITNESS: I believe my notes from the time. I believe that's what I'm looking at.

THE COURT: And are you using that to refresh your recollection?

THE WITNESS: I am.

THE COURT: So you'll need to review those notes and then set those notes aside. You can't just read from them --

THE WITNESS: Okay.

THE COURT: Because they haven't been admitted.

THE WITNESS: Okay.

THE COURT: So take whatever time you need to review them to refresh your recollection and then let Mr. McKowen know when you're ready.

THE WITNESS: Okay. Okay.

Q. (BY MR. MCKOWEN) So the first numbers that I'm looking for are for what you referenced as the allocated dollar amount for the seven different offerings. And so what do you recollect was the allocated dollar amount for GCP-1?

A. For that, I would go back to the exhibit

that I think you called 2006, page 4. And that is labeled -- shows the amounts year by year starting in 2014, and I can read those amounts to you from the exhibit that you have.

Q. It's a part of the exhibit that was handed to you or was sent to you; is that correct?

A. It's part of the overhead allocation methodology that we had done, and I think you have that exhibit. It's been admitted into evidence.

MR. MCKOWEN: Is that supposed to be a copy? Could we hold off a minute so we can get this copied?

MR. HARDING: Your Honor, the black and white is -- actually, the color ones were -- was given to them two or three weeks before this trial started. He should have it. You just requested a color copy for the black and white copy?

THE COURT: Correct.

MR. HARDING: You should have that. Do you need another copy?

THE COURT: We'll make a copy.

MS. HUNT: We all have it.

MR. MCKOWEN: We do? Make a copy. And what exhibit number was that?

MS. HUNT: 2006.

MR. MCKOWEN: Say again?

MS. HUNT: 2006.

MR. MCKOWEN: 2006.

MS. HUNT: Page 4.

MR. MCKOWEN: And then for Harding. Let me see if I can pull it up quickly.

MR. HARDING: I can e-mail it to you too, Mr. McKowen.

John, I just e-mailed it to you.

Q. (BY MR. MCKOWEN) And so I see three methodologies that are related to -- that are related to a time frame going through 2016, and then a time frame of July of 2016 to 2017 January, March. What -- what methodology was selected as our third methodology for allocating G&A?

A. Method three, using actual segment reporting from the 10-K and only on the parent G&A to other segments.

Q. So for the methodology for 2014, '15 and '16, would be contained in the line that says "parent"?

A. It would be the -- no. The line that says, "40 50 10 parent allocation."

Q. "40 50 10 parent allocation"?

A. Correct.

Q. And so...

A. That's the allocation of the line that you referred to, to farming, GrowCo and water.

Q. So let me see if I understand this because it's not really working for me. The 40, 50, 10 parent allocation is selecting an amount -- the amount that went to the parent is the consolidated number or the number on that line.

For example, 2014 was 2,364,000 in 2014, and you allocated 40 for farming, 50 for -- I'm not following the -- the allocation, what actually was spent on what. Can you -- so are you saying that 45 percent of the 2364 went to farming, and so that was 1068725.

A. That's 40 percent not 45 percent.

Q. What is the percentage above the 2,364-? What -- what is that percentage relating to?

A. That's the allocation percentage from what was reported in the 10-K and 10-Q.

Q. Okay. Again, so is the number 1068725 a 40 percent of the 2364 or is the 45 percent the allocation?

A. It's -- for farming, it's 40 percent of 2,364,000.

Q. And that number is the 1068725?

A. Yes, it is. I take that back. No, you're right. It's 45 percent of 2,364,000.
Q. And so the 5560, 23 percent is 55160?
A. Yes.
Q. And so for those three years, the allocation for GrowCo was 551,600, 570,800, and 221,600?
A. Plus, I think the -- from July through December of 2016, you would add another 262,000.
Q. And -- and the 10,800?
A. Is January through March of 2017.
Q. So for 2014, 2015, 2016, and the -- the segment in 2017, the numbers for farming were -- were a million 68725, 570800, 221600, 262, and 10,800; is that right?
A. That is correct.
Q. So do you know off the top of your head how much capital was raised by -- for farming -- or are these allocations of the funds that came into TR Capital for TR Capital, or did they come into TR Capital for the benefit of GrowCo?
A. These are the G&A expenses from -- from Two Rivers or TR Cap, I guess. And then the allocation of those went to the subsidiaries.
Q. Okay. So let me see if I understand,

again, what you're saying. These numbers are allocations based upon the audit committee's assessment of what the G&A was for GrowCo?

A. This is what we used. There was approximately a million three of cost from the parent that should have been billed to GrowCo for the period May 2014, which we have the least amount of information for. I think that's just when you were the CEO, through 2000 through June of 2016.

Q. So irrespective of when I was the CEO of -- and when Wayne Harding and -- and when you -- and I'm just trying to get out what the numbers mean. Does -- do any of these numbers reflect the capital -- the capital that was actually raised for GrowCo?

A. No. They do not.

Q. They what? They...

A. There was, I believe, roughly the net raise note cost of capital would have been roughly $17,948,508.

Q. The amount of capital, as a ballpark estimate, over these time frames you're saying was 17,500,000 raised by GrowCo -- or no?

A. 17,948,508.

Q. You mean 17 million? I misspoke.

17,500,000; is that right?
A. No.
Q. What is the 17,500,000 that you -- I think you said -- mentioned, 17,000,948?
A. $17,948,508 was the amount raised net of cost of capital by GrowCo in the seven -- in the seven issues.
Q. Was the amount raised net of cost of capital. Okay. And so from that -- and that's from the seven different capital raises that you're talking about?
A. Yes.
Q. Okay. And of that 17,500,000 and 948,508 of net, how much was actually spent on farming GrowCo water, and how much was deducted or paid to -- to TR Capital for G&A?
A. I don't know in total of all three of them, but for GrowCo, that would have been a million 300,000.
Q. So the number for GrowCo that was allocated for G&A during that time frame was a million 300,000; is that right?
A. Is the amount that should be billed to GrowCo over the period of May 2014 through June of 2016.

Q. I guess --

A. That's the -- that's the costs of the parent (ph) that should be billed to GrowCo for G&A.

Q. Yeah. I get -- I get that. Do you know how much money TR Capital and Two Rivers raised during this time frame?

A. No, I do not.

Q. That's the number that I'm still not able to get at from this report. The number that I'm seeing is a million three. Anyway, we're running out of time. You -- in your initial -- in your initial comments, you said that I had said that Sam Morris and Wayne Harding were diverting that money to themselves individually. Is that what you testified to?

A. That's the allegations we understood from the e-mail.

Q. And is that something that is printed in the report that you -- that you put out?

A. I think we talked about the -- I'd have to look at the report. And I think it was a number about $6 million.

The e-mail stated, and it said, "Wayne Harding and Sam Morris diverted proceeds of the GrowCo Super Units offering and the exchange note

offering to pay themselves and to secure and build the assets of GCP-1 and Two Rivers.

They have refused to provide any credible accounting or authorization for using over $6 million of Super Unit in exchange for those funds." That was a direct quote from the e-mail.

Q. And is the report -- is the e-mail attached to it, because I don't think that I -- is the e-mail attached to it that -- that -- that the report is quoting?

A. No.

Q. Okay.

MR. MCKOWEN: I don't have any more questions for the witness, Your Honor.

THE COURT: Mr. Harding, any redirect?

MR. HARDING: Yes. Yes, please.

Mr. Harnish, a few words of clarity. Can you hear me okay?

THE WITNESS: Yes, I can.

REDIRECT EXAMINATION

BY MR. HARDING:

Q. I think that -- I think you might have provided this exhibit, but it's our Exhibit 11 that Mr. -- that you were referring to that Mr. McKowen says where did this come from.

But this was an e-mail I think that you received from John McKowen on April 21, 20 -- 2018, kind of a what-you-need-to-know thing in the e-mail. Is that what you were reading from?

A. That was -- I was giving an excerpt from that e-mail directly, yeah.

Q. Okay. A couple of other questions. Did we ever have a conversation about, you know, our issues that we had with banking and we had to -- you know, we had to name accounts, different accounts, because of all the bankers out there and marijuana and the federal government. We -- we had different names or we used Two Rivers but we actually had actually names next to them so we knew what the accounts were?

A. That's correct.

Q. Do you remember that conversation?

A. I do.

Q. Okay. All right. So the audit committee was informed about different accounts, might -- the name might not be --

MS. KIDD-AARON: Objection; leading.

THE COURT: Sustained.

Q. (BY MR. HARDING) So this report that you did, would you classify it as an audit?

A. I would -- no. Because an audit would be a

certified report. I would classify this as an agreed upon procedures review. We had the segment under the AICPA guidelines. The allocation -- the allegation that we saw came about on April 21st.

We took it very seriously. That's why we immediately took a look at it and published the report four days later.

Q. So in general, because you were once a CPA, you probably know this. That, you know, that it's a triple arc, a compilation, a review and audit, correct?

A. Correct.

Q. Okay. And -- and so an audit, of all those different assurances or attestation services, audit would be the --

MS. KIDD-AARON: Objection; leading.

THE COURT: Sustained.

Q. (BY MR. HARDING) One last question. Knowing what you know about accounting, allocation of G&A -- allocation of any expenses between different operating entities that's -- that's pretty tough to do, right?

MS. KIDD-AARON: Objection.

THE WITNESS: Yes.

MS. KIDD-AARON: Leading.

THE COURT: Overruled.
MR. HARDING: Did you say "overruled"?
THE COURT: I said overruled. He answered.
MR. HARDING: Okay. He said, "yes."
THE COURT: He answered the question.
Q. (BY MR. HARDING) And so that's why -- one of the reasons why you put -- I mean, the audit committee, like, let's look at three different ways of doing it?
MS. KIDD-AARON: Objection; leading.
THE COURT: Sustained.
MR. HARDING: Thanks for your time. I appreciate it. Thank you, Mr. Harnish. I'm done.
THE COURT: All right. Thank you. Mr. Harnish, I do have some questions. I'm probably the slowest on the uptake here.

EXAMINATION

BY THE COURT:
Q. So in your report when you referred to farming, GrowCo, and water. I know what GrowCo is, but when you refer to farming, what are you referring to?
A. There was a subsidiary called Dionisio Farms.
Q. Okay.

A. And there was another wholly-owned subsidiary, Water Redevelopment Company.

Q. GrowCo, you're referring to GrowCo, Inc. Correct?

A. I am.

Q. And then "water," what are you referring to?

A. Water is the Water Redevelopment Company.

Q. All right. So "farming" is just Dionisio Farms?

A. Yes.

Q. And then "water" is Water Redevelopment Company?

A. Yes.

(Music playing in background.)

THE COURT: All right. And walk me through the report again. I'm down on that three. I understand you have three methods there and method three was the one that, ultimately, you relied upon as being the, I guess, most conservative or favorable to GrowCo? Is that fair to say.

THE WITNESS: That is correct. And this -- this schedule was prepared by Bill Gregorak, who is the CFO, and we asked him to go through all the records. So --

Q. (THE COURT) Hold on. And when you say "go through the records," whose records?
A. That would be the records of both. It depends on which year, but would be Two Rivers for sure in every year, and in the years prior to GrowCo becoming totally independent in 2017, that would also include those transactions.
Q. So in 2014, where it says "parent," it has 2,364,000?
A. Yes.
Q. Am I understanding correctly that that is the total amount of G&A funds or expenses that --
A. Expenses.
Q. Okay. Total G&A expenses of Two Rivers or TR Capital?
A. Two Rivers, the parent, yes.
Q. That they spent on each of those three entities? So for farming, Two Rivers spent 45 percent of those G&A expenses on Dionisio farms; is that correct?
A. That's correct.
Q. And that amount was 1,068,000 --
A. Yes.
Q. -- 725? And so the next one for GrowCo, Two Rivers spent $551,600 on G&A expenses for GrowCo?

A. Yes.
Q. And then for Water Redevelopment -- and this is all in 2014 -- Water Redevelopment, 31 percent of the total expenses for G&A were spent on Water Redevelopment. That equates to 243,675?
A. Yes.
Q. And then I see 215 -- or 2015, 2016, and then those two at the bottom as well?
A. That is correct.
Q. I take it that Two Rivers would have had its own G&A expenses, correct?
A. Yeah. So not a lot, because other than those three wholly owned subsidiaries, there's not much. It's primarily just overhead office expense, so on and so forth.
Q. Just give me one moment. Sorry. I don't think I have any further questions.
THE COURT: Mr. Harding, this is your witness. Do you have any follow-up questions?
MR. HARDING: I do not.
THE COURT: For plaintiff, any follow-up?
MS. KIDD-AARON: No, Your Honor.
THE COURT: Mr. McKowen?
MR. MCKOWEN: No, Your Honor.
THE COURT: All right. So we're free to

let Mr. Harnish leave. We don't need him tomorrow, right? His testimony is complete? Correct? Yes? Everybody's nodding their head, yes. All right. Mr. Harnish, your testimony is complete. Thank you. You may disconnect.

THE WITNESS: Okay. Thank you.

MR. HARDING: Thank you.

THE COURT: All right. So we are just a little past 5, so now would be a good time to recess, especially since the music's struck up outside. Mr. Harding, do you anticipate calling yourself as a witness tomorrow morning?

MR. HARDING: I do.

THE COURT: Okay. Any other witnesses that you expect besides yourself?

MR. HARDING: At this point in time, no, but I reserve the right to change that.

THE COURT: All right. Ms. Kidd-Aaron?

MS. KIDD-AARON: Your Honor, it looks like we may be done tomorrow, so we wanted to address closing. Because a lot of things have come up unexpectedly, and it seems that Mr. McKowen has a lot of issues. We thought it might be better to do written closing. I wanted to present that as an option.

THE COURT: Okay. That would be plaintiff's preference?

MS. KIDD-AARON: Yes, Your Honor.

THE COURT: So let me ask you this: So I'm going to request findings of fact, conclusions of law. Do you want those to be separate filings, or...

MS. KIDD-AARON: We can do it however it works best for the Court, Your Honor.

THE COURT: I will do it however you want me to do it. Whatever you think will present your case the way you want it presented.

MS. KIDD-AARON: We'll do two separate. We'll do both.

THE COURT: So what that means, Mr. McKowen and Mr. Harding, is usually at the end of the trial, especially if there was a jury here, once all of the evidence is completed you can do a closing argument in front of a jury where you argue the facts and the law.

With a court trial, it's done one of two ways. One, you can -- I can have you do an oral closing argument or I can have you do a written closing argument, and I will give you some time to prepare a written closing argument. I wouldn't expect it to be done in a week or so, probably give

you longer just given the amount of information.

And so I would allow you to do a written closing argument explaining the case and the evidence from your perspective for me to consider. And then I will also ask you to do proposed findings of fact and conclusions of law. So that is a document that you file with the court that says, this is what we want you to find, and this is what we want you to order.

Theoretically speaking, a court could take your proposed findings, maybe make some adjustments to it, and then enter an order based upon your proposed findings of fact.

So it's a document that's not a -- what's the right word? It's not really an argument. It's supposed to be kind of a form for the court to follow in potentially ruling in your favor and how you would want the court to rule.

They're two separate things. I'm going to ask that you do both. If we do written closing arguments, you're still going have to do those findings of fact and conclusions. If we do an oral closing argument, you will still have to do written findings of fact and conclusions, but I would give you time to do a written closing as well for the Court's consideration.

So my first question is, Mr. McKowen, do you understand the difference between those two filings?

MR. MCKOWEN: One is a --

THE COURT: Pull that microphone down.

MR. MCKOWEN: One is a proposed finding of facts and the other is proposed conclusions?

THE COURT: There's proposed findings of fact and conclusions of law, that's one filing. And then the other filing would be a written closing argument.

MR. MCKOWEN: Okay. So -- and would -- so there's one portion that is a written finding of fact and conclusions.

THE COURT: Correct.

MR. MCKOWEN: And in the conclusions, can we suggest what the relevant law is?

THE COURT: Yes. You can do that in your written closing as well. They're similar documents but they serve different purposes.

MR. MCKOWEN: Right. So we can -- it's -- it's kind of like when I propose a motion. I -- I state what I believe what facts are, and then I -- I believe what the relevant law is. I can do that in -- in the first part, which is the -- of this

segment; is that right?

THE COURT: Are you talking about the findings and conclusions?

MR. MCKOWEN: Yes.

THE COURT: You can. It's hard to articulate. If you're submitting proposed findings of fact and conclusions of law, you need to list them. You need to propose them to the Court as declared in statements for the Court either to adopt or reject.

So you would list what all the facts that you believe have been proven, striking out all the language that we believe this has been proven. It's just a listing of the statement of facts that you believe have been established by the evidence. And then you marry that to the law of the case and state conclusions of law for the Court either to adopt or to reject. All right? That document is similar but different than written closing arguments.

A written closing argument is you can argue in a written filing what you think the Court should do and why, what evidence supports your theories and why. You can put in there the law that you thinks -- you think applies and why.

And you just try to persuade the Court,

just as if you were giving an oral statement -- oral closing arguments, sorry, in front of the court or a jury.

MR. MCKOWEN: Your Honor, for this specific purpose, can I just do a screen capture of what you just said so I can maintain it as a -- a guide?

THE COURT: I don't know how you do that.

CART PROVIDER: Your Honor, I -- I'm sorry to interrupt. This is the CART provider. But he's not permitted to do that. He'll have to get the notes from the court reporter.

THE COURT: Okay. It will be part of the transcript.

MR. MCKOWEN: And so I would have to buy the transcript in order to...

THE COURT: Correct. And I can explain it further tomorrow if you're not understanding. I know we're passing by --

MR. MCKOWEN: I think I -- I think I generally understand it. It's not any different than how -- how the plaintiff presents their -- they talk about in an introduction and that. And they talk about what has happened and they put their argument together as what -- as what they think you should do.

THE COURT: Yeah. Look, let me back up.

Maybe I've made this more confusing than I need to on a Monday afternoon. We're not done with the case yet. Plaintiff is simply wondering if I'm going to ask for oral closing arguments tomorrow or written closing arguments tomorrow. Plaintiff prefers to do written closing arguments.

MR. MCKOWEN: Me too.

THE COURT: Mr. McKowen prefers to do written closing arguments. Mr. Harding, do you have a preference?

MR. HARDING: I object. I want to do a verbal closing argument, please.

THE COURT: Okay. I'm going to do written closing arguments because, frankly, with six days of testimony and all of the evidence that has been presented, I don't think listening to an oral closing argument and trying to digest everything that you're saying and tying into the evidence is going to be persuasive to me, or at least not particularly helpful to me.

So I will grant plaintiff and Mr. McKowen's request to do a closing -- a written closing argument. And the way I do that is I require the parties to do a simultaneous filing. So one side can't review the other side's closing argument and

adjust theirs accordingly. I will have them filed the same time. Okay?

MR. HARDING: So there's essentially two documents, then, written documents? Closing arguments and the statement of fact -- law.

THE COURT: There's a closing argument and then there's a findings of fact, proposed findings of fact, and conclusions of law.

MR. HARDING: Okay. So that's two documents from us?

THE COURT: But we can talk about it further tomorrow, but the parties do not have to be prepared to do a written -- or I'm sorry -- an oral closing argument tomorrow.

MR. MCKOWEN: And how much time do you -- are you suggesting that we be allocated to complete the written portion?

THE COURT: You can confer amongst each other and -- and see what works best for you. I generally give anywhere from 15 to 30 days, just depends on how much time you think you need to do that.

MR. MCKOWEN: Are you ready to suggest a time frame?

THE COURT: You don't have to do that now.

I'd ask the parties to confer first and we'll talk about it tomorrow when we're done with testimony. Okay.

MR. MCKOWEN: Okay.

THE COURT: And then longer for proposed findings if you need it.

MR. MCKOWEN: We can clarify that -- we can clarify that tomorrow and then hopefully between now and then we can talk about how much time.

THE COURT: Correct.

MR. HARDING: I have a timing procedural question tomorrow. Is that on the record or it's off?

THE COURT: We can do that now.

MR. HARDING: Do it now?

THE COURT: We can do it now.

MR. HARDING: Okay. So my understanding is I'm going to testify. Both parties will have the chance to cross-examine me on my testimony. Then I have one last shot at redirect of myself, and then assuming I'm not calling any additional witnesses, and I whatever it is -- close the case or I finish my case, right?

THE COURT: Right. You rest your case?

MR. HARDING: Rest the case. That's it.

Okay. And then once I rest, then we all rest?
THE COURT: I will ask plaintiff if they have any rebuttal witnesses.
MR. HARDING: Okay.
THE COURT: Based on the testimony you have heard so far, do you anticipate having any rebuttal witnesses.
MS. KIDD-AARON: No, Your Honor.
THE COURT: So they can change their mind tomorrow just like you can change your mind if you want to add or call a different witness. But right now it sounds like your testimony will be the last testimony in the case, and then the case will be over and we'll set a deadline for written closing arguments.
MR. HARDING: Thank you.
THE COURT: All right. Anything from plaintiff before we recess?
MS. KIDD-AARON: No, Your Honor.
THE COURT: Mr. McKowen?
MR. MCKOWEN: No, Your Honor.
THE COURT: Mr. Harding?
MR. HARDING: No, sir.
THE COURT: Okay. See you tomorrow at 8:30.

WHEREUPON, the within proceedings were adjourned at the approximate hour of 5:16 p.m. on the 17th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, THERESA L. MENDEZ, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 236 herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 8th day of August, 2023.

My commission expires September 21, 2025.

Theresa L. Mendez, RPR
Registered Professional Reporter
and Notary Public

DISTRICT COURT, CITY AND COUNTY OF DENVER
STATE OF COLORADO
Court Address:
1437 Bannock Street
Denver, Colorado 80202

Case No: 21CV33922
Courtroom: 259

TUNG CHAN, Securities Commissioner for the State of Colorado,

Plaintiff,

vs.

TWO RIVERS WATER AND FARMING CO., et al.,

Defendants.

REPORTER'S TRANSCRIPT
July 18, 2023
VOLUME VII

The above-entitled trial was conducted at Denver District Court, 1437 Bannock Street, Denver, Colorado 80202, Division 209, on Tuesday, July 18, 2023, at 8:30 a.m., before HONORABLE CHRISTOPHER J. BAUMANN. These proceedings were reported by Wendy McCaffrey, Registered Professional Reporter and Notary Public.

APPEARANCES:

For the Plaintiff:

ROBERT FINKE, ESQ.
First Assistant Attorney General
INDIA KIDD-AARON, ESQ.
Assistant Attorney General
JENNIFER HUNT, ESQ.
Senior Assistant Attorney General
Ralph L. Carr Judicial Building
1300 Broadway
8th Floor
Denver, Colorado 80203
(720) 508-6401
Robert.Finke@coag.gov
India.Kidd-Aaron@coag.gov
Jennifer.Hunt@coag.gov

For the Defendants:

WAYNE HARDING
Pro Se
22586 East Weaver Drive
Aurora, Colorado 80016
(303) 290-0123
wayne@wayneharding.com

JOHN MCKOWEN
Pro Se
335A Josephine Street
Denver, Colorado 80206
(303) 218-6883
john@johnmckowen.com

**REPORTER'S TRANSCRIPT - VOLUME VII - July 18, 2023**

INDEX


| WITNESSES: | Page |
|---|---|
| WAYNE HARDING | |
| Cross-Examination by Ms. Hunt | 58 |
| Cross-Examination by Mr. McKowen | 72 |
| Direct Examination by The Court | 83 |

EXHIBITS

| NUMBER | INITIAL REFERENCE | RECEIVED |
|---|---|---|
| 2001 | 15 | 16 |
| 2004 | 21 | 22 |
| 2005 | 8 | 52 |
| 2006 | 24 | 27 |

P R O C E E D I N G S

WHEREUPON, the following proceedings were taken pursuant to the Colorado Rules of Civil Procedure.

* * * * *

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. And we are in Mr. Harding's case. When I stepped out a little while ago, Mr. Harding, it sounded like there may be something the Court needs to address. Is it about a witness or an exhibit?

MR. HARDING: Yes, Your Honor. During -- during my testimony -- and I think that goes first?

THE COURT: Correct.

MR. HARDING: Okay. I'll be -- if I could be up here and spread things out, versus in this seat, but then, when people cross, I'd be happy to go back there.

THE COURT: That's fine with me. Plaintiff have any concerns about that?

MS. KIDD-AARON: We're fine with that.

THE COURT: Mr. McKowen, is that okay with you?

MR. MCKOWEN: I wasn't paying attention.

THE COURT: That's okay. Mr. Harding wants to do his direct examination or sworn statement from

the podium, and then, for cross-examination, he's welcome to come back to the witness stand and take questions from the witness stand, and then he can do his redirect from the podium. That's his request. Do you have any issues with that?

MR. MCKOWEN: I don't have a problem with that.

THE COURT: Okay. Anything else for Plaintiff, then, before we get going?

MS. HUNT: No, Your Honor. Thank you.

THE COURT: Mr. Harding?

MR. HARDING: Nothing else.

THE COURT: Mr. McKowen, anything we need to talk about before we start up?

MR. MCKOWEN: Nothing.

THE COURT: All right, then, Mr. Harding. Would you like to call your, I guess, first witness, second witness?

MR. HARDING: That would be me.

THE COURT: Okay.

MR. HARDING: I'm calling me.

THE COURT: Before you testify, I need to swear you in. It's a new day.

JOHN HARDING

was called as a witness on behalf of the Defendants

and, having been first duly sworn, testified as follows:

THE COURT: You may begin your statement.

MR. HARDING: I think it's important -- well, first of all I want to make a statement that, at the beginning, I stated that it's great to be in the court because I can tell my side of the story. I thought that was positive. It is.

And I don't want to get too cocky, because, on the other hand, I'm ashamed to be here. And I don't think -- I think that the facts -- I know the facts prove that I had no intention to fraud. It was no Ponzi scheme. And everything that I filed was full disclosure. And we'll walk through that today.

I also think it's important to look at the context that -- what we were operating under. From 2000 -- well, in 2000, Amendment 20 was passed for medical marijuana. In 2012, Amendment 64 was passed to expand that to recreational, or whatever you want to call it, adult use marijuana.

That gave rise to a rush of a lot of people, and a fair share of nefarious people, into this business, of which I'm not one. I harken back -- and it's important to understand that because, if you remember, back in 1858, two blokes from Georgia came

out here and found gold here at the Confluence Park area, where the Cherry Creek met the Platte River. Didn't take long. Just nine years after 1849 gold rush in California.

MS. HUNT: I'm sorry. I'm going to interject an objection. This is not facts related to this case, and this sounds like argument.

THE COURT: Sustained. So you have to make a statement of fact, Mr. Harding, and not an argument, not a presentation, necessarily, but you have to -- now is your chance to give me a sworn statement regarding the facts that you think are important for me to know about this case.

MR. HARDING: Okay. That being said, I think that there was no objection on my statement that, in 2012, after the Amendment 64 passed, there was a next gold rush, I guess, in Colorado, and we tried to address that with -- "we," Two Rivers, with the assets that we had in hand, which was land and water, that we applied some to farming.

But we think -- there was previous testimony that water development takes a very long time. And so what could we do for the benefit of our shareholders? I will show you today that I did not comingle funds. The funds were -- collected from the investors were

spent in the proper way, as disclosed to the investors.
There was absolutely no -- by me, no misappropriation of funds. And this was not a Ponzi scheme.
So if what -- in mind -- let's go ahead and start with the section -- and, by the way, I guess there's -- I need to admit these -- one of these items for evidence.
THE COURT: If they haven't been admitted by stipulation yet, then that's correct.
MR. HARDING: I'd like to try to admit Exhibit 2005, pictures and videos, and I also put together -- I know there's a lot there, so I also put together a quick slide show on that. So I'm offering that for admission.
THE COURT: All right. Exhibit 2005 is admitted. Plaintiff's position?
MS. HUNT: I don't know that we necessarily object to these pictures, but we do need some foundation laid for what they are --
THE COURT: All right. I'm sorry to interrupt. Go ahead.
MS. HUNT: The foundation of what they are and who took them.
THE COURT: Mr. McKowen, what's your

position?

MR. MCKOWEN: Same as hers.

THE COURT: Objection is foundation. Sustained. You have to -- there's an objection. They're not stipulated. So you have to establish what these pictures are, when they were taken.

MR. HARDING: These pictures are from me. Except for two -- two are from Tim Bell -- all these pictures were taken by me of the greenhouse in question, including GrowCo Partners 1 and GrowCo Partners 2.

THE COURT: Which ones were taken by Tim Bell?

MR. HARDING: I don't have them labeled.

THE COURT: Do you know when all of these pictures were taken?

MR. HARDING: They're in the slide. If I show the slide show, I can show you. I think it was the last slide, that -- it was the last slide, two pictures from Tim Bell.

And I'm thinking about this again, and with respect for the Court's time, I think there's been plenty of evidence of production and construction of GrowCo Partners 1 and GrowCo Partners 2, so I think I'll go ahead and table that evidence.

THE COURT: You're talking about the pictures?

MR. HARDING: Yeah. The pictures.

THE COURT: I'm fine with the pictures. I just need to know when they were taken. There's dates for each picture? Did you label the pictures?

MR. HARDING: So the -- if you look at the titles of the pictures -- for example, the first one is -- this one's a movie, but it doesn't matter. The first one is 2016/10. That means it was taken in October of 2016. Then, 2017/02 is taken in February of '17, 2017.

THE COURT: That's how it's listed on my pictures. I have slides. Number 1 doesn't have a date, GCP1 structure. July 2016 is Number 2.

MS. HUNT: Your Honor, the electronic versions that we have, many of them are labeled with what appear to be dates. There are a few that do not have dates.

THE COURT: Every one in my book, Slides 1 through 12, have a date in the title. So are you . . .

MR. HARDING: I think she's referring to -- I do have three pictures that are GCP1 Warehouse, but I did not take those.

MS. HUNT: My confusion is that the

electronic version that we received from Mr. Harding, they are way more than 12 pictures. So I think there's maybe a disconnect between what's in the hard copies, books, and what we were given.

THE COURT: All right. All I have is what's in the hard copy. So I don't have your digital evidence.

MR. HARDING: I think she's correct. What I did for you -- and maybe this is a violation of evidence -- but what I did for you was, instead of printing out all these pictures in color, I put together a PowerPoint slide. And that's what I gave you.

MS. HUNT: Could we -- can we get that? We have that?

MR. HARDING: You can. So . . .

THE COURT: One moment, please.

MCKOWEN: If I can, Your Honor.

THE COURT: Yes.

MR. MCKOWEN: I don't want to be a nit-picker here, but he's got dates on there. It's about -- it's -- there are pictures about the greenhouse and the warehouse. And it's in the time frame period of this case.

THE COURT: Okay. Well, I'm not being

nit-picky by the rules of evidence. There has to be a foundation, and what the Plaintiff has and what I have are apparently two different things.

So I would like to admit these -- have these admitted into evidence because I think they would be helpful for the Court, but you have to establish a basic foundation, which is when were they taken, and are they fair and accurate depictions of what this greenhouse looked like on that particular date.

So we haven't even narrowed down the date yet, which is what we're trying to do.

MR. HARDING: So I do have the slide show I put together for you of the pictures that were given to the -- the parties. And I would be happy to email that slide show to the Defendant and the Plaintiff.

THE COURT: Well, if that's what you're intending on admitting, they need to have a copy of that.

MR. HARDING: Okay.

MS. HUNT: Make sure you send it to me and Robert, please.

THE COURT: Send it to Connor as well.

MR. HARDING: The issue is, I would need to transfer it on a thumb drive because it's too large to mail. I'd be happy to do that.

THE COURT: That's fine. I don't know why -- I only have 12 slides. Is 12 slides too large to send?

MR. HARDING: It's 25 -- it's over 25 megabytes. I can try to reduce the file size, or I can show them on my computer, what I have, and they can take a look at it that way.

THE COURT: Either way, I have one copy here. I need to get a --

MR. HARDING: You can copy that off.

THE COURT: Not in color right now. That's why, if you emailed it to me, I could print it off in color. Either way, I need to have a color copy so we can upload it into the court file.

MR. HARDING: I can get you the color copy, and I'd be happy to show you that on a thumb drive. It would take a few minutes.

THE COURT: Go ahead. We'll make copies of this at the clerk's office.

MS. HUNT: You're not allowed to have --

THE COURT: We're going to make a color copy of the copy we have.

MS. HUNT: Our IT does not allow us to put unknown hard drives into our work computers.

MR. HARDING: So should I wait for a copy?

THE COURT: You can if you'd like to, or you

can move forward, and we can come back to it.

MR. HARDING: Let's come back to it, with respect to the Court's time. I'd like to.

MR. MCKOWEN: Your Honor?

THE COURT: Yes.

MR. MCKOWEN: Is this what you're trying to show? Is that uploaded on your site that we have access to? Pardon? When?

MS. HUNT: Mr. Harding, he's talking to you.

MR. MCKOWEN: Is what you're trying to show uploaded on your Google Drive that we've given access to?

MR. HARDING: It is. The only problem is the slide show I put together to condense everything is not up there. But I can put it up there on the drive. But, in the meantime, later include it for the Court on the color side, but it's all pictures that have been disclosed in that one exhibit.

MR. MCKOWEN: So it was not -- I don't know if I asked this of him or you -- so it was not uploaded and available as an exhibit? And -- because it's much easier for you to -- if you can get it accepted as an exhibit, it's much easier for you to put it up on your website and avoid the conflict that the State may have, I think, if it's put up on the . . .

MR. HARDING: I can also upload what's being copied, the slide show, to that Google Drive, you mean, and then you can get it that way; is that what you're asking?

MR. MCKOWEN: Yes.

MR. HARDING: Did you say "yes"?

MR. MCKOWEN: Yes.

THE COURT: We're making hard copies for everybody. So . . .

MR. HARDING: So let's go, since we have the hard copy being produced. The first thing I'd like to admit for evidence is a section of the U.S. GAAP, the United States Journal of Accounting Principals, and they're large volumes.

There's four or five volumes, and very thick, and I think I received permission to not bring in the entire set of volumes. The first one I'd like to -- Accounting Standards Codification, which is Section 280. That deals with the segment.

And then also, in Section 220, there is the SEC Supplement to Segment Reporting that I'd like to submit.

THE COURT: This is Exhibit 2001. Plaintiff's position?

MS. HUNT: We do object on a couple of

grounds, one being that is not relevant to any claim that we are bringing in this case. The commissioner is not making a claim that they have violated accounting standards. And this is also, I suppose, expert testimony of some sort. And hearsay. So we would object.

THE COURT: Mr. McKowen?

MR. MCKOWEN: I would like to see it.

THE COURT: 2001? It's been emailed to you previously, correct?

MR. MCKOWEN: Yes. I can pull it down from the trial exhibits that he's presented.

THE COURT: 2001 is being offered. What's your position?

MR. MCKOWEN: I would let it in.

THE COURT: So no objection from Mr. McKowen. Court will admit 2001. I do think it's relevant, based on some prior testimony that's already been had, and also may be relevant to the claim of fraud.

(Exhibit 2001 was admitted into evidence.)

MR. HARDING: Thank you, Your Honor. So if you open the first file, it says, "280, Segment Reporting." Again, this is taken directly out of the Accounting Standards Codification.

THE COURT: Let me interrupt you. Sorry. We

have those copies for everybody.

MR. HARDING: I'd draw the Court's attention to the second -- or the first full paragraph, the second page, labeled 280-120-5-4. This deals with the segment reporting.

THE COURT: Give me that section again, please.

MR. HARDING: 280-10-5-4.

THE COURT: Got it. Thank you.

MR. HARDING: I don't think that's it.

That's it. Second page, highlighted, "The management approach" -- what they're talking about is approach is segment reporting -- "facilitates consistent descriptions of a public entity to its annual report and various other published information."

It focuses on financial information that a public entity's decision-makers use to make decisions about public entities operating matters. The components that management establish for that purpose are called operating segments.

We established, there was -- operate -- some changes in operating segments, Your Honor, but we established corporate farms, water, and ag. Sorry -- farms, water, and GrowCo. Those are the four segments we established.

You go down the document. And this starts with a Section 280-10-50-1, "General." Keep going. I think -- yeah. Thank you.

It states, "An operating segment shall include components of a public entity that sell primarily or exclusively to the operating segments of a public entity if the public entity is managed that way.

"Information about the components engaged in each stage of production is particularly important for understanding virtually integrated public entities in certain businesses. For example, oil and gas entities. This information is also important because different activities within the entity may have significantly different prospects for future cash flows."

The next section. 280-10-50-3. "An operating segment may engage in business activities for which is yet to recognize revenues. For example, start-up operations, may be operating segments before recognizing revenues."

Page down another four or five. It's highlighted. Section 280-10-50-28. There. "If the chief operating decision maker uses only one measure of a segment's profit or loss and only one measure of segment's assets in assessing segment performance and deciding how to allocate resources, segment profit or

loss and assets shall be reported at those measures. If the chief operating decision maker uses more than one measure of the segment's profit or loss and more than one measure of the segment's assets, the reported measures shall be those that management believes are determined in accordance with the measurement principals most consistent with those used in measuring and corresponding amounts and the public entity's consolidated financial statements."

I'm done with that particular piece of evidence. If you go to the next one, which is the segment reporting, ASC-220. It's a supplemental to that standard, and it relates to what they call Regulation SX, which is an SEC documentation about what needs to be -- what needs to be reported.

And in this document here, it states that, "The following should be reported by a public entity." Down at 220-10-S-92, Number 1, "Set sales and gross revenues state separately, net sales of tangible products, operating revenues, income from rentals, revenue from services, and other revenues."

If you go down the next page, toward the top, Number 2, "Costs and expenses applicable to sales and revenues, states separately the amount of cost of tangible goods, cost of goods, tangible goods sold,

operating expenses of public utilities and others, expenses applicable to rental income, cost of services."

MS. HUNT: Your Honor; I'm sorry. Which exhibit are you on?

MR. HARDING: I'm on the Segment Reporting, ASC-220-20-S9.

THE COURT: It's still Exhibit 2001?

MR. HARDING: Yes. It switched from the --

THE COURT: You got to move back. There you go.

MR. HARDING: So I'm thinking I was with "states separately the amount." I read everything down to "cost of services and expenses applicable to other revenues." This is the authoritative guidance.

MR. MCKOWEN: I have a question. I'm not able to follow either -- I realize it's 2001, but is it the second document that you're referring to? Segment Reporting, ASC-220? Is that what you're looking at, or are you looking at the 280 Segment Reporting?

MR. HARDING: I'm referring to the entitled "Segment Reporting ASC-220, et al." Yes.

MR. MCKOWEN: Thank you.

MR. HARDING: Okay. That's the authoritative literature on segment reportings. The next thing I

would like to offer as evidence is Exhibit 2004. To give you some context on that, PDC, which is a well-respected, Big Four CPA consulting firm, they have numerous different documents to help understand the accounting standards codification under U.S. GAAP.

This, I provided, is the section on accounting for capital projects, which they quote from the different excerpts of the ASC. I thought it would be easier that way to show, how do you account for capital projects?

THE COURT: So are you offering 2004?

MR. HARDING: Yes.

THE COURT: Plaintiff's position?

MS. HUNT: We would object on hearsay grounds and also relevance.

THE COURT: Mr. McKowen?

MR. MCKOWEN: I have no -- no objection.

THE COURT: Mr. Harding, is this information that you relied on in performing your work as CFO in this case?

MR. HARDING: Yes.

MS. HUNT: I also -- I guess I want to -- to the extent Mr. Harding is intending to give an expert opinion, he's not been disclosed as an expert in accounting or any other field.

I understand he is an accountant, but he needed to do -- be disclosed as an expert if he wanted to give opinion testimony and rely on information that is not otherwise admission in court under Rule 702 and 3.

THE COURT: Well, it's true, he wasn't admitted as an expert, but he will be permitted to testify to what he did in this case as CFO and why he did it. And some background as to what informed that decision, I think, would be helpful to the Court. So 2004 will be admitted.

(Exhibit 2004 was admitted into evidence.)

THE COURT: But, Mr. Harding, you understand that you're not admitting yourself as an accounting expert, and you're not permitted to give opinions on the way -- expert opinions.

You're going to have to tell me what you did in this case and why you did it, but I'm not taking that as expert testimony. You understand that?

MR. HARDING: I understand that. And these are tools of -- that I used, reference material that we used to prepare financial disclosure reports that I think is important to this case. Thank you.

So -- and accounting -- that's it. "Accounting for Capital Projects." If you go down to

Section 1213, "Construction Stage Capital Projects." Section -- bullet point.

"Certain costs directly related to activities performed by the reporting entity or by third parties who are not independent of reporting entity for the construction or installation of specific PP&E," which means Property, Plant and Equipment, "and costs directly related to the preproduction test runs of PP&E that are necessary to get PP&E ready for intended use.

"These costs include only payroll, payroll benefit-related costs, including only the service costs components of a net" -- "of net period pension, and post retirement costs of employees which devote time to a PP&E construction project."

Further, if you go down to Section 1-2-2. One more page past that. At the -- almost the complete bottom, you'll see that, in terms of what to include into construction, it deals with interest costs. And it's talking about the three categories -- go back up. Yeah, they have it on the screen.

There's preliminary phase, pre-acquisition phase, construction phase. So if you look at the construction phase, down at "interest costs," it says to capitalize the interest expense.

Further, if you go to the top of the next

page, I believe, it says, "Project financing external fees." One more page. It states, "During construction, you accomplish that. Periodic specific increment costs directly attributed to project financing should be capitalized; for example, debt issuance cost: Any amory-station (sic) recorded during construction should be included in capitalize calculations" -- "capitalized" -- sorry -- "capitalized interest calculations."

So what I've done here is I laid a foundation, under U.S. GAAP, for the requirement for segment reporting and how to do that segment reporting. I also have established through authoritative sources, and that recommendation is to capitalize the costs and associated debt financing costs during the construction period.

Now I'd like to move on to Exhibit 2006. And I'd like to admit, first of all, that Betzer Forensic Accounting Report. I think it has already been admitted. I think the audit committee reports have been admitted.

I also think that -- and maybe not -- the very first file, the 10K Segment Reporting Summary, has not been admitted. This is taken from our disclosures, our financial reporting, as a summary, and I'm trying

to find the simple, most clear way to show the Court where the money went on audited financial information. That's the purpose for this particular exhibit.

THE COURT: This is 2006, page 7. What pages are you asking to admit?

MR. HARDING: It's the page titled -- you might have pages there -- it starts with 10K Summary of GrowCo and Sub, Expenses. It's on the board there.

THE COURT: I see it.

MR. HARDING: That's the first page. The second page is the -- kind of a summary of the capital raised that we've seen before.

THE COURT: So 2006, page 7 and page 8, are being offered. Plaintiff's position?

MS. HUNT: I -- I think we need just a little bit more foundation as to the source of this information and who prepared it.

THE COURT: Sustained. You just have to give me some background on --

MR. HARDING: Okay.

THE COURT: -- who prepared this.

MR. HARDING: Let me rephrase it. I'm being accused of some serious stuff here.

THE COURT: Hold on. It's not an argument. I just -- they're -- they want additional foundation,

which the Court agrees, there needs to be some additional foundation laid. What is this and who prepared it?

MR. HARDING: I prepared it. I'm trying to find a way that succinctly and with clarity shows the Court what happened to the money that was raised for GrowCo, and it's my work product, but it came out of audited financial information, which we'll look at.

THE COURT: And when did you prepare these two pages?

MR. HARDING: I think the first time I prepared it is, like, two, three months ago, as I'm trying to figure out how to communicate effectively accounting jargon.

THE COURT: All right. Plaintiff's position? Any objection?

MS. HUNT: If he's saying that it's part of the audited financials, then that, I don't think we object. It's not clear to me, though, whether he is saying he prepared this for this litigation and took information out of the 10Ks or financial statements.

THE COURT: Can you consider that, Mr. Harding?

MR. HARDING: The original page, the first page, is taken directly out of audited information of

the 10Ks, which we're going to go over and tie each number into. The second page is -- I believe I might have taken it from some other report.

Go back to the second page. That's been admitted in evidence already about the cap raise.

THE COURT: Any objection, Plaintiff?

MS. HUNT: No. The second page is a little bit different numbers. But, no. I think, no objection.

THE COURT: Mr. McKowen?

MR. MCKOWEN: I have no objection, Your Honor. It's -- these are the numbers that I've been trying to get out forever.

THE COURT: 2006, pages 7 and 8, are admitted.

(Exhibit 2006 was admitted into evidence.)

MR. HARDING: Thank you. I was trying to just figure out of my presentation, the best way to handle that. I may recommend a methodology, whereby, so there's understanding, we leave that page up, and then I can direct you to Exhibit --

THE COURT: Okay. Can you make one copy?

MR. HARDING: One moment. The exhibit labeled Exhibit 2001 -- sorry -- Exhibit 2002, Two Rivers 10K filings?

MS. HUNT: That's been stipulated.

MR. HARDING: Great. Would that be helpful if we go through some numbers here so you can look there and see where these numbers came from?

THE COURT: That's fine. I'm just making a copy of 2006, pages 7 and 8.

MR. HARDING: Okay. Thank you.

THE COURT: So wait until I get my copy back.

MR. HARDING: As we wait for that, Your Honor, a little bit more substance here about why I'm relying on 10K. We heard from three investors, I think, all on Monday, or two on Monday and one on Tuesday last week.

And they all -- my understanding is they all equated GrowCo as a subsidiary or part of Two Rivers. I relied -- based upon our legal consultant, I relied on disclosures contained here in the 10K. That's readily available to anybody, particularly an investor that's not only accredited but also sophisticated, which all signed that document stating they are.

So let's start -- let's go to 10K, for the year ending December 31st, 2015. These are disclosures of management and signed off by the board. And the section that it -- just to give you a feel for the 10K -- and I don't mean to be rudimentary, but there is

certain standards that you have to put in.

What I'm going to focus on but I will draw your attention to is representations of management, but I'm going to draw your attention to audited financial statements. I think that we heard Ms. Martinez say, on Tuesday, when I questioned her about the different levels of assurance to financial statements, first of all, there was nothing, then there's compilation.

There's leave, and then there's an audit. I believe that she agreed with me, with my statement that said that, everything else being general, you know, would you rely more on audited versus reviewed versus compilation?

She put "audited" at the top of the list, in terms of the assurance that a third party that goes -- that's also registered with the public company accounting oversight board, that so they get reviewed two or three times -- well, they get reviewed -- depends on how many audits they do -- but they get reviewed by an entity of the government, the auditing companies, by the PCAOB.

So an audit for particularly a public company is not a trivial matter. It's extensive. It's time-consuming. It's document oriented.

So, with that in mind, let's look at some of

the 10Qs. Let's go to page -- in the actual printout, this is the first 10Q, the 2015.

THE COURT: I have 10K. Are you referring to the 10K?

MR. HARDING: I'm sorry. 10K for 2015. Also, the 10Ks for small reporting companies contain two years. The current year, in this case, 2015 and the prior year, 2014. So if you go to -- and the printed copy, it's called page 14. I think the numbering is different.

But if you look at -- it's page 14 in the middle, right under "Leasing and Providing Services for Cannabis Growers." The last paragraph of that section. If you're not there, or anybody's not there, let me know.

MS. HUNT: We're having a little trouble finding what section you're on.

MR. MCKOWEN: I'm not there. Are you on Exhibit 26, Mr. Harding? Mr. Harding? Are you on Exhibit 2006?

MR. HARDING: 2002, the 10Ks.

MR. MCKOWEN: Okay.

MR. HARDING: It's Section Part 1, Item 1. It's a lot of pages, but it's about the business. And you'll see, in the handout that you have, the

pagination is different than what I have, so it's -- it says "14" on the page. Whatever number page that would be. Are you there?

THE COURT: I'm there.

MR. HARDING: "The development of the GrowCo business model of constructing and leasing greenhouse space to licensed marijuana growers," and states, "Where growing marijuana is legal is dependent on Colorado marijuana laws, remain in force at federal laws not being enforced. If Colorado marijuana laws were not to remain in force, or if federal marijuana laws were to be enforced, then greenhouse" -- "GrowCo greenhouses could be used to grow organic fruits and vegetables, in which case the cash flows would decrease approximately 75 percent."

If you go further in the document -- turn the next page. This is our disclosures to our investors or interested investors. It's Item 1(A), "Risk," at the top. If you look down, toward two-thirds of the way down, we state, "We can give no assurance of success or profitability to investors."

If you page a little bit further.

THE COURT: I'm not at that part. Item 1(A), "Risk Factors Relating to our Business"? And then the part you just read is in which paragraph?

MR. HARDING: It is -- I'm A -- at the very top, "Risk Factors," and it has the pagination 15, middle of the way through.

THE COURT: Got it.

MR. HARDING: Underneath there, the second bold category.

THE COURT: Got it.

MR. HARDING: Go, then, forward. One, two, three, four pages.

THE COURT: Which page number? Which page number?

MR. HARDING: I'm on -- it shows 18 in here in the printed copy.

THE COURT: Okay.

MR. HARDING: At the bottom, it starts with "Additional Risk Factors Relating to Our Greenhouse Business Tenant's Support Services." Do you see that?

THE COURT: I do.

MR. HARDING: I'll just go to the highlights. "We may be unable to develop the properties that are critical to our proposed greenhouse business." Second subcategory, "We may be unable to expand successfully into new markets."

Next page. First bullet, first bold, "The leasing market for marijuana leases could be volatile."

And then, down below that, "Other disclosure items for risk factors on greenhouses or greenhouse business," "We currently have only one tenant for our greenhouse. Including additional new greenhouses. Our greenhouse lessees may not be able to fund the lease and reap service payment.

"Our services for" -- "offered to our tenant might not be allowed under state cannabis regulations. Our future success depends on our ability to attract new greenhouse lessees. Our failure to obtain capital may significantly restrict our proposed greenhouse operations.

"Our proposed greenhouse business is dependent on state laws pertaining to the marijuana business."

Turn the page. Heading, again, "Marijuana remains illegal under federal law." Skip here to the next page. Well, the same page. "The tenant of GrowCo may have difficulty assessing the services of banks, which make it difficult for them to operate and remit payments."

Next category. "Laws and regulations affecting the medical marijuana industry are changing" -- "constantly changing and could detrimentally affect our greenhouse leasing

operations."

Next bullet point -- and I think I'll stop there. "We have leased our first greenhouse to a related party, which may result in actual or perceived conflicts of interest that could harm our operating results and reduce our stock price."

If you go in that body, first paragraph, I want to point out the second sentence: "On February 25, 2016, Suncanna's owner, who is not affiliated or associated with our company, entered into a definitive agreement to sell all of the outstanding equity interests of Suncanna to RH Group, LLC, a newly formed entity, of which John McKowen, the chief executive officer of Two Rivers and GrowCo, hold 6 percent ownership interest."

I can take the Court's time, but these risk factors are home -- almost the same for each one of our 10K filings through 2018, which was the last 10K filing that I was involved in.

And if you'd like me to go through that, we'll go. But let's do something -- be happy to do that. Go to, now, in the same document, the page that's printed, F18. And, by the way, for your reference -- I think I did this on every 10K -- that section that deals with the financial statements and

the notes to financial statements that are audited have a page number, F-dash- something.

And who did the audit? Actually, if you go to page F2 of that document -- so go back a little bit, that was done by Eide Bailly.

THE COURT: I don't know where you're at.

MR. HARDING: Page F2. It's on --

MS. HUNT: Are you still in the same 10K? Are you still in the 2015 10K?

MR. HARDING: 2015 10K, go to Section F. It's toward the end.

THE COURT: I got it.

MR. HARDING: Are you there?

THE COURT: I'm there.

MR. HARDING: F2 is our audit. It's what they call an unqualified audit, which means, you know, in our opinion, everything is material -- materially correct based upon the representations of management.

And then what's followed up is the four core financial statements. What I'd like to draw the Court's attention to is page 8 -- F18 of that report. I thought it was brought up in testimony about, how much do the greenhouses cost and whatever?

Understand that there's some improvements and other things we had to do at GCP1, but as of

December 31st, 2015, in both Greenhouse 1 and 2, there was 5,430,000 invested into that group, those two greenhouses, mostly to CGP1.

In this document, if you go to page -- it shows here in the printed thing F24.

THE COURT: Can you go back to F18? What was the point of taking me to F18?

MR. HARDING: The point of F18, we heard notifications that -- or testimony that the GCPSU documentation stated the cost of the greenhouse being 5 million -- approximately $5 million. And that was accurate and true. And I wanted to show you some audited numbers to that as of the date of GCPSU offering. After that --

THE COURT: Is that the chart there?

MR. HARDING: It's the tables that -- December 31st, 2015, 2014, and it's Construction and Progress. It says, "Beginning balance, additions, finish, transfer, ending balance."

THE COURT: Do you want to explain that to me?

MR. HARDING: What was the question, sir?

THE COURT: I said, do you want to explain that table to me?

MR. HARDING: Yes. So what this does is this

keeps track of our costs to date. When you construct a project under U.S. GAAP, you keep it in a -- you keep it in a work-in-progress, not as a full-fledged piece of asset until it's ready for occupation and use.

And so this is our construction and progress account. And there's also the disclosure that we made of 5.4 million in GrowCo Partners 1 and GrowCo Partners 2. So it just shows money spent, if something's done, transferred out, so help keep track of this cost.

So let's go through another six more pages, and this is when segment reporting comes up, as required by ASC-280. The first number that I'm going to tie in, or couple of numbers that I'm going to tie in -- actually, one number that I'm going to tie in to my reconciliation of, where did money go?

So in 2015, in that exhibit over there, you had expense, $632,000. Where did I get this? I got it from the segment reporting in the audited set of the finances.

If you look at the table, for the year-end December 31st, 2015, you will see the greenhouse leasing and services has their segment reporting. So what I did there is I looked at the segment, $632,000, under Greenhouse Leasing and Services, for the net loss attributed to Two Rivers.

THE COURT: I don't see where you're at. You're on F22, correct?

MR. HARDING: F24.

THE COURT: All right. I'm on the wrong page.

MR. HARDING: You there now?

THE COURT: I'm on that, 22.

MR. HARDING: It says F24, the table.

THE COURT: I mean, F24. Sorry.

MR. HARDING: And under December 31st, 2015, Greenhouse Leasing and Services, it shows a loss of $632,000.

THE COURT: Where is that?

MR. HARDING: Next to the very bottom. We'll deal with the segment assets in a minute, but see the 632,000?

THE COURT: On F24, no.

MR. HARDING: Page F24. That table. With your permission, I'll approach the bench and show you.

THE COURT: Yes.

MR. HARDING: You said yes?

THE COURT: Yes, please.

MR. HARDING: Under "Greenhouse Leasing," 632,000.

THE COURT: Thank you.

MR. HARDING: I will be showing you a couple of more tables on segment reporting to tie these numbers in the audited finance information. So that's 115.

Now, let's go to the next 10K that has a date, December 31st, 2016. Let me know when you have that in front of you.

THE COURT: Which page?

MR. HARDING: Go to page -- it says on the document -- printed document, 7.

THE COURT: Are we on the next 10K?

MR. HARDING: The next 10K for 2016. Page 7. And at the very top, you see, "GrowCo Partners 1, LLC, first greenhouse." Right?

THE COURT: I'm there.

MR. HARDING: Okay. Beginning of the second paragraph -- I'm not going to go into all of it, but here's the beginning of the paragraph.

"In 2016, the Suncanna lease arrangement was the subject of administrative and judicial proceedings." And it went down and highlighted that action and the issues that we had with Suncanna.

Let's go to page 13 of the document. Second paragraph, page 13 at the top. It's the same type of disclosure we had previously, and you'll see it in the

future documents that states the risk factors about the legalization and how that might impact our business.

Go forward three pages to page 16. Section -- I'm not going to repeat it. It's a lot about the same, but it's the additional risk factors relating to our greenhouse business. There's page 1, page 16. There's page 17. There's -- page 16 and 17 are the risk factors disclosed.

Page 20, Item 3, "Legal Proceedings." There's a listing of legal proceedings between -- with us and Suncanna that was disclosed, including the issues with the Marijuana Enforcement Division.

Next up, three more pages, page 25. This has the related party transactions. It has my name down there. And it shows my related party transactions. Short-term loan, 5,000, which I -- was repaid.

Short-term loan B, 27,000, which I have repaid. Invested 25,000 GCP preferred units and $100,000 in the $4 million note, which has already been testified to.

It doesn't say here something that occurred too. I think, around 2017 or '18, I went without payroll for a while. Eventually got caught up, but I personally went without payroll, and I convinced our accountant to go without payroll for a while.

Page 28. Here's a lease to related party. Middle of the page.

MR. MCKOWEN: 28? Page 28?

THE COURT: Page 28.

MR. MCKOWEN: Thank you.

MR. HARDING: Let's go to now the audited financials. Again, it starts with F. So page F2 is the audited opinion from Eide Bailly. Again, what they call in the business "an unqualified opinion."

MR. MCKOWEN: Can you hang on a second until I can get to page 2?

MR. HARDING: Let me know when you're there.

MR. MCKOWEN: Do you have a page count?

MR. HARDING: Page F2, the opinion.

MR. MCKOWEN: Okay. I'm there.

MR. HARDING: Okay. This is the opinion -- audit opinion for the last two years. Let's go to page F25. Again, audited information. On page F26 -- I think now, Your Honor, you can probably get the hang of it.

On December 31st, 2016, look down at greenhouses, down here, net operating loss, 4,181,000. If you look over here, there's your $4,181,000. There's also non-controlling interest. Without getting too geeky on that, what that means is there's expenses

that other minority interest holders are responsible for.

But, essentially, Two Rivers GrowCo had to pay those expenses. So we add that back in for a total of 4 million, 387. You see the 206 that I used in that column?

THE COURT: I do.

MR. MCKOWEN: Are we on F26?

MR. HARDING: We are.

MR. MCKOWEN: And what row are you -- what's the title of the row that you're talking about? Net? Net loss?

MR. HARDING: I'm talking about the row that says "Net Loss for December 31st, 2016," under "Greenhouse, GrowCo, GCP1, GCP1, 4,181,000."

MR. MCKOWEN: Got it.

MR. HARDING: Okay? And I'm also talking about the non-controlling interest is an expense that we incurred, paid for, but essentially by noncontrolling parties, but that was an expense. So I added those two numbers together, got 4 million, 387.

It's no secret, Your Honor; we were having problems. Why else would I skip payroll for a couple of times? Why else would we go out and ask for a modification of the notes, interest? So we needed to

conserve cash.

One of the principals -- underlying principals of accounting is whether or not you are a going concern. You have to liquidate something. You see those signs all over the different buildings, liquidation, going out of business sale.

Sometimes the truth, sometimes not. But they discount stuff 50, 60, 70 percent. The same philosophy here. We need to stay in business as a going concern, or else there's issues with representation of the financial statements.

So this is the first year, under Note 10, page F32, at the bottom. I'm sorry. At the top. A full note, almost a page worth of information, dealing with going concern issues that we had.

MR. MCKOWEN: What paragraph is that? First paragraph, "Ongoing Concerns"?

MR. HARDING: It's the top category on page F32, Note 9, "Going Concern."

MR. MCKOWEN: Got it. What paragraph?

MR. HARDING: Correct.

MR. MCKOWEN: I asked -- Mr. Harding, I asked what paragraph? Paragraph 1?

MR. HARDING: Well, I'm just -- I mean, we could read through the entire paragraph -- I mean, the

entire section, but I just wanted to note -- the Court to note that there was discussion, detailed discussion about our going concern and our issues. And at the time, this includes GrowCo and related entities because we were consolidating.

MR. MCKOWEN: Thank you.

MR. HARDING: All right. Let's now go to the 10K for December 31st, 2017. Again, it's a lot of redundancy. Forgot what's it called in evidence where you repeat things over and over again.

I want to direct your attention to the major categories. If you'd like, sir, you can go ahead and review them later. So, on page 6, at the -- close to the top, we have a category called "Our Greenhouse Operations." We discussed that in detail.

On the next page, page 7, part of our discussion about the greenhouse operations, the last paragraph before "Our Organizational Structure," the beginning sentence states, "On August 4th, 2016, GCP2 entered into a lease agreement with Johnnie Cannaseed."

Page 16 of the document. There's a section called -- again, to be respectful of the Court's time and not be redundant -- "Additional Risk Factors Relating to our Greenhouse Business." Page 16, page -- almost all of page 17, and then it goes to our common

stock.

Let's go to the audited financials, Section F, now. Page F2. We have new auditors. It's called M&K CPAs. They're out of Houston. They are certified as a registered accounting auditing firm with the SEC through the PCAOB, Public Accounting -- Public Company Accounting Oversight Board.

You will notice something a little bit different about this opinion. Take a look at the last paragraph.

The paragraph states, "The accompanying consolidated financial statements have been prepared assuming that the company will continue as a going concern. As discussed in Note 10 in the consolidated financial statements, the company suffered a net loss of operation and has a net capital deficiency, which raises substantial doubt about its ability" -- "ability to continue as a going concern."

Let's go to page F26 of the audited financials and footnotes. Let me know when you're there.

THE COURT: I'm there.

MR. HARDING: Again, getting used to this table. Look at December 31st, 2017, under "Greenhouse," there was a net loss of 1,731,000.

There's additional expenses on behalf of minority holders of 644,000. So therefore, what I did, in my table that I created, I put down 2017, expense, 1 million, 732 noncontrolling interest of the 644.

And, for reference, the opinion did reference a going concern. I'll just direct your attention to it. It's detailed out in Note 9 on page F32. Sorry; Note 10 on F32 and continues on to F33. I know this could be tedious. I get into this stuff.

So, finally, we're at the last one, the one that I signed off on that I put together and worked with the auditors on. This is the Form 10K for 2018.

Page 6. This talks about meeting box -- uh (sic), Extract, Ramsey, all this stuff. This is the tie end, I guess, to Greg Harrington. That was his company's -- that was disclosed.

Let's now go to the financial -- by the way, the risk factors are there too. It's pretty mundane. And redundant. So the risk factors are there and items like that.

Before we go to financials -- I'm sorry -- let's go to page, printed, 23. It's on "Revenue Recognition" and it's on "Leasing of the Greenhouse." And there, it goes into a lot of detail about the lease and about also the issues that we had, including with

Johnnie Cannaseed and the termination of that lease. That's on Paragraph 3 under that category.

Now let's go to the financial statements. Page marked F2, which is the financial -- the auditor opinion for the audit. And, again, the repeated -- this -- "The company's consolidated financial statements have been prepared assuming the company" -- and this is the last paragraph, first sentence -- "The company's consolidated financial statements have been prepared assuming the company will continue as a going concern."

Let's go to page F10. This is when we deconsolidated -- sorry. I'm jumping ahead. Are you there?

THE COURT: I'm there.

MR. HARDING: This is where we deconsolidated -- there's a subcategory there toward the bottom -- "Deconsolidation by GrowCo, audited by the auditors." It wasn't a simple -- simple calculation. But, as you can see down here, in there -- the table on the next page, how it impacts our noncontrolling interests.

Also, through the deconsolidation, it shows the investment in GrowCo Partners 1. We no longer consolidate the operations. We show it now as an

investment on our balance sheet. It's essentially how the -- how that happened.

Go to page -- there's no page marked there, but it's right after page F17. There's a table in the middle. Are you there?

THE COURT: F17 at the top, and then are you on the next page?

MR. HARDING: Yeah. Next page over. Didn't have pagination.

THE COURT: Starts "Revenue"?

MR. HARDING: Right above "Investment and Long-lived Assets." There's detail on GrowCo. And if you notice, during this time period, December 31st, 2018, there is a minority, noncontrolled interests that we paid for, trying to get back, but we haven't, for 308,000, which is this number right here.

Also, the 810,000 comes from that table here, totaling up to $1,190,000. Where did the 810 come from? Well, let's go back to our friend, segment reporting. That's after the printed page. It says F23 on it. That's our segment reporting.

There's the 810 again under that category. Finally, on the page right after the page marked F27, there's Note 9, "Going Concern" discussion. First, generally, how the funds flowed .

Every single subscription document has a place where you put the money in. Once the money gets in, funds are transferred out for the benefit of GrowCo. It could be for the general administrative expenses that we're able to charge based upon the term sheet.

And then it also went into construction, labor, that -- you know, to build the greenhouse and then operate the greenhouse -- operate the greenhouse and build the greenhouses. Even GCP1 didn't -- didn't complete the construction.

In addition, the names -- and I believe we had some evidence here, that -- from a subpoena, evidence that I provided to the State from a subpoena, about, here's the legal, official name, but here's what we're designating the account to.

So, based upon that, there was no commingling of funds. I have not heard any evidence stating otherwise. With that in mind, I guess my last piece of evidence is the one I stumbled on a little bit, and that was that slide show.

And I believe I remember which one was Tim Bell's. But I do have these dated when I took these pictures.

THE COURT: Let me get there. We're talking

about 2005?

MR. HARDING: It's the one with all the pictures on it that I condensed into a slide show.

THE COURT: It's 2005, and we made color copies for all parties.

MR. HARDING: 2005 summary.

THE COURT: So just -- well, you can -- you were talking about the pictures and the dates. Go ahead.

MR. HARDING: Yes. So, again, there was so many pictures and everything else, I decided to put it in kind of a PowerPoint. So on July 16th, this -- the first picture in the upper left is the -- part of the greenhouse.

And by the way, I want to correct one of my testimonies. I think -- when Mr. McKowen was asking me how large the greenhouse was, I think I said 40 or 45,000. It's actually double that. It's two acres. And that was my mistake. So this is a --

THE COURT: Let me just interrupt, Mr. Harding. Before we talk about the pictures, so the pictures have all been provided, and they all have dates on them; is that correct? All the pictures have dates at the top?

MR. HARDING: Yes.

THE COURT: Did you put those dates at the top? Did you --

MR. HARDING: They're on each individual slide.

THE COURT: Right. Did you do that?

MR. HARDING: I did do that because I took the pictures, except for two from Tim Bell, and I will point that out when I get to it. I believe it's Slide 9 on page 4 or 5, the July 2017 production.

THE COURT: So let me ask you, on that particular picture, even though you didn't take the pictures, do those pictures accurately depict what the warehouse and grow looked like as of July 2017?

MR. HARDING: Yes.

THE COURT: And who is that person in the picture?

MR. HARDING: That is, I think, Russ Copic, or --

MR. MCKOWEN: Can you hang on one second while I get to that picture?

THE COURT: Slide 9. Hold on. I'm not asking you. I'm asking Mr. Harding.

MR. HARDING: I think it's one of the growers. I think it might be Russ Copic. It's kind of hard to see with the glasses and cap on. It is not Tim

Bell. And I think this picture itself was used in prior evidence by Mr. McKowen.

THE COURT: All right. Is that an accurate depiction of what that grower looked like as of July 2017?

MR. HARDING: I don't know for sure on that particular picture.

THE COURT: What other picture did Tim Bell take?

MR. HARDING: The one right next to it.

THE COURT: So those two pictures on Slide 9?

MR. HARDING: -- (unintelligible) if you want.

THE COURT: I'm not looking to throw them out. But I just want to -- those two pictures on Slide 9 are the two pictures that Tim Bell took?

MR. HARDING: Correct.

THE COURT: Okay. All right. Any objection from Plaintiff to admitting 2005?

MS. HUNT: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Exhibit 2005 will be admitted.

(Exhibit 2005 was admitted into evidence.)

THE COURT: Mr. Harding, if you want to talk

about that exhibit, you can.

MR. HARDING: Yes. I want to also -- I don't know if I can do this or not, but I did some research about definition of Ponzi scheme, and I got, from Cornell Law, their definition.

Part of that was, "Original investors in the perpetrators of the fraud are paid off by funds from later investors, but there is little or no actual business activity that produces revenue."

That's the purpose of this evidence, to show you this. So GCP1 in the second slide, after the title slide, you can see the articulated roofs, and that's on the north side of the building.

Also, notice -- or, sorry -- that's on the south side of the building, I believe, and the other one's on the north side of the building below that, the articulated roofs. These are pictures of the warehouse.

I think Mr. McKowen had some pictures of that extraction machine. But these were taken by me on July 2016, the activity of the warehouse. In July 2016, we're trying to prep for new tenants and repair damage that was caused by the prior tenant. That's why it kind of looks all mumbo-jumble down there.

Slide Number 5 is GCP1, in 2017 and '18, still showing some activity. The one in the upper right is partially blocked off. That's on the north side. The one on the bottom, that's -- on the bottom is on the south side.

Notice that there's some vents down by that truck that we used on a pretty interesting device called a cooling wall, used evaporative cooling to cool the facilities. That was damaged severely by removal of Suncanna.

The next slide is Tim. Your Honor, I might have told you wrong. This might have been Tim's slides. I can correct that, then, after I see his text.

THE COURT: So there's two people in there. Which one's Tim Bell?

MR. HARDING: Well, Tim -- Tim is the one -- so I guess he couldn't have taken it. It's for me. I'm taking the picture of Tim. So that's Tim directing one of the growers to do something. I don't know what. And then that's also grow operations in February '17.

Slide 7 gives you some more grow operation pictures. Slide 8, May -- I have it dated May 2017. But there's also a mark on it that says April 18th and May 1st. So it's April, May of 2017, showing the grow

operations.

Slide 9 is what we talked about that I think came from Tim. Slide 10, we decided to lease to another tenant that was very focused on hemp seed production.

At the time, hemp seeds -- feminized -- guaranteed feminized hemp seeds -- were going -- one seed -- a dollar. And so the whole idea was to produce hemp seeds and sell it. Unfortunately, that did not occur because the hemp seed market collapsed, and they were not able to sell the hemp seeds.

Page 11. It's GCP 2, construction. That occurred. And also Slide 12. So during the end of my testimony, Your Honor, there was no commingling of funds. They were used as designated by the term sheets, as we saw with Mr. Rome.

There's no Ponzi scheme. Investments were made properly. And there's one last thing, talking -- and I forgot to mention on that one slide show that we tied everything into -- I apologize -- if we can bring that back up.

The slide -- or the show -- workbook that you had showing the segment reporting.

THE COURT: 2006, page 7?

MR. HARDING: I didn't complete my thought on

this. Okay. So audit numbers have the totals of operations of GrowCo and related subsidiaries of 8 million, 584. See that down here? So then, I said, Well, that's operating expense. What about capital improvements?

What I did was I went to the last segment reporting in 2018 for the 10K. And I'll show where I got that audit number. Let's go back there.

So, again, this is page -- there's two things here. This is 2018 -- 2000 -- 2018 report. And in this segment reporting, F23, there's a line there that says "Segment Assets."

THE COURT: Slow down just one second.

MR. MCKOWEN: Which exhibit are you on? I'm sorry.

MR. HARDING: I'm on 2002, the 10K for December 31st, 2018. I'm on page F -- marked page F23. There is a line there called "Segment Assets." Under GAAP, we have to not only show operations, but we show the assets assigned to each of these categories.

If you notice, on December 31st, 2018, there's nothing there. Why is that? That's because we deconsolidated, and we now carry it as an investment with impairments.

But in 2017, at the end of the year 2017, if

you look across, you can see the segment assets that have audited to 9 million, 433. I put the 9 million, 433 on that tab, on that table. So we had a total of 8,584,000 in operating expense. We had assets reported of 9 million, 433.

Together, that adds up to just over 18 million. While some debate about capital raise went with it, it didn't flop back and forth by more than a couple hundred thousand. I used the table that I disclosed in the second table. That was 17,948,508.

So, with audited numbers, it looks to me that TR -- or TR Capital or Two Rivers overpaid GrowCo by $68,492.

I have no further statements.

THE COURT: Let me think. Let's go ahead and take our recess now. Take a 15-minute recess, and we'll start up with cross-examination.

(Break from 10:02 a.m. to 10:20 a.m.)

THE COURT: Back on the record in 21CV33922. All parties and counsel are present. Mr. Harding is now sitting at the witness stand, ready for cross-examination in his case by the Plaintiff.

MR. HARDING: Before that happens, can I clarify one thing that I said earlier about those pictures and Tim Bell?

THE COURT: You can on redirect. You'll have another opportunity to make a statement.

CROSS-EXAMINATION

BY MS. HUNT:

Q. Mr. Harding, I want to start by talking about audits. You talked a lot about audits in your testimony and in previous days. When you're talking about the audit that -- when you refer to an "audit," that's on a test basis, correct? An audit review is on a test basis?

A. Yes.

Q. That means you're not -- the auditor who is reviewing is not going through the transactions line-by-line, correct?

A. They could. I mean, not line-by-line. But they do what they call substantial testing, which they do look at the transactions and make sure they're properly classified.

Q. They look at a sampling of transactions?

A. They start with a sampling, and if they had some errors or whatever, then they would expand their sample.

Q. And you would -- is it fair to say, you would agree with me that a forensic audit is a different thing than the kind of audit on a test basis, correct?

A. Correct.
Q. And a forensic audit would go line-by-line and look at individual transactions?
A. Never done a forensic audit, so I don't know.
Q. You talked also about the practice of capitalizing debt issuance costs and interest. If you're capitalizing those costs, that increases the reported value of assets while decreasing expenses; is that fair?
A. Well, I don't know -- it does increase the value of the asset, where the offsetting credit or other side of the entry goes, could go as a reduction of expenses. It could go to other things too, but, yes, it does increase the value of the asset.
Q. As depicted on the financials?
A. Correct.
Q. You understand, don't you, that compliance with GAAP standards is not the same thing as compliance with securities disclosure requirements, correct?
A. That is correct. They're different but a lot of times go hand-to-hand.
Q. But if they -- but if GAAP -- satisfying GAAP accounting standards is not sufficient, you understand, to comply with disclosure requirements, correct?
A. There's other documents that are required

when you have a security offering.
Q. And likewise, the PricewaterhouseCoopers accounting standard, that's -- complying with that isn't sufficient to comply with securities disclosure requirements?
A. I would agree with that.
Q. And I want to talk about the lease income. That was, of course, the main -- the only source of revenue that GrowCo was going to have, correct?
A. Yes.
Q. I want to make sure I have this right. You would book that lease income for accounting purposes even if it's not received, correct?
A. Correct.
Q. And so that made it look like, on the financials, that GrowCo was receiving rental income?
A. When -- when the lease income is accrued, yes, we book it, showing lease income.
Q. Okay. But for most of GrowCo's existence, they were not able to collect rent, correct?
A. That's correct.
Q. And we looked at the pictures we just looked at, Exhibit 2005, showing all the marijuana plants in the various stages. None of the grower tenants were ultimately ever able to successfully do business; is

that correct?

A. That's correct. Not successfully.

Q. I want to talk a little bit about the use of funds. Just briefly, we saw, when we went through the 10Ks, a listing of all the lawsuits -- those are all in the 10Ks -- there were quite a lot of lawsuits involved with GrowCo and Two Rivers, correct?

A. Define "quite a lot."

Q. All right. There was more than two or three.

A. Probably more than two or three. I would say less than five, four or five.

Q. Those included the Van Wingerden, Suncanna, and a few others?

A. Okay.

Q. Investor funds were used to pay these legal fees -- correct? -- for the lawsuits -- legal fees for the lawsuits?

A. Which lawsuit?

Q. Any lawsuit.

A. Not correct.

Q. So investor funds, money collected from investors was never used to pay legal fees for lawsuits?

A. That's not what I said.

Q. So what -- explain to me, then, how --

what -- what investor funds were used to pay for what lawsuits?
A. The Suncanna lawsuit, those were investor funds because we needed to evict the tenant in GCP1. So operating expense.
Q. Okay. You consider that operating, like general administrative and operating expenses?
A. I do.
Q. And you did not do that for any other lawsuits?
A. No. I never said that.
Q. So what other lawsuits did investor money pay for?
A. The other lawsuit with GrowCo GCP1. I don't remember at the time. There was also a lawsuit brought by the Attorney General's office about not being able to raise the dam, and that was not paid by GrowCo investor's funds.
Q. Okay. So that was a Two Rivers only?
A. Correct.
Q. Okay. You started out your testimony this morning talking about how everything that you filed was full disclosure. Do you recall that?
A. Everything I filed in terms of the 10K?
Q. You just said -- that was the statement you

made: Everything you filed was full disclosure.
A. I believe it was.
Q. When you say "everything you filed," you mean the 10Ks? The SEC filings?
A. Correct.
Q. And you walked us through those 10K disclosures earlier this morning, correct?
A. Yes.
Q. Were there any other filings you're referring to when you say everything you filed was full disclosure?
A. I believe that the -- I believe everything was full disclosure that I had anything to do with because I was relying on the filings that were previously -- previously made to the SEC, the 10Ks and other filings.
Q. Mr. Harding, that wasn't my question. Was -- my question was, aside from the SEC filings, the 10Ks that we looked at this morning, are there other filings that you're referring to when you say everything you filed was full disclosure?
A. Yes.
Q. What other filings?
A. The Form Ds.
THE REPORTER: The what? For a dees?

MR. HARDING: D, delta. D, delta.
Q. (BY MS. HUNT) So the SEC filings you're referring to as disclosures are Form Ds and 10Ks?
A. No. There's other filings to the SEC that in -- contains disclosures.
Q. And those are what?
A. 8Ks, mostly. There's 10Qs that we've talked about extensively too.
Q. Okay. So 8Ks, 10Qs, 10Ks, and Form Ds. Do I have the whole list now?
A. No.
Q. What other filings?
A. How about proxies? Proxy statements, one. Form 4s. Form 3s. I'm trying to do it from memory. All the different forms the SEC has, but that gives you a glimpse.
Q. And the Form 4s, Form 3s, other forms we haven't seen here today, those are also disclosure documents?
A. Everything filed with the SEC is disclosed.
Q. And those are Two Rivers filings, correct?
A. Form 3 and 4, yes. When you say "Two Rivers," you mean individually Two Rivers, or the consolidated Two Rivers?
Q. I mean Two Rivers, consolidated, any part of

Two Rivers. It's Two Rivers, correct?
A. That -- that's the reporting entity.
Q. Yes. Two Rivers is the public company?
A. That's correct.
Q. GrowCo was not a public company. It did not file independently, correct?
A. As long as I was there, they did not file independently.
Q. And you did not tell investors who came to you to invest in GrowCo -- you did not tell them to go look at the 10Ks?
A. I don't remember saying that to them.
Q. And you didn't tell them to go look at the 10Qs?
A. I don't remember saying that to them.
Q. Or any other Two Rivers disclosure document?
A. I don't remember saying to anyone to go to the SEC website for all your disclosures. I made the assumption -- might have been wrong -- that a sophisticated investor, which every single investor represented, knows how to get this information.
Q. You didn't prepare a Private Placement Memo that would include all the information that we walked through this morning in the 10Ks?
A. Correct.

Q. And then let's talk about the 10Ks a little bit themselves. The 10Ks, they're filed -- it's an annual report, correct?
A. Yes.
Q. So it's filed after the year is done?
A. Yes.
Q. So approximately when? I think they're probably dated, but usually in March of the following year?
A. 90 days, unless it's extended, at the -- 90 days after the year end, unless extended.
Q. And we went through the disclosures in some detail. I appreciated that you abridged it a little bit. We can all read the 10K ourselves. But I want to confirm -- there's a couple of things aren't in there.
There's nothing in any of those 10K disclosures about the reasons why the state regulators revoked Suncanna's license; is that correct?
A. Well, as you can see this morning, there's a lot of paperwork. And I think -- I don't remember -- I don't remember a disclosure like that revoking Suncanna's license -- say the question again. I'm sorry.
Q. The reasons why the Marijuana Enforcement Division revoked Suncanna's license.

A. You might be correct.

Q. And there's nothing in there -- and I think you testified last week that you did not put in there in any of the 10Ks the board's -- the board committee's concerns about Mr. McKowen's business activity?

A. Correct.

Q. Or anything about Mr. McKowen's past regulatory issues with his security license?

A. Correct.

Q. Or that GrowCo was paying unlicensed salespeople?

A. Correct.

MS. HUNT: And I think -- if we could just pull up the 2016 10K. It's 25, on the bottom of the page, but I believe it is PDF page 28.

Q. (BY MS. HUNT) There's a list of interested -- I believe this is the list of related party transactions?

A. It looks like it. I can't -- thank you. And what's the heading? I -- yes, I -- I remember, actually, using this document, referring to that document, yes.

Q. Thank you. I just want to refer to the paragraph that's on John McKowen.

MS. HUNT: If you could blow that up.

Q. (BY MS. HUNT) And it notes that, "He's a former CEO and largest shareholder of Two Rivers"; is that correct?

A. Yes.

Q. And this would have been -- this report would have been filed in March of 2017, correct?

A. Yes, thereabouts.

Q. And it says there -- it notes at the bottom, "Fees of 7,186,400 for GrowCo capital raised"?

A. Yes.

Q. Is that the right number of what GrowCo paid Mr. McKowen to raise capital?

A. During that time period, I'll stand by that number, yes.

Q. Okay. And then, if we could look at the same 10K, down on F32, Note 9. That's 83 of the PDF, I hope. I want to talk a little bit about this corner note.

If you'll see, down in the fourth paragraph, starts, "Since December 31, 2016, to March 21, 2017, the company collected $600,000 under its GrowCo exchange and offerings."

And then it says, "Beginning in the second quarter of 2016, GrowCo will begin receiving rent payments on the first greenhouse. The first use of

those funds would be to pay GCP1 accounts payable." Do you see that?

A. Yes.

Q. You said this was filed in March of 2017. At that point, you would know that, beginning in the second quarter of 2016, GrowCo did not receive rent payments?

A. Not necessarily. There could be deferral of rent or some explanation why that's not being paid.

Q. But here, it says that, "Beginning in the second quarter of 2016, they will begin receiving rent payments."

A. Okay.

Q. And the statement was in 2017, correct?

A. Yes.

Q. And you were not receiving rent payments?

A. I would have to go back. If you go back to the segment reporting, if we did receive rent payments, it would show up as revenue because we did receive some rent payments.

Q. Right. Do you recall how many -- how long you were receiving rent payments?

A. It was very sporadic. I think, for about two or three months, we received some rent payments, and some of that, we had to write off because our

anticipated rent payments at the time did not occur.

Q. Okay. Can I have you turn to the 2018 10K. And this is F32. It's page 94 of the PDF. And, bottom paragraph there, again -- 94. And . . .

MR. FINKE: This PDF is only 91 pages.

MR. HARDING: May I get my 10K book?

MS. HUNT: Sure.

MR. HARDING: Whatever happened to it.

MS. HUNT: I only have one more question about this 10K. But . . .

THE COURT: So we're at the end of 2017, not 2018?

MS. HUNT: Correct. Sorry. I misspoke.

THE COURT: 32?

MS. HUNT: Yes. F32.

MR. HARDING: So you're referring to the 10K for the year ending December 31st, 2017?

Q. (BY MS. HUNT) Correct. This would have been filed in approximately March of 2018.

A. Correct.

Q. And if you look at the bottom paragraph on that page, it says, "Since December 21, 2017, to March 21, 2018, the company's collected 535,000 under its financing management with Powderhorn, LLC, and debt equity financing." That was Two Rivers, correct?

A. Yes.

Q. Currently, "GrowCo, through GCP1 is receiving rent payments on one half of the first greenhouse. First use of these funds will be to pay GCP1 accounts payable, including GCP's obligation to GrowCo." In 2017, GrowCo was not receiving rent payments, correct?

A. I don't remember the timing.

Q. And you would agree with me -- correct? -- that that 2015, 2016, and 2017 -- well, for that matter, 2018, all of these 10Ks were -- that you're referring to as disclosures, they were all filed after Mary Loughran made her investment, correct?

A. Refresh my memory on when she made her investment.

Q. We can pull that up. She -- I believe she testified she made her investment in 2015.

A. It depends when in 2015 she made her investment. Let me look over it.

Your statement is correct.

MS. HUNT: Okay. One moment. If you could just give me one moment, I want to confer with my colleagues, see if we have anything more.

MS. HUNT: That's all I have. Thank you.

THE COURT: Thank you. Mr. McKowen? Any questions?

CROSS-EXAMINATION

BY MR. MCKOWEN:

Q. Mr. Harding, do you know what material inside information is?

A. Yes.

Q. Can you explain that to me? To us?

A. Well, I'll explain it on a public markets SEC environment, if you want me to do that.

Q. Yes.

A. Okay. It is a -- some information that you individually or a small group of people know that other people do not know.

Q. And is there a problem with disclosing material inside information to a select number of people, small group, or . . .

A. There could be a big problem. Not necessarily just because they received the information, but if they acted on that information to profit from that information, then that's a problem.

Q. And so there are reporting requirements, and you've listed some of them -- the K, the Q, the -- the Form AK, the registration statements.

When we as a public company put those together, did we interact with other players in the public company markets for a particular permit that is

required before we make those announcements to the public? Is that required?

A. Can you rephrase that question? I'm a little lost.

Q. Are we required to make sure our reports -- reporting to the public company markets are accurate?

A. Yes.

Q. And does it take time to make sure they're accurate before we release them?

A. Yes.

Q. And the time for a -- making sure they're accurate for a 10K, to report on a full year, is -- as you have stated, is in March; is that accurate?

A. No.

Q. When -- when do we typically -- as a public company, when do we typically publish a 10K, an annual report?

A. 90 days after year-end, which is the March, but the audit process even begins even before year-end because there's a lot of different tasks, functions, procedures you need to do.

Q. And do we report on a quarterly basis through the 10Q?

A. We do.

Q. And what is the relationship of a 10Q to a

10K in terms of audited reporting?

A. A 10Q is reviewed by the auditor. Remember, there's three different classifications. There is compilation review and audit. So a 10Q needs to be reviewed by an auditor.

They do not submit an opinion, but they review everything that we do to make sure it's accurate because we're the client, and they just want to keep up to date with us.

Q. So is a -- the baseline for any 10Q is the 10K, and we put that information together and put that out on a quarterly basis; is that -- is that accurate?

A. Yes.

Q. In communicating with investors, would you believe that talking to some of our shareholders in a -- in Two Rivers about material inside information would be problematic for us?

A. Yes.

Q. And do you recall, off the top of your head, how many shareholders were in Two Rivers?

A. It's actually disclosed in the 10K. But I think it was a total of about 1,100 to 1,300 investors.

Q. And how many investors, do you think, approximately, there were in -- in the GrowCo investments?

A. 75 to 100, 110.
Q. And so would there be a problem if we were communicating with a small group that were not management or the board, communicating with them about material inside information?
A. Yeah. There would be a problem, unless -- there's what they call an NDA, a nondisclosure agreement, that's -- that's filed, and it's a pretty meaty NDA about securities laws and, you know, keep your mouth shut, essentially.
Q. If -- do you think you can disclose material nonpublic -- material information to someone even if they have an NDA?
A. That's a legal question, and I don't know the answer to that.
Q. Okay. Do you think that you and I, as officers of the company, would -- I'm trying to phrase this so I'm asking the question -- do you think we tried to honor our duty to our investors and shareholders to make nonpublic material information disclosed to all the shareholders, all investors that weren't part of management, in a timely manner?
A. Yes.
Q. And what would -- what would we do to -- if it wasn't a 10K or a 10Q, what would we normally use as

a form or SEC requirement to announce something that was material?

A. It's called Form 8K.

Q. And did we file Form 8Ks?

A. Yes.

Q. Okay. I'll move on to another topic. And -- when we were operating as a company and through -- I think, when the company was offered in through the latter part of 2017, did the company carry what they call DNO insurance?

A. Yes, up until, I think, it was November of '17 or November of '18. November 9th, I think. And I can't remember the year. But . . .

Q. And what is DNO insurance?

A. It's Director and Officer Insurance. It protects the officers and directors of a company from lawsuits. I don't know about protection. That's not the right word. I mean, it covers, up to a certain extent, liability of directors and officers.

Q. And when you say "it covers," how does it cover?

A. I think of it almost like an error of omissions policy that other people, like an insurance broker, that if you -- if you do an error -- I mean, if you do something wrong, it's supposed to protect you.

I do think, in the DNO insurance, of course there's an exclusion for fraud. They won't cover for that. There's other exclusions, but that's what sticks in my brain.

Q. So if a -- if a company is -- or if a shareholder or an investor's suing the company or suing officers of the company, and the company is stating there is no fraud, does the insurance company pay for those legal expenses?

A. Up to the extent and based upon the conditions of that DNO insurance.

Q. And were there any lawsuits associated with the suits that -- that were brought up in your first cross?

A. There was a class action suit, if that's what you're referring to. We call it the Paulson suit because he was the first one in the class to sue on -- to sue GrowCo, and we turned that in to the DNO insurance company, and -- and I think their settlement, besides paying legal fees and other costs, are now being distributed on a pro rata basis to some of the investors.

Q. And with the lawsuit, that, I think, was referring to -- potentially referring to the tenant, Suncanna, was there -- was that a -- was that a

lawsuit?

A. That was another lawsuit, yes, and it was covered by DNO. No. I correct my testimony. That -- that particular lawsuit was not covered by Directors and Officers, but it was covered by a commercial -- commercial property policy that also includes slander, libel, theft, that -- that stuff. But it was not DNO insurance. It was a commercial insurance.

Q. But it was covered by insurance, right?

A. Yes.

Q. Can we pull up Exhibit 206 (sic). And go to the summary reporting part of 2006. I've got it up there. So let me see if I understand what you're saying here.

So, during this time frame, from 2015, January of 2015 through 2018, there was a total of $18 million raised; is that what we're seeing here?

A. Yes. There's been different numbers around that. But that -- that's -- in -- definitely in the strong ballpark. In fact, the second page of that exhibit shows you where that 17-948 came from.

Q. And total GC assets as of 12/31/17 was 9 million, 433,000?

A. Correct.

Q. And so does -- what -- what does that mean?

Not -- just generally, what does that mean?

A. Well, an asset, you know, could be a benefit, a cash, receivables. In this case, probably all, if not most of it, was property, plant and equipment. And then if it is property, plant and equipment, you're subject to depreciation, which we took, so that's net, I believe, after depreciation. But that's essentially assets.

Q. And so that is assets, and there's a total -- that is the number for that -- the 8,584,000, what does that number -- what does that number represent?

A. Could you repeat that number, please? Say again? Could you repeat the number you're asking about? I --

Q. The total for -- it just says "Total," so it's 854 -- 8,584,000.

A. That is a total -- net total for operations.

Q. It's the total --

A. Attributed -- sorry -- attributed to GrowCo and subs.

Q. So 9 million, 433 -- and I know this is a -- a broad category, is -- would you say that's what was spent on putting -- putting one of those greenhouses up?

A. That's the strong majority. 90, 95 percent

of that amount, if not almost a hundred, is the property, plant, and equipment.

Q. And 8 million, 584 was used -- is it -- is that G&A? Is it -- what is that number?

A. Well, as you can see in the second reporting, it breaks it down what that number is, but a large portion of that is G&A.

Q. I'm sorry. What part? A large portion of that is G&A? Would you say that this is representative of -- of a struggle session that you and I would have constantly had over me not understanding accounting that takes me to this sort of number?

A. Yes.

Q. And I have to say, wouldn't -- I don't have to say anything because I'm cross. But does the Plaintiff's complaint state something along the lines, along with the -- the BCLS audit, X dollar amount was raised, and that we said -- or X dollar amount was raised -- in this instance, say 18 million, 17,000 was raised totally, and how did we end up with only one and a half greenhouses? Is this an explanation of that?

A. It is.

Q. And -- and from your perspective, all of the reasons that you have gone through in -- in your very detailed, excellent communication in the cross by

Plaintiff is what you believe to be an -- what -- what -- do you believe it's accurate?

A. Are you talking about this exhibit here?

Q. And what it represents.

A. Yeah. Very accurate. And it represents where the money came from and where it went to.

MR. MCKOWEN: I have nothing, Your Honor.

THE COURT: All right. Thank you.

Mr. Harding, do you have any final statement you'd like to make on redirect? You can do that from the podium.

I have a few questions for you. It's not going to be particularly long. You can do it from there.

MR. HARDING: There was a question about lease income and income for GrowCo. Go back to segment reporting. I pulled one up.

Do you see, December 31st, and -- December 31st, 2016, and December 31st, 2015, you will find that in the December 31st, 2016, Form 10K. It was in the page F28, if you want to go back to it.

You can see on the revenue line that, in 2016, GrowCo -- we, GrowCo, and subs recognized $204,000.

THE COURT: Hold on one second. I want to

make sure I'm in the right spot. So this is the 10K for . . .

MR. HARDING: 2018, page -- printed page F26.

THE COURT: F26. Okay.

MR. HARDING: Top line, "Revenue."

THE COURT: Yes.

MR. HARDING: For '16, 204,000. For '15, $947,000. Also, to amplify on Mr. McKowen, what he was saying about, is it G&A or not? And there's a category called Total Operating Expense, and then Total Other Income and Expense. And that breaks that down also.

If you want to, we can go to the 2018 10K because that covers 2017. Page F22. In the year ending December 31st, 2017, there was $620,000 in booked revenue.

In 2018, there was --

THE COURT: Hold on. I'm having a hard time getting there. So the 10K for -- ending in 2018?

MR. HARDING: It's the 2018 10K, page F23. It's the second reporting again.

THE COURT: I'm there.

MR. HARDING: You can see that, in 2017, you recognize the 20,000, in 2018? There's no recognition of income. It's on the screen too. Okay?

THE COURT: Okay.

MR. HARDING: There was discussion about insurance and what it covers. And there was also reference from the Plaintiff about, well, who will pay for the legal fees? In these two cases, fortunately, the insurance companies paid that I mentioned.

That was the Paulson settlement, the Paulson lawsuit and the Suncanna action, suing our directors. It was paid by the insurance company. I think that does it.

DIRECT EXAMINATION

BY THE COURT:

Q. Just a couple of clarifying -- well, at least one clarifying question. From your perspective, what expenses or costs falls under G&A?

A. It's pretty well-defined. It's something -- I mean, almost like the thing says, general administrative. So that would include executive time spent on that particular project. It would include --

Q. Let me interrupt. You're talking about salary?

A. Salary, yes. And salary, overhead.

Q. Such as . . .

A. Proper costing of segments. It would include a pro rata of the rent payments, utilities, any other auxiliary charges -- travel, if any, unless the

travel's specific for -- for example, I think Mr. McKowen says I went down three or four times a week down there.

Well, that would be G&A out of -- out of GrowCo, GCP1, that you could define the particular activity to that particular cost. Otherwise, you have to allocate. And that's what we've done. And that's what the auditors audited.

Q. Anything else? So I have salary, rent, units, travel.

A. Advertising, marketing. I don't think we have any of that. I mentioned auto expense.

Q. What about interest payment on debt?

A. Interest payments on debt is not G&A. Interest payments on debt is -- as I previously testified, during construction period is capitalized.

Q. What does that mean?

A. What that means is, as we build the greenhouse -- in construction, you have all these different expenses, which includes, if you have debt, debt service.

From the time that you plan the project, break the ground, get the certificate of occupancy, or sometimes a temporary certificate of occupancy, that interest expense that's paid or accrued is capitalized.

What I mean by "capitalized," adds to the cost of the building.

Q. So the first capital raise debt offering was an equity raise, correct?

A. Yes.

Q. All right. The second one was a -- was the 4 million note, so that was a debt capital raise, correct?

A. Yes.

Q. And the third raise was the GCP super units equity raise?

A. Yes.

Q. Okay. The fourth one is the $1.5 million note that raised approximately $100,000?

A. Yes.

Q. Was any -- to your knowledge, as CFO, was any of that $100,000 used to pay interest owed to investors on the $4 million note?

A. I don't know that.

Q. Okay. And is there a reason why you don't know that?

A. There's a lot of transactions going back and forth. I cannot assuredly say that that money, that exact hundred thousand dollars that came in was used or any part of it used to cut a check because we had bank

accounts, you know, to -- to collect the funds and then go into operations. And the checks came out of that.

Q. Would you agree that's somewhere in the books, if that happened?

A. Just a minute. I'm trying to catch up on the transcript. Maybe you could repeat that question.

Q. Sure. If any of that 100,000 was used to pay interest to investors on the $4 million note, would that be reflected somewhere in the books?

A. It would be. It would be a capitalized item until the GrowCo Partners -- the first greenhouse was operational; then it would be an expense item and show them separately on the financials.

Q. Would you agree that, if any money from the $100,000 was used to pay interest to investors on the $4 million note, that that would be -- fall under the definition of a Ponzi scheme?

A. No.

Q. Why not?

A. I can tell you the reason why. The -- often, real estate developers that I know of have been exposed to -- and on my research -- I'll put that in my final report -- that just because you take interest to pay interest is not by itself a definition of a Ponzi scheme, and, in my mind, nonprofitable because, as you

mentioned before, part of the costs about a development project is debt service.

And you budget for that. You plan for that. You raise money for that. And if you're short, and it goes into the construction, part of the construction costs, in my mind, that's proper.

Q. The fifth raise was the $6 million note, correct?

A. Yes.

Q. And that was a -- structured as debt, and it raised 1 -- about $1.9 million?

A. Okay. It's -- it's in that one spreadsheet, but that sounds about right.

Q. Do you know if any funds raised in that $6 million note were used to pay interest on the -- to investors of the $1.5 million note or the $4 million note?

A. And so the raise for the -- was it the 7 million or 6?

Q. The one I asked about was the $6 million note.

A. And do you have the time frame? Or maybe we can bring back that evidence that I had. It helps spur my memory because there's, like, four debts and two equity raises.

Q. That time frame was March 2016 to July 2016.
A. Might have been.
Q. That's the $6 million note.
A. Right. Because I believe that, in July or August of 2016, that's when we began reaching out to the investors, Mr. McKowen, that email that said, you know, could be a Ponzi scheme, and we were concerned about that.
And so even though we think that funding interest payments is proper because it's part of the costs of construction, we're winding down construction at that point in time, and we don't have the funds to pay the interest.
And that's why the communication about modified -- modifying those notes. I believe the $4 million note was modified four different times.
Q. So my question is, to your knowledge, was any of the funds raised in the $6 million note used to pay interest on the previous notes?
A. I don't know for sure, but it could have happened.
Q. The same thing, the sixth capital raise was the $7 million note, that raised approximately $2.9 million?
A. There was a point in time that we stopped

paying interest to everyone. I forget when that point in time is. So without paying interest, there's no use of those funds to pay interest. I just don't know, off the top of my head, when that started occurring.

Q. Were you CFO or CEO when you stopped paying interest?

A. CEO at the time.

Q. So it would have been after July 2016?

A. July . . .

Q. Did you become CEO July 2016?

A. Correct. The modification, the first GrowCo $4 million note modification -- it was in evidence -- might have been before that. But I'm kind of thinking that the first modification was after that time frame.

Q. Okay. So, just to clarify, to your knowledge, was any of the $7 million note, the funds raised, 2.9 million, used to pay interest on any of the previous notes?

A. What time frame does that show 7 million?

Q. That's January 2016 to January 2017.

A. Could have, yes.

Q. And I show the seventh capital raise, the final raise, was the $2 million note. Was a debt offering, raised about $1.5 million; does that sound right?

A. Yes.

Q. And that was from February 2017 to September 2017?

A. I don't believe that was used for interest.

THE COURT: Those are the only questions I have. Since this is your case, any final statement you want to make in regards to the questions that I just asked you?

MR. HARDING: No, sir.

THE COURT: For Plaintiff, any follow-up questions?

MS. HUNT: No, thank you, Your Honor.

THE COURT: Mr. McKowen, any follow-up questions?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding, your testimony is complete. Thank you. You may step down.

MR. HARDING: Thank you.

(The witness, John Harding, was excused at 11:13 a.m.)

THE COURT: Mr. Harding, do you have any additional witnesses?

MR. HARDING: I do not.

THE COURT: Any rebuttal witnesses? First of all, do you rest your case?

MR. HARDING: I rest my case.

THE COURT: Any rebuttal case for the Plaintiff?

MS. HUNT: No, Your Honor. Thank you.

THE COURT: Testimony is complete in this case. We'll talk about closings and proposed findings and conclusions in just a moment. I want to talk first, however, about exhibits.

So I'm going to ask Plaintiff to, if you can, upload your exhibits within 14 days from today's date. And just label those as trial exhibits, and then by number. I would appreciate it.

I have a lengthy list of what exhibits have been admitted. Most of them are -- I think all of them eventually are by stipulation. And I carved out those reserved exhibits, most of which were never renamed.

But do the parties feel like you're on the same page as far as what Plaintiff's exhibits have been admitted?

MS. HUNT: We do, Your Honor. We believe that all of them that weren't reserved were admitted, ultimately, by stipulation.

THE COURT: Okay. If you can upload those within 14 days.

Let's talk about Mr. Harding's exhibit list.

I show the following exhibits were admitted: I have 2001, 2002, 2004, 2005; 2006, pages 1, 2, 4, 7, and 8; and then Exhibit 2013. Does Plaintiff agree?

MS. HUNT: I don't know. I'm not sure of 2013.

THE COURT: 2001?

MS. HUNT: 2001. The last one you mentioned was 2013?

THE COURT: That was the ID badge.

MS. HUNT: Oh, yeah. That's fine. 2006, the page numbers you have are different than what we have, so we would just like to see the hard copy of what was actually admitted. It would be helpful.

THE COURT: Okay. So with the exception of the ones today?

MS. HUNT: Everything else is correct. That's probably correct too. We just -- we don't have the -- we don't have the actual physical pages in that order.

THE COURT: 2006 that I'm referring to is pages 1 and 2. Those are uploaded. They're in the court file. Those were the letter from the board of directors audit committee, one signed by Mr. Harnish and one was signed by Mr. Cochran.

And then, 4, what I'm referring to as page 4

is the spreadsheet document that Mr. Harnish was working from yesterday. And that's also uploaded into the court file.

MS. HUNT: Okay.

THE COURT: And then, for today . . . 2006, 7, and 8. Oh, here it is. I'm sorry. Page 7 is the 10K summary that Mr. Harding was referring to. So that front page was the chart with the numbers that we went through, and then there's also a second page that is kind of of a summary of the different raises.

MS. HUNT: Yes. We are on the same page.

THE COURT: All right. Mr. Harding, do you agree that those were the exhibits that were admitted for you?

MR. HARDING: I do.

THE COURT: And, Mr. McKowen, do you agree?

MR. MCKOWEN: I do.

THE COURT: So I'm wondering if the Attorney General's office can help the Court. Most of these, the Court uploaded just to make sure they didn't get lost in the shuffle, and they were relatively short. The 2001 document, 2001 exhibit that was admitted is a little bit longer. Do you have that in digital format?

MS. HUNT: We do.

THE COURT: Can you upload that for the Court

and list it as Defense Exhibit 2001?

MS. HUNT: Yes. We will.

THE COURT: I appreciate that. And then, 2002 are the 10Ks. Those are also lengthy documents that were stipulated, but we didn't talk about them until today. They're not uploaded into the court file. Would you mind uploading that as well for the Court?

MS. HUNT: We will do that as well. Thank you.

THE COURT: Okay. Thank you. Would you mind doing the same for 2004 and 2006? Or, I'm sorry; 2005?

MS. HUNT: Yeah. 2005, we don't have that version. We only have the 20-some or 30 pictures. We don't have that PowerPoint.

THE COURT: The PowerPoint, the Court can do. Then, if we can get a copy of that color copy of that back. Can you upload 2004 for us?

MS. HUNT: Yes.

THE COURT: 2005, if we can get that color copy back, we'll make sure it's labeled and uploaded. Do we have a clean copy of page 7 and 8 of 2006? Does anybody have a clean copy of that?

MS. HUNT: You want that today?

THE COURT: Correct.

MS. HUNT: Yes. I believe -- I believe --

well, maybe not.

THE COURT: Do you have the hard copy, or is it digital?

MS. HUNT: We have the digital. He has several files. So I'm making sure we have it. It's not a 10K. This is the summary -- segment reporting summary. Yes. We have it.

THE COURT: Can you upload those two pages for me as well?

MS. HUNT: Yes.

THE COURT: ID badge is 2013. That's already uploaded. All right. Thank you for doing that. I appreciate that.

And this is what I show for Mr. McKowen.

MS. HUNT: Hold. I want to make sure. Do you need page 4 of 2006?

THE COURT: That is already uploaded.

MS. HUNT: Okay.

THE COURT: And then, that's the chart summary that Mr. Harnish was using. We already have that in the court file.

MS. HUNT: Okay.

THE COURT: Let's talk about Mr. McKowen's exhibits. I show the following exhibits have been admitted: So Exhibit 1005, 1006, 1007, 1008, 1009,

1010, 1011, 1012, 1015, 1016, which I corrected the title on that one. That's the Suncanna NIPA.

1017, 1018, 1019, 1027, 1028, 1029, 1031, 1032, 1033, 1037, 1038, 1039, 1042, 1047, 1048, 1049, 1050, 1051. Plaintiff agree with that list?

MS. HUNT: Brian tells me he's keeping track, and that's correct.

THE COURT: Thank you. Mr. McKowen, do you agree?

MR. MCKOWEN: Yes.

THE COURT: Mr. Harding?

MR. HARDING: Yes.

THE COURT: So I know these are a lot. More, certainly, than Mr. Harding. I'm wondering if you can help get those into the court file as well. I know that's extra burden on your staff, but I'm concerned about having a complete record.

And I think everything that we introduced here in court that I took here in court was uploaded by the Court. So 1047, 1048, 1049, 1050, 1051, and 1042 --

MS. HUNT: Yes.

THE COURT: -- were uploaded by the Court. The remaining exhibits, I don't have in digital or hard copy. Since you have them in digital, would you mind

uploading those?

MS. HUNT: No problem.

THE COURT: Okay. Thank you. Anything else for exhibits for Plaintiff?

MS. HUNT: No, Your Honor. Thank you.

THE COURT: Mr. McKowen, anything else concerning exhibits?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: No.

THE COURT: All right. Let's talk about written conclusions, then. The parties yesterday, at least Plaintiff and Mr. McKowen, had no objection to written closings. Mr. Harding voiced an objection.

I did state that I would allow the parties to do written closing arguments. Given the nature of the case and the evidence, I won't put any limitations on the closing argument. Whatever length you think is sufficient to reflect your position, I'll read whatever you provide to the Court.

How much time does Plaintiff want to prepare that filing?

MR. FINKE: I think we had a conferral yesterday, Your Honor, and the parties -- I can represent that the parties at that point agreed to

30 days for the closing and findings of fact and conclusions of law, all as one package.

THE COURT: Mr. McKowen, is that sufficient time for you?

MR. MCKOWEN: Yes.

THE COURT: And, Mr. Harding?

MR. HARDING: Yes.

MR. FINKE: I actually show August 18th being a Friday. That's a good day for everybody to -- to have that deadline.

THE COURT: Okay. So we'll do written closings and proposed findings of fact and conclusions of law. Deadline is Friday, August 18th. And I'll put a -- I'll put a simultaneous filing that day of 3:00 p.m.

MR. FINKE: 3:00 p.m., Friday, August 18th.

THE COURT: Right. So what that means is the AG's office can do that electronically. They'll file at 3:00 p.m. I think you're -- pro se parties, you'll have to do a filing here at the clerk's office. Is that how you've been filing your previous motions?

MR. HARDING: I mailed mine in in the past. So depending on how much time I have, I'll either bring it in or mail it.

THE COURT: You mailed it in to the clerk's

office?

MR. HARDING: I do.

THE COURT: So if they receive it by mail, they'll just process it?

MR. HARDING: Yes. They have in the past.

THE COURT: Okay. And, Mr. McKowen, how have you been submitting your filings?

MR. MCKOWEN: Yes, Your Honor.

THE COURT: No, how have you been doing that?

MR. MCKOWEN: I've been standing in line at the clerk's office and presenting them as a hard copy.

MS. HUNT: Your Honor, I did notice that there's a -- I don't know what the details are, but there's a sign at the Pro Se Assistance Center, I believe, and it says the parties can now use electronic filing.

So it might be worth investigating whether you can do electronic filing, maybe stopping by that office.

THE COURT: So thank you for pointing that out. So the pro se office is on this floor, around the corner from the elevators.

MR. MCKOWEN: That's got to be a recent change because I asked them previously.

MS. HUNT: Right. I just noticed the sign

this week. It's a big sign on the door that says pro se parties can now use E-filing. I don't know details or if there are limitations, but I just point it out in case that's helpful to the Defendants.

MR. HARDING: I will check on that. But the last time I checked on it, for civil cases, you could not access it. It's domestic and something else. But civil cases, they weren't allowing me to do that.

THE COURT: That might be right. So when I say "simultaneous filing," what I mean by that is, usually, if you have attorneys on both sides, I order that you file at the same time so you can't read the other person's filing and then adjust yours accordingly.

I don't know how much of a difference that makes. But I think it's pretty standard for courts to order simultaneous filing for that purpose. So if that means coming down to the court and filing on August 18th at 3:00 p.m., that's what you'll need to do.

If you mail it in, it may be received by the clerk's office and uploaded before that deadline, and if it's a court file, anybody that has access to it can review it.

So, 3:00 p.m. Clerk's office closes at 4:00.

So that should give you time to make that filing.

MR. MCKOWEN: So, Your Honor, that's an extraordinary burden, one, on -- this Defendant hasn't had to do it, but I've made as many as 10 trips down to court with the documents in hand, and if part of those documents are to include exhibits -- there's one exception to that: You let me file with a thumb drive, and those exhibits could amount to -- I don't know; something what you allowed me to use the thumb drive for.

And I would need to get a truck. And I could use FedEx, and they would have to -- that amount of exhibits, they will have to load onto several pallets and deliver it down to the Court.

THE COURT: That's not true because the exhibits that you're going to be referring to are the exhibits that were admitted here in court. So you don't need to resubmit the exhibits that are part of the court record. I will have those.

And you can refer to them in your filings, and I can review them because they will be in the court file, and the AG's office is helping upload all of the exhibits into the court file. The only potential exhibit that might exist would be the trial transcript.

And I'm going to get a copy of the trial

transcript, and I'm going to read it again and use it when I prepare my order. So if you are getting a transcript of the trial proceedings, you can refer to them by page, line in your filings, and you don't have to submit it as an additional exhibit.

MR. MCKOWEN: That's great, Your Honor.

THE COURT: If you do, that's fine, but those filings are going to, you know, probably be several reams of paper. No, it won't be that much. It'll be several reams of paper. It won't be as much as you're describing.

MR. MCKOWEN: That's a great relief. So if I'm just referring to an exhibit, the Court already has it, and I can just refer to the exhibit in the closing statements that I'm making?

THE COURT: That's correct.

MR. MCKOWEN: Okay. Very good. I have another question about the requirements. I am absolutely broke. I'll be losing my house next week. I can't -- or next month.

I can't afford to -- if I understand those things said here, I can't afford to pay the fee associated with the transcript. It is, I think, $1.70 a page, and I haven't called up the service that does that, Mackelprang, to see what the total cost would be.

Can I get some relief for that?

THE COURT: You would have to file a specific request to do that with the Court. I'm not sure that process. But these transcripts don't belong to me. They belong to the court reporter.

MR. MCKOWEN: So I would need to file a specific request to the Court to see if they can provide that transcript?

THE COURT: You're going to have to cite a rule. I don't know it off the top of my head. You'll probably also have to file what's called a MIFP, which is a motion to waive fees, and you can ask the pro se center about, how do I get a transcript of the trial if I can't afford it, and do I need to file MIFP? And they can help you.

MR. MCKOWEN: One other -- one question: One of the things that I didn't know -- and I said 30 days yesterday -- is the initial response of the court reporter yesterday was she doubted that they would have the transcript out within 30 days.

And so I don't know if that's true or not. I intend to call Mackelprang, which is the firm, and they've been very good, and I would like to know -- find out from them when they believe they will have that transcript available because it will be central to

me in filing my closing.

THE COURT: Okay. You can do that, if -- based on the information you receive, if you talk to the AG's office, and you think that 30 days needs to be pushed out to a different date, you can request that of the Court. But you'll have to explain why.

MR. MCKOWEN: Okay. I'll do that.

THE COURT: But that's closing arguments. Proposed findings of fact and conclusions of law, there was some discussion about that yesterday. Obviously, the AG's office knows what that is.

Any questions from you, Mr. McKowen, about that particular filing?

MR. MCKOWEN: So my understanding is is that there's two filings, and in one filing, you -- me, as the party, discusses the facts and conclusions of law that I would like to print, and then the second one is the -- the second portion of it is the argument. Is that right?

THE COURT: Well, you're making a filing, which is the closing argument, and in that file, you can argue the facts of the case and what they mean or should mean to the Court and address the law and argue why the law supports your position. That's closing argument.

A proposed findings of fact and conclusions of law is really drafted as a proposed order, so something that you would like the Court to order if I were to rule in your favor. So it's not a -- it's different than the closing argument. It is a proposed order for the Court to review, mark for identification, potentially adopt, and sign as an order of the Court.

MR. MCKOWEN: Okay. So let me see if I can restate that. So in the first filing, I'm going to state the facts or the proposed facts that I think are relevant; is that right?

THE COURT: In the proposed findings of fact and conclusions of law, as one filing.

MR. MCKOWEN: Okay. And then the third part -- the second part, that's one filing, and the -- the -- the third part is the proposed order? Or the second part is the proposed order?

THE COURT: In the document that is titled "Proposed Findings of Fact and Conclusions of Law," that is one filing. And in that file, you -- it is meant to be a proposed order for the Court, the entire file.

And in that order, proposed order, you state in there what facts you are asking the Court to find to be true, and you are stating in there what conclusions

of law you want the Court to draw from those facts based on the law.

MR. MCKOWEN: Okay. I get it. Thank you.

THE COURT: That's one document.

MR. MCKOWEN: And is there a -- limitations on the size of what this thing looks like?

THE COURT: I'm not putting any limitations on it.

Mr. Harding, do you have any questions about those two separate filings, closing argument and proposed findings of fact and conclusions of law?

MR. HARDING: I do not.

THE COURT: Anything else, then, for Plaintiff?

MR. FINKE: Nothing, Your Honor.

THE COURT: Anything else for you, Mr. McKowen?

MR. MCKOWEN: No, Your Honor.

THE COURT: Mr. Harding?

MR. HARDING: Your Honor, I move for a directed verdict. Nothing in the last eight days have proved the case against me by the Plaintiff.

THE COURT: Okay. Plaintiff, want to address the motion for a directed verdict by Mr. Harding?

MS. HUNT: We'll -- briefly, Your Honor. I

think the last week's testimony established that Mr. Harding was a control person, CFO, CEO, was responsible for putting out all of the investor documents and signing them while he was CFO, and that he admitted that they did not make many disclosures to the potential investors directly; that they did not disclose unlicensed sales representatives to investors; that he -- that they -- I think he's admitted that they did not -- or that they hired and used unlicensed sales representatives.

They've admitted that they did not file the notices that are required by the Colorado Securities Act.

So for all those three different categories, we believe we have presented more than sufficient evidence to certify our burden that Mr. Harding, in addition to Mr. McKowen, violated the Colorado Securities Act.

THE COURT: Just give me one moment. What was your argument again on the unlicensed -- was it unlicensed sales representatives?

MS. HUNT: Unlicensed sales representatives. I believe both Defendants have admitted that they, as control persons of GrowCo, the issuer, used salespersons who were not licensed to sell their

securities on a transaction basis.

THE COURT: And what was your argument on the fraud claim?

MS. HUNT: The fraud claim, that they have admitted that they did not provide disclosures directly to any investors, about multiple things, include- -- other than in the -- the 10Ks of the parent company, the 10Qs, the public SEC filings, and that they did not submit those filings or direct any investors to go look at those filings of the public company, and that GrowCo itself was not public; it was a private -- was a -- did not do its own filings, and that, even under those -- even looking at those 10Ks and 10Qs, that there are many things that were not disclosed, such as the details about why the licenses were being denied, about Mr. McKowen's past conduct, his businesses, and in his regulatory issues, and a variety of other disclosures that we talked about during -- you know, that we talked about during the testimony that were not in those 10Ks.

But, in any event, those disclosures should have been made directly to investors through a Private Placement Memorandum or otherwise, and that was not done. And Mr. McKowen, as a control person of issuer, had a responsibility to do that.

THE COURT: All right. Thank you.

Mr. Harding, your motion -- do you want to make any final argument in support of your motion for directed verdict?

MR. HARDING: Yes, sir. The Plaintiff's expert, Mr. Rome, stated that disclosures are not necessary if there's preexisting -- existing relationships, a stand-up relationship. I did not hear one shred of evidence that there was not a preexisting relationship with any of these investors or any witnesses they brought forward. Therefore, it mitigates disclosure.

In terms of fraud, I showed the Court that there was no fraud. Everything was fully disclosed and fully accounted for. Thank you.

THE COURT: In considering a motion for directed verdict, pursuant to Rule 50, a trial court must examine the evidence in the light most favorable to the non-moving party; in this case, the Plaintiff, indulging all reasonable inferences which may be drawn from the evidence in favor of the non-moving party.

If after such review the trial court determines that the evidence and all reasonable inferences drawn therefrom compels the conclusion that reasonable jurors would agree that a verdict against the moving party could not be sustained, the motion

should be granted.

Based on the evidence presented, the Court denies the motion for a directed verdict. In reaching this conclusion, the Court considers all evidence that was presented by both sides -- or both sides, all parties in this case, including the testimony of Tammie Martinez and Mr. Rome.

The Court's recollection of the evidence is that it's generally -- I believe it's undisputed that the Defendant Harding in this matter, Defendants in this case, did not file a notice of securities registration exemption with the Colorado commissioner pursuant to the Colorado Securities Act.

I understand that Mr. Hart may have provided contrary testimony, but it's for the Court to decide what weight, if any, to give Mr. Hart's testimony in resolving that particular issue and also to consider the applicable law and apply those to the facts that were presented over the last six and a half days of testimony.

There's also sufficient evidence to support denial of the Rule 50 admonition concerning use of unlicensed sales representatives. I think it's generally undisputed that George McCaffrey, Jan McCaffrey, and Kirsty Cameron were not licensed to sell

securities in the state of Colorado at the time these offerings were made.

There's some evidence in the record that commissions were paid to them as compensation for selling securities on behalf of GrowCo and related entities. Those numbers were reflected in some of the financial documents that were referred to, I think, at times as finder's fees.

But the question of whether or not they were selling securities and were unlicensed to do so and whether or not the Defendants knew that they were doing so is a matter for the Court to consider in drafting its order in this case. And a Rule 50 directed verdict on that issue is not appropriate.

Same thing for fraud. I know there's been a lot of testimony from both sides, various witnesses, whether or not fraud was committed in this case. I appreciate the testimony today of walking me through the 10Ks. I don't think that ends the inquiry, however.

The Court needs to consider all of the evidence that was presented in this case in deciding whether or not that claim has been proven against Plaintiffs.

Court will note that the 10Ks are a filing

with the SEC. The testimony from Mr. Rome was that there needed -- simply referring a potential investor to look at all the publicly available filings on an entity is not sufficient; that there needs to be more direct and active disclosure to potential investors; and that, in this particular case, the Court will have to consider all of the evidence after I have a chance to reread the transcript to decide whether such disclosure was made, disclosures concerning such -- such things as Mr. McKowen's prior bankruptcy, licensing, regulatory issues, using unlicensed sales representatives to sell securities, whether or not those particular things were directly disclosed to investors as part of the term sheets, the subscription agreements.

There's just a lot of information there for the Court to consider and weigh against the testimony that was presented. And I don't think a Rule 50 directed verdict is appropriate on that particular claim as well.

So, for all those reasons, Mr. Harding, your motion is denied.

Anything else from Plaintiff?

MS. HUNT: No, Your Honor.

THE COURT: Mr. McKowen?

MR. MCKOWEN: Your Honor, can we -- will we get a copy of that order that we can review in the next couple of days?

THE COURT: It's in the transcript. I'm not preparing a written order on the Rule 50 motion.

MR. MCKOWEN: Okay.

THE COURT: Anything else from you, Mr. Harding?

MR. HARDING: No, sir.

THE COURT: All right. Then we will go ahead and conclude this matter. I'll keep my binders that I have up here. Every other binder in the courtroom, however -- I don't think there were any extras on the witness stand -- please take those with you. And I'll just keep the ones I have.

Thank you for your work the past seven days. I appreciate it.

WHEREUPON, the within proceedings were concluded at 11:52 a.m. on the 18th day of July, 2023.

* * * * *

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, WENDY McCAFFREY, Registered Professional Reporter and Notary Public, State of Colorado, do hereby certify that the said proceedings were taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form, consisting of 114 pages herein; that the foregoing is a true transcript of the questions asked, testimony given and proceedings had. I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature and seal this 31st day of July, 2023.

My commission expires January 31, 2024.

/s/ Wendy McCaffrey

Wendy McCaffrey
Professional Court Reporter

# EXHIBIT 46

McKowen Amended Closing Argument, No. 2021CV33922 (August 21, 2023)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| | |
|---|---|
| DISTRICT COURT, DENVER COUNTY, COLORADO<br><br>1437 Bannock Street<br>Denver, CO 80202 | FILED IN DENVER DISTRICT COURT<br><br>AUG 21 2023<br><br>DENVER, COLORADO COUNTER CLERK COPY |
| TUNG CHAN, Securities Commissioner for the State of Colorado<br><br>Plaintiff, v.<br><br>TWO RIVERS WATER & FARMING COMPANY, et al.<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| JOHN MCKOWEN<br>335 A Josephine St<br>Denver, CO 80206<br>Tel: (303) 248-6883<br>john@johnmckowen.com<br>Self-Represented Defendant | Case No.: **21CV33922**<br><br>Courtroom: 259 |
| **JOHN MCKOWEN'S AMENDED CLOSING ARGUMENT** | |

## BACKGROUND

1. I founded and was the CEO and Chairman of Two Rivers Water & Farming Company and TR Capital, LLC and their affiliates, ("Two Rivers"), GrowCo Inc. and its affiliates ("GrowCo"), and VetaNova Inc. and its affiliates ("VetaNova"), collectively (the "McKowen Companies.")

2. I've personally invested over $5,000,000 in the McKowen Companies. I've not asked for or received anything back from my investment. I continue to invest more capital each month in pursuit of those who stole McKowen Companies' capital.

3. I'm defending myself pro se because I'm out of money, and the Two Rivers' D & O insurance policy was exhausted by lawyers in the Paulson v. McKowen class action, who paid themselves $1,000,000+ from a $2,000,000 D&O policy. Notably, the Paulson attorneys lost the FINRA arbitration of the same GrowCo fraud claims in a unanimous decision from a three-member panel in Philadelphia.

4. Plaintiff insists on lumping my behavior with that of Wayne Harding after I resigned on May 26, 2016. It's clear from the evidence that this is not true. Almost immediately after my resignation, our paths diverged over the Use of Proceeds from GrowCo capital raises. (***Exhibits 23, 63, 1031, 1032***)

**RELEVANT FACTS**

**Pre-Two Rivers**

1. In August 1996, I and other accredited investors, provided startup capital pursuant to Rule 506(c) private placement for a company called Navidec Inc ("NVDC"), an internet service provider, which subsequently became publicly traded on NASDAQ. The stock did well and rose to $800,000,000+ market capitalization. I and others sold our NVDC stock for a 5X+ gain before the dot.com market crash in 2000.

2. In September 2004, I and other accredited investors provided startup capital pursuant to Rule 506(c) private placement for BPZ Energy, Inc ("BPZ"), an oil & gas company, which subsequently became publicly traded on the NYSE. The stock did well and rose to $1,000,000,000+ market capitalization. I and others sold our BPZ stock for a 5X+ gain before the CDO market crash in 2008.

**Two Rivers & GrowCo**

3. In 2010, I created Two Rivers Water & Farming Company ("Two Rivers") and began conducting Rule 506(c) private placements to purchase and operate water and farming assets in Colorado. All capital raised was properly spent as described in the Use of Proceeds (Exhibits 5 & 1005).

4. In 2014, I realized I had misjudged the development capital needed to reach positive cash flow for Two Rivers. The "runway" was much longer than I had calculated. Two Rivers needed to create a new division that could realize positive cash flow more quickly. I created GrowCo, Inc. ("GrowCo") to build and lease state-of-the-art vertical greenhouses on Two Rivers properties that could be leased to a licensed marijuana grower (Exhibit 1006).

5. In order to establish and manage computer-controlled vertical greenhouses for GrowCo, I

needed a competent partner who could match my fundraising capabilities with their industry skills. Following discussions with several potential candidates, I ultimately and unfortunately chose the team of Aaron Van Wingerden and Tim Beall ("Van Wingerden Team") (Exhibit 1007)

6. The Van Wingerden Team conducted a thorough assessment of Two Rivers' farming and water resources and identified what they considered the best site for building four greenhouses. They also provided an estimate of the costs involved in constructing and running the first greenhouse, which was called GrowCo Partners 1, LLC (GCP 1) (1008, 1009).

7. In June 2014, I, Tim Beall, and others traveled to, met with, and received an offer from Emerging Growth Equities ("EGE"), a Philadelphia-based broker-dealer, who offered to raise $7MM for Two Rivers' GrowCo project, on a best-efforts basis. See Exhibit 30, p2 to download the EGE offer.

8. Starting in the fall of 2014, I began to raise capital pursuant to Rule 506(c) to construct the greenhouses and provide operational support for licensed tenants. (Exhibits1010, 1011 & 1012).

9. As collateral for the GrowCo capital raises, I included Deeds of Trust on Two Rivers water and farming assets (Exhibit 1017). Initially, Two Rivers was the sole owner GrowCo common stock.

10. As a result of the cost overruns and missing construction material, the trust between AVW Partners and GrowCo deteriorated completely. On February 25, 2016, AVW Partners and RH Group, an entity intended to be licensed to grow Marijuana formed by another investor and me, entered into a Membership Interest Purchase Agreement ("MIPA) with Van Wingerden. Van Wingerden was given a $350,000 escrow deposit.

11. Van Wingerden, contrary to the MIPA, cashed the escrow deposit immediately after receiving it to pay bills on his failing traditional greenhouse. Soon thereafter, Van Wingerden filed a complaint with the Marijuana Enforcement Division ("MED"), and RH Group's marijuana license was denied. I was never given the opportunity to speak with the MED directly about the denial of the RH Group license.

12. In June 2016, I was sent emails from Tim Beall containing dated and signed statements from Van Wingerden's employees and contractors corroborating my suspicions and claims that resources, including equipment, manpower, and funds, were stolen and taken to Van Wingerden's Larkspur greenhouse.

13. On August 13, 2019, the Paulson Class Action was filed in Denver District Court. On September 16, 2019, I had the case removed to the Federal District Court of Colorado. On March 16, 2023, a Final Order, based on the merits, with a Complete Bar Ordered, was entered dismissing the case with prejudice. The Colorado Securities Commissioner was aware of the filing of this action and stated they were not going to abide by the order.

14. Based on the Final Order, I believed I could finally complete the reorganization of my and the investor's GrowCo assets, raise some additional capital amongst ourselves and put the GrowCo greenhouse assets back to work.

15. Of the investors in GrowCo, 77.36% voluntarily and lawfully privately reorganized their GrowCo investment into VetaNova. See Exhibits 2 & 3.

16. In August 2021, I entered into an agreement with a national distributor of premium produce who would purchase 100% of all grade-one premium produce we could grow.

17. On December 6, 2021, I signed a contract with a national FINRA registered broker/dealer based in New York City, who agreed to raise $10,000,000 for VetaNova to start growing fruits and vegetables for sale to the national distributor.

18. From GrowCo's inception until I resigned on May 26, 2016, to form the RH Group, all the capital I contributed, which was in excess of $3,000,000, along with other accredited investors, was raised pursuant to exemptions and offering documents prepared by GrowCo's outside, experienced, Harvard educated SEC counsel.

19. From GrowCo's inception until I resigned on May 26, 2016, all capital was properly

credited to investors, and appropriate security agreements were created and filed with the appropriate County Clerks and Recorders.

20. After I resigned, I formed McGrow, LLC ('McGrow"). McGrow and GrowCo entered a series of Agreements, whereby McGrow provided six months of transition support. See Exhibit 13.

21. Part of the McGrow Agreements was a Construction Services Agreement where McGrow would complete GCP 1 and the additional greenhouses.

22. The only greenhouse completed was GCP 1, which was completed by McGrow.



23. McGrow provided the only funding for the new tenant operations.




24. In late 2016, I noticed that much of the capital raised for GrowCo after I resigned was being spent inappropriately. I began to question the new management of Two Rivers & GrowCo. The capital for the completion and operation of GrowCo greenhouse was being used for non-GrowCo purposes and

contrary to the Use of Proceeds in the offering documents.

25. By the end of 2017, all the GrowCo capital had been dissipated, my replacement management resigned, and I took over GrowCo again to revitalize and restructure it.

26. I filed for Chapter 11 to protect GrowCo while restructuring. However, the US Trustee for the Bankruptcy Court suggested GrowCo withdraw from bankruptcy because of its relationship with Marijuana.

27. In February 2018, The Division of Securities issued subpoenas to me requesting information regarding GrowCo. They continued to request more information for the next several years. I responded to each request through SEC counsel, whom I had used since 2004.

28. On March 19, 2018, The SEC issued a "No Action Letter" regarding Two Rivers and GrowCo's activities the SEC had investigated while and after I was the CEO of both companies.

29. On August 15, 2018, I received an Unopposed Dismissal from a Water Court case brought by the Division #2 Engineer in Pueblo County for failure to comply with the Court's April 27, 2016, Consent Decree requiring the removal of the Cucharas #5 Dam. The Colorado Attorney General's office concluded that I did not retain any ability, either directly or indirectly, to control the funds or assets of Two Rivers after I resigned.

30. On March 17, 2022, a FINRA Arbitration Panel denied all claims in their entirety alleged by Claimants, who were GrowCo investors during the relevant period, related to claims for common law material misrepresentations and omissions, and statutory material misrepresentations and omissions in the private placements of securities issued by GrowCo.

31. After voluntarily withdrawing GrowCo from bankruptcy, I began to privately reorganize GrowCo investors to refocus the investors and refinance the development of its assets. I contributed my ownership interests in my GrowCo Investments and contributed significant additional capital. Over time, 77.36% of the prior GrowCo investors, who had contributed more than 80% of the GrowCo capital, joined

me in the private restructuring.

32. Greg Harrington became CEO and Chairman of Two Rivers out of default when Wayne Harding walked away from the company in 2019.

33. Harrington had told me and others that he had been convicted of securities fraud securities sometime in the late 1980s or early 1990s. I provided this information to Plaintiff's counsel.

34. Harrington filed and signed one 10-Q Quarterly Report for Two Rivers on November 25, 2019.

35. If Harrington is, in fact, a convicted securities fraud felon, he is violating Sarbanes Oxley and committing additional felonies

**SECURITIES REGULATIONS**

36. For GrowCo and VetaNova, through Rule 506(b) private placements, I raised $15,000,000+ from accredited investors pursuant to Colorado and Federal regulations detailed in the paragraphs below.

37. **Coordination -** Colo. Rev. Stat § 11-51-101(3), The Colorado Security Act ("CSA") shall coordinate with federal acts, statutes, rules, and regulations as of January 1, 1990, as amended. CSA must coordinate with federal rules." See Chan v. HEI Resources, Inc., 512 P.3d 120 (Colo. 2022), Cagle v. Mathers Family Trust, 295 P.3d 460 (Colo. 2013)

38. **Exempt Transactions** - Colo. Rev. Stat. § 11-51-308(i). Any transaction not involving any public offering.

39. **Coordination of exemptions -** Colo. Rev. Stat. § 11-51-311. In furtherance of the policy stated in section 11-51-101(3), the exemptions under sections 11-51-307 to 11-51-309 shall be coordinated with exemptions for securities and transactions under the federal "Securities Act of 1933."

40. **1933 Act Exemption -** 17 CFR 230.506(b) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act. To qualify

for an exemption under this section offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

41. **Accredited Investor** -17 CFR 230.501(a) shall mean any person who comes within any of the categories as listed in GrowCo's offering documents, or who the issuer reasonably believes comes within any of the categories, at the time of the sale of the securities to that person: (***Pages 10-13 Exhibit 1010).***

42. **Disclosure -** 17 CFR 230.502(b)(1) The issuer is not required to furnish specified information to purchasers when it sells securities to accredited investors only.

43. **Bad Actor Disqualification -** 17 CFR 230.506(d)(2)(i) "Bad Actor" disqualification shall not apply with respect to any conviction, order, judgment, decree, suspension, expulsion, or bar that occurred or was issued before September 23, 2013.

44. **Barred Derivative Claims -** In the Paulson class action matter, the Settlement Agreement provided "The Settling Parties agree and acknowledge that this Settlement Agreement is intended to resolve and satisfy any and all claims that the Releasors have made or could have made against any of the Releasees arising out of the issuance or sale of GrowCo securities." Docket No. 180 at 19 ¶28. Further, it provided that "Releasor" means each and every one of, and "Releasors" means all of (i) the Representative Plaintiff, (ii) all other Class Members, (iii) their respective past or present parents, predecessors, successors, current and former affiliates, divisions, business units, joint ventures, subsidiaries, assigns, any entities in which any Releasor has or had a controlling interest, or that has or had a controlling interest in him, her, or it, and any other person or entity (including any governmental entity) claiming by or through, on behalf of, for the benefit of, derivatively for, or as representative of Representative Plaintiff or any other Class Member..." The claims of the Commissioner in this matter arise from the Commissioner's authorization under Colo. Rev. Stat. § 11-51-602(2) to assert a claim for damages *on behalf of* defrauded investors. "The

securities commissioner may include in any action authorized [by this section] a claim for damages under Colo. Rev. Stat. § 11-51-604 or restitution, disgorgement, or other equitable relief on behalf of some or all of the persons injured by the act or practice constituting the subject matter of the action . . . " § 11-51-602(2)."

See Feigin v. Alexa Group, Ltd., 19 P.3d 23 (Colo. 2001). And although the commissioner does not have a fiduciary duty to the investors, The commissioner's claims are still derivative of the underlying investors' claims. It is axiomatic that where those investors' claims have been resolved, so have the Commissioner's.

See O'Neil v. Simpson, 958 P.2d 1121, 1123 n. 4, 5 (Colo. 1998) (noting that res judicata bars subsequent claims by identical parties based on the same claim for relief, and that collateral estoppel applies where the party against whom estoppel is being asserted has been a party to or is in privity with a party in a prior proceeding).

45. **Failure to File Notice or Exemption** - Colo. Rev. Stat. § 11-51-604 "No person is liable under this subsection (1) for a violation of section 11-51-301 due solely to a failure to file the prescribed notification of exemption or to pay the required exemption fee for an exemption under section 11-51-308(1)(p)."

46. **Statute of Limitations -** Colo. Rev. Stat. § 11-51-604 "No person may sue under subsection (3) or (4) or paragraph (b) or (c) of subsection (5) of this section more than three years after the discovery of the facts giving rise to a cause of action under subsection (3) or (4) of this section or after such discovery should have been made by the exercise of reasonable diligence and in no event more than five years after the purchase or sale."

- Plaintiff began issuing subpoenas in late 2017. Three years from then is late 2020.

- I resigned from Two Rivers and GrowCo on May 26, 2016. Five years from then is May 26, 2021.

Plaintiff filed her Complaint on December 10, 2021. Therefore, Plaintiff's Complaint is time-barred for bringing suit against me.

47. **Fraud -** Colo. Rev. Stat. § 11-51-501(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;"

**FAILURE DUE TO THEFT OF MCKOWEN COMPANIES CAPITAL**

48. McKowen Companies' failed because others repeatedly stole its capital, not because of any fraud in raising capital.

49. In 2015, the original builder and tenant of GrowCo Partners 1, LLC stole GrowCo capital and equipment for use in his greenhouse, doubling the projected cost.

50. In 2016, Wayne Harding and the Two Rivers board began stealing GrowCo's capital for Two Rivers' water and farming projects. Then they covered it up, after the fact, by developing an "allocation" methodology rather than just recording actual expenses. Harding's "allocation" methodology preposterously created $8,584,000 or 47.64% of the net capital raised as General & Administrative expenses. (***Exhibit 2006 p.3***)

10K Summary of GrowCo and sub expenses
source: 10K Notes to Financial Statements
Information on Business Segments

| 10-K Year | 10K Note # | Expense | Non-controlling interest | Total |
|---|---|---|---|---|
| 2014 | n/a | $ - | | $ - |
| 2015 | 5 | $ 632,000 | $ - | $ 632,000 |
| 2016 | 6 | $ 4,181,000 | $ 206,000 | $ 4,387,000 |
| 2017 | 6 | $ 1,731,000 | $ 644,000 | $ 2,375,000 |
| 2018 | 3,6 | $ 810,000 | $ 380,000 | $ 1,190,000 |
| Totals | | $ 7,354,000 | $ 1,230,000 | $ 8,584,000 |
| Total GC assets at 12/31/17 | | $ 9,433,000 | $ - | $ 9,433,000 |
| Total audited | | $16,787,000 | $ 1,230,000 | $18,017,000 |

At trial, Harding imperiously berated Plaintiff's Accounting Expert, Ms. Martinez, about how she wasn't qualified to evaluate PCAOB accounting and everything was correct according to those standards. Ms. Martinez held her ground and stated she was reporting cash transfers, not performing an audit of a public company. Harding's accounting may have satisfied PCAOB standards, as reported in Two Rivers 10Ks. However, it is not what investors were told would be the Use of Proceeds in the GrowCo $7MM Exchange Note offering documents. The unauthorized use of those funds is where the sophisticated and deceptive cover-up and fraud occurred. (***Exhibits 1, 7, 2001, 2002, 2006 p. 3, 93, & 1032***)

51. On December 10, 2021, Plaintiff, by filing this unfounded, frivolous, and vexatious lawsuit against me, Plaintiff intentionally, knowingly, proximately, and foreseeably destroyed $65,000,000 in market capitalization of VetaNova, wherein 77.36% of GrowCo's investors voluntarily and lawfully privately reorganized their GrowCo and VetaNova investment that became a public company through a reverse merger and S-1 Registration Statement cleared by the Security and Exchange Commission (SEC) on September 27, 2021.

52. In May 2023, Plaintiff's counsel crafted a fraudulent, self-serving unsworn Stipulation they had Greg Harrington sign, a self-described securities fraud felon. The Stipulation was adopted in a Court order, incredibly and without any notice or hearing. (*Exhibits 1048 & 1049*). The Stipulation dismissed Two Rivers from this case. It unconstitutionally transferred millions of dollars of GrowCo and VetaNova investor collateral to Two Rivers, the same entity that had concocted the fraudulent G&A accounting methodology in item (b) above.

> See Hidden Lake Development Co. v. District Court, 183 Colo. 168, 515 P.2d 632 (1973). B.C., Ltd. v. Krinhop, 815 P.2d 1016 (Colo. App. 1991). C.R.C.P. 19(a); "A person or entity whose presence is necessary to assure complete relief or to protect a legally cognizable interest at stake in an action must be joined as a party thereto."

"Due process of law requires that those parties whose interests are at stake be before the court." Provident Tradesmens Bank and Trust Co. v. Lumbermens Mutual Casualty Co., 365 F.2d 802 (3d Cir. 1966). "Colorado is in agreement with those jurisdictions which hold the failure to join an indispensable party to be such an egregious defect that the court may dismiss the action on its own motion." Hennigh, supra; cf. Marsh v. Warren, 126 Colo. 298, 248 P.2d 825 (1952); See also 3A Moore, Federal Practice, § 19.07--2. Hidden Lake Development Co. v. District Court In and For Adams County, 515 P.2d 632, 183 Colo. 168 (Colo. 1973)

**PLAINTIFF & PLAINTIFF'S COUNSEL MISCONDUCT**

53. Plaintiff's counsel refused to and did not provide Plaintiff's Rule 30(b)(6) fact witness designee for deposition or testimony at trial. Thereby denying me the constitutional right to confront my accusers at trial under oath. In *Camp Bird Colo. v. Board of County Com'Rs*, 215 P.3d 1277 (Colo. App. 2009) the court stated: *See D.R. Horton, Inc.- Denver v. D & S Landscaping, LLC*, 215 P.3d 1167, 1167, 2008 WL 2522232, *4 (Colo.App. No. 07CA0890, June 26, 2008) (the organization must make a good faith effort to designate knowledgeable persons to testify on its behalf and prepare the designated deponents to answer fully and unevasively); *see also Sprint Commc'ns Co. v. Theglobe.com, Inc*., 236 F.R.D. 524, 528 (D.Kan.2006) (the comparable federal rule makes clear that a party is not permitted to undermine the beneficial purposes of the rule by responding that no witness is available with personal direct knowledge); *King v. Pratt & Whitney*, 161 F.R.D. 475, 476 (S.D.Fla.1995) (the federal rule delineates an affirmative duty to produce a representative who can answer questions both within the scope of the matters described in the notice and as to information known or reasonably available to the corporation), *aff'd*, 213 F.3d 646 (11th Cir.2000) (unpublished table decision)."

54. Plaintiff's counsel, at trial, when pressed for a fact witness to cross-examine regarding the alleged facts that were the basis for their Expert Witness testimony, Plaintiff's counsel, unbelievably, stated

they were the fact witness. Still, they could not be cross-examined because of attorney-client privilege.

55. **Plaintiff's Counsel as Advocate -** Colo. R. Prof'l. Cond. 3.7(a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:(1) the testimony relates to an uncontested issue;(2) the testimony relates to the nature and value of legal services rendered in the case; or(3) disqualification of the lawyer would work substantial hardship on the client.

56. Plaintiff eliminated trial time, sworn testimony, and cross-examination under oath over my objections by using unsworn Stipulations drafted and executed by Plaintiff's counsel.

57. With the assistance and collaboration of Plaintiff's counsel, similar obfuscation occurred in trying to depose and cross-examine Two Rivers Water & Farming Company and TR Capital, LLC, and their affiliates ("Two Rivers"). Plaintiff's counsel would schedule and then cancel Two Rivers' deposition. Two Rivers prepared a fraudulent unsworn Stipulation signed by Greg Harrington, the CEO, an admitted securities fraud felon, that excused Two Rivers from the case just weeks before the trial started.

58. Plaintiff's counsel effectively shielded, aided, and abetted Two Rivers' theft of millions of dollars of GrowCo and capital, violating my constitutional rights to a fair trial, due process, and equal protection under the law.

## CONCLUSIONS

59. Plaintiff alleges I sold unregistered non-exempt securities. See, Plaintiff's Complaint Para.3.

My response is that while I was the CEO of McKowen Companies, I utilized and relied on well-educated and experienced attorneys and accountants to prepare offering documents. The GrowCo offerings were private placements that were compliant with all requirements for an exemption under Regulation D, Rule 506(b), as stated in the Colorado and federal statutes and rules detailed below:

**Coordination of exemptions -** Colo. Rev. Stat. § 11-51-311. In furtherance of the policy stated in section 11-51-101(3), the exemptions under sections 11-51-307 to 11-51-309 shall be coordinated with exemptions for securities and transactions under the federal "Securities Act of 1933".

**1933 Act Exemption -** 17 CFR 230.506(b) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act. To qualify for an exemption under this section offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

**Accredited Investor** -17 CFR 230.501(a) shall mean any person who comes within any of the categories listed in GrowCo's offering documents, or who the issuer reasonably believes comes within any of the categories, at the time of the sale of the securities to that person.

**Disclosure -** 17 CFR 230.502(b)(1) The issuer is not required to furnish specified information to purchasers when it sells securities to accredited investors only.

**Bad Actor Disqualification -** 17 CFR 230.506(d)(2)(i) "Bad Actor" disqualification shall not apply *concerning* any conviction, order, judgment, decree, suspension, expulsion, or bar that occurred or was issued before September 23, 2013.

60. Plaintiff alleges I made material misrepresentations and omissions to investors in offering and selling securities. For example, despite representing to investors that investor funds would be used to build, manage, and operate greenhouses for use by marijuana growers and that a greenhouse cost $5,000,000 to complete, after raising more than $19,000,000, the Defendants have only completed one greenhouse. See, Plaintiff's Complaint Para.4.

My Response is that Plaintiff exaggerates and misstates the representation to investors in the sale of securities while I was the CEO of GrowCo. The offering documents clearly state that the use of proceeds from capital raised includes financing the construction of greenhouses, lending money to

tenants under lines of credit, purchasing farmland and water taps, and working capital and other general corporate purposes. See Exhibits 1010,1011,1012.

Additionally, unexpected costs include unforeseen circumstances, such as inaccurate construction and operating cost estimates, theft of GrowCo capital by the developer and tenant, or unethical accountants. They may or may not be foreseeable failures in the execution of a startup in a new industry where risks are high, as disclosed in offering documents. Still, they are not misrepresentations or omissions in the initial offer and sale of securities. See Exhibits 1008, 1009, 2006.

61. I admit we failed to file any notifications of securities registration exemption with the Commissioner as required by section 11-51-308(1)(p), C.R.S.

The penalties for **Failure to File Notice or Exemption** - Colo. Rev. Stat. § 11-51-604 "No person is liable under this subsection (1) for a violation of section 11-51-301 due solely to a failure to file the prescribed notification of exemption or to pay the required exemption fee for an exemption under section 11-51-308(1)(p)."

WHEREFORE, Plaintiff's claims against McKowen regarding the sale of securities while McKowen was the CEO of the McKowen Companies are time-barred, and secondarily, Plaintiff failed to prove the allegations of fraud in her Complaint beyond a preponderance of the evidence, as they relate to me. Therefore, the Court should deny all claims in Plaintiff's Complaint, and vacates its Order adopting the Stipulation by Two River signed by Greg Harrington, including the dismissal of Two Rivers from the cross complaint with me.

Dated this 21st day of August 2023.

JOHN MCKOWEN

/s/*John McKowen*

Self-Represented Defendant

CERTIFICATE OF SERVICE

I certify that on the 21st day of August 2023, the foregoing document was filed with the Clerk of the Denver District Court and emailed with Received and Read receipts to all other parties of record.

/s/ *John McKowen*

# EXHIBIT 47

Harrington Letter to Commissioner Chan (February 2, 2024)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Two Rivers
WATER & FARMING

February 2, 2024

**Attention: Commissioner Tung Chan**
Colorado Division of Securities
1560 Broadway, Suite 900
Denver, CO 80202

**Subject: Fraudulent Claims by Defendants in Violation of Judgements in Case No. 2021CV33922**

Dear Commissioner Tung Chan,

An issue has arisen regarding GrowCo and its successor VetaNova in connection with the judgments obtained by our office's complaint in the matter of Colorado Commissioner of Securities vs. Two Rivers Water and Farming Company (Two Rivers), TR Capital Partners, LLC (TR Cap) et al. This issue requires immediate attention. Although the Court has not yet ruled on the findings after the trial of two defendants, it is important to note that all other defendants either entered into a settlement agreement or, in the case of many corporate defendants, a default judgment was entered by the Court.

The defaulting parties are explicitly prohibited from offering securities to the public in the State of Colorado. However, despite this prohibition, defendant John McKowen, through VetaNova and other defaulting parties under his control, has persistently solicited funds, which appears to be an extension of the original fraudulent offering scheme. Notably, there is no mention of the judgment that prohibits the solicitation of securities in Colorado.

Furthermore, compounding this issue and affecting the settlement with your office by Two Rivers and TR Capital is Mr. McKowen's dissemination of false and misleading claims concerning the Bankruptcy proceedings of Two Rivers Farms F-2, Inc. and The Orlando Reservoir No. 2 Company, LLC. In his efforts to raise funds for VetaNova, Mr. McKowen has made claims to potential investors that directly contradict the evidence presented at trial. These false claims have significantly increased the work required to recover assets for the entitled parties, which has an impact on our settlement, including the substantial fine that was agreed upon.

Just one of many examples of Mr. McKowen's conduct directly violating the judgement's against his entities your office obtained was contained in an email to potential investors as recently as December 7, 2023 follows:

> ***From: John McKowen <john@vtanva.com>***
> *Sent: Thursday, December 7, 2023 12:06 PM*
> ***Subject: VetaNova, GrowCo Partners 1, LLC, Liquidation Offering Documents***
>
> *Dear VetaNova Shareholders & Former GrowCo Investors.*
> *Key Shareholders and I have carried this project to the point where we can likely seize and sell the*

Two Rivers
WATER & FARMING

*collateral, I put in place in 2015. I have been speaking to credible buyers who would purchase the property at the Appraised Value if we can clean up the title on the properties. If you contribute nothing more, you get the Yellow. If you contribute your portion of remaining costs, you get the Green, which triples your recovered capital. Attached are the Offering Documents…*

***(Excerpts from the offering material)***

*VetaNova Inc. Term Sheet for Private Placement of Shares This Term Sheet, originally dated as of December 1, 2023, summarizes the principal terms of a proposed private placement of Shares (as defined below) of VetaNova Inc. (the "Financing").*

Our intention with the settlement was to enable Two Rivers and TR Cap along with their subsidiaries to put this matter behind them. However, we are now confronted with the ongoing threat of publicity surrounding our inability to prevent Mr. McKowen from continuing to fraudulently seek funds to support baseless claims for the assets of the bankrupt companies. As private claimants, the companies lack the standing to seek relief from his actions and those of unnamed co-conspirators. Therefore, we respectfully request that you review the facts and take appropriate action before this matter further jeopardizes the interests of Colorado investors.

As we were not able to determine your email address the attachments only reflect a small portion of the false and misleading solicitations Mr. McKowen has made on behalf of the defaulted judgement entities. We would provide a complete file of those in our possession including attachments which purport to be offering documents to any designated email address you provide.

We have copied India Kid-Aaron, via email, on this letter and the attached Index with highlighted sections the referenced emails which provide our assessment of the claims being made to solicit funds in violation of the Judgement on the GrowCo / VetaNova Entities, which directly affect the orderly conduct of the Bankruptcy proceedings. Additionally, we have linked the supporting documents referenced as attachments in Mr. McKowen's emails, for further review.

Respectfully Submitted,

Greg Harrington
CEO, Two Rivers Water & Farming Company

*CC: India Kid-Aaron*
*Via email: India.Kidd-Aaron@coag.gov*

# EXHIBIT 48

Adversary Proceedings 24-01111 and 24-01112
(Complaints and Dismissals, Bankr. D. Colo.)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| TWO RIVERS FARMS F-2, INC., Debtor. | Case No. 23-15627-KHT<br>Chapter 11<br>Subchapter V |
| TWO RIVERS FARMS F-2, INC.,<br>Plaintiff,<br><br>v.<br><br>GROWCO CAPITAL PARTNERS 1, LLC,<br>I. WISTAR MORRIS,<br>CHRISTOPHER L. MORRIS,<br>JESSE DOVICH,<br>THE JON D. AND<br>LINDA W. GRUBER TRUST<br>SAMUEL W. MORRIS JR.,<br>MICHAEL S. BARRISH,<br>MATT EDMUNDSON,<br>JEFF PORTER,<br>ERIC PETERSEN,<br>THE CHARLES J. BLOOM IRA,<br>MARTHA MORRIS,<br>THE COTSWOLD FOUNDATION,<br>ELEVENTH GENERATION,<br>THE I. WISTAR MORRIS IRA,<br>JMW FUND, LLC,<br>SAN GABRIEL FUND, LLC,<br>JACOB A. BEVAN,<br>MICHELLE K. BEVAN,<br>HUGO ZIMMERMANN,<br>DAVID JENKINS,<br>NJEVITY, INC.,<br>RICHLAND FUND, LLC,<br>MICHAEL HARNISH,<br>LINDA HARNISH,<br>ELEVATION FUND,<br>MAUREEN MILLER,<br>GUS BLASS, III,<br>CAPITAL PROPERTIES, LLC, | Adv. Proc. No. ________________ |

L.A. WALKER III, )
LINDA WALKER, )
WEST HAMPTON SPECIAL, )
SITUATIONS FUND, LLC, )
JPG INVESTMENTS, LLC, )
JAMES COCHRAN, )
ERIC PORTER, )
KIRBY ENTERPRISE FUND, LLC, )
CHARLES B. KIRBY, )
THOMAS PRASIL, )
THE SAN GABRIEL BENEFIT PLAN )
f/b/o JOHN MCGRAIN, )
GROWTH VENTURES, INC. )
PROFIT SHARING PLAN & TRUST, )
THOMAS PRASIL TRUST, )
PAUL POWELL, )
JDC VENTURES, LLC, )
SONDRA W. MARGOLIES, )
THE SAN GABRIEL BENEFITS PLAN )
f/b/o JUSTIN YORKE, )
JOHN R. ROGERS, )
FRANK GUY, )
SANDRA DIAZ R/O IRA, )
MICHAEL BERENHAUS, )
CHARLES CURTIS, )
SANDRA CURTIS, )
JOHN J. BLUM, )
GREGORY A. HARRISON, )
DONALD S. DARENDINGER )
REVOCABLE TRUST U/A 7/3/2007, )
SUSAN DOUKAS, )
STEPHEN BROWN, )
SLMI HOLDING, LLC, )
PRESLEY REED, )
JOHN R. ROGERS SEP IRA NO. 2, )
HIGH-SPEED AGGREGATE, INC., )
WARDENBURG 2009 TRUST, )
JASON PAULLEY R/O IRA, )
JASON PAULLEY, )
MAUREEN MILLER IRA, )
FRANK MILLS, )
SHIRLEY MILLS, )
JORDAN FAMILY LLC, )
NORMAN MCCLAIN, )

LAWRENCE CAKE, )
KAREN CAKE, )
MARGARET ELIZABETH CRUMBLEY, )
TOM ELLISON, )
ROBERT STANGER, )
ADAM LINN, )
JOHN N. ALESANDRO, )
NAZIM LOKHANDWALA, )
LLOYD GRANT, )
BRENDA FORWOOD, )
F. RICHARD STARK, )
FRANCIS CHAN, )
JEFFERY CHAN, )
JOHN BLACK, )
JOSEPH R. STRANGER, )
KONRAD KUHN, )
LINDA KUHN, )
BELVA BARBALACE, )
CHARLES BIEMILLER IRA 2, )
CARL SWARTS IRA, )
WILLIAM C. KOTTKE R/O IRA, )
CONSTANTINE HAGEPANOS R/O IRA, )
ASHLEY WEATHERFORD R/O IRA, )
PAUL HARTMANN R/O IRA, )
TIMOTHY GILLIS, )
PATRICIA GILLIS, )
CONSTANTINE HAGEPANOS, )
GEORGE ROSCH, )
STEPHEN TROUTMAN, )
HEATHER EVANS, )
THOMAS FORTI, )
ERNEST DUFRESNE, )
WAYNE HARDING, )
WAYNE HARDING IRA, )
TR CAPITAL PARTNERS, LLC, )
DAVID MARSHALL, )
DAN FOSTER IRA, )
VETANOVA, INC., )
JOHN MCKOWEN, )
PRASIL FAMILY MATTERS, LLC, )
BLUE & GREEN, LLC, )
MARK E. ANDERSON MD APC PSP & T, )
MARY LOUGHRAN, )
IRAR FOB: STEPHEN ROBERT MARRINAN, )

GEOFFREY POREMBA, )
DONALD JEFFREY CAIN, )
PREFERRED MEMBERS OF )
TR CAPITAL PARTNERS, LLC, )
Defendants. )

**COMPLAINT AGAINST GROWCO PARTNERS-1, LLC, THE GCP-1 BENEFICIARIES, AND THE FILED CLAIMS**

TWO RIVERS FARMS F-2, INC. ("Debtor"), through counsel, respectfully submits this Complaint against the Defendants identified above and below including GrowCo Partners I, LLC ("GCP-1"), the GCP-1 Beneficiaries (as defined below), the Filed Claims (as defined below) and, states as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction pursuant to 28 U.S.C. §§157(a) & (b)(2)(A), (B), (O). This Court also has jurisdiction pursuant to 28 U.S.C. §1334.

2. Venue in this Court is proper as the Debtor filed for relief in this District with this Court. 28 U.S.C. §§1408 & 1409.

3. As more fully set forth below, the Debtor owns real property and water rights within the State of Colorado which are allegedly subject to the liens, encumbrances and/or interests of one or more of the Defendants.

4. The GCP-1 Beneficiaries (as defined below) transacted business with GrowCo, Inc. ("GrowCo"), GCP-1, Mr. John McKowen and/or Mr. Wayne Harding, concerning, among other things, solicitations for investments in and/or loans to GrowCo, among other companies.

5. Each of the GCP-1 Beneficiaries transacted business within the State of Colorado, transacted

business with a Colorado company, and allegedly assert an interest in real property within the State of Colorado owned by the Debtor, such that all such persons availed themselves of the laws of the State of Colorado, they have substantial contacts with the state of Colorado or at least have minimum contacts with the State of Colorado.

6. None of the GCP-1 Beneficiaries gave any consideration to the Debtor in exchange for their alleged interest in the real property and water rights owned by the Debtor.

7. Each of the Defendants who filed proofs of claim in the Debtor's bankruptcy case have submitted themselves to the jurisdiction of this Court for all purposes.

## PARTIES

8. The Debtor is a Colorado corporation with its principal place of business at 999 18th Street, Suite 3000, Denver, Colorado 80202.

## A. GrowCo Partners I, LLC

9. GrowCo Partners I, LLC ("GCP-1") is a Colorado limited liability corporation whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052. Upon information and belief, GCP-1 was and/or is affiliated with GrowCo.

## B. Beneficiaries of the GCP-1 Deed of Trust

10. The "GCP-1 Beneficiaries" are approximately 101 persons identified as beneficiaries on that certain Deed of Trust (the "GCP-1 Deed of Trust") allegedly executed by the Debtor on or about September 9, 2015, in favor of GCP-1 and all the persons identified on Exhibit A to said Deed of Trust, which was recorded with the Huerfano County Clerk and Recorder on September 25, 2015, at Reception No. 404224. *See, Exh. 4, infra.* The GCP-1 Beneficiaries also includes GCP-1 to the extent GCP-1 (or any alleged assignee) asserts any claims against

the Estate. The GCP-1 Beneficiaries are and/or were investors in and/or lenders to GrowCo and/or GCP-1 (among other entities), as more fully described below.

11. I. Wistar Morris is an individual whose last known address is 19 Pond Lane, Bryn Mawr, Pennsylvania 19010. Mr. Morris is also a preferred member of TR Capital Partners, LLC.

12. Christopher L. Morris is an individual whose last known address is 277 Central Drive, Phoenixville, Pennsylvania 19460.

13. Jesse Dovich is an individual whose last known address is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

14. Upon information and belief, the Jon D. and Linda W. Gruber Trust is an entity, whose last known principal place of business 300 Tamal Plaza, Suite 280, Corte Madera, California 94925. Such Trust filed Proof of Claim No. 8.

15. Samuel W. Morris Jr. is an individual whose last known address is 60 Foxcroft Lane, Phoenixville, Pennsylvania 19460.

16. Michael S. Barrish is an individual whose last known address is in care of Cabiar Investors 2401 East Second Avenue, Suite 600, Denver, Colorado 80206.

17. Matt Edmundson is an individual whose last known address is in care of GCP-1, whose last known business address is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

18. Jeff Porter is an individual whose last known address is 200 Alta Vista Avenue, Mill Valley, California 94941.

19. Eric Petersen is an individual whose last known address is 378 Conklin Road, Stanfordville, New York 12581.

20. Upon information and belief, the Charles J. Bloom IRA is an entity set up for the benefit of Charles J. Bloom, whose last known principal place of business is 418 Mulberry Lane, Haverford, Pennsylvania 19041.

21. Martha Morris is an individual whose last known address is 19 Pond Lane, Bryn Mawr, Pennsylvania 19010. Ms. Morris is also a preferred member of TR Capital Partners, LLC.

22. Upon information and belief, the Cotswold Foundation is an entity whose last known principal place of business is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052. Cotswold Foundation is also a preferred member of TR Capital Partners, LLC.

23. Upon information and belief, the Eleventh Generation is an entity whose last known principal place of business is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052. Eleventh Generation is also a preferred member of TR Capital Partners, LLC.

24. Upon information and belief, the I. Wistar Morris IRA is an entity whose last known principal place of business is in care of Mr. I. Wistar Morris at 19 Pond Lane, Bryn Mawr, Pennsylvania 19010.

25. Upon information and belief, the JMW Fund, LLC, is an entity whose last known principal place of business is at 4 Richland Place, Pasadena, California 91103.

26. Upon information and belief, the San Gabriel Fund, LLC, is an entity whose last known principal place of business is at 4 Richland Place, Pasadena, California 91103.

27. Jacob A. Bevan is an individual whose last known address is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson,

Nevada 89052.

28. Michelle K. Bevan is an individual whose last known address is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

29. Hugo Zimmermann is an individual whose last known address is Via Tull 7 7017, Films Dorf, Switzerland.

30. David Jenkins is an individual whose last known address is 9611 North US Highway 1, Sebastian, Florida 32958.

31. Upon information and belief, the Njevity, Inc., is an entity whose last known principal place of business is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

32. Upon information and belief, the Richland Fund, LLC, is an entity whose last known principal place of business is at 4 Richland Place, Pasadena, California 91103. Such entity filed Proof of Claim No. 15.

33. Michael Harnish is an individual whose last known address is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

34. Linda Harnish is an individual whose last known address is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

35. Upon information and belief, the Elevation Fund is an entity whose last known principal place of business is at 6161 South Syracuse Way, Suite 320, Greenwood Village, Colorado

80111. Elevation Fund is also a preferred member of TR Capital Partners, LLC.

36. Maureen Miller is an individual whose last known address is 6825 La Jolla Boulevard, La Jolla, California 92037.

37. Gus Blass, III is an individual whose last known address is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

38. Upon information and belief, the Capital Properties, LLC is an entity whose last known principal place of business is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

39. L.A. Walker III is an individual whose last known address is 5734 Oso Parkway, Corpus Christi, Texas 78414.

40. Linda Walker is an individual whose last known address is 5734 Oso Parkway Corpus Christi, Texas 78414.

41. Upon information and belief, the West Hampton Special Situations Fund, LLC is an entity whose last principal place of business is at 6161 South Syracuse Way, Suite 320, Greenwood Village, Colorado 80111. West Hampton Special Situations Fund, LLC is also a preferred member of TR Capital Partners, LLC.

42. Upon information and belief, the JPG Investments, LLC is an entity whose last known principal place of business is at 4 Richland Place, Pasadena, California 91103.

43. James Cochran is an individual whose last known address is 5445 South Grape Lane, Greenwood Village, Colorado 80121.

44. Eric Porter is an individual whose last known address is 200 Alta Vista Avenue, La Jolla,

California 92037.

45. Upon information and belief, the Kirby Enterprise Fund, LLC is an entity whose last known principal place of business is located at 6161 South Syracuse Way, Suite 320, Greenwood Village, Colorado 80111. Kirby Enterprise Fund is also a preferred member TR Capital Partners, LLC.

46. Charles B. Kirby is an individual whose last known address is 6161 South Syracuse Way, Suite 320, Greenwood Village, Colorado 80111. Mr. Kirby is also a preferred member of TR Capital Partners, LLC.

47. Thomas Prasil is an individual whose last known address is 3935 East San Miguel Avenue, Paradise Valley, Arizona 85253.

48. Upon information and belief, the San Gabriel Benefit Plan is an entity set up for the benefit of John McGrain, whose last known principal place of business is 4 Richland Place, Pasadena, California 91103.

49. Upon information and belief, the Growth Ventures, Inc. Profit Sharing Plan & Trust is an entity whose last known principal place of business is 14 Red Tail Drive, Highlands, Colorado 80126.

50. Upon information and belief, the Thomas Prasil Trust is an entity, of which Thomas Prasil is the trustee, whose last known principal place of business is 3935 East San Miguel Avenue, Paradise Valley, Arizona 85253.

51. Paul Powell is an individual whose last known address is 21508 Bethel Road, Tecumseh, Oklahoma 74873.

52. Upon information and belief, the JDC Ventures, LLC, is an entity whose last known

principal place of business is at 5445 South Grape Lane, Greenwood Village, Colorado 80121.

53. Sondra W. Margolies is an individual whose last known address is 191 Presidential Boulevard, Suite 912, Bala Cynwyd, Pennsylvania 19004.

54. Upon information and belief, the San Gabriel Benefits Plan, is an entity set up for the benefit of Justin Yorke, whose last known principal place of business is located at 4 Richland Place, Pasadena, California 91103.

55. John R. Rogers is an individual whose last known address is 2 Perimeter Park South, Ste. 100 West, Birmingham, Alabama 35243.

56. Frank Guy is an individual whose last known address is 3326 Glenway Drive, Kensington, Maryland 20895. Mr. Guy filed Proof of Claim No. 12.

57. Upon information and belief, the Sandra Diaz R/O IRA is an entity, whose last known principal place of business is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

58. Michael Berenhaus is an individual whose last known address is 10648 Muirfield Drive, Potomac, Maryland 20854.

59. Charles Curtis is an individual whose last known address is 902 Windsor Lane, Key West, Florida 33040. Mr. Curtis filed Proof of Claim No. 13.

60. Sandra Curtis is an individual whose last known address is 902 Windsor Lane, Key West, Florida 33040. Ms. Curtis filed Proof of Claim No. 13.

61. John J. Blum is an individual whose last known address is 6 Mink Hollow Court, Owings Mills, Maryland 21117. Mr. Blum filed Proof of Claim No. 11.

62. Gregory A. Harrison is an individual whose last known address is 16209 Kimberly Grove, Gaithersburg, Maryland 20878.

63. Upon information and belief, the Donald S. Darendinger Revocable Trust u/a 7/3/2007 is an entity, whose last known principal place of business is 27270 Lillegard Court, Tracy, California 95304.

64. Susan Doukas is an individual whose last known address is 1102 Newfield Road, Gwynn Oak, Maryland 21207.

65. Stephen Brown is an individual whose last known address is 24 Tower Road, Lincoln, Massachusetts 01773.

66. Upon information and belief, the SLMI Holding, LLC is an entity whose last known principal place of business is 1805 North Carson Street, Suite 383, Carson City, Nevada 89701.

67. Presley Reed is an individual whose last known address is 375 Bellevue Drive, Boulder, Colorado 80302.

68. Upon information and belief, the John R. Rogers SEP IRA No. 2 is an entity, whose last known principal place of business is 2 Perimeter Park South, Suite 100 West, Birmingham Alabama 35243.

69. High-Speed Aggregate, Inc., is an entity whose principal place of business is 8480 East Orchard Road, Suite 4900, Greenwood Village, Colorado 80111. This entity filed Proof of Claim No. 20.

70. Upon information and belief, the Wardenburg 2009 Trust is an entity whose last known principal place of business is located at 2249 South McDowell Boulevard Ext, Petaluma,

California 94954.

71. Upon information and belief, the Jason Paulley R/O IRA is an entity, whose last known principal place of business is 2 Perimeter Park South, Suite. 100 West, Birmingham, Alabama 35243.

72. Jason Paulley whose last known address is 2 Perimeter Park South, Suite. 100 West, Birmingham, Alabama 35243.

73. Upon information and belief, the Maureen Miller IRA is an entity set up for the benefit of Maureen Miller, whose last known principal place of business is in care of GCP-1, whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

74. Frank Mills is an individual whose last known address is 548 Palo Alto Avenue, Palo Alto, California 94301.

75. Shirley Mills is an individual whose last known address is 548 Palo Alto Avenue, Palo Alto, California 94301.

76. Upon information and belief, the Jordan Family LLC is an entity whose last known principal place of business is in care of VetaNova, Inc., 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

77. Norman McClain is an individual whose last known address is P.O. Box 36, Robertsdale, Pennsylvania 16674.

78. Lawrence Cake is an individual whose last known address is 32345 Apron Way, Long Neck, Delaware 19966.

79. Karen Cake is an individual whose last known address is 32345 Apron Way, Long Neck,

Delaware 19966.

80. Margaret Elizabeth Crumbley is an individual whose last known address is in care of GCP-1, 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

81. Tom Ellison is an individual whose last known address is P.O. Box 215, Boulder, Colorado 80306.

82. Robert Stanger is an individual whose last known address is in care of VetaNova, Inc., 2831 Street Rose Parkway, Suite 200, Henderson, Nevada 89052.

83. Adam Linn is an individual whose last known address is 980 Adams Road, Winchester, Virginia 22603.

84. John N. Alesandro is an individual whose last known address is 15 Westgate Road, Erial, New Jersey 08081.

85. Nazim Lokhandwala is an individual whose last known address is 7411 Paxton Road, Highlands Ranch, Colorado 80126.

86. Lloyd Grant is an individual whose last known address is 128 Belglen Way, Lost Gatos, California 95032.

87. Brenda Forwood is an individual whose last known address is 1464 Bethel Road, Garnet Valley, Pennsylvania 19060.

88. F. Richard Stark is an individual whose last known address is 110008 Spring House Court, Potomac, Maryland 20854.

89. Francis Chan is an individual whose last known address is 2400 Powers Ferry Drive South East, Marietta, Georgia 30067.

90. Jeffery Chan is an individual whose last known address is 2400 Powers Ferry Drive South

East, Marietta, Georgia 30067.

91. John Black is an individual whose last known address is 25335 Marsh Landing Pkwy, Ponte Vedra Beach, Florida 32082.

92. Joseph R. Stranger is an individual whose last known address is 206 East Drive, Princeton, West Virginia 24740.

93. Konrad Kuhn is an individual whose last known address is 5 Water Road, Rocky Point, New York 11778.

94. Linda Kuhn is an individual whose last known address is 5 Water Road, Rocky Point, New York 11778.

95. Belva Barbalace is an individual whose last known address is in care of GCP-1 whose last known principal place of business is 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052.

96. Upon information and belief, the Charles Biemiller IRA 2, is an entity whose last known principal place of business is 2 Perimeter Park South, Suite 100 West, Birmingham, Alabama 35243.

97. Upon information and belief, the Carl Swarts IRA is an entity, whose last known principal place of business is at19538 SE Langensand Rd. Sandy OR 97055.

98. Upon information and belief, the William C. Kottke R/O IRA is an entity, whose last known principal place of business is at 2 Perimeter Park South, Suite 100 West, Birmingham, Alabama 35243.

99. Upon information and belief, the Constantine Hagepanos R/O IRA is an entity, whose last known principal place of business is at 7909 Ardmore Avenue, Baltimore, Maryland 21234.

100. Upon information and belief, the Ashley Weatherford R/O IRA is an entity, whose last known principal place of business is at 2 Perimeter Park South, Suite 100 West, Birmingham, Alabama 35243.

101. Upon information and belief, the Paul Hartmann R/O IRA is an entity, whose last known principal place of business is at 2 Perimeter Park South, Suite 100 West, Birmingham, Alabama 35243.

102. Timothy Gillis is an individual whose last known address is 8 Badon Court, #302, Lutherville Timonium, Maryland 21093.

103. Patricia Gillis is an individual whose last known address is 8 Badon Court, Suite 302, Lutherville Timonium, Maryland 21093.

104. Constantine Hagepanos is an individual whose last known address is 7909 Ardmore Avenue, Baltimore, Maryland 21234.

105. George Rosch is an individual whose last known address is 5781 Cape Harbour Drive, Apartment 602, Cape Coral, Florida 33914. Mr. Rosch filed Proof of Claim No. 16.

106. Stephen Troutman is an individual whose last known address is 2600 Cherry Laurel Court, Abingdon, Maryland 21009.

107. Heather Evans is an individual whose last known address is 12906 North 4th Street, Parker, Colorado 80134.

108. Thomas Forti is an individual whose last known address is 7270 South Logan Street, Centennial, Colorado 80122.

109. Ernest Dufresne is an individual whose last known address is 476 Gianna Way, Saint Augustine, Florida 32086.

110. Wayne Harding whose last known address is 6825 La Jolla Boulevard, La Jolla, California 92037.

111. Upon information and belief, the Wayne Harding IRA is an entity, whose last known principal place of business is 6825 La Jolla Boulevard, La Jolla, California 92037.

112. TR Capital Partners, LLC, who does business at 999 18th Street, Suite 3000-S, Denver, Colorado 80202.

**C. Parties Who Filed Proofs of Claim Against the Debtor Asserting Interest in Property**

The following parties filed proofs of claim in the Debtor's underlying bankruptcy case who were not listed as a GCP-1 Beneficiary and/or who are asserting an interest in the Reservoir Parcel and/or Huerfano Water Rights (as described below) arising out of and/or relating to the GCP-1 Deed of Trust. Such parties do not include any persons senior to the GCP-1 Deed of Trust or asserting other claims in the Debtor's bankruptcy case.

113. David Marshall whose address is 626 Gilgalad Way, Fort Collins, Colorado 80526. Mr. Marshall filed Proof of Claim No. 1. Mr. Marshall asserts a secured claim in the principal amount of $60,000 arising out of a "Deed of Trust." *Id.*

114. Dan Foster IRA whose address is 2850 NW Lacamas Drive, Camas, Washington 98607. The Dan Foster IRA filed Proof of Claim No. 3. This entity asserts a secured claim in the amount of $355,107.00 arising out of "Note section 5; fileDOT." *Id.*

115. Upon information and belief, VetaNova, Inc. ("VetaNova") is a Nevada Corporation duly registered to do business within the State of Colorado, whose registered agent in Colorado is Mr. McKowen at 335 A Josephine Street, Denver, Colorado 80206. VetaNova allegedly conducts business at 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052. Upon

information and belief, VetaNova is also known and/or does business as GrowCo Partners 1, LLC, VitaNova Partners, LLC. VetaNova filed Proof of Claim No. 4. This entity asserts a secured claim in the amount of $7,213,515.00 arising out of a "Preferred Investment in GrowCo Partners 1, LLC." *Id.*

116. John McKowen, who resides within the State of Colorado and/or does business at 335 A Josephine Street, Denver, Colorado 80206. Mr. McKowen is also known and/or does business as VetaNova, Inc., VitaNova Partner(s), LLC, GrowCo, Inc., and/or GrowCo Partners 1, LLC. Mr. McKowen filed Proof of Claim No. 5. Mr. McKowen asserts a secured claim in the amount of $2,391,913.00 arising out of "Money Invested and/or Loaned." *Id.*

117. Prasil Family Matters, LLC, whose address is 7275 N Scottsdale Road, Unit 1007, Paradise Valley, Arizona 85253. Prasil Family Matters, LLC filed Proof of Claim No. 6. This entity asserts a secured claim in the amount of $1,825,425.00 arising out of "Beneficiaries of Deeds of Trust 40422 and 40425." *Id.* Upon information and belief, Prasil Family Matters, LLC may have acquired the claims of Thomas Prasil and/or the Thomas Prasil Trust under the GCP-1 Deed of Trust. *Id.*

118. Blue & Green, LLC, whose address is in care of Jennifer Salisbury, 1775 Sherman Street, Suite 1950, Denver, Colorado 80203. Blue & Green, LLC filed Proof of Claim No. 7. This entity asserts a claim in the amount of $5,419,569.82 arising out of a "Deed of Trust."

119. Mark E. Anderson MD APC PSP & T whose address is in care of Dr. Mark Anderson, 21 Southampton Court, Newport Beach, California 92660. This entity filed Proof of Claim No. 9. This entity asserts a secured claim in the amount of $485,289.00 arising out of "Deeds

of Trust Huerfano County, CO #404224 and 404225." *Id.*

120. Mary Loughran whose address is 5030 South Albion Way, Cherry Hills Village, Colorado 80121-5030. Ms. Loughran filed Proof of Claim No. 10. Ms. Loughran asserts a secured claim in the amount of $80,000 arising out of "Deeds of Trust on the Orlando Co&FarmF2 [sic]." *Id.*

121. IRAR FOB: Stephen Robert Marrinan is an entity whose address is 2130 NW Lacamas Drive, Camas Washington 98607-2130. Such entity filed Proof of Claim No. 14. Such entity asserts an unsecured claim in the amount of $90,000.00. *Id.* Upon information and belief, this entity may have acquired a claim from VetaNova, Inc. *Id.*

122. Geoffrey Poremba is an individual whose address is 20338 86th Place NE, Bothell, Washington 98011. Mr. Poremba filed Proof of Claim No. 17. Mr. Poremba asserts an unsecured claim in the amount of $44,144.42 arising from "Preferred stock purchase and dividends." *Id.*

123. Donald Jeffrey Cain whose address is 11859 Tomahawk Road, Parker, Colorado 80138. Mr. Cain filed Proof of Claim No. 19. Mr. Cain asserts an unsecured claim in the amount of $25,000 arising out of "Huerfano County, Colorado Deed of Trust #404224." *Id.*

124. The Preferred Members of TR Capital Partners, LLC ("Preferred Members"), are those certain persons who became preferred members of TR Capital Partners, LLC on or about January 31, 2014, including Charles Kirby, Elevation Fund, LLC, Kirby Enterprise Fund, LLC, West Hampton Special Situations Fund, LLC, I. Wistar Morris, Martha Morris, Cotswold Foundation, Eleventh Generation. The Preferred Members' last known address is in care of The MacCallum Law Firm, P.C., 685 Briggs Street, P.O. Box 929, Erie, Colorado

80516. Such members filed Proof of Claim No. 21. Such members assert a secured claim in the amount of $24,500,000.00 arising from "DOT #404224." *Id.*

**GENERAL ALLEGATIONS**

125. The Debtor filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on December 6, 2023 ("Petition Date").

126. The Debtor filed its Schedules and Statement of Financial Affairs on or about December 21, 2023. *See Case No. 23-15627 KHT, Docket Nos. 25-34.* The Debtor's Schedules and Statement of Financial Affairs, and all amendments thereto, are collectively referred to herein as the "Schedules".

127. The Debtor is operating as the Debtor-in-Possession pursuant to 11 U.S.C. §1107 and §1108.

128. The Debtor is a Colorado corporation owned by Two Rivers Farms F-1, Inc. ("F-1").

129. F-1 is in turn owned by Two Rivers Water and Farming Company ("Two Rivers").

130. The Debtor owns real property and certain water rights which were obtained from a related entity The Orlando Reservoir No. 2 Company, LLC ("Orlando") who commenced a Chapter 11 bankruptcy case in July 2023. *See Case No. 23-13178-KHT.*

131. Orlando is owned by TR Capital Partners, LLC ("TR Capital") and Mr. Greg Harrington.

132. TR Capital is also owned, in part, by Two Rivers.

**A. Pre-petition Acquisition of Land and Water Rights**

133. Pre-petition, the Debtor acquired land and water rights from Orlando through a series of transactions.

134. The Debtor acquired land generally described as: a Parcel of land containing the Orlando Reservoir Number Two, situated in Sections 17, 18, 19, and 20, Township 26 South, Range

66 West of the 6th P.M., in Huerfano County, Colorado ("Reservoir Parcel").

135. The Debtor also acquired certain decreed water rights from various individuals and entities, including rights from Mr. Leo Payne ("Mr. Payne"), Marksheffel-Woodman Investments, LLC ("MWI"), and Orlando.

136. The Debtor acquired additional real estate from MWI and its affiliates which are also included within the Reservoir Parcel.

*1. The Debtor's Acquisition of the Reservoir Parcel*

137. The Reservoir Parcel was originally acquired by Orlando via a warranty deed on or about May 9, 2005, from Mr. Payne.

138. On October 21, 2011, Orlando conveyed legal title to the Reservoir Parcel to the Debtor, and again on February 15, 2012, via Quit Claim Deeds.

139. As part of the conveyance of the Reservoir Parcel to the Debtor, the Debtor agreed to take on all valid debt associated with such real property, including the debts owed to the Colorado Water Conservation Board ("CWCB").

140. At the time of the transaction, CWCB asserted a lien against the Reservoir Parcel pursuant to a set of deeds of trust granted by the Debtor (and properly perfected) to secure a loan from the CWCB to the Debtor for funds to improve the Orlando Reservoir No. 2, among other things.

*2. The Debtor's Acquisition of the Huerfano Water Rights*

141. Orlando acquired certain decreed water rights (the "Initial Water Rights") from Mr. Payne on or about May 9, 2005, via Warranty Deed, located in Huerfano County, Colorado.

142. These Initial Water Rights include certain rights and priority rights to the Butte Valley Ditch,

storage of water in the Orlando Reservoir No. 2, the Mexican Branch Ditch, the Chitwood Ditch, the Parsons Ditch, the Weston Spring No. 1, the Weston Spring No. 2, the Weston Spring No. 4, and the Weston Spring No. 5.

143. Orlando also acquired certain decreed water rights from MWI via a Quit Claim Deed on January 28, 2011. These water rights are described as 3 C.F.S. No. 19 to the Robert Rice Ditch #15, based upon a decree dated March 1, 1987, which are also in Huerfano County, Colorado (the "MWI Water Rights").

144. Orlando acquired additional water storage rights for the Orlando Reservoir No. 2 from Randall W. Case, II on or about January 28, 2011, via a Quit Claim Deed (the "Case Water Rights").

145. The Initial Water Rights, the MWI Water Rights, and the Case Water Rights are collectively referred to hereinafter as the "Huerfano Water Rights."

146. However, on or about January 28, 2011, Orlando conveyed some of the Huerfano Water Rights to TRW Orlando Water Assets, LLC ("TRW") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to the Debtor on or about September 7, 2011 via a Special Warranty Deed.

147. On or about July 27, 2011, Orlando conveyed some of the Huerfano Water Rights to Family Ranch Holdings, LLC ("Family Ranch") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to Orlando on or about September 7, 2011, via a Special Warranty Deed.

148. On October 21, 2011, TRW conveyed the Huerfano Water Rights to the Debtor via a Quit Claim Deed.

149. On February 15, 2012, Orlando conveyed legal title in the Huerfano Water Rights to the Debtor via a "Water Deed - Quit Claim Deed."

150. As part of the conveyance of the Huerfano Water Rights to the Debtor, the Debtor agreed to take on all valid debt associated with such real property, including the debts owed to the CWCB.

151. At the time of the transaction, CWCB asserted a lien against the Huefano Water Rights pursuant to a set of deeds of trust granted by the Debtor (and properly perfected) to secure a loan from the CWCB to the Debtor for funds to improve the Orlando Reservoir No. 2, among other things.

**B. <u>Prior Management's Fraudulent Activities</u>**

152. Prior to 2019, GrowCo, Two Rivers and certain other companies were owned and/or controlled by Mr. McKowen (as CEO) and Mr. Harding (as CFO and Treasurer).

153. Mr. McKowen and Mr. Harding reorganized ownership of their operating subsidiaries based on two functional operations, water and farming.

154. GrowCo, and its subsidiaries including GCP-1, were used to solicit investors for funds to purchase real estate, construct greenhouses and then lease such facilities to cannabis growers.

155. Cannabis is illegal under Federal Law.[1]

---

[1] At all times relevant hereto, cannabis is a Schedule I controlled substance under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801, et seq. The CSA broadly provides that possessing, growing, and dispensing cannabis and assisting others to do so are illegal. Specifically, it is unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." See 21 U.S.C. § 841(a)(1). "Manufacture" includes the production, preparation, and propagation of a drug or other substance. See 21 U.S.C. § 802(15). Further, 21 U.S.C. § 856(a) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place" to manufacture or distribute a controlled substance.

156. Assisting others in businesses and activities that violate the CSA is also a crime. *See* 21 U.S.C. §846.

157. Mr. McKowen's solicitations for GrowCo and its subsidiaries, including GCP-1, were made without proper disclosures to investors and during a time when Mr. McKowen was not licensed to sell, offer or solicit securities in Colorado, among other things.

158. Mr. McKowen and Mr. Harding convinced many investors to put funds into GrowCo and its subsidiaries, including GCP-1 with the promise of additional collateral from their groups of companies.

159. Mr. McKowen and Mr. Harding failed to follow required corporate formalities, let alone proper methods for ordinary course business transactions for such offerings and soliciations.

160. Pre-petition, the Securities Commissioner for the State of Colorado, Ms. Tung Chan ("Securities Commissioner") sued GrowCo, GCP-1, Two Rivers, TR Capital, Mr. Harding, and Mr. McKowen, among others, alleging Mr. Harding and Mr. McKowen, through GrowCo, Two Rivers and TR Capital sold unregistered non-exempt securities in Colorado between 2014 and 2019 ("Commissioner Action"). A copy of the Commissioner's Complaint is attached hereto as **Exhibit 1** and incorporated herein.

161. The Commissioner alleged GCP-1 and GrowCo, among others, made unlawful, if not illegal, solicitations of securities and debt between November 2014 and June of 2017. *Id., at 9-16.*

162. In connection with these offerings, GrowCo and GCP-1, directly or indirectly, failed to, or inadequately disclosed material facts including, but not limited to, that NASD took disciplinary action against Mr. McKowen, that Mr. McKowen's prior bankruptcies, that as cannabis companies, the potential Offerings could face substantial losses if the federal

government chose to enforce the CSA, among other federal laws, that GrowCo and GCP-1 could not have their own bank accounts because of their violations of the CSA, that Mr. McKowen was acting as an unlicensed broker-dealer receiving finder's fees and/or commissions, and, that the money collected through the Offerings was used to pay attorney fees for the 2019 GrowCo Chapter 11 bankruptcy filing. *Id.,* at 24-26.

163. The Commissioner also alleged GrowCo and GCP-1, among others, misrepresented material facts to investors in connection with the Offerings including, but not limited to, the use of proceeds would go to the greenhouse and other greenhouse-related activities when the proceeds were not used as promised, that GrowCo's and GCP-1's managers did not have access to their financial records when Mr. Harding an executive with both companies and the companies made public filings with the SEC of their financial information, that GrowCo and GCP-1 were not involved in the cannabis business, which suggested that the Offerings were not subject to the potential risks and uncertainties that surrounded the enforcement of applicable federal cannabis laws, etc. *Id.* at 25-26.

164. All of the Offerings by GrowCo and GCP-1 were unregistered and failed to comply with the exemptions under Colorado and federal law. *Id.* at 27.

165. GrowCo and GCP-1, among others, acted as agents who were not properly licensed as a broker-dealer or sales representative under Colorado during the time of the Offerings. *Id.*

166. GrowCo and GCP-1 failed to timely respond to the Commissioner's Complaint.

167. As a result, a default was entered against GrowCo and GCP-1, among others. A copy of the Court's Order of Clerk's Default is attached hereto as **Exhibit 2** and incorporated herein.

168. As set forth in the Commissioner's Complaint against Mr. McKowen, Mr. Harding and

others, Mr. McKowen raised more than $19,000,000 through several debt and equity offerings of unregistered, non-exempt securities. *Id.*

169. At the time, there were numerous material facts which were not disclose to prospective investors including, but not limited to:

a. Mr. McKowen had been suspended from association with any securities dealer by the NASD. *Id. at 8.*

b. Mr. McKowen also had prior bankruptcies. *Id.*

170. Mr. McKowen then participated in raising over $1,775,00 in private debt from at least 22 transactions. *Id.*

171. As a result, the Commissioner claimed Mr. McKowen and Mr. Harding, among others, committed securities fraud under Colorado law by offering and/or selling securities in a scheme to defraud, with untrue statements of material fact or omissions of material facts, to investors. *Id. at 28-32.*

172. Mr. McKowen has been the subject of several regulatory actions concerning securities broker's license. A copy of a report from FINRA, the SEC regulatory arm, on Mr. McKowen is attached hereto as **Exhibit 3** and incorporated herein. *See also, Exh. 1.*

173. Notwithstanding such prior disciplinary actions and the Colorado Securities Commissioner's action, Mr. McKowen continues to unlawfully solicit investors.

174. Mr. McKowen confirms, in this new solicitation, the GrowCo and GCP-1 Deeds of Trust were granted as part of his schemes to raise capital for their illegal cannabis business in 2015.

175. The GrowCo offerings in 2014 and 2015 conducted by Mr. McKowen and Mr. Harding

offered and used the Reservoir Parcel and Huerfano Water Rights as a "back-stop" to the GrowCo and GCP-1 investors' investments in GrowCo and GCP-1. *Exh. 1, at 10-11; Id. at 12-13.*

176. Such unlawful use of the Debtor's property further evidences the schemes of Mr. McKowen's and Mr. Harding's GrowCo solicitations. *Id.*

177. No consideration was paid to either this Debtor or Orlando by any person, by GrowCo or GCP-1, or by any of the GCP-1 Beneficiaries, for the granting of encumbrances against the Reservoir Parcel and Huerfano Water Rights.

178. In reality, Mr. McKowen and Mr. Harding used the Reservoir Parcel and Huerfano Water Rights to further their scheme to defraud the investors in GrowCo and GCP-1, as well as the legitimate creditors of this Debtor and/or Orlando like the CWCB.

179. By this action, the Debtor seeks, among other things, a declaration the GCP-1 Deed of Trust is void and/or to quiet title of the Reservoir Parcel and Huerfano Water Rights in the Debtor.

180. GCP-1, the GCP-1 Beneficiaries and the Defendants, respectively, are therefore not legitimate creditors of the Debtor.

**C. GrowCo and GCP-1 Deeds of Trust**

181. On or about September 9, 2015, the Debtor and Orlando, through Mr. Harding, allegedly executed a Deed of Trust to GCP-1, for the benefit of approximately 100 Defendant Beneficiaries in the principal amount of $4,000,000 ("GCP-1 Deed of Trust" or "GCP-1 DOT"). A copy of the GCP-1 Deed of Trust is attached hereto as **Exhibit 4** and is incorporated herein.

182. The GCP-1 Deed of Trust was recorded with the Clerk and Recorder of Huerfano County, Colorado, at Reception No. 404224 on September 25, 2015. *Id.*

183. Upon information and belief, the GCP-1 Deed of Trust allegedly encumbers the Reservoir Parcel (and Huerfano Water Rights, *see infra*). *See Exh. 4*.

184. Also on or about September 9, 2015, the Debtor and Orlando, again both through Mr. Harding, allegedly executed a Deed of Trust to GrowCo for the benefit of approximately 17 Defendant Beneficiaries in the principal amount of $4,000,000 ("GrowCo Deed of Trust" and/or "GrowCo DOT"). A copy of the GrowCo Deed of Trust is attached hereto as **Exhibit 5** and is incorporated herein.

185. The GrowCo Deed of Trust was recorded with the Clerk and Recorder of Huerfano County, Colorado, at Reception No. 404225 on September 25, 2015. *Id.*

186. Upon information and belief, the GrowCo Deed of Trust allegedly encumbers the Reservoir Parcel (and Huerfano Water Rights, *see supra*). *See Exh. 5*.

## D. GrowCo Bankruptcy and Settlement

187. GrowCo filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on or about January 21, 2019, in the Bankruptcy Court for the District of Colorado, Case No. 19-10512-JGR ("GrowCo Bankruptcy Case").

188. On or about November 15, 2019, GrowCo commenced an adversary proceeding against Two Rivers, Adversary Proceeding No. 19-1337-JGR, seeking, among other things, repayment of a promissory note obligation ("First Adversary Proceeding").

189. GrowCo commenced another adversary proceeding on or about January 21, 2021, against TR Capital and Two Rivers, Adversary Proceeding No. 21-1020-JGR ("Second Adversary

Proceeding"). The Second Adversary Proceeding sought, among other things, to avoid money transfers to Two Rivers and TR Capital.

190. On or about May 26, 2021, GrowCo, GCP-1, Two Rivers, TR Capital, among others, entered into a Settlement Agreement (the "GPC-1 Settlement") in connection with GrowCo's bankruptcy case. A copy of this GCP-1 Settlement is attached hereto as **Exhibit 6** and incorporated herein.

191. Under the terms of the GCP-1 Settlement , GrowCo and GCP-1 agreed to release the GCP-1 Deed of Trust as such document was not a valid encumbrance, including as against any assets of the Debtor and/or Orlando. *Exh. 3, at 2.*

192. Under the terms of the GCP-1 Settlement, GrowCo and GCP-1 agreed to waive and release all claims against Two Rivers and TR Capital, including the Debtor and Orlando, from any and all claims. *Id. at 3.*

193. The waiver and release in the GCP-1 Settlement is extremely broad. *Id.*

194. The GCP-1 Deed of Trust was issued in connection with the same or similar investment scheme conducted by Mr. McKowen in connection with GrowCo and GCP-1. *See Exh. 1.*

195. As set forth above, the GCP-1 Deed of Trust was offered by GrowCo, GCP-1, Mr. McKowen and Mr. Harding, among others, in connection with a fraudulent and illegal scheme to solicit investments in GrowCo and GCP-1 for their federally illegal cannabis business.

196. No consideration was provided to the Debtor in exchange for the purported granting of the GCP-1 Deed of Trust.

197. Any obligations owing to the GCP-1 Beneficiaries and/or any of the Defendants by the

Debtor and/or any security interest in the Debtor's and the Estate's property, including all of the Debtor's real estate and water rights, is void for, among other things, as against public policy, an illegal scheme, a fraudulent transfer, and unjust enrichment.

198. GCP-1 and GrowCo are now deemed to have admitted to the illegality and fraudulent schemes of Mr. McKowen and Mr. Harding who unlawfully used the Debtor's assets for their private gain as the court in the Commissioner's Action entered a default against GrowCo and GCP-1. *See Exh. 2.*

**E. The Paulson Class Action Settlement**

199. One or more of the alleged GCP-1 Beneficiaries and/or Defendants herein, including such persons who filed proofs of claim in the Debtor's underlying bankruptcy case and/or in Orlando's bankruptcy case, are and/or were members of a class of persons and/or entities that held claims on securities in GCP-1, and purchased or otherwise acquired securities through Offerings during the period of October 2014 through December 2017 who suffered alleged losses therefrom.

200. On or about August 13, 2019, John Paulson, an alleged investor in GrowCo and/or GCP-1, among other entities owned and/or controlled by Mr. McKowen and/or Mr. Harding, commenced a civil action in Colorado State Court (the "Paulson Action") against Mr. McKowen and Mr. Harding, among others, for alleged damages relating to several investments, including in GrowCo and/or GCP-1.

201. Mr. McKowen caused the Paulson Action to be removed to the United States District Court, for the District of Colorado, Case No. 19-CV-02639-PAB-NYW.

202. Mr. Paulson alleged, in his amended complaint that, among other things, Mr. McKowen, Mr.

Harding and others sold and promoted the Offerings to Mr. Paulson and others while omitting material information about Mr. McKowen's background.

203. Mr. Paulson further asserted claims against Mr. McKowen, Mr. Harding and others under the Colorado Securities Act, §11-51-101, *et. seq.*, and Colorado common law for failure to disclose the allegedly material information about Defendant McKowen's background in the Offering Documents. Mr. Paulson alleged his securities became worthless upon GrowCo's bankruptcy filing.

204. A Class of Plaintiffs (the "Class") was certified pursuant to Fed.R.Civ.P. 23(a). The Class included persons who obtained securities in GrowCo, GCP-1 and/or other subsidiaries during the period of October 2014 through December 2017 and suffered certain losses.

205. Mr. Paulson and the Class entered into a Settlement Agreement (the "Paulson Settlement") which was approved by the U.S. District Court in or around October 2020. Under the terms of the Paulson Settlement, all members of the class waived and released all claims against GrowCo, GCP-1 and others arising out of the "Offerings" which included the monies raised by GrowCo and/or GCP-1 identified in the GrowCo Deed of Trust and/or the GCP-1 Deed of Trust. *See Paulson Action, Case No. 19-CV-02639-PAB-NYW, Docket No. 131, at 25-52.*

206. As a result of the Paulson Settlement, all of the persons who are alleged GCP-1 Beneficiaries under the GCP-1 Deed of Trust and/or any of the Defendants herein, have waived and released any and all claims arising out of such Offerings including claims against GCP-1, and thereby the Debtor. *Id.*

207. Based upon the terms of the Paulson Settlement, there are no obligations owing to any of the GCP-1 Beneficiaries and/or the Defendants herein which relate to the GCP-1 Deed of Trust.

208. Any and all claims of the GCP-1 Beneficiaries and/or the Defendants herein were satisfied under the Paulson Settlement in or around October 2020.

209. As the debts underlying the GCP-1 Deed of Trust were satisfied prior to the filing of the Debtor's bankruptcy case, the GCP-1 Deed of Trust can no longer encumber any of the Debtor's assets, including the Reservoir Parcel and/or the Huerfano Water Rights.

210. The GCP-1 Deed of Trust is therefore void and/or avoidable.

**<u>F. Bankruptcy Case</u>**

*1. Disputed, Contingent and Unliquidated Creditors*

211. The Debtor scheduled GCP-1 and the GCP-1 Beneficiaries as contingent, disputed, and unliquidated creditors. Several of the GCP-1 Beneficiaries filed claims against the Debtor and/or Orlando including John McKowen and VetaNova, Inc. (an entity owned and/or controlled by Mr. McKowen).

*2. Persons Who Filed Proofs of Claim Asserting an Interest in Property of the Estate*

212. Mr. David Marshall filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $60,000 allegedly from a "Loan/Debt Collateral". *See Proof of Claim No. 1.* Mr. Marshall asserts his claim is secured by a Deed of Trust against an unknown real estate. *Id.* Mr. Marshall did not submit any attachments to his Proof of Claim to identify the factual basis for such claim.

213. The Dan Foster IRA filed proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $355,107.00, allegedly from a "as per section of Secured Note Agreement". *See Proof of Claim No. 3.* The Dan Foster IRA asserts a secured claim pursuant to a Deed of Trust against an unknown real estate. *Id.* None of documentation

attached to the Dan Foster IRA proof of claim evidences any obligation of the Debtor, nor any assets of the Debtor which may be subject to a lien held by the Dan Foster IRA. *Id.*

214. VetaNova proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $7,213,515.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC". *See Proof of Claim No. 4.* VetaNova asserts its claim is secured by "Huerfano County, CO Deed of Trusts 404224 & 404225". *Id.* None of documentation attached to the VetaNova proof of claim evidences any obligation of the Debtor. *Id.*

215. Mr. McKowen filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $2,391,913.00 allegedly from a "Money Invested and/or Loaned". *See Proof of Claim No. 5.* Mr. McKowen allegedly acquired his claim from VetaNova. *Id.* Mr. McKowen asserts a secured claim by virtue of a "Deed of Trusts Huerfano County, CO #404224 and 404225". *Id.* None of documentation attached to Mr. McKowen's proof of claim evidences any obligation of the Debtor. *Id.*

216. Prasil Family Matters, LLC filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $1,825,425.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC". *See Proof of Claim No. 6.* Prasil Family Matters, LLC acquired this claim from the "Beneficiaries of Huerfano County, CO Deeds of Trust 404224 & 404225". *Id.* Prasil Family Matters, LLC also asserts VetaNova, Inc., previously filed a proof of claim for the amounts claimed by Prasil Family Matters, LLC. *Id.* Prasil Family Matters, LLC asserts a secured claim by virtue of "Beneficiaries of Deed of Trusts 404224 and 404225". *Id.* None of documentation attached to the Prasil Family Matters, LLC proof of claim evidences any obligation of the Debtor. *Id.*

217. Blue & Green, LLC filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $5,419,569.82 allegedly from a "See attached rider". *See Proof of Claim No. 7.* Blue & Green, LLC asserts a secured claim by virtue of "Deed of Trust" against "Water Rights and Real Estate". *Id.* None of documentation attached to the Blue & Green, LLC proof of claim evidences any obligation of the Debtor. *Id.*

218. Jon D. and Linda W. Gruber Trust filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $561,013.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC." *See Proof of Claim No. 8.* The Jon D. and Linda W. Gruber Trust allegedly acquired its claim from "GrowCo Partners 1, LLC and VitaNova Partners, LLC". *Id.* The Jon D. and Linda W. Gruber Trust asserts a secured claim by virtue of "Beneficiaries of Huerfano County, CO Deeds of Trust 404224 & 404225". *Id.* None of documentation attached to the Blue & Green, LLC proof of claim evidences any obligation of the Debtor. *Id.*

219. Dr. Anderson filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $485,289.00 allegedly for "Money Invested and/or Loaned" secured by "Deeds of Trust Huerfano County, CO #404224 and 404225." *See Proof of Claim No. 9.* None of documentation attached to Dr. Anderson's proof of claim evidences any obligation of the Debtor. *Id.*

220. Ms. Loughran filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $80,000 allegedly for "unpaid interest and principal on GrowCo note" secured by "Deeds of Trust on the Orlando Co & FarmF2." *See Proof of Claim No. 10.* None of documentation attached to Ms. Loughran's proof of claim evidences

any obligation of the Debtor. *Id.*

221. Mr. Blum filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $50,000 allegedly for "money loaned" secured by "Orlando Property Water & Rights." *See Proof of Claim No. 11.* None of documentation attached to Mr. Blum's proof of claim evidences any obligation of the Debtor. *Id.*

222. Mr. Guy filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $65,000 allegedly for "money loaned" secured by "Orlando Reservoir #2 Parcel." *See Proof of Claim No. 12.* None of documentation attached to Mr. Guy's proof of claim evidences any obligation of the Debtor. *Id.*

223. Mr. and Ms. Curtis jointly filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $85,000 allegedly for "money loaned" secured by "orlando reservoir #2 parcel water rights." *See Proof of Claim No. 13.* No documentation attached to the Curtis' proof of claim evidences any obligation of the Debtor. *Id.*

224. Mr. Marrinan's IRA filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting an unsecured claim in the amount of $90,000 allegedly for "money loaned." *See Proof of Claim No. 14.* Such entity did not file any supporting documentation with their claim. *Id.* As such, the Debtor asserts it does not owe any money to this entity.

225. Richland Fund, LLC filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $461,143.00 allegedly for "money loaned" secured by "Water Rights." *See Proof of Claim No. 15.* The Debtor asserts this obligation was satisfied pre-petition. Richland Fund, LLC did not attach any security documents to its proof of claim. *Id.*

226. Mr. Rosch filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $13,250.00 allegedly for "I own stock in this Company." *See Proof of Claim No. 16.* None of documentation attached to Mr. Rosch's proof of claim evidences any obligation of the Debtor. *Id.*

227. Mr. Poremba filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a unsecured claim in the amount of $44,144.22 allegedly for "Preferred stock purchase and dividends." *See Proof of Claim No. 17.* None of documentation attached to Mr. Poremba's proof of claim evidences any obligation of the Debtor. *Id.*

228. Mr. Cain filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a unsecured claim in the amount of $25,000 allegedly for "check." *See Proof of Claim No. 19.* None of documentation attached to Mr. Poremba's proof of claim evidences any obligation of the Debtor. *Id.*

229. High-Speed Aggregate, Inc. filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of "Unknown - $52k" allegedly for "Investment into TR Capital - Growco shares GCP-1" secured by "Real Estate and Water Rights." *See Proof of Claim No. 20.* High-Speed Aggregate did not attach any documentation to its proof of claim evidencing any obligation and/or security of the Debtor. *Id.*

230. Several Preferred Members of TR Capital filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $24,500,000 allegedly for "Money Invested or Loaned" secured by "DOT #404224." *See Proof of Claim No. 21.* None of documentation attached to these Preferred Members' proof of claim evidences any obligation of the Debtor. *Id.*

**FIRST CLAIM FOR RELIEF**
(11 U.S.C. §541 - Declaratory Judgment)

231. The Debtor incorporates by this reference all prior allegations.

232. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

233. The Debtor's rights to the Reservoir Parcel and/or the Huerfano Water Rights are affected by the GCP-1 Deed of Trust and the alleged interests of the Defendants, including all of the GCP-1 Beneficiaries' interests (and any assignee thereof), if any, in such real property.

234. There exists an actual controversy as to the rights and interests of the Parties as to the alleged interests of the Defendants, including all of the GCP-1 Beneficiaries' interests, in the Reservoir Parcel and/or Huerfano Water Rights.

235. Such controversy arises out of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the Defendants, including one or more of the GCP-1 Beneficiaries, the fraudulent schemes perpetrated by them, the releases in the GCP-1 Settlement, and the waivers and releases in the Paulson Settlement.

236. There is a dispute as to the nature, extent, and validity of the alleged interests of the Defendants, including one or more of the GCP-1 Beneficiaries' interests, in the Reservoir Parcel and/or Huerfano Water Rights pursuant to the GCP-1 Deed of Trust.

237. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against all of the Defendants, including the GCP-1 Beneficiaries' interests (including any assignee thereof), concerning the nature, extent, and validity of the Defendants' alleged right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights.

238. The issuance of a declaratory judgment will settle and afford relief from uncertainty and insecurity with regards to the rights and status of the Defendants' alleged right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights.

WHEREFORE, the Debtor respectfully requests this Court to enter a declaratory judgment declaring the rights of the Debtor in and to the Reservoir Parcel and the Huerfano Water Rights to be exclusive of any rights, title and/or interests of the all of the Defendants including, all of the GCP-1 Beneficiaries' interests, declaring all of the Parties' rights, title, and interests with respect to the GCP-1 Deed of Trust including, voiding such instruments, declaring all the Parties's rights, title, and interests with respect to the Reservoir Parcel and/or the Huerfano Water Rights, to award the Debtor all of its attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as the Court deems appropriate.

**<u>SECOND CLAIM FOR RELIEF</u>**
(11 U.S.C. §541 - Quiet Title)

239. The Debtor incorporates by this reference all prior allegations.

240. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

241. The Defendants, including the GCP-1 Beneficiaries, assert a right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights based on the GCP-1 Deed of Trust. *See Exh. 4.*

242. The alleged interests of the Defendants, including one or more of the GCP-1 Beneficiaries' interests, if any, arise out of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the Defendants and the fraudulent

schemes perpetrated by them.

243. The debts of the Defendants, including the debts allegedly owed to one or more of the GCP-1 Beneficiaries, if any, were satisfied pre-petition by, among other things, the releases in the GCP-1 Settlement, and the waivers and releases in the Paulson Settlement.

244. The Defendants, including all of the GCP-1 Beneficiaries, no longer hold any interests in the Debtor's assets including, the Reservoir Parcel and the Huerfano Water Rights as they pertain to the GCP-1 Deed of Trust.

245. Per the terms of the GCP-1 Settlement, GCP-1 agreed to release the GCP-1 Deed of Trust. *See Exh. 6 at ¶3*.

246. Per the terms of the GCP-1 Settlement, GrowCo and GCP-1 agreed to release the GCP-1 Deed of Trust as such instrument was not a valid encumbrance against any assets of the Debtor. *Id.* ¶*3.*

247. Because GCP-1 agreed to release the GCP-1 Deed of Trust, none of the Defendants, including all of the GCP-1 Beneficiaries, have any right, title, or interest in or to the Reservoir Parcel and/or the Huerfano Water Rights. *Id.*

248. The GCP-1 Deed of Trust, to the extent such instrument may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument. *Id.*

249. The releases by GrowCo and GCP-1 in the GCP-1 Settlement, including the release of all claims against Two Rivers, TR Capital, and their affiliates, included the Debtor as well as any and all claims and/or interests in any asset of the Debtor. *Id.* ¶4.

250. As a result of the releases by one or more of the Defendants, including the GCP-1 Beneficiaries, as members of the Class in the Paulson Action pursuant to the Paulson

Settlement, the GCP-1 Deed of Trust, to the extent they may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

251. As a result of the events described above including, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to one or more of the Defendants, including the GCP-1 Beneficiaries, and the fraudulent schemes perpetrated by them, including the GCP-1 Deed of Trust, to the extent such document may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

252. Default was entered against GrowCo and GCP-1, among others, in the Commissioner's Action. As a result, GrowCo and GCP-1 are deemed to have committed illegal and/or fraudulent acts such that the GCP-1 Deed of Trust, to the extent such document may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

253. None of the Defendants, including the GCP-1 Beneficiaries, have any right, title, and/or interest to or in the Reservoir Parcel and/or the Huerfano Water Rights.

254. Pursuant to C.R.C.P. 105, this Court may quiet title of the Reservoir Parcel and the Huerfano Water Rights, including all right, title and interest, in the Debtor to the exclusion of the Defendants, including all of the GCP-1 Beneficiaries, and voiding the GCP-1 Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in the Debtor's favor and against all of the Defendants quieting title to the Reservoir Parcel and Huerfano Water Rights in the Debtor free and clear of any and all liens, claims, interests and/or encumbrances by all the Defendants, including the GCP-1 Deed of Trust, to otherwise declare the GCP-1 Deed of

Trust invalid, to award the Debtor all of its attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as this Court deems appropriate.

**THIRD CLAIM FOR RELIEF**
(Objection to Claim - 11 U.S.C. §502)

255. The Debtor incorporates by this reference all prior allegations.

256. Out of an abundance of caution, the Debtor scheduled GCP-1 as a disputed, contingent, and unliquidated secured creditor of the Debtor.

*257.* The Debtor scheduled the GCP-1 Beneficiaries as unsecured, disputed, contingent, and unliquidated creditors of the Debtor.

258. The Debtor scheduled the alleged claims of Mr. McKowen and Mr. Harding as contingent, unliquidated, and disputed.

259. Several of the GCP-1 Beneficiaries, as well as others, have filed proofs of claim in the underlying bankruptcy case, including:

a. David Marshall
b. Dan Foster, IRA;
c. VetaNova, Inc.;
d. Mr. McKowen;
e. Prasil Family Matters, LLC;
f. Blue & Green, LLC;
g. John D. And Linda W. Gruber Trust;
h. Mary Loughran;
i. John J. Blum;
j. Frank Guy;
k. Charles & Sandra Curtis;
l. IRA FOB Stephen Robert Marrinan;
m. Richland Fund, LLC;
n. George Rosch;
o. Geoffrey Poremba;
p. Donald Jeffrey Cain;
q. High Speed Aggregate, Inc.; and,
r. Preferred Members of TR Capital Partners.
s. (collectively the "Filed Claims").

260. 11 U.S.C. §502(b) provides that if an objection to a claim is made, the Court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the Petition Date, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for reason other than because such claim is contingent or unmatured.

261. While filing a proof of claim constitutes prima facie evidence of a claim, such presumption is rebuttable. Fed.R.Bankr.P. 3001(f); *In re Kirkland*, 572 F.3d 838 (10th Cir. 2009). If evidence rebutting a proof of claim is brought forth, the claimant must produce additional evidence to prove validity of the claim by a preponderance of the evidence. *Id.*; See *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140 (10th Cir. BAP 2003) (discussing burden of proof in claims objection proceeding and noting that if a proof of claim is executed or filed improperly "it is not prima facie evidence of [the claim] and [the claimant] would have the initial burden of proving a claim exists and the amount of that claim"). A claim is not deemed filed under 11 U.S.C. §501 if such claim is scheduled as disputed, contingent, or unliquidated. 11 U.S.C. §1111(a).

262. If a creditor fails to carry its ultimate burden in proving validity and amount of its claim, a debtor's objection should be sustained. *In re Geneva Steel Colorado.*, 260 B.R. 517 (10th BAP 2001), judgment aff'd 281 F.3d 1173 (10th Cir. 2002).

263. As set forth above, the Defendants' interests, including the GCP-1 Beneficiaries' interests, if any, are void and/or voidable because of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and

others, their violations of the CSA in offering securities to one or more of the Defendants, including the GCP-1 Beneficiaries, and the fraudulent schemes perpetrated by them.

264. Similarly, the debts allegedly owed to the GCP-1 Beneficiaries, if any, were satisfied pre-petition by, among other things, the releases in the GCP-1 Settlement and the waivers and releases in the Paulson Settlement.

265. As set forth above, the Defendants' claims, including the Filed Claims, were voluntarily released and/or are invalid, are void, are void *ab initio*, voidable, illegal, unenforceable, and/or void as against public policy, among other things.

266. One or more of the Filed Claims lacks supporting documentation and/or the documentation included fails to identify any obligation owed by the Debtor to such claimant.

267. Pursuant to Fed.R.Bankr.P. 3001(c)(1), if a proof of claim is based upon a writing, a copy of the writing shall be filed with the proof of claim. Similarly, pursuant to Fed.R.Bankr.P. 3001(d), if a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected.

268. When a party fails to attach supporting documentation to a claim, the burden more readily shifts to the creditor, who then bears the obligation of persuasion to establish the enforceability, amount, and perfection of an asserted, secured claim. *Agricredit Corp. v. Harrison (In re Harrison)*, 987 F. 2d 677, 680 (10th Cir.1993); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 524 (10th Cir. BAP 2001). *See also, Caplan v. B–Line, LLC (In re Kirkland)*, 572 F.3d 838, 840-41 (10th Cir. 2009) (holding without required supporting documentation, "the burden would have improperly rested with the Trustee to disprove an unsubstantiated claim"); *see also Campbell v. Verizon Wireless S-CA (In re*

*Campbell)*, 336 B.R. 430, 432 (9th Cir. BAP 2005) ("[A] proof of claim filed without sufficient documentation does lack prima facie validity: the claim very likely will not survive a bona fide legal or factual objection absent an adequate response by the creditor.").

269. The Debtor asserts the Defendants, including the Filed Claims, are not valid creditors of the Debtor and/or the Debtor's Estate.

270. This Court therefore must determine the amount, if any, owed by the Debtor to the Defendants, including the Filed Claims, and whether such persons have any claim against the Estate and/or property of the Estate. 11 U.S.C. §502(b).

WHEREFORE, pursuant to 11 U.S.C. §502(b), the Debtor respectfully requests this Court to enter judgment in its favor and against all of the Defendants, including the GCP-1 Beneficiaries and the Filed Claims, determining whether such claims are allowed against the Debtor and/or the Estate, determining the amount of such claims, if any, and for such other relief as the Court deems appropriate.

**FOURTH CLAIM FOR RELIEF**
(Objection to Untimely Claims - 11 U.S.C. §502)

271. The Debtor incorporates by this reference all prior allegations.

272. The Debtor scheduled GCP-1, along with all of the GCP-1 Beneficiaries, including Mr. McKowen and Mr. Harding, as disputed, contingent, and unliquidated creditors of the Debtor.

273. Pursuant to Fed.R.Bankr.P. 3003(b)(1), if a debtor schedules a claim as undisputed, not contingent and liquidated in a Chapter 11 case, the creditor is not required to file a proof of claim.

274. GCP-1 and the GCP-1 Beneficiaries, among others, were all therefore required to file proofs

of claim in the Debtor's underlying bankruptcy case.

275. The Court set March 14, 2024 ("Bar Date") as the date for all creditors (except governmental claims) to file proofs of claim in the Debtor's underlying bankruptcy case.

276. Numerous GCP-1 Beneficiaries, as well as GCP-1, failed to file proofs of claim in the Debtor's underlying bankruptcy case (collectively the "Untimely Claims"). A list of the Untimely Claims is attached hereto as **Exhibit 7** and incorporated herein.

277. 11 U.S.C. §502(b) provides that if an objection to a claim is made, the Court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the Petition Date, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for reason other than because such claim is contingent or unmatured.

278. While filing a proof of claim constitutes prima facie evidence of a claim, such presumption is rebuttable. Fed.R.Bankr.P. 3001(f); *In re Kirkland*, 572 F.3d 838 (10th Cir. 2009). If evidence rebutting a proof of claim is brought forth, the claimant must produce additional evidence to prove validity of the claim by a preponderance of the evidence. *Id.*; See *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140 (10th Cir. BAP 2003) (discussing burden of proof in claims objection proceeding and noting that if a proof of claim is executed or filed improperly "it is not prima facie evidence of [the claim] and [the claimant] would have the initial burden of proving a claim exists and the amount of that claim"). A claim is not deemed filed under 11 U.S.C. §501 if such claim is scheduled as disputed, contingent, or unliquidated. 11 U.S.C. §1111(a).

279. If a creditor fails to carry its ultimate burden in proving validity and amount of its claim, a debtor's objection should be sustained. *In re Geneva Steel Colorado.*, 260 B.R. 517 (10th BAP 2001), judgment aff'd 281 F.3d 1173 (10th Cir. 2002).

280. As the Untimely Claims were not filed by the Bar Date, this Court should disallow all such claims. *See Grynberg v. United States (In re Grynberg)*, 986 F.2d 367 (10th Cir. 1993).

281. Such Untimely Claims must be prohibited from voting on any plan and prohibited from receiving any distribution from the Estate. *Id.*

WHEREFORE, pursuant to 11 U.S.C. §502(b), the Debtor respectfully requests this Court to enter judgment in its favor and against any of the Defendants who hold Untimely Claims and/or whose claims were scheduled by the Debtor as disputed, contingent, and/or unliquidated, disallowing such claims and, to grant such other relief as the Court deems appropriate.

## FIFTH CLAIM FOR RELIEF
(Determination of Secured Status Pursuant to 11 U.S.C. §506)

282. The Debtor incorporates by this reference all prior allegations.

283. Pursuant to 11 U.S.C. §506(a)(1), an allowed claim of a secured creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent the value of such creditor's interest is less than the amount of such allowed claim.

284. Most, if not all, of the GCP-1 Beneficiaries and/or the Filed Claims assert their claims are, at least in part, secured by the Debtor's assets.

285. As set forth above, there is a dispute nature, extent, and validity of the GCP-1 Deed of Trust, including the nature, extent and validity of the security interest in and lien upon the Debtor's

assets including the Reservoir Parcel and the Huerfano Water Rights.

286. To the extent the GCP-1 Deed of Trust is valid as against the Debtor (which is denied), the appraised value of the Reservoir Parcel and the Huerfano Water Rights, collectively, is less than the amount of the filed proofs of claim asserting a security interest thereon and all claims senior to the Defendants' claims.

287. To the extent any of the GCP-1 Beneficiaries and/or the persons having Filed Claims (assuming their claims are valid and allowed) do not have a properly perfected lien upon the Debtor's assets including the Reservoir Parcel and the Huerfano Water Rights, they are unsecured creditors.

288. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against all of the GCP-1 Beneficiaries and/or persons holding Filed Claims as to the secured status of such alleged creditors in the underlying bankruptcy case. 11 U.S.C. §506.

289. Similarly, the Debtor seeks declaratory relief to the extent that any of the GCP-1 Beneficiaries and/or persons holding Filed Claims are secured creditors, the value of the collateral is less than the amount owed to such Filed Claims. *Id.* As a result, GVP-1 Beneficiaries' and/or persons holding Filed Claims' secured claims (which are disputed) should be reduced to the value of the collateral. *Id.* Any amounts over the value of the collateral must be treated as an unsecured claim. *Id.*

WHEREFORE, the Debtor respectfully requests this Court to enter a declaratory judgment declaring the rights of all of the parties with respect to the secured status of the GCP-1 Beneficiaries and/or the Filed Claims and, to the extent such claims are secured creditors, determining whether the value of the collateral is less than the amount owed to the such claims that such claims are

unsecured and/or undersecured pursuant to 11 U.S.C. §506, for the Debtor's costs and attorney's fees as provided by statute or agreement and, for such other relief this Court deems appropriate.

**SIXTH CLAIM FOR RELIEF**
(11 U.S.C. §544(b) & C.R.S. §38-8-105)

290. The Debtor incorporates by this reference all prior allegations.

291. The Debtor scheduled an indebtedness owed to the IRS for past due taxes as the Debtor has not yet filed its tax returns for the years 2019 through 2023.

292. The IRS filed a proof of claim in the Debtor's underlying bankruptcy case asserting a claim, both priority and unsecured, in the amount of $6,768.86.

293. The Debtor brings this claim pursuant to 11 U.S.C. §544(b) and C.R.S. §38-8-105, "standing in the shoes" of an existing creditor with an actual claim who could avoid the transfers in question. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). *See also,* 11 U.S.C. §1108.

294. Pursuant to the holding in *Lofstedt v. Oletski-Behrends (In re Behrends)*, Adv. Proc. No. 14-1377-EEB, slip op. at 9-11 (Bankr.D.Colo. Apr. 10, 2017), the Debtor may assert state law fraudulent transfers claims which occurred up to 10 years prior to the Petition Date as the Debtor may "stand in the shoes" of the IRS's statute of limitation. *See* 26 U.S.C. § 6502.

295. The Debtor voluntarily and/or involuntarily transferred an interest in the Debtor's property, specifically the Reservoir Parcel and the Huerfano Water Rights, to the Defendants, including one or more of the GCP-1 Beneficiaries and/or Filed Claims, within 10 years prior to the Petition Date, via the GCP-1 Deed of Trust.

296. One or more of the Debtor's pre-petition transfers to the Defendants, including one or more of the GCP-1 Beneficiaries and/or Filed Claims, including the GCP-1 Deed of Trust, were

made with the actual intent to hinder, delay, and/or defraud the Debtor's creditors, including the IRS.

297. Pursuant to C.R.S. § 38-8-105(1)(a), one or more of the Debtor's pre-petition transfers to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust are avoidable as the Debtor made such transfers with the actual intent to hinder, delay or defraud creditors of the Debtor.

298. The Debtor, with rights as a hypothetical lien creditor and as a creditor holding an unsatisfied claim on the Petition Date, may avoid one or more of these pre-petition transfers to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust under applicable state fraudulent transfer law, whether or not such creditor exists. 11 U.S.C. §544; C.R.S. §38-8-105.

299. In addition, the Debtor's pre-petition transfers to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust are voidable under applicable non-bankruptcy law by a creditor holding an unsecured claim in the Debtor's bankruptcy case with allowable unsecured claims who could avoid the transfers under applicable non-bankruptcy law, including the IRS.

300. One or more of the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or Filed Claims, are the initial transferees of the Debtor's pre-petition transfers made pursuant to the GCP-1 Deed of Trust and the entities for whose benefit such transfers were made.

301. One or more of the badges of fraud exist with respect to the Debtor's pre-petition transfers to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust including, but not limited to, GrowCo and/or GCP-1

were owned and/or controlled by the principals of the Debtor at the time, including Mr. McKowen and/or Mr. Harding, the lack of any consideration, as well as one or more of the badges set forth in C.R.S. §38-8-105(2).

302. Pursuant to 11 U.S.C. §550 and/or C.R.S. §§38-8-108(1)(a) and 38-8-109(2), the Debtor may recover the property transferred or the value of such property from:

a. the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
b. any immediate or mediate transferee of such initial transfer.

303. Pursuant to C.R.S. §38-8-108, the Debtor may obtain:

a. avoidance of the transfer or obligation to the extent necessary to satisfy creditor claims;
b. an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the Colorado rules of civil procedure;
c. a judgment for one and one-half the value of the asset transferred or for one and one-half the amount necessary to satisfy creditor claims, whichever is less, together with the Debtor's actual costs;
d. Subject to the applicable principles of equity and in accordance with applicable rules of civil procedure:
    i. an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property;
    ii. appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
    iii. any other relief the circumstances may require.

304. The Defendants, including GCP-1, the GCP-1 Beneficiaries and the Filed Claims, lack a good faith defense to the Debtor's pre-petition transfers of property of the Estate including, pursuant to the GCP-1 Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in its favor and against the Defendants, including GCP-1, the GCP-1 Beneficiaries and the Filed Claims, to avoid and recover the Debtor's pre-petition transfers of property of the Estate, specifically the GCP-1 Deed of Trust, and/or the value thereof pursuant to 11 U.S.C. §§544 and 550 and C.R.S. §38-8-

105(1)(a), for all of the Debtor's attorney fees and costs as provided by law and/or agreement, and for such other relief as this Court deems appropriate.

**SEVENTH CLAIM FOR RELIEF**
(11 U.S.C. §544(b) & C.R.S. §38-8-105)

305. The Debtor incorporates by this reference all prior allegations.

306. The Debtor scheduled an indebtedness owed to the IRS for past due taxes as the Debtor has not yet filed its tax returns for the years 2019 through 2023.

307. The IRS filed a proof of claim in the Debtor's underlying bankruptcy case asserting a claim, both priority and unsecured, in the amount of $6,768.86.

308. The Debtor brings this claim pursuant to 11 U.S.C. §544(b) and C.R.S. §38-8-105, "standing in the shoes" of an existing creditor with an actual claim who could avoid the transfers in question. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). *See also,* 11 U.S.C. §1108.

309. Pursuant to the holding in *Lofstedt v. Oletski-Behrends (In re Behrends)*, Adv. Proc. No. 14-1377-EEB, slip op. at 9-11 (Bankr.D.Colo. Apr. 10, 2017), the Debtor may assert state law fraudulent transfers claims which occurred up to 10 years prior to the Petition Date as the Debtor may "stand in the shoes" of the IRS's statute of limitation. *See* 26 U.S.C. § 6502.

310. The Debtor voluntarily and/or involuntarily transferred an interest in the Debtor's property, specifically the Reservoir Parcel and the Huerfano Water Rights, to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, within 10 years prior to the Petition Date, via the GCP-1 Deed of Trust.

311. The Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, are the initial transferees of the Debtor's pre-petition transfers, pursuant to the GCP-1 Deed of Trust

and the entities for whose benefit such transfers were made.

312. The Debtor did not receive reasonably equivalent value in exchange for the pre-petition transfers of its property from the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claim, pursuant to the GCP-1 Deed of Trust.

313. The Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, did not give reasonably equivalent value to the Debtor in exchange for the Debtor's pre-petition transfers of property to them pursuant to the GCP-1 Deed of Trust.

314. At the time the Debtor made one or more of pre-petition transfers of its property to the Defendants, including GCP-1, the GCP-1 Beneficiaries, pursuant to the GCP-1 Deed of Trust, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

315. The Debtor, with rights as a hypothetical lien creditor and as a creditor holding an unsatisfied execution on the Petition Date, may avoid one or more of the Debtor's pre-petition transfers of property including, the GCP-1 Deed of Trust, under applicable state fraudulent transfer law, whether or not such creditor exists. 11 U.S.C. §544; C.R.S. §38-8-105.

316. In addition, the Debtor's pre-petition transfers to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust are voidable under applicable non bankruptcy law by a creditor holding an unsecured claim in the Debtor's bankruptcy case with allowable unsecured claims who could avoid the transfers under applicable non-bankruptcy law, including the IRS.

317. Pursuant to C.R.S. § 38-8-105(1)(b), one or more of the Debtor's pre-petition transfers of

property to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust, are avoidable as the Debtor made such transfers:

a. Without receiving a reasonably equivalent value in exchange for such transfers, and the Debtor:
b. Was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or
c. Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

318. Pursuant to 11 U.S.C. §550 and/or C.R.S. §§38-8-108(1)(a) and 38-8-109(2), the Debtor may recover the property transferred or the value of such property from:

a. the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
b. any immediate or mediate transferee of such initial transfer.

319. Pursuant to C.R.S. §38-8-108, the Debtor may obtain:

a. avoidance of the transfer or obligation to the extent necessary to satisfy creditor claims;
b. an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the Colorado rules of civil procedure;
c. a judgment for one and one-half the value of the asset transferred or for one and one-half the amount necessary to satisfy creditor claims, whichever is less, together with the Debtor's actual costs;
d. Subject to the applicable principles of equity and in accordance with applicable rules of civil procedure:
    i. an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property;
    ii. appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
    iii. any other relief the circumstances may require.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in its favor and against the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, to avoid and recover the Debtor's pre-petition transfers of property of the Estate, specifically the GCP-

1 Deed of Trust, and/or the value thereof pursuant to 11 U.S.C. §§544 and 550 and C.R.S. §38-8-105(1)(b), for all of the Debtor's attorney fees and costs as provided by law and/or agreement, and for such other relief as this Court deems appropriate.

**EIGHTH CLAIM FOR RELIEF**
(11 U.S.C. §551)

320. The Debtor incorporates by this reference all prior allegations.

321. To the extent the Debtor avoids any pre-petition transfers of property to the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, pursuant to the GCP-1 Deed of Trust, under 11 U.S.C. §551 such avoided transfer and/or lien is preserved for the benefit of the Debtor's bankruptcy estate.

WHEREFORE, the Debtor respectfully requests this Court to enter judgment in its favor and against the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, to preserve any avoided transfer and/or avoided lien for the benefit of the Estate pursuant to 11 U.S.C. § 551, for the Debtor's attorney fees and costs as provided by law and/or agreement, and for such other relief as this Court deems appropriate.

**NINTH CLAIM FOR RELIEF**
(Illegality/Void Against Public Policy)

322. The Debtor incorporates by this reference all prior allegations.

323. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

324. The Debtor's rights to the Reservoir Parcel and/or the Huerfano Water Rights are affected by the GCP-1 Deed of Trust and the interests of the Defendants' interests, if any, including the GCP-1 Beneficiaries' and the Filed Claims' interests (and any assignee thereof), if any,

in such property.

325. All property rights in bankruptcy are derived from non-bankruptcy law, including applicable State law. *Butner v. U.S.*, 440 U.S. 48 (1979).

326. The GCP-1 Deed of Trust was used, at least in part, to raise funds for a federally illegal activity, specifically the cannabis business. Cannabis is illegal under Federal Law. *See fn. 1, supra.*

327. Assisting others in businesses and activities that violate the CSA is also a crime. *See* 21 U.S.C. §846.

328. The GCP-1 Deed of Trust, including the Defendants' interests therein (and any assignee thereof), if any, in such real property arising from such instruments, are void as against public policy as such documents were executed and delivered in furtherance of an illegal activity. *Blue Dolphin Inv., Ltd. v. Kane*, 687 P.2d 533, 534 (Colo. App. 1984)("we will not give effect to a contractual provision which has as its purpose wrongful preclusion of a third party's exercise of a valid contractual right) *citing* Restatement (Second) of Contracts, § 194 (1981); *see also Core-Mark Midcontinental, Inc. v. Somitrol Corp.*, 300 P.3d 963, 967 (Colo.App. 2012) (courts will not enforce contract provision contrary to public policy).

329. The GCP-1 Deed of Trust was void *ab initio* as the product of a federally illegal activity. *See F.D.I.C. v. Am. Cas. Co.*, 843 P.2d 1285, 1290 (Colo.1992)(voiding contractual provisions as against public policy); *Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo.App. 2002)(same).

330. There exists an actual controversy as to the rights and interests of the Parties as to the interests of the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, in the Reservoir Parcel and/or Huerfano Water Rights arising out of and/or relating

to the GCP-1 Deed of Trust.

331. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against all of the Defendants and all persons asserting an interest in the Debtor's assets, including the Reservoir Parcel and/or Huerfano Water Rights, arising out of and/or related to the GCP-1 Deed of Trust such that all such interests are void as against public policy.

332. The issuance of a declaratory judgment will settle and afford relief from uncertainty and insecurity with regards to the rights and status of the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, in or to the Reservoir Parcel and/or Huerfano Water Rights arising out of and/or related to the GCP-1 Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter declaratory judgment in its favor and against the Defendants, including GCP-1, the GCP-1 Beneficiaries and/or the Filed Claims, declaring the GCP-1 Deed of Trust void *ab initio* as against public policy, to award the Debtor all of its attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as the Court deems appropriate.

Dated: May 22, 2024.

Respectfully submitted,
BUECHLER LAW OFFICE, LLC

*/s/ K. Jamie Buechler*

K. Jamie Buechler, #30906
*Gender Pronouns She/Her*
Jordan (Thomas) O'Connell, #59395
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel:720-381-0045
Fax: 720-381-0382
Jamie@KJBlawoffice.com
Jordan@KJBlawoffice.com
**ATTORNEYS FOR THE DEBTOR**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>TWO RIVERS FARMS F-2, INC.,<br><br>Debtor. | Case No. 23-15627 KHT<br><br>Chapter 11 |
| TWO RIVERS FARMS F-2, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GROWCO PARTNERS I, LLC, et al.,<br><br>Defendants. | Adversary No. 24-01111 KHT |

**ORDER DISMISSING ADVERSARY PROCEEDING**

THIS MATTER comes before the Court on its own review of the file. By Order entered April 1, 2025 (docket #56), the Court granted the Motion to Withdraw as Counsel (docket #53) filed by Plaintiff's counsel. That same date, the Court entered an Order Regarding Compliance with Rules (the "Compliance Order," docket #57), which provided, in relevant part, as follows:

> Plaintiff may not appear before a bankruptcy court in this district unless it is represented by counsel:
>
> > No corporation, partnership, or other unincorporated organization, or entity may file a petition under Title 11, of the United States Code, or otherwise appear in cases or proceedings before this court, unless it is represented by an attorney authorized to practice in this court. Where a corporate debtor is involved, the attorney representing such an entity must sign the petition and pleadings.
>
> L.B.R. 9010-1(e).
>
> Accordingly, it is hereby
>
> ORDERED that the Plaintiff has to and including **April 15, 2025** to comply with L.B.R. 9010-1(e), failing which this **case will be dismissed**.

Compliance Order at 1 (emphasis in original). Plaintiff has not filed a response to the Compliance Order. No attorney has entered an appearance on Plaintiff's behalf. Plaintiff has failed to comply with an order of this Court. Plaintiff's underlying bankruptcy case has been dismissed, and Plaintiff has failed to prosecute this adversary proceeding. The Court finds dismissal is appropriate.

Accordingly, it is

HEREBY ORDERED that the adversary proceeding is DISMISSED.

Dated April 16, 2025

BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | |
| TWO RIVERS FARMS F-2, INC., | Case No. 23-15627-KHT |
| | Chapter 11 |
| Debtor. | Subchapter V |
| TWO RIVERS FARMS F-2, INC., | |
| Plaintiff, | Adv. Proc. No. _________________ |
| v. | |
| GROWCO, INC., | |
| BLUE & GREEN, LLC, | |
| THOMAS PRASIL TRUST u/a/d 11-26-03, | |
| HUGO ZIMMERMAN, | |
| URSULA GUTSCHER, | |
| LEE JAMES WAGNER, | |
| BRANT WIWI, | |
| MATTHEW KELLY PENSCO TRUST, | |
| f/b/o MATTHEW J. KELLY IRA, | |
| MEGAN KELLY PENSCO TRUST | |
| f/b/o MEGAN KELLY IRA, | |
| MICHAEL HARNISH IRA | |
| RESOURCES, INC. f/b/o MICHAEL | |
| W. HARNISH IRA, | |
| MAUREEN MILLER IRA RESOURCES, INC. | |
| f/b/o MAUREEN A. MILLER IRA, | |
| RICHARD WIWI IRA RESOURCES, INC. | |
| f/b/o RICHARD WIWI IRA, | |
| DAVID MARSHALL, | |
| I. WISTAR MORRIS IRA, | |
| DAN FOSTER IRA, | |
| MARY LOUGHRAN SEP IRA NDIRA, INC., | |
| ANGELA SWARTZ IRA RESOURCES, INC. | |
| f/b/o ANGELA SWARTZ IRA, | |
| VETANOVA, INC., | |
| JOHN R. MCKOWEN, | |
| PRASIL FAMILY MATTERS, LLC, | |
| JON D. AND LINDA W. GRUBER TRUST, | |
| DR. MARK E. ANDERSON, | |
| MARY LOUGHRAN, | |

| | |
|---|---|
| JOHN J. BLUM, | ) |
| FRANK GUY, | ) |
| CHARLES AND SANDRA CURTIS, | ) |
| IRAR f/o/b STEPHEN R. MARRINAN, | ) |
| RICHLAND FUND, LLC, | ) |
| GEORGE ROSCH, | ) |
| GEOFFREY POREMBA, | ) |
| DONALD J. CAIN, | ) |
| HIGH SPEED AGGREGATE, INC., | ) |
| PREFERRED MEMBERS OF TR CAPITAL | ) |
| PARTNERS, LLC, | ) |
| Defendants. | ) |

**COMPLAINT**

TWO RIVERS FARMS F-2, INC. ("Debtor"), through counsel, respectfully submits this Complaint against the Defendants identified above and below including, GrowCo, Inc. ("GrowCo"), the GrowCo Beneficiaries (as defined below) and, states as follows:

**JURISDICTION AND VENUE**

1. This Court has jurisdiction pursuant to 28 U.S.C. §§157(a) & (b)(2)(A), (B), (O). This Court also has jurisdiction pursuant to 28 U.S.C. §1334.

2. Venue in this Court is proper as the Debtor filed for relief in this District with this Court. 28 U.S.C. §§1408 & 1409.

3. As more fully set forth below, the Debtor owns real property and water rights within the State of Colorado which are allegedly subject to the liens, encumbrances and/or interests of one or more of the Defendants.

4. The GrowCo Beneficiaries (as defined below) transacted business with GrowCo, GrowCo Partners 1, LLC ("GCP-1"), Mr. John McKowen and/or Mr. Wayne Harding, concerning, among other things, solicitations for investments in and/or loans to GrowCo and/or GCP-1,

among other companies.

5. Each of the GrowCo Beneficiaries transacted business within the State of Colorado, transacted business with a Colorado company, and allegedly assert an interest in real property within the State of Colorado owned by the Debtor, such that all such persons availed themselves of the laws of the State of Colorado, they have substantial contacts with the state of Colorado or at least have minimum contacts with the State of Colorado.

6. None of the GrowCo Beneficiaries gave any consideration to the Debtor in exchange for their alleged interest in the real property and water rights owned by the Debtor.

7. To the extent any Defendant filed a proof of claim, such Defendant consented to the jurisdiction of the Bankruptcy Court for all purposes.

## PARTIES

8. The Debtor is a Colorado corporation with its principal place of business at 4400 N. Scottsdale Road, Suite 9-289, Scottsdale, AZ 85251.

### A. GrowCo, Inc.

9. GrowCo, Inc. ("GrowCo") is a Colorado corporation with its last known principal place of business at 335A Josephine Street, Denver, Colorado 80206.

### B. Beneficiaries of the GrowCo Deed of Trust

10. The "GrowCo Beneficiaries" are approximately 18 persons identified as beneficiaries on that certain Deed of Trust, Security Agreement and Fixture Filing (the "GrowCo DOT") allegedly executed by the Debtor on or about September 9, 2015, in favor of GrowCo, Inc., and all the persons identified on Exhibit A to said Deed of Trust, which was recorded with the Huerfano County Clerk and Recorder on September 25, 2015, at Reception No. 404225.

*See, Exhibit 5, infra.* The GrowCo Beneficiaries includes GrowCo to the extent GrowCo (or any alleged assignee) asserts any claims against the Estate. The GrowCo Benfeficiaries are and/or were investors in and/or lenders to GrowCo and/or GCP-1 (among other entities), as more fully described below.

11. Blue & Green, LLC is a Colorado limited liability company with its last known principal place of business located at 8200 South Quebec Street, Suite A3-796, Centennial, Colorado 80112-4411. Blue & Green, LLC filed Proof of Claim No. 7.

12. Upon information and belief, the Thomas Prasil Trust is an entity whose last known address is 3935 East San Miguel Avenue, Paradise Valley, Arizona 85253. Praisal Family Matters, LLC filed Proof of Claim No. 6. Upon information and belief, Prasil Family Matters, LLC is the assignee of the Thomas Prasil Trust.

13. Hugo Zimmermann is an individual whose last known address is Via Tull 7 7017, Films Dorf, Switzerland.

14. Ursula Gutscher is an individual whose last known address is Via Tull 7 7017, Films Dorf, Switzerland.

15. Lee James Wagner is an individual whose last known address is 430 Edgewood Road, San Mateo, California 94402.

16. Brant Wiwi is an individual whose last known address is 11956 Laurelwood Drive, Suite. 9, Studio City, California 91604.

17. Upon information and belief, the Matthew Kelly Pensco Trust, is an entity set up for the benefit of the Matthew Kelly IRA, whose last known principal place of business is in care of GrowCo, whose last known principal place of business is 335A Josephine Street, Denver,

Colorado 80206.

18. Upon information and belief, the Megan Kelly Pensco Trust is an entity set up for the benefit of the Megan Kelly IRA, whose last known principal place of business is in care of GrowCo whose last known principal place of business is 335A Josephine Street, Denver, Colorado 80206.

19. Upon information and belief, the Michael Harnish IRA Resources, Inc., for the benefit of Michael W. Harnish, is an entity whose last known principal place of business is in care of GrowCo whose last known principal place of business is 335A Josephine Street, Denver, Colorado 80206.

20. Maureen Miller IRA Resources, Inc., for the benefit of Maureen A. Miller IRA, whose last known address is 6825 La Jolla Boulevard, La Jolla, California 92037. Such entity may also be doing business in care of GrowCo, Inc., whose address is 335A Josephine Street, Denver, Colorado 80206.

21. Richard Wiwi IRA Resources, Inc., for the benefit of Richard Wiwi IRA, whose last known address is 6825 La Jolla Boulevard, La Jolla, California 92037. Such entity may also be doing business in care of GrowCo, Inc., whose address is 335A Josephine Street, Denver, Colorado 80206.

22. Wayne Harding IRA Resources, Inc., for the benefit of Wayne Harding IRA, whose last known address is 6825 La Jolla Boulevard, La Jolla, California 92037.

23. David Marshall is an individual whose last known address is 626 Gilgalad Way, Fort Collins, Colorado 80526-1994. Mr. Marshall filed Proof of Claim No. 1.

24. Upon information and belief, the I. Wistar Morris IRA is an entity whose last known

principal place of business is 19 Pond Lane, Bryn Mawr, Pennsylvania 19010. Mr. I. Wistar Morris is one of the Preferred Members of TR Capital Partners, LLC, who filed Proof of Claim No. 21.

25. Upon information and belief, the Dan Foster IRA is an entity whose last known principal place of business is 2850 North West Lacamas Drive, Camas, Washington 98607. Dan Foster filed Proof of Claim No. 3.

26. Upon information and belief, the Mary Loughran SEP IRA NDIRA, Inc., is an entity whose last known principal place of business is 5030 South Albion Way, Cherry Hills Village, Colorado 80121. Mary Loughran filed Proof of Claim No. 10 which appears to be related to this entity.

27. Upon information and belief, the Angela Swartz, Angela IRA Resources, Inc., for the benefit of Angela Swartz IRA, is an entity whose last known principal place of business is 6825 La Jolla Boulevard, La Jolla, California 92037.

**C. Parties Who Filed Proofs of Claim Against the Debtor Asserting Interest in Property**

The following parties filed proofs of claim in the Debtor's underlying bankruptcy case who were not listed as a GrowCo Beneficiary and/or who are asserting an interest in the Reservoir Parcel and/or Huerfano Water Rights (as described below) arising out of and/or relating to the GrowCo Deed of Trust. Such parties do not include any persons senior to the GrowCo Deed of Trust or asserting other claims in the Debtor's bankruptcy case.

28. Upon information and belief, VetaNova, Inc. ("VetaNova") is a Nevada Corporation duly registered to do business within the State of Colorado, whose registered agent in Colorado is Mr. McKowen at 335 A Josephine Street, Denver, Colorado 80206. VetaNova allegedly

conducts business at 2831 Saint Rose Parkway, Suite 200, Henderson, Nevada 89052. Upon information and belief, VetaNova is also known and/or does business as GrowCo Partners 1, LLC, VitaNova Partners, LLC. VetaNova filed Proof of Claim No. 4.

29. John McKowen, who resides within the State of Colorado and/or does business at 335 A Josephine Street, Denver, Colorado 80206. Mr. McKowen is also known and/or does business as VetaNova, Inc., VitaNova Partner(s), LLC, GrowCo, Inc., and/or GrowCo Partners 1, LLC. Mr. McKowen filed Proof of Claim No. 5.

30. Prasil Family Matters, LLC, whose address is 7275 N Scottsdale Road, Unit 1007, Paradise Valley, Arizona 85253. Prasil Family Matters, LLC filed Proof of Claim No. 6. Upon information and belief, Prasil Family Matters, LLC may have acquired the claims of Thomas Prasil and/or the Thomas Prasil Trust under the GCP-1 Deed of Trust. *Id.*

31. Jon D. and Linda W. Gruber Trust whose address is 300 Tamal Plaza, Suite 215, Corte Madera, California 94925. The Gruber Trust filed Proof of Claim No. 8.

32. Mark E. Anderson MD APC PSP & T whose address is in care of Dr. Mark Anderson, 21 Southampton Court, Newport Beach, California 92660, who filed Proof of Claim No. 9.

33. Mary Loughran whose address is 5030 South Albion Way, Cherry Hills Village, Colorado 80121-5030. Ms. Loughran filed Proof of Claim No. 10. Ms. Loughran may have acquired from and/or filed a proof of claim for the Mary Loughran SEP IRA NDIRA, Inc.

34. John. J. Blum is an individual whose address is 6 Mink Hollow Court, Owings Mill, Maryland 21117-6. Mr. Blum filed Proof of Claim No. 11.

35. Frank Guy is an individual whose address is 3326 Glenway Drive, Kensington, Maryland 20895. Mr. Guy filed Proof of Claim No. 12.

36. Charles and Sandra Curtis are individuals whose address is 902 Windsor Lane, Key West, Florida 33040. Mr. and Ms. Curtis jointly filed Proof of Claim No. 13.

37. IRAR FOB: Stephen Robert Marrinan is an entity whose address is 2130 NW Lacamas Drive, Camas Washington 98607-2130. Such entity filed Proof of Claim No. 14.

38. Richland Fund, LLC whose address is 4 Richland Place, Pasadena, California 91103. Richland Fund, LLC filed Proof of Claim No. 15.

39. George Rosch is an individual whose address is 5781 Cape Harbour Drive, Apartment 602, Cape Coral, Florida 33914. Mr. Rosch filed Proof of Claim No. 16.

40. Geoffrey Poremba is an individual whose address is 20338 86th Place NE, Bothell, Washington 98011. Mr. Poremba filed Proof of Claim No. 17.

41. Donald Jeffrey Cain is an individual whose address is 11859 Tomahawk Road, Parker, Colorado 80138. Mr. Cain filed Proof of Claim No. 19.

42. High Speed Aggregate, Inc., whose address is 8480 East Orchard Road, Suite 4900, Greenwood Village, Colorado 80111. High Speed Aggregate, Inc., filed Proof of Claim No. 20.

43. The Preferred Members of TR Capital Partners, LLC ("Preferred Members"), are those certain persons who became preferred members of TR Capital Partners, LLC on or about January 31, 2014, including Charles Kirby, Elevation Fund, LLC, Kirby Enterprise Fund, LLC, West Hampton Special Situations Fund, LLC, I. Wistar Morris, Martha Morris, Cotswold Foundation, Eleventh Generation. The Preferred Members' last known address is in care of The MacCallum Law Firm, P.C., 685 Briggs Street, P.O. Box 929, Erie, Colorado 80516. Such members filed Proof of Claim No. 21.

## GENERAL ALLEGATIONS

44. The Debtor filed a Voluntary Petition for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code") on December 6, 2023 ("Petition Date").

45. The Debtor filed its Schedules and Statement of Financial Affairs on or about December 21, 2023. *See Case No. 23-15627 KHT, Docket Nos. 25-34.* The Debtor's Schedules and Statement of Financial Affairs, and all amendments thereto, are collectively referred to herein as the "Schedules".

46. The Debtor is operating as the Debtor-in-Possession pursuant to 11 U.S.C. §1107 and §1108.

47. The Debtor is a Colorado corporation owned by Two Rivers Farms F-1, Inc. ("F-1").

48. F-1 is in turn owned by Two Rivers Water and Farming Company ("Two Rivers").

49. The Debtor owns real property and certain water rights which were obtained from a related entity The Orlando Reservoir No. 2 Company, LLC ("Orlando") who commenced a Chapter 11 bankruptcy case in July 2023. *See Case No. 23-13178-KHT.*

50. Orlando is owned by TR Capital Partners, LLC ("TR Capital") and Mr. Greg Harrington.

51. TR Capital is also owned, in part, by Two Rivers.

**A. Pre-petition Acquisition of Land and Water Rights**

52. Pre-petition, the Debtor acquired land and water rights from Orlando through a series of transactions.

53. The Debtor acquired land generally described as: a Parcel of land containing the Orlando Reservoir Number Two, situated in Sections 17, 18, 19, and 20, Township 26 South, Range 66 West of the 6th P.M., in Huerfano County, Colorado ("Reservoir Parcel").

54. The Debtor also acquired certain decreed water rights from various individuals and entities,

including rights from Mr. Leo Payne ("Mr. Payne"), Marksheffel-Woodman Investments, LLC ("MWI"), and Orlando.

55. The Debtor acquired additional real estate from MWI and its affiliates which are also included within the Reservoir Parcel.

*1. The Debtor's Acquisition of the Reservoir Parcel*

56. The Reservoir Parcel was originally acquired by Orlando via a warranty deed on or about May 9, 2005, from Mr. Payne.

57. On October 21, 2011, Orlando conveyed legal title to the Reservoir Parcel to the Debtor, and again on February 15, 2012, via Quit Claim Deeds.

58. As part of the conveyance of the Reservoir Parcel to the Debtor, the Debtor agreed to take on all valid debt associated with such real property, including the debts owed to the Colorado Water Conservation Board ("CWCB").

59. At the time of the transaction, CWCB asserted a lien against the Reservoir Parcel pursuant to a set of deeds of trust granted by the Debtor (and properly perfected) to secure a loan from the CWCB to the Debtor for funds to improve the Orlando Reservoir No. 2, among other things.

*2. The Debtor's Acquisition of the Huerfano Water Rights*

60. Orlando acquired certain decreed water rights (the "Initial Water Rights") from Mr. Payne on or about May 9, 2005, via Warranty Deed, located in Huerfano County, Colorado.

61. These Initial Water Rights include certain rights and priority rights to the Butte Valley Ditch, storage of water in the Orlando Reservoir No. 2, the Mexican Branch Ditch, the Chitwood Ditch, the Parsons Ditch, the Weston Spring No. 1, the Weston Spring No. 2, the Weston

Spring No. 4, and the Weston Spring No. 5.

62. Orlando also acquired certain decreed water rights from MWI via a Quit Claim Deed on January 28, 2011. These water rights are described as 3 C.F.S. No. 19 to the Robert Rice Ditch #15, based upon a decree dated March 1, 1987, which are also in Huerfano County, Colorado (the "MWI Water Rights").

63. Orlando acquired additional water storage rights for the Orlando Reservoir No. 2 from Randall W. Case, II on or about January 28, 2011, via a Quit Claim Deed (the "Case Water Rights").

64. The Initial Water Rights, the MWI Water Rights, and the Case Water Rights are collectively referred to hereinafter as the "Huerfano Water Rights."

65. However, on or about January 28, 2011, Orlando conveyed some of the Huerfano Water Rights to TRW Orlando Water Assets, LLC ("TRW") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to the Debtor on or about September 7, 2011 via a Special Warranty Deed.

66. On or about July 27, 2011, Orlando conveyed some of the Huerfano Water Rights to Family Ranch Holdings, LLC ("Family Ranch") via a Water Deed - Special Warranty Deed. Such water rights were re-conveyed back to Orlando on or about September 7, 2011, via a Special Warranty Deed.

67. On October 21, 2011, TRW conveyed the Huerfano Water Rights to the Debtor via a Quit Claim Deed.

68. On February 15, 2012, Orlando conveyed legal title in the Huerfano Water Rights to the Debtor via a "Water Deed - Quit Claim Deed."

69. As part of the conveyance of the Huerfano Water Rights to the Debtor, the Debtor agreed to take on all valid debt associated with such real property, including the debts owed to the CWCB.

70. At the time of the transaction, CWCB asserted a lien against the Huefano Water Rights pursuant to a set of deeds of trust granted by the Debtor (and properly perfected) to secure a loan from the CWCB to the Debtor for funds to improve the Orlando Reservoir No. 2, among other things.

**B. Prior Management's Fraudulent Activities**

71. Prior to 2019, Two Rivers and certain other companies were owned and operated by Mr. McKowen (as CEO) and Mr. Harding (as CFO and Treasurer).

72. Mr. McKowen and Mr. Harding reorganized ownership of their operating subsidiaries based on two functional operations, water and farming.

73. GrowCo, Inc. ("GrowCo"), and its subsidiaries, including GCP-1, were used to solicit investors for funds to purchase real estate, construct greenhouses and then lease such facilities to cannabis growers.

74. Cannabis is illegal under Federal Law.[1]

75. Assisting others in businesses and activities that violate the CSA is also a crime. *See* 21 U.S.C. §846.

[1] At all times relevant hereto, cannabis is a Schedule I controlled substance under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801, et seq. The CSA broadly provides that possessing, growing, and dispensing cannabis and assisting others to do so are illegal. Specifically, it is unlawful for any person knowingly or intentionally "to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." See 21 U.S.C. § 841(a)(1). "Manufacture" includes the production, preparation, and propagation of a drug or other substance. See 21 U.S.C. § 802(15). Further, 21 U.S.C. § 856(a) makes it unlawful to "knowingly open, lease, rent, use, or maintain any place" to manufacture or distribute a controlled substance.

76. Mr. McKowen's solicitations for GrowCo and its subsidiaries, including GCP-1, were made without proper disclosures to investors and during a time when Mr. McKowen was not licensed to sell, offer or solicit securities in Colorado, among other things.

77. Mr. McKowen and Mr. Harding convinced many investors to put funds into GrowCo and its subsidiaries, including GCP-1 with the promise of additional collateral from their groups of companies.

78. Mr. McKowen and Mr. Harding failed to follow required corporate formalities, let alone proper methods for ordinary course business transactions for such offerings and solicitations.

79. Pre-petition, the Securities Commissioner for the State of Colorado, Ms. Tung Chan ("Securities Commissioner") sued GrowCo, GCP-1, Two Rivers, TR Capital, Mr. Harding, and Mr. McKowen, among others, alleging Mr. Harding and Mr. McKowen, through GrowCo, Two Rivers and TR Capital sold unregistered non-exempt securities in Colorado between 2014 and 2019 ("Commissioner Action"). A copy of the Commissioner's Complaint is attached hereto as **Exhibit 1** and incorporated herein.

80. The Commissioner alleged GrowCo and GCP-1, among others, made unlawful, if not illegal, solicitations of securities and debt between November 2014 and June of 2017. *Id., at 9-16.*

81. In connection with these offerings, GrowCo and GCP-1, directly or indirectly, failed to, or inadequately disclosed material facts including, but not limited to, that NASD took disciplinary action against Mr. McKowen, that Mr. McKowen's prior bankruptcies, that as cannabis companies, the potential Offerings could face substantial losses if the federal government chose to enforce the CSA, among other federal laws, that GrowCo and GCP-1 could not have their own bank accounts because of their violations of the CSA, that Mr.

McKowen was acting as an unlicensed broker-dealer receiving finder's fees and/or commissions, and, that the money collected through the Offerings was used to pay attorney fees for the 2019 GrowCo Chapter 11 bankruptcy filing. *Id.,* at 24-26.

82. The Commissioner also alleged GrowCo and GCP-1, among others, misrepresented material facts to investors in connection with the Offerings including, but not limited to, the use of proceeds would go to the greenhouse and other greenhouse-related activities when the proceeds were not used as promised, that GrowCo's and GCP-1's managers did not have access to their financial records when Mr. Harding an executive with both companies and the companies made public filings with the SEC of their financial information, that GrowCo and GCP-1 were not involved in the cannabis business, which suggested that the Offerings were not subject to the potential risks and uncertainties that surrounded the enforcement of applicable federal cannabis laws, etc. *Id.* at 25-26.

83. All of the Offerings by GrowCo and GCP-1 were unregistered and failed to comply with the exemptions under Colorado and federal law. *Id.* at 27.

84. GrowCo and GCP-1, among others, acted as agents who were not properly licensed as a broker-dealer or sales representative under Colorado during the time of the Offerings. *Id.*

85. GrowCo and GCP-1 failed to timely respond to the Commissioner's Complaint.

86. As a result, a default was entered against GrowCo and GCP-1. A copy of the Court's Order of Clerk's Default is attached hereto as **Exhibit 2** and incorporated herein.

87. As set forth in the Commissioner's Complaint against Mr. McKowen, Mr. Harding and others, Mr. McKowen raised more than $19,000,000 through several debt and equity offerings of unregistered, non-exempt securities. *Id.*

88. At the time, there were numerous material facts which were not disclose to prospective investors including, but not limited to:

a. Mr. McKowen had been suspended from association with any securities dealer by the NASD. *Id. at 8.*

b. Mr. McKowen also had prior bankruptcies. *Id.*

89. Mr. McKowen then participated in raising over $1,775,00 in private debt from at least 22 transactions. *Id.*

90. As a result, the Commissioner claimed Mr. McKowen and Mr. Harding, among others, committed securities fraud under Colorado law by offering and/or selling securities in a scheme to defraud, with untrue statements of material fact or omissions of material facts, to investors. *Id. at 28-32.*

91. Mr. McKowen has been the subject of several regulatory actions concerning securities broker's license. A copy of a report from FINRA, the SEC regulatory arm, on Mr. McKowen is attached hereto as **Exhibit 3** and incorporated herein. *See also, Exh. 1.*

92. Notwithstanding such prior disciplinary actions and the Colorado Securities Commissioner's action, Mr. McKowen continues to unlawfully solicit investors.

93. Mr. McKowen confirms, in this new solicitation, the GrowCo and GCP-1 Deeds of Trust were granted as part of his schemes to raise capital for their illegal cannabis business in 2015.

94. The GrowCo offerings in 2014 and 2015 conducted by Mr. McKowen and Mr. Harding offered and used the Reservoir and Water Rights to the GrowCo and GCP-1 investors additional collateral as a "back-stop" to their investments in GrowCo and GCP-1. *Exh. 1, at*

*10-11; Id. at 12-13.*

95. Such unlawful use of the Debtor's property further evidences the schemes of Mr. McKowen's and Mr. Harding's GrowCo solicitations. *Id.*

96. No consideration was paid to either this Debtor or Orlando by any person, by GrowCo or by any of the GrowCo Beneficiaries for the granting of encumbrances against the Reservoir and Water Rights.

97. In reality, Mr. McKowen and Mr. Harding used the Reservoir and Water Rights to further their scheme to defraud the investors in GrowCo and GCP-1, as well as the legitimate creditors of this Debtor and/or Orlando like the CWCB.

98. By this action, the Debtor seeks, among other things, a declaration the GrowCo Deed of Trust is void and/or to quiet title of the Reservoir Parcel and Water Rights in the Debtor.

99. The Defendants, including GrowCo and the GrowCo Beneficiaries, are therefore not valid creditors of the Debtor.

**C. GrowCo and GCP-1 Deeds of Trust**

100. On or about September 9, 2015, the Debtor and Orlando, through Mr. Harding, allegedly executed a Deed of Trust to GCP-1, for the benefit of approximately 100 Defendant Beneficiaries in the principal amount of $4,000,000 ("GCP-1 Deed of Trust" or "GCP-1 DOT"). A copy of the GCP-1 Deed of Trust is attached hereto as **Exhibit 4** and is incorporated herein.

101. The GCP-1 Deed of Trust was recorded with the Clerk and Recorder of Huerfano County, Colorado, at Reception No. 404224 on September 25, 2015. *Id.*

102. Upon information and belief, the GCP-1 Deed of Trust allegedly encumbers the Reservoir

Parcel (and Huerfano Water Rights, *see infra*). *See Exh. 4*.

103. Also on or about September 9, 2015, the Debtor and Orlando, again both through Mr. Harding, allegedly executed a Deed of Trust to GrowCo for the benefit of approximately 17 Defendant Beneficiaries in the principal amount of $4,000,000 ("GrowCo Deed of Trust" and/or "GrowCo DOT"). A copy of the GrowCo Deed of Trust is attached hereto as **Exhibit 5** and is incorporated herein.

104. The GrowCo Deed of Trust was recorded with the Clerk and Recorder of Huerfano County, Colorado, at Reception No. 404225 on September 25, 2015. *Id.*

105. Upon information and belief, the GrowCo Deed of Trust allegedly encumbers the Reservoir Parcel (and Huerfano Water Rights, *see supra*). *See Exh. 5*.

**D. <u>GrowCo Bankruptcy and Settlement</u>**

106. GrowCo filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on or about January 21, 2019, in the Bankruptcy Court for the District of Colorado, Case No. 19-10512-JGR ("GrowCo Bankruptcy Case").

107. On or about November 15, 2019, GrowCo commenced an adversary proceeding against Two Rivers, Adversary Proceeding No. 19-1337-JGR, seeking, among other things, repayment of a promissory note obligation ("First Adversary Proceeding").

108. GrowCo commenced another adversary proceeding on or about January 21, 2021, against TR Capital and Two Rivers, Adversary Proceeding No. 21-1020-JGR ("Second Adversary Proceeding"). The Second Adversary Proceeding sought, among other things, to avoid money transfers to Two Rivers and TR Capital.

109. On or about May 26, 2021, GrowCo, GCP-1, Two Rivers, TR Capital, among others, entered

into a Settlement Agreement (the "GPC-1 Settlement") in connection with GrowCo's bankruptcy case. A copy of this GCP-1 Settlement is attached hereto as **Exhibit 6** and incorporated herein.

110. Under the terms of the GCP-1 Settlement , GrowCo and GCP-1 agreed to release the GCP-1 Deed of Trust as such document was not a valid encumbrance, including as against any assets of the Debtor and/or Orlando. *Exh. 3, at 2.*

111. Under the terms of the GCP-1 Settlement, GrowCo and GCP-1 agreed to waive and release all claims against Two Rivers and TR Capital, including the Debtor and Orlando, from any and all claims. *Id. at 3.*

112. The waiver and release in the GCP-1 Settlement is extremely broad. *Id.*

113. Because of the broad waiver and release signed by GrowCo and GCP-1 in the GCP-1 Settlement, among other reasons, the GrowCo Deed of Trust is also invalid as against any assets of the Debtor and/or Orlando as well as any *in personam* claims against the Debtor and/or Orlando. *Id.*

114. The GrowCo and GCP-1 Deeds of Trust were both issued in connection with the same or similar investment scheme conducted by Mr. McKowen in connection with GrowCo. *See Exh. 1.*

115. As set forth above, the GrowCo and GCP-1 Deeds of Trust were offered by GrowCo, GCP-1, Mr. McKowen and Mr. Harding, among others, in connection with a fraudulent and illegal scheme to solicit investments in GrowCo for their federally illegal cannabis business.

116. No consideration was provided to the Debtor in exchange for the purported granting of the GrowCo and GCP-1 Deeds of Trust.

117. Any obligations owing to the GrowCo and/or GCP-1 Beneficiaries by the Debtor and/or any security interest in the Debtor's and the Estate's property, including all of the Debtor's real estate and water rights, is void for, among other things, as against public policy, an illegal scheme, a fraudulent transfer, and unjust enrichment.

118. GrowCo and GCP-1 are now deemed to have admitted to the illegality and fraudulent schemes of Mr. McKowen and Mr. Harding who unlawfully used the Debtor's assets for their private gain as the court in the Commissioner's Action entered a default against GrowCo and GCP-1. *See Exh. 2.*

**E. The Paulson Class Action Settlement**

119. One or more of the Defendants including, all persons who filed proofs of claim in the Debtor's underlying bankruptcy case and/or in Orlando's bankruptcy case, are and/or were members of a class of persons and/or entities that held claims on securities in GrowCo, GCP-1 and others, and purchased or otherwise acquired securities through Offerings during the period of October 2014 through December 2017 who suffered alleged losses therefrom.

120. On or about August 13, 2019, John Paulson, an alleged investor in GrowCo, and/or GCP-1, among other entities owned and/or controlled by Mr. McKowen and/or Mr. Harding, commenced a civil action in Colorado State Court (the "Paulson Action") against Mr. McKowen and Mr. Harding, among others, for alleged damages relating to several investments, including in GrowCo and/or GCP-1.

121. Mr. McKowen caused the Paulson Action to be removed to the United States District Court, for the District of Colorado, Case No. 19-CV-02639-PAB-NYW.

122. Mr. Paulson alleged, in his amended complaint that, among other things, Mr. McKowen, Mr.

Harding and others sold and promoted the Offerings to Mr. Paulson and others while omitting material information about Mr. McKowen's background.

123. Mr. Paulson further asserted claims against Mr. McKowen, Mr. Harding and others under the Colorado Securities Act, §11-51-101, *et. seq.*, and Colorado common law for failure to disclose the allegedly material information about Defendant McKowen's background in the Offering Documents. Mr. Paulson alleged his securities became worthless upon GrowCo's bankruptcy filing.

124. A Class of Plaintiffs (the "Class") was certified pursuant to Fed.R.Civ.P. 23(a). The Class included persons who obtained securities in GrowCo, GCP-1 and/or other subsidiaries during the period of October 2014 through December 2017 and suffered certain losses.

125. Mr. Paulson and the Class entered into a Settlement Agreement (the "Paulson Settlement") which was approved by the U.S. District Court in or around October 2020. Under the terms of the Paulson Settlement, all members of the class waived and released all claims against GrowCo, GCP-1 and others arising out of the "Offerings" which included the monies raised by GrowCo and/or GCP-1 identified in the GrowCo Deed of Trust and/or the GCP-1 Deed of Trust. *See Paulson Action, Case No. 19-CV-02639-PAB-NYW, Docket No. 131, at 25-52.*

126. As a result of the Paulson Settlement, all of the persons who are alleged GrowCo Beneficiaries under the GrowCo Deed of Trust have waived and released any and all claims arising out of such Offerings including claims against GrowCo and GCP-1, and thereby the Debtor. *Id.*

127. Based upon the terms of the Paulson Settlement, there are no obligations owing to any of the GrowCo Beneficiaries which relate to the GrowCo Deed of Trust.

128. Any and all claims of the GrowCo Beneficiaries were satisfied under the Paulson Settlement in or around October 2020.

129. As the debts underlying the GrowCo Deed of Trust were satisfied prior to the filing of the Debtor's bankruptcy case, the GrowCo Deed of Trust can no longer encumber any of the Debtor's assets, including the Reservoir Parcel and/or the Huerfano Water Rights.

130. The GrowCo Deed of Trust is therefore void and/or avoidable.

**F. Bankruptcy Case**

*1. Disputed, Contingent and Unliquidated Creditors*

131. The Debtor scheduled GrowCo and the GrowCo Beneficiaries as contingent, disputed, and unliquidated creditors. Several of the GrowCo Beneficiaries filed claims against the Debtor and/or Orlando including Blue & Green, LLC, VetaNova, LLC and/or John McKowen.

*2. Persons Who Filed Proofs of Claim Asserting an Interest in Property of the Estate*

132. Mr. David Marshall filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $60,000 allegedly from a "Loan/Debt Collateral". *See Proof of Claim No. 1.* Mr. Marshall asserts his claim is secured by a Deed of Trust against an unknown real estate. *Id.*

133. The Dan Foster IRA filed proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $355,107.00, allegedly from a "as per section of Secured Note Agreement". *See Proof of Claim No. 3.* The Dan Foster IRA asserts a secured claim pursuant to a Deed of Trust against an unknown real estate. *Id.* None of documentation attached to the Dan Foster IRA proof of claim evidences any obligation of the Debtor, nor any assets of the Debtor which may be subject to a lien held by the Dan Foster IRA. *Id.*

134. VetaNova proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $7,213,515.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC". *See Proof of Claim No. 4.* VetaNova asserts its claim is secured by "Huerfano County, CO Deed of Trusts 404224 & 404225". *Id.* None of documentation attached to the VetaNova proof of claim evidences any obligation of the Debtor. *Id.*

135. Mr. McKowen filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $2,391,913.00 allegedly from a "Money Invested and/or Loaned". *See Proof of Claim No. 5.* Mr. McKowen allegedly acquired his claim from VetaNova. *Id.* Mr. McKowen asserts a secured claim by virtue of a "Deed of Trusts Huerfano County, CO #404224 and 404225". *Id.* None of documentation attached to Mr. McKowen's proof of claim evidences any obligation of the Debtor. *Id.*

136. Prasil Family Matters, LLC filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $1,825,425.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC". *See Proof of Claim No. 6.* Prasil Family Matters, LLC acquired this claim from the "Beneficiaries of Huerfano County, CO Deeds of Trust 404224 & 404225". *Id.* Prasil Family Matters, LLC also asserts VetaNova, Inc., previously filed a proof of claim for the amounts claimed by Prasil Family Matters, LLC. *Id.* Prasil Family Matters, LLC asserts a secured claim by virtue of "Beneficiaries of Deed of Trusts 404224 and 404225". *Id.* None of documentation attached to Prasil Family Matters, LLC's proof of claim evidences any obligation of the Debtor. *Id.*

137. Blue & Green, LLC filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $5,419,569.82 allegedly from a "See attached rider". *See*

*Proof of Claim No. 7.* Blue & Green, LLC asserts a secured claim by virtue of "Deed of Trust" against "Water Rights and Real Estate". *Id.* None of documentation attached to the Blue & Green, LLC proof of claim evidences any obligation of the Debtor. *Id.*

138. Jon D. and Linda W. Gruber Trust filed a proof of claim in the Debtor's bankruptcy case asserting a secured claim in the amount of $561,013.00 allegedly from a "Preferred Investment in GrowCo Partners 1, LLC." *See Proof of Claim No. 8.* The Jon D. and Linda W. Gruber Trust allegedly acquired its claim from "GrowCo Partners 1, LLC and VitaNova Partners, LLC". *Id.* The Jon D. and Linda W. Gruber Trust asserts a secured claim by virtue of "Beneficiaries of Huerfano County, CO Deeds of Trust 404224 & 404225". *Id.* None of documentation attached to the Gruber Trust proof of claim evidences any obligation of the Debtor. *Id.*

139. Dr. Anderson filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $485,289.00 allegedly for "Money Invested and/or Loaned" secured by "Deeds of Trust Huerfano County, CO #404224 and 404225." *See Proof of Claim No. 9.* None of documentation attached to Dr. Anderson's proof of claim evidences any obligation of the Debtor. *Id.*

140. Ms. Loughran filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $80,000 allegedly for "unpaid interest and principal on GrowCo note" secured by "Deeds of Trust on the Orlando Co & FarmF2." *See Proof of Claim No. 10.* None of documentation attached to Ms. Loughran's proof of claim evidences any obligation of the Debtor. *Id.*

141. Mr. Blum filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a

secured claim in the amount of $50,000 allegedly for "money loaned" secured by "Orlando Property Water & Rights." *See Proof of Claim No. 11.* None of documentation attached to Mr. Blum's proof of claim evidences any obligation of the Debtor. *Id.*

142. Mr. Guy filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $65,000 allegedly for "money loaned" secured by "Orlando Reservoir #2 Parcel." *See Proof of Claim No. 12.* None of documentation attached to Mr. Guy's proof of claim evidences any obligation of the Debtor. *Id.*

143. Mr. and Ms. Curtis jointly filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $85,000 allegedly for "money loaned" secured by "orlando reservoir #2 parcel water rights." *See Proof of Claim No. 13.* No documentation attached to the Curtis' proof of claim evidences any obligation of the Debtor. *Id.*

144. Mr. Marrinan's IRA filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting an unsecured claim in the amount of $90,000 allegedly for "money loaned." *See Proof of Claim No. 14.* Such entity did not file any supporting documentation with their claim. *Id.* As such, the Debtor asserts it does not owe any money to this entity.

145. Richland Fund, LLC filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $461,143.00 allegedly for "money loaned" secured by "Water Rights." *See Proof of Claim No. 15.* The Debtor asserts this obligation was satisfied pre-petition. Richland Fund, LLC did not attach any security documents to its proof of claim. *Id.*

146. Mr. Rosch filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $13,250.00 allegedly for "I own stock in this Company." *See*

*Proof of Claim No. 16.* None of documentation attached to Mr. Rosch's proof of claim evidences any obligation of the Debtor. *Id.*

147. Mr. Poremba filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a unsecured claim in the amount of $44,144.22 allegedly for "Preferred stock purchase and dividends." *See Proof of Claim No. 17.* None of documentation attached to Mr. Poremba's proof of claim evidences any obligation of the Debtor. *Id.*

148. Mr. Cain filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a unsecured claim in the amount of $25,000 allegedly for "check." *See Proof of Claim No. 19.* None of documentation attached to Mr. Cain's proof of claim evidences any obligation of the Debtor. *Id.*

149. High Speed Aggregate, Inc. filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of "Unknown - $52k" allegedly for "Investment into TR Capital - Growco shares GCP-1" secured by "Real Estate and Water Rights." *See Proof of Claim No. 20.* High Speed Aggregate did not attach any documentation to its proof of claim evidencing any obligation and/or security of the Debtor. *Id.*

150. Several Preferred Members of TR Capital Partners, LLC, filed a Proof of Claim in the Debtor's underlying bankruptcy case asserting a secured claim in the amount of $24,500,000 allegedly for "Money Invested or Loaned" secured by "DOT #404224." *See Proof of Claim No. 21.* None of documentation attached to these Preferred Members' proof of claim evidences any obligation of the Debtor. *Id.*

**FIRST CLAIM FOR RELIEF**
(11 U.S.C. §541 - Declaratory Judgment)

151. The Debtor incorporates by this reference all prior allegations.

152. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

153. The Debtor's rights to the Reservoir Parcel and/or the Huerfano Water Rights are affected by the GrowCo Deed of Trust and the interests of the Defendants, including GrowCo and/or the GrowCo Beneficiaries (and any assignee thereof), if any, in such real property.

154. There exists an actual controversy as to the rights and interests of the Parties as to the Defendants' interests, including GrowCo and/or the GrowCo Beneficiaries, in the Reservoir Parcel and/or Huerfano Water Rights.

155. Such controversy arises out of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the GrowCo Beneficiaries, the fraudulent schemes perpetrated by them, the releases in the GCP-1 Settlement and the waivers and releases in the Paulson Settlement.

156. There is a dispute as to the nature, extent, and validity of the Defendants' interests, including GrowCo and/or the GrowCo Beneficiaries, in the Reservoir Parcel and/or Huerfano Water Rights pursuant to the GrowCo Deed of Trust.

157. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against the Defendants, including GrowCo and/or the GrowCo Beneficiaries (including any assignee thereof) concerning the nature, extent, and validity of the Defendants' alleged right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights.

158. The issuance of a declaratory judgment will settle and afford relief from uncertainty and insecurity with regards to the rights and status of the Defendants' alleged right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights.

WHEREFORE, the Debtor respectfully requests this Court to enter declaratory judgment declaring the rights of the Debtor in and to the Reservoir Parcel and the Huerfano Water Rights to be exclusive of any rights, title and/or interests of the all of the Defendants including, GrowCo and/or the GrowCo Beneficiaries, declaring all of the Parties' rights, title, and interests with respect to the GrowCo Deed of Trust including, voiding such instrument, declaring all the Parties's rights, title, and interests with respect to the Reservoir Parcel and/or the Huerfano Water Rights, to award the Debtor all of its attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as the Court deems appropriate.

**SECOND CLAIM FOR RELIEF**
(11 U.S.C. §541 - Quiet Title)

159. The Debtor incorporates by this reference all prior allegations.

160. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

161. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, assert a right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights based on the GrowCo Deed of Trust. *See Exhs. 5.*

162. The Defendants' interests, including GrowCo and/or the GrowCo Beneficiaries, if any, arise out of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the GrowCo Beneficiaries and GCP-1 Beneficiaries and, the

fraudulent schemes perpetrated by them.

163. The Defendants' debts, including any debts owed to GrowCo and/or the GrowCo Beneficiaries, were satisfied pre-petition by, among other things, the releases in the GCP-1 Settlement and the waivers and releases in the Paulson Settlement.

164. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, no longer hold any interests in the Debtor's assets including, the Reservoir Parcel and the Huerfano Water Rights as they pertain to the GrowCo Deed of Trust.

165. The releases by GrowCo in the GCP-1 Settlement, including the release of all claims against Two Rivers, TR Capital, and their affiliates, included the Debtor as well as any and all claims and/or interests in any asset of the Debtor. *Id.* ¶4.

166. As a result of the releases by GrowCo in the GCP-1 Settlement, GrowCo Deed of Trust is also invalid. *Id.* ¶4.

167. As a result of the releases by GrowCo in the GCP-1 Settlement, the GrowCo Deed of Trust, to the extent it may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

168. As a result of the events described above including, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the GrowCo Beneficiaries, and the fraudulent schemes perpetrated by them, the GrowCo Deed of Trust, to the extent such document may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

169. Default was entered against GrowCo and GCP-1, among others, in the Commissioner's Action. As a result, GrowCo and GCP-1 are deemed to have committed illegal and/or

fraudulent acts such that the GrowCo Deed of Trust, to the extent such document may encumber the Reservoir Parcel and/or Huerfano Water Rights, is no longer a valid instrument.

170. None of the Defendants, including GrowCo and/or the GrowCo Beneficiaries, have any right, title, and/or interest to or in the Reservoir Parcel and/or the Huerfano Water Rights.

171. Pursuant to C.R.C.P. 105, this Court may quiet title of the Reservoir Parcel and the Huerfano Water Rights, including all right, title and interest, in the Debtor to the exclusion of the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of and/or relating to the GrowCo Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in the Debtor's favor and against all of the Defendants quieting title to the Reservoir Parcel and Huerfano Water Rights in the Debtor free and clear of any and all liens, claims, interests and/or encumbrances by all the Defendants, including the GrowCo Deed of Trust, to otherwise declare the GrowCo Deed of Trust invalid, to award the Debtor all of its attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as this Court deems appropriate.

**THIRD CLAIM FOR RELIEF**
(Objection to Claim - 11 U.S.C. §502)

172. The Debtor incorporates by this reference all prior allegations.

173. Out of an abundance of caution, the Debtor scheduled GrowCo as a disputed, contingent, and unliquidated secured creditor of the Debtor.

174. The Debtor scheduled the GrowCo Beneficiaries as unsecured, disputed, contingent, and unliquidated creditors of the Debtor.

175. The Debtor scheduled the alleged claims of Mr. McKowen and Mr. Harding as contingent,

unliquidated, and disputed.

176. Several of the Defendants including one or more of the GrowCo Beneficiaries have filed proofs of claim in the underlying bankruptcy case, including:

a. David Marshall
b. Dan Foster, IRA;
c. VetaNova, Inc.;
d. Mr. McKowen;
e. Prasil Family Matters, LLC;
f. Blue & Green, LLC;
g. John D. And Linda W. Gruber Trust;
h. Mary Loughran;
i. John J. Blum;
j. Frank Guy;
k. Charles & Sandra Curtis;
l. IRA FOB Stephen Robert Marrinan;
m. Richland Fund, LLC;
n. George Rosch;
o. Geoffrey Poremba;
p. Donald Jeffrey Cain;
q. High Speed Aggregate, Inc.; and,
r. Preferred Members of TR Capital Partners.
s. (collectively the "Filed Claims").

177. 11 U.S.C. §502(b) provides that if an objection to a claim is made, the Court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the Petition Date, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for reason other than because such claim is contingent or unmatured.

178. While filing a proof of claim constitutes prima facie evidence of a claim, such presumption is rebuttable. Fed.R.Bankr.P. 3001(f); *In re Kirkland*, 572 F.3d 838 (10th Cir. 2009). If evidence rebutting a proof of claim is brought forth, the claimant must produce additional

evidence to prove validity of the claim by a preponderance of the evidence. *Id.*; See *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140 (10th Cir. BAP 2003) (discussing burden of proof in claims objection proceeding and noting that if a proof of claim is executed or filed improperly "it is not prima facie evidence of [the claim] and [the claimant] would have the initial burden of proving a claim exists and the amount of that claim"). A claim is not deemed filed under 11 U.S.C. §501 if such claim is scheduled as disputed, contingent, or unliquidated. 11 U.S.C. §1111(a).

179. If a creditor fails to carry its ultimate burden in proving validity and amount of its claim, a debtor's objection should be sustained. *In re Geneva Steel Colorado.*, 260 B.R. 517 (10th BAP 2001), judgment aff'd 281 F.3d 1173 (10th Cir. 2002).

180. As set forth above, the Defendants' interests, including GrowCo, the GrowCo Beneficiaries and/or the Filed Claims, if any, are void and/or voidable because of several pre-petition events including, as described above, the securities violations by Mr. McKowen and Mr. Harding, GrowCo and GCP-1, and others, their violations of the CSA in offering securities to the GrowCo Beneficiaries and the fraudulent schemes perpetrated by them.

181. Similarly, the debts allegedly owed to the Defendants, including GrowCo, the GrowCo Beneficiaries and/or the Filed Claims, if any, were satisfied pre-petition by, among other things, the releases in the GCP-1 Settlement and the waivers and releases in the Paulson Settlement.

182. As set forth above, the Defendants' claims, including the Filed Claims, were voluntarily released and/or are invalid, are void, are void *ab initio*, voidable, illegal, unenforceable, and/or void as against public policy, among other things.

183. One or more of the Defendants' claims, including the Filed Claims, lacks supporting documentation and/or the documentation included fails to identify any obligation owed by the Debtor to such claimant.

184. Pursuant to Fed.R.Bankr.P. 3001(c)(1), if a proof of claim is based upon a writing, a copy of the writing shall be filed with the proof of claim. Similarly, pursuant to Fed.R.Bankr.P. 3001(d), if a security interest in property of the debtor is claimed, the proof of claim shall be accompanied by evidence that the security interest has been perfected.

185. When a party fails to attach supporting documentation to a claim, the burden more readily shifts to the creditor, who then bears the obligation of persuasion to establish the enforceability, amount, and perfection of an asserted, secured claim. *Agricredit Corp. v. Harrison (In re Harrison)*, 987 F. 2d 677, 680 (10th Cir.1993); *Allen v. Geneva Steel Co. (In re Geneva Steel Co.)*, 260 B.R. 517, 524 (10th Cir. BAP 2001). *See also, Caplan v. B–Line, LLC (In re Kirkland)*, 572 F.3d 838, 840-41 (10th Cir. 2009) (holding without required supporting documentation, "the burden would have improperly rested with the Trustee to disprove an unsubstantiated claim"); *see also Campbell v. Verizon Wireless S-CA (In re Campbell)*, 336 B.R. 430, 432 (9th Cir. BAP 2005) ("[A] proof of claim filed without sufficient documentation does lack prima facie validity: the claim very likely will not survive a bona fide legal or factual objection absent an adequate response by the creditor.").

186. The Debtor asserts the Defendants, including the Filed Claims, are not valid creditors of the Debtor and/or the Debtor's Estate.

187. This Court therefore must determine whether any of the Defendants' claims, including the Filed Claims, are allowed as against the Debtor and/or the Estate, if allowed, determine the

amount, if any, owed to such Defendants, including the Filed Claims, and determine whether such persons have any claim against property of the Estate. 11 U.S.C. §502(b).

WHEREFORE, the Debtor respectfully requests, pursuant to 11 U.S.C. §502(b), this Court to enter judgment in favor of the Debtor and against the Defendants, including GrowCo, the GrowCo Beneficiaries and the persons holding Filed Claims, determining whether such persons asserted claims are allowed as against the Debtor and/or the Estate, determining the amount of the Defendants' claims, if any, determine whether such persons have any claim against property of the Estate and, to grant such other relief as the Court deems appropriate.

## FOURTH CLAIM FOR RELIEF
(Objection to Untimely Claims - 11 U.S.C. §502)

188. The Debtor incorporates by this reference all prior allegations.

189. The Debtor scheduled GrowCo along with all of the GrowCo Beneficiaries as well as Mr. McKowen and Mr. Harding, as unsecured, disputed, contingent, and unliquidated creditors of the Debtor.

190. Pursuant to Fed.R.Bankr.P. 3003(b)(1), if a debtor schedules a claim as undisputed, not contingent and liquidated in a Chapter 11 case, the creditor is not required to file a proof of claim.

191. GrowCo, the GrowCo Beneficiaries, and all other creditors were all therefore required to file proofs of claim in the Debtor's underlying bankruptcy case.

192. The Court set March 14, 2024 ("Bar Date") as the date for all creditors (except governmental claims) to file proofs of claim in the Debtor's underlying bankruptcy case.

193. Several of the GrowCo Beneficiaries failed to file proofs of claim in the Debtor's underlying bankruptcy case (collectively the "Untimely Claims"). A list of the Untimely Claims is

attached hereto as **Exhibit 7** and incorporated herein.

194. 11 U.S.C. §502(b) provides that if an objection to a claim is made, the Court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the Petition Date, and shall allow such claim in such amount, except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for reason other than because such claim is Contingent or unmatured.

195. While filing a proof of claim constitutes prima facie evidence of a claim, such presumption is rebuttable. Fed.R.Bankr.P. 3001(f); *In re Kirkland*, 572 F.3d 838 (10th Cir. 2009). If evidence rebutting a proof of claim is brought forth, the claimant must produce additional evidence to prove validity of the claim by a preponderance of the evidence. *Id.*; See *Wilson v. Broadband Wireless Int'l Corp. (In re Broadband Wireless Int'l Corp.)*, 295 B.R. 140 (10th Cir. BAP 2003) (discussing burden of proof in claims objection proceeding and noting that if a proof of claim is executed or filed improperly "it is not prima facie evidence of [the claim] and [the claimant] would have the initial burden of proving a claim exists and the amount of that claim"). A claim is not deemed filed under 11 U.S.C. §501 if such claim is scheduled as disputed, contingent, or unliquidated. 11 U.S.C. §1111(a).

196. If a creditor fails to carry its ultimate burden in proving validity and amount of its claim, a debtor's objection should be sustained. *In re Geneva Steel Colorado.*, 260 B.R. 517 (10th BAP 2001), judgment aff'd 281 F.3d 1173 (10th Cir. 2002).

197. As the Untimely Claims were not filed by the Bar Date, this Court should disallow all such claims. *See Grynberg v. United States (In re Grynberg)*, 986 F.2d 367 (10th Cir. 1993).

198. Such Untimely Claims must be prohibited from voting on any plan and prohibited from receiving any distribution from the Estate. *Id.*

WHEREFORE, the Debtor respectfully requests, pursuant to 11 U.S.C. §502(b), this Court to enter judgment in favor of the Debtor and against any of the Defendants who hold Untimely Claims and/or whose claims were scheduled by the Debtor as disputed, contingent, and/or unliquidated who failed to timely file a claim, disallowing all such claims, including the Untimely Claims, if any, and to grant such other relief as the Court deems appropriate.

**<u>FIFTH CLAIM FOR RELIEF</u>**
(Determination of Secured Status Pursuant to 11 U.S.C. §506)

199. The Debtor incorporates by this reference all prior allegations.

200. Pursuant to 11 U.S.C. §506(a)(1), an allowed claim of a secured creditor secured by a lien on property in which the estate has an interest is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, and is an unsecured claim to the extent the value of such creditor's interest is less than the amount of such allowed claim.

201. Most, if not all, of the Defendants' claims, including GrowCo, the GrowCo Beneficiaries, and the Filed Claims, assert their claims are, at least in part, secured by the Debtor's assets.

202. As set forth above, there is a dispute nature, extent, and validity of the GrowCo Deed of Trust, including the nature, extent and validity of the security interest in and lien upon the Debtor's assets including the Reservoir Parcel and the Huerfano Water Rights.

203. To the extent the GrowCo Deed of Trust is valid as against the Debtor (which is denied), the appraised value of the Reservoir Parcel and the Huerfano Water Rights, collectively, is less than the amount of the filed proofs of claim asserting a security interest thereon including

all claims senior to those of the GrowCo Deed of Trust.

204. To the extent any of the Defendants, including the GrowCo Beneficiaries and/or the Filed Claims (assuming their claims are valid and allowed) do not have a properly perfected lien upon the Debtor's assets including the Reservoir Parcel and the Huerfano Water Rights, they are unsecured creditors.

205. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against all of the Defendants' claims, including any claims of the GrowCo Beneficiaries and the Filed Claims, as to the secured status of such alleged creditors in the underlying bankruptcy case. 11 U.S.C. §506.

206. Similarly, the Debtor seeks declaratory relief to the extent that any of the Defendants' claims, including any of the GrowCo Beneficiaries' claims and/or the Filed Claims are secured creditors, the value of the collateral is less than the amount owed to such claims. *Id.* As a result, any such secured claim(s) (which is disputed) should be reduced to the value of the collateral. *Id.* Any amounts over the value of the collateral must be treated as an unsecured claim. *Id.*

WHEREFORE, the Debtor respectfully requests this Court to enter a declaratory judgment declaring the rights of all of the parties with respect to the secured status of the Defendants' claims, if any, including the GrowCo Beneficiary Claims and/or the Filed Claims and, to the extent such claims are secured creditors and the value of the collateral is less than the amount owed to such claims that such claims are unsecured and/or undersecured pursuant to 11 U.S.C. §506, for the Debtor's costs and attorney's fees as provided by statute or agreement and, to grant such other relief this Court deems appropriate.

**SIXTH CLAIM FOR RELIEF**
(11 U.S.C. §544(b) & C.R.S. §38-8-105)

207. The Debtor incorporates by this reference all prior allegations.

208. The Debtor scheduled an indebtedness owed to the IRS for past due taxes as the Debtor has not yet filed its tax returns for the years 2019 through 2023.

209. The IRS filed a proof of claim in the Debtor's underlying bankruptcy case asserting a claim, both priority and unsecured, in the amount of $6,768.86.

210. The Debtor brings this claim pursuant to 11 U.S.C. §544(b) and C.R.S. §38-8-105, "standing in the shoes" of an existing creditor with an actual claim who could avoid the transfers in question. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). *See also,* 11 U.S.C. §1108.

211. Pursuant to the holding in *Lofstedt v. Oletski-Behrends (In re Behrends)*, Adv. Proc. No. 14-1377-EEB, slip op. at 9-11 (Bankr.D.Colo. Apr. 10, 2017), the Debtor may assert state law fraudulent transfers claims which occurred up to 10 years prior to the Petition Date as the Debtor may "stand in the shoes" of the IRS's statute of limitation. *See* 26 U.S.C. § 6502.

212. The Debtor voluntarily and/or involuntarily transferred an interest in the Debtor's property, specifically the Reservoir Parcel and the Huerfano Water Rights, to one or more of the Defendants, including GrowCo and/or the GrowCo Beneficiaries, within 10 years prior to the Petition Date via the GrowCo Deed of Trust.

213. One or more of the Debtor's pre-petition transfers to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising from the GrowCo Deed of Trust were made with the actual intent to hinder, delay, and/or defraud the Debtor's creditors, including the IRS.

214. Pursuant to C.R.S. § 38-8-105(1)(a), one or more of the Debtor's pre-petition transfers to the

Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of the GrowCo Deed of Trust are avoidable as the Debtor made such transfers with the actual intent to hinder, delay or defraud creditors of the Debtor.

215. The Debtor, with rights as a hypothetical lien creditor and as a creditor holding an unsatisfied claim on the Petition Date, may avoid one or more of these pre-petition transfers to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of and/or related to the GrowCo Deed of Trust under applicable state fraudulent transfer law, whether or not such creditor exists. 11 U.S.C. §544; C.R.S. §38-8-105.

216. In addition, the Debtor's pre-petition transfers to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of and/or relating to the GrowCo Deed of Trust are voidable under applicable non-bankruptcy law by a creditor holding an unsecured claim in the Debtor's bankruptcy case with allowable unsecured claims who could avoid the transfers under applicable non-bankruptcy law, including the IRS.

217. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, are the initial transferees of the Debtor's pre-petition transfers, arising out of and/or relating to the GrowCo Deed of Trust and the entities for whose benefit such transfers were made.

218. One or more of the badges of fraud exist with respect to the Debtor's pre-petition transfers to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of and/or relating to the GrowCo Deed of Trust including, but not limited to, GrowCo was owned and/or controlled by the then principals of the Debtor including, Mr. McKowen and/or Mr. Harding, the lack of any consideration, as well as one or more of the badges set forth in C.R.S. §38-8-105(2).

219. Pursuant to 11 U.S.C. §550 and/or C.R.S. §§38-8-108(1)(a) and 38-8-109(2), the Debtor may recover the property transferred or the value of such property from:

a. the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
b. any immediate or mediate transferee of such initial transfer.

220. Pursuant to C.R.S. §38-8-108, the Debtor may obtain:

a. avoidance of the transfer or obligation to the extent necessary to satisfy creditor claims;
b. an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the Colorado rules of civil procedure;
c. a judgment for one and one-half the value of the asset transferred or for one and one-half the amount necessary to satisfy creditor claims, whichever is less, together with the Debtor's actual costs;
d. Subject to the applicable principles of equity and in accordance with applicable rules of civil procedure:
    i. an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property;
    ii. appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
    iii. any other relief the circumstances may require.

221. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, lack a good faith defense to the Debtor's pre-petition transfers of property of the Estate arising out of and/or relating to the GrowCo Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in its favor and against the Defendants, including GrowCo and the GrowCo Beneficiaries, to avoid and recover the Debtor's pre-petition transfers of property of the Estate, including the GrowCo Deed of Trust, and/or the value thereof pursuant to 11 U.S.C. §§548(a) and 550 and C.R.S. §38-8-105(1)(a), for all of the Debtor's attorney fees and costs as provided by law and/or agreement and, to grant such other relief as this Court deems appropriate.

## SEVENTH CLAIM FOR RELIEF

(11 U.S.C. §544(b) & C.R.S. §38-8-105)

222. The Debtor incorporates by this reference all prior allegations.

223. The Debtor scheduled an indebtedness owed to the IRS for past due taxes as the Debtor has not yet filed its tax returns for the years 2019 through 2023.

224. The IRS filed a proof of claim in the Debtor's underlying bankruptcy case asserting a claim, both priority and unsecured, in the amount of $6,768.86.

225. The Debtor brings this claim pursuant to 11 U.S.C. §544(b) and C.R.S. §38-8-105, "standing in the shoes" of an existing creditor with an actual claim who could avoid the transfers in question. *See Sender v. Simon*, 84 F.3d 1299, 1304 (10th Cir. 1996). *See also,* 11 U.S.C. §1108.

226. Pursuant to the holding in *Lofstedt v. Oletski-Behrends (In re Behrends)*, Adv. Proc. No. 14-1377-EEB, slip op. at 9-11 (Bankr.D.Colo. Apr. 10, 2017), the Debtor may assert state law fraudulent transfers claims which occurred up to 10 years prior to the Petition Date as the Debtor may "stand in the shoes" of the IRS's statute of limitation. *See* 26 U.S.C. § 6502.

227. The Debtor voluntarily and/or involuntarily transferred an interest in the Debtor's property, specifically the Reservoir Parcel and the Huerfano Water Rights, to the Defendants including GrowCo and/or the GrowCo Beneficiaries, within 10 years prior to the Petition Date via the GrowCo Deed of Trust.

228. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, are the initial transferees of the Debtor's pre-petition transfers, arising out of and/or relating to the GrowCo Deed of Trust and the entities for whose benefit such transfers were made.

229. The Debtor did not receive reasonably equivalent value from the Defendants, including

GrowCo and the GrowCo Beneficiaries, in exchange for the pre-petition transfers of its property to such persons arising out of and/or relating to the GrowCo Deed of Trust.

230. The Defendants, including GrowCo and/or the GrowCo Beneficiaries, did not give reasonably equivalent value to the Debtor in exchange for the Debtor's pre-petition transfers of property to them including the GrowCo Deed of Trust.

231. At the time the Debtor made one or more of pre-petition transfers of its property to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out of and/or relating to the GrowCo Deed of Trust, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

232. The Debtor, with rights as a hypothetical lien creditor and as a creditor holding an unsatisfied execution on the Petition Date, may avoid one or more of the Debtor's pre-petition transfers of property including transfers pursuant to the GrowCo Deed of Trust, under applicable state fraudulent transfer law, whether or not such creditor exists. 11 U.S.C. §544; C.R.S. §38-8-105.

233. In addition, the Debtor's pre-petition transfers to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, including the transfers pursuant to the GrowCo Deed of Trust, are voidable under applicable non bankruptcy law by a creditor holding an unsecured claim in the Debtor's bankruptcy case with allowable unsecured claims who could avoid the transfers under applicable non-bankruptcy law, including the IRS.

234. Pursuant to C.R.S. § 38-8-105(1)(b), one or more of the Debtor's pre-petition transfers of property to the Defendants, including GrowCo and/or the GrowCo Beneficiaries, arising out

of and/or relating to the GrowCo Deed of Trust, are avoidable as the Debtor made such transfers:

a. Without receiving a reasonably equivalent value in exchange for such transfers, and the Debtor:
b. Was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or
c. Intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

235. Pursuant to 11 U.S.C. §550 and/or C.R.S. §§38-8-108(1)(a) and 38-8-109(2), the Debtor may recover the property transferred or the value of such property from:

a. the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
b. any immediate or mediate transferee of such initial transfer.

236. Pursuant to C.R.S. §38-8-108, the Debtor may obtain:

a. avoidance of the transfer or obligation to the extent necessary to satisfy creditor claims;
b. an attachment or other provisional remedy against the asset transferred or other property of the transferee in accordance with the Colorado rules of civil procedure;
c. a judgment for one and one-half the value of the asset transferred or for one and one-half the amount necessary to satisfy creditor claims, whichever is less, together with the Debtor's actual costs;
d. Subject to the applicable principles of equity and in accordance with applicable rules of civil procedure:
    i. an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property;
    ii. appointment of a receiver to take charge of the asset transferred or of other property of the transferee; or
    iii. any other relief the circumstances may require.

WHEREFORE, the Debtor respectfully requests this Court to enter a judgment in its favor and against the Defendants including, GrowCo and/or the GrowCo Beneficiaries, to avoid and recover the Debtor's pre-petition transfers of property of the Estate, specifically the GrowCo Deed of Trust, and/or the value thereof pursuant to 11 U.S.C. §§544 and 550 and C.R.S. §38-8-105(1)(b),

for all of the Debtor's attorney fees and costs as provided by law and/or agreement and, to grant such other relief as this Court deems appropriate.

**EIGHTH CLAIM FOR RELIEF**
(11 U.S.C. §551)

237. The Debtor incorporates by this reference all prior allegations.

238. To the extent the Debtor avoids any pre-petition transfers of property to the Defendants including, GrowCo and/or the GrowCo Beneficiaries, arising out of and/or relating to the GrowCo Deed of Trust, pursuant to 11 U.S.C. §551 such avoided transfer and/or lien is preserved for the benefit of the Debtor's bankruptcy estate.

WHEREFORE, the Debtor respectfully requests this Court to enter judgment in its favor and against the Defendants including, GrowCo and/or the GrowCo Beneficiaries, to preserve any avoided transfer and/or avoided lien for the benefit of the Estate pursuant to 11 U.S.C. § 551, for the Debtor's attorney fees and costs as provided by law and/or agreement and, to grant such other relief as this Court deems appropriate.

**<u>NINTH CLAIM FOR RELIEF</u>**
(Illegality/Void Against Public Policy)

239. The Debtor incorporates by this reference all prior allegations.

240. The Debtor is the owner of all right, title, and/or interest in or to the Reservoir Parcel and/or Huerfano Water Rights which are located within the State of Colorado. 11 U.S.C. §541(a).

241. The Debtor's rights to the Reservoir Parcel and/or the Huerfano Water Rights are affected by the GrowCo Deed of Trust, as well as the interests of the Defendants including GrowCo and/or the GrowCo Beneficiaries (and any assignee thereof), if any, in such real property.

242. All property rights in bankruptcy are derived from non-bankruptcy law, including applicable State law. *Butner v. U.S.*, 440 U.S. 48 (1979).

243. The GrowCo Deed of Trust was used, at least in part, to raise funds for a federally illegal activity, specifically the cannabis business. Cannabis is illegal under Federal Law. *See fn. 1, supra.*

244. Assisting others in businesses and activities that violate the CSA is also a crime. *See* 21 U.S.C. §846.

245. The GrowCo Deed of Trust, the interests of the Defendants including, GrowCo and/or the GrowCo Beneficiaries' interests (and any assignee thereof), if any, in such real property arising from such instruments, are void as against public policy as such documents were executed and delivered in furtherance of an illegal activity. *Blue Dolphin Inv., Ltd. v. Kane*, 687 P.2d 533, 534 (Colo. App. 1984)("we will not give effect to a contractual provision which has as its purpose wrongful preclusion of a third party's exercise of a valid contractual right) *citing* Restatement (Second) of Contracts, § 194 (1981); *see also Core-Mark Midcontinental, Inc. v. Somitrol Corp.*, 300 P.3d 963, 967 (Colo.App. 2012) (courts will not

enforce contract provision contrary to public policy).

246. The GrowCo Deed of Trust was void *ab initio* as the product of a federally illegal activity. *See F.D.I.C. v. Am. Cas. Co.*, 843 P.2d 1285, 1290 (Colo.1992)(voiding contractual provisions as against public policy); *Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo.App. 2002)(same).

247. There exists an actual controversy as to the rights and interests of the Parties as to the Defendants' interests in and/or to the Reservoir Parcel and/or Huerfano Water Rights arising out of and/or relating to the GrowCo Deed of Trust.

248. Pursuant to 28 U.S.C. §2201 and Fed.R.Bankr.P. 7001(9), the Debtor seeks declaratory relief against the Defendants' interests (including any assignee thereof), if any, in or to the Reservoir Parcel and/or Huerfano Water Rights arising out of and/or related to the GrowCo Deed of Trust is void as against public policy.

249. The issuance of a declaratory judgment will settle and afford relief from uncertainty and insecurity with regards to the rights and status of the Defendants including GrowCo and/or the GrowCo Beneficiaries, in or to the Reservoir Parcel and/or Huerfano Water Rights arising out of and/or related to the GrowCo Deed of Trust.

WHEREFORE, the Debtor respectfully requests this Court to enter declaratory judgment in its favor and against the Defendants including, GrowCo and/or the GrowCo Beneficiaries, declaring the GrowCo Deed of Trust void *ab initio* as against public policy, to award the Debtor all of its

attorney fees and costs as provided by agreement and/or at law and, to grant such other relief as the Court deems appropriate.

Dated: May 23, 2024.

Respectfully submitted,
BUECHLER LAW OFFICE, LLC

*<u>/s/ K. Jamie Buechler</u>*

K. Jamie Buechler, #30906
*Gender Pronouns She/Her*
Jordan (Thomas) O'Connell, #59395
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel:720-381-0045
Fax: 720-381-0382
Jamie@KJBlawoffice.com
Jordan@KJBlawoffice.com
**ATTORNEYS FOR THE DEBTOR**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>TWO RIVERS FARMS F-2, INC.,<br><br>Debtor. | Case No. 23-15627 KHT<br><br>Chapter 11 |
| TWO RIVERS FARMS F-2, INC.,<br><br>Plaintiff,<br><br>v.<br><br>GROWCO INC., et al.,<br><br>Defendants. | Adversary No. 24-01112 KHT |

## ORDER DISMISSING ADVERSARY PROCEEDING

THIS MATTER comes before the Court on its own review of the file. By Order entered April 1, 2025 (docket #60), the Court granted the Motion to Withdraw as Counsel (docket #57) filed by Plaintiff's counsel. That same date, the Court entered an Order Regarding Compliance with Rules (the "Compliance Order," docket #61), which provided, in relevant part, as follows:

> Plaintiff may not appear before a bankruptcy court in this district unless it is represented by counsel:
>
> > No corporation, partnership, or other unincorporated organization, or entity may file a petition under Title 11, of the United States Code, or otherwise appear in cases or proceedings before this court, unless it is represented by an attorney authorized to practice in this court. Where a corporate debtor is involved, the attorney representing such an entity must sign the petition and pleadings.
>
> L.B.R. 9010-1(e).
>
> Accordingly, it is hereby
>
> ORDERED that the Plaintiff has to and including **April 15, 2025** to comply with L.B.R. 9010-1(e), failing which this **case will be dismissed**.

Compliance Order at 1 (emphasis in original). Plaintiff has not filed a response to the Compliance Order. No attorney has entered an appearance on Plaintiff's behalf. Plaintiff has failed to comply with an order of this Court. Plaintiff's underlying bankruptcy case has been dismissed, and Plaintiff has failed to prosecute this adversary proceeding. The Court finds dismissal is appropriate.

Accordingly, it is

HEREBY ORDERED that the adversary proceeding is DISMISSED.

Dated April 16, 2025

BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge

# EXHIBIT 49

Paulson Docket 199 Order (April 18, 2025)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 19-cv-02639-PAB-NRN

JOHN PAULSON, Individually and on Behalf of all Others Similarly Situated,

Plaintiff,

v.

JOHN R. MCKOWEN,
WAYNE HARDING, and
TIMOTHY BEALL,

Defendants.

---

**ORDER**

---

This matter is before the Court on defendant John McKowen's Motion to Reopen Case [Docket No. 195] and Motion to Enforce the Paulson Settlement Agreement, Release Property From Bankruptcy, and Appoint Trustee for Oversight [Docket No. 196]. On November 13, 2024, plaintiff John Paulson filed a response. Docket No. 197. On November 14, 2024, Mr. McKowen filed a reply. Docket No. 198.

**I. BACKGROUND**

The Court assumes the parties' familiarity with the background facts and procedural history in this case, which have been set forth in previous orders, *see* Docket Nos. 162, 178, 194, and will not be repeated here except to the extent necessary to resolve the present motions.

Mr. Paulson brought a securities class action against defendants McKowen, Wayne Harding, and Timothy Beall. Docket No. 56. On July 21, 2021, Mr. Paulson

filed an unopposed motion for preliminary approval of a settlement, approval of notice to the class, preliminary certification of the class for the purposes of settlement, and appointment of class counsel ("motion for preliminary approval"). Docket No. 157. On January 19, 2022, the Court granted plaintiff's motion for preliminary approval. Docket No. 162. On April 29, 2022, the Court held a fairness hearing. Docket No. 176.

On March 15, 2023, the Court granted Mr. Paulson's motion for final approval of the settlement. Docket No. 178 at 17. The Court certified the class as follows:

> [A]ll persons or entities that currently hold claims based on securities in GrowCo, and purchased or otherwise acquired the securities through Offerings during the period of October 2014 through December 2017 (the "Class Period"), and suffered Alleged Losses as defined above. For the avoidance of doubt, persons or entities who purchased or otherwise acquired the securities during the Class Period and who have assigned the securities to VitaNova Partners, LLC are not excluded as Class Members by virtue of such assignment. Excluded from the Class are (1) the Defendants; (2) the officers and directors of Two Rivers and GrowCo during the Class Period as set forth in the attached Exhibit E for securities purchased at the time or after they were officers or directors; (3) any judge or judicial officer who may hear any aspect of this Class Action and his or her law clerks; and (4) except as provided in clause (2) of this paragraph above, all persons or entities released in the Settlement. Also excluded from the Settlement Class are the persons and/or entities who request exclusion from the Settlement Class within the time period set by the Court in the Preliminary Approval Order.

*Id*. at 17-18. The Court gave final approval to the Settlement Agreement and ordered that "plaintiff and all class members are permanently enjoined and barred from asserting, initiating, prosecuting, or continuing any of the claims released by the Settlement Agreement." *Id*. at 19. No class members opted out of the settlement. *Id.* at 13, 19. The Court ordered "that, without affecting the finality of this Order, this Court retains jurisdiction to consider all further matters arising out of or connected with the Settlement Agreement, including its implementation." *Id*. at 20. Final judgment entered on March 16, 2023. Docket No. 179.

## II. ANALYSIS

On October 24, 2024, Mr. McKowen, who is proceeding pro se,[1] filed a motion to reopen this case to "address ongoing violations of the Paulson Settlement Agreement and to facilitate the Court's enforcement of the settlement provisions." Docket No. 195 at 1, ¶ 1. He cites Federal Rule of Civil Procedure 60(b) as "the basis for this motion to reopen" because there exists "fraud, misrepresentation, or misconduct by an opposing party." *Id.* at 3, ¶ 7. Mr. McKowen claims that the Paulson Settlement Agreement "prohibit[s] further litigation on any claim that were [sic] or could have been asserted in the class action." *Id*. at 2, ¶ 3. He argues that "Contemnors,[2] including Gregory A. Harrington, have taken actions in violation of the Paulson Settlement Agreement" by "filing adversary proceedings alleging claims that mirror those addressed and barred by the Paulson Settlement." *Id.*, ¶ 4. Mr. McKowen argues that the "Contemnors" are using "the bankruptcy process . . . to delay or obstruct foreclosure" that has "resulted in significant harm" to Mr. McKowen, "whose rights are protected under the Paulson

[1] Because Mr. McKowen is proceeding pro se, the Court will construe his filings liberally without serving as his advocate. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[2] Mr. McKowen identifies, in the captions to his motion to reopen this case and to his motion to enforce the Paulson Settlement Agreement, the "Contemnors" as Gregory A. Harrington, Two Rivers Water & Farming Company, TR Capital Partners, LLC, Two Rivers Farms F-2, Inc., and the Orlando Reservoir No. 2 Company, LLC. Docket No. 195 at 1; Docket No. 196 at 1. Mr. McKowen argues that the "Contemnors" are using "the bankruptcy process . . . to delay or obstruct foreclosure" that has "resulted in significant harm" to Mr. McKowen "whose rights are protected under the Paulson Settlement Agreement." Docket No. 195 at 2, ¶ 6. However, he only argues that "adversary complaints filed by Farms F-2 and Harrington's actions directly violate these terms by attempting to obstruct the foreclosure process and prevent secured creditors from exercising their rights under the Deeds of Trust," such that the "Court's authority to enforce the Paulson Settlement is critical." Docket No. 196 at 5. He does not explain how the other "Contemnors" are allegedly violating the Paulson Settlement Agreement.

Settlement Agreement." *Id.*, ¶ 6. Mr. McKowen states that this case should be reopened so that the Court can consider his motion to enforce the Paulson Settlement Agreement. *Id.* at 3, ¶ 2. Mr. McKowen asks that the Court enforce the Paulson Settlement Agreement by "releas[ing] property from bankruptcy to McKowen for development or sale," dismiss "adversary complaints" filed by Two Rivers Farms F-2 in the bankruptcy proceedings, and appoint a Trustee to oversee the management of property. Docket No. 196 at 5-8.

On March 3, 2025, Mr. McKowen filed a complaint against Greg Harrington, Two Rivers Water & Farming Company, TR Capital Partners, LLC, Two Rivers Farms F-2, Inc., Wayne Harding, The State of Colorado, Colorado Attorney General Philip Weiser, Colorado Securities Commissioner Tung Chang, and John Does. *McKowen v. Harrington*, 25-cv-00708-PAB-KAS, Docket No. 1. Only Mr. Harding and Mr. McKowen are parties to both that case and this case.

The Court finds that Mr. McKowen seeks to reopen this case based on the same underlying conduct that he alleges in *McKowen v. Harrington*, 25-cv-00708-PAB-KAS. Specifically, Mr. McKowen seeks to reopen this case because the "Contemnors," particularly Mr. Harrington and Two Rivers Farms F-2, Inc., are allegedly violating the Paulson Settlement Agreement through their participation in two adversary proceedings pending in bankruptcy court, *Two Rivers Farms F-2, Inc. v. GrowCo Capital Partners 1, LLC*, 24-01111-KHT, and *Two Rivers Farm F-2, Inc. v. GrowCo Inc.*, 24-01112-KHT. *See* Docket No. 195 at 1, ¶ 1; Docket No. 196 at 5-8; Docket No. 196-1 at 92, 202. Mr. McKowen challenges these same adversary proceedings in his new case on the basis that they violate the Paulson Settlement Agreement. *See McKowen v. Harrington*, 25-

cv-00708-PAB-KAS, Docket No. 1 at 5-8. In his new case, Mr. McKowen similarly asks the Court to "[e]nforce the Paulson Settlement Agreement and declare all bankruptcy claims barred." *Id.* at 8. He also similarly alleges that Two Rivers Farms F-2 Inc.'s and Mr. Harrington's participation in the bankruptcy process are violating the Paulson Settlement Agreement. *See id.* at 2-3, ¶ 6.

The Court finds that it serves the interests of judicial economy to resolve the issue of whether the "Contemnors" have violated the Paulson Settlement Agreement in *McKowen v. Harrington*, 25-cv-00708-PAB-KAS, rather than in this case. Doing so not only avoids duplicative litigation, but also has the advantage of resolving the issue in a case where the alleged "Contemnors" are parties to the case, which is not true in this case. *See Wiggins v. Hatch*, 2022 WL 2966622, at *1-2 (D.N.M. July 27, 2022) (denying the plaintiff's Rule 60(b) motion to reopen the case because the court found that "[r]eopening the case at this stage is also unnecessary and would result in duplicative litigation" because the plaintiff filed a new case that raised "claims related to the lost filing fee" that plaintiff previously cited as being the basis for the plaintiff's Rule 60(b) motion to reopen the case) (citing *Gabriel v. Melton Truck Lines*, 2022 WL 1275242, at *1 (10th Cir. Apr. 29, 2022)); *Riddick v. Dep't of Correction*, 2018 WL 4078273, at *5 (D. Conn. Aug. 27, 2018) (denying the plaintiff's "motions to reopen and to enforce the settlement agreements" without prejudice because the court found that "the claims for violations of the 2014 Settlement Agreement and the 2015 Clarification of the terms of that agreement will be addressed" in the new case filed by the plaintiff); *Barela v. Curry Cnty. Det. Ctr.,* 2021 WL 601842, at *3 (D.N.M. Feb. 16, 2021) (finding there was "no reason for the Court to reconsider and reopen this case" where the

plaintiff "filed a new case that remains pending before the Court"). Therefore, the Court will deny Mr. McKowen's motion to reopen this case and will deny without prejudice Mr. McKowen's motion to enforce the Paulson Settlement Agreement.

## III. CONCLUSION

It is therefore,

**ORDERED** that the Motion to Reopen Case [Docket No. 195] is **DENIED**. It is further

**ORDERED** that the Motion to Enforce the Paulson Settlement Agreement, Release Property From Bankruptcy, and Appoint Trustee for Oversight [Docket No. 196] is **DENIED without prejudice**.

DATED April 18, 2025.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

# EXHIBIT 50

Public Trustee Rejection of Non-Judicial Foreclosure (May 6, 2025)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**Tuesday, May 6, 2025 at 8:50:09 AM Mountain Daylight Time**

---

**Subject:** Re: Submission of Non-Judicial Foreclosure Documents – GCP-1 Deed of Trust (Reception No. 404224)
**Date:** Tuesday, May 6, 2025 at 8:31:27 AM Mountain Daylight Time
**From:** Debra Reynolds
**To:** johnmckowen
**Attachments:** image001.png

John

After seeking counsel, I will not be able to do this foreclosure. We can't do a foreclosure on an Operating Agreement or a Settlement Agreement. I have refunded your Foreclosure Fee.
I apologize, it took a while to get you an answer.

Thank you

*Debra J. Reynolds*
*Huerfano County Treasurer & Public Trustee*
*401 Main St. Ste 206*
*Walsenburg, CO 81089*
*719-738-3000 x505*
*www.huerfano.us*

***The sender and receiver should be aware that all incoming and outgoing emails may be subject to the Colorado Open Records Act, C.R.S. 24-72-201 through 24-72-206 et seq. Thank you.****

"You can't have a good day with a bad attitude, and you can't have a bad day with a good attitude."

On Wed, Apr 30, 2025 at 9:17 AM johnmckowen <john@johnmckowen.com> wrote:

> Hi Debbie,
>
> Attached are the documents in support of initiating the non-judicial foreclosure for the Deed of Trust recorded at Reception No. 404224, Huerfano County, Colorado. I am submitting these in my capacity as Liquidator and Qualified Holder for GrowCo Partners 1, LLC.
>
> The package includes:
>
> - Cover Letter
> - Notice of Election and Demand (NED)
> - Affidavit of Qualified Holder (notarized)
> - Exhibits A–D (Term Sheet, Operating Agreement, Deed of Trust, Mailing Matrix)

Please let me know if anything further is needed to proceed. I appreciate your guidance and look forward to your response.

Best regards,

John R. McKowen

Liquidator, GrowCo Partners 1, LLC



John McKowen
(303) 248-6883
john@johnmckowen.com

# EXHIBIT 51

Findings and Judgment — $16,578,690.33 (July 9, 2025)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| | |
|---|---|
| District Court, City and County of Denver, Colorado<br>City and County Building, Room 256<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED<br>July 9, 2025 1:35 PM<br>CASE NUMBER: 2021CV33922 |
| Plaintiff: **TUNG CHAN, Securities Commissioner for the State of Colorado**<br><br>v.<br><br>Defendants: **TWO RIVERS WATER & FARMING COMPANY, et al.** | ▲ COURT USE ONLY ▲<br><br>Case Number: 21CV33922<br><br>Division Courtroom 259 |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT**

This matter comes before the Court following a Court Trial held on July 10-18, 2023. The Complaint for Injunction and Other Relief filed by Plaintiff Tung Chan, the Securities Commissioner for the State of Colorado ("Plaintiff" or "Commissioner"), on December 10, 2021, contains the following three claims: (1) Securities Fraud; (2) Unlicensed Activity—Broker Dealer; and (3) Unregistered Securities. Per the Complaint, the Commissioner asserts these claims against the following twenty-one defendants: Two Rivers Water & Farming Company; TR Capital Partners, LLC; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; GCP Super Units, LLC; VitaNova Partners, LLC; VitaNova, Inc.; VitaNova, LLC; VitaNova Colorado, LLC; McGrow, LLC; MCG Services, LLC; GCO Land, LLC; Waterton Financial, Inc.; John Roderick McKowen; Wayne Harding; Jan M. McCaffrey; George McCaffrey; Edward J. Wallick; Richard G. Wiwi; and Kirsty Cameron. The claims against nineteen of the defendants were resolved in some fashion before the Court Trial commenced, and only *pro se* Defendants John Roderick McKowen ("McKowen") and Wayne Harding ("Harding") (collectively, "Defendants")

participated in the Court Trial.[1] The Commissioner submitted her Proposed Findings of Fact and Conclusions of Law, and her written Closing Argument, on August 18, 2023. Harding submitted his Final Statement and Position on Facts on August 21, 2023. McKowen submitted his Amended Closing Argument, and his Proposed Order, the same day. The Court, having reviewed the record, trial transcripts, admitted exhibits, and all pertinent pleadings and relevant legal authority, and being otherwise fully advised in the premises, finds and orders as follows:

**BACKGROUND**

Two Rivers Water & Farming Company (formerly Navidec Financial Services, Inc.)[2] (hereinafter "Two Rivers") is a public company founded by McKowen in or around 2009 to develop agricultural land and water resources near Pueblo, Colorado, in Pueblo, El Paso, and Huerfano Counties. Two Rivers operated its farming and water assets through several subsidiaries. One of these subsidiaries (Dionisio Farms) engaged in traditional farming activities growing crops and produce. Although Two Rivers, Dionisio Farms, and other subsidiaries were modestly profitable at times, Two Rivers began looking for ways to find the "highest and best use" of its land and water resources to increase profitability. The passage of Amendment 64 to the Colorado Constitution in 2012 presented such an opportunity. Amendment 64—enacted as Article 18, Section 16, of the Colorado Constitution—legalized the limited personal cultivation and recreational use of marijuana as of December 2012 and state-licensed commercial sales of marijuana as of January 2014.[3] Following the legalization of recreational marijuana, Two Rivers created a web of related entities to capitalize and build state of the art greenhouses on some of its

[1] The procedural history concerning the pleadings and resolution of various claims, cross-claims, and "counter" cross-claims is somewhat complicated. This history is discussed in more detail below. The only claims that remained for the Court Trial were the three claims asserted by the Commissioner against McKowen and Harding.

[2] Navidec Financial Services, Inc., was created in or about 2000.

[3] The passage of Amendment 20 to the Colorado Constitution in 2000—enacted as Article 18, Section 14, of the Colorado Constitution—allowed limited personal cultivation and use of marijuana for approved patients with written medical consent, i.e., a prescription.

land for lease to licensed marijuana growers. Subsidiaries GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GrowCo Partners Super Units, LLC, and others, were formed for this purpose. Defendants held executive management positions with these different entities, including president, chief executive officer, and chief financial officer. From 2014 to 2019, Defendants raised approximately $19,000,000.00 through various debt and equity offerings for the stated purpose of building several greenhouses and providing financial support to the growers who leased the facilities. There is no dispute these offerings constituted "securities" and were subject to the provisions of the Colorado Securities Act—§§ 11-51-101, C.R.S. (2024), *et seq.*[4] Although the expected cost of a single greenhouse was approximately $5,000,000.00, Defendants built only one facility and partially completed a second one with these investor funds. This business venture eventually proved to be unsuccessful and investors received little or no returns on their investments.

On December 10, 2021, the Commissioner filed a Complaint for Injunctive and Other Relief, alleging that Defendants sold unregistered, non-exempt securities through unlicensed broker-dealers or sales representatives and made material misrepresentations and omissions to investors during the offerings. The Commissioner generally alleges that Defendants: (1) misrepresented to investors how the funds would be used, including that (a) seven offerings would be used to construct four greenhouses but only one greenhouse was completed (b) a significant amount of funds was used for general administrative costs (salaries, etc.) and not for construction of greenhouses and (c) some funds in later offerings were used to pay interest due on earlier offerings; (2) Defendants failed to disclose material information to investors, such as (a) McKowen was suspended in or around 1989 for one year by the National Association of Securities Dealers

[4] Unless otherwise noted, all references to the CSA are to the 2024 version of the Colorado Revised Statutes.

(NASD) for charging excessive compensation when selling securities and for providing inadequate disclosures (b) George McCaffrey was suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc. (FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities, while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado) and (c) Defendants did not disclose to investors that they used unlicensed broker-dealers or sales representatives (George McCaffrey and Jan McCaffrey through Waterton Financial, Inc., Kirsty Cameron, Edward Wallick, and Richard Wiwi) who were paid commissions or finder's fees for selling the securities; and (3) for some of the offerings, Defendants filed the requisite Form D notices of securities registration with the Securities and Exchange Commission (SEC), but failed to file any notification of securities registration exemption with the Commissioner as required by § 11-51-308(1)(p).

As noted above, the claims against McKowen and Harding were the only ones to proceed to trial. The following procedural history in this matter explains why. In its Complaint, the Commissioner alleged three claims against twenty-one defendants. Defendants McKowen, GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GCP Super Units, LLC, VitaNova Partners, LLC, VitaNova Colorado, LLC, VitaNova, LLC, McGrow, LLC, MCG, LLC, GCO Land, LLC, and VitaNova, Inc., through counsel, filed their Answer on January 18, 2022. No cross-claims or counterclaims were asserted in this filing. Defendant Harding acting *pro se* filed his Answer on January 26, 2022. No cross-claims or counterclaims were asserted in this filing. Defendants George McCaffrey and Jan McCaffrey, through counsel, filed their Answer on January 31, 2022. No cross-claims or counterclaims were asserted in this filing. Thereafter, Defendants George McCaffrey, Jan McCaffrey, and Waterton Financial, Inc., through the same

counsel, filed an Answer on February 1, 2022. No cross-claims or counterclaims were asserted in this filing. Defendant Kirsty Cameron, through counsel, filed her Answer on February 1, 2022. No cross-claims or counterclaims were asserted in this filing.

Defendants Two Rivers and TR Capital Partners, LLC (a subsidiary of Two Rivers created to operate and control direct and indirect subsidiaries of Two Rivers) (hereinafter, collectively "Two Rivers" or "TR Capital"), through counsel, filed their Answer on March 4, 2022, and in the same filing asserted a cross-claim for breach of fiduciary duty against both McKowen and Harding. The Court notes that as of the filing of this lawsuit McKowen and Harding no longer held any executive or management positions at Two Rivers. On March 30, 2022, through counsel, McKowen filed his Answer to this cross-claim, and in the same filing asserted "amended counter" cross-claims on behalf of McKowen, VitaNova Partners, LLC, and GrowCo, Inc., against Two Rivers and their respective affiliates for breach of fiduciary duty, civil fraud, and conversion. Two Rivers, through counsel, filed their Answer to these "amended counter" cross-claims on April 19, 2022. On May 25, 2022, Harding acting *pro se* filed his Answer to the cross-claim asserted by Two Rivers, and in the same filing asserted a cross-claim against Two Rivers for enforcement of an arbitration award entered ten months before the present lawsuit commenced that apparently required "a grant of 222,581 shares of Two Rivers' common shares to be issued from Two Rivers' 2011 Long Term Stock Incentive Plan" to Harding. Finally, on July 22, 2022, Two Rivers, through counsel, filed a short First Amended Answer to the Commissioner's Complaint, modifying three paragraphs of its original Answer.

At a Status Conference held on November 3, 2022, the Commissioner informed the Court it was unable to achieve service of process on Defendants Edward Wallick and Richard Wiwi. The Court thus removed these parties from the lawsuit. In addition, the Court entered default against

Waterton Financial, Inc., as George McCaffrey and Jan McCaffrey informed the Court they were unable to retain counsel to represent the entity. The Court also permitted counsel for McKowen, GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GCP Super Units, LLC, VitaNova Partners, LLC, VitaNova Colorado, LLC, VitaNova, LLC, McGrow, LLC, MCG, LLC, GCO Land, LLC, and VitaNova, Inc., to withdraw. The Court ordered these entity defendants to retain counsel within twenty-eight days or risk being held in default. The entity defendants failed to hire new counsel, and the Court entered default against these entities on December 28, 2022.

On November 4, 2022, Two Rivers filed a motion to dismiss the cross-claim filed against it by Harding. The Court granted this motion per written order on June 16, 2023. On April 27, 2023, the Commissioner and Defendant Kirsty Cameron entered into a Stipulation for Order of Injunction resolving the claims against Ms. Cameron. On May 5, 2023, the Commissioner and Two Rivers entered into a Stipulation for Injunction and Other Relief resolving the claims against Two Rivers; as part of this settlement, Two Rivers agreed to withdraw its cross-claims against McKowen and Harding. The Court entered an Order of Injunction and Other Relief on May 9, 2023, concerning the claims against Two Rivers, and on May 18, 2023, Two Rivers filed a motion to dismiss its cross-claims against McKowen and Harding. The Court granted this motion at a Pretrial Conference held on June 1, 2023. On May 25, 2023, Two Rivers filed a motion to dismiss the cross-claim filed against it by McKowen. The Court granted this motion per written order on July 7, 2023. That same day, the Commissioner and Defendant Jan McCaffrey entered into a Stipulation for Order of Injunction resolving the claims against Ms. McCaffrey. The Court entered an Order of Injunction and Other Relief on July 11, 2023, concerning the claims against Ms. McCaffrey. On July 9, 2023, the Commissioner and Defendant George McCaffrey entered into a Stipulation for Order of Injunction resolving the claims against Mr. McCaffrey. The Court entered

an Order of Injunction and Other Relief on July 11, 2023, concerning the claims against Mr. McCaffrey. It does not appear the Commissioner entered into any stipulation with Defendant Waterton Financial, Inc. However, given the close association between George McCaffrey, Jan McCaffrey, and Waterton Financial, Inc., the Court construes the resolution of claims against George McCaffrey and Jan McCaffrey as a resolution of the default entered against Waterton Financial, Inc. Accordingly, once the dust settled on these pretrial maneuverings, only the claims against McKowen and Harding remained.

## APPLICABLE LAW

"The purposes [of the Colorado Securities Act (CSA)] are to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." *See* § 11-51-101(2). The CSA is "remedial in nature and is to be broadly construed to effectuate its purposes." *Id.* The CSA further provides, "The provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article and rules and regulations promulgated under those federal acts and statutes, to the extent coordination is consistent with both the purposes and the provisions of this article." *Id.* The U.S. Supreme Court in *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) "has recognized that the purpose of securities regulations is to substitute a philosophy of full disclosure for the philosophy of caveat emptor [i.e., let the buyer beware]. This philosophy is also reflected in the CSA, which places the burden of not making untrue statements of material fact, and not omitting to state material facts, on any person connected with the offer, sale, or purchase of any security." *See Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 738 (Colo. App. 2009) (internal citations and quotation marks

omitted). In short, "[t]he design of the [CSA] is to protect investors by promoting full disclosure." *Id.*, *citing Western-Realco Ltd. v. Harrison*, 791 P.2d 1139, 1144 (Colo. App. 1989).

To this end, section 11-51-501(1) of the CSA makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to engage in any of the following specified acts: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. "A misrepresented or omitted fact is considered material under [the CSA fraud and prohibited conduct provisions] if there is a substantial likelihood that a reasonable investor would consider the matter important in making an investment decision. Whether or not the misrepresented or omitted fact is important turns on whether a reasonable investor would regard it as significantly altering the total mix of information made available." *See Goss v. Clutch Exchange, Inc.*, 701 P.2d 33, 36 (Colo. 1985) (internal citations and quotation marks omitted);[5] *see also People v. Prendergast*, 87 P.3d 175, 180 (Colo. App. 2003) (adopting the definition of material fact used in civil cases per *Goss* for criminal cases).

In addition, section 11-51-301 of the CSA makes it unlawful for "any person to offer to sell or sell any security in this state unless it is registered under this article 51; the security or

---

[5] The Colorado Supreme Court in *Goss* granted certiorari to review jury instructions in a civil trial defining a "material fact" within the context of section 11-51-125(1), C.R.S. (1973), which provided, in pertinent part: "Any person who . . . offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue to recover the consideration paid for the security . . . ." Per the Editor's note of the current version of the CSA, §§ 11-51-101, C.R.S. (2024), *et seq.*, the substantive provisions of article 1 of chapter 125 of the CSA were repealed and replaced in 1990, resulting in the addition, relocation, and elimination of sections as well as subject matter. Section 11-51-604, C.R.S. (2024) which provides, in part, civil penalties for a violation of § 11-51-501, C.R.S. (2024), is similar to former § 11-51-125(1), C.R.S. (1973).

transaction is exempted under section 11-51-307, 11-51-308, 11-51-308.5, or 11-51-309; or the security is a federal covered security for which a notice filing has been made pursuant to section 11-51-304.5." Section 11-51-308(1)(p) provides, "The following transactions are exempted from sections 11-51-301 and 11-51-305 . . . Any offer or sale of a security in compliance with an exemption from registration with the securities and exchange commission under section 3(b)(1) or 4(a)(2) of the federal 'Securities Act of 1933' [the "Act"], as amended, 15 U.S.C. secs. 77c (b)(1) and 77d (a)(2), pursuant to regulations adopted in accordance with the federal act by the securities and exchange commission. The issuer shall file with the securities commissioner [of Colorado] a notification of exemption, in a form prescribed by the securities commissioner [of Colorado], and pay an exemption fee to be determined and collected pursuant to section 11-51-707." 15 U.S.C. § 77c(b)(1) states, "The [SEC] may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed herein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $5,000,000." 15 U.S.C. § 77d(a)(2) states, "The provision of section 77e [prohibiting the sale of unregistered securities] of this title shall not apply to . . . transactions by an issuer not involving any public offering." Per § 11-51-605, "the burden of proving an exemption or an exception from a definition is upon the person claiming it."

SEC Rule 506, 17 C.F.R. § 230.506, is a federal regulation establishing a registration exemption pursuant to Section 4(2) of the Act. 15 U.S.C. § 77d(2). Under Colorado law, a transaction in compliance with SEC Rule 506 is an exempt transaction. *See* § 11-51-308(1)(p).

Rule 506(a) provides, "Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act." SEC Rule 506 further provides:

(b) Conditions to be met in offerings subject to limitation on manner of offering

(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

(2) Specific conditions

(i) Limitation on number of purchasers. There are no more than, or the issuer reasonably believes that there are no more than, 35 purchasers of securities from the issuer in offerings under this section in any 90-calendar day period.

(ii) Nature of purchasers. Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.

(c) Conditions to be met in offerings not subject to limitation on manner of offering—

(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

(2) Specific conditions—

(i) Nature of purchasers. All purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors.

(ii) Verification of accreditor investor status. The issuer shall take reasonable steps to verify that purchasers of securities sold in any offering under paragraph (c) of the section are accredited investors. . . .

. . .

(d) "Bad Actor" disqualification.

(1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promotor connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

. . .

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

. . .

(2) Paragraph (d)(1) of this section shall not apply:

(i) With respect to any conviction, order, judgment, decree, suspension, expulsion or bar that occurred or was issued before September 23, 2013;

. . .

(e) Disclosure of prior "bad actor" events. The issuer shall furnish to each purchaser, a reasonable time prior to sale, a description in writing of any matters that would have triggered disqualification under paragraph (d)(1) of this section but occurred before September 23, 2013. The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes that it did not know and, in the exercise of reasonable care, could not have known of the existence of the undisclosed matter or matters.

Concerning whether a purchaser is an "accredited investor," SEC Rule 501, 17 C.F.R. § 230.501 provides, in part:[6]

As used in Regulation D (§ 230.501 et seq. of this chapter), the following terms shall have the meaning indicated:

(a) Accredited investor. Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

. . .

[6] The Court notes that 3 CCR 704-1:51-3.19 (Colorado Model Accredited Investor Exemption) states, "Any offer or sale of a security by an issuer in a transaction that meets the requirements of this Rule is exempted from the securities registration requirement of the CSA." Paragraph A of the Rule states, "Sales of securities shall be made only to persons who are or the issuer reasonably believes are 'accredited investors' as that term is defined in SEC Rule 501(a) of Regulation D."

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000;

. . .

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

Importantly, regarding the use of Regulation D (17 C.F.R. §§ 230.500 et seq.), 17 C.F.R. § 230.500 states, in pertinent part: (a) "Regulation D relates to transactions exempted from the registration requirements of section 5 of the Securities Act of 1933 (the Act) (15 U.S.C. 77a et seq., as amended). Such transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws. Issuers are reminded of their obligation to provide such further material information, if any, as may be necessary to make the information required under Regulation D, in light of the circumstances under which it is furnished, not misleading (b) Nothing in Regulation D obviates the need to comply with any applicable state law relating to the offer and sale of securities. "

Finally, concerning licensing of broker-dealers and sales representatives, section 11-51-401(1) of the CSA provides, "A person shall not transact business in this state as a broker-dealer or sales representative unless licensed or exempt from licensing under section 11-51-402. Section 11-51-401(2) prohibits an issuer of securities from engaging an individual to act as a sales representative unless the sales representative is licensed or exempt from licensing under § 11-51-402. Per § 11-51-201(1), "sales representative" means:

> [A]n individual, other than a broker-dealer, either authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities or authorized to act and acting for an issuer in effecting or attempting to effect purchases or sales of the issuer's own securities. An individual so acting for an issuer is not a sales representative if the individual primarily performs, or is intended primarily to perform upon completion of an offering of the issuer's own securities, substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities and the individual's compensation is not based, in whole or in part, upon the amount of purchases or sales of the issuer's own securities effected for the issuer. A partner, officer, or director of a broker-dealer or issuer, or an individual occupying a similar status or performing similar functions, is a sales representative only if the individual otherwise comes within the definition.

The term "effecting or attempting to effect purchases or sales" is not further defined in the statute. "Individuals who solicit investors by phone and in person, and who distribute documents and prepare and distribute sales circulars in the hope that potential investors will deposit money in the account, are seeking to effect securities transactions." *Black Diamond Fund, LLLP*, 211 P.3d at 734. In addition, "[e]ffecting transactions in securities is shown by actively soliciting clients, selling securities to the clients, and participating in securities transactions at key points in the chain of distribution." *Id.* (internal citations and quotation marks omitted). Receiving transaction-based compensation, locating prospective investors, discussing the offerings with prospective investors, and obtaining signed subscription agreements and money from prospective investors even without providing the "formal acceptance of the subscription agreements" are indicative of a sales representative. *Id.*; *cf. Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (E.D. Tex. Aug. 31, 2009) (court denies motion to dismiss for failure to state a claim under federal securities law in a contract dispute for a commission by defendant company who allegedly facilitated plaintiff company's purchase of other companies' assets without registering as a broker-dealer, noting, in part, "In *Cornhusker Energy Lexington,*

*LLC v. Prospect Street Ventures* [No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006)], the court extensively analyzed a claim that a putative contract was voidable due to the failure to register as a broker dealer. The court stated that a finder is like a party who 'will be performing the functions of a broker-dealer, triggering registration requirements, if [the finder's] activities include: analyzing the financial needs of an issuer, recommending or designing financing methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities.' Merely bringing together the parties to transactions, even those involving the purchase and sales of securities, is not enough.") In *Cornhusker*, the federal district court further stated, "Transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer. The underlying concern has been that transaction-based compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent." *Id.*

Section 11-51-402(2) provides, in pertinent part, "The following sales representatives are exempt from the license requirement of section 11-51-401(1):

> . . .
>
> (b) A sales representative employed or otherwise engaged by an issuer in effecting transactions only in securities exempted by section 11-51-307 (1)(a) to (1)(d) or (1)(j);
>
> (c) A sales representative employed by an issuer in effecting transactions only with employees, partners, officers, or directors of the issuer or of a parent or subsidiaries of the issuer, if no commission or other similar compensation is paid or given directly or indirectly to the sales representative for soliciting an employee, partner, officer, or director in this state; and
>
> (d) Other sales representatives the securities commissioner by rule or order exempts.

## FINDINGS OF FACT[7]

1. The facts set forth above in the "Background" section of this Order were established by credible and competent evidence during the Court Trial.

2. The following facts are true per the stipulations in the Trial Management Order entered by the Court on June 22, 2023:

a. John McKowen was a Control Person for all Defendant entities except Waterton Financial, Inc. He was Two Rivers CEO, Two Rivers Board of Directors member, and GrowCo Board of Directors member from inception until May 2016. McKowen also founded and held executive and board positions for the other GrowCo entities, the VitaNova entities, McGrow, LLC, and Johnny Cannaseed, LLC;

b. Wayne Harding was a Control Person of Two Rivers and the GrowCo entities. During the relevant time period, he was the CFO and CEO of Two Rivers, the CEO of GrowCo, and served in management for the other GrowCo entities. He left Two Rivers and GrowCo in 2019;

c. George McCaffrey was licensed to offer and sell securities from January 3, 1978 until October 30, 2017. He was an executive of VitaNova Colorado, LLC;

d. Jan McCaffrey is married to George McCaffrey. She was not licensed to offer and sell securities at any time relevant to this case. In 2017, Jan McCaffrey joined GrowCo to serve as its COO, as well as Secretary and Treasurer for the Board of Directors. She later served as a director on the VitaNova, Inc., Board of Directors, as well as VitaNova's COO;

[7] These findings of fact have been established by a preponderance of the evidence.

e. Two Rivers is a Colorado corporation that was incorporated on July 28, 2009. It later became the successor corporation after a merger with Two Rivers Water Basin, LLC, in September 2010;

f. During the time period relevant to this case, Two Rivers was the parent company of multiple subsidiaries, including: Water Redevelopment Company; Huerfano Cucharas Irrigation Company; Dionisio Farms & Produce, Inc.; Two Rivers Farms F-1, Inc.; Two Rivers Farms F-2, Inc.; TR Capital Partners, LLC; Orlando Reservoir No. 2, LLC; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; and GCP Super Units, LLC;

g. GrowCo, Inc. ("GrowCo") was a Colorado corporation incorporated on May 4, 2014, by McKowen. It was formerly a Two Rivers subsidiary with the stated purpose of constructing state-of-the-art greenhouses for third-party, licensed marijuana growers. The greenhouses were to be located on Two Rivers-owned property;

h. GrowCo Partners 1, LLC ("GCP1") is a Colorado limited liability company organized by Harding on October 31, 2014. It was formerly a subsidiary of Two Rivers. GCP1's stated purpose was to raise funds for and serve as landlord for the first marijuana greenhouse ("GCP1 Greenhouse");

i. The GrowCo entities largely shared the same management personnel;

j. McGrow, LLC ("McGrow") was a Colorado limited liability company organized by McKowen on June 12, 2016. McKowen was the sole officer of McGrow and controlling member. McGrow's stated purpose was providing greenhouse startup capital, machinery, materials, and services to licensed third-party marijuana

growers and extractors. McKowen voluntarily dissolved McGrow on May 24, 2021;

k. McKowen resigned from Two Rivers and its subsidiaries in May 2016 and created a series of new entities that he used to induce investors to convert their securities from GrowCo entities to the new entities. The new entities are named VitaNova, Inc. ("VitaNova"), VitaNova, LLC ("V. LLC"), VitaNova Partners, LLC ("V. Partners"), and VitaNova Colorado, LLC ("V. CO") (the "VitaNova Entities");

l. All three VitaNova, LLC, Boards of Managers consisted of McKowen and two other unnamed individuals. Their officers were McKowen acting as CEO and George McCaffrey acting as COO;

m. The individual Defendants used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities;

n. The McCaffreys offered and sold securities for the Defendant entities with[out] being properly licensed under the Colorado Securities Act and received fees for offering and selling Defendant entities' securities; and

o. None of the GrowCo entities filed exemption from registration notifications with the Colorado Securities Commissioner. (Ex. 48).

3. McKowen is the founder of Two Rivers. (Transcript "TR," 7/11/23, 113:2-3; 173:18-23). Two Rivers owned land, both non-productive and irrigable farming, in Pueblo, El Paso, and Huerfano Counties. Two Rivers also owned water rights in Huerfano and El Paso Counties, and had an interest in a municipal district in eastern El Paso County. (TR, 7/11/23, 113:9-14). Two Rivers "was formed to acquire and develop water rights and associated land in

Colorado." When the water rights were not producing enough revenue to pay Two Rivers' overhead, Two Rivers moved into farming and acquired Dionisio Farms. The farming operations were cash flow positive but eventually did not have enough revenue to pay its overhead. (TR, 7/12/23, 177:16-179:14). Thus, Two Rivers decided to use some of its land to construct greenhouses to lease to marijuana growers. (TR, 7/12/23, 180:4-12).

4. McKowen later formed TR Capital, GrowCo, GCP1, GCP2, GCP Super Units, McGrow, and the VitaNova entities. (TR, 7/12/23, 173:18-176:16).

5. In July 2008, Harding began working at Navidec Financial Services, which changed its name to Two Rivers about eighteen months later, as a senior accountant. In the fall of 2009, Harding became the Controller for Two Rivers. Approximately one year later, on or about January 1, 2011, Harding became CFO, a position he held until he became CEO on June 13, 2016, following the resignation of McKowen from his executive positions with Two Rivers. (TR, 7/17/23, 106:11-22; Ex. 4).

6. Harding was employed by Two Rivers during the time period of the GrowCo offerings described in detail below. He was also part of the management team at GrowCo as CFO during these offerings. (TR, 7/11/23, 103:2-24; 112:4-20). Harding testified that as CFO, "I [Harding] would oversee and review all the documents that go out when it comes to financing it [construction of the first greenhouse]. Capital raises. I would be involved in that." (TR, 7/17/23, 150:14-151:3). Harding resigned from Two Rivers and GrowCo on September 19, 2019. (TR, 7/11/23, 228:17-20; TR, 7/17/23, 176:3-5).

7. Following the legalization of recreational marijuana, McKowen formed GrowCo in 2014 as a wholly-owned subsidiary of Two Rivers to build and lease greenhouses to licensed marijuana growers. Harding described this period as the "next gold rush" in Colorado that "we

[Two Rivers] tried to address . . . with the assets that we had in hand, which was land and water, that we applied to some farming." (TR, 7/18/23, 7:16-20). Harding similarly described this period after legalization of recreational marijuana as the "wild west" and "everybody was trying to get on board." (TR, 7/11/23, 117:17-19).

8. Neither Two Rivers or GrowCo would be involved in the grow operation itself given that a publicly traded company (like Two Rivers) was precluded from such activity. (TR, 7/11/23, 118:11-119:12; TR, 7/12/23, 80:3-19). Suncanna was the original tenant and licensed grower/operator of the first greenhouse. Aaron Van Wingerden and Tim Beall operated Suncanna. Harding was CFO of Suncanna for several months after its lease began with GrowCo in order to provide "third-party oversight" of Suncanna while its initial lease payments accrued. (TR, 7/11/23, 122:7-124:7).

9. Per Harding, GrowCo is the "mothership" of the marijuana investments. Harding testified that "GCP1 relates to the land [and] water assets, construction improvements in the first greenhouse. [GCP2] is with the second greenhouse. And GCP Super Units, LLC, since we're running out of cash and need additional cash, that was another entity we used to raise money." (TR, 7/11/23, 130:21-131:16).

10. McKowen and Harding were the promoters of the offerings set forth below. The offerings were purported to be private offerings sold to accredited investors. Harding reviewed the accredited investor questionnaires received from potential investors to ensure the answers were complete and the potential investor met the criteria for an accredited investor. (TR, 7/11/23, 159:11-23). The pro formas provided to investors as part of the offerings were a "joint effort" by McKowen and Harding. (TR, 7/11/23, 141:10-14). Harding was primarily responsible for sending offering documents to potential investors and he assisted in preparing the Term Sheets for the

offerings. (TR, 7/11/23, 160:12-161:6). Any written disclosure of risks associated with the offerings were contained in the exhibits discussed during the Court Trial; no other written risk disclosures were provided to the investors. (TR, 7/11/23, 180:7-9).

11. Neither McKowen or Harding held a license to sell securities at the time of the offerings. (TR, 7/12/23, 200:10-16; Ex. 99 and 34). McKowen testified that in 1985 or 1986 his securities license was suspended for a month and then the SEC extended the suspension for one year, and when he did not apply for reinstatement the SEC revoked his license in 1990 for failing to re-register. (TR, 7/12/23, 172:11-20). Exhibit 99 reveals that on or about October 17, 1986, a NASD (National Association of Securities Dealers) complaint was filed against McKowen and others alleging, in part, that McKowen "engaged in a deceptive and fraudulent contrivance in completing a series of transactions to sell customer securities." McKowen was censured, fined $15,000.00, and ordered to disgorge $509,880.00. McKowen appealed to the Board of Governors. On June 9, 1987, the Board of Governors dismissed some findings (including, apparently, the fraud findings) and affirmed others, but then affirmed the censure, increased McKowen's fine to $25,000.00, suspended him for one year, and maintained the order of disgorgement. During his testimony, McKowen confirmed his suspension. (TR, 7/13/23, 190:20-193:21). On August 23, 1990, his NASD registration was revoked for "non-payment of fines and/or costs." His NASD (and later FINRA) registration was never reinstated.

12. No notices of exemption were ever filed with the Commissioner for any of the offerings. McKowen and Harding acknowledged as much during their testimony. (TR, 7/11/23, 159:7-10; TR, 7/12/23, 28:4-11; TR, 7/13/23, 175:1-180:21; TR, 7/17/23, 22:13-20). McKowen's own securities expert, William Hart, testified that a failure to file such notice with the

Commissioner is a violation of the CSA. (TR, 7/14/23, 40:16-18; 42:5-12; 43:22-44:2). Form D filings, however, were made with the SEC for the GrowCo offerings. (TR, 7/12/23, 27:16-28:3).

13. GrowCo used George McCaffrey, Jan McCaffrey, Kirsty Cameron, Richard Wiwi, and Ed Wallick to raise capital. McKowen and Harding did not ensure these individuals possessed a securities license because McKowen believed they (the McCaffreys, Cameron, Wiwi, and Wallick) could be paid "finders fees" without having a securities license. (TR, 7/11/23, 135:24-136:18; TR, 7/14/23, 175:1-176:2; Ex. 34). GrowCo paid these individuals (sometimes through a business entity, such as Waterton Financial for the McCaffreys) many thousands of dollars for their efforts to persuade potential investors to subscribe to a GrowCo offering. (Ex. 44). The amount of their compensation was "dependent on how much money they brought in." (TR, 7/11/23, 157:22-158:9).

14. At the outset of the Court Trial, the parties stipulated to the admission of various exhibits described below. Some of these exhibits show when entities in this lawsuit were formed, and contain early discussions regarding greenhouse construction and offering documents for raising money to fund the anticipated construction and operations of the greenhouses.

a. Exhibit 1005 is a Form 10-SB (General Form for Registration of Securities of Small Business Issuers) filed with the United States Securities and Exchange Commission ("SEC") by McKowen on behalf of Navidec Financial Services, Inc., on or about January 28, 2005. The document shows Articles of Incorporation of Navidec Capital, Inc., were filed with the Colorado Secretary of State ("SOS") on December 20, 2002, and that Articles of Amendment to Articles of Incorporation were filed with the SOS on October 4, 2003, to change the name of Navidec Capital, Inc., to Navidec Financial Services, Inc. The document lists McKowen as president of

Navidec Financial Services, Inc. Thereafter, on November 19, 2009, Articles of Amendment were filed with the SOS changing the name of Navidec Financial Services, Inc., to Two Rivers Water Company.

b. Exhibit 1006 is Articles of Incorporation for a Profit Corporation filed by McKowen with the SOS on May 4, 2014, for GrowCo, Inc. The Articles of Incorporation were filed four months after state-licensed commercial sales of marijuana became legal in the state of Colorado. The exhibit contains the By-Laws of GrowCo, Inc.

c. Exhibit 1007 is an email dated April 8, 2014 from Tim Beall (and Aaron Van Wingerden) to McKowen providing a description of Beall's experience growing tomatoes, peppers, and flowers in Colorado, and expressing an interest in building a two-acre greenhouse in Pueblo County—presumably for growing marijuana as he mentions using the greenhouse to grow tomatoes or flowers "if laws change later"—with possible expansion up to ten acres.

d. Exhibit 1008 is an email dated July 1, 2014 from Beall to McKowen, Kirsty Cameron, and Harding estimating the "total cost" of building a greenhouse to be $2,321,000.00 to $3,321,000.00. (TR, 7/12/23, 76:22-79:15). Importantly, the actual construction costs for the first greenhouse (completed around September 2015) ballooned to approximately $7,000,000.00—well over twice the amount of the original estimate. (TR, 7/12/23, 89:9-90:4; 92:5-11; 158:15-159:18).

e. Exhibit 1010 contains the offering documents for GCP1. Exhibit 1011 contains the offering documents for the GrowCo $4 Million Note. Exhibit 1012 contains the

offering documents for GCP Super Units, LLC. These offerings and others are discussed in the following paragraphs.

15. Concerning **GCP1** in Exhibits 27 and 1010—the first offering—the Memorandum of Terms ("Term Sheet") is dated October 31, 2014, and says that GCP1 is an indirect subsidiary of Two Rivers and that Two Rivers "is the parent of GrowCo." The Term Sheet states, in part, "This Memorandum dated October 31, 2014, summarizes the principal terms of an offering of preferred units of GrowCo Partners 1, LLC ('**Partners**') and associated warrants to purchase common stock of GrowCo, Inc. ('**GrowCo**'), an indirect subsidiary of Two Rivers Water and Farming Company ('**Two Rivers**')." The Term Sheet further states, "*Partners*, a Colorado limited liability company, has been formed to construct and manage either one or two greenhouse facilities . . . that will be leased to marijuana growers. *GrowCo*, a Colorado corporation, will perform construction, management and other services for Partners pursuant to a services agreement with specified periodic fees."

16. The Term Sheet for GCP1 indicates the offering proposes to raise $6 million for one greenhouse or $10 million for two greenhouses with a target closing date of November 14, 2014 (the subscription documents list an adjusted target closing date of December 15, 2014).

17. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used by Partners primarily: (1) to finance the construction of either one greenhouse or two greenhouses, each to be leased to marijuana growers, depending on the number of offered units sold; (2) to lend up to $1.0 million to greenhouse lessees pursuant to lines of credit; (3) to finance the purchase of farmland and water taps for the greenhouse(s); and (4) for working capital and other general corporate purposes of Partners.

18. The Liquidation Preference and Security section states, "In the event of any liquidation, dissolution or winding up of Partners . . . [t]he payment of the GCP Preferred Unit liquidation preference will be secured by . . . certain water rights and land located in Huerfano County, Colorado owned of record by Orlando Reservoir No. 2 Company, LLC, a wholly owned subsidiary of Two Rivers." The associated Deed of Trust filed by Harding as CFO and Treasurer of Orlando Reservoir No. 2 Company, LLC, and as CFO of Two Rivers Farms F-2, with the Huerfano County Clerk and Recorder on September 25, 2015, is contained in Exhibit 2015. Similarly, Harding as CFO of GCP1 filed a Deed of Trust with the Pueblo County Clerk and Recorder on October 2, 2015, which is contained in the same exhibit.

19. The subscription documents instruct potential purchasers of offered units to deliver all required documents to Wayne Harding, CFO of Two Rivers. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states, in part, "[B]y signing this Questionnaire you agree that Partners, GrowCo and their counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws." The subscription documents further instruct potential purchasers to contact McKowen with any questions.

20. Concerning the GrowCo **$4 Million Note** in Exhibit 1011—the second offering—the Term Sheet is dated June 1, 2015, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of senior secured notes of GrowCo, Inc., a Colorado corporation ('**GrowCo**'), and associated warrants to purchase the common stock of GrowCo. The Term Sheet

further states, "GrowCo, a Colorado corporation, constructs and leases greenhouse facilities . . . and provides other financial and management services for State licensed marijuana growers."

21. The Term Sheet for the $4 Million Note indicates the offering proposes to raise $5 million and that "[t]o date, $3,150,000 in commitments have been secured, leaving a balance of $2,350,000 in notes available for subscription," with a target closing date of June 15, 2015. It appears the earlier commitments were obtained beginning on April 1, 2015, with a closing on or around the same day. (Ex. 47). The subscription documents state, in pertinent part, "GrowCo, Inc. ('GrowCo') proposes to sell a total of $5,000,000 in promissory notes ('Notes' or 'Note') with closings beginning on April 15, 2015. Each Note will consist of (a) GrowCo promissory note and (b) a warrant exercisable to purchase one share of common stock of GrowCo."

22. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used: (1) to provide a $2,000,000.00 Letter of Credit to Suncanna, LLC, the licensed tenant/grower at GrowCo's first greenhouse located in Avondale, Colorado, "expected to be completed in May 2015 ('**GCP 1**') for the purchase of growing materials and inputs"; (2) to provide $2,250,000.00 in debt financing for the second greenhouse to be built in Avondale, Colorado ('**GCP 2**'), with no expected completion date given; and (3) "for general corporate purposes." The Note Purchase Agreement, paragraph 6(a), lists nearly identical use of net proceeds for this offering, and further states the net proceeds will be used, in part, "for working capital and other general corporate purposes of GrowCo."

23. The Term Sheet indicates the term of the promissory note is five years with an annual interest rate of 22.50%, payable monthly, and that the note "may be redeemed at face value at any time 12 months after issuance, solely at the option of, and upon 60 days' notice, by the holder. No early redemption at the option of GrowCo." These terms of redemption are also set

forth in paragraph 3 of the promissory note itself (a blank promissory note is provided in Exhibit 1011).

24. The Security section of this Term Sheet states, "The GrowCo Notes will be general obligations of GrowCo secured by . . . a promissory note and first deed of trust for the land, water and [g]reenhouse at GCP2, and second deed of trust for certain land and water rights owned by Two Rivers Water & Farming." There is additional language in paragraph 5 of the promissory note that explains various assets of Two Rivers will be used to secure the notes. The associated Deed of Trust filed with the Huerfano County Clerk and Recorder on September 25, 2015 is contained in Exhibit 2015. Similarly, Harding as CFO of GCP1 filed a Deed of Trust with the Pueblo County Clerk and Recorder on December 7, 2015, which is contained in the same exhibit.

25. Per the Note Purchase Agreement, paragraph 3, each investor represents, in part, that he or she "has had an opportunity to discuss with the management of GrowCo the business, management and financial affairs of GrowCo and the terms and conditions of the offering of the Notes and the Warrants," "has sufficient knowledge and experience in investing in companies similar to GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in such Investor's Note and such Investor's Warrant, and such investor is able financially to bear the risks thereof," and is an accredited investor as defined in Rule 501(a) of Regulation D.

26. The Note Purchase Agreement is signed by Harding as CFO of GrowCo, Inc. In addition, the subscription documents instruct potential purchasers of notes to deliver all required documents to Wayne Harding, CFO of Two Rivers. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states, in part, "[B]y signing this Questionnaire you agree that GrowCo and their counsel may rely on the

information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws."

27. Harding explained during his testimony that this $4 Million Note was needed "to make up for the major costs of overruns" for the first greenhouse. Harding further explained this "blown budget" contributed to the friction between McKowen and the first tenant (Suncanna). (TR, 7/12/23, 95:5-19). It does not appear from the evidence concerning this second offering that new investors were informed that the raise was necessary because of significant cost overruns and "blown budget" after the first raise. Even though McKowen was apparently keeping the largest investor in GCP1, Mr. Morris, personally apprised of the budget issues with the first greenhouse and first raise, the information for all but one of the later raises does not mention the budget shortcomings of the first raise—or the need to remedy those issues with additional funds—and, thus, was misleading to new investors apart perhaps from Mr. Morris. (TR, 7/12/23, 96:15-98:1).

28. The following timing is important in this regard: (a) per Exhibit 1032, discussed in more detail below, the first offering (GCP1) raised $3,075,000.00 between December 2014 and January 2015; (b) just two months later, beginning in March 2015, GrowCo began raising additional funds per the $4 Million Note offering in order to complete the first greenhouse, thus indicating GrowCo knew as early as March 2015 that the first raise likely would be insufficient to complete construction even if the full extent of the deficit was still unknown; (c) per Exhibit 1032, the $4 Million Note (the second offering) raised $4,000,000.00 between March 2015 and September 2015; (d) beginning in July 2015, four months after GrowCo began raising funds per the $4 Million Note offering, GrowCo started raising even more funds per the GCP Super Units offering (the third offering), thus indicating that GrowCo knew the first and second raises were

insufficient to complete the first greenhouse and to provide financial support to its tenant; and (e) the first greenhouse was apparently completed (or nearly so) in or around September 2015 because Suncanna took occupancy. (Ex. 85). McKowen and Harding thus would have known in the months leading up to the opening of its first greenhouse—i.e., during the months that the second and third offerings were introduced—that the project cost nearly twice as much as their original estimate.

29. With this said, the Court does not find that McKowen and Harding knowingly provided misleading estimates to investors in the first raise despite the actual costs significantly exceeding the estimated costs, because cost overruns and unexpected expenses can occur with construction projects and often do not materialize until later in the construction process. (TR, 7/12/23, 98:16-99:1). The Court, however, does find that McKowen and Harding did not inform investors in subsequent offerings of these emerging budget troubles, and that such information would have been material information for investors deciding whether to invest in later offerings.

30. Exhibit 1016 shows that McKowen, as the Manager of an entity named RH Group, LLC, actually purchased Suncanna from its manager/owner (Aaron Van Wingerden) on or about February 25, 2016, for $1,500,000.00. (TR, 7/12/23, 118:17-24). At the time of the sale, Suncanna was a licensed marijuana grower and tenant of the GCP1 greenhouse. The Colorado Marijuana Enforcement Division ("MED") suspended Suncanna's license on April 14, 2016. (Ex. 59, p. 2). Exhibit 1016 shows that the closing for the purchase was contingent, in part, upon the MED and Pueblo County Liquor and Marijuana Licensing Board approving the change of ownership with respect to a premises licensed to cultivate and sell retail marijuana in the state of Colorado. Although such approvals may have been given, McKowen never obtained a license to cultivate and sell retail marijuana in this state. (TR, 7/12/23, 122:2-9). During the period of time in which

McKowen was trying to obtain such a license so he could operate Suncanna and lease the greenhouse from his own company (i.e., from GCP1 and GrowCo), he resigned as CEO of Two Rivers on May 25, 2016, and the next day resigned from all of his other positions with Two Rivers and its subsidiaries, including as the Chairman of the Board of Two Rivers, due in large part to this potential conflict of interest. (Ex. 1018). Harding then became CEO of GrowCo, and eventually obtained a MED employee license. (TR, 7/13/23, 219:4-18; Ex. 2013).

31. Concerning **GCP Super Units, LLC** ("GCP SU") in Exhibits 28 and 1012—the third offering—the Term Sheet is dated September 30, 2015, and says that "*GCP SU*, a limited liability company, has been formed to invest in (a) up to four greenhouses that GrowCo is, or intends to, construct for leasing to third-party marijuana growers and (b) the operations of GrowCo Business Development, LLC ('**GBD**'), which will provide management services to the greenhouses."

32. The Term Sheet for GCP SU indicates the offering proposes to raise $5.5 million with a target final closing date of November 30, 2015. The subscription documents state GCP SU "proposes to sell a total of $5,500,000 in units . . . in a series of closings, with the initial closing expected to be held on or shortly after October 8, 2015." The units may be purchased by wire transfer of funds or by surrender of GrowCo equity units.

33. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used to purchase: (1) preferred units of GCP1 having a 5.00% profit interest in GCP1, which has been formed by GrowCo to construct an initial greenhouse facility and has entered into a lease pursuant to which that facility is being leased by a third-party marijuana grower; (2) preferred units of GBD having a 36.11% profit interest in GBD, which initially will provide services to GCP1 and subsequently will provide services to three other greenhouse facilities to be constructed by

GrowCo: GrowCo Partners 2, LLC ("GCP2"), GrowCo Partners 3, LLC ("GCP3") and GrowCo Partners 4, LLC ("GCP4"); and (3) preferred units of GCP2 having a 50.00% profit interest in GCP2, which has been formed by GrowCo to construct a second greenhouse facility that will be leased to, and operated by, the entity that will lease GCP1.

34. The GCP SU Purchase Agreement, in paragraph 1.4, states, "GCP SU will use the net proceeds of the sale of the Super Units to purchase the preferred units issued by GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, and GrowCo Business Development."

35. The GCP SU Purchase Agreement, in paragraph 2.8, states, "GCP SU has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GCP SU MAE (i.e., material adverse effect).

36. Per the Purchase Agreement, paragraph 3, each investor represents, in part, that he or she "has had an opportunity to discuss the business, management and financial affairs of GCP SU and GrowCo, and the terms and conditions of the offering of the Super Units, with the management of GCP SU and GrowCo," "has sufficient knowledge and experience in investing in companies similar to GCP SU and GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in the Super Units, and such investor is able financially to bear the risks of such investment," and is an accredited investor as defined in Rule 501(a) of Regulation D.

37. The GCP SU Purchase Agreement contains a signature line for Harding as CFO of GCP SU and Two Rivers. In addition, the subscription documents instruct potential purchasers of offered units to deliver all required documents to Harding. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states,

in part, "[B]y signing this Questionnaire you agree that the Issuers [GCP SU and GrowCo] and their counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws."

38. As part of the GCP SU offering, McKowen and Harding gave a PowerPoint presentation to potential investors. The slides for this PowerPoint are contained in Exhibit 1012. One of the slides informed potential investors of the following: (a) GrowCo raised $4.4 million in private equity to fund construction of the first greenhouse (the GCP1 offering); (b) GrowCo closed $4.0 million in venture debt to establish its "Tenant Services business" and fund one-half of the second greenhouse (the $4 Million Note); (c) GrowCo will use the $5.5 million raised from the Super Units offering to additionally fund the second greenhouse, fund expansion into other states, and cover general administrative expenses; and (d) Suncanna—the exclusive Colorado tenant for GrowCo—expects to begin planting within 30 days and anticipates a first harvest by year end.

39. The Confidential Summary concerning the GCP SU offering is contained in Exhibits 85 and 1012. The Summary states, in pertinent part, "GrowCo has completed construction of its first greenhouse facility and executed a lease agreement with Suncanna . . . a licensed Colorado [m]arijuana grower. Lease payments began accruing on September 1, 2015 with cash payments beginning upon the first harvest by Suncanna. The first greenhouse cost approximately $5.0mm to build . . . and estimates each additional greenhouse will cost approximately $5.0mm. Pursuant to the lease agreement with Suncanna the first greenhouse will generate $2.1 mm in annual gross lease payments, on a triple net basis. Additionally, GrowCo forecasts that each greenhouse could generate up to $2.2mm in annual administrative services revenue. On a combined basis GrowCo anticipates annual gross revenue of $4.3mm per

greenhouse. By July 2017, GrowCo is targeting to build and lease a total of 4 greenhouses and provide services to Suncanna on a 160-acre tract of land in Pueblo County, Colorado. GrowCo has already completed two financings in 2015 for a total of $8.5mm, the proceeds of which were used to complete the first greenhouse and provide Suncanna with services." Finally, the Summary states, "Assuming the entire $5.5mm is raised, the net proceeds will provide approximately $500,000 to finance overruns on the first greenhouse, $2,500,000 to finance construction of the second greenhouse, and $2,500,000 to finance administrative services for greenhouses."

40. Concerning the GrowCo **$6 Million Exchange Note** in Exhibit 49—the fourth offering—the Term Sheet is dated April 22, 2016, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of notes of GrowCo, Inc. (which may be exchanged for preferred units of GCP Super Units, LLC, together with warrants to purchase common stock of GrowCo, Inc. and its parent, Two Rivers Water & Farming Company." The Term Sheet further states, "GrowCo will issue up to $6,000,000 in principal amount 22.5% Senior Exchange Notes due May 31, 2018 ('**Senior Notes**'), together with warrants to acquire up to 6,000,000 shares of common stock of Two Rivers and up to 6,000,000 shares of common stock of GrowCo." The Term Sheet also says, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than May 31, 2016."

41. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to support the operations of the [GCP Super Units] LLC."

42. Concerning the GrowCo **$7 Million Exchange Note** in Exhibit 1—the fifth offering—the Term Sheet is dated June 6, 2016, and states, in part, "GrowCo will issue up to $7,000,000 in principal amount 22.5% Senior Exchange Notes due July 1, 2021 ('**Senior Notes**'), together with warrants to acquire up to 7,000,000 shares of common stock of GrowCo." The Term

Sheet further states, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than June 30, 2016."

43. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to support the operations of Two Rivers, GrowCo and of the [GCP Super Units] LLC."

44. The PowerPoint presentation to potential investors for this offering is contained in Exhibit 50. The contact person referenced on the last slide is Harding.

45. Concerning the GrowCo **$2 Million Exchange Note** in Exhibit 51—the sixth offering—the Term Sheet is dated February 15, 2017, and states, in part, "GrowCo will issue up to $2,000,000 in principal amount 22.5% Senior Exchange Notes due July 1, 2022 ('**Senior Notes**'), together with warrants to acquire up to 2,000,000 shares of common stock of GrowCo." The Term Sheet further states, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than April 30, 2017."

46. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to complete construction of the second greenhouse, warehouse and extraction facilities at GrowCo's complex located in Pueblo County Colorado along with general and administrative expe[n]ses."

47. Concerning the **$550K McGrow Units** in Exhibits 61 and 128—the seventh offering—the Term Sheet is dated July 18, 2017. The terms are also contained in an email dated the same day, from McKowen to potential investors for a 90-day loan at 22.5%, plus 50% of principal in startup fees, in order "to initiate the marijuana oil extraction and manufacturing operations of Amerijuana." Per the Term Sheet, "it is expected that all closings will be held by no later than July 31, 2017."

48. The Use of Proceeds section for the offering states, "Net proceeds will be used by McGrow to provide Amerijuana with startup capital, machinery, proprietary McGrow processes, formulas and material to extract oil from marijuana plants and manufacture vapor cartridges."

49. Finally, concerning the **VitaNova, Inc.**, offering in Exhibits 3 and 67—the eighth offering—the Term Sheet is dated April 19, 2018, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of senior secured notes and associated common stock purchase warrants of VitaNova, Inc., a Colorado corporation ('**VitaNova**'). The Term Sheet further states, "VitaNova provides financial services and best practices, including proprietary intellectual property, regarding greenhouse growing and management." This offering seeks to raise $1,000,000.00 and the "[n]et proceeds are expected to be used to provide a secured loan of up to $1,000,000 to GrowCo Partners Super Units, LLC, which will use its loan proceeds to fund operations and resolve litigation." The target closing date for this offering is April 30, 2018.

50. The Use of Proceeds section of the Term Sheet states, "Net proceeds are expected to be used to provide a secured loan of up to $1,000,000 to GrowCo Partners Super Units, LLC, which will use its loan proceeds to fund operations and resolve litigation."

51. The Seniority and Security section of this Term Sheet states, "The VitaNova notes will be senior indebtedness of VitaNova secured by . . . personal guarantee of John R. McKowen, CEO and stockholder of VitaNova, deed of trust for building and real estate at 456 Madison St., Denver, CO 80206, and 3,000,000 shares of common stock of Two Rivers Water & Farming Company, which could be eligible for public sale pursuant to Rule 144(a) under the Securities Act of 1933 beginning six months after the Closing."

52. The PowerPoint presentation to potential investors for this offering is contained in Exhibit 66. The "Leadership Team" slide lists McKowen as the "Managing Director,

Administration." The contact person referenced on the concluding slide for any questions is George McCaffrey. George McCaffrey was suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc. (FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities, while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado). (Ex. 65). McKowen testified that for this offering he did not disclose his or Mr. McCaffrey's regulatory action to potential investors. (TR, 7/13/23, 201:8-12).

53. The purpose of the various offerings described above was to raise money to construct four greenhouses so that the greenhouses could be leased by GrowCo to licensed marijuana growers and GrowCo could collect rent payments from the lessees. In addition, some offerings were intended to financially support the operations of the lessees so they could grow and process their marijuana and, thus, generate enough positive cash flow to pay their rent. This rental income was the primary source of revenue for GrowCo and investors depended on the greenhouses being built and then leased to growers in order to realize any return on their investments. (TR, 7/18/23, 60:7-10). The other potential sources of revenue, such as providing consulting services to growers, collecting interest on loans to growers, and selling soil, fertilizer, etc., to growers, were secondary to rent payments and were necessary only if the greenhouses were completed.

54. Included with some of the offerings were projections for the construction and operating costs of a greenhouse used for growing marijuana. Harding testified that he and McKowen relied on Aaron Van Wingerden and Tim Beall to provide these estimates because Harding and McKowen "[knew] nothing" about building or operating a marijuana greenhouse and "had no idea what it cost to build." (TR, 7/11/23, 122:11-123:10; 141:4-150:8; 163:13-166:5; TR,

7/12/23, 82:6-86:21, 93:3-15; TR, 7/17/23, 152:5-24; Ex. 1009). While this lack of knowledge when starting a new venture in an emerging industry in and of itself is unproblematic from a legal standpoint, the evidence suggests that neither McKowen or Harding fully disclosed to investors that they themselves knew nothing about the type of business that would be operating within their facilities or how much money it actually took to operate a marijuana business successfully. This becomes even more troubling when considering that Mr. Van Wingerden and Mr. Beall prior to their initial outreach to McKowen via email in April 2014 about starting a marijuana grow operation—just months before the first offering—were in the business of growing vegetables and flowers, not marijuana, yet were relied upon to provide accurate cost estimates and revenue projections for a new marijuana business. (Ex. 1007).

55. While the lack of knowledge and experience in the marijuana industry by McKowen, Harding, Mr. Van Wingerden, and Mr. Beall alone is not an issue, such information is material to investors and should have been fully disclosed during the offerings. This lack of experience proved to be ruinous for Suncanna, and by extension GrowCo, when a visibly "healthy" crop (to the untrained eyes of McKowen, Harding, Mr. Van Wingerden, and Mr. Beall) by its height and density had to be destroyed because it was overgrown and became diseased. To this end, during his testimony, McKowen stated, "[Mr. Beall] did not have the experience even though he claimed to have the experience to effectively grow a greenhouse." (TR, 7/14/23, 120:23-122:22; Ex. 1027). The Court notes that in the Confidential Summary for the third offering, Defendants state, "Suncanna is owned and operated by Aaron Van Wingerden. Aaron is a 3rd generation, successful operator and owner of a significant plant & flowers greenhouse farming operation located in Colorado. Additionally, Mr. Van Wingerden has been growing and consulting in the MJ [marijuana] space for over six years." (Ex. 1012, Confidential Summary, p. 3). Given

the mismanagement of the grow operation that resulted in the destruction of an entire crop, the Court finds it is likely that Defendants exaggerated Mr. Van Wingerden's claimed expertise in growing marijuana. Nonetheless, even if Mr. Van Wingerden did have some experience growing marijuana, the evidence suggest Mr. Beall did not, and Mr. Beall was actively involved in the grow operation that resulted in the crop destruction. This destruction wasted precious resources and precluded Suncanna from selling a product and paying its rent, which resulted in a lack of revenue to GrowCo and an inability to make timely payments to investors. These production issues created significant conflict between Suncanna and GrowCo, and eventually led to Suncanna being "fired." When asked why GrowCo was unable to keep making interest payments to investors in the middle of 2016, Harding explained, "The implosion of Suncanna, the issues that we had with trying to find a new tenant, so there was no real revenue coming in. Although, we did collect about, I think 20 to 30 thousand dollars [in rent] from Suncanna. I don't know exactly how much, but it was around that area." (TR, 7/11/23, 213:1-9). As CFO of Suncanna at the time (for "banking purposes"), Harding would have known how much rent Suncanna paid to GrowCo. (TR, 7/17/23, 160:11-25).

56. Importantly, the actual amount of rent GrowCo received from Suncanna ($20,000.00 to $30,000.00 according to Harding) is vastly different from the projections given to investors. By way of example, in its presentation concerning the $7 Million Note during this same time period (the offering began in or around June 6, 2016), the "Projections" slide indicates that GrowCo expected to receive $9,000,000.00 in rent payments. (Ex. 8). Although McKowen and Harding viewed Mr. Van Wingerden and Mr. Beall as "subject matter experts"—perhaps because Mr. Van Wingerden and Mr. Beall had experience growing vegetables and flowers in greenhouses—and GrowCo used their projections when preparing pro formas for investors, the

reality is that Mr. Van Wingerden and Mr. Beall were new to growing marijuana and their inexperience showed in their negative results. This lack of experience should have been disclosed when the pro formas based on the estimates of Mr. Van Wingerden and Mr. Beall were given to investors. While McKowen and Harding may have been comfortable with placing the success of their venture in the hands of marijuana-industry newcomers, investors may have felt differently had they been given this material information at the time of the offerings.

57. The Court rejects the suggestion by McKowen and Harding that they should not be held responsible for the failings of the grow operations, Suncanna's resulting inability to pay its rent, or the flaws in the pro forma projections because Mr. Van Wingerden and Mr. Beall claimed to be able to grow marijuana at industrial scale. McKowen and Harding hired these individuals—individuals who lacked any meaningful experience in the marijuana industry—and then relied on the projections prepared by them to induce investors to invest in the offerings without disclosing that the so-called "expert" growers lacked experience in the marijuana industry to make informed cost estimates and revenue projections.

58. Harding invested his own money in two offerings—$25,000.00 in GCP1 and $100,000.00 in the $4 Million Note. (TR, 7/12/23, 43:3-9). McKowen also invested a significant amount of his own money into this venture, perhaps as much as $2.5 to $3 million over several years. (TR, 7/14/23, 108:6-17; TR, 7/17/23, 114:8-11). Defendants thus had added incentive to ensure GrowCo remained capitalized and their own investments protected.

59. Exhibit 1032, a report prepared by accounting firm Betzer, Call, Lausten & Schwartz, LLP ("BCLS") dated December 4, 2018, shows GrowCo raised approximately $18,905,500.00 from investors between December 2014 and September 2017, as follows: (a) for the GCP1 equity raise (1st offering), $3,075,000.00 between December 2014 and January 2015;

(b) for the $4 Million Note debt raise (2nd offering), $4,000,000.00 between March 2015 and September 2015; (c) for the GCP Super Units equity raise (3rd offering), $5,323,500.00 between July 2015 and October 2017—all but $100,000.00 was raised between July 2015 and April 2016, before McKowen resigned from Two Rivers and GrowCo in May 2016; (d) for a $1.5 Million Note debt raise (not a numbered offering described above given its relatively nominal amount and lack of offering documents in the admitted exhibits), $100,000.00 in April 2016; (e) for the $6 Million Note debt raise (fourth offering), $1,910,000.00 between March 2016 and July 2016; (f) for the $7 Million Note debt raise (fifth offering), $2,977,000.00 between January 2016 and January 2017; and (g) for the $2 Million Note debt raise (sixth offering), $1,520,000.00 between February 2017 and September 2017. BCLS did not address how much money was raised in the $550K McGrow Units or the VitaNova, Inc., offerings.

60. The BCLS report concludes, in part, that Two Rivers owes GrowCo $4,227,894.00. In his testimony, McKowen acknowledged that the report prepared by BCLS, "seems to be well prepared." (TR, 7/14/23, 152:9-16). McKowen further stated that even if there might be some errors in the report, "I'm going to trust the BCLS report based upon the recommendation from the attorney who recommended them to me . . . ." (TR, 7/17/23, 38:17-39:8).

61. It is important to remember that McKowen was the CEO of GrowCo for the following offerings: GCP1, $4 Million Note, GCP SU, $1.5 Million Note, $6 Million Note, and portions of the $7 Million Note. The only GrowCo offering in which McKowen was not the CEO was the $2 Million Note. (TR, 7/12/23, 205:25-207:14).

62. Despite raising nearly $19,000,000.00 from investors, only one greenhouse was completed. Harding stated during his testimony, "[W]e were spending an incredible amount of money trying to finish [GCP1], going through different lawsuits and operating the business." The

Court interprets "operating the business" as paying salaries for McKowen and Harding and other general and administrative expenses ("G&A"). (TR, 7/12/23, 132:4-10). Relatedly, McKowen stated during his testimony, "I think the—the question posed by the complaint [filed by the Commissioner] is a legitimate question and I haven't—haven't seen anything that answers how you raise $18 million and you only put up 1-1/2 greenhouses. The complaint doesn't mention that you're also including expenses associated with funding the—the operations, which is what happened when I was there. And I think the fundamental question of where did $6 million go is yet to be answered. Whether it's asked correctly in the BCLS report or otherwise." (TR, 7/17/23, 53:5-18).

63. The BCLS report in Exhibit 1032 establishes that GrowCo spent $8,859,610.00 (46.9%) of investor funds on the construction of one greenhouse, the partial construction of a second greenhouse, and the financing and management of the tenants. (Ex. 1032, p. 6). McKowen testified this amount is "accurate." (TR, 7/14/23, 153:9-13). As such, $10,045,890.00—53.1% of the funds raised—was used for expenses and other payments not directly connected to building and operating greenhouses. In other words, GrowCo used less than half of the investor funds for the activities that had any real chance of generating revenues for GrowCo and producing a return on investment for the investors—i.e., the building and operating of greenhouses. The report also shows that a net amount of $5,566,381.25 was transferred from GrowCo to Two Rivers and its subsidiary entities or paid by GrowCo on behalf of Two Rivers and its subsidiary entities, and that Two Rivers owes GrowCo $4,227,894.00. This accounting report is particularly persuasive to the Court given the firm is an established and neutral entity that was asked to look at the QuickBooks and bank statements of GrowCo and "to perform a detailed analysis of the equity and debt funds

received by GrowCo from investors and held by Two Rivers, and the subsequent use of those funds." (Ex. 1032, p. 2).

64. These results are aligned with the analysis performed by Harding contained in Exhibit 1050 that suggests GrowCo raised $18,033,385.00 from investors and spent approximately $8,803,618.00 on the "total costs" for GCP1 and GCP2 and on an advance to its tenant (Suncanna), which equates to 48.8% of investor funds being used for the construction of one greenhouse, the partial construction of a second greenhouse, and tenant support. The numbers reached by BCLS and Harding are nearly identical (46.9% vs. 48.8%), and help explain why GrowCo was unable to deliver on its promises to investors. Harding's testimony and use of Exhibit 2006 (pages 7 and 8) are consistent with the above numbers in the BCLS report. Harding testified that GrowCo raised a total of $18,782,000.00, and had $8,584,000.00 in operational costs, a large portion of which was G&A. (TR, 7/12/23, 135:19-149:20; TR, 7/18/23, 80:3-13).

65. Harding also presented the testimony of Michael Harnish. Mr. Harnish is a retired certified public accountant with an inactive license who was called to testify about the results of a G&A review he performed and then memorialized in Exhibit 2006. (TR, 7/17/23, 195:24-225:5). Mr. Harnish was not offered as an expert in accounting but nevertheless testified without objection of the Commissioner about the review he performed. The Court reviewed Exhibit 2006 and the testimony of Mr. Harnish several times, and finds that the evidence presented by Mr. Harnish was not developed particularly well by the parties and was difficult to follow. As such, his testimony is not persuasive and does not assist the Court in resolving the disputed issues in this case.

66. During his testimony on the last day of trial, Harding presented similarly detailed accounting testimony, including information about segment reporting in Exhibit 2001, accounting for capital projects in Exhibit 2004, 10-K Summary of GrowCo and subsidiary expenses in Exhibit

2006 (page 7), list of capital raises in Exhibit 2006 (page 8), and Two Rivers 10-K filings with the SEC for years 2015, 2016, 2017, and 2018. Harding noted in his testimony that 10-K filings are publicly available. (TR, 7/19/23, 28:11-23). The Court carefully reviewed the 10-K filings referenced during Harding's testimony and recognizes the filings contain detailed information about Two Rivers and its various operations and subsidiaries, including a long list of risk factors related to its businesses each year.

67. However, the evidence shows that potential investors in GrowCo were not provided anywhere close to this level of detail in the offerings or presentations, nor were they encouraged to look at the 10-K filings for Two Rivers to get a more complete understanding of GrowCo and other direct and indirect subsidiaries of Two Rivers. Harding confirmed as much in his testimony, stating, in pertinent part, "I don't remember saying to anyone to go to the SEC website for all your disclosures. I made the assumption—might have been wrong—that a sophisticated investor, which every single investor represented, knows how to get this information." (TR, 7/18/23, 65:2-25). Nonetheless, the 10-K filings omit some information, such as McKowen's past regulatory issues and that GrowCo was paying unlicensed salespeople for its offerings, which Harding acknowledged during his testimony, that a reasonable investor would want to know. (TR, 7/18/23, 66:16-67:12).

68. One of the investors who lost her investment is Mary Loughran. Loughran participated in the second offering ($4 Million Note). Loughran presented as a credible witness given her demeanor and the substance of her responses.

69. Loughran is a software consultant. She is not an investment professional and does not regularly invest in private offerings. In fact, prior to her investment in the $4 Million Note,

she had not previously invested in a private placement offering or a start-up. (TR, 7/10/23, 94:2-12).

70. Loughran learned about GrowCo from her friend, Jan McCaffrey, with whom she played tennis. (TR, 7/10/23, 66:18-67:25; Ex. 35 and 47). Loughran and Ms. McCaffrey discussed that the note was "callable," meaning Loughran could demand that her principal be returned at any time. (TR, 7/10/23, 72:23-73:10). It never occurred to Loughran that she would not be able to get her principal back from this investment. (TR, 7/10/23, 75:13-17).

71. In June 2015, Loughran decided to invest $50,000.00 in this offering using some of her retirement funds, in large part because the note was callable and secured, had a good interest rate (22.5%), and her friend, Ms. McCaffrey, said it was a good investment. (TR, 7/10/23, 74:2-12; Ex. 56 and 114). Loughran completed an accredited investor questionnaire and represented that she is an accredited investor. (TR, 7/10/23, 111:17-21; 112:14-113:2; Ex. 1047).

72. In October 2016, Loughran was asked to amend her note because GrowCo was having trouble paying monthly interest on the note due to issues with its greenhouse tenant. Loughran agreed to the amendment, which stated, in pertinent part, "The Parties agree to an interest payment modification of the Note for a period of 7 months, commencing on September 1, 2016 and ending on March 31, 2017. During this time, the full 22.5% interest will accrue, but 12% will be paid each month with the remaining 10.5% being deferred. The deferred amount will be paid back in equal installments over the 6-month period beginning April 1, 2017." Harding, as Executive Chairman of the Board for GrowCo, signed the "First Amendment to $4,000,000 GrowCo Note" on October 3, 2016. (TR, 7/10/23, 79:9-81:3; Ex. 56, Bates page 57371).

73. Loughran sometimes did not receive her monthly interest payment, and she stopped receiving interest payments altogether in October 2017. (TR, 7/10/23, 81:4-82:7). On January 9,

2018, Ms. McCaffrey, as COO/Secretary of GrowCo sent an email to "GrowCo Note Holders," which included Loughran, in which Ms. McCaffrey acknowledged that GrowCo was behind on its interest payments. Ms. McCaffrey explained, in part, that its tenant had refused to pay their rent and was evicted on December 19, 2017. Harding and McKowen were copied on this email. (Ex. 36).

74. In response to this email, on January 30, 2018, Loughran informed Ms. McCaffrey that she would like to "call" her note. Over the next several months, Loughran attempted to "call" her note by sending additional emails to Ms. McCaffrey and to "GrowCo Leadership" at a Two Rivers' email address. (Ex. 116). In response to one such email, Harding, on April 30, 2018, in his capacity as CEO of Two Rivers, informed Loughran that "Two Rivers is no longer in the management or governance of GrowCo." Harding copied Ms. McCaffrey on this response.

75. Loughran was never able to successfully "call" her note, despite the Term Sheet stating, "A GrowCo Note may be redeemed at face value at any time 12 months after issuance, solely at the option of, and upon 60 days' notice, by the holder." (TR, 7/10/23, 86:2-4; Ex. 47). Per a text exchange between Loughran and Ms. McCaffrey on May 12-13, 2018, Ms. McCaffrey explained, "There is no money to pay the note right now." (TR, 7/10/23, 86:5-87:3; 113:15-23; Ex. 117).

76. All communications with GrowCo preceding Loughran's investment occurred with Ms. McCaffrey only. Loughran never spoke with McKowen or Harding. Loughran understood that Ms. McCaffrey did not have a securities license. Ms. McCaffrey informed Loughran that the offering was "going through George." (TR, 7/10/23, 87:5-20).

77. Loughran testified credibly that prior to investing in the $4 Million Note, she would have wanted to know the following information: (a) the note was not actually being sold through

Mr. McCaffrey; (b) as a publicly traded company, Two Rivers could not legally be involved in the marijuana business; (c) McKowen, a principal in GrowCo, was involved in activities that required a marijuana license but he did not have one; (d) McKowen's securities license had been suspended years earlier for failure to disclose material information to investors; (e) Two Rivers and GrowCo were experiencing cash flow problems; (f) investment funds raised for GrowCo were being used to support its parent company, Two Rivers; and (g) other investors in GrowCo offerings were not being paid. (TR, 7/10/23, 90:5-92:17).

78. Loughran believed "the money [from her investment in the $4 Million Note] was used inappropriately" by McKowen as CEO of GrowCo. (TR, 7/10/23, 108:2-5).

79. Joe McMahon is another investor who lost his investment. McMahon participated in the fifth offering by GrowCo ($7 Million Exchange Note) and the seventh offering through McGrow ($550K McGrow Units). McMahon presented as a credible witness given his demeanor and the substance of his responses.

80. McMahon is a landman with no professional background in finance or securities. However, he has made investments over the years, including in stocks, bonds, real estate, and oil and gas ventures.

81. McMahon learned about the $7 Million Exchange Note offering in 2016 through some golf friends who invited him to a meeting concerning a capital raise for greenhouses that were going to be built in Pueblo, Colorado. McKowen and Harding were at the meeting. McMahon believes McKowen gave the presentation describing the offering. (TR, 7/10/23, 184:11-186:11). Various slide show presentations for this offering are contained in Exhibits 8, 9, and 127. Nearly identical slides for a webcast presentation held several months later is contained in Exhibit 7. The webcast was presented on November 17, 2016, according to the final slide, and

lists Harding as the Managing Director of GrowCo. The Court notes that even though McKowen had resigned from his positions with Two Rivers and GrowCo in May 2016 prior to the presentation, McKowen was nonetheless "pitching the deal" at this presentation on behalf of GrowCo. (TR, 7/10/23, 241:17-243:12).

82. McMahon invested $100,000.00 in this offering. McMahon understood that he would receive 10% interest annually, paid monthly, until the greenhouse lessees could harvest their crop and become cash flow positive, after which the interest rate would increase to 22.5%, and that at the end of the term (July 1, 2021) he would get his original investment back or he could use his warrants to purchase stock in GrowCo. McMahon credibly testified that no one at the meeting explained how GrowCo was going to go public even though the company was involved in the marijuana industry and thus could not be publicly traded. In addition, no one at the meeting mentioned whether anyone at GrowCo had a marijuana license. It was stated, however, that McKowen intended to step down from Two Rivers as the company was public and an official in a public company could not hold a marijuana license or have a permit to grow marijuana. (TR, 7/10/23, 194:5-196:8).

83. McMahon completed an accredited investor questionnaire and represented that he is an accredited investor. (TR, 7/10/23, 189:3-190:13; 247:2-11). McMahon eventually received a letter from GrowCo dated August 23, 2016, and other documents, confirming his investment. These documents are contained in Exhibit 126.

84. Following his investment in August 2016, McMahon did receive at least six interest payments: (a) $194.44 for August, paid on September 21, 2016; (b) $833.33 for September, paid on October 18, 2016; (c) $833.33 for October, paid on November 15, 2016; (d) $833.33 for

November, paid on December 15, 2016; (e) $833.33 for December, paid on January 18, 2017; and (f) $833.33 for January, paid on February 27, 2017. (Ex. 55). These payments total $4,361.09.

85. In March 2017, McMahon was asked to amend his note because GrowCo was having trouble paying monthly interest on the note due to its greenhouse tenant being evicted and the new tenant needing time to grow a crop. McMahon agreed to the amendment, which stated in pertinent part, "The Parties agree to an interest payment modification of the Note will begin to accrue interest at 22.5% commencing on February 1, 2017. The 22.5% interest will accrue, but no interest will be paid each month until October 1, 2017. The deferred interest amount will be paid back in equal installments over the 6-month period beginning October 15, 2017." Harding, as Authorized Board Member for GrowCo, signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017. (TR, 7/10/23, 198:10-199:16; Ex. 57).

86. Several months later, on July 18, 2017, McKowen contacted some potential investors by email concerning the "least risky, most rewarding, offering I [McKowen] have brought to you." Per the email, the purpose of this "$500K Unit Offering" from McGrow—i.e., $550K McGrow Units—was "to initiate the oil extraction and manufacturing operations of Amerijuana." The email further stated, "We are lending capital to the licensee to pay for labor and machine fees. With that, we and the tenant/licensee are in business. We even have the wholesalers champing at the bit to sell them the product. As with the flower, we sell out all product each week on our McGrow Marketing web site, bestbuds.net. It is the most rewarding because it's a 90-day loan at 22.5%, plus 50% of principal in startup fees. We are offering the high return so we can close the loan quickly and focus on production." (Ex. 61). This email was eventually forwarded to McMahon from one of his golf friends who also attended the $7 Million Exchange Note presentation described above. McMahon invested $50,000.00 in this offering. McMahon spoke

to his golf friend about this offering but not McKowen or Harding before investing. (TR, 7/10/23, 199:24-205:21).

87. Concerning the $550K McGrow Units offering, McMahon testified, in part, "Well, when you hear interest rates like this, you always wonder things when you're raising money and you're—you know, everything you read, these are unregistered securities. So you know, you got a lot of bells and whistles going off when you're doing your due diligence So in my mind and in my world, when you start getting into interest payments higher than the norm, you kind of wonder, you know, are we looking at a Ponzi-scheme? And that's the first thing that crossed my mind." (TR, 7/10/23, 209:12-210:3). After investing in this McGrow offering, and after receiving his GrowCo interest payment in February 2017, McMahon never received any additional payments from either GrowCo or McGrow. McMahon testified that at this point he was thinking, "[W]ell, I think we just got duped." (TR, 7/10/23, 211:23-213:22; 226:9-13; 261:2-4).

88. McMahon understood GrowCo and McGrow were related entities because they were using the same greenhouse, i.e., GrowCo owned/operated the greenhouse and McGrow operated the machine on site used to extract oil from the marijuana grown in the greenhouse, and because McKowen solicited both of the offerings. (TR, 7/10/23, 219:1-220:19).

89. The Term Sheet for the $550K McGrow Units offering dated July 18, 2017, does not list any risk factors for this offering, including that in at least two previous offerings by McKowen—i.e., the $4 Million Note and $7 Million Exchange Note—the investors (like Loughren in October 2016 and McMahon in March 2017) were asked to amend their notes because GrowCo was having trouble paying monthly interest due to issues with its greenhouse tenant. (Ex. 128). McMahon offered credible testimony that he was never told of any risk factors for this offering. (TR, 7/10/23, 220:20-221:12). McKowen, as Managing Member of McGrow, did not disclose to

investors in the $550K McGrow Units offering that he was unable to satisfy his obligations to investors in earlier (and related) GrowCo offerings despite being fully aware that GrowCo had to ask its earlier investors to amend their notes. Such information is material to an investor deciding whether to invest in an offering. (Ex. 129).

90. On February 2, 2018, McMahon sent a letter to McKowen demanding full payment ($50,000.00) on his $550K McGrow Units promissory note. (Ex. 132). McMahon never received a response from McKowen. (TR, 7/10/23, 226:2-5). However, McMahon did receive a letter from Two Rivers dated February 20, 2018, signed by Harding as Acting CFO for Two Rivers, in which Harding acknowledged that auditors of Two Rivers were engaged in an examination of its financial statements, which included statements for GrowCo. Harding requested that McMahon confirm that the principal amount owed on the $7 Million Exchange Note was $100,000.00 and the interest owed was $16,250.00. (Ex. 133). McMahon signed the requested confirmation on March 6, 2018. (TR, 7/10/23, 227:7-24).

91. In total, McMahon lost approximately $150,000.00 with the two offerings. (TR, 7/10/23, 232:21-24).

92. McMahon would not have invested with McKowen in either GrowCo or McGrow if McMahon knew the following information before investing: (a) McKowen had previously declared bankruptcy; and (b) McKowen's securities license was previously revoked. (TR, 7/10/23, 232:25-233:17). It is unclear to the Court whether McKowen did, in fact, declare bankruptcy, either as an individual or on behalf of one of the entities he controlled.

93. Whitney Buchanan is an attorney in New Mexico who owns TOL Grizzly Bear, LLC ("TOL"), a Colorado limited liability company, that leases/owns/operates machinery used to extract oil from marijuana. TOL leased/owned the machinery used by McGrow to extract oil from

marijuana in the greenhouse. OGZ Holdings ("OGZ") is a processing and consulting firm that provided oil extraction processing services for McGrow. On August 28, 2017, TOL, OGZ, and McGrow entered into a Third Amended Service Agreement ("Agreement") for TOL to lease the oil extraction equipment to McGrow for a flat fee of $540,000.00 for one year (payable in monthly installments of $45,000.00) and for OGZ to operate the equipment and process the oil for a fee of $30,000.00 plus additional compensation based on output. McKowen signed the contract on behalf of McGrow as its Manager. (Ex. 62).

94. Buchanan presented as a credible witness given his demeanor and the substance of his responses. Buchanan testified that initially the contract negotiations and initial contract were between TOL and McKowen on behalf of GrowCo, but later McGrow was substituted for GrowCo. (TR, 7/11/23, 11:12-24). Buchanan understood that McKowen was involved in both companies. Buchanan testified, "I'm dealing with the same people. I'm dealing with John [McKowen] for McGrow and was dealing with John [McKowen] for GrowCo." (TR, 7/11/23, 22:13-19). Buchanan further testified, "I don't know your [McKowen's] titles [with GrowCo and McGrow]. I did know that you [McKowen] had operational authority over GrowCo and McGrow." (TR, 7/11/23, 50:12-21; 56:1-3). Although Buchanan was not aware that McKowen had resigned from GrowCo in May 2016, Buchanan believed McKowen had operational control over GrowCo because the one completed greenhouse "was a GrowCo-owned greenhouse, and Tim Beall said that [McKowen] ran it." During the time Buchanan was interacting with McKowen, Amerijuana, Inc., (owned by Mike McCullough) was the licensed marijuana grower leasing the greenhouse. (TR, 7/11/23, 56:4-58:5).

95. Per Buchanan, almost immediately after the Agreement was signed, McGrow "started creating excuses for not making payments." McGrow missed some payments and at other

times made partial payments. Buchanan estimated that McGrow missed one-half of its payments. TOL frequently sent notices of default and demands to McGrow, and eventually TOL had to repossess the equipment. (TR, 7/11/23, 13:17-17:15).

96. McGrow also missed payments to OGZ. Although OGZ was supposed to operate the equipment, after enough missed payments OGZ was "run off" and "McGrow's own employees began to operate [the equipment]." (TR, 7/11/23, 17:19-24). However, per Buchanan, McGrow did not have a marijuana license and, thus, it was unlawful for McGrow to operate the equipment. Eventually Amerijuana was substituted for McGrow on the equipment lease. Buchanan understood that Amerijuana was the tenant and authorized to touch the marijuana plants. (TR, 7/11/23, 17:25-19:20; 93:1-6).

97. Buchanan was also an investor in GrowCo who lost his investment. Buchanan participated in the sixth offering ($2 Million Exchange Note). Buchanan invested $100,000.00 in this offering. (TR, 7/11/23, 22:20-23:11). Buchanan completed an accredited investor questionnaire and represented that he is an accredited investor. (TR, 7/11/23, 26:23-27:11; 61:14-25). Buchanan is "an approved level three option trader and has pattern day trader status with his broker." Buchanan has not invested in private placements before. (TR, 7/11/23, 28:12-23).

98. Buchanan received a letter dated March 7, 2017, from Harding as CFO of GrowCo, and other documents, confirming his investment. This document and others signed by Harding are contained in Exhibit 51.

99. Buchanan understood that the funds in this offering would be used to "finish" building the second greenhouse. (TR, 7/11/23, 25:21-26:19). The Term Sheet for this offering indicated the same, as well as the Purchase Agreement in section 2.4 ("Use of Funds"). (Ex. 51).

100. When this offering was presented, the first greenhouse had been completed. Buchanan had visited the first greenhouse and described it as "spectacular," "state-of-the-art," and "the best greenhouse [he'd] ever seen." Buchanan could see that construction on the second greenhouse had begun (the "ribs" were present) and understood the second greenhouse was to be identical to the first greenhouse. (TR, 7/11/23, 24:6-25:16; 76:1-6; 77:3-7).

101. Buchanan testified he did not "get a presentation" or receive information about the offering other than the Term Sheet provided by Harding. (TR, 7/11/23, 60:7-61:13).

102. Buchanan provided credible testimony that he was never told about the risks associated with this investment. (TR, 7/11/23, 26:20-22; 27:19-28:11). By way of example, neither McKowen or Harding apparently ever told Buchanan that the cost estimates for the first greenhouse were inaccurate and that several million dollars of additional capital was needed to finish the greenhouse. This is material information when soliciting funds from investors in the $2 Million Note offering—an offering intended to complete a project modeled after an earlier project with significant cost overruns—on the promise that the money raised will be used to *complete* the second greenhouse (which, of course, never happened).

103. In addition, the Term Sheet for the $2 Million Note dated February 15, 2017 (and related documents in Exhibit 51) does not list any risk factors for this offering, including that in at least one previous offering by GrowCo—the $4 Million Note—investors (like Loughren) in October 2016 were asked to amend their notes because GrowCo was having trouble paying monthly interest on the notes due to issues with its greenhouse tenant. (Ex. 51). Neither McKowen (as a promoter of the $2 Million Exchange Note on behalf of GrowCo) nor Harding (as CEO of GrowCo) apparently disclosed to investors in the $2 Million Exchange Note offering that they were unable to satisfy their obligations to investors in an earlier offering despite being fully aware

that GrowCo had to ask its earlier investors to amend their promissory notes. Harding acknowledged as much during his testimony. (TR, 7/11/23, 181:13-24). Such information is material to an investor deciding whether to lend money to GrowCo.

104. The Court further notes that just one week after Buchanan invested in the $2 Million Exchange Note (on March 7, 2017), Harding, as Authorized Board Member of GrowCo, signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017. (Ex. 57). As explained above, in March 2017, McMahon was asked to amend his note because GrowCo was having trouble paying monthly interest on the note due to its greenhouse tenant being evicted and the new tenant needing time to grow a crop. Given the short amount of time between when the $2 Million Exchange Note was offered and when GrowCo asked the investors in the $7 Million Exchange Note to amend their notes, McKowen and Harding surely knew at the time they promoted the $2 Million Exchange Note that they were having issues with their tenant and would not be able to satisfy their obligations to investors in the earlier offering. Again, such information is material to an investor deciding whether to lend money to GrowCo.

105. Buchanan never received any interest payments per his promissory note, i.e., "not a penny," and was never told why. (TR, 7/11/23, 30:20-25; 33:6-21; 41:16-42:1). Buchanan never inquired why he was not receiving the promised payments on his notes because he was focused on McGrow's inability to make its payments on the oil extraction equipment and having to repossess the equipment. (TR, 7/11/23, 31:1-4). However, Buchanan did receive a letter from Two Rivers dated February 20, 2018, signed by Harding as Acting CFO for Two Rivers, in which Harding acknowledged that auditors of Two Rivers were engaged in an examination of its financial statements, which includes statements for GrowCo. Harding requested that Buchanan confirm the

principal amount owed on the $2 Million Exchange Note was $100,000.00 and the interest owed was $18,750.00. (Ex. 102). It is unclear whether Buchanan signed the requested confirmation.

106. Buchanan would not have invested in GrowCo if he knew the following information before investing: (a) there had been allegations regarding FINRA violations; (b) there had been multiple rounds of fundraising prior to the $2 Million Exchange Note being offered; (c) McGrow was not adequately capitalized to enter into the Third Amended Service Agreement for the oil extraction equipment; and (d) McGrow was not licensed to lease and operate the oil extraction equipment for marijuana. (TR, 7/11/23, 42:10-43:5).

107. Concerning the FINRA issue, Buchanan explained such information is important because any issues with FINRA are "a reflection of the willingness to comply with the law and the willingness to honor an agreement." (TR, 7/11/23, 43:6-16).

108. Concerning the previous rounds of fundraising, Buchanan explained, "I came to learn that this 2-million dollar raise was the 16th and 17th million-dollar raise. And, you know, this is a 5-million dollar facility on its best day. It's not a 20-million-dollar facility. So the question is, you know, where did the other 12 million dollars go?" (TR, 7/11/23, 43:19-44:6).

109. After getting the audit letter mentioned above, Buchanan received a solicitation to convert his GrowCo note to shares in VitaNova Partners, LLC. Buchanan understood VitaNova Partners, LLC, was formed by McKowen to "build a field of solar panels and grow hydroponic tomatoes and vegetables indoors and sell them to—as fresh produce to local markets," possibly using the one completed greenhouse. (TR, 7/11/23, 44:11-25). Buchanan eventually converted his promissory note to equitable shares in VitaNova Partners, LLC, on the advice of his bankruptcy attorney who said Buchanan would only recover through GrowCo's bankruptcy about $5,800.00 of the $118,500.00 owed to him on his promissory note. Buchanan testified that nothing ever came

of the equity shares in VitaNova Partners, LLC, as he does not believe VitaNova Partners, LLC, ever acquired a greenhouse. (TR, 7/11/23, 45:4-46:23; 77:15-79:10).

110. Tammie Martinez is an auditor with the Colorado Division of Securities. Ms. Martinez was qualified as an expert in forensic accounting and provided credible testimony based on her demeanor and the substance of her responses. (TR, 7/10/23, 125:25-126:2).

111. Ms. Martinez has experience reviewing and analyzing bank statements and related financial records, including checks, wire transfers, and deposits. (TR, 7/10/23, 125:9-13). Ms. Martinez reviewed bank records and source documentation for Two Rivers and the GrowCo entities. In anticipation of her testimony, Ms. Martinez prepared a summary of all banking transactions for eight different bank accounts for Two Rivers and the GrowCo entities. (Ex. 141). McKowen and Harding challenged the reliability of this summary given that it is not a "compilation, review, or audit" per the American Institute of Certified Public Accountants (AICPA). (TR, 7/10/23, 150:5-153:18; 160:11-162:4). The Court nonetheless finds Ms. Martinez and her summary to be reliable and persuasive. Ms. Martinez has worked for the Colorado Division of Securities for over sixteen years and has "testified in many cases using the same kind of summaries and information." (TR, 7/10/23, 174:5-21).

112. Exhibit 141 reveals, in part, the following concerning five bank accounts for Two Rivers (Wells Fargo accounts ending in 7366, 7539, 6629, 7974, and 8421, with various authorized signers over the course of several years, including McKowen, Harding, Tim Beall, Kirsty Cameron, and others): (a) $17,180,680.00 in investor funds was deposited into the accounts, which represented 80.87% of all deposits into the accounts; (b) $6,781,925.10 in business expenses (e.g., payments for phone bills, security team, construction costs, etc.) was paid out of the accounts, which represented 31.86% of all withdrawals from the accounts; (c) $6,556,005.15 was transferred

to TR Capital Partners, which represented 30.8% of all withdrawals from the accounts; (d) $847,962.75 was transferred to McGrow, which represented 3.98% of all withdrawals from the accounts; (e) $2,397,058.77 was paid to Aaron Van Wingerden for greenhouse construction expenses, which represents 11.26% of all withdrawals from the accounts; (f) $209,500.00 was paid to Waterton Financial (McCaffreys); and (g) $175,014.61 was paid to Kirsty Cameron and Anne Wallich for "Finders Fees." (TR, 7/10/23, 130:3-132:23).

113. Exhibit 141 also reveals, in part, the following concerning two bank accounts for MCG Services, LLC (Wells Fargo accounts ending in 2907 and 3906 with McKowen as the sole authorized signer): (a) $1,078,538.00 in investor funds was deposited into the accounts, which represented 31.25% of all deposits into the accounts; (b) $847,962.75 from Two Rivers was deposited into the accounts, which corresponds to the withdrawal for the same amount from the Two Rivers accounts above, and represents 24.57% of all deposits into the accounts; (c) $744,721.68 in income was deposited into the accounts, which represents 21.58% of all deposits into the accounts; and (d) $464,445.29 was transferred to Two Rivers, which corresponds to 13.46% of all withdrawals from the accounts.

114. Based on the above, Ms. Martinez concluded, "There was money from investors coming into this [MCG, Inc.] bank account. Also, I see that there's money transferred in from Two Rivers. So they're commingling funds between Two Rivers bank accounts, which are supposed to be for GrowCo and to the MCG Services accounts, which, I believe, was supposed to be for the McGrow operation. And I also see that there's money going back out to Two Rivers for over $464,000." Ms. Martinez explained that money from the various GrowCo entities was commingled with Two Rivers because GrowCo did not have its own bank accounts, and that money from Two Rivers was commingled with McGrow money. (TR, 7/10/23, 135:6-136:5).

During his testimony, Harding confirmed the GrowCo entities did not have their own bank accounts and, thus, the money from investors was deposited into bank accounts in which Two Rivers was the custodian. (TR, 7/11/23, 184:1-185:22; Ex. 10).

115. Exhibit 141 further reveals, in part, the following concerning the account for TR Capital Partners, LLC (Wells Fargo account ending in 7648 with McKowen, Harding, and Kirsty Cameron as authorized signers): (a) $6,556,005.15 from Two Rivers was deposited into the account, which corresponds to the withdrawal for the same amount from the Two Rivers account above, and represents 40.27% of all deposits into the account; (b) $1,027,299.29 in investor funds was deposited into the account, which represents 6.31% of all deposits into the account; (c) $47,012.95 from McGrow was deposited into the account; and (d) $7,826,858.52 in business expenses was paid out of the account, which represents 46.92% of all withdrawals from the account.

116. Based on the above, Ms. Martinez concluded, "This represented to me, again, that money was commingled . . . So it just shows that the money's commingled in this bank account as well and paying for a lot—a lot of different—different expenses here." (TR, 7/10/23, 137:7-23).

117. Exhibit 26 further provides an example of how money was moved between the accounts for these various entities. The exhibit shows that an investor (Hugo Zimmerman), on April 13, 2015, wired a total of $249,982.00 to the Two Rivers account ending in 7974. That same day, nearly an identical amount ($249,950.20, a $31.80 variance) was transferred to the TR Capital Partners, LLC, account ending in 7648. The next day, on April 14, 2015, this same amount ($249,950.20) was transferred to the Two Rivers account ending in 7366. Based on this information, Ms. Martinez concluded the flow of funds indicates, "[I]t's commingled to me . . . so there's a lot of back and forth." (TR, 7/10/23, 143:4-10; 145:25-146:3). Ms. Martinez explained

that commingling of funds makes it difficult from an accounting standpoint to track investor funds and should be avoided. (TR, 7/10/23, 164:23-167:19; 178:17-24).

118. Ms. Martinez also opined that based on her review of the financial records of the GrowCo entities that investor funds were used for personal use and for non-investment purposes. (TR, 7/10/23, 147:19-149:7; 164:3-8). For example, Ms. Martinez observed that $1,500.00 from the TR Capital Partners, LLC, account ending in 7648 was used to make a payment towards "JRM 300k Note," which Ms. Martinez believed benefited McKowen personally as this was his personal obligation. (TR, 7/10/23, 170:23-174:13). In addition, during his testimony, Harding confirmed that GrowCo investor funds were used for Two Rivers' operations, including overhead and salaries, i.e., G&A expenses, and that he spent a lot of time trying to allocate general and administrative expenses between the various entities based upon "time-driven activity-based costing." (TR, 7/11/23, 185:12-186:6).

119. As noted above, GrowCo had difficulties making its interest payments to investors due to issues with its tenants and inconsistent operations in its one completed greenhouse. For example, in or around 2016, Suncanna—the first licensed marijuana grower to lease the greenhouse—was on a deferred rent schedule until it could harvest the first crop and begin earning money from sales. Until Suncanna became cash positive, GrowCo used investor funds raised for construction costs and G&A overhead to pay the interest payments due on some promissory notes. (TR, 7/11/23, 188:16-189:17; TR, 7/12/23, 91:2-5). A dispute arose between Suncanna (owned and operated by Aaron Van Wingerden) and McKowen. The MED suspended the license held by Suncanna/Van Wingerden on April 14, 2016, due to suspicion that McKowen—not Van Wingerden—was actually operating the marijuana grow operation and McKowen did not have a license to do so. As a result of the suspension, the current crop had to be destroyed, which

precluded Suncanna from selling any product, earning money, and paying rent. (TR, 7/11/23, 190:4-191:8; TR, 7/12/23, 156:25-157:6; 158:2-10; Ex. 59). This in turn affected GrowCo's bottom line and GrowCo could not meet its financial obligations to investors.

120. These issues between Suncanna and McKowen and resulting financial troubles for GrowCo concerned the Two Rivers' board of directors. The board thus initiated an internal investigation of McKowen through its Nominating, Compensation and Corporate Governance Committee. (TR, 7/11/23, 191:4-192:24). The Committee produced a report of its investigation on June 29, 2016. (Ex. 22). The report revealed, in part, the following: (a) the lease between GCP1 (owner of the completed greenhouse) and Suncanna "in and of itself, was not necessarily an unusual transaction. However, problematic issues arose when, through the complex financial arrangements structured by McKowen, a series of entities was created beginning with GrowCo, Inc. which became the organizational and control center for the fundraising and ownership of all marijuana-related activities that the Company [Two Rivers], through its subsidiary, conducted," Ex. 22, p. 4; (b) "There were numerous delays and difficulties in getting the greenhouse built that Mr. McKowen attributes to Mr. Van Wingerden. . . . After much acrimony between [Van Wingerden and McKowen], in February 2016, Mr. McKowen attempted to purchase Mr. Van Wingerden's ownership of Suncanna, LLC through an entity named RH Group, LLC that [McKowen] formed and in which [McKowen] owned a majority interest. Mr. McKowen was to 'purchase' Suncanna's retail marijuana license in order to grow and sell marijuana in the greenhouse that [GCP1] had built. By doing so, [McKowen] would place himself on both sides of the transaction involving [Two Rivers]. This raised the conflict of interest and related party transaction red flag that the Committee began to investigate," Ex. 22, p. 4; (c) the transaction between Suncanna and RH Group failed; (d) thereafter, Suncanna defaulted on its rent payments

and GCP1 pursued eviction proceedings; (e) Van Wingerden then filed a complaint with MED over McKowen's alleged interference in the operation of the greenhouse and MED suspended the license of Suncanna and Van Wingerden, which prevented the replanting of any more marijuana plants and sale of any harvested crop; (f) based, in part, on some alleged concerning behavior of McKowen in response to the investigation (e.g., McKowen sent an email to some board members threatening to expose alleged criminal misdeeds of the committee members, which he said would have a negative effect on them and their families), the board set a Special Meeting of the [Two Rivers'] board for May 26, 2016, to consider removing McKowen as CEO of Two Rivers and to remove him as an officer of GrowCo—Two Rivers' direct subsidiary—and any other indirect affiliates; (g) the day of the Special Meeting, McKowen resigned from all positions with Two Rivers and GrowCo;[8] (h) the Committee concluded that "[m]uch of Mr. McKowen's conduct may be explained by his and Two Rivers' desperate need for capital," Ex. 22, p. 7; and (i) the Committee concluded, in part, "McKowen's attempted purchase of Suncanna, LLC and its continuing interest, through his majority control of RH Group, LLC, in becoming the greenhouse tenant to [GCP1] is a conflict of interest-related party transaction under Colorado law; however, because Mr. McKowen has resigned from all positions within [Two Rivers] and all of its subsidiaries and affiliates, the Committee no longer needs to consider this particular issue; it is rendered moot," Ex. 22, p. 10.

121. Concerning this report, Harding agreed during his testimony that there were numerous delays and setbacks in building the first greenhouse, and that he understood McKowen

[8] More precisely, the 8-K filing in Exhibit 1018 shows McKowen resigned as CEO of Two Rivers on May 25, 2016, and on May 26, 2016, he resigned from all of his other positions with Two Rivers and its subsidiaries, e.g., GrowCo, etc., including from the Two Rivers' board of directors. At the time of his resignation, McKowen was chairman of the board for Two Rivers and was not a member of any board committee. The 8-K is dated June 1, 2016, and was submitted to the SEC by Harding as CFO of Two Rivers.

intended on purchasing Suncanna's retail marijuana license so he (McKowen) could grow and sell marijuana in the greenhouse. (TR, 7/11/23, 194:10-195:4). However, Harding disagreed with much of the report and noted his disagreements in a Memorandum to File dated August 19, 2016, prepared with two other board members. (Ex. 24). The Memorandum reveals that the GrowCo board determined that the report should not be disclosed to outside parties. (Ex. 24, p. 3). McKowen acknowledged during his testimony that the report contained material information that a reasonable investor would want to know before investing in a GrowCo offering. (TR, 7/13/23, 166:16).

122. Importantly, after McKowen resigned from Two Rivers and GrowCo, Harding became the CEO of GrowCo, but McKowen continued to be closely involved in GrowCo as its largest shareholder—McGrow controlled two-thirds of GrowCo shares and had two parties on the GrowCo board—and as "advisor" pursuant to several written agreements (a Master Agreement, Construction Services Agreement, and Financial Services Agreement). (TR, 7/11/23, 203:10-21; TR, 7/12/23, 201:2-20; TR, 7/13/23, 139:22-140:2; 154:4-20; Ex. 13). The Agreements, executed on July 22, 2016, were between GrowCo and McGrow, Inc. Harding signed the Agreements on behalf of GrowCo and McKowen signed the Agreements on behalf of McGrow as its Manager. The Master Agreement states, McGrow provides advisory, construction and financing services for development stage companies . . . [and] GrowCo is a development stage company in need of advisory, construction and financing services." The Construction Services Agreement states McGrow "shall supervise all aspects of the construction of [GCP1, GCP2, and an on-site extraction facility]," for which McGrow (i.e., McKowen given his ownership of McGrow) is to receive $15,000.00 per month in fees. The Financial Services Agreement states McGrow "shall assist GrowCo in raising capital for its 22.5% Exchange Note Offering as of the date of this agreement,"

for which McGrow is to receive $7,500.00 per month in fees. During his testimony, Harding stated he believes the Exchange Note referred to in the Agreement is the $7 Million Exchange Note (the fifth offering described above).

123. McKowen confirmed during his testimony that he gave a presentation to potential investors for the $7 Million Exchange Note. McKowen also stated in his response to questioning by counsel for the Commissioner about GrowCo being in default of its obligations (e.g., not paying interest on promissory notes, attempts by investors to "call" their notes, etc.) that he did not disclose "any of the information that he knew about," because "that was not what I was hired for." (TR, 7/13/23, 134:2-136:20). The Court infers from this response that McKowen did not share with potential investors for the $7 Million Note, and likely the subsequent $2 Million Note, information about GrowCo's previous difficulties and its inability to meet its financial obligations to investors. Given that McKowen was "hired" to give the presentation, the Court infers that no one else participated in the presentation and, thus, information about GrowCo's troubles was not disclosed. Harding confirmed in his testimony that he did not disclose to new investors issues GrowCo was having with its tenants if such issues were concurrent with the offering. (TR, 7/11/23, 181:13-24).

124. With this lack of disclosure in mind, the Court notes that McKowen testified, "I think there was a duty at some point in time to say—to tell the investors, because of the time delays, we're not hitting our marks and what do you—what do you want to do?" (TR, 7/17/23, 54:23-55:4). Based on the totality of the evidence presented, the Court does not believe such a conversation ever took place between McKowen and/or Harding and the GrowCo investors, and GrowCo instead proceeded to continue raising funds through at least two additional offerings (i.e., the $7 Million Note and the $2 Million Note).

125. Bottom line, following McKowen's resignation from Two Rivers and GrowCo, McKowen was to receive $22,750.00 per month for continuing his oversight of the greenhouse construction—the success of which determined whether GrowCo survived or failed—and for continuing to raise money on behalf of GrowCo to finance such construction. McKowen thus may have resigned from his executive positions with GrowCo in May 2016, but he retained (by contractual agreement) significant ability to direct GrowCo's essential activities and control its economic success.

126. Exhibit 44 reveals that GrowCo paid MCG Services, LLC—i.e., McGrow: (a) $22,750.00 on 8/29/16; (b) $14,000.00 on 9/16/16 as a "Finder's Fee" for the $7 Million Note raise; (c) $9,800.00 on 10/3/16 for the $7 Million Note raise; (d) $22,750.00 on 10/28/16 for the $7 Million Note raise; (e) $22,500.00 (not $22,750.00) on 8/21/17 for the $2 Million Note raise; and (f) $4,000.00 on 8/31/17 for the $2 Million Note raise. When McKowen received the so-called Finder's Fee on 9/16/16, he was no longer an executive at GrowCo. Accordingly, per the above Agreements, McKowen received at least $95,800.00 in fees for supervising greenhouse construction and promoting at least two GrowCo offerings. (TR, 7/11/23, 208:3-209:23; TR, 7/13/23, 156:9-25; Ex. 38).

127. In addition to participating in construction oversight and additional GrowCo offerings, in June 2016, McKowen, through McGrow, entered into a lease with GCP1. The lease was actually between GCP1 and Johnny Cannaseed (another entity owned/operated by McKowen). (TR, 7/11/23, 209:24-210:11; TR, 7/13/23, 148:7-14; Ex. 25). Although Johnny Cannaseed was leasing the greenhouse, neither the entity or McKowen had a license to grow marijuana. In late August, Johnny Cannaseed and its owners (McKowen and Chad Kirby) applied for a marijuana license; the MED denied the application on November 23, 2016. (Ex. 59, p. 3).

Johnny Cannaseed thus apparently had to sublease the greenhouse to Amerijuana and to Quality Choice, both licensed growers. Neither one of these tenants was successful. Quality Choice moved out in the middle of the night, and Amerijuana was evicted. (TR, 7/11/23, 213:1-214:15; TR, 7/13/23, 153:10-14). Per Harding, following Suncanna's eviction, no tenant or subtenant ever consistently operated the greenhouse or paid rent. (TR, 7/11/23, 229:8-12; TR, 7/18/23, 60:24-61:2).

128. McKowen testified that he disclosed the November 2016 license denial for Johnny Cannaseed to subsequent McGrow investors, but did not disclose the reasons for the denial. (TR, 7/13/23, 128:21-129:25; TR, 7/14/23, 185:6-15). The Initial Decision upholding the November 2016 denial entered on December 15, 2017. The hearing officer found ten violations supporting the denial, including that Johnny Cannaseed and its owners "grew, cultivated, transferred and sold retail marijuana without a license between March 4 and April 18, 2016." (Ex. 59).

129. During this time (around June 2016), GrowCo received minimal rent from its tenants and, thus, had to rely in part on new investor funds to pay interest on the promissory notes held by earlier investors. Harding acknowledged such use of funds could have happened. (TR, 7/18/23, 87:14-89:21). This is a classic Ponzi scheme, about which McKowen and Harding became concerned. (TR, 7/11/23, 210:17-212:25; 216:4-7; TR, 7/13/23, 157:8-159:18). In an email dated June 27, 2016, with the subject line "Capital Raise Concerns," McKowen said to Harding, "We addressed concerns several weeks ago that the current capital raise could become a Ponzi scheme, whereby we were raising capital from some people for the stated purpose of building greenhouses but proceeds were, whether purposely or not, were in fact being spent primarily to pay interest to others and salaries I think we need to quickly assess where we stand. I suggest you compile data quickly that allows us to see how proceeds have been spen[t]

for the $2M raised to date and what the realistic expectation is for completion of this raise." (Ex. 23).

130. Per his testimony, Harding acknowledged that GrowCo probably used other investor money to make interest payments because the rent income GrowCo received was not enough to support its payment obligations on the promissory notes. (TR, 7/11/23, 212:18-213:9).

131. Per his testimony, McKowen seemed to acknowledge that GrowCo could have been engaged in a Ponzi scheme. McKowen stated, "I believe the issue was brought up on cross of whether these were interest payments or whether it was a Ponzi scheme. And I don't know, as I have said previously, whether it's a Ponzi scheme or whether it's interest payments. And I believe, based upon Mr. Harding's cross today that that issue remains unresolved, and that the critical issue to me and my understanding of whether something is a Ponzi scheme or an interest payment is that if you're paying off subsequent investors with money that you're raising from subsequent offerings, then that's a Ponzi scheme. And I think that there needs to be a clear definition of what the use of proceeds were that—that were provided to investors and whether or not any investors were paid off from funds raised from these offerings." (TR, 7/17/23, 83:10-84:6). It is significant to the Court that even McKowen could see that the activities of GrowCo raised a question about whether GrowCo was engaged in an unlawful Ponzi scheme.

132. As explained above, in or around October 2016, Loughran was asked to amend her note because GrowCo was having trouble paying monthly interest on the note due to issues with its greenhouse tenant. Loughran agreed to the amendment and signed the "First Amendment to $4,000,000 GrowCo Note" on October 3, 2016. (TR, 7/10/23, 79:9-81:3; Ex. 56, Bates page 57371). In addition, another investor, Michael Harnish was asked to amend his note. Harnish agreed to the amendment and signed the "First Amendment to $4,000,000 GrowCo Note" on

September 20, 2016. Harding, as Executive Chairman of the Board, signed the amendment. (Ex. 90).

133. It is reasonable to infer that for at least several months McKowen and Harding were aware that money from new investors likely was being used to pay old investors, and continued the practice in some degree, before reaching out to investors and seeking amendments to the promissory notes. It is also reasonable to infer that after seeking these amendments, McKowen and Harding continued to use money from new investors to pay old investors because rental payments remained sparse at best but investors continued to receive some interest payments—e.g., Loughran testified she sometimes received partial payments and stopped receiving interest payments altogether in October 2017, (TR, 7/10/23, 81:4-82:7), and McMahon testified that following his investment in August 2016, he receive at least six interest payments: (a) $194.44 for August, paid on September 21, 2016; (b) $833.33 for September, paid on October 18, 2016; (c) $833.33 for October, paid on November 15, 2016; (d) $833.33 for November, paid on December 15, 2016; (e) $833.33 for December, paid on January 18, 2017; and (f) $833.33 for January, paid on February 27, 2017. These payments total $4,361.09 per the cancelled checks in Exhibit 55. Accordingly, it is reasonable to conclude that McKowen and Harding were engaged in a classic Ponzi scheme with some of their offerings.

134. Despite these issues, GrowCo continued to make additional offerings and to raise capital, but did not inform potential investors of the tenant issues, its inability to pay the full amount of promised interest on the promissory notes, and its use of new investor funds to pay old investors. (TR, 7/11/23, 216:21-217:18). McKowen and Harding also did not tell investors in these later offerings that McKowen had resigned from Two Rivers and GrowCo and/or disclose the reasons for his "departure," which would not have been readily apparent given McKowen's

continued close involvement with GrowCo. (TR, 7/12/23, 160:24-161:8). While such information was contained in the Two Rivers 8-K filing with the SEC and publicly available, Ex. 1018, neither McKowen nor Harding affirmatively notified potential GrowCo investors of such information.

135. Lastly, the Commissioner's expert witness, Gerald Rome, offered opinions concerning registration, licensing, and disclosure of information surrounding securities offerings. Mr. Rome presented as a credible and persuasive witness based on his professional qualifications, demeanor while testifying, and substance of his responses. Mr. Rome, now retired, was the securities commissioner for the state of Colorado for four and half years. Prior to that, for ten years, Mr. Rome was deputy securities commissioner for the state of Colorado. In both roles, Mr. Rome was responsible for administering and enforcing the CSA. (TR, 7/13/23, 6:5-7:16). Without objection from McKowen or Harding, the Court qualified Mr. Rome as an expert in securities law and regulation. (TR, 7/13/23, 10:1-13).

136. Mr. Rome explained that the purpose of the CSA is "straightforward," and is meant "to protect investors and maintain investor confidence in the securities markets." Mr. Rome further explained the CSA does this "by requiring sellers of securities to make full and fair disclosure of material facts to investors. So it's the burden on the seller to make those disclosures, not the buyer to conduct their own sort of due diligence." (TR, 7/13/23, 10:14-11:2). Mr. Rome noted the CSA seeks to achieve its purposes by doing three things: (a) requiring registration of public securities offerings; (b) licensing of securities professionals; and (c) implementing anti-fraud provisions, such as requiring promoters and issuers to make full and fair disclosure of material facts to investors. (TR, 7/13/23, 13:21-14:20).

137. Concerning registration, Mr. Rome observed that federal law includes some exemptions for private offerings, known as Regulation D. When an issuer is claiming a "Reg D

exemption," the CSA requires the issuer to file a "Form D" with the Commissioner and pay a fee. Filing exemption paperwork with the SEC alone is not sufficient. (TR, 7/13/23, 16:22-17:14; 119:1-19). In addition, and importantly, compliance with registration requirements (such as filing an exemption) does not relieve the promotor or issuer of providing full and fair disclosure of material information to investors, including to accredited and sophisticated investors. The disclosure of material information to all investors is a requirement of every securities offering. (TR, 7/13/23, 17:15-23; 32:10-17).

138. As noted above in the "Applicable Law" section of this Order, concerning the disclosure of information, the CSA (§ 11-51-501) prohibits any person in connection with the offer, sale, or purchase of a security, from "directly or indirectly" making material misrepresentations or omissions. In other words, a person directly participating in a securities offering must make full and fair disclosure of information, and a "control" person for a company offering a security must ensure that anyone acting on his or her behalf in the transaction—e.g., a sales representative, promotor, etc.—also provides full and fair disclosure of information to investors. (TR, 7/13/23, 18:23-20:4). The parties have stipulated that McKowen and Harding were control persons for purposes of the present offerings.

139. Mr. Rome offered some examples of material information that would be important to a potential investor, including: (a) use of proceeds, i.e., how the money is going to be used by the promotor/issuer. For example, in a real estate development project to build a condominium complex, potential investors should be told the percentage of investor funds that will be used for actual construction costs versus administrative/overhead costs. This information is important because if a large percentage of investor funds are being used to support the business purpose that generates profits there is less risk that the investment may ultimately fail, and vice versa; (b)

whether investor funds for an offering will be commingled in accounts of other businesses or segregated in its own account. This is important because commingled funds can lose their identity and risk being used for other business purposes; (c) the background of a promotor in a small company with a limited group of control persons, including the promoter's past regulatory history, is important because the control person's decision making skills, business judgment, and honesty can appreciably influence the success or failure of the company; (d) performance of earlier offerings since past results can be predictive of future results; (e) status of any required licensing, e.g., whether a promotor of a marijuana offering has any required MED license, or whether the sellers of securities are licensed, because non-compliance with licensing requirements can affect the ongoing viability of a business; and (f) whether new investor funds will be used to pay interest to earlier investors, which implicates an illegal Ponzi scheme. (TR, 7/13/23, 20:9-29:22; 35:13-36:9; 90:18-91:7).

140. Mr. Rome explained, "There is no obligation on the investor to dig around, to do their research, to do their due diligence The burden is on the seller [to make full disclosure]." (TR, 7/13/23, 35:2-10). To this end, regarding so-called "safe harbor provisions" and/or risk disclaimers, Mr. Rome explained, "[Y]ou can't say to an investor, 'This is a highly risky investment; if you invest, you may lose your entire investment,' and call that good, call that full and fair disclosure. That is not what the law requires. The law requires that you provide the investor the reasons why it's a risky investment, the reasons why it may fail. You can tell the investor the reasons why it may succeed, but you need to inform the investor exactly what those risks are in that start-up company. . . . So you need to be, when you're making disclosures to investors, much more specific than this general notion that this is a start-up, and it's a risky

investment. . . . It needs to be full-throated disclosure of the important facts to that investor." (TR, 7/13/23, 64:6-65:8).

141. Concerning the use of funds in the present offerings, specifically funds for G&A expenses, Mr. Rome stated, "I think full disclosure would require you [McKowen and Harding] to identify the amounts [of administrative expenses]—and they can be approximations or estimates—but they should be fairly specific as to where the amounts [are] going to, those sorts of things. . . . So—so the term sheets that I read a bit ago indicated that the funds would be used both for construction of the greenhouses and for administrative purposes, but there's no—in my opinion, it's important to know how much of these proceeds are going to be used for the actual construction and how much are going to be used for administrative costs. (TR, 7/13/23, 22:16-21; 107:24-108:5).

142. Concerning McKowen's past regulatory history, Mr. Rome explained, "[I]f you look at the underlying basis for the regulatory action against Mr. McKowen, it involved inadequate disclosures and excessive fees, and those issues—or—are related to the allegations that have been raised in this lawsuit. So—so I think that, even though the event happened way back—not way back, but in 1985, they're relevant to the reasonable investor in that way." (TR, 7/13/23, 36:2-12).

143. During cross-examination by McKowen, Mr. Rome was asked whether the offerings at issue in this case were public or private offerings, and Mr. Rome credibly stated he believed the offerings were public offerings. Mr. Rome explained, "[T]he company used, accreditor investors, cold-call lists, and cold calls were made to investors, that take you out of the private offering exemption. There was also presentations made to investors, and if the company did not have a substantial preexisting relationship with the people it invited to those presentations, then that would take you out of the private offering exemption." (TR, 7/13/23, 50:7-53:6). It is

unclear to the Court whether *every* investor in the GrowCo offerings had a preexisting relationship with the promoters or issuers as the parties did not pursue this area of inquiry in any depth, but the Court is persuaded that at least some of the investors did not have such a relationship.

144. Concerning the issue of commissions for sales representatives versus finder's fees, Mr. Rome explained, "So if I'm a sales agent, and I'm asking an investor to invest in a company, and I receive a commission based upon the amount of the investment, transaction-based compensation, then I'm a securities sales representative, and I need to be licensed. So 'transaction-based compensation' is a term of art, and it may well encompass a flat fee, depending upon the circumstances of that payment of the flat fee What I'm saying is, transaction-based compensation, you can't get around the notion that you're receiving commission by somehow structuring it as a flat fee if your intent is to avoid that." (TR, 7/13/23, 53:9-56:15). Here, the evidence shows that George McCaffrey, Jan McCaffrey, Kirsty Cameron, Richard Wiwi, and Ed Wallick acted as sales representatives and received transaction-based compensation based upon the number and amount of the investments they procured for GrowCo. The amount of their compensation varied thus suggesting it depended on the amount of the investment. McKowen stated during his testimony that Kirsty Cameron and Jan McCaffrey received "commissions." (TR, 7/13/23, 217:16-218:8).

## <u>CONCLUSIONS OF LAW</u>

### A. Securities Fraud (claim one)

The Commissioner claims that McKowen and Harding violated § 11-51-501(1) of the CSA by offering or selling securities in a scheme to defraud investors, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices, or course

of business that operated as a fraud on investors. The Commissioner seeks injunctive relief against Defendants under § 11-51-602(1), and damages, restitution, and disgorgement pursuant to §§ 11-51-602(2) and 604(3), (4), and (5)(a). (Complaint, ¶¶ 211-214). In her written closing argument, the Commissioner states, "The main question for this Court to consider is whether the defendants truthfully disclosed all material facts about the GrowCo enterprises." (Plaintiff's Closing Argument, p. 2). Though the circumstances surrounding the various offerings is somewhat difficult to unwind, the picture that emerges from a close examination of the offerings is that McKowen and Harding misrepresented and omitted material information that a reasonable investor would consider important in deciding whether to invest in GrowCo and its related entities. The Commissioner sets forth a long list of such misrepresentations and omissions in her Proposed Findings of Fact and Conclusions of Law, and in her Closing Argument, many of which the Court discusses below.

Before doing so, however, it is important to note again the legal framework at work here. The Court first observes there is no dispute that the investments in this matter are securities and fall under the CSA. The CSA imposes independent regulatory requirements on securities sold from or in Colorado beyond any requirements that may be imposed by federal securities laws. While there are areas in which the CSA expressly coordinates with federal requirements, such as registration exemptions, compliance with federal laws is not in and of itself sufficient to comply with state requirements. As the Commissioner's securities regulation expert, Mr. Rome, explained during his testimony, the CSA's recognition that federal and state securities laws should be coordinated where appropriate does not mean that the CSA's provisions can be ignored. To the contrary, issuers and salespersons operating in Colorado must comply with the CSA's provisions in addition to any federal requirements.

The CSA makes it unlawful for any person, in connection with the offer, sale, or purchase of any security directly or indirectly: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. § 11-51-501(1)(a), (b), and (c). The securities regulatory system is focused on the promoter's activities and disclosure of information, rather than on the investor's aptitude to obtain the information by asking the right questions. As noted above, this is because securities laws were intended "to substitute a philosophy of *full disclosure* for the philosophy of caveat emptor [i.e., let the buyer beware] and thus to achieve a high standard of business ethics in the securities industry." *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (emphasis added). Like federal securities laws, "blue sky" laws such as the CSA were also intended to supplant the philosophy of caveat emptor and replace it with the philosophy of caveat venditor [i.e., let the seller beware] because the burden of disclosure rests with the selling party, rather than the purchasing party. *Id.* This philosophy is reflected in the CSA's language by placing the burden upon "any person" to not make untrue statements of material fact or omit to state material facts. § 11-51-501; *see also Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727 (Colo. App. 2009). The responsibility of disclosure by the promoters does not change depending on the sophistication of the purchaser, as "[t]he securities laws entitle all investors, both the experienced and the novice, to the full and truthful disclosure of material information." *Spatz v. Borenstein*, 513 F. Supp. 571, 580 (N.D. Ill. 1981), *citing Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980) (section 12(2) of the Securities Act of 1933 "does not establish a graduated scale of duty depending upon the

sophistication and access to information of the customer.") Because the CSA seeks to protect investors, it is "remedial in nature and is to be broadly construed to effectuate its purposes." § 11-51-101(2).

McKowen and Harding have suggested that the Commissioner must prove motive or intent to defraud—or scienter—to sustain claims for fraud under § 11-51-501. This is only partially correct. First, under the plain language of the statute, the Commissioner is not required to establish scienter for injunctive claims brought under § 11-51-602(1). Thus, this Court need not find any scienter to enter an injunction against Defendants. Second, to the extent that any scienter element applies to the Commissioner's claims for damages, the common law fraud elements do not apply. When the Commissioner seeks damages under her enforcement authority per § 11-51-602(2), the Court must apply the relevant scienter standard in § 11-51-604. As such, Defendants can be held liable under subsections 501(a) and (c) for selling securities "recklessly, knowingly, or with an intent to defraud." § 11-51-604(4). For claims under subsection 501(1)(b), the scienter standard places the burden of proof on Defendants to prove they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission" made to investors. *Id.*

**1. § 11-51-501(1)(b)—Misrepresentation or Omission of Material Fact**

With the above legal principles in mind, particularly that a seller of securities is required to make *full* disclosure of all material facts to investors, the Court concludes that the evidence mostly shows McKowen and Harding violated § 11-51-501(1)(b) of the CSA by making untrue statements of material fact and omitting to state other material facts to their investors. These misstatements and omissions increased over time with each additional offering and the worsening financial troubles of GrowCo. The Court, therefore, will address the actions of Defendants within the context of each offering in the order they were presented to investors.

**a. GCP1 (first offering)**

The first offering presented by GrowCo through McKowen and Harding was the GCP1 offering made in or around October 2014—the year that state-licensed commercial sales of marijuana became legal in Colorado. The terms of this offering are explained above in paragraphs 15-19 and will not be repeated here. The Court observes that in retrospect the terms of this offering were quite aspirational in that GrowCo hoped to raise up to $10 million in three months for the construction of two greenhouses but only raised $3,075,000.00—about half of what GrowCo believed it needed for one greenhouse. (Findings of Fact, "FOF," ¶ 59). It is, of course, legally permissible for Defendants to want to financially benefit from the recent legalization of recreational marijuana and to use the land and water resources of Two Rivers in the hopes of turning a nice profit within this emerging industry. Defendants having high expectations for GrowCo and encouraging potential investors to share in this enthusiasm by investing their money in GrowCo fell well within the bounds of the CSA. However, in the Court's judgment, Defendants violated the CSA with this first offering when they failed to share material information that a reasonable investor would consider important in making an investment decision.

First, Defendants failed to disclose that McKowen—the CEO of GrowCo and primary promoter of the offering—had a previous NASD violation in which McKowen had been accused of "engaging in a deceptive and fraudulent contrivance in completing a series of transactions to sell customer securities," and had his license suspended. (FOF, ¶ 11). While this action may have occurred in 1986 and the fraud claims were possibly dismissed on appeal, the fact that the person most responsible for the success of the offering (McKowen) previously had his securities license suspended, even if for a short time and regardless of the reason, is information a reasonable investor would consider important before investing. Whitney Buchanan, an investor in the sixth

offering, explained why such information is important: a promoter's NASD (or FINRA) issues are "a reflection of the willingness to comply with the law and the willingness to honor an agreement." Buchanan confirmed that he would not have participated in a GrowCo offering if he had known McKowen had prior regulatory issues. (FOF, ¶¶ 106-107). Mary Loughran, an investor in the second offering, and Joe McMahon, an investor in the fifth offering, expressed similar views. (FOF, ¶¶ 77, 92). It is reasonable to infer that one or more investors in this first offering would have felt the same way had they known this information. It does not matter that such information was publicly available; Defendants had an obligation to disclose the information and not to wait and see if the investors discovered it on their own. *Black Diamond Fund, LLLP*, 211 P.3d at 737-38 ("A division of this court has specifically held that evidence of NASD sanctions constituted the kind of information that a reasonable investor would consider in making an investment. . . . We are unaware of any authority which recognizes an exception to the CSA's disclosure requirements for publicly available information.") Mr. Rome explained why this information is important for investors, opining that the background of a promoter in a small company (like GrowCo), which includes the promoter's past regulatory history, can significantly influence the success or failure of a company. (FOF, ¶¶ 139, 142). Non-compliance with the CSA can lead to enforcement actions and lawsuits, both of which put the success of a venture at risk, and, therefore, a promoter's past disregard of regulatory requirements may suggest a present inclination to do the same.

Second, following this same rationale, i.e., that information concerning a promoter's willingness to follow the law is important to an investor before making an investment decision, it is also problematic that Defendants did not disclose to potential investors that they neglected to file a notice of exemption from registration with the Commissioner and, thus, they were out of

compliance with the CSA. (FOF, ¶¶ 2.o, 12). While Defendants suggest they may not have known about this particular CSA requirement, they have not established that they could not have known about the requirement in the exercise of reasonable care. Defendants are experienced promoters and expected to be familiar with the CSA. The plain language of § 11-51-308(1)(p) states, "The following transactions are exempted from sections 11-51-301 and 11-51-305 . . . Any offer or sale of a security in compliance with an exemption from registration with the securities and exchange commission under section 3(b)(1) or 4(a)(2) of the federal 'Securities Act of 1933', as amended, 15 U.S.C. secs. 77c (b)(1) and 77d (a)(2), pursuant to regulations adopted in accordance with the federal act by the securities and exchange commission. The issuer shall file with the securities commissioner [of Colorado] a notification of exemption, in a form prescribed by the securities commissioner, and pay an exemption fee to be determined and collected pursuant to section 11-51-707." Defendants may have been in compliance with federal filing requirements for exemptions, but they were in violation of the state filing requirements and should have disclosed as much to potential investors.

Third, Defendants also did not disclose that any cost estimates, revenue projections, and related pro formas supporting the offering were provided by individuals who had minimal or no experience growing marijuana at scale. As discussed above, Defendants relied on Aaron Van Wingerden and Tim Beall to provide these estimates because Harding and McKowen "[knew] nothing" about building or operating a marijuana greenhouse and "had no idea what it cost to build." (FOF, ¶¶ 54-55). While this lack of knowledge when starting a new venture is unproblematic from a legal standpoint and does not violate the CSA, Defendants should have disclosed to investors that they themselves knew nothing about growing marijuana, that they were relying on others who claimed to have such expertise, and that the claimed "experts" had not, in

fact, successfully grown marijuana on an industrial scale before. Understanding that hindsight is always 20/20, the failings of Mr. Van Wingerden, Mr. Beall, and Suncanna, and the negative results for GrowCo and its investors, illustrate why Defendants, at a minimum, should have informed potential investors that the success of the venture resided with growers/operators who had minimal experience in the marijuana industry. A reasonable investor would regard such information as "significantly altering the 'total mix' of information made available," and could have used it to make an informed decision whether investing money in a venture operated by industry newcomers was a risk worth taking. Defendants, by withholding such information, did not give their investors this opportunity.

Finally, Defendants did not fully disclose to potential investors how investment funds would be handled by GrowCo. First, investors were not told that GrowCo investment funds would be commingled in bank accounts belonging to other entities. Ms. Martinez, the auditor with the Colorado Division of Securities, explained that commingling of different funds makes it difficult from an accounting standpoint to track investor funds and the use of those funds. To this end, Ms. Martinez stated that she identified at least one transaction where potential GrowCo funds (albeit a modest amount, $1,500.00) were used to pay a personal financial obligation of McKowen. (FOF, ¶¶ 114-118). Mr. Rome similarly explained that commingled funds can lose their identity and risk being used for other business purposes. (FOF, ¶ 139). The BCLS report illustrates this point given that Two Rivers evidently owes over $4 million to GrowCo, a concern that McKowen himself expressed during the Court Trial. (FOF, ¶ 63). Second, Defendants did not fully disclose to potential investors how much of their investment would be used to support the business purpose that generates profits (building greenhouses and supporting tenant operations) and how much would be used for other expenses, such as G&A. Mr. Rome explained that the more investor funds

are used for the former instead of the latter, the less risk of the investment failing. (FOF, ¶ 139). This makes sense given that investors depended on greenhouses being built and then leased to licensed marijuana growers in order to realize any return on their investments. (FOF, ¶ 53). As explained above, the BCLS report in Exhibit 1032 establishes that GrowCo spent only 46.9% of investor funds on the construction of one greenhouse, the partial construction of a second greenhouse, and the financing and management of the tenants, and that the remaining 53.1% was spent on expenses and other payments not directly connected to building and operating greenhouses, i.e., mostly on G&A. (FOF, ¶ 63). Mr. Rome stated that disclosure to investors concerning use of funds for G&A expenses can be approximations or estimates but still should be "fairly specific" as to the amounts and anticipated uses. (FOF, ¶ 141).

Here, the information provided to investors did not provide any meaningful specificity about the nature of these expenses. The Use of Funds in the Term Sheet simply states that some of the proceeds will be used "for working capital and other general corporate purposes of Partners." (FOF, ¶ 17). The Operating Statement in Exhibit 1009 provides some estimates for "Operating Expenses," including "General and Administrative" expenses, without further description. The Use of Proceeds table in Exhibit 1010 similarly provides estimated amounts but only says such funds are for "Working Capital" and "Offering Costs," without explanation. This is inadequate and does not provide full disclosure to investors concerning use of funds.

**b. $4 Million Note (second offering)**

Concerning the second offering, the $4 Million Note, the terms of this offering are explained in paragraphs 20-30. The inadequate disclosures discussed above for the first offering are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry

experience of the greenhouse operators/marijuana growers; and (4) failure to disclose how investment funds would be handled by GrowCo. (i.e., commingling and description of G&A expenses). Beginning with this second offering, Defendants also had an obligation to fully disclose to investors any shortcomings experienced, or issues identified, during the previous offering(s), as such information would be important to a reasonable investor deciding whether to invest in a subsequent offering by the same issuer. From the Court's perspective, Defendants generally failed to do so.

For example, with this second offering, Defendants knew they intended to raise either $6 million for one greenhouse or $10 million for two greenhouses with their first offering, but only raised $3,075,000.00 between October 2014 (opening of offering) and January 2015 (closing of offering). (FOF, ¶¶ 16, 59). When Defendants made their second offering in or around June 2015, they knew that they had missed their goal for the initial offering by a wide margin, but did not inform potential investors in the second offering of this miscalculation. Thus, at the closing of the first offering (January 2015)—several months before the opening of the second offering (June 2015)—Defendants knew they had insufficient funds to complete construction on even one greenhouse and to support its first tenant, yet they did not fully inform potential investors in the second offering of these troubling financial circumstances. Mr. Rome explained that the performance of earlier offerings is material information that would be important to a reasonable investor given that past performance can be predicative of future results. (FOF, ¶ 139). Part of this past performance includes how much of the investor funds was actually used for greenhouse construction and how much was used for G&A expenses.

In addition, Harding explained during his testimony that the $4 Million Note was needed "to make up for the major costs of overruns" for the first greenhouse. Harding further explained

this "blown budget" contributed to the friction between McKowen and the first tenant (Suncanna). (FOF, ¶¶ 27-28). It does not appear from the evidence concerning this second offering that new investors were ever told that the second offering was necessary because of significant cost overruns and "blown budget" during construction of the first greenhouse. The information for this second offering does not mention these budget issues (even if the full extent of the deficit was still unknown)—or the need to remedy those issues with additional funds—and, thus, was misleading to new investors. (FOF, ¶ 29). To the extent Defendants suggest that the "Disclosure of Information" provision in the Note Purchase Agreement, which provides in part, "Such investor has had an opportunity to discuss with the management of GrowCo the business, management and financial affairs of GrowCo and the terms and conditions of the offering of the Notes and the Warrants," absolves them of any accountability, the Court rejects this argument. (Ex. 1011, Note Purchase Agreement, ¶ 3(c), p. 3). The law is clear that promoters are required to make full disclosure of all material information to potential investors, and boilerplate language in a note agreement that investors had a chance to ask questions and gather information does not relieve Defendants of their responsibility. This makes sense given Defendants alone were in possession of the financial information of GrowCo and potential investors may not have been sufficiently aware of any budget issues that warranted further inquiry.

**c. GCP Super Units, LLC (third offering)**

Concerning the third offering, the GCP Super Units, LLC, the terms of this offering are explained in paragraphs 31-39. The inadequate disclosures discussed above for the first and second offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the greenhouse operators/marijuana growers; and (4) failure

to disclose how investment funds would be handled by GrowCo. Unlike the second offering, Defendants did acknowledge per the Confidential Summary for this third offering that a portion of the money raised ($500,000.00) would be used to finance overruns on the first greenhouse. (FOF, ¶ 39). However, Defendants did not disclose that the "actual" cost to build the first greenhouse was over twice as much as the original estimate, which is material information for the reasonable investor being asked to invest in a subsequent offering by the same issuer. Per Exhibit 1008, Mr. Beall informed McKowen and Harding via email on July 1, 2014, that the estimated "total cost" of building a greenhouse was $2,321,000.000 to $3,321,000.00. (FOF, ¶ 14.d). In the Confidential Summary for this offering, Defendants state, in pertinent part, "The first greenhouse cost approximately $5.0mm to build (or approximately $50/sq ft) and estimates each additional greenhouse will cost approximately $5.0mm." (FOF, ¶ 14.d; Ex. 1012). This discrepancy of over $2 million between the estimate and the "actual" expense alone should have been disclosed to investors.

The significance of this lack of disclosure is even more concerning when considering that Harding testified the actual construction costs for the first greenhouse (completed around September 2015) was approximately $7 million *not* $5 million as reported in the Confidential Summary. Given that this third offering opened in or around September 2015, Defendants—as the CEO and CFO of GrowCo with ready access to the company's financials—knew or should have known with some precision the actual costs versus the reported costs of the completed greenhouse in the Confidential Summary. The Court rejects Harding's testimony that Defendants provided the $5 million figure to investors because that is what he and McKowen believed to be true at the time of the offering; the timing of the offering compared to the end of construction within the same month suggests otherwise. While some variance between the reported and final

costs of construction can be expected, a discrepancy of two million dollars (a difference of 40%) was not reasonable, and Defendants should have ensured that investors were provided with reasonably accurate numbers. Nonetheless, even if the "actual" costs of construction was $5 million as stated in the Confidential Summary, this discrepancy between the "actual" costs and estimated costs still should have been disclosed to investors.

The importance of Defendants disclosing the accuracy of any previous estimates cannot be overstated in this case where Defendants also provided revenue estimates in the Confidential Summary. Per the Confidential Summary, Defendants informed potential investors that "[p]ursuant to the lease agreement with Suncanna the first greenhouse will generate $2.1 million in annual gross lease payments." According to Harding, the actual amount of rent GrowCo received from Suncanna was only between $20,000.00 to $30,000.00, a circumstance that ultimately proved fatal to GrowCo. (FOF, ¶ 56). As recognized previously, hindsight is always 20/20, and the failings of Suncanna and lack of rent payments (arguably) could not have been predicted by GrowCo at the time of the third offering. Nonetheless, Defendants did know that their construction costs estimate diverged considerably from the "actual" costs and, thus, had Defendants disclosed the inaccuracy of their costs estimate in their Confidential Summary or during their investor presentation, (Exhibit 1012), potential investors could have inquired about, and more fully assessed, the accuracy of the revenue projection. In short, potential investors could have used Defendants' past performance on one estimate to measure the reliability of Defendants' current estimate. Defendants, by withholding such information, deprived their investors of this opportunity.

The Court makes two final conclusions concerning this third offering. First, given the Court's finding that Defendants likely exaggerated Mr. Van Wingerden's expertise in growing

marijuana, the Court concludes Defendants provided inaccurate information to potential investors in their Confidential Summary concerning its tenant and the tenants' ability to generate revenue. (FOF, ¶ 55). Second, per the rationale stated for the previous offering, the "Disclosure of Information" provision in the GCP Super Units Purchase Agreement, does not relieve Defendants of their responsibility to make full disclosure of all material information to potential investors. (Ex. 1012, Note Purchase Agreement, ¶ 3.3, p. 6).

**d. $1.5 Million Note (un-numbered offering)**

Concerning the $1.5 Million Note, an un-numbered offering given the relatively nominal amount raised ($100,000.00), apparent absence of offering documents in the admitted exhibits, and minimal testimony about the offering, the Court concludes the Commissioner has not proven Defendants violated the CSA regarding this offering. The Court notes this offering opened and closed in April 2016 (perhaps on the same day), which was between the openings for the third and fourth offerings.

**e. $6 Million Exchange Note (fourth offering)**

Concerning the fourth offering, the $6 Million Exchange Note, the terms of this offering are explained in paragraphs 40-41. The inadequate disclosures discussed above for the first, second, and third offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; and (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs. In addition, beginning with this offering, the evidence shows that GrowCo did not disclose to potential investors that its original tenant (Suncanna) had been purchased by McKowen through an entity

named RH Group, LLC, on or about February 25, 2016, that the MED suspended Suncanna's license on April 14, 2016, and that McKowen and his entity (Johnny Cannaseed) did not possess a MED license. (FOF, ¶¶ 30, 119). The buy-out and license suspension were material information that would be important to a reasonable investor given that the profitability of GrowCo depended exclusively on the success of its tenant. A change in grower/operator and licensing issues had the potential to disrupt greenhouse operations and interfere with marijuana production, which threatened the tenant's ability to generate revenue and pay its rent. Thus, when this fourth offering opened on or about April 22, 2016, Defendants should have informed potential investors of these emergent issues (even if the full impact was still unknown) given that tenant turnover/instability on its own had the potential to imperil GrowCo's bottom line. Once again, however, Defendants failed to disclose this information and the issues eventually proved to be detrimental for GrowCo and its investors. Defendants, by withholding such information, deprived investors of the opportunity to make an informed decision about their investment.

**f. $7 Million Exchange Note (fifth offering)**

Concerning the fifth offering, the $7 Million Exchange Note, the terms of this offering are explained in paragraphs 42-44. The inadequate disclosures discussed above for the first, second, third, and fourth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; and (6) failure to disclose tenant and licensing issues. Beginning with this offering, the troubles of GrowCo were accelerating and the misinformation and non-disclosure of material information were

compounding. The Court notes that when this offering opened on or around June 6, 2016, McKowen had just resigned from GrowCo several weeks earlier and Harding had assumed the chief executive duties. (FOF, ¶¶ 30, 81, 122). McKowen nonetheless continued to be closely involved in GrowCo as its largest shareholder (through his entity McGrow) and as an "advisor" pursuant to several written agreements formally executed on July 22, 2016. (FOF, ¶¶ 122, 125). McKowen also continued promoting GrowCo offerings at the request of GrowCo, including giving a presentation to potential investors for this fifth offering. (FOF, ¶ 56, 123). McMahon, an investor in this offering, confirmed that both McKowen and Harding were at the investor presentation for this offering, and that McKowen was "pitching the deal." (FOF, ¶ 81).

During this presentation, neither McKowen or Harding disclosed the concerning information described above or explained that GrowCo was on the brink financially and operationally (e.g., its previous tenant had failed, GrowCo had collected almost no rent in the past 12-18 months, GrowCo had "blown the budget" on the first greenhouse, GrowCo was struggling to pay investors, etc.) Rather, McKowen, at the behest of GrowCo and Harding, painted a much different picture of GrowCo and its future—a picture unsupported by events of the previous eighteen months. In its presentation, the "Projections" slide indicated that GrowCo expected to receive $9,000,000.00 in rent payments even though its tenant, Suncanna, had only paid $20,000.00 to $30,000.00 in rent during its tenancy, had at least one crop destroyed due to grower mismanagement, had recently lost (or was in the process of losing) its MED license, and was being evicted by GCP1. (FOF, ¶ 56; Ex. 8). In addition, McKowen did not disclose that a company owned by him (Johnny Cannaseed) was attempting to lease the greenhouse even though neither he or the entity possessed a license to grow marijuana. (FOF, ¶ 127). Similarly, the "Projections" slide indicated the projected revenue for the grower would be over $41 million even though the

original tenant was never profitable and experienced significant operational and financial challenges. While providing estimates of future revenues/profits to investors—even optimistic ones based on the hope that GrowCo's circumstances would improve—was permissible, it was misleading to present these projections without also disclosing the myriad issues that had plagued GrowCo and its tenant up to that time. By omitting this crucial information, McKowen and Harding ensured that potential investors would be making an investment decision without full knowledge of all material facts concerning the offering.

The Court also notes that the Two Rivers' board of directors conducted an internal investigation of McKowen concerning some of these same issues, and prepared a report of their findings on or about June 29, 2016. (FOF, ¶¶ 119-120). During his testimony, McKowen acknowledged the report contains material information that a reasonable investor would want to know before investing in GrowCo. (FOF, ¶ 121). Of particular note, the report suggests that much of McKowen's questionable conduct may be explained by his and Two Rivers' "desperate need for capital." (FOF, ¶ 120). Neither the report or the existence of an investigation was ever revealed to outside parties, including potential investors. By withholding this information, Defendants deprived investors of the opportunity to assess the trustworthiness of the promoters and the competence of those who would be handling their investment and, thus, precluded investors from making a fully informed decision about their investment with GrowCo.

**g. $2 Million Exchange Note (sixth offering)**

Concerning the sixth offering, the $2 Million Exchange Note, the terms of this offering are explained in paragraphs 45-46. The inadequate disclosures discussed above for the first, second, third, fourth, and fifth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3)

failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; and (6) failure to disclose tenant and licensing issues. Per Buchanan, the only information he received about this offering was the Term Sheet and he was never told about the risks associated with this investment. (FOF, ¶¶ 101-102, 106, 108). The Court concludes that other investors received the same limited information. The Term Sheet dated February 15, 2017, and other related documents in Exhibit 51, do not list any risk factors for this offering.

Beginning no later than this offering (and likely beginning with the fifth offering above), McKowen and Harding were well aware that GrowCo was unable to pay its investors on time or the full amount due. When this offering opened on or around February 15, 2017, previous GrowCo investors in the $4 Million Note (the second offering) had already been asked by Harding *four months earlier* to amend their promissory notes because GrowCo was struggling to pay monthly interest on the notes due to issues with its tenant. (FOF, ¶¶ 103). Moreover, just one week after Buchanan invested in this sixth offering (on March 7, 2017), Harding signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017, concerning McMahon's investment in the $7 Million Exchange Note. (Ex. 85). Given the short amount of time between when this offering was made and when GrowCo asked investors in the $7 Million Exchange Note to amend their notes, McKowen and Harding surely knew when they promoted this offering that they had not delivered on their promises to previous investors, and yet continued to solicit additional funds from new investors and make similar promises without disclosing GrowCo's financial troubles. This silence speaks volumes about the dire financial circumstances of GrowCo, its desperate need for additional capital, and Defendants' motivations to portray GrowCo in the best (albeit

misleading) possible light. Regardless of how damaging this information would have been to Defendants' efforts to entice new investment, Defendants were obligated to disclose this information as a reasonable investor undoubtedly would consider Defendants' current inability to pay investors essential in deciding whether to invest in the offering.

**h. $550K McGrow Units (seventh offering)**

Concerning the seventh offering, $550K McGrow Units, the terms of this offering are explained in paragraphs 47-48. The inadequate disclosures discussed above for the first, second, third, fourth, fifth, and sixth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo and McGrow; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; (6) failure to disclose tenant and licensing issues; and (7) failure to disclose GrowCo's inability to pay its investors. (FOF, ¶¶ 86-90). The Court first observes that it is unclear how much money was actually raised by McGrow given that the BCLS report does not address this offering. (FOF, ¶ 59). Nonetheless, the Court concludes that even though this is a McGrow offering, the offering itself and the business activities of McGrow are so closely intertwined with previous GrowCo offerings and GrowCo's business activities that any distinction between GrowCo and McGrow for purposes of resolving this claim is unimportant. (FOF, ¶ 88). As such, the Court considers the relationship between McKowen, Harding, and this McGrow offering to be the same as their relationship in the GrowCo offerings, and concludes that the inadequate disclosures in this seventh offering in violation of the CSA can be attributed to both McKowen and Harding.

**i. VitaNova, Inc. (eighth offering)**

Concerning the eighth offering, VitaNova, Inc., the terms of this offering are explained in paragraphs 49-52. The inadequate disclosures discussed above for the first, second, third, fourth, fifth, sixth, and seventh offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen and FINRA issues for George McCaffrey; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo, McGrow, and VitaNova, Inc.; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; (6) failure to disclose tenant and licensing issues; and (7) failure to disclose GrowCo's inability to pay its investors. (FOF, ¶¶ 2.c, 2.l, 52, 106-109). The Court first observes that it is unclear how much money was actually raised by VitaNova, LLC, given that the BCLS report does not address this offering. (FOF, ¶ 59). Nonetheless, the Court concludes that even though this is an offering by VitaNova, Inc., the offering itself and the business activities of VitaNova, Inc., are so closely intertwined with GrowCo and its business activities that any distinction between GrowCo and VitaNova, Inc., for purposes of resolving this claim is unimportant. The Term Sheet states the proceeds from this offering will be used solely to provide a secured loan to GrowCo Super Units, LLC. As such, the Court considers the relationship between McKowen, Harding, and this VitaNova, Inc., offering to be the same as their relationship in the GrowCo offerings, and concludes that the inadequate disclosures in violation of the CSA can be attributed to both McKowen and Harding.

In summary, based on the foregoing, the Court concludes that both McKowen and Harding promoted these eight offerings and failed to make full disclosure of all material facts to investors when doing so. It is of no consequence that some of the information may have been publicly

available per Two Rivers' SEC filings or that the investors were accredited investors and these were claimed private offerings. Defendants were still obligated per the CSA not to misrepresent or omit information that a reasonable investor would consider important in making an investment decision. The three investors—Loughran, McMahon, and Buchanan—who provided testimony concerning their investments in the offerings all stated they would not have invested in a GrowCo, McGrow, and/or VitaNova, Inc., offering if they had known certain material information that was not disclosed, e.g., financial troubles of GrowCo, regulatory issues for McKowen and Mr. McCaffrey, MED licensing issues for McKowen, inability to pay previous investors, etc. (FOF, ¶¶ 77, 92, 106). This is material information that any reasonable investor would have wanted to know before making an investment decision. It is remarkable to the Court that McKowen and Harding continued promoting offerings without fully disclosing the budget and financial troubles of GrowCo, including that GrowCo was unable to make payments to previous investors and that its projections of revenues and profits ignored the past challenges of GrowCo and its tenants. The Court rejects Defendants' suggestion that the "Disclosure of Information" provision in some of the offering documents absolves them of any responsibility for not providing such information. The law is clear that promoters are required to make full disclosure of all material information to potential investors, and boilerplate language in a note agreement that investors had a chance to ask questions and gather information does not relieve Defendants of this responsibility. Accordingly, the Court concludes that McKowen and Harding violated §11-51-501(1)(b) of the CSA.

**2. § 11-51-501(1)(a) and § 11-51-501(1)(c)**

The Court elects to consider the claimed violations of these two provisions together given their obvious overlap. In doing so, the Court relies on *Lorenzo v. S.E.C.*, 587 U.S. 71, 80, 139 S.Ct. 1094, 203 L.Ed.2d 484 (2019), in which the U.S. Supreme Court interpreted the provisions

of Securities and Exchange Commission Rule 10b-5 and relevant federal statutory provisions—the federal counterparts to § 11-51-501 of the CSA—and recognized the "considerable overlap" between subsections (a) and (c) of the Rule.[9] Identical to the CSA, subsection (a) of the federal rule makes it unlawful to "employ any device, scheme, or artifice to defraud," and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates as a fraud or deceit upon any person in connection with the purchase or sale of securities." The Supreme Court stated, in pertinent part, "[S]ince its earliest days, the [Securities and Exchange] Commission has not viewed these provisions as mutually exclusive The idea that each subsection of Rule 10b-5 governs a separate type of conduct is also difficult to reconcile with the language of subsections (a) and (c). It should go without saying that at least some conduct amounts to 'employ[ing]' a 'device, scheme, or artifice to defraud' under subsection (a) as well as 'engag[ing] in a[n] act . . . which operates . . . as a fraud' under subsection (c)." *Id.* In addition, the Supreme Court reaffirmed some definitions for words used in subsection (a) of the Rule: (1) a "device" is "that which is devised, or formed by design"; (2) a "scheme" is a "project, plan, or program of something to be done"; and (3) an "artifice" is an "artful stratagem or trick," and then noted that "[t]he words 'act' and 'practice' in subsection (c) are similarly expansive." *Id.* at 1101.

Concerning § 11-51-501(a) and (c), the Commissioner generally alleges in her Proposed Findings of Fact and Conclusions of Law that McKowen and Harding engaged in an elaborate plan to defraud investors over the course of several years and that nearly all of their actions during this period of time were in furtherance of this fraud. (Commissioner's Proposed Findings of Fact and Conclusions of Law, ¶¶ 55-62). The Commissioner sets out a narrative of events that purports to show that McKowen and Harding began down this dishonest road from the inception of GrowCo

[9] "Insofar as the provisions of Colorado securities laws have parallel federal statutes, federal authorities are persuasive in interpreting the CSA." *Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 735 (Colo. App. 2009).

in 2014. While the Court believes, as explained below, that McKowen and Harding did engage in fraudulent activity at times during these offerings, the Court is not entirely convinced that their actions between 2014 and the present were a continuous, singular, and pervasive effort to defraud investors for their own gain. McKowen and Harding had a vision of building state-of-the-art greenhouses and profiting on the legalization of recreational marijuana in Colorado. The fact that they were able to complete construction on one impressive greenhouse at a cost of $7 million—a "spectacular" structure that Buchanan said was the best greenhouse he had ever seen—indicates that McKowen and Harding seemingly hoped to deliver on their promises to investors and realize the ambitions of GrowCo. (FOF, ¶ 100). This, of course, did not happen, and the venture failed. McKowen maintained during the Court Trial that failure does not equal fraud. As a general rule, the Court agrees.

With this said, however, the Court does conclude that McKowen and Harding violated § 11-51-501(a) and (c) during this venture by employing a fraudulent strategy and engaging in a course of business which operated as a fraud or deceit upon their investors—especially during the later offerings when it became obvious that GrowCo was on the brink of failure and in desperate need of capital. Some of this fraudulent activity has been discussed above, such as McKowen and Harding promoting offerings without disclosing the budget and financial troubles of GrowCo (e.g., "blown budget," lack of rental income from tenant, etc.) or, perhaps most importantly, that GrowCo was unable to make payments to previous investors. This decision to withhold material information from investors appears to have been purposeful in order to paint the fortunes of GrowCo in a more favorable light so as to attract new investors, and then use the additional funds to satisfy its immediate financial obligations in an effort to bide time until GrowCo became profitable. Unfortunately, for GrowCo and its investors, this never happened, and Defendants

were left to promote additional offerings to offset the lack of revenue from its struggling operations. In doing so, Defendants had to know that investors were at risk of losing their investment.

As this pattern began to repeat itself and GrowCo used new investor funds, in part, to satisfy its obligations to previous investors, it became apparent that GrowCo was operating like a Ponzi scheme. Defendants themselves acknowledged this reality. (FOF, ¶¶ 129-131, 133, 139). Defendants discussed this issue on or around June 27, 2016—at the time of the $7 Million Exchange Note (the fifth offering)—and, thus, the Court concludes that for at least the sixth, seventh, and eighth offerings, Defendants raised money knowing that GrowCo, McGrow, and VitaNova, Inc., could be operating as a fraud or deceit upon the investors. However, the Court concludes that beginning with earlier offerings and continuing through the eighth offering, Defendants had reasons to know that GrowCo and related entities were operating as a Ponzi scheme and yet disregarded such information and continued to promote the offerings. In other words, at a minimum, Defendants recklessly sold securities in violation of § 11-51-501.[10]

In reaching this conclusion, the Court observes that the primary source of revenue for GrowCo was rental income from lessees and, thus, investors depended on the greenhouses being built and then leased to successful marijuana growers in order to realize any return on their investments. (FOF, ¶ 53). As discussed repeatedly throughout this Order, only one greenhouse was ever built despite promises to investors (beginning as early as the second offering) that their funds would be used to build multiple greenhouses. (FOF, ¶ 22). The first greenhouse was finished

[10] Per § 18-1-501(8), in criminal cases, "a person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists." In civil cases, "[w]anton and reckless conduct is defined as 'conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 578 (Colo. App. 2006).

in September 2015 and the first tenant (Suncanna) took occupancy. Suncanna was not a successful or profitable tenant. During its (approximate) seven months of tenancy, Suncanna had to destroy one entire crop due to disease and another crop in or around April 2016 after its MED license was revoked. (FOF, ¶¶ 55, 119). Suncanna therefore had minimal revenue to make its rent payments. Per Harding, GrowCo received only $20,000.00 to $30,000.00 in rent from Suncanna, and after its eviction no tenant or subtenant ever consistently operated the greenhouse or paid rent. (FOF, ¶¶ 55-56, 127). This is generally consistent with the evidence provided by Ms. Martinez, which showed that between December 2014 and March 2018, Two Rivers, on behalf of GrowCo and related entities, received $50,144.57 in "income" from Suncanna per a single transaction, and $5,600.00 in "lease income" from an unidentified source per three transactions. (Ex. 141). Given that rental payments were the only meaningful source of revenue for GrowCo, and GrowCo collected only a negligible amount of rent, the inescapable conclusion is that GrowCo relied on its only other real source of "income,"—new investor funds—to make payments on its promissory notes. Again, Defendants acknowledged as much during their testimony. (FOF, ¶¶ 129-131).

This conclusion is further supported by the reliable and persuasive testimony of Ms. Martinez and her summary in Exhibit 141. (FOF, ¶ 111). Per Exhibit 141, Two Rivers (in its five bank accounts controlled by McKowen, Harding, and others) received $17,180,680.00 in investor funds per 170 transactions; MCG Services, LLC (in its one account controlled by McKowen) received $1,078,538.00 in investor funds per 24 transactions; and TR Capital Partners, LLC (in its one account controlled by McKowen, Harding, and Kirsty Cameron) received $1,027,299.29 in investor funds per 34 transactions. These deposits of investor funds total $19,286,517.00. This is consistent with the BCLS report which shows $18,905,500.00 in investor funds were raised between December 2014 and September 2017, a variance of $381,017.00. As noted above, the

summary prepared by Ms. Martinez in Exhibit 141 examined banking activity for accounts open between December 2014 and March 2018, i.e., six months longer than the time period examined by BCLS and, thus, any investor funds received after September 2017 would not be reflected in the BCLS report. Exhibit 141 further shows that Two Rivers made $2,262,553.89 in investor payments per 512 transactions; MCG Services, LLC, made $134,916.65 in investor payments per 11 transactions; and TR Capital Partners, LLC, made $210,376.42 in investor payments per 78 transactions. These investor payments total $2,607,846.96. Since GrowCo and related entities likely received no more than $55,744.57 in lease payments and had no other appreciable source of income, and paid out over $2.6 million to investors, it is reasonable to conclude that GrowCo used investor funds to make these payments to investors. No persuasive alternative explanation has been offered by either McKowen or Harding to explain how these significant investor payments were made in the absence of a successful and profitable tenant, or other measurable source of revenue. This is quite telling given Defendants, as executives of GrowCo with access to the company's financials, were in the best position to know how GrowCo earned its revenue and how it paid its investors. The Court is left to conclude that GrowCo and its related entities devolved into a classic Ponzi scheme—a fraudulent strategy and a business which operated as a fraud or deceit upon its investors. Accordingly, the Court concludes that McKowen and Harding violated § 11-51-501(1)(a) and (c) of the CSA.[11]

**B. Unlicensed Activity—Sales Representative (claim two)**

The Commissioner claims that GrowCo and its related entities violated § 11-51-401 and § 11-51-402 of the CSA by using unlicensed sales representatives to offer and sell its securities without a lawful exemption. (Complaint, ¶¶ 217-219). The Court agrees. As an initial matter, the

[11] In light of this conclusion, the Court declines to address how conversion of debt securities into equity securities and how the order of liens may have violated the CSA.

Court notes that per paragraph 2.m above, the parties acknowledge that the "individual Defendants used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities." In addition, per paragraph 2.n, the parties agreed that the "McCaffreys offered and sold securities for the Defendant entities with[out] being properly licensed under the [CSA] and received fees for offering and selling Defendant entities' securities." The first question thus becomes whether any of the individuals who sold GrowCo securities without a license can be considered a "sales representative" under the CSA. Section 11-51-201(1) defines "sales representative" as:

> [A]n individual, other than a broker-dealer, either authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities or authorized to act and acting for an issuer in effecting or attempting to effect purchases or sales of the issuer's own securities. An individual so acting for an issuer is not a sales representative if the individual primarily performs, or is intended primarily to perform upon completion of an offering of the issuer's own securities, substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities and the individual's compensation is not based, in whole or in part, upon the amount of purchases or sales of the issuer's own securities effected for the issuer. A partner, officer, or director of a broker-dealer or issuer, or an individual occupying a similar status or performing similar functions, is a sales representative only if the individual otherwise comes within the definition.

The Court concludes that for certain offerings Ms. McCaffrey, Mr. McCaffrey, Kirsty Cameron, and McKowen acted as unlicensed sales representatives under § 11-51-401. (FOF, ¶¶ 13, 52, 76, 144).

First, in or around April 2015, Ms. McCaffrey solicited Loughran to invest in the second offering ($4 Million Note). Ms. McCaffrey discussed the offering with Loughran and explained that the note was "callable," secured, and had a good interest rate. Ms. McCaffrey answered questions Loughran had about the offering and advised Loughran that the offering was a "good

investment." (FOF, ¶¶ 70-71). After Loughran invested in this second offering, Ms. McCaffrey continued to solicit Loughran in at least one additional offering. Per Exhibit 35, in an email exchange between Ms. McCaffrey and Loughran concerning the third offering (GCP Super Units), Ms. McCaffrey provided Loughran with a GrowCo summary and spreadsheets showing cash flows, explained these cash flows and other issues concerning GrowCo going public in the future, and invited Loughran to reach out with any additional questions. It is important to note that in her signature line for this email, Ms. McCaffrey indicated that she works with RE/MAX Edge—a real estate company—and not GrowCo or a related entity. It is reasonable to infer that eight months earlier during her solicitation of Loughran for the second offering, Ms. McCaffrey was similarly associated with RE/MAX Edge and not employed by GrowCo or a related entity. Ms. McCaffrey did not join GrowCo's executive team until 2017. (FOF, ¶ 2.d). Ms. McCaffrey, through Waterton Financial, received compensation for her successful solicitation of Loughran. Exhibit 44 shows that on April 15, 2015, GrowCo paid Waterton Financial $26,500.00 for "Cost of GrowCo Note Raised." *See also* Exhibits 31 and 72.

Exhibit 44 also shows that GrowCo made the following payments to Waterton Financial for the same reason, i.e., "Cost of GrowCo Note Raised": (1) $11,750.00 on June 15, 2015; and (2) $2,500.00 on July 8, 2015. Two additional payments of $3,500.00 were made that same year for "Cost of Capital GC SU Raised," including one payment that was labeled a "Finders Fee Payment." In 2016, the year before Ms. McCaffrey joined the GrowCo executive team, GrowCo made fifteen additional payments to Waterton Financial, totaling $89,250.00 (in varying amounts, including $1,750.00, $3,500.00, $6,500.00, $7,000.00, and $10,500.00), only four of which were labeled as a "Finders Fee Payment," for cost of capital raised in the first, third, and fifth offerings. (Ex. 44). These fluctuating amounts indicate the payments were transaction-based payments, or

commissions, which is a hallmark of being a broker-dealer or sales representative. *Black Diamond Fund, LLLP*, 211 P.3d at 734; *cf. Cornhusker Energy Lexington, LLC*, No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006). Defendants' assertion that these payments are only Finder's Fees and, therefore, show that Ms. McCaffrey is not a sales representative is unpersuasive and not supported by any statute, rule, or caselaw provided by Defendants. The Court also notes that in 2017 GrowCo made eleven additional payments to Waterton Financial, totaling $55,169.35 (in varying amounts, including $1,750.00, $2,919.35, $3,500.00, $5,000.00, $7,000.00, and $10,500.00), none of which were labeled as a "Finders Fee Payment," for cost of capital raised, primarily for the sixth offering ($2 Million Note). (Ex. 44).

The Court concludes that Ms. McCaffrey was a sales representative for GrowCo because: (1) Ms. McCaffrey was an individual, not a broker-dealer; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities, that is Ms. McCaffrey solicited Loughran, distributed documents about the offering to Loughran, and answered questions about the offering for Loughran, all in the hope that Loughran would invest in the offering; (4) received transaction-based compensation for the solicitation; and (5) Ms. McCaffrey, at the time of the solicitation, did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. Ms. McCaffrey was not yet the COO, or Secretary/Treasurer for the Board of Directors, for GrowCo and related entities until approximately two years later. As such, the Court concludes that Ms. McCaffrey sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Second, concerning Mr. McCaffrey, he was licensed to sell securities from January 3, 1978 until on or around October 30, 2017. (FOF, ¶ 2.c). Mr. McCaffrey was formally suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc.

(FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities from GrowCo while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado). (FOF, ¶ 52; Ex. 14, 65). The FINRA BrokerCheck Report in Exhibit 14 says, in part, "The findings [of the FINRA investigation] stated that McCaffrey introduced the nine individuals to representatives of a greenhouse building and leasing company so they could invest in the company. The findings also stated that he reviewed and edited documents relating to the investments, forwarded investment-related documents to the customers, and communicated with the customers about their investments. Those investors purchased $1,775,000 in promissory notes of the greenhouse building and leasing company and preferred stock in one of the company's affiliates. The findings also included that in connection with these transactions, the company paid $124,250 in commissions to an entity controlled by McCaffrey's wife." (Ex. 14, p. 12). Mr. McCaffrey was ordered to disgorge these commissions. This FINRA report makes clear that Mr. McCaffrey was selling GrowCo securities outside of the requirements of his securities license.

The Court concludes that Mr. McCaffrey was a sales representative for GrowCo because: (1) Mr. McCaffrey was an individual, acting outside of his broker-dealer license; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities; (4) received transaction-based compensation for the solicitation; and (5) Mr. McCaffrey, at the time of the solicitation, did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. The Court understands that Mr. McCaffrey did not serve in any executive positions with GrowCo or its related entities until he became COO of VitaNova, LLC. (FOF, ¶ 2.l). Mr. McCaffrey acted as a sales representative for the twenty-two private securities transactions *prior* to his FINRA suspension in 2018—i.e., during

the first seven offerings unrelated to the VitaNova entities—and, therefore, he was not yet an executive of the issuer while soliciting potential investors. As such, the Court concludes that Mr. McCaffrey sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Third, concerning Kirsty Cameron, she was never licensed to sell securities. (FOF, ¶¶ 13). As noted above, the parties stipulated that Defendants "used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities." (FOF, ¶ 2.m). During their testimony, McKowen and Harding confirmed Ms. Cameron is one of those parties. (FOF, ¶ 13). McKowen also confirmed that Ms. Cameron received "commissions" for her sales efforts. (FOF, ¶ 144). Exhibit 141 shows that GrowCo paid $175,014.61 in "Finders Fees" per 24 transactions. Ms. Martinez testified she believed these particular fees were paid to Ms. Cameron and Anne Wallich. (FOF, ¶ 112). In addition, Exhibit 44 shows that GrowCo made the following two payments totaling $9,500.00 to Ms. Cameron for "Cost of GrowCo Note Raised": (1) $4,000.00 on April 20, 2015; and (2) $5,000.00 on May 4, 2015. Although it is somewhat difficult to discern from the trial evidence when Ms. Cameron left her employment with GrowCo and its related entities, the Court believes it was in or around February 17, 2015, when she was removed as an authorized signer on the Two Rivers' bank accounts. (Ex. 141). As such, the $9,500.00 in commission payments occurred after she left her employment with GrowCo and related entities and, therefore, at the time of at least two solicitations, Ms. Cameron did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. The Court thus concludes that Ms. Cameron sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Fourth, concerning McKowen, the Commissioner states in paragraph 40 of her Proposed Findings of Fact and Conclusions of Law, "Prior to his resignation from Two Rivers and the GrowCo Entities, McKowen was exempt from licensure as an executive acting on behalf of the issuer. However, after McKowen resigned from those companies, he [was] no longer an executive acting on behalf of the issuer and therefore no longer exempt from licensure." The Court generally agrees. Prior to McKowen's resignation from his executive positions with Two Rivers in May 2016, McKowen could offer and sell GrowCo securities without running afoul of § 11-51-401. Following his resignation from Two Rivers, McKowen was in a contractual relationship with GrowCo to promote its securities and to serve as an "advisor" pursuant to several written agreements for which he would receive $22,750.00 per month. (FOF, ¶¶ 122-125). In addition to promoting GrowCo's securities, McKowen was to continue his oversight of greenhouse construction. Even though he resigned from his executive positions with Two Rivers, he retained significant ability to direct GrowCo's essential activities and control its economic success. Thus, whether McKowen could be considered a sales representative following his resignation is a bit more complicated than the McCaffreys or Kirsty Cameron. Like the others, McKowen (1) was an individual, not a broker-dealer; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities; and (4) received transaction-based compensation for the solicitation.

However, unlike the McCaffreys and Ms. Cameron, McKowen (despite his resignation) did perform substantial duties for GrowCo otherwise than in connection with transactions in GrowCo's own securities—he oversaw greenhouse construction, perhaps the most important activity in which GrowCo was engaged at the time. Per the definition of "sales representative" in § 11-51-201(1), "An individual so acting for an issuer [i.e., effecting purchases or sales of

securities of the issuer's own securities] is not a sales representative if the individual primarily performs . . . substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities *and* the individual's compensation is *not* based, in whole *or in part*, upon the amount of purchases or sales of the issuer's own securities effected for the issuer." (Emphasis added). Although McKowen did perform substantial duties on behalf of GrowCo apart from promoting its securities, McKowen's overall compensation was based in part on the amount of securities he sold and, therefore, he did not satisfy the above "carve out" to the definition.

Exhibit 44 shows that on August 29, 2016, and again on October 28, 2016, GrowCo paid McKowen (through MCG Services, LLC) $22,750.00, his contractual fee per the three written agreements he executed with GrowCo after his resignation. McKowen also received payments in the amount of $14,000.00 on September 16, 2016, and $9,800.00 on October 3, 2016, for "Cost of Capital 7MM Note Raise," one of which was labeled a "Finders Fee," and $4,000.00 on August 31, 2017, for "Cost of Capital 2M Raise." (Ex. 44). The Court infers from these varying amounts that McKowen was receiving additional compensation based upon the number and amount of the investments he procured for GrowCo. As such, following his resignation, McKowen fell within the definition of "sales representative," and sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Concerning whether the McCaffreys, Kirsty Cameron, and/or McKowen were exempt from licensure under § 11-51-402, the Court concludes in the negative. None of the exemptions apply in this case for the following reasons: (1) subsection (1) of the statute applies to broker-dealers and the McCaffreys, Kirsty Cameron, and McKowen did not sell GrowCo securities as broker-dealers; (2) subsection (2)(a) of the statute applies to sales representatives employed or

otherwise engaged by a broker-dealer and the McCaffreys, Kirsty Cameron, and McKowen were not employed or engaged by a broker-dealer; (3) subsection (2)(b) of the statute applies to sales representatives employed or otherwise engaged by an issuer in effecting transactions only in securities exempted by section 11-51-307(1)(a) to (1)(d) or (1)(j), none of which apply in this case; (4) subsection (2)(c) of the statute applies to sales representatives employed by an issuer in effecting transactions only with employees, partners, officers, or directors of the issuer or of a parent or subsidiaries of the issuer, if no commission or other similar compensation is paid or given directly or indirectly to the sales representative for soliciting an employee, partner, officer, or director in this state. The McCaffreys, Kirsty Cameron, and McKowen sold securities to investors who were not just employees, partners, officers, or directors of GrowCo, Two Rivers, or related entities, and they received commissions for their sales efforts; and (5) per subsection (2)(d), the Commissioner has not by rule or order exempted GrowCo sales representatives, or any category of sales representatives in which the GrowCo sales representatives could be included, from the licensure requirements of § 11-51-401. Accordingly, the Court concludes that the McCaffreys, Kirsty Cameron, and McKowen sold GrowCo securities as unlicensed sales representatives under § 11-51-401, and were not exempted under § 11-51-402, in violation of the CSA.

Finally, in light of the above conclusion that the McCaffreys, Kirsty Cameron, and McKowen violated the licensure provisions of the CSA, the Court concludes that Defendants also violated § 11-51-501(1)(b) of the CSA by not disclosing such information to GrowCo investors. As discussed previously, non-compliance with the CSA can lead to enforcement actions and lawsuits, both of which put the success of a venture at risk. Information about a promoter's non-compliance with the CSA is important to an investor before making an investment decision, and Defendants did not disclose to potential investors that GrowCo used unlicensed, non-exempt, sales

representatives to sell its securities. This lack of disclosure is similar to Defendants' non-disclosure of the FINRA and NASD actions, and failure to file a notice of exemption from registration with the Commissioner, discussed earlier in this Order.

**C. Unregistered Securities (claim three)**

The Commissioner claims that GrowCo and its related entities violated federal and state registration requirements as follows: (1) for some offerings, Defendants failed to register or file for exemption from registration with the SEC; (2) for other offerings, Defendants filed for exemptions from registration with the SEC but did not meet the requirements for exemption; (3) for all offerings, Defendants failed to register or file for exemption from registration with the Commissioner; (4) for all offerings, Defendants failed to provide full and fair disclosures about the NASD issues involving McKowen, which disqualified the offerings from exemption from securities registration pursuant to Rule 506; and (5) for all offerings, Defendants failed to provide a notification of exemption to the Commissioner, as required by § 11-51-308(1)(p). (Complaint, ¶¶ 221-227). The Complaint provides minimal information for these allegations, and the Commissioner does not identify which offerings fall within the various categories.

Concerning these allegations, in her Proposed Findings of Facts and Conclusions of Law, the Commissioner states only that: (1) Defendants did not establish that they actually qualified for any of the federal exemptions for private offerings because federal exemptions only apply if a security is offered to accredited investors with whom the issuer or promoter has an existing relationship (i.e., not offered to the general public) and Defendants did not dispute the testimony of Mr. Rome that the eight offerings were made, in part, to the general public; and (2) Defendants admit that no notices of registration exemption were filed with the Commissioner and no fee was paid, as required by § 11-51-308(1)(p) and, therefore, even if all offerings qualified for a federal

exemption, Defendants still violated the CSA. (Commissioner's Proposed Findings of Fact and Conclusions of Law, ¶¶ 85-86). The Court will consider these two particular issues, and declines to consider any other claimed registration violations by Defendants not addressed by the Commissioner in her Proposed Findings of Fact and Conclusions of Law.

First, regarding whether Defendants promoted the offerings to members of the public, the Court notes that the Commissioner refers to the testimony of Mr. Rome and claimed lack of response by Defendants in her Conclusions of Law section, paragraph 85, but does not mention Mr. Rome's testimony or this particular issue in her proposed Findings of Fact. The Court, however, has considered the testimony of Mr. Rome in this regard and makes several observations: (1) Mr. Rome acknowledged that federal securities law includes some exemptions to registration, including exemptions for private offerings, known as Regulation D; (2) when an issuer is claiming a "Reg D exemption," the CSA requires the issuer to file a "Form D" with the Commissioner and pay a fee; (3) it is insufficient per the CSA for an issuer to file exemption paperwork with the SEC alone; (4) during his cross-examination of Mr. Rome, McKowen acknowledged that GrowCo relied on the exemption for transactions not involving a public offering; (5) on cross-examination, Mr. Rome testified credibly that he believed the offerings were public offerings because "the company used, accreditor investors, cold-call lists, and cold calls were made to investors, that take you out of the private offering exemption. There was also presentations made to investors, and if the company did not have a substantial preexisting relationship with the people it invited to those presentations, then that would take you out of the private offering exemption;" and (6) this testimony was unrebutted by any persuasive testimony or evidence offered by Defendants. (FOF, ¶¶ 137, 143). The Court is persuaded that some the offerings likely were not limited to accredited investors with whom the issuer or promoter had an existing relationship and, therefore, were not

exempt under federal statute. However, given the lack of detail in the Complaint and the Commissioner's Proposed Findings of Fact and Conclusions of Law concerning this issue, and the state of the evidence concerning the same, the Court cannot say which offerings were strictly private and which offerings were more public.

With this said, even if all offerings were exempt as private offerings, and Defendants complied with all federal registration requirements for each of the eight offerings, it is clear that Defendants did not comply with the CSA. Defendants themselves acknowledge that no notices of registration exemption were filed with the Commissioner and no fees were paid, as required by § 11-51-308(1)(p). (FOF, ¶¶ 2.o, 12). Any compliance with federal statute did not absolve Defendants of their duty to comply with the filings requirements of the CSA. *See* 17 C.F.R. § 230.500.

**D. Claimed Defenses**

First, Defendants' testimony suggests they believe any claimed failure to comply with the CSA should be excused because they relied on advice from their attorney. Good faith reliance on advice of counsel is not a complete defense to securities law violations, but it is a factor to consider regarding a defendant's scienter. *See People v. Terranova*, 563 P.2d 363, 366-67 (Colo. App. 1976). It is not a defense to any claims that do not include the scienter element. To establish the defense, Defendants must prove: (1) a request for advice of counsel on the legality of a proposed action; (2) full disclosure of the relevant facts to counsel; (3) receipt of advice from counsel that the action to be taken will be legal; and (4) reliance in good faith on counsel's advice. *C.E. Carlson, Inc. v. S.E.C.*, 859 F.2d 1429, 1436 (10th Cir. 1988). Neither McKowen or Harding presented sufficient evidence to support the elements of this defense. At most, they testified that they relied on their attorney's advice that their subscription documents and SEC filings were

sufficient to qualify for federal registration exemptions. They presented no evidence that their counsel was asked for or provided any advice regarding disclosure obligations under the CSA.

Second, Defendant McKowen asserts that the Commissioner's claims are barred by the statute of limitations set forth in § 11-51-604(8). The Court rejects this assertion. The statute of limitations in this section does not apply to the claims brought by the Commissioner. The CSA specifies limitations periods for private securities law claims brought by persons under § 11-51-604. The Commissioner brought her enforcement action under § 11-51-602, which contains no statute of limitations. To the contrary, that section allows the Commissioner to bring claims for injunctive relief "whenever" it appears that any person has engaged in any act or practice constituting a violation of the CSA. *See* § 11-51-602(1). Inclusion of claims for damages under § 11-51-602(2), which references § 11-51-604, does not import the private action statute of limitations set forth in § 11-51-604. The only limitation on damages claims brought by the Commissioner is that the applicable scienter standard of § 11-51-604 must be met. Accordingly, Defendants have not shown that the Commissioner's claims are barred by any statute of limitations.

**E. Remedies**

The Commissioner requests joint and several judgment against Defendants for restitution, disgorgement or other equitable relief, pursuant to § 11-51-602(1). In addition, the Commissioner claims damages under §§ 11-51-602(2) and 11-51-604(1), 2(a), (3), (4), and (5). Restitution is an equitable remedy that provides "a measure of damages which restores a party to his/her prior status." *Zeke Coffee, Inc. v. Pappas-Alstad Partnership*, 370 P.3d 261, 265 (Colo. App. 2015). It seeks to prevent unjust enrichment of the defendant's gain. *Earthinfo, Inc. v. Hydrosphere Resource Consultants*, 900 P.2d 113, 118 (Colo. 1995). Damages for registration and licensing

violations are calculated by the amount of the consideration paid for the security less any income received on the security. § 11-51-604(1), (2)(a). Damages may not be awarded under 604(1) if the only violation is failure to file the required notice of registration exemption or pay the required fee. § 11-51-602(2); § 11-51-604(1). For fraud violations, the CSA gives the Court broad discretion to award damages to make the investors whole, including the calculation of rescission or actual damages. § 11-51-604(3) and (4). The CSA provides for joint and several liability among all actors involved in CSA violations, including control persons who did not directly participate. § 11-51-604(5).

Section 11-51-604(4) states that any person who sells a security in violation of § 11-51-501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition. Section 11-51-604(4) gives the Court broad discretion to award damages to make the investors whole, including the calculation of rescission or actual damages.

The Court concludes as follows: (1) an injunction against Defendants is appropriate under § 11-51-602(1); and (2) damages, restitution, and disgorgement against Defendants and their related entities in default are appropriate under § 11-51-602(2) given Defendants' violations of §§

11-51-501, 401, and 301, as discussed above. In doing so, the Court reiterates that McKowen and Harding were directly involved in all of the conduct giving rise to liability in this case. Two Rivers and its subsidiaries were modest operations with a small, overlapping staff. As CEO of Two Rivers, McKowen controlled nearly all aspects of the business and its subsidiaries until his resignation in May 2016. After his resignation, McKowen continued to be involved in GrowCo as the largest shareholder and per the contracts he entered into with GrowCo to provide construction, consulting, and financial services. As CFO of Two Rivers until June 2016, Harding reviewed and signed all GrowCo investment documents and was responsible for securities regulatory filings. After McKowen's resignation, Harding took over as Two Rivers CEO with direct control over the GrowCo entities. Lastly, McKowen was the founder and manager of the VitaNova entities and McGrow. Neither McKowen nor Harding introduced any evidence to establish that they did not know the facts supporting the violations or that they did not directly or indirectly induce the entities to engage in fraud with respect to the investors. See § 11-51-604(5).

Finally, the Court observes that the Commissioner in her Proposed Findings of Fact and Conclusions of Law indicates that damages against Defendants should be awarded in the amount of $16,678,690.33—the amount of investor funds received during the offerings ($19,286,517.29) minus the amount of payments to investors ($2,607,826.96). The Court generally agrees. As discussed above, per the persuasive testimony of Ms. Martinez and Exhibits 141 and 1032, Two Rivers (in its five bank accounts) received $17,180,680.00 in investor funds; MCG Services, LLC (in its one account) received $1,078,538.00 in investor funds; and TR Capital Partners, LLC (in its one account) received $1,027,299.29 in investor funds, totaling $19,286,517.00. (FOF, ¶¶ 59, 110-115). Exhibit 141 further shows that Two Rivers made $2,262,553.89 in investor payments; MCG Services, LLC, made $134,916.65 in investor payments; and TR Capital Partners, LLC, made

$210,376.42 in investor payments, totaling $2,607,846.96. For the reasons stated previously, the Court concludes that the $100,000.00 in investor funds raised during the $1.5 Million Note (un-numbered offering) should be excluded in the damages calculation. Accordingly, the Court concludes that damages in the amount of $16,578,690.33 should be awarded against Defendants and their entities in default.

**FINAL ORDER**

The Court concludes the Commissioner has proven the following three claims by a preponderance of the evidence: (1) McKowen and Harding violated § 11-51-501(1)(a), (b), and (c) of the CSA by selling securities in a scheme to defraud investors, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, or course of business that operated as a fraud on investors; (2) GrowCo and its related entities violated § 11-51-401 and § 11-51-402 of the CSA by using unlicensed sales representatives to offer and sell its securities without a lawful exemption; and (3) McKowen and Harding violated § 11-51-308(1)(p) of the CSA by not filing a notification of exemption with the Commissioner, and paying the required fee.

The Court hereby ORDERS as follows: (1) Defendants McKowen and Harding are enjoined from any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order; and (2) judgment in the amount of $16,578,690.33 is entered against Defendants McKowen; Harding; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; GCP Super Units, LLC; VitaNova Partners, LLC; VitaNova Colorado, LLC; VitaNova, LLC; VitaNova, Inc.; McGrow, LLC; MCG, LLC; and GCO Land, LLC. The judgment is joint and several among all of these defendants.

IT IS SO ORDERED on this Wednesday, July 9, 2025.

BY THE COURT:

______________________________

Christopher J. Baumann,
Chief Judge