# EXHIBIT 52

Contempt Citation (April 14, 2026)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: FA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

# ENTRY OF APPEARANCE

Pursuant to C.R.C.P. Rule 121, § 1-1, subsection (1), Sarah P.J. Donahue, Assistant Attorney General II, hereby enters her appearance as counsel on behalf of Tung Chan, Securities Commissioner for the State of Colorado.

Respectfully submitted this 14th day of April, 2026.

PHILIP J. WEISER
Attorney General

*/s/ Sarah Donahue*
ROBERT W. FINKE, 40756*
First Assistant Attorney General
SARAH P.J. DONAHUE, 45212*
Assistant Attorney General II
Financial and Community Safety Unit
*Attorneys for Plaintiff Tung Chan, Securities Commissioner*

Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6376 (Finke)
(720) 508-6433 (Donahue)
(720) 508-6401
Fax: (720) 508-6037
Email: Robert.Finke@coag.gov
Sarah.Donahue@coag.gov
*Counsel of Record

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY, et al.,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: LA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲COURT USE ONLY▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>JENNIFER H. HUNT, 29964*<br>Senior Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>BRIAN A. KEENER, 58212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Jennifer.Hunt@coag.gov<br>Sarah.Donahue@coag.gov<br>Brian.Keener@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

## NOTICE OF WITHDRAWAL OF COUNSEL

Co-counsel having entered their appearance on behalf of Plaintiff, Tung Chan, Securities Commissioner for the State of Colorado, the undersigned hereby gives notice of her withdrawal pursuant to C.R.C.P. 121, § 1-1(2)(a).

Respectfully submitted this 14th day of April, 2026.

PHILIP J. WEISER
Attorney General

*/s/ Jennifer Hunt*
JENNIFER H. HUNT, 29964*
Senior Assistant Attorney General
*Attorney for Plaintiff Tung Chan, Securities Commissioner*

Ralph L. Carr Judicial Building
1300 Broadway
Denver, Colorado 80203
Telephone: (720) 508-6215 (Hunt)
(720) 508-6401
Fax: (720) 508-6037
Email: Jennifer.Hunt@coag.gov
*Counsel of Record

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: EA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

# CONTEMPT CITATION

TO: John Roderick McKowen:

YOU ARE HEREBY ORDERED and directed to be and appear personally in Courtroom 259 of the District Court in and for the City and County of Denver,

State of Colorado, located at 1437 Bannock Street, City and County Building, Denver, Colorado at _:00 _.m. on the ___ day of _____, 2026.

Please be advised that at this appearance, with respect to the punitive sanctions sought, pursuant to C.R.C.P. 107(d)(1), you shall be advised of the right to be represented by an attorney, and, if indigent and a jail sentence is contemplated, the court will appoint counsel. The maximum jail sentence shall not exceed six months unless you have been advised of the right to a jury trial. You shall also be advised of the right to plead either guilty or not guilty to the charges, the presumption of innocence, the right to require proof the charge beyond a reasonable doubt, the right to present witnesses at trial, the right to remain silent, the right to testify at trial, and the right to appeal any adverse decision. The court may impose a fine or imprisonment or both if the court expressly finds that your conduct was offensive to the authority and dignity of the court. You shall have the right to make a statement in mitigation prior to the imposition of sentence.

Please be advised that with respect to the remedial sanctions sought, pursuant to C.R.C.P. 107(d)(2), the court shall hear and consider the evidence for and against you and that the court may find you in contempt and order sanctions. The court shall enter an order in writing or on the records describing the means by which the person may purge the contempt and the sanctions that will be in effect until the contempt is purged. In all cases of indirect contempt where remedial sanctions are sought, the nature of the sanctions and remedies that may be imposed shall be described in the motion or citation. Costs and reasonable attorney's fees in connection with the contempt proceeding may be assessed in the discretion of the court. If the contempt consists of the failure to perform an act in the power of the person to perform and the court finds you have the present ability to perform the act so ordered, you may be fined or imprisoned until its performance.

YOU ARE FURTHER INFORMED, that if you fail to be and personally appear before this Court at the date, time and place specified herein, a bench warrant may be issued for your arrest without further notice.

DONE this ____ day of ___________ 2026.

_______________________________

Chris Jay Bauman
DISTRICT COURT JUDGE

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; et al.,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: EA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>JENNIFER H. HUNT, 29964*<br>Senior Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>BRIAN A. KEENER, 58212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Jennifer.Hunt@coag.gov<br>Sarah.Donahue@coag.gov<br>Brian.Keener@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

**NOTICE OF WITHDRAWAL OF COUNSEL**

Co-counsel having entered their appearance on behalf of Plaintiff, Tung Chan, Securities Commissioner for the State of Colorado, the undersigned hereby gives notice of his withdrawal pursuant to C.R.C.P. 121, § 1-1(2)(a).

Respectfully submitted this 14th day of April, 2026.

PHILIP J. WEISER
Attorney General

*/s/ Brian Keener*
BRIAN A. KEENER, 58212*
Assistant Attorney General II
*Attorney for Plaintiff Tung Chan, Securities Commissioner*

Ralph L. Carr Judicial Building
1300 Broadway
Denver, Colorado 80203
Telephone: (720) 508-6624 (Keener)
(720) 508-6401
Fax: (720) 508-6037
Email: Brian.Keener@coag.gov
*Counsel of Record

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: EA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

## ORDER GRANTING EX PARTE MOTION FOR ISSUANCE OF CONTEMPT CITATION

This matter comes before the Court on the EX PARTE MOTION FOR ISSUANCE OF CONTEMPT CITATION filed by Plaintiff. Having read the

Motion and being otherwise advised, Motion is hereby GRANTED. Counsel shall contact the Court to set a contempt hearing.

DONE this ____ day of ____________ 2026.

______________________________
Chris Jay Bauman
DISTRICT COURT JUDGE

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 15, 2026 11:43 AM<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |
| **CONTEMPT CITATION** | |

TO: John Roderick McKowen:

YOU ARE HEREBY ORDERED and directed to be and appear personally in Courtroom 259 of the District Court in and for the City and County of Denver,

State of Colorado, located at 1437 Bannock Street, City and County Building, Denver, Colorado at 11:00 a.m. on the 28th day of April, 2026.

Please be advised that at this appearance, with respect to the punitive sanctions sought, pursuant to C.R.C.P. 107(d)(1), you shall be advised of the right to be represented by an attorney, and, if indigent and a jail sentence is contemplated, the court will appoint counsel. The maximum jail sentence shall not exceed six months unless you have been advised of the right to a jury trial. You shall also be advised of the right to plead either guilty or not guilty to the charges, the presumption of innocence, the right to require proof the charge beyond a reasonable doubt, the right to present witnesses at trial, the right to remain silent, the right to testify at trial, and the right to appeal any adverse decision. The court may impose a fine or imprisonment or both if the court expressly finds that your conduct was offensive to the authority and dignity of the court. You shall have the right to make a statement in mitigation prior to the imposition of sentence.

Please be advised that with respect to the remedial sanctions sought, pursuant to C.R.C.P. 107(d)(2), the court shall hear and consider the evidence for and against you and that the court may find you in contempt and order sanctions. The court shall enter an order in writing or on the records describing the means by which the person may purge the contempt and the sanctions that will be in effect until the contempt is purged. In all cases of indirect contempt where remedial sanctions are sought, the nature of the sanctions and remedies that may be imposed shall be described in the motion or citation. Costs and reasonable attorney's fees in connection with the contempt proceeding may be assessed in the discretion of the court. If the contempt consists of the failure to perform an act in the power of the person to perform and the court finds you have the present ability to perform the act so ordered, you may be fined or imprisoned until its performance.

YOU ARE FURTHER INFORMED, that if you fail to be and personally appear before this Court at the date, time and place specified herein, a bench warrant may be issued for your arrest without further notice.

DONE this 15th day of April 2026.

Chris Jay Bauman
DISTRICT COURT JUDGE

DATE FILED
April 14, 2026 8:55 AM
FILING ID: EA297A56D0131
CASE NUMBER: 2021CV33922

**AMENDED RESOLUTION OF THE BOARD OF DIRECTORS**
**OF**
**VĒTANOVA INC.**
*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

**RECITALS**

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP 1 Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

EXHIBIT
4

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2, Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240/AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VētaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

### 1. Self-Executing Assignment of Individual Beneficial Interests.

Effective immediately upon adoption of this Resolution, VētaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional—it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

**2. Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

**3. Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

**4. Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

**5. Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

**6. Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

**7. Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

**8. Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

**9. Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT—with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VētaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

*/s/ John Roderick McKowen*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: EA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

**PLAINTIFF'S *EX PARTE* MOTION PURSUANT TO C.R.C.P. 107(C) FOR ISSUANCE OF CONTEMPT CITATION AND ORDER TO SHOW CAUSE**

Plaintiff Tung Chan, Securities Commissioner for the State of Colorado, ("Commissioner") files this *Ex Parte* Motion Pursuant to C.R.C.P. 107(c) for

Issuance of a Contempt Citation and Order to Show Cause ("Motion") against John Roderick McKowen ("McKowen").

## CERTIFICATION OF CONFERRAL

The Commissioner files this Motion *ex parte* pursuant to C.R.C.P. 107(c):

> When it appears to the court by motion supported by affidavit that indirect contempt has been committed, the court may *ex parte* order a citation to issue to the person so charged to appear and show cause at a date, time and place designated why the person should not be punished.

The Verification of Joseph Burtness is attached hereto as Exhibit 1 in support of this Motion. Therefore, C.R.C.P. 121 § 1-15(8) does not require the Commissioner to confer.

## INTRODUCTION

The Commissioner seeks a finding that McKowen is in contempt due to his complete disregard of an order issued by this Court. McKowen should be sanctioned for his willful disobedience of this Court's order.

On July 9, 2025, this Court entered its Findings of Fact, Conclusions of Law, and Judgment (the "Judgment"). *See* Exhibit 2. That same day, the Court also entered an Order, which states the same terms as those announced in the Judgment. Pursuant to the Judgment, "Defendants McKowen and Harding are enjoined from any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order." *Id.* at p. 112 (Judgment); *see also* Order at ¶ 1.

McKowen filed for Chapter 11 bankruptcy in his personal capacity in the U.S. Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT. McKowen has submitted a reorganization plan in this matter that includes the issuance of securities in VetaNova, Inc.

McKowen, the sole manager of VetaNova, has informed VetaNova shareholders that their shares will be converted to bonds under the proposed bankruptcy plan, provided the shareholders file a proof of claim and pay an additional $0.50 per share to accomplish the conversion.

This conduct is specifically prohibited by the terms of this Court's July 2025 Order. It constitutes an offering of securities under the Colorado Securities Act. Because of his willful and deliberate violation of this Court's Order, McKowen should be found in contempt.

## PROCEDURAL BACKGROUND

1. On December 10, 2021, the Commissioner filed her Complaint for Injunctive and Other Relief, in which she alleged that Defendants:

   a. Misrepresented to investors how the funds would be used, including that:

      i. Seven offerings would be used to construct four greenhouses but only one greenhouse was completed;

      ii. A significant amount of funds was used for general administrative costs (salaries, etc.) and not for construction of greenhouses; and

iii. Some funds in later offerings were used to pay interest due on earlier offerings. *See* Exhibit 2 at p. 3.

b. Defendants failed to disclose material information to investors, such as:

i. McKowen was suspended in or around 1989 for one year by the National Association of Securities Dealers. (NASD) for charging excessive compensation when selling securities and for providing inadequate disclosures;

ii. George McCaffrey was suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc. (FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities, while he was acting away from the supervision of his employer; and,

iii. Defendants did not disclose to investors that they used unlicensed broker-dealers or sales representatives (George McCaffrey and Jan McCaffrey through Waterton Financial, Inc., Kirsty Cameron, Edward Wallick, and Richard Wiwi) who were paid commissions or finder's fees for selling the securities. *See id.*

c. For some of the offerings, Defendants filed the requisite Form D notices of securities registration with the Securities and Exchange Commission (SEC) but failed to file any notification of securities registration

exemption with the Commissioner as required by § 11-51-308(1)(p). *See id.*

2. Trial on the merits was held from July 10 through July 18, 2023. Trial proceeded only against McKowen and Wayne Harding, as the remaining Defendants had either defaulted or settled.

3. On July 9, 2025, this Court issued its Judgment and Order. *See* Exhibit 2. In the Judgment, the Court determined that McKowen violated §§ 11-51-501(1)(a) and (c), by operating a fraudulent strategy and business which operated as a fraud or deceit of its investors, and by making repeated misrepresentations of fact and omissions of fact in the course of an offering. *See id.* at p. 97. The Court further concluded that McKowen violated § 11-51-401 by selling GrowCo securities as an unlicensed sales representative, and § 11-51-501(1)(b) by failing to disclose to investors he was an unlicensed sales representative. *See id.* at p. 105.

4. For these violations of the Colorado Securities Act, the Court concluded that injunctive relief against Defendants, including McKowen, who was "directly involved in all of the conduct giving rise to liability in this case," was appropriate under § 11-51-602(1). *See id.* at pp. 110-111.

5. Accordingly, the Court ordered that McKowen was "enjoined from any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order." *Id.* at p. 112; *see also* Order, entered July 9, 2025 (same language). Therefore, McKowen is enjoined from "any

participation in private securities transactions in or from Colorado" until July 9, 2045.

6. McKowen filed for personal bankruptcy on October 14, 2025, in the United States Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT.

7. On January 13, 2026, McKowen filed his Supplement to Disclosure Statement ("Supplement"). *See* Exhibit 3. In the Supplement, McKowen stated his intention to issue, through VetaNova Inc., the "Plan Bonds," which "are 6% Secured Convertible Bonds," issued "in three financing rounds capped at $2,000,000 for Round A, $3,000,000 for Round B, and $5,000,000 for Round C, with no minimum funding requirement and with qualified proceeds accepted when received." *Id.* at Exhibit A, p. 2. A "bond" is included in the definition of a security under the Colorado Securities Act. § 11-51-201(17), C.R.S.

8. McKowen continued: "The Plan Bonds include a conversion feature permitting bondholders, at their election and on the terms set forth in the definitive Bond Documents, to convert outstanding principal and accrued interest into equity securities of VetaNova, thereby allowing bondholders to transition from a secured creditor position to an equity ownership position." *Id.* at Exhibit A, p. 3.

9. McKowen continued: "The Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort and, together with any securities issued upon conversion, are intended to qualify for exemption from Securities Act registration." *Id.* at Exhibit A, pp. 3, 5.

10. Attached to the Supplement as Exhibit B is McKowen's "Draft Term Sheet for 6% Secured Convertible Bonds," which "summarizes pricing, rounds of offering, conversion mechanics, collateral, and conditions precedent for the Plan," and "Defines the Eligible Investor universe and Plan-based subscription framework." *Id.* at p. 9. McKowen claims that the "Securities Offered" are "Up to $10,000,000 aggregate principal amount of 6% Secured Convertible Bonds." *Id.* at p. 11. The "Unit Pricing" for Round A is $0.50 per $1.00 principal. *Id.* at p. 12.

11. McKowen included as Exhibit C the list of VetaNova shareholders, identifying how many shares each held and whether the investors were from Colorado. *Id.* at pp. 15-20. These are the "Eligible Investors," who are the "legacy GrowCo-investor cohort" referenced in Exhibit A at page 3 and 5. These investors "converted" their shares of GrowCo to shares of VetaNova in 2021 and 2022.

12. McKowen sent to the "Eligible Investors" an email providing "Instructions – Filing Your Proof of Claim VetaNova Beneficial Interest." *See* Exhibit 1 at ¶¶ 7-11. McKowen told the investors that "VetaNova has adopted a Resolution that assigns you your proportional share of the beneficial interest under [Deed of Trust] 404224. That Resolution is attached. Your interest vests when you file your Proof of Claim – if you don't file, the interest reverts back to VetaNova." *Id.* McKowen then provides step-by-step instructions on exactly how to fill out the Proof of Claim form as a creditor in his personal bankruptcy case. *Id.*

13. The referenced "Board Resolution" identifies VetaNova Inc. as "a Nevada corporation with its principal office in Greenwood Village, Colorado, and

John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President." Exhibit 4, Amended Resolution of the Board of Directors at p. 1. The resolution was "Adopted by Written Consent of the Sole Director," McKowen, on March 27, 2026. *Id.*

14. In the Board Resolution, McKowen clearly states that a "Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in [the bankruptcy case], asserting their beneficial interest....Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court....shall be deemed to have declined the assignment and such Beneficiary's proportional interest shall automatically revert to VetaNova without further action." *Id.* at p. 3. In other words, if an investor does not file a proof of claim in McKowen's *personal* bankruptcy action, they forfeit their shares.

15. Then, the Board (i.e., McKowen) "authorizes VetaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan," under which an existing VetaNova shareholder surrenders a share of VetaNova stock (valued at $1.00) and pays "$0.50 in new cash" per share. *Id.* at p. 4. In exchange, the shareholder receives a 6% Collateralized Bond. *Id.*

16. Per the Board Resolution authorized, written by, and adopted by McKowen, an investor's shares are reverted back to him unless and until the investor (1) files a Proof of Claim in his personal bankruptcy action, following his exact instructions, and (2) pays him an additional $0.50 per share to get the Bond.

17. Several shareholders have already filed Proofs of Claim. *See* Exhibit 5, Proofs of Claim. The investors have read McKowen's offering, followed his instructions, and have elected to take part in the offering, lest their entire investment be forfeited.

## ARGUMENT

### I. Legal Standard

Contempt includes "disobedience or resistance by any person to or interference with any lawful writ, process, or order of the court." C.R.C.P. 107(a)(1). Indirect contempt is ""[c]ontempt that occurs out of the direct sight or hearing of the court." C.R.C.P. 107(a)(3).

Courts have the "inherent and indispensable" power to punish for contempt as a punitive measure or to coerce obedience. *Austin v. City & Cnty. of Denver*, 156 Colo. 180, 184, 397 P.2d 743, 745 (1964); *see also Kourlis v. Port*, 18 P.3d 770, 773-74 (Colo. App. 2000). A finding of contempt is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *People v. Aleem*, 149 P.3d 765, 774 (Colo. 2007).

Upon a finding of contempt, the Court is empowered to impose remedial sanctions, punitive sanctions, or both. "Remedial and punitive sanctions may be combined by the court, provided appropriate procedures are followed relative to each type of sanction and findings are made to support the adjudication of both types of sanctions." C.R.C.P. 107(e).

"There is no fixed procedural formula for contempt proceedings." *In re Marriage of Barber*, 811 P.2d 451, 455 (Colo. App. 1991) (citing *In re Marriage of*

*Peper*, 554 P.2d 727 (Colo. 1976). Rather, "due process is satisfied if ... a contemnor has actual notice of the court order with which he must comply, notice of the purpose of the contempt hearing, and is afforded an opportunity to be heard." *Id.* (citing *In re Marriage of Zebedee*, 778 P.2d 694 (Colo. App. 1991).

**II. Punitive Sanctions are Appropriate because McKowen has Shown Willful Disregard of the Order**

Without question, McKowen's actions constitute "any participation in private securities transactions in or from the State of Colorado," in violation of this Court's July 9, 2025 Order. Under the circumstances, remedial sanctions alone are inadequate to address McKowen's deliberate disobedience of the Court's Order.

"Punitive sanctions are criminal in nature and are designed to punish 'by unconditional fine, fixed sentence of imprisonment, or both, for conduct that is found to be offensive to the authority and dignity of the court.'" *In re Cyr & Kay*, 186 P.3d at 91 (quoting C.R.C.P. 107(a)(4)). In order to impose punitive sanctions for contempt, the Court must make findings of fact establishing beyond a reasonable doubt:

(1) the existence of a lawful order of the court;

(2) the contemnor's knowledge of the order;

(3) the contemnor's ability to comply with the order; and

(4) the contemnor's willful refusal to comply with the order.

*See id.* at 92.

As stated above, the Commissioner can establish beyond a reasonable doubt that:

a. Existence of a lawful order of the court: This Court issued the Order on July 9, 2025. *See* Exhibit 2.

b. Knowledge of the order: McKowen was unquestionably aware of the issuance of the Order. He has acknowledged its existence in the bankruptcy court, and has appealed the judgment in the Colorado Court of Appeals.

c. Ability to comply with the order: McKowen was in full control of compliance with the Order. McKowen is not acting at the direction of a Board of Directors forcing him to offer securities. To the extent that the offer is coming from VetaNova, it is at the sole direction of McKowen. *See* Exhibit 4.

d. Willful refusal to comply with the order: The Order specifically states that McKowen is "enjoined from any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order." Exhibit 1. McKowen, though, submitted filings with the United States Bankruptcy Court indicating that he intended to offer securities in the form of bonds. He authored, voted on, and implemented a Board Resolution that constitutes the clear offering of securities. *See* Exhibits 3 and 4. The Amended Board Resolution appears to have been finalized in VetaNova's principal office in Greenwood Village, Colorado. *See* Exhibit 4. Not only that, the terms of the Board Resolution forced investors to comply with the offering, lest they lose their entire investment and see their shares revert to VetaNova. *See id.* McKowen then sent "Eligible Investors" the Board Resolution by email which instructs investors to file a proof of claim in order to retain their shares and instructs the investors to purchase bonds for an

additional payment of $0.50 per share of VetaNova then-held. *See* Exhibit 1 at ¶¶ 7-11; *see also* Exhibit 5, evidencing investors following instructions to file a Proof of Claim. The "Eligible Investors" list McKowen provided in his bankruptcy proposal to includes Colorado investors. *See* Exhibit 3 at pp. 5, 16-20; *see also* Exhibit 1 at ¶¶ 8-9 (McKowen contacting Colorado investor) and Exhibit 5 at pp. 26-31 (Colorado investor filing Proof of Claim).

These actions are not in compliance with the Order's injunction against McKowen's "participation in private securities transactions in or from the State of Colorado."

The Commissioner requests that this Court find that McKowen's deliberate creation of an offering and communication of that offering constitutes a willful disregard of the Court's Order and authority, warranting imprisonment commensurate with the gravity of the offense as a punitive sanction. The Commissioner urges this Court to find that imprisonment of no less than 90 days, and as much as 179 days, is an appropriate punitive sanction. McKowen brazenly violated the Order less than a year after its entry. Without punishment, McKowen may be emboldened to continue to violate the Order's terms.

## III. Remedial Sanctions in the Form of Attorney Fees and Costs Should be Imposed Against McKowen

"[R]emedial sanctions are civil in nature and are intended 'to force compliance with a lawful order or to compel performance of an act within the person's power or present ability to perform.'" *In re Marriage of Cyr & Kay*, 186 P.3d 88, 92 (Colo. App. 2008) (quoting C.R.C.P. 107(a)(5)).

To support a finding of remedial contempt, the movant must show facts establishing that the contemnor: "(1) did not comply with a lawful order of the court; (2) knew of the order; and (3) has the present ability to comply with the order." *Id.* at 92 (citations omitted). The contemnor has the burden of proving an inability to comply with the order. *Id.* (citing *In re Marriage of Lamutt*, 881 P.2d 445, 447 (Colo. App. 1994), *reh'g denied and opinion modified* (Aug. 4, 1994)).

Remedial sanctions are appropriate and should be imposed against McKowen. As addressed above, there existed a lawful Order of the Court of which McKowen was aware. McKowen had the ability to comply with the Order by not taking part in private securities transactions in or from the state of Colorado for twenty (20) years, but instead elected to write, approve, and communicate the terms of an offering of securities in Colorado and to Coloradoans.

The Commissioner requests that this Court impose remedial sanctions by (a) ordering McKowen to pay a fine in the amount of $25,000.00 and (b) awarding the Commissioner's attorney fees and costs as permitted by C.R.C.P. 107(d)(2). *See Madison Capital Co. v. Star Acquisition VIII*, 214 P.3d 557, 560-62 (Colo. App. 2009) (affirming trial court's award of attorney fees and costs in a contempt action); *Levin v. Anouna*, 990 P.2d 1136, 1139 (Colo. App. 1999) (affirming trial court's discretion to award fees in connection with a contempt proceeding pursuant to C.R.C.P. 107(d)(2)); *see also In re Marriage of Naekel*, 181 P.3d 1177, 1178 (Colo. App. 2008) (C.R.C.P. 107(d)(2) provides legal authority for the district court to enter an award of attorney fees).

As remedial action, the Commissioner further requests that this Court enter orders requiring McKowen to (1) rescind the offering to all individuals to whom the offering was made, (2) inform all offerees that Defendant may not participate in the offering or sale of securities for twenty (20) years, and (3) return any funds obtained (if any) as a result of this offering.

## CONCLUSION

McKowen violated the Order by willfully and deliberately participating in private securities transactions in or from Colorado. He should be sanctioned for his conduct.

WHEREFORE, the Commissioner respectfully requests that this Court issue an *ex parte* order granting the following relief:

A. A citation issued and served upon McKowen requiring him to appear before this Court at a specified date and time in order to show cause as to why McKowen should not be held in contempt of court for failing to comply with the Injunction (the citation will inform McKowen that if he fails to appear as ordered, a bench warrant may issue for McKowen's arrest without further notice);

B. Imposition of remedial sanctions as set forth above, including reasonable attorney fees and costs;

C. Imposition of punitive sanctions as set forth above; and,

D. Other relief as the Court deems just and proper to enforce compliance with this Court's Orders.

Respectfully submitted this 14th day of April, 2026.

PHILIP J. WEISER
Attorney General

*/s/ Sarah Donahue*
ROBERT W. FINKE, 40756*
First Assistant Attorney General
SARAH P.J. DONAHUE, 45212*
Assistant Attorney General II
Financial and Community Safety Unit
*Attorneys for Plaintiff Tung Chan, Securities Commissioner*

Ralph L. Carr Judicial Building
1300 Broadway, 8th Floor
Denver, Colorado 80203
Telephone: (720) 508-6376 (Finke)
(720) 508-6433 (Donahue)
(720) 508-6401
Fax: (720) 508-6037
Email: Robert.Finke@coag.gov
Sarah.Donahue@coag.gov
*Counsel of Record

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

FILED
April 14, 2026 8:55 AM
FILING ID: LA297A56D0131
CASE NUMBER: 2021CV33922

FILED
CLERK OF COURT
JAN 13 2026
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

In re: JOHN RODERICK McKOWEN,

Debtor.

Case No. 25-16665-KHT (Chapter 11)

---

## SUPPLEMENT TO DISCLOSURE STATEMENT

---

This Supplement to Disclosure Statement (the "Supplement") is filed to provide additional disclosure regarding the Plan's structured financing rounds referenced in Article X (Means for Implementation) of the Proposed Chapter 11 Plan filed December 8, 2025 (Doc. 38) (the "Plan"). This Supplement is intended to be read together with the Disclosure Statement filed December 8, 2025 (Doc. 39) and the Plan. This Supplement provides implementation detail developed after substantial deliberation and planning and is filed as a follow-up to the Plan's contemplated financing rounds; it is not filed to modify the classification or treatment of Classes 1–5.

1. **Business Model.** The Debtor's business model is not to operate an agricultural or technology business on a day-to-day basis. Instead, the Debtor uses VetaNova Inc. as a compliant public capital vehicle to assemble, finance, and validate an asset-anchored platform and then to identify and pair that platform with a qualified operating candidate. In this case, the Debtor intends to identify a third-party operating business that is seeking to go public and that operates within a business category and market style the Debtor determines to be appropriate. The Debtor's role is to structure the financing, preserve investor continuity, and allocate operating responsibility to such an operating candidate pursuant to the Plan, rather than assuming ongoing operating or execution risk itself.

EXHIBIT
3

2. **Collateral Ownership and Perfection.** The collateral securing the Plan Bonds consists of two properties currently owned by VetaNova Inc. and incorporated into the Plan's collateral platform. The Debtor holds an approximately thirty-four percent (34%) equity interest in VetaNova Inc. As part of the Round A financing and implementation milestones, the Debtor will undertake actions necessary to perfect and document title, recording, and lien posture so that the ownership record and the security package are fully perfected of record. These steps strengthen and evidence the collateral position and do not alter current ownership of the properties.

3. **Water Thesis and Technology-Ready Use.** A core premise of the Plan's collateral platform is that modern, commercially available sensing, automation, and data-driven control technologies can expand productive use within water-prior-appropriation-controlled environments that are not well suited to conventional farming practices. By enabling more precise monitoring and control of growing conditions and resource inputs, an operator can pursue consistent production within a constrained water-rights and delivery regime. The Debtor does not propose to design, develop, or operate such systems internally; rather, the platform is structured to be technology-ready so that a qualified third-party operator or operating candidate may deploy state-of-the-art AI-enabled, sensor-driven, and robotic control systems consistent with prevailing industry practices, following validation through the Plan's financing rounds.

4. **Plan Bond Characteristics.** The Plan Bonds are 6% Secured Convertible Bonds intended to be issued by VetaNova Inc. pursuant to and under the Plan following confirmation, in three financing rounds capped at $2,000,000 for Round A, $3,000,000 for Round B, and $5,000,000 for Round C, with no minimum funding requirement and with qualified proceeds

accepted when received. The Plan Bonds are secured by the Plan collateral package consisting primarily of two properties currently owned by VetaNova Inc., in which the Debtor holds an approximately thirty-four percent (34%) equity interest, with lien priority to be established and perfected through the Round A title, recording, and lien-perfection steps described in this Supplement. The Plan Bonds include a conversion feature permitting bondholders, at their election and on the terms set forth in the definitive Bond Documents, to convert outstanding principal and accrued interest into equity securities of VetaNova, thereby allowing bondholders to transition from a secured creditor position to an equity ownership position aligned with VetaNova's post-confirmation capitalization and business strategy. The Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort and, together with any securities issued upon conversion, are intended to qualify for exemption from Securities Act registration under 11 U.S.C. § 1145 without reliance on Regulation D, Rule 506, or any "accredited investor" framework.

5. **Summary of the Plan Bonds Program (Rounds A, B, and C).** The Plan's structured financing is implemented through rounds of 6% Secured Convertible Bonds (the "Plan Bonds") intended to be issued by VetaNova Inc. ("VetaNova") pursuant to and under the Plan following confirmation. The rounds are as follows:

   Round A: $2,000,000 principal cap.

   Round B: $3,000,000 principal cap.

   Round C: $5,000,000 principal cap.

   There is no minimum funding requirement for the Plan. Qualified proceeds may be accepted when received.

6. **Intended Goal for VetaNova – Avondale PILOT Platform.** The intended goal of VetaNova is to establish a modular, asset-anchored PILOT platform at Avondale that integrates land, water, energy, and compute into a single, expandable operating footprint. The PILOT is designed to validate layout, utilities, throughput, and governance before disciplined replication.

7. **Use of Proceeds & Goals**

Bond proceeds are allocated to the Use of Proceeds for identified Goals as outlined below:

| FINANCING ROUND | USES OF PROCEEDS & GOALS |
|---|---|
| **Round A**<br>$2,000,000 cap | 1. Engage Securities and Bankruptcy litigation counsel.<br>2. Perfect title to properties / collateral platform.<br>3. Pay past due property taxes.<br>4. Establish new senior deeds of trust / lien structure.<br>5. Initiate PILOT engineering plans. |
| **Round B**<br>$3,000,000 cap | 6. Reinstate VetaNova public trading status.<br>7. Enter Reverse Merger candidate agreement.<br>8. PILOT development |
| **Round C**<br>$5,000,000 cap | 9. Complete PILOT<br>10. Commence PILOT Production for phased deployment consistent with the Avondale template. |

8. **Eligible Investor Universe and Allocation.** The Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort (the "Eligible Investors") reflected on the VetaNova Reorganization Ledger (Exhibit C) (the "Ledger"). Allocation is pro rata based on each Eligible Investor's Original Invested Amount as reflected in the Ledger. Oversubscription and reallocation mechanics are described in the Plan Bonds term sheet (Exhibit B) and the Bond Documents.

9. **Securities Issuance Basis (No Regulation D).** The Plan Bonds (and any securities issued upon conversion) are intended to be issued pursuant to the Plan and exempt from Securities Act registration under 11 U.S.C. § 1145. Eligibility is limited to the Plan's defined investor cohort; no Regulation D, Rule 506, or "accredited investor" framework is invoked.

10. **Exhibits and Attachments**

Exhibit A: Avondale Site Plan & Cap Table.

Exhibit B: Term Sheet for 6% Secured Convertible Bonds (Plan / 11 U.S.C. § 1145 Version).

Exhibit C: VetaNova Reorganization Ledger – Allocation Schedule (Original Invested Amount).

Dated January 13, 2026

Respectfully submitted.

*s/ John R. McKowen*

John Roderick McKowen
Debtor-in-Possession
5200 S Quebec St. #117
Greenwood Village, CO 80111
(303) 248-6883
john@johnmckowen.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2026, a true and correct copy of the Supplement to Disclosure Statement and Exhibits A–C was served as follows:

1. Via CM/ECF upon all parties entitled to notice in this case who are registered CM/ECF users.
2. Via U.S. Mail (Certified), through LetterStream, upon all parties not registered for CM/ECF service, as listed on the service list maintained in this case, at their last known *addresses.*

*s/ John R. McKowen*
John Roderick McKowen

# EXHIBIT A

**Title: Avondale Site Plan & Cap Table**

**Date: January 12, 2026**

**Source: Prepared by the Debtor / VetaNova Inc. for Bankruptcy Case No. 25-16665-KHT**

**Topic:** Avondale PILOT platform site schematic and VTNA company capitalization table for Plan-based financ

- Site layout schematic for the Avondale PILOT platform (PILOT, WATER, ENVIRO & FERT, POWER & COMPUTE, SOLAR, and logistics blocks).
- Capitalization table summary reflecting post-split shares and illustrative financing components, including Plan Bond Rounds A, B, and C.
- Provided for reference in connection with Plan implementation and disclosure of the contemplated financing rounds.

# AVONDALE




VTNA – Company Cap Table

| CAPITAL | ROUND | POST SPLIT 1:60 SHARES | PRICE PER UNIT | NEW AUG |
|---|---|---|---|---|
| Reverse Split 1:60 Legacy VTNA Shareholders | $ 18,000,000 | 9,220,856 | $1.95 | |
| McKowen BK Claim $1,774,888 Exchange | $ 1,774,888 | 3,549,776 | $0.50 | |
| 6% Collaterized Bond Tranche 1 Units @ 50% Discount | $ 2,000,000 | 4,000,000 | $0.50 | |
| 6% Collaterized Bond Tranche 2 Units @ 12.5% Discount | $ 3,000,000 | 3,636,364 | $0.83 | |
| 6% Collaterized Bond Tranche 3 Units @ Par | $ 5,000,000 | 5,000,000 | $1.00 | |
| Reg A $ 75M @ $3.00 | $ 75,000,000 | 25,000,000 | $3.00 | 72 |
| A Warrant Exercise @ $5 | $ 252,034,978 | 50,406,996 | $5.00 | 91 |
| B Warrant Exercise @ $7.5 | $ 378,052,467 | 50,406,996 | $7.50 | 137 |
| TOTAL | $ 705,087,445 | 151,220,987 | $4.66 | 300 |

| | | |
|---|---|---|
| CAPEX PER AUG | $ | 2,764,001 |
| EBITDA PER AUG | $ | 250,802 |

# EXHIBIT B

**Title:** Draft Term Sheet for 6% Secured Convertible Bonds (Plan / 11 U.S.C. § 1145 Version)

**Date:** January 12, 2026

**Source:** Prepared by the Debtor / VetaNova Inc. for Bankruptcy Case No. 25-16665-KHT

**Topic:** Plan-based term sheet summarizing the economic and structural terms of the 6% Secured Convertible Bonds

- Summarizes pricing, rounds of offering, conversion mechanics, collateral, and conditions precedent for the Plan
- Defines the Eligible Investor universe and Plan-based subscription framework.
- Provided for reference in connection with Plan implementation and disclosure of the contemplated financing rounds.

**Senior Secured Convertible Notes of VetaNova, Inc.**
**and**
**Common Stock Purchase Warrants of VetaNova, Inc.**

**MEMORANDUM OF TERMS**

This Memorandum of Terms dated as of January __, 2026 summarizes the principal terms of a Plan-based issuance of secured convertible bonds (the "Bonds") of VetaNova Inc., a Nevada corporation (the "Issuer"), pursuant to and under the Chapter 11 Plan, and in connection with the Debtor's duties and authority as debtor-in-possession in Case No. 25-16665-KHT.

**THIS TERM SHEET IS NON-BINDING AND FOR DISCUSSION ONLY, DOES NOT PURPORT TO BE COMPLETE, AND IS QUALIFIED IN ITS ENTIRETY BY THE COMPLETE AND DEFINITIVE SUBSCRIPTION AGREEMENT, BOND INDENTURE, AND RELATED SECURITY DOCUMENTS; THE ISSUANCE AND SALE OF THE BONDS (AND ANY SECURITIES ISSUED UPON CONVERSION OR EXERCISE) IS CONTINGENT ON CONFIRMATION AND EFFECTIVENESS OF THE CHAPTER 11 PLAN, EXECUTION OF DEFINITIVE DOCUMENTATION, AND ANY REQUIRED BANKRUPTCY COURT APPROVALS.**

**<u>OFFERING</u>**

**Eligible Investors** ................ For purposes of this Term Sheet and the definitive documentation, "**Eligible Investors**" means the Post-Paulson GrowCo-related investors whose securities or claims arose from GrowCo offerings subject to the Settlement Agreement and Final Order entered in *Paulson v. Two Rivers Water and Farming Company, et al.*, Case No. 19-cv-02639-PAB-NRN (D. Colo.), including securities that retained reserved execution or collection rights under the Paulson Settlement and Final Judgment, and who subsequently exchanged their interests into VitaNova Partners, LLC and thereafter into equity securities of VetaNova Inc., as reflected on the VetaNova Reorganization Ledger (Exhibit C). Eligible Investors expressly exclude any legacy or residual shareholders of any acquired public shell whose shares were outstanding prior to the exchange transactions and any persons claiming through such legacy or residual holders.

**Plan / Court Control**............This Term Sheet is provided solely to summarize proposed economic terms for Plan implementation and does not amend, supplement, or modify the Chapter 11 Plan, the Disclosure Statement, any supplement thereto, or any order of the Bankruptcy Court. In the event of any inconsistency, the Plan and the Bankruptcy Court's orders control, and the definitive documentation will be conformed to the Plan and such orders.

**Securities Law Basis**............The Plan Bonds (and any securities issued upon conversion or exercise of warrants) are intended to be issued pursuant to and under the Chapter 11 Plan as a means of implementation under 11 U.S.C. §§ 1123 and 1129 and are intended to be exempt from Securities Act registration under 11 U.S.C. § 1145. This Term Sheet does not invoke Regulation D, Rule 506, or any "accredited investor" framework, and the Plan together with any applicable orders of the Bankruptcy Court governs the authority for issuance.

**Offering Scope**......................Participation in the offering is limited to Eligible Investors as defined herein, submitting subscriptions pursuant to the Plan's subscription procedures. This Term Sheet does not create, modify, or expand any class of claims or interests under the Plan.

**Subscription Acceptance**... Submission of a subscription does not create any obligation of the Issuer, the Debtor, or the estate. Subscriptions may be accepted or rejected in whole or in part in the Issuer's discretion, and no obligation arises unless and until the Issuer accepts the subscription and the applicable Conditions Precedent are satisfied.

**Securities Offered**................Up to $10,000,000 aggregate principal amount of 6% Secured Convertible Bonds (the "Bonds"), offered in three financing rounds as described below. The Issuer may conduct one or more closings within a Round and may terminate any Round in its discretion.

**Plan Effective Date**..............No Bonds will be issued and no Closing will occur except in connection with implementation of the Plan following confirmation and the Plan's effectiveness (or such other authority as may be approved by the Bankruptcy Court).

The Issuer may conduct one or more closings within a Round following the Plan Effective Date, subject to the Conditions Precedent and definitive documentation.

**Unit Pricing**.......................... Bonds are issued in $1.00 principal units. Subscription price varies by Round (original issue discount): Round A: $0.50 per $1.00 principal; Round B: $0.8755 per $1.00 principal; and Round C: $1.00 per $1.00 principal. Each Unit consists of (i) $1.00 principal amount of Bonds and (ii) two detachable common stock purchase warrants: Warrant A exercisable at $5.00 per share and Warrant B exercisable at $7.50 per share. Each warrant is exercisable for a number of shares equal to the number of shares issuable upon conversion of the associated principal amount (1:1 with conversion shares), subject to adjustment and the terms of definitive documentation.

**Maturity**................................ Two (2) years from the applicable Closing Date, unless earlier converted or redeemed in accordance with the terms of the Bonds.

**Interest Rate**.......................... 6.00% per annum, computed on a 360-day year and accruing daily, payable as paid-in-kind ("PIK") interest. Interest is capitalized to principal until conversion, redemption, or maturity, and any unpaid PIK interest is included in the conversion or redemption amount, subject to the terms of the Bonds and definitive documentation.

**Conversion Option**.............. At any time after issuance, the Noteholder may elect to convert all or any portion of the outstanding principal amount of its Bonds, together with accrued and unpaid PIK interest on the amount converted, into shares of the Issuer's common stock at the applicable Round conversion price: Round A $0.50 per share; Round B $0.8755 per share; and Round C $1.00 per share. The number of conversion shares equals the amount designated for conversion divided by the applicable conversion price, subject to adjustment and definitive documentation. Conversion will be effected in compliance with applicable law and any approvals later required.

**Collateral** ............................The Bonds shall be secured by a senior lien on the collateral package associated with

1. Deed of Trust No. 404224 (Huerfano County, Colorado), including the land and appurtenant water rights and storage interests described therein, and related proceeds, subject to the terms of definitive security documentation and any approvals later required.
2. Deeds of Trust (Pueblo County, Colorado) including the land and appurtenant water rights and described therein, and related proceeds, subject to the terms of definitive security documentation and any approvals later required.

**Use of Proceeds** ...................No Round assumes tenants, permitting, construction, revenues, or utility upgrades, and each Round is independent of the success of any other Round.

**Conditions Precedent** ..........Each Closing will be subject to standard conditions, including confirmation and effectiveness of the Chapter 11 Plan, satisfactory completion of due diligence to the extent required, Bankruptcy Court approval to the extent required, and execution of definitive documentation.

**Rounds of Offering** ..............Each Round:

**Round A:** up to $2,000,000 principal; subscription price $0.50 per $1.00 principal; intended for diligence, title/curative work, and asset preservation.

**Round B:** up to $3,000,000 principal; subscription price $0.8755 per $1.00 principal; intended for platform readiness items, including curative completion and governance/financing platform setup.

**Round C:** up to $5,000,000 principal; subscription price $1.00 per $1.00 principal; optional and not required for feasibility.

**Confidentiality** ...................... No recipient shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, trustees, managers, accountants, and attorneys who need to know such information for evaluation purposes, without

| | |
|---|---|
| | the written consent of the Issuer, except as required by law or Bankruptcy Court order. |
| **Placement Agents**.................. | The Issuer may engage one or more placement agents to assist with the Plan-based offering and may pay reasonable fees or commissions from offering proceeds. Any such engagement and compensation shall be disclosed in definitive documentation and shall be subject to authorization under the Chapter 11 Plan and/or approval by the Bankruptcy Court, as applicable. |

**Exhibit C**

**Title:** VetaNova Reorganization Ledger – GrowCo Securities Exchanges

**Source:** Internal investor reorganization records

**Date:** Compiled 2021–2022

**Summary:** Ledger documenting the exchange of GrowCo securities into VetaNova Inc. equity. The records show that approximately 77% of all GrowCo securities—including GrowCo Partners 1, LLC Preferred Stock, GrowCo Partners Super Units, and GrowCo Exchange Notes—were exchanged into VetaNova Inc. shares between 2021 and 2022. The ledger also details the amounts invested, certificate numbers, and whether securities were exchanged. This record demonstrates that VetaNova Inc. is the successor holder of the majority of GrowCo investor interests, consolidating ownership into a single entity. This supports Plaintiff's standing as CEO of VetaNova to act on behalf of all exchanged investors and underscores the need for immediate equitable relief to protect their rights through issuance of a deed in lieu under Deed of Trust 404224 and a stay of pending Treasurer's Deed auctions.

GrowCo Investor List

| GrowCo Partners 1, LLC | | | Domicile | | Exchanged | Units | |
|---|---|---|---|---|---|---|---|
| | | | Colorado | Certificate | Amount | Preferred | Percent of |
| Type Investment | Invest Date | Investor | Investor | Number | Invested | Shares | Outstanding |
| Preferred Stock | 10/24/17 | GCP SU | Yes | GCP1-300a | $ 2,459,070 | 2,459,070 | 32.83% |
| Preferred Stock | 10/25/17 | GCP SU | Yes | GCP1-200 | $ 500,000 | 500,000 | 6.67% |
| Preferred Stock | 1/15/15 | I.Wistar Morris | No | GCP1-001 | $1,086,957 | 1,086,957 | 14.51% |
| Preferred Stock | 1/15/15 | Jon Gruber | No | GCP1-004 | $ 250,000 | 250,000 | 3.34% |
| Preferred Stock | 1/15/15 | Sam Morris Jr. | No | GCP1-005 | $ 108,696 | 108,696 | 1.45% |
| Preferred Stock | 1/16/15 | Michael Barrish | Yes | GCP1-006 | $ 108,696 | 108,696 | 1.45% |
| Preferred Stock | 1/15/15 | Charles Bloom IRA | No | GCP1-009 | $ 100,000 | 100,000 | 1.33% |
| Preferred Stock | 4/22/15 | I.Wistar Morris | No | GCP1-035 | $ 92,858 | 92,858 | 1.24% |
| Preferred Stock | 6/2/15 | I. Wistar Morris | No | GCP1-0135 | $ 92,858 | 92,858 | 1.24% |
| Preferred Stock | 1/16/15 | David Jenkins | No | GCP1-018 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 1/16/15 | Hugo Zimmermann | No | GCP1-013 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 1/16/15 | Hugo Zimmermann | No | GCP1-012 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 4/22/15 | Martha Morris | No | GCP1-038 | $ 47,799 | 47,799 | 0.64% |
| Preferred Stock | 6/2/15 | Martha Morris | No | GCP1-0138 | $ 47,799 | 47,799 | 0.64% |
| Preferred Stock | 4/22/15 | Cotswold Foundation | No | GCP1-036 | $ 47,253 | 47,253 | 0.63% |
| Preferred Stock | 6/2/15 | Cotswold Foundation | No | GCP1-0136 | $ 47,253 | 47,253 | 0.63% |
| Preferred Stock | 4/22/15 | Eleventh Generation | No | GCP1-037 | $ 46,753 | 46,753 | 0.62% |
| Preferred Stock | 6/2/15 | Eleventh Generation | No | GCP1-0137 | $ 46,753 | 46,753 | 0.62% |
| Preferred Stock | 6/2/15 | I. Wistar Morris IRA | No | GCP1-039 | $ 44,620 | 44,620 | 0.60% |
| Preferred Stock | 6/2/15 | I.Wistar Morris IRA | No | GCP1-0139 | $ 44,620 | 44,620 | 0.60% |
| Preferred Stock | 1/16/15 | Michael & Linda Harnish | No | GCP1-015 | $ 32,609 | 32,609 | 0.44% |
| Preferred Stock | 1/16/15 | Wayne Harding | Yes | GCP1-016 | $ 27,174 | 27,174 | 0.36% |
| Preferred Stock | 1/15/15 | I.Wistar Morris | No | GCP1-001a | $ 5,589 | 5,589 | 0.07% |
| Preferred Stock | 4/22/15 | Sam Morris Jr. | No | GCP1-054 | $ 4,055 | 4,055 | 0.05% |
| Preferred Stock | 6/2/15 | Sam Morris Jr. | No | GCP1-0154 | $ 4,055 | 4,055 | 0.05% |
| Preferred Stock | 11/5/17 | Sondra Margolies | No | Affidavit | $ 3,922 | 3,922 | 0.05% |
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-080 | $ 3,435 | 3,435 | 0.05% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-0180 | $ 3,435 | 3,435 | 0.05% |
| Preferred Stock | 6/2/15 | Hugo Zimmermann | No | GCP1-0152 | $ 2,819 | 2,819 | 0.04% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-087 | $ 2,317 | 2,317 | 0.03% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-187 | $ 2,317 | 2,317 | 0.03% |
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-095 | $ 1,850 | 1,850 | 0.02% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-195 | $ 1,850 | 1,850 | 0.02% |
| Preferred Stock | 4/22/15 | Stephen Brown | No | GCP1-071 | $ 980 | 980 | 0.01% |
| Preferred Stock | 6/2/15 | Stephen Brown | No | GCP1-171 | $ 980 | 980 | 0.01% |
| Preferred Stock | 1/15/15 | Sam Morris Jr. | No | GCP1-005a | $ 756 | 756 | 0.01% |
| Preferred Stock | 4/22/15 | Nazim Lokhandwala | No | GCP1-062 | $ 490 | 490 | 0.01% |
| Preferred Stock | 6/2/15 | Nazim Lokhandwala | No | GCP1-0162 | $ 490 | 490 | 0.01% |
| Preferred Stock | 6/2/15 | Wayne Harding IRA | Yes | GCP1-014C | $ 444 | 444 | 0.01% |
| Preferred Stock | 4/22/15 | Carl Swarts | No | GCP1-068 | $ 429 | 429 | 0.01% |
| Preferred Stock | 6/2/15 | Carl Swarts | No | GCP1-168 | $ 429 | 429 | 0.01% |
| Preferred Stock | 1/15/15 | Hugo Zimmermann | No | GCP1-012a | $ 378 | 378 | 0.01% |
| Preferred Stock | 1/15/15 | Michael & Linda Harnish | No | GCP1-015a | $ 276 | 276 | 0.00% |
| Preferred Stock | 1/15/15 | Wayne Harding | Yes | GCP1-16a | $ 230 | 230 | 0.00% |
| Preferred Stock | 44 | Exchanged into VitaNova | No | | $5,423,294 | 5,423,294 | 72.39% |
| Preferred Stock | 8/17/21 | Sale to VetaNova Inc. | | | $5,423,294 | 5,423,294 | 72.39% |
| Preferred Stock | Various | Others | | | $2,068,024 | 2,068,024 | 27.61% |
| GCP 1 Preferred | | Total | | | $7,491,318 | 7,491,318 | 100.00% |

| GrowCo Inc<br>Type Investment | Invest Date | Investor | Colorado Investor | Note Number | Amount Invested | Secured Notes | Percent of Outstanding |
|---|---|---|---|---|---|---|---|
| $4MM Secured Not | 5/14/15 | Lee James Wagner | No | N-005 | $ 125,000 | 125,000 | 3.13% |
| $4MM Secured Not | 3/31/20 | Prasil Family Matters | No | ??? | $ 200,000 | 200,000 | 5.00% |
| $4MM Secured Not | 6/8/15 | Dave Marshall | Yes | N-014 | $ 60,000 | 60,000 | 1.50% |
| $4MM Secured Not | 5/13/15 | Hugo Zimmermann | No | N-003 | $ 300,000 | 300,000 | 7.50% |
| $4MM Secured Not | 5/14/15 | Ursula Gutscher | No | N-004 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 5/4/15 | Michael & Linda Harnish | No | N-010 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 5/27/15 | Wayne Harding IRA | Yes | N-013 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 6/10/15 | I. Wistar Morris IRA | No | N-015 | $ 250,000 | 250,000 | 6.25% |
| $4MM Secured Not | 6/12/15 | Hugo Zimmermann | No | N-016 | $ 125,000 | 125,000 | 3.13% |
| $4MM Secured Not | 6/12/15 | Ursula Gutscher | No | N-017 | $ 50,000 | 50,000 | 1.25% |
| $4MM Secured Not | 10 | Exchanged into VitaNova Partners, LLC | | | $1,410,000 | 1,410,000 | 35.25% |
| $4MM Secured Not | Various | Others | | | $ 475,000 | 475,000 | 11.88% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $4MM Secured Not | Various | Blue Green | No | | $2,115,000 | 2,115,000 | 52.88% |
| $4MM Secured Note | | Total | | 10 | $4,000,000 | 4,000,000 | 100.00% |
| GCP Super Units, LLC | | | Colorado | Certificate | Amount | Preferred | Percent of |
| Type Investment | Invest Date | Investor | Investor | Number | Invested | Shares | Outstanding |
| Preferred Stock | 10/19/15 | Michael & Linda Harnish | No | GCPSU-001 | $ 25,000 | 25,000 | 0.47% |
| Preferred Stock | 12/8/15 | Prasil Family Matters | No | GCPSU-002 | $ 700,000 | 700,000 | 13.21% |
| Preferred Stock | 10/27/15 | Marsha Walker | No | GCPSU-003 | $ 15,000 | 15,000 | 0.28% |
| Preferred Stock | 10/19/15 | Arnold Kern | No | GCPSU-005 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 11/19/15 | Cotswold Foundation | No | GCPSU-006 | $ 200,000 | 200,000 | 3.78% |
| Preferred Stock | 11/4/15 | Hugo Zimmermann | No | GCPSU-007 | $ 250,000 | 250,000 | 4.72% |
| Preferred Stock | 10/23/15 | Ursula Gutscher | No | GCPSU-008 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 11/4/15 | Dave Marshall | Yes | GCPSU-012 | $ 60,000 | 60,000 | 1.13% |
| Preferred Stock | 12/10/15 | Terry Gruber | No | GCPSU-015 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 10/31/15 | Brooks Family Trust | No | GCPSU-024 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 12/11/15 | Wistar Morris | No | GCPSU-025 | $ 250,000 | 250,000 | 4.72% |
| Preferred Stock | 12/11/15 | Jon Gruber | No | GCPSU-026 | $ 350,000 | 350,000 | 6.61% |
| Preferred Stock | 2/5/16 | Ursula Gutscher | No | GCPSU-028 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 1/5/15 | Hugo Zimmermann | No | GCPSU-029 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 2/2/15 | Hugo Zimmermann | No | GCPSU-030 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 9/2/15 | Lee James Wagner | No | GCPSU-032a | $ 90,000 | 90,000 | 1.70% |
| Preferred Stock | 2/16/16 | Lee James Wagner | No | GCPSU-032b | $ 25,000 | 25,000 | 0.47% |
| Preferred Stock | 2/20/16 | Andreas Weinberg | No | GCPSU-033 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 2/29/16 | Dave Patterson | No | GCPSU-034 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 3/15/16 | Peter Ammentorp | No | GCPSU-035 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 10/29/15 | Elizabeth Swarts | No | GCPSU-036 | $ 30,000 | 30,000 | 0.57% |
| Preferred Stock | 10/19/15 | John McKowen | Yes | GCPSU-039 | $1,218,157 | 1,218,157 | 23.00% |
| Preferred Stock | 10/27/17 | Mark Anderson | No | GCPSU-040 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | ??? | I. Wistar Morris | No | ??? | $ 200,000 | 200,000 | 3.78% |
| Preferred Stock | 24 | Exchanged into VitaNova Partners, LLC | | | $4,263,157 | 4,263,157 | 80.48% |
| Preferred Stock | | Not Exchanged | | | $1,034,000 | 1,034,000 | 19.52% |
| GCP SU Preferred | | Total | | 23 | $5,297,157 | 5,297,157 | 100.00% |
| GrowCo | | | | Note | Amount | Exchanged | Percent of |
| Type Investment | Invest Date | Investor | | Number | Invested | Notes | Outstanding |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $6+MM Exchange | 4/15/16 | Tricia Varrasso | No | E-003 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 4//25/16 | I. Wistar Morris | No | S-002 | $ 650,000 | 650,000 | 9.84% |
| $6+MM Exchange | 5/3/16 | Prasil Family Matters | No | S-003 | $ 400,000 | 400,000 | 6.05% |
| $6+MM Exchange | 5/18/16 | Mark Anderson | No | S-004 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 5/10/16 | Michael & Linda Harnish | No | S-005 | $ 35,000 | 35,000 | 0.53% |
| $6+MM Exchange | 5/27/16 | John Brooks IRA | No | S-006 | $ 75,000 | 75,000 | 1.14% |
| $6+MM Exchange | 5/4/16 | Steve Marrinan | No | S-007 | $ 90,000 | 90,000 | 1.36% |
| $6+MM Exchange | 6/12/16 | Terry Lee Swarts | No | S-009 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 5/17/16 | I. Wistar Morris IRA | No | S-012 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 6/2/15 | I. Wistar Morris IRA | No | S-013 | $ 125,000 | 125,000 | 1.89% |
| $6+MM Exchange | 8/17/16 | Jon D. and Linda W. Grut | No | SE1-003 | $ 250,000 | 250,000 | 3.78% |
| $6+MM Exchange | 6/20/16 | Melissa Richards | No | S-011 | $ 38,000 | 38,000 | 0.58% |
| $6+MM Exchange | 6/10/16 | Arnold Kern | No | SE-001 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 8/14/16 | Donald Gale | No | SE-105 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 6/22/16 | Hugo Zimmermann | No | SE-107 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 9/22/16 | Hugo Zimmermann | No | SE-116 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/26/16 | Jon D. and Linda W. Grut | No | SE-121 | $ 250,000 | 250,000 | 3.78% |
| $6+MM Exchange | 3/15/20 | Bill Reeb | No | SE-122 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/31/16 | Hugo Zimmermann | No | SE-123 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/31/16 | Ursula Gutscher | No | SE-124 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 11/14/16 | Mark Anderson MD APL F | No | SE-125 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 12/7/16 | Hugo Zimmermann | No | SE-131 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 1/12/17 | Hugo Zimmermann | No | SE-133 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 8/18/16 | I. Wistar Morris IRA | No | SE-134 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 1/17/17 | Prasil Family Matters | No | SE-135 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 2/24/17 | Lee James Wagner | No | SE-201 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 3/7/17 | Whitney Buchanan | No | SE-202 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 3/15/17 | Lee James Wagner | No | SE-203 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 3/16/17 | Lee James Wagner | No | SE-204 | $ 25,000 | 25,000 | 0.38% |
| $6+MM Exchange | 3/3/17 | Jon D. and Linda W. Grut | No | SE-205 | $ 200,000 | 200,000 | 3.03% |
| $6+MM Exchange | 3/31/17 | Hugo Zimmermann | No | SE-207 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 3/31/17 | Prasil Family Matters | No | SE-208 | $ 400,000 | 400,000 | 6.05% |
| $6+MM Exchange | 6/5/17 | Helen Wagner | No | SE-301 | $ 50,000 | 50,000 | 0.76% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $6+MM Exchange | 6/29/17 | Hugo Zimmermann | No | SE-302 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 8/18/17 | Lee James Wagner | No | SE-303 | $ 225,000 | 225,000 | 3.41% |
| $6+MM Exchange | 3/30/17 | Hugo Zimmermann | No | | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 10 | Exchanged into VitaNova Partners, LLC | | | $4,713,000 | 4,713,000 | 71.33% |
| $6+MM Exchange | Various | Others | | | $1,719,000 | 1,719,000 | 26.02% |
| $6+MM Exchange | Various | Blue Green | | | $ 175,000 | 175,000 | 2.65% |
| $6+MM Exchange Note | | Total | | 35 | $6,607,000 | 6,607,000 | 100.00% |

**Vetanova - Reorganizing GrowCo**

| | | | |
|---|---|---|---|
| Exchanged in VetaNova | $ | 15,809,451 | 77.36% |
| Unexchanged | $ | 4,626,954 | 22.64% |
| Total GrowCo Capit | $ | 20,436,405 | 100.00% |




Case:25-16665-KHT Doc#:60 Filed:01/13/26 Entered:01/13/26 11:11:37 Page20 of 20

| | |
|---|---|
| District Court, City and County of Denver, Colorado<br>City and County Building, Room 256<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED<br>[illegible]<br>[illegible]<br>CASE NUMBER: 2021CV33922 |
| Plaintiff: **TUNG CHAN, Securities Commissioner for the State of Colorado**<br><br>v.<br><br>Defendants: **TWO RIVERS WATER & FARMING COMPANY, et al.** | ▲ COURT USE ONLY ▲<br><br>Case Number: 21CV33922<br><br>Division Courtroom 259 |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT**

This matter comes before the Court following a Court Trial held on July 10-18, 2023. The Complaint for Injunction and Other Relief filed by Plaintiff Tung Chan, the Securities Commissioner for the State of Colorado ("Plaintiff" or "Commissioner"), on December 10, 2021, contains the following three claims: (1) Securities Fraud; (2) Unlicensed Activity—Broker Dealer; and (3) Unregistered Securities. Per the Complaint, the Commissioner asserts these claims against the following twenty-one defendants: Two Rivers Water & Farming Company; TR Capital Partners, LLC; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; GCP Super Units, LLC; VitaNova Partners, LLC; VitaNova, Inc.; VitaNova, LLC; VitaNova Colorado, LLC; McGrow, LLC; MCG Services, LLC; GCO Land, LLC; Waterton Financial, Inc.; John Roderick McKowen; Wayne Harding; Jan M. McCaffrey; George McCaffrey; Edward J. Wallick; Richard G. Wiwi; and Kirsty Cameron. The claims against nineteen of the defendants were resolved in some fashion before the Court Trial commenced, and only *pro se* Defendants John Roderick McKowen ("McKowen") and Wayne Harding ("Harding") (collectively, "Defendants")

EXHIBIT
2

participated in the Court Trial.[1] The Commissioner submitted her Proposed Findings of Fact and Conclusions of Law, and her written Closing Argument, on August 18, 2023. Harding submitted his Final Statement and Position on Facts on August 21, 2023. McKowen submitted his Amended Closing Argument, and his Proposed Order, the same day. The Court, having reviewed the record, trial transcripts, admitted exhibits, and all pertinent pleadings and relevant legal authority, and being otherwise fully advised in the premises, finds and orders as follows:

## BACKGROUND

Two Rivers Water & Farming Company (formerly Navidec Financial Services, Inc.)[2] (hereinafter "Two Rivers") is a public company founded by McKowen in or around 2009 to develop agricultural land and water resources near Pueblo, Colorado, in Pueblo, El Paso, and Huerfano Counties. Two Rivers operated its farming and water assets through several subsidiaries. One of these subsidiaries (Dionisio Farms) engaged in traditional farming activities growing crops and produce. Although Two Rivers, Dionisio Farms, and other subsidiaries were modestly profitable at times, Two Rivers began looking for ways to find the "highest and best use" of its land and water resources to increase profitability. The passage of Amendment 64 to the Colorado Constitution in 2012 presented such an opportunity. Amendment 64—enacted as Article 18, Section 16, of the Colorado Constitution—legalized the limited personal cultivation and recreational use of marijuana as of December 2012 and state-licensed commercial sales of marijuana as of January 2014.[3] Following the legalization of recreational marijuana, Two Rivers created a web of related entities to capitalize and build state of the art greenhouses on some of its

[1] The procedural history concerning the pleadings and resolution of various claims, cross-claims, and "counter" cross-claims is somewhat complicated. This history is discussed in more detail below. The only claims that remained for the Court Trial were the three claims asserted by the Commissioner against McKowen and Harding.
[2] Navidec Financial Services, Inc., was created in or about 2000.
[3] The passage of Amendment 20 to the Colorado Constitution in 2000—enacted as Article 18, Section 14, of the Colorado Constitution—allowed limited personal cultivation and use of marijuana for approved patients with written medical consent, i.e., a prescription.

land for lease to licensed marijuana growers. Subsidiaries GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GrowCo Partners Super Units, LLC, and others, were formed for this purpose. Defendants held executive management positions with these different entities, including president, chief executive officer, and chief financial officer. From 2014 to 2019, Defendants raised approximately $19,000,000.00 through various debt and equity offerings for the stated purpose of building several greenhouses and providing financial support to the growers who leased the facilities. There is no dispute these offerings constituted "securities" and were subject to the provisions of the Colorado Securities Act—§§ 11-51-101, C.R.S. (2024), *et seq.*[4] Although the expected cost of a single greenhouse was approximately $5,000,000.00, Defendants built only one facility and partially completed a second one with these investor funds. This business venture eventually proved to be unsuccessful and investors received little or no returns on their investments.

On December 10, 2021, the Commissioner filed a Complaint for Injunctive and Other Relief, alleging that Defendants sold unregistered, non-exempt securities through unlicensed broker-dealers or sales representatives and made material misrepresentations and omissions to investors during the offerings. The Commissioner generally alleges that Defendants: (1) misrepresented to investors how the funds would be used, including that (a) seven offerings would be used to construct four greenhouses but only one greenhouse was completed (b) a significant amount of funds was used for general administrative costs (salaries, etc.) and not for construction of greenhouses and (c) some funds in later offerings were used to pay interest due on earlier offerings; (2) Defendants failed to disclose material information to investors, such as (a) McKowen was suspended in or around 1989 for one year by the National Association of Securities Dealers

[4] Unless otherwise noted, all references to the CSA are to the 2024 version of the Colorado Revised Statutes.

(NASD) for charging excessive compensation when selling securities and for providing inadequate disclosures (b) George McCaffrey was suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc. (FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities, while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado) and (c) Defendants did not disclose to investors that they used unlicensed broker-dealers or sales representatives (George McCaffrey and Jan McCaffrey through Waterton Financial, Inc., Kirsty Cameron, Edward Wallick, and Richard Wiwi) who were paid commissions or finder's fees for selling the securities; and (3) for some of the offerings, Defendants filed the requisite Form D notices of securities registration with the Securities and Exchange Commission (SEC), but failed to file any notification of securities registration exemption with the Commissioner as required by § 11-51-308(1)(p).

As noted above, the claims against McKowen and Harding were the only ones to proceed to trial. The following procedural history in this matter explains why. In its Complaint, the Commissioner alleged three claims against twenty-one defendants. Defendants McKowen, GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GCP Super Units, LLC, VitaNova Partners, LLC, VitaNova Colorado, LLC, VitaNova, LLC, McGrow, LLC, MCG, LLC, GCO Land, LLC, and VitaNova, Inc., through counsel, filed their Answer on January 18, 2022. No cross-claims or counterclaims were asserted in this filing. Defendant Harding acting *pro se* filed his Answer on January 26, 2022. No cross-claims or counterclaims were asserted in this filing. Defendants George McCaffrey and Jan McCaffrey, through counsel, filed their Answer on January 31, 2022. No cross-claims or counterclaims were asserted in this filing. Thereafter, Defendants George McCaffrey, Jan McCaffrey, and Waterton Financial, Inc., through the same

counsel, filed an Answer on February 1, 2022. No cross-claims or counterclaims were asserted in this filing. Defendant Kirsty Cameron, through counsel, filed her Answer on February 1, 2022. No cross-claims or counterclaims were asserted in this filing.

Defendants Two Rivers and TR Capital Partners, LLC (a subsidiary of Two Rivers created to operate and control direct and indirect subsidiaries of Two Rivers) (hereinafter, collectively "Two Rivers" or "TR Capital"), through counsel, filed their Answer on March 4, 2022, and in the same filing asserted a cross-claim for breach of fiduciary duty against both McKowen and Harding. The Court notes that as of the filing of this lawsuit McKowen and Harding no longer held any executive or management positions at Two Rivers. On March 30, 2022, through counsel, McKowen filed his Answer to this cross-claim, and in the same filing asserted "amended counter" cross-claims on behalf of McKowen, VitaNova Partners, LLC, and GrowCo, Inc., against Two Rivers and their respective affiliates for breach of fiduciary duty, civil fraud, and conversion. Two Rivers, through counsel, filed their Answer to these "amended counter" cross-claims on April 19, 2022. On May 25, 2022, Harding acting *pro se* filed his Answer to the cross-claim asserted by Two Rivers, and in the same filing asserted a cross-claim against Two Rivers for enforcement of an arbitration award entered ten months before the present lawsuit commenced that apparently required "a grant of 222,581 shares of Two Rivers' common shares to be issued from Two Rivers' 2011 Long Term Stock Incentive Plan" to Harding. Finally, on July 22, 2022, Two Rivers, through counsel, filed a short First Amended Answer to the Commissioner's Complaint, modifying three paragraphs of its original Answer.

At a Status Conference held on November 3, 2022, the Commissioner informed the Court it was unable to achieve service of process on Defendants Edward Wallick and Richard Wiwi. The Court thus removed these parties from the lawsuit. In addition, the Court entered default against

Waterton Financial, Inc., as George McCaffrey and Jan McCaffrey informed the Court they were unable to retain counsel to represent the entity. The Court also permitted counsel for McKowen, GrowCo, Inc., GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, GCP Super Units, LLC, VitaNova Partners, LLC, VitaNova Colorado, LLC, VitaNova, LLC, McGrow, LLC, MCG, LLC, GCO Land, LLC, and VitaNova, Inc., to withdraw. The Court ordered these entity defendants to retain counsel within twenty-eight days or risk being held in default. The entity defendants failed to hire new counsel, and the Court entered default against these entities on December 28, 2022.

On November 4, 2022, Two Rivers filed a motion to dismiss the cross-claim filed against it by Harding. The Court granted this motion per written order on June 16, 2023. On April 27, 2023, the Commissioner and Defendant Kirsty Cameron entered into a Stipulation for Order of Injunction resolving the claims against Ms. Cameron. On May 5, 2023, the Commissioner and Two Rivers entered into a Stipulation for Injunction and Other Relief resolving the claims against Two Rivers; as part of this settlement, Two Rivers agreed to withdraw its cross-claims against McKowen and Harding. The Court entered an Order of Injunction and Other Relief on May 9, 2023, concerning the claims against Two Rivers, and on May 18, 2023, Two Rivers filed a motion to dismiss its cross-claims against McKowen and Harding. The Court granted this motion at a Pretrial Conference held on June 1, 2023. On May 25, 2023, Two Rivers filed a motion to dismiss the cross-claim filed against it by McKowen. The Court granted this motion per written order on July 7, 2023. That same day, the Commissioner and Defendant Jan McCaffrey entered into a Stipulation for Order of Injunction resolving the claims against Ms. McCaffrey. The Court entered an Order of Injunction and Other Relief on July 11, 2023, concerning the claims against Ms. McCaffrey. On July 9, 2023, the Commissioner and Defendant George McCaffrey entered into a Stipulation for Order of Injunction resolving the claims against Mr. McCaffrey. The Court entered

an Order of Injunction and Other Relief on July 11, 2023, concerning the claims against Mr. McCaffrey. It does not appear the Commissioner entered into any stipulation with Defendant Waterton Financial, Inc. However, given the close association between George McCaffrey, Jan McCaffrey, and Waterton Financial, Inc., the Court construes the resolution of claims against George McCaffrey and Jan McCaffrey as a resolution of the default entered against Waterton Financial, Inc. Accordingly, once the dust settled on these pretrial maneuverings, only the claims against McKowen and Harding remained.

## APPLICABLE LAW

"The purposes [of the Colorado Securities Act (CSA)] are to protect investors and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets." *See* § 11-51-101(2). The CSA is "remedial in nature and is to be broadly construed to effectuate its purposes." *Id.* The CSA further provides, "The provisions of this article and rules made under this article shall be coordinated with the federal acts and statutes to which references are made in this article and rules and regulations promulgated under those federal acts and statutes, to the extent coordination is consistent with both the purposes and the provisions of this article." *Id.* The U.S. Supreme Court in *S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) "has recognized that the purpose of securities regulations is to substitute a philosophy of full disclosure for the philosophy of caveat emptor [i.e., let the buyer beware]. This philosophy is also reflected in the CSA, which places the burden of not making untrue statements of material fact, and not omitting to state material facts, on any person connected with the offer, sale, or purchase of any security." *See Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 738 (Colo. App. 2009) (internal citations and quotation marks

omitted). In short, "[t]he design of the [CSA] is to protect investors by promoting full disclosure." *Id.*, *citing Western-Realco Ltd. v. Harrison*, 791 P.2d 1139, 1144 (Colo. App. 1989).

To this end, section 11-51-501(1) of the CSA makes it unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly, to engage in any of the following specified acts: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. "A misrepresented or omitted fact is considered material under [the CSA fraud and prohibited conduct provisions] if there is a substantial likelihood that a reasonable investor would consider the matter important in making an investment decision. Whether or not the misrepresented or omitted fact is important turns on whether a reasonable investor would regard it as significantly altering the total mix of information made available." *See Goss v. Clutch Exchange, Inc.*, 701 P.2d 33, 36 (Colo. 1985) (internal citations and quotation marks omitted);[5] *see also People v. Prendergast*, 87 P.3d 175, 180 (Colo. App. 2003) (adopting the definition of material fact used in civil cases per *Goss* for criminal cases).

In addition, section 11-51-301 of the CSA makes it unlawful for "any person to offer to sell or sell any security in this state unless it is registered under this article 51; the security or

[5] The Colorado Supreme Court in *Goss* granted certiorari to review jury instructions in a civil trial defining a "material fact" within the context of section 11-51-125(1), C.R.S. (1973), which provided, in pertinent part: "Any person who . . . offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue to recover the consideration paid for the security . . . ." Per the Editor's note of the current version of the CSA, §§ 11-51-101, C.R.S. (2024), *et seq.*, the substantive provisions of article 1 of chapter 125 of the CSA were repealed and replaced in 1990, resulting in the addition, relocation, and elimination of sections as well as subject matter. Section 11-51-604, C.R.S. (2024) which provides, in part, civil penalties for a violation of § 11-51-501, C.R.S. (2024), is similar to former § 11-51-125(1), C.R.S. (1973).

transaction is exempted under section 11-51-307, 11-51-308, 11-51-308.5, or 11-51-309; or the security is a federal covered security for which a notice filing has been made pursuant to section 11-51-304.5." Section 11-51-308(1)(p) provides, "The following transactions are exempted from sections 11-51-301 and 11-51-305 . . . Any offer or sale of a security in compliance with an exemption from registration with the securities and exchange commission under section 3(b)(1) or 4(a)(2) of the federal 'Securities Act of 1933' [the "Act"], as amended, 15 U.S.C. secs. 77c (b)(1) and 77d (a)(2), pursuant to regulations adopted in accordance with the federal act by the securities and exchange commission. . . . The issuer shall file with the securities commissioner [of Colorado] a notification of exemption, in a form prescribed by the securities commissioner [of Colorado], and pay an exemption fee to be determined and collected pursuant to section 11-51-707." 15 U.S.C. § 77c(b)(1) states, "The [SEC] may from time to time by its rules and regulations, and subject to such terms and conditions as may be prescribed herein, add any class of securities to the securities exempted as provided in this section, if it finds that the enforcement of this subchapter with respect to such securities is not necessary in the public interest and for the protection of investors by reason of the small amount involved or the limited character of the public offering; but no issue of securities shall be exempted under this subsection where the aggregate amount at which such issue is offered to the public exceeds $5,000,000." 15 U.S.C. § 77d(a)(2) states, "The provision of section 77e [prohibiting the sale of unregistered securities] of this title shall not apply to . . . transactions by an issuer not involving any public offering." Per § 11-51-605, "the burden of proving an exemption or an exception from a definition is upon the person claiming it."

SEC Rule 506, 17 C.F.R. § 230.506, is a federal regulation establishing a registration exemption pursuant to Section 4(2) of the Act. 15 U.S.C. § 77d(2). Under Colorado law, a transaction in compliance with SEC Rule 506 is an exempt transaction. *See* § 11-51-308(1)(p).

Rule 506(a) provides, "Offers and sales of securities by an issuer that satisfy the conditions in paragraph (b) or (c) of this section shall be deemed to be transactions not involving any public offering within the meaning of section 4(a)(2) of the Act." SEC Rule 506 further provides:

(b) Conditions to be met in offerings subject to limitation on manner of offering

(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

(2) Specific conditions

(i) Limitation on number of purchasers. There are no more than, or the issuer reasonably believes that there are no more than, 35 purchasers of securities from the issuer in offerings under this section in any 90-calendar day period.

(ii) Nature of purchasers. Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.

(c) Conditions to be met in offerings not subject to limitation on manner of offering—

(1) General conditions. To qualify for an exemption under this section, offers and sales must satisfy all the terms and conditions of §§ 230.501 and 230.502.

(2) Specific conditions—

(i) Nature of purchasers. All purchasers of securities sold in any offering under paragraph (c) of this section are accredited investors.

(ii) Verification of accreditor investor status. The issuer shall take reasonable steps to verify that purchasers of securities sold in any offering under paragraph (c) of the section are accredited investors. . . .

. . .

(d) "Bad Actor" disqualification.

(1) No exemption under this section shall be available for a sale of securities if the issuer; any predecessor of the issuer; any affiliated issuer; any director, executive officer, other officer participating in the offering, general partner or managing member of the issuer; any beneficial owner of 20% or more of the issuer's outstanding voting equity securities, calculated on the basis of voting power; any promotor connected with the issuer in any capacity at the time of such sale; any investment manager of an issuer that is a pooled investment fund; any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with such sale of securities; any general partner or managing member of any such investment manager or solicitor; or any director, executive officer or other officer participating in the offering of any such investment manager or solicitor or general partner or managing member of such investment manager or solicitor:

. . .

(vi) Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

. . .

(2) Paragraph (d)(1) of this section shall not apply:

(i) With respect to any conviction, order, judgment, decree, suspension, expulsion or bar that occurred or was issued before September 23, 2013;

. . .

(e) Disclosure of prior "bad actor" events. The issuer shall furnish to each purchaser, a reasonable time prior to sale, a description in writing of any matters that would have triggered disqualification under paragraph (d)(1) of this section but occurred before September 23, 2013. The failure to furnish such information timely shall not prevent an issuer from relying on this section if the issuer establishes that it did not know and, in the exercise of reasonable care, could not have known of the existence of the undisclosed matter or matters.

Concerning whether a purchaser is an "accredited investor," SEC Rule 501, 17 C.F.R. § 230.501 provides, in part:[6]

As used in Regulation D (§ 230.501 et seq. of this chapter), the following terms shall have the meaning indicated:

(a) Accredited investor. Accredited investor shall mean any person who comes within any of the following categories, or who the issuer reasonably believes comes within any of the following categories, at the time of the sale of the securities to that person:

. . .

[6] The Court notes that 3 CCR 704-1:51-3.19 (Colorado Model Accredited Investor Exemption) states, "Any offer or sale of a security by an issuer in a transaction that meets the requirements of this Rule is exempted from the securities registration requirement of the CSA." Paragraph A of the Rule states, "Sales of securities shall be made only to persons who are or the issuer reasonably believes are 'accredited investors' as that term is defined in SEC Rule 501(a) of Regulation D."

(5) Any natural person whose individual net worth, or joint net worth with that person's spouse or spousal equivalent, exceeds $1,000,000;

. . .

(6) Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse or spousal equivalent in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year.

Importantly, regarding the use of Regulation D (17 C.F.R. §§ 230.500 et seq.), 17 C.F.R. § 230.500 states, in pertinent part: (a) "Regulation D relates to transactions exempted from the registration requirements of section 5 of the Securities Act of 1933 (the Act) (15 U.S.C. 77a et seq., as amended). Such transactions are not exempt from the antifraud, civil liability, or other provisions of the federal securities laws. Issuers are reminded of their obligation to provide such further material information, if any, as may be necessary to make the information required under Regulation D, in light of the circumstances under which it is furnished, not misleading. . . . (b) Nothing in Regulation D obviates the need to comply with any applicable state law relating to the offer and sale of securities. . . ."

Finally, concerning licensing of broker-dealers and sales representatives, section 11-51-401(1) of the CSA provides, "A person shall not transact business in this state as a broker-dealer or sales representative unless licensed or exempt from licensing under section 11-51-402. Section 11-51-401(2) prohibits an issuer of securities from engaging an individual to act as a sales representative unless the sales representative is licensed or exempt from licensing under § 11-51-402. Per § 11-51-201(1), "sales representative" means:

> [A]n individual, other than a broker-dealer, either authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities or authorized to act and acting for an issuer in effecting or attempting to effect purchases or sales of the issuer's own securities. An individual so acting for an issuer is not a sales representative if the individual primarily performs, or is intended primarily to perform upon completion of an offering of the issuer's own securities, substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities and the individual's compensation is not based, in whole or in part, upon the amount of purchases or sales of the issuer's own securities effected for the issuer. A partner, officer, or director of a broker-dealer or issuer, or an individual occupying a similar status or performing similar functions, is a sales representative only if the individual otherwise comes within the definition.

The term "effecting or attempting to effect purchases or sales" is not further defined in the statute. "Individuals who solicit investors by phone and in person, and who distribute documents and prepare and distribute sales circulars in the hope that potential investors will deposit money in the account, are seeking to effect securities transactions." *Black Diamond Fund, LLLP*, 211 P.3d at 734. In addition, "[e]ffecting transactions in securities is shown by actively soliciting clients, selling securities to the clients, and participating in securities transactions at key points in the chain of distribution." *Id.* (internal citations and quotation marks omitted). Receiving transaction-based compensation, locating prospective investors, discussing the offerings with prospective investors, and obtaining signed subscription agreements and money from prospective investors even without providing the "formal acceptance of the subscription agreements" are indicative of a sales representative. *Id.*; *cf. Apex Global Partners, Inc. v. Kaye/Bassman Intern. Corp.*, No. 3:09-cv-637-M, 2009 WL 2777869, at *3 (E.D. Tex. Aug. 31, 2009) (court denies motion to dismiss for failure to state a claim under federal securities law in a contract dispute for a commission by defendant company who allegedly facilitated plaintiff company's purchase of other companies' assets without registering as a broker-dealer, noting, in part, "In *Cornhusker Energy Lexington,*

*LLC v. Prospect Street Ventures* [No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006)], the court extensively analyzed a claim that a putative contract was voidable due to the failure to register as a broker dealer. The court stated that a finder is like a party who 'will be performing the functions of a broker-dealer, triggering registration requirements, if [the finder's] activities include: analyzing the financial needs of an issuer, recommending or designing financing methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities.' Merely bringing together the parties to transactions, even those involving the purchase and sales of securities, is not enough.") In *Cornhusker*, the federal district court further stated, "Transaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer. The underlying concern has been that transaction-based compensation represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent." *Id.*

Section 11-51-402(2) provides, in pertinent part, "The following sales representatives are exempt from the license requirement of section 11-51-401(1):

. . .

(b) A sales representative employed or otherwise engaged by an issuer in effecting transactions only in securities exempted by section 11-51-307 (1)(a) to (1)(d) or (1)(j);

(c) A sales representative employed by an issuer in effecting transactions only with employees, partners, officers, or directors of the issuer or of a parent or subsidiaries of the issuer, if no commission or other similar compensation is paid or given directly or indirectly to the sales representative for soliciting an employee, partner, officer, or director in this state; and

(d) Other sales representatives the securities commissioner by rule or order exempts.

## FINDINGS OF FACT[7]

1. The facts set forth above in the "Background" section of this Order were established by credible and competent evidence during the Court Trial.

2. The following facts are true per the stipulations in the Trial Management Order entered by the Court on June 22, 2023:

a. John McKowen was a Control Person for all Defendant entities except Waterton Financial, Inc. He was Two Rivers CEO, Two Rivers Board of Directors member, and GrowCo Board of Directors member from inception until May 2016. McKowen also founded and held executive and board positions for the other GrowCo entities, the VitaNova entities, McGrow, LLC, and Johnny Cannaseed, LLC;

b. Wayne Harding was a Control Person of Two Rivers and the GrowCo entities. During the relevant time period, he was the CFO and CEO of Two Rivers, the CEO of GrowCo, and served in management for the other GrowCo entities. He left Two Rivers and GrowCo in 2019;

c. George McCaffrey was licensed to offer and sell securities from January 3, 1978 until October 30, 2017. He was an executive of VitaNova Colorado, LLC;

d. Jan McCaffrey is married to George McCaffrey. She was not licensed to offer and sell securities at any time relevant to this case. In 2017, Jan McCaffrey joined GrowCo to serve as its COO, as well as Secretary and Treasurer for the Board of Directors. She later served as a director on the VitaNova, Inc., Board of Directors, as well as VitaNova's COO;

[7] These findings of fact have been established by a preponderance of the evidence.

e. Two Rivers is a Colorado corporation that was incorporated on July 28, 2009. It later became the successor corporation after a merger with Two Rivers Water Basin, LLC, in September 2010;

f. During the time period relevant to this case, Two Rivers was the parent company of multiple subsidiaries, including: Water Redevelopment Company; Huerfano Cucharas Irrigation Company; Dionisio Farms & Produce, Inc.; Two Rivers Farms F-1, Inc.; Two Rivers Farms F-2, Inc.; TR Capital Partners, LLC; Orlando Reservoir No. 2, LLC; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; and GCP Super Units, LLC;

g. GrowCo, Inc. ("GrowCo") was a Colorado corporation incorporated on May 4, 2014, by McKowen. It was formerly a Two Rivers subsidiary with the stated purpose of constructing state-of-the-art greenhouses for third-party, licensed marijuana growers. The greenhouses were to be located on Two Rivers-owned property;

h. GrowCo Partners 1, LLC ("GCP1") is a Colorado limited liability company organized by Harding on October 31, 2014. It was formerly a subsidiary of Two Rivers. GCP1's stated purpose was to raise funds for and serve as landlord for the first marijuana greenhouse ("GCP1 Greenhouse");

i. The GrowCo entities largely shared the same management personnel;

j. McGrow, LLC ("McGrow") was a Colorado limited liability company organized by McKowen on June 12, 2016. McKowen was the sole officer of McGrow and controlling member. McGrow's stated purpose was providing greenhouse startup capital, machinery, materials, and services to licensed third-party marijuana

growers and extractors. McKowen voluntarily dissolved McGrow on May 24, 2021;

k. McKowen resigned from Two Rivers and its subsidiaries in May 2016 and created a series of new entities that he used to induce investors to convert their securities from GrowCo entities to the new entities. The new entities are named VitaNova, Inc. ("VitaNova"), VitaNova, LLC ("V. LLC"), VitaNova Partners, LLC ("V. Partners"), and VitaNova Colorado, LLC ("V. CO") (the "VitaNova Entities");

l. All three VitaNova, LLC, Boards of Managers consisted of McKowen and two other unnamed individuals. Their officers were McKowen acting as CEO and George McCaffrey acting as COO;

m. The individual Defendants used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities;

n. The McCaffreys offered and sold securities for the Defendant entities with[out] being properly licensed under the Colorado Securities Act and received fees for offering and selling Defendant entities' securities; and

o. None of the GrowCo entities filed exemption from registration notifications with the Colorado Securities Commissioner. (Ex. 48).

3. McKowen is the founder of Two Rivers. (Transcript "TR," 7/11/23, 113:2-3; 173:18-23). Two Rivers owned land, both non-productive and irrigable farming, in Pueblo, El Paso, and Huerfano Counties. Two Rivers also owned water rights in Huerfano and El Paso Counties, and had an interest in a municipal district in eastern El Paso County. (TR, 7/11/23, 113:9-14). Two Rivers "was formed to acquire and develop water rights and associated land in

Colorado." When the water rights were not producing enough revenue to pay Two Rivers' overhead, Two Rivers moved into farming and acquired Dionisio Farms. The farming operations were cash flow positive but eventually did not have enough revenue to pay its overhead. (TR, 7/12/23, 177:16-179:14). Thus, Two Rivers decided to use some of its land to construct greenhouses to lease to marijuana growers. (TR, 7/12/23, 180:4-12).

4. McKowen later formed TR Capital, GrowCo, GCP1, GCP2, GCP Super Units, McGrow, and the VitaNova entities. (TR, 7/12/23, 173:18-176:16).

5. In July 2008, Harding began working at Navidec Financial Services, which changed its name to Two Rivers about eighteen months later, as a senior accountant. In the fall of 2009, Harding became the Controller for Two Rivers. Approximately one year later, on or about January 1, 2011, Harding became CFO, a position he held until he became CEO on June 13, 2016, following the resignation of McKowen from his executive positions with Two Rivers. (TR, 7/17/23, 106:11-22; Ex. 4).

6. Harding was employed by Two Rivers during the time period of the GrowCo offerings described in detail below. He was also part of the management team at GrowCo as CFO during these offerings. (TR, 7/11/23, 103:2-24; 112:4-20). Harding testified that as CFO, "I [Harding] would oversee and review all the documents that go out when it comes to financing it [construction of the first greenhouse]. Capital raises. I would be involved in that." (TR, 7/17/23, 150:14-151:3). Harding resigned from Two Rivers and GrowCo on September 19, 2019. (TR, 7/11/23, 228:17-20; TR, 7/17/23, 176:3-5).

7. Following the legalization of recreational marijuana, McKowen formed GrowCo in 2014 as a wholly-owned subsidiary of Two Rivers to build and lease greenhouses to licensed marijuana growers. Harding described this period as the "next gold rush" in Colorado that "we

[Two Rivers] tried to address . . . with the assets that we had in hand, which was land and water, that we applied to some farming." (TR, 7/18/23, 7:16-20). Harding similarly described this period after legalization of recreational marijuana as the "wild west" and "everybody was trying to get on board." (TR, 7/11/23, 117:17-19).

8. Neither Two Rivers or GrowCo would be involved in the grow operation itself given that a publicly traded company (like Two Rivers) was precluded from such activity. (TR, 7/11/23, 118:11-119:12; TR, 7/12/23, 80:3-19). Suncanna was the original tenant and licensed grower/operator of the first greenhouse. Aaron Van Wingerden and Tim Beall operated Suncanna. Harding was CFO of Suncanna for several months after its lease began with GrowCo in order to provide "third-party oversight" of Suncanna while its initial lease payments accrued. (TR, 7/11/23, 122:7-124:7).

9. Per Harding, GrowCo is the "mothership" of the marijuana investments. Harding testified that "GCP1 relates to the land [and] water assets, construction improvements in the first greenhouse. [GCP2] is with the second greenhouse. And GCP Super Units, LLC, since we're running out of cash and need additional cash, that was another entity we used to raise money." (TR, 7/11/23, 130:21-131:16).

10. McKowen and Harding were the promoters of the offerings set forth below. The offerings were purported to be private offerings sold to accredited investors. Harding reviewed the accredited investor questionnaires received from potential investors to ensure the answers were complete and the potential investor met the criteria for an accredited investor. (TR, 7/11/23, 159:11-23). The pro formas provided to investors as part of the offerings were a "joint effort" by McKowen and Harding. (TR, 7/11/23, 141:10-14). Harding was primarily responsible for sending offering documents to potential investors and he assisted in preparing the Term Sheets for the

offerings. (TR, 7/11/23, 160:12-161:6). Any written disclosure of risks associated with the offerings were contained in the exhibits discussed during the Court Trial; no other written risk disclosures were provided to the investors. (TR, 7/11/23, 180:7-9).

11. Neither McKowen or Harding held a license to sell securities at the time of the offerings. (TR, 7/12/23, 200:10-16; Ex. 99 and 34). McKowen testified that in 1985 or 1986 his securities license was suspended for a month and then the SEC extended the suspension for one year, and when he did not apply for reinstatement the SEC revoked his license in 1990 for failing to re-register. (TR, 7/12/23, 172:11-20). Exhibit 99 reveals that on or about October 17, 1986, a NASD (National Association of Securities Dealers) complaint was filed against McKowen and others alleging, in part, that McKowen "engaged in a deceptive and fraudulent contrivance in completing a series of transactions to sell customer securities." McKowen was censured, fined $15,000.00, and ordered to disgorge $509,880.00. McKowen appealed to the Board of Governors. On June 9, 1987, the Board of Governors dismissed some findings (including, apparently, the fraud findings) and affirmed others, but then affirmed the censure, increased McKowen's fine to $25,000.00, suspended him for one year, and maintained the order of disgorgement. During his testimony, McKowen confirmed his suspension. (TR, 7/13/23, 190:20-193:21). On August 23, 1990, his NASD registration was revoked for "non-payment of fines and/or costs." His NASD (and later FINRA) registration was never reinstated.

12. No notices of exemption were ever filed with the Commissioner for any of the offerings. McKowen and Harding acknowledged as much during their testimony. (TR, 7/11/23, 159:7-10; TR, 7/12/23, 28:4-11; TR, 7/13/23, 175:1-180:21; TR, 7/17/23, 22:13-20). McKowen's own securities expert, William Hart, testified that a failure to file such notice with the

Commissioner is a violation of the CSA. (TR, 7/14/23, 40:16-18; 42:5-12; 43:22-44:2). Form D filings, however, were made with the SEC for the GrowCo offerings. (TR, 7/12/23, 27:16-28:3).

13. GrowCo used George McCaffrey, Jan McCaffrey, Kirsty Cameron, Richard Wiwi, and Ed Wallick to raise capital. McKowen and Harding did not ensure these individuals possessed a securities license because McKowen believed they (the McCaffreys, Cameron, Wiwi, and Wallick) could be paid "finders fees" without having a securities license. (TR, 7/11/23, 135:24-136:18; TR, 7/14/23, 175:1-176:2; Ex. 34). GrowCo paid these individuals (sometimes through a business entity, such as Waterton Financial for the McCaffreys) many thousands of dollars for their efforts to persuade potential investors to subscribe to a GrowCo offering. (Ex. 44). The amount of their compensation was "dependent on how much money they brought in." (TR, 7/11/23, 157:22-158:9).

14. At the outset of the Court Trial, the parties stipulated to the admission of various exhibits described below. Some of these exhibits show when entities in this lawsuit were formed, and contain early discussions regarding greenhouse construction and offering documents for raising money to fund the anticipated construction and operations of the greenhouses.

a. Exhibit 1005 is a Form 10-SB (General Form for Registration of Securities of Small Business Issuers) filed with the United States Securities and Exchange Commission ("SEC") by McKowen on behalf of Navidec Financial Services, Inc., on or about January 28, 2005. The document shows Articles of Incorporation of Navidec Capital, Inc., were filed with the Colorado Secretary of State ("SOS") on December 20, 2002, and that Articles of Amendment to Articles of Incorporation were filed with the SOS on October 4, 2003, to change the name of Navidec Capital, Inc., to Navidec Financial Services, Inc. The document lists McKowen as president of

Navidec Financial Services, Inc. Thereafter, on November 19, 2009, Articles of Amendment were filed with the SOS changing the name of Navidec Financial Services, Inc., to Two Rivers Water Company.

b. Exhibit 1006 is Articles of Incorporation for a Profit Corporation filed by McKowen with the SOS on May 4, 2014, for GrowCo, Inc. The Articles of Incorporation were filed four months after state-licensed commercial sales of marijuana became legal in the state of Colorado. The exhibit contains the By-Laws of GrowCo, Inc.

c. Exhibit 1007 is an email dated April 8, 2014 from Tim Beall (and Aaron Van Wingerden) to McKowen providing a description of Beall's experience growing tomatoes, peppers, and flowers in Colorado, and expressing an interest in building a two-acre greenhouse in Pueblo County—presumably for growing marijuana as he mentions using the greenhouse to grow tomatoes or flowers "if laws change later"—with possible expansion up to ten acres.

d. Exhibit 1008 is an email dated July 1, 2014 from Beall to McKowen, Kirsty Cameron, and Harding estimating the "total cost" of building a greenhouse to be $2,321,000.00 to $3,321,000.00. (TR. 7/12/23, 76:22-79:15). Importantly, the actual construction costs for the first greenhouse (completed around September 2015) ballooned to approximately $7,000,000.00—well over twice the amount of the original estimate. (TR. 7/12/23, 89:9-90:4; 92:5-11; 158:15-159:18).

e. Exhibit 1010 contains the offering documents for GCP1. Exhibit 1011 contains the offering documents for the GrowCo $4 Million Note. Exhibit 1012 contains the

offering documents for GCP Super Units, LLC. These offerings and others are discussed in the following paragraphs.

15. Concerning **GCP1** in Exhibits 27 and 1010—the first offering—the Memorandum of Terms ("Term Sheet") is dated October 31, 2014, and says that GCP1 is an indirect subsidiary of Two Rivers and that Two Rivers "is the parent of GrowCo." The Term Sheet states, in part, "This Memorandum dated October 31, 2014, summarizes the principal terms of an offering of preferred units of GrowCo Partners 1, LLC ('**Partners**') and associated warrants to purchase common stock of GrowCo, Inc. ('**GrowCo**'), an indirect subsidiary of Two Rivers Water and Farming Company ('**Two Rivers**')." The Term Sheet further states, "*Partners*, a Colorado limited liability company, has been formed to construct and manage either one or two greenhouse facilities . . . that will be leased to marijuana growers. *GrowCo*, a Colorado corporation, will perform construction, management and other services for Partners pursuant to a services agreement with specified periodic fees."

16. The Term Sheet for GCP1 indicates the offering proposes to raise $6 million for one greenhouse or $10 million for two greenhouses with a target closing date of November 14, 2014 (the subscription documents list an adjusted target closing date of December 15, 2014).

17. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used by Partners primarily: (1) to finance the construction of either one greenhouse or two greenhouses, each to be leased to marijuana growers, depending on the number of offered units sold; (2) to lend up to $1.0 million to greenhouse lessees pursuant to lines of credit; (3) to finance the purchase of farmland and water taps for the greenhouse(s); and (4) for working capital and other general corporate purposes of Partners.

18. The Liquidation Preference and Security section states, "In the event of any liquidation, dissolution or winding up of Partners . . . [t]he payment of the GCP Preferred Unit liquidation preference will be secured by . . . certain water rights and land located in Huerfano County, Colorado owned of record by Orlando Reservoir No. 2 Company, LLC, a wholly owned subsidiary of Two Rivers." The associated Deed of Trust filed by Harding as CFO and Treasurer of Orlando Reservoir No. 2 Company, LLC, and as CFO of Two Rivers Farms F-2, with the Huerfano County Clerk and Recorder on September 25, 2015, is contained in Exhibit 2015. Similarly, Harding as CFO of GCP1 filed a Deed of Trust with the Pueblo County Clerk and Recorder on October 2, 2015, which is contained in the same exhibit.

19. The subscription documents instruct potential purchasers of offered units to deliver all required documents to Wayne Harding, CFO of Two Rivers. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states, in part, "[B]y signing this Questionnaire you agree that Partners, GrowCo and their counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws." The subscription documents further instruct potential purchasers to contact McKowen with any questions.

20. Concerning the GrowCo **$4 Million Note** in Exhibit 1011—the second offering—the Term Sheet is dated June 1, 2015, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of senior secured notes of GrowCo, Inc., a Colorado corporation ('**GrowCo**'), and associated warrants to purchase the common stock of GrowCo. The Term Sheet

further states, "GrowCo, a Colorado corporation, constructs and leases greenhouse facilities . . . and provides other financial and management services for State licensed marijuana growers."

21. The Term Sheet for the $4 Million Note indicates the offering proposes to raise $5 million and that "[t]o date, $3,150,000 in commitments have been secured, leaving a balance of $2,350,000 in notes available for subscription," with a target closing date of June 15, 2015. It appears the earlier commitments were obtained beginning on April 1, 2015, with a closing on or around the same day. (Ex. 47). The subscription documents state, in pertinent part, "GrowCo, Inc. ('GrowCo') proposes to sell a total of $5,000,000 in promissory notes ('Notes' or 'Note') with closings beginning on April 15, 2015. Each Note will consist of (a) GrowCo promissory note and (b) a warrant exercisable to purchase one share of common stock of GrowCo."

22. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used: (1) to provide a $2,000,000.00 Letter of Credit to Suncanna, LLC, the licensed tenant/grower at GrowCo's first greenhouse located in Avondale, Colorado, "expected to be completed in May 2015 ('**GCP 1**') for the purchase of growing materials and inputs"; (2) to provide $2,250,000.00 in debt financing for the second greenhouse to be built in Avondale, Colorado ('**GCP 2**'), with no expected completion date given; and (3) "for general corporate purposes." The Note Purchase Agreement, paragraph 6(a), lists nearly identical use of net proceeds for this offering, and further states the net proceeds will be used, in part, "for working capital and other general corporate purposes of GrowCo."

23. The Term Sheet indicates the term of the promissory note is five years with an annual interest rate of 22.50%, payable monthly, and that the note "may be redeemed at face value at any time 12 months after issuance, solely at the option of, and upon 60 days' notice, by the holder. No early redemption at the option of GrowCo." These terms of redemption are also set

forth in paragraph 3 of the promissory note itself (a blank promissory note is provided in Exhibit 1011).

24. The Security section of this Term Sheet states, "The GrowCo Notes will be general obligations of GrowCo secured by . . . a promissory note and first deed of trust for the land, water and [g]reenhouse at GCP2, and second deed of trust for certain land and water rights owned by Two Rivers Water & Farming." There is additional language in paragraph 5 of the promissory note that explains various assets of Two Rivers will be used to secure the notes. The associated Deed of Trust filed with the Huerfano County Clerk and Recorder on September 25, 2015 is contained in Exhibit 2015. Similarly, Harding as CFO of GCP1 filed a Deed of Trust with the Pueblo County Clerk and Recorder on December 7, 2015, which is contained in the same exhibit.

25. Per the Note Purchase Agreement, paragraph 3, each investor represents, in part, that he or she "has had an opportunity to discuss with the management of GrowCo the business, management and financial affairs of GrowCo and the terms and conditions of the offering of the Notes and the Warrants," "has sufficient knowledge and experience in investing in companies similar to GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in such Investor's Note and such Investor's Warrant, and such investor is able financially to bear the risks thereof," and is an accredited investor as defined in Rule 501(a) of Regulation D.

26. The Note Purchase Agreement is signed by Harding as CFO of GrowCo, Inc. In addition, the subscription documents instruct potential purchasers of notes to deliver all required documents to Wayne Harding, CFO of Two Rivers. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states, in part, "[B]y signing this Questionnaire you agree that GrowCo and their counsel may rely on the

information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws."

27. Harding explained during his testimony that this $4 Million Note was needed "to make up for the major costs of overruns" for the first greenhouse. Harding further explained this "blown budget" contributed to the friction between McKowen and the first tenant (Suncanna). (TR, 7/12/23, 95:5-19). It does not appear from the evidence concerning this second offering that new investors were informed that the raise was necessary because of significant cost overruns and "blown budget" after the first raise. Even though McKowen was apparently keeping the largest investor in GCP1, Mr. Morris, personally apprised of the budget issues with the first greenhouse and first raise, the information for all but one of the later raises does not mention the budget shortcomings of the first raise—or the need to remedy those issues with additional funds—and, thus, was misleading to new investors apart perhaps from Mr. Morris. (TR, 7/12/23, 96:15-98:1).

28. The following timing is important in this regard: (a) per Exhibit 1032, discussed in more detail below, the first offering (GCP1) raised $3,075,000.00 between December 2014 and January 2015; (b) just two months later, beginning in March 2015, GrowCo began raising additional funds per the $4 Million Note offering in order to complete the first greenhouse, thus indicating GrowCo knew as early as March 2015 that the first raise likely would be insufficient to complete construction even if the full extent of the deficit was still unknown; (c) per Exhibit 1032, the $4 Million Note (the second offering) raised $4,000,000.00 between March 2015 and September 2015; (d) beginning in July 2015, four months after GrowCo began raising funds per the $4 Million Note offering, GrowCo started raising even more funds per the GCP Super Units offering (the third offering), thus indicating that GrowCo knew the first and second raises were

insufficient to complete the first greenhouse and to provide financial support to its tenant; and (e) the first greenhouse was apparently completed (or nearly so) in or around September 2015 because Suncanna took occupancy. (Ex. 85). McKowen and Harding thus would have known in the months leading up to the opening of its first greenhouse—i.e., during the months that the second and third offerings were introduced—that the project cost nearly twice as much as their original estimate.

29. With this said, the Court does not find that McKowen and Harding knowingly provided misleading estimates to investors in the first raise despite the actual costs significantly exceeding the estimated costs, because cost overruns and unexpected expenses can occur with construction projects and often do not materialize until later in the construction process. (TR, 7/12/23, 98:16-99:1). The Court, however, does find that McKowen and Harding did not inform investors in subsequent offerings of these emerging budget troubles, and that such information would have been material information for investors deciding whether to invest in later offerings.

30. Exhibit 1016 shows that McKowen, as the Manager of an entity named RH Group, LLC, actually purchased Suncanna from its manager/owner (Aaron Van Wingerden) on or about February 25, 2016, for $1,500,000.00. (TR, 7/12/23, 118:17-24). At the time of the sale, Suncanna was a licensed marijuana grower and tenant of the GCP1 greenhouse. The Colorado Marijuana Enforcement Division ("MED") suspended Suncanna's license on April 14, 2016. (Ex. 59, p. 2). Exhibit 1016 shows that the closing for the purchase was contingent, in part, upon the MED and Pueblo County Liquor and Marijuana Licensing Board approving the change of ownership with respect to a premises licensed to cultivate and sell retail marijuana in the state of Colorado. Although such approvals may have been given, McKowen never obtained a license to cultivate and sell retail marijuana in this state. (TR, 7/12/23, 122:2-9). During the period of time in which

McKowen was trying to obtain such a license so he could operate Suncanna and lease the greenhouse from his own company (i.e., from GCP1 and GrowCo), he resigned as CEO of Two Rivers on May 25, 2016, and the next day resigned from all of his other positions with Two Rivers and its subsidiaries, including as the Chairman of the Board of Two Rivers, due in large part to this potential conflict of interest. (Ex. 1018). Harding then became CEO of GrowCo, and eventually obtained a MED employee license. (TR, 7/13/23, 219:4-18; Ex. 2013).

31. Concerning **GCP Super Units, LLC** ("GCP SU") in Exhibits 28 and 1012—the third offering—the Term Sheet is dated September 30, 2015, and says that "*GCP SU*, a limited liability company, has been formed to invest in (a) up to four greenhouses that GrowCo is, or intends to, construct for leasing to third-party marijuana growers and (b) the operations of GrowCo Business Development, LLC ('**GBD**'), which will provide management services to the greenhouses."

32. The Term Sheet for GCP SU indicates the offering proposes to raise $5.5 million with a target final closing date of November 30, 2015. The subscription documents state GCP SU "proposes to sell a total of $5,500,000 in units . . . in a series of closings, with the initial closing expected to be held on or shortly after October 8, 2015." The units may be purchased by wire transfer of funds or by surrender of GrowCo equity units.

33. The Use of Proceeds section of the Term Sheet states "net proceeds" will be used to purchase: (1) preferred units of GCP1 having a 5.00% profit interest in GCP1, which has been formed by GrowCo to construct an initial greenhouse facility and has entered into a lease pursuant to which that facility is being leased by a third-party marijuana grower; (2) preferred units of GBD having a 36.11% profit interest in GBD, which initially will provide services to GCP1 and subsequently will provide services to three other greenhouse facilities to be constructed by

GrowCo: GrowCo Partners 2, LLC ("GCP2"), GrowCo Partners 3, LLC ("GCP3") and GrowCo Partners 4, LLC ("GCP4"); and (3) preferred units of GCP2 having a 50.00% profit interest in GCP2, which has been formed by GrowCo to construct a second greenhouse facility that will be leased to, and operated by, the entity that will lease GCP1.

34. The GCP SU Purchase Agreement, in paragraph 1.4, states, "GCP SU will use the net proceeds of the sale of the Super Units to purchase the preferred units issued by GrowCo Partners 1, LLC, GrowCo Partners 2, LLC, and GrowCo Business Development."

35. The GCP SU Purchase Agreement, in paragraph 2.8, states, "GCP SU has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GCP SU MAE (i.e., material adverse effect).

36. Per the Purchase Agreement, paragraph 3, each investor represents, in part, that he or she "has had an opportunity to discuss the business, management and financial affairs of GCP SU and GrowCo, and the terms and conditions of the offering of the Super Units, with the management of GCP SU and GrowCo," "has sufficient knowledge and experience in investing in companies similar to GCP SU and GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in the Super Units, and such investor is able financially to bear the risks of such investment," and is an accredited investor as defined in Rule 501(a) of Regulation D.

37. The GCP SU Purchase Agreement contains a signature line for Harding as CFO of GCP SU and Two Rivers. In addition, the subscription documents instruct potential purchasers of offered units to deliver all required documents to Harding. Such documents include an Accredited Investor Qualification Questionnaire for either an individual or an entity. The Questionnaire states,

in part, "[B]y signing this Questionnaire you agree that the Issuers [GCP SU and GrowCo] and their counsel may rely on the information set forth in this Questionnaire for purposes of complying with all applicable securities laws and may present this Questionnaire to such parties as it reasonably deems appropriate if called upon to establish its compliance with such securities laws."

38. As part of the GCP SU offering, McKowen and Harding gave a PowerPoint presentation to potential investors. The slides for this PowerPoint are contained in Exhibit 1012. One of the slides informed potential investors of the following: (a) GrowCo raised $4.4 million in private equity to fund construction of the first greenhouse (the GCP1 offering); (b) GrowCo closed $4.0 million in venture debt to establish its "Tenant Services business" and fund one-half of the second greenhouse (the $4 Million Note); (c) GrowCo will use the $5.5 million raised from the Super Units offering to additionally fund the second greenhouse, fund expansion into other states, and cover general administrative expenses; and (d) Suncanna—the exclusive Colorado tenant for GrowCo—expects to begin planting within 30 days and anticipates a first harvest by year end.

39. The Confidential Summary concerning the GCP SU offering is contained in Exhibits 85 and 1012. The Summary states, in pertinent part, "GrowCo has completed construction of its first greenhouse facility and executed a lease agreement with Suncanna . . . a licensed Colorado [m]arijuana grower. Lease payments began accruing on September 1, 2015 with cash payments beginning upon the first harvest by Suncanna. The first greenhouse cost approximately $5.0mm to build . . . and estimates each additional greenhouse will cost approximately $5.0mm. Pursuant to the lease agreement with Suncanna the first greenhouse will generate $2.1 mm in annual gross lease payments, on a triple net basis. Additionally, GrowCo forecasts that each greenhouse could generate up to $2.2mm in annual administrative services revenue. On a combined basis GrowCo anticipates annual gross revenue of $4.3mm per

greenhouse. By July 2017, GrowCo is targeting to build and lease a total of 4 greenhouses and provide services to Suncanna on a 160-acre tract of land in Pueblo County, Colorado. GrowCo has already completed two financings in 2015 for a total of $8.5mm, the proceeds of which were used to complete the first greenhouse and provide Suncanna with services." Finally, the Summary states, "Assuming the entire $5.5mm is raised, the net proceeds will provide approximately $500,000 to finance overruns on the first greenhouse, $2,500,000 to finance construction of the second greenhouse, and $2,500,000 to finance administrative services for greenhouses."

40. Concerning the GrowCo **$6 Million Exchange Note** in Exhibit 49—the fourth offering—the Term Sheet is dated April 22, 2016, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of notes of GrowCo, Inc. (which may be exchanged for preferred units of GCP Super Units, LLC, together with warrants to purchase common stock of GrowCo, Inc. and its parent, Two Rivers Water & Farming Company." The Term Sheet further states, "GrowCo will issue up to $6,000,000 in principal amount 22.5% Senior Exchange Notes due May 31, 2018 ('**Senior Notes**'), together with warrants to acquire up to 6,000,000 shares of common stock of Two Rivers and up to 6,000,000 shares of common stock of GrowCo." The Term Sheet also says, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than May 31, 2016."

41. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to support the operations of the [GCP Super Units] LLC."

42. Concerning the GrowCo **$7 Million Exchange Note** in Exhibit 1—the fifth offering—the Term Sheet is dated June 6, 2016, and states, in part, "GrowCo will issue up to $7,000,000 in principal amount 22.5% Senior Exchange Notes due July 1, 2021 ('**Senior Notes**'), together with warrants to acquire up to 7,000,000 shares of common stock of GrowCo." The Term

Sheet further states, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than June 30, 2016."

43. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to support the operations of Two Rivers, GrowCo and of the [GCP Super Units] LLC."

44. The PowerPoint presentation to potential investors for this offering is contained in Exhibit 50. The contact person referenced on the last slide is Harding.

45. Concerning the GrowCo **$2 Million Exchange Note** in Exhibit 51—the sixth offering—the Term Sheet is dated February 15, 2017, and states, in part, "GrowCo will issue up to $2,000,000 in principal amount 22.5% Senior Exchange Notes due July 1, 2022 ('**Senior Notes**'), together with warrants to acquire up to 2,000,000 shares of common stock of GrowCo." The Term Sheet further states, "Senior Notes may be sold at one or more closings held from time to time after the date hereof. It is expected that all closings will be held by no later than April 30, 2017."

46. The Use of Proceeds section of the Term Sheet states, "Net proceeds will be used by GrowCo to complete construction of the second greenhouse, warehouse and extraction facilities at GrowCo's complex located in Pueblo County Colorado along with general and administrative expe[n]ses."

47. Concerning the **$550K McGrow Units** in Exhibits 61 and 128—the seventh offering—the Term Sheet is dated July 18, 2017. The terms are also contained in an email dated the same day, from McKowen to potential investors for a 90-day loan at 22.5%, plus 50% of principal in startup fees, in order "to initiate the marijuana oil extraction and manufacturing operations of Amerijuana." Per the Term Sheet, "it is expected that all closings will be held by no later than July 31, 2017."

48. The Use of Proceeds section for the offering states, "Net proceeds will be used by McGrow to provide Amerijuana with startup capital, machinery, proprietary McGrow processes, formulas and material to extract oil from marijuana plants and manufacture vapor cartridges."

49. Finally, concerning the **VitaNova, Inc.**, offering in Exhibits 3 and 67—the eighth offering—the Term Sheet is dated April 19, 2018, and states, in part, "This Memorandum . . . summarizes the principal terms of an offering of senior secured notes and associated common stock purchase warrants of VitaNova, Inc., a Colorado corporation ('**VitaNova**'). The Term Sheet further states, "VitaNova provides financial services and best practices, including proprietary intellectual property, regarding greenhouse growing and management." This offering seeks to raise $1,000,000.00 and the "[n]et proceeds are expected to be used to provide a secured loan of up to $1,000,000 to GrowCo Partners Super Units, LLC, which will use its loan proceeds to fund operations and resolve litigation." The target closing date for this offering is April 30, 2018.

50. The Use of Proceeds section of the Term Sheet states, "Net proceeds are expected to be used to provide a secured loan of up to $1,000,000 to GrowCo Partners Super Units, LLC, which will use its loan proceeds to fund operations and resolve litigation."

51. The Seniority and Security section of this Term Sheet states, "The VitaNova notes will be senior indebtedness of VitaNova secured by . . . personal guarantee of John R. McKowen, CEO and stockholder of VitaNova, deed of trust for building and real estate at 456 Madison St., Denver, CO 80206, and 3,000,000 shares of common stock of Two Rivers Water & Farming Company, which could be eligible for public sale pursuant to Rule 144(a) under the Securities Act of 1933 beginning six months after the Closing."

52. The PowerPoint presentation to potential investors for this offering is contained in Exhibit 66. The "Leadership Team" slide lists McKowen as the "Managing Director,

Administration." The contact person referenced on the concluding slide for any questions is George McCaffrey. George McCaffrey was suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc. (FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities, while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado). (Ex. 65). McKowen testified that for this offering he did not disclose his or Mr. McCaffrey's regulatory action to potential investors. (TR, 7/13/23, 201:8-12).

53. The purpose of the various offerings described above was to raise money to construct four greenhouses so that the greenhouses could be leased by GrowCo to licensed marijuana growers and GrowCo could collect rent payments from the lessees. In addition, some offerings were intended to financially support the operations of the lessees so they could grow and process their marijuana and, thus, generate enough positive cash flow to pay their rent. This rental income was the primary source of revenue for GrowCo and investors depended on the greenhouses being built and then leased to growers in order to realize any return on their investments. (TR, 7/18/23, 60:7-10). The other potential sources of revenue, such as providing consulting services to growers, collecting interest on loans to growers, and selling soil, fertilizer, etc., to growers, were secondary to rent payments and were necessary only if the greenhouses were completed.

54. Included with some of the offerings were projections for the construction and operating costs of a greenhouse used for growing marijuana. Harding testified that he and McKowen relied on Aaron Van Wingerden and Tim Beall to provide these estimates because Harding and McKowen "[knew] nothing" about building or operating a marijuana greenhouse and "had no idea what it cost to build." (TR, 7/11/23, 122:11-123:10; 141:4-150:8; 163:13-166:5; TR,

7/12/23, 82:6-86:21, 93:3-15; TR, 7/17/23, 152:5-24; Ex. 1009). While this lack of knowledge when starting a new venture in an emerging industry in and of itself is unproblematic from a legal standpoint, the evidence suggests that neither McKowen or Harding fully disclosed to investors that they themselves knew nothing about the type of business that would be operating within their facilities or how much money it actually took to operate a marijuana business successfully. This becomes even more troubling when considering that Mr. Van Wingerden and Mr. Beall prior to their initial outreach to McKowen via email in April 2014 about starting a marijuana grow operation—just months before the first offering—were in the business of growing vegetables and flowers, not marijuana, yet were relied upon to provide accurate cost estimates and revenue projections for a new marijuana business. (Ex. 1007).

55. While the lack of knowledge and experience in the marijuana industry by McKowen, Harding, Mr. Van Wingerden, and Mr. Beall alone is not an issue, such information is material to investors and should have been fully disclosed during the offerings. This lack of experience proved to be ruinous for Suncanna, and by extension GrowCo, when a visibly "healthy" crop (to the untrained eyes of McKowen, Harding, Mr. Van Wingerden, and Mr. Beall) by its height and density had to be destroyed because it was overgrown and became diseased. To this end, during his testimony, McKowen stated, "[Mr. Beall] did not have the experience even though he claimed to have the experience to effectively grow a greenhouse." (TR, 7/14/23, 120:23-122:22; Ex. 1027). The Court notes that in the Confidential Summary for the third offering, Defendants state, "Suncanna is owned and operated by Aaron Van Wingerden. Aaron is a 3rd generation, successful operator and owner of a significant plant & flowers greenhouse farming operation located in Colorado. Additionally, Mr. Van Wingerden has been growing and consulting in the MJ [marijuana] space for over six years." (Ex. 1012, Confidential Summary, p. 3). Given

the mismanagement of the grow operation that resulted in the destruction of an entire crop, the Court finds it is likely that Defendants exaggerated Mr. Van Wingerden's claimed expertise in growing marijuana. Nonetheless, even if Mr. Van Wingerden did have some experience growing marijuana, the evidence suggest Mr. Beall did not, and Mr. Beall was actively involved in the grow operation that resulted in the crop destruction. This destruction wasted precious resources and precluded Suncanna from selling a product and paying its rent, which resulted in a lack of revenue to GrowCo and an inability to make timely payments to investors. These production issues created significant conflict between Suncanna and GrowCo, and eventually led to Suncanna being "fired." When asked why GrowCo was unable to keep making interest payments to investors in the middle of 2016, Harding explained, "The implosion of Suncanna, the issues that we had with trying to find a new tenant, so there was no real revenue coming in. Although, we did collect about, I think 20 to 30 thousand dollars [in rent] from Suncanna. I don't know exactly how much, but it was around that area." (TR, 7/11/23, 213:1-9). As CFO of Suncanna at the time (for "banking purposes"), Harding would have known how much rent Suncanna paid to GrowCo. (TR, 7/17/23, 160:11-25).

56. Importantly, the actual amount of rent GrowCo received from Suncanna ($20,000.00 to $30,000.00 according to Harding) is vastly different from the projections given to investors. By way of example, in its presentation concerning the $7 Million Note during this same time period (the offering began in or around June 6, 2016), the "Projections" slide indicates that GrowCo expected to receive $9,000,000.00 in rent payments. (Ex. 8). Although McKowen and Harding viewed Mr. Van Wingerden and Mr. Beall as "subject matter experts"—perhaps because Mr. Van Wingerden and Mr. Beall had experience growing vegetables and flowers in greenhouses—and GrowCo used their projections when preparing pro formas for investors, the

reality is that Mr. Van Wingerden and Mr. Beall were new to growing marijuana and their inexperience showed in their negative results. This lack of experience should have been disclosed when the pro formas based on the estimates of Mr. Van Wingerden and Mr. Beall were given to investors. While McKowen and Harding may have been comfortable with placing the success of their venture in the hands of marijuana-industry newcomers, investors may have felt differently had they been given this material information at the time of the offerings.

57. The Court rejects the suggestion by McKowen and Harding that they should not be held responsible for the failings of the grow operations, Suncanna's resulting inability to pay its rent, or the flaws in the pro forma projections because Mr. Van Wingerden and Mr. Beall claimed to be able to grow marijuana at industrial scale. McKowen and Harding hired these individuals—individuals who lacked any meaningful experience in the marijuana industry—and then relied on the projections prepared by them to induce investors to invest in the offerings without disclosing that the so-called "expert" growers lacked experience in the marijuana industry to make informed cost estimates and revenue projections.

58. Harding invested his own money in two offerings—$25,000.00 in GCP1 and $100,000.00 in the $4 Million Note. (TR, 7/12/23, 43:3-9). McKowen also invested a significant amount of his own money into this venture, perhaps as much as $2.5 to $3 million over several years. (TR, 7/14/23, 108:6-17; TR, 7/17/23, 114:8-11). Defendants thus had added incentive to ensure GrowCo remained capitalized and their own investments protected.

59. Exhibit 1032, a report prepared by accounting firm Betzer, Call, Lausten & Schwartz, LLP ("BCLS") dated December 4, 2018, shows GrowCo raised approximately $18,905,500.00 from investors between December 2014 and September 2017, as follows: (a) for the GCP1 equity raise (1st offering), $3,075,000.00 between December 2014 and January 2015;

(b) for the $4 Million Note debt raise (2[nd] offering), $4,000,000.00 between March 2015 and September 2015; (c) for the GCP Super Units equity raise (3[rd] offering), $5,323,500.00 between July 2015 and October 2017—all but $100,000.00 was raised between July 2015 and April 2016, before McKowen resigned from Two Rivers and GrowCo in May 2016; (d) for a $1.5 Million Note debt raise (not a numbered offering described above given its relatively nominal amount and lack of offering documents in the admitted exhibits), $100,000.00 in April 2016; (e) for the $6 Million Note debt raise (fourth offering), $1,910,000.00 between March 2016 and July 2016; (f) for the $7 Million Note debt raise (fifth offering), $2,977,000.00 between January 2016 and January 2017; and (g) for the $2 Million Note debt raise (sixth offering), $1,520,000.00 between February 2017 and September 2017. BCLS did not address how much money was raised in the $550K McGrow Units or the VitaNova, Inc., offerings.

60. The BCLS report concludes, in part, that Two Rivers owes GrowCo $4,227,894.00. In his testimony, McKowen acknowledged that the report prepared by BCLS, "seems to be well prepared." (TR. 7/14/23, 152:9-16). McKowen further stated that even if there might be some errors in the report, "I'm going to trust the BCLS report based upon the recommendation from the attorney who recommended them to me . . . ." (TR. 7/17/23, 38:17-39:8).

61. It is important to remember that McKowen was the CEO of GrowCo for the following offerings: GCP1, $4 Million Note, GCP SU, $1.5 Million Note, $6 Million Note, and portions of the $7 Million Note. The only GrowCo offering in which McKowen was not the CEO was the $2 Million Note. (TR. 7/12/23, 205:25-207:14).

62. Despite raising nearly $19,000,000.00 from investors, only one greenhouse was completed. Harding stated during his testimony, "[W]e were spending an incredible amount of money trying to finish [GCP1], going through different lawsuits and operating the business." The

Court interprets "operating the business" as paying salaries for McKowen and Harding and other general and administrative expenses ("G&A"). (TR, 7/12/23, 132:4-10). Relatedly, McKowen stated during his testimony, "I think the—the question posed by the complaint [filed by the Commissioner] is a legitimate question and I haven't—haven't seen anything that answers how you raise $18 million and you only put up 1-1/2 greenhouses. The complaint doesn't mention that you're also including expenses associated with funding the—the operations, which is what happened when I was there. And I think the fundamental question of where did $6 million go is yet to be answered. Whether it's asked correctly in the BCLS report or otherwise." (TR, 7/17/23, 53:5-18).

63. The BCLS report in Exhibit 1032 establishes that GrowCo spent $8,859,610.00 (46.9%) of investor funds on the construction of one greenhouse, the partial construction of a second greenhouse, and the financing and management of the tenants. (Ex. 1032, p. 6). McKowen testified this amount is "accurate." (TR, 7/14/23, 153:9-13). As such, $10,045,890.00—53.1% of the funds raised—was used for expenses and other payments not directly connected to building and operating greenhouses. In other words, GrowCo used less than half of the investor funds for the activities that had any real chance of generating revenues for GrowCo and producing a return on investment for the investors—i.e., the building and operating of greenhouses. The report also shows that a net amount of $5,566,381.25 was transferred from GrowCo to Two Rivers and its subsidiary entities or paid by GrowCo on behalf of Two Rivers and its subsidiary entities, and that Two Rivers owes GrowCo $4,227,894.00. This accounting report is particularly persuasive to the Court given the firm is an established and neutral entity that was asked to look at the QuickBooks and bank statements of GrowCo and "to perform a detailed analysis of the equity and debt funds

received by GrowCo from investors and held by Two Rivers, and the subsequent use of those funds." (Ex. 1032, p. 2).

64. These results are aligned with the analysis performed by Harding contained in Exhibit 1050 that suggests GrowCo raised $18,033,385.00 from investors and spent approximately $8,803,618.00 on the "total costs" for GCP1 and GCP2 and on an advance to its tenant (Suncanna), which equates to 48.8% of investor funds being used for the construction of one greenhouse, the partial construction of a second greenhouse, and tenant support. The numbers reached by BCLS and Harding are nearly identical (46.9% vs. 48.8%), and help explain why GrowCo was unable to deliver on its promises to investors. Harding's testimony and use of Exhibit 2006 (pages 7 and 8) are consistent with the above numbers in the BCLS report. Harding testified that GrowCo raised a total of $18,782,000.00, and had $8,584,000.00 in operational costs, a large portion of which was G&A. (TR. 7/12/23, 135:19-149:20; TR. 7/18/23, 80:3-13).

65. Harding also presented the testimony of Michael Harnish. Mr. Harnish is a retired certified public accountant with an inactive license who was called to testify about the results of a G&A review he performed and then memorialized in Exhibit 2006. (TR. 7/17/23, 195:24-225:5). Mr. Harnish was not offered as an expert in accounting but nevertheless testified without objection of the Commissioner about the review he performed. The Court reviewed Exhibit 2006 and the testimony of Mr. Harnish several times, and finds that the evidence presented by Mr. Harnish was not developed particularly well by the parties and was difficult to follow. As such, his testimony is not persuasive and does not assist the Court in resolving the disputed issues in this case.

66. During his testimony on the last day of trial, Harding presented similarly detailed accounting testimony, including information about segment reporting in Exhibit 2001, accounting for capital projects in Exhibit 2004, 10-K Summary of GrowCo and subsidiary expenses in Exhibit

2006 (page 7), list of capital raises in Exhibit 2006 (page 8), and Two Rivers 10-K filings with the SEC for years 2015, 2016, 2017, and 2018. Harding noted in his testimony that 10-K filings are publicly available. (TR, 7/19/23, 28:11-23). The Court carefully reviewed the 10-K filings referenced during Harding's testimony and recognizes the filings contain detailed information about Two Rivers and its various operations and subsidiaries, including a long list of risk factors related to its businesses each year.

67. However, the evidence shows that potential investors in GrowCo were not provided anywhere close to this level of detail in the offerings or presentations, nor were they encouraged to look at the 10-K filings for Two Rivers to get a more complete understanding of GrowCo and other direct and indirect subsidiaries of Two Rivers. Harding confirmed as much in his testimony, stating, in pertinent part, "I don't remember saying to anyone to go to the SEC website for all your disclosures. I made the assumption—might have been wrong—that a sophisticated investor, which every single investor represented, knows how to get this information." (TR, 7/18/23, 65:2-25). Nonetheless, the 10-K filings omit some information, such as McKowen's past regulatory issues and that GrowCo was paying unlicensed salespeople for its offerings, which Harding acknowledged during his testimony, that a reasonable investor would want to know. (TR, 7/18/23, 66:16-67:12).

68. One of the investors who lost her investment is Mary Loughran. Loughran participated in the second offering ($4 Million Note). Loughran presented as a credible witness given her demeanor and the substance of her responses.

69. Loughran is a software consultant. She is not an investment professional and does not regularly invest in private offerings. In fact, prior to her investment in the $4 Million Note,

she had not previously invested in a private placement offering or a start-up. (TR, 7/10/23, 94:2-12).

70. Loughran learned about GrowCo from her friend, Jan McCaffrey, with whom she played tennis. (TR, 7/10/23, 66:18-67:25; Ex. 35 and 47). Loughran and Ms. McCaffrey discussed that the note was "callable," meaning Loughran could demand that her principal be returned at any time. (TR, 7/10/23, 72:23-73:10). It never occurred to Loughran that she would not be able to get her principal back from this investment. (TR, 7/10/23, 75:13-17).

71. In June 2015, Loughran decided to invest $50,000.00 in this offering using some of her retirement funds, in large part because the note was callable and secured, had a good interest rate (22.5%), and her friend, Ms. McCaffrey, said it was a good investment. (TR, 7/10/23, 74:2-12; Ex. 56 and 114). Loughran completed an accredited investor questionnaire and represented that she is an accredited investor. (TR, 7/10/23, 111:17-21; 112:14-113:2; Ex. 1047).

72. In October 2016, Loughran was asked to amend her note because GrowCo was having trouble paying monthly interest on the note due to issues with its greenhouse tenant. Loughran agreed to the amendment, which stated, in pertinent part, "The Parties agree to an interest payment modification of the Note for a period of 7 months, commencing on September 1, 2016 and ending on March 31, 2017. During this time, the full 22.5% interest will accrue, but 12% will be paid each month with the remaining 10.5% being deferred. The deferred amount will be paid back in equal installments over the 6-month period beginning April 1, 2017." Harding, as Executive Chairman of the Board for GrowCo, signed the "First Amendment to $4,000,000 GrowCo Note" on October 3, 2016. (TR, 7/10/23, 79:9-81:3; Ex. 56, Bates page 57371).

73. Loughran sometimes did not receive her monthly interest payment, and she stopped receiving interest payments altogether in October 2017. (TR, 7/10/23, 81:4-82:7). On January 9,

2018, Ms. McCaffrey, as COO/Secretary of GrowCo sent an email to "GrowCo Note Holders," which included Loughran, in which Ms. McCaffrey acknowledged that GrowCo was behind on its interest payments. Ms. McCaffrey explained, in part, that its tenant had refused to pay their rent and was evicted on December 19, 2017. Harding and McKowen were copied on this email. (Ex. 36).

74. In response to this email, on January 30, 2018, Loughran informed Ms. McCaffrey that she would like to "call" her note. Over the next several months, Loughran attempted to "call" her note by sending additional emails to Ms. McCaffrey and to "GrowCo Leadership" at a Two Rivers' email address. (Ex. 116). In response to one such email, Harding, on April 30, 2018, in his capacity as CEO of Two Rivers, informed Loughran that "Two Rivers is no longer in the management or governance of GrowCo." Harding copied Ms. McCaffrey on this response.

75. Loughran was never able to successfully "call" her note, despite the Term Sheet stating, "A GrowCo Note may be redeemed at face value at any time 12 months after issuance, solely at the option of, and upon 60 days' notice, by the holder." (TR, 7/10/23, 86:2-4; Ex. 47). Per a text exchange between Loughran and Ms. McCaffrey on May 12-13, 2018, Ms. McCaffrey explained, "There is no money to pay the note right now." (TR, 7/10/23, 86:5-87:3; 113:15-23; Ex. 117).

76. All communications with GrowCo preceding Loughran's investment occurred with Ms. McCaffrey only. Loughran never spoke with McKowen or Harding. Loughran understood that Ms. McCaffrey did not have a securities license. Ms. McCaffrey informed Loughran that the offering was "going through George." (TR, 7/10/23, 87:5-20).

77. Loughran testified credibly that prior to investing in the $4 Million Note, she would have wanted to know the following information: (a) the note was not actually being sold through

Mr. McCaffrey; (b) as a publicly traded company, Two Rivers could not legally be involved in the marijuana business; (c) McKowen, a principal in GrowCo, was involved in activities that required a marijuana license but he did not have one; (d) McKowen's securities license had been suspended years earlier for failure to disclose material information to investors; (e) Two Rivers and GrowCo were experiencing cash flow problems; (f) investment funds raised for GrowCo were being used to support its parent company, Two Rivers; and (g) other investors in GrowCo offerings were not being paid. (TR, 7/10/23, 90:5-92:17).

78. Loughran believed "the money [from her investment in the $4 Million Note] was used inappropriately" by McKowen as CEO of GrowCo. (TR, 7/10/23, 108:2-5).

79. Joe McMahon is another investor who lost his investment. McMahon participated in the fifth offering by GrowCo ($7 Million Exchange Note) and the seventh offering through McGrow ($550K McGrow Units). McMahon presented as a credible witness given his demeanor and the substance of his responses.

80. McMahon is a landman with no professional background in finance or securities. However, he has made investments over the years, including in stocks, bonds, real estate, and oil and gas ventures.

81. McMahon learned about the $7 Million Exchange Note offering in 2016 through some golf friends who invited him to a meeting concerning a capital raise for greenhouses that were going to be built in Pueblo, Colorado. McKowen and Harding were at the meeting. McMahon believes McKowen gave the presentation describing the offering. (TR, 7/10/23, 184:11-186:11). Various slide show presentations for this offering are contained in Exhibits 8, 9, and 127. Nearly identical slides for a webcast presentation held several months later is contained in Exhibit 7. The webcast was presented on November 17, 2016, according to the final slide, and

lists Harding as the Managing Director of GrowCo. The Court notes that even though McKowen had resigned from his positions with Two Rivers and GrowCo in May 2016 prior to the presentation, McKowen was nonetheless "pitching the deal" at this presentation on behalf of GrowCo. (TR, 7/10/23, 241:17-243:12).

82. McMahon invested $100,000.00 in this offering. McMahon understood that he would receive 10% interest annually, paid monthly, until the greenhouse lessees could harvest their crop and become cash flow positive, after which the interest rate would increase to 22.5%, and that at the end of the term (July 1, 2021) he would get his original investment back or he could use his warrants to purchase stock in GrowCo. McMahon credibly testified that no one at the meeting explained how GrowCo was going to go public even though the company was involved in the marijuana industry and thus could not be publicly traded. In addition, no one at the meeting mentioned whether anyone at GrowCo had a marijuana license. It was stated, however, that McKowen intended to step down from Two Rivers as the company was public and an official in a public company could not hold a marijuana license or have a permit to grow marijuana. (TR, 7/10/23, 194:5-196:8).

83. McMahon completed an accredited investor questionnaire and represented that he is an accredited investor. (TR, 7/10/23, 189:3-190:13; 247:2-11). McMahon eventually received a letter from GrowCo dated August 23, 2016, and other documents, confirming his investment. These documents are contained in Exhibit 126.

84. Following his investment in August 2016, McMahon did receive at least six interest payments: (a) $194.44 for August, paid on September 21, 2016; (b) $833.33 for September, paid on October 18, 2016; (c) $833.33 for October, paid on November 15, 2016; (d) $833.33 for

November, paid on December 15, 2016; (e) $833.33 for December, paid on January 18, 2017; and (f) $833.33 for January, paid on February 27, 2017. (Ex. 55). These payments total $4,361.09.

85. In March 2017, McMahon was asked to amend his note because GrowCo was having trouble paying monthly interest on the note due to its greenhouse tenant being evicted and the new tenant needing time to grow a crop. McMahon agreed to the amendment, which stated in pertinent part, "The Parties agree to an interest payment modification of the Note will begin to accrue interest at 22.5% commencing on February 1, 2017. The 22.5% interest will accrue, but no interest will be paid each month until October 1, 2017. The deferred interest amount will be paid back in equal installments over the 6-month period beginning October 15, 2017." Harding, as Authorized Board Member for GrowCo, signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017. (TR, 7/10/23, 198:10-199:16; Ex. 57).

86. Several months later, on July 18, 2017, McKowen contacted some potential investors by email concerning the "least risky, most rewarding, offering I [McKowen] have brought to you." Per the email, the purpose of this "$500K Unit Offering" from McGrow—i.e., $550K McGrow Units—was "to initiate the oil extraction and manufacturing operations of Amerijuana." The email further stated, "We are lending capital to the licensee to pay for labor and machine fees. With that, we and the tenant/licensee are in business. We even have the wholesalers champing at the bit to sell them the product. As with the flower, we sell out all product each week on our McGrow Marketing web site, bestbuds.net. It is the most rewarding because it's a 90-day loan at 22.5%, plus 50% of principal in startup fees. We are offering the high return so we can close the loan quickly and focus on production." (Ex. 61). This email was eventually forwarded to McMahon from one of his golf friends who also attended the $7 Million Exchange Note presentation described above. McMahon invested $50,000.00 in this offering. McMahon spoke

to his golf friend about this offering but not McKowen or Harding before investing. (TR, 7/10/23, 199:24-205:21).

87. Concerning the $550K McGrow Units offering, McMahon testified, in part, "Well, when you hear interest rates like this, you always wonder things when you're raising money and you're—you know, everything you read, these are unregistered securities. So you know, you got a lot of bells and whistles going off when you're doing your due diligence . . . . So in my mind and in my world, when you start getting into interest payments higher than the norm, you kind of wonder, you know, are we looking at a Ponzi-scheme? And that's the first thing that crossed my mind." (TR, 7/10/23, 209:12-210:3). After investing in this McGrow offering, and after receiving his GrowCo interest payment in February 2017, McMahon never received any additional payments from either GrowCo or McGrow. McMahon testified that at this point he was thinking, "[W]ell, I think we just got duped." (TR, 7/10/23, 211:23-213:22; 226:9-13; 261:2-4).

88. McMahon understood GrowCo and McGrow were related entities because they were using the same greenhouse, i.e., GrowCo owned/operated the greenhouse and McGrow operated the machine on site used to extract oil from the marijuana grown in the greenhouse, and because McKowen solicited both of the offerings. (TR, 7/10/23, 219:1-220:19).

89. The Term Sheet for the $550K McGrow Units offering dated July 18, 2017, does not list any risk factors for this offering, including that in at least two previous offerings by McKowen—i.e., the $4 Million Note and $7 Million Exchange Note—the investors (like Loughren in October 2016 and McMahon in March 2017) were asked to amend their notes because GrowCo was having trouble paying monthly interest due to issues with its greenhouse tenant. (Ex. 128). McMahon offered credible testimony that he was never told of any risk factors for this offering. (TR, 7/10/23, 220:20-221:12). McKowen, as Managing Member of McGrow, did not disclose to

investors in the $550K McGrow Units offering that he was unable to satisfy his obligations to investors in earlier (and related) GrowCo offerings despite being fully aware that GrowCo had to ask its earlier investors to amend their notes. Such information is material to an investor deciding whether to invest in an offering. (Ex. 129).

90. On February 2, 2018, McMahon sent a letter to McKowen demanding full payment ($50,000.00) on his $550K McGrow Units promissory note. (Ex. 132). McMahon never received a response from McKowen. (TR, 7/10/23, 226:2-5). However, McMahon did receive a letter from Two Rivers dated February 20, 2018, signed by Harding as Acting CFO for Two Rivers, in which Harding acknowledged that auditors of Two Rivers were engaged in an examination of its financial statements, which included statements for GrowCo. Harding requested that McMahon confirm that the principal amount owed on the $7 Million Exchange Note was $100,000.00 and the interest owed was $16,250.00. (Ex. 133). McMahon signed the requested confirmation on March 6, 2018. (TR, 7/10/23, 227:7-24).

91. In total, McMahon lost approximately $150,000.00 with the two offerings. (TR, 7/10/23, 232:21-24).

92. McMahon would not have invested with McKowen in either GrowCo or McGrow if McMahon knew the following information before investing: (a) McKowen had previously declared bankruptcy; and (b) McKowen's securities license was previously revoked. (TR, 7/10/23, 232:25-233:17). It is unclear to the Court whether McKowen did, in fact, declare bankruptcy, either as an individual or on behalf of one of the entities he controlled.

93. Whitney Buchanan is an attorney in New Mexico who owns TOL Grizzly Bear, LLC ("TOL"), a Colorado limited liability company, that leases/owns/operates machinery used to extract oil from marijuana. TOL leased/owned the machinery used by McGrow to extract oil from

marijuana in the greenhouse. OGZ Holdings ("OGZ") is a processing and consulting firm that provided oil extraction processing services for McGrow. On August 28, 2017, TOL, OGZ, and McGrow entered into a Third Amended Service Agreement ("Agreement") for TOL to lease the oil extraction equipment to McGrow for a flat fee of $540,000.00 for one year (payable in monthly installments of $45,000.00) and for OGZ to operate the equipment and process the oil for a fee of $30,000.00 plus additional compensation based on output. McKowen signed the contract on behalf of McGrow as its Manager. (Ex. 62).

94. Buchanan presented as a credible witness given his demeanor and the substance of his responses. Buchanan testified that initially the contract negotiations and initial contract were between TOL and McKowen on behalf of GrowCo, but later McGrow was substituted for GrowCo. (TR, 7/11/23, 11:12-24). Buchanan understood that McKowen was involved in both companies. Buchanan testified, "I'm dealing with the same people. I'm dealing with John [McKowen] for McGrow and was dealing with John [McKowen] for GrowCo." (TR, 7/11/23, 22:13-19). Buchanan further testified, "I don't know your [McKowen's] titles [with GrowCo and McGrow]. I did know that you [McKowen] had operational authority over GrowCo and McGrow." (TR, 7/11/23, 50:12-21; 56:1-3). Although Buchanan was not aware that McKowen had resigned from GrowCo in May 2016, Buchanan believed McKowen had operational control over GrowCo because the one completed greenhouse "was a GrowCo-owned greenhouse, and Tim Beall said that [McKowen] ran it." During the time Buchanan was interacting with McKowen, Amerijuana, Inc., (owned by Mike McCullough) was the licensed marijuana grower leasing the greenhouse. (TR, 7/11/23, 56:4-58:5).

95. Per Buchanan, almost immediately after the Agreement was signed, McGrow "started creating excuses for not making payments." McGrow missed some payments and at other

times made partial payments. Buchanan estimated that McGrow missed one-half of its payments. TOL frequently sent notices of default and demands to McGrow, and eventually TOL had to repossess the equipment. (TR, 7/11/23, 13:17-17:15).

96. McGrow also missed payments to OGZ. Although OGZ was supposed to operate the equipment, after enough missed payments OGZ was "run off" and "McGrow's own employees began to operate [the equipment]." (TR, 7/11/23, 17:19-24). However, per Buchanan, McGrow did not have a marijuana license and, thus, it was unlawful for McGrow to operate the equipment. Eventually Amerijuana was substituted for McGrow on the equipment lease. Buchanan understood that Amerijuana was the tenant and authorized to touch the marijuana plants. (TR, 7/11/23, 17:25-19:20; 93:1-6).

97. Buchanan was also an investor in GrowCo who lost his investment. Buchanan participated in the sixth offering ($2 Million Exchange Note). Buchanan invested $100,000.00 in this offering. (TR, 7/11/23, 22:20-23:11). Buchanan completed an accredited investor questionnaire and represented that he is an accredited investor. (TR, 7/11/23, 26:23-27:11; 61:14-25). Buchanan is "an approved level three option trader and has pattern day trader status with his broker." Buchanan has not invested in private placements before. (TR, 7/11/23, 28:12-23).

98. Buchanan received a letter dated March 7, 2017, from Harding as CFO of GrowCo, and other documents, confirming his investment. This document and others signed by Harding are contained in Exhibit 51.

99. Buchanan understood that the funds in this offering would be used to "finish" building the second greenhouse. (TR, 7/11/23, 25:21-26:19). The Term Sheet for this offering indicated the same, as well as the Purchase Agreement in section 2.4 ("Use of Funds"). (Ex. 51).

100. When this offering was presented, the first greenhouse had been completed. Buchanan had visited the first greenhouse and described it as "spectacular," "state-of-the-art," and "the best greenhouse [he'd] ever seen." Buchanan could see that construction on the second greenhouse had begun (the "ribs" were present) and understood the second greenhouse was to be identical to the first greenhouse. (TR, 7/11/23, 24:6-25:16; 76:1-6; 77:3-7).

101. Buchanan testified he did not "get a presentation" or receive information about the offering other than the Term Sheet provided by Harding. (TR, 7/11/23, 60:7-61:13).

102. Buchanan provided credible testimony that he was never told about the risks associated with this investment. (TR, 7/11/23, 26:20-22; 27:19-28:11). By way of example, neither McKowen or Harding apparently ever told Buchanan that the cost estimates for the first greenhouse were inaccurate and that several million dollars of additional capital was needed to finish the greenhouse. This is material information when soliciting funds from investors in the $2 Million Note offering—an offering intended to complete a project modeled after an earlier project with significant cost overruns—on the promise that the money raised will be used to *complete* the second greenhouse (which, of course, never happened).

103. In addition, the Term Sheet for the $2 Million Note dated February 15, 2017 (and related documents in Exhibit 51) does not list any risk factors for this offering, including that in at least one previous offering by GrowCo—the $4 Million Note—investors (like Loughren) in October 2016 were asked to amend their notes because GrowCo was having trouble paying monthly interest on the notes due to issues with its greenhouse tenant. (Ex. 51). Neither McKowen (as a promoter of the $2 Million Exchange Note on behalf of GrowCo) nor Harding (as CEO of GrowCo) apparently disclosed to investors in the $2 Million Exchange Note offering that they were unable to satisfy their obligations to investors in an earlier offering despite being fully aware

that GrowCo had to ask its earlier investors to amend their promissory notes. Harding acknowledged as much during his testimony. (TR, 7/11/23, 181:13-24). Such information is material to an investor deciding whether to lend money to GrowCo.

104. The Court further notes that just one week after Buchanan invested in the $2 Million Exchange Note (on March 7, 2017), Harding, as Authorized Board Member of GrowCo, signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017. (Ex. 57). As explained above, in March 2017, McMahon was asked to amend his note because GrowCo was having trouble paying monthly interest on the note due to its greenhouse tenant being evicted and the new tenant needing time to grow a crop. Given the short amount of time between when the $2 Million Exchange Note was offered and when GrowCo asked the investors in the $7 Million Exchange Note to amend their notes, McKowen and Harding surely knew at the time they promoted the $2 Million Exchange Note that they were having issues with their tenant and would not be able to satisfy their obligations to investors in the earlier offering. Again, such information is material to an investor deciding whether to lend money to GrowCo.

105. Buchanan never received any interest payments per his promissory note, i.e., "not a penny," and was never told why. (TR, 7/11/23, 30:20-25; 33:6-21; 41:16-42:1). Buchanan never inquired why he was not receiving the promised payments on his notes because he was focused on McGrow's inability to make its payments on the oil extraction equipment and having to repossess the equipment. (TR, 7/11/23, 31:1-4). However, Buchanan did receive a letter from Two Rivers dated February 20, 2018, signed by Harding as Acting CFO for Two Rivers, in which Harding acknowledged that auditors of Two Rivers were engaged in an examination of its financial statements, which includes statements for GrowCo. Harding requested that Buchanan confirm the

principal amount owed on the $2 Million Exchange Note was $100,000.00 and the interest owed was $18,750.00. (Ex. 102). It is unclear whether Buchanan signed the requested confirmation.

106. Buchanan would not have invested in GrowCo if he knew the following information before investing: (a) there had been allegations regarding FINRA violations; (b) there had been multiple rounds of fundraising prior to the $2 Million Exchange Note being offered; (c) McGrow was not adequately capitalized to enter into the Third Amended Service Agreement for the oil extraction equipment; and (d) McGrow was not licensed to lease and operate the oil extraction equipment for marijuana. (TR, 7/11/23, 42:10-43:5).

107. Concerning the FINRA issue, Buchanan explained such information is important because any issues with FINRA are "a reflection of the willingness to comply with the law and the willingness to honor an agreement." (TR, 7/11/23, 43:6-16).

108. Concerning the previous rounds of fundraising, Buchanan explained, "I came to learn that this 2-million dollar raise was the 16th and 17th million-dollar raise. And, you know, this is a 5-million dollar facility on its best day. It's not a 20-million-dollar facility. So the question is, you know, where did the other 12 million dollars go?" (TR, 7/11/23, 43:19-44:6).

109. After getting the audit letter mentioned above, Buchanan received a solicitation to convert his GrowCo note to shares in VitaNova Partners, LLC. Buchanan understood VitaNova Partners, LLC, was formed by McKowen to "build a field of solar panels and grow hydroponic tomatoes and vegetables indoors and sell them to—as fresh produce to local markets," possibly using the one completed greenhouse. (TR, 7/11/23, 44:11-25). Buchanan eventually converted his promissory note to equitable shares in VitaNova Partners, LLC, on the advice of his bankruptcy attorney who said Buchanan would only recover through GrowCo's bankruptcy about $5,800.00 of the $118,500.00 owed to him on his promissory note. Buchanan testified that nothing ever came

of the equity shares in VitaNova Partners, LLC, as he does not believe VitaNova Partners, LLC, ever acquired a greenhouse. (TR, 7/11/23, 45:4-46:23; 77:15-79:10).

110. Tammie Martinez is an auditor with the Colorado Division of Securities. Ms. Martinez was qualified as an expert in forensic accounting and provided credible testimony based on her demeanor and the substance of her responses. (TR, 7/10/23, 125:25-126:2).

111. Ms. Martinez has experience reviewing and analyzing bank statements and related financial records, including checks, wire transfers, and deposits. (TR, 7/10/23, 125:9-13). Ms. Martinez reviewed bank records and source documentation for Two Rivers and the GrowCo entities. In anticipation of her testimony, Ms. Martinez prepared a summary of all banking transactions for eight different bank accounts for Two Rivers and the GrowCo entities. (Ex. 141). McKowen and Harding challenged the reliability of this summary given that it is not a "compilation, review, or audit" per the American Institute of Certified Public Accountants (AICPA). (TR, 7/10/23, 150:5-153:18; 160:11-162:4). The Court nonetheless finds Ms. Martinez and her summary to be reliable and persuasive. Ms. Martinez has worked for the Colorado Division of Securities for over sixteen years and has "testified in many cases using the same kind of summaries and information." (TR, 7/10/23, 174:5-21).

112. Exhibit 141 reveals, in part, the following concerning five bank accounts for Two Rivers (Wells Fargo accounts ending in 7366, 7539, 6629, 7974, and 8421, with various authorized signers over the course of several years, including McKowen, Harding, Tim Beall, Kirsty Cameron, and others): (a) $17,180,680.00 in investor funds was deposited into the accounts, which represented 80.87% of all deposits into the accounts; (b) $6,781,925.10 in business expenses (e.g., payments for phone bills, security team, construction costs, etc.) was paid out of the accounts, which represented 31.86% of all withdrawals from the accounts; (c) $6,556,005.15 was transferred

to TR Capital Partners, which represented 30.8% of all withdrawals from the accounts; (d) $847,962.75 was transferred to McGrow, which represented 3.98% of all withdrawals from the accounts; (e) $2,397,058.77 was paid to Aaron Van Wingerden for greenhouse construction expenses, which represents 11.26% of all withdrawals from the accounts; (f) $209,500.00 was paid to Waterton Financial (McCaffreys); and (g) $175,014.61 was paid to Kirsty Cameron and Anne Wallich for "Finders Fees." (TR, 7/10/23, 130:3-132:23).

113. Exhibit 141 also reveals, in part, the following concerning two bank accounts for MCG Services, LLC (Wells Fargo accounts ending in 2907 and 3906 with McKowen as the sole authorized signer): (a) $1,078,538.00 in investor funds was deposited into the accounts, which represented 31.25% of all deposits into the accounts; (b) $847,962.75 from Two Rivers was deposited into the accounts, which corresponds to the withdrawal for the same amount from the Two Rivers accounts above, and represents 24.57% of all deposits into the accounts; (c) $744,721.68 in income was deposited into the accounts, which represents 21.58% of all deposits into the accounts; and (d) $464,445.29 was transferred to Two Rivers, which corresponds to 13.46% of all withdrawals from the accounts.

114. Based on the above, Ms. Martinez concluded, "There was money from investors coming into this [MCG, Inc.] bank account. Also, I see that there's money transferred in from Two Rivers. So they're commingling funds between Two Rivers bank accounts, which are supposed to be for GrowCo and to the MCG Services accounts, which, I believe, was supposed to be for the McGrow operation. And I also see that there's money going back out to Two Rivers for over $464,000." Ms. Martinez explained that money from the various GrowCo entities was commingled with Two Rivers because GrowCo did not have its own bank accounts, and that money from Two Rivers was commingled with McGrow money. (TR, 7/10/23, 135:6-136:5).

During his testimony, Harding confirmed the GrowCo entities did not have their own bank accounts and, thus, the money from investors was deposited into bank accounts in which Two Rivers was the custodian. (TR, 7/11/23, 184:1-185:22; Ex. 10).

115. Exhibit 141 further reveals, in part, the following concerning the account for TR Capital Partners, LLC (Wells Fargo account ending in 7648 with McKowen, Harding, and Kirsty Cameron as authorized signers): (a) $6,556,005.15 from Two Rivers was deposited into the account, which corresponds to the withdrawal for the same amount from the Two Rivers account above, and represents 40.27% of all deposits into the account; (b) $1,027,299.29 in investor funds was deposited into the account, which represents 6.31% of all deposits into the account; (c) $47,012.95 from McGrow was deposited into the account; and (d) $7,826,858.52 in business expenses was paid out of the account, which represents 46.92% of all withdrawals from the account.

116. Based on the above, Ms. Martinez concluded, "This represented to me, again, that money was commingled . . . So it just shows that the money's commingled in this bank account as well and paying for a lot—a lot of different—different expenses here." (TR, 7/10/23, 137:7-23).

117. Exhibit 26 further provides an example of how money was moved between the accounts for these various entities. The exhibit shows that an investor (Hugo Zimmerman), on April 13, 2015, wired a total of $249,982.00 to the Two Rivers account ending in 7974. That same day, nearly an identical amount ($249,950.20, a $31.80 variance) was transferred to the TR Capital Partners, LLC, account ending in 7648. The next day, on April 14, 2015, this same amount ($249,950.20) was transferred to the Two Rivers account ending in 7366. Based on this information, Ms. Martinez concluded the flow of funds indicates, "[I]t's commingled to me . . . so there's a lot of back and forth." (TR, 7/10/23, 143:4-10; 145:25-146:3). Ms. Martinez explained

that commingling of funds makes it difficult from an accounting standpoint to track investor funds and should be avoided. (TR, 7/10/23, 164:23-167:19; 178:17-24).

118. Ms. Martinez also opined that based on her review of the financial records of the GrowCo entities that investor funds were used for personal use and for non-investment purposes. (TR, 7/10/23, 147:19-149:7; 164:3-8). For example, Ms. Martinez observed that $1,500.00 from the TR Capital Partners, LLC, account ending in 7648 was used to make a payment towards "JRM 300k Note," which Ms. Martinez believed benefited McKowen personally as this was his personal obligation. (TR, 7/10/23, 170:23-174:13). In addition, during his testimony, Harding confirmed that GrowCo investor funds were used for Two Rivers' operations, including overhead and salaries, i.e., G&A expenses, and that he spent a lot of time trying to allocate general and administrative expenses between the various entities based upon "time-driven activity-based costing." (TR, 7/11/23, 185:12-186:6).

119. As noted above, GrowCo had difficulties making its interest payments to investors due to issues with its tenants and inconsistent operations in its one completed greenhouse. For example, in or around 2016, Suncanna—the first licensed marijuana grower to lease the greenhouse—was on a deferred rent schedule until it could harvest the first crop and begin earning money from sales. Until Suncanna became cash positive, GrowCo used investor funds raised for construction costs and G&A overhead to pay the interest payments due on some promissory notes. (TR, 7/11/23, 188:16-189:17; TR, 7/12/23, 91:2-5). A dispute arose between Suncanna (owned and operated by Aaron Van Wingerden) and McKowen. The MED suspended the license held by Suncanna/Van Wingerden on April 14, 2016, due to suspicion that McKowen—not Van Wingerden—was actually operating the marijuana grow operation and McKowen did not have a license to do so. As a result of the suspension, the current crop had to be destroyed, which

precluded Suncanna from selling any product, earning money, and paying rent. (TR, 7/11/23, 190:4-191:8; TR, 7/12/23, 156:25-157:6; 158:2-10; Ex. 59). This in turn affected GrowCo's bottom line and GrowCo could not meet its financial obligations to investors.

120. These issues between Suncanna and McKowen and resulting financial troubles for GrowCo concerned the Two Rivers' board of directors. The board thus initiated an internal investigation of McKowen through its Nominating, Compensation and Corporate Governance Committee. (TR, 7/11/23, 191:4-192:24). The Committee produced a report of its investigation on June 29, 2016. (Ex. 22). The report revealed, in part, the following: (a) the lease between GCP1 (owner of the completed greenhouse) and Suncanna "in and of itself, was not necessarily an unusual transaction. However, problematic issues arose when, through the complex financial arrangements structured by McKowen, a series of entities was created beginning with GrowCo, Inc. which became the organizational and control center for the fundraising and ownership of all marijuana-related activities that the Company [Two Rivers], through its subsidiary, conducted," Ex. 22, p. 4; (b) "There were numerous delays and difficulties in getting the greenhouse built that Mr. McKowen attributes to Mr. Van Wingerden. . . . After much acrimony between [Van Wingerden and McKowen], in February 2016, Mr. McKowen attempted to purchase Mr. Van Wingerden's ownership of Suncanna, LLC through an entity named RH Group, LLC that [McKowen] formed and in which [McKowen] owned a majority interest. Mr. McKowen was to 'purchase' Suncanna's retail marijuana license in order to grow and sell marijuana in the greenhouse that [GCP1] had built. By doing so, [McKowen] would place himself on both sides of the transaction involving [Two Rivers]. This raised the conflict of interest and related party transaction red flag that the Committee began to investigate," Ex. 22, p. 4; (c) the transaction between Suncanna and RH Group failed; (d) thereafter, Suncanna defaulted on its rent payments

and GCPI pursued eviction proceedings; (e) Van Wingerden then filed a complaint with MED over McKowen's alleged interference in the operation of the greenhouse and MED suspended the license of Suncanna and Van Wingerden, which prevented the replanting of any more marijuana plants and sale of any harvested crop; (f) based, in part, on some alleged concerning behavior of McKowen in response to the investigation (e.g., McKowen sent an email to some board members threatening to expose alleged criminal misdeeds of the committee members, which he said would have a negative effect on them and their families), the board set a Special Meeting of the [Two Rivers'] board for May 26, 2016, to consider removing McKowen as CEO of Two Rivers and to remove him as an officer of GrowCo—Two Rivers' direct subsidiary—and any other indirect affiliates; (g) the day of the Special Meeting, McKowen resigned from all positions with Two Rivers and GrowCo;[8] (h) the Committee concluded that "[m]uch of Mr. McKowen's conduct may be explained by his and Two Rivers' desperate need for capital," Ex. 22, p. 7; and (i) the Committee concluded, in part, "McKowen's attempted purchase of Suncanna, LLC and its continuing interest, through his majority control of RH Group, LLC, in becoming the greenhouse tenant to [GCPI] is a conflict of interest-related party transaction under Colorado law; however, because Mr. McKowen has resigned from all positions within [Two Rivers] and all of its subsidiaries and affiliates, the Committee no longer needs to consider this particular issue; it is rendered moot." Ex. 22, p. 10.

121. Concerning this report, Harding agreed during his testimony that there were numerous delays and setbacks in building the first greenhouse, and that he understood McKowen

[8] More precisely, the 8-K filing in Exhibit 1018 shows McKowen resigned as CEO of Two Rivers on May 25, 2016, and on May 26, 2016, he resigned from all of his other positions with Two Rivers and its subsidiaries, e.g., GrowCo, etc., including from the Two Rivers' board of directors. At the time of his resignation, McKowen was chairman of the board for Two Rivers and was not a member of any board committee. The 8-K is dated June 1, 2016, and was submitted to the SEC by Harding as CFO of Two Rivers.

intended on purchasing Suncanna's retail marijuana license so he (McKowen) could grow and sell marijuana in the greenhouse. (TR, 7/11/23, 194:10-195:4). However, Harding disagreed with much of the report and noted his disagreements in a Memorandum to File dated August 19, 2016, prepared with two other board members. (Ex. 24). The Memorandum reveals that the GrowCo board determined that the report should not be disclosed to outside parties. (Ex. 24, p. 3). McKowen acknowledged during his testimony that the report contained material information that a reasonable investor would want to know before investing in a GrowCo offering. (TR, 7/13/23, 166:16).

122. Importantly, after McKowen resigned from Two Rivers and GrowCo, Harding became the CEO of GrowCo, but McKowen continued to be closely involved in GrowCo as its largest shareholder—McGrow controlled two-thirds of GrowCo shares and had two parties on the GrowCo board—and as "advisor" pursuant to several written agreements (a Master Agreement, Construction Services Agreement, and Financial Services Agreement). (TR, 7/11/23, 203:10-21; TR, 7/12/23, 201:2-20; TR, 7/13/23, 139:22-140:2; 154:4-20; Ex. 13). The Agreements, executed on July 22, 2016, were between GrowCo and McGrow, Inc. Harding signed the Agreements on behalf of GrowCo and McKowen signed the Agreements on behalf of McGrow as its Manager. The Master Agreement states, McGrow provides advisory, construction and financing services for development stage companies . . . [and] GrowCo is a development stage company in need of advisory, construction and financing services." The Construction Services Agreement states McGrow "shall supervise all aspects of the construction of [GCP1, GCP2, and an on-site extraction facility]," for which McGrow (i.e., McKowen given his ownership of McGrow) is to receive $15,000.00 per month in fees. The Financial Services Agreement states McGrow "shall assist GrowCo in raising capital for its 22.5% Exchange Note Offering as of the date of this agreement,"

for which McGrow is to receive $7,500.00 per month in fees. During his testimony, Harding stated he believes the Exchange Note referred to in the Agreement is the $7 Million Exchange Note (the fifth offering described above).

123. McKowen confirmed during his testimony that he gave a presentation to potential investors for the $7 Million Exchange Note. McKowen also stated in his response to questioning by counsel for the Commissioner about GrowCo being in default of its obligations (e.g., not paying interest on promissory notes, attempts by investors to "call" their notes, etc.) that he did not disclose "any of the information that he knew about," because "that was not what I was hired for." (TR, 7/13/23, 134:2-136:20). The Court infers from this response that McKowen did not share with potential investors for the $7 Million Note, and likely the subsequent $2 Million Note, information about GrowCo's previous difficulties and its inability to meet its financial obligations to investors. Given that McKowen was "hired" to give the presentation, the Court infers that no one else participated in the presentation and, thus, information about GrowCo's troubles was not disclosed. Harding confirmed in his testimony that he did not disclose to new investors issues GrowCo was having with its tenants if such issues were concurrent with the offering. (TR, 7/11/23, 181:13-24).

124. With this lack of disclosure in mind, the Court notes that McKowen testified, "I think there was a duty at some point in time to say—to tell the investors, because of the time delays, we're not hitting our marks and what do you—what do you want to do?" (TR, 7/17/23, 54:23-55:4). Based on the totality of the evidence presented, the Court does not believe such a conversation ever took place between McKowen and/or Harding and the GrowCo investors, and GrowCo instead proceeded to continue raising funds through at least two additional offerings (i.e., the $7 Million Note and the $2 Million Note).

125. Bottom line, following McKowen's resignation from Two Rivers and GrowCo, McKowen was to receive $22,750.00 per month for continuing his oversight of the greenhouse construction—the success of which determined whether GrowCo survived or failed—and for continuing to raise money on behalf of GrowCo to finance such construction. McKowen thus may have resigned from his executive positions with GrowCo in May 2016, but he retained (by contractual agreement) significant ability to direct GrowCo's essential activities and control its economic success.

126. Exhibit 44 reveals that GrowCo paid MCG Services, LLC—i.e., McGrow: (a) $22,750.00 on 8/29/16; (b) $14,000.00 on 9/16/16 as a "Finder's Fee" for the $7 Million Note raise; (c) $9,800.00 on 10/3/16 for the $7 Million Note raise; (d) $22,750.00 on 10/28/16 for the $7 Million Note raise; (e) $22,500.00 (not $22,750.00) on 8/21/17 for the $2 Million Note raise; and (f) $4,000.00 on 8/31/17 for the $2 Million Note raise. When McKowen received the so-called Finder's Fee on 9/16/16, he was no longer an executive at GrowCo. Accordingly, per the above Agreements, McKowen received at least $95,800.00 in fees for supervising greenhouse construction and promoting at least two GrowCo offerings. (TR, 7/11/23, 208:3-209:23; TR, 7/13/23, 156:9-25; Ex. 38).

127. In addition to participating in construction oversight and additional GrowCo offerings, in June 2016, McKowen, through McGrow, entered into a lease with GCP1. The lease was actually between GCP1 and Johnny Cannaseed (another entity owned/operated by McKowen). (TR, 7/11/23, 209:24-210:11; TR, 7/13/23, 148:7-14; Ex. 25). Although Johnny Cannaseed was leasing the greenhouse, neither the entity or McKowen had a license to grow marijuana. In late August, Johnny Cannaseed and its owners (McKowen and Chad Kirby) applied for a marijuana license; the MED denied the application on November 23, 2016. (Ex. 59, p. 3).

Johnny Cannaseed thus apparently had to sublease the greenhouse to Amerijuana and to Quality Choice, both licensed growers. Neither one of these tenants was successful. Quality Choice moved out in the middle of the night, and Amerijuana was evicted. (TR, 7/11/23, 213:1-214:15; TR, 7/13/23, 153:10-14). Per Harding, following Suncanna's eviction, no tenant or subtenant ever consistently operated the greenhouse or paid rent. (TR, 7/11/23, 229:8-12; TR, 7/18/23, 60:24-61:2).

128. McKowen testified that he disclosed the November 2016 license denial for Johnny Cannaseed to subsequent McGrow investors, but did not disclose the reasons for the denial. (TR, 7/13/23, 128:21-129:25; TR, 7/14/23, 185:6-15). The Initial Decision upholding the November 2016 denial entered on December 15, 2017. The hearing officer found ten violations supporting the denial, including that Johnny Cannaseed and its owners "grew, cultivated, transferred and sold retail marijuana without a license between March 4 and April 18, 2016." (Ex. 59).

129. During this time (around June 2016), GrowCo received minimal rent from its tenants and, thus, had to rely in part on new investor funds to pay interest on the promissory notes held by earlier investors. Harding acknowledged such use of funds could have happened. (TR, 7/18/23, 87:14-89:21). This is a classic Ponzi scheme, about which McKowen and Harding became concerned. (TR, 7/11/23, 210:17-212:25; 216:4-7; TR, 7/13/23, 157:8-159:18). In an email dated June 27, 2016, with the subject line "Capital Raise Concerns," McKowen said to Harding, "We addressed concerns several weeks ago that the current capital raise could become a Ponzi scheme, whereby we were raising capital from some people for the stated purpose of building greenhouses but proceeds were, whether purposely or not, were in fact being spent primarily to pay interest to others and salaries. . . . I think we need to quickly assess where we stand. I suggest you compile data quickly that allows us to see how proceeds have been spen[t]

for the $2M raised to date and what the realistic expectation is for completion of this raise." (Ex. 23).

130. Per his testimony, Harding acknowledged that GrowCo probably used other investor money to make interest payments because the rent income GrowCo received was not enough to support its payment obligations on the promissory notes. (TR, 7/11/23, 212:18-213:9).

131. Per his testimony, McKowen seemed to acknowledge that GrowCo could have been engaged in a Ponzi scheme. McKowen stated, "I believe the issue was brought up on cross of whether these were interest payments or whether it was a Ponzi scheme. And I don't know, as I have said previously, whether it's a Ponzi scheme or whether it's interest payments. And I believe, based upon Mr. Harding's cross today that that issue remains unresolved, and that the critical issue to me and my understanding of whether something is a Ponzi scheme or an interest payment is that if you're paying off subsequent investors with money that you're raising from subsequent offerings, then that's a Ponzi scheme. . . . And I think that there needs to be a clear definition of what the use of proceeds were that—that were provided to investors and whether or not any investors were paid off from funds raised from these offerings." (TR, 7/17/23, 83:10-84:6). It is significant to the Court that even McKowen could see that the activities of GrowCo raised a question about whether GrowCo was engaged in an unlawful Ponzi scheme.

132. As explained above, in or around October 2016, Loughran was asked to amend her note because GrowCo was having trouble paying monthly interest on the note due to issues with its greenhouse tenant. Loughran agreed to the amendment and signed the "First Amendment to $4,000,000 GrowCo Note" on October 3, 2016. (TR, 7/10/23, 79:9-81:3; Ex. 56, Bates page 57371). In addition, another investor, Michael Harnish was asked to amend his note. Harnish agreed to the amendment and signed the "First Amendment to $4,000,000 GrowCo Note" on

September 20, 2016. Harding, as Executive Chairman of the Board, signed the amendment. (Ex. 90).

133. It is reasonable to infer that for at least several months McKowen and Harding were aware that money from new investors likely was being used to pay old investors, and continued the practice in some degree, before reaching out to investors and seeking amendments to the promissory notes. It is also reasonable to infer that after seeking these amendments, McKowen and Harding continued to use money from new investors to pay old investors because rental payments remained sparse at best but investors continued to receive some interest payments—e.g., Loughran testified she sometimes received partial payments and stopped receiving interest payments altogether in October 2017, (TR, 7/10/23, 81:4-82:7), and McMahon testified that following his investment in August 2016, he receive at least six interest payments: (a) $194.44 for August, paid on September 21, 2016; (b) $833.33 for September, paid on October 18, 2016; (c) $833.33 for October, paid on November 15, 2016; (d) $833.33 for November, paid on December 15, 2016; (e) $833.33 for December, paid on January 18, 2017; and (f) $833.33 for January, paid on February 27, 2017. These payments total $4,361.09 per the cancelled checks in Exhibit 55. Accordingly, it is reasonable to conclude that McKowen and Harding were engaged in a classic Ponzi scheme with some of their offerings.

134. Despite these issues, GrowCo continued to make additional offerings and to raise capital, but did not inform potential investors of the tenant issues, its inability to pay the full amount of promised interest on the promissory notes, and its use of new investor funds to pay old investors. (TR, 7/11/23, 216:21-217:18). McKowen and Harding also did not tell investors in these later offerings that McKowen had resigned from Two Rivers and GrowCo and/or disclose the reasons for his "departure," which would not have been readily apparent given McKowen's

continued close involvement with GrowCo. (TR, 7/12/23, 160:24-161:8). While such information was contained in the Two Rivers 8-K filing with the SEC and publicly available, Ex. 1018, neither McKowen nor Harding affirmatively notified potential GrowCo investors of such information.

135. Lastly, the Commissioner's expert witness, Gerald Rome, offered opinions concerning registration, licensing, and disclosure of information surrounding securities offerings. Mr. Rome presented as a credible and persuasive witness based on his professional qualifications, demeanor while testifying, and substance of his responses. Mr. Rome, now retired, was the securities commissioner for the state of Colorado for four and half years. Prior to that, for ten years, Mr. Rome was deputy securities commissioner for the state of Colorado. In both roles, Mr. Rome was responsible for administering and enforcing the CSA. (TR, 7/13/23, 6:5-7:16). Without objection from McKowen or Harding, the Court qualified Mr. Rome as an expert in securities law and regulation. (TR, 7/13/23, 10:1-13).

136. Mr. Rome explained that the purpose of the CSA is "straightforward," and is meant "to protect investors and maintain investor confidence in the securities markets." Mr. Rome further explained the CSA does this "by requiring sellers of securities to make full and fair disclosure of material facts to investors. So it's the burden on the seller to make those disclosures, not the buyer to conduct their own sort of due diligence." (TR, 7/13/23, 10:14-11:2). Mr. Rome noted the CSA seeks to achieve its purposes by doing three things: (a) requiring registration of public securities offerings; (b) licensing of securities professionals; and (c) implementing anti-fraud provisions, such as requiring promoters and issuers to make full and fair disclosure of material facts to investors. (TR, 7/13/23, 13:21-14:20).

137. Concerning registration, Mr. Rome observed that federal law includes some exemptions for private offerings, known as Regulation D. When an issuer is claiming a "Reg D

exemption," the CSA requires the issuer to file a "Form D" with the Commissioner and pay a fee. Filing exemption paperwork with the SEC alone is not sufficient. (TR, 7/13/23, 16:22-17:14; 119:1-19). In addition, and importantly, compliance with registration requirements (such as filing an exemption) does not relieve the promotor or issuer of providing full and fair disclosure of material information to investors, including to accredited and sophisticated investors. The disclosure of material information to all investors is a requirement of every securities offering. (TR, 7/13/23, 17:15-23; 32:10-17).

138. As noted above in the "Applicable Law" section of this Order, concerning the disclosure of information, the CSA (§ 11-51-501) prohibits any person in connection with the offer, sale, or purchase of a security, from "directly or indirectly" making material misrepresentations or omissions. In other words, a person directly participating in a securities offering must make full and fair disclosure of information, and a "control" person for a company offering a security must ensure that anyone acting on his or her behalf in the transaction—e.g., a sales representative, promotor, etc.—also provides full and fair disclosure of information to investors. (TR, 7/13/23, 18:23-20:4). The parties have stipulated that McKowen and Harding were control persons for purposes of the present offerings.

139. Mr. Rome offered some examples of material information that would be important to a potential investor, including: (a) use of proceeds, i.e., how the money is going to be used by the promotor/issuer. For example, in a real estate development project to build a condominium complex, potential investors should be told the percentage of investor funds that will be used for actual construction costs versus administrative/overhead costs. This information is important because if a large percentage of investor funds are being used to support the business purpose that generates profits there is less risk that the investment may ultimately fail, and vice versa; (b)

whether investor funds for an offering will be commingled in accounts of other businesses or segregated in its own account. This is important because commingled funds can lose their identity and risk being used for other business purposes; (c) the background of a promotor in a small company with a limited group of control persons, including the promoter's past regulatory history, is important because the control person's decision making skills, business judgment, and honesty can appreciably influence the success or failure of the company; (d) performance of earlier offerings since past results can be predictive of future results; (e) status of any required licensing, e.g., whether a promotor of a marijuana offering has any required MED license, or whether the sellers of securities are licensed, because non-compliance with licensing requirements can affect the ongoing viability of a business; and (f) whether new investor funds will be used to pay interest to earlier investors, which implicates an illegal Ponzi scheme. (TR, 7/13/23, 20:9-29:22; 35:13-36:9; 90:18-91:7).

140. Mr. Rome explained, "There is no obligation on the investor to dig around, to do their research, to do their due diligence. . . . The burden is on the seller [to make full disclosure]." (TR, 7/13/23, 35:2-10). To this end, regarding so-called "safe harbor provisions" and/or risk disclaimers, Mr. Rome explained, "[Y]ou can't say to an investor, 'This is a highly risky investment; if you invest, you may lose your entire investment,' and call that good, call that full and fair disclosure. That is not what the law requires. The law requires that you provide the investor the reasons why it's a risky investment, the reasons why it may fail. You can tell the investor the reasons why it may succeed, but you need to inform the investor exactly what those risks are in that start-up company. . . . So you need to be, when you're making disclosures to investors, much more specific than this general notion that this is a start-up, and it's a risky

investment. . . . It needs to be full-throated disclosure of the important facts to that investor." (TR, 7/13/23, 64:6-65:8).

141. Concerning the use of funds in the present offerings, specifically funds for G&A expenses, Mr. Rome stated, "I think full disclosure would require you [McKowen and Harding] to identify the amounts [of administrative expenses]—and they can be approximations or estimates—but they should be fairly specific as to where the amounts [are] going to, those sorts of things. . . . So—so the term sheets that I read a bit ago indicated that the funds would be used both for construction of the greenhouses and for administrative purposes, but there's no—in my opinion, it's important to know how much of these proceeds are going to be used for the actual construction and how much are going to be used for administrative costs. (TR, 7/13/23, 22:16-21; 107:24-108:5).

142. Concerning McKowen's past regulatory history, Mr. Rome explained, "[I]f you look at the underlying basis for the regulatory action against Mr. McKowen, it involved inadequate disclosures and excessive fees, and those issues—or—are related to the allegations that have been raised in this lawsuit. So—so I think that, even though the event happened way back—not way back, but in 1985, they're relevant to the reasonable investor in that way." (TR, 7/13/23, 36:2-12).

143. During cross-examination by McKowen, Mr. Rome was asked whether the offerings at issue in this case were public or private offerings, and Mr. Rome credibly stated he believed the offerings were public offerings. Mr. Rome explained, "[T]he company used, accreditor investors, cold-call lists, and cold calls were made to investors, that take you out of the private offering exemption. There was also presentations made to investors, and if the company did not have a substantial preexisting relationship with the people it invited to those presentations, then that would take you out of the private offering exemption." (TR, 7/13/23, 50:7-53:6). It is

unclear to the Court whether *every* investor in the GrowCo offerings had a preexisting relationship with the promoters or issuers as the parties did not pursue this area of inquiry in any depth, but the Court is persuaded that at least some of the investors did not have such a relationship.

144. Concerning the issue of commissions for sales representatives versus finder's fees, Mr. Rome explained, "So if I'm a sales agent, and I'm asking an investor to invest in a company, and I receive a commission based upon the amount of the investment, transaction-based compensation, then I'm a securities sales representative, and I need to be licensed. . . . So 'transaction-based compensation' is a term of art, and it may well encompass a flat fee, depending upon the circumstances of that payment of the flat fee. . . . What I'm saying is, transaction-based compensation, you can't get around the notion that you're receiving commission by somehow structuring it as a flat fee if your intent is to avoid that." (TR, 7/13/23, 53:9-56:15). Here, the evidence shows that George McCaffrey, Jan McCaffrey, Kirsty Cameron, Richard Wiwi, and Ed Wallick acted as sales representatives and received transaction-based compensation based upon the number and amount of the investments they procured for GrowCo. The amount of their compensation varied thus suggesting it depended on the amount of the investment. McKowen stated during his testimony that Kirsty Cameron and Jan McCaffrey received "commissions." (TR, 7/13/23, 217:16-218:8).

## CONCLUSIONS OF LAW

### A. Securities Fraud (claim one)

The Commissioner claims that McKowen and Harding violated § 11-51-501(1) of the CSA by offering or selling securities in a scheme to defraud investors, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, or engaged in acts, practices, or course

of business that operated as a fraud on investors. The Commissioner seeks injunctive relief against Defendants under § 11-51-602(1), and damages, restitution, and disgorgement pursuant to §§ 11-51-602(2) and 604(3), (4), and (5)(a). (Complaint, ¶¶ 211-214). In her written closing argument, the Commissioner states, "The main question for this Court to consider is whether the defendants truthfully disclosed all material facts about the GrowCo enterprises." (Plaintiff's Closing Argument, p. 2). Though the circumstances surrounding the various offerings is somewhat difficult to unwind, the picture that emerges from a close examination of the offerings is that McKowen and Harding misrepresented and omitted material information that a reasonable investor would consider important in deciding whether to invest in GrowCo and its related entities. The Commissioner sets forth a long list of such misrepresentations and omissions in her Proposed Findings of Fact and Conclusions of Law, and in her Closing Argument, many of which the Court discusses below.

Before doing so, however, it is important to note again the legal framework at work here. The Court first observes there is no dispute that the investments in this matter are securities and fall under the CSA. The CSA imposes independent regulatory requirements on securities sold from or in Colorado beyond any requirements that may be imposed by federal securities laws. While there are areas in which the CSA expressly coordinates with federal requirements, such as registration exemptions, compliance with federal laws is not in and of itself sufficient to comply with state requirements. As the Commissioner's securities regulation expert, Mr. Rome, explained during his testimony, the CSA's recognition that federal and state securities laws should be coordinated where appropriate does not mean that the CSA's provisions can be ignored. To the contrary, issuers and salespersons operating in Colorado must comply with the CSA's provisions in addition to any federal requirements.

The CSA makes it unlawful for any person, in connection with the offer, sale, or purchase of any security directly or indirectly: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. § 11-51-501(1)(a), (b), and (c). The securities regulatory system is focused on the promoter's activities and disclosure of information, rather than on the investor's aptitude to obtain the information by asking the right questions. As noted above, this is because securities laws were intended "to substitute a philosophy of *full disclosure* for the philosophy of caveat emptor [i.e., let the buyer beware] and thus to achieve a high standard of business ethics in the securities industry." *S.E.C. v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963) (emphasis added). Like federal securities laws, "blue sky" laws such as the CSA were also intended to supplant the philosophy of caveat emptor and replace it with the philosophy of caveat venditor [i.e., let the seller beware] because the burden of disclosure rests with the selling party, rather than the purchasing party. *Id.* This philosophy is reflected in the CSA's language by placing the burden upon "any person" to not make untrue statements of material fact or omit to state material facts. § 11-51-501; *see also Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727 (Colo. App. 2009). The responsibility of disclosure by the promoters does not change depending on the sophistication of the purchaser, as "[t]he securities laws entitle all investors, both the experienced and the novice, to the full and truthful disclosure of material information." *Spatz v. Borenstein*, 513 F. Supp. 571, 580 (N.D. Ill. 1981), *citing Sanders v. John Nuveen & Co., Inc.*, 619 F.2d 1222, 1229 (7th Cir. 1980) (section 12(2) of the Securities Act of 1933 "does not establish a graduated scale of duty depending upon the

sophistication and access to information of the customer.") Because the CSA seeks to protect investors, it is "remedial in nature and is to be broadly construed to effectuate its purposes." § 11-51-101(2).

McKowen and Harding have suggested that the Commissioner must prove motive or intent to defraud—or scienter—to sustain claims for fraud under § 11-51-501. This is only partially correct. First, under the plain language of the statute, the Commissioner is not required to establish scienter for injunctive claims brought under § 11-51-602(1). Thus, this Court need not find any scienter to enter an injunction against Defendants. Second, to the extent that any scienter element applies to the Commissioner's claims for damages, the common law fraud elements do not apply. When the Commissioner seeks damages under her enforcement authority per § 11-51-602(2), the Court must apply the relevant scienter standard in § 11-51-604. As such, Defendants can be held liable under subsections 501(a) and (c) for selling securities "recklessly, knowingly, or with an intent to defraud." § 11-51-604(4). For claims under subsection 501(1)(b), the scienter standard places the burden of proof on Defendants to prove they "did not know, and in the exercise of reasonable care could not have known, of the untruth or omission" made to investors. *Id.*

**1. § 11-51-501(1)(b)—Misrepresentation or Omission of Material Fact**

With the above legal principles in mind, particularly that a seller of securities is required to make *full* disclosure of all material facts to investors, the Court concludes that the evidence mostly shows McKowen and Harding violated § 11-51-501(1)(b) of the CSA by making untrue statements of material fact and omitting to state other material facts to their investors. These misstatements and omissions increased over time with each additional offering and the worsening financial troubles of GrowCo. The Court, therefore, will address the actions of Defendants within the context of each offering in the order they were presented to investors.

**a. GCP1 (first offering)**

The first offering presented by GrowCo through McKowen and Harding was the GCP1 offering made in or around October 2014—the year that state-licensed commercial sales of marijuana became legal in Colorado. The terms of this offering are explained above in paragraphs 15-19 and will not be repeated here. The Court observes that in retrospect the terms of this offering were quite aspirational in that GrowCo hoped to raise up to $10 million in three months for the construction of two greenhouses but only raised $3,075,000.00—about half of what GrowCo believed it needed for one greenhouse. (Findings of Fact, "FOF," ¶ 59). It is, of course, legally permissible for Defendants to want to financially benefit from the recent legalization of recreational marijuana and to use the land and water resources of Two Rivers in the hopes of turning a nice profit within this emerging industry. Defendants having high expectations for GrowCo and encouraging potential investors to share in this enthusiasm by investing their money in GrowCo fell well within the bounds of the CSA. However, in the Court's judgment, Defendants violated the CSA with this first offering when they failed to share material information that a reasonable investor would consider important in making an investment decision.

First, Defendants failed to disclose that McKowen—the CEO of GrowCo and primary promoter of the offering—had a previous NASD violation in which McKowen had been accused of "engaging in a deceptive and fraudulent contrivance in completing a series of transactions to sell customer securities," and had his license suspended. (FOF, ¶ 11). While this action may have occurred in 1986 and the fraud claims were possibly dismissed on appeal, the fact that the person most responsible for the success of the offering (McKowen) previously had his securities license suspended, even if for a short time and regardless of the reason, is information a reasonable investor would consider important before investing. Whitney Buchanan, an investor in the sixth

offering, explained why such information is important: a promoter's NASD (or FINRA) issues are "a reflection of the willingness to comply with the law and the willingness to honor an agreement." Buchanan confirmed that he would not have participated in a GrowCo offering if he had known McKowen had prior regulatory issues. (FOF, ¶¶ 106-107). Mary Loughran, an investor in the second offering, and Joe McMahon, an investor in the fifth offering, expressed similar views. (FOF, ¶¶ 77, 92). It is reasonable to infer that one or more investors in this first offering would have felt the same way had they known this information. It does not matter that such information was publicly available; Defendants had an obligation to disclose the information and not to wait and see if the investors discovered it on their own. *Black Diamond Fund, LLLP*, 211 P.3d at 737-38 ("A division of this court has specifically held that evidence of NASD sanctions constituted the kind of information that a reasonable investor would consider in making an investment. . . . We are unaware of any authority which recognizes an exception to the CSA's disclosure requirements for publicly available information.") Mr. Rome explained why this information is important for investors, opining that the background of a promoter in a small company (like GrowCo), which includes the promoter's past regulatory history, can significantly influence the success or failure of a company. (FOF, ¶¶ 139, 142). Non-compliance with the CSA can lead to enforcement actions and lawsuits, both of which put the success of a venture at risk, and, therefore, a promoter's past disregard of regulatory requirements may suggest a present inclination to do the same.

Second, following this same rationale, i.e., that information concerning a promoter's willingness to follow the law is important to an investor before making an investment decision, it is also problematic that Defendants did not disclose to potential investors that they neglected to file a notice of exemption from registration with the Commissioner and, thus, they were out of

compliance with the CSA. (FOF, ¶¶ 2.o, 12). While Defendants suggest they may not have known about this particular CSA requirement, they have not established that they could not have known about the requirement in the exercise of reasonable care. Defendants are experienced promoters and expected to be familiar with the CSA. The plain language of § 11-51-308(1)(p) states, "The following transactions are exempted from sections 11-51-301 and 11-51-305 . . . Any offer or sale of a security in compliance with an exemption from registration with the securities and exchange commission under section 3(b)(1) or 4(a)(2) of the federal 'Securities Act of 1933', as amended, 15 U.S.C. secs. 77c (b)(1) and 77d (a)(2), pursuant to regulations adopted in accordance with the federal act by the securities and exchange commission. . . . The issuer shall file with the securities commissioner [of Colorado] a notification of exemption, in a form prescribed by the securities commissioner, and pay an exemption fee to be determined and collected pursuant to section 11-51-707." Defendants may have been in compliance with federal filing requirements for exemptions, but they were in violation of the state filing requirements and should have disclosed as much to potential investors.

Third, Defendants also did not disclose that any cost estimates, revenue projections, and related pro formas supporting the offering were provided by individuals who had minimal or no experience growing marijuana at scale. As discussed above, Defendants relied on Aaron Van Wingerden and Tim Beall to provide these estimates because Harding and McKowen "[knew] nothing" about building or operating a marijuana greenhouse and "had no idea what it cost to build." (FOF, ¶¶ 54-55). While this lack of knowledge when starting a new venture is unproblematic from a legal standpoint and does not violate the CSA, Defendants should have disclosed to investors that they themselves knew nothing about growing marijuana, that they were relying on others who claimed to have such expertise, and that the claimed "experts" had not, in

fact, successfully grown marijuana on an industrial scale before. Understanding that hindsight is always 20/20, the failings of Mr. Van Wingerden, Mr. Beall, and Suncanna, and the negative results for GrowCo and its investors, illustrate why Defendants, at a minimum, should have informed potential investors that the success of the venture resided with growers/operators who had minimal experience in the marijuana industry. A reasonable investor would regard such information as "significantly altering the 'total mix' of information made available," and could have used it to make an informed decision whether investing money in a venture operated by industry newcomers was a risk worth taking. Defendants, by withholding such information, did not give their investors this opportunity.

Finally, Defendants did not fully disclose to potential investors how investment funds would be handled by GrowCo. First, investors were not told that GrowCo investment funds would be commingled in bank accounts belonging to other entities. Ms. Martinez, the auditor with the Colorado Division of Securities, explained that commingling of different funds makes it difficult from an accounting standpoint to track investor funds and the use of those funds. To this end, Ms. Martinez stated that she identified at least one transaction where potential GrowCo funds (albeit a modest amount, $1,500.00) were used to pay a personal financial obligation of McKowen. (FOF, ¶¶ 114-118). Mr. Rome similarly explained that commingled funds can lose their identity and risk being used for other business purposes. (FOF, ¶ 139). The BCLS report illustrates this point given that Two Rivers evidently owes over $4 million to GrowCo, a concern that McKowen himself expressed during the Court Trial. (FOF, ¶ 63). Second, Defendants did not fully disclose to potential investors how much of their investment would be used to support the business purpose that generates profits (building greenhouses and supporting tenant operations) and how much would be used for other expenses, such as G&A. Mr. Rome explained that the more investor funds

are used for the former instead of the latter, the less risk of the investment failing. (FOF, ¶ 139). This makes sense given that investors depended on greenhouses being built and then leased to licensed marijuana growers in order to realize any return on their investments. (FOF, ¶ 53). As explained above, the BCLS report in Exhibit 1032 establishes that GrowCo spent only 46.9% of investor funds on the construction of one greenhouse, the partial construction of a second greenhouse, and the financing and management of the tenants, and that the remaining 53.1% was spent on expenses and other payments not directly connected to building and operating greenhouses, i.e., mostly on G&A. (FOF, ¶ 63). Mr. Rome stated that disclosure to investors concerning use of funds for G&A expenses can be approximations or estimates but still should be "fairly specific" as to the amounts and anticipated uses. (FOF, ¶ 141).

Here, the information provided to investors did not provide any meaningful specificity about the nature of these expenses. The Use of Funds in the Term Sheet simply states that some of the proceeds will be used "for working capital and other general corporate purposes of Partners." (FOF, ¶ 17). The Operating Statement in Exhibit 1009 provides some estimates for "Operating Expenses," including "General and Administrative" expenses, without further description. The Use of Proceeds table in Exhibit 1010 similarly provides estimated amounts but only says such funds are for "Working Capital" and "Offering Costs," without explanation. This is inadequate and does not provide full disclosure to investors concerning use of funds.

**b. $4 Million Note (second offering)**

Concerning the second offering, the $4 Million Note, the terms of this offering are explained in paragraphs 20-30. The inadequate disclosures discussed above for the first offering are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry

experience of the greenhouse operators/marijuana growers; and (4) failure to disclose how investment funds would be handled by GrowCo. (i.e., commingling and description of G&A expenses). Beginning with this second offering, Defendants also had an obligation to fully disclose to investors any shortcomings experienced, or issues identified, during the previous offering(s), as such information would be important to a reasonable investor deciding whether to invest in a subsequent offering by the same issuer. From the Court's perspective, Defendants generally failed to do so.

For example, with this second offering, Defendants knew they intended to raise either $6 million for one greenhouse or $10 million for two greenhouses with their first offering, but only raised $3,075,000.00 between October 2014 (opening of offering) and January 2015 (closing of offering). (FOF, ¶¶ 16, 59). When Defendants made their second offering in or around June 2015, they knew that they had missed their goal for the initial offering by a wide margin, but did not inform potential investors in the second offering of this miscalculation. Thus, at the closing of the first offering (January 2015)—several months before the opening of the second offering (June 2015)—Defendants knew they had insufficient funds to complete construction on even one greenhouse and to support its first tenant, yet they did not fully inform potential investors in the second offering of these troubling financial circumstances. Mr. Rome explained that the performance of earlier offerings is material information that would be important to a reasonable investor given that past performance can be predicative of future results. (FOF, ¶ 139). Part of this past performance includes how much of the investor funds was actually used for greenhouse construction and how much was used for G&A expenses.

In addition, Harding explained during his testimony that the $4 Million Note was needed "to make up for the major costs of overruns" for the first greenhouse. Harding further explained

this "blown budget" contributed to the friction between McKowen and the first tenant (Suncanna). (FOF, ¶¶ 27-28). It does not appear from the evidence concerning this second offering that new investors were ever told that the second offering was necessary because of significant cost overruns and "blown budget" during construction of the first greenhouse. The information for this second offering does not mention these budget issues (even if the full extent of the deficit was still unknown)—or the need to remedy those issues with additional funds—and, thus, was misleading to new investors. (FOF, ¶ 29). To the extent Defendants suggest that the "Disclosure of Information" provision in the Note Purchase Agreement, which provides in part, "Such investor has had an opportunity to discuss with the management of GrowCo the business, management and financial affairs of GrowCo and the terms and conditions of the offering of the Notes and the Warrants," absolves them of any accountability, the Court rejects this argument. (Ex. 1011, Note Purchase Agreement, ¶ 3(c), p. 3). The law is clear that promoters are required to make full disclosure of all material information to potential investors, and boilerplate language in a note agreement that investors had a chance to ask questions and gather information does not relieve Defendants of their responsibility. This makes sense given Defendants alone were in possession of the financial information of GrowCo and potential investors may not have been sufficiently aware of any budget issues that warranted further inquiry.

**c. GCP Super Units, LLC (third offering)**

Concerning the third offering, the GCP Super Units, LLC, the terms of this offering are explained in paragraphs 31-39. The inadequate disclosures discussed above for the first and second offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the greenhouse operators/marijuana growers; and (4) failure

to disclose how investment funds would be handled by GrowCo. Unlike the second offering, Defendants did acknowledge per the Confidential Summary for this third offering that a portion of the money raised ($500,000.00) would be used to finance overruns on the first greenhouse. (FOF, ¶ 39). However, Defendants did not disclose that the "actual" cost to build the first greenhouse was over twice as much as the original estimate, which is material information for the reasonable investor being asked to invest in a subsequent offering by the same issuer. Per Exhibit 1008, Mr. Beall informed McKowen and Harding via email on July 1, 2014, that the estimated "total cost" of building a greenhouse was $2,321,000.000 to $3,321,000.00. (FOF, ¶ 14.d). In the Confidential Summary for this offering, Defendants state, in pertinent part, "The first greenhouse cost approximately $5.0mm to build (or approximately $50/sq ft) and estimates each additional greenhouse will cost approximately $5.0mm." (FOF, ¶ 14.d; Ex. 1012). This discrepancy of over $2 million between the estimate and the "actual" expense alone should have been disclosed to investors.

The significance of this lack of disclosure is even more concerning when considering that Harding testified the actual construction costs for the first greenhouse (completed around September 2015) was approximately $7 million *not* $5 million as reported in the Confidential Summary. Given that this third offering opened in or around September 2015, Defendants—as the CEO and CFO of GrowCo with ready access to the company's financials—knew or should have known with some precision the actual costs versus the reported costs of the completed greenhouse in the Confidential Summary. The Court rejects Harding's testimony that Defendants provided the $5 million figure to investors because that is what he and McKowen believed to be true at the time of the offering; the timing of the offering compared to the end of construction within the same month suggests otherwise. While some variance between the reported and final

costs of construction can be expected, a discrepancy of two million dollars (a difference of 40%) was not reasonable, and Defendants should have ensured that investors were provided with reasonably accurate numbers. Nonetheless, even if the "actual" costs of construction was $5 million as stated in the Confidential Summary, this discrepancy between the "actual" costs and estimated costs still should have been disclosed to investors.

The importance of Defendants disclosing the accuracy of any previous estimates cannot be overstated in this case where Defendants also provided revenue estimates in the Confidential Summary. Per the Confidential Summary, Defendants informed potential investors that "[p]ursuant to the lease agreement with Suncanna the first greenhouse will generate $2.1 million in annual gross lease payments." According to Harding, the actual amount of rent GrowCo received from Suncanna was only between $20,000.00 to $30,000.00, a circumstance that ultimately proved fatal to GrowCo. (FOF, ¶ 56). As recognized previously, hindsight is always 20/20, and the failings of Suncanna and lack of rent payments (arguably) could not have been predicted by GrowCo at the time of the third offering. Nonetheless, Defendants did know that their construction costs estimate diverged considerably from the "actual" costs and, thus, had Defendants disclosed the inaccuracy of their costs estimate in their Confidential Summary or during their investor presentation, (Exhibit 1012), potential investors could have inquired about, and more fully assessed, the accuracy of the revenue projection. In short, potential investors could have used Defendants' past performance on one estimate to measure the reliability of Defendants' current estimate. Defendants, by withholding such information, deprived their investors of this opportunity.

The Court makes two final conclusions concerning this third offering. First, given the Court's finding that Defendants likely exaggerated Mr. Van Wingerden's expertise in growing

marijuana, the Court concludes Defendants provided inaccurate information to potential investors in their Confidential Summary concerning its tenant and the tenants' ability to generate revenue. (FOF, ¶ 55). Second, per the rationale stated for the previous offering, the "Disclosure of Information" provision in the GCP Super Units Purchase Agreement, does not relieve Defendants of their responsibility to make full disclosure of all material information to potential investors. (Ex. 1012, Note Purchase Agreement, ¶ 3.3, p. 6).

**d. $1.5 Million Note (un-numbered offering)**

Concerning the $1.5 Million Note, an un-numbered offering given the relatively nominal amount raised ($100,000.00), apparent absence of offering documents in the admitted exhibits, and minimal testimony about the offering, the Court concludes the Commissioner has not proven Defendants violated the CSA regarding this offering. The Court notes this offering opened and closed in April 2016 (perhaps on the same day), which was between the openings for the third and fourth offerings.

**e. $6 Million Exchange Note (fourth offering)**

Concerning the fourth offering, the $6 Million Exchange Note, the terms of this offering are explained in paragraphs 40-41. The inadequate disclosures discussed above for the first, second, and third offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; and (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs. In addition, beginning with this offering, the evidence shows that GrowCo did not disclose to potential investors that its original tenant (Suncanna) had been purchased by McKowen through an entity

named RH Group, LLC, on or about February 25, 2016, that the MED suspended Suncanna's license on April 14, 2016, and that McKowen and his entity (Johnny Cannaseed) did not possess a MED license. (FOF, ¶¶ 30, 119). The buy-out and license suspension were material information that would be important to a reasonable investor given that the profitability of GrowCo depended exclusively on the success of its tenant. A change in grower/operator and licensing issues had the potential to disrupt greenhouse operations and interfere with marijuana production, which threatened the tenant's ability to generate revenue and pay its rent. Thus, when this fourth offering opened on or about April 22, 2016, Defendants should have informed potential investors of these emergent issues (even if the full impact was still unknown) given that tenant turnover/instability on its own had the potential to imperil GrowCo's bottom line. Once again, however, Defendants failed to disclose this information and the issues eventually proved to be detrimental for GrowCo and its investors. Defendants, by withholding such information, deprived investors of the opportunity to make an informed decision about their investment.

**f. $7 Million Exchange Note (fifth offering)**

Concerning the fifth offering, the $7 Million Exchange Note, the terms of this offering are explained in paragraphs 42-44. The inadequate disclosures discussed above for the first, second, third, and fourth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; and (6) failure to disclose tenant and licensing issues. Beginning with this offering, the troubles of GrowCo were accelerating and the misinformation and non-disclosure of material information were

compounding. The Court notes that when this offering opened on or around June 6, 2016, McKowen had just resigned from GrowCo several weeks earlier and Harding had assumed the chief executive duties. (FOF, ¶¶ 30, 81, 122). McKowen nonetheless continued to be closely involved in GrowCo as its largest shareholder (through his entity McGrow) and as an "advisor" pursuant to several written agreements formally executed on July 22, 2016. (FOF, ¶¶ 122, 125). McKowen also continued promoting GrowCo offerings at the request of GrowCo, including giving a presentation to potential investors for this fifth offering. (FOF, ¶ 56, 123). McMahon, an investor in this offering, confirmed that both McKowen and Harding were at the investor presentation for this offering, and that McKowen was "pitching the deal." (FOF, ¶ 81).

During this presentation, neither McKowen or Harding disclosed the concerning information described above or explained that GrowCo was on the brink financially and operationally (e.g., its previous tenant had failed, GrowCo had collected almost no rent in the past 12-18 months, GrowCo had "blown the budget" on the first greenhouse, GrowCo was struggling to pay investors, etc.) Rather, McKowen, at the behest of GrowCo and Harding, painted a much different picture of GrowCo and its future—a picture unsupported by events of the previous eighteen months. In its presentation, the "Projections" slide indicated that GrowCo expected to receive $9,000,000.00 in rent payments even though its tenant, Suncanna, had only paid $20,000.00 to $30,000.00 in rent during its tenancy, had at least one crop destroyed due to grower mismanagement, had recently lost (or was in the process of losing) its MED license, and was being evicted by GCP1. (FOF, ¶ 56; Ex. 8). In addition, McKowen did not disclose that a company owned by him (Johnny Cannaseed) was attempting to lease the greenhouse even though neither he or the entity possessed a license to grow marijuana. (FOF, ¶ 127). Similarly, the "Projections" slide indicated the projected revenue for the grower would be over $41 million even though the

original tenant was never profitable and experienced significant operational and financial challenges. While providing estimates of future revenues/profits to investors—even optimistic ones based on the hope that GrowCo's circumstances would improve—was permissible, it was misleading to present these projections without also disclosing the myriad issues that had plagued GrowCo and its tenant up to that time. By omitting this crucial information, McKowen and Harding ensured that potential investors would be making an investment decision without full knowledge of all material facts concerning the offering.

The Court also notes that the Two Rivers' board of directors conducted an internal investigation of McKowen concerning some of these same issues, and prepared a report of their findings on or about June 29, 2016. (FOF, ¶¶ 119-120). During his testimony, McKowen acknowledged the report contains material information that a reasonable investor would want to know before investing in GrowCo. (FOF, ¶ 121). Of particular note, the report suggests that much of McKowen's questionable conduct may be explained by his and Two Rivers' "desperate need for capital." (FOF, ¶ 120). Neither the report or the existence of an investigation was ever revealed to outside parties, including potential investors. By withholding this information, Defendants deprived investors of the opportunity to assess the trustworthiness of the promoters and the competence of those who would be handling their investment and, thus, precluded investors from making a fully informed decision about their investment with GrowCo.

**g. $2 Million Exchange Note (sixth offering)**

Concerning the sixth offering, the $2 Million Exchange Note, the terms of this offering are explained in paragraphs 45-46. The inadequate disclosures discussed above for the first, second, third, fourth, and fifth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3)

failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; and (6) failure to disclose tenant and licensing issues. Per Buchanan, the only information he received about this offering was the Term Sheet and he was never told about the risks associated with this investment. (FOF, ¶¶ 101-102, 106, 108). The Court concludes that other investors received the same limited information. The Term Sheet dated February 15, 2017, and other related documents in Exhibit 51, do not list any risk factors for this offering.

Beginning no later than this offering (and likely beginning with the fifth offering above), McKowen and Harding were well aware that GrowCo was unable to pay its investors on time or the full amount due. When this offering opened on or around February 15, 2017, previous GrowCo investors in the $4 Million Note (the second offering) had already been asked by Harding *four months earlier* to amend their promissory notes because GrowCo was struggling to pay monthly interest on the notes due to issues with its tenant. (FOF, ¶¶ 103). Moreover, just one week after Buchanan invested in this sixth offering (on March 7, 2017), Harding signed the "First Amendment to $7,000,000 GrowCo Exchange Note" on March 15, 2017, concerning McMahon's investment in the $7 Million Exchange Note. (Ex. 85). Given the short amount of time between when this offering was made and when GrowCo asked investors in the $7 Million Exchange Note to amend their notes, McKowen and Harding surely knew when they promoted this offering that they had not delivered on their promises to previous investors, and yet continued to solicit additional funds from new investors and make similar promises without disclosing GrowCo's financial troubles. This silence speaks volumes about the dire financial circumstances of GrowCo, its desperate need for additional capital, and Defendants' motivations to portray GrowCo in the best (albeit

misleading) possible light. Regardless of how damaging this information would have been to Defendants' efforts to entice new investment, Defendants were obligated to disclose this information as a reasonable investor undoubtedly would consider Defendants' current inability to pay investors essential in deciding whether to invest in the offering.

**h. $550K McGrow Units (seventh offering)**

Concerning the seventh offering, $550K McGrow Units, the terms of this offering are explained in paragraphs 47-48. The inadequate disclosures discussed above for the first, second, third, fourth, fifth, and sixth offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo and McGrow; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; (6) failure to disclose tenant and licensing issues; and (7) failure to disclose GrowCo's inability to pay its investors. (FOF, ¶¶ 86-90). The Court first observes that it is unclear how much money was actually raised by McGrow given that the BCLS report does not address this offering. (FOF, ¶ 59). Nonetheless, the Court concludes that even though this is a McGrow offering, the offering itself and the business activities of McGrow are so closely intertwined with previous GrowCo offerings and GrowCo's business activities that any distinction between GrowCo and McGrow for purposes of resolving this claim is unimportant. (FOF, ¶ 88). As such, the Court considers the relationship between McKowen, Harding, and this McGrow offering to be the same as their relationship in the GrowCo offerings, and concludes that the inadequate disclosures in this seventh offering in violation of the CSA can be attributed to both McKowen and Harding.

i. **VitaNova, Inc. (eighth offering)**

Concerning the eighth offering, VitaNova, Inc., the terms of this offering are explained in paragraphs 49-52. The inadequate disclosures discussed above for the first, second, third, fourth, fifth, sixth, and seventh offerings are present in this offering as well: (1) failure to disclose NASD issues for McKowen and FINRA issues for George McCaffrey; (2) failure to disclose non-compliance with CSA filing requirements; (3) failure to disclose lack of industry experience of the original greenhouse operators/marijuana growers; (4) failure to disclose how investment funds would be handled by GrowCo, McGrow, and VitaNova, Inc.; (5) failure to disclose the discrepancy between actual construction costs and estimated construction costs; (6) failure to disclose tenant and licensing issues; and (7) failure to disclose GrowCo's inability to pay its investors. (FOF, ¶¶ 2.c, 2.l, 52, 106-109). The Court first observes that it is unclear how much money was actually raised by VitaNova, LLC, given that the BCLS report does not address this offering. (FOF, ¶ 59). Nonetheless, the Court concludes that even though this is an offering by VitaNova, Inc., the offering itself and the business activities of VitaNova, Inc., are so closely intertwined with GrowCo and its business activities that any distinction between GrowCo and VitaNova, Inc., for purposes of resolving this claim is unimportant. The Term Sheet states the proceeds from this offering will be used solely to provide a secured loan to GrowCo Super Units, LLC. As such, the Court considers the relationship between McKowen, Harding, and this VitaNova, Inc., offering to be the same as their relationship in the GrowCo offerings, and concludes that the inadequate disclosures in violation of the CSA can be attributed to both McKowen and Harding.

In summary, based on the foregoing, the Court concludes that both McKowen and Harding promoted these eight offerings and failed to make full disclosure of all material facts to investors when doing so. It is of no consequence that some of the information may have been publicly

available per Two Rivers' SEC filings or that the investors were accredited investors and these were claimed private offerings. Defendants were still obligated per the CSA not to misrepresent or omit information that a reasonable investor would consider important in making an investment decision. The three investors—Loughran, McMahon, and Buchanan—who provided testimony concerning their investments in the offerings all stated they would not have invested in a GrowCo, McGrow, and/or VitaNova, Inc., offering if they had known certain material information that was not disclosed, e.g., financial troubles of GrowCo, regulatory issues for McKowen and Mr. McCaffrey, MED licensing issues for McKowen, inability to pay previous investors, etc. (FOF, ¶¶ 77, 92, 106). This is material information that any reasonable investor would have wanted to know before making an investment decision. It is remarkable to the Court that McKowen and Harding continued promoting offerings without fully disclosing the budget and financial troubles of GrowCo, including that GrowCo was unable to make payments to previous investors and that its projections of revenues and profits ignored the past challenges of GrowCo and its tenants. The Court rejects Defendants' suggestion that the "Disclosure of Information" provision in some of the offering documents absolves them of any responsibility for not providing such information. The law is clear that promoters are required to make full disclosure of all material information to potential investors, and boilerplate language in a note agreement that investors had a chance to ask questions and gather information does not relieve Defendants of this responsibility. Accordingly, the Court concludes that McKowen and Harding violated §11-51-501(1)(b) of the CSA.

**2. § 11-51-501(1)(a) and § 11-51-501(1)(c)**

The Court elects to consider the claimed violations of these two provisions together given their obvious overlap. In doing so, the Court relies on *Lorenzo v. S.E.C.*, 587 U.S. 71, 80, 139 S.Ct. 1094, 203 L.Ed.2d 484 (2019), in which the U.S. Supreme Court interpreted the provisions

of Securities and Exchange Commission Rule 10b-5 and relevant federal statutory provisions—the federal counterparts to § 11-51-501 of the CSA—and recognized the "considerable overlap" between subsections (a) and (c) of the Rule.[9] Identical to the CSA, subsection (a) of the federal rule makes it unlawful to "employ any device, scheme, or artifice to defraud," and subsection (c) makes it unlawful to "engage in any act, practice, or course of business which operates as a fraud or deceit upon any person in connection with the purchase or sale of securities." The Supreme Court stated, in pertinent part, "[S]ince its earliest days, the [Securities and Exchange] Commission has not viewed these provisions as mutually exclusive. . . . The idea that each subsection of Rule 10b-5 governs a separate type of conduct is also difficult to reconcile with the language of subsections (a) and (c). It should go without saying that at least some conduct amounts to 'employ[ing]' a 'device, scheme, or artifice to defraud' under subsection (a) as well as 'engag[ing] in a[n] act . . . which operates . . . as a fraud' under subsection (c)." *Id.* In addition, the Supreme Court reaffirmed some definitions for words used in subsection (a) of the Rule: (1) a "device" is "that which is devised, or formed by design"; (2) a "scheme" is a "project, plan, or program of something to be done"; and (3) an "artifice" is an "artful stratagem or trick," and then noted that "[t]he words 'act' and 'practice' in subsection (c) are similarly expansive." *Id.* at 1101.

Concerning § 11-51-501(a) and (c), the Commissioner generally alleges in her Proposed Findings of Fact and Conclusions of Law that McKowen and Harding engaged in an elaborate plan to defraud investors over the course of several years and that nearly all of their actions during this period of time were in furtherance of this fraud. (Commissioner's Proposed Findings of Fact and Conclusions of Law, ¶¶ 55-62). The Commissioner sets out a narrative of events that purports to show that McKowen and Harding began down this dishonest road from the inception of GrowCo

---

[9] "Insofar as the provisions of Colorado securities laws have parallel federal statutes, federal authorities are persuasive in interpreting the CSA." *Black Diamond Fund, LLLP v. Joseph*, 211 P.3d 727, 735 (Colo. App. 2009).

in 2014. While the Court believes, as explained below, that McKowen and Harding did engage in fraudulent activity at times during these offerings, the Court is not entirely convinced that their actions between 2014 and the present were a continuous, singular, and pervasive effort to defraud investors for their own gain. McKowen and Harding had a vision of building state-of-the-art greenhouses and profiting on the legalization of recreational marijuana in Colorado. The fact that they were able to complete construction on one impressive greenhouse at a cost of $7 million—a "spectacular" structure that Buchanan said was the best greenhouse he had ever seen—indicates that McKowen and Harding seemingly hoped to deliver on their promises to investors and realize the ambitions of GrowCo. (FOF, ¶ 100). This, of course, did not happen, and the venture failed. McKowen maintained during the Court Trial that failure does not equal fraud. As a general rule, the Court agrees.

With this said, however, the Court does conclude that McKowen and Harding violated § 11-51-501(a) and (c) during this venture by employing a fraudulent strategy and engaging in a course of business which operated as a fraud or deceit upon their investors—especially during the later offerings when it became obvious that GrowCo was on the brink of failure and in desperate need of capital. Some of this fraudulent activity has been discussed above, such as McKowen and Harding promoting offerings without disclosing the budget and financial troubles of GrowCo (e.g., "blown budget," lack of rental income from tenant, etc.) or, perhaps most importantly, that GrowCo was unable to make payments to previous investors. This decision to withhold material information from investors appears to have been purposeful in order to paint the fortunes of GrowCo in a more favorable light so as to attract new investors, and then use the additional funds to satisfy its immediate financial obligations in an effort to bide time until GrowCo became profitable. Unfortunately, for GrowCo and its investors, this never happened, and Defendants

were left to promote additional offerings to offset the lack of revenue from its struggling operations. In doing so, Defendants had to know that investors were at risk of losing their investment.

As this pattern began to repeat itself and GrowCo used new investor funds, in part, to satisfy its obligations to previous investors, it became apparent that GrowCo was operating like a Ponzi scheme. Defendants themselves acknowledged this reality. (FOF, ¶¶ 129-131, 133, 139). Defendants discussed this issue on or around June 27, 2016—at the time of the $7 Million Exchange Note (the fifth offering)—and, thus, the Court concludes that for at least the sixth, seventh, and eighth offerings, Defendants raised money knowing that GrowCo, McGrow, and VitaNova, Inc., could be operating as a fraud or deceit upon the investors. However, the Court concludes that beginning with earlier offerings and continuing through the eighth offering, Defendants had reasons to know that GrowCo and related entities were operating as a Ponzi scheme and yet disregarded such information and continued to promote the offerings. In other words, at a minimum, Defendants recklessly sold securities in violation of § 11-51-501.[10]

In reaching this conclusion, the Court observes that the primary source of revenue for GrowCo was rental income from lessees and, thus, investors depended on the greenhouses being built and then leased to successful marijuana growers in order to realize any return on their investments. (FOF, ¶ 53). As discussed repeatedly throughout this Order, only one greenhouse was ever built despite promises to investors (beginning as early as the second offering) that their funds would be used to build multiple greenhouses. (FOF, ¶ 22). The first greenhouse was finished

[10] Per § 18-1-501(8), in criminal cases, "a person acts recklessly when he consciously disregards a substantial and unjustifiable risk that a result will occur or that a circumstance exists." In civil cases, "[w]anton and reckless conduct is defined as 'conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences.'" *Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 578 (Colo. App. 2006).

in September 2015 and the first tenant (Suncanna) took occupancy. Suncanna was not a successful or profitable tenant. During its (approximate) seven months of tenancy, Suncanna had to destroy one entire crop due to disease and another crop in or around April 2016 after its MED license was revoked. (FOF, ¶¶ 55, 119). Suncanna therefore had minimal revenue to make its rent payments. Per Harding, GrowCo received only $20,000.00 to $30,000.00 in rent from Suncanna, and after its eviction no tenant or subtenant ever consistently operated the greenhouse or paid rent. (FOF, ¶¶ 55-56, 127). This is generally consistent with the evidence provided by Ms. Martinez, which showed that between December 2014 and March 2018, Two Rivers, on behalf of GrowCo and related entities, received $50,144.57 in "income" from Suncanna per a single transaction, and $5,600.00 in "lease income" from an unidentified source per three transactions. (Ex. 141). Given that rental payments were the only meaningful source of revenue for GrowCo, and GrowCo collected only a negligible amount of rent, the inescapable conclusion is that GrowCo relied on its only other real source of "income,"—new investor funds—to make payments on its promissory notes. Again, Defendants acknowledged as much during their testimony. (FOF, ¶¶ 129-131).

This conclusion is further supported by the reliable and persuasive testimony of Ms. Martinez and her summary in Exhibit 141. (FOF, ¶ 111). Per Exhibit 141, Two Rivers (in its five bank accounts controlled by McKowen, Harding, and others) received $17,180,680.00 in investor funds per 170 transactions; MCG Services, LLC (in its one account controlled by McKowen) received $1,078,538.00 in investor funds per 24 transactions; and TR Capital Partners, LLC (in its one account controlled by McKowen, Harding, and Kirsty Cameron) received $1,027,299.29 in investor funds per 34 transactions. These deposits of investor funds total $19,286,517.00. This is consistent with the BCLS report which shows $18,905,500.00 in investor funds were raised between December 2014 and September 2017, a variance of $381,017.00. As noted above, the

summary prepared by Ms. Martinez in Exhibit 141 examined banking activity for accounts open between December 2014 and March 2018, i.e., six months longer than the time period examined by BCLS and, thus, any investor funds received after September 2017 would not be reflected in the BCLS report. Exhibit 141 further shows that Two Rivers made $2,262,553.89 in investor payments per 512 transactions; MCG Services, LLC, made $134,916.65 in investor payments per 11 transactions; and TR Capital Partners, LLC, made $210,376.42 in investor payments per 78 transactions. These investor payments total $2,607,846.96. Since GrowCo and related entities likely received no more than $55,744.57 in lease payments and had no other appreciable source of income, and paid out over $2.6 million to investors, it is reasonable to conclude that GrowCo used investor funds to make these payments to investors. No persuasive alternative explanation has been offered by either McKowen or Harding to explain how these significant investor payments were made in the absence of a successful and profitable tenant, or other measurable source of revenue. This is quite telling given Defendants, as executives of GrowCo with access to the company's financials, were in the best position to know how GrowCo earned its revenue and how it paid its investors. The Court is left to conclude that GrowCo and its related entities devolved into a classic Ponzi scheme—a fraudulent strategy and a business which operated as a fraud or deceit upon its investors. Accordingly, the Court concludes that McKowen and Harding violated § 11-51-501(1)(a) and (c) of the CSA.[11]

**B. Unlicensed Activity—Sales Representative (claim two)**

The Commissioner claims that GrowCo and its related entities violated § 11-51-401 and § 11-51-402 of the CSA by using unlicensed sales representatives to offer and sell its securities without a lawful exemption. (Complaint, ¶¶ 217-219). The Court agrees. As an initial matter, the

[11] In light of this conclusion, the Court declines to address how conversion of debt securities into equity securities and how the order of liens may have violated the CSA.

Court notes that per paragraph 2.m above, the parties acknowledge that the "individual Defendants used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities." In addition, per paragraph 2.n, the parties agreed that the "McCaffreys offered and sold securities for the Defendant entities with[out] being properly licensed under the [CSA] and received fees for offering and selling Defendant entities' securities." The first question thus becomes whether any of the individuals who sold GrowCo securities without a license can be considered a "sales representative" under the CSA. Section 11-51-201(1) defines "sales representative" as:

> [A]n individual, other than a broker-dealer, either authorized to act and acting for a broker-dealer in effecting or attempting to effect purchases or sales of securities or authorized to act and acting for an issuer in effecting or attempting to effect purchases or sales of the issuer's own securities. An individual so acting for an issuer is not a sales representative if the individual primarily performs, or is intended primarily to perform upon completion of an offering of the issuer's own securities, substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities and the individual's compensation is not based, in whole or in part, upon the amount of purchases or sales of the issuer's own securities effected for the issuer. A partner, officer, or director of a broker-dealer or issuer, or an individual occupying a similar status or performing similar functions, is a sales representative only if the individual otherwise comes within the definition.

The Court concludes that for certain offerings Ms. McCaffrey, Mr. McCaffrey, Kirsty Cameron, and McKowen acted as unlicensed sales representatives under § 11-51-401. (FOF, ¶¶ 13, 52, 76, 144).

First, in or around April 2015, Ms. McCaffrey solicited Loughran to invest in the second offering ($4 Million Note). Ms. McCaffrey discussed the offering with Loughran and explained that the note was "callable," secured, and had a good interest rate. Ms. McCaffrey answered questions Loughran had about the offering and advised Loughran that the offering was a "good

investment." (FOF, ¶¶ 70-71). After Loughran invested in this second offering, Ms. McCaffrey continued to solicit Loughran in at least one additional offering. Per Exhibit 35, in an email exchange between Ms. McCaffrey and Loughran concerning the third offering (GCP Super Units), Ms. McCaffrey provided Loughran with a GrowCo summary and spreadsheets showing cash flows, explained these cash flows and other issues concerning GrowCo going public in the future, and invited Loughran to reach out with any additional questions. It is important to note that in her signature line for this email, Ms. McCaffrey indicated that she works with RE/MAX Edge—a real estate company—and not GrowCo or a related entity. It is reasonable to infer that eight months earlier during her solicitation of Loughran for the second offering, Ms. McCaffrey was similarly associated with RE/MAX Edge and not employed by GrowCo or a related entity. Ms. McCaffrey did not join GrowCo's executive team until 2017. (FOF, ¶ 2.d). Ms. McCaffrey, through Waterton Financial, received compensation for her successful solicitation of Loughran. Exhibit 44 shows that on April 15, 2015, GrowCo paid Waterton Financial $26,500.00 for "Cost of GrowCo Note Raised." *See also* Exhibits 31 and 72.

Exhibit 44 also shows that GrowCo made the following payments to Waterton Financial for the same reason, i.e., "Cost of GrowCo Note Raised": (1) $11,750.00 on June 15, 2015; and (2) $2,500.00 on July 8, 2015. Two additional payments of $3,500.00 were made that same year for "Cost of Capital GC SU Raised," including one payment that was labeled a "Finders Fee Payment." In 2016, the year before Ms. McCaffrey joined the GrowCo executive team, GrowCo made fifteen additional payments to Waterton Financial, totaling $89,250.00 (in varying amounts, including $1,750.00, $3,500.00, $6,500.00, $7,000.00, and $10,500.00), only four of which were labeled as a "Finders Fee Payment," for cost of capital raised in the first, third, and fifth offerings. (Ex. 44). These fluctuating amounts indicate the payments were transaction-based payments, or

commissions, which is a hallmark of being a broker-dealer or sales representative. *Black Diamond Fund, LLLP*, 211 P.3d at 734; *cf. Cornhusker Energy Lexington, LLC*, No. 8:04CV586, 2006 WL 2620985, at *6 (D. Neb. Sept. 12, 2006). Defendants' assertion that these payments are only Finder's Fees and, therefore, show that Ms. McCaffrey is not a sales representative is unpersuasive and not supported by any statute, rule, or caselaw provided by Defendants. The Court also notes that in 2017 GrowCo made eleven additional payments to Waterton Financial, totaling $55,169.35 (in varying amounts, including $1,750.00, $2,919.35, $3,500.00, $5,000.00, $7,000.00, and $10,500.00), none of which were labeled as a "Finders Fee Payment," for cost of capital raised, primarily for the sixth offering ($2 Million Note). (Ex. 44).

The Court concludes that Ms. McCaffrey was a sales representative for GrowCo because: (1) Ms. McCaffrey was an individual, not a broker-dealer; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities, that is Ms. McCaffrey solicited Loughran, distributed documents about the offering to Loughran, and answered questions about the offering for Loughran, all in the hope that Loughran would invest in the offering; (4) received transaction-based compensation for the solicitation; and (5) Ms. McCaffrey, at the time of the solicitation, did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. Ms. McCaffrey was not yet the COO, or Secretary/Treasurer for the Board of Directors, for GrowCo and related entities until approximately two years later. As such, the Court concludes that Ms. McCaffrey sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Second, concerning Mr. McCaffrey, he was licensed to sell securities from January 3, 1978 until on or around October 30, 2017. (FOF, ¶ 2.c). Mr. McCaffrey was formally suspended in September 2018 for eighteen months by the Financial Industry Regulatory Authority, Inc.

(FINRA) for participating in twenty-two undisclosed private securities transactions with nine investors who purchased $1,775,000.00 in debt and equity securities from GrowCo while he was acting away from the supervision of his employer (NTB Financial Corporation, a broker-dealer based in Denver, Colorado). (FOF, ¶ 52; Ex. 14, 65). The FINRA BrokerCheck Report in Exhibit 14 says, in part, "The findings [of the FINRA investigation] stated that McCaffrey introduced the nine individuals to representatives of a greenhouse building and leasing company so they could invest in the company. The findings also stated that he reviewed and edited documents relating to the investments, forwarded investment-related documents to the customers, and communicated with the customers about their investments. Those investors purchased $1,775,000 in promissory notes of the greenhouse building and leasing company and preferred stock in one of the company's affiliates. The findings also included that in connection with these transactions, the company paid $124,250 in commissions to an entity controlled by McCaffrey's wife." (Ex. 14, p. 12). Mr. McCaffrey was ordered to disgorge these commissions. This FINRA report makes clear that Mr. McCaffrey was selling GrowCo securities outside of the requirements of his securities license.

The Court concludes that Mr. McCaffrey was a sales representative for GrowCo because: (1) Mr. McCaffrey was an individual, acting outside of his broker-dealer license; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities; (4) received transaction-based compensation for the solicitation; and (5) Mr. McCaffrey, at the time of the solicitation, did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. The Court understands that Mr. McCaffrey did not serve in any executive positions with GrowCo or its related entities until he became COO of VitaNova, LLC. (FOF, ¶ 2.l). Mr. McCaffrey acted as a sales representative for the twenty-two private securities transactions *prior* to his FINRA suspension in 2018—i.e., during

the first seven offerings unrelated to the VitaNova entities—and, therefore, he was not yet an executive of the issuer while soliciting potential investors. As such, the Court concludes that Mr. McCaffrey sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Third, concerning Kirsty Cameron, she was never licensed to sell securities. (FOF, ¶¶ 13). As noted above, the parties stipulated that Defendants "used unlicensed parties to offer and sell securities for the Defendant entities and paid those parties a fee for the offer and sale of those securities." (FOF, ¶ 2.m). During their testimony, McKowen and Harding confirmed Ms. Cameron is one of those parties. (FOF, ¶ 13). McKowen also confirmed that Ms. Cameron received "commissions" for her sales efforts. (FOF, ¶ 144). Exhibit 141 shows that GrowCo paid $175,014.61 in "Finders Fees" per 24 transactions. Ms. Martinez testified she believed these particular fees were paid to Ms. Cameron and Anne Wallich. (FOF, ¶ 112). In addition, Exhibit 44 shows that GrowCo made the following two payments totaling $9,500.00 to Ms. Cameron for "Cost of GrowCo Note Raised": (1) $4,000.00 on April 20, 2015; and (2) $5,000.00 on May 4, 2015. Although it is somewhat difficult to discern from the trial evidence when Ms. Cameron left her employment with GrowCo and its related entities, the Court believes it was in or around February 17, 2015, when she was removed as an authorized signer on the Two Rivers' bank accounts. (Ex. 141). As such, the $9,500.00 in commission payments occurred after she left her employment with GrowCo and related entities and, therefore, at the time of at least two solicitations, Ms. Cameron did not primarily perform substantial duties for or on behalf of GrowCo otherwise than in connection with transactions in GrowCo's own securities. The Court thus concludes that Ms. Cameron sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Fourth, concerning McKowen, the Commissioner states in paragraph 40 of her Proposed Findings of Fact and Conclusions of Law, "Prior to his resignation from Two Rivers and the GrowCo Entities, McKowen was exempt from licensure as an executive acting on behalf of the issuer. However, after McKowen resigned from those companies, he [was] no longer an executive acting on behalf of the issuer and therefore no longer exempt from licensure." The Court generally agrees. Prior to McKowen's resignation from his executive positions with Two Rivers in May 2016, McKowen could offer and sell GrowCo securities without running afoul of § 11-51-401. Following his resignation from Two Rivers, McKowen was in a contractual relationship with GrowCo to promote its securities and to serve as an "advisor" pursuant to several written agreements for which he would receive $22,750.00 per month. (FOF, ¶¶ 122-125). In addition to promoting GrowCo's securities, McKowen was to continue his oversight of greenhouse construction. Even though he resigned from his executive positions with Two Rivers, he retained significant ability to direct GrowCo's essential activities and control its economic success. Thus, whether McKowen could be considered a sales representative following his resignation is a bit more complicated than the McCaffreys or Kirsty Cameron. Like the others, McKowen (1) was an individual, not a broker-dealer; (2) authorized to act for the issuer (GrowCo); (3) in "effecting" a sale of GrowCo's own securities; and (4) received transaction-based compensation for the solicitation.

However, unlike the McCaffreys and Ms. Cameron, McKowen (despite his resignation) did perform substantial duties for GrowCo otherwise than in connection with transactions in GrowCo's own securities—he oversaw greenhouse construction, perhaps the most important activity in which GrowCo was engaged at the time. Per the definition of "sales representative" in § 11-51-201(1), "An individual so acting for an issuer [i.e., effecting purchases or sales of

securities of the issuer's own securities] is not a sales representative if the individual primarily performs . . . substantial duties for or on behalf of the issuer otherwise than in connection with transactions in the issuer's own securities *and* the individual's compensation is *not* based, in whole *or in part*, upon the amount of purchases or sales of the issuer's own securities effected for the issuer." (Emphasis added). Although McKowen did perform substantial duties on behalf of GrowCo apart from promoting its securities, McKowen's overall compensation was based in part on the amount of securities he sold and, therefore, he did not satisfy the above "carve out" to the definition.

Exhibit 44 shows that on August 29, 2016, and again on October 28, 2016, GrowCo paid McKowen (through MCG Services, LLC) $22,750.00, his contractual fee per the three written agreements he executed with GrowCo after his resignation. McKowen also received payments in the amount of $14,000.00 on September 16, 2016, and $9,800.00 on October 3, 2016, for "Cost of Capital 7MM Note Raise," one of which was labeled a "Finders Fee," and $4,000.00 on August 31, 2017, for "Cost of Capital 2M Raise." (Ex. 44). The Court infers from these varying amounts that McKowen was receiving additional compensation based upon the number and amount of the investments he procured for GrowCo. As such, following his resignation, McKowen fell within the definition of "sales representative," and sold GrowCo securities as an unlicensed sales representative under § 11-51-401.

Concerning whether the McCaffreys, Kirsty Cameron, and/or McKowen were exempt from licensure under § 11-51-402, the Court concludes in the negative. None of the exemptions apply in this case for the following reasons: (1) subsection (1) of the statute applies to broker-dealers and the McCaffreys, Kirsty Cameron, and McKowen did not sell GrowCo securities as broker-dealers; (2) subsection (2)(a) of the statute applies to sales representatives employed or

otherwise engaged by a broker-dealer and the McCaffreys, Kirsty Cameron, and McKowen were not employed or engaged by a broker-dealer; (3) subsection (2)(b) of the statute applies to sales representatives employed or otherwise engaged by an issuer in effecting transactions only in securities exempted by section 11-51-307(1)(a) to (1)(d) or (1)(j), none of which apply in this case; (4) subsection (2)(c) of the statute applies to sales representatives employed by an issuer in effecting transactions only with employees, partners, officers, or directors of the issuer or of a parent or subsidiaries of the issuer, if no commission or other similar compensation is paid or given directly or indirectly to the sales representative for soliciting an employee, partner, officer, or director in this state. The McCaffreys, Kirsty Cameron, and McKowen sold securities to investors who were not just employees, partners, officers, or directors of GrowCo, Two Rivers, or related entities, and they received commissions for their sales efforts; and (5) per subsection (2)(d), the Commissioner has not by rule or order exempted GrowCo sales representatives, or any category of sales representatives in which the GrowCo sales representatives could be included, from the licensure requirements of § 11-51-401. Accordingly, the Court concludes that the McCaffreys, Kirsty Cameron, and McKowen sold GrowCo securities as unlicensed sales representatives under § 11-51-401, and were not exempted under § 11-51-402, in violation of the CSA.

Finally, in light of the above conclusion that the McCaffreys, Kirsty Cameron, and McKowen violated the licensure provisions of the CSA, the Court concludes that Defendants also violated § 11-51-501(1)(b) of the CSA by not disclosing such information to GrowCo investors. As discussed previously, non-compliance with the CSA can lead to enforcement actions and lawsuits, both of which put the success of a venture at risk. Information about a promoter's non-compliance with the CSA is important to an investor before making an investment decision, and Defendants did not disclose to potential investors that GrowCo used unlicensed, non-exempt, sales

representatives to sell its securities. This lack of disclosure is similar to Defendants' non-disclosure of the FINRA and NASD actions, and failure to file a notice of exemption from registration with the Commissioner, discussed earlier in this Order.

**C. Unregistered Securities (claim three)**

The Commissioner claims that GrowCo and its related entities violated federal and state registration requirements as follows: (1) for some offerings, Defendants failed to register or file for exemption from registration with the SEC; (2) for other offerings, Defendants filed for exemptions from registration with the SEC but did not meet the requirements for exemption; (3) for all offerings, Defendants failed to register or file for exemption from registration with the Commissioner; (4) for all offerings, Defendants failed to provide full and fair disclosures about the NASD issues involving McKowen, which disqualified the offerings from exemption from securities registration pursuant to Rule 506; and (5) for all offerings, Defendants failed to provide a notification of exemption to the Commissioner, as required by § 11-51-308(1)(p). (Complaint, ¶¶ 221-227). The Complaint provides minimal information for these allegations, and the Commissioner does not identify which offerings fall within the various categories.

Concerning these allegations, in her Proposed Findings of Facts and Conclusions of Law, the Commissioner states only that: (1) Defendants did not establish that they actually qualified for any of the federal exemptions for private offerings because federal exemptions only apply if a security is offered to accredited investors with whom the issuer or promoter has an existing relationship (i.e., not offered to the general public) and Defendants did not dispute the testimony of Mr. Rome that the eight offerings were made, in part, to the general public; and (2) Defendants admit that no notices of registration exemption were filed with the Commissioner and no fee was paid, as required by § 11-51-308(1)(p) and, therefore, even if all offerings qualified for a federal

exemption, Defendants still violated the CSA. (Commissioner's Proposed Findings of Fact and Conclusions of Law, ¶¶ 85-86). The Court will consider these two particular issues, and declines to consider any other claimed registration violations by Defendants not addressed by the Commissioner in her Proposed Findings of Fact and Conclusions of Law.

First, regarding whether Defendants promoted the offerings to members of the public, the Court notes that the Commissioner refers to the testimony of Mr. Rome and claimed lack of response by Defendants in her Conclusions of Law section, paragraph 85, but does not mention Mr. Rome's testimony or this particular issue in her proposed Findings of Fact. The Court, however, has considered the testimony of Mr. Rome in this regard and makes several observations: (1) Mr. Rome acknowledged that federal securities law includes some exemptions to registration, including exemptions for private offerings, known as Regulation D; (2) when an issuer is claiming a "Reg D exemption," the CSA requires the issuer to file a "Form D" with the Commissioner and pay a fee; (3) it is insufficient per the CSA for an issuer to file exemption paperwork with the SEC alone; (4) during his cross-examination of Mr. Rome, McKowen acknowledged that GrowCo relied on the exemption for transactions not involving a public offering; (5) on cross-examination, Mr. Rome testified credibly that he believed the offerings were public offerings because "the company used, accreditor investors, cold-call lists, and cold calls were made to investors, that take you out of the private offering exemption. There was also presentations made to investors, and if the company did not have a substantial preexisting relationship with the people it invited to those presentations, then that would take you out of the private offering exemption;" and (6) this testimony was unrebutted by any persuasive testimony or evidence offered by Defendants. (FOF, ¶¶ 137, 143). The Court is persuaded that some the offerings likely were not limited to accredited investors with whom the issuer or promoter had an existing relationship and, therefore, were not

exempt under federal statute. However, given the lack of detail in the Complaint and the Commissioner's Proposed Findings of Fact and Conclusions of Law concerning this issue, and the state of the evidence concerning the same, the Court cannot say which offerings were strictly private and which offerings were more public.

With this said, even if all offerings were exempt as private offerings, and Defendants complied with all federal registration requirements for each of the eight offerings, it is clear that Defendants did not comply with the CSA. Defendants themselves acknowledge that no notices of registration exemption were filed with the Commissioner and no fees were paid, as required by § 11-51-308(1)(p). (FOF, ¶¶ 2.o, 12). Any compliance with federal statute did not absolve Defendants of their duty to comply with the filings requirements of the CSA. *See* 17 C.F.R. § 230.500.

**D. Claimed Defenses**

First, Defendants' testimony suggests they believe any claimed failure to comply with the CSA should be excused because they relied on advice from their attorney. Good faith reliance on advice of counsel is not a complete defense to securities law violations, but it is a factor to consider regarding a defendant's scienter. *See People v. Terranova*, 563 P.2d 363, 366-67 (Colo. App. 1976). It is not a defense to any claims that do not include the scienter element. To establish the defense, Defendants must prove: (1) a request for advice of counsel on the legality of a proposed action; (2) full disclosure of the relevant facts to counsel; (3) receipt of advice from counsel that the action to be taken will be legal; and (4) reliance in good faith on counsel's advice. *C.E. Carlson, Inc. v. S.E.C.*, 859 F.2d 1429, 1436 (10th Cir. 1988). Neither McKowen or Harding presented sufficient evidence to support the elements of this defense. At most, they testified that they relied on their attorney's advice that their subscription documents and SEC filings were

sufficient to qualify for federal registration exemptions. They presented no evidence that their counsel was asked for or provided any advice regarding disclosure obligations under the CSA.

Second, Defendant McKowen asserts that the Commissioner's claims are barred by the statute of limitations set forth in § 11-51-604(8). The Court rejects this assertion. The statute of limitations in this section does not apply to the claims brought by the Commissioner. The CSA specifies limitations periods for private securities law claims brought by persons under § 11-51-604. The Commissioner brought her enforcement action under § 11-51-602, which contains no statute of limitations. To the contrary, that section allows the Commissioner to bring claims for injunctive relief "whenever" it appears that any person has engaged in any act or practice constituting a violation of the CSA. *See* § 11-51-602(1). Inclusion of claims for damages under § 11-51-602(2), which references § 11-51-604, does not import the private action statute of limitations set forth in § 11-51-604. The only limitation on damages claims brought by the Commissioner is that the applicable scienter standard of § 11-51-604 must be met. Accordingly, Defendants have not shown that the Commissioner's claims are barred by any statute of limitations.

**E. Remedies**

The Commissioner requests joint and several judgment against Defendants for restitution, disgorgement or other equitable relief, pursuant to § 11-51-602(1). In addition, the Commissioner claims damages under §§ 11-51-602(2) and 11-51-604(1), 2(a), (3), (4), and (5). Restitution is an equitable remedy that provides "a measure of damages which restores a party to his/her prior status." *Zeke Coffee, Inc. v. Pappas-Alstad Partnership*, 370 P.3d 261, 265 (Colo. App. 2015). It seeks to prevent unjust enrichment of the defendant's gain. *Earthinfo, Inc. v. Hydrosphere Resource Consultants*, 900 P.2d 113, 118 (Colo. 1995). Damages for registration and licensing

violations are calculated by the amount of the consideration paid for the security less any income received on the security. § 11-51-604(1), (2)(a). Damages may not be awarded under 604(1) if the only violation is failure to file the required notice of registration exemption or pay the required fee. § 11-51-602(2); § 11-51-604(1). For fraud violations, the CSA gives the Court broad discretion to award damages to make the investors whole, including the calculation of rescission or actual damages. § 11-51-604(3) and (4). The CSA provides for joint and several liability among all actors involved in CSA violations, including control persons who did not directly participate. § 11-51-604(5).

Section 11-51-604(4) states that any person who sells a security in violation of § 11-51-501(1)(b) (the buyer not knowing of the untruth or omission) and who does not sustain the burden of proof that such person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security from such person, who may sue to recover the consideration paid for the security, together with interest at the statutory rate from the date of payment, costs, and reasonable attorney fees, less the amount of any income received on the security, upon the tender of the security, or is liable for damages if the buyer no longer owns the security. Damages are deemed to be the amount that would be recoverable upon a tender, less the value of the security when the buyer disposed of it, and interest at the statutory rate from the date of disposition. Section 11-51-604(4) gives the Court broad discretion to award damages to make the investors whole, including the calculation of rescission or actual damages.

The Court concludes as follows: (1) an injunction against Defendants is appropriate under § 11-51-602(1); and (2) damages, restitution, and disgorgement against Defendants and their related entities in default are appropriate under § 11-51-602(2) given Defendants' violations of §§

11-51-501, 401, and 301, as discussed above. In doing so, the Court reiterates that McKowen and Harding were directly involved in all of the conduct giving rise to liability in this case. Two Rivers and its subsidiaries were modest operations with a small, overlapping staff. As CEO of Two Rivers, McKowen controlled nearly all aspects of the business and its subsidiaries until his resignation in May 2016. After his resignation, McKowen continued to be involved in GrowCo as the largest shareholder and per the contracts he entered into with GrowCo to provide construction, consulting, and financial services. As CFO of Two Rivers until June 2016, Harding reviewed and signed all GrowCo investment documents and was responsible for securities regulatory filings. After McKowen's resignation, Harding took over as Two Rivers CEO with direct control over the GrowCo entities. Lastly, McKowen was the founder and manager of the VitaNova entities and McGrow. Neither McKowen nor Harding introduced any evidence to establish that they did not know the facts supporting the violations or that they did not directly or indirectly induce the entities to engage in fraud with respect to the investors. See § 11-51-604(5).

Finally, the Court observes that the Commissioner in her Proposed Findings of Fact and Conclusions of Law indicates that damages against Defendants should be awarded in the amount of $16,678,690.33—the amount of investor funds received during the offerings ($19,286,517.29) minus the amount of payments to investors ($2,607,826.96). The Court generally agrees. As discussed above, per the persuasive testimony of Ms. Martinez and Exhibits 141 and 1032, Two Rivers (in its five bank accounts) received $17,180,680.00 in investor funds; MCG Services, LLC (in its one account) received $1,078,538.00 in investor funds; and TR Capital Partners, LLC (in its one account) received $1,027,299.29 in investor funds, totaling $19,286,517.00. (FOF, ¶¶ 59, 110-115). Exhibit 141 further shows that Two Rivers made $2,262,553.89 in investor payments; MCG Services, LLC, made $134,916.65 in investor payments; and TR Capital Partners, LLC, made

$210,376.42 in investor payments, totaling $2,607,846.96. For the reasons stated previously, the Court concludes that the $100,000.00 in investor funds raised during the $1.5 Million Note (un-numbered offering) should be excluded in the damages calculation. Accordingly, the Court concludes that damages in the amount of $16,578,690.33 should be awarded against Defendants and their entities in default.

**FINAL ORDER**

The Court concludes the Commissioner has proven the following three claims by a preponderance of the evidence: (1) McKowen and Harding violated § 11-51-501(1)(a), (b), and (c) of the CSA by selling securities in a scheme to defraud investors, with untrue statements of material fact or omissions to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, or course of business that operated as a fraud on investors; (2) GrowCo and its related entities violated § 11-51-401 and § 11-51-402 of the CSA by using unlicensed sales representatives to offer and sell its securities without a lawful exemption; and (3) McKowen and Harding violated § 11-51-308(1)(p) of the CSA by not filing a notification of exemption with the Commissioner, and paying the required fee.

The Court hereby ORDERS as follows: (1) Defendants McKowen and Harding are enjoined from any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order; and (2) judgment in the amount of $16,578,690.33 is entered against Defendants McKowen; Harding; GrowCo, Inc.; GrowCo Partners 1, LLC; GrowCo Partners 2, LLC; GCP Super Units, LLC; VitaNova Partners, LLC; VitaNova Colorado, LLC; VitaNova, LLC; VitaNova, Inc.; McGrow, LLC; MCG, LLC; and GCO Land, LLC. The judgment is joint and several among all of these defendants.

IT IS SO ORDERED on this Wednesday, July 9, 2025.

BY THE COURT:

Christopher J. Baumann,
Chief Judge

Fill in this information to identify the case:

Debtor 1 John Roderick McKowen

Debtor 2 (Spouse, if filing) ____

United States Bankruptcy Court for the: District of Colorado

Case number 25-16665-KHT

DATE FILED: April 11, 2026 8:55 AM
FILING ID: EA297A56D0131
CASE NUMBER: 2021CV33922

## Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Prasil Family Matters LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ____

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes. From whom? VetaNova Inc, by Board Resolution Dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224.

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Thomas Prasil
Name

7275 N Scottsdale Rd - Unit 1007
Number Street

Paradise Valley AZ 85253
City State ZIP Code

Contact phone 312-286-5566

Contact email tsprasil1212@gmail.com

Where should payments to the creditor be sent? (if different)

Name ____

Number Street ____

City State ZIP Code ____

Contact phone ____

Contact email ____

Uniform claim identifier (if you use one)

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ____ Filed on ____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? ____



EXHIBIT 5

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

6. Do you have any number you use to identify the debtor?

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. How much is the claim?

$ 6,321,176.00. Does this amount include interest or other charges?
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Assigned beneficial interest under Huerfano County Deed of Trust No 404224 (Reception No 404224, Huerfano County, CO), pursuant to VetaNova Inc Board Resolution dated March 27, 2026. Paulson – preserved collection rights under GrowCo securities (Paulson v. Two Rivers, Civil Action No 19-cv-02639-PAB-NRN, D Colo.)

9. Is all or part of the claim secured?

☐ No
☑ Yes. The claim is secured by a lien on property.

Nature of property:

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ____________________

Basis for perfection: Deed of Trust No. 404224,, Huerfano County, Colorado. For Value of property and Amount secured

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ 6,321,176.00

Amount of the claim that is secured: $ 6,321,176.00

Amount of the claim that is unsecured: $ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $____________

Annual Interest Rate (when case was filed)_______%
☐ Fixed
☐ Variable

10. Is this claim based on a lease?

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $____________

11. Is this claim subject to a right of setoff?

☑ No
☐ Yes. Identify the property: ____________________

12 **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No
☐ Yes. *Check one:* — Amount entitled to priority

| | |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $__________ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $__________ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $__________ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $__________ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $__________ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $__________ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03/29/2026
MM / DD / YYYY

[signature]
Signature

**Print the name of the person who is completing and signing this claim:**

Name: Thomas Edward Prasil (First name / Middle name / Last name)

Title: Manager

Company: Prasil Family Matters LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 7275 N Scottsdale Rd - Unit 1007 (Number / Street)
Paradise Valley (City) AZ (State) 85253 (ZIP Code)

Contact phone: 312-286-5566 Email: tsprasil1212@gmail.com

# AMENDED RESOLUTION OF THE BOARD OF DIRECTORS OF VĒTANOVA INC.

*a Nevada Corporation*

Adopted by Written Consent of the Sole Director

March 27, 2026

## RECITALS

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP 1 Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2, Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240/AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VētaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

1. **Self-Executing Assignment of Individual Beneficial Interests.**

Effective immediately upon adoption of this Resolution, VētaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional — it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

**2. Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

3. **Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

4. **Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

5. **Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

6. **Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

7. **Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

8. **Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

9. **Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VētaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

*_/s/ John Roderick McKowen_*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

# VETANOVA INC.

Estimated Current Valuation (ECV) by Beneficial Owner

*Based on 75% Individual Beneficial Owner Allocation*

| Rank | Beneficial Owner | Ownership % | ECV Claim |
|---|---|---|---|
| 1 | JOHN R. MCKOWEN | 34.56% | $14,230,512 |
| 2 | PRASIL FAMILY MATTERS, LLC | 15.35% | $6,321,176 |
| 3 | JON D. AND LINDA W. GRUBER TRUST | 9.88% | $4,066,584 |
| 4 | RM MATERIALS LLC | 8.04% | $3,311,592 |
| 5 | I. WISTAR MORRIS | 7.84% | $3,229,994 |
| 6 | CEDE & CO | 4.73% | $1,947,837 |
| 7 | LEE JAMES WAGNER | 4.02% | $1,655,404 |
| 8 | MARK E. ANDERSON MD APC PSP & T | 4.01% | $1,650,801 |
| 9 | GEORGE MCCAFFREY | 3.72% | $1,533,676 |
| 10 | LOUISE LOWE | 1.18% | $487,680 |
| 11 | SAMUEL W. MORRIS, JR. | 0.74% | $306,087 |
| 12 | RUSSELL COPPOCK | 0.69% | $284,480 |
| 13 | COTSWOLD FOUNDATION | 0.52% | $215,794 |
| 14 | MICHAEL HARNISH IRA RESOURCES | 0.44% | $182,039 |
| 15 | MICHAEL MCCULLOUGH | 0.34% | $138,176 |
| 16 | MFFI, LLC | 0.29% | $117,904 |
| 17 | HEATHER BURSHTEN | 0.26% | $107,675 |
| 18 | MICHAEL & LINDA HARNISH REVOCABLE | 0.25% | $101,260 |
| 19 | WAYNE HARDING | 0.23% | $93,212 |
| 20 | MICHAEL BARISH | 0.21% | $87,779 |
| 21 | CORY BATAAN | 0.20% | $80,756 |
| 22 | CHARLES BLOOM | 0.20% | $80,756 |
| 23 | JOHN GROSSO | 0.20% | $80,756 |
| 24 | JAN MCCAFFREY | 0.20% | $80,756 |
| 25 | JOSEPH MCKOWEN | 0.20% | $80,756 |
| 26 | LAURA MCKOWEN | 0.20% | $80,756 |
| 27 | PORTER FAMILY LIVING TRUST DTD 9-5-2006 | 0.20% | $80,756 |
| 28 | TRICIA VARRASSO | 0.20% | $80,756 |
| 29 | MARTHA MORRIS | 0.17% | $69,625 |
| 30 | ELEVENTH GENERATION | 0.16% | $67,748 |
| 31 | PETER AMMENTORP | 0.15% | $60,803 |
| 32 | TERRY GRUBER | 0.11% | $44,696 |
| 33 | MELISSA RICHARDS IRA | 0.09% | $38,359 |
| 34 | JOHN P. BROOKS | 0.07% | $30,504 |
| 35 | JEANNE BROOKS | 0.07% | $30,401 |
| 36 | BILL REEB | 0.07% | $30,401 |
| 37 | CARL SWARTS | 0.07% | $27,412 |
| 38 | JOHN BROOKS | 0.06% | $26,498 |
| 39 | MARSHA WALKER | 0.04% | $16,353 |
| 59 | *PRIOR SHELL HOLDOVERS* | 0.02% | $7,833 |
| | **Reserved — Spinoff Entity** | **25.00%** | **$13,725,000** |
| | **GRAND TOTAL** | **100.00%** | **$54,900,000** |

*RISK DISCLOSURE: This ECV is for informational purposes only in connection with In re VetaNova Inc. Case No. 24-15438 (Bankr. D. Colo.) and does not guarantee any distribution. The $54.9M total is a preliminary estimate subject to material change; no independent appraisal has been obtained.*

## IMPORTANT NOTICE

All references in this document to the Bond Exchange, the Plan of Reorganization, or any securities offering are subject to approval by the United States Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT. No offering will be made and no bonds will be issued unless and until the Court confirms the Plan. Nothing in this document constitutes an offer to sell or a solicitation of an offer to buy any securities. Filing a Proof of Claim does not commit you to participate in any capital raise.

# Avondale Greenhouse Development

Transaction Overview for VētaNova Beneficial Interest Holder ("VBHI")

VētaNova Inc. | March 27, 2026 | CONFIDENTIAL — SUBJECT TO NDA



*This document describes the transaction that VētaNova Inc. is actively structuring with a qualified acquiring group that has approached us and is driving toward definitive agreements. The acquiring group is eager to move forward and has committed significant resources to due diligence, site assessment, and project planning. That said, nothing is done until the ink is dry and initial capital is exchanged. The structure, terms, and timeline remain subject to final negotiation, and the transaction requires Bankruptcy Court approval, regulatory compliance, and other conditions described herein.*

## Action Required: File Your Claim

**Every VētaNova Beneficial Interest Holder must file a proof of claim in the Chapter 11 case.** Filing a claim costs nothing except some time and postage. It is the only way to preserve your rights in the reorganization and ensure your participation in the value described in this document—the reverse merger, the 25% equity in the Surviving Company, the water rights in Spinoff Co., and the Paulson collection rights.

**If you do not file a claim, your VBHI remains with VētaNova**—you lose direct ownership—so you must file to ensure your VBHI claim is recognized, scheduled, and protected through the confirmation process. The Bankruptcy Court requires that creditors and interest holders affirmatively assert their claims. This is a simple, no-cost step that protects your position in everything that follows.

### How to File

- **Cost:** None—filing a proof of claim is free.
- **What you need:** A completed Proof of Claim form (Official Form 410), documentation of your investment (subscription agreements, cancelled checks, wire confirmations, or account statements), and postage to mail it to the court.
- **Where to file:** U.S. Bankruptcy Court, District of Colorado—Case No. 25-16665-KHT.
- **Deadline:** Check the court docket for the claims bar date—do not wait.

***Do not let a simple paperwork step cost you your position in the reorganized enterprise. File your claim now.***

## The Opportunity

A world-class team of international greenhouse specialists has approached VētaNova Inc. to develop a commercial greenhouse operation on approximately 157 acres of VētaNova-owned land in Avondale, Pueblo County, Colorado. This group identified our property and came to us. They bring proven experience constructing and operating over 160 acres of commercial greenhouse production, integrated climate automation systems installed across six continents, and over 175 years of combined institutional expertise in greenhouse engineering and technology.

Site assessment is already underway at their initiative. The property has access to plentiful multi use water supply through the St. Charles Water District, natural gas service, and favorable solar exposure. A mutual NDA has been executed and the acquiring group is actively requesting

land surveys, topographical data, and water availability information to prepare a site layout and project quotation. They are moving with purpose.

## Why This Is Not a Farm

This is not traditional agriculture. This is the convergence of three transformative technologies—**Artificial Intelligence**, **Robotics**, and **Controlled Environment Agriculture** (CEA)—into a single, integrated platform. The market does not value this as dirt farming. It values it as technology.

Modern commercial greenhouse operations deploy AI-driven climate management that optimizes temperature, light, humidity, $CO_2$ levels, and nutrient delivery in real time—maximizing yield per square foot while minimizing water, energy, and labor inputs. Robotic systems handle planting, harvesting, grading, and packing with precision and consistency that manual labor cannot match. CEA eliminates weather risk, seasonal constraints, and the inefficiencies of open-field agriculture entirely. The result: year-round production, dramatically higher yields per acre, 90%+ reduction in water usage compared to conventional farming, and a predictable, controllable output.

The facility will also integrate **Cogeneration ("CoGen")**—a combined heat and power system that simultaneously generates electricity and captures the thermal byproduct for direct use in the greenhouse. Instead of venting waste heat, a CoGen plant recycles it to maintain optimal growing temperatures, supplement $CO_2$ enrichment for accelerated plant growth, and drive absorption cooling during peak summer months. The electricity generated offsets or eliminates grid dependence, and surplus power can be sold back to the utility. CoGen transforms the greenhouse from an energy consumer into an energy producer, dramatically reducing operating costs while improving environmental performance. It is a force multiplier: one fuel input produces three outputs—electricity, heat, and $CO_2$—all of which the greenhouse consumes. This is the kind of integrated infrastructure the acquiring group intends to develop and refine at Avondale before deploying nationally.

**This matters to you as an investor.** Traditional agriculture trades at 8–12x earnings. Technology-integrated CEA companies—the ones deploying AI, robotics, and automation at scale—command PE ratios of **20x and above**. The public markets price these operations as tech platforms, not farms, because that is what they are: scalable, data-driven, resource-efficient systems that happen to produce food. The acquiring group's intention is to use Avondale as their national home base—not just a single greenhouse, but a technology application development campus where AI, robotics, and CEA systems are developed, tested, and refined before being deployed to facilities nationwide. They are building a platform, and Avondale is

where it starts. When the Surviving Company goes public through the reverse merger, it enters the market as an AI-integrated CEA platform with national expansion plans, 157 acres of anchor capacity, unlimited water, and a world-class build team already in motion. That is the multiple your 25% equity stake will be valued against.

## The Transaction

VētaNova will enter into a reverse merger with the acquiring group's entity (the "Surviving Company"). VētaNova contributes the **157-acre Avondale property**; the acquiring group contributes its expertise, management team, and operational infrastructure. The Surviving Company constructs and operates the greenhouse and goes public through the reverse merger. We control the asset they need. They bring the capability to develop it.

Simultaneously, a **new spinoff company** ("Spinoff Co.") is created for the exclusive benefit of John McKowen and VētaNova's beneficiary-shareholders—that's you.

## What You Receive

As a VētaNova beneficiary-shareholder, you will receive shares in Spinoff Co. proportional to your current ownership. Spinoff Co. holds three things on your behalf:

1. **25% equity in the Surviving Company.** This gives you direct ownership in the operating greenhouse business—a funded, professionally managed agricultural operation on land that VētaNova already owns.

2. **All water rights.** The Butte Valley and Orlando Reservoir water rights (estimated current value of approximately $51.4 million based on comparable transactions) transfer to Spinoff Co., not to the Surviving Company. These assets remain with you. The focus of Spinoff Co. will be to sell the Butte Valley water assets and distribute cash directly to the beneficial owners.

3. **All beneficial interests under Deed of Trust No. 404224.** Your collection rights, as preserved under the Paulson Complete Bar Order, remain intact and are held by Spinoff Co. for your benefit.

### TRANSACTION STRUCTURE




## Asset Separation

The transaction is structured to separate operating assets from the underlying security. The Surviving Company receives only what it needs to build and operate the greenhouse: the 157 acres of Avondale land and the bond exchange financing. Everything else—the water rights representing the bulk of the $54.9 million estimated valuation, the Deed of Trust interests, and the Paulson collection rights—stays with Spinoff Co. for your benefit.

This is by design and non-negotiable. The acquiring group gets land and capital to build a greenhouse. You keep the water and the security. We are not giving away the store.

## Bond Exchange Capital Raise

The greenhouse build-out will be funded through a bond exchange raising up to $10,000,000 in three tranches:

- Tranche A — **6% Convertible Bonds. $2,500,000 at $0.25 per bond (75% discount to face value). Investors contribute $0.50 in cash and surrender two existing VTNA shares to receive two 6% Convertible Bonds with $1.00 face value each. This structure rewards existing shareholders who move first.**
- Tranche B — **$2,500,000 at $0.875 per bond** (12.5% discount). Straight cash purchase, no share surrender required.
- Tranche C — **$5,000,000 at $1.00 per bond** (at par).

## Path to Liquidity

Following the reverse merger and formation of Spinoff Co., an SB-2 registration statement will be filed with the SEC to register Spinoff Co.'s shares. Upon effectiveness, your shares in Spinoff Co. become registered securities—giving you liquidity in a company that holds a 25% equity stake in an operating greenhouse company, plus water rights valued at approximately $51.4 million. Spinoff Co.'s principal objective will be the orderly sale of the Butte Valley water assets and direct cash distribution to beneficial owners. You get paid.

## Condition Precedent

VētaNova's contribution of the Avondale property is expressly conditioned on the beneficiary-shareholders receiving Class 3B voting rights in John McKowen's Chapter 11 bankruptcy case (No. 25-16665-KHT, filed October 14, 2025), consistent with the Board Resolution adopted March 27, 2026. The Court will hold a telephonic hearing on the Amended Disclosure Statement on **April 14, 2026 at 1:30 PM**. Objections are due by **April 6, 2026**. Counsel is being retained on your behalf, as described in separate correspondence.

### Confidentiality

*This document contains confidential information subject to a mutual non-disclosure agreement. The identity and proprietary details of the operating partners, the project quotation, technical specifications, and financial terms are strictly confidential and may not be disclosed to any third party without the prior written consent of VētaNova Inc. Your receipt of this document confirms your acknowledgment of these obligations.*

IMPORTANT NOTICE

*This document is for informational purposes only and does not constitute an offer to sell or a solicitation of an offer to buy any securities. A solicitation can only be made by means of an approved Disclosure Statement and Plan of Reorganization, after such Disclosure Statement has been approved by the United States Bankruptcy Court. The Plan of Reorganization and Disclosure Statement filed in Case No. 25-16665-KHT have not yet been approved by the Court. No securities may be offered or sold absent registration under the Securities Act of 1933, as amended, or an applicable exemption therefrom. Nothing in this document should be construed as legal, financial, or investment advice. Estimated valuations are based on comparable transactions and are not guaranteed. You should consult your own legal and financial advisors before making any investment decisions.*

**Fill in this information to identify the case:**

CASE NO:
25-16665-KHT

Debtor 1 ____

Debtor 2 ____
(Spouse, if filing)

United States Bankruptcy Court for the: ____ District of ____

Case number ____

FILED
U.S. COURT
APR - 2 2026
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

# Official Form 410
# Proof of Claim

**Read the instructions before filling out this form. This form is for making a claim for pay... make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents; they may be destroyed after scanning.** If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

MARK E. ANDERSON MD APC PSP ITT
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ____

**2. Has this claim been acquired from someone else?**

☐ No
☒ Yes. From whom? VETANOVA INC By Board Resolution March 27, 2026 assigning individual beneficial interest under Hot Aero Co Deed of Trust no 2704224

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

MARK E. ANDERSON MD
Name

21 SOUTHAMPTON CT
Number Street

NEWPORT Beach, CA 92660
City State ZIP Code

Contact phone 949-527-5891

Contact email mp and @prodigy.net and wmi 88@yahoo.com

Uniform claim identifier (if you use one):

____

Where should payments to the creditor be sent? (if different)

____
Name

____
Number Street

____
City State ZIP Code

Contact phone ____

Contact email ____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes. Claim number on court claims registry (if known) ____ Filed on ____ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? ____

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

☒ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ 1,650,801.⁰⁰

Does this amount include interest or other charges?
☒ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Assigned beneficial interest under Huerfano County Deed of Trust No. 404224 (reception No. 404224 Huerfano County, CO) pursuant to Veteran[illegible] Board Resolution dated March 27, 2026. Preserved collection rights under Gr[illegible] Co securities (Andrews v. Two Rivers, civil action No 19-cv-02C39-PAB-NRN, D. Colo)

**9. Is all or part of the claim secured?**

☐ No
☒ Yes. The claim is secured by a lien on property.

Nature of property:

☒ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ______________________

Basis for perfection: Deed of Trust No 404224 Huerfano Co Colorado for Value of Property [illegible]

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ 1,650,801.

Amount of the claim that is secured: $ 1,650,801.

Amount of the claim that is unsecured: $ 0 (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $______________

Annual Interest Rate (when case was filed) ______%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☒ No
☐ Yes. Amount necessary to cure any default as of the date of the petition. $______________

**11. Is this claim subject to a right of setoff?**

☒ No
☐ Yes. Identify the property: ______________

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $________ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $________ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $________ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $________ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $________ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $________ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☒ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03 29 2026
MM / DD / YYYY

[signature]
Signature

Print the name of the person who is completing and signing this claim:

Name: Mark (First name) Eugene (Middle name) Anderson MD (Last name)

Title: Owner

Company: Mark E. Anderson MD APC PSP&T
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 21 (Number) Southampton Ct (Street)
Newport Beach (City) CA (State) 92660 (ZIP Code)

Contact phone: 949-527-5891 Email: meamd@pacbell.net / wm788@yahoo.com

# AMENDED RESOLUTION OF THE BOARD OF DIRECTORS
# OF
# VĒTANOVA INC.

*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

## RECITALS

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP I Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2, Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240/AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VētaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

**1. Self-Executing Assignment of Individual Beneficial Interests.**

Effective immediately upon adoption of this Resolution, VētaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional—it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

2. **Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

3. **Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

4. **Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

5. **Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

6. **Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

7. **Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

8. **Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

9. **Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT—with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VētaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

*/s/ John Roderick McKowen*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

Fill in this information to identify the case:

Debtor 1 John Roderick McKowen

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: District of Colorado

Case number 25-16665-KHT

FILED
CLERK OF COURT
APR - 2 2026
U.S. B[illegible]
DISTRICT OF COLORADO

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents; they may be destroyed after scanning.** If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

MFFI LLC
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes. VitaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224.

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name: MFFI LLC | Name: MFFI LLC |
| Number Street: 5201 Madison Creek Dr | Number Street: 5201 Madison Creek Dr |
| City: Fort Collins State: CO ZIP Code: 80528 | City: Fort Collins State: CO ZIP Code: 80528 |
| Contact phone: 970.481.0755 | Contact phone: 970.481.0755 |
| Contact email: dvdjhmrhl@yahoo.com | Contact email: dvdjhmrhl@yahoo.com |

Uniform claim identifier (if you use one):

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) Filed on MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**
   ☑ No
   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___

7. **How much is the claim?** $ 112,891.00. **Does this amount include interest or other charges?**
   ☑ No
   ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c)
   Lim t disclosing information that is entitled to privacy, such as health care information.

   Assigned beneficial interest under Huerfano County Deed of Trust No. 404224 (Reception No. 404224, Huerfano County, CO), pursuant to VetaNova Inc. Board Resolution dated March 27, 2026. Paulson-preserved collection rights under GrowCo securities (Paulson v. Two Rivers, Civil Action No. 19-cv-02639-PAB-NRN, D. Colo).

9. **Is all or part of the claim secured?**
   ☐ No
   ☑ Yes The claim is secured by a lien on property.

   **Nature of property:**
   ☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
   ☐ Motor vehicle
   ☐ Other. Describe ______________________

   **Basis for perfection:** **Deed of Trust No. 404224, Huerfano County, Colorado. For Value of property and Amount secured**
   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:** $ 112,891
   **Amount of the claim that is secured:** $ 112,891
   **Amount of the claim that is unsecured:** $ 0 (The sum of the secured and unsecured amounts should match the amount in line 7)
   **Amount necessary to cure any default as of the date of the petition:** $ ______

   Annual Interest Rate (when case was filed) ______ %
   ☐ Fixed
   ☐ Variable

10. **Is this claim based on a lease?**
    ☑ No
    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ ______

11. **Is this claim subject to a right of setoff?**
    ☑ No
    ☐ Yes. Identify the property: ______________________

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No
☐ Yes. *Check one.*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03/28/2026
MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

Name: David J Marshall
First name / Middle name / Last name

Title: Member

Company: MFFI LLC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 5201 Madison Creek Dr
Number / Street

Fort Collins CO 80528
City / State / ZIP Code

Contact phone: 970.481.0755 Email dvdjhmrhl@yahoo.com

AMENDED RESOLUTION OF THE BOARD OF DIRECTORS
OF
VĒTANOVA INC.
*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

RECITALS

**WHEREAS,** VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS,** VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS,** approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS,** twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP I Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS,** the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS,** the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS,** John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional — it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

**2. Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

7. **Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

8. **Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

9. **Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT— with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VētaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

*/s/ John Roderick McKowen*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

**Fill in this information to identify the case:**

Debtor 1: John Roderick McKowen

Debtor 2 (Spouse, if filing): 

United States Bankruptcy Court for the: District of Colorado

Case number: 25-16665-KHT

CLERK OF COURT
APR - 2 2026
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents; they may be destroyed after scanning. If the documents are not available,** explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

Michael & Linda Harnish Revocable Trust
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor: 

**2. Has this claim been acquired from someone else?**

☐ No
☑ Yes. From whom? VetaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Name: Michael Harnish
Number Street: 3367 NW Lacamas Drive
City: Camas State: WA ZIP Code: 98607
Contact phone: (971) 998-2456
Contact email: mharnish1@icloud.com

**Where should payments to the creditor be sent? (if different)**

Name: 
Number Street: 
City: State: ZIP Code: 
Contact phone: 
Contact email: 

Uniform claim identifier (if you use one): 

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) ______ Filed on MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? ______

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

6. Do you have any number you use to identify the debtor?
☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ______

7. How much is the claim? $ 101,260.00

**Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Assigne[illegible] st under Huerfa[illegible] pursua[illegible], Board Resolut[illegible] securiti[illegible] Rivers Civil A[illegible]

9. Is all or part of the claim secured?
☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**
☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mort[illegible]* *Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ______

**Basis for perfection:** [illegible]

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 101,260.00

**Amount of the claim that is secured:** $ 101,260.00

**Amount of the claim that is unsecured:** $ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ ______

**Annual Interest Rate** (when case was filed) ______%
☐ Fixed
☐ Variable

10. Is this claim based on a lease?
☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ ______

11. Is this claim subject to a right of setoff?
☑ No
☐ Yes. Identify the property: ______

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No
☐ Yes. *Check one*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $______ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $______ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $______ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $______ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $______ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $______ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

**If you file this claim electronically,** FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03/30/2026
MM / DD / YYYY

____________________
Signature

**Print the name of the person who is completing and signing this claim:**

Name: Michael (First name) Wyly (Middle name) Harnish (Last name)

Title: Self

Company: ________
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 3367 NW Lacamas Drive (Number Street)
Camas (City) WA (State) 98607 (ZIP Code)

Contact phone: (971) 998-2456 Email: mharnish1@icloud.com

# AMENDED RESOLUTION OF THE BOARD OF DIRECTORS
# OF
# VĒTANOVA INC.

*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

## RECITALS

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests held across the GCP I Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2, Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240/AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VētaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

1. **Self-Executing Assignment of Individual Beneficial Interests.**

Effective immediately upon adoption of this Resolution, VetaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional—it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

2. **Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

/

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

**3. Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

**4. Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

**5. Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

**6. Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

7. **Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

8. **Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

9. **Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT—with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VetaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

/s/ *John Roderick McKowen*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

**Fill in this information to identify the case:**

Debtor 1 John Roderick McKowen

Debtor 2 (Spouse, if filing)

United States Bankruptcy Court for the: District of Colorado

Case number 25-16665-KHT

FILED CLERK OF COURT APR -2 2026 U.S. B... DISTRICT OF COLORADO

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents; they may be destroyed after scanning.** If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

**Part 1: Identify the Claim**

1. **Who is the current creditor?**

MICHAEL HARNISH IRA RESOURCES
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

2. **Has this claim been acquired from someone else?**

☐ No
☑ Yes. From whom? VetaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Michael Harnish
Name

3367 NW Lacamas Drive
Number Street

Camas WA 98607
City State ZIP Code

Contact phone (971) 998-2456

Contact email mharnish1@icloud.com

Uniform claim identifier (if you use one)

**Where should payments to the creditor be sent? (if different)**

Name

Number Street

City State ZIP Code

Contact phone

Contact email

4. **Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) Filed on MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor ____ ____ ____ ____

**7. How much is the claim?**

$ 182,039.00 . **Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Assigned beneficial interest under Huerfano County Deed of Trust No. [illegible] (Reception No. 40]224, Huerfan[illegible] pursuant to VetaNova Inc. Board Resolution dated March 27, 2026. Paulson [illegible] collection rights under G[illegible] securities (Paulson v. Two Rivers, Civil Action No. 19-cv-[illegible] PAB-NRN, D. Colo.)

**9. Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: ____________________

**Basis for perfection:** Deed of Trust [illegible], Huerfano County, Colorado

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ 182,039.00

**Amount of the claim that is secured:** $ 182,039.00

**Amount of the claim that is unsecured:** $ 0.00 (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ ____________

**Annual Interest Rate** (when case was filed) ____ %

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ ____________

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: ____________________

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one.*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $____________ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $____________ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $____________ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $____________ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $____________ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $____________ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date 03/30/2026
MM / DD / YYYY

______________________________
Signature

**Print the name of the person who is completing and signing this claim:**

Name: Michael (First name) Wyly (Middle name) Harnish (Last name)

Title: Self

Company: ______________________________
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 3367 NW Lacamas Drive (Number Street)

Camas (City) WA (State) 98607 (ZIP Code)

Contact phone: (971) 998-2456 Email: mharnish1@icloud.com

# AMENDED RESOLUTION OF THE BOARD OF DIRECTORS OF VĒTANOVA INC.

*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

## RECITALS

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP 1 Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2. Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240 AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VetaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

**1. Self-Executing Assignment of Individual Beneficial Interests.**

Effective immediately upon adoption of this Resolution, VētaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional—it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

2. **Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage.

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

3. **Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

4. **Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

5. **Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

6. **Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

7. **Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

8. **Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

9. **Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT—with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VetaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

/s John Roderick McKowen
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

| | |
|---|---|
| DISTRICT COURT DENVER COUNTY, COLORADO<br>1437 Bannock Street<br>Denver, CO 80202 | |
| TUNG CHAN, Securities Commissioner for the State of Colorado,<br><br>Plaintiff,<br><br>v.<br><br>TWO RIVERS WATER & FARMING COMPANY; GROWCO, INC.; GROWCO PARTNERS 1, LLC; GROWCO PARTNERS 2, LLC; GROWCO PARTNERS SUPER UNITS, LLC; TR CAPITAL PARTNERS, LLC; VITANOVA PARTNERS, LLC; VITANOVA, INC.; VITANOVA, LLC; VITANOVA COLORADO, LLC; McGROW, LLC; MCG, LLC; GCO LAND, LLC; WATERTON FINANCIAL, INC.; JOHN RODERICK McKOWEN; JAN McCAFFREY; GEORGE McCAFFREY; WAYNE HARDING; AND KIRSTY CAMERON,<br><br>Defendants. | DATE FILED<br>April 14, 2026 8:55 AM<br>FILING ID: EA297A56D0131<br>CASE NUMBER: 2021CV33922<br><br>▲ COURT USE ONLY ▲ |
| PHILIP J. WEISER, Attorney General<br>ROBERT W. FINKE, 40756*<br>First Assistant Attorney General<br>SARAH P.J. DONAHUE, 45212*<br>Assistant Attorney General II<br>Ralph L. Carr Judicial Building<br>1300 Broadway, 8th Floor<br>Denver, CO 80203<br>Tel: (720) 508-6401<br>Fax: (720) 508-6037<br>Robert.Finke@coag.gov<br>Sarah.Donahue@coag.gov<br>*Counsel of Record | Case No. 2021CV033922<br><br>Courtroom: 259 |

**VERIFICATION OF JOSEPH BURTNESS IN SUPPORT OF PLAINTIFF'S *EX PARTE* MOTION PURSUANT TO C.R.C.P. 107(C) FOR ISSUANCE OF CONTEMPT CITATION AND ORDER TO SHOW CAUSE**

EXHIBIT
1

I, Joseph Burtness, hereby submit this Verification, filed in support of Plaintiff's *Ex Parte* Motion Pursuant to C.R.C.P. 107(c) for Issuance of Contempt Citation and Order to Show Cause:

1) My name is Joseph Burtness, and I am an Investigator with the Colorado Division of Securities.

2) I am familiar with John Roderick McKowen, a Defendant in the above-captioned case, and am aware that this Court entered a final order enjoining him from "any participation in private securities transactions in or from the state of Colorado for twenty (20) years from the date of this Order."

3) I am also aware that Mr. McKowen filed for Chapter 11 bankruptcy in his personal capacity in the U.S. Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT.

4) I reviewed filings McKowen submitted in the bankruptcy matter. I saw that McKowen had submitted a reorganization plan in this matter that includes the issuance of securities in VetaNova, Inc. His Supplemental Disclosure, attached hereto as Exhibit A, appears to include an offering of securities.

5) For example, McKowen articulates the amounts and structures of three financing rounds through the issuance of the "Plan Bonds," which he states are "6% Secured Convertible Bonds intended to be issued by VetaNova Inc. pursuant to and under the Plan following confirmation." Exhibit A at p. 2. In addition to articulating details about the offering,

McKowen stated that the "Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort," which he defined as the "Eligible Investors." *Id.* at p. 2. Then, beginning at page 10 of Exhibit B, McKowen articulated the Memorandum of Terms for the purchase of bonds by Eligible Investors. *Id.* at pp. 10-15.

6) McKowen also included in his filings a list of eligible investors in this VetaNova offering. *Id.* at pp. 16-20. Some of these investors are from Colorado.

7) As part of my investigation, I called Colorado investors listed in McKowen's Supplemental Disclosure to determine what information they had, if any, regarding the VetaNova offering.

8) I received a response from an investor named Dave Marshall, who forwarded to me two emails he received from McKowen on March 25, 2026 and March 28, 2026. *See* Exhibits B and C.

9) McKowen's emails to Marshall provided Marshall instructions on how to file a Proof of Claim in McKowen's personal bankruptcy case, along with a copy of the Amended Board Resolution.

10) I also contacted Jennifer McCallum, an attorney who had entered an appearance in McKowen's personal bankruptcy case on behalf of some of McKowen's creditors. At least one of the creditors she represents is an elderly individual identified as one of the "Eligible Investors" by McKowen in his Supplemental Disclosure.

11) McCallum also sent to me an email that was sent to "Eligible Investors" on March 28, 2026. This email contains the same context as the one received by Dave Marshall on March 28, 2026, which provides instructions to investors on how to file proofs of claim in the personal bankruptcy case. In this email, McKowen tells investors: "Your interest vests when you file your Proof of Claim – if you don't file, the interest reverts back to VetaNova." Exhibit D.

12) Based upon these filings submitted by McKowen and from emails sent by McKowen to "eligible investors," I believe that McKowen is participating in private securities transactions in or from the state of Colorado, in violation of the Court's July 2025 Order.

I affirm by my signature that the statements above are true to the best of my knowledge.

Respectfully submitted this 10th day of April, 2026.

*/s/ Joseph Burtness*
JOSEPH BURTNESS

FILED
CLERK OF COURT
JAN 13 2026
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

In re: JOHN RODERICK McKOWEN,

Debtor.

Case No. 25-16665-KHT (Chapter 11)

---

## SUPPLEMENT TO DISCLOSURE STATEMENT

---

This Supplement to Disclosure Statement (the "Supplement") is filed to provide additional disclosure regarding the Plan's structured financing rounds referenced in Article X (Means for Implementation) of the Proposed Chapter 11 Plan filed December 8, 2025 (Doc. 38) (the "Plan"). This Supplement is intended to be read together with the Disclosure Statement filed December 8, 2025 (Doc. 39) and the Plan. This Supplement provides implementation detail developed after substantial deliberation and planning and is filed as a follow-up to the Plan's contemplated financing rounds; it is not filed to modify the classification or treatment of Classes 1–5.

1. **Business Model.** The Debtor's business model is not to operate an agricultural or technology business on a day-to-day basis. Instead, the Debtor uses VetaNova Inc. as a compliant public capital vehicle to assemble, finance, and validate an asset-anchored platform and then to identify and pair that platform with a qualified operating candidate. In this case, the Debtor intends to identify a third-party operating business that is seeking to go public and that operates within a business category and market style the Debtor determines to be appropriate. The Debtor's role is to structure the financing, preserve investor continuity, and allocate operating responsibility to such an operating candidate pursuant to the Plan, rather than assuming ongoing operating or execution risk itself.

EXHIBIT A

2. **Collateral Ownership and Perfection.** The collateral securing the Plan Bonds consists of two properties currently owned by VetaNova Inc. and incorporated into the Plan's collateral platform. The Debtor holds an approximately thirty-four percent (34%) equity interest in VetaNova Inc. As part of the Round A financing and implementation milestones, the Debtor will undertake actions necessary to perfect and document title, recording, and lien posture so that the ownership record and the security package are fully perfected of record. These steps strengthen and evidence the collateral position and do not alter current ownership of the properties.

3. **Water Thesis and Technology-Ready Use.** A core premise of the Plan's collateral platform is that modern, commercially available sensing, automation, and data-driven control technologies can expand productive use within water-prior-appropriation-controlled environments that are not well suited to conventional farming practices. By enabling more precise monitoring and control of growing conditions and resource inputs, an operator can pursue consistent production within a constrained water-rights and delivery regime. The Debtor does not propose to design, develop, or operate such systems internally; rather, the platform is structured to be technology-ready so that a qualified third-party operator or operating candidate may deploy state-of-the-art AI-enabled, sensor-driven, and robotic control systems consistent with prevailing industry practices, following validation through the Plan's financing rounds.

4. **Plan Bond Characteristics.** The Plan Bonds are 6% Secured Convertible Bonds intended to be issued by VetaNova Inc. pursuant to and under the Plan following confirmation, in three financing rounds capped at $2,000,000 for Round A, $3,000,000 for Round B, and $5,000,000 for Round C, with no minimum funding requirement and with qualified proceeds

accepted when received. The Plan Bonds are secured by the Plan collateral package consisting primarily of two properties currently owned by VetaNova Inc., in which the Debtor holds an approximately thirty-four percent (34%) equity interest, with lien priority to be established and perfected through the Round A title, recording, and lien-perfection steps described in this Supplement. The Plan Bonds include a conversion feature permitting bondholders, at their election and on the terms set forth in the definitive Bond Documents, to convert outstanding principal and accrued interest into equity securities of VetaNova, thereby allowing bondholders to transition from a secured creditor position to an equity ownership position aligned with VetaNova's post-confirmation capitalization and business strategy. The Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort and, together with any securities issued upon conversion, are intended to qualify for exemption from Securities Act registration under 11 U.S.C. § 1145 without reliance on Regulation D, Rule 506, or any "accredited investor" framework.

5. **Summary of the Plan Bonds Program (Rounds A, B, and C).** The Plan's structured financing is implemented through rounds of 6% Secured Convertible Bonds (the "Plan Bonds") intended to be issued by VetaNova Inc. ("VetaNova") pursuant to and under the Plan following confirmation. The rounds are as follows:

   Round A: $2,000,000 principal cap.

   Round B: $3,000,000 principal cap.

   Round C: $5,000,000 principal cap.

   There is no minimum funding requirement for the Plan. Qualified proceeds may be accepted when received.

6. **Intended Goal for VetaNova – Avondale PILOT Platform.** The intended goal of VetaNova is to establish a modular, asset-anchored PILOT platform at Avondale that integrates land, water, energy, and compute into a single, expandable operating footprint. The PILOT is designed to validate layout, utilities, throughput, and governance before disciplined replication.

7. **Use of Proceeds & Goals**

Bond proceeds are allocated to the Use of Proceeds for identified Goals as outlined below:

| FINANCING ROUND | USES OF PROCEEDS & GOALS |
|---|---|
| **Round A**<br>$2,000,000 cap | 1. Engage Securities and Bankruptcy litigation counsel.<br>2. Perfect title to properties / collateral platform.<br>3. Pay past due property taxes.<br>4. Establish new senior deeds of trust / lien structure.<br>5. Initiate PILOT engineering plans. |
| **Round B**<br>$3,000,000 cap | 6. Reinstate VetaNova public trading status.<br>7. Enter Reverse Merger candidate agreement.<br>8. PILOT development |
| **Round C**<br>$5,000,000 cap | 9. Complete PILOT<br>10. Commence PILOT Production for phased deployment consistent with the Avondale template. |

8. **Eligible Investor Universe and Allocation.** The Plan Bonds are offered exclusively to the legacy GrowCo-related investor cohort (the "Eligible Investors") reflected on the VetaNova Reorganization Ledger (Exhibit C) (the "Ledger"). Allocation is pro rata based on each Eligible Investor's Original Invested Amount as reflected in the Ledger. Oversubscription and reallocation mechanics are described in the Plan Bonds term sheet (Exhibit B) and the Bond Documents.

9. **Securities Issuance Basis (No Regulation D).** The Plan Bonds (and any securities issued upon conversion) are intended to be issued pursuant to the Plan and exempt from Securities Act registration under 11 U.S.C. § 1145. Eligibility is limited to the Plan's defined investor cohort; no Regulation D, Rule 506, or "accredited investor" framework is invoked.

10. **Exhibits and Attachments**

Exhibit A: Avondale Site Plan & Cap Table.

Exhibit B: Term Sheet for 6% Secured Convertible Bonds (Plan / 11 U.S.C. § 1145 Version).

Exhibit C: VetaNova Reorganization Ledger – Allocation Schedule (Original Invested Amount).

Dated January 13, 2026

Respectfully submitted,

*s/ John R. McKowen* JRM

John Roderick McKowen
Debtor-in-Possession
5200 S Quebec St. #117
Greenwood Village, CO 80111
(303) 248-6883
john@johnmckowen.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 13, 2026, a true and correct copy of the Supplement to Disclosure Statement and Exhibits A–C was served as follows:

1. Via CM/ECF upon all parties entitled to notice in this case who are registered CM/ECF users.
2. Via U.S. Mail (Certified), through LetterStream, upon all parties not registered for CM/ECF service, as listed on the service list maintained in this case, at their last known *addresses.*

*s/ John R. McKowen*
John Roderick McKowen

# EXHIBIT A

**Title: Avondale Site Plan & Cap Table**

**Date: January 12, 2026**

**Source: Prepared by the Debtor / VetaNova Inc. for Bankruptcy Case No. 25-16665-KHT**

**Topic:** Avondale PILOT platform site schematic and VTNA company capitalization table for Plan-based financ

- Site layout schematic for the Avondale PILOT platform (PILOT, WATER, ENVIRO & FERT, POWER & COMPUTE, SOLAR, and logistics blocks).
- Capitalization table summary reflecting post-split shares and illustrative financing components, including Plan Bond Rounds A, B, and C.
- Provided for reference in connection with Plan implementation and disclosure of the contemplated financing rounds.

# AVONDALE




VTNA – Company Cap Table

| CAPITAL | ROUND | POST SPLIT 1:60 SHARES | PRICE PER UNIT | NEW AUG |
|---|---|---|---|---|
| Reverse Split 1:60 Legacy VTNA Shareholders | $ 18,000,000 | 9,220,856 | $1.95 | |
| McKowen BK Claim $1,774,888 Exchange | $ 1,774,888 | 3,549,776 | $0.50 | |
| 6% Collaterlized Bond Tranche 1 Units @ 50% Discount | $ 2,000,000 | 4,000,000 | $0.50 | |
| 6% Collaterlized Bond Tranche 2 Units @ 12.5% Discount | $ 3,000,000 | 3,636,364 | $0.83 | |
| 6% Collaterlized Bond Tranche 3 Units @ Par | $ 5,000,000 | 5,000,000 | $1.00 | |
| Reg A $ 75M @ $3.00 | $ 75,000,000 | 25,000,000 | $3.00 | 72 |
| A Warrant Exercise @ $5 | $ 252,034,978 | 50,406,996 | $5.00 | 91 |
| B Warrant Exercise @ $7.5 | $ 378,052,467 | 50,406,996 | $7.50 | 137 |
| TOTAL | $ 705,087,445 | 151,220,987 | $4.66 | 300 |

| | |
|---|---|
| CAPEX PER AUG | $ 2,764,001 |
| EBITDA PER AUG | $ 250,802 |

# EXHIBIT B

**Title:** Draft Term Sheet for 6% Secured Convertible Bonds (Plan / 11 U.S.C. § 1145 Version)

**Date:** January 12, 2026

**Source:** Prepared by the Debtor / VetaNova Inc. for Bankruptcy Case No. 25-16665-KHT

**Topic:** Plan-based term sheet summarizing the economic and structural terms of the 6% Secured Convertible Bonds

- Summarizes pricing, rounds of offering, conversion mechanics, collateral, and conditions precedent for the Plan
- Defines the Eligible Investor universe and Plan-based subscription framework.
- Provided for reference in connection with Plan implementation and disclosure of the contemplated financing rounds.

**Senior Secured Convertible Notes of VetaNova, Inc.**
**and**
**Common Stock Purchase Warrants of VetaNova, Inc.**

**MEMORANDUM OF TERMS**

This Memorandum of Terms dated as of January __, 2026 summarizes the principal terms of a Plan-based issuance of secured convertible bonds (the "Bonds") of VetaNova Inc., a Nevada corporation (the "Issuer"), pursuant to and under the Chapter 11 Plan, and in connection with the Debtor's duties and authority as debtor-in-possession in Case No. 25-16665-KHT.

**THIS TERM SHEET IS NON-BINDING AND FOR DISCUSSION ONLY, DOES NOT PURPORT TO BE COMPLETE, AND IS QUALIFIED IN ITS ENTIRETY BY THE COMPLETE AND DEFINITIVE SUBSCRIPTION AGREEMENT, BOND INDENTURE, AND RELATED SECURITY DOCUMENTS; THE ISSUANCE AND SALE OF THE BONDS (AND ANY SECURITIES ISSUED UPON CONVERSION OR EXERCISE) IS CONTINGENT ON CONFIRMATION AND EFFECTIVENESS OF THE CHAPTER 11 PLAN, EXECUTION OF DEFINITIVE DOCUMENTATION, AND ANY REQUIRED BANKRUPTCY COURT APPROVALS.**

**OFFERING**

**Eligible Investors** ................ For purposes of this Term Sheet and the definitive documentation, "**Eligible Investors**" means the Post-Paulson GrowCo-related investors whose securities or claims arose from GrowCo offerings subject to the Settlement Agreement and Final Order entered in *Paulson v. Two Rivers Water and Farming Company, et al.*, Case No. 19-cv-02639-PAB-NRN (D. Colo.), including securities that retained reserved execution or collection rights under the Paulson Settlement and Final Judgment, and who subsequently exchanged their interests into VitaNova Partners, LLC and thereafter into equity securities of VetaNova Inc., as reflected on the VetaNova Reorganization Ledger (Exhibit C). Eligible Investors expressly exclude any legacy or residual shareholders of any acquired public shell whose shares were outstanding prior to the exchange transactions and any persons claiming through such legacy or residual holders.

**Plan / Court Control**........... This Term Sheet is provided solely to summarize proposed economic terms for Plan implementation and does not amend, supplement, or modify the Chapter 11 Plan, the Disclosure Statement, any supplement thereto, or any order of the Bankruptcy Court. In the event of any inconsistency, the Plan and the Bankruptcy Court's orders control, and the definitive documentation will be conformed to the Plan and such orders.

**Securities Law Basis**............ The Plan Bonds (and any securities issued upon conversion or exercise of warrants) are intended to be issued pursuant to and under the Chapter 11 Plan as a means of implementation under 11 U.S.C. §§ 1123 and 1129 and are intended to be exempt from Securities Act registration under 11 U.S.C. § 1145. This Term Sheet does not invoke Regulation D, Rule 506, or any "accredited investor" framework, and the Plan together with any applicable orders of the Bankruptcy Court governs the authority for issuance.

**Offering Scope**..................... Participation in the offering is limited to Eligible Investors as defined herein, submitting subscriptions pursuant to the Plan's subscription procedures. This Term Sheet does not create, modify, or expand any class of claims or interests under the Plan.

**Subscription Acceptance**... Submission of a subscription does not create any obligation of the Issuer, the Debtor, or the estate. Subscriptions may be accepted or rejected in whole or in part in the Issuer's discretion, and no obligation arises unless and until the Issuer accepts the subscription and the applicable Conditions Precedent are satisfied.

**Securities Offered**................ Up to $10,000,000 aggregate principal amount of 6% Secured Convertible Bonds (the "Bonds"), offered in three financing rounds as described below. The Issuer may conduct one or more closings within a Round and may terminate any Round in its discretion.

**Plan Effective Date**.............. No Bonds will be issued and no Closing will occur except in connection with implementation of the Plan following confirmation and the Plan's effectiveness (or such other authority as may be approved by the Bankruptcy Court).

The Issuer may conduct one or more closings within a Round following the Plan Effective Date, subject to the Conditions Precedent and definitive documentation.

**Unit Pricing** .......................... Bonds are issued in $1.00 principal units. Subscription price varies by Round (original issue discount): Round A: $0.50 per $1.00 principal; Round B: $0.8755 per $1.00 principal; and Round C: $1.00 per $1.00 principal. Each Unit consists of (i) $1.00 principal amount of Bonds and (ii) two detachable common stock purchase warrants: Warrant A exercisable at $5.00 per share and Warrant B exercisable at $7.50 per share. Each warrant is exercisable for a number of shares equal to the number of shares issuable upon conversion of the associated principal amount (1:1 with conversion shares), subject to adjustment and the terms of definitive documentation.

**Maturity** ............................... Two (2) years from the applicable Closing Date, unless earlier converted or redeemed in accordance with the terms of the Bonds.

**Interest Rate** ........................ 6.00% per annum, computed on a 360-day year and accruing daily, payable as paid-in-kind ("PIK") interest. Interest is capitalized to principal until conversion, redemption, or maturity, and any unpaid PIK interest is included in the conversion or redemption amount, subject to the terms of the Bonds and definitive documentation.

**Conversion Option** ............... At any time after issuance, the Noteholder may elect to convert all or any portion of the outstanding principal amount of its Bonds, together with accrued and unpaid PIK interest on the amount converted, into shares of the Issuer's common stock at the applicable Round conversion price: Round A $0.50 per share; Round B $0.8755 per share; and Round C $1.00 per share. The number of conversion shares equals the amount designated for conversion divided by the applicable conversion price, subject to adjustment and definitive documentation. Conversion will be effected in compliance with applicable law and any approvals later required.

**Collateral** ............................. The Bonds shall be secured by a senior lien on the collateral package associated with

1. Deed of Trust No. 404224 (Huerfano County, Colorado), including the land and appurtenant water rights and storage interests described therein, and related proceeds, subject to the terms of definitive security documentation and any approvals later required.
2. Deeds of Trust (Pueblo County, Colorado) including the land and appurtenant water rights and described therein, and related proceeds, subject to the terms of definitive security documentation and any approvals later required.

**Use of Proceeds** .................... No Round assumes tenants, permitting, construction, revenues, or utility upgrades, and each Round is independent of the success of any other Round.

**Conditions Precedent** .......... Each Closing will be subject to standard conditions, including confirmation and effectiveness of the Chapter 11 Plan, satisfactory completion of due diligence to the extent required, Bankruptcy Court approval to the extent required, and execution of definitive documentation.

**Rounds of Offering** .............. Each Round:

**Round A:** up to $2,000,000 principal; subscription price $0.50 per $1.00 principal; intended for diligence, title/curative work, and asset preservation.

**Round B:** up to $3,000,000 principal; subscription price $0.8755 per $1.00 principal; intended for platform readiness items, including curative completion and governance/financing platform setup.

**Round C:** up to $5,000,000 principal; subscription price $1.00 per $1.00 principal; optional and not required for feasibility.

**Confidentiality** ...................... No recipient shall disclose the terms of this Memorandum of Terms to any person other than its officers, directors, trustees, managers, accountants, and attorneys who need to know such information for evaluation purposes, without

| | |
|---|---|
| | the written consent of the Issuer, except as required by law or Bankruptcy Court order. |
| **Placement Agents**.................. | The Issuer may engage one or more placement agents to assist with the Plan-based offering and may pay reasonable fees or commissions from offering proceeds. Any such engagement and compensation shall be disclosed in definitive documentation and shall be subject to authorization under the Chapter 11 Plan and/or approval by the Bankruptcy Court, as applicable. |

**Exhibit C**

**Title:** VetaNova Reorganization Ledger – GrowCo Securities Exchanges

**Source:** Internal investor reorganization records

**Date:** Compiled 2021–2022

**Summary:** Ledger documenting the exchange of GrowCo securities into VetaNova Inc. equity. The records show that approximately 77% of all GrowCo securities—including GrowCo Partners 1, LLC Preferred Stock, GrowCo Partners Super Units, and GrowCo Exchange Notes—were exchanged into VetaNova Inc. shares between 2021 and 2022. The ledger also details the amounts invested, certificate numbers, and whether securities were exchanged. This record demonstrates that VetaNova Inc. is the successor holder of the majority of GrowCo investor interests, consolidating ownership into a single entity. This supports Plaintiff's standing as CEO of VetaNova to act on behalf of all exchanged investors and underscores the need for immediate equitable relief to protect their rights through issuance of a deed in lieu under Deed of Trust 404224 and a stay of pending Treasurer's Deed auctions.

GrowCo Investor List

| GrowCo Partners 1, LLC Type Investment | Invest Date | Investor | Domicile Colorado Investor | Certificate Number | Exchanged Amount Invested | Units Preferred Shares | Percent of Outstanding |
|---|---|---|---|---|---|---|---|
| Preferred Stock | 10/24/17 | GCP SU | Yes | GCP1-300a | $ 2,459,070 | 2,459,070 | 32.83% |
| Preferred Stock | 10/25/17 | GCP SU | Yes | GCP1-200 | $ 500,000 | 500,000 | 6.67% |
| Preferred Stock | 1/15/15 | I.Wistar Morris | No | GCP1-001 | $1,086,957 | 1,086,957 | 14.51% |
| Preferred Stock | 1/15/15 | Jon Gruber | No | GCP1-004 | $ 250,000 | 250,000 | 3.34% |
| Preferred Stock | 1/15/15 | Sam Morris Jr. | No | GCP1-005 | $ 108,696 | 108,696 | 1.45% |
| Preferred Stock | 1/16/15 | Michael Barrish | Yes | GCP1-006 | $ 108,696 | 108,696 | 1.45% |
| Preferred Stock | 1/15/15 | Charles Bloom IRA | No | GCP1-009 | $ 100,000 | 100,000 | 1.33% |
| Preferred Stock | 4/22/15 | I.Wistar Morris | No | GCP1-035 | $ 92,858 | 92,858 | 1.24% |
| Preferred Stock | 6/2/15 | I. Wistar Morris | No | GCP1-0135 | $ 92,858 | 92,858 | 1.24% |
| Preferred Stock | 1/16/15 | David Jenkins | No | GCP1-018 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 1/16/15 | Hugo Zimmermann | No | GCP1-013 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 1/16/15 | Hugo Zimmermann | No | GCP1-012 | $ 50,000 | 50,000 | 0.67% |
| Preferred Stock | 4/22/15 | Martha Morris | No | GCP1-038 | $ 47,799 | 47,799 | 0.64% |
| Preferred Stock | 6/2/15 | Martha Morris | No | GCP1-0138 | $ 47,799 | 47,799 | 0.64% |
| Preferred Stock | 4/22/15 | Cotswold Foundation | No | GCP1-036 | $ 47,253 | 47,253 | 0.63% |
| Preferred Stock | 6/2/15 | Cotswold Foundation | No | GCP1-0136 | $ 47,253 | 47,253 | 0.63% |
| Preferred Stock | 4/22/15 | Eleventh Generation | No | GCP1-037 | $ 46,753 | 46,753 | 0.62% |
| Preferred Stock | 6/2/15 | Eleventh Generation | No | GCP1-0137 | $ 46,753 | 46,753 | 0.62% |
| Preferred Stock | 6/2/15 | I. Wistar Morris IRA | No | GCP1-039 | $ 44,620 | 44,620 | 0.60% |
| Preferred Stock | 6/2/15 | I.Wistar Morris IRA | No | GCP1-0139 | $ 44,620 | 44,620 | 0.60% |
| Preferred Stock | 1/16/15 | Michael & Linda Harnish | No | GCP1-015 | $ 32,609 | 32,609 | 0.44% |
| Preferred Stock | 1/16/15 | Wayne Harding | Yes | GCP1-016 | $ 27,174 | 27,174 | 0.36% |
| Preferred Stock | 1/15/15 | I.Wistar Morris | No | GCP1-001a | $ 5,589 | 5,589 | 0.07% |
| Preferred Stock | 4/22/15 | Sam Morris Jr. | No | GCP1-054 | $ 4,055 | 4,055 | 0.05% |
| Preferred Stock | 6/2/15 | Sam Morris Jr. | No | GCP1-0154 | $ 4,055 | 4,055 | 0.05% |
| Preferred Stock | 11/5/17 | Sondra Margolies | No | Affidavit | $ 3,922 | 3,922 | 0.05% |
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-080 | $ 3,435 | 3,435 | 0.05% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-018C | $ 3,435 | 3,435 | 0.05% |
| Preferred Stock | 6/2/15 | Hugo Zimmermann | No | GCP1-0152 | $ 2,819 | 2,819 | 0.04% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-087 | $ 2,317 | 2,317 | 0.03% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-187 | $ 2,317 | 2,317 | 0.03% |
| Preferred Stock | 4/22/15 | Prasil Family Matters | No | GCP1-095 | $ 1,850 | 1,850 | 0.02% |
| Preferred Stock | 6/2/15 | Prasil Family Matters | No | GCP1-195 | $ 1,850 | 1,850 | 0.02% |
| Preferred Stock | 4/22/15 | Stephen Brown | No | GCP1-071 | $ 980 | 980 | 0.01% |
| Preferred Stock | 6/2/15 | Stephen Brown | No | GCP1-171 | $ 980 | 980 | 0.01% |
| Preferred Stock | 1/15/15 | Sam Morris Jr. | No | GCP1-005a | $ 756 | 756 | 0.01% |
| Preferred Stock | 4/22/15 | Nazim Lokhandwala | No | GCP1-062 | $ 490 | 490 | 0.01% |
| Preferred Stock | 6/2/15 | Nazim Lokhandwala | No | GCP1-0162 | $ 490 | 490 | 0.01% |
| Preferred Stock | 6/2/15 | Wayne Harding IRA | Yes | GCP1-014( | $ 444 | 444 | 0.01% |
| Preferred Stock | 4/22/15 | Carl Swarts | No | GCP1-068 | $ 429 | 429 | 0.01% |
| Preferred Stock | 6/2/15 | Carl Swarts | No | GCP1-168 | $ 429 | 429 | 0.01% |
| Preferred Stock | 1/15/15 | Hugo Zimmermann | No | GCP1-012a | $ 378 | 378 | 0.01% |
| Preferred Stock | 1/15/15 | Michael & Linda Harnish | No | GCP1-015a | $ 276 | 276 | 0.00% |
| Preferred Stock | 1/15/15 | Wayne Harding | Yes | GCP1-16a | $ 230 | 230 | 0.00% |
| Preferred Stock | 44 | Exchanged into VitaNova | No | | $5,423,294 | 5,423,294 | 72.39% |
| Preferred Stock | 8/17/21 | Sale to VetaNova Inc. | | | $5,423,294 | 5,423,294 | 72.39% |
| Preferred Stock | Various | Others | | | $2,068,024 | 2,068,024 | 27.61% |
| GCP 1 Preferred | | Total | | | $7,491,318 | 7,491,318 | 100.00% |
| GrowCo Inc | | | Colorado | Note | Amount | Secured | Percent of |
| Type Investment | Invest Date | Investor | Investor | Number | Invested | Notes | Outstanding |
| $4MM Secured Not | 5/14/15 | Lee James Wagner | No | N-005 | $ 125,000 | 125,000 | 3.13% |
| $4MM Secured Not | 3/31/20 | Prasil Family Matters | No | ??? | $ 200,000 | 200,000 | 5.00% |
| $4MM Secured Not | 6/8/15 | Dave Marshall | Yes | N-014 | $ 60,000 | 60,000 | 1.50% |
| $4MM Secured Not | 5/13/15 | Hugo Zimmermann | No | N-003 | $ 300,000 | 300,000 | 7.50% |
| $4MM Secured Not | 5/14/15 | Ursula Gutscher | No | N-004 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 5/4/15 | Michael & Linda Harnish | No | N-010 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 5/27/15 | Wayne Harding IRA | Yes | N-013 | $ 100,000 | 100,000 | 2.50% |
| $4MM Secured Not | 6/10/15 | I. Wistar Morris IRA | No | N-015 | $ 250,000 | 250,000 | 6.25% |
| $4MM Secured Not | 6/12/15 | Hugo Zimmermann | No | N-016 | $ 125,000 | 125,000 | 3.13% |
| $4MM Secured Not | 6/12/15 | Ursula Gutscher | No | N-017 | $ 50,000 | 50,000 | 1.25% |
| $4MM Secured Not | 10 | Exchanged into VitaNova Partners, LLC | | | $1,410,000 | 1,410,000 | 35.25% |
| $4MM Secured Not | Various | Others | | | $ 475,000 | 475,000 | 11.88% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $4MM Secured Not | Various | Blue Green | No | | $2,115,000 | 2,115,000 | 52.88% |
| $4MM Secured Note | | Total | | 10 | $4,000,000 | 4,000,000 | 100.00% |
| GCP Super Units, LLC | | | Colorado | Certificate | Amount | Preferred | Percent of |
| Type Investment | Invest Date | Investor | Investor | Number | Invested | Shares | Outstanding |
| Preferred Stock | 10/19/15 | Michael & Linda Harnish | No | GCPSU-001 | $ 25,000 | 25,000 | 0.47% |
| Preferred Stock | 12/8/15 | Prasil Family Matters | No | GCPSU-002 | $ 700,000 | 700,000 | 13.21% |
| Preferred Stock | 10/27/15 | Marsha Walker | No | GCPSU-003 | $ 15,000 | 15,000 | 0.28% |
| Preferred Stock | 10/19/15 | Arnold Kern | No | GCPSU-005 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 11/19/15 | Cotswold Foundation | No | GCPSU-006 | $ 200,000 | 200,000 | 3.78% |
| Preferred Stock | 11/4/15 | Hugo Zimmermann | No | GCPSU-007 | $ 250,000 | 250,000 | 4.72% |
| Preferred Stock | 10/23/15 | Ursula Gutscher | No | GCPSU-008 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 11/4/15 | Dave Marshall | Yes | GCPSU-012 | $ 60,000 | 60,000 | 1.13% |
| Preferred Stock | 12/10/15 | Terry Gruber | No | GCPSU-015 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 10/31/15 | Brooks Family Trust | No | GCPSU-024 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 12/11/15 | Wistar Morris | No | GCPSU-025 | $ 250,000 | 250,000 | 4.72% |
| Preferred Stock | 12/11/15 | Jon Gruber | No | GCPSU-026 | $ 350,000 | 350,000 | 6.61% |
| Preferred Stock | 2/5/16 | Ursula Gutscher | No | GCPSU-028 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 1/5/15 | Hugo Zimmermann | No | GCPSU-029 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 2/2/15 | Hugo Zimmermann | No | GCPSU-030 | $ 50,000 | 50,000 | 0.94% |
| Preferred Stock | 9/2/15 | Lee James Wagner | No | GCPSU-032a | $ 90,000 | 90,000 | 1.70% |
| Preferred Stock | 2/16/16 | Lee James Wagner | No | GCPSU-032b | $ 25,000 | 25,000 | 0.47% |
| Preferred Stock | 2/20/16 | Andreas Weinberg | No | GCPSU-033 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 2/29/16 | Dave Patterson | No | GCPSU-034 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 3/15/16 | Peter Ammentorp | No | GCPSU-035 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | 10/29/15 | Elizabeth Swarts | No | GCPSU-036 | $ 30,000 | 30,000 | 0.57% |
| Preferred Stock | 10/19/15 | John McKowen | Yes | GCPSU-039 | $1,218,157 | 1,218,157 | 23.00% |
| Preferred Stock | 10/27/17 | Mark Anderson | No | GCPSU-040 | $ 100,000 | 100,000 | 1.89% |
| Preferred Stock | ??? | I. Wistar Morris | No | ??? | $ 200,000 | 200,000 | 3.78% |
| Preferred Stock | 24 | Exchanged into VitaNova Partners, LLC | | | $4,263,157 | 4,263,157 | 80.48% |
| Preferred Stock | | Not Exchanged | | | $1,034,000 | 1,034,000 | 19.52% |
| GCP SU Preferred | | Total | | 23 | $5,297,157 | 5,297,157 | 100.00% |
| GrowCo | | | | Note | Amount | Exchanged | Percent of |
| Type Investment | Invest Date | Investor | | Number | Invested | Notes | Outstanding |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $6+MM Exchange | 4/15/16 | Tricia Varrasso | No | E-003 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 4//25/16 | I. Wistar Morris | No | S-002 | $ 650,000 | 650,000 | 9.84% |
| $6+MM Exchange | 5/3/16 | Prasil Family Matters | No | S-003 | $ 400,000 | 400,000 | 6.05% |
| $6+MM Exchange | 5/18/16 | Mark Anderson | No | S-004 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 5/10/16 | Michael & Linda Harnish | No | S-005 | $ 35,000 | 35,000 | 0.53% |
| $6+MM Exchange | 5/27/16 | John Brooks IRA | No | S-006 | $ 75,000 | 75,000 | 1.14% |
| $6+MM Exchange | 5/4/16 | Steve Marrinan | No | S-007 | $ 90,000 | 90,000 | 1.36% |
| $6+MM Exchange | 6/12/16 | Terry Lee Swarts | No | S-009 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 5/17/16 | I. Wistar Morris IRA | No | S-012 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 6/2/15 | I. Wistar Morris IRA | No | S-013 | $ 125,000 | 125,000 | 1.89% |
| $6+MM Exchange | 8/17/16 | Jon D. and Linda W. Grut | No | SE1-003 | $ 250,000 | 250,000 | 3.78% |
| $6+MM Exchange | 6/20/16 | Melissa Richards | No | S-011 | $ 38,000 | 38,000 | 0.58% |
| $6+MM Exchange | 6/10/16 | Arnold Kern | No | SE-001 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 8/14/16 | Donald Gale | No | SE-105 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 6/22/16 | Hugo Zimmermann | No | SE-107 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 9/22/16 | Hugo Zimmermann | No | SE-116 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/26/16 | Jon D. and Linda W. Grut | No | SE-121 | $ 250,000 | 250,000 | 3.78% |
| $6+MM Exchange | 3/15/20 | Bill Reeb | No | SE-122 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/31/16 | Hugo Zimmermann | No | SE-123 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 10/31/16 | Ursula Gutscher | No | SE-124 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 11/14/16 | Mark Anderson MD APL F | No | SE-125 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 12/7/16 | Hugo Zimmermann | No | SE-131 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 1/12/17 | Hugo Zimmermann | No | SE-133 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 8/18/16 | I. Wistar Morris IRA | No | SE-134 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 1/17/17 | Prasil Family Matters | No | SE-135 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 2/24/17 | Lee James Wagner | No | SE-201 | $ 150,000 | 150,000 | 2.27% |
| $6+MM Exchange | 3/7/17 | Whitney Buchanan | No | SE-202 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 3/15/17 | Lee James Wagner | No | SE-203 | $ 50,000 | 50,000 | 0.76% |
| $6+MM Exchange | 3/16/17 | Lee James Wagner | No | SE-204 | $ 25,000 | 25,000 | 0.38% |
| $6+MM Exchange | 3/3/17 | Jon D. and Linda W. Grut | No | SE-205 | $ 200,000 | 200,000 | 3.03% |
| $6+MM Exchange | 3/31/17 | Hugo Zimmermann | No | SE-207 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 3/31/17 | Prasil Family Matters | No | SE-208 | $ 400,000 | 400,000 | 6.05% |
| $6+MM Exchange | 6/5/17 | Helen Wagner | No | SE-301 | $ 50,000 | 50,000 | 0.76% |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| $6+MM Exchange | 6/29/17 | Hugo Zimmermann | No | SE-302 | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 8/18/17 | Lee James Wagner | No | SE-303 | $ 225,000 | 225,000 | 3.41% |
| $6+MM Exchange | 3/30/17 | Hugo Zimmermann | No | | $ 100,000 | 100,000 | 1.51% |
| $6+MM Exchange | 10 | Exchanged into VitaNova Partners, LLC | | | $4,713,000 | 4,713,000 | 71.33% |
| $6+MM Exchange | Various | Others | | | $1,719,000 | 1,719,000 | 26.02% |
| $6+MM Exchange | Various | Blue Green | | | $ 175,000 | 175,000 | 2.65% |
| $6+MM Exchange Note | | Total | | 35 | $6,607,000 | 6,607,000 | 100.00% |

**Vetanova - Reorganizing GrowCo**

| | | | |
|---|---|---|---|
| Exchanged in VetaNova | $ | 15,809,451 | 77.36% |
| Unexchanged | $ | 4,626,954 | 22.64% |
| Total GrowCo Capit | $ | 20,436,405 | 100.00% |




Case:25-16665-KHT Doc#:60 Filed:01/13/26 Entered:01/13/26 11:11:37 Page20 of 20

STATE OF COLORADO

Burtness - DORA, Joe <joe.burtness@state.co.us>

## Fw: Action Required -- Your Beneficial Interest in VētaNova Inc. Assets

1 message

**Dave M** <dvdjhmrhl@yahoo.com> Wed, Apr 1, 2026 at 5:11 PM
To: "joe.burtness@state.co.us" <joe.burtness@state.co.us>

----- Forwarded Message -----
**From:** johnmckowen <john@johnmckowen.com>
**Sent:** Wednesday, March 25, 2026 at 08:48:21 AM MDT
**Subject:** Action Required -- Your Beneficial Interest in VētaNova Inc. Assets

Dear VētaNova Beneficial Owner,

It's time to kick some butt and take some names.

I am writing to inform you of important developments in the reorganization of my estate under Chapter 11 of the United States Bankruptcy Code, Case No. 25-16665-KHT, United States Bankruptcy Court for the District of Colorado.

**Notice of Hearing on Amended Disclosure Statement**

On March 24, 2026, the Court filed a Notice of Hearing on the Debtor's Amended Disclosure Statement and Deadline for Filing Objections [Dkt. #97]. Please be advised of the following:

The Court will hold a hearing on the adequacy of the Amended Disclosure Statement on **Tuesday, April 14, 2026, at 1:30 p.m.** before the Honorable Kimberley H. Tyson, United States Bankruptcy Judge, in Courtroom D, Byron G. Rogers Federal Building, 1961 Stout Street, Denver, Colorado 80294. The hearing will be held by telephone. Information on telephonic appearances is available from the Court's website at https://www.cob.uscourts.gov/content/chief-judge-kimberley-h-tyson-kht.

Any party in interest wishing to object to the adequacy of the Amended Disclosure Statement must file a written objection with the Court and serve a copy on the Debtor no later than **April 6, 2026.**

**Amended Disclosure Statement and Plan**

I have also filed the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization ("DS&P") with the Court. The DS&P is attached to this email along with the Notice of Hearing. Please note that the DS&P has been filed but has not yet been approved by the Court. Court approval of the Disclosure Statement and confirmation of the Plan remain subject to further proceedings.

B
EXHIBIT

As an assigned beneficial owner of interest under Huerfano County Deed of Trust No. 404224, which secures real property and water rights in Huerfano County, Colorado. Your interest was assigned through the exchange of your original GrowCo securities into VitaNova Partners LLC and then into VētaNova Inc. The Plan proposes to preserve these rights in full — VētaNova Inc. will retain all water rights under DoT 404224, and your beneficial interest will not be impaired.

The water rights secured by DoT 404224 include Orlando Reservoir No. 2 (3,110 acre-feet of storage) and associated ditch rights. The estimated value of these rights is based on recent comparable transactions for water rights in Colorado and should be considered an estimate only, not an appraised or guaranteed value. Actual values may differ based on market conditions, adjudication, and other factors.

**Action Required: File Your Proof of Claim**

To participate in the Plan and preserve your voting rights, you must file a Proof of Claim with the Bankruptcy Court. I have attached a Proof of Claim form (B 410) for your use. Please complete the form and file it with the Clerk of the United States Bankruptcy Court for the District of Colorado. Your claim is based on your assigned beneficial interest as a beneficial owner under DoT 404224.

**Attachments:**

1. Proof of Claim Form (B 410)

2. Estimated Current Valuation by Shareholder

3. VētaNova Board Resolution — Beneficiary Rights, Assignment Chain, and Pledge Authorization

4. Notice of Hearing, Errata & Amended Combined Disclosure Statement and Plan of Reorganization (Court-Stamped)

If you have any questions, please do not hesitate to contact me directly. This has been a long road, but the Plan provides a real path forward for all of us. If your name is not on the list, and you think it should be, send me an email.Respectfully,

FREE TINA PETERS



John McKowen
(303) 248-6883
john@johnmckowen.com

**4 attachments**

**PROOF OF CLAIM FORM 410.pdf**
247K

- **Estimated Current Valuation.pdf**
  9K
- **VētaNova Board Resolution — Beneficiary Rights, Assignment Chain, and Pledge Authorization.pdf**
  119K
- **Notice of Hearing, Errata & DS&P.pdf**
  15014K

STATE OF COLORADO

Burtness - DORA, Joe <joe.burtness@state.co.us>

## Fw: Instructions — Filing Your Proof of Claim VētaNova Beneficial Interest (VBIH)

1 message

**Dave M** <dvdjhmrhl@yahoo.com> Wed, Apr 1, 2026 at 5:11 PM
To: "joe.burtness@state.co.us" <joe.burtness@state.co.us>

----- Forwarded Message -----
**From:** johnmckowen <john@johnmckowen.com>
**Sent:** Saturday, March 28, 2026 at 05:53:04 AM MDT
**Subject:** Instructions — Filing Your Proof of Claim VētaNova Beneficial Interest (VBIH)

Dear VētaNova Beneficial Owner,

VētaNova has adopted a Resolution that assigns you your individual proportional share of the beneficial interest under DoT 404224. That Resolution is attached. Your interest vests when you file your Proof of Claim — if you don't file, the interest reverts back to VētaNova.

**Instructions - How to fill out the Proof of Claim form (Official Form B 410):**

Top of Form — Case Information:

- **Debtor 1:** John Roderick McKowen
- **United States Bankruptcy Court for the:** District of Colorado
- **Case number:** 25-16665-KHT

Part 1 — Identify the Claim:

- **Box 1 — Who is the current creditor?** Write YOUR name (you are the creditor).
- **Box 2 — Has this claim been acquired from someone else?** Check **Yes**. Write: *VētaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224.*
- **Box 3 — Where should notices and payments be sent?** Write YOUR name, mailing address, phone, and email.
- **Box 4 — Does this claim amend one already filed?** Check **No**.
- **Box 5 — Has anyone else filed a proof of claim for this claim?** Check **No**.

Part 2 — Claim Information:

- **Box 6 — Any number to identify the debtor?** Check **No**.
- **Box 7 — How much is the claim?** Enter YOUR estimated claim amount from the attached Estimated Current Valuation schedule. Find your name and use the dollar amount shown. Check **No** for interest or other charges.
- **Box 8 — Basis of the claim?** Write: *Assigned beneficial interest under Huerfano County Deed of Trust No. 404224 (Reception No. 404224, Huerfano County, CO), pursuant to VētaNova Inc. Board Resolution dated March 27, 2026. Paulson-preserved collection rights under GrowCo securities (Paulson v. Two Rivers, Civil Action No. 19-cv-02639-PAB-NRN, D. Colo.).*

EXHIBIT C

- **Box 9 — Is all or part of the claim secured?** Check **Yes**. Under Nature of property, check **Real estate.** For Basis for perfection, write: *Deed of Trust No. 404224, Huerfano County, Colorado.* For Value of property and Amount secured, enter the same dollar amount from Box 7. Enter **$0** for Amount unsecured.
- **Box 10 — Based on a lease?** Check **No**.
- **Box 11 — Subject to a right of setoff?** Check **No**.
- **Box 12 — Entitled to priority?** Check **No**.

**Part 3 — Sign:**

- Check **"I am the creditor."**
- Enter today's date, sign, and print your name and address.

**Attach** a copy of the Board Resolution (included with this email) as supporting documentation.
**File it** with the Clerk of the U.S. Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT. You can file by mail to: U.S. Bankruptcy Court, 721 19th Street, Denver, CO 80202.
You do **not** need a lawyer to file. The Board Resolution gives you the absolute right to file on your own.
I've also attached the Estimated Current Valuation schedule so you can see your individual allocation, along with the Avondale Transaction Overview for context on the project.
**Attachments:**

1. Proof of Claim Form (B 410)
2. VētaNova Amended Board Resolution — Individual Assignment
3. Estimated Current Valuation
4. Avondale Transaction Overview - Confidential

If you have questions or believe your name should be on the beneficiary list, email me directly at john@johnmckowen.com.
Respectfully,
John McKowen
CEO & Sole Director, VētaNova Inc.

FREE TINA PETERS



John McKowen
(303) 248-6883
john@johnmckowen.com

**4 attachments**

**1. Proof of Claim Form B410.pdf**
247K

**2. VetaNova Amended Board Resolution - Individual Assignment.pdf**
127K

**3. Estimated Current Valuation.pdf**
91K

**4. Avondale Transaction Overview - Confidential.pdf**
3432K

STATE OF COLORADO

Burtness - DORA, Joe <joe.burtness@state.co.us>

## Fwd: Instructions — Filing Your Proof of Claim VētaNova Beneficial Interest (VBIH)

1 message

**Jennifer McCallum** <jennifermccallum@mccallumlaw.net> Tue, Mar 31, 2026 at 11:33 AM
To: Joe.Burtness@state.co.us

FYI - see below

Best regards,

Jennifer

Jennifer McCallum, Ph.D., Esq.
Patent Attorney
303-828-0655
Physical Address:
685 Briggs Street
Erie, CO 80516
Mailing Address:
P.O. Box 929
Erie, CO 80516
www.McCallumLaw.net

THE MCCALLUM LAW FIRM, P.C.
*"A woman-owned fully-integrated intellectual property law firm with a 20+ year history specializing in assisting technology or financial clients with their Intellectual Property and business needs whether they be litigation, licensing, regulatory approvals or financial transactions, such as acquisitions, mergers, large-scale funding events or global expansion of markets."*

CONFIDENTIALITY NOTICE: This transmission is intended only for the use of the addressee and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately via email at mail@mccallumlaw.net or by telephone at 303-828-0655 and destroy the original transmission and its attachments without reading or saving in any manner – Thank You.

PDF DISCLAIMER: The PDF or Microsoft Word document(s), attached to this email, if any, may only be modified with our express written consent. Accordingly, any alterations, additions, or deletions to the same are hereby rejected absent said written consent. By executing the document(s), you are agreeing to the terms as stated in the attached document(s), without regard to any unauthorized alterations, additions or deletions that may be made to the document(s).

EXHIBIT
D

----- Forwarded Message -----
**From:** johnmckowen <john@johnmckowen.com>
**Sent:** Saturday, March 28, 2026 at 05:53:04 AM MDT
**Subject:** Instructions — Filing Your Proof of Claim VētaNova Beneficial Interest (VBIH)

Dear VētaNova Beneficial Owner,

VētaNova has adopted a Resolution that assigns you your individual proportional share of the beneficial interest under DoT 404224. That Resolution is attached. Your interest vests when you file your Proof of Claim — if you don't file, the interest reverts back to VētaNova.

**Instructions - How to fill out the Proof of Claim form (Official Form B 410):**

**Top of Form — Case Information:**

- **Debtor 1:** John Roderick McKowen
- **United States Bankruptcy Court for the:** District of Colorado
- **Case number:** 25-16665-KHT

**Part 1 — Identify the Claim:**

- **Box 1 — Who is the current creditor?** Write YOUR name (you are the creditor).
- **Box 2 — Has this claim been acquired from someone else?** Check **Yes**. Write: *VētaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224.*
- **Box 3 — Where should notices and payments be sent?** Write YOUR name, mailing address, phone, and email.
- **Box 4 — Does this claim amend one already filed?** Check **No**.
- **Box 5 — Has anyone else filed a proof of claim for this claim?** Check **No**.

**Part 2 — Claim Information:**

- **Box 6 — Any number to identify the debtor?** Check **No**.
- **Box 7 — How much is the claim?** Enter YOUR estimated claim amount from the attached Estimated Current Valuation schedule. Find your name and use the dollar amount shown. Check **No** for interest or other charges.
- **Box 8 — Basis of the claim?** Write: *Assigned beneficial interest under Huerfano County Deed of Trust No. 404224 (Reception No. 404224, Huerfano County, CO), pursuant to VētaNova Inc. Board Resolution dated March 27, 2026. Paulson-preserved collection rights under GrowCo securities (Paulson v. Two Rivers, Civil Action No. 19-cv-02639-PAB-NRN, D. Colo.).*
- **Box 9 — Is all or part of the claim secured?** Check **Yes**. Under Nature of property, check **Real estate**. For Basis for perfection, write: *Deed of Trust No. 404224, Huerfano County, Colorado.* For Value of property and Amount secured, enter the same dollar amount from Box 7. Enter **$0** for Amount unsecured.
- **Box 10 — Based on a lease?** Check **No**.
- **Box 11 — Subject to a right of setoff?** Check **No**.
- **Box 12 — Entitled to priority?** Check **No**.

**Part 3 — Sign:**

- Check **"I am the creditor."**
- Enter today's date, sign, and print your name and address.

Attach a copy of the Board Resolution (included with this email) as supporting documentation.
**File it** with the Clerk of the U.S. Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT. You can file by mail to: U.S. Bankruptcy Court, 721 19th Street, Denver, CO 80202.
You do **not** need a lawyer to file. The Board Resolution gives you the absolute right to file on your own.
I've also attached the Estimated Current Valuation schedule so you can see your individual allocation, along with the Avondale Transaction Overview for context on the project.
**Attachments:**

1. Proof of Claim Form (B 410)
2. VětaNova Amended Board Resolution — Individual Assignment
3. Estimated Current Valuation
4. Avondale Transaction Overview - Confidential

If you have questions or believe your name should be on the beneficiary list, email me directly at john@johnmckowen.com.
Respectfully,
John McKowen
CEO & Sole Director, VětaNova Inc.

FREE TINA PETERS

<image001.png>

**4 attachments**



John McKowen
(303) 248-6883
john@johnmckowen.com

**image001.png**
19K

**1. Proof of Claim Form B410.pdf**
247K

**2. VetaNova Amended Board Resolution - Individual Assignment.pdf**
127K

**4. Avondale Transaction Overview - Confidential.pdf**
3432K

# EXHIBIT 53

Declaration of Dissolution and Distribution of Assets —
VitaNova Partners, LLC

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Docusign Envelope ID: FB060015-EC7E-460F-86D8-2FEB5749D822

**Declaration of Dissolution and Distribution of Assets**

VitaNova Partners, LLC

Date: November 30, 2024

I, John McKowen, declare as follows:

**Position and Authority:**

I am the sole member and designated Liquidator of VitaNova Partners, LLC ("VitaNova" or the "Company"), a Colorado limited liability company dissolved as of August 28, 2023.

**Dissolution Filing:**

On August 28, 2023, I filed the Company's Statement of Dissolution with the State of Colorado, officially dissolving VitaNova Partners, LLC on that date. A copy of the filed Statement of Dissolution is attached as Exhibit A.

**Final Accounting and Settlement of Liabilities:**

I confirm that, prior to the Effective Date of dissolution, VitaNova Partners, LLC had fully completed the settlement of all known debts, liabilities, and obligations, leaving no outstanding claims against the Company.

**Distribution of Remaining Assets:**

As of the Effective Date of dissolution, VitaNova's remaining assets consisted solely of Beneficiary Rights under Deed of Trust No. 404224 and Deed of Trust No. 404225. These Beneficiary Interests were distributed in-kind to me, as the sole member, prior to dissolution and remain held by me as the sole owner in accordance with the Company's Operating Agreement.

**Finalization of Winding Up:**

With all liabilities resolved and assets distributed, VitaNova Partners, LLC had fully completed its winding up and dissolution processes as required under the Operating Agreement and Colorado law.

**Declaration:**

I declare under penalty of perjury under the laws of the State of Colorado that the foregoing is true and correct to the best of my knowledge.

DocuSigned by:
John McKowen
F1F9A03D5622481...

10/30/2024

John McKowen
Sole Member and Liquidator
VitaNova Partners, LLC

Docusign Envelope ID: FB060015-EC7E-460F-86D8-2FEB5749D822

Date: November 30, 2024

# EXHIBIT 54

VetaNova Services Agreement (Beneficiary Interest Holders)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# SERVICES AGREEMENT

*Between VetaNova Inc. and Participating VBIHs*

This Services Agreement ("Agreement") is entered into as of ____________, 2026, by and between VetaNova Inc., a Nevada corporation ("VetaNova"), and the undersigned Beneficiary Interest Holder in the water rights and real-property rights assets secured by the Subject DOTs (defined below) — a "VBIH" — as reflected on the confidential VBIH Register maintained by VetaNova.

## 1. PURPOSE OF AGREEMENT

The purpose of this Agreement is to coordinate and fund the professional services necessary to formally establish, document, administer, and pursue the VBIH interests associated with the Subject Deeds of Trust (the "Subject DOTs") relating to the Avondale Property, the Huerfano County real property and its appurtenant water rights, and related assets. VBIH interests were previously preserved through the Final Order entered in Paulson. Participation under this Agreement is entirely voluntary; nothing herein requires any VBIH to participate, waives any VBIH right, or prevents any VBIH from retaining independent counsel and pursuing its interests separately. VetaNova's role is limited to coordinating professional services and related administrative efforts on behalf of participating VBIHs.

## 2. PROFESSIONAL SERVICES

To complete the contemplated work, VetaNova may coordinate the engagement of attorneys, accountants, title companies, water-rights professionals, surveyors, engineers, auditors, consultants, and other independent professionals as reasonably necessary, and may coordinate related administrative matters including VBIH communications, creditor-claim coordination, document management, public-record filings, and project administration.

## 3. NO SECURITIES OFFERING; LIMITATION OF ROLE

This Agreement is intended solely as a professional services and cost-sharing arrangement. It is not a securities offering, a private placement, an investment advisory agreement, or an agreement to purchase or sell securities, and no equity, bonds, beneficial interests, commissions, finder's fees, or transaction-based compensation are being offered or paid in connection with this Agreement. VetaNova is acting solely as a coordinator of professional services and administrative activities, and nothing in this Agreement shall be construed to authorize securities brokerage activity, investment advisory activity, securities solicitation, or securities placement activity. Each VBIH is encouraged to consult independent legal, tax, and financial advisors regarding participation.

## 4. PARTICIPATION AND COST SHARING

VBIHs participating in this Agreement fall into two classes: (a) Service-Fee-Paying VBIHs, who participate by paying a pro rata share of the professional fees and approved project costs payable

under this Agreement (the "Service Fees"); and (b) Former-Employee VBIHs, whose prior services to VetaNova constitute the consideration for their participation, as set forth in Section 4A. Each Service-Fee-Paying VBIH agrees to share the Service Fees on a pro rata basis according to the VBIH Register, with the pro-rata denominator including only Service-Fee-Paying VBIHs. Former-Employee VBIHs are not included in that denominator and are not required to pay any Service Fees. VBIHs who choose not to participate are not responsible for any Service Fees under this Agreement and retain whatever underlying VBIH interests they otherwise possess. Service Fees shall be paid by wire transfer in accordance with the Payment Instructions set forth on the signature page.

**4A. PRIOR SERVICES AND CONSIDERATION**

The Parties acknowledge that the Former-Employee VBIHs, including the CEO of VetaNova, have previously rendered professional, executive, and operational services to VetaNova in furtherance of the matters that are the subject of this Agreement and the position from which the VBIH interests derive. The reasonably documented value of such prior services substantially exceeds the entire forward budget contemplated under this Agreement, and such prior services constitute the full and adequate consideration for the participation of the Former-Employee VBIHs without further payment of Service Fees. No compensation, transaction-based fee, or other monetary consideration is being paid to any Former-Employee VBIH under this Agreement; the prior services were rendered for, and constitute consideration in connection with, each Former-Employee VBIH's existing beneficial interest in VetaNova.

**4B. DAMAGES AWARD FROM VETANOVA CLAIMS**

VetaNova has, or may in the future have, affirmative claims for damages against third parties arising from or related to the assets that are the subject of this Agreement (collectively, the "VetaNova Claims"). To the extent VetaNova receives any Net Damages Award on any VetaNova Claim, VetaNova shall distribute that Net Damages Award to the VBIHs, pro rata in accordance with their respective VBIH percentages as set forth on the VBIH Register, by check or wire transfer, as promptly as commercially reasonable.

"VetaNova Claims" includes, without limitation, claims for fraud, misrepresentation, breach of fiduciary duty, breach of contract, civil RICO, conversion, contempt-related counterclaims, and any other cause of action asserted by VetaNova in any proceeding, presently pending or hereafter commenced, together with any successor, appellate, or post-judgment proceedings of any of the foregoing. "Net Damages Award" means the gross amount paid to VetaNova in settlement of, judgment on, or post-judgment payment under, any VetaNova Claim, less VetaNova's reasonably documented legal fees, costs, expenses, and tax liability allocable to such recovery. VetaNova shall maintain records reasonably sufficient to support the calculation of any Net Damages Award and the allocation among VBIHs. Each VBIH is responsible for its own tax treatment of amounts received.

## 5. PHASED FUNDING AND PROJECT PHASES

The Parties currently estimate that total professional costs across all contemplated phases may approach approximately $500,000 over time. Funding is expected to occur in five (5) phases, each phase generally corresponding to the substantial completion of the prior phase; no later-phase funding request shall be made until substantial completion of the immediately preceding phase. Each Participating VBIH's proportional contribution amount shall be provided separately based upon that holder's percentage interest reflected on the VBIH Register.

The phases are: Phase 1 — recording and establishing beneficial ownership interests relating to DOT 404224; Phase 2 — recording and establishing beneficial ownership interests relating to the additional Avondale-property DOTs; Phase 3 — foreclosure, title consolidation, and related property coordination work associated with the Avondale assets; Phase 4 — pursuit of VetaNova public-company reporting and compliance restoration efforts; and Phase 5 — final operational, development, and asset-structuring work associated with the Avondale assets and related operations.

## 6. USE OF FUNDS

Funds paid under this Agreement shall be used solely for professional services, project administration, filing costs, consulting costs, and related expenses associated with the contemplated work. VetaNova shall maintain records reasonably sufficient to account for receipts and disbursements associated with the project.

## 7. TERM AND TERMINATION

This Agreement shall remain in effect until the earliest of substantial completion of the contemplated phases, written termination by VetaNova, or written termination by Participating VBIHs holding a majority of participating interests. Termination shall not affect obligations relating to amounts previously approved or incurred prior to termination.

## 8. GENERAL PROVISIONS

This Agreement shall be governed by the laws of the State of Nevada. It may be executed in counterparts and by electronic signature, and constitutes the entire agreement between the Parties concerning the subject matter hereof.

## SIGNATURES

VETANOVA INC.

By: ________________________________

Name: ______________________________

Title: _______________________________

Date: _______________________________

PARTICIPATING VBIH

Name: ______________________________
Signature: __________________________
Beneficial Interest Percentage: ___________
Email / Notice Address: ___________________
Date: ______________________________

**PAYMENT INSTRUCTIONS FOR SERVICE-FEE-PAYING VBIHs**

Service Fees shall be paid by wire transfer to the following account. Each Service-Fee-Paying VBIH shall include the reference noted below so Service Fees paid can be properly credited on the VBIH Register. VetaNova may update these Payment Instructions by written notice to Service-Fee-Paying VBIHs without requiring amendment of this Agreement.

Beneficiary (Account Holder): VetaNova Inc.
Bank Name: [BANK NAME]
Bank Address: [BANK ADDRESS]
Routing Number (ABA): [ROUTING NUMBER]
Account Number: [ACCOUNT NUMBER]
SWIFT / BIC (for international wires): [SWIFT / BIC, if applicable]
Reference / Memo: “VBIH Services Agreement — [VBIH NAME]”