# EXHIBIT 55

Notice of Distribution of Beneficiary Interests (Bankr. Dkt. 121, May 8, 2026)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

FILED
CLERK OF COURT
MAY - 8 2026
U.S. BANKRUPTCY COURT
DISTRICT OF COLORADO

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

In re:

JOHN RODERICK McKOWEN,

Debtor and Debtor-in-Possession.

Bankruptcy Case No. 25-16665-KHT
Chapter 11

---

**NOTICE OF DISTRIBUTION OF BENEFICIARY INTERESTS, SUPPLEMENT TO DEBTOR'S SECOND AMENDED DISCLOSURE STATEMENT (DKT. 108) UNDER 11 U.S.C. § 1125, AND REQUEST FOR COORDINATION WITH ANY LIMITED DISMISSAL**

---

John Roderick McKowen, Debtor and Debtor-in-Possession, appearing pro se, respectfully submits this Notice in his individual capacity to record the documentary chain of pre-petition operative facts establishing the cognizable interests of the Beneficial Interest Holders ("VBIHs") in property of the estate; to supplement the Debtor's Second Amended Disclosure Statement (Dkt. 108) under 11 U.S.C. § 1125 to fill specifically identified disclosure gaps; and to request that any limited dismissal be coordinated to preserve the interests so disclosed.

This Notice does not assert any claim on behalf of any individual VBIH and does not purport to represent the interests of any third party. The Debtor, as a pro se non-lawyer, may represent only himself. The relief described in this Notice for the VBIHs runs through their own filings; this Notice supplies only the framework, the documentary record, and the disclosure necessary for those filings to be properly understood by this Court.

## I. PURPOSE AND PROCEDURAL POSTURE

This Notice serves three concurrent functions. The Debtor respectfully requests that the Court determine the procedural form most appropriate to receive each function:

First, as a Notice in the Debtor's individual capacity, this filing places on the record the chain of pre-petition operative facts — the Paulson Final Order, the recorded Deeds of Trust, the GCP 1 § 13.03(c) framework, the VitaNova exchange and dissolution, the in-kind distribution to the Debtor, and the 80 named beneficiaries on Exhibit 8 to Deed of Trust No. 404224 — that establish the VBIHs' cognizable interests in property of the estate. The Notice does not create any of these facts. They preceded the petition and operate independently of it.

Second, as a Supplement to the Debtor's Second Amended Disclosure Statement (Dkt. 108) under 11 U.S.C. § 1125, this filing fills specifically identified gaps in the existing disclosure record. Those gaps include the Class 3B classification and treatment, the 6% Collateralized Bond Exchange under 11 U.S.C. § 1145(a), the March 27, 2026 VetaNova Inc. Amended Board Resolution, the GCP 1 § 13.03(c) Secured-Obligations framework, the Nevada-law fiduciary basis for the Debtor's March 27, 2026 disclosures to the VBIH base, the four-layer architecture disclosed by the Resolution and the underlying instruments, the narrow consequence of non-filing of an individual proof of claim, and the unauthorized-practice constraint that explains the individual-filing architecture.

Third, as a Request for Coordination, this filing asks that any limited dismissal coordinate with the disclosed framework so the VBIHs' underlying property and contractual rights — most particularly the Paulson-preserved collection rights and the security interests perfected by Deeds of Trust 404224 and 404225 — are not collaterally extinguished by the procedural posture of this case.

The Debtor offers to file a Third Amended Disclosure Statement reflecting the matters in this Supplement on direction of the Court, if the Court determines that to be the appropriate

procedural form. Alternatively, the Court may treat this filing as a § 1125 supplement to Dkt. 108 to be considered as part of the disclosure record at the disclosure hearing or such later proceeding as the Court directs.

The principal documentary foundation of this Notice is already in evidence on this Court's record. The Paulson Settlement Agreement and Complete Bar Order are attached as Exhibit 1 to Dkt. 108; Deed of Trust No. 404224 (including its Exhibit 8 listing of the named Beneficiaries) is attached as Exhibit 8 to Dkt. 108; the VetaNova Reorganization Ledger documenting the super-majority capital exchange addressed in Section II.H, infra, is attached as Exhibit 2 to Dkt. 108; and the Chan Judgment is attached as Exhibit 5 to Dkt. 108. Each of those four documents is incorporated by reference herein rather than re-attached. The exhibits attached to this Notice (Exhibits A through H hereto) are limited to documents not yet in evidence and necessary to complete the documentary record.

The Debtor appears pro se. The Debtor understood — and continues to understand — the disclosure-statement stage of a Chapter 11 case to be an iterative development process in which objections, comments, and additional information from the parties drive successive amendments under 11 U.S.C. § 1125. This Notice is offered in that spirit. The Debtor has reviewed the Objections to Dkt. 108, including the Securities Commissioner's Objection at ECF No. 101, has identified disclosure gaps and points of confusion to which those Objections can in fair part be attributed, and supplements the disclosure record accordingly.

## II. PRE-PETITION OPERATIVE FACTS

The matters set forth in this Section II are pre-petition operative facts established by recorded instruments, executed agreements, and entered orders of courts of competent jurisdiction. The

petition in this case was filed on October 14, 2025; each of the matters described below preceded that date.

**A. The GCP 1 LLC Operating Agreement and the § 13.03(c) Secured-Obligations Framework**

GrowCo Partners 1, LLC ("GCP 1") operates under a Limited Liability Company Operating Agreement (Ex. D hereto). Section 13.03(c) of that Agreement establishes the order of distribution upon liquidation, prioritizing the Preferred Members at clause (iii). The closing paragraph of § 13.03(c) further requires GCP 1 to enter into a Security Agreement "in favor of the Preferred Members" granting them a security interest in substantially all of GCP 1's assets to secure payment of the amounts set forth in clause (iii). The Security Agreement is by its terms pari passu with similar security interests granted in other limited liability companies of which TRCP is a sole or majority holder of common units. Deed of Trust No. 404224 (Dkt. 108 Ex. 8, incorporated by reference) and Deed of Trust No. 404225 (Ex. E hereto) are the recorded instruments perfecting that secured-creditor framework with respect to the Avondale greenhouse facility (Pueblo County) and the Butte Valley agricultural property and Orlando Reservoir No. 2 (Huerfano County).

**B. The February 23, 2020 Exchange Agreement**

On February 23, 2020, the Debtor and VitaNova Partners, LLC ("VNP") executed an Exchange Agreement (Ex. B hereto). Pursuant to Section 1.1 of that Agreement, the Debtor transferred to VNP 1,218,157 Preferred Units of GCP Super Units, LLC and 7,500,000 Units of McGrow, LLC. VNP, in exchange, issued to the Debtor 16,622,524 VNP common shares and assumed, as primary obligor, the Debtor's remaining obligation under the March 20, 2019 Blue Yellow Settlement Agreement. The Debtor represented and warranted his sole, direct, legal, and

beneficial ownership of the exchanged securities at § 3.3. After closing, VNP held the GCP-chain interests — with the corresponding Preferred-Member position under GCP 1 § 13.03(c) — and the beneficiary rights under Deeds of Trust 404224 and 404225 then began to flow through VNP.

**C. The Paulson Final Order and the §§ 1(g), 1(cc), 1(i), and 28 Carve-Outs**

On March 16, 2023, the United States District Court for the District of Colorado entered a Final Order in Paulson Investment Co. v. Two Rivers Water & Farming Co., No. 19-cv-02639-PAB-NRN (D. Colo.) (Dkt. 108 Ex. 1, incorporated by reference), approving the Settlement Agreement and entering a Complete Bar Order. The Settlement Agreement and Final Order, while imposing a global Bar Order at § 28, expressly preserved at §§ 1(g), 1(cc), and 1(i) the collection rights of the named beneficiaries under the GrowCo securities, including in any GrowCo liquidation or GrowCo bankruptcy. Section 1(i) further confirmed that assignors to VNP "are not excluded as Class Members by virtue of such assignment." The Bar Order is the protective component; the carve-outs are the preservation component. Together they ensure that the underlying contractual and secured-creditor rights of the named beneficiaries survived the Paulson global resolution intact — an outcome that depended on the carve-outs and that, without them, would have been extinguished.

**D. The August 28, 2023 Dissolution and the In-Kind Distribution to the Debtor**

On August 28, 2023, the Debtor filed VNP's Statement of Dissolution with the State of Colorado, dissolving VNP as of that date. The Debtor, in his capacity as sole member and designated Liquidator, executed under penalty of perjury a Declaration of Dissolution and Distribution of Assets (Ex. C hereto) confirming, inter alia, that VNP's remaining assets at the Effective Date "consisted solely of Beneficiary Rights under Deed of Trust No. 404224 and

Deed of Trust No. 404225," and that those Beneficiary Rights were distributed in-kind to the Debtor as sole member, prior to dissolution, and have remained held by him as sole owner. The Beneficiary Rights vested in the Debtor personally as of the Effective Date and have remained so vested.

**E. The 80 Named Beneficiaries on Exhibit 8 to Deed of Trust No. 404224**

Deed of Trust No. 404224 (Dkt. 108 Ex. 8, incorporated by reference) names approximately eighty (80) investor-beneficiaries on its Exhibit 8 — the constituency whose contributions to the GrowCo-chain entities were ultimately exchanged into VNP and, subsequently, into VetaNova Inc. equity. These named beneficiaries are not abstract investors. They are specific persons listed by name on a recorded instrument in the office of the Huerfano County Clerk and Recorder. Their identification was complete and recorded prior to the petition.

**F. The Debtor's Holding of the Beneficiary Rights**

As Liquidator of dissolved VNP, the Debtor holds the 404224 and 404225 Beneficiary Rights in his individual capacity. Those rights became property of the estate under 11 U.S.C. § 541 upon the filing of the petition.

**G. The Debtor's Bare Legal Title and the Pre-Petition Beneficial Allocation**

The Debtor's holding of the 404224 and 404225 Beneficiary Rights described in Section II.F, supra, is bare legal title. The Debtor holds that legal title in his capacity as Liquidator of dissolved VNP for the benefit of the underlying beneficial owners established by the documentary chain set forth in this Section II. Beneficial ownership, as a pre-petition operative fact, is allocated approximately ninety percent (90%) to VetaNova Inc. (representing the 77.36% capital-weighted super-majority exchange addressed in Section II.I, infra) and approximately ten percent (10%) directly to the named beneficiaries identified on Exhibit 8 to Deed of Trust No.

404224 who did not exchange their interests into the VNP / VetaNova chain. The 90% / 10% allocation is recited on the face of the March 27, 2026 Amended Resolution of the Board of Directors of VetaNova Inc. (Ex. F hereto, Recitals).

The legal architecture is, accordingly, that the Debtor's bare legal title to the 404224 and 404225 Beneficiary Rights is property of the Chapter 11 estate under 11 U.S.C. § 541, while the underlying beneficial interests — held by VetaNova Inc. (90%) and the non-exchanging named beneficiaries (10%) — were established pre-petition and are not property of the estate. The November 30, 2024 Declaration of Dissolution and Distribution of Assets (Ex. C hereto), in stating that the Debtor holds the Beneficiary Rights as "sole owner," is consistent with this allocation: the Debtor is the sole holder of the legal title that flows from the dissolution of VNP, and that legal title is held subject to the pre-existing beneficial allocations established by the documentary chain.

The March 27, 2026 Amended Board Resolution (Ex. F hereto), described further in Sections III.D and IV.C, infra, does not create the 90% / 10% beneficial allocation. The allocation pre-existed the Resolution and the petition. The Resolution operationalizes the allocation by directing how each individual beneficial owner's interest is to be adjudicated in this proceeding — specifically, by self-executing the assignment of each Beneficiary's proportional share of VetaNova's 90% interest to that Beneficiary, to vest in this proceeding upon the Beneficiary's filing of a Proof of Claim. The Resolution further authorizes execution of any recordable instruments that may be required to perfect the assignments under Colorado real-property law against third parties; those instruments will be executed and recorded as appropriate to the proceeding's development.

**H. VetaNova as the Willing Reorganization of a Super-Majority of Paulson-Protected Interests**

VetaNova Inc. is not an arbitrary vehicle. It is the present form of the willing reorganization of a super-majority of the Paulson-protected investor constituency. The VetaNova Reorganization Ledger (Dkt. 108 Ex. 2, incorporated by reference) documents that $15,809,451 — equal to 77.36% of total GrowCo capital of $20,436,405 — was voluntarily exchanged into VetaNova Inc. equity. That fraction is a super-majority of the very investor base whose collection rights the Paulson Final Order's Complete Bar Order was designed to protect.

The continuity of Class Member status through the chain is established on the face of the Paulson Settlement Agreement itself. Section 1(i) confirms that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment." That provision was drafted and entered with the present chain in view: the same investors who received Paulson protection were already in the process of consolidating their interests into VNP and, derivatively, into VetaNova Inc. equity. The Paulson Final Order does not merely tolerate that consolidation; it expressly preserves it.

The State Securities Commissioner's position in ECF No. 101 — that the VetaNova-aligned investor constituency is not properly cognizable in this estate — therefore amounts to a request that this Court disregard a federal court order entered by the Chief Judge of the District of Colorado that, by its own text, identifies the same constituency as preserved Class Members. The State cannot, by Plan Objection in this proceeding, alter the status that Chief Judge Brimmer's March 16, 2023 Final Order conferred. The 77.36% participation rate is not merely evidence of feasibility; it is the documentary record of the willing super-majority reorganization that Paulson § 1(i) preserves.

**I. Corroborating Pre-Petition Disclosure of the Distribution Upon Closure of VitaNova Partners**

The August 28, 2023 dissolution of VitaNova Partners, LLC and the resulting in-kind distribution of the 404224 and 404225 Beneficiary Rights to the Debtor — described in Section II.D, supra — are not merely the Debtor's present assertions in this proceeding. They were corroborated, independently and contemporaneously, on the public record of the United States Bankruptcy Court for the District of Colorado on November 1, 2024, when the Debtor, in his capacity as Defendant and Counterclaim Plaintiff in In re Two Rivers Farms F-2, Inc., Bankruptcy Case No. 23-13178-KHT (Bankr. D. Colo.), Adv. Proc. Nos. 24-01111-KHT and 24-01112-KHT, filed the Notice of Distribution of Beneficiary Interests and Request for Coordination with Limited Dismissal (Bankr. ECF No. 213) (Ex. A hereto). That filing memorialized to a federal bankruptcy court of competent jurisdiction the same chain of facts set forth in this Section II — most particularly the dissolution of VitaNova Partners, LLC and the in-kind distribution of the 404224 and 404225 Beneficiary Rights to the Debtor.

The 2024 Notice (Ex. A hereto) was filed on November 1, 2024 — approximately eleven months before the petition in this case (October 14, 2025) and approximately eighteen months before the filing of this Notice (May 8, 2026). It accordingly provides contemporaneous, court-of-record corroboration that (i) the dissolution of VitaNova Partners, LLC and the distribution of the Beneficiary Rights to the Debtor are pre-petition operative facts; (ii) those facts were disclosed by the Debtor to a federal bankruptcy court before this case was filed; and (iii) the documentary chain set forth in this Notice is not a post-petition construction. It is a pre-existing public-record framework, independently corroborated on the docket of another federal bankruptcy court before the present petition was filed.

**J. The May 5, 2023 Stipulation, the 2024 Adversary Proceedings, and the Dismissal of the Action Seeking to Void the Beneficiary Rights**

On May 5, 2023, Tung Chan, Securities Commissioner for the State of Colorado, and Two Rivers Water & Farming Company / TR Capital Partners, LLC entered into a Stipulation for Injunction and Other Relief in Chan v. Two Rivers Water & Farming Co., No. 2021CV033922 (Denver Dist. Ct.) (the "2023 Stipulation," attached as Dkt. 108 Ex. 4 and incorporated by reference herein). Section 2.a of the 2023 Stipulation required Two Rivers to place Orlando Reservoir No. 2 Company, LLC and Two Rivers Farms F-2, Inc. into bankruptcy "so that the Bankruptcy Court may equitably distribute any sale proceeds to individual investors identified in this action, which is the primary concern of the Commissioner. In part, the purpose of the Bankruptcy is to clear title on the assets that were improperly and fraudulently incumbered by the Defendants and alleged unnamed co-conspirators."

Pursuant to that requirement, Two Rivers Farms F-2, Inc. was placed in Chapter 11 bankruptcy as Case No. 23-15627-KHT (Bankr. D. Colo.) before the Hon. Kimberley H. Tyson.

On May 22 and May 23, 2024, Two Rivers Farms F-2, Inc., as debtor-in-possession, filed two adversary proceedings — Adv. Proc. Nos. 24-01111-KHT and 24-01112-KHT (Bankr. D. Colo.) — against approximately fifty named defendants, including the named beneficiaries on Exhibit 8 to Deed of Trust No. 404224, GrowCo Partners I, LLC, GrowCo, Inc., VetaNova Inc., and the Debtor. The complaints sought declaratory judgments voiding Deeds of Trust 404224 and 404225, disallowance of the beneficiaries' claims under 11 U.S.C. § 502(b), and avoidance of the underlying transfers as fraudulent under 11 U.S.C. § 548. The 2023 Stipulation was attached as Exhibit 1 to the 24-01111 Complaint and was relied upon as evidentiary support for the asserted "fraudulent encumbrance" theory.

The procedural inversion is straightforward and bears emphasis: the 2023 Stipulation identified equitable distribution to the individual investors as the Commissioner's primary concern; the bankruptcy of Two Rivers Farms F-2 was placed before the Court for that stated purpose; the action then taken in that bankruptcy proceeding was to name those same individual investors as defendants in adversary proceedings designed to extinguish their secured-creditor interests under Deeds of Trust 404224 and 404225.

On July 30, 2024, the Debtor, appearing pro se, filed in Adv. Proc. 24-01111-KHT a Motion to Dismiss for Lack of Jurisdiction and to Sever and Retain Counterclaims (Bankr. ECF No. 21), asserting, among other things, that the bankruptcy court lacked subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because the Paulson Final Order entered by Chief Judge Brimmer on March 16, 2023 was the controlling federal-court adjudication of the same subject matter, and that claim preclusion barred re-litigation of issues resolved by the Paulson Complete Bar Order. The Debtor's motion further articulated that the action subverted the Commissioner's stated purpose, observing that the recorded Deeds of Trust were the very instruments by which the Commissioner's identified individual investors held secured-creditor protections.

The Debtor's subsequent Notice of Distribution of Beneficiary Interests and Request for Coordination with Limited Dismissal (Bankr. ECF No. 213) (Ex. A hereto), described in Section II.I, supra, was filed on November 1, 2024 in defense of the Beneficiary Rights framework.

On April 16, 2025, after the corporate plaintiff's counsel withdrew (Bankr. ECF No. 56) and after the Bankruptcy Court directed compliance with the rule that corporations must be represented by counsel (Bankr. ECF No. 57), Two Rivers Farms F-2, Inc. failed to obtain new

counsel. The Court entered an Order Dismissing Adversary Proceeding 24-01111-KHT (Bankr. ECF No. 60), and the adversary was closed on May 1, 2025. The companion adversary 24-01112-KHT was likewise terminated.

The legal significance of this sequence for the present Notice is that the theory that the 404224 and 404225 Beneficiary Rights are "fraudulent encumbrances" that should be voided was advanced before a federal bankruptcy court of competent jurisdiction, was sustained by the proponent for nearly a year, and was ultimately dismissed without merits adjudication. The Beneficiary Rights remain on the recorded public record of Huerfano County. The documentary chain set forth in this Section II remains intact. The Commissioner's stated primary concern — equitable distribution to individual investors — was neither delivered through that proceeding nor extinguished by it.

## III. POST-PETITION DEVELOPMENTS

### A. The October 14, 2025 Petition

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025. The Beneficiary Rights described in Section II.D, supra, became property of the estate as of that date pursuant to 11 U.S.C. § 541. The Paulson §§ 1(g), 1(cc), 1(i), and 28 carve-outs continue to operate upon those rights and through them upon the chain of entities described herein.

### B. The State Securities Commissioner's Plan Objection (ECF No. 101)

On April 6, 2026, the Colorado Securities Commissioner filed an Objection to Debtor's Amended Combined Disclosure Statement and Plan of Reorganization (ECF No. 101). The Objection's framing of the VBIH base — most particularly any insinuation that the VBIHs are

not properly creditors of the estate or that any failure by an individual VBIH to file a Proof of Claim in this case extinguishes their underlying ownership — is addressed in Sections V and VI, infra. The Commissioner's position presents a contradiction with the State's own $16,578,690.33 securities judgment in Chan v. Two Rivers Water & Farming Co., 2021CV33922 (Denver Dist. Ct., entered July 9, 2025), which was premised on the proposition that the same investor constituency had been harmed by securities violations in the GrowCo and Two Rivers chain.

**C. The Second Amended Disclosure Statement (Dkt. 108)**

On April 9, 2026, the Debtor filed the Second Amended Disclosure Statement (Dkt. 108). That filing adequately discloses the Paulson chain in general terms, the 80-investor-beneficiary base, the 404224 Deed of Trust, the reverse-merger value-creation mechanism, and the Bar Order's carve-out preserving collection rights at a high level. As detailed in Section IV, infra, however, the Second Amended Disclosure Statement does not disclose certain matters that are material to the VBIHs' ability to participate in this Plan and to the Court's ability to evaluate confirmation. This Notice supplements Dkt. 108 to fill those identified gaps.

**D. The March 27, 2026 VetaNova Inc. Amended Board Resolution**

On March 27, 2026, the Board of Directors of VetaNova Inc., a Nevada corporation of which the Debtor is sole Director and Chief Executive Officer, adopted by Written Consent an Amended Resolution (Ex. F hereto) directed to the VBIH constituency. The Resolution recites that VetaNova holds approximately ninety percent (90%) of the beneficial interest under Deed of Trust No. 404224 (Resolution, Recitals); the remaining ten percent (10%) is held by named beneficiaries on Exhibit 8 to DoT 404224 who did not exchange into the VNP/VetaNova chain. The Resolution operates upon pre-petition operative facts — it does not create rights, it operationalizes them for individual filings in this case. As described in Section IV.C, infra, it: (1)

self-executes the assignment to each named Beneficiary on the Estimated Current Valuation schedule (Ex. G hereto) of that Beneficiary's proportional share of seventy-five percent (75%) of VetaNova's ninety-percent beneficial interest under Deed of Trust No. 404224 (i.e., approximately 67.5% of the total interest under the Deed of Trust), conditioned upon the Beneficiary filing a Proof of Claim in this case; (2) reserves the remaining twenty-five percent (25%) of VetaNova's ninety-percent interest (i.e., approximately 22.5% of the total) as a corporate Retained Interest of VetaNova; and (3) grants each Beneficiary the absolute and unconditional right to file an individual Proof of Claim, expressly without retention of legal counsel.

## IV. SUPPLEMENT TO THE SECOND AMENDED DISCLOSURE STATEMENT

This Section IV supplements the Second Amended Disclosure Statement (Dkt. 108) under 11 U.S.C. § 1125 to disclose the matters identified herein.

### A. Class 3B Classification and Treatment

The Debtor's Plan contemplates Class 3B treatment of the secured-creditor framework documented herein, grounded in (i) the GCP 1 § 13.03(c) Preferred-Member Security Agreement framework, (ii) the recorded Deeds of Trust 404224 and 404225, (iii) the Paulson §§ 1(g), 1(cc), and 1(i) carve-outs preserving collection rights, and (iv) the assignments effected by the March 27, 2026 Board Resolution upon individual Proof of Claim filings. Class 3B claims, as further described herein, are proposed to be satisfied through (a) the 6% Collateralized Bond Exchange under 11 U.S.C. § 1145(a) (Section IV.B, infra) and (b) where applicable, distributions of proceeds upon any sale, transfer, or other disposition of the properties securing the conveyances under Deed of Trust No. 404224.

**B. The 6% Collateralized Bond Exchange Under 11 U.S.C. § 1145(a)**

The Plan contemplates a 6% Collateralized Bond Exchange to be effectuated upon confirmation pursuant to 11 U.S.C. § 1145(a). Under the proposed structure, each participating Class 3B Beneficiary or VetaNova shareholder may surrender one share of VetaNova common stock (valued at $1.00 per share for conversion purposes) and contribute $0.50 in new cash, in exchange for a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount. The Bonds shall be secured by the same properties securing the conveyances under Deed of Trust No. 404224. The Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis. Issuance under § 1145(a) is contingent upon confirmation of the Plan.

VetaNova Inc., as a non-debtor entity holding record title to the Avondale (Pueblo County) and Butte Valley (Huerfano County) properties securing the conveyances under Deed of Trust No. 404224, is in active discussions with a qualified greenhouse development partner regarding a transaction that would generate proceeds for distribution under the Resolution and under the Plan. No definitive agreement is presently in place. Any such transaction would be subject to all required Bankruptcy Court, regulatory, and corporate approvals, and to satisfaction of customary closing conditions. Disclosure of further detail at this stage is constrained by an executed mutual non-disclosure agreement; the Debtor will supplement this disclosure to the extent and at the time consistent with the development of that transaction.

**C. The March 27, 2026 Board Resolution and the Self-Executing Assignment**

The Resolution at Ex. F hereto self-executes the assignment of each Beneficiary's proportional share of seventy-five percent (75%) of VetaNova's ninety-percent beneficial interest under Deed of Trust No. 404224, in the sense that no further corporate, board, or executive action by

VetaNova is required for the assignment to be operative as among VetaNova and the Beneficiary. The Resolution itself constitutes and operates as the instrument of assignment for each Beneficiary identified on the Estimated Current Valuation schedule (Ex. G hereto). VetaNova retains the remaining twenty-five percent (25%) of its ninety-percent interest as a corporate Retained Interest. The assignment vests in this proceeding — that is, the Beneficiary's assigned interest is adjudicated in this Chapter 11 case — upon the Beneficiary's filing of a Proof of Claim. Any Beneficiary who does not file within the time established for the filing of proofs of claim is deemed to have declined the assignment in this proceeding, and the proportional interest reverts to VetaNova as part of its Retained Interest. The Resolution further authorizes a self-executing pledge of VetaNova's real property in favor of the Bonds and the assigned Beneficiaries (Resolution § 4), grants each Beneficiary the absolute right to file individually, expressly without retention of counsel as a precondition (Resolution §§ 1, 2, 5), and authorizes execution of recordable instruments under Colorado real-property law as may be required to perfect the assignments against third parties.

The Debtor further discloses, candidly and out of an abundance of caution, that the Estimated Current Valuation circulated to the VBIH base on March 28, 2026 (Ex. G hereto) contains, in its risk-disclosure footer, an erroneous reference to "In re VētaNova Inc., Case No. 24-15438 (Bankr. D. Colo.)." The Debtor has determined that the citation matches no case to which the Debtor or VetaNova Inc. is a party; it appears to have been a clerical artifact of an earlier draft. The operative caption for this proceeding is, and was at all times material, "In re John Roderick McKowen, Case No. 25-16665-KHT (Bankr. D. Colo.)." The Debtor identifies and acknowledges the error, will recirculate a corrected ECV to the VBIH base, and respectfully requests that this Court accept the ECV at Ex. F as the operative valuation schedule

notwithstanding the citation error appearing in the original. The Debtor presents Ex. F as the document was actually circulated, rather than as a corrected reconstruction, in order to preserve the evidentiary integrity of the record.

**D. GCP 1 § 13.03(c) as the Secured-Creditor Anchor**

Section 13.03(c) of the GCP 1 LLC Operating Agreement (Ex. D hereto) is the textual source of the secured-creditor framework that the Plan classifies in Class 3B. Subsection (iii) prioritizes Preferred-Member distribution upon liquidation; the closing paragraph requires GCP 1 to grant Preferred Members "a security interest in substantially all of the assets of the Company solely for purposes of securing payment of amounts set forth in the preceding clause (iii)." The 404224 and 404225 Deeds of Trust are the recorded instruments perfecting that security interest with respect to the underlying real property. The Paulson §§ 1(g), 1(cc), and 1(i) carve-outs preserved both the underlying § 13.03(c) obligation and the recorded perfection. The GCP 1 § 13.03(c) framework, which Dkt. 108 does not specifically cite, is the foundation that makes "Preferred Member" and "secured creditor" textual rather than asserted.

**E. The Debtor's Affirmative Duty Under NRS § 78.138**

As Chief Executive Officer and sole Director of VetaNova Inc., the Debtor owes affirmative fiduciary duties to VetaNova shareholders under Nevada Revised Statutes § 78.138, including the duty to exercise such powers and to inform the shareholders of material developments affecting their investment. The adjudication of VBIH claims in this Chapter 11 case is such a material development. The Debtor's March 27, 2026 disclosures to the VBIH constituency — the Amended Board Resolution, the Estimated Current Valuation, the Avondale Transaction Overview, the Proof-of-Claim instructions, and the Proof-of-Claim form — were the discharge

of that statutory duty. Silence by the Debtor would itself have constituted a breach. The disclosures were not litigation positioning; they were compelled.

### F. The Four-Layer VBIH Ownership Architecture

The VBIHs' ownership exists in four distinct layers, only one of which depends on a Proof of Claim filed in this case:

> **Layer 1 — VetaNova Equity.** Each VBIH owns shares in VetaNova Inc., a non-debtor Nevada corporation. That equity is not in the Debtor's estate and is not subject to extinguishment by anything in this case.
>
> **Layer 2 — Direct Beneficial Interest Assignment (75% allocation).** Through the March 27, 2026 Resolution, VetaNova self-executingly assigned 75% of its 90% beneficial interest under Deed of Trust No. 404224 to the named Beneficiaries pro rata according to the Estimated Current Valuation. The assignment vests on each Beneficiary's filing of an individual Proof of Claim.
>
> **Layer 3 — VetaNova's Retained 25% Interest.** VetaNova retains 25% of its 90% beneficial interest under DoT 404224, plus any reverted percentages from non-filers. That Retained Interest is the property of VetaNova; it benefits the VBIH constituency derivatively through their Layer 1 equity.
>
> **Layer 4 — Paulson-Preserved Collection Rights.** Under Paulson §§ 1(g), 1(cc), 1(i), and 28, each Beneficiary's collection rights against the GrowCo securities, including in any GrowCo liquidation or GrowCo bankruptcy, were preserved at the VBIH level. Section 1(i) confirmed that assignors to VNP were not excluded by virtue of the assignment. These rights are independent of any filing in this case.

### G. The Narrow Non-Extinction Consequence

The consequence of an individual VBIH's failure to file a Proof of Claim in this case is procedural and proceeding-specific. The Beneficiary forgoes the opportunity to adjudicate the assigned direct (Layer 2) interest in this Chapter 11 proceeding, and the assigned percentage automatically reverts to VetaNova's Retained Interest (Layer 3) under § 1 of the Board Resolution. The Beneficiary does not lose: (i) their VetaNova equity (Layer 1); (ii) the derivative benefit through VetaNova's Retained Interest, including the reverted percentage (Layer 3); or

(iii) the Paulson-preserved collection rights against the GrowCo securities (Layer 4). Bankruptcy Rule 3003(c)(2) governs the right to share in distribution from this estate; it does not adjudicate or extinguish rights held outside the estate or preserved by the Final Order of another federal court. Sections 1141(d) and 1129 likewise discharge the Debtor from creditor claims; they do not extinguish the property and contractual rights of non-debtor entities (VetaNova, GrowCo) or rewrite the Paulson Bar Order's preserved carve-outs.

The Debtor's March 27, 2026 written disclosures to the VBIH base reflected this distinction precisely: the Avondale Transaction Overview stated that a non-filer would lose "direct ownership" (the Layer 2 assignment) and that the interest would "revert" to VetaNova; the Resolution stated the same in formal terms; the VBIH instructions email used the same construction. None of those communications suggested that any other layer was at risk. The State's contrary insinuation — that any non-filer loses ownership generally — collapses the layered structure and is, as a matter of pre-petition operative fact and as a matter of Bankruptcy Code construction, incorrect.

**H. The Unauthorized-Practice Constraint**

The Debtor, as a pro se non-lawyer, may represent only himself. The architecture of individual Proof-of-Claim filings by each VBIH was designed for that constraint: the Resolution self-executes without further action by the Debtor; the Resolution expressly states that no Beneficiary need retain counsel to file; the Proof-of-Claim instructions were delivered to each named Beneficiary directly; and optional collective counsel is provided as a resource, not as a precondition. The constraint also defines the limits of this Notice: this Notice is filed in the Debtor's individual capacity and does not assert any individual VBIH's claim. It supplies the framework so that each VBIH's independent filing may be properly understood by the Court.

## V. THE STATE SECURITIES COMMISSIONER'S POSTURE (ECF NO. 101)

The State Securities Commissioner's Plan Objection at ECF No. 101 takes the position that the VBIH constituency is not properly recognized as a creditor body of this estate and that any limited dismissal would be appropriate without coordination of the VBIHs' underlying rights. Both elements of that position rest on the absence of the matters in this Notice from the disclosure record. The Notice supplies them.

The State's position in this proceeding stands in tension with the State's prior securities judgment against the Debtor in Chan v. Two Rivers Water & Farming Co., 2021CV33922 (Denver Dist. Ct.) (Dkt. 108 Ex. 5, incorporated by reference), in the amount of $16,578,690.33. That judgment rested on the proposition that the GrowCo-chain investor constituency had been harmed by securities violations. The positions appear difficult to reconcile within the disclosed framework, but the Debtor advances no argument that this Court resolve that tension here; the Debtor merely identifies it as part of the documentary record this Notice supplies.

As established in Section II.H supra, the constituency at issue includes a super-majority — 77.36% by capital weight — of the Paulson Class Members whose status the Paulson Final Order expressly preserved through Section 1(i). The Paulson Final Order is a federal court order entered by Chief Judge Brimmer on March 16, 2023; this Notice does not ask this Court to interpret that order or to re-characterize it. It records the order's preserved status as a documentary fact bearing on the disclosure record.

## VI. REQUEST FOR COORDINATION WITH ANY LIMITED DISMISSAL

In the event the Court enters any order of limited dismissal, the Debtor respectfully requests that the order include the following or substantively equivalent language to coordinate with the disclosed framework:

> *Dismissal of this case shall not impair, nullify, or limit any of the following: (a) the named beneficiaries' secured-creditor rights under the recorded Deeds of Trust 404224 and 404225 (Huerfano County, Colorado); (b) the carve-outs preserved by the Paulson Final Order at §§ 1(g), 1(cc), 1(i), and 28; (c) the GCP 1 § 13.03(c) Secured-Obligations framework; (d) the assignments effected by the March 27, 2026 VetaNova Inc. Amended Board Resolution; (e) any individual Proof of Claim filed in this case prior to dismissal; (f) the VetaNova Inc. shareholders' equity ownership in VetaNova Inc.; or (g) the Debtor's individual holding of the 404224 and 404225 Beneficiary Rights as Liquidator of dissolved VitaNova Partners, LLC. Nothing herein limits any rights otherwise enforceable in another proper forum.*

The proposed language is consistent with the conventional principle that a bankruptcy court's exit from a case ordinarily preserves rather than disturbs the underlying property and contractual rights of non-debtor parties, and that a final order of another federal court — here, the Paulson Final Order — is not collaterally re-characterized through dismissal of an unrelated proceeding. A discharge under § 1141 or a dismissal under § 1112 binds the Debtor with respect to creditor claims; it does not adjudicate or extinguish the property and contractual rights of non-debtor entities or third parties.

## VII. COMPLIANCE WITH AND REQUEST FOR CLARIFICATION OF THE CHAN JUDGMENT BAR

The State's Objection at ECF No. 101 raises, among other things, the bar on the Debtor's participation in "private securities transactions" contained in the Chan judgment. The Debtor does not, in this proceeding, seek to modify, vacate, or avoid that judgment. The Debtor intends to comply with it. The Debtor's appeal of the Chan judgment is being pursued in the proper forum, the Colorado Court of Appeals (Case No. 2025CA001513).

As a threshold matter, the Debtor is not, and would not be, the issuer of any of the securities contemplated under the proposed Plan. The proposed 6% Collateralized Bonds described in Section IV.B, supra, would be issued, if and when the proposed Plan is confirmed, by the surviving entity of the proposed reverse merger between VetaNova Inc. and a qualified greenhouse development partner — a separate corporate entity from the Debtor. The corporate actions of VetaNova Inc. effecting the March 27, 2026 Amended Board Resolution are taken by that non-debtor corporation under Nevada law, not by the Debtor in his individual capacity. The contemplated disposition of real property described in Section IV.B is a transaction of VetaNova Inc. or its successor entity, not a transaction by the Debtor. The Debtor's role with respect to the proposed Plan is solely that of debtor-in-possession proponent. He is not the transactor in any of the securities or asset transactions described.

Moreover, the issuance and sale of any securities described in the proposed Plan would be required to be, and would be, conducted through a duly licensed FINRA broker/dealer. The Debtor is not, and does not act as, a broker/dealer. Whatever else may be encompassed within "private securities transactions" as that term might be applied, the Debtor has not identified authority suggesting the bar extends to securities offerings conducted by a non-debtor issuer through a regulated, FINRA-licensed intermediary pursuant to a confirmed plan of reorganization.

