# EXHIBIT 59

San Gabriel Benefit Plan fbo Justin Yorke — TR Capital Subscription and GrowCo Warrant

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

Two Rivers
WATER & FARMING

**TR Capital Partners, LLC**

Dear San Gabriel Benefit Plan fbo Justin Yorke,

We have received your TR Cap 20150630 LLC Joinder Agreements, and, if you elected to register your shares in a possible future registration with the SEC, your Selling Stockholder Notice and Questionnaire.

Therefore, this package contains the following:

1. Executed Joinder Agreements for:
   a. LLC Agreement
   b. Exchange Agreement
   c. Registration Rights Agreement
   d. If applicable, your completed Selling Stockholder Notice and Questionnaire
2. TR Cap 20150630 Distribution LLC Certificate representing 2,714 common units; and
3. GrowCo Inc Warrant representing 1,638 common shares.

Please note that you should retain your copies of the previously sent LLC Agreement, Exchange Agreement and Registration Rights Agreement. **It is very important to retain the LLC Certificate and Warrant.**

As always, if you have any questions please contact me. Thank you for your continued support of our Company.

Sincerely,

Wayne

Wayne Harding, CFO
Two Rivers Water & Farming Company
TR Capital Partners, LLC

Transfer Restricted – See Reverse Side Hereof

STATE OF COLORADO

# TRCAP 20150630 DISTRIBUTION, LLC

## Common Units

FULLY PAID

NONASSESSABLE

Number: TRC2015Q2-006

Units: 2,714

*This Certifies that* San Gabriel Benefit Plan fbo Justin Yorke is the registered holder of 2,714 (two thousand seven hundred fourteen and no/100) Common Units of TR Cap 20150630 Distribution, LLC, transferable only on the books of TR Cap 20150630 Distribution, LLC by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

*In Witness Whereof,* TR Cap 20150630 Distribution, LLC has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed as of this 19th day of January, 2016.

Chief Executive Officer

Chief Financial Officer

**THIS WARRANT AND THE UNDERLYING SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.**

# GROWCO, INC.

## COMMON STOCK PURCHASE WARRANT

**Certificate No. TRC2015Q2W-006** **Original Issue Date: January 19, 2016**

THIS COMMON STOCK PURCHASE WARRANT (this "**Warrant**") certifies that, for value received, San Gabriel Benefit Plan fbo Justin Yorke or its registered assigns (the "**Holder**"), having an address at 4 Richland Pl, Pasadena, CA 91103 is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time prior to 5 p.m., Mountain time, on October 31, 2020, to subscribe for and purchase from GrowCo, Inc. ("**GrowCo**"), a Colorado corporation having its principal office at 2000 Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, facsimile: (303) 845-9400, email: info@trgrowco.com (such address, or such other address as GrowCo may from time to time designate by notice in writing to the Holder, being referred to as the "**Principal Office**"), up to one thousand six hundred thirty eight ( 1,638 ) shares (the "**Warrant Shares**") of GrowCo's common stock, without par value ("**Common Shares**"), at a price of $1.00 per Warrant Share (as may be adjusted in accordance with Section 3, the "**Purchase Price**"). This Warrant is one of a series of Common Stock Purchase Warrants identified by certificate numbers designated "TRC2015Q2W" (collectively, the "**TRC2015Q2 Warrants**").

1. **Definitions.** As used herein, the following terms shall have the indicated meanings:

(a) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(b) "**Person**" shall mean an individual or a corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity.

(c) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

2. **Exercise.**

(a) **Manner of Exercise**. The rights represented by this Warrant may be exercised in whole or in part at any time prior to 5 p.m., Mountain time, on October 31, 2020 by delivery of the following to GrowCo at the Principal Office: (i) an executed Notice of Exercise in the form attached hereto; (ii) payment of the Purchase Price in cash by wire transfer or check; and (iii) this Warrant. Upon the Holder's exercise of the rights represented by this Warrant, a certificate for the Warrant Shares so purchased, registered in the name of the Holder or a Person affiliated with the Holder, if the Holder so designates, shall be issued and delivered to the Holder or such Person within a reasonable time after the rights represented by this Warrant shall have been so exercised. The Person in whose name any certificate for Warrant Shares is to be issued upon exercise of this Warrant shall be deemed to have become the holder of record of such Warrant Shares on the date on which this Warrant was surrendered and payment of the Purchase Price was made, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such surrender and payment is a date when the stock transfer books of GrowCo are closed, such Person shall be deemed to have become the holder of record of such Warrant Shares at the close of business on the next succeeding date on which the stock transfer books are open. If

this Warrant is exercised in part, GrowCo shall, at the time of delivery of the certificate representing the purchased Warrant Shares, deliver to the Holder a new TRC2015Q2 Warrant that evidences the rights of the Holder to purchase the remaining Warrant Shares represented by this Warrant and that bears a new certificate number, but that otherwise is identical to this Warrant.

(b) **No Fractional Warrant Shares**. No fractional shares shall be issued upon the exercise of this Warrant. As to any fraction of a Common Share that the Holder would otherwise be entitled to purchase upon an exercise, GrowCo shall instead pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Purchase Price.

(c) **Legends**. The Holder understands and agrees that any certificates evidencing Warrant Shares may bear a legend substantially in the following form:

> "THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SHARES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED."

(d) **Charges, Taxes and Expenses**. Issuance of certificates for Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by GrowCo; *provided* that in the event certificates for Warrant Shares are to be issued in a name other than the name of the Holder, GrowCo may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto.

**3. Adjustments of Purchase Price and Exercisability.**

(a) **Stock Dividends, Distributions, Subdivisions and Combinations**. If GrowCo shall: (i) pay a stock dividend or otherwise make a distribution or distributions on Common Shares in Common Shares, (ii) subdivide outstanding Common Shares into a larger number of shares, or (iii) combine (including by way of reverse stock split) outstanding Common Shares into a smaller number of shares, then (A) the Purchase Price shall be multiplied by a fraction of which the numerator shall be the number of Common Shares outstanding before such event and of which the denominator shall be the number of Common Shares outstanding after such event and (B) the number of shares issuable upon exercise of this Warrant, shall be proportionately adjusted such that the aggregate Purchase Price shall remain unchanged. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such a dividend or distribution or, in the case of such a subdivision, combination or reclassification, immediately after the effective date.

(b) **Subsequent Rights Offerings**. If GrowCo shall issue rights, options or warrants to all holders of Common Shares (and not to the Holder as such) entitling them to subscribe for or purchase Common Shares at a price per share less than the closing price of Common Shares on the record date for the determination of stockholders entitled to receive such rights, options or warrants, then the Purchase Price shall be multiplied by a fraction, of which (i) the numerator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of shares that the aggregate offering price of the total number of shares so offered (assuming receipt by GrowCo in full of all consideration payable upon exercise of such rights, options or warrants) would purchase at such closing price and (ii) the denominator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of additional Common Shares offered for subscription or purchase. Such adjustment shall be made whenever such rights, options or warrants are issued, and shall become effective immediately after the record date for the determination of stockholders entitled to receive such rights, options or warrants.

(c) **Pro Rata Distributions**. If GrowCo shall distribute to all holders of Common Shares (and not to the Holder as such) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security other than Common Shares, then in each such case the Purchase Price shall be adjusted by multiplying the Purchase Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction, of which (i) the numerator shall be the closing price of Common Shares determined as of the record date mentioned above less the per share fair market value at such record date of the portion of such assets or evidence of indebtedness or rights or warrants so distributed applicable to one outstanding Common Share as determined by the Board of Directors in good faith and (ii) the denominator shall be such closing price of Common Shares determined as of such record date. In either case the adjustments shall be described in a statement provided to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one Common Share. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

(d) **Fundamental Transaction**. If (i) GrowCo, directly or indirectly, effects any merger or consolidation of GrowCo with or into another Person, (ii) GrowCo, directly or indirectly, effects any sale of all or substantially all of its assets in one or a series of related transactions, (iii) any tender offer or exchange offer (whether by GrowCo or another Person) is completed pursuant to which holders of Common Shares are permitted to tender or exchange their shares for other securities, cash or property, (iv) GrowCo effects any reclassification, reorganization or recapitalization of the Common Shares or any compulsory share exchange pursuant to which the Common Shares are effectively converted into or exchanged for other securities, cash or property, or (v) GrowCo, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires a majority of the outstanding Common Shares (not including any Common Shares held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (in any such case, a "**Fundamental Transaction**"), then upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Common Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one Common Share (the "**Alternate Consideration**"). For purposes of any such conversion, the determination of the Purchase Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one Common Share in such Fundamental Transaction, and GrowCo shall apportion the Purchase Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Shares are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to GrowCo or surviving entity in such Fundamental Transaction shall issue to the Holder a new warrant consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant for the Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 3(d) and ensuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(e) **Calculation and Notice of Adjustment to Purchase Price**. Whenever an adjustment to the Purchase Price or other terms of this Warrant is effected pursuant to this Section 3, GrowCo shall thereafter promptly mail to the Holder a notice setting forth the Purchase Price and other terms of such adjustment and setting forth a brief statement of the facts requiring such adjustment.

**4. Notices to Facilitate Exercise.** If (a) GrowCo shall declare a dividend (or any other distribution) on the Common Shares, (b) GrowCo shall authorize the granting to all holders of Common Shares rights or warrants to subscribe for or purchase any shares of capital stock of any class, (c) the approval of any stockholders of GrowCo shall be required in connection with any reclassification of the Common Shares, any consolidation or merger to which GrowCo is a party, any sale or transfer of all or substantially all of the assets of GrowCo, or any compulsory share exchange whereby the Common Shares shall be converted into other securities, cash or property, or (d) GrowCo shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of GrowCo, then, in each case, GrowCo shall cause to be mailed to the Holder at the Holder's last address as it shall appear upon the books and records of GrowCo, at least ten Business Days prior to the applicable record or effective date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of record of Common Shares to be entitled to such dividend, distribution, rights or warrants are to be determined or (ii) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close and the date on which it is expected that holders of record of Common Shares will be entitled to exchange their Common Shares for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. To the extent the Holder would not otherwise be entitled to exercise this Warrant, the Holder is entitled to exercise this Warrant during the ten-Business Day period commencing as of the date of such notice to the effective date of the event triggering such notice.

**5. Representations of Holder.**

(a) **Acquisition of Warrant and Warrant Shares for Investment**. The Holder represents and warrants that it is acquiring this Warrant and any Warrant Shares solely for its account for investment and not with a view to or for sale or distribution of this Warrant or such Warrant Shares or any part thereof.

(b) **Securities Not Registered.**

(i) Notwithstanding anything to the contrary contained herein, the Holder may not exercise this Warrant unless the Warrant Shares issuable upon such exercise are then registered under the Securities Act and registered or qualified under any applicable state securities laws or, if such Warrant Shares are not then so registered, GrowCo has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act and the registration and qualification requirements of any applicable state securities laws.

(ii) The Holder understands that the issuance of this Warrant and the Warrant Shares have not been registered under the Securities Act on the basis that no distribution or public offering of the stock of GrowCo is to be effected. The Holder realizes that the basis for the exemption may not be present if, notwithstanding its representations, the Holder has a present intention of acquiring the securities for a fixed or determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities.

(iii) The Holder recognizes that this Warrant and the Warrant Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. The Holder recognizes that GrowCo has no obligation to register this Warrant or the Warrant Shares under the Securities Act, or to comply with any exemption from such registration.

(iv) The Holder is aware that neither this Warrant nor the Warrant Shares may be sold pursuant to Rule 144 under the Securities Act unless certain conditions are met, including, among

other things, the existence of a public market for the shares, the availability of certain current public information about GrowCo, the resale following the required holding period pursuant to Rule 144 under the Securities Act and the number of shares being sold during any three-month period not exceeding specified limitations. The Holder is aware that the conditions for resale set forth in Rule 144 under the Securities Act have not been satisfied and that GrowCo may not satisfy these conditions in the foreseeable future or at all.

**6. Lock-Up.**

(a) **Agreement to Lock-Up**. The Holder hereby agrees that the Holder will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to the initial underwritten public offering and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days, except that, to the extent requested by the lead managing underwriter(s) to accommodate regulatory restrictions of the Financial Industry Regulatory Authority or any applicable securities exchange relating to the publication or other distribution of research reports or analyst recommendations and opinions, such period may be extended to a total of 215 days), (a) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo held immediately prior to the effectiveness of the registration statement for such public offering or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such capital stock, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of capital stock or other securities, in cash or otherwise. The foregoing provisions of this Section 6(a) shall not apply to the sale of any shares to an underwriter in such public offering, and shall only be applicable to the Holder if all directors of GrowCo (other than a director designated by the Holder or its affiliates) enter into similar arrangements. The underwriters in connection with such public offering are intended third-party beneficiaries of this Section 6 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees, if requested by the underwriters of such public offering, to execute an agreement that is consistent with this Section 6 or that is necessary to give further effect hereto.

(b) **Stop Transfer Instructions**. In order to enforce the foregoing covenant, GrowCo may impose stop-transfer instructions with respect to the shares of capital stock of GrowCo held by the Holder (and transferees and assignees thereof) until the end of such restricted period.

**7. Transfer of Warrant.**

(a) **Transfers**. The Holder understands that this Warrant and the Warrant Shares have not been registered under the Securities Act and that neither this Warrant nor any Warrant Shares may be offered for sale, sold, pledged or hypothecated in the absence of either (i) an effective registration statement as to this Warrant and/or such Warrant Shares under the Securities Act or (ii) an opinion of counsel satisfactory to GrowCo that such registration is not required. Subject in all respects to the foregoing, this Warrant and all rights hereunder are transferable, with respect to all or a portion of the Warrant Shares, upon surrender of this Warrant to GrowCo at the Principal Office, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by or on behalf of the Holder and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, GrowCo shall deliver (A) to each assignee, a new SU Warrant (with a new certificate number) in the name of such assignee that evidences the rights to purchase the number of Warrant Shares specified in such instrument of assignment to be assigned to such assignee and (B) to the Holder, a new SU Warrant (with a new certificate number) in the name of the Holder that evidences the number of Warrant Shares, if any, not assigned. Each SU Warrant so issued shall otherwise be identical to this Warrant.

(b) **TRC2015Q2W Warrant Register**. GrowCo, or assigns, shall maintain the name and address of the Holder hereof from time to time in a register for the TRC2015Q2 Warrants. GrowCo may deem and treat the Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof and for all other purposes, absent actual notice to the contrary.

**8. Acceptance**. Receipt of this Warrant by the Holder shall constitute acceptance of, and agreement to, all of the terms and conditions contained herein.

**9. Miscellaneous.**

(a) **No Rights as Stockholder Until Exercise**. This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of GrowCo prior to the exercise hereof.

(b) **Loss, Theft, Destruction or Mutilation of Warrant**. GrowCo covenants that upon its receipt of (i) evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, (ii) in case of loss, theft or destruction of this Warrant, indemnity or security reasonably satisfactory to GrowCo (which shall not include the posting of any bond), and (iii) if mutilated, this Warrant, GrowCo will deliver to the Holder a new TRC2015Q2 Warrant that evidences the rights of the Holder to purchase the Warrant Shares then represented by this Warrant and that bears a new certificate number, that otherwise is identical with this Warrant.

(c) **Action on Business Days**. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

(d) **Authorized Warrant Shares**. GrowCo covenants that, during the period this Warrant is outstanding, it will reserve from its authorized and unissued Common Shares a sufficient number of Common Shares to provide for the issuance of the Warrant Shares upon the exercise of this Warrant. GrowCo further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for the Warrant Shares upon the exercise of this Warrant. GrowCo will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation or of any requirements of any securities exchange upon which the Common Shares may be listed. GrowCo covenants that all of the Warrant Shares will, upon exercise of this Warrant in accordance with the terms hereof, be duly authorized, validly issued, fully paid and non-assessable and free from all taxes, liens and charges created by GrowCo in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

(e) **Governing Law**. This Warrant shall be governed by the internal law of the State of Colorado.

(f) **Non-waiver**. No course of dealing or any delay or failure to exercise any right hereunder on the part of the Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies hereunder. If GrowCo willfully and knowingly fails to comply with any provision of this Warrant and such failure results in any material damages to the Holder, GrowCo shall pay to Holder such amounts as shall be sufficient to cover any costs and expenses, including reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in enforcing any of its rights, powers or remedies hereunder.

(g) **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next

Business Day; (iii) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to GrowCo or the Holder at the address listed on the first page hereof or at such other address as GrowCo or the Holder, as the case may be, as shall be specified in a notice given in accordance with this Section 9(g).

(h) **Limitation of Liability**. No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the Purchase Price of any Common Shares or as a stockholder of GrowCo, whether such liability is asserted by GrowCo or by creditors of GrowCo.

(i) **Remedies**. The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Warrant to the extent permitted by law. GrowCo agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

(j) **Successors and Assigns**. This Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of GrowCo and, subject to compliance with applicable securities laws, the successors and permitted assigns of the Holder.

(k) **Amendment**. This Warrant may be modified or amended or the provisions hereof waived with the written consent of GrowCo and the Holder.

(l) **Severability**. Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

(m) **Construction**. Any reference in this Warrant to a Section shall refer to a Section of this Warrant. The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant. The words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described.

IN WITNESS WHEREOF, GrowCo has caused this Warrant to be signed by its duly authorized officer as of January 19, 2016.

GROWCO, INC.

By: ______________________________
Name: Wayne Harding
Title: Chief Financial Officer

# NOTICE OF WARRANT EXERCISE

*Date:* ____________________

To: GrowCo, Inc.

The undersigned registered holder (the "**Holder**") of the attached Common Stock Purchase Warrant (the "**Warrant**") of GrowCo, Inc. ("**GrowCo**") hereby elects to purchase:

____________________________ shares

(the "**Acquired Warrant Shares**") of common stock of GrowCo pursuant to the terms of the Warrant and tenders herewith payment of the Purchase Price (as defined in the Warrant) in full, together with any applicable transfer taxes if the Acquired Warrant Shares are to be issued in a name other than the name of the Holder. The Holder confirms that the Holder (or any other individual or entity in whose name the Acquired Warrant Shares are to be issued) is an "accredited investor" as defined in Regulation D under the Securities Act of 1933.

If the Holder is requesting that the certificate representing the Acquired Warrant Shares be issued in a name other than the name of the Holder:

(a) the Holder is delivering herewith a supplemental letter of representations or opinion of counsel in such form as requested by GrowCo in order to confirm compliance with applicable federal and state securities laws; and

(b) the Holder has set forth below the name and address of the individual or entity to which the Holder has requested the Acquired Warrant Shares be issued *(please print or type)*:

*Name of Other Party:* ____________________________________________

*Address of Other Party:* ____________________________________________

____________________________________________

If the Holder is an individual:

*Name of Holder (please print or type)* .......................... ____________________________

*Signature of Holder* ...................................................... ____________________________

If the Holder is an entity:

*Name of Holder (please print or type)* .......................... ____________________________

*Signature of Authorized Signatory of Holder* ................ ____________________________

*Name of Authorized Signatory (please print or type)* .... ____________________________

*Title of Authorized Signatory (please print or type)* ..... ____________________________

# LIMITED LIABILITY COMPANY AGREEMENT

among

TR CAP 20150630 DISTRIBUTION, LLC

and

MEMBERS NAMED IN SCHEDULE 1

Dated as of November 18, 2015

TABLE OF CONTENTS

Page


ARTICLE I DEFINITIONS ..... 1
Section 1.01. Definitions ..... 1
Section 1.02. Interpretation ..... 7

ARTICLE II ORGANIZATION ..... 8
Section 2.01. Formation ..... 8
Section 2.02. Name ..... 8
Section 2.03. Principal Office ..... 8
Section 2.04. Registered Office and Agent ..... 8
Section 2.05. Purpose and Powers ..... 9
Section 2.06. Term ..... 9
Section 2.07. No State-Law Partnership ..... 9

ARTICLE III UNITS ..... 9
Section 3.01. Units Generally ..... 9
Section 3.02. Authorization and Issuance of Common Units ..... 9
Section 3.03. Certification of Units ..... 10
Section 3.04. Action by Consent ..... 10

ARTICLE IV MEMBERS ..... 10
Section 4.01. Admission of New Members ..... 10
Section 4.02. Representations and Warranties of Members ..... 10
Section 4.03. No Personal Liability ..... 11
Section 4.04. No Withdrawal ..... 11
Section 4.05. Death ..... 12
Section 4.06. Voting ..... 12
Section 4.07. Power of Members ..... 12
Section 4.08. No Interest in Company Property ..... 12

ARTICLE V CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ..... 12
Section 5.01. Existing Capital Contributions ..... 12
Section 5.02. Additional Capital Contributions ..... 13
Section 5.03. Maintenance of Capital Accounts ..... 13
Section 5.04. Succession Upon Transfer ..... 13
Section 5.05. Negative Capital Accounts ..... 13
Section 5.06. No Withdrawal ..... 14
Section 5.07. Treatment of Loans From Members ..... 14
Section 5.08. Modifications ..... 14

ARTICLE VI ALLOCATIONS ..... 14
Section 6.01. Allocation of Net Income and Net Loss ..... 14
Section 6.02. Regulatory and Special Allocations ..... 14
Section 6.03. Tax Allocations ..... 15
Section 6.04. Allocations in Respect of Transferred Units ..... 16
Section 6.05. Curative Allocations ..... 16

ARTICLE VII DISTRIBUTIONS ..... 16
Section 7.01. Participating Distributions ..... 16

Section 7.02. Other Distributions ... 17
Section 7.03. Tax Withholding; Withholding Advances ... 17
Section 7.04. Distributions in Kind ... 18
Section 7.05. Compliance with Law ... 18

ARTICLE VIII MANAGEMENT ... 19
Section 8.01. Establishment of the Board ... 19
Section 8.02. Board Composition; Vacancies ... 19
Section 8.03. Removal; Resignation ... 19
Section 8.04. Meetings ... 19
Section 8.05. Action By Written Consent ... 20
Section 8.06. Manager Status ... 20
Section 8.07. Officers ... 20
Section 8.08. No Personal Liability ... 20

ARTICLE IX EXCHANGES OF COMMON UNITS ... 20
Section 9.01. Exchange Agreement ... 20
Section 9.02. Transfer of Common Units Upon Exchange ... 20

ARTICLE X TRANSFERS ... 21
Section 10.01. General Restrictions on Transfer ... 21

ARTICLE XI CONFIDENTIALITY ... 22
Section 11.01. Nondisclosure ... 22
Section 11.02. Permitted Disclosures ... 22
Section 11.03. Excluded Information ... 22

ARTICLE XII TAX MATTERS ... 23
Section 12.01. Tax Matters Member ... 23
Section 12.02. Tax Returns ... 23
Section 12.03. Company Funds ... 24

ARTICLE XIII DISSOLUTION AND LIQUIDATION ... 24
Section 13.01. Events of Dissolution ... 24
Section 13.02. Effectiveness of Dissolution ... 24
Section 13.03. Liquidation ... 24
Section 13.04. Cancellation of Articles ... 25
Section 13.05. Survival of Rights, Duties and Obligations ... 25
Section 13.06. Recourse for Claims ... 25

ARTICLE XIV EXCULPATION AND INDEMNIFICATION ... 25
Section 14.01. Exculpation of Covered Persons ... 25
Section 14.02. Liabilities and Duties of Covered Persons; Conflicts of Interest ... 26
Section 14.03. Indemnification ... 27
Section 14.04. Survival ... 28

ARTICLE XV MISCELLANEOUS ... 31
Section 15.01. Further Assurances ... 31
Section 15.02. Notices ... 31
Section 15.03. Severability ... 31
Section 15.04. Entire Agreement ... 31

Section 15.05. Successors and Assigns ........ 32
Section 15.06. No Third-Party Beneficiaries ........ 32
Section 15.07. Amendment ........ 32
Section 15.08. Waiver ........ 32
Section 15.09. Governing Law ........ 32
Section 15.10. Submission to Jurisdiction ........ 32
Section 15.11. Waiver of Jury Trial ........ 33
Section 15.12. Equitable Remedies ........ 33
Section 15.13. Remedies Cumulative ........ 33

EXHIBIT A Form of Joinder Agreement
SCHEDULE 1 Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of TR Cap 20150630 Distribution, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of November 18, 2015 among the Company and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on November 18, 2015 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. **Definitions**. The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b) any consents or approvals of any Governmental Authority; and

(c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to

such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b) immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c) the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i) the acquisition of additional Units by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d) the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e) if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

"**Code**" means the Internal Revenue Code of 1986.

"**Colorado Act**" means the Colorado Limited Liability Company Act, Title 7, Article 80, Sections 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

"**Common Manager**" has the meaning set forth in Section 8.02(a)(i).

"**Common Members**" means the Member or Members who own Common Units as listed in the Member Schedule.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 14.01(a).

"**Credit Facility**" means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Exchange Agreement**" means the Exchange Agreement being entered into among the Company, GrowCo and the Holders listed on Schedule I thereto, in such form as an authorized Officer shall approve (such approval to be conclusively evidenced by such Officer's execution thereof on behalf of the Company).

"**Fair Market Value**" means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**Funded Date**" means the earlier of (a) the first day as of which the Company has applied the maximum amount contemplated by Section 2.05(a)(ii) to purchase preferred units of GCP3 and GCP4 and (b) the date, if any, on which the Board determines that no further amounts will be applied to purchase preferred units of GCP3 or GCP4 pursuant to Section 2.05(a)(ii).

"**GBD**" means GrowCo Business Development, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP1**" means GrowCo Partners 1, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP2**" means GrowCo Partners 2, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP3**" means GrowCo Partners 3, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP4**" means GrowCo Partners 4, LLC, a Colorado limited liability company, and any successor thereto.

"**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means the individuals and entities identified as a Member on the Member Schedule, so long as that Member executes the Joinder Agreement, including joinder agreements for the Exchange Agreement and Registration Rights Agreement, as the owner of one or more Units. The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context

requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

(a) a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b) a Distributive share of the assets of the Company,

(c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.07.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Quarterly Net Amount**" means, with respect to a Fiscal Quarter:

(a) the total amount of payments in cash received by the Company during such Fiscal Quarter from the Company's holdings of preferred membership units in one or more of GBD, GCP1, GCP2, GCP3 and GCP4, *less*

(b) the total amount of payments in cash made by or on behalf of the Company during such Fiscal Quarter for operating and other fees and expenses of third parties, plus the total amount, if any, determined by the Board in its sole discretion to be retained for the establishment of reserves, or payment to third parties, as the Board deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations and expenses and reasonable reserves for contingencies.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning set forth in Section 12.01Section 12.01(a).

"**Taxing Authority**" has the meaning set forth in Section 7.03(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water & Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.03(b).

Section 1.02. **Interpretation**. For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
## ORGANIZATION

Section 2.01. **Formation.**

(a) The Company was formed on November 18, 2015, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b) This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02. **Name.** The name of the Company shall be "TR Cap 20150630 Distribution, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03. **Principal Office.** The principal office of the Company shall be located at 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado, 80222 or such other place as may from time to time be determined by the Board. The Board shall give prompt notice of any such change to each of the Members.

Section 2.04. **Registered Office and Agent.**

(a) The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b) The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05. **Purpose and Powers.**

(a) The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto. Without limiting the foregoing:

(i) In exchange for the distribution owed to holders of TR Capital Partners, LLC preferred units of $497,405, the Company shall receive as follows:

(A) 326,595 preferred units of GBD;

(B) 45,219 preferred units of GCP1; and

(C) 452,186 preferred units of GCP2.

(ii) Seventy-five percent of the Quarterly Net Amount received with respect to each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2016 and continuing up to (but not including) the Fiscal Quarter in which the Funded Date occurs (that is, the portion of each such Quarterly Net Amount that is not Distributed to Common Members pursuant to Section 7.01(a)) shall be applied as follows (subject to rounding):

(A) up to $0.217277 per outstanding Common Unit shall be used to purchase preferred units of GCP3 at a per-unit price of $1.00; and/or

(B) up to $0.217277 per outstanding Common Unit shall be used to purchase preferred units of GCP4 at a per-unit price of $1.00;

*provided* that the majority (over 50%) of the Common Member vote to purchase fewer (but not more) preferred units of GCP3 and/or GCP4 than so calculated, in which case the unapplied amount shall be eligible for Distribution to Common Members pursuant to Section 7.02 or upon liquidation, but shall not be applied for the purchase other securities or assets.

(b) The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06. **Term**. The term of the Company commenced on November 18, 2015, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07. **No State-Law Partnership**. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
## UNITS

Section 3.01. **Units Generally**. Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable. The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02. **Authorization and Issuance of Common Units**. The Company is hereby authorized to issue a class of Units designated as Common Units. As of the date hereof, a total of 824,000 Common Units have been issued and are outstanding, subject to proper return of joinder agreements by each Common Member.

Section 3.03. **Certification of Units.** The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member. In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

"THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

"THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.04. **Action by Consent.** Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests. A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
## MEMBERS

Section 4.01. **Admission of New Members.** No New Members may be admitted.

Section 4.02. **Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members represents and warrants to the Company and acknowledges that:

(a) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b) Such Member (i) unless otherwise agreed to by the Board prior to such Member's execution of a Joinder Agreement, is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c) Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d) Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company

and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f) Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h) The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i) This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j) Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04. **No Withdrawal**. A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c) the making by such Member of a general assignment for the benefit of such Member's creditors;

(d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e) the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05. **Death.** The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06. **Voting.** Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07. **Power of Members.** The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act. Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08. **No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01. **Existing Capital Contributions.** Two Rivers has established this Company for the benefit of holders of TR Capital, LLC preferred members to provide value for the TR Capital, LLC preferred members as an in-kind distribution for TR Capital, LLC preferred members as of a record date of June 30, 2015. The value of this distribution is $497,405.

Section 5.02. **Additional Capital Contributions.**

(a) No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b) No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

Section 5.03. **Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 5.03. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Member's Capital Account shall be increased by the amount of:

(i) such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii) any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE VI; and

(iii) any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b) Each Member's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property Distributed to such Member pursuant to ARTICLE VII and Section 13.03(c);

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE VI; and

(iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04. **Succession Upon Transfer.** In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to ARTICLE VI, ARTICLE VII and ARTICLE XIII in respect of such Units.

Section 5.05. **Negative Capital Accounts.** In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.06. **No Withdrawal**. No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.07. **Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iii), if applicable.

Section 5.08. **Modifications**. The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

## ARTICLE VI
## ALLOCATIONS

Section 6.01. **Allocation of Net Income and Net Loss**. For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02. **Regulatory and Special Allocations**. Notwithstanding the provisions of Section 6.01:

(a) If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such

Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

(ii) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e) The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations.**

(a) Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c) If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04. **Allocations in Respect of Transferred Units.** In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of ARTICLE X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05. **Curative Allocations.** In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a) not specified in this ARTICLE VI, or

(b) clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Common Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01. **Participating Distributions.** Distributions pursuant to this Section 7.01 are subject only to Section 7.05, and no other Distributions shall be made unless and until all Distributions due under this Section 7.01 have been paid. The total amount of Distributions, if any, due under this Section 7.01 with respect to a Fiscal Quarter shall be allocated and paid to Common Members pro rata in proportion to their holdings of the Common Units as of the end of such Fiscal Quarter.

(a) The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2016 and continuing up to (but not including) the Fiscal Quarter in which the Funded Date occurs, Distribute with respect to the Common Units a total amount equal to 25% of the Quarterly Net Amount for such Fiscal Quarter.

(b) The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter in which the Funded Date occurs, Distribute with respect to the Common Units a total amount equal to the Quarterly Net Amount for such Fiscal Quarter.

Section 7.02. **Other Distributions.** After making all Distributions then due to Common Members under Section 7.01, and subject to Section 7.05 and Section 13.03, the Board shall have sole discretion regarding the amounts and timing of Distributions to Common Members, including to decide to forego payment of other Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including present and anticipated obligations and expenses and reasonable reserves for contingencies.

Section 7.03. **Tax Withholding; Withholding Advances.**

(a) **Tax Withholding.** If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i) an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii) any certificate that the Board may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.03(b).

(b) **Withholding Advances.** The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this Section 7.03(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances.** Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

(i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification.** Each Common Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this Section 7.03(d) and the obligations of a Member pursuant to Section 7.03(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.03, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding.** Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.04. **Distributions in Kind.**

(a) The Board is hereby authorized, in its sole discretion, to make Distributions to the Common Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.01 shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Common Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Common Members pursuant to Section 7.02.

(b) Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that Common Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.05. **Compliance with Law.** Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Common Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

## ARTICLE VIII
## MANAGEMENT

Section 8.01. **Establishment of the Board**. The Board is hereby established and shall be comprised of a natural Person (a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02. **Board Composition; Vacancies**.

(a) The Board shall be comprised as follows:

(i) one individual temporary designated as John McKowen; and

(ii) effective following the initial issuance of at least 600,000 Common Units, one individual designated by the Common Members by majority vote of the then outstanding Common Units.

(b) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03. **Removal; Resignation**.

(a) **Common Manager**. The Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b) **General**. The Manager may resign at any time from the Board by delivering a written resignation to the Common Members. Any such resignation shall be effective upon receipt thereof unless it is specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04. **Meetings**.

(a) **Generally**. The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board. Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b) **Attendance and Waiver of Notice**. Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05. **Action By Written Consent**. Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action. Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.06. **Manager Status**.

(a) **Reimbursement; Other Capacities**. Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time. Nothing contained in this Section 8.06 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b) **No Employment**. This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.07. **Officers**. The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable. The initial Officers of the Company shall consist of John McKowen, Chief Executive Officer, and Wayne Harding, Chief Financial Officer. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Board. Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time. A vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.08. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
## EXCHANGES OF COMMON UNITS

Section 9.01. **Exchange Agreement**. Contemporaneously with its execution and delivery of a Joinder Agreement, each Common Member shall execute and deliver to GrowCo and the Company a joinder agreement or other written understanding pursuant to which such Common Member becomes a party to the Exchange Agreement.

Section 9.02. **Transfer of Common Units Upon Exchange**. Upon the effective time of an exchange of a Common Unit as provided in Article II of the Exchange Agreement and without limitation by ARTICLE X, such Common Unit shall be Transferred to GrowCo, as provided in the Exchange Agreement, and all rights under this Agreement with respect to such Common Unit, including the right to receive Distributions, shall accrue to the benefit of GrowCo.