The term "private securities transactions" is not defined in the Chan judgment, in the Colorado Securities Act, or in any source the Debtor has been able to identify. Its scope as applied to the specific mechanics described in the proposed Plan — particularly where the Debtor is not the issuer or transactor and where the offering would be conducted through a regulated intermediary — is presently unclear. The ambiguity is sharpened by the fact that Colorado is a conforming

state under the federal securities regulatory framework: the Colorado Securities Act, C.R.S. § 11-51-101 et seq., expressly recognizes federal-covered-security preemption at C.R.S. § 11-51-308.5, and aligns its registration-exemption framework with the exemptions and definitions established under the Securities Act of 1933 and the Securities Exchange Act of 1934. To enable the Debtor to provide adequate information under 11 U.S.C. § 1125 regarding the proposed Plan mechanics, and to enable the parties in interest to evaluate the Disclosure Statement against the State's Objection, the Debtor respectfully requests clarification on the following:

(a) whether the issuance of the 6% Collateralized Bonds described in the proposed Plan — to be issued, if and when the proposed Plan is confirmed, by the surviving entity of the proposed reverse merger between VetaNova Inc. and a qualified greenhouse development partner (the Debtor not being the issuer), and to be offered and sold through a duly licensed FINRA broker/dealer (the Debtor not being a broker/dealer), pursuant to 11 U.S.C. § 1145(a), which exempts such securities from the registration requirements of the Securities Act of 1933 and from any state law requiring registration or qualification of securities, and which qualifies as a "covered security" for purposes of Section 18 of the Securities Act of 1933, 15 U.S.C. § 77r, and as a federal-covered security recognized by C.R.S. § 11-51-308.5 — falls outside the scope of the Chan judgment's bar, which by its terms constrains the Debtor's individual participation and not the corporate actions of separate entities;

(b) whether the corporate actions of VetaNova Inc., a non-debtor Nevada corporation, in self-executing the assignments effected by the March 27, 2026 Amended Board Resolution constitute "private securities transactions" by the Debtor within the bar's meaning, given that those actions are taken by the corporation under Nevada corporate law (NRS § 78.315) and not by the Debtor in his individual capacity, and given that intra-corporate distributions to existing equity holders

are not generally treated as "sales of securities" under either federal law (Securities Act § 2(a)(3), 15 U.S.C. § 77b(a)(3)) or Colorado law (C.R.S. § 11-51-201); and

(c) whether any disposition of real property by VetaNova Inc. or by the surviving entity of the proposed reverse merger (the contemplated Avondale transaction described in Section IV.B, supra) constitutes a "private securities transaction" within the bar's meaning, given that the contemplated transaction would be a real-property transaction by a non-debtor entity rather than a transaction in securities by the Debtor.

The Debtor requests clarification not to litigate the Chan judgment in this forum, but because the adequacy of the disclosure under § 1125 — and the Debtor's ability to describe how the proposed Plan mechanics would operate consistent with the bar — both turn on how the bar is construed in respect of these specific mechanics, including the threshold question of whether the bar reaches transactions by separate non-debtor entities at all. Without that clarification, the Debtor cannot effectively supplement the disclosure record on this point, and the parties in interest cannot adequately evaluate the proposed Plan as to the matters raised in the State's Objection. Such clarification is consistent with the iterative disclosure-development process that the Debtor has at all times sought in good faith to comply with.

## VIII. RESERVATIONS AND CONCLUSION

This Notice does not constitute a substitute for any party's independent legal advice. The Debtor reserves the right to amend, supplement, or refine the matters set forth herein as the record develops. Nothing in this Notice asserts any individual claim on behalf of any Beneficial Interest Holder or any other party; each Beneficiary's right to file a Proof of Claim, to elect or decline

collective counsel, and to assert (or to forgo) any rights in this Chapter 11 case is and remains his, her, or its own.

The Debtor respectfully requests that the Court receive this Notice in its individual capacity as a record of the matters disclosed; treat the matters in Section IV as a Supplement to the Second Amended Disclosure Statement (Dkt. 108) under 11 U.S.C. § 1125; and, if the Court determines that a Third Amended Disclosure Statement is the appropriate procedural form, direct the Debtor accordingly. The Debtor further requests that the Court, in the event of any limited dismissal, include or adopt the substance of the coordination language proposed in Section VI.

DATED: May 8, 2026.

Respectfully submitted,

/s/ John Roderick McKowen

John Roderick McKowen

Debtor and Debtor-in-Possession, Pro Se

355 A Josephine Street

Denver, CO 80206

Telephone: (303) 248-6883

Email: john@johnmckowen.com

## CERTIFICATE OF SERVICE

I certify that on May 8, 2026, I caused a true and correct copy of the foregoing Notice of Distribution of Beneficiary Interests, Supplement to Debtor's Second Amended Disclosure Statement (Dkt. 108) Under 11 U.S.C. § 1125, and Request for Coordination With Any Limited Dismissal to be filed with the Clerk of the United States Bankruptcy Court for the District of Colorado and served on all parties of record by the Court's CM/ECF system, including without limitation:

- Office of the United States Trustee, District of Colorado
- Counsel for the Colorado Securities Commissioner
- Counsel for the Debtor's scheduled creditors
- All other parties of record entitled to electronic notice

/s/ John Roderick McKowen

John Roderick McKowen, Pro Se

**EXHIBIT INDEX**

Documents already in evidence on the record of this case and incorporated herein by reference rather than re-attached:

- Paulson Settlement Agreement and Complete Bar Order, Paulson Investment Co. v. Two Rivers Water & Farming Co., No. 19-cv-02639-PAB-NRN (D. Colo., Final Order Mar. 16, 2023) — attached as Dkt. 108 Exhibit 1, with §§ 1(g), 1(cc), 1(i), and 28 pin-cited herein.
- VetaNova Reorganization Ledger — attached as Dkt. 108 Exhibit 2; documents the 77.36% / $15,809,451 super-majority capital exchange addressed in Section II.H, supra.
- Chan Judgment, Chan v. Two Rivers Water & Farming Co., No. 2021CV33922 (Denver Dist. Ct., July 9, 2025) — attached as Dkt. 108 Exhibit 5.
- Deed of Trust No. 404224, Huerfano County, Colorado, including Exhibit 8 listing the named Beneficiaries — attached as Dkt. 108 Exhibit 8.

Exhibits attached to this Notice (not yet in evidence):

Exhibit A. Notice of Distribution of Beneficiary Interests and Request for Coordination with Limited Dismissal, In re Two Rivers Farms F-2, Inc., No. 23-13178-KHT (Bankr. D. Colo.), Adv. Proc. Nos. 24-01111-KHT and 24-01112-KHT, Bankr. ECF No. 213 (filed Nov. 1, 2024).

Exhibit B. Exchange Agreement between John R. McKowen and VitaNova Partners, LLC (Feb. 23, 2020) (the "Feb. 23, 2020 Exchange Agreement" / Exhibit 122).

Exhibit C. Declaration of Dissolution and Distribution of Assets of VitaNova Partners, LLC (Nov. 30, 2024) (Exhibit 110).

Exhibit D. GrowCo Partners 1, LLC Limited Liability Company Operating Agreement, with Section 13.03(c) marked.

Exhibit E. Deed of Trust No. 404225, Huerfano County, Colorado.

Exhibit F. VetaNova Inc. Amended Resolution of the Board of Directors — Individual Assignment (Mar. 27, 2026).

Exhibit G. Estimated Current Valuation by Beneficial Owner — VetaNova Inc. — circulated to the VBIH base on March 28, 2026 (citation error in original footer candidly disclosed in Section IV.C, supra).

Exhibit H. VBIH Instructions Email and Proof of Claim Form B-410 (March 28, 2026), as transmitted to the VBIH base.

# EXHIBIT A

## 2024 Notice of Distribution of Beneficiary Interests

Notice of Distribution of Beneficiary Interests and Request for Coordination with Limited Dismissal — In re Two Rivers Farms F-2, Inc., No. 23-13178-KHT (Bankr. D. Colo.) — Adv. Proc. Nos. 24-01111-KHT and 24-01112-KHT — Bankr. ECF No. 213

*Filed November 1, 2024 by John McKowen, Defendant and Counterclaim Plaintiff, pro se*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| TWO RIVERS FARMS F-2, INC., | ) | Case No. 23-15627-KHT |
| | ) | Chapter 11 |
| Debtor. | ) | Subchapter V |
| | ) | |
| TWO RIVERS FARMS F-2, INC., | ) | |
| Plaintiff, | ) | Adv. Proc. No. 24-01111-KHT |
| | ) | Adv. Proc. No. 24-01112-KHT |
| | ) | |
| v. | ) | |
| | ) | |
| GROWCO PARTNERS 1, LLC, et al. | ) | |
| Defendant | ) | |
| JOHN MCKOWEN | ) | |
| Defendant | ) | |
| Counterclaim Plaintiff | ) | |

**NOTICE OF DISTRIBUTION OF BENEFICIARY INTERESTS AND REQUEST FOR COORDINATION WITH LIMITED DISMISSAL**

John McKowen, appearing pro se as Defendant and Counterclaim Plaintiff in the above-captioned cases, respectfully submits this Notice of Distribution of Beneficiary Interests and Request for Coordination with Dismissal to clarify the intended distribution of Beneficiary Interests to GrowCo investors, confirm their independent enforceability, and request that dismissal orders retain the rights and protections specified in this Notice. This filing also incorporates relevant legal authority, case law, and references to previous motions filed with this Court.

**1. Ownership and Purpose of Beneficiary Interest Distribution**

The Beneficiary Interests subject to this Notice are held independently of the debtor's estate, as clarified in the Motion to Enforce the Paulson Settlement (Doc. No. 51) filed on October 25, 2024. These interests are being distributed to GrowCo investors to enable each investor to

independently enforce their rights as secured creditors under the Deeds of Trust, consistent with the protections provided in the Paulson Settlement and the Court's prior orders.

**2. Retention of Rights from Limited Objection and Prior Filings**

The distribution preserves the rights specified in both the Limited Objection to Dismissal and the Motion to Reopen the Paulson Settlement Case (Doc. No. 50) filed on October 25, 2024. The rights retained include:

a) Secured Creditor Rights: Beneficiary Interest holders retain their rights to pursue payment and enforcement actions on the collateral independently, under state law, as supported by the protections specified in the Paulson Settlement.

b) Paulson Settlement and Court Order Protections: Consistent with the Motion to Enforce, each Beneficiary Interest holder retains the full protections of the Paulson Settlement's bar order against any contrary claims.

**3. Coordination with Dismissal and Proposed Language**

To avoid ambiguity and ensure independent enforceability of the Beneficiary Interests post-dismissal, this Notice requests that any dismissal order includes language to retain these rights, in alignment with the Motion to Enforce and Motion to Reopen. Specifically:

Dismissal should confirm that the rights of Beneficiary Interest holders under the Deeds of Trust are unaffected and enforceable under state law, consistent with *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017).

**Proposed Language for Dismissal Order:**

"Dismissal of this case shall not impair or nullify any secured creditor rights held by recipients of Beneficiary Interests under the Deeds of Trust, nor any protections established under the

Paulson Settlement. The rights detailed in the Limited Objection, Motion to Enforce (Doc. No. 51), and Motion to Reopen (Doc. No. 50) are preserved and enforceable independently under state law."

**4. Legal Authority and Case Law Supporting Distribution and Enforcement**

To confirm the independent enforceability of the Beneficiary Interests and the authority to distribute these interests, this Notice relies on the following statutory and case law authorities, as outlined in the referenced motions:

11 U.S.C. § 541 - Property of the Estate: Establishes that assets outside the debtor's estate are not subject to estate claims, supporting the independent nature of the Beneficiary Interests as outlined in the Motion to Enforce.

*Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017) and **Travelers Indemnity Co. v. Bailey**, 557 U.S. 137 (2009): Support the preservation of secured creditor rights and settlement protections, which are central to the distribution as described in the Motion to Reopen and Motion to Enforce.

**5. Supporting Documentation and Prior Filings**

For reference, attached to this Notice are the following supporting documents and previously filed motions:

Exhibit A: Declaration of Dissolution and Distribution of Assets.

Exhibit B: Distribution Agreement specifying the rights of Beneficiary Interest holders.

Exhibit C: Huerfano County Deeds of Trust (Document Nos. 404224 and 404225).

Doc 44: Limited Objection, outlining secured creditor rights and protections.

Doc. No. 50 - Motion to Reopen the Paulson Settlement Case: Ensuring that preclusive effects

of the Paulson Settlement remain enforceable

Doc. No. 51 - Motion to Enforce the Paulson Settlement: Supporting enforcement rights of Beneficiary Interest holders post-dismissal.

.

DATED: November 1, 2024

Respectfully submitted,

/S/ *John McKowen*
John McKowen
Pro Se Creditor, Defendant & Counterclaimant
355 A Josephine St
Denver CO 80206
Telephone (303) 248-6883
Email: john@vtna.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on November 1, 2024, 2024, a true and correct copy of the foregoing was filed and served via CM/ECF pursuant to 9036-1 as indicated below on the following:

**Via CM/ECF**

- Robert Samuel Boughner; Samuel.Boughner@usdoj.gov
- Kevin Neiman; Trustee@ksnpc.com
- Kelsey Jamie Buechler; jamie@kjblawoffice.com, Sharon@kjblawoffice.com
- Mark David Dennis; mdennis@slbiggs.com, ecf.alert+Dennis@titlexi.com
- Michael Lamb; mcl@kjblawoffice.com, Gabriel@kjblawoffice.com
- Jennifer M McCallum; jmccallum@mccallumlaw.net
- David M. Miller; dmiller@spencerfane.com
- US Trustee; USTPRegion19.DV.ECF@usdoj.gov
- Deanna L. Westfall; deanna.westfall@coag.gov
- Jennifer Salisbury; jsalisbury@markuswilliams.com
- Theodore J. Hartl; hartlt@ballardspahr.com

*/s/ John McKowen*

# Exhibit A

**Declaration of Dissolution and Distribution of Assets**

VitaNova Partners, LLC

Date: November 30, 2024

I, John McKowen, declare as follows:

**Position and Authority:**

I am the sole member and designated Liquidator of VitaNova Partners, LLC ("VitaNova" or the "Company"), a Colorado limited liability company dissolved as of August 28, 2023.

**Dissolution Filing:**

On August 28, 2023, I filed the Company's Statement of Dissolution with the State of Colorado, officially dissolving VitaNova Partners, LLC on that date. A copy of the filed Statement of Dissolution is attached as Exhibit A.

**Final Accounting and Settlement of Liabilities:**

I confirm that, prior to the Effective Date of dissolution, VitaNova Partners, LLC had fully completed the settlement of all known debts, liabilities, and obligations, leaving no outstanding claims against the Company.

**Distribution of Remaining Assets:**

As of the Effective Date of dissolution, VitaNova's remaining assets consisted solely of Beneficiary Rights under Deed of Trust No. 404224 and Deed of Trust No. 404225. These Beneficiary Interests were distributed in-kind to me, as the sole member, prior to dissolution and remain held by me as the sole owner in accordance with the Company's Operating Agreement.

**Finalization of Winding Up:**

With all liabilities resolved and assets distributed, VitaNova Partners, LLC had fully completed its winding up and dissolution processes as required under the Operating Agreement and Colorado law.

**Declaration:**

I declare under penalty of perjury under the laws of the State of Colorado that the foregoing is true and correct to the best of my knowledge.

DocuSigned by:
John McKowen
F1F9A03D5622481... 10/30/2024

John McKowen
Sole Member and Liquidator
VitaNova Partners, LLC

Document must be filed electronically.
Paper documents are not accepted.
Fees & forms are subject to change.
For more information or to print copies
of filed documents, visit www.coloradosos.gov.

E-Filed

Colorado Secretary of State
Date and Time: 08/28/2023 02:27 PM
ID Number: 20191913712

Document number: 20231903637
Amount Paid: $10.00

ABOVE SPACE FOR OFFICE USE ONLY

**Statement of Dissolution**
**Limited Liability Company**
Filed pursuant to §7-80-802 of the Colorado Revised Statutes (C.R.S)

ID number: 20191913712

1. Entity name: VitaNova Partners, LLC

2. Principal office address:

Street address: 335 A Josephine St
*(Street number and name)*

Denver *(City)* CO *(State)* 80206 *(ZIP/Postal Code)*
*(Province – if applicable)* United States *(Country)*

Mailing address (leave blank if same as above): 335 A
*(Street number and name or Post Office Box information)*
Josephine St

Denver *(City)* CO *(State)* 80206 *(ZIP/Postal Code)*
*(Province – if applicable)* United States *(Country)*

3. *(Optional)* Delayed effective date: ____________ *(mm/dd/yyyy)*

4. ☐ This document contains additional information as provided by law.

Notice:

Causing this document to be delivered to the secretary of state for filing shall constitute the affirmation or acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the individual's act and deed, or that the individual in good faith believes the document is the act and deed of the person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic statutes, and that the individual in good faith believes the facts stated in the document are true and the document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the secretary of state, whether or not such individual is named in the document as one who has caused it to be delivered.

5. Name(s) and address(es) of the individual(s) causing the document to be delivered for filing:

| McKowen | John | | |
|---|---|---|---|
| *(Last)* | *(First)* | *(Middle)* | *(Suffix)* |

335 A
*(Street name and number or Post Office Box information)*
Josephine St

| Denver | CO | 80206 |
|---|---|---|
| *(City)* | *(State)* | *(Postal/Zip Code)* |
| | United States | |
| *(Province – if applicable)* | *(Country – if not US)* | |

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form, and any related instructions, are not intended to provide legal, business or tax advice, and are offered as a public service without representation or warranty. While this form is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form. Questions should be addressed to the user's attorney.

# Exhibit B

# DISTRIBUTION AGREEMENT

Dated: November 30, 2024

This Distribution Agreement ("Agreement") is made and entered into as of November 30, 2024, by and between John McKowen ("McKowen"), the owner of certain Beneficiary Interests that originated with the GrowCo Investments, were held by VitaNova Partners, LLC (VNP), and are now being distributed directly to Shareholders of VetaNova, Inc. ("VTNA Shareholders") as of the date hereof.

## RECITALS

WHEREAS, McKowen holds Beneficiary Interests under specific Deeds of Trust Nos. 404224 and 404225, which originated with GrowCo Investments and were previously held by VitaNova Partners, LLC (VNP);

WHEREAS, these Beneficiary Interests were not included in the exchange of assets for VTNA as part of the Avondale property purchases and remain separate from VTNA's assets;

WHEREAS, McKowen now intends to distribute these Beneficiary Interests directly to VTNA Shareholders who were previously members of VNP, based on their proportional ownership in VTNA, while retaining his own individual interest separately;

## AGREEMENT

### 1. Ownership of Beneficiary Interests

McKowen affirms that he is the owner of Beneficiary Interests represented by Deeds of Trust Nos. 404224 and 404225, which originated with GrowCo Investments and were held by VNP, but were never included in the exchange for VTNA as part of the Avondale property purchases. These Beneficiary Interests are separate from other VTNA shareholder interests and are not part of VTNA's general assets.

### 2. Distribution of Proportionate Beneficiary Interests

McKowen agrees to distribute a proportional share of his Beneficiary Interests to VTNA Shareholders of record as of November 30, 2024, who were previously part of VNP, based on their ownership percentages in VTNA. This distribution applies solely to the Beneficiary Interests proportional to the VTNA Shareholders, while McKowen retains his own individual interest separately.

### 3. Retention of McKowen's Separate Interest

McKowen's retained Beneficiary Interests will remain under his individual ownership, separate from VTNA and the interests distributed to VTNA Shareholders. McKowen retains the right to manage, represent, and protect his own interest independently, including the right to represent himself pro se.

**4. Extension of Closing Date and Release of Cash Payment**

The closing date on VTNA's purchase of the Avondale Properties is extended to December 31, 2025. Additionally, McKowen releases VTNA from the obligation to pay the cash portion of the purchase price as specified in the original agreement. This release is given in consideration of VTNA Shareholders' interest in these Beneficiary Interests and in line with the original transaction structure.

**5. Preservation of Individual Ownership**

The Beneficiary Interests held by McKowen will not be re-aggregated, assigned, or transferred to VTNA, VNP, or any other entity. The distribution of economic benefits to VTNA Shareholders does not alter McKowen's ownership rights or his ability to independently manage and represent his retained Beneficiary Interests.

**6. Representation of Interests**

McKowen retains full authority to represent and control his retained Beneficiary Interests independently, with no requirement for third-party authorization, allowing him to protect and manage these interests as their individual owner.

**7. Governing Law**

This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada.

**8. Entire Agreement**

This Agreement represents the entire understanding between the parties regarding the subject matter herein and supersedes all prior agreements or understandings. Any amendments to this Agreement must be in writing and signed by McKowen.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

DocuSigned by:
John McKowen
F1F9A03D5622481...
10/30/2024

John McKowen
Owner of Beneficiary Interests Originating with GrowCo Investments

# Exhibit C

404224
Page 1 of 9
Nancy C. Cruz, Clerk & Recorder
Huerfano County, CO RP $0.00
09-25-2015 08:11 AM Recording Fee $51.00

# DEED OF TRUST

**THIS INDENTURE**, is made this 9th day of September, 2015 between Orlando Reservoir No. 2 Company, LLC, a Colorado limited liability, and Two Rivers Farms F-2, Inc., a Colorado corporation, whose address is 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, hereinafter referred to collectively as "Grantor," and the Public Trustee of Huerfano County, State of Colorado, hereinafter referred to as Public Trustee.

**WITNESSETH, THAT:**

**WHEREAS**, GrowCo Partners 1, LLC, a Colorado limited liability company ("GCP 1") and those beneficiaries listed on the attached Exhibit A (the "Beneficiaries"), whose address is c/o Wayne Harding, 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, are parties to that certain Limited Liability Company Agreement dated January 12, 2015 (the "Operating Agreement");

**AND WHEREAS**, pursuant to the Operating Agreement, the Beneficiaries are entitled to certain preferred payments upon liquidation of GCP 1, as more specifically set forth in Section 13.03(c) of the Operating Agreement (the "Secured Obligations");

**AND WHEREAS**, because of the business and ownership affiliation among Grantor and GCP 1, Grantor benefits from the financial investments made by the Beneficiaries pursuant to the Operating Agreement, as well as the business operations of GCP 1, and thus Grantor is desirous of securing the payment and performance of said Secured Obligations on behalf of GCP 1 and is willing to encumber the Property (as defined below) as provided herein;

**AND WHEREAS**, the rights of the Beneficiaries with respect to the Secured Obligations rank, and will rank, pari passu in right of enforcement among the Beneficiaries, such Beneficiaries having acknowledged and agreed that their rights shall be treated in a like and equal manner proportionate the amounts owing to such Beneficiaries under Section 13.03(c) of the Operating Agreement. Such Beneficiaries may appoint a lenders' agent to act for and on behalf of all Beneficiaries and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust.

**NOW THEREFORE**, the Grantor, in consideration of the premises and for the purpose aforesaid, does hereby grant, bargain, sell and convey unto the said Public Trustee in trust forever, the following described property and water rights ("Property"), situate in Huerfano County, State of Colorado, to wit:

See the attached Exhibit B.

also known by street address as: N/A
and assessor's schedule or parcel number: 2300000423

**TO HAVE AND TO HOLD** the same, together with all and singular the privileges and appurtenances thereunto belonging, in trust nevertheless, that: a) in case of default in the payment of said Secured Obligations or any part thereof, or b) in case default shall be made or violation or breach of any of the terms, conditions, covenants or agreements herein contained, the Beneficiaries hereunder or the legal holder of the indebtedness secured hereby may declare a violation of any of the covenants herein contained and may elect to advertise said property for sale, and demand such sale by filing a notice of election and demand for sale with the Public Trustee. Upon receipt of such notice of election and demand for sale, the Public Trustee shall cause such notice to be recorded in the recorder's office of the county in which said property is situated.

The Public Trustee shall then give public notice of the time and place of sale by advertisement to be published for four weeks (once each week for five successive weeks) in some newspaper of general circulation at that time published in the county or counties in which said property is located. A copy of such notice shall be mailed to all persons entitled to receive notice as provided by law. It shall and may then be lawful for the Public Trustee to sell said property for the highest and best price the property will bring in cash and to dispose of the said property (en masse or in separate parcels, as the said Public Trustee may think best), together with all the right, title and interest of the Grantor therein, at public auction at any place as may be specified by statute and designated in the notice of sale.

The Public Trustee shall make and give to the purchaser of such property at such sale, a certificate of purchase as required by law. Unless the property is redeemed, the public trustee shall execute and record a confirmation deed to the holder of the certificate of purchase no less than fifteen days after the date of sale or, if later, the expiration of all redemption periods and the receipt of all statutory fees and costs.

The Public Trustee shall, out of the proceeds of such sale and after first paying and retaining all fees, charges and costs of making said sale, pay to the Beneficiaries hereunder the Secured Obligations according to the tenor and effect thereof, rendering the overplus, if any, unto those persons entitled thereto as a matter of law. Said sale as evidenced by the

confirmation deed executed and recorded by the Public Trustee shall operate as a perpetual bar, both in law and equity, against the Grantor and all other persons claiming the said property, or any part thereof, by, from, through or under the Grantor. The holders of said Secured Obligations may purchase said property or any part thereof; and it shall not be obligatory upon the purchaser at any such sale to see to the application of the purchase money.

The Grantor covenants with and warrants to the Public Trustee, that at the time of the ensealing of and delivery of these presents the Grantor is well seized of the said lands, tenements and property in fee simple, and has good right, full power and lawful authority to grant, bargain, sell and convey the same in the manner and form as aforesaid; hereby fully and absolutely waiving and releasing all rights and claims the Grantor may have in or to said lands, tenements, and property under and by virtue of any act of the General Assembly of the State of Colorado or of the United States Congress, now existing or which may hereafter be passed in relation thereto, and that the same are free and clear of all liens and encumbrances whatever, except

The Grantor further warrants to the Public Trustee the quiet and peaceable possession of said property against all persons who may lawfully claim the whole or any part thereof, and that the Grantor shall and will forever defend the title to said property against such person or persons.

Until payment in full or other release of the Secured Obligations, the Grantor shall timely pay all taxes and assessments levied on the property; any and all amounts due on account of principal and interest or other sums on any senior or junior encumbrances, if any; and will keep all improvements that may be on said lands insured against any casualty loss, including extended coverage, in a company or companies, meeting the net worth requirements of the Beneficiaries hereof in an amount which will yield to the Beneficiaries, after reduction by co-insurance provisions of the policy, if any, not less than the then total indebtedness. Each policy shall contain a loss payable clause naming the Beneficiaries as mortgagee and shall further provide that the insurance may not be canceled upon less than ten days written notice to the Beneficiaries. At the option of the Beneficiaries, the original policy or policies of insurance shall be delivered to the Beneficiaries as further security for the indebtedness. Should the Grantor fail to insure and deliver the policies or to pay taxes or assessments as the same fall due, or to pay any amounts payable upon senior encumbrances, if any, the Beneficiaries may make any such payments or procure any such insurance, and all monies so paid shall be added to and become a part of the indebtedness secured by this Deed of Trust and may be paid out of the proceeds of the sale of the property if not paid by the Grantor. In addition, and at its option, the Beneficiaries may declare the indebtedness secured hereby and this Deed of Trust to be in default for failure to procure insurance or make any of the payments required by this paragraph.

If all or any part of the property or an interest therein is sold or transferred by the Grantor without the Beneficiaries' prior written consent, excluding (a) the creation of a lien or encumbrance on par or subordinate to this Deed of Trust, (b) the creation of a purchase money security interest, or (c) the grant of any leasehold interest, Beneficiaries may, at their option, declare all the sums secured by this Deed of Trust to be immediately due and payable. Beneficiaries shall have waived such option to accelerate if, prior to the sale or transfer, Beneficiaries and the person to whom the property is to be sold or transferred reach agreement in writing that the credit of such person is satisfactory to Beneficiaries and that the interest payable on the sums secured by this Deed of Trust shall be at such rate as Beneficiaries shall request.

**IN CASE OF ANY DEFAULT** whereby the right of foreclosure occurs hereunder, the Beneficiaries shall at once become entitled to the possession, use and enjoyment of the property aforesaid, and to the rents, issues and profits thereof, from the accruing of such right and during the pendency of foreclosure proceedings and the period of redemption, if any. Such possession shall at once be delivered to the beneficiaries on request. Upon refusal, delivery of such possession may be enforced by Beneficiaries by any appropriate civil suit or proceeding. The Beneficiaries shall be entitled to a Receiver for said property, and of the rents, issues and profits thereof, after such default, including the time covered by foreclosure proceedings and the period of redemption, if any, and shall be entitled thereto as a matter of right without regard to the solvency or insolvency of the Grantor or of the then owner of said property and without regard to the value thereof. Such Receiver may be appointed by any court of competent jurisdiction upon ex parte application and without notice -- notice being hereby expressly waived -- and all rents, issues and profits, income and revenue therefrom shall be applied by such Receiver to the payment of the indebtedness hereby secured, according to the law and the orders and directions of the court.

**IN THE CASE OF ANY DEFAULT** of any payments due with respect to the Secured Obligations, according to the tenor and effect of the Operating Agreement or any part thereof, or of a breach or violation of any of the covenants or agreements herein by the Grantor, the whole of said principal sum hereby secured and the interest thereon to the time of the sale may at once, at the option of the legal holder thereof, become due and payable, and the said property be sold in the manner and with the same effect as if said indebtedness had matured. If foreclosure be made by the Public Trustee, attorney's fees in the sum of up to $1,500 for services in the supervision of said foreclosure proceedings shall be allowed by the Public Trustee as a part of the cost of foreclosure; and if foreclosure be made through the courts, a reasonable attorney's fee shall be taxed by the court as a part of the cost of such foreclosure proceedings.

**IT IS FURTHER UNDERSTOOD AND AGREED** that if a release of this deed of trust is required, the Grantor will pay the expense thereof; all of the covenants and agreements herein contained shall extend to and be binding upon the heirs, personal representatives, successors and assigns of the respective parties hereto; and that the singular number shall include the plural and the plural the singular.

**IN WITNESS WHEREOF,** the Grantor has caused its corporate name to be hereunto subscribed by its CFO and Managing Member on the day first written above.

Executed on September 9, 2015.

ORLANDO RESERVOIR NO. 2 COMPANY, LLC
a Colorado limited liability company

By: Wayne Harding, CFO and Treasurer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

This instrument was acknowledged before me on this 9th day of September, 2015 by Wayne Harding in his capacity as Chief Financial Officer of Orlando Reservoir No. 2 Company, LLC.

ANASTASSIYA OSGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154021819
MY COMMISSION EXPIRES 06/06/2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

TWO RIVERS FARMS F-2, Inc.
a Colorado corporation

By:
Wayne Harding, CFO

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

The foregoing instrument was acknowledged before me this 9th day of September, 2015, by Wayne Harding, as Chief Financial Officer of Two Rivers Farms F-2, Inc. a Colorado corporation.

ANASTASSIYA OSGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154021819
MY COMMISSION EXPIRES 06/06/2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

**EXHIBIT A**
**to**
**Deed of Trust**

I. Wistar Morris
Christopher L. Morris
Jesse Dovich
Jon D. and Linda W. Gruber Trust
Samuel W. Morris, Jr.
Michael S. Barish
Matt Edmundson
Jeff Porter
Eric Petersen
Charles J. Bloom IRA
Martha Morris
Cotswold Foundation
Eleventh Generation
I. Wistar Morris IRA
JMW Fund, LLC
San Gabriel Fund, LLC
Hugo Zimmermann
Jacob A. & Michelle K. Bevan
Hugo Zimmermann
David A. Jenkins
Njevity, Inc.
Richland Fund, LLC
Michael and Linda Harnish
Elevation Fund
Maureen Miller
Gus Blass, III
Capital Properties LLC
L.A. & Linda Walker
West Hampton Special Situations Fund
JPG Investments, LLC
James Cochran
Eric Porter
Kirby Enterprise Fund
Samuel W. Morris, Jr.
Charles B Kirby
Thomas Prasil
San Gabriel Benefit Plan fbo John McGrain
Growth Ventures, Inc Profit Sharing Plan & Trust
Thomas Prasil Trustee U/A/D November 26, 2003
Paul Powell
JDC Ventures, LLC
Sondra W Margolies
Thomas Prasil Trustee UAD Nov 26, 2003
San Gabriel Benefit Plan fbo Justin Yorke
John R Rogers
Frank Guy
Sandra Diaz R/O IRA
Michael Berenhaus
Charles and Sandra Curtis
John J Blum
Gregory A. Harrison
Donald S Darendinger Rev. Trust u/a 7/3/2007
Susan Doukas
Stephen D. Brown

SLMI Holding LLC
Presley Reed
John R Rogers SEP IRA
High Speed Aggregate Inc.
Wardenburg 2009 Family Trust
Growth Ventures, Inc Pension Plan & Trust
Jason Paulley R/O IRA
Maureen Miller, IRA
Charles & Sandra Curtis JWROS
Frank & Shirley Mills
Jordan Family LLC
Norman McClain
Lawrence & Karen Cake
Margaret Elizabeth Crumbley
Tom Ellison
Robert Stanger
Adam Linn
John N. Alessandro
Nazim Lokhandwala
Lloyd Grant
Brenda Forwood
F. Richard Stark
Francis & Jeffrey Chan
John Black
Joseph R. Stanger
Konrad & Linda Kuhn
Belva Barbalace
Charles Biemiller, IRA
Carl Swarts, IRA a/c 177072
William C Kottke R/O IRA
Constantine Hagepanos R/O IRA
Ashley Weatherford R/O IRA
Paul Hartmann R/O IRA
John Black
John Alesandro
Timothy & Patricia Gillis
Constantine Hagepanos
George Rosch
Stephen Troutman
Heather Evans
Thomas Forti
Jason Paulley Roth IRA
Ernest Dufresne
Wayne Harding
Wayne Harding, IRA
TR Capital Partners, LLC

**EXHIBIT B**
**to**
**Deed of Trust**

**LAND – LEGAL DESCRIPTION**

A parcel of land located in Sections 17, 18, 19 and 20, Township 26 South, Range 66 West of the 6th P.M., County of Huerfano, State of Colorado, also being a portion of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E") being more particularly described as follows:

Beginning at the southeast corner of the Orlando Reservoir No. 2 parcel and the northerly right-of-way line of Huerfano County Road No. 104; thence along said northerly right-of-way line the following three (3) courses:

1) N 85°18'00"W, a distance of 303.00 feet;
2) On the arc of a curve to the right, through a central angle of 30°38'00", whose radius is 600.00 feet, an arc length of 320.79 feet;
3) 54°40'00"W, a distance of 665.85 feet; thence departing said northerly right-of-way line the following twenty-seven (27) courses:

1) N 29°45'12"W, a distance of 604.71 feet;
2) N 26°55'29"W, a distance of 359.64 feet;
3) N 20°11'06"W, a distance of 487.20 feet;
4) N 32°26'57"W, a distance of 602.35 feet;
5) N 53°33'17"W, a distance of 138.08 feet;
6) N 66°50'22"W, a distance of 301.61 feet;
7) N 75°17'28"W, a distance of 137.03 feet;
8) N 85°04'32"W, a distance of 309.44 feet;
9) S 88°31'11"W, a distance of 157.36 feet;
10) N 76°43'49"E, a distance of 182.98 feet;
11) N 73°18'09"E, a distance of 168.99 feet;
12) N 58°37'40"E, a distance of 47.34 feet;
13) N 28°30'52"E, a distance of 144.34 feet;
14) N 34°51'01"W, a distance of 140.93 feet;
15) N 18°19'17"E, a distance of 77.07 feet;
16) N 41°59'46"E, a distance of 118.15 feet;
17) N 42°50'14"E, a distance of 151.08 feet;
18) N 42°24'43"E, a distance of 253.21 feet;
19) N 38°36'33"E, a distance of 32.56 feet;
20) N 23°25'39"E, a distance of 141.45 feet;
21) N 00°39'19"E, a distance of 102.77 feet;
22) N 29°08'34"W, a distance of 378.60 feet;
23) N 34°13'15"W, a distance of 114.68 feet;
24) N 63°26'11"W, a distance of 100.95 feet;
25) N 63°26'11"W, a distance of 70.12 feet;
26) On the arc of a curve to the right, through a central angle of 153°27'11", whose radius is 381.91 feet, an arc length of 1022.84 feet;
27) N 00°01'00"E, a distance of 27.60 feet, to the North line of the Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence S 89°59'00"E, along said North line a distance of 2047.92 feet; thence departing said North line the following twenty-four (24) courses:

1) S 00°01'00"W, a distance of 61.13 feet;
2) S 55°00'31"E, a distance of 79.16 feet;

3) S 36°54'16"E, a distance of 228.02 feet;
4) S 47°48'31"E, a distance of 262.80 feet;
5) S 60°48'16"E, a distance of 90.60 feet;
6) S 30°37'38"E, a distance of 403.12 feet;
7) S 56°18'35"E, a distance of 376.36 feet;
8) S 57°59'41"E, a distance of 274.36 feet;
9) S 58°32'41"E, a distance of 402.85 feet;
10) S 35°31'10"E, a distance of 174.28 feet;
11) S 04°49'25"E, a distance of 111.00 feet;
12) S 21°50'49"W, a distance of 166.48 feet;
13) S 02°50'15"W, a distance of 67.98 feet;
14) N 81°50'02"W, a distance of 101.65 feet;
15) S 51°28'22"W, a distance of 87.41 feet;
16) S 67°08'14"W, a distance of 75.69 feet;
17) S 48°36'02"W, a distance of 36.58 feet;
18) S 17°31'48"W, a distance of 26.11 feet;
19) S 02°51'57"W, a distance of 138.14 feet;
20) S 70°33'01"E, a distance of 329.43 feet;
21) S 29°45'05"E, a distance of 173.68 feet;
22) S 48°12'39"E, a distance of 127.54 feet;
23) S 65°10'56"E, a distance of 67.41 feet;
24) S 45°56'50"E, a distance of 175.27 feet to the boundary of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence along said boundary the following three (3) courses:
1) S 06°27'00"E, a distance of 233.05 feet;
2) S 19°01'00"W, a distance of 799.00 feet;
3) S 46°14'00"W, a distance of 1850.00 feet, to the Point of Beginning, Containing 322.21 acres, more or less.