## ARTICLE X
### TRANSFERS

Section 10.01. **General Restrictions on Transfer.**

(a) Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi) if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii) if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b) Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01. **Nondisclosure.** Each Common Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not

generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Common Member acknowledges that: (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Common Member is subject, no Common Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Common Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Common Member is or becomes aware. Each Common Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02. **Permitted Disclosures.** Nothing contained in Section 11.01 shall prevent any Common Member from disclosing Confidential Information: (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Common Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Common Member's Representatives who, in the reasonable judgment of such Common Member, need to know such Confidential Information and agree to be bound by the provisions of this ARTICLE XI as if a Common Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units from such Common Member, as long as such Transferee agrees to be bound by the provisions of this ARTICLE XI as if a Common Member; *provided* that in the case of clause (a), (b) or (c), such Common Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03. **Excluded Information.** The restrictions of Section 11.01 shall not apply to Confidential Information that: (a) is or becomes generally available to the public other than as a result of a disclosure by a Common Member in violation of this Agreement; (b) is or becomes available to a Common Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Common Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Common Member without use of Confidential Information; or (d) becomes available to the receiving Common Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

## ARTICLE XII
## TAX MATTERS

Section 12.01. **Tax Matters Member.**

(a) **Appointment**. The Members hereby appoint Two Rivers as the "**Tax Matters Member**," which shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b) **Tax Examinations and Audits**. The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings. Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c) **Income Tax Elections**. The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Common Members holding a majority of the outstanding Common Units. All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d) **Tax Returns and Tax Deficiencies**. Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.03(d).

(e) **Resignation**. The Tax Matters Member may resign at any time. If Two Rivers ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Common Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02. **Tax Returns**. At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.07) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03. **Company Funds**. All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its

name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

Section 13.01. **Events of Dissolution**. The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a) the determination of the Board to dissolve the Company;

(b) an election to dissolve the Company made by holders of a majority of the Common Units;

(c) the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d) the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02. **Effectiveness of Dissolution**. Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03. **Liquidation**. If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

(a) **Liquidator**. The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the "**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting**. As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) **Distribution of Proceeds**. The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii) *third*, to the Common Members in amounts equal to their respective Capital Accounts; and

(iv) *fourth*, to the Common Members pro rata in accordance with the number of Common Units they hold.

(d) **Discretion of Liquidator**. Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Common Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04. **Cancellation of Articles**. Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05. **Survival of Rights, Duties and Obligations**. Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06. **Recourse for Claims**. Each Common Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
## EXCULPATION AND INDEMNIFICATION

Section 14.01. **Exculpation of Covered Persons.**

(a) **Covered Persons**. As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b) **Standard of Care**. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c) **Good Faith Reliance**. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Colorado Act.

Section 14.02. **Liabilities and Duties of Covered Persons; Conflicts of Interest.**

(a) **Limitation of Liability**. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) **Duties**. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

(c) **Conflicts of Interest.**

(i) For purposes of this Section 14.02(c), the term "**interest**" shall include personal interest, interest as officer, director, shareholder, partner, member, manager, employee, agent, representative, trustee or beneficiary of any concern, and having an immediate family member who holds such an interest in any concern. The term "**concern**" shall mean any corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity, but excluding the Company.

(ii) No Officer, Manager or Member shall be disqualified from holding any office or role in, or position with, the Company by reason of any interest in any concern or from dealing, either as vendor, purchaser or otherwise, or contracting or entering into any other transaction with the Company or any Affiliate of the Company. No transaction of the

Company shall be voidable by reason of the fact that an Officer, Manager or Member has an interest in the concern with which such transaction is entered into, *provided* the interest of such Officer, Manager or Member is fully disclosed to each of the Managers (whether in a meeting or otherwise and whether as a Board or individually).

Section 14.03. **Indemnification.**

(a) **Indemnification**. To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

(ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Reimbursement**. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c) **Entitlement to Indemnity**. The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person

remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d) **Insurance.** To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e) **Funding of Indemnification Obligation**. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause**. If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment**. The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section 14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04. **Survival**. The provisions of this ARTICLE XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
## MISCELLANEOUS

Section 15.01. **Further Assurances**. In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02. **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a

nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

| | |
|---|---|
| If to the Company: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Facsimile: (303) 845-9400<br>E-mail: info@2riverswater.com<br>Attention: Chief Financial Officer |

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04. **Entire Agreement**. This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibit and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05. **Successors and Assigns**. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06. **No Third-Party Beneficiaries**. Except as provided in ARTICLE XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07. **Amendment**. Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units. Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding a majority of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of

Units shall be effective only with that Member's consent. Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(b) and Section 15.11.

Section 15.09. **Governing Law**. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10. **Submission to Jurisdiction**. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11. **Waiver of Jury Trial**. Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12. **Equitable Remedies**. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an

injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13. **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**TR CAP 20150630 DISTRIBUTION, LLC**

By: ______________________
Wayne Harding
Chief Financial Officer

## JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement dated as of November 18, 2015, as it may be amended from time to time (the "**Agreement**"), among TR Cap 20150630 Distribution, LLC and the Members Named in SCHEDULE 1. Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and TR Cap 20150630 Distribution, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a Common Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: 4/5/2016

By: [signature]
Name: Justin Yerkee
Title: Manager
San Gabriel Def Benefit Justin Yerkee

Agreed and Accepted:

**TR CAP 20150630 DISTRIBUTION, LLC**

By: [signature]
Name: Wayne Harding
Title: Chief Financial Officer

# EXCHANGE AGREEMENT

among

TR CAP 20150630 DISTRIBUTION, LLC,

GROWCO, INC.

and

HOLDERS NAMED IN SCHEDULE 1

Dated as of November 18, 2015

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ..... 1
Section 1.01. Definitions ..... 1
Section 1.02. Interpretation ..... 3

ARTICLE II EXCHANGES OF SECURITIES ..... 4
Section 2.01. Exchanges ..... 4
Section 2.02. Adjustments ..... 6
Section 2.03. Authorized Shares ..... 6
Section 2.04. Limitations on Exchanges ..... 6

ARTICLE III MISCELLANEOUS ..... 7
Section 3.01. Notices ..... 7
Section 3.02. Severability ..... 7
Section 3.03. Entire Agreement ..... 7
Section 3.04. Additional Holders ..... 8
Section 3.05. Successors and Assigns ..... 8
Section 3.06. Amendments and Waivers ..... 8
Section 3.07. Governing Law ..... 8
Section 3.08. Counterparts ..... 8
Section 3.09. Dispute Resolution ..... 8

SCHEDULE I Schedule of Holders
EXHIBIT A Form of Joinder Agreement

THIS EXCHANGE AGREEMENT is entered into as of November 18, 2015 among TR Cap 20150630 Distribution, LLC ("**TRC 20150630**"), GrowCo, Inc. ("**GrowCo**"), and the several individuals and entities listed on SCHEDULE I (collectively the "**Holders,**" which term shall include each other individual or entity that after the date hereof becomes a member of TRC 20150630 and a party hereto by executing a Joinder Agreement, and with TRC 20150630 and GrowCo, collectively the "**Parties**"). Capitalized terms used herein have the meanings ascribed to them in Section 1.01.

**RECITALS**

WHEREAS, the Holders are entering into, as of the date hereof, the LLC Agreement, which, among other things, provides for the issuance of common membership interests designated as TRC 20150630 Common Units;

WHEREAS, Section 4.01 of the LLC Agreement provides that any individual or entity acquiring TRC 20150630 Common Units and thereby becoming a member of TRC 20150630 shall also become a party to this Agreement;

WHEREAS, the Holders are issued TRC 20150630 Common Units, from TRC 20150630; and

WHEREAS, the Parties wish to provide for terms pursuant to which (a) a Holder may, at its option, exchange TRC 20150630 Common Units for GrowCo Common Shares and (b) GrowCo may, at its option and subject to the prior satisfaction of certain market trading conditions with respect to GrowCo Common Shares, exchange TRC 20150630 Common Units for GrowCo Common Shares, all in the circumstances and subject to the conditions provided herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. **Definitions.** As used herein, the following terms shall have the indicated meanings:

(a) This "**Agreement**" means this Exchange Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

(b) "**Applicable Law**" means all applicable provisions of:

(i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(ii) any consents or approvals of any Governmental Authority; and

(iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

(c) "**Associated TRC 20150630 Warrant**" means, with respect to a TRC 20150630 Common Unit, the GrowCo TRC 20150630 Warrant delivered with such TRC 20150630 Common Unit, it being understood that an Associated GrowCo TRC 20150630 Warrant may relate to more than one TRC 20150630 Common Unit.

(d) "**Beneficially Own**," "**Beneficially Owned**" and "**Beneficial Ownership**" have the meanings ascribed to them for purposes of Section 13(d) of the Exchange Act.

(e) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(f) "**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(g) "**Exchange Act**" means the Securities Exchange Act of 1934.

(h) "**TRC 20150630**" means TR Cap 20150630 Distribution, LLC, a Colorado limited liability company, and any successor thereto.

(i) "**TRC 20150630 Common Units**" means membership interests in TRC 20150630 having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in the LLC Agreement.

(j) "**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

(k) "**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

(l) "**GrowCo Common Shares**" means shares of common stock, with $0.001 par value, of GrowCo.

(m) "**GrowCo TRC 20150630 Warrants**" means (i) common stock purchase warrants to purchase GrowCo Common Shares, which warrants constitute part of the TR Capital 20150630 Distribution Units and are being issued in a series identified by certificate numbers designated "TRC2015Q2W," or (ii) a replacement warrant of such series issued pursuant to Section 9(b) or the last sentence of Section 2(a) of a GrowCo TRC 20150630 Warrant.

(n) "**Holders**" has the meaning set forth in the Preamble hereto.

(o) "**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

(p) "**LLC Agreement**" means the Limited Liability Company Agreement of TR Cap 20150630 Distribution, LLC dated as of November 18, 2015.

(q) "**Mandatory Exchange Date**" has the meaning set forth in Section 2.02(a)(ii).

(r) "**Mandatory Exchange Notice**" has the meaning set forth in Section 2.02(a).

(s) "**Maximum Percentage**" has the meaning set forth in Section 2.04(a).

(t) "**National Exchange**" means the NASDAQ Global Market (including the NASDAQ Global Select Market), the NASDAQ Capital Market, the NYSE MKT, the New York Stock Exchange or any successor to any of the foregoing.

(u) "**Parties**" has the meaning set forth in the Preamble hereto.

(v) "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

(w) "**TR Capital 20150630 Distribution Units**" means up to 824,000 units, each of which consists of one TRC 20150630 Common Unit and a GrowCo TRC 20150630 Warrant to purchase one GrowCo Common Share.

(x) "**Termination Date**" means October 31, 2020.

(y) "**Trading Conditions**" means, with respect to a specified date:

(i) GrowCo Shares are then listed on a National Exchange; and

(ii) for a period of twenty consecutive trading days ending no more than ten trading days before such specified date, (A) the closing or last sale price of a GrowCo Common Share on the principal National Exchange on which GrowCo Common Shares are then traded was equal to, or greater than, $5.00 (subject to equitable adjustment for any stock dividend, split, recapitalization, combination or exchange or any similar transaction) for each such trading day and (B) the average daily trading volume of the GrowCo Common Shares on such National Exchange during such period equaled or exceeded 100,000 shares (subject to equitable adjustment as aforesaid).

(z) "**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units Beneficially Owned by a Person or any interest in any securities Beneficially Owned by a Person. "**Transfer**" when used as a noun, and "**Transferee**," "**Transferred**" and "**Transferring**" shall have correlative meanings.

Section 1.02. **Interpretation**. For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Schedule refer to an Article or Section of, or Schedule attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement and the LLC Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
## EXCHANGES OF SECURITIES

Section 2.01. **Exchanges.**

(a) Unless prohibited by Applicable Law and subject to compliance with the delivery requirements of Section 2.01(b) on or before the Termination Date, a Holder at its option may exchange all, but not less than all, of the TRC 20150630 Common Units then Beneficially Owned by such Holder for GrowCo Shares as follows:

(i) each of the TRC 20150630 Common Units then Beneficially Owned by such Holder, together with the right to acquire one GrowCo Common Share under the Associated GrowCo TRC 20150630 Warrant, may be exchanged for one fully paid and nonassessable GrowCo Common Share; and/or

(ii) each of the TRC 20150630 Common Units then Beneficially Owned by such Holder (other than any TRC 20150630 Common Units being exchanged simultaneously pursuant to the preceding clause (i)) may be exchanged for, subject to Section 2.02(b), nine-tenths (0.9) of a fully paid and nonassessable GrowCo Common Share.

(b) Before any Holder shall be entitled to effect any exchange with GrowCo pursuant to Section 2.01(a), such Holder shall deliver to GrowCo at its address for notices pursuant to Section 3.01 (or such other address as GrowCo may from time to time designate for such purpose by notice in writing to the Holders) by no later than the Termination Date:

(i) written notice of such Holder's election to effect such exchange, including a description of the securities to be exchanged pursuant to each of clauses (i) and (ii) of Section 2.01(a);

(ii) a certificate or certificates for the TRC 20150630 Common Units to be Transferred in such exchange (or, if such Holder alleges that any such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to TRC 20150630 to indemnify TRC 20150630 against any claim that may be made

against TRC 20150630 on account of the alleged loss, theft or destruction of such certificate), each of which certificates shall be endorsed or accompanied by a written instrument or instruments of Transfer, in form satisfactory to TRC 20150630, duly executed by such Holder or its attorney duly authorized in writing; and

(iii) in connection with an exchange pursuant to clause (i) of Section 2.01(a), the Associated GrowCo TRC 20150630 Warrant, with a written instrument of Transfer, in form satisfactory to TRC 20150630, duly executed by the Holder or its attorney duly authorized in writing, Transferring to GrowCo all of such Holder's rights under such Associated GrowCo TRC 20150630 Warrant with respect to a number of GrowCo Common Shares equal to the number of TRC 20150630 Common Units to be Transferred in such exchange pursuant to Section 2.01(a)(i).

Effective as of 5 p.m., Mountain time, on the first Business Day immediately following the date of receipt by GrowCo of the instruments to be delivered by such Holder pursuant to the preceding clauses (i) through (iii), (A) the tendered TRC 20150630 Common Units, together with any rights Transferred with respect to an Associated GrowCo TRC 20150630 Warrant, shall be deemed to have been exchanged for the appropriate number of GrowCo Common Shares, and all rights with respect thereto shall be Transferred to GrowCo, other than the rights of such Holder to receive such GrowCo Common Shares, and (B) such GrowCo Common Shares shall be deemed to be issued to such Holder and to be outstanding of record. GrowCo shall, as soon as practicable thereafter deliver to such Holder (1) a certificate representing such GrowCo Common Shares and (2) any cash payment for fractional GrowCo Common Shares due pursuant to Section 2.03(b).

Section 2.02. **Mandatory Exchanges.** On or before the Termination Date, GrowCo at its option may require that Holders exchange all, but not less than all, of the then-outstanding TRC 20150630 Common Units for GrowCo Shares as follows:

(a) On any day on which the Trading Conditions are satisfied, GrowCo may deliver to each of the Holders a written notice (a "**Mandatory Exchange Notice**"):

(i) stating that GrowCo intends to require that Holders exchange all of the then-outstanding TRC 20150630 Common Units for GrowCo Common Shares pursuant to this Section 2.02; and

(ii) specifying the date of the mandatory exchange (the "**Mandatory Exchange Date**").

(b) On the Mandatory Exchange Date, effective as of 5 p.m., Mountain time, the Holders shall exchange all of the then-outstanding TRC 20150630 Common Units for GrowCo Common Shares. On or before the Mandatory Exchange Date, each Holder shall tender the certificate or certificates therefor, duly endorsed (or, if such Holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to GrowCo to indemnify GrowCo against any claim that may be made against GrowCo on account of the alleged loss, theft or destruction of such certificate), to GrowCo, in the manner and at the place designated in the Mandatory Exchange Notice, and thereupon the GrowCo Common Shares shall be deliverable and payable to the order of such Holder. If the Mandatory Exchange Notice shall have been duly given, and if on the Mandatory Exchange Date the GrowCo Common Shares are, to the extent then due, delivered, paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then effective as of 5 p.m., Mountain time, and notwithstanding that any certificates evidencing any of such TRC 20150630 Common Units shall not have been tendered, such TRC 20150630 Common Units shall be deemed to have been exchanged for GrowCo Common Shares, and

all rights with respect to such TRC 20150630 Common Units, including the rights to receive any distribution, will accrue to the benefit of GrowCo, other than the rights of the former Holder.

Section 2.03. **Adjustments.**

(a) The number of GrowCo Common Shares to be issued in accordance with an exchange with GrowCo pursuant to Section 2.01 or 2.02 shall be subject to equitable adjustment by the Board of Managers of TRC 20150630 and the Board of Directors of GrowCo in the event of any change that is made in, or other event that occurs with respect to, TRC 20150630 Common Units or GrowCo Common Shares, which change or other event is effected, without receipt of consideration by the issuer thereof, through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or any similar equity restructuring transaction.

(b) Notwithstanding anything to the contrary contained herein, no fractional GrowCo Common Shares shall be issued in connection with any exchange with GrowCo pursuant to Section 2.01 or 2.02. If the total number of GrowCo Common Shares calculated to be issued pursuant to Section 2.01 or 2.02 is not a whole number, GrowCo shall pay in cash the fair market value of any fractional GrowCo Common Share.

Section 2.04. **Authorized Shares.** GrowCo covenants that, during the period from the date hereof through the fifth day following the Termination Date (or such earlier date as of which no TRC 20150630 Common Units are outstanding), it will reserve from its authorized and unissued capital stock a sufficient number of GrowCo Common Shares to provide for the issuance of GrowCo Common Shares upon exchanges with GrowCo pursuant to Section 2.01. GrowCo will take all such reasonable action as may be necessary to assure that GrowCo Common Shares may be issued as contemplated hereby without violation of any Applicable Law or of any requirements of any securities exchange upon which GrowCo Common Shares may be listed from time to time.

Section 2.05. **Limitations on Exchanges.**

(a) Notwithstanding anything to the contrary contained herein, the aggregate number of GrowCo Common Shares issuable as part of an exchange with GrowCo pursuant to Section 2.01 shall be limited to the extent necessary to ensure that, following such exchange, the total number of GrowCo Common Shares then Beneficially Owned by such Holder and any other Persons whose Beneficial Ownership of GrowCo Common Shares would be aggregated with such Holder's for purposes of Section 13(d) of the Exchange Act does not exceed 4.999% (the "**Maximum Percentage**") of the total number of issued and outstanding GrowCo Common Shares (including for such purpose GrowCo Common Shares issuable as part of such exchange). Each delivery of instruments by a Holder pursuant to Section 2.01(b) for a proposed exchange will constitute a representation by such Holder that it has evaluated the limitation set forth in this Section 2.05(a) and determined that the issuance of the GrowCo Common Shares in accordance with such Optional Exchange is permitted under this Section 2.05(a).

(b) By written notice to TRC 20150630, any Holder may waive the provisions of Section 2.05(a) or may increase the Maximum Percentage to any other percentage specified in such notice, but any such waiver or increase will not be effective until the sixty-first day after such notice is delivered to TRC 20150630 and will apply only to such Holder and not to any other Holder. Notwithstanding any other provision hereof, this Section 2.05 may not be amended as to a Holder without the written consent of such Holder.

(c) For purposes of this Section 2.05, in determining the number of outstanding GrowCo Common Shares, a Holder may rely on the number of outstanding GrowCo Common Shares as reflected

in (i) GrowCo's most recent Form 10-Q, Form 10-K or other public filing with the Securities and Exchange Commission, (ii) a more recent public announcement by GrowCo, or (iii) any other notice by GrowCo (or the transfer agent for GrowCo Common Shares) setting forth the number of GrowCo Common Shares outstanding. Upon the written request of any Holder, GrowCo shall promptly, but in no event later than one Business Day following the receipt of such notice, confirm in writing to such Holder the number of GrowCo Common Shares then outstanding.

## ARTICLE III
## MISCELLANEOUS

Section 3.01. **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (c) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 3.01):

| | |
|---|---|
| If to TRC 20150630 or GrowCo: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Facsimile: (303) 845-9400<br>E-mail: info@2riverswater.com<br>Attention: Chief Financial Officer |
| with a copy to: | K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts 02111-2950<br>Facsimile: (617) 261-3175<br>E-mail: mark.johnson@klgates.com<br>Attention: Mark L. Johnson |

If to a Holder, to the mailing address thereof set forth on Schedule 1.

Section 3.02. **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 3.03. **Entire Agreement**. This Agreement (including the Schedule hereto) and the LLC Agreement (including the Exhibit and Schedule thereto) constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 3.04. **Additional Holders.** A Holder has the right to Transfer TRC 20150630 Common Units in accordance with the LLC Agreement. Any Transferee of TRC 20150630 Common Units from a Holder may elect to become a party to this Agreement by executing and delivering a Joinder Agreement and, in such event, shall thereafter be deemed a Holder and Party for all purposes of this Agreement. In connection with the delivery of any such Joinder Agreement, TRC 20150630 shall amend and restate SCHEDULE 1 to reflect the related Transfer.

Section 3.05. **Successors and Assigns.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

Section 3.06. **Amendments and Waivers.** No provision of this Agreement may be amended or waived except by an instrument in writing executed by (a) TRC 20150630, (b) GrowCo and (c) Holders of two-thirds of the total number of TRC 20150630 Common Units then held by all Holders. Any such written amendment or waiver shall be binding upon TRC 20150630, GrowCo and each Holder, *provided* that (i) an amendment or waiver altering the rights or obligations of any Holders with respect to their holdings of GrowCo TRC 20150630 Warrants shall be effective only with the consent of Holders of two-thirds of the total number of GrowCo TRC 20150630 Warrants then held by all Holders and (ii) an amendment or waiver altering the rights or obligations of any Holder in a manner that is disproportionately adverse to such Holder relative to the rights of other Holders, as the case may be, shall be effective only with the consent of that Holder. For the avoidance of doubt, nothing contained in this Section 3.06 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 3.09(b).

Section 3.07. **Governing Law.** This Agreement shall be governed by the internal law of the State of Colorado.

Section 3.08. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g.*, *www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

Section 3.09. **Dispute Resolution.**

(a) The Parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Colorado and to the jurisdiction of the United States District Court for the State of Colorado for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Colorado or the United States District Court for the District of Colorado, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b) WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE

SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c) Each Party will bear its own costs in respect of any disputes arising under this Agreement. Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**TR CAP 20150630 DISTRIBUTION, LLC**

By: ______________________
Wayne Harding
Chief Financial Officer

**GROWCO, INC.**

By: ______________________
Wayne Harding
Chief Financial Officer

*[For Holders that are entities:]*

SAN GABRIEL Benefit Plan Justin Yeake
Print or Type Name of Holder

By: ______________________
Name: Justin Yeake
Title: Manager

*[For Holders who are individuals:]*

______________________
Signature

WAYNE HARDING IRA
Print or Type Name

EXHIBIT A

# JOINDER AGREEMENT TO EXCHANGE AGREEMENT

Reference is hereby made to the Exchange Agreement dated as of November 18, 2015, as it may be amended from time to time (the "**Agreement**"), among TR Cap 20150630 Distribution, LLC, GrowCo, Inc. and the Holders Named in SCHEDULE 1. Pursuant to and in accordance with Section 3.04 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by each of the undersigned, TR Cap 20150630 Distribution, LLC and GrowCo, Inc., the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed a "Holder" and "Party" for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, email or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: 4/5/2016

By: [signature]
Name: Justin Yoder
Title: manag.
San Gabriel Benefit Plan fbo Justin Yoder.

Agreed and Accepted:

**TR CAP 20150630 DISTRIBUTION, LLC**

By: [signature]
Name: Wayne Harding
Title: CFO

**GROWCO, INC.**

By: [signature]
Name: Wayne Harding
Title: CFO

# REGISTRATION RIGHTS AGREEMENT

between

GROWCO, INC.

and

SEVERAL HOLDERS NAMED IN SCHEDULE A

Dated as of November 18, 2015

## TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Form S-1 | 3 |
| 3. | Form S-1 Indemnification | 6 |
| 4. | Form 10 | 8 |
| 5. | Transfer Limitations | 9 |
| 6. | Registration Expenses | 9 |
| 7. | Miscellaneous | 10 |

SCHEDULE A. Schedule of Holders

EXHIBIT 1. Form of Joinder Agreement
EXHIBIT 2. Form of Selling Stockholder Questionnaire

THIS REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is entered into as of November 18, 2015 between GrowCo, Inc., a Colorado corporation ("**GrowCo**"), and the several equity holders named in SCHEDULE A (collectively the "**Holders**"), including persons who become Holders hereunder from time to time after the date hereof by completing and executing joinder agreements hereto in the form attached as EXHIBIT 1 ("**Joinder Agreements**").

Pursuant to TR Capital Partners, LLC June 30, 2015 distribution as declared by the TR Capital Partners, LLC Board of Manager, GrowCo has agreed to provide the Holders with certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "**Securities Act**"), and applicable state securities laws.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GrowCo and the several Holders (collectively, the "**Parties**") hereby agree as follows:

1. **Definitions**. As used in this Agreement, the following terms shall have the following meanings:

(a) "**Advice**" shall have the meaning set forth in Section 7(d).

(b) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(c) "**Common Stock**" means GrowCo's common stock, with $.001 par value.

(d) "**Covered Securities**" means, with respect to each Selling Stockholder, the Registrable Securities that such Selling Stockholder has requested, in its Selling Stockholder Questionnaire, be registered for resale pursuant to the Form S-1, *provided* that the Selling Stockholder's Covered Securities may not exceed one-third of the number of Registrable Securities originally purchased by such Selling Stockholder pursuant to the Purchase Agreement.

(e) "**Effective Date**" means the time and date, if any, that the Form S-1 is declared effective by the SEC.

(f) "**Effectiveness Period**" means the period, if any, commencing as of the Effective Date and ending as of 3 p.m., Mountain time, on June 30, 2016.

(g) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(h) "**Exchange Agreement**" means the Exchange Agreement dated as of November 18, 2015 between GrowCo and the Holders named from time to time in Schedule 1 thereto.

(i) "**Form 10**" means the registration statement on Form 10 (or such other form as may be appropriate in accordance with SEC Guidance), if any, required to be filed pursuant to Section 4 with respect to Common Stock, including amendments and exhibits thereto.

(j) "**Form S-1**" means the registration statement on Form S-1 required to be filed pursuant to Section 2 with respect to Covered Securities, including the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, and exhibits thereto.

(k) "**Indemnified Party**" shall have the meaning set forth in Section 3(c).

(l) "**Indemnifying Party**" shall have the meaning set forth in Section 3(c).

(m) "**Losses**" shall have the meaning set forth in Section 3(a).

(n) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization or a government or any department or agency thereof.

(o) "**Proceeding**" means an action, claim, suit, investigation or proceeding (including without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

(p) "**Prospectus**" means the prospectus included in the Form S-1, as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of the Covered Securities, and all other amendments and supplements to the Prospectus, including post-effective amendments.

(q) "**Registrable Securities**" means, as of any date of determination, (i) shares of Common Stock acquired pursuant to the Exchange Agreement and (ii) any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event with respect to such shares; *provided* that any such Registrable Securities shall cease to be Registrable Securities if such Registrable Securities have been disposed of by the Holder in accordance with the effective Registration Statement.

(r) "**Rule 144**" means Rule 144 promulgated by the SEC pursuant to the Securities Act, as such Rule may be amended from time to time.

(s) "**Rule 424**" means Rule 424 promulgated by the SEC pursuant to the Securities Act, as such Rule may be amended from time to time.

(t) "**SEC**" means the U.S. Securities and Exchange Commission.

(u) "**SEC Guidance**" means (i) any publicly available written or oral guidance of the SEC staff, or any comments, requirements or requests of the SEC staff and (ii) the Securities Act.

(v) "**Selling Stockholder Questionnaire**" shall mean a selling stockholder notice and questionnaire in the form attached to this Agreement as EXHIBIT 2.

(w) "**Selling Stockholders**" means all of the Holders, excluding any Holder that has directed GrowCo in writing not to include any Registrable Securities for resale pursuant to the Form S-1.

2. **Form S-1.** GrowCo shall use commercially reasonable efforts to prepare and file with the SEC on or prior to April 15, 2016 the Form S-1 covering the resale of all Covered Securities in an offering to be made on a continuous basis. Subject to the terms of this Agreement, GrowCo shall use commercially reasonable efforts to (x) cause the Form S-1 to be declared effective under the Securities Act as promptly as possible after the filing thereof and (y) keep the Form S-1 continuously effective under the Securities Act throughout the Effectiveness Period. GrowCo shall, by 7:30 a.m., Mountain time, on the Business Day after the Effective Date, notify the Selling Stockholders via email of the effectiveness of the Form S-1 and file the Prospectus with the SEC in accordance with Rule 424. In connection with the foregoing registration obligations:

(a) GrowCo shall, not less than five Business Days prior to the filing of the Form S-1 and not less than two Business Days prior to the filing of any amendment to the Form S-1 or of the Prospectus or any amendment or supplement thereto, (i) furnish to each Selling Stockholder copies of all such documents proposed to be filed, which documents will be subject to the review of the Selling Stockholders, and (ii) cause its officers and directors, after consulting with GrowCo's counsel and independent registered public accountants to the extent they deem appropriate, to respond to such inquiries as shall be necessary, in the reasonable opinion of respective counsel to each Selling Stockholder, to conduct a reasonable investigation within the meaning of the Securities Act. GrowCo shall not file the Form S-1 or any amendment thereto or the Prospectus or any amendment or supplement thereto to which Selling Stockholders owning a majority of the total number of Covered Securities shall reasonably object in good faith, *provided* that GrowCo is notified of such objection in writing no later than three Business Days after the Selling Stockholders have been so furnished copies of a Registration Statement or one Business Day after the Selling Stockholders have been so furnished copies of any amendment to the Form S-1 or of the Prospectus or any amendment or supplement thereto. Each Selling Stockholder agrees to furnish to GrowCo, within two Business Days following GrowCo's written request, a completed Selling Stockholder Questionnaire or an update to a previously delivered Selling Stockholder Questionnaire.

(b) GrowCo shall: (i) prepare and file with the SEC such amendments, including post-effective amendments, to the Form S-1 as may be necessary to keep the Form S-1 continuously effective as to the Covered Securities for the Effectiveness Period; (ii) cause the Prospectus to be amended or supplemented as required (subject to the terms of this Agreement) and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the SEC with respect to the Form S-1 or any amendment thereto; and (iv) comply in all material respects with the applicable provisions of the Securities Act with respect to the disposition of all Covered Securities during the Effectiveness Period in accordance (subject to the terms of this Agreement) with the intended methods of disposition by the Selling Stockholders thereof set forth in the Form S-1 as so amended or in the Prospectus as so amended or supplemented.

(c) GrowCo shall notify the Selling Stockholders (which notice shall, with respect to clauses (iii) through (vi) below, be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made) as promptly as reasonably possible, of:

(i) the receipt by GrowCo of any written comments from the SEC on the Form S-1 or of any request by the SEC or any other federal or state governmental authority for amendments or supplements to the Form S-1 or Prospectus or for additional information;

(ii) the effectiveness of any post-effective amendment to the Form S-1;

(iii) the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the Form S-1 covering any or all of the Covered Securities or the initiation of any Proceedings for that purpose;

(iv) the receipt by GrowCo of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Covered Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose;

(v) the occurrence of any event or passage of time that makes the financial statements included in the Form S-1 ineligible for inclusion therein or any statement made in

the Form S-1 or the Prospectus untrue in any material respect or that requires any revisions to the Form S-1, the Prospectus or other documents so that the Form S-1 or the Prospectus, as the case may be, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(vi) the occurrence or existence of any pending corporate development with respect to GrowCo that GrowCo believes may be material and that, in the determination of GrowCo, makes it not in the best interest of GrowCo to allow continued availability of the Form S-1 or the Prospectus, *provided* that any and all of such information shall remain confidential to each Selling Stockholder until such information otherwise becomes public, unless disclosure by a Selling Stockholder is required by law and *provided, further*, that notwithstanding each Selling Stockholder's agreement to keep such information confidential, each such Selling Stockholder makes no acknowledgement that any such information is material, non-public information.

(d) GrowCo shall use commercially reasonable efforts to avoid the issuance of, or, if issued, promptly obtain the withdrawal of (i) any order stopping or suspending the effectiveness of the Form S-1, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Covered Securities for sale in any jurisdiction.

(e) Subject to the terms of this Agreement, GrowCo hereby consents to the use of the Prospectus and each amendment or supplement thereto by each of the Selling Stockholders in connection with the offering and sale of the Covered Securities, except after the giving of any notice pursuant to Section 2(c).

(f) Prior to any resale of Covered Securities by a Selling Stockholder, GrowCo shall use its commercially reasonable efforts to (i) register or qualify or cooperate with such Selling Stockholder in connection with the registration or qualification (or exemption from the registration or qualification) of such Covered Securities for resale by such Selling Stockholder under the securities or "blue sky" laws of such jurisdictions within the United States as such Selling Stockholder reasonably requests in writing, (ii) keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period, and (iii) do any and all other acts or things reasonably necessary to enable the disposition in such jurisdictions of the Covered Securities; *provided* that GrowCo shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified, subject GrowCo to any tax in any such jurisdiction where it is not then so subject, or file a general consent to service of process in any such jurisdiction.

(g) If requested by a Selling Stockholder, GrowCo shall cooperate with such Selling Stockholder to (i) facilitate the timely preparation and delivery of certificates representing Covered Securities to be delivered to a transferee pursuant to the Form S-1, which certificates shall be free, to the extent permitted by SEC Guidance, of all restrictive legends, and (ii) enable such Covered Securities to be in such denominations and registered in such names as such Selling Stockholder may request.

(h) Upon the occurrence of any event contemplated by Section 2(c), as promptly as reasonably possible under the circumstances taking into account GrowCo's good faith assessment of any adverse consequences to GrowCo and its stockholders of the premature disclosure of such event, prepare a supplement or amendment, including a post-effective amendment, to the Form S-1 or a supplement to the Prospectus, and file any other required document so that, as thereafter delivered, neither the Form S-1

nor the Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If GrowCo notifies the Selling Stockholders in accordance with clauses (iii) through (vi) of Section 2(c) to suspend the use of the Prospectus until the requisite changes to such Prospectus have been made, then the Selling Stockholders shall suspend use of such Prospectus. GrowCo will use commercially reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable. GrowCo shall be entitled to exercise its right under this Section 2(h) to suspend the availability of the Form S-1 and the Prospectus for a period not to exceed 60 calendar days (which need not be consecutive days).