ACCORDING TO THE CLERK AND RECORDER FOR HUERFANO COUNTY, COLORADO.

## WATER RIGHTS – LEGAL DESCRIPTION

The following water rights situate, lying and being in the County of Huerfano, COLORADO, described as follows:

A) ORLANDO RESERVOIR NO. 2, decreed for a total of 3,110 acre- feet storage, as follows:

I) ORLANDO RESERVOIR NO. 2, for storage of 43,560,000 cubic feet of water (1,000 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication October 3, 1921 (previous adjudication date was October 15, 1901), in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River through and by means of the Orlando Canal No. 3, and Greasewood Arroyo, through and by means of the Greasewood Arroyo Diverting Canal, and as more particularly describes in the aforesaid Decree entered October 31, 1921, in Civil Action No. 1414 (Priority No. 349).

II) ORLANDO RESERVOIR NO. 2, (ENLARGEMENT), for storage of 35,078,750 CUBIC FEET OF WATER (800 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication (conditional) October 3, 1921 in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right made absolute by Decree in Civil Action No. 1414-60, and 1414-62, entered November 1, 1960, and November 8, 1962 (Priority No. 349).

III) ORLANDO RESERVOIR NO. 2, (SECOND ENLARGEMENT), for storage of 1,310 acre-feet of water, for irrigation, date of appropriation October 2, 1906, date of adjudication (conditional) October 3, 1921, in Civil Action 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right partly made absolute November 1, 1960 (320 acre-feet) and April 2, 1962 (990 acre-feet) (Priority No. 367 ½).

Together with the Orlando Canal No. 3 andthe Greasewood Arroyo Diverting Canal, described as follows:

IV) That the headgate of the Orlando Canal No. 3, is located at a point on the North bank of the Huerfano River, from whence the West quarter corner of Section 25, Township 26 South, Range 66 West of the 6th PM, bears North 5°30' West 973 feet, said canal having a carrying capacity of 130 cubic feet of water per second of time.

V) That the headgate of the Greasewood Arroyo Diverting Canal, is located at a point on the said Greasewood Arroyo, from whence the Northeast corner of Section 18, Township 26 South, Range 66 West of the 6th PM, bears North 68°3' East 2920 feet, said canal having a carrying capacity of 1500 cubic feet of water per second of time.

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

B) BUTTE VALLEY DITCH, decreed for a total of 9 cubic-feet per second, as follows:

I) BUTTE VALLEY DITCH for diversion of 1.2 cubic-feet of water per second of time, from The Huerfano River for irrigation, date of appropriation May 15, 1862, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. I).

II) BUTTE VALLEY DITCH (ENLARGEMENT) for diversion of 1.8 cubic-feet of water per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1865, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 9).

III) BUTTE VALLEY DITCH (SECOND ENLARGEMENT), for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼, Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 86).

IV) BUTTE VALLEY DITCH (KILLIAN) for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication February 23, 1898 (Killian Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (previous adjudication date of June 12, 1889) (Priority No. 111).

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

C) ROBERT RICE DITCH, decreed for a total of 3.0 cubic feet per second of time, as follows: From the Huerfano River, for irrigation, date of appropriation March 1, 1867, date of adjudication June 12, 1889 (Reed Decree), original decreed point of diversion in NW 1/4 Section 22, T. 26 S., R. 66 W., 6th P.M., point of diversion transferred to SW 1/4 Section 10, T. 26 S., R. 66 W, 6th P.M., approximately 1700 feet from the west line and 550 feet from the south line of said Section 10, in Case No. 91CW39, Water Div. 2 on May 19, 1992 Huerfano County, Colorado (Priority 19)

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

404225
Page 1 of 24
Nancy C. Cruz, Clerk & Recorder
Huerfano County, CO RP $0.00
09-25-2015 08:11 AM Recording Fee $126.00

Recording Requested by:

And when recorded mail to:

GrowCo Inc.
2000 South Colorado Boulevard
Tower 1, Suite 3100
Denver, Colorado 80222

---

**DEED OF TRUST, SECURITY AGREEMENT AND FIXTURE FILING**

**THIS DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING, AND ASSIGNMENT OF LEASES AND RENTS** (hereinafter referred to as "Deed of Trust") is made this 9th day of September 2015, by Orlando Reservoir No. 2 Company, LLC, a Colorado limited liability, and Two Rivers Farms F-2, Inc., a Colorado corporation, whose mailing address is 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222 (hereinafter referred to as "Grantors"), to THE PUBLIC TRUSTEE OF HUERFANO COUNTY (hereinafter referred to as "Trustee") for the benefit of the individuals and entities listed on **Schedule 1** attached hereto (hereinafter collectively referred to as "Beneficiary").

**WITNESSETH, THAT:**

**WHEREAS,** GrowCo, Inc. a Colorado corporation ("GrowCo") executed a promissory note or notes, hereinafter referred to as "Notes", dated various dates in 2015, totaling in the aggregate, the principal sum of Four Million and No/100 Dollars ($4,000,000.00), payable to the order of the Beneficiary, whose address is c/o Wayne Harding, 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, after the date hereof, with interest thereon from the date thereof at the rate of twenty-two and one-half per cent (22.5%) per annum (the "Note Rate") payable on or prior to April 1, 2020;

**AND WHEREAS,** the Grantors are desirous of securing payment of the principal and interest of said Notes in whose hands soever said Notes may be; and

**AND WHEREAS,** the Notes rank, and will rank, pari passu in right of enforcement with each other, such note holders having acknowledged and agreed that all such note holders shall be treated in a like and equal manner proportionate to the amount of each of the Notes and accrued interest owed to each such note holder, notwithstanding any differences as to the timing of each note holder's acquisition of the Notes. Such note holders may appoint a lenders' agent to act for and on behalf of all note holders and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust;

**AND WHEREAS,** Grantors benefit from the extension of the Notes and are affiliates of GrowCo, and willing to encumber the Property (as defined below) as provided herein.

**NOW THEREFORE,** the Grantors, in consideration of the premises and for the purpose aforesaid, do hereby grant, bargain, sell and convey unto the said Trustee in trust forever, the following described property, situate in Huerfano County, State of Colorado, as follow:

**Article 1**

1.1 **Conveyance and Grant.** For valuable consideration, Grantors hereby irrevocably grants, transfers and assigns to Trustee, in trust forever with power of sale, for the benefit of the Beneficiary, all of Grantors' right, title and interest in and to the real property set forth on **Exhibit A** attached hereto and incorporated herein by this reference consisting of three (3) pages together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances (the "Real Property"). Grantors hereby irrevocably grants, transfers and assigns to Trustee for the benefit of the Beneficiary, all of Grantors' right, title and interest in and to the all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights) set forth on **Exhibit B** attached hereto and incorporated herein by this reference (the "Water Rights") consisting of three (3) pages; and all other rights, royalties, and profits relating to the Real Property, including, without limitation all minerals, oil, gas, geothermal and similar matters. The Real Property and the Water Rights are collectively referred to hereinafter as the "Property" all of which are located in Huerfano County, State of Colorado.

1.2 **Junior Lien.** Beneficiary understands and acknowledges that this Deed of Trust is junior in right to senior pre-existing deeds of trust encumbering the Property, granted by Grantors to the Colorado Water Conservation Board, and will have similar priority (on a *pari passu* basis) with certain other deeds of trust granted by Grantors, subject to the terms of an intercreditor agreement with such other beneficiaries of said deeds of trust.

1.3 **Leases and Rents.** Grantors presently assigns to Beneficiary, all of Grantors's right, title and interest in and to all present and future leases of the Property and all Rents derived from the Property, if any. In addition, Grantors grants to Beneficiary a Uniform Commercial Code security interest in the Personal Property and Rents as defined herein.

**Article 2**

2.1 **Grantors' Representations and Warranties.** Grantors hereby unconditionally warrants and represents to Beneficiary as follows (which warranties and representations have been and will be relied upon by the Beneficiary in advancing funds to GrowCo):

(a) **Power.** Grantors have all requisite power and all governmental certificates of authority, licenses, permits, qualifications and documentation to own, lease and operate his properties and to carry on his business as now being, and as proposed to be, conducted.

(b) **Validity of Loan Documents.** The execution, delivery and performance by Grantors of this Deed of Trust are within Grantors' powers and all other requisite action for such authorization has been taken.

(c) **Title to Property and Priority of this Instrument.** This Deed of Trust constitutes a valid and subsisting Deed of Trust junior in right to those deeds of trust specified in Section 1.2 above.

(d) **Litigation.** There are no actions, suits or proceedings pending, or, to the knowledge of Grantors threatened against or affecting the Grantors or the Property, or involving the validity or enforceability of this Deed of Trust or the priority of the liens and security interests created hereby.

(e) **Miscellaneous Warranties and Representations.** Grantors warrants and represents this Deed of Trust is executed at Grantors' request; that Grantors has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantors and do not result in a violation of any law, regulation, court decree or order applicable to

Grantors; and Grantors has established adequate means of obtaining from Grantors on a continuing basis, information about Grantors' financial condition. Grantors shall observe, perform and discharge, duly and punctually, all and singular, its obligations set forth herein; and Grantors shall give prompt notice to Beneficiary of any failure on the part of Grantors to observe, perform and discharge the same or of any claim made or threatened for any such failure by Grantors.

2.2 **Grantors' Waivers.** Grantors waives all rights and defenses arising by reason of any "one-action" or "anti-deficiency" law, or any other law which may prevent Beneficiary from bringing any action against Grantors, including a claim for deficiency to the extent Beneficiary is otherwise entitled to a claim for deficiency, before or after Beneficiary's commencement or completion of a foreclosure action, either judicially or by exercise of a power of sale.

2.3 **Possession and Maintenance of the Property.** Beneficiaries and Grantors agree that Grantors' possession and use of the Property shall be governed by the following provisions:

(a) **Possession and Use.** Until the occurrence of an Event of Default, Grantors may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect Rents from the Property, if any.

(b) **Duty to Maintain.** Grantors shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value. Furthermore, Grantors will use its best efforts to prevent any act or occurrence that might impair the value or usefulness of the Property. In instances where repairs, replacements, renewals, additions, betterments, improvements or alterations are required in and to the Property in the course of routine maintenance and repair or on an emergency basis to prevent loss, damage, waste or destruction thereof, Grantors shall proceed to construct same, or cause same to be constructed; provided, however, that in instances where any emergency measures are to be taken, Grantors will notify Beneficiary, in writing, of the commencement of same and the measures to be taken, and when same are completed, the completion date and the measures actually taken.

(c) **Compliance with Governmental Requirements.** Grantors shall promptly comply with all laws, ordinances and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act. Grantors may, in good faith contest any such law, ordinance or regulation and withhold compliance during any such proceeding, including appropriate appeals, so long as Grantors has notified Beneficiary in writing prior to doing so and so long as, in Beneficiary's discretion, Beneficiary's interests in the Property are not jeopardized. Beneficiary may require Grantors to post adequate security or surety bond, reasonably satisfactory to Beneficiary to protect Beneficiary's interest.

(h) **Duty to Protect.** Grantors agrees neither to abandon nor leave unattended the Property. Grantors shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

2.4 **Taxes and Liens.** Grantors shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or materials furnished to the Property.

(a) **Right to Contest.** Grantors may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Beneficiary's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantors shall within fifteen (15) days after the lien arises, or if a lien is filed, within fifteen (15) days after

Grantors has notice of the filing, secure the discharge of the lien, or if requested by Beneficiary, deposit with Beneficiary cash or a sufficient corporate surety bond or other security satisfactory to Beneficiary in an amount sufficient to discharge the lien plus any costs and attorney fees, or other charges that could accrue as a result of foreclosure or sale under the lien. In any contest, Grantors shall defend itself and Beneficiary and shall satisfy any adverse judgment before enforcement against the Property. Grantors shall name an additional obligee under any surety bond furnished in the contest proceedings.

(b) **Evidence of Payment**. Grantors shall, upon demand, furnish to Beneficiary satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Beneficiary at any time, a written statement of the taxes and assessments against the Property.

2.5 **Property Damage Insurance.** Grantors shall at all times maintain with financially sound and reputable insurers satisfactory to Beneficiary, insurance satisfactory to Beneficiary, including, without limitation, the following: (a) casualty insurance insuring against all risk of loss, damage, destruction, theft or any other casualty or risk, covering the Property, including all of Grantors' Personal Property located therein, without deduction for depreciation, in an amount approved by Beneficiary, but in no event less than the full replacement cost thereof, with a deductible not in excess of $50,000; (b) commercial general liability insurance covering the Property and Grantors, in an amount not less than $2,000,000 per occurrence and $2,000,000 in the aggregate, for bodily injury and/or property damage liability, or such higher amounts as Beneficiary may reasonably require; (c) such other insurance or coverages as Beneficiary may require, including, without limitation, insurance against flood. All policies of insurance maintained pursuant to this section shall provide standard mortgagee endorsements or clauses naming Beneficiary as mortgagee and as loss payee (with respect to property insurance) or as additional insured (with respect to liability insurance) and shall include standard subrogation clauses acceptable to Beneficiary. All required policies shall provide for thirty (30) days' written notice to Beneficiary prior to the effective date of any cancellation or material modification thereof. Any insurance required of Grantors hereunder may be furnished by Grantors under a blanket policy, provided such policy: (1) strictly complies with all other terms and conditions contained in this section, and (2) includes an endorsement that identifies with specificity the Property as being covered under the blanket policy, provides minimum guaranteed coverage for the Property in the amounts as set forth above, and expressly waives any pro rata distribution requirement contained in such blanket policy.

Grantors shall cooperate with Beneficiary in obtaining for Beneficiary the benefits of any insurance, condemnation or other proceeds lawfully or equitably payable to it in connection with the transactions contemplated hereby, and will reimburse Beneficiary for any expenses incurred in connection therewith (including the payment by Grantors of the expense of an independent appraisal on behalf of Beneficiary in case of a fire or other casualty or condemnation affecting the Property). The delivery of any insurance policies hereunder shall constitute an assignment of all unearned premiums as further security hereunder. In the event of the foreclosure of this Deed of Trust in extinguishment or partial extinguishment of the Indebtedness, all right, title and interest of Grantors in and to all insurance policies then in force shall pass to the purchaser or to Beneficiary, as the case may be, and Beneficiary is hereby irrevocably appointed by Grantors as attorney-in-fact for Grantors to assign any such policy to said purchaser or to Beneficiary, as the case may be, without accounting to Grantors for any unearned premiums thereon. If in Beneficiary's reasonable discretion, the Property can be rehabilitated after a partial destruction of the Property, whether by flood, fire or otherwise, the proceeds derived from the insurance company's coverage shall be made available to Grantors for the repair and/or restoration of that portion of the Property that was destroyed.

2.6 **Beneficiary's Expenditures.** If any action or proceeding is commenced that would materially affect Beneficiary's interest in the Property or if Grantors fails to comply with any provision of this Deed of Trust including without limitation, Grantors' failure to discharge or pay when due any amounts Grantors is required to discharge or pay under this Deed of Trust Beneficiary on Grantors' behalf may (but shall not be

obligated to) take any action that Beneficiary deems appropriate, including, but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all such costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Beneficiary for such purposes will then bear interest at the rate charged under the Notes from the date incurred or paid by Beneficiary to the date of repayment by Grantors. All such expenses will become a part of the Indebtedness and, at Beneficiary's option, will (A) be payable on demand; (B) be added to the balance of the Notes and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Notes; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Beneficiary may be entitled upon Default.

## Article 3

3.1 **Warranty; Defense of Title.** Grantors warrants that: (a) Grantors hold good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than the senior deeds of trust referenced herein and any liens set forth in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by Beneficiary in connection with this Deed of Trust, and (b) Grantors have the full right, power and authority to execute and deliver this Deed of Trust to Beneficiary.

3.2 **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantors in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Grantors's Indebtedness shall be paid in full.

3.3 **Condemnation.**

(a) **Proceedings.** If any proceeding in condemnation is filed, Grantors shall promptly notify Beneficiary in writing and Grantors shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantors may be the nominal party in such proceeding, but Beneficiary shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Beneficiary's own choice, and Grantors will deliver, or cause to be delivered to Beneficiary such instruments as Beneficiary may request from time to time to permit such participation.

(b) **Application of Net Proceeds.** If all or any part of the Property is condemned by Eminent Domain proceedings or by any proceeding or purchase in lieu of condemnation, Beneficiary may, at its election, require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorney fees incurred by Trustee or Beneficiary in connection with the condemnation. If in Beneficiary's reasonable discretion, the Property can be rehabilitated after a partial condemnation, the proceeds derived from the government's award shall be made available to Grantors for the repair and/or restoration of that portion of the Property that was condemned.

3.4 **Imposition of Fees and Charges by Governmental Authorities.**

(a) **Current Taxes, Fees and Charges.** Upon request by Beneficiary, Grantors shall execute such documents in addition to this Deed of Trust and whatever other action is requested by Beneficiary to perfect and continue Beneficiary's lien on the Property. Grantors shall reimburse Beneficiary for all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps and other charges for recording this Deed of Trust.

(b) **Taxes.** The following shall constitute taxes to which this Section shall apply: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Grantors which Grantors is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3)a tax on this type of Deed of Trust chargeable against the Beneficiary or the holder of the Notes; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantors.

**Article 4**

**4.1 Security Agreement; Financing Statements Further Assurances.**

(a) **Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures and Beneficiary shall have all of the rights of a secured party under Article 9 of the Colorado Uniform Commercial Code, as amended from time to time.

(b) **Security Interest.** Grantors shall execute and deliver to Beneficiary, in form and substance satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may, from time to time, reasonably consider necessary to create, perfect and preserve Beneficiary's security interest herein granted, and Beneficiary may cause such statements and assurances to be recorded and filed, at such times and places as may be required or permitted by law, to so create, perfect and preserve such security interest. Grantors shall reimburse Beneficiary for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantors shall not remove, sever or detach the Personal Property from the Property. Grantors hereby irrevocably authorizes Beneficiary at any time and from time to time to file in any filing office any initial financing statements and amendments thereto that (1) indicate the collateral as "all assets of Grantors used or procured for use or otherwise relating to the Property" or words of similar effect, or as being of equal or lesser scope or in greater detail, and to indicate the Property as defined, or in a manner consistent with the term as defined, in this Deed of Trust and (2) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of any such filing office for the sufficiency or filing office acceptance of any initial financing statement or amendment. Grantors shall pay to Beneficiary, from time to time, upon demand, any and all reasonable costs and expenses incurred by Beneficiary in connection with the filing of any such initial financing statements and amendments, including reasonable attorneys' fees and all disbursements. Grantors shall, any time and from time to time, take such steps as Beneficiary may reasonably request for Beneficiary to obtain "control" of any Personal Property for which control is a permitted or required method to perfect, or to ensure priority of the security interest in such Personal Property granted herein.

(c) **Addresses.** The mailing address of Grantors as debtor and Beneficiary as secured party from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

(d) **Uniform Commercial Code Remedies.** Beneficiary shall have all the rights, remedies and recourses with respect to the Personal Property, Improvements, fixtures, and Rents afforded to a "**Beneficiary**" by the aforesaid Uniform Commercial Code in addition to, and not in limitation of, the other rights, remedies and recourses afforded by the Notes and Deed of Trust.

(e) **Fixture Filing.** This Deed of Trust shall also constitute a "fixture filing" for the purposes of the aforesaid Article 9 of the Uniform Commercial Code.

### Article 5

5.1 **Further Assurances.** At any time, and from time to time, upon request of Beneficiary, Grantors will make, execute and deliver, or will cause to be made, executed or delivered, to Beneficiary or to Beneficiary's designee, and when requested by Beneficiary, cause to be filed, recorded, refiled, or rerecorded as the case may be, at such times and in such offices and places as Beneficiary may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurances, certificates and other documents as may, in the sole discretion of Beneficiary, be necessary or desirable in order to effectuate, complete, perfect, continue or preserve (1) Grantors' obligations under the Notes and this Deed of Trust and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantors.

5.2 **Attorney-In-Fact.** If Grantors fails to do any of the things referred to in the preceding section, Beneficiary may do so for and in the name of Grantors and at Grantors' expense. For such purposes, Grantors hereby irrevocably appoints Grantors' attorney-in-fact for the purpose of making, executing, delivering, filing, recording and doing all other things as may be necessary or desirable, in Beneficiary's sole opinion, to accomplish the matters referred to in the preceding section.

5.3 **Full Performance.** Upon the full performance of all the obligations under the Notes and this Deed of Trust, Trustee shall, upon production of the documents and fees as required by Colorado law, release this Deed of Trust, and such release shall constitute a release of the lien. Beneficiary agrees to cooperate with Grantors in obtaining such release and releasing the other collateral securing the Indebtedness upon full payment and performance of all obligations under the Notes and Deed of Trust.

5.4 **Due on Sale and Transfers.** Beneficiary has the right, pursuant to the terms of the Notes, but not the obligation to call the Indebtedness immediately due and owing ("Acceleration") upon Grantors' Transfer (as defined herein) of the Property. The following events shall be referred to herein as a "Transfer": (i) a transfer or conveyance of title (or any portion thereof, legal or equitable) of the Property (or any part thereof or interest therein); (ii) the execution of a contract or agreement creating a right to title (or any portion thereof, legal or equitable) in the Property (or any part thereof or interest therein); (iii) a sale or transfer of, or the execution of a contract or agreement creating a right to acquire or receive any of the beneficial partnership interest in the Grantors; or (iv) a sale or transfer of, or the execution of a contract or agreement creating a right to acquire or receive the controlling interest of the Grantors, except in the event of a death or incapacity. Not to be included as a Transfer are (i) the creation of a lien or encumbrance subordinate to this Deed of Trust; or (ii) the creation of a purchase money security interest for day-to-day business operations; or (iii) the grant of any leasehold interest not containing an option to purchase. Upon any Transfer if Beneficiary exercises such option to Accelerate, Beneficiary shall give Grantors Notice of Acceleration. Such Notice shall also provide a period of not less than 10 days from the date the Notice is given within which Grantors may pay the sums declared due. If Grantors fails to pay such sums prior to the expiration of such period, Beneficiary may, without further notice or demand on Grantors, invoke any remedies permitted herein. If a Transfer occurs and should Beneficiary not exercise Beneficiary's option to Accelerate, Transferee shall be deemed to have assumed all obligations of Grantors under this Deed of Trust including all sums secured hereby whether or not the instrument evidencing such conveyance, contract, or grant expressly so provides. This covenant shall run with the Property and remains in full force and effect until the Indebtedness is paid in full. Should Beneficiary not elect to Accelerate upon the occurrence of such Transfer then, subject to the provisions above, the mere fact of a lapse of time or the acceptance of payment subsequent to any of such events, whether or not Beneficiary had actual or constructive notice of such Transfer, shall not be deemed a waiver of Beneficiary's right to make such election nor shall Beneficiary be estopped therefrom by virtue thereof.

## Article 6

6.1 **Events of Default.** Each of the following, at Beneficiary's option, shall constitute an Event of Default under this Deed of Trust:

(a) **Payment Default.** GrowCo fails to make any payment when due under the Indebtedness.

(b) **Other Defaults.** Grantors fail to comply with any other term, obligation, covenant or condition contained in this Deed of Trust.

(c) **Default on Other Payments.** Failure of Grantors within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

(d) **Default in Favor of Third Parties.** Should Grantors or GrowCo default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantors' Property or GrowCo's ability to repay the Indebtedness or Grantors' ability to perform the obligations under this Deed of Trust.

(e) **False Statements.** Any warranty, representation or statement made or furnished to Beneficiary by Grantors or on Grantors' behalf under this Deed of Trust is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

(f) **Breach of Other Agreement.** A breach by GrowCo of the terms of any other agreement between GrowCo and Beneficiary that is not remedied within any grace period provided for therein, including without limitation, any agreement concerning the Indebtedness or other obligation of GrowCo to Beneficiary, whether existing now or in the future.

(i) **Foreclosure of Other Liens.** If the holder of any lien or security interest or deed on the Property whether senior or junior to the lien of this Deed of Trust (without hereby implying Beneficiary's consent to the existence, placing, creating or permitting of any such lien or security interest or deed) institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

6.2 **Right to Cure.** If any default, other than a default in payment is curable, then it may be cured by Grantors and/or GrowCo if Grantors and/or GrowCo, after receiving written notice from Beneficiary demanding cure of such default: (1) cures the default within sixty (60) days; or (2) if the cure requires more than sixty (60) days, immediately initiates steps which Beneficiary deems sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

6.3 **Rights and Remedies on Default.** If an Event of Default occurs under this Deed of Trust, at any time Trustee or Beneficiary may exercise any one or more of the following rights and remedies:

(a) **Election of Remedies.** Election by Beneficiary to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantors under this Deed of Trust, after Grantors' failure to perform, shall not affect Beneficiary's right to declare a default and exercise its remedies.

(b) **Accelerate Indebtedness.** Beneficiary shall have the right, at its option and upon notice to Grantors or GrowCo, to declare the entire Indebtedness immediately due and payable.

(c) **Entry on Property**. Beneficiary shall have the right to demand that Grantors shall forthwith surrender to Beneficiary the actual possession of the Property, and to the fullest extent permitted by law, enter and take possession of all or any part of the Property with the appointment of a receiver and exclude Grantors and its agents and employees wholly therefrom, and have joint access with Grantors to the books, papers and accounts of Grantors. If Grantors shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by Beneficiary, Beneficiary may obtain a judgment or decree conferring upon Beneficiary the right to immediate possession or requiring Grantors to deliver immediate possession of the Property to Beneficiary, and Grantors hereby specifically covenants and agrees that Grantors will not oppose, contest or otherwise hinder or delay Beneficiary in any action or proceeding by Beneficiary to obtain such judgment or decree. Grantors will pay to Beneficiary, upon demand, all expenses of obtaining such judgment or decree, including, without limitation, reasonable compensation to Beneficiary, its attorneys and agents, and all such expenses and compensation shall, until paid, become part of the Indebtedness and shall be secured by this Deed of Trust. Upon every such entering upon or taking of possession, Beneficiary may hold, store, use, operate, manage and control the Property and conduct the business thereof, and, from time to time, (i) undertake all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other necessary property, (ii) insure or keep the Property insured, (iii) manage and operate the Property and exercise all the rights and powers of Grantors to the same extent as Grantors could in its own name, or otherwise act with respect to the same, and (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted to Beneficiary, all as Beneficiary from time to time may determine to be in its best interest. Beneficiary may collect, sue for and receive all the Rents and other issues, profits and revenues from the Property, including, without limitation, those past due as well as those accruing thereafter. Anything in this Deed of Trust to the contrary notwithstanding, Beneficiary shall not be obligated to discharge or perform the duties of the landlord to any tenant or Lessee or incur any liability as the result of any exercise by Beneficiary of its rights under this Deed of Trust until Beneficiary expressly assumes such obligations, and Beneficiary shall be liable to account only for the Rents actually received by Beneficiary. Whether or not Beneficiary takes possession of the Property, Beneficiary may make, modify, enforce, cancel or accept surrender of any management agreement or Lease, remove and evict any Lessee, increase or decrease Rents under any Lease, appear in and defend any action or proceeding purporting to affect the Property, and perform and discharge each and every obligation, covenant and agreement of Grantors contained in any Lease. Neither the entering upon and taking possession of the Property, nor the collection of any Rents and the application thereof as aforesaid, shall cure or waive any Event of Default theretofore or thereafter occurring, or affect any notice of an Event of Default or invalidate any act done pursuant to any such notice. Beneficiary shall not be liable to Grantors, anyone claiming under or through Grantors, or anyone having an interest in the Property by reason of anything done or left undone by Beneficiary pursuant to this section, unless such action or inaction by Beneficiary is a result of gross negligence or willful misconduct. Nothing contained in this section shall require Beneficiary to incur any expense or do any act. If the Rents are not sufficient to meet the costs of taking control of and managing the Property, any funds expended by Beneficiary for such purposes shall become indebtedness of Grantors to Beneficiary secured by this Deed of Trust. Such amounts, together with interest at the Default Interest Rate under the Notes and reasonable attorneys' fees, if applicable, shall be immediately due and payable. Notwithstanding Beneficiary's continuance in possession or receipt and application of Rents, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law upon or after the occurrence of an Event of Default. Any of the actions referred to in this Section may be taken by Beneficiary at such time as Beneficiary is so entitled, without regard to the adequacy of any security for the Indebtedness hereby secured.

(c) **Foreclosure.** Beneficiary shall have the right to cause all or any part of the Property and Personal Property, if Beneficiary decides to proceed against it as if it were real property, to be sold

by the Trustee according to the foreclosure laws of the State of Colorado. The Trustee shall give notice in accordance with the laws of Colorado. Beneficiary has the right to bid a deficiency amount at the foreclosure sale to preserve its right to collect the deficiency, if any, owed on the Indebtedness after the foreclosure sale. Beneficiary may bring an action in any court of competent jurisdiction to foreclose this Deed of Trust. Notwithstanding anything to the contrary contained in this Deed of Trust, the following provisions shall apply with respect to foreclosure proceedings:

1. **Public Trustee.** Beneficiary may foreclose this Deed of Trust, insofar as it encumbers the Property, by way of a trustee's sale pursuant to the provisions of Title 38, Article 38, Colorado Revised Statutes, as currently in effect, as amended, or in any other manner then permitted by law.

2. **Judicial Foreclosure.** The right to foreclose this Deed of Trust as a deed of trust by appropriate proceedings in any court of competent jurisdiction is also hereby given.

3. **Expenses of Trustee's Sale or Foreclosure.** All fees, costs and expenses of any kind incurred by Beneficiary in connection with foreclosure of this Deed of Trust, including, without limitation, the costs of any appraisals of the Property obtained by Beneficiary, all costs of any receivership for the Property advanced by Beneficiary, and all attorneys' and consultants' fees incurred by Beneficiary, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs and costs of procuring all such abstracts of title, title searches and examination, title insurance policies and similar data and assurances with respect to title, as Trustee or Beneficiary may deem necessary either to prosecute such suit or to evidence to bidders at the sale that may be had pursuant to such proceedings the true condition of the title to or the value of the Property, together with and including a reasonable compensation to Trustee, shall constitute a part of the obligations and may be included as part of the amount owing from Grantors to Beneficiary at any foreclosure sale.

4. **Notice and Mailing List.** Beneficiary may use the last known address or the address provided to Beneficiary for any party receiving notice of the foreclosure proceedings. Beneficiary shall not be under any duty to investigate or research current addresses for such notices. It shall be deemed sufficient for Beneficiary to send notices and/or pleadings to the address listed, if any, on the Colorado Secretary of State's website for a particular individual or entity.

(d) **Payment of Expenses.** Grantors shall pay, on demand, all expenses incurred by Beneficiary in any efforts to enforce any terms of this Deed of Trust after the occurrence of an Event of Default that is continuing, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred until actually paid by Grantors at the Default Interest Rate, and the same shall be secured by this Deed of Trust and by all of the other Loan Documents securing all or any part of the Indebtedness.

(e) **Remedies Cumulative Concurrent and Non-Exclusive.** Beneficiary shall have all rights, remedies and recourses available at law or equity (including, without limitation, those granted by the Uniform Commercial Code then in effect in the applicable jurisdiction) and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, successively or concurrently against others obligated under the Notes or against the Property, or against any one or more of them, at the sole discretion of Beneficiary, (c) may be exercised as often as

occasion therefor shall arise, it being agreed by Grantors that the exercise or failure to exercise any of same shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse, and (d) are intended to be, and shall be, nonexclusive. If there exists additional security for the performance of the obligations secured hereby, the holder of the Notes, at its sole option and without limiting or affecting its rights or remedies hereunder, may exercise any of the rights and remedies to which it may be entitled hereunder, either concurrently with whatever rights it may have in connection with such other security or in such order as it may determine.

(f) **No Conditions Precedent to Exercise of Remedies.** Neither Grantors nor any other person hereafter obligated for payment of all or any part of the Indebtedness, or fulfillment of all or any of the Obligations, shall be relieved of such obligation by reason of (a) the failure of Beneficiary to comply with any request of Grantors or of any other person so obligated, to foreclose the Deed of Trust, (b) the release, regardless of consideration, of the Property or the addition of any other property to the Property, (c) any agreement or stipulation between any subsequent owner of the Property and Beneficiary extending, renewing, rearranging or in any other way modifying the terms of this Deed of Trust without first having obtained the consent of, given notice to or paid any consideration to Grantors or such other person, and in such event, Grantors and all such other persons shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged, in writing, by Beneficiary, or (d) by any other act or occurrence, save and except the complete payment of the Indebtedness.

(g) **Waiver of Appraisement, Valuation, etc.** Grantors agrees, to the full extent permitted by law, that in case of an Event of Default on the part of Grantors hereunder, neither Grantors nor anyone claiming through or under Grantors will set up, claim or seek to take advantage of any moratorium, reinstatement, forbearance, appraisement, valuation, stay, extension, homestead exemption or redemption laws now or hereafter in force in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust or the sale of the Property, the delivery of possession thereof immediately after such sale to a receiver at such sale, or the exercise of any other remedy hereunder; and Grantors, for itself and all who may at any time claim through or under it, hereby waives to the full extent that it may lawfully so do, the benefit of all such laws, and any and all right to have assets subject to the security interest of this Deed of Trust marshaled upon any foreclosure or sale under the power herein granted or a sale in inverse order of alienation.

(h) **Discontinuance of Proceedings.** In case Beneficiary shall have proceeded to enforce any right, power or remedy under this Deed of Trust by foreclosure, entry or otherwise, or in the event Beneficiary commences advertising of the intended exercise of the sale under power provided hereunder and such proceeding or advertisement shall have been withdrawn, discontinued or abandoned for any reason, or shall have been determined adversely to Beneficiary, then in every such case (i) Grantors and Beneficiary shall be restored to their former positions and rights, (ii) all rights, powers and remedies of Beneficiary shall continue as if no such proceeding had been taken, (iii) each and every uncured Event of Default declared or occurring prior or subsequent to such withdrawal, discontinuance or abandonment shall be and shall be deemed to be a continuing Event of Default, and (iv) neither this Deed of Trust, nor the Notes, nor the Indebtedness shall be or shall be deemed to have been reinstated or otherwise affected by such withdrawal, discontinuance or abandonment; and Grantors hereby expressly waives the benefit of any statute or rule of law now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the above.

DEBTOR SHALL BE LIABLE FOR THE DEFICIENCIES IN THE EVENT THE PROCEEDS ARE NOT SUFFICIENT TO FULLY PAY ITEMS ABOVE TO THE EXTENT PERMITTED BY APPLICABLE LAW.

(j) **UCC Remedies.** With respect to all or any part of the Personal Property, Beneficiary shall have all the rights of a secured party under the Uniform Commercial Code as codified in Colorado Revised Statutes.

(k) **Collect Rents.** Beneficiary shall have the right, without notice to the Grantors or Grantors to take possession of and manage the Property and collect the Rents, if any, including amounts past due and unpaid (only if accruing after the date of this Deed of Trust), and apply the net proceeds, over and above Beneficiary's costs against the Indebtedness. In furtherance of this right, Beneficiary may require any tenant or other user of the Property to make payments of rent directly to Beneficiary. If the Rents are collected by Beneficiary, then Grantors irrevocably designates Grantors' attorney-in-fact to endorse instruments received in payment thereof in the name of Grantors and to negotiate the same and collect the proceeds. Payments by tenants or other users to Beneficiary in response to Beneficiary's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Beneficiary may exercise its rights under this section either in person, by agent or through a receiver.

(l) **Appoint Receiver.** Beneficiary shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Beneficiary's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Beneficiary shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon *ex parte* application and without notice, notice being hereby expressly waived.

(m) **Tenancy at Sufferance.** If Grantors remains in possession of the Property after the Property is sold as provided herein or Beneficiary otherwise becomes entitled to possession of the Property upon default of Grantors, Grantors shall become a tenant at sufferance of Beneficiary or the purchaser of the Property and shall, at Beneficiary's option, either (1) pay a reasonable rental for the use of the Property or (2) vacate the Property immediately upon the demand of Beneficiary.