(i) In connection with the preparation, filing and amendment of the Form S-1, GrowCo shall use commercially reasonable efforts to (A) prepare and file with the SEC a registration statement on Form 8-A (or such other form as is appropriate under SEC Guidance), (ii) cause such registration statement to be declared effective by the SEC as of the Effective Date, and (iii) during the Effectiveness Period, timely file with the SEC all periodic and current reports required under the Exchange Act.

(j) Notwithstanding any reference herein to the "filing" of the Form S-1 or any amendment thereto, GrowCo may, in its reasonable judgment, elect to effect such action by a confidential submission, rather than a filing publicly available on the EDGAR system.

3. **Form S-1 Indemnification.**

(a) **Indemnification by GrowCo.** GrowCo shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Selling Stockholder, the officers, directors, members, partners, agents, brokers (including brokers who offer and sell Covered Securities as principal as a result of a pledge or any failure to perform under a margin call of Common Stock), investment advisors and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each of them, each Person who controls any Selling Stockholder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, members, stockholders, partners, agents and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including reasonable attorneys' fees) and expenses (collectively, "**Losses**"), as incurred, arising out of or relating to (i) any untrue or alleged untrue statement of a material fact contained in the Form S-1, the Prospectus or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading or (ii) any violation or alleged violation by GrowCo of the Securities Act, the Exchange Act or any state securities law, or any rule or regulation thereunder, in connection with the performance of its obligations under Section 2, except to the extent, but only to the extent, that (A) such untrue statements or omissions are based solely upon information regarding a Selling Stockholder furnished in writing to GrowCo by such Selling Stockholder expressly for use therein, or to the extent that such information relates to a Selling Stockholder or such Selling Stockholder's proposed method of distribution of Covered Securities and was reviewed and expressly approved in writing by such Selling Stockholder expressly for use in the Form S-1, the Prospectus, or in any amendment or supplement thereto or (B) in the case of an occurrence of an event of the type specified in clauses (iii) through (vi) of Section 2(c), the use by such Selling Stockholder of an outdated, defective or otherwise unavailable Prospectus after GrowCo has notified such Selling Stockholder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Selling Stockholder and prior to the receipt by such Selling Stockholder of the Advice contemplated in Section 7(d). GrowCo shall notify the Selling Stockholders promptly of the

institution, threat or assertion of any Proceeding arising from or in connection with the transactions contemplated by Section 2 of which GrowCo becomes aware.

(b) **Indemnification by Selling Stockholders.** Each Selling Stockholder shall jointly indemnify and hold harmless GrowCo, its directors, officers, agents and employees, each Person who controls GrowCo (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, to the extent arising out of or based upon: (i) such Selling Stockholder's failure to comply with the prospectus delivery requirements of the Securities Act; (ii) any untrue or alleged untrue statement of a material fact contained in the Form S-1, the Prospectus, or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading (A) to the extent, but only to the extent, that such untrue statement or omission is contained in any information so furnished in writing by such Selling Stockholder to GrowCo specifically for inclusion in such Registration Statement or such Prospectus or (B) to the extent that such information relates to such Selling Stockholder's proposed method of distribution of Covered Securities and was reviewed and expressly approved in writing by such Selling Stockholder expressly for use in the Form S-1, the Prospectus or in any amendment or supplement thereto; or (iii) in the case of an occurrence of an event of the type specified in clauses (iii) through (vi) of Section 2(c), the use by such Selling Stockholder of an outdated, defective or otherwise unavailable Prospectus after GrowCo has notified such Selling Stockholder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Selling Stockholder and prior to the receipt by such Selling Stockholder of the Advice contemplated in Section 7(d).

(c) **Conduct of Indemnification Proceedings.**

(i) If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "**Indemnified Party**"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "**Indemnifying Party**") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; *provided* that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have prejudiced the Indemnifying Party.

(ii) An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (A) the Indemnifying Party has agreed in writing to pay such fees and expenses, (B) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding, or (C) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and counsel to the Indemnified Party shall reasonably believe that a material conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and the reasonable fees and expenses of no more than one separate counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its

written consent, which consent shall not be unreasonably withheld or delayed. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

(iii) Subject to the terms of this Agreement, all reasonable fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 3) shall be paid to the Indemnified Party, as incurred, within ten Business Days of written notice thereof to the Indemnifying Party; *provided* that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is judicially determined not to be entitled to indemnification hereunder.

(d) **Contribution**.

(i) If the indemnification under Section 3(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in this Agreement, any reasonable attorneys' or other fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section 3 was available to such party in accordance with its terms.

(ii) The Parties agree that it would not be just and equitable if contribution pursuant to this Section 3(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph.

(e) **Remedies Not Exclusive**. The indemnity and contribution agreements contained in this Section 4 are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

4. **Form 10**. In the event that, for any reason, as of June 30, 2016 the Common Stock is not the subject of an effective registration statement on Form 8-A (or other form) filed by GrowCo with the SEC in connection with the filing of the Form S-1, GrowCo shall use commercially reasonable efforts to prepare and file the Form 10 with the SEC on March 14, 2016 in order to register the Common Stock under Section 12(b) or (g) of the Exchange Act and shall withdraw the Form S-1 from filing under the Securities Act. Subject to the terms of this Agreement, GrowCo shall use commercially reasonable efforts to cause the Form 10 filed hereunder to be declared effective under the Exchange Act as promptly as possible after the filing thereof. GrowCo shall notify the Holders via email of the effectiveness of the

Form 10 within one Business Day of the date on which the Form 10 becomes effective. In connection with GrowCo's registration obligations under this Section 4, GrowCo shall: (i) prepare and file with the SEC such amendments to the Form 10 as may be necessary or desirable in connection with the effectiveness of the Form 10; (ii) respond as promptly as reasonably possible to any comments received from the SEC with respect to the Form 10 or any amendment thereto; (iii) if necessary or desirable, withdraw the Form 10 and promptly file a successor registration statement on Form 10 with respect to the Common Stock; and (iv) comply in all material respects with the applicable provisions of the Exchange Act with respect to the registration of the Common Stock under Section 12(b) or (g) of the Exchange Act.

5. **Transfer Limitations.**

(a) **Volume Restrictions**. Notwithstanding any other provision of this Agreement, the Purchase Agreement or the Exchange Agreement, each Holder hereby agrees that it will not, during any calendar quarter commencing with the quarter ending June 30, 2016 and ending with the quarter ending June 30, 2017, sell or otherwise transfer more than 20% of the total number of shares of Common Stock that have been issued by GrowCo to such Holder pursuant to the Exchange Agreement from time to time prior to the time of such transfer. No early release of any Holder from the foregoing limitation may be effected without each other Holder being granted an early release on the same terms and with respect to the same percentage of shares of Common Stock held by such other Holder from its obligations under the foregoing limitation.

(b) **Agreement to Lock-Up**. Each Holder hereby agrees that it will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to the first underwritten public offering of Common Stock and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days, except that, to the extent requested by the lead managing underwriter(s) to accommodate regulatory restrictions of the Financial Industry Regulatory Authority or any applicable securities exchange relating to the publication or other distribution of research reports or analyst recommendations and opinions, such period may be extended to a total of 215 days), (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo held immediately prior to the effectiveness of the registration statement for such public offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such capital stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock or other securities, in cash or otherwise. The foregoing provisions of this Section 5(b) shall not apply to the sale of any shares to an underwriter in such public offering, and shall only be applicable to the Holder if all directors of GrowCo (other than a director designated by the Holder or its affiliates) enter into similar arrangements. The underwriters in connection with such public offering are intended third party beneficiaries of this Section 5(b) and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees, if requested by the underwriters of such public offering, to execute an agreement that is consistent with this Section 5(b) or that is necessary to give further effect to this Section 5(b).

(c) **Stop Transfer Instructions**. In order to enforce the covenants set forth in this Section 5, GrowCo may impose stop-transfer instructions with respect to the shares of Common Stock held by the Holders (and transferees and assignees thereof) until, in the case of Section 5(a), March 31, 2017 and until, in the case of Section 5(b), the end of the restricted period referenced therein.

6. **Registration Expenses**. All fees and expenses incident to the performance of, or compliance with, this Agreement by GrowCo shall be borne by GrowCo whether or not any Covered Securities are

sold pursuant to the Form S-1. The fees and expenses referred to in the foregoing sentence shall include (a) all registration and filing fees with respect to filings made with the SEC or in compliance with applicable state securities or "blue sky" laws reasonably agreed to by GrowCo in writing, (b) fees and disbursements of counsel for GrowCo, including fees and expenses with respect to filings made with the SEC and in connection with "blue sky" qualifications or exemptions of the Covered Securities or the Common Stock as a class, (c) fees and expenses of GrowCo's independent registered public accountants, including fees and expenses with respect to filings made with the SEC and in connection with any review or audit of GrowCo's financial statements, and (d) fees and expenses of all other Persons retained by GrowCo in connection with the consummation of the transactions contemplated by this Agreement. In no event shall GrowCo be responsible for any broker or similar commissions of any Selling Stockholder or any legal fees or other costs of the Selling Stockholders.

7. **Miscellaneous.**

(a) **Remedies.** In the event of a breach by the Parties of any of their respective obligations under this Agreement, each Party, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. Each Party hereto agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall not assert or shall waive the defense that a remedy at law would be adequate. Each Holder agrees that GrowCo shall not be liable to such Holder for any failure of the Form S-1 or Form 10 to become effective as of any particular time or at all, except to the extent such failure results directly from a material breach or material violation by GrowCo of any express provision of this Agreement.

(b) **No Piggyback on Registrations; Limitation on Filing Other Registration Statements.** Neither GrowCo nor any of its security holders may include securities of GrowCo in any registration statement filed by GrowCo with the SEC, other than the inclusion of the Covered Securities in the Form S-1. GrowCo shall not file any other registration statement with the SEC until all Covered Securities have been registered pursuant to the Form S-1 and the Form S-1 has been declared effective by the SEC.

(c) **Compliance.** Each Selling Stockholder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Covered Securities pursuant to the Form S-1.

(d) **Discontinued Disposition.** Each Selling Stockholder agrees that, upon receipt of a notice from GrowCo of the occurrence of any event of the kind described in clauses (iii) through (vi) of Section 2(c), such Selling Stockholder will forthwith discontinue disposition of Covered Securities under the Form S-1 until it is advised in writing (the "**Advice**") by GrowCo that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. GrowCo will use commercially reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable.

(e) **No Inconsistent Agreements.** GrowCo has not entered, as of the date hereof, and shall not enter, on or after the date of this Agreement, into any agreement with respect to its securities that would have the effect of impairing the rights granted to the Selling Stockholders in this Agreement or otherwise conflict with the provisions hereof.

(f) **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the Party to be notified; (ii) when sent by confirmed email if sent during normal business

hours of the recipient or, if not, then on the next Business Day; (iii) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 8(f)):

| | |
|---|---|
| If to GrowCo: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Email: info@2riverswater.com<br>Attention: Chief Financial Officer |
| If to a Holder: | To the mailing address thereof set forth on the signature page hereof or on such Holder's Joinder Agreement, as the case may be. |

(g) **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(h) **Entire Agreement**. This Agreement (including the Schedule and Exhibits hereto) and the Purchase Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(i) **Interpretation**. For purposes of this Agreement:

(i) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(ii) any references herein to a Section, Schedule or Exhibit refer to a Section of, or Schedule or Exhibit attached to, this Agreement, unless specified otherwise;

(iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(iv) the words "include," "included" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(v) the word "or" is not exclusive;

(vi) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(vii) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(viii) unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(ix) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

(j) **Successors and Assigns.** This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the Parties. GrowCo may not assign (except by merger) its rights or obligations hereunder without the prior written consent of Holders of a majority of the then-outstanding Registrable Securities. No Selling Stockholder may assign its rights hereunder without the prior written consent of GrowCo.

(k) **Amendments and Waivers.** The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by GrowCo and the Holders of a majority of the then-outstanding Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of a Holder or some Holders (including Selling Stockholders) and that does not directly or indirectly affect the rights of other Holders may be given by such Holder or Holders of a majority of the Registrable Securities to which such waiver relates; *provided, however,* that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the first sentence of this Section 7(k).

(l) **Governing Law.** This Agreement shall be governed by the internal law of the State of Colorado.

(m) **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g., www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

(n) **Dispute Resolution.**

(i) The Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement or the transactions contemplated hereby, shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the Parties irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any

such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address for purposes of Section 7(f) shall be effective service of process for any suit, action or other proceeding brought in any such court.

(ii) WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION 7(n)(ii) HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(iii) Each Party shall bear its own costs in respect of any disputes arising under this Agreement. Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

(o) **Independent Nature of Holders' Obligations and Rights**. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder hereunder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder hereunder. Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert with respect to such obligations or the transactions contemplated by this Agreement. Each Holder shall be entitled to protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Holder to be joined as an additional Party in any proceeding for such purpose.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**GROWCO, INC.**

By: [signature]
Wayne Harding, Chief Financial Officer

*[For Holders that are entities:]*

______________________
Print or Type Name of Holder

By: ______________________
Name: ______________________
Title: ______________________

*Address:*

______________________
______________________
______________________

Email: ______________________

*[For Holders who are individuals:]*

[signature]
Signature

WAYNE HARDING IRA
Print or Type Name of Holder

*Address:*

2000 S Colo Blvd #1-3100
Denver CO 80222
______________________

Email: wayne@karaway.com

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

GROWCO, INC.

By: [signature]
Wayne Harding, Chief Financial Officer

*[For Holders that are entities:]*

San Gabriel Def Ben Plan Justin Yorke
Print or Type Name of Holder

By: [signature]
Name: Justin Yorke
Title: Manager

*Address:*

4 Richland Place
Pasadena, CA 91103

Email: justin@mcgrainfinancial.com

*[For Holders who are individuals:]*

[signature]
Signature

Wayne Harding IRA
Print or Type Name of Holder

*Address:*

200 S Colo Blvd #1-310
Denver CO 80222

Email: [illegible]@karaway.com

SIGNATURE PAGE TO REGISTRATION RIGHTS AGREEMENT

# JOINDER TO REGISTRATION RIGHTS AGREEMENT

Reference is hereby made to the Registration Rights Agreement, dated as of November 18, 2015, as amended from time to time (the "**Agreement**"), by and among GrowCo, Inc., a Colorado company ("**GrowCo**"), and the several Holders named in SCHEDULE A thereto.

Pursuant to the terms of the Agreement, the undersigned hereby acknowledges that it has received and reviewed a copy of the Agreement and agrees that, upon execution of this Joinder Agreement, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto, and shall be deemed to be an Investor for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder Agreement as of 4-6, 2016.

Justin Yorke
(Print Name)

By: [signature]
Name: San Gabriel Defined Benefit Justin Yorke
Title: Manager

Address:
4 Richland Place
Pasadena, CA 91103

Email: justin@mcgrainfinancial.com

*Accepted and confirmed as of the date above:*

GROWCO, INC.

By: [signature]
Title: Wayne Harding
Chief Financial Officer

Transfer Restrictions on Reverse Side Hereof

STATE OF COLORADO

# GROWCO PARTNERS 1, LLC

## Preferred Units

FULLY PAID

NONASSESSABLE

Number: GCP1-0127

Units: 1,639

*This Certifies that* San Gabriel Benefit Plan fbo Justin Yorke is the registered holder of 1,639 (one thousand six hundred thirty nine and no/100) Preferred Units of GrowCo Partners 1, LLC, transferable only on the books of GrowCo Partners 1, LLC by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

*In Witness Whereof,* GrowCo Partners 1, LLC has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed as of this 2nd day of June, 2015.

John R. McKowen
President

SEAL COLORADO 2014

Wayne Harding
Chief Financial Officer

**THIS WARRANT AND THE UNDERLYING SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.**

# GROWCO, INC.

## COMMON STOCK PURCHASE WARRANT

**Certificate No. OU-0127** **Original Issue Date: June 2, 2015**

THIS COMMON STOCK PURCHASE WARRANT (this "**Warrant**") certifies that, for value received, San Gabriel Benefit Plan fbo Justin Yorke or its registered assigns (the "**Holder**"), having an address at 4 Richland Place, Pasadena CA 91103 is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time prior to the Expiration Time (as defined hereinafter), to subscribe for and purchase from GrowCo, Inc. ("**GrowCo**"), a Colorado corporation having its principal office at 2000 Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, facsimile: (303) 845-9400, email: info@2riverswater.com (such address, or such other address as GrowCo may from time to time designate by notice in writing to the Holder, being referred to as the "**Principal Office**"), up to one thousand six hundred thirty nine (1,639) shares (the "**Warrant Shares**") of GrowCo's common stock, without par value ("**Common Shares**"), at a price of $1.00 per Warrant Share (as may be adjusted in accordance with Section 3, the "**Purchase Price**"). This Warrant is one of a series of Common Stock Purchase Warrants identified by certificate numbers designated "OU" (collectively, the "**OU Warrants**").

**1. Definitions.** As used herein, the following terms shall have the indicated meanings:

(a) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(b) "**Expiration Time**" shall mean the earlier of (a) 5 p.m., Mountain standard time, on December 31, 2019 and (b) immediately prior to the closing of a Qualified IPO.

(c) "**Person**" shall mean an individual or a corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity.

(d) "**Qualified IPO**" shall mean a firm-commitment underwritten public offering of Common Shares pursuant to a registration statement filed by GrowCo under the Securities Act with gross proceeds to GrowCo and selling stockholders of not less than $30,000,000.

(e) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**2. Exercise.**

(a) **Manner of Exercise**. The rights represented by this Warrant may be exercised in whole or in part at any time prior to the Expiration Time by delivery of the following to GrowCo at the Principal Office: (i) an executed Notice of Exercise in the form attached hereto; (ii) payment of the Purchase Price in cash by wire transfer or check; and (iii) this Warrant. Upon the Holder's exercise of the rights represented by this Warrant, a certificate for the Warrant Shares so purchased, registered in the name of the Holder or a Person affiliated with the Holder, if the Holder so designates, shall be issued and delivered

to the Holder or such Person within a reasonable time after the rights represented by this Warrant shall have been so exercised. The Person in whose name any certificate for Warrant Shares is to be issued upon exercise of this Warrant shall be deemed to have become the holder of record of such Warrant Shares on the date on which this Warrant was surrendered and payment of the Purchase Price was made, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such surrender and payment is a date when the stock transfer books of GrowCo are closed, such Person shall be deemed to have become the holder of record of such Warrant Shares at the close of business on the next succeeding date on which the stock transfer books are open. If this Warrant is exercised in part, GrowCo shall, at the time of delivery of the certificate representing the purchased Warrant Shares, deliver to the Holder a new OU Warrant that evidences the rights of the Holder to purchase the remaining Warrant Shares represented by this Warrant and that bears a new certificate number, but that otherwise is identical with this Warrant.

(b) **No Fractional Warrant Shares**. No fractional shares shall be issued upon the exercise of this Warrant. As to any fraction of a Common Share that the Holder would otherwise be entitled to purchase upon an exercise, GrowCo shall instead pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Purchase Price.

(c) **Legends**. The Holder understands and agrees that any certificates evidencing Warrant Shares may bear a legend substantially in the following form:

> "THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SHARES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED."

(d) **Charges, Taxes and Expenses**. Issuance of certificates for Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by GrowCo; *provided* that in the event certificates for Warrant Shares are to be issued in a name other than the name of the Holder, GrowCo may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto.

## 3. Adjustments of Purchase Price and Exercisability.

(a) **Stock Dividends, Distributions, Subdivisions and Combinations**. If GrowCo shall: (i) pay a stock dividend or otherwise make a distribution or distributions on Common Shares in Common Shares, (ii) subdivide outstanding Common Shares into a larger number of shares, or (iii) combine (including by way of reverse stock split) outstanding Common Shares into a smaller number of shares, then (A) the Purchase Price shall be multiplied by a fraction of which the numerator shall be the number of Common Shares outstanding before such event and of which the denominator shall be the number of Common Shares outstanding after such event and (B) the number of shares issuable upon exercise of this Warrant, shall be proportionately adjusted such that the aggregate Purchase Price shall remain unchanged. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such a dividend or distribution or, in the case of such a subdivision, combination or reclassification, immediately after the effective date.

(b) **Subsequent Rights Offerings**. If GrowCo shall issue rights, options or warrants to all holders of Common Shares (and not to the Holder as such) entitling them to subscribe for or purchase Common Shares at a price per share less than the closing price of Common Shares on the record date for

the determination of stockholders entitled to receive such rights, options or warrants, then the Purchase Price shall be multiplied by a fraction, of which (i) the numerator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of shares that the aggregate offering price of the total number of shares so offered (assuming receipt by GrowCo in full of all consideration payable upon exercise of such rights, options or warrants) would purchase at such closing price and (ii) the denominator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of additional Common Shares offered for subscription or purchase. Such adjustment shall be made whenever such rights, options or warrants are issued, and shall become effective immediately after the record date for the determination of stockholders entitled to receive such rights, options or warrants.

(c) **Pro Rata Distributions**. If GrowCo shall distribute to all holders of Common Shares (and not to the Holder as such) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security other than Common Shares, then in each such case the Purchase Price shall be adjusted by multiplying the Purchase Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction, of which (i) the numerator shall be the closing price of Common Shares determined as of the record date mentioned above less the per share fair market value at such record date of the portion of such assets or evidence of indebtedness or rights or warrants so distributed applicable to one outstanding Common Share as determined by the Board of Directors in good faith and (ii) the denominator shall be such closing price of Common Shares determined as of such record date. In either case the adjustments shall be described in a statement provided to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one Common Share. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

(d) **Fundamental Transaction**. If (i) GrowCo, directly or indirectly, effects any merger or consolidation of GrowCo with or into another Person, (ii) GrowCo, directly or indirectly, effects any sale of all or substantially all of its assets in one or a series of related transactions, (iii) any tender offer or exchange offer (whether by GrowCo or another Person) is completed pursuant to which holders of Common Shares are permitted to tender or exchange their shares for other securities, cash or property, (iv) GrowCo effects any reclassification, reorganization or recapitalization of the Common Shares or any compulsory share exchange pursuant to which the Common Shares are effectively converted into or exchanged for other securities, cash or property, or (v) GrowCo, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires a majority of the outstanding Common Shares (not including any Common Shares held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (in any such case, a "**Fundamental Transaction**"), then upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Common Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one Common Share (the "**Alternate Consideration**"). For purposes of any such conversion, the determination of the Purchase Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one Common Share in such Fundamental Transaction, and GrowCo shall apportion the Purchase Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Shares are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as

to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to GrowCo or surviving entity in such Fundamental Transaction shall issue to the Holder a new warrant consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant for the Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 3(d) and ensuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(e) **Calculation and Notice of Adjustment to Purchase Price**. Whenever an adjustment to the Purchase Price or other terms of this Warrant is effected pursuant to this Section 3, GrowCo shall thereafter promptly mail to the Holder a notice setting forth the Purchase Price and other terms of such adjustment and setting forth a brief statement of the facts requiring such adjustment.

**4. Notices to Facilitate Exercise.**

(a) **Corporate Actions**. If (i) GrowCo shall declare a dividend (or any other distribution) on the Common Shares, (ii) GrowCo shall authorize the granting to all holders of Common Shares rights or warrants to subscribe for or purchase any shares of capital stock of any class, (iii) the approval of any stockholders of GrowCo shall be required in connection with any reclassification of the Common Shares, any consolidation or merger to which GrowCo is a party, any sale or transfer of all or substantially all of the assets of GrowCo, or any compulsory share exchange whereby the Common Shares shall be converted into other securities, cash or property, or (iv) GrowCo shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of GrowCo, then, in each case, GrowCo shall cause to be mailed to the Holder at the Holder's last address as it shall appear upon the books and records of GrowCo, at least ten Business Days prior to the applicable record or effective date hereinafter specified, a notice stating (A) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of record of Common Shares to be entitled to such dividend, distribution, rights or warrants are to be determined or (B) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close and the date on which it is expected that holders of record of Common Shares will be entitled to exchange their Common Shares for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. To the extent the Holder would not otherwise be entitled to exercise this Warrant, the Holder is entitled to exercise this Warrant during the ten-Business Day period commencing as of the date of such notice to the effective date of the event triggering such notice.

(b) **Qualified IPO**. In the event of the occurrence of a Qualified IPO, GrowCo shall (i) by no later than five Business Days after the initial publicly available filing of a registration statement for a Qualified IPO, notify the Holder of GrowCo's intent to proceed with a Qualified IPO, (ii) by no later than two Business Days after the commencement of the road show presentations for a Qualified IPO, notify the Holder of the then-estimated closing date (or range of closing dates) for the Qualified IPO, and (iii) within one Business Day after the pricing of the Qualified IPO, notify the Holder of the expected closing date for the Qualified IPO.

**5. Representations of Holder.**

(a) **Acquisition of Warrant and Warrant Shares for Investment**. The Holder represents and warrants that it is acquiring this Warrant and any Warrant Shares solely for its account for investment

and not with a view to or for sale or distribution of this Warrant or such Warrant Shares or any part thereof.

(b) **Securities Not Registered.**

(i) Notwithstanding anything to the contrary contained herein, the Holder may not exercise this Warrant unless the Warrant Shares issuable upon such exercise are then registered under the Securities Act and registered or qualified under any applicable state securities laws or, if such Warrant Shares are not then so registered, GrowCo has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act and the registration and qualification requirements of any applicable state securities laws.

(ii) The Holder understands that the issuance of this Warrant and the Warrant Shares have not been registered under the Securities Act on the basis that no distribution or public offering of the stock of GrowCo is to be effected. The Holder realizes that the basis for the exemption may not be present if, notwithstanding its representations, the Holder has a present intention of acquiring the securities for a fixed or determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities.

(iii) The Holder recognizes that this Warrant and the Warrant Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. The Holder recognizes that GrowCo has no obligation to register this Warrant or the Warrant Shares under the Securities Act, or to comply with any exemption from such registration.

(iv) The Holder is aware that neither this Warrant nor the Warrant Shares may be sold pursuant to Rule 144 under the Securities Act unless certain conditions are met, including, among other things, the existence of a public market for the shares, the availability of certain current public information about GrowCo, the resale following the required holding period pursuant to Rule 144 under the Securities Act and the number of shares being sold during any three-month period not exceeding specified limitations. The Holder is aware that the conditions for resale set forth in Rule 144 under the Securities Act have not been satisfied and that GrowCo may not satisfy these conditions in the foreseeable future or at all.

**6. Lock-Up.**

(a) **Agreement to Lock-Up**. The Holder hereby agrees that the Holder will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to a Qualified IPO and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days, except that, to the extent requested by the lead managing underwriter(s) to accommodate regulatory restrictions of the Financial Industry Regulatory Authority or any applicable securities exchange relating to the publication or other distribution of research reports or analyst recommendations and opinions, such period may be extended to a total of 215 days), (a) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo held immediately prior to the effectiveness of the registration statement for the Qualified IPO or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such capital stock, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of capital stock or other securities, in cash or otherwise. The foregoing provisions of this Section 6(a) shall not apply to the sale of any shares to an underwriter in a Qualified IPO, and shall only be applicable to the Holder if all directors of GrowCo (other than a director designated by the Holder or its affiliates) enter

into similar arrangements. The underwriters in connection with the Qualified IPO are intended third-party beneficiaries of this Section 6 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees, if requested by the underwriters of the Qualified IPO, to execute an agreement that is consistent with this Section 6 or that is necessary to give further effect hereto.

(b) **Stop Transfer Instructions**. In order to enforce the foregoing covenant, GrowCo may impose stop-transfer instructions with respect to the shares of capital stock of GrowCo held by the Holder (and transferees and assignees thereof) until the end of such restricted period.

## 7. Transfer of Warrant.

(a) **Transfers**. The Holder understands that this Warrant and the Warrant Shares have not been registered under the Securities Act and that neither this Warrant nor any Warrant Shares may be offered for sale, sold, pledged or hypothecated in the absence of either (i) an effective registration statement as to this Warrant and/or such Warrant Shares under the Securities Act or (ii) an opinion of counsel satisfactory to GrowCo that such registration is not required. Subject in all respects to the foregoing, this Warrant and all rights hereunder are transferable, with respect to all or a portion of the Warrant Shares, upon surrender of this Warrant to GrowCo at the Principal Office, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by or on behalf of the Holder and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, GrowCo shall deliver (A) to each assignee, a new OU Warrant (with a new certificate number) in the name of such assignee that evidences the rights to purchase the number of Warrant Shares specified in such instrument of assignment to be assigned to such assignee and (B) to the Holder, a new OU Warrant (with a new certificate number) in the name of the Holder that evidences the number of Warrant Shares, if any, not assigned. Each OU Warrant so issued shall otherwise be identical to this Warrant.

(b) **OU Warrant Register**. GrowCo, or assigns, shall maintain the name and address of the Holder hereof from time to time in a register for the OU Warrants. GrowCo may deem and treat the Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof and for all other purposes, absent actual notice to the contrary.

## 8. Limitation on Exercises.

(a) **Limitation**. Notwithstanding anything to the contrary contained herein, the aggregate number of Warrant Shares issuable upon exercise of this Warrant shall be limited to the extent necessary to ensure that, following such exchange, the total number of Common Shares then beneficially owned by the Holder, its affiliates and any other Persons whose beneficial ownership of Common Shares would be aggregated with the Holder's for purposes of Section 13(d) of the Securities Exchange Act of 1934, as amended, does not exceed 9.999% (the "Maximum Percentage") of the total number of issued and outstanding Common Shares (including for such purpose issuable upon exercise of this Warrant). Each exercise of this Warrant will constitute a representation by the Holder that it has evaluated the limitation set forth in this Section 8(a) and determined that such exercise is permitted under this Section 8(a).

(b) **Waivers and Interpretation**. By written notice to GrowCo, the Holder may waive the provisions of Section 8(a) or may increase the Maximum Percentage to any other percentage specified in such notice, but any such waiver or increase will not be effective until the sixty-first day after such notice is delivered to GrowCo. For purposes of this Section 8, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended. For purposes of this Section 8, in determining the number of outstanding Common Shares, the Holder may rely on the number of outstanding the Common Shares as reflected in (i) GrowCo's most recent Form 10-Q, Form 10-K or

other public filing with the Securities and Exchange Commission, (ii) a more recent public announcement by GrowCo, or (iii) any other notice by GrowCo (or the transfer agent for GrowCo Warrant Shares) setting forth the number of Common Shares outstanding. Upon the written request of the Holder, GrowCo shall promptly, but in no even later than one Business Day following the receipt of such notice, confirm in writing to the Holder the number of Common Shares then outstanding.

**9. Acceptance**. Receipt of this Warrant by the Holder shall constitute acceptance of, and agreement to, all of the terms and conditions contained herein.

**10. Miscellaneous.**

(a) **No Rights as Stockholder Until Exercise**. This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of GrowCo prior to the exercise hereof.

(b) **Loss, Theft, Destruction or Mutilation of Warrant**. GrowCo covenants that upon its receipt of (i) evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, (ii) in case of loss, theft or destruction of this Warrant, indemnity or security reasonably satisfactory to GrowCo (which shall not include the posting of any bond), and (iii) if mutilated, this Warrant, GrowCo will deliver to the Holder a new OU Warrant that evidences the rights of the Holder to purchase the Warrant Shares then represented by this Warrant and that bears a new certificate number, that otherwise is identical with this Warrant.

(c) **Action on Business Days**. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

(d) **Authorized Warrant Shares**. GrowCo covenants that, during the period this Warrant is outstanding, it will reserve from its authorized and unissued Common Shares a sufficient number of Common Shares to provide for the issuance of the Warrant Shares upon the exercise of this Warrant. GrowCo further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for the Warrant Shares upon the exercise of this Warrant. GrowCo will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation or of any requirements of any securities exchange upon which the Common Shares may be listed. GrowCo covenants that all of the Warrant Shares will, upon exercise of this Warrant in accordance with the terms hereof, be duly authorized, validly issued, fully paid and non-assessable and free from all taxes, liens and charges created by GrowCo in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

(e) **Governing Law**. This Warrant shall be governed by the internal law of the State of Colorado.

(f) **Non-waiver**. No course of dealing or any delay or failure to exercise any right hereunder on the part of the Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies hereunder. If GrowCo willfully and knowingly fails to comply with any provision of this Warrant and such failure results in any material damages to the Holder, GrowCo shall pay to Holder such amounts as shall be sufficient to cover any costs and expenses, including reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in enforcing any of its rights, powers or remedies hereunder.

(g) **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (iii) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to GrowCo or the Holder at the address listed on the first page hereof or at such other address as GrowCo or the Holder, as the case may be, as shall be specified in a notice given in accordance with this Section 10(g).

(h) **Limitation of Liability**. No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the Purchase Price of any Common Shares or as a stockholder of GrowCo, whether such liability is asserted by GrowCo or by creditors of GrowCo.

(i) **Remedies**. The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Warrant to the extent permitted by law. GrowCo agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

(j) **Successors and Assigns**. This Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of GrowCo and, subject to compliance with applicable securities laws, the successors and permitted assigns of the Holder.

(k) **Amendment**. This Warrant may be modified or amended or the provisions hereof waived with the written consent of GrowCo and the Holder.

(l) **Severability**. Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

(m) **Construction**. Any reference in this Warrant to a Section shall refer to a Section of this Warrant. The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant. The words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described.

IN WITNESS WHEREOF, GrowCo has caused this Warrant to be signed by its duly authorized officer as of April 22, 2015.

GROWCO, INC.

By: [signature]
Name: Wayne Harding
Title: Chief Financial Officer

**NOTICE OF WARRANT EXERCISE**

*Date:* ________________

To: GROWCO, INC.

The undersigned registered holder (the "**Holder**") of the attached Common Stock Purchase Warrant (the "**Warrant**") of GrowCo, Inc. ("**GrowCo**") hereby elects to purchase:

________________________ shares

(the "**Acquired Warrant Shares**") of common stock of GrowCo pursuant to the terms of the Warrant and tenders herewith payment of the Purchase Price (as defined in the Warrant) in full, together with any applicable transfer taxes if the Acquired Warrant Shares are to be issued in a name other than the name of the Holder. The Holder confirms that the Holder (or any other individual or entity in whose name the Acquired Warrant Shares are to be issued) is an "accredited investor" as defined in Regulation D under the Securities Act of 1933.