(n) **Other Remedies.** Trustee or Beneficiary shall have any other right or remedy provided in this Deed of Trust or available at law or in equity.

6.4 **Sale of the Property.** In exercising its rights and remedies, Beneficiary shall be free to designate on or before it files a notice of election and demand with the Trustee, that the Trustee sell all or any part of the Property together or separately, in one sale or by separate sales. Beneficiary shall be entitled to bid at any public sale on all or any portion of the Property. Upon any sale of the Property, whether made under a power of sale granted in this Deed of Trust or pursuant to judicial proceedings, if the holder of the Notes is a purchaser at such sale it shall be entitled to use and apply all, or any portion of the Indebtedness for or in settlement or payment of all, or any portion of, the purchase price of the Property purchased, and, in such case, this Deed of Trust, the Notes, and any documents evidencing expenditures secured by this Deed of Trust shall be presented to the person conducting the sale in order that the amount of Indebtedness so used or applied may be credited therein as having been paid.

6.5 **Attorneys' Fees and Expenses.** If Beneficiary forecloses or institutes any suit to enforce any of the terms of this Deed of Trust, Beneficiary shall be entitled to recover its attorney fees and costs. Whether or not any court action is involved and to the extent not prohibited by law, all reasonable expenses Beneficiary

incurs that in Beneficiary's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable upon demand and shall bear interest at the Note Rate from the date the expenditure until repaid. Expenses covered by this section include, without limitation, Beneficiary's attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any post-judgment collection costs, costs for searching records, obtaining title reports (including foreclosure reports), surveyor's reports, appraisal fees, title insurance, and fees for the Trustee. Grantors will also pay any court costs in addition to all other sums provided by law.

6.6 **Rights of Trustee.** To the extent permitted by Colorado law, the Trustee shall have all of the rights and duties of Beneficiary as set forth in the foregoing section.

## Article 7

## Assignment of Leases and Rents

7.1 **Assignment.** Upon an Event of Default, the Beneficiary may invoke this Assignment of Leases and Rents and deal with the tenants directly for the collection of Rents. As additional consideration for the Indebtedness and to secure payment of the Indebtedness and performance of the obligations set forth herein, Grantors hereby assigns, conveys and transfers to Beneficiary the following:

(a) All Leases, written or oral, now in existence or hereafter arising, and all agreements entered into by Grantors or its predecessor in interest for the use and occupancy of all or any portion of the Property, with the right, power and authority of Grantors to alter, modify or change the terms of such Leases or to surrender, cancel or terminate such Leases without the consent of Grantors, together with any and all extensions and renewals thereof including subleases, if any.

## Article 8

## Miscellaneous Provisions

8.1 **Entire Agreement and Modification.** This Deed of Trust contains the entire agreement between the parties relating to the subject matter hereof and thereof, and all prior agreements, understandings and representations relative thereto which are not contained herein or therein are terminated. This Deed of Trust may not be amended, revised, waived, discharged, released or terminated unless a written instrument or instruments has or have been executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. Any alleged amendment, revision, waiver, discharge, release or termination, which is not so documented, shall not be effective as to any party.

8.2 **Notices.** Any notice required to be given under this Deed of Trust, including without limitation any notice of sale shall be given in writing and shall be effective when actually delivered, when actually received by facsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed when deposited in the U.S. mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown on the first page of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantors agrees to keep Beneficiary informed at all times of Grantors' current address. If there is more than one Grantors, any notice given by Beneficiary to any Grantors is deemed to be notice to all Grantors.

8.3 **Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**8.4 Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Beneficiary in any capacity, without the written consent of the Beneficiary.

**8.5 Governing Law.** This Deed of Trust shall be governed by federal law applicable to Beneficiary and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions.

**8.6 Joint and Several Liability.** All obligations of Grantors under this Deed of Trust shall be joint and several, and all references to Grantors shall mean each and every Grantors, and all references to Grantors shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, LLC or similar entity, it is not necessary for Beneficiary to inquire into the powers of any of the officers, directors, partners, members or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**8.7 No Waiver by Beneficiary.** Beneficiary shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Beneficiary. No delay or omission on the part of Beneficiary in exercising any right shall operate as a waiver of such right or any other right. A waiver by Beneficiary of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Beneficiary's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Beneficiary, nor any course of dealing between Beneficiary and Grantors, shall constitute a waiver of any of Beneficiary's rights or any of Grantors's obligations as to any future transactions. Whenever the consent of Beneficiary is required under this Deed of Trust, the granting of such consent by Beneficiary in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Beneficiary.

**8.8 Severability.** If a court of competent jurisdiction finds that any provision of this Deed of Trust to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**8.9 Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantors' interest, this Deed of Trust shall be binding upon and insure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person or entity other than Grantors, Beneficiary, without notice to Grantors, may deal with Grantors' successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantors from the obligations of this Deed of Trust or liability under the Indebtedness.

**8.10 Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**8.11 Waiver of Homestead Exemption.** Grantors hereby releases and waives all rights and benefits of the Colorado homestead exemption laws as to all Indebtedness secured by this Deed of Trust.

**8.12 Survival of Obligations.** Each and all of the obligations set forth herein shall survive the execution and delivery of the Notes and the consummation of the loan called for therein, and shall continue in full force and effect until the Indebtedness shall have been irrevocably paid in full.

**8.13 Covenants Running with the Land.** All obligations contained in this Deed of Trust are intended by the parties to be, and shall be construed as, covenants running with the Property.

**8.14 No Joint Venture.** The rights and obligations granted herein shall not, in any way create or contribute to the creation of a partnership or joint venture or similar arrangement between Grantors and the Beneficiary.

**8.15 Assignment.** This Deed of Trust is assignable by Beneficiary and any assignment hereof by Beneficiary shall operate to vest in the assignee all rights and powers herein conferred upon and granted to Beneficiary. If this Deed of Trust is assigned to one or more Beneficiaries, who, together with Beneficiary shall be Beneficiaries of this Deed of Trust, then one of such Beneficiaries, which may be, but is not required to be, Beneficiary, shall be designated as "Agent" or other representative with whom Grantors is to deal.

**8.16 Construction of this Instrument.** This instrument may be construed as a mortgage, Deed of Trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation, contract, or any one or more of them, in order to fully effectuate the liens and security interests hereof and the purposes and agreements herein set forth.

**8.17 Further Assurances.** Grantors, upon the request of Beneficiary, will execute, acknowledge, deliver and record and/or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Deed of Trust.

**8.18 Statute of Limitations.** The Grantors to the full extent permitted by law waives the pleading of any statute of limitations as a defense to any obligation secured by this Deed of Trust.

**8.19 No Third Parties Benefited.** This Deed of Trust is made and entered into for the sole protection of and benefit of Grantors and Beneficiary, and their successors and assigns, and no other person or persons shall have any right to action hereon or rights to the Loan funds at any time.

**8.20 Commercial Loan.** The Grantors hereby stipulates and warrants that the Loan secured hereby is a commercial loan, and that all of the proceeds of such Loan will be used solely to acquire or carry on a business or commercial activity.

**8.21 Waiver of Right to Trial by Jury.** To the maximum extent permitted by law, each party to this Deed of Trust hereby expressly waives any right to trial by jury of any claim, demand, action or cause of action (1) arising under this Deed of Trust or any other instrument, document or agreement executed or delivered in connection therewith, or (2) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect to this Deed of Trust or any other instrument, document or agreement executed or delivered in connection herewith, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and each party hereby agrees and consents that any such claim, demand, action or cause of action shall be decided by court trial without a jury, and that any party to this Deed of Trust may file an original counterpart or a copy of this section with any court as written evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

**8.22 Lien Irrevocable; No Offset.** The lien created hereby is irrevocable by Grantors. No offset or claim that Grantors may now or in the future have against Beneficiary shall relieve Grantors from paying any amounts or performing any obligations due hereunder.

## Article 9

**Definitions.** Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall

have the meanings attributed to such terms in the UCC. The following capitalized words and terms shall have the following meanings when used in this Deed of Trust:

9.1 Beneficiary. "Beneficiary" means those individuals and entities listed on **Schedule 1** attached hereto and their successors and assigns.

9.2 Environmental Laws. "Environmental Laws" means any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as amended, 42 U.S.C. Section 9601 et. seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S. C. Section 1801 et. seq., the Resource Conservation and Recovery Act, 42 U.S. C. Section 6901, et. seq. or other applicable state or federal laws, rules or regulations adopted pursuant thereto.

9.3 Event of Default. "Event of Default" means any of the events of default as set forth in this Deed of Trust in the events of default section of this Deed of Trust.

9.4 Grantors. "Grantors" mean Orlando Reservoir No. 2 Company, LLC and Two Rivers Farms F-2, Inc.

9.5 Hazardous Substances. "Hazardous Substances" means materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

9.6 Improvements. "Improvements" means all existing and future improvements, buildings, and structures affixed on the Property, facilities, additions, replacements and other construction on the Property.

9.7 Indebtedness. "Indebtedness" means all principal, interest and other amounts, costs and expenses payable under the Note or Notes, together will all renewals of, extensions of, modifications to, consolidations or and substitutions for the Notes and any amounts expended or advanced by Beneficiary to discharge Grantors' obligations or expenses incurred by Trustee or Beneficiary to enforce Grantors' obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

9.8 Lease. "Lease" means any agreement for the Lease of any portion of the Property in which Grantors is the Landlord under such lease agreement.

9.9 Beneficiary. "Beneficiary" means those individuals and entities listed on **Schedule 1** attached hereto and their successors and assigns.

9.10 Lessee. "Lessee" means any individual who has executed a lease agreement ("Lease") with the Grantors or any agent of the Grantors for purposes of creating a tenancy at the Property.

9.11 Personal Property. "Personal Property" means all equipment, furniture, fixtures and other articles of personal property now or hereafter owned by Grantors, and now or hereafter attached or affixed to the Property; together with all accessions, parts and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Personal Property

9.12 Rents. "Rents" means all of the rents, receipts, revenues, issues, income, proceeds, security and other types of deposits and other benefits and profits now due (excluding those which were incurred prior to the date of this Deed of Trust) or which may become due or to which Grantors may now or hereafter shall become entitled (whether upon the expiration of any applicable period of redemption or otherwise) or may demand or claim, arising or issuing from or out of the Leases, or from or out of using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Property.

9.13 Trustee. "Trustee" means the Public Trustee of Huerfano County.

GRANTORS ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST AND GRANTORS AGREES TO ITS TERMS.

IN WITNESS WHEREOF, Grantors has executed and delivered this Deed of Trust as of the date first mentioned above.

**GRANTORS:**

ORLANDO RESERVOIR NO. 2 COMPANY, LLC
a Colorado limited liability company

By: Wayne Harding, CFO and Treasurer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

This instrument was acknowledged before me on this 9th day of September, 2015 by Wayne Harding in his capacity as CFO of Orlando Reservoir No. 2 Company, LLC.

ANASTASSIYA DEGLDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154021819
MY COMMISSION EXPIRES JUN 6 2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

TWO RIVERS FARMS F-2, Inc.,
a Colorado corporation

By: ______________________
Wayne Harding, Chief Financial Officer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

The foregoing instrument was acknowledged before me this 9th day of September 2015, by Wayne Harding, as Chief Financial Officer of Two Rivers Farms F-2, Inc., a Colorado corporation.

ANASTASSIYA GEGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154022617
MY COMMISSION EXPIRES JUNE 6, 2019

______________________
Notary Public

[SEAL]

My commission expires:
June 6th, 2019

# SCHEDULE 1
# BENEFICIARIES

GrowCo Noteholders

| | |
|---|---|
| Blue & Green, LLC | $2,115,000 |
| Thomas Prasil Trust u/a/d 11-26-03 | $200,000 |
| Hugo Zimmermann | 425,000 |
| Ursula Gutscher | $150,000 |
| Lee James Wagner | $125,000 |
| Brant Wiwi | $65,000 |
| Kelly, Matthew Pensco Trust fbo Matthew J. Kelley IRA | $50,000 |
| Kelly, Megan Pensco Trust fbo Megan Kelley IRA | $50,000 |
| Harnish, Michael IRA Resources, Inc. FBO Michael Wyl Harnish IRA #35-37097 | $100,000 |
| Miller, Maureen IRA Resources, Inc. FBO Maureen A Miller IRA 35-37034 | $50,000 |
| Richard Wiwi IRA Resources, Inc. FBO Richard Wiwi IRA 35-37093 | $10,000 |
| Harding, Wayne IRA Resources, Inc.FBO Wayne Harding IRA 35-35551 | $100,000 |
| David Marshall | $60,000 |
| I. Wistar Morris IRA | $250,000 |
| Dan Foster IRA | $100,000 |
| Loughran, Mary SEP IRA NDIRA, Inc. #9001066 | $50,000 |
| Angela Swartz, Angela IRA Resources, Inc., FBO Angela Swartz IRA | $100,000 |
| Totals | $4,000,000 |

# EXHIBIT A
## LAND – LEGAL DESCRIPTION

A parcel of land located in Sections 17, 18, 19 and 20, Township 26 South, Range 66 West of the 6th P.M., County of Huerfano, State of Colorado, also being a portion of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E") being more particularly described as follows:

Beginning at the southeast corner of the Orlando Reservoir No. 2 parcel and the northerly right-of-way line of Huerfano County Road No. 104; thence along said northerly right-of-way line the following three (3) courses:

1) N 85°18'00"W, a distance of 303.00 feet;
2) On the arc of a curve to the right, through a central angle of 30°38'00", whose radius is 600.00 feet, an arc length of 320.79 feet;
3) 54°40'00"W, a distance of 665.85 feet; thence departing said northerly right-of-way line the following twenty-seven (27) courses:

1) N 29°45'12"W, a distance of 604.71 feet;
2) N 26°55'29"W, a distance of 359.64 feet;
3) N 20°11'06"W, a distance of 487.20 feet;
4) N 32°26'57"W, a distance of 602.35 feet;
5) N 53°33'17"W, a distance of 138.08 feet;
6) N 66°50'22"W, a distance of 301.61 feet;
7) N 75°17'28"W, a distance of 137.03 feet;
8) N 85°04'32"W, a distance of 309.44 feet;
9) S 88°31'11"W, a distance of 157.36 feet;
10) N 76°43'49"E, a distance of 182.98 feet;
11) N 73°18'09"E, a distance of 168.99 feet;
12) N 58°37'40"E, a distance of 47.34 feet;
13) N 28°30'52"E, a distance of 144.34 feet;
14) N 34°51'01"W, a distance of 140.93 feet;
15) N 18°19'17"E, a distance of 77.07 feet;
16) N 41°59'46"E, a distance of 118.15 feet;
17) N 42°50'14"E, a distance of 151.08 feet;
18) N 42°24'43"E, a distance of 253.21 feet;
19) N 38°36'33"E, a distance of 32.56 feet;
20) N 23°25'39"E, a distance of 141.45 feet;
21) N 00°39'19"E, a distance of 102.77 feet;
22) N 29°08'34"W, a distance of 378.60 feet;
23) N 34°13'15"W, a distance of 114.68 feet;
24) N 63°26'11"W, a distance of 100.95 feet;
25) N 63°26'11"W, a distance of 70.12 feet;
26) On the arc of a curve to the right, through a central angle of 153°27'11", whose radius is 381.91 feet, an arc length of 1022.84 feet;
27) N 00°01'00"E, a distance of 27.60 feet, to the North line of the Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence S 89°59'00"E, along said North line a distance of 2047.92 feet; thence departing said North line the following twenty-four (24) courses:

1) S 00°01'00"W, a distance of 61.13 feet;
2) S 55°00'31"E, a distance of 79.16 feet;
3) S 36°54'16"E, a distance of 228.02 feet;
4) S 47°48'31"E, a distance of 262.80 feet;

5) S 60°48'16"E, a distance of 90.60 feet;
6) S 30°37'38"E, a distance of 403.12 feet;
7) S 56°18'35"E, a distance of 376.36 feet;
8) S 57°59'41"E, a distance of 274.36 feet;
9) S 58°32'41"E, a distance of 402.85 feet;
10) S 35°31'10"E, a distance of 174.28 feet;
11) S 04°49'25"E, a distance of 111.00 feet;
12) S 21°50'49"W, a distance of 166.48 feet;
13) S 02°50'15"W, a distance of 67.98 feet;
14) N 81°50'02"W, a distance of 101.65 feet;
15) S 51°28'22"W, a distance of 87.41 feet;
16) S 67°08'14"W, a distance of 75.69 feet;
17) S 48°36'02"W, a distance of 36.58 feet;
18) S 17°31'48"W, a distance of 26.11 feet;
19) S 02°51'57"W, a distance of 138.14 feet;
20) S 70°33'01"E, a distance of 329.43 feet;
21) S 29°45'05"E, a distance of 173.68 feet;
22) S 48°12'39"E, a distance of 127.54 feet;
23) S 65°10'56"E, a distance of 67.41 feet;
24) S 45°56'50"E, a distance of 175.27 feet to the boundary of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence along said boundary the following three (3) courses:
1) S 06°27'00"E, a distance of 233.05 feet;
2) S 19°01'00"W, a distance of 799.00 feet;
3) S 46°14'00"W, a distance of 1850.00 feet, to the Point of Beginning, Containing 322.21 acres, more or less.

ACCORDING TO THE CLERK AND RECORDER FOR HUERFANO COUNTY, COLORADO.

# EXHIBIT B
# WATER RIGHTS – LEGAL DESCRIPTION

The following water rights situate, lying and being in the County of Huerfano, COLORADO, described as follows:

A) ORLANDO RESERVOIR NO. 2, decreed for a total of 3,110 acre- feet storage, as follows:

I) ORLANDO RESERVOIR NO. 2, for storage of 43,560,000 cubic feet of water (1,000 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication October 3, 1921 (previous adjudication date was October 15, 1901), in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River through and by means of the Orlando Canal No. 3, and Greasewood Arroyo, through and by means of the Greasewood Arroyo Diverting Canal, and as more particularly describes in the aforesaid Decree entered October 31, 1921, in Civil Action No. 1414 (Priority No. 349).

II) ORLANDO RESERVOIR NO. 2, (ENLARGEMENT), for storage of 35,078,750 CUBIC FEET OF WATER (800 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication (conditional) October 3, 1921 in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right made absolute by Decree in Civil Action No. 1414-60, and 1414-62, entered November 1, 1960, and November 8, 1962 (Priority No. 349).

III) ORLANDO RESERVOIR NO. 2, (SECOND ENLARGEMENT), for storage of 1,310 acre-feet of water, for irrigation, date of appropriation October 2, 1906, date of adjudication (conditional) October 3, 1921, in Civil Action 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right partly made absolute November 1, 1960 (320 acre-feet) and April 2, 1962 (990 acre-feet) (Priority No. 367 ½).

Together with the Orlando Canal No. 3 andthe Greasewood Arroyo Diverting Canal, described as follows:

IV) That the headgate of the Orlando Canal No. 3, is located at a point on the North bank of the Huerfano River, from whence the West quarter corner of Section 25, Township 26 South, Range 66 West of the 6th PM, bears North 5°30' West 973 feet, said canal having a carrying capacity of 130 cubic feet of water per second of time.

V) That the headgate of the Greasewood Arroyo Diverting Canal, is located at a point on the said Greasewood Arroyo, from whence the Northeast corner of Section 18, Township 26 South, Range 66 West of the 6th PM, bears North 68°3' East 2920 feet, said canal having a carrying capacity of 1500 cubic feet of water per second of time.

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

B) BUTTE VALLEY DITCH, decreed for a total of 9 cubic-feet per second, as follows:

I) BUTTE VALLEY DITCH for diversion of 1.2 cubic-feet of water per second of time, from The Huerfano River for irrigation, date of appropriation May 15, 1862, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. I).

II) BUTTE VALLEY DITCH (ENLARGEMENT) for diversion of 1.8 cubic-feet of water per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1865, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 9).

III) BUTTE VALLEY DITCH (SECOND ENLARGEMENT), for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼, Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 86).

IV) BUTTE VALLEY DITCH (KILLIAN) for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication February 23, 1898 (Killian Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (previous adjudication date of June 12, 1889) (Priority No. 111).

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

C) ROBERT RICE DITCH, decreed for a total of 3.0 cubic feet per second of time, as follows: From the Huerfano River, for irrigation, date of appropriation March 1, 1867, date of adjudication June 12, 1889 (Reed Decree), original decreed point of diversion in NW 1/4 Section 22, T. 26 S., R. 66 W., 6th P.M., point of diversion transferred to SW 1/4 Section 10, T. 26 S., R. 66 W, 6th P.M., approximately 1700 feet from the west line and 550 feet from the south line of said Section 10, in Case No. 91CW39, Water Div. 2 on May 19, 1992 Huerfano County, Colorado (Priority 19)

**Together withall ditches, ditchrights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.**

Friday, November 1, 2024 16:34

# Electronic Document Dropbox

| | |
|---|---|
| **Name** | John R. McKowen |
| **Debtor's Name (if different)** | Two Rivers Farms F-2, The Orlando Reservoir No.2 Company, LLC |
| **Email** | john@johnmckowen.com |
| **Phone Number** | (303) 248-6883 |
| **Case Number (if known)** | 23-15627, 23-13178, 2401111, 24-01112 KHT |

# EXHIBIT B

## February 23, 2020 Exchange Agreement

Exchange Agreement Between John R. McKowen and VitaNova Partners, LLC (Exhibit 122 / February 23, 2020)

*Executed February 23, 2020 — DocuSign Envelope 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9*

DocuSign Envelope ID: 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9

**EXCHANGE AGREEMENT**

**between**

**VITANOVA PARTNERS, LLC**

**and**

**JOHN R. MCKOWEN**

**Dated as of February 23, 2020**

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| 1. | EXCHANGE PROCEDURES | 1 |
| 1.1 | Exchange | 1 |
| 1.2 | Closing | 1 |
| 1.3 | Delivery | 1 |
| 2. | REPRESENTATIONS AND WARRANTIES OF VITANOVA | 2 |
| 2.1 | Organization, Good Standing, Power and Qualification | 2 |
| 2.2 | Authorization | 2 |
| 2.3 | Government Consents and Filings | 2 |
| 2.4 | Litigation | 2 |
| 2.5 | Compliance with Other Instruments | 3 |
| 2.6 | Permits | 3 |
| 3. | REPRESENTATIONS AND WARRANTIES OF THE HOLDER | 3 |
| 3.1 | Authorization | 3 |
| 3.2 | Residence | 3 |
| 3.3 | Exchange Securities | 3 |
| 3.4 | Further Assurances | 3 |
| 4. | MISCELLANEOUS | 3 |
| 4.1 | Survival | 3 |
| 4.2 | Successors and Assigns | 4 |
| 4.3 | Governing Law | 4 |
| 4.4 | Counterparts | 4 |
| 4.5 | Interpretation | 4 |
| 4.6 | Notices | 4 |
| 4.7 | No Finder's Fees | 4 |
| 4.8 | Fees and Expenses | 5 |
| 4.9 | Attorneys' Fees | 5 |
| 4.10 | Amendments and Waivers | 5 |
| 4.11 | Severability | 5 |
| 4.12 | Delays or Omissions | 5 |
| 4.13 | Entire Agreement | 5 |
| 4.14 | Dispute Resolution | 5 |

THIS EXCHANGE AGREEMENT (this "*Agreement*") is made as of February 23, 2020 between VitaNova Partners, LLC, a Colorado limited liability company ("*VitaNova*"), and John R. McKowen (the "*Holder*"). Certain capitalized terms used in this Agreement are defined in Section 1.5.

WHEREAS, the Holder holds 1,218,157 of the issued and outstanding Preferred Units of GCP Super Units, LLC and 7,500,000 of the issued and outstanding Units of McGrow, LLC (collectively, the "*Exchange Securities*"); and

WHEREAS, pursuant to a Settlement Agreement entered into as of March 20, 2019 with Blue Yellow, LLC, the Holder agreed to pay to Blue Yellow, LLC a principal amount of $1,250,000 together with interest thereon accruing at the rate of 10% per annum, of which principal and interest totaling $1,150,000 is outstanding as of the date of this Agreement (all remaining debt and all other liabilities, damages, causes of action, claims, obligations and other amounts owed or owing from time to time hereafter under such Settlement Agreement being hereinafter referred to as the "*Assumed Liabilities*"); and

WHEREAS, VitaNova and the Holder desire to enter into an exchange (the "*Exchange*") pursuant to which the Holder transfers the Exchange Securities to VitaNova and VitaNova assumes the Assumed Liabilities, all on the terms and conditions provided herein VitaNova issues 16,622,524 of its common shares (the "VitaNova Shares") to the Holder, all on the terms and conditions provided herein;

NOW, THEREFORE, in consideration of the foregoing, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1. Exchange Procedures.

1.1 Exchange. Subject to the terms and conditions of this Agreement, (a) the Holder is delivering to VitaNova the Exchange Securities and (b) VitaNova is agreeing to assume the Assumed Liabilities.

1.2 Closing. The closing of the exchange contemplated by Section 1.1 shall take place concurrently with the execution and delivery of this Agreement.

1.3 Delivery. Contemporaneously with the execution and delivery of this Agreement:

(a) The Holder is delivering to VitaNova each of the following:

(i) a certificate representing the Preferred Units of GCP Super Units, LLC included in the Exchange Securities, together with a written instrument of transfer, in form satisfactory to VitaNova, duly executed by the Holder or its attorney duly authorized in writing, that transfers and conveys to VitaNova all of the Holder's rights, title and interest to such Preferred Units;

(ii) a written consent of the board of managers of GCP Super Units, LLC recognizing and approving the transfer of the Preferred Units of GCP Super Units, LLC included in the Exchange Securities;

(iii) a certificate representing the Units of McGrow, LLC included in the Exchange Securities, together with a written instrument of transfer, in form satisfactory to VitaNova, duly executed by the Holder or its attorney duly authorized in writing, that transfers and conveys to VitaNova all of the Holder's rights, title and interest to such Units; and

DocuSign Envelope ID: 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9

(iv) a written consent of the board of managers of McGrow, LLC recognizing and approving the transfer of the Units of McGrow, LLC included in the Exchange Securities.

(b) Effective as of such time, VitaNova, without recourse, assumes from the Holder all of the Assumed Liabilities and agrees to pay the same as due to Blue Yellow, LLC in accordance with the terms and conditions set forth in the Settlement Agreement entered into as of March 20, 2019 with Blue Yellow, LLC.

1.5 Additional Defined Terms Used in this Agreement. In addition to the terms defined above or elsewhere in this Agreement, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

(a) "*Business Day*" means a day, other than a Saturday or Sunday, on which banks are open for business in Denver, Colorado, between the hours of 9:00 a.m. and 5:00 p.m., local time.

(b) "*Material Adverse Effect*" means a material adverse effect on the business, operations, assets (including intangible assets), liabilities, financial condition, operating results, or property of VitaNova.

(c) "*Person*" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

2. Representations and Warranties of VitaNova. VitaNova hereby represents and warrants to the Holder that the following representations are true and correct as of the date of this Agreement.

2.1 Organization, Good Standing, Power and Qualification. VitaNova is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite power and authority to carry on its business as presently conducted and as proposed to be conducted. The Articles of Organization of VitaNova are in full force and effect. VitaNova is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a Material Adverse Effect.

2.2 Authorization. All action required to be taken by VitaNova's Board of Managers or members in order to authorize VitaNova to enter into this Agreement has been taken. All action on the part of the officers of VitaNova necessary for the execution and delivery of this Agreement and the performance of all obligations of VitaNova under this Agreement has been taken, and VitaNova has performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by VitaNova. This Agreement constitutes a valid and legally binding obligation of VitaNova, enforceable against VitaNova in accordance with its terms except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

2.3 Government Consents and Filings. Assuming the accuracy of the representations made by the Holder in Section 3, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or regulatory body is required on the part of VitaNova in connection with the consummation of the transactions contemplated by this Agreement.

2.4 Litigation. There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or to the knowledge of VitaNova, currently threatened in writing that questions (a) the validity of this Agreement or (b) the right of VitaNova to enter into this Agreement or to consummate the transactions contemplated by this Agreement. Neither VitaNova nor, to the knowledge of VitaNova, any of

its officers or directors is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers or directors, such as would affect VitaNova).

2.5 Compliance with Other Instruments. VitaNova is not in violation or default (a) of any provisions of its Articles of Organization or the Limited Liability Company Agreement, dated as of August 27, 2019, among VitaNova and the Members named in Schedule I thereto, (b) of any instrument, judgment, order, writ or decree, (c) under any note, indenture or mortgage, or (d) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound, or, to its knowledge, of any provision of federal or state statute, rule or regulation applicable to VitaNova, the violation of which would have a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement or (ii) an event that results in the creation of any lien, charge or encumbrance upon any assets of VitaNova or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to VitaNova.

2.6 Permits. VitaNova has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a Material Adverse Effect. VitaNova is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

3. Representations and Warranties of the Holder. The Holder hereby represents and warrants to VitaNova that the following representations are true and correct as of the date of this Agreement.

3.1 Authorization. The Holder has performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Holder. This Agreement constitutes a valid and legally binding obligation of the Holder, enforceable in accordance with its terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

3.2 Residence. The Holder resides in the State of Colorado.

3.3 Exchange Securities. The Holder is the sole, direct, legal and beneficial owner of, and has good and marketable title to, all of the Exchange Securities, and none of the Exchange Securities or the underlying rights thereunder, in whole or in part, have been cashed, negotiated, sold, assigned, transferred, hypothecated, pledged or deposited under any agreement, or otherwise disposed of, and no claim of right, title or interest has been made or advanced by any Person.

3.4 Further Assurances. The Holder agrees, at any time or from time to time after the date hereof, to cooperate with VitaNova and, at the request of VitaNova, to execute and deliver any further instruments or documents and to take all such further action as VitaNova may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties.

4. Indemnification. VitaNova shall be liable as primary obligor for, and shall indemnify the Holder from and against, any and all liabilities, obligations, losses, damages, claims, actions and suits, and any and all reasonable costs, expenses and disbursements (including any voluntary payment made by the Holder) that may at any time be imposed on, incurred by or asserted against the Holder arising out of the Assumed Liabilities.

5. Miscellaneous.

5.1 Survival. Unless otherwise set forth in this Agreement, the representations and warranties of VitaNova and the Holder contained in or made pursuant to this Agreement shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Holder or VitaNova.

5.2 Successors and Assigns. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

5.3 Governing Law. This Agreement and any controversy arising out of or relating to this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado.

5.4 Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original but both of which together shall constitute one and the same instrument. Counterparts may be delivered via electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, *e.g., www.docusign.com*) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

5.5 Interpretation. For the purpose of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) references to a Section refer to a Section of this Agreement, unless specified otherwise;

(c) the words "includes" and "including" shall not be construed so as to exclude any other thing not referred to or described; and

(d) unless the context otherwise requires, (i) references to an agreement, instrument or other document (including this Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (ii) references to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder.

5.6 Notices. All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of: (a) personal delivery to, or other actual receipt by, the party to be notified; (b) when sent, if sent by electronic mail during normal business hours of the recipient, or, if not sent during the recipient's normal business hours, then on the next Business Day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after the Business Day of deposit with a nationally recognized overnight courier, freight prepaid, specifying next Business Day delivery, with written verification of receipt. If notice is given to VitaNova, it shall be sent to 335 A Josephine Street, Denver, Colorado 80206, Attention: COO, email: George@vtanva.com. If notice is given to the Holder, it shall be sent to 355 A Josephine Street, Denver, Colorado 80206, email: John@vtanva.com. Notwithstanding the foregoing, either party may subsequently modify its address or facsimile number for purposes of this Section 4.6 by delivering written notice to the other party in accordance with this Section 5.6.

5.7 No Finder's Fees. The Holder agrees to indemnify and hold harmless VitaNova from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Holder or any of his representatives is responsible. VitaNova agrees to indemnify and hold harmless the Holder from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which VitaNova or any of its officers, employees or representatives is responsible.

5.8 Fees and Expenses. Each party is responsible for all of its own expenses incurred in connection with this Agreement, including all applicable taxes.

5.9 Attorneys' Fees. If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

5.10 Amendments and Waivers. Any term of this Agreement may be amended, terminated or waived only with the written consent of VitaNova and the Holder.

5.11 Severability. The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

5.12 Delays or Omissions. No delay or omission to exercise any right, power or remedy accruing to either party, upon any breach or default of the other party, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of either party of any breach or default under this Agreement, or any waiver on the part of either party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to either party, shall be cumulative and not alternative.

5.13 Entire Agreement. This Agreement constitutes the full and entire understanding and agreement between the parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the parties is expressly canceled.

5.14 Dispute Resolution. The parties (a) irrevocably and unconditionally submit to the jurisdiction of the state courts of Colorado and to the jurisdiction of the U.S. District Court for the District of Colorado for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Colorado or the U.S. District Court for the District of Colorado, and (c) waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court. Each party will bear its own costs in respect of any disputes arising under this Agreement. Each of the parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

**WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR**

DocuSign Envelope ID: 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9

THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

* * *

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

| VITANOVA PARTNERS, LLC | JOHN R. MCKOWEN |
|---|---|
| By: ______________________ | DocuSigned by: John Mckowen F1F9A03D5622481... |
| George McCaffrey<br>Chief Operating Officer | |

DocuSign Envelope ID: 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9

| **Summary report: Litera® Change-Pro for Word 10.5.0.0 Document comparison done on 02/23/20 4:43:58 PM** | |
|---|---|
| **Style name:** KL Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** vita-exchange agmt (jmk) 20200215.docx | |
| **Modified filename:** vita-exchange agmt (jmk) 20200223.docx | |
| **Changes:** | |
| Add | 25 |
| ~~Delete~~ | 20 |
| ~~Move From~~ | 0 |
| Move To | 0 |
| Table Insert | 0 |
| ~~Table Delete~~ | 0 |
| Table moves to | 0 |
| ~~Table moves from~~ | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 45 |

DocuSign Envelope ID: 8E594FE6-9E96-49EF-B97D-B2E274F7BEA9

**THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.**

* * *

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

VITANOVA PARTNERS, LLC

By: ______________________
George McCaffrey
Chief Operating Officer

JOHN R. MCKOWEN

DocuSigned by:
John McKowen
______________________

# EXHIBIT C

## November 30, 2024 Declaration of Dissolution

Declaration of Dissolution and Distribution of Assets of VitaNova Partners, LLC (Exhibit 110 / November 30, 2024)

*Executed under penalty of perjury — DocuSign Envelope FB060015-EC7E-460F-86D8-2FEB5749D822*

**Exhibit 110**

**Title:** Declaration of Dissolution and Distribution of Assets

**Source:** Declaration by John McKowen (VitaNova Partners, LLC)

**Date:** November 30, 2024

**Summary:** This declaration, executed by John McKowen as the sole member and liquidator of VitaNova Partners, LLC, confirms the dissolution of the company as of August 28, 2023. It affirms that all debts and liabilities were resolved prior to dissolution and that the company's remaining assets consisted solely of beneficiary rights under Deed of Trust Nos. 404224 and 404225. These secured interests were distributed in-kind to McKowen prior to dissolution, leaving no outstanding claims against VitaNova. The declaration finalizes the company's winding up in accordance with Colorado law and its operating agreement.