If the Holder is requesting that the certificate representing the Acquired Warrant Shares be issued in a name other than the name of the Holder:

(a) the Holder is delivering herewith a supplemental letter of representations or opinion of counsel in such form as requested by GrowCo in order to confirm compliance with applicable federal and state securities laws; and

(b) the Holder has set forth below the name and address of the individual or entity to which the Holder has requested the Acquired Warrant Shares be issued *(please print or type)*:

*Name of Other Party:* ________________________________________

*Address of Other Party:* ________________________________________

________________________________________

If the Holder is an individual:

*Name of Holder (please print or type)* ........................ ________________________

*Signature of Holder* ..................................................... ________________________

If the Holder is an entity:

*Name of Holder (please print or type)* ........................ ________________________

*Signature of Authorized Signatory of Holder*.............. ________________________

*Name of Authorized Signatory (please print or type)*... ________________________

*Title of Authorized Signatory (please print or type)*..... ________________________

# EXHIBIT 60

Harding Weekly Asset-Transfer Reports to Yorke (September 4 and 18, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**From:** Wayne Harding <WHarding@2riverswater.com>
**To:** 'Justin Yorke' <justin@mcgrainfinancial.com>
**Cc:** John McKowen <JMcKowen@trgrowco.com>
**Date:** Fri, 04 Sep 2015 22:41:14 +0000
**Subject:** asset transfer update

Hi Justin – I want to give you an end of week update. First Oak sent us the transfer paperwork late yesterday and I need to review and approve. I expect that the transfer paperwork will be done next week. This is for the DFP assets.

In terms of Farm Credit (El Paso land), they were non responsive this week. I'll ping them again on Tuesday.

CWCB – expects to have the loan modification signed by the state controller in the next week or two and then we'll go back to ask for the transfer/name change on their collateral.

Have a safe, happy Labor Day weekend.

Wayne Harding, CFO
Two Rivers Water & Farming Company
w: (303) 222-1032
C: (303) 290-0123

**From:** Wayne Harding <WHarding@2riverswater.com>
**To:** 'Justin Yorke' <justin@mcgrainfinancial.com>
**Cc:** John McKowen <JMcKowen@trgrowco.com>
**Date:** Fri, 18 Sep 2015 22:50:15 +0000
**Subject:** TR Cap asset transfer

Hi Justin,

Here's the weekly update.

All of the paperwork from FirstOak bank (mostly DFP assets, including bessemer shares) has been completed and sent to me. I plan to sign in front of a notary tomorrow and ship them back to FirstOak for their signature and forwarding of some of the docs to Bessemer.

I didn't hear from Farm Credit this week (el Paso land) as they stated I would. So this morning I emailed my main contact asking for an update and no response yet. I'll call him on Monday if he doesn't respond.

No new progress on CWCB.

As always, call or email with any questions.

Sincerely,
Wayne

Wayne Harding, CFO
Two Rivers Water & Farming Company
w: (303) 222-1032
C: (303) 290-0123

# EXHIBIT 61

TR Capital LLC Agreement Modification Email (February 26, 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**From:** Wayne Harding <WHarding@2riverswater.com>
**To:** John McKowen <JMcKowen@trgrowco.com>, Wistar <iwmorris3@gmail.com>, Gus Blass <gusblass@aol.com>, 'Justin Yorke' <justin@mcgrainfinancial.com>, John McGrain <john@mcgrainfinancial.com>
**Cc:** "Johnson, Mark L." <Mark.Johnson@klgates.com>, Wayne Harding <WHarding@2riverswater.com>
**Date:** Thu, 26 Feb 2015 15:51:30 +0000
**Subject:** TR Capital LLC agreement modification
**Attachments:** TR Cap LLC Agreement First Amendment.pdf

Dear TR Capital Board, Justin and John,

Thank you for executing the LLC modification.  I've attached a copy for your records.

Wayne Harding
Two Rivers Water & Farming Company
(303) 222-1032

# EXHIBIT 62

Harding Payment Email to McGrain, Yorke, and Bragg (April 2, 2020)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

**From:** wayne harding <wayne@wayneharding.com>
**To:** John McGrain <john@mcgrainfinancial.com>, Justin Yorke <justin@mcgrainfinancial.com>, Chris Bragg <chris@mcgrainfinancial.com>
**Cc:** John McKowen <john@vtanva.com>, George McCaffrey <george@vtanva.com>, CHARLES KIRBY <ckc2155@aol.com>, wayne harding <wayne@wayneharding.com>
**Date:** Thu, 02 Apr 2020 19:37:24 +0000
**Subject:** payment

John, Justin and Chris –

In April and May 2018 you advanced the following funds to assist with legal fees for GCP1:

Richland Fund $10,000

JMW fund  $5,000

San Gabriel $5,000

As of December 31, 2019, I have calculated that GCP1 owes with interest the following:

Richland Fund $12,669.86

JMW fund  $6,369.71

San Gabriel $6,369.71

We have received a return from the attorney's trust account for $5,218.84.  Therefore, we are refunding the following to your funds:

Richland Fund $2,609.42

JMW fund  $1,304.71

San Gabriel $1,304.71

I'll get these amounts mail shortly.

Thank you for your past and continued support.  Call or email with any questions.

Wayne Harding

+1 (303) 290-0123

# EXHIBIT 63

McKowen GCP Super Units Subscription — $1,218,157 (October 2015)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

GrowCo

October 19, 2015

John R. McKowen
456 Madison St.
Denver, CO 80206

Dear John,

Thank you for your investment of $1,218,157 representing 1,218,157 Preferred Units of GCP Super Units, LLC.

Enclosed are the following documents:

- GCP Super Units, LLC Preferred Unit Certificate for 1,218,157 units. This is an original document. Please keep it in a safe place that can be retrieved later.
- A warrant certificate representing 1,218,157 shares of GrowCo common stock. This is an original document. Please keep it in a safe place that can be retrieved later.
- An executed GrowCo Super Unit Purchase Agreement with your joinder agreement.
- An executed Exchange Agreement with your joinder agreement.
- An executed Registration Rights Agreement with your joinder agreement with a copy of your selling stockholder questionnaire.
- A copy of the GCP Super Units, LLC Agreement and the amendment with your joinder agreement.

If you have any question or issues, please call me at 303-222-1032 or send me an email: wharding@trgrowco.com.

Sincerely,

Wayne Harding, CFO
GrowCo, Inc.

*Transfer Restricted – See Reverse Side Hereof*

STATE OF COLORADO

# GCP SUPER UNITS, LLC

## Preferred Units

FULLY PAID

NONASSESSABLE

**Number: GCPSU-039**

**Units: 1,218,157**

*This Certifies that* John R. McKowen is the registered holder of 1,218,157 (one million two hundred eighteen thousand one hundred fifty seven) Preferred Units of GCP Super Units, LLC, transferable only on the books of GCP Super Units, LLC by the holder hereof in person or by Attorney upon surrender of this Certificate properly endorsed.

*In Witness Whereof,* GCP Super Units, LLC has caused this Certificate to be signed by its duly authorized officers and its Corporate Seal to be hereunto affixed as of this 19th day of October, 2015.

Managing Member

Chief Financial Officer

**THIS WARRANT AND THE UNDERLYING SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SECURITIES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED.**

# GROWCO, INC.

## COMMON STOCK PURCHASE WARRANT

**Certificate No. SU-039** **Original Issue Date: October 19, 2015**

THIS COMMON STOCK PURCHASE WARRANT (this "**Warrant**") certifies that, for value received, John R. McKowen, or its registered assigns (the "**Holder**"), having an address at: 456 Madison St. Denver, CO 80206, email:john@johnmckowen.com, is entitled, upon the terms and subject to the limitations on exercise and the conditions hereinafter set forth, at any time prior to 5 p.m., Mountain time, on October 31, 2020, to subscribe for and purchase from GrowCo, Inc. ("**GrowCo**"), a Colorado corporation having its principal office at 2000 Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado 80222, facsimile: (303) 845-9400, email: info@trgrowco.com (such address, or such other address as GrowCo may from time to time designate by notice in writing to the Holder, being referred to as the "**Principal Office**"), up to one million two hundred eighteen thousand one hundred and fifty seven no/100 (1,218,157) shares (the "**Warrant Shares**") of GrowCo's common stock, without par value ("**Common Shares**"), at a price of $1.00 per Warrant Share (as may be adjusted in accordance with Section 3, the "**Purchase Price**"). This Warrant is one of a series of Common Stock Purchase Warrants identified by certificate numbers designated "SU" (collectively, the "**SU Warrants**").

**1. Definitions.** As used herein, the following terms shall have the indicated meanings:

(a) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(b) "**Person**" shall mean an individual or a corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity.

(c) "**Securities Act**" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

**2. Exercise.**

(a) **Manner of Exercise**. The rights represented by this Warrant may be exercised in whole or in part at any time prior to 5 p.m., Mountain time, on October 31, 2020 by delivery of the following to GrowCo at the Principal Office: (i) an executed Notice of Exercise in the form attached hereto; (ii) payment of the Purchase Price in cash by wire transfer or check; and (iii) this Warrant. Upon the Holder's exercise of the rights represented by this Warrant, a certificate for the Warrant Shares so purchased, registered in the name of the Holder or a Person affiliated with the Holder, if the Holder so designates, shall be issued and delivered to the Holder or such Person within a reasonable time after the rights represented by this Warrant shall have been so exercised. The Person in whose name any certificate for Warrant Shares is to be issued upon exercise of this Warrant shall be deemed to have become the holder of record of such Warrant Shares on the date on which this Warrant was surrendered and payment of the Purchase Price was made, irrespective of the date of delivery of such certificate or certificates, except that, if the date of such surrender and payment is a date when the stock transfer books of GrowCo are closed, such Person shall be deemed to have become the holder of record of such Warrant Shares at the close of business on the next succeeding date on which the stock transfer books are open. If

this Warrant is exercised in part, GrowCo shall, at the time of delivery of the certificate representing the purchased Warrant Shares, deliver to the Holder a new SU Warrant that evidences the rights of the Holder to purchase the remaining Warrant Shares represented by this Warrant and that bears a new certificate number, but that otherwise is identical to this Warrant.

(b) **No Fractional Warrant Shares**. No fractional shares shall be issued upon the exercise of this Warrant. As to any fraction of a Common Share that the Holder would otherwise be entitled to purchase upon an exercise, GrowCo shall instead pay a cash adjustment in respect of such final fraction in an amount equal to such fraction multiplied by the Purchase Price.

(c) **Legends**. The Holder understands and agrees that any certificates evidencing Warrant Shares may bear a legend substantially in the following form:

> "THESE SHARES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933. THEY MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT AS TO SUCH SHARES UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUER THAT SUCH REGISTRATION IS NOT REQUIRED."

(d) **Charges, Taxes and Expenses**. Issuance of certificates for Warrant Shares shall be made without charge to the Holder for any issue or transfer tax or other incidental expense in respect of the issuance of such certificate, all of which taxes and expenses shall be paid by GrowCo; *provided* that in the event certificates for Warrant Shares are to be issued in a name other than the name of the Holder, GrowCo may require, as a condition thereto, the payment of a sum sufficient to reimburse it for any transfer tax incidental thereto.

**3. Adjustments of Purchase Price and Exercisability.**

(a) **Stock Dividends, Distributions, Subdivisions and Combinations**. If GrowCo shall: (i) pay a stock dividend or otherwise make a distribution or distributions on Common Shares in Common Shares, (ii) subdivide outstanding Common Shares into a larger number of shares, or (iii) combine (including by way of reverse stock split) outstanding Common Shares into a smaller number of shares, then (A) the Purchase Price shall be multiplied by a fraction of which the numerator shall be the number of Common Shares outstanding before such event and of which the denominator shall be the number of Common Shares outstanding after such event and (B) the number of shares issuable upon exercise of this Warrant, shall be proportionately adjusted such that the aggregate Purchase Price shall remain unchanged. Any adjustment made pursuant to this Section 3(a) shall become effective immediately after the record date for the determination of stockholders entitled to receive such a dividend or distribution or, in the case of such a subdivision, combination or reclassification, immediately after the effective date.

(b) **Subsequent Rights Offerings**. If GrowCo shall issue rights, options or warrants to all holders of Common Shares (and not to the Holder as such) entitling them to subscribe for or purchase Common Shares at a price per share less than the closing price of Common Shares on the record date for the determination of stockholders entitled to receive such rights, options or warrants, then the Purchase Price shall be multiplied by a fraction, of which (i) the numerator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of shares that the aggregate offering price of the total number of shares so offered (assuming receipt by GrowCo in full of all consideration payable upon exercise of such rights, options or warrants) would purchase at such closing price and (ii) the denominator shall be the number of Common Shares outstanding on the date of issuance of such rights, options or warrants plus the number of additional Common Shares offered for subscription or purchase. Such adjustment shall be made whenever such rights, options or warrants are issued, and shall become effective immediately after the record date for the determination of stockholders entitled to receive such rights, options or warrants.

(c) **Pro Rata Distributions**. If GrowCo shall distribute to all holders of Common Shares (and not to the Holder as such) evidences of its indebtedness or assets (including cash and cash dividends) or rights or warrants to subscribe for or purchase any security other than Common Shares, then in each such case the Purchase Price shall be adjusted by multiplying the Purchase Price in effect immediately prior to the record date fixed for determination of stockholders entitled to receive such distribution by a fraction, of which (i) the numerator shall be the closing price of Common Shares determined as of the record date mentioned above less the per share fair market value at such record date of the portion of such assets or evidence of indebtedness or rights or warrants so distributed applicable to one outstanding Common Share as determined by the Board of Directors in good faith and (ii) the denominator shall be such closing price of Common Shares determined as of such record date. In either case the adjustments shall be described in a statement provided to the Holder of the portion of assets or evidences of indebtedness so distributed or such subscription rights applicable to one Common Share. Such adjustment shall be made whenever any such distribution is made and shall become effective immediately after the record date mentioned above.

(d) **Fundamental Transaction**. If (i) GrowCo, directly or indirectly, effects any merger or consolidation of GrowCo with or into another Person, (ii) GrowCo, directly or indirectly, effects any sale of all or substantially all of its assets in one or a series of related transactions, (iii) any tender offer or exchange offer (whether by GrowCo or another Person) is completed pursuant to which holders of Common Shares are permitted to tender or exchange their shares for other securities, cash or property, (iv) GrowCo effects any reclassification, reorganization or recapitalization of the Common Shares or any compulsory share exchange pursuant to which the Common Shares are effectively converted into or exchanged for other securities, cash or property, or (v) GrowCo, directly or indirectly, in one or more related transactions consummates a stock or share purchase agreement or other business combination (including a reorganization, recapitalization, spin-off or scheme of arrangement) with another Person whereby such other Person acquires a majority of the outstanding Common Shares (not including any Common Shares held by the other Person or other Persons making or party to, or associated or affiliated with the other Persons making or party to, such stock or share purchase agreement or other business combination) (in any such case, a "**Fundamental Transaction**"), then upon any subsequent exercise of this Warrant, the Holder shall have the right to receive, for each Common Share that would have been issuable upon such conversion absent such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one Common Share (the "**Alternate Consideration**"). For purposes of any such conversion, the determination of the Purchase Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one Common Share in such Fundamental Transaction, and GrowCo shall apportion the Purchase Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Shares are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any exercise of this Warrant following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to GrowCo or surviving entity in such Fundamental Transaction shall issue to the Holder a new warrant consistent with the foregoing provisions and evidencing the Holder's right to exercise such warrant for the Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 3(d) and ensuring that this Warrant (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(e) **Calculation and Notice of Adjustment to Purchase Price**. Whenever an adjustment to the Purchase Price or other terms of this Warrant is effected pursuant to this Section 3, GrowCo shall thereafter promptly mail to the Holder a notice setting forth the Purchase Price and other terms of such adjustment and setting forth a brief statement of the facts requiring such adjustment.

**4. Notices to Facilitate Exercise.** If (a) GrowCo shall declare a dividend (or any other distribution) on the Common Shares, (b) GrowCo shall authorize the granting to all holders of Common Shares rights or warrants to subscribe for or purchase any shares of capital stock of any class, (c) the approval of any stockholders of GrowCo shall be required in connection with any reclassification of the Common Shares, any consolidation or merger to which GrowCo is a party, any sale or transfer of all or substantially all of the assets of GrowCo, or any compulsory share exchange whereby the Common Shares shall be converted into other securities, cash or property, or (d) GrowCo shall authorize the voluntary or involuntary dissolution, liquidation or winding up of the affairs of GrowCo, then, in each case, GrowCo shall cause to be mailed to the Holder at the Holder's last address as it shall appear upon the books and records of GrowCo, at least ten Business Days prior to the applicable record or effective date hereinafter specified, a notice stating (i) the date on which a record is to be taken for the purpose of such dividend, distribution, redemption, rights or warrants, or if a record is not to be taken, the date as of which the holders of record of Common Shares to be entitled to such dividend, distribution, rights or warrants are to be determined or (ii) the date on which such reclassification, consolidation, merger, sale, transfer or share exchange is expected to become effective or close and the date on which it is expected that holders of record of Common Shares will be entitled to exchange their Common Shares for securities, cash or other property deliverable upon such reclassification, consolidation, merger, sale, transfer or share exchange, provided that the failure to mail such notice or any defect therein or in the mailing thereof shall not affect the validity of the corporate action required to be specified in such notice. To the extent the Holder would not otherwise be entitled to exercise this Warrant, the Holder is entitled to exercise this Warrant during the ten-Business Day period commencing as of the date of such notice to the effective date of the event triggering such notice.

**5. Representations of Holder.**

(a) **Acquisition of Warrant and Warrant Shares for Investment**. The Holder represents and warrants that it is acquiring this Warrant and any Warrant Shares solely for its account for investment and not with a view to or for sale or distribution of this Warrant or such Warrant Shares or any part thereof.

(b) **Securities Not Registered.**

(i) Notwithstanding anything to the contrary contained herein, the Holder may not exercise this Warrant unless the Warrant Shares issuable upon such exercise are then registered under the Securities Act and registered or qualified under any applicable state securities laws or, if such Warrant Shares are not then so registered, GrowCo has determined that such exercise and issuance would be exempt from the registration requirements of the Securities Act and the registration and qualification requirements of any applicable state securities laws.

(ii) The Holder understands that the issuance of this Warrant and the Warrant Shares have not been registered under the Securities Act on the basis that no distribution or public offering of the stock of GrowCo is to be effected. The Holder realizes that the basis for the exemption may not be present if, notwithstanding its representations, the Holder has a present intention of acquiring the securities for a fixed or determinable period in the future, selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the securities.

(iii) The Holder recognizes that this Warrant and the Warrant Shares must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. The Holder recognizes that GrowCo has no obligation to register this Warrant or the Warrant Shares under the Securities Act, or to comply with any exemption from such registration.

(iv) The Holder is aware that neither this Warrant nor the Warrant Shares may be sold pursuant to Rule 144 under the Securities Act unless certain conditions are met, including, among

other things, the existence of a public market for the shares, the availability of certain current public information about GrowCo, the resale following the required holding period pursuant to Rule 144 under the Securities Act and the number of shares being sold during any three-month period not exceeding specified limitations. The Holder is aware that the conditions for resale set forth in Rule 144 under the Securities Act have not been satisfied and that GrowCo may not satisfy these conditions in the foreseeable future or at all.

**6. Lock-Up.**

(a) **Agreement to Lock-Up**. The Holder hereby agrees that the Holder will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to the initial underwritten public offering and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days, except that, to the extent requested by the lead managing underwriter(s) to accommodate regulatory restrictions of the Financial Industry Regulatory Authority or any applicable securities exchange relating to the publication or other distribution of research reports or analyst recommendations and opinions, such period may be extended to a total of 215 days), (a) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo held immediately prior to the effectiveness of the registration statement for such public offering or (b) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such capital stock, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of capital stock or other securities, in cash or otherwise. The foregoing provisions of this Section 6(a) shall not apply to the sale of any shares to an underwriter in such public offering, and shall only be applicable to the Holder if all directors of GrowCo (other than a director designated by the Holder or its affiliates) enter into similar arrangements. The underwriters in connection with such public offering are intended third-party beneficiaries of this Section 6 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees, if requested by the underwriters of such public offering, to execute an agreement that is consistent with this Section 6 or that is necessary to give further effect hereto.

(b) **Stop Transfer Instructions**. In order to enforce the foregoing covenant, GrowCo may impose stop-transfer instructions with respect to the shares of capital stock of GrowCo held by the Holder (and transferees and assignees thereof) until the end of such restricted period.

**7. Transfer of Warrant.**

(a) **Transfers**. The Holder understands that this Warrant and the Warrant Shares have not been registered under the Securities Act and that neither this Warrant nor any Warrant Shares may be offered for sale, sold, pledged or hypothecated in the absence of either (i) an effective registration statement as to this Warrant and/or such Warrant Shares under the Securities Act or (ii) an opinion of counsel satisfactory to GrowCo that such registration is not required. Subject in all respects to the foregoing, this Warrant and all rights hereunder are transferable, with respect to all or a portion of the Warrant Shares, upon surrender of this Warrant to GrowCo at the Principal Office, together with a written assignment of this Warrant substantially in the form attached hereto duly executed by or on behalf of the Holder and funds sufficient to pay any transfer taxes payable upon the making of such transfer. Upon such surrender and, if required, such payment, GrowCo shall deliver (A) to each assignee, a new SU Warrant (with a new certificate number) in the name of such assignee that evidences the rights to purchase the number of Warrant Shares specified in such instrument of assignment to be assigned to such assignee and (B) to the Holder, a new SU Warrant (with a new certificate number) in the name of the Holder that evidences the number of Warrant Shares, if any, not assigned. Each SU Warrant so issued shall otherwise be identical to this Warrant.

(b) **SU Warrant Register**. GrowCo, or assigns, shall maintain the name and address of the Holder hereof from time to time in a register for the SU Warrants. GrowCo may deem and treat the Holder of this Warrant as the absolute owner hereof for the purpose of any exercise hereof and for all other purposes, absent actual notice to the contrary.

**8. Acceptance**. Receipt of this Warrant by the Holder shall constitute acceptance of, and agreement to, all of the terms and conditions contained herein.

**9. Miscellaneous.**

(a) **No Rights as Stockholder Until Exercise**. This Warrant does not entitle the Holder to any voting rights, dividends or other rights as a stockholder of GrowCo prior to the exercise hereof.

(b) **Loss, Theft, Destruction or Mutilation of Warrant**. GrowCo covenants that upon its receipt of (i) evidence reasonably satisfactory to it of the loss, theft, destruction or mutilation of this Warrant, (ii) in case of loss, theft or destruction of this Warrant, indemnity or security reasonably satisfactory to GrowCo (which shall not include the posting of any bond), and (iii) if mutilated, this Warrant, GrowCo will deliver to the Holder a new SU Warrant that evidences the rights of the Holder to purchase the Warrant Shares then represented by this Warrant and that bears a new certificate number, that otherwise is identical with this Warrant.

(c) **Action on Business Days**. If the last or appointed day for the taking of any action or the expiration of any right required or granted herein shall not be a Business Day, then such action may be taken or such right may be exercised on the next succeeding day that is a Business Day.

(d) **Authorized Warrant Shares**. GrowCo covenants that, during the period this Warrant is outstanding, it will reserve from its authorized and unissued Common Shares a sufficient number of Common Shares to provide for the issuance of the Warrant Shares upon the exercise of this Warrant. GrowCo further covenants that its issuance of this Warrant shall constitute full authority to its officers who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for the Warrant Shares upon the exercise of this Warrant. GrowCo will take all such reasonable action as may be necessary to assure that such Warrant Shares may be issued as provided herein without violation of any applicable law or regulation or of any requirements of any securities exchange upon which the Common Shares may be listed. GrowCo covenants that all of the Warrant Shares will, upon exercise of this Warrant in accordance with the terms hereof, be duly authorized, validly issued, fully paid and non-assessable and free from all taxes, liens and charges created by GrowCo in respect of the issue thereof (other than taxes in respect of any transfer occurring contemporaneously with such issue).

(e) **Governing Law**. This Warrant shall be governed by the internal law of the State of Colorado.

(f) **Non-waiver**. No course of dealing or any delay or failure to exercise any right hereunder on the part of the Holder shall operate as a waiver of such right or otherwise prejudice the Holder's rights, powers or remedies hereunder. If GrowCo willfully and knowingly fails to comply with any provision of this Warrant and such failure results in any material damages to the Holder, GrowCo shall pay to Holder such amounts as shall be sufficient to cover any costs and expenses, including reasonable attorneys' fees, including those of appellate proceedings, incurred by the Holder in enforcing any of its rights, powers or remedies hereunder.

(g) **Notices**. All notices, requests, consents, claims, demands, waivers and other communications hereunder required or permitted hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified; (ii) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next

Business Day; (iii) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to GrowCo or the Holder at the address listed on the first page hereof or at such other address as GrowCo or the Holder, as the case may be, as shall be specified in a notice given in accordance with this Section 9(g).

(h) **Limitation of Liability.** No provision hereof, in the absence of any affirmative action by the Holder to exercise this Warrant to purchase Warrant Shares, and no enumeration herein of the rights or privileges of the Holder, shall give rise to any liability of the Holder for the Purchase Price of any Common Shares or as a stockholder of GrowCo, whether such liability is asserted by GrowCo or by creditors of GrowCo.

(i) **Remedies.** The Holder, in addition to being entitled to exercise all rights granted by law, including recovery of damages, shall be entitled to specific performance of its rights under this Warrant to the extent permitted by law. GrowCo agrees that monetary damages would not be adequate compensation for any loss incurred by reason of a breach by it of the provisions of this Warrant and hereby agrees to waive and not to assert the defense in any action for specific performance that a remedy at law would be adequate.

(j) **Successors and Assigns.** This Warrant and the rights and obligations evidenced hereby shall inure to the benefit of and be binding upon the successors and permitted assigns of GrowCo and, subject to compliance with applicable securities laws, the successors and permitted assigns of the Holder.

(k) **Amendment.** This Warrant may be modified or amended or the provisions hereof waived with the written consent of GrowCo and the Holder.

(l) **Severability.** Wherever possible, each provision of this Warrant shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Warrant.

(m) **Construction.** Any reference in this Warrant to a Section shall refer to a Section of this Warrant. The headings used in this Warrant are for the convenience of reference only and shall not, for any purpose, be deemed a part of this Warrant. The words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described.

IN WITNESS WHEREOF, GrowCo has caused this Warrant to be signed by its duly authorized officer as of October 19, 2015.

GROWCO, INC.

By: ______________________
Name: Wayne Harding
Title: CFO

# NOTICE OF WARRANT EXERCISE

*Date:* ________________

To: GROWCO, INC.

The undersigned registered holder (the "**Holder**") of the attached Common Stock Purchase Warrant (the "**Warrant**") of GrowCo, Inc. ("**GrowCo**") hereby elects to purchase:

________________________ shares

(the "**Acquired Warrant Shares**") of common stock of GrowCo pursuant to the terms of the Warrant and tenders herewith payment of the Purchase Price (as defined in the Warrant) in full, together with any applicable transfer taxes if the Acquired Warrant Shares are to be issued in a name other than the name of the Holder. The Holder confirms that the Holder (or any other individual or entity in whose name the Acquired Warrant Shares are to be issued) is an "accredited investor" as defined in Regulation D under the Securities Act of 1933.

If the Holder is requesting that the certificate representing the Acquired Warrant Shares be issued in a name other than the name of the Holder:

(a) the Holder is delivering herewith a supplemental letter of representations or opinion of counsel in such form as requested by GrowCo in order to confirm compliance with applicable federal and state securities laws; and

(b) the Holder has set forth below the name and address of the individual or entity to which the Holder has requested the Acquired Warrant Shares be issued *(please print or type)*:

*Name of Other Party:* ________________________________________________

*Address of Other Party:* ________________________________________________

________________________________________________

If the Holder is an individual:

*Name of Holder (please print or type)* .......................... ________________________________

*Signature of Holder* ........................................................ ________________________________

If the Holder is an entity:

*Name of Holder (please print or type)* .......................... ________________________________

*Signature of Authorized Signatory of Holder* ................ ________________________________

*Name of Authorized Signatory (please print or type)* .... ________________________________

*Title of Authorized Signatory (please print or type)* ..... ________________________________

*Execution Copy*

# SUPER UNIT PURCHASE AGREEMENT

**between**

**GCP SUPER UNITS, LLC,**

**GROWCO, INC.**

**and**

**INVESTORS NAMED IN SCHEDULE 1**

**Dated as of October 16, 2015**

TABLE OF CONTENTS

Page

1. Purchase and Sale of Super Units ....1
   1.1 Issuance and Sale ....1
   1.2 Closings ....1
   1.3 Closing Deliverables ....2
   1.4 Use of Proceeds ....2

2. Representations and Warranties of GCP SU ....2
   2.1 Organization, Good Standing, Power and Authority ....3
   2.2 Capitalization ....3
   2.3 Authorization ....3
   2.4 Transfers ....4
   2.5 Governmental Consents and Filings ....4
   2.6 Litigation ....4
   2.7 Compliance with Other Instruments ....5
   2.8 Permits ....5

3. Representations and Warranties of the Investors ....6
   3.1 Authorization ....6
   3.2 Purchase Entirely for Own Account ....6
   3.3 Disclosure of Information ....6
   3.4 Knowledge and Experience ....6
   3.5 Restricted Securities ....6
   3.6 Accredited Investor ....7
   3.7 No General Solicitation ....7
   3.8 Exculpation Among Investors ....7
   3.9 Residence ....7

4. Miscellaneous ....7
   4.1 Notices ....7
   4.2 Severability ....8
   4.3 Entire Agreement ....8
   4.4 Survival of Warranties ....8
   4.5 Interpretation ....8
   4.6 Successors and Assigns ....9
   4.7 Amendments and Waivers ....9
   4.8 Governing Law ....9
   4.9 Counterparts ....9
   4.10 Dispute Resolution ....9

SCHEDULE 1. Schedule of Investors

EXHIBIT A. Form of Joinder Agreement
EXHIBIT B. Form of GrowCo Warrant

THIS SUPER UNIT PURCHASE AGREEMENT (this "**Agreement**") is entered into as of October 16, 2015 between GCP Super Units, LLC, a Colorado limited liability company ("**GCP SU**"), GrowCo, Inc., a Colorado corporation ("**GrowCo**"), and the several investors named in SCHEDULE 1 (collectively the "**Investors**"), including persons who become Investors hereunder from time to time after the date hereof by completing and executing joinder agreements hereto in the form attached as EXHIBIT A ("**Joinder Agreements**").

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GCP SU, GrowCo and the several Investors (collectively, the "**Parties**") hereby agree as follows:

1. **Purchase and Sale of Super Units.**

1.1 **Issuance and Sale.**

(a) GCP SU proposes to sell to the Investors a total of up to 5,500,000 units ("**Super Units**") at a purchase price of $1.00 per Super Unit. Each Super Unit shall consist of:

(i) one preferred unit of GCP SU ("**GCP SU Preferred Units**"); and

(ii) a common stock purchase warrant, in substantially the form of EXHIBIT B (a "**GrowCo Warrant**"), exercisable to purchase one share of GrowCo's common stock, without par value, at $1.00 per share ("**GrowCo Common**").

(b) Subject to the terms and conditions of this Agreement, each Investor agrees to purchase, and GCP SU agrees to sell and issue to each Investor, at a Closing (as defined in Section 1.2(b)), the number of Super Units set forth opposite such Investor's name on SCHEDULE 1, against payment of the purchase price therefor. The purchase price shall be payable in cash, except that each Investor whose name is marked with an asterisk ("*") on SCHEDULE 1 shall pay the aggregate purchase price for the number of Super Units being purchased by delivering (or otherwise surrendering all rights to) an equal number of the Equity Units ("**GrowCo Equity Units**") purchased by such Investor pursuant to the Equity Unit Purchase Agreement dated as of July 29, 2015 between GrowCo and the investors named in Schedule 1 thereto (including such Investor).

1.2 **Closings.**

(a) Subject to the terms and conditions of this Agreement, each Investor listed on SCHEDULE 1 as of the date hereof (each an "**Initial Investor**") agrees to purchase the number of Super Units set forth opposite such Initial Investor's name on SCHEDULE 1. Such purchase shall take place remotely via the exchange of documents and signatures on October 9, 2015, or at such other time and place as GCP SU and the Initial Investors mutually agree upon, orally or in writing (which time and place are designated as the "**Initial Closing**"). At the Initial Closing, GrowCo and each Initial Investor shall enter into an exchange agreement, dated as of the date of the Initial Closing, in the form previously furnished to each Initial Investor (the "**Exchange Agreement**").

(b) At any time and from time to time following the Initial Closing, GCP SU may sell, on the terms and conditions of this Agreement, up to that number of the total Super Units that are not sold at the Initial Closing, to one or more Investors acceptable to GCP SU (the "**Subsequent Investors**"). Each closing of the issuance and sale of Super Units pursuant to this Section 1.2(b) shall take place remotely via the exchange of documents and signatures at

such specific time and place as agreed upon, orally or in writing, by GCP SU and the Subsequent Investors purchasing Super Units at such closing (which time and place are designated as a "**Subsequent Closing**"). Each Subsequent Investor at a Subsequent Closing shall execute and deliver to GCP SU (i) a Joinder Agreement and thereafter shall be deemed an Investor hereunder and (ii) a joinder agreement to the Exchange Agreement. In connection with each Subsequent Closing, SCHEDULE 1 shall be updated to reflect the number of Super Units purchased by each Subsequent Investor at such Subsequent Closing. The Initial Closing and each Subsequent Closing are each sometimes referred to herein as a "**Closing**."

1.3 **Closing Deliverables.**

(a) At each Closing, each Investor purchasing Super Units shall deliver to GCP SU:

(i) the purchase price for such Super Units paid by wire transfer or, if such Investor is marked with an asterisk ("*") on SCHEDULE 1, by delivery of (or other surrender of rights to) GrowCo Equity Units;

(ii) an executed copy of, or joinder agreement to, the Limited Liability Company Agreement among GCP SU and the members named therein (the "**GCP SU LLC Agreement**"); and

(iii) an executed copy of, or joinder agreement to, the exchange agreement between GCP SU, GrowCo and holders of GCP Preferred Units from time to time (including the Investors) (the "**Exchange Agreement**").