# EXHIBIT D

## GCP 1 LLC Operating Agreement

GrowCo Partners 1, LLC Limited Liability Company Operating Agreement (Section 13.03(c) Secured-Obligations Framework)

*Section 13.03(c) establishes the priority obligation to Preferred Members and the security interest in substantially all of GCP 1's assets*

*[EXECUTION VERSION]*

# LIMITED LIABILITY COMPANY AGREEMENT

**among**

**GROWCO PARTNERS 1, LLC**

**and**

**MEMBERS NAMED IN SCHEDULE 1**

**Dated as of January 12, 2015**

## TABLE OF CONTENTS

**Page**

**ARTICLE I** DEFINITIONS ..... 1
Section 1.01 . Definitions ..... 1
Section 1.02 . Interpretation ..... 7

**ARTICLE II** ORGANIZATION ..... 8
Section 2.01 . Formation ..... 8
Section 2.02 . Name ..... 8
Section 2.03 . Principal Office ..... 8
Section 2.04 . Registered Office and Agent ..... 8
Section 2.05 . Purpose and Powers ..... 8
Section 2.06 . Term ..... 8
Section 2.07 . No State-Law Partnership ..... 8

**ARTICLE III** UNITS ..... 9
Section 3.01 . Units Generally ..... 9
Section 3.02 . Authorization and Issuance of Preferred Units ..... 9
Section 3.03 . Authorization and Issuance of Common Units ..... 9
Section 3.04 . Certification of Units ..... 9
Section 3.05 . Action by Consent ..... 10

**ARTICLE IV** MEMBERS ..... 10
Section 4.01 . Admission of New Members ..... 10
Section 4.02 . Representations and Warranties of Members ..... 10
Section 4.03 . No Personal Liability ..... 11
Section 4.04 . No Withdrawal ..... 11
Section 4.05 . Death ..... 12
Section 4.06 . Voting ..... 12
Section 4.07 . Power of Members ..... 12
Section 4.08 . No Interest in Company Property ..... 12

**ARTICLE V** CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ..... 12
Section 5.01 . Existing Capital Contributions ..... 12
Section 5.02 . Additional Capital Contributions ..... 12
Section 5.03 . Maintenance of Capital Accounts ..... 13
Section 5.04 . Quarterly Yield on Preferred Units ..... 13
Section 5.05 . Succession Upon Transfer ..... 13
Section 5.06 . Negative Capital Accounts ..... 13
Section 5.07 . No Withdrawal ..... 14
Section 5.08 . Treatment of Loans From Members ..... 14
Section 5.09 . Modifications ..... 14

**ARTICLE VI** ALLOCATIONS ..... 14
Section 6.01 . Allocation of Net Income and Net Loss ..... 14
Section 6.02 . Regulatory and Special Allocations ..... 14
Section 6.03 . Tax Allocations ..... 15
Section 6.04 . Allocations in Respect of Transferred Units ..... 16
Section 6.05 . Curative Allocations ..... 16

**ARTICLE VII** DISTRIBUTIONS ....17
Section 7.01 . Preferred Yield Distributions ....17
Section 7.02 . Participating Distributions ....17
Section 7.03 . Other Distributions ....18
Section 7.04 . Tax Withholding; Withholding Advances ....18
Section 7.05 . Distributions in Kind ....20
Section 7.06 . Compliance with Law ....20

**ARTICLE VIII** MANAGEMENT ....20
Section 8.01 . Establishment of the Board ....20
Section 8.02 . Board Composition; Vacancies ....20
Section 8.03 . Removal; Resignation ....21
Section 8.04 . Meetings ....21
Section 8.05 . Quorum; Manner of Acting ....22
Section 8.06 . Action By Written Consent ....22
Section 8.07 . Manager Status ....22
Section 8.08 . Committees ....22
Section 8.09 . Officers ....23
Section 8.10 . No Personal Liability ....23

**ARTICLE IX** EXCHANGES OF PREFERRED UNITS ....23
Section 9.01 . Exchange Agreement ....23
Section 9.02 . Transfer of Preferred Units Upon Exchange ....23

**ARTICLE X** TRANSFERS ....24
Section 10.01 . General Restrictions on Transfer ....24

**ARTICLE XI** CONFIDENTIALITY ....25
Section 11.01 . Nondisclosure ....25
Section 11.02 . Permitted Disclosures ....25
Section 11.03 . Excluded Information ....25

**ARTICLE XII** TAX MATTERS ....26
Section 12.01 . Tax Matters Member ....26
Section 12.02 . Tax Returns ....26
Section 12.03 . Company Funds ....27

**ARTICLE XIII** DISSOLUTION AND LIQUIDATION ....27
Section 13.01 . Events of Dissolution ....27
Section 13.02 . Effectiveness of Dissolution ....27
Section 13.03 . Liquidation ....27
Section 13.04 . Cancellation of Articles ....28
Section 13.05 . Survival of Rights, Duties and Obligations ....28
Section 13.06 . Recourse for Claims ....28

**ARTICLE XIV** EXCULPATION AND INDEMNIFICATION ....29
Section 14.01 . Exculpation of Covered Persons ....29
Section 14.02 . Liabilities and Duties of Covered Persons ....29
Section 14.03 . Indemnification ....30
Section 14.04 . Survival ....31

**ARTICLE XV** MISCELLANEOUS ........ 31
Section 15.01 . Further Assurances ........ 31
Section 15.02 . Notices ........ 31
Section 15.03 . Severability ........ 32
Section 15.04 . Entire Agreement ........ 32
Section 15.05 . Successors and Assigns ........ 32
Section 15.06 . No Third-Party Beneficiaries ........ 32
Section 15.07 . Amendment ........ 32
Section 15.08 . Waiver ........ 33
Section 15.09 . Governing Law ........ 33
Section 15.10 . Submission to Jurisdiction ........ 33
Section 15.11 . Waiver of Jury Trial ........ 33
Section 15.12 . Equitable Remedies ........ 33
Section 15.13 . Remedies Cumulative ........ 34

EXHIBIT A Form of Joinder Agreement
SCHEDULE 1 Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of GrowCo Partners 1, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of January 12, 2015 among the Company, TR Capital Partners, LLC and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on October 31, 2014 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
### DEFINITIONS

Section 1.01. **Definitions.** The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b) any consents or approvals of any Governmental Authority; and

(c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost

recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b) immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c) the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i) the acquisition of additional Units in the Company by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d) the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e) if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

**"Capital Contribution"** means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

**"Code"** means the Internal Revenue Code of 1986.

**"Colorado Act"** means the Colorado Limited Liability Company Act, Title 7, Article 80, Section s 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

**"Common Managers"** has the meaning set forth in Section 8.02(a)(i).

**"Common Members"** means the Members who own Common Units as listed in the Member Schedule.

**"Common Units"** means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

**"Company"** has the meaning set forth in the Preamble.

**"Company Minimum Gain"** means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

**"Confidential Information"** has the meaning set forth in Section 11.01.

**"Covered Person"** has the meaning set forth in Section 14.01(a).

**"Credit Facility"** means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

**"Distribution"** means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. **"Distribute"** when used as a verb shall have a correlative meaning.

**"Electronic Transmission"** means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

**"Exchange Agreement"** means the Exchange Agreement to be entered into among the Company, GrowCo, Two Rivers and the Holders listed on Schedule 1 thereto, in such form as an authorized Officer shall approve (such approval to be conclusively evidenced by such Officer's execution thereof on behalf of the Company).

**"Fair Market Value"** means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Lease Agreement**" means a lease agreement entered into by the Company, as lessor, and a third-party lessee in connection with the leasing of any greenhouse that is owned by the Company or an Affiliate thereof, if the construction or other acquisition of such greenhouse was funded (in whole or in part) with $50,000 or more of proceeds from the sale of Preferred Units.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means:

(a) TRCP, which as of the date of this Agreement holds 4,398,043 Common Units, has executed this Agreement and is identified as a Member on the Member Schedule, so long as it continues to be shown on the Member Schedule (as updated from time to time) as the owner of one or more Units; and

(b) each other Person who is admitted as a Member in accordance with the terms of this Agreement and the Colorado Act, in each case so long as such Person is shown on the Member Schedule (as updated from time to time) as the owner of one or more Units.

The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

(a) a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b) a Distributive share of the assets of the Company,

(c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

**"Nonrecourse Liability"** has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

**"Officers"** has the meaning set forth in Section 8.09.

**"Person"** means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

**"Preferred Managers"** has the meaning set forth in Section 8.02(a)(ii).

**"Preferred Members"** means Members who own Preferred Units as listed in the Member Schedule.

**"Preferred Units"** means Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement.

**"Quarterly Distributable Amount"** means, with respect to a Fiscal Quarter, the sum of: (a) the Company's cash flow from operations for such Fiscal Quarter, as determined in accordance with applicable U.S. generally accepted accounting principles in effect from time to time; (b) the total amount of principal and interest received by the Company during such Fiscal Quarter pursuant to payments made under any Credit Facility; and (c) the total amount of deferred lease payments received by the Company during such Fiscal Quarter pursuant to any Lease Agreement.

**"Quarterly Yield"** has the meaning set forth in Section 5.04.

**"Representative"** means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

**"Securities Act"** means the Securities Act of 1933.

**"Security Agreement"** means the pledge and security agreement to be entered into by the Company in favor of the Preferred Members, pursuant to Section 13.03(c).

**"Subsidiary"** means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

**"Tax Matters Member"** has the meaning set forth in Section 12.01.

**"Taxing Authority"** has the meaning set forth in Section 7.05(b).

**"Transfer"** means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. **"Transfer"** when used as a noun shall have a correlative meaning. **"Transferor"** and **"Transferee"** mean a Person who makes or receives a Transfer, respectively.

**"TRCP"** means TR Capital Partners, LLC, a Colorado limited liability company, or any of its successors or assigns.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water and Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Preferred Units and Common Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.04(b).

Section 1.02. **Interpretation**. For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

# ARTICLE II
## ORGANIZATION

Section 2.01. **Formation.**

(a) The Company was formed on October 31, 2014, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b) This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02. **Name**. The name of the Company shall be "GrowCo Partners 1, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03. **Principal Office**. The principal office of the Company shall be located at 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado, or such other place as may from time to time be determined by the Board. The Board shall give prompt notice of any such change to each of the Members.

Section 2.04. **Registered Office and Agent**.

(a) The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b) The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05. **Purpose and Powers**.

(a) The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto.

(b) The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06. **Term**. The term of the Company commenced on October 31, 2014, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07. **No State-Law Partnership**. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and

each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
### UNITS

Section 3.01. **Units Generally**. Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable. The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02. **Authorization and Issuance of Preferred Units**. Subject to compliance with Section 10.01(a), the Company is hereby authorized to issue a class of Units designated as Preferred Units, of which no Preferred Units are outstanding as of the date of this Agreement. The Company may issue up to a total of 10,000,000 Preferred Units.

Section 3.03. **Authorization and Issuance of Common Units**. The Company is hereby authorized to issue a class of Units designated as Common Units. As of the date hereof, (a) a total of 4,398,043 Common Units have been issued and are outstanding and (b) a total of 5,601,957 Common Units are subject to purchase by TRCP at a price of $0.0001 per Common Unit pursuant to the terms of a warrant issued by the Company to TRCP. TRCP is entitled to exercise such warrant to purchase Common Units only to the extent that more than 4,398,043 Preferred Units are issued, and such limitation on exercise may not be amended or modified without the approval of the Board, including at least one Preferred Member.

Section 3.04. **Certification of Units**. The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member. In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.
>
> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE

REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.05. **Action by Consent**. Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests (including Common Units and Preferred Units) may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests. A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
### MEMBERS

Section 4.01. **Admission of New Members.**

(a) New Members may be admitted from time to time subject to compliance with the provisions of Section 4.01(b) and, in connection with a Transfer of Units, Article X.

(b) In order for any Person not already a Member to be admitted as a Member, whether pursuant to an issuance or a Transfer of Units, such Person shall have executed and delivered a Joinder Agreement to the Company. Upon the amendment of the Member Schedule by the Board and the satisfaction of any other applicable conditions (including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units), such Person shall be admitted as a Member and issued such Units and the Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

Section 4.02. **Representations and Warranties of Members**. By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b) Such Member (i) unless otherwise agreed to by the Board prior to such Member's execution of a Joinder Agreement, is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c) Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d) Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f) Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h) The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i) This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j) Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04. **No Withdrawal.** A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c) the making by such Member of a general assignment for the benefit of such Member's creditors;

(d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e) the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05. **Death**. The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06. **Voting**. Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit and one vote per Preferred Unit (voting together as a single class) on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07. **Power of Members**. The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act. Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08. **No Interest in Company Property**. No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
### CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01. **Existing Capital Contributions**. TRCP has made the Capital Contribution giving rise to its initial Capital Account and is deemed to own 4,398,043 Common Units on the date hereof.

Section 5.02. **Additional Capital Contributions**.

(a) No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b) No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

Section 5.03. **Maintenance of Capital Accounts**. The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 5.03. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Member's Capital Account shall be increased by the amount of:

(i) such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii) the amount of any increase in such Capital Account pursuant to Section 5.04;

(iii) any Net Income or other item of income or gain allocated to such Member pursuant to Article VI; and

(iv) any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b) Each Member's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property Distributed to such Member pursuant to Article VII and Section 13.03(c);

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to Article VI; and

(iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04. **Quarterly Yield on Preferred Units**. Effective as of 11:59 p.m., Mountain time, on the final day of each Fiscal Quarter, the Capital Account balance of each Preferred Member shall be increased automatically by an amount equal to (a) a rate of return of 3.0% (or, if the Preferred Units held by such Preferred Member were not outstanding for the entire Fiscal Quarter, 3.0% multiplied by the percentage of the number of days in such Fiscal Quarter that such Preferred Units were outstanding), *multiplied by* (b) the amount of the Capital Account of such Preferred Member immediately prior to such time on such final day. As used herein, the term "**Quarterly Yield**" shall mean, with respect to a specified Preferred Member for a specified Fiscal Quarter, the amount of the increase in such Preferred Member's Capital Account for such Fiscal Quarter as computed in connection with this Section 5.04.

Section 5.05. **Succession Upon Transfer**. In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to Article VI, Article VII and Article XIII in respect of such Units.

Section 5.06. **Negative Capital Accounts**. In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.07. **No Withdrawal.** No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.08. **Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iv), if applicable.

Section 5.09. **Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

## ARTICLE VI
### ALLOCATIONS

Section 6.01. **Allocation of Net Income and Net Loss.** For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02 and the Preferred Unit Distributions set forth in Section 7.01, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02. **Regulatory and Special Allocations.** Notwithstanding the provisions of Section 6.01:

(a) If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Section s 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of

such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Section s 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

(ii) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this Article VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e) The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations.**

(a) Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c) If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04. **Allocations in Respect of Transferred Units**. In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of Article X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05. **Curative Allocations**. In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a) not specified in this Article VI, or

(b) clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01. **Preferred Yield Distributions**. Distributions pursuant to this Section 7.01 are subject only to Section 7.06, and no Distributions shall be made with respect to Common Units or any other Membership Interests unless and until all Distributions due under this Section 7.01 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to Preferred Units a total amount equal to the least of:

(a) the aggregate Quarterly Yields of all Preferred Members for such Fiscal Quarter;

(b) the Quarterly Distributable Amount with respect to such Fiscal Quarter; and

(c) the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter.

The total amount of Distributions, if any, due under this Section 7.01 with respect to a Fiscal Quarter shall be allocated and paid to Preferred Members as follows: (i) if such total amount of Distributions is determined pursuant to the preceding clause (a), to each Preferred Member in an amount equal to such Preferred Member's Quarterly Yield for such Fiscal Quarter; (ii) if such total amount of Distributions is determined pursuant to the preceding clause (b), to the Preferred Member's pro rata in proportion to their holdings of Preferred Units as of the end of such Fiscal Quarter; and (iii) if such total amount of Distributions is determined pursuant to the preceding clause (c), to each Preferred Member in an amount equal to the amount of such Preferred Member's Capital Account as of the end of such Fiscal Quarter.

Section 7.02. **Participating Distributions**. Distributions pursuant to this Section 7.02 are subject only to Section 7.01 and Section 7.06, and no other Distributions shall be made with respect to Preferred Units, Common Units or any other Membership Interests unless and until all Distributions due under Section 7.01 and this Section 7.02 have been paid. The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2015, Distribute with respect to those Common Units and Preferred Units that were outstanding for the entire Fiscal Quarter a total amount equal to the amount by which the Quarterly Distributable Amount with respect to such Fiscal Quarter exceeds the amount Distributable to Preferred Units in accordance with Section 7.01 for such Fiscal Quarter (that is, the amount, if any, by which the Quarterly Distributable Amount exceeds the amount determined pursuant to Section 7.01(a)). The total amount of Distributions, if any, due under this Section 7.02 with respect to a Fiscal Quarter shall be allocated and paid:

(a) if as of the end of such Fiscal Quarter any principal or interest under any Credit Facility is outstanding or any deferred lease amount under any Lease Agreement has not been paid in full, then to Preferred Members pro rata in proportion to their holdings of those Preferred Units that were outstanding for all of such Fiscal Quarter, *provided* that the amount Distributed to Preferred Members pursuant to this clause (a) shall not exceed the aggregate amount of all Capital Accounts of Preferred Members as of the end of such Fiscal Quarter (and any amount Distributable in excess thereof shall be paid in accordance with the following clause (b)); and

(b) otherwise, to Preferred Members and Common Members pro rata in proportion to their holdings of those Preferred Units and Common Units, collectively, that were outstanding for all of such Fiscal Quarter (that is, for purposes of clarity, each Member shall receive a Distribution equal to the total amount to be so Distributed *multiplied by* a fraction, the numerator of which shall be the number of such Member's Preferred Units that were

outstanding for all of such Fiscal Quarter plus the number of such Member's Common Units that were outstanding for all of such Fiscal Quarter and the denominator of which shall be the total number of Preferred Units outstanding plus the total number of Common Units outstanding, all such Units being determined as of the end of such Fiscal Quarter).

Section 7.03. **Other Distributions.**

(a) **General.** After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to Section 7.06, the Board shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forego payment of other Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies.

(b) **Priority of Distributions.** After making all Distributions then due to Preferred Members under Section 7.01 and all Distributions then due to Preferred Members and Common Members under Section 7.02, and subject to the priority of Distributions pursuant to Section 13.03(c), if applicable, all Distributions determined to be made by the Board pursuant to Section 7.02 shall be made in the following manner:

(i) *first,* to the Preferred Members pro rata in proportion to their holdings of Preferred Units, until Distributions under this clause (a) equal the aggregate amount of Capital Contributions attributable to the Preferred Members in respect of their acquisitions of Preferred Units;

(ii) *second,* to the Common Members pro rata in proportion to their holdings of Common Units, until Distributions under this clause (b) equal the aggregate amount of Capital Contributions attributable to the Common Members in respect of their acquisitions of Common Units; and

(iii) *third*, any remaining amounts to the Members holding Common Units and/or Preferred Units pro rata in proportion to their holdings of Preferred Units and Common Units, collectively, as of the end of such Fiscal Quarter (determined consistently with the provisions set forth in Section 7.02(b).

Section 7.04. **Tax Withholding; Withholding Advances.**

(a) **Tax Withholding.** If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i) an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii) any certificate that the Board may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.04(b).

(b) **Withholding Advances**. The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this Section 7.04(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances**. Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

(i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification**. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this Section 7.04(d) and the obligations of a Member pursuant to Section 7.04(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.04, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding**. Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the

event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.05. **Distributions in Kind.**

(a) The Board is hereby authorized, in its sole discretion, to make Distributions to the Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.01 and Section 7.02 shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Members pursuant to Section 7.03.

(b) Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.06. **Compliance with Law**. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

## ARTICLE VIII
### MANAGEMENT

Section 8.01. **Establishment of the Board**. The Board is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02. **Board Composition; Vacancies.**

(a) The Company and the Members shall take such actions as may be required to ensure that the number of managers constituting the Board initially is two and, commencing following the initial issuance of at least 1,000,000 Preferred Units and continuing at all times at which any Preferred Units are outstanding, five. The Board shall be comprised as follows:

(i) two individuals designated by the Common Members (the "**Common Managers**"), who initially shall be Tim Beall and John McKowen;

(ii) effective following the initial issuance of at least 1,000,000 Preferred Units, two individuals designated by the Preferred Members (the "**Preferred Managers**"); and

(iii) effective following the initial issuance of at least 1,000,000 Preferred Units, one individual (the "**Independent Manager**") who is not an Affiliate of the Company or any Member and who is acceptable to the Common Managers and the Preferred Managers.

(b) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Common Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(c) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Preferred Manager, then the Preferred Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(d) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of an Independent Manager, then the Common Managers and the Preferred Managers shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03. **Removal; Resignation**.

(a) **Common Managers**. A Common Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b) **Preferred Managers**. A Preferred Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Preferred Members.

(c) **General**. A Manager may resign at any time from the Board by delivering a written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04. **Meetings**.

(a) **Generally**. The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board. Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b) **Special Meetings**. Special meetings of the Board shall be held on the call of any three Managers upon at least three days' written notice (if the meeting is to be held in person) or 24 hours' written notice (if the meeting is to be held by telephone communications or video conference) to the Managers, or upon such shorter notice as may be approved by all the Managers. Any Manager may waive such notice as to himself.

(c) **Attendance and Waiver of Notice**. Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not

lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05. **Quorum; Manner of Acting**.

(a) **Quorum**. A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b) **Participation**. Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting. A Manager may vote or be present at a meeting either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.

(c) **Binding Act**. Each Manager shall have one vote on all matters submitted to the Board or any committee thereof. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board.

Section 8.06. **Action By Written Consent**. Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action. Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.07. **Manager Status**.

(a) **Reimbursement; Other Capacities**. Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time. Nothing contained in this Section 8.07 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b) **No Employment**. This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.08. **Committees**.

(a) **Establishment**. The Board may, by resolution approved by a majority of the Managers (including at least one of the Preferred Managers), designate from among the Managers one or more committees, each of which shall be comprised of one or more Managers; *provided* that in no event may the Board designate any committee with all of the authority of the Board. Subject to the immediately preceding proviso, any such committee, to the extent provided in the resolution forming such committee, shall have and may exercise the authority of the Board, subject to the

limitations set forth in Section 8.08(b). The Board at any time may, by resolution approved by a majority of the Managers, dissolve any committee or, by resolution approved by a majority of the Managers (including at least one of the Common Managers and at least one of the Preferred Managers), remove any member of a committee at any time.

(b) **Limitation of Authority**. No committee of the Board shall have the authority of the Board in reference to:

(i) authorizing or making Distributions to Members;

(ii) authorizing the issuance of any Membership Interest;

(iii) approving a plan of merger or sale of the Company;

(iv) recommending to the Members a voluntary dissolution of the Company or a revocation thereof;

(v) filling vacancies in the Board; or

(vi) altering or repealing any resolution of the Board that by its terms provides that it shall not be so amendable or repealable.

Section 8.09. **Officers**. The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Board. Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.10. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
### EXCHANGES OF PREFERRED UNITS

Section 9.01. **Exchange Agreement**. Contemporaneously with its execution and delivery of a Joinder Agreement, each Preferred Member may, at its election, execute and deliver to the Company a joinder agreement or other written understanding pursuant to which such Preferred Member becomes a party to the Exchange Agreement, *provided* that the foregoing requirement shall not apply to Two Rivers in connection with its acquisition of Preferred Units upon exchanges pursuant to the Exchange Agreement as contemplated by Section 9.02.

Section 9.02. **Transfer of Preferred Units Upon Exchange**. Upon the effective time of an exchange of a Preferred Unit as provided in Article II of the Exchange Agreement and without limitation by Article X, such Preferred Unit shall be Transferred to Two Rivers or GrowCo, as provided in the Exchange Agreement, and all rights under this Agreement with respect to such Preferred Unit, including

the right to receive Distributions, shall accrue to the benefit of Two Rivers or GrowCo, as the case may be.

## ARTICLE X
### TRANSFERS

Section 10.01. **General Restrictions on Transfer.**

(a) Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi) if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii) if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b) Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01. **Nondisclosure**. Each Preferred Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Preferred Member acknowledges that: (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Preferred Member is subject, no Preferred Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Preferred Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Preferred Member is or becomes aware. Each Preferred Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02. **Permitted Disclosures**. Nothing contained in Section 11.01 shall prevent any Preferred Member from disclosing Confidential Information: (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Preferred Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Preferred Member's Representatives who, in the reasonable judgment of such Preferred Member, need to know such Confidential Information and agree to be bound by the provisions of this Article XI as if a Preferred Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units from such Preferred Member, as long as such Transferee agrees to be bound by the provisions of this Article XI as if a Preferred Member; *provided* that in the case of clause (a), (b) or (c), such Preferred Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03. **Excluded Information**. The restrictions of Section 11.01 shall not apply to Confidential Information that: (a) is or becomes generally available to the public other than as a result of a disclosure by a Preferred Member in violation of this Agreement; (b) is or becomes available to a Preferred Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Preferred Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Preferred Member without use of Confidential Information; or (d) becomes available to the receiving Preferred Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential

Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

## ARTICLE XII
## TAX MATTERS

Section 12.01. **Tax Matters Member**.

(a) **Appointment**. The Members hereby appoint TRCP as the "**Tax Matters Member**" who shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b) **Tax Examinations and Audits**. The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings. Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c) **Income Tax Elections**. The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Members holding a majority of the outstanding Common Units. All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d) **Tax Returns and Tax Deficiencies**. Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.04(d).

(e) **Resignation**. The Tax Matters Member may resign at any time. If TRCP ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Preferred Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02. **Tax Returns**. At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.09) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03. **Company Funds**. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## ARTICLE XIII
### DISSOLUTION AND LIQUIDATION

Section 13.01. **Events of Dissolution**. The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a) the determination of the Board to dissolve the Company;

(b) an election to dissolve the Company made by holders of a majority of the Common Units;

(c) the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d) the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02. **Effectiveness of Dissolution**. Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03. **Liquidation**. If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

(a) **Liquidator**. The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting**. As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) **Distribution of Proceeds**. The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii) *third*, to the Preferred Members in amounts equal to their respective Capital Accounts; and

(iv) *fourth*, to Members in the same manner as Distributions are made under Section 7.03.

The Company shall, within sixty days after the date of the initial issuance of Preferred Units, enter into the Security Agreement in favor of the Preferred Members, pursuant to which the Company shall grant the Preferred Members a security interest in substantially all of the assets of the Company solely for purposes of securing payment of amounts set forth in the preceding clause (iii). As and to the extent set forth in the Security Agreement, the security interest granted to the Preferred Members pursuant to the Security Agreement shall be *pari passu* in all respects with any similar security interest granted in favor of the members of any other limited liability company of which TRCP is the sole or a majority holder of common units and that is formed in connection with the acquisition, construction and/or operation of up to three additional greenhouses (including related purchases of farmland and water taps) for leasing to marijuana growers. The Security Agreement shall be in a form prepared by the Company and approved by the Board, including at least one of the Preferred Managers.

(d) **Discretion of Liquidator**. Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04. **Cancellation of Articles**. Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05. **Survival of Rights, Duties and Obligations**. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06. **Recourse for Claims**. Each Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's

share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

Section 14.01. **Exculpation of Covered Persons.**

(a) **Covered Persons**. As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b) **Standard of Care**. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c) **Good Faith Reliance**. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Colorado Act.

Section 14.02. **Liabilities and Duties of Covered Persons.**

(a) **Limitation of Liability**. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) **Duties**. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

Section 14.03. **Indemnification.**

(a) **Indemnification**. To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

(ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Reimbursement**. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c) **Entitlement to Indemnity**. The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d) **Insurance.** To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e) **Funding of Indemnification Obligation.** Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause.** If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment.** The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04. **Survival.** The provisions of this Article XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
### MISCELLANEOUS

Section 15.01. **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02. **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or

(d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

| | |
|---|---|
| If to the Company: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Facsimile: (303) 845-9400<br>E-mail: info@2riverswater.com<br>Attention: Chief Financial Officer |
| with a copy to: | K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts 02111-2950<br>Facsimile: (617) 261-3175<br>E-mail: mark.johnson@klgates.com<br>Attention: Mark L. Johnson |

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04. **Entire Agreement**. This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibits and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05. **Successors and Assigns**. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06. **No Third-Party Beneficiaries**. Except as provided in Article XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07. **Amendment**. Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units and Preferred Units, voting together as a single class. Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a

manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding at least two-thirds of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of Units shall be effective only with that Member's consent. Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(c) and Section 15.11.

Section 15.09. **Governing Law**. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10. **Submission to Jurisdiction**. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11. **Waiver of Jury Trial**. Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12. **Equitable Remedies**. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other

parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13. **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**GROWCO PARTNERS 1, LLC**

By: [signature]
Name: WAYNE HARDING
Title: CFO

COMMON MEMBER:

**TR CAPITAL PARTNERS, LLC**

By: [signature]
Name: WAYNE HARDING
Title: CFO

EXHIBIT A

**FORM OF JOINDER AGREEMENT**

# JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement dated as of January 12, 2015, as it may be amended from time to time (the "**Agreement**"), among GrowCo Partners 1, LLC and the Members Named in SCHEDULE 1. Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GrowCo Partners 1, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a [Common][Preferred] Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: ______________________

**[NAME OF NEW MEMBER]**

By: ______________________________
Name:
Title:

Agreed and Accepted:

**GROWCO PARTNERS 1, LLC**

By: ______________________________
Name:
Title:

# MEMBER SCHEDULE

**Common Units**:

| Member Name and Address | Number of Units | Date of Issue | Capital Contribution | Certificate Number |
|---|---|---|---|---|
| TR Capital Partners, LLC<br>2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222 | 4,398,043 | January 12, 2015 | $1,000.00 | CU-1 |

**Preferred Units**: None.

| Name | Units |
|---|---|
| I. Wistar Morris | 1,278,262 |
| Christopher L. Morris | 500,000 |
| Jesse Dovich | 438,597 |
| Jon D. and Linda W. Gruber Trust | 250,000 |
| TR Capital Partners, LLC | 177,203 |
| Samuel W. Morris, Jr. | 117,562 |
| Michael S. Barish | 108,696 |
| Hugo Zimmermann | 106,295 |
| Matt Edmundson | 104,198 |
| Jeff Porter | 100,000 |
| Eric Petersen | 100,000 |
| Charles J. Bloom IRA | 100,000 |
| Martha Morris | 95,598 |
| Cotswold Foundation | 94,506 |
| Eleventh Generation | 93,506 |
| I. Wistar Morris IRA | 89,240 |
| JMW Fund, LLC | 65,732 |
| San Gabriel Fund, LLC | 65,732 |
| Jacob A. & Michelle K. Bevan | 50,362 |
| David A. Jenkins | 50,000 |
| Njevity, Inc. | 43,767 |
| Richland Fund, LLC | 34,640 |
| Michael and Linda Harnish | 32,885 |
| Elevation Fund | 29,332 |
| Wayne Harding | 28,292 |
| Maureen Miller | 25,000 |
| Gus Blass, III | 23,592 |
| Capital Properties LLC | 23,592 |
| L.A. & Linda Walker | 21,816 |
| West Hampton Special Situations Fund | 12,740 |
| JPG Investments, LLC | 12,268 |
| James Cochran | 11,796 |
| Eric Porter | 10,000 |
| Kirby Enterprise Fund | 9,038 |
| Thomas Prasil Trust | 8,334 |
| Charles B Kirby | 7,078 |
| Thomas Prasil | 6,870 |
| San Gabriel Benefit Plan fbo John McGrain | 6,554 |
| Growth Ventures, Inc Profit Sharing Plan & Trust | 4,676 |
| Paul Powell | 4,624 |
| JDC Ventures, LLC | 3,922 |
| Sondra W Margolies | 3,922 |
| San Gabriel Benefit Plan fbo Justin Yorke | 3,278 |
| John R Rogers | 2,820 |
| Frank Guy | 2,476 |
| Sandra Diaz R/O IRA | 2,164 |
| Michael Berenhaus | 1,960 |
| Charles and Sandra Curtis | 1,960 |
| John J Blum | 1,960 |
| Gregory A. Harrison | 1,960 |
| Donald S Darendinger Rev. Trust u/a 7/3/2007 | 1,960 |
| Susan Doukas | 1,960 |
| Stephen D. Brown | 1,960 |
| SLMI Holding LLC | 1,960 |
| Presley Reed | 1,958 |
| John R Rogers SEP IRA | 1,718 |
| High Speed Aggregate Inc. | 1,718 |
| Wardenburg 2009 Family Trust | 1,718 |
| Growth Ventures, Inc Pension Plan & Trust | 1,718 |
| Jason Paulley R/O IRA | 1,718 |
| Maureen Miller, IRA | 1,374 |
| Charles & Sandra Curtis JWROS | 1,202 |
| Frank & Shirley Mills | 1,176 |
| Jordan Family LLC | 1,030 |
| Norman McClain | 980 |
| Lawrence & Karen Cake | 980 |
| Margaret Elizabeth Crumbley | 980 |
| Tom Ellison | 980 |
| Robert Stanger | 980 |
| Adam Linn | 980 |
| John N. Alessandro | 980 |
| Nazim Lokhandwala | 980 |
| Lloyd Grant | 980 |
| Brenda Forwood | 980 |
| F. Richard Stark | 980 |
| Francis & Jeffrey Chan | 980 |
| John Black | 980 |
| Joseph R. Stanger | 980 |
| Konrad & Linda Kuhn | 980 |
| Belva Barbalace | 980 |
| Charles Biemiller, IRA | 980 |
| Carl Swarts, IRA a/c 177072 | 858 |
| William C Kottke R/O IRA | 858 |
| Constantine Hagepanos R/O IRA | 858 |
| Ashley Weatherford R/O IRA | 858 |
| Paul Hartmann R/O IRA | 858 |
| John Black | 858 |
| John Alesandro | 806 |
| Timothy & Patricia Gillis | 746 |
| Constantine Hagepanos | 490 |
| George Rosch | 490 |
| Stephen Troutman | 430 |
| Heather Evans | 344 |
| Thomas Forti | 344 |
| Jason Paulley Roth IRA | 344 |
| Ernest Dufresne | 172 |
| Total | 4,417,949 |

# EXHIBIT E

## Deed of Trust No. 404225

Deed of Trust No. 404225, Huerfano County, Colorado

*Recorded September 25, 2015 in the Office of the Huerfano County Clerk and Recorder, Reception No. 404225*

404225
Page 1 of 24
Nancy C. Cruz, Clerk & Recorder
Huerfano County, CO RP $0.00
09-25-2015 08:11 AM Recording Fee $126.00

Recording Requested by:

And when recorded mail to:

GrowCo Inc.
2000 South Colorado Boulevard
Tower 1, Suite 3100
Denver, Colorado 80222

---

**DEED OF TRUST, SECURITY AGREEMENT
AND FIXTURE FILING**

**THIS DEED OF TRUST, SECURITY AGREEMENT, FIXTURE FILING, AND ASSIGNMENT OF LEASES AND RENTS** (hereinafter referred to as "Deed of Trust") is made this 9th day of September 2015, by Orlando Reservoir No. 2 Company, LLC, a Colorado limited liability, and Two Rivers Farms F-2, Inc., a Colorado corporation, whose mailing address is 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222 (hereinafter referred to as "Grantors"), to THE PUBLIC TRUSTEE OF HUERFANO COUNTY (hereinafter referred to as "Trustee") for the benefit of the individuals and entities listed on **Schedule 1** attached hereto (hereinafter collectively referred to as "Beneficiary").

**WITNESSETH, THAT:**

**WHEREAS,** GrowCo, Inc. a Colorado corporation ("GrowCo") executed a promissory note or notes, hereinafter referred to as "Notes", dated various dates in 2015, totaling in the aggregate, the principal sum of Four Million and No/100 Dollars ($4,000,000.00), payable to the order of the Beneficiary, whose address is c/o Wayne Harding, 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, after the date hereof, with interest thereon from the date thereof at the rate of twenty-two and one-half per cent (22.5%) per annum (the "Note Rate") payable on or prior to April 1, 2020;

**AND WHEREAS,** the Grantors are desirous of securing payment of the principal and interest of said Notes in whose hands soever said Notes may be; and

**AND WHEREAS,** the Notes rank, and will rank, pari passu in right of enforcement with each other, such note holders having acknowledged and agreed that all such note holders shall be treated in a like and equal manner proportionate to the amount of each of the Notes and accrued interest owed to each such note holder, notwithstanding any differences as to the timing of each note holder's acquisition of the Notes. Such note holders may appoint a lenders' agent to act for and on behalf of all note holders and exercise such powers as are specifically delegated thereto with respect to enforcement of the terms of this Deed of Trust;

**AND WHEREAS,** Grantors benefit from the extension of the Notes and are affiliates of GrowCo, and willing to encumber the Property (as defined below) as provided herein.

**NOW THEREFORE,** the Grantors, in consideration of the premises and for the purpose aforesaid, do hereby grant, bargain, sell and convey unto the said Trustee in trust forever, the following described property, situate in Huerfano County, State of Colorado, as follow:

## Article 1

1.1 **Conveyance and Grant.** For valuable consideration, Grantors hereby irrevocably grants, transfers and assigns to Trustee, in trust forever with power of sale, for the benefit of the Beneficiary, all of Grantors' right, title and interest in and to the real property set forth on **Exhibit A** attached hereto and incorporated herein by this reference consisting of three (3) pages together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances (the "Real Property"). Grantors hereby irrevocably grants, transfers and assigns to Trustee for the benefit of the Beneficiary, all of Grantors' right, title and interest in and to the all water, water rights and ditch rights (including stock in utilities with ditch or irrigation rights) set forth on **Exhibit B** attached hereto and incorporated herein by this reference (the "Water Rights") consisting of three (3) pages; and all other rights, royalties, and profits relating to the Real Property, including, without limitation all minerals, oil, gas, geothermal and similar matters. The Real Property and the Water Rights are collectively referred to hereinafter as the "Property" all of which are located in Huerfano County, State of Colorado.

1.2 **Junior Lien.** Beneficiary understands and acknowledges that this Deed of Trust is junior in right to senior pre-existing deeds of trust encumbering the Property, granted by Grantors to the Colorado Water Conservation Board, and will have similar priority (on a *pari passu* basis) with certain other deeds of trust granted by Grantors, subject to the terms of an intercreditor agreement with such other beneficiaries of said deeds of trust.

1.3 **Leases and Rents.** Grantors presently assigns to Beneficiary, all of Grantors's right, title and interest in and to all present and future leases of the Property and all Rents derived from the Property, if any. In addition, Grantors grants to Beneficiary a Uniform Commercial Code security interest in the Personal Property and Rents as defined herein.

## Article 2

2.1 **Grantors' Representations and Warranties.** Grantors hereby unconditionally warrants and represents to Beneficiary as follows (which warranties and representations have been and will be relied upon by the Beneficiary in advancing funds to GrowCo):

(a) **Power.** Grantors have all requisite power and all governmental certificates of authority, licenses, permits, qualifications and documentation to own, lease and operate his properties and to carry on his business as now being, and as proposed to be, conducted.