(b) At each Closing, GCP SU shall deliver to each Investor purchasing Super Units:

(i) a certificate, executed by GCP SU, issued to the Investor and representing a number of GCP SU Preferred Units equal to the number of Super Units being purchased by such Investor at such Closing;

(ii) a GrowCo Warrant, executed by GrowCo, issued to the Investor and providing the Investor the right to purchase a number of shares of GrowCo Common equal to the number of Super Units being purchased by such Investor at such Closing;

(iii) an executed copy of, or countersigned joinder agreement to, the GCP SU LLC Agreement; and

(iv) an executed copy of, or countersigned joinder agreement to, the Exchange Agreement.

1.4 **Use of Proceeds.** GCP SU will use the net proceeds of the sale of the Super Units to purchase preferred units issued by GrowCo Partners 1, LLC, GrowCo Partners 2, LLC and GrowCo Business Development.

2. **Representations and Warranties of GCP SU and GrowCo.** GCP SU and GrowCo hereby represent and warrant to each Investor acquiring Super Units at the Closing that the following representations are true and complete as of the date hereof and will be true and complete as of the Closing, except to the extent made only as of a specified date, in which case as of such time or date:

2.1 **Organization, Good Standing, Power and Authority.**

(a) GCP SU is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as presently conducted and as currently proposed to be conducted. GCP SU is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of GCP SU (a "**GCP SU MAE**"). GCP SU has made available to each Investor a true and complete copy of its Articles of Organization as initially filed, and such Articles of Organization have not been amended since the date of such filing. GCP SU has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations hereunder, including to issue and sell the GCP SU Preferred Units included in the Super Units.

(b) GrowCo is a corporation duly organized, validly existing and in good standing under the laws of the State of Colorado and has all requisite corporate power and authority to carry on its business as presently conducted and as currently proposed to be conducted. GrowCo is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of GrowCo (a "**GrowCo MAE**"). GrowCo has made available to each Investor a true and complete copy of its Articles of Incorporation as initially filed, and such Articles of Incorporation have not been amended since the date of such filing. GrowCo has all requisite corporate power and authority to execute and deliver this Agreement, the Exchange Agreement and the GrowCo Warrants and to perform its obligations hereunder and thereunder, including to issue and sell the GrowCo Warrants included in the Super Units and to issue and sell shares of GrowCo Common pursuant to the GrowCo Warrants.

2.2 **Capitalization.**

(a) The authorized GCP SU membership interests consist of 5,500,000 common units owned by GrowCo and up to 5,500,000 GCP SU Preferred Units to be issued with the offering of the Super Units. GCP SU has no obligation (contingent or otherwise) to purchase or redeem any of its equity interests.

(b) The authorized capital stock of GrowCo consists of an unlimited number of shares of GrowCo Common, of which 31,275,000 shares are issued and outstanding. In addition to the shares of GrowCo Common that may be issued pursuant to the GrowCo Warrants, GrowCo may issue in connection with one or more Closings additional shares of GrowCo Common and GrowCo Warrants to one or more placement agents engaged in connection with the offering of the Super Units. GrowCo has no obligation (contingent or otherwise) to purchase or redeem any of its equity interests.

2.3 **Authorization.**

(a) All company action required to be taken by the managers and members of GCP SU in order to authorize GCP SU Preferred Units, to enter into this Agreement and to issue the GCP SU Preferred Units included in the Super Units has been taken. All action on the part of the officer of GCP SU necessary for the execution and delivery of this Agreement and the performance of all obligations of GCP SU hereunder to be performed as of such Closing, including the issuance of the GCP SU Preferred Units included in the Super Units, has been

taken. This Agreement constitutes a valid and legally binding obligations of GrowCo, enforceable against GrowCo in accordance with its terms except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b) All corporate action required to be taken by the board of directors and shareholders of GrowCo in order to authorize GrowCo to enter into this Agreement and the Exchange Agreement and to issue the GrowCo Warrants included in the Super Units has been taken. All action on the part of the officers of GrowCo necessary for the execution and delivery of this Agreement, the Exchange Agreement and the GrowCo Warrants and the performance of all obligations of GrowCo hereunder and thereunder to be performed as of such Closing has been taken. This Agreement and the Exchange Agreement constitute, and upon execution thereof at a Closing the GrowCo Warrants then issued will constitute, valid and legally binding obligations of GrowCo, enforceable against GrowCo in accordance with their respective terms except as limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

2.4 **Transfers**. The GCP SU Preferred Units and GrowCo Warrants included in the Super Units, when issued and sold in accordance with the terms and for the consideration set forth in this Agreement, will be free of restrictions on transfer other than restrictions on transfer under the GCP SU LLC Agreement, the GrowCo Warrants, applicable federal and state securities laws, and liens or encumbrances created or imposed by an Investor.

2.5 **Governmental Consents and Filings**. Assuming the accuracy of the representations made by the Investors in Section 3, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of GCP SU in connection with the issuance and sale of the Super Units, except for filings pursuant to Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, which have been made or will be made in a timely manner.

2.6 **Litigation**.

(a) There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the knowledge of GCP SU, threatened in writing that questions (i) the validity of this Agreement or (ii) the right of GCP SU to enter into, or consummate any of the transactions contemplated by, this Agreement. Neither GCP SU nor, to the knowledge of GCP SU, any of its managers or officers is a party to, or is named as subject to the provisions of, any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of such directors and officers, such as would affect GCP SU).

(b) There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the knowledge of GrowCo, threatened in writing that questions (i) the validity of this Agreement, the Exchange Agreement or any GrowCo Warrants or (ii) the right of GrowCo to enter into, or consummate any of the transactions contemplated by, this Agreement, the Exchange Agreement or the GrowCo Warrants, including the right of GrowCo to issue shares of GrowCo Common in accordance with the GrowCo Warrants.

Neither GrowCo nor, to the knowledge of GrowCo, any of its directors or officers is a party to, or is named as subject to the provisions of, any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of such directors and officers, such as would affect GrowCo).

2.7 **Compliance with Other Instruments.**

(a) GCP SU is not in violation or default of any provision of (i) its Articles of Organization, (ii) any judgment, order, writ or decree to which GCP SU or its properties are subject, (iii) any note, indenture, mortgage, lease, or other agreement or contract to which GCP SU is a party or by which it is bound, the violation of which would have a GCP SU MAE, or (iv) to its knowledge, any provision of federal or state statute, rule or regulation applicable to GCP SU, the violation of which would have a GCP SU MAE. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not (A) violate any provision of the Articles of Organization of GCP SU or any judgment, order, writ or decree to which GCP SU or its properties are subject, (B) violate or constitute, with or without the passage of time and giving of notice, a default under any note, indenture, mortgage, lease, or other agreement or contract to which GCP SU is a party or by which it is bound, (C) result in the creation of any lien, charge or encumbrance upon any assets of GCP SU or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to GCP SU, or (D) violate any provision of federal or state statute, rule or regulation applicable to GCP SU.

(b) GrowCo is not in violation or default of any provision of (i) its Articles of Incorporation, (ii) any judgment, order, writ or decree to which GrowCo or its properties are subject, (iii) any note, indenture, mortgage, lease, or other agreement or contract to which GrowCo is a party or by which it is bound, the violation of which would have a GrowCo MAE, or (iv) to its knowledge, any provision of federal or state statute, rule or regulation applicable to GrowCo, the violation of which would have a GrowCo MAE. The execution and delivery of this Agreement, the Exchange Agreement and the GrowCo Warrants and the consummation of the transactions contemplated hereby and thereby will not (A) violate any provision of the Articles of Incorporation of GrowCo or any judgment, order, writ or decree to which GrowCo or its properties are subject, (B) violate or constitute, with or without the passage of time and giving of notice, a default under any note, indenture, mortgage, lease, or other agreement or contract to which GrowCo is a party or by which it is bound, (C) result in the creation of any lien, charge or encumbrance upon any assets of GrowCo or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to GrowCo, or (D) violate any provision of federal or state statute, rule or regulation applicable to GrowCo.

2.8 **Permits.**

(a) GCP SU has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GCP SU MAE. GCP SU is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

(b) GrowCo has all franchises, permits, licenses and any similar authority necessary for the conduct of its business, the lack of which could reasonably be expected to have a GrowCo MAE. GrowCo is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

3. **Representations and Warranties of the Investors.** Each Investor, severally and not jointly, hereby represents and warrants to GCP SU as follows:

3.1 **Authorization.** If such Investor is a partnership, corporation, limited liability company or other entity, it has full power and authority to enter into each of this Agreement and the Exchange Agreement. This Agreement and the Exchange Agreement constitute valid and legally binding obligations of such Investor, enforceable against such Investor in accordance with their respective terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally and (b) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

3.2 **Purchase Entirely for Own Account.** The GCP SU Preferred Units and GrowCo Warrant included in the Super Units being acquired by such Investor are being acquired for investment for such Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and such Investor has no present intention of selling, granting any participation in or otherwise distributing any part thereof. Such Investor does not have any contract, undertaking, agreement or arrangement with any person or entity to sell, transfer or grant participations with respect to any of such GCP SU Preferred Units, such GrowCo Warrant or the shares of GrowCo Common subject to such GrowCo Warrant. Such Investor has not been formed for the specific purpose of acquiring GCP SU Preferred Units or GrowCo Warrants.

3.3 **Disclosure of Information.** Such Investor has had an opportunity to discuss the business, management and financial affairs of GCP SU and GrowCo, and the terms and conditions of the offering of the Super Units, with the management of GCP SU and GrowCo. The foregoing, however, does not limit or modify the representations and warranties of GCP SU and GrowCo in Section 2 or the right of such Investor to rely thereon.

3.4 **Knowledge and Experience.** Such Investor has sufficient knowledge and experience in investing in companies similar to GCP SU and GrowCo in terms of their stages of development so as to be able to evaluate the risks and merits of an investment in the Super Units, and such Investor is able financially to bear the risks of such investment.

3.5 **Restricted Securities.** Such Investor understands that the GCP SU Preferred Units and the GrowCo Warrant included in the Super Units being acquired by such Investor and any shares of GrowCo Common acquired by such Investor upon exercise of such GrowCo Warrant have not been registered under the Securities Act, by reason of specific exemptions from the registration provisions of the Securities Act that depend upon, among other things, the bona fide nature of such Investor's investment intent and the accuracy of such Investor's representations as set forth in this Section 3. Such Investor understands that the GCP SU Preferred Units and the GrowCo Warrant included in the Super Units are, and any such shares of GrowCo Common issued upon exercise of such GrowCo Warrant will be, "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to those laws, such Investor may be required to hold such securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified with state authorities or unless an exemption from such registration and qualification requirements is available. Such Investor further acknowledges that if an exemption from registration or qualification is available, such exemption may be conditioned on numerous requirements (including the time and manner of sale and the period for which held), including requirements relating to GCP SU that are outside of such Investor's control and that, GCP SUis under no obligation to, and may not be able to, satisfy. Such Investor understands that the offering and sale of securities contemplated by this Agreement,

the GrowCo Warrants and the Exchange Agreement is not intended to be part of a public offering, and that such Investor will not be able to rely on the protection of Section 11 of the Securities Act.

3.6 **Accredited Investor.** Such Investor is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act and has otherwise delivered to GCP SU a supplemental letter of investment representations in a form provided by GCP SU.

3.7 **No General Solicitation.** Neither such Investor nor any of its shareholders, partners, members, managers, directors, officers, employees or agents has directly or indirectly, including through a broker or finder, published any advertisement or otherwise engaged in any general solicitation in connection with the offer and sale of any Super Units or any GCP SU Preferred Units or GrowCo Warrant comprising any Super Units.

3.8 **Exculpation Among Investors.** Such Investor acknowledges that it is not relying upon any person or entity, other than GCP SU and its directors and officers, in making its decision to purchase Super Units and thereby invest in GCP SU and GrowCo. Neither such Investor nor any of its controlling persons or entities, officers, directors, partners, agents or employees shall be liable to any other Investor for any action heretofore taken or omitted to be taken by any of them in connection with a purchase of Super Units.

3.9 **Residence.** If such Investor is an individual, such Investor resides in the state or province identified in the address of such Investor set forth on, in the case of an Initial Investor, the signature page hereof and, in the case of a Subsequent Investor, such Subsequent Investor's Joinder Agreement. If such Investor is a partnership, corporation, limited liability company or other entity, the office of such Investor in which its principal place of business is identified in the address of such Investor set forth on, in the case of an Initial Investor, the signature page hereof and, in the case of a Subsequent Investor, such Subsequent Investor's Joinder Agreement.

4. **Miscellaneous.**

4.1 **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (c) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 4.1):

| | |
|---|---|
| If to GCP SU or GrowCo: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Email: info@2riverswater.com<br>Attention: Chief Financial Officer |

If to an Initial Investor, to the mailing address thereof set forth on the signature page hereof, and if to an Subsequent Investor, to the mailing address thereof set forth on such Subsequent Investor's Joinder Agreement.

For purposes hereof, "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

4.2 **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

4.3 **Entire Agreement**. This Agreement (including the Schedule and Exhibits hereto and including, with respect to any Investor, any supplemental letter of investment representations delivered by such Investor pursuant to Section 3.7), the Exchange Agreement and the GrowCo Warrants constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

4.4 **Survival of Warranties**. Unless otherwise set forth in this Agreement, the representations and warranties of the Parties contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and shall in no way be affected by any investigation of the subject matter thereof made by or on behalf of, or any knowledge of, the other Parties.

4.5 **Interpretation**. For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to a Section, Schedule or Exhibit refer to a Section of, or Schedule or Exhibit attached to, this Agreement, unless specified otherwise;

(c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(d) the words "include," "included" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(e) the word "or" is not exclusive;

(f) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(g) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(h) unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(i) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

4.6 **Successors and Assigns.** No Investor may assign its rights, remedies, obligations or liabilities under this Agreement without the written consent of GCP SU and GrowCo, and neither GCP SU nor GrowCo may assign its rights, remedies, obligations or liabilities under this Agreement without the written consent of Investors that purchased a majority of the Super Units issued hereunder. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective permitted successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective permitted successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

4.7 **Amendments and Waivers.** Except as otherwise expressly provided herein, any term of this Agreement may be amended, terminated or waived only with the written consent of GCP SU, GrowCo and Investors that purchased a majority of the Super Units issued hereunder. Any amendment, termination or waiver effected in accordance with this Section 4.7 shall be binding upon GCP SU, GrowCo and all of the Investors.

4.8 **Governing Law.** This Agreement shall be governed by the internal law of the State of Colorado.

4.9 **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g.*, *www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

4.10 **Dispute Resolution.**

(a) The Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement or the transactions contemplated hereby, shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the Parties irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address for purposes of Section 4.1 shall be effective service of process for any suit, action or other proceeding brought in any such court.

(b) WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS,

THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c) Each Party shall bear its own costs in respect of any disputes arising under this Agreement. Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**GCP SUPER UNITS, LLC**

By: [signature]
Name: Wayne Harding
Title: CFO

*[For Investors that are entities:]*

Number of Super Units for which Investor is subscribing (at $1.00 per Super Unit):

$25,000

Michael W. Harnish and Linda J. Harnish, Trustees, or their successors in trust, under the Michael And Linda Harnish Revocable Trust, dated June 11, 2012, and any ammendments thereto.

Print or Type Name of Investor

By: Michael W Harnish, Trustee
Name: Michael W. Harnish
Title: Trustee

*Address:*

3367 NW Lacamas Drive
Camas, WA 98607

Email: mharnish1@icloud.com

*[For Investors who are individuals:]*

Number of Super Units for which Investor is subscribing (at $1.00 per Super Unit)

__________

Signature

Print or Type Name of Investor

*Address:*

Email:

## JOINDER AGREEMENT

Reference is hereby made to the Super Unit Purchase Agreement, dated as of October 16, 2015, as may be amended from time to time (the "**Agreement**"), by and among GCP Super Units, LLC, a Colorado limited liability company, GrowCo, Inc., a Colorado corporation and the several Investors named in SCHEDULE 1 thereto.

Pursuant to the terms of the Agreement, the undersigned hereby acknowledges that it has received and reviewed a copy of the Agreement and agrees that, upon execution of this Joinder, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto, and shall be deemed to be an Investor for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder Agreement as of OCT 19, 2015.

Number of Super Units to be Purchased:

1,218,157

Purchase Price to be Paid by:

☐ Wire Transfer

☐ Surrender of GrowCo Equity Units

JOHN R MCKOWEN
(Print Name)

By: [signature]
Name:
Title:

Address: 456 MADISON ST
DENVER, CO 80206

Email:

*Accepted and confirmed as of the date above:*

GCP SUPER UNITS, LLC

By: [signature]
Name: Wayne Harding
Title: CFO

GROWCO, INC.

By: [signature]
Name: Wayne Harding
Title: CFO

SCHEDULE 1

# SCHEDULE OF INVESTORS

| NAME AND ADDRESS OF INVESTOR | NUMBER OF SUPER UNITS PURCHASED | AGGREGATE PURCHASE PRICE | DATE OF RELATED CLOSING |
|---|---|---|---|

EXHIBIT A

# FORM OF JOINDER AGREEMENT

*Execution Copy*

# EXCHANGE AGREEMENT

among

GCP SUPER UNITS, LLC,

GROWCO, INC.

and

HOLDERS NAMED IN SCHEDULE 1

Dated as of October 16, 2015

## TABLE OF CONTENTS


Page

ARTICLE I DEFINITIONS ....... 1
Section 1.01. Definitions ....... 1
Section 1.02. Interpretation ....... 3

ARTICLE II EXCHANGES OF SECURITIES ....... 4
Section 2.01. Exchanges ....... 4
Section 2.02. Adjustments ....... 6
Section 2.03. Authorized Shares ....... 6
Section 2.04. Limitations on Exchanges ....... 6

ARTICLE III MISCELLANEOUS ....... 7
Section 3.01. Notices ....... 7
Section 3.02. Severability ....... 7
Section 3.03. Entire Agreement ....... 7
Section 3.04. Additional Holders ....... 7
Section 3.05. Successors and Assigns ....... 8
Section 3.06. Amendments and Waivers ....... 8
Section 3.07. Governing Law ....... 8
Section 3.08. Counterparts ....... 8
Section 3.09. Dispute Resolution ....... 8

SCHEDULE 1 Schedule of Holders
EXHIBIT A Form of Joinder Agreement

THIS EXCHANGE AGREEMENT is entered into as of October 16, 2015 among GCP Super Units, LLC ("**GCP SU**"), GrowCo, Inc. ("**GrowCo**"), and the several individuals and entities listed on SCHEDULE 1 (collectively the "**Holders,**" which term shall include each other individual or entity that after the date hereof becomes a member of GCP SU and a party hereto by executing a Joinder Agreement, and with GCP SU and GrowCo, collectively the "**Parties**"). Capitalized terms used herein have the meanings ascribed to them in Section 1.01.

**RECITALS**

WHEREAS, the Holders are entering into, as of the date hereof, the LLC Agreement, which, among other things, provides for the issuance of preferred membership interests designated as GCP SU Preferred Units;

WHEREAS, Section 4.01 of the LLC Agreement provides that any individual or entity acquiring GCP SU Preferred Units and thereby becoming a member of GCP SU shall also become a party to this Agreement;

WHEREAS, the Holders are purchasing Super Units, including GCP SU Preferred Units, from GCP SU; and

WHEREAS, the Parties wish to provide for terms pursuant to which (a) a Holder may, at its option, exchange Super Units or GCP SU Preferred Units for GrowCo Common Shares and (b) GrowCo may, at its option and subject to the prior satisfaction of certain market trading conditions with respect to GrowCo Common Shares, exchange GCP SU Preferred Units for GrowCo Common Shares, all in the circumstances and subject to the conditions provided herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. **Definitions.** As used herein, the following terms shall have the indicated meanings:

(a) This "**Agreement**" means this Exchange Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

(b) "**Applicable Law**" means all applicable provisions of:

(i) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(ii) any consents or approvals of any Governmental Authority; and

(iii) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

(c) "**Associated GrowCo SU Warrant**" means, with respect to a GCP SU Preferred Unit, the GrowCo SU Warrant delivered and sold with such GCP SU Preferred Unit as part of a Super Unit (or any replacement GrowCo SU Warrant issued pursuant to Section 9(b) or the last sentence of

Section 2(a) of such original GrowCo SU Warrant), it being understood that an Associated GrowCo SU Warrant may relate to more than one GCP SU Preferred Unit.

(d) **"Beneficially Own," "Beneficially Owned"** and **"Beneficial Ownership"** have the meanings ascribed to them for purposes of Section 13(d) of the Exchange Act.

(e) **"Business Day"** shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(f) **"Electronic Transmission"** means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

(g) **"Exchange Act"** means the Securities Exchange Act of 1934.

(h) **"GCP SU"** means GCP Super Units, LLC, a Colorado limited liability company, and any successor thereto.

(i) **"GCP SU Preferred Units"** means membership interests in GCP SU having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in the LLC Agreement.

(j) **"Governmental Authority"** means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

(k) **"GrowCo"** means GrowCo, Inc., a Colorado corporation, and any successor thereto.

(l) **"GrowCo Common Shares"** means shares of common stock, without par value, of GrowCo.

(m) **"GrowCo SU Warrants"** means (i) common stock purchase warrants to purchase GrowCo Common Shares, which warrants constitute part of the Super Units and are being issued in a series identified by certificate numbers designated "SU," or (ii) a replacement warrant of such series issued pursuant to Section 9(b) or the last sentence of Section 2(a) of a GrowCo SU Warrant.

(n) **"Holders"** has the meaning set forth in the Preamble hereto.

(o) **"Joinder Agreement"** means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

(p) **"LLC Agreement"** means the Limited Liability Company Agreement of GCP SU dated as of October ___, 2015.

(q) **"Mandatory Exchange Date"** has the meaning set forth in Section 2.02(a)(ii).

(r) **"Mandatory Exchange Notice"** has the meaning set forth in Section 2.02(a).

(s) **"Maximum Percentage"** has the meaning set forth in Section 2.04(a).

(t) "**National Exchange**" means the NASDAQ Global Market (including the NASDAQ Global Select Market), the NASDAQ Capital Market, the NYSE MKT, the New York Stock Exchange or any successor to any of the foregoing.

(u) "**Parties**" has the meaning set forth in the Preamble hereto.

(v) "**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

(w) "**Super Units**" means up to 5,500,000 units, each of which consists of one GCP SU Preferred Unit and a GrowCo SU Warrant to purchase one GrowCo Common Share.

(x) "**Termination Date**" means October 31, 2020.

(y) "**Trading Conditions**" means, with respect to a specified date:

(i) GrowCo Shares are then listed on a National Exchange; and

(ii) for a period of twenty consecutive trading days ending no more than ten trading days before such specified date, (A) the closing or last sale price of a GrowCo Common Share on the principal National Exchange on which GrowCo Common Shares are then traded was equal to, or greater than, $5.00 (subject to equitable adjustment for any stock dividend, split, recapitalization, combination or exchange or any similar transaction) for each such trading day and (B) the average daily trading volume of the GrowCo Common Shares on such National Exchange during such period equaled or exceeded 100,000 shares (subject to equitable adjustment as aforesaid).

(z) "**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units Beneficially Owned by a Person or any interest in any securities Beneficially Owned by a Person. "**Transfer**" when used as a noun, and "**Transferee**," "**Transferred**" and "**Transferring**" shall have correlative meanings.

Section 1.02. **Interpretation.** For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Schedule refer to an Article or Section of, or Schedule attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement and the LLC Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
## EXCHANGES OF SECURITIES

Section 2.01. **Exchanges.**

(a) Unless prohibited by Applicable Law and subject to compliance with the delivery requirements of Section 2.01(b) on or before the Termination Date, a Holder at its option may exchange all, but not less than all, of the GCP SU Preferred Units then Beneficially Owned by such Holder for GrowCo Shares as follows:

(i) each of the GCP SU Preferred Units then Beneficially Owned by such Holder, together with the right to acquire one GrowCo Common Share under the Associated GrowCo SU Warrant, may be exchanged for one fully paid and nonassessable GrowCo Common Share; and/or

(ii) each of the GCP SU Preferred Units then Beneficially Owned by such Holder (other than any GCP SU Preferred Units being exchanged simultaneously pursuant to the preceding clause (i)) may be exchanged for, subject to Section 2.02(b), nine-tenths (0.9) of a fully paid and nonassessable GrowCo Common Share.

(b) Before any Holder shall be entitled to effect any exchange with GrowCo pursuant to Section 2.01(a), such Holder shall deliver to GrowCo at its address for notices pursuant to Section 3.01 (or such other address as GrowCo may from time to time designate for such purpose by notice in writing to the Holders) by no later than the Termination Date:

(i) written notice of such Holder's election to effect such exchange, including a description of the securities to be exchanged pursuant to each of clauses (i) and (ii) of Section 2.01(a);

(ii) a certificate or certificates for the GCP SU Preferred Units to be Transferred in such exchange (or, if such Holder alleges that any such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to GCP SU to indemnify GCP SU against any claim that may be made against GCP SU on account of the alleged loss, theft or destruction of such certificate), each of which certificates shall be endorsed or accompanied by a written instrument or instruments

of Transfer, in form satisfactory to GCP SU, duly executed by such Holder or its attorney duly authorized in writing; and

(iii) in connection with an exchange pursuant to clause (i) of Section 2.01(a), the Associated GrowCo SU Warrant, with a written instrument of Transfer, in form satisfactory to GCP SU, duly executed by the Holder or its attorney duly authorized in writing, Transferring to GrowCo all of such Holder's rights under such Associated GrowCo SU Warrant with respect to a number of GrowCo Common Shares equal to the number of GCP SU Preferred Units to be Transferred in such exchange pursuant to Section 2.01(a)(i).

Effective as of 5 p.m., Mountain time, on the first Business Day immediately following the date of receipt by GrowCo of the instruments to be delivered by such Holder pursuant to the preceding clauses (i) through (iii), (A) the tendered GCP SU Preferred Units, together with any rights Transferred with respect to an Associated GrowCo SU Warrant, shall be deemed to have been exchanged for the appropriate number of GrowCo Common Shares, and all rights with respect thereto shall be Transferred to GrowCo, other than the rights of such Holder to receive such GrowCo Common Shares, and (B) such GrowCo Common Shares shall be deemed to be issued to such Holder and to be outstanding of record. GrowCo shall, as soon as practicable thereafter deliver to such Holder (1) a certificate representing such GrowCo Common Shares and (2) any cash payment for fractional GrowCo Common Shares due pursuant to Section 2.03(b).

Section 2.02. **Mandatory Exchanges**. On or before the Termination Date, GrowCo at its option may require that Holders exchange all, but not less than all, of the then-outstanding GCP SU Preferred Units for GrowCo Shares as follows:

(a) On any day on which the Trading Conditions are satisfied, GrowCo may deliver to each of the Holders a written notice (a "**Mandatory Exchange Notice**"):

(i) stating that GrowCo intends to require that Holders exchange all of the then-outstanding GCP SU Preferred Units for GrowCo Common Shares pursuant to this Section 2.02; and

(ii) specifying the date of the mandatory exchange (the "**Mandatory Exchange Date**").

(b) On the Mandatory Exchange Date, effective as of 5 p.m., Mountain time, the Holders shall exchange all of the then-outstanding GCP SU Preferred Units for GrowCo Common Shares. On or before the Mandatory Exchange Date, each Holder shall tender the certificate or certificates therefor, duly endorsed (or, if such Holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to GrowCo to indemnify GrowCo against any claim that may be made against GrowCo on account of the alleged loss, theft or destruction of such certificate), to GrowCo, in the manner and at the place designated in the Mandatory Exchange Notice, and thereupon the GrowCo Common Shares shall be deliverable and payable to the order of such Holder. If the Mandatory Exchange Notice shall have been duly given, and if on the Mandatory Exchange Date the GrowCo Common Shares are, to the extent then due, delivered, paid or tendered for payment or deposited with an independent payment agent so as to be available therefor in a timely manner, then effective as of 5 p.m., Mountain time, and notwithstanding that any certificates evidencing any of such GCP SU Preferred Units shall not have been tendered, such GCP SU Preferred Units shall be deemed to have been exchanged for GrowCo Common Shares, and all rights with respect to such GCP SU Preferred Units, including the rights to receive any distribution, will accrue to the benefit of GrowCo, other than the rights of the former Holder.

Section 2.03. **Adjustments.**

(a) The number of GrowCo Common Shares to be issued in accordance with an exchange with GrowCo pursuant to Section 2.01 or 2.02 shall be subject to equitable adjustment by the Board of Managers of GCP SU and the Board of Directors of GrowCo in the event of any change that is made in, or other event that occurs with respect to, GCP SU Preferred Units or GrowCo Common Shares, which change or other event is effected, without receipt of consideration by the issuer thereof, through merger, consolidation, reorganization, recapitalization, reincorporation, stock dividend, dividend in property other than cash, stock split, liquidating dividend, combination of shares, exchange of shares, change in corporate structure or any similar equity restructuring transaction.

(b) Notwithstanding anything to the contrary contained herein, no fractional GrowCo Common Shares shall be issued in connection with any exchange with GrowCo pursuant to Section 2.01 or 2.02. If the total number of GrowCo Common Shares calculated to be issued pursuant to Section 2.01 or 2.02 is not a whole number, GrowCo shall pay in cash the fair market value of any fractional GrowCo Common Share.

Section 2.04. **Authorized Shares.** GrowCo covenants that, during the period from the date hereof through the fifth day following the Termination Date (or such earlier date as of which no GCP SU Preferred Units are outstanding), it will reserve from its authorized and unissued capital stock a sufficient number of GrowCo Common Shares to provide for the issuance of GrowCo Common Shares upon exchanges with GrowCo pursuant to Section 2.01. GrowCo will take all such reasonable action as may be necessary to assure that GrowCo Common Shares may be issued as contemplated hereby without violation of any Applicable Law or of any requirements of any securities exchange upon which GrowCo Common Shares may be listed from time to time.

Section 2.05. **Limitations on Exchanges.**

(a) Notwithstanding anything to the contrary contained herein, the aggregate number of GrowCo Common Shares issuable as part of an exchange with GrowCo pursuant to Section 2.01 shall be limited to the extent necessary to ensure that, following such exchange, the total number of GrowCo Common Shares then Beneficially Owned by such Holder and any other Persons whose Beneficial Ownership of GrowCo Common Shares would be aggregated with such Holder's for purposes of Section 13(d) of the Exchange Act does not exceed 4.999% (the "**Maximum Percentage**") of the total number of issued and outstanding GrowCo Common Shares (including for such purpose GrowCo Common Shares issuable as part of such exchange). Each delivery of instruments by a Holder pursuant to Section 2.01(b) for a proposed exchange will constitute a representation by such Holder that it has evaluated the limitation set forth in this Section 2.05(a) and determined that the issuance of the GrowCo Common Shares in accordance with such Optional Exchange is permitted under this Section 2.05(a).

(b) By written notice to GCP SU, any Holder may waive the provisions of Section 2.05(a) or may increase the Maximum Percentage to any other percentage specified in such notice, but any such waiver or increase will not be effective until the sixty-first day after such notice is delivered to GCP SU and will apply only to such Holder and not to any other Holder. Notwithstanding any other provision hereof, this Section 2.05 may not be amended as to a Holder without the written consent of such Holder.

(c) For purposes of this Section 2.05, in determining the number of outstanding GrowCo Common Shares, a Holder may rely on the number of outstanding GrowCo Common Shares as reflected in (i) GrowCo's most recent Form 10-Q, Form 10-K or other public filing with the Securities and Exchange Commission, (ii) a more recent public announcement by GrowCo, or (iii) any other notice by GrowCo (or the transfer agent for GrowCo Common Shares) setting forth the number of GrowCo

Common Shares outstanding. Upon the written request of any Holder, GrowCo shall promptly, but in no event later than one Business Day following the receipt of such notice, confirm in writing to such Holder the number of GrowCo Common Shares then outstanding.

## ARTICLE III
## MISCELLANEOUS

Section 3.01. **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the Party to be notified; (b) when sent by confirmed facsimile or email if sent during normal business hours of the recipient or, if not, then on the next Business Day; (c) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 3.01):

| | |
|---|---|
| If to GCP SU or GrowCo: | 2000 South Colorado Boulevard<br>Tower 1, Suite 3100<br>Denver, Colorado 80222<br>Facsimile: (303) 845-9400<br>E-mail: info@2riverswater.com<br>Attention: Chief Financial Officer |
| with a copy to: | K&L Gates LLP<br>One Lincoln Street<br>Boston, Massachusetts 02111-2950<br>Facsimile: (617) 261-3175<br>E-mail: mark.johnson@klgates.com<br>Attention: Mark L. Johnson |

If to a Holder, to the mailing address thereof set forth on Schedule 1.

Section 3.02. **Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 3.03. **Entire Agreement.** This Agreement (including the Schedule hereto), the LLC Agreement (including the Exhibit and Schedule thereto) and the Securities Purchase Agreement dated as of October ___, 2015 between GCP SU and the Holders (including the Schedule thereto) constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 3.04. **Additional Holders.** A Holder has the right to Transfer GCP SU Preferred Units in accordance with the LLC Agreement. Any Transferee of GCP SU Preferred Units from a Holder may elect to become a party to this Agreement by executing and delivering a Joinder Agreement and, in such event,

shall thereafter be deemed a Holder and Party for all purposes of this Agreement. In connection with the delivery of any such Joinder Agreement, GCP SU shall amend and restate SCHEDULE 1 to reflect the related Transfer.

Section 3.05. **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

Section 3.06. **Amendments and Waivers**. No provision of this Agreement may be amended or waived except by an instrument in writing executed by (a) GCP SU, (b) GrowCo and (c) Holders of two-thirds of the total number of GCP SU Preferred Units then held by all Holders. Any such written amendment or waiver shall be binding upon GCP SU, GrowCo and each Holder, *provided* that (i) an amendment or waiver altering the rights or obligations of any Holders with respect to their holdings of GrowCo SU Warrants shall be effective only with the consent of Holders of two-thirds of the total number of GrowCo SU Warrants then held by all Holders and (ii) an amendment or waiver altering the rights or obligations of any Holder in a manner that is disproportionately adverse to such Holder relative to the rights of other Holders, as the case may be, shall be effective only with the consent of that Holder. For the avoidance of doubt, nothing contained in this Section 3.06 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 3.09(b).