(b) **Validity of Loan Documents.** The execution, delivery and performance by Grantors of this Deed of Trust are within Grantors' powers and all other requisite action for such authorization has been taken.

(c) **Title to Property and Priority of this Instrument.** This Deed of Trust constitutes a valid and subsisting Deed of Trust junior in right to those deeds of trust specified in Section 1.2 above.

(d) **Litigation.** There are no actions, suits or proceedings pending, or, to the knowledge of Grantors threatened against or affecting the Grantors or the Property, or involving the validity or enforceability of this Deed of Trust or the priority of the liens and security interests created hereby.

(e) **Miscellaneous Warranties and Representations.** Grantors warrants and represents this Deed of Trust is executed at Grantors' request; that Grantors has the full power, right, and authority to enter into this Deed of Trust and to hypothecate the Property; the provisions of this Deed of Trust do not conflict with, or result in a default under any agreement or other instrument binding upon Grantors and do not result in a violation of any law, regulation, court decree or order applicable to

Grantors; and Grantors has established adequate means of obtaining from Grantors on a continuing basis, information about Grantors' financial condition. Grantors shall observe, perform and discharge, duly and punctually, all and singular, its obligations set forth herein; and Grantors shall give prompt notice to Beneficiary of any failure on the part of Grantors to observe, perform and discharge the same or of any claim made or threatened for any such failure by Grantors.

2.2 **Grantors' Waivers.** Grantors waives all rights and defenses arising by reason of any "one-action" or "anti-deficiency" law, or any other law which may prevent Beneficiary from bringing any action against Grantors, including a claim for deficiency to the extent Beneficiary is otherwise entitled to a claim for deficiency, before or after Beneficiary's commencement or completion of a foreclosure action, either judicially or by exercise of a power of sale.

2.3 **Possession and Maintenance of the Property.** Beneficiaries and Grantors agree that Grantors' possession and use of the Property shall be governed by the following provisions:

(a) **Possession and Use.** Until the occurrence of an Event of Default, Grantors may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect Rents from the Property, if any.

(b) **Duty to Maintain.** Grantors shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value. Furthermore, Grantors will use its best efforts to prevent any act or occurrence that might impair the value or usefulness of the Property. In instances where repairs, replacements, renewals, additions, betterments, improvements or alterations are required in and to the Property in the course of routine maintenance and repair or on an emergency basis to prevent loss, damage, waste or destruction thereof, Grantors shall proceed to construct same, or cause same to be constructed; provided, however, that in instances where any emergency measures are to be taken, Grantors will notify Beneficiary, in writing, of the commencement of same and the measures to be taken, and when same are completed, the completion date and the measures actually taken.

(c) **Compliance with Governmental Requirements.** Grantors shall promptly comply with all laws, ordinances and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans with Disabilities Act. Grantors may, in good faith contest any such law, ordinance or regulation and withhold compliance during any such proceeding, including appropriate appeals, so long as Grantors has notified Beneficiary in writing prior to doing so and so long as, in Beneficiary's discretion, Beneficiary's interests in the Property are not jeopardized. Beneficiary may require Grantors to post adequate security or surety bond, reasonably satisfactory to Beneficiary to protect Beneficiary's interest.

(h) **Duty to Protect.** Grantors agrees neither to abandon nor leave unattended the Property. Grantors shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

2.4 **Taxes and Liens.** Grantors shall pay when due (and in all events prior to delinquency) all taxes, special taxes, assessments, charges (including water and sewer), fines and impositions levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or materials furnished to the Property.

(a) **Right to Contest.** Grantors may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Beneficiary's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantors shall within fifteen (15) days after the lien arises, or if a lien is filed, within fifteen (15) days after

Grantors has notice of the filing, secure the discharge of the lien, or if requested by Beneficiary, deposit with Beneficiary cash or a sufficient corporate surety bond or other security satisfactory to Beneficiary in an amount sufficient to discharge the lien plus any costs and attorney fees, or other charges that could accrue as a result of foreclosure or sale under the lien. In any contest, Grantors shall defend itself and Beneficiary and shall satisfy any adverse judgment before enforcement against the Property. Grantors shall name an additional obligee under any surety bond furnished in the contest proceedings.

(b) **Evidence of Payment.** Grantors shall, upon demand, furnish to Beneficiary satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Beneficiary at any time, a written statement of the taxes and assessments against the Property.

2.5 **Property Damage Insurance.** Grantors shall at all times maintain with financially sound and reputable insurers satisfactory to Beneficiary, insurance satisfactory to Beneficiary, including, without limitation, the following: (a) casualty insurance insuring against all risk of loss, damage, destruction, theft or any other casualty or risk, covering the Property, including all of Grantors' Personal Property located therein, without deduction for depreciation, in an amount approved by Beneficiary, but in no event less than the full replacement cost thereof, with a deductible not in excess of $50,000; (b) commercial general liability insurance covering the Property and Grantors, in an amount not less than $2,000,000 per occurrence and $2,000,000 in the aggregate, for bodily injury and/or property damage liability, or such higher amounts as Beneficiary may reasonably require; (c) such other insurance or coverages as Beneficiary may require, including, without limitation, insurance against flood. All policies of insurance maintained pursuant to this section shall provide standard mortgagee endorsements or clauses naming Beneficiary as mortgagee and as loss payee (with respect to property insurance) or as additional insured (with respect to liability insurance) and shall include standard subrogation clauses acceptable to Beneficiary. All required policies shall provide for thirty (30) days' written notice to Beneficiary prior to the effective date of any cancellation or material modification thereof. Any insurance required of Grantors hereunder may be furnished by Grantors under a blanket policy, provided such policy: (1) strictly complies with all other terms and conditions contained in this section, and (2) includes an endorsement that identifies with specificity the Property as being covered under the blanket policy, provides minimum guaranteed coverage for the Property in the amounts as set forth above, and expressly waives any pro rata distribution requirement contained in such blanket policy.

Grantors shall cooperate with Beneficiary in obtaining for Beneficiary the benefits of any insurance, condemnation or other proceeds lawfully or equitably payable to it in connection with the transactions contemplated hereby, and will reimburse Beneficiary for any expenses incurred in connection therewith (including the payment by Grantors of the expense of an independent appraisal on behalf of Beneficiary in case of a fire or other casualty or condemnation affecting the Property). The delivery of any insurance policies hereunder shall constitute an assignment of all unearned premiums as further security hereunder. In the event of the foreclosure of this Deed of Trust in extinguishment or partial extinguishment of the Indebtedness, all right, title and interest of Grantors in and to all insurance policies then in force shall pass to the purchaser or to Beneficiary, as the case may be, and Beneficiary is hereby irrevocably appointed by Grantors as attorney-in-fact for Grantors to assign any such policy to said purchaser or to Beneficiary, as the case may be, without accounting to Grantors for any unearned premiums thereon. If in Beneficiary's reasonable discretion, the Property can be rehabilitated after a partial destruction of the Property, whether by flood, fire or otherwise, the proceeds derived from the insurance company's coverage shall be made available to Grantors for the repair and/or restoration of that portion of the Property that was destroyed.

2.6 **Beneficiary's Expenditures.** If any action or proceeding is commenced that would materially affect Beneficiary's interest in the Property or if Grantors fails to comply with any provision of this Deed of Trust including without limitation, Grantors' failure to discharge or pay when due any amounts Grantors is required to discharge or pay under this Deed of Trust Beneficiary on Grantors' behalf may (but shall not be

obligated to) take any action that Beneficiary deems appropriate, including, but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all such costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Beneficiary for such purposes will then bear interest at the rate charged under the Notes from the date incurred or paid by Beneficiary to the date of repayment by Grantors. All such expenses will become a part of the Indebtedness and, at Beneficiary's option, will (A) be payable on demand; (B) be added to the balance of the Notes and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Notes; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Deed of Trust also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Beneficiary may be entitled upon Default.

## Article 3

3.1 **Warranty; Defense of Title.** Grantors warrants that: (a) Grantors hold good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than the senior deeds of trust referenced herein and any liens set forth in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by Beneficiary in connection with this Deed of Trust, and (b) Grantors have the full right, power and authority to execute and deliver this Deed of Trust to Beneficiary.

3.2 **Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantors in this Deed of Trust shall survive the execution and delivery of this Deed of Trust, shall be continuing in nature, and shall remain in full force and effect until such time as Grantors's Indebtedness shall be paid in full.

3.3 **Condemnation.**

(a) **Proceedings.** If any proceeding in condemnation is filed, Grantors shall promptly notify Beneficiary in writing and Grantors shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantors may be the nominal party in such proceeding, but Beneficiary shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Beneficiary's own choice, and Grantors will deliver, or cause to be delivered to Beneficiary such instruments as Beneficiary may request from time to time to permit such participation.

(b) **Application of Net Proceeds.** If all or any part of the Property is condemned by Eminent Domain proceedings or by any proceeding or purchase in lieu of condemnation, Beneficiary may, at its election, require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorney fees incurred by Trustee or Beneficiary in connection with the condemnation. If in Beneficiary's reasonable discretion, the Property can be rehabilitated after a partial condemnation, the proceeds derived from the government's award shall be made available to Grantors for the repair and/or restoration of that portion of the Property that was condemned.

3.4 **Imposition of Fees and Charges by Governmental Authorities.**

(a) **Current Taxes, Fees and Charges.** Upon request by Beneficiary, Grantors shall execute such documents in addition to this Deed of Trust and whatever other action is requested by Beneficiary to perfect and continue Beneficiary's lien on the Property. Grantors shall reimburse Beneficiary for all expenses incurred in recording, perfecting or continuing this Deed of Trust, including without limitation all taxes, fees, documentary stamps and other charges for recording this Deed of Trust.

(b) **Taxes.** The following shall constitute taxes to which this Section shall apply: (1) a specific tax upon this type of Deed of Trust or upon all or any part of the Indebtedness secured by this Deed of Trust; (2) a specific tax on Grantors which Grantors is authorized or required to deduct from payments on the Indebtedness secured by this type of Deed of Trust; (3)a tax on this type of Deed of Trust chargeable against the Beneficiary or the holder of the Notes; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Grantors.

**Article 4**

**4.1 Security Agreement; Financing Statements Further Assurances.**

(a) **Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures and Beneficiary shall have all of the rights of a secured party under Article 9 of the Colorado Uniform Commercial Code, as amended from time to time.

(b) **Security Interest.** Grantors shall execute and deliver to Beneficiary, in form and substance satisfactory to Beneficiary, such financing statements and such further assurances as Beneficiary may, from time to time, reasonably consider necessary to create, perfect and preserve Beneficiary's security interest herein granted, and Beneficiary may cause such statements and assurances to be recorded and filed, at such times and places as may be required or permitted by law, to so create, perfect and preserve such security interest. Grantors shall reimburse Beneficiary for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantors shall not remove, sever or detach the Personal Property from the Property. Grantors hereby irrevocably authorizes Beneficiary at any time and from time to time to file in any filing office any initial financing statements and amendments thereto that (1) indicate the collateral as "all assets of Grantors used or procured for use or otherwise relating to the Property" or words of similar effect, or as being of equal or lesser scope or in greater detail, and to indicate the Property as defined, or in a manner consistent with the term as defined, in this Deed of Trust and (2) contain any other information required by part 5 of Article 9 of the Uniform Commercial Code of any such filing office for the sufficiency or filing office acceptance of any initial financing statement or amendment. Grantors shall pay to Beneficiary, from time to time, upon demand, any and all reasonable costs and expenses incurred by Beneficiary in connection with the filing of any such initial financing statements and amendments, including reasonable attorneys' fees and all disbursements. Grantors shall, any time and from time to time, take such steps as Beneficiary may reasonably request for Beneficiary to obtain "control" of any Personal Property for which control is a permitted or required method to perfect, or to ensure priority of the security interest in such Personal Property granted herein.

(c) **Addresses.** The mailing address of Grantors as debtor and Beneficiary as secured party from which information concerning the security interest granted by this Deed of Trust may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Deed of Trust.

(d) **Uniform Commercial Code Remedies.** Beneficiary shall have all the rights, remedies and recourses with respect to the Personal Property, Improvements, fixtures, and Rents afforded to a "**Beneficiary**" by the aforesaid Uniform Commercial Code in addition to, and not in limitation of, the other rights, remedies and recourses afforded by the Notes and Deed of Trust.

(e) **Fixture Filing.** This Deed of Trust shall also constitute a "fixture filing" for the purposes of the aforesaid Article 9 of the Uniform Commercial Code.

## Article 5

5.1 **Further Assurances.** At any time, and from time to time, upon request of Beneficiary, Grantors will make, execute and deliver, or will cause to be made, executed or delivered, to Beneficiary or to Beneficiary's designee, and when requested by Beneficiary, cause to be filed, recorded, refiled, or rerecorded as the case may be, at such times and in such offices and places as Beneficiary may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurances, certificates and other documents as may, in the sole discretion of Beneficiary, be necessary or desirable in order to effectuate, complete, perfect, continue or preserve (1) Grantors' obligations under the Notes and this Deed of Trust and (2) the liens and security interests created by this Deed of Trust as first and prior liens on the Property, whether now owned or hereafter acquired by Grantors.

5.2 **Attorney-In-Fact.** If Grantors fails to do any of the things referred to in the preceding section, Beneficiary may do so for and in the name of Grantors and at Grantors' expense. For such purposes, Grantors hereby irrevocably appoints Grantors' attorney-in-fact for the purpose of making, executing, delivering, filing, recording and doing all other things as may be necessary or desirable, in Beneficiary's sole opinion, to accomplish the matters referred to in the preceding section.

5.3 **Full Performance.** Upon the full performance of all the obligations under the Notes and this Deed of Trust, Trustee shall, upon production of the documents and fees as required by Colorado law, release this Deed of Trust, and such release shall constitute a release of the lien. Beneficiary agrees to cooperate with Grantors in obtaining such release and releasing the other collateral securing the Indebtedness upon full payment and performance of all obligations under the Notes and Deed of Trust.

5.4 **Due on Sale and Transfers.** Beneficiary has the right, pursuant to the terms of the Notes, but not the obligation to call the Indebtedness immediately due and owing ("Acceleration") upon Grantors' Transfer (as defined herein) of the Property. The following events shall be referred to herein as a "Transfer": (i) a transfer or conveyance of title (or any portion thereof, legal or equitable) of the Property (or any part thereof or interest therein); (ii) the execution of a contract or agreement creating a right to title (or any portion thereof, legal or equitable) in the Property (or any part thereof or interest therein); (iii) a sale or transfer of, or the execution of a contract or agreement creating a right to acquire or receive any of the beneficial partnership interest in the Grantors; or (iv) a sale or transfer of, or the execution of a contract or agreement creating a right to acquire or receive the controlling interest of the Grantors, except in the event of a death or incapacity. Not to be included as a Transfer are (i) the creation of a lien or encumbrance subordinate to this Deed of Trust; or (ii) the creation of a purchase money security interest for day-to-day business operations; or (iii) the grant of any leasehold interest not containing an option to purchase. Upon any Transfer if Beneficiary exercises such option to Accelerate, Beneficiary shall give Grantors Notice of Acceleration. Such Notice shall also provide a period of not less than 10 days from the date the Notice is given within which Grantors may pay the sums declared due. If Grantors fails to pay such sums prior to the expiration of such period, Beneficiary may, without further notice or demand on Grantors, invoke any remedies permitted herein. If a Transfer occurs and should Beneficiary not exercise Beneficiary's option to Accelerate, Transferee shall be deemed to have assumed all obligations of Grantors under this Deed of Trust including all sums secured hereby whether or not the instrument evidencing such conveyance, contract, or grant expressly so provides. This covenant shall run with the Property and remains in full force and effect until the Indebtedness is paid in full. Should Beneficiary not elect to Accelerate upon the occurrence of such Transfer then, subject to the provisions above, the mere fact of a lapse of time or the acceptance of payment subsequent to any of such events, whether or not Beneficiary had actual or constructive notice of such Transfer, shall not be deemed a waiver of Beneficiary's right to make such election nor shall Beneficiary be estopped therefrom by virtue thereof.

## Article 6

6.1 **Events of Default.** Each of the following, at Beneficiary's option, shall constitute an Event of Default under this Deed of Trust:

(a) **Payment Default.** GrowCo fails to make any payment when due under the Indebtedness.

(b) **Other Defaults.** Grantors fail to comply with any other term, obligation, covenant or condition contained in this Deed of Trust.

(c) **Default on Other Payments.** Failure of Grantors within the time required by this Deed of Trust to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

(d) **Default in Favor of Third Parties.** Should Grantors or GrowCo default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Grantors' Property or GrowCo's ability to repay the Indebtedness or Grantors' ability to perform the obligations under this Deed of Trust.

(e) **False Statements.** Any warranty, representation or statement made or furnished to Beneficiary by Grantors or on Grantors' behalf under this Deed of Trust is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

(f) **Breach of Other Agreement.** A breach by GrowCo of the terms of any other agreement between GrowCo and Beneficiary that is not remedied within any grace period provided for therein, including without limitation, any agreement concerning the Indebtedness or other obligation of GrowCo to Beneficiary, whether existing now or in the future.

(i) **Foreclosure of Other Liens.** If the holder of any lien or security interest or deed on the Property whether senior or junior to the lien of this Deed of Trust (without hereby implying Beneficiary's consent to the existence, placing, creating or permitting of any such lien or security interest or deed) institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

6.2 **Right to Cure.** If any default, other than a default in payment is curable, then it may be cured by Grantors and/or GrowCo if Grantors and/or GrowCo, after receiving written notice from Beneficiary demanding cure of such default: (1) cures the default within sixty (60) days; or (2) if the cure requires more than sixty (60) days, immediately initiates steps which Beneficiary deems sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

6.3 **Rights and Remedies on Default.** If an Event of Default occurs under this Deed of Trust, at any time Trustee or Beneficiary may exercise any one or more of the following rights and remedies:

(a) **Election of Remedies.** Election by Beneficiary to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantors under this Deed of Trust, after Grantors' failure to perform, shall not affect Beneficiary's right to declare a default and exercise its remedies.

(b) **Accelerate Indebtedness.** Beneficiary shall have the right, at its option and upon notice to Grantors or GrowCo, to declare the entire Indebtedness immediately due and payable.

(c) **Entry on Property.** Beneficiary shall have the right to demand that Grantors shall forthwith surrender to Beneficiary the actual possession of the Property, and to the fullest extent permitted by law, enter and take possession of all or any part of the Property with the appointment of a receiver and exclude Grantors and its agents and employees wholly therefrom, and have joint access with Grantors to the books, papers and accounts of Grantors. If Grantors shall for any reason fail to surrender or deliver the Property or any part thereof after such demand by Beneficiary, Beneficiary may obtain a judgment or decree conferring upon Beneficiary the right to immediate possession or requiring Grantors to deliver immediate possession of the Property to Beneficiary, and Grantors hereby specifically covenants and agrees that Grantors will not oppose, contest or otherwise hinder or delay Beneficiary in any action or proceeding by Beneficiary to obtain such judgment or decree. Grantors will pay to Beneficiary, upon demand, all expenses of obtaining such judgment or decree, including, without limitation, reasonable compensation to Beneficiary, its attorneys and agents, and all such expenses and compensation shall, until paid, become part of the Indebtedness and shall be secured by this Deed of Trust. Upon every such entering upon or taking of possession, Beneficiary may hold, store, use, operate, manage and control the Property and conduct the business thereof, and, from time to time, (i) undertake all necessary and proper maintenance, repairs, renewals, replacements, additions, betterments and improvements thereto and thereon and purchase or otherwise acquire additional fixtures, personalty and other necessary property, (ii) insure or keep the Property insured, (iii) manage and operate the Property and exercise all the rights and powers of Grantors to the same extent as Grantors could in its own name, or otherwise act with respect to the same, and (iv) enter into any and all agreements with respect to the exercise by others of any of the powers herein granted to Beneficiary, all as Beneficiary from time to time may determine to be in its best interest. Beneficiary may collect, sue for and receive all the Rents and other issues, profits and revenues from the Property, including, without limitation, those past due as well as those accruing thereafter. Anything in this Deed of Trust to the contrary notwithstanding, Beneficiary shall not be obligated to discharge or perform the duties of the landlord to any tenant or Lessee or incur any liability as the result of any exercise by Beneficiary of its rights under this Deed of Trust until Beneficiary expressly assumes such obligations, and Beneficiary shall be liable to account only for the Rents actually received by Beneficiary. Whether or not Beneficiary takes possession of the Property, Beneficiary may make, modify, enforce, cancel or accept surrender of any management agreement or Lease, remove and evict any Lessee, increase or decrease Rents under any Lease, appear in and defend any action or proceeding purporting to affect the Property, and perform and discharge each and every obligation, covenant and agreement of Grantors contained in any Lease. Neither the entering upon and taking possession of the Property, nor the collection of any Rents and the application thereof as aforesaid, shall cure or waive any Event of Default theretofore or thereafter occurring, or affect any notice of an Event of Default or invalidate any act done pursuant to any such notice. Beneficiary shall not be liable to Grantors, anyone claiming under or through Grantors, or anyone having an interest in the Property by reason of anything done or left undone by Beneficiary pursuant to this section, unless such action or inaction by Beneficiary is a result of gross negligence or willful misconduct. Nothing contained in this section shall require Beneficiary to incur any expense or do any act. If the Rents are not sufficient to meet the costs of taking control of and managing the Property, any funds expended by Beneficiary for such purposes shall become indebtedness of Grantors to Beneficiary secured by this Deed of Trust. Such amounts, together with interest at the Default Interest Rate under the Notes and reasonable attorneys' fees, if applicable, shall be immediately due and payable. Notwithstanding Beneficiary's continuance in possession or receipt and application of Rents, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law upon or after the occurrence of an Event of Default. Any of the actions referred to in this Section may be taken by Beneficiary at such time as Beneficiary is so entitled, without regard to the adequacy of any security for the Indebtedness hereby secured.

(c) **Foreclosure.** Beneficiary shall have the right to cause all or any part of the Property and Personal Property, if Beneficiary decides to proceed against it as if it were real property, to be sold

by the Trustee according to the foreclosure laws of the State of Colorado. The Trustee shall give notice in accordance with the laws of Colorado. Beneficiary has the right to bid a deficiency amount at the foreclosure sale to preserve its right to collect the deficiency, if any, owed on the Indebtedness after the foreclosure sale. Beneficiary may bring an action in any court of competent jurisdiction to foreclose this Deed of Trust. Notwithstanding anything to the contrary contained in this Deed of Trust, the following provisions shall apply with respect to foreclosure proceedings:

1. **Public Trustee.** Beneficiary may foreclose this Deed of Trust, insofar as it encumbers the Property, by way of a trustee's sale pursuant to the provisions of Title 38, Article 38, Colorado Revised Statutes, as currently in effect, as amended, or in any other manner then permitted by law.

2. **Judicial Foreclosure.** The right to foreclose this Deed of Trust as a deed of trust by appropriate proceedings in any court of competent jurisdiction is also hereby given.

3. **Expenses of Trustee's Sale or Foreclosure.** All fees, costs and expenses of any kind incurred by Beneficiary in connection with foreclosure of this Deed of Trust, including, without limitation, the costs of any appraisals of the Property obtained by Beneficiary, all costs of any receivership for the Property advanced by Beneficiary, and all attorneys' and consultants' fees incurred by Beneficiary, appraisers' fees, outlays for documentary and expert evidence, stenographers' charges, publication costs and costs of procuring all such abstracts of title, title searches and examination, title insurance policies and similar data and assurances with respect to title, as Trustee or Beneficiary may deem necessary either to prosecute such suit or to evidence to bidders at the sale that may be had pursuant to such proceedings the true condition of the title to or the value of the Property, together with and including a reasonable compensation to Trustee, shall constitute a part of the obligations and may be included as part of the amount owing from Grantors to Beneficiary at any foreclosure sale.

4. **Notice and Mailing List.** Beneficiary may use the last known address or the address provided to Beneficiary for any party receiving notice of the foreclosure proceedings. Beneficiary shall not be under any duty to investigate or research current addresses for such notices. It shall be deemed sufficient for Beneficiary to send notices and/or pleadings to the address listed, if any, on the Colorado Secretary of State's website for a particular individual or entity.

(d) **Payment of Expenses.** Grantors shall pay, on demand, all expenses incurred by Beneficiary in any efforts to enforce any terms of this Deed of Trust after the occurrence of an Event of Default that is continuing, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred until actually paid by Grantors at the Default Interest Rate, and the same shall be secured by this Deed of Trust and by all of the other Loan Documents securing all or any part of the Indebtedness.

(e) **Remedies Cumulative Concurrent and Non-Exclusive.** Beneficiary shall have all rights, remedies and recourses available at law or equity (including, without limitation, those granted by the Uniform Commercial Code then in effect in the applicable jurisdiction) and the same (a) shall be cumulative and concurrent, (b) may be pursued separately, successively or concurrently against others obligated under the Notes or against the Property, or against any one or more of them, at the sole discretion of Beneficiary, (c) may be exercised as often as

occasion therefor shall arise, it being agreed by Grantors that the exercise or failure to exercise any of same shall in no event be construed as a waiver or release thereof or of any other right, remedy or recourse, and (d) are intended to be, and shall be, nonexclusive. If there exists additional security for the performance of the obligations secured hereby, the holder of the Notes, at its sole option and without limiting or affecting its rights or remedies hereunder, may exercise any of the rights and remedies to which it may be entitled hereunder, either concurrently with whatever rights it may have in connection with such other security or in such order as it may determine.

(f) **No Conditions Precedent to Exercise of Remedies.** Neither Grantors nor any other person hereafter obligated for payment of all or any part of the Indebtedness, or fulfillment of all or any of the Obligations, shall be relieved of such obligation by reason of (a) the failure of Beneficiary to comply with any request of Grantors or of any other person so obligated, to foreclose the Deed of Trust, (b) the release, regardless of consideration, of the Property or the addition of any other property to the Property, (c) any agreement or stipulation between any subsequent owner of the Property and Beneficiary extending, renewing, rearranging or in any other way modifying the terms of this Deed of Trust without first having obtained the consent of, given notice to or paid any consideration to Grantors or such other person, and in such event, Grantors and all such other persons shall continue to be liable to make payment according to the terms of any such extension or modification agreement unless expressly released and discharged, in writing, by Beneficiary, or (d) by any other act or occurrence, save and except the complete payment of the Indebtedness.

(g) **Waiver of Appraisement, Valuation, etc.** Grantors agrees, to the full extent permitted by law, that in case of an Event of Default on the part of Grantors hereunder, neither Grantors nor anyone claiming through or under Grantors will set up, claim or seek to take advantage of any moratorium, reinstatement, forbearance, appraisement, valuation, stay, extension, homestead exemption or redemption laws now or hereafter in force in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust or the sale of the Property, the delivery of possession thereof immediately after such sale to a receiver at such sale, or the exercise of any other remedy hereunder; and Grantors, for itself and all who may at any time claim through or under it, hereby waives to the full extent that it may lawfully so do, the benefit of all such laws, and any and all right to have assets subject to the security interest of this Deed of Trust marshaled upon any foreclosure or sale under the power herein granted or a sale in inverse order of alienation.

(h) **Discontinuance of Proceedings.** In case Beneficiary shall have proceeded to enforce any right, power or remedy under this Deed of Trust by foreclosure, entry or otherwise, or in the event Beneficiary commences advertising of the intended exercise of the sale under power provided hereunder and such proceeding or advertisement shall have been withdrawn, discontinued or abandoned for any reason, or shall have been determined adversely to Beneficiary, then in every such case (i) Grantors and Beneficiary shall be restored to their former positions and rights, (ii) all rights, powers and remedies of Beneficiary shall continue as if no such proceeding had been taken, (iii) each and every uncured Event of Default declared or occurring prior or subsequent to such withdrawal, discontinuance or abandonment shall be and shall be deemed to be a continuing Event of Default, and (iv) neither this Deed of Trust, nor the Notes, nor the Indebtedness shall be or shall be deemed to have been reinstated or otherwise affected by such withdrawal, discontinuance or abandonment; and Grantors hereby expressly waives the benefit of any statute or rule of law now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the above.

DEBTOR SHALL BE LIABLE FOR THE DEFICIENCIES IN THE EVENT THE PROCEEDS ARE NOT SUFFICIENT TO FULLY PAY ITEMS ABOVE TO THE EXTENT PERMITTED BY APPLICABLE LAW.

(j) **UCC Remedies.** With respect to all or any part of the Personal Property, Beneficiary shall have all the rights of a secured party under the Uniform Commercial Code as codified in Colorado Revised Statutes.

(k) **Collect Rents.** Beneficiary shall have the right, without notice to the Grantors or Grantors to take possession of and manage the Property and collect the Rents, if any, including amounts past due and unpaid (only if accruing after the date of this Deed of Trust), and apply the net proceeds, over and above Beneficiary's costs against the Indebtedness. In furtherance of this right, Beneficiary may require any tenant or other user of the Property to make payments of rent directly to Beneficiary. If the Rents are collected by Beneficiary, then Grantors irrevocably designates Grantors' attorney-in-fact to endorse instruments received in payment thereof in the name of Grantors and to negotiate the same and collect the proceeds. Payments by tenants or other users to Beneficiary in response to Beneficiary's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Beneficiary may exercise its rights under this section either in person, by agent or through a receiver.

(l) **Appoint Receiver.** Beneficiary shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Beneficiary's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Beneficiary shall not disqualify a person from serving as a receiver. Receiver may be appointed by a court of competent jurisdiction upon *ex parte* application and without notice, notice being hereby expressly waived.

(m) **Tenancy at Sufferance.** If Grantors remains in possession of the Property after the Property is sold as provided herein or Beneficiary otherwise becomes entitled to possession of the Property upon default of Grantors, Grantors shall become a tenant at sufferance of Beneficiary or the purchaser of the Property and shall, at Beneficiary's option, either (1) pay a reasonable rental for the use of the Property or (2) vacate the Property immediately upon the demand of Beneficiary.

(n) **Other Remedies.** Trustee or Beneficiary shall have any other right or remedy provided in this Deed of Trust or available at law or in equity.

6.4 **Sale of the Property.** In exercising its rights and remedies, Beneficiary shall be free to designate on or before it files a notice of election and demand with the Trustee, that the Trustee sell all or any part of the Property together or separately, in one sale or by separate sales. Beneficiary shall be entitled to bid at any public sale on all or any portion of the Property. Upon any sale of the Property, whether made under a power of sale granted in this Deed of Trust or pursuant to judicial proceedings, if the holder of the Notes is a purchaser at such sale it shall be entitled to use and apply all, or any portion of the Indebtedness for or in settlement or payment of all, or any portion of, the purchase price of the Property purchased, and, in such case, this Deed of Trust, the Notes, and any documents evidencing expenditures secured by this Deed of Trust shall be presented to the person conducting the sale in order that the amount of Indebtedness so used or applied may be credited therein as having been paid.

6.5 **Attorneys' Fees and Expenses.** If Beneficiary forecloses or institutes any suit to enforce any of the terms of this Deed of Trust, Beneficiary shall be entitled to recover its attorney fees and costs. Whether or not any court action is involved and to the extent not prohibited by law, all reasonable expenses Beneficiary

incurs that in Beneficiary's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable upon demand and shall bear interest at the Note Rate from the date the expenditure until repaid. Expenses covered by this section include, without limitation, Beneficiary's attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any post-judgment collection costs, costs for searching records, obtaining title reports (including foreclosure reports), surveyor's reports, appraisal fees, title insurance, and fees for the Trustee. Grantors will also pay any court costs in addition to all other sums provided by law.

6.6 **Rights of Trustee.** To the extent permitted by Colorado law, the Trustee shall have all of the rights and duties of Beneficiary as set forth in the foregoing section.

**Article 7**

**Assignment of Leases and Rents**

7.1 **Assignment.** Upon an Event of Default, the Beneficiary may invoke this Assignment of Leases and Rents and deal with the tenants directly for the collection of Rents. As additional consideration for the Indebtedness and to secure payment of the Indebtedness and performance of the obligations set forth herein, Grantors hereby assigns, conveys and transfers to Beneficiary the following:

(a) All Leases, written or oral, now in existence or hereafter arising, and all agreements entered into by Grantors or its predecessor in interest for the use and occupancy of all or any portion of the Property, with the right, power and authority of Grantors to alter, modify or change the terms of such Leases or to surrender, cancel or terminate such Leases without the consent of Grantors, together with any and all extensions and renewals thereof including subleases, if any.

**Article 8**

**Miscellaneous Provisions**

8.1 **Entire Agreement and Modification.** This Deed of Trust contains the entire agreement between the parties relating to the subject matter hereof and thereof, and all prior agreements, understandings and representations relative thereto which are not contained herein or therein are terminated. This Deed of Trust may not be amended, revised, waived, discharged, released or terminated unless a written instrument or instruments has or have been executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. Any alleged amendment, revision, waiver, discharge, release or termination, which is not so documented, shall not be effective as to any party.

8.2 **Notices.** Any notice required to be given under this Deed of Trust, including without limitation any notice of sale shall be given in writing and shall be effective when actually delivered, when actually received by facsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed when deposited in the U.S. mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown on the first page of this Deed of Trust. Any party may change its address for notices under this Deed of Trust by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantors agrees to keep Beneficiary informed at all times of Grantors' current address. If there is more than one Grantors, any notice given by Beneficiary to any Grantors is deemed to be notice to all Grantors.

8.3 **Caption Headings.** Caption headings in this Deed of Trust are for convenience purposes only and are not to be used to interpret or define the provisions of this Deed of Trust.

**8.4 Merger.** There shall be no merger of the interest or estate created by this Deed of Trust with any other interest or estate in the Property at any time held by or for the benefit of Beneficiary in any capacity, without the written consent of the Beneficiary.

**8.5 Governing Law.** This Deed of Trust shall be governed by federal law applicable to Beneficiary and, to the extent not preempted by federal law, the laws of the State of Colorado without regard to its conflicts of law provisions.

**8.6 Joint and Several Liability.** All obligations of Grantors under this Deed of Trust shall be joint and several, and all references to Grantors shall mean each and every Grantors, and all references to Grantors shall mean each and every Grantor. This means that each Grantor signing below is responsible for all obligations in this Deed of Trust. Where any one or more of the parties is a corporation, partnership, LLC or similar entity, it is not necessary for Beneficiary to inquire into the powers of any of the officers, directors, partners, members or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Deed of Trust.

**8.7 No Waiver by Beneficiary.** Beneficiary shall not be deemed to have waived any rights under this Deed of Trust unless such waiver is given in writing and signed by Beneficiary. No delay or omission on the part of Beneficiary in exercising any right shall operate as a waiver of such right or any other right. A waiver by Beneficiary of a provision of this Deed of Trust shall not prejudice or constitute a waiver of Beneficiary's right otherwise to demand strict compliance with that provision or any other provision of this Deed of Trust. No prior waiver by Beneficiary, nor any course of dealing between Beneficiary and Grantors, shall constitute a waiver of any of Beneficiary's rights or any of Grantors's obligations as to any future transactions. Whenever the consent of Beneficiary is required under this Deed of Trust, the granting of such consent by Beneficiary in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Beneficiary.

**8.8 Severability.** If a court of competent jurisdiction finds that any provision of this Deed of Trust to be illegal, invalid or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Deed of Trust. Unless otherwise required by law, the illegality, invalidity or unenforceability of any provision of this Deed of Trust shall not affect the legality, validity or enforceability of any other provision of this Deed of Trust.

**8.9 Successors and Assigns.** Subject to any limitations stated in this Deed of Trust on transfer of Grantors' interest, this Deed of Trust shall be binding upon and insure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person or entity other than Grantors, Beneficiary, without notice to Grantors, may deal with Grantors' successors with reference to this Deed of Trust and the Indebtedness by way of forbearance or extension without releasing Grantors from the obligations of this Deed of Trust or liability under the Indebtedness.

**8.10 Time is of the Essence.** Time is of the essence in the performance of this Deed of Trust.

**8.11 Waiver of Homestead Exemption.** Grantors hereby releases and waives all rights and benefits of the Colorado homestead exemption laws as to all Indebtedness secured by this Deed of Trust.

**8.12 Survival of Obligations.** Each and all of the obligations set forth herein shall survive the execution and delivery of the Notes and the consummation of the loan called for therein, and shall continue in full force and effect until the Indebtedness shall have been irrevocably paid in full.

**8.13 Covenants Running with the Land.** All obligations contained in this Deed of Trust are intended by the parties to be, and shall be construed as, covenants running with the Property.

**8.14 No Joint Venture.** The rights and obligations granted herein shall not, in any way create or contribute to the creation of a partnership or joint venture or similar arrangement between Grantors and the Beneficiary.

**8.15 Assignment.** This Deed of Trust is assignable by Beneficiary and any assignment hereof by Beneficiary shall operate to vest in the assignee all rights and powers herein conferred upon and granted to Beneficiary. If this Deed of Trust is assigned to one or more Beneficiaries, who, together with Beneficiary shall be Beneficiaries of this Deed of Trust, then one of such Beneficiaries, which may be, but is not required to be, Beneficiary, shall be designated as "Agent" or other representative with whom Grantors is to deal.