Section 3.07. **Governing Law**. This Agreement shall be governed by the internal law of the State of Colorado.

Section 3.08. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g.*, *www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

Section 3.09. **Dispute Resolution.**

(a) The Parties (i) hereby irrevocably and unconditionally submit to the jurisdiction of the state courts of Colorado and to the jurisdiction of the United States District Court for the State of Colorado for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (ii) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the state courts of Colorado or the United States District Court for the District of Colorado, and (iii) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

(b) WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION,

INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(c) Each Party will bear its own costs in respect of any disputes arising under this Agreement. Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

*[SIGNATURE PAGES FOLLOW]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

**GCP SUPER UNITS, LLC**

By: [signature]
Wayne Harding
Chief Financial Officer

**GROWCO, INC.**

By: [signature]
Wayne Harding
Chief Financial Officer

*[For Holders that are entities:]*

Michael W. Harnish and Linda J. Harnish Trustees, or their successors in trust, under the Michael and Linda Harnish Revocable Trust, dated June 11, 2012, and any ammendments thereto.

Print or Type Name of Holder

By: [signature], Trustee
Name: Michael W Harnish
Title: Trustee

*[For Holders who are individuals:]*

Signature

Print or Type Name

EXHIBIT A

**JOINDER AGREEMENT TO EXCHANGE AGREEMENT**

Reference is hereby made to the Exchange Agreement dated as of October 16, 2015, as it may be amended from time to time (the "**Agreement**"), among GCP Super Units, LLC, GrowCo, Inc. and the Holders Named in SCHEDULE 1. Pursuant to and in accordance with Section 3.04 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by each of the undersigned, GCP Super Units, LLC and GrowCo, Inc., the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed a "Holder" and "Party" for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, email or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: OCT 19 2015

~~[NAME OF NEW HOLDER]~~ JOHN K McKOWEN

By: John K McKowen
Name:
Title:

Agreed and Accepted:

**GCP SUPER UNITS, LLC**

By: [signature]
Name: Wayne Harding
Title: CFO

**GROWCO, INC.**

By: [signature]
Name: Wayne Harding
Title: CFO

# SCHEDULE OF HOLDERS

| NAME AND ADDRESS OF INVESTOR |
| --- |

# REGISTRATION RIGHTS AGREEMENT

between

GROWCO, INC.

and

SEVERAL HOLDERS NAMED IN SCHEDULE A

Dated as of November 17, 2015

TABLE OF CONTENTS


| | | Page |
|---|---|---|
| 1. | Definitions | 2 |
| 2. | Form S-1 | 3 |
| 3. | Form S-1 Indemnification | 6 |
| 4. | Form 10 | 8 |
| 5. | Transfer Limitations | 9 |
| 6. | Registration Expenses | 9 |
| 7. | Miscellaneous | 10 |

SCHEDULE A. Schedule of Holders

EXHIBIT 1. Form of Joinder Agreement
EXHIBIT 2. Form of Selling Stockholder Questionnaire

THIS REGISTRATION RIGHTS AGREEMENT (this "**Agreement**") is entered into as of November 17, 2015 between GrowCo, Inc., a Colorado corporation ("**GrowCo**"), and the several equity holders named in SCHEDULE A (collectively the "**Holders**"), including persons who become Holders hereunder from time to time after the date hereof by completing and executing joinder agreements hereto in the form attached as EXHIBIT 1 ("**Joinder Agreements**").

Pursuant to the Super Unit Purchase Agreement dated October 16, 2015 (the "**Purchase Agreement**") between GrowCo and the Investors named therein, GrowCo has agreed to provide the Holders with certain registration rights under the Securities Act of 1933, as amended, and the rules and regulations thereunder (the "**Securities Act**"), and applicable state securities laws.

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, GrowCo and the several Holders (collectively, the "**Parties**") hereby agree as follows:

1. **Definitions**. As used in this Agreement, the following terms shall have the following meanings:

(a) "**Advice**" shall have the meaning set forth in Section 7(d).

(b) "**Business Day**" shall mean a day other than a Saturday or Sunday or a day on which banks in Colorado are authorized or required by law to close.

(c) "**Common Stock**" means GrowCo's common stock, with $.001 par value.

(d) "**Covered Securities**" means, with respect to each Selling Stockholder, the Registrable Securities that such Selling Stockholder has requested, in its Selling Stockholder Questionnaire, be registered for resale pursuant to the Form S-1, *provided* that the Selling Stockholder's Covered Securities may not exceed one-third of the number of Registrable Securities originally purchased by such Selling Stockholder pursuant to the Purchase Agreement.

(e) "**Effective Date**" means the time and date, if any, that the Form S-1 is declared effective by the SEC.

(f) "**Effectiveness Period**" means the period, if any, commencing as of the Effective Date and ending as of 3 p.m., Mountain time, on May 13, 2016.

(g) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations thereunder.

(h) "**Exchange Agreement**" means the Exchange Agreement dated as of October 16, 2015 between GCP Super Units, LLC, GrowCo and the Holders named from time to time in Schedule 1 thereto.

(i) "**Form 10**" means the registration statement on Form 10 (or such other form as may be appropriate in accordance with SEC Guidance), if any, required to be filed pursuant to Section 4 with respect to Common Stock, including amendments and exhibits thereto.

(j) "**Form S-1**" means the registration statement on Form S-1 required to be filed pursuant to Section 2 with respect to Covered Securities, including the Prospectus, amendments and supplements to such registration statement or Prospectus, including pre- and post-effective amendments, and exhibits thereto.

(k) "**Indemnified Party**" shall have the meaning set forth in Section 3(c).

(l) "**Indemnifying Party**" shall have the meaning set forth in Section 3(c).

(m) "**Losses**" shall have the meaning set forth in Section 3(a).

(n) "**Person**" means an individual, a limited liability company, a partnership, a joint venture, a corporation, a trust, an unincorporated organization or a government or any department or agency thereof.

(o) "**Proceeding**" means an action, claim, suit, investigation or proceeding (including without limitation, an investigation or partial proceeding, such as a deposition), whether commenced or threatened.

(p) "**Prospectus**" means the prospectus included in the Form S-1, as amended or supplemented by any prospectus supplement, with respect to the terms of the offering of the Covered Securities, and all other amendments and supplements to the Prospectus, including post-effective amendments.

(q) "**Registrable Securities**" means, as of any date of determination, (i) shares of Common Stock acquired pursuant to the Exchange Agreement and (ii) any securities issued or issuable upon any stock split, dividend or other distribution, recapitalization or similar event with respect to such shares; *provided* that any such Registrable Securities shall cease to be Registrable Securities if such Registrable Securities have been disposed of by the Holder in accordance with the effective Registration Statement.

(r) "**Rule 144**" means Rule 144 promulgated by the SEC pursuant to the Securities Act, as such Rule may be amended from time to time.

(s) "**Rule 424**" means Rule 424 promulgated by the SEC pursuant to the Securities Act, as such Rule may be amended from time to time.

(t) "**SEC**" means the U.S. Securities and Exchange Commission.

(u) "**SEC Guidance**" means (i) any publicly available written or oral guidance of the SEC staff, or any comments, requirements or requests of the SEC staff and (ii) the Securities Act.

(v) "**Selling Stockholder Questionnaire**" shall mean a selling stockholder notice and questionnaire in the form attached to this Agreement as EXHIBIT 2.

(w) "**Selling Stockholders**" means all of the Holders, excluding any Holder that has directed GrowCo in writing not to include any Registrable Securities for resale pursuant to the Form S-1.

2. **Form S-1**. GrowCo shall use commercially reasonable efforts to prepare and file with the SEC on or prior to January 15, 2016 the Form S-1 covering the resale of all Covered Securities in an offering to be made on a continuous basis. Subject to the terms of this Agreement, GrowCo shall use commercially reasonable efforts to (x) cause the Form S-1 to be declared effective under the Securities Act as promptly as possible after the filing thereof and (y) keep the Form S-1 continuously effective under the Securities Act throughout the Effectiveness Period. GrowCo shall, by 7:30 a.m., Mountain time, on the Business Day after the Effective Date, notify the Selling Stockholders via email of the effectiveness of the Form S-1 and file the Prospectus with the SEC in accordance with Rule 424. In connection with the foregoing registration obligations:

(a) GrowCo shall, not less than five Business Days prior to the filing of the Form S-1 and not less than two Business Days prior to the filing of any amendment to the Form S-1 or of the Prospectus or any amendment or supplement thereto, (i) furnish to each Selling Stockholder copies of all such documents proposed to be filed, which documents will be subject to the review of the Selling Stockholders, and (ii) cause its officers and directors, after consulting with GrowCo's counsel and independent registered public accountants to the extent they deem appropriate, to respond to such inquiries as shall be necessary, in the reasonable opinion of respective counsel to each Selling Stockholder, to conduct a reasonable investigation within the meaning of the Securities Act. GrowCo shall not file the Form S-1 or any amendment thereto or the Prospectus or any amendment or supplement thereto to which Selling Stockholders owning a majority of the total number of Covered Securities shall reasonably object in good faith, *provided* that GrowCo is notified of such objection in writing no later than three Business Days after the Selling Stockholders have been so furnished copies of a Registration Statement or one Business Day after the Selling Stockholders have been so furnished copies of any amendment to the Form S-1 or of the Prospectus or any amendment or supplement thereto. Each Selling Stockholder agrees to furnish to GrowCo, within two Business Days following GrowCo's written request, a completed Selling Stockholder Questionnaire or an update to a previously delivered Selling Stockholder Questionnaire.

(b) GrowCo shall: (i) prepare and file with the SEC such amendments, including post-effective amendments, to the Form S-1 as may be necessary to keep the Form S-1 continuously effective as to the Covered Securities for the Effectiveness Period; (ii) cause the Prospectus to be amended or supplemented as required (subject to the terms of this Agreement) and, as so supplemented or amended, to be filed pursuant to Rule 424; (iii) respond as promptly as reasonably possible to any comments received from the SEC with respect to the Form S-1 or any amendment thereto; and (iv) comply in all material respects with the applicable provisions of the Securities Act with respect to the disposition of all Covered Securities during the Effectiveness Period in accordance (subject to the terms of this Agreement) with the intended methods of disposition by the Selling Stockholders thereof set forth in the Form S-1 as so amended or in the Prospectus as so amended or supplemented.

(c) GrowCo shall notify the Selling Stockholders (which notice shall, with respect to clauses (iii) through (vi) below, be accompanied by an instruction to suspend the use of the Prospectus until the requisite changes have been made) as promptly as reasonably possible, of:

(i) the receipt by GrowCo of any written comments from the SEC on the Form S-1 or of any request by the SEC or any other federal or state governmental authority for amendments or supplements to the Form S-1 or Prospectus or for additional information;

(ii) the effectiveness of any post-effective amendment to the Form S-1;

(iii) the issuance by the SEC or any other federal or state governmental authority of any stop order suspending the effectiveness of the Form S-1 covering any or all of the Covered Securities or the initiation of any Proceedings for that purpose;

(iv) the receipt by GrowCo of any notification with respect to the suspension of the qualification or exemption from qualification of any of the Covered Securities for sale in any jurisdiction, or the initiation or threatening of any Proceeding for such purpose;

(v) the occurrence of any event or passage of time that makes the financial statements included in the Form S-1 ineligible for inclusion therein or any statement made in

the Form S-1 or the Prospectus untrue in any material respect or that requires any revisions to the Form S-1, the Prospectus or other documents so that the Form S-1 or the Prospectus, as the case may be, will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; and

(vi) the occurrence or existence of any pending corporate development with respect to GrowCo that GrowCo believes may be material and that, in the determination of GrowCo, makes it not in the best interest of GrowCo to allow continued availability of the Form S-1 or the Prospectus, *provided* that any and all of such information shall remain confidential to each Selling Stockholder until such information otherwise becomes public, unless disclosure by a Selling Stockholder is required by law and *provided, further*, that notwithstanding each Selling Stockholder's agreement to keep such information confidential, each such Selling Stockholder makes no acknowledgement that any such information is material, non-public information.

(d) GrowCo shall use commercially reasonable efforts to avoid the issuance of, or, if issued, promptly obtain the withdrawal of (i) any order stopping or suspending the effectiveness of the Form S-1, or (ii) any suspension of the qualification (or exemption from qualification) of any of the Covered Securities for sale in any jurisdiction.

(e) Subject to the terms of this Agreement, GrowCo hereby consents to the use of the Prospectus and each amendment or supplement thereto by each of the Selling Stockholders in connection with the offering and sale of the Covered Securities, except after the giving of any notice pursuant to Section 2(c).

(f) Prior to any resale of Covered Securities by a Selling Stockholder, GrowCo shall use its commercially reasonable efforts to (i) register or qualify or cooperate with such Selling Stockholder in connection with the registration or qualification (or exemption from the registration or qualification) of such Covered Securities for resale by such Selling Stockholder under the securities or "blue sky" laws of such jurisdictions within the United States as such Selling Stockholder reasonably requests in writing, (ii) keep each such registration or qualification (or exemption therefrom) effective during the Effectiveness Period, and (iii) do any and all other acts or things reasonably necessary to enable the disposition in such jurisdictions of the Covered Securities; *provided* that GrowCo shall not be required to qualify generally to do business in any jurisdiction where it is not then so qualified, subject GrowCo to any tax in any such jurisdiction where it is not then so subject, or file a general consent to service of process in any such jurisdiction.

(g) If requested by a Selling Stockholder, GrowCo shall cooperate with such Selling Stockholder to (i) facilitate the timely preparation and delivery of certificates representing Covered Securities to be delivered to a transferee pursuant to the Form S-1, which certificates shall be free, to the extent permitted by SEC Guidance, of all restrictive legends, and (ii) enable such Covered Securities to be in such denominations and registered in such names as such Selling Stockholder may request.

(h) Upon the occurrence of any event contemplated by Section 2(c), as promptly as reasonably possible under the circumstances taking into account GrowCo's good faith assessment of any adverse consequences to GrowCo and its stockholders of the premature disclosure of such event, prepare a supplement or amendment, including a post-effective amendment, to the Form S-1 or a supplement to the Prospectus, and file any other required document so that, as thereafter delivered, neither the Form S-1

nor the Prospectus will contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. If GrowCo notifies the Selling Stockholders in accordance with clauses (iii) through (vi) of Section 2(c) to suspend the use of the Prospectus until the requisite changes to such Prospectus have been made, then the Selling Stockholders shall suspend use of such Prospectus. GrowCo will use commercially reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable. GrowCo shall be entitled to exercise its right under this Section 2(h) to suspend the availability of the Form S-1 and the Prospectus for a period not to exceed 60 calendar days (which need not be consecutive days).

(i) In connection with the preparation, filing and amendment of the Form S-1, GrowCo shall use commercially reasonable efforts to (A) prepare and file with the SEC a registration statement on Form 8-A (or such other form as is appropriate under SEC Guidance), (ii) cause such registration statement to be declared effective by the SEC as of the Effective Date, and (iii) during the Effectiveness Period, timely file with the SEC all periodic and current reports required under the Exchange Act.

(j) Notwithstanding any reference herein to the "filing" of the Form S-1 or any amendment thereto, GrowCo may, in its reasonable judgment, elect to effect such action by a confidential submission, rather than a filing publicly available on the EDGAR system.

3. **Form S-1 Indemnification.**

(a) **Indemnification by GrowCo.** GrowCo shall, notwithstanding any termination of this Agreement, indemnify and hold harmless each Selling Stockholder, the officers, directors, members, partners, agents, brokers (including brokers who offer and sell Covered Securities as principal as a result of a pledge or any failure to perform under a margin call of Common Stock), investment advisors and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each of them, each Person who controls any Selling Stockholder (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) and the officers, directors, members, stockholders, partners, agents and employees (and any other Persons with a functionally equivalent role of a Person holding such titles, notwithstanding a lack of such title or any other title) of each such controlling Person, to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including reasonable attorneys' fees) and expenses (collectively, "**Losses**"), as incurred, arising out of or relating to (i) any untrue or alleged untrue statement of a material fact contained in the Form S-1, the Prospectus or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of the Prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading or (ii) any violation or alleged violation by GrowCo of the Securities Act, the Exchange Act or any state securities law, or any rule or regulation thereunder, in connection with the performance of its obligations under Section 2, except to the extent, but only to the extent, that (A) such untrue statements or omissions are based solely upon information regarding a Selling Stockholder furnished in writing to GrowCo by such Selling Stockholder expressly for use therein, or to the extent that such information relates to a Selling Stockholder or such Selling Stockholder's proposed method of distribution of Covered Securities and was reviewed and expressly approved in writing by such Selling Stockholder expressly for use in the Form S-1, the Prospectus, or in any amendment or supplement thereto or (B) in the case of an occurrence of an event of the type specified in clauses (iii) through (vi) of Section 2(c), the use by such Selling Stockholder of an outdated, defective or otherwise unavailable Prospectus after GrowCo has notified such Selling Stockholder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Selling Stockholder and prior to the receipt by such Selling Stockholder of the Advice contemplated in Section 7(d). GrowCo shall notify the Selling Stockholders promptly of the

institution, threat or assertion of any Proceeding arising from or in connection with the transactions contemplated by Section 2 of which GrowCo becomes aware.

(b) **Indemnification by Selling Stockholders.** Each Selling Stockholder shall jointly indemnify and hold harmless GrowCo, its directors, officers, agents and employees, each Person who controls GrowCo (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act), and the directors, officers, agents or employees of such controlling Persons, to the fullest extent permitted by applicable law, from and against all Losses, as incurred, to the extent arising out of or based upon: (i) such Selling Stockholder's failure to comply with the prospectus delivery requirements of the Securities Act; (ii) any untrue or alleged untrue statement of a material fact contained in the Form S-1, the Prospectus, or in any amendment or supplement thereto, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein not misleading (A) to the extent, but only to the extent, that such untrue statement or omission is contained in any information so furnished in writing by such Selling Stockholder to GrowCo specifically for inclusion in such Registration Statement or such Prospectus or (B) to the extent that such information relates to such Selling Stockholder's proposed method of distribution of Covered Securities and was reviewed and expressly approved in writing by such Selling Stockholder expressly for use in the Form S-1, the Prospectus or in any amendment or supplement thereto; or (iii) in the case of an occurrence of an event of the type specified in clauses (iii) through (vi) of Section 2(c), the use by such Selling Stockholder of an outdated, defective or otherwise unavailable Prospectus after GrowCo has notified such Selling Stockholder in writing that the Prospectus is outdated, defective or otherwise unavailable for use by such Selling Stockholder and prior to the receipt by such Selling Stockholder of the Advice contemplated in Section 7(d).

(c) **Conduct of Indemnification Proceedings.**

(i) If any Proceeding shall be brought or asserted against any Person entitled to indemnity hereunder (an "**Indemnified Party**"), such Indemnified Party shall promptly notify the Person from whom indemnity is sought (the "**Indemnifying Party**") in writing, and the Indemnifying Party shall have the right to assume the defense thereof, including the employment of counsel reasonably satisfactory to the Indemnified Party and the payment of all fees and expenses incurred in connection with defense thereof; *provided* that the failure of any Indemnified Party to give such notice shall not relieve the Indemnifying Party of its obligations or liabilities pursuant to this Agreement, except (and only) to the extent that it shall be finally determined by a court of competent jurisdiction (which determination is not subject to appeal or further review) that such failure shall have prejudiced the Indemnifying Party.

(ii) An Indemnified Party shall have the right to employ separate counsel in any such Proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party or Parties unless: (A) the Indemnifying Party has agreed in writing to pay such fees and expenses, (B) the Indemnifying Party shall have failed promptly to assume the defense of such Proceeding and to employ counsel reasonably satisfactory to such Indemnified Party in any such Proceeding, or (C) the named parties to any such Proceeding (including any impleaded parties) include both such Indemnified Party and the Indemnifying Party, and counsel to the Indemnified Party shall reasonably believe that a material conflict of interest is likely to exist if the same counsel were to represent such Indemnified Party and the Indemnifying Party (in which case, if such Indemnified Party notifies the Indemnifying Party in writing that it elects to employ separate counsel at the expense of the Indemnifying Party, the Indemnifying Party shall not have the right to assume the defense thereof and the reasonable fees and expenses of no more than one separate counsel shall be at the expense of the Indemnifying Party). The Indemnifying Party shall not be liable for any settlement of any such Proceeding effected without its

written consent, which consent shall not be unreasonably withheld or delayed. No Indemnifying Party shall, without the prior written consent of the Indemnified Party, effect any settlement of any pending Proceeding in respect of which any Indemnified Party is a party, unless such settlement includes an unconditional release of such Indemnified Party from all liability on claims that are the subject matter of such Proceeding.

(iii) Subject to the terms of this Agreement, all reasonable fees and expenses of the Indemnified Party (including reasonable fees and expenses to the extent incurred in connection with investigating or preparing to defend such Proceeding in a manner not inconsistent with this Section 3) shall be paid to the Indemnified Party, as incurred, within ten Business Days of written notice thereof to the Indemnifying Party; *provided* that the Indemnified Party shall promptly reimburse the Indemnifying Party for that portion of such fees and expenses applicable to such actions for which such Indemnified Party is judicially determined not to be entitled to indemnification hereunder.

(d) **Contribution.**

(i) If the indemnification under Section 3(a) or (b) is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then each Indemnifying Party shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The amount paid or payable by a party as a result of any Losses shall be deemed to include, subject to the limitations set forth in this Agreement, any reasonable attorneys' or other fees or expenses incurred by such party in connection with any Proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in this Section 3 was available to such party in accordance with its terms.

(ii) The Parties agree that it would not be just and equitable if contribution pursuant to this Section 3(d) were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding paragraph.

(e) **Remedies Not Exclusive.** The indemnity and contribution agreements contained in this Section 4 are in addition to any liability that the Indemnifying Parties may have to the Indemnified Parties.

4. **Form 10.** In the event that, for any reason, as of March 13, 2016 the Common Stock is not the subject of an effective registration statement on Form 8-A (or other form) filed by GrowCo with the SEC in connection with the filing of the Form S-1, GrowCo shall use commercially reasonable efforts to prepare and file the Form 10 with the SEC on March 14, 2016 in order to register the Common Stock under Section 12(b) or (g) of the Exchange Act and shall withdraw the Form S-1 from filing under the Securities Act. Subject to the terms of this Agreement, GrowCo shall use commercially reasonable efforts to cause the Form 10 filed hereunder to be declared effective under the Exchange Act as promptly as possible after the filing thereof. GrowCo shall notify the Holders via email of the effectiveness of the

Form 10 within one Business Day of the date on which the Form 10 becomes effective. In connection with GrowCo's registration obligations under this Section 4, GrowCo shall: (i) prepare and file with the SEC such amendments to the Form 10 as may be necessary or desirable in connection with the effectiveness of the Form 10; (ii) respond as promptly as reasonably possible to any comments received from the SEC with respect to the Form 10 or any amendment thereto; (iii) if necessary or desirable, withdraw the Form 10 and promptly file a successor registration statement on Form 10 with respect to the Common Stock; and (iv) comply in all material respects with the applicable provisions of the Exchange Act with respect to the registration of the Common Stock under Section 12(b) or (g) of the Exchange Act.

5. **Transfer Limitations.**

(a) **Volume Restrictions.** Notwithstanding any other provision of this Agreement, the Purchase Agreement or the Exchange Agreement, each Holder hereby agrees that it will not, during any calendar quarter commencing with the quarter ending March 31, 2016 and ending with the quarter ending March 31, 2017, sell or otherwise transfer more than 20% of the total number of shares of Common Stock that have been issued by GrowCo to such Holder pursuant to the Exchange Agreement from time to time prior to the time of such transfer. No early release of any Holder from the foregoing limitation may be effected without each other Holder being granted an early release on the same terms and with respect to the same percentage of shares of Common Stock held by such other Holder from its obligations under the foregoing limitation.

(b) **Agreement to Lock-Up.** Each Holder hereby agrees that it will not, without the prior written consent of the lead managing underwriter(s), during the period commencing on the date of the final prospectus relating to the first underwritten public offering of Common Stock and ending on the date specified by GrowCo and the lead managing underwriter(s) (such period not to exceed 180 days, except that, to the extent requested by the lead managing underwriter(s) to accommodate regulatory restrictions of the Financial Industry Regulatory Authority or any applicable securities exchange relating to the publication or other distribution of research reports or analyst recommendations and opinions, such period may be extended to a total of 215 days), (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of capital stock of GrowCo held immediately prior to the effectiveness of the registration statement for such public offering or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of such capital stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of capital stock or other securities, in cash or otherwise. The foregoing provisions of this Section 5(b) shall not apply to the sale of any shares to an underwriter in such public offering, and shall only be applicable to the Holder if all directors of GrowCo (other than a director designated by the Holder or its affiliates) enter into similar arrangements. The underwriters in connection with such public offering are intended third party beneficiaries of this Section 5(b) and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. The Holder further agrees, if requested by the underwriters of such public offering, to execute an agreement that is consistent with this Section 5(b) or that is necessary to give further effect to this Section 5(b).

(c) **Stop Transfer Instructions.** In order to enforce the covenants set forth in this Section 5, GrowCo may impose stop-transfer instructions with respect to the shares of Common Stock held by the Holders (and transferees and assignees thereof) until, in the case of Section 5(a), March 31, 2017 and until, in the case of Section 5(b), the end of the restricted period referenced therein.

6. **Registration Expenses.** All fees and expenses incident to the performance of, or compliance with, this Agreement by GrowCo shall be borne by GrowCo whether or not any Covered Securities are

sold pursuant to the Form S-1. The fees and expenses referred to in the foregoing sentence shall include (a) all registration and filing fees with respect to filings made with the SEC or in compliance with applicable state securities or "blue sky" laws reasonably agreed to by GrowCo in writing, (b) fees and disbursements of counsel for GrowCo, including fees and expenses with respect to filings made with the SEC and in connection with "blue sky" qualifications or exemptions of the Covered Securities or the Common Stock as a class, (c) fees and expenses of GrowCo's independent registered public accountants, including fees and expenses with respect to filings made with the SEC and in connection with any review or audit of GrowCo's financial statements, and (d) fees and expenses of all other Persons retained by GrowCo in connection with the consummation of the transactions contemplated by this Agreement. In no event shall GrowCo be responsible for any broker or similar commissions of any Selling Stockholder or any legal fees or other costs of the Selling Stockholders.

7. **Miscellaneous.**

(a) **Remedies.** In the event of a breach by the Parties of any of their respective obligations under this Agreement, each Party, in addition to being entitled to exercise all rights granted by law and under this Agreement, including recovery of damages, shall be entitled to specific performance of its rights under this Agreement. Each Party hereto agrees that monetary damages would not provide adequate compensation for any losses incurred by reason of a breach by it of any of the provisions of this Agreement and hereby further agrees that, in the event of any action for specific performance in respect of such breach, it shall not assert or shall waive the defense that a remedy at law would be adequate. Each Holder agrees that GrowCo shall not be liable to such Holder for any failure of the Form S-1 or Form 10 to become effective as of any particular time or at all, except to the extent such failure results directly from a material breach or material violation by GrowCo of any express provision of this Agreement.

(b) **No Piggyback on Registrations; Limitation on Filing Other Registration Statements.** Neither GrowCo nor any of its security holders may include securities of GrowCo in any registration statement filed by GrowCo with the SEC, other than the inclusion of the Covered Securities in the Form S-1. GrowCo shall not file any other registration statement with the SEC until all Covered Securities have been registered pursuant to the Form S-1 and the Form S-1 has been declared effective by the SEC.

(c) **Compliance.** Each Selling Stockholder covenants and agrees that it will comply with the prospectus delivery requirements of the Securities Act as applicable to it in connection with sales of Covered Securities pursuant to the Form S-1.

(d) **Discontinued Disposition.** Each Selling Stockholder agrees that, upon receipt of a notice from GrowCo of the occurrence of any event of the kind described in clauses (iii) through (vi) of Section 2(c), such Selling Stockholder will forthwith discontinue disposition of Covered Securities under the Form S-1 until it is advised in writing (the "**Advice**") by GrowCo that the use of the applicable Prospectus (as it may have been supplemented or amended) may be resumed. GrowCo will use commercially reasonable efforts to ensure that the use of the Prospectus may be resumed as promptly as is practicable.

(e) **No Inconsistent Agreements.** GrowCo has not entered, as of the date hereof, and shall not enter, on or after the date of this Agreement, into any agreement with respect to its securities that would have the effect of impairing the rights granted to the Selling Stockholders in this Agreement or otherwise conflict with the provisions hereof.

(f) **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the Party to be notified; (ii) when sent by confirmed email if sent during normal business

hours of the recipient or, if not, then on the next Business Day; (iii) three Business Days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (iv) one Business Day after deposit with a nationally recognized overnight courier, specifying next-day delivery, with written verification of receipt. Such communications shall be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 8(f)):

If to GrowCo: 2000 South Colorado Boulevard
Tower 1, Suite 3100
Denver, Colorado 80222
Email: info@2riverswater.com
Attention: Chief Financial Officer

If to a Holder: To the mailing address thereof set forth on the signature page hereof or on such Holder's Joinder Agreement, as the case may be.

(g) **Severability**. If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under applicable law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(h) **Entire Agreement**. This Agreement (including the Schedule and Exhibits hereto) and the Purchase Agreement constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersede all prior understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

(i) **Interpretation**. For purposes of this Agreement:

(i) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(ii) any references herein to a Section, Schedule or Exhibit refer to a Section of, or Schedule or Exhibit attached to, this Agreement, unless specified otherwise;

(iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(iv) the words "include," "included" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(v) the word "or" is not exclusive;

(vi) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(vii) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(viii) unless the context otherwise requires, (i) references herein to an agreement, instrument or other document (including this Agreement) mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (ii) references herein to a statute means such statute as amended from time to time and include any successor legislation thereto and any rules and regulations promulgated thereunder; and

(ix) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the Party drafting an instrument or causing any instrument to be drafted.

(j) **Successors and Assigns**. This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the Parties. GrowCo may not assign (except by merger) its rights or obligations hereunder without the prior written consent of Holders of a majority of the then-outstanding Registrable Securities. No Selling Stockholder may assign its rights hereunder without the prior written consent of GrowCo.

(k) **Amendments and Waivers**. The provisions of this Agreement, including the provisions of this sentence, may not be amended, modified or supplemented, and waivers or consents to departures from the provisions hereof may not be given, unless the same shall be in writing and signed by GrowCo and the Holders of a majority of the then-outstanding Registrable Securities. Notwithstanding the foregoing, a waiver or consent to depart from the provisions hereof with respect to a matter that relates exclusively to the rights of a Holder or some Holders (including Selling Stockholders) and that does not directly or indirectly affect the rights of other Holders may be given by such Holder or Holders of a majority of the Registrable Securities to which such waiver relates; *provided, however,* that the provisions of this sentence may not be amended, modified, or supplemented except in accordance with the provisions of the first sentence of this Section 7(k).

(l) **Governing Law**. This Agreement shall be governed by the internal law of the State of Colorado.

(m) **Counterparts**. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the ESIGN Act of 2000, *e.g., www.docusign.com*) or other transmission method, and any counterpart so delivered shall be deemed to have been duly and validly delivered and to be valid and effective for all purposes.

(n) **Dispute Resolution.**

(i) The Parties agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement or the transactions contemplated hereby, shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the Parties irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any

such court or that any such suit, action or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address for purposes of Section 7(f) shall be effective service of process for any suit, action or other proceeding brought in any such court.

(ii) WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION 7(n)(ii) HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

(iii) Each Party shall bear its own costs in respect of any disputes arising under this Agreement. Each of the Parties consents to personal jurisdiction for any equitable action sought in the U.S. District Court for the District of Colorado or any court of the State of Colorado having subject matter jurisdiction.

(o) **Independent Nature of Holders' Obligations and Rights**. The obligations of each Holder hereunder are several and not joint with the obligations of any other Holder hereunder, and no Holder shall be responsible in any way for the performance of the obligations of any other Holder hereunder. Nothing contained herein or in any other agreement or document delivered at any closing, and no action taken by any Holder pursuant hereto or thereto, shall be deemed to constitute the Holders as a partnership, an association, a joint venture or any other kind of entity, or create a presumption that the Holders are in any way acting in concert with respect to such obligations or the transactions contemplated by this Agreement. Each Holder shall be entitled to protect and enforce its rights, including without limitation the rights arising out of this Agreement, and it shall not be necessary for any other Holder to be joined as an additional Party in any proceeding for such purpose.

*[SIGNATURE PAGE FOLLOWS]*

IN WITNESS WHEREOF, each of the Parties has executed this Agreement, or has caused this Agreement to be executed by its officer thereunto duly authorized, as of the date first written above.

GROWCO, INC.

By: Wayne Harding

Digitally signed by Wayne Harding
DN: cn=Wayne Harding, o=GrowCo, Inc., ou=Finance Legal, email=wharding@trgrowco.com, c=US
Date: 2015.11.17 11:07:49 -07'00'

Wayne Harding, Chief Financial Officer

*[For Holders that are entities:]*

Michael W and Linda J Harnish Revocable Trust
Print or Type Name of Holder

By: Michael W Harnish Trustee
Name: Michael W HARNISH
Title: Trustee

*Address:*

3367 NW Lacamas Drive
Camas, WA 98607

Email: mharnish1@icloud.com

*[For Holders who are individuals:]*

Signature

Print or Type Name of Holder

*Address:*

Email:

**SIGNATURE PAGE TO REGISTRATION RIGHTS AGREEMENT**

JOINDER TO REGISTRATION RIGHTS AGREEMENT

Reference is hereby made to the Registration Rights Agreement, dated as of November 17, 2015, as amended from time to time (the "**Agreement**"), by and among GrowCo, Inc., a Colorado company ("**GrowCo**"), and the several Holders named in SCHEDULE A thereto.

Pursuant to the terms of the Agreement, the undersigned hereby acknowledges that it has received and reviewed a copy of the Agreement and agrees that, upon execution of this Joinder Agreement, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto, and shall be deemed to be an Investor for all purposes thereof and entitled to all the rights incidental thereto.

IN WITNESS WHEREOF, the parties hereto have executed this Joinder Agreement as of OCT 19, 2015.

JOHN R. MCKOWEN
(Print Name)

By: John R McKowen
Name:
Title:

Address:
456 MADISON ST
DENVER, CO 80206

Email:

*Accepted and confirmed as of the date above:*

GROWCO, INC.