**8.16 Construction of this Instrument.** This instrument may be construed as a mortgage, Deed of Trust, chattel mortgage, conveyance, assignment, security agreement, pledge, financing statement, hypothecation, contract, or any one or more of them, in order to fully effectuate the liens and security interests hereof and the purposes and agreements herein set forth.

**8.17 Further Assurances.** Grantors, upon the request of Beneficiary, will execute, acknowledge, deliver and record and/or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Deed of Trust.

**8.18 Statute of Limitations.** The Grantors to the full extent permitted by law waives the pleading of any statute of limitations as a defense to any obligation secured by this Deed of Trust.

**8.19 No Third Parties Benefited.** This Deed of Trust is made and entered into for the sole protection of and benefit of Grantors and Beneficiary, and their successors and assigns, and no other person or persons shall have any right to action hereon or rights to the Loan funds at any time.

**8.20 Commercial Loan.** The Grantors hereby stipulates and warrants that the Loan secured hereby is a commercial loan, and that all of the proceeds of such Loan will be used solely to acquire or carry on a business or commercial activity.

**8.21 Waiver of Right to Trial by Jury.** To the maximum extent permitted by law, each party to this Deed of Trust hereby expressly waives any right to trial by jury of any claim, demand, action or cause of action (1) arising under this Deed of Trust or any other instrument, document or agreement executed or delivered in connection therewith, or (2) in any way connected with or related or incidental to the dealings of the parties hereto or any of them with respect to this Deed of Trust or any other instrument, document or agreement executed or delivered in connection herewith, or the transactions related hereto or thereto, in each case whether now existing or hereafter arising, and each party hereby agrees and consents that any such claim, demand, action or cause of action shall be decided by court trial without a jury, and that any party to this Deed of Trust may file an original counterpart or a copy of this section with any court as written evidence of the consent of the parties hereto to the waiver of their right to trial by jury.

**8.22 Lien Irrevocable; No Offset.** The lien created hereby is irrevocable by Grantors. No offset or claim that Grantors may now or in the future have against Beneficiary shall relieve Grantors from paying any amounts or performing any obligations due hereunder.

## Article 9

**Definitions.** Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Deed of Trust shall

have the meanings attributed to such terms in the UCC. The following capitalized words and terms shall have the following meanings when used in this Deed of Trust:

9.1 Beneficiary. "Beneficiary" means those individuals and entities listed on **Schedule 1** attached hereto and their successors and assigns.

9.2 Environmental Laws. "Environmental Laws" means any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation, the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 as amended, 42 U.S.C. Section 9601 et. seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S. C. Section 1801 et. seq., the Resource Conservation and Recovery Act, 42 U.S. C. Section 6901, et. seq. or other applicable state or federal laws, rules or regulations adopted pursuant thereto.

9.3 Event of Default. "Event of Default" means any of the events of default as set forth in this Deed of Trust in the events of default section of this Deed of Trust.

9.4 Grantors. "Grantors" mean Orlando Reservoir No. 2 Company, LLC and Two Rivers Farms F-2, Inc.

9.5 Hazardous Substances. "Hazardous Substances" means materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

9.6 Improvements. "Improvements" means all existing and future improvements, buildings, and structures affixed on the Property, facilities, additions, replacements and other construction on the Property.

9.7 Indebtedness. "Indebtedness" means all principal, interest and other amounts, costs and expenses payable under the Note or Notes, together will all renewals of, extensions of, modifications to, consolidations or and substitutions for the Notes and any amounts expended or advanced by Beneficiary to discharge Grantors' obligations or expenses incurred by Trustee or Beneficiary to enforce Grantors' obligations under this Deed of Trust, together with interest on such amounts as provided in this Deed of Trust.

9.8 Lease. "Lease" means any agreement for the Lease of any portion of the Property in which Grantors is the Landlord under such lease agreement.

9.9 Beneficiary. "Beneficiary" means those individuals and entities listed on **Schedule 1** attached hereto and their successors and assigns.

9.10 Lessee. "Lessee" means any individual who has executed a lease agreement ("Lease") with the Grantors or any agent of the Grantors for purposes of creating a tenancy at the Property.

9.11 Personal Property. "Personal Property" means all equipment, furniture, fixtures and other articles of personal property now or hereafter owned by Grantors, and now or hereafter attached or affixed to the Property; together with all accessions, parts and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Personal Property

9.12 Rents. "Rents" means all of the rents, receipts, revenues, issues, income, proceeds, security and other types of deposits and other benefits and profits now due (excluding those which were incurred prior to the date of this Deed of Trust) or which may become due or to which Grantors may now or hereafter shall become entitled (whether upon the expiration of any applicable period of redemption or otherwise) or may demand or claim, arising or issuing from or out of the Leases, or from or out of using, leasing, licensing, possessing, operating from, residing in, selling or otherwise enjoying the Property.

9.13 Trustee. "Trustee" means the Public Trustee of Huerfano County.

GRANTORS ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS DEED OF TRUST AND GRANTORS AGREES TO ITS TERMS.

IN WITNESS WHEREOF, Grantors has executed and delivered this Deed of Trust as of the date first mentioned above.

**GRANTORS:**

ORLANDO RESERVOIR NO. 2 COMPANY, LLC
a Colorado limited liability company

By: Wayne Harding, CFO and Treasurer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

This instrument was acknowledged before me on this 9th day of September, 2015 by Wayne Harding in his capacity as CFO of Orlando Reservoir No. 2 Company, LLC.

ANASTASIYA GEOLOGOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154027819
MY COMMISSION EXPIRES JUN 6, 2019

Notary Public

[SEAL]

My commission expires: June 6th, 2019

TWO RIVERS FARMS F-2, Inc.,
a Colorado corporation

By: ______________________________
Wayne Harding, Chief Financial Officer

STATE OF COLORADO )
) ss.
COUNTY OF DENVER )

The foregoing instrument was acknowledged before me this 9th day of September 2015, by Wayne Harding, as Chief Financial Officer of Two Rivers Farms F-2, Inc., a Colorado corporation.

ANASTASSIYA GEGEDOSH
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154021812
MY COMMISSION EXPIRES JUNE 6, 2019

______________________________
Notary Public

[SEAL]

My commission expires:
June 6th, 2019

SCHEDULE 1
BENEFICIARIES

GrowCo Noteholders

| | |
|---|---|
| Blue & Green, LLC | $2,115,000 |
| Thomas Prasil Trust u/a/d 11-26-03 | $200,000 |
| Hugo Zimmermann | 425,000 |
| Ursula Gutscher | $150,000 |
| Lee James Wagner | $125,000 |
| Brant Wiwi | $65,000 |
| Kelly, Matthew Pensco Trust fbo Matthew J. Kelley IRA | $50,000 |
| Kelly, Megan Pensco Trust fbo Megan Kelley IRA | $50,000 |
| Harnish, Michael IRA Resources, Inc. FBO Michael Wyl Harnish IRA #35-37097 | $100,000 |
| Miller, Maureen IRA Resources, Inc. FBO Maureen A Miller IRA 35-37034 | $50,000 |
| Richard Wiwi IRA Resources, Inc. FBO Richard Wiwi IRA 35-37093 | $10,000 |
| Harding, Wayne IRA Resources, Inc.FBO Wayne Harding IRA 35-35551 | $100,000 |
| David Marshall | $60,000 |
| I. Wistar Morris IRA | $250,000 |
| Dan Foster IRA | $100,000 |
| Loughran, Mary SEP IRA NDIRA, Inc. #9001066 | $50,000 |
| Angela Swartz, Angela IRA Resources, Inc.,FBO Angela Swartz IRA | $100,000 |
| Totals | $4,000,000 |

# EXHIBIT A
## LAND – LEGAL DESCRIPTION

A parcel of land located in Sections 17, 18, 19 and 20, Township 26 South, Range 66 West of the 6th P.M., County of Huerfano, State of Colorado, also being a portion of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E") being more particularly described as follows:

Beginning at the southeast corner of the Orlando Reservoir No. 2 parcel and the northerly right-of-way line of Huerfano County Road No. 104; thence along said northerly right-of-way line the following three (3) courses:

1) N 85°18'00"W, a distance of 303.00 feet;
2) On the arc of a curve to the right, through a central angle of 30°38'00", whose radius is 600.00 feet, an arc length of 320.79 feet;
3) 54°40'00"W, a distance of 665.85 feet; thence departing said northerly right-of-way line the following twenty-seven (27) courses:

1) N 29°45'12"W, a distance of 604.71 feet;
2) N 26°55'29"W, a distance of 359.64 feet;
3) N 20°11'06"W, a distance of 487.20 feet;
4) N 32°26'57"W, a distance of 602.35 feet;
5) N 53°33'17"W, a distance of 138.08 feet;
6) N 66°50'22"W, a distance of 301.61 feet;
7) N 75°17'28"W, a distance of 137.03 feet;
8) N 85°04'32"W, a distance of 309.44 feet;
9) S 88°31'11"W, a distance of 157.36 feet;
10) N 76°43'49"E, a distance of 182.98 feet;
11) N 73°18'09"E, a distance of 168.99 feet;
12) N 58°37'40"E, a distance of 47.34 feet;
13) N 28°30'52"E, a distance of 144.34 feet;
14) N 34°51'01"W, a distance of 140.93 feet;
15) N 18°19'17"E, a distance of 77.07 feet;
16) N 41°59'46"E, a distance of 118.15 feet;
17) N 42°50'14"E, a distance of 151.08 feet;
18) N 42°24'43"E, a distance of 253.21 feet;
19) N 38°36'33"E, a distance of 32.56 feet;
20) N 23°25'39"E, a distance of 141.45 feet;
21) N 00°39'19"E, a distance of 102.77 feet;
22) N 29°08'34"W, a distance of 378.60 feet;
23) N 34°13'15"W, a distance of 114.68 feet;
24) N 63°26'11"W, a distance of 100.95 feet;
25) N 63°26'11"W, a distance of 70.12 feet;
26) On the arc of a curve to the right, through a central angle of 153°27'11", whose radius is 381.91 feet, an arc length of 1022.84 feet;
27) N 00°01'00"E, a distance of 27.60 feet, to the North line of the Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence S 89°59'00"E, along said North line a distance of 2047.92 feet; thence departing said North line the following twenty-four (24) courses:

1) S 00°01'00"W, a distance of 61.13 feet;
2) S 55°00'31"E, a distance of 79.16 feet;
3) S 36°54'16"E, a distance of 228.02 feet;
4) S 47°48'31"E, a distance of 262.80 feet;

5) S 60°48'16"E, a distance of 90.60 feet;
6) S 30°37'38"E, a distance of 403.12 feet;
7) S 56°18'35"E, a distance of 376.36 feet;
8) S 57°59'41"E, a distance of 274.36 feet;
9) S 58°32'41"E, a distance of 402.85 feet;
10) S 35°31'10"E, a distance of 174.28 feet;
11) S 04°49'25"E, a distance of 111.00 feet;
12) S 21°50'49"W, a distance of 166.48 feet;
13) S 02°50'15"W, a distance of 67.98 feet;
14) N 81°50'02"W, a distance of 101.65 feet;
15) S 51°28'22"W, a distance of 87.41 feet;
16) S 67°08'14"W, a distance of 75.69 feet;
17) S 48°36'02"W, a distance of 36.58 feet;
18) S 17°31'48"W, a distance of 26.11 feet;
19) S 02°51'57"W, a distance of 138.14 feet;
20) S 70°33'01"E, a distance of 329.43 feet;
21) S 29°45'05"E, a distance of 173.68 feet;
22) S 48°12'39"E, a distance of 127.54 feet;
23) S 65°10'56"E, a distance of 67.41 feet;
24) S 45°56'50"E, a distance of 175.27 feet to the boundary of Orlando Reservoir No. 2, per plat of Amended Grant of Easement and Result of Survey Plat recorded April 29, 1981, as Map 170, Pocket 3, Folder 3, (also known as Colorado Land and Grazing, Unit "E"); thence along said boundary the following three (3) courses:
1) S 06°27'00"E, a distance of 233.05 feet;
2) S 19°01'00"W, a distance of 799.00 feet;
3) S 46°14'00"W, a distance of 1850.00 feet, to the Point of Beginning, Containing 322.21 acres, more or less.

ACCORDING TO THE CLERK AND RECORDER FOR HUERFANO COUNTY, COLORADO.

# EXHIBIT B
## WATER RIGHTS – LEGAL DESCRIPTION

The following water rights situate, lying and being in the County of Huerfano, COLORADO, described as follows:

A) ORLANDO RESERVOIR NO. 2, decreed for a total of 3,110 acre- feet storage, as follows:

I) ORLANDO RESERVOIR NO. 2, for storage of 43,560,000 cubic feet of water (1,000 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication October 3, 1921 (previous adjudication date was October 15, 1901), in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River through and by means of the Orlando Canal No. 3, and Greasewood Arroyo, through and by means of the Greasewood Arroyo Diverting Canal, and as more particularly describes in the aforesaid Decree entered October 31, 1921, in Civil Action No. 1414 (Priority No. 349).

II) ORLANDO RESERVOIR NO. 2, (ENLARGEMENT), for storage of 35,078,750 CUBIC FEET OF WATER (800 acre-feet), for irrigation, date of appropriation December 14, 1905, date of adjudication (conditional) October 3, 1921 in Civil Action No. 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right made absolute by Decree in Civil Action No. 1414-60, and 1414-62, entered November 1, 1960, and November 8, 1962 (Priority No. 349).

III) ORLANDO RESERVOIR NO. 2, (SECOND ENLARGEMENT), for storage of 1,310 acre-feet of water, for irrigation, date of appropriation October 2, 1906, date of adjudication (conditional) October 3, 1921, in Civil Action 1414, District Court, in and for Huerfano County, located in Section 17, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado, sources The Huerfano River and Greasewood Arroyo, and the conditional right partly made absolute November 1, 1960 (320 acre-feet) and April 2, 1962 (990 acre-feet) (Priority No. 367 ½).

Together with the Orlando Canal No. 3 andthe Greasewood Arroyo Diverting Canal, described as follows:

IV) That the headgate of the Orlando Canal No. 3, is located at a point on the North bank of the Huerfano River, from whence the West quarter corner of Section 25, Township 26 South, Range 66 West of the 6th PM, bears North 5°30' West 973 feet, said canal having a carrying capacity of 130 cubic feet of water per second of time.

V) That the headgate of the Greasewood Arroyo Diverting Canal, is located at a point on the said Greasewood Arroyo, from whence the Northeast corner of Section 18, Township 26 South, Range 66 West of the 6th PM, bears North 68°3' East 2920 feet, said canal having a carrying capacity of 1500 cubic feet of water per second of time.

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

B) BUTTE VALLEY DITCH, decreed for a total of 9 cubic-feet per second, as follows:

I) BUTTE VALLEY DITCH for diversion of 1.2 cubic-feet of water per second of time, from The Huerfano River for irrigation, date of appropriation May 15, 1862, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 1).

II) BUTTE VALLEY DITCH (ENLARGEMENT) for diversion of 1.8 cubic-feet of water per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1865, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 9).

III) BUTTE VALLEY DITCH (SECOND ENLARGEMENT), for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication June 12, 1889 (Reed Decree), point of diversion in the NW ¼ NE ¼, Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (Priority No. 86).

IV) BUTTE VALLEY DITCH (KILLIAN) for diversion of 3.0 cubic feet per second of time, from The Huerfano River, for irrigation, date of appropriation May 15, 1886, date of adjudication February 23, 1898 (Killian Decree), point of diversion in the NW ¼ NE ¼ Section 30, Township 26 South, Range 66 West, 6th PM, Huerfano County, Colorado (previous adjudication date of June 12, 1889) (Priority No. 111).

Together with all ditches, ditch rights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

C) ROBERT RICE DITCH, decreed for a total of 3.0 cubic feet per second of time, as follows: From the Huerfano River, for irrigation, date of appropriation March 1, 1867, date of adjudication June 12, 1889 (Reed Decree), original decreed point of diversion in NW 1/4 Section 22, T. 26 S., R. 66 W., 6th P.M., point of diversion transferred to SW 1/4 Section 10, T. 26 S., R. 66 W, 6th P.M., approximately 1700 feet from the west line and 550 feet from the south line of said Section 10, in Case No. 91CW39, Water Div. 2 on May 19, 1992 Huerfano County, Colorado (Priority 19)

Together withall ditches, ditchrights, easements, rights of way, and appurtenances, including headgates, measuring devices, and other fixtures thereon.

Friday, November 1, 2024 16:34

# Electronic Document Dropbox

| | |
|---|---|
| **Name** | John R. McKowen |
| **Debtor's Name (if different)** | Two Rivers Farms F-2, The Orlando Reservoir No.2 Company, LLC |
| **Email** | john@johnmckowen.com |
| **Phone Number** | (303) 248-6883 |
| **Case Number (if known)** | 23-15627, 23-13178, 2401111, 24-01112 KHT |

# EXHIBIT F

## VetaNova Board Resolution (March 27, 2026)

Amended Resolution of the Board of Directors of VetaNova Inc. — Individual Assignment of Beneficial Interests

*Adopted by Written Consent of the Sole Director on March 27, 2026, pursuant to NRS § 78.315*

**AMENDED RESOLUTION OF THE BOARD OF DIRECTORS**
**OF**
**VĒTANOVA INC.**
*a Nevada Corporation*
Adopted by Written Consent of the Sole Director
March 27, 2026

## RECITALS

**WHEREAS**, VētaNova Inc. ("VētaNova" or the "Company") is a Nevada corporation with its principal office in Greenwood Village, Colorado, and John Roderick McKowen serves as its sole Director, Chief Executive Officer, and President;

**WHEREAS**, VētaNova holds approximately ninety percent (90%) of the beneficial interest under the Deed of Trust recorded as Reception No. 404224 in Huerfano County, Colorado ("DoT 404224"). The conveyances under DoT 404224 are secured by the Orlando Reservoir No. 2 property and the Butte Valley agricultural property, both located in Huerfano County, Colorado, and by the Avondale greenhouse facility located in Pueblo County, Colorado;

**WHEREAS**, approximately eighty (80) investor-beneficiaries are identified by name in Exhibit 8 to DoT 404224 (the "Beneficiaries");

**WHEREAS**, twenty-six (26) Beneficiaries voluntarily exchanged their GrowCo securities interests—held across the GCP 1 Preferred, GCP Super Units, and McGrow, LLC capital accounts—into proportional membership interests in VitaNova Partners, LLC ("VNP"), and twenty-five (25) of those members subsequently exchanged into equity shares of VētaNova Inc., through which VētaNova acquired approximately ninety percent (90%) of the beneficial interest under DoT 404224;

**WHEREAS**, the United States District Court for the District of Colorado approved the Paulson Settlement Agreement and Complete Bar Order in *Paulson v. Two Rivers Water & Farming Co.*, Civil Action No. 19-cv-02639-PAB-NRN (Final Order, March 16, 2023), which expressly preserved the Beneficiaries' "claims for collection of any amounts due under the GrowCo securities pursuant to the terms of the securities, including claims in the event of a GrowCo liquidation including in the GrowCo Bankruptcy Action" (§§ 1(g), 1(cc), 28);

**WHEREAS**, the Paulson Complete Bar Order further provides that assignors to VitaNova Partners, LLC "are not excluded as Class Members by virtue of such assignment" (§ 1(i)), confirming that the Beneficiaries' collection rights survived the exchange of their interests into VētaNova;

**WHEREAS**, John Roderick McKowen filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on October 14, 2025, Case No. 25-16665-KHT (the "Bankruptcy Case"), in the United States Bankruptcy Court for the District of Colorado;

**WHEREAS**, the Debtor's Amended Combined Disclosure Statement and Plan of Reorganization proposes to classify the Beneficiaries' secured interests as Class 3B and to treat those interests through a 6% Collateralized Bond exchange issued pursuant to 11 U.S.C. § 1145(a);

**WHEREAS**, the Board has determined that each Beneficiary should be able to file an individual Proof of Claim in the Bankruptcy Case asserting their Paulson-preserved collection rights and their status as a named beneficiary under DoT 404224, without being required to retain legal counsel as a precondition to participation;

**WHEREAS**, to enable individual filing, VētaNova must assign to each Beneficiary their proportional share of the Company's beneficial interest under DoT 404224, so that each Beneficiary holds a direct secured interest that can be independently asserted in the Bankruptcy Case;

**WHEREAS**, the properties securing the conveyances under DoT 404224 have been independently appraised as follows: (a) the Avondale greenhouse facility, Pueblo County, Colorado, appraised at $3,500,000 (Lone Pine Appraisals, Inc., March 2022); and (b) the Butte Valley agricultural property including Orlando Reservoir No. 2, Huerfano County, Colorado, originally appraised at $5,195,000 (WestWater Research, LLC, January 2012), now valued at approximately $51,400,000 based on senior water rights alone (3,110 acre-feet of decreed storage at $10,240/AF, plus Butte Valley Ditch and Robert Rice Ditch senior direct flow rights, all adjudicated in the Reed Decree) at the current market comparable (City of Aurora/Otero County transaction, April 2024), for a combined estimated value of approximately $54,900,000;

**WHEREAS**, VētaNova is a non-debtor entity whose real property is not property of the Debtor's bankruptcy estate, and VētaNova may pledge its own assets and assign its beneficial interests without bankruptcy court authorization;

**WHEREAS**, the Board has determined that each Beneficiary's proportional ownership percentage within the 75% Individual Beneficial Interest Owner Allocation, as set forth in the ECV Schedule and derived from the original GrowCo securities exchange ratios, constitutes a permanent and irrevocable allocation of beneficial interest under DoT 404224 that shall not be subject to dilution, reallocation, or diminishment by any subsequent corporate action of VētaNova, including without limitation any reverse merger, share exchange, or similar corporate reorganization transaction, and the filing of a Proof of Claim by any Beneficiary shall permanently establish that Beneficiary's right to recover in proportion to that fixed percentage from the full value of the collateral securing the conveyances under DoT 404224, as that value may be determined from time to time;

**NOW, THEREFORE, BE IT RESOLVED**, that the Board of Directors of VētaNova Inc., acting by written consent of its sole Director pursuant to Nevada Revised Statutes § 78.315, hereby adopts the following resolutions:

## RESOLUTIONS

### 1. Self-Executing Assignment of Individual Beneficial Interests.

Effective immediately upon adoption of this Resolution, VētaNova hereby assigns, transfers, and conveys to each Beneficiary identified in the Estimated Current Valuation schedule (the "ECV

Schedule") their proportional share of seventy-five percent (75%) of VētaNova's beneficial interest under DoT 404224, as set forth in the ECV Schedule by ownership percentage (the "Individual Beneficial Interest Owner Allocation"). VētaNova shall retain the remaining twenty-five percent (25%) of its beneficial interest under DoT 404224 as a corporate reserve (the "Retained Interest"). The Retained Interest shall remain the property of VētaNova and shall be excluded from any reverse merger, share exchange, or similar corporate reorganization transaction involving VētaNova. This Resolution shall itself constitute and operate as the instrument of assignment for each Beneficiary without the requirement of any further action, instrument, or delivery by VētaNova or its officers. The estimated value of each Beneficiary's interest is based on the combined estimated collateral value of approximately $54,900,000 and the 75% Individual Beneficial Interest Owner Allocation, and is provided for informational purposes only; the actual value of each interest will be determined through the claims allowance process in the Bankruptcy Case.

**Condition.** Each individual Beneficiary's assigned interest shall vest upon that Beneficiary filing a Proof of Claim in Case No. 25-16665-KHT asserting their beneficial interest under DoT 404224. Any Beneficiary who does not file a Proof of Claim within the time period established by the Bankruptcy Court for the filing of proofs of claim (or any extension thereof) shall be deemed to have declined the assignment, and such Beneficiary's proportional interest shall automatically revert to VētaNova without further action. For the avoidance of doubt, each Beneficiary's right to file is absolute and unconditional—it is not subject to prior approval by VētaNova, the Debtor, or any other party, and does not require the retention of legal counsel.

**Mandatory Distribution Upon Sale.** In the event of any sale, transfer, or other disposition of all or any portion of the properties securing the conveyances under DoT 404224—including the Avondale greenhouse facility, the Butte Valley agricultural property, Orlando Reservoir No. 2, and all associated water rights, ditch rights, easements, and appurtenances—VētaNova shall distribute to each Beneficiary whose interest has vested under this Resolution their proportionate share of the net proceeds of such sale, calculated according to that Beneficiary's ownership percentage as set forth in the ECV Schedule. This distribution obligation is mandatory and self-executing, requires no further Board action or approval, and shall not be subordinated to any obligation arising from a reverse merger, share exchange, or other corporate reorganization of VētaNova. VētaNova shall effect such distribution within thirty (30) days of receipt of sale proceeds. This right shall survive any change in VētaNova's corporate structure, including without limitation any merger, consolidation, reorganization, or dissolution.

**2. Right to File Individual Proofs of Claim.**

Each Beneficiary identified in Exhibit 8 to DoT 404224 and the ECV Schedule shall have the absolute and unconditional right to file an individual Proof of Claim in Case No. 25-16665-KHT, asserting: (a) their status as a named beneficiary under DoT 404224 as identified in Exhibit 8; (b) their Paulson-preserved collection rights under the GrowCo securities; and (c) their direct beneficial interest as assigned by this Resolution. No Beneficiary shall be required to retain legal counsel as a precondition to filing a Proof of Claim. This right is self-executing and requires no further corporate action by VētaNova. VētaNova shall provide each Beneficiary with a certified copy of this Resolution, the ECV Schedule identifying their proportional ownership percentage,

the relevant pages of DoT 404224 and Exhibit 8, and the pertinent provisions of the Paulson Complete Bar Order, to serve as supporting documentation for their individual filings.

**3. Acknowledgment of Paulson-Preserved Rights.**

The Board acknowledges that the Paulson Complete Bar Order (Civil Action No. 19-cv-02639-PAB-NRN, D. Colo., Final Order March 16, 2023) expressly preserved the Beneficiaries' claims for collection of amounts due under the GrowCo securities, including claims in the event of a GrowCo liquidation and in the GrowCo Bankruptcy Action. The Board further acknowledges that the assignment of interests to VitaNova Partners, LLC did not extinguish these rights, as confirmed by § 1(i) of the Paulson Settlement Agreement. The assignments effected by Resolution 1 restore to each Beneficiary a direct interest that may be asserted without intermediation by VētaNova or collective counsel.

**4. Self-Executing Pledge of Real Property.**

Effective immediately upon adoption of this Resolution, VētaNova hereby pledges and grants a lien on the properties securing the conveyances under DoT 404224—specifically, the Avondale greenhouse facility (Pueblo County, Colorado), and the Butte Valley agricultural property including Orlando Reservoir No. 2 (Huerfano County, Colorado)—to secure the 6% Collateralized Bonds to be issued under the Plan pursuant to 11 U.S.C. § 1145(a) and to secure the beneficial interests assigned to the Beneficiaries under Resolution 1. This Resolution shall constitute the operative authorization for such pledge without the requirement of any further corporate action. The combined estimated value of the pledged properties is approximately $54,900,000, based on the Lone Pine Appraisals (March 2022) for Avondale and the updated senior water rights valuation at current market comparables for Orlando/Butte Valley. The Chief Executive Officer is authorized to execute all documents necessary to record and perfect this pledge, including deeds of trust, security agreements, and UCC financing statements.

**5. Optional Collective Counsel.**

The Board authorizes the Chief Executive Officer to retain, on behalf of VētaNova and any Beneficiaries who voluntarily elect collective representation, qualified legal counsel admitted to practice before the United States Bankruptcy Court for the District of Colorado. Retention of collective counsel is optional and is provided as a resource for Beneficiaries who desire legal representation. No Beneficiary's right to file an individual Proof of Claim or to participate in the Bankruptcy Case shall be conditioned upon the retention of collective counsel or upon any Beneficiary's decision to participate in or decline collective representation.

**6. Bond Exchange Authorization.**

The Board hereby authorizes VētaNova to participate in the 6% Collateralized Bond exchange described in the Debtor's Plan, under which: (a) each participating VētaNova shareholder shall surrender one share of VētaNova common stock (valued at $1.00 per share conversion) and contribute $0.50 in new cash; (b) in exchange, each participating shareholder shall receive a 6% Collateralized Bond with $2.00 face value, representing a combined 25% discount; (c) the Bonds shall be issued pursuant to 11 U.S.C. § 1145(a) upon confirmation of the Plan; (d) the Bonds shall be secured by the same properties securing the conveyances under DoT 404224; and (e) the

Tranche A Bond Exchange is capped at $2,500,000 in new cash contributions from existing shareholders on a first-come, first-served basis.

**7. Officer Authorization.**

The Board hereby authorizes the Chief Executive Officer to execute and deliver all agreements, instruments, certificates, and other documents, and to take all actions, as may be necessary or desirable to carry out the purposes and intent of these Resolutions, including without limitation: (a) individual Assignment of Beneficial Interest instruments for each Beneficiary; (b) engagement letters with legal counsel; (c) deeds of trust, security agreements, and pledge agreements relating to the Company's real property; (d) communications with the Bankruptcy Court, the United States Trustee, and parties in interest; (e) informational packages to Beneficiaries including Proof of Claim instructions and supporting documentation; and (f) any filings required in connection with the Bond Exchange or the Plan.

**8. Ratification.**

The Board hereby ratifies and confirms all actions heretofore taken by the officers and agents of the Company that are consistent with these Resolutions.

**9. Confirmation of Asset Contribution and Beneficiary Voting Rights.**

The Board hereby confirms that VētaNova's pledge of its land and water rights under Resolution 4 is intended to secure both the Collateralized Bonds under the Plan and the beneficial interests assigned to the Beneficiaries under Resolution 1. The assignments effected by this Resolution and the pledge of real property are self-executing and irrevocable, subject only to the condition in Resolution 1 that each individual Beneficiary's interest vests upon filing a Proof of Claim. The Board affirms that the purpose of these actions is to provide the Beneficiaries—who are the beneficial owners of the assets and who were targeted as defendants in the now-dismissed adversary proceeding No. 24-01111-KHT—with a direct interest in the estate that entitles them to vote on the Plan as Class 3B creditors. The Board determines that these actions are in the best interests of VētaNova and its shareholders, as they ensure that the persons for whose benefit these assets are held have a meaningful voice in the reorganization process.

The undersigned, being the sole Director of VētaNova Inc., hereby executes this Written Consent effective as of the date first written above.

*/s/ John Roderick McKowen*
John Roderick McKowen
Sole Director, Chief Executive Officer, and President
VētaNova Inc.

# EXHIBIT G

## Estimated Current Valuation

Estimated Current Valuation by Beneficial Owner — VetaNova Inc. — circulated to the VBIH base on March 28, 2026 (note: ECV footer error candidly disclosed in Notice § IV.C)

*Per-Beneficiary allocation under the 75% Individual Beneficial Interest Owner Allocation*

**VETANOVA INC.**

Estimated Current Valuation (ECV) by Beneficial Owner

*Based on 75% Individual Beneficial Owner Allocation*

| Rank | Beneficial Owner | Ownership % | ECV Claim |
|---|---|---|---|
| 1 | JOHN R. MCKOWEN | 34.56% | $14,230,512 |
| 2 | PRASIL FAMILY MATTERS, LLC | 15.35% | $6,321,176 |
| 3 | JON D. AND LINDA W. GRUBER TRUST | 9.88% | $4,066,584 |
| 4 | RM MATERIALS LLC | 8.04% | $3,311,592 |
| 5 | I. WISTAR MORRIS | 7.84% | $3,229,994 |
| 6 | CEDE & CO | 4.73% | $1,947,837 |
| 7 | LEE JAMES WAGNER | 4.02% | $1,655,404 |
| 8 | MARK E. ANDERSON MD APC PSP & T | 4.01% | $1,650,801 |
| 9 | GEORGE MCCAFFREY | 3.72% | $1,533,676 |
| 10 | LOUISE LOWE | 1.18% | $487,680 |
| 11 | SAMUEL W. MORRIS, JR. | 0.74% | $306,087 |
| 12 | RUSSELL COPPOCK | 0.69% | $284,480 |
| 13 | COTSWOLD FOUNDATION | 0.52% | $215,794 |
| 14 | MICHAEL HARNISH IRA RESOURCES | 0.44% | $182,039 |
| 15 | MICHAEL MCCULLOUGH | 0.34% | $138,176 |
| 16 | MFFI, LLC | 0.29% | $117,904 |
| 17 | HEATHER BURSHTEN | 0.26% | $107,675 |
| 18 | MICHAEL & LINDA HARNISH REVOCABLE | 0.25% | $101,260 |
| 19 | WAYNE HARDING | 0.23% | $93,212 |
| 20 | MICHAEL BARISH | 0.21% | $87,779 |
| 21 | CORY BATAAN | 0.20% | $80,756 |
| 22 | CHARLES BLOOM | 0.20% | $80,756 |
| 23 | JOHN GROSSO | 0.20% | $80,756 |
| 24 | JAN MCCAFFREY | 0.20% | $80,756 |
| 25 | JOSEPH MCKOWEN | 0.20% | $80,756 |
| 26 | LAURA MCKOWEN | 0.20% | $80,756 |
| 27 | PORTER FAMILY LIVING TRUST DTD 9-5-2006 | 0.20% | $80,756 |
| 28 | TRICIA VARRASSO | 0.20% | $80,756 |
| 29 | MARTHA MORRIS | 0.17% | $69,625 |
| 30 | ELEVENTH GENERATION | 0.16% | $67,748 |
| 31 | PETER AMMENTORP | 0.15% | $60,803 |
| 32 | TERRY GRUBER | 0.11% | $44,696 |
| 33 | MELISSA RICHARDS IRA | 0.09% | $38,359 |
| 34 | JOHN P. BROOKS | 0.07% | $30,504 |
| 35 | JEANNE BROOKS | 0.07% | $30,401 |
| 36 | BILL REEB | 0.07% | $30,401 |
| 37 | CARL SWARTS | 0.07% | $27,412 |
| 38 | JOHN BROOKS | 0.06% | $26,498 |
| 39 | MARSHA WALKER | 0.04% | $16,353 |
| 59 | *PRIOR SHELL HOLDOVERS* | 0.02% | $7,833 |
| | **Reserved — Spinoff Entity** | **25.00%** | **$13,725,000** |
| | GRAND TOTAL | 100.00% | $54,900,000 |

*RISK DISCLOSURE: This ECV is for informational purposes only in connection with In re VētaNova Inc., Case No. 24-15438 (Bankr. D. Colo.) and does not guarantee any distribution. The $54.9M total is a preliminary estimate subject to material change; no independent appraisal has been obtained.*

# EXHIBIT H

## VBIH Instructions Email and POC Form B-410

Email transmitted by John McKowen to the VetaNova Beneficial Interest Holder base on March 28, 2026, with attached Proof of Claim Form B-410 as circulated

*Email and POC Form B-410 as transmitted; Bcc email addresses redacted by Debtor for privacy*

**From:** **johnmckowen** john@johnmckowen.com
**Subject:** Instructions — Filing Your Proof of Claim VētaNova Beneficial Interest (VBIH)
**Date:** March 28, 2026 at 5:52 AM
**To:**
**Bcc:** [redacted]



Dear VētaNova Beneficial Owner,

VētaNova has adopted a Resolution that assigns you your individual proportional share of the beneficial interest under DoT 404224. That Resolution is attached. Your interest vests when you file your Proof of Claim — if you don't file, the interest reverts back to VētaNova.

**Instructions - How to fill out the Proof of Claim form (Official Form B 410):**

**<u>Top of Form — Case Information:</u>**

- **Debtor 1:** John Roderick McKowen
- **United States Bankruptcy Court for the:** District of Colorado
- **Case number:** 25-16665-KHT

**<u>Part 1 — Identify the Claim:</u>**

- **Box 1 — Who is the current creditor?** Write YOUR name (you are the creditor).
- **Box 2 — Has this claim been acquired from someone else?** Check **Yes**. Write: *VētaNova Inc., by Board Resolution dated March 27, 2026, assigning individual beneficial interest under Huerfano County Deed of Trust No. 404224.*
- **Box 3 — Where should notices and payments be sent?** Write YOUR name, mailing address, phone, and email.
- **Box 4 — Does this claim amend one already filed?** Check **No**.
- **Box 5 — Has anyone else filed a proof of claim for this claim?** Check **No**.

**<u>Part 2 — Claim Information:</u>**

- **Box 6 — Any number to identify the debtor?** Check **No**.
- **Box 7 — How much is the claim?** Enter YOUR estimated claim amount from

- **Box 7 — How much is the claim?** Enter YOUR estimated claim amount from the attached Estimated Current Valuation schedule. Find your name and use the dollar amount shown. Check **No** for interest or other charges.
- **Box 8 — Basis of the claim?** Write: *Assigned beneficial interest under Huerfano County Deed of Trust No. 404224 (Reception No. 404224, Huerfano County, CO), pursuant to VētaNova Inc. Board Resolution dated March 27, 2026. Paulson-preserved collection rights under GrowCo securities (Paulson v. Two Rivers, Civil Action No. 19-cv-02639-PAB-NRN, D. Colo.).*
- **Box 9 — Is all or part of the claim secured?** Check **Yes**. Under Nature of property, check **Real estate**. For Basis for perfection, write: *Deed of Trust No. 404224, Huerfano County, Colorado.* For Value of property and Amount secured, enter the same dollar amount from Box 7. Enter **$0** for Amount unsecured.
- **Box 10 — Based on a lease?** Check **No**.
- **Box 11 — Subject to a right of setoff?** Check **No**.
- **Box 12 — Entitled to priority?** Check **No**.