By: [signature]
Title:

# SCHEDULE OF HOLDERS

| NAME AND ADDRESS OF HOLDER | NUMBER OF REGISTRABLE SHARES |
|---|---|

**FORM OF JOINDER AGREEMENT**

# LIMITED LIABILITY COMPANY AGREEMENT

among

GCP SUPER UNITS, LLC

and

MEMBERS NAMED IN SCHEDULE 1

Dated as of October 16, 2015

TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ... 1
Section 1.01. Definitions ... 1
Section 1.02. Interpretation ... 7

ARTICLE II ORGANIZATION ... 8
Section 2.01. Formation ... 8
Section 2.02. Name ... 8
Section 2.03. Principal Office ... 8
Section 2.04. Registered Office and Agent ... 8
Section 2.05. Purpose and Powers ... 9
Section 2.06. Term ... 9
Section 2.07. No State-Law Partnership ... 9

ARTICLE III UNITS ... 10
Section 3.01. Units Generally ... 10
Section 3.02. Authorization and Issuance of Preferred Units ... 10
Section 3.03. Authorization and Issuance of Common Units ... 10
Section 3.04. Certification of Units ... 10
Section 3.05. Action by Consent ... 10

ARTICLE IV MEMBERS ... 11
Section 4.01. Admission of New Members ... 11
Section 4.02. Representations and Warranties of Members ... 11
Section 4.03. No Personal Liability ... 12
Section 4.04. No Withdrawal ... 12
Section 4.05. Death ... 13
Section 4.06. Voting ... 13
Section 4.07. Power of Members ... 13
Section 4.08. No Interest in Company Property ... 13

ARTICLE V CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS ... 13
Section 5.01. Existing Capital Contributions ... 13
Section 5.02. Additional Capital Contributions ... 13
Section 5.03. Maintenance of Capital Accounts ... 13
Section 5.04. Succession Upon Transfer ... 14
Section 5.05. Negative Capital Accounts ... 14
Section 5.06. No Withdrawal ... 14
Section 5.07. Treatment of Loans From Members ... 14
Section 5.08. Modifications ... 14

ARTICLE VI ALLOCATIONS ... 15
Section 6.01. Allocation of Net Income and Net Loss ... 15
Section 6.02. Regulatory and Special Allocations ... 15
Section 6.03. Tax Allocations ... 16
Section 6.04. Allocations in Respect of Transferred Units ... 17
Section 6.05. Curative Allocations ... 17

ARTICLE VII DISTRIBUTIONS ....................17
Section 7.01. No Distributions on Common Units....................17
Section 7.02. Participating Distributions....................17
Section 7.03. Other Distributions....................17
Section 7.04. Tax Withholding; Withholding Advances ....................18
Section 7.05. Distributions in Kind....................19
Section 7.06. Compliance with Law ....................19

ARTICLE VIII MANAGEMENT....................19
Section 8.01. Establishment of the Board ....................19
Section 8.02. Board Composition; Vacancies....................20
Section 8.03. Removal; Resignation ....................20
Section 8.04. Meetings....................21
Section 8.05. Quorum; Manner of Acting....................21
Section 8.06. Action By Written Consent....................21
Section 8.07. Manager Status....................22
Section 8.08. Committees....................22
Section 8.09. Officers....................22
Section 8.10. No Personal Liability ....................23

ARTICLE IX EXCHANGES OF PREFERRED UNITS ....................23
Section 9.01. Exchange Agreement ....................23
Section 9.02. Transfer of Preferred Units Upon Exchange....................23

ARTICLE X TRANSFERS....................23
Section 10.01. General Restrictions on Transfer....................23

ARTICLE XI CONFIDENTIALITY ....................24
Section 11.01. Nondisclosure....................24
Section 11.02. Permitted Disclosures....................24
Section 11.03. Excluded Information....................25

ARTICLE XII TAX MATTERS ....................25
Section 12.01. Tax Matters Member....................25
Section 12.02. Tax Returns ....................26
Section 12.03. Company Funds....................26

ARTICLE XIII DISSOLUTION AND LIQUIDATION ....................26
Section 13.01. Events of Dissolution ....................26
Section 13.02. Effectiveness of Dissolution....................26
Section 13.03. Liquidation ....................26
Section 13.04. Cancellation of Articles....................27
Section 13.05. Survival of Rights, Duties and Obligations....................27
Section 13.06. Recourse for Claims ....................28

ARTICLE XIV EXCULPATION AND INDEMNIFICATION ....................28
Section 14.01. Exculpation of Covered Persons ....................28
Section 14.02. Liabilities and Duties of Covered Persons; Conflicts of Interest....................28
Section 14.03. Indemnification ....................29
Section 14.04. Survival ....................31

ARTICLE XV MISCELLANEOUS ....... 31
Section 15.01. Further Assurances ....... 31
Section 15.02. Notices ....... 31
Section 15.03. Severability ....... 31
Section 15.04. Entire Agreement ....... 31
Section 15.05. Successors and Assigns ....... 32
Section 15.06. No Third-Party Beneficiaries ....... 32
Section 15.07. Amendment ....... 32
Section 15.08. Waiver ....... 32
Section 15.09. Governing Law ....... 32
Section 15.10. Submission to Jurisdiction ....... 32
Section 15.11. Waiver of Jury Trial ....... 33
Section 15.12. Equitable Remedies ....... 33
Section 15.13. Remedies Cumulative ....... 33

EXHIBIT A Form of Joinder Agreement
SCHEDULE 1 Member Schedule

THIS LIMITED LIABILITY COMPANY AGREEMENT of GCP Super Units, LLC, a Colorado limited liability company (the "**Company**"), is entered into as of October 16, 2015 among the Company and each other individual or entity that after the date hereof becomes a member of the Company and a party hereto by executing a Joinder Agreement (as defined below).

## RECITALS

WHEREAS, the Company was formed under the laws of the State of Colorado by the filing of Articles of Organization with the Secretary of State of the State of Colorado on September 25, 2015 (the "**Articles of Organization**");

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01. **Definitions.** The following terms shall have the meanings set forth or referenced below:

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, shall mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership interests, by contract or otherwise; and the terms "controlling" and "controlled" shall have correlative meanings.

This "**Agreement**" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of:

(a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations or orders of any Governmental Authority;

(b) any consents or approvals of any Governmental Authority; and

(c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Articles of Organization**" has the meaning set forth in the Recitals.

"**Board**" means the board of managers of the Company established in accordance with Section 8.01.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation shall be an amount that bears the same ratio to

such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; *provided* that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the asset is positive, Book Depreciation shall be determined with reference to such beginning Book Value using any permitted method selected by the Board in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(*g*)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a) the initial Book Value of any Company asset contributed by a Member to the Company shall be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b) immediately prior to the Distribution by the Company of any Company asset to a Member, the Book Value of such asset shall be adjusted to its gross Fair Market Value as of the date of such Distribution;

(c) the Book Value of all Company assets shall be adjusted to equal their respective gross Fair Market Values, as determined by the Board, as of the following times:

(i) the acquisition of additional Units by a new or existing Member in consideration of a Capital Contribution of more than a *de minimis* amount;

(ii) the Distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest in the Company; and

(iii) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

*provided* that adjustments pursuant to clauses (i), (ii) and (iii) above need not be made if the Board reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d) the Book Value of each Company asset shall be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); *provided* that Book Values shall not be adjusted pursuant to this clause (d) to the extent that an adjustment pursuant to clause (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this clause (d); and

(e) if the Book Value of a Company asset has been determined pursuant to clause (a) above or adjusted pursuant to clause (c) or (d) above, such Book Value shall thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Capital Account**" has the meaning set forth in Section 5.03.

"**Capital Contribution**" means, for any Member, the total amount of cash and property contributed to the Company by such Member, as set forth opposite the name of such Member in the Member Schedule.

"**Code**" means the Internal Revenue Code of 1986.

"**Colorado Act**" means the Colorado Limited Liability Company Act, Title 7, Article 80, Sections 80-101, *et seq.*, and any successor statute, as it may be amended from time to time.

"**Common Manager**" has the meaning set forth in Section 8.02(a)(i).

"**Common Members**" means the Member or Members who own Common Units as listed in the Member Schedule.

"**Common Units**" means the Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the Preamble.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 11.01.

"**Covered Person**" has the meaning set forth in Section 14.01(a).

"**Credit Facility**" means a credit facility agreement entered into by the Company, as lender, and a lessee under a Lease Agreement.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution or otherwise; *provided* that none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a Manager, Officer or employee of the Company or a Subsidiary. "**Distribute**" when used as a verb shall have a correlative meaning.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Exchange Agreement**" means the Exchange Agreement being entered into among the Company, GrowCo and the Holders listed on Schedule 1 thereto, in such form as an authorized Officer shall approve (such approval to be conclusively evidenced by such Officer's execution thereof on behalf of the Company).

"**Fair Market Value**" means, with respect to an asset as of a specified date, the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's-length transaction on such date, as determined in good faith by the Board based on such factors as the Board, in the exercise of its reasonable business judgment, considers relevant.

"**Fiscal Quarter**" means the first three-month period, second three-month period, third three-month period or fourth three-month period of a Fiscal Year.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year shall be the period that conforms to the Company's taxable year.

"**Funded Date**" means the earlier of (a) the first day as of which the Company has applied the maximum amount contemplated by Section 2.05(a)(ii) to purchase preferred units of GCP3 and GCP4 and (b) the date, if any, on which the Board determines that no further amounts will be applied to purchase preferred units of GCP3 or GCP4 pursuant to Section 2.05(a)(ii).

"**GBD**" means GrowCo Business Development, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP1**" means GrowCo Partners 1, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP2**" means GrowCo Partners 2, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP3**" means GrowCo Partners 3, LLC, a Colorado limited liability company, and any successor thereto.

"**GCP4**" means GrowCo Partners 4, LLC, a Colorado limited liability company, and any successor thereto.

"**GrowCo**" means GrowCo, Inc., a Colorado corporation, and any successor thereto.

"**Governmental Authority**" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of law), or any arbitrator, court or tribunal of competent jurisdiction.

"**Joinder Agreement**" means a written undertaking substantially in the form of the joinder agreement attached as EXHIBIT A.

"**Liquidator**" has the meaning set forth in Section 13.03(a).

"**Losses**" has the meaning set forth in Section 14.03(a).

"**Manager**" has the meaning set forth in Section 8.01.

"**Member**" means:

(a) Two Rivers, which as of the date of this Agreement holds 5,500,000 Common Units, has executed this Agreement and is identified as a Member on the Member Schedule, so long as it continues to be shown on the Member Schedule (as updated from time to time) as the owner of one or more Units; and

(b) each other Person who is admitted as a Member in accordance with the terms of this Agreement and the Colorado Act, in each case so long as such Person is shown on the Member Schedule (as updated from time to time) as the owner of one or more Units.

The Members shall constitute the "members" (as that term is defined in the Colorado Act) of the Company.

"**Member Nonrecourse Debt Minimum Gain**" means, with respect to any "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4) (substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires), an amount equal to the Company Minimum Gain that would result if such debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Schedule**" has the meaning set forth in Section 3.01.

"**Membership Interest**" means an interest in the Company owned by a Member, including such Member's right (based on the type and class of Unit or Units held by such Member), as applicable, to:

(a) a Distributive share of Net Income, Net Losses and other items of income, gain, loss and deduction of the Company,

(b) a Distributive share of the assets of the Company,

(c) vote on, consent to or otherwise participate in any decision of the Members as provided in this Agreement, and

(d) any and all other benefits to which such Member may be entitled as provided in this Agreement or the Colorado Act.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year, Fiscal Quarter or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), shall be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(i) as items described in Code Section 705(a)(2)(B), shall be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis shall be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment shall be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Section 732(d), 734(b) or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.09.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"**Preferred Manager**" has the meaning set forth in Section 8.02(a)(ii).

"**Preferred Members**" means Members who own Preferred Units as listed in the Member Schedule.

"**Preferred Units**" means Units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement.

"**Quarterly Net Amount**" means, with respect to a Fiscal Quarter:

(a) the total amount of payments in cash received by the Company during such Fiscal Quarter from the Company's holdings of preferred membership units in one or more of GBD, GCP1, GCP2, GCP3 and GCP4, *less*

(b) the total amount of payments in cash made by or on behalf of the Company during such Fiscal Quarter for operating and other fees and expenses of third parties, plus the total amount, if any, determined by the Board in its sole discretion to be retained for the establishment of reserves, or payment to third parties, as the Board deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when due of the Company's obligations and expenses and reasonable reserves for contingencies.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"**Securities Act**" means the Securities Act of 1933.

"**Subsidiary**" means any Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the Company.

"**Tax Matters Member**" has the meaning set forth in Section 12.01Section 12.01(a).

"**Taxing Authority**" has the meaning set forth in Section 7.04(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Units owned by a Person or any interest (including a beneficial interest) in any Units owned by a Person. "**Transfer**" when used as a noun shall have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means final or temporary regulations issued by the U.S. Department of Treasury pursuant o authority under the Code, and any successor regulations.

"**Two Rivers**" means Two Rivers Water & Farming Company, a Colorado corporation, or any successor thereto.

"**Unit**" means a unit representing a fractional part of the Membership Interests of the Members and shall include all types and classes of Units, including Preferred Units and Common Units, *provided* that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations and rights set forth in this Agreement and the Membership Interests represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations and rights.

"**Withholding Advances**" has the meaning set forth in Section 7.04(b).

Section 1.02. **Interpretation.** For purposes of this Agreement:

(a) headings used in this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement;

(b) any references herein to an Article, Section or Exhibit refer to an Article or Section of, or Exhibit attached to, this Agreement, unless specified otherwise;

(c) the word "day" refers to a calendar day;

(d) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole;

(e) the words "include," "includes" and "including" as used herein shall not be construed so as to exclude any other thing not referred to or described;

(f) the word "or" is not exclusive;

(g) the definition given for any term in this Agreement shall apply equally to both the singular and plural forms of the term defined;

(h) whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms;

(i) unless the context otherwise requires, (1) references herein to an agreement, instrument or other document mean such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (2) references herein to a statute means such statute as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder; and

(j) this Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

## ARTICLE II
## ORGANIZATION

Section 2.01. **Formation.**

(a) The Company was formed on September 25, 2015, pursuant to the provisions of the Colorado Act, upon the filing of the Articles of Organization with the Secretary of State of the State of Colorado.

(b) This Agreement shall constitute the "operating agreement" (as that term is used in the Colorado Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Colorado Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Colorado Act in the absence of such provision, this Agreement shall, to the extent permitted by the Colorado Act, control.

Section 2.02. **Name.** The name of the Company shall be "GCP Super Units, LLC" or such other name or names as the Board may from time to time designate; *provided* that the name shall always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."

Section 2.03. **Principal Office.** The principal office of the Company shall be located at 2000 South Colorado Boulevard, Tower 1, Suite 3100, Denver, Colorado, 80222 or such other place as may from time to time be determined by the Board. The Board shall give prompt notice of any such change to each of the Members.

Section 2.04. **Registered Office and Agent.**

(a) The registered office of the Company shall be the office of the initial registered agent named in the Articles of Organization or such other office (which need not be a place of business of the Company) as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

(b) The registered agent for service of process on the Company in the State of Colorado shall be the initial registered agent named in the Articles of Organization or such other Person or Persons as the Board may designate from time to time in the manner provided by the Colorado Act and other Applicable Law.

Section 2.05. **Purpose and Powers.**

(a) The purpose of the Company is to engage in any lawful act or activity for which limited liability companies may be formed under the Colorado Act and in any and all activities necessary or incidental thereto. Without limiting the foregoing:

(i) The proceeds received by the Company from initial sales of Preferred Units, net of placement fees associated therewith, shall be applied as follows (subject to rounding):

(A) five-elevenths (45.454545%) of such net proceeds shall be used to purchase preferred units of GBD at a per-unit price of $0.692273;

(B) one-eleventh (9.090909%) of such net proceeds shall be used to purchase preferred units of GCP1 at a per-unit price of $1.00; and

(C) five-elevenths (45.454545%) of such net proceeds shall be used to purchase preferred units of GCP2 at a per-unit price of $0.692273.

(ii) Seventy-five percent of the Quarterly Net Amount received with respect to each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2016 and continuing up to (but not including) the Fiscal Quarter in which the Funded Date occurs (that is, the portion of each such Quarterly Net Amount that is not Distributed to Preferred Members pursuant to Section 7.02(a)) shall be applied as follows (subject to rounding):

(A) up to $0.217277 per outstanding Preferred Unit shall be used to purchase preferred units of GCP3 at a per-unit price of $1.00; and/or

(B) up to $0.217277 per outstanding Preferred Unit shall be used to purchase preferred units of GCP4 at a per-unit price of $1.00;

*provided* that the Board in its sole discretion may determine to cause the Company to purchase fewer (but not more) preferred units of GCP3 and/or GCP4 than so calculated, in which case the unapplied amount shall be eligible for Distribution to Preferred Members pursuant to Section 7.03or upon liquidation, but shall not be applied for the purchase other securities or assets.

(b) The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Colorado Act.

Section 2.06. **Term**. The term of the Company commenced on September 25, 2015, and shall continue perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

Section 2.07. **No State-Law Partnership**. The Members intend that the Company shall be treated as a partnership for federal and, if applicable, state and local income tax purposes, and, to the extent permissible, the Company shall elect to be treated as a partnership for such purposes. The Company and each Member shall file all tax returns and shall otherwise take all tax and financial reporting positions in a manner consistent with such treatment and no Member shall take any action inconsistent with such treatment. The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture and that no Member, Manager or Officer of the Company shall be a partner or joint venturer of any other Member, Manager or Officer of the Company, for any purposes other than as set forth in the first sentence of this Section 2.07.

## ARTICLE III
### UNITS

Section 3.01. **Units Generally.** Membership Interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes or series. Each type, class or series of Units shall have the privileges, preference, duties, liabilities, obligations and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class or series. The Board shall maintain a schedule (the "**Member Schedule**") setting forth the name and address of each Member and, with respect to each type, class or series of Units held by such Member, (a) the number and issue date thereof, (b) the number of the certificate (if any) issued therefor, (c) the Capital Contribution of the Member with respect thereto, and (d) such other information as the Board may determine to be desirable. The Company shall update the Member Schedule upon the issuance or Transfer of any Units to any new or existing Member. A copy of the Member Schedule as of the date of this Agreement is attached as SCHEDULE 1.

Section 3.02. **Authorization and Issuance of Preferred Units.** Subject to compliance with Section 10.01(a), the Company is hereby authorized to issue a class of Units designated as Preferred Units, of which no Preferred Units are outstanding as of the date of this Agreement. The Company may issue up to a total of 5,500,000 Preferred Units.

Section 3.03. **Authorization and Issuance of Common Units.** The Company is hereby authorized to issue a class of Units designated as Common Units. As of the date hereof, a total of 5,500,000 Common Units have been issued and are outstanding.

Section 3.04. **Certification of Units.** The Board shall cause the Company to issue to each Member a certificate or certificates representing the Units held by the Member. In addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Units shall bear a legend substantially in the following form:

> "THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION OR OTHER DISPOSITION OF THE UNITS REPRESENTED BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.
>
> "THE UNITS REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 AND MAY NOT BE OFFERED FOR SALE, SOLD, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR AN OPINION OF COUNSEL SATISFACTORY TO THE ISSUE THAT SUCH REGISTRATION IS NOT REQUIRED."

Section 3.05. **Action by Consent.** Any matter that is to be voted on, consented to or approved by the holders of one or more types, classes or series of Membership Interests (including Common Units and Preferred Units) may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members holding not less than a majority of such types, classes or series of Membership Interests. A record shall be maintained by the Board of each such action taken by written consent of a Member or Members.

## ARTICLE IV
## MEMBERS

Section 4.01. **Admission of New Members.**

(a) New Members may be admitted from time to time subject to compliance with the provisions of Section 4.01(b) and, in connection with a Transfer of Units, ARTICLE X.

(b) In order for any Person not already a Member to be admitted as a Member, whether pursuant to an issuance or a Transfer of Units, such Person shall have executed and delivered a Joinder Agreement to the Company. Upon the amendment of the Member Schedule by the Board and the satisfaction of any other applicable conditions (including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units), such Person shall be admitted as a Member and issued such Units and the Board shall adjust the Capital Accounts of the Members as necessary in accordance with Section 5.03.

Section 4.02. **Representations and Warranties of Members.** By execution and delivery of this Agreement or a Joinder Agreement, as applicable, each of the Members, whether admitted as of the date hereof or pursuant to Section 4.01, represents and warrants to the Company and acknowledges that:

(a) The Units have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act and (ii) the provisions of this Agreement have been complied with.

(b) Such Member (i) unless otherwise agreed to by the Board prior to such Member's execution of a Joinder Agreement, is an "accredited investor" within the meaning of Rule 501 under the Securities Act and (ii) agrees that such Member will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 under the Securities Act with respect to the offer and sale of the Units.

(c) Such Member's Units are being acquired for its own account solely for investment and not with a view to resale or distribution thereof.

(d) Such Member has conducted its own independent review and analysis of the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries, and such Member acknowledges that it has been provided adequate access to the personnel, properties, premises and records of the Company and the Subsidiaries for such purpose.

(e) The determination of such Member to acquire Units has been made by such Member independent of any other Member and independent of any statements or opinions as to the advisability of such purchase or as to the business, operations, assets, liabilities, results of operations, financial condition and prospects of the Company and the Subsidiaries that may have been made or given by any other Member or by any agent or employee of any other Member.

(f) Such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto.

(g) Such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time.

(h) The execution, delivery and performance of this Agreement have been duly authorized by such Member and do not require such Member to obtain any consent or approval that has not been obtained and do not contravene or result in a default in any material respect under any provision of any law or regulation applicable to such Member or other governing documents or any agreement or instrument to which such Member is a party or by which such Member is bound.

(i) This Agreement is valid, binding and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity).

(j) Neither the issuance of any Units to any Member nor any provision contained herein will entitle the Member to remain in the employment of the Company or any Subsidiary or affect the right of the Company or any Subsidiary to terminate the Member's employment at any time for any reason, other than as otherwise provided in such Member's employment agreement or other similar agreement with the Company or such Subsidiary, if applicable.

None of the foregoing shall replace, diminish or otherwise adversely affect any Member's representations and warranties made by it in any purchase agreement.

Section 4.03. **No Personal Liability**. Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Member will be obligated personally for any debt, obligation or liability of the Company, any Subsidiary or any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member.

Section 4.04. **No Withdrawal**. A Member shall not cease to be a Member as a result of the occurrence of any of the following:

(a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets;

(b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due;

(c) the making by such Member of a general assignment for the benefit of such Member's creditors;

(d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or

(e) the expiration of sixty days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of

the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 4.05. **Death.** The death of any Member shall not cause the dissolution of the Company. In such event the Company and its business shall be continued by the remaining Member or Members and the Units owned by the deceased Member shall automatically be Transferred to such Member's heirs; *provided* that within a reasonable time after such Transfer, the applicable heirs shall sign a Joinder Agreement.

Section 4.06. **Voting.** Except as otherwise provided by this Agreement (including Section 15.07) or as otherwise required by the Colorado Act or other Applicable Law, each Member shall be entitled to one vote per Common Unit and one vote per Preferred Unit (voting together as a single class) on all matters upon which the Members have the right to vote under this Agreement.

Section 4.07. **Power of Members.** The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Colorado Act. Except as otherwise specifically provided by this Agreement or required by the Colorado Act, no Member, in its capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 4.08. **No Interest in Company Property.** No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company. Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

## ARTICLE V
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

Section 5.01. **Existing Capital Contributions.** Two Rivers has made the Capital Contribution giving rise to its initial Capital Account and owns 5,500,000 Common Units on the date hereof.

Section 5.02. **Additional Capital Contributions.**

(a) No Member shall be required to make any additional Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board.

(b) No Member shall be required to lend any funds to the Company or shall have any personal liability for the payment or repayment of any Capital Contribution by or to any other Member.

Section 5.03. **Maintenance of Capital Accounts.** The Company shall establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 5.03. Each Capital Account shall be established and maintained in accordance with the following provisions:

(a) Each Member's Capital Account shall be increased by the amount of:

(i) such Member's Capital Contributions, including such Member's initial Capital Contribution;

(ii) any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE VI; and

(iii) any liabilities of the Company that are assumed by such Member or secured by any property Distributed to such Member.

(b) Each Member's Capital Account shall be decreased by:

(i) the cash amount or Book Value of any property Distributed to such Member pursuant to ARTICLE VII and Section 13.03(c);

(ii) the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE VI; and

(iii) the amount of any liabilities of such Member assumed by the Company or which are secured by any property contributed by such Member to the Company.

Section 5.04. **Succession Upon Transfer.** In the event that any Membership Interests of Members are Transferred in accordance with the terms of this Agreement, the Transferee shall succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Units and, subject to Section 6.04, shall receive allocations and Distributions pursuant to ARTICLE VI, ARTICLE VII and ARTICLE XIII in respect of such Units.

Section 5.05. **Negative Capital Accounts.** In the event that any Member shall have a deficit balance in its Capital Account, such Member shall have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any Capital Contributions to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

Section 5.06. **No Withdrawal.** No Member shall be entitled to withdraw any part of its Capital Account or to receive any Distribution from the Company, except as provided in this Agreement. No Member shall receive any interest, salary or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement. The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss and deduction among the Members and shall have no effect on the amount of any Distributions to any Members, in liquidation or otherwise.

Section 5.07. **Treatment of Loans From Members.** Loans by any Member to the Company shall not be considered Capital Contributions and shall not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 5.03(a)(iii), if applicable.

Section 5.08. **Modifications.** The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Treasury Regulations. If the Board determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Board may authorize such modifications.

## ARTICLE VI
## ALLOCATIONS

Section 6.01. **Allocation of Net Income and Net Loss**. For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss or deduction) of the Company shall be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.02, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the Distributions that would be made to such Member pursuant to Section 13.03(c) if the Company were dissolved and its affairs wound up, its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), the net assets of the Company were Distributed, in accordance with Section 13.03(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

Section 6.02. **Regulatory and Special Allocations**. Notwithstanding the provisions of Section 6.01:

(a) If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). The items to be so allocated shall be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2). This Section 6.02(a) is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(b) Any "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires, shall be allocated in the manner required by Treasury Regulations Section 1.704-2(i). Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain shall be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain. Items to be allocated pursuant to this paragraph shall be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 6.02(b) is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c) In the event any Member unexpectedly receives any adjustments, allocations or Distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income shall be specially allocated to such Member in an amount and manner sufficient to eliminate, as quickly as possible, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704 1(b)(2)(ii)(c), 1.704 2(g)(1) and 1.704 2(I HBY); and

(ii) debiting to such Capital Account the items described in Treasury Regulations Sections 1.704 1(b)(2)(ii)(d)(4), (5) and (6).

This Section 6.02(c) is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(d) The allocations set forth in Sections 6.02(a), (b) and (c) are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this ARTICLE VI (other than Sections 6.02(a), (b) and (c)), the allocations set forth in Sections 6.02(a), (b) and (c) shall be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the allocations to each Member in accordance with Sections 6.02(a), (b) and (c) shall be equal to the net amount that would have been allocated to such Member if the allocations in accordance with Sections 6.02(a), (b) and (c) had not occurred.

(e) The Company and the Members acknowledge that allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) result from the allocations of Net Income and Net Loss provided for in this Agreement. For the avoidance of doubt, the Company is entitled to make allocations like those described in Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) and, once required by applicable final or temporary guidance, allocations of Net Income and Net Loss will be made in accordance with Proposed Treasury Regulations Section 1.704-1(b)(4)(xii)(c) or any successor provision or guidance.

Section 6.03. **Tax Allocations.**

(a) Subject to clauses (b) through (e) of this Section 6.03, all income, gains, losses and deductions of the Company shall be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions among the Members for computing their Capital Accounts, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions shall be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth herein in computing their Capital Accounts.

(b) Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) and the traditional method of Treasury Regulations Section 1.704-3(b), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c) If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in clause (c) of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d) Allocations of tax credit, tax credit recapture and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Board taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e) Allocations pursuant to this Section 6.03 are solely for purposes of federal, state and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital

Account or share of Net Income, Net Losses, Distributions or other items pursuant to any provisions of this Agreement.

Section 6.04. **Allocations in Respect of Transferred Units**. In the event of a Transfer of Units during any Fiscal Year made in compliance with the provisions of ARTICLE X, Net Income, Net Losses and other items of income, gain, loss and deduction of the Company attributable to such Units for such Fiscal Year shall be determined using the interim closing of the books method.

Section 6.05. **Curative Allocations**. In the event that the Tax Matters Member determines, after consultation with counsel experienced in income tax matters, that the allocation of any item of Company income, gain, loss or deduction is:

(a) not specified in this ARTICLE VI, or

(b) clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii)),

then the Board may allocate such item described in the foregoing clause (a), or reallocate such item described in the foregoing clause (b), to reflect such economic interests; *provided* that (i) no such allocation shall be made without the prior consent of each Member that would be adversely and disproportionately affected thereby and (ii) no such allocation shall have any material effect on the amounts distributable to any Preferred Member, including the amounts to be distributed upon the complete liquidation of the Company.

## ARTICLE VII
### DISTRIBUTIONS

Section 7.01. **No Distributions on Common Units**. No Distributions shall be made with respect to Common Units, including upon liquidation.

Section 7.02. **Participating Distributions**. Distributions pursuant to this Section 7.02 are subject only to Section 7.06, and no other Distributions shall be made unless and until all Distributions due under this Section 7.02 have been paid. The total amount of Distributions, if any, due under this Section 7.02 with respect to a Fiscal Quarter shall be allocated and paid to Preferred Members pro rata in proportion to their holdings of the Preferred Units as of the end of such Fiscal Quarter.

(a) The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter ending March 31, 2016 and continuing up to (but not including) the Fiscal Quarter in which the Funded Date occurs, Distribute with respect to the Preferred Units a total amount equal to 25% of the Quarterly Net Amount for such Fiscal Quarter.

(b) The Company shall, within 45 days after the end of each Fiscal Quarter commencing with the Fiscal Quarter in which the Funded Date occurs, Distribute with respect to the Preferred Units a total amount equal to the Quarterly Net Amount for such Fiscal Quarter.

Section 7.03. **Other Distributions**. After making all Distributions then due to Preferred Members under Section 7.02, and subject to Section 7.06 and Section 13.03, the Board shall have sole discretion regarding the amounts and timing of Distributions to Preferred Members, including to decide to forego payment of other Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company, which needs may include the payment or the making of provision for the payment when

due of the Company's obligations, including present and anticipated obligations and expenses and reasonable reserves for contingencies.

Section 7.04. **Tax Withholding; Withholding Advances.**

(a) **Tax Withholding.** If requested by the Board, each Member shall, if able to do so, deliver to the Board:

(i) an affidavit in form satisfactory to the Board that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign or other Applicable Law;

(ii) any certificate that the Board may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Board relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Board the affidavit described in the preceding clause (i), the Board may withhold amounts from such Member in accordance with Section 7.04(b).

(b) **Withholding Advances.** The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Tax Matters Member based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local or foreign taxing authority (a "**Taxing Authority**") with respect to any Distribution or allocation by the Company of income or gain to such Member and to withhold the same from Distributions to such Member. Any funds withheld from a Distribution by reason of this Section 7.04(b) shall nonetheless be deemed Distributed to the Member in question for all purposes under this Agreement and, at the option of the Board, shall be charged against the Member's Capital Account.

(c) **Repayment of Withholding Advances.** Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a Distribution to that Member shall be, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in *The Wall Street Journal* on the date of payment plus two percent per annum:

(i) promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member shall not constitute a Capital Contribution, but shall credit the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Board, repaid by reducing the amount of the next succeeding Distribution or Distributions to be made to such Member (which reduction amount shall be deemed to have been Distributed to the Member, but shall not further reduce the Member's Capital Account if the Board shall have initially charged the amount of the Withholding Advance to the Capital Account).

Interest shall cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) **Indemnification.** Each Preferred Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts Distributable or allocable to such Member. The provisions of this Section 7.04(d) and the obligations of a Member pursuant to Section 7.04(c) shall survive the termination, dissolution, liquidation and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Units. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.04, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e) **Overwithholding.** Neither the Company nor the Board shall be liable for any excess taxes withheld in respect of any Distribution or allocation of income or gain to a Member. In the event of an overwithholding, a Member's sole recourse shall be to apply for a refund from the appropriate Taxing Authority.

Section 7.05. **Distributions in Kind.**

(a) The Board is hereby authorized, in its sole discretion, to make Distributions to the Preferred Members in the form of securities or other property held by the Company, *provided* that Distributions pursuant to Section 7.02 shall only be made in cash. In any non-cash Distribution, the securities or property so Distributed will be Distributed among the Preferred Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be Distributed among the Preferred Members pursuant to Section 7.03.

(b) Any Distribution of securities shall be subject to such conditions and restrictions as the Board determines are required or advisable to ensure compliance with Applicable Law. In furtherance of the foregoing, the Board may require that Preferred Members execute and deliver such documents as the Board may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such Distribution and any further Transfer of the Distributed securities and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

Section 7.06. **Compliance with Law.** Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Preferred Members if such Distribution would violate either Colorado Act Section 7-80-606 or any other Applicable Law.

## ARTICLE VIII
## MANAGEMENT

Section 8.01. **Establishment of the Board.** The Board is hereby established and shall be comprised of natural Persons (each such Person, a "**Manager**") who shall be appointed in accordance with the provisions of Section 8.02. The business and affairs of the Company shall be managed, operated and controlled by or under the direction of the Board, and the Board shall have, and is hereby granted, the full and complete power, authority and discretion for, on behalf of and in the name of the Company, to take such actions as it may in its sole discretion deem necessary or advisable to carry out any and all of the objectives and purposes of the Company, subject only to the terms of this Agreement.

Section 8.02. **Board Composition; Vacancies.**

(a) The Company and the Members shall take such actions as may be required to ensure that the number of Managers constituting the Board initially is one and, commencing following the initial issuance of at least 2,000,000 Preferred Units and continuing at all times at which any Preferred Units are outstanding, three. The Board shall be comprised as follows:

(i) one individual designated by the Common Members (the "**Common Manager**"), who initially shall be John McKowen;

(ii) effective following the initial issuance of at least 2,000,000 Preferred Units, one individual designated by the Preferred Members (the "**Preferred Manager**"); and

(iii) effective following the initial issuance of at least 2,000,000 Preferred Units, one individual (the "**Independent Manager**") who is not an Affiliate of the Company or any Member and who is acceptable to the Common Manager and the Preferred Manager.