**Part 3 — Sign:**

- Check **"I am the creditor."**
- Enter today's date, sign, and print your name and address.

**Attach** a copy of the Board Resolution (included with this email) as supporting documentation.

**File it** with the Clerk of the U.S. Bankruptcy Court for the District of Colorado, Case No. 25-16665-KHT. You can file by mail to: U.S. Bankruptcy Court, 721 19th Street, Denver, CO 80202.

You do **not** need a lawyer to file. The Board Resolution gives you the absolute right to file on your own.

I've also attached the Estimated Current Valuation schedule so you can see your individual allocation, along with the Avondale Transaction Overview for context on the project.

**Attachments:**

1. Proof of Claim Form (B 410)
2. VētaNova Amended Board Resolution — Individual Assignment
3. Estimated Current Valuation
4. Avondale Transaction Overview - Confidential

If you have questions or believe your name should be on the beneficiary list, email me directly at john@johnmckowen.com.

Respectfully,
John McKowen
CEO & Sole Director, VētaNova Inc.

**FREE TINA PETERS**

**Fill in this information to identify the case:**

Debtor 1 ____________________

Debtor 2 (Spouse, if filing) ____________________

United States Bankruptcy Court for the: __________ District of __________

Case number ____________________

Official Form 410

# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1: Identify the Claim

**1. Who is the current creditor?**

____________________
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor ____________________

**2. Has this claim been acquired from someone else?**

- ☐ No
- ☐ Yes. From whom? ____________________

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- |
| Name | Name |
| Number Street | Number Street |
| City State ZIP Code | City State ZIP Code |
| Contact phone ________ | Contact phone ________ |
| Contact email ________ | Contact email ________ |

Uniform claim identifier (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

**4. Does this claim amend one already filed?**

- ☐ No
- ☐ Yes. Claim number on court claims registry (if known) ______ Filed on ________ MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

- ☐ No
- ☐ Yes. Who made the earlier filing? ____________________

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

6. **Do you have any number you use to identify the debtor?**
❑ No
❑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?** $______________. **Does this amount include interest or other charges?**
❑ No
❑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**
Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.
______________________________

9. **Is all or part of the claim secured?**
❑ No
❑ Yes. The claim is secured by a lien on property.

**Nature of property:**
❑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
❑ Motor vehicle
❑ Other. Describe: ______________________________

**Basis for perfection:** ______________________________
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $______________
**Amount of the claim that is secured:** $______________
**Amount of the claim that is unsecured:** $______________ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $______________

**Annual Interest Rate** (when case was filed)_______%
❑ Fixed
❑ Variable

10. **Is this claim based on a lease?**
❑ No
❑ Yes. **Amount necessary to cure any default as of the date of the petition.** $______________

11. **Is this claim subject to a right of setoff?**
❑ No
❑ Yes. Identify the property: ______________________________

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No
☐ Yes. *Check one:*

| | **Amount entitled to priority** |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $___________ |
| ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $___________ |
| ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $___________ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $___________ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $___________ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $___________ |

* Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ____________
MM / DD / YYYY

_______________________________
Signature

**Print the name of the person who is completing and signing this claim:**

Name ______________________________
First name Middle name Last name

Title ______________________________

Company ______________________________
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address ______________________________
Number Street

______________________________
City State ZIP Code

Contact phone ______________ Email ______________

# EXHIBIT 56

Original Vaxa Letter of Intent (June 20, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# Exhibit F

Two Rivers
WATER & FARMING

June 20, 2018

Mr. Greg Harrington, Managing Director
VAXA GLOBAL, LLC
201 Portage Avenue, Suite #1800
Winnipeg, MB R3B 3K6

**LETTER OF INTENT ("LOI")**

Dear Mr. Harrington:

This letter sets forth the principal terms and conditions of a proposed transaction (the "Transaction") pursuant to which TWO RIVERS WATER & FARMING COMPANY, a Colorado corporation ("TURV" or the "Buyer"), will purchase 100% of the membership units of VAXA GLOBAL, LLC and its 100% owned subsidiary Ekstrak Labs, LLC (the "Company"), which is owned by Investors Fiduciary Trust Company, LLC (collectively the "Seller"). This LOI outlines the basic terms and conditions of the Transaction.

The Buyer shall purchase 100 percent of the issued and outstanding membership units of the Company from the Seller for an aggregate purchase price to be determined by a Fairness Opinion ("Opinion"), an appraisal of future projections, or a combination of both. The provider of the Opinion and appraisal will be mutually agreed upon by Buyer and Seller. The purchase price will be set at no greater than US $20,000,000 based on Earn-Out of $2,000,000 EBITDA (earnings, as defined by U.S. GAAP, before interest, taxes, depreciation and amortization) in the 12 month period, defined below in Section 1 (d) (ii). This is a valuation of 10 times EBITDA. The purchase price will be subject to earn out provisions set forth below (as so adjusted, the "Purchase Price"), payable in TURV Common Shares valued as described below. The Seller shall deliver to Buyer stock certificates, free and clear of all liens and encumbrances other than transfer restrictions under federal and state securities laws.

1. Purchase Price and Payment.

(a) The enterprise value of the Company shall be no greater than $20.0 million and subject to the earn out provision in Section (1)(d) below. The enterprise value of the Company represents 100% of the issued and outstanding membership units of the Company, including the value of the intellectual property, manufacturing processes, supply contracts, equipment, inventories and strains. This valuation can be adjusted during the 12 month earn-out period is based on 10 times the Company's EBITDA; therefore it can increase or decrease due to EBITDA, for example if EBITDA during the earn out time period is $2.0 million, the enterprise value would be $20.0 million; if EBITDA is $750,000 during the earn out time period, the enterprise value would be $7.5 million; and so on. EBITDA is only calculated on the business generated by Seller.

(b) The Buyer must validate the Purchase Price valuation via an independent fairness opinion and an appraisal, not to exceed $50,000 in cost, which cost will be borne by the Buyer.

(c) On the Closing Date, the Buyer shall purchase 100 percent of the issued and outstanding membership units of the Company for the Purchase Price.

(d) Pricing of TURV's common shares will be as follows:

(i) For the Initial Closing, the Buyer's common share closing price based on the prior 10-day average VWAP (volume weighted average price) before closing, referred to the "Share Price Closing 1". At Closing, the Seller will receive $1,500,000 in common shares of TURV valued at the Share Price Closing 1. For example, if the Share Price is $0.25, then Seller will receive 6,000,000 TURV common shares. The $1,500,000 is applied toward the total Purchase Price and is deducted from the first $10,000,000 earn out.



SH

(ii) Subsequent closings will take place in four installments on successive quarters commencing with a calendar quarter to be determined at closing (each a "Measuring Period"). The Company's Measuring Period enterprise value shall be calculated at the end of each Measuring Period based on the EBITDA generated by Seller and multiplied by 10.0. Payment of the amount of Buyer's common stock shall be based upon its common shares closing price at closing for the prior 10-day VWAP (volume weighted average price) for the first $10,000,000 earn-out will be Share Price Closing 1 provided that the $1,000,000 EBITA is met by year end 2018. Otherwise, the first tranche will be based upon a 10-day VWAP fixed on the quarterly anniversary of the earn-our period based on 66% of the VWAP price, and for the second $10,000,000 in earn-out, during the same time period will be fixed at the prior 10-day VWAP at the quarterly review based on market before the end of each Measuring Period. In no event, however, shall the total value of Buyer's common stock exceed $18.5M ($20M less the $1.5M initial payment pursuant to subsection (i) above).

(e) The earn-out payout will be identified by EBITDA over the Measurement Period. Buyer shall pay, or cause to be paid, to the Seller in Buyer's common shares, within 30 days after the end of such Earn-Out Period.

(f) Bridge Loan: The Company and/or its related investment group will provide to Buyer a Convertible Bridge loan in the form of a note with the following terms:

(ii) Principal: $500,000, with a rolling close as follows:

a. $200,000 within 5 days of signing the LOI and/or completion of Due Diligence by our related investment group, whichever is sooner;
b. $150,000 within 30 days from completion of above
c. $150,000 within 60 days from completion of above.

Interest at the rate of ten percent (20%) per annum for a period of one year, secured by a senior lien on HCIC shares held by Buyer that are free and clear of any encumbrances. Note holder, can convert the note to common stock, at their election, after a min. of $200,000.00 is funded. The conversion price will be $.14 per share. This conversion option is available for a period of one year from the date of the initial Note.

(iii) Additional Security: The Buyer will establish a reserve at its transfer agent, Broadridge, a reserve of 10,000,000 TURV common shares to secure the Note. This reserve remains in effect until the Note is paid in full or converted.

2. Definitive Agreement and Closing Conditions. The Transaction is subject to the negotiation, execution and delivery of a mutually acceptable definitive agreement (the "Definitive Agreement") between the Buyer and the Seller, providing for the consummation of the Transaction substantially on the terms described herein and containing representations, warranties, covenants, indemnities and other terms and conditions customary in such agreements. Prior to, or contemporaneously with, the execution of the Definitive Agreement, (w) the Buyer shall have conducted and shall be satisfied with the results of its legal, financial and commercial due diligence investigation of the Company, (x) shall enter into a non-competition agreement in favor of the Buyer and (y) Buyer and Seller shall agree on an operating budget through December 31, 2020. In such connection, the parties hereto do hereby agree that the Definitive Agreement shall, inter alia, contain the following provisions and closing conditions:

(a) All necessary tax clearances required on behalf of the Seller shall have been obtained;

(b) All regulatory filings, consents and approvals shall have been made or obtained, including approval for change of control being obtained from the licensing bodies and, if and to the extent required, filings with the United States Securities and Exchange Commission;



SH

Two Rivers
WATER & FARMING

(c) Seller and/or related investment group, will acquire the existing HCIC Seller Carry Back Notes ("HCIC Notes") with a carrying value of approximately $6,800,000 ("Face Value"). Seller and Buyer will use mutual best efforts to obtain discounts from the note holders ("Note Discount"). The difference between the Face Value and Note Discount is the "New HCIC Note". Payments will be as follows:

(i) The Note Discount will be converted into Buyer's common shares priced at a prior 10-day VWAP at closing of the New HCIC Note.

(ii) The New HCIC Note will have the following terms:

- i. Due date 2 years after funding the New HCIC Note purchase ("HCIC Funding Date");
- ii. 10% per annum, accrued until note due date;
- iii. Conversion rights:
  1. One-half (1/2) of the New HCIC Note principal and accrued interest at $1.00/share expiring 3 years from HCIC Funding Date;
  2. The remaining one-half (1/2) of the New HCIC Note principal and accrued interest at $1.50/share expiring 4 years from HCIC Funding Date

(iii) As an example, assume the following:

- i. Face value plus accrued interest of the HCIC Seller Carry Back Notes is $6,800,000;
- ii. Note Discount is $3,000,000;
- iii. Therefore, the New HCIC Note is $3,800,000;
- iv. Share Price VWAP is $0.25/share,
- v. Therefore:
  1. 12,000,000 Buyer shares issued ($3,000,000/$0.25) for the Note Discount;
  2. $3,800,000 in New HCIC Note, which at the option of the Seller can be converted into 1,900,000 of Buyer's common stock within a 2-year period from closing of the New HCIC Note ($1,900,000/$1.00 – not including any accrued interest), and
  3. $3,800,000 in New HCIC Note, which at the option of the Seller can be converted into 1,266,667 of Buyer's common stock within a 3-year period from closing of the New HCIC Note ($1,900,000/$1.50 – not including any accrued interest).

(d) Sellers investment bank and/or related investment group will supply additional funds up to $10,000,000, at note holders discretion, (less note(s) referred to in 2(c) above, and $500,000 operating line in 1(f) above) for the development of the water and farm assets. The note will have the following terms:

- a. Due date 5 years after funding;
- b. 10% per annum, paid annually;
- c. Additional borrowings on the facility will be added to the $3,800,000.00 HCIC note and will be subject to the same lien of the $3,800,000.00 senior note assets of TURV.
- d. Conversion rights:
  - i. One-half of the principal at $1.50/share expiring 3 years from funding date;
  - ii. One-half of the principal at $2.00/share expiring 4 years from funding date.

(e) At acceptance of this LOI, Liquid Gold Fund 1, LLC and/or assigns will be granted an option for up to 3 years to purchase 10% of the issued and outstanding interest of Huerfano Cucharas Irrigation Company, for the amount of $2,500,000.

(f) The Definitive Agreement shall contain an eighteen (18) month survival period for all representations and warranties, other than those relating to title, capitalization, due authority and organization, brokers' fees, intentional misrepresentations and fraud, environmental matters, pensions and tax matters; and

SH

Two Rivers
WATER & FARMING

(g) Closing of the transaction shall be subject to the absence of any material adverse change in the operations, assets, results of operations, or condition, financial or otherwise, of the Company through the closing of the Transaction.

3. This letter constitutes the agreement of the Seller to work exclusively with the Buyer towards the closing of the Transaction. The Seller shall not, other than in the ordinary course of business, (a) directly or indirectly through any other party engage in any negotiations with or provide any information to any other person, firm or corporation with respect to a sale or other disposition of the Company or any of its assets, (b) directly or indirectly through any other party solicit or encourage the making of any proposal relating to a purchase of, or other major transaction involving, the Company or any of its assets and shall notify the Buyer promptly of the receipt of any unsolicited offer therefor. The foregoing agreement of the Seller shall be effective from the date of this letter of intent until the earlier of (a) the termination by the Buyer of negotiations for the Transaction and (b) 11:59 p.m., Mountain daylight saving time, on July 31, 2018. Furthermore, any negotiations regarding an acquisition transaction involving the Seller or its assets (other than negotiations with the Buyer) in progress as of the date of this letter of intent shall be suspended during the period provided for in the preceding paragraph, and the Seller shall not accept or enter into any agreement, arrangement or understanding regarding any such third-party acquisition transaction during such period.

4. Timing of Transaction; Conduct of Company.

(a) We anticipate that the timing of the transaction will be as follows:

(i) execution of the Definitive Agreement with completed Exhibits (including employment agreements, and non-competition agreements, where applicable) by within sixty (60) days of the mutual signing of this LOI;

(ii) completion of due diligence investigation by within forty-five (45) days of the mutual signing of this LOI, and

(iii) the closing of the Transaction shall occur on a mutually agreed date (the "Closing Date") within fifteen (15) days of the date of the execution of the Definitive Agreement; provided, that in the event the regulatory authorities require a longer time to approve the change of control of the Company, either party may extend the date of closing as will be necessary to obtain such regulatory approvals.

(b) During the term of this LOI the Company will continue to conduct its business only in the ordinary course and, without the prior approval of Buyer, will not undertake any extraordinary business activities or make extraordinary payments to owners or employees that could reasonably be expected to make the Transaction materially more difficult to consummate or materially decrease the enterprise value of the Company.

5. Negotiations. Upon execution of this letter and subject to the conditions hereof, Buyer and the Seller agree to negotiate, in good faith, the further terms and conditions to be embodied in the Definitive Agreement and exhibits. The parties will use their commercially reasonable efforts to obtain any necessary shareholder and regulatory approvals as may be agreed to and set forth in the Definitive Agreement.

6. Access. Upon the execution of any confidentiality agreement reasonably requested by the Company or the Seller and in accordance with the provisions of such confidentiality agreement, and continuing until the termination of the covenant set forth in Section 3, the Company will provide Buyer and its representatives and agents reasonable access (during normal business hours and after reasonable advance notice) to the books, records, facilities and representatives of the Company in order to enable Buyer and its representatives to expeditiously finalize their due diligence review of the Company. Buyer agrees that it and its representatives will hold in confidence any confidential or proprietary information or materials of the Company, the Owners or their affiliates, obtained in the course of such due diligence review in accordance with the provisions of the confidentiality agreements referred to above.



SH

Two Rivers
WATER & FARMING

7. Public Announcement. Except as may be required by applicable law, each party, including Buyer, agrees that it shall not make or issue any public statement or announcement with respect to the Transaction or this letter without the prior written consent of the other party. Even if required by law, the disclosing party will inform the other party prior to disclosure and afford the other party with reasonable input as to the text and manner of any such announcement. Nothing contained herein shall prohibit the Company, the Seller or their affiliates or representatives from communicating with existing lenders, affiliates and advisors as necessary or desirable in connection with the Transaction.

8. Expenses. All expenses incident to the Transaction, whether or not the Transaction is consummated, will be borne exclusively by the party making the expenditure or incurring the expense, including any expenses incurred prior to the date hereof, as well as those incurred after the date hereof. Both parties agree there is an acquisition fee and financing fee of 8% of the purchase price and financing that is procured for this transaction, payable to Fenner & Beane, PLLP, and is payable out of the proceeds of this transaction.

9. Notices. Any notice or communication required or permitted hereunder must be in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, (c) United States registered or certified mail, postage prepaid, or (d) telecopy (provided that the telecopy is confirmed by mail in the manner previously described), to the applicable parties at addresses, telephone numbers and email addresses to be furnished by each of the Buyer, the Company and the Seller to the other parties hereto or to such other address or to the attention of such other person as the applicable party hereafter designates by written notice sent in accordance herewith. Any such notice or communication will be deemed to have been given either at the time of personal delivery or, in the case of delivery by service or mail, as of the date of delivery at the address and in the manner provided herein, or, in the case of telecopy, on receipt.

10. Acceptance. If this letter is not executed by June 22, 2018, the offer contained herein shall terminate as of said date.

11. Governing Law. This letter will be governed by and construed in accordance with the laws of the State of Colorado, United States, excluding any conflicts of laws and provisions that would render the law of another jurisdiction applicable.

12. Counterparts; Facsimile Execution. This letter may be executed in multiple counterparts, each of which will be deemed an original and all of which together will constitute one and the same document. This letter may be executed by facsimile transmission which signatures shall have the same binding effect as original signatures.

13. Limited Binding Effect. Each party hereto understands and agrees that this letter, with the exception of Section 1(e), Section 3, 4(b), the last sentence of Section 6, Sections 7 through 12 and this Section 13 (which are binding upon the parties), does not constitute a binding agreement between the parties or an agreement to agree with respect to any transaction, and none of the parties or any affiliate, officer, director, employee, financial advisor, agent, member, or other representative of any of the parties will have any liability with respect hereto (subject to the aforementioned binding provisions). Except for an action for breach of any of the aforementioned binding provisions, no party hereto will bring any claim against any other party or against any other party's affiliates, officers, directors, employees, financial advisors, agents, members, or other representatives based on this letter as a result of any failure to agree on or enter into a Definitive Agreement. It is understood that a binding agreement providing for the Transaction (or any other transaction or series of transactions involving the acquisition of the Company or any of its affiliates) will only exist following the parties' execution and delivery of the Definitive Agreement. Under no circumstances will any oral understanding between the parties or any of their respective affiliates with respect to the Transaction (or any such other transaction or series of transactions) be a binding contract. The provisions of this letter of intent will be subject to and superseded by the final, definitive terms of the duly executed and delivered Definitive Agreement.

If this letter accurately sets forth your understanding of the Transaction, please so indicate by returning one fully executed copy of this letter to the undersigned.



SH

Two Rivers
WATER & FARMING

Very truly yours,

**TWO RIVERS WATER & FARMING COMPANY**

By: ______________________________
WAYNE HARDING
Chief Executive Officer

ACCEPTED AND AGREED TO,
This 20 day of June 2018:

**VAXA GLOBAL, LLC**

By: ______________________________
Name: GREG HARRINGTON
Title: Mgr Director

**INVESTORS FIDUCIARY TRUST COMPANY**

By: ______________________________
Name: GREG HARRINGTON
Title: Mgr. Director

# EXHIBIT 57

Binding Revised Vaxa Letter of Intent (October 22, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# Exhibit G

Two Rivers
WATER & FARMING

October 22, 2018

Mr. Greg Harrington, Managing Director
VAXA GLOBAL, LLC
201 Portage Avenue, Suite #1800
Winnipeg, MB R3B 3K6

**BINDING LETTER OF INTENT ("LOI")**

Dear Mr. Harrington:

This letter sets forth the principal terms and conditions of a proposed transaction (the "Transaction") pursuant to which TWO RIVERS WATER & FARMING COMPANY, a Colorado corporation ("TURV" or the "Buyer"), will purchase 100% of the membership units of VAXA GLOBAL, LLC and its 100% owned subsidiary Ekstrak Labs, LLC (together referred to as the "Company"), which is owned by Investors Fiduciary, LLC (collectively the "Seller"). This LOI outlines the basic terms and conditions of the Transaction.

The Buyer shall purchase 100 percent of the issued and outstanding membership units of the Company from the Seller. The purchase price will be set at no greater than US $20,000,000 based on Earn-Out of $2,000,000 EBITDA (earnings, as defined by U.S. GAAP, before interest, taxes, depreciation and amortization) in the 12 month period, defined below in Section 1 (c) (ii). This is a valuation of 10 times EBITDA. The purchase price will be subject to earn out provisions set forth below (as so adjusted, the "Purchase Price"), payable in TURV Common Shares valued as described below. Upon agreement on mutually acceptable terms, the Buyer will also enter into a joint-venture agreement with the Seller's affiliated company Montverde Partners, LLC for the development of an extraction facility in Colorado. The Seller shall deliver to Buyer membership units, free and clear of all liens and encumbrances other than transfer restrictions under federal and state securities laws.

1. Purchase Price and Payment.

(a) The enterprise value of the Company shall be no greater than $20.0 million and subject to the earn out provision in Section (1)(d) below. The enterprise value of the Company represents 100% of the issued and outstanding membership units of the Company, including the value of the intellectual property, manufacturing processes, supply contracts, equipment, inventories and strains. This valuation can be adjusted during the 12 month earn-out period is based on 10 times the Company's EBITDA; therefore it can increase or decrease due to EBITDA, for example if EBITDA during the earn out time period is $2.0 million, the enterprise value would be $20.0 million; if EBITDA is $750,000 during the earn out time period, the enterprise value would be $7.5 million; and so on. EBITDA is only calculated on the business generated by Seller.

(b) On the Closing Date, the Buyer shall purchase 100 percent of the issued and outstanding membership units of the Company for the Purchase Price.

(c) Pricing of TURV's common shares will be as follows:

(i) For the Initial Closing. At Closing, the Seller will receive 30,000,000 in newly issued common shares of TURV.

(ii) Subsequent closings will take place in four installments on successive quarters commencing with a calendar quarter to be determined at closing (each a "Measuring Period"). The Company's Measuring Period EBITDA shall be calculated at the end of each Measuring Period and multiplied by 2.5. Payment of the amount of Buyer's common stock shall be based upon its common share closing price for the prior 10-day VWAP (volume weighted average price) before the end of each Measuring Period. In no event, however, shall the total

Two Rivers
WATER & FARMING

value of Buyer's common stock exceed $14.0M ($20M less the $6.0M initial payment pursuant to subsection (i) above).

(d) The earn-out payout will be identified by EBITDA over the Measurement Period. Buyer shall pay, or cause to be paid, to the Seller in Buyer's common shares, within 30 days after the end of such Earn-Out Period.

(e) Bridge Loan(s): The Company and/or its related investment group will provide to Buyer a bridge loan(s) in the form of a note with the following terms:

(i) Principal: 5 X $500,000.00, or total of up to $2,500,000.00:
  a. $400,000.00 has been funded to date, $100,000.00 upon signatures of this binding letter of intent.
  b. $500,000.00, $100,000.00 within 10 days of this LOI and $400,000.00 within 60 days from the date of this LOI.
  c. $1,500,000.00 within 1 year from completion of above, at lenders' discretion.

(ii) Collateral: 2,456.5 Shares of Huerfano-Cucharas Irrigation Company, Terms and Conditions of Bridge Loans and Pledge Agreement are attached in Addendum A-B.

(iii) Conversion: At the option of Seller, any time after six (6) months from the funding date of the Bridge Loan, Seller can convert all or some, with a minimum of $200,000 in principal and accrued interest, into Common Stock at a price set at the time of origination of the this note, using the prior 10-day VWAP, with a ceiling of 0.14.

(iv) Due date August 1, 2019, with prepayment penalty of six (6) months of interest. However, if Buyer, wishes to prepay the Note, Buyer will provide Seller with a 30-day notice of such prepayment. Buyer will have the option for the Conversion listed above in 1(e) (iii).

(v) Security: The Buyer will establish a reserve at its transfer agent, Broadridge, a reserve of 10,000,000 TURV common shares to secure the Note. This reserve remains in effect until the Note is paid in full or converted.

2. Definitive Agreement and Closing Conditions. The Transaction is subject to the negotiation, execution and delivery of a mutually acceptable definitive agreement (the "Definitive Agreement") between the Buyer and the Seller, providing for the consummation of the Transaction substantially on the terms described herein and containing representations, warranties, covenants, indemnities and other terms and conditions customary in such agreements. Prior to, or contemporaneously with, the execution of the Definitive Agreement, (w) the Buyer shall have conducted and shall be satisfied with the results of its legal, financial and commercial due diligence investigation of the Company, (x) shall enter into a non-competition agreement in favor of the Buyer and (y) Buyer and Seller shall agree on an operating budget through December 31, 2020. In such connection, the parties hereto do hereby agree that the Definitive Agreement shall, inter alia, contain the following provisions and closing conditions:

(a) All necessary tax clearances required on behalf of the Seller shall have been obtained;

(b) All regulatory filings, consents and approvals shall have been made or obtained, including approval for change of control being obtained from the licensing bodies and, if and to the extent required, filings with the United States Securities and Exchange Commission;

(c) In order for this merger to close, the Company is requesting to change the terms of the TR Capital, LLC operating and exchange agreement. The company is requesting the following changes:
- TR Capital will end accruals of dividend distributions effective June 30, 2018;
- the existing accrued TR Capital dividend distributions of approximately $4.9 million will be added to the TR Capital capital account ("Combined Capital Account");

Two Rivers
WATER & FARMING

- Require an exchange from 1 TR Capital Combined Capital Account into 1 Two Rivers Water & Company ("Two Rivers") shares, not to exceed 35,000,000 in newly issued common shares.
- Extend and reprice the warrants. The number of Two Rivers' warrants held by TR Capital preferred units remains the same with the following changes:
  - Extend the expiration date of the warrants from January 1, 2019 to January 1, 2021.
  - Reprice the warrant exercise price from $2.10/share of Two Rivers to $0.53/share of Two Rivers.

(d) Seller and/or related investment group, will acquire the existing HCIC Seller Carry Back Notes ("HCIC Notes") with a carrying value of approximately $6,800,000 ("Face Value"). Seller and Buyer will use mutual best efforts to obtain discounts from the note holders ("Note Discount"). The difference between the Face Value and Note Discount is the "New HCIC Note". Payments will be as follows:

(i) The Notes will be converted into Buyer's common shares priced at a prior 10-day VWAP at closing of the New HCIC Note, with a ceiling price of 0.25 per share. This conversion will occur on or before December 31, 2019.

(e) At acceptance of this LOI, Liquid Gold Fund 1, LLC and/or assigns will be granted an option for up to 1 year to purchase 10% of the issued and outstanding interest of Huerfano Cucharas Irrigation Company, for the amount of $2,500,000.

(f) Upon closing, Two Rivers will grant Sellers 3 out of Two Rivers' 7 board seats. After the first EBITDA threshold is achieved, Two Rivers' will grant Sellers 4 out of Two Rivers' 7 board seats.

(g) The Definitive Agreement shall contain an eighteen (18) month survival period for all representations and warranties, other than those relating to title, capitalization, due authority and organization, brokers' fees, intentional misrepresentations and fraud, environmental matters, pensions and tax matters; and

(h) Closing of the transaction shall be subject to the absence of any material adverse change in the operations, assets, results of operations, or condition, financial or otherwise, of the Company through the closing of the Transaction.

3. This letter constitutes the agreement of the Seller to work exclusively with the Buyer towards the closing of the Transaction. The Seller shall not, other than in the ordinary course of business, (a) directly or indirectly through any other party engage in any negotiations with or provide any information to any other person, firm or corporation with respect to a sale or other disposition of the Company or any of its assets, (b) directly or indirectly through any other party solicit or encourage the making of any proposal relating to a purchase of, or other major transaction involving, the Company or any of its assets and shall notify the Buyer promptly of the receipt of any unsolicited offer therefor. The foregoing agreement of the Seller shall be effective from the date of this letter of intent until the earlier of (a) the termination by the Buyer of negotiations for the Transaction and (b) 11:59 p.m., Mountain daylight saving time, on October 19, 2018. Furthermore, any negotiations regarding an acquisition transaction involving the Seller or its assets (other than negotiations with the Buyer) in progress as of the date of this letter of intent shall be suspended during the period provided for in the preceding paragraph, and the Seller shall not accept or enter into any agreement, arrangement or understanding regarding any such third-party acquisition transaction during such period.

4. Timing of Transaction; Conduct of Company.

(a) We anticipate that the timing of the transaction will be as follows:

(i) execution of the Definitive Agreement with completed Exhibits (including employment agreements, and non-competition agreements, where applicable) by within seventy-five (75) days of the mutual signing of this LOI;

(ii) completion of due diligence investigation by within sixty (60) days of the mutual signing of this LOI, and

(iii) the closing of the Transaction shall occur on a mutually agreed date (the "Closing Date") within fifteen (15) days of the date of the execution of the Definitive Agreement; provided, that in the event the regulatory authorities require a longer time to approve the change of control of the Company, either party may extend the date of closing as will be necessary to obtain such regulatory approvals.

(b) During the term of this LOI the Company will continue to conduct its business only in the ordinary course and, without the prior approval of Buyer, will not undertake any extraordinary business activities or make extraordinary payments to owners or employees that could reasonably be expected to make the Transaction materially more difficult to consummate or materially decrease the enterprise value of the Company.

5. Negotiations. Upon execution of this letter and subject to the conditions hereof, Buyer and the Seller agree to negotiate, in good faith, the further terms and conditions to be embodied in the Definitive Agreement and exhibits. The parties will use their commercially reasonable efforts to obtain any necessary shareholder and regulatory approvals as may be agreed to and set forth in the Definitive Agreement.

6. Access. Upon the execution of any confidentiality agreement reasonably requested by the Company or the Seller and in accordance with the provisions of such confidentiality agreement, and continuing until the termination of the covenant set forth in Section 3, the Company will provide Buyer and its representatives and agents reasonable access (during normal business hours and after reasonable advance notice) to the books, records, facilities and representatives of the Company in order to enable Buyer and its representatives to expeditiously finalize their due diligence review of the Company. Buyer agrees that it and its representatives will hold in confidence any confidential or proprietary information or materials of the Company, the Owners or their affiliates, obtained in the course of such due diligence review in accordance with the provisions of the confidentiality agreements referred to above.

7. Public Announcement. Except as may be required by applicable law, each party, including Buyer, agrees that it shall not make or issue any public statement or announcement with respect to the Transaction or this letter without the prior written consent of the other party. Even if required by law, the disclosing party will inform the other party prior to disclosure and afford the other party with reasonable input as to the text and manner of any such announcement. Nothing contained herein shall prohibit the Company, the Seller or their affiliates or representatives from communicating with existing lenders, affiliates and advisors as necessary or desirable in connection with the Transaction.

8. Expenses. All expenses incident to the Transaction, whether or not the Transaction is consummated, will be borne exclusively by the party making the expenditure or incurring the expense, including any expenses incurred prior to the date hereof, as well as those incurred after the date hereof. Both parties agree there is an acquisition fee and financing fee of 8% of the purchase price and financing that is procured for this transaction, payable to Fenner & Beane, PLLP, which is the sole responsibility of the Seller and its related investment group.

9. Notices. Any notice or communication required or permitted hereunder must be in writing and sent by (a) personal delivery, (b) expedited delivery service with proof of delivery, (c) United States registered or certified mail, postage prepaid, or (d) telecopy (provided that the telecopy is confirmed by mail in the manner previously described), to the applicable parties at addresses, telephone numbers and email addresses to be furnished by each of the Buyer, the Company and the Seller to the other parties hereto or to such other address or to the attention of such other person as the applicable party hereafter designates by written notice sent in accordance herewith. Any such notice or communication will be deemed to have been given either at the time of personal delivery or, in the case of delivery by service or mail, as of the date of delivery at the address and in the manner provided herein, or, in the case of telecopy, on receipt.

Two Rivers
WATER & FARMING

10. Acceptance. If this letter is not executed by October 19, 2018, the offer contained herein shall terminate as of said date.

11. Governing Law. This letter will be governed by and construed in accordance with the laws of the State of Colorado, United States, excluding any conflicts of laws and provisions that would render the law of another jurisdiction applicable.

12. Counterparts; Facsimile Execution. This letter may be executed in multiple counterparts, each of which will be deemed an original and all of which together will constitute one and the same document. This letter may be executed by facsimile transmission which signatures shall have the same binding effect as original signatures.

13. Limited Binding Effect. Each party hereto understands and agrees that this letter, with the exception of Section 1(e), Section 3, 4(b), the last sentence of Section 6, Sections 7 through 12 and this Section 13 (which are binding upon the parties), does not constitute a binding agreement between the parties or an agreement to agree with respect to any transaction, and none of the parties or any affiliate, officer, director, employee, financial advisor, agent, member, or other representative of any of the parties will have any liability with respect hereto (subject to the aforementioned binding provisions). Except for an action for breach of any of the aforementioned binding provisions, no party hereto will bring any claim against any other party or against any other party's affiliates, officers, directors, employees, financial advisors, agents, members, or other representatives based on this letter as a result of any failure to agree on or enter into a Definitive Agreement. It is understood that a binding agreement providing for the Transaction (or any other transaction or series of transactions involving the acquisition of the Company or any of its affiliates) will only exist following the parties' execution and delivery of the Definitive Agreement. Under no circumstances will any oral understanding between the parties or any of their respective affiliates with respect to the Transaction (or any such other transaction or series of transactions) be a binding contract. The provisions of this letter of intent will be subject to and superseded by the final, definitive terms of the duly executed and delivered Definitive Agreement.

If this letter accurately sets forth your understanding of the Transaction, please so indicate by returning one fully executed copy of this letter to the undersigned.

Very truly yours,

**TWO RIVERS WATER & FARMING COMPANY**

By: [signature]
WAYNE HARDING
Chief Executive Officer

ACCEPTED AND AGREED TO,
This __ day of October 2018:

**VAXA GLOBAL, LLC**

By: [signature]
Name: GREG HARRINGTON
Title: Mgr Director

**INVESTORS FIDUCIARY, LLC**

By: [signature]
Name: GREG HARRINGTON
Title: Mgr. Director

# EXHIBIT 58

TR Capital Partners Board Minutes (February 12 and 14, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**TR Capital Partners, LLC**

**Meeting of the Board of Directors**

**February 12, 2015 and Continued on February 14, 2015**

A meeting of the Board of Directors (the "**Board**") of TR Capital Partners, LLC, a Colorado limited liability company (the "**Company**"), was held by telephone conference commencing at 12:10 pm, Mountain Standard Time (MST), on February 12, 2015 and with a telephone conference continuation beginning at 1:07 pm MST on February 14, 2015. Attending were all of the directors: John McKowen, Wistar Morris, Gus Blass, and Wayne Harding.

Mr. McKowen, as Chairman, called the meeting to order.

As the first order of business, Mr. McKowen reviewed the preliminary year ending 2014 financial results of the Company including an overview of the Company's cash position. Due to the need of the Company to conserve its cash position the Board considered the declaration and payment of an in-kind distribution to holders of the Company's preferred membership units for the quarter ending December 31, 2014.

After a proper motion made, it was unanimously,

**RESOLVED:** That the Company declare an in-kind distribution of one preferred membership unit of GrowCo Partners 1, LLC, that is currently owned by the Company, for each $1 earned by owners the Company's preferred membership units based on 2% of the total invested dollars. This in-kind distribution will be effective on February 17, 2015 to holders of record as of December 31, 2014.

As the second order of business, Mr. Harding noted that the Company's Board meeting held on November 12, 2014 consisted of the wrong members of the Board. Mr. Justin Yorke and Mr. Wayne Harding were present in lieu of Mr. Gus Blass and Ms. Kirsty Cameron. Subsequent to the November 12, 2014 meeting, Ms. Cameron resigned and the Common Member of the Company selected Wayne Harding to replace Ms. Cameron. Therefore, after a proper motion made, it was unanimously,

**RESOLVED:** The current Board of the Company re-affirmed the motion and subsequent payment of the distribution declared on November 17, 2014 to holders of record as of September 30, 2014.

There being no further business to conduct, upon motion the meeting was adjourned at 1:25 p.m., MST.

[signature]

Wayne Harding, Board Member and Secretary