(b) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Common Manager, then the Common Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(c) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of a Preferred Manager, then the Preferred Members shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

(d) In the event that a vacancy is created on the Board at any time due to the death, Disability, retirement, resignation or removal of the Independent Manager, then the Common Manager and the Preferred Manager shall have the right to designate an individual to fill such vacancy and the Company and each Member hereby agree to take such actions as may be required to ensure the election or appointment of such designee to fill such vacancy on the Board.

Section 8.03. **Removal; Resignation.**

(a) **Common Manager**. The Common Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Common Members.

(b) **Preferred Manager**. The Preferred Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of the Preferred Members.

(c) **Independent Manager.** The Independent Manager may be removed or replaced at any time from the Board, with or without cause, upon, and only upon, the written request of both the Common Manager and the Preferred Manager.

(d) **General**. A Manager may resign at any time from the Board by delivering a written resignation to the Board. Any such resignation shall be effective upon receipt thereof unless it is

specified to be effective at some other time or upon the occurrence of some other event. The Board's acceptance of a resignation shall not be necessary to make it effective.

Section 8.04. **Meetings.**

(a) **Generally**. The Board shall meet at such time and at such place as the Board may designate. Meetings of the Board may be held either in person or by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, at the principal office of the Company or such other place (either within or outside the State of Colorado) as may be determined from time to time by the Board. Written notice of each meeting of the Board shall be given to each Manager at least 24 hours prior to each such meeting.

(b) **Special Meetings.** Special meetings of the Board shall be held on the call of any two Managers upon at least three days' written notice (if the meeting is to be held in person) or 24 hours' written notice (if the meeting is to be held by telephone communications or video conference) to the Managers, or upon such shorter notice as may be approved by all the Managers. Any Manager may waive such notice as to himself.

(c) **Attendance and Waiver of Notice.** Attendance of a Manager at any meeting shall constitute a waiver of notice of such meeting, except where a Manager attends a meeting for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Board need be specified in the notice or waiver of notice of such meeting.

Section 8.05. **Quorum; Manner of Acting.**

(a) **Quorum**. A majority of the Managers serving on the Board shall constitute a quorum for the transaction of business of the Board. At all times when the Board is conducting business at a meeting of the Board, a quorum of the Board must be present at such meeting. If a quorum shall not be present at any meeting of the Board, then the Managers present at the meeting may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

(b) **Participation**. Any Manager may participate in a meeting of the Board by means of telephone or video conference or other communications device that permits all Managers participating in the meeting to hear each other, and participation in a meeting by such means shall constitute presence in person at such meeting. A Manager may vote or be present at a meeting either in person or by proxy, and such proxy may be granted in writing, by means of Electronic Transmission or as otherwise permitted by Applicable Law.

(c) **Binding Act**. Each Manager shall have one vote on all matters submitted to the Board or any committee thereof. With respect to any matter before the Board, the act of a majority of the Managers shall be the act of the Board.

Section 8.06. **Action By Written Consent**. Notwithstanding anything herein to the contrary, any action of the Board (or any committee of the Board) may be taken without a meeting if either (a) a written consent of a majority of the Managers on the Board (or committee) shall approve such action, *provided* that prior written notice of such action is provided to all Managers at least one day before such action is taken, or (b) a written consent constituting all of the Managers on the Board (or committee) shall approve such action. Such consent shall have the same force and effect as a vote at a meeting where a quorum was present and may be stated as such in any document or instrument filed with the Secretary of State of Colorado.

Section 8.07. **Manager Status.**

(a) **Reimbursement; Other Capacities**. Managers shall be reimbursed for reasonable out-of-pocket expenses incurred in the performance of their duties as Managers, pursuant to such policies as are established by the Board from time to time. Nothing contained in this Section 8.07 shall be construed to preclude any Manager from serving the Company in any other capacity and receiving reasonable compensation for such services.

(b) **No Employment**. This Agreement does not, and is not intended to, confer upon any Manager any rights with respect to continued employment by the Company, and nothing herein should be construed to have created any employment agreement with any Manager.

Section 8.08. **Committees.**

(a) **Establishment**. The Board may, by resolution approved by a majority of the Managers (including the Common Manager and the Preferred Manager), designate from among the Managers one or more committees, each of which shall be comprised of one or more Managers, *provided* that in no event may the Board designate any committee with all of the authority of the Board. Subject to the immediately preceding proviso, any such committee, to the extent provided in the resolution forming such committee, shall have and may exercise the authority of the Board, subject to the limitations set forth in Section 8.08(b). The Board at any time may, by resolution approved by a majority of the Managers, dissolve any committee or, by resolution approved by a majority of the Managers (including the Common Manager and the Preferred Manager), remove any member of a committee at any time.

(b) **Limitation of Authority.** No committee of the Board shall have the authority of the Board in reference to:

(i) authorizing or making Distributions to Members;

(ii) authorizing the issuance of any Membership Interest;

(iii) approving a plan of merger or sale of the Company;

(iv) recommending to the Members a voluntary dissolution of the Company or a revocation thereof;

(v) filling vacancies in the Board; or

(vi) altering or repealing any resolution of the Board that by its terms provides that it shall not be so amendable or repealable.

Section 8.09. **Officers**. The Board may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Board may delegate to such Officers such power and authority as the Board deems advisable. The initial Officers of the Company shall consist of: John McKowen, Chief Executive Officer, and Wayne Harding, Chief Financial Officer. No Officer need be a Member or Manager. Any individual may hold two or more offices of the Company. Each Officer shall hold office until his successor is designated by the Board or until his earlier death, resignation or removal. Any Officer may resign at any time upon written notice to the Board. Any Officer may be removed by the Board (acting by majority vote of all Managers other than the Officer being considered for removal, if applicable) with or without cause at any time. A

vacancy in any office occurring because of death, resignation, removal or otherwise may, but need not, be filled by the Board.

Section 8.10. **No Personal Liability.** Except as otherwise provided in the Colorado Act, by other Applicable Law or expressly in this Agreement, no Manager will be obligated personally for any debt, obligation or liability of the Company or any Subsidiary, whether arising in contract, tort or otherwise, solely by reason of being a Manager.

## ARTICLE IX
### EXCHANGES OF PREFERRED UNITS

Section 9.01. **Exchange Agreement.** Contemporaneously with its execution and delivery of a Joinder Agreement, each Preferred Member shall execute and deliver to GrowCo and the Company a joinder agreement or other written understanding pursuant to which such Preferred Member becomes a party to the Exchange Agreement.

Section 9.02. **Transfer of Preferred Units Upon Exchange.** Upon the effective time of an exchange of a Preferred Unit as provided in Article II of the Exchange Agreement and without limitation by ARTICLE X, such Preferred Unit shall be Transferred to GrowCo, as provided in the Exchange Agreement, and all rights under this Agreement with respect to such Preferred Unit, including the right to receive Distributions, shall accrue to the benefit of GrowCo.

## ARTICLE X
### TRANSFERS

Section 10.01. **General Restrictions on Transfer.**

(a) Each Member acknowledges and agrees that it will not, directly or indirectly, Transfer any of its Units, and the Company agrees that it shall not issue any Units:

(i) except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of Units, if requested by the Company, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii) if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Code Section 7704(b) within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii) if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Colorado Act;

(iv) if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v) if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi) if such Transfer or issuance would cause the Company or any of the Subsidiaries to be required to register as an investment company under the Investment Company Act of 1940; or

(vii) if such Transfer or issuance would cause the assets of the Company or any of the Subsidiaries to be deemed "Plan Assets" as defined for purposes of the Employee Retirement Income Security Act of 1974 or result in any "prohibited transaction" thereunder involving the Company or any Subsidiary.

In any event, the Board may refuse the Transfer to any Person if such Transfer would have a material adverse effect on the Company as a result of any regulatory or other restrictions imposed by any Governmental Authority.

(b) Any Transfer or attempted Transfer of any Units in violation of this Agreement shall be null and void, no such Transfer shall be recorded on the Company's books and the purported Transferee in any such Transfer shall not be treated (and the purported Transferor shall continue be treated) as the holder of such Units for all purposes of this Agreement.

## ARTICLE XI
### CONFIDENTIALITY

Section 11.01. **Nondisclosure.** Each Preferred Member acknowledges that during the term of this Agreement, he will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company, the Subsidiaries and their Affiliates that are not generally known to the public, including information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents which the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Preferred Member acknowledges that: (a) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (b) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (c) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public. Without limiting the applicability of any other agreement to which any Preferred Member is subject, no Preferred Member shall, directly or indirectly, disclose or use (other than solely for the purposes of such Preferred Member monitoring and analyzing his investment in the Company or performing his duties as a Manager, Officer, employee, consultant or other service provider of the Company) at any time, including use for personal, commercial or proprietary advantage or profit, either during his association or employment with the Company or thereafter, any Confidential Information of which such Preferred Member is or becomes aware. Each Preferred Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft.

Section 11.02. **Permitted Disclosures.** Nothing contained in Section 11.01 shall prevent any Preferred Member from disclosing Confidential Information: (a) upon the order of any court or administrative agency; (b) upon the request or demand of any regulatory agency or authority having jurisdiction over such Preferred Member; (c) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (d) to the extent necessary in connection with the exercise of any remedy hereunder; (e) to other Members; (f) to such Preferred Member's Representatives who, in the reasonable judgment of such Preferred Member, need to know such Confidential Information and agree to be bound by the provisions of this ARTICLE XI as if a Preferred Member; or (g) to any potential Transferee in connection with a proposed Transfer of Units

from such Preferred Member, as long as such Transferee agrees to be bound by the provisions of this ARTICLE XI as if a Preferred Member; *provided* that in the case of clause (a), (b) or (c), such Preferred Member shall notify the Company and other Members of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other Members) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

Section 11.03. **Excluded Information.** The restrictions of Section 11.01 shall not apply to Confidential Information that: (a) is or becomes generally available to the public other than as a result of a disclosure by a Preferred Member in violation of this Agreement; (b) is or becomes available to a Preferred Member or any of its Representatives on a non-confidential basis prior to its disclosure to the receiving Preferred Member and any of its Representatives in compliance with this Agreement; (c) is or has been independently developed or conceived by such Preferred Member without use of Confidential Information; or (d) becomes available to the receiving Preferred Member or any of its Representatives on a non-confidential basis from a source other than the Company, any other Member or any of their respective Representatives; *provided* that such source is not known by the recipient of the Confidential Information to be bound by a confidentiality agreement with the disclosing Member or any of its Representatives.

## ARTICLE XII
## TAX MATTERS

Section 12.01. **Tax Matters Member.**

(a) **Appointment.** The Members hereby appoint Two Rivers as the "**Tax Matters Member**," which shall serve as the "tax matters partner" (as such term is defined in Code Section 6231) for the Company.

(b) **Tax Examinations and Audits.** The Tax Matters Member is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. Each Member agrees to cooperate with the Tax Matters Member and to do or refrain from doing any or all things reasonably requested by the Tax Matters Member with respect to the conduct of examinations by Taxing Authorities and any resulting proceedings. Each Member agrees that any action taken by the Tax Matters Member in connection with audits of the Company shall be binding upon such Members and that such Member shall not independently act with respect to tax audits or tax litigation affecting the Company.

(c) **Income Tax Elections.** The Tax Matters Member shall have sole discretion to make any income tax election it deems advisable on behalf of the Company; *provided* that the Tax Matters Member will make an election under Code Section 754, if requested in writing by Common Members holding a majority of the outstanding Common Units. All determinations as to tax elections and accounting principles shall be made solely by the Tax Matters Member.

(d) **Tax Returns and Tax Deficiencies.** Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return. The Tax Matters Member shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority. Any deficiency for taxes imposed on any Member (including penalties, additions to tax or interest imposed with respect to such taxes) will be paid by such

Member and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.04(d).

(e) **Resignation.** The Tax Matters Member may resign at any time. If Two Rivers ceases to be the Tax Matters Member for any reason, the holders of a majority of the Common Units and Preferred Units, voting together as a single class, shall appoint a new Tax Matters Member.

Section 12.02. **Tax Returns.** At the expense of the Company, the Board (or any Officer that it may designate pursuant to Section 8.09) shall endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company and the Subsidiaries own property or do business. As soon as reasonably possible after the end of each Fiscal Year, the Board or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

Section 12.03. **Company Funds.** All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such Officer or Officers as the Board may designate.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

Section 13.01. **Events of Dissolution.** The Company shall be dissolved and is affairs wound up only upon the occurrence of any of the following events:

(a) the determination of the Board to dissolve the Company;

(b) an election to dissolve the Company made by holders of a majority of the Common Units and a majority of the Preferred Units;

(c) the sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(d) the entry of a decree of judicial dissolution under Colorado Act Section 80-810.

Section 13.02. **Effectiveness of Dissolution.** Dissolution of the Company shall be effective on the day on which the event described in Section 13.01 occurs, but the Company shall not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.03 and the Articles of Organization shall have been cancelled as provided in Section 13.04.

Section 13.03. **Liquidation.** If the Company is dissolved pursuant to Section 13.01, the Company shall be liquidated and its business and affairs wound up in accordance with the Colorado Act and the following provisions:

(a) **Liquidator.** The Board, or, if the Board is unable to do so, a Person selected by the holders of a majority of the Common Units, shall act as liquidator to wind up the Company (the

"**Liquidator**"). The Liquidator shall have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b) **Accounting.** As promptly as possible after dissolution and again after final liquidation, the Liquidator shall cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c) **Distribution of Proceeds.** The Liquidator shall liquidate the assets of the Company and Distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i) *first*, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii) *second*, to the establishment of and additions to reserves that are determined by the Board in its sole discretion to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company;

(iii) *third*, to the Preferred Members in amounts equal to their respective Capital Accounts; and

(iv) *fourth*, to the Preferred Members pro rata in accordance with the number of Preferred Units they hold.

For purposes of clarity, no Distribution of any proceeds of a liquidation shall be made with respect to Common Units.

(d) **Discretion of Liquidator.** Notwithstanding the provisions of Section 13.03(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.03(c), if upon dissolution of the Company the Liquidator determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may, in its absolute discretion, Distribute to the Preferred Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.03(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such Distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time. For purposes of any such Distribution, any property to be Distributed will be valued at its Fair Market Value.

Section 13.04. **Cancellation of Articles.** Upon completion of the Distribution of the assets of the Company as provided in Section 13.03(c), the Company shall be terminated and the Liquidator shall cause the cancellation of the Articles of Organization in the State of Colorado and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Colorado and shall take such other actions as may be necessary to terminate the Company.

Section 13.05. **Survival of Rights, Duties and Obligations.** Dissolution, liquidation, winding up or termination of the Company for any reason shall not release any party from any Loss which at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or

which thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination. For the avoidance of doubt, none of the foregoing shall replace, diminish or otherwise adversely affect any Member's right to indemnification pursuant to Section 14.03.

Section 13.06. **Recourse for Claims**. Each Preferred Member shall look solely to the assets of the Company for all Distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and shall have no recourse therefor (upon dissolution or otherwise) against the Board, the Liquidator or any other Member.

## ARTICLE XIV
### EXCULPATION AND INDEMNIFICATION

Section 14.01. **Exculpation of Covered Persons.**

(a) **Covered Persons**. As used herein, the term "**Covered Person**" shall mean (i) each Member, (ii) each officer, director, shareholder, partner, member, controlling Affiliate, employee, agent or representative of each Member, and each of their controlling Affiliates, and (iii) each Manager, Officer, employee, agent or representative of the Company.

(b) **Standard of Care**. No Covered Person shall be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good-faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud or willful misconduct by such Covered Person.

(c) **Good Faith Reliance**. A Covered Person shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions might properly be paid) of the following Persons or groups: (i) another Manager; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Colorado Act.

Section 14.02. **Liabilities and Duties of Covered Persons; Conflicts of Interest.**

(a) **Limitation of Liability**. This Agreement is not intended to, and does not, create or impose any fiduciary duty on any Covered Person. Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement. The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b) **Duties**. Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person shall be entitled to consider only such interests and

factors as such Covered Person desires, including its own interests, and shall have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person. Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person shall act under such express standard and shall not be subject to any other or different standard imposed by this Agreement or any Applicable Law.

(c) **Conflicts of Interest.**

(i) For purposes of this Section 14.02(c), the term "**interest**" shall include personal interest, interest as officer, director, shareholder, partner, member, manager, employee, agent, representative, trustee or beneficiary of any concern, and having an immediate family member who holds such an interest in any concern. The term "**concern**" shall mean any corporation, partnership, joint venture, limited liability company, unincorporated organization, trust, association or other entity, but excluding the Company.

(ii) No Officer, Manager or Member shall be disqualified from holding any office or role in, or position with, the Company by reason of any interest in any concern or from dealing, either as vendor, purchaser or otherwise, or contracting or entering into any other transaction with the Company or any Affiliate of the Company. No transaction of the Company shall be voidable by reason of the fact that an Officer, Manager or Member has an interest in the concern with which such transaction is entered into, *provided* the interest of such Officer, Manager or Member is fully disclosed to each of the Managers (whether in a meeting or otherwise and whether as a Board or individually).

Section 14.03. **Indemnification.**

(a) **Indemnification.** To the fullest extent permitted by the Colorado Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Colorado Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company shall indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i) any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any Affiliate of the foregoing in connection with the business of the Company; or

(ii) the fact that such Covered Person is or was acting in connection with the business of the Company as a partner, member, stockholder, controlling Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective controlling Affiliates, or that such Covered Person is or was serving at the request of the Company as a partner, member, manager, director, officer, employee or agent of any Person including the Company or any Subsidiary;

*provided* that (A) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful and (B) such

Covered Person's conduct did not constitute fraud or willful misconduct, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud or willful misconduct.

(b) **Reimbursement**. The Company shall promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 14.03; *provided* that if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this Section 14.03, then such Covered Person shall promptly reimburse the Company for any reimbursed or advanced expenses.

(c) **Entitlement to Indemnity**. The indemnification provided by this Section 14.03 shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise. The provisions of this Section 14.03 shall continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this Section 14.03 and shall inure to the benefit of the executors, administrators, legatees and distributees of such Covered Person.

(d) **Insurance**. To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Board may determine; *provided* that the failure to obtain such insurance shall not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person shall, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(e) **Funding of Indemnification Obligation**. Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this Section 14.03 shall be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) shall have personal liability on account thereof or shall be required to make additional Capital Contributions to help satisfy such indemnity by the Company.

(f) **Savings Clause**. If this Section 14.03 or any portion hereof shall be invalidated on any ground by any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Covered Person pursuant to this Section 14.03 to the fullest extent permitted by any applicable portion of this Section 14.03 that shall not have been invalidated and to the fullest extent permitted by Applicable Law.

(g) **Amendment**. The provisions of this Section 14.03 shall be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this Section 14.03 is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound. No amendment, modification or repeal of this Section

14.03 that adversely affects the rights of a Covered Person to indemnification for Losses incurred or relating to a state of facts existing prior to such amendment, modification or repeal shall apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

Section 14.04. **Survival.** The provisions of this ARTICLE XIV shall survive the dissolution, liquidation, winding up and termination of the Company.

## ARTICLE XV
### MISCELLANEOUS

Section 15.01. **Further Assurances.** In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

Section 15.02. **Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next day (other than a Saturday, Sunday or other day on which commercial banks in the City of Denver are authorized or required to close) if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 15.02):

If to the Company:

2000 South Colorado Boulevard
Tower 1, Suite 3100
Denver, Colorado 80222
Facsimile: (303) 845-9400
E-mail: info@2riverswater.com
Attention: Chief Financial Officer

If to a Member, to such Member's mailing address as set forth on the Member Schedule.

Section 15.03. **Severability.** If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

Section 15.04. **Entire Agreement.** This Agreement, including the Exhibit and Schedule hereto, and the Exchange Agreement, including the Exhibit and Schedule thereto, constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to such subject matter.

Section 15.05. **Successors and Assigns**. Subject to the restrictions on Transfers set forth herein, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

Section 15.06. **No Third-Party Beneficiaries**. Except as provided in ARTICLE XIV, which shall be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors and assigns) and nothing herein, express or implied, is intended to or shall confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 15.07. **Amendment**. Except as otherwise expressly provided herein, no provision of this Agreement may be amended or modified except by an instrument in writing executed by the Company and Members holding at least two-thirds of the Common Units and Preferred Units, voting together as a single class. Any such written amendment or modification will be binding upon the Company and each Member; *provided* that (a) an amendment or modification altering any provision of this Agreement in a manner that adversely alters the powers, preferences or rights of a class of Units shall be effective only with the consent of the Members holding a majority of such class of Units and (b) an amendment or modification altering the rights or obligations of any Member in a manner that is disproportionately adverse to other Members holding the same class of Units shall be effective only with that Member's consent. Notwithstanding the foregoing, amendments to the Member Schedule following any new issuance, redemption, repurchase or Transfer of Units in accordance with this Agreement may be made by the Board without the consent of, or other action by, any of the Members.

Section 15.08. **Waiver**. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. For the avoidance of doubt, nothing contained in this Section 15.08 shall diminish any of the explicit and implicit waivers described in this Agreement, including in Section 8.04(c) and Section 15.11.

Section 15.09. **Governing Law**. All issues and questions concerning the application, construction, validity, interpretation and enforcement of this Agreement shall be governed by and construed in accordance with the internal laws of the State of Colorado, without giving effect to any choice or conflict of law provision or rule (whether of the State of Colorado or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Colorado.

Section 15.10. **Submission to Jurisdiction**. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Colorado or in the Court of Chancery of the State of Colorado (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Colorado), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Colorado. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now

or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice or other document by registered mail to the address set forth in Section 15.02 shall be effective service of process for any suit, action or other proceeding brought in any such court.

Section 15.11. **Waiver of Jury Trial**. Each party hereto hereby acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

Section 15.12. **Equitable Remedies**. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto shall, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

Section 15.13. **Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in Section 14.02 to the contrary.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

COMPANY:

**GCP SUPER UNITS, LLC**

By: ______________________________
Wayne Harding
Chief Financial Officer

COMMON MEMBER:

**TWO RIVERS WATER & FARMING COMPANY**

By: ______________________________
Wayne Harding
Chief Financial Officer

EXHIBIT A

# FORM OF JOINDER AGREEMENT

**JOINDER TO LIMITED LIABILITY COMPANY AGREEMENT**

Reference is hereby made to the Limited Liability Company Agreement dated as of October __, 2015, as it may be amended from time to time (the "**Agreement**"), among GCP Super Units, LLC and the Members Named in SCHEDULE 1. Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GCP Super Units, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a Preferred Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: 10/8/2015

Michael + Linda Harnish Revocable Trust

By: Michael H Harnish, Trustee

Name: Michael Harnish

Title: Trustee

Agreed and Accepted:

**GCP SUPER UNITS, LLC**

By: [signature]

Name: Wayne Harding

Title: CFO

**JOINDER SIGNATURE PAGE TO LIMITED LIABILITY COMPANY AGREEMENT**

## JOINDER AGREEMENT TO LIMITED LIABILITY COMPANY AGREEMENT

Reference is hereby made to the Limited Liability Company Agreement dated as of October 16, 2015, as it may be amended from time to time (the "**Agreement**"), among GCP Super Units, LLC and the Members Named in SCHEDULE 1. Pursuant to and in accordance with Section 4.01 of the Agreement, the undersigned hereby acknowledges that the undersigned has received and reviewed a complete copy of the Agreement and agrees that, upon execution of this Joinder Agreement by the undersigned and GCP Super Units, LLC, the undersigned shall become a party to the Agreement and shall be fully bound by, and subject to, all of the covenants, terms and conditions of the Agreement as though an original party thereto and shall be deemed, and is hereby admitted as, a Member for all purposes thereof and entitled to all the rights incidental thereto, and shall hold the status of a Preferred Member.

IN WITNESS WHEREOF, the parties hereto have executed the Agreement as of the date set forth below. A signed copy of this Joinder Agreement delivered by facsimile, e-mail or other means of Electronic Transmission (as defined in the Agreement) shall be deemed to have the same legal effect as delivery of an original signed copy of this Joinder Agreement.

Date: OCT 19 2015

[NAME OF NEW MEMBER] JOHN R. McKOWEN

By: John R McKowen
Name:
Title:

Agreed and Accepted:

GCP SUPER UNITS, LLC

By: [signature]
Name: Wayne Harding
Title: Chief Financial Officer

# EXHIBIT 64

GCP SU Secured Promissory Note — VitaNova Revolving Facility (June 1, 2018)

McKowen v. Harrington, et al.
No. 1:25-cv-00708-PAB-NRN (D. Colo.)

# SECURED PROMISSORY NOTE

**Principal: U.S. UP TO $10,000,000.00**
**Due Date: See Payment Terms below**

**Denver, Colorado**
**Date Executed: June 1, 2018**

FOR VALUE RECEIVED, and upon the terms and conditions set forth herein, GCP Super Units, LLC., a Colorado limited liability company ("GCP SU") having an office and address for purposes of notices and legal process at 456 Madison Street, Denver, CO 80206 ("Borrower") promises to pay to the order of VitaNova, LLC, a Colorado Limited Liability Company ("VitaNova") whose address is 456 Madison Street, Denver, CO 80206 ("Lender") or at any such other place as may be designated in writing by Lender, the principal sum of UP TO TEN MILLION DOLLARS ($10,000,000.00), in lawful money of the United States of America, together with interest thereon to be computed from the date hereof at the Interest Rate (as defined below), and to be paid in accordance with the terms of this Promissory Note ("Note"). This Secured Promissory Note (the "Note") is the "Note" described in that certain LOAN AND SECURITY AGREEMENT FOR REVOLVING CREDIT FACILITY (the "Agreement") dated as of the date hereof by and among Borrower and Lender. All undefined initially capitalized terms herein shall have the meanings given to them in the Agreement.

INTEREST:
The term "Interest Rate", as used herein shall mean an interest rate equal to twenty-two and one-half percent (22.5%) per annum. Interest for any month or fractional part thereof shall be calculated on the basis of a 360-day year and twelve 30-day months and the daily amount so determined shall be multiplied by the actual number of days for which interest is being paid. It shall also be calculated by the Interest Rate multiplied by the balance of the Loan Amount.

PAYMENT TERMS:
Borrower shall pay to Lender: (a) Commencing on July 1, 2019 and continuing the 15th of each calendar month thereafter, Borrower shall make interest payments on any balance owed that is equal to the amount of the Loan Account multiplied by the interest rate detailed in the note of 22.5% per annum.; (b) The remaining amount of the Loan Account on or before the Termination Date.

All parties hereto, whether Borrower, principal, surety, guarantor or endorser, hereby waive demand, notice of demand, presentment for payment, notice of dishonor, protest and notice of protest.

PREPAYMENT: Borrower shall have the right at any time to prepay this Note in whole or in part without penalty.

REMEDIES: If default is made in the payment of interest, principal, or both when due and such default shall continue for a period of ten days after Payee shall send a notice of such default to Borrower, the entire principal, together with accrued but unpaid interest arising under this Promissory Note, shall immediately become due and payable at the option of Payee or the holder hereof.

Borrower and all sureties, endorsers and guarantors of this Note hereby (a) waive demand, presentment for payment, notice of nonpayment, protest, notice of protest, and all other notices, filing of suit, and diligence in collecting this Note, in enforcing any of the security

rights; (b) agree that Lender shall not be required first to institute any suit or to exhaust his, their or its remedies against Borrower or any other person or party to become liable hereunder in order to endorse payment of this Note; (c) consent to any extension, rearrangement, renewal, or postponement of time of payment of this Note and to any other indulgence with respect thereto without notice, consent or consideration to any of them; and (d) agree that, notwithstanding the occurrence of any of the foregoing (except the express written release by Lender of any such person), they shall be and remain jointly and severally, directly, and primarily liable for all sums due under this Note.

The indebtedness evidenced by this Note is secured by a Deed of Trust dated as of the date hereof, and until released said Deed of Trust contains additional rights of Note Holder. Such rights may cause Acceleration of the indebtedness evidenced by this Note. Reference is made to said Deed of Trust for such additional terms. Said Deed of Trust grants rights in the following legally described property located in the County of Pueblo, State of Colorado:

> A portion of the Southeast ¼ of Section 15, T22 S, R 63 West of the 6th Principal Meridian, Pueblo County Colorado to wit:
>
> Commencing at the southeast corner of said Section 15; thence N45° 32' 51" W, a distance of 42.18 feet to the True Point of Beginning, thence S89° 06' 55" W, a distance of 1001.76 feet; thence N00° 53' 05" W, a distance of 616.18; thence S88° 49' 55" W, a distance of 945.94 feet; thence N00° 55' 06"W, a distance of 503.00 feet; thence N 89° 04' 54" E, a distance of 1378.83 feet; thence N00° 55' 06' W, a distance of 188.19 feet; thence N89° 04' 54" E, a distance of 584.36 feet; thence S00° 13' 17" E, a distance of 1303.92 feet, to the True Point of Beginning, containing 39.215 Acres, more or less.

The indebtedness evidenced by this Note is further secured by a security interest in all of the Borrower's present and future right, title and interest in and to any and all of the following property wherever located and whether now existing or hereafter created or assumed (collectively, the "Collateral"):

> All equipment and fixtures, as defined in the Uniform Commercial Code (the "Uniform Commercial Code") and all machinery, tools, parts, furniture, furnishings, motor vehicles and other personal property, tangible or intangible, presently owned or hereafter acquired by the Borrower, together with all additions and accessions thereto and substitutions and replacements therefor (herein, collectively "Equipment"), and all products and proceeds (including insurance and condemnation proceeds) thereof;
>
> All inventory and goods as defined in the Uniform Commercial Code whether presently owned or hereafter acquired, including, without limitation, all inventory in the possession of others or in transit, all goods held for sale or lease or to be furnished under contracts for service or which have been so furnished, raw materials, work in process, and materials used or consumed or to be used or consumed in the business of the Borrower, and completed and unshipped merchandise (herein, collectively, "Inventory"), and all products and proceeds (including insurance and condemnation proceeds) of the foregoing;
>
> All accounts, chattel paper, instruments, documents and all other forms of obligations at any time owing to the Borrower, including those now existing and those hereafter arising or coming into existence, and including, without limitation, all rights of payment for goods sold or leased or services rendered, all rights of payment under contracts whether or not currently due or not yet earned by performance and accounts

receivable arising or to arise therefrom, and all rights of the Borrower in and to the goods represented thereby including returned and repossessed goods, and all rights the Borrower may have or acquire for securing or enforcing the foregoing, including, without limitation, all guaranties, collateral, liens on or security interest in real or personal property, leases, letters of credit, the rights to reserves, deposits, choses in action, judgments or insurance proceeds together with all customer lists, books and records, ledger and account cards, computer tapes, computer software, disks, printouts and data processing records, now existing or hereafter created, and all other property evidencing or relating to Collateral (herein, collectively "Accounts"), and all products and proceeds of all of the foregoing;

All of Borrower's general intangibles, now existing or hereafter owned or acquired, including, but not limited to, interests in limited partnerships or other entities in which a security interest may be obtained under the Uniform Commercial Code, trade names, trade processes, trade secrets, copyrights, patents, patent applications, trademarks, trademark registrations and applications therefor, licenses, franchises, tax refunds, customer lists, the name and goodwill of Borrower's business, and all tax refunds and/or tax rebates (herein, collectively "General Intangibles"), and all proceeds of any of the foregoing;

All books and records relating to the conduct of Borrower's business (herein, collectively, "Books and Records");

All deposit accounts maintained by the Borrower with the Lender or other Lender, trust company, investment firm or fund or any similar institution or organization (herein, collectively "Deposit Accounts"), and the proceeds thereof;

Any deposits, credits, securities, interests, participations, shares, collateral or property of the Borrower at any time now or thereafter in the possession, custody, safekeeping or control of or in transit to the Lender and the proceeds thereof (the "Deposits and Securities").

This Note is executed in the State of Colorado and shall be construed by and enforced in accordance with the laws of the State of Colorado.

**WAIVER OF JURY TRIAL.** BORROWER, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY KNOWINGLY, INTENTIONALLY, IRREVOCABLY, UNCONDITIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO THIS NOTE OR ANY CONDUCT, ACT OR OMISSION OF LENDER OR BORROWER, OR ANY OF THEIR DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGE TS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH LE IDER OR BORROWER, IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE.

**WAIVER OF FRAUDULENT INDUCEMENT.** NEITHER LENDER OR ANY AFFILIATE OF LENDER HAS MADE ANY REPRESENTATIO WARRANTY OR STATEMENT TO BORROWER IN ORDER TO INDUCE BORROWER TO EXECUTE THIS NOTE OR THE OTHER LOAN DOCUME ITS. BORROWER HEREBY EXPRESSLY WAIVES ANY CLAIM OF FRAUDULENT INDUCEMENT TO EXECUTE THIS NOTE OR THE OTHER LOAN DOCUMENTS AND FURTHER DISCLAIMS ANY RELIANCE OR STATEMENTS ON OR REPRESENTATIONS OF LENDER IN

JM

WAIVING SUCH CLAIM.

**WAIVER OF CONSEQUENTIAL, PUNITIVE AND SPECULATIVE DAMAGES.** BORROWER AND LENDER AGREE THAT, IN CONNECTION WITH ANY ACTION, SUIT OR PROCEEDING RELATING TO OR ARISING OUT OF THIS NOTE, EACH MUTUALLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY CLAIM FOR CONSEQUENTIAL PUNITIVE OR SPECULATIVE DAMAGES.

This Note may not be changed or terminated orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification, termination or discharge is sought.

This Note and all the covenants, promises and agreements contained herein shall be binding upon Borrower's successors, assigns, heirs and personal representatives and inure to the benefit of Lender's successors and assigns.

At the option of Lender, Lender may exchange principal owed on this Note for any future offering of securities by Borrower.

If any provision of this Note or the application thereof to any person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, then neither the remainder of this Note nor the application of such provision to other persons or circumstances nor the other instruments referred to herein shall be affected thereby, but rather shall be enforced to the greatest extent permitted by applicable law.

IN WITNESS WHEREOF, this Promissory Note has been executed on the date first above written.

**"BORROWER"**

GCP Super Units, LLC

By: ______________________
Name: Jan McCaffrey
Title: COO